# EXHIBIT 4

**Fill in this information to identify the case:**

Debtor __Highland Capital Management, L.P.__

United States Bankruptcy Court for the: __Northern__   District of __Texas__
(State)

Case number   __19-34054__

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

| 1. | Who is the current creditor? | UBS Securities LLC |
| --- | --- | --- |
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor _____ |

| 2. | Has this claim been acquired from someone else? | ☑ No |
| --- | --- | --- |
| | | ☐ Yes.   From whom? _____ |

| 3. | Where should notices and payments to the creditor be sent? | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
| --- | --- | --- | --- |
| | Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | UBS Securities LLC<br>Attn:  Suzanne Forster<br>1285 Avenue of the Americas<br>New York, New York 10019 | |
| | | Contact phone __2127133432__ | Contact phone _____ |
| | | Contact email __suzanne.forster@ubs.com__ | Contact email _____ |
| | | **(see summary page for notice party information)** | |
| | | Uniform claim identifier for electronic payments in chapter 13 (if you use one): | |
| | | ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ | |

| 4. | Does this claim amend one already filed? | ☑ No |
| --- | --- | --- |
| | | ☐ Yes.   Claim number on court claims registry (if known) _____   Filed on _____<br>MM / DD / YYYY |

| 5. | Do you know if anyone else has filed a proof of claim for this claim? | ☐ No |
| --- | --- | --- |
| | | ☑ Yes. Who made the earlier filing?   __UBS AG, London Branch__ - this is a joint litigation claim. |

Official Form 410                    **Proof of Claim**

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**

$ <u>1,039,957,799.40</u>. **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

<u>Litigation - See attached addendum</u>

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

1934054200626000000000002

| | | |
|---|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No<br><br>☐ Yes. *Check all that apply:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

| | |
|---|---|
| **13. Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No<br><br>☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.<br><br>$_____ |

---

| **Part 3:** | **Sign Below** |
|---|---|

| | |
|---|---|
| **The person completing this proof of claim must sign and date it. FRBP 9011(b).**<br><br>If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.<br><br>**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | *Check the appropriate box:*<br><br>☐ I am the creditor.<br><br>☑ I am the creditor's attorney or authorized agent.<br><br>☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.<br><br>☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.<br><br>I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.<br><br>I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.<br><br>I declare under penalty of perjury that the foregoing is true and correct.<br><br>Executed on date ___06/26/2020___<br>　　　　　　　　　MM / DD / YYYY<br><br>___/s/Asif Attarwala___<br>Signature<br><br>**Print the name of the person who is completing and signing this claim:** |

| | |
|---|---|
| Name | __Asif__　　　　　　__Attarwala__<br>First name　　Middle name　　Last name |
| Title | __Associate__ |
| Company | __Latham and Watkins LLP__<br>Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 330 North Wabash Ave., Suite 2800, Chicago, IL, 60611 |
| Contact phone | __3128767667__　　　　　Email __asif.attarwala@lw.com__ |

1934054200626000000000002

# KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |

**District:**
Northern District of Texas, Dallas Division

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| UBS Securities LLC | Yes, supporting documentation successfully uploaded |
| Attn: Suzanne Forster | **Related Document Statement:** |
| 1285 Avenue of the Americas | |
| | **Has Related Claim:** |
| New York, New York, 10019 | Yes |
| **Phone:** | **Related Claim Filed By:** |
| 2127133432 | UBS AG, London Branch - this is a joint litigation claim. See attached addendum |
| **Phone 2:** | |
| **Fax:** | **Filing Party:** |
| | Authorized agent |
| **Email:** | |
| suzanne.forster@ubs.com | |

**Disbursement/Notice Parties:**
Latham and Watkins LLP
Andrew Clubok
555 Eleventh Street, NW

Washington, D.C., 2004-1304

**Phone:**
2026373323
**Phone 2:**

**Fax:**

**E-mail:**
andrew.clubok@lw.com

| | |
|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** |
| | No |
| | **Acquired Claim:** |
| | No |

| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
|---|---|---|
| Litigation - See attached addendum | No | |

| **Total Amount of Claim:** | **Includes Interest or Charges:** |
|---|---|
| 1,039,957,799.40 | Yes |

| **Has Priority Claim:** | **Priority Under:** |
|---|---|
| No | |

| **Has Secured Claim:** | **Nature of Secured Amount:** |
|---|---|
| No | **Value of Property:** |
| **Amount of 503(b)(9):** | |
| No | **Annual Interest Rate:** |
| **Based on Lease:** | **Arrearage Amount:** |
| No | |
| **Subject to Right of Setoff:** | **Basis for Perfection:** |
| No | **Amount Unsecured:** |

**Submitted By:**
Asif Attarwala on 26-Jun-2020 5:10:38 p.m. Eastern Time
**Title:**
Associate
**Company:**
Latham and Watkins LLP

VN: 263C0DA37074A0C87DC02EBD3F8F26A3

**Optional Signature Address:**

Asif Attarwala

330 North Wabash Ave.

Suite 2800

Chicago, IL, 60611

**Telephone Number:**

3128767667

**Email:**

asif.attarwala@lw.com

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054-sgj11 (SGJ) |
| | ) |
| Debtor. | ) |
| | ) |

**ADDENDUM TO PROOF OF CLAIM FILED BY
UBS AG, LONDON BRANCH**

1.       UBS Securities LLC hereby submits this addendum to its proof of claim (together, the "**Proof of Claim**") against Highland Capital Management, L.P. (the "**Debtor**") in the above-captioned chapter 11 case (the "**Chapter 11 Case**").

2.       UBS Securities LLC and UBS AG, London Branch (together, the "**Claimant**" or "**UBS**") each have claims against the Debtor and each is filing a proof of claim in this Chapter 11 Case.  Because their claims arise from the same set of factual events, including the same failed transaction, misconduct involving the Debtor and its affiliates, and subsequent litigation, the UBS claims overlap and their proof of claim forms and addendums are substantially the same.

3.       This addendum is attached to, incorporated into, and constitutes an integral part of Claimant's Proof of Claim against the Debtor.   Claimant files this Proof of Claim under compulsion of the *Order (I) Establishing Bar Dates for Filing Claims and (II) Approving the Form and Manner of Notice Thereof* [Docket No. 488], as extended by the *Joint Stipulation and Order Extending Bar Date* [Docket No. 547] and modified by the *Order Denying UBS's Motion for Relief*

---

[1]       The Debtor's last four digits of its taxpayer identification number are 6725.  The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

*from the Automatic Stay to Proceed with State Court Action* [Docket No. 765], solely for the purpose of asserting Claimant's claims against the Debtor, as more particularly described and subject to any limitations set forth below.

### Factual Background

A.      **The Knox Transaction**

2.      Claimant's claims arise out of a failed transaction dating back thirteen years ago and the state court action (the "**State Court Action**") that followed between Claimant, the Debtor, Highland CDO Opportunity Master Fund, L.P. ("**CDO Fund**") and Highland Special Opportunities Holding Company ("**SOHC**") (together with CDO Fund, the "**Fund Counterparties**," and the Fund Parties and the Debtor collectively, "**Highland**"), among other parties.[2]

3.      In early 2007, Claimant and Highland agreed to pursue a complex form of securitization transaction known as a "CLO Squared" (the "**Knox Transaction**"). (Ex. B, Decision at 2.) The purpose of the Knox Transaction was to acquire and securitize a series of collateralized loan obligation ("**CLO**") securities and credit default swap ("**CDS**") assets (the "**Knox Assets**"). To that end, the Debtor agreed to be the "Servicer" of the Knox Transaction, and as such was responsible for identifying the specific CLO and CDS assets to be securitized. Claimant agreed to finance the acquisition of the CLO and CDS assets identified by Highland. Claimant would then hold, or "warehouse," the assets until the securitization was completed (the "**Knox Warehouse**"). Under this arrangement, Claimant financed the acquisition of $818 million in Knox Assets. (*Id.*)

---

[2]     The procedural history of the State Court Action is incorporated by reference, but is voluminous. The operative Second Amended Complaint and Phase I Decision and Order are attached as **Exhibit A** and **Exhibit B**, respectively. Additional pleadings and orders can be found on the State Court docket for Index No. 650097/2009 or by contacting Claimant's counsel. Claimant reserves the right to file a copy of additional pleadings or orders with this Court.

4.     The parties' first attempt at the Knox Transaction was not completed successfully and the relevant agreements expired in August 2007 without the contemplated securitization having occurred. (*Id.* at 3.)  Rather than end their relationship, however, Highland and Claimant continued to consider the possibility of pursuing the contemplated securitization in 2008 under restructured versions of the prior agreements.  Highland and Claimant always understood that—if the securitization were not successful—the Fund Counterparties would be obligated to pay Claimant for 100% of the losses on any CLO or CDS assets that been acquired and warehoused for the securitization.  In order to convince Claimant to agree to enter restructured versions of those agreements and to finance the acquisition of the CLO and CDS assets, Highland assured Claimant that the Fund Counterparties had sufficient assets to cover any losses.  It did so by providing Claimant with false, incomplete, and otherwise misleading information concerning the Fund Counterparties' finances and assets.  (Ex. A, Compl. ¶¶ 47-61.)

**5.**     In addition, Claimant specifically conditioned its agreement to enter the restructured agreements on the Fund Counterparties' ability to post an additional $70 million in cash and securities as collateral (the "**Initial Restructuring Collateral**"), in which Claimant would hold a security interest.  (*Id.* ¶¶ 56-59; Ex. B, Decision at 3.)  Highland assembled $70 million in such Initial Restructuring Collateral.  But what Highland did not tell Claimant—and what is now clear was omitted on purpose—was that the Fund Counterparties did not own all of the Initial Restructuring Collateral they were expected to post.  Instead, to meet this obligation, the Debtor exercised its control over other Highland affiliates, transferring and redirecting assets from such other entities that it controlled to assemble the Initial Restructuring Collateral.  (Ex. A, Compl. ¶¶ 56-59.)

3

6. Similarly, while negotiating the restructured transaction, Highland provided Claimant with financial reports and statements that contained materially false and misleading information and omissions concerning the financial condition of the Fund Counterparties. (*Id.* ¶¶ 47-52.) The Debtor itself had prepared these financial statements and knew they contained material misstatements. (*Id.* ¶¶ 48-50, 54.) Among other things, Highland misrepresented the amount of cash held by CDO Fund. (*Id.* ¶ 52.) Highland also failed to disclose that many of the assets on the Fund Counterparties' financial statements already had been encumbered. (*Id.* ¶¶ 51, 53.) These misrepresentations not only evince a specific intent by Highland to induce Claimant into entering the restructured agreements, but a longstanding willingness to prevent Claimant from ever recovering the amounts owed under the parties' proposed agreements in the event the Knox Assets suffered any losses. In addition, these events show the Debtor's singular control over—and ability to move—assets from one Highland affiliate to another at will.

7. Based on Highland's material misstatements and omissions, Claimant agreed to pursue the restructured transaction and once more attempt the securitization, and the parties executed three new written agreements: an Engagement Letter, a Cash Warehouse Agreement, and a Synthetic Warehouse Agreement (collectively, the "**Warehouse Agreements**"). (*See* Ex. B, Decision at 3.) The Engagement Letter was executed by Claimant and the Debtor; the Fund Counterparties were not parties to the Engagement Letter. (Ex. A, Compl. ¶ 62.) The Cash Warehouse and Synthetic Warehouse Agreements were executed by Claimant and the Debtor, along with the Fund Counterparties. (*Id.* ¶¶ 64-65.)

8. As described above, Claimant agreed to finance the acquisition of the CLO and CDS assets that the parties planned to securitize. In so doing, the key risk Claimant faced was the possibility that the Knox Assets would lose value while securitization was pending. To address

4

this risk, Claimant and the Debtor agreed in the Engagement Letter that the Fund Counterparties would bear this risk. Notably, at the time, the Debtor was the Investment Manager to the Fund Counterparties under agreements that gave the Debtor total control over those entities. (Ex. A, Compl. ¶¶ 24, 26.)

9. The Warehouse Agreements reiterated that the Fund Counterparties (as controlled by the Debtor) would bear the risk, specifying that if the Knox Assets lost value while securitization was pending, the Fund Counterparties "will in aggregate bear 100% of the risk" for the Knox Assets—with CDO Fund bearing 51% of any losses and SOHC bearing the remaining 49%.

10. To further protect Claimant in the event that the Knox Assets lost value, the Warehouse Agreements provided for recurring measurements of mark-to-market losses on all assets in the Knox Warehouse and required the Fund Counterparties to post collateral in the event the Knox Assets lost a set amount of value. Specifically, the parties agreed that the Fund Counterparties would post an additional $10 million in collateral for each $100 million in losses to the overall value of the Knox Assets. (Ex. B, Decision at 4.)

11. In September and October 2008, amid the global economic recession, the value of the Knox Assets dropped by $100 million, twice. Thus, Claimant twice exercised its contractual right to demand additional collateral. And twice Highland posted the required collateral. (*Id.*) Although the Warehouse Agreements specified that it was the Fund Counterparties who would post collateral, the Debtor moved assets around from other entities it controlled to make the first two collateral calls (without disclosing this practice to Claimant). (Ex. A, Compl. ¶ 79.) On or about November 7, 2008, Claimant issued a third margin call, because the value of the Knox Assets suffered additional losses of $200 million (bringing the aggregate losses to over $400 million).

(Ex. B, Decision at 4.) This time, Highland refused to provide the additional collateral required under the Warehouse Agreements.

12.     Highland's default on Claimant's third margin call triggered a termination event under the Warehouse Agreements. (*Id.*) On December 5, 2008, Claimant gave Highland formal notice of default and demanded the Fund Counterparties pay Claimant for 100% of the losses incurred on the Knox Assets—which had, by then, grown to over $520 million.

13.     There is no question that the Debtor knew the Fund Counterparties were liable for the losses under the Warehouse Agreements. Indeed, the Highland officer who executed the Warehouse Agreements admitted under oath that, "as of the end of the year 2008," Highland knew that the Fund Counterparties owed Claimant "hundreds of millions of dollars in connection with the Knox Warehouse Agreements." (Travers Dep. at 261:8-20).) But rather than paying Claimant what it was owed, the Debtor, with Mr. Dondero at the helm, "devised a strategy to delay the resolution of that obligation [to pay Claimant] for as long as possible." (*Id*.) To that end, Highland devised and subsequently deployed a multifaceted strategy—one that would last for many years thereafter—to intentionally frustrate and prevent Claimant from recovering any of the amounts that both the Debtor and the Fund Counterparties knew were rightfully owed to Claimant under the Warehouse Agreements.

14.     First, the Debtor directed the Fund Counterparties to withhold any payment to Claimant—a position that the Fund Counterparties maintained (again, under the specific direction of the Debtor) for more than a decade. (*See id.*) The Debtor did so not only with the specific knowledge that the Fund Counterparties owed hundreds of millions of dollars to Claimant for the losses on the Knox Assets, but with the knowledge that Claimant would come seeking payment

for such losses and, in particular, to look toward any and all collateral owned by the Fund Counterparties as one source of payment. As one of Highland's officers stated an internal email to Mr. Dondero in an internal email dated January 16, 2009: "[UBS] is going to be calling [] today asking for all additional collateral that cdo and sohc have left to cover the obligation left by the knox transaction." But rather than turning over the collateral in question to Claimant or, at the very least, securing such assets so that they could be used to pay Claimant, the Debtor directed the Fund Counterparties to withhold such assets and payments from Claimant: "[T]hey can see us in court for their additional collateral." True to that promise, even after Claimant filed suit and laid out the amounts due under the contracts, the Debtor forced the Fund Counterparties to launch an affirmative, multi-year campaign—one which would consume much of the cash and assets belonging to the Fund Counterparties themselves—to stave off any payment from the Fund Counterparties to force Claimant to try to recover such claims through litigation and, once in litigation, devising knowingly baseless defenses and arguments for the Fund Counterparties to assert in such litigation.

15.     On top of directing the Fund Counterparties to withhold payment and force Claimant to litigate for amounts the Debtor already knew they rightfully owed to Claimant, the Debtor undertook a litany of other actions to ensure that, even if Claimant were successful in the litigation it had been forced to initiate against the Fund Counterparties, it would not be able to collect any judgment arising out of the litigation. Such actions included, but were not limited to, a series of fraudulent transfers out of, and away from, an alter ego of SOHC, Highland Financial Partners, L.P. ("**HFP**"). (Ex. A, Compl. ¶ 109.) These internal transfers of funds—all overseen by James Dondero, the Debtor's founder and president—were designed to prevent Claimant from ever collecting the millions of dollars it was owed under the Warehouse Agreements.

16.     In addition to such fraudulent transfers, the Debtor also took steps after the lawsuit was filed to ensure that no additional value would be transferred ***to*** the Fund Counterparties— deliberately taking steps to keep both SOHC and CDO Fund undercapitalized.  Not only did the Debtor prevent additional value from being transferred to the Fund Counterparties, it is clear that the Debtor also failed to ensure that the Fund Counterparties retained assets that could be used to pay any such judgment.  Quite to the contrary, it is now clear that any and all assets of any value that once belonged to the Fund Counterparties have, in one way or another, been transferred away, drained, or otherwise wasted by the Fund Counterparties, the Debtor itself, or the Debtor's affiliates—all at the Debtor's direction.  Indeed, in a recent filing before this Court, the Debtor recently disclosed that both of the Fund Counterparties are completely "insolvent."  (Docket No. 687 at 1.) This means that—separate and apart from the transfers of assets out of, and away from, HFP that occurred in 2009—the Debtor has directed, or otherwise permitted, the Fund Counterparties to engage in acts that have left these once marque investment funds with literally ***no*** assets that can be used to pay Claimant.  All such actions and omissions by the Debtor were performed with either the specific intent to prevent or frustrate Claimant's ability to recover the amounts owed under the Warehouse Agreements, or a wanton and reckless disregard of Claimant's rights to those amounts. Such actions and omissions constitute breaches of the Debtor's duty of good faith and fair dealing under the Warehouse Agreements.

**B.     The State Court Action and the Debtor's Efforts to Avoid Paying Claimant**

17.     On February 24, 2009, Claimant filed a complaint in the Supreme Court of the State of New York (the "**State Court**") against the Debtor and the Fund Counterparties.  With knowledge of Claimant's lawsuit, the Debtor exercised its control over the Fund Counterparties to ensure they would not meet their obligations and to impede Claimant's ability to recover the

amounts owed by those entities. (*Id.* ¶¶ 112, 114.) Rather than paying Claimant what it was owed, and as discussed above, the Debtor orchestrated an extensive multi-part strategy to delay resolution of Claimant's claims for as long as possible. As a result, the Debtor further interfered with Claimant's contractual rights, thereby breaching the covenants of good faith and fair dealing inherent in the Warehouse Agreements. (*Id.*)

18. By this time, the Fund Counterparties and SOHC's alter ego, HFP, had become insolvent, although they still owned significant assets. (*Id.* ¶ 108.) Nonetheless, the Debtor failed to act in good faith to cause HFP to satisfy the debts, as much as possible, then owed to Claimant. Instead, the Debtor caused HFP to make additional improper and fraudulent asset transfers, deliberately kept the Fund Counterparties undercapitalized, and allowed all assets of any value to be drained from the Fund Counterparties—acts which not only impaired Claimant's ability to recover anything from the Fund Counterparties, but precluded it altogether. (*Id.* ¶ 111.) In March 2009, conscious that Claimant had commenced an action against Highland a few weeks earlier, and in breach of their continuing duty of good faith and fair dealing, and with actual fraudulent intent, the Debtor and HFP caused asset transfers of millions of dollars of assets to the Debtor, Highland Credit Strategies Master Fund, L.P., Highland Crusader Offshore Partners, L.P., and Highland Credit Opportunities CDO, L.P. (now Highland Multi Strategy Credit Fund, L.P.) (collectively, the "**Affiliated Transferee Defendants**"), among others, thereby further reducing Highland's abilities to meet their obligations to Claimant. (*Id.* ¶¶ 111, 113.) The Debtor and its principals exercised domination over the Fund Counterparties to improperly transfer substantial assets from the Fund Counterparties and HFP for their own personal gain, i.e., solely and improperly to protect and enhance the value of the Debtor and its principals by wrongful and improper means. In the

9

process, the Debtor and its principals made it impossible for the Fund Counterparties to pay Claimant the losses that they and the Debtor had agreed they would pay under the Warehouse Agreements. (*Id.* ¶¶ 112-114.)

19.     As Claimant learned about Highland's conduct through discovery, Claimant amended its complaint to assert additional claims and name additional Highland entities, including HFP, the Affiliated Transferee Defendants, and Strand Advisors, Inc. As amended and stated in its Second Amended Complaint (attached hereto as Exhibit A) in the State Court Action, filed on May 11, 2011, Claimant's claims include breach of contract claims directly against the Fund Counterparties, as well as claims for fraudulent inducement, breach of the duty of good faith and fair dealing, fraudulent conveyance, tortious interference, and declaratory judgments for alter ego liability against HFP and general partner liability against Strand Advisors, Inc. The Debtor subsequently brought counterclaims against Claimant for breach of contract and unjust enrichment. (*See* Ex. B, Decision at 35-37.)

20.     The procedural history of the State Court Action is complex. The Debtor and its affiliates and Claimant filed, and the State Court ruled on, four sets of motions to dismiss. The Debtor and its affiliates then filed two sets of summary judgment motions, which led to a series of complex rulings by the State Court in 2017. The parties filed various interlocutory appeals of the State Court's rulings on the motions to dismiss and for summary judgment. Those appeals were heard by the Appellate Division for the First Judicial Department in the County of New York, with the Appellate Division issuing five decisions over this suit's protracted history (some of which are still subject to further appellate rights).

21.     Also included in the Appellate Division's decisions was an order arising from an appeal of the State Court's ruling on Claimant's motion to restrain Defendants Highland Credit

Strategies Master Fund, L.P. and Highland Crusader Partners, L.P. from disposing of property received through the fraudulent transfers orchestrated by the Debtor. Claimant showed it had a likelihood of success on the merits of its fraudulent transfer claims, and the Appellate Division enjoined both Highland entities from disposing of their assets. Ultimately, these injunctions resulted in partial settlements between Claimant and Highland Credit Strategies Master Fund, L.P. and Highland Crusader Partners, L.P.

