# EXHIBIT 5

Case 19-34054-sgj11 Doc 933-5 Filed 08/07/20 Entered 08/07/20 23:11:52 Page 2 of 41

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: COMMERCIAL DIVISION PART 60

-------------------------------------------------------------------X

UBS SECURITIES LLC and UBS AG, LONDON BRANCH,

                        Plaintiff,

                  - v -

HIGHLAND CAPITAL MANAGEMENT, L.P., HIGHLAND
SPECIAL OPPORTUNITIES HOLDING COMPANY,
HIGHLAND CDO OPPORTUNITY MASTER FUND, L.P.,
HIGHLAND FINANCIAL PARTNERS, L.P., HIGHLAND
CREDIT STRATEGIES MASTER FUND, L.P., HIGHLAND
CRUSADER OFFSHORE PARTNERS, L.P., HIGHLAND
CREDIT OPPORTUNITIES CDO, L.P., STRAND ADVISORS,
INC.,

                        Defendant.

| | |
|---|---|
| INDEX NO. | 650097/2009 |

DECISION AND ORDER AFTER
TRIAL

-------------------------------------------------------------------X

      This action arises out of a failed restructured transaction between plaintiffs UBS

Securities LLC and UBS AG, London Branch (collectively, UBS) and defendants Highland

CDO Opportunity Master Fund, L.P. (CDO Fund) and Highland Special Opportunities Holding

Company (SOHC) (together, the Fund Counterparties), and defendant Highland Capital

Management, L.P. (Highland Capital) (together with the Fund Counterparties, Highland), for the

securitization of collateralized loan obligations (CLOs) and credit default swaps (CDSs).

      The court conducted a bench trial from July 9 through July 27, 2018 on plaintiffs' third

and fourth causes of action in the second amended complaint for breach of contract, and on

defendant Highland Capital's first and second counterclaims against plaintiff UBS Securities

1

LLC for breach of contract and unjust enrichment, respectively.[1]  Based on the credible evidence at trial, the court now makes the following determination as to the breach of contract causes of action and counterclaims.[2]

In April and May 2007, the parties agreed to pursue a collateralized debt obligations transaction governed by an Engagement Letter, a Synthetic Warehouse Agreement for CDSs, and a Warehouse Agreement for CLOs (Original Agreements).  (DX 4, DX 5, DX 6.)[3]  It is undisputed that UBS acted as the "financial arranger" for the transaction and was responsible for financing the acquisition of assets, which would then be held in portfolios, which the parties refer to as the Cash Warehouse and the Synthetic Warehouse or collectively as the Knox Warehouse.  (Ps.'s Findings, ¶ 4; Ds.'s Findings, ¶ 5.)[4]  Highland Capital acted as the "Servicer" and was responsible for identifying the specific CLOs to be securitized and the Reference Obligations for the CDSs to be securitized.  (Ps.'s Findings, ¶¶ 3, 4; Ds.'s Findings, ¶¶ 6, 8.)

In furtherance of the transaction, UBS acquired assets with a notional value of $818 million.  (Ps.'s Findings, ¶ 6; Ds.'s Findings, ¶ 5.)  There were 33 CLO tranches in the Cash Warehouse, with a notional value of $174 million.  UBS paid $170 or $170.5 million to acquire the CLOs because the bonds were purchased at a slight discount on their par value.  (Ds.' Findings, ¶ 6; Ps.'s Findings, ¶ 6.)  The Synthetic Warehouse contained 87 credit default swaps,

---

[1] By decision on the record on May 1, 2018 (NYSCEF Doc. No. 494), the court bifurcated the trial.  The decision held that the breach of contract claims, which were to be heard by the court, would be determined prior to claims, including fraudulent conveyance claims, which were to be heard by a jury.
[2] At the trial, the parties agreed to the submission of extensive evidence, subject to standing objections.  This decision is not based on such evidence, unless the decision expressly states otherwise.
[3] Defendants' and plaintiffs' trial exhibits will be referred to as DX ___ and PX ___, respectively.  The parties' demonstrative exhibits will be referred to as DX Demo. ___ and PX Demo. ___
[4] The Fund Counterparties' and Highland Capital Management, L.P.'s Proposed Findings of Fact and Conclusions of Law will be referred to as Ds.'s Findings.  Plaintiffs' Proposed Findings of Fact and Conclusions of Law will be referred to as Ps.'s Findings.  Defendants' Findings are all identified by paragraph number.  Plaintiffs' Findings of Fact are identified by paragraph number, while their Findings of Law are identified only by page number.

2

FILED: NEW YORK COUNTY CLERK 11/14/2019 04:03 PM    INDEX NO. 650097/2009

NYSCEF DOC. NO. 641    Case 19-34054-sgj11 Doc 933-5 Filed 08/07/20    Entered 08/07/20 23:11:52    Page 4 of 41    RECEIVED NYSCEF: 11/14/2019

with a notional value of $644 million. (Ds.'s Findings, ¶ 7; Ps.'s Findings, ¶ 6.). UBS served as

the protection seller on all of the CDSs. (Ps.'s Findings, ¶ 4; Ds.'s Findings, ¶ 8.) For five of

the CDSs, with a notional value of $45 million, Lehman Brothers Special Financing, Inc.

(Lehman) acted as the protection buyer (Lehman Swaps). (Ps.'s Findings, ¶ 8; Ds.'s Findings, ¶

9; PX 755[5], at 1.) For 20 of the CDSs, with a notional value of $124 million, UBS acted as both

protection seller and protection buyer (the Internal Swaps). (Ds.'s Findings, ¶ 10; Ps.'s Findings,

¶ 9; PX 755, at 4-5.)

The Original Agreements expired by their terms on August 15, 2007. (PX 1, at 1.) The

parties agreed to restructure the transaction, signing a new Engagement Letter, the 2008 Cash

Warehouse Agreement (CWA), and the 2008 Synthetic Warehouse Agreement (SWA), as of

March 14, 2008. (See PX 1, PX 2, PX 3.) As of March 14, 2008, the Knox assets had lost

significant value and the parties agreed that, given the market conditions existing as of the date

of the restructured transaction, it was not then feasible to sell the securities and close the

transaction. (Ps.'s Findings, ¶ 20; 2008 Engagement Letter [PX 1, at 8].)

As discussed further below, the Synthetic Warehouse Agreement provided for the roll-

over of the Existing Credit Default Swaps and the Existing Collateral Portfolio into the

warehouses created under the 2008 restructured transaction. (See SWA, Whereas Clause 5.)

Section 12 of the Synthetic Warehouse Agreement provided that the Fund Counterparties would

transfer additional cash and securities "to secure its obligations to UBS" under the SWA and the

CWA. In particular, this Section required the Fund Counterparties to make an Initial Deposit of

$20 million in cash and approximately $54 million in Eligible Securities on the date of the

---

[5] PX 755 is a document that that was jointly prepared by plaintiffs' and defendants' counsel so that specific
information regarding the Knox Warehouse assets could be found in one place. (Trial Tr. at 858.)

3

execution of the SWA. (Id., § 12 [A].) The SWA contained a collateral call provision under

which UBS was required to track its CDS and Cash Exposure to losses, as defined under the

Agreement, on a semi-monthly basis, and the Fund Counterparties were required to deposit an

additional $10 million in collateral (cash and/or Eligible Securities) for every $100 million

increase in the defined Deposit Threshold Exposure Amount. (Id., §§ 12 [B], [C].)

It is undisputed that, pursuant to Section 12 (C) of the SWA, UBS made a first collateral

call for $10 million on September 17, 2008 (PX 4), and a second collateral call for $10 million

on October 21, 2008 (PX 5), both of which were satisfied by the Fund Counterparties.

(Testimony of Keith Grimaldi, Former Head of UBS's CDO Secondary Trading Desk, Trial

Transcript (Tr.) at 81, 112, 119.)

On November 7, 2008, UBS issued the third, and final, collateral call to the Fund

Counterparties for an additional $10 million. (PX 6.) It is undisputed that the Fund

Counterparties did not meet this collateral call. (Ds.'s Findings, ¶ 17; Ps.'s Findings, ¶¶ 43-47).[6]

On December 3, 2008, UBS sent a notice to Highland stating that, to date, no deposits

have been made in response to the November collateral call, and that "a Termination Date has

occurred under the Warehouse Agreements and a termination date has occurred under the

Engagement Letter." (PX 7; PX 9.) The notice further stated that "UBS is forbearing from

exercising its remedies [under the Agreements] for a period of two Business Days from the date

hereof in order to permit [the Fund Counterparties] to pay the Additional Deposits by 5 pm New

York time on December 5, 2008." (Id.) On December 5, 2008, UBS sent an additional notice to

---

[6] It is undisputed that the Fund Counterparties offered to post CLO assets to satisfy the third collateral call and that
UBS did not accept that collateral. UBS's Keith Grimaldi testified that UBS rejected the CLOs because "at that
time the marketplace was declining and declining rapidly. We thought there would be more declines, so we
collectively made a decision that we wanted cash or government securities ... that would be easily liquid and reflect
better value." (Trial Tr. at 122.) Defendants stipulated that UBS had the right to insist on cash. (See Statement of
Andrew Cruciani [Ds.'s Atty.], Trial Tr. at 1736.)

4

Highland stating that the Additional Deposit has not been made, and that "[c]onsequently, UBS

will proceed to exercise the rights and remedies available to it under the Warehouse Agreements,

the Engagement Letter, at law and otherwise." (PX 8.)

### THIRD COLLATERAL CALL

As a threshold matter, the parties dispute whether the third collateral call was proper.

Highland argues that UBS should not have included the 20 Internal Swaps in calculating the

Deposit Threshold Exposure Amount "because the Intradesk [i.e., Internal] Swaps were not

Existing Credit Default Swaps under the SWA . . . ." (Ds.'s Findings, ¶ 28.) Highland also

claims that the Lehman Swaps were not properly included in the calculation because they had

been terminated prior to the third collateral call. (See id., ¶ 27.)

