# EXHIBIT 8

CONFIDENTIAL MATERIAL SUBJECT TO THE STIPULATION AND ORDER FOR
THE PRODUCTION AND EXCHANGE OF CONFIDENTIAL INFORMATION
ENTERED IN UBS SECURITIES LLC, ET AL. v. HIGHLAND CAPITAL
MANAGEMENT, L.P., ET AL., INDEX NO. 650097/2009, HAS BEEN REDACTED

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| UBS SECURITIES LLC and UBS AG, LONDON BRANCH, | Index No. |
| Plaintiffs, | |
| -against- | **COMPLAINT** |
| HIGHLAND CRUSADER HOLDING CORPORATION, | |
| Defendant. | |

Plaintiffs, UBS Securities LLC ("UBSS") and UBS AG, London Branch ("UBS AG") (collectively, "UBS"), for their Complaint allege against defendant Highland Crusader Holding Corporation ("Crusader Holding Corp."), as follows:

## NATURE OF THE ACTION

1.     UBS brings this action to recover damages in excess of $686 million resulting from the wrongful conduct of defendant Crusader Holding Corp. (and others), based on causes of action for fraudulent conveyances and tortious interference.

2.     Highland Capital Management, L.P. ("Highland Capital") is a defendant in an action commenced by UBS (the "Highland Capital Action") on or about June 28, 2010, which involves, among other things, fraudulent conveyance claims arising out of asset transfers directed by Highland Capital in March of 2009. Highland Special Opportunities Holding Company ("SOHC"), Highland CDO Opportunity Master Fund, L.P. ("CDO Fund," and together with SOHC, the "Fund Counterparties"), Highland Financial Partners, L.P. ("Highland Financial"), Highland Credit Strategies Master Fund, L.P. ("Credit Strategies"), Highland Crusader Offshore Partners, L.P. (the "Crusader Fund"), Highland Credit Opportunities CDO, L.P. (the "Credit

Opp. Fund"), and Strand Advisors, Inc. ("Strand") are defendants (collectively, the "Highland Entities") in a separate action commenced by UBS (the "Highland Entities Action") on February 24, 2009. The Highland Entities Action concerns, among other things, claims for fraudulent conveyances, fraudulent inducement and breach of contract. On or about October 7, 2010, this Court consolidated the Highland Entities Action and the Highland Capital Action. The Highland Entities Action and the Highland Capital Action are referred to herein as the "Consolidated Action". As alleged in the Consolidated Action, together with Highland Capital, the Fund Counterparties fraudulently induced UBS to restructure a transaction to avoid Highland Capital's and the Fund Counterparties' contractual obligation to pay UBS over $86 million. Once Highland Capital and the Fund Counterparties succeeded in misleading UBS into restructuring the original transaction, Highland Capital and its affiliates, including defendant Crusader Holding Corp., made it impossible for the Fund Counterparties to meet their obligations to UBS by stripping the Fund Counterparties and SOHC's alter ego, of their valuable assets through fraudulent conveyances and otherwise dealing in bad faith with their contractual obligations to UBS.

3.      When UBS finally terminated the restructured transaction and demanded payment from Highland Capital and the Fund Counterparties, it was owed in excess of $686 million that the Fund Counterparties could not pay because of the misappropriations and improper transfers of assets directed by Highland Capital and the Fund Counterparties. Even after UBS demanded payment, Highland Capital, the Highland Entities and defendant Crusader Holding Corp. engaged in further unlawful conduct that harmed UBS by

2

4. ██████████████████████████████████

## SUMMARY OF THE ACTION

5.     This action arises out of Highland Capital's efforts in the Spring of 2007 to sponsor a collateralized debt obligation ("CDO") securitization (the "Original Engagement"). In connection with the Original Engagement, UBS agreed to finance the purchase of various collateralized loan obligation ("CLO") securities, as well as credit default swap obligations that referenced similar CLO securities. UBS agreed to hold or "warehouse" the CLO securities and credit default swaps (collectively, the "Warehouse Assets" or "Warehouse Facility") for Highland Capital's benefit.

6.     On or about August 15, 2007, the Original Engagement terminated by its terms without the contemplated securitization having occurred. As a result of the termination, Highland Capital and two of its affiliates, the Fund Counterparties, owed UBS in excess of $86 million related to the decline in the value of the Warehouse Assets.

7.     Instead of paying UBS what it was owed, Highland Capital and the Fund Counterparties fraudulently induced UBS to restructure the Original Engagement by providing UBS with false, incomplete and otherwise misleading information concerning the Fund Counterparties' finances and assets. Using both affirmative material misrepresentations and omissions (material facts or information needed to be disclosed to make the statements actually made not misleading, and which were not disclosed, are referred to hereinafter as "Omissions"), Highland Capital, its principals and the Fund Counterparties misled UBS regarding the financial

3

health of the Fund Counterparties and their creditworthiness, thereby causing UBS to forego recovering its losses from Highland Capital in favor of agreeing to restructure the terms of the parties' prior agreements (the "Restructured Transaction").

8.      For example, the strength of the Fund Counterparties' financial statements, and their purported ability to use the hundreds of millions of dollars worth of assets reflected therein to satisfy future obligations to UBS under the Warehouse Agreements were material to UBS's decision to agree to the restructuring. Consequently, in connection with negotiating the Restructured Transaction, UBS conditioned any restructuring on the Fund Counterparties' ability to post $70 million in cash and securities as collateral (the "Initial Restructuring Collateral") with State Street Bank and Trust Company ("State Street"), in which UBS would hold a security interest. Highland Capital and the Fund Counterparties were able to conceal important information about the Fund Counterparties' financial weakness that was both quantitatively and qualitatively material to UBS, and which would have caused UBS not to enter the Restructured Transaction.

