# EXHIBIT 13

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

UBS SECURITIES LLC and UBS AG, LONDON BRANCH,

Plaintiffs,

-against-

HIGHLAND CAPITAL MANAGEMENT, L.P.

Defendant.

---

Index No. 650752/2010

**SUMMONS**

TO THE ABOVE NAMED DEFENDANT:

YOU ARE HEREBY SUMMONED to answer the Complaint in this action and to serve a copy of your answer on plaintiffs' attorneys within (20) days after service of this summons, exclusive of the date of service, or within thirty (30) days after service is complete if the summons is not personally delivered to you within the State of New York. In case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the Complaint.

As set forth in the Complaint, plaintiffs designate New York County as the place of venue pursuant to Section 503 of the Civil Practice Law and Rules, and pursuant to written agreements among plaintiffs and defendant Highland Capital Management, L.P.

Dated:   New York, New York
June 28, 2010

CADWALADER, WICKERSHAM & TAFT LLP

By: _____ /s/ Gregory A. Markel_____
Gregory A. Markel
Howard R. Hawkins, Jr.
Jason Jurgens
Ellen M. Halstead

Office and Post Office Address:
One World Financial Center
New York, NY 10281
Telephone:  (212) 504-6000
Facsimile:  (212) 504-6666

*Attorneys for Plaintiffs UBS Securities LLC and
UBS AG, London Branch*

To:   HIGHLAND CAPITAL MANAGEMENT, L.P.
13455 Noel Road, Suite 800
Dallas, Texas 75240

9 West 57th Street
New York, New York

CONTAINS UNREDACTED CONFIDENTIAL MATERIAL SUBJECT TO STIPULATION AND ORDER FOR THE PRODUCTION AND EXCHANGE OF CONFIDENTIAL INFORMATION

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

UBS SECURITIES LLC and UBS AG, LONDON BRANCH,

Plaintiffs,

-against-

HIGHLAND CAPITAL MANAGEMENT, L.P.,

Defendant.

Index No. 650752/2010

**COMPLAINT**

---

Plaintiffs, UBS Securities LLC ("UBSS") and UBS AG, London Branch ("UBS AG") (collectively, "UBS"), for their Complaint allege against defendant Highland Capital Management, L.P. ("Highland Capital"), as follows:

## NATURE OF THE ACTION

1.     UBS brings this action to recover damages in excess of $686 million resulting from the wrongful conduct of Highland Capital, based on causes of action for fraudulent inducement, breach of the duty of good faith and fair dealing, and fraudulent conveyance.

2.     Highland Capital and two of its affiliates, Highland Special Opportunities Holding Company ("SOHC") and Highland CDO Opportunity Master Fund, L.P. ("CDO Fund," and together with SOHC, the "Fund Counterparties"), fraudulently induced UBS to restructure a transaction to avoid Highland Capital's and the Fund Counterparties' contractual obligation to pay UBS over $86 million. Once Highland Capital and the Fund Counterparties succeeded in misleading UBS into restructuring the original transaction, Highland Capital and its affiliates made it impossible for the Fund Counterparties to meet their obligations to UBS by stripping the

Fund Counterparties of their valuable assets through fraudulent conveyances and otherwise dealing in bad faith with their contractual obligations to UBS.

3.    When UBS finally terminated the restructured transaction and demanded payment from Highland Capital and the Fund Counterparties, it was owed in excess of $686 million that the Fund Counterparties could not pay because of the misappropriations and improper transfers of assets directed by Highland Capital and the Fund Counterparties. Even after UBS demanded payment, Highland Capital and certain of its affiliates engaged in further unlawful conduct that harmed UBS by making fraudulent asset transfers from SOHC's alter ego (Highland Financial Partners, L.P. ("Highland Financial")) to Highland Capital, as well as to Highland Credit Strategies Fund ("HCF Trust"), Highland Crusader Offshore Partners, L.P. (the "Crusader Fund") and Highland Credit Opportunities CDO, L.P. (the "Credit Opp. Fund") (collectively, the "Affiliated Transferees" and together with Highland Financial, the Fund Counterparties and Strand Advisors, Inc. ("Strand"), the "Highland Entities"). The Highland Entities are defendants in the separate but related action commenced by UBS on or about February 24, 2009 (the "Highland Entity Action"). In accordance with this Court's June 17, 2010 Order, UBS filed the First Amended Complaint in the Highland Entity Action concurrently with filing this Complaint.

## SUMMARY OF THE ACTION

4.    This action arises out of defendant Highland Capital's efforts in the Spring of 2007 to sponsor a collateralized debt obligation ("CDO") securitization (the "Original Engagement"). In connection with the Original Engagement, UBS agreed to finance the purchase of various collateralized loan obligation ("CLO") securities, as well as credit default swap obligations that referenced similar CLO securities. UBS agreed to hold or "warehouse" the

CLO securities and credit default swaps (collectively, the "Warehouse Assets" or "Warehouse Facility") for Highland Capital's benefit.

5.     On or about August 15, 2007, the Original Engagement terminated by its terms without the contemplated securitization having occurred. As a result of the termination, Highland Capital and two of its affiliates, the Fund Counterparties, owed UBS in excess of $86 million related to the decline in the value of the Warehouse Assets.

6.     Instead of paying UBS what it was owed, Highland Capital and the Fund Counterparties fraudulently induced UBS to restructure the Original Engagement by providing UBS with false, incomplete and otherwise misleading information concerning the Fund Counterparties' finances and assets. Using both affirmative material misrepresentations and omissions (material facts or information needed to be disclosed to make the statements actually made not misleading, and which were not disclosed, are referred to hereinafter as "Omissions"), Highland Capital, its principals and the Fund Counterparties misled UBS regarding the financial health of the Fund Counterparties and their creditworthiness, thereby causing UBS to forego recovering its losses from Highland Capital in favor of agreeing to restructure the terms of the parties' prior agreements (the "Restructured Transaction").

7.     For example, the strength of the Fund Counterparties' financial statements, and their purported ability to use the hundreds of millions of dollars worth of assets reflected therein to satisfy future obligations to UBS under the Warehouse Agreements were material to UBS's decision to agree to the restructuring. Consequently, in connection with negotiating the Restructured Transaction, UBS conditioned any restructuring on the Fund Counterparties' ability to post $70 million in cash and securities as collateral (the "Initial Restructuring Collateral") with State Street Bank and Trust Company ("State Street"), in which UBS would hold a security interest. In a serious Omission, Highland Capital and the Fund

3

Counterparties failed to disclose to UBS that the Fund Counterparties did not own all of the Initial Restructuring Collateral that they were expected to post. Instead, to meet the Initial Restructuring Collateral obligation, Highland Capital transferred assets from other entities that it controlled. By making these transfers, Highland Capital and the Fund Counterparties were able to conceal important information about the Fund Counterparties' financial weakness that was both quantitatively and qualitatively material to UBS, and which would have caused UBS not to enter the Restructured Transaction.

8. Similarly, while negotiating the Restructured Transaction, Highland Capital and the Fund Counterparties provided UBS with financial reports and statements for the Fund Counterparties. The financial information that Highland Capital and the Fund Counterparties provided to UBS contained materially false and misleading information and Omissions concerning the financial condition of the Fund Counterparties. Among other things, Highland Capital and the Fund Counterparties misrepresented the amount of cash held by CDO Fund. Highland Capital and the Fund Counterparties failed to disclose that many of the assets that were accounted for on the Fund Counterparties' financial statements already had been encumbered (e.g., the Fund Counterparties had pledged the assets as collateral to other parties).

9. In reliance on material misstatements and Omissions made by Highland Capital and the Fund Counterparties, UBS agreed to restructure the Original Engagement, and thereby were fraudulently induced to give up contractual rights under the terms of the Original Engagement. In particular, UBS reasonably and justifiably relied on misrepresentations and Omissions of facts and information solely and peculiarly within the knowledge of Highland Capital and the Fund Counterparties. Given UBS's prior dealings with Highland Capital and its affiliates, as well as Highland Capital's size and presence in the market, UBS had no reason to believe that Highland Capital and its affiliates would provide it with false, incomplete or

otherwise misleading information about the Fund Counterparties' finances and assets, as they in fact did.

10. Had UBS known that the Fund Counterparties could not satisfy their Initial Restructuring Collateral obligations using their own assets, and still have sufficient liquidity to meet future collateral obligations, it would not have gone forward with the Restructured Transaction. UBS never would have agreed to the Restructured Transaction had it known prior to entering the Restructured Transaction the true status of the Fund Counterparties' financial condition and the true fair market value of the Fund Counterparties' holdings that would have been available to satisfy their then-existing and future obligations to UBS. UBS's losses described herein were directly and proximately caused by the conduct of Highland Capital and the Highland Entities described herein.

11. Almost immediately after UBS agreed to the Restructured Transaction, Highland Capital began the process of making it impossible for the Fund Counterparties to ever repay UBS what they owed. In particular, exercising its control over the Fund Counterparties, Highland Capital caused the Fund Counterparties to transfer cash for the benefit of Highland Capital and its principals, and, separately, in violation of UBS' rights, encumbered the Fund Counterparties' assets that UBS believed would be available to it, all during a time when the Fund Counterparties owed UBS hundreds of millions of dollars.

12. For example, in or around May 2008, Highland Capital caused the dissipation of approximately $100 million in cash that CDO Fund held after it sold a long position in a company called SunCom Wireless. Highland Capital drained CDO Fund's cash resources despite CDO Fund's ever-increasing obligations to UBS. Highland Capital's bad faith conduct caused injury to UBS by making it impossible for the Fund Counterparties to satisfy their contractual obligations to UBS.

5

13.     In September 2008, as losses in the Warehouse Facility continued to grow, UBS began to exercise its contractual rights and make margin calls demanding additional collateral from the Fund Counterparties. Because Highland Capital had routinely taken cash out of the Fund Counterparties, the Fund Counterparties were undercapitalized and lacked assets and liquidity to meet UBS's demands for additional collateral.

14.     Highland Capital and its principals, including its president and founder, James D. Dondero, knew that if the Fund Counterparties defaulted on their obligations to UBS (or any other creditor), Highland Capital's ability to conduct business in the financial community and to keep or solicit investors would be harmed. Investors in Highland Capital's hedge fund family would withdraw their investments. In addition, creditors would take actions to protect themselves, including foreclosing on collateral and aggressively enforcing their contractual rights. Highland Capital and its principals were concerned that upon the disclosure of the true state of their affairs, their business would collapse.

15.     To avoid that result, Highland Capital and its principals resorted to commingling Highland Capital's various affiliates' assets to generate short-term liquidity for the Fund Counterparties to satisfy obligations as they came due. In doing so, Highland Capital and its principals consciously decided to ignore the corporate formalities of the Fund Counterparties and the other affiliates that they controlled, including SOHC's alter ego, Highland Financial. For example, as UBS would eventually learn, Highland Capital satisfied the second margin call that UBS made to the Fund Counterparties in October 2008 with assets that did not belong to the Fund Counterparties. Highland Capital also loaned its own money to CDO Fund, and orchestrated other asset transfers to temporarily prop up the Fund Counterparties.

16.     Highland Capital's and its principals' belated attempt to protect their reputation by continuing to fraudulently portray the Fund Counterparties as viable independent

entities was ultimately unsuccessful. By late October 2008, Highland Capital could no longer continue to prop up the Fund Counterparties.

