IN THE UNITED STATES BANKRUPTCY COURT
                        FOR THE NORTHERN DISTRICT OF TEXAS
                                 DALLAS DIVISION

                                    )   **Case No. 19-34054-sgj-11**
    In Re:                          )
                                    )
    HIGHLAND CAPITAL                 )   Dallas, Texas
    MANAGEMENT, L.P.,               )   Tuesday, October 6, 2020
                                    )   1:30 p.m. Docket
              Debtor.              )
                                    )   STATUS CONFERENCE RE:
                                    )   OBJECTION TO CLAIM OF UBS
                                    )   SECURITIES, LLC AND UBS AG,
                                    )   LONDON BRANCH (#928)
    _____ )

                           TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                      UNITED STATES BANKRUPTCY JUDGE.

    WEBEX/TELEPHONIC APPEARANCES:

    For the Debtor:              Jeffrey N. Pomerantz
                                 PACHULSKI STANG ZIEHL & JONES, LLP
                                 10100 Santa Monica Blvd.,
                                  13th Floor
                                 Los Angeles, CA  90067
                                 (310) 277-6910

    For the Debtor:              Robert J. Feinstein
                                 PACHULSKI STANG ZIEHL & JONES, LLP
                                 780 Third Avenue, 34th Floor
                                 New York, NY  10017-2024
                                 (212) 561-7700

    For UBS Securities, LLC:     Andrew Clubok
                                 Sarah A. Tomkowiak
                                 LATHAM & WATKINS, LLP
                                 555 Eleventh Street, NW,
                                  Suite 1000
                                 Washington, DC  20004
                                 (202) 637-2200

    For UBS Securities, LLC:     Jeff Bjork
                                 LATHAM & WATKINS, LLP
                                 355 South Grand Avenue, Suite 100
                                 Los Angeles, CA  90071-1560
                                 (213) 891-8872

```
 1   APPEARANCES, cont'd.:

 2   For Redeemer Committee of    Terri L. Mascherin
     the Highland Crusader         JENNER & BLOCK, LLP
 3   Fund:                         353 N. Clark Street
                                   Chicago, IL  60654-3456
 4                                 (312) 923-2799

 5   For Redeemer Committee of    Mark B. Hankin
     the Highland Crusader         JENNER & BLOCK, LLP
 6   Fund:                         919 Third Avenue
                                   New York, NY  10022-3098
 7                                 (212) 891-1600

 8   For Redeemer Committee of    Mark A. Platt
     the Highland Crusader         FROST BROWN TODD, LLC
 9   Fund:                         100 Crescent Court, Suite 350
                                   Dallas, TX  75201
10                                 (214) 580-5852

11   For the Official Committee   Matthew A. Clemente
     of Unsecured Creditors:       SIDLEY AUSTIN, LLP
12                                 One South Dearborn
                                   Chicago, IL  60603
13                                 (312) 853-7539

14   Recorded by:                 Michael F. Edmond, Sr.
                                   UNITED STATES BANKRUPTCY COURT
15                                 1100 Commerce Street, 12th Floor
                                   Dallas, TX  75242
16                                 (214) 753-2062

17   Transcribed by:              Kathy Rehling
                                   311 Paradise Cove
18                                 Shady Shores, TX  76208
                                   (972) 786-3063
19

20

21

22

23

24
            Proceedings recorded by electronic sound recording;
25             transcript produced by transcription service.
```

1          <u>DALLAS, TEXAS - OCTOBER 6, 2020 - 1:36 P.M.</u>

2          THE COURT:  Now our Highland status conference

3   regarding the UBS proof of claim and objections.  I'm going to

4   just take appearances from, I think, the three main parties in

5   interest here.  First, for the Debtor team, who do we have

6   appearing this afternoon?

7          MR. POMERANTZ:  Jeff Pomerantz; Pachulski Stang Ziehl

8   & Jones.  I'm joined with a few of my colleagues, but the most

9   important one for this hearing is my partner, Robert

10  Feinstein, who will be handling the status conference.

11         THE COURT: All right.  Thank you.  For UBS, who do

12  we have appearing this afternoon?

13         MR. CLUBOK:  Good afternoon, Your Honor.  This is

14  Andrew Clubok from Latham & Watkins, LLP.  Can you hear me

15  okay?

16         THE COURT:  I can, yes.

17         MR. CLUBOK:  Oh, great.  And I'm here with my

18  colleagues Jeff Bjork and Sarah Tomkowiak.

19         THE COURT:  All right.  Thank you.  The Redeemer

20  Committee has filed its own objection to the UBS proof of

21  claim.  Who do we have appearing for the Redeemer Committee?

22         MS. MASCHERIN:  Good afternoon, Your Honor.  This is

23  Terri Mascherin from Jenner & Block.  My colleague Mark Hankin

24  is also on the line today, as I believe is our local counsel,

25  Mark Platt.

1          THE COURT:  All right.  Thank you.

2      All right.  So, I know there are lots of other people,

3  either on video or phone.  I think we're probably only going

4  to be hearing from Debtor, UBS, and Redeemer Committee today.

5  Before we conclude, I'll see if there's anyone out there who

6  wanted to say anything today, but I'm guessing we just are

7  going to have observers.

8      All right.  So, I guess we'll begin with:  Mr. Feinstein,

9  what did you hope to accomplish today?

10         MR. FEINSTEIN:  Thank you, Your Honor.  Good

11  afternoon.  First, can you hear me and see me okay?

12         THE COURT:  I can.  Thank you.

13         MR. FEINSTEIN:  Thank you.  So, what we hope to

14  accomplish this afternoon, Your Honor, is first to update Your

15  Honor on the status of the claim since the mediation

16  terminated, and also to lay out for Your Honor our plan to

17  bring a motion for partial summary judgment with respect to a

18  number of issues we think are resolvable that way, and to do

19  so promptly.  And, in fact, to try to get a hearing before

20  Your Honor prior to confirmation.  We think that that will

21  substantially reduce the issues between the parties.

22      And in that regard, Your Honor, I note that the mediation

23  was not successful in resulting -- in resolving the UBS claim,

24  and I think that's largely because of the different

25  perceptions of the parties about the value of the claim.  I

1    think UBS still believes they've got a claim for one billion

2    dollars, and none of the other constituents accept that

3    premise.

4         And I guess, while I'm always optimistic going into a

5    mediation, certainly, given the posture of UBS with respect to

6    this claim, I was doubtful, and it turns out that doubt proved

7    to be true, doubtful that this could be resolved in that

8    context, but that it can and should be litigated in the

9    context of partial summary judgment.  And then after Your

10   Honor rules, perhaps the claim -- the issues will be narrowed

11   so much that the claim could be resolved at that time.

12        So, we think that the partial summary judgment motion

13   makes a lot of sense.  We've proposed a schedule for the

14   filing of the motion and briefing to UBS.  You'll hear from

15   their counsel that they've not accepted that, that they'd

16   rather try the case.

17        We think that the summary judgment which we -- partial

18   summary judgment we alluded to, both in the opposition to

19   UBS's stay relief motion and then in our claim objection, we

20   think that there are two very significant arguments that could

21   dispel the notion that there is a billion dollar claim in this

22   case.

23        One would be, Your Honor, regarding on the res judicata

24   opinions of the New York Appellate Division, First Department,

25   holding in essence that UBS cannot make claims, assert claims,

1   based on operative facts that occurred prior to February 24th

2   of 2009.  I don't think there's any operative facts that post-

3   date that date except for the fraudulent transfers.

4       So, in a way, the -- or the breach of implied covenant

5   claim is redundant of the fraudulent transfer claims.   We

6   think that with an appropriate ruling based on those

7   decisions, Your Honor should eliminate any construct, any

8   notion that there's a billion dollar claim in this case, and

9   you can talk about the fraudulent transfers.

10      The second branch of the motion, Your Honor, will be to

11  enforce the settlement releases.  Your Honor may recall from

12  the papers that there's a total of $233 million of asserted

13  transfers, but $172 million of those transfers were settled,

14  and settled pursuant to a relief -- a relief -- documents

15  which provided a release to the Debtor for, quote, losses or

16  other relief specifically arising from the fraudulent

17  transfers.

18      So we think, Your Honor, the transactional release, if you

19  will, bars all claims of any characterization -- alter ego,

20  implied covenant, fraudulent transfer -- based on those

21  operative facts, which, again, are the only operative facts

22  that post-dated February 24th of 2009.

23      There's one more aspect to this, Your Honor, that I think

24  is kind of remarkable, again, and it's based on something that

25  was included in UBS's response to our objection to claim.  And

1    that is, you know, they've danced around for a long time that

2    they're not -- they're going to assert an alter ego claim

3    against the Debtor for the entirety of the breach of contract

4    judgment, the billion dollars.  And what UBS has asserted from

5    time to time is that they don't need to bring that claim

6    because it's a post-judgment remedy under New York State

7    procedure.  And yet, Your Honor, there's a bar date.  The

8    Debtor is in bankruptcy.  So for UBS to say, voluntarily,

9    we're not making this claim now, we think in effect they've

10   voluntarily, through gamesmanship or whatever, missed

11   asserting the alter ego claim prior to the bar date.  So we

12   intend to brief that as well.

