THIS IS NOT A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE
PLAN IN ACCORDANCE WITH BANKRUPTCY CODE SECTION 1125 AND
WITHIN THE MEANING OF BANKRUPTCY CODE SECTION 1126, 11 U.S.C. §§
1125, 1126. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY
THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT HAS BEEN
SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE. THE INFORMATION IN THIS
DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**DISCLOSURE STATEMENT FOR THE ~~SECOND~~FOURTH AMENDED PLAN OF
REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.**

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.com:

Counsel for the Debtor and Debtor-in-Possession

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

**ARTICLE I. EXECUTIVE SUMMARY** ........................................................ 6

   **A.**   **Summary of the Plan** ................................................................... ~~7~~6

   **B.**   **An Overview of the Chapter 11 Process** ................................. 8

   **C.**   **Purpose and Effect of the Plan** .............................................. ~~9~~8

       1.   The Plan of Reorganization ........................................... ~~9~~8

       2.   Plan Overview ................................................................. 9

       3.   Voting on the Plan ........................................................... 10

       4.   Confirmation of the Plan ................................................. 11

       5.   Confirming and Effectuating the Plan ........................... ~~11~~12

       6.   Rules of Interpretation .................................................... 12

       7.   Distribution of Confirmation Hearing Notice and Solicitation Package to Holders of Claims and Equity Interests ...... 12

       8.   Instructions and Procedures for Voting .......................... ~~13~~14

       9.   The Confirmation Hearing .............................................. 15

       10.   The Deadline for Objecting to Confirmation of the Plan ... ~~15~~16

       11.   Notice Parties ................................................................. 16

       12.   Effect of Confirmation of the Plan ................................. 16

   **D.**   **Effectiveness of the Plan** ........................................................ ~~16~~17

   **E.**   **RISK FACTORS** ....................................................................... ~~16~~17

**ARTICLE II. BACKGROUND TO THE CHAPTER 11 CASE AND SUMMARY OF BANKRUPTCY PROCEEDINGS TO DATE** ........... 17

   **A.**   **Description and History of the Debtor's Business** ............... 17

   **B.**   **The Debtor's Corporate Structure** ......................................... 17

   **C.**   **Business Overview** .................................................................. ~~17~~18

   **D.**   **Prepetition Capital Structure** ................................................ 18

       1.   Jefferies Margin Borrowings (Secured) ......................... 18

       2.   The Frontier Bank Loan (Secured) ................................. ~~18~~19

       3.   Other Unsecured Obligations ......................................... 19

|  |  |  |  |
|---|---|---|---|
|  | 4. | Equity Interests | ~~19~~20 |
| E. | SEC Filings | | 20 |
| F. | Events Leading Up to the Debtor's Bankruptcy Filings | | 20 |
| G. | Additional Prepetition Litigation | | 21 |
| H. | The Debtor's Bankruptcy Proceeding | | ~~23~~24 |
| I. | First Day Relief | | 24 |
| J. | Other Procedural and Administrative Motions | | ~~24~~25 |
| K. | United States Trustee | | 25 |
| L. | Appointment of Committee | | ~~25~~26 |
| M. | Meeting of Creditors | | ~~25~~26 |
| N. | Schedules, Statements of Financial Affairs, and Claims Bar Date | | 26 |
| O. | Governance Settlement with the Committee | | ~~26~~27 |
| P. | Appointment of James P. Seery, Jr., as Chief Executive Officer and Chief Restructuring Officer | | 27 |
| Q. | Mediation | | ~~27~~28 |
| R. | Postpetition Settlements | | ~~27~~28 |
|  | 1. | Settlement with Acis and the Terry Parties | ~~27~~28 |
|  | 2. | Settlement with the Redeemer Committee | ~~28~~29 |
| S. | Certain Outstanding Material Claims | | ~~29~~30 |
| T. | **Treatment of Shared Service and Sub-Advisory Agreements** | | 31 |
| U. | **Portfolio Managements with Issuer Entities** | | 32 |
| V. | Resignation of James Dondero | | ~~31~~33 |
| ~~U~~W. | Exclusive Periods for Filing a Plan and Soliciting Votes | | ~~31~~33 |
| ~~V~~X. | Negotiations with Constituents | | ~~31~~34 |
| ~~W~~Y. | Highland Capital Management, L.P. Retirement Plan and Trust | | ~~32~~34 |
| **ARTICLE III. SUMMARY OF THE PLAN** | | | ~~33~~35 |
| A. | Administrative and Priority Tax Claims | | ~~33~~35 |
|  | 1. | Administrative Expense Claims | ~~33~~35 |
|  | 2. | Professional Fee Claims | ~~33~~36 |
|  | 3. | Priority Tax Claims | ~~34~~37 |

B.    **Classification and Treatment of Classified Claims and Equity Interests** ............................................................................ ~~34~~37

    1.    Summary ......................................................................... ~~34~~37

    2.    Elimination of Vacant Classes ....................................... ~~35~~38

    3.    Impaired/Voting Classes ................................................ ~~35~~38

    4.    Unimpaired/Non-Voting Classes .................................... ~~35~~38

    5.    Impaired/Non-Voting Classes ........................................ ~~36~~38

    6.    Cramdown ...................................................................... ~~36~~39

C.    **Classification and Treatment of Claims and Equity Interests** ...... ~~36~~39

    1.    *Class 1 – Jefferies Secured Claim* ................................ ~~36~~39

    2.    *Class 2 – Frontier Secured Claim* ................................ ~~36~~39

    3.    *Class 3 – Other Secured Claims* ................................... ~~37~~40

    4.    *Class 4 – Priority Non-Tax Claims* ............................... ~~37~~40

    5.    *Class 5 – Retained Employee Claims* ........................... ~~38~~41

    6.    *Class 6 – PTO Claims* .................................................. ~~38~~41

    7.    *Class 7 – Convenience Claims* ...................................... ~~38~~41

    8.    *Class 8 – General Unsecured Claims* ........................... ~~39~~42

    9.    *Class 9 – Subordinated Claims* ..................................... ~~40~~43

    10.    *Class 10 – Class B/C Limited Partnership Interests* ..... ~~40~~44

    11.    *Class 11 – Class A Limited Partnership Interests* ......... ~~41~~44

D.    **Special Provision Governing Unimpaired Claims** ..................... ~~41~~45

E.    **Subordinated Claims** ................................................................. ~~42~~45

F.    **Means for Implementation of the Plan** ..................................... ~~42~~45

    1.    Summary ......................................................................... ~~42~~45

    2.    The Claimant Trust ........................................................ ~~43~~46

    (a)    *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.* ..................................................... ~~43~~46

(ba) *Claimant Trust Oversight Committee* ............................................... 4447

(b) *Purpose of the Claimant Trust.* ......................................................... 48

(c) *Purpose of the Claimant Litigation Sub-Trust.* .............................. 4448

(d) *Claimant TrusteeTrust Agreement and Claimant Litigation Sub-Trust Agreement.* ............................................................. 4548

(e) *Compensation and Duties of Trustees.* ............................................ 4650

(f) *Cooperation of Debtor and Reorganized Debtor.* ......................... 4650

(g) *United States Federal Income Tax Treatment of the Claimant Trust.* ................................................................................................ 4650

(h) *Tax Reporting.* ................................................................................... 4750

(i) *Claimant Trust Assets.* ...................................................................... 4751

(j) *Claimant Trust Expenses.* ................................................................. 4751

(k) *Trust Distributions to Claimant Trust Beneficiaries.* ..................... 4851

(l) *Cash Investments.* .............................................................................. 4851

(m) *Dissolution of the Claimant Trust.* .......................... 48 *and Litigation Sub-Trust.* 52

3. The Reorganized Debtor ..................................................................... 4952

(a) *Corporate Existence* ........................................................................... 4952

(b) *Cancellation of Equity Interests and Release* ................................. 4953

(c) *Issuance of New Partnership Interests* ............................................. 4953

(d) *Management of the Reorganized Debtor* .......................................... 4953

(e) *Vesting of Assets in the Reorganized Debtor* ................................... 4953

(f) *Purpose of the Reorganized Debtor* ................................................. 54

(g) *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets* ............................................. 5054

4. Company Action .................................................................................. 5054

5. Release of Liens, Claims and Equity Interests ................................ 5155

6.     Cancellation of Notes, Certificates and Instruments ............................................ ~~51~~55

7.     Cancellation of Existing Instruments Governing Security Interests ...................................................................................................... ~~52~~56

8.     Control Provisions ...................................................................................... ~~52~~56

9.     Treatment of Vacant Classes .................................................................... ~~52~~56

10.    Plan Documents .......................................................................................... ~~52~~56

11.    Highland Capital Management, L.P. Retirement Plan and Trust ............................................................................................................. ~~53~~56

**A.**    **Treatment of Executory Contracts and Unexpired Leases** ............. ~~53~~57

    1.     Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases .............................................................................. ~~53~~57

    2.     Claims Based on Rejection of Executory Contracts or Unexpired Leases .......................................................................................... ~~54~~58

    3.     Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases ...................................................... ~~54~~58

    ~~4.     Assumption of Insurance Policies ............................................ 55~~

**B.**    **Provisions Governing Distributions** ................................................... ~~55~~59

    1.     Dates of Distributions ................................................................................ ~~55~~59

    2.     Distribution Agent ....................................................................................... ~~56~~60

    3.     Cash Distributions ....................................................................................... ~~57~~60

    4.     Disputed Claims Reserve .......................................................................... ~~57~~60

    5.     <u>Distributions from the Disputed Claims Reserve</u> ...................... <u>61</u>

    <u>6.</u>     Rounding of Payments ............................................................................... ~~57~~61

    ~~6.~~<u>7.</u>     *De Minimis* Distribution ......................................................................... ~~57~~61

    ~~7.~~<u>8.</u>     Distributions on Account of Allowed Claims .................................. ~~57~~62

    ~~8.~~<u>9.</u>     General Distribution Procedures .......................................................... ~~58~~62

    ~~9.~~<u>10.</u>    Address for Delivery of Distributions ............................................... ~~58~~62

    ~~10.~~<u>11.</u>  Undeliverable Distributions and Unclaimed Property ................. ~~58~~62

11.12. Withholding Taxes .................................................. 5863

12.13. Setoffs .................................................................. 5963

13.14. Surrender of Cancelled Instruments or Securities ...... 5963

14.15. Lost, Stolen, Mutilated or Destroyed Securities ....... 5963

C.     **Procedures for Resolving Contingent, Unliquidated and Disputed Claims** ............................................... 5964

    1.    Filing of Proofs of Claim ..................................... 5964

    2.    Disputed Claims .................................................. 6064

    3.    Procedures Regarding Disputed Claims or Disputed Equity Interests ........................................ 6064

    4.    Allowance of Claims and Equity Interests ............ 6064

*Allowance of Claims* ................................................... 6064

*Estimation* ................................................................. 6065

*Disallowance of Claims* .............................................. 6165

D.     **Effectiveness of the Plan** ........................................ 6166

    1.    Conditions Precedent to the Effective Date .......... 6166

    2.    Waiver of Conditions .......................................... 6267

    3.    Effect of Non-Occurrence of Conditions to Effectiveness ...... 6367

    4.    Dissolution of the Committee ............................... 6367

E.     **Exculpation, Injunction, and Related Provisions** ........ 6368

    1.    General .............................................................. 6368

    3.    Exculpation ........................................................ 6569

    4.    Releases by the Debtor ........................................ 6570

    5.    Preservation of Rights of Action ......................... 6671

*Maintenance of Causes of Action* ............................... 6671

*Preservation of All Causes of Action Not Expressly Settled or Released* ..... 6672

    6.    Injunction .......................................................... 6772

    7.    Term of Injunctions or Stays ............................... 6873

              8.      Continuance of January 9 Order                                    73
       F.      Article XII.D of the Plan                                               74
       G.      Binding Nature of Plan                                                 6874
       GH.     Statutory Requirements for Confirmation of the Plan                    6874
              1.      Best Interests of Creditors Test                                6975
              2.      Liquidation Analysis                                            7075
              3.      Feasibility                                                     7076
              4.      Valuation                                                       7177
              5.      Acceptance by Impaired Classes                                  7177
              6.      Confirmation Without Acceptance by Impaired Classes             7278
              7.      No Unfair Discrimination                                        7278
              8.      Fair and Equitable Test                                         7278
ARTICLE IV. RISK FACTORS                                                              7379
       HA.     Certain Bankruptcy Law and Other Considerations                       7379
              1.      Parties in Interest May Object to the Debtor's Classification of
                      Claims and Equity Interests, or Designation as Unimpaired.      7379
              2.      The Debtor May Not Be Able to Secure Confirmation of the
                      Plan.                                                           7479
              3.      The Conditions Precedent to the Effective Date of the Plan
                      May Not Occur.                                                  7480
              4.      Continued Risk Following Effectiveness.                         7480
              5.      The Effective Date May Not Occur.                               7580
              6.      The Chapter 11 Case May Be Converted to Cases Under
                      Chapter 7 of the Bankruptcy Code                                7581
              7.      Claims Estimation                                               7581
              8.      The Financial Information Contained Herein is Based on the
                      Debtor's Books and Records and, Unless Otherwise Stated,
                      No Audit was Performed.                                         7581
       IB.     Risks Related to Recoveries under the Plan                             7581

1. The Reorganized Debtor and/or Claimant Trust May Not Be Able to Achieve the Debtor's Projected Financial Results .......... ~~75~~81

2. Claim Contingencies Could Affect Creditor Recoveries .......... ~~76~~82

3. If Approved, the Debtor Release Could Release Claims Against Potential Defendants of Estate Causes of Action With Respect to Which the Claimant Trust Would Otherwise Have Recourse .......... ~~76~~82

~~J~~C. **Investment Risk Disclaimer** .......... ~~76~~82

1. Investment Risks in General. .......... ~~76~~82

2. General Economic and Market Conditions and Issuer Risk. .......... ~~77~~82

~~K~~D. **Disclosure Statement Disclaimer** .......... ~~77~~83

1. The Information Contained Herein is for Disclosure Purposes Only. .......... ~~77~~83

2. This Disclosure Statement was Not Approved by the SEC. .......... ~~77~~83

3. This Disclosure Statement Contains Forward-Looking Statements. .......... ~~77~~83

4. No Legal or Tax Advice is Provided to You by This Disclosure Statement. .......... ~~78~~83

5. No Admissions Are Made by This Disclosure Statement. .......... ~~78~~84

6. No Reliance Should Be Placed on Any Failure to Identify Litigation Claims or Projected Objections. .......... ~~78~~84

7. Nothing Herein Constitutes a Waiver of Any Right to Object to Claims or Equity Interests or Recover Transfers and Assets. .......... ~~78~~84

8. The Information Used Herein was Provided by the Debtor and was Relied Upon by the Debtor's Advisors. .......... ~~78~~84

9. The Disclosure Statement May Contain Inaccuracies. .......... ~~79~~84

10. No Representations Made Outside the Disclosure Statement Are Authorized. .......... ~~79~~85

ARTICLE ~~II~~V. ALTERNATIVES TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN .......... ~~79~~85

ARTICLE ~~V~~VI. U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN .......... ~~79~~85

| | | | |
|---|---|---|---|
| **A.** | **Consequences to the Debtor** | | **81**86 |
| | 1. | Cancellation of Debt | **81**86 |
| | 2. | Transfer of Assets | **81**87 |
| **B.** | **U.S. Federal Income Tax Treatment of the Claimant Trust** | | **81**87 |
| **C.** | **Consequences to Holders of Allowed Claims** | | **83**88 |
| | 1. | Recognized Gain or Loss | **83**88 |
| | 2. | Distribution in Discharge of Accrued Unpaid Interest | **83**89 |
| | 3. | Information Reporting and Withholding | **83**89 |
| **D.** | **Treatment of the Disputed Claims Reserve** | | **84**89 |
| **ARTICLE ~~VI~~VII. RECOMMENDATION** | | | **84**90 |

HIGHLAND CAPITAL MANAGEMENT, L.P., as debtor and debtor-in-possession in the above-captioned cases (the "Debtor"), is sending you this document and the accompanying materials (the "Disclosure Statement") because you are a creditor or interest holder in connection with the ~~Second~~Fourth *Amended Chapter 11 Plan of Reorganization of Highland Capital Management, L.P.*, dated ~~October 25,~~November 20, 2020, as the same may be amended from time to time (the "Plan").[2]  The Debtor has filed a voluntary petition under chapter 11 of title 11 of the United States Code, as amended (the "Bankruptcy Code").

This Disclosure Statement has not yet been approved by the Bankruptcy Court as containing adequate information within the meaning of section 1125(a) of the Bankruptcy Code. The Debtor intends to seek an order or orders of the Bankruptcy Court (a) approving this Disclosure Statement as containing adequate information and (b) confirming the Plan.

A copy of the Plan is attached hereto as **Exhibit A**.

The Debtor believes that the Plan is fair and equitable, will maximize the value of the Debtor's Estate, and is in the best interests of the Debtor and its constituents.  Notably, the Plan provides for the transfer of the majority of the Debtor's Assets to a Claimant Trust.  The balance of the Debtor's Assets, including the management of the Managed Funds, will remain with the Reorganized Debtor.  The Reorganized Debtor will be managed by New GP LLC – a wholly-owned subsidiary of the Claimant Trust.  This structure will allow for continuity in the Managed Funds and an orderly and efficient monetization of the Debtor's Assets.

The Claimant Trust, the Litigation Trust, or the Reorganized Debtor, as applicable, will institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action without any further order of the Bankruptcy Court, and the Claimant Trust and Reorganized Debtor, as applicable, will sell, liquidate, or otherwise monetize all Claimant Trust Assets and Reorganized Debtor Assets and resolve all Claims, except as otherwise provided in the Plan, the Claimant Trust Agreement, or the Reorganized Limited Partnership Agreement.

---

**IMPORTANT INFORMATION ABOUT THIS
DISCLOSURE STATEMENT FOR YOU TO READ**

---

**The Debtor is providing the information in this Disclosure Statement to Holders of Claims and Equity Interests in connection with the Debtor's Plan.  Nothing in this Disclosure Statement may be relied upon or used by any Entity for any purpose other than with respect to confirmation of the Plan.  The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and confirmation of, the Plan and may not be relied on for any other purpose.**

**This Disclosure Statement has not been filed for approval with the Securities and Exchange Commission ("SEC") or any state authority and neither the SEC nor any state authority has passed upon the accuracy or adequacy of this Disclosure Statement or upon the merits of the Plan.  Any representation to the contrary is a criminal offense.  This**

---

[2]  All capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.  To the extent that a definition of a term in the text of this Disclosure Statement and the definition of such term in the Plan are inconsistent, the definition included in the Plan shall control and govern.

Disclosure Statement does not constitute an offer to sell or the solicitation of an offer to buy securities in any state or jurisdiction.

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The Debtor considers all statements regarding anticipated or future matters to be forward-looking statements. Forward-looking statements may include statements about:

- the effects of insolvency proceedings on the Debtor's business and relationships with its creditors;

- business strategy;

- financial condition, revenues, cash flows, and expenses;

- financial strategy, budget, projections, and operating results;

- variation from projected operating and financial data;

- substantial capital requirements;

- availability and terms of capital;

- plans, objectives, and expectations;

- the adequacy of the Debtor's capital resources and liquidity; and

- the Claimant Trust's or the Reorganized Debtor's ability to satisfy future cash obligations.

Statements concerning these and other matters are not guarantees of the Claimant Trust's or Reorganized Debtor's future performance. There are risks, uncertainties, and other important factors that could cause the Claimant Trust's or Reorganized Debtor's actual performance or achievements to be different from those that may be projected. The reader is cautioned that all forward-looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements. Therefore, any analyses, estimates, or recovery projections may or may not turn out to be accurate.

This Disclosure Statement has been prepared pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3016 and is not necessarily in accordance with federal or state securities laws or other similar laws.

No legal or tax advice is provided to you by this Disclosure Statement. The Debtor urges each Holder of a Claim or an Equity Interest to consult with its own advisers with

respect to any legal, financial, securities, tax or business advice in reviewing this Disclosure Statement, the Plan and each of the proposed transactions contemplated thereby. Further, the Bankruptcy Court's approval of the adequacy of disclosures contained in this Disclosure Statement does not constitute the Bankruptcy Court's approval of the merits of the Plan or a guarantee by the Bankruptcy Court of the accuracy or completeness of the information contained herein.

Pachulski Stang Ziehl & Jones LLP ("PSZ&J") is general insolvency counsel to the Debtor. Development Specialists, Inc. ("DSI") is the Debtor's financial advisor. PSZ&J, DSI, and the Independent Board (as defined below) have relied upon information provided by the Debtor in connection with preparation of this Disclosure Statement. PSZ&J has not independently verified the information contained herein.

This Disclosure Statement contains, among other things, summaries of the Plan, the management of the Reorganized Debtor, the Claimant Trust, certain statutory provisions, certain events in the Debtor's Chapter 11 Case, and certain documents related to the Plan that are attached hereto and incorporated herein by reference or that may be filed later with the Plan Supplement. Although the Debtor believes that these summaries are fair and accurate, these summaries are qualified in their entirety to the extent that the summaries do not set forth the entire text of such documents or statutory provisions or every detail of such events. In the event of any conflict, inconsistency or discrepancy between a description in this Disclosure Statement and the terms and provisions of the Plan or any other documents incorporated herein by reference, the Plan or such other documents will govern and control for all purposes. Except where otherwise specifically noted, factual information contained in this Disclosure Statement has been provided by the Debtor's management. The Debtor does not represent or warrant that the information contained herein or attached hereto is without any material inaccuracy or omission.

In preparing this Disclosure Statement, the Debtor relied on financial data derived from the Debtor's books and records and on various assumptions regarding the Debtor's business. The Debtor's management has reviewed the financial information provided in this Disclosure Statement. Although the Debtor has used its reasonable business judgment to ensure the accuracy of this financial information, the financial information contained in, or incorporated by reference into, this Disclosure Statement has not been audited (unless otherwise expressly provided herein) and no representations or warranties are made as to the accuracy of the financial information contained herein or assumptions regarding the Debtor's business and its, the Reorganized Debtor's, and the Claimant Trust's future results. The Debtor expressly cautions readers not to place undue reliance on any forward-looking statements contained herein.

This Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation or waiver. Rather, this Disclosure Statement shall constitute a statement made in settlement negotiations related to potential contested matters, potential adversary proceedings and other pending or threatened litigation or actions.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in the Disclosure Statement. Except as provided under the Plan, the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, may seek to investigate, file and prosecute Claims and Causes of Action and may object to Claims or Equity Interests after the Confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies any such Claims or Equity Interests or objections to Claims or Equity Interests on the terms specified in the Plan.

The Debtor is generally making the statements and providing the financial information contained in this Disclosure Statement as of the date hereof where feasible, unless otherwise specifically noted. Although the Debtor may subsequently update the information in this Disclosure Statement, the Debtor has no affirmative duty to do so. Holders of Claims and Equity Interests reviewing this Disclosure Statement should not infer that, at the time of their review, the facts set forth herein have not changed since the Disclosure Statement was sent. Information contained herein is subject to completion, modification, or amendment. The Debtor reserves the right to file an amended or modified Plan and related Disclosure Statement from time to time.

The Debtor has not authorized any Entity to give any information about or concerning the Plan other than that which is contained in this Disclosure Statement. The Debtor has not authorized any representations concerning the Debtor or the value of its property other than as set forth in this Disclosure Statement.

Holders of Claims or Equity Interests must rely on their own evaluation of the Debtor and their own analyses of the terms of the Plan in considering the Plan. Importantly, each Holder of a Claim should review the Plan in its entirety and consider carefully all of the information in this Disclosure Statement and any exhibits hereto, including the risk factors described in greater detail in ARTICLE IV herein, "Risk Factors."

If the Plan is confirmed by the Bankruptcy Court and the Effective Date occurs, all Holders of Claims against, and Holders of Equity Interests in, the Debtor will be bound by the terms of the Plan and the transactions contemplated thereby.

The effectiveness of the Plan is subject to certain material conditions precedent described herein and set forth in Article IX of the Plan. There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied for the Plan to become effective will be satisfied (or waived).

## **EXHIBITS**

**EXHIBIT A** – Plan of Reorganization

**EXHIBIT B** – Organizational Chart of the Debtor

**EXHIBIT C** – Liquidation Analysis/Financial Projections

THE DEBTOR HEREBY ADOPTS AND INCORPORATES EACH EXHIBIT
ATTACHED TO THIS DISCLOSURE STATEMENT BY REFERENCE AS THOUGH
FULLY SET FORTH HEREIN.

# ARTICLE I.
## EXECUTIVE SUMMARY

**This Disclosure Statement is provided for informational purposes only.**

**In the opinion of the Debtor, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for the highest distributions to the Debtor's creditors and interest holders. The Debtor believes that any delay in confirmation of the Plan would result in significant administrative expenses resulting in less value available to the Debtor's constituents. In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Equity Interests than that which is proposed under the Plan. Accordingly, the Debtor recommends that all Holders of Claims and Equity Interests support confirmation of the Plan.**

~~**The Plan is not supported by the Official Committee of Unsecured Creditors (the "Committee"). The Committee urges unsecured creditors not to vote to accept the Plan. Information regarding the Committee's position is set forth in certain sections of this Disclosure Statement.**~~

This Executive Summary is being provided to Holders of Allowed Claims and Equity Interests as an overview of the material items addressed in the Disclosure Statement and the Plan, which is qualified by reference to the entire Disclosure Statement and by the actual terms of the Plan (including all exhibits attached hereto and to the Plan and the Plan Supplement), and should not be relied upon for a comprehensive discussion of the Disclosure Statement and/or the Plan. Section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance or rejection of the plan of reorganization or liquidation. As such, this Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code. This Disclosure Statement includes, without limitation, information about:

- the Debtor's operating and financial history;

- the significant events that have occurred to date;

- the Confirmation process; and

- the terms and provisions of the Plan, including key aspects of the Claimant Trust and the Reorganized Debtor, certain effects of Confirmation of the Plan, certain risk factors relating to the Plan, and the manner in which distributions will be made under the Plan.

The Debtor believes that any alternative to Confirmation of the Plan would result in significant delays, litigation, and additional costs, and ultimately would diminish the Debtor's value. **Accordingly, the Debtor strongly supports confirmation of the Plan.** ~~**The Committee disagrees with the Debtor's assessment and is urging unsecured creditors to vote to reject the Plan.**~~

A.      **Summary of the Plan**

The Plan represents a significant achievement for the Debtor.  As discussed herein, the Plan provides that the Claimant Trust will receive the majority of the Debtor's assets, including Causes of Action.  The assets being transferred to the Claimant Trust are referred to, collectively, as the Claimant Trust Assets.  The Claimant Trust will – for the benefit of the Claimant Trust Beneficiaries – monetize the Claimant Trust Assets, pursue the Causes of Action, and work to conclude the various lawsuits and litigation claims pending against the Estate.

