PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | **Re: Docket No. 1528** |
| | ) | |

## DEBTOR'S RESPONSE TO MOTION FOR ORDER IMPOSING TEMPORARY RESTRICTIONS ON DEBTOR'S ABILITY, AS PORTFOLIO MANAGER, TO INITIATE SALES BY NON-DEBTOR CLO VEHICLES

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

The above-captioned debtor and debtor-in-possession (the "Debtor") hereby submits this response (the "Response") to the *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* [Docket No. 1528] (the "Motion").[2]  In support of the Response, the Debtor respectfully states as follows:

## **PRELIMINARY STATEMENT**

1.      Through the Motion, Highland Capital Management Fund Advisors, L.P. ("HCMFA") and NexPoint Advisors, L.P. ("NPA," and together with HCMFA, the "Advisors") and Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (collectively, the "Funds,"[3] and together with the Advisors, the "Movants") seek entry of an order enjoining the Debtor from exercising its authority and duties as Portfolio Manager with respect to the CLOs – each of which is a non-debtor – for a period of thirty days.  The Advisors are controlled by Mr. James Dondero, and the Funds are managed by Mr. Dondero.[4]  Mr. Dondero's attempt to hide behind the Funds' "independent" boards does not change this reality.[5]

---

[2] All capitalized terms used but not defined herein have the meanings given to them in the Motion.

[3] HCMFA is the investment advisor for Highland Income Fund.  NPA is the investment advisor for NexPoint Strategic Opportunities Fund and NexPoint Capital, Inc.

[4] **NexPoint Strategic Opportunities Fund**, Form N-2, filed Aug. 27, 2019 ("[NexPoint Advisors, L.P.] is controlled by James Dondero by virtue of his control of its general partner, NexPoint Advisors GP, LLC. . . [NexPoint Strategic Opportunities Fund's] portfolio manager is James Dondero.  Mr. Dondero has managed the portfolio since September 2012.  His investment decisions are not subject to the oversight, approval or ratification of a committee."); **NexPoint Capital, Inc.**, Form 497, filed March 14, 2018, ("Our portfolio managers are James Dondero, Michael Gregory, and Nate Burns.  Their investment decisions are not subject to the oversight, approval or ratification of a committee"); **Highland Income Fund**, Form 497, filed July 29, 2019, ("Mr. Dondero is a founder and President of HCMLP and has managed [Highland Income Fund] since June 2018. . . Highland Capital Management Fund Advisors, L.P. serves as [Highland Income Fund's] investment adviser pursuant to the Investment Advisory Agreement with [Highland Income Fund].  HCMFA is controlled by James Dondero and Mark Okada, by virtue of their respective share ownership, and its general partner, Strand Advisors XVI, Inc., of which Mr. Dondero is the sole stockholder.").  True and accurate copies of each of the foregoing are attached hereto as Exhibit A-1, A-2, and A-3, respectively.

[5] In their annual proxy statements filed with the Securities and Exchange Commission (the "SEC"), each Fund discloses its directors, their compensation, and their past experience.  Each Fund has generally the same slate of directors, and each Fund's "independent" board consists of John Honis, Bryan Ward, Ethan Powell, and Robert Froehlich.  NexPoint Strategic Opportunities Fund recently added an additional director with respect to its REIT operations, Edward Constantino.  Each director receives a $150,000 annual stipend for its services across the "Highland Complex."  On information and belief, each of the directors with the exception of Mr. Constantino,

2.      The Motion, instead of addressing the Movants' contractual rights with respect to the CLOs (which, as shown below, prohibit the relief requested in the Motion) or following the proper procedures for a temporary injunction (which also would be unavailing), urges this Court to use its powers under 11 U.S.C. §§ 105 and 363 to enjoin the Debtor from fulfilling its responsibilities to manage the property of the non-debtor CLOs.  Barring that, the Movants ask this Court to amend the Debtor's Operating Protocols to limit the Debtor's ability to cause the CLOs to sell assets.  Each of these arguments is without merit.  As discussed below:

- The agreements governing the CLOs expressly grant the Debtor, as Portfolio Manager, the authority and discretion to cause the CLOs to sell assets, and *no* investor has any right under those agreements to control or otherwise interfere with the Debtor's discretion;

- The Debtor is authorized under 11 U.S.C. § 363(c) to continue exercising its discretion with respect to the CLOs without interference;

- There are no grounds to enjoin the Debtor from exercising that authority or for this Court to interfere with the rights of third parties; and

- The Operating Protocols were negotiated with the CLOs expressly to preserve the Debtor's discretion to manage the CLOs' assets without interference.

