# EXHIBIT A-1

12/14/2020    Case 19-34054-sgj11 Doc 1578-1 Filed 12/15/20    Entered 12/15/20 16:32:49    Page 2 of
267
N-2/A 1 d797775dn2a.htm NEXPOINT STRATEGIC OPPORTUNITIES FUND

Table of Contents

As filed with the Securities and Exchange Commission on August 27, 2019

**1933 Act File No. 333-230078**
**1940 Act File No. 811-21869**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

## FORM N-2
**(Check appropriate box or boxes)**

# REGISTRATION STATEMENT
*UNDER*
*THE SECURITIES ACT OF 1933*                                           ☒
**Pre-Effective Amendment No. 1**
AND
# REGISTRATION STATEMENT
*UNDER*
*THE INVESTMENT COMPANY ACT OF 1940*                                   ☒
**Amendment No. 36**

---

# NexPoint Strategic Opportunities Fund
**(Exact Name of Registrant as Specified in the Declaration of Trust)**

---

**300 Crescent Court, Suite 700**
**Dallas, Texas 75201**
**(Address of Principal Executive Offices)**

**(866) 351-4440**
**(Registrant's Telephone Number, including area code)**

---

**(Name and Address of Agent for Service)**

**Ms. Lauren Thedford, Esq.**
**NexPoint Strategic Opportunities Fund**
**300 Crescent Court, Suite 700**
**Dallas, Texas 75201**

*Copies of Communications to:*

**R. Charles Miller, Esq.**
**K&L Gates LLP**
**1601 K Street, NW**
**Washington, DC 20006**

---

**Approximate Date of Proposed Public Offering:**
**From time to time after the effective date of this Registration Statement.**

If any of the securities being registered on this form are offered on a delayed or continuous basis in reliance on Rule 415 under the Securities Act of 1933, other than securities offered in connection with a dividend reinvestment plan, check the following box. ☒

It is proposed that this filing will become effective (check appropriate box)

☒     when declared effective pursuant to section 8(c)

☐     on March 19, 2018 pursuant to Rule 486(b) as applied by no-action relief granted to the Registrant on June 26, 2013

**Table of Contents**

---

### CALCULATION OF REGISTRATION FEE UNDER THE SECURITIES ACT OF 1933

| Title of<br>Securities Being Registered | Proposed<br>Maximum<br>Aggregate<br>Offering Price (1) | Amount of<br>Registration Fee |
|---|---|---|
| Preferred Shares of Beneficial Interest (2) | | |
| Subscription Rights for Preferred Shares (2) | | |
| | | |
| | | |
| | | |
| Total | $500,000,000 | $60,600.00(3) |

(1) Estimated pursuant to Rule 457(o) solely for the purpose of determining the registration fee. The proposed maximum offering price per security will be determined, from time to time, by the Registrant in connection with the sale by the Registrant of the securities registered under this registration statement.

(2) There is being registered hereunder an indeterminate principal amount of preferred shares or subscription rights to purchase preferred shares as may be sold, from time to time. In no event will the aggregate offering price of all securities issued from time to time pursuant to this registration statement exceed $500,000,000.

(3) A registration fee amount of $60,600 was paid with respect to the Registrant's registration statement on Form N-2 (File No. 333-230078 filed on March 5, 2019.

The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically state that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act of 1933 or until the registration statement shall become effective on such dates as the Commission, acting pursuant to said Section 8(a), may determine.

---

**Table of Contents**

**NEXPOINT STRATEGIC OPPORTUNITIES FUND**

**CROSS REFERENCE SHEET**
**PARTS A AND B**

| Item No. | Registration Statement Caption | Caption in Part A or Part B |
|---|---|---|
| 1. | Outside Front Cover | Front Cover |
| 2. | Inside Front and Back Cover Page | Front and Back Cover |
| 3. | Fee Table and Synopsis | Prospectus Summary/Fees and Expenses of the Trust |
| 4. | Financial Highlights | Financial Highlights |
| 5. | Plan of Distribution | Plan of Distribution |
| 6. | Selling Shareholders | Not Applicable |
| 7. | Use of Proceeds | Use of Proceeds |
| 8. | General Description of Registrant | The Fund |
| 9. | Management | Management of the Trust |
| 10. | Capital Stock, Long-Term Debt, and Other Securities | Description of Capital Structure |
| 11. | Defaults and Arrears on Senior Securities | Not Applicable |
| 12. | Legal Proceedings | Legal Proceedings |
| 13. | Table of Contents of the Statement of Additional Information | Table of Contents of the Statement of Additional Information |
| 14. | Cover Page | Cover Page |
| 15. | Table of Contents | Table of Contents |
| 16. | General Information and History | The Fund |
| 17. | Investment Objective and Policies | Investment Strategies and Risks |
| 18. | Management | Management of the Trust |
| 19. | Control Persons and Principal Holders of Securities | Control Persons and Principal Holders of Securities |
| 20. | Investment Advisory and Other Services | Investment Adviser |
| 21. | Portfolio Managers | Portfolio Managers |
| 22. | Brokerage Allocation and Other Practices | Portfolio Transactions and Brokerage |
| 23. | Tax Status | Tax Matters |
| 24. | Financial Statements | Financial Statements |

**Part C**

The information required to be included in Part C is set forth under the appropriate Item, so numbered, in Part C of the Registration Statement.

**Table of Contents**

# NexPoint Strategic Opportunities Fund

**Prospectus dated August 27, 2019**

**Preferred Shares**

**Subscription Rights to Purchase Preferred Shares**

———————————

NexPoint Strategic Opportunities Fund (formerly, NexPoint Credit Strategies Fund) is a non-diversified, closed-end management investment company that commenced operations on June 29, 2006, following its initial public offering. Throughout this Prospectus, NexPoint Strategic Opportunities Fund is referred to as the "Trust."

The Trust's investment objectives are to provide both current income and capital appreciation. The Trust seeks to achieve its investment objectives by investing primarily in the following categories of securities and instruments of corporations and other business entities: (i) secured and unsecured floating and fixed rate loans; (ii) bonds and other debt obligations; (iii) debt obligations of stressed, distressed and bankrupt issuers; (iv) structured products, including but not limited to, mortgage-backed and other asset-backed securities and collateralized debt obligations; (v) equities; (vi) other investment companies, including business development companies ("BDCs"); and (vii) real estate investment trusts ("REITs"). The Trust may also invest in derivative instruments that have economic characteristics similar to instruments in investment categories (i) - (vii). Subject to these general guidelines, NexPoint Advisors, L.P. (the "Investment Adviser") has broad discretion to allocate the Trust's assets among these investment categories and other investments and to change allocations as conditions warrant.

Additionally, the Trust has a fundamental policy to concentrate its investments in the real estate industry, and, under normal market conditions, the Trust invests at least 25% of the value of its total assets at the time of purchase in the securities of issuers conducting their principal business activities in the real estate industry.

You should read this Prospectus and the related Prospectus Supplement, which contains important information about the Trust, before deciding whether to invest, and retain it for future reference. A Statement of Additional Information ("SAI"), dated August 27, containing additional information about the Trust has been filed with the Commission and is incorporated by reference in its entirety into this Prospectus. You can review the table of contents of the SAI on page 110 of this Prospectus. You may request a free copy of the SAI request the Trust's most recent annual and semi-annual reports, request information about the Trust and make shareholder inquiries by calling 1-866-351-4440 or by writing to the Trust at 300 Crescent Court, Suite 700, Dallas, Texas 75201. You may also obtain a copy of the SAI (and other information regarding the Trust) from the Commission's Public Reference Room in Washington, D.C. by calling 1-202-551-8090. The Commission charges a fee for copies. The Trust's most recent annual and semi-annual reports are available, free of charge, on the Trust's website at www.nexpointadvisors.com. You can obtain the same information, free of charge, from the Commission's web site at www.sec.gov.

———————————

Investing in our securities involves a high degree of risk and may be considered speculative. Before investing in the Trust's securities, you should read the discussion of the material risks of investing in the Trust, including the risks of leverage, in the "Principal Risks of the Trust" section of this Prospectus.

Neither the U.S. Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined that this Prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

Beginning on January 1, 2021, as permitted by regulations adopted by the U.S. Securities and Exchange Commission, paper copies of the Fund's annual and semi-annual shareholder reports will no longer be sent by mail, unless you specifically request paper copies of the reports. Instead, the reports will be made available on the Fund's website (highlandfunds.com), and you will be notified by mail each time a report is posted and provided with a website link to access the report.

If you already elected to receive shareholder reports electronically, you will not be affected by this change and you need not take any action. You may elect to receive shareholder reports and other communications from a Fund electronically by contacting your

financial intermediary (such as a broker-dealer or bank) or, if you are a direct investor, by contacting the Fund's transfer agent at 1-877-665-1287.

Beginning on January 1, 2019, you may elect to receive all future reports in paper free of charge. If you invest through a financial intermediary, you can contact your financial intermediary to request that you continue to receive paper copies of your shareholder reports. If you invest directly with the Fund, you can call 1-877-665-1287 to let the Fund know you wish to continue receiving paper copies of your shareholder reports. Your election to receive reports in paper will apply to all funds held in your account if you invest through your financial intermediary or all funds held with the fund complex if you invest directly with the Fund.

The Trust's securities do not represent a deposit or obligation of, and are not guaranteed or endorsed by, any bank or other insured depository institution, and are not federally insured by the Federal Deposit Insurance Corporation, the Federal Reserve Board or any other government agency.

**Table of Contents**

|  | Page |
|---|---|
| Cautionary Notice Regarding Forward-Looking Statements | 1 |
| About this Prospectus | 1 |
| Prospectus Summary | 2 |
| Summary of Trust Fees and Expenses | 41 |
| Financial Highlights | 43 |
| Plan of Distribution | 45 |
| Use of Proceeds | 46 |
| The Trust | 46 |
| Investment Objectives and Policies | 46 |
| Investment Strategies | 47 |
| Portfolio Composition | 48 |
| Use of Leverage | 64 |
| Principal Risks of the Trust | 65 |
| Management of the Trust | 88 |
| Determination of Net Asset Value | 92 |
| Distributions | 94 |
| Dividend Reinvestment Plan | 95 |
| Shareholder Loyalty Program | 95 |
| Description of Capital Structure | 96 |
| Market and Net Asset Value Information | 102 |
| Anti-Takeover Provisions in the Agreement and Declaration of Trust | 103 |
| Closed-End Fund Structure | 105 |
| Repurchase of Common Shares; Discount | 105 |
| Tax Matters | 106 |
| Custodian and Transfer Agent | 109 |
| Legal Opinion | 109 |
| Privacy Principles of the Trust | 109 |
| Where You Can Find Additional Information | 109 |
| Table of Contents for the Statement of Additional Information | 110 |

You should rely only on the information contained or incorporated by reference in this Prospectus. The Trust has not authorized any other person to provide you with different information. If anyone provides you with different or inconsistent information, you should not rely on it. The Trust is not making an offer to sell these securities in any jurisdiction where the offer or sale is not permitted. The information in this Prospectus and any accompanying Prospectus Supplements is accurate only as of the date of this Prospectus or such Prospectus Supplement, as applicable, and under no circumstances should the delivery of this Prospectus or any accompanying Prospectus Supplement or the sale of any securities imply that the information in this Prospectus or such accompanying Prospectus Supplement is accurate as of any later date or that the affairs of the Trust have not changed since the date hereof or thereof. Our business, financial condition, results of operations and prospects may have changed since then. We will update the information in these documents to reflect material changes only as required by law.

i

[Table of Contents](#)

**Cautionary Notice Regarding Forward-Looking Statements**

This Prospectus and the SAI contain "forward-looking statements." Forward-looking statements relate to future events or the Trust's future financial performance. Forward-looking statements can generally be identified by terminology such as "may," "will," "should," "expects," "plans," "anticipates," "could," "intends," "target," "projects," "contemplates," "believes," "estimates," "predicts," "potential" or "continue" or the negative of these terms or other similar words. Important assumptions in forward-looking statements include the Trust's ability to acquire or originate new investments and to achieve certain margins and levels of profitability. In light of these and other uncertainties, the inclusion of a projection or forward-looking statement should not be regarded as a representation by the Trust that its plans or objectives will be achieved.

There are a number of important risks and uncertainties that could cause the Trust's actual results to differ materially from those indicated by such forward-looking statements. These risks include, but are not limited to, the following:

- Investment risk;

- Changes in interest rates;

- Risks associated with investing in high yield securities (also known as "junk securities"), senior loans and other debt and equity securities;

- Risks of investing in obligations of stressed, distressed and bankrupt issuers;

- Risks associated with the Trust's use of leverage;

- Risk associated with investments in REITs;

- Derivatives and structured finance securities risk; and

- Market risk generally.

For a discussion of these and additional risks as well as other factors that could cause the Trust's actual results to differ from forward-looking statements contained in this Prospectus and in the SAI please see the discussion under "Principal Risks of the Trust." You should not place undue reliance on these forward-looking statements. The forward-looking statements made in this Prospectus and in the SAI relate only to events as of the date on which the statements are made. The Trust undertakes no obligation to update any forward-looking statement to reflect events or circumstances occurring after the date of this Prospectus and SAI except as required by federal securities laws.

The forward-looking statements contained in this Prospectus are excluded from the safe harbor protection provided by Section 27A of the Securities Act of 1933, as amended, and the forward looking statements contained in our periodic reports are excluded from the safe harbor protection provided by Section 21E of the Securities Exchange Act of 1934, as amended.

**About this Prospectus**

This Prospectus is part of a registration statement that we have filed with the Commission using the "shelf" registration process. Under the shelf registration process, we may offer, from time to time, in one or more offerings or series, up to $500,000,000 of our fixed rate preferred shares or subscription rights for fixed rate preferred shares, on the terms to be determined at the time of the offering. The securities may be offered at prices and on terms described in one or more Supplements to this Prospectus. This Prospectus provides you with a general description of the securities that we may offer. Each time we use this Prospectus to offer securities, we will provide a Prospectus Supplement that will contain specific information about the terms of that offering. The Prospectus Supplement may also add, update or change information contained in this Prospectus. Please carefully read this Prospectus and any Prospectus Supplement, together with any exhibits, any material terms of which will be summarized in the Prospectus and any applicable Prospectus Supplement, and the additional information described under the headings "Principal Risks of the Trust" and "Where You Can Find Additional Information" before you make an investment decision.

1

**Table of Contents**

### Prospectus Summary

*The following summary highlights information contained elsewhere in this Prospectus. This summary may not contain all of the information that you should consider before investing in the Trust. You should review the more detailed information contained in this Prospectus and in the Statement of Additional Information, especially the information set forth under the heading "Principal Risks of the Trust."*

| | |
|---|---|
| **The Trust** | The Trust is a non-diversified, closed-end management investment company. The Trust commenced operations on June 29, 2006, following its initial public offering. |
| **Offerings** | The Trust may offer, on an immediate, continuous or delayed basis, in one or more offerings (each, an "Offering" and together, the "Offerings"), up to $500,000,000 of the Trust's fixed rate preferred shares or rights to purchase fixed rate preferred shares (sometimes referred to as subscription rights), which we refer to collectively as the "securities," on terms to be determined at the time of the Offerings. The securities may be offered at prices and on terms to be set forth in one or more Prospectus Supplements to this Prospectus, unless otherwise required by the Commission or its staff. Offerings of the securities will be subject to the provisions of the Investment Company Act of 1940, as amended (the "1940 Act"), which generally require that the price at which a closed-end investment company sells its common shares (exclusive of distribution commissions and discounts) must equal or exceed the net asset value per share of a company's common shares (calculated within 48 hours of pricing), except (i) in connection with a rights offering to our existing shareholders, (ii) with the consent of the majority of our common shareholders, or (iii) under such circumstances as the Commission may permit. Any offering of securities by a closed-end investment company that requires shareholder approval must occur, if at all, within one year after receiving such shareholder approval. |

The Prospectus Supplement relating to any sale of fixed rate preferred shares will set forth the liquidation preference and information about the dividend period, dividend rate, any call protection or non-call period and other matters. The Prospectus Supplement relating to any offering of subscription rights will set forth the number of common and/or fixed rate preferred shares issuable upon the exercise of each right and the other terms of such rights offering. You should read this Prospectus and the related Prospectus Supplement carefully before you decide to invest in any of the securities.

While the aggregate number and amount of securities we may issue pursuant to this registration statement is limited to $500,000,000 of securities, our Board of Trustees (the "Board") may, without any action by the shareholders, amend our Agreement and Declaration of Trust from time to time to increase or decrease the aggregate number of shares or the number of shares of any class or series that we have authority to issue.

The Trust may offer the securities directly to one or more purchasers, through agents that the Trust or the purchasers designate from time to time, or to or through underwriters or dealers (including agents, underwriters or dealers affiliated with the Trust's investment adviser). The Prospectus Supplement relating to the Offering will identify any agents or underwriters involved in the sale of the securities, and will set forth any applicable purchase price, fee, commission or discount arrangement between the Trust and such agents or underwriters or among underwriters or the basis upon which such amount may be calculated. See "Plan of Distribution." The securities may not be sold through agents, underwriters or dealers without delivery of a Prospectus Supplement describing the method and terms of the Offering. The Trust (and thus, indirectly, the Trust's common shareholders) will bear all of the expenses of any such offering.

2

Table of Contents

| | |
|---|---|
| **Preferred Shares** | The term the preferred shares may be fixed by the Board and may materially limit and/or qualify the rights of holders of the Trust's common shares. If the Trust's Board determines that it may be advantageous to the holders of the Trust's common shares for the Trust to utilize additional leverage, the Trust may issue additional series of fixed rate preferred shares. Any fixed rate preferred shares issued by the Trust will pay distributions at a fixed rate. Leverage creates a greater risk of loss as well as a potential for more gains for the common shares than if leverage were not used. The Trust may also determine in the future to issue other forms of senior securities, such as securities representing debt, subject to the limitations of the Investment Company Act. The Trust may also engage in investment management techniques which will not be considered senior securities if the Trust establishes a segregated account with cash or other liquid assets or sets aside assets on the accounting records equal to the Trust's obligations in respect of such techniques. The Trust may also borrow money, to the extent permitted by the Investment Company Act. |
| **Investment Adviser and Administrator** | NexPoint Advisors, L.P. (the "Investment Adviser") is the investment adviser and administrator of the Trust. As of June 30, 2019, the Investment Adviser, together with its affiliates, managed approximately $9.9 billion in assets on behalf of investors around the world. In return for its advisory services, the Investment Adviser receives an annual fee, payable monthly, in an amount equal to 1.00% of the average weekly value of the Trust's Managed Assets. In return for its administrative services, the Investment Adviser receives an annual fee, payable monthly, in an amount equal to 0.20% of the average weekly value of the Trust's Managed Assets. "Managed Assets" means the total assets of the Trust, including assets attributable to any form of investment leverage, minus all accrued expenses incurred in the normal course of operations, but not excluding any liabilities or obligations attributable to investment leverage obtained through (i) indebtedness of any type (including, without limitation, borrowing through a credit facility or the issuance of debt securities), (ii) the issuance of preferred shares or other similar preference securities, (iii) the reinvestment of collateral received for securities loaned in accordance with the Trust's investment objectives and policies, and/or (iv) any other means. The Investment Adviser, at its own expense, has the authority to engage both a sub-adviser and a sub-administrator, each of which may be an affiliate of the Investment Adviser. See "Management of the Trust — Investment Adviser" and "Management of the Trust — Administrator/Sub-Administrator."

*Potential Conflicts of Interest.* As a result of the Trust's arrangements with Highland Capital Management, L.P. ("Highland"), an affiliate of the Investment Adviser, there may be times when Highland, the Investment Adviser or their affiliates have interests that differ from those of the Trust's shareholders, giving rise to a conflict of interest. Highland and the Investment Adviser are under common ownership, and the Trust's officers serve or may serve as officers, directors or principals of entities that operate in the same or a related line of business as the Trust does, or of investment funds managed by the Investment Adviser or its affiliates. Similarly, the Investment Adviser or its affiliates may have other clients with similar, different or competing investment objectives. In serving in these multiple capacities, they may have obligations to other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Trust or its shareholders. For example, the Trust's officers have, and will continue to have, management responsibilities for other investment funds, accounts or other investment vehicles managed or sponsored by the Investment Adviser and its affiliates.

The Trust's investment objective may overlap, in part or in whole, with the investment objective of such affiliated investment funds, accounts or other investment vehicles. As a result, those individuals may face conflicts in the allocation of investment opportunities among the Trust and other investment funds or accounts advised by or affiliated with the Investment Adviser. The Investment Adviser will seek to allocate investment opportunities among eligible accounts in a |

[Table of Contents](#)

manner that is fair and equitable over time and consistent with its allocation policy. However, the Trust can offer no assurance that such opportunities will be allocated to it fairly or equitably in the short-term or over time.

Currently, a substantial portion of the Trust's net assets are invested in REITs, asset-backed securities and/or collateralized loan obligations ("CLOs") sponsored, organized and/or managed by Highland and its affiliates. The Investment Adviser will monitor for conflicts of interest in accordance with its fiduciary duties and will provide the independent trustees of the Trust with an opportunity to periodically review the Trust's investments in such REITs, asset-backed securities and/or CLOs and assure themselves that continued investment in such securities remains in the best interests of the Trust and its shareholders. Please see "Risk Factors—Potential Conflicts of Interest" for a description of risks associated with conflicts of interest. See "Management of the Trust — Investment Adviser."

4

[Table of Contents](#)

| | |
|---|---|
| **Custodian and Transfer Agent** | The custodian of the assets of the Trust is Bank of New York Mellon (240 Greenwich Street, New York, New York 10286). The custodian performs custodial services for the Trust. American Stock Transfer & Trust Company, LLC (6201 15th Avenue, Brooklyn, New York 11219; telephone (718) 921-8200) serves as the Trust's transfer agent with respect to its securities. |
| **Closed-End Structure** | Closed-end funds differ from open-end management investment companies (commonly referred to as mutual funds) in that closed-end funds generally list their shares for trading on a securities exchange and do not redeem their shares at the option of the shareholder. By comparison, mutual funds issue securities redeemable at net asset value ("NAV") at the option of the shareholder and typically engage in a continuous offering of their shares. Mutual funds are subject to continuous asset in-flows and out-flows that can complicate portfolio management, whereas closed-end funds generally can stay more fully invested in securities consistent with the closed-end fund's investment objective and policies. In addition, in comparison to open-end funds, closed-end funds have greater flexibility in their ability to make certain types of investments, including investments in illiquid securities. |
| | Shares of closed-end investment companies listed for trading on a securities exchange frequently trade at a discount from NAV, but in some cases trade at a premium. The market price may be affected by NAV, dividend or distribution levels (which are dependent, in part, on expenses), supply of and demand for the shares, stability of dividends or distributions, trading volume of the shares, general market and economic conditions and other factors beyond the control of the closed-end fund. The foregoing factors may result in the market price of the common shares of the Trust being greater than, less than or equal to, NAV. The Board has reviewed the structure of the Trust in light of its investment objective and policies and has determined that the closed-end structure is appropriate. As described in this Prospectus, however, the Board may review periodically the trading range and activity of the Trust's common shares with respect to their NAV and may take certain actions to seek to reduce or eliminate any such discount. Such actions may include open market repurchases or tender offers for the common shares at NAV or the possible conversion of the Trust to an open-end investment company. There can be no assurance that the Board will decide to undertake any of these actions or that, if undertaken, such actions would result in the common shares trading at a price equal to or close to NAV per Share. In addition, as noted above, the Board determined in connection with the initial offering of common shares of the Trust that the closed-end structure is desirable, given the Trust's investment objective and policies. Investors should assume, therefore, that it is highly unlikely that the Board would vote to convert the Trust to an open-end investment company. See "Anti-Takeover Provisions in the Agreement and Declaration of Trust; Closed-End Fund Structure; Repurchase of Common Shares; Discount." |
| **Listing** | The Trust's outstanding common shares are listed on the New York Stock Exchange ("NYSE") under the symbol "NHF". Since the Trust commended trading on the NYSE, the Trust's common shares have traded at a discount to NAV as high as -40.89% and a premium as high as 9.78%. Any additional series of fixed rate preferred shares or subscription rights issued in the future pursuant to a Prospectus Supplement by the Trust may be listed on the NYSE. |
| **Use of Proceeds** | Unless otherwise specified in a Prospectus Supplement, the Trust will use the net proceeds of the sale of securities to invest in accordance with the Trust's investment objectives and policies as stated below, or use such proceeds for other general corporate purposes. See "Use of Proceeds." |

5

Table of Contents

**Investment Objectives and Policies**

The Trust's investment objectives are to provide both current income and capital appreciation. The Trust seeks to achieve its investment objectives by investing primarily in the following categories of securities and instruments of corporations and other business entities: (i) secured and unsecured floating and fixed rate loans; (ii) bonds and other debt obligations; (iii) debt obligations of stressed, distressed and bankrupt issuers; (iv) structured products, including but not limited to, mortgage-backed and other asset-backed securities and collateralized debt obligations; (v) equities; (vi) other investment companies, including BDCs; and (vii) REITs. The Trust may also invest in other securities and instruments, including derivative instruments. Subject to these general guidelines, the Investment Adviser has broad discretion to allocate the Trust's assets among these investment categories and other investments and to change allocations as conditions warrant.

The Trust has a fundamental policy to concentrate its investments in the real estate industry, and, under normal market conditions, the Trust invests at least 25% of the value of its total assets at the time of purchase in the securities of issuers conducting their principal business activities in the real estate industry. Within the categories of obligations and securities in which the Trust invests, the Investment Adviser employs various trading strategies, including capital structure arbitrage, pair trades and shorting. Capital structure arbitrage is a strategy in which the Trust seeks opportunities created by mispricing in different markets of various instruments issued by one corporation. Pair trades involve matching a long position with a short position in two stocks of different issuers in the same sector, betting that the "spread" between the two will eventually converge. Short selling (also known as shorting or going short) is a strategy in which the Trust sells a security it does not own in anticipation that the market price of that security will decline. See "Portfolio Composition" for further description of these strategies.

The Trust may also invest in these categories of obligations and securities through the use of derivatives. The Trust is not limited in the amount it may invest in derivatives, and it may use derivatives for speculative purposes. There is no limitation on the amount of securities and other instruments rated below investment grade, which are commonly referred to as "junk securities," that the Trust may purchase, and under normal circumstances substantially all of the Trust's investment portfolio is expected to consist of junk-rated securities and non-investment grade investments and instruments or securities and other instruments which, if unrated, are considered to be of similar quality.

The Trust may invest a significant portion of its assets in issuers that are in default or that present a high risk of default. Junk securities are subject to greater risk of loss of principal and interest and may be less liquid than investment grade securities. The Trust may invest up to 15% of its net assets in entities that are excluded from registration under the Investment Company Act by virtue of section 3(c)(1) and 3(c)(7) of the Investment Company Act (such as private equity funds or hedge funds). This limitation does not apply to any CLOs, certain of which may rely on Section 3(c)(1) or 3(c)(7) of the Investment Company Act. The Trust's investment objectives may be changed without shareholder approval. There can be no assurance that the Trust's investment objectives will be achieved. See "Investment Objectives and Policies."

6

Table of Contents

| | |
|---|---|
| **Investment Strategies** | Under normal market conditions, the Trust invests across various markets in which the Investment Adviser holds significant investment experience: primarily the leveraged loan, high yield, other credit investments, structured products, real estate, communications, natural resources, stressed and distressed markets and equity markets. The Investment Adviser makes investment decisions based on quantitative analysis, which employs sophisticated, data-intensive models to drive the investment process. The Investment Adviser has full discretion regarding the capital markets from which it can access investment opportunities in accordance with the investment limitations set forth in this Prospectus. |

The Investment Adviser uses trading strategies to seek to exploit pricing inefficiencies across the credit markets, or debt markets, and within an individual issuer's capital structure. The Investment Adviser varies the Trust's investments by strategy, industry, security type and credit market, but reserves the right to re-position the Trust's investment portfolio among these criteria depending on market dynamics, and thus the Trust may experience high portfolio turnover. The Investment Adviser manages interest rate, default, currency and systemic risks through a variety of trading methods and market tools, including derivative hedging instruments, as it deems appropriate.

This multi-strategy investment program allows the Investment Adviser to assess what it considers to be the best opportunities across multiple markets and to adjust quickly the Trust's trading strategies and market focus to changing conditions. The Investment Adviser focuses primarily on the U.S. marketplace, but may pursue opportunities in the non-U.S. credit or securities markets by investing in credit or securities market investments that are either issued by entities domiciled outside of the U.S., or denominated in currencies other than the U.S. dollar, or both ("Non-U.S. Securities").

The Trust invests and trades in listed and unlisted, public and private, rated and unrated, debt and equity instruments and other obligations, including structured debt and equity instruments and financial derivatives. Investments may include investments in stressed and distressed positions, which may include publicly-traded debt and equity securities (including securities of REITs, BDCs and master limited partnerships ("MLPs")), obligations which were privately placed with banks, insurance companies and other lending institutions, trade claims, accounts receivable and any other form of obligation recognized as a claim in a bankruptcy or workout process.

REITs are pooled investment vehicles that invest primarily in income-producing real estate or real estate-related loans or interests. Foreign REIT equivalents are entities located in jurisdictions that have adopted legislation substantially similar to the REIT tax provisions in that they provide for favorable tax treatment for the foreign REIT equivalent and require distributions of income to shareholders. The Trust seeks to gain exposure to the real estate markets, in whole or in part, by investing in certain REIT subsidiaries of the Trust, notably NexPoint Real Estate Opportunities, LLC (formerly Freedom REIT) ("NREO") and NexPoint Real Estate Capital, LLC ("NREC").

With respect to the Trust's real estate investments, the Adviser seeks to: (i) recognize and allocate capital based upon where the Adviser believes we are in the current real estate cycle, and as a result (ii) minimize drawdowns during market downturns and maximize risk adjusted returns during all market cycles, though there can be no assurance that this strategy will achieve this objective. The Trust will rely on the expertise of the Adviser and its affiliates to determine the appropriate structure for structured credit investments, which may include bridge loans, common and preferred equity or other debt-like positions, as well as the acquisition of such instruments from banks, servicers or other third parties.

Preferred equity and mezzanine investments in real estate transactions come in various forms which may or may not be documented in the borrower's organizational documents. Generally, real estate preferred equity and/or mezzanine investments are typically junior to first mortgage financing but senior to the borrower's or sponsor's equity contribution. The investments are typically structured as an investment by a third-party investor in the real estate owner or various affiliates in the chain of ownership in exchange for a direct or indirect ownership interest in the real estate owner entitling it to a preferred/priority return on its investment. Sometimes, the investment is structured much like a loan where (i) "interest" on the investment is required to be paid monthly by the "borrower" regardless of available property cash flow; (ii) the entire investment is required to be paid by a certain maturity date; (iii) default rate "interest" and penalties are assessed against the "borrower" in the event payments are not made timely; and (iv) a default in the repayment of investment potentially results in the loss of management and/or ownership control by the "borrower" in the company in favor of the investor or other third-party.

As part of its investment program, the Trust may invest, from time to time, in securities or other instruments that are sold in private placements and that are neither listed on an exchange, nor traded over the counter. The Trust may also receive equity or equity-related securities in connection with a workout transaction or may invest directly in equity securities.

The Trust may employ currency hedges (either in the forward or options markets) in certain circumstances to reduce currency risk and may engage in other derivative transactions for hedging purposes or to enhance total return. The Trust may also lend securities and engage in short sales of securities. In addition, the Trust may invest in the securities of companies whose capital structures are highly leveraged.

7

Table of Contents

From time to time, the Investment Adviser may also invest a portion of the Trust's assets in short-term U.S. government obligations, certificates of deposit, commercial paper and other money market instruments, including repurchase agreements with respect to such obligations and pooled investment vehicles (for example, money market funds) that invest in these obligations, to enable the Trust to make investments quickly, to serve as collateral with respect to certain of its investments, and for other cash management purposes. A greater percentage of Trust assets may be invested in such obligations if the Investment Adviser believes that a defensive position is appropriate because of the outlook for security prices or in order to respond to adverse market, economic, business or political conditions. See "Investment Objectives and Policies — Investment Strategies."

**Use of Leverage**

As provided in the Investment Company Act and subject to certain exceptions, the Trust may issue debt or preferred shares with the condition that immediately after issuance the value of its total assets, less ordinary course liabilities, exceeds 300% of the amount of the debt outstanding and exceeds 200% of the sum of the amount of debt and preferred shares outstanding.

Thus, the Trust may use leverage in the form of borrowings in an amount up to 33 1/3% of the Trust's total assets (including the proceeds of such leverage) and may use leverage in the form of preferred shares in an amount up to 50% of the Trust's total assets (including the proceeds of such leverage). As of the date of this Prospectus, the Trust has no preferred shares outstanding. The total leverage of the Trust is generally expected to range between 25% and 30% of the Trust's total assets. The Trust seeks a leverage ratio, based on a variety of factors including market conditions and the Investment Adviser's market outlook, where the rate of return, net of applicable Trust expenses, on the Trust's portfolio investments purchased with leverage exceeds the costs associated with such leverage. The leverage ratio as of August 13, 2019 was 25%.

The Trust, as of January 31, 2018, was leveraged through borrowings from a committed facility with BNP Paribas Prime Brokerage, Inc. ("BNP") with a total commitment of $135,000,000. As of June 30, 2019, the Trust had drawn on the $66.0 million committed facility.

In addition, the Trust intends to leverage its portfolio through a master repurchase agreement entered into with BNP Paribas Securities Corp. ("BNP Securities") on November 16, 2017, as amended, that allows the Trust to enter into reverse repurchase transactions from time to time pursuant to the terms of the master repurchase agreement.

On August 14, 2018, the Trust, and two of its wholly-owned subsidiaries, NexPoint Real Estate Capital, LLC ("NREC") and NexPoint Real Estate Opportunities, LLC ("NREO"), entered into a $75.0 million revolving bridge credit agreement with KeyBank National Association. The revolving balance stepped down to $60.0 million after September 14, 2018. As of June 30, 2019, The Trust had drawn $55.4 million on the bridge facility.

The Trust's asset coverage ratio as of June 30, 2019 was 524.7% See "Principal Risks of the Trust — Leverage Risk" for a brief description of the Trust's committed facility, master repurchase agreement and bridge credit agreement.

8

**Table of Contents**

Following the completion of an Offering, the Trust may increase the amount of leverage outstanding. The Trust may engage in additional borrowings, issue notes, or issue preferred shares in order to maintain the Trust's desired leverage ratio. Leverage creates a greater risk of loss, as well as a potential for more gain, for the common shares than if leverage were not used. Interest on borrowings (or dividends on preferred shares) may be at a fixed or floating rate and generally will be based on short-term rates. The costs associated with the Trust's use of leverage, including the issuance of such leverage and the payment of dividends or interest on such leverage, will be borne entirely by the holders of common shares. As long as the rate of return, net of applicable Trust expenses, on the Trust's portfolio investments purchased with leverage exceeds the costs associated with such leverage, the Trust will generate more return or income than will be needed to pay such costs. In this event, the excess will be available to pay higher dividends to holders of common shares. Conversely, if the Trust's return on such assets is less than the cost of leverage and other Trust expenses, the return to the holders of the common shares will diminish. To the extent that the Trust uses leverage, the NAV and market price of the common shares and the yield to holders of common shares will be more volatile. The Trust's leveraging strategy may not be successful. See "Principal Risks of the Trust—Leverage Risk."

| | |
|---|---|
| **Distributions** | *Common Shares Distributions.* Subject to market conditions, the Trust plans to pay distributions monthly and capital gain distributions annually to common shareholders. |

*Preferred Shares Distributions.* As required by the Investment Company Act, all preferred shares of the Trust must have the same seniority with respect to distributions. Accordingly, no complete distribution due for a particular dividend period will be declared or paid on any series of preferred shares of the Trust for any dividend period, or part thereof, unless full cumulative dividends and distributions due through the most recent dividend payment dates for all series of outstanding preferred shares of the Trust are declared and paid. If full cumulative distributions due have not been declared and made on all outstanding preferred shares of the Trust, any distributions on such preferred shares will be made as nearly pro rata as possible in proportion to the respective amounts of distributions accumulated but unmade on each such series of preferred shares on the relevant dividend payment date.

The Trust's annualized distributions may in the future contain a return of capital and should not be considered as the dividend yield or total return of an investment in its common or preferred shares. Shareholders who receive the payment of a distribution consisting of a return of capital may be under the impression that they are receiving net profits when they are not. Shareholders should not assume that the source of a distribution from the Trust is net profit. The composition of each distribution is estimated based on the earnings of the Trust as of the record date for each distribution. The actual composition of each of the current year's distributions will be based on the Trust's investment activity through the end of the calendar year.

Distributions on fixed rate preferred shares, at the applicable annual rate of the per share liquidation preference, are cumulative from the original issue date and are payable, when, as and if declared by the Board, out of funds legally available therefor.

| | |
|---|---|
| **Principal Risks of the Trust** | The following is a summary of the principal risks associated with an investment in the Trust's securities. **Investors should also refer to "Principal Risks of the Trust" in this Prospectus for a more detailed explanation of the risks associated with investing in the Trust's securities.** Given the risks described below, an investment in the securities of the Trust may not be appropriate for all investors. |

9

**Table of Contents**

You should carefully consider your ability to assume these risks before making an investment in securities of the Trust.

10

[Table of Contents](#)

*REIT-Specific Risk*. REITs may be affected by changes in the real estate markets generally as well as changes in the values of the properties owned by the REIT or securing the mortgages owned by the REIT (which changes in value could be influenced by market conditions for real estate in general or fluctuations in the value of rights to natural resources appurtenant to the property held by the REIT). REITs are dependent upon management skill and are not diversified. REITs are also subject to heavy cash flow dependency, defaults by borrowers, self-liquidation, and the possibility of failing to qualify for special tax treatment under the Internal Revenue Code of 1986, as amended (the "Code") and to maintain an exemption under the Investment Company Act. For example, because a REIT may acquire debt securities of issuers primarily engaged in or related to the real estate industry, it also could conceivably own real estate directly as a result of a default on such securities. Any rental income or income from the disposition of such real estate could adversely affect its ability to retain its tax status, which would have adverse tax consequences on its shareholders. Finally, certain REITs may be self-liquidating at the end of a specified term, and run the risk of liquidating at an economically inopportune time.

The Trust seeks to gain exposure to the real estate markets, in whole or in part, through investing in certain REIT subsidiaries of the Trust. The Trust invests in NREO, organized under the laws of Delaware on September 17, 2012 and NREC, organized under the laws of Delaware on March 31, 2014 (each, a "Subsidiary"). Each Subsidiary has elected to be taxed as a REIT. Each Subsidiary is generally subject to the same investment policies and restrictions of the Trust. As of June 30, 2019, NREO and NREC accounted for approximately 2.9% and 22.0% respectively, of the Trust's Managed Assets, and approximately 2.8% and 21.7% respectively, of the Trust's total (gross) assets. The Investment Adviser does not charge an additional fee on assets held in each Subsidiary. The Trust intends to limit its investments in each Subsidiary and related entities to the extent necessary to qualify as a RIC for tax purposes. In general, and subject to certain exceptions not applicable here, a RIC is not permitted to invest, including through corporations in which the RIC owns a 20% or more voting stock interest, more than 25% of its total assets in any one issuer, or in any two or more issuers which the taxpayer controls and which are determined to be engaged in the same or similar trades or businesses or related trades or businesses.

In 2015, the Trust completed its spin-off of NexPoint Residential Trust, Inc. ("NXRT") pursuant to an exemptive order obtained from the Commission. No assurance can be given that the Trust would be able to obtain another exemptive order in the event that it should again believe a spin-off of a REIT subsidiary to be in the best interests of the Trust's shareholders. As a result, the Trust may not be able to dispose of its interests in a REIT subsidiary in the manner the Investment Adviser believes would be most efficient.

*Interest Rate Risk*. Interest rate risk is the risk that debt securities, and the Trust's net assets, may decline in value because of changes in interest rates. Generally, fixed rate debt securities will decrease in value when interest rates rise and increase in value when interest rates decline. To the extent the Trust invests in fixed rate debt securities with longer duration, the Trust is subject to greater interest rate risk than funds investing solely in shorter-term fixed rate debt securities. In addition, in a period of rising interest rates, the higher cost of any leverage employed by the Trust and/or increasing defaults by issuers of high-yield securities would likely exacerbate any decline in the Trust's NAV.

*Prepayment Risk*. If interest rates fall, the principal on bonds and loans held by the Trust may be paid earlier than expected. If this happens, the proceeds from a prepaid security may be reinvested by the Trust in securities bearing lower interest

11

**Table of Contents**

rates, resulting in a possible decline in the Trust's income and distributions to shareholders. The Trust may invest in pools of mortgages or other assets issued or guaranteed by private issuers or U.S. government agencies and instrumentalities. Mortgage-related securities are especially sensitive to prepayment risk because borrowers often refinance their mortgages when interest rates decline.

*Risks of Investing in High-Yield Securities, also Known as "Junk Securities."* A substantial portion of the Trust's investments will consist of investments that may generally be characterized as "high-yield securities" or "junk securities," and the Trust may invest without limit in such securities. Such securities are typically rated below investment grade by one or more nationally recognized statistical rating organizations or are unrated but of comparable credit quality to obligations rated below investment grade, and have greater credit and liquidity risk than more highly rated obligations. High-yield securities are generally unsecured and may be subordinate to other obligations of the obligor. The lower rating of high-yield securities reflects a greater possibility that adverse changes in the financial condition of the issuer or in general economic conditions (including, for example, a substantial period of rising interest rates or declining earnings) or both may impair the ability of the issuer to make payment of principal and interest. Many issuers of high-yield securities are highly leveraged, and their relatively high debt to equity ratios create increased risks that their operations might not generate sufficient cash flow to service their obligations. Overall declines in the high-yield bond and other markets may adversely affect such issuers by inhibiting their ability to refinance their obligations at maturity.

12

**Table of Contents**

*Illiquidity of Investments.* The investments made by the Trust may be very illiquid, and consequently, the Trust may not be able to sell such investments at prices that reflect the Investment Adviser's assessment of their fair value or the amount paid for such investments by the Trust or to sell such investments in a timely fashion. An inability to sell a portfolio position can adversely affect the Trust's value or prevent the Trust from being able to take advantage of other investment opportunities. Illiquidity may result from the absence of an established market for the investments as well as legal, contractual or other restrictions on their resale by the Trust and other factors. Furthermore, the nature of the Trust's investments, especially those in financially stressed and distressed companies, may require a long holding period prior to being able to determine whether the investment will be profitable or not. There is no limit on the amount of the Trust's investment portfolio that can be invested in illiquid securities.

*Risks of Investing in Senior Loans.* Senior loans, such as bank loans, are typically at the most senior level of the capital structure, and are sometimes secured by specific collateral, including, but not limited to, trademarks, patents, accounts receivable, inventory, equipment, buildings, real estate, franchises and common and preferred stock of the obligor or its affiliates. A portion of the Trust's investments may consist of loans and participations therein originated by banks and other financial institutions, typically referred to as "bank loans." The Trust's investments may include loans of a type generally incurred by borrowers in connection with highly leveraged transactions, often to finance internal growth, acquisitions, mergers or stock purchases, or for other reasons. As a result of the additional debt incurred by the borrower in the course of the transaction, the borrower's creditworthiness is often judged by the rating agencies to be below investment grade. Such loans are typically private corporate loans negotiated by one or more commercial banks or financial institutions and syndicated among a group of commercial banks and financial institutions. In order to induce the lenders to extend credit and to offer a favorable interest rate, the borrower often provides the lenders with extensive information about its business that is not generally available to the public. To the extent the Trust receives material non-public information, it may be prohibited from trading in certain securities, even when it might otherwise be beneficial to do so.

13

Table of Contents

*Legislation Risk.* To the extent that legislation or state or federal regulators impose additional requirements or restrictions with respect to the ability of financial institutions to make loans in connection with highly leveraged transactions, the availability of senior loan interests for investment by the Trust may be adversely affected. In addition, such requirements or restrictions may reduce or eliminate sources of financing for affected borrowers. Further, to the extent that legislation or federal or state regulators require such institutions to dispose of senior loan interests relating to highly leveraged transactions or subject such senior loan interests to increased regulatory scrutiny, such financial institutions may determine to sell senior loan interests in a manner that results in a price that, in the opinion of the Investment Adviser, is not indicative of fair value. Were the Trust to attempt to sell a senior loan interest at a time when a financial institution was engaging in such a sale with respect to the senior loan interest, the price at which the Trust could consummate such a sale might be adversely affected.

*Second Lien Loans Risk.* Second lien loans are subject to the same risks associated with investment in senior loans and non-investment grade securities. However, second lien loans are second in right of payment to senior loans and therefore are subject to additional risk that the cash flow of the borrower and any property securing the loan may be insufficient to meet scheduled payments after giving effect to the senior secured obligations of the borrower. Second lien loans are expected to have greater price volatility than senior loans and may be less liquid. There is also a possibility that originators will not be able to sell participations in second lien loans, which would create greater credit risk exposure.

*Other Secured Loans Risk.* Secured loans other than senior loans and second lien loans are subject to the same risks associated with investment in senior loans, second lien loans and non-investment grade securities. However, such loans may rank lower in right of payment than any outstanding senior loans and second lien loans of the borrower and therefore are subject to additional risk that the cash flow of the borrower and any property securing the loan may be insufficient to meet scheduled payments after giving effect to the higher-ranking secured obligations of the borrower. Lower-ranking secured loans are expected to have greater price volatility than senior loans and second lien loans and may be less liquid. There is also a possibility that originators will not be able to sell participations in lower-ranking secured loans, which would create greater credit risk exposure.

*Unsecured Loans Risk.* Unsecured loans are subject to the same risks associated with investment in senior loans, second lien loans, other secured loans and non-investment grade securities. However, because unsecured loans have lower priority in right of payment to any higher ranking obligations of the borrower and are not backed by a security interest in any specific collateral, they are subject to additional risk that the cash flow of the borrower and available assets may be insufficient to meet scheduled payments after giving effect to any higher ranking obligations of the borrower. Unsecured loans are expected to have greater price volatility than senior loans, second lien loans and other secured loans and may be less liquid. There is also a possibility that originators will not be able to sell participations in unsecured loans, which would create greater credit risk exposure.

14

Table of Contents

*Risks of Investing in Obligations of Stressed, Distressed and Bankrupt Issuers.* The Trust is authorized to invest in the securities and other obligations of stressed, distressed and bankrupt issuers, including debt obligations that are in covenant or payment default. There is no limit on the amount of the Trust's investment portfolio that can be invested in stressed, distressed or bankrupt issuers, and the Trust may invest for purposes of control. Such investments generally trade significantly below par and are considered highly speculative. The repayment of defaulted obligations is subject to significant uncertainties. Defaulted obligations might be repaid only after lengthy workout or bankruptcy proceedings, during which the issuer might not make any interest or other payments. Typically such workout or bankruptcy proceedings result in only partial recoveries, which may be in the form of cash payments or an exchange of the defaulted obligation for other debt or equity securities of the issuer or its affiliates, which may in turn be illiquid or highly speculative. It is also possible that there could be limited or no recovery for creditors in a bankruptcy or workout.

15

**Table of Contents**

*Insolvency Considerations with Respect to Issuers of Debt Obligations.* Various laws enacted for the protection of creditors may apply to the debt obligations held by the Trust. The information in this paragraph is applicable with respect to U.S. issuers subject to U.S. bankruptcy laws. Insolvency considerations may differ with respect to other issuers. If a court in a lawsuit brought by an unpaid creditor or representative of creditors of an issuer of a debt obligation, such as a trustee in bankruptcy or a creditors' committee, were to find that the issuer did not receive fair consideration or reasonably equivalent value for incurring the indebtedness constituting the debt obligation and, after giving effect to such indebtedness, the issuer (i) was insolvent, (ii) was engaged in a business for which the remaining assets of such issuer constituted unreasonably small capital, or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature, such court could determine to invalidate, in whole or in part, such indebtedness as a fraudulent conveyance, to subordinate such indebtedness to existing or future creditors of such issuer, or to recover amounts previously paid by such issuer in satisfaction of such indebtedness.

16

Table of Contents

*Litigation Risk.* The Trust is sometimes subject to legal proceedings and claims based on the securities and instruments in which the Trust invests. Litigation may result in substantial costs and may seriously harm the Trust's investments and overall financial condition. In addition, legal claims that have not yet been asserted against the Trust may be asserted in the future.

*Leverage Risk.* When deemed appropriate by the Investment Adviser and subject to applicable regulations, the Trust may use leverage in its investment program, including through the issuance of preferred shares, borrowings from a credit facility, issuing notes or other debt securities and investments in certain types of options, such as puts, calls and warrants. While such strategies and techniques increase the opportunity to achieve higher returns on the amounts invested, they also increase the risk of loss. To the extent the Trust purchases securities with borrowed funds, its net assets will tend to increase or decrease at a greater rate than if borrowed funds are not used. The level of interest rates generally, and the rates at which such funds may be borrowed in particular, could affect the operating results of the Trust. If the interest expense on borrowings were to exceed the net return on the portfolio securities purchased with borrowed funds, the Trust's use of leverage would result in a lower rate of return than if the Trust were not leveraged.

The Trust's leveraged capital structure creates special risks not associated with unleveraged funds having a similar investment objective and policies. These include the possibility of greater loss and the likelihood of higher volatility of the NAV of the Trust and the asset coverage for the preferred shares.

17

**Table of Contents**

*Other Investment Companies.* The Trust may invest in the securities of other investment companies, which can include open-end funds, closed-end funds, unit investment trusts and BDCs. Investment companies combine shareholders' funds for investment in a variety of instruments, including equity securities, debt securities, and money market instruments and may invest primarily in a particular type of security, a particular industry or a mix of securities and industries. An investment company is not taxed on income distributed to shareholders if, among other things, it distributes to its shareholders substantially all of its taxable income for each taxable year. As a shareholder of another investment company, the Trust, and therefore its shareholders, will bear a proportionate share of the expenses of such other investment companies, including management fees, administration fees and custodial fees, in addition to the expenses of the Trust. Under one provision of the Investment Company Act, the Trust may not acquire the securities of other investment companies if, as a result, (i) more than 10% of the Trust's total assets would be invested in securities of other investment companies, (ii) such purchase would result in more than 3% of the total outstanding voting securities of any one investment company being held by the Trust or (iii) more than 5% of the Trust's total assets would be invested in any one investment company. Other provisions of the Investment Company Act are less restrictive, provided that the Trust is able to meet certain conditions. These limitations do not apply to the acquisition of shares of any investment company in connection with a merger, consolidation, reorganization or acquisition of substantially all of the assets of another investment company.

*Preferred Share Risk.* Preferred share risk is the risk associated with the issuance of preferred shares to leverage the common shares. If preferred shares are issued, the NAV and market value of the common shares will be more volatile, and the yield to the holders of common shares will tend to fluctuate with changes in the shorter-term dividend rates on the preferred shares. The Trust will pay (and the holders of common shares will bear) all costs and expenses relating to the issuance and ongoing maintenance of the preferred shares, including higher advisory fees. Accordingly, the issuance of preferred shares may not result in a higher yield or return to the holders of the common shares. If the dividend rate and other costs of the preferred shares approach the net rate of return on the Trust's investment portfolio, the benefit of leverage to the holders of the common shares would be reduced. If the dividend rate and other costs of the preferred shares exceed the net rate of return on the Trust's investment portfolio, the leverage will result in a lower rate of return to the holders of common shares than if the Trust had not issued preferred shares.

18

Table of Contents

*Common Stock Risk*. The Trust may invest in common stock. Although investments in common stock have historically generated higher average total returns than fixed income securities over the long-term, investments in common stock also have historically experienced significantly more volatility in those returns. Therefore, the Trust's investments in common stock could result in worse performance than would be the case had the Trust been invested solely in debt securities. An adverse event, such as an unfavorable earnings report, may depress the value of a particular investment in common stock held by the Trust. Also, the price of common stock is sensitive to general movements in the stock market and a drop in the stock market may depress the price of a common stock to which the Trust has exposure. Common stock prices fluctuate for several reasons, including changes in investors' perceptions of the financial condition of an issuer or the general condition of the relevant stock market, or when political or economic events affecting an issuer occur. In addition, common stock prices may be particularly sensitive to rising interest rates, as the cost of capital rises and borrowing costs increase.

*Dividend Risk*. Dividends on common stock are not fixed but are declared at the discretion of an issuer's board of directors. There is no guarantee that the issuers of the common stocks in which the Trust invests will declare dividends in the future or that, if declared, the dividends will remain at current levels or increase over time.

19

Table of Contents

*Non-U.S. Securities Risk*. The Trust may invest without limit in Non-U.S. Securities. The Trust may invest in Non-U.S. Securities of so-called emerging market issuers. The Trust currently does not expect to invest more than 15%, but may invest up to 20%, of its assets in emerging market issuers. Investing in Non-U.S. Securities involves certain risks not involved in domestic investments, including, but not limited to: (i) fluctuations in foreign exchange rates; (ii) future foreign economic, financial, political and social developments; (iii) different legal systems; (iv) the possible imposition of exchange controls or other foreign governmental laws or restrictions; (v) lower trading volume; (vi) much greater price volatility and illiquidity of certain non-U.S. securities markets; (vii) different trading and settlement practices; (viii) less governmental supervision; (ix) changes in currency exchange rates; (x) high and volatile rates of inflation; (xi) fluctuating interest rates; (xii) less publicly available information; and (xiii) different accounting, auditing and financial recordkeeping standards and requirements. In addition, certain investments in Non-U.S. Securities may be subject to foreign withholding or other taxes on interest, dividends, capital gains or other income. Those taxes will reduce the Trust's yield on any such securities.

20

[Table of Contents](#)

*Emerging Markets Risk.* The Trust currently does not expect to invest more than 15%, but may invest up to 20% of its total assets in securities of issuers based in emerging markets. An emerging market country is any country having an economy and market that are (or would be) considered by the World Bank to be emerging or developing or is listed in the Morgan Stanley Capital International Emerging Markets Index. Emerging market countries are located in regions such as Asia, Latin America, the Middle East, Southern Europe, Eastern Europe (including the former republics of the Soviet Union and the Eastern Bloc) and Africa. Investing in securities of issuers based in emerging markets entails all of the risks of investing in securities of non-U.S. issuers, but to a heightened degree. These heightened risks include: (i) greater risks of expropriation, confiscatory taxation, nationalization, and less social, political and economic stability; (ii) the smaller size of the markets for such securities and a lower volume of trading, resulting in lack of liquidity and in price volatility; and (iii) certain national policies which may restrict the Trust's investment opportunities including restrictions on investing in issuers or industries deemed sensitive to relevant national interests.

*Foreign Currency Risk.* Because the Trust may invest in securities denominated or quoted in currencies other than the U.S. dollar, changes in foreign currency exchange rates may affect the value of securities owned by the Trust, the unrealized appreciation or depreciation of investments and gains on and income from investments. Currencies of certain countries may be volatile and therefore may affect the value of securities denominated in such currencies, which means that the Trust's NAV could decline as a result of changes in the exchange rates between foreign currencies and the U.S. dollar. These risks often are heightened for investments in smaller or emerging capital markets. In addition, the Trust may enter into foreign currency transactions in an attempt to enhance total return, which may further expose the Trust to the risks of foreign currency movements and other risks. The use of foreign currency transactions can result in the Trust incurring losses as a result of the imposition of exchange controls, suspension of settlements or the inability of the Trust to deliver or receive a specified currency.

*Investments in Unseasoned Companies.* The Trust may invest in the securities of less seasoned companies. These investments may present greater opportunities for growth, but also involve greater risks than customarily are associated with investments in securities of more established companies. Some of the companies in which the Trust may invest will be start-up companies that may have insubstantial operational or earnings history or may have limited products, markets, financial resources or management depth. Some may also be emerging companies at the research and development stage with no products or technologies to market or approved for marketing. Securities of emerging companies may lack an active secondary market and may be subject to more abrupt or erratic price movements than securities of larger, more established companies or stock market averages in general. Competitors of certain companies may have substantially greater financial resources than many of the companies in which the Trust may invest.

21

**Table of Contents**

*Initial Public Offerings Risk.* The Trust may invest in shares of companies through initial public offerings ("IPOs"). IPOs and companies that have recently gone public have the potential to produce substantial gains for the Trust. However, the Trust may not have access to or invest in IPOs that are ultimately profitable for investors. The investment performance of the Trust during periods when it is unable to invest significantly or at all in IPOs may be lower than during periods when the Trust is able to do so. Securities issued in IPOs are subject to many of the same risks as investing in companies with smaller market capitalizations. Securities issued in IPOs have no trading history, and information about the companies may be available for limited periods of time. In addition, the prices of securities sold in IPOs may be highly volatile or may decline shortly after the IPO.

*Securities Lending Risk.* Under the Trust's current securities lending agreement, the Trust may lend its portfolio securities (up to a maximum of one-third of its total assets) to financial institutions on an approved list of borrowers. Securities lending is subject to the risk that loaned securities may not be available to the Trust on a timely basis and the Trust may, therefore, lose the opportunity to sell the securities at a desirable price. Any loss in the market price of securities loaned by the Trust that occurs during the term of the loan would be borne by the Trust and would adversely affect the Trust's performance. Also, there may be delays in recovery, or no recovery, of securities loaned should the borrower of the securities fail financially while the loan is outstanding. In addition, voting rights with respect to loaned securities generally pass to the borrower. The Trust, as the lender, retains the right to recall the loans and obtain the return of the securities loaned in order to vote the loaned securities. However, in many circumstances the Trust may be unable to recall the securities in time to vote or may determine that the benefits to the Trust of voting are outweighed by the indirect or direct costs of such a recall. In these circumstances, loaned securities may be voted or not voted in a manner adverse to the best interests of the Trust. All of the aforementioned risks may be greater for Non-U.S. Securities.

*Risks Associated with Options on Securities.* There are several risks associated with transactions in options on securities, such as exchange-listed, over-the-counter and index options. For example, there are significant differences between the securities and options markets that could result in an imperfect correlation between these markets, causing a given transaction not to achieve its objectives. A decision as to whether, when and how to use options involves the exercise of skill and judgment, and even a well-conceived transaction may be unsuccessful to some degree because of market behavior or unexpected events.

22

**Table of Contents**

*Exchange-Listed Option Risks.* A liquid market may not exist when the Trust seeks to close out an option position on an options exchange. Reasons for the absence of a liquid secondary market on an exchange include the following: (i) there may be insufficient trading interest in certain options; (ii) restrictions may be imposed by an exchange on opening transactions or closing transactions or both; (iii) trading halts, suspensions or other restrictions may be imposed with respect to particular classes or series of options; (iv) unusual or unforeseen circumstances may interrupt normal operations on an exchange; (v) the facilities of an exchange or the Options Clearing Corporation "OCC" may not at all times be adequate to handle current trading volume; or (vi) one or more exchanges could, for economic or other reasons, decide or be compelled at some future date to discontinue the trading of options (or a particular class or series of options). If trading were discontinued, the secondary market on that exchange (or in that class or series of options) would cease to exist. However, outstanding options on that exchange that had been issued by the OCC as a result of trades on that exchange would continue to be exercisable in accordance with their terms. If the Trust were unable to close out a covered call option that it had written on a security, it would not be able to sell the underlying security unless the option expired without exercise.

23

Table of Contents

*Over-the-Counter Option Risk*. The Trust may purchase and write (sell) unlisted ("OTC" or "over-the-counter") options. Options written by the Trust with respect to Non-U.S. Securities, indices or sectors generally will be OTC options. OTC options differ from exchange-listed options in that they are two-party contracts, with exercise price, premium and other terms negotiated between buyer and seller, and generally do not have as much market liquidity as exchange-listed options. The counterparties to these transactions typically will be major international banks, broker-dealers and financial institutions. The Trust may be required to treat as illiquid those securities being used to cover certain written OTC options. The OTC options written by the Trust will not be issued, guaranteed or cleared by the OCC. In addition, the Trust's ability to terminate the OTC options may be more limited than with exchange-traded options. Banks, broker-dealers or other financial institutions participating in such transactions may fail to settle a transaction in accordance with the terms of the option as written. In the event of default or insolvency of the counterparty, the Trust may be unable to liquidate an OTC option position.

*Index Option Risk*. The Trust may purchase and sell index put and call options from time to time. The purchaser of an index put option has the right to any depreciation in the value of the index below the exercise price of the option on or before the expiration date. The purchaser of an index call option has the right to any appreciation in the value of the index over the exercise price of the option on or before the expiration date. Because the exercise of an index option is settled in cash, sellers of index call options, such as the Trust, cannot provide in advance for their potential settlement obligations by acquiring and holding the underlying securities. The Trust will lose money if it is required to pay the purchaser of an index option the difference between the cash value of the index on which the option was written and the exercise price and such difference is greater than the premium received by the Trust for writing the option. The value of index options written by the Trust, which will be priced daily, will be affected by changes in the value and dividend rates of the underlying common stocks in the respective index, changes in the actual or perceived volatility of the stock market and the remaining time to the options' expiration. The value of the index options also may be adversely affected if the market for the index options becomes less liquid or smaller. Distributions paid by the Trust on its common shares may be derived in part from the net index option premiums it receives from selling index put and call options, less the cost of paying settlement amounts to purchasers of the options that exercise their options. Net index option premiums can vary widely over the short term and long term.

*Asset-Backed Securities Risk*. Payment of interest and repayment of principal on asset-backed securities is largely dependent upon the cash flows generated by the assets backing the securities and, in certain cases, supported by letters of credit, surety bonds or other credit enhancements. Asset-backed security values may also be affected by the creditworthiness of the servicing agent for the pool, the originator of the loans or receivables and any entities providing the credit enhancement. In addition, the underlying assets are subject to prepayments that shorten the securities' weighted average maturity and may lower their return.

*Mortgage-Backed Securities Risk*. A mortgage-backed security, which represents an interest in a pool of assets such as mortgage loans, will mature once all the mortgages in the pool mature or are prepaid. Therefore, mortgage-backed securities do not have a fixed maturity, and their expected maturities may vary when interest rates rise or fall.

24

Table of Contents

When interest rates fall, homeowners are more likely to prepay their mortgage loans. An increased rate of prepayments on the Trust's mortgage-backed securities will result in an unforeseen loss of interest income to the Trust, as the Trust may be required to reinvest assets at a lower interest rate. Because prepayments increase when interest rates fall, the price of mortgage-backed securities does not increase as much as that of other fixed income securities when interest rates fall.

When interest rates rise, homeowners are less likely to prepay their mortgage loans. A decreased rate of prepayments lengthens the expected maturity of a mortgage-backed security. Therefore, the prices of mortgage-backed securities may decrease more than prices of other fixed income securities when interest rates rise.

25

**Table of Contents**

*Repurchase Agreement Risk.* The Trust may enter into reverse repurchase transactions with BNP Securities or other banks and securities dealers. A reverse repurchase transaction is a repurchase transaction in which the Trust is the seller of, rather than the investor in, securities or other assets and agrees to repurchase them at a date certain or on demand. Use of a reverse repurchase transaction may be preferable to a regular sale and later repurchase of securities or other assets because it avoids certain market risks and transaction costs. Reverse repurchase transactions involve the risk that the market value of securities and/or other assets purchased by the Trust with the proceeds received by the Trust in connection with such reverse repurchase transactions may decline below the market value of the securities the Trust is obligated to repurchase under such reverse repurchase transactions. They also involve the risk that the counterparty liquidates the securities delivered to it by the Trust under the reverse repurchase agreement following the occurrence of an event of default under the reverse repurchase agreement by the Trust. At the time when the Trust enters into a reverse repurchase transactions, liquid securities (cash, U.S. Government securities or other "high grade" debt obligations) of the Trust having a value at least as great as the Purchase Price of the securities to be purchased will be segregated on the books of the Trust throughout the period of the obligation. The use of these investment strategies may increase NAV fluctuation.

26

Table of Contents

*Derivatives Risk.* Derivative transactions in which the Trust may engage for hedging and speculative purposes or to enhance total return, including engaging in transactions such as options, futures, swaps, foreign currency transactions, forward foreign currency contracts, currency swaps or options on currency futures and other derivatives transactions (collectively, "Derivative Transactions"), involve certain risks and special considerations. Derivatives Risk is a combination of several risks, including the risks that: (1) an investment in a derivative instrument may not correlate well with the performance of the securities or asset class to which the Trust seeks exposure, (2) derivative contracts, including options, may expire worthless and the use of derivatives may result in losses to the Trust, (3) a derivative instrument entailing leverage may result in a loss greater than the principal amount invested, (4) derivatives not traded on an exchange may be subject to credit risk, for example, if the counterparty does not meet its obligations (see also "Counterparty Risk"), and (5) derivatives not traded on an exchange may be subject to liquidity risk and the related risk that the instrument is difficult or impossible to value accurately. Derivatives are financial contracts whose value depends on, or is derived from, the value of underlying assets, reference rates, or indices. Derivatives involve the risk that changes in their value may not move as expected relative to the value of the assets, rates, or indices they are designed to track. Derivatives include futures, non-U.S. currency contracts, swap contracts, warrants, and options contracts. Derivatives may relate to securities, interest rates, currencies or currency exchange rates, inflation rates, commodities, and indices.

27

Table of Contents

*Derivatives; Future Developments.* The above discussion relates to the Trust's proposed use of certain types of derivatives currently available. However, the Trust is not limited to the transactions described above. In addition, the relevant markets and related regulations are constantly changing and, in the future, the Trust may use derivatives not currently available or widely in use.

*Regulatory Risk.* Legal, tax and regulatory changes could occur and may adversely affect the Trust and its ability to pursue its investment strategies and/or increase the costs of implementing such strategies. New (or revised) laws or regulations may be imposed by the Commission, the U.S. Commodity Futures Trading Commission (the "CFTC"), the Internal Revenue Service ("IRS"), the U.S. Federal Reserve or other banking regulators, other governmental regulatory authorities or self-regulatory organizations that supervise the financial markets that could adversely affect the Trust. In particular, these agencies are empowered to promulgate a variety of new rules pursuant to financial reform legislation in the United States. The Trust also may be adversely affected by changes in the enforcement or interpretation of existing statutes and rules by these governmental regulatory authorities or self regulatory organizations.

28

Table of Contents

*Regulatory Risk – Commodity Pool Operator.* The Trust is operated by a person who has claimed an exclusion from the definition of the term "commodity pool operator" under the Commodity Exchange Act ("CEA") pursuant to Rule 4.5 under the CEA; therefore, the Investment Adviser (with respect to the Trust) is not subject to registration or regulation as a "commodity pool operator" under the CEA. To remain eligible for the exclusion, the Trust will be limited in its ability to use certain derivatives instruments regulated under the CEA ("commodity interests"), including futures, most swaps and options on futures. In the event that the Trust's investments in commodity interests exceed a certain threshold, the Investment Adviser may be required to register as a "commodity pool operator" and/or "commodity trading advisor" with the CFTC with respect to the Trust. The Investment Adviser's eligibility to claim the exclusion with respect to the Trust will be based upon the level and scope of the Trust's investment in commodity interests, the purposes of such investments and the manner in which the Trust holds out its use of commodity interests. For example, CFTC Rule 4.5 requires a fund with respect to which the operator is claiming the exclusion to, among other things, satisfy one of the two following trading thresholds: (i) the aggregate initial margin and premiums required to establish positions in commodity interests cannot exceed 5% of the liquidation value of a fund's portfolio, after taking into account unrealized profits and unrealized losses; or (ii) the aggregate net notional value of commodity interests not used solely for "bona fide hedging purposes," determined at the time the most recent position was established, cannot generally exceed 100% of the liquidation value of a fund's portfolio, after taking into account unrealized profits and unrealized losses on any such positions it has entered into. The Trust currently intends to operate in a manner that would permit the Investment Adviser to continue to claim the exclusion under Rule 4.5, which may adversely affect the Investment Adviser's ability to manage the Trust under certain market conditions and may adversely affect the Trust's total return. In the event the Investment Adviser becomes unable to rely on the exclusion in Rule 4.5 and is required to register with the CFTC as a commodity pool operator, the Trust's expenses may increase, adversely affecting the Trust's total return.

29

**Table of Contents**

*Counterparty Risk*. The Trust will be subject to credit risk with respect to the counterparties to the derivative contracts purchased or sold by the Trust. Recently, several broker-dealers and other financial institutions have experienced extreme financial difficulty, sometimes resulting in bankruptcy of the institution. Although the Investment Adviser monitors the creditworthiness of the Trust's counterparties, there can be no assurance that the Trust's counterparties will not experience similar difficulties, possibly resulting in losses to the Trust. If a counterparty becomes bankrupt, or otherwise fails to perform its obligations under a derivative contract due to financial difficulties, the Trust may experience significant delays in obtaining any recovery under the derivative contract in a bankruptcy or other reorganization proceeding. The Trust may obtain only a limited recovery or may obtain no recovery in such circumstances. Material exposure to a single or small group of counterparties increases the Trust's counterparty risk.

*Credit Default Swaps Risk*. The Trust may enter into credit default swap agreements, which may have as reference obligations one or more debt securities or an index of such securities. In a credit default swap, one party (the "protection buyer") is obligated to pay the other party (the "protection seller") a stream of payments over the term of the contract, provided that no credit event, such as a default or, in some instances, a downgrade in credit rating, occurs on the reference obligation. If a credit event occurs, the protection seller must generally pay the protection buyer the "par value" (the agreed-upon notional value) of the referenced debt obligation in exchange for an equal face amount of deliverable reference obligations.

30

**Table of Contents**

*Market Risk Generally.* The profitability of a significant portion of the Trust's investment program depends to a great extent upon correctly assessing the future course of the price movements of securities and other investments and the movements of interest rates. The Investment Adviser may not be able to predict accurately these price and interest rate movements. With respect to certain investment strategies the Trust utilizes, there is a high degree of market risk.

*Reinvestment Risk.* The Trust reinvests the cash flows received from a security. The additional income from such reinvestment, sometimes called interest-on-interest, is reliant on the prevailing interest rate levels at the time of reinvestment. There is a risk that the interest rate at which interim cash flows can be reinvested will fall. Reinvestment risk is greater for longer holding periods and for securities with large, early cash flows such as high-coupon bonds. Reinvestment risk also applies generally to the reinvestment of the proceeds the Trust receives upon the maturity or sale of a portfolio security.

31

Table of Contents

*Timing Risk*. Many agency, corporate and municipal bonds, and most mortgage-backed securities, contain a provision that allows the issuer to "call" all or part of the issue before the bond's maturity date — often after five or ten years. The issuer usually retains the right to refinance the bond in the future if market interest rates decline below the coupon rate. There are three disadvantages to the call provision. First, the cash flow pattern of a callable bond is not known with certainty. Second, because an issuer is more likely to call the bonds when interest rates have dropped, the Trust is exposed to reinvestment risk, i.e., the Trust may have to reinvest at lower interest rates the proceeds received when the bond is called. Finally, the capital appreciation potential of a bond will be reduced because the price of a callable bond may not rise much above the price at which the issuer may call the bond.

*Inflation Risk*. Inflation risk results from the variation in the value of cash flows from a security due to inflation, as measured in terms of purchasing power. For example, if the Trust purchases a bond in which it can realize a coupon rate of 5%, but the rate of inflation increases from 2% to 6%, then the purchasing power of the cash flow has declined. For all but adjustable bonds or floating rate bonds, the Trust is exposed to inflation risk because the interest rate the issuer promises to make is fixed for the life of the security. To the extent that interest rates reflect the expected inflation rate, floating rate bonds have a lower level of inflation risk. In addition, during any periods of rising inflation, dividend rates of any variable rate preferred stock issued by the Trust would likely increase, which would tend to further reduce returns to common shareholders.

*Arbitrage Risks*. The Trust engages in capital structure arbitrage and other arbitrage strategies. Arbitrage strategies entail various risks, including the risk that external events, regulatory approvals and other factors will impact the consummation of announced corporate events and/or the prices of certain positions. In addition, hedging is an important feature of capital structure arbitrage. There is no guarantee that the Investment Adviser will be able to hedge the Trust's investment portfolio in the manner necessary to employ successfully the Trust's strategy.

*Short Sales Risk*. Short selling involves selling securities that may or may not be owned and borrowing the same securities for delivery to the purchaser, with an obligation to replace the borrowed securities at a later date. Short selling allows the Trust to profit from declines in market prices to the extent such decline exceeds the transaction costs and the costs of borrowing the securities. However, because the borrowed securities must be replaced by purchases at market prices in order to close out the short position, any appreciation in the price of the borrowed securities would result in a loss. The securities necessary to cover a short position may not be available for purchase. Purchasing securities to close out the short position can itself cause the price of the securities to rise further, thereby exacerbating the loss. The Trust may mitigate such losses by replacing the securities sold short before the market price has increased significantly. Under adverse market conditions, the Trust might have difficulty purchasing securities to meet its short sale delivery obligations, and might have to sell portfolio securities to raise the capital necessary to meet its short sale obligations at a time when fundamental investment considerations would not favor such sales. Short sales by the Trust that are not made "against the box" theoretically involve unlimited loss potential, since the market price of securities sold short may continuously increase.

32

Table of Contents

*REIT Tax Risk for REIT Subsidiaries.* In addition to NREO and NREC, we may form one or more subsidiaries that will elect to be taxed as REITs beginning with the first year in which they commence material operations. In order for each subsidiary to qualify and maintain its qualification as a REIT, it must satisfy certain requirements set forth in the Code and Treasury Regulations that depend on various factual matters and circumstances. The Trust and the Investment Adviser intend to structure each REIT subsidiary and its activities in a manner designed to satisfy all of these requirements. However, the application of such requirements is not entirely clear, and it is possible that the IRS may interpret or apply those requirements in a manner that jeopardizes the ability of such REIT subsidiary to satisfy all of the requirements for qualification as a REIT.

33

**Table of Contents**

*MLP Risk*. The Trust may invest in "MLP" securities. MLPs typically are characterized as "publicly traded partnerships" that qualify to be treated as partnerships for U.S. federal income tax purposes and are principally engaged in one or more aspects of the exploration, production, processing, transmission, marketing, storage or delivery of energy-related commodities, such as natural gas, natural gas liquids, coal, crude oil or refined petroleum products (collectively, the energy industry). As a result, holders of MLP securities will be subject to risks related to the energy industry, including: (i) fluctuations in commodity prices; (ii) reduced volumes of natural gas or other energy commodities available for transporting, processing, storing or distributing; (iii) slowdowns in new construction and acquisitions; (iv) reduced demand for commodities such as crude oil, natural gas and refined petroleum products; (v) depletion of natural gas reserves or other commodities; (vi) extreme weather and environmental hazards; (vii) stricter laws, regulations or enforcement policies; and (viii) dangers inherent to the energy industry, such as leaks, fires, explosions, damage to facilities and equipment resulting from natural disasters, inadvertent damage to facilities and equipment and terrorist acts.

34

**Table of Contents**

*BDC Risk.* BDCs generally invest in less mature private companies or thinly traded U.S. public companies which involve greater risk than well-established publicly-traded companies. The Trust will indirectly bear its proportionate share of any management and other operating expenses and of any performance-based or incentive fees charged by the BDCs in which it invests, in addition to the expenses paid by the Trust. The Investment Company Act imposes certain constraints upon the operations of a BDC. Generally, little public information exists for private and thinly traded companies in which a BDC may invest and there is a risk that investors may not be able to make a fully informed evaluation of a BDC and its portfolio of investments. In addition, to qualify and remain eligible for the special tax treatment accorded to regulated investment companies ("RICs") and their shareholders, the BDCs in which the Trust invests must meet certain source-of-income, asset diversification and annual distribution requirements. If a BDC in which the Trust invests fails to qualify as a RIC, such BDC would be liable for federal, and possibly state, corporate taxes on its taxable income and gains. Such failure by a BDC could substantially reduce the BDC's net assets and the amount of income available for distribution to the Trust, which would in turn decrease the total return of the Trust in respect of such investment.

*Risks of Investing in Structured Finance Securities.* A portion of the Trust's investments may consist of equipment trust certificates, collateralized mortgage obligations, collateralized bond obligations ("CBOs"), CLOs or similar instruments. Such structured finance securities are generally backed by an asset or a pool of assets, which serve as collateral. Depending on the type of security, the collateral may take the form of a portfolio of mortgage loans or bonds or other assets. The Trust and other investors in structured finance securities ultimately bear the credit risk of the underlying collateral. In some instances, the structured finance securities are issued in multiple tranches, offering investors various maturity and credit risk characteristics, often categorized as senior, mezzanine and subordinated/equity according to their degree of risk. If there are defaults or the relevant collateral otherwise underperforms, scheduled payments to senior tranches of such securities take precedence over those of mezzanine tranches, and scheduled payments to mezzanine tranches take precedence over those to subordinated/equity tranches. In light of the above considerations, structured finance securities may present risks similar to those of the other types of debt obligations in which the Trust may invest and, in fact, such risks may be of greater significance in the case of structured finance securities. Moreover, investing in structured finance securities may entail a variety of unique risks. In addition to the risks noted above and other risks, structured finance securities may be subject to prepayment risk. In addition, the performance of a structured finance security will be affected by a variety of factors, including the security's priority in the capital structure of the issuer thereof, the availability of any credit enhancement, the level and timing of payments and recoveries on and the characteristics of the underlying receivables, loans or other assets that are being securitized, remoteness of those assets from the originator or transferor, the adequacy of and ability to realize upon any related collateral and the capability of the servicer of the securitized assets. In addition, the complex structure of the security may produce unexpected investment results, especially during times of market stress or volatility. Investments in structured finance securities may also be subject to illiquidity risk. Collateralized mortgage obligations may have risks similar to those of mortgage-backed securities. See "Mortgage-Backed Securities Risk" for more information.

35

**Table of Contents**

*Risks of Investing in Preferred Securities*. There are special risks associated with investing in preferred securities, including:

- *Deferral*. Preferred securities may include provisions that permit the issuer, at its discretion, to defer distributions for a stated period without any adverse consequences to the issuer. If the Trust owns a preferred security that is deferring the payment of its distributions, the Trust may be required to report income for U.S. federal income tax purposes to the extent of any such deferred distribution even though the Trust has not yet received such income. In order to receive the special treatment accorded to RICs and their shareholders under the Code and to avoid U.S. federal income or excise taxes at the Trust level, the Trust may be required to distribute this reported income to shareholders in the tax year in which the income is reported (without a corresponding receipt of cash). Therefore, the Trust may be required to pay out as an income distribution in any such tax year an amount greater than the total amount of income the Trust actually received, and, among other things, to sell portfolio securities, including at potentially disadvantageous times or prices, to obtain cash needed for these income distributions.

- *Subordination*. Preferred securities are subordinated to bonds and other debt instruments in a company's capital structure in terms of priority to corporate income and liquidation payments, and therefore will be subject to greater credit risk than more senior debt instruments.

- *Liquidity*. Preferred securities may be substantially less liquid than many other securities, such as common stock or U.S. government securities.

- *Limited Voting Rights*. Generally, preferred security holders have no voting rights with respect to the issuing company unless preferred dividends have been in arrears for a specified number of periods, at which time the preferred security holders may elect a number of directors to the issuer's board. Generally, once all the arrearages have been paid, the preferred security holders no longer have voting rights.

*Risks of Investing in Swaps*. Investments in swaps involve the exchange by the Trust with another party of their respective commitments. Use of swaps subjects the Trust to risk of default by the counterparty. If there is a default by the counterparty to such a transaction, there may be contractual remedies pursuant to the agreements related to the transaction although contractual remedies may not be sufficient in the event the counterparty is insolvent. The Trust may enter into credit default swaps, currency swaps or other swaps which may be surrogates for other instruments such as currency forwards or options. Swap agreements are sophisticated financial instruments that typically involve a small investment of cash relative to the magnitude of risks assumed. Swaps can be highly volatile and may have a considerable impact on the Trust's performance, as the potential gain or loss on any swap transaction is not necessarily subject to any fixed limit.

36

**Table of Contents**

*Risks of Investing in Synthetic Securities.* In addition to credit risks associated with holding non-investment grade loans and high-yield debt securities, with respect to synthetic securities the Trust will usually have a contractual relationship only with the counterparty of such synthetic securities, and not the issuer (the "Reference Obligor") of the debt security or other obligation upon which the synthetic security is based (the "Reference Obligation"). The Trust generally will have no right to enforce directly compliance by the Reference Obligor with the terms of the Reference Obligation nor any rights of setoff against the Reference Obligor, nor have any voting rights with respect to the Reference Obligation. The Trust will not benefit directly from any collateral supporting the Reference Obligation or have the benefit of the remedies on default that would normally be available to a holder of such Reference Obligation. In addition, in the event of insolvency of its counterparty, the Trust will be treated as a general creditor of such counterparty and will not have any claim with respect to the credit risk of the counterparty as well as that of the Reference Obligor. As a result, investments in synthetic securities are subject to an additional degree of risk because they are subject to the credit risk of the counterparty as well as that of the Reference Obligor. The Investment Adviser may not perform independent credit analyses of any particular counterparty, or any entity guaranteeing the obligations of such counterparty. See "Prospectus Summary – Principal Risks of the Trust – Counterparty Risk."

The Trust currently does not expect to invest more than 10% of its assets in synthetic securities as measured on a mark-to-market basis. However, the Trust's investments in synthetic securities may exceed this amount from time to time.

*Valuation Risk.* Portfolio securities may be valued using techniques other than market quotations, under the circumstances described under "Determination of Net Asset Value." The value established for a portfolio security may be different than what would be produced through the use of another methodology or if it had been priced using market quotations. Portfolio securities that are valued using techniques other than market quotations, including "fair valued" securities, may be subject to greater fluctuation in their value from one day to the next than would be the case if market quotations were used. In addition, there is no assurance that the Fund could sell a portfolio security for the value established for it at any time and it is possible that the Fund would incur a loss because a portfolio security is sold at a discount to its established value.

Fair value is defined as the amount for which assets could be sold in an orderly disposition over a reasonable period of time, taking into account the nature of the asset. Fair value pricing, however, involves judgments that are inherently subjective and inexact, since fair valuation procedures are used only when it is not possible to be sure what value should be attributed to a particular asset or when an event will affect the market price of an asset and to what extent. As a result, fair value pricing may not reflect actual market value, and it is possible that the fair value determined for a security will be materially different from the value that actually could be or is realized upon the sale of that asset.

*Risks of Non-Diversification and Other Focused Strategies*. While the Investment Adviser invests in a number of fixed-income and equity instruments issued by different issuers and employs multiple investment strategies with respect to the Trust's investment portfolio, it is possible that a significant amount of the Trust's investments could be invested in the instruments of only a few companies or other issuers or that at any particular point in time one investment strategy could be more heavily weighted than the others. The focus of the Trust's investment portfolio in any one issuer would subject the Trust to a greater degree of risk with respect to defaults by such issuer or other adverse events affecting that issuer, and the focus of the portfolio in any one industry or group of industries would subject the Trust to a greater degree of risk with respect to economic downturns relating to such industry or industries. The focus of the Trust's investment portfolio in any one investment strategy would subject the Trust to a greater degree of risk than if the Trust's investment portfolio were varied in its investments with respect to several investment strategies.

37

Table of Contents

*Risks Related to Current Market Conditions.* Recently, debt markets have experienced a period of high volatility, which has negatively impacted market liquidity conditions and prices. Initially, the concerns on the part of market participants were focused on the subprime segment of the mortgage-backed securities market. These concerns expanded to include derivatives, securitized assets and a broad range of other debt securities, including those rated investment grade, the U.S. and international credit and interbank money markets generally, and a wide range of financial institutions and markets, asset classes, and sectors. As a result, debt instruments have experienced, and may in the future experience, liquidity issues, increased price volatility, credit downgrades, and increased likelihood of default. Debt securities may be difficult to value during such periods. These market conditions may have an adverse effect on the Trust's investments and hamper the Trust's ability to sell the debt securities in which it invests or to find and purchase suitable debt instruments. Because the Trust invests heavily in fixed income securities and related investments, it may underperform during periods of rising interest rates. Market conditions may also make it more difficult or impossible for the Trust to use leverage to the degree required, or make any such leverage more expensive (for example, by increasing interest expense). In addition, these conditions may directly and adversely affect the setting of dividend rates on the common shares.

*Risks of Investing in a Trust with Anti-Takeover Provisions.* The Trust's Agreement and Declaration of Trust includes provisions that could limit the ability of other entities or persons to acquire control of the Trust or convert the Trust to open-end status.

*Key Adviser Personnel Risk.* The Trust's ability to identify and invest in attractive opportunities is dependent upon the Investment Adviser. If one or more key individuals leaves the Investment Adviser, the Investment Adviser may not be able to hire qualified replacements or may require an extended time to do so. This situation could prevent the Trust from achieving its investment objectives.

38

Table of Contents

*Risks Relating to Dilution of Shareholders' Interests.* Shareholders' interests in the Trust may be diluted if they do not fully exercise their subscription rights in any rights offering. In addition, if the subscription price is less than our NAV per share, then there will be an immediate dilution of the aggregate NAV of our shares. In the event we issue subscription rights, shareholders who do not fully exercise their rights should expect that they will, at the completion of a rights offering pursuant to this Prospectus, own a smaller proportional interest in us than would otherwise be the case if they fully exercised their rights. Such dilution is not currently determinable because it is not known what proportion of the shares will be purchased as a result of such rights offering. Any such dilution will disproportionately affect non-exercising shareholders. This dilution could be substantial. The amount of any decrease in NAV is not predictable because it is not known at this time what the subscription price and NAV per share will be on the expiration date of the rights offering or what proportion of the shares will be purchased as a result of such rights offering.

*Risks Relating to Trust's Tax Status.* To remain eligible for the special tax treatment accorded to RICs and their shareholders under the Code, the Trust must meet certain source of income, asset diversification and annual distribution requirements. If the Trust were to fail to comply with the income, diversification or distribution requirements, the Trust could in some cases cure such failure, including by paying a Trust-level tax, paying interest, making additional distributions, or disposing of certain assets. If the Trust were ineligible to or otherwise did not cure such failure for any year, or were to otherwise fail to qualify as a RIC accorded special tax treatment, all of its taxable income regardless of whether timely distributed to shareholders would be subject to corporate-level tax and all of its distributions from earnings and profits (including from net long-term capital gains) would be taxable to shareholders as ordinary income. For individual shareholders who meet certain holding period requirements, such distributions would be eligible for reduced tax rates applicable to qualified dividend income. In any such event, the resulting corporate taxes could substantially reduce the Trust's net assets, the amount of income available for distribution and the amount of its distributions. Any such failure would have a material adverse effect on the Trust and its shareholders. In addition, in some cases, the Trust could be required to recognize unrealized gains, pay substantial taxes and interest and make substantial distributions in order to re-qualify as a RIC.

*RIC-Related Risks of Investments Generating Non-Cash Taxable Income.* Certain of the Trust's investments will require the Trust to recognize taxable income in a taxable year in excess of the cash generated on those investments during that year. In particular, the Trust expects that a substantial portion of its investments in loans and other debt obligations will be treated as having "market discount" and/or "original issue discount" for U.S. federal income tax purposes, which, in some cases, could be significant. Because the Trust may be required to recognize income in respect of these investments before or without receiving cash representing such income, the Trust may have difficulty satisfying the annual distribution requirements applicable to RICs and avoiding Trust-level U.S. federal income or excise taxes. Accordingly, the Trust may be required to sell portfolio securities, including at potentially disadvantageous times or prices, raise additional debt or equity capital, or reduce new investments, to obtain the cash needed to make these income distributions. If the Trust liquidates portfolio securities to raise cash, the Trust may realize gain or loss on such liquidations; in the event the Trust realizes net long-term or short-term capital gains from such liquidation transactions, its shareholders may receive larger capital gain or ordinary dividends, respectively, than they would in the absence of such transactions.

39

**Table of Contents**

*Limitations of Credit Ratings.* Credit ratings represent only the opinion of the rating agency with respect to the ability of the issuer to make principal and interest payments on the securities. In determining a credit rating, rating agencies do not evaluate the risks of fluctuations in market value. Further, there may be limits on the effectiveness of the rating agencies' financial models. For these and other reasons, a credit rating may not fully reflect the risks inherent in the relevant security. Further, a rating organization may have a conflict of interest with respect to a security for which it assigns a particular rating. For example, if the issuer or sponsor of a security pays a rating agency for the analysis of the security, an inherent conflict of interest may exist that could affect the reliability of the rating. In addition, credit rating agencies may or may not make timely changes in a rating to reflect changes in the economy or in the conditions of the issuer that affect the market value of the security. In other words, a security or an issuer may maintain a certain credit rating even though conditions have deteriorated since the rating was issued. Consequently, credit ratings should not necessarily be relied upon as an indicator of investment quality. If a rating organization changes the rating assigned to one or more of the Trust's portfolio securities, the Trust is not required to sell the relevant securities.

*Certain Affiliations.* Certain broker-dealers may be considered to be affiliated persons of the Trust or the Investment Adviser. Absent an exemption from the SEC or other regulatory relief, the Trust is generally precluded from effecting certain principal transactions with affiliated brokers, and its ability to purchase securities being underwritten by an affiliated broker or a syndicate including an affiliated broker, or to utilize affiliated brokers for agency transactions, is subject to restrictions. This could limit the Trust's ability to engage in securities transactions and take advantage of market opportunities. In addition, unless and until the underwriting syndicate is broken in connection with the IPO of the securities, the Trust will be precluded from effecting principal transactions with brokers who are members of the syndicate.

*Operational and Technology Risk.* Cyberattacks, disruptions, or failures that affect the Trust's service providers, counterparties, market participants, or issuers of securities held by the Trust may adversely affect the Trust and its shareholders, including by causing losses for the Trust or impairing Trust operations.

*Concentration Risk - Real Estate.* The Trust is required to invest at least 25% of the value of its total assets at the time of purchase in the securities of issuers conducting their principal business activities in the real estate industry. Under this policy, the Trust may be subject to greater market fluctuations than a fund that does not concentrate its investments in a particular industry. Financial, economic, business, and other developments affecting issuers in the real estate industry will have a greater effect on the Trust, and if securities of the real estate industry fall out of favor, the Trust could underperform, or its NAV may be more volatile than, funds that have greater industry diversification.

*Real Estate Industry Risk.* Issuers principally engaged in real estate industry, including REITs, may be subject to risks similar to the risks associated with the direct ownership of real estate, including: (i) changes in general economic and market conditions; (ii) changes in the value of real estate properties; (iii) risks related to local economic conditions, overbuilding and increased competition; (iv) increases in property taxes and operating expenses; (v) changes in zoning laws; (vi) casualty and condemnation losses; (vii) variations in rental income, neighborhood values or the appeal of property to tenants; (viii) the availability of financing and (ix) changes in interest rates and leverage.

40

**Table of Contents**

*Communications Industry Risk*. The market for communications products and services is characterized by rapidly changing technology, rapid product obsolescence, cyclical market patterns, evolving industry standards and frequent new product introductions. The success of the communications industry issuers depends in substantial part on the timely and successful introduction of new products and services. An unexpected change in in the market for products or services based on a particular technology could have a material adverse affect on an issuer's operating results. Furthermore, there can be no assurance that communications industry issuers will be able to respond in a timely manner to compete in the rapidly developing marketplace. Many communications companies rely on a combination of patents, copyrights, trademarks and trade secret laws to establish and protect their intellectual property. There can be no assurance that the steps taken to protect intellectual property will be adequate to prevent misappropriation or that competitors will not independently develop products or services that are substantially equivalent or superior to such issuers' products or services.

*Given the risks described above, an investment in the securities may not be appropriate for all investors. You should carefully consider your ability to assume these risks before making an investment in the Trust.*

The Trust's common and preferred shares are registered under the Securities Exchange Act of 1934, as amended (the "Exchange Act") and we are required to file reports, proxy statements and other information with the Commission. The materials we file are available at the Commission's public reference room at 100 F Street, N.E., Washington, D.C. 20549. You may obtain information about the operation of the Commission's public reference room by calling the Commission at 1-800-SEC-0330. In addition, the Commission maintains an Internet website, at *http://www.sec.gov*, that contains reports, proxy and information statements, and other information regarding issuers, including us, that file documents electronically with the Commission.

## Summary of Trust Fees and Expenses

The following table shows the Trust's expenses, including preferred shares offering expenses, as a percentage of net assets attributable to common shares.

| | |
|---|---|
| **Shareholder Transaction Expenses** | |
| Sales load (as a percentage of offering price) | — % |
| Offering expenses borne by holders of common shares (as a percentage of offering price) | 0.05%(1) |
| Dividend reinvestment and cash purchase plan fees | None(2) |
| Preferred Shares Offering Expenses Borne by the Trust (as a percentage of net assets attributable to common shares) | |

| | **Percentage of Net Assets Attributable to Common Shares (Gives Effect to Leverage Through Borrowings(3))** |
|---|---|
| **Annual Expenses** | |
| Management fees | 1.60%(4) |
| Other expenses | 1.74%(5) |
|    Dividend expense on short sales | 0.16% |
|    Interest payments on borrowed funds | 1.27%(6) |
|    Remainder of other expenses | 0.31% |
| Total annual expenses | 3.34% |
| Dividends on Preferred Shares | —% |
| Total Annual Expenses and Dividends on Preferred Shares | 3.34% |

(1)   The fees and expenses of the Offering will be borne by the Trust and indirectly by all of its common shareholders, including those who do not exercise their Rights.

(2)   Common shareholders will pay a brokerage commission of $0.04 per share sold if they direct the Plan Agent (as defined in the accompanying Prospectus) to sell common shares held in a dividend reinvestment account. See "Dividend Reinvestment Plan" in the accompanying Prospectus.

41

**Table of Contents**

(3)   Assumes leverage in the amount of 25% of net assets. As of December 31, 2018, the Trust employed leverage in an amount equal to 23.7% of net assets. The Trust may use leverage through borrowings and/or preferred shares. The Trust currently leverages through borrowings from two committed facilities and through a master repurchase agreement. See "Principal Risks of the Trust — Leverage Risk" in the accompanying Prospectus for a brief description of the Trust's Committed Facility with BNP, the Repurchase Agreement with BNP Securities and the Committed Facility with KeyBank National Association.

(4)   Management fees are the investment advisory and administrative services fees paid to the Investment Adviser, which are computed based on Managed Assets. See "Management of the Trust — Investment Adviser" and "Management of the Trust — Administrator/Sub-Administrator" in the accompanying Prospectus. Such fees have been converted to net assets for purposes of the fee table presentation as follows: management fees, assuming no leverage, divided by (one minus the Trust's assumed leverage of 25% of the Trust's total assets). Because the base management fees of 1.20% (including an administrative fee of 0.20%) are based on the Trust's gross assets, when the Trust uses leverage, the base management fees as a percentage of net assets attributable to common shares will increase because the Trust's common shareholders bear all of the fees and expenses of the Trust.

(5)   "Other Expenses," which is based on the Trust's estimated current expenses, includes costs associated with the Trust's short sales on securities, including dividend and interest expenses associated with securities sold short. When a cash dividend is declared or interest is payable on a security for which the Trust holds a short position, the Trust incurs the obligation to pay an amount equal to that dividend or interest to the lender of the shorted security. Thus, the estimate for dividend and interest expenses paid is also based on the dividend yields or interest payments of securities that would be sold short as part of anticipated trading practices (which may involve avoiding dividend or interest expenses with respect to certain short sale transactions by closing out the position prior to the underlying issuer's ex-dividend or ex-interest date). "Other Expenses" also includes the dividend and interest expense that the Trust is expected to incur during the current fiscal year.

(6)   Assumes the use of leverage in the form of borrowings representing 25% of the Trust's total assets (including assets obtained through such borrowing) at an effective annual interest rate cost to the Trust of 3.81%. This variable rate is based on current interest rates under the Trust's borrowing facilities and is subject to change. The interest rate will increase in rising interest rate environments and, therefore, the actual interest expense borne by Trust shareholders will increase over time in a rising interest rate environment. The Margin Facility has a rolling 90-day term. There is no guarantee that the Trust will be able to renew its credit facility on these or other favorable terms in the future. While the Trust has no present intention to issue preferred shares within the next twelve months, if an attractive preferred shares financing opportunity were to come to the Trust's attention during that period, the Trust may consider that opportunity.

(7)   Dividends on Preferred Shares, which will be disclosed in the related Prospectus Supplement, represent the aggregate of (1) the estimated distributions on the existing preferred shares outstanding and (2) the distributions that would be made assuming $— million of preferred shares is issued with a fixed dividend rate of —%. There can, of course, be no guarantee that any preferred shares would be issued or, if issued, the terms thereof. This information will be updated if and when preferred shares are outstanding.

### EXAMPLE

The following example illustrates the projected expenses that you would pay on a $1,000 investment in preferred shares of the Trust (including the estimated costs of this offering borne by the Trust of $455,000), assuming (1) that the Trust's current net assets do not increase or decrease, (2) that the Trust maintains a leverage ratio of 20% from all sources of leverage, (3) that the Trust incurs total annual expenses of 3.34% of net assets attributable to common shares through year 10, and (4) a 5% annual return. The following example also assumes all dividends and distributions are reinvested at NAV. **The example should not be considered a representation of future expenses, and actual expenses (including leverage and other expenses) may be greater or less than those shown.**

42

**Table of Contents**

| | 1 Year | 3 Years | 5 Years | 10 Years |
|---|---|---|---|---|
| Total expenses incurred | $ 34 | $ 103 | $ 175 | $ 363 |

** The example includes Dividends of Preferred Shares. If Dividends on Preferred Shares were not included in the example calculation, the expenses for the 1-, 3-, 5- and 10-year periods in the table above would be as follows (based on the same assumptions as above): $34, $103, $175 and $363. The applicable Prospectus Supplement to be used in connection with any sales of securities will set forth any applicable sales load and the estimated offering expenses borne by the Trust.

### Financial Highlights

The following Financial Highlights table is intended to help you understand the Trust's financial performance since inception. The information in the table was audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm. Financial statements for the fiscal year ended December 31, 2018 and the Report of the Independent Registered Accounting Firm thereon appear in the Trust's Annual Report for the Fiscal Year Ended December 31, 2018 are incorporated by reference into the Statement of Additional Information ("SAI") and available from the Trust upon request. The Trust's performance has been enhanced by the existence of contractual waivers of fees and expenses, which may not continue into the future.

**Selected data for a share outstanding throughout each period is as follows:**

| | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2018** | **2017** | **2016** | **2015\*** | **2014** |
| **Net Asset Value, Beginning of Year** | $ 26.02 | $ 25.89 | $ 22.92 | $ 53.92 | $ 11.34 |
| Income from Investment Operations: | | | | | |
| Net investment income(a) | 0.75 | 0.93 | 4.08 | 8.75(b) | 0.82 |
| Net realized and unrealized gain/(loss) | 0.83 | 2.88 | 1.69 | (16.08) | 2.02 |
| Total from investment operations | 1.58 | 3.81 | 5.77 | (7.33) | 2.84 |
| **Less Distributions Declared to Common Shareholders:** | | | | | |
| From net investment income | (0.77) | (2.39) | (2.80) | (2.88) | (0.70) |
| From return of capital | (1.63) | (0.01) | — | — | — |
| From spin-off(d) | — | — | — | (20.79) | — |
| Total distributions declared to common shareholders | (2.40) | (2.40) | (2.80) | (23.67) | (0.70) |
| **Issuance of Common Shares(e):** | | | | | |
| Shares Issued: | (1.46) | (1.28) | | | |
| **Net Asset Value, End of Period** | $ 23.74 | $ 26.02 | $ 25.89 | $ 22.92 | $ 13.48 |
| **Market Value, End of Period** | $ 19.93 | $ 25.29 | $ 22.77 | $ 20.44 | $ 11.23 |
| Market Value Total Return(f) | (8.93)% | 27.31% | 27.69% | (18.09)% | 26.77% |
| **Ratios to Average Net Assets/ Supplemental Data:** | | | | | |
| Net assets, end of period (in 000's) | $767,711 | $592,309 | $414,800 | $366,078 | $860,877 |
| **Common Shares Information at End of Period:** | | | | | |
| **Ratios based on average net assets of common shares:** | | | | | |
| Gross operating expenses(g) | 2.65% | 2.58% | 3.12% | 3.43% | 2.48% |
| Net investment income/(loss) | 3.02% | 3.69% | 17.34% | 24.23%(h) | 6.45% |
| **Common and Preferred Shares Information at End of Period:** | | | | | |
| **Ratios based on average managed assets of common shares:** | | | | | |
| Gross operating expenses(g) | 2.14% | 2.21% | 2.17% | 2.23% | 1.68% |
| Net investment income/(loss) | 2.44% | 3.16% | 12.05% | 15.79%(i) | 4.38% |
| Portfolio turnover rate(j) | 48% | 36% | 41% | 31% | 59% |
| Average commission rate paid(k) | 0.0263 | 0.0286 | 0.0294 | 0.0223 | 0.0266 |

* Per share data prior to October 6, 2015 has been adjusted to give effect to a 4 to 1 reverse stock split.

43

Table of Contents

(a)  Net investment income (loss) per share was calculated using average shares outstanding during the period.
(b)  Includes non-recurring dividend from NREO.
(c)  Less than 0.005%
(d)  On April 1, 2015, the Fund completed a spinoff transaction whereby shares of NexPoint Residential Trust, Inc. were distributed to shareholders in a pro-rata taxable distribution
(e)  Shares issued at a discount to NAV. The per share impact was derived by computing (A) the number of shares issued times (B) the difference between the net proceeds per share and NAV divided by (C) the total shares outstanding following the share issuance.
(f)  Based on market value per share. Distributions, if any, are assumed for purposes of this calculation to be reinvested at prices obtained under the Fund's Dividend Reinvestment Plan.
(g)  Supplemental expense ratios are shown below:

| | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2018** | **2017** | **2016** | **2015** | **2014** |
| **Ratios based on average net assets of common shares:** | | | | | |
| Net operating expenses (net of waiver/reimbursement, if applicable, but gross of all other operating expenses) | 2.65% | 2.58% | 3.12% | 3.43% | 2.48% |
| Interest expense and commitment fees | 0.90% | 0.69% | 0.93% | 0.71% | 0.50% |
| Dividends and fees on securities sold short | — %(c) | — %(c) | 0.07% | 0.24% | 0.07% |

| | For the Years Ended December 31, | | | | |
|---|---|---|---|---|---|
| | **2018** | **2017** | **2016** | **2015** | **2014** |
| **Ratios based on Managed Assets of common shares:** | | | | | |
| Net operating expenses (net of waiver/reimbursement, if applicable, but gross of all other operating expenses) | 2.14% | 2.21% | 2.17% | 2.23% | 1.68% |
| Interest expense and commitment fees | 0.73% | 0.59% | 0.65% | 0.46% | 0.34% |
| Dividends and fees on securities sold short | — %(c) | — %(c) | 0.05% | 0.15% | 0.04% |

(h)  Net investment income (excluding non-recurring dividend from NREO) was 9.76%.
(i)  Net investment income (excluding non-recurring dividend from NREO) was 6.36%.
(j)  Excludes in-kind activity.
(k)  Represents the total dollar amount of commissions paid on portfolio transactions divided by total number of portfolio shares purchased and sold for which commissions were charged.

The following table sets forth additional information regarding the Trust's credit facility since inception:

| Year | Total Amount Outstanding | Asset Coverage per $1,000 of Indebtedness | |
|---|---|---|---|
| 2007 | 248,000,000 | $ | 3,504 |
| 2008 | 141,000,000 | $ | 3,562 |
| 2009 | 112,000,000 | $ | 5,096 |
| 2010 | 120,000,000 | $ | 5,106 |
| 2011 | 173,000,000 | $ | 3,561 |
| 2012 | 225,000,000 | $ | 3,117 |
| 2013 | 318,500,000 | $ | 3,275 |
| 2014 | 385,336,455 | $ | 3,230 |
| 2015 | 186,625,315[1] | $ | 2,962[1,2] |
| 2016 | 124,983,081 | $ | 4,319 |
| 2017 | 31,933,494 | $ | 19,548 |
| 2018 | 239,507,979 | $ | 4,205 |

1   Excludes borrowings of $29,300,000 deemed to be temporary in accordance with Section 18 of the Investment Company Act.
2   The Trust closes its net asset value daily, and using asset prices available at the time of the December 31, 2015 NAV close, the Trust calculated asset coverage of greater than 300%. The Trust received updated prices for certain instruments in January that were used for financial reporting purposes. These updated prices pushed the percentage of asset coverage down to 296.2%. As of February 4, 2016, the date that the Trust declared the February monthly dividend, the percentage of asset coverage was over 300%.

Table of Contents

## NexPoint Strategic Opportunities Fund

### Plan of Distribution

We may offer, from time to time, in one or more Offerings, up to $500,000,000 of our fixed rate preferred shares or subscription rights (either transferable or non-transferable), separately or as units comprising any combination of the foregoing, on the terms to be determined at the time of such Offering. The Prospectus Supplement relating to any sale of fixed rate preferred shares will set forth the liquidation preference and information about the dividend period, dividend rate, any call protection or non-call period and other matters. The Prospectus Supplement relating to any offering of subscription rights will set forth the number of common and/or fixed rate preferred shares issuable upon the exercise of each right and the other terms of such rights offering. We may sell the securities through underwriters or dealers, directly to one or more purchasers, through agents or through a combination of any such methods of sale (including agents, underwriters or dealers affiliated with the Investment Adviser). Any underwriter or agent involved in the offer and sale of the securities will be named in the applicable Prospectus Supplement.

While the aggregate number and amount of securities we may issue pursuant to this registration statement is limited to $500,000,000 of securities, our Board may, without any action by the shareholders, amend our Agreement and Declaration of Trust from time to time to increase or decrease the aggregate number of shares or the number of shares of any class or series that we have authority to issue. We may not sell any of our securities through agents, underwriters or dealers without delivery of a Prospectus Supplement describing the method and terms of the particular offering.

The distribution of the securities may be effected from time to time in one or more transactions at a fixed price or prices, which may be changed, at prevailing market prices at the time of sale, at prices related to such prevailing market prices, or at negotiated prices; *provided, however*, that the price per share at which our common shares are sold, less any underwriting commissions or discounts, must equal or exceed the NAV per share of our common shares at the time of the offering except (i) in connection with a rights offering to our existing shareholders, (ii) with the consent of the majority of our common shareholders, or (iii) under such circumstances as the Commission may permit.

In connection with the sale of the securities, underwriters or agents may receive compensation from us or from purchasers of the securities, for whom they may act as agents, in the form of discounts, concessions, commissions, structuring fees, distribution assistance payments or other compensation. Underwriters may sell the securities to or through dealers and such dealers may receive compensation in the form of discounts, concessions or commissions from the underwriters and/or commissions from the purchasers for whom they may act as agents. Underwriters, dealers and agents that participate in the distribution of the securities may be deemed to be underwriters under the Securities Act of 1933, as amended (the "Securities Act") and any discounts, commissions or other compensation they receive from us and any profit realized by them on the resale of the securities may be deemed to be underwriting discounts and commissions under the Securities Act. Any such underwriter or agent will be identified and any such compensation received from us will be described in the applicable Prospectus Supplement. The maximum commission or discount to be received by any member of the Financial Industry Regulatory Authority ("FINRA") or independent broker-dealer will not be greater than 9% for the sale of any securities being registered.

We may sell the securities through agents from time to time. The Prospectus Supplement will name any agent involved in the offer or sale of the securities and any commissions we pay to them. Generally, any agent will be acting on a best efforts basis for the period of its appointment.

Any securities sold pursuant to a Prospectus Supplement may be traded on the New York Stock Exchange (the "NYSE"), or another exchange on which the securities are traded.

Under agreements that we may enter, underwriters, dealers and agents who participate in the distribution of shares of our securities may be entitled to indemnification by us against certain liabilities, including liabilities under the Securities Act. Underwriters, dealers and agents may engage in transactions with, or perform services for, us in the ordinary course of business.

45

[Table of Contents](#)

In order to comply with the securities laws of certain states, if applicable, our securities offered hereby will be sold in such jurisdictions only through registered or licensed brokers or dealers.

The Trust's common shareholders will indirectly bear all of the various expenses incurred in connection with the distribution activities described herein.

## Use of Proceeds

The Trust will invest the net proceeds of the Offer in accordance with the Trust's investment objectives and policies as stated in the accompanying Prospectus Supplement. Assuming current market conditions, the Trust estimates that investment of the net proceeds of an Offering will be substantially complete within one to three months of the completion of such Offering. Pending such investment, it is anticipated that the proceeds of the Offering may be invested in cash and/or short-term debt securities. These temporary investments are expected to provide a lower net return than we hope to achieve from our targeted investments. Following the completion of the Offering, the Trust may increase the amount of leverage outstanding. See "Use of Leverage."

## The Trust

The Trust is a non-diversified, closed-end management investment company. The Trust was organized as a Delaware statutory trust on March 10, 2006, pursuant to an Agreement and Declaration of Trust governed by the laws of the State of Delaware. The Trust commenced operations on June 29, 2006, following its IPO. The Trust's principal office is located at 300 Crescent Court, Suite 700, Dallas, Texas 75201 and its telephone number is 1-866-351-4440.

## Investment Objectives and Policies

The Trust's investment objectives are to provide both current income and capital appreciation. The Trust seeks to achieve its investment objectives by investing primarily in the following categories of securities and instruments of corporations and other business entities: (i) secured and unsecured floating and fixed rate loans; (ii) bonds and other debt obligations; (iii) debt obligations of stressed, distressed and bankrupt issuers; (iv) structured products, including but not limited to, mortgage-backed and other asset-backed securities and collateralized debt obligations; (v) equities; (vi) other investment companies, including BDCs; and (vii) REITs. The Trust may also invest in other securities and instruments, including derivative instruments. Subject to these general guidelines, the Investment Adviser has broad discretion to allocate the Trust's assets among these investment categories and other investments and to change allocations as conditions warrant. In order to pursue most effectively its opportunistic investment strategy, the Trust will not maintain fixed duration, maturity or credit quality policies. The Trust may invest in debt obligations of any credit quality. The Trust may invest in securities and obligations of domestic issuers and in credit or securities market investments that are Non-U.S. Securities.

Additionally, the Trust has a fundamental policy to concentrate its investments in the real estate industry, and, under normal market conditions, the Trust invests at least 25% of the value of its total assets at the time of purchase in the securities of issuers conducting their principal business activities in the real estate industry. Within the categories of obligations and securities in which the Trust invests, the Investment Adviser employs various trading strategies, including capital structure arbitrage, pair trades and shorting. Capital structure arbitrage is a strategy in which the Trust seeks opportunities created by mispricing in different markets of various instruments issued by one corporation. Pair trades involve matching a long position with a short position in two stocks of different issuers in the same sector, betting that the "spread" between the two will eventually converge. Short selling (also known as shorting or going short) is a strategy in which the Trust sells a security it does not own in anticipation that the market price of that security will decline. See "Portfolio Composition" for further description of these strategies. The Trust may also invest in these categories of obligations and securities through the use of derivatives. The Trust is not limited in the amount it may invest in derivatives, and it may use derivatives for speculative purposes. There is no limitation on the amount of securities and other instruments rated below investment grade, which are commonly referred to as "junk securities," that the Trust may purchase, and under normal circumstances substantially all of the Trust's investment portfolio is expected to consist of such securities and instruments or securities and other instruments which, if unrated, are considered to be of similar quality. The Trust may invest a significant portion of its assets in issuers that are in default or that present a high risk of default. Junk securities are subject to greater risk of loss of principal and interest and may be less liquid than investment grade securities. The Trust may invest up to 15% of its net assets in entities that are excluded from registration under the Investment Company Act by virtue of section 3(c)(1) and 3(c)(7) of the Investment Company Act (such as private equity funds or hedge funds). This limitation does not apply to any CLOs, certain of which may rely on Section 3(c)(1) or 3(c)(7) of the Investment Company Act.

Table of Contents

The Trust's investment objectives may be changed without shareholder approval. There can be no assurance that the Trust's investment objectives will be achieved.

## Investment Strategies

Under normal market conditions, the Trust invests across various markets in which the Investment Adviser holds significant investment experience: primarily the leveraged loan, high yield, structured products, real estate, communications, natural resources and stressed and distressed markets. The Investment Adviser makes investment decisions based on quantitative analysis, which employs sophisticated, data-intensive models to drive the investment process. The Trust has a fundamental policy to concentrate its investments in the real estate industry, and, under normal market conditions, the Trust invests at least 25% of the value of its total assets at the time of purchase in the securities of issuers conducting their principal business activities in the real estate industry and the Investment Adviser has full discretion regarding the capital markets from which it can access investment opportunities in accordance with the investment limitations set forth in this Prospectus.

The Investment Adviser uses trading strategies to seek to exploit pricing inefficiencies across the credit markets, or debt markets, and within an individual issuer's capital structure. The Investment Adviser varies its investments by strategy, industry, security type and credit market, but reserves the right to re-position its portfolio among these criteria depending on market dynamics, and thus the Trust may experience high portfolio turnover. The Investment Adviser manages interest rate, default, currency and systemic risks through a variety of trading methods and market tools, including derivative hedging instruments, as it deems appropriate. This multi-strategy investment program allows the Investment Adviser to assess what it considers to be the best opportunities across multiple markets and to adjust quickly the Trust's trading strategies and market focus to changing conditions. The Investment Adviser focuses primarily on the U.S. marketplace, but may pursue opportunities in the non-U.S. credit or securities markets by investing the Trust's assets in Non-U.S. Securities.

The Investment Adviser may select investments from a wide range of trading strategies and credit markets in order to vary the Trust's investments and to optimize the risk-reward parameters of the Trust. The Investment Adviser does not intend to invest the Trust's assets according to pre-determined allocations. The investment team and other personnel of the Investment Adviser use a wide range of resources to identify attractive individual investments and promising investment strategies for consideration in connection with investments by the Trust. The following is a description of the general types of securities in which the Trust may invest. This description is merely a summary, and the Investment Adviser has discretion to cause the Trust to invest in other types of securities and to follow other investment criteria and guidelines as described herein.

The Trust invests and trades in listed and unlisted, public and private, rated and unrated, debt and equity instruments and other obligations, including structured debt and equity instruments and financial derivatives. Investments may include investments in stressed and distressed positions, which may include publicly-traded debt and equity securities (including securities of REITs, BDCs and MLPs), obligations which were privately placed with banks, insurance companies and other lending institutions, trade claims, accounts receivable and any other form of obligation recognized as a claim in a bankruptcy or workout process. The Trust may invest in securities traded in foreign countries and denominated in foreign currencies.

REITs are pooled investment vehicles that invest primarily in income-producing real estate or real estate-related loans or interests. Foreign REIT equivalents are entities located in jurisdictions that have adopted legislation substantially similar to the REIT tax provisions in that they provide for favorable tax treatment for the foreign REIT equivalent and require distributions of income to shareholders. The Trust seeks to gain exposure to the real estate markets, in whole or in part, by investing in certain REIT subsidiaries of the Trust, notably NexPoint Real Estate Opportunities, LLC (formerly Freedom REIT) ("NREO") and NexPoint Real Estate Capital, LLC ("NREC").

With respect to the Trust's real estate investments, the Adviser seeks to: (i) recognize and allocate capital based upon where the Adviser believes we are in the current real estate cycle, and as a result (ii) minimize drawdowns during market downturns and maximize risk adjusted returns during all market cycles, though there can be no assurance that this strategy will achieve this objective. The Trust will rely on the expertise of the Adviser and its affiliates to determine the appropriate structure for structured credit investments, which may include bridge loans, common and preferred equity or other debt-like positions, as well as the acquisition of such instruments from banks, servicers or other third parties.

Preferred equity and mezzanine investments in real estate transactions come in various forms which may or may not be documented in the borrower's organizational documents. Generally, real estate preferred equity and/or mezzanine investments are typically junior to first mortgage financing but senior to the borrower's or sponsor's equity contribution. The investments are typically

structured as an investment by a third-party investor in the real estate owner or various affiliates in the chain of ownership in exchange for a direct or indirect ownership interest in the real estate owner entitling it to a preferred/priority return on its investment. Sometimes, the investment is structured much like a loan where (i) "interest" on the investment is required to be paid monthly by the "borrower" regardless of available property cash flow; (ii) the entire investment is required to be paid by a certain maturity date; (iii) default rate "interest" and penalties are assessed against the "borrower" in the event payments are not made timely; and (iv) a default in the repayment of investment potentially results in the loss of management and/or ownership control by the "borrower" in the company in favor of the investor or other third-party.

As part of its investment program, the Trust may invest, from time to time, in securities or other instruments that are sold in private placements and that are neither listed on an exchange, nor traded over the counter. The Trust may also receive equity or equity-related securities in connection with a workout transaction or may invest directly in equity securities.

The Trust may employ currency hedges (either in the forward or options markets) in certain circumstances to reduce currency risk and may engage in other derivative transactions for hedging purposes or to enhance total return. The Trust may also lend securities and engage in short sales of securities. The Trust currently leverages through borrowings from a committed facility, through a master repurchase agreement and through a bridge credit agreement. Additionally, the Trust may continue to use leverage in the future through borrowings or the issuance of preferred shares. However, the Trust has no present intention to issue preferred shares within the next twelve months. However, it is possible that an attractive preferred shares financing opportunity may arise, which the Trust may consider. In addition, the Trust may invest in the securities of companies whose capital structures are highly leveraged.

From time to time, the Investment Adviser may also invest a portion of the Trust's assets in short-term U.S. government obligations, certificates of deposit, commercial paper and other money market instruments, including repurchase agreements with respect to such obligations and pooled investment vehicles (for example, money market funds) that invest in these obligations, to enable the Trust to make investments quickly, to serve as collateral with respect to certain of its investments, and for other cash management purposes. A greater percentage of Trust assets may be invested in such obligations if the Investment Adviser believes that a defensive position is appropriate because of the outlook for security prices or in order to respond to adverse market, economic, business or political conditions.

47

Table of Contents

As of June 30, 2019, 14% of the Trust's investment portfolio consisted of unrated securities, 3% of the Trust's investment portfolio consisted of securities rated below investment grade, also known as "junk securities," 1% of the Trust's investment portfolio consisted of securities of issuers that are in default, 1% of the Trust's investment portfolio consisted of securities rated investment grade, 47% of the Trust's investment portfolio consisted of equities (excluding investments considered to be debt obligations) and 34% of the Trust's investment portfolio consisted of REITs. All of the unrated securities referenced in the prior sentence have credit characteristics substantially equivalent to below investment grade securities, which are also known as "junk securities."

For a more complete discussion of the Trust's investment portfolio composition, see "Portfolio Composition" below.

## Portfolio Composition

The Trust's investment portfolio will be composed principally of the following investments. Additional information relating to the Trust's investment policies and restrictions and the Trust's portfolio investments is contained in the SAI.

*Senior Loans.* Senior loans hold the most senior position in the capital structure of a business entity, are typically secured with specific collateral and have a claim on the general assets of the borrower that is senior to that held by subordinated debtholders and stockholders of the borrower. The proceeds of senior loans primarily are used to finance leveraged buyouts, recapitalizations, mergers, acquisitions, stock repurchases, and, to a lesser extent, to finance internal growth and for other corporate purposes. Senior loans typically have rates of interest which are redetermined either daily, monthly, quarterly or semi-annually by reference to a base lending rate, plus a premium. These base lending rates generally are the London Interbank Offered Rate ("LIBOR"), the prime rate offered by one or more major U.S. banks ("Prime Rate") or the certificate of deposit ("CD") rate or other base lending rates used by commercial lenders.

Senior loans will generally be supported by liens in the Trust's favor on all or a portion of the assets of the portfolio company or on assets of affiliates of the portfolio company. Although the Trust may seek to dispose of such collateral in the event of default, it may be delayed in exercising such rights or its rights may be contested by others. In addition, the value of the collateral may deteriorate so that the collateral is insufficient for the Trust to recover its investment in the event of default.

The Trust also may invest in unsecured loans, other floating rate debt securities such as notes, bonds and asset-backed securities (such as securities issued by special purchase funds investing in bank loans), investment grade and below-investment grade fixed income debt obligations and money market instruments, such as commercial paper. The Trust also may purchase obligations issued in connection with a restructuring pursuant to Chapter 11 of the U.S. Bankruptcy Code.

Loans and other corporate debt obligations are subject to the risk of non-payment of scheduled interest or principal. Such non-payment would result in a reduction of income to the Trust, a reduction in the value of the investment and a potential decrease in the NAV of the Trust. Liquidation of any collateral securing a senior loan may not satisfy a borrower's obligation in the event of non-payment of scheduled interest or principal payments, or that such collateral could be readily liquidated. In the event of bankruptcy of a borrower, the Trust could experience delays or limitations with respect to its ability to realize the benefits of the collateral securing a senior loan. To the extent that a senior loan is collateralized by stock in the borrower or its subsidiaries, such stock may lose all or substantially all of its value in the event of the bankruptcy of a borrower. Some senior loans are subject to the risk that a court, pursuant to fraudulent conveyance or other similar laws, could subordinate senior loans to presently existing or future indebtedness of the borrower or take other action detrimental to the holders of senior loans including, in certain circumstances, invalidating such senior loans or causing interest previously paid to be refunded to the borrower. If interest were required to be refunded, it could negatively affect the Trust's performance. To the extent a senior loan is subordinated in the capital structure, it will have characteristics similar to other subordinated debtholders, including a greater risk of nonpayment of interest or principal.

Many loans in which the Investment Adviser anticipates the Trust will invest, and the issuers of such loans, may not be rated by a rating agency, will not be registered with the Commission or any state securities commission and will not be listed on any national securities exchange. The amount of public information available with respect to issuers of senior loans will generally be less extensive than that available for issuers of registered or exchange listed securities. In evaluating the creditworthiness of borrowers, the Investment Adviser will consider, and may rely in part, on analyses performed by others. The Investment Adviser does not view ratings as the determinative factor in its investment decisions and relies more upon its credit analysis abilities than upon ratings. Borrowers may have outstanding debt obligations that are rated below investment grade by a rating agency. A high percentage of senior loans held by the Trust may be rated, if at all, below investment grade by independent rating agencies. In the event senior loans are not rated, they are likely to be the equivalent of below investment grade quality. Debt securities which are unsecured and rated below investment grade (*i.e.*, Ba and below by Moody's Investors Service, Inc. ("Moody's") or BB and below by Standard & Poor's Ratings Group, a division of

The McGraw-Hill Companies, Inc. ("S&P")) and comparable unrated bonds, are viewed by the rating agencies as having speculative characteristics and are commonly known as "junk bonds." A description of the ratings of corporate

48

[Table of Contents](#)

bonds by Moody's and S&P is included as Appendix A to the SAI. Because senior loans are senior in a borrower's capital structure and are often secured by specific collateral, the Investment Adviser believes that senior loans have more favorable loss recovery rates as compared to most other types of below investment grade debt obligations. However, the Trust's actual loss recovery experience may not be consistent with the Investment Adviser's prior experience and the Trust's senior loans may not achieve any specific loss recovery rates.

No active trading market may exist for many senior loans, and some senior loans may be subject to restrictions on resale. The Trust is not limited in the percentage of its assets that may be invested in senior loans and other securities deemed to be illiquid. A secondary market may be subject to irregular trading activity, wide bid/ask spreads and extended trade settlement periods, which may impair the ability to realize full value on the disposition of an illiquid senior loan, and cause a material decline in the Trust's NAV.

Senior loans generally are arranged through private negotiations between a borrower and a group of financial institutions initially represented by an agent who is usually one of the originating lenders. In larger transactions, it is common to have several agents. Generally, however, only one such agent has primary responsibility for ongoing administration of a senior loan. Agents are typically paid fees by the borrower for their services. The agent is primarily responsible for negotiating the credit agreement which establishes the terms and conditions of the senior loan and the rights of the borrower and the lenders. The agent is also responsible for monitoring collateral and for exercising remedies available to the lenders such as foreclosure upon collateral.

Credit agreements may provide for the termination of the agent's status in the event that it fails to act as required under the relevant credit agreement, becomes insolvent, enters Federal Deposit Insurance Corporation ("FDIC") receivership or, if not FDIC insured, enters into bankruptcy. Should such an agent, lender or assignor with respect to an assignment interpositioned between the Trust and the borrower become insolvent or enter FDIC receivership or bankruptcy, any interest in the senior loan of such person and any loan payment held by such person for the benefit of the Trust should not be included in such person's or entity's bankruptcy estate. If, however, any such amount were included in such person's or entity's bankruptcy estate, the Trust would incur certain costs and delays in realizing payment or could suffer a loss of principal or interest. In this event, the Trust could experience a decrease in NAV.

The Trust's investments in senior loans may take one of several forms, including acting as one of the group of lenders originating a senior loan, purchasing an assignment of a portion of a senior loan from a third party or acquiring a participation in a senior loan. When the Trust is a member of the originating syndicate for a senior loan, it may share in a fee paid to the syndicate. When the Trust acquires a participation in, or an assignment of, a senior loan, it may pay a fee to, or forego a portion of interest payments from, the lender selling the participation or assignment. The Trust will act as lender, or purchase an assignment or participation, with respect to a senior loan only if the agent is determined by the Investment Adviser to be creditworthy.

When the Trust is one of the original lenders, it will have a direct contractual relationship with the borrower and can enforce compliance by the borrower with terms of the credit agreement. It also may have negotiated rights with respect to any funds acquired by other lenders through setoff. Original lenders also negotiate voting and consent rights under the credit agreement. Actions subject to lender vote or consent generally require the vote or consent of the majority of the holders of some specified percentage of the outstanding principal amount of the senior loan. Certain decisions, such as reducing the interest rate, or extending the maturity of a senior loan, or releasing collateral securing a senior loan, among others, frequently require the unanimous vote or consent of all lenders affected.

When the Trust is a purchaser of an assignment, it typically succeeds to all the rights and obligations under the credit agreement of the assigning lender and becomes a lender under the credit agreement with the same rights and obligations as the assigning lender. Assignments are, however, arranged through private negotiations between potential assignees and potential assignors, and the rights and obligations acquired by the purchaser of an assignment may be more limited than those held by the assigning lender.

The Trust may also invest in participations in senior loans. The rights of the Trust when it acquires a participation are likely to be more limited than the rights of an original lender or an investor who acquired an assignment. Participation by the Trust in a lender's portion of a senior loan typically means that the Trust has only a contractual relationship with the lender, not with the borrower. This means that the Trust has the right to receive payments of principal, interest and any fees to which it is entitled only from the lender selling the participation and only upon receipt by the lender of payments from the borrower.

With a participation, the Trust will have no rights to enforce compliance by the borrower with the terms of the credit agreement or any rights with respect to any funds acquired by other lenders through setoff against the borrower. In addition, the Trust may not directly benefit from the collateral supporting the senior loan because it may be treated as a general creditor of the lender instead of a senior secured creditor of the borrower. As a result, the Trust may be subject to delays, expenses and risks that are greater than those that exist when the Trust is the original lender or holds an assignment. This means the Trust must assume the credit risk of both the

borrower and the lender selling the participation. The Trust will consider a purchase of participations only in those situations where the Investment Adviser considers the participating lender to be creditworthy.

49

Table of Contents

In the event of a bankruptcy or insolvency of a borrower, the obligation of the borrower to repay the senior loan may be subject to certain defenses that can be asserted by such borrower against the Trust as a result of improper conduct of the lender selling the participation. A participation in a senior loan will be deemed to be a senior loan for the purposes of the Trust's investment objectives and policies.

The Trust may have difficulty disposing of assignments and participations. Because there is no liquid market for such securities, the Trust anticipates that such securities could be sold only to a limited number of institutional investors. The lack of a liquid secondary market will have an adverse impact on the value of such securities and on the Trust's ability to dispose of particular assignments or participations when necessary to meet the Trust's liquidity needs or in response to a specific economic event, such as a deterioration in the creditworthiness of the borrower. The lack of a liquid secondary market for assignments and participations also may make it more difficult for the Trust to assign a value to those securities for purposes of valuing the Trust's investment portfolio and calculating its NAV.

Investing in senior loans involves investment risk. Some borrowers default on their senior loan payments. The Trust attempts to manage this credit risk through multiple different investments within the portfolio and ongoing analysis and monitoring of borrowers. The Trust also is subject to market, liquidity, interest rate and other risks. See "Principal Risks of the Trust."

Loans other than senior loans may not be acceptable collateral under the Trust's current credit facility or under any future credit facilities, or may require a higher collateral-to-loan ratio, and therefore to the extent the Trust invests in such loans its ability to borrow may be reduced.

*Second Lien Loans.* Second lien loans are loans made by public and private corporations and other non-governmental entities and issuers for a variety of purposes. Second lien loans are second in right of payment to one or more senior loans of the related borrower. Second lien loans typically are secured by a second priority security interest or lien to or on specified collateral securing the borrower's obligation under the loan and typically have similar protections and rights as senior loans. Second lien loans are not (and by their terms cannot) become subordinate in right of payment to any obligation of the related borrower other than senior loans of such borrower. Second lien loans, like senior loans, typically have adjustable floating rate interest payments. Because second lien loans are second to senior loans, they present a greater degree of investment risk but often pay interest at higher rates reflecting this additional risk. Such investments generally are of below investment grade quality. Other than their subordinated status, second lien loans have many characteristics and risks similar to senior loans discussed above. In addition, second lien loans of below investment grade quality share many of the risk characteristics of non-investment grade securities. As in the case of senior loans, the Trust may purchase interests in second lien loans through assignments or participations.

Second lien loans are subject to the same risks associated with investment in senior loans and non-investment grade securities. Because second lien loans are second in right of payment to one or more senior loans of the related borrower, they therefore are subject to additional risk that the cash flow of the borrower and any property securing the loan may be insufficient to meet scheduled payments after giving effect to the senior secured obligations of the borrower. Second lien loans are also expected to have greater price volatility than senior loans and may be less liquid. There is also a possibility that originators will not be able to sell participations in second lien loans, which would create greater credit risk exposure.

The risks associated with second lien loans are higher than the risks of loans with first priority over the collateral. In the event of default on a second lien loan, the first priority lien holder has first claim to the underlying collateral of the loan. It is possible that no collateral value would remain for the second priority lien holder, resulting in a loss to the Trust.

*Other Secured Loans.* Secured loans other than senior loans and second lien loans are made by public and private corporations and other non-governmental entities and issuers for a variety of purposes. Such secured loans may rank lower in right of payment to one or more senior loans and second lien loans of the borrower. Such secured loans typically are secured by a lower priority security interest or lien to or on specified collateral securing the borrower's obligation under the loan, and typically have more subordinated protections and rights than senior loans and second lien loans. Secured loans may become subordinated in right of payment to more senior obligations of the borrower issued in the future. Such secured loans may have fixed or adjustable floating rate interest payments. Because such secured loans may rank lower as to right of payment than senior loans and second lien loans of the borrower, they may present a greater degree of investment risk than senior loans and second lien loans but often pay interest at higher rates reflecting this additional risk. Such investments generally are of below investment grade quality. Other than their more subordinated status, such investments have many characteristics and risks similar to senior loans and second lien loans discussed above. In addition, secured loans of below investment grade quality share many of the risk characteristics of non-investment grade securities. As in the case of senior loans and second lien loans, the Trust may purchase interests in other secured loans through assignments or participations. Other secured loans are subject to the same risks associated with investment in senior loans, second lien loans and non-investment

grade securities. Because such loans, however, may rank lower in right of payment to senior loans and second lien loans of the borrower, they may be subject to additional risk that the cash flow of the borrower and any property securing the loan may be insufficient to repay the scheduled payments after giving effect to more senior secured obligations of the borrower. Such secured loans are also expected to have greater price volatility than senior loans and second lien loans and may be less liquid. There is also a possibility that originators will not be able to sell participations in other secured loans, which would create greater credit risk exposure.

50

**Table of Contents**

*Unsecured Loans.* Unsecured loans are loans made by public and private corporations and other non-governmental entities and issuers for a variety of purposes. Unsecured loans generally have lower priority in right of payment compared to holders of secured debt of the borrower. Unsecured loans are not secured by a security interest or lien to or on specified collateral securing the borrower's obligation under the loan. Unsecured loans by their terms may be or may become subordinate in right of payment to other obligations of the borrower, including senior loans, second lien loans and other secured loans. Unsecured loans may have fixed or adjustable floating rate interest payments. Because unsecured loans are subordinate to the secured debt of the borrower, they present a greater degree of investment risk but often pay interest at higher rates reflecting this additional risk. Such investments generally are of non-investment grade quality. Other than their subordinated and unsecured status, such investments have many characteristics and risks similar to senior loans, second lien loans and other secured loans discussed above. In addition, unsecured loans of non-investment grade quality share many of the risk characteristics of non-investment grade securities. As in the case of secured loans, the Trust may purchase interests in unsecured loans through assignments or participations.

Unsecured loans are subject to the same risks associated with investment in senior loans, second lien loans, other secured loans and non-investment grade securities. However, because unsecured loans rank lower in right of payment to any secured obligations of the borrower, they may be subject to the additional risk that the cash flow of the borrower and available assets may be insufficient to meet scheduled payments after giving effect to the secured obligations of the borrower. Unsecured loans are also expected to have greater price volatility than secured loans and may be less liquid. There is also a possibility that loan originators will not be able to sell participations in unsecured loans, which would create greater credit risk exposure.

*Mezzanine Debt.* The Trust's assets may include mezzanine loans. Structurally, mezzanine loans usually rank subordinate in priority of payment to senior debt, such as senior bank debt, and are often unsecured. However, mezzanine loans rank senior to common and preferred equity in a borrower's capital structure. Mezzanine debt is often used in leveraged buyout and real estate finance transactions. Typically, mezzanine loans have elements of both debt and equity instruments, offering the fixed returns in the form of interest payments associated with senior debt, while providing lenders an opportunity to participate in the capital appreciation of a borrower, if any, through an equity interest. This equity interest typically takes the form of warrants. Due to their higher risk profile and often less restrictive covenants as compared to senior loans, mezzanine loans generally earn a higher return than senior secured loans. The warrants associated with mezzanine loans are typically detachable, which allows lenders to receive repayment of their principal on an agreed amortization schedule while retaining their equity interest in the borrower. Mezzanine loans also may include a "put" feature, which permits the holder to sell its equity interest back to the borrower at a price determined through an agreed-upon formula. The Trust believes that mezzanine loans offer an alternative investment opportunity based upon their historical returns and resilience during economic downturns.

*Investment Grade Securities.* The Trust may invest in a wide variety of bonds that are rated or determined by the Investment Adviser to be of investment grade quality of varying maturities issued by U.S. corporations and other business entities. Bonds are fixed or variable rate debt obligations, including bills, notes, debentures, money market instruments and similar instruments and securities. Bonds generally are used by corporations and other issuers to borrow money from investors for a variety of business purposes. The issuer pays the investor a fixed or variable rate of interest and normally must repay the amount borrowed on or before maturity. Certain bonds are "perpetual" in that they have no maturity date. Some investment grade securities, such as zero coupon bonds, do not pay current interest, but are sold at a discount from their face values. Although more creditworthy and generally less risky than non-investment grade securities, investment grade securities are still subject to market and credit risk. Market risk relates to changes in a security's value as a result of interest rate changes generally. Investment grade securities have varying levels of sensitivity to changes in interest rates and varying degrees of credit quality. In general, bond prices rise when interest rates fall, and fall when interest rates rise. Longer-term bonds and zero coupon bonds are generally more sensitive to interest rate changes. Credit risk relates to the ability of the issuer to make payments of principal and interest. The values of investment grade securities like those of other debt securities may be affected by changes in the credit rating or financial condition of an issuer. Investment grade securities are generally considered medium- and high-quality securities. Some, however, may possess speculative characteristics, and may be more sensitive to economic changes and to changes in the financial condition of issuers. The market prices of investment grade securities in the lowest investment grade categories may fluctuate more than higher-quality securities and may decline significantly in periods of general or regional economic difficulty. Like non-investment grade securities, such investment grade securities in the lowest investment grade categories may be thinly traded, making them difficult to sell promptly at an acceptable price.

*Other Fixed Income Securities.* The Trust also may purchase unsecured loans, other floating rate or fixed rate debt securities such as notes, bonds and asset-backed securities (such as securities issued by special purpose funds investing in bank loans), investment grade and below investment grade fixed income debt obligations and money market instruments, such as commercial paper. The high yield securities in which the Trust invests are rated Ba or lower by Moody's or BB or lower by S&P or are unrated but determined by the Investment Adviser to be of comparable quality. Debt securities rated below investment grade are commonly referred to as "junk securities" and are considered speculative with respect to the issuer's capacity to pay interest and repay principal.

51

**Table of Contents**

Below investment grade debt securities involve greater risk of loss, are subject to greater price volatility and are less liquid, especially during periods of economic uncertainty or change, than higher rated debt securities. The Trust's fixed-income securities may have fixed or variable principal payments and all types of interest rate and dividend payment and reset terms, including fixed rate, adjustable rate, zero coupon, contingent, deferred, payment in kind and auction rate features. The Trust may invest in fixed-income securities with a broad range of maturities. The Trust may invest in zero coupon bonds, deferred interest bonds and bonds or preferred stock on which the interest is payable-in-kind (PIK bonds). To the extent the Trust invests in such instruments, they will not contribute to the Trust's goal of current income. Zero coupon and deferred interest bonds are debt obligations which are issued at a significant discount from face value. While zero coupon bonds do not require the periodic payment of interest, deferred interest bonds provide for a period of delay before the regular payment of interest begins. PIK bonds are debt obligations that provide that the issuer thereof may, at its option, pay interest on such bonds in cash or in the form of additional debt obligations. Such investments may experience greater volatility in market value due to changes in interest rates. The Trust may be required to recognize income on these investments for U.S. federal income tax purposes even though the Trust receives no corresponding interest payment in cash on the investments. As a result, in order to receive the special treatment accorded to regulated investment companies ("RICs") and their shareholders under the Internal Revenue Code of 1986, as amended (the "Code") and to avoid any U.S. federal income or excise taxes at the Trust level, the Trust may be required to pay out as an income distribution each year an amount greater than the total amount of interest and other income the Trust actually received. The Trust may be required to, among other things, sell securities, including at potentially disadvantageous times or prices, to obtain cash needed for income distributions, and may realize gain or loss from such liquidations. In the event the Trust realizes net long-term or short-term capital gains from such liquidation transactions, its shareholders may receive larger capital gain or ordinary dividends, respectively, than they would in the absence of such transactions.

*Non-Investment Grade Securities.* The Trust may invest a significant portion of its assets in securities rated below investment grade, such as those rated Ba or lower by Moody's and BB or lower by S&P or securities comparably rated by other rating agencies or in unrated securities determined by the Investment Adviser to be of comparable quality. Securities rated Ba by Moody's are judged to have speculative elements, their future cannot be considered as well assured and often the protection of interest and principal payments may be very moderate. Securities rated BB by S&P are regarded as having predominantly speculative characteristics and, while such obligations have less near-term vulnerability to default than other speculative grade debt, they face major ongoing uncertainties or exposure to adverse business, financial or economic conditions which could lead to inadequate capacity to meet timely interest and principal payments. Securities rated C are regarded as having extremely poor prospects of ever attaining any real investment standing. Securities rated D are in default and the payment of interest and/or repayment of principal is in arrears. The Trust may purchase securities rated as low as D. When the Investment Adviser believes it to be in the best interests of the Trust's shareholders, the Trust will reduce its investment in lower grade securities.

Lower grade securities, though generally high-yielding, are characterized by high risk. They may be subject to certain risks with respect to the issuing entity and to greater market fluctuations than certain lower yielding, higher rated securities. The secondary market for lower grade securities may be less liquid than that of higher rated securities. Adverse conditions could make it difficult at times for the Trust to sell certain securities or could result in lower prices than those used in calculating the Trust's NAV.

The prices of debt securities generally are inversely related to interest rate changes; however, the price volatility caused by fluctuating interest rates of securities also is inversely related to the coupon of such securities. Accordingly, below investment grade securities may be relatively less sensitive to interest rate changes than higher quality securities of comparable maturity, because of their higher coupon. This higher coupon is what the investor receives in return for bearing greater credit risk. The higher credit risk associated with below investment grade securities potentially can have a greater effect on the value of such securities than may be the case with higher quality issues of comparable maturity, and may cause the value of the Trust's securities to fluctuate. Distressed debt securities often are priced based on estimated recovery value and are less sensitive to interest rate movement.

Lower grade securities may be particularly susceptible to economic downturns. It is likely that an economic recession could severely disrupt the market for such securities and may have an adverse impact on the value of such securities. In addition, it is likely that any such economic downturn could adversely affect the ability of the issuers of such securities to repay principal and pay interest thereon and increase the incidence of default for such securities.

The ratings of Moody's, S&P and any other rating agencies represent their opinions as to the quality of the obligations which they undertake to rate. Ratings are relative and subjective and, although ratings may be useful in evaluating the safety of interest and principal payments, they do not evaluate the market value risk of such obligations. Although these ratings may be an initial criterion for selection of portfolio investments, the Investment Adviser also will independently evaluate these securities and the ability of the issuers of such securities to pay interest and principal. To the extent that the Trust invests in lower grade securities that have not been rated by a rating agency, the Trust's ability to achieve its investment objectives will be more dependent on the Investment Adviser's credit analysis than would be the case when the Trust invests in rated securities.

*Asset-Backed Securities.* The Trust may invest a portion of its assets in asset-backed securities. Asset-backed securities are generally issued as pass-through certificates, which represent undivided fractional ownership interests in an underlying pool of assets,

52

Table of Contents

or as debt instruments, which are also known as collateralized obligations, and are generally issued as the debt of a special purpose entity organized solely for the purpose of owning such assets and issuing such debt. Asset-backed securities are often backed by a pool of assets representing the obligations of a number of different parties. Credit card receivables are generally unsecured, and the debtors are entitled to the protection of a number of state and federal consumer credit laws which give debtors the right to setoff certain amounts owed on the credit cards, thereby reducing the balance due. Most issuers of automobile receivables permit the servicers to retain possession of the underlying obligations. If the servicer were to sell these obligations to another party, there is a risk that the purchaser would acquire an interest superior to that of the holders of the related automobile receivables. In addition, because of the large number of vehicles involved in a typical issuance and technical requirements under state laws, the trustee for the holders of the automobile receivables may not have an effective security interest in all of the obligations backing such receivables. Therefore, there is a possibility that recoveries on repossessed collateral may not, in some cases, be able to support payments on these securities.

*Royalty Securitizations.* Companies holding rights to intellectual property may create bankruptcy remote special purpose entities whose underlying assets are royalty license agreements and intellectual property rights related to a product. A significant portion of the Trust's investments will be related to pharmaceutical royalties that are secured by rights related to one or more drugs. The Trust may, however, invest in royalty streams related to other industries.

Royalty securities may include bonds, loans and equity issued by the special purpose entity. The Investment Adviser believes that the terms of royalty securities that are bonds may be favorable as compared to the broader debt universe, and that the returns are not highly correlated with general credit market events.

In a typical structure in the pharmaceutical industry, a small pharmaceutical company that develops a compound may license the commercial opportunity to a large-cap pharmaceutical company in exchange for payments upon completion of certain milestones (for example, Food and Drug Administration ("FDA") approval) and a percentage of future product sales. Upon securing the right to receive royalties on product sales, the small pharmaceutical company finances a loan or bond secured by the royalty stream, which is typically non-recourse to either of the pharmaceutical companies.

In addition, a company, the sponsor, may create a wholly owned subsidiary, the issuer, that issues the royalty securities. The sponsor sells, assigns and contributes to the issuer rights under one or more license agreements, including the right to receive royalties and certain other payments from sales of the pharmaceutical or other products. The sponsor also pledges the equity ownership interests in the issuer to the trustee under the indenture related to the notes. In return, the sponsor receives the proceeds of the securities from the issuer. The issuer of the securities grants a security interest in its assets to the trustee and is responsible for the debt service on the notes. An interest reserve account may be established to provide a source for payments should there be a cash flow shortfall for one or more periods. Many structures include a 100% cash flow sweep, which means that the principal is paid down by all cash flows received. Although the notes may have a legal maturity date of up to five to sixteen years from issuance, the expected weighted average maturity of the notes may be significantly shorter because of expected required principal repayments if funds are available.

If the issuer of the loan or bond defaults, any recourse will be limited to the issuer (which is formed for the limited purpose of purchasing and holding the license agreement or related intellectual property) and the collateral. The pharmaceutical or other company sponsoring the special purpose entity will generally not have the obligation to contribute additional equity to the issuer. If the sponsor of the issuer were to become a debtor in a bankruptcy case, a creditor, debtor in possession or trustee could request that the bankruptcy court substantively consolidate the issuer of the royalty security with the sponsor and/or recharacterize the transaction pursuant to which the royalty stream was transferred to the issuer and/or take other actions challenging the transaction. To the extent that these efforts are successful, these actions may adversely impact the securities and the Trust.

*Collateralized Loan Obligations and Bond Obligations.* The Trust may invest in certain asset-backed securities that are securitizing certain financial assets by issuing securities in the form of negotiable paper that are issued by a financing company (generally called a Special Purpose Vehicle or "SPV"). These securitized assets are, as a rule, composed financial assets brought into a pool according to specific diversification rules. The SPV is a company founded solely for the purpose of securitizing these claims and its only asset is the diversified asset pool. On this basis, marketable securities are issued which, due to the diversification of the underlying risk, are generally considered to represent a lower level of risk than the original assets taken separately. The redemption of the securities issued by the SPV takes place at maturity out of the cash flow generated by the collected claims.

A CLO is a structured security issued by an SPV that was created to reapportion the risk and return characteristics of a pool of assets. The assets, typically senior loans, are used as collateral supporting the various debt and equity tranches issued by the SPV. The key feature of the CLO structure is the prioritization of the cash flows from a pool of debt (and, to a lesser degree, equity) securities among the several classes of securities issued by a CLO. The Trust may invest in both equity and debt tranches issued by the SPV.

The Trust may also invest in CBOs, which are structured securities backed by a diversified pool of high-yield, public or private fixed income securities. These may be fixed pools or may be "market value" (or managed) pools

53

Table of Contents

of collateral. The CBO issues debt securities that are typically separated into tranches representing different degrees of credit quality. The top tranche of securities has the greatest collateralization and pays the lowest interest rate. Lower CBO tranches have a lesser degree of collateralization quality and pay higher interest rates intended to compensate for the attendant risks. The bottom tranche specifically receives the residual interest payments (*i.e.*, money that is left over after the higher tranches have been paid) rather than a fixed interest rate. The return on the lower tranches of CBOs/CLOs is especially sensitive to the rate of defaults in the collateral pool and lower tranches of CBOs/CLOs typically present the highest risk of loss of entire investment and are required to bear losses before the higher tranches. Under normal market conditions, the Trust expects to invest in the lower tranches of CBOs/CLOs, including equity tranches.

*Distressed Debt.* The Trust is authorized to invest in the securities and other obligations of distressed and bankrupt issuers, including debt obligations that are in covenant or payment default. Such investments generally trade significantly below par and are considered speculative. The repayment of defaulted obligations is subject to significant uncertainties. Defaulted obligations might be repaid only after lengthy workout or bankruptcy proceedings, during which the issuer might not make any interest or other payments. Typically such workout or bankruptcy proceedings result in only partial recovery of cash payments or an exchange of the defaulted obligation for other debt or equity securities of the issuer or its affiliates, which may in turn be illiquid or speculative. The Trust may invest in securities of a company for purposes of gaining control.

*Stressed Debt.* The Trust is authorized to invest in securities and other obligations of stressed issuers. Stressed issuers are issuers that are not yet deemed distressed or bankrupt and whose debt securities are trading at a discount to par, but not yet at distressed levels. An example would be an issuer that is in technical default of its credit agreement, or undergoing strategic or operational changes, which results in market pricing uncertainty.

*Credit Derivatives.* The Trust may engage in credit derivative transactions for hedging or capital appreciation purposes. There are two broad categories of credit derivatives: default price risk derivatives and market spread derivatives. Default price risk derivatives are linked to the price of reference securities or loans after a default by the issuer or borrower, respectively. Market spread derivatives are based on the risk that changes in market factors, such as credit spreads, can cause a decline in the value of a security, loan or index.

There are currently three basic transactional forms for credit derivatives: swaps, options and structured instruments. The use of credit derivatives is a highly specialized activity which involves strategies and risks different from those associated with ordinary portfolio security transactions. If the Investment Adviser is incorrect in its forecasts of default risks, market spreads or other applicable factors, the investment performance of the Trust would diminish compared with what it would have been if these techniques were not used. Moreover, even if the Investment Adviser is correct in its forecasts, there is a risk that a credit derivative position may correlate imperfectly with the price of the asset or liability being purchased. There is no limit on the amount of credit derivative transactions that may be entered into by the Trust. The Trust's risk of loss in a credit derivative transaction varies with the form of the transaction. For example, if the Trust purchases a default option on a security, and if no default occurs with respect to the security, the Trust's loss is limited to the premium it paid for the default option. In contrast, if there is a default by the grantor of a default option, the Trust's loss will include both the premium that it paid for the option and the decline in value of the underlying security that the default option protects.

The sections entitled "Derivative Transactions and Risk Management" and "Additional Characteristics and Risks of Derivative Transactions" in the Trust's SAI contain further information about the characteristics, risks and possible benefits of Derivative Transactions and the Trust's other policies and limitations (which are not fundamental policies) relating to investment in futures contracts and options. The principal risks relating to the use of futures contracts and other Derivative Transactions are: (i) less than perfect correlation between the prices of the instrument and the market value of the securities in the Trust's investment portfolio; (ii) possible lack of a liquid secondary market for closing out a position in such instruments; (iii) losses resulting from interest rate or other market movements not anticipated by the Investment Adviser; and (iv) the obligation to meet additional variation margin or other payment requirements, all of which could result in the Trust being in a worse position than if such techniques had not been used.

*Credit Default Swaps.* The Trust may enter into credit default swap agreements for hedging or capital appreciation purposes. The "buyer" in a credit default contract is obligated to pay the "seller" a periodic stream of payments over the term of the contract provided that no event of default on an underlying reference obligation has occurred. If an event of default occurs, the seller must pay the buyer the "par value" (full notional value) of the reference obligation in exchange for the reference obligation. The Trust may be either the buyer or seller in the transaction. If the Trust is a buyer and no event of default occurs, the Trust loses its investment and recovers nothing. However, if an event of default occurs, the buyer receives full notional value for a reference obligation that may have little or no value. As a seller, the Trust receives income throughout the term of the contract, which typically is between six months and three years, provided that there is no default event.

**Table of Contents**

Credit default swaps involve greater risks than if the Trust had invested in the reference obligation directly. In addition to general market risks, credit default swaps are subject to illiquidity risk, counterparty risk and credit risks. The Trust will enter into swap agreements only with counterparties that are judged by the Investment Adviser to present acceptable credit risk to the Trust. A buyer also will lose its investment and recover nothing should no event of default occur. If an event of default were to occur, the value of the reference obligation received by the seller, coupled with the periodic payments previously received, may be less than the full notional value it pays to the buyer, resulting in a loss of value to the seller. Credit default swaps also involve the risk of imperfect correlation between the value of such instruments and the underlying assets and may involve commissions or other costs. When buying protection under a swap, the risk of loss with respect to swaps generally is limited to the net amount of payments that the Trust is contractually obligated to make. When selling protection under a swap, however, the risk of loss is often the notional value of the underlying asset, which can result in a loss substantially greater than the amount invested in the swap itself. In addition, collateral posting requirements are individually negotiated and there is no regulatory requirement that a counterparty post collateral to secure its obligations or a specified amount of cash, depending upon the terms of the swap, under a credit default swap. Furthermore, there is no requirement that a party be informed in advance when a credit default swap agreement is transferred. Accordingly, the Trust may have difficulty identifying the party responsible for payment of its claims. The notional value of credit default swaps with respect to a particular investment is often larger than the total par value of such investment outstanding and, in event of a default, there may be difficulties in making the required deliveries of the reference investments, possibly delaying payments. The market for credit default swaps has become more volatile recently as the creditworthiness of certain counterparties has been questioned and/or downgraded. If a counterparty's credit becomes significantly impaired, multiple requests for collateral posting in a short period of time could increase the risk that the Trust may not receive adequate collateral. There is no readily available market for trading credit default swaps. The Trust generally may exit its obligations under a credit default swap only by terminating the contract and paying applicable breakage fees, or by entering into an offsetting credit default swap position, which may cause the Trust to incur more losses. When the Trust acts as a seller of a credit default swap agreement it is exposed to many of the same risks of leverage described under "Principal Risks of the Trust — Leverage Risk" in this Prospectus. If the Trust uses credit default swaps to leverage its portfolio, the Trust will be exposed to additional risks, including the risk that the Trust's use of leverage will magnify the effect of any losses the Trust incurs since if an event of default occurs the seller must pay the buyer the full notional value of the reference obligation. The Trust will at all times segregate liquid securities or cash in an amount at least equal to the notional amount of the credit default swap due to the buyer if the credit event occurs. Such segregation will ensure that the Trust has assets available to satisfy its obligations and will limit any potential leveraging of the Trust's portfolio with respect to the transaction. Such segregation will not limit the Trust's exposure to loss.

The Trust is generally not limited in the amount it may invest in credit default swaps and all other derivatives. The Trust may use derivatives for speculative purposes.

*Senior Loan Based Derivatives.* The Trust may obtain exposure to senior loans and baskets of senior loans through the use of derivative instruments. The Investment Adviser reserves the right to utilize these instruments and similar instruments that may be available in the future. For example, the Trust may invest in a derivative instrument known as the Loan-Only Credit Default Swap Index ("LCDX"), a tradeable index with 100 equally-weighted underlying single-name long-only credit default swaps ("LCDS"). Each underlying LCDS references an issuer whose loans trade in the secondary leveraged loan market. The Trust can either buy the Index (take on credit exposure) or sell the Index (pass credit exposure to a counterparty). In either case, the Trust is in essence taking a macro view of the market as a whole rather than on a particular issuer. To compensate investors for the change in the value of the Index over time, an upfront payment is made at the time of a trade to account for the change in the present value of the Index since inception. The payment is the difference between par (or 100) and the amount of the purchase price, plus or minus (depending on whether the Trust is a buyer or seller of the Index) accrued interest. Each version of the Index launches with a fixed coupon which the seller of the Index pays quarterly (and the buyer of the Index receives quarterly). The amount of payments received or paid is the coupon times the notional amount. While investing in these types of derivatives will increase the universe of debt securities to which the Trust is exposed, such investments entail risks that are not typically associated with investments in other debt securities. The liquidity of the market for these types of instruments will be subject to liquidity in the secured loan and derivatives markets. The Trust may also be subject to the risk that the counterparty in a derivative transaction will default on its obligations. These transactions generally involve the risk of loss due to unanticipated adverse changes in securities prices, interest rates, the inability to close out a position, imperfect correlation between a position and the desired hedge, uncertainty regarding the tax rules applicable to these transactions and portfolio management constraints on securities subject to such transactions. The potential loss on derivative instruments may be substantially greater than the initial investment therein.

Investments in the Index may involve greater risks than if the Trust had invested in the reference obligation directly. The Trust will not engage in these transactions for speculative purposes and will use them only as a means to hedge or manage the risks associated with assets held in, or anticipated to be purchased for, the investment portfolio or obligations incurred by the Trust.

*Credit-Linked Notes.* The Trust may invest in credit-linked notes ("CLNs") for risk management purposes and to vary its portfolio. A CLN is a derivative instrument. It is a synthetic obligation between two or more parties where the payment of principal and/or interest is based on the performance of some obligation (a reference obligation). In addition to credit risk of the reference obligations and interest rate risk, the buyer/seller of the CLN is subject to counterparty risk.

55

**Table of Contents**

*Common Stocks.* The Trust may acquire an interest in common stocks in various ways, including upon the default of a senior loan secured by such common stock, in a workout or restructuring or by acquiring common stock for investment. The Trust may also acquire warrants or other rights to purchase a borrower's common stock in connection with the making of a senior loan. Common stocks of a corporation or other entity entitle the holder to a pro rata share of the profits, if any, of the corporation without preference over any other shareholder or class of shareholders, including holders of such entity's preferred stocks and other senior equity securities. Common stock usually carries with it the right to vote and frequently an exclusive right to do so.

*Preferred Stocks.* The Trust may invest in preferred stocks. Preferred stocks are equity securities, but they have many characteristics of fixed income securities, such as a fixed dividend payment rate and/or a liquidity preference over the issuer's common shares. However, because preferred stocks are equity securities, they may be more susceptible to risks traditionally associated with equity investments than the Trust's fixed income securities.

The market value of preferred stocks may be affected by favorable and unfavorable changes impacting companies in the utilities and financial services sectors, which are prominent issuers of preferred stocks, and by actual and anticipated changes in tax laws, such as changes in U.S. federal corporate income tax rates or the dividends-received deduction. Because the claim on an issuer's earnings represented by traditional preferred stocks may become onerous when interest rates fall below the rate payable on such stocks, the issuer may redeem the stocks. Thus, in declining interest rate environments in particular, the Trust's holdings of higher rate-paying fixed rate preferred stocks may be reduced and the Trust would be unable to acquire securities of comparable credit quality paying comparable rates with the redemption proceeds.

Fixed rate preferred stocks have fixed dividend rates. They can be perpetual, with no mandatory redemption date, or issued with a fixed mandatory redemption date. Certain issues of preferred stock are convertible into other equity securities. Perpetual preferred stocks provide a fixed dividend throughout the life of the issue, with no mandatory retirement provisions, but may be callable. Sinking fund preferred stocks provide for the redemption of a portion of the issue on a regularly scheduled basis with, in most cases, the entire issue being retired at a future date. The value of fixed rate preferred stocks can be expected to vary inversely with interest rates.

Adjustable rate preferred stocks have a variable dividend rate which is determined periodically, typically quarterly, according to a formula based on a specified premium or discount to the yield on particular U.S. Treasury securities, typically the highest base-rate yield of one of three U.S. Treasury securities: the 90-day Treasury bill; the 10-year Treasury note; and either the 20-year or 30-year Treasury bond or other index. The premium or discount to be added to or subtracted from this base-rate yield is fixed at the time of issuance and cannot be changed without the approval of the holders of the adjustable rate preferred stock. Some adjustable rate preferred stocks have a maximum and a minimum rate and in some cases are convertible into common stocks.

Auction rate preferred stocks pay dividends that adjust based on periodic auctions. Such preferred stocks are similar to short-term corporate money market instruments in that an auction rate preferred stockholder has the opportunity to sell the preferred stock at par in an auction, normally conducted at least every 49 days, through which buyers set the dividend rate in a bidding process for the next period. The dividend rate set in the auction depends on market conditions and the credit quality of the particular issuer. Typically, the auction rate preferred stock's dividend rate is limited to a specified maximum percentage of an external commercial paper index as of the auction date. Further, the terms of the auction rate preferred stocks generally provide that they are redeemable by the issuer at certain times or under certain conditions. In early 2008, auction rate preferred stocks became subject to numerous "failed" auctions, causing securities previously thought to be liquid to become illiquid. It is not known when, if ever, these auction markets will begin to function again. Special tax considerations may apply to the Trust's investments in preferred stock. See "Tax Matters" below.

*Convertible Securities.* The Trust's investment in fixed income securities may include convertible securities. A convertible security is a bond, debenture, note, preferred stock or other security that may be converted into or exchanged for a prescribed amount of common stock or other equity security of the same or a different issuer within a particular period of time at a specified price or formula. A convertible security entitles the holder to receive interest paid or accrued on debt or the dividend paid on preferred stock until the convertible security matures or is redeemed, converted or exchanged. Before conversion, convertible securities have characteristics similar to nonconvertible income securities in that they ordinarily provide a stable stream of income with generally higher yields than those of common stocks of the same or similar issuers, but lower yields than comparable nonconvertible securities.

The value of a convertible security is influenced by changes in interest rates, with investment value declining as interest rates increase and increasing as interest rates decline. The credit standing of the issuer and other factors also may have an effect on the convertible security's investment value. Convertible securities rank senior to common stock in a corporation's capital structure but are usually subordinated to comparable nonconvertible securities. Convertible securities may be subject to redemption at the option of the issuer at a price established in the convertible security's governing instrument.

Depending on the relationship of the conversion price to the market value of the underlying securities, convertible securities may trade more like equity securities than debt instruments.

56

Table of Contents

*Money Market Instruments.* The Trust may invest in money market instruments, which include short-term U.S. government securities, U.S. dollar-denominated, high quality commercial paper (unsecured promissory notes issued by corporations to finance their short-term credit needs), certificates of deposit, bankers' acceptances and repurchase agreements relating to any of the foregoing, and pooled investment vehicles (for example, money market funds) that invest in these obligations. U.S. government securities include Treasury notes, bonds and bills, which are direct obligations of the U.S. government backed by the full faith and credit of the U.S. and securities issued by agencies and instrumentalities of the U.S. government, which may be guaranteed by the U.S. Treasury, may be supported by the issuer's right to borrow from the U.S. Treasury or may be backed only by the credit of the federal agency or instrumentality itself.

*U.S. Government Securities.* U.S. government securities in which the Trust invests include debt obligations of varying maturities issued by the U.S. Treasury or issued or guaranteed by an agency or instrumentality of the U.S. government, including the Federal Housing Administration, Federal Financing Bank, Farmers Home Administration, Export-Import Bank of the United States, Small Business Administration, Government National Mortgage Association (GNMA), General Services Administration, Central Bank for Cooperatives, Federal Farm Credit Banks, Federal Home Loan Banks, Federal Home Loan Mortgage Corporation (FHLMC), Federal National Mortgage Association (FNMA), Maritime Administration, Tennessee Valley Authority, District of Columbia Armory Board and various institutions that previously were or currently are part of the Farm Credit System (which has been undergoing reorganization since 1987). Some U.S. government securities, such as U.S. Treasury bills, Treasury notes and Treasury bonds, which differ only in their interest rates, maturities and times of issuance, are supported by the full faith and credit of the U.S. government. Others are supported by (i) the right of the issuer to borrow from the U.S. Treasury, such as securities of the Federal Home Loan Banks; (ii) the discretionary authority of the U.S. government to purchase the agency's obligations; or (iii) only the credit of the issuer. The U.S. government may not in the future continue to provide financial support to U.S. government agencies, authorities or instrumentalities that are not supported by the full faith and credit of the United States. To the extent the Trust invests in U.S. Government securities that are not backed by the full faith and credit of the U.S. Treasury, such investments may involve a greater risk of loss of principal and interest since the Trust must look principally or solely to the issuing or guaranteeing agency or instrumentality for repayment.

Securities guaranteed as to principal and interest by the U.S. government, its agencies, authorities or instrumentalities include (i) securities for which the payment of principal and interest is backed by an irrevocable letter of credit issued by the U.S. government or any of its agencies, authorities or instrumentalities; and (ii) participations in loans made to non-U.S. governments or other entities that are so guaranteed. The secondary market for certain of these participations is limited and therefore may be regarded as illiquid.

In September 2008, the U.S. Treasury Department placed FNMA and FHLMC into conservatorship. The companies remain in conservatorship, and the effect that this conservatorship will have on the companies' debt and equity securities is unclear. Although the U.S. government has recently provided financial support to FNMA and FHLMC, there can be no assurance that it will support these or other government-sponsored enterprises in the future. In addition, any such government support may benefit the holders of only certain classes of an issuer's securities.

*Other Investment Companies.* The Trust may invest in the securities of other investment companies, which can include open-end funds, closed-end funds, unit investment trusts and BDCs. Investment companies combine shareholders' funds for investment in a variety of instruments, including equity securities, debt securities, and money market instruments and may invest primarily in a particular type of security, a particular industry or a mix of securities and industries. An investment company is not taxed on income distributed to shareholders if, among other things, it distributes to its shareholders substantially all of its taxable income for each taxable year. As a shareholder of another investment company, the Trust, and therefore its shareholders, will bear a proportionate share of the expenses of such other investment companies, including management fees, administration fees and custodial fees, in addition to the expenses of the Trust. Under one provision of the Investment Company Act, the Trust may not acquire the securities of other investment companies if, as a result, (i) more than 10% of the Trust's total assets would be invested in securities of other investment companies, (ii) such purchase would result in more than 3% of the total outstanding voting securities of any one investment company being held by the Trust or (iii) more than 5% of the Trust's total assets would be invested in any one investment company. Other provisions of the Investment Company Act are less restrictive, provided that the Trust is able to meet certain conditions. These limitations do not apply to the acquisition of shares of any investment company in connection with a merger, consolidation, reorganization or acquisition of substantially all of the assets of another investment company.

The Trust, as a holder of the securities of other investment companies, will bear its pro rata portion of the other investment companies' expenses, including advisory fees. These expenses will be in addition to the direct expenses incurred by the Trust.

*Exchange Traded Funds.* Although not a principal investment strategy of the Trust, subject to the limitations on investment in other investment companies, the Trust may invest in exchange traded funds ("ETFs"). ETFs, such as SPDRs, NASDAQ 100 Index Trading Stock (QQQs), iShares and various country index funds, are funds whose shares are traded on a national securities exchange or

the National Association of Securities Dealers' Automatic Quotation System (NASDAQ). ETFs may be based on underlying equity or fixed income securities. SPDRs, for example, seek to provide investment results that generally correspond to the performance of the

57

**Table of Contents**

component common stocks of the S&P 500. ETFs do not sell individual shares directly to investors and only issue their shares in large blocks known as "creation units." The investor purchasing a creation unit may sell the individual shares on a secondary market. Therefore, the liquidity of ETFs depends on the adequacy of the secondary market. An ETF's investment objective may not be achieved. ETFs based on an index may not replicate and maintain exactly the composition and relative weightings of securities in the index and for these and other reasons the returns of an ETF may diverge significantly from the index which it is designated to track. ETFs are subject to the risks of investing in the underlying securities. The Trust, as a holder of the securities of the ETF, will bear its pro rata portion of the ETF's expenses, including advisory fees. These expenses are in addition to the direct expenses of the Trust's own operations.

*Master Limited Partnerships.* The Trust may invest in MLPs. MLPs typically are characterized as "publicly traded partnerships" that qualify to be treated as partnerships for U.S. federal income tax purposes and are principally engaged in one or more aspects of the exploration, production, processing, transmission, marketing, storage or delivery of energy-related commodities, such as natural gas, natural gas liquids, coal, crude oil or refined petroleum products. The Trust's MLP investments include investments that offer economic exposure to public MLPs in the form of common or subordinated units issued by MLPs, securities of entities holding primarily general partner or managing member interests in MLPs, debt securities of MLPs, and securities that are derivatives of interests in MLPs, including I-Shares, and derivative instruments in which the Trust may invest that have economic characteristics of MLP securities. The Trust intends to limit its investments in MLPs and related entities to the extent necessary to qualify as a RIC for tax purposes. In general, a RIC is not permitted to invest, including through corporations in which the RIC owns a 20% or more voting stock interest, more than 25% of its total assets in qualified publicly-traded partnerships.

*Real Estate Investment Trusts.* The Trust may invest in REITs. REITs are pooled investment vehicles that invest primarily in income-producing real estate or real estate-related loans or interests. REITs are generally classified as equity REITs, mortgage REITs or a combination of equity and mortgage REITs. Equity REITs invest the majority of their assets directly in real property and derive income primarily from the collection of rents. Equity REITs can also realize capital gains by selling properties that have appreciated in value. Mortgage REITs invest the majority of their assets in real estate mortgages and derive income from the collection of interest payments. REITs are not taxed on income distributed to shareholders provided they comply with the applicable requirements of the Code. The Trust will indirectly bear its proportionate share of any management and other expenses paid by REITs in which it invests in addition to the expenses paid by the Trust. Debt securities issued by REITs are, for the most part, general and unsecured obligations and are subject to risks associated with REITs.

The Trust seeks to gain exposure to the real estate markets, in whole or in part, through investment in each Subsidiary. Each Subsidiary has elected to be taxed as a REIT. Each Subsidiary is generally subject to the same investment policies and restrictions of the Trust. As of June 30, 2019, NREO and NREC accounted for approximately 2.9% and 22.0% respectively, of the Trust's Managed Assets. The Investment Adviser does not charge an additional fee on assets held in each Subsidiary. The Trust intends to limit its investments in each Subsidiary and related entities to the extent necessary to qualify as a RIC for tax purposes. In general, and subject to certain exceptions not applicable here, a RIC is not permitted to invest, including through corporations in which the RIC owns a 20% or more voting stock interest, more than 25% of its total assets in any one issuer, or in any two or more issuers which the RIC controls and which are determined to be engaged in the same or similar trades or businesses or related trades or businesses.

*Structured Investments.* The Trust may invest a portion of its assets in interests in entities organized and operated solely for the purpose of restructuring the investment characteristics of securities. This type of restructuring involves the deposit with or purchase by an entity, such as a corporation or a trust, of specified instruments and the issuance by that entity of one or more classes of securities ("Structured Investments") backed by, or representing interests in the underlying instruments. The cash flow on the underlying instruments may be apportioned among the newly issued Structured Investments to create securities with different investment characteristics such as varying maturities, payment priorities and interest rate provisions, and the extent of the payments made with respect to Structured Investments is dependent on the extent of the cash flow on the underlying instruments. Because Structured Investments of the type in which the Trust anticipates it will invest typically involve no credit enhancement, their credit risk generally will be equivalent to that of the underlying instruments.

The Trust is permitted to invest in a class of Structured Investments that is either subordinated or not subordinated to the right of payment of another class. Subordinated Structured Investments typically have higher yields and present greater risks than unsubordinated Structured Investments.

Certain issuers of Structured Investments may be deemed to be "investment companies" as defined in the Investment Company Act. As a result, the Trust's investment in these Structured Investments may be limited by the restrictions contained in the Investment Company Act. Structured Investments are typically sold in private placement transaction, and there currently is no active trading market for Structured Investments.

*Zero Coupon Securities.* The securities in which the Trust invests may include zero coupon securities, which are debt obligations that are issued or purchased at a significant discount from face value. The discount approximates the total amount of

58

[Table of Contents](#)

interest the security will accrue and compound over the period until maturity or the particular interest payment date at a rate of interest reflecting the market rate of the security at the time of issuance. Zero coupon securities do not require the periodic payment of interest. These investments benefit the issuer by mitigating its need for cash to meet debt service, but generally require a higher rate of return to attract investors who are willing to defer receipt of cash. These investments may experience greater volatility in market value than securities that make regular payments of interest. The Trust is generally required to recognize income on these investments for U.S. federal income tax purposes even though the Trust receives no corresponding interest payment in cash on the investments. As a result, in order to receive the special treatment accorded to RICs and their shareholders under the Code and to avoid any U.S. federal income or excise taxes at the Trust level, the Trust may be required to pay out as an income distribution each year an amount greater than the total amount of interest or other income the Trust actually received. The Trust may be required to, among other things, sell portfolio securities, including at potentially disadvantageous times or prices, to obtain cash needed for these income distributions, and may realize gain or loss from such liquidations. In the event the Trust realizes net long-term or short-term capital gains from such liquidation transactions, its shareholders may receive larger capital gain or ordinary dividends, respectively, than they would in the absence of such transactions.

*Deferred Payment Obligations.* Deferred payment securities are securities that remain zero coupon securities until a predetermined date, at which time the stated coupon rate becomes effective and interest becomes payable at regular intervals. Deferred payment securities are subject to greater fluctuations in value and may have lesser liquidity in the event of adverse market conditions than comparably rated securities paying cash interest at regular interest payment periods. Because, during the period before interest payments begin on deferred payment securities, the Trust will not receive cash payments on a current basis in respect of income it is required to recognize on these securities for U.S. federal income tax purposes, the Trust may be required to pay out as an income distribution each year an amount greater than the total amount of interest and other income the Trust actually received, in order to receive the special treatment accorded to RICs and their shareholders under the Code and to avoid any U.S. federal income or excise taxes at the Trust level. The Trust may be required to, among other things, sell portfolio securities, including at potentially disadvantageous times or prices, to obtain cash needed for these income distributions, and may realize gain or loss from such liquidations. In the event the Trust realizes net long-term or short-term capital gains from such liquidation transactions, its shareholders may receive larger capital gain or ordinary dividends, respectively, than they would in the absence of such transactions.

*Derivative Transactions.* In addition to the credit and senior loan based derivatives discussed above the Trust may, but is not required to, use various Derivative Transactions described below to earn income, facilitate portfolio management and mitigate risks. Such Derivative Transactions are generally accepted under modern portfolio management theory and are regularly used by many mutual funds and other institutional investors. Although the Investment Adviser seeks to use the practices to further the Trust's investment objectives, no assurance can be given that these practices will achieve this result. With changes in the market or the Investment Adviser's strategy, it is possible that these instruments may be a more significant part of the Trust's investment approach in the future.

The Trust may purchase and sell derivative instruments such as exchange-listed and over-the-counter put and call options on securities, financial futures, equity, fixed-income and interest rate indices, and other financial instruments, purchase and sell financial futures contracts and options thereon, enter into various interest rate transactions such as swaps, caps, floors or collars and enter into various currency transactions such as currency forward contracts, currency futures contracts, currency swaps or options on currency or currency futures or credit transactions and credit default swaps. The Trust also may purchase derivative instruments that combine features of these instruments. The Trust generally seeks to use Derivative Transactions as a portfolio management or hedging technique to seek to protect against possible adverse changes in the market value of senior loans or other securities held in or to be purchased for the Trust's investment portfolio, protect the value of the Trust's investment portfolio, facilitate the sale of certain securities for investment purposes, manage the effective interest rate exposure of the Trust, protect against changes in currency exchange rates, manage the effective maturity or duration of the Trust's investment portfolio, or establish positions in the derivatives markets as a temporary substitute for purchasing or selling particular securities.

Derivative Transactions have risks, including the imperfect correlation between the value of such instruments and the underlying assets, the possible default of the other party to the transaction or illiquidity of the derivative instruments. Furthermore, the ability to use Derivative Transactions successfully depends on the Investment Adviser's ability to predict pertinent market movements, which cannot be assured. Thus, the use of Derivative Transactions may result in losses greater than if they had not been used, may require the Trust to sell or purchase portfolio securities at inopportune times or for prices other than current market values, may limit the amount of appreciation the Trust can realize on an investment, or may cause the Trust to hold a security that it might otherwise sell. The use of currency transactions can result in the Trust incurring losses as a result of the imposition of exchange controls, suspension of settlements or the inability of the Trust to deliver or receive a specified currency. Additionally, amounts paid by the Trust as premiums and cash or other assets held in margin accounts with respect to Derivative Transactions are not otherwise available to the Trust for investment purposes. In addition, the Trust's Derivative Transactions are generally subject to numerous special and complex tax rules. Because the tax rules applicable to such transactions may be uncertain under current law, an adverse determination or future Internal

Revenue Service ("IRS") guidance with respect to these rules (which determination or guidance could be retroactive) may affect whether the Trust has made sufficient distributions, and otherwise satisfied the relevant requirements, to maintain its qualification as a

59

Table of Contents

RIC and avoid Trust-level U.S. federal income or excise taxes. Therefore, the Trust's investments in derivative instruments may be limited by these or other U.S. federal income tax considerations. Recently enacted legislation provides for new regulation of certain portions of the derivatives market, including clearing, margin, reporting, recordkeeping, and registration requirements. Because the legislation leaves much to rule making, its ultimate impact remains unclear. New regulations could, among other things, restrict the Trust's ability to engage in derivatives transactions (for example, by making certain types of derivatives transactions no longer available to the Trust) and/or increase the costs of such derivatives transactions (for example, by increasing margin or capital requirements), and the Trust may be unable to execute its investment strategy as a result.

A more complete discussion of Derivative Transactions and their risks is contained in the SAI.

*Other Derivatives; Future Developments.* The above discussion relates to the Trust's proposed use of certain types of derivatives currently available. However, the Trust is not limited to the transactions described above. In addition, the relevant markets and related regulations are constantly changing and, in the future, the Trust may use derivatives not currently available or widely in use.

*Swaps.* Swap contracts may be purchased or sold to obtain investment exposure and/or to hedge against fluctuations in securities prices, currencies, interest rates or market conditions, to change the duration of the overall portfolio or to mitigate default risk. In a standard "swap" transaction, two parties agree to exchange the returns (or differentials in rates of return) on different currencies, securities, baskets of currencies or securities, indices or other instruments, which returns are calculated with respect to a "notional value," *i.e.*, the designated reference amount of exposure to the underlying instruments. The Trust intends to enter into swaps primarily on a net basis, *i.e.*, the two payment streams are netted out, with the Trust receiving or paying, as the case may be, only the net amount of the two payments. If the other party to a swap contract entered into on net basis defaults, the Trust's risk of loss will consist of the net amount of payments that the Trust is contractually entitled to receive. The net amount of the excess, if any, of the Trust's obligations over its entitlements will be maintained in a segregated account by the Trust's custodian. The Trust will not enter into a swap agreement unless the claims-paying ability of the other party thereto is considered to be an acceptable credit risk to the Trust by the Investment Adviser. If there is a default by the other party to such a transaction, the Trust will have contractual remedies pursuant to the agreements related to the transaction. Swap instruments are not exchange-listed securities and may be traded only in the over-the-counter market.

*Interest Rate Swaps.* Interest rate swaps involve the exchange by the Trust with another party of their respective commitments to pay or receive interest (*e.g.*, an exchange of fixed rate payments for floating rate payments). The Trust may use interest rate swaps for risk management purposes and as a speculative investment.

*Total Return Swaps.* Total return swaps are contracts in which one party agrees to make payments of the total return from the designated underlying asset(s), which may include securities, baskets of securities, or securities indices, during the specified period, in return for receiving payments equal to a fixed or floating rate of interest or the total return from the other designated underlying asset(s). The Trust may use total return swaps for risk management purposes and as a speculative investment.

*Currency Swaps.* Currency swaps involve the exchange of the two parties' respective commitments to pay or receive fluctuations with respect to a notional amount of two different currencies (*e.g.*, an exchange of payments with respect to fluctuations in the value of the U.S. dollar relative to the Japanese yen). The Trust may enter into currency swap contracts and baskets thereof for risk management purposes and as a speculative investment.

*Short Sales.* The Trust may attempt to limit exposure to a possible market decline in the value of its portfolio securities through short sales of securities that the Investment Adviser believes possess volatility characteristics similar to those being hedged. In addition, the Trust intends to use short sales for non-hedging purposes to pursue its investment objectives. Subject to the requirements of the Investment Company Act and the Code, the Trust will not make a short sale if, after giving effect to such sale, the market value of all securities sold short by the Trust exceeds 25% of the value of its total assets. The Trust may make short sales "against the box" (as described below) without respect to such limitations.

A short sale is a transaction in which the Trust sells a security it does not own in anticipation that the market price of that security will decline. When the Trust makes a short sale, it must borrow the security sold short from a broker-dealer and deliver it to the buyer upon conclusion of the sale. The Trust may have to pay a fee to borrow particular securities and is often obligated to pay over any payments received on such borrowed securities.

The Trust's obligation to replace the borrowed security will be secured by collateral deposited with the broker-dealer, usually cash, U.S. government securities or other liquid securities. The Trust will also be required to designate on its books and records similar collateral with its custodian to the extent, if any, necessary so that the aggregate collateral value is at all times at least equal to the

current market value of the security sold short. Depending on arrangements made with the broker-dealer from which it borrowed the security regarding payment over of any payments received by the Trust on such security, the Trust may not receive any payments (including interest) on its collateral deposited with such broker-dealer.

60

Table of Contents

If the price of the security sold short increases between the time of the short sale and the time the Trust replaces the borrowed security, the Trust will incur a loss; conversely, if the price declines, the Trust will realize a gain. Any gain will be decreased, and any loss increased, by the transaction costs described above. Although the Trust's gain is limited to the price at which it sold the security short, its potential loss is unlimited.

The Trust may also sell a security short if it owns at least an equal amount of the security sold short or another security convertible or exchangeable for an equal amount of the security sold short without payment of further compensation (a short sale against the box). In a short sale against the box, the short seller is exposed to the risk of being forced to deliver stocks that it holds to close the position if the borrowed stock is called in by the lender, which would cause gain or loss to be recognized on the delivered stock. The Trust expects normally to close its short sales against the box by delivering newly acquired stock.

Purchasing securities to close out the short position can itself cause the price of the securities to rise further, thereby exacerbating the loss. Short-selling exposes the Trust to unlimited risk with respect to that security due to the lack of an upper limit on the price to which an instrument can rise. Although the Trust reserves the right to utilize short sales, and currently intends to utilize short sales, the Investment Adviser is under no obligation to utilize short sales at all. Special tax considerations will apply to the Trust's short sales. See "Tax Matters" below.

*Capital Structure Arbitrage*. Capital structure arbitrage typically involves establishing long and short positions in securities (or their derivatives) at different tiers within an issuer's capital structure in ratios designed to maintain a generally neutral overall exposure to the issuer while exploiting a pricing inefficiency. Some issuers may also have more than one class of shares or an equivalent vehicle that trades in a different market (*e.g.*, European equities and their American Depository Receipt counterparts). This strategy seeks to profit from the disparity in prices between the various related securities in anticipation that over time all tiers and classes will become more efficiently priced relative to one another.

*Pair Trades*. Pair trades involve the establishment of a long position in one security and a short position in another security at the same time. A pair trade attempts to minimize the effect of larger market trends and emphasizes the performance of one security relative to another.

*Repurchase Agreements*. The Trust may invest up to 33 1/3% of its assets in repurchase agreements. It may enter into repurchase agreements with broker-dealers, member banks of the Federal Reserve System and other financial institutions. Repurchase agreements are loans or arrangements under which the Trust purchases securities and the seller agrees to repurchase the securities within a specific time and at a specific price. The repurchase price is generally higher than the Trust's purchase price, with the difference being income to the Trust. Under the direction of the Board, the Investment Adviser reviews and monitors the creditworthiness of any institution which enters into a repurchase agreement with the Trust. The counterparty's obligations under the repurchase agreement are collateralized with U.S. Treasury and/or agency obligations with a market value of not less than 100% of the obligations, valued daily. Collateral is held by the Trust's custodian in a segregated, safekeeping account for the benefit of the Trust. Repurchase agreements afford the Trust an opportunity to earn income on temporarily available cash at relatively low risk. In the event of commencement of bankruptcy or insolvency proceedings with respect to the seller of the security before repurchase of the security under a repurchase agreement, the Trust may encounter delay and incur costs before being able to sell the security. Such a delay may involve loss of interest or a decline in price of the security. If the court characterizes the transaction as a loan and the Trust has not perfected a security interest in the security, the Trust may be required to return the security to the seller's estate and be treated as an unsecured creditor of the seller. As an unsecured creditor, the Trust would be at risk of losing some or all of the principal and interest involved in the transaction.

*Reverse Repurchase Agreements*. A reverse repurchase agreement is an investment technique under which the Trust sells an underlying debt security and simultaneously obtains the commitment of the purchaser (generally, a commercial bank or a broker or dealer) to sell the security back to the Trust at an agreed upon price on an agreed upon date. The repurchase price is generally higher than the Trust's sale price. Reverse repurchase agreements could involve certain risks in the event of default or insolvency of the other party, including possible delays or restrictions upon the Trust's ability to dispose of the underlying securities. An additional risk is that the market value of securities sold by the Trust under a reverse repurchase agreement could decline below the price at which the Trust is obligated to repurchase them. Reverse repurchase agreements will be considered borrowings by the Trust and as such would be subject to any restrictions on borrowing.

Reverse repurchase agreements are also generally subject to earmarking and coverage requirements, with the result that the Trust will designate on its books and records on an ongoing basis cash, U.S. government securities, or other liquid securities in an amount at least equal to the Trust's obligations under the reverse repurchase agreement.

Table of Contents

*Restricted and Illiquid Securities.* Certain of the Trust's investments may be illiquid. Illiquid securities are subject to legal or contractual restrictions on disposition or lack an established secondary trading market. The sale of restricted and illiquid securities often requires more time and results in higher brokerage charges or dealer discounts and other selling expenses than does the sale of securities eligible for trading on national securities exchanges or in the over-the-counter markets. Restricted securities may sell at a price lower than similar securities that are not subject to restrictions on resale.

*Pay-in-kind (PIK) Securities.* PIK securities are securities which pay interest through the issuance of additional debt or equity securities. Similar to zero coupon obligations, PIK securities also carry additional risk as holders of these types of securities realize no cash until the cash payment date unless a portion of such securities is sold. If the issuer defaults, the Trust may obtain no return at all on its investment. The market price of PIK securities is affected by interest rate changes to a greater extent, and therefore tends to be more volatile, than that of securities which pay interest in cash. Additionally, the Trust may be required to recognize income on certain PIK securities for U.S. federal income tax purposes even though the Trust receives no corresponding interest payment in cash on the investments. As a result, in order to receive the special treatment accorded to RICs and their shareholders under the Code and to avoid any U.S. federal income or excise taxes at the Trust level, the Trust may be required to pay out as an income distribution each year an amount greater than the total amount of interest or other income the Trust actually received. The Trust may be required to, among other things, sell portfolio securities, including at potentially disadvantageous times or prices, to obtain cash needed for these income distributions, and may realize gain or loss from such liquidations. In the event the Trust realizes net long-term or short-term capital gains from such liquidation transactions, its shareholders may receive larger capital gain or ordinary dividends, respectively, than they would in the absence of such transactions.

*When-Issued, Delayed-Delivery and Forward Commitment Purchases.* The Trust may purchase securities on a "when-issued" basis and may purchase or sell securities on a "forward commitment" basis in order to acquire the security or to offset against anticipated changes in interest rates and prices. When such transactions are negotiated, the price, which is generally expressed in yield terms, is fixed at the time the commitment is made, but delivery and payment for the securities take place at a later date. When-issued securities and forward commitments may be sold prior to the settlement date, but the Trust will enter into when-issued and forward commitments only with the intention of actually receiving or delivering the securities, as the case may be. If the Trust disposes of the right to acquire a when-issued security prior to its acquisition or disposes of its right to deliver or receive against a forward commitment, it might incur a gain or loss. At the time the Trust enters into a transaction on a when-issued or forward commitment basis, it will designate on its books and records cash or liquid securities equal to at least the value of the when-issued or forward commitment securities. The value of these assets will be monitored daily to ensure that their marked to market value will at all times equal or exceed the corresponding obligations of the Trust. There is always a risk that the securities may not be delivered and that the Trust may incur a loss. Settlements in the ordinary course, which may take substantially more than five business days, are not treated by the Trust as when-issued or forward commitment transactions and accordingly are not subject to the foregoing restrictions.

*Lending of Assets.* Under the Trust's current securities lending agreement, the Trust may lend up to 33 1/3% of its portfolio securities to financial institutions on an approved list of borrowers. The agreement requires that the loans be secured continuously by collateral maintained on a current basis at an amount at least equal to the market value of the securities loaned. The Trust generally accepts cash (U.S. and foreign currency), securities issued or guaranteed by the U.S. government or its agencies or instrumentalities, or sovereign debt as collateral for these lending transactions, although in the future, it may accept other types of collateral. The Trust continues to receive the equivalent of the interest or dividends paid by the issuer on the securities loaned as well as the benefit of an increase and the detriment of any decrease in the market value of the securities loaned and would also receive compensation based on investment of the collateral. The Trust would not, however, have the right to vote any securities having voting rights during the existence of the loan, but would have the right to call the loan in anticipation of an important vote to be taken among holders of the securities or of the giving or withholding of consent on a material matter affecting the investment (although it may not always be able to call the loan in time to vote or consent, or may choose not to for various reasons).

As with other extensions of credit, there are risks of delay in recovery or even loss of rights in the collateral should the borrower of the securities fail financially. In addition, any income or gains and losses from investing and reinvesting any cash collateral delivered by a borrower pursuant to a loan are generally at the Trust's risk, and to the extent any such losses reduce the amount of cash below the amount required to be returned to the borrower upon the termination of any loan, the Trust may be required to pay or cause to be paid to such borrower or another entity an amount equal to such shortfall in cash.

*Non-U.S. Securities.* The Trust may invest without limit in Non-U.S. Securities, which may include securities denominated in U.S. dollars or in non-U.S. currencies or multinational currency units. The Trust may invest in Non-U.S. Securities of so-called emerging market issuers. The Trust does not currently expect to invest more than 15%, but may invest up to 20%, of its assets in emerging market issuers. For purposes of the Trust, a company is deemed to be a non-U.S. company if it meets any of the following tests: (i) such company was not organized in the United States; (ii) such company's primary business office is not in the United States; (iii) the

principal trading market for such company's securities is not located in the United States; (iv) less than 50% of such company's assets are located in the United States; or (v) 50% or more of such issuer's revenues are derived from outside the United States.

62

Table of Contents

Non-U.S. securities markets generally are not as developed or efficient as those in the United States. Securities of some non-U.S. issuers are less liquid and more volatile than securities of comparable U.S. issuers. Similarly, volume and liquidity in most non-U.S. securities markets are less than in the United States and, at times, volatility of price can be greater than in the United States. In addition, certain investments in Non-U.S. Securities may be subject to foreign withholding or other taxes on interest, dividends, capital gains or other income. Those taxes will reduce the Trust's yield on any such securities. See "Tax Matters" below.

Because evidences of ownership of such securities usually are held outside the United States, the Trust would be subject to additional risks if it invested in Non-U.S. Securities, which include possible adverse political and economic developments, seizure or nationalization of foreign deposits and adoption of governmental restrictions which might adversely affect or restrict the payment of principal and interest on the Non-U.S. Securities to investors located outside the country of the issuer, whether from currency blockage or otherwise.

Since Non-U.S. Securities may be purchased with and payable in foreign currencies, the value of these assets as measured in U.S. dollars may be affected favorably or unfavorably by changes in currency rates and exchange control regulations.

*Options.* An option on a security is a contract that gives the holder of the option, in return for a premium, the right to buy from (in the case of a call) or sell to (in the case of a put) the writer of the option the security underlying the option at a specified exercise or "strike" price. The writer of an option on a security has the obligation upon exercise of the option to deliver the underlying security upon payment of the exercise price or to pay the exercise price upon delivery of the underlying security. Certain options, known as "American style" options, may be exercised at any time during the term of the option. Other options, known as "European style" options, may be exercised only on the expiration date of the option.

If an option written by the Trust expires unexercised, the Trust realizes on the expiration date a capital gain equal to the premium received by the Trust at the time the option was written. If an option purchased by the Trust expires unexercised, the Trust realizes a capital loss equal to the premium paid. Prior to the earlier of exercise or expiration, an exchange-traded option may be closed out by an offsetting purchase or sale of an option of the same series (type, underlying security, exercise price and expiration). There can be no assurance, however, that a closing purchase or sale transaction can be effected when or at the price the Trust desires. The Trust may sell put or call options it has previously purchased, which could result in a net gain or loss depending on whether the amount realized on the sale is more or less than the premium and other transaction costs paid on the put or call option when purchased. The Trust will realize a capital gain from a closing purchase transaction if the cost of the closing option is less than the premium received from writing the option, or, if it is more, the Trust will realize a capital loss. If the premium received from a closing sale transaction is more than the premium paid to purchase the option, the Trust will realize a capital gain or, if it is less, the Trust will realize a capital loss.

*Futures Contracts and Options on Futures Contracts.* The sale of a futures contract creates an obligation by the Trust, as seller, to deliver the specific type of financial instrument called for in the contract at a specified future time for a specified price. Options on futures contracts are similar to options on securities except that an option on a futures contract gives the purchaser the right in return for the premium paid to assume a position in a futures contract (a long position if the option is a call and a short position if the option is a put).

At the time a futures contract is purchased or sold, the Trust must allocate cash or securities as a deposit payment ("initial margin"). It is expected that the initial margin that the Trust will pay may range from approximately 1% to approximately 5% of the value of the securities or commodities underlying the contract. In certain circumstances, however, such as periods of high volatility, the Trust may be required by an exchange to increase the level of its initial margin payment. Additionally, initial margin requirements may be increased generally in the future by regulatory action. An outstanding futures contract is valued daily and the payment in case of "variation margin" may be required, a process known as "marking to the market." Transactions in listed options and futures are usually settled by entering into an offsetting transaction, and are subject to the risk that the position may not be able to be closed if no offsetting transaction can be arranged.

*Forward Foreign Currency Contracts.* The Trust may enter into forward currency contracts to purchase or sell foreign currencies for a fixed amount of U.S. dollars or another foreign currency. A forward currency contract involves an obligation to purchase or sell a specific currency at a future date, which may be any fixed number of days from the date of the forward currency contract agreed upon by the parties, at a price set at the time the forward currency contract is entered into. Forward currency contracts are traded directly between currency traders (usually large commercial banks) and their customers.

*Short-Term Debt Securities; Temporary Defensive Position; Invest-Up Period.* During the period in which the net proceeds of this offering of common shares are being invested, during periods of adverse market conditions, during periods in which the Investment Adviser determines that it is temporarily unable to follow the Trust's investment strategy or that it would not be in the best interest of

the Trust to do so or pending reinvestment of proceeds received in connection with the sale of a portfolio security or the issuance of additional securities or borrowing money by the Trust, all or any portion of the Trust's assets may be invested in cash or

63

**Table of Contents**

cash equivalents. The Investment Adviser's determination that it is temporarily unable to follow the Trust's investment strategy or that it is impractical to do so will generally occur only in situations in which a market disruption event has occurred and where trading in the securities selected through application of the Trust's investment strategy is extremely limited or absent. In such a case, the market price of the Trust's securities may be adversely affected, and the Trust may not pursue or achieve its investment objectives.

## Use of Leverage

As provided in the Investment Company Act and subject to certain exceptions, the Trust may issue debt or preferred shares with the condition that immediately after issuance the value of its total assets, less certain ordinary course liabilities, exceed 300% of the amount of the debt outstanding and exceed 200% of the sum of the amount of debt and preferred shares outstanding.

Thus, the Trust may use leverage in the form of borrowings in an amount up to 33 1/3% of the Trust's total assets (including the proceeds of such leverage) and may use leverage in the form of preferred shares in an amount up to 50% of the Trust's total assets (including the proceeds of such leverage). The total leverage of the Trust is currently expected to range between 25% and 30% of the Trust's total assets. The Trust seeks a leverage ratio, based on a variety of factors including market conditions and the Investment Adviser's market outlook, for which the rate of return, net of applicable Trust expenses, on the Trust's portfolio investments purchased with leverage exceeds the costs associated with such leverage.

The Trust, as of June 30, 2019, was leveraged through borrowings from a committed facility with BNP Paribas Prime Brokerage, Inc. ("BNP") with a total commitment of $135,000,000. As of June 30, 2019, the Trust had drawn $66.0 million on the committed facility. In addition, the Trust intends to leverage its portfolio through a master repurchase agreement entered into with BNP Paribas Securities Corporation ("BNP Securities") on November 16, 2017, as amended, that allows the Trust to enter into reverse repurchase transactions from time to time pursuant to the terms of the master repurchase agreement. On August 14, 2018, the Trust, and two of its wholly-owned subsidiaries, NREC and NREO, entered into a $75.0 million revolving credit agreement with KeyBank National Association. The revolving balance stepped down to $60.0 million after September 14, 2018. As of June 30, 2019, The Trust had drawn $55.4 million on the committed facility. The Trust's asset coverage ratio as of June 30, 2019 was 524.7%. See "Principal Risks of the Trust — Leverage Risk" for a brief description of the Trust's committed facility, master repurchase agreement and bridge credit agreement.

Following the completion of an Offering, the Trust may increase the amount of leverage outstanding. The Trust may engage in additional borrowings, issue notes, or issue preferred shares in order to maintain the Trust's desired leverage ratio. Leverage creates a greater risk of loss, as well as a potential for more gain, for the common shares than if leverage were not used. Interest on borrowings (or dividends on preferred shares) may be at a fixed or floating rate and generally will be based on short-term rates. The costs associated with the Trust's use of leverage, including the issuance of such leverage and the payment of dividends or interest on such leverage, will be borne entirely by the holders of common shares. As long as the rate of return, net of applicable Trust expenses, on the Trust's portfolio investments purchased with leverage exceeds the costs associated with such leverage, the Trust will generate more return or income than will be needed to pay such costs. In this event, the excess will be available to pay higher dividends to holders of common shares. Conversely, if the Trust's return on such assets is less than the cost of leverage and other Trust expenses, the return to the holders of the common shares will diminish. To the extent that the Trust uses leverage, the NAV and market price of the common shares and the yield to holders of common shares will be more volatile. The Trust's leveraging strategy may not be successful. See "Principal Risks of the Trust—Leverage Risk."

Assuming the utilization of leverage in the amount of 25.0% of the Trust's total assets and an annual interest rate of 3.81% payable on such leverage based on market rates as of June 30, 2019, the additional income that the Trust must earn (net of expenses) in order to cover such leverage is 3.26% of NAV. Actual costs of leverage may be higher or lower than that assumed in the previous example.

The following table is designed to illustrate the effect on the return to a holder of the Trust's common shares of leverage in the amount of approximately 25.0% of the Trust's total assets, assuming hypothetical annual returns of the Trust's investment portfolio of minus 10% to plus 10%. As the table shows, leverage generally increases the return to holders of common shares when portfolio return is positive and greater than the cost of leverage and decreases the return when the portfolio return is negative or less than the cost of leverage. The figures appearing in the table are hypothetical and actual returns may be greater or less than those appearing in the table.

| | -10% | -5% | 0% | 5% | 10% |
|---|---|---|---|---|---|
| **Assumed return on portfolio (net of expenses)** | -10% | -5% | 0% | 5% | 10% |
| **Corresponding return to common stockholder** | -14.4% | -7.8% | -1.1% | 5.6% | 12.2% |

[Table of Contents](#)

## Principal Risks of the Trust

The following is a description of the principal risks associated with an investment in the Trust's common and preferred shares specifically, as well as those risks generally associated with investment in a company with investment objectives, investment policies, capital structure or trading markets similar to the Trust. Given the risks described below, an investment in the common shares of the Trust may not be appropriate for all investors. You should carefully consider your ability to assume these risks before making an investment in common shares of the Trust.

### INVESTMENT AND MARKET DISCOUNT RISK

An investment in the Trust's common shares is subject to investment risk, including the possible loss of the entire amount that you invest. As with any stock, the price of the Trust's shares fluctuates with market conditions and other factors. If common shares are sold, the price received may be more or less than the original investment. Shares of closed-end management investment companies frequently trade at a discount to their NAV. The Trust's common shares may trade at a price that is less than the offering price. This risk may be greater for investors who sell their shares in a relatively short period of time after completion of an Offering. Common shares are designed for long-term investors and should not be treated as trading vehicles.

### REIT-SPECIFIC RISK

REITs may be affected by changes in the real estate markets generally as well as changes in the values of the properties owned by the REIT or securing the mortgages owned by the REIT (which changes in value could be influenced by market conditions for real estate in general or fluctuations in the value of rights to natural resources appurtenant to the property held by the REIT). REITs are dependent upon management skill and are not diversified. REITs are also subject to heavy cash flow dependency, defaults by borrowers, self-liquidation, and the possibility of failing to qualify for special tax treatment under the Code and to maintain an exemption under the Investment Company Act. For example, because a REIT may acquire debt securities of issuers primarily engaged in or related to the real estate industry, it also could conceivably own real estate directly as a result of a default on such securities. Any rental income or income from the disposition of such real estate could adversely affect its ability to retain its tax status, which would have adverse tax consequences on its shareholders. Finally, certain REITs may be self-liquidating at the end of a specified term, and run the risk of liquidating at an economically inopportune time.

Each Subsidiary has elected to be taxed as a REIT. In order for each Subsidiary to qualify and maintain its qualification as a REIT, it must satisfy certain requirements set forth in the Code and Treasury Regulations that depend on various factual matters and circumstances. The Trust and the Investment Adviser intend to structure each REIT Subsidiary and its activities in a manner designed to satisfy all of these requirements. However, the application of such requirements is not entirely clear, and it is possible that the IRS may interpret or apply those requirements in a manner that jeopardizes the ability of such REIT Subsidiary to satisfy all of the requirements for qualification as a REIT.

If a REIT Subsidiary fails to qualify as a REIT for any taxable year and it does not qualify for certain statutory relief provisions, it will be subject to U.S. federal income tax on its taxable income at corporate rates. In addition, it will generally be disqualified from treatment as a REIT for the four taxable years following the year of losing its REIT status. Losing its REIT status will reduce its net earnings available for investment or distribution to stockholders because of the additional tax liability. In addition, distributions to stockholders will no longer qualify for the dividends paid deduction, and the REIT Subsidiary will no longer be required to make distributions. If this occurs, such REIT Subsidiary might be required to borrow funds or liquidate some investments in order to pay the applicable tax.

To obtain the favorable tax treatment afforded to REITs under the Code, each REIT Subsidiary generally will be required each year to distribute to its stockholders at least 90% of its REIT taxable income determined without regard to the dividends-paid deduction and excluding net capital gain. To the extent that it does not distribute all of its net capital gains, or distributes at least 90%, but less than 100%, of its REIT taxable income, as adjusted, it will have to pay tax on amounts retained at regular ordinary and capital gains corporate tax rates. Furthermore, if it fails to distribute during each calendar year at least the sum of (a) 85% of its ordinary income for that year, (b) 95% of its capital gain net income for that year, and (c) any undistributed taxable income from prior periods, it would have to pay a 4% nondeductible excise tax on the excess of the amounts required to be distributed over the sum of (a) the amounts that it actually distributed and (b) the amounts it retained and upon which it paid income tax at the corporate level. These requirements could cause it to distribute amounts that otherwise would be spent on investments in real estate assets, and it is possible that the REIT Subsidiary might be required to borrow funds, possibly at unfavorable rates, or sell assets to fund the required distributions.

Table of Contents

## INTEREST RATE RISK

Interest rate risk is the risk that debt securities, and the Trust's net assets, may decline in value because of changes in interest rates. Generally, debt securities will decrease in value when interest rates rise and increase in value when interest rates decline. This means that the NAV of the common shares will fluctuate with interest rate changes and the corresponding changes in the value of the Trust's debt security holdings. To the extent the Trust invests in longer duration fixed rate debt securities, the Trust is subject to greater interest rate risk than funds investing solely in shorter-term fixed-rate debt securities. Interest rate risk may be heightened when interest rates are below or significantly below historical averages. As of the date of this Prospectus, interest rates in the U.S. are at or near historically low levels, increasing the exposure of debt securities to the risks associated with rising interest rates. Rising market interest rates could have unpredictable effects on the markets and may expose fixed-income and related markets to heightened volatility. Recent and potential future changes in government policy may affect interest rates. In addition, in a period of rising interest rates, the higher cost of any leverage employed by the Trust and/or increasing defaults by issuers of high yield securities would likely exacerbate any decline in the Trust's NAV.

Duration is a measure used to determine the sensitivity of a security's price to changes in interest rates that incorporates a security's yield, coupon, final maturity and call features, among other characteristics. Duration is useful primarily as a measure of the sensitivity of a fixed income security's market price to interest rate (i.e. yield) movements. All other things remaining equal, for each one percentage point increase in interest rates, the value of a portfolio of fixed income investments would generally be expected to decline by one percent for every year of the portfolio's average duration above zero. For example, the value of a portfolio of fixed income securities with an average duration of three years would generally be expected to decline by approximately 3% if interest rates rose by one percentage point.

## PREPAYMENT RISK

If interest rates fall, the principal on bonds and loans held by the Trust may be paid earlier than expected. If this happens, the proceeds from a prepaid security may be reinvested by the Trust in securities bearing lower interest rates, resulting in a possible decline in the Trust's income and distributions to shareholders. The Trust may invest in pools of mortgages or other assets issued or guaranteed by private issuers or U.S. government agencies and instrumentalities. Mortgage-related securities are especially sensitive to prepayment risk because borrowers often refinance their mortgages when interest rates decline.

## RISKS OF INVESTING IN HIGH-YIELD SECURITIES

A substantial portion of the Trust's investments will consist of investments that may generally be characterized as "high-yield securities" or "junk securities," and the Trust may invest without limit in such securities. Such securities are typically rated below investment grade by one or more nationally recognized statistical rating organizations or are unrated but of comparable credit quality to obligations rated below investment grade, and have greater credit and liquidity risk than more highly rated obligations. High-yield securities are generally unsecured and may be subordinate to other obligations of the obligor. The lower rating of high-yield securities reflects a greater possibility that adverse changes in the financial condition of the issuer or in general economic conditions (including, for example, a substantial period of rising interest rates or declining earnings) or both may impair the ability of the issuer to make payment of principal and interest. Many issuers of high-yield securities are highly leveraged, and their relatively high debt to equity ratios create increased risks that their operations might not generate sufficient cash flow to service their obligations. Overall declines in the high-yield bond and other markets may adversely affect such issuers by inhibiting their ability to refinance their obligations at maturity.

High-yield securities are often issued in connection with leveraged acquisitions or recapitalizations in which the issuers incur a substantially higher amount of indebtedness than the level at which they had previously operated. High-yield securities that are debt instruments have historically experienced greater default rates than has been the case for investment grade securities. The Trust may also invest in equity securities issued by entities whose obligations are unrated or are rated below investment grade.

The Trust is authorized to invest in obligations of issuers that are generally trading at significantly higher yields than had been historically typical of the applicable issuer's obligations. Such investments may include debt obligations that have a heightened probability of being in covenant or payment default in the future. Such investments generally are considered highly speculative. The repayment of defaulted obligations is subject to significant uncertainties. Defaulted obligations might be repaid only after lengthy workout or bankruptcy proceedings, during which the issuer might not make any interest or other payments. Typically such workout or bankruptcy proceedings result in only partial recovery of cash payments or an exchange of the defaulted security for other debt or equity securities of the issuer or its affiliates, which may in turn be illiquid or highly speculative.

High-yield securities purchased by the Trust are subject to certain additional risks to the extent that such obligations may be unsecured and subordinated to substantial amounts of senior indebtedness, all or a significant portion of which may be secured. Moreover, such obligations purchased by the Trust may not be protected by financial covenants or limitations upon additional indebtedness and are unlikely to be secured by collateral.

66

Table of Contents

## ILLIQUIDITY OF INVESTMENTS

The investments made by the Trust may be very illiquid, and consequently, the Trust may not be able to sell such investments at prices that reflect the Investment Adviser's assessment of their fair value or the amount paid for such investments by the Trust. An inability to sell a portfolio position can adversely affect the Trust's value or prevent the Trust from being able to take advantage of other investment opportunities. Illiquidity may result from the absence of an established market for the investments as well as legal, contractual or other restrictions on their resale by the Trust and other factors. Furthermore, the nature of the Trust's investments, especially those in financially stressed and distressed companies, may require a long holding period prior to being able to determine whether the investment will be profitable or not. There is no limit on the amount of the Trust's investment portfolio that can be invested in illiquid securities.

## RISKS OF INVESTING IN SENIOR LOANS

Senior loans, such as bank loans, are typically at the most senior level of the capital structure, and are sometimes secured by specific collateral, including, but not limited to, trademarks, patents, accounts receivable, inventory, equipment, buildings, real estate, franchises and common and preferred stock of the obligor or its affiliates. A portion of the Trust's investments may consist of loans and participations therein originated by banks and other financial institutions, typically referred to as "bank loans." The Trust's investments may include loans of a type generally incurred by borrowers in connection with highly leveraged transactions, often to finance internal growth, acquisitions, mergers or stock purchases, or for other reasons. As a result of the additional debt incurred by the borrower in the course of the transaction, the borrower's creditworthiness is often judged by the rating agencies to be below investment grade. Such loans are typically private corporate loans negotiated by one or more commercial banks or financial institutions and syndicated among a group of commercial banks and financial institutions. In order to induce the lenders to extend credit and to offer a favorable interest rate, the borrower often provides the lenders with extensive information about its business that is not generally available to the public. To the extent the Trust receives material non-public information, it may be prohibited from trading in certain securities, even when it might otherwise be beneficial to do so.

Bank loans often, but not always, contain restrictive covenants designed to limit the activities of the borrower in an effort to protect the right of lenders to receive timely payments of principal and interest. Such covenants may include restrictions on distribution payments, specific mandatory minimum financial ratios, limits on total debt and other financial tests. Bank loans usually have shorter terms than subordinated obligations and may require mandatory prepayments from excess cash flow, asset dispositions and offerings of debt and/or equity securities. The bank loans and other debt obligations to be acquired by the Trust are likely to be below investment grade.

The Trust may acquire interests in bank loans and other debt obligations either directly (by way of sale or assignment) or indirectly (by way of participation). The purchaser of an assignment typically succeeds to all the rights and obligations of the assigning institution and becomes a lender under the credit agreement with respect to the debt obligation; however, its rights can be more restricted than those of the assigning institution, and, in any event, the Trust may not be able unilaterally to enforce all rights and remedies under the loan and any associated collateral. A participation interest in a portion of a debt obligation typically results in a contractual relationship only with the institution participating out the interest, not with the borrower. In purchasing participations, the Trust generally will have no right to enforce compliance by the borrower with the terms of the loan agreement or any rights of setoff against the borrower, and the Trust may not directly benefit from the collateral supporting the debt obligation in which it has purchased the participation. As a result, the Trust will be exposed to the credit risk of both the borrower and the institution selling the participation.

Purchasers of bank loans are predominantly commercial banks, investment funds and investment banks. As secondary market trading volumes increase, new bank loans frequently adopt standardized documentation to facilitate loan trading, which the Investment Adviser believes should improve market liquidity. However, no active trading market may exist for certain senior loans, which may impair the ability of the Trust to realize full value in the event of the need to liquidate such assets. Adverse market conditions may impair the liquidity of some actively traded senior loans. In addition, future levels of supply and demand in bank loan trading may not provide an adequate degree of liquidity and the current level of liquidity may not continue. Because of the provision to holders of such loans of confidential information relating to the borrower, the unique and customized nature of the loan agreement, the limited universe of eligible purchasers and the private syndication of the loan, bank loans are not as easily purchased or sold as a publicly-traded security.

As with any debt instrument, senior loans are generally subject to the risk of price declines and as interest rates rise, the cost of borrowing increases, which may increase the risk of default. In addition, the interest rates of floating rate loans typically only adjust to changes in short-term

67

Table of Contents

interest rates; long-term interest rates can vary dramatically from short-term interest rates. Declines in interest rates may increase prepayments of debt obligations and require the Trust to invest assets at lower yields.

## LEGISLATION RISK

To the extent that legislation or state or federal regulators impose additional requirements or restrictions with respect to the ability of financial institutions to make loans in connection with highly leveraged transactions, the availability of senior loan interests for investment by the Trust may be adversely affected. In addition, such requirements or restrictions may reduce or eliminate sources of financing for affected borrowers. Further, to the extent that legislation or federal or state regulators require such institutions to dispose of senior loan interests relating to highly leveraged transactions or subject such senior loan interests to increased regulatory scrutiny, such financial institutions may determine to sell senior loan interests in a manner that results in a price that, in the opinion of the Investment Adviser, is not indicative of fair value. Were the Trust to attempt to sell a senior loan interest at a time when a financial institution was engaging in such a sale with respect to the senior loan interest, the price at which the Trust could consummate such a sale might be adversely affected.

## SECOND LIEN LOANS RISK

Second lien loans are subject to the same risks associated with investment in senior loans and non-investment grade securities. However, second lien loans are second in right of payment to senior loans and therefore are subject to additional risk that the cash flow of the borrower and any property securing the loan may be insufficient to meet scheduled payments after giving effect to the senior secured obligations of the borrower. Second lien loans are expected to have greater price volatility than senior loans and may be less liquid. There is also a possibility that originators will not be able to sell participations in second lien loans, which would create greater credit risk exposure.

## OTHER SECURED LOANS RISK

Secured loans other than senior loans and second lien loans are subject to the same risks associated with investment in senior loans, second lien loans and non-investment grade securities. However, such loans may rank lower in right of payment than any outstanding senior loans and second lien loans of the borrower and therefore are subject to additional risk that the cash flow of the borrower and any property securing the loan may be insufficient to meet scheduled payments after giving effect to the higher-ranking secured obligations of the borrower. Lower-ranking secured loans are expected to have greater price volatility than senior loans and second lien loans and may be less liquid. There is also a possibility that originators will not be able to sell participations in lower-ranking secured loans, which would create greater credit risk exposure.

## UNSECURED LOANS RISK

Unsecured loans are subject to the same risks associated with investment in senior loans, second lien loans, other secured loans and non-investment grade securities. However, because unsecured loans have lower priority in right of payment to any higher ranking obligations of the borrower and are not backed by a security interest in any specific collateral, they are subject to additional risk that the cash flow of the borrower and available assets may be insufficient to meet scheduled payments after giving effect to any higher ranking obligations of the borrower. Unsecured loans are expected to have greater price volatility than senior loans, second lien loans and other secured loans and may be less liquid. There is also a possibility that originators will not be able to sell participations in unsecured loans, which would create greater credit risk exposure.

Loans other than senior loans may not be acceptable collateral under the Trust's current credit facility or under any future credit facilities, or may require a higher collateral-to-loan ratio, and therefore to the extent the Trust invests in such loans its ability to borrow may be reduced.

68

Table of Contents

## RISKS OF INVESTING IN OBLIGATIONS OF STRESSED, DISTRESSED AND BANKRUPT ISSUERS

The Trust is authorized to invest in the securities and other obligations of stressed, distressed and bankrupt issuers, including debt obligations that are in covenant or payment default. There is no limit on the amount of the Trust's investment portfolio that can be invested in stressed, distressed or bankrupt issuers, and the Trust may invest for purposes of control. Such investments generally trade significantly below par and are considered highly speculative. The repayment of defaulted obligations is subject to significant uncertainties. Defaulted obligations might be repaid only after lengthy workout or bankruptcy proceedings, during which the issuer might not make any interest or other payments. Typically such workout or bankruptcy proceedings result in only partial recoveries, which may be in the form of cash payments or an exchange of the defaulted obligation for other debt or equity securities of the issuer or its affiliates, which may in turn be illiquid or highly speculative. It is also possible that there could be limited or no recovery for creditors in a bankruptcy or workout.

There are a number of significant risks inherent in the bankruptcy process, including, without limitation, those set forth in this paragraph. First, many events in a bankruptcy are the product of contested matters and adversary proceedings and are beyond the control of the creditors. While creditors are generally given an opportunity to object to significant actions, a bankruptcy court in the exercise of its broad equitable powers may approve actions that are contrary to the interests of the Trust. Second, a bankruptcy filing by an issuer may adversely and permanently affect the issuer. The issuer may lose its market position and key employees and otherwise become incapable of restoring itself as a viable entity. If for this or any other reason the proceeding is converted to a liquidation, the value of the issuer may not equal the liquidation value that was believed to exist at the time of the investment. Third, the duration of a bankruptcy proceeding is difficult to predict. A creditor's return on investment can be adversely affected by delays while the plan of reorganization is being negotiated (or, in some cases, litigated), approved by the creditors and confirmed by the bankruptcy court and until it ultimately becomes effective. Fourth, the administrative costs in connection with a bankruptcy proceeding are frequently high and would be paid out of the debtor's estate prior to any return to creditors. For example, if a proceeding involves protracted or difficult litigation, or turns into a liquidation, substantial assets may be devoted to administrative costs. Fifth, bankruptcy law permits the classification of "substantially similar" claims in determining the classification of claims in a reorganization. Because the standard for classification is vague, there exists the risk that the Trust's influence with respect to the class of securities or other obligations it owns can be lost by increases in the number and amount of claims in that class or by different classification and treatment. Sixth, in certain circumstances in which the Trust acquires claims against the issuer to obtain a control position with respect to a class or classes of claims, the Trust's influence with respect to all of the class or classes of securities or other obligations it owns can be lost if the bankruptcy court designates the Trust's vote or votes on the Chapter 11 plan as a result of the Trust's claim purchases. Seventh, in the early stages of the bankruptcy process it is often difficult to estimate the extent of, or even to identify, any contingent claims that might be made. Eighth, especially in the case of investments made prior to the commencement of bankruptcy proceedings, creditors can lose their ranking and priority if they exercise "domination and control" over a debtor and other creditors can demonstrate that they have been harmed by such actions. Ninth, certain claims that have priority by law (for example, claims for taxes) may be substantial.

In any investment involving stressed and distressed debt obligations, there exists the risk that the transaction involving such debt obligations will be unsuccessful, take considerable time or will result in a distribution of cash or a new security or obligation in exchange for the stressed and distressed debt obligations, the value of which may be less than the Trust's purchase price of such debt obligations. Furthermore, if an anticipated transaction does not occur, the Trust may be required to sell its investment at a loss. Given the substantial uncertainties concerning transactions involving stressed and distressed debt obligations in which the Trust invests, there is a potential risk of loss by the Trust of its entire investment in any particular investment.

Investments in companies operating in workout modes or under Chapter 11 of the Bankruptcy Code are also, in certain circumstances, subject to certain additional liabilities, which may exceed the value of the Trust's original investment in a company. For example, under certain circumstances, creditors who have inappropriately exercised control over the management and policies of a debtor may have their claims subordinated or disallowed or may be found liable for damages suffered by parties as a result of such actions. The Investment Adviser's active management style may present a greater risk in this area than would a more passive approach. In addition, under certain circumstances, payments to the Trust and distributions by the Trust or payments on the debt may be reclaimed if any such payment is later determined to have been a fraudulent conveyance or a preferential payment.

The Investment Adviser on behalf of the Trust (and its other clients) may participate on committees formed by creditors to negotiate with the management of financially troubled companies that may or may not be in bankruptcy or may negotiate directly with debtors with respect to restructuring issues. If the Trust does choose to join a committee, the Trust would likely be only one of many

69

Table of Contents

participants, all of whom would be interested in obtaining an outcome that is in their individual best interests. The Trust may not be successful in obtaining results most favorable to it in such proceedings, although the Trust may incur significant legal and other expenses in attempting to do so. As a result of participation by the Trust on such committees, the Trust may be deemed to have duties to other creditors represented by the committees, which might thereby expose the Trust to liability to such other creditors who disagree with the Trust's actions. Participation by the Trust on such committees may cause the Trust to be subject to certain restrictions on its ability to trade in a particular investment and may also make the Trust an "insider" or an "underwriter" for purposes of the federal securities laws. Either circumstance will restrict the Trust's ability to trade in or acquire additional positions in a particular investment when it might otherwise desire to do so.

Investments in distressed debt obligations that are at risk of or in default present special tax issues for the Trust. Tax rules are not entirely clear about issues such as whether and to what extent the Trust should recognize "market discount" on certain distressed debt obligations; when the Trust may cease to accrue interest, "original issue discount" or market discount; when and to what extent the Trust may take deductions for bad debts or worthless securities and how the Trust should allocate payments received on obligations in default between principal and income. These and other related issues will be addressed by the Trust when, as and if it invests in such obligations, in order to seek to ensure that it distributes sufficient income to maintain its eligibility for treatment as a RIC under the Code and that it does not become subject to Trust-level U.S. federal income or excise taxes.

## INSOLVENCY CONSIDERATIONS WITH RESPECT TO ISSUERS OF DEBT OBLIGATIONS

Various laws enacted for the protection of creditors may apply to the debt obligations held by the Trust. The information in this paragraph is applicable with respect to U.S. issuers subject to U.S. bankruptcy laws. Insolvency considerations may differ with respect to other issuers. If a court in a lawsuit brought by an unpaid creditor or representative of creditors of an issuer of a debt obligation, such as a trustee in bankruptcy or a creditors' committee, were to find that the issuer did not receive fair consideration or reasonably equivalent value for incurring the indebtedness constituting the debt obligation and, after giving effect to such indebtedness, the issuer (i) was insolvent, (ii) was engaged in a business for which the remaining assets of such issuer constituted unreasonably small capital, or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature, such court could determine to invalidate, in whole or in part, such indebtedness as a fraudulent conveyance, to subordinate such indebtedness to existing or future creditors of such issuer, or to recover amounts previously paid by such issuer in satisfaction of such indebtedness.

The measure of insolvency for purposes of the foregoing will vary. Generally, an issuer would be considered insolvent at a particular time if the sum of its debts were then greater than all of its property at a fair valuation, or if the present fair saleable value of its assets was then less than the amount that would be required to pay its probable liabilities on its existing debts as they became absolute and matured. There can be no assurance as to what standard a court would apply in order to determine whether the issuer was "insolvent" after giving effect to the incurrence of the indebtedness constituting the debt obligation or that, regardless of the method of valuation, a court would not determine that the issuer was "insolvent" upon giving effect to such incurrence. In addition, in the event of the insolvency of an issuer of a debt obligation, payments made on such debt obligation could be subject to avoidance as a "preference" if made within a certain period of time (which may be as long as one year) before insolvency. Similarly, a court might apply the doctrine of equitable subordination to subordinate the claim of a lending institution against an issuer, to claims of other creditors of the borrower, when the lending institution, another investor, or any of their transferees, is found to have engaged in unfair, inequitable, or fraudulent conduct. In general, if payments on a debt obligation are avoidable, whether as fraudulent conveyances or preferences, such payments can be recaptured either from the initial recipient (such as the Trust) or from subsequent transferees of such payments (such as the investors in the Trust). To the extent that any such payments are recaptured from the Trust the resulting loss will be borne by the investors. However, a court in a bankruptcy or insolvency proceeding would be able to direct the recapture of any such payment from such a recipient or transferee only to the extent that such court has jurisdiction over such recipient or transferee or its assets. Moreover, it is likely that avoidable payments could not be recaptured directly from any such recipient or transferee that has given value in exchange for its note, in good faith and without knowledge that the payments were avoidable. Although the Investment Adviser will seek to avoid conduct that would form the basis for a successful cause of action based upon fraudulent conveyance, preference or equitable subordination, these determinations are made in hindsight and a court could disagree with the Trust's position, and, in any event, there can be no assurance as to whether any lending institution or other investor from which the Trust acquired the debt obligations engaged in any such conduct (or any other conduct that would subject the debt obligations and the issuer to insolvency laws) and, if it did, as to whether such creditor claims could be asserted in a U.S. court (or in the courts of any other country) against the Trust.

## LITIGATION RISK

The Trust is sometimes subject to legal proceedings and claims based on the securities and instruments in which the Trust invests. Litigation may result in substantial costs and may seriously harm the Trust's investments and overall financial condition. In

Next Generation Corporate Entities Zund

addition, legal claims that have not yet been asserted against the Trust may be asserted in the future.

70

[Table of Contents](#)

**LEVERAGE RISK**

When deemed appropriate by the Investment Adviser and subject to applicable regulations, the Trust may use leverage in its investment program, including through the issuance of preferred shares, borrowings from a credit facility, issuing notes or other debt securities and investments in certain types of options, such as puts, calls and warrants. While such strategies and techniques increase the opportunity to achieve higher returns on the amounts invested, they also increase the risk of loss. To the extent the Trust purchases securities with borrowed funds, its net assets will tend to increase or decrease at a greater rate than if borrowed funds are not used. The level of interest rates generally, and the rates at which such funds may be borrowed in particular, could affect the operating results of the Trust. If the interest expense on borrowings were to exceed the net return on the portfolio securities purchased with borrowed funds, the Trust's use of leverage would result in a lower rate of return than if the Trust were not leveraged.

The Trust's leveraged capital structure creates special risks not associated with unleveraged funds having a similar investment objective and policies. These include the possibility of greater loss and the likelihood of higher volatility of the NAV of the Trust and the asset coverage for the preferred shares.

Pursuant to regulations and/or published positions of the Commission, the Trust may be required to earmark liquid assets in an amount equal to the Trust's daily marked-to-market value of its transactions in futures and options. To maintain this required margin, the Trust may have to sell portfolio securities at disadvantageous prices or times because it may not be possible to liquidate a position at a reasonable price. In addition, the earmarking of such assets will have the effect of limiting the Trust's ability otherwise to invest those assets.

The Trust also has the ability to use leverage through the issuance of preferred shares, borrowings from a credit facility, issuance of secured notes or other debt securities, or any combination of the three. The Trust currently leverages through borrowings from a committed facility, through a master repurchase agreement and through a bridge credit agreement. The use of leverage, which can be described as exposure to changes in price at a ratio greater than the amount of equity invested, either through the issuance of preferred shares, borrowings or other forms of market exposure, magnifies both the favorable and unfavorable effects of price movements in the investments made by the Trust. Insofar as the Trust continues to employ leverage in its investment operations, the Trust will be subject to substantial risks of loss.

Therefore, if the market value of the Trust's investment portfolio declines, any leverage will result in a greater decrease in NAV to common shareholders than if the Trust were not leveraged. Such greater NAV decrease will also tend to cause a greater decline in the market price for the common shares. Further, if at any time while the Trust has leverage outstanding it does not meet applicable asset coverage requirements (as discussed below), it may be required to suspend distributions to common shareholders until the requisite asset coverage is restored. Any such suspension might impair the ability of the Trust to meet the RIC distribution requirements and to avoid Trust-level U.S. federal income or excise taxes.

As noted above, the Trust currently leverages through borrowings from a committed facility, through a master repurchase agreement and through a bridge credit agreement. The Trust had previously entered into a secured Credit Facility with State Street. Such borrowings constitute financial leverage.

Indebtedness incurred under the Committed Facility is not convertible into any other securities of the Trust. Outstanding amounts would be payable at maturity or such earlier times as required by the Committed Facility agreement. The Trust may be required to prepay outstanding amounts under the Committed Facility or incur a penalty rate of interest in the event of the occurrence of certain events of default. The Committed Facility agreement obligates the Trust to provide certain indemnities to the agent and the lenders and their affiliates. The Trust is required to pay ongoing commitment fees on the undrawn amount under the terms of the Committed Facility agreement. With the use of borrowings, there is a risk that the interest rates paid by the Trust on the amount it borrows will be higher than the return on the Trust's investments. The Committed Facility may in the future be replaced or refinanced by one or more credit facilities having substantially different terms or by the issuance of preferred shares, or the Trust may be unable to renew or replace its Committed Facility upon the termination of the current facilities, possibly requiring it to sell portfolio securities at times or prices that are disadvantageous. Any of these situations could adversely impact income or total return to shareholders.

The Trust must comply with investment quality, diversification and other guidelines established by the Committed Facility agreement. The Trust does not anticipate that such guidelines will have a material adverse effect on the Trust's common shareholders or its ability to achieve its investment objectives.

Successful use of a leveraging strategy may depend on the Investment Adviser's ability to predict correctly interest rates and market movements, and there is no assurance that a leveraging strategy will be successful during any period in which it is employed.

**RISKS OF INVESTING IN OTHER INVESTMENT COMPANIES**

The Trust may invest in investment companies such as open-end funds (mutual funds), closed-end funds and ETFs (also referred to as "Underlying Funds"). The Trust may invest in Underlying Funds subject to the limitations set forth in the Investment Company Act. Underlying Funds typically incur fees that are separate from those fees incurred directly by the Trust; therefore, the Trust's purchase of Underlying Funds' securities results in the layering of expenses. The Trust's shareholders indirectly bear a proportionate share of the operating expenses of Underlying Funds (including advisory fees) in addition to bearing the Trust's expenses.

71

Table of Contents

The Trust may invest in investment companies that are advised by the Investment Adviser or its affiliates, including ETFs, to the extent permitted by applicable law and/or pursuant to exemptive relief from the SEC. These investment companies typically incur fees that are separate from those fees incurred directly by the Trust. The Trust's purchase of such investment company securities results in the layering of expenses, such that shareholders would indirectly bear a proportionate share of the operating expenses of such investment companies, including advisory fees, in addition to paying Trust expenses.

Shares of closed-end funds are typically offered to the public in a one-time initial public offering by a group of underwriters who retain a spread or underwriting commission of between 4% or 6% of the initial public offering price. Such securities are then listed for trading on the New York Stock Exchange, the National Association of Securities Dealers Automated Quotation System (commonly known as "NASDAQ") and, in some cases, may be traded in other over-the-counter markets. Because the shares of closed-end funds cannot be redeemed upon demand to the issuer like the shares of an open-end investment company (such as the Funds), investors seek to buy and sell shares of closed-end funds in the secondary market.

The Trust generally will purchase shares of closed-end funds only in the secondary market. The Trust will incur normal brokerage costs on such purchases similar to the expenses the Trust would incur for the purchase of securities of any other type of issuer in the secondary market. The Trust may, however, also purchase securities of a closed-end fund in an initial public offering when, in the opinion of the Investment Adviser, based on a consideration of the nature of the closed-end fund's proposed investments, the prevailing market conditions and the level of demand for such securities, they represent an attractive opportunity for growth of capital. The initial offering price typically will include a dealer spread, which may be higher than the applicable brokerage cost if the Trust purchased such securities in the secondary market.

The shares of many closed-end funds, after their initial public offering, frequently trade at a price per share that is less than the NAV per share, the difference representing the "market discount" of such shares. This market discount may be due in part to the investment objective of long-term appreciation, which is sought by many closed-end funds, as well as to the fact that the shares of closed-end funds are not redeemable by the holder upon demand to the issuer at the next determined NAV but rather are subject to the principles of supply and demand in the secondary market. A relative lack of secondary market purchasers of closed-end fund shares also may contribute to such shares trading at a discount to their NAV.

The Trust may invest in shares of closed-end funds that are trading at a discount to NAV or at a premium to NAV. There can be no assurance that the market discount on shares of any closed-end fund purchased by the Trust will ever decrease. In fact, it is possible that this market discount may increase and the Trust may suffer realized or unrealized capital losses due to further decline in the market price of the securities of such closed-end funds, thereby adversely affecting the NAV of the Trust's shares. Similarly, there can be no assurance that any shares of a closed-end fund purchased by the Trust at a premium will continue to trade at a premium or that the premium will not decrease subsequent to a purchase of such shares by the Trust.

Closed-end funds may issue senior securities (including preferred stock and debt obligations) for the purpose of leveraging the closed-end fund's common shares in an attempt to enhance the current return to such closed-end fund's common shareholders. The Trust's investment in the common shares of closed-end funds that are financially leveraged may create an opportunity for greater total return on its investment, but at the same time may be expected to exhibit more volatility in market price and NAV than an investment in shares of investment companies without a leveraged capital structure.

The majority of ETFs are passive funds that track their related index and have the flexibility of trading like a security. They are managed by professionals and provide the investor with diversification, cost and tax efficiency, liquidity, margin-ability, are useful for hedging, have the ability to go long and short, and some provide quarterly dividends. Additionally, some ETFs are unit investment trusts (UITs), which are unmanaged portfolios overseen by trustees.

There is a risk that an ETF in which the Trust invests may terminate due to extraordinary events that may cause any of the service providers to the ETFs, such as the trustee or sponsor, to close or otherwise fail to perform their obligations to the ETF. Also, because the ETFs in which the Trust intends to principally invest may be granted licenses by agreement to use the indices as a basis for determining their compositions and/or otherwise to use certain trade names, the ETFs may terminate if such license agreements are terminated. In addition, an ETF may terminate if its entire NAV falls below a certain amount. Although the Trust believes that, in the event of the termination of an underlying ETF, it will be able to invest instead in shares of an alternate ETF tracking the same market index or another market index with the same general market, there is no guarantee that shares of an alternate ETF would be available for investment at that time. To the extent the Trust invests in a sector product, the Fund is subject to the risks associated with that sector.

Certain ETFs that invest in commodities or commodity-related instruments may give rise to income that is not "qualifying income" for purposes of the 90% gross income test for qualification as a RIC for U.S. federal income tax purposes. The Trust's investment in

such an ETF may bear on or be limited by the Trust's intention to qualify as a RIC. Further, certain ETFs that invest in commodities or certain commodity-related derivatives may qualify as "qualified publicly traded partnerships" ("QPTPs") for U.S. federal income tax purposes with the net income generated thereon treated as qualifying income for purposes of this 90% gross income test. Under the tax diversification requirements applicable to RICs, the Trust's investment in one or more entities qualifying as QPTPs may not exceed 25% of the Fund's total assets at the end of each quarter of each taxable year.

**PREFERRED SHARE RISK**

Preferred share risk is the risk associated with the issuance of preferred shares to leverage the common shares. If preferred shares are issued, the NAV and market value of the common shares will be more volatile, and the yield to the holders of common shares will tend to fluctuate with changes in the shorter-term dividend rates on the preferred shares. The Trust will pay (and

72

Table of Contents

the holders of common shares will bear) all costs and expenses relating to the issuance and ongoing maintenance of the preferred shares, including higher advisory fees. Accordingly, the issuance of preferred shares may not result in a higher yield or return to the holders of the common shares. If the dividend rate and other costs of the preferred shares approach the net rate of return on the Trust's investment portfolio, the benefit of leverage to the holders of the common shares would be reduced. If the dividend rate and other costs of the preferred shares exceed the net rate of return on the Trust's investment portfolio, the leverage will result in a lower rate of return to the holders of common shares than if the Trust had not issued preferred shares.

Similarly, any decline in the NAV of the Trust's investments will be borne entirely by the holders of common shares. Therefore, if the market value of the Trust's investment portfolio declines, the leverage will result in a greater decrease in NAV to the holders of common shares than if the Trust were not leveraged. This greater NAV decrease will also tend to cause a greater decline in the market price for the common shares. The Trust might be in danger of failing to maintain the required asset coverage of the preferred shares or of losing its ratings on the preferred shares or, in an extreme case, the Trust's current investment income might not be sufficient to meet the dividend requirements on the preferred shares. In order to counteract such an event, the Trust might need to liquidate investments in order to fund a redemption of some or all of the preferred shares. Liquidation at times of low prices may result in capital loss and may reduce returns to the holders of common shares.

If preferred shares are issued, holders of preferred shares may have differing interests than holders of common shares and holders of preferred shares may at times have disproportionate influence over the Trust's affairs. If preferred shares are issued, holders of preferred shares, voting separately as a single class, would have the right to elect two members of the Board at all times. The remaining members of the Board would be elected by holders of common shares and preferred shares, voting as a single class. The Investment Company Act requires that, in addition to any approval by shareholders that might otherwise be required, the approval of the holders of a majority of any outstanding preferred shares, voting separately as a class, would be required to (i) adopt any plan of reorganization that would adversely affect the preferred shares and (ii) take any action requiring a vote of security holders under Section 13(a) of the Investment Company Act, including, among other things, changes in the Trust's subclassification as a closed-end investment company or changes in its fundamental investment restrictions.

If the Trust issues preferred shares, the Trust would likely seek a credit rating on the preferred shares from one or more nationally recognized statistical rating organizations. The Trust expects that, at anytime when preferred shares were outstanding, the composition of its investment portfolio would reflect guidelines established by any rating agencies, including for example, asset coverage requirements that are more restrictive than those under the Investment Company Act, restrictions on certain portfolio investments and investment practices, requirements that the Trust maintain a portion of its assets in higher rated debt securities and certain mandatory redemption requirements relating to the preferred shares. No assurance can be given that the guidelines actually imposed with respect to preferred shares by rating agencies would be more or less restrictive than these examples. These restrictions may require the Trust to alter its investment strategy and invest in different types of assets some of which may be lower yielding or result in less opportunities for capital appreciation. No minimum rating is required for the issuance of preferred shares by the Trust.

## COMMON STOCK RISK

The Trust may invest in common stock. Although investments in common stock have historically generated higher average total returns than fixed income securities over the long-term, investments in common stock also have historically experienced significantly more volatility in those returns. Therefore, the Trust's investments in common stock could result in worse performance than would be the case had the Trust been invested solely in debt securities. An adverse event, such as an unfavorable earnings report, may depress the value of a particular investment in common stock held by the Trust. Also, the price of common stock is sensitive to general movements in the stock market and a drop in the stock market may depress the price of common stock to which the Trust has exposure. Common stock prices fluctuate for several reasons, including changes in investors' perceptions of the financial condition of an issuer or the general condition of the relevant stock market, or when political or economic events affecting an issuer occur. In addition, common stock prices may be particularly sensitive to rising interest rates, as the cost of capital rises and borrowing costs increase.

## DIVIDEND RISK

Dividends on common stock are not fixed but are declared at the discretion of an issuer's board of directors. There is no guarantee that the issuers of the common stock in which the Trust invests will declare dividends in the future or that, if declared, the dividends will remain at current levels or increase over time.

## SMALL AND MID-CAP SECURITIES RISK

The Trust may invest in companies with small or medium-sized capitalizations. Securities issued by small and medium-sized companies can be more volatile than, and perform differently from, larger company securities. There may be less trading in a small or medium-sized company's securities, which means that buy and sell transactions in those securities could have a larger impact on the

73

[Table of Contents](#)

security's price than is the case with larger company securities. Small or medium-sized companies may have fewer business lines; changes in any one line of business, therefore, may have a greater impact on a small or medium-sized company's security price than is the case for a larger company. In addition, small or medium-sized company securities may not be well known to the investing public.

## NON-U.S. SECURITIES RISK

The Trust may invest without limit in Non-U.S. Securities. Investing in Non-U.S. Securities involves certain risks not involved in domestic investments, including, but not limited to: (i) fluctuations in foreign exchange rates; (ii) future foreign economic, financial, political and social developments; (iii) different legal systems; (iv) the possible imposition of exchange controls or other foreign governmental laws or restrictions; (v) lower trading volume; (vi) much greater price volatility and illiquidity of certain non-U.S. securities markets; (vii) different trading and settlement practices; (viii) less governmental supervision; (ix) changes in currency exchange rates; (x) high and volatile rates of inflation; (xi) fluctuating interest rates; (xii) less publicly available information; and (xiii) different accounting, auditing and financial recordkeeping standards and requirements. In addition, certain investments in Non-U.S. Securities may be subject to foreign withholding or other taxes on interest, dividends, capital gains or other income. Those taxes will reduce the Trust's yield on any such securities. See "Tax Matters" below.

Certain countries in which the Trust may invest, especially emerging market countries, historically have experienced, and may continue to experience, high rates of inflation, high interest rates, exchange rate fluctuations, large amounts of external debt, balance of payments and trade difficulties and extreme poverty and unemployment. Many of these countries are also characterized by political uncertainty and instability. These risks are especially evident in the Middle East and Africa. The cost of servicing external debt will generally be adversely affected by rising international interest rates because many external debt obligations bear interest at rates which are adjusted based upon international interest rates. In addition, with respect to certain foreign countries, there is a risk of: (i) the possibility of expropriation or nationalization of assets; (ii) confiscatory taxation; (iii) difficulty in obtaining or enforcing a court judgment; (iv) economic, political or social instability; and (v) diplomatic developments that could affect investments in those countries. In addition, individual foreign economies may differ favorably or unfavorably from the U.S. economy in such respects as: (i) growth of gross domestic product; (ii) rates of inflation; (iii) capital reinvestment; (iv) resources; (v) self-sufficiency; and (vi) balance of payments position.

As a result of these potential risks, the Investment Adviser may determine that, notwithstanding otherwise favorable investment criteria, it may not be practicable or appropriate to invest in a particular country. The Trust may invest in countries in which foreign investors, including the Investment Adviser, have had no or limited prior experience.

## EMERGING MARKETS RISK

The Trust currently does not expect to invest more than 15%, but may invest up to 20% of its total assets in securities of issuers based in emerging markets. An emerging market country is any country having an economy and market that are (or would be) considered by the World Bank to be emerging or developing or is listed in the Morgan Stanley Capital International Emerging Markets Index. Emerging market countries are located in regions such as Asia, Latin America, the Middle East, Southern Europe, Eastern Europe (including the former republics of the Soviet Union and the Eastern Bloc) and Africa. Investing in securities of issuers based in emerging markets entails all of the risks of investing in securities of non-U.S. issuers, but to a heightened degree. These heightened risks include: (i) greater risks of expropriation, confiscatory taxation, nationalization, and less social, political and economic stability; (ii) the smaller size of the markets for such securities and a lower volume of trading, resulting in lack of liquidity and in price volatility; and (iii) certain national policies which may restrict the Trust's investment opportunities including restrictions on investing in issuers or industries deemed sensitive to relevant national interests.

## FOREIGN CURRENCY RISK

Because the Trust may invest in securities denominated or quoted in currencies other than the U.S. dollar, changes in foreign currency exchange rates may affect the value of securities owned by the Trust, the unrealized appreciation or depreciation of investments and gains on and income from investments. Currencies of certain countries may be volatile and therefore may affect the value of securities denominated in such currencies, which means that the Trust's NAV could decline as a result of changes in the exchange rates between foreign currencies and the U.S. dollar. These risks often are heightened for investments in smaller or emerging capital markets. In addition, the Trust may enter into foreign currency transactions in an attempt to enhance total return, which may further expose the Trust to the risks of foreign currency movements and other risks. The use of foreign currency transactions can result in the Trust incurring losses as a result of the imposition of exchange controls, suspension of settlements or the inability of the Trust to deliver or receive a specified currency.

Table of Contents

## INVESTMENTS IN UNSEASONED COMPANIES

The Trust may invest in the securities of less seasoned companies. These investments may present greater opportunities for growth, but also involve greater risks than customarily are associated with investments in securities of more established companies. Some of the companies in which the Trust may invest will be start-up companies that may have insubstantial operational or earnings history or may have limited products, markets, financial resources or management depth. Some may also be emerging companies at the research and development stage with no products or technologies to market or approved for marketing. Securities of emerging companies may lack an active secondary market and may be subject to more abrupt or erratic price movements than securities of larger, more established companies or stock market averages in general. Competitors of certain companies may have substantially greater financial resources than many of the companies in which the Trust may invest.

## INITIAL PUBLIC OFFERINGS RISK

The Trust may invest in shares of companies through IPOs. IPOs and companies that have recently gone public have the potential to produce substantial gains for the Trust. However, the Trust may not have access to or invest in IPOs that are ultimately profitable for investors. The investment performance of the Trust during periods when it is unable to invest significantly or at all in IPOs may be lower than during periods when the Trust is able to do so. Securities issued in IPOs are subject to many of the same risks as investing in companies with smaller market capitalizations. Securities issued in IPOs have no trading history, and information about the companies may be available for limited periods of time. In addition, the prices of securities sold in IPOs may be highly volatile or may decline shortly after the IPO.

## SECURITIES LENDING RISK

Under the Trust's current securities lending agreement, the Trust may lend its portfolio securities (up to a maximum of one-third of its total assets) to financial institutions on an approved list of borrowers. Securities lending is subject to the risk that loaned securities may not be available to the Trust on a timely basis and the Trust may, therefore, lose the opportunity to sell the securities at a desirable price. Any loss in the market price of securities loaned by the Trust that occurs during the term of the loan would be borne by the Trust and would adversely affect the Trust's performance. Also, there may be delays in recovery, or no recovery, of securities loaned should the borrower of the securities fail financially while the loan is outstanding. In addition, voting rights with respect to loaned securities generally pass to the borrower. The Trust, as the lender, retains the right to recall the loans and obtain the return of the securities loaned in order to vote the loaned securities. However, in many circumstances the Trust may be unable to recall the securities in time to vote or may determine that the benefits to the Trust of voting are outweighed by the indirect or direct costs of such a recall. In these circumstances, loaned securities may be voted or not voted in a manner adverse to the best interests of the Trust. All of the aforementioned risks may be greater for Non-U.S. Securities.

These lending transactions must be fully collateralized at all times, but involve some credit risk to the Trust if the borrower or the party (if any) guaranteeing the loan should default on its obligation and the Trust is delayed in or prevented from recovering the collateral. In addition, any income or gains and losses from investing and reinvesting any cash collateral delivered by a borrower pursuant to a loan are generally at the Trust's risk, and to the extent any such losses reduce the amount of cash below the amount required to be returned to the borrower upon the termination of any loan, the Trust may be required to pay or cause to be paid to such borrower or another entity an amount equal to such shortfall in cash. The Trust generally accepts cash (U.S. and foreign currency), securities issued or guaranteed by the U.S. government or its agencies or instrumentalities, or sovereign debt as collateral for these lending transactions, although in the future, it may accept other types of collateral.

## RISKS ASSOCIATED WITH OPTIONS ON SECURITIES

There are several risks associated with transactions in options on securities, such as exchange-listed, over-the-counter and index options. For example, there are significant differences between the securities and options markets that could result in an imperfect correlation between these markets, causing a given transaction not to achieve its objectives. A decision as to whether, when and how to use options involves the exercise of skill and judgment, and even a well-conceived transaction may be unsuccessful to some degree because of market behavior or unexpected events.

As the writer of a covered call option, the Trust forgoes, during the option's life, the opportunity to profit from increases in the market value of the security covering the call option above the sum of the premium and the strike price of the call, but has retained the risk of loss should the price of the underlying security decline. As the Trust writes covered calls over more of its portfolio, its ability to benefit from capital appreciation becomes more limited. The writer of an option has no control over the time when it may be required to

fulfill its obligation as a writer of the option. Once an option writer has received an exercise notice, it cannot effect a closing purchase transaction in order to terminate its obligation under the option and must deliver the underlying security at the exercise price.

75

Table of Contents

When the Trust writes covered put options, it bears the risk of loss if the value of the underlying stock declines below the exercise price minus the put premium. If the option is exercised, the Trust could incur a loss if it is required to purchase the stock underlying the put option at a price greater than the market price of the stock at the time of exercise plus the put premium the Trust received when it wrote the option. While the Trust's potential gain in writing a covered put option is limited to distributions earned on the liquid assets securing the put option plus the premium received from the purchaser of the put option, the Trust risks a loss equal to the entire exercise price of the option minus the put premium.

## EXCHANGE-LISTED OPTION RISKS

A liquid market may not exist when the Trust seeks to close out an option position on an options exchange. Reasons for the absence of a liquid secondary market on an exchange include the following: (i) there may be insufficient trading interest in certain options; (ii) restrictions may be imposed by an exchange on opening transactions or closing transactions or both; (iii) trading halts, suspensions or other restrictions may be imposed with respect to particular classes or series of options; (iv) unusual or unforeseen circumstances may interrupt normal operations on an exchange; (v) the facilities of an exchange or the OCC may not at all times be adequate to handle current trading volume; or (vi) one or more exchanges could, for economic or other reasons, decide or be compelled at some future date to discontinue the trading of options (or a particular class or series of options). If trading were discontinued, the secondary market on that exchange (or in that class or series of options) would cease to exist. However, outstanding options on that exchange that had been issued by the OCC as a result of trades on that exchange would continue to be exercisable in accordance with their terms. If the Trust were unable to close out a covered call option that it had written on a security, it would not be able to sell the underlying security unless the option expired without exercise.

The hours of trading for options on an exchange may not conform to the hours during which the underlying securities are traded. To the extent that the options markets close before the markets for the underlying securities, significant price and rate movements can take place in the underlying markets that cannot be reflected in the options markets. Call options are marked to market daily, and their value will be affected by changes in the value and dividend rates of the underlying common shares, an increase in interest rates, changes in the actual or perceived volatility of the stock market and the underlying common shares and the remaining time to the options' expiration. Additionally, the exercise price of an option may be adjusted downward before the option's expiration as a result of the occurrence of certain corporate events affecting the underlying equity security, such as extraordinary dividends, stock splits, merger or other extraordinary distributions or events. A reduction in the exercise price of a call option would reduce the Trust's capital appreciation potential on the underlying security.

## OVER-THE-COUNTER OPTION RISK

The Trust may purchase or sell/write unlisted ("OTC" or "over-the-counter") options. Options entered into by the Trust with respect to Non-U.S. Securities, indices or sectors generally will be OTC options. OTC options differ from exchange-listed options in that they are two-party contracts, with exercise price, premium and other terms negotiated between buyer and seller, and generally do not have as much market liquidity as exchange-listed options. The counterparties to these transactions typically will be major international banks, broker-dealers and financial institutions. The Trust may be required to treat as illiquid those securities being used to cover certain written OTC options. The OTC options written by the Trust will not be issued, guaranteed or cleared by the OCC. In addition, the Trust's ability to terminate the OTC options may be more limited than with exchange-traded options. Banks, broker-dealers or other financial institutions participating in such transactions may fail to settle a transaction in accordance with the terms of the option as written. In the event of default or insolvency of the counterparty, the Trust may be unable to liquidate an OTC option position.

## INDEX OPTION RISK

The Trust may purchase or sell/write index put and call options from time to time. The purchaser of an index put option has the right to any depreciation in the value of the index below the exercise price of the option on or before the expiration date. The purchaser of an index call option has the right to any appreciation in the value of the index over the exercise price of the option on or before the expiration date. Because the exercise of an index option is settled in cash, sellers of index call options, such as the Trust, cannot provide in advance for their potential settlement obligations by acquiring and holding the underlying securities. The Trust will lose money if it is required to pay the purchaser of an index option the difference between the cash value of the index on which the option was written and the exercise price and such difference is greater than the premium received by the Trust for writing the option. The value of index options written by the Trust, which will be priced daily, will be affected by changes in the value and dividend rates of the underlying common shares in the respective index, changes in the actual or perceived volatility of the stock market and the remaining time to the options' expiration. The value of the index options also may be adversely affected if the market for the index options becomes less liquid or smaller. Distributions paid by the Trust on its common shares may be derived in part from the net index option premiums it receives

from selling index put and call options, less the cost of paying settlement amounts to purchasers of the options that exercise their options. Net index option premiums can vary widely over the short term and long term.

76

Table of Contents

## ASSET-BACKED SECURITIES RISK

Payment of interest and repayment of principal on asset-backed securities is largely dependent upon the cash flows generated by the assets backing the securities and, in certain cases, supported by letters of credit, surety bonds or other credit enhancements. Asset-backed security values may also be affected by the creditworthiness of the servicing agent for the pool, the originator of the loans or receivables and any entities providing the credit enhancement. In addition, the underlying assets are subject to prepayments that shorten the securities' weighted average maturity and may lower their return.

## MORTGAGE-BACKED SECURITIES RISK

A mortgage-backed security, which represents an interest in a pool of assets such as mortgage loans, will mature once all the mortgages in the pool mature or are prepaid. Therefore, mortgage-backed securities do not have a fixed maturity, and their expected maturities may vary when interest rates rise or fall.

When interest rates fall, homeowners are more likely to prepay their mortgage loans. An increased rate of prepayments on the Trust's mortgage-backed securities will result in an unforeseen loss of interest income to the Trust, as the Trust may be required to reinvest assets at a lower interest rate. Because prepayments increase when interest rates fall, the price of mortgage-backed securities does not increase as much as that of other fixed income securities when interest rates fall.

When interest rates rise, homeowners are less likely to prepay their mortgage loans. A decreased rate of prepayments lengthens the expected maturity of a mortgage-backed security. Therefore, the prices of mortgage-backed securities may decrease more than prices of other fixed income securities when interest rates rise.

Timely payment of interest and principal of mortgage-backed securities may be supported by various forms of private insurance or guarantees, including individual loan, title, pool and hazard insurance purchased or held by the issuer. Private insurers may not, however, be able to meet their obligations under the policies. An unexpectedly high rate of defaults on the mortgages held by a mortgage pool may adversely affect the value of a mortgage-backed security and could result in losses to the Trust. The risk of such defaults is generally higher in the case of mortgage pools that include sub-prime mortgages (which are typically granted to individuals with poor credit histories who, as a result of their deficient credit ratings, would not be able to qualify for conventional mortgages), "Alt-A" mortgages (typically characterized by borrowers with less than full documentation, lower credit scores or higher loan-to-value ratios), "interest only" mortgages (which permit interest-only payments for a specified period before payment of principal is required) and/or "option ARM" mortgages (which are typically 30-year adjustable rate mortgages that initially offer a borrower four monthly payment options: a specified minimum payment, an interest-only payment, a 15-year fully amortizing payment and a 30-year fully amortizing payment). Some of these types of mortgages may be subject to "negative amortization," which occurs whenever the loan payment for any period is less than the interest charged over that period so that the outstanding principal balance of the loan increases. The types of mortgages discussed above are made to borrowers with weakened credit histories or with a lower capacity to make timely payments on their mortgages, and are subject to a greater risk of default than "prime" mortgages. Market factors adversely affecting mortgage loan repayments may include a general economic downturn, high unemployment, a general slowdown in the real estate market, a drop in the market prices of real estate, or an increase in interest rates resulting in higher mortgage payments by holders of adjustable rate mortgages. To the extent the Trust invests in securities directly or indirectly backed by these types of mortgages, it will be subject to greater risks.

Credit ratings on mortgage-backed securities are subject to the same limitations that apply to credit ratings generally. See "Limitations of Credit Ratings" in this Prospectus. In the past, the market for mortgage-backed and asset-backed securities has experienced high volatility and a lack of liquidity. As a result, the value of many of these securities has significantly declined. These markets may not become more liquid or less volatile, and it is possible that the value of these securities could decline further.

Mortgage-backed securities may not be readily marketable. To the extent any of these securities are not readily marketable in the judgment of the Investment Adviser, the Trust's restrictions on investments in illiquid instruments will apply.

## RISKS OF INVESTING IN ROYALTY SECURITIES

The Trust may invest in debt and/or equity royalty securities. The risks of investing in these securities will include the risks of investing in the underlying industry. In addition, royalty securities are currently not widely recognized or understood and the Trust may not be able to sell the securities when it wants to do so. Under certain market conditions, these securities may also become highly illiquid. Each security will include different risk factors specific to that transaction. Risk factors of royalty securities generally include

risks relating to the products associated with the royalty stream, risks relating to the license agreement, risks relating to the structure of the financing and risks relating to bankruptcy or reorganization proceedings.

77

[Table of Contents](#)

**REPURCHASE AGREEMENT RISK**

The Trust may enter into repurchase agreements up to a maximum of 33 1/3% of its total assets. Repurchase agreements may be considered loans to the seller, collateralized by the underlying securities. If the seller does not pay the Trust the agreed-upon sum on the repurchase date, the Trust is entitled to sell the underlying collateral. If the value of the collateral declines after the agreement is entered into, and if the seller defaults under a repurchase agreement when the value of the underlying collateral is less than the repurchase price, the Trust could incur a loss of both principal and interest. If the seller were to be subject to a federal bankruptcy proceeding, the ability of the Trust to liquidate the collateral could be delayed or impaired because of certain provisions of the bankruptcy laws.

**DERIVATIVES RISK**

The Trust may engage in derivative transactions for hedging and speculative purposes or to enhance total return, including engaging in transactions such as options, futures, swaps, foreign currency transactions, forward foreign currency contracts, currency swaps or options on currency futures and other derivatives transactions (collectively, "Derivative Transactions"). The Trust may use any or all types of Derivative Transactions which it is authorized to use at any time; no particular strategy will dictate the use of one type of Derivative Transaction rather than another, as use of any authorized Derivative Transaction will be a function of numerous variables, including market conditions. Derivatives Risk is a combination of several risks, including the risks that: (1) an investment in a derivative instrument may not correlate well with the performance of the securities or asset class to which the Trust seeks exposure, (2) derivative contracts, including options, may expire worthless and the use of derivatives may result in losses to the Trust, (3) a derivative instrument entailing leverage may result in a loss greater than the principal amount invested, (4) derivatives not traded on an exchange may be subject to credit risk, for example, if the counterparty does not meet its obligations (see also "Counterparty Risk"), and (5) derivatives not traded on an exchange may be subject to liquidity risk and the related risk that the instrument is difficult or impossible to value accurately. Derivatives are financial contracts whose value depends on, or is derived from, the value of underlying assets, reference rates, or indices. Derivatives involve the risk that changes in their value may not move as expected relative to the value of the assets, rates, or indices they are designed to track. Derivatives include futures, non-U.S. currency contracts, swap contracts, warrants, and options contracts. Derivatives may relate to securities, interest rates, currencies or currency exchange rates, inflation rates, commodities, and indices.

If a put or call option purchased by the Trust is not sold when it has remaining value, and if the market price of the underlying security remains equal to or greater than the exercise price (in the case of a put), or remains less than or equal to the exercise price (in the case of a call), the Trust will lose its entire investment in the option.

Also, where a put or call option on a particular security is purchased to hedge against price movements in a related security, the price of the put or call option may move more or less than the price of the related security. If restrictions on exercise were imposed, the Trust might be unable to exercise an option it had purchased. If the Trust were unable to close out an option that it had purchased on a security, it would have to exercise the option in order to realize any profit or the option may expire worthless.

The Trust's Derivative Transactions are generally subject to numerous special and complex tax rules. Because the tax rules applicable to such transactions may be uncertain under current law, an adverse determination or future IRS guidance with respect to these rules (which determination or guidance could be retroactive) may affect whether the Trust has made sufficient distributions, and otherwise satisfied the relevant requirements, to maintain its qualification as a RIC and avoid Trust-level U.S. federal income or excise taxes. See "Risks Relating to the Trust's Tax Status" below for more information about the risks of a failure to qualify as a RIC. The Trust's investments in derivative instruments may be limited by the RIC qualification requirements or other U.S. federal income tax considerations.

In addition, the Commission recently proposed a rule under the Investment Company Act regulating the use by registered investment companies of derivatives and many related instruments. That rule, if adopted as proposed, would, among other things, restrict the Trust's ability to engage in derivatives transactions, and may so increase the cost of derivatives transactions that the Trust would be unable to implement its investment strategy.

**ADDITIONAL RISK FACTORS IN CLEARED DERIVATIVES TRANSACTIONS**

Under recently adopted rules and regulations, transactions in some types of swaps (including interest rate swaps and credit default swaps on North American and European indices) are required to be centrally cleared. In a transaction involving those swaps ("cleared derivatives"), the Trust's counterparty is a clearing house, rather than a bank or broker. Since the Trust is not a member of a clearing house and only members of a clearing house (a "clearing member") can participate directly in the clearing house, the Trust

78

**Table of Contents**

will hold cleared derivatives through accounts at a clearing member. In cleared derivatives positions, the Trust will make payments (including margin payments) to and receive payments from a clearing house through its accounts at a clearing member. A clearing member guarantees performance of its clients' obligations to the clearing house.

In many ways, cleared derivative arrangements are less favorable to mutual funds than bilateral arrangements. For example, the Trust may be required to provide more margin for cleared derivatives positions than for bilateral derivatives positions. Also, in contrast to a bilateral derivatives position, following a period of notice to the Trust, a clearing member generally can require termination of an existing cleared derivatives position at any time or an increase in margin requirements above the margin that the clearing member required at the beginning of a transaction. Clearing houses also have broad rights to increase margin requirements for existing positions or to terminate those positions at any time. Any increase in margin requirements or termination of existing cleared derivatives positions by the clearing member or the clearing house could interfere with the ability of the Trust to pursue its investment strategy. Further, any increase in margin requirements by a clearing member could expose the Trust to greater credit risk to its clearing member because margin for cleared derivatives positions in excess of a clearing house's margin requirements typically is held by the clearing member. Also, the Trust is subject to risk if it enters into a derivatives transaction that is required to be cleared (or that the Investment Adviser expects to be cleared), and no clearing member is willing or able to clear the transaction on the Trust's behalf. While the documentation in place between the Trust and its clearing member generally provides that the clearing member will accept for clearing all cleared derivatives transactions that are within credit limits (specified in advance) for the Trust, the Trust is still subject to the risk that no clearing member will be willing or able to clear a transaction. In those cases, the position might have to be terminated, and the Trust could lose some or all of the benefit of the position, including loss of an increase in the value of the position and/or loss of hedging protection. In addition, the documentation governing the relationship between the Trust and a clearing member is drafted by the clearing member and generally is less favorable to the Trust than typical bilateral derivatives documentation. For example, documentation relating to cleared derivatives generally includes a one-way indemnity by the Trust in favor of the clearing member for losses the clearing member incurs as the Trust's clearing member and typically does not provide the Trust any remedies if the clearing member defaults or becomes insolvent. While futures contracts entail similar risks, the risks likely are more pronounced for cleared swaps due to their more limited liquidity and market history.

Some types of cleared derivatives are required to be executed on an exchange or on a swap execution facility. A swap execution facility is a trading platform where multiple market participants can execute derivatives by accepting bids and offers made by multiple other participants in the platform. While this execution requirement is designed to increase transparency and liquidity in the cleared derivatives market, trading on a swap execution facility can create additional costs and risks for the Trust. For example, swap execution facilities typically charge fees, and if the Trust executes derivatives on a swap execution facility through a broker intermediary, the intermediary may impose fees as well. Also, the Trust may indemnify a swap execution facility, or a broker intermediary who executes cleared derivatives on a swap execution facility on the Trust's behalf, against any losses or costs that may be incurred as a result of the Trust's transactions on the swap execution facility.

These and other new rules and regulations could, among other things, further restrict the Trust's ability to engage in, or increase the cost to the Trust of, derivatives transactions, for example, by making some types of derivatives no longer available to the Trust, increasing margin or capital requirements, or otherwise limiting liquidity or increasing transaction costs. These regulations are new and evolving, so their potential impact on the Trust and the financial system are not yet known. While the new regulations and central clearing of some derivatives transactions are designed to reduce systemic risk (i.e., the risk that the interdependence of large derivatives dealers could cause them to suffer liquidity, solvency or other challenges simultaneously), there is no assurance that the new clearing mechanisms will achieve that result, and in the meantime, as noted above, central clearing and related requirements expose the Trust to new kinds of risks and costs.

The above discussion and under "Derivatives Risks" relates to the Trust's proposed use of certain types of derivatives currently available. However, the Trust is not limited to the transactions described above. In addition, the relevant markets and related regulations are constantly changing and, in the future, the Trust may use derivatives not currently available or widely in use.

**REGULATORY RISK**

Legal, tax and regulatory changes could occur and may adversely affect the Trust and its ability to pursue its investment strategies and/or increase the costs of implementing such strategies. New (or revised) laws or regulations may be imposed by the Commission, the U.S. Commodity Futures Trading Commission (the "CFTC"), the IRS, the U.S. Federal Reserve or other banking regulators, other governmental regulatory authorities or self-regulatory organizations that supervise the financial markets that could adversely affect the Trust. In particular, these agencies are empowered to promulgate a variety of new rules pursuant to financial reform legislation in the United States. The Trust also may be adversely affected by changes in the enforcement or interpretation of existing statutes and rules by these governmental regulatory authorities or self regulatory organizations.

To the extent that legislation or state or federal regulators impose additional requirements or restrictions with respect to the ability of financial institutions to make loans in connection with highly leveraged transactions, the availability of senior loan interests for investment by the Trust may be adversely affected. To the extent that legislation or state or federal regulators impose additional requirements or restrictions with respect to the ability of the Trust to invest in the assets of distressed companies, the availability of distressed company interests for investment by the Trust may be adversely affected. In addition, such requirements or restrictions may reduce or eliminate sources of financing for affected borrowers. Further, to the extent that legislation or federal or state regulators require such institutions to dispose of senior loan interests relating to highly leveraged transactions or subject such senior loan interests to increased regulatory scrutiny, such financial institutions may determine to sell senior loan interests in a manner that results in a price that, in the opinion of the Investment Adviser, is not indicative of fair value. Were the Trust to attempt to sell a senior loan interest at a time when a financial institution was engaging in such a sale with respect to the senior loan interest, the price at which the Trust could consummate such a sale might be adversely affected.

### REGULATORY RISK – COMMODITY POOL OPERATOR

The Trust is sponsored by a person who has claimed an exclusion from the definition of the term "commodity pool operator" under the CEA pursuant to Rule 4.5 under the CEA; therefore, the Investment Adviser (with respect to the Trust) is not subject to registration or regulation as a "commodity pool operator" under the CEA. To remain eligible for the exclusion, the Trust will be limited in its ability to use certain derivatives instruments regulated under the CEA ("commodity interests"), including futures, swaps and options on futures. In the event that the Trust's investments in commodity interests exceed a certain threshold, the Investment Adviser may be required to register as a "commodity pool operator" and/or "commodity trading advisor" with the CFTC with respect to the Trust. The Investment Adviser's eligibility to claim the exclusion with respect to the Trust will be based upon the level and scope of the Trust's investment in commodity interests, the purposes of such investments and the manner in which the Trust holds out its use of commodity interests. For example, CFTC Rule 4.5 requires a fund with respect to which the sponsor is claiming the exclusion to, among other things, satisfy one of the two following trading thresholds: (i) the aggregate initial margin and premiums

79

Table of Contents

required to establish positions in commodity interests cannot exceed 5% of the liquidation value of a fund's portfolio, after taking into account unrealized profits and unrealized losses; or (ii) the aggregate net notional value of commodity interests not used solely for "bona fide hedging purposes," determined at the time the most recent position was established, cannot generally exceed 100% of the liquidation value of a fund's portfolio, after taking into account unrealized profits and unrealized losses on any such positions it has entered into. The Trust currently intends to operate in a manner that would permit the Investment Adviser to continue to claim the exclusion under Rule 4.5, which may adversely affect the Investment Adviser's ability to manage the Trust under certain market conditions and may adversely affect the Trust's total return. In the event the Investment Adviser becomes unable to rely on the exclusion in Rule 4.5 and is required to register with the CFTC as a commodity pool operator, the Trust's expenses may increase, adversely affecting the Trust's total return.

**COUNTERPARTY RISK**

The Trust will be subject to credit risk with respect to the counterparties to the derivative contracts purchased or sold by the Trust. Recently, several broker-dealers and other financial institutions have experienced extreme financial difficulty, sometimes resulting in bankruptcy of the institution. Although the Investment Adviser monitors the creditworthiness of the Trust's counterparties, there can be no assurance that the Trust's counterparties will not experience similar difficulties, possibly resulting in losses to the Trust. If a counterparty becomes bankrupt, or otherwise fails to perform its obligations under a derivative contract due to financial difficulties, the Trust may experience significant delays in obtaining any recovery under the derivative contract in a bankruptcy or other reorganization proceeding. The Trust may obtain only a limited recovery or may obtain no recovery in such circumstances. Material exposure to a single or small group of counterparties increases the Trust's counterparty risk.

**CREDIT DEFAULT SWAPS RISK**

The Trust may enter into credit default swap agreements, which may have as reference obligations one or more debt securities or an index of such securities. In a credit default swap, one party (the "protection buyer") is obligated to pay the other party (the "protection seller") a stream of payments over the term of the contract, provided that no credit event, such as a default or, in some instances, a downgrade in credit rating, occurs on the reference obligation. If a credit event occurs, the protection seller must generally pay the protection buyer the "par value" (the agreed-upon notional value) of the referenced debt obligation in exchange for an equal face amount of deliverable reference obligations.

The Trust may be either the protection buyer or protection seller in a credit default swap. If the Trust is a protection buyer, the Trust would pay the counterparty a periodic stream of payments over the term of the contract and would not recover any of those payments if no credit event were to occur. However, if a credit event occurs, the Trust as a protection buyer has the right to deliver the referenced debt obligations or a specified amount of cash, depending upon the terms of the swap, and receive the par value of such debt obligations from the counterparty protection seller. As a protection seller, the Trust would receive fixed payments throughout the term of the contract if no credit event occurs. If a credit event occurs, however, the value of the obligation received by the Trust (e.g., bonds which defaulted), plus the periodic payments previously received, may be less than the par value of the obligation, or cash received, resulting in a loss to the protection seller. Furthermore, the Trust as a protection seller would effectively add leverage to its portfolio because it will have investment exposure to the notional amount of the swap.

Credit default swap agreements are subject to greater risk than a direct investment in the reference obligation. Like all swap agreements, credit default swaps are subject to liquidity, credit and counterparty risks. In addition, collateral posting requirements are individually negotiated and there is no regulatory requirement that a counterparty post collateral to secure its obligations under a credit default swap. Furthermore, there is no requirement that a party be informed in advance when a credit default swap agreement is sold. Accordingly, the Trust may have difficulty identifying the party responsible for payment of its claims. The notional value of credit default swaps with respect to a particular investment is often larger than the total par value of such investment outstanding and, in event of a default, there may be difficulties in making the required deliveries of the reference investments, possibly delaying payments.

In the past, the market for credit default swaps has become more volatile as the creditworthiness of certain counterparties has been questioned and/or downgraded. If a counterparty's credit becomes significantly impaired, multiple requests for collateral posting in a short period of time could increase the risk that the Trust may not receive adequate collateral. There is no readily available market for trading credit default swaps. The Trust generally may exit its obligations under a credit default swap only by terminating the contract and paying applicable breakage fees, or by entering into an offsetting credit default swap position, which may cause the Trust to incur more losses.

In addition, the Trust may invest in publicly or privately issued interests in investment pools whose underlying assets are credit default, credit-linked, interest rate, currency exchange, equity-linked or other types of swap contracts and related underlying securities

or securities loan agreements. The pools' investment results may be designed to correspond generally to the performance of a specified securities index or "basket" of securities, sometimes a single security.

80

[Table of Contents](#)

These types of pools are often used to gain exposure to multiple securities with a smaller investment than would be required to invest directly in the individual securities. They may also be used to gain exposure to foreign securities markets without investing in the foreign securities themselves or the relevant foreign market. To the extent that the Trust invests in pools of swaps and related underlying securities or securities loan agreements whose return corresponds to the performance of a foreign securities index or one or more foreign securities, investing in such pools will involve risks similar to the risks of investing in foreign securities. See "Foreign Securities" below. In addition to the risks associated with investing in swaps generally, the Trust bears the risks and costs generally associated with investing in pooled investment vehicles, such as paying the fees and expenses of the pool and the risk that the pool or the operator of the pool may default on its obligations to the holder of interests in the pool, such as the Trust. Interests in privately offered investment pools of swaps may be considered illiquid or deemed liquid, subject to the Trust's restrictions on investments in illiquid securities.

**MARKET RISK GENERALLY**

The profitability of a significant portion of the Trust's investment program depends to a great extent upon correctly assessing the future course of the price movements of securities and other investments and the movements of interest rates. The Investment Adviser may not be able to predict accurately these price and interest rate movements. With respect to certain investment strategies the Trust utilizes, there is a high degree of market risk.

**REINVESTMENT RISK**

The Trust reinvests the cash flows received from a security. The additional income from such reinvestment, sometimes called interest-on-interest, is reliant on the prevailing interest rate levels at the time of reinvestment. There is a risk that the interest rate at which interim cash flows can be reinvested will fall. Reinvestment risk is greater for longer holding periods and for securities with large, early cash flows such as high-coupon bonds. Reinvestment risk also applies generally to the reinvestment of the proceeds the Trust receives upon the maturity or sale of a portfolio security.

**TIMING RISK**

Many agency, corporate and municipal bonds, and most mortgage-backed securities, contain a provision that allows the issuer to "call" all or part of the issue before the bond's maturity date — often after 5 or 10 years. The issuer usually retains the right to refinance the bond in the future if market interest rates decline below the coupon rate. There are three disadvantages to the call provision. First, the cash flow pattern of a callable bond is not known with certainty. Second, because an issuer is more likely to call the bonds when interest rates have dropped, the Trust is exposed to reinvestment risk, *i.e.*, the Trust may have to reinvest at lower interest rates the proceeds received when the bond is called. Finally, the capital appreciation potential of a bond will be reduced because the price of a callable bond may not rise much above the price at which the issuer may call the bond.

**INFLATION RISK**

Inflation risk results from the variation in the value of cash flows from a security due to inflation, as measured in terms of purchasing power. For example, if the Trust purchases a bond in which it can realize a coupon rate of 5%, but the rate of inflation increases from 2% to 6%, then the purchasing power of the cash flow has declined. For all but adjustable bonds or floating rate bonds, the Trust is exposed to inflation risk because the interest rate the issuer promises to make is fixed for the life of the security. To the extent that interest rates reflect the expected inflation rate, floating rate bonds have a lower level of inflation risk. In addition, during any periods of rising inflation, dividend rates of any variable rate preferred share issued by the Trust would likely increase, which would tend to further reduce returns to common shareholders.

**ARBITRAGE RISKS**

The Trust engages in capital structure arbitrage and other arbitrage strategies. Arbitrage strategies entail various risks, including the risk that external events, regulatory approvals and other factors will impact the consummation of announced corporate events and/or the prices of certain positions. In addition, hedging is an important feature of capital structure arbitrage. There is no guarantee that the Investment Adviser will be able to hedge the Trust's investment portfolio in the manner necessary to employ successfully the Trust's strategy.

**SHORT SALES RISK**

Short selling involves selling securities that may or may not be owned and borrowing the same securities for delivery to the purchaser, with an obligation to replace the borrowed securities at a later date. Short selling allows the Trust to profit from declines in market prices to the extent such decline exceeds the transaction costs and the costs of borrowing the securities. However, because the

81

[Table of Contents](#)

borrowed securities must be replaced by purchases at market prices in order to close out the short position, any appreciation in the price of the borrowed securities would result in a loss. The securities necessary to cover a short position may not be available for purchase. Purchasing securities to close out the short position can itself cause the price of the securities to rise further, thereby exacerbating the loss. The Trust may mitigate such losses by replacing the securities sold short before the market price has increased significantly. Under adverse market conditions, the Trust might have difficulty purchasing securities to meet its short sale delivery obligations, and might have to sell portfolio securities to raise the capital necessary to meet its short sale obligations at a time when fundamental investment considerations would not favor such sales. Short sales by the Trust that are not made "against the box" theoretically involve unlimited loss potential, since the market price of securities sold short may continuously increase.

## MLP RISK

The Trust may invest in MLP securities. MLPs typically are characterized as "publicly traded partnerships" that qualify to be treated as partnerships for U.S. federal income tax purposes and are principally engaged in one or more aspects of the exploration, production, processing, transmission, marketing, storage or delivery of energy-related commodities, such as natural gas, natural gas liquids, coal, crude oil or refined petroleum products (collectively, the energy industry). As a result, holders of MLP securities will be subject to risks related to the energy industry, including: (i) fluctuations in commodity prices; (ii) reduced volumes of natural gas or other energy commodities available for transporting, processing, storing or distributing; (iii) slowdowns in new construction and acquisitions; (iv) reduced demand for commodities such as crude oil, natural gas and refined petroleum products; (v) depletion of natural gas reserves or other commodities; (vi) extreme weather and environmental hazards; (vii) stricter laws, regulations or enforcement policies; and (viii) dangers inherent to the energy industry, such as leaks, fires, explosions, damage to facilities and equipment resulting from natural disasters, inadvertent damage to facilities and equipment and terrorist acts.

Generally, an MLP is operated under the supervision of one or more managing general partners. Limited partners (like the Trust when it invests in an MLP) are not involved in the day-to-day management of the partnership. The Trust also may invest in companies who serve (or whose affiliates serve) as the general partner of an MLP. These investments may not be taxed as partnerships for U.S. Federal income tax purposes. Conflicts of interest may exist among unit holders, subordinated unit holders and the general partner of an MLP, including those arising from incentive distribution payments. General Partners typically have limited fiduciary duties to an MLP, which could allow a general partner to favor its own interests over the MLP's interests. Additionally, general partners of MLPs often have limited call rights that may require MLP unit holders to sell their common units at an undesirable time or price.

Holders of MLP securities have limited control and voting rights on matters affecting the partnership. Holders of securities issued by an MLP are exposed to a remote possibility of liability for all of the obligations of that MLP in the event that a court determines that the rights of the holders of MLP securities to vote to remove or replace the general partner of that MLP, to approve amendments to that MLP's partnership agreement, or to take other action under the partnership agreement of that MLP would constitute "control" of the business of that MLP, or a court or governmental agency determines that the MLP is conducting business in a state without complying with the partnership statute of that state. Holders of MLP securities are also exposed to the risk that they will be required to repay amounts to the MLP that are wrongfully distributed to them.

In addition, MLPs are subject to the risk that they will fail to be treated as partnerships for U.S. federal income tax purposes. If an MLP does not meet current legal requirements to maintain its partnership status, or if it is unable to do so because of tax or other law changes, it would be treated as a corporation for U.S. federal income tax purposes. In that case, the MLP would be obligated to pay U.S. federal income tax (as well as state and local taxes) at the entity level on its taxable income and distributions received by the Trust would be taxable to the Trust as dividend income to the extent of the MLP's current and accumulated earnings and profits for federal tax purposes. The classification of an MLP as a corporation for U.S. federal income tax purposes could have the effect of reducing the amount of cash available for distribution by the MLP and the value of the Trust's investment in any such MLP. As a result, the value of the Trust's shares and the cash available for distribution to Trust shareholders could be materially reduced.

The Trust intends to limit its investments in MLPs and related entities to the extent necessary to qualify as a RIC for tax purposes. In general, a RIC is not permitted to invest, including through corporations in which the RIC owns a 20% or more voting stock interest, more than 25% of its total assets in qualified publicly-traded partnerships.

82

Table of Contents

## BDC RISK

BDCs generally invest in less mature private companies or thinly traded U.S. public companies which involve greater risk than well-established publicly-traded companies. The Trust will indirectly bear its proportionate share of any management and other operating expenses and of any performance-based or incentive fees charged by the BDCs in which it invests, in addition to the expenses paid by the Trust. The Investment Company Act imposes certain constraints upon the operations of a BDC. Generally, little public information exists for private and thinly traded companies in which a BDC may invest and there is a risk that investors may not be able to make a fully informed evaluation of a BDC and its portfolio of investments. In addition, to qualify and remain eligible for the special tax treatment accorded to RICs and their shareholders, the BDCs in which the Trust invests must meet certain source-of-income, asset diversification and annual distribution requirements. If a BDC in which the Trust invests fails to qualify as a RIC, such BDC would be liable for federal, and possibly state, corporate taxes on its taxable income and gains. Such failure by a BDC could substantially reduce the BDC's net assets and the amount of income available for distribution to the Trust, which would in turn decrease the total return of the Trust in respect of such investment.

## RISKS OF INVESTING IN STRUCTURED FINANCE SECURITIES

A portion of the Trust's investments may consist of equipment trust certificates, collateralized mortgage obligations, CBOs, CLOs or similar instruments. Such structured finance securities are generally backed by an asset or a pool of assets, which serve as collateral. Depending on the type of security, the collateral may take the form of a portfolio of mortgage loans or bonds or other assets. The Trust and other investors in structured finance securities ultimately bear the credit risk of the underlying collateral. In some instances, the structured finance securities are issued in multiple tranches, offering investors various maturity and credit risk characteristics, often categorized as senior, mezzanine and subordinated/equity according to their degree of risk. The riskiest securities are the equity tranche, which bears the bulk of defaults from the bonds or loans serving as collateral, and thus may protect the other, more senior tranches from default. If there are defaults or the relevant collateral otherwise underperforms, scheduled payments to senior tranches of such securities take precedence over those of mezzanine tranches, and scheduled payments to mezzanine tranches take precedence over those to subordinated/equity tranches. A senior tranche typically has higher ratings and lower yields than the underlying securities, and may be rated investment grade. Despite the protection from the equity tranche, other tranches can experience substantial losses due to actual defaults, increased sensitivity to defaults due to previous defaults and the disappearance of protecting tranches, market anticipation of defaults and aversion to certain structured finance securities as a class. In light of the above considerations, structured finance securities may present risks similar to those of the other types of debt obligations in which the Trust may invest and, in fact, such risks may be of greater significance in the case of structured finance securities. Moreover, investing in structured finance securities may entail a variety of unique risks. In addition, the performance of a structured finance security will be affected by a variety of factors, including the security's priority in the capital structure of the issuer thereof, the availability of any credit enhancement, the level and timing of payments and recoveries on and the characteristics of the underlying receivables, loans or other assets that are being securitized, remoteness of those assets from the originator or transferor, the adequacy of and ability to realize upon any related collateral and the capability of the servicer of the securitized assets. Structured finance securities carry additional risks that include, but are not limited to: (i) the possibility that distributions from collateral securities will not be adequate to make interest or other payments; (ii) the structure and complexity of the transaction and the legal documents could lead to disputes among investors regarding the characterization of proceeds; (iii) the investment return achieved by the Trust could be significantly different than those predicted by financial models; (vi) the lack of a readily available secondary market for structured finance securities; (v) risk of forced "fire sale" liquidation due to technical defaults such as coverage test failures; and (vi) the manager of a structured finance security may perform poorly. In addition, the complex structure of the security may produce unexpected investment results, especially during times of market stress or volatility, and a small number of defaults may have a disproportionate impact on the performance of the security. Investments in structured finance securities may also be subject to illiquidity risk, as they are normally privately offered and sold and thus, are not registered under securities laws. In addition to the risks noted above and other risks, structured finance securities may be subject to prepayment risk. Collateralized mortgage obligations may have risks similar to those of mortgage-backed securities. See "Mortgage-Backed Securities Risk" for more information.

83

[Table of Contents](#)

### RISKS OF INVESTING IN PREFERRED SECURITIES

There are special risks associated with investing in preferred securities, including:

- *Deferral.* Preferred securities may include provisions that permit the issuer, at its discretion, to defer distributions for a stated period without any adverse consequences to the issuer. If the Trust owns a preferred security that is deferring the payment of its distributions, the Trust may be required to report income for U.S. federal income tax purposes to the extent of any such deferred distribution even though the Trust has not yet received such income. In order to receive the special treatment accorded to RICs and their shareholders under the Code and to avoid U.S. federal income and/or excise taxes at the Trust level, the Trust may be required to distribute this reported income to shareholders in the tax year in which the income is reported (without a corresponding receipt of cash). Therefore, the Trust may be required to pay out as an income distribution in any such tax year an amount greater than the total amount of income the Trust actually received, and may, among other things, sell portfolio securities, including at potentially disadvantageous times or prices, to obtain cash needed for these income distributions.

- *Subordination.* Preferred securities are subordinated to bonds and other debt instruments in a company's capital structure in terms of priority to corporate income and liquidation payments, and therefore will be subject to greater credit risk than more senior debt instruments.

- *Liquidity.* Preferred securities may be substantially less liquid than many other securities, such as common stock or U.S. government securities.

- *Limited Voting Rights.* Generally, preferred security holders have no voting rights with respect to the issuing company unless preferred dividends have been in arrears for a specified number of periods, at which time the preferred security holders may elect a number of trustees to the issuer's board. Generally, once all the arrearages have been paid, the preferred security holders no longer have voting rights.

### RISKS OF INVESTING IN SWAPS

Investments in swaps involve the exchange by the Trust with another party of their respective commitments. Use of swaps subjects the Trust to risk of default by the counterparty. If there is a default by the counterparty to such a transaction, there may be contractual remedies pursuant to the agreements related to the transaction although contractual remedies may not be sufficient in the event the counterparty is insolvent. The Trust may enter into credit default swaps, currency swaps or other swaps which may be surrogates for other instruments such as currency forwards or options. Swap agreements are sophisticated financial instruments that typically involve a small investment of cash relative to the magnitude of risks assumed. Swaps can be highly volatile and may have a considerable impact on the Trust's performance, as the potential gain or loss on any swap transaction is not necessarily subject to any fixed limit.

Recently, several broker-dealers and other financial institutions have experienced extreme financial difficulty, sometimes resulting in bankruptcy of the institution. Although the Investment Adviser monitors the creditworthiness of the Trust's counterparties, the Trust's counterparties could experience similar difficulties, possibly resulting in losses to the Trust.

### RISKS OF INVESTING IN SYNTHETIC SECURITIES

In addition to credit risks associated with holding non-investment grade loans and high-yield debt securities, with respect to synthetic securities the Trust will usually have a contractual relationship only with the counterparty of such synthetic securities, and not the Reference Obligor on the Reference Obligation. The Trust generally will have no right to enforce directly compliance by the Reference Obligor with the terms of the Reference Obligation nor any rights of setoff against the Reference Obligor, nor have any voting rights with respect to the Reference Obligation. The Trust will not benefit directly from any collateral supporting the Reference Obligation or have the benefit of the remedies on default that would normally be available to a holder of such Reference Obligation. In addition, in the event of insolvency of its counterparty, the Trust will be treated as a general creditor of such counterparty and will not have any claim with respect to the credit risk of the counterparty or of the Reference Obligor. As a result, investments in synthetic securities are subject to an additional degree of risk because they are subject to the credit risk of the counterparty as well as that of the Reference Obligor. The Investment Adviser may not perform independent credit analyses of any particular counterparty, or any entity guaranteeing the obligations of such counterparty. See "Principal Risks of the Trust – Counterparty Risk."

The Trust currently does not expect to invest more than 10% of its assets in synthetic securities as measured on a mark-to-market basis. However, the Trust's investments in synthetic securities may exceed this amount from time to time.

[Table of Contents](#)

## VALUATION RISK

Portfolio securities may be valued using techniques other than market quotations, under the circumstances described under "Determination of Net Asset Value." The value established for a portfolio security may be different than what would be produced through the use of another methodology or if it had been priced using market quotations. Portfolio securities that are valued using techniques other than market quotations, including "fair valued" securities, may be subject to greater fluctuation in their value from one day to the next than would be the case if market quotations were used. In addition, there is no assurance that the Fund could sell a portfolio security for the value established for it at any time and it is possible that the Fund would incur a loss because a portfolio security is sold at a discount to its established value.

Fair value is defined as the amount for which assets could be sold in an orderly disposition over a reasonable period of time, taking into account the nature of the asset. Fair value pricing, however, involves judgments that are inherently subjective and inexact, since fair valuation procedures are used only when it is not possible to be sure what value should be attributed to a particular asset or when an event will affect the market price of an asset and to what extent. As a result, fair value pricing may not reflect actual market value, and it is possible that the fair value determined for a security will be materially different from the value that actually could be or is realized upon the sale of that asset.

## RISKS OF NON-DIVERSIFICATION AND OTHER FOCUSED STRATEGIES

While the Investment Adviser invests in a number of fixed-income and equity instruments issued by different issuers and employs multiple investment strategies with respect to the Trust's investment portfolio, it is possible that a significant amount of the Trust's investments could be invested in the instruments of only a few companies or other issuers or that at any particular point in time one investment strategy could be more heavily weighted than the others. The focus of the Trust's investment portfolio in any one issuer would subject the Trust to a greater degree of risk with respect to defaults by such issuer or other adverse events affecting that issuer, and the focus of the portfolio in any one industry or group of industries would subject the Trust to a greater degree of risk with respect to economic downturns relating to such industry. The focus of the Trust's investment portfolio in any one investment strategy would subject the Trust to a greater degree of risk than if the Trust's investment portfolio were varied in its investments with respect to several investment strategies.

## RISKS RELATED TO CURRENT MARKET CONDITIONS

Recently, debt markets have experienced a period of high volatility, which has negatively impacted market liquidity conditions and prices. Initially, the concerns on the part of market participants were focused on the subprime segment of the mortgage-backed securities market. These concerns expanded to include derivatives, securitized assets and a broad range of other debt securities, including those rated investment grade, the U.S. and international credit and interbank money markets generally, and a wide range of financial institutions and markets, asset classes, and sectors. As a result, debt instruments have experienced, and may in the future experience, liquidity issues, increased price volatility, credit downgrades, and increased likelihood of default. Debt securities may be difficult to value during such periods. These market conditions may have an adverse effect on the Trust's investments and hamper the Trust's ability to sell the debt securities in which it invests or to find and purchase suitable debt instruments. Because the Trust invests heavily in fixed income securities and related investments, it may underperform during periods of rising interest rates. Market conditions may also make it more difficult or impossible for the Trust to use leverage to the degree required, or make any such leverage more expensive (for example, by increasing interest expense). In addition, these conditions may directly and adversely affect the setting of dividend rates on the common shares.

In recent periods, governmental financial regulators, including the U.S. Federal Reserve, have taken steps to maintain historically low interest rates by purchasing bonds. The ending of those programs, and withdrawal of other measures of government support, along with any increase to base interest rates, could result in the effects described above or otherwise adversely affect the value of the Trust's investments, and could have a material adverse effect on prices for debt securities and on the management of the Trust.

The recent market conditions have also caused domestic and international issuers to seek capital infusions to strengthen their financial positions or to remain financially viable. These capital infusions have taken a variety of forms, including the public or private issuance of additional debt securities, equity securities or both, which have been purchased by, among others, public and private investors, government agencies, and sovereign wealth funds. If the Trust owns shares of an issuer that sells additional equity securities and the Trust cannot or chooses not to purchase shares in the offering, the Trust's interest in the issuing company will be diluted.

## RISKS OF INVESTING IN A TRUST WITH ANTI-TAKEOVER PROVISIONS

The Trust's Agreement and Declaration of Trust includes provisions that could limit the ability of other entities or persons to acquire control of the Trust or convert the Trust to open-end status. These provisions could deprive the holders of common shares of opportunities to sell their common shares at a premium over the then current market price of the common shares or at NAV. See "Anti-Takeover Provisions in the Agreement and Declaration of Trust".

85

[Table of Contents](https://www.sec.gov/...)

**KEY ADVISER PERSONNEL RISK**

The Trust's ability to identify and invest in attractive opportunities is dependent upon the Investment Adviser. If one or more key individuals leaves the Investment Adviser, the Investment Adviser may not be able to hire qualified replacements or may require an extended time to do so. This situation could prevent the Trust from achieving its investment objectives.

**RISKS RELATING TO DILUTION OF SHAREHOLDERS' INTERESTS**

Shareholders' interests in the Trust may be diluted if they do not fully exercise their subscription rights in any rights offering. In addition, if the subscription price is less than our NAV per share, then there will be an immediate dilution of the aggregate NAV of our shares. In the event we issue subscription rights, shareholders who do not fully exercise their rights should expect that they will, at the completion of a rights offering pursuant to this Prospectus, own a smaller proportional interest in us than would otherwise be the case if they fully exercised their rights. Such dilution is not currently determinable because it is not known what proportion of the shares will be purchased as a result of such rights offering. Any such dilution will disproportionately affect non-exercising shareholders. This dilution could be substantial. The amount of any decrease in NAV is not predictable because it is not known at this time what the subscription price and NAV per share will be on the expiration date of the rights offering or what proportion of the shares will be purchased as a result of such rights offering.

**RISKS RELATING TO TRUST'S TAX STATUS**

To remain eligible for the special tax treatment accorded to RICs and their shareholders under the Code, the Trust must meet certain source of income, asset diversification and annual distribution requirements. Very generally, in order to qualify as a RIC, the Trust must derive at least 90% of its gross income for each taxable year from dividends, interest, payments with respect to certain securities loans, gains from the sale or other disposition of stock, securities or foreign currencies, or other income derived with respect to its business of investing in stock or other securities. In some cases, if the Trust fails to meet these income requirements at the end of a taxable year, it will be able to cure such failure by paying a Trust-level tax to avoid the loss of its RIC status; such tax could be substantial. The Trust must also meet certain asset diversification requirements at the end of each quarter of each of its taxable years. Failure to meet these diversification requirements on the last day of a quarter will result in the Trust's loss of RIC status, unless it is able to cure such failure, for instance, by disposing of certain investments, including at potentially disadvantageous times and prices, and, in some cases, by paying a Trust-level tax.

In addition, in order to be eligible for the special tax treatment accorded RICs, the Trust must meet the annual distribution requirement, requiring it to distribute with respect to each taxable year at least the sum of 90% of its "investment company taxable income" (as that term is defined in the Code without regard to the deduction for dividends paid – generally its taxable ordinary income and realized net short-term capital gains in excess of realized net long-term capital losses, if any) and 90% of its net tax-exempt income (if any), to its shareholders. Because the Trust currently maintains a committed facility, and may use additional debt financing in the future, the Trust is subject to certain asset coverage ratio requirements under the Investment Company Act that could, under certain circumstances, restrict the Trust from making the distributions necessary to satisfy this annual distribution requirement and to avoid corporate-level U.S. federal income or excise taxes. Any taxable income (including net long-term capital gains) that the Trust is unable to distribute will be subject to corporate-level tax at regular corporate rates. Further, if the Trust fails to meet the annual distribution requirement, the source of income requirement or the asset diversification requirement in respect of a taxable year and is ineligible to or otherwise does not cure such failure for any such year, all of its taxable income regardless of whether timely distributed to shareholders will be subject to corporate-level tax and all of its distributions from earnings and profits (including from net long-term capital gains) will be taxable to shareholders as ordinary income. For individual shareholders who meet certain holding period requirements, such distributions would be eligible for reduced tax rates applicable to qualified dividend income.

In any such event, the resulting corporate taxes could substantially reduce the Trust's net assets, the amount of income available for distribution and the amount of its distributions. Such a failure would have a material adverse effect on the Trust and its shareholders. In addition, in some cases, the Trust could be required to recognize unrealized gains, pay substantial taxes and interest and make substantial distributions in order to re-qualify as a RIC.

**RIC-RELATED RISKS OF INVESTMENTS GENERATING NON-CASH TAXABLE INCOME**

Certain of the Trust's investments will require the Trust to recognize taxable income in a taxable year in excess of the cash generated on those investments during that year. In particular, the Trust expects that a substantial portion of its investments in loans and other debt obligations will be treated as having "market discount" and/or "original issue discount" for U.S. federal income tax purposes, which, in some cases, could be significant. Because the Trust may be required to recognize income in respect of these

investments before or without receiving cash representing such income, the Trust may have difficulty satisfying the annual distribution requirements applicable to RICs and avoiding Trust-level U.S. federal income or excise taxes. Accordingly, the Trust may be required

86

[Table of Contents](#)

to sell portfolio securities, including at potentially disadvantageous times or prices, raise additional debt or equity capital, or reduce new investments, to obtain the cash needed to make these income distributions. If the Trust liquidates portfolio securities to raise cash, the Trust may realize gain or loss on such liquidations; in the event the Trust realizes net long-term or short-term capital gains from such liquidation transactions, its shareholders may receive larger capital gain or ordinary dividends, respectively, than they would in the absence of such transactions.

## LIMITATIONS OF CREDIT RATINGS

Credit ratings represent only the opinion of the rating agency with respect to the ability of the issuer to make principal and interest payments on the securities. In determining a credit rating, rating agencies do not evaluate the risks of fluctuations in market value. Further, there may be limits on the effectiveness of the rating agencies' financial models. For these and other reasons, a credit rating may not fully reflect the risks inherent in the relevant security. Further, a rating organization may have a conflict of interest with respect to a security for which it assigns a particular rating. For example, if the issuer or sponsor of a security pays a rating agency for the analysis of the security, an inherent conflict of interest may exist that could affect the reliability of the rating. In addition, credit rating agencies may or may not make timely changes in a rating to reflect changes in the economy or in the conditions of the issuer that affect the market value of the security. In other words, a security or an issuer may maintain a certain credit rating even though conditions have deteriorated since the rating was issued. Consequently, credit ratings should not necessarily be relied upon as an indicator of investment quality. If a rating organization changes the rating assigned to one or more of the Trust's portfolio securities, the Trust is not required to sell the relevant securities.

## CERTAIN AFFILIATIONS

Certain broker-dealers may be considered to be affiliated persons of the Trust or the Investment Adviser. Absent an exemption from the Commission or other regulatory relief, the Trust is generally precluded from effecting certain principal transactions with affiliated brokers, and its ability to purchase securities being underwritten by an affiliated broker or a syndicate including an affiliated broker, or to utilize affiliated brokers for agency transactions, is subject to restrictions. This could limit the Trust's ability to engage in securities transactions and take advantage of market opportunities. In addition, unless and until the underwriting syndicate is broken in connection with the initial public offering of the securities, the Trust will be precluded from effecting principal transactions with brokers who are members of the syndicate.

## OPERATIONAL AND TECHNOLOGY RISK

The Trust, its service providers, and other market participants increasingly depend on complex information technology and communications systems to conduct business functions. These systems are subject to a number of different threats or risks that could adversely affect the Trust and its shareholders, despite the efforts of the Trust and its service providers to adopt technologies, processes, and practices intended to mitigate these risks.

For example, unauthorized third parties may attempt to improperly access, modify, disrupt the operations of, or prevent access to these systems of the Trust, the Trust's service providers, counterparties, or other market participants or data within them (a "cyber-attack"). Power or communications outages, acts of god, information technology equipment malfunctions, operational errors, and inaccuracies within software or data processing systems may also disrupt business operations or impact critical data. Market events also may trigger a volume of transactions that overloads current information technology and communication systems and processes, impacting the ability to conduct the Trust's operations.

Cyber-attacks, disruptions, or failures that affect the Trust's service providers or counterparties may adversely affect the Trusts and its shareholders, including by causing losses for the Trust or impairing Trust operations. For example, the Trust's or its service providers' assets or sensitive or confidential information may be misappropriated, data may be corrupted, and operations may be disrupted (e.g., cyber-attacks or operational failures may cause the release of private shareholder information or confidential Trust information, interfere with the processing of shareholder transactions, impact the ability to calculate the Trust's NAV, and impede trading). In addition, cyber-attacks, disruptions, or failures may cause reputational damage and subject the Trust or its service providers to regulatory fines, litigation costs, penalties or financial losses, reimbursement or other compensation costs, and/or additional compliance costs. While the Trust and its service providers may establish business continuity and other plans and processes to address the possibility of cyber-attacks, disruptions, or failures, there are inherent limitations in such plans and systems, including that they do not apply to third parties, such as other market participants, as well as the possibility that certain risks have not been identified or that unknown threats may emerge in the future.

Similar types of operational and technology risks are also present for issuers of the Trust's investments, which could have material adverse consequences for such issuers, and may cause the Trust's investments to lose value. In addition, cyber-attacks involving the Trust counterparty could affect such counterparty's ability to meet its obligations to the Trust, which may result in losses to the Trust and its shareholders. Furthermore, as a result of cyber-attacks, disruptions, or failures, an exchange or market may close or issue trading halts on specific securities or the entire market, which may result in the Trust being, among other things, unable to buy or sell certain securities or financial instruments or unable to accurately price its investments. The Trust cannot directly control any cybersecurity plans and systems put in place by its service providers, Trust counterparties, issuers in which the Trust invests, or securities markets and exchanges.

87

[Table of Contents](#)

## CONCENTRATION RISK – REAL ESTATE

The Trust is required to invest at least 25% of the value of its total assets at the time of purchase in the securities of issuers conducting their principal business activities in the real estate industry. Under this policy, the Trust may be subject to greater market fluctuations than a fund that does not concentrate its investments in a particular industry. Financial, economic, business, and other developments affecting issuers in the real estate industry will have a greater effect on the Trust, and if securities of the real estate industry fall out of favor, the Trust could underperform, or its NAV may be more volatile than, funds that have greater industry diversification.

## REAL ESTATE INDUSTRY RISK

Issuers principally engaged in real estate industry, including real estate investment trusts, may be subject to risks similar to the risks associated with the direct ownership of real estate, including: (i) changes in general economic and market conditions; (ii) changes in the value of real estate properties; (iii) risks related to local economic conditions, overbuilding and increased competition; (iv) increases in property taxes and operating expenses; (v) changes in zoning laws; (vi) casualty and condemnation losses; (vii) variations in rental income, neighborhood values or the appeal of property to tenants; (viii) the availability of financing and (ix) changes in interest rates and leverage.

## COMMUNICATIONS INDUSTRY RISK

The market for communications products and services is characterized by rapidly changing technology, rapid product obsolescence, cyclical market patterns, evolving industry standards and frequent new product introductions. The success of the communications industry issuers depends in substantial part on the timely and successful introduction of new products and services. An unexpected change in in the market for products or services based on a particular technology could have a material adverse effect on an issuer's operating results. Furthermore, there can be no assurance that communications industry issuers will be able to respond in a timely manner to compete in the rapidly developing marketplace. Many communications companies rely on a combination of patents, copyrights, trademarks and trade secret laws to establish and protect their intellectual property. There can be no assurance that the steps taken to protect intellectual property will be adequate to prevent misappropriation or that competitors will not independently develop products or services that are substantially equivalent or superior to such issuers' products or services.

## Management of the Trust

The Trust is a party to contractual arrangements with various parties, including, among others, the Trust's investment adviser, administrator, distributor, and shareholder servicing agent, who provide services to the Trust. Shareholders are not parties to, or intended ("third party") beneficiaries of, any such contractual arrangements, and such contractual arrangements are not intended to create in any individual shareholder or group of shareholders any right to enforce them against the service providers or to seek any remedy under them against the service providers, either directly or on behalf of the Trust.

Neither this Prospectus, nor the related SAI, is intended, or should be read, to be or to give rise to an agreement or contract between the Trust and any investor, or to give rise to any rights in any shareholder or other person other than any rights under federal or state law that may not be waived.

## TRUSTEES AND OFFICERS

The Board is responsible for the overall management of the Trust, including supervision of the duties performed by the Investment Adviser. There are five trustees of the Trust. Four of the trustees are not "interested persons" (as defined in the Investment Company Act) of the Trust. The names and business addresses of the trustees and officers of the Trust and their principal occupations and other affiliations during the past five years are set forth under "Management of the Trust" in the SAI.

## INVESTMENT ADVISER

NexPoint Advisors, L.P. acts as the Trust's investment adviser. The Investment Adviser is located at 300 Crescent Court, Suite 700, Dallas, Texas 75201. As of June 30, 2019, the Investment Adviser, together with its affiliates, managed approximately $9.9 billion in assets on behalf of investors around the world. The Investment Adviser is controlled by James Dondero by virtue of his control of its general partner, NexPoint Advisors GP, LLC.

Table of Contents

*Responsibilities.* The Investment Adviser provides the following services to the Trust: (i) furnishes an investment program for the Trust; (ii) determines, subject to the overall supervision and review of the Board, the investments to be purchased, held, sold or exchanged by the Trust and the portion, if any, of the assets of the Trust to be held uninvested; (iii) makes changes in the investments of the Trust; and (iv) votes, exercises consents, and exercises all other rights pertaining to such investments. Subject to the foregoing, the Investment Adviser will have the authority to engage one or more sub-advisers in connection with the portfolio management of the Trust, which sub-advisers may be affiliates of the Investment Adviser; provided, however, that the Investment Adviser shall remain responsible to the Trust with respect to its duties and obligations set forth in the investment advisory agreement.

*Compensation.* In return for its advisory services, the Investment Adviser receives an annual fee, payable monthly, in an amount equal to 1.00% of the average weekly value of the Trust's Managed Assets (the "Advisory Fee"). The accrued fees are payable monthly as promptly as possible after the end of each month during which the investment advisory agreement is in effect. A discussion regarding the basis for the approval of the investment advisory agreement by the Board is available in the Trust's report to shareholders for the period ended December 31, 2017.

*Potential Conflicts of Interest.* The Investment Adviser is an affiliate of Highland Capital Management Fund Advisors, L.P. ("HCMFA"). The Investment Adviser and/or its general partner, limited partners, officers, affiliates and employees provide investment advice to other parties and manage other accounts and private investment vehicles similar to the Trust. For the purposes of this section, the term "Highland" shall include the Investment Adviser and its affiliated investment advisors, including Highland Capital Management, L.P. and its affiliates. In connection with such other investment management activities, the Investment Adviser and/or its general partner, limited partners, officers, affiliates and employees may decide to invest the funds of one or more other accounts or recommend the investment of funds by other parties, rather than the Trust's monies, in a particular security or strategy. In addition, the Investment Adviser and such other persons will determine the allocation of funds from the Trust and such other accounts to investment strategies and techniques on whatever basis they consider appropriate or desirable in their sole and absolute discretion.

Highland has built a professional working environment, a firm-wide compliance culture and compliance procedures and systems designed to protect against potential incentives that may favor one account over another. Highland has adopted policies and procedures that address the allocation of investment opportunities, execution of portfolio transactions, personal trading by employees and other potential conflicts of interest that are designed to ensure that all client accounts are treated equitably over time. Nevertheless, Highland furnishes advisory services to numerous clients in addition to the Trust, and Highland may, consistent with applicable law, make investment recommendations to other clients or accounts (including accounts that have performance or higher fees paid to Highland or in which portfolio managers have a personal interest in the receipt of such fees) that may be the same as or different from those made to the Trust. In addition, Highland, its affiliates and any of their partners, directors, officers, stockholders or employees may or may not have an interest in the securities whose purchase and sale the Investment Adviser recommends to the Trust. Actions with respect to securities of the same kind may be the same as or different from the action that the Investment Adviser, or any of its affiliates, or any of their partners, directors, officers, stockholders or employees or any member of their families may take with respect to the same securities. Moreover, the Investment Adviser may refrain from rendering any advice or services concerning securities of companies of which any of the Investment Adviser's (or its affiliates') partners, directors, officers or employees are directors or officers, or companies as to which the Investment Adviser or any of its affiliates or partners, directors, officers and employees of any of them has any substantial economic interest or possesses material non-public information. In addition to its various policies and procedures designed to address these issues, Highland includes disclosure regarding these matters to its clients in both its Form ADV and investment advisory agreements.

The Investment Adviser, its affiliates or their partners, directors, officers or employees similarly serve or may serve other entities that operate in the same or related lines of business, including accounts managed by an investment adviser affiliated with the Investment Adviser. Accordingly, these individuals may have obligations to investors in those entities or funds or to other clients, the fulfillment of which might not be in the best interests of the Trust. As a result, the Investment Adviser will face conflicts in the allocation of investment opportunities to the Trust and other funds and clients. In order to enable such affiliates to fulfill their fiduciary duties to each of the clients for which they have responsibility, the Investment Adviser will endeavor to allocate investment opportunities in a fair and equitable manner, pursuant to policies and procedures adopted by the Investment Adviser and its advisory affiliates that are designed to manage potential conflicts of interest, which may, subject to applicable regulatory constraints, involve pro rata co-investment by the Trust and such other clients or may involve a rotation of opportunities among the Trust and such other clients. The Trust will only make investments in which the Investment Adviser or an affiliate hold an interest to the extent permitted under the Investment Company Act and SEC staff interpretations or pursuant to the terms and conditions of the exemptive order received by the Investment Adviser and certain funds affiliated with the Trust, dated April 19, 2016. For example, exemptive relief is not required for the Trust to invest in syndicated deals and secondary loan market transactions in which the Investment Adviser or an affiliate has an interest where price is the only negotiated point. The order applies to all "Investment Companies," which includes future closed-end investment companies registered under the Investment Company Act that are managed by the affiliated advisers,

89

Table of Contents

which includes the Trust. The Trust, therefore, may in the future invest in accordance with the terms and conditions of the exemptive order. To mitigate any actual or perceived conflicts of interest, allocation of limited offering securities (such as IPOs and registered secondary offerings) to principal accounts that do not include third party investors may only be made after all other client account orders for the security have been filled. However, there can be no assurance that such policies and procedures will in every case ensure fair and equitable allocations of investment opportunities, particularly when considered in hindsight.

Conflicts may arise in cases when clients and/or the Investment Adviser and other affiliated entities invest in different parts of an issuer's capital structure, including circumstances in which one or more clients own private securities or obligations of an issuer and other clients may own public securities of the same issuer. In addition, one or more clients may invest in securities, or other financial instruments, of an issuer that are senior or junior to securities, or financial instruments, of the same issuer that are held by or acquired for, one or more other clients. For example, if such issuer encounters financial problems, decisions related to such securities (such as over the terms of any workout or proposed waivers and amendments to debt covenants) may raise conflicts of interests. In such a distressed situation, a client holding debt securities of the issuer may be better served by a liquidation of the issuer in which it may be paid in full, whereas a client holding equity securities of the issuer might prefer a reorganization that holds the potential to create value for the equity holders. In the event of conflicting interests within an issuer's capital structure, Highland will generally pursue the strategy that Highland believes best reflects what would be expected to be negotiated in an arm's length transaction, but in all instances with due consideration being given to Highland's fiduciary duties to each of its accounts (without regard to the nature of the accounts involved or fees received from such accounts). This strategy may be recommended by one or more Highland investment professionals. A single person may represent more than one part of an issuer's capital structure. The recommended course of action will be presented to the conflicts committee for final determination as to how to proceed. Highland may elect, but is not required, to assign different teams to make recommendations for different parts of the capital structure as the conflicts committee determines in its discretion. In the event any Highland personnel serve on the board of the subject company, they generally recuse themselves from voting on any board matter with respect to a transaction that has an asymmetrical impact on the capital structure. Highland personnel board members may still make recommendations to the conflicts committee. If any such persons are also on the conflicts committee, they may recuse themselves from the committee's determination. A portfolio manager with respect to any applicable Highland registered investment company clients ("Retail Accounts") participates in such discussions, but makes an independent determination as to which course of action he or she determines is in the best interest of the applicable Retail Accounts. Highland may use external counsel for guidance and assistance.

The Investment Adviser and its affiliates have both subjective and objective procedures and policies in place designed to manage potential conflicts of interest involving clients so that, for example, investment opportunities are allocated in a fair and equitable manner among the Trust and such other clients. An investment opportunity that is suitable for multiple clients of the Investment Adviser and its affiliates may not be capable of being shared among some or all of such clients due to the limited scale of the opportunity or other factors, including regulatory restrictions imposed by the Investment Company Act. There can be no assurance that the Investment Adviser's or its affiliates' efforts to allocate any particular investment opportunity fairly among all clients for whom such opportunity is appropriate will result in an allocation of all or part of such opportunity to the Trust. Not all conflicts of interest can be expected to be resolved in favor of the Trust.

Another type of conflict may arise if one client account buys a security and another client account sells or shorts the same security. Currently, such opposing positions are generally not permitted within the same account without prior trade approval by the Chief Compliance Officer. However, a portfolio manager may enter into opposing positions for different clients to the extent each such client has a different investment objective and each such position is consistent with the investment objective of the applicable client. In addition, transactions in investments by one or more affiliated client accounts may have the effect of diluting or otherwise disadvantaging the values, prices or investment strategies of other client accounts.

Because certain client accounts may have investment objectives, strategies or legal, contractual, tax or other requirements that differ (such as the need to take tax losses, realize profits, raise cash, diversification, etc.), an affiliated advisor may purchase, sell or continue to hold securities for certain client accounts contrary to other recommendations. In addition, an affiliated advisor may be permitted to sell securities or instruments short for certain client accounts and may not be permitted to do so for other affiliated client accounts.

As a result of the Trust's arrangements with Highland, there may be times when Highland, the Investment Adviser or their affiliates have interests that differ from those of the Trust's shareholders, giving rise to a conflict of interest. Highland and the Investment Adviser are under common ownership, and the Trust's officers serve or may serve as officers, directors or principals of entities that operate in the same or a related line of business as the Trust does, or of investment funds managed by the Investment Adviser or its affiliates. Similarly, the Investment Adviser or its affiliates may have other clients with similar, different or competing investment objectives. In serving in these multiple capacities, they may have obligations to other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Trust or its shareholders. For example, the Trust's officers have, and will

continue to have, management responsibilities for other investment funds, accounts or other investment vehicles managed or sponsored by the Investment Adviser and its affiliates. The Trust's investment objective may overlap, in part or in whole, with the investment objective of such affiliated investment funds, accounts or other investment vehicles. As a result, those individuals may face conflicts in the allocation of investment opportunities among the

90

[Table of Contents](#)

Trust and other investment funds or accounts advised by or affiliated with the Investment Adviser. The Investment Adviser will seek to allocate investment opportunities among eligible accounts in a manner that is fair and equitable over time and consistent with its allocation policy. However, the Trust can offer no assurance that such opportunities will be allocated to it fairly or equitably in the short-term or over time. See "Conflicts of Interest" for a discussion of our Investment Adviser's allocation policy.

Currently a substantial portion of the Trust's assets are invested in REITs, asset-backed securities and/or CLOs sponsored, organized and/or managed by Highland and its affiliates. The Investment Adviser will monitor for conflicts of interest in accordance with its fiduciary duties and will provide the independent trustees of the Trust with an opportunity to periodically review the Trust's investments in such REITs, asset-backed securities and/or CLOs and assure themselves that continued investment in such securities remains in the best interests of the Trust and its shareholders. The Investment Adviser may effect client cross-transactions where it causes a transaction to be effected between the Trust and another client advised by the Investment Adviser or any of its affiliates. The Investment Adviser may engage in a client cross-transaction involving the Trust any time that the Investment Adviser believes such transaction to be fair to the Trust and the other client of the Investment Adviser or its affiliates.

As further described below, the Investment Adviser may effect principal transactions where the Trust may make and/or hold an investment, including an investment in securities, in which the Investment Adviser and/or its affiliates have a debt, equity or participation interest, in each case in accordance with applicable law, which may include the Investment Adviser obtaining the consent and approval of the Trust prior to engaging in any such principal transaction between the Trust and the Investment Adviser or its affiliates.

The Investment Adviser may direct the Trust to acquire or dispose of investments in cross trades between the Trust and other clients of the Investment Adviser or its affiliates in accordance with applicable legal and regulatory requirements. In addition, to the extent permitted by the Investment Company Act and SEC staff interpretations, the Trust may make and/or hold an investment, including an investment in securities, in which the Investment Adviser and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Trust may enhance the profitability of the Investment Adviser's own investments in such companies.

During periods in which the Trust is using leverage, the fees paid to the Investment Adviser for investment advisory services and to the Administrator for administrative services will be higher than if the Trust did not use leverage because the fees paid will be calculated on the basis of the Trust's Managed Assets, which may create an incentive for the Investment Adviser to leverage the Trust or to leverage using strategies that increase the Investment Adviser's fee. Furthermore, the Investment Adviser will also benefit to the extent that the Trust's Managed Assets are derived from the reinvested collateral received on portfolio securities loaned.

In addition to the Advisory Fee of the Investment Adviser, the Trust pays all other costs and expenses of its operations, including, but not limited to, compensation of its trustees (other than those affiliated with the Investment Adviser), custodian, transfer and dividend disbursing agent expenses, legal fees, listing fees and expenses, expenses of independent auditors, expenses of preparing, printing and distributing shareholder reports, notices, proxy statements and reports to governmental agencies, and reimbursement of actual expenses of the Investment Adviser or others for registration and maintenance of the Trust's registration with the Commission and other jurisdictions and taxes, if any.

Pursuant to the Trust's investment advisory agreement, the Trust has undertaken to indemnify the Investment Adviser and its partners, officers, employees, agents, and controlling persons for certain liabilities arising under the agreement, except liabilities arising from their willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of his position. In accordance with the indemnification provision in the Trust's Investment Advisory Agreement, the Trust has in the past indemnified the Investment Adviser from time to time, and may continue to do so in the future.

Real Estate Allocation Procedures.

Members of the Trust's management team also operate: (1) an externally managed publicly traded REIT ("NXRT"), that manages a portfolio of Class B, value add multifamily properties; (2) VineBrook Homes Trust, Inc., an externally managed private REIT that manages a portfolio of single-family housing properties in the Midwest U.S. ("VineBrook"); (3) NexPoint Hospitality Trust, an externally managed publicly traded REIT ("NHT") listed on the TSX Venture Exchange, that manages a portfolio of hospitality assets located in the U.S; (4) a private REIT (NFRO REIT Sub, LLC), which is wholly-owned by Highland Income Fund ("HFRO"), that invests in real estate transactions, or real estate operating companies, via debt instruments; (5) a private REIT (NRESF REIT Sub, LLC), which is wholly-owned by NexPoint Real Estate Strategies Fund ("NRESF"), that invests directly in real estate transactions or real estate operating companies; (6) a private REIT (NexPoint Capital REIT, LLC), which is wholly-owned by NexPoint Capital Inc., that invests in both direct interests in opportunistic real estate investments and preferred equity investments for entities that own real estate, and (7) a private

REIT (GAF REIT, LLC), which is wholly-owned by Highland Global Allocation Fund, that invest in real estate transactions, or real estate operating companies, via debt and equity instruments.

If a potential investment is appropriate for either the Trust or another entity noted above, the Investment Adviser and its affiliates have an allocation policy that provides that opportunities will be allocated among those accounts for which participation in the respective opportunity is considered most appropriate, taking into account, among other considerations with respect to any real estate investments:

- which fund has available cash (including availability under lines of credit) to acquire the investment;

- whether there are any positive or negative income tax effects on any of the funds relating to the purchase;

- whether the investment opportunity creates geographic, asset class or tenant concentration / diversification concerns for any of the funds;

- how the investment size, potential leverage, transaction structure and anticipated cash flows affect each fund, including earnings and distribution coverage; and

- whether one or more of the funds has an existing relationship with the tenant(s), operator, facility or system associated with the investment, or a significant geographic presence that would make the investment strategically more important.

The Investment Adviser will allocate investment opportunities across the entities for which such opportunities are appropriate, consistent with its internal conflict of interest and allocation policies. As noted above, the Investment Adviser will seek to allocate investment opportunities among such entities in a manner that is fair and equitable over time and consistent with its allocation policy. However, there is no assurance that such investment opportunities will be allocated to the Trust fairly or equitably in the short-term or over time and there can be no assurance that the Trust will be able to participate in all such investment opportunities that are suitable for the Trust.

*No-Action Letter and Exemptive Order*

The Commission staff, through a No-Action Letter dated June 26, 2013, has stated that it will not recommend enforcement action if the Trust utilizes Rule 486(b) of the Securities Act to file post-effective amendments to its shelf registration statement in order to update the Trust's financial statements and make other non-material changes.

Additionally, the Trust, HCMFA and the Investment Adviser have obtained an exemptive order dated April 19, 2016 from the Commission to permit certain co-investments among the Trust and other accounts managed by the Investment Adviser or its affiliates, subject to certain conditions.

## ADMINISTRATOR/SUB-ADMINISTRATOR

Under an administration agreement dated June 29, 2006 and amended June 6, 2008, (the "Administration Agreement"), the Investment Adviser provides administration services to the Trust, provides executive and other personnel necessary to administer the

91

Table of Contents

Trust and furnishes office space. Some of the administrative services provided by the Investment Adviser under the Administration Agreement, include, but are not limited to:

- preparing and coordinating the Trust's state filings;

- determining and overseeing publication of the Trust's NAV and distribution amounts;

- overseeing and liaising with services providers, such as the custodian and transfer agent;

- monitoring leverage compliance;

- coordinating the negotiation of credit agreements and other agreements with counterparties;

- investigating customer complaints;

- determining and monitoring expense accruals;

- authorizing expenditures and bill payments on behalf of the Trust; and

- performing such additional administrative duties as requested by the Trust.

Effective June 14, 2012, NexPoint Advisors, L.P. became the investment advisor and administrator to the Trust. Prior to June 14, 2012, HCMFA was the investment advisor and administrator to the Trust. The Investment Adviser will receive an annual fee, payable monthly, in an amount equal to 0.20% of the average weekly value of the Trust's Managed Assets. The Investment Adviser earned for administration services $1,083,853 in fees for the fiscal year ended December 31, 2016, $1,170,744 in fees for the fiscal year ended December 31, 2017, and $959,793 in fees for the fiscal year ended December 31, 2018. The Investment Adviser may waive a portion of its fees.

As of October 1, 2018, under a separate sub-administration agreement, NexPoint has delegated certain administrative functions to SEI Investments Global Funds Services ("SEI"), One Freedom Valley Drive, Oaks, Pennsylvania 19456, and pays SEI a portion of the fee it receives from the Trust. Under the sub-administration agreement, SEI has agreed to provide fund accounting services; asset data services; fund administration and reporting services; and regulatory administration services, including preparation and filing of various reports with the appropriate regulatory agencies and the SEC for the Trust.

## PORTFOLIO MANAGER

The Trust's portfolio manager is James Dondero. Mr. Dondero has managed the portfolio since September 2012. His investment decisions are not subject to the oversight, approval or ratification of a committee.

Mr. Dondero has over 25 years of experience in the credit markets. In addition to his role at the Investment Adviser, Mr. Dondero is the co-founder and President of Highland Capital Management, L.P. and NexPoint Advisors, L.P. Mr. Dondero has over 30 years of experience investing in credit and equity markets and has helped pioneer credit asset classes. Prior to founding Highland Capital Management in 1993, Mr. Dondero served as Chief Investment Officer of Protective Life's GIC subsidiary and helped grow the business from concept to over $2 billion between 1989 and 1993. His portfolio management experience includes mortgage-backed securities, investment grade corporates, leveraged bank loans, high-yield bonds, emerging market debt, real estate, derivatives, preferred stocks and common stocks. From 1985 to 1989, he managed approximately $1 billion in fixed income funds for American Express. Mr. Dondero received a BS in Commerce (Accounting and Finance) from the University of Virginia, and is a Certified Managerial Accountant. Mr. Dondero has earned the right to use the Chartered Financial Analyst designation. Mr. Dondero currently serves as Chairman of NexBank SSB and serves on the Board of Directors of American Banknote Corporation, Metro-Goldwyn-Mayer, Jernigan Capital, Inc., Cornerstone Healthcare Group, and Texmark Timber Treasury, L.P.

The SAI provides additional information about the portfolio manager's compensation, other accounts managed by the portfolio manager and the portfolio manager's ownership of securities issued by the Trust.

### Determination of Net Asset Value

The NAV of the common shares of the Trust is computed based upon the value of the Trust's investment portfolio securities and other assets. NAV per common share is determined daily on each day that the NYSE is open for business as of the close of the regular trading session on the NYSE, usually 4:00 p.m., Eastern time. The NYSE is open Monday through Friday, but currently is scheduled to

be closed on New Year's Day, Dr. Martin Luther King, Jr. Day, Presidents' Day, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day and Christmas Day or on the preceding Friday or subsequent Monday when a holiday falls on a Saturday or Sunday, respectively. The Trust calculates NAV per common share by subtracting liabilities (including accrued expenses or dividends) from the total assets of the Trust (the value of the securities plus cash or other assets, including interest accrued but not yet received) and dividing the result by the total number of outstanding common shares of the Trust.

92

[Table of Contents](#)

**VALUATIONS**

The Trust uses the following valuation methods to determine either current market value for investments for which market quotations are available or, if not available, the fair value, as determined in good faith pursuant to policies and procedures approved by the Board:

- The market value of each security listed or traded on any recognized securities exchange or automated quotation system will be the last reported sale price at the relevant valuation date on the composite tape or on the principal exchange on which such security is traded, except that debt securities that are not credit-impaired and have remaining maturities of 60 days or less will be valued at amortized cost, a method of valuation that approximates market value. If no sale is reported on that date, or for over-the-counter securities, the Investment Adviser utilizes, when available, pricing quotations from principal market makers. Such quotations may be obtained from third-party pricing services or directly from investment brokers and dealers in the secondary market. Generally, the Trust's loan and bond positions are not traded on exchanges and consequently are valued based on market prices received from third-party pricing services or broker-dealer sources.

- Dividends declared but not yet received, and rights in respect of securities which are quoted ex-dividend or ex-rights, will be recorded at the fair value thereof, as determined by the Investment Adviser, which may (but need not) be the value so determined on the day such securities are first quoted ex-dividend or ex-rights.

- Listed options, or over-the-counter options for which representative brokers' quotations are available, will be valued in the same manner as listed or over-the-counter securities as hereinabove provided. Premiums for the sale of such options written by the Trust will be included in the assets of the Trust, and the market value of such options shall be included as a liability.

- The Trust's non-marketable investments for which market quotations are not readily will generally be valued in such manner as the Investment Adviser determines in good faith to reflect their fair values under procedures established by, and under the general supervision and responsibility of, the Board. The pricing of all assets that are fair valued in this manner will be subsequently reported to and ratified by the Board. Pursuant to the Trust's pricing procedures, securities for which market quotations are not readily available may include securities that are subject to legal or contractual restrictions on resale, securities for which no or limited trading activity has occurred for a period of time, or securities that are otherwise deemed to be illiquid (i.e., securities that cannot be disposed of within seven days at approximately the price at which the security is currently priced by the Trust). Swaps and other derivatives would generally fall under this category.

When determining the fair value of an asset, the Investment Adviser seeks to determine the price that the Trust might reasonably expect to receive from the current sale of that asset in an arm's-length transaction. Fair value is defined as the amount for which assets could be sold in an orderly disposition over a reasonable period of time, taking into account the nature of the asset. Fair value determinations are based upon all available factors that the Investment Adviser deems relevant. Fair value pricing, however, involves judgments that are inherently subjective and inexact, since fair valuation procedures are used only when it is not possible to be sure what value should be attributed to a particular asset or when an event will affect the market price of an asset and to what extent. As a result, fair value pricing may not reflect actual market value, and it is possible that the fair value determined for a security will be materially different from the value that actually could be or is realized upon the sale of that asset.

93

**Table of Contents**

### Distributions

Subject to market conditions, the Trust expects to declare dividends on the Trust's common shares on a monthly basis. The Trust intends to pay any net capital gain distributions annually.

Various factors will affect the level of the Trust's current income and current gains, such as its asset mix and the Trust's use of options and other derivative transactions. To permit the Trust to maintain more stable monthly dividends and annual capital gain distributions, the Trust may from time to time distribute less than the entire amount of income and gains earned in the relevant month or year, respectively. The undistributed income and gains would be available to supplement future distributions. As a result, the distributions paid by the Trust for any particular period may be more or less than the amount of income and gains actually earned by the Trust during the applicable period. Undistributed income and gains will add to the Trust's NAV, and, correspondingly, distributions from previously undistributed income and gains, as well as from capital, if any, will be deducted from the Trust's NAV.

Shareholders will automatically receive newly issued common shares for all dividends declared for common shares of the Trust in accordance with the Trust's Dividend Reinvestment Plan unless an election is made to receive cash. Participants requesting a sale of securities through the plan agent of the Trust's Dividend Reinvestment Plan are subject to a sales fee and a brokerage commission. See "Dividend Reinvestment Plan."

94

[Table of Contents](#)

## Dividend Reinvestment Plan

Unless the registered owner of common shares elects to receive cash by contacting the Plan Agent, all dividends declared for the common shares of the Trust will be automatically paid in the form of, or reinvested by Global Shares ("Global Shares" or the "Plan Agent") in, common shares of the Trust purchased in the open market at prevailing market prices. If you are a registered owner of common shares and elect not to participate in the Plan, you will receive all dividends or other distributions (together, a "dividend") in cash paid by check mailed directly to you (or, if the shares are held in street or other nominee name, then to such nominee) by American Stock Transfer and Trust Company LLC ("AST"), as dividend disbursing agent. You may elect not to participate in the Plan and to receive all dividends in cash by sending written instructions or by contacting AST, as dividend disbursing agent, at the address set forth below. Participation in the Plan is completely voluntary and may be terminated or resumed at any time without penalty by contacting the Plan Agent before the dividend record date; otherwise such termination or resumption will be effective with respect to any subsequently declared dividend. Some brokers may automatically elect to receive cash on your behalf and may reinvest that cash in additional shares of the Trust for you.

The Plan Agent will open an account for each shareholder under the Plan in the same name in which such shareholder's shares are registered. Whenever the Trust declares a dividend payable in cash, non-participants in the Plan will receive cash and participants in the Plan will receive the equivalent in newly issued common shares. The common shares will be acquired by the Plan Agent through receipt of additional unissued but authorized common shares from the Trust. The number of newly issued common shares to be credited to each participant's account will be determined by dividing the dollar amount of the dividend by the lesser of (i) the NAV per common share determined on the declaration date and (ii) the market price per common share as of the close of regular trading on the NYSE on the declaration date.

The Plan Agent maintains all shareholders' accounts in the Plan and furnishes written confirmation of all transactions in the accounts, including information needed by shareholders for tax records. Common shares in the account of each Plan participant will be held by the Plan Agent on behalf of the Plan participant, and each shareholder proxy will include those shares purchased or received pursuant to the Plan. The Plan Agent will forward all proxy solicitation materials to participants and vote proxies for shares held under the Plan in accordance with the instructions of the participants.

In the case of shareholders such as banks, brokers or nominees which hold shares for others who are the beneficial owners, the Plan Agent will administer the Plan on the basis of the number of common shares certified from time to time by the record shareholder's name and held for the account of beneficial owners who participate in the Plan.

There will be no brokerage charges with respect to common shares issued directly by the Trust. The automatic reinvestment of dividends will not relieve participants of any tax that may be payable (or required to be withheld) on such dividends. Accordingly, any taxable dividend received by a participant that is reinvested in additional common shares will be subject to U.S. federal (and possibly state and local) income tax even though such participant will not receive a corresponding amount of cash with which to pay such taxes. See "Tax Matters."

There will be no brokerage charges with respect to common shares issued directly by the Trust. Participants who request a sale of shares through the Plan Agent pay a brokerage commission of $0.4 per share sold.

The Trust reserves the right to amend or terminate the Plan. There is no direct service charge to participants in the Plan; however, the Trust reserves the right to amend the Plan to include a service charge payable by the participants.

All correspondence concerning the Plan should be directed to the Plan Agent at Global Shares, 111 Town Square Place, Suite 1401, Jersey City, NJ 07310; telephone (732) 256-1005.

## Shareholder Loyalty Program

To promote loyalty and long-time alignment of interests among the Trust's shareholders, the Investment Adviser offers an incentive to shareholders that buy and hold the Trust's common shares for a period of at least twelve months through its Shareholder Loyalty Plan (the "Plan"). To participate in the Plan, existing shareholders must open an account (the "Account") with the Plan's administrator, Global Shares. Subsequently, if a participant makes contributions to the Account during a defined trading period to purchase shares, NexPoint will make a corresponding contribution on such participant's behalf (the "Gross-up"). The Gross-up is determined by NexPoint and may be adjusted at any point without notice by NexPoint prospectively from time to time in accordance with the terms of the Plan. For example, if a participant contributes $10,000 to the Account during a defined trading period to purchase

shares and NexPoint has determined the participant's Gross-up will be 2%, NexPoint will make a corresponding contribution of $200, or 2% of the total $10,000, to purchase additional Shares for the participant (the "Gross-up Shares"). In addition, Plan participants will not be required to pay any customary purchase commissions or distribution fees on the purchase of shares under the Plan.

95

[Table of Contents](#)

NexPoint will pay all expenses incident to the purchase of shares under the Plan and for operation of the Plan, including the costs of recordkeeping, accounting fees, legal fees and the costs of delivery of stock certificates, if any, to participants; provided, however, that NexPoint will not pay any expenses incurred in connection with any sale or transfer of shares credited to a participant's Account. Expenses incurred in connection with any such sales will be deducted from the proceeds of sale prior to any remittance to the participant.

While the portion of the Trust's common shares that are acquired through the participant's contribution will vest immediately, the Gross-up Shares will not vest until the first anniversary of the date that the Gross-up Shares were purchased. Vested shares and Gross-up Shares will be held in the Account with Global Shares' broker, Maxim Group, LLC ("Maxim"). A participant may not sell or otherwise withdraw, pledge, transfer, assign, hypothecate or dispose of any Gross-up Shares prior to the date on which they become vested Shares. Under the Plan, participants must contribute a minimum of $2,500 for purchases of shares in the initial contribution and each subsequent monthly contribution unless NexPoint, in its sole discretion, decides to permit contributions for a lesser amount. The maximum monthly contribution limit under the Plan is $1,000,000, which amount may be adjusted from time to time by NexPoint in its sole discretion.

All dividends received on shares that are purchased under the Plan will be automatically reinvested through the Plan. Shares acquired through the reinvestment of dividends paid to the holder of a vested share will vest immediately. Shares acquired through the reinvestment of dividends paid to the holder of a non-vested Gross-up share will vest on the first anniversary of the reinvest date. In addition, for dividends paid to holders of vested shares, NexPoint will provide a Gross-up on the amount of such reinvested dividends.

Maxim maintains all shareholders' accounts in the Plan and, upon request, furnishes written confirmation of all transactions in the accounts, including information needed by shareholders for tax records. Shares in the account of each Plan participant will be held by Maxim on behalf of the Plan participant, and each shareholder proxy will include those shares purchased or received pursuant to the Plan. Maxim will forward all proxy solicitation materials to participants and vote proxies for shares held under the Plan in accordance with the instructions of the participants.

In the case of shareholders such as banks, brokers or nominees which hold shares for others who are the beneficial owners, Global Shares and Maxim will administer the Plan on the basis of the number of common shares certified from time to time by the record shareholder's name and held for the account of beneficial owners who participate in the Plan.

NexPoint reserves the right to amend or terminate the Plan. To help align the interests of NexPoint's employees with the interests of the Trust's shareholders, NexPoint also offers the Plan to its employees.

Participants in the Plan should be aware that their receipt of Gross-up Shares under the Plan constitutes taxable income to them. In addition, such participants owe taxes on that portion of any distribution that constitutes taxable income in respect of shares of our common stock held in their Plan accounts, whether or not such shares of common stock have vested in the hands of the participants. To the extent any payments or distributions under the Plan are subject to U.S. federal, state or local taxes, the Trust, any participating affiliate of the Trust or the agent for the Plan may satisfy its tax withholding obligation by (1) withholding shares allocated to the participant's account or (2) deducting cash from the participant's account. Plan participants should consult their tax advisers regarding the tax consequences to them of participating in the Plan.

The Plan may create an incentive for shareholders to invest additional amounts in the Trust. Because the Adviser's management fee is based on a percentage of the assets of the Trust, the Plan will result in increased net revenues to NexPoint if the increase in the management fee due to the increased asset base offsets the costs associated with establishing and maintaining the Plan.

## Description of Capital Structure

This Prospectus contains a summary of the preferred shares and subscription rights available in an Offering. These summaries are not meant to be a complete description of each security. However, this Prospectus will contain the material terms and conditions for each security.

Any of the securities described herein may be issued separately or as part of a unit consisting of two or more securities (for example, common shares and rights), which may or may not be separable from one another. If such units are publicly offered, they and their underlying securities will be registered under the Securities Act prior to completion of the offering.

[Table of Contents](#)

## PREFERRED SHARES

The Trust's Agreement and Declaration of Trust provides that the Board may authorize and issue preferred shares with rights as determined by the Board, by action of the Board without the approval of the holders of the common shares. Holders of common shares have no preemptive right to purchase any preferred shares that might be issued. Whenever preferred shares are outstanding, the Trust will not be permitted to declare any distributions from the Trust unless all accrued dividends on preferred shares have been paid, unless asset coverage (as defined in the Investment Company Act) with respect to preferred shares would be at least 200% after giving effect to the distributions and unless certain other requirements imposed by any rating agencies rating the preferred shares have been met.

Currently, an unlimited number of the Trust's shares have been classified by the Board as preferred shares, par value $0.001 per share. The terms of such preferred shares may be fixed by the Board and would materially limit and/or qualify the rights of the holders of the Trust's common shares. Although the terms of any preferred shares, including dividend rate, liquidation preference and redemption provisions, will be determined by the Board, subject to applicable law and the Trust's Agreement and Declaration of Trust, it is likely that the preferred shares will be structured to carry a relatively short-term dividend rate reflecting interest rates on short-term bonds, by providing for the periodic redetermination of the dividend rate at relatively short intervals through an auction, remarketing or other procedure. The Trust also believes that it is likely that the liquidation preference, voting rights and redemption provisions of the preferred shares will be similar to those stated below.

*Liquidation Preference.* In the event of any voluntary or involuntary liquidation, dissolution or winding up of the Trust, the holders of preferred shares will be entitled to receive a preferential liquidating distribution, which is expected to equal the original purchase price per preferred share plus accrued and unpaid dividends, whether or not declared, before any distribution of assets is made to holders of common shares. After payment of the full amount of the liquidating distribution to which they are entitled, the holders of preferred shares will not be entitled to any further participation in any distribution of assets by the Trust.

*Voting Rights.* The Investment Company Act requires that the holders of any preferred shares, voting separately as a single class, have the right to elect at least two trustees at all times. The remaining trustees will be elected by holders of common shares and preferred shares, voting together as a single class. In addition, subject to the prior rights, if any, of the holders of any other class of senior securities outstanding, the holders of any preferred shares have the right to elect a majority of the trustees of the Trust at any time two years' dividends on any preferred shares are unpaid. The Investment Company Act also requires that, in addition to any approval by shareholders that might otherwise be required, the approval of the holders of a majority of any outstanding preferred shares, voting separately as a class, would be required to (i) adopt any plan of reorganization that would adversely affect the preferred shares, and (ii) take any action requiring a vote of security holders under Section 13(a) of the Investment Company Act, including, among other things, changes in the Trust's subclassification as a closed-end investment company or changes in its fundamental investment restrictions. As a result of these voting rights, the Trust's ability to take any such actions may be impeded to the extent that there are any preferred shares outstanding. The Board presently intends that, except as otherwise indicated in this Prospectus and except as otherwise required by applicable law, holders of preferred shares will have equal voting rights with holders of common shares (one vote per share, unless otherwise required by the Investment Company Act) and will vote together with holders of common shares as a single class.

The affirmative vote of the holders of a majority of the outstanding preferred shares, voting as a separate class, will be required to amend, alter or repeal any of the preferences, rights or powers of holders of preferred shares that materially and adversely affect such preferences, rights or powers, or to increase or decrease the authorized number of preferred shares. The class vote of holders of preferred shares described above will in each case be in addition to any other vote required to authorize the action in question.

*Redemption, Purchase and Sale of Preferred Shares by the Trust.* The terms of the preferred shares are expected to provide that (i) they are redeemable by the Trust in whole or in part at the original purchase price per share plus accrued dividends per share, (ii) the Trust may tender for or purchase preferred shares, and (iii) the Trust may subsequently resell any shares so tendered for or purchased.

Any redemption or purchase of preferred shares by the Trust will reduce the leverage applicable to the common shares, while any resale of shares by the Trust will increase that leverage.

The discussion above describes the possible offering of preferred shares by the Trust. If the Board determines to proceed with such an offering, the terms of the preferred shares may be the same as, or different from, the terms described above, subject to applicable law and the Trust's Agreement and Declaration of Trust. The Board, without the approval of the holders of common shares, may authorize an offering of preferred shares or may determine not to authorize such an offering and may fix the terms of the preferred shares to be offered.

If preferred shares are offered in the future, such shares will be registered under the Securities Act prior to the offering.

97

**Table of Contents**

## SUBSCRIPTION RIGHTS

*General*

We may issue subscription rights to our shareholders to purchase preferred shares. Subscription rights may be issued independently or together with any other offered security and may or may not be transferable by the person purchasing or receiving the subscription rights. In connection with a subscription rights offering to our shareholders, we would distribute certificates evidencing the subscription rights and a Prospectus Supplement to our shareholders on the record date that we set for receiving subscription rights in such subscription rights offering.

The applicable Prospectus Supplement would describe the following terms of subscription rights in respect of which this Prospectus is being delivered:

- the period of time the offering would remain open;

- the title of such subscription rights;

- the exercise price for such subscription rights (or method of calculation thereof);

- the ratio of the offering;

- the number of such subscription rights issued to each shareholder;

- the extent to which such subscription rights are transferable and the market on which they may be traded if they are transferable;

- the date on which the right to exercise such subscription rights shall commence, and the date on which such right shall expire (subject to any extension);

- the extent to which such subscription rights include an over-subscription privilege with respect to unsubscribed securities and the terms of such over-subscription privilege;

- any termination right we may have in connection with such subscription rights offering; and

- any other terms of such subscription rights, including exercise, settlement and other procedures and limitations relating to the transfer and exercise of such subscription rights.

98

[Table of Contents](#)

*Exercise of Subscription Rights*

Each subscription right would entitle the holder of the subscription right to purchase for cash such amount of preferred shares at such exercise price as shall in each case be set forth in, or be determinable as set forth in, the Prospectus Supplement relating to the subscription rights offered thereby. Under the Investment Company Act, we may generally only offer subscription rights that expire not later than 120 days after their issuance and are issued exclusively and ratably to a class or classes of our security holders. Subscription rights may be exercised at any time up to the close of business on the expiration date for such subscription rights set forth in the Prospectus Supplement. After the close of business on the expiration date, all unexercised subscription rights would become void.

Subscription rights may be exercised as set forth in the Prospectus Supplement relating to the subscription rights offered thereby. Upon receipt of payment and the subscription rights certificate properly completed and duly executed at the corporate trust office of the subscription rights agent or any other office indicated in the Prospectus Supplement we will forward, as soon as practicable, the preferred shares purchasable upon such exercise. To the extent permissible under applicable law, we may determine to offer any unsubscribed offered securities directly to persons other than shareholders, to or through agents, underwriters or dealers or through a combination of such methods, as set forth in the applicable Prospectus Supplement. The Trust's common shareholders will indirectly bear all of the expenses of any subscription rights offerings, regardless of whether the Trust's common shareholders exercise any subscription rights.

*Dilutive Effect*

The Trust may effectuate one or more rights offerings, as part of which the Trust will issue subscription rights. In any such event, shareholders who do not fully exercise their subscription rights should expect that they will, at the completion of a rights offering pursuant to this Prospectus, own a smaller proportional interest in the Trust than would otherwise be the case if they fully exercised their rights. We cannot state precisely the amount of any such dilution in share ownership because we do not know at this time what proportion of the shares will be purchased as a result of such rights offering. These shareholders will also experience a disproportionately greater decrease in their participation in the Trust's earnings and assets and their voting power than the increase the Trust will experience in its assets, potential earning power and voting interests due to such offering. These shareholders may also experience a decline in the market price of their shares, which often reflects to some degree announced or potential increases and decreases in NAV per share. This decrease could be more pronounced as the size of the offering and level of discounts increases. Further, if current shareholders do not purchase any shares to maintain their percentage interest, regardless of whether such offering is above or below the then current NAV, their voting power will be diluted.

*U.S. Federal Income Tax Consequences of an Issuance of Subscription Rights to Common Shareholders*

The following is a summary of the material U.S. federal income tax consequences of an issuance of subscription rights to our common shareholders pursuant to this Prospectus (for purposes of this section, each such issuance is referred to as an "offer" and each subscription right, a "right"), under the provisions of the Code, U.S. Treasury regulations promulgated under the Code ("Treasury regulations"), and other applicable authority in effect as of the date of the Prospectus that are generally applicable to common shareholders who are "United States persons" within the meaning of the Code. This summary does not address any state, local, foreign or other tax consequences. These authorities may be changed, possibly with retroactive effect, or become subject to new legislative, administrative, or judicial interpretation. Common shareholders or other holders of rights should consult their tax advisors regarding the tax consequences, including U.S. federal, state, or local, or foreign or other tax consequences, relevant to their particular circumstances. This summary assumes that the rights are issued separately by the Trust and not as part of a unit consisting of two or more securities.

The Trust believes that the value of any right issued pursuant to an offer will not be includible in the income of a common shareholder at the time the right is issued, and the Trust will not report to the IRS that a common shareholder has income as a result of the issuance of the right; however, depending on the specific terms of the offer, there may be no guidance directly on point concerning certain aspects of the taxation of the offer. The remainder of this discussion assumes that the receipt of the rights by common shareholders will not be a taxable event for U.S. federal income tax purposes.

99

[Table of Contents](#)

The basis of a right issued to a common shareholder will be zero, and the basis of the common share(s) with respect to which the right was issued (the "Old Share(s)") will remain unchanged, except that the shareholder must allocate its basis in the Old Share(s) between the Old Shares and the right in proportion to their respective fair market values on the date of distribution of the right if (i) either (a) the fair market value of the right on the date of distribution is at least 15% of the fair market value of the Old Share(s) on that date, or (b) the shareholder affirmatively elects (in the manner set out in Treasury regulations) to allocate to the right a portion of the basis of the Old Share(s), and (ii) the right does not expire unexercised in the hands of the shareholder (i.e., the shareholder either exercises or sells the right following its issuance). In compliance with Treasury regulations, the Trust will report to the common shareholders and to the IRS within 45 days of the distribution of the rights (or, if earlier, January 15 of the year following the calendar year of the distribution), either by mail or on the Trust's website, the effect, if any, of the offer on the common shareholders' basis in their Old Shares. Any determination the Trust makes with respect to the value of the rights in connection with this reporting requirement will not be binding on the IRS. Shareholders should consult with their tax advisers to determine the proper allocation, if any, of tax basis between rights and Old Shares, including whether the election described above would be appropriate for their situation.

No loss will be recognized by a common shareholder if a right distributed to such shareholder expires unexercised in the hands of such shareholder.

The basis of a right purchased in the market generally will be its purchase price. If a right that has been purchased in the market expires unexercised, the holder will recognize a loss equal to the basis of the right.

Any gain or loss on the sale of a right or, in the case of rights purchased in the market, any loss from a right that expires unexercised, will be a capital gain or loss if the right is held as a capital asset (which, in the case of rights issued to common shareholders, will normally depend on whether the Old Shares are held as capital assets), and will be a long-term capital gain or loss if the holding period of the right exceeds (or is deemed to exceed) one year. The deductibility of capital losses is subject to limitation. The holding period of a right issued to a common shareholder will include the holding period of the Old Share(s).

No gain or loss will be recognized by a holder upon the exercise of a right, and the basis of any common share acquired upon exercise (the "New Share") will equal the sum of the basis, if any, of the right and the subscription price for the New Share. When a holder exercises a right, the holder's holding period in the New Share(s) does not include the time during which the holder held the unexercised right; the holding period of the New Share(s) will begin no later than the date following the date of exercise of the right.

Employee retirement plans and other tax-exempt entities, including governmental plans, should also be aware that if they borrow in order to finance their exercise of rights, they may become subject to the tax on unrelated business taxable income ("UBTI") under Section 511 of the Code. If any portion of an individual retirement account ("IRA") is used as security for a loan, the portion so used may also be treated as distributed to the IRA depositor.

For more information relating to the U.S. federal income tax consequences of an investment in the Trust, see "Tax Matters" below and "Tax Matters" in the SAI.

### U.S. Federal Income Tax Consequences of an Issuance of Subscription Rights to Preferred Shareholders

The following is a summary of the material U.S. federal income tax consequences of an issuance of subscription rights to our preferred shareholders pursuant to this Prospectus (for purposes of this section, each such issuance is referred to as an "offer" and each subscription right, a "right"), under the provisions of the Code, Treasury regulations, and other applicable authority in effect as of the date of the Prospectus that are generally applicable to preferred shareholders who are "United States persons" within the meaning of the Code. This summary does not address any state, local, foreign or other tax consequences. These authorities may be changed, possibly with retroactive effect, or become subject to new legislative, administrative, or judicial interpretation. Preferred shareholders or other holders of rights should consult their tax advisors regarding the tax consequences, including U.S. federal, state, or local, or foreign or other tax consequences, relevant to their particular circumstances. This summary assumes that the rights are issued separately by the Trust and not as part of a unit consisting of two or more securities.

The Trust believes that the value of any right issued pursuant to an offer will be includible in the income of a preferred shareholder at the time the right is issued, and the Trust will report to the IRS that a preferred shareholder has income as a result of the issuance of the right; however, depending on the specific terms of the offer, there may be no guidance directly on point concerning certain aspects of the taxation of the offer. The remainder of this discussion assumes that the receipt of the rights by preferred shareholders will be a taxable event for U.S. federal income tax purposes.

100

**Table of Contents**

The basis of a right issued to a preferred shareholder will be the value of the right that is taxable at the time of the issuance, and the basis of the preferred share(s) with respect to which the right was issued (the "Old Share(s)") will remain unchanged.

In the event that a right received by a preferred shareholder expires unexercised, the preferred shareholder will recognize a loss equal to the value of the right that is taxable at the time of the issuance.

The basis of a right purchased in the market generally will be its purchase price. If a right that has been purchased in the market expires unexercised, the holder will recognize a loss equal to the basis of the right.

Any gain or loss on the sale of a right or, in the case of rights purchased in the market, any loss from a right that expires unexercised, will be a capital gain or loss if the right is held as a capital asset (which, in the case of rights issued to preferred shareholders, will normally depend on whether the Old Shares are held as capital assets), and will be a long-term capital gain or loss if the holding period of the right exceeds (or is deemed to exceed) one year. The deductibility of capital losses is subject to limitation. The holding period of a right issued to a preferred shareholder will not include the holding period of the Old Share(s).

No gain or loss will be recognized by a holder upon the exercise of a right, and the basis of any common share acquired upon exercise (the "New Share") will equal the sum of the basis, if any, of the right and the subscription price for the New Share. When a holder exercises a right, the holder's holding period in the New Share(s) does not include the time during which the holder held the unexercised right; the holding period of the New Share(s) will begin no later than the date following the date of exercise of the right.

Employee retirement plans and other tax-exempt entities, including governmental plans, should also be aware that if they borrow in order to finance their exercise of rights, they may become subject to the tax on unrelated business taxable income ("UBTI") under Section 511 of the Code. If any portion of an individual retirement account ("IRA") is used as security for a loan, the portion so used may also be treated as distributed to the IRA depositor.

For more information relating to the U.S. federal income tax consequences of an investment in the Trust, see "Tax Matters" below and "Tax Matters" in the SAI.

*Previous Rights Offerings*

On January 18, 2008, the Trust offered subscription rights to its common shareholders. The net proceeds from this rights offering was $143.6 million.

On May 8, 2017, the Trust offered subscription rights to its common shareholders. The net proceeds from this rights offering was $139.9 million.

On May 10, 2018, the Trust offered subscription rights to its common shareholders. The net proceeds from this rights offering was $201.8 million.

On April 30, 2019, the Trust offered subscription rights to its common shareholders. The net proceeds from this rights offering was $239.9 million.

**EMPLOYEE PLAN CONSIDERATIONS**

Shareholders whose shares are held in employee benefit plans subject to the Employee Retirement Income Security Act of 1974 ("ERISA") or Section 4975 of the Code (including corporate savings and 401(k) plans, Keogh or H.R. 10 plans of self-employed individuals and individual retirement accounts) (each, a "Plan") should be aware that additional contributions of cash to the Plan (other than rollover contributions or trustee-to-trustee transfers from other Plans) in order to exercise rights would be treated as contributions to such Plan and, when taken together with contributions previously made, may result in, among other things, excise taxes for excess or nondeductible contributions. In the case of Plans qualified under Section 401(a) of the Code and certain other retirement plans, additional cash contributions could cause the maximum contribution limitations of Section 415 of the Code or other qualification rules to be violated. In addition, there may be other adverse tax and ERISA consequences if rights are sold or transferred by a Plan.

Plans also should be aware that if they borrow in order to finance their exercise of rights, they may become subject to the tax on UBTI under Section 511 of the Code. If any portion of an IRA is used as security for a loan, the portion so used also is treated as distributed to the IRA depositor.

ERISA contains fiduciary responsibility requirements, and ERISA and the Code contain prohibited transaction rules that may affect the exercise or transfer of rights. Due to the complexity of these rules and the penalties for noncompliance, fiduciaries of Plans and other retirement plans should consult with their counsel and other advisers regarding the consequences of their exercise or transfer of rights under ERISA and the Code.

101

Table of Contents

## COMMITTED FACILITY, MASTER REPURCHASE AGREEMENT AND REVOLVING CREDIT AGREEMENT

The Trust currently leverages through borrowings from a committed facility, a master repurchase agreement and a revolving credit facility. The Trust has entered into the Committed Facility with BNP to borrow up to $135,000,000. The Committed Facility has a rolling 90-day term (referred to as a "90-day evergreen"). Absent a default or termination event, as described in the Committed Facility, or the ratings decline as described in the following sentence, BNP is required to provide the Trust with 180 days' notice prior to terminating or materially amending the Committed Facility. BNP has a termination right if BNP's long-term credit rating declines three or more notches below its highest rating by any of Standard & Poor's Ratings Services, Moody's Investor Service, Inc. or Fitch Ratings, Ltd., during the period commencing on and including October 28, 2014 and ending on the date of such long-term credit rating decline. Upon any such termination, BNP shall pay the Trust a fee equal to 0.10% of the maximum amount of financing available on the termination date. The Trust pays interest on borrowed amounts under the Committed Facility at an annual rate of the one month LIBOR plus 0.60% to 1.30%, depending on the asset class of the underlying collateral. The Committed Facility agreement contains customary covenant and default provisions. When borrowings are made under the Committed Facility, collateral must be posted to an account with the Trust's custodian, Bank of New York Melon held for the benefit of BNP. Such borrowings constitute financial leverage.

The Trust has entered into an agreement with BNP Securities under which it may from time to time enter into reverse repurchase transactions pursuant to the terms of a master repurchase agreement and related annexes, dated as of November 16, 2017 (collectively the "Repurchase Agreement"). A reverse repurchase transaction is a repurchase transaction in which the Trust is the seller of securities or other assets and agrees to repurchase them at a date certain or on demand. Pursuant to the Repurchase Agreement, the Trust may agree to sell securities or other assets to BNP Securities for an agreed-upon price (the "Purchase Price"), with a simultaneous agreement to repurchase such securities or other assets from BNP Securities for the Purchase Price plus a price differential that is economically similar to interest. The price differential is negotiated for each transaction.

On August 14, 2018, the Trust, and two of its wholly-owned subsidiaries, NexPoint Real Estate Capital, LLC ("NREC") and NexPoint Real Estate Opportunities, LLC ("NREO"), entered into a revolving credit agreement (the "KeyBank Facility") with KeyBank National Association, as administrative agent and lender. Under the terms of the KeyBank Facility, the Trust, NREC and NREO may borrow up to $60.0 million.

The KeyBank Facility has an initial term of two years, maturing on August 14, 2020, with one-year extension options outlined further in the credit agreement for the KeyBank Facility (the "KeyBank Credit Agreement"). Payments due pursuant to the KeyBank Facility are interest-only. The KeyBank Facility bears interest based on the type of borrowing. The ABR Loans bear interest at the lesser of (x) the Alternate Base Rate (as defined in the KeyBank Credit Agreement) plus the Applicable Rate, or (y) the Maximum Rate (as defined in the KeyBank Credit Agreement). The Eurodollar Loans bear interest at the lesser of (a) the Adjusted LIBO Rate (as defined in the KeyBank Credit Agreement) for the Interest Period in effect plus the Applicable Rate, or (b) the Maximum Rate (as defined in the KeyBank Credit Agreement). The Applicable Rate means for any Eurodollar Loan, 200 basis points, and for any ABR Loan, 100 basis points. Pursuant to the KeyBank Credit Agreement, the Trust is subject to certain loan compliance covenants.

The KeyBank Facility is fully recourse and is secured by Collateral (as defined in the KeyBank Credit Agreement). The KeyBank Facility may be prepaid or terminated at any time without penalty, provided, however, that KeyBank National Association shall be indemnified for any breakage costs.

Any senior security representing indebtedness, as defined in Section 18(g) of the Investment Company Act, must have asset coverage of at least 300%.

### Market and Net Asset Value Information

The Trust's common shares are listed on the NYSE under the symbol "NHF." The Trust's common shares commenced trading on the NYSE in June 2006. In the trading history of the Trust's common shares, the Trust's common shares have traded at both a premium and a discount to NAV. The Trust cannot predict whether its shares will trade in the future at a premium or discount to NAV. Issuance of additional common shares may have an adverse effect on prices in the secondary market for the Trust's common shares by increasing the number of shares available, which may put downward pressure on the market price for the shares.

The following table sets forth, for each of the periods indicated, the high and low closing market prices of the Trust's common shares on the NYSE, the corresponding NAV per share on such dates and the corresponding premium/discount to NAV per share on such dates. See "Net Asset Value" for information as to how the Trust's NAV is determined.

**Table of Contents**

| Quarter* | Market Price | | Net Asset Value per Share | | Premium/ (Discount) as a % of Net Asset Value | |
|---|---|---|---|---|---|---|
| | High | Low | High | Low | High | Low |
| 1st Quarter 2017 | $23.75 | $22.54 | $ 26.47 | $ 25.01 | (8.04)% | (11.62)% |
| 2nd Quarter 2017 | $22.84 | $21.45 | $ 25.54 | $ 23.95 | (6.46)% | (13.40)% |
| 3rd Quarter 2017 | $23.05 | $21.85 | $ 25.22 | $ 23.95 | (6.58)% | (12.77)% |
| 4th Quarter 2017 | $25.40 | $23.11 | $ 26.61 | $ 24.85 | (3.64)% | (9.05)% |
| 1st Quarter 2018 | $24.72 | $22.25 | $ 25.64 | $ 24.78 | (3.33)% | (10.48)% |
| 2nd Quarter 2018 | $23.81 | $21.82 | $ 26.47 | $ 24.26 | (7.65)% | (16.05)% |
| 3rd Quarter 2018 | $23.11 | $21.99 | $ 24.98 | $ 23.98 | (6.21)% | (10.79)% |
| 4th Quarter 2018 | $22.50 | $18.71 | $ 24.48 | $ 23.22 | (7.94)% | (19.66)% |
| 1st Quarter 2019 | $21.08 | $19.33 | $ 23.54 | $ 22.61 | (8.28)% | (15.77)% |
| 2nd Quarter 2019 | $21.19 | $18.26 | $ 24.29 | $ 21.72 | (8.36)% | (23.63)% |

The Trust's NAV per common share at the close of business on August 23, 2019 (the last trading date prior to the date of this Prospectus on which the Trust determined its NAV) was $21.22 and the last reported sale price of a common share on the NYSE on that day was $18.08, a discount to NAV of 14.80%.

## Anti-Takeover Provisions in the Agreement and Declaration of Trust

The Agreement and Declaration of Trust includes provisions that could have the effect of limiting the ability of other entities or persons to acquire control of the Trust or to change the composition of its Board. This could have the effect of depriving shareholders of an opportunity to sell their shares at a premium over prevailing market prices by discouraging a third party from seeking to obtain control over the Trust. Such attempts could have the effect of increasing the expenses of the Trust and disrupting the normal operation of the Trust. The Board is divided into three classes, with the terms of one class expiring at each annual meeting of shareholders. At each annual meeting, one class of trustees is elected to a three-year term. This provision could delay for up to two years the replacement of a majority of the Board. A trustee may be removed from office (for cause, and not without cause) by the action of a majority of the remaining trustees followed by a vote of the holders of at least 75% of the shares then entitled to vote for the election of the respective trustee.

In addition, the Trust's Agreement and Declaration of Trust requires the favorable vote of a majority of the Board followed by the favorable vote of the holders of at least 75% of the outstanding shares of each affected class or series of the Trust, voting separately as a class or series, to approve, adopt or authorize certain transactions with 5% or greater holders of a class or series of shares and their associates, unless the transaction has been approved by at least 80% of the trustees, in which case "a majority of the outstanding voting securities" (as defined in the Investment Company Act) of the Trust shall be required. For purposes of these provisions, a 5% or greater holder of a class or series of shares (a "Principal Shareholder") refers to any person who, whether directly or indirectly and whether alone or together with its affiliates and associates, beneficially owns 5% or more of the outstanding shares of all outstanding classes or series of shares of beneficial interest of the Trust.

The 5% holder transactions subject to these special approval requirements are: the merger or consolidation of the Trust or any subsidiary of the Trust with or into any Principal Shareholder; the issuance of any securities of the Trust to any Principal Shareholder for cash, except pursuant to any automatic dividend reinvestment plan; the sale, lease or exchange of all or any substantial part of the assets of the Trust to any Principal Shareholder, except assets having an aggregate fair market value of less than 2% of the total assets of the Trust, aggregating for the purpose of such computation all assets sold, leased or exchanged in any series of similar transactions within a twelve-month period; or the sale, lease or exchange to the Trust or any subsidiary of the Trust, in exchange for securities of the Trust, of any assets of any Principal Shareholder, except assets having an aggregate fair market value of less than 2% of the total assets of the Trust, aggregating for purposes of such computation all assets sold, leased or exchanged in any series of similar transactions within a twelve-month period.

To convert the Trust to an open-end investment company, the Trust's Agreement and Declaration of Trust requires the favorable vote of a majority of the board of the trustees followed by the favorable vote of the holders of at least 75% of the outstanding shares of each affected class or series of shares of the Trust, voting separately as a class or series, unless such amendment has been approved by at least 80% of the trustees, in which case "a majority of the outstanding voting securities" (as defined in the Investment Company Act) of the Trust shall be required. The foregoing vote would satisfy a separate requirement in the Investment Company Act that any

conversion of the Trust to an open-end investment company be approved by the shareholders. If approved in the foregoing manner, conversion of the Trust to an open-end investment company could not occur until 90 days after the shareholders' meeting at which

103

Table of Contents

such conversion was approved and would also require at least 30 days' prior notice to all shareholders. Following any such conversion, it is possible that certain of the Trust's investment policies and strategies would have to be modified to assure sufficient portfolio liquidity. In the event of conversion, the common shares would cease to be listed on the NYSE or other national securities exchanges or market systems. Shareholders of an open-end investment company may require the company to redeem their shares at any time, except in certain circumstances as authorized by or under the Investment Company Act, at their NAV, less such redemption charge, if any, as might be in effect at the time of a redemption. The Trust expects to pay all such redemption requests in cash, but reserves the right to pay redemption requests in a combination of cash and securities. If such partial payment in securities were made, investors may incur brokerage costs in converting such securities to cash. If the Trust were converted to an open-end fund, it is likely that new shares would be sold at NAV plus a sales load. The Board believes, however, that the closed-end structure is desirable in light of the Trust's investment objectives and policies. Therefore, you should assume that it is not likely that the Board would vote to convert the Trust to an open-end fund.

For the purposes of calculating "a majority of the outstanding voting securities" under the Trust's Agreement and Declaration of Trust, each class and series of the Trust shall vote together as a single class, except to the extent required by the Investment Company Act or the Trust's Agreement and Declaration of Trust, with respect to any class or series of shares. If a separate class vote is required, the applicable proportion of shares of the class or series, voting as a separate class or series, also will be required.

The Agreement and Declaration of Trust also provides that the Trust may be liquidated upon the approval of 80% of the trustees.

The Board has determined that provisions with respect to the Board and the shareholder voting requirements described above, which voting requirements are greater than the minimum requirements under Delaware law or the Investment Company Act, are in the best interest of shareholders generally. Reference should be made to the Trust's Agreement and Declaration of Trust, on file with the Commission, for the full text of these provisions, the material terms of which are summarized in this Prospectus.

104

Table of Contents

## Closed-End Fund Structure

The Trust is a non-diversified, closed-end management investment company (commonly referred to as a closed-end fund). Closed-end funds differ from open-end funds (which are generally referred to as mutual funds) in that closed-end funds generally list their shares for trading on a stock exchange and do not redeem their shares at the request of the shareholder. This means that if you wish to sell your shares of a closed-end fund you must trade them on the market like any other stock at the prevailing market price at that time. In a mutual fund, if the shareholder wishes to sell shares of the fund, the mutual fund will redeem or buy back the shares at NAV (less a redemption fee, if applicable, or contingent deferred sales charge, if applicable). Also, mutual funds generally offer new shares on a continuous basis to new investors, and closed-end funds generally do not. The continuous inflows and outflows of assets in a mutual fund can make it difficult to manage a mutual fund's investments. By comparison, closed-end funds are generally able to stay more fully invested in securities that are consistent with their investment objective and also have greater flexibility to make certain types of investments and to use certain investment strategies, such as financial leverage and investments in illiquid securities.

Shares of closed-end funds frequently trade at a discount to their NAV. Because of this possibility and the recognition that any such discount may not be in the interest of shareholders, the Board might consider from time to time engaging in open-market repurchases, tender offers for shares or other programs intended to reduce the discount. We cannot guarantee or assure, however, that the Board will decide to engage in any of these actions, nor is there any guarantee or assurance that such actions, if undertaken, would result in the shares trading at a price equal or close to NAV per share. The Board might also consider converting the Trust to an open-end mutual fund, which would also require a vote of the shareholders of the Trust.

## Repurchase of Common Shares; Discount

Shares of closed-end investment companies often trade at a discount to their NAV, and the Trust's common shares may also trade at a discount to their NAV, although it is possible that they may trade at a premium above NAV. The market price of the Trust's common shares will be determined by such factors as relative demand for and supply of such common shares in the market, the Trust's NAV, general market and economic conditions and other factors beyond the control of the Trust. See "Net Asset Value." Although the Trust's common shareholders will not have the right to redeem their common shares, the Trust may take action to repurchase common shares in the open market or make tender offers for its common shares. This may have the effect of reducing any market discount from NAV. The Board may decide not to take any of these actions. In addition, there can be no assurance that share repurchases or tender offers, if undertaken, will reduce market discount. On November 2, 2016, the Board approved a share repurchase program (the "Repurchase Program") pursuant to which the Trust may repurchase, over a six-month period beginning in December 2016, up to $10 million of its shares of its outstanding shares in open-market transactions. In connection with the May 8, 2017 rights offering, the Board approved the extension of the Repurchase Program for a period of one year from the closing of the rights offering. As of the date of this Prospectus, the Trust has not completed any repurchases.

The amount and timing of the repurchases will be at the discretion of the Trust's Investment Adviser, subject to market conditions and investment considerations. There is no assurance that the Trust will purchase shares at any particular discount levels or in any particular amounts. Any repurchases made under the Repurchase Program would be made on a national securities exchange at the prevailing market price, subject to exchange requirements regarding volume, timing and other limitations under federal securities laws.

Notwithstanding the foregoing, at any time when there are outstanding borrowings, the Trust may not purchase, redeem or otherwise acquire any of its common shares unless (i) all accrued preferred shares dividends have been paid, and (ii) at the time of such purchase, redemption or acquisition, the NAV of the Trust's portfolio (determined after deducting the acquisition price of the common shares) is at least 200% of the liquidation value of the outstanding borrowings. Any service fees incurred in connection with any tender offer made by the Trust will be borne by the Trust and will not reduce the stated consideration to be paid to tendering shareholders.

There is no assurance that, if action is undertaken to repurchase or tender for common shares, such action will result in the common shares trading at a price which approximates their NAV. Although share repurchases and tenders could have a favorable effect on the market price of the Trust's common shares, you should be aware that the acquisition of common shares by the Trust will decrease the capital of the Trust and, therefore, may have the effect of increasing the Trust's expense ratio and decreasing the asset coverage with respect to any borrowings. Any share repurchases or tender offers will be made in accordance with requirements of the Exchange Act, the Investment Company Act, and the principal stock exchange on which the common shares are traded. See the Trust's SAI for a discussion of the U.S. federal income tax implications of a repurchase or tender offer by the Trust.

105

[Table of Contents](#)

Before deciding whether to take any action if the common shares trade below NAV, the Board would likely consider all relevant factors, including the extent and duration of the discount, the liquidity of the Trust's portfolio, the impact of any action that might be taken on the Trust or its shareholders and market considerations. Based on these considerations, even if the Trust's shares should trade at a discount, the Board may determine that, in the interest of the Trust and its shareholders, no action should be taken.

## Tax Matters

The following is a general summary of some of the important U.S. federal income tax considerations affecting the Trust and its common or preferred shareholders that are "United States persons" within the meaning of the Code, and does not address any state, local, foreign or other tax consequences. It reflects provisions of the Code, existing Treasury regulations, and other applicable authority, as of the date of this Prospectus. These authorities may be changed, possibly with retroactive effect, or become subject to new legislative, administrative, or judicial interpretations. This summary does not purport to be a complete description of the U.S. federal income tax considerations applicable to common or preferred shareholders of the Trust. For example, it does not describe certain tax considerations that may be relevant to certain types of holders subject to special treatment under the U.S. federal income tax laws, including shareholders subject to the U.S. federal alternative minimum tax, insurance companies, tax-exempt organizations, pension plans and trusts, RICs, dealers in securities, shareholders holding Trust shares through tax-advantaged accounts (such as 401(k) plans or IRAs), financial institutions, persons who are neither citizens nor residents of the United States, and shareholders holding Trust shares as part of a hedge, straddle, or conversion transaction. This summary assumes that investors hold Trust common or preferred shares as capital assets (within the meaning of the Code). Your investment in the Trust may have other tax implications. Please consult your tax advisor about U.S. federal, state, local, foreign or other tax laws applicable to you, as the tax consequences to an investor in the Trust's common or preferred shares will depend on the facts of his, her or its particular situation. For more information, including a summary of certain tax consequences of investing in the Trust for non-U.S. persons, please see the SAI under "Tax Matters."

This summary does not discuss the tax consequences of an investment in subscription rights of the Trust, separately, or as part of a unit consisting of two or more securities. See "Description of Capital Structure—U.S. Federal Income Tax Consequences of an Issuance of Subscription Rights to Common Shareholders" above for a discussion of the material U.S. federal income tax consequences of the Trust's issuance of subscription rights to common shareholders.

The Trust has elected to be treated as a RIC under Subchapter M of the Code and intends each year to qualify and to be eligible to be treated as such. In order to qualify for the special tax treatment accorded RICs and their shareholders, the Trust must, among other things:

(i) derive at least 90% of its gross income for each taxable year from: (a) dividends, interest (including tax-exempt interest), payments with respect to certain securities loans, gains from the sale or other disposition of stock, securities or foreign currencies, or other income (including but not limited to gains from options, futures and forward contracts) derived with respect to its business of investing in such stock, securities or foreign currencies; and (b) net income derived from interests in "qualified publicly traded partnerships";

(ii) diversify its holdings so that, at the end of each quarter of the Trust's taxable year, (a) at least 50% of the market value of the Trust's total assets consists of cash and cash items, U.S. government securities, the securities of other RICs and other securities limited, in respect of any one issuer, to an amount not greater than 5% of the value of the Trust's total assets and not more than 10% of the outstanding voting securities of such issuer, and (b) not more than 25% of the value of the Trust's total assets is invested, including through corporations in which the Trust owns a 20% or more voting stock interest, (x) in the securities (other than U.S. government securities and the securities of other RICs) of any one issuer or of two or more issuers that the Trust controls, as determined under applicable Code rules, and that are determined to be engaged in the same business or similar or related trades or businesses, or (y) in the securities of one or more "qualified publicly traded partnerships"; and

(iii) distribute to its shareholders with respect to each taxable year at least the sum of 90% of its "investment company taxable income" (as that term is defined in the Code, without regard to the deduction for dividends paid—generally taxable ordinary income and the excess, if any, of net short-term capital gains over net long-term capital losses) and 90% of any net tax-exempt interest income, for such year.

In general, a RIC is not subject to tax at the corporate level on income and gains from investments that are distributed in a timely manner to shareholders in the form of dividends, provided the RIC complies with these ongoing requirements. If the Trust were to fail to comply with the income, diversification or distribution requirements, the Trust could in some cases cure such failure, including by paying a Trust-level tax, paying interest, making additional distributions, or disposing of certain assets. If the Trust were ineligible to or otherwise did not cure such failure for any year or otherwise were to fail to qualify as a RIC accorded special tax treatment, the Trust

would be subject to Trust-level taxation on its taxable income at regular corporate rates and consequently the income available for distribution to shareholders would be reduced. Additionally, all of its distributions from earnings and profits

106

**Table of Contents**

(including from net long-term capital gains) would be taxable to shareholders as ordinary income. For individual shareholders who meet certain holding period requirements, such distribution would be eligible for reduced tax rates applicable to qualified dividend income. In addition, in some cases, the Trust could be required to recognize unrealized gains, pay substantial taxes and interest and make substantial distributions in order to re-qualify as a RIC.

Amounts not distributed on a timely basis in accordance with a calendar-year distribution requirement are subject to a nondeductible 4% federal excise tax at the Trust level. To avoid the tax, the Trust must distribute during each calendar year an amount at least equal to the sum of (i) 98% of its ordinary income (not taking into account any capital gains or losses) for the calendar year, (ii) 98.2% of its capital gains in excess of its capital losses (adjusted for certain ordinary losses) for a one-year period generally ending on October 31 of the calendar year (unless an election is made to use the Trust's taxable year end) and (iii) any such undistributed income from the prior year. For these purposes, the Trust will be treated as having distributed any amount on which it has been subject to corporate income tax in the taxable year ending with the calendar year. The Trust reserves the right to pay the excise tax when circumstances warrant.

Certain of the Trust's investment practices, including Derivative Transactions, short sales and hedging activities generally, as well as the Trust's investments in certain types of securities, including loans or other debt obligations issued or purchased at a discount and preferred stock, may be subject to special and complex U.S. federal income tax provisions that may, among other things: (i) disallow, suspend or otherwise limit the allowance of certain losses or deductions, (ii) convert long-term capital gain or "qualified dividend income" into short-term capital gain or ordinary income taxable at higher rates, (iii) accelerate the recognition of income, (iv) convert short-term losses into long-term losses, (v) cause the Trust to recognize income or gain without a corresponding receipt of cash, (vi) adversely affect the time a purchase or sale of stock or other securities is deemed to occur, (vii) cause adjustments in the holding periods of the Trust's securities, or (viii) otherwise adversely alter the characterization of certain complex financial transactions. These U.S. federal income tax provisions could therefore affect the amount, timing and/or character of distributions to shareholders. In particular, the Trust expects that a substantial portion of the Trust's investments in loans and other debt obligations will be treated as having "market discount" and/or "original issue discount" for U.S. federal income tax purposes, which, in some cases, could be significant, and could cause the Trust to recognize income in respect of these investments before or without receiving cash representing such income. Accordingly, the Trust may be required to, among other things, dispose of securities, including at potentially disadvantageous times or prices, to obtain the cash needed to meet the distribution requirements for qualification as a RIC and to avoid incurring Trust-level U.S. federal income or excise taxes.

Investments in distressed debt obligations that are at risk of or are in default present special tax issues for the Trust. Tax rules are not entirely clear about issues such as whether and to what extent the Trust should recognize market discount on a distressed debt obligation; when the Trust may cease to accrue interest, original issue discount or market discount; when and to what extent the Trust may take deductions for bad debts or worthless securities and how the Trust should allocate payments received on obligations in default between principal and income. These and other related issues will be addressed by the Trust as necessary, in order to seek to ensure that it distributes sufficient income to preserve its eligibility for treatment as a RIC and that it does not become subject to Trust-level U.S. federal income or excise taxes.

Special tax rules may affect the treatment of gains and losses recognized by the Trust when the Trust invests in certain foreign debt securities or engages in foreign currency transactions. The application of these special rules may accelerate or increase the Trust's recognition of ordinary income or loss, and affect the timing, amount and/or character of distributions made by the Trust. In addition, dividend, interest, capital gains and other income received by the Trust from investments outside the United States may be subject to withholding and other taxes imposed by foreign countries. Tax treaties between the United States and other countries may reduce or eliminate such taxes. Shareholders generally will not be entitled separately to claim a credit or deduction with respect to such foreign taxes incurred by the Trust. This will decrease the Trust's yield on securities subject to such taxes. Foreign taxes paid by or withheld from the Trust will reduce the return from the Trust's underlying investments.

Distributions paid to shareholders by the Trust from its net realized long-term capital gains (that is, the excess of any net long-term capital gain over net short-term capital loss, in each case determined with reference to any loss carryforwards) that the Trust properly reports as capital gain dividends ("capital gain dividends") are generally taxable to you as long-term capital gains, regardless of how long you have held your shares. All other dividends paid to you by the Trust, including dividends from net investment income and from short-term capital gains (that is, the excess of any net short-term capital gain over any net long-term capital loss, in each case determined with reference to loss carryforwards), from its earnings and profits are generally taxable to you as ordinary income. Distributions of investment income properly reported by the Trust as derived from "qualified dividend income" will be taxed in the hands of individuals at the rates applicable to long-term capital gains, provided holding period and other requirements are met at both the shareholder and Trust levels. It is not generally expected that a significant portion of Trust distributions will qualify for favorable tax treatment as "qualified dividend income" or as income eligible for the dividend-received deduction for corporate shareholders.

The Trust will designate dividends made to holders of common shares and to holders of preferred shares in accordance with each class's proportionate share of each item of Trust income (such as net capital gains and other taxable income). A class's

107

[Table of Contents](#)

proportionate share of a particular type of income for a year is determined according to the percentage of total dividends paid by the Trust during that year to the class. Although the matter is not free from doubt, due to the absence of direct regulatory or judicial authority, under current law the manner in which the Trust intends to allocate items of ordinary income and net capital gain between the Trust's common shares and its preferred shares will be respected for federal income tax purposes. It is possible that the IRS could disagree and attempt to reallocate the Trust's net capital gain or other taxable income.

The Code generally imposes a 3.8% Medicare contribution tax on the "net investment income" of certain individuals, estates and trusts to the extent their income exceeds certain threshold amounts. Net investment income generally includes for this purpose dividends paid by the Trust, including any capital gain dividends and net capital gains recognized on the sale or exchange of shares of the Trust. Shareholders are advised to consult their tax advisors regarding the possible implications of this additional tax on their investment in the Trust.

If, for any taxable year, the Trust's total distributions exceed both current earnings and profits and accumulated earnings and profits, the excess will generally be treated as a tax-free return of capital up to the amount of your tax basis in the shares. The amount treated as a tax-free return of capital will reduce your tax basis in the shares, thereby increasing your potential gain or reducing your potential loss on a subsequent taxable disposition of the shares. Any amounts distributed to you in excess of your tax basis in the shares will be taxable to you as capital gain.

Dividends and other taxable distributions are taxable to you even if they are reinvested in additional shares of the Trust under the Trust's Dividend Reinvestment Plan. If your dividends and other distributions are reinvested in shares under the Dividend Reinvestment Plan, you generally will be treated as having received a dividend equal to either (i) if shares are purchased on the open market on your behalf, the amount of cash allocated to you for the purchase of such shares, or (ii) if newly issued shares are issued to you, generally, the fair market value of such new shares. Dividends and other distributions paid by the Trust are generally treated as received by you at the time the dividend or distribution is made. If, however, the Trust pays you a dividend in January that was declared and payable to shareholders of record in the previous October, November or December, then such dividend will be treated for tax purposes as being paid by the Trust and received by you on December 31 of the year in which the dividend was declared.

The price of shares purchased at any time may reflect either unrealized gains, or realized but undistributed income or gains. If you purchase shares just prior to a distribution, you will receive a distribution that may be taxable to you even though it economically represents in part a return of your invested capital.

Your broker or other intermediary will send you information after the end of each year setting forth the amount and tax status of any distributions paid to you by the Trust.

If you sell or otherwise dispose of shares of the Trust, you will generally recognize a gain or loss in an amount equal to the difference between your tax basis in such shares of the Trust and the amount you receive in exchange for such shares. Any such gain or loss generally will be long-term capital gain or loss if you have held (or are treated as having held) such shares for more than one year at the time of sale. All or a portion of any loss you realize on a taxable sale or exchange of your shares of the Trust will be disallowed if you acquire other shares of the Trust (whether through the automatic reinvestment of dividends or otherwise) within a 61-day period beginning 30 days before and ending 30 days after your sale or exchange of the shares. In such case, the basis of the shares acquired will be adjusted to reflect the disallowed loss. In addition, any loss realized upon a taxable sale or exchange of Trust shares held (or deemed held) by you for six months or less will be treated as long-term, rather than short-term, to the extent of any capital gain dividends received (or deemed received) by you with respect to those shares.

Your broker or other intermediary may be required to withhold, for U.S. federal backup withholding tax purposes, a portion of the dividends, distributions and redemption proceeds payable to an individual shareholder who fails to provide the broker or other intermediary with the shareholder's correct taxpayer identification number (in the case of an individual, generally, such individual's social security number) or to make the required certification, or who has been notified by the IRS that such shareholder is subject to backup withholding. Certain shareholders are exempt from backup withholding. Backup withholding is not an additional tax and any amount withheld may be refunded or credited against your U.S. federal income tax liability, if any, provided that you furnish the required information to the IRS.

Upon the sale or exchange of shares of the Trust, your broker or other intermediary generally will be required to provide you and the IRS with cost basis and certain other related tax information about the Trust shares you sold or exchanged. This cost basis reporting requirement is effective for shares purchased, including through dividend reinvestment, on or after January 1, 2012. Please consult your broker or other intermediary for more information regarding available methods for cost basis reporting and how to select a particular method. Please consult your tax advisor to determine which available cost basis method is best for you.

108

[Table of Contents](#)

       **The discussions set forth herein and in the Statement of Additional Information do not constitute tax advice, and you are urged to consult your own tax advisor to determine the specific U.S. federal, state, local and foreign tax consequences to you of investing in the Trust.**

**Custodian and Transfer Agent**

       The custodian of the assets of the Trust and its wholly-owned subsidiaries is Bank of New York Mellon (240 Greenwich Street, New York, New York 10286). The custodian performs custodial services for the Trust. American Stock Transfer & Trust Company, LLC (6201 15th Avenue, Brooklyn, New York 11219; telephone (718) 921-8200) serves as the Trust's transfer agent with respect to its common shares.

**Legal Opinion**

       Certain legal matters in connection with the securities have been passed upon for the Trust by Smith, Katzenstein & Jenkins LLP, special Delaware counsel to the Trust.

**Privacy Principles of the Trust**

       The Trust is committed to maintaining the privacy of its shareholders and to safeguarding their non-public personal information. The following information is provided to help you understand what personal information the Trust collects, how the Trust protects that information and why, in certain cases, the Trust may share information with select other parties.

       Generally, the Trust does not receive any non-public personal information relating to its shareholders, although certain non-public personal information of its shareholders may become available to the Trust. The Trust does not disclose any non-public personal information about its shareholders or former shareholders to anyone, except as permitted by law or as is necessary in order to service shareholder accounts (for example, to a transfer agent or third party administrator).

       The Trust restricts access to non-public personal information about its shareholders to employees of the Trust's Investment Adviser and its affiliates with a legitimate business need for the information. The Trust maintains physical, electronic and procedural safeguards designed to protect the non-public personal information of its shareholders.

       No dealer, salesperson or any other person has been authorized to give any information or to make any representations other than those contained in this Prospectus in connection with the Offer and, if given or made, such information or representations must not be relied upon as having been authorized by the Trust or the Investment Adviser. This Prospectus does not constitute an offer to sell or the solicitation of any offer to buy any security other than the common shares of the Trust offered by this Prospectus, nor does it constitute an offer to sell or a solicitation of any offer to buy the common shares of the Trust by anyone in any jurisdiction in which such offer or solicitation is not authorized, or in which the person making such offer or solicitation is not qualified to do so, or to any such person to whom it is unlawful to make such offer or solicitation. Neither the delivery of this Prospectus nor any sale made hereunder shall, under any circumstances, create any implication that information contained herein is correct as of any time subsequent to the date hereof. However, if any material change occurs while this Prospectus is required by law to be delivered, the Prospectus will be amended or Supplemented accordingly.

**Where You Can Find Additional Information**

       We have filed with the Commission a registration statement on Form N-2 together with all amendments and related exhibits under the Securities Act. The registration statement contains additional information about us and the securities being offered by this Prospectus.

       We file annual and semi-annual reports, proxy statements and other information with the Commission. You can inspect any materials we file with the Commission, without charge, at the Commission's Public Reference Room at 100 F Street, N.E., Washington, D.C. 20549. Please call the Commission at 1-800-SEC-0330 for further information on the Public Reference Room. The information we file with the Commission is available free of charge by contacting us at 300 Crescent Court, Suite 700, Dallas, Texas 75201 or by telephone at 1-866-351-4440 or on our web site at *www.nexpointadvisors.com.* The Commission also maintains a web site that contains reports, proxy

statements and other information regarding registrants, including us, that file such information electronically with the Commission. The address of the Commission's web site is *www.sec.gov*. Unless specifically incorporated into this Prospectus, documents contained on our web site or on the Commission's web site about us are not incorporated into this Prospectus and should not be considered to be part of this Prospectus.

## Legal Proceedings

The Trust and Highland Income Fund (formerly, Highland Floating Rate Opportunities Fund), an affiliated fund, are the beneficiaries of a +$360 million judgment against Credit Suisse related to a syndicated real estate transaction fraudulently underwritten by Swiss bank. Credit Suisse is appealing the judgment against it. The two funds also are participants in a similar action against Credit Suisse related to five additional real estate deals in which the funds allege Credit Suisse committed fraud in relation to the underwriting. Case or Docket Number: 05-15-01463CV. Full Names of Principal Parties: Claymore Holdings, LLC v. Credit Suisse AG, Cayman Islands Branch and Credit Suisse Securities (USA) LLC. The Trust would be entitled to 18% of any net amounts ultimately collected on the judgment against Credit Suisse.

109

Table of Contents

**TABLE OF CONTENTS FOR THE STATEMENT OF ADDITIONAL INFORMATION**

|  | Page |
|---|---|
| USE OF PROCEEDS | **1** |
| INVESTMENT RESTRICTIONS | **1** |
| INVESTMENT POLICIES AND TECHNIQUES | **2** |
| OTHER INVESTMENT POLICIES AND TECHNIQUES | **9** |
| MANAGEMENT OF THE TRUST | **12** |
| PORTFOLIO TRANSACTIONS AND BROKERAGE | **24** |
| CONTROL PERSONS AND PRINCIPAL HOLDERS OF SECURITIES | **26** |
| REPURCHASE OF COMMON SHARES | **26** |
| TAX MATTERS | **28** |
| INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM | **39** |
| CUSTODIAN | **39** |
| ADDITIONAL INFORMATION | **39** |
| FINANCIAL STATEMENTS | **39** |
| APPENDIX A | **A-1** |
| APPENDIX B | **B-1** |

110

**Table of Contents**

# NexPoint Strategic Opportunities Fund

**Preferred Shares**
**Subscription Rights**

---

**PROSPECTUS**

---

**August 27, 2019**

Table of Contents

**The information in this preliminary Statement of Additional Information is not complete and may be changed. We may not sell these securities until the Registration Statement filed with the U.S. Securities and Exchange Commission is effective. This preliminary Statement of Additional Information is not an offer to sell these securities and is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.**

**Subject to Completion, Dated August 27, 2019**

**NexPoint Strategic Opportunities Fund**

**Statement of Additional Information**

NexPoint Strategic Opportunities Fund (the "Trust" or "NHF") (formerly, NexPoint Credit Strategies Fund) is a non-diversified, closed-end management investment company registered under the Investment Company Act of 1940, as amended (the "Investment Company Act"). This Statement of Additional Information ("SAI") does not constitute a prospectus, but should be read in conjunction with the prospectus relating thereto dated August 27, 2019 (the "Prospectus"), which is incorporated by reference into this SAI. This SAI does not include all information that a prospective investor should consider before purchasing common shares, and investors should obtain and read the Prospectus prior to purchasing such shares. A copy of the Prospectus may be obtained without charge by calling 1-866-351-4440. You may also obtain a copy of the Prospectus on the U.S. Securities and Exchange Commission's web site *www.sec.gov*. Capitalized terms used but not defined in this SAI have the meanings ascribed to them in the Prospectus.

Table of Contents

## TABLE OF CONTENTS

|  | Page |
|---|---|
| USE OF PROCEEDS | 1 |
| INVESTMENT RESTRICTIONS | 1 |
| INVESTMENT POLICIES AND TECHNIQUES | 2 |
| OTHER INVESTMENT POLICIES AND TECHNIQUES | 9 |
| MANAGEMENT OF THE TRUST | 12 |
| PORTFOLIO TRANSACTIONS AND BROKERAGE | 24 |
| CONTROL PERSONS AND PRINCIPAL HOLDERS OF SECURITIES | 26 |
| REPURCHASE OF COMMON SHARES | 26 |
| TAX MATTERS | 28 |
| INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM | 39 |
| CUSTODIAN | 39 |
| ADDITIONAL INFORMATION | 39 |
| FINANCIAL STATEMENTS | 39 |
| APPENDIX A | A-1 |
| APPENDIX B | B-1 |

[Table of Contents](#)

*This Statement of Additional Information is dated August 27, 2019*

## USE OF PROCEEDS

Unless otherwise specified in a Prospectus Supplement, the Trust will invest the net proceeds of any sales of securities (the "Offering") in accordance with the Trust's investment objectives and policies as stated below, or use such proceeds for other general corporate purposes. Assuming current market conditions, the Trust estimates that investment of the net proceeds of the Offering will be substantially complete within one to three months of the completion of the Offering. Pending such investment, it is anticipated that the proceeds of the Offering will be invested in cash and/or short-term debt securities.

## INVESTMENT RESTRICTIONS

**Fundamental Investment Restrictions**. The following are the fundamental investment restrictions of the Trust, which may not be changed without the approval of the holders of a majority of the outstanding common shares and preferred shares, if any, voting together as a single class, and of the holders of a majority of the outstanding preferred shares, if any, voting as a separate class:

(1) **The Trust will**, under normal market conditions, invest at least 25% of the value of its total assets at the time of purchase in the securities of issuers conducting their principal business activities in the real estate industry, including obligations issued or guaranteed by the U.S. Government, any state or territory of the United States or any of their agencies, instrumentalities or political subdivisions, and investments by any territory of the United States or any of their agencies, instrumentalities or political subdivisions for which the underlying collateral is real estate;

**Except as described below, the Trust, as a fundamental policy, may not:**

(2) issue senior securities or borrow money other than as permitted by the Investment Company Act or pledge its assets other than to secure such issuances or in connection with hedging transactions, short sales, securities lending, when issued and forward commitment transactions and similar investment strategies;

(3) make loans of money or property to any person, except through loans of portfolio securities up to a maximum of 33 1/3% of the Trust's total assets, the purchase of debt securities, including bank loans (senior loans) and participations therein, or the entry into repurchase agreements up to a maximum of 33 1/3% of the Trust's total assets;

(4) underwrite the securities of other issuers, except to the extent that, in connection with the disposition of portfolio securities or the sale of its own securities, the Trust may be deemed to be an underwriter;

(5) purchase or sell real estate, except that the Trust may invest in securities of companies that deal in real estate or are engaged in the real estate business, including real estate investment trusts and real estate operating companies, and instruments secured by real estate or interests therein and the Trust may acquire, hold and sell real estate acquired through default, liquidation, or other distributions of an interest in real estate as a result of the Trust's ownership of such other assets; or

(6) purchase or sell commodities or commodity contracts for any purposes except as, and to the extent, permitted by applicable law without the Trust becoming subject to registration with the Commodity Futures Trading Commission (the "CFTC") as a commodity pool.

As currently relevant to the Trust, the Investment Company Act requires an asset coverage of 200% for a closed-end fund issuing preferred shares and 300% for a closed-end fund issuing borrowings (excluding certain temporary borrowings). The Trust will not engage in any secured borrowings constituting senior securities described under investment restriction number 2 pursuant to which the lenders would be able to foreclose on more than 33 1/3% of the Trust's total assets, measured at the date of the initial borrowing.

**Non-Fundamental Investment Restrictions**. The Trust is also subject to the following non-fundamental restrictions and policies, which may be changed by the Board of Trustees of the Trust (the "Board") and without shareholder approval. The Trust may not:

(1) make any short sale of securities except in conformity with applicable laws, rules and regulations and unless after giving effect to such sale, the market value of all securities sold short does not exceed 25% of the value of the Trust's total assets and the Trust's aggregate short sales of a particular class of securities of an issuer does not exceed 25% of the then outstanding securities of that class. The Trust may also make short sales "against the box" without respect to such limitations. In this type of short sale, at the time of the sale, the Trust owns or has the immediate and unconditional right to acquire at no additional cost the identical security; and

(2)    purchase securities of open-end or closed-end investment companies except in compliance with the Investment Company Act or any exemptive relief obtained thereunder. Under the Investment Company Act, the Trust may invest up to 10% of

1

**Table of Contents**

its total assets in the aggregate in shares of other investment companies and up to 5% of its total assets in any one investment company, provided the investment does not represent more than 3% of the voting stock of the acquired investment company at the time such shares are purchased. As a shareholder in any investment company, the Trust will bear its ratable share of that investment company's expenses, and will remain subject to payment of the Advisory Fees and other expenses with respect to assets so invested. Holders of common shares will therefore be subject to duplicative expenses to the extent the Trust invests in other investment companies. In addition, the securities of other investment companies may be leveraged and will therefore be subject to the risks of leverage. The NAV and market value of leveraged shares will be more volatile and the yield to shareholders will tend to fluctuate more than the yield generated by unleveraged shares.

In addition, to comply with the federal tax requirements for qualification as a registered investment company, the Trust's investments must meet certain diversification requirements. See "Tax Matters."

For purposes of this SAI, a "majority of the outstanding" shares means (a) 67% or more of the Trust's outstanding voting securities present at a meeting, if the holders of more than 50% of its outstanding voting securities are present or represented by proxy, or (b) more than 50% of its outstanding voting securities, whichever is less.

The percentage limitations applicable to the Trust's portfolio described in the Prospectus and this SAI apply only at the time of investment, except that the percentage limitation with respect to borrowing applies at all times, and the Trust will not be required to sell securities due to subsequent changes in the value of securities it owns.

<h2 style="text-align:center">INVESTMENT POLICIES AND TECHNIQUES</h2>

The following information supplements the discussion of the Trust's investment objectives, policies and techniques that are described in the Prospectus.

The Trust's investment objectives are to provide both current income and capital appreciation. The Trust seeks to achieve its investment objectives by investing primarily in the following categories of securities and instruments of corporations and other business entities: (i) secured and unsecured floating and fixed rate loans; (ii) bonds and other debt obligations; (iii) debt obligations of stressed, distressed and bankrupt issuers; (iv) structured products, including but not limited to, mortgage-backed and other asset-backed securities and collateralized debt obligations; (v) equities; (vi) other investment companies, including business development companies ("BDCs"); and (vii) real estate investment trusts ("REITs"). The Trust may also invest in derivative instruments that have economic characteristics similar to instruments in investment categories (i) - (vii). Subject to these general guidelines, NexPoint Advisors, L.P. (the "Investment Adviser") has broad discretion to allocate the Trust's assets among these investment categories and other investments and to change allocations as conditions warrant.

There can be no assurance that the Trust will achieve its investment objective. Investors should not consider the one Trust alone to be a complete investment program. The Trust is subject to the risk of changing economic conditions, as well as the risk inherent in the ability of the portfolio manager to make changes in the composition of the Trust in anticipation of changes in economic, business and financial conditions. As with any security, a risk of loss is inherent in an investment in the shares of the Trust. The securities, investments, and investment practices used by the Trust all have attendant risks of varying degrees. As described below, an investment in the Trust entails special additional risks as a result of its ability to invest a substantial portion of their assets in foreign securities.

Unless otherwise indicated, the Trust is permitted to engage in the following investment strategies and techniques. The Trust is not obligated to pursue the following strategies or techniques and does not represent that these strategies or techniques are available now or will be available at any time in the future. The Trust will not purchase all of the following types of securities or employ all of the following strategies unless doing so is consistent with its investment objective.

### Short-Term Debt Securities

For temporary defensive purposes or to keep cash on hand, the Trust may invest up to 100% of its total assets in cash equivalents and short-term debt securities. Short-term debt investments are defined to include, without limitation, the following securities, as well as pooled investment vehicles (for example, money market funds) that invest in these securities:

(1) U.S. government securities, including bills, notes and bonds differing as to maturity and rates of interest that are either issued or guaranteed by the U.S. Treasury or by U.S. government agencies or instrumentalities. U.S. government securities include securities

issued by (a) the Federal Housing Administration, Farmers Home Administration, Export-Import Bank of the United States, Small Business Administration, and Government National Mortgage Association, whose securities are supported by the full faith and credit of the United States; (b) the Federal Home Loan Banks, Federal Intermediate Credit Banks, and Tennessee Valley Authority, whose securities are supported by the right of the agency to borrow from the U.S. Treasury; (c) the Federal National Mortgage Association

2

Table of Contents

(FNMA) and Federal Home Loan Mortgage Corporation (FHLMC), whose securities had historically been supported by the discretionary authority of the U.S. government to purchase certain obligations of the agencies or instrumentalities but which are now in U.S. government receivership; and (d) the Student Loan Marketing Association, whose securities are supported only by its credit. While the U.S. government provides financial support to such U.S. government-sponsored agencies or instrumentalities, no assurance can be given that it always will do so since it is not so obligated by law. The U.S. government, its agencies and instrumentalities do not guarantee the market value of their securities. Consequently, the value of such securities may fluctuate.

(2) Certificates of deposit issued against funds deposited in a bank or a savings and loan association. Such certificates are for a definite period of time, earn a specified rate of return, and are normally negotiable. The issuer of a certificate of deposit agrees to pay the amount deposited plus interest to the bearer of the certificate on the date specified thereon. Certificates of deposit purchased by the Trust may not be fully insured by the Federal Deposit Insurance Corporation.

(3) Repurchase agreements, which involve purchases of debt securities. At the time the Trust purchases securities pursuant to a repurchase agreement, it simultaneously agrees to resell and redeliver such securities to the seller, who also simultaneously agrees to buy back the securities at a fixed price and time. This assures a predetermined yield for the Trust during its holding period, because the resale price is always greater than the purchase price and reflects an agreed-upon market rate. Such actions afford an opportunity for the Trust to invest temporarily available cash. The Trust may enter into repurchase agreements only with respect to obligations of the U.S. government, its agencies or instrumentalities; certificates of deposit; or bankers' acceptances in which the Trust may invest. Repurchase agreements may be considered loans to the seller, collateralized by the underlying securities. The risk to the Trust is limited to the ability of the seller to pay the agreed-upon sum on the repurchase date; in the event of default, the repurchase agreement provides that the Trust is entitled to sell the underlying collateral. If the value of the collateral declines after the agreement is entered into, and if the seller defaults under a repurchase agreement when the value of the underlying collateral is less than the repurchase price, the Trust could incur a loss of both principal and interest. If the seller were to be subject to a federal bankruptcy proceeding, the ability of the Trust to liquidate the collateral could be delayed or impaired because of certain provisions of the bankruptcy laws.

(4) Commercial paper, which consists of short-term unsecured promissory notes, including variable rate master demand notes issued by corporations to finance their current operations. Master demand notes are direct lending arrangements between the Trust and a corporation. There is no secondary market for such notes. However, they are redeemable by the Trust at any time. NexPoint Advisors, L.P., the Trust's investment adviser (the "Investment Adviser") will consider the financial condition of the corporation (*e.g.*, earning power, cash flow and other liquidity ratios) and will continually monitor the corporation's ability to meet all of its financial obligations, because the Trust's liquidity might be impaired if the corporation were unable to pay principal and interest on demand. Investments in commercial paper will be limited to commercial paper rated in the highest categories by a major rating agency and which mature within one year of the date of purchase or carry a variable or floating rate of interest.

**Equity Securities**

The Trust may invest in equity securities including preferred stock, convertible securities, warrants and depository receipts.

*Preferred Stock*. Preferred stock has a preference over common stock in liquidation (and generally dividends as well) but is subordinated to the liabilities of the issuer in all respects. As a general rule, the market value of preferred stock with a fixed dividend rate and no conversion element varies inversely with interest rates and perceived credit risk, while the market price of convertible preferred stock generally also reflects some element of conversion value. Because preferred stock is junior to debt securities and other obligations of the issuer, deterioration in the credit quality of the issuer will cause greater changes in the value of a preferred stock than in a more senior debt security with similar stated yield characteristics. Unlike interest payments on debt securities, preferred stock dividends are payable only if declared by the issuer's board of directors. Preferred stock also may be subject to optional or mandatory redemption provisions.

*Convertible Securities*. A convertible security is a bond, debenture, note, preferred stock or other security that may be converted into or exchanged for a prescribed amount of common stock or other equity security of the same or a different issuer within a particular period of time at a specified price or formula. A convertible security entitles the holder to receive interest paid or accrued on debt or the dividend paid on preferred stock until the convertible security matures or is redeemed, converted or exchanged. Before conversion, convertible securities have characteristics similar to nonconvertible income securities in that they ordinarily provide a stable stream of income with generally higher yields than those of common stocks of the same or similar issuers, but lower yields than comparable nonconvertible securities. The value of a convertible security is influenced by changes in interest rates, with investment value declining as interest rates increase and increasing as interest rates decline. The credit standing of the issuer and other factors also may have an effect on the convertible security's investment value. Convertible securities rank senior to common stock in a corporation's capital

structure but are usually subordinated to comparable nonconvertible securities. Convertible securities may be subject to redemption at the option of the issuer at a price established in the convertible security's governing instrument.

*Warrants*. Warrants, which are privileges issued by corporations enabling the owners to subscribe to and purchase a specified number of shares of the corporation at a specified price during a specified period of time. Subscription rights normally have a short life span to expiration. The purchase of warrants involves the risk that the Trust could lose the purchase value of a right or warrant if

3

Table of Contents

the right to subscribe to additional shares is not exercised prior to the warrants' expiration. Also, the purchase of warrants involves the risk that the effective price paid for the warrant added to the subscription price of the related security may exceed the value of the subscribed security's market price such as when there is no movement in the level of the underlying security.

*Depository Receipts*. The Trust may invest in both sponsored and unsponsored American Depository Receipts ("ADRs"), European Depository Receipts ("EDRs"), Global Depository Receipts ("GDRs") and other similar global instruments. ADRs typically are issued by an American bank or trust company and evidence ownership of underlying securities issued by a non-U.S. corporation. EDRs, which are sometimes referred to as Continental Depository Receipts, are receipts issued in Europe, typically by non-U.S. banks and trust companies, that evidence ownership of either non-U.S. or U.S. underlying securities. GDRs are depository receipts structured like global debt issues to facilitate trading on an international basis. Unsponsored ADR, EDR and GDR programs are organized independently and without the cooperation of the issuer of the underlying securities. As a result, available information concerning the issuer may not be as current as for sponsored ADRs, EDRs and GDRs, and the prices of unsponsored ADRs, EDRs and GDRs may be more volatile than if such instruments were sponsored by the issuer. Investments in ADRs, EDRs and GDRs may present additional investment considerations of credit or securities market investments that are either issued by entities domiciled outside of the U.S., or denominated in currencies other than the U.S. dollar, or both ("Non-U.S. Securities").

### Variable and Floating Rate Instruments

The Trust may purchase rated and unrated variable and floating rate instruments. These instruments may include variable amount master demand notes that permit the indebtedness thereunder to vary in addition to providing for periodic adjustments in the interest rate. The Trust may invest in leveraged inverse floating rate debt instruments ("Inverse Floaters"). The interest rate of an Inverse Floater resets in the opposite direction from the market rate of interest to which it is indexed. An Inverse Floater may be considered to be leveraged to the extent that its interest rate varies by a magnitude that exceeds the magnitude of the change in the index rate of interest. The higher degree of leverage inherent in Inverse Floaters is associated with greater volatility in their market values. Issuers of unrated variable and floating rate instruments must satisfy the same criteria as set forth above for the Trust. The absence of an active secondary market with respect to particular variable and floating rate instruments, however, could make it difficult for the Trust to dispose of a variable or floating rate instrument if the issuer defaulted on its payment obligation or during periods when the Trust is not entitled to exercise its demand rights.

Such instruments may include variable amount master demand notes that permit the indebtedness thereunder to vary in addition to providing for periodic adjustments in the interest rate. The absence of an active secondary market with respect to particular variable and floating rate instruments could make it difficult for the Trust to dispose of a variable or floating rate note if the issuer defaulted on its payment obligation or during periods that the Trust is not entitled to exercise its demand rights, and the Trust could, for these or other reasons, suffer a loss, with respect to such instruments.

### Derivative Transactions and Risk Management

Consistent with its investment objectives and policies set forth in the Prospectus and in addition to its option strategy, the Trust may also enter into certain risk management transactions. In particular, the Trust may purchase and sell futures contracts, exchange listed and over-the-counter put and call options on securities, equity and other indices and futures contracts, forward foreign currency contracts, and may enter into various interest rate transactions. Derivative Transactions may be used to attempt to protect against possible changes in the market value of the Trust's portfolio resulting from fluctuations in the securities markets and changes in interest rates, to protect the Trust's unrealized gains in the value of its portfolio securities, to facilitate the sale of such securities for investment purposes and to establish a position in the securities markets as a temporary substitute for purchasing particular securities. Any or all of these Derivative Transactions may be used at any time. There is no particular strategy that requires use of one technique rather than another. Use of any Derivative Transaction is a function of market conditions. The ability of the Trust to manage them successfully will depend on the Investment Adviser's ability to predict pertinent market movements as well as sufficient correlation among the instruments, which cannot be assured. The Derivative Transactions that the Trust may use are described below.

*Futures Contracts and Options on Futures Contracts*. In connection with its Derivative Transactions and other risk management strategies, the Trust may also enter into contracts for the purchase or sale for future delivery ("futures contracts") of securities, aggregates of securities or indices or prices thereof, other financial indices and U.S. government debt securities or options on the above. The Trust will engage in such transactions only for bona fide risk management and other portfolio management purposes.

*Forward Foreign Currency Contracts*. The Trust may enter into forward currency contracts to purchase or sell foreign currencies for a fixed amount of U.S. dollars or another foreign currency. A forward currency contract involves an obligation to purchase or sell a specific currency at a future date, which may be any fixed number of days from the date of the forward currency contract agreed upon

by the parties, at a price set at the time the forward currency contract is entered into. Forward currency contracts are traded directly between currency traders (usually large commercial banks) and their customers.

4

[Table of Contents](#)

The Trust may engage in various forward currency contract strategies, including without limitation the following:

- The Trust may purchase a forward currency contract to lock in the U.S. dollar price of a security denominated in a foreign currency that the Trust intends to acquire. The Trust may sell a forward currency contract to lock in the U.S. dollar equivalent of the proceeds from the anticipated sale of a security or a dividend or interest payment denominated in a foreign currency.

- The Trust may also use forward currency contracts to shift the Trust's exposure to foreign currency exchange rate changes from one currency to another. For example, if the Trust owns securities denominated in a foreign currency and the Investment Adviser believes that currency will decline relative to another currency, the Trust might enter into a forward currency contract to sell the appropriate amount of the first foreign currency with payment to be made in the second currency.

- The Trust may also purchase forward currency contracts to enhance income when the Investment Adviser anticipates that the foreign currency will appreciate in value but securities denominated in that currency do not present attractive investment opportunities.

- The Trust may also use forward currency contracts to offset against a decline in the value of existing investments denominated in a foreign currency. Such a transaction would tend to offset both positive and negative currency fluctuations, but would not offset changes in security values caused by other factors.

- The Trust could also enter into a forward currency contract to sell another currency expected to perform similarly to the currency in which the Trust's existing investments are denominated. This type of transaction could offer advantages in terms of cost, yield or efficiency, but may not offset currency exposure as effectively as a simple forward currency transaction to sell U.S. dollars. This type of transaction may result in losses if the currency sold does not perform similarly to the currency in which the Trust's existing investments are denominated.

- The Trust may also use forward currency contracts in one currency or a basket of currencies to attempt to offset against fluctuations in the value of securities denominated in a different currency if the Investment Adviser anticipates that there will be a correlation between the two currencies.

- The cost to the Trust of engaging in forward currency contracts varies with factors such as the currency involved, the length of the contract period and the market conditions then prevailing. Because forward currency contracts are usually entered into on a principal basis, no fees or commissions are involved.

- When the Trust enters into a forward currency contract, it relies on the counterparty to make or take delivery of the underlying currency at the maturity of the contract. Failure by the counterparty to do so would result in the loss of some or all of any expected benefit of the transaction. Secondary markets generally do not exist for forward currency contracts, with the result that closing transactions generally can be made for forward currency contracts only by negotiating directly with the counterparty. Thus, there can be no assurance that the Trust will in fact be able to close out a forward currency contract at a favorable price prior to maturity. In addition, in the event of insolvency of the counterparty, the Trust might be unable to close out a forward currency contract. In either event, the Trust would continue to be subject to market risk with respect to the position, and would continue to be required to maintain a position in securities denominated in the foreign currency or to maintain cash or liquid assets in a segregated account. The precise matching of forward currency contract amounts and the value of the securities involved generally will not be possible because the value of such securities, measured in the foreign currency, will change after the forward currency contract has been established. Thus, the Trust might need to purchase or sell foreign currencies in the spot (cash) market to the extent such foreign currencies are not covered by forward currency contracts. The projection of short-term currency market movements is extremely difficult, and the successful execution of a short-term strategy is highly uncertain.

***Calls on Securities, Indices and Futures Contracts***. In addition to its option strategy, in order to enhance income or reduce fluctuations on NAV, the Trust may sell or purchase call options ("calls") on securities and indices based upon the prices of futures contracts and debt or equity securities that are traded on U.S. and non-U.S. securities exchanges and in the over-the-counter markets. A call option gives the purchaser of the option the right to buy, and obligates the seller to sell, the underlying security, futures contract or index at the exercise price at any time or at a specified time during the option period. All such calls sold by the Trust must be "covered" as long as the call is outstanding (*i.e.*, the Trust must own the instrument subject to the call or other securities or assets acceptable for applicable segregation and coverage requirements). A call sold by the Trust exposes the Trust during the term of the option to possible loss of opportunity to realize appreciation in the market price of the underlying security, index or futures contract and may require the Trust to hold an instrument which it might otherwise have sold. The purchase of a call gives the Trust the right to buy a security,

futures contract or index at a fixed price. Calls on futures on securities must also be covered by assets or instruments acceptable under applicable segregation and coverage requirements.

*Puts on Securities, Indices and Futures Contracts*. In addition to its option strategy, the Trust may purchase put options ("puts") that relate to securities (whether or not it holds such securities in its portfolio), indices or futures contracts. For the same

5

[Table of Contents](#)

purposes, the Trust may also sell puts on securities, indices or futures contracts on such securities if the Trust's contingent obligations on such puts are covered by assets consisting of cash or securities having a value not less than the exercise price. In selling puts, there is a risk that the Trust may be required to buy the underlying security at a price higher than the current market price.

*Interest Rate Transactions*. Among the Derivative Transactions in which the Trust may enter into are interest rate swaps and the purchase or sale of interest rate caps and floors. The Trust expects to enter into these transactions primarily to preserve a return or spread on a particular investment or portion of its portfolio as a duration management technique or to protect against any increase in the price of securities the Trust anticipates purchasing at a later date. Interest rate swaps involve the exchange by the Trust with another party of their respective commitments to pay or receive interest, *e.g.*, an exchange of floating rate payments for fixed rate payments with respect to a notional amount of principal. The purchase of an interest rate cap entitles the purchaser, to the extent that a specified index exceeds a predetermined interest rate, to receive payments of interest on a notional principal amount from the party selling such interest rate cap. The purchase of an interest rate floor entitles the purchaser, to the extent that a specified index falls below a predetermined interest rate, to receive payments of interest on a notional principal amount from the party selling such interest rate floor.

The Trust may enter into interest rate swaps, caps and floors on either an asset-based or liability-based basis, depending on whether it is offsetting volatility with respect to its assets or liabilities, and will usually enter into interest rate swaps on a net basis, *i.e.*, the two payment streams are netted out, with the Trust receiving or paying, as the case may be, only the net amount of the two payments on the payment dates. Inasmuch as these Derivative Transactions are entered into for good faith risk management purposes, the Investment Adviser and the Trust will not treat them as being subject to its borrowing restrictions. The Trust will accrue the net amount of the excess, if any, of the Trust's obligations over its entitlements with respect to each interest rate swap on a daily basis and will designate on its books and records with a custodian an amount of cash or liquid securities having an aggregate NAV at all times at least equal to the accrued excess. The Trust will enter into interest rate swap, cap or floor transactions only with counterparties that are judged by the Investment Adviser to present acceptable credit risk to the Trust. If there is a default by the other party to such a transaction, the Trust will have contractual remedies pursuant to the agreements related to the transaction. The swap market has grown substantially in recent years with a large number of banks and investment banking firms acting both as principals and as agents utilizing standardized swap documentation. Caps and floors are more recent innovations for which standardized documentation has not yet been developed and, accordingly, they are less liquid than swaps.

**Additional Characteristics and Risks of Derivative Transactions**

In order to manage the risk of its securities portfolio, or to enhance income or gain as described in the Prospectus, the Trust will engage in Derivative Transactions. The Trust will engage in such activities in the Investment Adviser's discretion, and may not necessarily be engaging in such activities when movements in interest rates that could affect the value of the assets of the Trust occur. The Trust's ability to pursue certain of these strategies may be limited by applicable regulations of the CFTC. The Trust's Derivative Transactions may affect the amount, timing and character of distributions to shareholders and, therefore, may accelerate and/or increase the amount of taxes payable by shareholders. In addition, the Trust's ability to engage in certain Derivative Transactions may be limited by tax considerations. See "Tax Matters" below for more information.

**Put and Call Options on Securities and Indices**

The Trust may purchase and sell put and call options on securities and indices. A put option gives the purchaser of the option the right to sell and the writer the obligation to buy the underlying security at the exercise price during the option period. The Trust may also purchase and sell options on securities indices ("index options"). Index options are similar to options on securities except that, rather than taking or making delivery of securities underlying the option at a specified price upon exercise, an index option gives the holder the right to receive cash upon exercise of the option if the level of the securities index upon which the option is based is greater, in the case of a call, or less, in the case of a put, than the exercise price of the option. The purchase of a put option on a security could protect the Trust's holdings in a security or a number of securities against a substantial decline in the market value. A call option gives the purchaser of the option the right to buy and the seller the obligation to sell the underlying security or index at the exercise price during the option period or for a specified period prior to a fixed date. The purchase of a call option on a security could protect the Trust against an increase in the price of a security that it intended to purchase in the future. In the case of either put or call options that it has purchased, if the option expires without being sold or exercised, the Trust will experience a loss in the amount of the option premium plus any related commissions. When the Trust sells put and call options, it receives a premium as the seller of the option. The premium that the Trust receives for selling the option will serve as a partial offset, in the amount of the option premium, against changes in the value of the securities in its portfolio. During the term of the option, however, a covered call seller has, in return for the premium on the option, given up the opportunity for capital appreciation above the exercise price of the option if the value of the underlying security increases, but has retained the risk of loss should the price of the underlying security decline. Conversely, a secured put seller retains the risk of loss should the market value of the underlying security decline below the exercise price of the option, less the premium

received on the sale of the option. The Trust is authorized to purchase and sell exchange listed options and over the-counter options ("OTC Options") which are privately negotiated with the counterparty. Listed options are issued by the Options Clearing Corporation ("OCC") which guarantees the performance of the obligations of the parties to such options.

6

**Table of Contents**

The Trust's ability to close out its position as a purchaser or seller of an exchange listed put or call option is dependent upon the existence of a liquid secondary market on option exchanges. Among the possible reasons for the absence of a liquid secondary market on an exchange are: (i) insufficient trading interest in certain options; (ii) restrictions on transactions imposed by an exchange; (iii) trading halts, suspensions or other restrictions imposed with respect to particular classes or series of options or underlying securities; (iv) interruption of the normal operations on an exchange; (v) inadequacy of the facilities of an exchange or OCC to handle current trading volume; or (vi) a decision by one or more exchanges to discontinue the trading of options (or a particular class or series of options), in which event the secondary market on that exchange (or in that class or series of options) would cease to exist, although outstanding options on that exchange that had been listed by the OCC as a result of trades on that exchange would generally continue to be exercisable in accordance with their terms. OTC Options are purchased from or sold to dealers, financial institutions or other counterparties which have entered into direct agreements with the Trust. With OTC Options, such variables as expiration date, exercise price and premium will be agreed upon between the Trust and the counterparty, without the intermediation of a third party such as the OCC. If the counterparty fails to make or take delivery of the securities underlying an option it has written, or otherwise settle the transaction in accordance with the terms of that option as written, the Trust would lose the premium paid for the option as well as any anticipated benefit of the transaction.

The hours of trading for options on securities may not conform to the hours during which the underlying securities are traded. To the extent that the option markets close before the markets for the underlying securities, significant price movements can take place in the underlying markets that cannot be reflected in the option markets.

**Futures Contracts and Related Options**

*Characteristics*. The Trust may sell financial futures contracts or purchase put and call options on such futures as an offset against anticipated market movements. The sale of a futures contract creates an obligation by the Trust, as seller, to deliver the specific type of financial instrument called for in the contract at a specified future time for a specified price. Options on futures contracts are similar to options on securities except that an option on a futures contract gives the purchaser the right in return for the premium paid to assume a position in a futures contract (a long position if the option is a call and a short position if the option is a put).

*Margin Requirements*. At the time a futures contract is purchased or sold, the Trust must allocate cash or securities as a deposit payment ("initial margin"). It is expected that the initial margin that the Trust will pay may range from approximately 1% to approximately 5% of the value of the securities or commodities underlying the contract. In certain circumstances, however, such as periods of high volatility, the Trust may be required by an exchange to increase the level of its initial margin payment. Additionally, initial margin requirements may be increased generally in the future by regulatory action. An outstanding futures contract is valued daily and the payment in case of "variation margin" may be required, a process known as "marking to the market." Transactions in listed options and futures are usually settled by entering into an offsetting transaction, and are subject to the risk that the position may not be able to be closed if no offsetting transaction can be arranged.

*Limitations on Use of Futures and Options on Futures*. The Trust currently may enter into such transactions without limit for bona fide strategic purposes, including risk management and duration management and other portfolio strategies. The Trust may also engage in transactions in futures contracts or related options for non-strategic purposes to enhance income or gain provided that the Trust will not enter into a futures contract or related option (except for closing transactions) for purposes other than bona fide strategic purposes, or risk management including duration management if, immediately thereafter, the sum of the amount of its initial deposits and premiums on open contracts and options would exceed 5% of the Trust's liquidation value, *i.e.*, net assets (taken at current value); provided, however, that in the case of an option that is in-the-money at the time of the purchase, the in-the-money amount may be excluded in calculating the 5% limitation. The above policies are non-fundamental and may be changed by the Board at any time. Also, when required, an account of cash equivalents designated on the books and records will be maintained and marked to market on a daily basis in an amount equal to the market value of the contract.

*Segregation and Cover Requirements*. Futures contracts, interest rate swaps, caps, floors and collars, short sales, reverse repurchase agreements and dollar rolls, and listed or OTC options on securities, indices and futures contracts sold by the Trust are generally subject to earmarking and coverage requirements of either the CFTC or the SEC, with the result that, if the Trust does not hold the security or futures contract underlying the instrument, the Trust will be required to designate on its books and records on an ongoing basis cash, U.S. government securities, or other liquid securities in an amount at least equal to the Trust's net obligations with respect to such instruments.

*Such Amounts Fluctuate as the Obligations Increase or Decrease*. The earmarking requirement can result in the Trust maintaining securities positions it would otherwise liquidate, segregating assets at a time when it might be disadvantageous to do so or

otherwise restrict portfolio management.

7

[Table of Contents](#)

*Derivative Transactions Present Certain Risks*. With respect to Derivative Transactions and risk management, the variable degree of correlation between price movements of strategic instruments and price movements in the position being offset create the possibility that losses using the strategy may be greater than gains in the value of the Trust's position. The same is true for such instruments entered into for income or gain. In addition, certain instruments and markets may not be liquid in all circumstances. As a result, in volatile markets, the Trust may not be able to close out a transaction without incurring losses substantially greater than the initial deposit. Although the use of Derivative Transactions for hedging purposes may reduce the risk of loss due to a decline in the value of an underlying securities position, at the same time such use tends to limit any potential gain which might result from an increase in the value of such position. The ability of the Trust to successfully utilize Derivative Transactions will depend on the Investment Adviser's ability to predict pertinent market movements and sufficient correlations, which cannot be assured. Finally, the daily deposit requirements in futures contracts that the Trust has sold create an ongoing greater potential financial risk than do options transactions, where the exposure is limited to the cost of the initial premium. Losses due to the use of Derivative Transactions will reduce NAV.

*Regulatory Considerations*. The Trust is sponsored by a person who has claimed an exclusion from the definition of the term "commodity pool operator" under the Commodity Exchange Act ("CEA") pursuant to Rule 4.5 under the CEA; therefore, the Investment Adviser (with respect to the Trust) is not subject to registration or regulation as a "commodity pool operator" under the CEA.

**Real Estate Investment Trusts ("REITs")**

The Trust may invest in REITs. REITs are pooled investment vehicles that invest primarily in income-producing real estate or real estate-related loans or interests. REITs are subject to risks similar to those associated with direct ownership of real estate (including loss to casualty or condemnation, increases in property taxes and operating expenses, zoning law amendments, changes in interest rates, overbuilding and increased competition, variations in market value, adverse changes in the real estate markets generally or in specific sectors of the real estate industry and possible environmental liabilities), as well as additional risks discussed below.

REITs are generally classified as equity REITs, mortgage REITs or a combination of equity and mortgage REITs. Equity REITs invest the majority of their assets directly in real property and derive income primarily from the collection of rents. Equity REITs can also realize capital gains by selling properties that have appreciated in value. Mortgage REITs invest the majority of their assets in real estate mortgages and derive income from the collection of interest payments. REITs are not taxed on income distributed to shareholders provided they comply with the applicable requirements of the Internal Revenue Code of 1986, as amended (the "Code"). The Trust will indirectly bear its proportionate share of any management and other expenses paid by REITs in which it invests in addition to the expenses paid by the Trust. Debt securities issued by REITs are, for the most part, general and unsecured obligations and are subject to risks associated with REITs.

Investing in REITs involves certain unique risks in addition to those risks associated with investing in the real estate industry in general. An equity REIT may be affected by changes in the value of the underlying properties owned by the REIT. A mortgage REIT may be affected by changes in interest rates and the ability of the issuers of its portfolio mortgages to repay their obligations. REITs are dependent upon the skills of their managers and are not diversified. REITs are generally dependent upon maintaining cash flows to repay borrowings and to make distributions to shareholders and are subject to the risk of default by lessees or borrowers. REITs whose underlying assets are concentrated in properties used by a particular industry, such as health care, are also subject to risks associated with such industry. REITs are often leveraged or invest in properties that are themselves leveraged, exposing them to the risks of leverage generally. Among other things, leverage will generally increase losses during periods of real estate market declines.

REITs (especially mortgage REITs) are also subject to interest rate risks. When interest rates decline, the value of a REIT's investment in fixed rate obligations can be expected to rise. Conversely, when interest rates rise, the value of a REIT's investment in fixed rate obligations can be expected to decline. If the REIT invests in adjustable rate mortgage loans the interest rates on which are reset periodically, yields on a REIT's investments in such loans will gradually align themselves to reflect changes in market interest rates. This causes the value of such investments to fluctuate less dramatically in response to interest rate fluctuations than would investments in fixed rate obligations.

REITs may have limited financial resources, may trade less frequently and in a more limited volume and may be subject to more abrupt or erratic price movements than larger company securities.

The Trust seeks to gain exposure to the real estate markets, in whole or in part, through investing in certain REIT subsidiaries of the Trust. The Trust invests in NexPoint Real Estate Opportunities, LLC (formerly Freedom REIT) ("NREO"), organized under the laws of Delaware on September 17, 2012 and NexPoint Real Estate Capital, LLC ("NREC"), organized under the laws of Delaware on March 31, 2014 (each, a "Subsidiary"). Each Subsidiary has elected to be taxed as a REIT. Each Subsidiary is generally subject to the same

investment policies and restrictions of the Trust. As of June 30, 2019, NREO and NREC accounted for approximately, 2.9% and 22.0% respectively, of the Trust's Managed Assets and approximately 2.8% and 21.7%, respectively, of the Trust's total (gross)

8

[Table of Contents](#)

assets. The Investment Adviser does not charge an additional fee on assets held in each Subsidiary. The Trust intends to limit its investments in each Subsidiary and related entities to the extent necessary to qualify as a regulated investment company ("RIC") for tax purposes. In general, and subject to certain exceptions not applicable here, a RIC is not permitted to invest, including through corporations in which the RIC owns a 20% or more voting stock interest, more than 25% of its total assets in any one issuer, or in any two or more issuers which the taxpayer controls and which are determined to be engaged in the same or similar trades or businesses or related trades or businesses.

### Portfolio Turnover

The Trust's annual portfolio turnover rate may vary greatly from year to year. Although the Trust cannot accurately predict its annual portfolio turnover rate, it is not expected to exceed 100% under normal circumstances. For the fiscal year ended December 31, 2018, the portfolio turnover rate was 48%, and for the fiscal year ended December 31, 2017, the portfolio turnover rate was 36%. Portfolio turnover rate is not considered a limiting factor in the execution of investment decisions for the Trust. There are no limits on the rate of portfolio turnover, and investments may be sold without regard to length of time held when the Trust's investment strategy so dictates. A higher portfolio turnover rate results in correspondingly greater brokerage commissions and other transactional expenses that are borne by the Trust. High portfolio turnover may result in the realization of net short-term capital gains by the Trust which, when distributed to common shareholders, will be taxable as ordinary income. See "Tax Matters."

## OTHER INVESTMENT POLICIES AND TECHNIQUES

### When-Issued and Forward Commitment Securities

The Trust may purchase securities on a "when-issued" basis and may purchase or sell securities on a "forward commitment" basis in order to acquire the security or to offset against anticipated changes in interest rates and prices. When such transactions are negotiated, the price, which is generally expressed in yield terms, is fixed at the time the commitment is made, but delivery and payment for the securities take place at a later date. When-issued securities and forward commitments may be sold prior to the settlement date, but the Trust will enter into when-issued and forward commitments only with the intention of actually receiving or delivering the securities, as the case may be. If the Trust disposes of the right to acquire a when-issued security prior to its acquisition or disposes of its right to deliver or receive against a forward commitment, it might incur a gain or loss. At the time the Trust enters into a transaction on a when-issued or forward commitment basis, it will designate on its books and records cash or liquid securities equal to at least the value of the when-issued or forward commitment securities. The value of these assets will be monitored daily to ensure that their marked to market value will at all times equal or exceed the corresponding obligations of the Trust. There is always a risk that the securities may not be delivered and that the Trust may incur a loss. Settlements in the ordinary course, which may take substantially more than five business days, are not treated by the Trust as when-issued or forward commitment transactions and accordingly are not subject to the foregoing restrictions.

### Pay-In-Kind Securities

The Trust may invest in Pay-in-kind, or "PIK" securities. PIK securities are securities which pay interest through the issuance of additional debt or equity securities. Similar to zero coupon obligations, PIK securities also carry additional risk as holders of these types of securities typically do not receive cash until the final payment date on the security unless such security is sold. In addition, if the issuer defaults, the Trust may obtain no return at all on its investment. The market price of PIK securities is affected by interest rate changes to a greater extent, and therefore tends to be more volatile, than that of securities which pay interest in cash. Additionally, U.S. federal income tax law requires the holder of certain PIK securities to recognize interest income with respect to these securities prior to the actual receipt of cash payments. In order to receive the special treatment accorded to RICs and their shareholders under Subchapter M of the Code, and to avoid liability for U.S. federal income or excise taxes at the Trust level, the Trust may be required to distribute income recognized with respect to these securities prior to the Trust's receipt of cash on these securities and thus may, among other things, dispose of portfolio securities under potentially disadvantageous circumstances in order to generate cash to satisfy these distribution requirements. See "Tax Matters" below.

9

[Table of Contents](#)

**Mezzanine Investments**

The Trust may invest in certain high yield securities known as mezzanine investments, which are subordinated debt securities which are generally issued in private placements in connection with an equity security (*e.g.*, with attached warrants). Such mezzanine investments may be issued with or without registration rights. Similar to other high yield securities, maturities of mezzanine investments are typically seven to ten years, but the expected average life is significantly shorter at three to five years. Mezzanine investments are usually unsecured and subordinate to other obligations of the issuer.

**Loan Participations and Assignments**

The Trust may invest in fixed and floating rate loans ("Loans") arranged through private negotiations between a corporation or foreign government and one or more financial institutions ("Lenders"). The Trust's investments in Loans are expected in most instances to be in the form of participations in Loans ("Participations") and assignments of all or a portion of Loans ("Assignments") from third parties. Participations typically will result in the Trust having a contractual relationship only with the Lender, not the borrower. The Trust will have the right to receive payments of principal, interest and any fees to which it is entitled only from the Lender selling the Participation and the Trust and only upon receipt by the Lender of the payments by the borrower. In connection with purchasing Participations, the Trust generally has no direct right to enforce compliance by the borrower with the terms of the loan agreement relating to the Loan, nor any rights of set-off against the borrower, and the Trust may not directly benefit from any collateral supporting the Loan in which it has purchased the Participation. As a result the Trust will assume the credit risk of both the borrower and the Lender that is selling the Participation. In the event of the insolvency of the Lender selling a Participation, the Trust may be treated as a general creditor of the Lender and may not benefit from any set-off between the Lender and the borrower. The Trust will acquire Participations only if the Lender interpositioned between the Trust and the borrower is determined by the Investment Adviser to be creditworthy. When the Trust purchases Assignments from Lenders, the Trust will acquire direct rights against the borrower on the Loan. However, because Assignments are arranged through private negotiations between potential assignees and assignors, the rights and obligations acquired by the Trust as the purchaser of an Assignment may differ from, and be more limited than, those held by the assigning Lender.

The Trust may have difficulty disposing of Assignments and Participations. Because there is no public market for such securities, the Trust anticipates that such securities could be sold only to a limited number of institutional investors. The lack of a liquid secondary market will have an adverse impact on the value of such securities and on the Trust's ability to dispose of particular Assignments or Participations when necessary to meet the Trust's liquidity needs or in response to a specific economic event, such as a deterioration in the creditworthiness of the borrower. The lack of a liquid secondary market for Assignments and Participations also may make it more difficult for the Trust to assign a value to those securities for purposes of valuing the Trust's portfolio and calculating its NAV.

**Project Loans**

The Trust may invest in project loans, which are fixed income securities of issuers whose revenues are primarily derived from mortgage loans to multi-family, nursing home and other real estate development projects. The principal payments on these mortgage loans will be insured by agencies and authorities of the U.S. government.

**Zero Coupons and Deferred Payment Obligations**

The Trust may invest in zero-coupon bonds, which are normally issued at a significant discount from face value and do not provide for periodic interest payments. Zero-coupon bonds may experience greater volatility in market value than similar maturity debt obligations which provide for regular interest payments. The Trust may also invest in deferred payment securities. Deferred payment securities are securities that remain zero-coupon securities until a predetermined date, at which time the stated coupon rate becomes effective and interest becomes payable at regular intervals. Deferred payment securities are subject to greater fluctuations in value and may have lesser liquidity in the event of adverse market conditions than comparably rated securities paying cash interest at regular interest payment periods.

U.S. federal income tax law requires the holder of certain zero-coupon bonds or deferred payment securities to recognize interest income with respect to these securities prior to the actual receipt of cash payments by the holder. In order to receive the special treatment accorded to RICs and their shareholders under the Code and to avoid liability for U.S. federal income or excise taxes at the Trust level, the Trust may be required to distribute income recognized with respect to these securities prior to the Trust's receipt of cash on these securities and thus may, among other things, dispose of Trust securities under potentially disadvantageous circumstances in order to generate cash to satisfy these distribution requirements. See "Tax Matters" below.

[Table of Contents](#)

## Master Limited Partnerships ("MLPs")

The Trust may invest in MLPs. MLPs typically are characterized as "publicly traded partnerships" that qualify to be treated as partnerships for U.S. federal income tax purposes and are principally engaged in one or more aspects of the exploration, production, processing, transmission, marketing, storage or delivery of energy-related commodities, such as natural gas, natural gas liquids, coal, crude oil or refined petroleum products (collectively, the energy industry). The Trust's MLP investments include investments that offer economic exposure to public MLPs in the form of common or subordinated units issued by MLPs, securities of entities holding primarily general partner or managing member interests in MLPs, debt securities of MLPs, and securities that are derivatives of interests in MLPs, including I-Shares, and derivative instruments in which the Trust may invest that have economic characteristics of MLP securities.

Generally, an MLP is operated under the supervision of one or more managing general partners. Limited partners (like the Trust when it invests in an MLP) are not involved in the day-to-day management of the partnership. The Trust also may invest in companies who serve (or whose affiliates serve) as the general partner of an MLP. These investments may not be taxed as partnerships for U.S. federal income tax purposes. Conflicts of interest may exist among unit holders, subordinated unit holders and the general partner of an MLP, including those arising from incentive distribution payments. General Partners typically have limited fiduciary duties to an MLP, which could allow a general partner to favor its own interests over the MLP's interests. Additionally, general partners of MLPs often have limited call rights that may require MLP unit holders to sell their common units at an undesirable time or price.

Holders of MLP securities have limited control and voting rights on matters affecting the partnership. Holders of securities issued by a MLP are exposed to a remote possibility of liability for all of the obligations of that MLP in the event that a court determines that the rights of the holders of MLP securities to vote to remove or replace the general partner of that MLP, to approve amendments to that MLP's partnership agreement, or to take other action under the partnership agreement of that MLP would constitute "control" of the business of that MLP, or a court or governmental agency determines that the MLP is conducting business in a state without complying with the partnership statute of that state. Holders of MLP securities are also exposed to the risk that they will be required to repay amounts to the MLP that are wrongfully distributed to them.

Investments in MLP securities also present special tax risks. For example, if an MLP does not meet current legal requirements to maintain its partnership status, or if it is unable to do so because of tax or other law changes, it would be treated as a corporation for U.S. federal income tax purposes. In that case, the MLP would be obligated to pay U.S. federal income tax at corporate rates (as well as state and local taxes) at the entity level on its taxable income and distributions received by the Trust would be taxable to the Trust as dividend income to the extent of the MLP's current and accumulated earnings and profits for federal tax purposes. The classification of an MLP as a corporation for U.S. federal income tax purposes could have the effect of reducing the amount of cash available for distribution by the MLP and the value of the Trust's investment in any such MLP. As a result, the value of the Trust's shares and the cash available for distribution to Trust shareholders could be materially reduced.

The Trust intends to limit its investments in MLPs and related entities to the extent necessary to qualify as a RIC for tax purposes. In general, a RIC is not permitted to invest, including through corporations in which the RIC owns a 20% or more voting stock interest, more than 25% of its total assets in qualified publicly-traded partnerships.

## Life Settlement Investments

The Trust may invest in life settlements, which are the transfers of the beneficial interest in a life insurance policy by the underlying insured person to a third party. The Trust will generally purchase the beneficial interest in a life insurance policy for more than its cash surrender value but at a discount to its face value (i.e., the payment amount set forth in the life insurance policy that is payable on the death of the insured or upon maturity of the life insurance policy). After purchase the Trust will be responsible for premiums payable on the life insurance policy and will be entitled to receive the full face value from the insurance company upon maturation (i.e., upon the death of the insured). Accordingly, if the Trust is unable to make premium payments on a purchased life insurance policy due to liquidity issues or for any other reason, the policy will lapse, and the Trust will lose its ownership interest in the policy. In addition, the Trust's investments in life settlement policies involve certain additional risks, including inaccurate estimations of life expectancy of the insured individuals, liquidity risk, credit risk of the insurance company, risks of any policies purchased being unenforceable and risks of adverse regulatory and legal changes.

The actual rate of return on a life settlement policy cannot be calculated before the insured dies and the longer the insured lives, the lower the rate of return on the related life settlement policy will be. Current privacy laws may limit the information available to the Trust about insureds and may cause the Trust to inaccurately estimate the value of particular policies. The Trust's inability to predict with certainty the life expectancies of the pool of underlying insured persons tied to purchased life settlement policies may cause unanticipated delays in the collection of a substantial number of life settlement policies. Life settlements are also generally considered

illiquid because there is a limited secondary market for such policies to be bought and sold. Accordingly, the Trust may be limited in its ability to sell policies in its portfolio in a timely fashion and/or at a favorable price. In addition, if a life insurance company declares bankruptcy or otherwise is insolvent, there may not be sufficient funds for it to pay its liability, and while many states have an insurance guarantee fund to provide payments to beneficiaries of insurance companies that declare bankruptcy, the collection process can be prolonged and complicated, and collection may not be possible in all circumstances.

11

[Table of Contents](#)

Life settlement policies may also be subject to contest by the issuing life insurance company. If the insurance company successfully contests a policy, the policy will be rescinded and declared void. For example, insurers may refuse to pay benefits on certain life insurance policies on the basis that there was no "insurable interest" on the part of the purchaser of a life insurance policy at the time such policy was issued. Recently the issue of a lack of insurable interest has been raised by insurers and beneficiaries of irrevocable life insurance trusts, in the context of so-called "stranger originated life insurance" policies. It is possible that courts may void certain life settlement policies for these or other reasons. The market for life settlement policies may also be subject to new government regulation that may impact the ability of the Trust to obtain life settlement policies. Insurance companies may seek regulation or changes of law restricting or otherwise encumbering the transfer of life insurance policies in life settlement policy transactions. No assurance can be made that insurance companies will not be successful in limiting the supply of life insurance policies available for purchase in life settlement policy transactions.

Any or all of the risks described above could have a material adverse effect on the Trust's investment returns and, therefore, on its ability to make distributions to its shareholders. In addition, it is unclear whether the income from life settlements is qualifying income for purposes of the Internal Revenue Service ("IRS") 90% gross income test the Trust must satisfy each year to qualify as a RIC. The Trust intends to monitor its investments to ensure that the Trust remains qualified as a RIC.

## MANAGEMENT OF THE TRUST

### Trustees

The Board provides broad oversight over the operations and affairs of the Trust and protects the interests of shareholders. The Board has overall responsibility to manage and control the business affairs of the Trust, including the complete and exclusive authority to establish policies regarding the management, conduct and operation of the Trust's business. The names and birthdates of the Trustees and officers of the Trust, the year each was first elected or appointed to office, their principal business occupations during the last five years, the number of funds overseen by each Trustee and other directorships or trusteeships they hold are shown below. The business address of the Trust, the Investment Adviser and their Board members and officers is 300 Crescent Court, Suite 700, Dallas, Texas 75201, unless otherwise specified below.

### Information About Each Trustee's Experience, Qualifications, Attributes, or Skills for Board Membership

The following provides an overview of the considerations that led the Board to conclude that each individual serving as a Trustee of the Trust should so serve, as well as each Trustee's name and certain biographical information as reported by them to the Trust. Among the factors the Board considered when concluding that an individual should serve on the Board were the following: (i) the individual's business and professional experience and accomplishments; (ii) the individual's ability to work effectively with the other members of the Board; (iii) the individual's prior experience, if any, serving on company boards (including public companies and, where relevant, other investment companies) and the boards of other complex enterprises and organizations; and (iv) how the individual's skills, experiences and attributes would contribute to an appropriate mix of relevant skills and experience on the Board.

12

In respect of each Trustee, the individual's professional accomplishments and prior experience, including, in some cases, in fields related to the operations of the Trust, were a significant factor in the determination that the individual should serve as a Trustee of the Trust. Each Trustee's professional experience and additional considerations that contributed to the Board's conclusion that an individual should serve on the Board are summarized in the table below.

The "Highland Funds Complex," as referred to herein consists of: the Trust, each series of Highland Funds I ("HFI"), each series of Highland Funds II ("HFII"), Highland Global Allocation Fund ("GAF"), Highland Income Fund ("HFRO"), NexPoint Event-Driven Fund ("NEDF"), NexPoint Latin American Opportunities Fund ("NLAF"), NexPoint Real Estate Strategies Fund ("NRESF"), NexPoint Strategic Income Fund ("NSIF"), NexPoint Energy and Materials Opportunities Fund ("NEMO"), NexPoint Discount Strategies Fund ("NDSF"), NexPoint Healthcare Opportunities Fund ("NHOF", and together with NEDF, NLAF, NRESF, NSIF, NEMO, and NDSF, the "Interval Funds"), and NexPoint Capital, Inc. (the "BDC"), a closed-end management investment company that has elected to be treated as a business development company under the 1940 Act.

| Name, Date of Birth, Position(s) with the Trust and Length of Time Served, Term of Office[1] and Number of Portfolios in the Highland Funds Complex Overseen by the Trustees Independent Trustees | Principal Occupations(s) During the Past Five Years and Other Directorships/ Trusteeships Held During the Past Five Years | Experience, Qualifications, Attributes, Skills for Board Membership During the Past Five Years |
|---|---|---|
| Dr. Bob Froehlich (4/28/1953) Trustee since March 2016; 3 year term (expiring at 2020 annual meeting) for the Trust. 23 funds | Retired. Trustee of ARC Realty Finance Trust, Inc. (from January 2013 to May 2016); Director of KC Concessions, Inc. (since January 2013); Trustee of Realty Capital Income Funds Trust (from January 2014 to December 2016); Director of American Realty Capital Healthcare Trust II (from January 2013 to June 2016); Director, American Realty Capital Daily Net Asset Value Trust, Inc. (from November 2012 to July 2016); Director of American Sports Enterprise, Inc. (since January 2013); Director of Davidson Investment Advisors (from July 2009 to July 2016); Chairman and owner, Kane County Cougars Baseball Club (since January 2013); Advisory Board of Directors, Internet Connectivity Group, Inc. (from January 2014 to April 2016); Director of AXAR Acquisition Corp. (formerly AR Capital Acquisition Corp.) (from October 2014 to October 2017); Director of The Midwest League of Professional Baseball Clubs, Inc.; Director of Kane County Cougars Foundation, Inc.; Director of Galen Robotics, Inc.; Chairman and Director of FC Global Realty, Inc. (from May 2017 to June 2018); Chairman and Director of First Capital Investment Corp. (from March 2017 to March 2018); and Director and Special Advisor to Vault Data, LLC (since February 2018). | Significant experience in the financial industry; significant managerial and executive experience; significant experience on other boards of directors, including as a member of several audit committees. |
| John Honis[2] (6/16/1958) Trustee since July 2013; 3 year term (expiring at 2021 annual meeting) for the Trust. 23 funds | President of Rand Advisors, LLC since August 2013; Partner of Highland Capital Management, L.P. ("HCM") from February 2007 until his resignation in November 2014. Manager of Turtle Bay Resort, LLC (August 2011 – December 2018); Manager of American Home Patient (November 2011 to February 2016). | Significant experience in the financial industry; significant managerial and executive experience, including experience as president, chief executive officer or chief restructuring officer of five telecommunication firms; experience on other boards of directors. |

13

**Table of Contents**

| Name, Date of Birth, Position(s) with the Trust and Length of Time Served, Term of Office1 and Number of Portfolios in the Highland Funds Complex Overseen by the Trustees Independent Trustees | Principal Occupations(s) During the Past Five Years and Other Directorships/ Trusteeships Held During the Past Five Years | Experience, Qualifications, Attributes, Skills for Board Membership During the Past Five Years |
|---|---|---|
| **Ethan Powell3** (6/20/1975)<br><br>Trustee since December 2013; Chairman of the Board since December 2013; 3 year term (expiring at 2022 annual meeting) for the Trust.<br><br>23 funds | Trustee of Impact Shares Funds I Trust President and Founder of Impact Shares LLC since December 2015; Trustee/Director of the Highland Funds Complex from June 2012 until July 2013 and since December 2013; Chief Product Strategist of Highland Capital Management Fund Advisors, L.P. ("HCMFA") from 2012 until December 2015; Senior Retail Fund Analyst of HCM from 2007 until December 2015 and HCMFA from its inception until December 2015; President and Principal Executive Officer of NHF from June 2012 until May 2015; Secretary of NHF from May 2015 until December 2015; Executive Vice President and Principal Executive Officer of HFI and HFII from June 2012 until December 2015; and Secretary of HFI and HFII from November 2010 to May 2015. | Significant experience in the financial industry; significant executive experience including past service as an officer of funds in the Highland Funds Complex; significant administrative and managerial experience. |
| **Bryan A. Ward** (2/4/1955)<br><br>Trustee since May 2006 3 year term (expiring at 2022 annual meeting).<br><br>23 funds | Senior Advisor, CrossFirst Bank since April 2019; Private Investor, BW Consulting, LLC since 2014; Senior Manager, Accenture, LLP (a consulting firm) from 1991 until retirement in 2014.<br><br>Director of Equity Metrix, LLC | Significant experience on this and/or other boards of directors/trustees; significant managerial and executive experience; significant experience as a management consultant. |
| **Interested Trustees Dustin Norris4** (1/6/1984)<br><br>Trustee since February 2018; Executive Vice President since April 2019; Nominee for 3 year term expiring at 2021 annual meeting.<br><br>23 funds | Head of Distribution and Chief Product Strategist at NexPoint since March 2019; President of NexPoint Securities, Inc. (formerly, Highland Capital Funds Distributor, Inc.) since April 2018; Head of Distribution at HCMFA from November 2017 until March 2019; Secretary of HFRO, GAF, HFI and HFII from October 2017 until April 2019; Assistant Secretary of HFRO and GAF II from August 2017 to October 2017; Chief Product Strategist at HCMFA from September 2015 to March 2019; Director of Product Strategy at HCMFA from May 2014 to September 2015; Assistant Secretary of HFI and HFII from March 2017 to October 2017; Secretary of NHF from December 2015 until April 2019; Assistant Treasurer of NexPoint Real Estate Advisors, L.P. since May 2015; Assistant Treasurer of NexPoint Real Estate Advisors II, L.P. since June 2016; Assistant Treasurer of HFI and HFII from November 2012 to March 2017; Assistant Treasurer of NHF from November 2012 to December 2015; Secretary of the BDC from 2014 until April 2019; and Secretary of the Interval Funds from March 2016 until April 2019.<br><br>None | Significant experience in the financial industry; significant managerial and executive experience, including experience as an officer of the Highland Funds Complex since 2012. |

14

Table of Contents

1    On an annual basis, as a matter of Board policy, the Governance and Compliance Committee reviews each Trustee's performance and determines whether to extend each such Trustee's service for another year. Effective June 2013, the Board adopted a retirement policy wherein the Governance and Compliance Committee shall not recommend the continued service as a Trustee of a Board member who is older than 80 years of age at the time the Governance and Compliance Committee reports its findings to the Board.

2    Since May 1, 2015, Mr. Honis has been treated as an Independent Trustee of the Trust. Prior to that date, Mr. Honis was treated as an Interested Trustee because he was a partner of an investment adviser affiliated with the Adviser until his resignation in November 2014. As of May 31, 2019, Mr. Honis was entitled to receive aggregate severance and/or deferred compensation payments of approximately $390,000 from another affiliate of the Adviser.

In addition, Mr. Honis serves as a trustee of a trust that owns substantially all of the economic interest in an investment adviser affiliated with the Adviser. Mr. Honis indirectly receives an asset-based fee in respect of such interest, which is projected to range from $450,000-$550,000 annually. Additionally, an investment adviser controlled by Mr. Honis has entered into a shared services arrangement with an affiliate of the Adviser, pursuant to which the affiliate provides back office support in exchange for approximately $50,000 per quarter. The affiliated adviser was paid $147,000 and $208,000 in 2017 and 2018, respectively. In light of these relationships between Mr. Honis and affiliates of the Adviser, it is possible that the SEC might in the future determine Mr. Honis to be an interested person of the Trust.

3    Prior to December 8, 2017, Mr. Powell was treated as an Interested Trustee of the Trust for all purposes other than compensation and the Trust's code of ethics.

4    On February 7, 2018, Mr. Norris was appointed as an Interested Trustee of the Trust.

## OFFICERS

| Name, Date of Birth, Position(s) held with the Trust and Length of Time Served, Term of Office | Principal Occupations(s) During the Past Five Years |
|---|---|
| **James Dondero** (6/29/1962)<br><br>President and Principal Executive Officer since May 2015; Indefinite Term | President of HCM, which he co-founded in 1993; Chairman of the Board of NexPoint Residential Trust, Inc. since May 2015; Portfolio Manager of NHF; GAF; Highland Energy MLP Fund, Highland Small-Cap Equity Fund and Highland Premier Growth Equity Fund (each a series of HFII); Highland Opportunistic Credit Fund (series of HFI); the BDC; and the Interval Funds. |
| **Frank Waterhouse** (4/14/1971)<br><br>Treasurer since May 2015; Principal Financial Officer and Principal Accounting Officer since October 2017; Principal Executive Officer since February 2018; Indefinite Term | Partner and Chief Financial Officer of HCM; Treasurer of the Highland Funds Complex since May 2015. |
| **Clifford Stoops** (11/17/1970)<br><br>Assistant Treasurer since March 2017; Indefinite Term | Chief Accounting Officer at HCM; Assistant Treasurer of the Highland Funds Complex since March 2017. |

15

**Table of Contents**

| Name, Date of Birth, Position(s) held with the Trust and Length of Time Served, Term of Office | Principal Occupations(s) During the Past Five Years |
|---|---|
| **Jason Post** (1/9/1979)<br><br>Chief Compliance Officer since September 2015; Indefinite Term | Chief Compliance Officer for HCMFA and NexPoint since September 2015; Chief Compliance Officer and Anti-Money Laundering Officer of the Highland Funds Complex since September 2015. Prior to his current role at HCMFA and NexPoint, Mr. Post served as Deputy Chief Compliance Officer and Director of Compliance for HCM. |
| **Dustin Norris** (1/6/1984)<br><br>Executive Vice President since April 2019; Indefinite Term<br><br>Trustee since February 2018 | Head of Distribution and Chief Product Strategist at NexPoint since March 2019; President of NexPoint Securities, Inc. since April 2018; Head of Distribution at HCMFA from November 2017 until March 2019; Chief Product Strategist at HCMFA from September 2015 to March 2019; Director of Product Strategy at HCMFA from May 2014 to September 2015; Officer of the Highland Funds Complex since November 2012. |
| **Lauren Thedford** (1/7/1989)<br><br>Secretary since April 2019; Indefinite Term | Associate General Counsel at HCM since September 2017; In-House Counsel at HCM from January 2015 until September 2017; Secretary of the Highland Funds Complex since April 2019. |

1    The address for each officer is c/o NexPoint Advisors, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201.

**Role of the Board of Trustees, Leadership Structure and Risk Oversight**

*The Role of the Board of Trustees*

The Board oversees the management and operations of the Trust. Like most registered investment companies, the day-to-day management and operation of the Trust is performed by various service providers to the Trust, such as the Investment Adviser, and the distributor, administrator, custodian, and transfer agent. The Board has appointed senior employees of certain of these service providers as officers of the Trust, with responsibility to monitor and report to the Board on the Trust's operations. The Board receives regular reports from these officers and service providers regarding the Trust's operations. For example, the Treasurer provides reports as to financial reporting matters and investment personnel report on the performance of the Trust. The Board has appointed a Chief Compliance Officer who administers the Trust's compliance program and regularly reports to the Board as to compliance matters. Some of these reports are provided as part of formal in-person Board meetings, which are typically held quarterly, in person, and involve the Board's review of, among other items, recent Trust operations. The Board also periodically holds telephonic meetings as part of its review of the Trust's activities. From time to time one or more members of the Board may also meet with management in

16

Table of Contents

less formal settings, between scheduled Board meetings, to discuss various topics. In all cases, however, the role of the Board and of any individual Trustee is one of oversight and not of management of the day-to-day affairs of the Trust and its oversight role does not make the Board a guarantor of the Trust's investments, operations or activities.

### Board Structure and Leadership

The Board has structured itself in a manner that it believes allows it to perform its oversight function effectively. The Board consists of five Trustees, four of whom are Independent Trustees. Mr. Powell serves as Chairman of the Board. The Trustees meet periodically throughout the year in person and by telephone to oversee the Trust's activities, review contractual arrangements with service providers for the Trust and review the Trust's performance. The Board conducts much of its work through certain standing Committees, each of whose meetings are chaired by an Independent Trustee: an Audit and Qualified Legal Compliance Committee, a Governance and Compliance Committee, and a Distribution and Alternatives Oversight Committee, which are discussed in greater detail below.

*Audit and Qualified Legal Compliance Committee.* The members of the Audit and Qualified Legal Compliance Committee (formerly named the Audit Committee) are Dr. Froehlich and Messrs. Powell and Ward, each of whom is independent for purposes of the Investment Company Act. The Audit and Qualified Legal Compliance Committee is responsible for approving the Trust's independent accountants, reviewing with the Trust's independent accountants the plans and results of the audit engagement and the adequacy of the Trust's internal accounting controls, approving professional services provided by the Trust's independent accountants. The Audit and Qualified Legal Compliance Committee is charged with compliance with Rules 205.2(k) and 205.3(c) of Title 17 of the Code of Federal Regulations regarding alternative reporting procedures for attorneys representing the Trust who appear and practice before the SEC on behalf of the Trust. The Audit and Qualified Legal Compliance Committee is also responsible for reviewing and overseeing the valuation of debt and equity securities that are not publicly traded or for which current market values are not readily available pursuant to policies and procedures adopted by the Board. The Board and Audit and Qualified Legal Compliance Committee will use the services of one or more independent valuation firms to help them determine the fair value of these securities. In addition, each member of the Audit and Qualified Legal Compliance Committee meets the current independence and experience requirements of Rule 10A-3 under the Exchange Act.

The Audit and Qualified Legal Compliance Committee met seven times during the fiscal year ended December 31, 2018. Mr. Ward acts as the Chairman of the Audit and Qualified Legal Compliance Committee and as the audit committee financial expert.

*Governance and Compliance Committee.* The Trust's Governance and Compliance Committee's function is to oversee and make recommendations to the full Board or the Independent Trustees, as applicable, with respect to the governance of the Trust, selection and nomination of Trustees, compensation of Trustees, and related matters. The Governance and Compliance Committee is also responsible for at least annually evaluating each Trustee and determining whether to recommend each Trustee's continued service in that capacity. The Governance and Compliance Committee will consider recommendations for Trustee nominees from shareholders sent to the Secretary of the Trust, 300 Crescent Court, Suite 700, Dallas, Texas 75201. A nomination submission must include all information relating to the recommended nominee that is required to be disclosed in solicitations or proxy statements for the election of Trustees, as well as information sufficient to evaluate the recommended nominee's ability to meet the responsibilities of a Trustee of the Trust. Nomination submissions must be accompanied by a written consent of the individual to stand for election if nominated by the Board and to serve if elected by the shareholders, and such additional information must be provided regarding the recommended nominee as reasonably requested by the Governance and Compliance Committee. The Governance and Compliance Committee is currently comprised of Dr. Froehlich and Messrs. Honis, Ward and Powell, each of whom is independent for purposes of the 1940 Act. Mr. Powell serves as the Chairman of the Governance and Compliance Committee. The Governance and Compliance Committee met three times during the fiscal year ended December 31, 2018.

*The Distribution and Alternatives Oversight Committee.* The members of the Distribution and Alternatives Oversight Committee are Dr. Froehlich, Messrs. Honis, Norris, Ward, and Powell. The Distribution and Alternatives Oversight Committee is responsible for overseeing any Funds that in the Board's determination employ alternative investment strategies. Dr. Froehlich serves as Chairman of the Distribution and Alternatives Oversight Committee. The Distribution and Alternatives Oversight Committee met two times during the fiscal year ended December 31, 2018.

The Board periodically reviews its leadership structure, including the role of the Chairman. The Board also completes an annual self-assessment during which it reviews its leadership and Committee structure and considers whether its structure remains appropriate in light of the Trust's current operations. The Board believes that its leadership structure, including the current percentage of the Board who are Independent Trustees, is appropriate given its specific characteristics. These characteristics include: (i) the extent to which the work of the Board is conducted through the standing committees; (ii) the extent to which the Independent Trustees meet as needed,

together with their independent legal counsel, in the absence of members of management and members of the Board who are "interested persons" of the Trust; and (iii) Mr. Powell's and Mr. Honis' previous positions with affiliates of the Investment Adviser, which enhance the Board's understanding of the operations of the Investment Adviser.

17

[Table of Contents](#)

### Board Oversight of Risk Management

The Board's role is one of oversight, rather than active management. This oversight extends to the Trust's risk management processes. These processes are embedded in the responsibilities of officers of, and service providers to, the Trust. For example, the Investment Adviser and other service providers to the Trust are primarily responsible for the management of the Trust's investment risks. The Board has not established a formal risk oversight committee. However, much of the regular work of the Board and its standing Committees addresses aspects of risk oversight. For example, the Trustees seek to understand the key risks facing the Trust, including those involving conflicts of interest; how management identifies and monitors these risks on an ongoing basis; how management develops and implements controls to mitigate these risks; and how management tests the effectiveness of those controls.

In the course of providing that oversight, the Board receives a wide range of reports on the Trust's activities from the Investment Adviser and other service providers, including reports regarding the Trust's investment portfolio, the compliance of the Trust with applicable laws, and the Trust's financial accounting and reporting. The Board also meets periodically with the Trust's Chief Compliance Officer to receive reports regarding the compliance of the Trust with the federal securities laws and the Trust's internal compliance policies and procedures and meets with the Trust's Chief Compliance Officer periodically, including at least annually, to review the Chief Compliance Officer's annual report, including the Chief Compliance Officer's risk-based analysis for the Trust. The Board's Audit Committee also meets regularly with the Treasurer and the Trust's independent public accounting firm to discuss, among other things, the internal control structure of the Trust's financial reporting function. The Board also meets periodically with the portfolio managers of the Trust to receive reports regarding the management of the Trust, including its investment risks.

The Board recognizes that not all risks that may affect the Trust can be identified, that it may not be practical or cost-effective to eliminate or mitigate certain risks, that it may be necessary to bear certain risks (such as investment-related risks) to achieve the Trust's goals, that reports received by the Trustees with respect to risk management matters are typically summaries of the relevant information, and that the processes, procedures and controls employed to address risks may be limited in their effectiveness. As a result of the foregoing and other factors, risk management oversight by the Board and by the Committees is subject to substantial limitations.

### Compensation of Trustees

The officers of the Trust and those of its Trustees who are "interested persons" (as defined in the 1940 Act) of the Trust receive no direct remuneration from the Trust. The following table sets forth the aggregate compensation paid to each of the Trustees who is not an "interested person" (as defined in the 1940 Act) of the Trust (the "Independent Trustees") by the Trust and the total compensation paid to each of the Trustees by the Highland Funds Complex for the fiscal year ended December 31, 2018.

18

Table of Contents

The following table summarizes the compensation paid by the Trust to the Independent Trustees and the aggregate compensation paid by the Fund Complex to the Independent Trustees for the fiscal year ended December 31, 2018.

| Name of Trustee | Aggregate Compensation From the Trust | Pension or Retirement Benefits Accrued as Part of the Trust's Expense | Estimated Annual Benefits Upon Retirement | Aggregate Compensation from the Highland Funds Complex |
|---|---|---|---|---|
| **Independent Trustees** | | | | |
| Timothy K. Hui[1] | $ 26,810.30 | $ 0 | $ 0 | $ 150,000 |
| Bryan A. Ward[2] | $ 28,844.46 | $ 0 | $ 0 | $ 160,000 |
| Dr. Bob Froehlich | $ 26,810.30 | $ 0 | $ 0 | $ 150,000 |
| John Honis[3] | $ 26,810.30 | $ 0 | $ 0 | $ 150,000 |
| Ethan Powell[2,4] | $ 28,844.46 | $ 0 | $ 0 | $ 160,000 |
| **Interested Trustee** | | | | |
| Dustin Norris[5] | N/A | N/A | N/A | N/A |

[1] Effective March 31, 2019, Mr. Hui resigned as an Independent Trustee of the Trust. Mr. Hui's resignation was related to a reduction in the size of the Board to five members. There were no material conflicts, disagreements or other issues between Mr. Hui, the Board of Trustees or NexPoint.

[2] Effective December 31, 2018, the Board approved an aggregate compensation increase of $10,000 payable to each of the Chairman of the Audit Committee and the Chairman of the Board.

[3] Effective May 1, 2015, Mr. Honis is treated as an Independent Trustee of the Trust.

[4] Prior to December 8, 2017, Mr. Powell was treated as an Interested Trustee of the Trust for all purposes other than compensation and the Trust's code of ethics.

[5] On February 7, 2018, Mr. Norris was appointed an Interested Trustee of the Trust.

**Share Ownership**

The following table shows the dollar range of equity securities beneficially owned by the Trustees in the Trust and the aggregate dollar range of equity securities owned by the Trustees in all funds overseen by the Trustees in the Highland Funds Complex as of June 30, 2018.

| Name of Trustee | Dollar Range of Equity Securities in the Trust | Aggregate Dollar Range of Equity Securities Owned in All Funds of the Highland Fund Complex[1] Overseen by Trustee |
|---|---|---|
| **Independent Trustees** | | |
| Ethan Powell[1] | Over $ 100,000 | Over $ 100,000 |
| John Honis[2] | None | None |
| Dr. Bob Froehlich | None | Over $ 100,000 |
| Bryan A. Ward | $1-$10,000 | Over $ 100,000 |
| **Interested Trustee** | | |
| Dustin Norris[3] | Over $ 100,000 | Over $ 100,000 |

[1] Prior to December 8, 2017, Mr. Powell was treated as an Interested Trustee of the Trust for all purposes other than compensation and the Trust's code of ethics.

[2] Effective May 1, 2015, Mr. Honis is treated as an Independent Trustee of the Trust.

[3] On February 7, 2018, Mr. Norris was appointed an Interested Trustee of the Trust.

**Proxy Voting Policies and Procedures**

The Board has delegated the voting of proxies for Trust securities to the Investment Adviser pursuant to the Investment Adviser's proxy voting policies and procedures. Under these policies and procedures, the Investment Adviser will vote proxies related to Trust securities in the best interests of the Trust and its shareholders. A copy of the Investment Adviser's proxy voting policies and procedures is attached as Appendix B to this SAI. The Trust's proxy voting record for the most recent 12- month period ending June 30 is available (i) without charge, upon request, by calling 1-866-351-4440 and (ii) on the SEC's web site (http://www.sec.gov).

Table of Contents

## Codes of Ethics

The Trust and the Investment Adviser have adopted codes of ethics under Rule 17j-1 of the Investment Company Act. These codes permit personnel subject to the codes to invest in securities, including securities that may be purchased or held by the Trust. These codes can be reviewed and copied at the SEC's Public Reference Room in Washington, D.C. Information on the operation of the Public Reference Room may be obtained by calling the SEC at 1-202-551-8090. The codes of ethics are available on the EDGAR Database on the SEC's web site (http://www.sec.gov), and copies of these codes may be obtained, after paying a duplicating fee, by electronic request at the following e-mail address: publicinfo@sec.gov, or by writing the SEC's Public Reference Section, Washington, D.C. 20549-0102.

## Investment Adviser

Effective June 14, 2012, NexPoint Advisors, L.P. became the investment adviser and administrator to the Trust. Prior to June 14, 2012, HCMFA (formerly Pyxis Capital, L.P.) was the investment adviser and administrator to the Trust. For a description of the Investment Adviser, including a description of its controlling persons, see "Management of the Trust—Investment Adviser" in the Trust's Prospectus.

As described in more detail in the Trust's Prospectus, in return for its advisory services, the Investment Adviser receives an annual fee, payable monthly, in an amount equal to 1.00% of the average weekly value of the Trust's Managed Assets (the "Advisory Fee"). The accrued fees are payable monthly as promptly as possible after the end of each month during which the investment advisory agreement is in effect.

Pursuant to the investment advisory agreement, the Trust has paid the following amounts as Advisory Fees to the Investment Adviser for the past three fiscal years:

| 2016 | 2017 | 2018 |
|---|---|---|
| $5,419,265 | $5,853,721 | $8,590,032 |

## Administration Services

As described in more detail in the Trust's Prospectus, in return for its administrative services, the Investment Adviser receives an annual fee, payable monthly, in an amount equal to 0.20% of the average weekly value of the Trust's Managed Assets. Pursuant to the Trust's administration services agreement, the Investment Adviser performs the following services: (i) prepare monthly security transaction listings; (ii) supply various normal and customary portfolio and Trust statistical data as requested on an ongoing basis; (iii) prepare for execution and file the Trust's Federal and state tax returns: prepare a fiscal tax provision in coordination with the annual audit; prepare an excise tax provision; and prepare all relevant 1099 calculations; (iv) coordinate contractual relationships and communications between the Trust and its contractual service providers; (v) coordinate printing of the Trust's annual and semi-annual shareholder reports; (vi) prepare income and capital gain distributions; (vii) prepare the semiannual and annual financial statements; (viii) monitor the Trust's compliance with Internal Revenue Code, SEC and Prospectus requirements; (ix) prepare, coordinate with the Trust's counsel and coordinate the filing with the SEC: annual reports on Form N-CEN and semi-annual reports on Form N-CSR; Form N-PORT; and Form N-PX based upon information provided by the Trust; assist in the preparation of Forms 3, 4 and 5 pursuant to Section 16 of the Securities Exchange Act of 1934, as amended, and Section 30(h) of the Investment Company Act for the officers and trustees of the Trust, such filings to be based on information provided by those persons; (x) assist in the preparation of notices of meetings of shareholders and coordinate preparation of proxy statements; (xi) assist in obtaining the fidelity bond and trustees' and officers'/errors and omissions insurance policies for the Trust in accordance with the requirements of Rule 17g-1 and 17d-1(d)(7) under the Investment Company Act; (xii) monitor the Trust's assets to assure adequate fidelity bond coverage is maintained; (xiii) draft agendas and resolutions for quarterly and special Board meetings; (xiv) coordinate the preparation, assembly and mailing of Board materials; (xv) attend Board meetings and draft minutes thereof; (xvi) maintain the Trust's corporate calendar to assure compliance with various filing and Board approval deadlines; (xvii) assist the Trust in the handling of SEC examinations and responses thereto; (xviii) assist the Trust's chief executive officer and chief financial officer in making certifications required under the SEC's disclosure forms; (xix) prepare and coordinate the Trust's state notice filings; (xx) furnish the Trust office space in the offices of the Investment Adviser, or in such other place or places as may be agreed from time to time, and all necessary office facilities, simple business equipment, supplies, utilities and telephone service for managing the affairs of the Trust; (xxi) perform clerical, bookkeeping and other administrative services not provided by the Trust's other service providers; (xxii) determine or oversee the determination and publication of the Trust's NAV in accordance with the Trust's policies as adopted from time to time by the Board; (xxiii) oversee the maintenance by the Trust's custodian and transfer agent and dividend disbursing agent of certain books and records of the Trust as required under Rule 31a-1(b)(2)(iv) of the Investment Company Act and maintain (or oversee maintenance by such

Table of Contents

other persons as approved by the Board) such other books and records required by law or for the proper operation of the Trust; (xxiv) determine the amounts available for distribution as dividends and distributions to be paid by the Trust to its shareholders; calculate, analyze and prepare a detailed income analysis and forecast future earnings for presentation to the Board; prepare and arrange for the printing of dividend notices to shareholders, as applicable, and provide the Trust's dividend disbursing agent and custodian with such information as is required for such parties to effect the payment of dividends and distributions and to implement the Trust's dividend reinvestment plan; (xxv) serve as liaison between the Trust and each of its service providers; (xxvi) assist in monitoring and tracking the daily cash flows of the individual assets of the Trust, as well as security position data of portfolio investments; assist in resolving any identified discrepancies with the appropriate third party, including the Trust's custodian, administrative agents and other service providers, through various means including researching available data via agent notices, financial news and data services, and other sources; (xxvii) monitor compliance with leverage tests under the Trust's credit facility, and communicate with leverage providers and rating agencies; (xxviii) coordinate negotiation and renewal of credit agreements for presentation to the Board; (xxix) coordinate negotiations of agreements with counterparties and the Trust's custodian for derivatives, short sale and similar transactions, as applicable; (xxx) provide assistance with the settlement of trades of portfolio securities; (xxxi) coordinate and oversee the provision of legal services to the Trust; (xxxii) cooperate with the Trust's independent registered public accounting firm in connection with audits and reviews of the Trust's financial statements, including interviews and other meetings, and provide necessary information and coordinate confirmations of bank loans and other assets for which custody is not through DTC, as necessary; (xxxiii) provide Secretary and any Assistant Secretaries, Treasurer and any Assistant Treasurers and other officers for the Trust as requested; (xxxiv) develop or assist in developing compliance guidelines and procedures; (xxxv) investigate and research customer and other complaints to determine liability, facilitate resolution and promote equitable treatment of all parties; (xxxvi) determine and monitor expense accruals for the Trust; (xxxvii) authorize expenditures and approve bills for payment on behalf of the Trust; (xxxviii) monitor the number of shares of the Trust registered and assist in the registration of additional shares, as necessary; (xxxix) prepare such reports as the Board may request from time to time; (xl) administer and oversee any securities lending program of the Trust; and (xli) perform such additional administrative duties relating to the administration of the Trust as may subsequently be agreed upon in writing between the Trust and the Investment Adviser. The Investment Adviser shall have the authority to engage a sub-administrator in connection with the administrative services of the Trust, which sub-administrator may be an affiliate of the Investment Adviser; provided, however, that the Investment Adviser shall remain responsible to the Trust with respect to its duties and obligations set forth in the administration services agreement. Accordingly, under a separate sub-administration services agreement, dated July 19, 2018, as amended from time to time, the Investment Adviser has delegated certain administrative functions to SEI Investments Global Funds Services.

Pursuant to the administration services agreement, the Trust has paid the following amounts as Administration Fees to the Investment Adviser and HCMFA for the past three fiscal years:

**Administration Fees**

| 2016 | 2017 | 2018 |
|---|---|---|
| $1,083,853 | $1,170,744 | $959,793 |

**Portfolio Manager**

The portfolio manager of the Trust is James Dondero.

As of June 30, 2019, Mr. Dondero managed the following client accounts:

| Type of Account | Number of Accounts Managed | Total Assets (millions) | | Number of Accounts Managed Subject to Performance-Based Advisory Fee | Total Assets Subject to Performance-Based Advisory Fee (millions) | |
|---|---|---|---|---|---|---|
| Registered Investment Companies: | 11 | $ | 1,760 | 1 | $ | 91 |
| Other Pooled Investment Vehicles: | 2 | $ | 1,046 | 2 | $ | 1,046 |
| Other Accounts: | 0 | $ | 0 | 0 | $ | 0 |

Because the portfolio manager manages other accounts, including accounts that may pay higher fees, potential conflicts of interest exist, including potential conflicts between the investment strategy of the Trust and the investment strategy of the other accounts managed by the portfolio manager and potential conflicts in the allocation of investment opportunities between the Trust and the other accounts.

Table of Contents

The Investment Adviser has built a professional working environment, a firm-wide compliance culture and compliance procedures and systems designed to protect against potential incentives that may favor one account over another. The Investment Adviser has adopted policies and procedures that address the allocation of investment opportunities, execution of portfolio transactions, personal trading by employees and other potential conflicts of interest that are designed to ensure that all client accounts are treated equitably over time. Nevertheless, the Investment Adviser furnishes advisory services to numerous clients in addition to the Trust, and the Investment Adviser may, consistent with applicable law, make investment recommendations to other clients or accounts (including accounts which are hedge funds or have performance or higher fees paid to the Investment Adviser, or in which portfolio managers have a personal interest in the receipt of such fees), which may be the same as or different from those made to the Trust. In addition, the Investment Adviser, its affiliates and any officer, director, stockholder or employee may or may not have an interest in the securities whose purchase and sale the Investment Adviser recommends to the Trust. Actions with respect to securities of the same kind may be the same as or different from the action which the Investment Adviser, or any of its affiliates, or any officer, director, stockholder, employee or any member of their families may take with respect to the same securities. Moreover, the Investment Adviser may refrain from rendering any advice or services concerning securities of companies of which any of the Investment Adviser's (or its affiliates') officers, directors or employees are directors or officers, or companies as to which the Investment Adviser or any of its affiliates or the officers, directors and employees of any of them has any substantial economic interest or possesses material non-public information. In addition to its various policies and procedures designed to address these issues, the Investment Adviser includes disclosure regarding these matters to its clients in both its Form ADV and investment advisory agreements.

The Investment Adviser, its affiliates or their officers and employees serve or may serve as officers, directors or principals of entities that operate in the same or related lines of business or of investment funds managed by affiliates of the Investment Adviser. Accordingly, these individuals may have obligations to investors in those entities or funds or to other clients, the fulfillment of which might not be in the best interests of the Trust. As a result, the Investment Adviser will face conflicts in the allocation of investment opportunities to the Trust and other funds and clients. In order to enable such affiliates to fulfill their fiduciary duties to each of the clients for which they have responsibility, the Investment Adviser will endeavor to allocate investment opportunities in a fair and equitable manner which may, subject to applicable regulatory constraints, involve pro rata co-investment by the Trust and such other clients or may involve a rotation of opportunities among the Trust and such other clients.

The Investment Adviser and its affiliates have both subjective and objective procedures and policies in place designed to manage the potential conflicts of interest between the Investment Adviser's fiduciary obligations to the Trust and their similar fiduciary obligations to other clients so that, for example, investment opportunities are allocated in a fair and equitable manner among the Trust and such other clients. An investment opportunity that is suitable for multiple clients of the Investment Adviser and its affiliates may not be capable of being shared among some or all of such clients due to the limited scale of the opportunity or other factors, including regulatory restrictions imposed by the Investment Company Act. There can be no assurance that the Investment Adviser's or its affiliates' efforts to allocate any particular investment opportunity fairly among all clients for whom such opportunity is appropriate will result in an allocation of all or part of such opportunity to the Trust. Not all conflicts of interest can be expected to be resolved in favor of the Trust.

Under current SEC guidance, the Trust may be prohibited from co-investing with certain of its affiliates in some types of private placement transactions (see Co-Investment Opportunities, below, for more information).

**Compensation**

The Investment Adviser's financial arrangements with its portfolio managers, its competitive compensation and its career path emphasis at all levels reflect the value senior management places on key resources. Compensation may include a variety of components and may vary from year to year based on a number of factors including the relative performance of a portfolio managers' underlying account, the combined performance of the portfolio managers underlying accounts, and the relative performance of the portfolio managers underlying accounts measured against other employees. The principal components of compensation include a base salary, a discretionary bonus and various retirement benefits.

*Base Compensation.* Generally, portfolio managers receive base compensation based on their seniority and/or their position with the firm, which may include the amount of assets supervised and other management roles within the firm. Base compensation is determined by taking into account current industry norms and market data to ensure that the Investment Adviser pays a competitive base compensation.

22

Table of Contents

*Discretionary Compensation.* In addition to base compensation, portfolio managers may receive discretionary compensation, which can be a substantial portion of total compensation. Discretionary compensation can include a discretionary cash bonus paid to recognize specific business contributions and to ensure that the total level of compensation is competitive with the market, as well as participation in incentive plans.

Because each person's compensation is based on his or her individual performance, the Investment Adviser does not have a typical percentage split among base salary, bonus and other compensation. Senior portfolio managers who perform additional management functions may receive additional compensation in these other capacities. Compensation is structured such that key professionals benefit from remaining with the Investment Adviser. The Investment Adviser believes it is in the best interest of shareholders to maintain stability of portfolio management personnel.

**Conflicts of Interest**

From time to time, potential and actual conflicts of interest may arise between the portfolio manager's management of the investments of the Trust, on the one hand, and the management of other accounts, on the other. Potential and actual conflicts of interest may also arise as a result of the Investment Adviser's other business activities and the Investment Adviser's possession of material non-public information about an issuer. Other accounts managed by the portfolio manager might have similar investment objectives or strategies as the Trust, or otherwise hold, purchase, or sell securities that are eligible to be held, purchased or sold by the Trust. The other accounts might also have different investment objectives or strategies than the Trust.

*Knowledge and Timing of Trust Trades.* A potential conflict of interest may arise as a result of the portfolio manager's day-to-day management of the Trust. Because of his position with the Trust, the portfolio manager knows the size, timing and possible market impact of the Trust's trades. It is theoretically possible that the portfolio manager could use this information to the advantage of other accounts he manages and to the possible detriment of the Trust.

*Investment Opportunities.* A potential conflict of interest may arise as a result of the portfolio manager's management of a number of accounts with varying investment guidelines. Often, an investment opportunity may be suitable for both the Trust and other accounts managed by the portfolio manager, but may not be available in sufficient quantities for both the Trust and the other accounts to participate fully. Similarly, there may be limited opportunity to sell an investment held by the Trust and another account. The Investment Adviser has adopted policies and procedures reasonably designed to allocate investment opportunities on a fair and equitable basis over time.

Under the Investment Adviser's allocation procedures, investment opportunities are allocated among various investment strategies based on individual account investment guidelines and the Investment Adviser's investment outlook. The Investment Adviser has also adopted additional procedures to complement the general trade allocation policy that are designed to address potential conflicts of interest due to the side-by-side management of the Trust and certain pooled investment vehicles, including investment opportunity allocation issues.

Conflicts potentially limiting the Trust's investment opportunities may also arise when the Trust and other clients of the Investment Adviser invest in different parts of an issuer's capital structure, such as when the Trust owns senior debt obligations of an issuer and other clients own junior tranches of the same issuer, or when the Trust owns debt securities of an issuer and other clients own equity securities of the same issuer. In such circumstances, if the issuer experiences financial or operational challenges, decisions over whether to trigger an event of default, over the terms of any workout, or how to exit an investment may result in conflicts of interest (including, for example, conflicts over proposed waivers and amendments to debt covenants). For example, a debt holder may be better served by a liquidation of the issuer in which it may be paid in full, whereas an equity holder might prefer a reorganization that holds the potential to create value for the equity holders. In addition, the Investment Adviser may also, in certain circumstances, pursue or enforce rights with respect to a particular issuer jointly on behalf of one or more of its clients, or the Investment Adviser's personnel may work together to pursue or enforce such rights. Certain clients may be negatively impacted by the Investment Adviser's activities on behalf of its other clients, and transactions on behalf of some clients may be impaired or effected at prices or terms that may be less favorable than would otherwise have been the case. In order to minimize such conflicts, the portfolio manager may avoid certain investment opportunities that would potentially give rise to conflicts with other clients of the Investment Adviser or the Investment Adviser may enact internal procedures designed to minimize such conflicts, which could have the effect of limiting the Trust's investment opportunities.

23

[Table of Contents](#)

Additionally, if the Investment Adviser acquires material non-public confidential information in connection with its business activities for other clients, the portfolio manager may be restricted from purchasing securities or selling securities for the Trust. When making investment decisions where a conflict of interest may arise, the Investment Adviser will endeavor to act in a fair and equitable manner as between the Trust and other clients; however, in certain instances the resolution of the conflict may result in the Investment Adviser acting on behalf of another client in a manner that may not be in the best interest, or may be opposed to the best interest, of the Trust.

*Performance Fees.* The portfolio manager may advise certain accounts with respect to which the advisory fee is based entirely or partially on performance. Performance fee arrangements may create a conflict of interest for the portfolio manager in that the portfolio manager may have an incentive to allocate the investment opportunities that he believes might be the most profitable to such other accounts instead of allocating them to the Trust. The Investment Adviser has adopted policies and procedures reasonably designed to allocate investment opportunities between the Trust and such other accounts on a fair and equitable basis over time.

### Co-Investment Opportunities

The Trust expects in the future to co-invest on a concurrent basis with other affiliates, unless doing so is impermissible under existing regulatory guidance, applicable regulations and our allocation procedures. The Trust, HCMFA and the Investment Adviser have obtained an exemptive order dated April 19, 2016 from the SEC to permit co-investments among the Trust and other accounts managed by the Investment Adviser or its affiliates, subject to certain conditions.

### Securities Ownership of Portfolio Manager

The following table sets forth the dollar range of equity securities of the Trust beneficially owned by the portfolio manager as of June 30, 2019.

| Name of Portfolio Manager | Dollar Range of Equity Securities in the Trust |
|---|---|
| James Dondero | Over $1,000,000 |

## PORTFOLIO TRANSACTIONS AND BROKERAGE

### Selection of Broker-Dealers; Order Placement

Subject to the overall review of the Board, the Investment Adviser is responsible for decisions to buy and sell securities and other portfolio holdings of the Trust, for selecting the broker or dealer to be used, and for negotiating any commission rates paid. In underwritten offerings, securities usually are purchased at a fixed price that includes an amount of compensation to the underwriter, generally referred to as the underwriter's concession or discount. On occasion, certain money market instruments may be purchased directly from an issuer, in which case no commissions or discounts are paid.

The Investment Adviser and its affiliates manage other accounts, including private funds and individual accounts that invest in senior loans and Trust investments. Although investment decisions for the Trust are made independently from those of such other accounts, investments of the type the Trust may make also may be made on behalf of such other accounts. When the Trust and one or more other accounts is prepared to invest in, or desires to dispose of, the same investment, available investments or opportunities for each are allocated in a manner believed by the Investment Adviser to be equitable over time. The Investment Adviser may (but is not obligated to) aggregate orders, which may include orders for accounts in which the Investment Adviser or its affiliates have an interest, to purchase and sell securities to obtain favorable execution or lower brokerage commissions, to the extent permitted by applicable laws and regulations. Although the Investment Adviser believes that, over time, the potential benefits of participating in volume transactions and negotiating lower transaction costs should benefit all participating accounts, in some cases these activities may adversely affect the price paid or received or the size of the position obtained by or disposed of for the Trust. Where trades are aggregated, the investments or proceeds, as well as the expenses incurred, will be allocated by the Investment Adviser in a manner designed to be equitable and consistent with the Investment Adviser's fiduciary duty to the Trust and its other clients (including its duty to seek to obtain best execution of client trades).

### Commission Rates; Brokerage and Research Services

In placing orders for the Trust's portfolio, the Investment Adviser is required to give primary consideration to obtaining the most favorable price and efficient execution. This means that the Investment Adviser will seek to execute each transaction at a price and commission, if any, which provides the most favorable total cost or proceeds reasonably attainable in the circumstances. In seeking the most favorable price and execution, the Investment Adviser, having in mind the Trust's best interests, will consider all

24

Table of Contents

factors it deems relevant, including, by way of illustration: price; the size, type and difficulty of the transaction; the nature of the market for the security; the amount of the commission; the timing of the transaction taking into account market prices and trends; operational capabilities; the reputation, experience and financial stability of the broker-dealer involved; and the quality of service rendered by the broker-dealer in other transactions. Though the Investment Adviser generally seeks reasonably competitive commissions or spreads, the Trust will not necessarily be paying the lowest commission or spread available. The Investment Adviser may place portfolio transactions, to the extent permitted by law, with brokerage firms participating in a distribution of the Trust's shares if it reasonably believes that the quality of execution and the commission are comparable to that available from other qualified firms.

The Investment Adviser seeks to obtain "best execution" considering the execution price and overall commission costs paid and other factors. The Investment Adviser routes its orders to various broker-dealers for execution at its discretion. Factors involved in selecting brokerage firms include the size, type and difficulty of the transaction, the nature of the market for the security, the reputation, experience and financial stability of the broker-dealer involved, the quality of service, the quality of research and investment information provided and the firm's risk in positioning a block of securities. Within the framework of the policy of obtaining the most favorable price and efficient execution, the Investment Adviser does consider "brokerage and research services" (as defined in the Securities Exchange Act of 1934, as amended) provided by brokers who effect portfolio transactions with the Investment Adviser or the Trust. "Brokerage and research services" are services that brokerage houses customarily provide to institutional investors and include statistical and economic data and research reports on particular issuers and industries.

**Affiliated Brokers; Regular Broker-Dealers**

The Investment Adviser is currently affiliated with NexBank Securities, Inc. ("NexBank"), a Financial Industry Regulatory Authority ("FINRA") member broker-dealer that is indirectly controlled by the principals of the Investment Adviser. Absent an exemption from the SEC or other regulatory relief, the Trust is generally precluded from effecting certain principal transactions with affiliated brokers. The Trust may utilize affiliated brokers for agency transactions subject to compliance with policies and procedures adopted pursuant to Rule 17e-1 under the Investment Company Act. These policies and procedures are designed to provide that commissions, fees or other remuneration received by any affiliated broker or its affiliates for agency transactions are reasonable and fair compared to the remuneration received by other brokers in comparable transactions.

During the fiscal years ended December 31, 2016, December 31, 2017 and December 31, 2018, the Trust paid brokerage commissions of $290,318, $557,751 and $521,016, respectively, of which $0 was paid to NexBank.

There were no payments made to other brokers by the Trust during the fiscal year ended December 31, 2018 that were directed at least partially on the basis of research services they provided.

During the fiscal year ended December 31, 2018, the Trust did not acquire any securities of its regular brokers or dealers. At that date, the Trust did not hold any securities of its regular brokers or dealers. For these purposes, regular brokers or dealers are (a) the brokers or dealers that received the greatest dollar amount of brokerage commissions by virtue of direct or indirect participation in the Trust's portfolio transactions during the Trust's most recent fiscal year, (b) the brokers or dealers that engaged as principal in the largest dollar amount of portfolio transactions of the Trust during the Trust's most recent fiscal year, or (c) the brokers or dealers that sold the largest dollar amount of securities of the Trust during the Trust's most recent fiscal year.

25

**Table of Contents**

## CONTROL PERSONS AND PRINCIPAL HOLDERS OF SECURITIES

The following table sets forth, as of June 30, 2019, the beneficial ownership of each of our directors, executive officers, each person known to us to beneficially own 5% or more of the outstanding shares of our common stock, and the executive officers and directors as a "group," as the term is defined in Section 13(d) of the 1934 Act.

| Name and Address on Account | % of Shares |
| --- | --- |
| Morgan Stanley 2000 Westchester Avenue Purchase, NY 10577-2530 | 14.83% |
| Wells CLRG One North Jefferson Avenue Mail Code: H0004-050 St. Louis, MO 63103 | 10.72% |
| National Financial Services LLC For exclusive benefit of our customers 499 Washington Blvd. Attn. Mutual Funds Dept. 4th Floor Jersey City, NJ 07310 | 9.79% |
| Pershing One Pershing Plaza Jersey City, NJ 07399 | 7.55% |
| Charles Schwab 211 Main Street San Francisco, CA 94105 States | 5.77% |

## REPURCHASE OF COMMON SHARES

The Trust is a closed-end management investment company and as such its shareholders will not have the right to cause the Trust to redeem their shares. Instead, the Trust's common shares will trade in the open market at a price that will be a function of several factors, including dividend levels (which are in turn affected by performance and expenses), NAV, call protection, dividend stability, relative demand for and supply of such shares in the market, general market and economic conditions and other factors. Because shares of a closed-end investment company may frequently trade at prices lower than NAV, the Board may consider action that might be taken to reduce or eliminate any material discount from NAV in respect of common shares, which may include the repurchase of such shares in the open market or in private transactions, the making of a tender offer for such shares, or the conversion of the Trust to an open-end investment company. The Board may decide not to take any of these actions. In addition, there can be no assurance that share repurchases or tender offers, if undertaken, will reduce market discount. On November 2, 2016, the Board approved a share repurchase program pursuant to which the Trust may repurchase, over a six-month period beginning on December 1, 2016, up to $10 million of its shares of its outstanding shares in open-market transactions. In connection with the May 8, 2017 rights offering, the Board approved the extension of the Repurchase Program for a period of one year from the closing of the rights offering. As of the date of the Prospectus, the Trust has not completed any repurchases.

Notwithstanding the foregoing, at any time when there are outstanding borrowings, the Trust may not purchase, redeem or otherwise acquire any of its common shares unless (i) all accrued preferred shares dividends have been paid and (ii) at the time of such purchase, redemption or acquisition, the NAV of the Trust's portfolio (determined after deducting the acquisition price of the common shares) is at least 200% of the liquidation value of the outstanding borrowings. Any service fees incurred in connection with any tender offer made by the Trust will be borne by the Trust and will not reduce the stated consideration to be paid to tendering shareholders.

Subject to its investment restrictions, the Trust may borrow to finance the repurchase of shares or to make a tender offer. Interest on any borrowings to finance share repurchase transactions or the accumulation of cash by the Trust in anticipation of share repurchases or tenders will reduce the Trust's net income. Any share repurchase, tender offer or borrowing that might be approved by the Board would have to comply with the Securities Exchange Act of 1934, as amended, the Investment Company Act and the rules and regulations thereunder.

Although the decision to take action in response to a discount from NAV will be made by the Board at the time it considers such issue, it is the Board's present policy, which may be changed by the Board, not to authorize repurchases of common

26

Table of Contents

shares or a tender offer for such shares if: (1) such transactions, if consummated, would (a) result in the delisting of the common shares from the New York Stock Exchange, or (b) impair the Trust's eligibility for treatment as a RIC under the Code (which could cause the Trust's income to be taxed at the corporate level in addition to the taxation of shareholders who receive dividends from the Trust), or as a registered closed-end investment company under the Investment Company Act; (2) the Trust would not be able to liquidate portfolio securities in an orderly manner and consistent with the Trust's investment objectives and policies in order to repurchase shares; or (3) there is, in the Board's judgment, any (a) material legal action or proceeding instituted or threatened challenging such transactions or otherwise materially adversely affecting the Trust, (b) general suspension of or limitation on prices for trading securities on the New York Stock Exchange, (c) declaration of a banking moratorium by federal or state authorities or any suspension of payment by U.S. or New York banks, (d) material limitation affecting the Trust or the issuers of its portfolio securities by federal or state authorities on the extension of credit by lending institutions or on the exchange of foreign currency, (e) commencement of war, armed hostilities or other international or national calamity directly or indirectly involving the United States or (f) other event or condition which would have a material adverse effect (including any adverse tax effect) on the Trust or its shareholders if shares were repurchased. The Board may in the future modify these conditions in light of experience.

The repurchase by the Trust of its shares at prices below NAV will result in an increase in the NAV of those shares that remain outstanding. However, there can be no assurance that share repurchases or tender offers at or below NAV will result in the Trust's shares trading at a price equal to their NAV. Nevertheless, the fact that the Trust's shares may be the subject of repurchase or tender offers from time to time, or that the Trust may be converted to an open-end investment company, may reduce any spread between market price and NAV that might otherwise exist.

Before deciding whether to take any action if the common shares trade below NAV, the Board would likely consider all relevant factors, including the extent and duration of the discount, the liquidity of the Trust's portfolio, the impact of any action that might be taken on the Trust or its shareholders and market considerations. Based on these considerations, even if the Trust's shares should trade at a discount, the Board may determine that, in the interest of the Trust and its shareholders, no action should be taken.

If the Board determines to repurchase common shares in a private transaction or to make a tender offer for the common shares, the terms of any such offer may require a selling or tendering (as applicable) shareholder to sell or tender (and thus effectively sell) all of his or her or its common shares held, or considered to be held under certain attribution rules of the Code, by such shareholder. Shareholders who sell (in a private repurchase transaction) or successfully tender and effectively sell (pursuant to a tender offer) to the Trust all common shares held or considered to be held by them generally will be treated as having sold their shares and generally will realize a capital gain or loss. If a shareholder sells or tenders and effectively sells, as applicable, fewer than all of his or her common shares, such shareholder may be treated as having received a distribution under Section 301 of the Code ("Section 301 distribution") unless such distribution is treated as being either (i) "substantially disproportionate" with respect to such shareholder or (ii) otherwise "not essentially equivalent to a dividend" under the relevant rules of the Code. A Section 301 distribution is not treated as a sale or exchange giving rise to a capital gain or loss, but rather is treated as a dividend to the extent supported by the Fund's current and accumulated earnings and profits, with the excess treated as a return of capital reducing the shareholder's tax basis in Fund shares, and thereafter as capital gain. Where a redeeming shareholder is treated as receiving a dividend, there is a risk that remaining shareholders whose percentage share interests in the Trust increase as a result of such sale or tender by the other shareholder will be treated as having received a taxable distribution from the Trust. The extent of such risk will vary depending upon the particular circumstances of the private repurchase or tender offer, in particular whether such offer is a single and isolated event or is part of a plan for periodically redeeming the common shares of the Trust; if isolated, any such risk is likely remote. If, instead, the Board determines to repurchase common shares on the open market, a selling shareholder may also be treated as having received a taxable dividend upon the sale, even though a selling shareholder would have no specific knowledge that he or she or it is selling shares to the Trust. In that event, there is generally a risk that remaining shareholders whose percentage share interests in the Trust increase as a result of any such open-market sales will be treated as having received a taxable distribution from the Trust.

To the extent the Trust recognizes net gains on the liquidation of portfolio securities to meet any such repurchase or tender, the Trust will be required to make additional distributions to its common shareholders.

27

[Table of Contents](#)

## TAX MATTERS

The following discussion of U.S. federal income tax consequences of investment in common and preferred shares of the Trust is based on the Code, U.S. Treasury regulations promulgated thereunder, and other applicable authority, as of the date of this SAI. These authorities may be changed, possibly with retroactive effect, or become subject to new legislative, administrative, or judicial interpretation. The following discussion is only a summary of some of the important U.S. federal tax considerations generally applicable to investments in the Trust and does not constitute tax advice. This summary does not purport to be a complete description of the U.S. federal income tax considerations applicable to an investment in common or preferred shares of the Trust. There may be other U.S. federal income tax consequences applicable to particular common or preferred shareholders. For example, except as otherwise specifically noted herein, we have not described certain tax considerations that may be relevant to certain types of holders subject to special treatment under the U.S. federal income tax laws, including shareholders subject to the U.S. federal alternative minimum tax, insurance companies, tax-exempt organizations, pension plans and trusts, RICs, dealers in securities, shareholders holding Trust shares through tax-advantaged accounts (such as 401(k) plans or individual retirement accounts), financial institutions, shareholders holding Trust shares as part of a hedge, straddle, or conversion transaction, entities that are not organized under the laws of the United States or a political subdivision thereof, and persons who are neither citizens nor residents of the United States. This summary assumes that investors hold Trust common or preferred shares as capital assets (within the meaning of the Code). Shareholders should consult their own tax advisers regarding their particular situation and the possible application of U.S. federal, state, local, foreign or other tax laws.

This summary does not discuss the tax consequences of an investment in subscription rights of the Trust, separately, or as part of a unit consisting of two or more securities. See "Description of Capital Structure—Subscription Rights" in the Prospectus for a discussion of the material U.S. federal income tax consequences of the Trust's issuance of subscription rights to common and preferred shareholders.

**Taxation of the Trust**

The Trust has elected to be treated as a RIC under Subchapter M of the Code and intends each year to qualify and to be eligible to be treated as such. In order to qualify for the special tax treatment accorded RICs and their shareholders, the Trust must, among other things:

(i) derive at least 90% of its gross income for each taxable year from: (a) dividends, interest (including tax-exempt interest), payments with respect to certain securities loans, gains from the sale or other disposition of stock, securities or foreign currencies, or other income (including but not limited to gains from options, futures and forward contracts) derived with respect to its business of investing in such stock, securities or foreign currencies; and (b) net income derived from interests in "qualified publicly traded partnerships" (as described below);

(ii) diversify its holdings so that, at the end of each quarter of the Trust's taxable year, (a) at least 50% of the market value of the Trust's total assets consists of cash and cash items, U.S. government securities, the securities of other RICs and other securities limited, in respect of any one issuer, to an amount not greater than 5% of the value of the Trust's total assets and not more than 10% of the outstanding voting securities of such issuer, and (b) not more than 25% of the value of the Trust's total assets is invested, including through corporations in which the Trust owns a 20% or more voting stock interest, (x) in the securities (other than U.S. government securities and the securities of other RICs) of any one issuer or of two or more issuers that the Trust controls, as determined under applicable Code rules, and that are determined to be engaged in the same business or similar or related trades or businesses, or (y) in the securities of one or more "qualified publicly traded partnerships" (as described below); and

(iii) distribute to its shareholders with respect to each taxable year at least the sum of 90% of its "investment company taxable income" (as that term is defined in the Code, without regard to the deduction for dividends paid—generally taxable ordinary income and the excess, if any, of net short-term capital gains over net long-term capital losses) and 90% of any net tax-exempt interest income (the excess of its gross tax-exempt interest over certain disallowed deductions), for such year.

In general, for purposes of the 90% gross income requirement described in (i) above, income derived from a partnership will be treated as qualifying income only to the extent such income is attributable to items of income of the partnership which would be qualifying income if realized directly by the RIC. However, 100% of the net income derived from an interest in a "qualified publicly traded partnership" (generally, a partnership (y) interests in which are traded on an established securities market or readily tradable on a secondary market or the substantial equivalent thereof and (z) that meets certain qualifying income requirements but derives less than 90% of its income from the qualifying income described in (i)(a) above) will be treated as qualifying income. In general, such entities will be treated as partnerships for federal income tax purposes because they meet the passive income requirement under Section 7704(c)(2) of the Code. MLPs in which the Trust may invest will generally qualify as qualified publicly traded partnerships. In addition, although in

general the passive loss rules of the Code do not apply to RICs, such rules do apply to a RIC with respect to items attributable to an interest in a qualified publicly traded partnership.

28

Table of Contents

For purposes of meeting the diversification requirement described in (ii) above, the term "outstanding voting securities of such issuer" will include the equity securities of a qualified publicly traded partnership. Also, for purposes of the diversification test in (ii) above, the identification of the issuer (or, in some cases, issuers) of a particular Trust investment can depend on the terms and conditions of that investment. In some cases, identification of the issuer (or issuers) is uncertain under current law, and an adverse determination or future guidance by the IRS with respect to issuer identification for a particular type of investment may adversely affect the Trust's ability to meet the diversification test in (ii) above.

If the Trust qualifies as a RIC (i.e., satisfies the source of income and diversification requirements described in (i) and (ii) above) and satisfies the annual distribution requirement described in (iii) above, the Trust will not be subject to U.S. federal income tax on income or gains distributed in a timely manner to its shareholders in the form of dividends (including Capital Gain Dividends, as defined below).

If, for any taxable year, the Trust were to fail to meet the income, diversification or distribution test described above, the Trust could in some cases cure such failure, including by paying a Trust-level tax, paying interest, making additional distributions or disposing of certain assets. If the Trust were ineligible to or otherwise did not cure any such failure for any year, or if the Trust were otherwise to fail to qualify as a RIC accorded special tax treatment for such year, the Trust would be subject to tax on its taxable income at corporate rates, and all distributions from earnings and profits, including any distributions of net long-term capital gains, would be taxable to shareholders as ordinary income. Some portions of such distributions might be eligible for the dividends-received deduction in the case of corporate shareholders and might be eligible to be treated as "qualified dividend income" and thus taxable at the lower long-term capital gain rate in the case of shareholders taxed at individual rates, provided, in both cases, the shareholder met certain holding period and other requirements in respect of the Trust's shares (as described below). In addition, the Trust might be required to recognize unrealized gains, pay substantial taxes and interest and make substantial distributions before re-qualifying as a RIC.

The Trust intends to distribute at least annually to its shareholders all or substantially all of its investment company taxable income (computed without regard to the dividends-paid deduction) and its net capital gain (that is, the excess of net long-term capital gain over net short-term capital loss, in each case determined with reference to any loss carryforwards). Any investment company taxable income retained by the Trust will be subject to a Trust-level tax at regular corporate rates. The Trust may also retain for investment its net capital gain. If the Trust retains any net capital gain, it will be subject to Trust-level tax at regular corporate rates on the amount retained, but may designate the retained amount as undistributed capital gains in a timely notice to its shareholders who would then, in turn, be (i) required to include in income for U.S. federal income tax purposes, as long-term capital gain, their shares of such undistributed amount, and (ii) entitled to credit their proportionate shares of the tax paid by the Trust on such undistributed amount against their U.S. federal income tax liabilities, if any, and to claim refunds on a properly-filed U.S. tax return to the extent the credit exceeds such liabilities. If the Trust makes this designation, for U.S. federal income tax purposes, the tax basis of shares owned by a shareholder of the Trust would be increased by an amount equal under current law to the difference between the amount of undistributed capital gains included in the shareholder's gross income under clause (i) of the preceding sentence and the tax deemed paid by the shareholder under clause (ii) of the preceding sentence. The Trust is not required to, and there can be no assurance the Trust will, make this designation if it retains all or a portion of its net capital gain in a taxable year.

In determining its net capital gain, including in connection with determining the amount available to support a Capital Gain Dividend, its taxable income, and its earnings and profits, a RIC generally may elect to treat part or all of any post-October capital loss (defined as any net capital loss attributable to the portion of the taxable year after October 31 or, if there is no such loss, the net long-term capital loss or net short-term capital loss attributable to such portion of the taxable year) or late-year ordinary loss (generally, the sum of its (i) net ordinary loss from the sale, exchange or other taxable disposition of property, attributable to the portion of the taxable year after October 31, and its (ii) other net ordinary loss attributable to the portion, if any, of the taxable year after December 31) as if incurred in the succeeding taxable year.

If the Trust fails to distribute in a calendar year at least an amount equal to the sum of 98% of its ordinary income for such year and 98.2% of its capital gain net income (adjusted for certain ordinary losses) for the one-year period ending on October 31 of such year (unless an election is made to use the Trust's taxable year), plus any such undistributed amounts from the prior year, the Trust will be subject to a nondeductible 4% excise tax on the undistributed amounts. For purposes of the required excise tax distribution, a RIC's ordinary gains and losses from the sale, exchange or other taxable disposition of property that would otherwise be taken into account after October 31 of a calendar year generally (unless an election is made to use the Trust's taxable year) are treated as arising on January 1 of the following calendar year. Also, for these purposes, the Trust will be treated as having distributed any amount on which it has been subject to corporate income tax in the taxable year ending with the calendar year. The Trust reserves the right to pay the excise tax when circumstances warrant.

Capital losses in excess of capital gains ("net capital losses") are not permitted to be deducted against the Trust's net investment income. Instead, potentially subject to certain limitations, the Trust may carry net capital losses from any taxable year forward to subsequent taxable years to offset capital gains, if any, realized during such subsequent taxable year. Capital loss carryforwards are

29

Table of Contents

reduced to the extent they offset current-year net realized capital gains, whether the Trust retains or distributes such gains. If the Trust incurs or has incurred net capital losses in taxable years beginning after December 22, 2010 ("post-2010 losses"), those losses will be carried forward to one or more subsequent taxable years without expiration to offset capital gains realized during such subsequent taxable years; any such carryforward losses will retain their character as short-term or long-term. If the Trust incurred net capital losses in a taxable year beginning on or before December 22, 2010 ("pre-2011 losses"), the Trust is permitted to carry such losses forward for eight taxable years; in the year to which they are carried forward, such losses are treated as short-term capital losses that first offset any short-term capital gains, and then offset any long-term capital gains. The Trust must use any post-2010 losses, which will not expire, before it uses any pre-2011 losses. This increases the likelihood that pre-2011 losses will expire unused at the conclusion of the eight-year carryforward period.

The Trust's ability to use net capital losses may be limited following the occurrence of certain (i) acquisitive reorganizations and (ii) shifts in the ownership of the Trust by a shareholder owning or treated as owning 5% or more of the shares of the Trust (each, an "ownership change"). The Code may similarly limit the Trust's ability to use any of its other capital losses, or ordinary losses, that have accrued but have not been recognized (i.e., "built-in" losses) at the time of an ownership change to the extent they are realized within the five-year period following the ownership change.

See the Trust's most recent annual shareholder report for the Trust's available capital loss carryovers as of the end of its most recently ended fiscal year.

### Trust Distributions

Distributions are taxable to shareholders even if they are paid from income or gains earned by the Trust before a shareholder invested in the Trust (and thus were included in the price the shareholder paid for its shares). Distributions are taxable whether shareholders receive them in cash or reinvest them in additional shares through the Trust's Dividend Reinvestment Plan. A shareholder whose distributions are reinvested in shares through the Trust's Dividend Reinvestment Plan will be treated as having received a dividend equal to, generally, the fair market value of new shares issued to the shareholder. See "Dividend Reinvestment Plan" in the Trust's Prospectus for more information.

Dividends and other distributions paid by the Trust are generally treated under the Code as received by shareholders at the time the dividend or distribution is made. However, a dividend paid to shareholders in January of a year generally is deemed to have been paid by the Trust on December 31 of the preceding year, if the dividend was declared and payable to shareholders of record on a date in October, November or December of that preceding year.

Your broker or other intermediary will send you information after the end of each year setting forth the amount and tax status of any dividends or other distributions paid to you by the Trust.

For U.S. federal income tax purposes, distributions of investment income are generally taxable as ordinary income. Taxes on distributions of capital gains are determined by how long the Trust has owned or is treated as having owned the investments that generated them, rather than how long a shareholder has owned his or her shares. In general, the Trust will recognize long-term capital gain or loss on investments it has owned (or is deemed to have owned) for more than one year, and short-term capital gain or loss on investments it has owned (or is deemed to have owned) for one year or less. Distributions of net capital gain that are properly reported by the Trust as capital gain dividends ("Capital Gain Dividends") will generally be taxable to shareholders as long-term capital gains. Distributions from capital gains are generally made after applying any available capital loss carryovers. Distributions of net short-term capital gain (that is, the excess of net short-term capital gain over net long-term capital loss for the taxable year, in each case determined with reference to loss carryforwards) will generally be taxable to shareholders receiving such distributions as ordinary income. Distributions of investment income reported by the Trust as derived from "qualified dividend income" will be taxed in the hands of individuals at the rates applicable to long-term capital gain, provided holding period and other requirements are met at both the shareholder and Trust level. The Trust does not expect a significant portion of Trust distributions to be derived from qualified dividend income.

The Trust will designate dividends made to holders of common shares and to holders of preferred shares in accordance with each class's proportionate share of each item of Trust income (such as net capital gains and other taxable income). A class's proportionate share of a particular type of income for a year is determined according to the percentage of total dividends paid by the Trust during that year to the class. Although the matter is not free from doubt, due to the absence of direct regulatory or judicial authority, under current law the manner in which the Trust intends to allocate items of ordinary income and net capital gain between the Trust's common shares and its preferred shares will be respected for federal income tax purposes. It is possible that the IRS could disagree and attempt to reallocate the Trust's net capital gain or other taxable income.

In order for some portion of the dividends received by a Trust shareholder to be qualified dividend income, the Trust must meet holding period and other requirements with respect to some portion of the dividend-paying stocks in its portfolio and the shareholder

30

Table of Contents

must meet holding period and other requirements with respect to the Trust's shares. In general, a dividend will not be treated as qualified dividend income (at either the Trust or shareholder level) (1) if the dividend is received with respect to any share of stock held for fewer than 61 days during the 121-day period beginning on the date which is 60 days before the date on which such share becomes ex-dividend with respect to such dividend (or, in the case of certain preferred stock, 91 days during the 181-day period beginning 90 days before such date), (2) to the extent that the recipient is under an obligation (whether pursuant to a short sale or otherwise) to make related payments with respect to positions in substantially similar or related property, (3) if the recipient elects to have the dividend income treated as investment income for purposes of the limitation on deductibility of investment interest, or (4) if the dividend is received from a foreign corporation that is (a) not eligible for the benefits of a comprehensive income tax treaty with the United States (with the exception of dividends paid on stock of such a foreign corporation readily tradable on an established securities market in the United States) or (b) treated as a passive foreign investment company.

In general, distributions of investment income reported by the Trust as derived from qualified dividend income will be treated as qualified dividend income by a shareholder taxed at individual rates, provided the shareholder meets the holding period and other requirements described in the paragraph immediately above with respect to the Trust's shares.

In general, dividends of net investment income received by corporate shareholders of the Trust will qualify for the 50% dividends-received deduction generally available to corporations to the extent of the amount of eligible dividends received by the Trust from domestic corporations for the taxable year. In general, a dividend received by the Trust will not be treated as a qualifying dividend (i) if it has been received with respect to any share of stock that the Trust has held for less than 46 days (91 days in the case of certain preferred stock) during the 91-day period beginning on the date which is 45 days before the date on which such share becomes ex-dividend with respect to such dividend (during the 181-day period beginning 90 days before such date in the case of certain preferred stock) or (ii) to the extent that the Trust is under an obligation (pursuant to a short sale or otherwise) to make related payments with respect to positions in substantially similar or related property. Moreover, the dividends-received deduction may be disallowed or reduced (i) if the corporate shareholder fails to satisfy the foregoing requirements with respect to its shares of the Trust or (ii) by application of various provisions of the Code (for instance, the dividends-received deduction is reduced in the case of a dividend received on debt-financed portfolio stock (generally, stock acquired with borrowed funds)). The Trust does not expect a significant portion of Trust distributions to be eligible for this corporate dividends-received deduction.

Any distribution of income that is attributable to (i) income received by the Trust in lieu of dividends with respect to securities on loan pursuant to a securities lending transaction or (ii) dividend income received by the Trust on securities it temporarily purchased from a counterparty pursuant to a repurchase agreement that is treated for U.S. federal income tax purposes as a loan by the Trust will not constitute qualified dividend income to individual shareholders and will not be eligible for the dividends-received deduction for corporate shareholders.

The Code generally imposes a 3.8% Medicare contribution tax on the net investment income of certain individuals, trusts and estates to the extent their income exceeds certain threshold amounts. For these purposes, "net investment income" generally includes, among other things, (i) distributions paid by the Trust of net investment income and capital gains as described above, and (ii) any net gain from the sale or exchange of Trust shares. Shareholders are advised to consult their tax advisors regarding the possible implications of this additional tax on their investment in the Trust.

**Return of Capital Distributions**

If the Trust makes a distribution to a shareholder in excess of the Trust's current and accumulated earnings and profits in any taxable year, the excess distribution will be treated as a return of capital to the extent of such shareholder's tax basis in its shares, and thereafter as capital gain. A return of capital is not taxable, but it reduces a shareholder's tax basis in its shares, thus reducing any loss or increasing any gain on a subsequent taxable disposition by the shareholder of its shares.

Distributions on the Trust's shares are generally subject to U.S. federal income tax as described herein to the extent they do not exceed the Trust's realized income and gains, even though such dividends and distributions may economically represent a return of a particular shareholder's investment. Such distributions are likely to occur in respect of shares purchased at a time when the Trust's NAV reflects either unrealized gains, or realized but undistributed income or gains, that were therefore included in the price the shareholder paid. Such distributions may reduce the value of the Trust's shares below the shareholder's cost basis in those shares. As described above, the Trust is required to distribute realized income and gains regardless of whether the Trust's NAV also reflects unrealized losses.

**Tax Implications of Certain Trust Investments**

Some debt obligations with a fixed maturity date of more than one year from the date of issuance that are acquired by the Trust in the secondary market may be treated as having "market discount." Very generally, market discount is the excess of the stated redemption price of a debt obligation (or in the case of an obligation issued with OID (as defined below), its "revised issue price")

31

**Table of Contents**

over the purchase price of such obligation. Generally, any gain recognized on the disposition of, and any partial payment of principal on, a debt obligation having market discount is treated as ordinary income to the extent the gain, or principal payment, does not exceed the "accrued market discount" on such debt obligation. Alternatively, a holder may elect to accrue market discount currently. As of the date of this SAI, the Trust has made this election, and as such, the Trust is required to include currently any accrued market discount on such debt obligations in the Trust's taxable income (as ordinary income) and thus distribute it over the terms of the obligations, even though payment of those amounts is not received until a later time, upon partial or full repayment or disposition of the applicable debt obligations. The Trust reserves the right to revoke this election at any time pursuant to applicable IRS procedures. The rate at which market discount accrues, and thus is included in the Trust's income, will depend upon which of the permitted accrual methods the Trust elects.

In addition, some debt obligations with a fixed maturity date of more than one year from the date of issuance (and zero-coupon debt obligations with a fixed maturity date of more than one year from the date of issuance) will be treated as debt obligations that are issued originally at a discount. Generally, the amount of the original issue discount ("OID") is treated as interest income and is included in taxable income (and required to be distributed by the Trust) over the term of the debt obligation, even though payment of that amount is not received until a later time, upon partial or full repayment or disposition of the debt obligation. In addition, PIK securities will give rise to income which is required to be distributed and is taxable even though the Trust receives no interest payment in cash on the security during the year in which the income was accrued.

The Trust expects that a substantial portion of the Trust's investments in loans and other debt obligations will be treated as having market discount and/or OID, which, in some cases, could be significant.

Some debt obligations with a fixed maturity date of one year or less from the date of issuance that are acquired by the Trust may be treated as having OID or, in certain cases, "acquisition discount" (very generally, the excess of the stated redemption price over the purchase price). Generally, the Trust will be required to include the OID or acquisition discount in income (as ordinary income) over the term of the debt obligation and thus distribute it over the term of the debt obligation, even though payment of that amount is not received until a later time, upon partial or full repayment or disposition of the debt obligation. The rate at which OID or acquisition discount accrues, and thus is included in the Trust's income, will depend upon which of the permitted accrual methods the Trust elects.

Some preferred securities may include provisions that permit the issuer, at its discretion, to defer the payment of distributions for a stated period without any adverse consequences to the issuer. If the Trust owns a preferred security that is deferring the payment of its distributions, the Trust may be required to report income for U.S. federal income tax purposes to the extent of any such deferred distribution even though the Trust has not yet actually received the cash distribution.

As a result of holding the foregoing kinds of debt obligations or other debt obligations subject to special rules under the Code, the Trust may be required to pay out as an income distribution each year an amount which is greater than the total amount of cash interest (or dividends in the case of preferred securities) the Trust actually received. Such distributions may be made from, among other things, the cash assets of the Trust or cash generated from the Trust's liquidation of portfolio securities. The Trust may realize gains or losses from such liquidations. In the event the Trust realizes net long-term or short-term capital gains from such transactions, its shareholders may receive a larger capital gain or ordinary dividend, respectively, than they would in the absence of such transactions.

Investments in distressed debt obligations that are at risk of or in default present special tax issues for the Trust. Tax rules are not entirely clear about issues such as whether and to what extent the Trust should recognize market discount on these debt obligations, when the Trust may cease to accrue interest, OID or market discount, when and to what extent the Trust may take deductions for bad debts or worthless securities and how the Trust should allocate payments received on obligations in default between principal and income. These and other related issues will be addressed by the Trust when, as and if it invests in such securities, in order to seek to ensure that it distributes sufficient income to preserve its eligibility for treatment as a RIC and does not become subject to U.S. federal income or excise tax.

A portion of the OID accrued on certain high-yield discount obligations owned by the Trust may not be deductible to the issuer and will instead be treated as a dividend paid by the issuer for purposes of the dividends-received deduction. In such cases, if the issuer of the obligation is a domestic corporation, dividend payments by the Trust may be eligible for the dividends-received deduction to the extent of the deemed dividend portion of such OID.

Any transactions by the Trust in foreign currencies, foreign currency-denominated debt obligations and certain foreign currency options, futures contracts and forward contracts (and similar instruments) may give rise to ordinary income or loss to the extent such income or loss results from fluctuations in the value of the foreign currency concerned. Such ordinary income treatment may accelerate

Trust distributions to shareholders and increase the distributions taxed to shareholders as ordinary income. Any net ordinary losses so created cannot be carried forward by the Trust to offset income or gains earned in subsequent years.

32

[Table of Contents](#)

Any equity investments by the Trust in certain "passive foreign investment companies" ("PFICs") could potentially subject the Trust to a U.S. federal income tax (including interest charges) on distributions received from the PFIC or on proceeds received from the disposition of shares in the PFIC. This tax cannot be eliminated by making distributions to Trust shareholders. However, the Trust may elect to avoid the imposition of that tax. For example, the Trust may elect to treat a PFIC as a "qualified electing fund" (i.e., make a "QEF election"), in which case the Trust will be required to include its share of the PFIC's income and net capital gains annually, regardless of whether it receives any distribution from the company. The Trust also may make an election to mark the gains (and to a limited extent losses) in such holdings "to the market" as though it had sold and repurchased its holdings in those PFICs on the last day of the Trust's taxable year. Such gains and losses are treated as ordinary income and loss. The QEF and mark-to-market elections may accelerate the recognition of income (without the receipt of cash) and increase the amount required to be distributed by the Trust to avoid taxation. Making either of these elections therefore may require the Trust to liquidate other investments (including when it is not advantageous to do so) to meet its distribution requirement, which also may accelerate the recognition of gain and affect the Trust's total return. Dividends paid by PFICs will not be eligible to be treated as qualified dividend income.

Because it is not always possible to identify a foreign corporation as a PFIC, the Trust may incur the tax and interest charges described above in some instances.

Income proceeds and gains received by the Trust from sources within foreign countries may be subject to withholding and other taxes imposed by such countries. Tax treaties between certain countries and the United States may reduce or eliminate such taxes. Shareholders generally will not be entitled to separately claim a credit or deduction with respect to foreign taxes incurred by the Trust. This will decrease the Trust's yield on securities subject to such taxes.

The Trust's Derivative Transactions, as well as any of its other hedging, short sale or similar transactions, may be subject to one or more special tax rules (including, for instance, notional principal contract, mark-to-market, constructive sale, straddle, wash sale and short-sale rules). These rules may affect whether gains and losses recognized by the Trust are treated as ordinary or capital and/or as short-term or long-term, accelerate the recognition of income or gains to the Trust, defer losses, and cause adjustments in the holding periods of the Trust's securities. The rules could therefore affect the amount, timing and/or character of distributions to shareholders.

Because the tax rules applicable to derivative financial instruments are in some cases uncertain under current law, an adverse determination or future guidance by the IRS with respect to these rules (which determination or guidance could be retroactive) may affect whether the Trust has made sufficient distributions, and otherwise satisfied the relevant requirements, to maintain its qualification as a RIC and avoid a Trust-level tax.

Certain of the Trust's Derivative Transactions and investments in foreign currency-denominated instruments, and any of the Trust's transactions in foreign currencies and hedging activities, are likely to produce a difference between its book income and the sum of its taxable income and net tax-exempt income (if any). If such a difference arises, and the Trust's book income is less than the sum of its taxable income and net tax-exempt income (if any), the Trust could be required to make distributions exceeding book income to qualify as a RIC that is accorded special tax treatment and to avoid a Trust-level tax. In the alternative, if the Trust's book income exceeds the sum of its taxable income and net tax-exempt income (if any), the distribution (if any) of such excess generally will be treated as (i) a dividend to the extent of the Trust's remaining earnings and profits (including earnings and profits arising from any tax-exempt income), (ii) thereafter, as a return of capital to the extent of the recipient's basis in its shares, and (iii) thereafter, as gain from the sale or exchange of a capital asset.

The Trust's investments in equity securities of REITs may result in the Trust's receipt of cash in excess of the REIT's earnings; if the Trust distributes these amounts, these distributions could constitute a return of capital to Trust shareholders for U.S. federal income tax purposes. Dividends received by the Trust from a REIT will not qualify for the corporate dividends-received deduction and generally will not constitute qualified dividend income.

Under a notice issued by the IRS in October 2006 and Treasury regulations that have yet to be issued but may apply retroactively, a portion of a Trust's income (if any) (including income allocated to the Trust from a REIT or other pass-through entity) that is attributable to a residual interest in a real estate mortgage investment conduit ("REMIC") (including residual interests in collateralized mortgage obligations) or an equity interest in a taxable mortgage pool ("TMP") (referred to in the Code as an "excess inclusion") will be subject to U.S. federal income tax in all events. This notice also provides, and the regulations are expected to provide, that excess inclusion income of a RIC will be allocated to shareholders of the RIC in proportion to the dividends received by such shareholders, with the same consequences as if the shareholders held the related interest directly. As a result, to the extent the Trust invests in any such interests, it may not be a suitable investment for certain tax-exempt shareholders (as noted below in "Tax-Exempt Shareholders").

In general, excess inclusion income allocated to shareholders (i) cannot be offset by net operating losses (subject to a limited exception for certain thrift institutions), (ii) will constitute unrelated business taxable income ("UBTI") to entities (including a

33

[Table of Contents](#)

qualified pension plan, an individual retirement account, a 401(k) plan, a Keogh plan or other tax-exempt entity) subject to tax on UBTI, thereby potentially requiring such an entity that is allocated excess inclusion income, and otherwise might not be required to file a U.S. federal income tax return, to file such a tax return and pay tax on such income, and (iii) in the case of a non-U.S. shareholder, will not qualify for any reduction in U.S. federal withholding tax. A shareholder will be subject to U.S. federal income tax on such inclusions notwithstanding any exemption from such income tax otherwise available under the Code.

Effective for taxable years beginning after December 31, 2017 and before January 1, 2026, the Code generally allows individuals and certain non-corporate entities a deduction for 20% of qualified REIT dividends. Recently issued proposed regulations allow a RIC such as the Trust to pass the character of its qualified REIT dividends through to its shareholders provided certain holding period requirements are met. As a result, eligible shareholders in the Trust may receive the benefit of the deduction with respect to qualified REIT dividends received by the Trust that are distributed to shareholders.

### Backup Withholding

Your broker or other intermediary generally is required to withhold and remit to the U.S. Treasury a percentage of the taxable distributions and redemption proceeds paid to any individual shareholder who fails to properly furnish the broker or other intermediary with a correct taxpayer identification number ("TIN"), who has under-reported dividend or interest income, or who fails to certify to the broker or other intermediary that he or she is not subject to such withholding.

Backup withholding is not an additional tax. Any amounts withheld may be credited against the shareholder's U.S. federal income tax liability, provided the appropriate information is furnished to the IRS.

### Sale or Exchange of Trust Shares

The sale or exchange of Trust shares may give rise to a gain or loss. In general, any gain or loss realized upon a taxable disposition of shares will be treated as long-term capital gain or loss if the shares have been held for more than 12 months. Otherwise, the gain or loss on the taxable disposition of Trust shares will be treated as short-term capital gain or loss. However, any loss realized upon a taxable disposition of shares held for six months or less will be treated as long-term, rather than short-term, to the extent of any Capital Gain Dividends received (or deemed received) by the shareholder with respect to the shares. All or a portion of any loss realized upon a taxable disposition of Trust shares will be disallowed if other substantially identical shares are purchased within 30 days before or after the disposition. In such a case, the basis of the newly purchased shares will be adjusted to reflect the disallowed loss.

Shareholders may be entitled to offset their Capital Gain Dividends with capital loss from other sources. The Code contains a number of statutory provisions affecting the circumstances under which capital loss may be offset against capital gain and limiting the use of loss from certain investments and activities. Accordingly, shareholders that have capital losses are urged to consult their tax advisers.

### Tax Shelter Reporting Regulations

Under Treasury regulations, if a shareholder recognizes a loss of $2 million or more for an individual shareholder or $10 million or more for a corporate shareholder, the shareholder must file with the IRS a disclosure statement on Form 8886. Direct holders of portfolio securities are in many cases excepted from this reporting requirement, but under current guidance, shareholders of a RIC are not excepted. Future guidance may extend the current exception from this reporting requirement to shareholders of most or all RICs. The fact that a loss is reportable under these regulations does not affect the legal determination of whether the taxpayer's treatment of the loss is proper. Shareholders should consult their tax advisers to determine the applicability of these regulations in light of their individual circumstances.

### Non-U.S. Shareholders

Distributions by the Trust to shareholders that are not "U.S. persons" within the meaning of the Code ("foreign shareholders)" properly reported by the Trust as (1) Capital Gain Dividends, (2) short-term capital gain dividends and (3) interest-related dividends, each as defined and subject to certain conditions described below, generally are not subject to U.S. federal income tax withholding.

In general, the Code defines (1) "short-term capital gain dividends" as distributions of net short-term capital gains in excess of net long-term capital losses and (2) "interest-related dividends" as distributions from U.S. source interest income of types similar to those not subject to U.S. federal income tax if earned directly by an individual foreign shareholder, in each case, to the extent such distributions are properly reported as such by the Trust in a written notice to shareholders.

12/14/2020    Case 19-34054-sgj11 Doc 1578-1 Filed 12/15/20   Entered 12/15/20 16:32:49    Page 231 of 267
Next Gen Strategic Opportunities Fund

34

Table of Contents

The exceptions to withholding for Capital Gain Dividends and short-term capital gain dividends do not apply to (A) distributions to an individual foreign shareholder who is present in the United States for a period or periods aggregating 183 days or more during the year of the distribution and (B) distributions attributable to gain that is treated as effectively connected with the conduct by the foreign shareholder of a trade or business within the United States under special rules regarding the disposition of U.S. real property interests ("USRPIs") as described below.

The exception to withholding for interest-related dividends does not apply to distributions to a foreign shareholder (A) that has not provided a satisfactory statement that the beneficial owner is not a U.S. person, (B) to the extent that the dividend is attributable to certain interest on an obligation if the foreign shareholder is the issuer or is a 10% shareholder of the issuer, (C) that is within certain foreign countries that have inadequate information exchange with the United States, or (D) to the extent the dividend is attributable to interest paid by a person that is a related person of the foreign shareholder and the foreign shareholder is a controlled foreign corporation.

35

**Table of Contents**

The Trust is permitted to report such part of its dividends as short-term capital gain and/or interest-related dividends as are eligible, but is not required to do so. In the case of shares held through an intermediary, the intermediary may withhold even if the Fund reports all or a portion of a payment as an interest-related or short-term capital gain dividend to shareholders.

Foreign shareholders should contact their intermediaries regarding the application of these rules to their accounts.

Distributions by the Trust to foreign shareholders other than Capital Gain Dividends, short-term capital gain dividends and interest-related dividends (e.g., dividends attributable to dividend and foreign-source interest income or to short-term capital gains or U.S. source interest income to which the exception from withholding described above does not apply) are generally subject to withholding of U.S. federal income tax at a rate of 30% (or lower applicable treaty rate).

A foreign shareholder is not, in general, subject to U.S. federal income tax on gains (and is not allowed a deduction for losses) realized on the sale of shares of the Trust unless (i) such gain is effectively connected with the conduct of a trade or business carried on by such holder within the United States, (ii) in the case of an individual holder, the holder is present in the United States for a period or periods aggregating 183 days or more during the year of the sale and certain other conditions are met, or (iii) the special rules relating to gain attributable to the sale or exchange of USRPIs apply to the foreign shareholder's sale of shares of the Trust (as described below).

Foreign shareholders with respect to whom income from the Trust is effectively connected with a trade or business conducted by the foreign shareholder within the United States will in general be subject to U.S. federal income tax on the income derived from the Trust at the graduated rates applicable to U.S. citizens, residents or domestic corporations, whether such income is received in cash or reinvested in additional shares of the Trust and, in the case of a foreign corporation, may also be subject to a branch profits tax. If a foreign shareholder is eligible for the benefits of a tax treaty, any effectively connected income or gain will generally be subject to U.S. federal income tax on a net basis only if it is also attributable to a permanent establishment maintained by the shareholder in the United States. More generally, foreign shareholders who are residents of a country with an income tax treaty with the United States may obtain different tax results than those described herein, and are urged to consult their tax advisers.

Special rules would apply if the Trust were a qualified investment entity ("QIE") because it is either a "U.S. real property holding corporation" ("USRPHC") or would be a USRPHC but for the operation of certain exceptions to the definition of USRPIs described below. Very generally, a USRPHC is a domestic corporation that holds USRPIs the fair market value of which equals or exceeds 50% of the sum of the fair market values of the corporation's USRPIs, interests in real property located outside the United States, and other trade or business assets. USRPIs generally are defined as any interest in U.S. real property and any interest (other than solely as a creditor) in a USRPHC or, very generally, an entity that has been a USRPHC in the last five years. A RIC that holds, directly or indirectly, significant interests in REITs may be a USRPHC. Interests in domestically controlled QIEs, including REITs and RICs that are QIEs, not-greater-than-10% interests in publicly traded classes of stock in REITs and not-greater-than-5% interests in publicly traded classes of stock in RICs generally are not USRPIs, but these exceptions do not apply for purposes of determining whether a RIC is a QIE.

If an interest in the Trust were a USRPI, a greater-than-5% foreign shareholder generally would be required to file a U.S. tax return in connection with the sale of its Trust shares, and pay related taxes due on any gain realized on the sale.

If the Trust were a QIE, under a special "look-through" rule, any distributions by the Trust to a foreign shareholder attributable directly or indirectly to (i) distributions received by the Trust from a lower-tier RIC or REIT that the Trust is required to treat as USRPI gain in its hands and (ii) gains realized on the disposition of USRPIs by the Trust would retain their character as gains realized from USRPIs in the hands of the Trust's foreign shareholders and would be subject to U.S. tax withholding. In addition, such distributions could result in the foreign shareholder being required to file a U.S. tax return and pay tax on the distributions at regular U.S. federal income tax rates. The consequences to a foreign shareholder, including the rate of such withholding and character of such distributions (e.g., as ordinary income or USRPI gain), would vary depending upon the extent of the foreign shareholder's current and past ownership of the Trust.

Foreign shareholders of the Trust also may be subject to "wash sale" rules to prevent the avoidance of the tax-filing and - payment obligations discussed above through the sale and repurchase of Trust shares.

The Trust generally does not expect that it will be a QIE.

Foreign shareholders should consult their tax advisers and, if holding shares through intermediaries, their intermediaries, concerning the application of these rules to their investment in the Trust.

[Table of Contents](#)

In order to have qualified for any exemption from withholding described above (to the extent applicable) or for lower withholding tax rates under income tax treaties, or to establish an exemption from backup withholding, a foreign shareholder must have complied with applicable certification and filing requirements relating to its non-U.S. status (including, in general, furnishing an IRS Form W-8BEN, W-8BEN-E or substitute form). Foreign shareholders should contact their tax advisers in this regard.

Special rules (including withholding and reporting requirements) apply to foreign partnerships and those holding Trust shares through foreign partnerships. Additional considerations may apply to foreign trusts and estates. Investors holding Trust shares through foreign entities should consult their tax advisers.

A foreign shareholder may be subject to state and local tax and to the U.S. federal estate tax in addition to the U.S. federal tax on income referred to above.

### Tax-Exempt Shareholders

Income of the Trust that would be UBTI if earned directly by a tax exempt entity generally will not constitute UBTI when distributed to tax-exempt shareholders of the Trust. Notwithstanding this "blocking" effect, a tax-exempt shareholder could realize UBTI by virtue of its investment in the Trust if shares in the Trust constitute debt-financed property in the hands of the tax-exempt shareholder within the meaning of Section 514(b) of the Code.

A tax-exempt shareholder may also recognize UBTI if the Trust recognizes excess inclusion income derived from direct or indirect investments in residual interests in REMICS or equity interests in TMPs if the amount of such income recognized by the Trust exceeds the Trust's investment company taxable income (after taking into account deductions for dividends paid by the Trust).

In addition, special tax consequences apply to charitable remainder trusts ("CRTs") that invest in RICs that invest directly or indirectly in residual interests in REMICs or equity interests in TMPs. Under legislation enacted in December 2006, a CRT (as defined in Section 664 of the Code) that realizes any UBTI for a taxable year must pay an excise tax annually of an amount equal to such UBTI. Under IRS guidance issued in October 2006, a CRT will not recognize UBTI as a result of investing in a RIC that recognizes excess inclusion income. Rather, if at any time during any taxable year a CRT (or one of certain other tax-exempt shareholders, such as the United States, a state or political subdivision, or an agency or instrumentality thereof, and certain energy cooperatives) is a record holder of a share in a RIC that recognizes excess inclusion income, then the RIC will be subject to a tax on that portion of its excess inclusion income for the taxable year that is allocable to such shareholders at the highest federal corporate income tax rate. The extent to which this IRS guidance remains applicable in light of the December 2006 legislation is unclear. To the extent permitted under the Investment Company Act, the Trust may elect to specially allocate any such tax to the applicable CRT, or other shareholder, and thus reduce such shareholder's distributions for the year by the amount of the tax that relates to such shareholder's interest in the Trust.

CRTs and other tax-exempt investors are urged to consult their tax advisers concerning the consequences of investing in the Trust.

### Shareholder Reporting Obligations With Respect to Foreign Bank and Financial Accounts

Shareholders that are U.S. persons and own, directly or indirectly, more than 50% of the Trust could be required to report annually their "financial interest" in the Trust's "foreign financial accounts," if any, on FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR). Shareholders should consult their tax advisers, and persons investing in the Trust through an intermediary should contact their intermediary to determine the applicability to them of this reporting requirement.

### Other Reporting and Withholding Requirements

Sections 1471-1474 of the Code and the U.S. Treasury and IRS guidance issued thereunder (collectively, "FATCA") generally require the Trust to obtain information sufficient to identify the status of each of its shareholders under FATCA or under an applicable intergovernmental agreement (an "IGA"). If a shareholder fails to provide this information or otherwise fails to comply with FATCA or an IGA, the Trust may be required to withhold under FATCA at a rate of 30% with respect to that shareholder on ordinary dividends it pays. Recently issued proposed regulations would eliminate the 30% withholding tax with respect to the gross proceeds from the sale or exchange of shares and certain Capital Gain Dividends that was scheduled to go in to effect after December 31, 2018. If a payment by the Trust is subject to FATCA withholding, the Trust is required to withhold even if such payment would otherwise be exempt from withholding under the rules applicable to foreign shareholders described above (e.g., Capital Gain Dividends, short-term capital gain dividends and interest-related dividends).

Table of Contents

Each prospective investor is urged to consult its tax adviser regarding the applicability of FATCA and any other reporting requirements with respect to the prospective investor's own situation, including investments through an intermediary.

38

[Table of Contents](#)

**Shares Purchased Through Tax Qualified Plans**

Special tax rules apply to investments through defined contribution plans and other tax-qualified plans. Shareholders should consult their tax advisers to determine the suitability of shares of the Trust as an investment through such plans and the precise effect of an investment on their particular tax situation.

**General Considerations**

The U.S. federal income tax discussion set forth above is for general information only. Prospective investors should consult their tax advisers regarding the specific federal tax consequences of purchasing, holding, and disposing of shares of the Trust, as well as the effects of state, local and foreign tax law and any proposed tax law changes.

## INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

PricewaterhouseCoopers LLP provides accounting and auditing services to the Trust.

## CUSTODIAN

The custodian of the assets of the Trust and its wholly-owned subsidiaries is Bank of New York Mellon (240 Greenwich Street, New York, New York 10286). The custodian performs custodial services for the Trust.

## ADDITIONAL INFORMATION

A registration statement on Form N-2, including amendments thereto, relating to the shares offered hereby (the "Registration Statement"), has been filed by the Trust with the SEC. The Prospectus and this SAI do not contain all of the information set forth in the Registration Statement, including any exhibits and schedules thereto. For further information with respect to the Trust and the securities offered hereby, reference is made to the Registration Statement. Statements contained in the Prospectus and this SAI as to the contents of any contract or other document referred to are not necessarily complete and in each instance reference is made to the copy of such contract or other document filed as an exhibit to the Registration Statement, each such statement being qualified in all respects by such reference. A copy of the Registration Statement may be inspected without charge at the SEC's principal office in Washington, D.C., and copies of all or any part thereof may be obtained from the SEC upon the payment of certain fees prescribed by the SEC.

## FINANCIAL STATEMENTS

The Trust's audited financial statements appearing in the Trust's annual shareholder report for the period ended December 31, 2018 are incorporated by reference in this SAI and have been so incorporated in reliance upon the report of PricewaterhouseCoopers LLP, independent registered public accounting firm for the Trust. The Trust's annual and semiannual shareholder reports are available upon request and without charge by writing to the Trust at 300 Crescent Court, Suite 700, Dallas, Texas 75201 or by calling 1-866-351-4440 and viewed on the Trust's website at www.nexpointadvisors.com.

**Table of Contents**

## APPENDIX A

*Standard & Poor's*—A brief description of the applicable rating symbols of Standard & Poor's and their meanings (as published by Standard & Poor's) follows:

### Issue Credit Rating Definitions

A Standard & Poor's issue credit rating is a forward-looking opinion about the creditworthiness of an obligor with respect to a specific financial obligation, a specific class of financial obligations, or a specific financial program (including ratings on medium-term note programs and commercial paper programs). It takes into consideration the creditworthiness of guarantors, insurers, or other forms of credit enhancement on the obligation and takes into account the currency in which the obligation is denominated. The opinion reflects Standard & Poor's view of the obligor's capacity and willingness to meet its financial commitments as they come due, and may assess terms, such as collateral security and subordination, which could affect ultimate payment in the event of default.

Issue credit ratings can be either long-term or short-term. Short-term ratings are generally assigned to those obligations considered short-term in the relevant market. In the U.S., for example, that means obligations with an original maturity of no more than 365 days—including commercial paper. Short-term ratings are also used to indicate the creditworthiness of an obligor with respect to put features on long-term obligations. Medium-term notes are assigned long-term ratings.

### Long-Term Issue Credit Ratings

Issue credit ratings are based, in varying degrees, on Standard & Poor's analysis of the following considerations:

i)   Likelihood of payment—capacity and willingness of the obligor to meet its financial commitment on an obligation in accordance with the terms of the obligation;

ii)  Nature of and provisions of the obligation, and the promise we impute;

iii) Protection afforded by, and relative position of, the obligation in the event of bankruptcy, reorganization, or other arrangement under the laws of bankruptcy and other laws affecting creditors' rights.

Issue ratings are an assessment of default risk, but may incorporate an assessment of relative seniority or ultimate recovery in the event of default. Junior obligations are typically rated lower than senior obligations, to reflect the lower priority in bankruptcy, as noted above. (Such differentiation may apply when an entity has both senior and subordinated obligations, secured and unsecured obligations, or operating company and holding company obligations.)

### AAA

An obligation rated 'AAA' has the highest rating assigned by Standard & Poor's. The obligor's capacity to meet its financial commitment on the obligation is extremely strong.

### AA

An obligation rated 'AA' differs from the highest-rated obligations only to a small degree. The obligor's capacity to meet its financial commitment on the obligation is very strong.

### A

An obligation rated 'A' is somewhat more susceptible to the adverse effects of changes in circumstances and economic conditions than obligations in higher-rated categories. However, the obligor's capacity to meet its financial commitment on the obligation is still strong.

### BBB

An obligation rated 'BBB' exhibits adequate protection parameters. However, adverse economic conditions or changing circumstances are more likely to lead to a weakened capacity of the obligor to meet its financial commitment on the obligation.

A-1

Table of Contents

**BB, B, CCC, CC, and C**

Obligations rated 'BB', 'B', 'CCC', 'CC', and 'C' are regarded as having significant speculative characteristics. 'BB' indicates the least degree of speculation and 'C' the highest. While such obligations will likely have some quality and protective characteristics, these may be outweighed by large uncertainties or major exposures to adverse conditions.

**BB**

An obligation rated 'BB' is less vulnerable to nonpayment than other speculative issues. However, it faces major ongoing uncertainties or exposure to adverse business, financial, or economic conditions which could lead to the obligor's inadequate capacity to meet its financial commitment on the obligation.

**B**

An obligation rated 'B' is more vulnerable to nonpayment than obligations rated 'BB', but the obligor currently has the capacity to meet its financial commitment on the obligation. Adverse business, financial, or economic conditions will likely impair the obligor's capacity or willingness to meet its financial commitment on the obligation.

**CCC**

An obligation rated 'CCC' is currently vulnerable to nonpayment, and is dependent upon favorable business, financial, and economic conditions for the obligor to meet its financial commitment on the obligation. In the event of adverse business, financial, or economic conditions, the obligor is not likely to have the capacity to meet its financial commitment on the obligation.

**CC**

An obligation rated 'CC' is currently highly vulnerable to nonpayment. The 'CC' rating is used when a default has not yet occurred, but Standard & Poor's expects default to be a virtual certainty, regardless of the anticipated time to default.

**C**

An obligation rated 'C' is currently highly vulnerable to nonpayment, and the obligation is expected to have lower relative seniority or lower ultimate recovery compared to obligations that are rated higher.

**D**

An obligation rated 'D' is in default or in breach of an imputed promise. For non-hybrid capital instruments, the 'D' rating category is used when payments on an obligation are not made on the date due, unless Standard & Poor's believes that such payments will be made within five business days in the absence of a stated grace period or within the earlier of the stated grace period or 30 calendar days. The 'D' rating also will be used upon the filing of a bankruptcy petition or the taking of similar action and where default on an obligation is a virtual certainty, for example due to automatic stay provisions. An obligation's rating is lowered to 'D' if it is subject to a distressed exchange offer.

**Plus (+) or minus (—)**

The ratings from 'AA' to 'CCC' may be modified by the addition of a plus (+) or minus (—) sign to show relative standing within the major rating categories.

**NR**

This indicates that no rating has been requested, that there is insufficient information on which to base a rating, or that Standard & Poor's does not rate a particular obligation as a matter of policy.

A-2

[Table of Contents](#)

**Short-Term Issue Credit Ratings**

**A-1**

A short-term obligation rated 'A-1' is rated in the highest category by Standard & Poor's. The obligor's capacity to meet its financial commitment on the obligation is strong. Within this category, certain obligations are designated with a plus sign (+). This indicates that the obligor's capacity to meet its financial commitment on these obligations is extremely strong.

**A-2**

A short-term obligation rated 'A-2' is somewhat more susceptible to the adverse effects of changes in circumstances and economic conditions than obligations in higher rating categories. However, the obligor's capacity to meet its financial commitment on the obligation is satisfactory.

**A-3**

A short-term obligation rated 'A-3' exhibits adequate protection parameters. However, adverse economic conditions or changing circumstances are more likely to lead to a weakened capacity of the obligor to meet its financial commitment on the obligation.

**B**

A short-term obligation rated 'B' is regarded as vulnerable and has significant speculative characteristics. The obligor currently has the capacity to meet its financial commitments; however, it faces major ongoing uncertainties which could lead to the obligor's inadequate capacity to meet its financial commitments.

**C**

A short-term obligation rated 'C' is currently vulnerable to nonpayment and is dependent upon favorable business, financial, and economic conditions for the obligor to meet its financial commitment on the obligation.

**D**

A short-term obligation rated 'D' is in default or in breach of an imputed promise. For non-hybrid capital instruments, the 'D' rating category is used when payments on an obligation are not made on the date due, unless Standard & Poor's believes that such payments will be made within any stated grace period. However, any stated grace period longer than five business days will be treated as five business days. The 'D' rating also will be used upon the filing of a bankruptcy petition or the taking of a similar action and where default on an obligation is a virtual certainty, for example due to automatic stay provisions. An obligation's rating is lowered to 'D' if it is subject to a distressed exchange offer.

**SPUR (Standard & Poor's Underlying Rating)**

A SPUR rating is an opinion about the stand-alone capacity of an obligor to pay debt service on a credit-enhanced debt issue, without giving effect to the enhancement that applies to it. These ratings are published only at the request of the debt issuer/obligor with the designation SPUR to distinguish them from the credit-enhanced rating that applies to the debt issue. Standard & Poor's maintains surveillance of an issue with a published SPUR.

**Municipal Short-Term Note Ratings Definitions**

A Standard & Poor's U.S. municipal note rating reflects Standard & Poor's opinion about the liquidity factors and market access risks unique to the notes. Notes due in three years or less will likely receive a note rating. Notes with an original maturity of more than three years will most likely receive a long-term debt rating. In determining which type of rating, if any, to assign, Standard & Poor's analysis will review the following considerations:

a.    Amortization schedule — the larger the final maturity relative to other maturities, the more likely it will be treated as a note; and

A-3

Table of Contents

b.    Source of payment — the more dependent the issue is on the market for its refinancing, the more likely it will be treated as a note. Note rating symbols are as follows:

**SP-1**

Strong capacity to pay principal and interest. An issue determined to possess a very strong capacity to pay debt service is given a plus (+) designation.

**SP-2**

Satisfactory capacity to pay principal and interest, with some vulnerability to adverse financial and economic changes over the term of the notes.

**SP-3**

Speculative capacity to pay principal and interest.

**Dual Ratings**

Dual Ratings may be assigned to debt issues that have a put option or demand feature. The first component of the rating addresses the likelihood of repayment of principal and interest as due, and the second component of the rating addresses only the demand feature. The first component of the rating can relate to either a short-term or long-term transaction and accordingly use either short-term or long-term rating symbols. The second component of the rating relates to the put option and is assigned a short-term rating symbol (for example, 'AAA/A-1+' or 'A-1+/A-1'). With U.S. municipal short-term demand debt, the U.S. municipal short-term note rating symbols are used for the first component of the rating (for example, 'SP-1+/A-1+').

The analyses, including ratings, of Standard & Poor's and its affiliates (together, Standard and Poor's) are statements of opinion as of the date they are expressed and not statements of fact or recommendations to purchase, hold, or sell any securities or make any investment decisions. Standard & Poor's assumes no obligation to update any information following publication. Users of ratings or other analyses should not rely on them in making any investment decision. Standard & Poor's opinions and analyses do not address the suitability of any security. Standard & Poor's does not act as a fiduciary or an investment advisor except where registered as such. While Standard & Poor's has obtained information from sources it believes to be reliable, Standard & Poor's does not perform an audit and undertakes no duty of due diligence or independent verification of any information it receives. Ratings and other opinions may be changed, suspended, or withdrawn at any time.

**Active Qualifiers (Currently applied and/or outstanding)**

Standard & Poor's uses six qualifiers that limit the scope of a rating. The structure of the transaction can require the use of a qualifier such as a 'p' qualifier, which indicates the rating addressed the principal portion of the obligation only. Likewise, the qualifier can indicate a limitation on the type of information used, such as "pi" for public information. A qualifier appears as a suffix and is part of the rating.

**Federal deposit insurance limit: 'L' qualifier**

Ratings qualified with 'L' apply only to amounts invested up to federal deposit insurance limits.

**Principal: 'p' qualifier**

This suffix is used for issues in which the credit factors, the terms, or both, that determine the likelihood of receipt of payment of principal are different from the credit factors, terms or both that determine the likelihood of receipt of interest on the obligation. The 'p' suffix indicates that the rating addresses the principal portion of the obligation only and that the interest is not rated.

**Public Information Ratings: 'pi' qualifier**

Ratings with a 'pi' suffix are based on an analysis of an issuer's published financial information, as well as additional information in the public domain. They do not, however, reflect in-depth meetings with an issuer's management and therefore may be based on less

comprehensive information than ratings without a 'pi' suffix. Ratings with a 'pi' suffix are reviewed annually based on a new year's financial statements, but may be reviewed on an interim basis if a major event occurs that may affect the issuer's credit quality.

A-4

[Table of Contents](#)

### Preliminary Ratings: 'prelim' qualifier

Preliminary ratings, with the 'prelim' suffix, may be assigned to obligors or obligations, including financial programs, in the circumstances described below. Assignment of a final rating is conditional on the receipt by Standard & Poor's of appropriate documentation. Standard & Poor's reserves the right not to issue a final rating. Moreover, if a final rating is issued, it may differ from the preliminary rating.

- Preliminary ratings may be assigned to obligations, most commonly structured and project finance issues, pending receipt of final documentation of legal opinions.

- Preliminary ratings are assigned to Rule 415 Shelf Registrations. As specific issues, with defined terms, are offered from the master registration, a final rating may be assigned to them in accordance with Standard & Poor's policies.

- Preliminary ratings may be assigned to obligations that will likely be issued upon the obligor's emergence from bankruptcy or similar reorganization, based on late-stage reorganization plans, documentation and discussions with the obligor. Preliminary ratings may also be assigned to the obligors. These ratings consider the anticipated general credit quality of the reorganized or post-bankruptcy issuer as well as attributes of the anticipated obligation(s).

- Preliminary ratings may be assigned to entities that are being formed or that are in the process of being independently established when, in Standard & Poor's opinion, documentation is close to final. Preliminary ratings may also be assigned to the obligations of these entities.

- Preliminary ratings may be assigned when a previously unrated entity is undergoing a well-formulated restructuring, recapitalization, significant financing or other transformative event, generally at the point that investor or lender commitments are invited. The preliminary rating may be assigned to the entity and to its proposed obligation(s). These preliminary ratings consider the anticipated general credit quality of the obligor, as well as attributes of the anticipated obligation(s), assuming successful completion of the transformative event. Should the transformative event not occur, Standard & Poor's would likely withdraw these preliminary ratings.

- A preliminary recovery rating may be assigned to an obligation that has a preliminary issue credit rating.

### Termination Structures: 't' qualifier

This symbol indicates termination structures that are designed to honor their contracts to full maturity or, should certain events occur, to terminate and cash settle all their contracts before their final maturity date.

### Inactive Qualifiers (No longer applied or outstanding)

### Contingent upon final documentation: '*' in active qualifier

This symbol that indicated that the ratings was contingent upon Standard & Poor 's receipt of an executed copy of the escrow agreement or closing documentation confirming investments and cash flows. Discontinued use in August 1998.

### Termination of obligation to tender: 'c' inactive qualifier

This qualifier was used to provide additional information to investors that the bank may terminate its obligation to purchase tendered bonds if the long-term credit rating of the issuer was lowered to below an investment-grade level and/or the issuer's bonds are deemed taxable. Discontinued use in January 2001.

### U.S. direct government securities: 'G' inactive qualifier

The letter 'G' followed the rating symbol when a fund's portfolio consisted primarily of direct U.S. government securities.

### Provisional Ratings: 'pr' inactive qualifier

The letters 'pr' indicate that the rating was provisional. A provisional rating assumed the successful completion of a project financed by the debt being rated and indicates that the payment of debt service requirements was largely or entirely dependent upon the successful, timely completion of the project. This rating, however, while addressing credit quality subsequent to completion of the project, made no comment on the likelihood of or the risk of default upon failure of such completion.

Table of Contents

**Quantitative Analysis of public information: 'q' inactive qualifier**

A 'q' subscript indicates that the rating is based solely on quantitative analysis of publicly available information. Discontinued use in April 2001.

**Extraordinary risks: 'r' inactive qualifier**

The 'r' modifier was assigned to securities containing extraordinary risks, particularly market risks, which are not covered in the credit rating. The absence of an 'r' modifier should not be taken as an indication that an obligation will not exhibit extraordinary non-credit related risks. Standard & Poor's discontinued the use of the 'r' modifier for most obligations in June 2000 and for the balance of obligations (mainly structured finance transactions) in November 2002.

*Moody's Investors Service, Inc.*—A brief description of the applicable Moody's Investors Service, Inc. ("Moody's") rating symbols and their meanings (as published by Moody's) follows:

**Long-Term Obligation Ratings**

Moody's long-term obligation ratings are opinions of the relative credit risk of a fixed income obligations with an original maturity of one year or more. They address the possibility that a financial obligation will not be honored as promised. Such ratings reflect both the likelihood of default and any financial loss suffered in the event of default.

**Moody's Global Long-Term Rating Scale Definitions:**

**Aaa**

Obligations rated Aaa are judged to be of the highest quality, subject to the lowest level of credit risk.

**Aa**

Obligations rated Aa are judged to be of high quality and are subject to very low credit risk.

**A**

Obligations rated A are judged to be upper medium-grade and are subject to low credit risk.

**Baa**

Obligations rated Baa are judged to be medium-grade and subject to moderate credit risk and as such may possess certain speculative characteristics.

**Ba**

Obligations rated Ba are judged to be speculative elements and are subject to substantial credit risk.

**B**

Obligations rated B are considered speculative and are subject to high credit risk.

**Caa**

Obligations rated Caa are judged to be speculative of poor standing and are subject to very high credit risk.

**Ca**

Obligations rated Ca are highly speculative and are likely in, or very near, default, with some prospect of recovery of principal and interest.

12/14/2020 Case 19-34054-sgj11 Doc 1578-1 Filed 12/15/20 Entered 12/15/20 16:32:49 Page 246 of 267
NexPoint Strategic Opportunities Fund

C

Obligations rated C are the lowest rated and are typically in default, with little prospect for recovery of principal or interest.

A-6

Table of Contents

**Note**: Moody's appends numerical modifiers 1, 2, and 3 to each generic rating classification from Aa through Caa. The modifier 1 indicates that the obligation ranks in the higher end of its generic rating category; the modifier 2 indicates a mid-range ranking; and the modifier 3 indicates a ranking in the lower end of that generic rating category. Additionally, a "(hyb)" indicator is appended to all ratings of hybrid securities issued by banks, insurers, finance companies, and securities firms.

\* By their terms, hybrid securities allow for the omission of scheduled dividends, interest, or principal payments, which can potentially result in impairment if such an omission occurs. Hybrid securities may also be subject to contractually allowable write- downs of principal that could result in impairment. Together with the hybrid indicator, the long-term obligation rating assigned to a hybrid security is an expression of the relative credit risk associated with that security.

**Medium-Term Note Ratings**

Moody's assigns provisional ratings to medium-term note (MTN) programs and definitive ratings to the individual debt securities issued from them (referred to as drawdowns or notes).

MTN program ratings are intended to reflect the ratings likely to be assigned to drawdowns issued from the program with the specified priority of claim (e.g. senior or subordinated). To capture the contingent nature of a program rating, Moody's assigns provisional ratings to MTN programs. A provisional rating is denoted by a (P) in front of the rating and is defined elsewhere in this document.

The rating assigned to a drawdown from a rated MTN or bank/deposit note program is definitive in nature, and may differ from the program rating if the drawdown is exposed to additional credit risks besides the issuer's default, such as links to the defaults of other issuers, or has other structural features that warrant a different rating. In some circumstances, no rating may be assigned to a drawdown.

Moody's encourages market participants to contact Moody's Ratings Desks or visit www.moodys.com directly if they have questions regarding ratings for specific notes issued under a medium-term note program. Unrated notes issued under an MTN program may be assigned an NR (not rated) symbol.

**Global Short-Term Rating Scale:**

Moody's short-term ratings are opinions of the ability of issuers to honor short-term financial obligations. Ratings may be assigned to issuers, short-term programs or to individual short-term debt instruments. Such obligations generally have an original maturity not exceeding thirteen months, unless explicitly noted.

Moody's employs the following designations to indicate the relative repayment ability of rated issuers:

*P-1*

Issuers (or supporting institutions) rated Prime-1 have a superior ability to repay short-term debt obligations.

*P-2*

Issuers (or supporting institutions) rated Prime-2 have a strong ability to repay short-term debt obligations.

*P-3*

Issuers (or supporting institutions) rated Prime-3 have an acceptable ability to repay short-term obligations.

*NP*

Issuers (or supporting institutions) rated Not Prime do not fall within any of the Prime rating categories.

A-7

**Table of Contents**

APPENDIX B

**POLICY REGARDING PROXY VOTING**

**Purpose and Scope**

The purpose of these voting policies and procedures (the "Policy") is to set forth the principles and procedures by which NexPoint Advisors, L.P. (the "Company") votes or gives consents with respect to the securities owned by Clients for which the Company exercises voting authority and discretion.[1] For avoidance of doubt, this includes any proxy and any shareholder vote or consent, including a vote or consent for a private company or other issuer that does not involve a proxy. These policies and procedures have been designed to help ensure that votes are cast in the best interests of Clients in accordance with the Company's fiduciary duties and Rule 206(4)-6 under the Investment Advisers Act of 1940 (the "Advisers Act").

This Policy applies to securities held in all Client accounts (including Retail Funds and other pooled investment vehicles) as to which the Company has explicit or implicit voting authority. Implicit voting authority exists where the Company's voting authority is implied by a general delegation of investment authority without reservation of proxy voting authority to the Client.

If the Company has delegated voting authority to an investment sub-adviser with respect to any Retail Fund, such sub-adviser will be responsible for voting all proxies for such Retail Funds in accordance with the sub-adviser's proxy voting policies. The Compliance Department, to provide oversight over the proxy voting by sub-advisers and to ensure that votes are executed in the best interests of the Retail Funds, shall (i) review the proxy voting policies and procedures of each Retail Fund sub-adviser to confirm that they comply with Rule 206(4)-6, both upon engagement of the sub-adviser and upon any material change to the sub-adviser's proxy voting policies and procedures, and (ii) require each such sub-adviser to provide quarterly certifications that all proxies were voted pursuant to the sub-adviser's policies and procedures or to describe any inconsistent votes.

**General Principles**

The Company and its affiliates engage in a broad range of activities, including investment activities for their own accounts and for the accounts of various Clients and providing investment advisory and other services to Clients. In the ordinary course of conducting the Company's activities, the interests of a Client may conflict with the interests of the Company, other Clients and/or the Company's affiliates and their clients. Any conflicts of interest relating to the voting of proxies, regardless of whether actual or perceived, will be addressed in accordance with these policies and procedures. The guiding principle by which the Company votes all proxies is to vote in the best interests of each Client by maximizing the economic value of the relevant Client's holdings, taking into account the relevant Client's investment horizon, the contractual obligations under the relevant advisory agreements or comparable documents and all other relevant facts and circumstances at the time of the vote. The Company does not permit voting decisions to be influenced in any manner that is contrary to, or dilutive of, this guiding principle.

**Voting Procedures**

*Third-Party Proxy Advisors*

The Company may engage a third-party proxy advisor ("Proxy Advisor") to provide proxy voting recommendations with respect to Client proxies. Proxy Advisor voting recommendation guidelines are generally designed to increase investors' potential financial gain. When considering whether to retain or continue retaining any particular Proxy Advisor, the Compliance Department will ascertain, among other things, whether the Proxy Advisor has the capacity and competency to adequately analyze proxy issues. In this regard, the Compliance Department will consider, among other things: the adequacy and quality of the Proxy Advisor's staffing and

---

1     In any case where a Client has instructed the Company to vote in a particular manner on the Client's behalf, those instructions will govern in lieu of parameters set forth in the Policy. personnel; the robustness of its policies and procedures regarding its ability to (a) ensure that its proxy voting recommendations are based on current and accurate information and (b) identify and address any conflicts of interest and any other considerations that the Compliance Department determines would be appropriate in considering the nature and quality of the services provided by the Proxy Advisor. To identify and address any conflicts that may arise on the part of the Proxy Advisor, the Compliance Department will ensure that the Proxy Advisor notifies the Compliance Department of any relevant business changes or changes to its policies and procedures regarding conflicts.

B-1

**Table of Contents**

*Third-Party Proxy Voting Services*

The Company may utilize a third-party proxy voting service ("Proxy Voting Service") to monitor holdings in Client accounts for purposes of determining whether there are upcoming shareholder meetings or similar corporate actions and to execute Client proxies on behalf of the Company pursuant to the Company's instructions, which shall be given in a manner consistent with this Policy. The Compliance Department will oversee each Proxy Voting Service to ensure that proxies have been voted in a manner consistent with the Company's instructions.

*Monitoring*

Subject to the procedures regarding Nonstandard Proxy Notices described below, the Compliance Department of the Company shall have responsibility for monitoring Client accounts for proxy notices. Except as detailed below, if proxy notices are received by other employees of the Company, such employees must promptly forward all proxy or other voting materials to the Compliance Department.

*Portfolio Manager Review and Instruction*

From time to time, the settlement group of the Company may receive nonstandard proxy notices, regarding matters including, but not limited to, proposals regarding corporate actions or amendments ("Nonstandard Proxy Notices") with respect to securities held by Clients. Upon receipt of a Nonstandard Proxy Notice, a member of the settlement group (the "Settlement Designee") shall send an email notification containing all relevant information to the Portfolio Manager(s) with responsibility for the security and *[          .com]*. Generally, the relevant Portfolio Manager(s) shall deliver voting instructions for Nonstandard Proxy Notices by replying to the email notice sent to the Portfolio Manager(s) and *[          .com]* by the Settlement Designee or by sending voting instructions to *[          .com]* and copying *[          .com]*. Any conflicts for Nonstandard Proxy Notices should also be disclosed to the Compliance Department. In the event a Portfolio Manager orally conveys voting instructions to the Settlement Designee or any other member of the Company's settlement group, that Settlement Designee or member of the Company's settlement group shall respond to the original notice email sent to *[          .com]* detailing the Portfolio Manager(s) voting instructions.

With regard to standard proxy notices, on a weekly basis, the Compliance Department will send a notice of upcoming proxy votes related to securities held by Clients and the corresponding voting recommendations of the Proxy Advisor to the relevant Portfolio Manager(s). Upon receipt of a proxy notice from the Compliance Department, the Portfolio Manager(s) will review and evaluate the upcoming votes and recommendations. The Portfolio Managers may rely on any information and/or research available to him or her and may, in his or her discretion, meet with members of an issuer's management to discuss matters of importance to the relevant Clients and their economic interests. Should the Portfolio Manager determine that deviating from the Proxy Advisor's recommendation is in a Client's best interest, the Portfolio Manager shall communicate his or her voting instructions to the Compliance Department.

In the event that more than one Portfolio Manager is responsible for making a particular voting decision and such Portfolio Managers are unable to arrive at an agreement as to how to vote with respect to a particular proposal, they should consult with the applicable Chief Compliance Officer (the "CCO") for guidance.

*Voting*

Upon receipt of the relevant Portfolio Managers' voting instructions, if any, the Compliance Department will communicate the instructions to the Proxy Voting Service to execute the proxy votes.

*Non-Votes*

It is the general policy of the Company to vote or give consent on all matters presented to security holders in any vote, and these policies and procedures have been designated with that in mind. However, the Company reserves the right to abstain on any particular vote if, in the judgment of the CCO, or the relevant Portfolio Manager, the effect on the relevant Client's economic interests or the value of the portfolio holding is insignificant in relation to the Client's portfolio, if the costs associated with voting in any particular instance outweigh the benefits to the relevant Clients or if the circumstances make such an abstention or withholding otherwise advisable and in the best interests of the relevant Clients not to vote. Such determination may apply in respect of all Client holdings of the securities or only certain specified Clients, as the Company deems appropriate under the circumstances. As examples, a Portfolio Manager may determine: (a) not to recall securities on loan if, in his or her judgment, the matters being voted upon are not material events affecting the securities and the negative consequences to Clients of disrupting the securities lending program would outweigh

the benefits of voting in the particular instance or (b) not to vote proxies relating to certain foreign securities if, in his or her judgment, the expense and administrative inconvenience outweighs the benefits to Clients of voting the securities.

B-2

**Table of Contents**

*Conflicts of Interest*

The Company's Compliance Department is responsible for monitoring voting decisions for any conflicts of interest, regardless of whether they are actual or perceived. All voting decisions contrary to the recommendation of a Proxy Advisor require a mandatory conflicts of interest review by the Compliance Department, which will include a consideration of whether the Company or any Portfolio Manager or other person recommending or providing input on how to vote has an interest in the vote that may present a conflict of interest.

In addition, all Company investment professionals are expected to perform their tasks relating to the voting of proxies in accordance with the principles set forth above, according the first priority to the best interest of the relevant Clients. If at any time a Portfolio Manager or any other investment professional becomes aware of a potential or actual conflict of interest regarding any particular voting decision, he or she must contact the Compliance Department promptly and, if in connection with a proxy that has yet to be voted, prior to such vote. If any investment professional is pressured or lobbied, whether from inside or outside the Company, with respect to any particular voting decision, he or she should contact the Compliance Department promptly. The CCO will use his or her best judgment to address any such conflict of interest and ensure that it is resolved in accordance with his or her independent assessment of the best interests of the relevant Clients.

In the event of a conflict, the Company may choose to address such conflict by: (i) voting in accordance with the Proxy Advisor's recommendation; (ii) the CCO determining how to vote the proxy (if the CCO approves deviation from the Proxy Advisor's recommendation, then the CCO shall document the rationale for the vote); (iii) "echo voting" or "mirror voting" the proxy in the same proportion as the votes of other proxy holders that are not Clients; or (iv) with respect to Clients other than Retail Funds, notifying the affected Client of the material conflict of interest and seeking a waiver of the conflict or obtaining such Client's voting instructions. Where the Compliance Department deems appropriate, third parties may be used to help resolve conflicts. In this regard, the CCO or his or her delegate shall have the power to retain fiduciaries, consultants or professionals to assist with voting decisions and/or to delegate voting or consent powers to such fiduciaries, consultants or professionals.

Where a conflict of interest arises with respect to a voting decision for a Retail Fund, the Company shall disclose the conflict and the rationale for the vote taken to the Retail Fund's Board of Directors/Trustees at the next regularly scheduled quarterly meeting. The Compliance Department will maintain a log documenting the basis for the decision and will furnish the log to the Board of Trustees.

*Material Conflicts of Interest*

The following relationships or circumstances are examples of situations that may give rise to a material conflict of interest for purposes of this Policy. This list is not exclusive or determinative; any potential conflict (including payments of the types described below but less than the specified threshold) should be identified to the Company's Compliance Department:

(i)     The issuer is a Client of the Company, or of an affiliate, accounting for more than 5% of the Company's or affiliate's annual revenues.

(ii)    The issuer is an entity that reasonably could be expected to pay the Company or its affiliates more than $1 million through the end of the Company's next two full fiscal years.

(iii)   The issuer is an entity in which a "Covered Person" (as defined in the Company's Policies and Procedures Designed to Detect and Prevent Insider Trading and to Comply with Rule 17j-1 of the Investment Company Act of 1940, as amended (the "Code of Ethics")) has a beneficial interest contrary to the position held by the Company on behalf of Clients.

(iv)    The issuer is an entity in which an officer or partner of the Company or a relative of any such person is or was an officer, director or employee, or such person or relative otherwise has received more than $150,000 in fees, compensation and other payment from the issuer during the Company's last three fiscal years; provided, however, that the Compliance Department may deem such a relationship not to be a material conflict of interest if the Company representative serves as an officer or director of the issuer at the direction of the Company for purposes of seeking control over the issuer.

(v)     The matter under consideration could reasonably be expected to result in a material financial benefit to the Company or its affiliates through the end of the Company's next two full fiscal years (for example, a vote to increase an investment advisory fee for a Retail Fund advised by the Company or an affiliate).

(vi)   Another Client or prospective Client of the Company, directly or indirectly, conditions future engagement of the Company on voting proxies in respect of any Client's securities on a particular matter in a particular way.

B-3

Table of Contents

(vii) The Company holds various classes and types of equity and debt securities of the same issuer contemporaneously in different Client portfolios.

(viii) Any other circumstance where the Company's duty to serve its Clients' interests, typically referred to as its "duty of loyalty," could be compromised.

Notwithstanding the foregoing, a conflict of interest described above shall not be considered material for the purposes of this Policy in respect of a specific vote or circumstance if:

The securities in respect of which the Company has the power to vote account for less than 1% of the issuer's outstanding voting securities, but only if: (i) such securities do not represent one of the 10 largest holdings of such issuer's outstanding voting securities and (ii) such securities do not represent more than 2% of the Client's holdings with the Company.

The matter to be voted on relates to a restructuring of the terms of existing securities or the issuance of new securities or a similar matter arising out of the holding of securities, other than common equity, in the context of a bankruptcy or threatened bankruptcy of the issuer.

## Recordkeeping

Following the submission of a proxy vote, the Fund will maintain a report of the vote and all relevant documentation.

The Fund shall retain records relating to the voting of proxies and the Company shall conduct due diligence, including on Proxy Voting Services and Proxy Advisors, as applicable, to ensure the following records are adequately maintained by the appropriate party:

(i) Copies of this Policy and any amendments thereto.

(ii) A current copy of the Proxy Advisor's voting guidelines, as amended.

(iii) A copy of each proxy statement that the Company receives regarding Client securities. The Company may rely on a third party to make and retain, on the Company's behalf, a copy of a proxy statement, provided that the Company has obtained an undertaking from the third party to provide a copy of the proxy statement promptly upon request.

(iv) Records of each vote cast by the Company on behalf of Clients. The Company may satisfy this requirement by relying on a third party to make and retain, on the Company's behalf, a record of the vote cast, provided that the Company has obtained an undertaking from the third party to provide a copy of the record promptly upon request.

(v) A copy of any documents created by the Company that were material to making a decision how to vote or that memorializes the basis for that decision.

(vi) A copy of each written request for information on how the Company voted proxies on behalf of the Client, and a copy of any written response by the Company to any (oral or written) request for information on how the Company voted.

These records shall be maintained and preserved in an easily accessible place for a period of not less than five years from the end of the Company's fiscal year during which the last entry was made in the records, the first two years in an appropriate office of the Company.2

## Enforcement of this Policy

It shall be the responsibility of the Compliance Department to handle or coordinate the enforcement of this Policy. The Compliance Department will periodically sample proxy voting records to ensure that proxies have been voted in accordance with this Policy, with a particular focus on any proxy votes that require additional analysis (e.g., proxies voted contrary to the recommendations of a Proxy Advisor).

If the Compliance Department determines that a Proxy Advisor or Proxy Voting Service may have committed a material error, the Compliance Department will investigate the error, taking into account the nature of the error, and seek to determine whether the Proxy Advisor or Proxy Voting Service is taking reasonable steps to reduce similar errors in the future.

**Table of Contents**

       In addition, no less frequently than annually, the Compliance Department will review the adequacy of this Policy to ensure that it has been implemented effectively and to confirm that this Policy continues to be reasonably designed to ensure that proxies are voted in the best interest of Clients.

---

2    If the Company has essentially immediate access to a book or record (on the Company's proprietary system or otherwise) through a computer located at an appropriate office of the Company, then that book or record will be considered to be maintained at an appropriate office of the Company. "Immediate access" to books and records includes that the Company has the ability to provide promptly to Securities and Exchange Commission (the "SEC") examination staff hard copies of the books and records or access to the storage medium. The party responsible for the applicable books and records as described above shall also be responsible for ensuring that those books and records for the first two years are either physically maintained in an appropriate office of the Company or that the Company otherwise has essentially immediate access to the required books and records for the first two years.

**Disclosures to Clients and Investors**

       The Company includes a description of its policies and procedures regarding proxy voting in Part 2 of Form ADV, along with a statement that Clients can contact the CCO to obtain a copy of these policies and procedures and information about how the Company voted with respect to a Client's securities. This Policy is, however, subject to change at any time without notice.

       As a matter of policy, the Company does not disclose how it expects to vote on upcoming proxies. Additionally, the Company does not disclose the way it voted proxies to unaffiliated third parties without a legitimate need to know such information.

B-5

[Table of Contents](#)

Part C

**Other Information**

**Item 25.**     *Financial Statements and Exhibits*

**1. Financial Statements**

Part A — Financial Highlights.

Part B — Audited financial statements for the period ended December 31, 2018 are incorporated by reference herein to the Trust's annual report for the period ended December 31, 2018.

**2. Exhibits**

| | |
|---|---|
| (a) | Agreement and Declaration of Trust (1) |
| (b) | By-Laws (1) |
| (c) | Not applicable |
| (d)(1) | Provisions of instruments defining the rights of holders of securities are contained in the Trust's Agreement and Declaration of Trust and By-Laws |
| (e) | Dividend Reinvestment Plan (19) |
| (f) | Not applicable |
| (g) | Amended and Restated Investment Advisory Agreement, dated June 29, 2006, between the Trust and NexPoint Advisors, L.P. (7) |
| (h) | Not applicable |
| (i) | Not applicable |
| (j)(1) | Master Custodian Agreement dated October 3, 2018 between Bank of New York Mellon ("BNY") and NexPoint Real Estate Strategies Fund, NexPoint Healthcare Opportunities Fund, NexPoint Latin American Opportunities Fund, NexPoint Discount Strategies Fund, NexPoint Energy and Materials Opportunities Fund, NexPoint Strategic Income Fund and NexPoint Event Driven Fund (the "Interval Funds") listed on Annex A thereto (as Annex A may be amended from time to time), is filed herewith. |
| (j)(2) | Amendment 1 to Master Custodian Agreement dated April 8, 2019 between BNY and the Trust, the Interval Funds, the series of Highland Funds II, the series of Highland Funds I, the Trust, Highland Income Fund, Highland Global Allocation Fund and Gambier Bay, LLC, is filed herewith. |
| (j)(3) | Amendment 2 to Master Custodian Agreement dated April 8, 2019 between BNY and the Trust, the Interval Funds, the series of Highland Funds II, the series of Highland Funds I, the Trust, Highland Income Fund, Highland Global Allocation Fund and Gambier Bay, LLC, is filed herewith. |
| (k)(1) | Transfer Agency and Registrar Services Agreement, dated January 18, 2013, between the Trust and American Stock Transfer & Trust Company, LLC (10) |
| (k)(2) | Administration Services Agreement, dated June 29, 2006, between the Trust and Highland Capital Management, L.P. (10) |
| (k)(3) | Amendment No. 1, dated June 6, 2008, to Administration Services Agreement, dated December 4, 2006, between the Trust and Highland Capital Management, L.P. (10) |
| (k)(4) | Master Sub-Administration Agreement, dated July 19, 2018, between SEI investments Global Funds Services and NexPoint Advisors, L.P. (19) |
| (k)(5) | Committed Facility Agreement, dated May 16, 2013, between BNP Paribas Prime Brokerage, Inc. ("BNP") and the Trust (8) |
| (k)(6) | First Amendment Agreement, dated May 29, 2013, to the Committed Facility Agreement, dated May 16, 2013, between BNP and the Trust (12) |
| (k)(7) | Second Amendment Agreement, dated December 11, 2013, to the Committed Facility Agreement, dated May 16, 2013, between BNP and the Trust (10) |

(k)(8)    Third Amendment Agreement, dated May 6, 2014, to the Committed Facility Agreement, dated May 16, 2013, between BNP and the Trust (10)

**Table of Contents**

(k)(9)  Fourth Amendment Agreement, dated October 28, 2014, to the Committed Facility Agreement, dated May 16, 2013, between BNP and the Trust (10)

(k)(10)  Fifth Amendment Agreement, dated February 26, 2015, to the Committed Facility Agreement, dated May 16, 2013, between BNP and the Trust (10)

(k)(11)  Sixth Amendment Agreement, dated August 3, 2015, to the Committed Facility Agreement, dated May 16, 2013, between BNP and the Trust (11)

(k)(12)  Seventh Amendment Agreement, dated November 30, 2015, to the Committed Facility Agreement, dated May 16, 2013, between BNP and the Trust (11)

(k)(13)  Eighth Amendment Agreement, dated December 9, 2015, to the Committed Facility Agreement, dated May 16, 2013, between BNP and the Trust (11)

(k)(14)  Ninth Amendment Agreement, dated March 16, 2016, to the Committed Facility Agreement, dated May 16, 2013, between BNP and the Trust (18)

(k)(15)  Tenth Amendment Agreement, dated March 9, 2018, to the Committed Facility Agreement, dated May 16, 2013, between BNP and the Trust (18)

(k)(16)  Annex to the Master Repurchase Agreement dated November 17, 2017, between BNP Paribas Securities Corp. and NexPoint Advisors, L.P. (17)

(k)(17)  Form of Special Custody and Pledge Agreement (8)

(k)(18)  Form of U.S. PB Agreement (8)

(k)(19)  Rights Offering Marketing Support Agreement dated March 16, 2018, between Highland Capital Funds Distributor, Inc. and the Trust (18)

(k)(20)  ISDA Master Agreement dated August 4, 2017, Credit Support Annex and related Schedules between Societe Generale and NexPoint Advisors, L.P. (17)

(k)(21)  Amended and Restated Revolving Credit Agreement dated August 14, 2018, between the Trust, NexPoint Real Estate Opportunities, LLC and NexPoint Real Estate Capital, LLC and Keybank, National Association (19)

(l)(1)  Opinion of Counsel to the Trust, to be filed by amendment.

(l)(2)  Consent of Counsel to the Trust, filed herewith

(m)  Not applicable

(n)  Consent of Independent Registered Public Accounting Firm, filed herewith.

(o)  Not applicable

(p)  Subscription Agreement, dated June 1, 2006, between the Trust and Highland Capital Management Services, Inc. (1)

(q)  Not applicable

(r)(1)  Code of Ethics of the Trust (13)

(r)(2)  Code of Ethics of the Investment Adviser (19)

(s)  Powers of Attorney for Ethan Powell, Bryan A. Ward, John Honis, Dustin Norris and Dr. Bob Froehlich, filed herewith

---

(1)  Incorporated by reference from Pre-Effective Amendment No. 4 to the Trust's Registration Statement on Form N-2 (File No. 333-132436), filed on June 9, 2006.

(2)  Incorporated by reference from Pre-Effective Amendment No. 5 to the Trust's Registration Statement on Form N-2 (File No. 333-132436), filed on June 21, 2006.

[Table of Contents](#)

(3)  Incorporated by reference from the Trust's Registration Statement on Form N-14 (File No. 333-156464), filed on December 24, 2008.

(4)  Incorporated by reference from the Trust's Registration Statement on Form N-2 (File No. 333-173004), filed on March 23, 2011.

(5)  Incorporated by reference from the Trust's Registration Statement on Form N-2 (File No. 333-173004), filed on July 29, 2011.

(6)  Incorporated by reference from the Trust's Registration Statement on Form N-2 (File No. 333-173004), filed on May 7, 2013.

(7)  Incorporated by reference from the Trust's Registration Statement on Form N-2 (File No. 333-173004), filed on August 21, 2013.

(8)  Incorporated by reference from the Trust's Registration Statement on Form N-2 (File No. 333-173004), filed on November 12, 2013.

(9)  Incorporated by reference from the Trust's Registration Statement on Form N-2 (File No. 333-173004), filed on May 1, 2014.

(10)  Incorporated by reference from the Trust's Registration Statement on Form N-2 (File No. 333-173004), filed on April 30, 2015.

(11)  Incorporated by reference from the Trust's Registration Statement on Form N-2 (File No. 333-209877), filed on March 2, 2016.

(12)  Incorporated by reference from the Trust's Registration Statement on Form N-2 (File No. 333-215796), filed on January 27, 2017.

(13)  Incorporated by reference from the Trust's Registration Statement on Form N-2 (File No. 333-215796), filed on March 13, 2017.

(14)  Incorporated by reference from the Trust's Registration Statement on Form N-2 (File No. 333-215796), filed on April 14, 2017.

(15)  Incorporated by reference from Post-Effective Amendment No. 1 to the Trust's Registration Statement on Form N-2 (File No. 333-215796), filed on April 21, 2017.

(16)  Incorporated by reference from the Trust's Registration Statement on Form N-2 (File No. 333-219983), filed on August 15, 2017.

(17)  Incorporated by reference from the Trust's Registration Statement on Form N-2 (File No. 333-219983), filed on December 19, 2017.

(18)  Incorporated by reference from Post-Effective Amendment No. 1 to the Trust's Registration Statement on Form N-2 (File No. 333-219983), filed March 23, 2018.

(19)  Incorporated by reference to the Trust's Registration Statement on Form N-2 (File No. 333-230078), filed on March 5, 2019.


**Item 26.**     *Marketing Arrangements*

Not applicable.


**Item 27.**     *Other Expenses of Issuance and Distribution*

The following table sets forth the estimated expenses to be incurred in connection with all offerings described in this Registration Statement:

| | |
|---|---|
| Legal Fees | $165,000 |
| Subscription Agent | 60,000 |
| Information Agent | 25,000 |
| Printing and Mailing | 50,000 |
| NYSE Listing Fee | 50,000 |
| SEC Registration Fee | 60,600 |
| FINRA Fee | 7,000 |
| Other | 27,400 |
| Total | $445,000 |

Note: All amounts are estimates.

**Table of Contents**

**Item 28.**      *Persons Controlled by or Under Common Control with the Registrant*

As of June 30, 2019, the Trust beneficially owns 100% of NexPoint Real Estate Opportunities, LLC and 100% of NexPoint Real Estate Capital, LLC, each a Delaware limited liability company that has elected to be treated as a real estate investment trust. See "Portfolio Composition" in the Trust's Prospectus and "Investment Policies and Techniques—Real Estate Investment Trusts 'REITS'" in the Trust's statement of additional information filed herewith. As of June 30, 2019, the Trust beneficially owns 100% of Specialty Financial Products Ltd., a private company with limited liability duly incorporated under the laws of Ireland.

**Item 29.**      *Number of Holders of Shares*

As of June 30, 2019:

| Title of Class | Number of Registered Holders |
|---|---|
| Common Shares of Beneficial Interest | 1,166 |

**Item 30.**      *Indemnification*

Article V of the Registrant's Agreement and Declaration of Trust provides as follows:

5.1 *No Personal Liability of Shareholders, Trustees, etc.* No Shareholder of the Trust shall be subject in such capacity to any personal liability whatsoever to any Person in connection with Trust Property or the acts, obligations or affairs of the Trust. Shareholders shall have the same limitation of personal liability as is extended to stockholders of a private corporation for profit incorporated under the Delaware General Corporation Law. No trustee or officer of the Trust shall be subject in such capacity to any personal liability whatsoever to any Person, save only liability to the Trust or its Shareholders arising from bad faith, willful misfeasance, gross negligence or reckless disregard for his duty to such Person; and, subject to the foregoing exception, all such Persons shall look solely to the Trust Property for satisfaction of claims of any nature arising in connection with the affairs of the Trust. If any Shareholder, trustee or officer, as such, of the Trust, is made a party to any suit or proceeding to enforce any such liability, subject to the foregoing exception, he shall not, on account thereof, be held to any personal liability. Any repeal or modification of this Section 5.1 shall not adversely affect any right or protection of a trustee or officer of the Trust existing at the time of such repeal or modification with respect to acts or omissions occurring prior to such repeal or modification.

5.2 *Mandatory Indemnification.* (a) The Trust hereby agrees to indemnify each person who at any time serves as a trustee or officer of the Trust (each such person being an "indemnitee") against any liabilities and expenses, including amounts paid in satisfaction of judgments, in compromise or as fines and penalties, and reasonable counsel fees reasonably incurred by such indemnitee in connection with the defense or disposition of any action, suit or other proceeding, whether civil or criminal, before any court or administrative or investigative body in which he may be or may have been involved as a party or otherwise or with which he may be or may have been threatened, while acting in any capacity set forth in this Article V by reason of his having acted in any such capacity, except with respect to any matter as to which he shall not have acted in good faith in the reasonable belief that his action was in the best interest of the Trust or, in the case of any criminal proceeding, as to which he shall have had reasonable cause to believe that the conduct was unlawful, provided, however, that no indemnitee shall be indemnified hereunder against any liability to any person or any expense of such indemnitee arising by reason of (i) willful misfeasance, (ii) bad faith, (iii) gross negligence, or (iv) reckless disregard of the duties involved in the conduct of his position (the conduct referred to in such clauses (i) through (iv) being sometimes referred to herein as "disabling conduct"). Notwithstanding the foregoing, with respect to any action, suit or other proceeding voluntarily prosecuted by any indemnitee as plaintiff, indemnification shall be mandatory only if the prosecution of such action, suit or other proceeding by such indemnitee (1) was authorized by a majority of the trustees or (2) was instituted by the indemnitee to enforce his or her rights to indemnification hereunder in a case in which the indemnitee is found to be entitled to such indemnification. The rights to indemnification set forth in this Declaration shall continue as to a person who has ceased to be a trustee or officer of the Trust and shall inure to the benefit of his or her heirs, executors and personal and legal representatives. No amendment or restatement of this Declaration or repeal of any

[Table of Contents](#)

of its provisions shall limit or eliminate any of the benefits provided to any person who at any time is or was a trustee or officer of the Trust or otherwise entitled to indemnification hereunder in respect of any act or omission that occurred prior to such amendment, restatement or repeal.

(b) Notwithstanding the foregoing, no indemnification shall be made hereunder unless there has been a determination (i) by a final decision on the merits by a court or other body of competent jurisdiction before whom the issue of entitlement to indemnification hereunder was brought that such indemnitee is entitled to indemnification hereunder or, (ii) in the absence of such a decision, by (1) a majority vote of a quorum of those trustees who are neither "interested persons" of the Trust (as defined in Section 2(a)(19) of the Investment Company Act) nor parties to the proceeding ("Disinterested Non-Party Trustees"), that the indemnitee is entitled to indemnification hereunder, or (2) if such quorum is not obtainable or even if obtainable, if such majority so directs, independent legal counsel in a written opinion concludes that the indemnitee should be entitled to indemnification hereunder. All determinations to make advance payments in connection with the expense of defending any proceeding shall be authorized and made in accordance with the immediately succeeding paragraph (c) below.

(c) The Trust shall make advance payments in connection with the expenses of defending any action with respect to which indemnification might be sought hereunder if the Trust receives a written affirmation by the indemnitee of the indemnitee's good faith belief that the standards of conduct necessary for indemnification have been met and a written undertaking to reimburse the Trust unless it is subsequently determined that the indemnitee is entitled to such indemnification and if a majority of the trustees determine that the applicable standards of conduct necessary for indemnification appear to have been met. In addition, at least one of the following conditions must be met: (i) the indemnitee shall provide adequate security for his undertaking, (ii) the Trust shall be insured against losses arising by reason of any lawful advances, or (iii) a majority of a quorum of the Disinterested Non-Party Trustees, or if a majority vote of such quorum so direct, independent legal counsel in a written opinion, shall conclude, based on a review of readily available facts (as opposed to a full trial-type inquiry), that there is substantial reason to believe that the indemnitee ultimately will be found entitled to indemnification.

(d) The rights accruing to any indemnitee under these provisions shall not exclude any other right which any person may have or hereafter acquire under this Declaration, the By-Laws of the Trust, any statute, agreement, vote of stockholders or trustees who are "disinterested persons" (as defined in Section 2(a)(19) of the Investment Company Act) or any other right to which he or she may be lawfully entitled.

(e) Subject to any limitations provided by the Investment Company Act and this Declaration, the Trust shall have the power and authority to indemnify and provide for the advance payment of expenses to employees, agents and other Persons providing services to the Trust or serving in any capacity at the request of the Trust to the full extent corporations organized under the Delaware General Corporation Law may indemnify or provide for the advance payment of expenses for such Persons, provided that such indemnification has been approved by a majority of the trustees.

5.3 *No Bond Required of Trustees*. No trustee shall, as such, be obligated to give any bond or other security for the performance of any of his duties hereunder.

5.4 *No Duty of Investigation; Notice in Trust Instruments, etc.* No purchaser, lender, transfer agent or other person dealing with the trustees or with any officer, employee or agent of the Trust shall be bound to make any inquiry concerning the validity of any transaction purporting to be made by the trustees or by said officer, employee or agent or be liable for the application of money or property paid, loaned, or delivered to or on the order of the trustees or of said officer, employee or agent. Every obligation, contract, undertaking, instrument, certificate, Share, other security of the Trust, and every other act or thing whatsoever executed in connection with the Trust shall be conclusively taken to have been executed or done by the executors thereof only in their capacity as trustees under this Declaration or in their capacity as officers, employees or agents of the Trust. The trustees may maintain insurance for the protection of the Trust Property, its Shareholders, trustees, officers, employees and agents in such amount as the trustees shall deem adequate to cover possible tort liability, and such other insurance as the trustees in their sole judgment shall deem advisable or is required by the Investment Company Act.

5.5 *Reliance on Experts, etc*. Each trustee and officer or employee of the Trust shall, in the performance of its duties, be fully and completely justified and protected with regard to any act or any failure to act resulting from reliance in

**Table of Contents**

good faith upon the books of account or other records of the Trust, upon an opinion of counsel, or upon reports made to the Trust by any of the Trust's officers or employees or by any advisor, administrator, manager, distributor, selected dealer, accountant, appraiser or other expert or consultant selected with reasonable care by the trustees, officers or employees of the Trust, regardless of whether such counsel or expert may also be a trustee.

Insofar as indemnification for liabilities arising under the Securities Act of 1933, as amended (the "1933 Act"), may be permitted to trustees, officers and controlling persons of the Trust, pursuant to the foregoing provisions or otherwise, the Trust has been advised that in the opinion of the Commission such indemnification is against public policy as expressed in the 1933 Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the Trust of expenses incurred or paid by a trustee, officer or controlling person of the Trust in the successful defense of any action, suit or proceeding) is asserted by such trustee, officer or controlling person in connection with the securities being registered, the Trust will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the 1933 Act and will be governed by the final adjudication of such issue. Reference is made to Section 7 of the Dealer Manager Agreement, which will be filed as Exhibit (h) in a subsequent pre-effective amendment and will discuss the rights, responsibilities and limitations with respect to indemnity and contribution.

### Item 31. *Business and Other Connections of Investment Advisor*

(a) The description of the business of NexPoint Advisors, L.P. ("NexPoint"), the investment adviser, is set forth under the caption "Management of the Funds" in the Prospectus and under the caption "Management" in the SAI, each forming part of this Registration Statement. The information as to other businesses, if any, and the directors and officers of NexPoint is set forth in its Form ADV, as filed with the SEC through the Investment Adviser Registration Depository (IARD) on (File No. 801-54874) and as amended through the date hereof, and is incorporated herein by reference.

(b) Highland Capital Management Fund Advisors, L.P. ("HCMFA"), Highland Capital Management, L.P. ("HCM") and NexBank Securities, Inc., each with its principal place of business located at 300 Crescent Court, Suite 700, Dallas, Texas 75201, are registered investment advisers affiliated with NexPoint.

The following person is a non-executive officer of HCMFA and NexPoint:

(1) Jason Post, Chief Compliance Officer

The following persons are executive offers of the general partner of HCMFA, Strand Advisors XVI, Inc.:

(1) Frank Waterhouse, Treasurer

(2) Dustin Norris, Executive Vice President

(3) Lauren Thedford, Secretary

The following persons are executive officers of the general partner of HCM and Strand Advisors, Inc.:

(1) James Dondero, President

(2) Mark Okada, Executive Vice President

(3) Scott Ellington, Secretary

(4) Frank Waterhouse, Treasurer

(5) Trey Parker, Assistant Secretary

The following persons are non-executive officers of NexBank Securities, Inc.

(1) Eric Holt, Chief Compliance Officer

(2) Stacy Hodges, Financial and Operations Principal

The following person is the executive officer of NexBank Securities, Inc.:

(1) Craig Campbell, President

**Table of Contents**

**Item 32.** *Location of Accounts and Records*

(1) American Stock Transfer & Trust Company, LLC, 6201 15th Avenue, Brooklyn, NY 11219 (records relating to its function as transfer agent).

(2) Bank of New York Mellon, 240 Greenwich Street, New York, New York 10286 (records relating to its function as custodian).

(3) NexPoint Advisors, L.P., 300 Crescent Court, Suite 700, Dallas, Texas 75201 (records relating to its function as adviser and administrator).

(4) SEI Investments Global Fund Services, One Freedom Valley Drive, Oaks, Pennsylvania 19456 (records relating to its function as sub-administrator).

**Item 33.** *Management Services*

Not Applicable.

**Item 34.** *Undertakings*

(1) The Registrant hereby undertakes to suspend the offering of its shares until it amends its prospectus if (a) subsequent to the effective date of its Registration Statement, the net asset value declines more than 10 percent from its net asset value as of the effective date of the Registration Statement, or (b) the net asset value increases to an amount greater than its net proceeds as stated in the prospectus.

(2) The Registrant undertakes to file a post-effective amendment to the registration statement, and to suspend any offers or sales pursuant to the registration statement until such post-effective amendment has been declared effective under the 1933 Act in the event the shares of the Registrant are trading below its net asset value and either (i) the Registrant receives, or has been advised by its independent registered accounting firm that it will receive, an audit report reflecting substantial doubt regarding the registrant's ability to continue as a going concern; or (ii) the Registrant has concluded that a material adverse change has occurred in its financial position or results of operations that has caused the financial statements and other disclosures on the basis of which the offering would be made to be materially misleading.

(3) If the securities being registered are to be offered to existing shareholders pursuant to rights, and any securities not taken by shareholders are to be reoffered to the public, the Registrant undertakes to supplement the prospectus, after the expiration of the subscription period, to set forth the results of the subscription offer, the transactions by underwriters during the subscription period, the amount of unsubscribed securities to be purchased by underwriters, and the terms of any subsequent reoffering thereof. If any public offering by the underwriters of the securities being registered is to be made on terms differing from those set forth on the cover page of the prospectus, the Registrant further undertakes to file a post-effective amendment to set forth the terms of such offering.

(4) The Registrant undertakes:

(a) to file, during any period in which offers or sales are being made, a post-effective amendment to this Registration Statement:

(1) to include any prospectus required by Section 10(a)(3) of the 1933 Act;

(2) to reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement; and

(3) to include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement;

Table of Contents

(b) that, for the purpose of determining liability under the 1933 Act, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of those securities at that time shall be deemed to be the initial bona fide offering thereof; and

(c) to remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering;

(d) that, for the purpose of determining liability under the 1933 Act to any purchaser, if the Registrant is subject to Rule 430C; each prospectus filed pursuant to Rule 497(b), (c), (d) or (e) under the 1933 Act, shall be deemed to be part of and included in this registration statement as of the date it is first used after effectiveness. Provided, however, that no statement made in this registration statement or prospectus that is part of this registration statement or made in a document incorporated or deemed incorporated by reference into this registration statement or prospectus that is art of this registration statement will, as to a purchaser with a time of contract of sale prior to such first use, supersede or modify any statement that was made in this registration statement or prospectus that was part of this registration statement or made in any such document immediately prior to such date of first use;

(e) that for the purpose of determining liability of the Registrant under the 1933 Act to any purchaser in the initial distribution of securities, the undersigned Registrant undertakes that in a primary offering of securities of the undersigned Registrant pursuant to this registration statement, regardless of the underwriting method used to sell the securities to the purchaser, if the securities are offered or sold to such purchaser by means of any of the following communications, the undersigned Registrant will be a seller to the purchaser and will be considered to offer or sell such securities to the purchaser:

(1) any preliminary prospectus or prospectus of the undersigned Registrant relating to the offering required to be filed pursuant to Rule 497 under the 1933 Act;

(2) the portion of any advertisement pursuant to Rule 482 under the 1933 Act relating to the offering containing material information about the undersigned Registrant or its securities provided by or on behalf of the undersigned Registrant; and

(3) any other communication that is an offer in the offering made by the undersigned Registrant to the purchaser.

(5) The Registrant undertakes that:

(a) For the purposes of determining any liability under the Securities Act of 1933, the information omitted from the form of prospectus filed as part of a registration statement in reliance upon Rule 430A and contained in the form of prospectus filed by the Registrant under Rule 497 (h) under the 1933 Act shall be deemed to be part of the Registration Statement as of the time it was declared effective.

(b) For the purpose of determining any liability under the 1933 Act, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of the securities at that time shall be deemed to be the initial bona fide offering thereof.

(6) The Registrant undertakes to send by first class mail or other means designed to ensure equally prompt delivery within two business days of receipt of a written or oral request, any Statement of Additional Information.

(7) The Registrant undertakes to file a post-effective amendment under Section 8(c) of the 1933 Act in connection with any one or more offerings of the Registrant's common shares (including rights to purchase the common shares) below net asset value that will result in greater than 15% dilution, in the aggregate, to existing net asset value per share.

**Table of Contents**

### SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, as amended (the "1933 Act") and the Investment Company Act of 1940, as amended (the "1940 Act"), the Registrant has duly caused this Registration Statement to be signed on its behalf by the undersigned, thereunto duly authorized, in the City of Dallas and the State of Texas, on the on the 27th day of August, 2019.

/s/ James Dondero
_____
James Dondero
President (Principal Executive Officer)

Pursuant to the requirements of the 1933 Act and the 1940 Act, this Registration Statement has been signed by the following persons in the capacities set forth below on the 27th day of August, 2019.

| Signature | Title |
|---|---|
| /s/ James Dondero<br>**James Dondero** | President (Principal Executive Officer) |
| /s/ Ethan Powell*<br>**Ethan Powell** | Chairman of the Board of Trustees |
| /s/ Dr. Bob Froehlich*<br>**Dr. Bob Froehlich** | Trustee |
| /s/ John Honis*<br>**John Honis** | Trustee |
| /s/ Bryan A. Ward*<br>**Bryan A. Ward** | Trustee |
| /s/ Dustin Norris*<br>**Dustin Norris** | Trustee |
| /s/ Frank Waterhouse<br>**Frank Waterhouse** | Treasurer (Principal Financial and Accounting Officer) |

* By:  /s/ Frank Waterhouse
_____
Frank Waterhouse
Attorney in Fact*

\*  Pursuant to powers of attorney filed herewith.

**Table of Contents**

**EXHIBIT INDEX**

| EXHIBIT NUMBER | DESCRIPTION |
|---|---|
| (j)(1) | Master Custodian Agreement dated October 3, 2018 between Bank of New York Mellon ("BNY") and NexPoint Real Estate Strategies Fund, NexPoint Healthcare Opportunities Fund, NexPoint Latin American Opportunities Fund, NexPoint Discount Strategies Fund, NexPoint Energy and Materials Opportunities Fund, NexPoint Strategic Income Fund and NexPoint Event Driven Fund (the "Interval Funds") listed on Annex A thereto (as Annex A may be amended from time to time) |
| (j)(2) | Amendment 1 to Master Custodian Agreement dated April 8, 2019 between BNY and the Trust, the Interval Funds, the series of Highland Funds II, the series of Highland Funds I, the Trust, Highland Income Fund, Highland Global Allocation Fund and Gambier Bay, LLC |
| (j)(3) | Amendment 2 to Master Custodian Agreement dated April 8, 2019 between BNY and the Trust, the Interval Funds, the series of Highland Funds II, the series of Highland Funds I, the Trust, Highland Income Fund, Highland Global Allocation Fund and Gambier Bay, LLC |
| (l)(2) | Consent of Counsel to the Trust Dated August 27, 2019 |
| (n) | Consent of Independent Registered Public Accounting Firm |
| (s) | Powers of Attorney for Ethan Powell, Bryan A. Ward, John Honis , Dustin Norris and Dr. Bob Froehlich |