22.     By early 2018, more than nine years after Claimant first filed suit, the parties were finally ready to proceed to trial. Due to a jury waiver clause in the Warehouse Agreements, however, and after related pre-trial briefing, the State Court bifurcated Claimant's claims into two distinct phases for trial: Phase I, consisting of a bench trial on Claimant's claims against the Fund Counterparties for breach of the Cash Warehouse and Synthetic Warehouse Agreements, as well as the Debtor's counterclaims; and Phase II, consisting of a jury trial on Claimant's remaining claims against all remaining Highland entities, including the Debtor.[3] (Ex. B, Decision at 2 n.1, 38.)

23.     The State Court presided over a thirteen-day bench trial for Phase I from July 9 through July 27, 2018. (*Id.* at 1.) On November 14, 2019, the State Court entered a Decision and Order on Phase I (attached hereto as Exhibit B), ruling in favor of Claimant on almost every issue presented in Phase I. In particular, the court found the Fund Counterparties liable to Claimant for breach of the Cash Warehouse and Synthetic Warehouse Agreements, found no liability on the part of Claimant for either of the Debtor's counterclaims, and rejected almost every one of the Debtor's offset arguments with the only remaining issue (affecting approximately $70,500,000) to

---

[3]     Remaining claims are to be tried to a jury, with the court deciding liability as to the breach of the implied covenant of good faith and fair dealing claim and the jury deciding all remaining issues.

be determined after Phase II. (*Id.* at 39.) An Entry of Judgment on Phase I was entered on February 10, 2020. Under that Phase I final judgment, Claimant is entitled to $1,039,957,799.44, consisting of $519,374,149.00 in damages and $520,583,650.44 in pre-judgment interest as of January 22, 2020, with additional interest of $128,065 having accrued daily until the Entry of Judgment.

24.     The next step in the State Court Action is Phase II of the trial, where Claimant's remaining claims against not only the Debtor, but also against other Highland affiliates are to be tried to a jury, with the court deciding liability as to the breach of the implied covenant of good faith and fair dealing claim and the jury deciding all remaining claims. (*Id.* at 2 n.1, 38.) The claims to be tried in Phase II include claims for breach of the implied covenant of good faith and fair dealing, fraudulent conveyances, and alter-ego liability. The specific amounts the two non-Debtor affiliates owe to Claimant for their breach of the Warehouse Agreements are now set forth and embodied in the final $1 billion judgment from Phase I. And Claimant has stated claims against the Debtor—which was also a party to the same contract and exercised complete control over the two liable affiliates—under which Claimant is entitled to damages that are at least as much as the Phase I judgment amount. Claimant will seek damages for the Debtor's various breaches of the implied covenant as well as its specific role in the fraudulent transfer scheme, and pre-judgment interest and attorneys' fees where available. In addition, Claimant will seek punitive damages against the Debtor for its role in orchestrating the extended efforts to prevent Claimant from collecting the amounts owed under the Warehouse Agreements.

25.     Currently, Phase II of the State Court Action is stayed against the Debtor by the automatic stay imposed pursuant to section 362 of the Bankruptcy Code when the Debtor commenced this Chapter 11 Case.

26.     Claimant hereby asserts a claim, pending litigation of Phase II, for damages arising from the Debtor's breach of the implied covenant of good faith and fair dealing, its specific role in directing the fraudulent transfers of assets involving HFP, additional interest, further damages (including punitive damages), and attorneys' fees that may be awarded by any court at the conclusion of Phase II.

### Reservation of Rights

27.     Claimant does not waive or release, and expressly reserves, all rights and remedies at law or in equity that it has or may have against the Debtor, the Fund Counterparties, Strand Advisors, Inc., other non-Debtor Highland Defendants, or any other Debtor affiliate, subsidiary, person, or entity.

28.     Claimant expressly reserves all of its rights to assert any additional claims, defenses, remedies, and causes of action, including without limitation, claims for fraudulent inducement, breach of contract, tortious interference with contractual relations, fraudulent conveyances, or alter ego recovery.  Claimant further reserves all rights to amend, modify, supplement, reclassify, or otherwise revise its Proof of Claim at any time and in any respect, including, without limitation, as necessary or appropriate to amend, quantify or correct amounts, to provide additional detail regarding the claims set forth herein, to assert additional grounds for any of the claims, to seek reconsideration under section 502(j) of the Bankruptcy Code or otherwise of any disallowance of any amounts claimed hereunder, or to reflect any and all additional claims of whatever kind or nature that Claimant has or may have against the Debtor.

29.    To the extent any payment to Claimant based on this Proof of Claim, or any portion thereof, is clawed back from Claimant, avoided, or set aside, for any reason whatsoever, or Claimant is required to disgorge any such payment, or any portion thereof, Claimant hereby reserves its rights to amend this Proof of Claim accordingly.

30.    The execution and filing of this Proof of Claim is not intended as, nor should it be construed as or deemed to be any of the following: (i) a waiver of the right to seek withdrawal of the reference, or to otherwise challenge the jurisdiction of this Court, with respect to the subject matter of the claims asserted herein, any objection or other proceeding commenced with respect thereto, or any other action or proceeding commenced in this Chapter 11 Case against or otherwise involving Claimant; (ii) an admission that any matter is a core matter for purposes of 28 U.S.C. § 157(b) or is a matter as to which this Court can enter a final order or judgment consistent with Article III of the United States Constitution; (iii) a waiver of the right to *de novo* review by the district court of any order or judgment for which this Court, absent Claimant's consent, lacks authority to enter a final order or judgment; (iv) a consent to the entry by this Court of a final order or judgment with respect to the claims asserted herein or any other matter; (v) a waiver of Claimant's right to a jury trial against the Debtor, as applicable, or waiver of Claimant's right to a jury trial against any of the non-Debtor Defendants; (vi) a waiver or release of the claims or rights of Claimant against any other entity or person that may be liable for all or any part of the claims or any matters related to the claims asserted herein; (vii) a waiver of any rights and remedies Claimant has or may have under the Cash Warehouse and Synthetic Warehouse Agreements, Engagement Letter, or any other contract, whether mentioned in this Proof of Claim or not; (viii) a waiver of Claimant's contractual right to seek to have these or any other claims settled by binding arbitration; (ix) a waiver of any right related to the confirmation of any plan of reorganization proposed in this

14

Chapter 11 Case, or any other insolvency-related proceeding that may be commenced, either in the United States or abroad, by or against the Debtor, or any non-Debtor affiliate; (x) a waiver or agreement granting any party relief; or (xi) an election of remedies.

31.     Neither this Proof of Claim nor any of its contents shall be deemed or construed as an acknowledgment or admission of any liability or obligation on the part of Claimant. Claimant specifically reserves all of its defenses and rights, procedural and substantive, including, without limitation, its rights with respect to any claim that may be asserted against Claimant by the Debtor, the Fund Counterparties, or any affiliate of the Debtor, and its rights to enforce the Cash Warehouse or Synthetic Warehouse Agreements, Engagement Letter, or any other contract.

## **Right of Setoff and Recoupment**

32.     Claimant reserves all rights of setoff and recoupment that it may have. To the extent the Debtor or any non-Debtor affiliate asserts any claim against Claimant, Claimant shall have a secured claim to the extent of its right of setoff under section 553 of the Bankruptcy Code or right of recoupment against such claim with respect to the claims asserted herein and any amendments thereto.

## **Notice**

33.     Copies of all notices and communications concerning this Proof of Claim should be sent to:

> UBS Securities LLC
> 1285 Avenue of the Americas
> New York, NY 10019
> Attn: Suzanne Forster
> Telephone: (212) 713-3432
> Email: suzanne.forster@ubs.com

> With a copy to:

John Lantz
UBS Securities LLC
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 713-1371
Email: john.lantz@ubs.com

Andrew Clubok
Sarah Tomkowiak
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, District of Columbia 20004
Telephone: (202) 637-2200
Email: andrew.clubok@lw.com
  sarah.tomkowiak@lw.com

Jeffrey E. Bjork
Kimberly A. Posin
LATHAM & WATKINS LLP
355 South Grand Avenue, Ste. 100
Los Angeles, California 90071
Telephone: (213) 485-1234
Email: jeff.bjork@lw.com
  kim.posin@lw.com

Asif Attarwala
LATHAM & WATKINS LLP
330 N. Wabash Avenue, Ste. 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700
Email: asif.attarwala@lw.com

# Exhibit A

## Second Amended Complaint

Case 19-34054-sgj11 Doc 933-4 Filed 08/07/20 Entered 08/07/20 23:11:52 Page 24 of 122

**CONFIDENTIAL MATERIAL SUBJECT TO THE STIPULATION
AND ORDER FOR THE PRODUCTION AND EXCHANGE
OF CONFIDENTIAL INFORMATION HAS BEEN REDACTED**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

UBS SECURITIES LLC and UBS AG, LONDON BRANCH,

                                    Plaintiffs,

                    -against-

HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND
SPECIAL OPPORTUNITIES HOLDING COMPANY,
HIGHLAND CDO OPPORTUNITY MASTER FUND, L.P.,
HIGHLAND FINANCIAL PARTNERS, L.P., HIGHLAND
CREDIT STRATEGIES MASTER FUND, L.P., HIGHLAND
CRUSADER OFFSHORE PARTNERS, L.P., HIGHLAND
CREDIT OPPORTUNITIES CDO, L.P., and STRAND
ADVISORS, INC.,

                                    Defendants.

---

Index No. 650097/2009
(I.A.S. Part 60, Fried, J.)

**SECOND AMENDED
COMPLAINT**

---

Plaintiffs, UBS Securities LLC ("UBSS") and UBS AG, London Branch ("UBS AG") (collectively, "UBS"), for their Second Amended Complaint allege against defendants Highland Special Opportunities Holding Company ("SOHC"), Highland CDO Opportunity Master Fund, L.P. ("CDO Fund," and together with SOHC, the "Fund Counterparties"), Highland Financial Partners, L.P. ("Highland Financial"), Highland Credit Strategies Master Fund, L.P. ("Credit Strategies"), Highland Crusader Offshore Partners, L.P. (the "Crusader Fund"), Highland Credit Opportunities CDO, L.P. (the "Credit Opp. Fund"), and Strand Advisors, Inc. ("Strand"), as follows:

### NATURE OF THE ACTION

1.      UBS brings this action to recover damages in excess of $686 million resulting from the wrongful conduct of defendants, based on causes of action for fraudulent inducement, breach of contract, fraudulent conveyances, and declaratory judgment.

2.      Counterclaim-plaintiff Highland Capital Management, L.P. ("Highland Capital") is a defendant in the action commenced by UBS (the "Highland Capital Action") concurrently with the filing of the First Amended Complaint in this action. The Highland Capital Action was consolidated with this action by a Decision and Order, entered by this Court on October 7, 2010 (this action and the Highland Capital Action are referred to herein as the "Consolidated Action"). Together with Highland Capital, the Fund Counterparties fraudulently induced UBS to restructure a transaction to avoid Highland Capital's and the Fund Counterparties' contractual obligation to pay UBS over $86 million. Once Highland Capital and the Fund Counterparties succeeded in misleading UBS into restructuring the original transaction, Highland Capital and its affiliates made it impossible for the Fund Counterparties to meet their obligations to UBS by stripping the Fund Counterparties of their valuable assets through fraudulent conveyances and otherwise dealing in bad faith with their contractual obligations to UBS.

3.      When UBS finally terminated the restructured transaction and demanded payment from Highland Capital and the Fund Counterparties, it was owed in excess of $686 million that the Fund Counterparties could not pay because of the misappropriations and improper transfers of assets directed by Highland Capital and the Fund Counterparties. Even after UBS demanded payment, Highland Capital and defendants engaged in further unlawful conduct that harmed UBS by

2

## SUMMARY OF THE ACTION

4.      This action arises out of Highland Capital's efforts in the Spring of 2007 to sponsor a collateralized debt obligation ("CDO") securitization (the "Original Engagement"). In connection with the Original Engagement, UBS agreed to finance the purchase of various collateralized loan obligation ("CLO") securities, as well as credit default swap obligations that referenced similar CLO securities. UBS agreed to hold or "warehouse" the CLO securities and credit default swaps (collectively, the "Warehouse Assets" or "Warehouse Facility") for Highland Capital's benefit.

5.      On or about August 15, 2007, the Original Engagement terminated by its terms without the contemplated securitization having occurred. As a result of the termination, Highland Capital and two of its affiliates, the Fund Counterparties, owed UBS in excess of $86 million related to the decline in the value of the Warehouse Assets.

6.      Instead of paying UBS what it was owed, Highland Capital and the Fund Counterparties fraudulently induced UBS to restructure the Original Engagement by providing UBS with false, incomplete and otherwise misleading information concerning the Fund Counterparties' finances and assets. Using both affirmative material misrepresentations and omissions (material facts or information needed to be disclosed to make the statements actually made not misleading, and which were not disclosed, are referred to hereinafter as "Omissions"), Highland Capital, its principals and the Fund Counterparties misled UBS regarding the financial health of the Fund Counterparties and their creditworthiness, thereby causing UBS to forego recovering its losses from Highland Capital in favor of agreeing to restructure the terms of the parties' prior agreements (the "Restructured Transaction").

7.      For example, the strength of the Fund Counterparties' financial statements, and their purported ability to use the hundreds of millions of dollars worth of assets

3

reflected therein to satisfy future obligations to UBS under the Warehouse Agreements were material to UBS's decision to agree to the restructuring. Consequently, in connection with negotiating the Restructured Transaction, UBS conditioned any restructuring on the Fund Counterparties' ability to post $70 million in cash and securities as collateral (the "Initial Restructuring Collateral") with State Street Bank and Trust Company ("State Street"), in which UBS would hold a security interest.



Highland Capital and the Fund Counterparties were able to conceal important information about the Fund Counterparties' financial weakness that was both quantitatively and qualitatively material to UBS, and which would have caused UBS not to enter the Restructured Transaction.

8.     Similarly, while negotiating the Restructured Transaction, Highland Capital and the Fund Counterparties provided UBS with financial reports and statements for the Fund Counterparties.   The financial information that Highland Capital and the Fund Counterparties provided to UBS contained materially false and misleading information and Omissions concerning the financial condition of the Fund Counterparties.  Among other things,

9.     In reliance on material misstatements and Omissions made by Highland Capital and the Fund Counterparties, UBS agreed to restructure the Original Engagement, and

4

thereby were fraudulently induced to give up contractual rights under the terms of the Original Engagement. In particular, UBS reasonably and justifiably relied on misrepresentations and Omissions of facts and information solely and peculiarly within the knowledge of Highland Capital and the Fund Counterparties. Given UBS's prior dealings with Highland Capital and its affiliates, as well as Highland Capital's size and presence in the market, UBS had no reason to believe that Highland Capital and its affiliates would provide it with false, incomplete or otherwise misleading information about the Fund Counterparties' finances and assets, as they in fact did.

10.     Had UBS known that the Fund Counterparties could not

, it would not have gone forward with the Restructured Transaction. UBS never would have agreed to the Restructured Transaction had it known prior to entering the Restructured Transaction the true status of the Fund Counterparties' financial condition and the true fair market value of the Fund Counterparties' holdings that would have been available to satisfy their then-existing and future obligations to UBS. UBS's losses described herein were directly and proximately caused by the conduct of Highland Capital and the defendants as described herein.

11.     Almost immediately after UBS agreed to the Restructured Transaction, Highland Capital began the process of making it impossible for the Fund Counterparties to ever repay UBS what they owed. In particular, exercising its control over the Fund Counterparties, Highland Capital caused the Fund Counterparties to transfer cash for the benefit of Highland Capital and its principals, and, separately, in violation of UBS's rights,

, all during a time when the Fund Counterparties owed UBS hundreds of millions of dollars.

12.     For example, in or around May 2008, Highland Capital caused the dissipation of approximately $100 million in cash that CDO Fund held after it sold a long position in a company called SunCom Wireless. Highland Capital drained CDO Fund's cash resources despite CDO Fund's ever-increasing obligations to UBS. Highland Capital's bad faith conduct caused injury to UBS by making it impossible for the Fund Counterparties to satisfy their contractual obligations to UBS.

13.     In September 2008, as losses in the Warehouse Facility continued to grow, UBS began to exercise its contractual rights and make margin calls demanding additional collateral from the Fund Counterparties. Because Highland Capital had routinely taken cash out of the Fund Counterparties, the Fund Counterparties were undercapitalized and lacked assets and liquidity to meet UBS's demands for additional collateral.

14.     Highland Capital and its principals, including its president and founder, James D. Dondero, knew that if the Fund Counterparties defaulted on their obligations to UBS (or any other creditor), Highland Capital's ability to conduct business in the financial community and to keep or solicit investors would be harmed. Investors in Highland Capital's hedge fund family would withdraw their investments. In addition, creditors would take actions to protect themselves, including foreclosing on collateral and aggressively enforcing their contractual rights. Highland Capital and its principals were concerned that upon the disclosure of the true state of their affairs, their business would collapse.

15.     To avoid that result, Highland Capital and its principals resorted to



16.     Highland Capital's and its principals' belated attempt to protect their reputation by continuing to fraudulently portray the Fund Counterparties as viable independent entities was ultimately unsuccessful.  By late October 2008, Highland Capital could no longer continue to prop up the Fund Counterparties.

17.     On or about November 11, 2008, UBS demanded additional collateral from the Fund Counterparties.  The Fund Counterparties defaulted.  On December 3, 2008, UBS terminated the Restructured Transaction.  As a result of UBS's termination of the Restructured Transaction, the Fund Counterparties were contractually obligated to pay UBS in excess of $686 million.

18.     On or about February 24, 2009, UBS filed the original complaint in this Court against the Fund Counterparties for breach of the Warehouse Agreements that had been entered in connection with the Restructured Transaction.  By that time, the Fund Counterparties and SOHC's alter ego, Highland Financial, had been insolvent and unable to pay their creditors for some time.  Nonetheless, Highland Capital and Highland Financial

19.    In sum, after fraudulently inducing UBS to agree to the Restructured
Transaction, Highland Capital and its principals exercised their domination over the Fund
Counterparties to improperly transfer substantial assets from the Fund Counterparties for their
own personal gain, i.e., solely and improperly to protect and enhance the value of Highland
Capital and its principals by wrongful and improper means. In the process, they made it
impossible for the Fund Counterparties to pay UBS the losses they had agreed to pay on the
Warehouse Facility.

## THE PARTIES

### A.    The Plaintiffs

20.    Plaintiff UBS AG, London Branch, is a banking corporation organized
under the laws of Switzerland with its principal place of business at Finsbury Avenue, London,
United Kingdom.

21.    Plaintiff UBSS is a limited liability company organized under the laws of
Delaware with its principal places of business at 677 Washington Blvd., Stamford, Connecticut,
and 299 Park Avenue, New York, New York.

### B.    Highland Capital

22.    Highland Capital Management, L.P. ("Highland Capital") is a limited
partnership organized under the laws of Delaware, with its principal place of business at 13455
Noel Road, Suite 800, Dallas, Texas 75240, and an office at 9 West 57th Street, New York, New
York. Highland Capital is registered to do business in New York. Highland Capital describes
itself as a 100% employee-owned partnership. Highland Capital is an investment adviser that
manages a large number of investment entities that operate as hedge funds for Highland Capital's
principals and affiliates, as well as unaffiliated investors. Highland Capital currently manages

8

over $25 billion in various assets, including structured financial products. Highland Capital also holds direct and indirect equity and ownership interests in the entities that it manages, including in Highland Financial, the Fund Counterparties and the Affiliated Transferee Defendants. James D. Dondero is the President of Highland Capital, as well as one of its founders. Concurrently with filing the First Amended Complaint in this Action, UBS commenced a separate action against Highland Capital (the "Highland Capital Action"). The Highland Capital Action was later consolidated with this action by a Decision and Order, entered by this Court on October 7, 2010 (this action and the Highland Capital Action are referred to herein as the "Consolidated Action").

## C.   **The Defendants**

### 1.   **Defendant Strand**

23.   Defendant Strand Advisors, Inc. ("Strand") is Highland Capital's general partner. Strand is a Delaware corporation principally engaged in the business of serving as the general partner of Highland Capital. As Highland Capital's general partner, Strand is responsible for Highland Capital's liabilities and obligations and regularly conducts business in New York, or causes its affiliates to conduct business in New York.

### 2.   **Defendants Highland Financial and SOHC**

24.   Highland Special Opportunities Holding Company ("SOHC") is a company organized under the laws of the Cayman Islands, with its offices at Walker House, PO Box 908GT, Mary Street, George Town, Grand Cayman, Cayman Islands. SOHC is a wholly-owned subsidiary of defendant Highland Financial Partners, L.P. (a Delaware limited partnership) ("Highland Financial"). SOHC has six sister subsidiaries, all of which are owned in whole or in part by Highland Financial. Highland Capital serves as investment manager to defendant Highland Financial, SOHC and its sister subsidiaries.

9

25. Highland Financial is SOHC's alter ego.



For all purposes relevant to this action, Highland Financial and SOHC should be treated as a single entity and as alter egos of one another.

**3.    Defendant CDO Fund**

26.    Defendant Highland CDO Opportunity Master Fund, L.P. ("CDO Fund") is a Bermuda exempted limited partnership, with its principal place of business at 52 Reid Street, Hamilton, Bermuda. Highland Capital controls CDO Fund's investment decisions through an investment management agreement. Between January 31, 2007 and August 31, 2008, Highland Capital's and its affiliates' aggregate ownership interest in CDO Fund ranged between 43.36% and 56.44%. Highland CDO Opportunity Fund, L.P. and Highland CDO Opportunity Fund, Ltd. serve as so-called "feeder funds" for defendant CDO Fund.

4.      **The Affiliated Transferee Defendants** ████████████████
████████████

27.     Defendant Highland Credit Strategies Master Fund, L.P. ("Credit Strategies") is a Bermuda limited partnership organized with its principal place of business at Victoria Place, 31 Victoria Street, Hamilton HM10, Bermuda. Credit Strategies transacts business within New York, and derives substantial revenue from interstate and international commerce.

28.     Defendant Highland Crusader Offshore Partners, L.P. (the "Crusader Fund") is a Bermuda limited partnership with its principal place of business at Victoria Place, 31 Victoria Street, Hamilton HM10, Bermuda. The Crusader Fund also has an office located at 13455 Noel Road, Suite 800, Dallas, Texas 75240. The Crusader Fund transacts business within New York, and derives substantial revenue from interstate and international commerce.