More particularly, Highland claims that the Internal Swaps were not Existing Credit

Default Swaps because they were not documented, as allegedly required by Section 3 of the

SWA, in the form of an ISDA Master Agreement and ISDA Confirmation. (Ds.'s Findings, ¶¶

28, 30-31.) UBS does not dispute that the Internal Swaps were not documented by the ISDA

Master Agreement and Confirmation, but argues that Section 3 does not require such

documentation for the Internal Swaps. (Ps.'s Findings, at 24-25.)[7]

Resolution of this dispute involves an issue of contract interpretation. It is well settled

that the determination of whether a contract is ambiguous is one of law to be resolved by the

court. (Matter of Wallace v 600 Partners Co., 86 NY2d 543, 548 [1995]; W.W.W. Assocs., Inc.

v Giancontieri, 77 NY2d 157, 162 [1990].) Written agreements are to be construed in

accordance with the parties' intent, and "the best evidence of what parties to a written agreement

---

[7] It is undisputed that the Internal Swaps were documented by electronic trading tickets but not by ISDA Master Agreements or ISDA trade confirmations. (Ds.'s Findings, ¶ 10; Ps.'s Findings, ¶¶ 16-17; PX 29 [electronic trading tickets].)

5

intend is what they say in their writing." (Schron v Troutman Sanders LLP, 20 NY3d 430, 436 [2013] [internal quotation marks, brackets, and citation omitted].) The court should determine from contractual language, without regard to extrinsic evidence, whether there is any ambiguity. (Chimart Assocs. v Paul, 66 NY2d 570, 573 [1986].) Extrinsic or parol evidence "may not be considered when the intent of the parties can be gleaned from the face of the instrument." (Id. at 572-573.) "Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous. . . ." (Greenfield v Philles Records, Inc., 98 NY2d 562, 569 [2002].) "Ambiguity in a contract arises when the contract, read as a whole, fails to disclose its purpose and the parties' intent, or where its terms are subject to more than one reasonable interpretation." (Universal Am. Corp. v National Union Fire Ins. Co. of Pittsburgh, Pa., 25 NY3d 675, 680 [2015] [internal quotation marks and citation omitted].)

It is also well settled that a court should "construe the [contract] so as to give full meaning and effect to the material provisions. A reading of the contract should not render any portion meaningless. Further, a contract should be read as a whole, and every part will be interpreted with reference to the whole; and if possible it will be so interpreted as to give effect to its general purpose." (Beal Sav. Bank v Sommer, 8 NY3d 318, 324-25 [2007] [internal quotation marks and citations omitted]; National Conversion Corp. v Cedar Bldg. Corp., 23 NY2d 621, 625 [1969] [holding that "[a]ll parts of an agreement are to be reconciled, if possible, in order to avoid inconsistency"].)

Applying these precepts, the court holds that the SWA is not ambiguous with respect to the requirements for documentation of CDSs, that Section 3 of the SWA only applies to CDSs in which a third party is the protection buyer, and that this Section does not require ISDA documentation for the Internal Swaps.

6

The SWA defines "Existing Credit Default Swap[s]" as the CDSs "that were the subject of the Original Synthetic Warehouse Agreement." (SWA, Whereas Clause 5.) Section 3 of the SWA provides, in pertinent part:

> "<u>Form of Documentation.</u> Each Existing Credit Default Swap between UBS, acting as Seller, and a counterparty, acting as Buyer, has been documented in the form of (i) the ISDA Master Agreement and Schedule currently in effect between UBS and the related counterparty, which documents are confidential between UBS and such counterparty and (ii) an ISDA published confirmation. . . . Each Additional Credit Default Swap between UBS, acting as Seller, and a counterparty, acting as Buyer, will be documented in the form of (i) the ISDA Master Agreement and Schedule currently in effect between UBS and the related counterparty, which documents are confidential between UBS and such counterparty and (ii) the Confirmation attached [to the SWA] . . . ."

As the Agreement that governs the securitization of Existing and Additional Credit Default Swaps, the SWA contains numerous detailed provisions regarding the accumulation and disposition of these financial instruments. Section 3, which pertains to documentation of the swaps, is the only provision in the SWA that is limited to CDSs in which UBS is the Seller and a counterparty is the Buyer. All of the other provisions of the SWA refer to CDSs without such limitation.

Moreover, like SWA Section 3, the Original SWA provided: "Each Credit Default Swap between UBS, acting as Seller, and a counterparty, acting as Buyer, will be documented in the form of (i) the ISDA Master Agreement and Schedule currently in effect between UBS and the counterparty, which documents are confidential between UBS and each counterparty and (ii) the Confirmation attached hereto. . . ." (Original SWA, § 3 [NYSCEF Doc. No. 626].) It is undisputed, however, that the Internal Swaps were included in the Original SWA portfolio but were not documented by the ISDA Master Agreement or Confirmation. It is also undisputed that the Internal Swaps were nevertheless again included in the Initial Net Exposure Amount in the SWA for the restructured transaction. (Testimony of Peter Vinella [Highland's expert in

7

structured financial products], Trial Tr. at 1097, 1124-1125 [acknowledging that the Internal Swaps were included in the Initial Net Exposure Amount].)

Initial Net Exposure Amount is defined in the SWA[8] as "111,767,486.88, being the amount by which the Aggregate Net Exposure Amount as of the date hereof [i.e., the March 14, 2008 "as of" date of the SWA] exceeds the Initial Deposit." As defined in SWA Section 12 (A), the Initial Deposit is the deposit of approximately $74,000,000 in cash and Eligible Securities made on the date of execution of the SWA. Aggregate Net Exposure Amount is defined as the amount by which CDS Exposure and Cash Exposure, as of the date of the collateral calculation, exceed the balance on deposit in the Deposit Account plus Positive Carry with respect to each Collateral Obligation.[9] As discussed above, Section 12 (C) of the SWA requires a deposit of $10 million in additional collateral when the Deposit Threshold Exposure Amount is greater than or equal to $100 million. The Deposit Threshold Exposure Amount is defined in the SWA as "the amount, if any, by which (i) the Aggregate Net Exposure Amount as of [the date of the collateral calculation] exceeds (ii) the Initial Net Exposure Amount." The Initial Net Exposure Amount, which includes the Internal Swaps, is thus integral to the calculation of the Deposit Threshold Exposure Amount.

Based on this reading of the SWA as a whole, the court concludes that the Internal Swaps were Existing Credit Default Swaps within the meaning of the SWA. The lack of ISDA documentation was therefore not a bar to their inclusion in the collateral call calculation.

The court rejects Highland's further contention that the Internal Swaps should not have been included because there was "no economic consequence" to UBS from these swaps. (Ds.'s

[8] Definitions are found in the Definitions section of the SWA (SWA, Ex. A), unless the term is defined in a particular provision of the SWA, in which case the provision will be cited.
[9] Positive Carry is defined in the CWA. As explained by Adam Warren, Highland's damages expert, carry includes interest payments from the CLOs. (Warren Testimony, Trial Tr. at 1299.)

Findings, ¶ 33.) The complex formula set forth in Section 12 for calculating the exposure of UBS on the assets in the warehouse that would trigger a collateral call does not contain any requirement that UBS include in the calculation only assets for which it was at risk of sustaining actual losses.[10]

The court further holds that, although the Internal Swaps were properly included in the third collateral call calculation, the Lehman Swaps were not. The parties do not dispute that the Lehman Swaps had been terminated based on the Event of Default that occurred upon Lehman's filing for bankruptcy on September 15, 2008. (DX 87 [UBS Default Notice].) Highland asserts, and UBS does not persuasively counter, that the Lehman Swaps should not have been included in the third collateral call. Indeed, UBS's Grimaldi forthrightly acknowledged that, given the termination, there should not have been "markdowns" on the Lehman Swaps. (Grimaldi Testimony, Trial Tr. at 297-298.).

Highland contends, based on the inclusion of the Lehman Swaps and Internal Swaps in the third collateral call calculation, that UBS "committed a prior material breach by failing to

---

[10] In view of this holding that the Internal Swaps were properly included in the collateral call calculation pursuant to the unambiguous terms of the SWA, the court has not considered parol evidence on the issue.

The court thus rejects Highland's request for a finding that UBS admitted that the SWA required ISDA documentation of the Internal Swaps. (See Ds.'s Findings, ¶¶ 30-31.) This request is based on testimony of UBS's Keith Grimaldi who, when shown Section 3 during cross-examination and asked if every CDS was required to have ISDA documentation, responded: "According to the language, yes." (Grimaldi Testimony, Trial Tr. at 262-264.) Even if this evidence were properly considered, Highland's reliance on this answer ignores that Mr. Grimaldi further testified that ISDA documentation would not be "filled out" until the assets were transferred in the securitization. (Id. at 267-270.)

The court further notes that Highland requests a finding, arguably in support of its claim that the CDSs were not Existing Credit Default Swaps, that a CDS "cannot be created with the same legal entity on both sides of the transaction. . . ." (Ds.'s Findings, ¶ 29.) Even if parol evidence were properly considered, there was substantial evidence in the record that internal swaps were common in securitizations of synthetic assets. (LeRoux Testimony, Trial Tr. at 1673-1676; (Vinella Testimony, Trial Tr. at 1158-1162 [denying that intracompany swaps are "economic transactions" but acknowledging their use in CLO securitizations].)

9

properly calculate the collateral call[].'' (Ds.'s Findings, ¶¶ 23, 27-28.)  In support of this

contention, Highland relies on the testimony of its expert Peter Vinella.  According to Mr.