9.      Similarly, while negotiating the Restructured Transaction, Highland Capital and the Fund Counterparties provided UBS with financial reports and statements for the Fund Counterparties. The financial information that Highland Capital and the Fund Counterparties provided to UBS contained materially false and misleading information and Omissions concerning the financial condition of the Fund Counterparties. Among other things,



10.     In reliance on material misstatements and Omissions made by Highland Capital and the Fund Counterparties, UBS agreed to restructure the Original Engagement, and thereby were fraudulently induced to give up contractual rights under the terms of the Original Engagement.  In particular, UBS reasonably and justifiably relied on misrepresentations and Omissions of facts and information solely and peculiarly within the knowledge of Highland Capital and the Fund Counterparties.  Given UBS's prior dealings with Highland Capital and its affiliates, as well as Highland Capital's size and presence in the market, UBS had no reason to believe that Highland Capital and its affiliates would provide it with false, incomplete or otherwise misleading information about the Fund Counterparties' finances and assets, as they in fact did.

11.     Had UBS known that the Fund Counterparties could not ███████████████████████ it would not have gone forward with the Restructured Transaction.  UBS never would have agreed to the Restructured Transaction had it known prior to entering the Restructured Transaction the true status of the Fund Counterparties' financial condition and the true fair market value of the Fund Counterparties' holdings that would have been available to satisfy their then-existing and future obligations to UBS.  UBS's losses described herein were directly and proximately caused by the conduct of Highland Capital, defendant Crusader Holding Corp. and the Highland Entities as described herein.

12.     Almost immediately after UBS agreed to the Restructured Transaction, Highland Capital began the process of making it impossible for the Fund Counterparties to ever

5

repay UBS what they owed. In particular, exercising its control over the Fund Counterparties, Highland Capital caused the Fund Counterparties to transfer cash for the benefit of Highland Capital and its principals, and, separately, in violation of UBS's rights, ███████████ ███████████████████████████████ all during a time when the Fund Counterparties owed UBS hundreds of millions of dollars.

13.     For example, in or around May 2008, Highland Capital caused the dissipation of approximately $100 million in cash that CDO Fund held after it sold a long position in a company called SunCom Wireless. Highland Capital drained CDO Fund's cash resources despite CDO Fund's ever-increasing obligations to UBS. Highland Capital's bad faith conduct caused injury to UBS by making it impossible for the Fund Counterparties to satisfy their contractual obligations to UBS.

14.     In September 2008, as losses in the Warehouse Facility continued to grow, UBS began to exercise its contractual rights and make margin calls demanding additional collateral from the Fund Counterparties. Because Highland Capital had routinely taken cash out of the Fund Counterparties, the Fund Counterparties were undercapitalized and lacked assets and liquidity to meet UBS's demands for additional collateral.

15.     Highland Capital and its principals, including its president and founder, James D. Dondero, knew that if the Fund Counterparties defaulted on their obligations to UBS (or any other creditor), Highland Capital's ability to conduct business in the financial community and to keep or solicit investors would be harmed. Investors in Highland Capital's hedge fund family would withdraw their investments. In addition, creditors would take actions to protect themselves, including foreclosing on collateral and aggressively enforcing their contractual rights. Highland Capital and its principals were concerned that upon the disclosure of the true state of their affairs, their business would collapse.

16. To avoid that result, Highland Capital and its principals resorted to



17. Highland Capital's and its principals' belated attempt to protect their reputation by continuing to fraudulently portray the Fund Counterparties as viable independent entities was ultimately unsuccessful. By late October 2008, Highland Capital could no longer continue to prop up the Fund Counterparties.

18. On or about November 11, 2008, UBS demanded additional collateral from the Fund Counterparties. The Fund Counterparties defaulted. On December 3, 2008, UBS terminated the Restructured Transaction. As a result of UBS's termination of the Restructured Transaction, the Fund Counterparties were contractually obligated to pay UBS in excess of $686 million.

19. On or about February 24, 2009, UBS filed the original complaint in this Court against the Fund Counterparties for breach of the Warehouse Agreements that had been entered in connection with the Restructured Transaction. By that time, the Fund Counterparties and SOHC's alter ego, Highland Financial, had been insolvent and unable to pay their creditors for some time. Nonetheless, Highland Capital and Highland Financial



20.     In sum, after fraudulently inducing UBS to agree to the Restructured Transaction, Highland Capital and its principals exercised their domination over the Fund Counterparties to improperly transfer substantial assets from the Fund Counterparties for their own personal gain, i.e., solely and improperly to protect and enhance the value of Highland Capital and its principals by wrongful and improper means. In the process, they made it impossible for the Fund Counterparties to pay UBS the losses they had agreed to pay on the Warehouse Facility.

## THE PARTIES

### A.     The Plaintiffs

21.     Plaintiff UBS AG, London Branch, is a banking corporation organized under the laws of Switzerland with its principal place of business at Finsbury Avenue, London, United Kingdom.

22.     Plaintiff UBSS is a limited liability company organized under the laws of Delaware with its principal places of business at 677 Washington Blvd., Stamford, Connecticut, and 299 Park Avenue, New York, New York.

8

**B.      Defendant Crusader Holding Corp.**

23.      Defendant Highland Crusader Holding Corporation ("Crusader Holding Corp.") is a Delaware corporation with its principal place of business at 13455 Noel Road, Suite 800, Dallas, Texas 75240.   On information and belief, Crusader Holding Corp. is a wholly-owned subsidiary of the Crusader Fund.  Crusader Holding Corp. transacts business within New York, and derives substantial revenue from interstate and international commerce.