17. On or about November 11, 2008, UBS demanded additional collateral from the Fund Counterparties. The Fund Counterparties defaulted. On December 3, 2008, UBS terminated the Restructured Transaction. As a result of UBS's termination of the Restructured Transaction, the Fund Counterparties were contractually obligated to pay UBS in excess of $686 million.

18. On or about February 24, 2009, UBS commenced the Highland Entity Action by filing a complaint in this Court against the Fund Counterparties for breach of the Warehouse Agreements that had been entered in connection with the Restructured Transaction. By that time, the Fund Counterparties and SOHC's alter ego, Highland Financial, had been insolvent and unable to pay their creditors for some time. Nonetheless, Highland Capital and Highland Financial effected an additional improper and fraudulent asset transfer, which further impaired UBS's ability to recover anything from the Fund Counterparties. In March 2009, conscious that UBS had commenced the Highland Entity Action against the Fund Counterparties a few weeks earlier, Highland Capital and Highland Financial caused asset transfers whereby millions of dollars of assets were fraudulently transferred to Highland Capital and the Affiliated Transferees, thereby further reducing the Fund Counterparties' abilities to meet their obligations to UBS.

19. In sum, after fraudulently inducing UBS to agree to the Restructured Transaction, Highland Capital and its principals exercised their domination over the Fund Counterparties to improperly transfer substantial assets from the Fund Counterparties for their own personal gain, i.e., solely and improperly to protect and enhance the value of Highland Capital and its principals by wrongful and improper means. In the process, they made it

7

impossible for the Fund Counterparties to pay UBS the losses they had agreed to pay on the Warehouse Facility.

## THE PARTIES

### A. The Plaintiffs

20. Plaintiff UBS AG, London Branch, is a banking corporation organized under the laws of Switzerland with its principal place of business at Finsbury Avenue, London, United Kingdom.

21. Plaintiff UBSS is a limited liability company organized under the laws of Delaware with its principal places of business at 677 Washington Blvd., Stamford, Connecticut, and 299 Park Avenue, New York, New York.

### B. The Defendant

22. Defendant Highland Capital Management, L.P. ("Highland Capital") is a limited partnership organized under the laws of Delaware, with its principal place of business at 13455 Noel Road, Suite 800, Dallas, Texas 75240, and an office at 9 West 57th Street, New York, New York. Highland Capital is registered to do business in New York. Highland Capital describes itself as a 100% employee-owned partnership. Highland Capital is an investment adviser that manages a large number of investment entities that operate as hedge funds for Highland Capital's principals and affiliates, as well as unaffiliated investors. Highland Capital currently manages over $25 billion in various assets, including structured financial products. Highland Capital also holds direct and indirect equity and ownership interests in the entities that it manages, including in Highland Financial, the Fund Counterparties and the Affiliated Transferees. James D. Dondero is the President of Highland Capital, as well as one of its founders. Highland Capital is a counterclaim-plaintiff in a separate but related action (the

8

"Highland Entity Action") commenced by UBS concurrently with the filing of this Complaint in accordance with this Court's June 17, 2010 Order with Memorandum.

## C. **Other Parties**

### 1. **Strand**

23.     Strand Advisors, Inc. ("Strand") is Highland Capital's general partner. Strand is a Delaware corporation principally engaged in the business of serving as the general partner of Highland Capital.  As Highland Capital's general partner, Strand is responsible for Highland Capital's liabilities and obligations and regularly conducts business in New York, or causes its affiliates to conduct business in New York.  Strand is a defendant in the Highland Entity Action.

### 2. **Highland Financial and SOHC**

24.     Highland Special Opportunities Holding Company ("SOHC") is a company organized under the laws of the Cayman Islands, with its offices at Walker House, PO Box 908GT, Mary Street, George Town, Grand Cayman, Cayman Islands.  SOHC is a wholly-owned subsidiary of Highland Financial Partners, L.P. (a Delaware limited partnership) ("Highland Financial").  SOHC has six sister subsidiaries, all of which are owned in whole or in part by Highland Financial.  Highland Capital serves as investment manager to Highland Financial, SOHC and its sister subsidiaries.  Highland Financial and SOHC are defendants in the Highland Entity Action.

25.     Highland Financial is SOHC's alter ego.  The minutes from Highland Financial's board meetings during 2007, 2008 and 2009 demonstrate that Highland Financial, its board of directors (including Dondero), and Highland Capital all treated SOHC (and its sister affiliates) as Highland Financial's alter ego and instrumentality.  Among other things, Highland Financial's board minutes (and conduct in connection with the Restructured

9

Transaction) establish that Dondero, Highland Capital, and Highland Financial's board of directors did not distinguish between Highland Financial's debts and obligations, and the debts and obligations of its subsidiaries, including SOHC. Instead, they operated Highland Financial and its subsidiaries, including SOHC, as a single economic entity, regularly commingling assets among the affiliates to achieve Highland Financial's, Dondero's and/or Highland Capital's goals. From December 2007 to April 2009, SOHC was undercapitalized, had little liquidity of its own and was insolvent for much of the period. It depended on Highland Financial for liquidity. For all purposes relevant to this action, Highland Financial and SOHC should be treated as a single entity and as alter egos of one another.

### 3.     CDO Fund

26.     Highland CDO Opportunity Master Fund, L.P. ("CDO Fund") is a Bermuda exempted limited partnership, with its principal place of business at 52 Reid Street, Hamilton, Bermuda. Defendant Highland Capital controls CDO Fund's investment decisions through an investment management agreement. Between January 31, 2007 and August 31, 2008, Highland Capital's and its affiliates' aggregate ownership interest in CDO Fund ranged between 43.36% and 56.44%. Highland CDO Opportunity Fund, L.P. and Highland CDO Opportunity Fund, Ltd. serve as so-called "feeder funds" for CDO Fund. CDO Fund is a defendant in the Highland Entity Action.

### 4.     The Affiliated Transferees Involved In the March 2009 Fraudulent Conveyance

27.     Highland Credit Strategies Fund ("HCF Trust") is a Delaware statutory trust, and a closed-end management investment company registered under the Investment Company Act of 1940. It is publicly traded on the New York Stock Exchange under the ticker: "HCF." HCF Trust's principal place of business is 13455 Noel Road, Suite 800, Dallas, Texas

75240. R. Joseph Dougherty of Highland Capital is HCF Trust's President and CEO. Highland Capital serves as the investment advisor to HCF Trust. HCF Trust is a defendant in the Highland Entity Action.

28.     Highland Crusader Offshore Partners, L.P. (the "Crusader Fund") is a Bermuda limited partnership with its principal place of business at Magnolia House Building, 1st Floor, 119 Front Street, Hamilton HM 12, Bermuda. The Crusader Fund also has an office located at 13455 Noel Road, Suite 800, Dallas, Texas 75240. The Crusader Fund transacts business within New York, and derives substantial revenue from interstate and international commerce. Crusader Fund is a defendant in the Highland Entity Action.

29.     Highland Credit Opportunities CDO, L.P. (the "Credit Opp. Fund") is a Delaware limited partnership with its principal place of business at 13455 Noel Road, Suite 800, Dallas, Texas 75240. Credit Opp. Fund is a defendant in the Highland Entity Action.

30.     HCF Trust, the Crusader Fund and the Credit Opp. Fund are referred to herein collectively as the "Affiliated Transferees" as they benefited from fraudulent conveyances engineered and directed by Highland Capital and Highland Financial in March 2009 to UBS's detriment. The Affiliated Transferees, Highland Financial, the Fund Counterparties and Strand are referred to herein collectively as the "Highland Entities."

## D.     Non-Parties Affiliated With Highland Capital In Which The Fund Counterparties Invested

31.     The Fund Counterparties held investments in several Highland Capital-affiliated funds, including Highland Credit Opportunities CDO, L.P., Highland Legacy, Highland Loan Funding V, Highland Park CDO I, Ltd., Highlander Euro CDO B.V. and Highlander Euro CDO III B.V. Highland Capital served as the investment manager for these affiliated funds, and received valuable fees derived from the valuations of these funds' assets, which it managed.

## JURISDICTION AND VENUE

32. Venue in this Court is proper under CPLR 503 because plaintiff UBSS has a principal place of business in New York County.

33. Venue is also proper under CPLR 501, and this Court may exercise jurisdiction over Highland Capital because UBS, Highland Capital and the Fund Counterparties all agreed in writing, before this action was commenced, to submit to such jurisdiction and venue, in connection with any dispute that may arise out of, in connection with, or related to, the Agreements (defined below), or any of the matters contemplated thereby.

34. This Court also may exercise jurisdiction over Highland Capital pursuant to CPLR 301 and 302(a)(1) and (3), because Highland Capital has an office in New York, is a foreign limited partnership registered to do business in New York, regularly transacts and solicits business in New York, committed tortious acts causing injury in New York, should reasonably have expected that its tortious acts would have consequences in New York, the effect of its wrongful conduct was felt in New York, and/or derives substantial revenue from interstate or international commerce.

## FACTUAL BACKGROUND

### A. The Original Engagement

35. In or around April 2007, Highland Capital approached UBS for short-term financing in connection with a securitization that Highland Capital wanted to sponsor. UBS agreed to do so (the "Original Engagement").

36. On or about April 20, 2007, UBSS and Highland Capital entered into an engagement letter (the "Original Engagement Letter"), which contemplated that UBSS would act as the exclusive financial arranger and placement agent for a type of collateralized debt obligation transaction ("CDO"), known as a collateralized loan obligation ("CLO") squared or

12

"CLO Squared" transaction. (A copy of the Original Engagement Letter is annexed hereto as Exhibit A.)

37.     CLOs are a form of securitization where interest and principal payments on corporate loans made to multiple mid-sized and large businesses are pooled together by a lender or the owner of the loans, and then passed on through a securitization structure to investors. CLOs typically involve multi-million dollar loans known as syndicated loans, or leveraged loans made to new businesses or existing businesses, often to acquire other companies. The loan originators are able to spread risk through the CLO securitization, and simultaneously free up capital to make new loans to other businesses. The Original Engagement contemplated the securitization of CLO securities. Thus, the securitization contemplated by Highland Capital would have been a "CLO Squared" transaction.

38.     On or about May 22, 2007, as contemplated by the Original Engagement Letter, UBSS and Highland Capital entered into a warehouse agreement (the "Original Cash Warehouse Agreement"). (A copy of the Original Cash Warehouse Agreement is annexed hereto as Exhibit B.) In accordance with the terms of the Original Engagement Letter and the Original Cash Warehouse Agreement, UBSS agreed to acquire securities as directed by Highland Capital. Highland Capital instructed UBS to acquire various CLO securities issued in connection with prior CLO transactions involving other sponsors and issuers (the "Cash Portfolio").

39.     In a separate but related synthetic warehouse agreement (the "Original Synthetic Warehouse Agreement," and together with the "Original Cash Warehouse Agreement," the "Original Warehouse Agreements"), UBS AG agreed to enter into credit default swaps (the "CDS Portfolio," and together with the Cash Portfolio, the "Warehouse Assets"), pursuant to which UBS AG sold credit protection to various third parties. (A copy of the Original Synthetic Warehouse Agreement is annexed hereto as Exhibit C.)