13       So what we proposed, Your Honor, to UBS is that we would

14   file our motion in the next ten days.  We were targeting

15   October the 16th.  We've heard that maybe Redeemer wants to

16   file a motion, too.  We propose an opposition November the

17   6th, that reply papers would be November the 16th, and then

18   that we have oral argument on the motion at Your Honor's

19   convenience.  November 19th or 20th would be ideal, but

20   somewhere in that time frame.  All of which, obviously, would

21   be prior to the timeline for the scheduled hearing on

22   confirmation of the Debtor's plan.

23       The other thing we raised with UBS and we haven't gotten a

24   response is that their claim is disputed in the case.

25   Obviously, it's been objected to.  And if they want to file a

1    motion under Bankruptcy Rule 3018 for temporary allowance of

2    their claim for voting purposes, given the, essentially, the

3    overlap or identity of the issues, we thought it'd be

4    appropriate to tee up any -- any motion that UBS would like to

5    make in that regard along the same timeline, that they file

6    such a motion October 16th, et cetera, et cetera, and we have

7    it heard at the same hearing on November 19th or 20th.

8        So, we had a call with UBS yesterday.  We've heard just

9    before the hearing that they are not interested in agreeing to

10   our schedule, or, for that matter, agreeing to summary

11   judgment practice, motion practice at all.  We intend to make

12   such a motion, so I don't know that we need their permission,

13   but they don't want to engage on an agreeable timeline.  They

14   want to take the case to trial, which we think it would be an

15   absurdity, Your Honor.

16       I'd also note, Your Honor, just by way of an update, that

17   I read in the *New York Law Journal* in the last week that

18   Justice Friedman, who presides over the case when it was

19   pending in New York State Supreme Court, presided over the

20   phase one trial, announced her retirement.

21           THE COURT:  Oh.

22           MR. FEINSTEIN:  She says she's retiring by the end of

23   this year.

24           THE COURT:  Okay.

25           MR. FEINSTEIN:  So I guess she won't be hearing phase

1   two, if there's ever a phase two.

2          THE COURT:  I guess I feel better about my denial of

3   the motion to lift stay now.  Hmm.  If I --

4          MR. FEINSTEIN:  Exactly, Your Honor.

5          THE COURT:  If I had any lingering concerns.  Wow.  I

6   hope this case didn't make her want to retire early.

7          MR. FEINSTEIN:  Probably more than that, Your Honor.

8          THE COURT:  Okay.

9          MR. FEINSTEIN:  Anyway, I'm going to stop there, Your

10  Honor.  I hope that answers Your Honor's questions.

11         THE COURT:  Yes.

12         MR. FEINSTEIN:  I'm happy to answer any questions.

13         THE COURT:  Two or three --

14         MR. POMERANTZ:  Your Honor, this is --

15         THE COURT:  Two or three follow-up questions before

16  we move on.  Okay.  So we have our disclosure statement

17  hearing, I know, October 22nd.  I seem to recall I gave you

18  sort of a tentative pencil-in date for a confirmation hearing,

19  assuming I approve the disclosure statement on October 22nd.

20  Can someone remind me what that was?  Was it early December?

21         MR. POMERANTZ:  Yes, Your Honor.  This is Jeff

22  Pomerantz.  It's December 3rd.

23      I also wanted to point out, Your Honor, that the mediation

24  has not terminated.  It has not proven successful with UBS

25  yet, but the mediation continues to be open.  We actually just

1  recently, before this hearing, were on the phone with the

2  mediators on some issues.  So the mediation hasn't terminated,

3  and we always will welcome the opportunity to continue

4  discussions.

5         THE COURT:  Okay.  Well, good.  I'm glad to hear

6  that.

7      Another question I had is this.  I know that my courtroom

8  deputy was on the phone with one of Debtor's counsel earlier

9  today about, if we do this, setting oral argument the week of

10  November 16th.  You know, the 19th or 20th.  Am I correct in

11  that the time estimate was a three or four-hour hearing on

12  oral argument?  I mean, do you really -- I know we have three

13  parties who would be arguing back and forth.  Let me just

14  clarify that that is your best guess.

15         MR. FEINSTEIN:  Yes, Your Honor.  I mean, it's hard

16  to anticipate how long others will spend arguing, but I would

17  imagine that our portion of the argument would last 45 minutes

18  to an hour, --

19         THE COURT:  Uh-huh.

20         MR. FEINSTEIN:  -- without question, and that there

21  are two other parties who I expect would want to be heard.

22         THE COURT:  Uh-huh.  But, while complex, you distill

23  it down to three relevant issues:  Whether res judicata bars

24  UBS from bringing any claims that arose before February 24,

25  2009, and you think I'm going to look principally at a state

1    court order, I guess, in that regard.  And --

2              MR. FEINSTEIN:  Yes.

3              THE COURT:  -- second, the motion for summary

4    judgment, partial summary judgment, would argue there was a

5    release by UBS of certain claims in a 2015 settlement

6    agreement involving the Crusader Fund.  And then you, I think,

7    third, threw in that any alter ego claim they're asserting is

8    barred by not having asserted it by the bar date.  Is that

9    what you're saying?

10             MR. FEINSTEIN:  Technically, yes, Your Honor.  That's

11   correct.

12             THE COURT:  Okay.  So, distilling this down further,

13   I think you said that if you win on the res judicata argument,

14   that would eliminate any claims except fraudulent transfer

15   claims.  Did I get that correct?  And then, further, --

16             MR. FEINSTEIN:  Yes.  I think the -- the --

17   actionable claims, that's correct, yes.

18             THE COURT:  So, it -- oh, okay.  And then, further,

19   if you win on the release argument, you would say -- you would

20   say that, out of, what, $233 million potential fraudulent

21   transfers, $172 million were settled.  So, is it the Debtor's

22   --

23             MR. FEINSTEIN:  Yes.

24             THE COURT:  -- theory of the case that UBS has a

25   maximum of a $61 million claim?  And I'm just doing the math.

1          MR. FEINSTEIN:  A maximum -- a maximum --

2          THE COURT:  $233 million minus $172 million?  Is that

3    --

4          MR. FEINSTEIN:  Yes.  Yes.  And even as to -- even as

5    to the $61 million that remains, there are other arguments and

6    objections to the claim.  But the ones we think are

7    susceptible to summary judgment are the ones we have

8    identified.

9          THE COURT:  Okay.

10          MR. FEINSTEIN:  But there are further issues that

11    would take those $61 million conceivably down to zero.  But at

12    least for now, if we were to prevail on all the motions, the

13    aspects of the motion we're talking about, we'd be looking at

14    no higher than a $61 million claim.  That's correct.

15          THE COURT:  Okay.  That's just giving me context and

16    certainly helping me to understand why this hasn't settled.

17    You're very, very far apart on the numbers.

18     All right.  Well, Mr. Clubok, do you -- well, I guess --

19    maybe I should take friendlies together before I go to Mr.

20    Clubok.

21     Ms. Mascherin, is there anything that you wanted to say?

22    Do you anticipate that the Redeemer Committee would also want

23    to file a motion for partial summary judgment, or perhaps just

24    a joinder into the Debtor, or what is your view on this?

25          MS. MASCHERIN:  Yes, Your Honor.  We would either

1   file our own motion or join in the Debtor's motion.  But we

2   would -- we are focused on two of the three issues that Mr.

3   Feinstein identified, the res judicata issue and the release

4   issue.

5       And just to -- to preempt any questions Your Honor may

6   have, --

7           THE COURT:  Uh-huh.

8           MS. MASCHERIN:  -- I think our view of the case is

9   very similar to the Debtor's view, as you heard in the hearing

10  on the motion to lift stay.

11      And with regard to amount of time for an argument, I would

12  imagine, for our part, that we would be able to argue in

13  something like 30 minutes.

14          THE COURT:  Okay.  All right.  And -- okay.  I think

15  that's all I have for now.  I may have one or two other

16  questions.

17      Mr. Clubok, you don't like this proposed game plan.  Tell

18  me why you don't like it.

19          MR. CLUBOK:  Your Honor, we don't like it because,

20  number one, it decreases efficiency.  In fact, it's an

21  incredibly inefficient way to proceed as compared to what

22  we're going to propose.

23      And number two, it is just an effort by Highland to have a

24  do-over of what has already been litigated and decided in the

25  state court.

1      They are asking Your Honor -- first of all, with respect

2  to the res judicata argument, the argument, Your Honor, that

3  has been argued, I've lost track, maybe five times in the New

4  York courts.  It was originally -- there are at least three, I

5  believe four appellate decisions that address that.  There is

6  a summary judgment decision that addressed the impact of res

7  judicata.  And there was an appeal of that summary judgment

8  decision to the appellate court in New York.  And these

9  arguments that Highland wants to make again have all been

10  rejected.  They've been rejected time and time again.  And

11  three or four times in a row, Highland kept saying, well, the

12  last court decision didn't really resolve it, or the last

13  court decision doesn't mean what UBS thinks it means.  Or at

14  the summary judgment proceeding, they said, we still have this

15  argument about res judicata.