The Plan also provides for the reorganization of the Debtor.  This will be accomplished by the cancellation of the Debtor's current Equity Interests, which consist of partnership interests held by:  The Dugaboy Investment Trust;[3] the Hunter Mountain Investment Trust ("Hunter Mountain"); Mark Okada, personally and through family trusts; and Strand, the Debtor's general partner.  On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor.  The Reorganized Debtor will be managed by the Claimant Trust, as the managing member of New GP LLC.

The Reorganized Debtor will oversee the monetization of the Reorganized Debtor Assets, which consist of, among other Assets, the management of the Managed Funds.  The net proceeds from the Reorganized Debtor Assets will ultimately be distributed to the Claimant Trust and available for distribution to the Claimant Trust Beneficiaries.

The following is an overview of certain other material terms of the Plan:

- Allowed Priority Non-Tax Claims will be paid in full;

- Allowed Retained Employee Claims will be Reinstated;

- Allowed Convenience Claims will receive the lesser of  (i) 85% of their Allowed Claim or (ii) such Holder's Pro Rata share of the Convenience Claims Cash Pool (*i.e.*, $~~12,750,000~~13,150,000).  Holders of Convenience Claims can elect the treatment provided to General Unsecured Claims by making the GUC Election on their Ballots;

- Allowed General Unsecured Claims and Allowed Subordinated Claims will receive their Pro Rata share of Claimant Trust Interests.  The Claimant Trust Interests distributed to Allowed General Unsecured Claims will be senior to those distributed to Allowed Subordinated Claims as set forth in the Claimant Trust Agreement.  Holders of General Unsecured Claims that are liquidated as of the Confirmation Date can elect the treatment provided to Convenience Class Election by reducing their Claims to $1,000,000 and making the Convenience Class Election on their Ballots; and

---

[3] The Dugaboy Investment Trust is a Delaware trust created to manage the assets of James Dondero and his family.

- Allowed Class B/C Limited Partnership Interests and Allowed Class A Limited Partnership Interests will receive their Pro Rata share of the Contingent Claimant Trust Interests.

## B. An Overview of the Chapter 11 Process

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Pursuant to chapter 11 of the Bankruptcy Code, a debtor may remain in possession of its assets and business and attempt to reorganize its business for the benefit of such debtor, its creditors, and other parties in interest. A plan of reorganization sets forth the means for satisfying claims against and interests in a debtor. Confirmation of a plan of reorganization by a bankruptcy court makes the plan binding upon the debtor and any creditor of or interest holder in the debtor, whether or not such creditor or interest holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan.

The commencement of a Chapter 11 case creates an estate comprised of all of the legal and equitable interests of a debtor in property as of the date that the bankruptcy petition is filed. Sections 1107 and 1108 of the Bankruptcy Code provide that a debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession," unless the bankruptcy court orders the appointment of a trustee. The filing of a bankruptcy petition also triggers the automatic stay provisions of section 362 of the Bankruptcy Code which provide, among other things, for an automatic stay of all attempts to collect prepetition claims from a debtor or otherwise interfere with its property or business. Except as otherwise ordered by the bankruptcy court, the automatic stay generally remains in full force and effect until the consummation of a plan of reorganization or liquidation, following confirmation of such plan of reorganization.

The Bankruptcy Code provides that upon commencement of a chapter 11 bankruptcy case, the Office of the United States Trustee may appoint a committee of unsecured creditors and may, in its discretion, appoint additional committees of creditors or of equity interest holders if necessary to assure adequate representation. Please see ARTICLE II for a discussion of the U.S. Trustee and the statutory committees.

Upon the commencement of a chapter 11 bankruptcy case, all creditors and equity interest holders generally have standing to be heard on any issue in the chapter 11 proceedings pursuant to section 1109(b) of the Bankruptcy Code.

The formulation and confirmation of a plan is the principal objective of a chapter 11 case. The plan sets forth the means of satisfying the claims against and equity interests in the debtor.

## C. Purpose and Effect of the Plan

### 1. The Plan of Reorganization

The Debtor is reorganizing pursuant to chapter 11 of the Bankruptcy Code. As a result, the Confirmation of the Plan means that the Debtor's business will continue to operate following confirmation of the Plan through the Claimant Trust and the Reorganized Debtor to monetize assets for distribution to Holders of Allowed Claims. The Claimant Trust will hold the Claimant

Trust Assets and manage the efficient monetization of, the Claimant Trust Assets. The Claimant Trust will also manage the Reorganized Debtor through the Claimant Trust's ownership of the Reorganized Debtor's general partner, New GP LLC. The Claimant Trust will also be the sole limited partner in the Reorganized Debtor. The Reorganized Debtor will manage the wind down of the Managed Funds as well as the monetization of the balance of the Reorganized Debtor Assets. The Claimant Trust ~~may~~will also establish a Litigation Sub-Trust in accordance with the Plan, which will also be for the benefit of the Claimant Trust Beneficiaries. ~~If established, the~~The Litigation Sub-Trust will receive the Estate Claims ~~and a Litigation Trustee will be appointed by the Committee~~. The Litigation Trustee shall be the exclusive trustee of the Estate Claims included in the Claimant Trust Assets subject to oversight by the Claimant Trust Oversight Committee

A bankruptcy court's confirmation of a plan binds the debtor, any entity acquiring property under the plan, any holder of a claim or an equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code to the terms and conditions of the confirmed plan, whether or not such Entity voted on the plan or affirmatively voted to reject the plan.

    2.    <u>Plan Overview</u>

The Plan provides for the classification and treatment of Claims against and Equity Interests in the Debtor. For classification and treatment of Claims and Equity Interests, the Plan designates Classes of Claims and Classes of Equity Interests. These Classes and Plan treatments take into account the differing nature and priority under the Bankruptcy Code of the various Claims and Equity Interests.

The following chart briefly summarizes the classification and treatment of Claims and Equity Interests under the Plan.[4] Amounts listed below are estimated.

In accordance with section 1122 of the Bankruptcy Code, the Plan provides for eight Classes of Claims against and/or Equity Interests in the Debtor.

**The projected recoveries set forth in the table below are estimates only and therefore are subject to change. For a complete description of the Debtor's classification and treatment of Claims or Equity Interests, reference should be made to the entire Plan and the risk factors described in ARTICLE IV below. For certain classes of Claims, the actual amount of Allowed Claims could be materially different than the estimated amounts shown in the table below.**

---

[4] This chart is only a summary of the classification and treatment of Claims and Equity Interests under the Plan. References should be made to the entire Disclosure Statement and the Plan for a complete description.

| Class | Type of Claim or Interest | Estimated Prepetition Claim Amount [1] | Impaired | Entitled to Vote | Estimated Recovery |
|---|---|---|---|---|---|
| 1 | Jefferies Secured Claim | $0.00 | No | No | 100% |
| 2 | Frontier Secured Claim[5][2] | $5,209,964 | Yes | Yes | 100% |
| 3 | Other Secured Claims | $551,116 | No | No | 100% |
| 4 | Priority Non-Tax Claim | $16,489 | No | No | 100% |
| 5 | Retained Employee Claim | $0 | No | No | 100% |
| 6 | PTO Claims [3] | Undetermined$1,181,886 | No | No | 100% |
| 7 | Convenience Claims[6] [4] | $7,607,91512,064,333 | Yes | Yes | 85.00% |
| 8 | General Unsecured Claims[7] [45] | $186,489,987180,442,199 | Yes | Yes | 91.87585.31% |
| 9 | Subordinated Claims | Undetermined | Yes | Yes | Undetermined |
| 10 | Class B/C Limited Partnership Interests | N/A | Yes | Yes | Undetermined |
| 11 | Class A Limited Partnership Interests | N/A | Yes | Yes | Undetermined |

[1] Excludes Priority Tax Claims and certain other unclassified amounts totaling approximately $1.1 million owed to Joshua and Jennifer Terry and Acis under a settlement agreement.

[2] Excludes interest accrued postpetition estimated at $253,000, which will be paid on the Effective Date. The Liquidation Analysis/Financial Projections provide for the payment of postpetition interest.

[3] Represents outstanding PTO Claims as of September 30, 2020. PTO Claims are subject to adjustment depending on the amount of actual prepetition PTO Claims outstanding as of the Effective Date. PTO claims are accounted for in the Liquidation Analysis/Financial Projections as an administrative claim and will be paid out in ordinary courses pursuant to applicable state law.

[4] Represents the estimated gross prepetition amount of Convenience Claims with a total payout amount estimated at 85% of $12.06 million, or $10.25 million. This number includes approximately $1.113 million of potential Rejection Claims and assumes that Holders of Allowed General Unsecured Claims that are each less than $2.50 million opt into the Convenience Class.

[5] Assumes no recovery for UBS, the HarbourVest Entities, IFA, Hunter Mountain, and an Allowed Claim of only $3,722,019 for Mr. Daugherty (each as discussed further below). Assumes $1.440 million of potential rejection damage claims. The Liquidation Analysis/Financial Projections assume Highland RCP, LP and Highland RCP Offshore, LP offset their Claim of $4.4 million against amounts owed to the Debtor.

   3.   Voting on the Plan

Under the Bankruptcy Code, acceptance of a plan by a Class of Claims or Equity Interests is determined by calculating the number and the amount of Claims voting to accept, based on the actual total Allowed Claims or Equity Interests voting on the Plan. Acceptance by a Class of Claims requires more than one-half of the number of total Allowed Claims in the Class to vote in

[5] Excludes interest accrued postpetition. The Financial Projections provide for the payment of postpetition interest.
[6] Excludes potential Rejection Claims, and assumes no General Unsecured Claims opt into the Convenience Class.
[7] Assumes no recovery for UBS, the HarbourVest Entities, IFA, Hunter Mountain, and Mr. Daugherty (each as discussed further below).

favor of the Plan and at least two-thirds in dollar amount of the total Allowed Claims in the Class to vote in favor of the Plan. Acceptance by a Class of Equity Interests requires at least two-thirds in amount of the total Allowed Equity Interests in the Class to vote in favor of the Plan.

Under the Bankruptcy Code, only Classes of Claims or Equity Interests that are "Impaired" and that are not deemed as a matter of law to have rejected a plan under Section 1126 of the Bankruptcy Code are entitled to vote to accept or reject the Plan. Any Class that is "Unimpaired" is not entitled to vote to accept or reject a plan and is conclusively presumed to have accepted the Plan. As set forth in Section 1124 of the Bankruptcy Code, a Class is "Impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that Class are modified or altered.

Pursuant to the Plan, Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims and Equity Interests in those Classes are entitled to vote to accept or reject the Plan. Whether a Holder of a Claim or Equity Interest in Class 2 and Class 7 through Class 11 may vote to accept or reject the Plan will also depend on whether the Holder held such Claim or Equity Interest as of [＿＿＿＿] (the "<u>Voting Record Date</u>"). The Voting Record Date and all of the Debtor's solicitation and voting procedures shall apply to all of the Debtor's Creditors and other parties in interest.

Pursuant to the Plan, Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

Pursuant to the Plan, there are no Classes that will not receive or retain any property and no Classes are deemed to reject the Plan.

4. <u>Confirmation of the Plan</u>

(a) Confirmation Generally

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of reorganization or liquidation. The timing, standards and factors considered by the Bankruptcy Court in deciding whether to confirm a plan of reorganization are discussed below.

The confirmation of a plan by the Bankruptcy Court binds the debtor, any issuer of securities under a plan, any person acquiring property under a plan, any creditor or equity interest holder of a debtor, and any other person or entity as may be ordered by the Bankruptcy Court in accordance with the applicable provisions of the Bankruptcy Code. Subject to certain limited exceptions, the order issued by the Bankruptcy Court confirming a plan discharges a debtor from any debt that arose before the confirmation of such plan and provides for the treatment of such debt in accordance with the terms of the confirmed plan.

(b) The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

The Debtor will provide notice of the Confirmation Hearing to all necessary parties. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing of any adjournment thereof.

5.      Confirming and Effectuating the Plan

It is a condition to the Effective Date of the Plan that the Bankruptcy Court shall have entered the Confirmation Order in form and substance reasonably acceptable to the Debtor and the Official Committee of Unsecured Creditors (the "Committee"). Certain other conditions contained in the Plan must be satisfied or waived pursuant to the provisions of the Plan.

6.      Rules of Interpretation

The following rules for interpretation and construction shall apply to this Disclosure Statement: (1) capitalized terms used in the Disclosure Statement and not otherwise defined shall have the meaning ascribed to such terms in the Plan; (2) unless otherwise specified, any reference in this Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document shall be a reference to such document in the particular form or substantially on such terms and conditions described; (3) unless otherwise specified, any reference in this Disclosure Statement to an existing document, schedule, or exhibit, whether or not filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (4) any reference to an entity as a Holder of a Claim or Equity Interest includes that Entity's successors and assigns; (5) unless otherwise specified, all references in this Disclosure Statement to Sections are references to Sections of this Disclosure Statement; (6) unless otherwise specified, all references in this Disclosure Statement to exhibits are references to exhibits in this Disclosure Statement; (7) unless otherwise set forth in this Disclosure Statement, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (8) any term used in capitalized form in this Disclosure Statement that is not otherwise defined in this Disclosure Statement or the Plan but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

7.      Distribution of Confirmation Hearing Notice and Solicitation Package to Holders of Claims and Equity Interests

As set forth above, Holders of Claims in Class 1 and Class 3 through Class 6 are not entitled to vote on the Plan. As a result, such parties will not receive solicitation packages or ballots but, instead, will receive this a notice of non-voting status, a notice of the Confirmation Hearing, and instructions on how to receive a copy of the Plan and Disclosure Statement.

The Debtor, with the approval of the Bankruptcy Court, has engaged Kurtzman Carson Consultants LLC (the "Voting Agent") to serve as the voting agent to process and tabulate Ballots for each Class entitled to vote on the Plan and to generally oversee the voting process. The following materials shall constitute the solicitation package (the "Solicitation Package"):

- This Disclosure Statement, including the Plan and all other Exhibits annexed thereto;

- The Bankruptcy Court order approving this Disclosure Statement (the "Disclosure Statement Order") (excluding exhibits);

- The notice of, among other things, (i) the date, time, and place of the hearing to consider Confirmation of the Plan and related matters and (ii) the deadline for filing objections to Confirmation of the Plan (the "Confirmation Hearing Notice");

- A single Ballot, to be used in voting to accept or to reject the Plan and applicable instructions with respect thereto (the "Voting Instructions");

- A pre-addressed, postage pre-paid return envelope; and

- Such other materials as the Bankruptcy Court may direct or approve.

The Debtor, through the Voting Agent, will distribute the Solicitation Package in accordance with the Disclosure Statement Order. The Solicitation Package is also available at the Debtor's restructuring website at www.kccllc.net/hcmlp.

Not less than one week prior to the Voting Deadline,On November 13, 2020, the Debtor intends to file ahas filed the Plan Supplement that includes, among other things, the form of Claimant Trust Agreement, the Litigation Sub-Trust Agreement, the Reorganized Limited Partnership Agreement, New GP LLC Documents, the New Frontier Note, the Senior Employee Stipulation, and the identity of the initial members of the Claimant Trust Oversight Committee. The Plan Supplement will also includeincludes a schedule of the Causes of Action that will be retained after the Effective Date. AsIf the Plan Supplement is supplemented, such supplemented documents will be made available on the Debtor's restructuring website at www.kccllc.net/hcmlp.

If you are the Holder of a Claim or Equity Interest and believe that you are entitled to vote on the Plan, but you did not receive a Ballot or your Ballot is damaged or illegible, or if you have any questions concerning voting procedures, you should contact the Voting Agent by writing to Kurtzman Carson Consultants LLC, via email at HighlandInfo@kccllc.com and reference "Highland Capital Management, L.P." in the subject line or by telephone at toll free: (877) 573-3984, or international: (310) 751-1829. If your Claim or Equity Interest is subject to a pending claim objection and you wish to vote on the Plan, you must file a motion pursuant to Bankruptcy Rule 3018 with the Bankruptcy Court for the temporary allowance of your Claim or Equity Interest for voting purposes or you will not be entitled to vote to accept or reject the Plan. Any such motion must be filed so that it is heard in sufficient time prior to the Voting Deadline to allow for your vote to be tabulated.

**THE DEBTOR, THE REORGANIZED DEBTOR, AND THE CLAIMANT TRUSTEE, AS APPLICABLE, RESERVE THE RIGHT THROUGH THE CLAIM OBJECTION PROCESS TO OBJECT TO OR SEEK TO DISALLOW ANY CLAIM OR EQUITY INTEREST FOR DISTRIBUTION PURPOSES.**

8.    <u>Instructions and Procedures for Voting</u>

All votes to accept or reject the Plan must be cast by using the Ballots enclosed with the Solicitation Packages or otherwise provided by the Debtor or the Voting Agent. No votes other than ones using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise. The Bankruptcy Court has fixed [_____] as the Voting Record Date for the determination of the Holders of Claims and Equity Interests who are entitled to (a) receive a copy of this Disclosure Statement and all of the related materials and (b) vote to accept or reject the Plan. The Voting Record Date and all of the Debtor's solicitation and voting procedures shall apply to all of the Debtor's Creditors and other parties in interest.

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying Ballot.

**The deadline to vote on the Plan is [_____] at 4:00 p.m. (prevailing Central Time) (the "<u>Voting Deadline</u>")**. In order for your vote to be counted, your Ballot must be properly completed in accordance with the Voting Instructions on the Ballot, and received no later than the Voting Deadline at the following address, as applicable:

**If by first class mail, personal delivery, or overnight mail to:**

**HCMLP Ballot Processing Center**
**c/o KCC**
**222 N. Pacific Coast Highway, Suite 300**
**El Segundo, CA 90245**

**If by electronic voting:**

**You may submit your Ballot via the Balloting Agent's online portal. Please visit http://www.kccllc.net/hcmlp and click on the "Submit Electronic Ballot" section of the website and follow the instructions to submit your Ballot. IMPORTANT NOTE: You will need the Unique Electronic Ballot ID Number and the Unique Electronic Ballot PIN Number set forth on your customized ballot in order to vote via the Balloting Agent's online portal. Each Electronic Ballot ID Number is to be used solely for voting on those Claims or Interests on your electronic ballot. You must complete and submit an electronic ballot for each Electronic Ballot ID Number you receive, as applicable. Parties who cast a Ballot using the Balloting Agent's online portal should NOT also submit a paper Ballot.**

Only the Holders of Claims and Equity Interests in Class 2 and Class 7 through Class 11 as of the Voting Record Date are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate Ballots and returning them in the envelope provided to the Voting Agent so as to be actually received by the Voting Agent by the Voting Deadline. Each Holder of a Claim and Equity Interest must vote its entire Claim or Equity Interest, as applicable, within a particular Class either to accept or reject the Plan and may not split such votes. If multiple Ballots are received from the same Holder with respect to the same Claim or Equity Interest prior

to the Voting Deadline, the last timely received, properly executed Ballot will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot.  The Ballots will clearly indicate the appropriate return address.  It is important to follow the specific instructions provided on each Ballot.

**ALL BALLOTS ARE ACCOMPANIED BY VOTING INSTRUCTIONS.  IT IS IMPORTANT THAT THE HOLDER OF A CLAIM OR EQUITY INTEREST IN THE CLASSES ENTITLED TO VOTE FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED WITH EACH BALLOT.**

If you have any questions about (a) the procedure for voting your Claim or Equity Interest, (b) the Solicitation Package that you have received, or (c) the amount of your Claim or Equity Interest, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any appendices or Exhibits to such documents, please contact the Voting Agent at the address specified above.  Copies of the Plan, Disclosure Statement and other documents filed in these Chapter 11 Case may be obtained free of charge on the Voting Agent's website at www.kccllc.net/hcmlp or by calling toll free at: (877) 573-3984, or international at: (310) 751-1829.  You may also obtain copies of pleadings filed in the Debtor's case for a fee via PACER at pacer.uscourts.gov.    Subject to any rules or procedures that have or may be implemented by the Court as a result of the COVID 19 Pandemic, documents filed in this case may be examined between the hours of 8:00 a.m. and 4:00 p.m., prevailing Central Time, Monday through Friday, at the Office of the Clerk of the Bankruptcy Court, Earle Cabell Federal Building, 1100 Commerce Street, Room 1254, Dallas, Texas 75242-1496.

The Voting Agent will process and tabulate Ballots for the Classes entitled to vote to accept or reject the Plan and will file a voting report (the "Voting Report") by [_____].  The Voting Report will, among other things, describe every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity, including, but not limited to, those Ballots that are late, illegible (in whole or in material part), unidentifiable, lacking signatures, lacking necessary information, or damaged.

**THE DEBTOR URGES HOLDERS OF CLAIMS AND EQUITY INTERESTS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO ACCEPT THE PLAN BY THE VOTING DEADLINE.**  ~~THE COMMITTEE URGES HOLDERS OF UNSECURED CLAIMS TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO REJECT THE PLAN BY THE VOTING DEADLINE.~~

9.    The Confirmation Hearing

**The Bankruptcy Court has scheduled Confirmation Hearing Dates on** ~~December 3 and December 4, 2020, at 9:30 a~~[_____], at [___] [_].**m. prevailing Central time.**  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtor without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code, prior to, during or as a result of the Confirmation Hearing, without further notice to parties-in-interest.

10.     The Deadline for Objecting to Confirmation of the Plan

**The Bankruptcy Court has set a deadline of [    ]at 4:00 p.m. prevailing Central time, for the filing of objections to confirmation of the Plan (the "Confirmation Objection Deadline")**. Any objection to confirmation of the Plan must: (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; (iii) state the name of the objecting party and the amount and nature of the Claim of such Entity or the amount of Equity Interests held by such Entity; (iv) state with particularity the legal and factual bases and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (v) be filed, contemporaneously with a proof of service, with the Bankruptcy Court and served so that it is **actually received** no later than the Confirmation Objection Deadline by the parties set forth below (the "Notice Parties").

**CONFIRMATION OBJECTIONS NOT TIMELY FILED AND SERVED IN THE MANNER SET FORTH HEREIN MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND MAY BE OVERRULED WITHOUT FURTHER NOTICE. INSTRUCTIONS WITH RESPECT TO THE CONFIRMATION HEARING AND DEADLINES WITH RESPECT TO CONFIRMATION WILL BE INCLUDED IN THE NOTICE OF CONFIRMATION HEARING APPROVED BY THE BANKRUPTCY COURT.**

11.     Notice Parties

- Debtor: Highland Capital Management, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201 (Attn: James P. Seery, Jr.);

- Counsel to the Debtor: Pachulski Stang Ziehl & Jones LLP, 10100 Santa Monica Boulevard, 13th Floor, Los Angeles, California 90067-4003 (Attn: Jeffrey Pomerantz, Esq.; Ira Kharasch, Esq., and Gregory Demo, Esq.);

- Counsel to the Committee: Sidley Austin, LLP, One South Dearborn, Chicago, Illinois 60603 (Attn: Matthew Clemente, Esq., and Alyssa Russell, Esq.); and

- Office of the United States Trustee, 1100 Commerce Street, Room 976, Dallas, Texas 75242 (Attn: Lisa Lambert, Esq.).

12.     Effect of Confirmation of the Plan

The Plan contains certain provisions relating to (a) the compromise and settlement of Claims and Equity Interests; (b) exculpation of certain parties; and (c) the release of claims against certain parties by the Debtor.

**The Plan shall bind all Holders of Claims against and Equity Interests in the Debtor to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder (i) will receive or retain any property or interest in property under the Plan, (ii) has filed a proof of claim in the Chapter 11 Case, or (iii) did not vote to accept or reject the Plan.**

D.    **Effectiveness of the Plan**

It will be a condition to the Effective Date of the Plan that all provisions, terms and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article IX of the Plan.  Following confirmation, the Plan will go into effect on the Effective Date.

E.    **RISK FACTORS**

**Each Holder of a Claim or an Equity Interest is urged to consider carefully all of the information in this Disclosure Statement, including the risk factors described in ARTICLE IV herein titled, "Risk Factors."**

**ARTICLE II.**
**BACKGROUND TO THE CHAPTER 11 CASE AND SUMMARY OF BANKRUPTCY PROCEEDINGS TO DATE**

A.    **Description and History of the Debtor's Business**

Prior to the Petition Date, the Debtor was a multibillion-dollar global alternative investment manager founded in 1993 by James Dondero and Mark Okada.  A pioneer in the leveraged loan market, the firm evolved over twenty-five years, building on its credit expertise and value-based approach to expand into other asset classes.

As of the Petition Date, the Debtor operated a diverse investment platform, serving both institutional and retail investors worldwide.  In addition to high-yield credit, the Debtor's investment capabilities include public equities, real estate, private equity and special situations, structured credit, and sector- and region-specific verticals built around specialized teams. Additionally, the Debtor provided shared services to its affiliated registered investment advisers.

B.    **The Debtor's Corporate Structure**

The Debtor is headquartered in Dallas, Texas.  The Debtor itself is a Delaware limited partnership and one of the principal operating arms of the Debtor's business.  As of the Petition Date, the Debtor employed approximately 76 people, including executive-level management employees, finance and legal staff, investment professionals, and back-office accounting and administrative personnel.

Pursuant to various contractual arrangements, the Debtor, as of the Petition Date, provided money management and advisory services for approximately $2.5 billion of assets under management shared services for approximately $7.5 billion of assets managed by a variety of affiliated and unaffiliated entities, including other affiliated registered investment advisors. None of these affiliates filed for Chapter 11 protection.  As of ~~June~~September 30, 2020, the Debtor provided money management and advisory services for approximately $~~1.725~~1.641 billion of assets under management and shared services for approximately $~~7.115~~7.136 billion of assets managed by a variety of affiliated and unaffiliated entities, including other affiliated registered investment advisors.  Further, on the Petition Date, the value of the Debtor's Assets

was approximately $566.5 million. As of ~~June~~September 30, 2020, the total value of Debtor's Assets totaled approximately $~~351.7~~328.3 million.

The drop in the value of the Debtor's Assets and assets under management was caused, in part, by the COVID-19 global pandemic ~~and the associated liquidation of Securities~~. Specifically, the decline was the result of, among other things, the drop in value of the Debtor's assets generally, the loss of value in the Prime Accounts discussed below, the professional and other costs associated with the Chapter 11 Case, and the reserve of approximately $59 million against a loan receivable listed as an asset.

| Asset | 10/16/2019 | 9/30/2020 |
|---|---|---|
| Investments (FV)[1] | $232,620,000 | $109,479,000 |
| Investments (Equity) | $161,819,000 | $101,213,000 |
| Cash/Cash Equivalents | $2,529,000 | $5,888,000 |
| Management/Incentive Fees Receivable | $2,579,000 | $3,350,000 |
| Fixed Assets, net | $3,754,000 | $2,823,000 |
| Loan Receivables | $151,901,000 | $93,445,000[2] |
| Other Assets | $11,311,000 | $12,105,000 |
| Totals | $566,513,000 | $328,302,000 |

[1] Includes decrease in value of assets, costs of Chapter 11 Cases, and assets sold to satisfy liabilities.