3.      Ultimately, the Movants state that they filed the Motion to "preserve the status quo" while the Movants explore replacing the Debtor "consensually or through the contractual process" in the Management Agreements.  Motion, ¶ 21.  That statement is disingenuous.  The

---

serves on twenty-three separate boards of funds managed by the Advisors.  *See* Highland Income Fund, Form 497, dated July 29, 2019.

The Funds admit that Mr. Honis is not disinterested.  Mr. Honis is the president of Rand Advisors, LLC, which manages the Hunter Mountain Investment Trust ("Hunter Mountain").  Hunter Mountain is the Debtor's largest limited partner and is currently in litigation with the Debtor.  Although deemed to be disinterested, until December 2015, Mr. Powell was a long-tenured employee of the Debtor, HCMFA, and various Debtor- and Debtor-affiliate managed funds.  Mr. Constantino has served as a member of NexPoint Residential Trust, Inc. – an affiliated fund – since March 2015 and is a director of NexPoint Residential Trust, Inc. – another affiliated fund.  No information is currently known about the relationship, if any, between Mr. Ward, Dr. Froehlich, and Mr. Dondero.  *See* Highland Income Fund, Form DEF-14A, filed April 22, 2020 (the "HIF Proxy"); NexPoint Strategic Opportunities Fund, Form DEF-14A, filed July 10, 2020 (the "NPSO Proxy"); NexPoint, Capital, Inc., Form DEF-14A, filed April 22, 2020 (the "NC Proxy").  True and accurate copies of each of the foregoing are attached hereto as Exhibit B-1, B-2, and B-3, respectively.

Debtor offered the Movants the chance to purchase the Management Agreements on December 5, 2020. The Movants responded to that offer by filing the Motion. The Motion does not want to preserve the status quo; it is simply a pretext for Mr. Dondero's continuing efforts to thwart the Debtor's effort to fulfill its contractual and statutory duties to manage the CLOs without interference as the Debtor proceeds towards confirmation of its plan. On December 10, 2020, the Court entered the *Order Granting Debtor's Motion for a Temporary Restraining Order against James Dondero*, Adv. Proc. No. 20-03190-sgj [Docket No. 10] (the "TRO"). The TRO was necessitated by Mr. Dondero's unlawful interference in the Debtor's management of the CLOs and threats made by Mr. Dondero to Mr. James P. Seery, Jr., and the Debtor's employees. This Motion, together with Mr. Dondero's *Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside of the Ordinary Course of Business* [Docket No. 1439] (the "Dondero Motion"), are desperate attempts by Mr. Dondero to regain control over the Debtor after his alternative plan proposal received no traction with the Debtor's creditors.

## **BACKGROUND**

4.     Each CLO is a Cayman-domiciled entity that owns a pool of loans. To finance its acquisition of loans, each CLO issued notes and preference shares to third party investors. The Preference Shares referenced in the Motion receive the CLOs' available residual cash flow after the CLO has made the required payments on the notes. Although called equity, the Preference Shares are not common equity and are not owed any statutory or common law duties.[6] Each CLO is a passive vehicle that has contracted with a third-party portfolio manager to manage its

---

[6] Attached as Exhibit A to the Motion is a chart showing the current capital structure of each of the CLOs and the Movants' alleged ownership in each CLO. As set forth on Exhibit B to the Motion, the Movants are minority investors in the Preference Shares in all but three CLOs and are junior to senior noteholders in a third of the CLOs. All other investors in the CLOs are, on information and belief, third party investors that are not affiliated or related to the Debtor, the Movants, or Mr. Dondero.

portfolio of loans. With respect to each CLO, the Debtor is the third-party "Portfolio Manager" retained by the CLO pursuant to the terms of various portfolio management or servicer agreements between the Debtor and the CLO (collectively, the "Management Agreements").[7] The Debtor, as Portfolio Manager, manages those assets, on a discretionary basis, which includes selling those assets if the Debtor, as Portfolio Management, determines that such sale is in the best interests of the CLOs.