29.     Defendant Highland Credit Opportunities CDO, L.P. (the "Credit Opp. Fund") is a Delaware limited partnership with its principal place of business at 13455 Noel Road, Suite 800, Dallas, Texas 75240.

30.     Credit Strategies, the Crusader Fund and the Credit Opp. Fund are referred to herein collectively as the "Affiliated Transferee Defendants" ████████████
████████████████████████████
██████████████████

D.      **Non-Parties Affiliated With Highland Capital In Which The Fund Counterparties Invested**

31.     The Fund Counterparties held investments in several Highland Capital-affiliated funds, including Highland Credit Opportunities CDO, L.P., Highland Legacy, Highland Loan Funding V, Highland Park CDO I, Ltd., Highlander Euro CDO B.V. and Highlander Euro

CDO III B.V. Highland Capital served as the investment manager for these affiliated funds, and received valuable fees derived from the valuations of these funds' assets, which it managed.

## JURISDICTION AND VENUE

32. Venue in this Court is proper under CPLR 503 because plaintiff UBSS has a principal place of business in New York County.

33. Venue is also proper under CPLR 501, and this Court may exercise jurisdiction over the Fund Counterparties because UBS, Highland Capital and the Fund Counterparties all agreed in writing, before this action was commenced, to submit to such jurisdiction and venue, in connection with any dispute that may arise out of, in connection with, or related to, the Agreements (defined below), or any of the matters contemplated thereby. This Court also may exercise jurisdiction over Highland Financial because it is the alter ego of SOHC.

34. This Court also may exercise jurisdiction over all defendants pursuant to CPLR 301 and 302(a)(1) and (3), because defendants regularly transact and solicit business in New York, committed tortious acts causing injury in New York, should reasonably have expected that their tortious acts would have consequences in New York, the effect of their wrongful conduct was felt in New York, and/or derive substantial revenue from interstate or international commerce. Additionally, Highland Capital has an office in New York and is a foreign limited partnership registered to do business in New York.

## FACTUAL BACKGROUND

### A.    The Original Engagement

35. In or around April 2007, Highland Capital approached UBS for short-term financing in connection with a securitization that Highland Capital wanted to sponsor. UBS agreed to do so (the "Original Engagement").

12

36.     On or about April 20, 2007, UBSS and Highland Capital entered into an engagement letter (the "Original Engagement Letter"), which contemplated that UBSS would act as the exclusive financial arranger and placement agent for a type of collateralized debt obligation transaction ("CDO"), known as a collateralized loan obligation ("CLO") squared or "CLO Squared" transaction. (A copy of the Original Engagement Letter is annexed hereto as Exhibit A.)

37.     CLOs are a form of securitization where interest and principal payments on corporate loans made to multiple mid-sized and large businesses are pooled together by a lender or the owner of the loans, and then passed on through a securitization structure to investors. CLOs typically involve multi-million dollar loans known as syndicated loans, or leveraged loans made to new businesses or existing businesses, often to acquire other companies. The loan originators are able to spread risk through the CLO securitization, and simultaneously free up capital to make new loans to other businesses. The Original Engagement contemplated the securitization of CLO securities. Thus, the securitization contemplated by Highland Capital would have been a "CLO Squared" transaction.

38.     On or about May 22, 2007, as contemplated by the Original Engagement Letter, UBSS and Highland Capital entered into a warehouse agreement (the "Original Cash Warehouse Agreement"). (A copy of the Original Cash Warehouse Agreement is annexed hereto as Exhibit B.) In accordance with the terms of the Original Engagement Letter and the Original Cash Warehouse Agreement, UBSS agreed to acquire securities as directed by Highland Capital. Highland Capital instructed UBS to acquire various CLO securities issued in connection with prior CLO transactions involving other sponsors and issuers (the "Cash Portfolio").

39.     In a separate but related synthetic warehouse agreement (the "Original Synthetic Warehouse Agreement," and together with the "Original Cash Warehouse

13

Agreement," the "Original Warehouse Agreements"), UBS AG agreed to enter into credit default swaps (the "CDS Portfolio," and together with the Cash Portfolio, the "Warehouse Assets"), pursuant to which UBS AG sold credit protection to various third parties. (A copy of the Original Synthetic Warehouse Agreement is annexed hereto as Exhibit C.)

40.     For Highland Capital's benefit, UBS held the Warehouse Assets on its balance sheet (the "Warehouse Facility"). UBS was expected to hold the Warehouse Assets until such time as the parties could arrange for the assets to be securitized as part of the contemplated securitization. In particular, if the parties believed that a securitization was economically feasible, they would create a special purpose entity that would acquire the Warehouse Assets from UBS using the proceeds from the sale of securities to investors. The special purpose entity's debt securities would be secured by those Warehouse Assets.

41.     Under the Original Warehouse Agreements, if the Original Engagement terminated without a securitization, Highland Capital and the Fund Counterparties were obligated to pay UBS for losses on the Warehouse Assets. In particular, under the terms of the Original Cash Warehouse Agreement, Highland Capital was directly responsible for the first $50 million in losses in the Cash Portfolio, and under the terms of the Original Synthetic Warehouse Agreement, the Fund Counterparties were obligated to pay UBS for any and all losses suffered on the CDS Portfolio.

42.     The Original Engagement Letter expired by its terms on August 15, 2007 without a securitization occurring. The Original Warehouse Agreements expired on the same date in accordance with their respective terms.

43.     As of August 15, 2007, the Warehouse Assets in the Warehouse Facility had lost in excess of $86 million in value. Although they had sufficient capital to do so,

14

Highland Capital and the Fund Counterparties failed and refused to pay UBS what it was owed under the Original Warehouse Agreements.

44. As a result of extensive negotiations as well as representations and warranties made by Highland Capital on its own behalf, and on behalf of the Fund Counterparties as their investment manager, UBS agreed to restructure the terms of the Original Engagement.

**B.    Highland Capital And The Fund Counterparties Resort To Fraud To Avoid Highland Capital's Obligations To UBS**

45. As alleged above, as a result of the termination of the Original Engagement, Highland Capital was directly liable to UBS under the Original Warehouse Agreement for in excess of $86 million.

46. Between August 2007 and March 14, 2008, UBS, Highland Capital and the Fund Counterparties had discussions and negotiations concerning a restructuring of the terms of the Original Engagement. Those negotiations resulted in agreements to restructure the Original Engagement (the "Restructured Transaction"), including a release by UBS of its claims against Highland Capital and the Fund Counterparties arising out of the Original Engagement. (The terms of the Restructured Transaction are set forth in the Engagement Letter and Warehouse Agreements described below (collectively, the "Agreements"), which are annexed hereto as Exhibits D, E and F, respectively.)

47. During the course of negotiations and before March 14, 2008, Highland Capital and Fund Counterparties made several material misrepresentations to UBS concerning the creditworthiness of the Fund Counterparties. Dondero, Highland Capital and the Fund Counterparties also failed to disclose to UBS information which would have been material to UBS's decision to enter the Restructured Transaction ("Omissions," as defined above). As

15

Highland Capital and the Fund Counterparties knew, UBS reasonably relied upon those material misrepresentations and, due to the Omissions, a misstated assessment of the Fund Counterparties, all to its detriment in deciding whether to enter the Restructured Transaction. UBS reasonably and justifiably relied on these misrepresentations and Omissions of facts and information that were solely and peculiarly within the knowledge of Highland Capital and the Fund Counterparties. Given UBS's prior dealings with Highland Capital and its affiliates, as well as Highland Capital's size and presence in the market, UBS reasonably believed that Highland Capital and the Fund Counterparties would not provide it with false, incomplete or otherwise misleading information about the Fund Counterparties' finances and assets as it in fact did.

48.     For example, on or about December 28, 2007, to induce UBS to enter the Restructured Transaction and related Agreements, Gibran Mahmud of Highland Capital sent SOHC financial statements to UBS. On or about January 29, 2008, UBS requested additional financial information related to SOHC. Later that same day, to induce UBS to enter the Restructured Transaction and related Agreements, Phil Braner of Highland Capital emailed UBS a copy of SOHC's Statement of Financial Condition, dated December 31, 2007.

49.     As described with more particularity below, the SOHC financial information that Highland Capital and the Fund Counterparties provided to UBS, which Highland Capital was responsible for preparing, was materially false and misleading. Highland Capital and the Fund Counterparties knew that UBS would rely upon SOHC's financial information in connection with deciding whether to agree to the Restructured Transaction and the terms of the Agreements being negotiated.

50.     On or about February 4, 2008, Matt Killebrew of Highland Capital provided UBS with financial reports via email that reflected financial summaries, and aggregate

valuations for CDO Fund's assets as of December 31, 2007. On or about March 4, 2008, Mr. Killebrew sent UBS similar reports for the period ended January 31, 2008. As described with more particularity below, these financial reports, which Highland Capital prepared, also were materially false and misleading. Highland Capital and the Fund Counterparties knew that UBS would rely upon CDO Fund's financial information in connection with deciding whether to agree to the Restructured Transaction and the terms of the Agreements being negotiated.



51.     The Fund Counterparties' financial statements

These facts and information were solely and peculiarly within the knowledge of Highland Capital and the Fund Counterparties.



52.     CDO Fund's financial statements



53.     Similarly, Highland Capital and the Fund Counterparties concealed from UBS the fact that the Fund Counterparties



54.     In addition, the Fund Counterparties' financial statements that Highland Capital and the Fund Counterparties provided to UBS in advance of the Restructured Transaction contained



55. During the course of negotiations concerning the restructuring, UBS also insisted that the Fund Counterparties have the ability to post $70 million in cash and securities as collateral, which would be held at State Street Bank (the "Initial Restructured Transaction Collateral"), and in which UBS would hold a security interest. The Fund Counterparties' ability to do so using their own assets was qualitatively and quantitatively material to UBS. Among other things, it demonstrated the strength of their balance sheets, and by extension, their ability to satisfy future obligations to UBS.

56. Highland Capital and the Fund Counterparties agreed that the Fund Counterparties would post $70 million in Initial Restructuring Collateral.

57.



58.

As the Fund Counterparties'
investment manager, Highland Capital maintained the Fund Counterparties' accounting records,
and knew

Given UBS's prior dealings with Highland Capital and its affiliates, as well as
Highland Capital's size and presence in the market, UBS had no reason to believe, and
reasonably did not believe, that Highland Capital would provide it with false, incomplete or
otherwise misleading information about

59.     If UBS had known that the Fund Counterparties



It also would have drawn into question the Fund Counterparties' liquidity.

60.     But for Dondero's, Highland Capital's and the Fund Counterparties' false and misleading statements and Omissions concerning the Fund Counterparties' finances and assets, and ███████████████████████████████████ UBS would not have entered into the Restructured Transaction or the Agreements that memorialized its terms.  Given the Fund Counterparties' weak credit quality, additional adverse information about their collective or individual creditworthiness would have deterred UBS from going forward with the Restructured Transaction and putting more assets at risk.   These misrepresentations and Omissions proximately caused harm to UBS.

61.     UBS would not have entered into a transaction with parties that made misrepresentations as Highland Capital and the Fund Counterparties did.  UBS also would not have agreed to release its valuable claims arising out of the Original Engagement under such circumstances.  Because of, and in reliance on, the false and misleading information about the Fund Counterparties provided by Dondero, Highland Capital and the Fund Counterparties, UBS entered into the Restructured Transaction memorialized in the Agreements.  Because each of the misrepresentations and Omissions identified above disguised the Fund Counterparties' inability to satisfy their obligations to UBS, the misrepresentations and Omissions proximately caused harm to UBS.

**C.   The Restructured Transaction Agreements**

   **1.   The Engagement Letter**

62.   On or about March 14, 2008, the parties reached agreement on the terms of a restructured engagement, which were memorialized in a new engagement letter (the "Engagement Letter," annexed hereto as Exhibit D).   Pursuant to the Engagement Letter, Highland Capital re-engaged UBSS to act as placement agent in the event that market conditions improved, and the parties could go forward with securitizing the Warehouse Assets already held by UBS in the Warehouse Facility.  UBS agreed to continue holding the Warehouse Assets in the Warehouse Facility, which had a notional value of approximately $818 million.

63.   Under the terms of the Engagement Letter, UBS released claims against Highland Capital and the Fund Counterparties arising out of the Original Engagement.

   **2.   The Restructured Warehouse Agreements**

64.   On March 14, 2008, UBSS, the Fund Counterparties and Highland Capital also entered into a cash warehouse agreement (the "Cash Warehouse Agreement"), pursuant to which UBSS agreed to continue to hold the Cash Portfolio.  (A true and correct copy of the Cash Warehouse Agreement is annexed hereto as Exhibit E.)

65.   UBS AG, the Fund Counterparties and Highland Capital also entered into a synthetic warehouse agreement, dated as of March 14, 2008 (the "Synthetic Warehouse Agreement," and together with the Cash Warehouse Agreement, the "Warehouse Agreements"), pursuant to which UBS AG agreed to continue warehousing credit protection that it sold, i.e., the CDS Portfolio. (A true and correct copy of the Synthetic Warehouse Agreement is annexed hereto as Exhibit F.)

66.   Section 13(B) of the Cash Warehouse Agreement and § 11(B) of the Synthetic Warehouse Agreement make Highland Capital liable for losses, including losses in the

22

Warehouse Facility, by reason of acts or omissions constituting bad faith, willful misconduct, or gross negligence.

67.     Under § 12 of the Synthetic Warehouse Agreement, the Fund Counterparties agreed to transfer to State Street the Initial Restructuring Collateral to partially secure their respective obligations to UBS under the Warehouse Agreements. Annex C to the Synthetic Warehouse Agreement identified the six assets that the Fund Counterparties purportedly transferred to State Street to satisfy their Initial Restructuring Collateral obligations, along with $20 million in cash.

68.     The Warehouse Agreements also contained releases whereby UBS agreed to release claims it had against Highland Capital and the Fund Counterparties for losses arising out of the Original Engagement.

**D.     Highland Capital Uses Its Control Over The Fund Counterparties To Dissipate Their Assets Without Regard For The Fund Counterparties' Growing Obligations To UBS**

69.     Almost immediately after the Restructured Transaction Agreements were executed, Highland Capital and the Fund Counterparties knowingly began to dissipate the Fund Counterparties' assets and make it impossible for the Fund Counterparties to ever repay UBS what they owed. Highland Capital and the Fund Counterparties did so at various times when the Fund Counterparties owed UBS hundreds of millions of dollars.

70.     For example, on or about March 26, 2008, just days after entering the Restructured Transaction, Highland Capital caused certain SOHC assets to be encumbered by entering into a transaction with Barclays Bank, plc. ("Barclays"). At or around the same time, CDO Fund was negotiating financing arrangements with Morgan Stanley & Co. International Ltd. and Highland Capital IV SPC, whereby it granted a security interest in its assets to those entities. By granting a security interest in the Fund Counterparties' assets to other creditors,

23

Highland Capital unfairly and improperly reduced the assets available to satisfy the Fund Counterparties' obligations to UBS in bad faith and in violation of UBS's rights.

71.     Similarly, on or about April 2, 2008, Highland Capital advised UBS that defendant CDO Fund had recently monetized a $129 million long position in SunCom Wireless. When Highland Capital and CDO Fund subsequently provided UBS with additional financial information about CDO Fund, however, UBS discovered that Highland Capital had caused CDO Fund to transfer approximately $100 million of the cash proceeds from the SunCom Wireless sale out of CDO Fund.

72.     By improperly removing such a substantial amount of cash from CDO Fund, Highland Capital interfered in bad faith with CDO Fund's ability to satisfy its steadily increasing financial obligations to UBS. In particular, in or around May 2008, when the cash proceeds from the SunCom Wireless position were siphoned off, the Fund Counterparties owed UBS in excess of $166 million related to losses in the Warehouse Facility, approximately 50% of which CDO Fund was obligated to pay.

73.     Highland Capital also repeatedly caused SOHC's cash to be transferred by defendant Highland Financial. In particular, during the first five months of 2008, SOHC's cash position was reduced by over $10 million at a time when its obligations to UBS were increasing substantially.

E.     **In the Fall of 2008, Losses Mount And The Fund Counterparties Face Collateral Calls From Creditors Including UBS That They Cannot Meet Despite Highland Capital's Belated Efforts To Do So** ███████

74.     Under the terms of the Warehouse Agreements, the Fund Counterparties were required to post additional collateral with UBS if the combined market value of (a) the

Warehouse Assets and (b) the Initial Restructured Transaction Collateral, declined below a certain amount.

75. By September 2008, losses in the Warehouse Facility had increased significantly. At the same time, the value of the Initial Restructuring Collateral had declined substantially, as had the value of the assets held by the Fund Counterparties.

76. Highland Capital was desperate to avoid a default by any of its affiliates, including the Fund Counterparties. If a Highland Capital affiliate defaulted on its obligations to a creditor, Highland Capital's reputation in the investment community would be damaged, and there was a risk that Highland Capital's business would collapse. Highland Capital feared that a public default would lead investors in Highland Capital's hedge fund family to withdraw their capital, and lead creditors to take aggressive actions to protect themselves, including foreclosing on collateral and aggressively enforcing their contractual rights.

1. **The First Margin Call**

77. On or about September 16, 2008, as losses in the Warehouse Facility continued to grow, UBS began to exercise its contractual rights and make margin calls demanding additional collateral from the Fund Counterparties. Specifically, UBS notified Highland Capital and the Fund Counterparties that, pursuant to § 12(C) of the Synthetic Warehouse Agreement, the Fund Counterparties were each required to post $10 million in cash or equivalent securities (the "First Margin Call").

78. Because Highland Capital had routinely drained cash from the Fund Counterparties, the Fund Counterparties lacked the liquidity to meet UBS's demands using their own assets.

79. On or about September 19, 2008, the Fund Counterparties satisfied the First Margin Call by together posting $20 million in cash as additional collateral. █████████



**2. UBS Is Harmed By Highland Capital's Response To The Fund Counterparties' Liquidity Crisis**

80. In the wake of the First Margin Call, the Fund Counterparties remained starved for liquidity. Still desperate to avoid defaults to creditors and the consequences described above, Highland Capital resorted to

81. Highland Capital and the individuals that directed the Fund Counterparties knew that they had caused the Fund Counterparties to become incapable of satisfying their obligations to all of their respective creditors when they came due, and that they were insolvent or, at the very least, within the zone of insolvency.

82. For example, on or about September 26, 2008, Dondero and Highland Capital improperly



83.

84.

85.



86.

Highland Capital executed this plan at UBS's expense to protect their substantial personal stake in Highland Financial and prevent negative publicity associated with defaulting ▮▮▮▮▮▮▮▮▮. Implementing this plan, however, caused SOHC (and its alter ego, Highland Financial) to improperly and in bad faith breach duties and obligations to UBS.

87.

SOHC's expected obligations to UBS were well in excess of $250 million, which were due and owing to UBS no later than March 14, 2009. Thus, by ▮▮▮▮▮▮▮▮, Highland Capital and the Fund Counterparties made a fraudulent conveyance and interfered in bad faith with the Fund Counterparties' ability to meet their contractual obligations to UBS.

88. Given the state of the financial markets at the time, Highland Capital, Highland Financial and SOHC had no expectation that SOHC would be able to satisfy its

28

obligations to UBS when they came due.



89.

### 3.     The Second Margin Call

90.     On or about October 21, 2008, UBS notified Highland Capital that, pursuant to § 12(C) of the Synthetic Warehouse Agreement, the Fund Counterparties each owed another $10 million (the "Second Margin Call").

91.     In response to the Second Margin Call, Highland Capital offered UBS numerous assets as collateral. UBS rejected those offers for various business-related reasons. As UBS would later learn, however, at the time Highland Capital was offering the assets to UBS, the Fund Counterparties did not own them.

92.     On or about October 24, 2008, the Fund Counterparties satisfied the Second Margin Call by together posting assets with a notional value of $49.97 million (but a market value of approximately $20 million), with the understanding that UBS would authorize State Street to return the securities if and when the Fund Counterparties were able to replace

those securities with $20 million in cash. As UBS would later learn,



93.     Moreover, at the same time that Highland Capital was telling UBS that the

Fund Counterparties did not have sufficient cash assets to meet the Second Margin call,

### 4.     The Third Margin Call

94.     On or about November 7, 2008, UBS notified Highland Capital and the

Fund Counterparties that, pursuant to § 12(C) of the Synthetic Warehouse Agreement, the Fund

Counterparties had an obligation to post another $10 million as collateral (the "Third Margin

Call").

95.     On or about November 11, 2008, Highland Capital and the Fund

Counterparties offered to post various securities to satisfy the Third Margin Call. In response to

the Third Margin Call, Phil Braner of Highland Capital emailed UBS a list of proposed collateral

including eight securities with a purported market value of approximately $20 million (i.e., twice

the amount of cash due to satisfy the Third Margin Call).

96.     Pursuant to the Warehouse Agreements, UBS was authorized to reject

proposed collateral. UBS determined that the proposed additional collateral offered by Highland

Capital and the Fund Counterparties was unacceptable. On or after November 13, 2008, UBS

formally rejected the offered securities, and requested that the Fund Counterparties provide cash

or cash equivalent collateral to satisfy their obligations under § 12(C) of the Synthetic Warehouse Agreement.

97.    UBS would later learn that 

98.    When UBS confronted Highland Capital about this issue Mr. Braner of Highland Capital explained that 

**F.    Termination Of The Agreements And Demand For Payment Of Losses**

99.    As of December 3, 2008, the Fund Counterparties still had not met the Third Margin Call in accordance with § 12(C) of the Synthetic Warehouse Agreement.  This failure resulted in UBS's declaration of a termination date ("Termination Date") under the Agreements.

100.    On December 3, 2008, UBS delivered a letter (the "Termination Date Letter") to Highland Capital and the Fund Counterparties notifying them of such failure and the

occurrence of a Termination Date under each Agreement. (A true and correct copy of the Termination Date Letter is annexed hereto as Exhibit G.)

101. Sections 5 and 7 of the Cash Warehouse Agreement provided that if the closing date of the securitization contemplated by the Restructured Transaction failed to occur on or prior to March 14, 2009, UBSS could, in its sole discretion, retain any of the securities in the Warehouse Facility or sell such securities to one of UBSS's affiliates or an unaffiliated party.