Vinella's own analysis, however, if the Lehman swaps are excluded from the calculation for the

third collateral call, but the Internal Swaps are included, the total increase in the Deposit

Threshold Exposure Amount as of November 4, 2008 is $328.62 million—an amount greater

than the $300 million required to authorize the third collateral call pursuant to Section 12 of the

SWA.  (Vinella Testimony, Trial Tr. at 1122-1139; DX Demo. 8.)  Louis Dudney, UBS's expert

in forensic accounting and damages (Trial Tr. at 824), analyzed Mr. Vinella's testimony and

confirmed, using the same numbers as Mr. Vinella, that the Deposit Threshold Exposure Amount

still exceeded $300 million on November 4, 2008, after excluding the Lehman Swaps but

including the Internal Swaps.  (PX Demo. 20 [accepted without objection in lieu of Dudney

rebuttal testimony, Trial Tr. at 1870-1871].)

Based on this credible testimony that the threshold for the collateral call was met without

the Lehman Swaps, the court holds that the third collateral call did not constitute a material

breach of the contract, notwithstanding UBS's improper inclusion of the Lehman Swaps in the

calculation.[11]  (See generally Awards.Com v Kinko's, Inc., 42 AD3d 178, 187 [1st Dept 2007],

affd 14 NY3d 791, 793 [2010]; Frank Felix Assocs., Ltd. v Austin Drugs, Inc., 111 F3d 284, 289

[2d Cir 1997] [under New York law, for a breach to be material, "it must go to the root of the

agreement between the parties"] [internal quotation marks and citations omitted].)

---

[11] In view of this holding that the Deposit Threshold Exposure Amount exceeded $300 million as of November 7, 2008, the court need not reach UBS's contention that the collateral call was proper because the Deposit Threshold Exposure Amount exceeded $300 million as of December 2, 2008, prior to the termination of the transaction.  (Ps.'s Findings, at 15 n 10.)

10

As discussed above, there is no dispute that the Fund Counterparties failed to meet the third collateral call. The court accordingly finds that the Fund Counterparties breached the SWA and turns to the issue of damages.

## DAMAGES

### Designation of Ineligible Securities

A critical issue in determining UBS's damages is whether UBS may recover damages for CDSs that UBS retained after its termination of the 2008 transaction, under these circumstances in which UBS did not designate the underlying reference obligations for any of the CDSs as "Ineligible Securities." Resolution of this issue requires interpretation of the SWA. Highland and UBS both contend that the SWA is unambiguous as to whether Ineligible Securities must be designated, but assert fundamentally inconsistent readings of the Agreement. (Ds.'s Findings, ¶¶ 44-49; see Ps.'s Findings, at 29 n 21.)

As held above, the determination of whether a contract is ambiguous is one of law to be resolved by the court. (Matter of Wallace, 86 NY2d at 548.) Ambiguity will be found to arise where the terms of a contract are "subject to more than one reasonable interpretation." (Universal Am. Corp., 25 NY3d at 680 [internal quotation marks and citation omitted].) As also held above, a court should construe a contract so as to give full meaning and effect to its material provisions, and should read the contract as a whole and so as not to render any portion meaningless, if possible. (See Beal Sav. Bank, 8 NY3d at 324-25.)

Sections 5 (A), 5 (B), and 6 of the SWA are relevant to the calculation of CDS damages: Section 5 (A) provides for the calculation of losses with respect to CDSs removed from the warehouse during the term of the Agreement or "otherwise pursuant to Section 6"; Section 5 (B) (2) governs the calculation of losses upon a closing; and Section 6 governs this calculation in the event of a failure to close, incorporating terms from Sections 5 (A) and 5 (B).

11

Section 6 provides in pertinent part:

> "(A)  If the Closing Date fails to occur on or prior to the
> Termination Date, then UBS may, with the consent of the
> related counterparty, either (at the election of the Servicer;
> provided that notice of such election is received on or prior
> to the Termination Date) (i) terminate each Credit Default
> Swap or (ii) novate each Credit Default Swap to a third
> party or to the Servicer (or any Affiliate of the Servicer
> designated by the Servicer), in each case, on the
> Termination Date.
>
> . . . .
>
> (C)  To the extent there are any CDS Losses, the CDO Fund and
> SOHC shall collectively be responsible for 100% of any
> such CDS Losses.  Such CDS Losses shall be allocated
> between the CDO Fund and SOHC on the basis of their
> respective Allocation Percentages.  Each of the CDO Fund
> and SOHC shall, after notice of the amount due from UBS,
> remit such amounts by wire transfer in immediately
> available funds to UBS within three Business Days after the
> Termination Date."

CDS Losses are in turn defined in Section 5 (B) (2), the closing

provision, as:

> "(x) the sum of (1) the aggregate Floating Amount payments and
> Physical Settlement Amount payments made by UBS with respect
> to all of the Credit Default Swaps as to which a Floating Amount
> Event or a Credit Event occurred under the terms thereof, plus (2)
> the aggregate amount of Net Hedging Payments made by UBS
> with respect to all Hedging Transactions related to the Credit
> Default Swaps, plus (3) the aggregate Replacement Losses
> determined with respect to all of the Credit Default Swaps and the
> related Hedging Transactions that were terminated or novated or as
> to which the exposure was retained by UBS, in each case upon the
> designation of the Reference Obligation relating to such Credit
> Default Swap as an Ineligible Security (such amount in this clause
> (x), the 'CDS Losses') . . . ."

Relying on the requirement in the definition of CDS Losses that Reference Obligations

be designated as Ineligible Securities, Highland argues that "[t]he term 'CDS Losses'

12

unambiguously limits UBS's recovery for unrealized (mark-to-market) losses to securities

designated as 'Ineligible Securities,' and the Court is bound to enforce the agreement pursuant to

its unambiguous terms." (Ds.'s Findings, ¶ 46.) Put another way, Highland argues that UBS

may recover mark-to-market losses only on CDSs that have been designated Ineligible

Securities. (Id., ¶ 53.)[12] UBS asserts, among other things, that under Section 6, UBS may

terminate, novate, or retain CDSs regardless of eligibility, that ineligibility designations are not

relevant absent a closing, and that Highland's reading renders meaningless other provisions of

the SWA. (Ps.'s Findings, at 29 n 21.)

Upon close reading of the SWA, the court concludes that the SWA is not ambiguous with

respect to ineligibility designations and that, under Section 6, upon the failure to close UBS is

entitled to retain CDSs and to recover losses for the retained CDSs, without first designating the

underlying Reference Obligations as Ineligible Securities. Section 6 (A) expressly provides for

UBS to terminate or novate the CDSs, and does not require UBS to first make such designation.

Although Section 6 (A) does not also, by its terms, provide for UBS to retain CDSs, a reading of

the contract as a whole leaves no question that UBS was not only entitled to retain the CDSs

upon the failure to close, but also that it was entitled to recover losses on the retained CDSs

without first designating the underlying Reference Obligations as Ineligible.[13]

---

[12] Highland's damages expert, Adam Warren, testified that realized losses are losses sustained where a transaction has been closed out and an actual cash payment has been made. (Warren Testimony, Trial Tr. at 1249, 1253.) He also testified that, in his opinion, there were no unrealized losses in the Synthetic Warehouse because no assets had been designated as ineligible. (Id. at 1257 ["[O]ur computation is that there are no unrealized losses in the Synthetic Warehouse because of the need to . . . create a designation of ineligible. And we saw no evidence of any Synthetic Warehouse asset being designated ineligible"].)

[13] In its decision of defendants' motion for summary judgment, this court held that it could not determine on the record of that motion whether the SWA was ambiguous with respect to UBS's entitlement to recover losses on retained CDSs, pursuant to Section 6, without a prior designation of such assets as Ineligible Securities. (2017 NY Slip Op. 30546[U], 2017 WL 1103879, * 4-7 [Sup Ct, NY County Mar. 13 2017], affd 159 AD3d 512, lv dismissed 32 NY3d 1080.) With the benefit of the parties' extensive trial briefing on this issue, the court now concludes, for the reasons discussed further in the text, that the agreement is not ambiguous.

13

As the above-quoted definition of CDS Losses in Section 5 (B) (2) shows, this definition relates to Credit Default Swaps which, upon a closing, have been "terminated or novated or as to which the exposure was retained by UBS, in each case upon the designation of the Reference Obligation relating to such Credit Default Swap as an Ineligible Security . . . ." After setting forth the definition of CDS Losses (and CDS Gains) in the context of a closing, Section 5 (B) (2) further provides: "To the extent the Closing Date fails to occur, allocation of CDS Losses, CDS Gains and any other amounts payable hereunder will be determined in accordance with the provisions of Section 6 hereof."

Significantly, while Section 6 (C) incorporates the defined term CDS Losses, the term CDS Losses also incorporates both the definition of Ineligible Security and the term Replacement Losses from Section 5 (A). These incorporated terms modify the definition of CDS Losses where a closing does not occur.

The definition of Ineligible Security pertains to securities that are ineligible for securitization upon a closing. The SWA thus defines Ineligible Security, in pertinent part, as "any Reference Obligation in the CDS Portfolio which has become ineligible for sale to the Issuer on the Closing Date as a result of the failure of such Reference Obligation to conform to the Eligibility Criteria as it exists at such time of determination . . . ." (SWA, Exhibit A-2 [emphasis added].)

Section 5 (A), which defines the term Replacement Losses, distinguishes between such Losses sustained during the term of the Agreement and those sustained upon termination in the event of a failure to close pursuant to Section 6. Section 5 (A) primarily addresses the removal of CDSs from the warehouse "during the term of this [the SWA] Agreement" where "a Reference Obligation or the related Credit Default Swap does not conform to the Eligibility Criteria" that must be met for securitization. This section provides that "UBS shall be entitled in

Case 19-34054-sgj11 Doc 933-5 Filed 08/07/20 Entered 08/07/20 23:11:52 Page 16 of 41
RECEIVED NYSCEF: 11/14/2019

good faith to designate any Reference Obligation (and the related Credit Default Swap) as an

Ineligible Security and (ii) in its sole discretion to remove any such Reference Obligation (and

the related Credit Default Swap) from the CDS Portfolio." Section 5 (A), however, continues:

> "To the extent any such Credit Default Swaps are terminated or
> novated, or at UBS's discretion, such exposure is retained
> following the designation of such Reference Obligations as
> Ineligible Securities or otherwise pursuant to Section 6, UBS shall
> determine the Replacement Gain or Replacement Loss relating to
> such Credit Default Swaps [according to the formula that
> follows]."