**C.      The Other Affiliated Transferees** ███████████████

24.      Highland Credit Strategies Master Fund, L.P. ("Credit Strategies") is a Bermuda limited partnership organized with its principal place of business at Victoria Place, 31 Victoria Street, Hamilton HM10, Bermuda.   Credit Strategies transacts business within New York, and derives substantial revenue from interstate and international commerce.

25.      Highland Crusader Offshore Partners, L.P. (the "Crusader Fund") is a Bermuda limited partnership with its principal place of business at Victoria Place, 31 Victoria Street, Hamilton HM10, Bermuda.  The Crusader Fund also has an office located at 13455 Noel Road, Suite 800, Dallas, Texas 75240.  The Crusader Fund transacts business within New York, and derives substantial revenue from interstate and international commerce.

26.      Highland Credit Opportunities CDO, L.P. (the "Credit Opp. Fund") is a Delaware limited partnership with its principal place of business at 13455 Noel Road, Suite 800, Dallas, Texas 75240.

27.      Defendant Crusader Holding Corp., Credit Strategies, the Crusader Fund and the Credit Opp. Fund are referred to herein collectively as the "Affiliated Transferees" ███

9

**D.  Highland Capital**

28.  Highland Capital Management, L.P. ("Highland Capital") is a limited partnership organized under the laws of Delaware, with its principal place of business at 13455 Noel Road, Suite 800, Dallas, Texas 75240, and an office at 9 West 57th Street, New York, New York. Highland Capital is registered to do business in New York. Highland Capital describes itself as a 100% employee-owned partnership. Highland Capital is an investment adviser that manages a large number of investment entities that operate as hedge funds for Highland Capital's principals and affiliates, as well as unaffiliated investors. Highland Capital currently manages over $25 billion in various assets, including structured financial products. Highland Capital also holds direct and indirect equity and ownership interests in the entities that it manages, including in Highland Financial, the Fund Counterparties and the Affiliated Transferees. James D. Dondero is the President of Highland Capital, as well as one of its founders. On or about June 28, 2010, UBS commenced the Highland Capital Action against Highland Capital. The Highland Capital Action was later consolidated with the Highland Entities Action by a Decision and Order, entered by this Court on October 7, 2010 (this action and the Highland Capital Action are referred to herein as the "Consolidated Action").

**E.  Strand**

29.  Strand Advisors, Inc. ("Strand") is Highland Capital's general partner. Strand is a Delaware corporation principally engaged in the business of serving as the general partner of Highland Capital. As Highland Capital's general partner, Strand is responsible for Highland Capital's liabilities and obligations and regularly conducts business in New York, or causes its affiliates to conduct business in New York.

10

F.     **Highland Financial and SOHC**

30.     Highland Special Opportunities Holding Company ("SOHC") is a company organized under the laws of the Cayman Islands, with its offices at Walker House, PO Box 908GT, Mary Street, George Town, Grand Cayman, Cayman Islands. SOHC is a wholly-owned subsidiary of Highland Financial Partners, L.P. (a Delaware limited partnership) ("Highland Financial"). SOHC has six sister subsidiaries, all of which are owned in whole or in part by Highland Financial. Highland Capital serves as investment manager to Highland Financial, SOHC and its sister subsidiaries.

31.     Highland Financial is SOHC's alter ego.



For all purposes relevant to this action, Highland Financial and SOHC should be treated as a single entity and as alter egos of one another.

### G. CDO Fund

32.    Highland CDO Opportunity Master Fund, L.P. ("CDO Fund") is a Bermuda exempted limited partnership, with its principal place of business at 52 Reid Street, Hamilton, Bermuda. Highland Capital controls CDO Fund's investment decisions through an investment management agreement. Between January 31, 2007 and August 31, 2008, Highland Capital's and its affiliates' aggregate ownership interest in CDO Fund ranged between 43.36% and 56.44%. Highland CDO Opportunity Fund, L.P. and Highland CDO Opportunity Fund, Ltd. serve as so-called "feeder funds" for CDO Fund.

### H. Non-Parties Affiliated With Highland Capital In Which The Fund Counterparties Invested

33.    The Fund Counterparties held investments in several Highland Capital-affiliated funds, including Highland Credit Opportunities CDO, L.P., Highland Legacy, Highland Loan Funding V, Highland Park CDO I, Ltd., Highlander Euro CDO B.V. and Highlander Euro CDO III B.V. Highland Capital served as the investment manager for these affiliated funds, and received valuable fees derived from the valuations of these funds' assets, which it managed.

### JURISDICTION AND VENUE

34.    Venue in this Court is proper under CPLR 503 because plaintiff UBSS has a principal place of business in New York County.

35.    This Court also may exercise jurisdiction over Crusader Holding Corp. pursuant to CPLR 301 and 302(a)(1) and (3), because Crusader Holding Corp. regularly transacts and solicits business in New York, committed tortious acts causing injury in New York, should reasonably have expected that its tortious acts would have consequences in New York, the effect of its wrongful conduct was felt in New York, and/or derive substantial revenue from interstate or international commerce.

## FACTUAL BACKGROUND

### A.    The Original Engagement

36.    In or around April 2007, Highland Capital approached UBS for short-term financing in connection with a securitization that Highland Capital wanted to sponsor. UBS agreed to do so (the "Original Engagement").

37.    On or about April 20, 2007, UBSS and Highland Capital entered into an engagement letter (the "Original Engagement Letter"), which contemplated that UBSS would act as the exclusive financial arranger and placement agent for a type of collateralized debt obligation transaction ("CDO"), known as a collateralized loan obligation ("CLO") squared or "CLO Squared" transaction. (A copy of the Original Engagement Letter is annexed hereto as Exhibit A.)