13

40.     For Highland Capital's benefit, UBS held the Warehouse Assets on its balance sheet (the "Warehouse Facility"). UBS was expected to hold the Warehouse Assets until such time as the parties could arrange for the assets to be securitized as part of the contemplated securitization. In particular, if the parties believed that a securitization was economically feasible, they would create a special purpose entity that would acquire the Warehouse Assets from UBS using the proceeds from the sale of securities to investors. The special purpose entity's debt securities would be secured by those Warehouse Assets.

41.     Under the Original Warehouse Agreements, if the Original Engagement terminated without a securitization, Highland Capital and the Fund Counterparties were obligated to pay UBS for losses on the Warehouse Assets. In particular, under the terms of the Original Cash Warehouse Agreement, Highland Capital was directly responsible for the first $50 million in losses in the Cash Portfolio, and under the terms of the Original Synthetic Warehouse Agreement, the Fund Counterparties were obligated to pay UBS for any and all losses suffered on the CDS Portfolio.

42.     The Original Engagement Letter expired by its terms on August 15, 2007 without a securitization occurring. The Original Warehouse Agreements expired on the same date in accordance with their respective terms.

43.     As of August 15, 2007, the Warehouse Assets in the Warehouse Facility had lost in excess of $86 million in value. Although they had sufficient capital to do so, Highland Capital and the Fund Counterparties failed and refused to pay UBS what it was owed under the Original Warehouse Agreements.

44.     As a result of extensive negotiations as well as representations and warranties made by Highland Capital on its own behalf, and on behalf of the Fund

14

Counterparties as their investment manager, UBS agreed to restructure the terms of the Original Engagement.

**B.   Highland Capital And The Fund Counterparties Resort To Fraud To Avoid Highland Capital's Obligations To UBS**

45.    As alleged above, as a result of the termination of the Original Engagement, Highland Capital was directly liable to UBS under the Original Warehouse Agreement for in excess of $86 million.

46.    Between August 2007 and March 14, 2008, UBS and Highland Capital had discussions and negotiations concerning a restructuring of the terms of the Original Engagement. Those negotiations resulted in agreements to restructure the Original Engagement (the "Restructured Transaction"), including a release by UBS of its claims against Highland Capital and the Fund Counterparties arising out of the Original Engagement. (The terms of the Restructured Transaction are set forth in the Engagement Letter and Warehouse Agreements described below (collectively, the "Agreements"), which are annexed hereto as Exhibits D, E and F, respectively.)

47.    During the course of negotiations and before March 14, 2008, Highland Capital and the Fund Counterparties made several material misrepresentations to UBS concerning the creditworthiness of the Fund Counterparties. Dondero, Highland Capital and the Fund Counterparties also failed to disclose to UBS information which would have been material to UBS's decision to enter the Restructured Transaction ("Omissions," as defined above). As Highland Capital and the Fund Counterparties knew, UBS reasonably relied upon those material misrepresentations and, due to the Omissions, a misstated assessment of the Fund Counterparties, all to its detriment in deciding whether to enter the Restructured Transaction. UBS reasonably and justifiably relied on these misrepresentations and Omissions of facts and

15

information that were solely and peculiarly within the knowledge of Highland Capital and the Fund Counterparties. Given UBS's prior dealings with Highland Capital and its affiliates, as well as Highland Capital's size and presence in the market, UBS reasonably believed that Highland Capital and the Fund Counterparties would not provide it with false, incomplete or otherwise misleading information about the Fund Counterparties' finances and assets as it in fact did.

48. For example, on or about December 28, 2007, to induce UBS to enter the Restructured Transaction and related Agreements, Gibran Mahmud of Highland Capital sent SOHC financial statements to UBS. On or about January 29, 2008, UBS requested additional financial information related to SOHC. Later that same day, to induce UBS to enter the Restructured Transaction and related Agreements, Phil Braner of Highland Capital emailed UBS a copy of SOHC's Statement of Financial Condition, dated December 31, 2007.

49. As described with more particularity below, the SOHC financial information that Highland Capital and the Fund Counterparties provided to UBS, which Highland Capital was responsible for preparing, was materially false and misleading. Highland Capital and the Fund Counterparties knew that UBS would rely upon SOHC's financial information in connection with deciding whether to agree to the Restructured Transaction and the terms of the Agreements being negotiated.

50. On or about February 4, 2008, Matt Killebrew of Highland Capital provided UBS with financial reports via email that reflected financial summaries, and aggregate valuations for CDO Fund's assets as of December 31, 2007. On or about March 4, 2008, Mr. Killebrew sent UBS similar reports for the period ended January 31, 2008. As described with more particularity below, these financial reports, which Highland Capital prepared, also were materially false and misleading. Highland Capital and the Fund Counterparties knew that

16

UBS would rely upon CDO Fund's financial information in connection with deciding whether to agree to the Restructured Transaction and the terms of the Agreements being negotiated.

51. The Fund Counterparties' financial statements falsely set forth the assets and resources that would be available to the Fund Counterparties to satisfy their obligations to UBS. In particular, as UBS would later learn, the financial information that Highland Capital and the Fund Counterparties provided to it during the restructuring negotiations failed to disclose that a material amount of CDO Fund's assets already had been pledged as collateral or otherwise encumbered in connection with other transactions involving other counterparties. These facts and information were solely and peculiarly within the knowledge of Highland Capital and the Fund Counterparties.

52. CDO Fund's financial statements also materially overstated the cash position it held as of December 31, 2007. Specifically, the December 31, 2007 financial summary for CDO Fund that UBS received in connection with negotiating the restructuring falsely represented that CDO Fund held over $22 million in cash when, in fact, as UBS subsequently learned after commencing the Highland Entity Action, CDO Fund's cash position as of December 31, 2007 was just over $13 million, i.e., approximately 50% lower. As CDO Fund's investment manager, Highland Capital knew at the time of the misrepresentation on February 4, 2008 the value of CDO Fund's cash assets. This misrepresentation was material because CDO Fund was offering to pledge $10 million in cash to UBS as Initial Restructured Collateral. If UBS had known that CDO Fund was agreeing to a cash collateral obligation that would exhaust nearly all of its cash liquidity, UBS would not have entered the Restructured Transaction and would not have suffered the losses proximately caused by this misrepresentation.

53.     Similarly, Highland Capital and the Fund Counterparties concealed from UBS the fact that the Fund Counterparties were simultaneously negotiating several financing arrangements with other parties pursuant to which SOHC had agreed to pledge a significant portion of its assets to Barclays Bank plc ("Barclays"), and CDO Fund would pledge a significant portion of its assets to Morgan Stanley & Co International Ltd., Highland Capital IV SPC and Citibank NA. This information was solely and peculiarly within the knowledge of Highland Capital and the Fund Counterparties.

54.     In addition, the Fund Counterparties' financial statements that Highland Capital and the Fund Counterparties provided to UBS in advance of the Restructured Transaction contained inflated and mistated valuations of their respective assets. As UBS ultimately discovered, the valuations assigned to the Fund Counterparties' assets by Highland Capital and the Fund Counterparties were knowingly materially misstated and fraudulent. In particular, Highland Capital and the Fund Counterparties knew that the market quotations and other variables that they relied upon to value the Fund Counterparties' assets were unreasonable or inaccurate given the market conditions existing at the time. Yet, they used those market quotations and variables to value the Fund Counterparties' assets, including the Fund Counterparties' interests in other Highland Capital affiliates, and to prepare the false and misleading financial reports that they provided to UBS in connection with negotiating the Restructured Transaction. Highland Capital had a financial incentive to ignore the inaccuracy of the market quotations, and use an unreasonable valuation methodology to inflate the Fund Counterparties' asset values as Highland Capital earned management fees predicated, in part, on the value of the assets that it managed. The truth about Highland Capital's and the Fund Counterparties' valuation methodology was solely and peculiarly within the knowledge of Highland Capital and the Fund Counterparties.

55.     During the course of negotiations concerning the restructuring, UBS also insisted that the Fund Counterparties have the ability to post $70 million in cash and securities as collateral, which would be held at State Street Bank (the "Initial Restructured Transaction Collateral"), and in which UBS would hold a security interest. The Fund Counterparties' ability to do so using their own assets was qualitatively and quantitatively material to UBS. Among other things, it demonstrated the strength of their balance sheets, and by extension, their ability to satisfy future obligations to UBS.

56.     Highland Capital and the Fund Counterparties agreed that the Fund Counterparties would post $70 million in Initial Restructuring Collateral. In or around November 2007, Highland Capital and the Fund Counterparties identified the assets that would be offered and eventually pledged to UBS as part of the Initial Restructuring Collateral. In particular, Highland Capital and the Fund Counterparties identified six specific assets that the Fund Counterparties would transfer to State Street for UBS's benefit. As the Fund Counterparties' investment manager, Highland Capital and the Fund Counterparties knew whether and to what extent the Fund Counterparties could pledge assets as collateral to UBS, as well as what assets the Fund Counterparties held to satisfy the collateral obligations being negotiated.

57.     On or about November 26, 2007, UBS approved the list of collateral authorized and approved by Dondero to fulfill the Fund Counterparties' Initial Restructuring Collateral obligations in connection with the Restructured Transaction. On January 15, 2008, Phil Braner of Highland Capital confirmed that the Fund Counterparties would be posting the Initial Restructuring Collateral. The securities first offered as part of the collateral in November 2007 were eventually transferred to State Street in accordance with the Warehouse Agreements.

58.     Although Dondero was personally involved in the selection of the securities included as part of the Initial Restructuring Collateral, and he sent email to UBS regarding the same, in another Omission, Dondero failed to disclose that the assets being offered to UBS as collateral were not owned by the Fund Counterparties. As UBS would later learn, the Fund Counterparties did not own two of the six assets that Dondero, Highland Capital and the Fund Counterparties represented were Fund Counterparty assets. As the Fund Counterparties' investment manager, Highland Capital maintained the Fund Counterparties' accounting records, and knew who owned the assets that it was offering to UBS to satisfy the Initial Restructuring Collateral obligation. Facts and information concerning which Highland Capital affiliates owned certain assets was solely and peculiarly within the knowledge of Highland Capital and its affiliates. Given UBS's prior dealings with Highland Capital and its affiliates, as well as Highland Capital's size and presence in the market, UBS had no reason to believe, and reasonably did not believe, that Highland Capital would provide it with false, incomplete or otherwise misleading information about the Fund Counterparties' assets or their ability to satisfy the Initial Restructuring Collateral obligations using their own assets.

59.     If UBS had known that the Fund Counterparties did not have assets on their balance sheets available to satisfy the Initial Restructuring Collateral obligations that the parties had negotiated, UBS would not have agreed to the Restructured Transaction and the related Agreements. Information about the Fund Counterparties' available assets was solely and peculiarly within the knowledge of Highland Capital and the Fund Counterparties. The Fund Counterparties' inability to satisfy their Initial Restructuring Collateral obligation using their own assets would have signaled to UBS that, despite the information on their financial statements, the Fund Counterparties' asset base and finances were not what they seemed. It also would have drawn into question the Fund Counterparties' liquidity. The fact that the Fund

Counterparties did not own these assets, and were not able to satisfy the Initial Restructuring Collateral obligations with their own assets, proximately caused injury to UBS.