16      Your Honor, that has all been decided time and again, and

17  that's why, where we were, where this thing left off in state

18  court was post-summary judgment, post the fourth or fifth

19  appellate decision on res judicata rejecting this argument

20  that Highland now wants to present to you for either the

21  fourth or the fifth or the sixth time.  I've just lost track.

22  It's in our papers.

23      And we were ready to just go to trial on our claims with

24  the rules of res judicata clearly laid out in the -- in Judge

25  Friedman's summary judgment decision and the appellate court's

1   affirmance of that.

2       So they want one more bite at the apple, one more effort

3   to change the case.  And frankly, Your Honor, it's really not

4   going to change -- as a practical matter, it's a little bit of

5   a tempest in a teapot because I don't think it's going to

6   decrease the evidence to be presented at trial.  They've never

7   explained exactly how it could.  But they just want to shoot

8   down measure of damages.  It's really all about shooting down

9   our measure of damages in a way that we'll, you know, if we

10  have to brief it again, Your Honor, you know, obviously

11  requires us to, then we'll do it, but it's given Highland the

12  fourth or fifth or sixth bite at this same apple.  And that's

13  why we strenuously object to it.

14      It's -- it's -- you know, Your Honor, Highland told you

15  that if you just keep the stay in place and you move these

16  proceedings here, there will be a swift resolution, a much

17  swifter resolution than if it happened in Justice Friedman's

18  chambers.  And I just heard the glee in their voice as they

19  talk about Justice Friedman retiring.  I think, frankly, had

20  we -- had we -- we could have -- we could have finished these

21  proceedings already in Justice Friedman's court at the

22  beginning of the year, absent what Highland set in motion.

23      But setting that aside, Your Honor, where we left off when

24  they told you, keep this thing in place and we'll get a quick

25  resolution in this Court, is that, hey, we're all ready for

1    trial.  That was all that was left to do.  Summary judgment

2    had been argued.  This res judicata and the other -- and I'll

3    get to the settlement issues in a second -- had all been

4    argued.  There was no further chance for them to get another

5    bite at that apple.  And that's the reason why, Your Honor, we

6    do object to this.  And we get it if Your Honor wants to hear

7    them out and we'd have to respond and we'll do it in a

8    reasonable schedule.

9        But what we propose instead, Your Honor, is that this

10   matter just be set for resolution.  We would be ready, and

11   Highland has -- Highland had told Justice Friedman they'd be

12   ready to try this case in June.  We know from their papers

13   they've spent I think close to two million dollars now getting

14   ready for this.  We're all ready to try the case as

15   expeditiously as possible, but certainly before the plan

16   confirmation.  We would say let's just adjudicate our claim

17   in, you know, November, whether it's mid-November or late

18   November, sometime so that our claim is just resolved.

19       What Highland proposed to us yesterday is, you know, they

20   get to do another summary judgment bite at the apple.  They

21   get another chance to convince you to do something different

22   than the New York Court of Appeals and Justice Friedman told

23   them they could do when they said denied, go forward to trial.

24   So they want -- they hope to somehow convince you to do

25   something different than what the New York courts were -- had

1   forced them to do.

2        And then they also said, by the way, what we'd like you to

3   do is put in a 3018 motion so you sort of present a truncated

4   view of your claim just for purposes of voting on the plan.

5   And what we say is none of that is efficient.  It's -- it's --

6   what's efficient is the parties just move forward to trial.

7   We set a trial first thing in November.  The parties can -- by

8   the way, if all these issues have been mostly briefed, anyway,

9   and the objections and the responses -- you know, we've

10  already almost fully briefed these matters anyway -- but the

11  parties could do supplemental pre-trial briefs.  And when Your

12  Honor hears the case, Your Honor can just decide.  If what

13  Highland is telling you is true, then -- and it somehow

14  precludes some of our evidence as a result, which, by the way,

15  I don't -- that premise isn't even -- isn't even true.  It's

16  not even if they win this it'll cut down on the witnesses or

17  the evidence or anything that we present at trial, which I can

18  explain in a minute.  But if any of that is true, then instead

19  of a three-day trial we have a two-day trial, or instead of a

20  two-day trial we have a one-day trial.

21              THE COURT:  Let me -- let me --

22              MR. CLUBOK:  Your Honor could just --

23              THE COURT:  Can I stop you right there?

24              MR. CLUBOK:  Absolutely.

25              THE COURT:  You say, you know, UBS wants this set for

1  trial maybe mid-November.  If I didn't hear cross-motions for

2  partial summary judgment, so that there was no possibility of

3  narrowing of issues, what is your estimate of a trial?  I

4  remember vividly you told me there was a 13-day bench trial in

5  phase one of this litigation, so I'm just speculating that we

6  would be looking at something like that here if there is no

7  narrowing of the issues.  What is your guess about that?

8          MR. CLUBOK:  Well, Your Honor, I don't think so at

9  all.  Well, and first, not to relitigate this, but for someone

10  who's familiar with that 13-day record, I think maybe we need

11  another three days to try the case.  Okay?  Presuming full

12  familiarity with that 13-day trial record, it's maybe another

13  three days or so to try this case.

14    It's not -- the additional issues that are remaining do

15  focus on events that occurred -- they focus on claims that

16  accrued after February of 2009 and actions that Highland took

17  post-February 2009, which, by the way, not just to the extent

18  they committed fraudulent transfers, but to the extent they

19  breached their implied duty of good faith and fair dealing

20  under the contract.

21          THE COURT:  Can I --

22          MR. CLUBOK:  Mr. Feinstein --

23          THE COURT:  Can I -- once again, I'm sorry I keep

24  interrupting, but --

25          MR. CLUBOK:  That's okay.

1          THE COURT:  -- it almost sounded like you're agreeing

2   with their res judicata argument, that there are no claims for

3   conduct arising before February 24, 2009.  Did I

4   misunderstand?

5          MR. CLUBOK:  I'm not entirely sure what their

6   argument is.  I do not -- cannot imagine there can be a

7   dispute over res judicata unless they're trying to relitigate

8   what happened.  What the Court has said, and I'm paraphrasing

9   this, is that, against Highland, the claims have to have

10  arisen after February of 2009, but we can rely on evidence

11  pre-February of 2009 to the extent that helps us support our

12  claims.  That is the sort of split-the-baby, if you want to

13  call it, approach that the appellate courts took, that the

14  trial court took and the appellate courts affirmed, that, as

15  long as the claim doesn't accrue -- in other words, for a

16  claim to accrue, you know, it might be four steps for a claim

17  to accrue, but it's that fourth final step that occurs after

18  February of 2009, if that's the case, you can still talk about

19  the three steps leading up to that fourth step, and that's the

20  issue that Highland repeatedly tried to convince the Court we

21  would not be allowed to do.  That's what they were repeatedly

22  shut down on.  I actually am surprised.  It's hard for me to

23  imagine what's the remaining res judicata issue.

24      So, we agree that there are no claims pre-February 2009.

25  The part that we disagree, and this is what Mr. Feinstein

1    said, you asked exactly the right question, okay, and I don't

2    know if it was -- I assume it was unintentional on Mr.

3    Feinstein's part.  But he said, well, if they arise after

4    February 2009.  And you said, oh, does that mean all that's

5    left are fraudulent conveyance claims?  And he, I think he

6    said yes or indicated yes to that question.  What he didn't

7    tell you, and this is the rub, was that it's not just

8    fraudulent conveyance claims after February 2009; it's also

9    breach of implied duty of the covenant of good faith and fair

10   dealing, because Highland was a contractual party to UBS

11   directly.

12       Highland had a contract with UBS, and they had an implied,

13   under New York law, duty of good faith and fair dealing.  And

14   the actions they took after February 2009 to frustrate the

15   ability of the parties to fulfill their contractual

16   obligations, that supports not just fraudulent transfer but a

17   separate claim of the breach of the implied duty of good faith

18   and fair dealing, and that's the issue that we won time and

19   time again.

20       Every time Highland tried to do -- Highland, in the past,

21   did the same thing basically that Mr. Feinstein just did:

22   They would talk about the obvious res judicata issue -- that

23   is, claims that arose before February 2009.  There's no

24   dispute that that's what the appellate court ruled were out of

25   the case.  At least the (inaudible) Court of Appeals in New

1    York.

2        What implication flows from that is whether or not that

3    kills our implied duty of good faith and fair dealing claim

4    that we argue arose after February of 2009.  It's that issue

5    that we have won time and time again in the New York courts,

6    including on summary judgment, defeating their summary

7    judgment motion, and which was affirmed by the First

8    Department Court of Appeals in New York.

9        So, we agree with the legal principle that he said.  What

10   we disagree about is the implication.  And that issue, of the

11   implication of that ruling, whether it kills our implied

12   covenant of good faith and fair dealing claim, that's the

13   issue that's been decided by the appellate courts.  We

14   shouldn't even have to argue it again.