[2] Net of reserve of $59 million.

The Debtor's organizational chart is attached hereto as **Exhibit B**. The organizational chart is not all inclusive and certain entities have been excluded for the sake of brevity.

## C. Business Overview

The Debtor's primary means of generating revenue has historically been from fees collected for the management and advisory services provided to funds that it manages, plus fees generated for services provided to its affiliates. For additional liquidity, the Debtor, prior to the Petition Date, would sell liquid securities in the ordinary course held through its prime brokerage account at Jefferies, LLC ("Jefferies"), as described in additional detail below. The Debtor would also, from time to time, sell assets at non-Debtor subsidiaries and distribute those proceeds to the Debtor in the ordinary course of business. During calendar year 2018, the Debtor's stand-alone annual revenue totaled approximately $50 million. During calendar year 2019, the Debtor's stand-alone revenue totaled approximately $36.1 million.

**D.     Prepetition Capital Structure**

1.     Jefferies Margin Borrowings (Secured)

The Debtor is party to that certain *Prime Brokerage Customer Agreement* with Jefferies dated May 24, 2013 (the "Brokerage Agreement"). Pursuant to the terms of the Brokerage Agreement and related documents, the Debtor maintains a prime brokerage account with Jefferies (the "Prime Account"). A prime brokerage account is a unique type of brokerage account that allows sophisticated investors to, among other things, borrow both money on margin to purchase securities and common stock to facilitate short positions. A prime brokerage account also serves as a custodial account and holds client securities in the prime broker's street name.

As of the Petition Date, the Debtor held approximately $57 million of equity in the liquid and illiquid securities (the "Securities") in the Prime Account. Pursuant to the Brokerage Agreement, the Debtor granted a lien in favor of Jefferies in the Securities and all of the proceeds thereof.

However, because of the economic distress caused by the COVID-19 global pandemic, the value of the Securities held in the Prime Account dropped since the Petition Date, and Jefferies has exerted significant pressure on the Debtor to liquidate the Securities to satisfy margin calls. As of ~~June~~September 30, 2020, the equity value of the Securities in the Prime Account was approximately $~~26.5~~22.3 million, and the Debtor owed no amounts to Jefferies. The Debtor has been actively selling Securities to cover operating expenses and professional fees.

2.     The Frontier Bank Loan (Secured)

The Debtor and Frontier State Bank ("Frontier Bank") are parties to that certain *Loan Agreement* dated as of August 17, 2015 (the "Original Frontier Loan Agreement"), pursuant to which Frontier Bank loaned to the Debtor the aggregate principal amount of $9.5 million. On March 29, 2018, the Debtor and Frontier Bank entered into that certain First Amended and Restated Loan Agreement (the "Amended Frontier Loan Agreement"), amending and superseding the Original Frontier Loan Agreement. Pursuant to the Amended Frontier Loan Agreement, Frontier Bank made an additional $1 million loan to the Debtor (together with the borrowings under the Original Frontier Loan Agreement, the "Frontier Loan"). The Frontier Loan matures on August 17, 2021.

Pursuant to that certain Security and Pledge Agreement dated August 17, 2015, between Frontier Bank and the Debtor, as amended by the Amended Frontier Loan Agreement, the Debtor's obligations under the Frontier Loan are secured by 171,724 shares of voting common stock of MGM Holdings, Inc. (collectively, the "Frontier Collateral").

The aggregate principal balance of the Frontier Loan was approximately $5.2 million. As of ~~June~~September 30, 2020, the value of the Frontier Collateral was approximately $~~14.1~~13.1 million, and approximately $~~235,000~~300,000 in postpetition interest had accrued.

- 19 -

3.    Other Unsecured Obligations

As discussed below, the Plan provides for four Classes of unsecured claims: (i) PTO Claims, (ii) the Convenience Claims, (iii) the General Unsecured Claims, and (iv) the Subordinated Claims.

The Debtor has various substantial litigation claims asserted against it, which have been classified as General Unsecured Claims. In addition, as of the Petition Date, the Debtor had ordinary course trade debt, unaccrued employee bonus obligations and loan repayment, and contractual commitments to various affiliated and unaffiliated non-Debtor entities for capital calls, contributions, and other potential reimbursement or funding obligations that were potentially in the tens of millions of dollars. The Debtor is still assessing these claims and its liability for such amounts. These Claims have been classified as Convenience Claims and Subordinated Claims.

~~Based on the Schedules (as defined below) and the proofs of claim that have been filed, the Debtor estimates that non-subordinated, unsecured Claims against the Debtor, including claims filed by certain Related Entities and affiliates but excluding claims filed by Acis, UBS, the Redeemer Committee, Patrick Daugherty, Integrated Financial Associates, Inc. ("IFA"), Hunter Mountain, and the HarbourVest Entities[8] should total approximately $29.6 million. This estimate, however, does not account for any additional General Unsecured Claims against the Debtor arising from the rejection of executory contracts and leases pursuant to the Plan. Further, the Debtor anticipates that the Claimant Trustee or the Reorganized Debtor, as applicable, will object to a number of the filed proofs of claim. Thus, the total amount of Allowed unsecured Claims may vary substantially from the estimates set forth herein.~~

4.    Equity Interests

The Debtor is a Delaware limited partnership. As of the Petition Date, the Debtor had three classes of limited partnership interest (Class A, Class B, and Class C). The Class A interests were held by The Dugaboy Investment Trust, Mark Okada, personally and through family trusts, and Strand, the Debtor's general partner. The Class B and C interests were held by Hunter Mountain.

In the aggregate, the Debtor's limited partnership interests were held: (a) 99.5% by Hunter Mountain; (b) 0.1866% by The Dugaboy Investment Trust, (c) 0.0627% by Mark Okada, personally and through family trusts, and (d) 0.25% by Strand.

**E.    SEC Filings**

The Debtor is an investment adviser registered with the SEC as required by the Investment Advisers Act of 1940. As a registered investment adviser, the Debtor is required to file (at least annually) a Form ADV. The Debtor's current Form ADV is available at https://adviserinfo.sec.gov/.

---

[8] ~~"HarbourVest Entities" means HarbourVest 2017 Global Fund, L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment, L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners, L.P.~~

- 20 -

Following the Effective Date, it is anticipated that the Reorganized Debtor will maintain its registration with the SEC as a registered investment adviser.

**F.      Events Leading Up to the Debtor's Bankruptcy Filings**

The Chapter 11 Case was precipitated by the rendering of an Arbitration Award (as that term is defined below) against the Debtor on May 9, 2019, by a panel of the American Arbitration Association (the "Panel"), in favor of the Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee").

The Debtor was formerly the investment manager for the Highland Crusader Funds (the "Crusader Funds") that were formed between 2000 and 2002. In September and October 2008, as the financial markets in the United States began to fail, the Debtor was flooded with redemption requests from Crusader Funds' investors, as the Crusader Funds' assets lost significant value.

On October 15, 2008, the Debtor placed the Crusader Funds in wind-down, thereby compulsorily redeeming the Crusader Funds' limited partnership interests. The Debtor also declared that it would liquidate the Crusader Funds' remaining assets and distribute the proceeds to investors.

However, disputes concerning the distribution of the assets arose among certain investors. After several years of negotiations, a Joint Plan of Distribution of the Crusader Funds (the "Crusader Plan"), and the Scheme of Arrangement between Highland Crusader Fund and its Scheme Creditors (the "Crusader Scheme"), were adopted in Bermuda and became effective in August 2011. As part of the Crusader Plan and the Crusader Scheme, the Redeemer Committee was elected from among the Crusader Funds' investors to oversee the Debtor's management of the Crusader Funds.

Between October 2011 and January 2013, in accordance with the Crusader Plan and the Crusader Scheme, the Debtor distributed in excess of $1.2 billion to the Crusader Funds' investors. The Debtor distributed a further $315.3 million through June 2016.

However, disputes subsequently arose between the Redeemer Committee and the Debtor. On July 5, 2016, the Redeemer Committee (a) terminated and replaced the Debtor as investment manager of the Crusader Fund, (b) commenced an arbitration against the Debtor (the "Arbitration"), and (c) commenced litigation in Delaware Chancery Court, to, among other things, obtain a status quo order in aid of the arbitration, which order was subsequently entered.

Following an evidentiary hearing, the Panel issued (a) a *Partial Final Award,* dated March 6, 2019 (the "March Award"), (b) a *Disposition of Application for Modification of Award,* dated March 14, 2019 (the "Modification Award"), and (c) a *Final Award,* dated May 9, 2019 (the "Final Award" and together with the March Award and the Modification Award, the "Arbitration Award"). Pursuant to the Arbitration Award, the Redeemer Committee was awarded gross damages against the Debtor in the aggregate amount of $136,808,302; as of the Petition Date, the total value of the Arbitration Award was $190,824,557, inclusive of interest

Prior to the Petition Date, the Redeemer Committee moved in the Chancery Court to confirm the Arbitration Award. For its part, the Debtor moved to vacate parts of the Final Award contending that certain aspects were procedurally improper. The Redeemer Committee's motion to confirm the Arbitration Award and the Debtor's motion to vacate were fully briefed and were scheduled to be heard by the Chancery Court on the day the Debtor filed for bankruptcy

On the Petition Date, the Debtor believed that the aggregate value of its assets exceeded the amount of its liabilities; however, the Debtor filed the Chapter 11 Case because it did not have sufficient liquidity to immediately satisfy the Award or post a supersedeas bond necessary to pursue an appeal.

## G. Additional Prepetition Litigation

In addition to the litigation with the Redeemer Committee described above, the Debtor, both directly and through certain subsidiaries, affiliates, and related entities, was party to substantial prepetition litigation. Although the Debtor disputes the allegations raised in this litigation and believes it has substantial defenses, this litigation has resulted in substantial Claims against the Debtor's Estate, each of which has been classified as a General Unsecured Claim. To the extent that these litigation Claims cannot be resolved consensually, they will be litigated by the Claimant Trustee or Reorganized Debtor, as applicable. The Debtor's major prepetition litigation is as follows:

- <u>Redeemer Committee</u>:  The dispute with the Redeemer Committee is described in ARTICLE II.F above.  As discussed in ARTICLE II.R, the ~~Debtor and the Redeemer Committee have reached~~<u>Bankruptcy Court entered an order approving</u> a settlement~~, which~~ <u>that</u> resolves the Redeemer Committee's claims against the Estate<u>; however, that order is currently subject to appeal</u>.

- <u>Acis Capital Management, L.P., & Acis Capital Management GP, LLC</u>:  On January 30, 2018, Joshua Terry filed involuntary bankruptcy petitions against both Acis Capital Management, L.P. ("<u>Acis LP</u>") and its general partner, Acis Capital Management GP, LLC ("<u>Acis GP</u>," and collectively with Acis LP, "<u>Acis</u>") in the Bankruptcy Court for the Northern District of Texas, Dallas Division, the Honorable Judge Jernigan presiding (the same judge presiding over the Chapter 11 Case), Case No. 18-30264-SGJ (the "<u>Acis Case</u>").  Mr. Terry had been an employee of the Debtor and a limited partner of Acis LP.  Mr. Terry was terminated in June 2016, and obtained a multi-million dollar arbitration award against Acis.  Overruling various objections, the Bankruptcy Court entered the orders for relief for the Acis debtors in April 2018, and a chapter 11 trustee was appointed.  The Debtor filed a proof of claim against Acis and an administrative claim.  Acis disputes the Debtor's claim, and the Debtor has not received any distributions on its claim to date.  On January 31, 2019, Acis's chapter 11 plan was confirmed, and Mr. Terry become the sole owner of reorganized Acis.  Several appeals remain pending, including an appeal of the entry of the Acis orders for relief and the Acis confirmation order.

The Acis trustee commenced a lawsuit against the Debtor, among others, alleging fraudulent conveyance and other causes of action in relation to the Debtor's alleged prepetition effort to control and transfer away Acis's assets to avoid paying Mr. Terry's claim. After the confirmation of the Acis plan, reorganized Acis allegedly supplanted the Acis Trustee as plaintiff and filed an amended complaint against the Debtor and other defendants, which claims comprise Acis's pending proof of claim against the Debtor.

As discussed in ARTICLE II.R, the ~~Debtor and Acis have reached~~Bankruptcy Court entered an order approving a settlement~~, which~~ that resolves Acis's claims against the Estate; however, that order is currently subject to appeal.

- UBS Securities LLC and UBS AG London Branch: UBS Securities LLC ("UBS Securities") filed a proof of claim in the amount of $1,039,957,799.40 [Claim No. 190] (the "UBS Securities Claim"), and UBS AG, London Branch ("UBS London," and together with UBS Securities, "UBS") filed a substantively identical proof of claim in the amount of $1,039,957,799.40 [Claim No. 191] (the "UBS London Claim" and together with the UBS Securities Claim, the "UBS Claim"). The UBS Claim was based on the amount of a judgment UBS received on a breach of contract claim against funds related to the Debtor that were unable to honor margin calls in 2008. Although the Debtor had no obligation under UBS's contracts with the funds, UBS alleges the Debtor is liable for the judgment because it (i) breached an alleged duty to ensure that the funds could pay UBS, (ii) caused or permitted $233 million in alleged fraudulent transfers to be made by Highland Financial Partners, L.P. ("HFP") in March 2009, and (iii) is an alter ego of the funds. The Debtor believes there are meritorious defenses to most, if not all, of the UBS Claim for numerous reasons, including: (i) decisions by the New York Appellate Division that limited UBS's claims to the March 2009 transfers that it alleges were fraudulent; (ii) those decisions should also apply to any alter ego claim (which at this time has not been formally asserted against the Debtor); (iii) UBS settled claims relating to $172 million of the $233 million in alleged fraudulent transfers and the Debtor is covered by the release; and (iv) the March 2009 transfers were in any event part of a wholly legitimate transaction that did not target UBS and for which HFP received fair consideration. Those and several additional defenses are described in the *Debtor's Objection to Proofs of Claim 190 and 191 of UBS Securities LLC and UBS AG, London Branch* [D.I. 928].

On October 19, 2020, both the Debtor and the Redeemer Committee filed motions seeking partial summary judgment of the UBS Claim, which, if granted, will significantly decrease the UBS Claim.[95] UBS responded to these motions on

---

[95] See *Debtor's Motion for Partial Summary Judgment on Proof of Claim Nos. 190 and 191 of UBS Securities LLC and UBS AG, London Branch* [D.I. 1180]; *Debtor's Opening Brief in Support of Motion for Partial Summary Judgment on Proof of Claim Nos. 190 and 191 of UBS Securities LLC and UBS AG, London Branch* [D.I. 1181]; *Redeemer Committee of the Highland Crusader Fund and the Crusaders Funds' Motion for Partial Summary Judgment on Proof of Claim Nos. 190 and 191 of UBS AG, London Branch and UBS Securities LLC* [D.I. 1183]; and *Redeemer Committee of the Highland Crusader Fund and the Crusaders Funds' Brief in Support of Motion for Partial Summary Judgment and Joinder in the Debtor's Motion for Partial Summary Judgment on Proof of Claim No. 190 and 191 of UBS AG, London Branch and UBS Securities LLC* [D.I. 1186].

November 6, 2020 [D.I. 1341]. On November 20, 2020, the Bankruptcy Court granted partial summary judgment in favor of the Debtor and the Redeemer Committee. It is anticipated that the Bankruptcy Court will enter a formal order within the next couple of weeks.

- **Patrick Daugherty**: Patrick Daugherty has Filed a Proof of Claim for "at least $37,483,876.62" [Claim Nos. 67; 77] (the "Daugherty Claim").[6] Mr. Daugherty is a former limited partner and employee of the Debtor. The Daugherty Claim has three components, and Mr. Daugherty asserts claims: (1) for indemnification for any taxes Mr. Daugherty is required to pay as a result of the IRS audit of the Debtor's 2008-2009 tax return; (2) for defamation arising from a 2017 press release posted by the Debtor; and (3) arising from a pending Delaware lawsuit against the Debtor, which seeks to recover a judgment of $2.6 million in respect of Highland Employee Retention Assets ("HERA"), plus interest, from assets Mr. Daugherty claims were fraudulently transferred to the Debtor. The Daugherty Claim also seeks (a) the value of Mr. Daugherty's asserted interest in HERA, which he values at approximately $26 million; and (b) indemnification for fees incurred in the Delaware action and in previous litigation in Texas State Court. The Debtor believes that the Daugherty Claim should be allowed in the amount of $3,722,019; however, the Debtor believes, for various reasons, that the balance of the Daugherty Claim lacks merit. The Debtor's defenses to the Daugherty Claim are described in the *Debtor's (i) Objection to Claim No. 77 of Patrick Hagaman Daugherty and (ii) Complaint to Subordinate Claim of Patrick Hagaman Daugherty* [D.I. 1008].

## H. The Debtor's Bankruptcy Proceeding

On October 16, 2019, the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court"). On December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Chapter 11 Case to the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court").[107] The Debtor continues to operate its business and manage its properties as debtor-in-possession under the jurisdiction of the Bankruptcy Court and in accordance with the applicable provisions of the Bankruptcy Code and orders of the Bankruptcy Court.

An immediate effect of commencement of the Chapter 11 Case was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts, the enforcement of liens against property of the Debtor, and the continuation of litigation against the Debtor during the pendency of the Chapter 11 Case. The automatic stay will remain in effect, unless modified by the Bankruptcy

---

[6] On October 23, 2020, Mr. Daugherty filed *Patrick Hagaman Daugherty's Motion for Leave to Amend Proof of Claim No. 77* [D.I. 1280] pursuant to which Mr. Daugherty has asked leave to amend the Daugherty Claim to assert damages of $40,710,819.42. On November 17, 2020, the Bankruptcy Court approved Mr. Daugherty's request to amend the Daugherty Claim from the bench.

[107] All docket reference numbers refer to the docket maintained by the Bankruptcy Court.

Court, until the later of the Effective Date and the date indicated in any order providing for the implementation of such stay or injunction.

## I.    First Day Relief

On or about the Petition Date, the Debtor filed certain "first day" motions and applications (the "First Day Motions") with the Delaware Bankruptcy Court seeking certain immediate relief to aid in the efficient administration of this Chapter 11 Case and to facilitate the Debtor's transition to debtor-in-possession status. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Frank Waterhouse in Support of First Day Motions* [D.I. 11] (the "First Day Declaration"). At a hearing on October 19, 2019, the Delaware Bankruptcy Court granted virtually all of the relief initially requested in the First Day Motions [D.I. 39, 40, 42-44].

The Delaware Bankruptcy Court subsequently entered an order authorizing the Debtor to pay critical vendor claims on a final basis [D.I. 168]. Following the transfer of the Chapter 11 Case to the Bankruptcy Court, the Bankruptcy Court entered an order authorizing the Debtor to continue its cash management system on a final basis [~~Docket No~~D.I. 379]

The First Day Motions, the First Day Declaration, and all orders for relief granted in this case can be viewed free of charge at https://www.kccllc.net/hcmlp.

## J.    Other Procedural and Administrative Motions

On and after the Petition Date, the Debtor also filed a number of motions and applications to retain professionals and to streamline the administration of the Chapter 11 Case, including:

- Interim Compensation Motion. On October 29, 2019, the Debtor filed the *Debtor's Motion Pursuant o Sections 105(a), 330 and 331 of the Bankruptcy Code for Administrative Order Establishing Procedures for Interim Compensation and Reimbursement of Expenses of Professionals* [D.I. 72] (the "Interim Compensation Motion"). The Interim Compensation Motion sought to establish procedures for the allowance and payment of compensation and reimbursement of expenses for attorneys and other professionals whose retentions are approved by the Bankruptcy Court pursuant to section 327 or 1103 of the Bankruptcy Code and who will be required to file applications for allowance of compensation and reimbursement of expenses pursuant to section 330 and 331 of the Bankruptcy Code. On November 14, 2019, the Delaware Bankruptcy Court entered an order granting the Interim Compensation Motion [D.I. 141].

- Ordinary Course Professionals. On October 29, 2019, the Debtor filed the Motion of the Debtor for an Order Authorizing the Debtor to Retain, Employ, and Compensate Certain Professionals Utilized by the Debtor in the Ordinary Course of Business [D.I. 75] (the "OCP Motion"). The OCP Motion sought authority for the Debtor to retain and compensate certain professionals in the ordinary course of its business. On November 26, 2019, the Delaware Bankruptcy Court entered an order granting the OCP Motion [D.I. 176].

- <u>Retention Applications</u>. During the course of the chapter 11 case, the Delaware Bankruptcy Court or Bankruptcy Court, as applicable, have approved a number of applications by the Debtor seeking to retain certain professionals pursuant to sections 327, 328 and/or 363 of the Bankruptcy Code, including Pachulski Stang Ziehl & Jones LLP as legal counsel [D.I. 183], Development Specialists, Inc. as chief restructuring officer and financial advisor [D.I. 342], Kurtzman Carson Consultants LLC as administrative advisor [D.I. 74], Mercer (US) Inc. as compensation consultant [D.I. 381], Hayward & Associates PLLC as local counsel [D.I. 435], Foley Gardere, Foley & Lardner LLP as special Texas counsel [D.I. 513], Deloitte Tax LLP as tax services provider [D.I. 551], Wilmer Cutler Pickering Hale and Dorr LLP as regulatory and compliance counsel [D.I. 669], and Hunton Andrews Kurth LLP as special tax counsel [D.I. 763].

## K.    United States Trustee

While the Chapter 11 Case was pending in the Delaware Bankruptcy Court, the U.S. Trustee for Region 3 appointed Jane Leamy as the attorney for the U.S. Trustee in connection with this Chapter 11 Case (the "<u>Delaware U.S. Trustee</u>"). Following the transfer of the Chapter 11 Case to the Bankruptcy Court, the Delaware U.S. Trustee no longer represented the U.S. Trustee, and the U.S. Trustee for Region 6 appointed Lisa Lambert as the attorney for the U.S. Trustee in connection with this Chapter 11 Case (the "<u>Texas U.S. Trustee</u>," and together with the Delaware U.S. Trustee, the "<u>U.S. Trustee</u>"). The Debtor has worked cooperatively to address concerns and comments from the U.S. Trustee's office during this Chapter 11 Case.

## L.    Appointment of Committee

On October 29, 2019, the Delaware U.S. Trustee appointed the Committee in this Chapter 11 Case [D.I. 65]. The members of the Committee are (a) Redeemer Committee of Highland Crusader Fund, (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch, and (d) Acis Capital Management, L.P. and Acis Capital Management GP, LLP. Meta-E Discovery is a vendor to the Debtor. The other members of the Committee are litigants in prepetition litigation with the Debtor as described in ARTICLE II.G. The Bankruptcy Court approved the retention of Sidley Austin LLP as counsel to the Committee [D.I. 334], Young Conaway Stargatt & Taylor, LLP as Delaware co-counsel to the Committee [D.I. 337], and FTI Consulting, Inc. as financial advisor to the Committee [D.I. 336].

## M.    Meeting of Creditors

The meeting of creditors under section 341(a) of the Bankruptcy Code was initially scheduled for November 20, 2019, at 9:30 a.m. (prevailing Eastern Time) at the J. Caleb Boggs Federal Building, 844 N. King Street, Room 3209, Wilmington, Delaware 19801, and was rescheduled to December 3, 2019, at 10:30 a.m. (prevailing Eastern Time). At the meeting of creditors, the Delaware U.S. Trustee and creditors asked questions of a representative of the Debtor.

Following the transfer of the Chapter 11 Case to the Bankruptcy Court, the Texas U.S. Trustee scheduled an additional meeting of creditors under section 341(a) for January 9, 2020, at 11:00 a.m. (prevailing Central Time) at the Office of the U.S. Trustee, 1100 Commerce Street,

Room 976, Dallas, Texas 75242, at the conclusion of that meeting, the Texas U.S. Trustee continued the meeting to January 22, 2020. The Texas U.S. Trustee and creditors asked questions of a representative of the Debtor at the January 9 and January 22, 2020 meetings.

## N. Schedules, Statements of Financial Affairs, and Claims Bar Date

The Debtor filed its Schedules of Assets and Liabilities and Statements of Financial Affairs (the "Schedules") on December 19, 2019 [D.I. 247-248]. A creditor whose Claim is set forth in the Schedules and not identified as contingent, unliquidated or disputed may have elected to file a proof of claim against the Debtor.

The Bankruptcy Court established (i) April 8, 2020 as the deadline for Creditors (other than governmental units) to file proofs of claim against the Debtor; (ii) April 13, 2020, as the deadline for any governmental unit (as such term is defined in section 101(27) of the Bankruptcy Code), (iii) April 23, 2020, and as the deadline for any investors in any fund managed by the Debtor to file proofs of claim against the Debtor; and (iv) May 26, 2020 as the deadline for the Debtor's employees to file proofs of claim against the Debtor pursuant to and accordance with Court's order entered on April 3, 2020 [D.I. 560].[118] Consequently, the bar date for filing proofs of claims has passed and any claims filed after the applicable bar date will be considered late filed.

## O. Governance Settlement with the Committee

On January 9, 2020, the Bankruptcy Court entered the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [D.I. 339] (the "Settlement Order").

Among other things, the Settlement Order approved a term sheet (the "Term Sheet") agreed to by the Debtor and the Committee pursuant to which the Debtor agreed to abide by certain protocols governing the production of documents and certain protocols governing the operation of the Debtor's business (the "Operating Protocols"). Under the Operating Protocols, the Debtor agreed to seek consent from the Committee prior to entering into certain "Transactions" (as defined in the Operating Protocols. The Operating Protocols were amended on February 21, 2020, with the consent of the Committee [D.I. 466].

Pursuant to the Term Sheet, the Debtor also granted the Committee standing to pursue certain estate claims and causes of action against Mr. Dondero, Mr. Okada, other insiders of the Debtor, and the Related Entities (as defined in the Operating Protocols) (collectively, the "Estate Claims"). To the extent permitted, the Estate Claims and the ability to pursue the Estate Claims are being transferred to either the Claimant Trust or Litigation Sub-Trust pursuant to the Plan.

In connection with the Settlement Order, an independent board of directors was also appointed at Strand, the Debtor's general partner (the "Independent Board"). The members of the Independent Board are John S. Dubel, James P. Seery, Jr., and Russell Nelms. The Independent Board was tasked with managing the Debtor's operations during the Chapter 11 Case and facilitating a reorganization or orderly liquidation of the Debtor's Estate.

---

[118] During the course of its Chapter 11 Case, the Debtor entered into stipulations to extend the Bar Date for certain other claimants or potential claimants.

**P.     Appointment of James P. Seery, Jr., as Chief Executive Officer and Chief Restructuring Officer**

Following their appointment in January 2020, the Independent Board determined that it would be more efficient for the Debtor to have a traditional corporate management structure, i.e. a fully engaged chief executive officer supervised by the Independent Board.  The Independent Board ultimately determined that Mr. Seery – a member of the Independent Board – had the requisite experience and expertise to lead the Debtor.  On June 23, 2020, the Debtor filed *Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc to March 15, 2020* [D.I. 774] (the "Seery Retention Motion") to retain Mr. Seery as chief executive officer, chief restructuring officer, and foreign representative.