5.      Each investor in the CLOs agreed that the Portfolio Manager would have sole power to direct the CLOs with respect to investment decisions. What rights investors have are governed by the terms of the indentures governing the CLOs (collectively, the "Indentures"),[8] the preference share paying agency agreements, and in certain cases the Management Agreements. However, the investors have no right to direct the Portfolio Manager or to otherwise have a say in how the CLOs' assets are managed or sold.[9] Any effort by an individual investor to usurp that control is impermissible and contrary to the CLO agreements and the expectations of all investors. Mr. Dondero is, with three potential exceptions, a minority or junior investor in the CLOs and the Court should reject his attempt to usurp the Debtor's right to

---

[7] True and accurate copies of the Management Agreements are attached hereto as Exhibit C.

[8] True and accurate copies of the Indentures are attached hereto as Exhibit D.

[9] *See, e.g.,* Offering Memorandum, Grayson CLO, Ltd., Grayson CLO Corp, dated October 7, 2005, Risk Factors, page 44:

> *The Issuer Will Have Limited Control of the Administration and Amendment of the Collateral Obligations*
>
> The Servicer will cause the Issuer to exercise or enforce or refrain from exercising or enforcing its rights in connection with the Collateral Obligations or any related documents or will refuse amendments or waivers of the terms of any Collateral Obligation and related documents in accordance with its ordinary business practices as if the Servicer were administering the Collateral Obligations for its own account The authority of the Servicer to cause the Issuer to change the terms of the Collateral Obligations will generally not be restricted by the Indenture or the Servicing Agreement. As result the Issuer will be relying on the Servicers customary standards policies and procedures with respect to the servicing of the Collateral Obligations The Holders of the Securities and the Issuer will not have any right to compel the Issuer or the Servicer to take or refrain from taking any actions other than in accordance with its ordinary business practices.

A true and correct copy of the Grayson CLO, Ltd., Grayson CLO, Corp. Offering Memorandum is attached as Exhibit E.

manage the CLOs without interference from Mr. Dondero or his funds.

**REPLY**

**I.     The Motion and Requested Relief Are Contrary to the CLO Agreements.**

6.     The relief sought by the Movants is barred under the terms of the agreements governing the CLOs.  The Indentures define the procedures for buying, managing, and selling the CLOs' assets (referred to in the Indentures as the Collateral or Collateral Obligations or Reference Obligations).  The Management Agreements set forth the Portfolio Manager's duties and obligations and the requirements for removing the Portfolio Manager if investors are not satisfied.[10]  It is telling that the Motion is silent about those provisions; indeed, they offer no support for the Motion.  As explained below, the Movants have no authority to stop the Debtor or the CLOs from managing and selling their assets as required under the Indenture and cannot unilaterally remove the Debtor as Portfolio Manager.[11]

**The Movants Have No Contractual Right to Stop Sales of CLO Assets**

7.     The CLO agreements strictly define when and how the CLOs' assets are sold and the Portfolio Manager's rights and obligations related thereto.  *See generally* Indenture § 12.1;

---

[10] The Debtor's role is referred to as either the Servicer of Portfolio Manager.  References to the "Management Agreements" are to the Servicing Agreement or Portfolio Management Agreement entered by the Debtor and each CLO, and references to the "Indentures" are to the Indentures entered into by each CLO.  All of the Management Agreements and Indentures are governed by New York law, and the relevant provisions of those agreements are identical in all material respects across the CLOs at issue in the Motion.  To the extent that relevant differences exist, they are identified.  For ease of reference, unless otherwise noted, the citations herein are to the Management Agreement and Indenture of the Grayson CLO.  Exhibit F hereto includes references to the relevant provisions of each Indenture and Management Agreement.