102. Pursuant to the terms of the Agreements, if the closing date of the securitization contemplated by the Restructured Transaction failed to occur on or prior to March 14, 2009, each of the Fund Counterparties was obligated to pay to UBS its pro rata share of any market value losses on the Warehouse Assets, which UBS determined it had experienced and so notified Highland Capital and the Fund Counterparties.

103. On December 19, 2008, UBSS delivered a letter (the "Cash Warehouse Demand Letter") to Highland Capital and the Fund Counterparties demanding payment for its losses. (A true and correct copy of the Cash Warehouse Demand Letter is annexed hereto as Exhibit H.) UBSS demanded that Highland Capital and the Fund Counterparties wire that required amount to UBSS no later than 5:00 pm on December 24, 2008 (i.e., the third business day after the date of the Cash Warehouse Demand Letter) (the "Final Payment Date"). Highland Capital and the Fund Counterparties failed to make the required payment to UBSS.

104. The Synthetic Warehouse Agreement provided that in the event the closing date of the securitization contemplated by the Restructured Transaction failed to occur on or prior to March 14, 2009, the Fund Counterparties would be collectively responsible for 100% of the aggregate amount of losses on the CDS Portfolio and each of the Fund Counterparties would pay, after notice of such amount due from UBS, its pro rata share of such amount to UBS within three business days.

105.    On December 19, 2008, UBS AG delivered a letter (the "Synthetic Warehouse Demand Letter") to Highland Capital and the Fund Counterparties demanding payment for its losses. (A true and correct copy of the Synthetic Warehouse Demand Letter is annexed hereto as Exhibit I.) UBS AG demanded that the Highland Capital and the Fund Counterparties wire the required amount to UBS AG no later than 5:00 PM on the Final Payment Date (i.e., December 24, 2008 — the third business day after the date of the Synthetic Warehouse Demand Letter). Highland Capital and the Fund Counterparties failed to make the required payment to UBS AG.

## G.    Notice Of Failure to Pay, Auction And Final Accounting Letter

106.    On January 5, 2009, UBS notified Highland Capital and the Fund Counterparties of the failure to make the requisite payments when due pursuant to the Agreements and the applicable demand letters. On or about January 16, 2009, in connection with unwinding the Warehouse Facility, UBS conducted the auction contemplated by the Warehouse Agreements.

107.    On or about March 19, 2009, UBS delivered a letter to Highland Capital and the Fund Counterparties concerning a final accounting concerning the auction and the losses in the Warehouse Facility. UBS determined that Highland Capital and the Fund Counterparties owed it $686,853,290.26.

## H.    Highland Capital ███████████████████████

108.    ████████████████████████████████████████

109. In December 2008, immediately after UBS terminated the Restructured Transaction, Dondero and Highland Capital 

110. On or about February 24, 2009, UBS commenced this action against Highland Capital and the Fund Counterparties. At the time, SOHC and Highland Financial, as its alter ego, owed UBS approximately $345 million.

111. Undeterred, on or about March 17, 2009, Dondero and Highland Capital



- 

112. As a result, Highland Capital (a) further interfered in bad faith with UBS's contractual rights and the Fund Counterparties' contractual obligations under the Warehouse Agreements, thereby breaching the covenants of good faith and fair dealing inherent in the Warehouse Agreements; and (b)



113. The full extent of UBS's injury should be determined at trial.

114. 



## FIRST CAUSE OF ACTION
### (Fraud Against The Fund Counterparties)

115.   UBS repeats and realleges the allegations set forth in paragraphs 1 through 114 of this Second Amended Complaint as if fully set forth herein.

116.   In connection with restructuring the Original Engagement, and negotiating the terms of the Agreements and Restructured Transaction, Highland Capital and the Fund Counterparties had a duty to communicate accurate and complete information to UBS.

117.   As alleged above, in connection with negotiating the Restructured Transaction, Highland Capital and the Fund Counterparties intentionally misrepresented material facts and made Omissions (as defined earlier herein).

118.   As set forth in more detail above, prior to the restructuring being completed, and the Agreements being executed, Highland Capital and the Fund Counterparties misrepresented information and made Omissions to UBS concerning the creditworthiness of the Fund Counterparties as well as information about their finances and assets, including, but not limited to, information regarding the following:

(a) ██████████████████████████████

(b) ████████████████████

(c) ██████████████████████████████

36

119. Highland Capital and the Fund Counterparties acted knowingly and purposefully in making the materially false representations and Omissions to UBS in connection with negotiating the Restructured Transaction to induce UBS to enter the Agreements. Highland Capital and the Fund Counterparties knew that their representations and Omissions were materially false and misleading. Knowingly using material misrepresentations and Omissions, Highland Capital and the Fund Counterparties intended to induce, and fraudulently induced UBS into entering the Agreements.

120. Highland Capital and the Fund Counterparties also knew that their false representations and Omissions were material to and caused UBS's decision to enter the Agreements. In particular, the misrepresentations and Omissions were both quantitatively and qualitatively material to UBS inasmuch as UBS would have acted differently had it known the truth about the Fund Counterparties' finances and assets when UBS made the decision to go forward with the restructuring and releasing, among other things, valuable claims against Highland Capital.

121. UBS was not aware and could not have been aware of the falsity and misleading nature of Highland Capital's and the Fund Counterparties' misrepresentations and Omissions. The facts and information underlying the false, inaccurate and incomplete financial reports that Highland Capital provided to UBS in connection with negotiating the Restructured Transaction were peculiarly within Highland Capital's and the Fund Counterparties' knowledge.

122. Highland Capital and the Fund Counterparties had superior knowledge compared to UBS about Highland Capital's and the Fund Counterparties' finances and assets. Indeed, such facts and information were solely and peculiarly within the knowledge of Highland Capital and the Fund Counterparties. Moreover, it was necessary for Highland Capital and the Fund Counterparties to complete or clarify the information that it provided to UBS concerning

the Fund Counterparties' finances and assets. Consequently, Highland Capital's and the Fund Counterparties' concealment of the Fund Counterparties' finances and assets was fraudulent.

123. UBS reasonably and justifiably relied to its detriment on Highland Capital's and the Fund Counterparties' misrepresentations and Omissions regarding the Fund Counterparties' financial condition and assets. In particular, UBS reasonably and justifiably relied on misrepresentations and Omissions of facts and information solely and peculiarly within the knowledge of Highland Capital and the Fund Counterparties. Given UBS's prior dealings with Highland Capital and its affiliates, as well as Highland Capital's size and presence in the market, UBS had no reason to question the veracity and completeness of the financial information that Highland Capital provided to UBS about the Fund Counterparties' finances and assets. UBS also had no reason to believe that the financial information that Highland Capital provided to it to induce UBS to enter the Restructured Transaction would be false, incomplete or otherwise misleading. When UBS evaluated the Fund Counterparties' financial statements in early 2008,



124. But for Highland Capital's and the Fund Counterparties' material misrepresentations and Omissions, UBS would not have entered the Agreements, or released its claims against Highland Capital and the Fund Counterparties arising out of the Original Engagement.

125.    In reasonable and justifiable reliance on the foregoing material misrepresentations and Omissions, UBS also surrendered and released valuable claims against Highland Capital and the Fund Counterparties at a time when UBS could have been made whole for the losses that it had suffered to that point as a result of the Original Engagement. Nor would UBS have suffered the additional losses in the Warehouse Facility.

126.    UBS reasonably relied to its detriment on Highland Capital's and the Fund Counterparties' material misrepresentations and Omissions. As a direct and proximate result of Highland Capital's and the Fund Counterparties' misrepresentations and Omissions, UBS continued to maintain the Warehouse Facility through, at least, December 3, 2008, suffering in excess of $686 million in losses that the Fund Counterparties cannot pay to UBS.

127.    Highland Capital's and the Fund Counterparties' material misrepresentations and Omissions were the direct and proximate cause of UBS's losses complained of herein. As a direct result of, and in reliance upon, Highland Capital's and the Fund Counterparties' material misrepresentations and Omissions, UBS was induced to, among other things, (a) enter the Agreements; (b) release its pre-existing claims against Highland Capital and the Fund Counterparties related to the Original Engagement; and (c) assume the credit-risk of the Fund Counterparties; and as a direct result, caused UBS to incur substantial losses and damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Fraud Against The Fund Counterparties)
### (Pled Solely To Preserve For Appeal)

128.    UBS repeats and realleges the allegations set forth in paragraphs 1 through 127 of this Second Amended Complaint as if fully set forth herein.

129. In connection with restructuring the Original Engagement, and negotiating the terms of the Agreements and Restructured Transaction, Highland Capital and the Fund Counterparties had a duty to communicate accurate and complete information to UBS.

130. As alleged above, in connection with negotiating the Restructured Transaction, Highland Capital and the Fund Counterparties intentionally misrepresented material facts and made Omissions (as defined earlier herein).

131. As set forth in more detail above, prior to the restructuring being completed, and the Agreements being executed, Highland Capital and the Fund Counterparties misrepresented information and made Omissions to UBS concerning the creditworthiness of the Fund Counterparties and information about their finances, assets and business practices, including, but not limited to, information regarding the following:

(a)

(b)

(c)

(d)

(e)

(f)



(g) ████████████████████████

132.     Highland Capital and the Fund Counterparties acted knowingly and purposefully in making the materially false representations and Omissions to UBS in connection with negotiating the Restructured Transaction to induce UBS to enter the Agreements. Highland Capital and the Fund Counterparties knew that their representations and Omissions were materially false and misleading. Knowingly using material misrepresentations and Omissions, Highland Capital and the Fund Counterparties intended to induce, and fraudulently induced UBS into entering the Agreements.

133.     These Omissions rendered the Fund Counterparties' representations, statements and financial statements materially misleading. Because Highland Capital and the Fund Counterparties concealed this information from UBS, UBS could not properly evaluate SOHC's ability to satisfy its obligations to UBS. For instance, UBS received financial reports from Highland Capital for the Fund Counterparties that suggested that the Fund Counterparties held hundreds of millions of dollars worth of assets that could be used to satisfy their obligations to UBS. However, a substantial portion of the assets that UBS reasonably believed would be available, were, in fact, not going to be available to pay UBS because they were going to be encumbered as a result of other transactions. In other words, because Highland Capital concealed its intentions, the financial reports that it provided to UBS were misleading as they provided UBS with false and illusory comfort regarding the Fund Counterparties' capacity to fulfill their contractual obligations to UBS. As the Fund Counterparties' investment manager, Highland Capital would have led the negotiations related to the other financing arrangements.

134.     Similarly, during negotiations concerning the Initial Restructuring Collateral, Highland Capital and SOHC made an additional Omission by not disclosing to UBS

41

the fact that SOHC had a serious liquidity problem. SOHC had to borrow cash from Highland Capital to satisfy the cash portion of its Initial Restructuring Collateral obligation. On or about December 18, 2007, while the parties were negotiating the restructuring, Highland Capital loaned $30 million to SOHC, which Highland Capital and SOHC's alter ego, Highland Financial, earmarked for SOHC to use as collateral in connection with negotiating extensions of warehouse facilities, including the one with UBS. As Highland Financial's and SOHC's investment manager, Highland Capital knew about SOHC's liquidity problems since they were discussed openly at Highland Financial board meetings attended by Highland Capital. The failure to fully disclose SOHC's liquidity problem, and its inability to meet the Initial Restructuring Collateral obligation using its own cash assets was an Omission, because it was indicative of the strength of SOHC's finances and assets, and SOHC's ability to satisfy obligations to UBS.

135. Highland Capital and Fund Counterparties also concealed from UBS that Highland Capital had to commingle assets among its various affiliates and disregard corporate formalities to satisfy the Fund Counterparties' liquidity needs. Facts and information concerning these business practices, including Highland Capital's commingling of assets and disregard of corporate formalities was information solely and peculiarly within the knowledge of Highland Capital and its affiliates. As the investment manager to Highland Financial, SOHC and CDO Fund (as well as the Affiliated Transferee Defendants), Highland Capital knowingly arranged and caused the asset transfers between and among the various affiliates in disregard of corporate formalities.

136. Highland Capital and the Fund Counterparties also knew that their false representations and Omissions were material to and caused UBS's decision to enter the Agreements. In particular, the misrepresentations and Omissions were both quantitatively and

42

qualitatively material to UBS inasmuch as UBS would have acted differently had it known the truth about the Fund Counterparties' finances, assets and business practices when UBS made the decision to go forward with the restructuring and releasing, among other things, valuable claims against Highland Capital.

137. In addition, if UBS had known that Highland Capital and the Fund Counterparties ignored corporate formalities or that Highland Capital freely transferred assets among its controlled entities, UBS would not have entered the Restructured Transaction. These misrepresentations and Omissions proximately caused harm to UBS.

138. UBS was not aware and could not have been aware of the falsity and misleading nature of Highland Capital's and the Fund Counterparties' misrepresentations and Omissions. The facts and information underlying the false, inaccurate and incomplete financial reports that Highland Capital and the Fund Counterparties provided to UBS in connection with negotiating the Restructured Transaction were peculiarly within Highland Capital's and the Fund Counterparties' knowledge.

139. Highland Capital and the Fund Counterparties had superior knowledge compared to UBS about Highland Capital's and the Fund Counterparties' finances, assets and business practices. Indeed, such facts and information were solely and peculiarly within the knowledge of Highland Capital and the Fund Counterparties. Moreover, it was necessary for Highland Capital and the Highland Entities to complete or clarify the information that it provided to UBS concerning the Fund Counterparties' finances, assets and business practices. Consequently, Highland Capital's and the Fund Counterparties' concealment about the Fund Counterparties' finances, assets and business practices was fraudulent.

140. UBS reasonably and justifiably relied to its detriment on Highland Capital's and the Fund Counterparties' misrepresentations and Omissions regarding the Fund

Counterparties' financial condition, assets and business practices. In particular, UBS reasonably and justifiably relied on misrepresentations and Omissions of facts and information solely and peculiarly within the knowledge of Highland Capital and the Fund Counterparties. Given UBS's prior dealings with Highland Capital and its affiliates, as well as Highland Capital's size and presence in the market, UBS had no reason to question the veracity and completeness of the financial information that Highland Capital provided to UBS about the Fund Counterparties' finances, assets and business practices. UBS also had no reason to believe that the financial information that Highland Capital and the Fund Counterparties provided to it to induce UBS to enter the Restructured Transaction would be false, incomplete or otherwise misleading. When UBS evaluated the Fund Counterparties' financial statements in early 2008,



141. But for Highland Capital's and the Fund Counterparties' material misrepresentations and Omissions, UBS would not have entered the Agreements, or released its claims against Highland Capital and the Fund Counterparties arising out of the Original Engagement.

142. In reasonable and justifiable reliance on the foregoing material misrepresentations and Omissions, UBS also surrendered and released valuable claims against Highland Capital and the Fund Counterparties at a time when UBS could have been made whole

44

for the losses that it had suffered to that point as a result of the Original Engagement. Nor would UBS have suffered the additional losses in the Warehouse Facility.

143. UBS reasonably relied to its detriment on Highland Capital's and the Fund Counterparties' material misrepresentations and Omissions. As a direct and proximate result of Highland Capital's and the Fund Counterparties' misrepresentations and Omissions, UBS continued to maintain the Warehouse Facility through, at least, December 3, 2008, suffering in excess of $686 million in losses that the Fund Counterparties cannot pay to UBS.

144. Highland Capital's and the Fund Counterparties' material misrepresentations and Omissions were the direct and proximate cause of UBS's losses complained of herein. As a direct result of, and in reliance upon, Highland Capital's and the Fund Counterparties' material misrepresentations and Omissions, UBS was induced to, among other things, (a) enter the Agreements; (b) release its pre-existing claims against Highland Capital and the Fund Counterparties related to the Original Engagement; and (c) assume the credit-risk of the Fund Counterparties; and as a direct result, caused UBS to incur substantial losses and damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**(Breach of Contract Under the Cash Warehouse Agreement Against The Fund Counterparties)**

145. Plaintiff UBSS repeats and realleges the allegations set forth in paragraphs 1 through 144 of this Second Amended Complaint as if fully set forth herein.

146. The Cash Warehouse Agreement is a valid and binding contract.

147. UBSS has performed all of its obligations under the Cash Warehouse Agreement.

45

148. Pursuant to the Cash Warehouse Agreement, each of the Fund Counterparties was required to transfer their respective pro rata shares of additional collateral to satisfy the Third Margin Call within two business days of November 7, 2008. The Fund Counterparties failed to make the required transfer. The Fund Counterparties' failure to make such transfer is a breach under the Cash Warehouse Agreement, and resulted in a Termination Date under the Cash Warehouse Agreement.

149. In accordance with the terms of the Cash Warehouse Agreement, UBSS demanded that each of the Fund Counterparties pay to UBS their respective pro rata shares of the amount of losses on the Cash Portfolio and estimated expenses by 5 P.M. on the Final Payment Date (i.e., December 24, 2008 – the third business day after the date of the Cash Warehouse Demand Letter). The Fund Counterparties failed to pay this amount to UBSS. The failure to pay these amounts to UBSS when due under the Cash Warehouse Agreement constituted a further breach under the Cash Warehouse Agreement.

150. By reason of the foregoing, UBSS has suffered and will continue to suffer damages in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
#### (Breach of Contract Under the Synthetic Warehouse Agreement Against The Fund Counterparties)

151. Plaintiff UBS AG, repeats and realleges the allegations set forth in paragraphs 1 through 150 of this Second Amended Complaint as if fully set forth herein.

152. The Synthetic Warehouse Agreement is a valid and binding contract.

153. UBS AG has performed all of its obligations under the Synthetic Warehouse Agreement.

154.     Pursuant to the Synthetic Warehouse Agreement, each of the Fund Counterparties were required to transfer their respective pro rata shares of additional collateral to satisfy the Third Margin Call within two business days of November 7, 2008.  The Fund Counterparties failed to make the requisite transfer.  The failure to make such transfer resulted in a breach and a Termination Date under the Synthetic Warehouse Agreement.

155.     UBS AG demanded that each of the Fund Counterparties pay to UBS AG their pro rata share of losses on the CDS Portfolio and estimated expenses by 5 P.M. on the Final Payment Date (i.e., December 24, 2008 – the third business day after the date of the Synthetic Warehouse Demand Letter).  The Fund Counterparties failed to pay this amount to UBS.   The failure to pay these amounts when due under the Agreements was a further breach under the Synthetic Warehouse Agreement.

156.     By reason of the foregoing, UBS AG has suffered and will continue to suffer damages in an amount to be determined at trial.

157.     Paragraphs 157 to 166 have been intentionally left blank.

## FIFTH CAUSE OF ACTION
### (Fraudulent Conveyances Against All Defendants)

167.     UBS repeats and realleges the allegations set forth in paragraphs 1 through 166 of this Second Amended Complaint as if fully set forth herein.

168.     Between March 14, 2008 and December 3, 2008, as losses in the Warehouse Facility grew, Highland Capital exercised its control over the Fund Counterparties and caused the Fund Counterparties to transfer valuable cash and assets out of the Fund Counterparties, thereby impairing their ability to bear losses in the Warehouse Facility, and otherwise satisfy their obligations to creditors, including UBS.  █████████████████

47



169.

170.



171.

172.

173.



174.

175.



176.

177.

178.



179.   As a result of the foregoing fraudulent conveyances, the Fund Counterparties were unable to satisfy their obligations to UBS.  As a result of the foregoing fraudulent conveyances, UBS has been harmed in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION
### (Tortious Interference With Contractual Relations
### Against The Affiliated Transferee Defendants)
### (Pled Solely To Preserve For Appeal)

180.   UBS repeats and realleges the allegations set forth in paragraphs 1 through 179 of this Second Amended Complaint as if fully set forth herein.

181.   The Agreements are valid and binding contracts.

182.   The parties agreed that UBS would not bear the risk of any losses in connection with the Restructured Transaction.  As a direct result of the Fund Counterparties' breach of the Warehouse Agreements, UBS suffered no less than $686,853,290.26 in damages. Under the terms of the Warehouse Agreements, the Fund Counterparties' obligation to pay UBS for losses in the Warehouse Facility expressly survived the termination of the Agreements.

183.   Highland Capital knew of the Agreements, and were familiar with their terms, including the Fund Counterparties' obligations to UBS thereunder.   The Affiliated

Transferee Defendants, also knew of the Agreements, and their terms, including the Fund Counterparties' obligations to UBS thereunder.

184.     Highland Capital and the Affiliated Transferee Defendants intentionally and improperly caused and ensured a breach of the Warehouse Agreements by the Fund Counterparties, thereby tortiously interfering with UBS's rights under the Agreements.

185.     Specifically, in 2008 and 2009 Highland Capital wrongfully caused the improper and fraudulent asset transfers, payments, distributions and dividends described above, and thereby tortiously interfered with UBS's contractual relationship with the Fund Counterparties by knowingly impairing UBS's contractual right under the Warehouse Agreements to be reimbursed by the Fund Counterparties for the losses on the Warehouse Assets.     For example, Highland Capital wrongfully caused the March 2009 Fraudulent Conveyance for which there was no legitimate purpose.  The Affiliated Transferee Defendants

186.     Highland Capital and the Affiliated Transferee Defendants

187.     Highland Capital and the Affiliated Transferee Defendants engaged in the foregoing unlawful and improper conduct, and tortiously interfered with UBS's contractual rights under the Warehouse Agreements, for their own improper personal gain by knowingly violating UBS's rights and making it impossible for the Fund Counterparties to perform under the Warehouse Agreements.  In particular, the foregoing conduct constitutes independent torts

and predatory acts directed at UBS for Highland Capital's and the Affiliated Transferee Defendants' own personal gain.

188. As a direct and proximate result of Highland Capital's and the Affiliated Transferee Defendants' tortious interference with UBS's contractual rights under the Agreements, UBS has suffered damages in an amount to be determined at trial. Had Highland Capital and the Affiliated Transferee Defendants not tortiously interfered with UBS's contractual rights, the Fund Counterparties would have been able to make payments to UBS of the amount they owed to UBS under the Warehouse Agreements.

## SEVENTH CAUSE OF ACTION
### (Declaratory Judgment For General Partner Liability Against Strand)

189. UBS repeats and realleges the allegations set forth in paragraphs 1 through 188 of this Second Amended Complaint as if fully set forth herein.

190. A limited partnership's general partner is personally liable for the partnership obligations of the limited partnership.