(emphasis added). Section 5 (A) then sets forth a formula for calculating Replacement Gain and

Replacement Loss, which specifically provides for such calculation not only upon termination or

novation but also upon UBS's retention of the CDSs. (SWA § 5 [A] [1] – [3].)

Section 5 (A) thus clearly contemplates that UBS may novate, terminate, or retain CDSs

both during the term of the Agreement and in the event of a failure to close. The Section affords

UBS the discretion to terminate, novate, or retain CDSs "pursuant to Section 6," as distinct from

its discretion to do so upon a designation of the underlying Reference Obligation as Ineligible

during the term of the Agreement. Any other reading would render meaningless the Section 5

(A) provision "or otherwise pursuant to Section 6."

Moreover, in order to reconcile all of the provisions of the SWA, the Section 5 (B) (2)

definition of CDS Losses, when used in Section 6, cannot be construed as requiring a designation

of Ineligible Securities. As discussed above, Ineligible Securities are defined as securities

ineligible for sale at a closing. Section 5 (B) (2), which governs the calculation of losses where a

closing will occur, requires the designation of Ineligible Securities to facilitate the parties'

calculation of losses on assets deemed ineligible for inclusion in the securitization that will occur

upon the closing. When a closing will not occur, none of the CDSs or other assets will be

securitized, and there is no need to distinguish between eligible and ineligible assets. While the

15

definition of CDS Losses with the Ineligible Security designation requirement serves the

purposes of Section 5 (B) (2) in the event of a closing, it is inconsistent with the CDS Loss

calculation required in Section 6 where the closing does not occur.

Contrary to Highland's apparent contention (Ds.'s Findings, ¶ 46), a reading of the CDS

Loss provision in Section 6 to permit calculation of losses on retained assets without an

Ineligible Security designation does not violate the fundamental precept that a defined term in a

contract must be given effect. (See generally Mionis v Bank Julius Baer & Co., 301 AD2d 104,

109 [1st Dept 2002].) Rather, the CDS Loss definition, as used in Section 6, is modified by the

contractual provisions discussed above.

Although inartfully drafted, the SWA is not ambiguous. If the contract is read as a

whole, and all of the provisions are given meaning, it is reasonably susceptible to only one

meaning—namely, that CDS Losses for retained assets may be recovered without a designation

of the underlying Reference Obligations as Ineligible Securities where, as here, the contract has

been terminated before the closing.[14] The court accordingly holds that UBS is entitled to recover

damages for the retained CDSs in the Synthetic Warehouse.[15]

Calculation of Damages

As discussed above, UBS terminated the transaction based on the Fund Counterparties'

---

[14] The court notes that the SWA and the Cash Warehouse Agreement (CWA) both contain provisions which state that the two agreements "set forth the entire understanding of the parties hereto relating to the subject matter hereof . . . ." (SWA, § 18; CWA, § 18.) Assuming, without deciding, that these agreements should be read together in construing the SWA, the court finds that, although the assets at issue in the SWA and the CWA have markedly different attributes, the CWA is consistent with the SWA to the extent that the CWA permits UBS, in the event a closing does not occur, to retain and recover for losses on the CLOs that are the subject of the CWA, without a designation of the CLOs as Ineligible Securities. (See CWA, §§ 5 [A], 7 [A].)

[15] In view of this holding that the SWA is not ambiguous as to whether CDS losses may be recovered without designation of the underlying Reference Obligations as Ineligible Securities, the court has not considered any parol evidence, either documentary or testimonial, in construing the SWA in this regard. Without limiting the foregoing, the court has not considered prior drafts of the SWA, which Highland offered in the event parol evidence were to be admitted. (See Ds.'s Findings, ¶ 53.)

16

failure to meet the third collateral call. UBS sent Highland a notice, dated December 3, 2008,

stating that a Termination Date had occurred under the Warehouse Agreements but that it would

forbear from exercising its remedies for two days to permit the Fund Counterparties to meet this

collateral call. (PX 7.) UBS then sent a further notice to Highland, dated December 5, 2008,

stating that it would exercise its remedies as the call had not been met. (PX 8.) UBS held a

public auction of the assets in the Knox Warehouse on December 16, 2008. By notice dated

December 19, 2008, UBS demanded payment for its claimed losses based on the results of the

auction—$157,949,885.47 for the assets in the Cash Warehouse (PX 10) and $587,357,060.59

for the assets in the Synthetic Warehouse. (PX 11.) UBS also notified Highland that it elected to

retain the Collateral Obligations in the Cash Warehouse. (PX 10.)

<u>CDS Damages</u>

Highland argues that even if the recovery of damages for the CDSs is not barred by

UBS's failure to designate the Reference Obligations for the CDSs as Ineligible Securities (a

claim this court has rejected above), UBS has not proved damages for these CDSs. Specifically,

Highland contends that UBS did not comply with the contractual requirements for calculation of

losses because its post-termination auction was untimely and otherwise improper. (Ds.'s

Findings, ¶¶ 57-59.) Highland also contends that UBS's marks do not otherwise "establish a

reasonable connection between the asset value and UBS's alleged damages." (<u>Id.</u>, ¶¶ 60-65.)

UBS disputes these assertions. (Ps.'s Findings, at 29-31.)

Sections 6 (C), 5 (B) (2), and 5 (A) (3) are the provisions of the SWA that govern the

calculation of CDS Losses upon termination. Section 6 (C) provides in full:

> "To the extent there are any CDS Losses, the CDO Fund and SOHC shall
> collectively be responsible for 100% of any such CDS Losses. Such CDS
> Losses shall be allocated between the CDO Fund and SOHC on the basis
> of their respective Allocation Percentages. Each of the CDO Fund and
> SOHC shall, after notice of the amount due from UBS, remit such

17

amounts by wire transfer in immediately available funds to UBS within three Business Days after the Termination Date."

As discussed above, the definition of CDS Losses in Section 5 (B) (2) includes Replacement Loss, the calculation of which is governed by Section 5 (A). With respect to Replacement Loss relating to CDSs that are retained, Section 5 (A) (3) provides in full:

> "To the extent UBS retains such exposure, the Replacement Gain and Replacement Loss will be imputed based on the arithmetic average of at least three bids (or, if UBS if unable to obtain three such bids having made commercially reasonable efforts, such lesser number of bids as UBS is able to obtain) obtained by or on behalf of UBS from nationally recognized derivatives dealers in the relevant market (no more than one of which may be UBS or any of its Affiliates; provided that any such bid must be provided in good faith) to assume UBS's position under such Credit Default Swap."

The SWA, by its terms, thus contemplated that payment would be made within three days after the Termination Date, subject to notice from UBS. As the SWA provided for an auction to calculate the amount of the losses, it also contemplated that an auction could or would occur within that three day period.

By the terms of UBS's notices to Highland, although a Termination Date had occurred as of December 3, UBS extended the Fund Counterparties' time to meet the third collateral call until December 5. The court thus finds that the Fund Counterparties' breach of the Agreements for failure to meet the third collateral call occurred on December 5. UBS did not conduct the auction to calculate the CDS Losses until December 16.

UBS's delay of approximately 11 days in conducting the auction, while seemingly de minimis, in fact had momentous financial consequences, given that the delay occurred in the wake of the September 15, 2008 Lehman bankruptcy filing and at the height of the financial crisis. With the market spiraling downward, the CDS losses ascertained through the auction process were approximately $117 million more than the losses calculated by using UBS's marks

18

on either December 3 or December 5. (PX Demo. 21; DX Demo. 12 [showing UBS and Highland marks as of December 3 and 5; PX Demo. 28 at 60 [Ps.'s Closing Statement Demonstrative Exhibit, acknowledging that CDS damages, as calculated based on the auction, exceeded the losses calculated using UBS's marks on December 3 and 5 by over $117 million].)[16]

UBS contends that the three day payment period was for its benefit and that it "could exercise its right to get paid after three business days without waiver." (Ps.'s Findings, at 28.) The court agrees that UBS's delay in demanding payment or holding the auction did not result in a waiver of its right to seek payment of its damages resulting from the Fund Counterparties' breach. (See SWA § 20 ["Neither the failure nor any delay on the part of any party hereto to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver hereof. . . ."].) Highland correctly contends, however, that the delayed auction could not serve as a basis for calculating UBS's damages because the results of the auction did not reflect market conditions as of the date of termination or breach. (See Ds.'s Findings, ¶ 57.)

As explained by the Court of Appeals:

"It has long been recognized that the theory underlying damages is to make good or replace the loss caused by the breach of contract. Damages are intended to return the parties to the point at which the breach arose and to place the nonbreaching party in as good a position as it would have been had the contract been performed. Thus, damages for breach of contract are ordinarily ascertained as of the date of the breach."

(Brushton-Moira Cent. Sch. Dist. v Fred H. Thomas Assocs., P.C., 91 NY2d 256, 261 [1998] [internal citations omitted].)

---

[16] At the trial, the parties stipulated to dispense with rebuttal testimony from plaintiffs' damages expert, Louis Dudney and, in lieu of such testimony, to the admission into evidence of plaintiffs' Demonstrative Exhibits 20 and 21, and defendants' Demonstrative Exhibit 12. (Trial Tr. at 1868, 1870 [Stipulation].) PX Demo. 21 and DX Demo. 12, which were prepared by Mr. Dudney, calculated damages using plaintiffs' and defendants' marks, respectively, on December 3 and 5, 2008. (Trial Tr. at 1870-1877.)