38.    CLOs are a form of securitization where interest and principal payments on corporate loans made to multiple mid-sized and large businesses are pooled together by a lender or the owner of the loans, and then passed on through a securitization structure to investors. CLOs typically involve multi-million dollar loans known as syndicated loans, or leveraged loans made to new businesses or existing businesses, often to acquire other companies. The loan originators are able to spread risk through the CLO securitization, and simultaneously free up capital to make new loans to other businesses. The Original Engagement contemplated the securitization of CLO securities. Thus, the securitization contemplated by Highland Capital would have been a "CLO Squared" transaction.

39.    On or about May 22, 2007, as contemplated by the Original Engagement Letter, UBSS and Highland Capital entered into a warehouse agreement (the "Original Cash Warehouse Agreement"). (A copy of the Original Cash Warehouse Agreement is annexed hereto as Exhibit B.) In accordance with the terms of the Original Engagement Letter and the

13

Original Cash Warehouse Agreement, UBSS agreed to acquire securities as directed by Highland Capital. Highland Capital instructed UBS to acquire various CLO securities issued in connection with prior CLO transactions involving other sponsors and issuers (the "Cash Portfolio").

40. In a separate but related synthetic warehouse agreement (the "Original Synthetic Warehouse Agreement," and together with the "Original Cash Warehouse Agreement," the "Original Warehouse Agreements"), UBS AG agreed to enter into credit default swaps (the "CDS Portfolio," and together with the Cash Portfolio, the "Warehouse Assets"), pursuant to which UBS AG sold credit protection to various third parties. (A copy of the Original Synthetic Warehouse Agreement is annexed hereto as Exhibit C.)

41. For Highland Capital's benefit, UBS held the Warehouse Assets on its balance sheet (the "Warehouse Facility"). UBS was expected to hold the Warehouse Assets until such time as the parties could arrange for the assets to be securitized as part of the contemplated securitization. In particular, if the parties believed that a securitization was economically feasible, they would create a special purpose entity that would acquire the Warehouse Assets from UBS using the proceeds from the sale of securities to investors. The special purpose entity's debt securities would be secured by those Warehouse Assets.

42. Under the Original Warehouse Agreements, if the Original Engagement terminated without a securitization, Highland Capital and the Fund Counterparties were obligated to pay UBS for losses on the Warehouse Assets. In particular, under the terms of the Original Cash Warehouse Agreement, Highland Capital was directly responsible for the first $50 million in losses in the Cash Portfolio, and under the terms of the Original Synthetic Warehouse Agreement, the Fund Counterparties were obligated to pay UBS for any and all losses suffered on the CDS Portfolio.

14

43.     The Original Engagement Letter expired by its terms on August 15, 2007 without a securitization occurring.  The Original Warehouse Agreements expired on the same date in accordance with their respective terms.

44.     As of August 15, 2007, the Warehouse Assets in the Warehouse Facility had lost in excess of $86 million in value.  Although they had sufficient capital to do so, Highland Capital and the Fund Counterparties failed and refused to pay UBS what it was owed under the Original Warehouse Agreements.

45.     As a result of extensive negotiations as well as representations and warranties made by Highland Capital on its own behalf, and on behalf of the Fund Counterparties as their investment manager, UBS agreed to restructure the terms of the Original Engagement.

**B.     Highland Capital And The Fund Counterparties Resort To Fraud To Avoid
          Highland Capital's Obligations To UBS**

46.     As alleged above, as a result of the termination of the Original Engagement, Highland Capital was directly liable to UBS under the Original Warehouse Agreement for in excess of $86 million.

47.     Between August 2007 and March 14, 2008, UBS, Highland Capital and the Fund Counterparties had discussions and negotiations concerning a restructuring of the terms of the Original Engagement.  Those negotiations resulted in agreements to restructure the Original Engagement (the "Restructured Transaction"), including a release by UBS of its claims against Highland Capital and the Fund Counterparties arising out of the Original Engagement. (The terms of the Restructured Transaction are set forth in the Engagement Letter and Warehouse Agreements described below (collectively, the "Agreements"), which are annexed hereto as Exhibits D, E and F, respectively.)

48.     During the course of negotiations and before March 14, 2008, Highland Capital and Fund Counterparties made several material misrepresentations to UBS concerning the creditworthiness of the Fund Counterparties. Dondero, Highland Capital and the Fund Counterparties also failed to disclose to UBS information which would have been material to UBS's decision to enter the Restructured Transaction ("Omissions," as defined above). As Highland Capital and the Fund Counterparties knew, UBS reasonably relied upon those material misrepresentations and, due to the Omissions, a misstated assessment of the Fund Counterparties, all to its detriment in deciding whether to enter the Restructured Transaction. UBS reasonably and justifiably relied on these misrepresentations and Omissions of facts and information that were solely and peculiarly within the knowledge of Highland Capital and the Fund Counterparties. Given UBS's prior dealings with Highland Capital and its affiliates, as well as Highland Capital's size and presence in the market, UBS reasonably believed that Highland Capital and the Fund Counterparties would not provide it with false, incomplete or otherwise misleading information about the Fund Counterparties' finances and assets as it in fact did.

49.     For example, on or about December 28, 2007, to induce UBS to enter the Restructured Transaction and related Agreements, Gibran Mahmud of Highland Capital sent SOHC financial statements to UBS. On or about January 29, 2008, UBS requested additional financial information related to SOHC. Later that same day, to induce UBS to enter the Restructured Transaction and related Agreements, Phil Braner of Highland Capital emailed UBS a copy of SOHC's Statement of Financial Condition, dated December 31, 2007.