60. But for Dondero's, Highland Capital's and the Fund Counterparties false and misleading statements and Omissions concerning the Fund Counterparties' finances and assets, and the Fund Counterparties' inability to satisfy collateral and loss obligations, UBS would not have entered into the Restructured Transaction or the Agreements that memorialized its terms. Given the Fund Counterparties' weak credit quality, additional adverse information about their collective or individual creditworthiness would have deterred UBS from going forward with the Restructured Transaction and putting more assets at risk. These misrepresentations and Omissions proximately caused harm to UBS.

61. UBS would not have entered into a transaction with parties that made misrepresentations as Highland Capital and the Fund Counterparties did. UBS also would not have agreed to release its valuable claims arising out of the Original Engagement under such circumstances. Because of, and in reliance on, the false and misleading information about the Fund Counterparties provided by Dondero, Highland Capital and the Fund Counterparties, UBS entered into the Restructured Transaction memorialized in the Agreements. Because each of the misrepresentations and Omissions identified above disguised the Fund Counterparties' inability to satisfy their obligations to UBS, the misrepresentations and Omissions proximately caused harm to UBS.

## C. The Restructured Transaction Agreements

### 1. The Engagement Letter

62. On or about March 14, 2008, the parties reached agreement on the terms of a restructured engagement, which were memorialized in a new engagement letter (the "Engagement Letter," annexed hereto as Exhibit D). Pursuant to the Engagement Letter,

Highland Capital re-engaged UBSS to act as placement agent in the event that market conditions improved, and the parties could go forward with securitizing the Warehouse Assets already held by UBS in the Warehouse Facility. UBS agreed to continue holding the Warehouse Assets in the Warehouse Facility, which had a notional value of approximately $818 million.

63. Under the terms of the Engagement Letter, UBS released claims against Highland Capital and the Fund Counterparties arising out of the Original Engagement.

### 2. The Restructured Warehouse Agreements

64. On March 14, 2008, UBSS, the Fund Counterparties and Highland Capital also entered into a cash warehouse agreement (the "Cash Warehouse Agreement"), pursuant to which UBSS agreed to continue to hold the Cash Portfolio. (A true and correct copy of the Cash Warehouse Agreement is annexed hereto as Exhibit E.)

65. UBS AG, the Fund Counterparties and Highland Capital also entered into a synthetic warehouse agreement, dated as of March 14, 2008 (the "Synthetic Warehouse Agreement," and together with the Cash Warehouse Agreement, the "Warehouse Agreements"), pursuant to which UBS AG agreed to continue warehousing credit protection that it sold, i.e., the CDS Portfolio. (A true and correct copy of the Synthetic Warehouse Agreement is annexed hereto as Exhibit F.)

66. Section 13(B) of the Cash Warehouse Agreement and § 11(B) of the Synthetic Warehouse Agreement make Highland Capital liable for losses, including losses in the Warehouse Facility, by reason of acts or omissions constituting bad faith, willful misconduct, or gross negligence.

67. Under § 12 of the Synthetic Warehouse Agreement, the Fund Counterparties agreed to transfer to State Street the Initial Restructuring Collateral to partially secure their respective obligations to UBS under the Warehouse Agreements. Annex C to the

Synthetic Warehouse Agreement identified the six assets that the Fund Counterparties purportedly transferred to State Street to satisfy their Initial Restructuring Collateral obligations, along with $20 million in cash.

68.     The Warehouse Agreements also contained releases whereby UBS agreed to release claims it had against Highland Capital and the Fund Counterparties for losses arising out of the Original Engagement.

**D.     Highland Capital Uses Its Control Over The Fund Counterparties To Dissipate Their Assets Without Regard For The Fund Counterparties' Growing Obligations To UBS**

69.     Almost immediately after the Restructured Transaction Agreements were executed, Highland Capital and the Fund Counterparties knowingly began to dissipate the Fund Counterparties' assets and make it impossible for the Fund Counterparties to ever repay UBS what they owed. Highland Capital and the Fund Counterparties did so at various times when the Fund Counterparties owed UBS hundreds of millions of dollars.

70.     For example, on or about March 26, 2008, just days after entering the Restructured Transaction, Highland Capital caused certain SOHC assets to be encumbered by entering into a transaction with Barclays Bank, plc. ("Barclays"). At or around the same time, CDO Fund was negotiating financing arrangements with Morgan Stanley & Co. International Ltd. and Highland Capital IV SPC, whereby it granted a security interest in its assets to those entities. By granting a security interest in the Fund Counterparties' assets to other creditors, Highland Capital unfairly and improperly reduced the assets available to satisfy the Fund Counterparties' obligations to UBS in bad faith and in violation of UBS's rights.

71.     Similarly, on or about April 2, 2008, Highland Capital advised UBS that CDO Fund had recently monetized a $129 million long position in SunCom Wireless. When Highland Capital and CDO Fund subsequently provided UBS with additional financial

information about CDO Fund, however, UBS discovered that Highland Capital had caused CDO Fund to transfer approximately $100 million of the cash proceeds from the SunCom Wireless sale out of CDO Fund.

72. By improperly removing such a substantial amount of cash from CDO Fund, Highland Capital interfered in bad faith with CDO Fund's ability to satisfy its steadily increasing financial obligations to UBS. In particular, in or around May 2008, when the cash proceeds from the SunCom Wireless position were siphoned off, the Fund Counterparties owed UBS in excess of $166 million related to losses in the Warehouse Facility, approximately 50% of which CDO Fund was obligated to pay.

73. Highland Capital also repeatedly caused SOHC's cash to be transferred by Highland Financial. In particular, during the first five months of 2008, SOHC's cash position was reduced by over $10 million at a time when its obligations to UBS were increasing substantially.

**E.    In the Fall of 2008, Losses Mount And The Fund Counterparties Face Collateral Calls From Creditors Including UBS That They Cannot Meet Despite Highland Capital's Belated Efforts To Do So By Ignoring Corporate Formalities**

74. Under the terms of the Warehouse Agreements, the Fund Counterparties were required to post additional collateral with UBS if the combined market value of (a) the Warehouse Assets and (b) the Initial Restructured Transaction Collateral, declined below a certain amount.

75. By September 2008, losses in the Warehouse Facility had increased significantly. At the same time, the value of the Initial Restructuring Collateral had declined substantially, as had the value of the assets held by the Fund Counterparties.

76. Highland Capital was desperate to avoid a default by any of its affiliates, including the Fund Counterparties. If a Highland Capital affiliate defaulted on its obligations to a creditor, Highland Capital's reputation in the investment community would be damaged, and there was a risk that Highland Capital's business would collapse. Highland Capital feared that a public default would lead investors in Highland Capital's hedge fund family to withdraw their capital, and lead creditors to take aggressive actions to protect themselves, including foreclosing on collateral and aggressively enforcing their contractual rights.

## 1. The First Margin Call

77. On or about September 16, 2008, as losses in the Warehouse Facility continued to grow, UBS began to exercise its contractual rights and make margin calls demanding additional collateral from the Fund Counterparties. Specifically, UBS notified Highland Capital and the Fund Counterparties that, pursuant to § 12(C) of the Synthetic Warehouse Agreement, the Fund Counterparties were each required to post $10 million in cash or equivalent securities (the "First Margin Call").

78. Because Highland Capital had routinely drained cash from the Fund Counterparties, the Fund Counterparties lacked the liquidity to meet UBS's demands using their own assets.

79. On or about September 19, 2008, the Fund Counterparties satisfied the First Margin Call by together posting $20 million in cash as additional collateral. As UBS would later learn, however, to satisfy the First Margin Call, Highland Capital had to cause SOHC's alter ego and parent, Highland Financial, to provide CDO Fund with $5 million in cash. This transfer is further evidence of the alter ego relationship between Highland Financial and SOHC, as Highland Financial would not have provided CDO Fund with the $5 million but for its alter ego relationship with SOHC and the control and domination exercised by Highland Capital.

### 2. UBS Is Harmed By Highland Capital's Response To The Fund Counterparties' Liquidity Crisis

80.      In the wake of the First Margin Call, the Fund Counterparties remained starved for liquidity.   Still desperate to avoid defaults to creditors and the consequences described above, Highland Capital resorted to commingling assets of various Highland Capital affiliates to generate short-term liquidity for the Fund Counterparties to satisfy obligations as they came due without regard for future mid-term and long-term obligations that they had.   In doing so, Highland Capital consciously decided to continue to ignore the corporate formalities of the Fund Counterparties and the other affiliates that they controlled.

81.      Highland Capital and the individuals that directed the Fund Counterparties knew that they had caused the Fund Counterparties to become incapable of satisfying their obligations to all of their respective creditors when they came due, and that they were insolvent or, at the very least, within the zone of insolvency.

82.      For example, on or about September 26, 2008, Dondero and Highland Capital improperly caused Highland Financial to take on additional debt by offering notes to other Highland affiliates, including CDO Fund, in exchange for cash-generating assets, which it hoped would allow SOHC to address short-term cash needs, and satisfy obligations SOHC had to Barclays under both a swap financing facility and a separate guarantee arrangement between SOHC and Barclays.

83.      Pursuant to the note offering, Highland Financial acquired approximately $321 million of risky CLO assets (CLO mezzanine paper and CLO equity assets), and life settlement insurance contracts from the Affiliated Transferees in exchange for senior secured notes in a principal amount of approximately $316 million with a maturity date of 2018 (the "September 2008 Note Offering," and the notes issued in connection therewith, the "September

2008 Notes"). The September 2008 Note Offering required Highland Financial to make amortized payments to the Affiliated Transferees each quarter starting in February 2009 of \$15 million. Highland Financial also was required to transfer a security interest to the Affiliated Transferees in the shares it held of two wholly-owned subsidiaries — HFP Asset Funding II and HFP Asset Funding III — into which Highland Financial transferred the assets that it received from the Affiliated Transferees.

84.     The granting of this security interest and related asset transfers constituted fraudulent conveyances, which made payment by the Fund Counterparties and Highland Financial of their obligations to UBS impossible and defrauded UBS. At the time of the September 2008 Note Offering, Highland Financial, as SOHC's alter ego, owed UBS hundreds of millions of dollars that it could not pay. The September 2008 Note Offering and related asset transfers were not arm's-length transactions or done for reasonably equivalent value. Dondero and Highland Capital caused Highland Financial to grant the security interest to affiliated insiders. Afterwards, Highland Financial concealed the security interest that it had granted to the Affiliated Transferees from UBS.

85.     On or about October 7, 2008, Highland Capital proposed that Highland Financial conduct an additional note offering on the same terms as the September 2008 Note Offering. In accordance with Highland Capital's proposal, Highland Financial issued an additional \$55,488,000 of 10% Senior Secured Notes due 2018 to be given to the Crusader Fund (the "October 2008 Note Offering," and together with the September 2008 Note Offering, the "Fall 2008 Note Offerings," and the notes issued in connection therewith, together with the September 2008 Notes, the "Fall 2008 Notes"). As a result of the October 2008 Note Offering, Highland Financial's debt obligation to the Affiliated Transferees was \$371,458,681, plus interest. The granting of a security interest and related asset transfers in connection with the

27

October 2008 Note Offering constitute fraudulent conveyances for substantially identical reasons as the conveyances made in connection with the September 2008 Note Offering.