15       If we have -- because -- if we have to, so be it.  We'll

16   do it.  We presume you will go along with the rulings.  And as

17   you said, you're not going to relitigate.  So if we're forced

18   to do five weeks of briefing on that issue, of course we'll do

19   it, but we shouldn't have to do it again because that -- all

20   you have to do is look at the summary judgment decision by

21   Justice Friedman and look at the appellate court decision

22   affirming it and know that she was ready, had not for COVID

23   and not for bankruptcy, to just give us -- to go forward with

24   that trial.

25       And right after the bench decision was handed down, we

1   were supposed to, within a matter of -- originally, within a

2   matter of like six weeks -- go forward, have our trial then

3   for the remaining breach of implied duty of good faith and

4   fair dealing against Highland, the remaining fraudulent

5   conveyance claims that are left as well, and get a result.

6   And no more summary judgments, no more pre-trial motions.  All

7   that stuff has been argued, lost, waived, done.

8        And by moving it here, Your Honor, Highland's plan, it's

9   been clear, it's now clear to us -- we assumed it, but it's

10  clear to us -- their whole plan was to just convince you,

11  because it's so complex, because all this sounds so

12  complicated, and you don't know the record as well as --

13  obviously, you can't, possibly, you weren't personally

14  involved -- they want you to just give them another bite at

15  this apple and they just rebrief it.  And again, if we have

16  to, we will.  We do not think it's appropriate.  We think it

17  is a do-over.  We think it's exactly the cases that we cited,

18  you know, in our papers, in our response to their objection.

19  You know, like *In re Ocasio* and the other cases that we cited,

20  about not giving people do-overs, not using a bankruptcy

21  petition as a litigation tactic to slip arguments through the

22  back door when they would have been so clearly turned away at

23  the front door.

24              THE COURT:  Okay.

25              MR. CLUBOK:  They know, because Justice Friedman

1  already did, would have rejected these out of hand, and we

2  would have gone forward with the trial, absent a stay and

3  maybe absent COVID.

4      They hope that you will give them another chance to slip

5  through the back door what they couldn't have gotten through

6  the front door.  And that's why we think we should just go

7  forward with the trial as scheduled.  But, again, of course,

8  Your Honor, if you tell us -- if we have to brief summary

9  judgment, of course we will.

10         THE COURT:  All right.  So, what I heard you answer

11  on my question of how many days would a trial take if we have

12  no motions for summary judgment, you said three or four days

13  is your guess?

14         MR. CLUBOK:  I believe so, Your Honor.  And we would

15  work with them to narrow issues and do it as efficiently as

16  possible.  It's hard for me to imagine we need more time than

17  that.  You know, again, I'm assuming familiarity with the

18  previous record, and so maybe there's some time, and if it's

19  your -- to your benefit to have a rehash of the stuff that was

20  in the first 13 days as background, we could, you know spend

21  time doing that.

22      But in terms of new things to be argued, there is a set of

23  facts that support our breach of implied duty of good faith

24  and fair dealing claims for post -- that arose post-February

25  2009.  Okay.  Those facts also may support fraudulent transfer

1   claims.  They also -- they -- and the damages that flow from

2   those facts may or may not be affected by the settlement.

3       By the way, Justice Friedman also said that the time to

4   determine the impact of a settlement is after, that that's a

5   -- that's a post-trial motion, not a pre-trial motion.  She

6   already ruled on that.  Mr. Feinstein is shaking his head

7   vigorously, but that's true.  She actually specifically denied

8   their efforts to do this very thing in her court.

9       And so the -- it's not -- again, we could go down

10  witnesses right now, and I'd like to hear -- if we had to, I'd

11  ask through the Court, well, which witnesses are not going to

12  be available?  You know, as you heard -- you said, I think,

13  $61 million, I think -- and by the way, that's pre -- that's

14  before pre-judgment interest, so it's really doubled.

15  Everyone understands that prejudgment interest applies or --

16  or at least we understand that.  And Redeemer -- that's one

17  thing Redeemer agrees with us on.  They do not -- we cited

18  what they said in their papers.  But there are not witnesses

19  that are going to be different if the measure of damages is in

20  the, you know, tens or a hundred million versus if it's in

21  several hundred million.  The fact pattern that supports the

22  breach of implied duty of good faith and fair dealing is

23  similar to the facts that are in support of the fraudulent

24  transfers.  It's -- it would be the same length of trial,

25  whether you granted this or not.

1      It's true, I suppose, that if Your Honor, for the first

2   time ever, ruled that our implied duty of good faith and fair

3   dealing claim is wiped away, Your Honor overrules the First

4   Department and the New York Court of Appeals and all those

5   decisions and said that claim is completely gone, actually,

6   even so, we'd still have our fraudulent conveyance claims.  So

7   even that wouldn't really affect the length of the trial.

8      I think all of this is just -- again, we laid this out in

9   our papers.  We tried to -- we tried -- I know it's -- it's

10  complicated.  It's a lot of history here.  And there are so

11  many decisions of the First Department.  But suffice it to say

12  that after ten years of litigating in New York and after going

13  up to the Court of Appeals at least five times, we got to a

14  point where Justice Friedman had said the next thing that's

15  going to happen is a trial.

16     And by the way, Highland even -- even after the first

17  phase of the trial but before the second case started, they --

18  they called her up and they said, oh, we have this brand new

19  idea.  We want to file another pre-trial motion.  And I don't

20  -- you -- there wasn't a tape-recording of it because it was

21  oral conversation, but I could get their lawyers on the phone

22  and I'm sure they would agree:  Justice Friedman raised her

23  voice in a way I've never heard her raise her voice in her

24  refusal to go along with more motions.  She said no, the next

25  thing that's happening is the trial.

1     And so that's where we left off this case in New York.

2   Highland told you, if you lift the stay, it'll move quickly

3   here.  We want to take them at their word.  We want to move

4   quickly here.  We are ready to just resolve our claim, prior

5   to a vote on the plan confirmation, for the benefit of every

6   creditor.

7     And by the way, I want to say one other thing, Your Honor.

8   You know, I don't want to get so much into the mediation.  I'm

9   not going to get anything into the specifics of the mediation.

10  But Mr. Feinstein said -- well, first of all, I'm glad -- I

11  appreciate Mr. Pomerantz affirming that the mediation has not

12  ended.  We -- hope springs eternal.  We still believe and hope

13  this case can be mediated, settled, and resolved.  Okay.

14     Mr. Feinstein threw out the billion dollars.  Just let --

15  suffice -- I'm not going to get into anything on the

16  mediation, but suffice it to say that's not our -- that's not

17  a settlement position.  We -- we fully believe this case still

18  could be resolved.  And it should be.  And we -- and since --

19  we hope the mediation is open.  I'm glad to hear Mr. Pomerantz

20  say it is still open.  I think the parties should keep trying

21  at that and seeing where we can go.

22     And, you know, again, there's -- you know, quite frankly,

23  Your Honor, we'd even be creative if we had to and offer

24  something.  We'd do binding arbitration with the mediators if

25  that would resolve our claim.  We are -- we believe there's

1  efficient ways to resolve this very quickly.  But what we

2  object to is having to redo things that we did already in New

3  York.  Again, if it's helpful to Your Honor, if we have to do

4  it, of course we'll do it.  We just think that Highland should

5  not be allowed to do it, and we, most importantly, not just

6  about the prejudice, but the inefficiency that that will

7  create, as opposed to just getting our claim resolved.

8         THE COURT:  All right.  A couple of additional

9  questions.  And then, of course, I'm going to have several

10  questions for Mr. Feinstein.

11     So, three or four days of trial, you think, if we went to

12  trial in mid-November?  Can you tell me how many witnesses you

13  would have on your side of this?

14         MR. CLUBOK:  I -- off the top of my head, I -- I

15  would hate to commit to it right here, Your Honor.  I could

16  briefly estimate -- you know, we have lots of video

17  depositions, so it -- you know, some of those witnesses are in

18  this jurisdiction, so it kind -- it may depend on whether the

19  parties stipulate that we could play video depositions instead

20  of calling them live.  Right?  But I think the parties should

21  be able to work together on a fair amount of that.

22     I think that there are -- so, there's a lot of deposition

23  testimony.  Okay?  In terms of live witnesses, there's

24  probably -- it's a total guess, Your Honor, because I haven't

25  gone back and done this -- I would say four or five that need

1    to be called.  But I caveat that by what I would do is -- and

2    by the way, we -- I, you know, we -- obviously, we put in our

3    papers we think the trial should go forward.  I understand --

4    and I don't -- I understand that Mr. Feinstein has a different

5    approach.  But if the parties were forced to just sit and talk

6    and try for a couple days to see if we could agree on a

7    witness list, I would hope we could come up with a trial plan

8    that is designed to be a three or four-day trial.