The Bankruptcy Court entered an order approving the Seery Retention Motion on July 16, 2020 [D.I. 854].  Mr. Seery was retained as the Debtor's chief executive officer and the duties of Bradley Sharp of DSI as the Debtor's chief restructuring officer and foreign representative were transferred to Mr. Seery.

**Q.     Mediation**

On August 3, 2020, the Bankruptcy Court entered the *Order Directing Mediation* [D.I. 912] pursuant to which the Bankruptcy Court ordered the Debtor, the Committee, UBS, Acis, the Redeemer Committee, and Mr. Dondero into mediation and appointed Sylvia Mayer and Allan Gropper as the mediators (the "Mediators").  The mediation began on August 27, 2020, and is still open as of the date of this Disclosure Statement

**R.     Postpetition Settlements**

1.     Settlement with Acis and the Terry Parties

With the assistance of the Mediators, on September 9, 2020, (i) the Debtor, (ii) Acis LP, (iii) Acis GP, and (iv) Joshua N. Terry, individually and for the benefit of his individual retirement accounts, and Jennifer G. Terry, individually and for the benefit of her individual retirement accounts and as trustee of the Terry Family 401-K Plan (together, the "Terry Parties") executed that certain Settlement Agreement and General Release.  On September 23, 2020, the Debtor filed *Debtor's Motion for Entry of an Order Approving Settlement with (a) Acis Capital Management, L.P. and Acis Capital Management GP LLC (Claim No. 23), (b) Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and (c) Acis Capital Management, L.P. (Claim No. 159) and Authorizing Actions Consistent Therewith* [D.I. 1087] (the "Acis Settlement Motion").  ~~The Acis Settlement Motion was approved from the bench on October 21, 2020, and fully resolved Acis's and the Terry Parties' claims against the Estate and granted, with certain material exceptions, mutual releases to the Debtor, Acis, and the Terry Parties, among others.  It is anticipated that a signed order will be entered shortly.~~

The Settlement Agreement and General Release contain the following material terms, among others:

- The proof of claim filed by Acis [Claim No. 23] will be Allowed in the amount of $23,000,000 as a General Unsecured Claim.

- On the Effective Date of the Plan (or any other plan of reorganization confirmed by the Bankruptcy Court), the Debtor will pay in cash to:

  o Mr. and Mrs. Terry in the amount of $425,000 plus 10% simple interest (calculated on the basis of a 360-day year from and including June 30, 2016), in full and complete satisfaction of the proof of claim filed by the Terry Parties [Claim No. 156];

  o Acis LP in the amount of $97,000, which amount represents the legal fees incurred by Acis LP with respect to the N*WCC, LLC v. Highland CLO Management, LLC, et al.*, Index No. 654195/2018 (N.Y. Sup. Ct. 2018), in full and complete satisfaction of the proof of claim filed by Acis LP [Claim No. 159]; and

  o Mr. Terry in the amount of $355,000 in full and complete satisfaction of the legal fees assessed against Highland CLO Funding, Ltd., in *Highland CLO Funding v. Joshua Terry*, [No Case Number], pending in the Royal Court of the Island of Guernsey;

The Settlement Agreement also provides that within five days of the Bankruptcy Court's approval of the Settlement Agreement and the General Release, the Debtor will move to withdraw, with prejudice, the proofs of claim that the Debtor filed in the Acis bankruptcy cases and the motion filed by the Debtor in the Acis bankruptcy cases seeking an administrative claim for postpetition services provided to Acis.

On October 5, 2020, James Dondero filed an objection to the Acis Settlement Motion [D.I. 1121] (the "Dondero Objection"). On October 28, 2020, the Bankruptcy Court entered an order approving the Acis Settlement Motion and overruling the Dondero Objection in its entirety [D.I. 1347]. On November 9, 2020, Mr. Dondero filed a notice of his intent to appeal the order approving the Acis Settlement Motion.

The foregoing is a summary only, and all parties are encouraged to review the Acis Settlement Motion and related documents for additional information on the Settlement Agreement and General Release.

2.    Settlement with the Redeemer Committee

The Debtor, Eames, Ltd., the Redeemer Committee, and the Crusader Funds (collectively, the "Settling Parties") executed a settlement (the "Redeemer Stipulation"). The Redeemer Stipulation was also executed, solely with respect to paragraphs 10 through 15 thereof, by Hockney, Ltd., Strand, Highland CDO Opportunity Master Fund, L.P., Highland Credit Strategies Master Fund, L.P., Highland Credit Opportunities CDO, L.P., House Hanover, LLC, and Alvarez & Marsal CRF Management, LLC (collectively, the "Additional Release Parties"). On September 23, 2020, the Debtor filed *Debtor's Motion for Entry of an Order Approving Settlements with (A) the Redeemer Committee of the Highland Crusader Funds (Claim No. 72),*

*and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* [D.I. 1089] seeking approval of the Redeemer Stipulation (the "Redeemer Settlement Motion"). ~~The Redeemer Settlement Motion was approved by the Bankruptcy Court [D.I. 1273] and fully resolved the Redeemer Committee and Crusader Funds' claims against the Estate.~~

The Redeemer Stipulation contains the following material terms, among others:

- The proof of claim filed by the Redeemer Committee [Claim No. 72] will be Allowed in the amount of $136,696,610 as a General Unsecured Claim;

- The proof of claim filed by the Crusader Funds [Claim No. 81] will be Allowed in the amount of $50,000 as a General Unsecured Claim;

- The Debtor and Eames, Ltd., each (a) consented to the cancellation of certain interests in the Crusader Funds held by them, and (b) agreed that they will not object to the cancellation of certain interests in the Crusader Funds held by the Charitable Donor Advised Fund;4

- The Debtor and Eames each acknowledged that they will not receive any portion of certain reserved distributions, and the Debtor further acknowledged that it will not receive any payments from the Crusader Funds in respect of any deferred fees, distribution fees, or management fees;

- The Debtor and the Redeemer Committee agreed to a form of amendment to the shareholders' agreement for Cornerstone Healthcare Group and to a process to monetize Cornerstone Healthcare Group;

- Upon the effective date of the Redeemer Stipulation, the Settling Parties and the Additional Release Parties shall exchange releases as set forth in the Redeemer Stipulation; and

- All litigation between the Debtor, Eames, Ltd., and the Additional Highland Release Parties (as defined in the Redeemer Stipulation) on the one hand, and the Redeemer Committee and the Crusader Funds, on the other hand, will cease.

On October 16, 2020, UBS filed an objection to the Redeemer Settlement Motion [D.I. 1190] (the "UBS Objection"). On October 22, 2020, the Bankruptcy Court entered an order approving the Redeemer Settlement Motion and overruling the UBS Objection in its entirety [D.I. 1273]. On November 6, 2020, UBS filed a notice of its intent to appeal the order approving the Redeemer Settlement Motion.

The foregoing is a summary only, and all parties are encouraged to review the Redeemer Settlement Motion and related documents for additional information on the Redeemer Stipulation.

S. **Certain Outstanding Material Claims**

As discussed above, April 8, 2020, was the general bar date for filing proofs of claim. The Debtor has begun the process of resolving those Claims. Although each Claim represents a potential liability of the Estate, the Debtor believes that, in addition to UBS's Claim, the Claims filed by ~~IFA~~Integrated Financial Associates, Inc. ("IFA"), the HarbourVest Entities,[9] and Hunter Mountain represent the largest unresolved Claims against the Estate.

- IFA Proof of Claim. IFA filed a proof of claim [Claim No. 93] (the "IFA Claim") seeking damages in the amount of $241,002,696.73 arising from the purported joint control of the Debtor and NexBank, SSB, and the Debtor's management of various lenders to IFA. The Debtor believes that IFA's claim should be disallowed in its entirety. IFA's claim and the Debtor's defenses thereto are described in greater detail in the *Objection to Proof of Claim No. 93 of Integrated Financial Associates, Inc.* [D.I. 868]. On October 4, 2020, the Bankruptcy Court entered the *Order Approving Stipulation Regarding Proof of Claim No. 93 of Integrated Financial Associates, Inc.* [D.I. 1126], which capped the IFA Claim, for all purposes, at $8,000,000.

- HarbourVest Entities Proofs of Claim. The HarbourVest Entities are investors in Highland CLO Funding, Ltd. ("HCLOF") and filed proofs of claim against the Debtor's Estate [Claim No. 143, 147, 149, 150, 153, 154] (the "HarbourVest Claims"). The Debtor included an assertion of "no liability" in respect of the HarbourVest Claims in its Debtor's *First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No-Liability Claims; and (f) Insufficient Documentation Claims* [D.I. 906]. HarbourVest provided a response in its *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [D.I. 1057]. The HarbourVest Entities' response argued that the Debtor's objection should be overruled, and set forth allegations in support of claims under federal and state law and Guernsey law, including claims for fraud, violations of securities laws, breaches of fiduciary duties, and RICO violations. The Debtor intends to vigorously defend the HarbourVest Claims on various grounds, including, among others, the failure to state a claim upon which relief can be granted, the lack of reasonable reliance, the lack of misrepresentations, the lack of reasonable reliance, the failure to mitigate damages, the parties' agreements bar or otherwise limit the Debtor's liability, and waiver and estoppel. The HarbourVest Entities invested approximately $80 million in HCLOF but seek an allowed claim in excess of $300 million dollars (after giving effect to treble damages for the alleged RICO violations).

- Hunter Mountain Proof of Claim. Hunter Mountain is one of the Debtor's limited partners. Hunter Mountain filed a proof of claim [Claim No. 152] seeking a

---

[9] "HarbourVest Entities" means HarbourVest 2017 Global Fund, L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment, L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners, L.P.

$60,298,739 indemnification claim against the Debtor because of the Debtor's alleged failures to make priority distributions to Hunter Mountain under the Debtor's Partnership Agreement. The Debtor believes that it has meritorious defenses to Hunter Mountain's claim. Hunter Mountain's claim and the Debtor's defenses to such claim are described in greater detail in the *Debtor's (i) Objection to Claim No. 152 of Hunter Mountain Investment Trust and (ii) Complaint to Subordinate Claim of Hunter Mountain Investment Trust and for Declaratory Relief* [D.I. 995]. The Debtor believes that Hunter Mountain's proof of claim should either be disallowed in its entirety or subordinated in its entirety.

In addition to the foregoing, the UBS Claim (in the amount of $1,039,957,799.40) and the Daugherty Claim (in the amount of ~~at least $37,483,876.62) remain outstanding.~~ $40,710,819.42) remain outstanding. As set forth above, partial summary judgment on the UBS Claim was granted in favor of the Debtor and the Redeemer Committee on November 20, 2020, and a formal order is expected to be entered within the next couple of weeks.

The Daugherty Claim has been allowed for voting purposes only in the amount of $9,134,019 [D.I. 1422]. In a bench ruling on November 20, 2020, the Bankruptcy Court allowed UBS Claims for voting purposes only in the amount of $94,761,076.

**T. Treatment of Shared Service and Sub-Advisory Agreements**

As discussed in the Plan, the Reorganized Debtor will manage the wind down of the Managed Funds. However, it is not anticipated that either the Reorganized Debtor or the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities[10] pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities.

Currently, the Debtor receives approximately $2.6 million per month in revenue from such contracts. However, in order to service those contracts, the Debtor must maintain a full staff and the cost of providing services under such contracts, among other factors, has historically resulted in a net loss to the Debtor. As such, the Debtor does not believe that assuming these contracts would benefit the Estate.

Further, the contracts generally contain anti-assignment provisions which the Debtor believes may be enforceable under 11 U.S.C. § 365(c). These provisions, therefore, would arguably prevent the assignment of such contracts without the consent of the Debtor's contract counterparty. However, even if 11 U.S.C. § 365(c) would not prevent assignment, the contracts are generally terminable at will by either party. As such, assuming and assigning such contracts without the consent of the contract counterparty would be of nominal or no benefit to the Estate. It is doubtful that any assignee would provide consideration to the Debtor for the assignment of such contract as the contract counterparty could simply terminate the contract immediately following assignment. As such, the Debtor does not believe that there is any benefit to the Estate in attempting to assign these contracts.

---

[10] For the avoidance of doubt, the Debtor does not consider any of the Issuers (as defined herein) to be a Related Entity.

Notwithstanding the foregoing disclosure, the Debtor is currently assessing whether it is both possible and in the best interests of the Estate to assume and assign such shared services and sub-advisory agreements to a Related Entity.

During the course of this Chapter 11 Case, Mr. Daugherty stated that he would be willing to assume the Debtor's obligations under the shared service and sub-advisory contracts. The Independent Directors reviewed Mr. Daugherty's proposal and for the foregoing reasons, among others, determined that it was not workable and would provide no benefit to the Estate.

**U.**     **Portfolio Managements with Issuer Entities**

The Debtor is party to certain portfolio management agreements (including any ancillary agreements relating thereto collectively being the "Portfolio Management Agreements" and each a "Portfolio Management Agreement") with ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Bristol Bay Funding Ltd. Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd. (each an "Issuer" and collectively the "Issuers") wherein the Debtor agreed to generally provide certain services to each Issuer in the Debtor's capacity as a portfolio manager in exchange for certain fees as described in the applicable Portfolio Management Agreement.

The Issuers filed proofs of claim [Claim No. 165, 168, and 169] asserting claims against the Debtor for damages arising from, relating to or otherwise concerning (i) such Issuer's Portfolio Management Agreement(s) with the Debtor, including, without limitation, failure to perform or other breach of the Portfolio Management Agreement(s), rejection of the Portfolio Management Agreement(s), any cure amount as a result of assumption of the Portfolio Management Agreement(s), any adequate assurance of future performance as a result of assumption of the Portfolio Management Agreement(s), and any failure to provide and pay for indemnification or other obligations under the Portfolio Management Agreement(s); and (ii) the action or inaction of the Debtor to the detriment of such Issuer (collectively, the "Issuer Claims"). The Debtor believes that it has satisfied its obligations to the Issuers; that the Issuer Claims lack merit; and that the Debtor will have no liability with respect to the Issuer Claims. However, such proofs of claim remain outstanding.

The Issuers have taken the position that the rejection of the Portfolio Management Agreements (including any ancillary documents) would result in material rejection damages and have encouraged the Debtor to assume such agreements. Nonetheless, the Issuers and the Debtor are working in good faith to address any outstanding issues regarding such assumption. The Portfolio Management Agreements may be assumed either pursuant to the Plan or by separate motion filed with the Bankruptcy Court.

The Debtor is still assessing its options with respect to the Portfolio Management Agreements, including whether to assume the Portfolio Management Agreements.

**V.** ~~T.~~ **Resignation of James Dondero**

On October 9, 2020, Mr. Dondero resigned as an employee and portfolio manager of the Debtor.

**W.** ~~U.~~ **Exclusive Periods for Filing a Plan and Soliciting Votes**

Under the Bankruptcy Code, a debtor has the exclusive right to file and solicit acceptance of a plan or plans of reorganization for an initial period of 120 days from the date on which the debtor filed for voluntary relief. If a debtor files a plan within this exclusive period, then the debtor has the exclusive right for 180 days from the petition date to solicit acceptances to the plan. During these exclusive periods, no other party in interest may file a competing plan of reorganization; however, a court may extend these periods upon request of a party in interest and "for cause."

The Debtor filed motions to extend the exclusive period, and the Bankruptcy Court entered the following orders granting such applications:

- Order Granting Debtor's Motion for Entry of an Order Pursuant to 11 U.S.C. § 1121(d) and Local Rule 3016-1 Extending the Exclusivity Periods for the Filing and Solicitation of Acceptances of a Chapter 11 Plan [D.I. 460];

- Agreed Order Extending Exclusive Periods by Thirty Days [D.I. 668];

- Order Granting Debtor's Third Motion for Entry of an Order Pursuant to 11 U.S.C. § 1121(d) and Local Rule 3016-1 Further Extending the Exclusivity Periods for the Filing and Solicitation of Acceptances of a Chapter 11 Plan [D.I. 820]; and

- Order Further Extending the Debtor's Exclusive Period for Solicitation of Acceptance of a Chapter 11 Plan [D.I. 1092].

Pursuant to the foregoing orders, the Bankruptcy Court extended the exclusivity period through June 12, 2020, for the filing of a plan, which was subsequently extended through July 13, 2020, and again through August 12, 2020. The Bankruptcy Court also extended the exclusivity period for the solicitation of votes to accept such plan through August 11, 2020, which was subsequently extended through September 10, 2020, and again through October 13, 2020, and December 4, 2020.

**X.** ~~V.~~ **Negotiations with Constituents**

~~The Debtor has engaged with the Committee in negotiating the terms of the Plan, but the Committee has raised a number of material issues with respect to the Plan that the Debtor has not agreed to as of the date of this Disclosure Statement. As such, the Committee does support the Plan.~~

The Debtor, Mr. Dondero, and certain of the creditors have been negotiating a consensual reorganization plan for the Debtor that contemplates the Debtor continuing its business largely in

- 34 -

its current form. Those negotiations have yet to reach conclusion but are continuing, and the negotiations were part of the previously discussed mediation. There is no certainty that those negotiations will reach a consensual resolution of the Debtor's bankruptcy case.

**Y.** ~~W.~~ **Highland Capital Management, L.P. Retirement Plan and Trust**

The Highland Capital Management, L.P. Retirement Plan And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). 29 U.S.C. §§ 1301-1461.

The Debtor is the contributing sponsor of the Pension Plan. As such, the PBGC asserts that Debtor is liable to contribute to the Pension Plan the amounts necessary to satisfy the minimum funding standards in ERISA and the Internal Revenue Code of 1986, as amended ("IRC"). *See* 29 U.S.C. §§ 1082, 1083; 26 U.S.C. §§ 412, 430. As the sponsor of the Pension Plan, the PBGC asserts Debtor is also liable for insurance premiums owed to PBGC. *See* 29 U.S.C. §§ 1306, 1307. The PBGC asserts that any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) are also jointly and severally liable with the Debtor for such obligations relating to the Pension Plan.

The Pension Benefit Guaranty Corporation ("PBGC"), the federal agency that administers the pension insurance program under Title IV of ERISA, filed contingent proofs of claims against the Debtors for (1) the Pension Plan's potential underfunded benefit liabilities; (2) the potential unliquidated unpaid minimum funding contributions owed to the Pension Plan; and (3) the potential unliquidated insurance premiums owed to PBGC. The PBGC acknowledges that, as of the date of this Disclosure Statement, there is nothing currently owed by the Debtor to the PBGC.

The Debtor reserves the right to contest any claims filed by the PBGC for any reason.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC. In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

No provision contained in the Disclosure Statement, the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof), shall be construed as discharging, releasing, exculpating, or relieving any person or entity, including the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, government policy, or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions for satisfaction,

release, injunction, exculpation, and discharge of claims in the Plan, Confirmation Order, or the Bankruptcy Code.

## ARTICLE III.
## SUMMARY OF THE PLAN

**THIS ARTICLE III IS INTENDED ONLY TO PROVIDE A SUMMARY OF THE MATERIAL TERMS OF THE PLAN AND IS QUALIFIED BY REFERENCE TO THE ENTIRE DISCLOSURE STATEMENT AND THE PLAN AND SHOULD NOT BE RELIED ON FOR A COMPREHENSIVE DISCUSSION OF THE PLAN. TO THE EXTENT THERE ARE ANY INCONSISTENCIES OR CONFLICTS BETWEEN THIS ARTICLE III AND THE PLAN, THE TERMS AND CONDITIONS SET FORTH IN THE PLAN SHALL CONTROL AND GOVERN.**

**A.     Administrative and Priority Tax Claims**

1.     Administrative Expense Claims

On the later of the Effective Date or the date on which an Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or, in each such case, as soon as practicable thereafter, each Holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims) will receive, in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Administrative Expense Claim either (i) payment in full in Available Cash for the unpaid portion of such Allowed Administrative Expense Claim; or (ii) such other less favorable treatment as agreed to in writing by the Debtor or the Reorganized Debtor, as applicable, and such Holder; *provided, however,* that Administrative Expense Claims incurred by the Debtor in the ordinary course of business may be paid in the ordinary course of business in the discretion of the Debtor in accordance with such applicable terms and conditions relating thereto without further notice to or order of the Bankruptcy Court. All statutory fees payable under 28 U.S.C. § 1930(a) shall be paid as such fees become due.

If an Administrative Expense Claim (other than a Professional Fee Claim) is not paid by the Debtor in the ordinary course, the Holder of such Administrative Expense Claim must File, on or before the applicable Administrative Expense Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for allowance and payment of such Administrative Expense Claim.

Objections to any Administrative Expense Claim (other than a Professional Fee Claim) must be Filed and served on the Debtor or the Reorganized Debtor, as applicable, and the party asserting such Administrative Expense Claim by the Administrative Expense Claims Objection Deadline.

2.     Professional Fee Claims

Professionals or other Entities asserting a Professional Fee Claim for services rendered through the Effective Date must submit fee applications under sections 327, 328, 329, 330, 331,

503(b) or 1103 of the Bankruptcy Code and, upon entry of an order of the Bankruptcy Court granting such fee applications, such Professional Fee Claim shall promptly be paid in Cash in full to the extent provided in such order.

Professionals or other Entities asserting a Professional Fee Claim for services rendered on or prior to the Effective Date must File, on or before the Professional Fee Claims Bar Date, and serve on the Debtor or Reorganized Debtor, as applicable, and such other Entities who are designated as requiring such notice by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, an application for final allowance of such Professional Fee Claim.

Objections to any Professional Fee Claim must be Filed and served on the Debtor or Reorganized Debtor, as applicable, and the party asserting the Professional Fee Claim by the Professional Fee Claim Objection Deadline. Each Holder of an Allowed Professional Fee Claim will be paid by the Debtor or the Claimant Trust, as applicable, in Cash within ten (10) Business Days of entry of the order approving such Allowed Professional Fee Claim.

On the Effective Date, the Claimant Trustee shall establish the Professional Fee Reserve. The Professional Fee Reserve shall vest in the Claimant Trust and shall be maintained by the Claimant Trustee in accordance with the Plan and Claimant Trust Agreement. The Claimant Trust shall fund the Professional Fee Reserve on the Effective Date in an estimated amount determined by the Debtor in good faith prior to the Confirmation Date and that approximates the total projected amount of unpaid Professional Fee Claims on the Effective Date. Following the payment of all Allowed Professional Fee Claims, any excess funds in the Professional Fee Reserve shall be released to the Claimant Trust to be used for other purposes consistent with the Plan and the Claimant Trust Agreement.

3.    Priority Tax Claims

On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Priority Tax Claim is an Allowed Priority Tax Claim as of the Effective Date or (ii) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, each Holder of an Allowed Priority Tax Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Priority Tax Claim, at the election of the Debtor: (a) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, or (b) such other less favorable treatment as agreed to in writing by the Debtor and such Holder. Payment of statutory fees due pursuant to 28 U.S.C. § 1930(a)(6) will be made at all appropriate times until the entry of a final decree; *provided, however*, that the Debtor may prepay any or all such Claims at any time, without premium or penalty.

**B.    Classification and Treatment of Classified Claims and Equity Interests**

1.    Summary

All Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, are classified in the Classes set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.

The categories of Claims and Equity Interests listed below classify Claims and Equity Interests for all purposes including, without limitation, confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class. A Claim or Equity Interest is in a particular Class only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid, released or otherwise settled (in each case, by the Debtor or any other Entity) prior to the Effective Date.

**<u>Summary of Classification and Treatment of Classified Claims and Equity Interests</u>**

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Jefferies Secured Claim | Unimpaired | Deemed to Accept |
| 2 | Frontier Secured Claim | Impaired | Entitled to Vote |
| 3 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 4 | Priority Non-Tax Claim | Unimpaired | Deemed to Accept |
| 5 | Retained Employee Claim | Unimpaired | Deemed to Accept |
| 6 | PTO Claims | Unimpaired | Deemed to Accept |
| 7 | Convenience Claims | Impaired | Entitled to Vote |
| 8 | General Unsecured Claims | Impaired | Entitled to Vote |
| 9 | Subordinated Claims | Impaired | Entitled to Vote |
| 10 | Class B/C Limited Partnership Interests | Impaired | Entitled to Vote |
| 11 | Class A Limited Partnership Interests | Impaired | Entitled to Vote |

2.    <u>Elimination of Vacant Classes</u>

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Equity Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

3.    <u>Impaired/Voting Classes</u>

Claims and Equity Interests in Class 2 and Class 7 through Class 11 are Impaired by the Plan, and only the Holders of Claims or Equity Interests in those Classes are entitled to vote to accept or reject the Plan.

Please refer to "Distribution of Confirmation Hearing Notice and Solicitation Package to Holders of Claims and Equity Interests" and "Instructions and Procedures for Voting" in

ARTICLE I.C.7 and ARTICLE I.C.8 for a discussion of how the how votes on the Plan will be solicited and tabulated.

4.        Unimpaired/Non-Voting Classes

Claims in Class 1 and Class 3 through Class 6 are Unimpaired by the Plan, and such Holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

5.        Impaired/Non-Voting Classes

There are no Classes under the Plan that will not receive or retain any property and no Classes are deemed to reject the Plan.

6.        Cramdown

If any Class of Claims or Equity Interests is deemed to reject the Plan or does not vote to accept the Plan, the Debtor may (i) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (ii) amend or modify the Plan in accordance with the terms of the Plan and the Bankruptcy Code. If a controversy arises as to whether any Claims or Equity Interests, or any class of Claims or Equity Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**C.    Classification and Treatment of Claims and Equity Interests**

1.        *Class 1 – Jefferies Secured Claim*

- *Classification*: Class 1 consists of the Jefferies Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 1 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 1 Claim, at the election of the Debtor: (A) Cash equal to the amount of such Allowed Class 1 Claim; (B) such other less favorable treatment as to which the Debtor and the Holder of such Allowed Class 1 Claim will have agreed upon in writing; or (C) such other treatment rendering such Claim Unimpaired. Each Holder of an Allowed Class 1 Claim will retain the Liens securing its Allowed Class 1 Claim as of the Effective Date until full and final payment of such Allowed Class 1 Claim is made as provided herein.

- *Impairment and Voting*: Class 1 is Unimpaired, and the Holders of Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 1 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

2. *Class 2 – Frontier Secured Claim*

- *Classification*: Class 2 consists of the Frontier Secured Claim.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 2 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, such Allowed Class 2 Claim: (A) Cash in an amount equal to all accrued but unpaid interest on the Frontier Claim through and including the Effective Date and (B) the New Frontier Note. The Holder of an Allowed Class 2 Claim will retain the Liens securing its Allowed Class 2 Claim as of the Effective Date until full and final payment of such Allowed Class 2 Claim is made as provided herein.