[11] The Movants lack the requisite standing to enforce the CLO agreements.  While they claim to be Preference Shareholders, none of the Movants actually holds the Preferred Shares:  The Advisors, by their own admission, do not actually hold any Preference Shares or any other interest in the CLOs; and although the Funds may have such an interest, they are not the registered holders of such shares, *i.e.* the parties whose name shows up on the CLOs share register.   Absent authorization from the registered holder, the Movants cannot enforce any rights with respect to the CLOs.  *See, e.g., Cortlandt St. Recovery Corp. v. Hellas Telecommc'ns, S.a.r.l.*, 996 N.Y.S.2d 476, 489 (Sup. Ct. N.Y. Cnty. 2014), *aff'd as modified*, 142 A.D.3d 833 (1st Dep't 2016) (holding that under New York law, "it is well settled that a beneficial holder of a note lacks standing to sue for payments due upon the note where, as here, the indenture reserves the right to sue to the registered holder of the note."); *Springwell Nav. Corp. v. Sanluis Corporacion, S.A.*, 46 A.D.3d 377 (1st Dep't 2007) (same).

6

Management Agreement § 2. There is no dispute that these provisions make clear that sales take place at the Portfolio Manager's direction and sole discretion, subject to the limitations in the Indenture. *See* Indenture § 12.1 ("[T]he Issuer may, at the direction of the [Portfolio Manager], direct the Trustee to sell any Collateral Obligation or Workout Asset"); Management Agreement § 2(a)(iv) ("[T]he [Portfolio Manager], subject to and in accordance with the provisions of the Indenture may, at any time permitted under the Indenture, and shall, when required by the Indenture, direct the Trustee to . . . dispose of a Collateral Obligation"); Motion, ¶ 7 ("[T]he Debtor is responsible, among other things, for making decisions to sell the CLOs' assets.").

8. Unlike other instances where "Noteholders" or "Preferred Shareholders" may have direction rights, nothing in the Indentures or the Management Agreements gives Movants (or any other investor in the CLOs) the right to block, interfere with, influence, control, or otherwise direct the asset sale process. This is dispositive under the maxim of "*expressio unium est exclusio alterius.*" *Int'l Fid. Ins. Co. v. Cty. of Rockland*, 98 F. Supp. 2d 400, 412-13 (S.D.N.Y. 2000); *accord Rowe v. Great Atl. & Pac. Tea Co.*, 46 N.Y.2d 62, 72 (N.Y. 1978) ("[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include."). The Movants thus have no contractual basis to stop sales of the CLOs' assets in any way whatsoever – temporarily or otherwise.

9. The Movants try to sidestep these unambiguous provisions by vaguely alluding, "upon information and belief," to asset sales the Movants "do not agree with." Motion ¶¶ 12, 15-16. First, whether an investor in a CLO agrees or disagrees with the Portfolio Manager's investment decisions has no bearing under the CLO agreements, and the Movants do not and cannot contend otherwise. Second, the Movants' criticism of the Debtor's "disposition of other

assets" that it holds or controls outside of the CLOs is equally unavailing. Motion ¶¶ 15-16. The Management Agreements plainly allow the Portfolio Manager to hold its own assets and use different investment strategies for those assets, even if they are similar to the CLOs' assets. *See* Management Agreement § 4.

10.    There is likewise no merit to the Movants' assertion that the Debtor should forbear selling assets in order to try "to secure a substantially better price for [an asset] by being willing to hold it and transacting [sic] at a later date." Motion ¶ 15. For ten of the fifteen CLOs (including the three CLOs, discussed below, in which the Movants hold a majority of the Preference Shares),[12] the Debtor is actually prohibited from trying to time the market. *See* Indenture § 12.1(i) ("Notwithstanding anything herein to the contrary, the Issuer (at the direction of the [Portfolio Manager] or otherwise) shall not acquire or dispose of Collateral Obligation . . . for the primary purpose of recognizing gains or decreasing losses resulting from market value changes."). As such, the Movants are advocating that the Debtor breach the Indenture not just by ceding management discretion to the Movants but by trying to do the very thing the Debtor is expressly prohibited from doing, *i.e.*, trying to time the market.