191. Highland Capital is a Delaware limited partnership. Defendant Strand is Highland Capital's general partner. As such, Strand is personally liable for the liability, debts and obligations of Highland Capital, including but not limited to Highland Capital's liabilities to UBS arising out of the Consolidated Action.

192. A justiciable controversy exists as to whether Strand is liable to UBS for the injuries caused by Highland Capital complained of in the Consolidated Action as a result of Strand being Highland Capital's general partner.

**EIGHTH CAUSE OF ACTION**
**(Declaratory Judgment For Alter Ego Liability**
**Against Highland Financial)**

193. UBS repeats and realleges the allegations set forth in paragraphs 1 through 192 of this Second Amended Complaint as if fully set forth herein.

194. As alleged above, SOHC breached the Warehouse Agreements and otherwise harmed UBS by engaging in fraudulent misconduct. Highland Financial is SOHC's alter ego and should be held responsible and liable for SOHC's breach of the Warehouse Agreements and fraudulent misconduct.

195. SOHC is a mere instrumentality of Highland Financial. SOHC had no independence and could not exercise any business discretion whatsoever.                SOHC did not have its own offices, officers or employees. Rather, it shared common officers, directors and employees, as well as common office space, with Highland Financial.

196. As alleged in detail above, Highland Financial completely dominated the day-to-day operations of SOHC as well as SOHC's sister-affiliates. In particular, Highland Financial operated Highland Financial and its subsidiaries, including SOHC, as a single entity,

197.    A justiciable controversy exists as to whether Highland Financial is liable to UBS as SOHC's alter ego for the losses and harm that UBS suffered that were caused by SOHC's breach of the Warehouse Agreements, and the fraudulent and tortious conduct complained of herein.

### RELIEF DEMANDED

WHEREFORE, plaintiffs UBSS and UBS AG demand judgment:

(a)    On the first cause of action, as against the Fund Counterparties, declaring that UBS was induced to enter the Agreements as a result of fraud committed by the Fund Counterparties, and awarding damages to UBS for all losses and liabilities incurred by UBS, and that UBS incurs, with respect to the Agreements and the Warehouse Facility, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses and any other losses, fees and expenses that UBS incurred or incurs, in an amount to be determined at trial but in any event, no less than $686,853,290.26;

(b)    On the second cause of action, which is pled solely to preserve UBS's appellate rights, as against the Fund Counterparties, declaring that UBS was induced to enter the Agreements as a result of fraud committed by the Fund Counterparties, and awarding damages to UBS for all losses and liabilities incurred by UBS, and that UBS incurs, with respect to the Agreements and the Warehouse Facility, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses and any other losses, fees and expenses that UBS incurred or incurs, in an amount to be determined at trial but in any event, no less than $686,853,290.26;

(c)     On the third cause of action, as against the Fund Counterparties, declaring that the Fund Counterparties breached the Cash Warehouse Agreement, and awarding UBS an amount to be determined at trial;

(d)     On the fourth cause of action, as against the Fund Counterparties, declaring that the Fund Counterparties breached the Synthetic Warehouse Agreement, and awarding UBS an amount to be determined at trial;

(e)     On the fifth cause of action, as against all defendants, (i) declaring that the dispositions of the Fund Counterparties' and Highland Financial's assets, as directed by Highland Capital, constituted fraudulent conveyances; (ii) appointing a receiver over defendants; (iii) directing that a full accounting be had of defendants' affairs and finances; (iv) imposing a constructive trust over defendants' assets until such an accounting is completed; and/or (v) awarding UBS damages in an amount to be determined at trial, but no less than the value of the assets fraudulently and improperly transferred, or, alternatively, directing that defendants and their partners, members or shareholders return to the Fund Counterparties any assets or consideration received from Highland Financial or the Fund Counterparties, directly or indirectly, as distributions, dividends, consideration, compensation, fees, interest, principal or otherwise, between March 14, 2008 and the present.

(f)     On the sixth cause of action, as against the Affiliated Transferee Defendants, which is pled solely to preserve UBS's appellate rights, declaring that each of those defendants is liable for tortiously interfering with UBS's contractual rights under the Warehouse Agreements, and awarding UBS an amount to be determined at trial;

(g)     On the seventh cause of action, as against defendant Strand, declaring that Strand is responsible for Highland Capital's liability and obligations arising out of the Consolidated Action;

(h)     On the eighth cause of action, as against defendant Highland Financial,

declaring that Highland Financial is SOHC's alter ego, and that as such, Highland Financial is

responsible for SOHC's liability and obligations to UBS arising out of this action;

(i)     Awarding UBS punitive damages in an amount to be determined at trial;

(j)     Granting UBS its costs and disbursements, including reasonable attorneys'

fees and expenses of this action;

(k)     Granting UBS pre-judgment interest; and

(l)     Granting such other and further relief as the Court deems just and proper.

Dated:     New York, New York
           May 11, 2011

CADWALADER, WICKERSHAM & TAFT LLP


By: /s/ *Gregory A. Markel*
    Gregory A. Markel
    Howard R. Hawkins, Jr.
    Jason Jurgens
    Ellen M. Halstead

    Office and Post Office Address:
    One World Financial Center
    New York, NY 10281
    Telephone: (212) 504-6000
    Facsimile: (212) 504-6666

    *Attorneys for Plaintiffs UBS Securities LLC and*
    *UBS AG, London Branch*

# **Exhibit B**

# **Phase I Decision and Order**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION PART 60

-------------------------------------------------------------------X

UBS SECURITIES LLC and UBS AG, LONDON BRANCH,

                             Plaintiff,

                         - v -

HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND
SPECIAL OPPORTUNITIES HOLDING COMPANY,
HIGHLAND CDO OPPORTUNITY MASTER FUND, L.P.,
HIGHLAND FINANCIAL PARTNERS, L.P., HIGHLAND
CREDIT STRATEGIES MASTER FUND, L.P., HIGHLAND
CRUSADER OFFSHORE PARTNERS, L.P., HIGHLAND
CREDIT OPPORTUNITIES CDO, L.P., STRAND ADVISORS,
INC.,

                         Defendant.

-------------------------------------------------------------------X

INDEX NO.       650097/2009

DECISION AND ORDER AFTER
TRIAL

This action arises out of a failed restructured transaction between plaintiffs UBS

Securities LLC and UBS AG, London Branch (collectively, UBS) and defendants Highland

CDO Opportunity Master Fund, L.P. (CDO Fund) and Highland Special Opportunities Holding

Company (SOHC) (together, the Fund Counterparties), and defendant Highland Capital

Management, L.P. (Highland Capital) (together with the Fund Counterparties, Highland), for the

securitization of collateralized loan obligations (CLOs) and credit default swaps (CDSs).

    The court conducted a bench trial from July 9 through July 27, 2018 on plaintiffs' third

and fourth causes of action in the second amended complaint for breach of contract, and on

defendant Highland Capital's first and second counterclaims against plaintiff UBS Securities

1

LLC for breach of contract and unjust enrichment, respectively.[1] Based on the credible evidence at trial, the court now makes the following determination as to the breach of contract causes of action and counterclaims.[2]

In April and May 2007, the parties agreed to pursue a collateralized debt obligations transaction governed by an Engagement Letter, a Synthetic Warehouse Agreement for CDSs, and a Warehouse Agreement for CLOs (Original Agreements). (DX 4, DX 5, DX 6.)[3] It is undisputed that UBS acted as the "financial arranger" for the transaction and was responsible for financing the acquisition of assets, which would then be held in portfolios, which the parties refer to as the Cash Warehouse and the Synthetic Warehouse or collectively as the Knox Warehouse. (Ps.'s Findings, ¶ 4; Ds.'s Findings, ¶ 5.)[4] Highland Capital acted as the "Servicer" and was responsible for identifying the specific CLOs to be securitized and the Reference Obligations for the CDSs to be securitized. (Ps.'s Findings, ¶¶ 3, 4; Ds.'s Findings, ¶¶ 6, 8.)

In furtherance of the transaction, UBS acquired assets with a notional value of $818 million. (Ps.'s Findings, ¶ 6; Ds.'s Findings, ¶ 5.) There were 33 CLO tranches in the Cash Warehouse, with a notional value of $174 million. UBS paid $170 or $170.5 million to acquire the CLOs because the bonds were purchased at a slight discount on their par value. (Ds.' Findings, ¶ 6; Ps.'s Findings, ¶ 6.) The Synthetic Warehouse contained 87 credit default swaps,

---

[1] By decision on the record on May 1, 2018 (NYSCEF Doc. No. 494), the court bifurcated the trial. The decision held that the breach of contract claims, which were to be heard by the court, would be determined prior to claims, including fraudulent conveyance claims, which were to be heard by a jury.

[2] At the trial, the parties agreed to the submission of extensive evidence, subject to standing objections. This decision is not based on such evidence, unless the decision expressly states otherwise.

[3] Defendants' and plaintiffs' trial exhibits will be referred to as DX _ and PX _, respectively. The parties' demonstrative exhibits will be referred to as DX Demo. _ and PX Demo. _

[4] The Fund Counterparties' and Highland Capital Management, L.P.'s Proposed Findings of Fact and Conclusions of Law will be referred to as Ds.'s Findings. Plaintiffs' Proposed Findings of Fact and Conclusions of Law will be referred to as Ps.'s Findings. Defendants' Findings are all identified by paragraph number. Plaintiffs' Findings of Fact are identified by paragraph number, while their Findings of Law are identified only by page number.

2

with a notional value of $644 million. (Ds.'s Findings, ¶ 7; Ps.'s Findings, ¶ 6.). UBS served as

the protection seller on all of the CDSs. (Ps.'s Findings, ¶ 4; Ds.'s Findings, ¶ 8.) For five of

the CDSs, with a notional value of $45 million, Lehman Brothers Special Financing, Inc.

(Lehman) acted as the protection buyer (Lehman Swaps). (Ps.'s Findings, ¶ 8; Ds.'s Findings, ¶

9; PX 755[5], at 1.) For 20 of the CDSs, with a notional value of $124 million, UBS acted as both

protection seller and protection buyer (the Internal Swaps). (Ds.'s Findings, ¶ 10; Ps.'s Findings,

¶ 9; PX 755, at 4-5.)

    The Original Agreements expired by their terms on August 15, 2007. (PX 1, at 1.) The

parties agreed to restructure the transaction, signing a new Engagement Letter, the 2008 Cash

Warehouse Agreement (CWA), and the 2008 Synthetic Warehouse Agreement (SWA), as of

March 14, 2008. (See PX 1, PX 2, PX 3.) As of March 14, 2008, the Knox assets had lost

significant value and the parties agreed that, given the market conditions existing as of the date

of the restructured transaction, it was not then feasible to sell the securities and close the

transaction. (Ps.'s Findings, ¶ 20; 2008 Engagement Letter [PX 1, at 8].)

    As discussed further below, the Synthetic Warehouse Agreement provided for the roll-

over of the Existing Credit Default Swaps and the Existing Collateral Portfolio into the

warehouses created under the 2008 restructured transaction. (See SWA, Whereas Clause 5.)

Section 12 of the Synthetic Warehouse Agreement provided that the Fund Counterparties would

transfer additional cash and securities "to secure its obligations to UBS" under the SWA and the

CWA. In particular, this Section required the Fund Counterparties to make an Initial Deposit of

$20 million in cash and approximately $54 million in Eligible Securities on the date of the

---

[5] PX 755 is a document that that was jointly prepared by plaintiffs' and defendants' counsel so that specific
information regarding the Knox Warehouse assets could be found in one place. (Trial Tr. at 858.)

execution of the SWA. (Id., § 12 [A].) The SWA contained a collateral call provision under which UBS was required to track its CDS and Cash Exposure to losses, as defined under the Agreement, on a semi-monthly basis, and the Fund Counterparties were required to deposit an additional $10 million in collateral (cash and/or Eligible Securities) for every $100 million increase in the defined Deposit Threshold Exposure Amount. (Id., §§ 12 [B], [C].)

It is undisputed that, pursuant to Section 12 (C) of the SWA, UBS made a first collateral call for $10 million on September 17, 2008 (PX 4), and a second collateral call for $10 million on October 21, 2008 (PX 5), both of which were satisfied by the Fund Counterparties. (Testimony of Keith Grimaldi, Former Head of UBS's CDO Secondary Trading Desk, Trial Transcript (Tr.) at 81, 112, 119.)

On November 7, 2008, UBS issued the third, and final, collateral call to the Fund Counterparties for an additional $10 million. (PX 6.) It is undisputed that the Fund Counterparties did not meet this collateral call. (Ds.'s Findings, ¶ 17; Ps.'s Findings, ¶¶ 43-47).[6]

On December 3, 2008, UBS sent a notice to Highland stating that, to date, no deposits have been made in response to the November collateral call, and that "a Termination Date has occurred under the Warehouse Agreements and a termination date has occurred under the Engagement Letter." (PX 7; PX 9.) The notice further stated that "UBS is forbearing from exercising its remedies [under the Agreements] for a period of two Business Days from the date hereof in order to permit [the Fund Counterparties] to pay the Additional Deposits by 5 pm New York time on December 5, 2008." (Id.) On December 5, 2008, UBS sent an additional notice to

---

[6] It is undisputed that the Fund Counterparties offered to post CLO assets to satisfy the third collateral call and that UBS did not accept that collateral. UBS's Keith Grimaldi testified that UBS rejected the CLOs because "at that time the marketplace was declining and declining rapidly. We thought there would be more declines, so we collectively made a decision that we wanted cash or government securities ... that would be easily liquid and reflect better value." (Trial Tr. at 122.) Defendants stipulated that UBS had the right to insist on cash. (See Statement of Andrew Cruciani [Ds.'s Atty.], Trial Tr. at 1736.)

4

Highland stating that the Additional Deposit has not been made, and that "[c]onsequently, UBS

will proceed to exercise the rights and remedies available to it under the Warehouse Agreements,

the Engagement Letter, at law and otherwise." (PX 8.)

## THIRD COLLATERAL CALL

As a threshold matter, the parties dispute whether the third collateral call was proper.

Highland argues that UBS should not have included the 20 Internal Swaps in calculating the

Deposit Threshold Exposure Amount "because the Intradesk [i.e., Internal] Swaps were not

Existing Credit Default Swaps under the SWA . . . ." (Ds.'s Findings, ¶ 28.) Highland also

claims that the Lehman Swaps were not properly included in the calculation because they had

been terminated prior to the third collateral call. (See id., ¶ 27.)

More particularly, Highland claims that the Internal Swaps were not Existing Credit

Default Swaps because they were not documented, as allegedly required by Section 3 of the

SWA, in the form of an ISDA Master Agreement and ISDA Confirmation. (Ds.'s Findings, ¶¶

28, 30-31.) UBS does not dispute that the Internal Swaps were not documented by the ISDA

Master Agreement and Confirmation, but argues that Section 3 does not require such

documentation for the Internal Swaps. (Ps.'s Findings, at 24-25.)[7]

Resolution of this dispute involves an issue of contract interpretation. It is well settled

that the determination of whether a contract is ambiguous is one of law to be resolved by the

court. (Matter of Wallace v 600 Partners Co., 86 NY2d 543, 548 [1995]; W.W.W. Assocs., Inc.

v Giancontieri, 77 NY2d 157, 162 [1990].) Written agreements are to be construed in

accordance with the parties' intent, and "the best evidence of what parties to a written agreement

---

[7] It is undisputed that the Internal Swaps were documented by electronic trading tickets but not by ISDA Master Agreements or ISDA trade confirmations. (Ds.'s Findings,¶ 10; Ps.'s Findings,¶¶ 16-17; PX 29 [electronic trading tickets].)

5

FILED: NEW YORK COUNTY CLERK 11/14/2019 04:03 PM
NYSCEF DOC. NO.: 641
Case 19-34054-sgj11 Doc 933-4 Filed 08/07/20 Entered 08/07/20 23:11:52 Page 88 of
122

INDEX NO.: 650097/2009
RECEIVED NYSCEF: 11/14/2019

intend is what they say in their writing." (Schron v Troutman Sanders LLP, 20 NY3d 430, 436 [2013] [internal quotation marks, brackets, and citation omitted].) The court should determine from contractual language, without regard to extrinsic evidence, whether there is any ambiguity. (Chimart Assocs. v Paul, 66 NY2d 570, 573 [1986].) Extrinsic or parol evidence "may not be considered when the intent of the parties can be gleaned from the face of the instrument." (Id. at 572-573.) "Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous. . . ." (Greenfield v Philles Records, Inc., 98 NY2d 562, 569 [2002].) "Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent, or where its terms are subject to more than one reasonable interpretation." (Universal Am. Corp. v National Union Fire Ins. Co. of Pittsburgh, Pa., 25 NY3d 675, 680 [2015] [internal quotation marks and citation omitted].)

It is also well settled that a court should "construe the [contract] so as to give full meaning and effect to the material provisions. A reading of the contract should not render any portion meaningless. Further, a contract should be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose." (Beal Sav. Bank v Sommer, 8 NY3d 318, 324-25 [2007] [internal quotation marks and citations omitted]; National Conversion Corp. v Cedar Bldg. Corp., 23 NY2d 621, 625 [1969] [holding that "[a]ll parts of an agreement are to be reconciled, if possible, in order to avoid inconsistency"].)

Applying these precepts, the court holds that the SWA is not ambiguous with respect to the requirements for documentation of CDSs, that Section 3 of the SWA only applies to CDSs in which a third party is the protection buyer, and that this Section does not require ISDA documentation for the Internal Swaps.

6

FILED: NEW YORK COUNTY CLERK 11/14/2019 04:03 PM
NYSCEF DOC. NO. 641

Case 19-34054-sgj11 Doc 933-4 Filed 08/07/20 Entered 08/07/20 23:11:52 Page 89 of
122

INDEX NO. 650097/2009

RECEIVED NYSCEF: 11/14/2019

The SWA defines "Existing Credit Default Swap[s]" as the CDSs "that were the subject

of the Original Synthetic Warehouse Agreement." (SWA, Whereas Clause 5.) Section 3 of the

SWA provides, in pertinent part:

> "Form of Documentation. Each Existing Credit Default Swap between
> UBS, acting as Seller, and a counterparty, acting as Buyer, has been
> documented in the form of (i) the ISDA Master Agreement and Schedule
> currently in effect between UBS and the related counterparty, which
> documents are confidential between UBS and such counterparty and (ii)
> an ISDA published confirmation. . . . Each Additional Credit Default
> Swap between UBS, acting as Seller, and a counterparty, acting as Buyer,
> will be documented in the form of (i) the ISDA Master Agreement and
> Schedule currently in effect between UBS and the related counterparty,
> which documents are confidential between UBS and such counterparty
> and (ii) the Confirmation attached [to the SWA] . . . ."

As the Agreement that governs the securitization of Existing and Additional Credit

Default Swaps, the SWA contains numerous detailed provisions regarding the accumulation and

disposition of these financial instruments. Section 3, which pertains to documentation of the

swaps, is the only provision in the SWA that is limited to CDSs in which UBS is the Seller and a

counterparty is the Buyer. All of the other provisions of the SWA refer to CDSs without such

limitation.

Moreover, like SWA Section 3, the Original SWA provided: "Each Credit Default Swap

between UBS, acting as Seller, and a counterparty, acting as Buyer, will be documented in the

form of (i) the ISDA Master Agreement and Schedule currently in effect between UBS and the

counterparty, which documents are confidential between UBS and each counterparty and (ii) the

Confirmation attached hereto. . . ." (Original SWA, § 3 [NYSCEF Doc. No. 626].) It is

undisputed, however, that the Internal Swaps were included in the Original SWA portfolio but

were not documented by the ISDA Master Agreement or Confirmation. It is also undisputed that

the Internal Swaps were nevertheless again included in the Initial Net Exposure Amount in the

SWA for the restructured transaction. (Testimony of Peter Vinella [Highland's expert in

7

FILED: NEW YORK COUNTY CLERK 11/14/2019 04:03 PM
NYSCEF DOC. NO. 641
INDEX NO. 650097/2009
RECEIVED NYSCEF: 11/14/2019
Case 19-34054-sgj11 Doc 933-4 Filed 08/07/20 Entered 08/07/20 23:11:52 Page 90 of
122

structured financial products], Trial Tr. at 1097, 1124-1125 [acknowledging that the Internal Swaps were included in the Initial Net Exposure Amount].)

Initial Net Exposure Amount is defined in the SWA[8] as "111,767,486.88, being the amount by which the Aggregate Net Exposure Amount as of the date hereof [i.e., the March 14, 2008 "as of" date of the SWA] exceeds the Initial Deposit." As defined in SWA Section 12 (A), the Initial Deposit is the deposit of approximately $74,000,000 in cash and Eligible Securities made on the date of execution of the SWA. Aggregate Net Exposure Amount is defined as the amount by which CDS Exposure and Cash Exposure, as of the date of the collateral calculation, exceed the balance on deposit in the Deposit Account plus Positive Carry with respect to each Collateral Obligation.[9] As discussed above, Section 12 (C) of the SWA requires a deposit of $10 million in additional collateral when the Deposit Threshold Exposure Amount is greater than or equal to $100 million. The Deposit Threshold Exposure Amount is defined in the SWA as "the amount, if any, by which (i) the Aggregate Net Exposure Amount as of [the date of the collateral calculation] exceeds (ii) the Initial Net Exposure Amount." The Initial Net Exposure Amount, which includes the Internal Swaps, is thus integral to the calculation of the Deposit Threshold Exposure Amount.

Based on this reading of the SWA as a whole, the court concludes that the Internal Swaps were Existing Credit Default Swaps within the meaning of the SWA. The lack of ISDA documentation was therefore not a bar to their inclusion in the collateral call calculation.

The court rejects Highland's further contention that the Internal Swaps should not have been included because there was "no economic consequence" to UBS from these swaps. (Ds.'s

---

[8] Definitions are found in the Definitions section of the SWA (SWA, Ex. A), unless the term is defined in a particular provision of the SWA, in which case the provision will be cited.

[9] Positive Carry is defined in the CWA. As explained by Adam Warren, Highland's damages expert, carry includes interest payments from the CLOs. (Warren Testimony, Trial Tr. at 1299.)