It is further settled that damages need not be proven with mathematical certainty. It is sufficient that a reasonable basis for the calculation of damages be shown. (See generally J.R. Loftus, Inc. v White, 85 NY2d 874, 877 [1995] ["While a plaintiff may recover damages when the measure of damages is unavoidably uncertain or difficult to ascertain, a reasonable connection between a plaintiff's proof and a [] determination of damages is nevertheless necessary"]; CDO Plus Master Fund Ltd. v Wachovia Bank, N.A., No. 07 Civ. 11078 [LTS], 2011 WL 4526132, *2 [US Dist Ct SD NY, Sept. 29, 2011] ["The law of New York is clear that once the fact of damage has been established, the non-breaching party need only provide a stable foundation for a reasonable estimate [of damages]" [internal quotation marks and citations omitted, brackets in original].)

UBS's December 16, 2008 auction cannot satisfy either of these standards because, as held above, the auction did not provide a reliable basis for determining UBS's losses at, or even shortly after, the breach, due to the exceptional circumstances presented by the financial crisis.[17] The court accordingly turns to the alternative basis advanced by UBS for the calculation of damages—its marks on December 5, 2008. (Ps.'s Findings, at 29.)

It is well settled that "where the breach involves the deprivation of an item with a determinable market value, the market value at the time of the breach is the measure of damages." (Sharma v Skaarup Ship Mgt. Corp., 916 F2d 820, 825 [2d Cir 1990], cert denied 499 US 907 [1991] [applying New York law and citing Simon v Electrospace

---

[17] There is authority that "in accordance with the objective that a party seeking recovery for breach of contract is entitled 'to be made whole' as of the time of the breach, the [factfinder] should be able to make its valuation determination on all relevant elements of the case, whether dated prebreach, on the date of breach, or 'some short time period thereafter.'" (Credit Suisse First Boston v Utrecht-America Fin. Co., 84 AD3d 579, 580 [1st Dept 2011] [quoting Boyce v Soundview Tech. Group, Inc., 464 F3d 376, 389 [2d Cir 2006] [other internal quotation marks and citations omitted].) Although the auction was held shortly after the breach, this authority does not support calculation of damages based on the auction results, as the auction did not provide a reliable basis for assessing the losses.

20

Corp., 28 NY2d 136, 145-146 [1971], <u>motion to amend remittitur and clarify denied</u> 28
NY2d 809].) In accordance with the objective that the injured party be made whole,
"damages for breach of contract are ordinarily ascertained as of the date of the breach."
(<u>Brushton-Moira Cent. Sch. Dist.</u>, 91 NY2d at 261.)

      UBS offered credible testimony that its December 5, 2008 marks reasonably reflected the
market value of the CDSs as of the December 5 breach date. In particular, Timothy LeRoux,
who at the time of the transaction was second in command to Mr. Grimaldi on the UBS trading
desk (LeRoux Testimony, Trial Tr. at 1640), gave credible testimony that, in the regular course of
business, the trading desk "marked to market" hundreds of CLO assets, and every week or two
was required to assign values on every one of the assets, both cash and synthetic, in the Knox
Warehouse. (<u>Id.</u> at 1724.) Mr. LeRoux also described the marking process and identified
information, including public information as to offers and bids on CDSs in the marketplace, that
UBS considered in developing "objective" prices. (<u>Id.</u> at 1727, 1745-1750.) Mr. Grimaldi also
testified that, although the trading desk performed the mark-to-market valuation of the assets in
the Knox Warehouse, the UBS valuation group established oversight due to the volatility of the
market and "would look at other market observations and make sure that those [the trading desk
marks] were in line with the marketplace." (Grimaldi Testimony, Trial Tr. at 207-208.)

      Highland does not dispute that the mark-to-market process is a methodology for
determining loss in market value of retained assets. (<u>See</u> e.g. Testimony of Adam Warren
[Highland's damages expert], Trial Tr. at 1268-1269; Testimony of Philip Braner [Highland
former executive], Trial Tr. at 469-472; Testimony of UBS's Timothy LeRoux, Trial Tr. at 1640,
1727-1729.)

      Rather, in claiming that UBS's marks are not competent evidence on which to award
damages, Highland suggests that the setting of marks by the trading group involved a conflict of

21

interest, because the trading group's bonuses were based on the performance of the mark-to-mark assets and the group had the incentive to inflate the value of the assets. (Ds.s' Findings, ¶¶ 61-62.) Highland makes no showing that UBS inflated the value of the CDSs or that trading groups do not routinely develop marks. Moreover, Highland's assertion that "UBS's trading group alone set the marks for the Knox Warehouse assets" (Ds.'s Findings, ¶ 62) ignores UBS's credible testimony, discussed above, that the valuation group exercised oversight in connection with the development of the marks.

Highland's further assertion that its own marks are more reliable (Ds.'s Findings, ¶ 65) is unsupported by persuasive evidence. Philip Braner, who ultimately became Chief Operating Officer of the Highland Capital Management CLO Group and COO of Highland Financial Partners (Braner Testimony, Trial Tr. at 397), testified that Highland was itself tracking marks on the assets in the Knox Warehouse (id. at 615) and had an "internal valuation team that was responsible for accumulating marks" in a process in which portfolio managers of the Highland funds participated. (See id. at 467.) While Highland appears to assert that its marks are more reliable than UBS's because they were set by a valuation team, Highland fails to show that the role of its valuation team differed in any material respect from that of the UBS valuation group that performed oversight on its trading group in the marking process.

Notably, Highland fails to explain how its methodology in setting marks was more reliable than UBS's. Adam Warren, Highland's damages expert, forthrightly testified that he was not opining on the reasonableness of any marks in this case (Warren Testimony, Trial Tr. at 1247-1248), and he did not in fact give any testimony on whether UBS's or Highland's marks were more reliable.

The evidence at trial also demonstrated that Highland, like UBS, set marks on the CDSs on an asset by asset basis from March 2008 through October 2008. While there were differences

between Highland's and UBS's marks during this period, the Highland and UBS marks in the month of October were substantially similar. The difference in the marks did not escalate substantially until November 2008. (PX Demo. 9, at 4.) Mr. Dudney gave testimony, which was not disputed, that although Highland, like UBS, had been setting marks on an asset by asset basis, Highland stopped doing so as of October 2008 and, in a November 30, 2008 calculation of damages, attributed the same mark (37) to each asset. (Dudney Testimony, Trial Tr. at 883-884, 905-909, DX 116.) Highland offered no explanation for this change in methodology. Mr. Dudney, in contrast, gave plausible testimony that this use of the same mark did not make sense given the deterioration of the market. (Id. at 908.)

In sum, based on the credible evidence at the trial, the court holds that UBS has met its burden of demonstrating that its December 5, 2008 marks provide a reasonable basis, under the circumstances, for the calculation of damages at the time of the breach. In so holding, the court rejects Highland's not fully articulated contention that only an auction, and not a mark-to-market methodology, is a reliable method for calculating damages. (See Ds.'s Findings, ¶ 59.) Highland's reliance on the testimony of its damages expert, Adam Warren, in support of this contention (see id.) is misplaced. While Mr. Warren testified that CDSs are "bespoke contracts," he did not give any testimony that an auction was required to ascertain their value.

Further, as held above, the auction did not provide a reliable basis for determining UBS's damages due to the volatility of the market at the time of the auction. It bears emphasis that, although the market was also volatile at the time the December 5, 2008 marks were accumulated, Highland has not advanced an alternative, other than the non-viable auction, to the mark-to-market valuation methodology. Nor has Highland made any showing that the market value of

23

the CDSs was not <u>reasonably</u> determinable as of the date of breach using the mark-to-market

valuation methodology.[18]

      The court further holds that UBS has met its burden of demonstrating the reasonableness

of its calculation of damages using those marks. UBS's and Highland's experts both provided

the court with calculations of damages using UBS's and Highland's marks, respectively, as of

December 5, 2008. Mr. Warren confirmed that his main differences with Mr. Dudney regarding

the calculation of damages for the Synthetic Warehouse were that Mr. Dudney considered it

appropriate, and he did not, to include damages for unrealized CDS losses and for the 20 Internal

Swaps in which UBS was both the protection seller and the protection buyer. (Warren

Testimony, Trial Tr. at 1298; DX Demo. 12; PX Demo. 21; <u>see also</u> Dudney Testimony, Trial

Tr. at 1004.)

      Mr. Warren excluded from his damages calculation unrealized CDS losses for all CDSs

as to which a designation of ineligibility had not been made. He testified that his basis for doing

so was his understanding of the contract—i.e, his understanding that the SWA required such

designation—and not industry custom. (Warren Testimony, Trial Tr. at 1281-1282.) For the

reasons discussed above, this court has rejected Highland's position that the SWA should be

---

[18] In its post-trial briefing, Highland sought a finding that if UBS is held to be entitled to recover damages for CDS losses, Highland's marks are more reliable than UBS's for determining those damages. (Ds.'s Findings, ¶ 65.) Highland did not argue that the market value of the losses could not reasonably be determined by using marks. In contrast, in support of its claim that it is entitled to an offset against CDS damages for post-breach termination payments received by UBS on the CDSs, Highland questioned the accuracy of the market valuation at the time of the breach. Highland thus asserted in a footnote: "Given the scant market pricing data available at the time of the breach, post-termination payments and asset dispositions are relevant for the additional reason that they provide a more accurate measurement of the actual value of the Knox assets." (Ds.'s Post-Trial Memo., at 8 n 5.) This assertion is unsupported by any citation to trial testimony. More important, at the trial Highland did not offer any expert testimony that the mark-to-market methodology was not a reliable basis for calculating the CDS damages. For the additional reasons set forth in the section of this decision on Highland's requested Offset for Post-Breach Appreciation In CDS Asset Value, the court finds that offset of post-breach payments received by UBS on the CDSs would be inconsistent with calculation of UBS's damages based on their market value at the time of the breach.

construed as requiring ineligibility designations as a condition of the inclusion of unrealized losses on the CDSs in the calculation of damages. Also for the reasons discussed above, the court has rejected Highland's position that the losses on the Internal Swaps should not be included in this calculation.