50.     As described with more particularity below, the SOHC financial information that Highland Capital and the Fund Counterparties provided to UBS, which Highland Capital was responsible for preparing, was materially false and misleading. Highland

16

Capital and the Fund Counterparties knew that UBS would rely upon SOHC's financial information in connection with deciding whether to agree to the Restructured Transaction and the terms of the Agreements being negotiated.

51.     On or about February 4, 2008, Matt Killebrew of Highland Capital provided UBS with financial reports via email that reflected financial summaries, and aggregate valuations for CDO Fund's assets as of December 31, 2007.   On or about March 4, 2008, Mr. Killebrew sent UBS similar reports for the period ended January 31, 2008.   As described with more particularity below, these financial reports, which Highland Capital prepared, also were materially false and misleading.   Highland Capital and the Fund Counterparties knew that UBS would rely upon CDO Fund's financial information in connection with deciding whether to agree to the Restructured Transaction and the terms of the Agreements being negotiated.

52.     The Fund Counterparties' financial statements



These facts and information were solely and peculiarly within the knowledge of Highland Capital and the Fund Counterparties.

53.     CDO Fund's financial statements



17



54. Similarly, Highland Capital and the Fund Counterparties concealed from UBS the fact that the Fund Counterparties



55.



18



56. During the course of negotiations concerning the restructuring, UBS also insisted that the Fund Counterparties have the ability to post $70 million in cash and securities as collateral, which would be held at State Street Bank (the "Initial Restructured Transaction Collateral"), and in which UBS would hold a security interest. The Fund Counterparties' ability to do so using their own assets was qualitatively and quantitatively material to UBS. Among other things, it demonstrated the strength of their balance sheets, and by extension, their ability to satisfy future obligations to UBS.

57. Highland Capital and the Fund Counterparties agreed that the Fund Counterparties would post $70 million in Initial Restructuring Collateral.

19

58. 

59.

As the Fund Counterparties' investment manager, Highland Capital maintained the Fund Counterparties' accounting records, and knew

Given UBS's prior dealings with Highland Capital and its affiliates, as well as Highland Capital's size and presence in the market, UBS had no reason to believe, and reasonably did not believe, that Highland Capital would provide it with false, incomplete or otherwise misleading information about

60.

20



It also would have drawn into question the Fund Counterparties' liquidity.

61. But for Dondero's, Highland Capital's and the Fund Counterparties' false and misleading statements and Omissions concerning the Fund Counterparties' finances and assets, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, UBS would not have entered into the Restructured Transaction or the Agreements that memorialized its terms. Given the Fund Counterparties' weak credit quality, additional adverse information about their collective or individual creditworthiness would have deterred UBS from going forward with the Restructured Transaction and putting more assets at risk. These misrepresentations and Omissions proximately caused harm to UBS.

62. UBS would not have entered into a transaction with parties that made misrepresentations as Highland Capital and the Fund Counterparties did. UBS also would not have agreed to release its valuable claims arising out of the Original Engagement under such circumstances. Because of, and in reliance on, the false and misleading information about the Fund Counterparties provided by Dondero, Highland Capital and the Fund Counterparties, UBS entered into the Restructured Transaction memorialized in the Agreements. Because each of the misrepresentations and Omissions identified above disguised the Fund Counterparties' inability

to satisfy their obligations to UBS, the misrepresentations and Omissions proximately caused harm to UBS.

## C.    The Restructured Transaction Agreements

### 1.    The Engagement Letter

63.    On or about March 14, 2008, the parties reached agreement on the terms of a restructured engagement, which were memorialized in a new engagement letter (the "Engagement Letter," annexed hereto as Exhibit D).    Pursuant to the Engagement Letter, Highland Capital re-engaged UBSS to act as placement agent in the event that market conditions improved, and the parties could go forward with securitizing the Warehouse Assets already held by UBS in the Warehouse Facility.  UBS agreed to continue holding the Warehouse Assets in the Warehouse Facility, which had a notional value of approximately $818 million.

64.    Under the terms of the Engagement Letter, UBS released claims against Highland Capital and the Fund Counterparties arising out of the Original Engagement.

### 2.    The Restructured Warehouse Agreements

65.    On March 14, 2008, UBSS, the Fund Counterparties and Highland Capital also entered into a cash warehouse agreement (the "Cash Warehouse Agreement"), pursuant to which UBSS agreed to continue to hold the Cash Portfolio.  (A true and correct copy of the Cash Warehouse Agreement is annexed hereto as Exhibit E.)

66.    UBS AG, the Fund Counterparties and Highland Capital also entered into a synthetic warehouse agreement, dated as of March 14, 2008 (the "Synthetic Warehouse Agreement," and together with the Cash Warehouse Agreement, the "Warehouse Agreements"), pursuant to which UBS AG agreed to continue warehousing credit protection that it sold, i.e., the CDS Portfolio. (A true and correct copy of the Synthetic Warehouse Agreement is annexed hereto as Exhibit F.)

22

67.     Section 13(B) of the Cash Warehouse Agreement and § 11(B) of the Synthetic Warehouse Agreement make Highland Capital liable for losses, including losses in the Warehouse Facility, by reason of acts or omissions constituting bad faith, willful misconduct, or gross negligence.

68.     Under § 12 of the Synthetic Warehouse Agreement, the Fund Counterparties agreed to transfer to State Street the Initial Restructuring Collateral to partially secure their respective obligations to UBS under the Warehouse Agreements. Annex C to the Synthetic Warehouse Agreement identified the six assets that the Fund Counterparties purportedly transferred to State Street to satisfy their Initial Restructuring Collateral obligations, along with $20 million in cash.

69.     The Warehouse Agreements also contained releases whereby UBS agreed to release claims it had against Highland Capital and the Fund Counterparties for losses arising out of the Original Engagement.