86.     Highland Capital caused Highland Financial and SOHC to use the assets that they acquired to pay down a substantial portion of SOHC's debt to Barclays to the detriment of UBS.  Highland Capital executed this plan at UBS's expense to protect their substantial personal stake in Highland Financial and prevent negative publicity associated with defaulting on obligations to Barclays.  Implementing this plan, however, caused SOHC (and its alter ego, Highland Financial) to improperly and in bad faith breach duties and obligations to UBS.

87.     When SOHC and its alter ego, Highland Financial, used up their cash flows to pay Barclays, SOHC's expected obligations to UBS were well in excess of $250 million, which were due and owing to UBS no later than March 14, 2009.  Thus, by favoring Barclays over UBS, Highland Capital and the Fund Counterparties made a fraudulent conveyance and interfered in bad faith with the Fund Counterparties' ability to meet their contractual obligations to UBS.

88.     Given the state of the financial markets at the time, Highland Capital, Highland Financial and SOHC had no expectation that SOHC would be able to satisfy its obligations to UBS when they came due.  Indeed, not only was SOHC insolvent (or, at the very least, within the zone of insolvency), but Highland Financial, SOHC's alter ego, also was insolvent (or, at the very least, within the zone of insolvency), and would be certified insolvent by Highland Capital by year-end.  Consequently, the payments to Barclays constituted fraudulent conveyances that interfered in bad faith with SOHC's obligations under the Warehouse Agreements.  By orchestrating and causing the fraudulent transfers and improper payments to Barclays to protect its own self-interest, Highland Capital interfered in bad faith with UBS's contract with SOHC.

28

89. In addition to the foregoing, CDO Fund used the Fall 2008 Notes that it received in exchange for substantially all of its unencumbered assets to satisfy obligations to Citibank, NA ("Citi"). This too constituted an improper transfer as it was made by CDO Fund at a time when it was insolvent, and with an intention to give Citi a preference over UBS.

### 3. The Second Margin Call

90. On or about October 21, 2008, UBS notified Highland Capital that, pursuant to § 12(C) of the Synthetic Warehouse Agreement, the Fund Counterparties each owed another $10 million (the "Second Margin Call").

91. In response to the Second Margin Call, Highland Capital offered UBS numerous assets as collateral. UBS rejected those offers for various business-related reasons. As UBS would later learn, however, at the time Highland Capital was offering the assets to UBS, the Fund Counterparties did not own them.

92. On or about October 24, 2008, the Fund Counterparties satisfied the Second Margin Call by together posting assets with a notional value of $49.97 million (but a market value of approximately $20 million), with the understanding that UBS would authorize State Street to return the securities if and when the Fund Counterparties were able to replace those securities with $20 million in cash. As UBS would later learn, the Fund Counterparties did not own and failed to disclose that four of the assets used to satisfy the Second Margin Call were owned by HFP Asset Funding II, one of SOHC's affiliated sister funds which, like SOHC, was controlled by Highland Financial and Highland Capital.

93. Moreover, at the same time that Highland Capital was telling UBS that the Fund Counterparties did not have sufficient cash assets to meet the Second Margin call, Highland Capital was using the liquid resources available to SOHC (through its alter ego,

29

Highland Financial) to make payments to another SOHC creditor, i.e., Barclays, which improperly favored Barclays over UBS, and directly and proximately caused injury to UBS.

### 4. The Third Margin Call

94. On or about November 7, 2008, UBS notified Highland Capital and the Fund Counterparties that, pursuant to § 12(C) of the Synthetic Warehouse Agreement, the Fund Counterparties had an obligation to post another $10 million as collateral (the "Third Margin Call").

95. On or about November 11, 2008, Highland Capital and the Fund Counterparties offered to post various securities to satisfy the Third Margin Call. In response to the Third Margin Call, Phil Braner of Highland Capital emailed UBS a list of proposed collateral including eight securities with a purported market value of approximately $20 million (i.e., twice the amount of cash due to satisfy the Third Margin Call).

96. Pursuant to the Warehouse Agreements, UBS was authorized to reject proposed collateral. UBS determined that the proposed additional collateral offered by Highland Capital and the Fund Counterparties was unacceptable. On or after November 13, 2008, UBS formally rejected the offered securities, and requested that the Fund Counterparties provide cash or cash equivalent collateral to satisfy their obligations under § 12(C) of the Synthetic Warehouse Agreement.

97. UBS would later learn that neither of the Fund Counterparties owned the assets that Highland Capital proposed using to satisfy the Third Margin Call. Rather, SOHC's affiliate, HFP Asset Funding II owned each of the eight assets that Highland Capital had proposed using to satisfy the Third Margin Call.

98. When UBS confronted Highland Capital about this issue Mr. Braner of Highland Capital explained that Highland Capital could (and was willing to) exercise its control

over the various Highland-affiliated funds to move assets between and among the affiliated funds, thereby making assets available to UBS from Highland-affiliated funds other than the Fund Counterparties. Mr. Braner explained how Highland Capital could effectuate the asset transfers by simply ignoring corporate formalities, transferring assets among companies, utilizing accounting entries and otherwise taking advantage of the corporate relationship shared by the various Highland-affiliated funds to engineer non-arm's-length transactions. Mr. Braner also divulged to UBS that Highland Capital was willing to ignore corporate formalities because it wanted to avoid any further reputational harm to Highland Capital and the Highland organization that would occur if the Fund Counterparties defaulted on UBS's margin calls.

### F.    Termination Of The Agreements And Demand For Payment of Losses

99.    As of December 3, 2008, the Fund Counterparties still had not met the Third Margin Call in accordance with § 12(C) of the Synthetic Warehouse Agreement. This failure resulted in UBS's declaration of a termination date ("Termination Date") under the Agreements.

100.    On December 3, 2008, UBS delivered a letter (the "Termination Date Letter") to Highland Capital and the Fund Counterparties notifying them of such failure and the occurrence of a Termination Date under each Agreement. (A true and correct copy of the Termination Date Letter is annexed hereto as Exhibit G.)

101.    Sections 5 and 7 of the Cash Warehouse Agreement provided that if the closing date of the securitization contemplated by the Restructured Transaction failed to occur on or prior to March 14, 2009, UBSS could, in its sole discretion, retain any of the securities in the Warehouse Facility or sell such securities to one of UBSS's affiliates or an unaffiliated party.

102.    Pursuant to the terms of the Agreements, if the closing date of the securitization contemplated by the Restructured Transaction failed to occur on or prior to

31

March 14, 2009, each of the Fund Counterparties was obligated to pay to UBS its pro rata share of any market value losses on the Warehouse Assets, which UBS determined it had experienced and so notified Highland Capital and the Fund Counterparties.

103. On December 19, 2008, UBSS delivered a letter (the "Cash Warehouse Demand Letter") to Highland Capital and the Fund Counterparties demanding payment for its losses. (A true and correct copy of the Cash Warehouse Demand Letter is annexed hereto as Exhibit H.) UBSS demanded that Highland Capital and the Fund Counterparties wire that required amount to UBSS no later than 5:00 pm on December 24, 2008 (i.e., the third business day after the date of the Cash Warehouse Demand Letter) (the "Final Payment Date"). Highland Capital and the Fund Counterparties failed to make the required payment to UBSS.

104. The Synthetic Warehouse Agreement provided that in the event the closing date of the securitization contemplated by the Restructured Transaction failed to occur on or prior to March 14, 2009, the Fund Counterparties would be collectively responsible for 100% of the aggregate amount of losses on the CDS Portfolio and each of the Fund Counterparties would pay, after notice of such amount due from UBS, its pro rata share of such amount to UBS within three business days.

105. On December 19, 2008, UBS AG delivered a letter (the "Synthetic Warehouse Demand Letter") to Highland Capital and the Fund Counterparties demanding payment for its losses. (A true and correct copy of the Synthetic Warehouse Demand Letter is annexed hereto as Exhibit I.) UBS AG demanded that the Highland Capital and the Fund Counterparties wire the required amount to UBS AG no later than 5:00 PM on the Final Payment Date (i.e., December 24, 2008 — the third business day after the date of the Synthetic Warehouse Demand Letter). Highland Capital and the Fund Counterparties failed to make the required payment to UBS AG.

G.     **Notice of Failure To Pay, Auction And Final Accounting Letter**

106.    On January 5, 2009, UBS notified Highland Capital and the Fund Counterparties of the failure to make the requisite payments when due pursuant to the Agreements and the applicable demand letters. On or about January 16, 2009, in connection with unwinding the Warehouse Facility, UBS conducted the auction contemplated by the Warehouse Agreements.

107.    On or about March 19, 2009, UBS delivered a letter to Highland Capital and the Fund Counterparties concerning a final accounting concerning the auction and the losses in the Warehouse Facility. UBS determined that Highland Capital and the Fund Counterparties owed it $686,853,290.26.

H.     **Highland Capital Renders The Fund Counterparties Judgment-Proof To Avoid Their Obligations To UBS**

108.    Prior to December 31, 2008, Highland Financial was insolvent. During the fourth quarter of 2008, Highland Financial's book value declined below zero. As a result, each of the limited partners' interests in Highland Financial had no value. Likewise, SOHC was insolvent.

109.    In December 2008, immediately after UBS terminated the Restructured Transaction, Dondero and Highland Capital executed a plan to continue to reduce UBS's ability to recover from the Fund Counterparties. Among other things, Dondero and Highland Capital began the process of ensuring that Highland Financial and SOHC were insolvent and unable to meet their obligations to UBS by transferring assets from Highland Financial (and its subsidiaries) to the Affiliated Transferees. Dondero and Highland Capital tried to hide this fraudulent conveyance by tying it to the cancellation of the Fall 2008 Notes.

110. On or about February 24, 2009, UBS commenced the Highland Entity Action against Highland Capital and the Fund Counterparties. At the time, SOHC and Highland Financial, as its alter ego, owed UBS approximately $345 million.

111. Undeterred, on or about March 17, 2009, Dondero and Highland Capital caused SOHC's parent and alter ego, Highland Financial, to transfer virtually all of its (and SOHC's) assets to Highland Capital and the Affiliated Transferees, including millions of dollars worth of assets to which they were not entitled (the "March 2009 Fraudulent Conveyance"). In particular, on March 17, 2009, Highland Capital caused assets with a purported value of $239 million to be transferred from Highland Financial and its subsidiaries to the Affiliated Transferees, including assets from two Highland Financial subsidiaries that had no obligations to the Affiliated Transferees: Highland Financial Real Estate and CDO HoldCo. (a/k/a HFP Asset Funding I). Among other things, in connection with the March 2009 Fraudulent Conveyance, Highland Capital and the Affiliated Transferees improperly received the following assets from Highland Financial:

- HCF received (a) STRAF-1A (Floating – 11/2021 – D – 86280AAF4), (b) Red River (Floating – 07/2018 – E – 75686XAA8), (c) REIT - HE 1001 West Loop Project LLC and (d) REIT - HE 2425 West Loop, L.P.

- The Crusader Fund received (a) STRAF 2007-1A (Floating – 11/2021 – C – 86280AE7), (b) ROCKW 2007-1A A3L, (c) STRAF 2007-1A (C tranche), (d) Ginn LA Conduit Lender, Inc. (First Lien Tranche A Credit Linked Deposit) and (e) Ginn LA Conduit Lender, Inc. (First Lien Tranche B Term Loan).