9         THE COURT:  All right.  Well, again, if you get your

10   wish, we're talking a month from now, or, you know, five weeks

11   from now.  And these are pretty big details to work through,

12   given that you all have been litigating eleven years.  But you

13   said maybe five live witnesses, but there would be a lot of

14   potential depositions that you would want the Court to either

15   see video played or read the transcripts of.  Help me to

16   understand that, because that's -- whether it's you all

17   sitting here or me going back in chambers and reading, it's

18   Court time.

19        MR. CLUBOK:  Yeah, I -- Your Honor, so I'm doing this

20   on the fly, but I do think this is the type of thing that the

21   parties should work together and roll up our sleeves on.  I

22   would -- I'm just trying to run through the witnesses.  I

23   think there is probably -- I mean, they're snippets of video

24   depositions.  You know, there's maybe -- there may be ten

25   witnesses for each of whom there's ten minutes of video

1    deposition.  Okay?  So there's a number of people who have a

2    key aspect of the case that, unless the parties just stipulate

3    to, I guess you would have to see or hear or read.  But, you

4    know, we're talking about a number of witnesses that might

5    have ten minutes or so each.  So, you know, maybe a couple

6    hours, two to three hours combined of video depositions if you

7    were to watch them.

8         THE COURT:  Unless the other side says, you know

9    what, optional completeness, you need to see more.  And so --

10        MR. CLUBOK:  For sure.  For sure.  And --

11        THE COURT:  -- you're telling me there are ten

12    depositions that I might end up being asked, Look at the whole

13    darn thing if you're looking at part of it.

14        MR. CLUBOK:  Oh, I cannot imagine there's any depo --

15    I -- look, I cannot imagine lawyers on any side would ever

16    tell you, Look at the whole deposition.  These depositions are

17    -- you know, we did this in the first trial, Your Honor.  In

18    the first trial, the parties agreed and we -- we cut these

19    down.

20        THE COURT:  Okay.

21        MR. CLUBOK:  And by the way, Justice Friedman didn't

22    want to watch ten hours of depositions.  She said, Cut them

23    down to like a combined thirty minutes each or something, or

24    twenty minutes each.  We worked together to really cut them

25    down to just the key stuff.  And if you just roll up your

1   sleeves, you can do that.

2        And so I'm -- this is very much off the top of my head.  I

3   guess I would like -- I just keep trying to caveat it.  If we

4   were required, even for the next day or two, in good faith, to

5   work with Mr. Feinstein and his colleagues, I'll bet you we

6   can come up with a very concise plan.  And when we really get

7   into it, okay, Mr. Smith has to testify for twenty minutes and

8   Mr. Johnson and Ms. Smith, you know, if we roll up our sleeves

9   and do that, I know that lawyers of, you know, their caliber

10  can work with us to find a way to do this efficiently.

11            THE COURT:  All right.  Well, I guess at this point

12  I'm going to turn back to Mr. Feinstein and ask:  Basically,

13  I've heard that there's res judicata on the res judicata

14  issue.  You're collaterally estopped from arguing res

15  judicata, you know, the state court has already weighed in on

16  this, he says multiple times.  So, what is your response to

17  that?  And just so you know, I have not pored over the UBS

18  proof of claim and the objections to -- I was going to say I

19  have only a 30,000-foot view.  I have better than that, but

20  I'm not, you know, intimately familiar with every argument

21  yet.

22       So, what -- are you asking this Court to review the very

23  same res judicata issue that the state court has already

24  denied?

25            MR. FEINSTEIN:  No, Your Honor.  And without going

1    decision by decision, I guess our -- our overall view is that

2    Mr. Clubok is exaggerating or mischaracterizing a number of

3    those opinions, and he's going to have the right, in

4    opposition to the partial summary judgment motion, to point to

5    specific rulings that would bar the arguments that we're

6    making.  I don't believe they exist.

7              THE COURT:  Okay.

8              MR. CLUBOK:  May I respond, Your Honor, to that?

9              THE COURT:  Not yet.

10             MR. CLUBOK:  Exaggerating?

11             THE COURT:  Not yet.

12             MR. CLUBOK:  Okay.

13             THE COURT:  Not yet.  I'm just trying to -- can you

14   elaborate a little, Mr. Feinstein, without, you know, making a

15   one-hour argument?  I mean, he says that the judge in New York

16   was ready to go to trial, was absolutely finished with, you

17   know, partial summary judgment requests, and this has

18   absolutely been argued, the issue -- well, of course, there

19   was nuance in the way he said it.  He said the -- I think what

20   I heard Mr. Clubok say is he does not disagree that claims

21   that might have arose before February 24, 2009 were barred,

22   but there's this issue of can you put in evidence to show that

23   part of the cause of action for breach of implied duty of good

24   faith was in play before then and the claim didn't actually

25   arise until after?

1      Okay.  I'm not sure I said that very clearly.

2           MR. FEINSTEIN:  Yes.

3           THE COURT:  But --

4           MR. FEINSTEIN:  I think I understand the question,

5      though, Your Honor.

6           THE COURT:  Okay.  So, please elaborate.

7           MR. FEINSTEIN:  If I may.  Yes.  So there's a

8      difference between the operative facts that would support a

9      cause of action and the evidence that you would seek to

10     introduce to prove the operative facts.

11          Now, what the Appellate Division has made clear more than

12     once is that the operative facts for a cause of action that

13     UBS could bring that wasn't in its original complaint can only

14     have occurred after February of 2009.  Right?  So the

15     actionable conduct is what the Appellate Division was focused

16     on.  If there was earlier actionable conduct, it should have

17     been in their first complaint, but it wasn't.

18          So now the only actionable conduct that Mr. Clubok alleges

19     occurred after February of 2009 were those transfers that form

20     the basis for the fraudulent transfer claims.  So he can't --

21     he is trying to prove a breach of contract liability against

22     the Debtor on account of a contract that was breached prior to

23     February of 2009.  That's the plain fact.  Right?  So you

24     can't get to a billion dollar claim (audio gap) ruling barred

25     that.  (garbled) res judicata barring the kind of arguments

1   he's making now, that he can freely go back to 2008 and seize

2   on evidence and say, This is when the cause of action -- these

3   are germane to the causes of action.

4        Again, it is conceivable that there are elements of

5   evidence of things that may have happened prior to that date

6   that might be germane to whether or not there's liability for

7   post-February 2009 operative facts -- coloration, what have

8   you, I don't know -- but he cannot rely on operative facts

9   that occurred prior to that date.  And the operative fact that

10  supports a billion dollar judgment is a breach of contract

11  that allegedly occurred in 2008.  Right?

12       So that's what we'd want to show.  There's a big

13  difference between a billion-dollar contract breach claim for

14  which he's now trying to hold the Debtor liable on a breach of

15  implied covenant theory, that's a 2008 claim, that's barred.

16  That's been well-established.  And that all that's left is the

17  fraudulent transfers.

18       Now, one other point, Your Honor, on the impact of the

19  releases.  The state court order barred dispositive motions

20  after sometime in 2013.  These settlements occurred in 2015.

21  So there was no opportunity for the Debtor to go back in time

22  and make a summary judgment motion based on the impact of

23  those releases because those didn't happen until 2015, after

24  the deadline for dispositive motions in the state court

25  proceeding.  And as I understand the record in the state

1    court, what Justice Friedman said when she was asked, Can we

2    deal with the releases now, is, look, we're trying the

3    fraudulent transfer claims in phase two, so I'm not going to

4    adjudicate now the impact of claims that were released until I

5    know if there's fraudulent transfer liability to begin with,

6    which will be determined in phase two.

7        And let me just say, I'm sure Your Honor is going to ask

8    me how much trial time, and so I'm going to give the answer to

9    that, I do want to respond, but at least let me just stop

10   there, having answered the question you --

11            THE COURT:  No questions.

12            MR. FEINSTEIN:  I would like to address the trial

13   time, because I think three days is simply absurd.

14            THE COURT:  Okay.  What is your best guess?

15            MR. FEINSTEIN:  So, Your Honor, you have to look at

16   the nature of the claims.  So, what -- a critical aspect of

17   the fraudulent transfer claims is establishing alter ego

18   liability in HFP.  Otherwise, there are no claims.

19       So, alter ego is a notoriously fact-specific evidentiary-

20   based claim that it could take some time to prove.  Also,

21   fraudulent transfer claims require proof of insolvency.  And

22   so parties are going to have expert testimony about insolvency

23   at various points in time.  The -- and the underlying

24   transactions we're talking about, the note, the note

25   settlement, these are fairly complicated transactions.  So, it

1    really just defies credibility, Your Honor, that that case is

2    -- which is very complex, could be tried by Mr. Clubok in

3    three days, when it took the state court 13 days to try a

4    bench trial on a breach of contract claim.

5        There's a ton of witnesses, expert testimony, complexity

6    to the underlying causes of action.  I cannot imagine him

7    completing his own case in three days, let alone -- let alone

8    both parties fully trying and submitting a case like this in

9    24 working hours in the court.  I just think it's impossible.

10   That's -- I would imagine -- again, I'm not close enough to

11   the history of the state court, but I know enough about it,

12   Your Honor, to estimate that a trial like this would be weeks.

13   Would be weeks.  Several weeks.

14           THE COURT:  Okay.  And I didn't even ask Mr. Clubok

15   about discovery, if discovery had been completed in the state

16   court or not.