- *Impairment and Voting*: Class 2 is Impaired, and the Holders of Class 2 Claims are entitled to vote to accept or reject the Plan.

  The New Frontier Note will include the following terms: (i) an extension of the maturity date to December 31, 2022; (ii) quarterly interest only payments; (iii) a payment on the New Frontier Note equal to fifty percent of the outstanding principal on December 31, 2021, if the New Frontier Note is not paid in full on or prior to such date; (iv) mandatory prepayments from the proceeds of the sale of any collateral securing the New Frontier Note; and (v) the payment of fees and expenses incurred in negotiating the terms of the New Frontier Note.

3. *Class 3 – Other Secured Claims*

- *Classification*: Class 3 consists of the Other Secured Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 3 Claim is Allowed on the Effective Date or (ii) the date on which such Class 3 Claim becomes an Allowed Class 3 Claim, each Holder of an Allowed Class 3 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 3 Claim, at the option of the Debtor, or following the Effective Date, the Reorganized Debtor or Claimant Trustee, as applicable, (i) Cash equal to such Allowed Other Secured Claim, (ii) the collateral securing its Allowed Other Secured Claim, plus postpetition interest to the extent required under Bankruptcy Code Section 506(b), or (iii) such other treatment rendering such Claim Unimpaired.

- *Impairment and Voting*: Class 3 is Unimpaired, and the Holders of Class 3 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 3

Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

4.    *Class 4 – Priority Non-Tax Claims*

- *Classification*:  Class 4 consists of the Priority Non-Tax Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 4 Claim is Allowed on the Effective Date or (ii) the date on which such Class 4 Claim becomes an Allowed Class 4 Claim, each Holder of an Allowed Class 4 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 4 Claim Cash equal to the amount of such Allowed Class 4 Claim.

- *Impairment and Voting*:  Class 4 is Unimpaired, and the Holders of Class 4 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 4 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

5.    *Class 5 – Retained Employee Claims*

- *Classification*:  Class 5 consists of the Retained Employee Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Allowed Class 5 Claim will be Reinstated.

- *Impairment and Voting*:  Class 5 is Unimpaired, and the Holders of Class 5 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, the Holders of Class 5 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

6.    *Class 6 – PTO Claims*

- *Classification*:  Class 6 consists of the PTO Claims.

- *Allowance and Treatment*:  On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 6 Claim is Allowed on the Effective Date or (ii) the date on which such Class 6 Claim becomes an Allowed Class 6 Claim, each Holder of an Allowed Class 6 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Claim 6 Claim Cash equal to the amount of such Allowed Class 6 Claim.

- *Impairment and Voting*:  Class 6 is Unimpaired, and the Holders of Class 6 Claims are conclusively deemed to have accepted the Plan pursuant to

section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Class 6 Claims are not entitled to vote to accept or reject the Plan and will not be solicited.

"*PTO Claims*" means any Claim for paid time off in favor of any Debtor employee in excess of the amount that would qualify as a Priority Non-Tax Claim under section 507(a)(4) of the Bankruptcy Code.

7.    *Class 7 – Convenience Claims*

- *Classification*: Class 7 consists of the Convenience Claims.

- *Allowance and Treatment*: On or as soon as reasonably practicable after the later of (i) the Initial Distribution Date if such Class 7 Claim is Allowed on the Effective Date or (ii) the date on which such Class 7 Claim becomes an Allowed Class 7 Claim, each Holder of an Allowed Class 7 Claim will receive in full satisfaction, settlement, discharge and release of, and in exchange for, its Allowed Class 7 Claim (1) the treatment provided to Allowed Holders of Class 8 General Unsecured Claims if the Holder of such Class 7 Claim makes the GUC Election or (2) an amount in Cash equal to the lesser of (a) 85% of the Allowed amount of such Holder's Class 7 Claim or (b) such Holder's Pro Rata share of the Convenience Claims Cash Pool.

- *Impairment and Voting*: Class 7 is Impaired, and the Holders of Class 7 Claims are entitled to vote to accept or reject the Plan.

"*Convenience Claim*" means any prepetition, liquidated, and unsecured Claim against the Debtor that is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election. For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

"*Convenience Claim Pool*" means the $~~12,750,000~~13,150,000 in Cash that shall be available upon the Effective Date for distribution to Holders of Convenience Claims under the Plan as set forth herein. ~~If the total amount of Allowed Convenience Claims is less than $12,750,000, any~~Any Cash remaining in the Convenience Claim Pool after all distributions ~~to Allowed Holders~~on account of Convenience Claims have been made will be transferred to the Claimant Trust and administered as a Claimant Trust Asset.

By making the GUC Election on their Ballots, each Holder of a Convenience Claim can elect the treatment provided to General Unsecured Claims.

8. *Class 8 – General Unsecured Claims*

- *Classification*:  Class 8 consists of the General Unsecured Claims.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes the Convenience Class Election.

  Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any General Unsecured Claim, except with respect to any General Unsecured Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*:  Class 8 is Impaired, and the Holders of Class 8 Claims are entitled to vote to accept or reject the Plan.

  "*General Unsecured Claim*" means any prepetition Claim against the Debtor that is not Secured and is not a/an:  (a) Administrative Expense Claim; (b) Professional Fee Claim; (c) Priority Tax Claim; (d) Priority Non-Tax Claim; or (e) Convenience Claim.

  "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim that is a liquidated Claim as of the Confirmation Date on their Ballot to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.

9. *Class 9 – Subordinated Claims*

- *Classification*:  Class 9 consists of the Subordinated Claims.

- *Treatment*:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 9 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive either (i) the treatment provided to Allowed Class 8 Claims or (ii) if such Allowed Class 9 Claim is subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or Final Order of the Bankruptcy Court, its Pro Rata share of the Subordinated Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Subordinated Claim, except with respect to any Subordinated Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 9 is Impaired, and the Holders of Class 9 Claims are entitled to vote to accept or reject the Plan.

"*Subordinated Claim*" means any Claim that (i) is or may be subordinated to the Convenience Claims and General Unsecured Claims pursuant to 11 U.S.C. § 510 or Final Order of the Bankruptcy Court or (ii) arises from a Class A Limited Partnership Interest or a Class B/C Limited Partnership Interest.

10. *Class 10 – Class B/C Limited Partnership Interests*

- *Classification*: Class 10 consists of the Class B/C Limited Partnership Interests.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 10 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class B/C Limited Partnership Interest Claim, except with respect to any Class B/C Limited Partnership Interest Claim Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 10 is Impaired, and the Holders of Class 10 Claims are entitled to vote to accept or reject the Plan.

11. *Class 11 – Class A Limited Partnership Interests*

- *Classification*: Class 11 consists of the Class A Limited Partnership Interests.

- *Treatment*: On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 11 Claim, in full satisfaction,

settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Contingent Claimant Trust Interests or (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing.

Notwithstanding anything to the contrary herein, after the Effective Date and subject to the other provisions of the Plan, the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Class A Limited Partnership Interest, except with respect to any Class A Limited Partnership Interest Allowed by Final Order of the Bankruptcy Court.

- *Impairment and Voting*: Class 11 is Impaired, and the Holders of Class 11 Claims are entitled to vote to accept or reject the Plan.

## D. Special Provision Governing Unimpaired Claims

Except as otherwise provided in the Plan, nothing under the Plan will affect the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims.

## E. Subordinated Claims

The allowance, classification, and treatment of all Claims under the Plan shall take into account and conform to the contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Under section 510 of the Bankruptcy Code, upon written notice, the Debtor the Reorganized Debtor, and the Claimant Trustee reserve the right to re-classify, or to seek to subordinate, any Claim in accordance with any contractual, legal, or equitable subordination relating thereto, and the treatment afforded any Claim under the Plan that becomes a subordinated Claim at any time shall be modified to reflect such subordination.

## F. Means for Implementation of the Plan

1. <u>Summary</u>

The Plan will be implemented through (i) the Claimant Trust (including, if applicable, (ii) the Litigation Sub-Trust), and (iiiii) the Reorganized Debtor.

On the Effective Date, all Class A Limited Partnership Interests, including the Class A Limited Partnership Interests held by Strand, as general partner, and Class B/C Limited Partnerships in the Debtor will be cancelled, and new Class A Limited Partnership Interests in the Reorganized Debtor will be issued to the Claimant Trust and New GP LLC – a newly-chartered limited liability company wholly-owned by the Claimant Trust. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor, and on and following the Effective Date, the Claimant Trust will be the Reorganized Debtor's limited partner and New GP LLC will be its general partner. The

Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement, which will amend and restate, in all respects, the Debtor's current Limited Partnership Agreement. Following the Effective Date, the Reorganized Debtor will be managed consistent with the terms of the Reorganized Limited Partnership Agreement by New GP LLC. The sole managing member of New GP LLC will be the Claimant Trust, and the Claimant Trustee will be the sole officer of New GP LLC on the Effective Date.

Following the Effective Date, the Claimant Trust will administer the Claimant Trust Assets pursuant to the Plan and the Claimant Trust Agreement, and the Litigation Trustee will pursue, if applicable, the Estate Claims pursuant to the terms of the Litigation Sub-Trust Agreement and the Plan. The Reorganized Debtor will administer the Reorganized Debtor Assets and, if needed, with the utilization of a Sub-Servicer, which administration will include, among other things, managing the wind down of the Managed Funds.

Although the Reorganized Debtor will manage the wind down of the Managed Funds, it is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities. The Debtor believes that the continued provision of the services under such contracts will not be cost effective.

The Reorganized Debtor will distribute all proceeds from the wind down to the Claimant Trust, as its limited partner, and New GP LLC, as its general partner, in each case in accordance with the Reorganized Limited Partnership Agreement. Such proceeds, along with the proceeds of the Claimant Trust Assets, will ultimately be distributed to the Claimant Trust Beneficiaries as set forth in the Plan and the Claimant Trust Agreement.

    2.    The Claimant Trust[11]

    (a)    *Creation and Governance of the Claimant Trust and Litigation Sub-Trust.*

On or prior to the Effective Date, the Debtor and the Claimant Trustee shall execute the Claimant Trust Agreement and shall take all steps necessary to establish the Claimant Trust and, if applicable, the Litigation Sub-Trust in accordance with the Plan and the beneficial interests therein, which shall be in each case for the benefit of the Claimant Trust Beneficiaries. Additionally, on or prior to the Effective Date, the Debtor shall irrevocably transfer and shall be deemed to have irrevocably transferred to the Claimant Trust all of its rights, title, and interest in and to all of the Claimant Trust Assets, and in accordance with section 1141 of the Bankruptcy Code, the Claimant Trust Assets shall automatically vest in the Claimant Trust free and clear of all Claims, Liens, encumbrances, or interests subject only to the Claimant Trust Interests and the Claimant Trust Expenses, as provided for in the Claimant Trust Agreement, and such transfer shall be exempt from any stamp, real estate transfer, mortgage from any stamp, transfer, reporting, sales, use, or other similar tax.

---

[11] In the event of a conflict between the terms of this summary and the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, the terms of the Claimant Trust Agreement or the Litigation Sub-Trust Agreement, as applicable, shall control.

The Claimant Trustee shall be the exclusive trustee of the Claimant Trust Assets, excluding the Estate Claims ~~if~~and the Litigation ~~Sub-Trust is established.~~Trustee shall be the exclusive trustee with respect to the Estate Claims in each case for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Claimant Trust Assets. The Claimant ~~Trust~~Trustee shall also be responsible for resolving all ~~Disputed or disallowed~~Claims and Equity Interests in Class 8 through Class 11, under the supervision of the Claimant Trust Oversight Committee.

On the Effective Date, the Claimant Trustee and Litigation Trustee shall execute the Litigation Sub-Trust Agreement and shall take all steps necessary to establish the Litigation Sub-Trust. Upon the creation of the Litigation Sub-Trust, the Claimant Trust shall irrevocably transfer and assign to the Litigation Sub-Trust the Estate Claims. The Claimant Trust shall be governed by the Claimant Trust Agreement and administered by the Claimant Trustee. The powers, rights, and responsibilities of the Claimant Trustee shall be specified in the Claimant Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in Article IV of the Plan, subject to any required reporting to the Claimant Trust Oversight Committee as may be set forth in the Claimant Trust Agreement. The Claimant Trust shall hold and distribute the Claimant Trust Assets (including the proceeds from the Estate Claims, if any) in accordance with the provisions of the Plan and the Claimant Trust Agreement; *provided* that the Claimant Trust Oversight Committee may direct the Claimant Trust to reserve Cash from distributions as necessary to fund the Claimant Trust and Litigation Sub-Trust. Other rights and duties of the Claimant Trustee and the Claimant Trust Beneficiaries shall be as set forth in the Claimant Trust Agreement. After the Effective Date, neither the Debtor nor the Reorganized Debtor shall have any interest in the Claimant Trust Assets.

~~If applicable, on or after the Effective Date, the Claimant Trustee and Litigation Trustee may enter into a separate agreement that shall delineate the~~The Litigation Sub-Trust shall be governed by the Litigation Sub-Trust Agreement and administered by the Litigation Trustee. The powers, rights, and responsibilities of the Litigation Trustee ~~and administration and governance of the Litigation Sub-Trust in a manner consistent with the Claimant Trust Agreement.~~shall be specified in the Litigation Sub-Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in Article IV of the Plan, subject to any required reporting as may be set forth in the Litigation Sub-Trust Agreement. The Litigation Sub-Trust shall investigate, prosecute, settle, or otherwise resolve the Estate Claims in accordance with the provisions of the Plan and the Litigation Sub-Trust Agreement and shall distribute the proceeds therefrom to the Claimant Trust for distribution. Other rights and duties of the Litigation Trustee shall be as set forth in the Litigation Sub-Trust Agreement.

~~The Claimant Trustee will be James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer, or such other Person identified in the Plan Supplement. The Litigation Trustee will also be identified in the Plan Supplement. The Claimant Trustee and Litigation Trustee will act as the trustee of the Claimant Trust and Litigation Sub-Trust, respectively, in accordance with the Plan, the Confirmation Order, and Claimant Trust Agreement or any replacement trustee pursuant to (and in accordance with) the Claimant Trust Agreement.~~

### (a) ~~(b)~~ *Claimant Trust Oversight Committee*

The Claimant Trust, the Claimant Trustee, the management and monetization of the Claimant Trust Assets, and the management of the Reorganized Debtor (through the Claimant Trust's role as managing member of New GP LLC) and the Litigation Sub-Trust will be overseen by the Claimant Trust Oversight Committee, subject to the terms of the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as applicable.

The Claimant Trust Oversight Committee will initially consist of five members. Four of the five members will be representatives of the members of the Committee: (i) the Redeemer Committee of Highland Crusader Fund, (ii) UBS, (iii) Acis, and (iv) Meta-e Discovery. The fifth member will be an independent, natural Person chosen by the Committee and reasonably acceptable to the Debtor. The members of the Claimant Trust Oversight Committee may be replaced as set forth in the Claimant Trust Agreement. The identity of the members of the Claimant Trust Oversight Committee will be disclosed in the Plan Supplement.

As set forth in the Claimant Trust Agreement, in no event will any member of the Claimant Trust Oversight Committee with a Claim against the Estate be entitled to vote, opine, or otherwise be involved in any matters related to such member's Claim.

The ~~members~~independent member(s) of the Claimant Trust Oversight Committee may be entitled to compensation for their services as set forth in the Claimant Trust Agreement. Any member of the Claimant Trust Oversight Committee may be removed, and successor chosen, in the manner set forth in the Claimant Trust Agreement.

### (b) ~~(c)~~ *Purpose of the Claimant Trust.*

The Claimant Trust shall be established for the purpose of (i) managing and monetizing the Claimant Trust Assets, subject to the terms of the Claimant Trust Agreement and the oversight of the Claimant Trust Oversight Committee, (ii) serving as the limited partner of, and holding the limited partnership interests in, the Reorganized Debtor, (iii) serving as the sole member and manager of New GP LLC, the Reorganized Debtor's general partner, (iv) in its capacity as the sole member and manager of New GP LLC, overseeing the management and monetization of the Reorganized Debtor Assets pursuant to the terms of the Reorganized Limited Partnership Agreement~~,~~; and (v) administering the Disputed Claims Reserve and serving as Distribution Agent~~.~~ with respect to Disputed Claims in Class 7 or Class 8.

In its management of the Claimant Trust Assets, the Claimant Trust will also reconcile and object to the General Unsecured Claims, Subordinated Claims, Class B/C Limited Partnership Interests, and Class A Limited Partnership Interests, as provided for in the Plan and the Claimant Trust Agreement, and make Trust Distributions to the Claimant Trust Beneficiaries in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

The purpose of the Reorganized Debtor is discussed at greater length ~~below and~~ in Article IV.C of the Plan.

(c)     *Purpose of the Litigation Sub-Trust.*

The Litigation Sub-Trust shall be established for the purpose of investigating, prosecuting, settling, or otherwise resolving the Estate Claims.  Any proceeds therefrom shall be distributed by the Litigation Sub-Trust to the Claimant Trust for distribution to the Claimant Trust Beneficiaries pursuant to the terms of the Claimant Trust Agreement.

(d)     *Claimant ~~Trustee~~Trust Agreement and ~~Claimant~~ Litigation Sub-Trust Agreement.*

The Claimant Trust Agreement generally will provide for, among other things:

- ~~(i)~~ the payment of the Claimant Trust Expenses;

- ~~(ii)~~ the payment of other reasonable expenses of the Claimant Trust;

- ~~(iii)~~ the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation;

- ~~(iv)~~ the investment of Cash by the Claimant Trustee within certain limitations, including those specified in the Plan;

- ~~(v)~~ the orderly monetization of the Claimant Trust Assets;

- ~~(vi)~~ litigation of any Causes of Action, which may include the prosecution, settlement, abandonment, or dismissal of any such Causes of Action, subject to reporting and oversight by the Claimant Trust Oversight Committee;

- ~~(vii)~~ the resolution of ~~Disputed or disallowed Claims and the allowance, prosecution, and resolution of objections to~~ Claims and Equity Interests~~,~~ in Class 8 through Class 11, subject to reporting and oversight by the Claimant Trust Oversight Committee;

- ~~(viii)~~ the administration of the Disputed Claims Reserve and distributions to be made therefrom; and

- ~~(ix)~~ the management of the Reorganized Debtor, including the utilization of a Sub-Servicer, with the Claimant Trust serving as the managing member of New GP LLC.

Except as otherwise ordered by the Bankruptcy Court, the Claimant Trust Expenses shall be paid from the Claimant Trust Assets in accordance with the Plan and Claimant Trust Agreement.  The Claimant Trustee may establish a reserve for the payment of Claimant Trust Expenses and shall periodically replenish such reserve, as necessary.

~~The Trustees, on behalf of the Claimant Trust, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.~~

~~The Claimant Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation~~

Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

In furtherance of, and consistent with the purpose of, the Claimant Trust and the Plan, the Trustees, for the benefit of the Claimant Trust, shall, subject to reporting and oversight by the Claimant Trust Oversight Committee as set forth in the Claimant Trust Agreement: (i) hold the Claimant Trust Assets for the benefit of the Claimant Trust Beneficiaries, (ii) make Distributions to the Claimant Trust Beneficiaries as provided herein and in the Claimant Trust Agreement, and (iii) have the sole power and authority to prosecute and resolve any Causes of Action and objections to Claims and Equity Interests (other than those assigned to the Litigation Sub-Trust), without approval of the Bankruptcy Court. Except as otherwise provided in the Claimant Trust Agreement, the Claimant Trustee shall be responsible for all decisions and duties with respect to the Claimant Trust and the Claimant Trust Assets; *provided, however,* that if a Litigation Sub-Trust is created upon or after the Effective Date, the prosecution and resolution of any Estate Claims included in the Claimant Trust Assets shall be the responsibility of the Litigation Trustee. In all circumstances, the ~~Trustees~~Claimant Trustee shall act in the best interests of the Claimant Trust Beneficiaries and with the same fiduciary duties as a chapter 7 trustee.

The Litigation Sub-Trust Agreement generally will provide for, among other things:

- the payment of other reasonable expenses of the Litigation Sub-Trust;

- the retention of employees, counsel, accountants, financial advisors, or other professionals and the payment of their reasonable compensation; and

- the investigation and prosecution of Estate Claims, which may include the prosecution, settlement, abandonment, or dismissal of any such Estate Claims, subject to reporting and oversight as set forth in the Litigation Sub-Trust Agreement.

The Trustees, on behalf of the Claimant Trust and Litigation Sub-Trust, as applicable, may each employ, without further order of the Bankruptcy Court, employees and other professionals (including those previously retained by the Debtor and the Committee) to assist in carrying out the Trustees' duties hereunder and may compensate and reimburse the reasonable expenses of these professionals without further Order of the Bankruptcy Court from the Claimant Trust Assets in accordance with the Plan and the Claimant Trust Agreement.

The Claimant Trust Agreement and Litigation Sub-Trust Agreement may include reasonable and customary provisions that allow for indemnification by the Claimant Trust in favor of the Claimant Trustee, Litigation Trustee, and the Claimant Trust Oversight Committee. Any such indemnification shall be the sole responsibility of the Claimant Trust and payable solely from the Claimant Trust Assets.

(e)     *Compensation and Duties of Trustees.*

The salient terms of each Trustee's employment, including such Trustee's duties and compensation shall be set forth in the Claimant Trust Agreement and the Litigation Sub-Trust Agreement, as appropriate. The Trustees shall each be entitled to reasonable compensation in an amount consistent with that of similar functionaries in similar types of bankruptcy cases.

(f)     *Cooperation of Debtor and Reorganized Debtor.*

To effectively investigate, prosecute, compromise and/or settle the Claims and/or Causes of Action that constitute Claimant Trust Assets ~~on behalf of the Claimant Trust~~(including Estate Claims), the Claimant Trustee, Litigation Trustee, and each of their ~~counsel~~professionals may require reasonable access to the Debtor's and Reorganized Debtor's documents, information, and work product relating to the Claimant Trust Assets. Accordingly, the Debtor and the Reorganized Debtor, as applicable, shall reasonably cooperate with the Claimant Trustee ~~and Litigation Trustee shall have reasonable access to copies of the Debtor's and Reorganized Debtor's records and information relating to the Claimant Trust Assets, including electronic records, documents or work product related to the Claims and/or Causes of Action that constitute Claimant Trust Assets~~ and Litigation Trustee, as applicable, in their prosecution of Causes of Action and in providing the Claimant Trustee and Litigation Trustee with copies of documents and information in the Debtor's possession, custody, or control on the Effective Date that either Trustee indicates relates to the Estate Claims or other Causes of Action.

The Debtor and Reorganized Debtor shall preserve all records, documents or work product (including all electronic records, documents, or work product) related to the Claims and~~/or~~ Causes of Action ~~that constitute Claimant Trust Assets~~, including Estate Claims, until the earlier of (a) the dissolution of the Reorganized Debtor or (b) termination of the Claimant Trust and Litigation Sub-Trust.

(g)     *United States Federal Income Tax Treatment of the Claimant Trust.*

Unless the IRS requires otherwise, for all United States federal income tax purposes, the parties shall treat the transfer of the Claimant Trust Assets to the Claimant Trust as:  (a) a transfer of the Claimant Trust Assets (other than the amounts set aside in the Disputed ~~Claim~~Claims Reserve, if the Claimant Trustee makes the election described in Section 7 below) directly to the applicable Claimant Trust Beneficiaries followed by (b) the transfer by the such Claimant Trust Beneficiaries to the Claimant Trust of such Claimant Trust Assets in exchange for the Claimant Trust Interests.  Accordingly, the applicable Claimant Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of the Claimant Trust Assets.  The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.

(h)     *Tax Reporting.*

~~(a)~~ The Claimant Trustee shall file tax returns for the Claimant Trust treating the Claimant Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a). The Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed ~~Claim~~Claims Reserve as a separate taxable entity.

~~(b)~~ The Claimant Trustee shall be responsible for payment, out of the Claimant Trust Assets, of any taxes imposed on the Claimant Trust or its assets.

- 51 -

(c) The Claimant Trustee shall determine the fair market value of the Claimant Trust Assets as of the Effective Date and notify the applicable Claimant Trust Beneficiaries of such valuation, and such valuation shall be used consistently for all federal income tax purposes.

(d) The Claimant Trustee shall distribute such tax information to the applicable Claimant Trust Beneficiaries as the Claimant Trustee determines is required by applicable law.

(i)     *Claimant Trust Assets.*

The Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Causes of Action included in the Claimant Trust Assets (except for the Estate Claims) without any further order of the Bankruptcy Court and the Claimant Trustee shall have the exclusive right, on behalf of the Claimant Trust, to sell, liquidate, or otherwise monetize all Claimant Trust Assets, except as otherwise provided in the Plan or in the Claimant Trust Agreement, without any further order of the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Litigation Trustee shall have the exclusive right to institute, file, prosecute, enforce, abandon, settle, compromise, release, or withdraw any and all Estate Claims included in the Claimant Trust Assets without any further order of the Bankruptcy Court.

From and after the Effective Date, the Trustees, in accordance with section 1123(b)(3) and (4) of the Bankruptcy Code, and on behalf of the Claimant Trust, shall each serve as a representative of the Estate with respect to any and all Claimant Trust Assets, including the Causes of Action and Estate Claims, as appropriate, and shall retain and possess the right to (a) commence, pursue, settle, compromise, or abandon, as appropriate, any and all Causes of Action in any court or other tribunal and (b) sell, liquidate, or otherwise monetize all Claimant Trust Assets.

(j)     *Claimant Trust Expenses.*

From and after the Effective Date, the Claimant Trust shall, in the ordinary course of business and without the necessity of any approval by the Bankruptcy Court, pay the reasonable professional fees and expenses incurred by the Claimant Trust, the Litigation Sub-Trust, and any professionals retained by the Claimant Trust such parties and entities from the Claimant Trust Assets, except as otherwise provided in the Claimant Trust Agreement.

(k)     *Trust Distributions to Claimant Trust Beneficiaries.*

The Claimant Trustee, in its discretion, may make Trust Distributions to the Claimant Trust Beneficiaries at any time and/or use the Claimant Trust Assets or proceeds thereof, *provided* that such Trust Distributions or use is otherwise permitted under the terms of the Plan, the Claimant Trust Agreement, and applicable law.