11.    Ultimately, while the Movants may not like the way the Debtor is managing the CLOs, they have no contractual right to do anything about it absent a showing that the Debtor has engaged in bad faith, willful misconduct, gross negligence, or a breach of its fiduciary duty to the CLO. *See* Management Agreement § 10(a) (limiting the Portfolio Manager's liability to "acts or omissions constituting bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of the obligations of the [Portfolio Manager under the Management Agreements] and under the Indenture."). And even in those

---

[12] There is no "Supervening Requirement" in the Gleneagles, Jasper, Liberty, Southfork, [and Valhalla] CLOs.

extreme circumstances, which are plainly not present here, the Movants' remedy would be to replace the Portfolio Manager or seek money damages, not impose a prohibition on future sales.

**The Movants Cannot Replace the Portfolio Manager**

12.     If the Preference Shareholders wish to remove the Portfolio Manager, the Management Agreements allow them to do so in certain circumstances not present here.  Indeed, the Movants' "belief" that "replacing the Debtor as portfolio manager is appropriate," Motion ¶ 24, does not come close to satisfying the removal requirements under the Management Agreements, which set forth the process for replacing the Portfolio Manager for each CLO.  Specifically, the replacement is made by the CLO, at the direction of at least a majority of Preferred Shareholders *not* affiliated with the existing Portfolio Manager, and is subject to certain express conditions, including approval of credit rating agencies.  The Movants do not and cannot satisfy any of those requirements.

13.     Among other deficiencies, the Movants do not satisfy the minimum holdings requirement to replace the Portfolio Manager.  Under the Management Agreements, the Movants need a majority (and for some CLOs, a supermajority) of Preference Shares in each CLO to direct the CLO to terminate and appoint a new Portfolio Manager.  *See* Management Agreement §§ 12(e)(i); 14.[13]  The Movants admit they lack the requisite majority for twelve of the fifteen CLOs.

14.     But even with respect to the remaining three CLOs (Grayson, Greenbriar, and Stratford), the Movants cannot exercise their votes to remove the Debtor as Portfolio Manager.  The Management Agreements unambiguously exclude the votes of the Portfolio Manager's "Affiliates."  *Id.*  As set forth in their most recent proxy statements, the Movants (specifically the

---

[13]  Preferred Shareholders have no right whatsoever to remove the Portfolio Manager of the Loan Funding VII (aka Valhalla) CLO.  *See* Valhalla Management Agreement § 14.

Funds) consider themselves "affiliates" of the Debtor.[14] This disqualifies the Movants from voting their Preference Shares to remove the Portfolio Manager in *each* CLO, including the three in which they hold the majority. While the Indentures' definition of "Affiliate" may differ from how the Movants use the term in their SEC filings,[15] there is no question that the Movants were the Debtor's "Affiliates" before January 9, 2020. Equity does not permit the Movants (and Mr. Dondero) to use the bankruptcy to avoid the contracts and declare themselves non-"Affiliates" so they can usurp control of the CLOs. *See, e.g., Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814-15 (1945) ("[T]he equitable maxim that 'he who comes into equity must come with clean hands' . . . closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief").

**The Movants' Rights Are a Matter of Contract**

15. Finally, in an effort to justify the Motion, the Movants invoke the Investment Advisers Act of 1940 (the "Advisers Act") as setting forth the Debtor's obligations to the investors in the CLOs.[16] Yet, it is axiomatic that those obligations (and CLOs generally) are purely creatures of contract and governed by the CLO agreements. *See*, *e.g.*, Management Agreement § 10(a) ("The [Portfolio Manager] assumes no responsibility under this Agreement

---

[14] *See* HIF Proxy; NPSO Proxy; NC Proxy ("Given Mr. Dondero's historic role with [the Debtor] and his continued ownership interest and roles with respect to the Highland platform as a whole, as well as the shared services agreements between [the Debtor] and the Adviser," each Fund will "still treat" the Debtor as the Fund's affiliates).