FILED: NEW YORK COUNTY CLERK 11/14/2019 04:03 PM
NYSCEF DOC. NO. 641
Case 19-34054-sgj11 Doc 933-4 Filed 08/07/20 Entered 08/07/20 23:11:52 Page 91 of
122
INDEX NO. 650097/2009
RECEIVED NYSCEF: 11/14/2019

Findings, ¶ 33.) The complex formula set forth in Section 12 for calculating the exposure of UBS on the assets in the warehouse that would trigger a collateral call does not contain any requirement that UBS include in the calculation only assets for which it was at risk of sustaining actual losses.[10]

The court further holds that, although the Internal Swaps were properly included in the third collateral call calculation, the Lehman Swaps were not. The parties do not dispute that the Lehman Swaps had been terminated based on the Event of Default that occurred upon Lehman's filing for bankruptcy on September 15, 2008. (DX 87 [UBS Default Notice].) Highland asserts, and UBS does not persuasively counter, that the Lehman Swaps should not have been included in the third collateral call. Indeed, UBS's Grimaldi forthrightly acknowledged that, given the termination, there should not have been "markdowns" on the Lehman Swaps. (Grimaldi Testimony, Trial Tr. at 297-298.).

Highland contends, based on the inclusion of the Lehman Swaps and Internal Swaps in the third collateral call calculation, that UBS "committed a prior material breach by failing to

---

[10] In view of this holding that the Internal Swaps were properly included in the collateral call calculation pursuant to the unambiguous terms of the SWA, the court has not considered parol evidence on the issue.

The court thus rejects Highland's request for a finding that UBS admitted that the SWA required ISDA documentation of the Internal Swaps. (See Ds.'s Findings, ¶¶ 30-31.) This request is based on testimony of UBS's Keith Grimaldi who, when shown Section 3 during cross-examination and asked if every CDS was required to have ISDA documentation, responded: "According to the language, yes." (Grimaldi Testimony, Trial Tr. at 262-264.) Even if this evidence were properly considered, Highland's reliance on this answer ignores that Mr. Grimaldi further testified that ISDA documentation would not be "filled out" until the assets were transferred in the securitization. (Id. at 267-270.)

The court further notes that Highland requests a finding, arguably in support of its claim that the CDSs were not Existing Credit Default Swaps, that a CDS "cannot be created with the same legal entity on both sides of the transaction. . . ." (Ds.'s Findings, ¶ 29.) Even if parol evidence were properly considered, there was substantial evidence in the record that internal swaps were common in securitizations of synthetic assets. (LeRoux Testimony, Trial Tr. at 1673-1676; (Vinella Testimony, Trial Tr. at 1158-1162 [denying that intracompany swaps are "economic transactions" but acknowledging their use in CLO securitizations].)

9

properly calculate the collateral call[]." (Ds.'s Findings, ¶¶ 23, 27-28.) In support of this

contention, Highland relies on the testimony of its expert Peter Vinella. According to Mr.

Vinella's own analysis, however, if the Lehman swaps are excluded from the calculation for the

third collateral call, but the Internal Swaps are included, the total increase in the Deposit

Threshold Exposure Amount as of November 4, 2008 is $328.62 million—an amount greater

than the $300 million required to authorize the third collateral call pursuant to Section 12 of the

SWA. (Vinella Testimony, Trial Tr. at 1122-1139; DX Demo. 8.) Louis Dudney, UBS's expert

in forensic accounting and damages (Trial Tr. at 824), analyzed Mr. Vinella's testimony and

confirmed, using the same numbers as Mr. Vinella, that the Deposit Threshold Exposure Amount

still exceeded $300 million on November 4, 2008, after excluding the Lehman Swaps but

including the Internal Swaps. (PX Demo. 20 [accepted without objection in lieu of Dudney

rebuttal testimony, Trial Tr. at 1870-1871].)

Based on this credible testimony that the threshold for the collateral call was met without

the Lehman Swaps, the court holds that the third collateral call did not constitute a material

breach of the contract, notwithstanding UBS's improper inclusion of the Lehman Swaps in the

calculation.[11] (See generally Awards.Com v Kinko's, Inc., 42 AD3d 178, 187 [1st Dept 2007],

affd 14 NY3d 791, 793 [2010]; Frank Felix Assocs., Ltd. v Austin Drugs, Inc., 111 F3d 284, 289

[2d Cir 1997] [under New York law, for a breach to be material, "it must go to the root of the

agreement between the parties"] [internal quotation marks and citations omitted].)

---

[11] In view of this holding that the Deposit Threshold Exposure Amount exceeded $300 million as of November 7, 2008, the court need not reach UBS's contention that the collateral call was proper because the Deposit Threshold Exposure Amount exceeded $300 million as of December 2, 2008, prior to the termination of the transaction. (Ps.'s Findings, at 15 n 10.)

10

FILED: NEW YORK COUNTY CLERK 11/14/2019 04:03 PM
NYSCEF DOC. NO. 641
Case 19-34054-sgj11 Doc 933-4 Filed 08/07/20 Entered 08/07/20 23:11:52 Page 93 of
122
INDEX NO. 650097/2009
RECEIVED NYSCEF: 11/14/2019

As discussed above, there is no dispute that the Fund Counterparties failed to meet the third collateral call. The court accordingly finds that the Fund Counterparties breached the SWA and turns to the issue of damages.

## DAMAGES

### Designation of Ineligible Securities

A critical issue in determining UBS's damages is whether UBS may recover damages for CDSs that UBS retained after its termination of the 2008 transaction, under these circumstances in which UBS did not designate the underlying reference obligations for any of the CDSs as "Ineligible Securities." Resolution of this issue requires interpretation of the SWA. Highland and UBS both contend that the SWA is unambiguous as to whether Ineligible Securities must be designated, but assert fundamentally inconsistent readings of the Agreement. (Ds.'s Findings, ¶¶ 44-49; see Ps.'s Findings, at 29 n 21.)

As held above, the determination of whether a contract is ambiguous is one of law to be resolved by the court. (Matter of Wallace, 86 NY2d at 548.) Ambiguity will be found to arise where the terms of a contract are "subject to more than one reasonable interpretation." (Universal Am. Corp., 25 NY3d at 680 [internal quotation marks and citation omitted].) As also held above, a court should construe a contract so as to give full meaning and effect to its material provisions, and should read the contract as a whole and so as not to render any portion meaningless, if possible. (See Beal Sav. Bank, 8 NY3d at 324-25.)

Sections 5 (A), 5 (B), and 6 of the SWA are relevant to the calculation of CDS damages: Section 5 (A) provides for the calculation of losses with respect to CDSs removed from the warehouse during the term of the Agreement or "otherwise pursuant to Section 6"; Section 5 (B) (2) governs the calculation of losses upon a closing; and Section 6 governs this calculation in the event of a failure to close, incorporating terms from Sections 5 (A) and 5 (B).

11

Section 6 provides in pertinent part:

> "(A) If the Closing Date fails to occur on or prior to the
> Termination Date, then UBS may, with the consent of the
> related counterparty, either (at the election of the Servicer;
> provided that notice of such election is received on or prior
> to the Termination Date) (i) terminate each Credit Default
> Swap or (ii) novate each Credit Default Swap to a third
> party or to the Servicer (or any Affiliate of the Servicer
> designated by the Servicer), in each case, on the
> Termination Date.

> (C) To the extent there are any CDS Losses, the CDO Fund and
> SOHC shall collectively be responsible for 100% of any
> such CDS Losses. Such CDS Losses shall be allocated
> between the CDO Fund and SOHC on the basis of their
> respective Allocation Percentages. Each of the CDO Fund
> and SOHC shall, after notice of the amount due from UBS,
> remit such amounts by wire transfer in immediately
> available funds to UBS within three Business Days after the
> Termination Date."

CDS Losses are in turn defined in Section 5 (B) (2), the closing

provision, as:

> "(x) the sum of (1) the aggregate Floating Amount payments and
> Physical Settlement Amount payments made by UBS with respect
> to all of the Credit Default Swaps as to which a Floating Amount
> Event or a Credit Event occurred under the terms thereof, plus (2)
> the aggregate amount of Net Hedging Payments made by UBS
> with respect to all Hedging Transactions related to the Credit
> Default Swaps, plus (3) the aggregate Replacement Losses
> determined with respect to all of the Credit Default Swaps and the
> related Hedging Transactions that were terminated or novated or as
> to which the exposure was retained by UBS, in each case upon the
> designation of the Reference Obligation relating to such Credit
> Default Swap as an Ineligible Security (such amount in this clause
> (x), the 'CDS Losses') . . . ."

Relying on the requirement in the definition of CDS Losses that Reference Obligations

be designated as Ineligible Securities, Highland argues that "[t]he term 'CDS Losses'

12

FILED: NEW YORK COUNTY CLERK 11/14/2019 04:03 PM
INDEX NO. 650097/2009
NYSCEF DOC. NO. 681
RECEIVED NYSCEF: 11/14/2019

Case 19-34054-sgj11 Doc 933-4 Filed 08/07/20 Entered 08/07/20 23:11:52 Page 95 of
122

unambiguously limits UBS's recovery for unrealized (mark-to-market) losses to securities designated as 'Ineligible Securities,' and the Court is bound to enforce the agreement pursuant to its unambiguous terms." (Ds.'s Findings, ¶ 46.) Put another way, Highland argues that UBS may recover mark-to-market losses only on CDSs that have been designated Ineligible Securities. (Id., ¶ 53.)[12] UBS asserts, among other things, that under Section 6, UBS may terminate, novate, or retain CDSs regardless of eligibility, that ineligibility designations are not relevant absent a closing, and that Highland's reading renders meaningless other provisions of the SWA. (Ps.'s Findings, at 29 n 21.)

Upon close reading of the SWA, the court concludes that the SWA is not ambiguous with respect to ineligibility designations and that, under Section 6, upon the failure to close UBS is entitled to retain CDSs and to recover losses for the retained CDSs, without first designating the underlying Reference Obligations as Ineligible Securities. Section 6 (A) expressly provides for UBS to terminate or novate the CDSs, and does not require UBS to first make such designation. Although Section 6 (A) does not also, by its terms, provide for UBS to retain CDSs, a reading of the contract as a whole leaves no question that UBS was not only entitled to retain the CDSs upon the failure to close, but also that it was entitled to recover losses on the retained CDSs without first designating the underlying Reference Obligations as Ineligible.[13]

---

[12] Highland's damages expert, Adam Warren, testified that realized losses are losses sustained where a transaction has been closed out and an actual cash payment has been made. (Warren Testimony, Trial Tr. at 1249, 1253.) He also testified that, in his opinion, there were no unrealized losses in the Synthetic Warehouse because no assets had been designated as ineligible. (Id. at 1257 ["[O]ur computation is that there are no unrealized losses in the Synthetic Warehouse because of the need to . . . create a designation of ineligible. And we saw no evidence of any Synthetic Warehouse asset being designated ineligible"].)

[13] In its decision of defendants' motion for summary judgment, this court held that it could not determine on the record of that motion whether the SWA was ambiguous with respect to UBS's entitlement to recover losses on retained CDSs, pursuant to Section 6, without a prior designation of such assets as Ineligible Securities. (2017 NY Slip Op. 30546[U], 2017 WL 1103879, * 4-7 [Sup Ct, NY County Mar. 13 2017], affd 159 AD3d 512, lv dismissed 32 NY3d 1080.) With the benefit of the parties' extensive trial briefing on this issue, the court now concludes, for the reasons discussed further in the text, that the agreement is not ambiguous.

13

FILED: NEW YORK COUNTY CLERK 11/14/2019 04:03 PM
NYSCEF DOC. NO. 641

INDEX NO. 650097/2009
RECEIVED NYSCEF: 11/14/2019

Case 19-34054-sgj11 Doc 933-4 Filed 08/07/20 Entered 08/07/20 23:11:52 Page 96 of
122

As the above-quoted definition of CDS Losses in Section 5 (B) (2) shows, this definition relates to Credit Default Swaps which, upon a closing, have been "terminated or novated or as to which the exposure was retained by UBS, in each case upon the designation of the Reference Obligation relating to such Credit Default Swap as an Ineligible Security . . . ." After setting forth the definition of CDS Losses (and CDS Gains) in the context of a closing, Section 5 (B) (2) further provides: "To the extent the Closing Date fails to occur, allocation of CDS Losses, CDS Gains and any other amounts payable hereunder will be determined in accordance with the provisions of Section 6 hereof."

Significantly, while Section 6 (C) incorporates the defined term CDS Losses, the term CDS Losses also incorporates both the definition of Ineligible Security and the term Replacement Losses from Section 5 (A). These incorporated terms modify the definition of CDS Losses where a closing does not occur.

The definition of Ineligible Security pertains to securities that are ineligible for securitization upon a closing. The SWA thus defines Ineligible Security, in pertinent part, as "any Reference Obligation in the CDS Portfolio which has become ineligible for sale to the Issuer on the Closing Date as a result of the failure of such Reference Obligation to conform to the Eligibility Criteria as it exists at such time of determination . . . ." (SWA, Exhibit A-2 [emphasis added].)

Section 5 (A), which defines the term Replacement Losses, distinguishes between such Losses sustained during the term of the Agreement and those sustained upon termination in the event of a failure to close pursuant to Section 6. Section 5 (A) primarily addresses the removal of CDSs from the warehouse "during the term of this [the SWA] Agreement" where "a Reference Obligation or the related Credit Default Swap does not conform to the Eligibility Criteria" that must be met for securitization. This section provides that "UBS shall be entitled in

14

FILED: NEW YORK COUNTY CLERK 11/14/2019 04:03 PM
NYSCEF DOC. NO. 641    Case 19-34054-sgj11 Doc 933-4 Filed 08/07/20 Entered 08/07/20 23:11:52 Page 97 of

INDEX NO. 650097/2009
RECEIVED NYSCEF: 11/14/2019

122

good faith to designate any Reference Obligation (and the related Credit Default Swap) as an

Ineligible Security and (ii) in its sole discretion to remove any such Reference Obligation (and

the related Credit Default Swap) from the CDS Portfolio." Section 5 (A), however, continues:

> "To the extent any such Credit Default Swaps are terminated or
> novated, or at UBS's discretion, such exposure is retained
> following the designation of such Reference Obligations as
> Ineligible Securities or otherwise pursuant to Section 6, UBS shall
> determine the Replacement Gain or Replacement Loss relating to
> such Credit Default Swaps [according to the formula that
> follows]."

(emphasis added). Section 5 (A) then sets forth a formula for calculating Replacement Gain and

Replacement Loss, which specifically provides for such calculation not only upon termination or

novation but also upon UBS's retention of the CDSs. (SWA § 5 [A] [1] – [3].)

Section 5 (A) thus clearly contemplates that UBS may novate, terminate, or retain CDSs

both during the term of the Agreement and in the event of a failure to close. The Section affords

UBS the discretion to terminate, novate, or retain CDSs "pursuant to Section 6," as distinct from

its discretion to do so upon a designation of the underlying Reference Obligation as Ineligible

during the term of the Agreement. Any other reading would render meaningless the Section 5

(A) provision "or otherwise pursuant to Section 6."

Moreover, in order to reconcile all of the provisions of the SWA, the Section 5 (B) (2)

definition of CDS Losses, when used in Section 6, cannot be construed as requiring a designation

of Ineligible Securities. As discussed above, Ineligible Securities are defined as securities

ineligible for sale at a closing. Section 5 (B) (2), which governs the calculation of losses where a

closing will occur, requires the designation of Ineligible Securities to facilitate the parties'

calculation of losses on assets deemed ineligible for inclusion in the securitization that will occur

upon the closing. When a closing will not occur, none of the CDSs or other assets will be

securitized, and there is no need to distinguish between eligible and ineligible assets. While the

15

FILED: NEW YORK COUNTY CLERK 11/14/2019 04:03 PM
NYSCEF DOC. NO. 681
INDEX NO. 650097/2009
RECEIVED NYSCEF: 11/14/2019

Case 19-34054-sgj11 Doc 933-4 Filed 08/07/20 Entered 08/07/20 23:11:52 Page 98 of
122

definition of CDS Losses with the Ineligible Security designation requirement serves the

purposes of Section 5 (B) (2) in the event of a closing, it is inconsistent with the CDS Loss

calculation required in Section 6 where the closing does not occur.

Contrary to Highland's apparent contention (Ds.'s Findings, ¶ 46), a reading of the CDS

Loss provision in Section 6 to permit calculation of losses on retained assets without an

Ineligible Security designation does not violate the fundamental precept that a defined term in a

contract must be given effect. (See generally Mionis v Bank Julius Baer & Co., 301 AD2d 104,

109 [1st Dept 2002].) Rather, the CDS Loss definition, as used in Section 6, is modified by the

contractual provisions discussed above.

Although inartfully drafted, the SWA is not ambiguous. If the contract is read as a

whole, and all of the provisions are given meaning, it is reasonably susceptible to only one

meaning—namely, that CDS Losses for retained assets may be recovered without a designation

of the underlying Reference Obligations as Ineligible Securities where, as here, the contract has

been terminated before the closing.[14] The court accordingly holds that UBS is entitled to recover

damages for the retained CDSs in the Synthetic Warehouse.[15]

<u>Calculation of Damages</u>

As discussed above, UBS terminated the transaction based on the Fund Counterparties'

---

[14] The court notes that the SWA and the Cash Warehouse Agreement (CWA) both contain provisions which state that the two agreements "set forth the entire understanding of the parties hereto relating to the subject matter hereof ...." (SWA, § 18; CWA, § 18.) Assuming, without deciding, that these agreements should be read together in construing the SWA, the court finds that, although the assets at issue in the SWA and the CWA have markedly different attributes, the CWA is consistent with the SWA to the extent the CWA permits UBS, in the event a closing does not occur, to retain and recover for losses on the CLOs that are the subject of the CWA, without a designation of the CLOs as Ineligible Securities. (See CWA, §§ 5 [A], 7 [A].)

[15] In view of this holding that the SWA is not ambiguous as to whether CDS losses may be recovered without designation of the underlying Reference Obligations as Ineligible Securities, the court has not considered any parol evidence, either documentary or testimonial, in construing the SWA in this regard. Without limiting the foregoing, the court has not considered prior drafts of the SWA, which Highland offered in the event parol evidence were to be admitted. (See Ds.'s Findings, ¶ 53.)

16

failure to meet the third collateral call. UBS sent Highland a notice, dated December 3, 2008, stating that a Termination Date had occurred under the Warehouse Agreements but that it would forbear from exercising its remedies for two days to permit the Fund Counterparties to meet this collateral call. (PX 7.) UBS then sent a further notice to Highland, dated December 5, 2008, stating that it would exercise its remedies as the call had not been met. (PX 8.) UBS held a public auction of the assets in the Knox Warehouse on December 16, 2008. By notice dated December 19, 2008, UBS demanded payment for its claimed losses based on the results of the auction—$157,949,885.47 for the assets in the Cash Warehouse (PX 10) and $587,357,060.59 for the assets in the Synthetic Warehouse. (PX 11.) UBS also notified Highland that it elected to retain the Collateral Obligations in the Cash Warehouse. (PX 10.)

<u>CDS Damages</u>

Highland argues that even if the recovery of damages for the CDSs is not barred by UBS's failure to designate the Reference Obligations for the CDSs as Ineligible Securities (a claim this court has rejected above), UBS has not proved damages for these CDSs. Specifically, Highland contends that UBS did not comply with the contractual requirements for calculation of losses because its post-termination auction was untimely and otherwise improper. (Ds.'s Findings, ¶¶ 57-59.) Highland also contends that UBS's marks do not otherwise "establish a reasonable connection between the asset value and UBS's alleged damages." (<u>Id.</u>, ¶¶ 60-65.) UBS disputes these assertions. (Ps.'s Findings, at 29-31.)

Sections 6 (C), 5 (B) (2), and 5 (A) (3) are the provisions of the SWA that govern the calculation of CDS Losses upon termination. Section 6 (C) provides in full:

> "To the extent there are any CDS Losses, the CDO Fund and SOHC shall collectively be responsible for 100% of any such CDS Losses. Such CDS Losses shall be allocated between the CDO Fund and SOHC on the basis of their respective Allocation Percentages. Each of the CDO Fund and SOHC shall, after notice of the amount due from UBS, remit such

17

FILED: NEW YORK COUNTY CLERK 11/14/2019 04:03 PM
NYSCEF DOC. NO. 641
INDEX NO. 650097/2009
RECEIVED NYSCEF: 11/14/2019

Case 19-34054-sgj11 Doc 933-4 Filed 08/07/20 Entered 08/07/20 23:11:52 Page 100 of
122

amounts by wire transfer in immediately available funds to UBS within three Business Days after the Termination Date."

As discussed above, the definition of CDS Losses in Section 5 (B) (2) includes Replacement Loss, the calculation of which is governed by Section 5 (A). With respect to Replacement Loss relating to CDSs that are retained, Section 5 (A) (3) provides in full:

> "To the extent UBS retains such exposure, the Replacement Gain and Replacement Loss will be imputed based on the arithmetic average of at least three bids (or, if UBS if unable to obtain three such bids having made commercially reasonable efforts, such lesser number of bids as UBS is able to obtain) obtained by or on behalf of UBS from nationally recognized derivatives dealers in the relevant market (no more than one of which may be UBS or any of its Affiliates; provided that any such bid must be provided in good faith) to assume UBS's position under such Credit Default Swap."

The SWA, by its terms, thus contemplated that payment would be made within three days after the Termination Date, subject to notice from UBS. As the SWA provided for an auction to calculate the amount of the losses, it also contemplated that an auction could or would occur within that three day period.

By the terms of UBS's notices to Highland, although a Termination Date had occurred as of December 3, UBS extended the Fund Counterparties' time to meet the third collateral call until December 5. The court thus finds that the Fund Counterparties' breach of the Agreements for failure to meet the third collateral call occurred on December 5. UBS did not conduct the auction to calculate the CDS Losses until December 16.