Review of the experts' calculations shows, moreover, that when such losses are included in the calculations, the difference between Highland's and UBS's totals is substantially reduced. As previously noted, the parties stipulated to the introduction into evidence of charts prepared by Mr. Dudney comparing his and Mr. Warren's calculations of CDS damages using UBS's and Highland's marks as of December 5, 2008. Using Highland's marks, Mr. Dudney calculated CDS mark-to-market losses of $388,284,750, compared to Mr. Warren's calculation of $26,952,895—a difference of $361,331,855. (DX Demo. 12.) Using UBS's marks, Mr. Dudney calculated losses of $470,113,605, compared to Mr. Warren's calculation of $26,952,895—a difference of $443,160,710. (PX Demo. 21.)

The difference in the totals is largely due to Mr. Warren's exclusion from his calculation of all unrealized CDS losses and all losses for the Internal Swaps. (Warren Testimony, Trial Tr. at 1296-1299.) His calculation of $26,952,895 for CDS losses includes only realized CDS losses. (Id. at 1250.) According to Mr. Warren, the Internal Swaps account for $93,952,173 of the CDS damages using UBS's marks, or $68,801,027 using Highland's marks. (Id. at 1269.) Although Mr. Warren disputed UBS's entitlement to unrealized CDS losses, he performed a calculation including such losses. Using UBS's marks as of December 5, 2008, these losses totaled $355,487,606. (DX Demo. 10, at 14.) Using Highland's marks as of that date, these losses totaled $299,118,973. (Warren Testimony, Trial Tr. at 1269; DX Demo. 10, at 14.) Mr. Warren's total, using UBS's marks, for the Internal Swaps ($93,952.173) and the unrealized CDS losses ($355,487,606) was $449,439,779. (DX Demo. 10, at 14.) As stated above, Mr. Dudney's

25

calculation of total Synthetic Warehouse losses, using UBS's December 5, 2008 marks, was $470,113,605. Given the magnitude of the damages, this disparity is not material.

The court accordingly holds that UBS incurred losses in the Synthetic Warehouse of $470,113,605 as of December 5, 2008, the date of the breach, subject to the adjustments discussed below.

CLO Damages

Highland does not dispute that unrealized losses are recoverable for the CLO assets. (Warren Testimony, Trial Tr. at 1293.) Moreover, UBS's (Mr. Dudney's) and Highland's (Mr. Warren's) calculations of the CLO losses as of December 5, 2008 are the same: Using Highland's marks, these losses were $106,157,101. (DX Demo. 12, at 2.) Using UBS's marks, the losses were $128,848,101. (PX Demo. 21.) Having concluded that UBS's damages were properly calculated based on UBS's marks as of December 5, 2008, the date of the breach, the court holds that UBS incurred losses in the Cash Warehouse of $128,848,101, subject to the adjustments discussed below.

Adjustments to Damages Calculation

In calculating the Synthetic and Cash Warehouse losses, Mr. Dudney and Mr. Warren made adjustments for the same items: carry (premiums and interest), collateral value, financing fees, and financing savings. Mr. Dudney's adjustment of $79,587,557 and Mr. Warren's adjustment of $76,632,634 did not differ materially. (PX Demo. 21.) According to Mr. Warren, the difference of approximately $3 million is due to Mr. Warren's exclusion of the Internal Swaps in calculating the carry. (Warren Testimony, Trial Tr. at 1298-1299.) As the court has held that the Internal Swaps were properly included in the damages calculation, Mr. Dudney's adjustments will be accepted.

Reducing UBS's damages by the adjustments, the court holds that UBS sustained total

26

damages of $519,374,149 (Cash Warehouse Losses of $128,848,101 plus Synthetic Warehouse

Losses of $470,113,605 minus $79,587,557).

OFFSETS

Offset for Post-Breach Appreciation In CDS Asset Value

A central issue in this action is whether Highland is entitled to an offset against UBS's

damages for appreciation in the value of the CDSs after the breach. The parties stipulated that

UBS received post-breach termination payments net of carry on the CDSs, including the Internal

Swaps, in the amount of $202,223,059. (DX 491.) It is undisputed that these payments were

received months and, for many of the CDSs, years after the termination of the transaction. (Ds.'s

Post-Trial Memo., at 10 [acknowledging that UBS "liquidated the assets years later"]; PX 335

[spreadsheet showing termination dates for CDSs through 2011].)

Highland argues that, at the time the transaction was terminated, "frozen credit markets

had created a severe mismatch between the assets' alleged market value and their actual value

based on their cash flows." (Ds.'s Post-Trial Memo., at 10.) Highland further argues that UBS

was able to sell these assets for hundreds of millions of dollars more than their December 2008

marks and that, while UBS is entitled to retain the sale proceeds, "it cannot ignore these monies

in calculating the harm it actually suffered." (Id. at 11.) According to Highland, if disposition of

the assets after the termination is not considered, UBS will receive "an enormous windfall." (Id.)

UBS acknowledges that if a non-breaching party obtains a benefit "because of the breach," the

benefit must be offset against the non-breaching party's damages. (Ps.'s Post-Trial Memo., at 6

[emphasis UBS's].) UBS argues, however, that the Fund Counterparties' breach was not a but

for cause of the post-breach payments UBS received for the CDSs. (Id. at 7.) Rather,

subsequent gains that resulted from UBS's disposition of the assets were "the result of UBS's

contractual rights [to retain the assets] in the event of any termination and of its subsequent

27

Case 19-34054-sgj11 Doc 933-5 Filed 08/07/20    Entered 08/07/20 23:11:52    Page 29 of 41

investment strategy." (Id. at 14.) According to UBS, the Fund Counterparties' proposed offset would deprive UBS of the benefit of the bargain and result in a windfall for the Fund Counterparties. (Id.)

As discussed above, contract damages are intended to make "good or replace the loss" caused to a party by the breach of contract and "to place the nonbreaching party in as good a position as it would have been had the contract been performed. Thus, damages for breach of contract are ordinarily ascertained as of the date of the breach." (Brushton-Moira Cent. Sch. Dist., 91 NY2d at 261.) Further, "where the breach involves the deprivation of an item with a determinable market value, the market value at the time of the breach is the measure of damages." (Sharma, 916 F2d at 825 [applying New York law and citing Simon, 28 NY2d at 145-146].)

The calculation of damages is also subject to the fundamental precept that where a non-breaching party acquires a "benefit or opportunity for benefit . . . because of the breach, a balance must be struck between benefit and loss" and the benefit must be offset against the non-breaching party's damages. (Indu Craft, Inc. v Bank of Baroda, 47 F3d 490, 495 [2d Cir 1995] [applying New York law]; accord Aristocrat Leisure Ltd. v Deutsche Bank Trust Co. Americas, 727 F Supp 2d 256, 289 [SD NY 2010] ["[I]f a victim derives a benefit from the breaching party's breach of contract, the breaching party only is responsible for the victim's net loss"], reconsideration denied 2010 WL 3431132; Fertico Belgium S.A. v Phosphate Chemicals Export Assn., Inc., 70 NY2d 76, 84 [1987], rearg denied 70 NY2d 694 [holding, in a "cover" action governed by the Uniform Commercial Code, that "'[g]ains made by the injured party on other transactions after the breach are never to be deducted from the damages that are otherwise recoverable, unless such gains could not have been made, had there been no breach'"] [quoting 5 Corbin, Contracts § 1041].)

28

Here, although UBS and Highland agree that any benefit derived by UBS because of the breach must be offset against its losses, neither party has cited, and the court's own research has not located, any case in which a court has considered how to apply this precept to a non-breaching party's retention of assets upon a failed securitization transaction and realization of subsequent gains. There is, however, a substantial body of law involving a breaching party's failure to deliver or purchase assets subject to fluctuations in value, in which the courts have assessed damages based on the market value of the assets at the time of breach and have declined to consider any subsequent increases or decreases in value of the assets. As discussed further below, the court concludes that these cases are inconsistent with the offset sought by Highland.

As the Second Circuit has explained in reviewing this body of law, New York courts reject damage awards "based on what 'the actual economic conditions and performance' were in light of hindsight." (Sharma, 916 F2d at 826, quoting Aroneck v Atkin, 90 AD2d 966, 967 [4th Dept 1982], lv denied 59 NY2d 601 [1983].) "They have explicitly rejected the use of subsequent changes in value or profits where they would increase an award, and where they would decrease the award." (Sharma, 916 F2d at 826 [internal citations omitted].)

In the securities context, courts have repeatedly held that the damages for failure to deliver or purchase shares of stock should be based on their market value at the time of breach, and not on any subsequent increase or decrease in their value. (Simon, 28 NY2d at 145-146 [where the seller breached a contract to deliver shares, holding: "The proper measure of damages for breach of contract is determined by the loss sustained or gain prevented at the time and place of breach. The rule is precisely the same when the breach of contract is nondelivery of shares of stock"] [internal citations omitted]; Aroneck, 90 AD2d at 967 [where the buyer breached a contract to purchase shares, holding that

29

damages should be based on market value at the time of breach, and rejecting the buyer's

theory that the "value should be based on the actual economic conditions and

performance" of the company post-breach]; Emposimato v CIFC Acquisition Corp., 89

AD3d 418, 421 [1st Dept 2011] [quoting Aroneck and citing Simon in holding that "[i]n

the case of a breach of contract to sell securities, expectation damages are calculated as

'the difference between the agreed price of the shares and the fair market value at the

time of the breach'"]; Oscar Gruss & Son, Inc. v Hollander, 337 F3d 186, 197 [2d Cir

2003] [following Simon and Aroneck in a case involving the defendant's breach of a

contract to deliver warrants]; see also Kaminsky v Herrick Feinstein LLP, 59 AD3d 1, 11-

12 [1st Dept 2008], lv denied 12 NY3d 715 [2009] [holding that damages for breach of

contract to deliver shares prior to an initial public offering (IPO) should be awarded

based on the value of the shares at time of the breach, not their higher value post-IPO].)