**D.      Highland Capital Uses Its Control Over The Fund Counterparties To Dissipate Their Assets Without Regard For The Fund Counterparties' Growing Obligations To UBS**

70.     Almost immediately after the Restructured Transaction Agreements were executed, Highland Capital and the Fund Counterparties knowingly began to dissipate the Fund Counterparties' assets and make it impossible for the Fund Counterparties to ever repay UBS what they owed. Highland Capital and the Fund Counterparties did so at various times when the Fund Counterparties owed UBS hundreds of millions of dollars.

71.     For example, on or about March 26, 2008, just days after entering the Restructured Transaction, Highland Capital caused certain SOHC assets to be encumbered by entering into a transaction with Barclays Bank, plc. ("Barclays"). At or around the same time, CDO Fund was negotiating financing arrangements with Morgan Stanley & Co. International

23

Ltd. and Highland Capital IV SPC, whereby it granted a security interest in its assets to those entities. By granting a security interest in the Fund Counterparties' assets to other creditors, Highland Capital unfairly and improperly reduced the assets available to satisfy the Fund Counterparties' obligations to UBS in bad faith and in violation of UBS's rights.

72.     Similarly, on or about April 2, 2008, Highland Capital advised UBS that CDO Fund had recently monetized a $129 million long position in SunCom Wireless. When Highland Capital and CDO Fund subsequently provided UBS with additional financial information about CDO Fund, however, UBS discovered that Highland Capital had caused CDO Fund to transfer approximately $100 million of the cash proceeds from the SunCom Wireless sale out of CDO Fund.

73.     By improperly removing such a substantial amount of cash from CDO Fund, Highland Capital interfered in bad faith with CDO Fund's ability to satisfy its steadily increasing financial obligations to UBS. In particular, in or around May 2008, when the cash proceeds from the SunCom Wireless position were siphoned off, the Fund Counterparties owed UBS in excess of $166 million related to losses in the Warehouse Facility, approximately 50% of which CDO Fund was obligated to pay.

74.     Highland Capital also repeatedly caused SOHC's cash to be transferred by Highland Financial. In particular, during the first five months of 2008, SOHC's cash position was reduced by over $10 million at a time when its obligations to UBS were increasing substantially.

**E.** **In the Fall of 2008, Losses Mount And The Fund Counterparties Face Collateral Calls From Creditors Including UBS That They Cannot Meet Despite Highland Capital's Belated Efforts To Do So** █████████████

75.    Under the terms of the Warehouse Agreements, the Fund Counterparties were required to post additional collateral with UBS if the combined market value of (a) the Warehouse Assets and (b) the Initial Restructured Transaction Collateral, declined below a certain amount.

76.    By September 2008, losses in the Warehouse Facility had increased significantly. At the same time, the value of the Initial Restructuring Collateral had declined substantially, as had the value of the assets held by the Fund Counterparties.

77.    Highland Capital was desperate to avoid a default by any of its affiliates, including the Fund Counterparties. If a Highland Capital affiliate defaulted on its obligations to a creditor, Highland Capital's reputation in the investment community would be damaged, and there was a risk that Highland Capital's business would collapse. Highland Capital feared that a public default would lead investors in Highland Capital's hedge fund family to withdraw their capital, and lead creditors to take aggressive actions to protect themselves, including foreclosing on collateral and aggressively enforcing their contractual rights.

**1.** **The First Margin Call**

78.    On or about September 16, 2008, as losses in the Warehouse Facility continued to grow, UBS began to exercise its contractual rights and make margin calls demanding additional collateral from the Fund Counterparties. Specifically, UBS notified Highland Capital and the Fund Counterparties that, pursuant to § 12(C) of the Synthetic Warehouse Agreement, the Fund Counterparties were each required to post $10 million in cash or equivalent securities (the "First Margin Call").

25

79.     Because Highland Capital had routinely drained cash from the Fund Counterparties, the Fund Counterparties lacked the liquidity to meet UBS's demands using their own assets.

80.     On or about September 19, 2008, the Fund Counterparties satisfied the First Margin Call by together posting $20 million in cash as additional collateral.

## 2.     UBS Is Harmed By Highland Capital's Response To The Fund Counterparties' Liquidity Crisis

81.     In the wake of the First Margin Call, the Fund Counterparties remained starved for liquidity. Still desperate to avoid defaults to creditors and the consequences described above, Highland Capital resorted to

82.     Highland Capital and the individuals that directed the Fund Counterparties knew that they had caused the Fund Counterparties to become incapable of satisfying their obligations to all of their respective creditors when they came due, and that they were insolvent or, at the very least, within the zone of insolvency.

83. For example, on or about September 26, 2008, Dondero and Highland Capital improperly



84.

85.

27



86.

87.

88.



██████ Highland Capital executed this plan at UBS's expense to protect their substantial personal stake in Highland Financial and prevent negative publicity associated with defaulting ██ ████████████ Implementing this plan, however, caused SOHC (and its alter ego, Highland Financial) to improperly and in bad faith breach duties and obligations to UBS.

89. ████████████████████████ ████████████ SOHC's expected obligations to UBS were well in excess of $250 million, which were due and owing to UBS no later than March 14, 2009. Thus, by ████ ████████████, Highland Capital and the Fund Counterparties made a fraudulent conveyance and interfered in bad faith with the Fund Counterparties' ability to meet their contractual obligations to UBS.

90. Given the state of the financial markets at the time, Highland Capital, Highland Financial and SOHC had no expectation that SOHC would be able to satisfy its obligations to UBS when they came due.

91.

### 3. The Second Margin Call

92. On or about October 21, 2008, UBS notified Highland Capital that, pursuant to § 12(C) of the Synthetic Warehouse Agreement, the Fund Counterparties each owed another $10 million (the "Second Margin Call").