- Highland Capital received the following REIT interests: (a) HE Capital KR, LLC, (b) HE Mezz KR, LLC, (c) HCREA Breckenridge, L.P., (d) HCREA Lockhill Retail, L.P., (e) HCREA Nolen Drive, L.P., (f) HCREA Trimarchi, (g) HE Sugar Lend Project, LLC and (h) NBREC Highland Village.

112. As a result, Highland Capital (a) further interfered in bad faith with UBS's contractual rights and the Fund Counterparties' contractual obligations under the Warehouse Agreements, thereby breaching the covenants of good faith and fair dealing inherent in the Warehouse Agreements; and (b) caused the fraudulent conveyance of assets from SOHC's alter ego and parent, Highland Financial, to various other Highland affiliates.

113. At the time of the March 2009 Fraudulent Conveyance, the assets that Highland Financial transferred to the Affiliated Transferees were worth millions of dollars. Because these assets were fraudulently transferred, they were not available to SOHC, and Highland Financial as SOHC's alter ego, to satisfy their debt to UBS under the Warehouse Agreements. UBS had a legal interest in, and right to the fraudulently transferred assets, as a creditor of SOHC, Highland Financial's alter ego. Consequently, as a direct and proximate cause of the March 2009 Fraudulent Conveyance, UBS was injured. The full extent of UBS's injury should be determined at trial.

114. The March 2009 Fraudulent Conveyance was not an arm's-length transaction or for reasonably equivalent value. Dondero, Highland Capital and Highland Financial knew that transferring those assets to Highland Capital and Affiliated Transferees would be a fraudulent transfer, interfere in bad faith with the Fund Counterparties' ability to meet their obligations to UBS under the Warehouse Agreement and otherwise be improper. For example, at Highland Financial's March 17, 2009 board meeting, in connection with approving the March 2009 Fraudulent Conveyance, those in attendance discussed how the March 2009 Fraudulent Conveyance should be considered in light of (a) the Highland Entity Action commenced by UBS against Highland Capital and SOHC, and (b) Highland Financial's active consideration of bankruptcy as an option to deal with its inability to satisfy its obligations to creditors.

## FIRST CAUSE OF ACTION
### (Fraud)

115. UBS repeats and realleges the allegations set forth in paragraphs 1 through 114 of this Complaint as if fully set forth herein.

116. In connection with restructuring the Original Engagement, and negotiating the terms of the Agreements and Restructured Transaction, Highland Capital and the Fund Counterparties had a duty to communicate accurate and complete information to UBS.

117. As alleged above, in connection with negotiating the Restructured Transaction, Highland Capital and the Fund Counterparties intentionally misrepresented material facts and made Omissions (as defined earlier herein).

118. As set forth in more detail above, prior to the restructuring being completed, and the Agreements being executed, Highland Capital and the Fund Counterparties misrepresented information and made Omissions to UBS concerning the creditworthiness of the Fund Counterparties as well as information about their finances and assets, including, but not limited to, information regarding the following:

      (a)    the Fund Counterparties' inability to satisfy the Initial Restructuring Collateral obligations using their own assets;

      (b)    the size of CDO Fund's cash position; and

      (c)    the material inaccuracy of the summary asset valuations provided by Highland Capital and the Fund Counterparties.

119. Highland Capital and the Fund Counterparties acted knowingly and purposefully in making the materially false representations and Omissions to UBS in connection with negotiating the Restructured Transaction to induce UBS to enter the Agreements. Highland Capital and the Fund Counterparties knew that their representations and Omissions were materially false and misleading. Knowingly using material misrepresentations and Omissions,

36

Highland Capital and the Fund Counterparties intended to induce, and fraudulently induced UBS into entering the Agreements.

120.     Highland Capital and the Fund Counterparties also knew that their false representations and Omissions were material to and caused UBS's decision to enter the Agreements. In particular, the misrepresentations and Omissions were both quantitatively and qualitatively material to UBS inasmuch as UBS would have acted differently had it known the truth about the Fund Counterparties' finances and assets when UBS made the decision to go forward with the restructuring and releasing, among other things, valuable claims against Highland Capital.

121.     UBS was not aware and could not have been aware of the falsity and misleading nature of Highland Capital's and the Fund Counterparties' misrepresentations and Omissions. The facts and information underlying the false, inaccurate and incomplete financial reports that Highland Capital provided to UBS in connection with negotiating the Restructured Transaction were peculiarly within Highland Capital's and the Fund Counterparties' knowledge.

122.     Highland Capital and the Fund Counterparties had superior knowledge compared to UBS about Highland Capital's and the Fund Counterparties' finances and assets. Indeed, such facts and information were solely and peculiarly within the knowledge of Highland Capital and the Fund Counterparties. Moreover, it was necessary for Highland Capital and the Fund Counterparties to complete or clarify the information that it provided to UBS concerning the Fund Counterparties' finances and assets. Consequently, Highland Capital's and the Fund Counterparties' concealment of the Fund Counterparties' finances and assets was fraudulent.

123.     UBS reasonably and justifiably relied to its detriment on Highland Capital's and the Fund Counterparties' misrepresentations and Omissions regarding the Fund Counterparties' financial condition and assets. In particular, UBS reasonably and justifiably

relied on misrepresentations and Omissions of facts and information solely and peculiarly within the knowledge of Highland Capital and the Fund Counterparties. Given UBS's prior dealings with Highland Capital and its affiliates, as well as Highland Capital's size and presence in the market, UBS had no reason to question the veracity and completeness of the financial information that Highland Capital provided to UBS about the Fund Counterparties' finances and assets. UBS also had no reason to believe that the financial information that Highland Capital provided to it to induce UBS to enter the Restructured Transaction would be false, incomplete or otherwise misleading. When UBS evaluated the Fund Counterparties' financial statements in early 2008, it did not know about Highland Capital's and the Fund Counterparties' false asset valuations and methodology nor did UBS know of Highland Capital's plan to enter additional financing arrangements, and to encumber the Fund Counterparties' assets in connection with those transactions, thereby reducing the assets to which UBS could look to satisfy the Fund Counterparties' contractual obligations. UBS also did not know that Highland Capital and the Fund Counterparties provided it with false and misleading information, or that they had concealed material information from UBS about the Fund Counterparties' finances and assets.

124. But for Highland Capital's and the Fund Counterparties' material misrepresentations and Omissions, UBS would not have entered the Agreements, or released its claims against Highland Capital and the Fund Counterparties arising out of the Original Engagement.

125. In reasonable and justifiable reliance on the foregoing material misrepresentations and Omissions, UBS also surrendered and released valuable claims against Highland Capital and the Fund Counterparties at a time when UBS could have been made whole for the losses that it had suffered to that point as a result of the Original Engagement. Nor would UBS have suffered the additional losses in the Warehouse Facility.

38

126. UBS reasonably relied to its detriment on Highland Capital's and the Fund Counterparties' material misrepresentations and Omissions. As a direct and proximate result of Highland Capital's and the Fund Counterparties' misrepresentations and Omissions, UBS continued to maintain the Warehouse Facility through, at least, December 3, 2008, suffering in excess of $686 million in losses that the Fund Counterparties cannot pay to UBS.

127. Highland Capital's and the Fund Counterparties' material misrepresentations and Omissions were the direct and proximate cause of UBS's losses complained of herein. As a direct result of, and in reliance upon, Highland Capital's and the Fund Counterparties' material misrepresentations and Omissions, UBS was induced to, among other things, (a) enter the Agreements; (b) release its pre-existing claims against Highland Capital and the Fund Counterparties related to the Original Engagement; and (c) assume the credit-risk of the Fund Counterparties; and as a direct result, caused UBS to incur substantial losses and damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Fraud)
### (Pled Solely To Preserve For Appeal)

128. UBS repeats and realleges the allegations set forth in paragraphs 1 through 127 of this Complaint as if fully set forth herein.

129. In connection with restructuring the Original Engagement, and negotiating the terms of the Agreements and Restructured Transaction, Highland Capital and the Fund Counterparties had a duty to communicate accurate and complete information to UBS.

130. As alleged above, in connection with negotiating the Restructured Transaction, Highland Capital and the Fund Counterparties intentionally misrepresented material facts and made Omissions (as defined earlier herein).

131. As set forth in more detail above, prior to the restructuring being completed, and the Agreements being executed, Highland Capital and the Fund Counterparties misrepresented information and made Omissions to UBS concerning the creditworthiness of the Fund Counterparties and information about their finances, assets and business practices, including, but not limited to, information regarding the following:

    (a)    the Fund Counterparties having pledged and encumbered a substantial portion of its assets prior to entering the Agreements;

    (b)    CDO Fund's having pledged and encumbered a substantial portion of its assets prior to entering the Agreements;

    (c)    Highland Capital's and the Fund Counterparties' plan to encumber more of the Fund Counterparties' assets, including immediately after March 14, 2008;

    (d)    the commingling of assets between and among the various entities related to Highland Capital and the Fund Counterparties;

    (e)    the practice of shuttling assets between the Fund Counterparties and their affiliates to satisfy the Fund Counterparties' day-to-day expenses, liquidity and financial statement needs;

    (f)    Highland Capital's and the Fund Counterparties' disregard for the corporate form in managing the Fund Counterparties' assets; and

    (g)    SOHC's liquidity problems, and need to borrow money from Highland Capital to satisfy its Initial Restructuring Collateral obligations.

132. Highland Capital and the Fund Counterparties acted knowingly and purposefully in making the materially false representations and Omissions to UBS in connection with negotiating the Restructured Transaction to induce UBS to enter the Agreements. Highland Capital and the Fund Counterparties knew that their representations and Omissions were materially false and misleading. Knowingly using material misrepresentations and Omissions,

Highland Capital and the Fund Counterparties intended to induce, and fraudulently induced UBS into entering the Agreements.

133. These Omissions rendered the Fund Counterparties' representations, statements and financial statements materially misleading. Because Highland Capital and the Fund Counterparties concealed this information from UBS, UBS could not properly evaluate SOHC's ability to satisfy its obligations to UBS. For instance, UBS received financial reports from Highland Capital for the Fund Counterparties that suggested that the Fund Counterparties held hundreds of millions of dollars worth of assets that could be used to satisfy their obligations to UBS. However, a substantial portion of the assets that UBS reasonably believed would be available, were, in fact, not going to be available to pay UBS because they were going to be encumbered as a result of other transactions. In other words, because Highland Capital concealed its intentions, the financial reports that it provided to UBS were misleading as they provided UBS with false and illusory comfort regarding the Fund Counterparties' capacity to fulfill their contractual obligations to UBS. As the Fund Counterparties' investment manager, Highland Capital would have led the negotiations related to the other financing arrangements.

134. Similarly, during negotiations concerning the Initial Restructuring Collateral, Highland Capital and SOHC made an additional Omission by not disclosing to UBS the fact that SOHC had a serious liquidity problem. SOHC had to borrow cash from Highland Capital to satisfy the cash portion of its Initial Restructuring Collateral obligation. On or about December 18, 2007, while the parties were negotiating the restructuring, Highland Capital loaned $30 million to SOHC, which Highland Capital and SOHC's alter ego, Highland Financial, earmarked for SOHC to use as collateral in connection with negotiating extensions of warehouse facilities, including the one with UBS. As Highland Financial's and SOHC's investment manager, Highland Capital knew about SOHC's liquidity problems since they were

41

discussed openly at Highland Financial board meetings attended by Highland Capital. The failure to fully disclose SOHC's liquidity problem, and its inability to meet the Initial Restructuring Collateral obligation using its own cash assets was an Omission, because it was indicative of the strength of SOHC's finances and assets, and SOHC's ability to satisfy obligations to UBS.