17           MR. CLUBOK:  Yes.  It had, Your Honor.

18           THE COURT:  Okay.

19           MR. CLUBOK:  With the exception of one limited --

20   with one small amount of discovery that Highland is producing

21   to us -- I think they said substantial completion by this

22   Thursday.  So, they have committed -- there's one category of

23   information, just about the assets of the entities.  That

24   information was supposed to be -- they have committed to

25   substantially completing that by this Thursday.

1        So that should be all of the discovery.  There's no other

2   discovery that was going to be included in New York.

3        By the way, if I may respond very briefly to four things

4   that Mr. Feinstein said that I think are very important?

5              THE COURT:  Very briefly.

6              MR. CLUBOK:  I'll be very brief.

7              THE COURT:  Uh-huh.

8              MR. CLUBOK:  Okay.  Number one, I just tried to focus

9   you on this conduct distinction as a conduct matter.  I just

10  want to read you this quote from -- I think this was the last

11  appellate court decision, when Highland made this same

12  argument to them.  And this is cited on Page 19 of our

13  opposition.  This is what the Appellate Division in New York

14  said, quote:  Neither our prior decisions nor the doctrine of

15  res judicata bars Plaintiffs from introducing evidence of pre-

16  [February] 24, 2009 conduct to the extent necessary to prove,

17  with respect to post-February 24, 2009 conduct, their alter

18  ego, fraudulent conveyance and breach of implied covenant

19  claims.

20       That, in a nutshell, that -- again, I urge you just to

21  read the appellate court's decision denying summary judgment.

22  I'm sorry, affirming Justice Friedman's denial of summary

23  judgment, where Highland said, hey, those past three appellate

24  arguments all mean that we still can't talk about conduct

25  before pre -- February 2009, oh, it's going to kill everything

1   except for fraudulent conveyance and we don't get to -- it

2   doesn't kill -- it would kill the implied covenant.  All of

3   that was addressed in the very last appellate decision, with

4   some frustration, as you can see.  The Court said, Look at our

5   -- based on our past decisions.  I mean, they refer to the

6   past decision.  You know, they knew it.  They -- this was the

7   fourth time they were dealing with this.  And they said,

8   Highland's argument is just wrong.

9        So that's all that needs to be read, I believe, as opposed

10  to a full briefing.  But, again, if you want us to brief, we

11  will.

12       The other thing is, in terms of the summary judgment,

13  summary judgment was argued after the settlement.  In fact,

14  the settlement -- the summary judgment was delayed repeatedly

15  and repeatedly while we were having settlement discussions.

16  Mr. Feinstein, I am certain, is just wrong about his

17  chronology, but summary judgment was definitely argued after

18  the settlement, not before.  He -- he just said that.  He was

19  just inaccurate.

20       Third, and very importantly, in terms of the time it would

21  take, Your Honor, we won a preliminary injunction in which we

22  showed alter ego and fraudulent transfer, we won it in about a

23  three-hour argument, because the evidence was -- which we

24  showed a substantial likelihood of success.  We actually had

25  an injunction years ago in this case.  You know, under the

1  preliminary injunction standard, so it's substantial

2  likelihood of success and irreparable injury.  But we were

3  able to meet the substantial likelihood of success in about

4  three hours, because solvency has been admitted by Highland.

5  It's been admitted by half a dozen of their employees.  It's

6  in a letter -- it's -- their board of directors.  Insolvency,

7  I understand they're fighting it and they said they were going

8  to fight it in court, but as we showed in the summary judgment

9  there and as we showed in our preliminary injunction victory,

10 it won't take -- I don't think it will take more than a few

11 hours for you to say, call the fight, I can see they're

12 insolvent.  It's in black and white.  There's the letters.

13 There's statements to the board of directors.  Insolvency was

14 not an issue of any great merit.  Certainly, not one that's

15 going to take very long to prove.

16     The other one that he said was very fact-specific.  Oh,

17 alter ego.  The other one.  We also proved alter ego at the

18 preliminary injunction stage because the facts are just

19 overwhelming on the alter ego claim.  And it's an alter ego

20 claim that is properly pled.

21     You know, there are -- again, I know we've thrown a lot at

22 you, but there are at least three live claims remaining at the

23 appellate court now.

24           THE COURT:  What -- what --

25           MR. CLUBOK:  We have an alter ego --

1              THE COURT:  Can I stop you?  What --

2              MR. CLUBOK:  Yes.

3              THE COURT:  What law did you argue/are you arguing --

4              MR. CLUBOK:  We are --

5              THE COURT:  -- on alter ego?

6              MR. CLUBOK:  In alter ego, we argued it under both

7    Texas law and New York law.  And under either standard, it was

8    -- it was -- it was the same -- essentially the same facts, so

9    we, to be safe, we argued under -- there's slightly different

10   wordings of the tests, I believe, but it's essentially the

11   same facts, which I'm sure Your Honor is very familiar with,

12   and we argued under those -- under those same tests.  We all

13   -- there wasn't an issue about the law or about what the facts

14   -- had -- the -- not -- there was a seven-factor test, I

15   believe, or a nine-factor test.

16             THE COURT:  For alter ego?  Because --

17             MR. CLUBOK:  Yes, Your Honor.

18             THE COURT:  -- the Texas statute is -- it's reined it

19   in.  You know, that's why I asked what law, because, you know,

20   it's not the old-fashioned, what was it, *Castleberry,* the

21   famous Texas Supreme Court case.  It's changed hugely in the

22   past --

23             MR. CLUBOK:  Yes.  I think the parties --

24             THE COURT:  -- 20 years.  It's a tougher road.

25             MR. CLUBOK:  Right.

1          THE COURT:  Uh-huh.

2          MR. CLUBOK:  The parties have agreed that -- the

3   parties had agreed under standard of law, I believe we all

4   agreed New York applied, but belt-and-suspenders, I believe we

5   agreed Texas law.  But it didn't come down to a fight over the

6   law.  It just came down to the facts.

7          THE COURT:  Okay.

8          MR. CLUBOK:  It was a multipart test, and -- and Your

9   Honor, again, we were able to show it in a preliminary

10  injunction hearing that was -- that went up to the appellate

11  court as well.  You know, went up with a TRO pending appeal.

12  So I -- it gets complicated, but suffice it to say at summary

13  judgment we did the same thing.  We went through our -- we

14  went through our alter ego arguments at summary judgment in

15  maybe 45 minutes.  And so that's -- a summary judgment

16  proceeding, a lot faster than a trial would be.

17      But it's -- you know, there's multiple Highland witnesses

18  who made damning admissions, including their own expert -- I'm

19  sorry about saying that -- made, you know, troubling

20  admissions, I would say, for Highland.  And, you know, again,

21  that, in a vacuum, Mr. Feinstein wants to get up there and

22  just tell you it's going to be two weeks, three weeks, four

23  weeks.

24      If we sit down and go through the witnesses, I mean, we

25  can agree to a shot clock.  A chess clock, I mean, Your Honor.

 1   We can do this in a way that -- you know, Mr. Feinstein and

 2   his colleagues told you, if you just keep the stay in place

 3   and we come here, this will all be done quickly.  We are -- we

 4   are willing to accept that.  Okay?  For the sake of

 5   efficiency, for the sake of getting our claim adjudicated

 6   prior to the confirmation hearing.  As I said before, we would

 7   do it as a binding arbitration --

 8            THE COURT:  Okay.

 9            MR. CLUBOK:  -- with the mediators you put in.  We

10   would do it any way possible that's very quick, so that we

11   don't -- so we have a fair shot, we don't have to relitigate

12   issues which we don't think we should be put to relitigating,

13   particularly the clear language of the Appellate Division.

14   Given that this case was all set for trial and there was no

15   other summary judgment proceedings or opportunities and

16   Justice Friedman had shut them down when they tried to do this

17   very same thing in front of her, we hoped that you'd pick up

18   where she left off and we just get this claim adjudicated.

19            THE COURT:  All right.

20            MR. FEINSTEIN:  Your Honor, can I speak for one

21   minute?  Just one minute, please?

22            THE COURT:  Okay.  And I'm just letting you know that

23   one thing I've been kind of monitoring today is I have a

24   matter that is set for trial docket call November 9th.

25   Meaning, you know, normally, we set for trial something the

1   following week.  So my courtroom deputy has been communicating

2   with these parties that were set for trial docket call

3   November 9th, and they say yes, they are trial-ready, and they

4   need seven or eight days of trial.  And these are people who

5   are earlier in the queue than you all.

6       So I'm just letting you know, me being able to do a three

7   or four-day trial in mid-November just went out the window.

8   You know, they're much earlier in the queue than you all, at

9   least.

10              MR. CLUBOK:  Understood, Your Honor.  Frankly, --

11              THE COURT:  Okay.

12              MR. CLUBOK:  And, frankly, even if -- if the

13  confirmation hearing has to be pushed back a week or two, just

14  for efficiency's sake, if that would help, obviously, we would

15  try this November 16th or the first week in December, whenever

16  -- even if it has to be November 2nd, frankly.  If you say

17  that's when you have to try it, we'll try it then.

18              THE COURT:  I actually have another trial set the

19  first week of November, but I think they may --

20              MR. CLUBOK:  Understood.

21              THE COURT:  They may want to continue.  I'm waiting

22  to hear on that one as well.