(l)     *Cash Investments.*

With the consent of the Claimant Trust Oversight Committee, the Claimant Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in a manner consistent with the terms of the Claimant Trust Agreement; *provided, however,* that such investments are

investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

(m) *Dissolution of the Claimant Trust and Litigation Sub-Trust.*

The Trustees and the Claimant Trust and Litigation Sub-Trust shall be discharged or dissolved, as the case may be, at such time as: (a) the Litigation Trustee determines that the pursuit of ~~additional Causes of Action~~Estate Claims is not likely to yield sufficient additional proceeds to justify further pursuit of such ~~Causes of Action, (b~~Estate Claims, (b) the Claimant Trustee determines that the pursuit of Causes of Action (other than Estate Claims) is not likely to yield sufficient additional proceeds to justify further pursuit of such Causes of Action, (c) the Clamant Trustee determines that the pursuit of sales of other Claimant Trust Assets is not likely to yield sufficient additional proceeds to justify further pursuit of such sales of Claimant Trust Assets, (~~c~~d) all objections to Disputed Claims and Equity Interests are fully resolved, (~~d~~e) the Reorganized Debtor is dissolved, and (~~e~~f) all Distributions required to be made by the Claimant Trustee to the Claimant Trust Beneficiaries under the Plan have been made, but in no event shall the Claimant Trust be dissolved later than three years from the Effective Date unless the Bankruptcy Court, upon motion made within the six-month period before such third anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension (not to exceed two years, together with any prior extensions, without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes) is necessary to facilitate or complete the recovery on, and liquidation of, the Claimant Trust Assets; *provided, however,* that each extension must be approved, upon a finding that the extension is necessary to facilitate or complete the recovery on, and liquidation of the Claimant Trust Assets, by the Bankruptcy Court within 6 months of the beginning of the extended term and no extension, together with any prior extensions, shall exceed three years without a favorable letter ruling from the Internal Revenue Service or an opinion of counsel that any further extension would not adversely affect the status of the Claimant Trust as a liquidating trust for federal income tax purposes.

Upon dissolution of the Claimant Trust, and pursuant to the Claimant Trust Agreement, any remaining Claimant Trust Assets that exceed the amounts required to be paid under the Plan will be transferred (in the sole discretion of the Claimant Trustee) in Cash or in-kind to the Holders of the Claimant Trust Interests as provided in the Claimant Trust Agreement.

3.    The Reorganized Debtor

(a)    *Corporate Existence*

The Debtor will continue to exist after the Effective Date, with all of the powers of partnerships pursuant to the law of the State of Delaware and as set forth in the Reorganized Limited Partnership Agreement.

(b) *Cancellation of Equity Interests and Release*

On the Effective Date, (i) all prepetition Equity Interests, including the Class A Limited Partnership Interests and the Class B/C Limited Partnership Interests, in the Debtor shall be canceled, and (ii) all obligations or debts owed by, or Claims against, the Debtor on account of, or based upon, the Interests shall be deemed as cancelled, released, and discharged, including all obligations or duties by the Debtor relating to the Equity Interests in any of the Debtor's formation documents, including the Limited Partnership Agreement.

(c) *Issuance of New Partnership Interests*

On the Effective Date, the Debtor or the Reorganized Debtor, as applicable, will issue new Class A Limited Partnership Interests to (i) the Claimant Trust, as limited partner, and (ii) New GP LLC, as general partner, and will admit (a) the Claimant Trust as the limited partner of the Reorganized Debtor, and (b) New GP LLC as the general partner of the Reorganized Debtor. The Claimant Trust, as limited partner, will ratify New GP LLC's appointment as general partner of the Reorganized Debtor. Also, on the Effective Date, the Claimant Trust, as limited partner, and New GP LLC, as general partner, will execute the Reorganized Limited Partnership Agreement and receive partnership interests in the Reorganized Debtor consistent with the terms of the Reorganized Limited Partnership Agreement.

(d) *Management of the Reorganized Debtor*

Subject to and consistent with the terms of the Reorganized Limited Partnership Agreement, the Reorganized Debtor shall be managed by its general partner, New GP LLC. The initial officers and employees of the Reorganized Debtor shall be selected by the ~~Debtor~~Claimant Trustee. The Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees.

As set forth in the Reorganized Limited Partnership Agreement, New GP LLC will receive a fee for managing the Reorganized Debtor. Although New GP LLC will be a limited liability company, it will elect to be treated as a C-Corporation for tax purposes. Therefore, New GP LLC (and any taxable income attributable to it) will be subject to corporate income taxation on a standalone basis, which may reduce the return to Claimants.

(e) *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in the Plan or the Confirmation Order, on or after the Effective Date, all Reorganized Debtor Assets will vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under the Plan upon the Effective Date.

The Reorganized Debtor shall be the exclusive trustee of the Reorganized Debtor Assets for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3), as well as the representative of the Estate appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Reorganized Debtor Assets.

- 54 -

(f)     *Purpose of the Reorganized Debtor*

Except as may be otherwise provided in the Plan or the Confirmation Order, the Reorganized Debtor will continue to manage the Reorganized Debtor Assets (which shall include, for the avoidance of doubt, serving as the investment manager of the Managed Funds) and may use, acquire or dispose of the Reorganized Debtor Assets and compromise or settle any Claims with respect to the Reorganized Debtor Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. The Reorganized Debtor shall oversee the resolution of Claims in Class 1 through Class 7.

Without limiting the foregoing, the Reorganized Debtor will pay the charges that it incurs after the Effective Date for Professionals' fees, disbursements, expenses or related support services (including reasonable fees relating to the preparation of Professional fee applications) in the ordinary course of business and without application or notice to, or order of, the Bankruptcy Court.

(g)     (f) *Distribution of Proceeds from the Reorganized Debtor Assets; Transfer of Reorganized Debtor Assets*

Any proceeds received by the Reorganized Debtor will be distributed to the Claimant Trust, as limited partner, and New GP LLC, as general partner, in the manner set forth in the Reorganized Limited Partnership Agreement. As set forth in the Reorganized Limited Partnership Agreement, the Reorganized Debtor may, from time to time distribute Reorganized Debtor Assets to the Claimant Trust either in Cash or in-kind, including to institute the wind-down and dissolution of the Reorganized Debtor. Any assets distributed to the Claimant Trust will be (i) deemed transferred in all respects as forth in Article IV.B.1 of the Plan, (ii) deemed Claimant Trust Assets, and (iii) administered as Claimant Trust Assets.

4.     Company Action

Each of the Debtor, the Reorganized Debtor, and the Trustees, as applicable, may take any and all actions to execute, deliver, File or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan, the Claimant Trust Agreement, the Reorganized Limited Partnership Agreement, or the New GP LLC Documents, as applicable, in the name of and on behalf of the Debtor, the Reorganized Debtor, or the Trustees, as applicable, and in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, officers, or directors of the Debtor or the Reorganized Debtor, as applicable, or by any other Person.

Prior to, on or after the Effective Date (as appropriate), all matters provided for pursuant to the Plan that would otherwise require approval of the stockholders, partners, directors, managers, or members of the Debtor, any Related Entity, or any Affiliate thereof (as of prior to the Effective Date) will be deemed to have been so approved and will be in effect prior to, on or after the Effective Date (as appropriate) pursuant to applicable law and without any requirement

of further action by the stockholders, partners, directors, managers or members of such Persons, or the need for any approvals, authorizations, actions or consents of any Person.

All matters provided for in the Plan involving the legal or corporate structure of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, and any legal or corporate action required by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, in connection with the Plan, will be deemed to have occurred and will be in full force and effect in all respects, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by the security holders, partners, directors, managers, or members of the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, or by any other Person. On the Effective Date, the appropriate officers of the Debtor and the Reorganized Debtor, as applicable, as well as the Trustees, are authorized to issue, execute, deliver, and consummate the transactions contemplated by, the contracts, agreements, documents, guarantees, pledges, consents, securities, certificates, resolutions and instruments contemplated by or described in the Plan in the name of and on behalf of the Debtor and the Reorganized Debtor, as well as the Trustees, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. The appropriate officer of the Debtor, the Reorganized Debtor, as well as the Trustees, will be authorized to certify or attest to any of the foregoing actions.

5.      Release of Liens, Claims and Equity Interests

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, from and after the Effective Date and concurrently with the applicable distributions made pursuant to the Plan, all Liens, Claims, Equity Interests, mortgages, deeds of trust, or other security interests against the property of the Estate will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any Entity. Any Entity holding such Liens or Equity Interests extinguished pursuant to the prior sentence will, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, such instruments of termination, release, satisfaction and/or assignment (in recordable form) as may be reasonably requested by the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, Article IV.C.2 of the Plan.

6.      Cancellation of Notes, Certificates and Instruments

Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, on the Effective Date, all agreements, instruments, Securities and other documents evidencing any prepetition Claim or Equity Interest and any rights of any Holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect. The holders of or parties to such cancelled instruments, Securities, and other documentation will have no rights arising from or related to such instruments, Securities, or other documentation or the

cancellation thereof, except the rights provided for pursuant to the Plan, and the obligations of the Debtor thereunder or in any way related thereto will be fully released, terminated, extinguished and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or any requirement of further action, vote or other approval or authorization by any Person. For the avoidance of doubt, this section is in addition to, and shall not be read to limit in any respects, Article IV.C.2 of the Plan.

7.     Cancellation of Existing Instruments Governing Security Interests

Upon payment or other satisfaction of an Allowed Class 1 or Allowed Class 2 Claim, or promptly thereafter, the Holder of such Allowed Class 1 or Allowed Class 2 Claim shall deliver to the Debtor, the Reorganized Debtor, or the Claimant Trustee, as applicable, any collateral or other property of the Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Class 1 or Allowed Class 2 Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or *lis pendens*, or similar interests or documents.

8.     Control Provisions

To the extent that there is any inconsistency between the Plan as it relates to the Claimant Trust, the Claimant Trust Agreement, the Reorganized Debtor, or the Reorganized Limited Partnership Agreement, the Plan shall control.

9.     Treatment of Vacant Classes

Any Claim or Equity Interest in a Class considered vacant under Article III.C of the Plan shall receive no Plan Distributions.

10.     Plan Documents

The documents, if any, to be Filed as part of the Plan Documents, including any documents filed with the Plan Supplement, and any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I of the Plan) and fully enforceable as if stated in full herein.

The Debtor and the Committee are currently working to finalize the forms of certain of the Plan Documents to be filed with the Plan Supplement. To the extent that the Debtor and the Committee cannot agree as to the form and content of such Plan Documents, they intend to submit the issue to non-binding mediation pursuant to the *Order Directing Mediation* entered on August 3, 2020 [D.I. 912].

11.     Highland Capital Management, L.P. Retirement Plan and Trust

The Highland Capital Management, L.P. Retirement And Trust ("Pension Plan") is a single-employer defined benefit pension plan covered by Title IV of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). 29 U.S.C. §§ 1301-1461. The Debtor is

the contributing sponsor and, as such, the PBGC asserts that the Debtor is liable along with any members of the contributing sponsor's controlled-group within the meaning of 29 U.S.C. §§ 1301(a)(13), (14) with respect to the Pension Plan.

Upon the Effective Date, the Reorganized Debtor shall be deemed to have assumed the Pension Plan and shall comply with all applicable statutory provisions of ERISA and the Internal Revenue Code (the "IRC"), including, but not limited to, satisfying the minimum funding standards pursuant to 26 U.S.C. §§ 412, 430, and 29 U.S.C. §§ 1082, 1083; paying the PBGC premiums in accordance with 29 U.S.C. §§ 1306 and 1307; and administering the Pension Plan in accordance with its terms and the provisions of ERISA and the IRC. In the event that the Pension Plan terminates after the Plan of Reorganization Effective Date, the PBGC asserts that the Reorganized Debtor and each of its controlled group members will be responsible for the liabilities imposed by Title IV of ERISA.

Notwithstanding any provision of the Plan, the Confirmation Order, or the Bankruptcy Code (including section 1141 thereof) to the contrary, neither the Plan, the Confirmation Order, or the Bankruptcy Code shall be construed as discharging, releasing, exculpating or relieving the Debtor, the Reorganized Debtor, or any person or entity in any capacity, from any liability or responsibility, if any, with respect to the Pension Plan under any law, governmental policy, or regulatory provision. PBGC and the Pension Plan shall not be enjoined or precluded from enforcing such liability or responsibility against any person or entity as a result of any of the provisions of the Plan, the Confirmation Order, or the Bankruptcy Code. The Debtor reserves the right to contest any such liability or responsibility.

## A. Treatment of Executory Contracts and Unexpired Leases

### 1. Assumption, Assignment, or Rejection of Executory Contracts and Unexpired Leases

Unless an Executory Contract or Unexpired Lease: (i) was previously assumed or rejected by the Debtor pursuant to a Final Order of the Bankruptcy Court entered prior to the Effective Date; (ii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iii) is the subject of a motion to assume filed by the Debtor on or before the Confirmation Date; (iv) contains a change of control or similar provision that would be triggered by the Chapter 11 Case (unless such provision has been irrevocably waived); or (v) is specifically designated as a contract or lease to be assumed in the Plan Supplement, on the Effective Date, each Executory Contract and Unexpired Lease shall be deemed rejected pursuant to section 365 of the Bankruptcy Code, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease is listed in the Plan Supplement.

At any time on or prior to the Effective Date, the Debtor or the Reorganized Debtor, as applicable, may may (i) amend the Plan Supplement in order to add or remove a contract or lease from the list of contracts to be assumed or (ii) assign (subject to applicable law) any Executory Contract or Unexpired Lease, as determined by the Debtor in consultation with the Committee, or the Reorganized Debtor, as applicable.

The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, rejections, and assumptions and assignments. Except as otherwise provided herein or agreed to by the Debtor and the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtor during the Chapter 11 Case shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith. To the extent applicable, no change of control (or similar provision) will be deemed to occur under any such Executory Contract or Unexpired Lease.

If certain, but not all, of a contract counterparty's Executory Contracts and/or Unexpired Leases are rejected pursuant to the Plan, the Confirmation Order shall be a determination that such counterparty's Executory Contracts and/or Unexpired Leases that are being assumed pursuant to the Plan are severable agreements that are not integrated with those Executory Contracts and/or Unexpired Leases that are being rejected pursuant to the Plan. Parties seeking to contest this finding with respect to their Executory Contracts and/or Unexpired Leases must file a timely objection to the Plan on the grounds that their agreements are integrated and not severable, and any such dispute shall be resolved by the Bankruptcy Court at the Confirmation Hearing (to the extent not resolved by the parties prior to the Confirmation Hearing).

Notwithstanding anything herein to the contrary, the Debtor shall assume or reject that certain real property lease with Crescent TC Investors L.P. ("Landlord") for the Debtor's headquarters located at 200/300 Crescent Ct., Suite #700, Dallas, Texas 75201 (the "Lease") in accordance with the notice to Landlord, procedures and timing required by 11 U.S.C. §365(d)(4), as modified by that certain *Agreed Order Granting Motion to Extend Time to Assume or Reject Unexpired Nonresidential Real Property Lease* [D.I. 1122].

2.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Any Executory Contract or Unexpired Lease not assumed or rejected on or before the Effective Date shall be deemed rejected, pursuant to the Confirmation Order. Any Person asserting a Rejection Claim shall File a proof of claim within thirty days of the Effective Date. Any Rejection Claims that are not timely Filed pursuant to the Plan shall be forever disallowed and barred. If one or more Rejection Claims are timely Filed, the Claimant Trustee may File an objection to any Rejection Claim.

Rejection Claims shall be classified as Convenience Claims or General Unsecured Claims, as applicable, and shall be treated in accordance with Article III of the Plan.

3.    Cure of Defaults for Assumed or Assigned Executory Contracts and Unexpired Leases

Any monetary amounts by which any Executory Contract or Unexpired Lease to be assumed or assigned hereunder is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtor upon assumption or assignment thereof, by payment of the

default amount in Cash as and when due in the ordinary course or on such other terms as the parties to such Executory Contracts may otherwise agree. The Debtor may serve a notice on the Committee and parties to Executory Contracts or Unexpired Leases to be assumed or assigned reflecting the Debtor's or Reorganized Debtor's intention to assume or assign the Executory Contract or Unexpired Lease in connection with the Plan and setting forth the proposed cure amount (if any).

If a dispute regarding (1) the amount of any payments to cure a default, (2) the ability of the Debtor, the Reorganized Debtor, or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assigned or (3) any other matter pertaining to assumption or assignment, the cure payments required by section 365(b)(1) of the Bankruptcy Code will be made following the entry of a Final Order or orders resolving the dispute and approving the assumption or assignment.

Assumption or assignment of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise and full payment of any applicable cure amounts pursuant to Article V.C of the Plan shall result in the full release and satisfaction of any cure amounts, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed or assigned Executory Contract or Unexpired Lease at any time prior to the effective date of assumption or assignment. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed or assigned in the Chapter 11 Case, including pursuant to the Confirmation Order, and for which any cure amounts have been fully paid pursuant to Article V.C of the Plan, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

4. ~~Assumption of Insurance Policies~~

~~Upon the Effective Date, the Reorganized Debtor will assume all of the Insurance Policies pursuant to section 365(a) of the Bankruptcy Code and all such Insurance Policies shall vest in the Reorganized Debtor. Unless previously effectuated by separate order entered by the Bankruptcy Court, entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtor's foregoing assumption of each of the Insurance Policies and all such Insurance Policies shall continue in full force and effect thereafter in accordance with their respective terms. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan will not impair or otherwise modify any rights of the Debtor or the Reorganized Debtor under the Insurance Policies. To the extent that any Insurance Policy is not assumable, it will be Reinstated.~~

## B. Provisions Governing Distributions

1. Dates of Distributions

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or if a Claim is not an Allowed Claim or Equity Interest on the Effective

Date, on the date that such Claim or Equity Interest becomes an Allowed Claim or Equity Interest, or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim or Equity Interest against the Debtor shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Equity Interests in the applicable Class and in the manner provided herein. If any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent there are Disputed Claims or Equity Interests, distributions on account of any such Disputed Claims or Equity Interests shall be made pursuant to the provisions provided in the Plan. Except as otherwise provided in the Plan, Holders of Claims and Equity Interests shall not be entitled to interest, dividends or accruals on the distributions provided for therein, regardless of whether distributions are delivered on or at any time after the Effective Date.

Upon the Effective Date, all Claims and Equity Interests against the Debtor shall be deemed fixed and adjusted pursuant to the Plan and none of the Debtor, the Reorganized Debtor, or the Claimant Trust will have liability on account of any Claims or Equity Interests except as set forth in the Plan and in the Confirmation Order. All payments and all distributions made by the Distribution Agent under the Plan shall be in full and final satisfaction, settlement and release of all Claims and Equity Interests against the Debtor and the Reorganized Debtor.

At the close of business on the Distribution Record Date, the transfer ledgers for the Claims against the Debtor and the Equity Interests in the Debtor shall be closed, and there shall be no further changes in the record holders of such Claims and Equity Interests. The Debtor, the Reorganized Debtor, the Trustees, and the Distribution Agent, and each of their respective agents, successors, and assigns shall have no obligation to recognize the transfer of any Claims against the Debtor or Equity Interests in the Debtor occurring after the Distribution Record Date and shall be entitled instead to recognize and deal for all purposes hereunder with only those record holders stated on the transfer ledgers as of the close of business on the Distribution Record Date irrespective of the number of distributions to be made under the Plan to such Persons or the date of such distributions.

2.     Distribution Agent

Except as provided herein, all distributions under the Plan shall be made by the Claimant Trustee, as Distribution Agent, or by such other Entity designated by the Claimant Trustee, as a Distribution Agent on the Effective Date or thereafter. The Reorganized Debtor will be the Distribution Agent with respect to Claims in Class 1 through Class 7.

The Claimant Trustee, or such other Entity designated by the Claimant Trustee to be the Distribution Agent, shall not be required to give any bond or surety or other security for the performance of such Distribution Agent's duties unless otherwise ordered by the Bankruptcy Court.

The Distribution Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect

to its responsibilities; and (d) exercise such other powers as may be vested in the Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Distribution Agent to be necessary and proper to implement the provisions of the Plan.

The Distribution Agent shall not have any obligation to make a particular distribution to a specific Holder of an Allowed Claim if such Holder is also the Holder of a Disputed Claim.

3.  Cash Distributions

Distributions of Cash may be made by wire transfer from a domestic bank, except that Cash payments made to foreign creditors may be made in such funds and by such means as the Distribution Agent determines are necessary or customary in a particular foreign jurisdiction.

4.  Disputed Claims Reserve

As set forth in the Claimant Trust Agreement, the Claimant Trustee, as Distribution Agent, shall establish, fund, and maintain a reserve at the Claimant Trust. Any payments to be made under the Plan after the Effective Date shall be paid from the Disputed Claims Reserve as set forth in the Claimant Trust Agreement. As set forth in the Claimant Trust Agreement, the Claimant Trust may distribute amounts from the Disputed Claims Reserve to the Reorganized Debtor to satisfy certain Claims. Upon the resolution of all Disputed Claims, funds remaining in the Disputed Claims Reserve shall be allocated in the manner set forth in the Claimant Trust Agreement.

On or prior to the Initial Distribution Date, the Claimant Trustee shall establish, fund and maintain the Disputed Claims Reserve(s) in the appropriate Disputed Claims Reserve Amounts on account of any Disputed Claims.

As used above, "*Disputed Claims Reserve*" means the appropriate reserve(s) or account(s) to be established on the Initial Distribution Date and maintained by the Claimant Trustee for distributions on account of Disputed Claims that may subsequently become an Allowed Claim.

"*Disputed Claims Reserve Amount*" means, for purposes of determining the Disputed Claims Reserve, the Cash that would have otherwise been distributed to a Holder of a Disputed Claim at the time any distributions of Cash are made to the Holders of Allowed Claims. The amount of the Disputed Claim upon which the Disputed Claims Reserve is calculated shall be: (a) the amount set forth on either the Schedules or the filed Proof of Claim, as applicable; (b) the amount agreed to by the Holder of the Disputed Claim and the Claimant Trustee or Reorganized Debtor, as applicable; (c) the amount ordered by the Bankruptcy Court if it enters an order disallowing, in whole or in part, a Disputed Claim; or (d) as otherwise ordered by the Bankruptcy Court, including an order estimating the Disputed Claim.

HarbourVest has objected to the mechanisms for calculating the amount of the Disputed Claims Reserve with respect to the HarbourVest Claim and intends to press its objection at the hearing for confirmation of the Plan.

5. Distributions from the Disputed Claims Reserve

The Disputed Claims Reserve shall at all times hold Cash in an amount no less than the Disputed Claims Reserve Amount. To the extent a Disputed Claim becomes an Allowed Claim pursuant to the terms of the Plan, within 30 days of the date on which such Disputed Claim becomes an Allowed Claim pursuant to the terms of the Plan, the Claimant Trustee shall distribute from the Disputed Claims Reserve to the Holder thereof any prior distributions, in Cash, that would have been made to such Allowed Claim if it had been Allowed as of the Effective Date. For the avoidance of doubt, each Holder of a Disputed Claim that subsequently becomes an Allowed Claim will also receive its Pro Rata share of the Claimant Trust Interests. If, upon the resolution of all Disputed Claims any Cash remains in the Disputed Claims Reserve, such Cash shall be transferred to the Claimant Trust and deemed a Claimant Trust Asset.

6. 5. Rounding of Payments

Whenever the Plan would otherwise call for, with respect to a particular Person, payment of a fraction of a dollar, the actual payment or distribution shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash to be distributed under the Plan remains undistributed as a result of the aforementioned rounding, such Cash or stock shall be treated as "Unclaimed Property" under the Plan.

7. 6. *De Minimis* Distribution

Except as to any Allowed Claim that is Unimpaired under the Plan, none of the Debtor, the Reorganized Debtor, or the Distribution Agent shall have any obligation to make any Plan Distributions with a value of less than $100, unless a written request therefor is received by the Distribution Agent from the relevant recipient at the addresses set forth in Article VI.I of the Plan within 120 days after the later of the (i) Effective Date and (ii) the date such Claim becomes an Allowed Claim. *De minimis* distributions for which no such request is timely received shall revert to the Claimant Trust. Upon such reversion, the relevant Allowed Claim (and any Claim on account of missed distributions) shall be automatically deemed satisfied, discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

8. 7. Distributions on Account of Allowed Claims

Except as otherwise agreed by the Holder of a particular Claim or as provided in the Plan, all distributions shall be made pursuant to the terms of the Plan and the Confirmation Order. Except as otherwise provided in the Plan, distributions to any Holder of an Allowed Claim shall, to the extent applicable, be allocated first to the principal amount of any such Allowed Claim, as determined for U.S. federal income tax purposes and then, to the extent the consideration exceeds such amount, to the remainder of such Claim comprising accrued but unpaid interest, if any (but solely to the extent that interest is an allowable portion of such Allowed Claim).

9 8. General Distribution Procedures

The Distribution Agent, shall make all distributions of Cash or other property required under the Plan, unless the Plan specifically provides otherwise. All Cash and other property held

- 63 -

by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable, for ultimate distribution under the Plan shall not be subject to any claim by any Person.

10. ~~9.~~ Address for Delivery of Distributions

Distributions to Holders of Allowed Claims, to the extent provided for under the Plan, shall be made (1) at the addresses set forth in any written notices of address change delivered to the Debtor and the Distribution Agent; (2) at the address set forth on any Proofs of Claim Filed by such Holders (to the extent such Proofs of Claim are Filed in the Chapter 11 Case), (2), or (3) at the addresses in the Debtor's books and records.

If there is any conflict or discrepancy between the addresses set forth in (1) through (3) in the foregoing sentence, then (i) the address in Section (2) shall control; (ii) if (2) does not apply, the address in (1) shall control, and (iii) if (1) does not apply, the address in (3) shall control.

11. ~~10.~~ Undeliverable Distributions and Unclaimed Property

If the distribution to the Holder of any Allowed Claim is returned to the Reorganized Debtor or the Claimant Trust as undeliverable, no further distribution shall be made to such Holder, and Distribution Agent shall not have any obligation to make any further distribution to the Holder, unless and until the Distribution Agent is notified in writing of such Holder's then current address.

Any Entity that fails to claim any Cash within six months from the date upon which a distribution is first made to such Entity shall forfeit all rights to any distribution under the Plan and such Cash shall thereafter be deemed an Claimant Trust Asset in all respects and for all purposes. Entities that fail to claim Cash shall forfeit their rights thereto and shall have no claim whatsoever against the Debtor's Estate, the Reorganized Debtor, the Claimant Trust, or against any Holder of an Allowed Claim to whom distributions are made by the Distribution Agent.

12. ~~11.~~ Withholding Taxes

In connection with the Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. The Distribution Agent shall be entitled to deduct any U.S. federal, state or local withholding taxes from any Cash payments made with respect to Allowed Claims, as appropriate. As a condition to receiving any distribution under the Plan, the Distribution Agent may require that the Holder of an Allowed Claim entitled to receive a distribution pursuant to the Plan provide such Holder's taxpayer identification number and such other information and certification as may be deemed necessary for the Distribution Agent to comply with applicable tax reporting and withholding laws. If a Holder fails to comply with such a request within one year, such distribution shall be deemed an unclaimed distribution. Any amounts withheld pursuant hereto shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.