[15] The Indentures define the term "Affiliate" in Section 1.1 and ground it in common corporate or voting control.

[16] The Movants state – without authority – that the CLOs are only the Debtor's "nominal" clients and that the Debtor's true clients are "holders of the beneficial interests in the CLOs, such as the fund" and cite to various cases interpreting the Advisers Act to justify that position. Motion, ¶¶ 22-23. There is no statutory or common law basis for this argument. In fact, the seminal ruling in *Goldstein v. SEC* directly contradicts the Movant's position. 451 F.3d 873, 881-82 (D.C. Cir. 2006) (finding that under Section 206 of the Investment Advisers Act of 1940 and other provisions "[t]he adviser owes fiduciary duties only to the fund, not to the fund's investors. . . If the investors are owed fiduciary duty and the entity is also owed a fiduciary duty, then the adviser will inevitably face conflicts of interest."). *Goldstein* clarified that the investment adviser's only client is the fund itself and overturned an interpretation of Section 206 of the Advisers Act that would have broadened the adviser's fiduciary duties to include the underlying investors in the fund – the Movant's position. Subsequent to *Goldstein*, the SEC updated their guidance consistent with *Goldstein*. The Debtor's duties, as Portfolio Manager, to the underlying investors in the CLO, if any, are prescribed by contract.

other than to render the services called for hereunder and under the terms of the Transaction Documents made applicable to it pursuant to the terms of this Agreement"); *id.* § 2(b) ("In performing its duties hereunder, the [Portfolio Manager] shall seek to preserve the value of the Collateral for the benefit of the Holders of the Securities;" however the Portfolio Manager "shall not be responsible if such objectives are not achieved so long as [it] performs its duties under this Agreement").[17] The Movants' rights are therefore limited to those provided in the CLO agreements, and the Movants cannot cite to non-existent, extra-contractual duties to justify the relief requested.

**II.     11 U.S.C. § 363 Does Not Authorize the Relief Requested**

16.     Although the issues set forth above are fatal to the Movants, their Motion also fails because the Debtor's contractual rights under the Management Agreements and Indentures to direct the sale of the CLOs' assets are an asset of the estate, and the Debtor has the right to use those assets – without interference – in the ordinary course of its business. *See In re Thomas*, 2020 Bankr. LEXIS 1364 at *31 (Bankr. W.D. Tenn. May 7, 2020); *see also In re New Center Hospital*, 200 B.R. 592 (E.D. Mich. 1996) (finding that a chapter 11 trustee was required to fulfill its duties as the administrator of an employee benefit plan governed by ERISA).  As discussed below and in the Debtor's objection to the Dondero Motion [Docket No. 1546], the manner in which the Debtor may exercise its rights with respect to the CLOs in the ordinary course of its business was highly negotiated with the Committee and with the CLOs themselves. There is no basis under the Bankruptcy Code or otherwise to now require the Debtor to seek leave from this Court (and the Movants) to operate its business in the ordinary course.

---

[17] The Movants state that the Management Agreements "generally impose a duty on the Debtor. . . to maximize the value of the CLO's [sic] assets for the benefit of the CLO's [sic] noteholders and preference shareholders."  Motion, ¶ 7.  That duty is only found in four out of the fifteen Management Agreements – Gleneagles, Jasper, Liberty, and Southfork – and runs to the benefit of all holders of notes and Preference Shares, not just the Movants.