UBS's delay of approximately 11 days in conducting the auction, while seemingly de minimis, in fact had momentous financial consequences, given that the delay occurred in the wake of the September 15, 2008 Lehman bankruptcy filing and at the height of the financial crisis. With the market spiraling downward, the CDS losses ascertained through the auction process were approximately $117 million more than the losses calculated by using UBS's marks

18

FILED: NEW YORK COUNTY CLERK 11/14/2019 04:03 PM
NYSCEF DOC. NO. 641
Case 19-34054-sgj11 Doc 933-4 Filed 08/07/20 Entered 08/07/20 23:11:52 Page 101 of
122
INDEX NO. 650097/2009
RECEIVED NYSCEF: 11/14/2019

on either December 3 or December 5. (PX Demo. 21; DX Demo. 12 [showing UBS and Highland marks as of December 3 and 5; PX Demo. 28 at 60 [Ps.'s Closing Statement Demonstrative Exhibit, acknowledging that CDS damages, as calculated based on the auction, exceeded the losses calculated using UBS's marks on December 3 and 5 by over $117 million].)[16]

UBS contends that the three day payment period was for its benefit and that it "could exercise its right to get paid after three business days without waiver." (Ps.'s Findings, at 28.) The court agrees that UBS's delay in demanding payment or holding the auction did not result in a waiver of its right to seek payment of its damages resulting from the Fund Counterparties' breach. (See SWA § 20 ["Neither the failure nor any delay on the part of any party hereto to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver hereof. . . ."].) Highland correctly contends, however, that the delayed auction could not serve as a basis for calculating UBS's damages because the results of the auction did not reflect market conditions as of the date of termination or breach. (See Ds.'s Findings, ¶ 57.)

As explained by the Court of Appeals:

"It has long been recognized that the theory underlying damages is to make good or replace the loss caused by the breach of contract. Damages are intended to return the parties to the point at which the breach arose and to place the nonbreaching party in as good a position as it would have been had the contract been performed. Thus, damages for breach of contract are ordinarily ascertained as of the date of the breach."

(Brushton-Moira Cent. Sch. Dist. v Fred H. Thomas Assocs., P.C., 91 NY2d 256, 261 [1998] [internal citations omitted].)

---

[16] At the trial, the parties stipulated to dispense with rebuttal testimony from plaintiffs' damages expert, Louis Dudney and, in lieu of such testimony, to the admission into evidence of plaintiffs' Demonstrative Exhibits 20 and 21, and defendants' Demonstrative Exhibit 12. (Trial Tr. at 1868, 1870 [Stipulation].) PX Demo. 21 and DX Demo. 12, which were prepared by Mr. Dudney, calculated damages using plaintiffs' and defendants' marks, respectively, on December 3 and 5, 2008. (Trial Tr. at 1870-1877.)

It is further settled that damages need not be proven with mathematical certainty. It is sufficient that a reasonable basis for the calculation of damages be shown. (See generally J.R. Loftus, Inc. v White, 85 NY2d 874, 877 [1995] ["While a plaintiff may recover damages when the measure of damages is unavoidably uncertain or difficult to ascertain, a reasonable connection between a plaintiff's proof and a [] determination of damages is nevertheless necessary"]; CDO Plus Master Fund Ltd. v Wachovia Bank, N.A., No. 07 Civ. 11078 [LTS], 2011 WL 4526132, *2 [US Dist Ct SD NY, Sept. 29, 2011] ["The law of New York is clear that once the fact of damage has been established, the non-breaching party need only provide a stable foundation for a reasonable estimate [of damages]" [internal quotation marks and citations omitted, brackets in original].)

UBS's December 16, 2008 auction cannot satisfy either of these standards because, as held above, the auction did not provide a reliable basis for determining UBS's losses at, or even shortly after, the breach, due to the exceptional circumstances presented by the financial crisis.[17] The court accordingly turns to the alternative basis advanced by UBS for the calculation of damages—its marks on December 5, 2008. (Ps.'s Findings, at 29.)

It is well settled that "where the breach involves the deprivation of an item with a determinable market value, the market value at the time of the breach is the measure of damages." (Sharma v Skaarup Ship Mgt. Corp., 916 F2d 820, 825 [2d Cir 1990], cert denied 499 US 907 [1991] [applying New York law and citing Simon v Electrospace

---

[17] There is authority that "in accordance with the objective that a party seeking recovery for breach of contract is entitled 'to be made whole' as of the time of the breach, the [factfinder] should be able to make its valuation determination on all relevant elements of the case, whether dated prebreach, on the date of breach, or 'some short time period thereafter.'" (Credit Suisse First Boston v Utrecht-America Fin. Co., 84 AD3d 579, 580 [1st Dept 2011] [quoting Boyce v Soundview Tech. Group, Inc., 464 F3d 376, 389 [2d Cir 2006] [other internal quotation marks and citations omitted].) Although the auction was held shortly after the breach, this authority does not support calculation of damages based on the auction results, as the auction did not provide a reliable basis for assessing the losses.

20

Corp., 28 NY2d 136, 145-146 [1971], <u>motion to amend remittitur and clarify denied</u> 28

NY2d 809].) In accordance with the objective that the injured party be made whole,

"damages for breach of contract are ordinarily ascertained as of the date of the breach."

(<u>Brushton-Moira Cent. Sch. Dist.</u>, 91 NY2d at 261.)

     UBS offered credible testimony that its December 5, 2008 marks reasonably reflected the

market value of the CDSs as of the December 5 breach date. In particular, Timothy LeRoux,

who at the time of the transaction was second in command to Mr. Grimaldi on the UBS trading

desk (LeRoux Testimony, Trial Tr. at 1640), gave credible testimony that, in the regular course of

business, the trading desk "marked to market" hundreds of CLO assets, and every week or two

was required to assign values on every one of the assets, both cash and synthetic, in the Knox

Warehouse. (<u>Id.</u> at 1724.) Mr. LeRoux also described the marking process and identified

information, including public information as to offers and bids on CDSs in the marketplace, that

UBS considered in developing "objective" prices. (<u>Id.</u> at 1727, 1745-1750.) Mr. Grimaldi also

testified that, although the trading desk performed the mark-to-market valuation of the assets in

the Knox Warehouse, the UBS valuation group established oversight due to the volatility of the

market and "would look at other market observations and make sure that those [the trading desk

marks] were in line with the marketplace." (Grimaldi Testimony, Trial Tr. at 207-208.)

     Highland does not dispute that the mark-to-market process is a methodology for

determining loss in market value of retained assets. (<u>See</u> e.g. Testimony of Adam Warren

[Highland's damages expert], Trial Tr. at 1268-1269; Testimony of Philip Braner [Highland

former executive], Trial Tr. at 469-472; Testimony of UBS's Timothy LeRoux, Trial Tr. at 1640,

1727-1729.)

     Rather, in claiming that UBS's marks are not competent evidence on which to award

damages, Highland suggests that the setting of marks by the trading group involved a conflict of

21

interest, because the trading group's bonuses were based on the performance of the mark-to-mark assets and the group had the incentive to inflate the value of the assets. (Ds.s' Findings, ¶¶ 61-62.) Highland makes no showing that UBS inflated the value of the CDSs or that trading groups do not routinely develop marks. Moreover, Highland's assertion that "UBS's trading group alone set the marks for the Knox Warehouse assets" (Ds.'s Findings, ¶ 62) ignores UBS's credible testimony, discussed above, that the valuation group exercised oversight in connection with the development of the marks.

Highland's further assertion that its own marks are more reliable (Ds.'s Findings, ¶ 65) is unsupported by persuasive evidence. Philip Braner, who ultimately became Chief Operating Officer of the Highland Capital Management CLO Group and COO of Highland Financial Partners (Braner Testimony, Trial Tr. at 397), testified that Highland was itself tracking marks on the assets in the Knox Warehouse (id. at 615) and had an "internal valuation team that was responsible for accumulating marks" in a process in which portfolio managers of the Highland funds participated. (See id. at 467.) While Highland appears to assert that its marks are more reliable than UBS's because they were set by a valuation team, Highland fails to show that the role of its valuation team differed in any material respect from that of the UBS valuation group that performed oversight on its trading group in the marking process.

Notably, Highland fails to explain how its methodology in setting marks was more reliable than UBS's. Adam Warren, Highland's damages expert, forthrightly testified that he was not opining on the reasonableness of any marks in this case (Warren Testimony, Trial Tr. at 1247-1248), and he did not in fact give any testimony on whether UBS's or Highland's marks were more reliable.

The evidence at trial also demonstrated that Highland, like UBS, set marks on the CDSs on an asset by asset basis from March 2008 through October 2008. While there were differences

between Highland's and UBS's marks during this period, the Highland and UBS marks in the month of October were substantially similar. The difference in the marks did not escalate substantially until November 2008. (PX Demo. 9, at 4.) Mr. Dudney gave testimony, which was not disputed, that although Highland, like UBS, had been setting marks on an asset by asset basis, Highland stopped doing so as of October 2008 and, in a November 30, 2008 calculation of damages, attributed the same mark (37) to each asset. (Dudney Testimony, Trial Tr. at 883-884, 905-909, DX 116.) Highland offered no explanation for this change in methodology. Mr. Dudney, in contrast, gave plausible testimony that this use of the same mark did not make sense given the deterioration of the market. (Id. at 908.)

In sum, based on the credible evidence at the trial, the court holds that UBS has met its burden of demonstrating that its December 5, 2008 marks provide a reasonable basis, under the circumstances, for the calculation of damages at the time of the breach. In so holding, the court rejects Highland's not fully articulated contention that only an auction, and not a mark-to-market methodology, is a reliable method for calculating damages. (See Ds.'s Findings, ¶ 59.) Highland's reliance on the testimony of its damages expert, Adam Warren, in support of this contention (see id.) is misplaced. While Mr. Warren testified that CDSs are "bespoke contracts," he did not give any testimony that an auction was required to ascertain their value.

Further, as held above, the auction did not provide a reliable basis for determining UBS's damages due to the volatility of the market at the time of the auction. It bears emphasis that, although the market was also volatile at the time the December 5, 2008 marks were accumulated, Highland has not advanced an alternative, other than the non-viable auction, to the mark-to-market valuation methodology. Nor has Highland made any showing that the market value of

23

the CDSs was not <u>reasonably</u> determinable as of the date of breach using the mark-to-market valuation methodology.[18]

The court further holds that UBS has met its burden of demonstrating the reasonableness of its calculation of damages using those marks. UBS's and Highland's experts both provided the court with calculations of damages using UBS's and Highland's marks, respectively, as of December 5, 2008. Mr. Warren confirmed that his main differences with Mr. Dudney regarding the calculation of damages for the Synthetic Warehouse were that Mr. Dudney considered it appropriate, and he did not, to include damages for unrealized CDS losses and for the 20 Internal Swaps in which UBS was both the protection seller and the protection buyer. (Warren Testimony, Trial Tr. at 1298; DX Demo. 12; PX Demo. 21; <u>see also</u> Dudney Testimony, Trial Tr. at 1004.)

Mr. Warren excluded from his damages calculation unrealized CDS losses for all CDSs as to which a designation of ineligibility had not been made. He testified that his basis for doing so was his understanding of the contract—i.e, his understanding that the SWA required such designation—and not industry custom. (Warren Testimony, Trial Tr. at 1281-1282.) For the reasons discussed above, this court has rejected Highland's position that the SWA should be

---

[18] In its post-trial briefing, Highland sought a finding that if UBS is held to be entitled to recover damages for CDS losses, Highland's marks are more reliable than UBS's for determining those damages. (Ds.'s Findings, ¶ 65.) Highland did not argue that the market value of the losses could not reasonably be determined by using marks. In contrast, in support of its claim that it is entitled to an offset against CDS damages for post-breach termination payments received by UBS on the CDSs, Highland questioned the accuracy of the market valuation at the time of the breach. Highland thus asserted in a footnote: "Given the scant market pricing data available at the time of the breach, post-termination payments and asset dispositions are relevant for the additional reason that they provide a more accurate measurement of the actual value of the Knox assets." (Ds.'s Post-Trial Memo., at 8 n 5.) This assertion is unsupported by any citation to trial testimony. More important, at the trial Highland did not offer any expert testimony that the mark-to-market methodology was not a reliable basis for calculating the CDS damages. For the additional reasons set forth in the section of this decision on Highland's requested Offset for Post-Breach Appreciation In CDS Asset Value, the court finds that offset of post-breach payments received by UBS on the CDSs would be inconsistent with calculation of UBS's damages based on their market value at the time of the breach.

FILED: NEW YORK COUNTY CLERK 11/14/2019 04:03 PM
INDEX NO. 650097/2009
NYSCEF DOC. NO. 641
RECEIVED NYSCEF: 11/14/2019

Case 19-34054-sgj11 Doc 933-4 Filed 08/07/20 Entered 08/07/20 23:11:52 Page 107 of

122

construed as requiring ineligibility designations as a condition of the inclusion of unrealized losses on the CDSs in the calculation of damages. Also for the reasons discussed above, the court has rejected Highland's position that the losses on the Internal Swaps should not be included in this calculation.

Review of the experts' calculations shows, moreover, that when such losses are included in the calculations, the difference between Highland's and UBS's totals is substantially reduced. As previously noted, the parties stipulated to the introduction into evidence of charts prepared by Mr. Dudney comparing his and Mr. Warren's calculations of CDS damages using UBS's and Highland's marks as of December 5, 2008. Using Highland's marks, Mr. Dudney calculated CDS mark-to-market losses of $388,284,750, compared to Mr. Warren's calculation of $26,952,895—a difference of $361,331,855. (DX Demo. 12.) Using UBS's marks, Mr. Dudney calculated losses of $470,113,605, compared to Mr. Warren's calculation of $26,952,895—a difference of $443,160,710. (PX Demo. 21.)

The difference in the totals is largely due to Mr. Warren's exclusion from his calculation of all unrealized CDS losses and all losses for the Internal Swaps. (Warren Testimony, Trial Tr. at 1296-1299.) His calculation of $26,952,895 for CDS losses includes only realized CDS losses. (Id. at 1250.) According to Mr. Warren, the Internal Swaps account for $93,952,173 of the CDS damages using UBS's marks, or $68,801,027 using Highland's marks. (Id. at 1269.) Although Mr. Warren disputed UBS's entitlement to unrealized CDS losses, he performed a calculation including such losses. Using UBS's marks as of December 5, 2008, these losses totaled $355,487,606. (DX Demo. 10, at 14.) Using Highland's marks as of that date, these losses totaled $299,118,973. (Warren Testimony, Trial Tr. at 1269; DX Demo. 10, at 14.) Mr. Warren's total, using UBS's marks, for the Internal Swaps ($93,952.173) and the unrealized CDS losses ($355,487,606) was $449,439,779. (DX Demo. 10, at 14.) As stated above, Mr. Dudney's

25

calculation of total Synthetic Warehouse losses, using UBS's December 5, 2008 marks, was

$470,113,605. Given the magnitude of the damages, this disparity is not material.

The court accordingly holds that UBS incurred losses in the Synthetic Warehouse of

$470,113,605 as of December 5, 2008, the date of the breach, subject to the adjustments

discussed below.

### CLO Damages

Highland does not dispute that unrealized losses are recoverable for the CLO assets.

(Warren Testimony, Trial Tr. at 1293.) Moreover, UBS's (Mr. Dudney's) and Highland's (Mr.

Warren's) calculations of the CLO losses as of December 5, 2008 are the same: Using

Highland's marks, these losses were $106,157,101. (DX Demo. 12, at 2.) Using UBS's marks,

the losses were $128,848,101. (PX Demo. 21.) Having concluded that UBS's damages were

properly calculated based on UBS's marks as of December 5, 2008, the date of the breach, the

court holds that UBS incurred losses in the Cash Warehouse of $128,848,101, subject to the

adjustments discussed below.

### Adjustments to Damages Calculation

In calculating the Synthetic and Cash Warehouse losses, Mr. Dudney and Mr. Warren

made adjustments for the same items: carry (premiums and interest), collateral value, financing

fees, and financing savings. Mr. Dudney's adjustment of $79,587,557 and Mr. Warren's

adjustment of $76,632,634 did not differ materially. (PX Demo. 21.) According to Mr. Warren,

the difference of approximately $3 million is due to Mr. Warren's exclusion of the Internal Swaps

in calculating the carry. (Warren Testimony, Trial Tr. at 1298-1299.) As the court has held that

the Internal Swaps were properly included in the damages calculation, Mr. Dudney's adjustments

will be accepted.

Reducing UBS's damages by the adjustments, the court holds that UBS sustained total

FILED: NEW YORK COUNTY CLERK 11/14/2019 04:03 PM
NYSCEF DOC. NO. 641

INDEX NO. 650097/2009
RECEIVED NYSCEF: 11/14/2019

Case 19-34054-sgj11 Doc 933-4 Filed 08/07/20 Entered 08/07/20 23:11:52 Page 109 of
122

damages of $519,374,149 (Cash Warehouse Losses of $128,848,101 plus Synthetic Warehouse

Losses of $470,113,605 minus $79,587,557).

OFFSETS

Offset for Post-Breach Appreciation In CDS Asset Value

A central issue in this action is whether Highland is entitled to an offset against UBS's

damages for appreciation in the value of the CDSs after the breach. The parties stipulated that

UBS received post-breach termination payments net of carry on the CDSs, including the Internal

Swaps, in the amount of $202,223,059. (DX 491.) It is undisputed that these payments were

received months and, for many of the CDSs, years after the termination of the transaction. (Ds.'s

Post-Trial Memo., at 10 [acknowledging that UBS "liquidated the assets years later"]; PX 335

[spreadsheet showing termination dates for CDSs through 2011].)

Highland argues that, at the time the transaction was terminated, "frozen credit markets

had created a severe mismatch between the assets' alleged market value and their actual value

based on their cash flows." (Ds.'s Post-Trial Memo., at 10.) Highland further argues that UBS

was able to sell these assets for hundreds of millions of dollars more than their December 2008

marks and that, while UBS is entitled to retain the sale proceeds, "it cannot ignore these monies

in calculating the harm it actually suffered." (Id. at 11.) According to Highland, if disposition of

the assets after the termination is not considered, UBS will receive "an enormous windfall." (Id.)

UBS acknowledges that if a non-breaching party obtains a benefit "because of the breach," the

benefit must be offset against the non-breaching party's damages. (Ps.'s Post-Trial Memo., at 6

[emphasis UBS's].) UBS argues, however, that the Fund Counterparties' breach was not a but

for cause of the post-breach payments UBS received for the CDSs. (Id. at 7.) Rather,

subsequent gains that resulted from UBS's disposition of the assets were "the result of UBS's

contractual rights [to retain the assets] in the event of any termination and of its subsequent

27

FILED: NEW YORK COUNTY CLERK 11/14/2019 04:03 PM INDEX NO. 650097/2009

NYSCEF DOC. NO. 641    Case 19-34054-sgj11 Doc 933-4 Filed 08/07/20    Entered 08/07/20 23:11:52    Page 110 of RECEIVED NYSCEF: 11/14/2019

122

investment strategy." (Id. at 14.) According to UBS, the Fund Counterparties' proposed offset would deprive UBS of the benefit of the bargain and result in a windfall for the Fund Counterparties. (Id.)

As discussed above, contract damages are intended to make "good or replace the loss" caused to a party by the breach of contract and "to place the nonbreaching party in as good a position as it would have been had the contract been performed. Thus, damages for breach of contract are ordinarily ascertained as of the date of the breach." (Brushton-Moira Cent. Sch. Dist., 91 NY2d at 261.) Further, "where the breach involves the deprivation of an item with a determinable market value, the market value at the time of the breach is the measure of damages." (Sharma, 916 F2d at 825 [applying New York law and citing Simon, 28 NY2d at 145-146].)

The calculation of damages is also subject to the fundamental precept that where a non-breaching party acquires a "benefit or opportunity for benefit . . . because of the breach, a balance must be struck between benefit and loss" and the benefit must be offset against the non-breaching party's damages. (Indu Craft, Inc. v Bank of Baroda, 47 F3d 490, 495 [2d Cir 1995] [applying New York law]; accord Aristocrat Leisure Ltd. v Deutsche Bank Trust Co. Americas, 727 F Supp 2d 256, 289 [SD NY 2010] ["[I]f a victim derives a benefit from the breaching party's breach of contract, the breaching party only is responsible for the victim's net loss"], reconsideration denied 2010 WL 3431132; Fertico Belgium S.A. v Phosphate Chemicals Export Assn., Inc., 70 NY2d 76, 84 [1987], rearg denied 70 NY2d 694 [holding, in a "cover" action governed by the Uniform Commercial Code, that "'[g]ains made by the injured party on other transactions after the breach are never to be deducted from the damages that are otherwise recoverable, unless such gains could not have been made, had there been no breach'"] [quoting 5 Corbin, Contracts § 1041].)

28

Case 19-34054-sgj11 Doc 933-4 Filed 08/07/20 Entered 08/07/20 23:11:52 Page 111 of
122

Here, although UBS and Highland agree that any benefit derived by UBS because
of the breach must be offset against its losses, neither party has cited, and the court's own
research has not located, any case in which a court has considered how to apply this
precept to a non-breaching party's retention of assets upon a failed securitization
transaction and realization of subsequent gains. There is, however, a substantial body of
law involving a breaching party's failure to deliver or purchase assets subject to
fluctuations in value, in which the courts have assessed damages based on the market
value of the assets at the time of breach and have declined to consider any subsequent
increases or decreases in value of the assets. As discussed further below, the court
concludes that these cases are inconsistent with the offset sought by Highland.

As the Second Circuit has explained in reviewing this body of law, New York courts
reject damage awards "based on what 'the actual economic conditions and performance' were in
light of hindsight." (Sharma, 916 F2d at 826, quoting Aroneck v Atkin, 90 AD2d 966, 967 [4th
Dept 1982], lv denied 59 NY2d 601 [1983].) "They have explicitly rejected the use of
subsequent changes in value or profits where they would increase an award, and where they
would decrease the award." (Sharma, 916 F2d at 826 [internal citations omitted].)

In the securities context, courts have repeatedly held that the damages for failure
to deliver or purchase shares of stock should be based on their market value at the time of
breach, and not on any subsequent increase or decrease in their value. (Simon, 28 NY2d
at 145-146 [where the seller breached a contract to deliver shares, holding: "The proper
measure of damages for breach of contract is determined by the loss sustained or gain
prevented at the time and place of breach. The rule is precisely the same when the breach
of contract is nondelivery of shares of stock"] [internal citations omitted]; Aroneck, 90
AD2d at 967 [where the buyer breached a contract to purchase shares, holding that

29

damages should be based on market value at the time of breach, and rejecting the buyer's

theory that the "value should be based on the actual economic conditions and

performance" of the company post-breach]; Emposimato v CIFC Acquisition Corp., 89

AD3d 418, 421 [1st Dept 2011] [quoting Aroneck and citing Simon in holding that "[i]n

the case of a breach of contract to sell securities, expectation damages are calculated as

'the difference between the agreed price of the shares and the fair market value at the

time of the breach'"]; Oscar Gruss & Son, Inc. v Hollander, 337 F3d 186, 197 [2d Cir

2003] [following Simon and Aroneck in a case involving the defendant's breach of a

contract to deliver warrants]; see also Kaminsky v Herrick Feinstein LLP, 59 AD3d 1, 11-

12 [1st Dept 2008], lv denied 12 NY3d 715 [2009] [holding that damages for breach of

contract to deliver shares prior to an initial public offering (IPO) should be awarded

based on the value of the shares at time of the breach, not their higher value post-IPO].)