The court holds that these cases involve transactions that are analogous to

(although far less complex than) the transaction at issue, and apply the same measure of

damages that this court has adopted above—namely, the measure of damages based on

the market value of the assets on the date of the breach. These cases accordingly govern

the calculation of damages here. The court notes, moreover, that sound reasons support

the application of this measure of damages without consideration of post-breach

fluctuations in the value of the assets.

As the Second Circuit reasoned, a contrary rule that would permit calculation of

damages at the time of trial "would be a two-edged sword, because courts would have to

diminish damage awards where the value of the item decreased or where losses were

encountered subsequent to the breach as well as enhance them where conditions improve.

However, New York courts have expressly refused to adopt this 'wait and see' theory of

INDEX NO. 650097/2009

damages." (Sharma, 916 F2d at 826.) In addition, although the court does not adjust for

changes in the value of the shares when calculating damages according to the date of

breach measure, the parties themselves can protect against changes in value by hedging

or acquiring shares in the market. As the Second Circuit further reasoned: "To be sure,

uncertainties about the future and lack of perfect information may cause an asset to be

under- or over-valued at any particular time. At that time, however, either party has an

opportunity to hedge according to his or her judgment about the future stream of

income." (Sharma, 916 F2d at 826; see also Simon, 28 NY2d at 146 [where the seller

breached a contract to deliver shares, reasoning that "[i]f plaintiff were anxious to own

the shares rather than obtain their value, he was free to purchase them in the market. His

cause of action should not and may not be converted into carrying a market 'call' or

'warrant' to acquire the stock on demand if the price rose above its value as reflected in

his cause of action"].)

      The court further holds that application of the date of breach measure of damages,

without adjustments for fluctuations in the value of the assets, will serve the objective of

putting UBS in the position it would have been in had the contract been performed. If the

securitization had closed, UBS would have been entitled, under the express terms of the

SWA, to novate to the Issuer its positions as protection seller on all of the eligible Knox

CDSs. (SWA § 5 [B] [1].) As a result of the breach, UBS was forced to assume a

substantial risk of loss under the CDSs that would have been novated to the Issuer had the

closing occurred. As discussed above, the loss in market value of the retained CDSs as of

the date of breach was determined using the mark-to-market methodology. More

specifically, as confirmed by both UBS's and Highland's experts, the mark-to-market

losses calculated as of the date of breach represent the cost to UBS to exit the CDSs—

31

that is, the payments to be made to third-parties so that they would take on, and UBS could extricate itself from, the risk. (Warren Testimony, Trial Tr. at 1304-1306; Dudney Testimony, Trial Tr. at 894-895.) A damage award for these mark-to-market losses will therefore compensate UBS for the exposure to risk that it would not have faced had the contract been performed.

To the extent that Highland contends that a damage award is not appropriate for these mark-to-market losses because the losses were not realized, the court rejects that contention. The damage award is appropriate, notwithstanding that the losses were not realized, because, as held above, the contract affords UBS the right of recovery for such losses. (See CDO Plus Master Fund Ltd. v Wachovia Bank, N.A., No. 07 Civ. 11078 [LTS], 2011 WL 4526132, * 2 [US Dist Ct SD NY, Sept. 29, 2011] [reasoning that, where the contractual definition of loss for the purpose of calculating damages did not require the CDS protection buyer to sustain "actual loss," "[t]he absence of an actual loss on a Reference Obligation transaction, thus, is not a barrier to [the protection buyer's] recovery. . ."] [emphasis in original].)

The court further holds that the record does not support Highland's contention that UBS's post-breach gains were realized because of the breach, and that this case therefore falls under the line of authority that requires an offset for such gains. Highland in effect contends that because UBS retained the CDSs as a result of the breach, it also realized the post-breach gains because of the breach.[19] That conclusion does not follow. As held

---

[19] In so holding, the court rejects UBS's contention that it would have been entitled to retain the CDS assets, regardless of the Fund Counterparties' breach, because the Agreements would have terminated in any event as of March 14, 2009, at which point UBS would have had the contractual right to retain the assets. (Ps.'s Post-Trial Memo., at 8.) This assertion is not only speculative but ignores that UBS did in fact acquire the right to retain the assets upon the Fund Counterparties' breach of the Agreements as a result of their failure to meet the third collateral call. For the reasons discussed in the text, however, the court cannot accept Highland's further contention that UBS realized gains on the retained CDSs because of the breach.

32

above, UBS had a contractual right to retain the CDSs upon the termination of the transaction based on the Fund Counterparties' breach of the SWA by failing to meet the collateral call. The SWA does not contain any provision that limited UBS's discretion as to when to dispose of the assets after termination. Rather, as UBS persuasively argues, the gains realized as a result of the post-breach disposition of assets were attributable not to the breach itself but to UBS's assumption of the risk of loss on the CDSs and its investment strategy as to when to dispose of them based on its assessment of the market. (See G & R Corp. v American Sec. Trust Co., 523 F2d 1164, 1175 [DC Cir 1975] [holding that while the transfer of property to the plaintiffs was caused by the defendant's breach, the profit realized by the plaintiffs from a post-breach sale was not "caused by the breach" but was "attributable to the [plaintiffs'] decision to hold [the property] until [its] condition and the market were favorable for sale"].)

Nor does Highland successfully argue that the gains realized by UBS on the post-breach disposition of the assets must be offset under general principles which require a party who suffers damages as a result of another's breach to take reasonable steps to mitigate its damages. (See Ds.'s Post-Trial Memo., at 5-9.) Highland cites cases requiring mitigation in connection with the purchase and sale of securities and transactions in other markets. (See e.g. Drummond v Morgan Stanley & Co., Inc., No. 95 Civ. 2011 [DC], 1996 WL 631723, * 2-3 [US Dist Ct SD NY, Oct. 31, 1996] [holding that where the buyer breached a contract to purchase securities, the seller must take steps to mitigate its damages by selling the securities within "a reasonable period of time"]; Saboundjian v Bank Audi (USA), 157 AD2d 278, 284-285 [1st Dept 1990] [holding that where a broker failed to execute a customer's speculative currency exchange order, the customer was required to direct execution of the trade "within a reasonable time after he learned that it had not been effected earlier"].)

33

These cases are inapposite, as the SWA affords UBS the contractual right to retain the securities upon the Fund Counterparties' breach. Ironically, although purporting to rely on these cases, which in fact require that the non-breaching party mitigate within a reasonable period of time, Highland argues not that UBS was required to dispose of the CDSs within a reasonable period of time after the breach but that it was required to hold them for months and, indeed, years, until the market improved. Highland thus asserts that UBS reasonably mitigated by "holding (as opposed to fire selling) fully performing interest and premium-bearing assets in the face of a dysfunctional market . . ," and that "UBS's mitigation was not only reasonable, but required by law." (Ds.'s Post-Trial Memo., at 7.) Put another way, Highland does not identify a specific date or dates by which UBS was required to mitigate. To the contrary, without citation to any legal authority, Highland argues that UBS was required to hold the assets for an indefinite period, until the market improved, to minimize its losses.

The mitigation cases provide no support for Highland's assertion that UBS's disposition, months and years after the breach, of assets that it had a contractual right to retain, constitutes mitigation.[20] Rather, in claiming that it is entitled to "offsets" for the post-breach gains realized by UBS, Highland appears in effect to advance a measure of damages that is patently inconsistent with the fundamental tenet of the date of breach measure of damages—namely, that a non-breaching party's damages for assets with a determinable market value must be calculated

---

[20] Nor does Highland cite any other authority that supports its claim that it is entitled to offsets for post-breach gains realized by UBS. Cases in which a party has a duty to cover (see e.g. Fertico Belgium S.A. v Phosphate Chemicals Export Assn., Inc., 70 NY2d 76, supra) are inapposite, given UBS's contractual right to retain the CDSs upon the breach. Cases in which a party is on both sides of a securities transaction are factually dissimilar. (See Aristocrat Leisure Ltd. v Deutsche Bank Trust Co. Americas, 727 F Supp 2d 256, supra [where the plaintiff company breached a contract affording the defendant bondholders the right to convert their bonds to the company's stock, and the bondholders held open existing short positions in the company's stock on which they realized post-breach gains, the company was entitled to an offset]; see also Minpeco, S.A. v Conticommodity Servs., Inc., 676 F Supp 486, 490 [SD NY 1987] [holding that the plaintiff's losses on short futures positions on silver as a result of the defendants' manipulation of the market were required to be offset by the plaintiff's profits on physical silver positions also then held by the plaintiff].)

34

at the date of breach, not based on hindsight, and that neither party can select the date on which

the damages calculation will be most favorable to it. Thus, a non-breaching buyer cannot select

the date on which the assets "had their highest value or a period of time that was profitable but

that excludes periods when losses occurred." (See Sharma, 916 F2d at 826.) Similarly, a

breaching buyer cannot avoid or reduce the damages caused by its breach by invoking post-

breach decreases in the value of the assets. (See id.)

The court accordingly holds that Highland's request for an offset for UBS's post-breach

gains from the disposition of the CDSs must be denied.

### Offset for Right of First Refusal Counterclaim

Highland Capital Management, L.P. (Highland Capital) seeks judgment on its first

counterclaim against plaintiff UBS Securities LLC for breach of the Cash Warehouse Agreement

provision affording it the right to purchase CLO assets in the event UBS elected to retain such

assets upon the termination of the Agreement. Section 5 (A) of the CWA provides that in event

of failure to close, "UBS shall be authorized (but not required) to sell each Collateral Obligation

then in the Warehouse Account in accordance with the Liquidation Procedures." The Liquidation

Procedures set forth in section 7 (A) of the CWA provide in pertinent part:

> "If any Collateral Obligation is to be sold, UBS shall have the right
> to direct such sale on such terms and in such manner and at such
> time that it deems appropriate in its sole discretion. UBS may, in
> its sole discretion, elect to retain any such Collateral Obligation or
> to sell such Collateral Obligation to one of UBS's Affiliates in
> which event, for purposes of determining Net Collateral Gain and
> Net Collateral Loss, such Collateral Obligation shall be deemed to
> have been liquidated at a price equal to its Market Value. To the
> extent that UBS in its sole discretion elects to retain such
> Collateral Obligation, the Servicer will have the right to purchase
> such Collateral Obligation at its Market Value."