93. In response to the Second Margin Call, Highland Capital offered UBS numerous assets as collateral. UBS rejected those offers for various business-related reasons. As UBS would later learn, however, at the time Highland Capital was offering the assets to UBS, the Fund Counterparties did not own them.

94. On or about October 24, 2008, the Fund Counterparties satisfied the Second Margin Call by together posting assets with a notional value of $49.97 million (but a market value of approximately $20 million), with the understanding that UBS would authorize State Street to return the securities if and when the Fund Counterparties were able to replace those securities with $20 million in cash. As UBS would later learn, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

95. Moreover, at the same time that Highland Capital was telling UBS that the Fund Counterparties did not have sufficient cash assets to meet the Second Margin call, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

### 4. The Third Margin Call

96. On or about November 7, 2008, UBS notified Highland Capital and the Fund Counterparties that, pursuant to § 12(C) of the Synthetic Warehouse Agreement, the Fund

Counterparties had an obligation to post another $10 million as collateral (the "Third Margin Call").

97. On or about November 11, 2008, Highland Capital and the Fund Counterparties offered to post various securities to satisfy the Third Margin Call. In response to the Third Margin Call, Phil Braner of Highland Capital emailed UBS a list of proposed collateral including eight securities with a purported market value of approximately $20 million (i.e., twice the amount of cash due to satisfy the Third Margin Call).

98. Pursuant to the Warehouse Agreements, UBS was authorized to reject proposed collateral. UBS determined that the proposed additional collateral offered by Highland Capital and the Fund Counterparties was unacceptable. On or after November 13, 2008, UBS formally rejected the offered securities, and requested that the Fund Counterparties provide cash or cash equivalent collateral to satisfy their obligations under § 12(C) of the Synthetic Warehouse Agreement.

99. UBS would later learn that 

100. When UBS confronted Highland Capital about this issue Mr. Braner of Highland Capital explained that

31



**F.**    **Termination Of The Agreements And Demand For Payment Of Losses**

101.   As of December 3, 2008, the Fund Counterparties still had not met the Third Margin Call in accordance with § 12(C) of the Synthetic Warehouse Agreement. This failure resulted in UBS's declaration of a termination date ("Termination Date") under the Agreements.

102.   On December 3, 2008, UBS delivered a letter (the "Termination Date Letter") to Highland Capital and the Fund Counterparties notifying them of such failure and the occurrence of a Termination Date under each Agreement. (A true and correct copy of the Termination Date Letter is annexed hereto as Exhibit G.)

103.   Sections 5 and 7 of the Cash Warehouse Agreement provided that if the closing date of the securitization contemplated by the Restructured Transaction failed to occur on or prior to March 14, 2009, UBSS could, in its sole discretion, retain any of the securities in the Warehouse Facility or sell such securities to one of UBSS's affiliates or an unaffiliated party.

104.   Pursuant to the terms of the Agreements, if the closing date of the securitization contemplated by the Restructured Transaction failed to occur on or prior to March 14, 2009, each of the Fund Counterparties was obligated to pay to UBS its pro rata share of any market value losses on the Warehouse Assets, which UBS determined it had experienced and so notified Highland Capital and the Fund Counterparties.

105.   On December 19, 2008, UBSS delivered a letter (the "Cash Warehouse Demand Letter") to Highland Capital and the Fund Counterparties demanding payment for its

32

losses. (A true and correct copy of the Cash Warehouse Demand Letter is annexed hereto as Exhibit H.) UBSS demanded that Highland Capital and the Fund Counterparties wire that required amount to UBSS no later than 5:00 pm on December 24, 2008 (i.e., the third business day after the date of the Cash Warehouse Demand Letter) (the "Final Payment Date"). Highland Capital and the Fund Counterparties failed to make the required payment to UBSS.

106.    The Synthetic Warehouse Agreement provided that in the event the closing date of the securitization contemplated by the Restructured Transaction failed to occur on or prior to March 14, 2009, the Fund Counterparties would be collectively responsible for 100% of the aggregate amount of losses on the CDS Portfolio and each of the Fund Counterparties would pay, after notice of such amount due from UBS, its pro rata share of such amount to UBS within three business days.

107.    On December 19, 2008, UBS AG delivered a letter (the "Synthetic Warehouse Demand Letter") to Highland Capital and the Fund Counterparties demanding payment for its losses. (A true and correct copy of the Synthetic Warehouse Demand Letter is annexed hereto as Exhibit I.) UBS AG demanded that the Highland Capital and the Fund Counterparties wire the required amount to UBS AG no later than 5:00 PM on the Final Payment Date (i.e., December 24, 2008 – the third business day after the date of the Synthetic Warehouse Demand Letter). Highland Capital and the Fund Counterparties failed to make the required payment to UBS AG.

**G.    Notice Of Failure to Pay, Auction And Final Accounting Letter**

108.    On January 5, 2009, UBS notified Highland Capital and the Fund Counterparties of the failure to make the requisite payments when due pursuant to the Agreements and the applicable demand letters. On or about January 16, 2009, in connection

33

with unwinding the Warehouse Facility, UBS conducted the auction contemplated by the Warehouse Agreements.

109.    On or about March 19, 2009, UBS delivered a letter to Highland Capital and the Fund Counterparties concerning a final accounting concerning the auction and the losses in the Warehouse Facility.  UBS determined that Highland Capital and the Fund Counterparties owed it $686,853,290.26.

**H.    Highland Capital** 

110.

111.    In December 2008, immediately after UBS terminated the Restructured Transaction, Dondero and Highland Capital 

112.    On or about February 24, 2009, UBS commenced this action against Highland Capital and the Fund Counterparties.  At the time, SOHC and Highland Financial, as its alter ego, owed UBS approximately $345 million.