135.    Highland Capital and the Fund Counterparties also concealed from UBS that Highland Capital had to commingle assets among its various affiliates and disregard corporate formalities to satisfy the Fund Counterparties' liquidity needs. Facts and information concerning these business practices, including Highland Capital's commingling of assets and disregard of corporate formalities was information solely and peculiarly within the knowledge of Highland Capital and its affiliates. As the investment manager to Highland Financial, SOHC and CDO Fund (as well as the Affiliated Transferees), Highland Capital knowingly arranged and caused the asset transfers between and among the various affiliates in disregard of corporate formalities.

136.    Highland Capital and the Fund Counterparties also knew that their false representations and Omissions were material to and caused UBS's decision to enter the Agreements. In particular, the misrepresentations and Omissions were both quantitatively and qualitatively material to UBS inasmuch as UBS would have acted differently had it known the truth about the Fund Counterparties' finances, assets and business practices when UBS made the decision to go forward with the restructuring and releasing, among other things, valuable claims against Highland Capital.

137.    In addition, if UBS had known that Highland Capital and the Fund Counterparties ignored corporate formalities or that Highland Capital freely transferred assets

among its controlled entities, UBS would not have entered the Restructured Transaction. These misrepresentations and Omissions proximately caused harm to UBS.

138. UBS was not aware and could not have been aware of the falsity and misleading nature of Highland Capital's and the Fund Counterparties' misrepresentations and Omissions. The facts and information underlying the false, inaccurate and incomplete financial reports that Highland Capital and the Fund Counterparties provided to UBS in connection with negotiating the Restructured Transaction were peculiarly within Highland Capital's and the Fund Counterparties' knowledge.

139. Highland Capital and the Fund Counterparties had superior knowledge compared to UBS about Highland Capital's and the Fund Counterparties' finances, assets and business practices. Indeed, such facts and information were solely and peculiarly within the knowledge of Highland Capital and the Fund Counterparties. Moreover, it was necessary for Highland Capital and the Highland Entities to complete or clarify the information that it provided to UBS concerning the Fund Counterparties' finances, assets and business practices. Consequently, Highland Capital's and the Fund Counterparties' concealment about the Fund Counterparties' finances, assets and business practices was fraudulent.

140. UBS reasonably and justifiably relied to its detriment on Highland Capital's and the Fund Counterparties' misrepresentations and Omissions regarding the Fund Counterparties' financial condition, assets and business practices. In particular, UBS reasonably and justifiably relied on misrepresentations and Omissions of facts and information solely and peculiarly within the knowledge of Highland Capital and the Fund Counterparties. Given UBS's prior dealings with Highland Capital and its affiliates, as well as Highland Capital's size and presence in the market, UBS had no reason to question the veracity and completeness of the financial information that Highland Capital provided to UBS about the Fund Counterparties'

finances, assets and business practices. UBS also had no reason to believe that the financial information that Highland Capital and the Fund Counterparties provided to it to induce UBS to enter the Restructured Transaction would be false, incomplete or otherwise misleading. When UBS evaluated the Fund Counterparties' financial statements in early 2008, it did not know of Highland Capital's plan to enter additional financing arrangements, and to encumber the Fund Counterparties' assets in connection with those transactions, thereby reducing the assets to which UBS could look to satisfy the Fund Counterparties' contractual obligations. Nor did UBS know about Highland Capital's and the Fund Counterparties' false asset valuations and methodology. UBS also did not know that Highland Capital and the Fund Counterparties provided it with false and misleading information, or that they had concealed material information from UBS about the Fund Counterparties' assets, finances and business practices.

141. But for Highland Capital's and the Fund Counterparties' material misrepresentations and Omissions, UBS would not have entered the Agreements, or released its claims against Highland Capital and the Fund Counterparties arising out of the Original Engagement.

142. In reasonable and justifiable reliance on the foregoing material misrepresentations and Omissions, UBS also surrendered and released valuable claims against Highland Capital and the Fund Counterparties at a time when UBS could have been made whole for the losses that it had suffered to that point as a result of the Original Engagement. Nor would UBS have suffered the additional losses in the Warehouse Facility.

143. UBS reasonably relied to its detriment on Highland Capital's and the Fund Counterparties' material misrepresentations and Omissions. As a direct and proximate result of Highland Capital's and the Fund Counterparties' misrepresentations and Omissions, UBS

continued to maintain the Warehouse Facility through, at least, December 3, 2008, suffering in excess of $686 million in losses that the Fund Counterparties cannot pay to UBS.

144. Highland Capital's and the Fund Counterparties' material misrepresentations and Omissions were the direct and proximate cause of UBS's losses complained of herein. As a direct result of, and in reliance upon, Highland Capital's and the Fund Counterparties' material misrepresentations and Omissions, UBS was induced to, among other things, (a) enter the Agreements; (b) release its pre-existing claims against Highland Capital and the Fund Counterparties related to the Original Engagement; and (c) assume the credit-risk of the Fund Counterparties; and as a direct result, caused UBS to incur substantial losses and damages in an amount to be determined at trial.

145. Paragraphs 145 to 156 have been intentionally left blank.

### THIRD CAUSE OF ACTION
### (Breach of Covenant of Good Faith and Fair Dealing)

157. UBS repeats and realleges the allegations set forth in paragraphs 1 through 156 of this Complaint as if fully set forth herein.

158. The Agreements are valid and binding contracts. As such, they each contain an implied covenant of good faith and fair dealing. UBS has fully performed all of its obligations under the Agreements.

159. Highland Capital controlled the Fund Counterparties through both its direct and indirect ownership and other interests in various entities, including the Fund Counterparties, and its role as investment manager for the Fund Counterparties.

160. When it entered the Agreements, Highland Capital agreed that UBS would not have to bear the risk of loss in connection with the Warehouse Assets that UBS held in the Warehouse Facility. Instead, Highland Capital agreed that the Fund Counterparties, which

Highland Capital controlled, would bear 100% of the risk of loss in connection with the Restructured Transaction.

161. Highland Capital had an implied duty of good faith not to take (or fail to take) any actions that would frustrate the clear intent of the parties that UBS would not have to bear any of the risk of losses in the Warehouse Facility. In particular, the implied covenant of good faith and fair dealing inherent in the Agreements barred Highland Capital from taking affirmative measures that increased the likelihood that the Fund Counterparties would be unable to bear losses in connection with the Restructured Transaction.

162. Highland Capital breached the implied covenant of good faith and fair dealing implied in the Agreements by taking affirmative actions (and refraining from taking other actions) that impaired UBS's ability to recover losses from the Fund Counterparties as contemplated by the Agreements, and by making it impossible for the Fund Counterparties to pay UBS what they owed it under the terms of the Warehouse Agreements.

163. Specifically, as described above, between March 14, 2008 and December 3, 2008, as losses in the Warehouse Facility grew, Highland Capital exercised its control over the Fund Counterparties to dissipate the Fund Counterparties' assets and transfer their assets to other Highland affiliates, principals and creditors, thereby impairing the Fund Counterparties' ability to bear losses in the Warehouse Facility. Highland Capital transferred assets out of the Fund Counterparties during the course of the Restructured Transaction in bad faith, and to UBS's detriment. Given its knowledge of the Fund Counterparties' obligations to UBS, the transfers caused by Highland Capital violated the duty of good faith and fair dealing owed by Highland Capital to UBS under the Agreements.

164. Highland Capital also granted security interests in certain of the Fund Counterparties' assets to third parties during the course of the Restructured Transaction. By

encumbering the Fund Counterparties' assets, Highland Capital impaired the Fund Counterparties' ability to make UBS whole for losses. Given their knowledge of the Fund Counterparties' obligations to UBS, the encumbrances that Highland Capital caused violated the duty of good faith and fair dealing owed by Highland Capital to UBS under the Agreements.

165. Highland Capital also used its control over the Fund Counterparties to give preferred treatment to other creditors, all to UBS's detriment. Highland Capital also caused the March 2009 Fraudulent Conveyance, which transferred assets to which UBS was entitled to the Affiliated Transferees and Highland Capital.

166. As a result of Highland Capital's breaches of the duty of good faith and fair dealing implied in the Agreements, UBS has incurred losses that should have been borne by the Fund Counterparties. UBS has suffered and will continue to suffer losses and damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Fraudulent Conveyances)

167. UBS repeats and realleges the allegations set forth in paragraphs 1 through 166 of this Complaint as if fully set forth herein.

168. Between March 14, 2008 and December 3, 2008, as losses in the Warehouse Facility grew, Highland Capital exercised its control over the Fund Counterparties and caused the Fund Counterparties to transfer valuable cash and assets out of the Fund Counterparties, thereby impairing their ability to bear losses in the Warehouse Facility, and otherwise satisfy their obligations to creditors, including UBS. In the Fall of 2008 and in March 2009, Highland Capital also caused Highland Financial to engage in asset transfers intended to hinder, delay and defraud UBS.

169.     The asset transfers that Highland Capital and Highland Financial caused to be made from SOHC were intended to defraud UBS as they were intended to defeat SOHC's obligations to UBS as evidenced by, among other things, the fact that (a) the transfers were made to insider affiliates, (b) the transfers were made when SOHC was insolvent or became insolvent shortly thereafter, (c) the transfers were made by commingling corporate assets of various Highland Financial affiliates, and otherwise in disregard of various corporate formalities and/or (d) the transfers occurred shortly after a substantial debt was incurred by SOHC. The asset transfers from SOHC also were made for no valuable consideration and less than reasonably equivalent value.

170.     For example, as alleged above, in the Fall of 2008, SOHC made payments to Barclays at a time when it was insolvent (or shortly before it became insolvent), and without regard for UBS's rights as a creditor of SOHC. In connection with making those payments to Barclays, Highland Capital caused Highland Financial to disregard corporate formalities and commingle assets between its subsidiaries, including SOHC so that SOHC could pay Barclays, and Highland Capital could avoid any consequences of a default to Barclays. In doing so, however, Highland Capital and SOHC intended to defeat an obligation owed to UBS. In addition, during the course of the Restructured Transaction, Highland Capital caused SOHC to make a number of upstream dividend payments to Highland Financial in exchange for no consideration or no fair consideration to SOHC, or consideration that had significantly less value than the dividend payments. These payments were made shortly after SOHC incurred its substantial debt to UBS.

171.     The asset transfers that Highland Capital caused to be made from CDO Fund were made with the intention to defraud UBS as the dominant purpose of the assets transfers from CDO Fund was to put CDO Fund's property and assets beyond the reach of UBS.

48

In particular, Highland Capital's and CDO Fund's intention to place property and assets beyond the reach of UBS is evidenced by, among other things, the fact that (a) the transfers were made to insider affiliates, (b) CDO Fund, through Highland Capital, retained control over the assets transferred after the transfer, (c) Highland Capital concealed details concerning the transfers from UBS, (d) the transfer involved substantially all of CDO Fund's valuable assets, (e) at the time of the transfers, CDO Fund was insolvent or became insolvent shortly thereafter, (f) the transfer occurred shortly after a substantial debt was incurred by CDO Fund and (g) CDO Fund transferred assets to an intermediary who subsequently transferred the assets to an insider affiliate. The asset transfers from CDO Fund also were made for no valuable consideration, or consideration that was less than reasonably equivalent value.