23      All right.  So, Mr. Feinstein, --

24              MR. CLUBOK:  But by the way, I'm --

25              THE COURT:  Yes, I --

1          MR. CLUBOK:  I'm so sorry, but can I correct

2    something that I said, Your Honor?

3          THE COURT:  Yes, if you're going to correct.

4          MR. CLUBOK:  May I correct something that I said

5    earlier?

6          THE COURT:  What do you want to correct?

7          MR. CLUBOK:  I just -- my colleague, thankfully, Ms.

8    Tomkowiak, just reminded me that we -- the parties did agree

9    that the alter ego that applied here was New York law.  And so

10   it was -- it was just two basic elements, but there's a number

11   of factors, and that's what the parties had -- we all had

12   agreed to throughout the course of the proceedings, and

13   certainly the arguments that were used.

14       There was a lot of different laws or -- I'm sorry, a lot

15   of different legal standards, and I just forget right now

16   exactly which ones.

17          THE COURT:  Yes.

18          MR. CLUBOK:  But my colleagues are showing New York

19   law applied.

20          THE COURT:  Okay.  Well, I, you know, I don't know if

21   there's any dispute about that, but we have, like I said, a

22   statute in Texas that --

23          MR. CLUBOK:  Yeah, maybe --

24          THE COURT:  -- is really --

25          MR. CLUBOK:  Yeah.

1          THE COURT:  -- narrowly defined.  Well, in some

2   contexts.

3          MR. CLUBOK:  Yeah.

4          THE COURT:  But, anyway, an issue maybe for another

5   day.

6       All right.  Mr. Feinstein, I think --

7          MR. FEINSTEIN:  Thank you, Your Honor.

8          THE COURT:  I'm going to get -- this is the last

9   round.  What would you like to say?

10         MR. FEINSTEIN:  Yes.  Just very quickly, Your Honor.

11  Mr. Clubok said more than once that there were findings of

12  substantial likelihood of success to support a preliminary

13  injunction.  I read the record myself.  That's just not true.

14      Second, he said the Debtors asked Your Honor to keep the

15  case here and we would move it quickly.  And we intend to do

16  so.  What we also said when we made that request, Your Honor,

17  is that we would do exactly what we're doing today, which is

18  proposed to make a partial summary judgment motion on key

19  dispositive issues.  We didn't say that we were going to try

20  the case in bankruptcy after it stayed here.

21      And Mr. Clubok cleverly conflated something the Debtor

22  said before it filed for bankruptcy, around the time of the

23  end of the phase one trial, that the Debtor would be ready in

24  June for trial.  That was before the Debtor filed for

25  bankruptcy, and obviously the Debtor has got a lot on its

1  hands being in bankruptcy.  So that June date was certainly

2  overtaken by many, many events.

3      But to come back to the main point, Your Honor, we think

4  -- we promised you we'd make a summary judgment motion.  We

5  think that's the best course.  Mr. Clubok can make all of his

6  arguments about what -- the meaning of those state court

7  decisions in opposition papers.  We think this is the best way

8  to advance the case, Your Honor.

9            THE COURT:  All right.

10           MS. MASCHERIN:  Your Honor?

11           THE COURT:  Yes?

12           MS. MASCHERIN:  Excuse me, Your Honor.

13           THE COURT:  Yes, Ms. --

14           MS. MASCHERIN:  Would you entertain just a brief

15  comment from me?

16           THE COURT:  Yes.  I said it was the last round, but

17  you only spoke once today, and very briefly, so go ahead.

18           MS. MASCHERIN:  And I will try to be brief again,

19  Your Honor.

20      First of all, my client -- and I'm, for purposes of this

21  objection, I'm representing both the Crusader Fund, which is a

22  party to that settlement agreement, and the Redeemer

23  Committee.  My client is a party to the release.  My client

24  was not a party at the time summary judgment was being argued

25  in New York.  I've not eaten this apple, Your Honor.  I'd like

1  to take a bite.

2      Whatever -- obviously, you are the -- you're the queen of

3  your docket and you will decide what you think is the wisest

4  way to approach this, but I would just ask that Crusader and

5  the Redeemer Committee be given an opportunity to be heard on

6  these two legal issues, the release and res judicata.

7      Second, with regard to res judicata, I've just been

8  listening to the argument, and I think that, really, the

9  salient point for Your Honor to focus on with regard to res

10  judicata is what are the damages claims that are still in

11  play, given the Court's ruling on res judicata, that only --

12  the only conduct that can be actionable is conduct that

13  occurred after February 24 of '09?  And I would submit, Your

14  Honor, that the record ultimately will show that whether --

15  whether we call it damages for breach of implied covenant of

16  good faith and fair dealing or damages from fraudulent

17  transfers, the damages that arose post-February 24, '09 are

18  the fraudulent transfer, you know, the values of the

19  fraudulent transfers.

20      So, I think -- I think I've been hearing folks sort of

21  talking past each other to a little bit, to a little extent,

22  but I think that those are -- from our perspective, those are

23  the two key legal issues that will have a material effect on

24  the maximum size of the claim here.  And we just, however Your

25  Honor determines you'd prefer to hear the issues, we would

1 | just request the opportunity to be heard.

2 | THE COURT:  All right.  Here's what I'm going to do.

3 | I am going to issue a scheduling order along the lines of what

4 | the Debtor has proposed, so that there will be a deadline of

5 | October 16th for any motions for partial summary judgment.

6 | Oppositions will be due November 6th.  You did not mention

7 | replies, Mr. Feinstein.

8 | MR. FEINSTEIN:  Sorry, Your Honor.  I think -- I

9 | mentioned -- or, yeah, just November 16th, in advance of the

10 | November 19th or 20th hearing.

11 | THE COURT:  Okay.  November 16th for replies.

12 | I'm also going to argue that, if UBS wants to file a 3018

13 | motion to have its claim estimated for voting purposes, that

14 | we'll use this very same time frame, October 16th for such a

15 | motion, and then responses will be due November 6th, and

16 | replies to that for November 16th.

17 | I think, you know, Mr. Clubok, I mean, we have to give

18 | this a shot.  I understand you very passionately believe and

19 | argue that there's res judicata on the res judicata.  That's

20 | my interpretation of what you're saying.  But, you know, you

21 | can lay that all out very clearly in your response to the

22 | motions for summary judgment:  Here, Judge, look at this,

23 | this, this, and this.  Collateral estoppel, already decided.

24 | Or, you know, or whatever estoppel doctrine.  And we'll see if

25 | we get where the Debtor thinks we're going to get or not prior

1  to confirmation.

2      Now, --

3          MR. CLUBOK:  Your --

4          THE COURT:  -- let me ask you this.  Well, here's

5  what I'll do.  I'll set this Friday, November 20th, at 9:30.

6  I'm making my own life kind of uncomfortable doing that, with

7  this allegedly six or seven-day trial I'm going to have in the

8  middle of November.  But, you know, hopefully you won't give

9  me each a stack of 500 pages.

10      But maybe you will.  I mean, just be honest.  Is your

11  summary judgment evidence going to be a stack of 500 pages,

12  Mr. Feinstein?

13          MR. FEINSTEIN:  I don't think so, Your Honor, no.

14          THE COURT:  Okay.  All right.

15          MR. CLUBOK:  Your Honor, if I may?  The only thing I

16  would ask is it is extremely prejudicial to us to have to file

17  a 3018 next Friday, simply because, you know, we -- you know,

18  that very much merges with what we would be presenting at a

19  trial, in terms of being able to really bolster our claim.  I

20  know that it's truncated.  I know that we don't have to put as

21  much in, you know, et cetera, but we sort of will get faced

22  with the choice of either watering down our evidence and not

23  showing you, you know, giving you enough so that you can

24  sufficiently value our claim in the context of 3018, or having

25  to do that all by next Friday.  And so much of what we're

1  going to say is going to overlap with our opposition to their

2  summary judgment motion, I believe.

3      It would be much more efficient, if it's acceptable, for

4  us to file that -- our motion for 3018 concurrent with our

5  opposition to --

6            THE COURT:  November 6th?

7            MR. CLUBOK:  -- summary judgment.

8            THE COURT:  November 6th?  What do you --

9            MR. CLUBOK:  Okay.

10           THE COURT:  What do you say about that, Mr.

11 Feinstein?

12           MR. FEINSTEIN:  It's less than ideal, Your Honor, but

13 we'll work with it.  It's -- I mean, to hear Mr. Clubok say

14 he's unprepared to do this, but also say he's trial-ready in

15 three weeks is a little surprising.

16     It would be better if we could do these on parallel

17 tracks, because we have a certain amount of personnel that are

18 going to be working on the various papers, so this seemed --

19 what we proposed we thought kind of synchronized the parties'

20 activities as well, so that, you know, while one party is

21 making a motion, the other party is working on oppositions.

22 It just it seemed more efficient that way.

23           MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.

24 I might add that we have our disclosure statement motion on

25 calendar for October 22nd, which we filed two to three weeks

1  ago.  Or two weeks ago.  And that said that 3018 motions --

2  and Your Honor hasn't approved it -- but had to be heard by

3  November 20th.

4      So, Mr. Clubok was on notice.  Of course, he has the

5  opportunity to object, and he could object by the objection

6  deadline, but this isn't something new we sprung upon him

7  yesterday.