13. 12. Setoffs

The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to the Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim that are not otherwise waived, released or compromised in accordance with the Plan; *provided, however*, that neither such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtor, the Reorganized Debtor, or the Claimant Trustee of any such claims, rights and causes of action that the Debtor, the Reorganized Debtor, or Claimant Trustee possesses against such Holder. Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

14. 13. Surrender of Cancelled Instruments or Securities

As a condition precedent to receiving any distribution pursuant to the Plan on account of an Allowed Claim evidenced by negotiable instruments, securities, or notes canceled pursuant to Article IV of the Plan, the Holder of such Claim will tender the applicable negotiable instruments, securities, or notes evidencing such Claim (or a sworn affidavit identifying the negotiable instruments, securities, or notes formerly held by such Holder and certifying that they have been lost), to the Distribution Agent unless waived in writing by the Distribution Agent.

15. 14. Lost, Stolen, Mutilated or Destroyed Securities

In addition to any requirements under any applicable agreement and applicable law, any Holder of a Claim or Equity Interest evidenced by a security or note that has been lost, stolen, mutilated, or destroyed will, in lieu of surrendering such security or note to the extent required by the Plan, deliver to the Distribution Agent: (i) evidence reasonably satisfactory to the Distribution Agent of such loss, theft, mutilation, or destruction; and (ii) such security or indemnity as may be required by the Distribution Agent to hold such party harmless from any damages, liabilities, or costs incurred in treating such individual as a Holder of an Allowed Claim or Equity Interest. Upon compliance with Article VI.NO of the Plan as determined by the Distribution Agent, by a Holder of a Claim evidenced by a security or note, such Holder will, for all purposes under the Plan, be deemed to have surrendered such security or note to the Distribution Agent.

**C.      Procedures for Resolving Contingent, Unliquidated and Disputed Claims**

1.      Filing of Proofs of Claim

Unless such Claim appeared in the Schedules and is not listed as disputed, contingent, or unliquidated, or such Claim has otherwise been Allowed or paid, each Holder of a Claim was required to file a Proof of Claim on or prior to the Bar Date.

2.     Disputed Claims

Following the Effective Date, each of the Reorganized Debtor or the Claimant Trustee, as applicable, may File with the Bankruptcy Court an objection to the allowance of any Disputed Claim or Disputed Equity Interest or any other appropriate motion or adversary proceeding with respect thereto, which shall be litigated to Final Order or, at the discretion of the Reorganized Debtor or Claimant Trustee, as applicable, compromised, settled, withdrew or resolved without further order of the Bankruptcy Court, and (ii) unless otherwise provided in the Confirmation Order, the Reorganized Debtor or the Claimant Trust, as applicable, are authorized to settle, or withdraw any objections to, any Disputed Claim or Disputed Equity Interests following the Effective Date without further notice to creditors (other than the Entity holding such Disputed Claim or Disputed Equity Interest) or authorization of the Bankruptcy Court, in which event such Claim or Equity Interest shall be deemed to be an Allowed Claim or Equity Interest in the amount compromised for purposes of the Plan.

3.     Procedures Regarding Disputed Claims or Disputed Equity Interests

No payment or other distribution or treatment shall be made on account of a Disputed Claim or Disputed Equity Interest, even if a portion of the Claim is not disputed, unless and until such Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interests and the amount of such Allowed Claim or Equity Interest, as applicable, is determined by order of the Bankruptcy Court or by stipulation between the Reorganized Debtor or Claimant Trust, as applicable, and the Holder of the Claim or Equity Interest.

4.     Allowance of Claims and Equity Interests

Following the date on which a Disputed Claim or Disputed Equity Interest becomes an Allowed Claim or Equity Interest after the Distribution Date, the Distribution Agent shall make a distribution to the Holder of such Allowed Claim or Equity Interest in accordance with the Plan.

*Allowance of Claims*

After the Effective Date and subject to the other provisions of the Plan, the Reorganized Debtor or the Claimant Trust, as applicable, will have and will retain any and all rights and defenses under bankruptcy or nonbankruptcy law that the Debtor had with respect to any Claim. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Case prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim or Equity Interest will become an Allowed Claim or Equity Interest unless and until such Claim or Equity Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered an order, including, without limitation, the Confirmation Order, in the Chapter 11 Case allowing such Claim or Equity Interest.

*Estimation*

Subject to the other provisions of the Plan, the Debtor, prior to the Effective Date, and the Reorganized Debtor or the Claimant Trustee, as applicable, after the Effective Date, may, at any time, request that the Bankruptcy Court estimate (a) any Disputed Claim or Disputed Equity Interest pursuant to applicable law and in accordance with the Plan and (b) any contingent or

- 66 -

unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, and the Bankruptcy Court will retain jurisdiction under 28 U.S.C. §§ 157 and 1334 to estimate any Disputed Claim or Disputed Equity Interest, contingent Claim or unliquidated Claim, including during the litigation concerning any objection to any Claim or Equity Interest or during the pendency of any appeal relating to any such objection. All of the aforementioned objection, estimation and resolution procedures are cumulative and not exclusive of one another. Claims or Equity Interests may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court. The rights and objections of all parties are reserved in connection with any such estimation proceeding.

*Disallowance of Claims*

Any Claims or Equity Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Reorganized Debtor or the Claimant Trust, as applicable, by that Entity have been turned over or paid to the Reorganized Debtor or the Claimant Trust, as applicable.

**EXCEPT AS OTHERWISE PROVIDED HEREIN OR AS AGREED TO BY THE DEBTOR, REORGANIZED DEBTOR, OR CLAIMANT TRUSTEE, AS APPLICABLE, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

## D.    Effectiveness of the Plan

### 1.    Conditions Precedent to the Effective Date

The Effective Date of the Plan will be conditioned upon the satisfaction or waiver by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee with such consent not to be unreasonably withheld), pursuant to the provisions of Article VIII.B of the Plan of the following:

- the Plan and the Plan Documents, including the Claimant Trust Agreement and the Reorganized Limited Partnership Agreement, and all schedules, documents, supplements and exhibits to the Plan shall have been Filed in form and substance reasonably acceptable to the Debtor and the Committee.

- The Confirmation Order shall have been entered, not subject to stay pending appeal, and shall be in form and substance reasonably acceptable to the Debtor and the

Committee. The Confirmation Order shall provide that, among other things, (i) the Debtor, the Reorganized Debtor, the Claimant Trustee, or the Litigation Trustee are authorized to take all actions necessary or appropriate to effectuate and consummate the Plan, including, without limitation, (a) entering into, implementing, effectuating, and consummating the contracts, instruments, releases, and other agreements or documents created in connection with or described in the Plan, (b) assuming the Executory Contracts and Unexpired Leases set forth in the Plan Supplement, (c) making all distributions and issuances as required under the Plan; and (d) entering into any transactions as set forth in the Plan Documents; (ii) the provisions of the Confirmation Order and the Plan are nonseverable and mutually dependent; (iii) the implementation of the Plan in accordance with its terms is authorized; (iv) pursuant to section 1146 of the Bankruptcy Code, the delivery of any deed or other instrument or transfer order, in furtherance of, or in connection with the Plan, including any deeds, bills of sale, or assignments executed in connection with any disposition or transfer of Assets contemplated under the Plan, shall not be subject to any Stamp or Similar Tax; and (v) the vesting of the Claimant Trust Assets in the Claimant Trust and the Reorganized Debtor Assets in the Reorganized Debtor, in each case as of the Effective Date free and clear of liens and claims to the fullest extent permissible under applicable law pursuant to section 1141(c) of the Bankruptcy Code except with respect to such Liens, Claims, charges and other encumbrances that are specifically preserved under the Plan upon the Effective Date.

- All documents and agreements necessary to implement the Plan, including without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, in each case in form and substance reasonably acceptable to the Debtor and the Committee, shall have (a) been tendered for delivery, and (b) been effected by, executed by, or otherwise deemed binding upon, all Entities party thereto and shall be in full force and effect. All conditions precedent to such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements.

- All authorizations, consents, actions, documents, approvals (including any governmental approvals), certificates and agreements necessary to implement the Plan, including, without limitation, the Reorganized Limited Partnership Agreement, the Claimant Trust Agreement, and the New GP LLC Documents, shall have been obtained, effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws and any applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain or prevent effectiveness or consummation of the Restructuring.

- The Professional Fee Reserve shall be funded pursuant to the Plan in an amount determined by the Debtor in good faith.

2. <u>Waiver of Conditions</u>

The conditions to effectiveness of the Plan set forth in Article VIII of the Plan (other than that the Confirmation Order shall have been entered) may be waived in whole or in part by the Debtor (and, to the extent such condition requires the consent of the Committee, the consent of the Committee), without notice, leave or order of the Bankruptcy Court or any formal action other than proceeding to confirm or effectuate the Plan. The failure to satisfy or waive a condition to the Effective Date may be asserted by the Debtor regardless of the circumstances giving rise to the failure of such condition to be satisfied. The failure of the Debtor to exercise any of the foregoing rights will not be deemed a waiver of any other rights, and each right will be deemed an ongoing right that may be asserted at any time by the Debtor, the Reorganized Debtor, or the Claimant Trust, as applicable.

3. <u>Effect of Non-Occurrence of Conditions to Effectiveness</u>

Unless waived as set forth in Article VIII.B of the Plan, if the Effective Date of the Plan does not occur within twenty calendar days of entry of the Confirmation Order, the Debtor may withdraw the Plan and, if withdrawn, the Plan shall be of no further force or effect.

4. <u>Dissolution of the Committee</u>

On the Effective Date, the Committee will dissolve, and the members of the Committee and the Committee's Professionals will cease to have any role arising from or relating to the Chapter 11 Case, except in connection with final fee applications of Professionals for services rendered prior to the Effective Date (including the right to object thereto). The Professionals retained by the Committee and the members thereof will not be entitled to assert any fee claims for any services rendered to the Committee or expenses incurred in the service of the Committee after the Effective Date, except for reasonable fees for services rendered, and actual and necessary costs incurred, in connection with any applications for allowance of Professional Fees pending on the Effective Date or filed and served after the Effective Date pursuant to the Plan. Nothing in the Plan shall prohibit or limit the ability of the Debtor's or Committee's Professionals to represent either of the Trustees or to be compensated or reimbursed per the Plan and the Claimant Trust Agreement in connection with such representation.

**E.      Exculpation, Injunction, and Related Provisions**

1. <u>General</u>

Notwithstanding anything contained in the Plan to the contrary, the allowance, classification and treatment of all Allowed Claims and Equity Interests and their respective distributions and treatments under the Plan shall take into account the relative priority and rights of the Claims and the Equity Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto whether arising under general principles of equitable subordination, section 510 of the Bankruptcy Code, or otherwise.

For purposes of the following provisions:

- "*Exculpated Parties*" means, collectively, (i) the Debtor, ~~(ii~~ and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, ~~(iii) the Committee, (iv~~v) the Committee, (vi) the members of the Committee (in their official capacities), (~~v~~vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, ~~(vi) Strand (solely from the date of appointment of the Independent Directors),~~ (~~vii~~viii) the CEO/CRO; and (~~viii~~ix) the Related Persons of each of the parties listed in (i~~i~~v) through (~~vii~~viii); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

- "*Released Parties*" means, collectively, (i) ~~Reorganized Debtor, (ii) the Claimant Trust, (iii) the Litigation Trust, (iv) the~~ Independent Directors,~~(v~~; (ii) Strand (solely from the date of the appointment of the Independent Directors)~~, (vi) the Committee, (vii) the officers, directors, employees, and agents of the Debtor and Strand in each case (a) as are employed as of the Effective Date or (b) as are employed as of the date hereof and subsequently transferred by the Debtor or terminated by the Debtor without cause prior to the Effective Date, (viii) the CEO/CRO; and (ix) the Related Persons of each of the parties listed in (i) through (vi); *provided, however,* that none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Released Party."~~ through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities), (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees.

- "*Protected Parties*" means, collectively, (i) the Debtor,~~(ii) Strand (solely from the date of the appointment of the Independent Directors), (iii~~ and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (i~~v~~v) the Independent Directors, (~~v) the Committee,~~ (vi) the Committee, (vii) the members of the Committee (in their official capacities),~~ (vii) the Claimant Trust,~~ (viii) the Claimant ~~Trustee~~Trust, (ix) the ~~Litigation~~Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (~~xi~~xiii) New GP LLC, (~~xii~~xiv) the Professionals retained by the

- 70 -

Debtor and the Committee in the Chapter 11 Case, (xiiixv) the CEO/CRO; and (xivxvi) the Related Persons of each of the parties listed in (iiv) through (xiixv); *provided, however,* that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), NexBank, SSB (and any of its subsidiaries), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Protected Party."

2.  Discharge of Claims

To the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, all consideration distributed under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and Equity Interests of any kind or nature whatsoever against the Debtor or any of its Assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtor and its Estate will be deemed discharged and released under and to the fullest extent provided under section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in section 502(g), 502(h), or 502(i) of the Bankruptcy Code.

3.  Exculpation

ToSubject in all respects to Article XII.D of the Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v); *provided, however,* the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in

limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of the Plan, including Article IV.C.2 of the Plan, protecting such Exculpated Parties from liability.

    4.    <u>Releases by the Debtor</u>

On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise, that the Debtor or the Estate would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Person.

Notwithstanding anything contained herein to the contrary, the foregoing release does not release: (i) any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan, (ii) the rights or obligations of any current employee of the Debtor under any employment agreement or plan, (iii) the rights of the Debtor with respect to any confidentiality provisions or covenants restricting competition in favor of the Debtor under any employment agreement with a current or former employee of the Debtor, (iv) any Avoidance Actions, or (v) any Causes of Action arising from willful misconduct, criminal misconduct, actual fraud, or gross negligence of such applicable Released Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction.

Notwithstanding anything herein to the contrary, any release provided ~~to a current or former officer or employee of the Debtor~~ pursuant to Article IX.D of the Plan <u>(i) with respect to a Senior Employee, is conditioned in all respects on (a) such Senior Employee executing a Senior Employee Stipulation on or prior to the Effective Date and (b) the reduction of such Senior Employee's Allowed Claim as set forth in the Senior Employee Stipulation (such amount, the "Reduced Employee Claim"), and (ii) with respect to any Employee, including a Senior Employee,</u> shall be deemed null and void and of no force and effect ~~if the Claimant Trustee, with the agreement of the independent member(s)~~<u>(1) if there is more than one member</u> of the Claimant Trust Oversight ~~Board, determines that such person~~<u>Committee who does not represent entities holding a Disputed or Allowed Claim (the "Independent Members"), the Claimant Trustee and the Independent Members by majority vote determine or (2) if there is only one Independent Member, the Independent Member after discussion with the Claimant Trustee, determines (in each case after discussing with the full Claimant Trust Oversight Committee) that such Employee</u> (regardless of whether <u>the Employee is</u> then currently employed by the Debtor, the Reorganized Debtor, or the Claimant Trustee)~~(i:~~

- <u>sues, attempts to sue, or threatens or works with or assists any entity or person to sue, attempt to sue, or threaten the Reorganized Debtor, the Claimant Trust, the Litigation Sub-Trust, or any of their respective employees or agents, or any Released Party on or in connection with any claim or cause of action arising prior to the Effective Date,</u>

- has taken any action that, impairs or harms the value of the Claimant Trust Assets or the Reorganized Debtor Assets, or

- (x) upon the request of the Claimant Trustee, has failed to provide reasonable assistance in good faith to the Claimant Trustee or the Reorganized Debtor with respect to (a1) the monetization of the Claimant Trust Assets or Reorganized Debtor Assets, as applicable, or (b2) the resolution of Claims, or (iiy) has taken any action that impedes or frustrates the Claimant Trustee or the Reorganized Debtor with respect to any of the foregoing.

*Provided, however,* that the release provided pursuant to Article IX.D of the Plan will vest and the Employee will be indefeasibly released pursuant to Article IX.D of the Plan if such Employee's release has not been deemed null and void and of no force and effect on or prior to the date that is the date of dissolution of the Claimant Trust pursuant to the Claimant Trust Agreement.

By executing the Senior Employee Stipulation embodying this release, each Senior Employee acknowledges and agrees, without limitation, to the terms of this release and the tolling agreement contained in the Senior Employee Stipulation.

The provisions of this release and the execution of a Senior Employee Stipulation will not in any way prevent or limit any Employee from (i) prosecuting its Claims, if any, against the Debtor's Estate, (ii) defending him or herself against any claims or causes of action brought against the Employee by a third party, or (iii) assisting other persons in defending themselves from any Estate Claims brought by the Litigation Trustee (but only with respect to Estate Claims brought by the Litigation Trustee and not collection or other actions brought by the Claimant Trustee).

In addition to the obligations set forth in Article IX.D of the Plan, as additional consideration for the foregoing releases, the Senior Employees will waive their rights to certain deferred compensation owed to them by the Debtor. As of the date hereof, the total deferred compensation owed to the Senior Employees was approximately $3.9 million, which will be reduced by approximately $2.2 million to approximately $1.7 million. That reduction is composed of a reduction of (i) approximately $560,000 in the aggregate in order to qualify as Convenience Claims, (ii) approximately $510,000 in the aggregate to reflect the Convenience Claims treatment of 85% (and may be lower depending on the number of Convenience Claims), and (iii) of approximately $1,15 million in the aggregate to reflect an additional reduction of 40%.

As of the date of this Disclosure Statement, the Debtor has not identified any Causes of Action against any Released Parties. However, as set forth above, during the Chapter 11 Case, the Committee was granted sole standing to investigate and pursue the Estate Claims, which may include Causes of Action against certain of the Released Parties. As of the date of this Disclosure Statement, the Committee has not identified any Estate Claims against any Released Parties. The Debtor currently believes that there are no material Estate Claims or other Causes of Action against any Released Party.

5.      Preservation of Rights of Action

*Maintenance of Causes of Action*

Except as otherwise provided in the Plan, after the Effective Date, the Reorganized Debtor or the Claimant Trust will retain all rights to commence, pursue, litigate or settle, as appropriate, any and all Causes of Action included in the Reorganized Debtor Assets or Claimant Trust Assets, as applicable, whether existing as of the Petition Date or thereafter arising, in any court or other tribunal including, without limitation, in an adversary proceeding Filed in the Chapter 11 Case and, as the successors in interest to the Debtor and the Estate, may, and will have the exclusive right to, enforce, sue on, settle, compromise, transfer or assign (or decline to do any of the foregoing) any or all of the Causes of Action without notice to or approval from the Bankruptcy Court.

*Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Cause of Action against a Holder of a Claim or an Equity Interest or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including, without limitation, the Confirmation Order), such Cause of Action is expressly reserved for later adjudication by the Reorganized Debtor or Claimant Trust, as applicable (including, without limitation, Causes of Action not specifically identified or of which the Debtor may presently be unaware or that may arise or exist by reason of additional facts or circumstances unknown to the Debtor at this time or facts or circumstances that may change or be different from those the Debtor now believes to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such Causes of Action as a consequence of the confirmation, effectiveness, or consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such Causes of Action have been expressly released in the Plan or any other Final Order (including, without limitation, the Confirmation Order). In addition, the right of the Reorganized Debtor or the Claimant Trust to pursue or adopt any claims alleged in any lawsuit in which the Debtor is a plaintiff, defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits, is expressly reserved.

6.      Injunction

Upon entry of the Confirmation Order, all holders of Claims and Equity Interests and other parties in interest, along with their respective Related Persons, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan.

Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether proof of such Claims or Equity Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective Related Persons, are permanently enjoined, on and after the Effective Date, with respect to such Claims and Equity Interests, from (i) commencing, conducting, or

- 74 -

continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or the property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust, (iv) asserting any right of setoff, directly or indirectly, against any obligation due from the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust or against property or interests in property of any of the Debtor, the Independent Directors, the Reorganized Debtor, or the Claimant Trust; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

The injunctions set forth herein shall extend to any successors of the Debtor, the Reorganized Debtor, and the Claimant Trust and their respective property and interests in property.

**~~No~~Subject in all respects to Article XII. D of the Plan, no Entity may commence or pursue a claim or cause of action of any kind against any Protected Party that arose from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant Trust, or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice, that such claim or cause of action represents a colorable claim of bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such Entity to bring such claim against any such ~~Plan Party~~Protected Party; _provided, however,_ the foregoing will not apply to Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. As set forth in Article XI of the Plan, the Bankruptcy Court will have sole jurisdiction to adjudicate any such claim for which approval of the Bankruptcy Court to commence or pursue has been granted.**

7.     Term of Injunctions or Stays

Unless otherwise provided in the Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Case under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

8.    Continuance of January 9 Order

Unless otherwise provided in the Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, the restrictions set forth in paragraphs 9 and 10 of the *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course*, entered by the Bankruptcy Court on January 9, 2020 [D.I. 339] shall remain in full force and effect following the Effective Date until the dissolution of each of the Claimant Trust and the Litigation Trust.

**F.    Article XII.D of the Plan**

Article XII.D of the Plan provides that, notwithstanding anything in the Plan to the contrary, nothing in the Plan will affect or otherwise limit or release any non-Debtor Entity's (including any Exculpated Party's) duties or obligations, including any contractual and indemnification obligations, to the Debtor, the Reorganized Debtor, or any other Entity whether arising under contract, statute, or otherwise.

**G.    ~~F.~~ Binding Nature of Plan**

On the Effective Date, and effective as of the Effective Date, the Plan, including, without limitation, the provisions in Article IX of the Plan, will bind, and will be deemed binding upon, all Holders of Claims against and Equity Interests in the Debtor and such Holder's respective successors and assigns, to the maximum extent permitted by applicable law, notwithstanding whether or not such Holder will receive or retain any property or interest in property under the Plan. All Claims and Debts shall be fixed and adjusted pursuant to the Plan. The Plan shall also bind any taxing authority, recorder of deeds, or similar official for any county, state, Governmental Unit or parish in which any instrument related to the Plan or related to any transaction contemplated thereby is to be recorded with respect to nay taxes of the kind specified in Bankruptcy Code section 1146(a)

**H.    ~~G.~~ Statutory Requirements for Confirmation of the Plan**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtor believes that: (i) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtor has complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith. Specifically, the Debtor believes that the Plan satisfies or will satisfy the applicable confirmation requirements of section 1129 of the Bankruptcy Code set forth below.

- The Plan complies with the applicable provisions of the Bankruptcy Code;

- The Debtor has complied and will comply with the applicable provisions of the Bankruptcy Code;

- The Plan has been proposed in good faith and not by any means forbidden by law;

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Debtor's bankruptcy case, or in connection with the Plan and incident to the case, has been or will be disclosed to the Bankruptcy Court, and any such payment: (i) made before the confirmation of the Plan is reasonable; or (ii) is subject to the approval of the Bankruptcy Court as reasonable if it is to be fixed after confirmation of the Plan;

- Each Class of Claims or Equity Interests that is entitled to vote on the Plan will have accepted the Plan, or the Plan can be confirmed without the approval of such voting Class pursuant to section 1129(b) of the Bankruptcy Code;

- Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Administrative Expense Claims and Priority Claims will be paid in full in Cash on the Effective Date, or as soon thereafter as is reasonably practicable;

- Confirmation of the Plan will not likely be followed by the liquidation or the need for further financial reorganization of the Debtor or any successor thereto under the Plan;

- The Debtor has paid or will pay all fees payable under section 1930 of title 28, and the Plan provides for the payment of all such fees on the Effective Date; and

- The Plan provides for the continuation after the Effective Date of payment of all retiree benefits, if applicable.

1.    Best Interests of Creditors Test

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that the bankruptcy court find, as a condition to confirmation of a chapter 11 plan, that each holder of a claim or equity interest in each impaired class: (i) has accepted the plan; or (ii) among other things, will receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the amount that such Person would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code. To make these findings, the Bankruptcy Court must: (a) estimate the net Cash proceeds (the "Liquidation Proceeds") that a chapter 7 trustee would generate if the Debtor's Chapter 11 Case were converted to a chapter 7 case on the Effective Date and the assets of such Debtor's Estate were liquidated; (b) determine the distribution (the "Liquidation Distribution") that each non-accepting Holder of a Claim or Equity Interest would receive from the Liquidation Proceeds under the priority scheme dictated in chapter 7; and (c) compare each Holder's Liquidation Distribution to the distribution under the Plan that such Holder would receive if the Plan were confirmed and consummated.

2.      Liquidation Analysis

Any liquidation analysis, including the estimation of Liquidation Proceeds and Liquidation Distributions, with respect to the Debtor (the "Liquidation Analysis") is subject to numerous assumptions and there can be no guarantee that the Liquidation Analysis will be accurate. No order or finding has been entered by the Bankruptcy Court estimating or otherwise fixing the amount of Claims and Equity Interests at the projected amounts of Allowed Claims and Equity Interests set forth in the Liquidation Analysis. In preparing the Liquidation Analysis, the Debtor has projected an amount of Allowed Claims and Equity Interests that represents its best estimate of the chapter 7 liquidation dividend to Holders of Allowed Claims and Equity Interests. The estimate of the amount of Allowed Claims and Equity Interests set forth in the Liquidation Analysis should not be relied on for any other purpose, including, without limitation, any determination of the value of any Plan Distribution to be made on account of Allowed Claims and Equity Interests under the Plan and Disclosure Statement.

The full Liquidation Analysis is attached hereto as **Exhibit C**.

Furthermore, any chapter 7 trustee appointed in a chapter 7 liquidation would have to confront all of the issues described in this Disclosure Statement, including the prepetition litigation claims. This process would be significantly time-consuming and costly, and reduce any recoveries available to the Debtor's Estate. The Debtor believes that liquidation under chapter 7 would result in (i) smaller distributions being made to creditors than those provided for in the Plan because of the additional administrative expenses involved in the appointment of a trustee and attorneys and other professionals to assist such trustee, (ii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of executory contracts in connection with the cessation of the Debtor's operations, and (iii) the failure to realize greater value from all of the Debtor's assets.

Therefore, the Debtor believes that confirmation of the Plan will provide each Holder of a Claim with a greater recovery than such Holder would receive pursuant to the liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

3.      Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that the bankruptcy court find that confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor, or any successor to the Debtor, unless the plan contemplates such liquidation or reorganization. For purposes of demonstrating that the Plan meets this "feasibility" standard, the Debtor has analyzed the ability of the Claimant Trust and the Reorganized Debtor to meet their obligations under the Plan and to retain sufficient liquidity and capital resources to conduct their business. A copy of the financial projections prepared by the Debtor is attached hereto as **Exhibit C**.

The Debtor believes that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code. In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtor analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital

resources. The Debtor believes that its available Cash and any additional proceeds from the Debtor's Assets will be sufficient to allow the Debtor, the Reorganized Debtor, and the Claimant Trust, as applicable, to make all payments required to be made under the Plan. Accordingly, the Debtor believes that the Plan is feasible.

4.    Valuation

In order to provide information and full disclosure to parties in interest regarding the Debtor's assets, the Debtor estimates that its value and the total value of its Assets, as of JuneSeptember 30, 2020, was approximately $351.7328.3 million.