17.     Furthermore, each of the CLOs is a Cayman-domiciled entity that owns its own assets and those assets are not, in any sense of the word, property of the Debtor's estate.  The fact that the Debtor has the authority to direct the disposition of those assets does not turn those assets into the Debtor's property or allow this Court to limit the transfer of such assets under 11 U.S.C. § 363(b) or otherwise.  *See Thomas*, 2020 Bankr. LEXIS 1364 at *31 (a debtor's membership interest in an LLC, including both its economic rights and governance rights, became property of the estate on the petition date, but the assets of the LLC remain separate and the debtor must manage them consistent with the terms of the operating agreement and applicable law); *In re Cardinal Indus.*, 105 B.R. 834, 849 (Bankr. S.D. Ohio 1989) (a debtor's ownership interests and control rights in non-debtor partnerships were property of the estate; but those rights did not make the assets of the partnership property of the estate or implicate the automatic stay so as to prevent secured creditors of the non-debtor partnerships from foreclosing on properties of the partnerships).  The assets of the CLOs are not subject to 11 U.S.C. § 363, and, notwithstanding the bankruptcy, the Debtor is still required to fulfill its obligations as Portfolio Manager for the CLOs.  Movants cite no authority allowing this Court to interfere with the disposition of the CLOs' assets or the CLOs' rights under the Management Agreements and the other agreements governing the CLOs.  The Movants also do not cite to any authority allowing this Court under 11 U.S.C. § 363(b) or otherwise to amend the CLO agreements without the consent of the parties to those agreements to grant the Movants additional rights under those agreements.

18.     As such, the Debtor is allowed to exercise its discretion with respect to the management of the CLOs under 11 U.S.C. § 363.  Despite this, the Movants seek to stop the Debtor from managing the CLOs citing to the Court's equitable powers under 11 U.S.C. § 105.

12

As a general matter, Section 105(a) does not allow this type of relief *unless* the moving party follows the procedures and pleading requirements for a preliminary injunction. *Feld v. Zale Corp. (in re Zale Corp.)*, 62 F.3d 746, 765 (5th Cir. 1995) (citing *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 858 (6th Cir. 1992) ("When issuing a preliminary injunction pursuant to its powers set forth in section 105(a), a bankruptcy court must consider the traditional factors governing preliminary injunctions issued pursuant to Federal Rule of Civil Procedure 65."). Here, however, the Movants have not followed the procedural or substantive requirements to obtain a preliminary injunction, and the relief requested in the Motion should be denied.[18]

19.     Even assuming that the Movants could challenge the Debtor's use of its property under 11 U.S.C. § 363 – and they cannot not – any such challenge would fail because the Debtor's conduct is fully justified.   The Motion references three sales as highlighting the Debtor's purported shortsightedness.   Each of these examples is misplaced, and the Movants' references to these examples only underscore Mr. Dondero's continued desire to re-assert control over the Debtor and to prevent the Debtor from maximizing value for both the Debtor's creditors and the investors in the CLOs.[19]

---

[18] The requirement to seek an injunction should not be a surprise to the Movants.  CLO Holdco, Ltd., made this exact argument when the Committee moved to prevent distributions to CLO Holdco, Ltd., from a non-Debtor entity. *See Motion for Remittance of Funds Held in Registry of Court* [Docket No. 590].  CLO Holdco, Ltd., is a direct and wholly-owned subsidiary of the Charitable DAF Fund, L.P.  The Charitable DAF Fund, L.P., as this Court knows, is a donor advised fund founded by Mr. Dondero, which invests in multiple Debtor-managed vehicles, including the CLOs.  Similarly, Highland CLO Funding Ltd. ("HCLOF") followed the correct procedures for a temporary restraining order by filing an adversary proceeding in *In re Acis Capital Management, L.P., et al.*, Case No. 18-30264-sgj (Bankr. N.D. Tex. 2018) by filing an adversary and seeking an injunction requiring the Chapter 11 trustee to fulfill its contractual obligations under certain CLO portfolio management agreements.  Adv. Proc. No. 18-030178-sgj (Bankr. N.D. Tex. 2018).  At the time of that filing, HCLOF was an investment vehicle controlled by Mr. Dondero.  The irony of (i) the Movant seeking to force the Debtor's *not* to comply with its obligations to the CLOs and (ii) HCLOF filing a motion seeking to force Acis Capital Management, L.P., *to* comply with its obligations should not be lost on this Court.