The court holds that these cases involve transactions that are analogous to

(although far less complex than) the transaction at issue, and apply the same measure of

damages that this court has adopted above—namely, the measure of damages based on

the market value of the assets on the date of the breach. These cases accordingly govern

the calculation of damages here. The court notes, moreover, that sound reasons support

the application of this measure of damages without consideration of post-breach

fluctuations in the value of the assets.

As the Second Circuit reasoned, a contrary rule that would permit calculation of

damages at the time of trial "would be a two-edged sword, because courts would have to

diminish damage awards where the value of the item decreased or where losses were

encountered subsequent to the breach as well as enhance them where conditions improve.

However, New York courts have expressly refused to adopt this 'wait and see' theory of

FILED: NEW YORK COUNTY CLERK 11/14/2019 04:03 PM
INDEX NO. 650097/2009
NYSCEF DOC. NO. 641
RECEIVED NYSCEF: 11/14/2019

Case 19-34054-sgj11 Doc 933-4 Filed 08/07/20 Entered 08/07/20 23:11:52 Page 113 of
122

damages." (Sharma, 916 F2d at 826.) In addition, although the court does not adjust for

changes in the value of the shares when calculating damages according to the date of

breach measure, the parties themselves can protect against changes in value by hedging

or acquiring shares in the market. As the Second Circuit further reasoned: "To be sure,

uncertainties about the future and lack of perfect information may cause an asset to be

under- or over-valued at any particular time. At that time, however, either party has an

opportunity to hedge according to his or her judgment about the future stream of

income." (Sharma, 916 F2d at 826; see also Simon, 28 NY2d at 146 [where the seller

breached a contract to deliver shares, reasoning that "[i]f plaintiff were anxious to own

the shares rather than obtain their value, he was free to purchase them in the market. His

cause of action should not and may not be converted into carrying a market 'call' or

'warrant' to acquire the stock on demand if the price rose above its value as reflected in

his cause of action"].)

The court further holds that application of the date of breach measure of damages,

without adjustments for fluctuations in the value of the assets, will serve the objective of

putting UBS in the position it would have been in had the contract been performed. If the

securitization had closed, UBS would have been entitled, under the express terms of the

SWA, to novate to the Issuer its positions as protection seller on all of the eligible Knox

CDSs. (SWA § 5 [B] [1].) As a result of the breach, UBS was forced to assume a

substantial risk of loss under the CDSs that would have been novated to the Issuer had the

closing occurred. As discussed above, the loss in market value of the retained CDSs as of

the date of breach was determined using the mark-to-market methodology. More

specifically, as confirmed by both UBS's and Highland's experts, the mark-to-market

losses calculated as of the date of breach represent the cost to UBS to exit the CDSs—

31

that is, the payments to be made to third-parties so that they would take on, and UBS

could extricate itself from, the risk. (Warren Testimony, Trial Tr. at 1304-1306; Dudney

Testimony, Trial Tr. at 894-895.) A damage award for these mark-to-market losses will

therefore compensate UBS for the exposure to risk that it would not have faced had the

contract been performed.

To the extent that Highland contends that a damage award is not appropriate for these

mark-to-market losses because the losses were not realized, the court rejects that contention. The

damage award is appropriate, notwithstanding that the losses were not realized, because, as held

above, the contract affords UBS the right of recovery for such losses. (See CDO Plus Master

Fund Ltd. v Wachovia Bank, N.A., No. 07 Civ. 11078 [LTS], 2011 WL 4526132, * 2 [US Dist Ct

SD NY, Sept. 29, 2011] [reasoning that, where the contractual definition of loss for the purpose

of calculating damages did not require the CDS protection buyer to sustain "actual loss," "[t]he

absence of an actual loss on a Reference Obligation transaction, thus, is not a barrier to [the

protection buyer's] recovery. . ."] [emphasis in original].)

The court further holds that the record does not support Highland's contention that

UBS's post-breach gains were realized because of the breach, and that this case therefore

falls under the line of authority that requires an offset for such gains. Highland in effect

contends that because UBS retained the CDSs as a result of the breach, it also realized the

post-breach gains because of the breach.[19] That conclusion does not follow. As held

---

[19] In so holding, the court rejects UBS's contention that it would have been entitled to retain the CDS assets, regardless of the Fund Counterparties' breach, because the Agreements would have terminated in any event as of March 14, 2009, at which point UBS would have had the contractual right to retain the assets. (Ps.'s Post-Trial Memo., at 8.) This assertion is not only speculative but ignores that UBS did in fact acquire the right to retain the assets upon the Fund Counterparties' breach of the Agreements as a result of their failure to meet the third collateral call. For the reasons discussed in the text, however, the court cannot accept Highland's further contention that UBS realized gains on the retained CDSs because of the breach.

32

FILED: NEW YORK COUNTY CLERK 11/14/2019 04:03 PM
NYSCEF DOC. NO. 641

INDEX NO. 650097/2009

RECEIVED NYSCEF: 11/14/2019

Case 19-34054-sgj11 Doc 933-4 Filed 08/07/20 Entered 08/07/20 23:11:52 Page 115 of
122

above, UBS had a contractual right to retain the CDSs upon the termination of the

transaction based on the Fund Counterparties' breach of the SWA by failing to meet the

collateral call. The SWA does not contain any provision that limited UBS's discretion as

to when to dispose of the assets after termination. Rather, as UBS persuasively argues,

the gains realized as a result of the post-breach disposition of assets were attributable not

to the breach itself but to UBS's assumption of the risk of loss on the CDSs and its

investment strategy as to when to dispose of them based on its assessment of the market.

(See G & R Corp. v American Sec. Trust Co., 523 F2d 1164, 1175 [DC Cir 1975]

[holding that while the transfer of property to the plaintiffs was caused by the defendant's

breach, the profit realized by the plaintiffs from a post-breach sale was not "caused by the

breach" but was "attributable to the [plaintiffs'] decision to hold [the property] until [its]

condition and the market were favorable for sale"].)

Nor does Highland successfully argue that the gains realized by UBS on the post-breach

disposition of the assets must be offset under general principles which require a party who

suffers damages as a result of another's breach to take reasonable steps to mitigate its damages.

(See Ds.'s Post-Trial Memo., at 5-9.) Highland cites cases requiring mitigation in connection

with the purchase and sale of securities and transactions in other markets. (See e.g. Drummond v

Morgan Stanley & Co., Inc., No. 95 Civ. 2011 [DC], 1996 WL 631723, * 2-3 [US Dist Ct SD

NY, Oct. 31, 1996] [holding that where the buyer breached a contract to purchase securities, the

seller must take steps to mitigate its damages by selling the securities within "a reasonable period

of time"]; Saboundjian v Bank Audi (USA), 157 AD2d 278, 284-285 [1st Dept 1990] [holding

that where a broker failed to execute a customer's speculative currency exchange order, the

customer was required to direct execution of the trade "within a reasonable time after he learned

that it had not been effected earlier"].)

33

FILED: NEW YORK COUNTY CLERK 11/14/2019 04:03 PM
NYSCEF DOC. NO. 641

INDEX NO. 650097/2009
RECEIVED NYSCEF: 11/14/2019

Case 19-34054-sgj11 Doc 933-4 Filed 08/07/20 Entered 08/07/20 23:11:52 Page 116 of
122

These cases are inapposite, as the SWA affords UBS the contractual right to retain the securities upon the Fund Counterparties' breach. Ironically, although purporting to rely on these cases, which in fact require that the non-breaching party mitigate within a reasonable period of time, Highland argues not that UBS was required to dispose of the CDSs within a reasonable period of time after the breach but that it was required to hold them for months and, indeed, years, until the market improved. Highland thus asserts that UBS reasonably mitigated by "holding (as opposed to fire selling) fully performing interest and premium-bearing assets in the face of a dysfunctional market. . . ," and that "UBS's mitigation was not only reasonable, but required by law." (Ds.'s Post-Trial Memo., at 7.) Put another way, Highland does not identify a specific date or dates by which UBS was required to mitigate. To the contrary, without citation to any legal authority, Highland argues that UBS was required to hold the assets for an indefinite period, until the market improved, to minimize its losses.

The mitigation cases provide no support for Highland's assertion that UBS's disposition, months and years after the breach, of assets that it had a contractual right to retain, constitutes mitigation.[20] Rather, in claiming that it is entitled to "offsets" for the post-breach gains realized by UBS, Highland appears in effect to advance a measure of damages that is patently inconsistent with the fundamental tenet of the date of breach measure of damages—namely, that a non-breaching party's damages for assets with a determinable market value must be calculated

---

[20] Nor does Highland cite any other authority that supports its claim that it is entitled to offsets for post-breach gains realized by UBS. Cases in which a party has a duty to cover (see e.g. Fertico Belgium S.A. v Phosphate Chemicals Export Assn., Inc., 70 NY2d 76, supra) are inapposite, given UBS's contractual right to retain the CDSs upon the breach. Cases in which a party is on both sides of a securities transaction are factually dissimilar. (See Aristocrat Leisure Ltd. v Deutsche Bank Trust Co. Americas, 727 F Supp 2d 256, supra [where the plaintiff company breached a contract affording the defendant bondholders the right to convert their bonds to the company's stock, and the bondholders held open existing short positions in the company's stock on which they realized post-breach gains, the company was entitled to an offset]; see also Minpeco, S.A. v Conticommodity Servs., Inc., 676 F Supp 486, 490 [SD NY 1987] [holding that the plaintiff's losses on short futures positions on silver as a result of the defendants' manipulation of the market were required to be offset by the plaintiff's profits on physical silver positions also then held by the plaintiff].)

at the date of breach, not based on hindsight, and that neither party can select the date on which

the damages calculation will be most favorable to it. Thus, a non-breaching buyer cannot select

the date on which the assets "had their highest value or a period of time that was profitable but

that excludes periods when losses occurred." (See Sharma, 916 F2d at 826.) Similarly, a

breaching buyer cannot avoid or reduce the damages caused by its breach by invoking post-

breach decreases in the value of the assets. (See id.)

The court accordingly holds that Highland's request for an offset for UBS's post-breach

gains from the disposition of the CDSs must be denied.

<u>Offset for Right of First Refusal Counterclaim</u>

Highland Capital Management, L.P. (Highland Capital) seeks judgment on its first

counterclaim against plaintiff UBS Securities LLC for breach of the Cash Warehouse Agreement

provision affording it the right to purchase CLO assets in the event UBS elected to retain such

assets upon the termination of the Agreement. Section 5 (A) of the CWA provides that in event

of failure to close, "UBS shall be authorized (but not required) to sell each Collateral Obligation

then in the Warehouse Account in accordance with the Liquidation Procedures." The Liquidation

Procedures set forth in section 7 (A) of the CWA provide in pertinent part:

> "If any Collateral Obligation is to be sold, UBS shall have the right
> to direct such sale on such terms and in such manner and at such
> time that it deems appropriate in its sole discretion. UBS may, in
> its sole discretion, elect to retain any such Collateral Obligation or
> to sell such Collateral Obligation to one of UBS's Affiliates in
> which event, for purposes of determining Net Collateral Gain and
> Net Collateral Loss, such Collateral Obligation shall be deemed to
> have been liquidated at a price equal to its Market Value. To the
> extent that UBS in its sole discretion elects to retain such
> Collateral Obligation, the Servicer will have the right to purchase
> such Collateral Obligation at its Market Value."

Section 7 (A) further provides that if UBS elects to sell CLOs upon termination, "the Servicer

will have the right to bid for and purchase such Collateral Obligation at a purchase price equal to

35

Case 19-34054-sgj11 Doc 933-4 Filed 08/07/20 Entered 08/07/20 23:11:52 Page 118 of
122

the highest third party bid received by UBS for the purchase of such Collateral Obligation."

It is undisputed that Highland Capital notified UBS that it sought to purchase six of the CLOs with a bid price of $1.9 million and a notional value of $44 million, but that it sought to provide the funds for the purchase, and to settle the trades, in the name of one of its affiliates, CLO Value Fund. (Ds.'s Findings, ¶ 21.) UBS declined to agree to the sale to the Highland Capital affiliate. (Id.; DX 72; PX 292.)

The court is unpersuaded that a Highland Capital affiliate had the right, under the CWA, to purchase the CLOs. Section 7 (A), which governs the disposition of the CLO assets upon termination, expressly affords one UBS Affiliate the right to purchase CLOs. In contrast, this Section affords the right to purchase only to the Servicer, and not to any other Highland entity. The Servicer is defined as Highland Capital Management, L.P. (CWA, First Paragraph.) Reading the CWA as a whole, the court further finds that no other provision modifies or is inconsistent with this limitation. On the contrary, where the acts of Highland Capital's Affiliates were implicated, the CWA expressly referred to the Affiliates. (CWA, § 13 [B] [limiting the liability of the "Servicer" "for any acts or omissions by the Servicer or any Affiliate of the Servicer, or any of their directors, officers, members, agents, equity holders [and others] under or in connection with this Agreement, or for any decrease in the value of the Collateral Portfolio . . . ."].)[21] The court accordingly holds that the CWA unambiguously provides that the right to purchase retained CLOs is limited, among the Highland entities, to Highland Capital.

In view of this holding that the CWA is not ambiguous with respect to Highland's post-

---

[21] The parties to the transaction knew how to afford rights to purchase assets to Affiliates of the Servicer. The SWA provides that if the closing fails to occur, UBS may, with the consent of the related counterparty, novate CDSs "to a third party or to the Servicer (or any Affiliate of the Servicer designated by the Servicer). . . ." (SWA § 6 [A].) The omission from the CWA of authorization to Affiliate(s) of the Servicer to purchase CLOs is therefore notable. Moreover, Highland Capital does not claim that the concerns—regulatory and other—that are implicated in novating CDSs are comparable to those in selling CLOs.

36

FILED: NEW YORK COUNTY CLERK 11/14/2019 04:03 PM
NYSCEF DOC. NO. 641
INDEX NO. 650097/2009
RECEIVED NYSCEF: 11/14/2019

Case 19-34054-sgj11 Doc 933-4 Filed 08/07/20 Entered 08/07/20 23:11:52 Page 119 of
122

termination right to purchase CLOs, the court rejects Highland's contention that the court should consider evidence allegedly showing that UBS and Highland Capital had a prior course of conduct in which UBS permitted Highland Capital to settle trades "at its fund level." (Ds.'s Findings, ¶¶ 80-81.) Parol evidence of course of conduct is not admissible to construe an unambiguous contract. (See e.g. Sigismondi v Queens Transit Corp., 38 AD2d 71, 73 [2d Dept 1971], affd no opinion 32 NY2d 745 [1973]; Evans v Famous Music Corp., 1 NY3d 452, 459 [2004].)

The court further notes that even if Highland Capital could recover on its counterclaim, the damages it seeks are not recoverable. Highland Capital seeks a finding that because the CLOs continued to perform until maturity, "it would have profited $46 million" if it had been permitted to exercise its right of first refusal to purchase the CLOs. (Ds.'s Findings, ¶ 82; DX Demo. 9.) As Highland Capital acknowledges, however, the market value of the CLOs at the time of breach was $1,934,214. (DX Demo. 9.) The measure of damages, as explained above in connection with Highland Capital's claim for offsets against UBS's damages, is the market value of the assets as of the date of breach, not the increase in their value in the indefinite future.

Offset for Unjust Enrichment

Highland Capital also seeks judgment on its second counterclaim alleging that UBS was unjustly enriched by its failure to permit Highland Capital, through its affiliate CLO Value Fund, to purchase the Collateral Obligations upon termination. This claim for unjust enrichment is not maintainable as the right to purchase is governed by contract—the CWA. (See generally Pappas v Tzolis, 20 NY3d 228, 234 [2012], rearg denied 20 NY3d 1075 [2013]; Clark-Fitzpatrick, Inc. v Long Is. R.R. Co., 70 NY2d 382, 388-389 [1987].)

Offset for Settlements with Highland Affiliates

37

Highland also requests an offset for settlements with three Highland Affiliates—Highland

Credit Strategies Master Fund, L.P. (Credit Strategies), Highland Crusader Offshore Partners,

L.P. (Crusader Offshore), and Highland Crusader Holding Corporation (Crusader Holding)

(collectively, the Settling Highland Affiliates). Credit Strategies and Crusader Offshore were

defendants in this action. UBS asserted its fraudulent conveyance cause of action against them

as well as all of the other defendants. (Second Am Compl., Fifth Cause of Action.) Crusader

Holding was a defendant in a separate complaint, which asserted a fraudulent conveyance cause

of action against it. (UBS Secs. LLC v Highland Crusader Holding Corp., Sup Ct, NY County,

Index No. 652646/11, Compl., First Cause of Action; Ps.'s Letters, dated July 21, 2015

[NYSCEF Doc. No. 397]; Jan. 7, 2016 [NYSCEF Doc. No. 398].) This court bifurcated the trial

of this action, directing that it would first hold a bench trial on the breach of contract claims,

which were triable by the court and are the subject of this decision, and that the fraudulent

conveyance and other claims, which are triable by a jury, would be heard subsequently. (May 1,

2018 Decision on the Record [NYSCEF Doc. No. 494].)

The parties dispute whether the confidential settlements (DX 76 id and DX 77 id) may be

considered in this action. They also dispute whether the settlements may be offset, pursuant to

statute or case law, against the damages awarded by this decision to UBS against the Fund

Counterparties on the breach of contract causes of action. (See Ps.'s Post-Trial Memo., at 14-21;

Ds.'s Post-Trial Memo., at 15-19, 21-24.)

Even assuming, without deciding, that the damages may be subject to offset by the

settlements, the determination of whether or to what extent the offset should be allowed must

await determination of the jury trial. Where an offset for a settlement is sought, "the damages

against which the settlement is sought to be applied should be determined so a proper

comparison can be made between them and the damages covered by the settlement." (Carter v.

38

FILED: NEW YORK COUNTY CLERK 11/14/2019 04:03 PM
NYSCEF DOC. NO. 641

INDEX NO. 650097/2009
RECEIVED NYSCEF: 11/14/2019

Case 19-34054-sgj11 Doc 933-4 Filed 08/07/20 Entered 08/07/20 23:11:52 Page 121 of
122

State of New York, 139 Misc 2d 423, 429 [Ct Cl, 1988], affd 154 AD2d 642 [2d Dept 1989];

accord Moller v North Shore Univ. Hosp., 12 F3d 13, 16 [2d Cir 1993] [applying New York

law].)

Here, Highland argues that the causes of action against the settling defendants are

"wholly derivative of its breach-of-contract claims against the Fund counterparties." (Ds.'s Post-

Trial Memo., at 16.) UBS persuasively argues, in opposition, that the fraudulent conveyance

causes of action seek relief in addition to compensatory damages, including imposition of a

constructive trust and punitive damages. (Ps.'s Post-Trial Memo, at 22-24; Second Am. Compl.,

at 57-58.) Moreover, the damages, if any, that will be awarded against the Fund Counterparties

and Highland Capital on the fraudulent conveyance cause of action remain to be determined at

the jury trial. On this record the court accordingly cannot compare the settlements with the

fraudulent conveyance damages. Nor is there any basis for the court to determine the extent to

which the settlements cover the same damages, or damages that overlap with, the breach of

contract damages awarded to UBS against the Fund Counterparties by this decision. The

determination of the offset issue will therefore be deferred pending the jury trial. As it appears,

however, that Highland may be entitled to an offset for some or all of the settlement amounts, the

court will stay enforcement, to the extent of the settlement amount ($70.5 million), of the

judgment to be awarded to UBS against the Fund Counterparties for the damages for breach of

contract.

Conclusion

UBS is entitled to damages for $519,374,149 on the third and fourth causes of action

against the Fund Counterparties for breach of the Cash Warehouse and Synthetic Warehouse

Agreements. Enforcement of the judgment for this amount will be stayed up to $70.5 million,

the amount of the settlements with the Settling Highland Affiliates.

39

FILED: NEW YORK COUNTY CLERK 11/14/2019 04:03 PM
NYSCEF DOC. NO. 641
INDEX NO. 650097/2009
RECEIVED NYSCEF: 11/14/2019
Case 19-34054-sgj11 Doc 933-4 Filed 08/07/20 Entered 08/07/20 23:11:52 Page 122 of
122

ORDER

It is hereby ORDERED that the parties shall meet and confer with a view to reaching agreement on the form of the judgment, including but not limited to the Allocation Percentages of CDO Fund and SOHC, and the award of interest. If the parties are unable to reach such agreement, they shall promptly settle judgment; and it is further

ORDERED that this decision shall be filed under seal for ten business days from the date hereof to afford the parties the opportunity to confer and to advise the court as to whether there is any information in the decision which is claimed by any party to be confidential. The parties shall, within five business days of the date hereof, submit a joint letter of no more than three pages, advising the court of their positions on this issue. The letter should be accompanied by a joint copy of the decision, highlighting the portion(s) of the decision which each party claims is confidential and should be redacted in the decision that will be publicly filed; and it is further

ORDERED that the parties shall telephone the court on a conference call within five business days of the date hereof (at a specific date and time to be arranged with the Clerk of Part 60) to discuss the above confidentiality issue as well as the jury trial phase of this action. The parties should be prepared to address whether, or to what extent, the jury trial may proceed in light of Highland Capital's filing of a bankruptcy petition.[22]

This constitutes the decision and order of the court.

Dated: New York, New York
November 14, 2019

MARCY FRIEDMAN, J.S.C.

---

[22] By letter dated October 17, 2019 (NYSCEF Doc. No. 640), counsel (Reid Collins & Tsai LLP) for Highland Capital, the Fund Counterparties and other Highland defendants, advised the court of Highland Capital's bankruptcy filing, and represented that the automatic stay does not preclude decision of the causes of action against the Fund Counterparties or the counterclaim by Highland Capital. This letter sought to reserve defendants' position on the effect of the bankruptcy filing on subsequent proceedings in this action.