Section 7 (A) further provides that if UBS elects to sell CLOs upon termination, "the Servicer

will have the right to bid for and purchase such Collateral Obligation at a purchase price equal to

35

the highest third party bid received by UBS for the purchase of such Collateral Obligation."

It is undisputed that Highland Capital notified UBS that it sought to purchase six of the CLOs with a bid price of $1.9 million and a notional value of $44 million, but that it sought to provide the funds for the purchase, and to settle the trades, in the name of one of its affiliates, CLO Value Fund. (Ds.'s Findings, ¶ 21.) UBS declined to agree to the sale to the Highland Capital affiliate. (Id.; DX 72; PX 292.)

The court is unpersuaded that a Highland Capital affiliate had the right, under the CWA, to purchase the CLOs. Section 7 (A), which governs the disposition of the CLO assets upon termination, expressly affords one UBS Affiliate the right to purchase CLOs. In contrast, this Section affords the right to purchase only to the Servicer, and not to any other Highland entity. The Servicer is defined as Highland Capital Management, L.P. (CWA, First Paragraph.) Reading the CWA as a whole, the court further finds that no other provision modifies or is inconsistent with this limitation. On the contrary, where the acts of Highland Capital's Affiliates were implicated, the CWA expressly referred to the Affiliates. (CWA, § 13 [B] [limiting the liability of the "Servicer" "for any acts or omissions by the Servicer or any Affiliate of the Servicer, or any of their directors, officers, members, agents, equity holders [and others] under or in connection with this Agreement, or for any decrease in the value of the Collateral Portfolio . . . ."].)[21] The court accordingly holds that the CWA unambiguously provides that the right to purchase retained CLOs is limited, among the Highland entities, to Highland Capital.

In view of this holding that the CWA is not ambiguous with respect to Highland's post-

---

[21] The parties to the transaction knew how to afford rights to purchase assets to Affiliates of the Servicer. The SWA provides that if the closing fails to occur, UBS may, with the consent of the related counterparty, novate CDSs "to a third party or to the Servicer (or any Affiliate of the Servicer designated by the Servicer). . . ." (SWA § 6 [A].) The omission from the CWA of authorization to Affiliate(s) of the Servicer to purchase CLOs is therefore notable. Moreover, Highland Capital does not claim that the concerns—regulatory and other—that are implicated in novating CDSs are comparable to those in selling CLOs.

36

termination right to purchase CLOs, the court rejects Highland's contention that the court should consider evidence allegedly showing that UBS and Highland Capital had a prior course of conduct in which UBS permitted Highland Capital to settle trades "at its fund level." (Ds.'s Findings, ¶¶ 80-81.) Parol evidence of course of conduct is not admissible to construe an unambiguous contract. (See e.g. Sigismondi v Queens Transit Corp., 38 AD2d 71, 73 [2d Dept 1971], affd no opinion 32 NY2d 745 [1973]; Evans v Famous Music Corp., 1 NY3d 452, 459 [2004].)

The court further notes that even if Highland Capital could recover on its counterclaim, the damages it seeks are not recoverable. Highland Capital seeks a finding that because the CLOs continued to perform until maturity, "it would have profited $46 million" if it had been permitted to exercise its right of first refusal to purchase the CLOs. (Ds.'s Findings, ¶ 82; DX Demo. 9.) As Highland Capital acknowledges, however, the market value of the CLOs at the time of breach was $1,934,214. (DX Demo. 9.) The measure of damages, as explained above in connection with Highland Capital's claim for offsets against UBS's damages, is the market value of the assets as of the date of breach, not the increase in their value in the indefinite future.

Offset for Unjust Enrichment

Highland Capital also seeks judgment on its second counterclaim alleging that UBS was unjustly enriched by its failure to permit Highland Capital, through its affiliate CLO Value Fund, to purchase the Collateral Obligations upon termination. This claim for unjust enrichment is not maintainable as the right to purchase is governed by contract—the CWA. (See generally Pappas v Tzolis, 20 NY3d 228, 234 [2012], rearg denied 20 NY3d 1075 [2013]; Clark-Fitzpatrick, Inc. v Long Is. R.R. Co., 70 NY2d 382, 388-389 [1987].)

Offset for Settlements with Highland Affiliates

37

Highland also requests an offset for settlements with three Highland Affiliates—Highland

Credit Strategies Master Fund, L.P. (Credit Strategies), Highland Crusader Offshore Partners,

L.P. (Crusader Offshore), and Highland Crusader Holding Corporation (Crusader Holding)

(collectively, the Settling Highland Affiliates). Credit Strategies and Crusader Offshore were

defendants in this action. UBS asserted its fraudulent conveyance cause of action against them

as well as all of the other defendants. (Second Am Compl., Fifth Cause of Action.) Crusader

Holding was a defendant in a separate complaint, which asserted a fraudulent conveyance cause

of action against it. (UBS Secs. LLC v Highland Crusader Holding Corp., Sup Ct, NY County,

Index No. 652646/11, Compl., First Cause of Action; Ps.'s Letters, dated July 21, 2015

[NYSCEF Doc. No. 397]; Jan. 7, 2016 [NYSCEF Doc. No. 398].) This court bifurcated the trial

of this action, directing that it would first hold a bench trial on the breach of contract claims,

which were triable by the court and are the subject of this decision, and that the fraudulent

conveyance and other claims, which are triable by a jury, would be heard subsequently. (May 1,

2018 Decision on the Record [NYSCEF Doc. No. 494].)

The parties dispute whether the confidential settlements (DX 76 id and DX 77 id) may be

considered in this action. They also dispute whether the settlements may be offset, pursuant to

statute or case law, against the damages awarded by this decision to UBS against the Fund

Counterparties on the breach of contract causes of action. (See Ps.'s Post-Trial Memo., at 14-21;

Ds.'s Post-Trial Memo., at 15-19, 21-24.)

Even assuming, without deciding, that the damages may be subject to offset by the

settlements, the determination of whether or to what extent the offset should be allowed must

await determination of the jury trial. Where an offset for a settlement is sought, "the damages

against which the settlement is sought to be applied should be determined so a proper

comparison can be made between them and the damages covered by the settlement." (Carter v.

38

State of New York, 139 Misc 2d 423, 429 [Ct Cl, 1988], affd 154 AD2d 642 [2d Dept 1989];
accord Moller v North Shore Univ. Hosp., 12 F3d 13, 16 [2d Cir 1993] [applying New York
law].)

Here, Highland argues that the causes of action against the settling defendants are
"wholly derivative of its breach-of-contract claims against the Fund counterparties." (Ds.'s Post-
Trial Memo., at 16.) UBS persuasively argues, in opposition, that the fraudulent conveyance
causes of action seek relief in addition to compensatory damages, including imposition of a
constructive trust and punitive damages. (Ps.'s Post-Trial Memo, at 22-24; Second Am. Compl.,
at 57-58.) Moreover, the damages, if any, that will be awarded against the Fund Counterparties
and Highland Capital on the fraudulent conveyance cause of action remain to be determined at
the jury trial. On this record the court accordingly cannot compare the settlements with the
fraudulent conveyance damages. Nor is there any basis for the court to determine the extent to
which the settlements cover the same damages, or damages that overlap with, the breach of
contract damages awarded to UBS against the Fund Counterparties by this decision. The
determination of the offset issue will therefore be deferred pending the jury trial. As it appears,
however, that Highland may be entitled to an offset for some or all of the settlement amounts, the
court will stay enforcement, to the extent of the settlement amount ($70.5 million), of the
judgment to be awarded to UBS against the Fund Counterparties for the damages for breach of
contract.

Conclusion

UBS is entitled to damages for $519,374,149 on the third and fourth causes of action
against the Fund Counterparties for breach of the Cash Warehouse and Synthetic Warehouse
Agreements. Enforcement of the judgment for this amount will be stayed up to $70.5 million,
the amount of the settlements with the Settling Highland Affiliates.

ORDER

It is hereby ORDERED that the parties shall meet and confer with a view to reaching agreement on the form of the judgment, including but not limited to the Allocation Percentages of CDO Fund and SOHC, and the award of interest. If the parties are unable to reach such agreement, they shall promptly settle judgment; and it is further

ORDERED that this decision shall be filed under seal for ten business days from the date hereof to afford the parties the opportunity to confer and to advise the court as to whether there is any information in the decision which is claimed by any party to be confidential. The parties shall, within five business days of the date hereof, submit a joint letter of no more than three pages, advising the court of their positions on this issue. The letter should be accompanied by a joint copy of the decision, highlighting the portion(s) of the decision which each party claims is confidential and should be redacted in the decision that will be publicly filed; and it is further

ORDERED that the parties shall telephone the court on a conference call within five business days of the date hereof (at a specific date and time to be arranged with the Clerk of Part 60) to discuss the above confidentiality issue as well as the jury trial phase of this action. The parties should be prepared to address whether, or to what extent, the jury trial may proceed in light of Highland Capital's filing of a bankruptcy petition.[22]

This constitutes the decision and order of the court.

Dated: New York, New York
       November 14, 2019

MARCY FRIEDMAN, J.S.C.

---

[22] By letter dated October 17, 2019 (NYSCEF Doc. No. 640), counsel (Reid Collins & Tsai LLP) for Highland Capital, the Fund Counterparties and other Highland defendants, advised the court of Highland Capital's bankruptcy filing, and represented that the automatic stay does not preclude decision of the causes of action against the Fund Counterparties or the counterclaim by Highland Capital. This letter sought to reserve defendants' position on the effect of the bankruptcy filing on subsequent proceedings in this action.