113.    Undeterred, on or about March 17, 2009, Dondero and Highland Capital





114.

115. As a result, Highland Capital (a) further interfered in bad faith with UBS's contractual rights and the Fund Counterparties' contractual obligations under the Warehouse Agreements, thereby breaching the covenants of good faith and fair dealing inherent in the Warehouse Agreements; and



116.

117.

36



## FIRST CAUSE OF ACTION
### (Fraudulent Conveyances)

118. UBS repeats and realleges the allegations set forth in paragraphs 1 through 117 of this Complaint as if fully set forth herein.

119. In the Fall of 2008 and in March 2009, Highland Capital



120.

121.

37

122. 

123.

124.

125.

126.



127.

128.

129.

130. 

131.    As a result of the foregoing fraudulent conveyances and defendant Crusader Holding Corp.'s involvement therein, the Fund Counterparties and SOHC's alter ego, Highland Financial, were unable to satisfy their obligations to UBS. As a result of the foregoing fraudulent conveyances, UBS has been harmed in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Tortious Interference With Contractual Relations)

132.    UBS repeats and realleges the allegations set forth in paragraphs 1 through 131 of this Complaint as if fully set forth herein.

133.    The Agreements are valid and binding contracts.

134.    The parties agreed that UBS would not bear the risk of any losses in connection with the Restructured Transaction. As a direct result of the Fund Counterparties' breach of the Warehouse Agreements, UBS suffered no less than $686,853,290.26 in damages. Under the terms of the Warehouse Agreements, the Fund Counterparties' obligation to pay UBS for losses in the Warehouse Facility expressly survived the termination of the Agreements.

40

135.    Highland Capital knew of the Agreements, and was familiar with their terms, including the Fund Counterparties' obligations to UBS thereunder. The Affiliated Transferees, including Crusader Holding Corp., also knew of the Agreements, and their terms, including the Fund Counterparties' obligations to UBS thereunder.

136.    Highland Capital and the Affiliated Transferees, including defendant Crusader Holding Corp., intentionally and improperly caused and ensured a breach of the Warehouse Agreements by the Fund Counterparties, thereby tortiously interfering with UBS's rights under the Agreements.

137.    Specifically, in 2008 and 2009 defendant Crusader Holding Corp. wrongfully participated and caused the improper and fraudulent asset transfers, payments, distributions and dividends described above, and thereby tortiously interfered with UBS's contractual relationship with the Fund Counterparties by knowingly impairing UBS's contractual right under the Warehouse Agreements to be reimbursed by the Fund Counterparties for the losses on the Warehouse Assets.

138.    Highland Capital and the Affiliated Transferees, including defendant Crusader Holding Corp.,

139.    Highland Capital and the Affiliated Transferees, including defendant Crusader Holding Corp., engaged in the foregoing unlawful and improper conduct, and tortiously interfered with UBS's contractual rights under the Warehouse Agreements, for their own improper personal gain by knowingly violating UBS's rights and making it impossible for the Fund Counterparties to perform under the Warehouse Agreements. In particular, the foregoing

41

conduct constitutes independent torts and predatory acts directed at UBS for the personal gain of defendant Crusader Holding Corp., its parent, the Crusader Fund, Highland Capital and its principals.

140. As a direct and proximate result of defendant Crusader Holding Corp.'s tortious interference with UBS's contractual rights under the Agreements, UBS has suffered damages in an amount to be determined at trial. Had defendant Crusader Holding Corp., Highland Capital and the other Affiliated Transferees not tortiously interfered with UBS's contractual rights, the Fund Counterparties would have been able to make payments to UBS of the amount they owed to UBS under the Warehouse Agreements.

### RELIEF DEMANDED

WHEREFORE, plaintiffs UBSS and UBS AG demand judgment:

(a) On the first cause of action: (i) declaring that the dispositions of the Fund Counterparties' and Highland Financial's assets involving defendant Crusader Holding Corp., constituted fraudulent conveyances; (ii) appointing a receiver over Crusader Holding Corp.; (iii) directing that a full accounting be had of Crusader Holding Corp.'s affairs and finances; (iv) imposing a constructive trust over Crusader Holding Corp.'s assets until such an accounting is completed; and/or (v) awarding UBS damages in an amount to be determined at trial, but no less than the value of the assets fraudulently and improperly transferred, or, alternatively, directing that Crusader Holding Corp. and its partners, members or shareholders return any assets or consideration received from Highland Financial or the Fund Counterparties, directly or indirectly, as distributions, dividends, consideration, compensation, fees, interest, principal or otherwise, between March 14, 2008 and the present;

42

(b)     On the second cause of action, declaring that Crusader Holding Corp. is liable for tortiously interfering with UBS's contractual rights under the Warehouse Agreements, and awarding UBS an amount to be determined at trial;

(c)     Awarding UBS punitive damages in an amount to be determined at trial;

(d)     Granting UBS its costs and disbursements, including reasonable attorneys' fees and expenses of this action;

(e)     Granting UBS pre-judgment interest; and

(f)     Granting such other and further relief as the Court deems just and proper.

Dated:     New York, New York
           September 26, 2011

CADWALADER, WICKERSHAM & TAFT LLP

By: _/s/ Gregory A. Markel_____
    Gregory A. Markel
    Jason Jurgens
    Ellen M. Halstead

    Office and Post Office Address:
    One World Financial Center
    New York, NY 10281
    Telephone:  (212) 504-6000
    Facsimile:  (212) 504-6666

    *Attorneys for Plaintiffs UBS Securities LLC and
    UBS AG, London Branch*

43