172. At the time of the asset transfers from CDO Fund, it was reasonably foreseeable to CDO Fund and Highland Capital that CDO Fund was going to owe UBS substantial sums of money well in excess of $100 million. It also was reasonable for Highland Capital and CDO Fund to believe that after the CDO Fund transfers, CDO Fund would be unable to pay its liabilities as they came due. At the time of CDO Fund's fraudulent conveyances, CDO Fund owed a contingent liability to UBS, and since the time of the transfers, the contingency giving rise to the obligation has occurred, and that obligation remains unsatisfied. CDO Fund's obligations to UBS came due within two years of the fraudulent conveyances complained of herein, and as of this time, remain unsatisfied.

173. For example, in or around May 2008, Highland Capital caused CDO Fund to transfer out of CDO Fund approximately $100 million that CDO Fund received after it monetized its long position in SunCom Wireless. CDO Fund did not use the proceeds from the SunCom Wireless sale to purchase valuable assets or pay debts to creditors in the ordinary course of business as debts came due. Rather, Highland Capital caused a substantial portion of

the proceeds to be distributed to CDO Fund's partners, including Highland Capital, its affiliates and principals, in exchange for no consideration or no fair consideration to CDO Fund, or consideration that had significantly less value than the $100 million that was transferred. Highland Capital concealed the details concerning this fraudulent conveyance from UBS.

174. Highland Capital also caused CDO Fund to participate in the Fall 2008 Note Offerings. In particular, at a time when CDO Fund was insolvent or would soon become insolvent, Highland Capital caused CDO Fund to transfer substantially all of its unencumbered assets to Highland Financial in exchange for the September 2008 Notes. Highland Capital subsequently caused CDO Fund to transfer the September 2008 Notes to Citi in exchange for no fair consideration to CDO Fund. This constituted a voidable preference under the applicable law as CDO Fund was insolvent (or contemplating insolvency) at the time and owed UBS in excess of $200 million. Finally, in March 2009, after UBS brought the Highland Entity Action against CDO Fund, the assets that Highland Capital caused CDO Fund to transfer to Highland Financial were transferred again, this time to the Affiliated Transferees and Citi as part of the March 2009 Fraudulent Conveyance.

175. The asset transfers that Highland Capital caused to be made from Highland Financial were made with actual intent to hinder, delay and defraud UBS as a creditor of Highland Financial's alter ego, SOHC. In particular, Highland Capital's and Highland Financial's actual intent to hinder, delay and defraud UBS is evidenced by, among other things, the fact that (a) the transfers were made to insider affiliates, including to Highland Capital, (b) Highland Capital retained control over the assets transferred, (c) before the transfer, SOHC had been sued and threatened with suit, (d) the transfer involved substantially all of Highland Financial's assets, (e) Highland Financial was insolvent at the time of the transfer or became

insolvent shortly afterwards, and/or (f) the transfer occurred at or around the time SOHC's contingent obligation to UBS became enforceable.

176.    The asset transfers that Highland Capital caused to be made from Highland Financial also were made without Highland Financial receiving reasonably equivalent value in exchange for the transfer. At the time of the transfers, Highland Financial's remaining assets were unreasonably small in relation to its business. At the time of the transfers, Highland Capital and Highland Financial's board of directors knew or reasonably should have believed that Highland Financial would not be able to pay its debts, including the debts of its alter egos, when they came due.

177.    For example, in the Fall of 2008, Highland Capital caused Highland Financial to become indebted to the Affiliated Transferees by entering the Fall 2008 Note Offerings. In connection with the Fall 2008 Note Offerings, Highland Financial improperly conveyed a security interest in the equity of two of its affiliates to the Affiliated Transferees to UBS's detriment. Highland Financial did not receive reasonably equivalent value in exchange for granting that security interest to the Affiliated Transferees. Moreover, when Highland Financial issued the Fall 2008 Notes, Highland Capital and Highland Financial knew or should have known that Highland Financial was incurring a debt beyond Highland Financial's ability to pay when it came due, especially given Highland Financial's existing debts to UBS at the time.

178.    In March 2009, after the Highland Entity Action was commenced by UBS, Highland Capital caused SOHC's alter ego, Highland Financial to engage in the March 2009 Fraudulent Conveyance, whereby Highland Financial fraudulently transferred assets to the Affiliated Transferees, as well as Highland Capital and a CDO Fund creditor (other than UBS). At the time of the March 2009 Fraudulent Conveyance, Highland Capital and the Highland Entities knew that SOHC and its alter ego, Highland Financial, were insolvent. Highland Capital

and the Highland Entities also knew that SOHC and its alter ego, Highland Financial, owed UBS approximately $350 million. Nevertheless, they caused almost all of Highland Financial's remaining valuable assets to be transferred to Highland Capital and its affiliates, thereby preventing UBS from being able to recover against Highland Financial or SOHC.

179. As a result of the foregoing fraudulent conveyances, the Fund Counterparties were unable to satisfy their obligations to UBS. As a result of the foregoing fraudulent conveyances, UBS has been harmed in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Tortious Interference With Contractual Relations)
### (Pled Solely To Preserve For Appeal)

180. UBS repeats and realleges the allegations set forth in paragraphs 1 through 179 of this Complaint as if fully set forth herein.

181. The Agreements are valid and binding contracts.

182. The parties agreed that UBS would not bear the risk of any losses in connection with the Restructured Transaction. As a direct result of the Fund Counterparties' breach of the Warehouse Agreements, UBS suffered no less than $686,853,290.26 in damages. Under the terms of the Warehouse Agreements, the Fund Counterparties' obligation to pay UBS for losses in the Warehouse Facility expressly survived the termination of the Agreements.

183. Highland Capital knew of the Agreements, and were familiar with their terms, including the Fund Counterparties' obligations to UBS thereunder. The Affiliated Transferee Defendants, also knew of the Agreements, and their terms, including the Fund Counterparties' obligations to UBS thereunder.

184. Highland Capital and the Affiliated Transferee Defendants intentionally and improperly caused and ensured a breach of the Warehouse Agreements by the Fund Counterparties, thereby tortiously interfering with UBS's rights under the Agreements.

185. Specifically, in 2008 and 2009 Highland Capital wrongfully caused the improper and fraudulent asset transfers, payments, distributions and dividends described above, and thereby tortiously interfered with UBS's contractual relationship with the Fund Counterparties by knowingly impairing UBS's contractual right under the Warehouse Agreements to be reimbursed by the Fund Counterparties for the losses on the Warehouse Assets. For example, Highland Capital wrongfully caused the March 2009 Fraudulent Conveyance for which there was no legitimate purpose. The Affiliated Transferee Defendants knowingly participated in Highland Capital's tortious interference with UBS's rights under the Agreements.

186. Highland Capital and the Affiliated Transferee Defendants conceived of, advocated for, implemented, authorized, approved and engaged in the foregoing improper conduct and unlawful asset transfers, including the Fall 2008 Note Offerings and the March 2009 Fraudulent Conveyances, which constitute independent torts.

187. Highland Capital and the Affiliated Transferee Defendants engaged in the foregoing unlawful and improper conduct, and tortiously interfered with UBS's contractual rights under the Warehouse Agreements, for their own improper personal gain by knowingly violating UBS's rights and making it impossible for the Fund Counterparties to perform under the Warehouse Agreements. In particular, the foregoing conduct constitutes independent torts and predatory acts directed at UBS for Highland Capital's and the Affiliated Transferee Defendants' own personal gain.

188.    As a direct and proximate result of Highland Capital's and the Affiliated Transferee Defendants' tortious interference with UBS's contractual rights under the Agreements, UBS has suffered damages in an amount to be determined at trial. Had Highland Capital and the Affiliated Transferee Defendants not tortiously interfered with UBS's contractual rights, the Fund Counterparties would have been able to make payments to UBS of the amount they owed to UBS under the Warehouse Agreements.

189.    Paragraphs 189 to 197 have been intentionally left blank.

### RELIEF DEMANDED

WHEREFORE, plaintiffs UBSS and UBS AG demand judgment:

(a)    On the first cause of action, declaring that UBS was induced to enter the Agreements as a result of fraud committed by Highland Capital, and awarding damages to UBS for all losses and liabilities incurred by UBS, and that UBS incurs, with respect to the Agreements and the Warehouse Facility, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses and any other losses, fees and expenses that UBS incurred or incurs, in an amount to be determined at trial but in any event, no less than $686,853,290.26;

(b)    On the second cause of action, which is pled solely to preserve UBS's appellate rights, declaring that UBS was induced to enter the Agreements as a result of fraud committed by Highland Capital, and awarding damages to UBS for all losses and liabilities incurred by UBS, and that UBS incurs, with respect to the Agreements and the Warehouse Facility, including, without limitation, interest, reasonable attorneys' and accountants' fees and expenses and any other losses, fees and expenses that UBS incurred or incurs, in an amount to be determined at trial but in any event, no less than $686,853,290.26;

(c)     On the third cause of action, declaring that Highland Capital breached the duty of good faith and fair dealing implied in the Agreements, and awarding UBS an amount to be determined at trial;

(d)     On the fourth cause of action, (i) declaring that the dispositions of the Fund Counterparties' and Highland Financial's assets, as directed by Highland Capital, constituted fraudulent conveyances; (ii) appointing a receiver over Highland Capital; (iii) directing that a full accounting be had of Highland Capital's affairs and finances; (iv) imposing a constructive trust over Highland Capital's assets until such an accounting is completed; and/or (v) awarding UBS damages in an amount to be determined at trial, but no less than the value of the assets fraudulently and improperly transferred, or, alternatively, directing that Highland Capital and its partners, members or shareholders return to the Fund Counterparties any assets or consideration received from Highland Financial or the Fund Counterparties, directly or indirectly, as distributions, dividends, consideration, compensation, fees, interest, principal or otherwise, between March 14, 2008 and the present.

(e)     On the fifth cause of action, which is pled solely to preserve UBS's appellate rights, declaring that Highland Capital is liable for tortiously interfering with UBS's contractual rights under the Warehouse Agreements, and awarding UBS an amount to be determined at trial;

(f)     Awarding UBS punitive damages in an amount to be determined at trial;

(g)     Granting UBS its costs and disbursements, including reasonable attorneys' fees and expenses of this action;

(h)     Granting UBS pre-judgment interest; and

(i)     Granting such other and further relief as the Court deems just and proper.

New York, New York
    June 28, 2010

                              CADWALADER, WICKERSHAM & TAFT LLP


                              By: /s/ Gregory A. Markel
                                  Gregory A. Markel
                                  Howard R. Hawkins, Jr.
                                  Jason Jurgens
                                  Ellen M. Halstead

                                  Office and Post Office Address:
                                  One World Financial Center
                                  New York, NY 10281
                                  Telephone: (212) 504-6000
                                  Facsimile: (212) 504-6666

                                  *Attorneys for Plaintiffs UBS Securities LLC
                                  and UBS AG, London Branch*