8          THE COURT:  Okay.  Well, you know, this time frame

9  works rather nicely, actually, if I'm setting this for

10  November 20th at 9:30 in the morning.

11      Does your proposed order talk about when the motion to

12  estimate must be filed, or only the date by which it must be

13  heard?

14          MR. POMERANTZ:  It says that -- when it must be

15  heard, --

16          THE COURT:  Okay.

17          MR. POMERANTZ:  -- I believe, Your Honor.  But it

18  didn't contemplate an emergency setting.  And if you look at

19  the calendar, in order to timely file it, it would have to be

20  filed by this date.

21      So, again, it should not come as any surprise.  And I

22  think we need the sufficient time that we would have to file

23  the opposition.

24      So, I would concur with Mr. Feinstein's comments, that we

25  would like it filed on the same time frame.  We think it's

1  fair.

2          THE COURT:  All right.

3          MR. CLUBOK:  Your Honor, I liked Mr. Feinstein's

4  initial reaction better.

5          THE COURT:  I'm sorry?

6          MR. CLUBOK:  You know, if -- go ahead.

7          THE COURT:  Well, I mean, I'm just thinking through.

8  In a more normal scenario, the way this would play out is

9  usually we don't have 3018 motion, response, and then reply.

10 So, on the other hand, if he had envisioned November 20th,

11 that kind of envisioned you would file a 3018 motion, you

12 know, around October 30th.  But it's silly to inject yet

13 another deadline.

14    I'm going to go with your proposal, Mr. Clubok.  And your

15 3018 motion is going to be due November 6th, the same day as

16 your opposition.  And any objection to the 3018 motion of

17 either the Debtor or Redeemer is going to be due November

18 16th.  So we're compressing those a little, but that's what

19 we're going to do.

20         MR. CLUBOK:  Thank you, Your Honor.

21         THE COURT:  So, any questions?  Mr. Feinstein, I

22 would like sort of a mini-scheduling order to be submitted,

23 setting those forth.

24         MR. FEINSTEIN:  Sure.

25         THE COURT:  And any other housekeeping matters you

1  can think of?

2          MR. FEINSTEIN:  We'll prepare a form of order, Your

3  Honor, and circulate it to Mr. Clubok.

4          THE COURT:  Okay.  I'm going to say it again, even if

5  it's wasted breath.  I am urging you, pleading with you, to

6  give another shot at settlement.

7      I'm a little confused, Mr. Clubok, because in your urgency

8  to have this go to trial sooner rather than later, I think I

9  heard you said we might even agree to binding arbitration.

10 Well, I've just sent you to mediation with people who are very

11 respected arbitrators as well, and I don't -- you know, I'm

12 like, why would that be successful if weeks of trying to

13 settle this with two arbitrators/mediators hasn't proven

14 fruitful?

15         MR. CLUBOK:  My only point is if we want to make --

16 give them the decision-making authority, to take the parties

17 out of it, I'm happy to -- I'm happy to turn the decision over

18 to them and make it a binding mediation instead of a

19 mediation.

20     I do think the mediators you chose are terrific.  I think

21 they can settle this case.  I think the parties should work

22 with them, and I think we should be able to.  And my only

23 point was, if the parties can't do it, we'd be fine letting

24 the mediators become binding mediators or binding arbitration

25 and letting them just make the decision.

1    We trust the mediators.  And we trust their ability to get

2    this settled.  But if whoever, you know, can't get it done,

3    neither party is to blame, without getting into it, we're fine

4    letting the mediators be binding mediators.

5            THE COURT:  Well, --

6            MR. CLUBOK:  We do agree that it can be settled.  It

7    should be settled.

8    You know, you were told -- you keep being told this

9    billion dollars, as if that's the gulf.  I'm not going to get

10   into the details, of course, because it's mediation, but I

11   feel it's safe for me to respond to that.  That is not the

12   gulf here.  And the parties should be able to resolve this in

13   a reasonable amount.

14   And the mediators you chose are terrific.  We trust them.

15   We think if we keep working -- I was glad to hear Mr.

16   Pomerantz say they have not declared mediation over.  We

17   think we should keep working with them and see if we can get

18   it done.  And if we can't, either we -- either we'd like a

19   fast trial or we'd take binding mediation or binding

20   arbitration, whatever you want to call it.  We believe this

21   matter can be resolved by reasonable people.

22           THE COURT:  All right.  Well, I mean, I hope

23   everyone is keeping in the forefront of their mind that there

24   are other parties caught in the crosshairs here.  I mean,

25   before the bankruptcy, Highland, UBS, I can understand in

1    that scenario people get very entrenched in their positions.

2    One billion-dollar gulf, as you say.

3        But we have Ms. Mascherin's client, who has been

4    litigating or did litigate with Highland probably before you

5    even started, UBS.  I can't remember the timing.  Around the

6    same time, right?  Around the same time?  Wasn't it after the

7    2008 great recession that -- so, but my point is, we've got a

8    party out there with a $200 million-plus, I can't remember,

9    arbitration award, compromised.  You know, we have Acis out

10   there that, you know, had a 34-count adversary proceeding in

11   my Court that felt very passionate about their claims.  And

12   we've got others.

13       So, you know, this is one of the obvious reasons I am

14   urging you all to go back to the table, go back to the

15   mediators.  It's not just about UBS.  It's not just about

16   Highland.  And we're marching forward with confirmation

17   because it's not just about these two parties.  It's about

18   other people who have been trying for a very long time to get

19   paid on their claims.

20       And so please keep that in mind in settlement discussions,

21   you know, that your --

22           MR. CLUBOK:  Absolutely.

23           THE COURT:  -- your respective clients understand

24   it's not just about them.  Okay?

25           MR. CLUBOK:  We wholeheartedly agree with that, and

1    we understand that completely.

2              THE COURT:  Okay.

3              MR. POMERANTZ:  Your Honor, I have one comment on the

4    Rule 3018 scheduling order that we are to prepare.  You did

5    not motion a reply.  We take that, since the scheduling is

6    going to be truncated, to be purposeful and intentional and

7    that you're expecting to rule on the papers on the motion and

8    the opposition, so that we don't have anyone scurrying and

9    getting a reply the night before the hearing.

10             THE COURT:  That's correct.

11             MR. POMERANTZ:  I just wanted to make sure that was

12   clear.

13             THE COURT:  That's what I meant, --

14             MR. POMERANTZ:  Thank you, Your Honor.

15             THE COURT:  -- if I was not clear.

16        All right.  Is there any other business in this bankruptcy

17   case that you wanted to bring up?  I think I've set a hearing

18   again this week on Thursday on a Committee motion to extend

19   their deadline to bring an adversary against CLO Holdco.  I

20   think that's set later this week.  But any other case business

21   that you want to bring up at this time?

22             MR. POMERANTZ:  Nothing from the Debtor, Your Honor.

23             THE COURT:  Okay.  I'll open it up to the floor,

24   since I know we have others listening in.  Committee, or

25   anyone else out there, have anything they want to raise before

1  we conclude?

2          MR. CLEMENTE:  Matt Clemente on behalf of the

3  Committee.  You're correct.  I believe there's been a

4  scheduling for Thursday.  But there's nothing else, nothing

5  else we wish to raise, Your Honor.

6          THE COURT:  Okay.  It would be very lovely if that

7  could be an agreed order, but I don't know how hopeful you are

8  on that.

9          MR. POMERANTZ:  I would hope that it could be, Your

10 Honor, since it's just a set of dates.  So, I would hope we

11 and Mr. Clubok could at least agree on that.

12         THE COURT:  Okay.  Well, but Mr. Clemente, on your --

13 I cannot remember what the current deadline is, and are you in

14 discussions with CLO Holdco on maybe mutually agreeing to this

15 extension?

16         MR. CLEMENTE:  This is Matt Clemente.  And my partner

17 has been handling it primarily, but it is safe to say that we

18 have been discussing the extension with CLO Holdco.  We have

19 not come to agreement with them.  That does not mean we won't

20 continue to discuss it with them before Thursday.

21         THE COURT:  Okay.  Thank you.  All right.  Well, if

22 there's nothing else, I'll look for the form of order on

23 today's matter, and see you Thursday.  Okay.  Thank you.

24         MR. POMERANTZ:  Thank you, Your Honor.

25         MR. CLUBOK:  Thank you, Your Honor.

1          MR. CLEMENTE:  Thank you, Your Honor.

2       (Proceedings concluded at 2:51 p.m.)

3                    --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                   CERTIFICATE

21     I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22 above-entitled matter.

23   **/s/ Kathy Rehling**                      **10/07/2020**

24 _____        _____
   Kathy Rehling, CETD-444                      Date
25 Certified Electronic Court Transcriber

1

2                                    INDEX

PROCEEDINGS                                                              3

WITNESSES
-none-

EXHIBITS
-none-

RULINGS                                                                47

END OF PROCEEDINGS                                                     57

INDEX                                                                  58

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25