5.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accepts the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (i) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default— (a) cures any such default that occurred before or after the commencement of the Chapter 11 Case, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code or of a kind that section 365(b)(2) expressly does not require to be cured; (b) reinstates the maturity of such claim or interest as such maturity existed before such default; (c) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; (d) if such claim or such interest arises from any failure to perform a nonmonetary obligation, other than a default arising from failure to operate a nonresidential real property lease subject to section 365(b)(1)(A), compensates the holder of such claim or such interest (other than the debtor or an insider) for any actual pecuniary loss incurred by such holder as a result of such failure; and (e) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan and are not insiders. Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of equity interests as acceptance by holders of at least two-thirds in amount of the allowed interests of such class. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their ballots in favor of acceptance. Section 1126(d) of the Bankruptcy Code, except as otherwise provided in section 1126(e) of the Bankruptcy Code, defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two-thirds in amount of equity interests in that class actually voting to accept or to reject the plan.

Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims or Equity Interests in any voting class must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Class, and without considering whether the Plan "discriminates unfairly" with respect to such Class, as both standards are described herein.

6.      Confirmation Without Acceptance by Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if less than all impaired classes entitled to vote on the plan have accepted it, *provided* that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired Class's rejection or deemed rejection of the Plan, the Plan will be confirmed, at the Debtor's request, in a procedure commonly known as "cram down," so long as the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each Class of Claims or Equity Interests that is impaired under, and has not accepted, the Plan.

7.      No Unfair Discrimination

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

8.      Fair and Equitable Test

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the dissenting class, the test sets different standards depending on the type of claims or equity interests in such class:

The condition that a plan be "fair and equitable" to a non-accepting Class of Secured Claims includes the requirements that: (a) the Holders of such Secured Claims retain the liens securing such Claims to the extent of the Allowed amount of the Claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the Plan; and (b) each Holder of a Secured Claim in the Class receives deferred Cash payments totaling at least the Allowed amount of such Claim with a present value, as of the Effective Date of the Plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

The condition that a plan be "fair and equitable" with respect to a non-accepting Class of unsecured Claims includes the requirement that either: (a) the plan provides that each Holder of a Claim of such Class receive or retain on account of such Claim property of a value, as of the Effective Date of the plan, equal to the allowed amount of such Claim; or (b) the Holder of any

Claim or Equity Interest that is junior to the Claims of such Class will not receive or retain under the plan on account of such junior Claim or Equity Interest any property.

The condition that a plan be "fair and equitable" to a non accepting Class of Equity Interests includes the requirements that either: (a) the plan provides that each Holder of an Equity Interest in that Class receives or retains under the plan, on account of that Equity Interest, property of a value, as of the Effective Date of the plan, equal to the greater of (i) the allowed amount of any fixed liquidation preference to which such Holder is entitled, (ii) any fixed redemption price to which such Holder is entitled, or (iii) the value of such interest; or (b) if the Class does not receive such an amount as required under (a), no Class of Equity Interests junior to the non-accepting Class may receive a distribution under the plan.

To the extent that any class of Claims or Class of Equity Interests rejects the Plan, the Debtor reserves the right to seek (a) confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan in accordance with Article XIII.C of the Plan.

The Debtor believes that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for non-consensual confirmation of the Plan.

## ARTICLE IV.
## RISK FACTORS

> **ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD READ AND CONSIDER CAREFULLY THE RISK FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT. THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTOR'S BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.**

**A.** ~~**H.**~~ **Certain Bankruptcy Law and Other Considerations**

 1. <u>Parties in Interest May Object to the Debtor's Classification of Claims and Equity Interests, or Designation as Unimpaired.</u>

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtor believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Holders of Claims or Equity Interests or the Bankruptcy Court will reach the same conclusion.

There is also a risk that the Holders of Claims or Equity Interests could object to the Debtor's designation of Claims or Equity Interests as Unimpaired, and the Bankruptcy Court could reach the same conclusion.

2. <u>The Debtor May Not Be Able to Secure Confirmation of the Plan.</u>

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan and requires, among other things, findings by the bankruptcy court that: (i) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (ii) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to Holders of Claims within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the Bankruptcy Court will confirm the Plan. The Bankruptcy Court could decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.

If the Plan is not confirmed by the Bankruptcy Court, there can be no assurance that any alternative plan of reorganization or liquidation would be on terms as favorable to Holders of Claims as the terms of the Plan. In addition, there can be no assurance that the Debtor will be able to successfully develop, prosecute, confirm and consummate an alternative plan that is acceptable to the Bankruptcy Court and the Debtor's creditors.

3. <u>The Conditions Precedent to the Effective Date of the Plan May Not Occur.</u>

As more fully set forth in Article IX of the Plan, the Effective Date of the Plan is subject to a number of conditions precedent. If such conditions precedent are not waived or not met, the Effective Date will not take place.

4. <u>Continued Risk Following Effectiveness.</u>

Even if the Effective Date of the Plan occurs, the Debtor, the Reorganized Debtor, and Claimant Trust will continue to face a number of risks, including certain risks that are beyond its control, such as changes in assets, asset values, and increasing expenses. Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of liquidation reflecting the Plan will achieve the Debtor's stated goals.

In addition, at the outset of the Chapter 11 Case, the Bankruptcy Code provides the Debtor with the exclusive right to propose the Plan and prohibits creditors and others from proposing a plan. The Debtor will have retained the exclusive right to propose the Plan upon filing its petition. If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtor's ability to achieve confirmation of the Plan in order to achieve the Debtor's stated goals.

5.    The Effective Date May Not Occur.

Although the Debtor believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

6.    The Chapter 11 Case May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtor believes that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in the Plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, rather than selling the assets in an orderly and controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation.

7.    Claims Estimation

There can be no assurance that the estimated Claim amounts set forth herein are correct, and the actual amount of Allowed Claims may differ from the estimates.  The estimated amounts are subject to certain risks, uncertainties, and assumptions.  Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual amount of Allowed Claims may vary from those estimated herein.

8.    The Financial Information Contained Herein is Based on the Debtor's Books and Records and, Unless Otherwise Stated, No Audit was Performed.

**The financial information contained in this Disclosure Statement has not been audited**.  In preparing this Disclosure Statement, the Debtor relied on financial data derived from their books and records that was available at the time of such preparation.  Although the Debtor has used its reasonable business judgment to ensure the accuracy of the financial information provided in this Disclosure Statement and, while the Debtor believes that such financial information fairly reflects its financial condition, the Debtor is unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

**B.**    ~~I.~~ **Risks Related to Recoveries under the Plan**

1.    The Reorganized Debtor and/or Claimant Trust May Not Be Able to Achieve the Debtor's Projected Financial Results

The Reorganized Debtor or Claimant Trust, as applicable, may not be able to achieve their projected financial results.  The Financial Projections represent the best estimate of the Debtor's future financial performance, which is necessarily based on certain assumptions

- 83 -

regarding the anticipated future performance of the Reorganized Debtor or Claimant Trust, as well as the United States and world economies in general, and the investment industry in which the Debtor operates. The Debtor's Financial Projections include key assumptions on (i) target asset monetization values, (ii) timing of asset monetization, and (iii) costs to effectuate the Plan. In terms of achieving target asset monetization values, the Debtor faces issues including investment assets with cross-ownership across related entities and challenges associated with collecting notes due from affiliates. The Debtor's Financial Projections anticipate that all investment assets will be sold by 2022, which may be at risk due to the semi-liquid or illiquid nature of the Debtor's assets, as well as general market conditions, including the sustained impact of COVID-19. Costs are based on estimates and may increase with delays or any other unforeseen factor. If the Reorganized Debtor or Claimant Trust do not achieve their projected financial results, the recovery for Claimant Trust Beneficiaries may be negatively affected and the Claimant Trust may lack sufficient liquidity after the Effective Date.

2.     <u>Claim Contingencies Could Affect Creditor Recoveries</u>

The estimated Claims and projected creditor recoveries set forth in this Disclosure Statement are based on various assumptions the actual amount of Allowed Claims may differ from the estimates. Should one or more of the underlying assumptions ultimately prove incorrect, the actual Allowed amounts of Claims may vary materially from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtor cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to Holders of Allowed Claims under the Plan.

3.     <u>If Approved, the Debtor Release Could Release Claims Against Potential Defendants of Estate Causes of Action With Respect to Which the Claimant Trust Would Otherwise Have Recourse</u>

The Claimant Trust Assets will include, among other things, Causes of Action, including Estate Claims that will be assigned to the Litigation Sub-Trust. The Committee's investigation of potential Estate Claims is still ongoing. Because the Committee has not concluded its investigation as of the date hereof, and such investigation will be transferred to the Litigation Trustee, there is no certainty of whether there are viable Estate Claims against any of the Released Parties. In the event there are viable Estate Claims against any of the Released Parties, such claims cannot be pursued for the ultimate benefit of Claimant Trust Beneficiaries if the Debtor Release is approved.

**<span style="color:blue"><u>C.</u></span>**     <span style="color:red">~~J.~~</span>**Investment Risk Disclaimer**

1.     <u>Investment Risks in General.</u>

The Reorganized Debtor is and will remain a registered investment adviser under the Investment Advisers Act of 1940, and the Reorganized Debtor will continue advising the Managed Funds. No guarantee or representation is made that the Reorganized Debtor's or the Managed Funds' investment strategy will be successful, and investment results may vary substantially over time.

2. <u>General Economic and Market Conditions and Issuer Risk.</u>

Any investment in securities carries certain market risks. Investments by the Reorganized Debtor, the Managed Funds, or the Claimant Trust may decline in value for any number of reasons over which none of the Managed Funds, the Reorganized Debtor, the Claimant Trust, or the Claimant Trustee may have control, including changes in the overall market and other general economic and market conditions, such as interest rates, availability of credit, inflation rates, economic uncertainty, changes in laws, currency exchange rates and controls and national, international political circumstances (including wars and security operations), and acts of God (including pandemics like COVID-19). The value of the Managed Funds or the assets held by the Reorganized Debtor or Claimant Trust may also decline as a result of factors pertaining to particular securities held by the Managed Funds, Reorganized Debtor, or Claimant Trust, as applicable, such as perception or changes in the issuer's management, the market for the issuer's products or services, sources of supply, technological changes within the issuer's industry, the availability of additional capital and labor, general economic conditions, political conditions, acts of God, and other similar conditions. All of these factors may affect the level and volatility of security prices and the liquidity and the value of the securities held by the Managed Fund, Reorganized Debtor, or Claimant Trust. Unexpected volatility or illiquidity could impair the Managed Funds', Reorganized Debtor's, or Claimant Trust's profitability or result in it suffering losses.

**D.** ~~K.~~**Disclosure Statement Disclaimer**

1. <u>The Information Contained Herein is for Disclosure Purposes Only.</u>

The information contained in this Disclosure Statement is for purposes of disclosure in connection with the Plan and may not be relied upon for any other purposes.

2. <u>This Disclosure Statement was Not Approved by the SEC.</u>

Neither the SEC nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

3. <u>This Disclosure Statement Contains Forward-Looking Statements.</u>

This Disclosure Statement contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward-looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward-looking statements.

4.      No Legal or Tax Advice is Provided to You by This Disclosure Statement.

**This Disclosure Statement is not legal or tax advice to you**.  The contents of this Disclosure Statement should not be construed as legal, business or tax advice, and are not personal to any person or entity.  Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any legal, tax and other matters concerning his or her Claim or Equity Interest.  This Disclosure Statement may not be relied upon for any purpose other than as a disclosure of certain information to determine how to vote on the Plan or object to confirmation of the Plan.

5.      No Admissions Are Made by This Disclosure Statement.

The information and statements contained in this Disclosure Statement will neither (i) constitute an admission of any fact or liability by any Entity (including, without limitation, the Debtor) nor (ii) be deemed evidence of the tax or other legal effects of the Plan on the Debtor, the Reorganized Debtor, the Claimant Trust, Holders of Allowed Claims or Equity Interests, or any other parties in interest.

6.      No Reliance Should Be Placed on Any Failure to Identify Litigation Claims or Projected Objections.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim or Equity Interest is, or is not, identified in this Disclosure Statement.  The Debtor or the Reorganized Debtor or Claimant Trustee, as applicable, may seek to investigate, file and prosecute litigation rights and claims against any third parties and may object to Claims after the Confirmation Date or Effective Date of the Plan irrespective of whether the Disclosure Statement identifies such litigation claims or objections to Claims or Equity Interests.

7.      Nothing Herein Constitutes a Waiver of Any Right to Object to Claims or Equity Interests or Recover Transfers and Assets.

The Debtor, the Reorganized Debtor, the Claimant Trustee, or any party in interest, as the case may be, reserve any and all rights to object to that Holder's Allowed Claim regardless of whether any Claims or Causes of Action of the Debtor or its Estate are specifically or generally identified herein.

8.      The Information Used Herein was Provided by the Debtor and was Relied Upon by the Debtor's Advisors.

Counsel to and other advisors retained by the Debtor have relied upon information provided by the Debtor in connection with the preparation of this Disclosure Statement.  Although counsel to and other advisors retained by the Debtor have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not verified independently the information contained herein.

9.      The Disclosure Statement May Contain Inaccuracies.

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date.  While the Debtor has used its reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtor nonetheless cannot, and does not, confirm the current accuracy of all statements appearing in this Disclosure Statement.  Further, the information contained in this Disclosure Statement is as of the date of the Disclosure Statement and does not address events that may occur after such date.  The Debtor may update this Disclosure Statement but is not required to do so.

10.      No Representations Made Outside the Disclosure Statement Are Authorized.

No representations concerning or relating to the Debtor, the Chapter 11 Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  You should promptly report unauthorized representations or inducements to the counsel to the Debtor and the U.S. Trustee.

## ARTICLE V.ARTICLE II.
## ALTERNATIVES TO CONFIRMATION AND EFFECTIVENESS OF THE PLAN

If no chapter 11 plan can be confirmed, the Chapter 11 Case may be converted to a case under chapter 7 of the Bankruptcy Code in which case, a trustee would be elected or appointed to liquidate the Debtor's assets.  If the Plan is not confirmed by the Bankruptcy Court, there can be no assurance that any alternative plan of reorganization or liquidation would be on terms as favorable to Holders of Claims as the terms of the Plan.  In addition, there can be no assurance that the Debtor will be able to successfully develop, prosecute, confirm and consummate an alternative plan that is acceptable to the Bankruptcy Court and the Debtor's creditors.

## ARTICLE VI.ARTICLE V.
## U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

Implementation of the Plan will have federal, state, local or foreign tax consequences to the Debtor and Holders of Equity Interests as well as Holders of Claims.  No tax opinion or ruling has been sought or will be obtained with respect to any tax consequences of the Plan, and the following discussion does not constitute and is not intended to constitute either a tax opinion or tax advice to any person.

The following discussion summarizes certain U.S. federal income tax consequences of the Plan to the Debtor and to Holders of Claims.  This discussion assumes that each Holder of Claims is for United States federal income tax purposes:

- An individual who is a citizen or resident of the United States for federal income tax purposes;

- 87 -

- a corporation (or other entity treated as a corporation for United States federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- any other person that is subject to U.S. federal income taxation on a net income basis.

- an estate the income of which is subject to United States federal income tax without regard to its source; or

- a trust (1) that is subject to the primary supervision of a United States court and the control of one or more United States persons or (2) that has a valid election in effect under applicable treasury regulations to be treated as a United States person.

This discussion also assumes that each Holder holds the Claims as capital assets under Section 1221 of the Internal Revenue Code.

The summary provides general information only and does not purport to address all of the federal income tax consequences that may be applicable to the Debtor or to any particular Holder of Claims in light of such Holder's own individual circumstances. In particular, the summary does not address the federal income tax consequences of the Plan to Holders of Claims that may be subject to special rules, such as non-U.S. persons, insurance companies, financial institutions, regulated investment companies, broker-dealers, persons who acquired Claims as part of a straddle, hedge, conversion transaction or other integrated transaction, or persons who acquired Claims  in connection with the performance of services; persons who hold Claims through a partnership or other pass-through entity and tax-exempt organizations.  The summary does not address foreign, state, local, estate or gift tax consequences of the Plan, nor does it address the federal income tax consequences to Holders of Equity Interests.

This summary is based on the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), the final, temporary and proposed Treasury regulations promulgated thereunder, judicial decisions and administrative rulings and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof and all of which are subject to change (possibly with retroactive effect) by legislation, judicial decision or administrative action. Moreover, due to a lack of definitive authority, substantial uncertainties exist with respect to various tax consequences of the Plan.

**THE TAX CONSEQUENCES TO THE HOLDERS OF CLAIMS OR EQUITY INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER.  MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE APPLICABLE TAX LAW.  THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED.  ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST SHOULD CONSULT WITH**

**ITS OWN TAX ADVISOR REGARDING THE FOREIGN, FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN.**

**A.  Consequences to the Debtor**

It is anticipated that the consummation of the Plan will not result in any federal income tax liability to the Debtor.  The Debtor is a partnership for federal income tax purposes.  Therefore, the income and loss of the Debtor is passed-through to the Holders of its Equity Interests, and the Debtor does not pay federal income tax.

1.  Cancellation of Debt

Generally, the discharge of a debt obligation of a debtor for an amount less than the adjusted issue price (in most cases, the amount the debtor received on incurring the obligation, with certain adjustments) creates cancellation of indebtedness ("COD") income that must be included in the debtor's income.  Due to the nature of the Impaired Claims, it is anticipated that the Debtor will not recognize any material amount of COD income.  If any such COD income is recognized, it will be passed-through to the Holders of its Equity Interests, and the Holders of such Equity Interest generally will be required to include such amounts in income, unless a Holder is entitled to exclude such amounts from income under Section 108 of the Internal Revenue Code, based on the Holder's individual circumstances.

2.  Transfer of Assets

Pursuant to the Plan, the Debtor's assets (including the Claimant Trust Assets and Reorganized Debtor Assets) will be transferred directly or indirectly to the Claimant Trust.  For federal income tax purposes, any such assets transferred to the Claimant Trust will be deemed to have been transferred to the Claimant Trust Beneficiaries followed by the transfer by such Holders to the Claimant Trust of such assets in exchange for the respective Holders' beneficial interests in the Claimant Trust.  The Claimant Trust thereafter will be treated as a grantor trust for federal income tax purposes.  See U.S. Federal Income Tax Treatment of the Claimant Trust, below.

The Debtor's transfer of its assets pursuant to the Plan will constitute a taxable disposition of such assets.  As discussed above, the Debtor is a partnership for federal income tax purposes.  Any gain or loss recognized as a result of the taxable disposition of such assets will be passed through to the Holders of Equity Interests in the Debtor.  The Debtor will not be required to pay any tax as a result of such disposition.

**B.  U.S. Federal Income Tax Treatment of the Claimant Trust**

It is intended that the Claimant Trust will be treated as a "grantor trust" for U.S. federal income tax purposes.  In general, a grantor trust is not a separate taxable entity.  The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an advanced ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  Consistent with the requirements of Revenue Procedure 94-45, the Claimant Trust Agreement requires all relevant parties to treat, for U.S. federal income tax purposes, the transfer of the Debtor's assets to the Claimant Trust as (i) a transfer of such assets to the Claimant Trust

Beneficiaries (to the extent of the value of their respective interests in the applicable Claimant Trust Assets) followed by (ii) a transfer of such assets by such beneficiaries to the Claimant Trust (to the extent of the value of their respective interests in the applicable Claimant Trust Assets), with the beneficiaries being treated as the grantors and owners of the Claimant Trust.

The Plan and the Claimant Trust Agreement generally provide that the Claimant Trust Beneficiaries must value the assets of the Claimant Trust consistently with the values determined by the Claimant Trustee for all U.S. federal income tax purposes. As soon as possible after the Effective Date, the Claimant Trustee, based upon his good faith determination after consultation with his counsel and other advisors, shall inform the beneficiaries in writing as to his estimate of the value of the assets transferred to the Claimant Trust and the value of such assets allocable to each Class of beneficiaries.

Consistent with the treatment of the Claimant Trust as a grantor trust, the Claimant Trust Agreement will require each beneficiary to report on its U.S. federal income tax return its allocable share of the Claimant Trust's income, gain, loss or deduction that reflects the beneficiary's interest in the interim and final distributions to be made by the Claimant Trust. Furthermore, certain of the assets of the Claimant Trust will be interests in the Reorganized Debtor, which will be a partnership for U.S. federal income tax purposes. The income, gain, loss or deduction of the Reorganized Debtor will also flow through the Claimant Trust to the beneficiaries of the Claimant Trust. Therefore, a beneficiary may incur a federal income tax liability with respect to its allocable share of the income of the Claimant Trust (including the income of the Reorganized Debtor) whether or not the Claimant Trust has made any distributions to such beneficiary. The character of items of income, gain, deduction, and credit to any beneficiary and the ability of such beneficiary to benefit from any deduction or losses will depend on the particular situation of such beneficiary. The interests of the beneficiaries may shift from time to time as the result of the allowance or disallowance of claims that have not been allowed at the Effective Date, which could give rise to tax consequences both to the Holders of claims that have, and have not been, allowed at the Effective Date. The Claimant Trustee will file with the IRS tax returns for the Claimant Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) and will also send to each beneficiary a separate statement setting forth such beneficiary's share of items of Trust income, gain, loss, deduction, or credit. Each beneficiary will be required to report such items on its U.S. federal income tax return. Holders are urged to consult their tax advisors regarding the appropriate federal income tax treatment of distributions from the Claimant Trust.

The discussion above assumes that the Claimant Trust will be respected as a grantor trust for U.S. federal income tax purposes. If the IRS were to challenge successfully such classification, the U.S. federal income tax consequences to the Claimant Trust and the beneficiaries could differ materially from those discussed herein (including the potential for an entity level tax to be imposed on all income of the Claimant Trust).

### C. Consequences to Holders of Allowed Claims

1.  Recognized Gain or Loss

In general, each Holder of an Allowed Claim will recognize gain or loss in an amount equal to the difference between (i) the "amount realized" by such Holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (ii) such holder's adjusted tax basis in such Claim (other than any Claim for accrued but unpaid interest). In general, the "amount realized" by a Holder will equal the sum of any cash and the aggregate fair market value of any property received by such Holder pursuant to the Plan (for example, such Holder's undivided beneficial interest in the assets of the Claimant Trust). A Holder that receives or is deemed to receive for U.S. federal income tax purposes a non-cash asset under the Plan in respect of its Claim should generally have a tax basis in such asset in an amount equal to the fair market value of such asset on the date of its receipt or deemed receipt. See U.S. Federal Income Tax Treatment of the Claimant Trust, above for more information regarding the tax treatment of the Claimant Trust Interests.

Where gain or loss is recognized by a Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the Holder, whether the claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the claim was acquired at a market discount, and whether and to what extent the Holder had previously claimed a bad debt deduction.

A Holder who, under the Plan, receives in respect of an Allowed Claim an amount less than the Holder's tax basis in the Allowed Claim may be entitled to a deduction for U.S. federal income tax purposes. The rules governing the character, timing and amount of such a deduction place considerable emphasis on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

2.  Distribution in Discharge of Accrued Unpaid Interest

Pursuant to the Plan, a distribution received in respect of Allowed Claims will be allocated first to the principal amount of such Claims, with any excess allocated to unpaid accrued interest. However, there is no assurance that the IRS would respect such allocation for federal income tax purposes. In general, to the extent that an amount received (whether cash or other property) by a Holder of a claim is received in satisfaction of interest that accrued during its holding period, such amount will be taxable to the Holder as interest income if not previously included in the Holder's gross income. Conversely, a Holder generally recognizes a deductible loss to the extent that it does not receive payment of interest that has previously been included in its income. Holders of Claims are urged to consult their tax advisors regarding the allocation of consideration and the deductibility of unpaid interest for tax purposes.

3.  Information Reporting and Withholding

All distributions to Holders of Allowed Claims under the Plan are subject to any applicable withholding tax requirements. Under federal income tax law, interest, dividends, and

other reportable payments, may, under certain circumstances, be subject to "backup withholding" (currently at a rate of up to 24%). Backup withholding generally applies if the Holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

**D.    Treatment of the Disputed Claims Reserve**

Pursuant to the Plan, the Claimant Trustee may file an election pursuant to Treasury Regulation 1.468B-9(c) to treat the Disputed Claims Reserve as a disputed ownership fund, in which case the Claimant Trustee will file federal income tax returns and pay taxes for the Disputed ~~Claim~~Claims Reserve as a separate taxable entity. Such taxes will be paid out of the Disputed Claims Reserve and therefore may reduce amounts paid to Holders of Allowed Claims from the Claimant Trust. If the Claimant Trustee does not make such an election to treat the Disputed ~~Claim~~Claims Reserve as a separate taxable entity, the net income, if any, earned in the Disputed Claims Reserve will be taxable to the Holders of Allowed Claims in accordance with the principles discussed above under the heading "U.S. Federal Income Tax Treatment of the Claimant Trust", possibly in advance of any distributions to the Holders.

**AS INDICATED ABOVE, THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT WITH HIS OWN TAX ADVISOR REGARDING THE TAX CONSEQUENCES OF THE PLAN.**

**ARTICLE VII.~~ARTICLE VI.~~**
**RECOMMENDATION**

In the opinion of the Debtor, the Plan is preferable to the alternatives described in this Disclosure Statement because it provides for the highest distribution to the Debtor's creditors and interest holders. In addition, any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses resulting in smaller distributions to Holders of Allowed Claims and Equity Interests than that which is proposed under the Plan. Accordingly, the Debtor recommends that all Holders of Claims and Equity Interests support confirmation of the Plan.

~~In the opinion of the Committee, the Plan is not confirmable. Accordingly, the Committee recommends that all general unsecured creditors oppose confirmation of the Plan.~~

Dated: ~~October 25,~~November 20, 2020

Respectfully submitted,

HIGHLAND CAPITAL MANAGEMENT, L.P.

_____

James P. Seery, Jr.
Chief Executive Officer and Chief Restructuring
Officer

Prepared by:

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Boulevard, 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        gdemo@pszjlaw.com

and

**HAYWARD & ASSOCIATES PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
Zachery Z. Annable (TX Bar No. 24053075)
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110
Email: MHayward@HaywardFirm.com
        ZAnnable@HaywardFirm.Com:

*Counsel for the Debtor and Debtor-in-Possession*

## **EXHIBIT A**

## **PLAN OF REORGANIZATION**

## **EXHIBIT B**

## **ORGANIZATIONAL CHART OF THE DEBTOR**

**<u>EXHIBIT C</u>**

**LIQUIDATION ANALYSIS/FINANCIAL PROJECTIONS**

Document comparison by Workshare 9.5 on Friday, November 20, 2020 6:47:59 PM

| Input: | |
|---|---|
| Document 1 ID | PowerDocs://DOCS_NY/40478/22 |
| Description | DOCS_NY-#40478-v22-Highland_-_Disclosure_Statement |
| Document 2 ID | PowerDocs://DOCS_NY/40478/28 |
| Description | DOCS_NY-#40478-v28-Highland_-_Disclosure_Statement |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 506 |
| Deletions | 385 |
| Moved from | 7 |
| Moved to | 7 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 905 |