[19] The first sales referenced by the Movants are the equity trades that were prevented by Mr. Dondero's inappropriate interference in the Debtor's business.  This action and Mr. Dondero's threats were the basis for the TRO.  The second sale is the sale of unsecured debt in OmniMax International, Inc. ("OmniMax").  The Movants allege that other entities received a higher price for the OmniMax debt; however, those parties only received a higher price because of Mr. Dondero's interference in that sale. *See Written Consent of the General Partner of*

13

### III.      The Operating Protocols Do Not Justify the Relief Requested

20.     Finally, the Movants cite to the highly negotiated and carefully crafted Operating Protocols as precedent for the relief requested in the Motion.  That argument ignores the actual terms of the Operating Protocols and the history of Section IV(B)(3)(a) thereof.  The CLOs objected to the Operating Protocols.  *See Limited Objection to Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 324] (the "CLO Issuers Objection").  As a result of the CLO Issuers Objection, the Debtor – with the consent of the Committee – amended the Operating Protocols to add the carve out in Section IV(B)(3)(a).  The CLOs requested this carve out because, among other reasons:

> The stakeholders purchased notes offered by the applicable Issuers relying upon the terms of the relevant indenture and related public documents.  The [Operating Protocols] would effectively modify the collateral management agreements in a way that is inconsistent with the investors' expectations and the [D]ebtor's fiduciary duty to each Issuer, because the [Operating Protocols] extends the time it may take for an Issuer to complete a transaction recommended by the Debtor in its capacity as collateral manager and provides the Committee – a party that did not exist at the time of the sale of the notes and that has neither a contractual relationship with, nor a fiduciary duty to, the Issuers – a review and objection right.  The result is that investors may lose value that they bargained for when they purchased the applicable notes if, for example, the Collateral Manager cannot timely close a sale or purchase.

CLO Issuers Objection, ¶¶ 3.

21.     Consequently, the carve out in Section IV(B)(3)(a) was specifically negotiated to allow the Debtor to fulfill its obligations to the CLOs without interference.  The revision to the Operating Protocols requested by the Movants would therefore be in *direct* conflict with the Operating Protocols.  The Motion would transfer investment discretion from the Debtor – the

---

*Highland Capital Management, L.P., Effective September 21, 2020*, a true and correct copy of which is attached as Exhibit G.  Finally, the Movants reference the sale of SSPI Holdings, Inc. ("SSPI"), a subsidiary of SSP Holdings, LLC.  None of the CLOs held an equity interest in SSPI, its direct parent, SSP Holdings, LLC, or Trussway Holdings, LLC.  The CLOs held debt instruments, and those instruments were repaid in accordance with their terms.

Portfolio Manager – to the Movants (and Mr. Dondero) and impermissibly abrogate the terms of the various Management Agreements that all investors – not just the Movants – relied on when they invested in the CLOs.  *See Paradigm Air Carriers v. Tex. Rangers Baseball Partners (In re Tex. Rangers Baseball Partners)*, 521 B.R. 134, 180 (Bankr. N.D. Tex. 2014) (finding that a debtor – in the context of 11 U.S.C. § 365 – could not amend the terms of a contract without the consent of its contract counterparty).

22.    Ultimately, the Movants' (and Mr. Dondero's) attempts to interfere with the operation of the Debtor's estate and non-debtor CLOs, and to re-insert themselves as the decision-making authority are meritless.  The Motion should be denied.

*[Remainder of Page Intentionally Blank]*

DOCS_NY:41726.7 36027/002

WHEREFORE, for the reasons set forth above, the Debtor respectfully requests that the

Court deny the Motion.

Dated:  December 15, 2020.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717) (*pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*pro hac vice*)
John A. Morris (NY Bar No. 266326) (*pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
                ikharasch@pszjlaw.com
                jmorris@pszjlaw.com
                gdemo@pszjlaw.com
                hwinograd@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*