**EXECUTION COPY**

**RED RIVER CLO LTD.**

Issuer

**RED RIVER CLO CORP.**

Co-Issuer

AND

**STATE STREET BANK AND TRUST**

Successor Trustee

**AMENDMENT NO. 1**

**TO**

**INDENTURE**

Dated as of October 2, 2007

_____

**COLLATERALIZED DEBT OBLIGATIONS**

_____

**THIS AMENDMENT NO. 1 TO INDENTURE** (the "Amendment"), dated as of October 2, 2007, among Red River CLO Ltd. (the "Issuer"), Red River CLO Corp. (the "Co-Issuer") and State Street Bank and Trust, as successor in interest to Investors Bank & Trust Company (the "Successor Trustee"), hereby amends the Indenture, dated as of August 3, 2006, among the Issuer, the Co-Issuer and the Successor Trustee (the "Indenture").

### W I T N E S S E T H

WHEREAS, the Issuer, the Co-Issuer and U.S. Bank National Association (the "Original Trustee") entered into the Indenture;

WHEREAS, the Issuer, the Co-Issuer and the Successor Trustee entered into the Supplemental Indenture No. 1, dated as of March 28, 2007, which replaced the Original Trustee with the Successor Trustee;

WHEREAS, the Issuers and the Noteholders desire to amend certain definitions contained in the Indenture;

WHEREAS, Highland Capital Management, L.P. acts as Servicer with respect to the Collateral;

WHEREAS, Section 8.2 of the Indenture provides that the Indenture may be amended by the Issuer, Co-Issuer and the Trustee with the consent of the Servicer, Majority of each Class of Notes adversely affected thereby and a Majority of the Preference Shares adversely affected thereby;

WHEREAS, the necessary consents pursuant to the preceding paragraph have been obtained;

WHEREAS, Section 8.2 of the Indenture provides that the Ratings Agencies shall confirm that this Amendment to the Indenture will not cause the rating of any Class of Notes to be reduced or withdrawn; and

WHEREAS, the Ratings Agencies have confirmed that this Amendment to the Indenture will not cause the rating of any Class of Notes to be reduced or withdrawn.

NOW, THEREFORE, the parties hereto agree as follows:

SECTION 1.   Defined Terms.

For purposes of this Amendment, all capitalized terms which are used but not otherwise defined herein shall have the respective meanings assigned to such terms in the Indenture.

SECTION 2.   Amendment.

Section 1.1 of the Indenture is hereby amended to replace in its entirety the definition of Servicing Fee Portion with the following:

"*Servicing Fee Portion*":  100% minus (a) for any Payment Date from the Closing Date until (and including) the Payment Date in February 2008, the Class II Preference Share Percentage for such Payment Date and (b) for any other Payment Date, a percentage (between 0% and 100%) selected by the Servicer in its sole discretion and reported to the Trustee in writing on or before the related Determination Date; provided that, with respect to the Payment Date in May 2008, such percentage shall be a minimum of the product of (i) the Class II Preference Share Percentage for such Payment Date and (ii) 3.3%.

SECTION 3.   Effect of Amendment.

Upon execution of this Amendment, the Indenture shall be, and be deemed to be, modified and amended in accordance herewith and the respective rights, limitations, obligations, duties, liabilities and immunities of the Issuer, Co-Issuer and the Successor Trustee shall hereafter be determined, exercised and enforced subject in all respects to such modifications and amendments, and all the terms and conditions of this Amendment shall be deemed to be part of the terms and conditions of the Indenture for any and all purposes.  Except as modified and expressly amended by this Amendment, the Indenture is in all respects ratified and confirmed, and all the terms, provisions and conditions thereof shall be and remain in full force and effect.

SECTION 4.   Binding Effect.

The provisions of this Amendment shall be binding upon and inure to the benefit of the Issuer, the Co-Issuer and the Successor Trustee and each of their respective successors and assigns.

SECTION 5.   GOVERNING LAW.

THIS AMENDMENT TO THE INDENTURE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

SECTION 6.   Severability of Provisions.

If any one or more of the provisions or terms of this Amendment shall be for any reason whatsoever held invalid, then such provisions or terms shall be deemed severable from the remaining provisions or terms of this Amendment and shall in no way affect the validity or enforceability of the other provisions or terms of this Amendment.

SECTION 7.   <u>Section Headings</u>.

The section headings herein are for convenience of reference only, and shall not limit or otherwise affect the meaning hereof.

SECTION 8.   <u>Counterparts</u>.

This Amendment may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

[Signature pages follow]

IN WITNESS WHEREOF, the Issuer, Co-Issuer and the Successor Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized, all as of the day and year first above written.

RED RIVER CLO LTD.,
as Issuer


By:_____
    Name: **VIJAYABALAN MURUGESU**
    Title: **DIRECTOR**

RED RIVER CLO CORP.,
as Co-Issuer



By:_____
    Name:
    Title:


STATE STREET BANK AND TRUST, as Successor Trustee



By:_____
    Name:
    Title:

IN WITNESS WHEREOF, the Issuer, Co-Issuer and the Successor Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized, all as of the day and year first above written.

RED RIVER CLO LTD.,
as Issuer

By:_____
    Name:
    Title:

RED RIVER CLO CORP.,
as Co-Issuer

By: _____
    Name:  Donald O. Puglisi
    Title:  President

STATE STREET BANK AND TRUST, as
Successor Trustee

By:_____
    Name:
    Title:

IN WITNESS WHEREOF, the Issuer, Co-Issuer and the Successor Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized, all as of the day and year first above written.

RED RIVER CLO LTD.,
as Issuer


By:_____
    Name:
    Title:

RED RIVER CLO CORP.,
as Co-Issuer


By:_____
    Name:
    Title:


STATE STREET BANK AND TRUST, as Successor Trustee

By:_____
    Name:
    Title: **Brian Peterson**
            **Director**

**CONSENTED AND AGREED TO BY**:

Name: _Todd Travers_
Title: _CEO & CIO_
E-mail address: _tatravers @ hawlp.com_
Aggregate Outstanding Amount/Face Amount of Class II
Preferred Shares Held: _45,000,000_
CUSIP/ISIN: _75687 73204_

HIGHLAND CAPITAL MANAGEMENT, L.P., as
Servicer

By: _____
    Name:          Todd Travers
    Title:      Senior Portfolio Manager
             Highland Capital Management, L.P.

*EXECUTION COPY*

---

**ROCKWALL CDO LTD.,**
**Issuer**

**ROCKWALL CDO (DELAWARE) CORP.,**
**Co-Issuer**

**and**

**JPMORGAN CHASE BANK, NATIONAL ASSOCIATION**
**as Trustee and as Securities Intermediary**

---

**INDENTURE**

---

**Dated as of May 10, 2006**

US_EAST:6212215.13

INDENTURE, dated as of May 10, 2006, among ROCKWALL CDO LTD., an exempted limited liability company incorporated under the laws of the Cayman Islands (the "Company" and, together with its permitted successors and assigns, the "Issuer"), ROCKWALL CDO (DELAWARE) CORP., a Delaware corporation (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers") and JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, as trustee (together with its permitted successors in the trusts hereunder, the "Trustee") and as Securities Intermediary.

## PRELIMINARY STATEMENT

The Co-Issuers are duly authorized to execute and deliver this Indenture to provide for the Notes issuable as provided in this Indenture. All representations, warranties, covenants and agreements made by the Co-Issuers herein are for the benefit and security of the Noteholders and the Trustee. The Co-Issuers are entering into this Indenture, and the Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

It is a condition of issuance of the Notes that the Class A-1LA Notes be rated "AAA" by Standard & Poor's and "Aaa" by Moody's, the Class X Notes be rated "AAA" by Standard & Poor's and "Aaa" by Moody's, the Class A-1LB Notes be rated "AAA" by Standard & Poor's and "Aaa" by Moody's, the Class A-2L Notes be rated at least "AA" by Standard & Poor's and at least "Aa2" by Moody's, the Class A-3L Notes be rated at least "A" by Standard & Poor's and at least "A2" by Moody's, the Class A-4L Notes be rated at least "A-" by Standard & Poor's and at least "A3" by Moody's and the Class B-1L Notes be rated at least "BBB" by Standard & Poor's and at least "Baa2" by Moody's. With respect to the Notes, such ratings by Standard & Poor's address solely the likelihood of the timely payment of the Periodic Interest Amount (which consists of interest accrued on the Aggregate Principal Amount of each applicable Class of Notes at the Applicable Periodic Rate) and the ultimate payment of the Aggregate Principal Amount in the case of the Class A-1LA Notes, the Class A-1LB Notes and the Class A-2L Notes, timely payment of Class X Payments and the ultimate payment of the Cumulative Interest Amount and the Aggregate Principal Amount in the case of the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes. Such ratings by Moody's address the ultimate cash receipt of all required payments as provided by the governing documents, and are based on the expected loss to the Noteholders of each Class relative to the promise of receiving the present value of such payments. Notwithstanding the foregoing, the obligation to make any Extension Bonus Payment will not be rated by the Rating Agencies.

All things necessary to make this Indenture a valid agreement of the Co-Issuers in accordance with its terms have been done.

## GRANTING CLAUSES

The Issuer hereby Grants to the Trustee, for the benefit and security of the Holders of the Notes, the Trustee, the Paying and Transfer Agent, the Default Swap Counterparties, the Servicer, the Collateral Administrator and the Securities Intermediary (collectively, the "Secured Parties"), all of its right, title and interest, whether now owned or

1

hereafter acquired, in, to and under the following: (a) the Initial Portfolio Collateral listed in Schedule A to this Indenture, all payments thereon or with respect thereto, all Portfolio Collateral (including all Original Portfolio Collateral, all Additional Portfolio Collateral and all Substitute Portfolio Collateral, whether or not any of the same may become at any time or times Defaulted Portfolio Collateral, Credit Risk Portfolio Collateral, Equity Portfolio Collateral or Credit Improved Portfolio Collateral) which may be delivered to the Trustee in the future and all payments thereon or with respect thereto, (b) the Issuer's rights, remedies, powers, privileges and claims under or with respect to the Servicing Agreement as set forth in Article XIV hereof, (c) the Collection Account, the Collateral Account, the Reserve Account, the Expense Reimbursement Account, the Closing Expense Account, the Initial Deposit Account, the Loan Funding Account, each Default Swap Collateral Account, each Default Swap Issuer Account, each Securities Lending Account, and all investment property, money, instruments and other property credited to or carried in such Accounts including, without limitation, the Eligible Investments, (d) the Default Swap Collateral, the Securities Lending Collateral, and the trust accounts described in Section 11.4 hereof, (e) all other assets of the Issuer (other than the Preferred Shares Collection Account and all funds deposited therein or credited thereto, the Issuer's share capital on account of its ordinary issued shares and any transaction fee for issuing the Notes and the Preferred Shares, each held in its account in the Cayman Islands and any interest thereon) and all other property delivered to the Trustee, (f) all accounts, general intangibles, chattel paper, instruments, documents, money, deposit accounts, goods, letters of credit, letter-of-credit rights, oil, gas, and other minerals, and investment property, consisting of, arising from, or relating to any of the foregoing, and (g) all proceeds, profits, rents, products, earnings, interest, dividends (whether in the form of cash, securities, instruments or other property) and distributions (whether of rights, options, stock, warrants, securities or other property) of or with respect to any of the foregoing; *provided that* such Grant shall not extend to any property, cash or other amounts specifically released from the lien of this Indenture or otherwise paid to the Issuer in accordance with the terms hereof; *and provided further that* the rights of each Default Swap Counterparty as a Secured Party shall be limited to only the related Default Swap Collateral, the related Default Swap Collateral Account, and the property credited thereto. The collateral described in the preceding sentence is referred to as the "Trust Estate." Such Grant is made, however, in trust, to secure the Notes equally and ratably without prejudice, priority or distinction, except as expressly provided in this Indenture, between any Note and any other Note by reason of difference in time of issuance or otherwise, and to secure in accordance with the priorities set forth in this Indenture (i) the payment of all amounts due on the Notes in accordance with their terms, (ii) the payment of all other sums payable under this Indenture and all amounts payable to the Servicer under the Servicing Agreement, and (iii) compliance with the provisions of this Indenture and the Servicing Agreement, all as provided in this Indenture.

The Trustee acknowledges such Grant, accepts the trusts hereunder and agrees to perform the duties herein in accordance with the provisions hereof.

## ARTICLE I

## DEFINITIONS

Section 1.1.    Definitions

Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Indenture, and the definitions of such terms are equally applicable both to the singular and plural forms of such terms and, where applicable, to the masculine, feminine and neuter genders of such terms. Whenever any reference is made to an amount the determination of which is governed by Section 1.3 hereof, the provisions of Section 1.3 hereof shall be applicable to such determination or calculation, whether or not reference is specifically made to Section 1.3 hereof, unless some other method of calculation or determination is expressly specified in the particular provisions.

"Account Income":  Any interest or other earnings on funds in the Collection Account, the Initial Deposit Account, the Loan Funding Account or the Expense Reimbursement Account.

"Accounts": The meaning specified in Section 10.2 hereof.

"Accrued Interest on Sale": Interest accrued on an item of Portfolio Collateral at the time of sale or other disposition to the extent paid to the Issuer as part of the sale or other disposition price of such item of Portfolio Collateral after deducting amounts representing Purchased Accrued Interest on such item of Portfolio Collateral.

"Accountants' Certificate":  A certificate of a firm of Independent certified public accountants of national reputation in the United States of America appointed by the Issuer pursuant to Section 10.6(a) hereof.

"Additional Collateral Deposit Requirement":  With respect to each Payment Date after the second Payment Date, the amount necessary such that (a) the sum of: (i) the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate as of the Calculation Date relating to such Payment Date, plus (ii) the sum of the Balance of Eligible Investments and cash in the Collection Account representing Collateral Principal Collections *plus* the Balance of Eligible Investments and cash in the Initial Deposit Account *plus* unpaid Purchased Accrued Interest as of such date, less (iii) the Overcollateralization Haircut Amount (if any), equals or exceeds: (b) 107.00% of the amount necessary, after giving effect to the amount applied to any O/C Redemption of the Notes  (other than the Class X Notes) to satisfy the Overcollateralization Tests and the Interest Coverage Test (if applicable) on such Payment Date, to repay the Aggregate Principal Amount of the Note (other that the Class X Notes), including any Periodic Rate Shortfall Amounts.   Notwithstanding the foregoing, if Additional Collateral Deposit Requirement is a positive number that is more than the amount available therefore in the priority of distributions set forth in Section 11.1, then the amount distributed with respect to the Additional Collateral Deposit Requirements shall be such lesser amount available.

For purposes of the Additional Collateral Deposit Requirement, no item of Equity Portfolio Collateral shall be included as Portfolio Collateral.  In addition for purposes of this

requirement, (i) with respect to Defaulted Portfolio Collateral as to which there has occurred a payment default or an event of bankruptcy, only the portion equal to the lesser of (a) the Market Value of such item of Defaulted Portfolio Collateral and (b) the Applicable Percentage multiplied by the Principal Balance of such item of Portfolio Collateral, shall be included as Portfolio Collateral and (ii) with respect to items of Discount Portfolio Collateral, only an amount equal to the original purchase price of such item of Discount Portfolio Collateral shall be included as Portfolio Collateral. For purposes of calculating the Additional Collateral Deposit Requirement, to the extent an item of Portfolio Collateral is considered Defaulted Portfolio Collateral, Discount Portfolio Collateral and/or is included in the Overcollateralization Haircut Amount, such item of Portfolio Collateral will not be discounted multiple times, but will be treated in the category that results in the largest discount to the par amount of the Portfolio Collateral.

"Additional Fee Amount":  With respect to each Due Period, an amount equal to 0.35% per annum of the Quarterly Collateral Amount, calculated on the basis of a 360-day year and the actual number of days elapsed.

"Additional Issuance":  The issuance and sale of Additional Preferred Shares by the Issuer at any time during the Revolving Period, the proceeds of which (net of any fees and expenses incurred in connection with the issuance thereof, including, without limitation, compensation payable to the Initial Purchaser or any placement agent for any services provided in connection therewith) are used to purchase additional eligible Portfolio Collateral (which may include eligible Portfolio Collateral purchased from any Servicer Entity on an arms-length transaction basis); *provided* that (a) such Additional Issuance will be for an Additional Issuance Percentage; (b) such Additional Preferred Shares must be issued for a cash sales price (the net sale proceeds to be used to purchase eligible Portfolio Collateral (or, pending such application, deposited into the Collection Account and held in Eligible Investments)); (c) the terms (other than the date of issuance, the issue price, the date from which dividends will accrue and similar matters) of such Preferred Shares must be identical to the terms of the applicable Class of Preferred Shares; (d) the Holders of Preferred Shares must be notified in writing 30 days prior to such issuance; (e) the Servicer must consent to such Additional Issuance; and (f) Initial Purchaser must be notified in writing at least 30 days prior to such issuance.

"Additional Issuance Percentage":  With respect to any Additional Issuance, a percentage specified by the Servicer of the original issue price of the Preferred Shares issued and Outstanding on the date of such Additional Issuance.

"Additional Portfolio Collateral":  Any and all items of Portfolio Collateral which are purchased pursuant to Section 11.3 hereof with Collections (other than Collateral Disposition Proceeds).

"Additional Preferred Shares": Any additional Preferred Shares issued after the Closing Date in accordance with the applicable terms hereof and the Paying and Transfer Agency Agreement.

"Additional Servicing Fee":  For any Payment Date, an amount equal to the sum of (a) product of (i) the Additional Fee Amount for such Payment Date and (ii) the Servicing Fee

Portion for such Payment Date plus (b) on any Payment Date that any part of the Base Servicing Fee was not paid on the preceding Payment Date, interest on such unpaid amount in an amount equal to the product of (i) LIBOR for the applicable period plus 3.0% per annum and (ii) the actual number of days in such Due Period, divided by 360 plus (c) on any Payment Date that any part of the Additional Servicing Fee was not paid on the preceding Payment Date, such unpaid Additional Servicing Fee and interest on such unpaid amount in an amount equal to the product of (i) LIBOR for the applicable period plus 3.0% per annum and (ii) the actual number of days in such Due Period divided by 360; *provided* that in the event that the Servicer is removed or resigns, the amount of such fee accrued to the effective date of such removal or resignation will be payable to the Servicer on the next succeeding Payment Date or Payment Dates on which such amount may be paid, in accordance with Section 11.1 (provided that the payment of any fee payable pursuant to this proviso will be *pari passu* with the payment of any servicing fees to the then-current servicer).

"Adjusted Collections":  With respect to any Payment Date, the sum of (i) the Adjusted Collateral Interest Collections collected during the applicable Due Period, (ii) the Adjusted Collateral Principal Collections collected during the applicable Due Period and (iii) the available funds in the Expense Reimbursement Account, as each is determined as of the Calculation Date relating to such Payment Date.

"Adjusted Collateral Interest Collections":  With respect to any Payment Date, the Collateral Interest Collections collected during the applicable Due Period, as determined as of the Calculation Date relating to such Payment Date, *less* the sum of (i) the amount of the Collateral Interest Collections paid to the Trustee and the Paying and Transfer Agent pursuant to Section 11.1(b) hereof with respect to such Payment Date, (ii) the amount of the Collateral Interest Collections paid to the Issuer or deposited in the Expense Reimbursement Account pursuant to Section 11.1(b) hereof with respect to such Payment Date, (iii) the amount of the Collateral Interest Collections paid to the Servicer pursuant to Section 11.1(b) hereof with respect to such Payment Date and (iv) during any time prior to the Final Maturity Date, any Collateral Interest Collections attributable to the Collateral Purchase Amount held in the Collection Account pending application to purchase Portfolio Collateral.

"Adjusted Collateral Principal Collections":  With respect to any Payment Date, the Collateral Principal Collections collected during the applicable Due Period, as determined as of the Calculation Date relating to such Payment Date, *less* the sum of (i) the amount of the Collateral Principal Collections paid to the Trustee and the Paying and Transfer Agent pursuant to Section 11.1(b) hereof with respect to such Payment Date, (ii) the amount of Collateral Principal Collections paid to the Issuer or deposited in the Expense Reimbursement Account pursuant to Section 11.1(b) hereof with respect to such Payment Date, (iii) the amount of Collateral Principal Collections paid to the Servicer pursuant to Section 11.1(b) hereof with respect to such Payment Date, (iv) any Collateral Disposition Proceeds released from the Collection Account for the purchase of Portfolio Collateral during the applicable Due Period pursuant to Section 10.2(e) hereof, and (v) during any time prior to the Final Maturity Date, any amount attributable to the Collateral Purchase Amount held in the Collection Account pending application to purchase Portfolio Collateral.

"Administration Agreement":  The Administration Agreement, dated as of May 10, 2006, between the Issuer and the Administrator.

"Administrator":  Maples Finance Limited, or any successor thereto appointed by the Issuer.

"Affiliate":  With respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person.  For the purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing; *provided that* (for the avoidance of doubt) the only Affiliate of the Issuer shall be the Co-Issuer and the only Affiliate of the Co-Issuer shall be the Issuer.

"Aggregate Base Fees and Expenses":  For any Payment Date, the total aggregate amount of fees and expenses payable pursuant to Section 11.1(b).

"Aggregate Par Amount":  With respect to any date of determination, the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate, including cash and Eligible Investments representing Collateral Principal Collections on deposit in the Collection Account and the Initial Deposit Account.

"Aggregate Principal Amount":  With respect to any date of determination, when used with respect to the Portfolio Collateral, the aggregate Principal Balances of such items of Portfolio Collateral on such date of determination.  With respect to any date of determination, when used with respect to any Eligible Investments, the Balance of such Eligible Investments on such date of determination.  When used with respect to any Note or Class of Notes, as of any date of determination, the original principal amount of such Note or Class of Notes, as applicable, reduced by all prior payments, if any, made with respect to principal of such Note.  When used with respect to the Notes in the aggregate, the sum of the Aggregate Principal Amount of each Class of the Outstanding Notes.

"Ambac":  Ambac Assurance Corporation.

"Amendment Buy-Out":  The purchase of all Notes and Preferred Shares of Non-Consenting Holders by the Amendment Buy-Out Purchaser pursuant to the exercise of the Amendment Buy-Out Option.

"Amendment Buy-Out Option":  In the case of any supplemental indenture that requires the consent of one or more Holders of the Notes or Preferred Shares, the right (but not the obligation) of an Amendment Buy-Out Purchaser to purchase from Non-Consenting Holders all Notes and Preferred Shares held by such Holder whose consent was solicited with respect to such supplemental indenture, regardless of the applicable percentage of the Aggregate Principal Amount of the Notes or Preferred Shares the consent of whose Holders is required for such supplemental indenture.

"Amendment Buy-Out Purchase Price": The price payable by the Amendment Buy-Out Purchaser for Notes or Preferred Shares purchased in an Amendment Buy-Out in an amount equal to (i) in the case of Notes, the Aggregate Principal Amount thereof, plus accrued and unpaid interest to the date of purchase payable to the Non-Consenting Holder (giving effect to all amounts paid to such Holder on such date) and plus any unpaid Extension Bonus Payment, and (ii) in the case of the Preferred Shares, an amount that, when taken together with all payments and distributions made in respect of such Preferred Shares since the Closing Date (and any amounts payable, if any to such Holder on the next succeeding Payment Date) would cause such Preferred Shares to have received (as of the date of purchase thereof) an Internal Rate of Return of 12.0% (assuming such date was a Payment Date under the Indenture); *provided that*, after the date on which any Holder of Preferred Shares has received an Internal Rate of Return equal to or in excess of 12.0%, the Amendment Buy-Out Purchase Price for such Preferred Shares shall be equal to zero.

"Amendment Buy-Out Purchaser": The Servicer (or any of its affiliates acting as principal or agent); *provided that* in the event that the Servicer elects not to purchase Notes or Preferred Shares from Holders pursuant to the Amendment Buy-Out, "Amendment Buy-Out Purchaser" shall mean one or more qualifying purchasers (which may include the Initial Purchaser or any of its affiliates acting as principal or agent) designated by the Servicer; *provided, however*, none of the Servicer, the Initial Purchaser or any of their respective affiliates shall have any duty to act as an Amendment Buy-Out Purchaser.

"Amortization Period": The period beginning on the day following the end of the Revolving Period and ending on the Payment Date upon which the Aggregate Principal Amount of the Notes is paid in full.

"Applicable Percentage": The lesser of the Moody's Priority Category Recovery Rate and the S&P Priority Category Recovery Rate applicable to such item of Portfolio Collateral as specified in the tables below and in Schedule C hereto:

| Moody's Priority Category* | Moody's Priority Category Recovery Rate |
|---|---|
| Senior Secured Loans: | |
| +2 or more Rating Subcategories Difference | 60% |
| +1 Rating Subcategories Difference | 50% |
| 0 Rating Subcategories Difference | 45% |
| -1 Rating Subcategories Difference | 40% |
| -2 Rating Subcategories Difference | 30% |
| -3 or less Rating Subcategories Difference | 20% |
| DIP Loan (senior secured) | 50% |

| Moody's Priority Category* | Moody's Priority Category Recovery Rate |
|---|---|
| **Non-Senior Secured Loans:** | |
| +2 or more Rating Subcategories Difference | 45% |
| +1 Rating Subcategories Difference | 42.5% |
| 0 Rating Subcategories Difference | 40% |
| -1 Rating Subcategories Difference | 30% |
| -2 Rating Subcategories Difference | 15% |
| -3 or less Rating Subcategories Difference | 10% |
| Debt Securities | |
| +2 or more Rating Subcategories Difference | 40% |
| +1 Rating Subcategories Difference | 35% |
| 0 Rating Subcategories Difference | 30% |
| -1 Rating Subcategories Difference | 15% |
| -2 Rating Subcategories Difference | 10% |
| -3 or less Rating Subcategories Difference | 2% |
| Synthetic Securities | In the case of (i) any Synthetic Security under clause (A) or clause (B) of the definition thereof, the "Moody's Priority Category Recovery Rate" referred to in this clause for the related Reference Obligation (or deliverable obligation to the extent such deliverable obligation is not the Reference Obligation), (ii) any Synthetic Security under clause (C) of the definition thereof, the "Moody's Priority Category Recovery Rate" given by Moody's to such Synthetic Security at the time of acquisition of such Synthetic Security, and (iii) any Synthetic Security which has the ability to vary the nature of the deliverable obligation from the time of the initial acquisition, the "Moody's Priority Category Recovery Rate" given by Moody's to such Synthetic Security at such time. |
| CLO Securities: | |

| Moody's Priority Category* | Moody's Priority Category Recovery Rate | | | | | |
| Percentage of Total Capitalization | Moody's Default Probability Rating | | | | | |
| | Aaa | Aa | A | Baa | Ba | B |
| Greater than 70% | 85.0% | 80.0% | 65.0% | 55.0% | 45.0% | 30.0% |
| Less than or equal to 70%, but greater than 10% | 75.0% | 70.0% | 60.0% | 50.0% | 40.0% | 25.0% |
| Less than or equal to 10%, but greater than 5% | 65.0% | 55.0% | 50.0% | 40.0% | 30.0% | 20.0% |
| Less than or equal to 5%, but greater than 2% | 55.0% | 45.0% | 40.0% | 35.0% | 25.0% | 10.0% |
| Less than or equal to 2% | 45.0% | 35.0% | 30.0% | 25.0% | 10.0% | 5.0% |

*   For purposes of the Moody's Priority Category, the classification of a Portfolio Loan shall be determined as of each date of determination.

| S&P Priority Category | S&P Priority Category Recovery Rate |
| --- | --- |
| Senior secured Portfolio Loans | 55% |
| Second lien Portfolio Loans | 37.5% |
| Senior unsecured Portfolio Loans | 37.5% |
| Subordinated Portfolio Loans | 21.5% |
| DIP Loan | To be determined on a case-by-case basis by S&P |
| Synthetic Securities | The "S&P Priority Category Recovery Rate" given by Standard & Poor's to such Synthetic Security at the time of acquisition of such Synthetic Security. |
| Debt Securities | |
| Senior secured Debt Securities | 44.0% |
| Senior unsecured Debt Securities | 30.0% |
| Subordinated Debt Securities | 18.0% |

US_EAST:6212215.13

9

"Applicable Periodic Rate":  With respect to the Class A-1LA Notes and for each Periodic Interest Accrual Period, a *per annum* rate equal to 0.30% above LIBOR for such Periodic Interest Accrual Period.  With respect to the Class A-1LB Notes and for each Periodic Interest Accrual Period, a *per annum* rate equal to 0.50% above LIBOR for such Periodic Interest Accrual Period.  With respect to the Class A-2L Notes and for each Periodic Interest Accrual Period, a *per annum* rate equal to 0.65% above LIBOR for such Periodic Interest Accrual Period.  With respect to the Class A-3L Notes and for each Periodic Interest Accrual Period, a *per annum* rate equal to 1.40% above LIBOR for such Periodic Interest Accrual Period.  With respect to the Class A-4L Notes and for each Periodic Interest Accrual Period, a *per annum* rate equal to 1.70% above LIBOR for such Periodic Interest Accrual Period.  With respect to the Class B-1L Notes and for each Periodic Interest Accrual Period, a *per annum* rate equal to 2.25% above LIBOR for such Periodic Interest Accrual Period.  With respect to the Class X Notes and for each Periodic Interest Accrual Period, a *per annum* rate equal to 0.36% above LIBOR for such Periodic Interest Accrual Period.

"Applicable Procedures":  The meaning specified in Section 2.5(b) hereof.

"Approved Pricing Service":  Any pricing service (including any of its successors and assigns) listed as an Approved Pricing Service in Schedule J or otherwise disclosed in writing by the Issuer to the Trustee and the Holders of the Notes, and not objected to by the Requisite Noteholders within 15 days of such disclosure, *provided that* the Rating Condition has been satisfied with respect to any pricing service not included on Schedule J.

"Ask-Side Market Value":   As of any Measurement Date, the market value determined by the Servicer and reported to the Trustee as an amount rather than as a percentage or fraction of par (expressed in Dollars) of any lent item of Portfolio Collateral based upon the Servicer's commercially reasonable judgment and based upon the following order of priority: (i) the average of the ask-side market prices obtained by the Servicer from three Independent broker-dealers active in the trading of such obligations or (ii) if the foregoing set of prices were not obtained, the higher of the ask-side market prices obtained by the Servicer from two Independent broker-dealers active in the trading of such obligations or (iii) if the foregoing sets of prices were not obtained, the average of the ask-side prices for the purchase of such item of Portfolio Collateral determined by an Approved Pricing Service (Independent from the Servicer) that derives valuations by polling broker-dealers (Independent from the Servicer); *provided* that if the Ask-Side Market Value of any lent item of Portfolio Collateral cannot be so determined then such item of Portfolio Collateral shall be deemed to have a Market Value equal to the outstanding principal balance thereof.

"Asset Backed Security":   Any obligation that is either (i) a security that is primarily serviced by the cash flows of a discrete pool of receivables or other financial assets, either fixed or revolving, and that, by its terms converts into cash within a finite time period, plus any rights or other assets designed to assure the servicing or timely distribution of proceeds to the holders thereof or (ii) an "asset-backed security" as such term may be defined from time to time in the "General Instructions to Form S-3 Registration Statement" promulgated under the Securities Act, including collateralized bond obligations and collateralized loan obligations. Notwithstanding the foregoing, a Synthetic Security shall not be considered an Asset Backed

Security for purposes of this Indenture unless the related Reference Obligation is an Asset Backed Security.

"<u>Assumed Interest Rate</u>": A rate equal to LIBOR as of the most recent LIBOR Determination Date minus 0.25%, but not less than zero.

"<u>Authenticating Agent</u>": An agent of the Trustee appointed by the Trustee pursuant to Section 2.4 to authenticate the Notes.

"<u>Authorized Officer</u>": With respect to either of the Co-Issuers, any chairman, deputy chairman, president, vice president, managing director, secretary, director, treasurer or other officer thereof or any chairman, deputy chairman, president, vice president, secretary, director, treasurer or other officer of any duly appointed agent thereof who is authorized to act for the Issuer or the Co-Issuer, as the case may be, in matters relating to, and binding upon, such Issuer or the Co-Issuer. With respect to the Servicer, any member, manager, officer, employee or agent of the Servicer, as applicable, who is authorized to act for the Servicer, in matters relating to, and binding upon, the Servicer, with respect to the subject matter of the request, certificate or order in question. With respect to the Trustee or any other bank or trust company acting as trustee of any express trust or as custodian, a Responsible Officer. Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any person to act, and such certification may be considered as in full force and effect until receipt by such other party of written notice to the contrary.

"<u>Balance</u>": On any date, with respect to cash or Eligible Investments in the Collection Account, the Initial Deposit Account, the Loan Funding Account or the Expense Reimbursement Account, the aggregate (i) face amount or current balance, as the case may be, of cash, demand deposits, time deposits, certificates of deposit, bankers' acceptances, federal funds and commercial bank money market accounts; (ii) outstanding principal amount of interest-bearing government and corporate securities; and (iii) purchase price of non-interest-bearing government and corporate securities, commercial paper and repurchase obligations.

"<u>Bankruptcy Code</u>": Title 11 of the United States Code (11 U.S.C. §§ 101 et seq.), as amended, and any successor statute and/or any bankruptcy, insolvency, reorganization or similar law enacted under the laws of the Cayman Islands.

"<u>Base Fee Amount</u>": With respect to each Due Period, an amount equal to 0.20% per annum of the Quarterly Collateral Amount, calculated on the basis of a 360-day year and the actual number of days elapsed.

"<u>Base Servicing Fee</u>": For any Payment Date, an amount equal to the product of (a) the Base Fee Amount for such Payment Date and (b) the Servicing Fee Portion for such Payment Date; *provided* that in the event that the Servicer is removed or resigns, the amount of such fee accrued to the effective date of such removal or resignation will be payable to the Servicer on the next succeeding Payment Date or Payment Dates on which such amount may be paid, in accordance with the priority of payments set forth in Section 11.1 (provided that the payment of any fee payable pursuant to this proviso will be *pari passu* with the payment of any servicing fees to the then-current servicer).

"B Rating Category":  Having a Moody's Rating of "B1" or below or an S&P Rating of "B+" or below.

"BB Rating Category":  Having a Moody's Rating of "Ba1" or below or an S&P Rating of "BB+" or below.

"Bear Notes": Notes of any Class, if any, initially issued to Bear Stearns or an Affiliate of Bear Stearns on the Closing Date.

"Bear Stearns":  Bear, Stearns & Co. Inc., a Delaware corporation.

"Beneficial Owners":  The meaning specified in the Investment Company Act and the rules and regulations promulgated thereunder.

"Business Day":  Any day that is not a Saturday, Sunday or other day on which commercial banking institutions in the City of New York, the State of New York, or in the city in which the Corporate Trust Office is located, or, to the extent action is required of a Paying Agent or the Paying and Transfer Agent, including the Trustee, in the city of the place of payment, are authorized or obligated by law or executive order to be closed. To the extent action is required of the Irish Paying Agent, Dublin, Ireland shall be considered in determining "Business Day" for purposes of determining when such Irish Paying Agent action is required.

"Calculation Agent":  The meaning specified in Section 2.11(a) hereof.

"Calculation Date":  The last day of each Due Period.

"CCC/Caa Portfolio Collateral":  Portfolio Collateral (excluding Defaulted Portfolio Collateral) that has a Moody's Rating below "B3" or an S&P Rating below "B-".

"CCC Rating Category":  Having a Moody's Rating of "Caa1" or below or an S&P Rating of "CCC+" or below.

"CIFG":  CIFG Services, Inc.

"Class":  Any of the Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes, the Class B-1L Notes and the Class X Notes.

"Class A Notes":  The Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes and the Class A-4L Notes.

"Class A Overcollateralization Percentage": 107.00% (for purposes of the Class A Overcollateralization Test).

"Class A Overcollateralization Ratio":  As of any date of determination, the ratio (expressed as a percentage) obtained by dividing (a) the sum of (1) the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate as of such date, calculated in accordance with the Overcollateralization Ratio Adjustment, plus (2) the sum of the Balance of Eligible

Investments and cash in the Collection Account, representing Collateral Principal Collections plus the Balance of Eligible Investments and cash in the Initial Deposit Account plus unpaid Purchased Accrued Interest, each as of such date by (b) the sum of the Aggregate Principal Amount of the Class A Notes (including for this purpose any unpaid Periodic Rate Shortfall Amounts with respect to such Classes of Notes not paid when due, until such amounts, if any, are paid in full) as of such date.

"Class A Overcollateralization Test":  A test that will be satisfied on any date of determination if the Class A Overcollateralization Ratio is at least equal to the Class A Overcollateralization Percentage.

"Class A-1L Notes":  The Class A-1LA Notes and the Class A-1LB Notes.

"Class A-1LA Notes":  The U.S. $538,000,000 Class A-1LA Floating Rate Extendable Notes due August 2021 issued hereunder by the Co-Issuers and having the terms described herein.

"Class A-1LB Notes":  The U.S. $96,000,000 Class A-1LB Floating Rate Extendable Notes due August 2021 issued hereunder by the Co-Issuers and having the terms described herein

"Class A-2L Notes":  The U.S. $76,000,000 Class A-2L Floating Rate Extendable Notes due August 2021 issued hereunder by the Co-Issuers and having the terms described herein.

"Class A-3L Notes":  The U.S. $36,500,000 Class A-3L Floating Rate Extendable Notes due August 2021 issued hereunder by the Co-Issuers and having the terms described herein.

"Class A-4L Notes":  The U.S. $10,000,000 Class A-4L Floating Rate Extendable Notes due August 2021 issued hereunder by the Co-Issuers and having the terms described herein.

"Class B-1L Notes":  The U.S. $21,000,000 Class B-1L Floating Rate Extendable Notes due August 2021 issued hereunder by the Co-Issuers and having the terms described herein.

"Class B-1L Overcollateralization Percentage":  106.00% (for purposes of the Class B-1L Overcollateralization Test).

"Class B-1L Overcollateralization Ratio": As of any date of determination, the ratio (expressed as a percentage) obtained by dividing (a) the sum of (1) the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate as of such date, calculated in accordance with the Overcollateralization Ratio Adjustment less the Overcollateralization Haircut Amount, if any, plus (2) the sum of the Balance of Eligible Investments and cash in the Collection Account, representing Collateral Principal Collections plus the Balance of Eligible Investments and cash in the Initial Deposit Account plus unpaid Purchased Accrued Interest, each as of such date by (b) the sum of the Aggregate Principal Amounts of the Class A Notes and the Class B-1L

Notes (including for this purpose any unpaid Periodic Rate Shortfall Amounts with respect to such Classes of Notes not paid when due, until such amounts, if any, are paid in full) as of such date.

If an item of Portfolio Collateral is both eligible to be included in the Overcollateralization Haircut Amount and is subject to an Overcollateralization Ratio Adjustment, for purposes of calculating the Class B-1L Overcollateralization Ratio, such item of Portfolio Collateral will not be discounted multiple times, but will be treated in the category that results in the largest discount to the par amount of such item of Portfolio Collateral.

"Class B-1L Overcollateralization Test": A test that will be satisfied as of any date of determination if the Class B-1L Overcollateralization Ratio is at least equal to the Class B-1L Overcollateralization Percentage.

"Class I Preferred Shares": The Class I Preferred Shares, par value $0.001 per share, issued by the Issuer; *provided* that any transfer of Class I Preferred Shares to HFP from any third party shall require the exchange and conversion of such Class I Preferred Shares into Class II Preferred Shares.

"Class II Preferred Share Dividend": Class II Preferred Share Base Dividend, Class II Preferred Share Additional Dividend and Class II Preferred Share Supplemental Dividend.

"Class II Preferred Share Additional Dividend": For any Payment Date, an amount equal to the sum of (a) the product of (i) the Additional Fee Amount for such Payment Date and (ii) the Class II Preferred Share Portion for such Payment Date plus (b) on any Payment Date that any part of the Class II Preferred Share Base Dividend was not paid on the preceding Payment Date, interest on such unpaid amount in an amount equal to the product of (i) LIBOR for the applicable period and (ii) the actual number of days in such Due Period, divided by 360 plus (c) on any Payment Date that any part of the Class II Preferred Share Additional Dividend was not paid on the preceding Payment Date, such unpaid Class II Preferred Share Additional Dividend and interest thereon in an amount equal to the product of (i) LIBOR for the applicable period and (ii) the actual number of days in such Due Period divided by 360.

"Class II Preferred Share Base Dividend": For any Payment Date, an amount equal to the product of (a) the Base Fee Amount for such Payment Date and (b) the Class II Preferred Share Portion for such Payment Date.

"Class II Preferred Share Supplemental Dividend": For any Payment Date, an amount equal to the product of (a) the Supplemental Fee Amount for such Payment Date and (b) the Class II Preferred Share Portion for such Payment Date.

"Class II Preferred Share Percentage": For any Payment Date, a fraction, expressed as a percentage, the numerator of which is the number of Outstanding Class II Preferred Shares on the Calculation Date related to such Payment Date and the denominator of which is the total number of Outstanding Preferred Shares on such Calculation Date.

"Class II Preferred Share Portion": For any Payment Date, 100% minus the Servicing Fee Portion for such Payment Date.

"Class II Preferred Shares": The Class II Preferred Shares, par value $0.001 per share, issued by the Issuer and held by HFP; *provided* that any transfer of Class II Preferred Shares by HFP to any third party shall require the exchange and conversion of such shares into Class I Preferred Shares.

"Class X Interest Payment": The Periodic Interest Amount with respect to the Class X Notes.

"Class X Notes": The U.S.$14,000,000 Class X Floating Rate Notes Due August 2013.

"Class X Payment": With respect to each Payment Date; the Class X Interest Payment and the Class X Principal Payment; *provided*, such amount may be reduced in connection with a redemption of the Class X Notes, as set forth in the Indenture.

"Class X Principal Payment": With respect to the Class X Notes and any Payment Date, an amount equal to the Class X Principal Payment for such Payment Date beginning on the Payment Date in November 2007, in accordance with the amortization schedule set forth in Schedule K.

"Class X Shortfall Amount": With respect to the Class X Notes and any Payment Date, any shortfall or shortfalls in the payment of the Class X Payment with respect to any preceding Payment Date or Payment Dates together with interest accrued thereon at the Periodic Interest Rate relating to the Class X Notes (net of all Class X Shortfall Amounts, if any, paid with respect to the Class X Notes prior to such Payment Date).

"Clearance System": The Euroclear System or Clearstream or both.

"Clearstream": Clearstream Banking, *société anonyme*.

"CLO Security": A U.S. dollar-denominated collateralized loan obligation or a similar obligation that entitles the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the CLO Securities) on the credit exposure to, or cash flow from, a portfolio of collateral of which at least 75% consists of commercial loans (including eligible synthetic securities whose reference obligations consist of commercial loans); *provided* that not more than 25% of the Aggregate Principal Amount of any CLO Security may be comprised of Synthetic Securities; and *provided further* that each CLO Security must have a public or an estimated rating from each of the Rating Agencies.

"Closing Date": May 10, 2006.

"Closing Expense Account": The meaning specified in Section 10.2 hereof.

"<u>Closing Expense Deposit</u>":  The cash credited to the Closing Expense Account on the Closing Date pursuant to Section 3.2(f) hereof.

"<u>Closing Expenses</u>":  The meaning specified in Section 11.1(a) hereof.

"<u>Code</u>":  The United States Internal Revenue Code of 1986, as amended.

"<u>Co-Issuer</u>":  As defined in the first sentence of this Indenture.

"<u>Co-Issuers</u>":  The Issuer and the Co-Issuer.

"<u>Collateral</u>":  The Trust Estate.

"<u>Collateral Account</u>":  The meaning specified in Section 10.2 hereof.

"<u>Collateral Administration Agreement</u>":  The meaning specified in Section 10.5(g) hereof.

"<u>Collateral Administrator</u>":  The collateral administrator under the Collateral Administration Agreement, initially JPMorgan Chase Bank, National Association.

"<u>Collateral Agent</u>": The meaning specified in the Paying and Transfer Agency Agreement.

"<u>Collateral Disposition Proceeds</u>":  All proceeds (including, to the extent so determined by the Servicer, any payments received in connection with a consent or similar solicitation and including any amounts received in connection with an item of Defaulted Portfolio Collateral up to an amount equal to, in the aggregate, the Principal Balance of such item of Defaulted Portfolio Collateral) received during a Due Period from the sale or other disposition of any Portfolio Collateral included in the Trust Estate, net of any reasonable amounts expended by the Trustee in connection with such sale or other disposition (including without limitation disposition proceeds from liquidation of the Trust Estate pursuant to Section 9.11).  Accrued interest may also be treated as Collateral Disposition Proceeds (y) to the extent necessary to pay for the principal amount of or accrued interest on Substitute Portfolio Collateral if the item of sold Portfolio Collateral paid interest before, and in the same Due Period as, the date of sale or (z) to the extent such amounts are Purchased Accrued Interest treated as Collateral Principal Collections hereunder.  Amounts received with respect to Equity Portfolio Collateral or in connection with a consent or similar solicitation shall be treated as Collateral Interest Collections to the extent such proceeds are in excess of the Principal Balance (determined immediately prior to such Portfolio Collateral becoming Equity Portfolio Collateral) of the Portfolio Collateral disposed of.

"<u>Collateral Interest Collections</u>":  With respect to any Payment Date, the sum of (i) all payments of interest with respect to any Portfolio Collateral (excluding accrued interest classified as Collateral Disposition Proceeds but including any other receipts of accrued interest (including Accrued Interest on Sale)  and, to the extent so determined by the Servicer, any payments (other than principal) received in connection with a consent or similar solicitation, fees received in connection with an amendment (but only to the extent such amendment does not

result in diminishing the principal money terms of such item of Portfolio Collateral) and including any commitment, standby or similar fees with respect to the unfunded portion of the Issuer's commitment to make or otherwise fund advances with respect to a Delayed Drawdown Loan or a Revolving Loan which are received during the applicable Due Period, less any Retained Accrued Interest, (ii) the Account Income, if any, in the Collection Account, the Initial Deposit Account and the Loan Funding Account which is received during the applicable Due Period, as each is determined as of the Calculation Date relating to such Payment Date (including, without limitation, Account Income on funds on deposit in the Initial Deposit Account transferred to the Collection Account on the Effective Date pursuant to Section 3.3(a) hereof), (iii) on or after the Effective Date, any funds transferred by the Trustee from the Initial Deposit Account pursuant to Section 10.2(f) hereof and (iv) income on Eligible Investments in and/or the securities credited to the Default Swap Collateral Account (to the extent the Issuer is entitled to receive such income pursuant to the terms hereof).

"Collateral LIBOR":  With respect to any item of Portfolio Collateral, the London interbank offered rate for U.S. dollar deposits as determined under the terms of the related Underlying Instrument.

"Collateral Principal Collections":  With respect to any Payment Date, all payments of principal of any Portfolio Collateral (including (i) any remaining Deposit (but excluding any Account Income thereon and subject to Section 3.4(d) hereof) not applied to purchase Original Portfolio Collateral or to effect an Initial Deposit Redemption, (ii) any payment of Premium, (iii) to the extent so determined by the Servicer, any payments received in connection with a consent or similar solicitation, fees received in connection with an amendment and including principal received in connection with or any payments received with respect to an item of Credit Risk Portfolio Collateral in connection with any consent or solicitation, (iv) all proceeds received from the sale of any warrant (whether sold as part of a Unit or separately), (v) any Collateral Disposition Proceeds which are received during the applicable Due Period, as determined as of the Calculation Date relating to such Payment Date, (vi) amounts representing Purchased Accrued Interest and (vii) amounts transferred from the Loan Funding Account upon the sale or disposition of Delayed Drawdown Loans or Revolving Loans or upon the expiration of a drawdown or revolving period, (viii) funds (other than income thereon) transferred from a Default Swap Collateral Account to the Collection Account, (ix) any amounts received by the Issuer that do not qualify as Collateral Interest Collections (other than those standing to the credit of any Default Swap Collateral Account or Default Swap Issuer Account) and (x) on or after the Effective Date, any funds in the Initial Deposit Account not considered Collateral Interest Collections pursuant to Section 10.2(f) hereof).  Notwithstanding the foregoing, Collateral Principal Collections shall include (A) any other amounts not included in Collateral Interest Collections or Adjusted Collateral Interest Collections, (B) any payments received with respect to an item of Defaulted Portfolio Collateral up to, in the aggregate, the Principal Balance of such item of Defaulted Portfolio Collateral and (C) any amounts recharacterized as Collateral Principal Collections in connection with any distribution of Payment Date Equity Securities.

"Collateral Purchase Amount":  With respect to any Payment Date, the aggregate amount of funds deposited into the Collection Account on such Payment Date pursuant to clause NINTH of Section 11.1(c)(i) and clause THIRD of Section 11.1(c)(ii).

"Collateral Quality Formula": The formula set forth in Annex D to be used to interpolate between values or rows of the criteria set forth in the Collateral Quality Matrix. For purposes of such calculation, (i) the Moody's Asset Correlation Test requirement in the applicable row of the Collateral Quality Matrix must be equal to or less than 4.0% and greater than or equal to 3.0%, (ii) the Moody's Minimum Average Recovery Rate requirement in the applicable row of the Collateral Quality Matrix must be less than or equal to 45.5% and greater than or equal to 40.0%, (iii) the Moody's Weighted Average Rating Test requirement in the applicable row of the Collateral Quality Matrix must be equal to or greater than 1500 and less than or equal to 2500 and (iv) the Weighted Average Margin requirement in the applicable row of the Collateral Quality Matrix must be equal to or greater than 1.5% and less than or equal to 3.0%.

"Collateral Quality Matrix": For any date of determination, the row of the table set forth in Annex D that has been selected by the Servicer (in accordance with the procedures described in the next sentence) for use in determining the scores that are required to satisfy the Moody's Asset Correlation Test, the Minimum Average Recovery Rate Test with respect to Moody's, the Moody's Weighted Average Rating Test, the Weighted Average Coupon Test and the Weighted Average Margin Test. The Servicer may elect to (i) have a different row of the table set forth in Annex D apply and (ii) add additional rows to the table set forth in Annex D by interpolating using the Collateral Quality Formula (which may or may not include a combination of existing values), in each case upon providing written notice to the Issuer and the Trustee, so long as, immediately after giving effect to the change in rows, each of the Moody's Correlation Factor Test, the Minimum Average Recovery Rate Test with respect to Moody's, the Moody's Weighted Average Rating Test, the Weighted Average Coupon Test and the Weighted Average Margin Test will be satisfied according to the scores that are prescribed by the newly selected row and the Standard & Poor's CDO Monitor Test would have been satisfied as of the date of the most recent purchase or sale of an item of Portfolio Collateral had such test been calculated using the Current Portfolio, the Proposed Portfolio, and the S&P Scenario Loss Rate that was in effect immediately prior to such purchase or sale, but using the S&P Break-Even Loss Rate applicable to the Notes that would have been applicable after giving effect to the change in combinations; it being agreed that the Servicer shall be under no obligation to elect to change the Collateral Quality Matrix In determining whether the criteria set forth in the Collateral Quality Matrix are satisfied, the Servicer may use the Collateral Quality Formula to interpolate between values of such criteria or may use any other method that is agreed by the Issuer and Moody's with written notice to the Trustee. If a new Standard & Poor's CDO Monitor is required in connection with selecting a new row of the matrix, the Servicer will give notice to S&P and the Trustee at least two weeks prior to the selection of such new row.

"Collateral Quality Tests": The Moody's Correlation Factor Test, the Minimum Average Recovery Rate Test, the Moody's Weighted Average Rating Test, the Weighted Average Coupon Test, the Weighted Average Margin Test, the Weighted Average Life Requirement and the Standard & Poor's CDO Monitor Test.

"Collection Account": The meaning specified in Section 10.2 hereof.

"Collections":  With respect to any Payment Date, the sum of (i) the Collateral Interest Collections collected during the applicable Due Period and (ii) the Collateral Principal Collections collected during the applicable Due Period, as each is determined as of the Calculation Date relating to such Payment Date.

"Controlling Class":  Shall mean the Class A-1LA Notes and the Class X Notes, so long as any Class A-1LA Notes and Class X Notes are Outstanding, then the Class A-1LB Notes, so long as any Class A-1LB Notes are Outstanding, then the Class A-2L Notes, so long as any Class A-2L Notes are Outstanding, then the Class A-3L Notes, so long as any Class A-3L Notes are Outstanding, then the Class A-4L Notes, so long as any Class A-4L Notes are Outstanding and then the Class B-1L Notes, so long as any Class B-1L Notes are Outstanding.

"Corporate Trust Office":  The principal corporate trust office of the Trustee currently located at 600 Travis Street, 50th Floor, Houston, Texas 77002, Attention: Worldwide Securities Services-ROCKWALL CDO, or at such other address as the Trustee may designate by notice to the Noteholders, the Servicer, the Issuer and the Rating Agencies or the principal corporate trust office in the United States of any successor Trustee.

"Coupon Adjustment": To the extent the Weighted Average Coupon of the Fixed Rate Portfolio Collateral exceeds the percentage specified in the row of the Collateral Quality Matrix then in effect for such Weighted Average Coupon, then the Weighted Average Margin Test (as specified in the row of the Collateral Quality Matrix then in effect), will be reduced by a per annum percentage equal to the product of (x) the amount by which the Weighted Average Coupon of the Fixed Rate Portfolio Collateral exceeds the percentage specified in the row of the Collateral Quality Matrix then in effect for such Weighted Average Coupon, times (y) a fraction, the numerator of which is the Aggregate Principal Amount of the Fixed Rate Portfolio Collateral and the denominator of which is the Aggregate Principal Amount of the Floating Rate Portfolio Collateral, times (z) 360/365.

To the extent the Weighted Average Margin of the Floating Rate Portfolio Collateral exceeds the percentage specified in the row of the Collateral Quality Matrix then in effect for such Weighted Average Margin, then the Weighted Average Coupon Test (as specified in the row of the Collateral Quality Matrix then in effect) will be reduced by a per annum percentage equal to the product of (x) the amount by which the Weighted Average Margin exceeds the percentage specified in the current row of the Collateral Quality Matrix, times (y) a fraction, the numerator of which is the Aggregate Principal Amount of the Floating Rate Portfolio Collateral and the denominator of which is the Aggregate Principal Amount of the Fixed Rate Portfolio Collateral, times (z) 365/360.

"Credit Improved Criteria":  Shall mean with respect to any item of Portfolio Collateral, in the Servicer's reasonable judgment, such item of Portfolio Collateral has significantly improved in credit quality, and:

(a) Moody's, S&P or Fitch has placed such item of Portfolio Collateral or any other class of security issued together with such item of Portfolio Collateral (or, if such item of Portfolio Collateral is not rated, the issuer thereof) on its credit watch list (or similar list) with the potential for developing positive credit implications since the date the Issuer first acquired such

item of Portfolio Collateral (and for so long as such item of Portfolio Collateral or issuer, as applicable, remains on such list) or there has been an upgrade in the rating of such item of Portfolio Collateral, issuer or other class of security issued together with such item of Portfolio Collateral, as applicable, by Moody's, S&P or Fitch by one or more subcategories from the rating of such item of Portfolio Collateral or issuer, as applicable, by Moody's, S&P or Fitch, as applicable, in effect on the date the Issuer first acquired such item of Portfolio Collateral;

(b) with respect to a Portfolio Loan, since the date on which such Portfolio Loan was first acquired by the Issuer, has increased in price to 101.5% or more of its original purchase price or the spread of which over the related reference rate has been reduced, in each case, in accordance with its Underlying Instruments since the date on which such item of Portfolio Collateral was first acquired by the Issuer by 0.25% or more (in the case of an item of Portfolio Collateral with a spread over the related reference rate less than or equal to 2.00% at the time such item of Portfolio Collateral was first acquired by the Issuer) or 0.50% or more (in the case of an item of Portfolio Collateral with a spread over the related reference rate greater than 2.00% at the time such item of Portfolio Collateral was first acquired by the Issuer) for reasons primarily due to an improvement in the related borrower's financial ratios or financial results and not as a result of general market conditions; or

(c) with respect to any item of Portfolio Collateral which is not a Portfolio Loan, an increase in the market price (expressed as a percentage of par value) since the date of purchase of such item of Portfolio Collateral which, compared to the change in the average market price of a representative sample (as determined by the Servicer) of other debt securities with similar terms and credit characteristics and that would be eligible to be pledged as Portfolio Collateral, is greater than 3.00% of the par value or more relative to such representative sample; or a decrease since the date of purchase of such item of Portfolio Collateral of more than 10.0% in the difference between the yield to worst call on such item of Portfolio Collateral compared to the yield on the relevant United States Treasury security;

*provided, however*, that the criteria in (b) and (c) above may be used only as corroboration of other bases for the Servicer's Judgment.

"<u>Credit Improved Portfolio Collateral</u>":  Any item of Portfolio Collateral which, (a) in the Servicer's commercially reasonable judgment consistent with the standard of care set forth in the Servicing Agreement (provided, that in forming such judgment a decrease in credit spread or an increase in Market Value of such item of Portfolio Collateral may only be utilized as corroboration of other bases of such judgment), has improved in credit quality or otherwise satisfies the Credit Improved Criteria or (b) is sold pursuant to a Portfolio Improvement Exchange; *provided* that the Aggregate Principal Amount of any such Portfolio Collateral sold pursuant to clause (b) shall not exceed, during any twelve-month period, 20% (or such lower amount as determined by the Servicer) of the Aggregate Par Amount as of the first day of such period.

"<u>Credit Risk Criteria</u>":  With respect to any item of Portfolio Collateral:

(a) Moody's, Fitch or S&P has placed such item of Portfolio Collateral or any other class of security issued together with such item of Portfolio Collateral (or, if such item of

Portfolio Collateral is not rated, the issuer thereof) on its credit watch list with the potential for developing negative credit implications (or similar list) since the date the Issuer first acquired such item of Portfolio Collateral (and for so long as such item of Portfolio Collateral or issuer, as applicable, remains on such list) or there has been a reduction in the rating of such item of Portfolio Collateral, issuer or other class of security issued together with such item of Portfolio Collateral, as applicable, by Moody's, Fitch or S&P, as applicable, by one or more subcategories from the rating of such item of Portfolio Collateral or issuer, as applicable, by Moody's, Fitch or S&P, as applicable, in effect on the date the Issuer first acquired such item of Portfolio Collateral;

(b) which is a Portfolio Loan, the spread over the applicable reference rate has been increased in accordance with the related Underlying Instruments since the date on which such Portfolio Loan was first acquired by the Issuer by 0.50% or more (in the case of a Portfolio Loan with a spread over the applicable reference rate at the time such Portfolio Loan was first acquired by the Issuer less than or equal to 2.00%) or 0.75% or more (in the case of a Portfolio Loan with a spread over the applicable reference rate at the time such Portfolio Loan was first acquired by the Issuer greater than 2.00%) primarily due to a deterioration in the related borrower's financial ratios or financial results and not as a result of general market conditions; *provided, however*, that the criteria in this paragraph (b) may be used only as corroboration of other bases for the Servicer's judgment;

(c) which is a CLO Security, a decline in the par amount of underlying collateral such that the aggregate par amount of the entire class of securities to which such item of Portfolio Collateral belongs and all other securities secured by the same pool of collateral and that rank senior in priority of payment to such class of securities exceeds the aggregate par amount of all collateral (excluding defaulted collateral) securing such securities; or

(d) it is a Deferred Interest PIK Bond or a partial Deferred Interest PIK Bond.

"Credit Risk Portfolio Collateral": Any item of Portfolio Collateral (other than an item of Defaulted Portfolio Collateral) which, in the Servicer's commercially reasonable business judgment consistent with the standard of care set forth in the Servicing Agreement (which judgment shall not be questioned as a result of subsequent events; *provided*, that in forming such judgment an increase in credit spread or a decrease in Market Value of such item of Portfolio Collateral may only be utilized as corroboration of other bases of such judgment), (i) is likely to decline in credit quality and, with the passage of time, become Defaulted Portfolio Collateral, and (ii) if a Sales Restriction Condition has occurred, otherwise satisfies the Credit Risk Criteria.

"Cumulative Class X Payment": With respect to any Payment Date and the Class X Notes, the Class X Payment with respect to such Payment Date and the Class X Shortfall Amount, if any, with respect to such Payment Date.

"Cumulative Interest Amount": With respect to a Payment Date and any Class of Notes the applicable Periodic Interest Amount with respect to such Payment Date and the applicable Periodic Rate Shortfall Amount, if any, with respect to such Payment Date.

"Current Pay Obligation": An item of Portfolio Collateral that would otherwise be an item of Defaulted Portfolio Collateral but as to which (i) no interest payments (including deferred interest) or scheduled principal payments are due and payable that are unpaid and the Servicer reasonably expects that the issuer or obligor of such item of Portfolio Collateral will continue to make scheduled payments in cash of interest or principal thereon and will pay the principal thereof by maturity, (ii) if the issuer or obligor of such item of Portfolio Collateral is subject to a bankruptcy proceeding, a bankruptcy court has authorized the payment of interest due and payable on such item of Portfolio Collateral, and (iii) either (a) the Market Value of such item of Portfolio Collateral is equal to or greater than 80% of par and the Moody's Rating of such item of Portfolio Collateral is at least "Caa1" or (b) the Market Value of such item of Portfolio Collateral is equal to or greater than 85% of par and the Moody's Rating of such item of Portfolio Collateral is at least "Caa2" (or, if the Moody's Rating has been withdrawn, the Moody's Rating of such item of Portfolio Collateral was at least "Caa2" prior to withdrawal) or (c) if the Moody's Rating of such item of Portfolio Collateral is less than "Caa2" or is "Caa2" and on credit watch with negative implications, but greater than or equal to "Caa3" without credit watch with negative implications, the Market Value of the such item of Portfolio Collateral is at least equal to 90% of its Principal Balance; *provided* that if the Moody's Rating of the item of Portfolio Collateral has been withdrawn but the obligation had a Moody's rating of at least "Caa3" without credit watch with negative implications at the time of default, such item of Portfolio Collateral may be treated as a Current Pay Obligation if its Market Value is at least equal to 90% of its Principal Balance.

"Current Portfolio":  Pledged Securities in the Trust Estate immediately prior to the sale, maturity or the other disposition of an item of Portfolio Collateral or immediately prior to the purchase of an item of Portfolio Collateral, as the case may be.

"Custodian":  As such term is defined in Section 2.1(b) hereof.

"Debt Security": Each Structured Finance Investment and interests in corporate and other debt securities (including senior secured floating notes) included in the Portfolio Collateral (other than Eligible Investments, CLO Securities and Portfolio Loans) and, for the avoidance of doubt, Portfolio Loans shall not be considered Debt Securities.

"Default":  Any event or condition the occurrence or existence of which, with the giving of notice or lapse of time or both, would become an Event of Default.

"Defaulted Portfolio Collateral":  Any item of Portfolio Collateral (other than an item of Portfolio Collateral which is a DIP Loan, unless such item of Portfolio Collateral itself is in default since acquisition), including with respect to a Synthetic Security, the related Reference Obligation, with respect to which:

(i)     the issuer thereof has defaulted in the payment of principal or interest (in respect of Portfolio Loans only, beyond five Business Days, *provided* the Servicer certifies in writing to the Trustee that it believes, in its reasonable business judgment, that such delay is not credit related), unless, in the case of a failure of such issuer to make required interest payments, such issuer has resumed current cash payments of interest and paid in full all accrued and unpaid interest;

(ii)  such item of Portfolio Collateral is *pari passu* with or subordinated to other material indebtedness for borrowed money owing by the issuer thereof ("Other Indebtedness") and such issuer has defaulted in the payment of principal or interest (beyond any applicable grace or notice period and without regard to any waiver of such default) on such Other Indebtedness, unless, in the case of a failure of such issuer to make required interest payments, such issuer has resumed current cash payments of interest and has paid in full any accrued interest due and payable thereon;

(iii)  an Insolvency Event has occurred with respect to the issuer thereof;

(iv)  the Servicer has knowledge (or such rating information has been published) that the issuer thereof is rated "D" or "SD" by S&P (calculated in accordance with Schedule D) (or S&P has withdrawn its rating which prior to such withdrawal was "D" or "SD");

(v)  there has been proposed or effected any distressed exchange or other distressed debt restructuring where the issuer of such Portfolio Collateral has offered the debt holders a new security or package of securities that, in the commercially reasonable judgment of the Servicer amounts to a diminished financial obligation;

(vi)  such item of Portfolio Collateral is declared to be an item of Defaulted Portfolio Collateral by the Servicer, but only so long as it remains so designated by the Servicer in its sole discretion; or

(vii)  such item of Portfolio Collateral is a CLO Security which is rated "CC" or below by S&P (or S&P has withdrawn its rating which prior to such withdrawal was rated "CC") or rated "Ca" or "C" or below by Moody's;

*provided* that any item of Portfolio Collateral that is classified as an item of "Defaulted Portfolio Collateral" will cease to be so classified if such item of Portfolio Collateral, at any date thereafter, (a) would not otherwise be classified as an item of Defaulted Portfolio Collateral in accordance with the definition of such term and (b) otherwise meets the collateral criteria described herein as of such date.

"Default Swap":  Any U.S. dollar denominated "pay as you go" credit default swap or total return swap with respect to a Reference Obligation, which the Issuer (directly or indirectly) purchased from or entered into with a Default Swap Counterparty, which contains equivalent probability of default, recovery upon default (or a specific percentage thereof), expected loss, maturity, interest rate and other non-credit characteristics as those of the related Reference Obligation (without taking account of such considerations as they relate to the Default Swap Counterparty); *provided* that (i) the Reference Obligation is a CLO Security, (ii) such Default Swap will not cause the Issuer to be treated as engaged in a trade or business in the United States for U.S. Federal income tax purposes or otherwise subject the Issuer (or the beneficial owners thereof) to U.S. Federal income tax on a net income tax basis, (iii) either (a) amounts receivable by the Issuer are not expected to (based on the Servicer's determination, which may include consultation with counsel to the Issuer) be subject to U.S. or foreign withholding tax in respect of the Default Swap or (b) the Default Swap Counterparty is required

to make "gross-up" payments pursuant to the related Underlying Instruments that cover the full amount of any such withholding tax on an after-tax basis (including any tax on such additional payments), (iv) the Issuer has caused to be deposited in a Default Swap Collateral Account an amount in cash at least equal to the aggregate of (or the amount required under the terms of the Synthetic Security to provide for) all further payments (contingent or otherwise) that the Issuer is or may be required to make to the Default Swap Counterparty under the Default Swap; (v) the agreement relating to such Default Swap contains "non-petition" provisions with respect to the Issuer and "limited recourse" provisions limiting the Default Swap Counterparty's rights in respect of the Default Swap Collateral to the funds and other property credited to the Default Swap Collateral Account related to such Default Swap; (vi) the notional amount of such Default Swap is equal to the principal amount of the Reference Obligation; (vii) the agreement relating to such Default Swap Collateral contains provisions to the effect that upon the occurrence of an "Event of Default" or "Termination Event" (other than an "Illegality" or "Tax Event"), if any, where the Default Swap Counterparty is the sole "Defaulting Party" or the sole "Affected Party" ("Event of Default," "Termination Event," "Illegality," "Tax Event," "Defaulting Party" or "Affected Party," as applicable, as such terms are defined in the ISDA Master Agreement relating to such Default Swap), (a) the Issuer may terminate its obligations under such Default Swap and upon such termination and payment of any termination amount payable under the Default Swap, any lien in favor of the Default Swap Counterparty over its related Default Swap Collateral Account will be terminated and (b) upon payment of any termination amount payable under the Default Swap, the Issuer will no longer be obligated to make any payments to the Default Swap Counterparty with respect to such Default Swap, (viii) any Default Swap shall be positively indexed to the related Reference Obligation on no more than a one-to-one basis, (ix) if any Reference Obligation delivered pursuant to any Default Swap does not constitute Portfolio Collateral and it would cause any collateral quality test or concentration limitation not to be satisfied, such Reference Obligation shall be deemed Equity Portfolio Collateral, and (x) (a) such Default Swap shall be documented with a standard ISDA form master agreement, as modified by appropriate schedules and confirmations and (b) (1) such Default Swap is a Form-Approved Synthetic Security or (2) the Rating Condition has been satisfied with respect to the purchase of or entry into such Default Swap.

"Default Swap Collateral":  Cash, securities or other collateral purchased or posted by the Issuer in connection with the purchase of a Default Swap, including without limitation a payment of cash or delivery of securities by the Issuer.

"Default Swap Collateral Account":  The account established pursuant to Section 10.2 hereof with the Securities Intermediary in the name of the Trustee.

"Default Swap Counterparty":  Any entity, whose long term senior unsecured debt or derivatives counterparty rating shall be at least "A2" by Moody's and a long term rating of at least "A" or a short term rating of at least "A-1" by S&P, required to make payments on Synthetic Portfolio Collateral pursuant to the terms of such Default Swap or any guarantee thereof to the extent that a Reference Obligor makes payments on a related Reference Obligation.

"Default Swap Counterparty Termination Payment":  An amount payable by the Issuer to a Default Swap Counterparty that is due following the designation of an "Early

Termination Date" (as defined in the related credit default swap) (other than in respect of "Illegality" or a "Tax Event" (each as defined in the related credit default swap)), as to which the Default Swap Counterparty is the sole "Defaulting Party" or the sole "Affected Party" (as each such term is defined in the ISDA Master Agreement related to such Synthetic Security).

"Default Swap Issuer Account": The account established pursuant to Section 10.2 hereof with the Securities Intermediary in the name of the Trustee.

"Deferred Interest PIK Bond": As of any date of determination, any PIK Bond that is not an item of Defaulted Portfolio Collateral that has, in accordance with its terms, deferred or paid "in-kind" any amount of interest for a period equal to:

(a) in the case of an item of Portfolio Collateral that has a Moody's Rating below "Baa3" (or, if rated "Baa3," is on credit watch for possible downgrade) or, if rated by S&P, a rating by S&P below "BBB-" (or, if rated "BBB-," is on credit watch for possible downgrade), the shorter of one accrual period or six months; and

(b) in all other cases, the shorter of two accrual periods or twelve months;

and has not, as of such date of determination, resumed timely payment of current interest in cash and repaid all outstanding deferred or capitalized interest in cash. For the avoidance of doubt, an item of Portfolio Collateral will not constitute a Deferred Interest PIK Bond if it resumes timely payment of current interest in cash and repays all outstanding deferred or capitalized interest in cash on the Payment Date immediately succeeding the end of the interest accrual period(s) set forth above.

"Definitive Notes": Registered definitive notes in substantially the form set forth in Exhibits A-1L-4, A-2L-4, A-3L-4 and B-1L-4.

"Delayed Drawdown Loan": A Portfolio Loan that, pursuant to the related Underlying Instrument or Underlying Loan and Security Agreement and lender or lenders, would obligate the Issuer, if the Issuer were to become a lender thereunder by purchasing such Portfolio Loan for inclusion in the Trust Estate, to make or otherwise fund one or more future advances to the related borrower and meeting the criteria described in Section 3.4; *provided* that, if a Delayed Drawdown Loan has been drawn in full and there are no future advance obligations to the related borrower, such Portfolio Loan will no longer be considered a Delayed Drawdown Loan.

"Deliver" or "Delivery": The taking of the following steps by the Issuer:

(a) with respect to such of the Trust Estate as constitutes an instrument, causing the Trustee to take possession in the State of New York of such instrument, indorsed to the Trustee or in blank by an effective indorsement;

(b) with respect to such of the Trust Estate as constitutes tangible chattel paper, goods, a negotiable document, or money, causing the Trustee to take possession in the State of New York of such tangible chattel paper, goods, negotiable document, or money;

(c) with respect to such of the Trust Estate as constitutes a certificated security in bearer form, causing the Trustee to acquire possession in the State of New York of the related security certificate;

(d) with respect to such of the Trust Estate as constitutes a certificated security in registered form, causing the Trustee to acquire possession in the State of New York of the related security certificate, indorsed to the Trustee or in blank by an effective indorsement, or registered in the name of the Trustee, upon original issue or registration of transfer by the issuer of such certificated security;

(e) with respect to such of the Trust Estate as constitutes an uncertificated security, causing the issuer of such uncertificated security to register the Trustee as the registered owner of such uncertificated security;

(f) with respect to such of the Trust Estate as constitutes a security entitlement, causing the Securities Intermediary to indicate by book entry that the financial asset relating to such security entitlement has been credited to the appropriate Account;

(g) with respect to such of the Trust Estate as constitutes an account or a general intangible, (i) causing the account debtor for such account or general intangible to be notified of the grant to the Trustee of a security interest in such account or general intangible, (ii) causing to be taken any steps necessary to perfect a security interest in such account or general intangible under the laws of the Cayman Islands, and (iii) causing to be filed with the District of Columbia Recorder of Deeds a properly completed UCC financing statement that names the Issuer as debtor and the Trustee as secured party and that covers such account or general intangible;

(h) with respect to such of the Trust Estate as constitutes a deposit account, causing such deposit account to be maintained in the name of the Trustee and causing the bank with which such deposit account is maintained to agree in writing with the Trustee and the Issuer that (i) such bank will comply with instructions originated by the Trustee directing disposition of the funds in such deposit account without further consent of any other person or entity, (ii) such bank will not agree with any person or entity other than the Trustee to comply with instructions originated by any person or entity other than the Trustee, (iii) such deposit account and the property deposited therein will not be subject to any lien, security interest, encumbrance, or right of set-off in favor of such bank or anyone claiming through it (other than the Trustee), (iv) such agreement will be governed by the laws of the State of New York, and (v) the State of New York will be the bank's jurisdiction of such bank for purposes of Article 9 of the UCC; or

(i) in the case of each of paragraphs (a) through (h) above, such additional or alternative procedures as may hereafter become appropriate to grant and perfect a security interest in such items of the Trust Estate in favor of the Trustee, consistent with applicable law or regulations.

In each case of Delivery contemplated herein, the Trustee shall make appropriate notations on its records indicating that such item of the Trust Estate is held by the Trustee pursuant to and as provided herein.

Effective upon Delivery of any item of the Trust Estate, the Trustee shall be deemed to have (i) represented that its purchase of such item of the Trust Estate is made in good faith, and without notice of any adverse claim thereto appearing on the face of such item (if in physical form) or otherwise known to a Responsible Officer of the Trustee; *provided that* such representation shall not impose any other affirmative duty or obligation upon the Trustee with regard to inquiry or investigation of, or constructive notice of, adverse claims; and (ii) acknowledged that it holds such item of the Trust Estate as Trustee hereunder for the benefit of the Holders of the Notes and the other Secured Parties. Any additional or alternative procedures for accomplishing "Delivery" for purposes of paragraph (i) of this definition shall be permitted only upon delivery to the Trustee of an Opinion of Counsel to the effect that such procedures are appropriate to grant and perfect a security interest in the applicable type of collateral in favor of the Trustee.

"Deposit": The cash credited to the Initial Deposit Account on the Closing Date (or with respect to the Post-Closing Sale Collateral, within 10 days of the Closing Date) in accordance with Section 3.2(e) hereof, including any reimbursement for amounts withdrawn from the Initial Deposit Account pursuant to Section 10.2(f), and including the first interest payment received on each Portfolio Loan and on CLO Securities (other than certain CLO Securities, as indicated on Schedule A) purchased on the Closing Date.

"Deposit Account": The meaning specified in Section 10.2 hereof.

"Depository": With respect to the Regulation S Global Notes and the Rule 144A Global Notes, DTC, its nominees, and their respective successors.

"DIP Loan": Any interest in a loan or financing facility (a) which at the time of purchase is an obligation of a debtor-in-possession pursuant to Section 364 of United States the Bankruptcy Code, (b) the terms of which have been approved by an order of a United States Bankruptcy Court, a United States District Court, or any other court of competent jurisdiction, the enforceability of which order is not subject to any pending contested matter or proceeding (as such terms are defined in the Federal Rules of Bankruptcy Procedure), (c) which has the priority allowed by either Section 364(c) or 364(d) of the Bankruptcy Code, (d) which pays interest in cash on a current basis, and (e) as to which the obligor has paid its most recent scheduled interest and principal payments (if any) and the Servicer reasonably expects that such obligor will continue to pay interest and principal payments. For purposes hereof, a DIP Loan shall not be considered a Current Pay Obligation. Any DIP Loan added as an item of Portfolio Collateral must be assigned a formal or estimated rating by Moody's and S&P.

"Discount Portfolio Collateral": (a) Any Portfolio Loan which had a Moody's Rating of at least "B3" at the time of purchase and which was purchased at a price less than 85% of the Principal Balance thereof, (b) any Portfolio Loan which had a Moody's Rating below "B3" at the time of purchase and which was purchased at a price less than 90% of the Principal Balance thereof, (c) any item of Portfolio Collateral which is not a Portfolio Loan and which had a Moody's Rating of at least "B3" at the time of purchase and which was purchased at a price less than 80% of the Principal Balance thereof, (d) any item of Portfolio Collateral which is not a Portfolio Loan and which had a Moody's Rating below "B3" at the time of purchase and which was purchased at a price less than 85% of the Principal Balance thereof and (e) any CLO

Security which had a Moody's Rating of "Aa3" or greater at the time of purchase or originally rated "Aa3" or greater by Moody's which was purchased at a price less than 92% of the Principal Balance thereof and the provisions of this definition set forth below will not be applicable to these CLO Securities; *provided* that, (i) any item of Portfolio Collateral that would otherwise be considered Discount Portfolio Collateral, but that has a Market Value above 90% of its Principal Balance for 22 consecutive Business Days if it is a Portfolio Loan or above 85% of its Principal Balance for 60 consecutive days if it is a CLO Security, after being purchased by the Issuer, will no longer be considered Discount Portfolio Collateral and (ii) any item of Portfolio Collateral that would otherwise be considered Discount Portfolio Collateral, but that is purchased with the proceeds of sale of an item of Portfolio Collateral that was not an item of Discount Portfolio Collateral at the time of its purchase, so long as such item of Portfolio Collateral (a) was purchased or committed to be purchased within five Business Days of such sale, (b) was purchased at a price (as a percentage of par) equal to or greater than the sale price of the sold item of Portfolio Collateral, (c) was purchased at a purchase price not less than 65% of the Principal Balance thereof and (d) had a rating equal to or greater than the rating of the sold item of Portfolio Collateral, will not be considered Discount Portfolio Collateral. Notwithstanding the foregoing, at no time during the period commencing on the Closing Date through the Final Maturity Date, shall the Aggregate Principal Amount of all items of Discount Portfolio Collateral purchased pursuant to clause (ii) exceed in the aggregate 10% of the Required Portfolio Collateral Amount; *provided* that no more than 3% of the Required Portfolio Collateral Amount of such 10% cumulative limitation may consist of CLO Securities; *provided* that if a Portfolio Loan purchased pursuant to clause (ii) above is repaid in full, is sold for a price equal to at least 97.5% of its unpaid Principal Balance or has a Market Value above 90% of its Principal Balance for at least 22 consecutive Business Days after being purchased, such Portfolio Loan shall not be taken into account for purposes of clause (ii) above; *provided further* that, as of any date of determination, the Aggregate Principal Amount of items of Portfolio Collateral in the Trust Estate purchased pursuant to clause (ii) above, may not exceed (x) 5% of the Aggregate Par Amount or (y) if the weighted average purchase price of Portfolio Collateral purchased pursuant to clause (b) above is less than 75% as of such date of determination, 2.5% of the Aggregate Par Amount.

"Distributable Equity Securities" Any and all Equity Portfolio Collateral, which cannot be sold by the Servicer as a result of the regulatory, market or other restrictions, as determined in good faith by the Servicer, and shall have the value as determined by an independent third party with relevant experience in making such valuation.

"Distribution Compliance Period": The period ending on the 40th day after the later of the conclusion of the offering of the Notes and the Closing Date.

"DTC": The Depository Trust Company, a New York corporation, or any successor thereto.

"Due Date": Each date on which a distribution or payment is due on a Pledged Security (which includes any Eligible Investment).

"Due Period": With respect to any Payment Date, the period beginning on the day following the last day of the immediately preceding Due Period (or, in the case of the Due

Period that is applicable to the first Payment Date beginning on the Closing Date) and ending at the close of business on the seventh Business Day preceding such Payment Date.

"Effective Date":  The earlier of (i) the first date on which the Deposit has been applied to the purchase (or committed to the purchase) of Original Portfolio Collateral such that the Aggregate Principal Amount of the Portfolio Collateral (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any of the Original Portfolio Collateral on or before the Effective Date) is at least equal to the Required Portfolio Collateral Amount or (ii) September 10, 2006.

"Eligible Investments": Any U.S. dollar denominated investment that is one or more of the following (including security entitlements with respect thereto):

(a) direct registered obligations of, and registered obligations fully guaranteed by, the United States of America or any agency or instrumentality of the United States of America the obligations of which are backed by the full faith and credit of the United States of America or United States Security Entitlements (as defined in the Indenture) other than obligations or security entitlements of the Federal Home Loan Mortgage Corporation; *provided, however,* that, in the case of obligations or United States Security Entitlements that are rated, each such obligation shall, at the time of its inclusion in the Trust Estate, have a credit rating of "AA-" or better or "A-1+" or better, as applicable, by S&P (except that Eligible Investments in an amount up to 20% of the Aggregate Principal Amount of the Notes Outstanding may be rated "A-1") and "Aa3" or better (if such obligation has a long-term rating) or "P-1" or better by Moody's, and, in each case, is not put on credit watch (with negative implications);

(b) demand and time deposits in, trust accounts with, and certificates of deposit of, any depository institution or trust company (including the Trustee) incorporated under the laws of the United States of America or any state thereof and subject to the supervision and examination by federal and/or state banking authorities so long as the commercial paper and/or debt obligations of such depository institution or trust company (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company) at the time of purchase or contractual commitment providing for such purchase have a credit rating of "AA-" or better, in the case of debt obligations, or "A-1+" or better, in the case of commercial paper, by S&P (except that Eligible Investments in an amount up to 20% of the Aggregate Principal Amount of the Notes Outstanding may be rated "A-1") and "Aa3" or better (if such obligation has a long-term rating) or "P-1" or better by Moody's, and, in each case, is not put on credit watch (with negative implications)**;**

(c) registered securities bearing interest or sold at a discount issued by any corporation incorporated under the laws of the United States of America or any state thereof that have a credit rating of  "AA-" or better by S&P and "Aa3" or better (if such obligation has a long-term rating) or "P-1" or better by Moody's at the time of purchase or contractual commitment providing for such purchase, and, in each case, is not put on credit watch (with negative implications);

(d) repurchase obligations with respect to any security described in clause (a) above, entered into with a depository institution or trust company (acting as principal) described in clause (b) above (including the Trustee) or entered into with a corporation (acting as principal) whose short-term debt has a credit rating of "A-1+" (except that Eligible Investments in an amount up to 20% of the Aggregate Principal Amount of the Notes Outstanding may be rated "A-1") or better by S&P and "Aa3" or better (if such obligation has a long-term rating) or "P-1" or better by Moody's at the time of purchase in the case of any repurchase obligation for a security having a maturity not more than 183 days from the date of its issuance or whose long-term debt has a credit rating of "AA-"- or better by S&P and "Aa3" or better (if such obligation has a long-term rating) by Moody's at the time of purchase in the case of any repurchase obligation for a security having a maturity more than 183 days from the date of its issuance and, in each case, is not put on credit watch (with negative implications);

(e) commercial paper having at the time of purchase a credit rating of "A-l+" (except that an amount up to 20% of the Aggregate Principal Amount of the Notes Outstanding may be rated "A-1") or better by S&P and "Aa3" or better (if such obligation has a long-term rating) or "P-1" or better by Moody's and that has a maturity of not more than 183 days from its date of issuance; *provided, however,* that in the case of commercial paper with a maturity of longer than 91 days, the issuer of such commercial paper (or, in the case of a principal depository institution in a holding company system, the holding company of such system), if rated by S&P, must have at the time of purchase a long-term credit rating of "AA-" or better by S&P and "Aa3" or better (if such obligation has a long-term rating) by Moody's and, in each case, is not put on credit watch (with negative implications);

(f) off-shore money market funds, which funds have, at all times, the highest credit rating assigned to such investment category by S&P and Moody's; and

(g) such other Eligible Investments acceptable to the Rating Agencies;

*provided, however,* that: (i) Eligible Investments purchased with funds in the Collection Account shall be held until maturity (or sold only for an amount at least equal to the par amount of such Eligible Investment) and shall include only such obligations or securities as mature no later than the Business Day prior to the next Payment Date and Eligible Investments purchased with funds in the Initial Deposit Account shall be held until maturity (or sold only for an amount at least equal to the par amount of such Eligible Investment) and shall include only such obligations or securities as mature no later than the Business Day prior to the date expected to be used and in any event prior to the Initial Deposit Redemption Date; (ii) none of the foregoing obligations or securities shall constitute Eligible Investments if all, or substantially all, of the remaining amounts payable thereunder shall consist of interest and not principal payments; (iii) none of the S&P ratings required above shall have a subscript of "r", "t", "p", "pi" or "q"; (iv) none of the foregoing obligations or securities shall constitute Eligible Investments if such obligations or securities are mortgage-backed securities; (v) no such obligation may be margin stock, securities which have a mandatory or optional conversion to equity or securities which are subject to an Offer; (vi) no such obligation may have coupons or other payments that are subject to U.S. withholding tax or are subject to foreign withholding under the terms of the underlying instruments where the issuer is not required to make "gross-up" payments sufficient to cause the net amount to be received on the debt obligations to equal the amount that would have been paid

had no such withholding tax applied; and (vii) any such Eligible Investment purchased on the basis of S&P's short-term rating of "A-1" shall mature not later than thirty (30) days after the date of purchase. Eligible Investments may include those Eligible Investments with respect to which the Trustee or its Affiliates provide services.

"Equity Portfolio Collateral": Any security (or any other right, interest or property or security entitlement) which does not entitle the holder thereof to receive periodic payments of interest no less frequently than semiannually and one or more installments of principal, in cash and sufficient to retire in full the stated principal amount thereof on the stated maturity date therefor; *provided, however,* that such definition will not include warrants, profit participations or similar equity-based rights that are a component of a Unit to the extent that the Aggregate Principal Amount of Portfolio Collateral in the Trust Estate with a warrant, profit participation or similar equity-based right attached thereto as a component of a Unit does not exceed 10% of the Aggregate Principal Amount of all Pledged Securities in the Trust Estate.

"ERISA": The United States Employee Retirement Income Security Act of 1974, as amended.

"Euroclear Operator": Euroclear Bank S.A./N.V., as operator of the Euroclear System, and any successor thereto.

"Event of Default": The meaning specified in Section 5.1 hereof.

"Exchange Act": The United States Securities Exchange Act of 1934, as amended.

"Exchange Certificate": The certification delivered in the form of Exhibit F hereto.

"Exchange Offer": With respect to any item of Portfolio Collateral, (i) an offer by the issuer of such item of Portfolio Collateral or by any other Person made to all holders of such item of Portfolio Collateral to exchange such item of Portfolio Collateral held by them for an item of Equity Portfolio Collateral or other debt instruments that do not otherwise satisfy the definition of Portfolio Collateral or (ii) any solicitation by such issuer or other Person to amend, modify or waive any provision of such item of Portfolio Collateral or of the related Underlying Instrument, the effect of which would be to convert such item of Portfolio Collateral into an item of Equity Portfolio Collateral or other debt instruments that do not otherwise satisfy the definition of Portfolio Collateral.

"Excluded Accrued Interest": With respect to any item of Initial Portfolio Collateral, any accrued and unpaid interest thereon (i) which was not included in the purchase price thereof that the Issuer paid on the Closing Date, and (ii) which will be paid by the Trustee from the Trust Estate, as instructed by Bear Stearns, in accordance with the terms of the Indenture.

"Expected Maturity Date": With respect to the Class X Notes, the Payment Date occurring in August 2013.

"Expense Reimbursement Account": The meaning specified in Section 10.2 hereof.

"Extended Final Maturity Date" If a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Final Maturity Date (or, in the case of the first Extended Final Maturity Date, the Payment Date in August 2025).

"Extended Revolving Period End Date": If an Extension has occurred, the sixteenth Payment Date after the then current Extended Revolving Period End Date (or, in the case of the first Extension, the Payment Date in August 2015).

"Extended Weighted Average Life Date": If a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Weighted Average Life Date (or, in the case of the first Extended Weighted Average Life Date, May 1, 2019).

"Extension": An extension of the Revolving Period, the Final Maturity Date of the Notes and the Weighted Average Life Test in accordance with the Indenture.

"Extension Bonus Payment": With respect to each Maturity Extension, a single payment to each applicable Noteholder as set forth in Sections 11.1(c) and (d) in an amount equal to (1) in the case of the Class A-1LA Notes, 0.25% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (2) in the case of the Class A-1LB Notes, 0.25% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (3) in the case of the Class A-2L Notes, 0.25% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (4) in the case of the Class A-3L Notes, 0.50% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (5) in the case of the Class A-4L Notes, 0.50% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, and (6) in the case of the Class B-1L Notes, 0.50% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable Extension Effective Date.

"Extension Bonus Eligibility Certification": With respect to each Maturity Extension and each beneficial owner of Notes other than Extension Sale Securities, the written certification by such beneficial owner acceptable to the Issuer to the effect that it held Notes other than Extension Sale Securities on the applicable Extension Effective Date, including the Aggregate Principal Amount thereof and wire transfer instructions for the Extension Bonus Payment and any required documentation thereunder.

"Extension Conditions": As defined under Section 2.3(d).

"Extension Determination Date": The 8th Business Day prior to each Extension Effective Date.

"Extension Effective Date": If an Extension has occurred, the sixteenth Payment Date after the then current Extension Effective Date (or, in the case of the first Extension Effective Date, the Payment Date in August 2011).

"Extension Notice": The notice given by the Issuer of its election to extend the Revolving Period substantially in the form of Exhibit I.

"Extension Purchase Price": The purchase price payable by the Extension Qualifying Purchasers for Extension Sale Securities in connection with each Maturity Extension, if any, in an amount equal to (i) in the case of the Notes, the Aggregate Principal Amount thereof, plus accrued and unpaid interest as of the applicable Extension Effective Date (giving effect to any amounts paid to the Holder on such date), (ii) in the case of the Preferred Shares, an amount that, when taken together with all payments and distributions made in respect of such Preferred Shares since the Closing Date would cause such Preferred Shares to have received (as of the date of purchase thereof) an Internal Rate of Return of 12.0% (assuming such purchase date was a "Payment Date" under the Indenture); *provided, however, that* if the applicable Extension Effective Date is on or after the date on which such Holders have received an Internal Rate of Return equal to or in excess of 12.0%, the applicable Extension Purchase Price for such Preferred Shares shall be zero.

"Extension Qualifying Purchasers": The Servicer (or any of its Affiliates acting as principal or agent); *provided* that in the event the Servicer elects not to purchase Securities from Holders pursuant to the Extension Conditions set forth in Section 2.3(d); "Extension Qualifying Purchasers" shall mean one or more qualifying purchasers (which may include the Initial Purchaser or any of its Affiliates acting as principal or agent) designated by the Servicer; *provided, however*, none of the Servicer, the Initial Purchaser, or any of their respective Affiliates shall have any duty to act as an Extension Qualifying Purchaser.

"Extension Sale Notice": Irrevocable notice given by any Holder of Notes (other than the Class X Notes) and Preferred Shares of its intention to sell its Notes or Preferred Shares to an Extension Qualifying Purchaser in the case of a Maturity Extension substantially in the form of Enclosure B to Exhibit I.

"Extension Sale Notice Period": Within 30 days after the Issuer has delivered the Extension Notice.

"Extension Sale Securities": Notes or Preferred Shares as to which an Extension Sale Notice has been duly given.

"Final Maturity Date": With respect to each Class of Notes (other than the Class X Notes) the Payment Date occurring in August 2021 and with respect to the Class X Notes, the Payment Date occurring in August 2013 or such earlier date on which the Aggregate Principal Amount of each Class of Notes is paid in full, including in connection with an Optional Redemption; *provided that* the "Final Maturity Date" with respect to the Notes (other than the Class X Notes) will be extended to the applicable Extended Final Maturity Date upon the occurrence of a Maturity Extension.

"Fitch": Fitch Ratings or any successor thereto.

"Fixed Rate Portfolio Collateral": An item of Portfolio Collateral that bears interest at a fixed rate.

"Floating Rate Portfolio Collateral": An item of Portfolio Collateral that bears interest at a floating rate.

"Foreign Intermediaries": The meaning specified in Section 3.5 hereof.

"Form-Approved Synthetic Security": A Synthetic Security (a)(i) the Reference Obligation of which would be eligible for purchase by the Issuer as an item of Portfolio Collateral without any required action by the Rating Agencies or for which the Rating Condition has been satisfied or (ii) the Reference Obligation of which would satisfy clause (i) but for the currency in which it is payable and such Synthetic Security is payable in U.S. Dollars, does not provide for physical settlement and does not expose the Issuer to currency risk, (b) the documentation of which conforms (but for the amount and timing of periodic payments, the name of the Reference Obligation, the notional amount, the effective date, the termination date and other similarly necessary changes) to a form in respect of which the Rating Condition has been satisfied for use in this transaction, (c) which provides that any "credit event" thereunder shall not include restructuring (other than modified restructuring as defined in the 2003 ISDA Credit Derivatives Definitions), repudiation, moratorium, obligation default or obligation acceleration unless such Synthetic Security may be settled only through a physical settlement of a deliverable obligation to the Issuer and not in cash, (d) which has been certified in writing by the Servicer to the Trustee and the Issuer as meeting the requirements of this definition and (e) for which the Issuer has provided the Rating Agencies notice of the purchase of such Synthetic Security no less than five Business Days prior to such purchase; *provided that* each Rating Agency may revoke its consent to a Form-Approved Synthetic Security upon 30 days' written notice to the Trustee and the Issuer.

"Global Note": A Temporary Regulation S Global Note, a Permanent Regulation S Global Note or a Rule 144A Global Note.

"Grant": To grant, bargain, sell, warrant, alienate, remise, demise, release, convey, assign, transfer, mortgage, pledge, create and grant a security interest in and right of set-off against, deposit, set over and confirm. A Grant of any item of the Trust Estate shall include all rights, powers and options (but none of the obligations) of the granting party thereunder, including without limitation the immediate and continuing right to claim for, collect, receive and receipt for principal and interest payments in respect of such item of the Trust Estate, and all other monies payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

"Group A Country": Australia, Canada, the United Kingdom, the Federal Republic of Germany or The Netherlands (so long as the U.S. dollar denominated sovereign debt obligations of such jurisdiction are rated at least "Aa2" by Moody's and the foreign currency issuer credit rating assigned by S&P to such jurisdiction is at least "AA" and, in each case, is not put on credit watch (with negative implications)).

"Group B Country": Austria, Belgium, Bermuda, Denmark, Finland, France, Ireland, Italy, Liechtenstein, Luxembourg, New Zealand, Norway, Portugal, Spain, Sweden or

Switzerland or any other member state of the European Union (as of the Closing Date) identified from time to time by the Servicer and subject to the satisfaction of the Rating Condition with respect to each Rating Agency with respect thereto (so long as the U.S. dollar denominated sovereign debt obligations of such jurisdiction are rated at least "Aa2" by Moody's and the foreign currency issuer credit rating assigned by S&P to such jurisdiction is at least "AA" and, in each case, is not put on credit watch (with negative implications)).

"HFP Shares": Preferred Shares beneficially owned or controlled by Highland Financial Partners, L.P., an affiliate of the Servicer.

"Holder" and "Noteholder": The Person in whose name a Note is registered in the Note Register.

"Indenture": This Indenture, as supplemented or amended in accordance with the terms hereof.

"Independent": When used with respect to any specified Person means such a Person who (a) is in fact independent of the Issuer and any other obligor upon the Notes and the Servicer or any Affiliate of the Issuer or such other obligor or the Servicer, (b) does not have any direct financial interest or any material indirect financial interest in the Issuer or in any such other obligor or the Servicer or in an Affiliate of the Issuer or such other obligor or the Servicer, and (c) is not connected with the Issuer or any such other obligor or the Servicer or any Affiliate of the Issuer or such other obligor or the Servicer as an officer, employee, promoter, underwriter, trustee, partner, director or Person performing similar functions. "Independent" when used with respect to any accountant may include an accountant who audits the books of such Person if in addition to satisfying the criteria set forth above the accountant is independent with respect to such Person within the meaning of Rule 101 of the Code of Ethics of the American Institute of Certified Public Accountants. Whenever it is provided herein that any Independent Person's opinion or certificate shall be furnished to the Trustee, such Person shall be appointed by Issuer Order and such opinion or certificate shall state that the signer has read this definition and that the signer is independent within the meaning thereof. Notwithstanding anything herein to the contrary, Bear Stearns shall be "Independent" for all purposes hereof.

"Initial Consent Period": The period of 15 Business Days from but excluding the date on which the Trustee provided notice of a proposed supplemental indenture pursuant to Section 82 hereof to the Holders of any Notes or Preferred Shares.

"Initial Deposit Redemption": A redemption of the Class X Notes and the Class A-1LA Notes pursuant to Section 3.3 hereof.

"Initial Deposit Redemption Amount": The meaning specified in Section 3.3.

"Initial Deposit Redemption Date": The November 2006 Payment Date.

"Initial Portfolio Collateral": The Portfolio Collateral that, in the case of CLO Securities, will be purchased on or prior to the Closing Date and, in the case of Portfolio Loans, will be purchased on or before the Closing Date or identified by the Issuer and for which commitments will be entered into on or prior to the Closing Date for purchase on or as soon as

practicable after (not scheduled to exceed sixty (60) days after) the Closing Date with the net proceeds from the sale of the Notes and the net proceeds from the sale of the Preferred Shares on the Closing Date, which Initial Portfolio Collateral is set forth on <u>Schedule A</u> hereto.

"<u>Initial Portfolio Collateral Amount</u>": U.S. $765,000,000 (or such larger Aggregate Principal Amount of Portfolio Collateral as may be purchased on the Closing Date by the Issuer).

"<u>Insolvency Event</u>": With respect to any Person, means that:

(i)     an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (a) liquidation, reorganization or other relief in respect of such Person or its debts, or of all or substantially all of its assets, under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (b) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such Person or for all or substantially all of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 30 days; or an order or decree approving or ordering any of the foregoing shall be entered; or

(ii)    such Person shall (a) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (b) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (i) above, (c) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator or conservator or for all or substantially all of its assets, (d) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (e) make a general assignment for the benefit of creditors or (f) take any action for the purpose of effecting any of the foregoing.

"<u>Institutional Investor</u>": Any one of the following persons: (i) any bank, trust company or national banking association, acting for its own account or in a fiduciary capacity, (ii) any charitable foundation or eleemosynary institution, (iii) any insurance company, (iv) any pension or retirement trust or fund for which any bank, trust company, national banking association or investment adviser registered under the Investment Advisers Act of 1940, as amended from time to time, is acting as trustee or agent, or that manages its own assets, having funds of at least $5,000,000, (v) any investment company, as defined in the Investment Company Act, (vi) any college or university, (vii) any government or public employees' pension or retirement system, or any other governmental agency supervising the investment of public funds, or (viii) any corporation, limited liability company, business trust or partnership having total assets in excess of $5,000,000.

"<u>Interest Coverage Ratio</u>": with respect to any Payment Date after the second Payment Date, a number (expressed as a percentage) calculated by dividing (a) four times the amount by which (i) the Collateral Interest Collections received or scheduled to be received during the Due Period in which such calculation occurs (other than Collateral Interest Collections (including deferred interest thereon) scheduled to be received on any item of Portfolio Collateral that is not paying or expected to pay current interest), exceeds (ii) the

Periodic Reserve Amount (excluding amounts payable on the Class B-1L Notes) as of such Payment Date, by (b) the Aggregate Principal Amount of Class A Notes with respect to such Payment Date, as adjusted, to take into account any O/C Redemption to occur on the Payment Date related to such Due Period pursuant the Indenture pursuant to Section 11.2 hereof.

For purposes of calculating the Interest Coverage Ratio, any item of Portfolio Collateral as to which any interest or other payment thereon is subject to withholding tax or other deductions on account of tax of any jurisdiction, each such payment of interest or other payment thereon will be deemed to be payable net of such withholding tax or other deductions on account of tax unless, in the case of a withholding tax, the issuer thereof or obligor thereon is required to make additional payments to fully compensate the Issuer for such withholding taxes (including in respect of any such additional payments) and on any date of determination, the amount of any scheduled payment due on any future date will be assumed to be made net of any such uncompensated withholding tax or other deductions on account of tax based upon withholding or other applicable tax rates in effect on such date of determination.

"Interest Coverage Test":  A test which is applicable on each Payment Date after the second Payment Date and will be satisfied as of such determination date if the Interest Coverage Ratio will be at least 1.5%.

"Internal Rate of Return":  With respect to any Payment Date, the annualized discount rate at which the sum of the discounted values of the following cashflows is equal to zero, assuming discounting on a quarterly basis as of each Payment Date: (1) the Notional Amount of the Preferred Shares (which amount will be deemed to be negative for purposes of this calculation), (2) each distribution of Collateral Interest Collections made to the holders of the Preferred Shares on any prior Payment Date and, to the extent necessary to reach the applicable Internal Rate of Return, such Payment Date and (3) each distribution of Collateral Principal Collections made to the holders of the Preferred Shares on any prior Payment Date and, to the extent necessary to reach the applicable Internal Rate of Return, such Payment Date.

"Investment Company Act":  The United States Investment Company Act of 1940, as amended.

"Investor Corp.":  Rockwall Investors Corp., a Cayman Islands limited liability company, which will hold all of the Class I Preferred Shares, and which will issue its preferred shares to third party investors.

"Investor Representation Letter":  A certificate delivered by a prospective transferee of a Note in the form of Exhibit C hereto.

"Irish Paying Agent":  RSM Robson Rhodes LLP, or any successors thereto.

"Issuer":  The meaning specified in the first sentence of this Indenture.

"Issuer Base Administrative Expenses":  With respect to any Payment Date, the administrative expenses paid or payable by the Issuer during the applicable Due Period, including, without limitation, taxes, government fees, indemnities, registered office fees and expenses for third party loan pricing services and accountants, if any, in the following order: (i)

*pro rata*, taxes of the Co-Issuers, surveillance fees, shadow rating fees and credit estimate fees, if any, of the Rating Agencies; fees due to any Listing and Paying Agent; fees due to any stock exchange on which any Class of the Notes or the Preferred Shares are listed; governmental fees, registered office fees and any other fees which are deemed necessary by the Servicer for administration of the Trust Estate, and (ii) *pro rata* reimbursement of expenses (including indemnities) of the Servicer required to be paid pursuant to the Servicing Agreement; and all expenses of the Administrator, the Listing and Paying Agent, the Securities Intermediary (if not the same person as the Trustee), the accountants and any fiscal agent retained in connection with the issuance of income notes, if any, in which the primary collateral for such income notes are obligations of the Issuer, any expenses of Investor Corp. and all other administrative expenses of the Co-Issuers, each as determined as of the Calculation Date relating to such Payment Date and as set forth in the related Note Valuation Report.

"Issuer Excess Administrative Expenses": With respect to any Payment Date, (i) the Trustee Administrative Expenses for the Due Period relating to such Payment Date in excess of the amount paid pursuant to Clause FIRST of Section 11.1(b) for the corresponding period, (ii) the Preferred Shares Administrative Expenses for the Due Period relating to such Payment Date in excess of the amount paid pursuant to clause FIRST of Section 11.1(b) for the corresponding period and (iii) the administrative expenses or other amounts (including indemnities) paid or payable by the Issuer during the applicable Due Period, as determined as of the Calculation Date relating to such Payment Date and as set forth in the related Note Valuation Report, in excess of the amount of the Issuer Base Administrative Expenses paid pursuant to Clause SECOND of Section 11.1(b).

"Issuer Order" and "Issuer Request": A written order or request dated and signed in the name of the Issuer by an Authorized Officer of the Issuer or a Person designated in writing by an Authorized Officer of the Issuer.

"LIBOR": For any Periodic Interest Accrual Period, the London interbank offered rate for three-month (or, for the period from the Closing Date to the November 2006 Payment Date, as described in Section 2.11 hereof) U.S. dollar deposits, as determined by the Calculation Agent in accordance with the provisions of Section 2.11 hereof.

"LIBOR Determination Date": The second London Business Day prior to the commencement of a Periodic Interest Accrual Period.

"Loan Funding Account": The account specified in Section 10.2 as that maintained by the Trustee into which the Issuer shall remit the full amount of the Issuer's commitment to make or otherwise fund draws related to any Delayed Drawdown Loans or Revolving Loans in the Portfolio Collateral.

"London Business Day": Any day on which dealings in deposits in U.S. dollars are transacted in the London interbank market.

"Majority Noteholders": The Holders of more than 50% of the Aggregate Principal Amount of the Outstanding Notes, voting as a single class; *provided that* upon the occurrence of a Default or an Event of Default pursuant to Section 5.1 hereof, "Majority

Noteholders" shall mean the Holders of more than 50% of the Controlling Class, voting together as a single class.

"Majority Preferred Shareholders":  The Holders of more than 50% of the outstanding Preferred Shares.

"Mandatory Redemption":  An O/C Redemption or a Rating Confirmation Failure Redemption.

"Mandatory Redemption Date":  Any Payment Date on which an O/C Redemption or a Rating Confirmation Failure Redemption is required.

"Mandatory Redemption Price":  When used with respect to an O/C Redemption or a Rating Confirmation Failure Redemption, an amount equal to the principal amount of the Notes being redeemed (or, in the case of the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes, first to pay any Periodic Rate Shortfall Amount with respect to such Notes and then to pay principal).

"Market Value":  On any date of determination with respect to an item of Portfolio Collateral, any of:

(a) the average of the bid-side prices for the purchase of such item of Portfolio Collateral determined by an Approved Pricing Service that derives valuations by polling broker-dealers (Independent from the Servicer); or

(b) the arithmetic average of bid-side quotations for the purchase of such item of Portfolio Collateral obtained by the Servicer from three or more broker-dealers (*provided* if upon reasonable efforts of the Servicer, quotations from three broker-dealers are not available, the lower of the quotations from two broker-dealers may be used), in each case, Independent from the Servicer, in the relevant market; *provided* that one such bid must be from a broker-dealer other than Bear Stearns or an Affiliate of Bear Stearns and any bid received from Bear Stearns or an Affiliate of Bear Stearns hereunder cannot be more than 10% higher than the next highest bid; and

(c) if the determinations of the broker-dealers specified in the foregoing clauses (a) or (b) are not available (as reasonably determined by the Servicer) and so long as the Servicer is subject to the Investment Advisors Act of 1940, as amended, the bid-side market value of such item of Portfolio Collateral as certified by the Servicer as consistent with reasonable and customary market practice; *provided*, that, as of any date of determination (x) no more than 5.0% of the Aggregate Principal Amount of Portfolio Collateral may have market values determined in the manner provided in this clause (c) and (y) if the item of Portfolio Collateral constitutes collateral for any other issuer or account managed or serviced by the Servicer or its Affiliates, the Market Value of such item of Portfolio Collateral determined pursuant to this clause (c) shall be consistent with the market value applied by the Servicer or its Affiliates for such item of Portfolio Collateral for such for such other issuers or accounts; and

(d) if the market value cannot be determined in the manner described in clause (a), (b) or (c) above, an amount equal to the Principal Balance of the Portfolio Collateral as of

such date multiplied by the Applicable Percentage for such item of Portfolio Collateral; *provided,* that if the market value cannot be determined in the manner described in clauses (a), (b) or (c) above for more than thirty (30) Business Days immediately following any date such market value is determined pursuant to this clause (d), then the market value of such item of Portfolio Collateral shall be automatically deemed to be zero following such 30-Business-Day period until the market value can be determined in the manner described in clause (a), (b) or (c) above as of any date of determination;

*provided that* (A) for purposes of determining Market Value, but subject to clause (b) hereof, Bear Stearns will be deemed to be Independent from the Servicer (*provided that* any quotes received from such entity will be on an arm's-length basis); (B) the Market Value of any item of Portfolio Collateral with respect to which the Issuer has entered into a commitment to sell but has not settled will be deemed to be the agreed sales price therefor (determined exclusive of accrued interest); and (C) the Market Value is determined only for purposes of compliance with covenants, coverage tests, overcollateralization tests, or any other requirements or tests set forth herein, or the determination of redemption prices.

"Maturity":  With respect to any Note, the date on which the Aggregate Principal Amount of such Note becomes due and payable as therein and herein provided, whether at the Final Maturity Date or by declaration of acceleration or otherwise.

"Maturity Extension":  As defined in Section 2.3(b) hereof.

"Minimum Average Recovery Rate Test": A test that will be satisfied with respect to Moody's, by application of the Collateral Quality Matrix and with respect to S&P, if the S&P Minimum Average Recovery Rate is greater than or equal to the S&P Weighted Average Recovery Rate then applicable in table set forth in the definition of S&P Break-Even Loss Rate.

"Monthly Report":  The meaning specified in Section 10.5(a) hereof.

"Moody's":  Moody's Investors Service, Inc. or any successor thereto.

"Moody's Default Probability Rating":  For a Portfolio Loan which is (i) a Senior Secured Loan, the Moody's corporate family rating for the obligor of such Portfolio Loan and, if any such obligor does not have a Moody's corporate family rating, such rating will be determined in accordance with the methodology described in Schedule F or (ii) a Non-Senior Secured Loan, the Moody's senior unsecured rating for the obligor of such Portfolio Loan and, if any such obligor does not have a Moody's senior unsecured rating, such rating will be determined by reference to the Moody's long-term issuer rating of the obligor of such Portfolio loan and, if such obligor does not have a Moody's senior unsecured rating or a Moody's long-term issuer rating, such rating will be determined in accordance with the methodology described in Schedule F.

"Moody's Asset Correlation Test" or "MAC Test":  A test satisfied on each Measurement Date if the Moody's Correlation Factor on such Measurement Date (rounded up to the nearest whole number) is equal to or less than the designated Moody's Correlation Factor determined by application of the Collateral Quality Matrix.

"Moody's Correlation Factor": a single number determined by the Servicer in accordance with the correlation methodology provided to the Servicer and the Collateral Administrator by Moody's, and for which the number of assets represented by (N) on the calculation shall always equal 100.

"Moody's Minimum Average Recovery Rate": The number obtained by summing the products obtained by multiplying the Principal Balance of each item of Portfolio Collateral (excluding Defaulted Portfolio Collateral) by the Applicable Percentage (according to the Moody's Priority Category) applicable to such item of Portfolio Collateral as set forth in the definition above, dividing such sum by the Aggregate Principal Amount of all Portfolio Collateral, and rounding up to the fourth decimal place.

"Moody's Priority Category": Senior Secured Loans, Non-Senior Secured Loans, DIP Loans and/or Synthetic Securities.

"Moody's Priority Category Recovery Rate": For any item of Portfolio Collateral, the percentage specified in the definition of the term "Applicable Percentage" opposite the Moody's Priority Category of such item of Portfolio Collateral, taking into account the Rating Subcategories Difference applicable to such item of Portfolio Collateral.

"Moody's Rating": The rating determined in accordance with the methodology described in Schedule F.

"Moody's Weighted Average Rating": Shall have the meaning set forth in Schedule F.

"Moody's Weighted Average Rating Test": A test that will be satisfied by application of the Collateral Quality Matrix.

"Non-Senior Secured Loan": A Portfolio Loan that is not a Senior Secured Loan.

"Non-Call Period": The period beginning on the Closing Date and ending on August 1, 2010.

"Non-Consenting Holder": With respect to any supplemental indenture proposed pursuant to the Indenture that requires the consent of one or more Holders of the Notes or the Preferred Shares, any such Holder, or, in the case of Notes or Preferred Shares in global form, any beneficial owner, that either (i) has declared in writing that it will not consent to such supplemental indenture or (ii) has not consented to such supplemental indenture within 15 Business Days from the date on which the Trustee provided notice of such proposed supplemental indenture pursuant to the Indenture to such Holder or beneficial owner; *provided*, that in the case of the Non-Call Period, "Non-Consenting Holder" shall exclude any Holder of Class A-1LA Notes (unless such Holder has consented in writing to be designated as a Non-Consenting Holder) and the Amendment Buy-Out Option shall not be applicable to such Class A-1LA Notes.

"Non-U.S. Obligor": An issuer of or obligor on an item of Portfolio Collateral that is located outside the United States and is not a Permitted Non-U.S. Obligor.

"Non-U.S. Person":  A Person who is not a U.S. Person.

"Non-U.S. Person Certificate":  A certificate substantially in the form of Exhibit G hereto.

"Noteholder" and "Holder":  The Person in whose name a Note is registered in the Note Register.

"Noteholder Report":  The meaning specified in Section 10.5(c) hereof.

"Note Register" and "Note Registrar":  The respective meanings specified in Section 2.5 hereof.

"Note Valuation Report":  The meaning specified in Section 10.5(b) hereof.

"Notes":  The Class X Notes, the A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes.

"Notice":  The meaning specified in Section 13.3 hereof.

"Notional Amount":  When used with respect to the Preferred Shares, as of any date of determination, $1.00 per Preferred Share.

"O/C Redemption":  The redemption of a Class or Classes of Notes other than the Class X Notes (including, with respect to the Class B-1L Notes, the applicable Periodic Rate Shortfall Amount, as set forth herein), to the extent necessary such that the Overcollateralization Tests and the Interest Coverage Test are satisfied, such tests to be calculated according to the method prescribed by Annex A and Annex B, respectively.

"Offer":  With respect to any security, (a) any offer by the issuer of such security or by any other Person made to all of the holders of such class of security to purchase or otherwise acquire all such securities (other than pursuant to any redemption in accordance with the terms of the related Underlying Instruments) or to exchange such securities for any other security or other property or (b) any solicitation by the issuer of such security or any other Person to amend, modify or waive any provision of such security or any related Underlying Instrument.

"Officer":  With respect to any corporation or company other than the corporation or company acting as Trustee, the Chief Executive Officer, the President, any Vice President, the Secretary or the Treasurer of such corporation or any other officer duly authorized by the Board of Directors; and with respect to the Trustee (and any other bank or trust company acting as trustee of an express trust or as custodian), any Responsible Officer thereof.

"Officer's Certificate":  A certificate signed on behalf of the Issuer, the Co-Issuer or the Servicer by an Authorized Officer of the Issuer, the Co-Issuer or the Servicer, as the case may be.

"Opinion of Counsel":  A written opinion, addressed to the Trustee (or on which the Trustee may rely) and in form and substance reasonably satisfactory to the Trustee, of an attorney at law admitted to practice before the highest court of any state of the United States or the District of Columbia or, with respect to matters relating to the laws of the Cayman Islands, the Cayman Islands, which attorney or attorneys may, except as otherwise expressly provided in this Indenture, be counsel for the Issuer, the Servicer or the Trustee and who shall be reasonably satisfactory to the Trustee.

"Optional Redemption":  A redemption of the Notes in whole pursuant to Section 9.1 hereof.

"Optional Redemption Date":  The Payment Date fixed by the Issuer for an Optional Redemption, which shall be no earlier than the first Payment Date occurring in August 2010.

"Optional Redemption Price": With respect to each Class of Notes, an amount equal to the aggregate of (i) the Aggregate Principal Amount of such Class of Notes as of the Optional Redemption Date, (ii) the applicable Cumulative Interest Amount with respect to the Optional Redemption Date and (iii) any unpaid Extension Bonus Payments in respect of such Notes.

For any Partial Optional Redemption, the Optional Redemption Price shall be equal to the applicable Partial Redemption Percentage of the Optional Redemption Price that would have applied for a Total Optional Redemption occurring on the applicable Optional Redemption Date.

"Original HFP Share Amount": The amount of HFP Shares acquired by the Servicer Entities on the Closing Date.

"Original Portfolio Collateral":  The Portfolio Collateral, including the Initial Portfolio Collateral, purchased by the Issuer with the Deposit on or before the Effective Date and, in the case of Portfolio Loans, which will be identified by the Issuer and for which commitments will be entered into on or prior to the Effective Date for purchase on or as soon as practicable thereafter (but not scheduled to exceed sixty (60) days thereafter) pursuant to Section 3.4 hereof.

"Original Portfolio Collateral Criteria":  The requirements for the acquisition of Original Portfolio Collateral prior to the Effective Date, as set forth in Section 3.4 hereof.

"Outstanding":  With respect to the Preferred Shares, as of the date of determination and subject to the proviso below, "Outstanding" refers to all Preferred Shares issued and indicated in the Share Register as outstanding.  With respect to the Notes, as of the date of determination, "Outstanding" refers to all Notes theretofore authenticated and delivered under this Indenture except:

(i)     Notes theretofore canceled by the Note Registrar or delivered (or to be delivered pursuant to Sections 2.9 or 9.8 hereof) to the Note Registrar for cancellation;

(ii)    Notes or portions thereof for whose payment or redemption money in the necessary amount has been theretofore irrevocably deposited with the Trustee or any Paying Agent in trust for the Holders of such Notes; *provided that*, if such Notes or portions thereof are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made;

(iii)    Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture, unless proof satisfactory to the Trustee is presented that any such Notes are held by a protected purchaser; and

(iv)    Notes alleged to have been mutilated, destroyed, lost or stolen for which replacement Notes have been issued as provided in Section 2.6 hereof;

*provided that*, in determining whether the Holders of the requisite Aggregate Principal Amount have given any request, demand, authorization, direction, notice, consent or waiver hereunder, Notes owned by or pledged to the Issuer, the Trustee or any other obligor upon the Notes or any Affiliate of the Issuer, the Trustee or of such other obligor, and solely for purposes of termination of the Servicer, the Servicer and any Affiliate thereof, shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes that a Responsible Officer of the Trustee has actual knowledge to be so owned or pledged shall be so disregarded.

"Overcollateralization Haircut Amount": With respect to any date of determination, an amount equal to the sum of:

(A)    the greatest of the following:

(a) the product of (i) the applicable Overcollateralization Haircut Percentage multiplied by (ii) the Aggregate Principal Amount of all CLO Securities (other than Deferred Interest PIK Bonds and Defaulted Portfolio Collateral) on such date of determination that have an S&P Rating or a Moody's Rating within the CCC Rating Category;

(b) the product of (i) the applicable Overcollateralization Haircut Percentage multiplied by (ii) the excess, if any, of (x) the Aggregate Principal Amount of all CLO Securities included in the pledged Portfolio Collateral (other than Deferred Interest PIK Bonds and Defaulted Portfolio Collateral) on such date of determination that have an S&P Rating or a Moody's Rating within the B Rating Category or an S&P Rating or a Moody's Rating within the CCC Category over (y) 5.0% of the Aggregate Par Amount as of the date of the applicable Overcollateralization Test; *provided* that at no time during the period commencing on the Closing Date through the Final Maturity Date, shall the Aggregate Principal Amount of all CLO Securities exempt from haircut based on subclause (y) above exceed in the aggregate 5.0% of the Required Portfolio Collateral Amount; and

(c) the product of (i) the applicable Overcollateralization Haircut Percentage multiplied by (ii) the excess, if any, of (x) the Aggregate Principal Amount of all CLO Securities included in the pledged Portfolio Collateral (other than Deferred Interest PIK Bonds and Defaulted Portfolio Collateral) on such date of determination that have an S&P Rating or a

Moody's Rating within the BB Rating Category, the B Rating Category or the CCC Rating Category over (y) 10.25% of the Aggregate Par Amount as of the date of the applicable Overcollateralization Test; *provided* that if at the date of measurement, Portfolio Loans within the CCC Rating Category is less than 6.25% of the Aggregate Par Amount, then 10.25% will be increased by the difference between 6.25% and percentage of the Aggregate Par Amount representing Portfolio Loans in the CCC Rating Category; *provided* that in no event shall such percentage increase to greater than 15%;

*provided that* for the avoidance of doubt, for purposes of clauses (a), (b) and (c) above, the applicable Overcollateralization Haircut Percentage shall always be applied first to the lowest rated Portfolio Collateral that falls within such clause, then to the next lowest rated Portfolio Collateral, etc., so that the maximum applicable haircut shall be applied to the Portfolio Collateral;

plus

(B)     the product of (i) the applicable Overcollateralization Haircut Percentage multiplied by (ii) the excess, if any, of (x) the Aggregate Principal Amount of all Portfolio Loans included in the pledged Portfolio Collateral (other than Deferred Interest PIK Bonds and Defaulted Portfolio Collateral) on such date of determination that have an S&P Rating or a Moody's Rating within the CCC Rating Category over (y) 6.25% of the Aggregate Par Amount as of the applicable Overcollateralization Test.

"Overcollateralization Haircut Percentage": (i) With respect to CLO Securities with an S&P Rating or a Moody's Rating falling within the BB Rating Category, 10%, (ii) with respect to CLO Securities with an S&P Rating or a Moody's Rating falling within the B Rating Category, 20%, (iii) with respect to Portfolio Loans with an S&P Rating or a Moody's Rating falling within the CCC Rating Category, the greater of (x) 30% and (y) one minus the weighted average Market Value of all Portfolio Loans with an S&P Rating or a Moody's Rating falling within the CCC Rating Category and (iv) with respect to CLO Securities with an S&P Rating or a Moody's Rating falling within the CCC Rating Category, 50%.

"Overcollateralization Ratio":  The Class A Overcollateralization Ratio or the Class B-1L Overcollateralization Ratio, as the context may require.

"Overcollateralization Ratio Adjustment":  For purposes of calculating the Overcollateralization Ratios (i) items of Equity Portfolio Collateral shall not be included as Portfolio Collateral, (ii) items of Deferred Interest PIK Bonds and Defaulted Portfolio Collateral shall be included at the lesser of (a) the Market Value of such item of Deferred Interest PIK Bonds, Defaulted Portfolio Collateral and (b) the Applicable Percentage for such item of Deferred Interest PIK Bonds and Defaulted Portfolio Collateral multiplied by its Principal Balance; *provided* that any Portfolio Loan that has been an item of Defaulted Portfolio Collateral for four years shall not be included as Portfolio Collateral and any CLO Security that has been an item of Defaulted Portfolio Collateral for three years shall not be included as Portfolio Collateral, (iii) with respect to items of Discount Portfolio Collateral, an amount equal to the original purchase price of such item of Discount Portfolio Collateral shall be included as Portfolio

Collateral and (iv) to the extent the Aggregate Principal Amount of Current Pay Obligations exceeds 7.5% of the Aggregate Par Amount, such excess shall be included as Defaulted Portfolio Collateral. If an item of Portfolio Collateral could be classified in more than one of the categories set forth in clauses (i) through (iv), such item of Portfolio Collateral will not be discounted multiple times but will be treated in the applicable category that results in the largest discount to the par amount of such item of Portfolio Collateral. Notwithstanding the foregoing, there may be included as Portfolio Collateral (with respect to items (i) through (iv) above) such greater amount as confirmed by the Rating Agencies which will not result in a reduction or withdrawal of the then-current ratings assigned by them to any Class of the Notes.

"Overcollateralization Tests": With respect to any date of determination, tests met when the Class A Overcollateralization Ratio is at least equal to the Class A Overcollateralization Percentage and the Class B-1L Overcollateralization Ratio is at least equal to the Class B-1L Overcollateralization Percentage, each relating to such date of determination.

"Partial Deferred Interest Bonds": Any debt obligation, with respect to which a portion of the interest thereon can be partially deferred without causing a payment default of such debt obligation under its underlying documents. For purposes of calculating the Weighted Average Coupon, the portion of interest that is deferrable with respect to any Partial Deferred Interest Bond will be assumed to be zero.

"Partial Optional Redemption": An Optional Redemption in part, in accordance with the terms specified herein.

"Partial Redemption Percentage": The percentage of Notes that will be subject to redemption *pro rata.*

"Participation": With respect to any Portfolio Loan, a participation interest in a commercial loan purchased from a Selling Institution that does not entitle the holder thereof to direct rights against the obligor.

"Paying Agent": The Trustee, the Irish Paying Agent or any other depository institution or trust company authorized by the Co-Issuers pursuant hereto to pay principal of or any interest that may become payable on any Class of Notes on behalf of the Co-Issuers.

"Paying and Transfer Agency Agreement": The agreement dated as of the Closing Date between the Issuer and the Paying and Transfer Agent with respect to the Preferred Shares.

"Paying and Transfer Agent": JPMorgan Chase Bank, National Association, as Paying and Transfer Agent with respect to (i) the Preferred Shares and (ii) the preferred shares issued by Investor Corp.

"Payment Date": November 1, February 1, May 1 and August 1 of each year, commencing November 1, 2006 (or if any such date is not a Business Day, the next succeeding Business Day).

"Payment Date Equity Securities" shall mean, with respect to any Payment Date, Distributable Equity Securities that the Issuer, in its sole discretion but on the advice of the Servicer, elects to distribute in lieu of cash on such Payment Date to the Holders of Preferred Shares in accordance with the terms hereof.

"Periodic Interest Accrual Period": With respect to any Payment Date, the period commencing on the prior Payment Date (or the Closing Date in the case of the first Payment Date) and ending on the day preceding such Payment Date.

"Periodic Interest Amount": With respect to the Class A-1LA Notes, the Class A-1LB Notes and the Class X Notes on any Payment Date, the aggregate amount of interest accrued at the Applicable Periodic Rate during the related Periodic Interest Accrual Period on (i) with respect to the first Payment Date, the average daily Aggregate Principal Amount of such Class of Notes during such Periodic Interest Accrual Period, and (ii) thereafter, the Aggregate Principal Amount of such Class of Notes on the first day of such Periodic Interest Accrual Period (after giving effect to any payment of principal of such Class of Notes on such day). With respect to each other Class of Notes and any Payment Date, the aggregate amount of interest accrued at the Applicable Periodic Rate during the related Periodic Interest Accrual Period on the Aggregate Principal Amount of such Class on the first day of such Periodic Interest Accrual Period (after giving effect to any payment of principal of such Class of Notes on such date, including in connection with a redemption of a Class of Notes on any date during the related Periodic Interest Accrual Period).

"Periodic Rate Shortfall Amount": With respect to each Class of Notes and any Payment Date, any shortfall or shortfalls in the payment of the Periodic Interest Amount on such Class of Notes with respect to any preceding Payment Date or Payment Dates, together with interest accrued thereon at the Applicable Periodic Rate (net of all Periodic Rate Shortfall Amounts, if any, paid with respect to such Class of Notes prior to such Payment Date).

"Periodic Reserve Amount": As of any date of determination, an amount equal to the sum of (i) the Trustee Administrative Expenses and Preferred Shares Administrative Expenses payable on the next succeeding Payment Date; (ii) without duplication of amounts payable pursuant to clause (i) hereof, the Issuer Base Administrative Expenses payable on the next succeeding Payment Date; (iii) the Base Fee Amount payable on the next succeeding Payment Date; (iv) the Cumulative Interest Amount for the Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes and the Periodic Interest Amount for the Class B-1L Notes due on the next succeeding Payment Date; and (v) the Cumulative Class X Payment due on the next succeeding Payment Date.

"Permanent Global Note": The Rule 144A Global Notes and the Permanent Regulation S Global Notes.

"Permanent Regulation S Global Note": With respect to any Class, the permanent global note issued to Non-U.S. Persons in exchange for the Temporary Regulation S Global Note of such Class after the Distribution Compliance Period, the permanent global note substantially in the form attached hereto as Exhibits A-1L-2, A-2L-2, A-3L-2 and B-1L-2.

"Permitted Non-U.S. Obligor": An issuer of or obligor on an item of Portfolio Collateral that is located in (a) a Group A Country or (b)(i) a Group B Country, (ii) any tax advantaged jurisdiction (including the Cayman Islands, Netherlands Antilles, Bermuda, Ireland, Luxembourg and the Channel Islands) or (iii) any tax advantaged jurisdiction or any tax neutral or other jurisdiction subject to Moody's and S&P confirming to the Issuer, the Trustee and the Servicer that an immediate withdrawal, reduction or other adverse action with respect to any then current rating (including any private or confidential rating) of any Class of Notes will not occur as a result of such obligor being a Permitted Non-U.S. Obligor); *provided* that, with respect to the obligors of an item of Portfolio Collateral qualifying as Permitted Non-U.S. Obligors under this clause (b)(ii), at least 80% of such obligor's underlying assets must be domiciled in the United States or another Permitted Non-U.S. Obligor jurisdiction to so qualify as a Permitted Non-U.S. Obligor. For purposes of this definition, the Servicer may specify the location of a Permitted Non-U.S. Obligor to be the country in which at least 80% of such obligor's underlying assets are domiciled, if such assets are domiciled in the United States or another Permitted Non-U.S. Obligor jurisdiction; *provided* that the Aggregate Principal Amount of the Portfolio Collateral as to which the Servicer so specifies the location of a Permitted Non-U.S. Obligor may not exceed 5% of the Aggregate Par Amount. If the location of a Permitted Non-U.S. Obligor is specified by the Servicer to be in a country other than where it is domiciled in accordance with the foregoing sentence, for purposes of the concentration limitations and collateral quality tests described herein, such item of Portfolio Collateral will be considered to be domiciled in the country so specified.

"Person": Any individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization, government or any agency or political subdivision thereof.

"PIK Bond": Any item of Portfolio Collateral that, pursuant to the terms of the related Underlying Instruments, permits the payment of interest thereon to be deferred and capitalized or otherwise provides that interest will accrue on such deferred interest or that issues identical securities in place of payments of interest in cash.

"Pledged Securities": On any date of determination, the Portfolio Collateral and the Eligible Investments in the Trust Estate.

"Portfolio Collateral": (I) Any United States dollar denominated commercial loan, including participation or assignment interests therein, in Registered form or Registered debt obligation (other than Eligible Investments) of any corporation, limited liability company, partnership, trust or other entity or of the United States government or any agency or instrumentality thereof or of any state or political subdivision or any agency or instrumentality thereof or of any sovereign issuer (including any security entitlement with respect thereto) and any United States Security Entitlement, which obligation, security entitlement or United States Security Entitlement, when Granted to the Trustee or committed to be purchased by the Issuer (with written notice to the Trustee):

(a) is an "eligible asset" as defined in Rule 3a-7;

(b) except as permitted under Section 12.10(b), provides for periodic payments of interest thereon in cash no less frequently than semiannually, or, in the case of Portfolio Loans, quarterly;

(c) provides for a fixed amount of principal to be payable according to a fixed schedule or at maturity;

(d) is not an item of Defaulted Portfolio Collateral, an item of Equity Portfolio Collateral or a margin stock, or, except as permitted under Section 12.4, an item of Credit Risk Portfolio Collateral;

(e) is not a zero-coupon bond, a bond that provides for a combination of no coupon and a fixed coupon, a step-up bonds (except for step-up bonds providing for the payment of current interest at a rate no less than 5% *per annum* or Collateral LIBOR, if floating rate), other than with respect to the Initial Portfolio Collateral on the Closing Date, a Partial Deferred Interest Bond (except for such bonds providing for the payment of current interest at a rate no less than 5% *per annum* or Collateral LIBOR, if floating rate);

(f) is not currently the subject of an Offer that would result in (i) the Issuer owning a security not meeting the requirements of Portfolio Collateral, not paying current interest, or, in the reasonable judgment of the Servicer, not expected to pay in full at maturity, or (ii) the Issuer receiving Eligible Investments or cash in a par amount less than that of the original security or the subject of an Exchange Offer;

(g) does not provide for conversion or exchange into equity capital at any time over its life (other than the exercise of any warrant, profit participation or other equity-like interest which is a component of a Unit);

(h) with respect to Portfolio Collateral which consists of Floating Rate Portfolio Collateral, has an interest rate which adjusts periodically in accordance with changes in one or more established indices at least one of which is the London interbank offered rate for one-, two-, three- or six-month U.S. dollar deposits and which adjusts at least semiannually or, with respect to items of Fixed Rate Portfolio Collateral, has an interest rate that remains constant until the maturity of such obligations or is a Reset Debt Security; *provided* that not more than 5.0% of the Aggregate Principal Amount of the Portfolio Collateral included in the Trust Estate may include items of Portfolio Collateral the interest rate on which adjusts in accordance with one or more indices that do not include the London interbank offered rate for one-, two-, three-, or six-month U.S. Dollar deposits;

(i) has coupon or other payments that are not subject to U.S. withholding tax and are not at time of purchase subject to foreign withholding tax unless the issuer of the security is required to make "gross-up" payments sufficient to cause the net amount to be received on the debt obligations to equal the amount that would have been paid had no such withholding tax applied;

(j) matures on or before August 1, 2021, or, if a Maturity Extension as occurred, the then applicable Extended Final Maturity Date, except that up to 5.0% of the Aggregate Par Amount may mature after such date but before 5 years after such date; *provided that*, with

respect to Portfolio Loans, no more than 3.0% of the Aggregate Par Amount may mature after August 1, 2021, or, if a Maturity Extension as occurred, the then applicable Extended Final Maturity Date, but before two years after such date and no Portfolio Loans may mature after two years after such date;

(k) the terms of which do not, unless it is a Delayed Drawdown Loan or Revolving Loan, require the Holder to assume or otherwise undertake any funding obligations or liabilities (of a contingent nature or otherwise);

(l)  is payable only in United States dollars;

(m) is not a Current Pay Obligation;

(n)  is not a Debt Security;

(o) the S&P Rating of which does not include a subscript of "r", "t", "p", "pi" or "q" unless otherwise agreed to by Standard & Poor's in writing and a Moody's Rating that addresses the full amount of principal or interest indicated would be paid;

(p) any, during the Revolving Period, CLO Security has a Moody's Rating of "Ba2" or higher and an S&P Rating of "BB" or higher and, after the Revolving Period, are not CLO Securities;

(q) is not a PIK Bond which is currently deferring interest payments or receiving payments in-kind pursuant to the terms of the Underlying Instrument; and

(r) satisfies, together with the other Portfolio Collateral to be concurrently included in the Trust Estate, the other applicable criteria set forth in this Indenture, including the ratings guidelines and guidelines concerning issuer concentration and industry concentration; or

(II) a Synthetic Security; *provided* that the Servicer concludes, based on advice of counsel, that the Synthetic Security is an "eligible asset" for purposes of Rule 3a-7.

"Portfolio Improvement Exchange":   The disposition, during the Revolving Period, of an item of Portfolio Collateral and corresponding acquisition of one or more items of Substitute Portfolio Collateral which in the aggregate will result in (i) the Collateral Quality Tests, the Interest Coverage Test, the Overcollateralization Tests and the other collateral criteria set forth in Section 12.2 being satisfied (or bring the total Portfolio Collateral closer to compliance with any such test or limitation) or if one or more of such Collateral Quality Tests, Interest Coverage Test, Overcollateralization Tests or collateral criteria set forth in Section 12.2 is not satisfied, the degree of compliance therewith would be improved and (ii) improving, on a net basis, the quality of the Portfolio Collateral as measured by such Collateral Quality Tests, Interest Coverage Test, Overcollateralization Tests and collateral criteria set forth in Section 12.2, and (iii) in the case of each of clause (i) and (ii) not causing any other Collateral Quality Tests, Interest Coverage Test, Overcollateralization Tests or collateral criteria set forth in Section 12.2, to be violated or significantly increase the likelihood of such violation in the future.

"Portfolio Loan":  Interests in commercial loans included in the Portfolio Collateral.

"Post-Closing Sale Collateral":  An asset acquired by the Issuer which as of the Closing Date has a commitment to be sold by the Issuer within 10 days of the Closing Date.

"Preferred Shares":  The 33,200,000 Class I Preferred Shares of the Issuer, par value U.S.$0.001 per share, and the 45,000,000 Class II Preferred Shares of the Issuer, par value U.S.$0.001 per share, that will be issued on the Closing Date pursuant to the Issuer's Memorandum of Association and Articles of Association and any further Preferred Shares issued from time to time by the Issuer.

"Preferred Shares Administrative Expenses": With respect to any Payment Date (including without limitation the Final Maturity Date), the Paying and Transfer Agent's administrative expenses for each of the Issuer and Investor Corp. for the Due Period relating to such Payment Date.

"Preferred Shares Collection Account":  The meaning set forth in the Paying and Transfer Agency Agreement.

"Premium":  With respect to any item of Portfolio Collateral sold pursuant to the terms hereof or called pursuant to the terms thereof, the excess, if any, of (a) the sale or call price of such item of Portfolio Collateral less any accrued interest with respect to such item of Portfolio Collateral over (b) the Aggregate Principal Amount of such item of Portfolio Collateral.

"Principal Balance":  With respect to any Pledged Security, as of any date of determination, the outstanding principal amount of such Pledged Security, *provided* that (i) unless otherwise stated herein or in the Indenture, the "Principal Balance" of any Delayed Drawdown Loan or Revolving Loan shall refer to the sum of the outstanding aggregate principal amount of such Delayed Drawdown Loan or Revolving Loan *plus* the amount of the unfunded portion of the Issuer's commitment to make or otherwise fund advances related thereto (to the extent, and without duplication, of amounts on deposit in the Loan Funding Account available to fund such advances), (ii) the "Principal Balance" of any Synthetic Security shall be equal to (a) in the case of any Synthetic Security other than a Default Swap, the outstanding principal amount of the Reference Obligation or the notional amount of the Synthetic Security related thereto and (b) in the case of any Default Swap, the cash and the principal amount of the securities in the related Default Swap Collateral Account reduced by the amount of any payments due and payable to the Default Swap Counterparty by reason of the occurrence of one or more "credit events" or other similar circumstances to the extent such payments have not yet been made; and (iii) with respect to any item of Equity Portfolio Collateral, the "Principal Balance" shall equal zero.

"Proceedings":  Any suit in equity, action at law or other judicial or administrative proceeding.

"Proposed Portfolio": The Aggregate Par Amount resulting from the sale, maturity or other disposition of an item of Portfolio Collateral or a proposed purchase of an item of Portfolio Collateral, as the case may be.

"Purchased Accrued Interest": Interest accrued on or purchased with respect to an item of Portfolio Collateral as part of the price paid by the Issuer to acquire such item of Portfolio Collateral less any amount of Collateral Interest Collections applied by the Issuer to acquire such; *provided* that accrued interest on certain CLO Securities as indicated on Schedule A shall not constitute Purchased Accrued Interest.

"Qualified Institutional Buyer": A "qualified institutional buyer" within the meaning of Rule 144A.

"Qualified Purchaser": A "qualified purchaser" within the meaning of Section 3(c)(7) of the Investment Company Act.

"Quarterly Collateral Amount": With respect to any Due Period, the average of (i) the Aggregate Principal Amount of Portfolio Collateral on the first day of such Due Period and (ii) the Aggregate Principal Amount of Portfolio Collateral on the last day of such Due Period. For purposes of such amounts, Equity Portfolio Collateral and Defaulted Portfolio Collateral shall be excluded in calculating the Aggregate Principal Amount of the Portfolio Collateral.

"Rating Agencies": Standard & Poor's and Moody's, collectively.

"Rating Condition": With respect to any Rating Agency and any action proposed to be taken under this Indenture, a condition that is satisfied when such Rating Agency has confirmed in writing to the Issuer, the Trustee and the Servicer that no withdrawal, reduction or suspension (and not restored) with respect to any then current rating, if any, by such Rating Agency (including any private or confidential rating) of any Class of Notes will occur as a result of such proposed action.

"Rating Confirmation": Written confirmation from each of the Rating Agencies that it has not reduced or withdrawn (and not restored) the rating assigned by it on the Closing Date to any Class of Notes.

"Rating Confirmation Failure": A failure to obtain Rating Confirmation by the 35th day after the Effective Date (or if such day is not a Business Day, the succeeding Business Day).

"Rating Confirmation Failure Redemption": The redemption of a Class or Classes of Notes, as a result of a Rating Confirmation Failure pursuant to Section 9.2.

"Rating Subcategories Difference": The number of ratings subcategories difference between the rating by Moody's or, if not actually rated by Moody's, the Moody's Rating, of an item of Portfolio Collateral and the Moody's Default Probability Rating of such item of Portfolio Collateral.

"Record Date": With respect to any Payment Date, the Business Day immediately preceding such Payment Date; *provided however*, that if any Definitive Notes are issued, the Record Date for such Definitive Notes shall be fifteen calendar days preceding such Payment Date.

"Redemption Date Statement":  The meaning specified in Section 10.5(e) hereof.

"Redemption Record Date":  With respect to an Optional Redemption Date, a Special Redemption Date, a Tax Event Redemption Date or a Mandatory Redemption Date, the Business Day preceding such Optional Redemption Date, Special Redemption Date, Tax Event Redemption Date or Mandatory Redemption Date, and with respect to an Initial Deposit Redemption, the last day of the calendar month preceding the month in which the Initial Deposit Redemption Date occurs.

"Reference Banks":  Four major banks in the London interbank market selected by the Calculation Agent (after consultation with the Servicer).

"Reference Obligation":  A security or other debt obligation that satisfies the definition of Portfolio Collateral other than as to payment terms; *provided that* notwithstanding the definition thereof, a Reference Obligation may be a loan (but not a participation interest in a loan, except as permitted in the Indenture).

"Reference Obligor":  The obligor under a Reference Obligation.

"Registered":  When used with respect to any Portfolio Collateral or Eligible Investment, an instrument issued after July 18, 1984, that is in registered form for purposes of the Code.

"Regulation S":  Regulation S promulgated under the Securities Act.

"Regulation S Global Note":  Temporary Regulation S Global Notes, together with the Permanent Regulation S Global Notes.

"Regulation S Transferor Certificate":  A certificate substantially in the form of Exhibit E hereto.

"Relevant Date":  The Final Maturity Date, except that if the full amount payable on the Notes has not been duly received by the Trustee or Paying Agent on or prior to the Final Maturity Date, the "Relevant Date" shall be the date on which such monies have been so received.

"Repository":  Shall mean the internet-based password protected electronic repository of transaction documents relating to privately offered and sold collateralized debt obligation securities located at "www.cdolibrary.com".

"Required Portfolio Collateral Amount":  U.S. $850,000,000.

"Requisite Noteholders":  The Holders of at least 60% of the Aggregate Principal Amount of the Outstanding Notes (voting as a single class); *provided that* (i) upon the occurrence of a Default or an Event of Default under this Indenture, "Requisite Noteholders" shall mean the Holders of at least 60% of the Aggregate Principal Amount of the Controlling Class.  If the Person that is acting as Trustee hereunder is a Holder of any Note for its own account, such Person shall be excluded as a Holder for purposes of this definition in connection

with the consent or approval by Noteholders of any supplemental indenture affecting the provisions hereof relating to the Trustee.

"Reserve Account": The meaning specified in Section 10.2 hereof.

"Reserve Amount": A portion of the proceeds from the sale of the Notes in an amount equal to US$1,600,000 to fund a portion of the payments to be made on any Payment Date in accordance with the Priority of Payments, or to otherwise fund any payments of interest or principal on the Notes at the direction and the sole discretion of the Servicer.

"Reset Debt Security":  An item of Portfolio Collateral bearing a rate of interest that varies periodically (including, without limitation, daily), which at the time of its inclusion in the Trust Estate has a minimum rate of interest of at least 5.0% *per annum* with respect to Fixed Rate Portfolio Collateral or Collateral LIBOR with respect to Floating Rate Portfolio Collateral, and which minimum interest rate is not subject to adjustment on or after its inclusion in the Trust Estate, pursuant to the terms of the related Underlying Instrument to a rate of interest which is lower than the rate of interest borne by such item of Portfolio Collateral on the date that such item of Portfolio Collateral was included in the Trust Estate.

"Responsible Officer":  When used with respect to the Trustee, any officer within the Corporate Trust Office (or any successor group of the Trustee) including any vice president, assistant vice president, assistant treasurer, assistant secretary, trust officer or any other officer of the Trustee customarily performing functions similar to those performed by the persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred within the Corporate Trust Office because of his or her knowledge of and familiarity with the particular subject.

"Retained Accrued Interest"  Any accrued and unpaid interest with respect to any Portfolio Collateral which was not included in the purchase price for such collateral at the time of purchase.

"Revolving Loan": A Portfolio Loan that, pursuant to the agreement or instrument that governs the rights and obligations of the parties thereto, would obligate the Issuer, if the Issuer were to purchase such Portfolio Loan for inclusion in the Trust Estate, to make or otherwise fund one or more future advances to the related borrower.

"Revolving Period":  The period beginning on the Closing Date and ending on the earliest of (i) August 1, 2011 for Portfolio Loans or August 1, 2009 for CLO Securities or, in the case of an Extension, the Extended Revolving Period End Date; *provided* that Portfolio Loans and CLO Securities may be purchased for the period of any such Extension, and (ii) the occurrence and continuance of an Event of Default; *provided* that in no event shall date of termination of the Revolving Period be determined on the basis of the Market Value of the Portfolio Collateral.

"Rule 144A":  Rule 144A promulgated under the Securities Act.

"Rule 144A Global Note":  With respect to any Class, the permanent global note issued to U.S. Persons.

"Rule 144A Transferor Certificate":  A certificate substantially in the form of Exhibit D hereto.

"Rule 3a-7":  Rule 3a-7 under the Investment Company Act.

"Sale":  The meaning specified in Section 5.18 hereof.

"Sale Restriction Condition":  Shall mean (x) with respect to sales of Credit Risk Portfolio Collateral, if the rating of the Class A-1LA Notes, the Class A-1LB or the Class A-2L Notes has been downgraded at least one rating sub-category below the original rating by Moody's (and such original rating has not been restored to the original rating) or the original rating of the Class A-3L Notes, the Class A-4L Notes or the Class B-1L Notes has been downgraded at least two rating sub-categories by Moody's (and has not been restored to a rating no more than one rating sub-category below the original rating of such Class of Notes), or if the Class A Overcollateralization Ratio is less than 90% of the Class A Overcollateralization Percentage or (y) with respect to sales of Credit Improved Portfolio Collateral, if the original rating of the Class A-1LA Notes, the Class A-1LB Notes or the Class A-2L Notes has been downgraded at least one rating sub-category by Moody's (and such original rating has not been restored) or the original rating of the Class A-3L Notes, the Class A-4L Notes or the Class B-1L Notes has been downgraded at least two rating sub-categories by Moody's (and has not been restored to a rating no more than one rating sub-category below the original rating of such Class of Notes).

"Schedule of Portfolio Collateral":  The Initial Portfolio Collateral listed on Schedule A hereto, as amended from time to time to reflect Portfolio Collateral in the Trust Estate, including the inclusion of Portfolio Collateral purchased pursuant to Section 3.4(a) hereof, the inclusion of Additional Portfolio Collateral as provided in Section 11.3 hereof, the release of Portfolio Collateral pursuant to Article X hereof, and the inclusion of Substitute Portfolio Collateral as provided in Section 12.4 hereof.

"Scheduled Distribution":  With respect to any Pledged Security, for each Due Date after the date of determination, the scheduled payment of principal and/or interest due on such Due Date with respect to such Pledged Security, determined in accordance with the assumptions specified in Section 1.3 hereof.

"Secured Parties":  The meaning specified in the Granting Clauses hereof.

"Securities Act":  The United States Securities Act of 1933, as amended.

"Securities Intermediary":  The meaning specified in Section 6.15 hereof.

"Securities Lending Agreements": The meaning specified in Section 7.19 hereof.

"Securities Lending Collateral": The meaning specified in Section 7.19 hereof.

"Securities Lending Counterparty": The meaning specified in Section 7.19 hereof.

"<u>Selling Institution</u>": The seller of a Participation or, if applicable, its guarantor, which has a long-term senior unsecured debt rating of at least "A2" by Moody's and at least "A" by S&P at the time such Participation is committed to be acquired by the Issuer.

"<u>Senior Class A Notes</u>":  The Class A-1LA Notes, the Class A-1LB Notes and the Class A-2L Notes.

"<u>Senior Class Overcollateralization Ratio</u>" With respect to a determination made as of any date of calculation, the ratio (expressed as a percentage) obtained by dividing (a) the sum of (1) the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate (other than items of Equity Portfolio Collateral, which shall not be included as Portfolio Collateral) as of such date, *plus* (2) the sum of the Balance of Eligible Investments and cash in the Collection Account representing Collateral Principal Collections plus the Balance of Eligible Investments and cash in the Initial Deposit Account plus unpaid Purchased Accrued Interest, each as of such date by (b) the sum of the Aggregate Principal Amount of the Senior Class A Notes (including for this purpose any Periodic Rate Shortfall Amounts with respect to such Class of Notes not paid when due, until such amounts, if any, are paid in full) as of such date.

"<u>Senior Secured Loan</u>":  A loan that (i) is not (and by its terms is not permitted to become) subordinate in right of payment to any other debt for borrowed money incurred by the obligor under such loan and (ii) is secured by a valid first priority perfected security interest or lien on specified collateral securing the obligor's obligations under such Senior Secured Loan, which security interest or lien is not subordinate to the security interest or lien securing any other debt for borrowed money.  For the avoidance of doubt, any second lien Portfolio Loan which has a Moody's obligation rating at least equal to the Moody's corporate family implied rating of such issuer, will be treated as Senior Secured Loan for the purposes of determining Moody's Priority Category Recovery Rate.

"<u>Servicer</u>": Highland Capital Management, L.P., unless and until a successor Person becomes the servicer pursuant to the provisions of the Servicing Agreement, and thereafter "Servicer" shall mean such successor Person.

"<u>Servicer Entities</u>": Collectively, the Servicer, entities affiliated with the Servicer or clients of the Servicer.

"<u>Servicer Order</u>" and "<u>Servicer Request</u>":  A written order or request dated and signed in the name of the Servicer by an Authorized Officer of the Servicer.

"<u>Servicing Agreement</u>":  The Servicing Agreement, dated as of the Closing Date, between the Issuer and the Servicer, and if amended as permitted therein and in Section 14.1(f), as so amended.

"<u>Servicing Fee Portion</u>":  100% minus (a) for any Payment Date prior to the two-year anniversary of the Closing Date, the Class II Preferred Share Percentage for such Payment Date and (b) for any other Payment Date, a percentage selected by the Servicer in its sole discretion.

"Share Register":  The register maintained under the Paying and Transfer Agency Agreement for the Preferred Shares and any other shares of the Issuer.

"Share Registrar":  Maples Finance Limited or any successor thereto appointed by the Issuer.

"Special Redemption":  A redemption of the Notes pursuant to Section 9.4 hereof.

"Special Redemption Date":  The Payment Date during the Revolving Period fixed by the Issuer for a Special Redemption.

"Special Redemption Price":  When used with respect to a Special Redemption, an amount equal to the principal amount of the Notes being redeemed (or, in the case of the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes, first to pay any Periodic Rate Shortfall Amount with respect to such Notes and then to pay principal).

"Standard & Poor's" or "S&P":  Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or any successor thereto.

"Standard & Poor's CDO Monitor":  The dynamic, analytical computer model developed by Standard & Poor's and used to estimate default risk of Portfolio Collateral and provided to the Servicer, the Issuer and the Trustee on or before the Effective Date, as it may be modified by Standard & Poor's in connection with its confirmation of the ratings of the Notes following the Closing Date.

"Standard & Poor's CDO Monitor Test":  A test that is satisfied if, after giving effect to the sale of an item of Portfolio Collateral or the purchase of an item of Portfolio Collateral (or both), as the case may be (i) the S&P Loss Differential of the Proposed Portfolio is positive or (ii) the S&P Loss Differential of the Proposed Portfolio is greater than the S&P Loss Differential of the Current Portfolio.

"Standard & Poor's Industry Category":  When used with respect to an item of Portfolio Collateral, any of the industry categories established by Standard & Poor's set forth in Schedule B hereto, and any additional categories that may be subsequently established by Standard & Poor's.

"Standard & Poor's Preferred Format":  A Microsoft Excel file (or such other format agreed by Standard & Poor's) of the Standard & Poor's CDO Monitor input file and, with respect to each item of Portfolio Collateral, the name of each obligor thereon, the CUSIP number thereof (if applicable) and the Standard & Poor's Industry Category thereof.

"Standard & Poor's Rating":  The rating determined in accordance with the methodology described in Schedule D.

"S&P Break-Even Loss Rate": At any time, the maximum percentage of defaults which the Current Portfolio or the Proposed Portfolio, as applicable, can sustain, as determined by S&P through application of the Standard & Poor's CDO Monitor, which, after giving effect to S&P's assumptions on recoveries and timing and to the priority of payments, will result in

sufficient funds remaining for the principal repayment of the Notes in full and the timely payment, as applicable, of interest on each Class of Notes. The Issuer shall cause the relevant version of the Standard & Poor's CDO Monitor Test provided by S&P to be run to determine the appropriate S&P Break-Even Loss Rate.

| Standard & Poor's CDO Monitor | Weighted Average Spread | S&P Minimum Average Recovery Rate | | | |
|:---:|:---:|:---:|:---:|:---:|:---:|
| | | **AAA** | **AA** | **A** | **BBB** |
| 1 | 255 | 46.48% | 47.69% | 48.98% | 51.21% |
| 2 | 255 | 45.80% | 47.01% | 48.30% | 50.53% |
| 3 | 255 | 47.90% | 48.91% | 49.98% | 51.84% |
| 4 | 245 | 45.80% | 47.01% | 48.30% | 50.53% |
| 5 | 245 | 46.48% | 47.69% | 48.98% | 51.21% |
| 6 | 265 | 45.80% | 47.01% | 48.30% | 50.53% |
| 7 | 265 | 45.50% | 46.71% | 48.00% | 50.24% |

"S&P Loss Differential": At any time, the rate calculated by subtracting the S&P Scenario Loss Rate from the S&P Break-Even Loss Rate at such time.

"S&P Minimum Average Recovery Rate": The number obtained by summing the products obtained by multiplying the Principal Balance of each item of Portfolio Collateral (excluding Defaulted Portfolio Collateral) by the Applicable Percentage (according to the S&P Priority Category) applicable to such item of Portfolio Collateral as set forth in the definition above, dividing such sum by the Aggregate Principal Amount of all Portfolio Collateral (excluding Defaulted Portfolio Collateral), and rounding up to the fourth decimal place.

"S&P Priority Category": Senior secured Portfolio Loans and Debt Securities, second lien Portfolio Loans, senior unsecured Portfolio Loans and Debt Securities, subordinated Portfolio Loans and Debt Securities, DIP Loans and Synthetic Securities.

"S&P Priority Category Recovery Rate": For any item of Portfolio Collateral, the percentage specified in the definition of the term "Applicable Percentage" opposite the S&P Priority Category of item of Portfolio Collateral.

"S&P Scenario Loss Rate": At any time, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with a "AAA" rating of the Class A-1LA Notes, the Class A-1LB Notes and the Class X Notes, a "AA" rating of the Class A-2L Notes, a "A" rating of the Class A-3L Notes, a "A-" rating of the Class A-4L Notes and a "BBB" rating of the Class B-1L Notes, in each case by Standard & Poor's, determined by application of the Standard & Poor's CDO Monitor at such time.

"Subsequent Delivery Date":  A date fixed by the Issuer for the delivery of an item of Portfolio Collateral to be included in the Trust Estate after the Effective Date.

"Substitute Portfolio Collateral":  An item of Portfolio Collateral that is Delivered to the Trustee under this Indenture as security for the Notes in accordance with Section 12.4 hereof.

"Supplemental Fee Amount":  The amount used to pay the Supplemental Servicing Fee pursuant to clause FOURTEENTH(a) of Section 11.1(c)(i) and clause FOURTEENTH(a) of Section 11.(d).

"Supplemental Servicing Fee":  For any Payment Date, an amount equal to the product of (a) the Supplemental Fee Amount for such Payment Date and (b) the Servicing Fee Portion for such Payment Date.

"Suspension Trigger Event":  As of any date of determination, (I) the ratio (expressed as a percentage) obtained by dividing (a) the sum of (1) the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate as of such date, calculated in accordance with the Overcollateralization Ratio Adjustment less the Overcollateralization Haircut Amount, if any, plus (2) the sum of the Balance of Eligible Investments and cash in the Collection Account, representing Collateral Principal Collections plus the Balance of Eligible Investments and cash in the Initial Deposit Account plus unpaid Purchased Accrued Interest, each as of such date by (b) the sum of the Aggregate Principal Amount of the Class A-1L Notes (including for this purpose any unpaid Periodic Rate Shortfall Amounts with respect to such Classes of Notes not paid when due, until such amounts, if any, are paid in full) as of such date, is than (II) 110%.

"Synthetic Security":  Any (I) U.S. dollar denominated swap transaction, security issued by a trust or similar vehicle or other asset purchased from or entered into by the Issuer with a Synthetic Security Counterparty the returns on which (as determined by the Servicer) are linked to the credit performance of a Reference Obligation, but which may provide for a different maturity, payment dates or interest rate or interest rate basis than such Reference Obligation; *provided* that, either (A) (i) such Synthetic Security will not require the Issuer to make any payment to the Synthetic Security Counterparty after the initial purchase thereof by the Issuer, (ii) the ownership of such Synthetic Security, based on the Servicer's determination (which may include consultation with counsel to the Issuer), is not expected to subject the Issuer to withholding tax, (iii) such Synthetic Security terminates on or prior to the redemption or repayment in full of the Reference Obligation, (iv) the principal amount of such Synthetic Security is equal to the principal amount of the Reference Obligation, (v) all scheduled payments made pursuant to the terms of such Synthetic Security are at a fixed or floating interest rate based on an interest rate used for borrowings or financings in domestic or international markets or are linked to the payments on one or more Reference Obligations (which payments are themselves at a fixed interest rate or such floating rate), (vi) the minimum coupon on such Synthetic Security is 6.0%, if such Synthetic Security is fixed rate, (vii) the minimum margin on such Synthetic Security is 0.60%, if such Synthetic Security is floating rate, (viii) the terms of such Synthetic Security provide that upon maturity, acceleration or any early termination of such Synthetic Security, the Synthetic Security Counterparty of such Synthetic Security must deliver the Reference Obligation or an amount greater than or equal to the then par amount of the Reference

Obligation, except (a) the Issuer may accept an amount equal to the fair market value of the Reference Obligation if the Servicer chooses to terminate such Synthetic Security in connection with the sale of such Synthetic Security as Credit Risk Portfolio Collateral, Credit Improved Portfolio Collateral, Defaulted Portfolio Collateral or Equity Portfolio Collateral or pursuant to the right of the Issuer to sell Portfolio Collateral which is not Credit Improved Portfolio Collateral, Credit Risk Portfolio Collateral, Defaulted Portfolio Collateral or Equity Portfolio Collateral or (b) following a credit event with respect to the Reference Obligation, the Issuer may accept an amount equal to the fair market value of such Reference Obligation; *provided, however*, that this clause (viii) shall not apply to an acceleration or early termination upon the exercise of any put or call provision of the Synthetic Security or any Reference Obligation, (ix) upon the exercise of any put or call provision of the Synthetic Security or any Reference Obligation, the holder of such Synthetic Security will receive a Reference Obligation or an amount greater than or equal to the par amount of such Reference Obligation, plus, if the Reference Obligation is a bond, accrued interest, (x) such Synthetic Security will not constitute a commodity option, leverage transaction or futures contract that is subject to the jurisdiction of the U.S. Commodity Futures Trading Commission, (xi) the acquisition of such Synthetic Security would not cause the Issuer to be "engaged in a U.S. trade or business" for Federal income tax purposes or otherwise cause the Issuer (or the beneficial owners thereof) to become subject to U.S. net income tax, (xii) the Underlying Instrument with respect to such Synthetic Security is governed by the laws of the State of New York, contains a non-petition clause and a limited recourse clause, each as against the Issuer, and is documented with a standard ISDA form master agreement, as modified by appropriate schedules and confirmations and (xiii) total payments including termination payments may not exceed the notional amount of such Synthetic Security; *provided* that if any Reference Obligation delivered pursuant to any Synthetic Security does not constitute Portfolio Collateral and would cause a breach of any concentration limitation, such Reference Obligation shall be deemed Equity Portfolio Collateral, and (B) (i) such Synthetic Security is a Form-Approved Synthetic Security or (ii) the Rating Condition has been satisfied with respect to the purchase of such Synthetic Security; *provided further*, that any Synthetic Security shall be positively indexed to the related Reference Obligation on no more than a one-to-one basis and (II) any Default Swap.

"Synthetic Security Counterparty": An entity which is required to make payments to the Issuer on a Synthetic Security to the extent that the issuer of the related Reference Obligation makes payments thereon pursuant to the terms of such Synthetic Security and any Default Swap Counterparty.

"Tax Event Redemption": A redemption of the Notes in whole pursuant to Section 9.5 hereof.

"Tax Event Redemption Date": The Payment Date fixed by the Issuer for a Tax Event Redemption.

"Tax Event Redemption Price": An amount equal to the aggregate of (i) the Aggregate Principal Amount of each Class of Notes as of the Tax Event Redemption Date and (ii) the applicable Cumulative Interest Amount with respect to each Class of Notes as of the Tax Event Redemption Date.

"<u>Temporary Regulation S Global Notes</u>":  With respect to any Notes issued to Non-U.S. Persons that will be represented by a temporary global note, the temporary global note substantially in the form attached hereto as <u>Exhibits A-1L-1</u>, <u>A-2L-1</u>, <u>A-3L-1</u> and <u>B-1L-1</u>.

"<u>Total Optional Redemption</u>":  An Optional Redemption in whole, in accordance with the terms specified herein.

"<u>Transaction Documents</u>":  This Indenture, the Paying and Transfer Agency Agreement, the Servicing Agreement and the Collateral Administration Agreement.

"<u>Transfer Agent</u>":  Any transfer agent appointed by the Issuer.

"<u>Transferor Certificates</u>":  Collectively, the Regulation S Transferor Certificate and the Rule 144A Transferor Certificate.

"<u>Trust Estate</u>":  The meaning specified in the Granting Clauses of this Indenture.

"<u>Trust Termination Date</u>":  The date on which the obligations of the Issuer hereunder are terminated as set forth in Section 4.1 or Section 9.11 hereof.

"<u>Trustee</u>":  As defined in the first sentence of this Indenture.

"<u>Trustee Administrative Expenses</u>":  With respect to any Payment Date (including without limitation the Final Maturity Date), fees, expenses or other amounts due or accrued and payable to the Trustee for the Due Period relating to such Payment Date, including, but not limited to, all amounts payable to the Trustee under Section 6.7 hereof and all fees and expenses pursuant to duties performed as Collateral Administrator and Paying and Transfer Agent, and as paying and transfer agent of Investor Corp., *provided* such payment pursuant to clause FIRST of Section 11.1(b) shall not exceed on such Payment Date one-quarter of 0.0275% of the Aggregate Par Amount as of the Calculation Date relating to such Payment Date (such amount subject to a minimum of U.S.$74,000 per annum), plus U.S.$7,500 per annum for payments of expenses and certain other amounts under Section 6.7, if any.

"<u>Trustee Fee Letter Agreement</u>":  The Trustee fee letter agreement, dated as of May 1, 2006.

"<u>Trustee Payment-Related Event of Default</u>":  An Event of Default caused solely by and based solely upon a failure to pay any amounts owing to the Trustee or the Paying and Transfer Agent pursuant to Section 6.7 hereof or to the Paying and Transfer Agent pursuant to Section 11 of the Paying and Transfer Agency Agreement (other than the amount payable to the Trustee as its fee (but not expenses) under the Trustee Fee Letter Agreement).

"<u>UCC</u>": The New York Uniform Commercial Code.

"<u>Underlying Instrument</u>":  With respect to any item of Portfolio Collateral, any loan participation agreement, loan assignment agreement, indenture, pooling and servicing agreement, trust agreement, instrument, or other agreement pursuant to which such item of Portfolio Collateral has been created or issued or of which the holders of such item of Portfolio

Collateral are the beneficiaries, and any instrument evidencing or constituting such item of Portfolio Collateral (in the case of Portfolio Collateral evidenced by or in the form of instruments).

"<u>Underlying Loan and Security Agreement</u>": Any agreement (other than an Underlying Instrument) which governs the terms of or guarantees or secures the obligations represented by any Portfolio Collateral or of which the holders of such Portfolio Collateral are the beneficiaries (which in the case of a Portfolio Loan which is a Participation shall include the loan and security documentation with respect to the underlying loan).

"<u>Unit</u>": An item of Portfolio Collateral with a warrant, profit participation or other equity-based feature (including but not limited to convertible bonds) included as a component thereof which otherwise meets the requirements for Portfolio Collateral; *provided* that (i) the value of such warrant, profit participation or other equity-based feature at the time of purchase, as determined by the Servicer in good faith, is less than 2% of the purchase price of such item of Portfolio Collateral and (ii) such warrant, profit participation or other equity-like feature at the time of purchase shall not, relate to or be exchangeable for, margin stock.

"<u>United States Regulations</u>": 31 C.F.R. Part 357, Subpart B; 12 C.F.R. Part 615, Subparts O, R and S; 12 C.F.R. Part 987; 12 C.F.R. Part 1511; 24 C.F.R. Part 81, Subpart H; 31 C.F.R. Part 354; 18 C.F.R. Part 1314; and 24 C.F.R. Part 350.

"<u>United States Security Entitlement</u>": A Security Entitlement as defined in a United States Regulation.

"<u>Unregistered Securities</u>": The meaning specified in Section 5.18(c) hereof.

"<u>Unscheduled Principal Proceeds</u>": Collateral Principal Collections received by the Issuer from an unscheduled prepayment, in whole or in part, by the obligor of an item of Portfolio Collateral prior to the stated maturity date of such item of Portfolio Collateral, including without limitation, any Collateral Disposition Proceeds received from the sale of any item of Portfolio Collateral received in an Offer, Exchange Offer or similar tender, whether such tender required action on the part of the Issuer or otherwise.

"<u>USA PATRIOT Act</u>": The Uniting and Strengthening America By Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001.

"<u>U.S. Person</u>":

(i) (a) a citizen of the United States;

(b) a natural person who is a resident of the United States or a resident alien of the United States as defined by section 7701(b) of the Code;

(c) any partnership (unless otherwise provided in the regulations), corporation or other entity created, organized or incorporated in or under the laws of the United States, its states, territories or possessions, or the District of Columbia;

(d)  any estate or trust as defined by section 7701(a)(30)(D) and (E) of the Code, respectively; or

(ii)  as defined in Regulation S, as the context may require.

"Weighted Average Coupon": The amount (rounded up to the nearest 0.001%) determined by summing the products obtained by multiplying, for each item of Fixed Rate Portfolio Collateral then included in the Trust Estate (other than items of Defaulted Portfolio Collateral), the Principal Balance of such item of Portfolio Collateral and the stated rate of interest of such item of Portfolio Collateral and then dividing such sum by the Aggregate Principal Amount of all of the Fixed Rate Portfolio Collateral included in the Trust Estate (other than items of Defaulted Portfolio Collateral) as of such date of determination.

"Weighted Average Coupon Test":  A test that will be satisfied by application of the Collateral Quality Matrix, after giving effect to any Coupon Adjustment.

"Weighted Average Life":  As of any date of determination, the amount determined by summing the products obtained by multiplying, for each item of Portfolio Collateral (other than items of Defaulted Portfolio Collateral) then included in the Trust Estate, the Principal Balance of such item of Portfolio Collateral and the Average Life (as such term is defined below) of such item of Portfolio Collateral as of such date of determination and then dividing such sum by the Aggregate Principal Amount of all of the Portfolio Collateral included in the Trust Estate as of such date of determination.  For any item of Portfolio Collateral (other than items of Defaulted Portfolio Collateral), the "Average Life" shall be equal to the number of years obtained by dividing (a) the Principal Balance of such item of Portfolio Collateral into (b) the sum of the products obtained by multiplying (i) the amount of each of the remaining, required principal payments on such item of Portfolio Collateral by (ii) the number of years (calculated to the nearest one-twelfth) that will have elapsed between such date of determination and the making of such payment.

"Weighted Average Life Requirement": A test that will be satisfied on any date of determination if the Weighted Average Life on such date of all items of Portfolio Collateral (other than items of Defaulted Portfolio Collateral) is equal to or less than the number of years set forth in Schedule I hereto opposite the period set forth in Schedule I hereto in which such test is being measured.  Notwithstanding the foregoing, the Weighted Average Life may vary from the restrictions set forth above, if the Rating Agencies have confirmed such variance would not result in a withdrawal or downgrade of any of the then current ratings assigned by them to the Notes.

"Weighted Average Margin":  The amount (rounded up to the nearest 0.001%) equal to (i) the sum of the products obtained by multiplying the margin over Collateral LIBOR on each item of Floating Rate Collateral (other than items of Defaulted Portfolio Collateral) as of the date of calculation (which will be determined for items of Floating Rate Collateral that do not bear interest based on Collateral LIBOR by expressing the current interest rate on such Floating Rate Collateral as a margin above or below three-month LIBOR on the date of determination, which margin will be expressed as a negative number if such current interest rate is lower than three-month LIBOR) by the Principal Balance of such item of Floating Rate Collateral (other

than items of Defaulted Portfolio Collateral) as of such date, divided by (ii) the Aggregate Principal Amount of all such Floating Rate Collateral (other than items of Defaulted Portfolio Collateral) on such date. For purposes of calculating the Weighted Average Margin for any Delayed Drawdown Loan or Revolving Loan, the principal balance representing the funded portion will be multiplied by the margin above Collateral LIBOR and the principal balance representing the unfunded portion will be multiplied by the commitment fee related thereto. If an item of Floating Rate Portfolio Collateral does not provide for Collateral LIBOR, the margin for this purpose shall be equal to the then applicable interest rate minus then current LIBOR. If an item of Floating Rate Portfolio Collateral has a Collateral LIBOR floor, the excess of such floor rate over Collateral LIBOR will be added to the margin above Collateral LIBOR for purposes of calculating the Weighted Average Margin of such item of Floating Rate Portfolio Collateral.

"Weighted Average Margin Test": A test that will be satisfied by application of the Collateral Quality Matrix, after giving effect to any Coupon Adjustment.

Section 1.2.    Other Definitional Provisions.

All references in this instrument to designated "Annexes," "Articles," "Sections," "Subsections" and other subdivisions are to the designated Annexes, Articles, Sections, Subsections and other subdivisions of this instrument as originally executed. The words "herein," "hereof," "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Annex, Article, Section, Subsection or other subdivision. Unless the context otherwise requires, terms defined in the UCC and not otherwise defined in this Indenture shall have the meanings set forth in the UCC.

Any reference herein to a "beneficial interest" in a security also shall mean, unless the context otherwise requires, a security entitlement with respect to such security, and any reference herein to a "beneficial owner" or "beneficial holder" of a security also shall mean, unless the context otherwise requires, the holder of a security entitlement with respect to such security.

Section 1.3.    Assumptions as to Portfolio Collateral and Trust Estate.

Except as otherwise expressly set forth herein, in connection with all calculations required to be made pursuant to this Indenture with respect to Scheduled Distributions on any Pledged Security, or any payments on any other assets included in the Trust Estate, and with respect to the income that can be earned on Scheduled Distributions on such Pledged Securities and on any other amounts that may be received for deposit in the Collection Account, the provisions set forth in this Section 1.3 shall apply.

All calculations with respect to Scheduled Distributions on the Pledged Securities shall be made on the basis of information as to the terms of each such Pledged Security and upon accounting of payments, if any, received on such Pledged Security that are furnished by or on behalf of the issuer of such Pledged Security and such information or report may be conclusively relied upon in making such calculations.

For each Due Period, the Scheduled Distributions on any Pledged Security (excluding any item of Defaulted Portfolio Collateral and Equity Portfolio Collateral, as to which Scheduled Distributions shall be assumed to be zero) shall be the amount required to be paid (including coupon payments, accrued interest, scheduled principal payments, if any, by way of sinking fund payments which are assumed to be on a *pro rata* basis or other scheduled amortization of principal (excluding any optional redemption), return of principal, and redemption premium, if any) that, if paid as scheduled, will be available in the Collection Account at the end of such Due Period. For purposes of calculating interest on Pledged Securities that have a rate of interest which varies with an objective index, the interest to be received thereon shall be assumed to be equal to the interest that would be received on such Pledged Security if the rate of interest accruing on such Pledged Security on the date of determination were to remain constant for each succeeding Due Period.

Each Scheduled Distribution with respect to a Pledged Security shall be assumed to be received on the applicable Due Date, and each such Scheduled Distribution shall be assumed to be immediately deposited in the Collection Account and to earn interest at the Assumed Interest Rate. All funds assumed to earn interest as provided herein shall be assumed to continue to earn interest at the applicable rate until the date on which they are required to be available in the Collection Account for application, in accordance with the terms hereof, to payment of principal of or interest on the Notes or other amounts payable or otherwise for application in accordance with the terms of this Indenture.

Notwithstanding anything to the contrary contained in this Indenture if the Trustee receives an Issuer Order or Issuer Request and also receives a Servicer Order or Servicer Request with respect to the same subject matter, the Issuer Order or Issuer Request, as the case may be, shall supersede any such Servicer Order or Servicer Request and be the controlling order or request hereunder.

## ARTICLE II

## THE NOTES

Section 2.1.  Forms Generally.

(a) The Notes and the Trustee's certificate of authentication thereon shall be in substantially the forms required by this article with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon, as may, consistently herewith, be determined by the Authorized Officer of the Issuer executing such Notes as evidenced by such Authorized Officer's execution of such Notes. Any portion of the text of any Note may be set forth on the reverse thereof, with an appropriate reference thereto on the face of the Note.

(b) Regulation S Notes. The Class A-1L Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes, the Class B-1L Notes and the Class X Notes initially sold to Non-U.S. Persons in "offshore transactions" (within the meaning of Regulation S) shall be represented initially by single global notes (the "Temporary Regulation S Global Notes") in fully

registered form without coupons, authenticated and delivered in substantially the forms attached hereto as Exhibit A-1L-1, Exhibit A-2L-1, Exhibit A-3L-1, Exhibit B-1L-1 and [Exhibit X-1], respectively. The Issuer shall deposit such Notes on behalf of the subscribers for such Notes with the Trustee as custodian (in such capacity, the "Custodian") for the Depository, registered in the name of a nominee of the Depository for the accounts of each of the Clearance Systems, for credit by the Clearance Systems to the respective accounts designated by the subscribers of such Notes (or to such other accounts as they may direct) at each of the Clearance Systems. The Temporary Regulation S Global Notes shall be exchanged for interests in the Permanent Regulation S Global Notes as set forth below. The Permanent Regulation S Global Notes shall be substantially in the form set forth as Exhibit A-1L-2, Exhibit A-2L-2, Exhibit A-3L-2, Exhibit B-1L-2 and [Exhibit X].

After the expiration of the Distribution Compliance Period beneficial interests in the Temporary Regulation S Global Note of each Class shall be exchanged for a Permanent Regulation S Global Note for such Class pursuant to and as provided below.

Without unnecessary delay but in any event prior to the termination of the Distribution Compliance Period, the Issuer shall deliver to the Trustee or the Authenticating Agent the Permanent Regulation S Global Notes executed by the Co-Issuers. Upon the termination of the Distribution Compliance Period, any Classes of Temporary Regulation S Global Notes shall be surrendered by the Custodian to the Trustee, in each case as the Issuer's agent for such purpose (or, at the Authenticating Agent's option, the Custodian shall be instructed by the Authenticating Agent or the Trustee to endorse each such Temporary Regulation S Global Note to reduce the principal amount thereof), to be exchanged, in whole or from time to time in part, for a Permanent Regulation S Global Note without charge and the Authenticating Agent shall authenticate and deliver to the Custodian for delivery in exchange for each such Temporary Regulation S Global Note or the portions thereof to be exchanged, an equal aggregate principal amount of a Permanent Regulation S Global Note, as shall be specified by the Custodian; *provided that*, upon such presentation by the Custodian: (i) the Trustee receives a certificate substantially in the form set forth in Exhibit F attached hereto, and signed by the respective Clearance System as to the portions of each Temporary Regulation S Global Note held for the respective accounts of such Clearance System, that it has received from each beneficial owner of the portion of each Temporary Regulation S Global Note then to be exchanged, written certification substantially to the effect set forth in Exhibit G attached hereto, with such changes therein as shall be approved by the Issuer, (ii) none of the Trustee or any Paying Agent have actual knowledge, nor have they received notification from the Issuer with respect to the original issuance and distribution of the Global Notes that such Person has actual knowledge, that such certificate is false, and (iii) the Trustee and any Paying Agent do not have a United States address as the address for payment to any Holder of the Permanent Regulation S Global Note issuable upon such exchange. Notwithstanding the foregoing, in the event of redemption in whole or acceleration of all or any part of the Notes prior to the termination of the Distribution Compliance Period, the Permanent Regulation S Global Notes will not be issuable in respect of the Temporary Regulation S Global Note or portion thereof, and payment thereon will be made as provided in the Temporary Regulation S Global Note. Any Class of Note in the form of a Temporary Regulation S Global Note presented to the Trustee for a Permanent Regulation S Global Note shall be endorsed by the Trustee to reduce the principal amount

thereof by the amount so exchanged, and shall then be returned to the Custodian, pending exchange of the remaining balance thereof pursuant to the terms hereof.

On each Payment Date, if any, that falls on or prior to the date on which all Temporary Regulation S Global Notes shall have been exchanged for Permanent Regulation S Global Notes (the "Exchange Date"), interest, if any, and principal on the Temporary Regulation S Global Notes shall be paid to the Custodian acting on behalf of the Clearance System for the benefit of persons for whom the Clearance System holds the Temporary Regulation S Global Notes on each such Payment Date to the extent the Clearance System has delivered a certificate or certificates, appropriately completed and signed, in substantially the form set forth in Exhibit F attached hereto, which certificate or certificates shall be dated the relevant Payment Date and shall be delivered to the Custodian.

The Issuer will obtain from each Clearance System an agreement that it will credit principal and interest, if any, as of each Payment Date that falls on or prior to the termination of the Distribution Compliance Period, received in respect of each Temporary Regulation S Global Note to the respective accounts of the persons for whom the Clearance System holds a Temporary Regulation S Global Note on each such Payment Date, upon, and only upon, receipt of certificates from such account holders in substantially the form set forth in Exhibit G attached hereto to be dated on or before each relevant Payment Date (copies of such form being available from the offices of Clearstream at 67, Boulevard Grande-Duchesse Charlotte, Luxembourg, the offices of Euroclear at 1 Boulevard du Roi Albert II, B-1210 Brussels, Belgium, and each other Paying Agent of the Issuer).

Upon any such exchange of a portion of any Temporary Regulation S Global Note for a Permanent Regulation S Global Note, the Custodian shall endorse (or, as provided above, the Trustee shall instruct the Custodian) such Temporary Regulation S Global Note to reflect the reduction of the principal amount evidenced thereby.

(c) Rule 144A Global Notes. The Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes, the Class B-1L Notes and the Class X Notes initially sold to U.S. Persons (within the meaning of Rule 144A) shall be represented by single global notes (the "Rule 144A Global Notes") in fully registered form without coupons, authenticated and delivered in substantially the forms attached hereto as Exhibit A-1L-3, Exhibit A-2L-3, Exhibit A-3L-3, Exhibit B-1L-3 and [Exhibit X-1] respectively, which the Issuer shall deposit on behalf of the subscribers for such Notes with the Custodian for the Depository and registered in the name of Cede & Co., the nominee of DTC. The Aggregate Principal Amount of each Rule 144A Global Note may from time to time be increased or decreased by adjustments made on the records of the Custodian for DTC or its nominees, as the case may be.

(d) Book-Entry Provisions. This Section 2.1(d) shall apply only to Regulation S Global Notes or Rule 144A Global Notes ("Global Notes") deposited with or on behalf of the Depository. On or prior to the Closing Date, the Issuer shall provide to the Trustee or Authenticating Agent (as applicable) an Issuer Order setting forth the amount of Notes (if any) to be issued on the Closing Date in the form of Temporary Regulation S Global Notes and Rule 144A Global Notes for each Class. With respect to the Notes, a Temporary Regulation S Global

Note may be initially issued for each Class with an outstanding principal balance of zero (and the same may be reduced to zero at any time during the Distribution Compliance Period without cancellation).

(e) <u>Definitive Notes</u>. If at any time (including without limitation during the Distribution Compliance Period) (i) the Temporary Regulation S Global Notes or the Permanent Regulation S Global Notes or any of them become immediately due and repayable pursuant to Article Five hereof or (ii) any of DTC, Euroclear or Clearstream (A) is closed for business for a continuous period of 14 days (other than by reason of holiday, statutory or otherwise) or (B) announces an intention permanently to cease business and no alternative clearance system satisfactory to the Issuer is available or (iii) as a result of any amendment to, or change in, the laws or regulations of the Cayman Islands or of any authority therein or thereof having power to tax or in the interpretation or administration of such laws or regulations which becomes effective on or after the Closing Date, the Issuer or any Paying Agent is or will be required to make any deduction or withholding from any payment in respect of the Notes which would not be required were the Notes in definitive registered form or (iv) the Issuer so elects by notice to the Noteholders and Euroclear or Clearstream, as the case may be, does not object (as determined by the Issuer), then the Issuer will issue Definitive Notes in exchange for and to the extent of such Global Notes within 30 days of the occurrence of the relevant event set forth in (i), (ii), (iii) or (iv) above.

If at any time (i) the Notes or any of them become immediately due and payable following an Event of Default hereunder or (ii) DTC notifies the Issuer or the Trustee in writing that it is unwilling or unable to discharge properly its responsibilities as a depository with respect to the Rule 144A Global Notes or it ceases to be a "clearing agency" registered under the Exchange Act, and the Issuer is unable to locate a qualified successor within 90 days after such notice, then the Issuer will issue Definitive Notes in exchange for and to the extent of such Rule 144A Global Notes within 30 days of the occurrence of the relevant event set forth in (i) or (ii) above.

The Issuer shall notify the Trustee forthwith upon the occurrence of any of the events referred to in the two immediately preceding paragraphs and the Issuer shall, unless the Trustee agrees otherwise, promptly give notice thereof and of its obligation to issue Definitive Notes to the Noteholders. Upon giving such notice, the Issuer promptly shall cause the Custodian, as the case may be, to present forthwith for exchange and surrender such Global Note to the Trustee for cancellation, together with appropriate exchange, registration, payment and delivery instructions (identifying according to its records the beneficial holders to whom, and in the amounts, the Definitive Notes are to be registered and delivered), upon which the Trustee shall be entitled to rely conclusively. The Issuer shall prepare, execute and deliver to the Trustee at its specified office a sufficient number of duly executed Definitive Notes not later than the 20th day following the date of such notice, and the Trustee shall then promptly authenticate and deliver the appropriate number and amount of such Definitive Notes in accordance with the instructions received from the Custodian.

(f) <u>Form of Notes</u>. The Notes shall be typed, printed, lithographed or engraved or produced by any combination of these methods or may be produced in any other manner, all as

determined by the Authorized Officers of the Co-Issuers, as applicable, executing such Notes, as evidenced by the Authorized Officers' execution of such Notes.

Section 2.2. Authorized Amount.

The aggregate principal amount of Class A-1LA Notes, the Class A-1LB Notes, Class A-2L Notes, Class A-3L Notes, Class A-4L Notes, Class B-1L Notes and Class X Notes that may be authenticated and delivered under this Indenture is limited to $538,000,000, $96,000,000, $76,000,000, $36,500,000, $10,000,000, $21,000,000 and $14,000,000, respectively, except for Notes authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Notes pursuant to Section 2.5, 2.6 or 8.5 hereof.

Section 2.3. Denominations; Extension of Revolving Period and Final Maturity.

(a) Each Class of the Notes shall be issuable on the Closing Date in the forms set forth herein, without coupons, in minimum denominations of $200,000 and integral multiples of $1 in excess thereof (in each case expressed in terms of the stated or principal amounts thereof, as the case may be, at the Closing Date).

(b) The Issuer, if directed by the Board Resolution of the Issuer at the request of the Servicer, shall be entitled on each Extension Effective Date to extend the Revolving Period to the applicable Extended Revolving Period End Date up to a maximum of four times (so that the Notes can only be extended to 2037) if (i) in the case of an Extension Effective Date occurring after the first Extension Effective Date, the Issuer has previously effected a Maturity Extension for each preceding Extension Effective Date in accordance with this Section 2.3, (ii) the Extension Conditions set forth in Section 2.3(d) are satisfied, (iii) the Issuer has given written notice to the Trustee of its election to extend the Revolving Period no later than 60 days and no earlier than 90 days prior to such Extension Effective Date and (iv) no Event of Default has occurred and is continuing. If the Extension Conditions are satisfied, the Final Maturity Date of the Notes (other than the Class X Notes) shall be automatically extended to the related Extended Final Maturity Date and the Weighted Average Life Test shall be automatically extended to the related Extended Weighted Average Life Date, without any requirement for approval or consent of any Holders of Notes or Preferred Shares (other than as may be required pursuant to the Extension Conditions) or amendment or supplement to this Indenture or the Paying and Transfer Agency Agreement (the "Maturity Extension"); *provided* that the Issuer will not be permitted to effect more than four Maturity Extensions. The Final Maturity Date of the Class X Notes is not subject to extension.

(c) In the case of a Maturity Extension, any Holder or Beneficial Owner of Notes (other than Class X Notes) or Preferred Shares wishing to sell such Notes or Preferred Shares to an Extension Qualifying Purchaser pursuant to the Extension Conditions must provide the applicable Extension Sale Notice within the Extension Sale Notice Period pursuant to Section 2.3(d) (such Notes and Preferred Shares as to which an Extension Sale Notice has been duly given, "Extension Sale Securities"). The Class X Notes are not subject to sale in connection with a Maturity Extension and the maturity of the Class X Notes is not subject to extension. Notwithstanding anything to the contrary herein, each Holder providing an Extension Sale Notice shall be deemed to agree that no Extension Sale Securities of any Holder shall be

purchased unless all Extension Sale Securities of all Holders are purchased and settled at the applicable Extension Purchase Price on the applicable Extension Effective Date and the other Extension Conditions are satisfied as of such date.

(d) The Maturity Extension shall be effective only if the following conditions (the "Extension Conditions") are satisfied:

(i)    the purchase of all Extension Sale Securities has been settled by the designated Extension Qualifying Purchasers at the applicable Extension Purchase Price as of the applicable Extension Effective Date;

(ii)   all such purchases of Extension Sale Securities individually and in the aggregate comply with the applicable transfer restrictions herein, in the Indenture and the Preferred Share Paying and Transfer Agency Agreement immediately after such purchase and the legends on such Notes and Preferred Shares and all applicable law, rules and regulations (including, without limitation, rules, regulations and procedures of any applicable securities exchange, self-regulatory organization or clearing agency);

(iii)  the Rating Condition has been satisfied with respect to S&P (so long as any Notes are then rated by S&P) and (b) either (A) the Class B-1L Overcollateralization Ratio is at least 107.5% and the Collateral Quality Tests are satisfied as of the related Extension Determination Date and the Interest Coverage Test was satisfied on the immediately preceding Payment Date, the rating of each Class of Notes by Moody's has not been downgraded, withdrawn or qualified from that in effect on the Closing Date (unless it subsequently has been reinstated to the rating assigned on the Closing Date) or (B) the Rating Condition has been satisfied with respect to Moody's (so long as any Notes are then rated by Moody's); and

(iv)   (A) the Holders of 100% of the Outstanding Aggregate Principal Amount of the Class A-1LA Notes have delivered the Extension Sale Notice in the Extension Sale Notice Period or (B) if the Holders of 100% of the Aggregate Outstanding Amount of the Class A-1LA Notes fail to deliver an Extension Sale Notice pursuant to the preceding clause (A), either (x) the Issuer, acting through the Servicer, notifies the Holders of the Class A-1LA Notes in writing not later than the last day of the Extension Sale Notice Period that such Class A-1LA Notes shall constitute "Extension Sale Securities" (as a result of which such Class A-1LA Notes must be purchased by an Extension Qualifying Purchaser) or (y) the Holders of 100% of the Aggregate Outstanding Amount of the Class A-1LA Notes have consented in writing to the Maturity Extension not later than the last day of the Extension Sale Notice Period.

The Issuer, the Trustee and, by its acceptance of the Notes or Preferred Shares, each Holder or Beneficial Owner of Notes or Preferred Shares agrees that the Placement Agent shall not be responsible for causing the Extension Conditions to be satisfied and shall not be liable to any such person or Holder of Notes or Preferred Shares (whether or not such Holder gave an Extension Sale Notice with respect to its Notes or Preferred Shares) or to any other person if the Extension Conditions are not satisfied.  Failure of the Extension Conditions to be satisfied shall not constitute a Default or Event of Default under this Indenture.

(e) The following procedure shall apply to effect any extension of the Revolving Period or the Maturity Date, pursuant to Section 2.3:

(i) No later than three Business Days following receipt by the Trustee of the notice given by the Issuer of its election to extend the Revolving Period (the "Extension Notice"), at the cost of the Issuer the Trustee shall deliver the Extension Notice to all Holders of Notes (other than the Class X Notes) and the Preferred Shares Paying and Transfer Agent (for forwarding to the Holders of the Preferred Shares) and each Rating Agency (so long as any rated Notes are Outstanding), in the form set out in the Indenture, and shall request the Rating Condition for the Maturity Extension from S&P, if applicable. Such Extension Notice shall include a statement to the effect that (i) no Extension Sale Notice delivered after the end of the Extension Sale Notice Period shall be effective and (ii) only the Class A-1LA Notes for which an Extension Sale Notice has been delivered may be treated as Extension Sale Securities pursuant to the Extension Conditions (with the result that the Class A-1LA Notes must be purchased by an Extension Qualifying Purchaser).

(ii) Any Holder of Notes (other than the Class X Notes) or Preferred Shares may give irrevocable notice (an "Extension Sale Notice") within 30 days after the Trustee has delivered the Extension Notice (the "Extension Sale Notice Period") of its intention to sell its Notes or Preferred Shares to an Extension Qualifying Purchaser in the case of a Maturity Extension. Any Extension Sale Notice received by the Trustee after the Extension Sale Notice Period shall be disregarded and deemed not to have been given. No Holder of Notes or Preferred Shares that has not given such an Extension Sale Notice within the Extension Sale Notice Period shall be entitled to sell its Notes or Preferred Shares to an Extension Qualifying Purchaser in connection with the Maturity Extension.

(iii) If the Holders of 100% of the Outstanding Aggregate Principal Amount of the Class A-1LA Notes have not delivered the Extension Sale Notice to the Trustee by the 20th calendar day after the date of the Extension Notice, the Trustee shall notify the Holders of the Class A-1LA Notes of the date on which the Extension Sale Notice Period shall end and include a statement to the effect that (A) no Extension Sale Notice delivered after the end of the Extension Sale Notice Period shall be effective and (B) the Class A-1LA Notes for which no Extension Sale Notice has been delivered may be treated as Extension Sale Securities pursuant to clause (iv) of the Extension Conditions (as a result of which the Class A-1LA Notes must be purchased by an Extension Qualifying Purchaser).

(iv) On the applicable Extension Determination Date, the Issuer (or its agent) shall confirm (A) whether or not Extension Qualifying Purchasers for all Extension Sale Securities have been designated to purchase such Notes or Preferred Shares in compliance with all transfer restrictions in the Indenture and the legends on such Notes or Preferred Shares and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency), (B) whether the requirements of clause (iii) of the Extension Conditions are satisfied as of the applicable Extension Determination

Date and (C) whether all other Extension Conditions can be satisfied as of the applicable Extension Effective Date.

(v) On each Extension Effective Date, the Maturity Extension shall become effective under the terms of the Indenture; *provided* that all Extension Conditions set forth above are satisfied. No later than two Business Days after each Extension Effective Date, the Trustee based on a determination made by the Issuer, at the expense of the Co-Issuers, shall deliver a notice to all Holders of Notes and the Preferred Shares Paying and Transfer Agent (for forwarding to the Holders of Preferred Shares), the Servicer, the Initial Purchaser, each Rating Agency (so long as any rated Notes are Outstanding) and the Irish Stock Exchange (if and for so long as any Class of Notes is listed thereon) confirming whether or not the Maturity Extension became effective. If the Maturity Extension became effective, the Issuer shall make any required notifications thereof to the Depositary for any Notes subject to the Maturity Extension. None of the Initial Purchaser, the Servicer or any of their respective Affiliates shall have any duty to act as an Extension Qualifying Purchaser.

(vi) In the case of a Maturity Extension, each Holder of Notes (other than Extension Sale Securities) shall be entitled to receive an amount equal to the applicable Extension Bonus Payment to the extent of available funds and as provided in Section 11.1. Holders of the Preferred Shares shall not be entitled to receive any Extension Bonus Payment. The obligation to make any Extension Bonus Payment shall not be rated by Rating Agencies.

(f) The Extension Bonus Payment shall be payable to any applicable qualifying Beneficial Owners who have provided the Trustee with an Extension Bonus Eligibility Certification on or before the 5th Business Day prior to the first Payment Date from and including each Extension Effective Date on which funds are available to be used for such purposes in accordance with Priority of Payments, but in any event, no later than the earlier of the Final Maturity Date and the date of redemption of the Notes (other than the Class X Notes). Extension Bonus Payments which are not available to be paid on a Payment Date in accordance with the Priority of Payments on a Payment Date shall not be considered "due and payable" hereunder but are due and payable on the next Payment Date on which funds are due and payable. The failure to pay any such Extension Bonus Payment on such date shall not be an Event of Default, unless the Issuer shall fail to pay in full such Extension Bonus Payment on the earlier of the Final Maturity Date and the date of redemption in full of the relevant Notes (other than the Class X Notes). Unpaid Extension Bonus Payments shall not accrue interest. Such amounts shall be paid, in the case of the Notes (other than the Class X Notes), to the accounts designated in the applicable Extension Bonus Eligibility Certification or, to the extent otherwise required by the rules of any applicable securities exchange or clearing agency, in a manner determined by the Issuer.

Section 2.4. <u>Execution, Authentication, Delivery and Dating</u>.

The Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes, the Class B-1L Notes and the Class X Notes shall be executed on behalf of the Issuer, by an Authorized Officer of each of the Issuer or the Co-Issuer,

as applicable. The signature of such Authorized Officers on the Notes may be manual or facsimile.

Notes bearing the manual or facsimile signature of an individual who was at any time the Authorized Officer of the Co-Issuers (as applicable) shall bind the applicable Co-Issuer, notwithstanding the fact that such individual has ceased to hold such office prior to the authentication and delivery of such Notes or did not hold such office at the date of issuance of such Notes.

At any time and from time to time after the execution and delivery of this Indenture, the Co-Issuers may deliver the Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes, the Class B-1L Notes and the Class X Notes to the Trustee for authentication and the Trustee (or an Authenticating Agent on its behalf), upon Issuer Order, shall authenticate and deliver such Notes as provided in this Indenture and not otherwise.

Each Note authenticated and delivered by the Trustee (or the Authenticating Agent) to or upon Issuer Order on the Closing Date shall be dated as of the Closing Date. All other Notes that are authenticated after the Closing Date for any other purpose hereunder shall be dated the date of their authentication.

Notes issued upon transfer, exchange or replacement of other Notes shall be issued in authorized denominations reflecting the original aggregate stated or principal amount of the Notes so transferred, exchanged or replaced, but shall represent only the stated or principal amount of the Notes so transferred, exchanged or replaced. If any Note is divided into more than one Note in accordance with this Article II, the stated or original principal amount of such Note shall be proportionately divided among the Notes delivered in exchange therefor and shall be deemed to be the aggregate stated or original principal amount of such subsequently issued Notes.

No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Note a certificate of authentication, substantially in the form provided for herein, executed by the Trustee (or Authenticating Agent, as provided below) by the manual signature of one of its Authorized Officers, and such certificate upon any Note shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

Upon the request of the Issuer, the Trustee shall and, at the election of the Trustee, the Trustee may, appoint one or more Authenticating Agents with power to act on its behalf and subject to its direction in the authentication of Notes in connection with transfers and exchanges thereof hereunder as fully to all intents and purposes as though each such Authenticating Agent had been expressly authorized by this Indenture to authenticate the Notes; *provided that* any such appointment shall be upon terms and conditions reasonably acceptable to the Trustee (with respect to which the Trustee may require, among other things, appropriate indemnification for any damages, losses or reasonable costs arising from acts or omissions of such Authenticating Agent). For all purposes of this Indenture, the authentication of Notes by an Authenticating

Agent pursuant to this Section shall be deemed to be an authentication of such Notes "by the Trustee."

JPMorgan Chase Bank, National Association, is hereby appointed, at the request of the Issuer, as Authenticating Agent for purposes of authenticating Definitive Notes issued in exchange for beneficial interests in the Global Notes.

RSM Robson Rhodes LLP is hereby appointed, at the request of the Issuer, as the initial Irish Paying Agent with respect to the Notes.

Any corporation into which any Paying Agent, Transfer Agent or Authenticating Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, consolidation or conversion to which any Paying Agent, Transfer Agent or Authenticating Agent shall be a party, or any corporation succeeding to the corporate trust business of any Paying Agent, Transfer Agent or Authenticating Agent, shall be the successor of such Paying Agent, Transfer Agent or Authenticating Agent hereunder, without the execution or filing of any further act on the part of the parties hereto or such Paying Agent, Transfer Agent or Authenticating Agent or such successor corporation.

Any Paying Agent, Transfer Agent or Authenticating Agent may at any time resign by giving written notice of resignation to the Trustee and the Issuer. The Trustee may at any time terminate the agency of any Paying Agent, Transfer Agent or Authenticating Agent by giving written notice of termination to such Paying Agent, Transfer Agent or Authenticating Agent and the Issuer.

The Trustee shall pay to any Paying Agent, Transfer Agent or Authenticating Agent reasonable compensation and shall reimburse each Paying Agent, Transfer Agent or Authenticating Agent for expenses reasonably incurred by such Paying Agent, Transfer Agent or Authenticating Agent in the performance of its duties as a Paying Agent, Transfer Agent or Authenticating Agent, in each case as and to the extent agreed upon between the Trustee and such Paying Agent, Transfer Agent or Authenticating Agent; *provided that* if the appointment of such Paying Agent, Transfer Agent or Authenticating Agent is at the election or request of the Issuer, the Trustee's obligation to make such payments shall be limited to amounts for which it is entitled to be reimbursed pursuant to Section 6.7(b) or (c). The provisions of Section 6.5 shall be applicable to any Paying Agent, Transfer Agent or Authenticating Agent.

Section 2.5.  Registration, Registration of Transfer and Exchange.

(a) The Issuer shall cause to be kept a register (the "Note Register") in which, subject to such reasonable procedures as it may prescribe, the Issuer shall provide for the registration of the Notes and the registration of transfers of the Notes. The Trustee is hereby appointed "Note Registrar" for the purpose of registering and transferring the Notes as herein provided. The Note Registrar shall supply all relevant documents to the Share Registrar necessary for the Share Registrar to maintain the Share Register accordingly and the Share Registrar shall be able to rely upon such information provided by the Note Registrar without any liability on its part. The Issuer will notify the Trustee of any Notes owned by or pledged to the Issuer or any of its Affiliates promptly upon the acquisition thereof or the creation of such

pledge. So long as an Event of Default shall be continuing, the Note Registrar shall promptly, upon the written request of a Noteholder or holder of a Preferred Share, but in no event later than five Business Days following such request, furnish such Noteholder or holder of a Preferred Share with a list of all other Noteholders, holders of Preferred Shares (as applicable); *provided that* the Note Registrar shall have no liability to any person for furnishing the Note Register to any Noteholder or holder of a Preferred Share. The Note Registrar shall, upon request, furnish a copy of the Note Register to the Trustee and the Servicer.

Subject to the provisions of paragraphs (b), (c), (d), (e), (f) and (k) of this Section 2.5, upon surrender for registration of transfer of any Note, the Issuer and the Co-Issuer (as applicable) shall execute, and the Trustee or the Authenticating Agent shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes of the same Class, of any authorized denomination and of a like aggregate principal amount.

Subject to the provisions of paragraphs (b), (c), (d), (e), (f) and (k) of this Section 2.5, at the option of the Holder, Notes may be exchanged for other Notes of the same Class, in any authorized denominations and of a like aggregate stated or principal amount, upon surrender of the Notes to be exchanged at the office of the Trustee. Whenever any Notes are so surrendered for exchange, the Issuer and the Co-Issuer (as applicable) shall execute, and the Trustee or the Authenticating Agent shall authenticate and deliver, the Notes that the Holder making the exchange is entitled to receive.

All Notes issued upon any registration of transfer or exchange of Notes shall be the valid obligations of the Co-Issuers, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Notes, as applicable, surrendered upon such registration of transfer or exchange.

Every Note presented or surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Co-Issuers (as applicable) and the Trustee duly executed by the Holder thereof or his attorney duly authorized in writing.

No service charge shall be made to a Holder for any registration of transfer or exchange of Notes, but the Co-Issuers or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Notes.

(b) No Note may be sold or transferred (including, without limitation by pledge or hypothecation) unless such sale or transfer is exempt from the registration requirements of the Securities Act and is exempt under applicable state securities laws. No purported transfer of any interest in any Note or any portion thereof that is not made in accordance with this Section 2.5 shall be given effect to or be binding upon the Trustee or the Co-Issuers (as applicable) and any such purported transfer shall be null and void *ab initio* and vest in the transferee no rights against the Trustee, the Co-Issuers (as applicable) or the Trust Estate.

By its acceptance of a Note or a beneficial interest in a Note, each owner thereof will be deemed to have represented and agreed that transfer thereof is restricted and agrees that it

shall transfer such Note or beneficial interest in such Note, only in accordance with the terms of this Indenture and such Note and in compliance with applicable law.

The applicable rules, regulations and procedures utilized or imposed by any Clearance System or DTC (collectively, "Applicable Procedures") shall be applicable to the Global Notes insofar as and to the extent beneficial interests in such Global Notes are held by the agent members of or participants in Euroclear, Clearstream or DTC, respectively. Account holders or agent members of or participants in Euroclear, Clearstream and DTC shall have no rights under this Indenture with respect to such Global Notes, and DTC (or its nominee) as registered Holder of any Global Notes may be treated by the Co-Issuers, the Trustee, the Note Registrar, the Authenticating Agent and any other Paying Agent (and any agent of any of the foregoing) as the owner of such Global Notes for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Co-Issuers, the Trustee, the Note Registrar, the Authenticating Agent or any Paying Agent from giving effect to any written certification, proxy or other authorization furnished by DTC or any Clearance System or impair, as between DTC, the Clearance System and its agent members or participants, the operation of customary practices governing the exercise of the rights of a Holder of any Notes. Requests or directions from, or votes of, DTC or any Clearance System with respect to any matter shall not be deemed inconsistent if made with respect to (or in separate proportions corresponding to) different beneficial owners. None of the Trustee, the Transfer Agent, the Note Registrar, the Authenticating Agent, nor the Paying Agent shall have any duty to monitor, maintain records concerning (or determine compliance with any of the restrictions on transfer set forth herein with respect to) owners of beneficial interests in the Global Notes. None of the Trustee, the Transfer Agent, the Note Registrar, the Authenticating Agent, nor the Paying Agent shall have any liability for the accuracy of the records of DTC or any Clearance System, or any actions or omissions of DTC or any Clearance System (or of the agent members of or participants in any Clearance System).

A Noteholder may transfer a Note or its beneficial interest in a Note only in accordance with the following provisions:

(i)     Definitive Note to Temporary Regulation S Global Note. To the extent permitted by the Applicable Procedures and subject to the provisions of Section 2.5, if a Holder of a Definitive Note of any Class wishes at any time to transfer its beneficial interest in such Definitive Note to a Non-U.S. Person during the Distribution Compliance Period, such Holder shall, subject to the provisions of this Section 2.5, transfer its interest in such Definitive Note for an equivalent beneficial interest in the Temporary Regulation S Global Note of the same Class. Upon (A) the surrender to the Trustee for cancellation of the Definitive Notes representing the beneficial interest to be so transferred and (B) the receipt by the Trustee and the Co-Issuers of (1) an Investor Representation Letter from such Noteholder's transferee, (2) a Regulation S Transferor Certificate from such Noteholder, and (3) a written order in accordance with the Applicable Procedures containing information regarding the Euroclear or Clearstream account to be credited with the increase in the Regulation S Global Note and the name of such account, the Trustee shall cancel such Definitive Note and, concurrently with such cancellation, instruct the Euro Transfer Agent to adjust the Common Depository's position in the Temporary Regulation S Global Note of the same Class to reflect an increase of the

Aggregate Principal Amount thereof by the same amount and to credit or cause to be credited to the account of the transferee a beneficial interest in such Temporary Regulation S Global Note equal to the Aggregate Principal Amount of the Definitive Note so cancelled. In the event of any partial transfer of an interest in a Definitive Note to a Temporary Regulation S Global Note, the Co-Issuers shall execute and provide to the Trustee, and the Trustee shall authenticate and return to the Holder, a Definitive Note evidencing the remaining balance thereof. After the Distribution Compliance Period, interests in any Definitive Notes may not be transferred or exchanged for interests in a Temporary Regulation S Global Note.

(ii)    <u>Definitive Note to Permanent Regulation S Global Note</u>. If a Holder of a Definitive Note wishes at any time after the Distribution Compliance Period to transfer its interest in such Definitive Note to a Non-U.S. Person, such Holder shall, subject to the provisions of this Section 2.5, transfer its interest in such Definitive Note for an equivalent beneficial interest in such Permanent Regulation S Global Note of the same Class. Upon (A) the surrender to the Euro Transfer Agent located in London in the case of the Class B-2L Notes, and the Trustee in the case of any other Class of Notes, of the Definitive Note representing the interest to be so transferred, for cancellation and (B) the receipt by the Trustee and the Co-Issuers of (1) an Investor Representation Letter from such Noteholder's transferee, (2) a Regulation S Transferor Certificate from such Noteholder and (3) a written order in accordance with the Applicable Procedures containing information regarding the Euroclear or Clearstream account to be credited with the increase in the Regulation S Global Note and the name of such account, the Trustee shall cancel such Definitive Note, and, concurrently with such cancellation, in the case of the Class B-2L Notes, instruct the Common Depository and in the case of any other Class of Notes, instruct the Custodian to endorse the Permanent Regulation S Global Note to reflect an increase of the Aggregate Principal Amount thereof by the same amount and to credit or cause to be credited to the account of the transferee a beneficial interest in such Permanent Regulation S Global Note equal to the Aggregate Principal Amount of the Definitive Note so cancelled. In the event of any partial transfer of an interest in a Definitive Note to a Permanent Regulation S Global Note, the Co-Issuers or the Issuer, as applicable, shall execute and provide to the Trustee (or the Euro Transfer Agent located in London), and the Trustee (or the Euro Transfer Agent located in London) shall authenticate and return to the Holder, a Definitive Note evidencing the remaining balance thereof (which Definitive Note shall be so mailed or otherwise delivered from a location outside the United States).

(iii)    <u>Temporary Regulation S Global Note to Definitive Note or Rule 144A Global Note</u>. To the extent permitted by DTC and subject to the provisions of Section 2.5(k), if a Holder of a beneficial interest in the Temporary Regulation S Global Note of a particular Class wishes at any time during the Distribution Compliance Period to transfer its beneficial interest in such Temporary Regulation S Global Note to a U.S. Person, such holder shall, subject to the provisions of this Section 2.5, transfer its beneficial interest in such Temporary Regulation S Global Note for an equivalent interest in a Rule 144A Global Note. Upon receipt by the Trustee of (A) a certificate substantially in the form of Exhibit G hereto and (B) a written order given in accordance with the Applicable Procedures, the Trustee shall instruct the Custodian to adjust the Depository's position in

the Temporary Regulation S Global Note to reflect a reduction of the Aggregate Principal Amount thereof by the Aggregate Principal Amount of the beneficial interest thereof to be so transferred and concurrently with such reduction, in the case of a Rule 144A Global Note, instruct the Custodian to adjust the Depository's position in the Rule 144A Global Note of the same Class to reflect an increase of the Aggregate Principal Amount thereof by the same amount and to credit or cause to be credited to the account of the transferee a beneficial interest in such Rule 144A Global Note equal to the Aggregate Principal Amount of the Temporary Regulation S Global Note so reduced, and, in the case of a Definitive Note, the Co-Issuers shall execute and furnish to the Trustee, and the Trustee or the Authenticating Agent shall authenticate and deliver to such Holder, a Definitive Note in a principal amount equal to the amount of the reduction in the Aggregate Principal Amount of the Temporary Regulation S Global Note of such Class.

(iv)     <u>Transfer of Interests in a Definitive Note</u>. A Holder of a Definitive Note may at any time transfer its interest in such Definitive Note in accordance with this Section 2.5(b)(iv).  Any transfer of an interest in a Definitive Note to a Non-U.S. Person during the Distribution Compliance Period shall be made only pursuant to Section 2.5(b)(iii) above.  Otherwise, the Trustee shall require, prior to any such transfer of a Definitive Note, receipt by the Trustee and the Co-Issuers of (A) an Investor Representation Letter from such Noteholder's transferee and (B) a Transferor Certificate from such Noteholder (which shall only be a Regulation S Transferor Certificate for transfers to Non-U.S. Persons during the Distribution Compliance Period).  Upon receipt of such letter and certificate, and surrender to the Trustee the Definitive Note representing the interest to be so transferred, the Trustee shall cancel such Definitive Note and the Co-Issuers shall execute and provide to the Trustee, and the Trustee or the Authenticating Agent shall authenticate and deliver, a Definitive Note to such transferee (and, in the event of a partial transfer, the Co-Issuers shall execute and provide to the Trustee, and the Trustee or the Authenticating Agent shall authenticate and deliver, a Definitive Note evidencing the remaining balance to the transferring Holder).

(v)     <u>Transfer of Interests in the Temporary Regulation S Global Note</u>. Transfers of beneficial interests in the Temporary Regulation S Global Note may only be made (A) in accordance with Section 2.5(b)(i) above or (B) by book-entry transfer of beneficial interests in the Temporary Regulation S Global Note within the Clearance System (and subject to the Applicable Procedures) to Non-U.S. Persons in accordance with Regulation S in "offshore transactions" (as defined in Regulation S).

(vi)     <u>Transfer of Interests in a Permanent Regulation S Global Note</u>. If a Holder of a beneficial interest in the Permanent Regulation S Global Note wishes at any time to transfer its beneficial interest in such Permanent Regulation S Global Note to a U.S. Person, such Holder shall, subject to the provisions of this Section 2.5 and the Applicable Procedures, transfer its beneficial interest in such Permanent Regulation S Global Note for an equivalent interest in a Rule 144A Global Note.  Upon receipt by the Trustee of (A) a certificate substantially in the form of Exhibit G hereto and (B) a written order given in accordance with the Applicable Procedures, the Trustee shall instruct the Custodian to adjust the Depository's position in the Permanent Regulation S Global Note to reflect a reduction of the Aggregate Principal Amount thereof by the Aggregate

Principal Amount of the beneficial interest thereof to be so transferred and concurrently with such reduction, in the case of a Rule 144A Global Note, instruct the Custodian to adjust the Depository's position in the Rule 144A Global Note of the same Class to reflect an increase of the Aggregate Principal Amount thereof by the same amount and to credit or cause to be credited to the account of the transferee a beneficial interest in such Rule 144A Global Note equal to the Aggregate Amount Principal amount of the Permanent Regulation S Global Note so reduced, and, in the case of a Definitive Note, the Issuer shall execute and furnish to the Trustee (or Paying Agent, as directed by the Trustee) and the Trustee shall authenticate and deliver to such Holder a Definitive Note in the Aggregate Principal Amount equal to the amount of the reduction in the Aggregate Principal Amount of the Permanent Regulation S Global Note (which Definitive Note shall be mailed or otherwise delivered to such Holder from a location outside the United States). Interests in any Permanent Regulation S Global Note shall not be exchanged for or transferred to a Definitive Note (except pursuant to the preceding sentence or Section 2.1, if applicable).

(vii)     Transfer of Interest in a Rule 144A Global Note. Subject to the provisions of Section 2.5(k), transfers of beneficial interests in a Rule 144A Global Note may only be made (A) in accordance with the provisions of this Section 2.5(b)(iv) or (B) by book-entry transfer of beneficial interests in a Rule 144A Global Note within DTC (and subject to the Applicable Procedures) and in accordance with the transfer restrictions contained in the legend on such Rule 144A Global Note. If a Holder of a beneficial interest in a Rule 144A Global Note wishes to transfer its beneficial interest in such Rule 144A Global Note to a Non-U.S. Person, such holder shall, subject to the provisions of this Section 2.5 and the Applicable Procedures, transfer its beneficial interest in such Rule 144A Global Note for an equivalent interest in a Temporary Regulation S Global Note or a Permanent Regulation S Global Note, *provided* such transfer occurs after the Distribution Compliance Period. Upon receipt by the Trustee of (A) a Regulation S Transferor Certificate from such Noteholder and (B) a written order given in accordance with the DTC's Applicable Procedures, the Trustee shall instruct the Custodian to adjust the Depository's position in the Rule 144A Global Note to reflect a reduction of the Aggregate Principal Amount thereof by the Aggregate Principal Amount of the beneficial interest thereof to be so transferred and concurrently with such reduction, instruct the Custodian to adjust the Depository's position in such Temporary Regulation S Global Note or the Permanent Regulation S Global Note of the same Class to reflect an increase of the Aggregate Principal Amount thereof by the same amount and to credit or cause to be credited to the account of the transferee a beneficial interest in such Temporary Regulation S Global Note or Permanent Regulation S Global Note equal to the Aggregate Principal Amount of the Rule 144A Global Note so reduced.

(viii)     Initial Sale of Notes. Notwithstanding anything in clauses (i) through (v) of this Section 2.5(b) to the contrary, in connection with any sale of Bear Notes by Bear Stearns, no delivery of an Investor Representation Letter or a Transferor Certificate shall be required so long as each purchaser of Notes executes and delivers a transferee certificate acceptable to Bear Stearns (which certificate shall, in the case of any transfer of Definitive Notes, identify each transferee, including name, address, payment

instructions, Taxpayer information and such other information as the Trustee may reasonably require), which transferee certificate shall be delivered to the Trustee.

(ix)     <u>Securities Act</u>.  No transfer of any Note or any beneficial interest in any Note shall be made unless such transfer (a) is made pursuant to an effective registration statement under the Securities Act and registration or qualification under applicable state securities laws or (b) is exempt from such registration or qualification requirements.

The Investor Representation Letters (and any alternative certification acceptable to Bear Stearns pursuant to clause (vi) above) and the Transferor Certificates furnished pursuant to this Section may be relied on conclusively by the Trustee in determining whether the provisions of this Section have been complied with.  None of the Issuer, the Co-Issuer, the Trustee or any other person shall be required to register the Notes under the Securities Act or any state securities laws.

(c) Unless a prospective Holder of a Note (and each beneficial owner of an interest in a Global Note) otherwise provides another representation acceptable to each of the Trustee, the Servicer and the Issuer, each Holder of a Note (other than each beneficial owner of an interest in a Global Note), by its purchase thereof, shall be deemed to have represented to the Issuer, the Servicer and the Trustee that (a) in the case of the Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes or the Class X Notes, either no part of the funds being used to pay the purchase price for such Notes constitutes an asset of any "employee benefit plan" (as defined in Section 3(3) of ERISA) or "plan" (as defined in Section 4975(e)(1) of the Code) that is subject to Title I of ERISA or Section 4975 of the Code (each a "<u>Plan</u>"), including assets held in an insurance company general account, or (b) if the funds being used to pay the purchase price for such Notes include assets of any Plan, an exemption to the prohibited transaction rules applies to the purchase and holding of such Notes, and (b) in the case of the Class B-1L Notes, either (i) such Holder (or such beneficial owner) is not a Plan and is not acquiring the Class B-1L Notes with the assets of the Plan, (ii) such Holder (or beneficial owner) is an insurance company and the funds being used to pay the purchase price for such Notes includes only assets of its general account and its acquisition and holding of such Notes are eligible for exemptive relief under Section I of U.S. Department of Labor Prohibited Transaction Class Exemption ("PTCE") 95-60, or (iii) the acquisition and holding of such Notes by such Holder (or beneficial owner) are eligible for the exemptive relief under PTCE 96-23, 91-38, 90-1 or 84-14.

(d) No Note shall be sold or transferred (including, without limitation, by pledge or hypothecation), except to Non-U.S. Persons in "offshore transactions" in accordance with Regulation S under the Securities Act, unless the purchaser or transferee is a Qualified Purchaser.  Notwithstanding anything to the contrary in this Indenture, no transfer of a Note may be made if such transfer would require registration of the Issuer or Co-Issuer under the Investment Company Act (subject, as regards the Trustee's duties, to Section 2.5(f) below).

(e) At any time when the Issuer is not subject to Section 13 or 15(d) of the United States Securities Exchange Act of 1934, as amended, upon the request of any Noteholder, the Issuer shall promptly furnish to such Noteholder or to a prospective purchaser of any Note designated by such Noteholder, as the case may be, the information which the Issuer determines

to be required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act ("Rule 144A Information") in order to permit compliance by such Noteholder with Rule 144A in connection with the resale of such Note by such Noteholder; *provided that* the Issuer shall not be required to provide audited financial statements more than once a year or to furnish Rule 144A Information in connection with any request made on or after the date that is three years from the later of (i) the date such Note (or any predecessor Note) was acquired from the Issuer or (ii) the date such Note (or any predecessor Note) was last acquired from an "affiliate" of the Issuer within the meaning of Rule 144A, in each case as determined by the Issuer.  Upon request by the Issuer, the Trustee shall cooperate with the Issuer in mailing or otherwise distributing (at the Issuer's expense) to such Noteholders or prospective purchasers, at and pursuant to the Issuer's written direction, the foregoing materials prepared and provided by the Issuer; *provided that* the Trustee shall be entitled to affix thereto or enclose therewith such disclaimers as the Trustee shall deem reasonably appropriate, at its discretion (such as, for example, a disclaimer that such Rule 144A Information was assembled by the Issuer and not by the Trustee, that the Trustee has not reviewed or verified the accuracy thereof, and that it makes no representation as to the sufficiency of such information under Rule 144A or for any other purpose).

(f) The Trustee shall not be responsible for ascertaining whether any transfer complies with, or otherwise to monitor or determine compliance with, the requirements or terms of the Securities Act, applicable state securities laws, ERISA, the Code or the Investment Company Act; except that if a certificate is specifically required by the terms of this Section to be provided to the Trustee by a prospective transferee, transferor or the Issuer, the Trustee shall be under a duty to receive and examine the same to determine whether it conforms substantially on its face to the applicable requirements of this Section.

(g) If a Responsible Officer of the Trustee becomes aware that (i) a transfer or attempted or purported transfer of any Note or interest therein was consummated in compliance with the provisions of this Section 2.5 on the basis of a materially incorrect certification from the transferor or purported transferee, (ii) a transferee failed to deliver to the Trustee any certificate required to be delivered hereunder or (iii) the Holder of any Note or interest therein is in material breach of any representation or agreement set forth in any certificate or any deemed representation or agreement of such Holder, the Trustee will direct the Note Registrar not to register such attempted or purported transfer and if a transfer has been registered, such transfer shall be absolutely null and void *ab initio* and shall vest no rights in the purported transferee (such purported transferee, a "Disqualified Transferee") and the last preceding Holder of such Note that was not a Disqualified Transferee shall be restored to all rights as a Holder thereof retroactively to the date of transfer of such Note by such Holder.

(h) For so long as one or more Global Notes are Outstanding:

(i)     the Trustee and its directors, officers, employees and agents may deal with the Depository for all purposes (including the making of distributions on, and the giving of notices with respect to, the Global Notes);

(ii)     unless otherwise provided herein, the rights of beneficial owner in a Global Note shall be exercised only through the respective Depository and shall be

limited to those established by law and agreements between such beneficial owners and the respective Depository;

(iii)    for purposes of determining the identity of and Aggregate Principal Amount of Notes beneficially owned by a Holder, the records of the Depository shall be conclusive evidence of such identity and Aggregate Principal Amount and the Trustee may conclusively rely on such records when acting hereunder;

(iv)    the Depository will make book-entry transfers among the Depository participants of the Depository and will receive and transmit distributions of principal of and interest on the Global Notes to such Depository participants; and

(v)    the Depository participants of the Depository shall have no rights under this Indenture under or with respect to any of the Global Notes held on their behalf by the Depository, and the Depository may be treated by the Trustee and its agents, employees, officers and directors as the absolute owner of the Global Notes for all purposes whatsoever.

(i)    Each transferee of a Note (except with respect to a transfer pursuant to Regulation S) will be deemed to represent at time of transfer that the transferee is a Qualified Institutional Buyer and that (i) it is a Qualified Purchaser, (ii) it is not formed for the purpose of investing in the Notes, unless each of its beneficial owners is a Qualified Purchaser, (iii) it is not a dealer described in paragraph (a)(1)(ii) of Rule 144A unless such transferee owns and invests on a discretionary basis at least U.S.$25 million in securities of issuers that are not affiliated persons of such dealer, (iv) it is not a plan referred to in paragraph (a)(1)(i)(D) or (E) of Rule 144A or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such plan, unless investment decisions are made solely by the fiduciary, trustee or sponsor of such plan, (v) it and each account for which it is purchasing is purchasing Notes in at least the minimum denomination and (vi) it will provide written notice of the foregoing and any other applicable transfer restrictions to any transferee.

(j)    Any Note issued upon the transfer, exchange or replacement of Notes shall bear such applicable legend set forth in the relevant Exhibit hereto unless there is delivered to the Trustee, Note Registrar and the Issuer such satisfactory evidence, which may include an Opinion of Counsel, as may be reasonably required by any of the Trustee, Note Registrar and the Issuer to the effect that (i) neither such applicable legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof comply with the provisions of Rule 144A and to ensure that neither of the Co-Issuers nor the Portfolio Collateral becomes an investment company required to be registered under the Investment Company Act, and (ii) the Co-Issuers and the Portfolio Collateral are exempt from registration under the Investment Company Act other than by reason of Section 3(c)(7) thereof. Upon provision of such satisfactory evidence, the Trustee, at the direction of the Issuer, shall authenticate and deliver Notes that do not bear such applicable legend.

(k)    If, notwithstanding the restrictions set forth in this Section 2.5, either of the Co-Issuers determines that any beneficial owner or Holder of a Rule 144A Global Note (i) is a U.S. Person and (ii) is not (A) a Qualified Purchaser or (B) a company beneficially owned

exclusively by Qualified Purchasers, the Co-Issuers may require, by notice to such beneficial owner or Holder, as the case may be, that such beneficial owner or Holder sell all of its right, title and interest to such Note (or interest therein) to a Person that is both (1) a Qualified Institutional Buyer and (2) a Qualified Purchaser or a company beneficially owned exclusively by Qualified Purchasers, with such sale to be effected within 30 days after notice of such sale requirement is given.  If such beneficial owner or Holder fails to effect the transfer required within such 30-day period, (x) upon written direction from the Issuer, the Trustee shall, and is hereby irrevocably authorized by such beneficial owner or Holder, as the case may be, to cause its interest in such Note to be transferred in a commercially reasonable sale (conducted by the Trustee or by an investment banking firm selected by the Trustee and approved by the Issuer (whose fees are to be paid exclusively from the proceeds of such sale)), in accordance with Section 9-504(3) of the UCC as applied to securities that are sold on a recognized market or that may decline speedily in value) to a Person that certifies to the Trustee and the Co-Issuers, in connection with such transfer, that such Person is both (1) a Qualified Institutional Buyer and (2) a Qualified Purchaser or a company beneficially owned exclusively by one or more Qualified Purchasers and (y) pending such transfer, no further payments will be made in respect of such Note (or beneficial interest therein) held by such Holder or beneficial owner.

Section 2.6.     Mutilated, Destroyed, Lost or Stolen Notes.

If (i) any mutilated Note is surrendered to the Trustee or the Issuer or the Trustee and the Issuer receive evidence to their reasonable satisfaction of the destruction, loss or theft of any Note, and (ii) in the case of a destroyed, lost, or stolen Note, there is delivered to the Issuer and the Trustee such security or indemnity as may be required by them to save each of them harmless (an unsecured indemnity agreement of an Institutional Investor organized under the laws of the United States or any State in the United States with a net worth at least equal to twice the amount of the security or indemnity being deemed sufficient to satisfy such security or indemnity requirement), then, in the absence of notice to the Co-Issuers or the Trustee that such Note has been acquired by a protected purchaser, the Co-Issuers shall execute and, upon a written request therefor by the Issuer, the Trustee shall authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Note, a new Note of the same Class, tenor and principal amount, bearing a number not contemporaneously outstanding.  If, after the delivery of such new Note, a protected purchaser of the original Note in lieu of which such new Note was issued presents such original Note for payment, the Issuer and the Trustee shall be entitled to recover such new Note from the Person to whom it was delivered or any Person taking title therefrom, except a protected purchaser, and the Issuer and the Trustee shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Co-Issuers, or the Trustee, in connection therewith.  If any such mutilated, destroyed, lost or stolen Note shall have become or shall be about to become due and payable in full, or shall have been called for redemption in full, instead of issuing a new Note, the Co-Issuers may pay such Note without surrender thereof, except that any mutilated Note shall be surrendered.

Upon the issuance of any new Note under this Section 2.6, the Issuer or the Trustee may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed or any other reasonable expense in relation thereto.

Every new Note issued pursuant to this Section in lieu of any mutilated, destroyed, lost or stolen Note shall constitute an original additional contractual obligation of the Issuer, whether or not the mutilated, destroyed, lost or stolen Note shall be at any time enforceable by anyone, and shall be entitled to all the benefits of this Indenture equally and proportionately with any and all other Notes of the same Class duly issued hereunder.

The provisions of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes.

Section 2.7.    Payments on the Notes.

(a)    No principal will be payable in respect of the Class A-1L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of an Initial Deposit Redemption, an Optional Redemption, a Special Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-1L Notes as described herein.  On each Payment Date with respect to the Amortization Period, the principal of the Class A-1L Notes will be payable (to the extent of funds available therefor and in the order of priority described herein) first to the Class A-1LA Notes and then to the Class A-1LB Notes, until the Payment Date on which the Aggregate Principal Amount of such Class A-1L Notes have been paid in full.  The unpaid principal amount of the Class A-1L Notes shall accrue interest at the Applicable Periodic Rate for such Class from the Closing Date until such unpaid principal amount is paid in full and such accrued interest shall be payable on each Payment Date. To the extent there is any shortfall in the payment of accrued interest at the Applicable Periodic Rate on any Payment Date with respect to any of the Class A-1L Notes, the Periodic Rate Shortfall Amount will be paid (to the extent of available funds therefor and as described herein) on one or more subsequent Payment Dates after payment of the Periodic Interest Amount with respect to the Class A-1L Notes, unless earlier paid upon an Initial Deposit Redemption, an Optional Redemption, a Special Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-1L Notes as described herein.  In addition, all payments of principal on the Class A-1LA Notes that are made in connection with an Initial Deposit Redemption, a Rating Confirmation Failure, a Tax Event Redemption or an Optional Redemption and all payments of interest will be paid on a *pro rata* basis with the Class X Notes as described herein.  All outstanding principal of the Class A-1L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date.

(b)    No principal will be payable in respect of the Class A-2L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of a Special Redemption, an Optional Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-2L Notes, but only after the Aggregate Principal Amount of the Class A-1L Notes (other than with respect to a Special Redemption or an O/C Redemption) and the Class X Notes have been paid in full.  The unpaid principal amount of the Class A-2L Notes shall accrue interest at the Applicable Periodic Rate for such Class from the Closing Date until such unpaid principal amount is paid in full and such accrued interest shall be payable on each Payment Date.  To the extent there is any shortfall in the payment of accrued interest at the Applicable Periodic Rate on any Payment Date with respect to the Class A-2L Notes, the Periodic Rate Shortfall Amount will be paid (to the extent of

available funds therefor and as described herein) on one or more subsequent Payment Dates after payment of the Periodic Interest Amount with respect to the Class A-2L Notes, unless earlier paid upon an Initial Deposit Redemption, an Optional Redemption, a Special Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-2L Notes as described herein. All outstanding principal of the Class A-2L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date.

(c)     No principal will be payable in respect of the Class A-3L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of a Special Redemption, an Optional Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-3L Notes, but only after the Aggregate Principal Amount of the Class A-1L Notes, the Class A-2L Notes (other than with respect to a Special Redemption or an O/C Redemption) and the Class X Notes have been paid in full. The unpaid principal amount of the Class A-3L Notes shall accrue interest at the Applicable Periodic Rate for such Class from the Closing Date until such unpaid principal amount is paid in full and such accrued interest shall be payable on each Payment Date. To the extent there is any shortfall in the payment of accrued interest at the Applicable Periodic Rate on any Payment Date with respect to the Class A-3L Notes, the Periodic Rate Shortfall Amount will be paid (to the extent of available funds therefor and as described herein) on one or more subsequent Payment Dates after payment of the Periodic Interest Amount with respect to the Class A-3L Notes, unless earlier paid upon an Initial Deposit Redemption, an Optional Redemption, a Special Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-3L Notes as described herein. All outstanding principal of the Class A-3L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date.

(d)     No principal will be payable in respect of the Class A-4L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of a Special Redemption, an Optional Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-4L Notes, but only after the Aggregate Principal Amount of the Class A-1L Notes, the Class A-2L Notes, the Class A-3L Notes (other than with respect to a Special Redemption or an O/C Redemption) and the Class X Notes have been paid in full. The unpaid principal amount of the Class A-4L Notes shall accrue interest at the Applicable Periodic Rate for such Class from the Closing Date until such unpaid principal amount is paid in full and such accrued interest shall be payable on each Payment Date. To the extent there is any shortfall in the payment of accrued interest at the Applicable Periodic Rate on any Payment Date with respect to the Class A-4L Notes, the Periodic Rate Shortfall Amount will be paid (to the extent of available funds therefor and as described herein) on one or more subsequent Payment Dates after payment of the Periodic Interest Amount with respect to the Class A-4L Notes, unless earlier paid upon an Initial Deposit Redemption, an Optional Redemption, a Special Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-4L Notes as described herein. All outstanding principal of the Class A-4L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date.

(e)     Except in connection with the application of the Additional Collateral Deposit Requirement as described herein, no principal will be payable in respect of the Class B-1L Notes during the Revolving Period, except in the event of a Special Redemption, an Optional

Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class B-1L Notes. The principal amount of the Class B-1L Notes shall be due and payable (to the extent of funds available therefore and in the order of priority as described herein) on each Payment Date during the Amortization Period, but only after the Aggregate Principal Amount of the Class A-1L Notes, the Class A-2L Notes, the Class A-3L, the Class A-4L (other than with respect to a Special Redemption or an O/C Redemption) and the Class X Notes have been paid in full. The unpaid principal amount of the Class B-1L Notes shall accrue interest at the Applicable Periodic Rate for such Class from the Closing Date until such unpaid principal amount is paid in full and such accrued interest shall be payable on each Payment Date. To the extent there is any shortfall in the payment of accrued interest at the Applicable Periodic Rate on any Payment Date with respect to the Class B-1L Notes, the Periodic Rate Shortfall Amount will be paid (to the extent of available funds therefor and as described herein) on one or more subsequent Payment Dates after payment of the Periodic Interest Amount with respect to the Class B-1L Notes, unless earlier paid upon an Initial Deposit Redemption, an Optional Redemption, a Special Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class B-1L Notes as described herein. All outstanding principal of the Class B-1L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date.

(f)     The Class X Notes will provide for the Class X Payment (to the extent funds are available therefore as described herein) on each Payment Date, commencing on the November 2006 Payment Date through and including the August 2013 Payment Date. The Aggregate Principal Amount of the Class X Notes will be due and payable on the Final Maturity Date of the Class X Notes. To the extent the Class X Payment will not be paid on any Payment Date, the resulting Class X Shortfall Amount will be paid (as described herein) on one or more subsequent Payment Dates after payment of the Class X Payment with respect to such Class X Notes.

(g)     Holders of the Notes of each Class as of the Record Date in respect of a Payment Date or as of the Redemption Record Date with respect to the Initial Deposit Redemption Date, an Optional Redemption Date, a Special Redemption Date, a Tax Event Redemption Date or a Mandatory Redemption Date, shall be entitled, to the extent provided for herein, to the interest accrued and payable and principal payable (or Initial Deposit Redemption Price, an Optional Redemption Price, a Special Redemption Price, a Tax Event Redemption Price or a Mandatory Redemption Price payable, as applicable) on such Payment Date or Record Date with respect to the Initial Deposit Redemption Date, an Optional Redemption Date, a Special Redemption Date, a Tax Event Redemption Date or a Mandatory Redemption Date. Payments of principal to Holders entitled thereto shall be made in the proportion that the Aggregate Principal Amount of the Notes of such Class registered in the name of each such Holder on such Record Date or Redemption Record Date with respect to the Initial Deposit Redemption Date, an Optional Redemption Date, a Special Redemption Date, a Tax Event Redemption Date or a Mandatory Redemption Date.

(h)     Interest accrued with respect to any Class of Notes shall be computed on the basis of a 360-day year and the actual number of days elapsed during each Periodic Interest Accrual Period.

(i)    Notwithstanding any other provision of this Indenture, the obligations of the Co-Issuers' under this Indenture and the payment of principal of, interest on and all other amounts payable on or in respect of the Class A-1L Notes, the Class A-2L Notes, the Class A-3L Notes, Class A-4L Notes, the Class B-1L Notes and the Class X Notes will constitute nonrecourse obligations of the Co-Issuers, payable solely from the Trust Estate. Having realized the Collateral and distributed the net proceeds thereof, in each case in accordance with this Indenture, neither the Trustee nor any holders of Notes may take any further steps against the Co-Issuers to recover any sum still unpaid in respect of any claims under this Indenture or the Notes issued under this Indenture and all claims against the Co-Issuers in respect of any such sum due but still unpaid shall be extinguished and shall not revive.  Neither of the Co-Issuers, nor any of their respective agents, partners, beneficiaries, officers, directors, employees or any Affiliate of any of them or any of their respective successors or assigns shall be personally liable for any amounts payable, or performance due, under the Notes or this Indenture.  It is understood that the foregoing provisions of this paragraph shall not (A) prevent recourse to the Trust Estate for the sums due or to become due under any security, instrument or agreement which is part of the Trust Estate or (B) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Notes or secured by this Indenture, but the same shall continue until paid or discharged or (C) constitute a waiver of an otherwise valid cause of action with respect to the performance of the Servicer's obligations as set forth in the Servicing Agreement or (D) constitute a waiver of any otherwise valid cause of action against the Co-Issuers wherein the loss complained of is directly attributable to the willful misconduct or fraud of the Co-Issuers in making their respective representations or warranties or the performance of their respective obligations under this Indenture or (E) limit the right of any person to name the Co-Issuers as parties defendant in any action, suit or in the exercise of any other remedy under the Notes or in this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such person or entity.

Section 2.8.    Persons Deemed Owners.

The Co-Issuers, the Trustee, the Note Registrar and the Servicer, and any agent of the Co-Issuers, the Trustee, the Note Registrar and the Servicer shall treat the Person in whose name any Note is registered as it appears on the Note Register as the owner of such Note for the purpose of receiving payments on such Note, and for all other purposes whatsoever (whether or not such Note is overdue), and none of the Issuer, the Trustee, the Note Registrar or the Servicer, nor any agent of any of them, shall be affected by notice to the contrary.

Section 2.9.    Cancellation.

All Notes surrendered for payment, registration of transfer, exchange or redemption, or deemed destroyed, lost or stolen, shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee and shall be promptly cancelled by it.  No Notes shall be authenticated in lieu of or in exchange for any Notes cancelled as provided in this Section 2.9, except as expressly permitted by this Indenture.  All cancelled Notes held by the Trustee shall be destroyed or held by the Trustee in accordance with its standard retention policy unless the Issuer shall direct by an Issuer Order that they be returned to the Issuer.

Section 2.10.    Tax Purposes.

Each of the Co-Issuers shall, and each Holder by acceptance of its Note shall be deemed to have agreed to, treat the Notes as debt solely of the Issuer for United States federal income tax purposes.

Section 2.11.    Calculation Agent; Determination of LIBOR.

(a) The Issuer hereby agrees that for so long as any of the Notes remain Outstanding, there will at all times be an agent appointed to calculate LIBOR in respect of each Periodic Interest Accrual Period in accordance with the terms of the Notes.  The Issuer has initially appointed JPMorgan Chase Bank, National Association, as agent with respect to the determination of LIBOR (in such capacity, the "Calculation Agent").  The Calculation Agent may be removed by the Issuer at any time.  If the Calculation Agent is unable or unwilling to act as such or is removed by the Issuer, or if the Calculation Agent fails to determine LIBOR for a Periodic Interest Accrual Period, the Issuer will promptly appoint as a replacement Calculation Agent a leading bank which is engaged in transactions in U.S. dollar deposits in the international U.S. dollar market and which does not control or is not controlled by or under common control with the Co-Issuers or their Affiliates.  The Calculation Agent may not resign or be removed from its respective duties without a successor having been duly appointed.

(b) The Calculation Agent shall determine LIBOR for each Periodic Interest Accrual Period in accordance with the following provisions:

On each LIBOR Determination Date, LIBOR shall equal the rate, as obtained by the Calculation Agent, for three-month U.S. dollar deposits which appears on Telerate Page 3750 (as reported by Bloomberg Financial Markets Commodities News) or such other page as may replace such Page 3750, as of 11:00 a.m. (London time) on such LIBOR Determination Date.  Notwithstanding the foregoing, LIBOR for the initial Periodic Interest Accrual Period shall be determined through the use of straight-line interpolation by reference to two rates calculated in accordance with the provisions above, one of which shall be for five-month U.S. dollar deposits and the other of which shall be for six-month U.S. dollar deposits.

If, on any LIBOR Determination Date, such rate does not appear on Telerate Page 3750 (as reported by Bloomberg Financial Markets Commodities News) or such other page as may replace such Page 3750, the Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks (as defined below) to leading banks in the London interbank market for three-month (or five-month or six-month, as applicable) U.S. dollar deposits in an amount determined by the Calculation Agent by reference to requests for quotations as of approximately 11:00 a.m. (London time) on the LIBOR Determination Date made by the Calculation Agent to the Reference Banks.  If, on any LIBOR Determination Date, at least two of the Reference Banks provide such quotations, LIBOR shall equal such arithmetic mean of such quotations.  If, on any LIBOR Determination Date, only one or none of the Reference Banks provide such quotations, LIBOR shall be deemed to be the arithmetic mean of the offered quotations that leading banks in The City of New York selected by the Calculation Agent (after consultation with the Servicer) are quoting on the relevant LIBOR Determination Date for three-month (or five-month or six-month, as applicable) U.S. dollar deposits in an

amount determined by the Calculation Agent that is representative of a single transaction in such market at such time by reference to the principal London offices of leading banks in the London interbank market; *provided that,* if the Calculation Agent is required but is unable to determine a rate in accordance with at least one of the procedures provided above, LIBOR shall be LIBOR as determined on the previous LIBOR Determination Date. As used herein, "Reference Banks" means four major banks in the London interbank market selected by the Calculation Agent (after consultation with the Servicer).

For purposes of any calculations referred to in this paragraph (b), all percentages resulting from such calculations will be rounded, if necessary, to the nearest one hundred-thousandth of a percentage point.

(c) As soon as possible after 11:00 a.m. (New York time) on each LIBOR Determination Date, but in no event later than 11:00 a.m. (New York time) on the Business Day immediately following each LIBOR Determination Date, the Calculation Agent will notify the Issuer, the Trustee, the Irish Paying Agent (as long as any of the Notes are listed on the Irish Stock Exchange) and the Servicer of LIBOR for the next Periodic Interest Accrual Period. The Calculation Agent will also specify to the Issuer the quotations upon which LIBOR is based, and in any event the Calculation Agent shall notify the Issuer before 5:00 p.m. (New York time) on each LIBOR Determination Date that either: (i) it has determined or is in the process of determining LIBOR or (ii) it has not determined and is not in the process of determining LIBOR together with its reasons therefor.

(d) Upon receipt of notice of LIBOR for each Periodic Interest Accrual Period from the Calculation Agent pursuant to subsection (c) of this Section 2.11, the Trustee shall determine the Applicable Periodic Rate with respect to the Notes for such Periodic Interest Accrual Period and notify the Irish Stock Exchange of the Applicable Periodic Rate for each Class of Note (as long as any of the Notes are listed on the Irish Stock Exchange).

(e) The determination of LIBOR by the Calculation Agent and the Applicable Periodic Rate with respect to the Notes by the Trustee (in the absence of manifest error) shall be final and binding upon all parties.

Section 2.12. Option to Acquire Credit Enhancement.

Holders of any Class of Notes may elect to acquire bond insurance, a surety bond or similar credit enhancement supporting the payment of principal and/or interest on such Class of Notes, on terms and conditions acceptable to such Holders and at the sole expense of such Holders. Any Class of Notes subject to such enhancement will be designated pursuant to a supplemental indenture adopted pursuant to Section 8.1 as "Insured Notes" of such Class. Premiums for any such enhancement (together with any other amounts payable to the issuer of such bond insurance policy, surety bond or similar credit enhancement, including, without limitation, amounts payable to any such issuer to reimburse it for draws thereunder, together with interest thereon), and costs incurred by the Co-Issuers in connection with such enhancement will be payable from amounts otherwise payable to such Class of Insured Notes, or in such other manner chosen by such Holder (*provided that* any such payment does not adversely affect any other Noteholder or holder of a Preferred Share). Any Insured Notes for substantially all other

purposes will be treated as Notes of such Class, except that the issuer of the bond insurance policy, surety bond or other such credit enhancement will generally be deemed to be the Holder of the Notes of such Class, enhanced by such entity and will in such capacity be entitled to exercise the rights otherwise exercisable by Holders of such Notes.

Section 2.13.    Prescription.

Payment in respect of any Note will cease to be due if not paid to the Holder of such Note due to insufficient payment instructions from such Holder to the Trustee or the Paying Agent for a period of twenty years from the Relevant Date.

ARTICLE III

AUTHENTICATION AND DELIVERY OF NOTES

Section 3.1.    General Provisions.

On the Closing Date, the Notes shall be executed by the Co-Issuers and delivered to the Trustee for authentication and thereupon the same shall be authenticated and delivered by the Trustee upon the Issuer's written request and upon compliance with the conditions of Section 3.2 hereof, and upon receipt by the Trustee of the following:

(a) an Officers' Certificate of the Co-Issuers evidencing the authorization of the execution, authentication and delivery of the Transaction Documents, the Notes and the Preferred Shares and specifying the Final Maturity Dates, the applicable principal or stated amounts and the interest rates and yields of each Class of the Notes to be authenticated and delivered;

(b) an Opinion or Opinions of Counsel, dated the Closing Date, substantially in the form or forms attached hereto as Schedule G.

(c) an Officer's Certificate or Certificates of the Co-Issuers stating that all representations and warranties of the Co-Issuers set forth in the Transaction Documents are true and correct and neither of the Co-Issuers is in Default under this Indenture and that the issuance of the Notes and the Preferred Shares then applied for will not result in a breach of any of the terms, conditions or provisions of, or constitute a default under, any indenture or other agreement or instrument to which the Issuer or the Co-Issuer, as applicable, is a party or by which the Issuer or the Co-Issuer, as applicable, is bound, or any order of any court or administrative agency entered in any proceeding to which the Issuer or the Co-Issuer, as applicable, is a party or by which the Issuer or the Co-Issuer, as applicable, is bound or to which the Issuer or the Co-Issuer, as applicable, is subject; and that all conditions precedent (other than the deposit of cash by the Trustee in the appropriate accounts as provided in Section 3.2(e), (f) and (g) hereof) provided in this Section 3.1 and all requirements under Section 3.2 hereof and all conditions precedent otherwise provided in this Indenture relating to the authentication and delivery of the Notes applied for have been complied with;

(d) an Accountants' Certificate in form and substance acceptable to the Issuer and the Co-Issuer confirming that the Notes of each Class will be retired by their Final Maturity

Dates in accordance with the assumptions set forth in Section 1.3 hereof and specifying the procedures undertaken by them to review data and computations relating to the foregoing;

(e) an executed counterpart of the Servicing Agreement, the Paying and Transfer Agency Agreement and the Collateral Administration Agreement;

(f) the Initial Portfolio Collateral as provided in Section 3.2(a) hereof;

(g) an Issuer Request directing the Trustee to authenticate the Notes in the amounts set forth therein, registered in the name(s) set forth therein or as otherwise provided to the Trustee by the Issuer or at its direction, and to make delivery thereof to the Issuer or as it may otherwise direct therein;

(h) an Officer's Certificate from the Servicer (i) confirming that <u>Schedule A</u> attached to this Indenture correctly lists the Initial Portfolio Collateral to be granted to the Trustee on the Closing Date (in the case of items of Debt Securities) or scheduled to be granted to the Trustee on or not later than thirty (30) days after the Closing Date (in the case of Portfolio Loans) pursuant to Section 3.2(a) hereof and (ii) confirming such information with respect to each item of Initial Portfolio Collateral as the Issuer reasonably deems necessary to confirm that such item of Initial Portfolio Collateral, individually and in the aggregate, meets the requirements specified in this Indenture; and

(i) such other documents as the Trustee may reasonably require.

Section 3.2.    Security for Notes.

On the Closing Date, the following conditions shall have been satisfied:

(a) <u>Delivery of Initial Portfolio Collateral</u>.  The Initial Portfolio Collateral to be Granted to the Trustee on such Closing Date, in an amount at least equal to the Initial Portfolio Collateral Amount, shall have been Delivered to the Trustee (or, with respect to Portfolio Loans, trade confirmations, commitment letters, assignment documents or other documents evidencing a commitment to purchase by the Issuer of the Initial Portfolio Collateral on or not later than thirty (30) days after the Closing Date shall have been delivered to the Trustee).

(b) <u>Certificate of the Issuer</u>.  A certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, shall have been delivered to the Trustee to the effect, in the case of each item of Portfolio Collateral and the Deposit included in the Trust Estate on the Closing Date, that as of the Closing Date:

(i) the Issuer is the owner of such item of Portfolio Collateral and the Deposit free and clear of any liens, claims (including any adverse claims) or encumbrances of any nature whatsoever, except for those granted or expressly permitted pursuant to this Indenture and due bills, if any, with respect to interest, or a portion thereof, accrued on such Portfolio Collateral prior to the first payment date and owed by the Issuer to the seller of such Portfolio Collateral;

(ii)    the Issuer has acquired its ownership in such item of Portfolio Collateral and the Deposit in good faith without notice of any adverse claim, except as described in paragraph (b)(i) above;

(iii)    the Issuer has Delivered such item of Portfolio Collateral to the Trustee and has not assigned, pledged or otherwise encumbered any interest in such Portfolio Collateral or the Deposit other than interests granted or expressly permitted pursuant to this Indenture;

(iv)    the Issuer has full right to Grant and does hereby Grant such item of Portfolio Collateral and the Deposit to the Trustee;

(v)    the information set forth with respect to such item of Portfolio Collateral in Schedule A hereto is correct;

(vi)    such item of Portfolio Collateral satisfies the requirements of the definition of Portfolio Collateral; and

(vii)    no such item of Portfolio Collateral is Discount Portfolio Collateral.

(c)    Rating Letters.  The Trustee shall have received written evidence that the Class X Notes have been rated "AAA" by Standard & Poor's and "Aaa" by Moody's,  the Class A-1LA Notes have been rated "AAA" by Standard & Poor's and "Aaa" by Moody's, the Class A-1LB Notes have been rated "AAA" by Standard & Poor's and "Aaa" by Moody's, the Class A-2L Notes have been rated at least "AA" by Standard & Poor's and at least "Aa2" by Moody's, the Class A-3L Notes have been rated at least "A" by Standard & Poor's and at least "A2" by Moody's, the Class A-4L Notes have been rated "A-" by Standard & Poor's and "A3" by Moody's and that the Class B-1L Notes have been rated "BBB" by Standard & Poor's and "Baa2" by Moody's.

(d)    Accounts.  The Collection Account, the Collateral Account, the Initial Deposit Account, the Reserve Account, the Expense Reimbursement Account, the Closing Expense Account, the Loan Funding Account, the Default Swap Collateral Account, the Default Swap Issuer Account and the Preferred Shares Collection Account shall have been established.

(e)    Initial Deposit Account.  The Issuer shall have delivered to the Trustee on the Closing Date cash in the amount of $125,678,543.30 representing the Deposit for inclusion in the Trust Estate and the Trustee shall have credited such cash to the Initial Deposit Account.

(f)    Expense Reimbursement Account; Closing Expense Deposit.  The Issuer shall have delivered to the Trustee on the Closing Date cash in the amount of at least $50,000 for inclusion in the Trust Estate and the Trustee shall have credited such cash to the Expense Reimbursement Account.  The Issuer shall have delivered to the Trustee on the Closing Date cash in the amount of $2,512,500 for inclusion in the Trust Estate, and the Trustee shall have credited such cash to the Closing Expense Account (the "Closing Expense Deposit") which, after payment of all closing expenses (according to the list delivered to the Trustee), shall be transferred to the Initial Deposit Account or the Collection Account and applied as set forth in Section 10.2(h).

(g) <u>Loan Funding Account</u>.  The Issuer shall have delivered to the Trustee on the Closing Date cash in the amount of $5,784,684.17 which is equal to the Issuer's commitment to make or otherwise fund draws related to any Delayed Drawdown Loans or Revolving Loans in the Initial Portfolio Collateral and the Trustee shall have credited such cash to the Loan Funding Account.

Section 3.3.  Initial Deposit Redemption.

(a) The Issuer shall use reasonable efforts to use on or prior to the Effective Date the available funds and Eligible Investments in the Initial Deposit Account (other than Account Income on funds on deposit in the Initial Deposit Account) to purchase additional Original Portfolio Collateral as permitted pursuant to Section 3.4 hereof taking into account the Initial Portfolio Collateral and Original Portfolio Collateral already purchased by the Issuer in the Trust Estate (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any of the Original Portfolio Collateral on or before the Effective Date).  If the remaining Deposit in the Initial Deposit Account as of the Effective Date equals or exceeds $2,000,000 and the Aggregate Principal Amount of the Original Portfolio Collateral (determined in accordance with the foregoing sentence) acquired or committed to be acquired by the Issuer is less than the Required Portfolio Collateral Amount (subject to the second paragraph of Section 3.4(a)), the Issuer shall cause an Initial Deposit Redemption to occur on the Initial Deposit Redemption Date by redeeming the Class A-1LA Notes and the Class X Notes in an aggregate amount equal to the excess of the Required Portfolio Collateral Amount over the par amount of Original Portfolio Collateral; *provided that* the amount applied to such Initial Deposit Redemption shall not exceed the remaining amount of the Deposit (the "Initial Deposit Redemption Amount").  No interest or other amount in excess of the Initial Deposit Redemption Amount, other than the Periodic Interest Amount with respect to the Class A-1LA Notes and the Class X Notes through the Initial Deposit Redemption Date due on the next succeeding Payment Date, shall be payable on or in respect of the Class A-1LA or the Class Notes X Notes redeemed in an Initial Deposit Redemption.  If there is a Deposit in the Initial Deposit Account on the Effective Date but no Initial Deposit Redemption is required pursuant to the terms of this Section 3.3(a), the remaining Deposit in the Initial Deposit Account shall be transferred to the Collection Account on the Effective Date and shall, subject to Section 3.4(d), constitute Collateral Principal Collections. Account Income in the Initial Deposit Account shall be transferred to the Collection Account on the Effective Date and shall constitute Collateral Interest Collections.

(b) If an Initial Deposit Redemption is required, the Issuer, not later than the third Business Day immediately following the Effective Date, shall notify the Trustee and each Rating Agency in writing that an Initial Deposit Redemption is required pursuant to Section 3.3(a) hereof and the amount of the Class A-1LA Notes and the Class X Notes required to be redeemed pursuant thereto.

(c) Notice of an Initial Deposit Redemption shall be given by the Trustee by first-class mail, postage prepaid, mailed not less than ten calendar days prior to the Initial Deposit Redemption Date, to each Holder of the Class A-1LA Notes and the Class X Notes to be redeemed at the address for such Holder in the Note Register and so long as any Notes are listed on the Irish Stock Exchange, to the Irish Paying Agent.  All notices of Initial Deposit

Redemption shall state the Initial Deposit Redemption Date, the Redemption Record Date with respect thereto, the Aggregate Principal Amount of the Class A-1LA Notes and the Class X Notes to be redeemed, and that no interest or other amount in excess of the Initial Deposit Redemption Amount shall be payable on the amount of the Class A-1LA Notes and the Class X Notes to be redeemed.

(d) If an Initial Deposit Redemption is required, all Eligible Investments in the Initial Deposit Account representing the Deposit not applied to the purchase of Portfolio Collateral on or before the Effective Date shall be liquidated on the Business Day immediately preceding the Initial Deposit Redemption Date and the proceeds thereof shall be held in the Initial Deposit Account. On the Initial Deposit Redemption Date, the Trustee shall withdraw from the Initial Deposit Account all funds therein and apply such funds to the payment of Holders of the Notes in an amount equal to the Initial Deposit Redemption Amount or to a deposit in the Collection Account, as applicable.

Section 3.4. <u>Purchase of Portfolio Collateral between the Closing Date and the Effective Date; Effective Date Conditions.</u>

(a) The Issuer may (i) purchase Original Portfolio Collateral on any Business Day during the period from and including the Closing Date to and including the Effective Date or (ii) enter into a commitment to purchase Original Portfolio Collateral on any Business Day during the period from and including the Closing Date to and including the Effective Date for purchase on or as soon as practicable thereafter (*provided that* the agreed to settlement date shall not be more than thirty (30) days after the Effective Date), in each case, for inclusion in the Trust Estate in an aggregate amount equal to the Deposit in the Initial Deposit Account. Upon receipt of a Servicer Order requesting the purchase of Original Portfolio Collateral the Trustee shall pay out of the Initial Deposit Account, during the period commencing on the Closing Date and ending on the Effective Date, all or a portion of the funds available therein for the purpose of purchasing Original Portfolio Collateral.

No Original Portfolio Collateral may be purchased prior to the Effective Date unless immediately following the purchase of such item of Portfolio Collateral (as certified by Servicer Order), the remaining Deposit in the Initial Deposit Account, after giving effect to such purchase, is sufficient as of the date of determination to purchase Original Portfolio Collateral in an Aggregate Principal Amount at least equal to the Required Portfolio Collateral Amount for delivery into the Trust Estate (taking into account the Initial Portfolio Collateral and Original Portfolio Collateral already in the Trust Estate (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any of the Original Portfolio Collateral on or before the Effective Date)).

Notwithstanding the foregoing, or any other provision hereof, if the Issuer has previously entered into a commitment to purchase an item of Portfolio Collateral to be included in the Trust Estate, such commitment not to exceed thirty (30) days, and at the time of such commitment such an item of Portfolio Collateral complied with the definition of Portfolio Collateral and this Section 3.4(a), then the Issuer may consummate the purchase of such an item

of Portfolio Collateral notwithstanding that such an item of Portfolio Collateral fails to comply with the definition of Portfolio Collateral and such criteria on the date of settlement.

(b) The Servicer shall cause to be delivered to the Trustee on the Effective Date an amended Schedule A to this Indenture listing all Original Portfolio Collateral (including the Initial Portfolio Collateral then in the Trust Estate) and all commitments to purchase Original Portfolio Collateral, which schedule shall supersede any prior Schedule A delivered to the Trustee.

(c) The Issuer will use its commercially reasonable efforts to purchase, or to enter into binding agreements to purchase, Original Portfolio Collateral by the Effective Date, that, including the Initial Portfolio Collateral, will satisfy, as of the Effective Date, the Collateral Quality Tests, the criteria set forth in Section 12.2 and the Overcollateralization Tests. Within 5 Business Days after the Effective Date, the Issuer or the Servicer (on behalf of the Issuer) shall request a Rating Confirmation on behalf of the Issuer and shall provide a report to the Rating Agencies identifying the Original Portfolio Collateral and the Issuer shall obtain and deliver to the Trustee and the Rating Agencies, together with the delivery of a report (and an electronic file of the Original Portfolio Collateral to S&P) substantially in the form of a Monthly Report as of the Effective Date, an Accountants' Certificate (a) confirming the maturity date, rating, spread, coupon and recovery rate for each item of Original Portfolio Collateral as of the Effective Date and the information provided by the Issuer with respect to every other asset included or to be included in the Trust Estate, by reference to such sources as shall be specified therein, (b) confirming that as of the Effective Date (1) each Overcollateralization Test is met; (2) the Aggregate Principal Amount of the Original Portfolio Collateral that the Issuer owned or committed to purchase as of the Effective Date is at least equal to the Required Portfolio Collateral Amount and (3) the Portfolio Collateral complies with all of the requirements of the Collateral Quality Tests and the criteria set forth in Section 12.2 and (c) specifying the procedures undertaken by them to review data and computations relating to the foregoing statements. If a Rating Confirmation Failure should occur, the Notes will be redeemed pursuant to Section 9.2 hereof.

(d) Notwithstanding any provision in this Indenture to the contrary, if, on the Effective Date, the Aggregate Principal Amount of the Portfolio Collateral (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to the Original Portfolio Collateral on or prior to such time) exceeds the Required Portfolio Collateral Amount and there are funds remaining from the Deposit held in the Initial Deposit Account, the Servicer may direct the Trustee to transfer up to the least of (i) 25% of such funds and (iii) $1,000,000, to the Collection Account as additional Collateral Interest Collections; *provided* that the Overcollateralization Tests and the collateral criteria described herein are satisfied and the Interest Coverage Test for the most recent Payment Date was satisfied. The remainder of the Deposit shall be transferred by the Trustee to the Collection Account to be applied as Collateral Principal Collections on the Payment Date immediately following the date of determination.

Section 3.5.    Intermediaries.

(a) Notwithstanding anything herein to the contrary, to the extent any items of Portfolio Collateral issued by an issuer that is not the United States of America, an agency or instrumentality thereof, or some other U.S. Person (collectively, "Non-U.S. Portfolio Securities") are Granted to the Trustee, such Non-U.S. Portfolio Securities may be delivered to and held by the Trustee through one or more Foreign Sub-custodians or Foreign Clearance Systems (as those terms are defined in the Section below; collectively, "Foreign Intermediaries") if such Non-U.S. Portfolio Securities cannot be Delivered to the Trustee.

(b) The Trustee, for the purpose of receiving and holding any Non-U.S. Portfolio Securities (as defined in Section 3.5(a)), may appoint one or more banking or securities institutions located outside the United States (each a "Foreign Sub-custodian") and/or clearing agencies or systems located outside the United States (each, a "Foreign Clearance System"), including without limitation Euroclear and Clearstream.  With respect to Non-U.S. Portfolio Securities (and related cash) held through Foreign Intermediaries, such Foreign Intermediaries may be authorized to hold Non-U.S. Portfolio Securities in central securities depositories or clearing agencies in which such Foreign Intermediaries participate.

(c) The Trustee's responsibility with respect to the selection or appointment of Foreign Intermediaries shall be limited to a duty to exercise reasonable care in the selection or retention of such Foreign Intermediaries in light of prevailing settlement and securities handling practices, procedures and controls in the relevant market and subject to Section 6.3 hereof; *provided that* the appointment of Euroclear or Clearstream to act as Foreign Intermediary shall be deemed to have been made in the exercise of due care.  With respect to any costs, expenses, damages, liabilities, or claims (including, without limitation, attorneys' and accountants' fees) incurred by the Issuer as a result of the acts or the failure to act by any Foreign Intermediaries, the Trustee shall take reasonable action to recover such costs, expenses, damages, liabilities, or claims from such Foreign Intermediaries; *provided that* the Trustee's sole liability in that regard shall be limited to amounts actually received by it from such Foreign Intermediaries (exclusive of related costs and expenses incurred by the Trustee).  The Trustee shall not be responsible or liable for any failure or delay in the performance of its obligations under this Indenture arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including without limitation, acts of God; earthquakes or fires; floods, wars, civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communication service; accidents; labor disputes; acts of civil or military authority; governmental actions; or inability to obtain labor, material, equipment or transportation.

ARTICLE IV

SATISFACTION AND DISCHARGE

Section 4.1.    Satisfaction and Discharge of Indenture.

Provided no Event of Default has occurred and is continuing hereunder, this Indenture shall cease to be of further effect with respect to the Notes except as to (i) rights of registration of transfer and exchange, (ii) substitution of mutilated, destroyed, lost or stolen

Notes, (iii) rights of Noteholders to receive payments of principal thereof and interest thereon, as applicable, and any other amounts payable in respect thereof, (iv) the rights, obligations and immunities of the Trustee hereunder and (v) the rights of Noteholders as beneficiaries hereof with respect to the property deposited with the Trustee and payable to all or any of them and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture when:

(1)     Either

(a) all Notes theretofore authenticated and delivered (other than (i) Notes which have been destroyed, lost or stolen and which have been paid or replaced as provided in Section 2.6 hereof and (ii) Notes for whose payment money has theretofore been deposited in trust and thereafter repaid to the Issuer or discharged from such trust, as provided in Section 7.3 hereof) have been delivered to the Trustee for cancellation; or

(b) all Notes not theretofore delivered to the Trustee for cancellation (i) have become due and payable, or (ii) will become due and payable at their Final Maturity Dates within one year;

and the Issuer, in the case of (b)(i) or (ii) above, has (x) irrevocably deposited or caused to be deposited with the Trustee in trust for such purpose, cash or Eligible Investments (any security satisfying the definition of Eligible Investments but for the maturity of such security shall for this purpose be deemed an Eligible Investment), the amount of cash and the Scheduled Distributions on any Eligible Investments being in an amount sufficient to pay and discharge the amount that equals the sum of the Cumulative Interest Amount on each Class of Notes to the date of such deposit or to the Final Maturity Date, as the case may be, and the Aggregate Principal Amount of each Class of Notes not theretofore delivered to the Trustee for cancellation, in each case to the extent not previously paid and (y) delivered an Accountants' Certificate to the Trustee confirming such calculations; *provided that* subsection (b) hereof shall not apply if an election to act in accordance with the provisions of Section 5.5 hereof shall have been made and not rescinded (except that the deposit of cash that would otherwise apply in the case of such subsection (b) shall nevertheless be required); *provided further* that any Eligible Investments deposited hereunder shall at the date of such deposit be rated no lower than the highest rating assigned to any of the Notes then outstanding;

(2)     the Issuer has paid or caused to be paid all other sums payable hereunder by the Issuer; and

(3)     the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture with respect to the Notes have been complied with.

Section 4.2.     Application of Trust Money.

All monies deposited with the Trustee pursuant to Section 4.1 hereof shall be held in trust by the Trustee and applied by it, in accordance with the provisions of the Notes and this Indenture, to the payment to the Person entitled thereto of the principal and interest in

accordance with Section 11.1 hereof for whose payment such money has been deposited with the Trustee, and such money shall be held in a non-interest bearing segregated trust account identified as being held in trust for the benefit of the Noteholders. Except as specifically provided herein, the Trustee shall not be responsible for payment of interest upon any monies deposited with it.

ARTICLE V

REMEDIES

Section 5.1.    Events of Default.

"Event of Default" means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a) (i) default for a period of four Business Days or more (or, in the case of a default in payment due to an administrative error or omission by the Trustee, any Paying Agent or the Note Registrar, for a period of seven Business Days or more, *provided that* the Trustee has notified each Rating Agency in writing of any such administrative error or omission) in the payment of any amount payable in respect of any Note when due when funds in such amount are available for payment as provided herein, or (ii) the failure to apply funds which are available for payment in accordance with the priority of distribution set forth in Article XI hereof, which failure shall continue for a period of four Business Days (or, in the case of a default in payment due solely to an administrative error or omission by the Trustee, any Paying Agent or the Note Registrar, for a period of seven Business Days or more, *provided that* the Trustee has notified each Rating Agency in writing of any such administrative error or omission), or (iii) default for a period of four Business Days or more (or, in the case of a default in payment due to an administrative error or omission by the Trustee, any Paying Agent or the Note Registrar, for a period of seven Business Days or more, *provided that* the Trustee has notified each Rating Agency in writing of any such administrative error or omission) in the payment of the Periodic Interest Amount due on any Class of Senior Class A Notes or Class X Payment, or, after the Senior Class A Notes and the Class X Notes are paid in full, the Periodic Interest Amount due on any Class A-3L Notes, or after the Senior Class A Notes, the Class X Notes and the Class A-3L Notes are paid in full, the Periodic Interest Amount due on any Class A-4L Notes, or after the Class A Notes and the Class X Notes are paid in full, the Class B-1L Notes, on any Payment Date, or (iv) default in the payment of the Aggregate Principal Amount and the Cumulative Interest Amount, due on any Class of Notes on the Final Maturity Date; or

(b) default in the performance or breach of any covenant, representation, warranty or other agreement of the Co-Issuers (or either one of them), other than compliance with the Overcollateralization Tests, the Interest Coverage Test or the criteria set forth in Section 12.2 hereof or a default in the performance or breach of a covenant, representation, warranty or other agreement which is specifically dealt with elsewhere in this Section or in Article VII hereof, or the failure of any representation or warranty of the Co-Issuers (or either one of them) made in this Indenture or in any certificate or other writing delivered pursuant hereto or in connection

herewith to be correct in all material respects when the same shall have been made, in either case which materially and adversely affects the rights of any Class of Noteholders and continuance of such default, breach or failure for a period of 30 days after written notice thereof shall have been given to the Co-Issuers or the Servicer by the Trustee or to the Co-Issuers, the Servicer and the Trustee by the Majority Noteholders, specifying such default, breach or failure and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder; or

(c) the entry of a decree or order by a court having jurisdiction in the premises adjudging either of the Co-Issuers as bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of either of the Co-Issuers under the Bankruptcy Code or any other applicable law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of either of the Co-Issuers or of any substantial part of their respective property, or ordering the winding up or liquidation of their respective affairs, and the continuance of any such decree, order, case or proceeding not dismissed, discharged or stayed and in effect for a period of 60 consecutive days; or

(d) the institution by either of the Co-Issuers of proceedings to be adjudicated as bankrupt or insolvent, or the consent by either of them to the institution of bankruptcy or insolvency proceedings against either of them, or the filing by either of them of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Code or any other similar applicable law, or the consent by either of the Co-Issuers to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of either of the Co-Issuers or of any substantial part of their respective property, or to the ordering of the winding up or liquidation of their respective affairs, or the making by either of them of an assignment for the benefit of creditors, or the admission by either of them in writing of its inability to pay its debts generally as they become due, or the taking of any action by either of the Co-Issuers in furtherance of any such action; or

(e) either of the Co-Issuers or the pool of assets constituting the Trust Estate becomes required to register as an "investment company" under the Investment Company Act; or

(f) the failure to maintain on any Calculation Date a Senior Class A Overcollateralization Ratio greater than or equal to 100%.

Section 5.2. Acceleration of Maturity; Rescission and Annulment.

(a) If an Event of Default (other than an Event of Default specified in Section 5.1(c) or (d)) with respect to the Notes occurs and is continuing, the Trustee may, with the consent of the Requisite Noteholders, and shall, at the direction of the Requisite Noteholders, declare the principal of the Notes to be immediately due and payable, by a notice in writing to the Issuer and the Servicer. If an Event of Default as specified in Section 5.1(c) or (d) occurs and is continuing, the principal of the Notes shall be and become immediately due and payable without the necessity of notice or any other action of any Person. If the Notes are declared to be immediately due and payable or if an Event of Default specified in Section 5.1(c) or (d) hereof occurs, the Holders of each Class of Notes shall be entitled to receive, as applicable, and in the order of priority set forth in Section 11.1(d), the Cumulative Interest Amount and the Aggregate Principal Amount with respect thereto (in each case as calculated and accrued through the date of

payment in full of the Aggregate Principal Amount of each Class of Notes), and the Servicer shall be entitled to receive the amounts payable to the Servicer under and in the order of priority set forth in Sections 11.1(b) and 11.1(d).

(b) At any time after such a declaration of acceleration of maturity has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee as provided in this Article, the Requisite Noteholders, by written notice to the Trustee and the Co-Issuers, may rescind and annul such declaration and its consequences if:

(i)     the Issuer has paid or deposited with the Trustee a sum sufficient to pay:

(A)   all overdue amounts payable on or in respect of the Notes (other than amounts due solely as a result of the acceleration);

(B)   to the extent that payment of interest on such amount is lawful, interest on such overdue amounts at the Applicable Periodic Rate; and

(C)   all unpaid Trustee Administrative Expenses, Preferred Shares Administrative Expenses, Issuer Base Administrative Expenses, Issuer Excess Administrative Expenses, and other sums paid or advanced by the Trustee and the Paying and Transfer Agent hereunder and under the Paying and Transfer Agency Agreement and the reasonable compensation, expenses, disbursements and advances of the Trustee and the Paying and Transfer Agent, their agents and counsel.

(ii)     the Trustee has (A) received written evidence that the sum paid or deposited with the Trustee by the Issuer pursuant to clause (i) above is sufficient, and (B) determined that all Events of Default, other than the nonpayment of such amount that has become due solely by such acceleration, have been (1) cured, and the Requisite Noteholders by written notice to the Trustee have agreed with such determination (which agreement shall not unreasonably be withheld), or (2) waived as provided in Section 5.15 hereof.

Section 5.3.     Proceedings.

If an Event of Default has occurred and is continuing and the Notes have been declared due and payable and such declaration and its consequences have not been rescinded and annulled, or at any time on or after the Final Maturity Date, the Trustee may in its discretion proceed to protect and enforce its rights and the rights of the Noteholders by such appropriate Proceedings, in its own name and as trustee of an express trust, as the Trustee shall deem most effective or as the Trustee may be directed by the Requisite Noteholders to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or for collection of sums due and unpaid, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by this Indenture or by law, but subject, however, to the terms of Section 5.4 hereof.  The reasonable compensation, costs, expenses, disbursements and advances incurred or paid by the Trustee, and its agents and counsel, in connection with any such Proceeding, including, without limitation, the exercise of any remedies pursuant to Section 5.4 hereof, shall be reimbursed to the Trustee pursuant to Section 6.7 hereof.

Section 5.4.   Remedies.

(a)     If the Notes have been declared due and payable and such declaration and its consequences have not been rescinded or annulled, or at any time on or after the Final Maturity Date, the Trustee may, after written notice to the Noteholders, and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent, and shall, upon direction by the Requisite Noteholders, to the extent permitted by applicable law, do one or more of the following:

(i)     institute Proceedings for the collection of all amounts then payable on the Notes or under this Indenture, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Trust Estate securing the Notes monies adjudged due;

(ii)    institute Proceedings for the complete or partial foreclosure of this Indenture with respect to the Trust Estate securing the Notes;

(iii)   exercise any remedies of a secured party under the UCC including the sale or liquidation of the Trust Estate in accordance with Section 5.18 hereof and take any other appropriate action to protect and enforce the rights and remedies of the Trustee or the Holders of the Notes hereunder; or

(iv)    exercise any other rights and remedies that may be available at law or in equity;

*provided that* the Trustee may not sell or liquidate the Trust Estate, or any portion thereof, or any rights or interest therein, unless (x) in the case of an acceleration resulting from an Event of Default set forth in Section 5.1(a) hereof, or a sale or liquidation of any portion of the Trust Estate at or greater than its par value (*provided that* Defaulted Portfolio Collateral may be liquidated without reference to, or inclusion in the calculation of, such limitation), the Requisite Noteholders have so directed the Trustee in writing to sell or liquidate the Trust Estate or any portion thereof or (y) in the case of any other Event of Default or resulting sale or liquidation, 100% of the Noteholders have so directed the Trustee in writing to sell or liquidate the Trust Estate or any portion thereof; *provided further* that no Default Swap or Synthetic Security may be terminated so long as a declaration of acceleration may be resending or annulled pursuant to Section 5.2(b).  The Trustee shall send written notice to each of the Noteholders, with a copy to the Rating Agencies and so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent, of any proposed sale or liquidation of the Trust Estate together with a brief description thereof and such written notice shall be accompanied by an Accountant's Certificate (i) confirming the information with respect to such sale or liquidation (to the extent such accountants shall be able and willing to confirm such information) and (ii) specifying the procedures, if any, undertaken by them to review the data and computations relating to such sale or liquidation.  The cost of such Accountant's Certificate shall be reimbursed to the Trustee pursuant to Section 6.7 hereof.  If the applicable Noteholders direct any sale or liquidation of the Trust Estate, or any portion thereof, the Trustee shall sell or liquidate the Trust Estate, or portion, thereof, in accordance with Section 5.18 hereof at one or more public or private sales conducted in any manner permitted by law.

(b) If an Event of Default as described in Section 5.1(b) hereof has occurred and is continuing, the Trustee may, after written notice to the Noteholders, with a copy to the Rating Agencies, and so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent, and shall, upon direction of the Requisite Noteholders, institute a Proceeding to compel performance of the covenant or to cure the representation or warranty, the breach of which gave rise to the Event of Default under such Section and enforce any decree or order arising from such Proceeding.

(c) If an Event of Default described in Sections 5.1(a)(iii) or 5.1(a)(iv) hereof has occurred and is continuing, the Trustee shall, upon written direction of the Requisite Noteholders, terminate the services of the Servicer in accordance with the terms of the Servicing Agreement.

Section 5.5. <u>Preservation of Trust Estate.</u>

(a) If an Event of Default has occurred and is continuing or if the Final Maturity Date has occurred and subject to Section 5.4 hereof, the Trustee shall retain the Trust Estate securing the Notes intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of the Notes in accordance with the provisions of Sections 10.1, 10.2(a), 10.2(b) and 11.1 hereof (unless and until the Notes have been declared due and payable and the applicable Noteholders have directed the Trustee pursuant to Section 5.4(a) hereof to sell or liquidate the Trust Estate or any portion thereof). The Trustee shall give written notice of the retention of the Trust Estate to the Issuer. If the Notes have been declared due and payable pursuant to Section 5.2 hereof or if the Final Maturity Date has occurred, any such retention pursuant to this Section 5.5(a) may be rescinded at any time by written notice to the Trustee and the Co-Issuers from the applicable Noteholders directing the Trustee to sell or liquidate the Trust Estate or any portion thereof.

(b) Nothing contained in Section 5.5(a) hereof shall be construed to require the Trustee to preserve the Trust Estate securing the Notes if prohibited by applicable law.

Section 5.6. <u>Trustee May File Proofs of Claim.</u>

In case there shall be pending Proceedings relative to the Issuer or any other obligor upon the Notes under the Bankruptcy Code or any other applicable bankruptcy, insolvency or other similar law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Issuer or its property or such other obligor or its property, or in case of any other comparable Proceedings relative to the Issuer or other obligor, or in case of any voluntary dissolution, liquidation or winding-up of the Issuer, regardless of whether the principal of any Notes shall then be due and payable as therein expressed or by declaration or otherwise and regardless of whether the Trustee shall have made any demand pursuant to the provisions of Section 5.3 hereof, the Trustee is hereby entitled and empowered to, and may and at the direction of the Requisite Noteholders, shall, by intervention in such Proceedings or otherwise:

(i) file and prove a claim or claims for the whole amount of principal and interest owing and unpaid in respect of the Notes, and to file such other papers or

documents and take such other action, including participating as a member, voting or otherwise, of any committee of creditors, as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made by the Trustee and each predecessor Trustee or any Noteholder, except as a result of negligence or bad faith) and of the Noteholders allowed in any Proceedings relative to the Issuer or other obligor upon the Notes or this Indenture or to the creditors or property of the Issuer or such other obligor;

(ii)     unless prohibited by applicable law and regulations, upon direction of the Requisite Noteholders vote on behalf of the Holders of the Notes in any election of a trustee or a standby trustee in arrangement, reorganization, liquidation or other bankruptcy or insolvency Proceedings (or person performing similar functions in comparable Proceedings); and

(iii)     collect and receive any monies or other property payable to or deliverable on any such claims, and distribute in accordance with Section 5.8 hereof all amounts received with respect to the claims of the Noteholders and the Trustee on their behalf; and any trustee, receiver or liquidator, custodian or other similar official is hereby authorized by each of the Noteholders to make payments to the Trustee, and, in the event that the Trustee shall consent to the making of payments directly to the Noteholders, to pay to the Trustee such amounts as shall be sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee and their respective agents, attorneys and counsel, and all other expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee or any Noteholder except as a result of negligence or bad faith.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Noteholder any plan of reorganization, arrangement, adjustment or compromise affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Noteholder in any such Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy (or person performing similar functions in comparable Proceedings) or to participate as a member of any committee of creditors.

In any Proceedings brought by the Trustee (and also any Proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party) the Trustee shall be held to represent all the Holders of the Notes subject to the provisions of this Indenture, and it shall not be necessary to make any Holders of the Notes parties to any such Proceedings.

Section 5.7.     Trustee May Enforce Claims Without Possession of Notes.

All rights of action and claims under this Indenture or the Notes may be prosecuted and enforced by the Trustee without the possession of any of the Notes or the production thereof in any Proceeding relating thereto, and any such Proceeding instituted by the

Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall be applied as set forth in Section 5.8 hereof.

Section 5.8.    Application of Money Collected.

Any money collected by or on behalf of the Trustee with respect to the Notes pursuant to this Article V (including all collections from, and proceeds of the sale or liquidation of, the Trust Estate) shall be applied at the date or dates fixed by the Trustee and in the same order as specified in Sections 11.1(b) and 11.1(d) hereof.

Section 5.9.    Limitation on Suits.

Except as otherwise provided in Section 5.10 hereof, no Holder of any Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(a) such Holder has previously given written notice to the Trustee of a continuing Event of Default;

(b) the Requisite Noteholders shall have made written request to the Trustee to institute Proceedings in respect of such Event of Default in its own name as Trustee hereunder;

(c) such Holder or Holders have offered to the Trustee indemnity reasonably satisfactory to the Trustee against the costs, expenses and liabilities to be incurred by the Trustee in compliance with such request;

(d) the Trustee for 30 days after its receipt of such notice, request and offer of such indemnity has failed to institute any such Proceedings; and

(e) no direction inconsistent with such written request has been given to the Trustee during such 30-day period by the Requisite Noteholders;

it being understood and intended that no one or more Holders of Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Notes of the same Class or to obtain or to seek to obtain priority or preference over any other Holders of Notes of the same Class or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all the Holders of Notes of the same Class.

Section 5.10.    Unconditional Rights of Noteholders to Receive Principal and Interest.

Notwithstanding any other provision in this Indenture, but subject to the provisions of Sections 2.7 and 11.1 hereof, (a) the Holders of the Class A-1LA Notes shall have the right, which is absolute and unconditional, to receive an aggregate amount equal to the unpaid Periodic Rate Shortfall Amount, if any, the Aggregate Principal Amount of the Class A-1LA Notes and the Class X Notes, as applicable, and accrued and unpaid interest thereon at the Applicable Periodic Rate, as any such amounts become due and payable, (b) the

Holders of the Class A-1LB Notes shall have the right, which is absolute and unconditional, to receive an aggregate amount equal to the unpaid Periodic Rate Shortfall Amount, if any, the Aggregate Principal Amount of the Class A-1LB Notes and accrued and unpaid interest thereon at the Applicable Periodic Rate, as any such amounts become due and payable, (c) the Holders of the Class A-2L Notes shall have the right, which is absolute and unconditional, to receive an aggregate amount equal to the unpaid Periodic Rate Shortfall Amount, if any, the Aggregate Principal Amount of the Class A-2L Notes and accrued and unpaid interest thereon at the Applicable Periodic Rate, as any such amounts become due and payable, (d) the Holders of the Class A-3L Notes shall have the right, which is absolute and unconditional, to receive an aggregate amount equal to the unpaid Periodic Rate Shortfall Amount, if any, the Aggregate Principal Amount of the Class A-3L Notes and accrued and unpaid interest thereon at the Applicable Periodic Rate, as any such amounts become due and payable, (e) the Holders of the Class A-4L Notes shall have the right, which is absolute and unconditional, to receive an aggregate amount equal to the unpaid Periodic Rate Shortfall Amount, if any, the Aggregate Principal Amount of the Class A-4L Notes and accrued and unpaid interest thereon at the Applicable Periodic Rate, as any such amounts become due and payable, and (f) the Holders of the Class B-1L Notes shall have the right, which is absolute and unconditional, to receive an aggregate amount equal to the unpaid Periodic Rate Shortfall Amount, if any, the Aggregate Principal Amount of the Class B-1L Notes and the accrued and unpaid interest thereon at the Applicable Periodic Rate as any such amounts become due and payable. Furthermore, the Holder of any Note shall have the right, which is absolute and unconditional, to institute Proceedings for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder. Notwithstanding any other provision in this Section 5.10 or otherwise in this Indenture to the contrary, (i) Holders of the Class A-3L Notes shall have no right to institute Proceedings for the enforcement of any such payment until such time as no Senior Class A Notes remain Outstanding, (ii) Holders of the Class A-4L Notes shall have no right to institute Proceedings for the enforcement of any such payment until such time as no Senior Class A Notes remain Outstanding, and (iii) Holders of the Class B-1L Notes shall have no right to institute Proceedings for the enforcement of any such payment until such time as no Class A Notes remain Outstanding, and, in each case, any such right to institute Proceedings shall be subject to the provisions of Section 5.9 hereof.

Section 5.11.　Restoration of Rights and Remedies.

If the Trustee or any Noteholder has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Noteholder, then and in every such case the Issuer, the Trustee and the Noteholder shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Trustee and the Noteholders shall continue as though no such Proceeding had been instituted.

Section 5.12.　Rights and Remedies Cumulative.

No right or remedy herein conferred upon or reserved to the Trustee or to the Holders of the Notes is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right

and remedy given hereunder or now or hereafter existing by law or in equity or otherwise.  The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 5.13.   Delay or Omission Not Waiver.

No delay or omission of the Trustee or of any Holder of any Note to exercise any right or remedy occurring upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein.  Every right and remedy given by this Article V or by law to the Trustee or to the Noteholders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Noteholders, as the case may be.

Section 5.14.   Control by Noteholders.

Notwithstanding any other provision of this Indenture, the Requisite Noteholders, on behalf of the Holders of all the Notes, shall have the right (a) to cause the institution of and direct the time, method and place of conducting any Proceeding for any remedy available to the Trustee or (b) subject to Section 6.3(e) hereof, to direct the Trustee with respect to its exercise of any right, remedy, trust or power conferred on the Trustee; *provided that*:

(i)     such direction shall not be in conflict with any rule of law or with any express provision of this Indenture (including, without limitation, any provision hereof providing express personal protection to the Trustee or a limitation on the liability of the Co-Issuers as set forth in Section 2.7(i) hereof), and

(ii)    the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction; *provided that,* subject to Section 6.1 hereof, the Trustee need not take any action that it reasonably determines might involve it in liability.

Section 5.15.   Waiver of Past Defaults.

Prior to the time a judgment or decree for payment of the money due has been obtained by the Trustee, the Requisite Noteholders may on behalf of the Holders of all the Notes waive any past Default and its consequences, with notice to the Rating Agencies, except a Default:

(a) in the payment of the principal of or interest on any Note, or

(b) in respect of a covenant or provision hereof that under Section 8.2 hereof cannot be modified or amended without the consent of the Holder of each Outstanding Note affected.

In the case of any such waiver, the Issuer, the Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder, respectively; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto. Upon such waiver, such Default shall cease to exist, and any Event of Default arising therefrom

shall be deemed to have been cured, for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

Section 5.16.  Undertaking for Costs.

All parties to this Indenture agree, and each Holder of any Note by his acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken, or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this Section 5.16 shall not apply to any suit instituted by the Trustee, to any suit instituted by any Noteholder, or group of Noteholders, holding in the aggregate more than 10% in Aggregate Principal Amount of the Notes, or to any suit instituted by any Noteholder for the enforcement of the payment of the principal of or interest on any Note on or after the Final Maturity Date expressed in such Note.

Section 5.17.  Waiver of Stay or Execution Laws.

Each of the Co-Issuers covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or execution law wherever enacted, including, but not limited to, filing a voluntary petition under the Bankruptcy Code now or at any time hereafter in force, which may affect the covenants or the performance of or the exercise of any remedies under this Indenture; and each of the Co-Issuers (to the extent that they may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee or any Noteholder, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 5.18.  Sale of Trust Estate.

(a) The power to effect any sale (a "Sale") of any portion of the Trust Estate pursuant to Section 5.4 and Section 5.5 hereof shall not be exhausted by any one or more Sales as to any portion of such Trust Estate remaining unsold, but shall continue unimpaired until the entire Trust Estate securing the Notes shall have been sold or all amounts payable on the Notes under this Indenture with respect thereto shall have been paid.  The costs of any such sale of the Trust Estate shall be reimbursable to the Trustee pursuant to Section 6.7 hereof.  The Trustee may, upon notice to the Noteholders, and so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent, and shall, upon direction of the Requisite Noteholders, postpone any Sale by public announcement made at the time of and place of such Sale.  The Trustee hereby expressly waives its right to any amount fixed by law as compensation for any Sale.

(b) The Trustee may bid for and acquire any portion of the Trust Estate in connection with a Sale thereof on an arm's length basis to the extent not prohibited by applicable law, and may pay all or part of the purchase price by crediting against amounts owing on the

Notes or other amounts secured by this Indenture, all or part of the net proceeds of such Sale after deducting the reasonable costs, charges and expenses incurred by the Trustee in connection with such Sale notwithstanding the provisions of Section 6.7 hereof. The Notes need not be produced in order to complete any such Sale, or in order for the net proceeds of such Sale to be credited against amounts owing on the Notes. The Trustee may hold, lease, operate, manage or otherwise deal with any property so acquired in any manner permitted by law in accordance with this Indenture.

(c) If any portion of the Trust Estate consists of securities issued without registration under the Securities Act ("Unregistered Securities"), the Trustee may seek an Opinion of Counsel, or, if no such Opinion of Counsel can be obtained and with the consent of the Requisite Noteholders, seek a no-action position from the Securities and Exchange Commission or any other relevant Federal or state regulatory authorities, regarding the legality of a public or private sale of such Unregistered Securities (the costs of which in each case, shall be reimbursable to the Trustee pursuant to Section 6.7 hereof).

(d) The Trustee shall execute and deliver an appropriate instrument of conveyance transferring its interest in any portion of the Trust Estate in connection with a Sale thereof. In addition, the Trustee is hereby irrevocably appointed the agent and attorney-in-fact of the Issuer to transfer and convey its interest in any portion of the Trust Estate in connection with a Sale thereof and to take all action necessary to effect such Sale. No purchaser or transferee at such a Sale shall be bound to ascertain the Trustee's authority, inquire into the satisfaction of any conditions precedent or see to the application of any monies.

Section 5.19.   Action on Notes.

The Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture. Neither the lien of this Indenture nor any rights or remedies of the Trustee or the Noteholders hereunder shall be impaired by the recovery of any judgment by the Trustee.

## ARTICLE VI

## THE TRUSTEE

Section 6.1.   Certain Duties and Responsibilities.

(a) Except during the continuance of an Event of Default (other than a Trustee Payment-Related Event of Default):

(1)   the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(2)   in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the

requirements of this Indenture; *provided that* in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform on their face to the requirements of this Indenture and shall promptly notify the party delivering the same if such certificate or opinion does not so conform. If a corrected certificate or opinion shall not have been delivered to the Trustee within 15 days after such notice from the Trustee, the Trustee shall so notify the Noteholders.

(b) In case an Event of Default (other than a Trustee Payment-Related Event of Default) of which the Trustee has actual knowledge has occurred and is continuing, the Trustee shall, prior to the receipt of directions, if any, from the Requisite Noteholders, exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(c) No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(1) this subsection shall not be construed to limit the effect of subsection (a) of this Section;

(2) the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it shall be proven that the Trustee was negligent in ascertaining the pertinent facts;

(3) the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Issuer or the Co-Issuer in accordance with this Indenture and/or the Requisite Noteholders (or Holders with such larger percentage as may be required by the terms hereof) relating to the time, method and place of conducting any Proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture;

(4) no provision of this Indenture shall require the Trustee to expend or risk its own funds or incur any extraordinary financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not reasonably assured to it (provided that the unsecured agreement of any Noteholder that is an Institutional Investor organized under the laws of the United States or any State in the United States shall constitute adequate assurance with respect to repayment and indemnity; *provided that* the aggregate net worth of the Institutional Investors providing such unsecured agreements shall be not less than $200,000,000); *provided that* the reasonable costs of performing its ordinary services under this Indenture shall not be deemed an "extraordinary financial liability" for purposes hereof; and

(5) the Trustee shall not be liable to the Noteholders for any action taken or omitted by it at the direction of the Issuer, the Servicer and/or the Holders of the

Notes under circumstances in which such direction is required or permitted by the terms of this Indenture.

(d) Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section 6.1 and Section 6.3 hereof.

(e) The Trustee, promptly after receipt by a Responsible Officer, shall transmit by first class mail all Holders of Notes, as their names and addresses appear on the Note Register, all written communications that are required hereunder to be delivered to the Trustee and are received from or on behalf of the Issuer or the Servicer (excluding in the case of the Holders (i) information provided by the Trustee to the Issuer pursuant to Section 10.4 hereof, (ii) so long as no Event of Default (other than a Trustee Payment-Related Event of Default) has occurred and is continuing, Servicer Orders received by the Trustee pursuant to Sections 10.2, 11.3 and 12.4 hereof, and (iii) Monthly Reports received pursuant to Section 10.5(a) hereof, unless, in any such case, requested by any Holder) and any notification or other communication received from any of the Rating Agencies stating that the rating of any Class of Notes has been, or will be, changed or withdrawn.

Section 6.2. [Notice of Default.](#)

Promptly (and in no event later than 5 Business Days) after the occurrence of any Default or Event of Default of which a Responsible Officer of the Trustee has actual knowledge or after any declaration of acceleration has been made by or delivered to the Trustee pursuant to Section 5.2 hereof, the Trustee shall transmit by mail to the Rating Agencies, to all Holders of Notes, as their names and addresses appear on the Note Register, and to the Issuer and the Servicer, notice of all Defaults or Events of Default hereunder of which a Responsible Officer of the Trustee has actual knowledge, unless such Default or Event of Default shall have been cured or waived.

Section 6.3. [Certain Rights of Trustee.](#)

Except as otherwise provided in Section 6.1 hereof:

(a) the Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or document (including but not limited to any reports prepared and delivered under Article X hereunder) believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties;

(b) any request or direction of the Servicer mentioned herein shall be sufficiently evidenced by a Servicer Request or Servicer Order, as the context may require;

(c) whenever in the administration of this Indenture the Trustee shall (i) deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon an Officer's Certificate or (ii) be required to determine the value of any Collateral or funds hereunder or the cash flows projected to be received

therefrom, the Trustee may, in the absence of bad faith on its part, rely on reports of nationally recognized accounting firms or other persons qualified to provide the information required to make such determination including nationally recognized dealers in securities of the type being valued and securities quotation services;

(d) as a condition to the taking or omitting of any action by it hereunder, the Trustee may consult with counsel and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in reliance thereon;

(e) the Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Noteholders pursuant to this Indenture unless such Noteholders shall have offered to the Trustee security reasonably satisfactory to it or indemnity against all costs, expenses and liabilities which might reasonably be incurred by it in compliance with such request or direction (an unsecured indemnity agreement of an Institutional Investor organized under the laws of the United States or any state in the United States shall be deemed sufficient; *provided that* the aggregate net worth of the Institutional Investors providing such unsecured agreements shall not be less than $200,000,000);

(f) the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or documents received by it, but the Trustee, in its discretion, may and, upon written direction of the Majority Noteholders shall, make such further inquiry or investigation into such facts or matters as it may see fit or as it shall be directed, and the Trustee and any Noteholder (acting solely through the Trustee and at the expense of such Noteholder) shall be entitled, on reasonable prior request (which request shall include a statement of the purpose therefor) made in advance to the Issuer, the Trustee and the Servicer, to examine the books and records of the Issuer and the Servicer relating to the Trust Estate, personally or by agent or attorney during the Issuer's or the Servicer's normal business hours; *provided that* the Trustee or any such Noteholder shall, and shall cause its agents, to hold in confidence all such information, except (i) to the extent disclosure may be required by law, by any regulatory authority, the Transaction Documents or by the National Association of Insurance Commissioners, (ii) a Noteholder may disclose such information to any prospective transferee and to such Noteholder's and transferee's accountants, consultants, attorneys and similar agents; *provided that* all such persons agree in writing to hold such information as confidential and (iii) except to the extent that the Trustee, in its sole judgment, may determine that such disclosure is consistent with its obligations hereunder;

(g) the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder;

(h) to the extent permitted by applicable law, the Trustee shall not be required to give any bond or surety in respect of the execution of this Indenture or otherwise;

(i)  the Trustee shall not be deemed to have notice or knowledge of any matter unless a Responsible Officer within the Corporate Trust Office has actual knowledge thereof or unless written notice thereof is received by the Trustee at the Corporate Trust Office and such notice references the Notes generally, the Issuer or this Indenture.  Whenever reference is made in this Indenture to a Default or an Event of Default such reference shall, insofar as determining any liability on the part of the Trustee is concerned, be construed to refer only to a Default or an Event of Default of which the Trustee is deemed to have knowledge in accordance with this paragraph;

(j)  the permissive right of the Trustee to take or refrain from taking any actions enumerated in this Indenture shall not be construed as a duty;

(k) the Trustee shall not be liable for any action it takes, or omits to take, in good faith that it reasonably believes to be authorized or within its rights or powers hereunder;

(l) the rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and to each Paying Agent, Paying and Transfer Agent, Authenticating Agent, Transfer Agent and Note Registrar;

(m)  the Trustee shall not be responsible for the accuracy of the books or records of, or acts or omissions of, the Depository, any Transfer Agent (other than the Trustee itself acting in that capacity), Clearstream, Euroclear, any Calculation Agent (other than the Trustee itself acting in that capacity) or any Paying Agent (other than the Trustee itself acting in that capacity); *provided*, the Trustee will make reasonable efforts to correct any errors they become aware of or to notify the appropriate parties of any errors they become aware of; and

(n)  the Trustee will not be liable for the actions or omissions of the Servicer, and without limiting the foregoing, the Trustee will not be under any obligation to monitor, evaluate or verify compliance by the Servicer with the terms hereof or the Servicing Agreement, or to verify or independently determine the accuracy of the information received by it from the Servicer (or from any selling institution, agent, bank, trustee or similar source) with respect to the Portfolio Collateral.

Section 6.4.    Not Responsible for Recitals or Issuance of Notes.

The recitals contained herein and in the Notes, other than the certificate of authentication thereon, shall be taken as the statements of the Issuer, and the Trustee assumes no responsibility for their correctness.  The Trustee makes no representation as to the validity or sufficiency of this Indenture, of the Trust Estate, or of the Notes.  The Trustee shall not be accountable for the use or application by the Issuer of the Notes or Preferred Shares or the proceeds thereof.

Section 6.5.    May Hold Notes.

(a) JPMorgan Chase Bank, National Association, or any other Person that becomes Trustee hereunder, in any capacity, may become the owner or pledgee of Notes, and

may otherwise deal with the Issuer or any Affiliate thereof with the same rights it would have if it were not Trustee.

(b) The Trustee and its Affiliates may invest in for their own account obligations or securities that would be appropriate for inclusion in the assets as Portfolio Collateral, and the Trustee in making those investments has no duty to act in a way that is favorable to the Issuer or the Holders of the Notes or the Preferred Shares.  The Trustee's Affiliates currently serve, and may in the future serve as investment advisor for other issuers of collateralized debt obligations.

(c) The Trustee and its Affiliates are permitted to receive additional compensation that could be deemed to be in the Trustee's economic self interest for (i) serving as investment advisor, administrator, shareholder, servicing agent, custodian or sub-custodian with respect to certain Eligible Investments, (ii) using Affiliates to effect transactions in certain Eligible Investments selected by the Servicer and (iii) effecting transactions in certain Eligible Investments.  Such compensation shall not be an amount that is reimbursable or payable pursuant to this Indenture.   All purchases of Eligible Investments shall be made in accordance with Section 10.2(b).

Section 6.6.    Money Held in Trust.

Money held by the Trustee in trust hereunder need not be segregated from other funds held by the Trustee in trust hereunder except to the extent required herein or required by law.  The Trustee shall be under no liability for interest on any money received by it hereunder except as otherwise agreed upon with the Issuer and except to the extent of income or other gain on Eligible Investments which are deposits in or certificates of deposit of the Trustee in its commercial capacity and income or other gain actually received by the Trustee on Eligible Investments.   Under no circumstances shall the Trustee be responsible for any losses on investments made in accordance with an Issuer Order or Servicer Order, unless such investment is made in an obligation of the Trustee in its corporate capacity.

Section 6.7.    Compensation and Reimbursement.

The Issuer agrees:

(a) to pay the Trustee on each Payment Date (in accordance with the priority of payment provisions set forth in Section 11.1 hereof) compensation for all services rendered by it hereunder (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) in accordance with the Trustee Fee Letter Agreement;

(b) except as otherwise expressly provided herein, to reimburse the Trustee (in accordance with the priority of payment provisions set forth in Section 11.1 hereof) in a timely manner upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee (as such or as Securities Intermediary) in accordance with any provision of this Indenture or in the enforcement of any provision hereof (including the reasonable compensation and the expenses and disbursements of its agents and counsel) and expenses related to the maintenance and administration of the Collateral; *provided that* any securities transaction charges to the extent included above shall, in the case of certain Eligible Investments

specified by the Servicer, be waived in the event that any amounts are received by the Trustee during a Due Period from a financial institution in consideration of purchasing such Eligible Investments, except any such expense, disbursement or advance as may be attributable to the Trustee's negligence, willful misconduct or bad faith;

(c) to reimburse the Trustee (in accordance with the priority of payment provisions set forth in Section 11.1 hereof) for its payment of the fees and expenses of any accounting firm or investment banking firm employed by the Trustee to perform the accounting required pursuant to Section 5.4, Section 5.5, Section 6.3(c) or Section 10.6 hereof and for its payment of the fees and expenses of the Irish Paying Agent, Paying Agents or Authenticating Agents appointed by it at the request of the Issuer pursuant to Section 2.4;

(d) to indemnify the Trustee, its directors, officers, employees and agents (in accordance with the priority of payment provisions set forth in Section 11.1 hereof) for, and to hold it harmless against, any loss, liability or expense (including without limitation reasonable attorney's fees and expenses) incurred without negligence, willful misconduct or bad faith arising out of or in connection with the acceptance or administration of this trust and the Transaction Documents, including the costs and expenses of defense against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder (including as Securities Intermediary); and

(e) to pay the Trustee (in accordance with the priority of payment provisions set forth in Section 11.1 hereof) reasonable additional compensation together with its expenses (including reasonable attorneys' fees) for any collection action taken pursuant to Section 6.12 hereof.

Section 6.8.    Corporate Trustee Required; Eligibility.

There shall at all times be a Trustee hereunder which shall be a bank organized and doing business under the laws of the United States of America or of any State, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $200,000,000, having a long-term unsecured debt rating of "BBB" or better by Standard & Poor's and "Baa1" or better by Moody's, and subject to supervision or examination by Federal or state authority.  If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section 6.8, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. In addition, the Trustee shall not be "affiliated" (as that term is defined in Rule 405 of the Securities Act) with the Co-Issuers or with any person involved in the organization or operation of the Co-Issuers and shall not offer or provide credit or credit enhancement to the Co-Issuers (as provided per Rule 3a-7).  If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section 6.8, it shall resign immediately in the manner and with the effect hereinafter specified in this Article VI.

Section 6.9.    Resignation and Removal; Appointment of Successor.

(a) No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Article VI shall become effective until the acceptance of appointment by the successor Trustee under Section 6.10 hereof.  The indemnifications in favor of the Trustee in Section 6.7 hereof shall survive any resignation or removal (to the extent of any indemnified liabilities, costs, expenses and other amounts arising or incurred prior to, or arising out of actions or omissions occurring prior to, such resignation or removal).

(b) The Trustee may resign at any time by giving written notice thereof to the Issuer, the Rating Agencies, the Noteholders and the Servicer and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent.  Upon receiving such notice of resignation, the Issuer shall at the direction of its board of directors (with the written consent of the Servicer, not to be unreasonably withheld) promptly appoint a successor trustee or trustees by written instrument, in duplicate, executed by an Authorized Officer of the Issuer on behalf of the Issuer, one original copy of which shall be delivered to the Trustee so resigning and one original copy to the successor trustee or trustees, together with a copy to each Noteholder.  If no successor trustee shall have been appointed and an instrument of acceptance by a successor Trustee shall not have been delivered to the Trustee within 30 days after the giving of such notice of resignation, the resigning Trustee, or any Holder of a Note, may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(c) Subject to Section 6.9(a) hereof, the Trustee may be removed at any time at the direction the Holders of more than 50% of the Aggregate Principal Amount of the Controlling Class.

(d) The Issuer, at the direction of its board of directors, by Issuer Order, may remove the Trustee petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee, if at any time:

(i)     the Trustee shall cease to be eligible under Section 6.8 hereof and shall fail to resign after written request therefor by the Issuer or by the Requisite Noteholders, or

(ii)     the Trustee shall become incapable of acting or shall be adjudged bankrupt or insolvent or a receiver or liquidator of the Trustee or of its property shall be appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation.

(e) If the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of the Trustee for any cause, the Issuer, at the direction of its board of directors, by Issuer Order, shall (with the written consent of the Servicer, not to be unreasonably withheld) promptly appoint a successor Trustee.  If no successor Trustee shall have been so appointed by the Issuer and shall have accepted appointment in the manner hereinabove provided, any Noteholder may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(f)  The Issuer shall give prompt notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by giving facsimile notice of such event, confirmed by first-class mail, postage prepaid, to each Rating Agency, Bear Stearns, the Servicer and to the Holders of the Notes as their names and addresses appear in the Note Register.  Each notice shall include the name of the successor Trustee and the address of its Corporate Trust Office.

Section 6.10.   Acceptance of Appointment by Successor.

Every successor Trustee appointed hereunder shall be required to meet the eligibility requirements set forth in Section 6.8 hereof and shall execute, acknowledge and deliver to the Issuer and the retiring Trustee an instrument accepting such appointment, and thereupon the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts, duties and obligations of the retiring Trustee; but, on request of the Issuer, the successor Trustee or the Requisite Noteholders, such retiring Trustee shall, upon payment of its fees, expenses and indemnities then unpaid, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder, subject nevertheless to its lien, if any; provided for in Section 6.13 hereof.  Upon request of any such successor Trustee, the Issuer shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts.

No appointment of a successor Trustee shall become effective until the date ten days after notice of such appointment has been given to each Noteholder, and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent.

Section 6.11.   Merger, Conversion, Consolidation or Succession to Business of Trustee.

Any corporation into which the Trustee may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any corporation succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder; *provided* such corporation shall be otherwise qualified and eligible under this Article, without the execution or filing of any paper or any further act on the part of any of the parties hereto.  In case any Notes have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to such authenticating Trustee may adopt such authentication and deliver the Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Notes.

Section 6.12.   Certain Duties of Trustee Related to Delayed Payment of Proceeds.

If in any month the Trustee shall not have received a payment with respect to any Pledged Security on its Due Date, (a) the Trustee shall promptly notify the Issuer and the Servicer in writing and, (b) unless within three Business Days after such notice such payment

shall have been received by the Trustee, or the Issuer shall have made provision for such payment satisfactory to the Trustee in accordance with Section 10.2(a) hereof, the Trustee shall request the issuer of such Pledged Security, the trustee under the related Underlying Instrument or paying agent designated by either of them, as the case may be, to make such payment as soon as practicable after such request but in no event later than three Business Days after the date of such request.  If such payment is not made within such time period, the Trustee shall take such action as the Servicer shall direct in writing; *provided that* any expenses incurred or to be incurred in taking any such action shall be deemed to be an "extraordinary financial liability" under clause (4) of Section 6.1(c) hereof.  Any such action shall be without prejudice to any right to claim a Default or Event of Default under this Indenture.  In the event that the Issuer or the Servicer requests a release of a Pledged Security and/or delivers Substitute Portfolio Collateral in connection with any such action under the Servicing Agreement, such release and/or substitution shall be subject to Section 10.3 hereof and Article XII of this Indenture as the case may be. Notwithstanding any other provision hereof the Trustee shall deliver to the Issuer or its designee any payment with respect to any Pledged Security received after the Due Date thereof to the extent the Issuer previously made provisions for such payment satisfactory to the Trustee in accordance with this Section 6.12 and such payment shall not be deemed part of the Trust Estate.

Section 6.13.    Non-Petition.

None of the Trustee, the Secured Parties, the Noteholders or the Paying and Transfer Agent, shall cause or join in the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for any reason, including for the nonpayment to any such party of any amounts due hereunder or under the Paying and Transfer Agency Agreement or under the Notes, as applicable, until the expiration of the period which is one year and one day (or such longer preference period as may be in effect) after the final payment on the Notes; *provided, however,* nothing herein shall be deemed to prohibit the Trustee from filing proofs of claim for itself and on behalf of the Noteholders.

Section 6.14.    Withholding.

(a) If any withholding tax is imposed on the Co-Issuers' payment (or allocations of income) to any Noteholder, such tax shall reduce the amount otherwise distributable to such Noteholder.  The Trustee is hereby authorized and directed to retain from amounts otherwise distributable to any Noteholder sufficient funds for the payment of any tax that is legally owed by the Trust Estate or the Co-Issuers (as directed to it in writing by the Co-Issuers) (but such authorization shall not prevent the Trustee from contesting any such tax in appropriate Proceedings and withholding payment of such tax, if permitted by law, pending the outcome of such Proceedings), or that the Trustee may otherwise determine it is obligated to withhold under applicable law or regulation.  The amount of any withholding tax imposed with respect to any Noteholder shall be treated as cash distributed to such Noteholder at the time it is withheld by the Trustee and remitted to the appropriate taxing authority.  If there is a possibility that withholding tax is payable with respect to a distribution, the Trustee may in its sole discretion withhold such amounts in accordance with this Section 6.14 (a).  If any Noteholder wishes to apply for a refund of any such withholding tax, the Trustee shall reasonably cooperate with such Noteholder in making such claim so long as such Noteholder agrees to reimburse the Trustee for any out-of-pocket expenses incurred. Nothing in this Section 6.14 shall be construed to impose upon the

Trustee any obligation or duty to determine the tax liability or responsibilities of the Co-Issuers or the Trust Estate other than the duties required under applicable law, or otherwise to perform any related tax administration or return preparation or filing responsibilities, or to impose upon the Trustee any duty or obligation to commence Proceedings to contest any tax.

(b) In order to receive payments on its Note free of U.S. federal withholding and backup withholding tax, each Holder shall timely furnish the Issuer or its agents any U.S. federal income tax form or certification (such as Internal Revenue Service ("IRS") Form W-8BEN (Certification of Foreign Status), Form W-8IMY (Certification of Foreign Intermediary Status), Form W-9 (Request for Taxpayer Identification Number and Certification) or Form W-8ECI (Certification of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with Conduct of a U.S. Trade or Business) or any successors to such IRS forms) that the Issuer or its agents may reasonably request and shall update or replace such form or certification in accordance with its terms or its subsequent amendments.

Section 6.15.   The Securities Intermediary.

(a) There shall at all times be one or more securities intermediaries appointed for purposes of this Indenture (the "Securities Intermediary").  JPMorgan Chase Bank, National Association, is hereby appointed as the initial Securities Intermediary hereunder (in such capacity, "JPMorgan Chase"), and JPMorgan Chase accepts such appointment.

(b) The Securities Intermediary shall be, and JPMorgan Chase as initial Securities Intermediary hereby represents and warrants that it is as of the date hereof and shall be, for so long as it is the Securities Intermediary hereunder, a corporation or national bank that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity hereunder.  The Securities Intermediary shall, and JPMorgan Chase as initial Securities Intermediary does, agree with the parties hereto that each Account shall be an account to which financial assets may be credited and undertake to treat the Trustee as entitled to exercise the rights that comprise such financial assets.  The Securities Intermediary shall, and JPMorgan Chase as initial Securities Intermediary does, agree with the parties hereto that each item of property credited to each Account shall be treated as a financial asset.  The Securities Intermediary shall, and JPMorgan Chase as initial Securities Intermediary does, agree with the parties hereto that, for purposes of the UCC and the United States Regulations, the securities intermediary's jurisdiction of the Securities Intermediary with respect to the Trust Estate shall be the State of New York.  The Securities Intermediary shall, and JPMorgan Chase as initial Securities Intermediary does, represent and covenant that it is not and will not be (as long as it is the Securities Intermediary hereunder) a party to any agreement that is inconsistent with the provisions of this Indenture.  The Securities Intermediary shall, and JPMorgan Chase as initial Securities Intermediary does, covenant that it will not take any action inconsistent with the provisions of this Indenture applicable to it.  The Securities Intermediary shall, and JPMorgan Chase as initial Securities Intermediary does, agree that any item of property credited to any Account shall not be subject to any security interest, lien, encumbrance or right of setoff in favor of the Securities Intermediary or anyone claiming through the Securities Intermediary (other than the Trustee).

(c) It is the intent of the Trustee and the Co-Issuers that each Account shall be a securities account of the Trustee and not an account of the Co-Issuers. Nonetheless, the Securities Intermediary shall agree to comply with entitlement orders originated by the Trustee without further consent by the Co-Issuers or any other person or entity, and JPMorgan Chase as initial Securities Intermediary agrees that, for so long as it is the Securities Intermediary hereunder, it will comply with entitlement orders originated by the Trustee without further consent by the Co-Issuers or any other person or entity. The Securities Intermediary shall covenant that it will not agree with any person or entity other than the Trustee that it will comply with entitlement orders originated by any person or entity other than the Trustee, and JPMorgan Chase as initial Securities Intermediary hereby covenants that, for so long as it is the Securities Intermediary hereunder, it will not agree with any person or entity other than the Trustee that it will comply with entitlement orders originated by any person or entity other than the Trustee.

(d) Nothing herein shall imply or impose upon the Securities Intermediary any duties or obligations other than those expressly set forth herein and those applicable to a securities intermediary under the UCC and the United States Regulations (and the Securities Intermediary shall be entitled to all of the protections available to a securities intermediary under the UCC and the United States Regulations). Without limiting the foregoing, nothing herein shall imply or impose upon the Securities Intermediary any duties of a fiduciary nature (such as, without limitation, the fiduciary duties of the Trustee hereunder).

(e) The Securities Intermediary may at any time resign by notice to the Trustee and may at any time be removed by notice from the Trustee; *provided however* that it shall be the responsibility of the Trustee to appoint a successor Securities Intermediary and to cause the Accounts to be established and maintained with such successor Securities Intermediary in accordance with the terms hereof; and the responsibilities and duties of the retiring Securities Intermediary hereunder shall remain in effect until all of the Trust Estate credited to the Accounts held by such retiring Securities Intermediary have been transferred to such successor. Any corporation into which the Securities Intermediary may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, consolidation or conversion to which the Securities Intermediary shall be a party, shall be the successor of the Securities Intermediary hereunder, without the execution or filing of any further act on the part of the parties hereto or such Securities Intermediary or such successor corporation.

Section 6.16.   Eligible Investments.

Eligible Investments acquired with available funds in an Account shall be credited by the Trustee to such Account.

Section 6.17.   Fiduciary For Noteholders; Agent for the Other Secured Parties.

With respect to the security interest created hereunder, the Delivery of any item of Collateral to the Trustee is to the Trustee as representative of the Noteholders and agent for the other Secured Parties. In furtherance of the foregoing, the possession by the Trustee of any item of Collateral, the indorsement to or registration in the name of the Trustee of any item of Collateral and the status of the Trustee as entitlement holder with respect to the Accounts are all undertaken by the Trustee in its capacity as representative of the Noteholders and agent for the

other Secured Parties.  The Trustee shall not by reason of this Indenture be deemed to be acting as a fiduciary for the Secured Parties other than the Noteholders; *provided that* the foregoing shall not limit any of the express obligations of the Trustee under this Indenture.

ARTICLE VII

COVENANTS

Section 7.1.    Payment of Principal and Interest.

The Co-Issuers (as applicable) will duly and punctually pay the principal of, interest on and all other amounts payable on or in respect of the Notes in accordance with the terms of the Notes and this Indenture.

Section 7.2.    Maintenance of Office or Agency.

The Trustee will maintain an office or agency in the Borough of Manhattan, the City of New York, the State of New York, where Notes may be presented or surrendered for payment.  The Trustee hereby initially appoints the office of JPMorgan Chase Bank, National Association (the "New York Presenting Agent"), currently located at JPMorgan Chase Bank, 4 New York Plaza, ground floor, New York, New York 10004, Attention: WSS Window – WSS (Houston)—Rockwall CDO, as such office or agency.  The Trustee shall give prompt written notice to the Co-Issuers and the Noteholders of any change in the location of the New York Presenting Agent. If the location of the New York Presenting Agent changes and such notice is not given or the Trustee fails to maintain any such office or agency, presentations and surrenders of the Notes may be made or served at the Corporate Trust Office.

Section 7.3.    Money for Note Payments to Be Held in Trust.

All payments of amounts due and payable with respect to any Notes that are to be made from amounts withdrawn from the Collection Account shall be made on behalf of the Issuer by the Trustee.

Section 7.4.    Existence of Co-Issuers; Corporate Formalities.

(a) Each of the Co-Issuers will, to the maximum extent permitted by applicable law, maintain in full force and effect its existence, rights and franchises as a company or corporation incorporated or organized under the laws of the jurisdiction of its incorporation or organization, as the case may be, and will obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Indenture, the Notes or any of the Pledged Securities or other property included in the Trust Estate.  Each of the Co-Issuers shall comply with its charter documents and shall not amend its charter documents without the consent of the Requisite Noteholders if such amendment would have a material adverse effect on the rights of the Noteholders and, for so long as any Notes are then rated, shall notify the Rating Agencies of any amendment and shall not amend its charter document in any material way without satisfaction of the Rating Condition.

(b) The Issuer shall ensure that all corporate or other formalities regarding its existence (including, to the extent required, holding, to the extent required, regular meetings of the board of directors and shareholders) are followed. The Issuer shall not take any action, or conduct its affairs in a manner, that is likely to result in its separate existence being ignored or its assets and liabilities being substantively consolidated with any other Person in a bankruptcy, reorganization or other insolvency proceeding. Without limiting the foregoing, (i) the Issuer shall not have any subsidiaries except the Co-Issuer, and (ii) the Issuer shall not (A) have any employees (other than its directors), (B) engage in any transaction with any shareholder that would constitute a conflict of interest, *provided, however, that* the entry into the Administration Agreement and the Paying and Transfer Agency Agreement with Maples Finance Limited shall not be deemed a conflict of interest or (C) pay dividends other than in accordance with the terms of this Indenture, its organizational documents, and with regard to its Preferred Shares, in accordance with the terms of the Paying and Transfer Agency Agreement.

Section 7.5. Protection of Trust Estate.

(a) The Issuer shall authorize, execute, deliver and file all such supplements and amendments hereto and all such financing statements, amendments of financing statements, continuation statements, instruments of further assurance and other instruments and shall take such other action as may be necessary or advisable to:

(i) Grant more effectively all or any portion of the Trust Estate;

(ii) maintain or preserve the lien of this Indenture or to carry out more effectively the purposes hereof;

(iii) perfect, publish notice of, or protect the validity of any Grant made or to be made by this Indenture;

(iv) enforce any of the Pledged Securities or other instruments or property included in the Trust Estate;

(v) preserve and defend title to the Trust Estate and the rights therein of the Secured Parties against the claims of all other Persons; and

(vi) pay any and all taxes levied or assessed upon all or any part of the Trust Estate.

The Issuer hereby authorizes the filing of financing statements (and amendments of financing statements and continuation statements) that name the Issuer as debtor and the Trustee as secured party and that cover all personal property of the Issuer. The Issuer also hereby ratifies the filing of any such financing statements (or amendments of financing statements or continuation statements) that were filed prior to the execution hereof. The Issuer hereby designates the Trustee its agent and attorney-in-fact to take any action or authorize or execute any financing statement, amendment of financing statement, continuation statement or other instrument required pursuant to this Section 7.5; *provided that* such appointment shall not impose upon the Trustee any of the Issuer's obligations under this Section 7.5.

The Trustee shall give written notice to the Issuer, the Servicer and the legal counsel who rendered the most recent Opinion of Counsel received by the Trustee under Section 7.6(a) of the pending expiration of the financing statement filed in connection with the closing of the transaction contemplated herein and any continuation statement relating thereto, no earlier than six months prior to the scheduled expiration date of such financing statement or continuation statement, as applicable, and no later than two months prior to such scheduled expiration date.

(b) The Trustee shall not, except in accordance with the provisions of this Indenture, release any portion of the Trust Estate from the security interest and lien hereunder or remove any portion of the Trust Estate from the jurisdictions indicated in Section 10.3(a) hereof; *provided that* the Trustee shall be entitled to remove the Trust Estate or any portion thereof to a jurisdiction other than the applicable jurisdiction or jurisdictions indicated in Section 10.3(a) hereof if the Trustee shall have first obtained an Opinion of Counsel, at its own expense, to the effect that the lien and security interest created by this Indenture with respect to such property, including the perfection and priority thereof, will continue to be maintained after giving effect to such action, and *provided further that* the Trustee shall thereafter (for so long as such property continues to be so located in such other jurisdiction) obtain at its own expense an annual Opinion of Counsel, on or before the date specified in Section 7.6(a) hereof, confirming the matters required by such Section to the extent governed by the law of such other jurisdiction.

(c) The Issuer shall pay or cause to be paid taxes, if any, levied on account of the beneficial ownership by the Issuer of any Pledged Securities.

(d) The Issuer hereby represents and warrants that its registered office is, and always has been, in the Cayman Islands; it has never had any offices in the United States of America, and the only offices of any type it has ever had have been in the Cayman Islands.

Section 7.6.    Opinions and Tax Certificates.

(a) On or before May 31 in each calendar year, commencing in 2007, the Issuer shall cause to be delivered to the Trustee an Opinion of Counsel (and the Trustee shall deliver copies of such to the Servicer and the Rating Agencies), stating that, in the opinion of such counsel, as of the date of such opinion, the Indenture creates in favor of the Trustee a security interest in the Trust Estate and that such security interest is perfected.

(b) If required to prevent the withholding and imposition of United States income tax, the Issuer shall deliver or cause to be delivered (as applicable) a United States Internal Revenue Service Form W-8BEN or W-8IMY (with applicable supporting documentation), or any successor forms thereto, to each issuer of any Portfolio Collateral and each issuer of an Eligible Investment in the Trust Estate at the time such Portfolio Collateral or Eligible Investment is purchased by the Issuer and annually thereafter.

(c) The Issuer will elect to be treated as a partnership for U.S. federal income tax purposes. In the event that the Issuer is treated as a corporation, the Issuer will take all actions necessary in order to permit any holder of a Preferred Share, any holder of equity in the Issuer or any Holder of a Note or other security that is or may reasonably be characterized as an equity

interest in the Issuer for United States federal income tax purposes to make a "qualified electing fund" election for United States federal income tax purposes and to satisfy the ongoing requirements with respect to such an election. Further, in such event, the Issuer will provide, upon the reasonable request of any holder of a Preferred Share, any holder of equity in the Issuer or any such Holder of a Note, any information the Issuer has available to it that assists such holders with regard to filing requirements such holders may have as a result of the controlled foreign corporation rules under the Code.

(d) The Issuer will not take the position that it is engaged in a United States trade or business for federal income tax purposes.

Section 7.7.    Performance of Obligations.

(a) The Co-Issuers shall not take any action, and, where applicable, will not consent to any action proposed to be taken by others, that would release any Person from any of such Person's covenants or obligations under any instrument included in the Trust Estate, except in the case of enforcement action taken with respect to any Defaulted Portfolio Collateral in accordance with the provisions hereof and as otherwise required hereby.

(b) The Co-Issuers may contract with other Persons, including JPMorgan Chase Bank, National Association, and the Servicer, for the performance by such Persons of the Issuer's obligations hereunder and under the Servicing Agreement. Notwithstanding any such arrangement, the Issuer shall remain primarily liable with respect thereto. With respect to any such contract, the performance of such obligations by such Persons shall be deemed to be performance of such obligations by the Issuer.

Section 7.8.    Negative Covenants.

(a) The Issuer will not:

(1)    sell, transfer, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (or permit such to occur or suffer such to exist), any part of the Trust Estate, except as expressly permitted by this Indenture and the Servicing Agreement;

(2)    claim any credit on, or make any deduction from, the amount payable with respect to the Notes other than amounts withheld pursuant to Section 6.14 hereof, or assert any claim against any present or future Noteholder, by reason of the payment of any taxes levied or assessed upon any part of the Trust Estate;

(3)    incur or assume any indebtedness other than pursuant to this Indenture or the Paying and Transfer Agency Agreement, or incur, assume or guaranty the indebtedness of any Person, issue any additional class of securities or issue any additional shares, shares of stock or membership interests;

(4)    (A) permit the validity or effectiveness of this Indenture or any Grant hereunder to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from

any covenants or obligations with respect to this Indenture or the Notes, except, in each case, as may be expressly permitted hereby, thereby, or by the Servicing Agreement, (B) permit any lien, charge, adverse claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden the Trust Estate or any part thereof, any interest therein or the proceeds thereof except as may be expressly permitted hereby, or (C) take any action that would permit the lien of this Indenture not to constitute a valid first priority perfected security interest in the Trust Estate except as may be expressly permitted hereby;

(5)     act as agent, negotiator or structurer with respect to any Portfolio Collateral, act as a participant in negotiating the terms of a primary loan agreement, except to the extent provided in the Servicing Agreement, enter into a binding commitment to purchase any Portfolio Collateral prior to the issuance of such Portfolio Collateral or engage in any transaction or activity that would cause the Issuer to be treated as engaged in a trade or business in the United States within the meaning of section 864 of the Code;

(6)     change its name or its type or jurisdiction of organization unless it has first (i) made all filings and taken all actions in all relevant jurisdictions under the applicable Uniform Commercial Code and other applicable law as are necessary to continue and maintain the priority and perfection of the security interest of the Trustee in the Trust Estate, and (ii) delivered to the Trustee an Opinion of Counsel to the effect that all necessary filings have been made under the applicable Uniform Commercial Code in all relevant jurisdictions as are necessary to continue and maintain the priority and perfection of the security interest of the Trustee in the Trust Estate;

(7)     enter into any agreements or amendments thereto unless such agreements and any amendments thereto contain "non-petition" and "limited recourse" provisions, except with respect to any agreements involving the purchase and sale of Portfolio Collateral having customary purchase or sale terms and documented with customary trading documentation;

(8)     enter into any agreements or amendments to the Transaction Documents with respect to the "non-petition" or "limited recourse" provisions without satisfying the Rating Condition; or

(9)     commingle any of the Collateral with the assets of any other Person, except as expressly permitted by this Indenture and the Servicing Agreement.

(b) The Co-Issuer will not enter into any agreement, contract or indenture other than this Indenture and shall not incur or assume any indebtedness other than pursuant to or as may be expressly permitted by this Indenture, or incur, assume or guaranty the indebtedness of any Person.

(c) The Trustee shall not sell, transfer, exchange or otherwise dispose of, or enter into or engage in any business with respect to, any part of the Trust Estate, except as expressly permitted by this Indenture or the Servicing Agreement.

(d) Neither of the Co-Issuers shall to the maximum extent permitted by applicable law (i) commence any case, proceeding or other action under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have any order for relief entered with respect to it, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (ii) seek appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or make a general assignment for the benefit of its creditors; neither of the Co-Issuers shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth above; and each of the Co-Issuers shall generally pay debts as they become due and not admit in writing its inability to pay its debts as they become due.

(e) Except as permitted by Section 8.2 hereof, the Issuer shall not waive nor permit the amendment of Section 19 or Section 20 of the Servicing Agreement or Section 20 of the Paying and Transfer Agency Agreement.

Section 7.9.  Statement as to Compliance.

On or before July 31 following each calendar year, beginning in 2007, or immediately if there has been a Default under this Indenture, the Issuer shall deliver to the Trustee, and the Trustee in turn shall deliver a copy to the Rating Agencies (and any Noteholder upon receipt by the Trustee of a certificate in the form of Exhibit H), an Officer's Certificate of the Issuer stating that:

(1)  a review of the activities of the Issuer during such year and of the Issuer's performance under this Indenture has been made under his or her supervision; and

(2)  to the best of his or her knowledge, based on such review, the Issuer has fulfilled all of its obligations under this Indenture throughout such year, or, if there has been a Default hereunder, specifying each such Default known to him or her and the nature and status thereof, including any actions taken to remedy the same.

Section 7.10.  Issuer and Co-Issuer May Not Consolidate or Merge.

Neither the Issuer nor the Co-Issuer shall consolidate or merge with or into any other Person.

Section 7.11.  No Other Business.

Neither the Issuer nor the Co-Issuer shall engage in any business or activity other than (i) the issuance and redemption of the Notes and the Preferred Shares, the issuance and redemption of its ordinary shares, and acquiring, owning, managing, holding and pledging the Pledged Securities and any other instrument or property included in the Trust Estate and (ii) engaging in any other activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith.

Section 7.12. Purchase of Notes.

Notwithstanding anything contained in this Indenture to the contrary, the Issuer may acquire Notes in open market or privately negotiated transactions or otherwise (and the Issuer shall give prompt written notice thereof to the Trustee): *provided that* so long as any Class A Notes are Outstanding, the Issuer shall not acquire any Class B-1L Notes. Any Notes acquired by the Issuer shall be delivered to the Trustee for cancellation.

Section 7.13. Notice of Rating.

(a) The Issuer shall use reasonable efforts to cause the payment of the Periodic Interest Amount and the Aggregate Principal Amount of the Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes and the Class X Notes to be rated by Standard & Poor's and Moody's (as applicable) and the ultimate payment of the Cumulative Interest Amount and the Aggregate Principal Amount of the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes to be rated by Standard & Poor's and Moody's. Notwithstanding anything to the contrary contained herein, the failure by the Issuer to maintain a rating of each Class of the Class A Notes and the Class B-1L Notes shall not constitute a Default or an Event of Default.

(b) The Issuer shall promptly notify the Trustee in writing (and the Trustee shall promptly notify the Noteholders and the Servicer) if at any time the rating of any Class of Notes has been, or the Issuer knows will be, changed or withdrawn.

Section 7.14. Process Agent.

The Issuer irrevocably designates and appoints CT Corporation, 111 Eighth Avenue, New York, New York 10011, as its agent (the "Process Agent") for service of all process served in connection with this Indenture, such service being hereby acknowledged to be effective and binding service upon the Issuer in every respect.

Section 7.15. Additional Covenants.

(a) Each of the Co-Issuers shall comply with all applicable laws, rules, regulations, orders, writs, judgments, injunctions, decrees, determinations and awards (including, without limitation, any fiscal and accounting rules and regulations and any foreign or domestic law, rule or regulation), including, without limitation, in connection with the issuance, offer and sale of the Notes.

(b) The Issuer shall give prompt notice in writing to the Trustee, the Servicer and the Rating Agencies, upon becoming aware of the occurrence of any Event of Default hereunder.

(c) Each of the Co-Issuers shall take all reasonable actions necessary so as to be exempt from registration under the Investment Company Act.

(d) The Co-Issuers shall take all reasonable actions necessary so as to exempt from registration the sale of Notes under the Securities Act or under any applicable United States state securities or "blue sky" laws.

(e) Each of the Co-Issuers shall maintain all licenses, permits, charters and registrations which are material to the conduct of its business.

(f) The Issuer shall maintain its corporate records and books of account outside of the United States separate from any other Person, including, without limitation, any Person which owns more than 50% of its equity securities.

(g) Each of the Co-Issuers shall use its best efforts to minimize taxes and any other costs arising in connection with its activities.

(h) Each of the Co-Issuers shall treat the purchase of Portfolio Collateral as a purchase for tax, accounting and reporting purposes.

(i) Each of the Co-Issuers shall maintain at least one director who is Independent of the Issuer, the Co-Issuer, the Servicer and Bear Stearns.

(j) Each of the Co-Issuers shall only conduct business in its own name as set forth in its organizational documents.

(k) The Issuer shall cause each item of Collateral to be Delivered to the Trustee.

(l) The Issuer shall cause the Schedule of Portfolio Collateral to at all times correctly list all Portfolio Collateral that is included in the Trust Estate, including all Initial Portfolio Collateral, all Original Portfolio Collateral, all Additional Portfolio Collateral, all Substitute Portfolio Collateral, all Defaulted Portfolio Collateral, all Credit Risk Portfolio Collateral, all Equity Portfolio Collateral and all Credit Improved Portfolio Collateral. The Issuer shall cause Schedule A to be amended to reflect the inclusion of Portfolio Collateral purchased pursuant to Section 3.4(a) hereof, the inclusion of Additional Portfolio Collateral as provided in Section 11.3 hereof, the release of Portfolio Collateral pursuant to Article X hereof, and the inclusion of Substitute Portfolio Collateral as provided in Section 12.4 hereof.

Section 7.16.   Representations and Warranties of the Co-Issuers.

Each of the Co-Issuers represents and warrants to the Trustee with respect to itself, as of the Closing Date that:

(a) Such Co-Issuer is a corporation duly incorporated or organized, as the case may be, validly existing and in good standing under the laws of the jurisdiction of its incorporation and in each jurisdiction where the conduct of its business requires such license, qualification or good standing, except where the failure to be so licensed or qualified or in good standing would not adversely affect the validity or enforceability of this Indenture or the other Transaction Documents to which it is a party, or the ability of such Co-Issuer to perform its obligations hereunder or thereunder.

(b) Such Co-Issuer has the power and authority to execute and deliver the Transaction Documents and all other documents and agreements contemplated hereby and thereby to which it is a party, as well as to carry out the terms hereof and thereof.

(c) Such Co-Issuer has taken all necessary action, including but not limited to all requisite corporate action, to authorize the execution, delivery and performance of the Transaction Documents and all other documents and agreements contemplated hereby and thereby to which it is a party. When executed and delivered by such Co-Issuer and the other parties thereto, each of the Transaction Documents will constitute the legal, valid and binding obligation of such Co-Issuer enforceable in accordance with its terms subject, as to enforcement, to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect affecting the enforcement of creditors' rights in general, and except as such enforceability may be limited by general principles of equity (whether considered in a suit at law or in equity) and to the payment of stamp duty.

(d) All authorizations, licenses, permits, certificates, franchises, consents, approvals and undertakings which are required to be obtained by such Co-Issuer under any applicable law which are material to (i) the conduct of its business, (ii) the ownership, use, operation or maintenance of its properties and (iii) the performance by such Co-Issuer of its obligations under or in connection with the Transaction Documents, the Notes and the Preferred Shares have been received and all such authorizations, licenses, permits, certificates, franchises, consents, approvals and undertakings are in full force and effect.

(e) The execution, issuance and delivery of, and performance by such Co-Issuer of its respective obligations under the Transaction Documents and any and all instruments or documents required to be executed or delivered pursuant to or in connection herewith or therewith were and are within the powers of such Co-Issuer and will not violate any provision of any law, regulation, decree or governmental authorization applicable to such Co-Issuer, or its charter or by-laws or other organizational documents and will not violate or cause a default under any provision of any contract, agreement, mortgage, indenture or other undertaking to which such Co-Issuer is a party or which is binding upon such Co-Issuer or any of its property or assets, and will not result in the imposition or creation of any lien, charge, or encumbrance upon any of its properties or assets of such Co-Issuer pursuant to the provisions of any such contract, agreement, mortgage, indenture or undertaking, other than as specifically set forth herein.

(f) There are no legal, governmental or regulatory Proceedings pending to which such Co-Issuer is a party or of which any of its property is the subject, which if determined adversely to such Co-Issuer would individually or in the aggregate have a material adverse effect on the performance by such Co-Issuer of the Transaction Documents or the consummation of the transactions contemplated hereunder or thereunder; and to the best of its knowledge, no such Proceedings are threatened or contemplated.

(g) Neither the Notes nor the Preferred Shares are required to be registered pursuant to the Securities Act, such Co-Issuer is not required to be registered as an investment company pursuant to the Investment Company Act, and the Indenture is not required to be qualified under the Trust Indenture Act of 1939, as amended.

(h) Except with respect to amounts owed under the Notes and the Preferred Shares and liabilities incurred in connection with the issuance of the Notes, the Preferred Shares and the Transaction Documents, such Co-Issuer has not incurred any indebtedness for borrowed money or any other material liabilities.

(i)  The Issuer has no subsidiaries other than the Co-Issuer.

(j)  The Issuer is not a securities intermediary, broker, or commodity intermediary as defined in the UCC, or a Participant as defined in the United States Regulations.

Section 7.17.    Representations Relating to the Security Interests in the Collateral.

(a) The Issuer hereby represents that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and, with respect to Collateral Delivered after the Closing Date, be deemed to be repeated on the date on which such Collateral is Delivered as if made at and as of that time), with respect to the then existing Collateral:

(i)    The Issuer owns and has good and marketable title to such Collateral free and clear of any lien, claim or encumbrance of any person, other than such as are created under, or expressly permitted by, this Indenture.

(ii)    Other than the security interest granted to the Trustee pursuant to this Indenture and conveyances permitted by this Indenture, the Issuer has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed such Collateral.  The Issuer has not authorized the filing of and is not aware of any financing statements against the Issuer that include a description of collateral covering such Collateral other than any financing statement relating to the security interest granted to the Trustee hereunder or that has been terminated.  The Issuer is not aware of any judgment, Pension Benefit Guaranty Corporation or tax lien filings against the Issuer.

(iii)    Such Collateral is comprised of "instruments", "security entitlements", "general intangibles", "tangible chattel paper", "deposit accounts", "accounts", "certificated securities", "uncertificated securities" or "securities accounts" (each as defined in the applicable Uniform Commercial Code).

(iv)    All Accounts constitute "securities accounts" as defined in the applicable Uniform Commercial Code.

(v)    This Indenture creates a valid and continuing security interest (as defined in the applicable Uniform Commercial Code) in such Collateral in favor of the Trustee, which security interest is prior to all other liens and is enforceable as such against creditors of and purchasers from the Issuer except as expressly permitted under this Indenture.

(vi)    The Issuer has received all consents and approvals required by the terms of such Collateral to the transfer to the Trustee of its interest and rights in such Collateral hereunder.

(b)    The Issuer hereby represents that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and, with respect to Collateral Delivered after the Closing Date, be deemed to be repeated on the date on which such Collateral is Delivered as if made at and as of that time), with respect to the then existing

Collateral that constitutes "securities accounts", the Indenture creates a valid and continuing security interest (as defined in the applicable Uniform Commercial Code) in the Accounts in favor of the Trustee, which security interest is perfected by control (as defined in the applicable Uniform Commercial Code) because the Trustee has control of each security entitlement carried in each Account.

(c) The Issuer hereby represents that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and, with respect to Collateral Delivered after the Closing Date, be deemed to be repeated on the date on which such Collateral is Delivered as if made at and as of that time), with respect to the then existing Collateral that constitute "instruments":

(i)    All original executed copies of each promissory note or mortgage note that constitutes or evidences such instruments have been delivered to the Trustee and (ii) none of the promissory notes or the mortgage notes that constitute or evidence such instruments has any marks or notations indicating that it has been pledged, assigned or otherwise conveyed to any person other than the Trustee.

(d) The Issuer hereby represents that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and, with respect to Collateral Delivered after the Closing Date, be deemed to be repeated on the date on which such Collateral is Delivered as if made at and as of that time), with respect to the then existing Collateral that constitute "security entitlements":

(i)    All of such security entitlements have been credited to one of the Accounts. The securities intermediary for each Account has agreed to treat all assets credited to such Account as "financial assets" within the meaning of the applicable Uniform Commercial Code.

(ii)    The Issuer has taken all steps necessary to cause the securities intermediary to identify in its records the Trustee as the person having a security entitlement against the securities intermediary in each of the Accounts.

(iii)    The Accounts are not in the name of any person other than the Trustee. The Issuer has not consented to the securities intermediary of any Account to comply with the entitlement order of any person other than the Trustee.

(e) The Issuer hereby represents that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and, with respect to Collateral Delivered after the Closing Date, be deemed to be repeated on the date on which such Collateral is Delivered as if made at and as of that time), with respect to the then existing Collateral that constitutes "general intangibles" or "accounts":

(i)    The Issuer has caused or will have caused, within ten days after the Closing Date, the filing of all appropriate financing statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect the security interest in such general intangibles or accounts granted to the Trustee hereunder.

(f) The Issuer hereby represents that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and, with respect to Collateral Delivered after the Closing Date, be deemed to be repeated on the date on which such Collateral is Delivered as if made at and as of that time), with respect to the then existing Collateral that constitutes "tangible chattel paper":

(i)    (A) All original executed copies of each agreement that constitutes or evidences such tangible chattel paper have been delivered to the Trustee and (B) none of the agreements that constitute or evidence such tangible chattel paper has any marks or notations indicating that it has been pledged, assigned or otherwise conveyed to any person other than the Trustee.

(ii)    The Issuer has taken all steps necessary to perfect the security interest against the account debtor in the property securing the agreements that constitute such tangible chattel paper.

(g) The Issuer hereby represents that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and, with respect to Collateral Delivered after the Closing Date, be deemed to be repeated on the date on which such Collateral is Delivered as if made at and as of that time), with respect to the then existing Collateral that constitutes "deposit accounts":

(i)    The Issuer has taken all steps necessary to cause the Trustee to become the account holder of such deposit accounts.

(ii)    Such deposit accounts are not in the name of any person other than the Trustee.  The Issuer has not consented to the bank maintaining any such deposit account to comply with the instructions of any person other than the Trustee.

(h) The Issuer hereby represents that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and, with respect to Collateral Delivered after the Closing Date, be deemed to be repeated on the date on which such Collateral is Delivered as if made at and as of that time), with respect to the then existing Collateral that constitutes a certificated security, such certificated security has been delivered to the Trustee and, if in registered form, has been indorsed to the Trustee or in blank by an effective indorsement or has been registered in the name of the Trustee upon original issue or registration of transfer by the issuer of such certificated security.

(i) The Issuer hereby represents that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and, with respect to Collateral Delivered after the Closing Date, be deemed to be repeated on the date on which such Collateral is Delivered as if made at and as of that time), with respect to the then existing Collateral that constitutes an uncertificated security, the issuer of such uncertificated security has registered the Trustee as the registered owner of such uncertificated security.

(j)  None of the provisions of this Section 7.17 shall be waived without the prior written confirmation from S&P that such waiver shall not result in a reduction or withdrawal of the then-current rating of any Class of Notes.

Section 7.18.   No "Gross-up" Amounts.

The Co-Issuers shall not be required to pay any "gross-up" or other additional amounts to the Holders of any Class of Notes because taxes or related amounts are required to be withheld from payments on the Notes or any payments to either of the Co-Issuers on any item of Portfolio Collateral or other assets of the Co-Issuers.

Section 7.19.   Securities Lending.

(a) So long as no Event of Default is continuing and if after the completion of the transaction the limit in subsection 12.2(u) would be satisfied, the Servicer may cause Portfolio Collateral that are not Defaulted Portfolio Collateral to be lent for a term of 90 days or less to banks, broker-dealers, and other financial institutions (other than insurance companies) having long-term and short-term senior unsecured debt ratings or guarantors with ratings of at least "A1" (and not "A1" but on credit watch with negative implications) and "P-1" (and not on credit watch for possible downgrade) from Moody's and a long-term senior unsecured debt rating of at least "A+" from S&P (each, a "Securities Lending Counterparty") pursuant to one or more agreements (each, a "Securities Lending Agreement"); *provided* that Portfolio Collateral whose Market Value cannot be determined under clauses (a), (b) or (c) of that definition may not be lent pursuant to a Securities Lending Agreement; *provided, further*, that the gross income from all such transactions during any fiscal year shall not exceed 15% of the gross income of the Issuer for such fiscal year.  Upon receipt of an Issuer Order, the Trustee shall release any lent Portfolio Collateral to a Securities Lending Counterparty as directed by the Servicer. The Securities Lending Counterparties may be Affiliates of the Placement Agent or Affiliates of the Servicer. The duration of any Securities Lending Agreement shall not exceed the Final Maturity Date of the Notes.

(b) Each Securities Lending Agreement shall be on market terms as determined by the Servicer (except as may be required below) and shall:

(i)    require that the Securities Lending Counterparty return to the Trustee debt obligations that are identical (in terms of issue and class) to the lent items of Portfolio Collateral;

(ii)    require that the Securities Lending Counterparty pay to the Trustee amounts equivalent to all interest and other payments that the owner of the lent items of Portfolio Collateral is entitled to for the period during which the Portfolio Collateral is lent and require that any such payments not be subject to withholding tax imposed by any jurisdiction unless the Securities Lending Counterparty is required under the Securities Lending Agreement to make "gross-up" payments to the Issuer that cover the full amount of the withholding tax on an after-tax basis;

(iii)    require that the Rating Condition with respect to each Rating Agency shall be satisfied with respect to the execution of the Securities Lending Agreement;

(iv)    satisfy any other requirements of Section 1058 of the Code and the Treasury Regulations promulgated under it;

(v)    be governed by the laws of New York;

(vi)    permit the Issuer to assign its rights under the Securities Lending Agreement to the Trustee pursuant to this Indenture;

(vii)    provide for early termination and the delivery of any lent item of Portfolio Collateral from the Issuer with no penalty if the Portfolio Collateral becomes Credit Risk Portfolio Collateral or is subject to redemption in accordance with its terms;

(viii)    provide for early termination and the delivery of any lent item of Portfolio Collateral with no penalty upon any redemption of the Notes in whole;

(ix)    require the Securities Lending Counterparty to post with the Trustee collateral consisting of Cash or direct registered debt obligations of the United States of America that have a maturity date no later than the Business Day preceding the stated termination date of the Securities Lending Agreement (the "Securities Lending Collateral") to secure its obligation to return the Portfolio Collateral;

(x)    provide that the Securities Lending Collateral shall be maintained at all times in an amount equal to at least 102% of the current Ask-Side Market Value (determined daily and monitored by the Servicer) of the lent Portfolio Collateral and if securities are delivered to the Trustee as security for the obligations of the Securities Lending Counterparty under the related Securities Lending Agreement, the Servicer on behalf of the Issuer will negotiate with the Securities Lending Counterparty a rate for the loan fee to be paid to the Issuer for lending the lent Collateral Obligations;

(xi)    the lent Portfolio Collateral shall be marked-to-market on a daily basis by the Servicer on the basis of their Market Value;

(xii)    the Collateral will include the Issuer's rights under the related Securities Lending Agreement rather than the lent Portfolio Collateral;

(xiii)    provide for early termination within 10 days at the option of the Issuer and the delivery of any lent Portfolio Collateral from the Issuer with no penalty if the Securities Lending Counterparty is no longer in compliance with the requirements relating to the credit ratings of the Securities Lending Counterparty and the noncompliance is not cured as provided in this Indenture; and

(xiv)    contain appropriate limited recourse and non-petition provisions that survive the termination of the agreement (to the extent the Issuer has contractual payment obligations to the Securities Lending Counterparty) equivalent (*mutatis mutandis*) to those in this Indenture.

(c)  If either Moody's or S&P downgrades a Securities Lending Counterparty such that the Securities Lending Agreements to which the Securities Lending Counterparty is a party are no longer in compliance with the requirements relating to the credit ratings of the Securities Lending Counterparty, then the Servicer on behalf of the Issuer, within 10 days of the downgrade, shall

(i)    terminate its Securities Lending Agreements with the Securities Lending Counterparty unless a guarantor for the Securities Lending Counterparty's obligations under the Securities Lending Agreements has been obtained; or

(ii)    reduce the percentage of the Aggregate Principal Balance of the Portfolio Collateral lent to the downgraded Securities Lending Counterparty so that the Securities Lending Agreements to which the Securities Lending Counterparty is a party, together with all other Securities Lending Agreements, are in compliance with the requirements relating to the credit ratings of Securities Lending Counterparties; or

(iii)    take any other steps Moody's or S&P may require to cause the Securities Lending Counterparty's obligations under the Securities Lending Agreements to which the Securities Lending Counterparty is a party to be treated by Moody's or S&P, as the case may be, as if the obligations were owed by a counterparty having a rating at least equivalent to the rating that was assigned by Moody's or S&P, as the case may be, to the downgraded Securities Lending Counterparty before its being downgraded.

(d) In connection with any such direction by the Servicer to enter into a Securities Lending Agreement, the Trustee may receive and rely on an Issuer Order to the effect that the Securities Lending Agreement, and its Securities Lending Counterparty, is each in compliance with the requirements of this Indenture (including the definition of "Securities Lending Counterparty"). The Issuer and the Trustee may enter into any Securities Lending Agreement at the instruction of the Servicer, and deliver and accept delivery and return of any Portfolio Collateral pursuant to the Securities Lending Agreement, or pursuant to instructions from the Servicer in connection with the Securities Lending Agreement. The Trustee may take any actions and exercise any rights and remedies under any Securities Lending Agreement that the Servicer instructs. The Trustee need not enter into any Securities Lending Agreement that would in its judgment, subject it to any liability, whether financial or otherwise, or cause it to incur or subject it to risk of any cost or disbursement for which it is not, in its judgment, adequately indemnified, or that would impose on it any obligations or administrative burdens that are unacceptable to it. The Servicer shall instruct the Trustee in writing with respect to the administration of any Securities Lending Agreement (including with respect to any default and the exercise of rights under it). The Trustee shall not have any responsibility for evaluating the sufficiency, validity, or acceptability of any Securities Lending Agreement or for the qualifications or eligibility of any Securities Lending Counterparty. Nothing in this Indenture shall be construed to cause the Trustee to have any fiduciary duties to any Securities Lending Counterparty.

So long as any Portfolio Collateral is on loan pursuant to a Securities Lending Agreement, (a) the Trustee shall have no liability for any failure or inability on its part to receive any information or take any action with respect to the Portfolio Collateral because of its being on loan (including any failure to take action with respect to a notice of redemption, consent solicitation, exchange or tender offer, or similar corporate action), and (b) the lent Portfolio Collateral shall not be disqualified for return to the Trustee as an item of Portfolio Collateral by any change in circumstance or status during the time while on loan (including any change that would cause the Portfolio Collateral to be ineligible for purchase by the Issuer under this Indenture if applied to a proposed purchase of it in the open market at the time of its return from loan).

## ARTICLE VIII

## SUPPLEMENTAL INDENTURES

Section 8.1.    Supplemental Indentures Without Consent of Noteholders.

Without the consent of the Holders of any Notes, but with the consent of the Servicer, the Co-Issuers and the Trustee, at any time, may enter into one or more indentures supplemental hereto, in form satisfactory to the Trustee, for any of the following purposes:

(1)    to correct or amplify the description of any property at any time subject to the lien of this Indenture, or better to assure, convey and confirm unto the Trustee any property subject or required to be subjected to the lien of this Indenture, or to subject to the lien of this Indenture additional property;

(2)    to evidence the succession of another Person to the Issuer or the Co-Issuer, and the assumption by any such successor of the covenants of the Issuer or the Co-Issuer contained herein and in the Notes;

(3)    to add to the covenants of the Issuer, the Co-Issuer or the Trustee, for the benefit of the Holders of the Notes, or to surrender any right or power herein conferred upon the Issuer or the Co-Issuer;

(4)    to Grant any property to the Trustee;

(5)    to evidence and provide for the acceptance of appointment hereunder by a successor Trustee and to add to or change any of the provisions of this Indenture as shall be necessary to facilitate the administration of the Trust Estate by more than one Trustee, pursuant to the requirements of Section 6.9 or 6.10 hereof;

(6)    to cure any ambiguity, or to correct, modify or supplement any provision which is defective or inconsistent with any other provision herein;

(7)    to take any action necessary or helpful to prevent the Issuer or the Trustee from becoming subject to any withholding or other taxes or assessments or to reduce the risk that the Issuer will be engaged in a United States trade or business or that the Issuer (or the beneficial owners thereof) will be subject to United States income tax on a net income basis;

(8)    to correct any manifest error in any provision hereof upon receipt by the Trustee of written direction from the Issuer or Co-Issuer (as to which the Trustee may rely) describing in reasonable detail such error and the modification necessary to correct such error; or

(9)    to effectuate the provisions of Section 2.12 hereof *provided that* such amendment shall not, as evidenced by an Officer's Certificate of the Issuer, adversely affect in any material respect the interests of any Noteholder; or

135

(10) to facilitate the delivery and maintenance of the Notes in accordance with the requirements of DTC, Euroclear or Clearstream;

(11) to authorize the appointment of any listing agent, Transfer Agent, Paying Agent or additional registrar for any Class of Notes required or advisable in connection with the listing of the Notes on the Irish Stock Exchange or any other stock exchange and otherwise to amend this Indenture to incorporate any changes required or requested by any governmental authority, stock exchange authority, listing agent, Transfer Agent, Paying Agent or additional registrar for such Notes in connection therewith;

(12) to modify the restrictions on and procedures for resale and other transfer of the Notes in accordance with any change in any applicable law or regulation (or the interpretation thereof) or to enable the Co-Issuers to rely upon any less restrictive exemption from registration under the Securities Act or the Investment Company Act or to remove restrictions on resale and transfer to the extent not required thereunder;

(13) evidence the addition of an additional issuer or of a wholly owned subsidiary of the Issuer that, in either case, will acquire securities from the Issuer and pledge its assets to secure the obligations of the Issuer secured by the Trust Estate, to the extent necessary to permit the Issuer to comply with the Bank Holding Company Act of 1956, as amended, and the rules and regulation s thereunder or any other statute, rule or regulation applicable to the Issuer, and the assumption by any such additional issuer or subsidiary of the covenants and obligations of the Issuer in this Indenture; or

(14) prevent the Issuer from becoming an "investment company" as defined in the Investment Company Act or better assure compliance with the requirements of Rule 3a-7 thereunder; *provided* that, as a condition to the effectiveness of any such supplemental indenture, each of the Issuer, the Trustee and the Initial Purchaser shall have received (A) a Rating Condition with respect to such supplemental indenture and (B) a customary, unqualified opinion of counsel from a nationally recognized law firm (which may be supported as to factual matters by any relevant certificates or other documents necessary or advisable in the judgment of counsel delivering such opinion) providing that, after giving effect to such supplemental indenture, the Issuer is exempt from registration as an "investment company" under the Investment Company Act;

*provided further* that (A) such amendment for any matters described in clauses (1) through (13) shall not, as evidenced by an Opinion of Counsel (which may be supported as to factual matters by any relevant certificates or other documents necessary or advisable in the judgment of counsel delivering such opinion), adversely affect in any material respect the interests of any Noteholder and (B) no amendment shall be made that would cause the Issuer to register as an "investment company" under the Investment Company Act.

The Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations that may be therein contained. At the cost of the Issuer, the Trustee shall provide to the Servicer and for so long as any Notes are then rated, each Rating Agency then rating any Notes a copy of any proposed supplemental indenture at least 10 days prior to the execution thereof by the Trustee

and request written confirmation that the entering into of such supplemental indenture satisfies the Rating Condition. The Trustee shall not enter into any such supplemental indenture if such supplemental indenture does not satisfy the Rating Condition, and, as soon as practicable after the execution by the Trustee and the Issuer of any such supplemental indenture, the Issuer or the Trustee at the request of the Issuer shall provide to the Servicer and each Rating Agency then rating any Notes a copy of the executed supplemental indenture.

Section 8.2.   Supplemental Indentures with Consent of Noteholders.

With the consent of the Requisite Noteholders, the Servicer and the Holders of the Preferred Shares, to the extent described in the Paying and Transfer Agency Agreement, the Co-Issuers and the Trustee may enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, this Indenture or of modifying in any manner the rights of the Holders of the Notes under this Indenture; *provided that*, notwithstanding any Amendment Buy-Out Option described in Section 9.4(b), no such supplemental indenture shall, without the consent of each Noteholder of each Class adversely affected thereby:

(1)   change the Final Maturity Date or Payment Date of any Note, or reduce the principal amount, notional principal amount or stated amount thereof, as the case may be, or the means of determining the Applicable Periodic Rate, the Optional Redemption Price, the Special Redemption Price, the Tax Event Redemption Price or the Mandatory Redemption Price, as applicable, with respect thereto, change the provisions of this Indenture relating to the application of proceeds of the Trust Estate to the payment of the Notes or change the jurisdiction where any Note is payable, or the coin or currency in which, any Note or any amount thereunder is payable, or impair the right to institute suit for the enforcement of any such payment on or after the maturity thereof;

(2)   reduce the percentage in Aggregate Principal Amount, the consent of the Holders of which is required for the execution of any such supplemental indenture, or the consent of the Holders of which is required for any waiver of compliance with certain provisions of this Indenture or certain Events of Default hereunder and their consequences provided for in this Indenture;

(3)   impair or adversely affect the Trust Estate except as otherwise permitted herein;

(4)   permit the creation of any lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Trust Estate or terminate the lien of this Indenture on any property at any time subject hereto (other than pursuant to the terms of this Indenture) or deprive the Holder of any Note or any other party expressly secured hereby of the security afforded by the lien of this Indenture;

(5)   reduce the percentage of the Aggregate Principal Amount of the Notes whose Holders must direct the Trustee to preserve the Trust Estate or must consent before any request is made to rescind the Trustee's election to preserve the Trust Estate pursuant to Section 5.5 hereof, or to sell or liquidate the Trust Estate pursuant to Section 5.4, 5.5 or 9.7

hereof or modify the requirement for consent of any other party to which the right to consent is expressly granted hereby;

(6)    modify any of the provisions of this Section or Section 5.15 hereof, except to increase any such percentage or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Note affected thereby;

(7)    modify the provisions of Article XI hereof or the definition of the term "Holder," "Noteholder," "Majority Noteholders," "Majority Preferred Shareholders," "Requisite Noteholders" or of the term "Outstanding";

(8)    amend any provision of this Indenture relating to the institution of proceedings for the Issuer or the Co-Issuer to be adjudicated as bankrupt or insolvent, or the consent by the Issuer or the Co-Issuer to the institution of bankruptcy or insolvency proceedings against it, or the filing with respect to the Issuer or the Co-Issuer of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Code or any other similar applicable law, or the consent by the Issuer or the Co-Issuer to the filing of any such petition as to the appointment of a receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, respectively;

(9)    amend any provision of this Indenture or other such document that provides that the obligations of the Co-Issuer or the Issuer, as the case may be, are non-recourse obligations of the Co-Issuer or the Issuer, respectively, payable solely from the Collateral in accordance with the terms hereof; or

(10)    modify any of the provisions of this Indenture in such a manner as to affect the calculation of the amount or timing of any payment of interest or principal due on any Note on any Payment Date (including the calculation of any of the individual components of such calculation) or to affect the rights of the Holders of Notes to the benefit of any provisions for the redemption of such Notes contained herein.

With respect to any action that requires consent from 100% of the Noteholders, if any Noteholder has notified the Trustee in writing that pursuant to such Noteholder's organizational documents or other documents governing such Noteholder's actions, the Noteholder is not permitted to take any affirmative action approving, rejecting or otherwise acting upon any Issuer request under the Indenture, the failure by such Noteholder to consent to or reject any such requested action will be deemed a consent by such Noteholder to the requested action.

Not later than 15 Business Days prior to the execution of any proposed supplemental indenture pursuant to this Section, the Trustee shall mail to the Servicer and, so long as any Notes are then rated by any Rating Agency, to each such Rating Agency, a copy of such supplemental indenture and, if any Notes are then rated, prior to the execution of the proposed supplemental indenture, the Rating Condition must be satisfied with respect to such supplemental indenture.

It shall not be necessary in connection with any consent of Noteholders under this Section for the Noteholders to approve the specific form of any proposed supplemental indenture, but it shall be sufficient if such consent shall approve the substance thereof.

In the event that any supplemental indenture is consented to by the Issuer, the Co-Issuer and 100% of the Aggregate Outstanding Amount of each Class of Notes and the Rating Condition is satisfied or is specifically waived by all consenting parties, all conditions precedent to the execution of such supplemental indenture shall be deemed satisfied, the execution of such supplemental indenture shall be authorized or permitted by this Indenture, and the Trustee shall execute and accept the additional trusts created by such supplemental indenture pursuant to this Article VIII or modification thereby of the trusts created by this Indenture without obtaining an Opinion of Counsel.

Promptly after the execution by the Co-Issuers and the Trustee of any supplemental indenture pursuant to this Section 8.2, the Issuer or the Trustee at the request of the Issuer shall deliver to the Holders of the Notes, the Servicer, each Rating Agency then rating any Notes and the Repository (for posting on the Repository in the manner described in Section 13.17), a copy thereof.

Section 8.3.  Execution of Supplemental Indentures.

In executing or accepting the additional trusts created by any supplemental indenture permitted by this Article VIII or the modifications thereby of the trusts created by this Indenture, the Trustee shall be entitled to receive, and (subject to Section 6.3(d) hereof) shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture, and that all conditions precedent applicable thereto under this Indenture have been satisfied.  The Trustee may, but shall not be obligated to, enter into any such supplemental indenture which affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.

Section 8.4.  Effect of Supplemental Indentures.

Upon the execution of any supplemental indenture under this Article VIII, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Notes theretofore and thereafter authenticated and delivered hereunder shall be bound thereby.

Section 8.5.  Reference in Notes to Supplemental Indentures.

Notes authenticated and delivered after the execution of any supplemental indenture pursuant to this Article VIII may, and if required by the Trustee shall, bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture.  If the Issuer shall so determine, new Notes, so modified as to conform in the opinion of the Trustee and the Issuer to any such supplemental indenture, may be prepared and executed by the Issuer and authenticated and delivered by the Trustee in exchange for Outstanding Notes.

ARTICLE IX

REDEMPTION; TERMINATION OF TRUST

Section 9.1.    Optional Redemption.    On the Optional Redemption Date, which date shall be considered the Final Maturity Date in the case of a Total Optional Redemption, subject to satisfaction of certain conditions described herein, the Notes will be redeemed, in whole or in part, by the Co-Issuers or the Issuer, as applicable, in accordance with the priority of distributions described herein, if such redemption is directed by the holders of Preferred Shares in the amounts described below.

(a)    In the case of a Total Optional Redemption:

(i)    the Holders of at least 75% of the outstanding Preferred Shares eligible to vote direct the Co-Issuer or the Issuer to redeem the Notes;  *provided* that any Preferred Shares beneficially owned or controlled by the Servicer, entities affiliated with the Servicer Entities in excess of the Original HFP Share Amount, shall be excluded from, and be deemed ineligible to participate in, any such vote to direct any Total Optional Redemption;

(ii)    sufficient liquidation proceeds from the Portfolio Collateral must exist to effect the redemption of all Notes in full at their Redemption Price in accordance with the priority of distributions described herein; and

(b)    in the case of a Partial Optional Redemption:

(i)    the Holders of at least 10% of the outstanding Preferred Shares eligible to vote direct the Co-Issuer or the Issuer to redeem the Notes in part;  *provided* that any Preferred Shares beneficially owned or controlled by the Servicer Entities, including any HFP Shares, shall be excluded from, and be deemed ineligible to participate in, any such vote to direct any Partial Optional Redemption;

(ii)    the Holders of Preferred Shares directing such Partial Optional Redemption shall specify the Partial Redemption Percentage; *provided* that the Partial Redemption Percentage must be the percentage equivalent to at least 10% of the aggregate outstanding principal amount of the Notes as of the Closing Date; and

(iii)    the following conditions must be satisfied:

(1)    the Partial Redemption Percentage of the Notes must be redeemed *pro rata* at their respective Optional Redemption Price,

(2)    the Collateral Quality Matrix tests, Overcollateralization Tests, Interest Coverage Tests and any other eligibility criteria with respect to the Portfolio Collateral must be satisfied before and after giving effect to such redemption; *provided* that the degree of compliance with the Moody's Weighted Average Rating Test and the Weighted Average Margin Test shall not be diminished after giving effect to such redemption,

140

(3)    any applicable Default Swaps of the Issuer must be modified or terminated in a manner consistent with the economic effect of such redemption and in consideration of the Portfolio Collateral and Eligible Investments that will be owned by the Issuer after giving effect to such redemption, and any net termination payments payable by the Issuer must be paid,

(4)    the Rating Condition must be satisfied with respect to each Rating Agency,

(5)    not more than three (3) prior Partial Optional Redemptions may have occurred, and

(6)    no claims may be pending against the Issuer or the Co-Issuer and no judgments may have been rendered against the Issuer or the Co-Issuer which exceed, or reasonably could be expected to result in liabilities that exceed, in the aggregate, $100,000, unless adequate funds have been reserved or set aside for the payment thereof.

In connection with any Optional Redemption, the Issuer may use all funds credited to the Collection Account to provide for payment of the Optional Redemption Price.  If there are not sufficient funds in the Collection Account as of the date the notice of redemption is given to pay the Optional Redemption Price on the Optional Redemption Date and all such payments, fees and expenses (including any termination payments with respect to any Synthetic Securities and any Default Swaps), the Servicer is required to give the Trustee written direction to sell Portfolio Collateral in an amount sufficient to provide funds to pay the Optional Redemption Price in full. The Trustee will give notice of an Optional Redemption to the Company Announcements Office of the Irish Stock Exchange if any Class of Notes is then listed on the Irish Stock Exchange.

The Servicer shall have the right to purchase the Preferred Shares held by any Holder that directs the Issuer to effect a Partial Optional Redemption at a price equal to the liquidation value of such Preferred Shares.

(c) The election of the Issuer to redeem any Notes pursuant to this Section 9.1 shall be set forth in an Issuer Order, given to the Trustee in accordance with Section 9.5 hereof, directing the Trustee to make the payment of the Optional Redemption Price for all the Notes, from funds in the Collection Account and/or from monies deposited with the Trustee by the Issuer pursuant to Section 9.8 hereof.

(d) The Issuer shall, simultaneously with electing to redeem Notes under this Section 9.1, set the Optional Redemption Date and the Redemption Record Date for any redemption pursuant to this Section and give notice thereof to the Trustee pursuant to Section 9.6 hereof.

(e) The Issuer shall have the option to withdraw the notice of redemption until the earlier of the fifth Business Day prior to the proposed Optional Redemption Date and the date on which a forward purchase contract is entered into pursuant to Section 9.8 by written notice to the Trustee and the Servicer on or prior to such earlier day.

(f) On the Optional Redemption Date, the Optional Redemption Price shall be distributed pursuant to Section 11.1(d) after payment of all amounts required to be paid pursuant to Section 11.1(b).

        Section 9.2.    Mandatory Redemption.

If either the Interest Coverage Test or the Overcollateralization Tests are not satisfied as of any applicable Calculation Date or a Rating Confirmation Failure occurs, all or a portion of the Notes shall be redeemed (or, in the case of the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes, any Periodic Rate Shortfall Amounts shall be paid and then the Notes shall be redeemed) by the Issuer, in the order set forth in Section 11.1 hereof, on the Payment Date immediately following such Calculation Date at the Mandatory Redemption Price (pursuant to the applicable provisions of Sections 11.1 and 11.2 hereof) in an amount sufficient such that the Interest Coverage Test and Overcollateralization Tests are satisfied or a Rating Confirmation is received, as applicable. The amount of any Mandatory Redemption hereunder shall be determined in accordance with the provisions of Section 11.2 hereof.

        Section 9.3.    Additional Collateral Deposit Requirement.

On each Payment Date after the second Payment Date, the Additional Collateral Deposit Requirement shall be applied by the Issuer in the order set forth in Section 11.1 hereof.

        Section 9.4.    Special Redemption; Amendment Buy-Out

(a) The Notes (other than Class X) shall be redeemable in part on any Payment Date during the Revolving Period at the option of the Issuer, as directed by and at the discretion of the Servicer, to the extent more than U.S. $2,000,000 of Collateral Principal Collections held in the Collection Account are not applied to the purchase of Additional Portfolio Collateral satisfying the criteria contained in Section 11.3 hereof by the earlier of the last day of the next succeeding Due Period or the last day of the Revolving Period, in the order and priority set forth in Section 11.1 hereof.

(b) In the case of any supplemental indenture pursuant to Section 8.2 that requires the consent of one or more Holders of Notes or Preferred Shares, the Amendment Buy-Out Purchaser shall have the right, but not the obligation, to purchase from Non-Consenting Holders all Notes (other than the Class A-1LA Notes) or Preferred Shares held by such Holders of the Class of Notes or Preferred Shares whose consent was solicited with respect to such supplemental indenture (the ″Amendment Buy-Out Option″) for the applicable Amendment Buy-Out Purchase Price; *provided, however*, that the Amendment Buy-Out Purchaser may not exercise the Amendment Buy-Out Option during the Non-Call Period in connection with a proposed amendment to reduce the rate of interest on any Security, as applicable, or to change the earliest date on which Notes of any Class or Preferred Shares may be redeemed at the option of the Issuer; *provided further*, that notwithstanding the definition of Non-Consenting Holder, any Holder of Notes (other than the Class A-1LA Notes) or Preferred Shares who fails to respond to any such consent solicitation shall be deemed to have consented to any such supplemental indenture. Notwithstanding the foregoing, during the Non-Call Period, "Non-Consenting Holder" shall exclude any Holder of Class A-1LA Notes (unless such Holder has

consented in writing to be designated as a Non-Consenting Holder) and the Amendment Buy-Out Option shall not be applicable to such Class A-1LA Notes. If the Amendment Buy-Out Option is exercised, the Amendment Buy-Out Purchaser must purchase all such Notes or Preferred Shares of Non-Consenting Holders, regardless of the applicable percentage of the Aggregate Outstanding Amount of the Notes or Preferred Shares the consent of whose Holders is required for such supplemental indenture (an ″Amendment Buy-Out″). By its acceptance of its Securities or Preferred Shares hereunder, each Holder of Notes or Preferred Shares agrees that if the Amendment Buy-Out Option is exercised, any Non-Consenting Holder will be required to sell its applicable Notes or Preferred Shares to the Amendment Buy-Out Purchaser. For the avoidance of doubt, nothing described above shall in any way limit or restrict the rights of Holders of the Class A-1LA Notes to consent or withhold their consent to a supplemental indenture or otherwise vote their interest both during and after the Non-Call Period. Neither the Amendment Buy-Out Purchaser nor any other Person shall have any liability to any Holder or Beneficial Owner of Securities or Preferred Shares as a result of an election by the Amendment Buy-Out Purchaser not to exercise the Amendment Buy-Out Option. For the avoidance of doubt, (i) nothing described above or in the Indenture shall in any way limit or restrict the rights of the Holders of the Class A-1LA Notes to consent or withhold their consent to a supplemental indenture or to otherwise vote their interest both during and after the Non-Call Period and (ii) the Trustee shall have no responsibility for overseeing the Servicer's compliance with the Amendment Buy-Out provisions herein.

(c) All purchases made pursuant to an Amendment Buy-Out Option individually and in the aggregate must comply with the applicable transfer restrictions for the relevant Securities or Preferred Shares set forth herein and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency).

Section 9.5. Tax Event Redemption.

(a) The Notes shall be redeemable, in whole but not in part, by the Issuer at the direction of 66-2/3% of the Preferred Shares or a majority of the Controlling Class (but only if the Aggregate Principal Balance of Portfolio Collateral is less than 100% of the Class A-1L Notes) on any Payment Date at the Tax Event Redemption Price, if as a result of (i) change in tax law, rule or regulation or the interpretation thereof, the payments to be received on the Portfolio Collateral are reduced as a result of the imposition of withholding tax, (ii) the Issuer is otherwise subjected to tax such that the income of the Issuer is reduced in an amount determined by such holders of Preferred Shares to be material, (iii) (A) one or more items of Portfolio Collateral that were not subject to withholding tax when the Issuer committed to purchase them have become subject to withholding tax or the rate of withholding has increased on one or more items of Portfolio Collateral that were subject to withholding tax when the Issuer committed to purchase them and (B) in any Due Period the aggregate of the payments subject to withholding tax on new withholding tax obligations and the increase in payments subject to withholding tax on increased rate withholding tax obligations, in each case to the extent not "grossed-up" (on an after-tax basis) by the related obligor, represent 5% or more of Interest Proceeds for the Due Period, or (iv) taxes, fees, assessments or other similar charges are imposed on the Issuer or the Co-Issuer in an aggregate amount in any 12-month period in excess of $2,000,000, other than liabilities for withholding taxes included in clause (iii) above. No redemption pursuant to this Section 9.5

shall occur unless all Outstanding Notes are redeemed and unless all payments, fees and expenses are paid in full on the date of such redemption.

(b) The election of the Issuer to redeem any Notes pursuant to this Section 9.5 shall be set forth in an Issuer Order, given to the Trustee in accordance with Section 9.6 hereof, directing the Trustee to make the payment of the Tax Event Redemption Price from funds in the Collection Account and/or from monies deposited with the Trustee by the Issuer pursuant to Section 9.8 hereof.

(c) The Issuer shall, simultaneously with electing to redeem Notes under this Section 9.5, set the Tax Event Redemption Date and the Redemption Record Date for any redemption pursuant to this Section 9.5 and give notice thereof to the Trustee pursuant to Section 9.6 hereof.

(d) The Issuer shall have the option to withdraw the notice of redemption until the earlier of the fifth Business Day prior to the proposed Tax Event Redemption Date and the date on which a forward purchase contract is entered into pursuant to Section 9.8(b) hereof by written notice to the Trustee and the Servicer on or prior to such earlier day.

(e) On the Tax Redemption Date, the Tax Event Redemption Price shall be distributed pursuant to Section 11.1(d) hereof after payment of all amounts required to be paid pursuant to Section 11.1(b) hereof.

Section 9.6. [Notice to Trustee, Rating Agencies and the Servicer.](#)

(a) The Issuer shall by Issuer Order, in connection with an Optional Redemption pursuant to Section 9.1 or a Tax Event Redemption pursuant to Section 9.5, not later than the twentieth Business Day immediately preceding the proposed Optional Redemption Date or Tax Event Redemption Date, as applicable, notify in writing the Trustee, each Rating Agency then rating any Class of Notes and the Servicer of such proposed Optional Redemption Date or Tax Event Redemption Date, as applicable, and the proposed Redemption Record Date and Optional Redemption Price for each Class of Notes.

(b) If any Mandatory Redemption is required pursuant to Section 9.2 hereof, the Issuer shall, not later than the third Business Day after the related Calculation Date, notify in writing the Trustee, each Rating Agency then rating any Class of Notes, the Servicer and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent that such redemption is required and the amount of the Notes of each Class required to be redeemed pursuant to the provisions of Section 11.2 hereof.

(c) If any Special Redemption is required pursuant to Section 9.4 hereof, the Issuer shall, not later than twentieth Business Day preceding the proposed Special Redemption Date, notify in writing the Trustee, each Rating Agency then rating any Class of Notes, the Servicer and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent that such proposed redemption is required and the amount of the Notes of each Class to be redeemed.

Section 9.7.    Notice of Optional Redemption and Tax Event Redemption by the Issuer.

(a) If notice thereof has been received by the Trustee from the Issuer pursuant to Section 9.6 hereof, notice of an Optional Redemption shall be given by the Trustee by first-class mail, postage prepaid, mailed not less than twenty calendar days prior to the proposed Redemption Record Date, to each Holder of Notes to be redeemed at the address in the Note Register (with a copy to the Rating Agencies at the addresses specified in Section 10.7 hereof), and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent.

All notices of Optional Redemption shall state:  the proposed Optional Redemption Date; the proposed Redemption Record Date; and that on such proposed Optional Redemption Date, all Outstanding Notes are to be redeemed and paid in full and that applicable interest thereon shall cease to accrue on the date specified in the notice and the place where such Notes may be surrendered for payment of the Optional Redemption Price, which shall be the agency of the Trustee to be maintained as provided in Section 7.2 hereof; and that the Issuer may withdraw such election at any time on or prior to the earlier of the Business Day prior to such proposed Optional Redemption Date and the date before which a forward purchase contract is entered into pursuant to Section 9.8(a) hereof.

At the cost of the Issuer, the Trustee shall give notice of any withdrawal of the notice of redemption pursuant to Section 9.1(d) hereof (to the extent feasible) by overnight courier guaranteeing next day delivery, sent not later than the third Business Day prior to the previously proposed Optional Redemption Date, to each Holder of Notes to be redeemed at the address in the Note Register, and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent.

Notice of Optional Redemption of the Notes shall be given by the Issuer or, at the Issuer's request, by the Trustee in the name of the Issuer and at the expense of the Issuer.  Failure to give notice of redemption or notice of withdrawal, or any defect therein, to any Holder of any Note shall not impair or affect the validity of the redemption of the Notes or give rise to any claim based upon such failure or defect.

(b) If notice thereof has been received by the Trustee from the Issuer pursuant to Section 9.6 hereof, notice of a Tax Event Redemption shall be given by the Trustee by first-class mail, postage prepaid, mailed not less than twenty calendar days prior to the proposed Redemption Record Date, to each Holder of Notes to be redeemed at the address in the Note Register (with a copy to the Rating Agencies at the addresses specified in Section 10.7 hereof), and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent.

All notices of a Tax Event Redemption shall state: the proposed Tax Event Redemption Date; the proposed Redemption Record Date; and that on such proposed Tax Event Redemption Date, all of the Notes (to the extent of the Aggregate Principal Amount) are to be redeemed and paid in full and that interest thereon shall cease to accrue on the date specified in the notice and the place where such Notes may be surrendered for payment of the Tax Event Redemption Price, which shall be the agency of the Trustee to be maintained as provided in Section 7.2 hereof; and that the Issuer may withdraw such election at any time on or prior to the

earlier of the fifth Business Day prior to such proposed Tax Event Redemption Date and the date before which a forward purchase contract is entered into pursuant to Section 9.8(b) hereof.

At the cost of the Issuer, the Trustee shall give notice of any withdrawal of the notice of redemption pursuant to Section 9.5 hereof (to the extent feasible) by overnight courier guaranteeing next day delivery, sent not later than the third Business Day prior to the previously proposed Tax Event Redemption Date, to each Holder of Notes to be redeemed at the address in the Note Register (with a copy to the Rating Agencies at the addresses specified in Section 10.7 hereof), and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent.

Notice of Tax Event Redemption of the Notes shall be given by the Issuer or, at the Issuer's request, by the Trustee in the name of the Issuer and at the expense of the Issuer. Failure to give notice of redemption or notice of withdrawal, or any defect therein, to any Holder of any Note shall not impair or affect the validity of the redemption of the Notes or the withdrawal thereof or give rise to any claim based upon such failure or defect.

Section 9.8.    Deposit of Optional Redemption Price and Tax Event Redemption Price.

(a) In the case of an Optional Redemption, on or before the fifth Business Day preceding the proposed Optional Redemption Date contained in the notice of redemption as provided in Section 9.6 hereof, the Issuer shall deposit with the Trustee cash or Eligible Investments maturing no later than the Business Day prior to the Optional Redemption Date (unless such Eligible Investments are issued by the Person acting as Trustee, in which event they may mature on the Optional Redemption Date), or any combination thereof, in an amount sufficient to provide for payment of the Optional Redemption Price with respect to the Outstanding Notes and all amounts due under Sections 11.1(b) and 11.1(d) hereof. The Issuer may use all available funds in the Collection Account to provide for payment of the Optional Redemption Price in accordance with Section 11.1 hereof. In the event that there are not sufficient available funds in the Collection Account as of the date the notice of redemption is sent out pursuant to Section 9.6 hereof to pay the Optional Redemption Price on the Optional Redemption Date in accordance with Sections 11.1(b) and 11.1(d) hereof, the Servicer shall give the Trustee written direction to sell Portfolio Collateral in an amount sufficient to provide available funds to pay the Optional Redemption Price in full pursuant to Sections 11.1(b) and 11.1(d) hereof, and shall give the Issuer written direction to enter into, as of a date which is not later than five (5) Business Days prior to the Optional Redemption Date, forward contracts (each of which shall provide for "payment versus delivery" and shall direct that payment be made to the Trustee) with a financial institution rated "A-1+" by Standard & Poor's and "P-1" by Moody's to sell such Portfolio Collateral for settlement at least three Business Days prior to the Optional Redemption Date, and shall provide a copy of such contract to the Trustee prior to such Business Day preceding such redemption date; and pursuant to such instruction, the Trustee shall release and sell such Portfolio Collateral for purposes of such redemption. In determining whether the proceeds of any Optional Redemption will be sufficient to pay the Optional Redemption Price on the Optional Redemption Date, the Issuer and the Trustee may rely on the Market Value of the Portfolio Collateral when entering into any forward purchase agreements.

(b) In the case of a Tax Event Redemption, on or before the fifth Business Day preceding the proposed Tax Event Redemption Date contained in the notice of redemption as provided in Section 9.6 hereof, the Issuer shall deposit with the Trustee cash or Eligible Investments maturing no later than the Business Day prior to the Tax Event Redemption Date (unless such Eligible Investments are issued by the Person acting as Trustee, in which event they may mature on the Tax Event Redemption Date), or any combination thereof, in an amount sufficient to provide for payment of the Tax Event Redemption Price with respect to the Outstanding Notes and all amounts due under Sections 11.1(b) and 11.1(d) hereof. The Issuer may use all available funds in the Collection Account to provide for payment of the Tax Event Redemption Price in accordance with Section 11.1 hereof. In the event that there are not sufficient available funds in the Collection Account as of the date the notice of redemption is sent out pursuant to Section 9.6 hereof to pay the Tax Event Redemption Price on the Tax Event Redemption Date in accordance with Sections 11.1(b) and 11.1(d) hereof, the Servicer shall give the Trustee written direction to sell Portfolio Collateral in an amount sufficient to provide available funds to pay the Tax Event Redemption Price in full pursuant to Sections 11.1(b) and 11.1(d) hereof, and shall give the Issuer written direction to enter into, as of a date which is not later than five Business Days prior to the Tax Event Redemption Date, forward contracts (each of which shall provide for "payment versus delivery" and shall direct that payment be made to the Trustee) with a financial institution rated "A-1+" by Standard & Poor's and "P-1" by Moody's to sell such Portfolio Collateral for settlement at least three Business Days prior to the Tax Event Redemption Date, and shall provide a copy of such contract to the Trustee prior to such third Business Day preceding such redemption date; and pursuant to such instruction, the Trustee shall release and sell such Portfolio Collateral for purposes of such redemption.

Section 9.9.     Notes Payable on Optional Redemption Date.

In the event that notice of Optional Redemption pursuant to Section 9.1 hereof has been given as provided in Section 9.6 hereof and not withdrawn, all Outstanding Notes shall on the Optional Redemption Date become due and payable at the Optional Redemption Price, and (unless the Issuer shall default in the payment of the Optional Redemption Price) all Outstanding Notes shall cease to bear interest on the Optional Redemption Date. Each Holder shall present and surrender its Note at the place specified in the notice of Optional Redemption on or prior to such Optional Redemption Date; *provided that* if there is delivered to the Issuer and the Trustee such security or indemnity as may be required by them to save each of them harmless (an unsecured indemnity agreement of an Institutional Investor organized under the laws of the United States or any state in the United States with a net worth at least twice the amount of the security or indemnity being deemed sufficient to satisfy such security or indemnity requirement) and an undertaking thereafter to surrender such Note, then, in the absence of notice to the Issuer or the Trustee that the applicable Note has been acquired by a protected purchaser, such payment shall be made without presentation or surrender.

If any Note called for redemption shall not be so paid upon surrender thereof for Optional Redemption (or the delivery of the indemnity pursuant to the preceding paragraph), the principal shall, until paid, bear interest from the Optional Redemption Date at the Applicable Periodic Rate.

Section 9.10.   Notes Payable on Mandatory Redemption Date.

In the event of a Mandatory Redemption pursuant to Section 9.2 hereof, principal of the Notes (or, in the case of the Class A-3L Notes, Class A-4L Notes and the Class B-1L Notes, any Periodic Rate Shortfall Amount and then any principal) in an amount determined pursuant to Section 11.2 hereof shall on the Mandatory Redemption Date become due and payable, and (unless the Issuer shall default in the payment of the Mandatory Redemption Price) such amounts shall cease to bear interest on the Mandatory Redemption Date.

Section 9.11.   Notes Payable on Tax Event Redemption.

In the event that notice of a Tax Event Redemption pursuant to Section 9.5 hereof has been given as provided in Section 9.6 hereof and not withdrawn, all Outstanding Notes shall on the Tax Event Redemption Date become due and payable at the Tax Event Redemption Price, and (unless the Issuer shall default in the payment of the Tax Event Redemption Price) all Outstanding Notes shall cease to bear interest on the Tax Event Redemption Date.  Each Holder shall present and surrender its Note at the place specified in the notice of redemption on or prior to such Tax Event Redemption Date; *provided that* if there is delivered to the Issuer and the Trustee such security or indemnity as may be required by them to save each of them harmless (an unsecured indemnity agreement of an Institutional Investor organized under the laws of the United States or any state in the United States with a net worth at least twice the amount of the security or indemnity being deemed sufficient to satisfy such security or indemnity requirement) and an undertaking thereafter to surrender such Note, then, in the absence of notice to the Issuer or the Trustee that the applicable Note has been acquired by a bona fide purchaser, such payment shall be made without presentation or surrender.

If any Note called for a Tax Event Redemption shall not be so paid upon surrender thereof for a Tax Event Redemption (or the delivery of the indemnity pursuant to the preceding paragraph), the principal shall, until paid, bear interest from the Tax Event Redemption Date at the Applicable Periodic Rate.

Section 9.12.   Initial Deposit Redemption.

The Class A-1LA Notes and the Class X Notes shall be subject to Initial Deposit Redemption pursuant to the terms of Section 3.3 hereof.

Section 9.13.   Reserved.

Section 9.14.   Notes Payable on Special Redemption Date.

In the event of a Special Redemption pursuant to Section 9.4 hereof, principal of the Notes (or, in the case of the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes, any Periodic Rate Shortfall Amount and then any principal) in an amount determined pursuant to Section 11.1 hereof shall on the Special Redemption Date become due and payable and (unless the Issuer shall default in the payment of the Special Redemption Price) such amounts shall cease to bear interest on the Special Redemption Date.

## ARTICLE X

## ACCOUNTS, ACCOUNTINGS AND RELEASES

Section 10.1.  Collection of Money.

Except as otherwise expressly provided herein, the Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all money and other property payable to or receivable by the Trustee pursuant to this Indenture, including all payments due on the Pledged Securities included in the Trust Estate, in accordance with the terms and conditions of such Pledged Securities.  The Trustee shall segregate and hold all such money and property received by it in trust for the Holders of the Notes and shall apply it as provided in this Indenture.

Section 10.2.  Accounts.

(a) The Trustee shall, on or prior to the Closing Date, establish ten non-interest bearing segregated trust accounts (collectively, the "Accounts") which shall be designated as the "Collection Account," the "Collateral Account," the "Reserve Account," the "Initial Deposit Account," the "Expense Reimbursement Account," the "Loan Funding Account," the "Closing Expense Account," the "Securities Lending Account," the "Default Swap Collateral Account," and the "Default Swap Issuer Account," respectively, identified as held in trust for the benefit of the Noteholders and the applicable Secured Parties or, in the case of the Default Swap Collateral Account, as held in trust for the benefit of the related Default Swap Counterparty and, to the extent provided in this Indenture, the other Secured Parties. The Trustee may establish any number of sub-accounts to the Collection Account for its convenience in administering the Accounts and Trust Estate.

Each Account (including any sub account) shall be a securities account established with the Securities Intermediary in the name of the Trustee in accordance with Section 6.15.

A Default Swap Collateral Account shall be established for each Default Swap. The Trustee shall credit to each such Default Swap Collateral Account on the Closing Date or on the date any such Default Swap is entered into, as applicable, the amount required to secure the obligations of the Issuer in accordance with the terms of the related Default Swap, as directed by the Servicer, which amount shall be at least equal to the amount referred to in paragraph (iv) of the definition of Default Swap.

Amounts credited to a Default Swap Collateral Account shall be maintained in accordance with the terms and provisions of the related Default Swap.  Amounts and property credited to a Default Swap Collateral Account shall be withdrawn by the Trustee and applied to the payment of any amounts payable by, or to the delivery of investment property deliverable by, the Issuer to the related Default Swap Counterparty, as directed by the Servicer, in accordance with the terms of such Default Swap.  Income received on amounts credited to a Default Swap Collateral Account will be applied in accordance with the terms of the applicable Default Swap to the payment of any periodic amounts owed by the Issuer to the applicable Default Swap

Counterparty on the date such amounts are due. After application of such amounts, any income then contained in such Default Swap Collateral Account will be withdrawn from such Account and credited to the Collection Account for distribution as Collateral Interest Collections. After payment of all amounts owing by the Issuer to a Default Swap Counterparty in accordance with the terms of the related Default Swap (other than any Default Swap Counterparty Termination Payment) the Trustee shall be directed by the Servicer to withdraw all funds and other property credited to the Default Swap Collateral Account related to such Default Swap and credit such funds and other property to the Collection Account, as Collateral Principal Collections (in the case of cash and Eligible Investments) and the Collateral Account (in the case of Portfolio Collateral and other financial assets) for application as Collateral Principal Collections (other than any income thereon which will be Collateral Interest Collections) in accordance with the terms of the Indenture. Any Default Swap Counterparty Termination Payments owed by the Issuer to the Default Swap Counterparty shall be paid solely from amounts available therefor under the priority of payment provisions described herein.

Except for interest on securities credited to a Default Swap Collateral Account payable to the Issuer as described pursuant to the preceding paragraph, funds and other property standing to the credit of a Default Swap Collateral Account will not be considered to be an asset of the Issuer for purposes of the Interest Coverage Test or the Overcollateralization Tests; *provided, however that* the Default Swap that relates to such Default Swap Collateral Account will be considered an asset of the Issuer for such purposes.

If the terms of any Default Swap require the Default Swap Counterparty to secure its obligations with respect to such Default Swap, the Trustee will cause to be established a Default Swap Issuer Account in respect of such Default Swap. The Trustee shall credit to any such Default Swap Issuer Account all funds and other property received from the applicable Default Swap Counterparty to secure the obligations of such Default Swap Counterparty in accordance with the terms of such Default Swap.

Funds and other property standing to the credit of any Default Swap Issuer Account will not be considered to be an asset of the Issuer for purposes of the Interest Coverage Test or the Overcollateralization Tests; *provided, however that* the Default Swap that relates to such Default Swap Issuer Account will be considered an asset of the Issuer for such purposes.

In accordance with the terms of the applicable Default Swap, funds and other property standing to the credit of the related Default Swap Issuer Account will be withdrawn by the Trustee, as directed by the Servicer, and applied to the payment of any amount owing by the related Default Swap Counterparty to the Issuer. After payment of all amounts owing by the Default Swap Counterparty to the Issuer in accordance with the terms of the related Default Swap, all funds and other property standing to the credit of the related Default Swap Issuer Account will be withdrawn from such Default Swap Issuer Account and paid or transferred to the related Default Swap Counterparty in accordance with the applicable Default Swap.

The Collection Account shall be a segregated trust account (or, at the Trustee's option, may be comprised of two separate, segregated trust accounts, designated for the collection of Collateral Interest Collections and Collateral Principal Collections, respectively), to which money required to be credited to the Collection Account (and Eligible Investments in

which such money may be held from time to time, which Eligible Investments shall be acquired and held pursuant to the terms of Section 6.16 hereof) shall be credited.

All Portfolio Collateral Delivered to the Trustee shall be credited to the Collateral Account.

On or before the date on which the Issuer enters into a Securities Lending Agreement and delivers a copy of it to the Trustee, the Trustee shall create a segregated trust account designated as the Securities Lending Account with respect to any such Securities Lending Agreement. All Securities Lending Collateral posted by any Securities Lending Counterparty in support of its respective obligation under a Securities Lending Agreement shall be immediately credited to the Securities Lending Account and posted to a sub-account related to the Securities Lending Account. The only permitted withdrawal from or application of funds credited to the Securities Lending Account shall be: (i) for application to obligations of the relevant Securities Lending Counterparty to the Issuer under a Securities Lending Agreement if the Securities Lending Agreement becomes subject to early termination or in the exercise of remedies under the related Securities Lending Agreement upon any "event of default" under and as defined in the related Securities Lending Agreement, including liquidating the related Securities Lending Collateral, or (ii) to return the Securities Lending Collateral to the relevant Securities Lending Counterparty when and as required by the relevant Securities Lending Agreement, in each case as directed by the Servicer.

Amounts credited to the Securities Lending Account shall be applied pursuant to this Section 10.2. To the extent provided in a Securities Lending Agreement, earnings on amounts credited to the Securities Lending Account shall be payable by the Issuer to the related Securities Lending Counterparty.

Amounts credited to the Securities Lending Account shall not be considered an asset of the Issuer for the purposes of the Coverage Tests, but the loaned security or asset that relates to the Securities Lending Account shall be so considered an asset of the Issuer.

The Trustee shall credit to the Collection Account (i) all Collections and (ii) all amounts required to be credited thereto pursuant to this Indenture, including but not limited to, Section 10.3(e)(i) hereof.

The Trustee shall credit to the Initial Deposit Account (i) the Deposit received on the Closing Date for credit to the Initial Deposit Account pursuant to Section 3.2(e) hereof, (ii) all amounts required to be credited thereto pursuant to this Indenture, including but not limited to, Sections 3.2(e), 10.3(e)(ii) and 11.3 hereof and (iii) all proceeds received with respect to the sale of the Post-Closing Sale Collateral, notwithstanding anything to the contrary herein.

Upon the purchase of any item of Portfolio Collateral that is a Delayed Drawdown Loan or a Revolving Loan, the Trustee (as instructed by the Servicer) shall credit Collateral Principal Collections to the Loan Funding Account in an amount equal to the Issuer's maximum future funding obligations under the terms of such Delayed Drawdown Loan or a Revolving Loan and the Collateral Principal Collections so credited shall be considered part of the purchase price of such Delayed Drawdown Loan or Revolving Loan for purposes of Article

XII hereof. When Collateral Principal Collections are received by the Trustee with respect to a Delayed Drawdown Loan or a Revolving Loan, the amount of such Collateral Principal Collections that may thereafter be re-borrowed under the terms of the Delayed Drawdown Loan or the Revolving Loan shall be credited to the Loan Funding Account.

The Trustee shall credit to the Expense Reimbursement Account (i) on the Closing Date the $50,000 received on the Closing Date for credit to the Expense Reimbursement Account pursuant to Section 3.2(f) hereof, (ii) all amounts required to be credited thereto from available amounts in the Collection Account pursuant to Section 11.1 hereof and (iii) all amounts required to be credited thereto pursuant to Section 10.3(e)(iii) hereof.

The Trustee shall credit to the Closing Expense Account on the Closing Date the amount specified pursuant to Section 3.2(f) hereof.

In addition, the Issuer may, but under no circumstances shall be required to, credit such monies to the Collection Account as it deems, in its sole discretion, to be advisable in the event that, but for such action, an Event of Default would occur.

All monies, instruments, investment property and other property credited to the Collection Account, the Initial Deposit Account, the Expense Reimbursement Account, the Loan Funding Account, the Closing Expense Account and the Reserve Account pursuant to this Indenture, and all Portfolio Collateral and other property credited to the Collateral Account, shall be held by the Trustee as part of the Trust Estate and shall be applied in the manner set forth herein.

The Trustee shall pay free and clear of the lien of the Indenture, upon receipt (or withdrawal from the Collection Account if previously credited thereto), all Retained Accrued Interest, as directed by Bear Stearns.

(b) Upon Servicer Order (which may be in the form of standing instructions) or, after the occurrence of an Event of Default upon written direction of the Requisite Noteholders, any portion of the monies in the Collection Account, the Initial Deposit Account, the Loan Funding Account, the Expense Reimbursement Account, Reserve Account and the Closing Expense Account in excess of $10,000 (in the aggregate) shall be applied by the Trustee as directed in such Servicer Order (or written direction of Requisite Noteholders, as the case may be) to purchase one or more Eligible Investments, *provided that* Eligible Investments in the Loan Funding Account are to mature no later than one Business Day after the date of such purchase. If the amount in such Accounts is equal to or less than $10,000, such amount shall remain on deposit therein and shall not be held in Eligible Investments. The Servicer and Issuer acknowledge that the selection of Eligible Investments by the Servicer pursuant to the preceding sentence shall be subject to the availability of such Eligible Investment at the depositary institution at which such Account is held. If, prior to the occurrence of an Event of Default, the Servicer shall not have given directions pursuant to this Section 10.2(b) with respect to any amounts in excess of $10,000 for one Business Day, the Trustee, unless otherwise directed by the Issuer within one Business Day, shall apply such monies to purchase Eligible Investments described in paragraph (b) of the definition of Eligible Investments (which, in the case of Eligible Investments in the Loan Funding Account, are to mature no later than one Business Day

after the date of such purchase). If, after the occurrence of an Event of Default, the Requisite Noteholders shall not have given directions pursuant to this Section 10.2(b) with respect to any amounts in excess of $10,000 for one Business Day, the Trustee shall apply such moneys as fully as practicable to purchase Eligible Investments described in paragraph (b) of the definition of Eligible Investments and maturing not later than the earlier of (i) 30 days after the date of such purchase or (ii) the Business Day prior to the next Payment Date (or, in the case of Eligible Investments in the Initial Deposit Account, the Business Day prior to the Effective Date and in the case of Eligible Investments in the Loan Funding Account, one Business Day after the date of such purchase). All income or other gain from such Eligible Investments shall be credited to the Collection Account, the Initial Deposit Account, the Loan Funding Account, the Expense Reimbursement Account, the Reserve Account or the Closing Expense Account, as the case may be (for which the related purchase was made) and any loss resulting from such Eligible Investments shall be charged to the Collection Account, the Initial Deposit Account, the Loan Funding Account, the Expense Reimbursement Account, the Reserve Account or the Closing Expense Account, as the case may be (for which the related purchase was made). The Trustee shall not in any way be held liable by reason of any insufficiency in the Collection Account, the Initial Deposit Account, the Expense Reimbursement Account, the Loan Funding Account or the Closing Expense Account resulting from any loss on any Eligible Investment.

(c) Upon Servicer Order and subject to the provisions of Section 11.3 hereof, on any Business Day, the applicable portion of Collateral Interest Collections shall be released from the Collection Account as specified in such Servicer Order and applied by the Trustee in accordance with such Servicer Order in payment of one or more specified items of Additional Portfolio Collateral purchased in accordance with the provisions of Section 11.3 hereof.

(d) Upon Servicer Order and subject to the provisions of Section 11.3 hereof on any Business Day all or a portion of the Collateral Principal Collections (other than Collateral Disposition Proceeds) shall be released from the Collection Account as specified in such Servicer Order and applied by the Trustee in accordance with such Servicer Order in payment of one or more specified items of Additional Portfolio Collateral purchased in accordance with the provisions of Section 11.3 hereof.

(e) Upon Servicer Order and subject to the provisions of Section 12.4 hereof, on any Business Day all or a portion of the Collateral Disposition Proceeds shall be released from the Collection Account and applied by the Trustee in accordance with such Servicer Order in payment of one or more specified items of Substitute Portfolio Collateral purchased in accordance with the provisions of Section 12.4 hereof.

(f) Upon Servicer Order and subject to the requirements of Section 3.4 hereof, between the Closing Date and the close of business on the Effective Date only, all or a portion of the Deposit available in the Initial Deposit Account shall be released from the Initial Deposit Account and applied by the Trustee in accordance with such Servicer Order in payment for Original Portfolio Collateral purchased in accordance with Section 3.4 hereof. Upon Servicer Order, on the Effective Date and pursuant to Section 3.4(d), all Account Income credited to the Initial Deposit Account shall be released from the Initial Deposit Account and credited to the Collection Account to be applied as Collateral Interest Collections on the next Payment Date and the remainder of such funds shall be considered Collateral Principal Collections.

(g) Upon Servicer Order on behalf of the Issuer, all or a portion of the funds available in the Expense Reimbursement Account shall be released from the Expense Reimbursement Account and applied by the Trustee to the payment to the Issuer for the purpose of paying on or prior to the next Payment Date following the date of delivery of such Servicer Order the Issuer Base Administrative Expenses, as specified therein, which are payable during the Due Period relating to such Payment Date.

(h) On or before the first Payment Date, any remaining portion of the Closing Expense Deposit after the closing expenses have been paid in full (including any Account Income thereon) shall be transferred (i) upon receipt by the Trustee of a Servicer Order to the Initial Deposit Account (and be deemed to be part of the Deposit) or, after the Effective Date, to the Collection Account to be applied as Collateral Interest Collections or (ii) if no such Servicer Order has been received on the Business Day prior to the second Payment Date, to the Collection Account to be applied as Collateral Interest Collections.

(i) Upon Servicer Order on behalf of the Issuer, all or a portion of the funds available in the Loan Funding Account shall be released from the Loan Funding Account and applied by the Trustee to fund amounts drawn under any Delayed Drawdown Loan or Revolving Loan and only funds in the Loan Funding Account shall be used for such purpose. In addition, upon Servicer Order on behalf of the Issuer, all or a portion of the funds available in the Loan Funding Account at any time in excess of the aggregate principal amount of commitments which may be drawn upon all Delayed Drawdown Loans and Revolving Loans in the Portfolio Collateral will be released from the Loan Funding Account and applied by the Trustee to the Collection Account to be applied as Collateral Principal Collections.

(j) On or before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Reserve Account, that shall be held in trust in the name of the Trustee for the benefit of the applicable Secured Parties, and over which the Trustee shall have exclusive control and the sole right of withdrawal. On the Closing Date, the Trustee, at the direction of the Issuer, shall credit to the Reserve Account approximately U.S.$1,600,000 from the net proceeds of the Offering. Amounts credited to the Reserve Account shall be applied pursuant to subclause (b) of this Section 10.2.

Section 10.3.   Custody and Release of Portfolio Collateral.

(a) The Issuer shall cause each item of the Trust Estate to be Delivered, and the Trustee shall hold each item of the Trust Estate as Delivered, separate and apart from all other property held by the Trustee. To the extent that such of the Trust Estate as constitutes a deposit account is maintained with JPMorgan Chase, JPMorgan Chase hereby makes the agreements required under the UCC in order for such deposit account to be Delivered. Notwithstanding any other provision of this Indenture, the Trustee shall not hold any part of the Trust Estate through an agent or nominee except as expressly permitted by this Section 10.3(a). Each of the preceding requirements of this Section 10.3(a) is subject to the right of the Trustee to relocate the Trust Estate to another jurisdiction pursuant to and upon compliance with Section 7.5(b) hereof.

(b) If no Event of Default has occurred and is continuing, the Servicer, by a Servicer Order delivered to the Trustee on or before the settlement date for any sale of an item of

Portfolio Collateral, certifying that (i) it has determined that such Portfolio Collateral has become an item of Credit Risk Portfolio Collateral, an item of Credit Improved Portfolio Collateral, an item of Defaulted Portfolio Collateral, an item of Equity Portfolio Collateral or an item of Portfolio Collateral to be sold pursuant to Section 12.1(d) hereof and, in each case, the sale of such Portfolio Collateral is in compliance with Section 12.1 hereof or (ii) based upon receipt of an Issuer Order, on or after the Payment Date occurring in June 2010, the Collections from the sale of such Portfolio Collateral shall be used to effect an Optional Redemption in accordance with Section 9.1 hereof or (iii) based on receipt of an Issuer Order, the Collections from the sale of such Portfolio Collateral shall be used to effect a Tax Event Redemption in accordance with Section 9.5 hereof or (iv) it has determined that such Portfolio Collateral has become subject to withholding or similar tax and its sale is in compliance with Section 12.1 hereof, may direct the Trustee to release from the lien of this Indenture and deliver the Portfolio Collateral specified in such Servicer Order and, upon receipt of such Servicer Order, the Trustee shall release such Portfolio Collateral from such lien and deliver such Portfolio Collateral in accordance with the Servicer Order, in each case against receipt of sale proceeds therefor.

(c) The Trustee on behalf of the Issuer shall notify the Servicer of any Portfolio Collateral that is being redeemed or paid in full. The Trustee, upon Servicer Order, shall release from the lien of this Indenture such Portfolio Collateral and shall deliver such Portfolio Collateral in accordance with the terms of the redemption or payment in full, in each case against receipt of the proceeds of the redemption price therefor or payment in full thereof.

(d) The Trustee on behalf of the Issuer shall notify the Servicer of any Portfolio Collateral that is subject to an Offer. If no Event of Default has occurred and is continuing and subject to the provisions of Article XII hereof, the Servicer shall, by Servicer Order delivered to the Trustee on or before the date set for an exchange, tender or sale of such Portfolio Collateral, set forth in reasonable detail the procedure for response to such Offer and direct the Trustee to release from the lien of this Indenture such Portfolio Collateral in accordance with the terms of the Offer in each case against receipt of payment therefor.

(e) (i)The Trustee shall credit all proceeds received by it from the disposition of Portfolio Collateral to the Collection Account unless simultaneously applied to purchase in Substitute Portfolio Collateral (as directed by the Servicer). The Trustee shall also credit to the Collection Account (A) all Account Income with respect to the Collection Account, (B) all proceeds received by it from the disposition of an Eligible Investment in the Collection Account, (C) any portion of the Deposit remaining in the Initial Deposit Account on the Effective Date if an Initial Deposit Redemption is not required on such date, which shall be deemed Collateral Principal Collections; *provided that*, at the direction of the Servicer, up to 25% of such remaining Deposit may be deemed to be Collateral Interest Collections, pursuant to Section 3.4(d) hereof, and (D) upon Servicer Order pursuant to Section 10.2(f) hereof, all Account Income in the Initial Deposit Account on the Effective Date.

(ii) The Trustee shall credit to the Initial Deposit Account all proceeds received by it from the disposition of an Eligible Investment in the Initial Deposit Account (subject, however, to the terms of Section 10.2(f) regarding the transfer of such Account Income to the Collection Account on the Effective Date).

(iii) The Trustee shall credit to the Expense Reimbursement Account all Account Income with respect to the Expense Reimbursement Account and all proceeds received by it from the disposition of an Eligible Investment in the Expense Reimbursement Account.

(f) The Trustee shall, at such time as there are no Notes Outstanding and all obligations of the Issuer under or pursuant to this Indenture have been satisfied, upon receipt of written notice from the Servicer that all amounts owing to the Servicer have been paid, release the Trust Estate from the lien of this Indenture.

Section 10.4. Reports of Trustee.

Upon written request, the Trustee shall supply to the Issuer and the Servicer at least three (3) Business Days prior to the date required hereunder for delivery of each Note Valuation Report and each Monthly Report, all information that it has received hereunder with respect to the Pledged Securities which is reasonably required for the preparation of the Note Valuation Report and Monthly Report. The Trustee shall supply in a timely fashion to the Issuer, Bear Stearns and the Servicer any other information that the Issuer or the Servicer may reasonably request from time to time that is in the possession of the Trustee and required to be provided by Section 10.5 hereof. The Trustee shall promptly forward to the Issuer, Bear Stearns, and the Servicer copies of notices and other writings received by it from the issuer of any Pledged Security or from any clearing agency with respect to any Pledged Security advising the holders of such security of any rights that the holders might have with respect thereto (including, without limitation, notices of calls and redemptions) as well as all periodic financial reports received from such issuers and clearing agencies with respect to such issuers. Nothing in this Section 10.4 hereof shall be construed to impose upon the Trustee, in such capacity, any duty to prepare any report or statement which the Issuer is required to prepare or provide under Section 10.5 hereof or to calculate, recalculate or verify any information required to be set forth in any such report or statement (other than information regularly maintained by the Trustee by reason of its acting as Trustee hereunder) prepared or required to be prepared by the Issuer or the Servicer. Nothing herein shall be construed to obligate the Trustee to disclose any information concerning its business or its operations which it reasonably considers confidential in nature.

On the date each Monthly Report is delivered or two Business Days prior to the Payment Date if with respect to a Note Valuation Report delivered in a month in which such Payment Date occurs, the Issuer shall cause to be promptly delivered to Standard & Poor's the Standard & Poor's CDO Monitor input file in the Standard & Poor's Preferred Format (provided that the specific parameters identified by Standard & Poor's have been delivered to the Issuer and the Trustee prior to the Closing Date and are limited to the scope herein stated) containing the Current Portfolio as of the date of determination and used to determine the S&P Scenario Loss Rate and the Schedule of Portfolio Collateral to Moody's in electronic format. In addition, the Issuer may provide any such reports in electronic form on a password-protected internet site or such other electronic format as the Issuer deems desirable.

Section 10.5.    Accountings.

(a) Monthly.  Not later than the (i) the first day of each month (or if such day is not a Business Day on the next succeeding Business Day) for months where no Payment Date occurs or (ii) the related Payment Date, for months in which a Payment Date occurs, commencing in July 2006, the Issuer shall compile and provide, or procure the provision, to the Trustee, the Paying and Transfer Agent, each Noteholder or Beneficial Owner (upon receipt by the Trustee of a certificate in the form of Exhibit H and to any Servicer of such Noteholder or Beneficial Owner to whom such Noteholder or Beneficial Owner has in writing directed the Trustee to send a copy of such report), Bear Stearns, the Servicer, the Repository and each Rating Agency (but only so long as any Class of Notes is rated) a monthly report (the "Monthly Report"), which shall contain the following information and instructions with respect to the Pledged Securities included in the Trust Estate, determined as of the seventh Business Day preceding either (i) the first day of such month (or if such day is not a Business Day on the next succeeding Business Day) or (ii) the Payment Date in months in which a Payment Date occurs (based in part on information provided by the Servicer):

(1)     the Aggregate Principal Amount of the Portfolio Collateral, the Principal Balance of each item of Portfolio Collateral, and the annual interest rate, maturity date, the designated seniority, and the LIN, or, with respect to Loan X Inc., the applicable ID (if either is used by the Servicer) or CUSIP Number of each item of Portfolio Collateral in the Trust Estate, as well as the rating by Standard & Poor's and the rating by Moody's (provided that any private confidential credit assessments, including estimated or shadow ratings, shall not be disclosed in any report issued and/or published to any party other than the Issuer, the Trustee and the Servicer) of such item of Portfolio Collateral determined according to the methods prescribed by Schedules D and F, respectively, and the Moody's corporate family rating, senior unsecured rating or long-term issuer rating, as applicable, the Moody's Default Probability Rating and the notch difference, if any, of each item of Portfolio Collateral;

(2)     the Balance of the Eligible Investments in the Collection Account, the annual interest rate, maturity date, Principal Balance and issuer of each Eligible Investment in the Trust Estate, as well as the rating by Standard & Poor's and the rating by Moody's of such Eligible Investment;

(3)     the nature, source and amount of any Collections in the Collection Account, including the Collateral Interest Collections and Collateral Principal Collections received since the date of determination of the last Monthly Report (or since the Closing Date, in the case of the first such report);

(4)     the amount and identity of each item of Portfolio Collateral that was released for sale indicating the reason for such sale; and the amount and identity of each item of Portfolio Collateral that was Granted, since the date of determination of the last Monthly Report (or since the Closing Date, in the case of the first such report);

(5)     the identity, principal amount of and Market Value (segregating the Market Value determinations made by the Serving Entities) of each item of Portfolio Collateral in the Trust Estate which is an item of Defaulted Portfolio Collateral and

Deferred Interest PIK Bond and the identity and principal amount of each item of Portfolio Collateral that became an item of Defaulted Portfolio Collateral, Deferred Interest PIK Bond or Equity Portfolio Collateral since the date of determination of the last Monthly Report (or since the Closing Date, in the case of the first such report);

(6)     the purchase price of each Pledged Security Granted and the purchase price and sale price of each Pledged Security subject to a sale since the date of determination of the last Monthly Report (or since the Closing Date, in the case of the first such report); whether such Pledged Security is Portfolio Collateral or an Eligible Investment in the Collection Account;

(7)     (i) the identity, principal amount, Market Value, purchase price and percentage of the Aggregate Par Amount of each item of Portfolio Collateral included in the Trust Estate which is an item of Discount Portfolio Collateral, since the date of determination of the last Monthly Report (or since the Closing Date, in the case of the first such report) and (ii) the number of consecutive Business Days such item of Discount Portfolio Collateral has traded above (i) 90% of its Principal Balance with respect to Portfolio Loans and (ii) 85% of its Principal Balance with respect to Debt Securities;

(8)     after the Effective Date, the calculation of the Class A Overcollateralization Ratio, the Class B-1L Overcollateralization Ratio and the Interest Coverage Ratio and the amount of any Additional Collateral Deposit Requirement and prior to the Effective Date and with respect to the Interest Coverage Ratio and the amount of any Additional Collateral Deposit Requirement, prior to the second Payment Date, listing such information as "not applicable" and with respect to the Interest Coverage Ratio, in months other than months in which a Payment Date occurs, calculated in accordance with the second paragraph of the definition of the Interest Coverage Ratio and listing such results but marking them as "not applicable";

(9)     information with respect to the Portfolio Collateral Granted to the Trustee since the date of determination of the last Monthly Report (or since the Closing Date, in the case of the first such report) reasonably necessary to determine whether the eligibility criteria set forth in Section 12.2 were satisfied (at the time of such grant);

(10)     the percentage of the Aggregate Par Amount comprised of non-U.S. Portfolio Collateral and the rating of the sovereign country in which the issuer of such non-U.S. Portfolio Collateral is domiciled;

(11)     the identity of and the Market Value of each item of Portfolio Collateral which is a Current Pay Obligation and the percentage of the Aggregate par Amount comprised of Current Pay Obligations;

(12)     the percentage of Portfolio Loans for which a Facility Rating has been withdrawn by Moody's due to a restructuring of such Portfolio Loan;

(13)     the Weighted Average Life, the Moody's Weighted Average Rating (determined in accordance with the procedures set forth in <u>Schedule F</u>), the Weighted Average Coupon of the Fixed Rate Portfolio Collateral and the Weighted Average

Margin of the Floating Rate Portfolio Collateral, the S&P Minimum Average Recovery Rate and the Moody's Minimum Average Recovery Rate of the Portfolio Collateral, the Moody's Correlation Factor of the Portfolio Collateral, the Aggregate Principal Amount and percentage of the Aggregate Par Amount of Portfolio Collateral which consists of DIP Loans, Delayed Drawdown Loans, Revolving Loans and which has a Moody's Rating or Standard & Poor's Rating of "Caa1" or below or "CCC+" or below, respectively, other than Defaulted Portfolio Collateral, and the Applicable Percentage of each item of Portfolio Collateral;

(14)    (a) the percentage of the Aggregate Par Amount consisting of obligations of issuers domiciled in a Group A Country, (b) the percentage of the Aggregate Par Amount consisting of obligations of issuers domiciled in a Group B Country and (c) the percentage of the Aggregate Par Amount consisting of obligations of issuers domiciled in any country other than the United States of America, a Group A Country or a Group B Country;

(15)    the percentage of the Aggregate Par Amount consisting of Synthetic Securities including the identity of the Synthetic Security Obligors and the Reference Obligation and their rating, and the percentage of the Aggregate Par Amount consisting of Strip Securities;

(16)    the Aggregate Principal Amount of the Portfolio Collateral and the percentage of the Aggregate Principal Amount of the Portfolio Collateral consisting of obligations maturing after August 1, 2021;

(17)    the par amount of all Portfolio Collateral included in the Trust Estate as of the Effective Date;

(18)    the results of the Standard & Poor's CDO Monitor determined in accordance with Schedule D hereto, whether the Standard & Poor's CDO Monitor Test is passed or failed and the S&P Break-Even Loss Rate and the S&P Scenario Loss Rate for each Class;

(19)    the Aggregate Principal Amount consisting of CLO Securities, including the Aggregate Principal Amount of each CLO Security with a Moody's Rating below "Baa3" or a Standard & Poor's Rating below "BBB-" and (b) the percentage of the Aggregate Par Amount of CLO Securities managed by any Servicer Entities; and

(20)    such other information as the Trustee or the Servicer may reasonably request.

Upon receipt of each Monthly Report, the Servicer shall compare the information contained therein and described in clauses (1) through (19) above to the information contained in its records with respect to the Collateral and shall, within three Business Days after receipt of each such Monthly Report, notify the Issuer, the Collateral Administrator (if different from the Trustee) and the Trustee in writing of any discrepancies between the information contained in the Monthly Report and the information maintained by the Servicer with respect to the Collateral.  If any discrepancy exists, the Issuer and the Servicer shall attempt to resolve the discrepancy.  If such discrepancy cannot be promptly resolved, the Trustee shall cause the Independent Accountants appointed by the Issuer pursuant to Section 10.6 hereof to review such Monthly

Report and the Trustee's records to determine the cause of such discrepancy.  If such review reveals an error in the Monthly Report or the Issuer's records, the Monthly Report or the Issuer's records shall be revised accordingly and, as so revised, shall be utilized in making all calculations pursuant to this Indenture.  Each Rating Agency (in each case only so long as any Class of Notes is rated by it), Bear Stearns and the Servicer shall be notified in writing of any such revisions by the Trustee on behalf of the Issuer.

After the end of the Revolving Period, the Monthly Report shall also contain a statement to the effect that it is not unusual for the eligibility criteria set forth in Section 12.2 hereof not to be satisfied following the Revolving Period as the Portfolio Collateral matures or is otherwise disposed of and principal on the Notes is paid down.

Each of the Issuer, Bear Stearns and the Servicer acknowledges and agrees that each Monthly Report shall be forwarded to the Repository for posting in the manner provided by the Repository.

(b) Payment Date Accounting.  With respect to each Calculation Date, the Issuer shall render or cause to be rendered an accounting (the "Note Valuation Report"), determined as of such Calculation Date, and delivered to the Trustee, the Paying and Transfer Agent, Bear Stearns, the Servicer, the Repository, the Collateral Administrator and each Rating Agency (but only so long as any Class of Notes is rated by it), not later than the Business Day prior to the Payment Date related to such Calculation Date.  Upon receipt by the Trustee of a certificate in the form of Exhibit H, the Trustee shall make available the Note Valuation Report to the requesting Noteholder or Beneficial Owner.   The Note Valuation Report shall contain the following information (based in part on information provided by the Servicer):

(1) The Aggregate Principal Amount of the Portfolio Collateral as of the close of business on such Calculation Date, after giving effect to Collateral Principal Collections received during the related Due Period and applied to purchase Additional Portfolio Collateral or Substitute Portfolio Collateral in accordance with the provisions of this Indenture, the sale or other disposition of each item of Portfolio Collateral during such Due Period and the Grant in favor of the Trustee of each item of Substitute Portfolio Collateral and Additional Portfolio Collateral during such Due Period.

(2) The Aggregate Principal Amount of the Class A-1LA Notes as of the Calculation Date and such Aggregate Principal Amount expressed as a percentage of the original Aggregate Principal Amount of the Class A-1LA Notes, and the amount of principal payments to be made on the Class A-1LA Notes on the Payment Date relating to such Calculation Date and the Aggregate Principal Amount of the Class A-1LA Notes after giving effect to such principal payments and expressed as a percentage of the original Aggregate Principal Amount of the Class A-1LA Notes.

(3) The Aggregate Principal Amount of the Class A-1LB Notes as of the Calculation Date and such Aggregate Principal Amount expressed as a percentage of the original Aggregate Principal Amount of the Class A-1LB Notes, and the amount of principal payments to be made on the Class A-1LB Notes on the Payment Date relating to such Calculation Date and the Aggregate Principal Amount of the Class A-1LB Notes after giving

effect to such principal payments and expressed as a percentage of the original Aggregate Principal Amount of the Class A-1LB Notes

The Aggregate Principal Amount of the Class A-2L Notes as of the Calculation Date and such Aggregate Principal Amount expressed as a percentage of the original Aggregate Principal Amount of the Class A-2L Notes, and the amount of principal payments to be made on the Class A-2L Notes on the Payment Date relating to such Calculation Date and the Aggregate Principal Amount of the Class A-2L Notes after giving effect to such principal payments and expressed as a percentage of the original Aggregate Principal Amount of the Class A-2L Notes.

(4)     The Aggregate Principal Amount of the Class A-3L Notes as of the Calculation Date and such Aggregate Principal Amount expressed as a percentage of the original Aggregate Principal Amount of the Class A-3L Notes, and the amount of principal payments to be made on the Class A-3L Notes on the Payment Date relating to such Calculation Date and the Aggregate Principal Amount of the Class A-3L Notes after giving effect to such principal payments and expressed as a percentage of the original Aggregate Principal Amount of the Class A-3L Notes.

(5)     The Aggregate Principal Amount of the Class A-4L Notes as of the Calculation Date and such Aggregate Principal Amount expressed as a percentage of the original Aggregate Principal Amount of the Class A-4L Notes, and the amount of principal payments to be made on the Class A-4L Notes on the Payment Date relating to such Calculation Date and the Aggregate Principal Amount of the Class A-4L Notes after giving effect to such principal payments and expressed as a percentage of the original Aggregate Principal Amount of the Class A-3L Notes.

(6)     The Aggregate Principal Amount of the Class B-1L Notes as of the Calculation Date and such Aggregate Principal Amount expressed as a percentage of the original Aggregate Principal Amount of the Class B-1L Notes, and the amount of principal payments to be made on the Class B-1L Notes on the Payment Date relating to such Calculation Date and the Aggregate Principal Amount of the Class B-1L Notes after giving effect to such principal payments and expressed as a percentage of the original Aggregate Principal Amount of the Class B-1L Notes.

(7)     The Aggregate Principal Amount of the Class X Notes as of the Calculation Date and such Aggregate Principal Amount expressed as a percentage of the original Aggregate Principal Amount of the Class X Notes, and the amount of principal payments to be made on the Class X Notes on the Payment Date relating to such Calculation Date and the Aggregate Principal Amount of the Class X Notes after giving effect to such principal payments and expressed as a percentage of the original Aggregate Principal Amount of the Class X Notes

(8)     The Base Servicing Fee, the Additional Servicing Fee, the Supplemental Servicing Fee (if any), the Trustee Administrative Expenses, the Preferred Shares Administrative Expenses, the Issuer Base Administrative Expenses, any replenishment of the Expense Reimbursement Account and the Issuer Excess Administrative Expenses, in each case

including any amount with respect to any previous Payment Date that was not paid on a previous Payment Date relating to such Calculation Date on an itemized basis.

(9)     For the Collection Account:

(a) the Balance in the Collection Account as of such Calculation Date;

(b) the amounts payable from the Collection Account pursuant to Article XI hereof on the Payment Date relating to such Calculation Date (in the aggregate and under each Section and subsection of Article XI hereof); and

(c) the Balance remaining in the Collection Account immediately after giving effect to all payments to be made on the Payment Date relating to such Calculation Date.

(10)     For the Loan Funding Account, the Balance in the Loan Funding Account as of such Calculation Date, the amounts, if any, payable from the Loan Funding Account to fund amounts drawn under any Delayed Drawdown Loan or Revolving Loan with respect to such Calculation Date and the amount, if any, transferred from the Loan Funding Account to the Collection Account as Collateral Principal Collections with respect to such Calculation Date.

(11)     (A) The Overcollateralization Ratios and the Interest Coverage Ratio (including a break-down of the components of such ratios) and the results of the Overcollateralization Tests, the Interest Coverage Test and the amount of any Additional Collateral Deposit Requirement (which shall not be reported on a pass/fail basis) as of the close of business on such Calculation Date (after giving effect to any payments to be made on the Payment Date relating to such Calculation Date, other than payments of the Mandatory Redemption Price with respect to an O/C Redemption, if any, made pursuant to Section 9.2 hereof and Section 11.2 hereof), (B) if the Interest Coverage Test or any Overcollateralization Test is not met, the amount of O/C Redemption of each Class of Notes on the related Payment Date pursuant to Section 9.2 hereof that would be necessary on the related Payment Date in order to cause the Interest Coverage Test or such Overcollateralization Test to be met (after giving effect to all payments to be made on such Payment Date), (C) the results of the Interest Coverage Test and the Overcollateralization Tests after giving effect to such O/C Redemptions pursuant to Section 9.2 hereof and the other payments, if any, to be made on such Payment Date, (D) if a Rating Confirmation Failure has occurred, the amount of Rating Confirmation Failure Redemption of each Class of Notes on the related Payment Date pursuant to Section 9.2 hereof that would be necessary on the related Payment Date in order to receive a Rating Confirmation (after giving effect to all payments to be made on such Payment Date), and (E) if the Additional Collateral Deposit Requirement is not met, the amount of cash that would be necessary on the related Payment Date to be applied in accordance with Section 11.1 in order to cause the Additional Collateral Deposit Requirement to be met (after giving effect to all payments to be made on such Payment Date); *provided that* the Note Valuation Report need not contain information relating to the Interest Coverage Test or the Additional Collateral Deposit Requirement with respect to the first Calculation Date.

(c) <u>Noteholder Report</u>. With respect to each Calculation Date, the Issuer shall render or cause to be rendered an accounting (the "<u>Noteholder Report</u>"), determined as of such Calculation Date, and completed not later than the Business Day preceding the Payment Date relating to such Calculation Date. The Issuer shall deliver to the Trustee, each Noteholder or Beneficial Owner (upon receipt by the Trustee of a certificate in the form of Exhibit H), each Rating Agency (but only so long as any Class of Notes is rated by such Rating Agency), the Paying and Transfer Agent and the Servicer, a copy of the Noteholder Report promptly after such completion no later than the tenth day after such Calculation Date. The Noteholder Report shall contain the information contained in Section 10.5(b)(1) through (9) and Section 10.5(a)(1) through (19).

Each Noteholder Report shall contain the following statement: "Each holder of a Note (other than those issued pursuant to Regulation S) or any interest therein is required at all times to be "Qualified Institutional Buyer" within the meaning of Rule 144A ("<u>Rule 144A</u>") under the U.S. Securities Act of 1933, as amended (the "<u>Securities Act</u>") who is also a "Qualified Purchaser" within the meaning of Section 3(c)(7) of the U.S. Investment Company Act of 1940, as amended (the "<u>Investment Company Act</u>") and each such holder (i) is not formed for the purpose of investing in the Notes (unless all of its beneficial owners are Qualified Purchasers), (ii) is not a dealer described in paragraph (a)(1)(ii) of Rule 144A (unless such holder owns and invests on a discretionary basis at least U.S. $25 million in securities of issuers that are not affiliated persons of such dealer), (iii) is not a plan referred to in paragraph (a)(1)(i)(D) or (E) of Rule 144A or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such plan (unless investment decisions are made solely by the fiduciary, trustee or sponsor of such plan), (iv) each account for which it is holds Notes is holding Notes in at least the minimum denomination set forth in the Indenture and (v) will provide written notice of the foregoing and any other applicable transfer restrictions to any transferee of a Note or any interest therein. The Notes (other than those issued pursuant to Regulation S) and any interest therein may only be transferred to a transferee that can make the foregoing representations and the Co-Issuers have the right, at any time, to force any holder of a Note who is not a Qualified Institutional Buyer and a Qualified Purchaser to sell or redeem its Notes."

After the end of the Revolving Period, the Noteholder Report shall also contain a statement to the effect that it is not unusual for the eligibility criteria set forth in Section 12.2 hereof not to be satisfied following the Revolving Period as the Portfolio Collateral matures or is otherwise disposed of and principal on the Notes is paid down.

(d) <u>Payment Date Instructions</u>. The Note Valuation Report referred to in subsection (b) of this Section 10.5 shall constitute instructions to the Trustee to withdraw on the Payment Date relating to such Note Valuation Report the available funds from the Collection Account and make the payments set forth in the Note Valuation Report in the manner specified, and in accordance with the priorities established, in Article XI hereof.

(e) <u>Optional Redemption Instructions</u>. Not less than three Business Days after an Issuer Order electing an Optional Redemption of the Notes pursuant to Section 9.1 has been delivered to the Trustee, the Issuer shall compute the following information and provide such information in a statement (the "<u>Redemption Date Statement</u>") delivered to the Trustee, the Servicer and the Rating Agencies:

(1)     the amounts payable to the Trustee, the Paying and Transfer Agent, the Issuer and the Servicer pursuant to Sections 11.1(b) and (d);

(2)     the amount in the Collection Account available for payment of the Optional Redemption Price; and

(3)     the Optional Redemption Price.

(f)  Tax Event Redemption Instructions.  Not later than three Business Days after an Issuer Order electing a Tax Event Redemption of the Notes Pursuant to Section 9.5 has been delivered to the Trustee, the Issuer shall compute the following information and provide such information in a statement (also, a "Redemption Date Statement") delivered to the Trustee, the Servicer and the Rating Agencies.

(1)     the amounts payable to the Trustee, the Issuer, the Paying and Transfer Agent and the Servicer pursuant to Sections 11.1(b) and (d);

(2)     the amount in the Collection Account available for payment of the Tax Event Redemption Price; and

(3)  the Tax Event Redemption Price.

(g) Appointment of Agent.  The Issuer may appoint an administrator or other agent to perform its obligations to provide reports pursuant to this Article X and certain calculations pursuant to Article XII.  Pursuant and subject to the terms of a collateral administration agreement (the "Collateral Administration Agreement") entered into or to be entered into among the Issuer, the Servicer and JPMorgan Chase Bank, National Association, the Issuer has appointed or shall appoint JPMorgan Chase Bank, National Association, as its initial agent for such purposes and JPMorgan Chase Bank, National Association, has accepted or shall accept such appointment and has agreed or shall agree to perform such obligations, as provided therein.

Section 10.6.  Reports by Independent Accountants.

(a) The Issuer will appoint prior to the Effective Date, a nationally recognized firm of accountants as the firm or firms of Independent certified public accountants to prepare and deliver the reports or certificates of such accountants required by this Indenture.  Upon any resignation by, or removal of, such firm, the Issuer shall promptly appoint a successor thereto that shall also be a firm of Independent certified public accountants of recognized national reputation in the United States and for so long as any Notes are then rated, provide notice of such successor to each Rating Agency then rating any Notes.  If the Issuer shall not have appointed a successor within 30 days of any firm resigning from the position of Independent certified public accountants to the Issuer, the Trustee shall promptly appoint a successor firm of Independent certified public accountants of recognized national reputation in the United States and for so long as any Notes are then rated, provide notice of such successor to each Rating Agency then rating any Notes.  The fees of such Independent certified public accountants and its successor shall be payable by the Issuer.

(b) On or before May 31 in 2007 and on or before May 31 in each year thereafter through 2011, the Issuer shall cause to be delivered to the Trustee, the Servicer and each Rating Agency, if any, then rating any Class of Notes a certificate (the "Accountants' Certificate") from the firm of Independent certified public accountants appointed by the Issuer indicating (i) that such firm has reviewed the Note Valuation Reports and Redemption Date Statements relating to the Payment Dates in such period, (ii) that the calculations within such Note Valuation Reports and Redemption Date Statements have been performed in accordance with the applicable provisions of this Indenture (except as otherwise noted in a statement), (iii) the Aggregate Principal Amount of the Portfolio Collateral securing the Notes as of the Calculation Date relating to such Payment Dates and (iv) the procedures undertaken by such accountants to perform such calculations. In the event such firm requires the Trustee to agree to the procedures performed by such firm, the Servicer shall direct the Trustee in writing to so agree; it being understood and agreed that the Trustee will deliver such letter agreement in conclusive reliance upon the direction of the Servicer, and the Trustee makes no independent inquiry or investigation as to, and shall have no obligation or liability in respect of the sufficiency, validity or correctness of such procedures. Upon receipt by the Trustee of a certificate in the form of Exhibit H, the Trustee shall make available a copy of the Accountant's Certificate to the requesting Noteholder.

(c) Beginning with the year 2007, on or before (i) January 31 of each year or, (ii) if later, on or before any date in each year on which any of the information described below is required to be delivered to the Noteholders under the Code or any other applicable law, but, in any case, not later than March 1 of each year, the Issuer shall cause each Paying Agent in the United States to prepare and deliver a Form 1099 to each Noteholder and the Issuer shall provide or cause to be provided such other information as is requested by a Noteholder, which is necessary to permit such Holder to prepare and file any applicable U.S. income tax returns related to the most recently ended calendar year.

Section 10.7. Reports to Rating Agencies.

For so long as any Class of Notes is rated by a Rating Agency, the Issuer shall provide or cause to be provided to each Rating Agency then rating such Notes with a copy of each Monthly Report, each Note Valuation Report, each Noteholder Report, each Accountants' Certificate and any other notification delivered to any Noteholder pursuant to the provisions of this Indenture and with such additional information as such Rating Agency may from time to time reasonably request and the Issuer determines in its sole discretion may be obtained and provided without unreasonable burden or expense. In addition, upon receipt of actual knowledge thereof, the Trustee shall send to each Rating Agency notice of any Default set forth in Section 5.1 hereof. The Trustee will also give notice to the Rating Agencies, of any removal of the Servicer pursuant to Section 5.4(c). In addition, the Servicer shall provide to the Rating Agencies those notices related to the Issuer's purchase of Synthetic Securities that are contemplated by Section 12.10 (which notices, in the case of notices provided by the Servicer to Moody's, shall be sent to the attention of a "Managing Director" of Moody's CBO/CLO Group); and, if Standard & Poor's or Moody's so requests and if such requesting party did not rate the related Synthetic Securities, the Servicer shall also provide to such requesting party a copy of the transaction documents in its possession, relating to all Synthetic Securities. The Servicer shall also notify Standard & Poor's if more than 10% of the Aggregate Principal Amount of Portfolio Collateral are obligations of issuers domiciled outside the United States. The address of

Standard & Poor's for purposes of notices and reports hereunder shall be as follows: 55 Water Street, New York, New York 10041-0003, (email: cdo_surveillance@sandp.com), Attention: Structured Finance Ratings, or such other address of which the Issuer is notified in writing by Standard & Poor's. The address of Moody's for purposes of notices and reports hereunder shall be as follows: 99 Church Street, New York, New York 10007, email: cdomonitoring@moodys.com, Attention: CBO Monitoring Group or such other address of which the Issuer is notified in writing by Moody's.

## ARTICLE XI

## APPLICATION OF MONIES

Section 11.1.   Disbursements of Monies from Collection Account.

Except as otherwise set forth in Section 10.2 hereof, disbursements of monies from the Closing Expense Account and the Collection Account shall be made at the following times and in the following order of priority:

(a) On the Closing Date, the Trustee shall pay, from the funds deposited in the Closing Expense Account, the fees, commissions and expenses associated with the Closing (collectively, "Closing Expenses") as set forth in an Issuer Order delivered to the Trustee on the Closing Date; *provided that* any such Closing Expenses may in the alternative be paid on any date after the Closing Date and prior to the Payment Date in November 2006 from the Closing Expense Deposit in the Closing Expense Account pursuant to an Issuer Order delivered to the Trustee (which shall state that the amounts called for to be paid therein are Closing Expenses). All payments pursuant to Section 11.1 hereof may be made from the United States. The Issuer may appoint an agent or agents for purposes of making payment of expenses, fees and commissions to be paid on its behalf from outside the United States pursuant hereto and (each such person shall be considered, a "Paying Agent" hereunder).   The Issuer hereby initially appoints JPMorgan Chase Bank, National Association, as such Paying Agent for such limited purpose.

(b) On each Payment Date (including the Final Maturity Date and if funds become available after the Final Maturity Date, on any date after the Final Maturity Date) and in accordance with the Note Valuation Report for the Calculation Date immediately preceding such Payment Date, the Trustee shall withdraw from the Collection Account (to the extent of the available funds therein excluding therefrom (I) during the Revolving Period, any Collateral Disposition Proceeds received during the Due Period relating to such Calculation Date to be applied by the Trustee during the related Due Period or the immediately succeeding Due Period as set forth in Section 12.4 hereof and (II) during the Revolving Period or Amortization Period, Collateral Principal Collections in an aggregate amount equal to the agreed purchase prices for Additional Portfolio Collateral with respect to which the Issuer has entered into a commitment (as set forth in the notice from the Servicer to the Trustee) prior to the end of such Due Period for the purchase thereof, but has not settled such purchase by the end of such Due Period, as set forth in Section 11.3 hereof) an amount up to the Collateral Interest Collections and, to the extent the amount of the Collateral Interest Collections is not sufficient, an amount up to the Collateral Principal Collections, and shall make a disbursement in the following order of priority:

FIRST:  To the Trustee for the payment in full of the Trustee Administrative Expenses for the related Due Period and any Trustee Administrative Expenses with respect to any previous Payment Date that were not paid on any previous Payment Date, and then to the Paying and Transfer Agent for the payment in full of the Preferred Shares Administrative Expenses for the related Due Period and any Preferred Shares Administrative Expenses with respect to any previous Payment Date that were not paid on any previous Payment Date;

SECOND:  To the Issuer for the payment of Issuer Base Administrative Expenses with respect to the related Due Period and any Issuer Base Administrative Expenses with respect to a previous Payment Date that were not paid on a previous Payment Date;

THIRD:  For the replenishment of the Expense Reimbursement Account up to an amount equal to U.S. $50,000 to the extent any amount therein has paid the Issuer Base Administrative Expenses for the related Due Period and to the extent any amount so paid for any prior Due Period has not been so replenished; *provided however*, notwithstanding anything to the contrary herein, the amounts set forth in clauses FIRST through this clause THIRD shall not exceed (i) $250,000 per annum plus (ii) the greater of $75,000 per annum and 0.0275% per annum of the Aggregate Par Amount on the related Calculation Date.

FOURTH: To the Servicer for the payment of the Base Servicing Fee with respect to such Payment Date and any Base Servicing Fee with respect to any previous Payment Date that was not paid on a previous Payment Date, and to the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Base Dividend then due and any Class II Preferred Share Base Dividend with respect to any previous Payment Date that was not paid on a previous Payment Date.

Notwithstanding anything herein to the contrary, any amounts to be paid to the Paying and Transfer Agent in its capacity as paying and transfer agent for the Preferred Shares pursuant to the Indenture will be delivered by the Trustee to the Paying and Transfer Agent for deposit in the Preferred Shares Collection Account in accordance with the Paying and Transfer Agency Agreement.

(c) On each Payment Date with respect to the **Revolving Period** and the **Amortization Period** in accordance with the Note Valuation Report for the Calculation Date immediately preceding such Payment Date, the Trustee shall withdraw from the Collection Account (to the extent of the available funds therein, excluding therefrom (I) during the Revolving Period, any Collateral Disposition Proceeds received during the Due Period relating to such Calculation Date to be applied by the Trustee during the related Due Period or the immediately succeeding Due Period as set forth in Section 12.4 hereof and (II) during the Revolving Period, Collateral Principal Collections in an aggregate amount equal to the agreed purchase prices for Additional Portfolio Collateral with respect to which the Issuer has entered into a commitment (as set forth in the notice from the Servicer to the Trustee) prior to the end of such Due Period for the purchase thereof, but has not settled such purchase by the end of such Due Period, as set forth in Section 11.3 hereof) an amount equal to the Adjusted Collections and shall make the following disbursements:

(i)     The Trustee shall apply such amounts constituting Adjusted Collateral Interest Collections (to the extent of available funds therefor) in the following order of priority:

FIRST:   To the payment, *pari passu*, to (i) the Holders of the Class A-1LA Notes and the Class A-1LB Notes of an amount equal to the applicable Cumulative Interest Amount and, on each Payment Date and (ii) on each Payment Date through the August 1, 2013 Payment Date, the Cumulative Class X Payment with respect to the Class X Notes;

SECOND: To the payment to the Holders of the Class A-2L Notes of an amount equal to the applicable Cumulative Interest Amount;

THIRD:   To the payment to the Holders of the Class A-3L Notes of an amount equal to the applicable Cumulative Interest Amount;

FOURTH:  To the payment to the Holders of the Class A-4L Notes of an amount equal to the applicable Cumulative Interest Amount;

FIFTH: To the payment of principal in the amount, if any, required to be paid in order to satisfy the Class A Overcollateralization Test and, on each Payment Date after the second Payment Date, the Interest Coverage Test, such amount to be paid first, to the Class A-1LA Notes; second, to the Class A-1LB Notes; third, to the Class A-2L Notes, fourth, to any Periodic Rate Shortfall Amount with respect to the Class A-3L Notes, and then to principal of the Class A-3L Notes; and fifth, to any Periodic Rate Shortfall Amount with respect to the Class A-4L Notes, and then to principal of the A-4L Notes, in that order, until each such Class is paid in full, to the extent required to satisfy the Class A Overcollateralization Test and the Interest Coverage Test;

SIXTH: To the payment of the Periodic Interest Amount with respect to the Class B-1L Notes and such Payment Date;

SEVENTH: To the payment of principal as an O/C Redemption or a Rating Confirmation Failure Redemption in the amount, if any, required to be paid in order to satisfy the Class B-1L Overcollateralization Test or in order to receive a Rating Confirmation, as applicable, such amount to be paid first, *pro rata*, to the Class X Notes, only in connection with a Rating Confirmation Failure Redemption, and to the Class A-1LA Notes; second, to the Class A-1LB Notes; third, to the Class A-2L Notes; fourth, to any Periodic Rate Shortfall Amount with respect to the Class A-3L Notes and then to principal of the Class A-3L Notes; fifth, to any Periodic Rate Shortfall Amount with respect to the Class A-4L Notes and then to principal of the Class A-4L Notes; and sixth, to principal of the Class B-1L Notes, in that order, until each such Class is paid in full, to the extent required to satisfy the Class B-1L Overcollateralization Test or in order to receive a Rating Confirmation, as applicable;

EIGHTH:  To the payment to the Holders of the Class B-1L Notes of an amount equal to the Cumulative Interest Amount for the Class B-1L Notes and such Payment Date to the extent not paid to the Holders of the Class B-1L Notes pursuant to clauses SIXTH OR SEVENTH of this Section 11.1(c)(i);

NINTH: (I) During the Revolving Period, on each Payment Date after the second Payment Date to the extent of available funds, *pro rata*, an amount equal to 35% of the funds available up to the Additional Collateral Deposit Requirement to be deposited into the Collection Account and applied to pay principal of the Class B-1L Notes until such Class is paid in full and an amount equal to 65% (or, after the Class B-1L Notes are paid in full, 100%) of the funds available up to the Additional Collateral Deposit Requirement for the purchase of Additional Portfolio Collateral (other than CLO Securities), as directed by the Servicer or the Issuer, pursuant to Section 11.3 hereof during the immediately succeeding Due Period and (II) during the Amortization Period to the extent of available funds, *pro rata*, an amount equal to 35% of the funds available up to the Additional Collateral Deposit Requirement to be deposited into the Collection Account and applied to pay principal of the Class B-1L Notes until such Class is paid in full and an amount equal to 65% (or, after the Class B-1L Notes are paid in full, 100%) of the funds available up to the Additional Collateral Deposit Requirement to the payment of principal of the Notes in the order of priority described in clause SEVENTH above;

TENTH: To the payment to the Default Swap Counterparty any Default Swap Counterparty Termination Payment;

ELEVENTH: To the payment, *first* (a) to the Servicer the Additional Servicing Fee with respect to such Payment Date, and (b) to the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Additional Dividend then due and unpaid, and *second*, to the Holders of the Notes any due and unpaid Extension Bonus Payment;

TWELFTH: To the payment to the Issuer of Issuer Excess Administrative Expenses with respect to such Payment Date and any Issuer Excess Administrative Expenses with respect to any previous Payment Date that were not paid on a previous Payment Date; and

THIRTEENTH: If the Internal Rate of Return of the Preferred Shares as of such Payment Date is less than 12%, to the payment to the Holders of the Preferred Shares, but only up to an amount that would cause the Internal Rate of Return of the Preferred Shares to equal 12%; and

FOURTEENTH: Any remaining amounts, (a) 20% to (x) the payment of the Supplemental Servicing Fee for such Payment Date, and (y) the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Supplemental Dividend then due and unpaid, and (b) 80% to the Holders of the Preferred Shares in accordance with the Paying and Transfer Agency Agreement, as a dividend thereon or as a redemption payment on the Redemption Date, as applicable.

(ii) During the **Revolving Period**, the Trustee shall apply the Adjusted Collateral Principal Collections (to the extent of available funds therefor) in the following order of priority:

FIRST: To the payment of the amounts described in clauses FIRST through SEVENTH of Section 11.1(c)(i) hereof with respect to Collateral Interest Collections

and the Revolving Period, in the order described therein, in each case to the extent such amounts have not been paid from Adjusted Collateral Interest Collections with respect to such Payment Date; *provided however* that, with respect to the payment described in clause THIRD of Section 11.1(c)(i) hereof, so long as any Class X Notes, Class A-1L Notes or Class A-2L are Outstanding, the Class A-3L Notes shall only be entitled to receive an amount sufficient to pay the Periodic Interest Amount (or, after the Class A-2L Notes are paid in full, the Cumulative Interest Amount) due to the Class A-3L Notes for such Payment Date from Collateral Principal Collections, but only to the extent this payment will not cause the failure of the Class B-1L Overcollateralization Test, with respect to clause FOURTH of Section 11.1(c)(i) above, so long as any Class X Notes, Class A-1L Notes, Class A-2L Notes or Class A-3L Notes are Outstanding, the Class A-4L Notes shall only be entitled to receive an amount sufficient to pay the Periodic Interest Amount (or, after the Class A-3L Notes are paid in full, the Cumulative Interest Amount) due to the Class A-4L Notes for such Payment Date from Collateral Principal Collections, and with respect to the payment described in clause SIXTH of Section 11.1(c)(i) hereof, so long as any Class X Notes, Class A-1L Notes, Class A-2L Notes, the Class A-3L Notes or the Class A-4L Notes are Outstanding, the Class B-1L Notes shall only be entitled to receive an amount sufficient to pay the Periodic Interest Amount due to the Class B-1L Notes for such Payment Date from Collateral Principal Collections, but only to the extent this payment will not cause the failure of the Class B-1L Overcollateralization Test; and *provided further*, so long as any Class A-1L Notes or Class A-2L Notes are not Outstanding, the Class A-3L Notes shall be entitled to receive an amount sufficient to pay the Cumulative Interest Amount due to the Class A-3L Notes for such Payment Date from Collateral Principal Collections and, so long as any Class A-1L Notes, Class A-2L Notes or Class A-3L Notes are not Outstanding, the Class A-4L Notes shall be entitled to receive an amount sufficient to pay the Cumulative Interest Amount due to the Class A-4L Notes for such Payment Date from Collateral Principal Collections, and then any remaining amounts shall be distributed pursuant to clauses FIFTH through SEVENTH of Section 11.1(c)(i) hereof, in the order described therein;

SECOND: To pay principal of the Notes in a Special Redemption, such amount to be paid first, (A) to the Class A-1LA Notes; second, to the Class A-1LB Notes; third, to the Class A-2L Notes; fourth, to any Periodic Rate Shortfall Amount with respect to the Class A-3L Notes; fifth, to principal of the Class A-3L Notes; sixth, to any Periodic Rate Shortfall Amount with respect to the Class A-4L Notes; seventh, to principal of the Class A-4L Notes; and eighth, to the Class B-1L Notes, in that order, until each such Class is paid in full; and

THIRD: As directed by the Servicer or the Issuer (or deposited by the Trustee in the Collection Account), to the purchase of Additional Portfolio Collateral meeting the specified requirements no later than the last day of the Due Period relating to the Payment Date next following such Payment Date, such amounts to be applied in the manner described herein.

(iii) During the **Amortization Period**, the Trustee shall apply the Adjusted Collateral Principal Collections (to the extent of available funds therefor and including for purposes of this Section 11.1(c)(iii) any Collateral Disposition Proceeds (other than Collateral Disposition Proceeds received in connection with the sale of an item of Credit Improved Portfolio Collateral to be reinvested pursuant to Section 12.4(a)) received

170

during the Due Period relating to such Calculation Date to be applied by the Trustee as set forth in this Section 11.1(c)(iii)) in the following order of priority:

FIRST: To the payment of the amounts described in clauses FIRST through SEVENTH of Section 11.1(c)(i) hereof with respect to Collateral Interest Collections and the Amortization Period, in the order described therein, in each case to the extent such amounts have not been paid from Adjusted Collateral Interest Collections with respect to such Payment Date; *provided however* that, with respect to the payment described in clause THIRD of Section 11.1(c)(i) hereof, so long as any Class X Notes, Class A-1L Notes or Class A-2L Notes are Outstanding, the Class A-3L Notes shall only be entitled to receive an amount sufficient to pay the Periodic Interest Amount (or, after the Class A-2L Notes are paid in full, the Cumulative Interest Amount) due to the Class A-3L Notes for such Payment Date from Collateral Principal Collections, but only to the extent this payment will not cause the failure of the Class B-1L Overcollateralization Test, and with respect to clause FOURTH of Section 11.1(c)(i) above, so long as any Class X Notes, Class A-1L Notes, Class A-2L Notes or Class A-3L Notes are Outstanding, the Class A-4L Notes shall only be entitled to receive an amount sufficient to pay the Periodic Interest Amount (or, after the Class A-3L Notes are paid in full, the Cumulative Interest Amount) due to the Class A-4L Notes for such Payment Date from Collateral Principal Collections, but only to the extent this payment will not cause the failure of the Class B-1L Overcollateralization Test, and with respect to clause SIXTH of Section 11.1(c)(i) above, so long as any Class X Notes, Class A-1L Notes, Class A-2L Notes, Class A-3L Notes or Class A-4L Notes are Outstanding, the Class B-1L Notes shall only be entitled to receive an amount sufficient to pay the Periodic Interest Amount due to the Class B-1L Notes for such Payment Date from Collateral Principal Collections but only to the extent this payment will not cause the failure of the Class B-1L Overcollateralization Test, and then any remaining amounts shall be distributed pursuant to clauses FIFTH and SEVENTH of Section 11.1(c)(i) hereof, in the order described therein; and *provided further*, so long as any Class A-1L Notes or Class A-2L Notes are not Outstanding, the Class A-3L Notes shall be entitled to receive an amount sufficient to pay the Cumulative Interest Amount due to the Class A-3L Notes for such Payment Date from Collateral Principal Collections and, so long as any Class A-1L Notes, Class A-2L Notes or Class A-3L Notes are not Outstanding, the Class A-4L Notes shall be entitled to receive an amount sufficient to pay the Cumulative Interest Amount due to the Class A-4L Notes for such Payment Date from Collateral Principal Collections, and then any remaining amounts shall be distributed pursuant to clauses FIFTH through SEVENTH of Section 11.1(c)(i) hereof, in the order described therein;

SECOND:  So long as no Event of Default has occurred and is continuing and as directed by the Servicer or the Issuer (or deposited by the Trustee in the Collection Account), to the purchase of Additional Portfolio Collateral from the proceeds of Collateral Principal Collections from any unscheduled prepayment or to the purchase of Substitute Portfolio Collateral from the sales proceeds of Credit Improved Portfolio Collateral, meeting the specified requirements with respect to the Amortization Period no later than ninety days after receipt of such amounts, to be applied in the manner described herein; and

THIRD:  To pay the Notes as follows: first, to the Class A-1LA Notes until the Aggregate Principal Amount thereof has been paid in full; second, to the Class A-1LB Notes until the Aggregate Principal Amount thereof has been paid in full; third, to the Class

A-2L Notes until the Aggregate Principal Amount thereof has been paid in full; fourth, to any Periodic Rate Shortfall Amount with respect to the Class A-3L Notes and then to principal of the Class A-3L Notes until the Aggregate Principal Amount thereof has been paid in full; fifth, to any Periodic Rate Shortfall Amount with respect to the Class A-4L Notes and then to principal of the Class A-4L Notes until the Aggregate Principal Amount thereof has been paid in full; and sixth, to any Periodic Rate Shortfall Amount with respect to Class B-1L Notes and then to principal of the Class B-1L Notes until the Aggregate Principal Amount thereof has been paid in full.

(d) On the **Final Maturity Date** (including the Optional Redemption Date, the Tax Event Redemption Date or any other Payment Date on which the Aggregate Principal Amounts of the Notes is paid in full) and, if funds become available after the Final Maturity Date, on any other date after the Final Maturity Date, and in accordance with the Note Valuation Report for the Calculation Date immediately preceding such Payment Date (or in the case of an Optional Redemption or a Tax Event Redemption, in accordance with the related Redemption Date Statement), the Trustee shall withdraw from the Collection Account an amount equal to the Adjusted Collateral Collections (including Collateral Disposition Proceeds) and from the Expense Reimbursement Account and the Loan Funding Account any amount on deposit therein and shall make the following disbursements in the following order of priority:

FIRST:  To the payment, *pari passu*, to the Holders of the Class A-1LA Notes of an amount equal to the applicable Cumulative Interest Amount, to the Holders of the Class A-1LB Notes of an amount equal to the applicable Cumulative Interest Amount and to the Holders of the Class X Notes an amount equal to the Class X Shortfall Amount plus the Periodic Interest Amount for the Class X Note;

SECOND:  To the payment of principal of the Class A-1LA Notes and the Class X Notes in amounts not to exceed the Aggregate Principal Amounts of the Class A-1LA Notes and the Class X Notes, respectively, and then to the payment of principal of the Class A-1LB Notes in an amount not to exceed the Aggregate Principal Amount of the Class A-1LB Notes;

THIRD:  To the payment to the Holders of the Class A-2L Notes of an amount equal to the applicable Cumulative Interest Amount;

FOURTH:  To the payment of principal of the Class A-2L Notes in an amount not to exceed the Aggregate Principal Amount of the Class A-2L Notes;

FIFTH:  To the payment to the Holders of the Class A-3L Notes of an amount equal to the applicable Cumulative Interest Amount;

SIXTH:  To the payment of principal of the Class A-3L Notes in an amount not to exceed the Aggregate Principal Amount of the Class A-3L Notes;

SEVENTH:  To the payment to the Holders of the Class A-4L Notes of an amount equal to the applicable Cumulative Interest Amount;

EIGHTH: To the payment of principal of the Class A-4L Notes in an amount not to exceed the Aggregate Principal Amount of the Class A-4L Notes.

NINTH: To the payment of the Holders of the Class B-1L Notes of an amount equal to the applicable Cumulative Interest Amount;

TENTH: To the payment of principal of the Class B-1L Notes in an amount not to exceed the Aggregate Principal Amount of the Class B-1L Notes;

ELEVENTH: To the payment of principal of any Default Swap Counterparty Termination Payments to the Default Swap Counterparty;

TWELFTH: *First,* (a) to the Servicer the Additional Servicing Fee with respect to such Payment Date and (b) to the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Additional Dividend then due and unpaid and, *second,* to the Holders of the Notes any due and unpaid Extension Bonus Payment;

THIRTEENTH: To the payment to the Issuer of amounts due the Issuer for Issuer Excess Administrative Expenses and any such amounts that were due on any prior Payment Date but remain unpaid;

FOURTEENTH: If the Internal Rate of Return of the Preferred Shares as of such Payment Date is less than 12%, to the payment to the Holders of the Preferred Shares, but only up to an amount that would cause the Internal Rate of Return of the Preferred Shares to equal 12%; and

FIFTEENTH: Any remaining amounts, (a) 20% to (x) the payment of the Supplemental Servicing Fee for such Payment Date, and (y) the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Supplemental Dividend then due and unpaid, and (b) 80% to the Holders of the Preferred Shares in accordance with the Paying and Transfer Agency Agreement, as a dividend thereon or as a redemption payment on the Redemption Date, as applicable.

The obligation to pay the foregoing amounts on the Final Maturity Date is absolute and unconditional, but recourse therefor will be limited to the Trust Estate.

(e) Notwithstanding anything in this Indenture to the contrary, with respect to Adjusted Collateral Collections held in the Collection Account in Eligible Investments pending application to purchase Portfolio Collateral, any such amounts not used to purchase Portfolio Collateral by the last day of the Due Period next succeeding the Due Period in which such amounts were collected may be used to purchase Portfolio Collateral in subsequent Due Periods in accordance with Section 11.3 hereof (until otherwise applied pursuant to this Section 11.1).

(f) Notwithstanding anything to the contrary in this Section 11.1, upon the direction of the Servicer (and in the time and manner directed by the Servicer), Payment Date Equity Securities may be distributed on any Payment Date, in lieu of cash on any Payment Date as follows:

(i)     Payment Date Equity Securities will be paid as Collateral Interest Collections in accordance with Section 11.1 with respect to the Preferred Shares, and upon such payment, the aggregate amount of Collateral Interest distributable to the Holders of the Preferred Shares on such Payment Date will be reduced by the value of such Payment Date Equity Securities.  Payment Date Equity Securities distributed on any Payment Date shall be distributed to the Holders of the Preferred Shares in the same manner as Collateral Interest Collections would be distributable to such Holders of Preferred Shares on such Payment Date and subject to the same restriction as to payment set out in the Paying and Transfer Agency Agreement.

(ii)     In calculating the amounts of Collateral Interest Collections and Collateral Principal Collections for such Payment Date, Collateral Interest in an amount equal to the value of Payment Date Equity Securities distributed to the Holders of the Preferred Shares shall be recharacterized as Collateral Principal Collections and disbursed in accordance with Sections 11.1(b) and 11.1(c) of the Indenture.

Section 11.2.  Mandatory Redemption With Respect to Overcollateralization Tests, Interest Coverage Test and Rating Confirmation Failure

On any applicable Payment Date with respect to which an Overcollateralization Test or the Interest Coverage Test (as calculated in the Note Valuation Report for the Calculation Date immediately preceding such Payment Date), would not be met (but for this Section 11.2) or, during the Revolving Period, a Rating Confirmation Failure has occurred and is continuing, the Issuer shall redeem the Notes (or, in the case of the Class A-3L Notes, the Class A-4L Notes and the Class B-1L Notes, pay any Periodic Rate Shortfall Amounts and then redeem the Notes pursuant to Section 9.2 hereof), and the Trustee shall pay to the Holders thereof (to be applied against the principal amount thereof) pursuant to the applicable provisions of Section 11.1 hereof, an aggregate amount necessary to cause each of the Overcollateralization Tests to be met as of such Calculation Date, in the case of the Interest Coverage Test, to cause such test to have been met as of such Calculation Date had such redemption been made on the immediately preceding Payment Date or to cause a Rating Confirmation to be received by the Issuer, as applicable.

Section 11.3.  Purchase of Additional Portfolio Collateral

(a) The Issuer may purchase Additional Portfolio Collateral on any Business Day during the Revolving Period for inclusion in the Trust Estate in an amount permitted pursuant to the applicable subsection of Section 11.1 hereof subject to the conditions set forth in this Section 11.3.  Upon receipt by the Trustee of a Servicer Order with respect thereto, Collateral Principal Collections (or Collateral Interest Collections deposited to the Collection Account pursuant to clause NINTH of Section 11.1(c)(i)), collected during a Due Period (other than Collateral Disposition Proceeds) may be paid out of the Collection Account by the Trustee on any Business Day during such Due Period or the immediately succeeding Due Period for the purpose of purchasing such Additional Portfolio Collateral specified in such Servicer Order; *provided that* as of such date the following conditions shall have been satisfied:

(i)      the Balance of the Collection Account remaining after giving effect to any such purchase of Additional Portfolio Collateral shall equal or exceed the Periodic Reserve Amount with respect to the Payment Date relating to such Due Period as shown on the Note Valuation Report for the prior Payment Date;

(ii)      (1) each Overcollateralization Test and the Interest Coverage Test are satisfied and (2) the Collateral Quality Tests and the criteria set forth in Section 12.2 hereof are satisfied or if any of the Collateral Quality Tests or the criteria set forth in Section 12.2 is not satisfied, the degree of compliance with such criteria would not be diminished; *provided however*, with respect to Additional Portfolio Collateral purchased with Unscheduled Principal Proceeds, if any of the Overcollateralization Tests or the Interest Coverage Test is not satisfied as set forth in clause (1), the degree of compliance with such tests would not be diminished;

(iii)      the Trustee shall have received (i) a certificate of the Servicer dated as of the date of the purchase and the Grant of such Additional Portfolio Collateral to the effect that such purchase is in compliance with the requirements of this Section 11.3 and Section 12.5(a) hereof and (ii) the certificate required pursuant to Section 12.2 hereof.

(b) For purposes of calculating the Collections for this Section 11.3 (and the Balance in the Collection Account for purposes of subsection (a) hereof), Collections shall be deemed to include, as of any date of determination, the sum of 100% of all cash collections actually received in respect of the Portfolio Collateral during such Due Period as of such date of determination and 100% of all Scheduled Distributions to be received (including those which are reasonably expected to be received) in respect of the Portfolio Collateral during such Due Period (excluding, however, any Scheduled Distributions to be received with respect to an item of Defaulted Portfolio Collateral or an item of Equity Portfolio Collateral during such Due Period).

Section 11.4.      Trust Account

All monies held by the Trustee in the Collection Account, the Initial Deposit Account, the Closing Expense Account, the Loan Funding Account or the Expense Reimbursement Account pursuant to the provisions of this Indenture, and not used to purchase Portfolio Collateral or Eligible Investments as herein provided, shall be deposited in one or more trust accounts, established in the name of the Trustee, as trustee of the trust created pursuant hereto for the benefit of the Holders of Notes and other Secured Parties hereunder; *provided that* to the extent funds deposited in such accounts exceed the amounts insured by the Federal Deposit Insurance Corporation, such excess shall be used to purchase Eligible Investments (pursuant to and as provided in Section 10.2 hereof). All monies held in the trust accounts described in the first sentence of this Section 11.4 shall be held as part of the Trust Estate subject to the provisions of this Indenture.

ARTICLE XII

SALE OF PORTFOLIO COLLATERAL; SUBSTITUTION

Section 12.1.    Sale of Portfolio Collateral

(a) Provided that no Event of Default has occurred and is continuing and subject to the satisfaction of the conditions specified in Section 10.3 hereof and the restrictions in this Article, the Servicer may direct the Trustee, by Servicer Order, to sell, and the Trustee shall release (or cause to be released) from the lien of this Indenture and sell in the manner directed by the Servicer, any Defaulted Portfolio Collateral, Equity Portfolio Collateral, Credit Risk Portfolio Collateral or Credit Improved Portfolio Collateral (as described in such direction) so long as, with respect to an item of Credit Improved Portfolio Collateral or Credit Risk Portfolio Collateral, the Servicer certifies to the Trustee, as applicable, that:

(i)    in the case of an item of Credit Improved Portfolio Collateral (including in connection with a Portfolio Improvement Exchange), in writing before the sale, that the Servicer has identified one or more specific manners in which it will be able, in compliance with the criteria set forth in Section 12.2 and the other requirements of Article XII (and in connection with a Portfolio Improvement Exchange, the requirements set forth in the definition of such term), to cause the Issuer to purchase with the applicable Collateral Disposition Proceeds net of accrued interest and costs, no later than the end of the immediately succeeding Due Period (it being understood that such identification shall not be considered either a requirement or an assurance that any specified purchase will be consummated), one or more items of Substitute Portfolio Collateral having an Aggregate Principal Balance equal to or greater than the Principal Balance of such Credit Improved Portfolio Collateral; and

(ii)    in the case of an item of Credit Improved Portfolio Collateral, after giving effect to such sale and the subsequent purchase described in (a) above, the Servicer is required to certify that it reasonably believes that (x) either the Collateral Quality Tests and the criteria set forth in Section 12.2 hereof are satisfied or if one or more of such Collateral Quality Tests or criteria is not satisfied, the degree of compliance therewith would not be diminished and (y) either the Overcollateralization Tests and the Interest Coverage Test are satisfied or if any Overcollateralization Test or the Interest Coverage Test is not satisfied, the degree of compliance with such tests would not be diminished.

(b) An item of Credit Risk Portfolio Collateral may be sold at any time, subject to the Sale Restriction Condition as set forth below.

(c) Notwithstanding any term hereof to the contrary and *provided that* no Event of Default has occurred and is continuing and subject to compliance with the conditions specified in Section 10.3 hereof, any Portfolio Collateral may be sold upon delivery to the Trustee of a certificate of the Servicer to the effect that it has reasonably determined, which may be based upon the advice of an opinion of counsel (a copy of which opinion shall be included with such certificate), that such Portfolio Collateral is, or may become, subject to a withholding or other similar tax (or to an increased rate of withholding or other similar tax). Further, notwithstanding

anything to the contrary stated herein, the Servicer may direct the sale of an item of Portfolio Collateral that was CCC/Caa Portfolio Collateral or Discount Portfolio Collateral at the time of purchase only if it constitutes Credit Risk Portfolio Collateral or Defaulted Portfolio Collateral, is sold in connection with the Optional Redemption of Notes in whole or if the Servicer reasonably expects that the sale and any related purchase of Substitute Portfolio Collateral will restore compliance with any of the Interest Coverage Test, the criteria set forth in Section 12.2 or the Overcollateralization Tests that would be failed or not satisfied in the absence of such sale and purchase.

(d) During any period after the first Due Period if a Sale Restriction Condition occurs, the Issuer shall send a notice to the Trustee and the Holders of the Notes to the effect that, for so long as the applicable Sale Restriction Condition exists, unless the Holders of at least 60% in Aggregate Principal Amount of the Notes elect to retain the guidelines in effect on the Closing Date for sales of an item of Credit Risk Portfolio Collateral or Credit Improved Portfolio Collateral, as applicable, (i) no item of Credit Risk Portfolio Collateral may be sold unless (A) the rating of the obligor or of any debt or securities issued by the obligor under such an item of Credit Risk Portfolio Collateral has been lowered, withdrawn or put on any "credit watch" list for possible downgrade (or similar list) with negative implications by S&P, Moody's or Fitch or (B) such an item of Credit Risk Portfolio Collateral satisfies the Credit Risk Criteria and is not objected to by the Holders of more than 60% in Aggregate Principal Amount of the Notes within forty-five (45) days of the date of such notice, or such later date as extended by the Trustee at the direction of the Servicer *provided* that in making such determination to sell an item of Credit Risk Portfolio Collateral, an increase in credit spread or a decrease in Market Value of such item of Credit Risk Portfolio Collateral may only be used as corroboration of other bases for such determination or (ii) no item of Credit Improved Portfolio Collateral may be sold unless such item of Credit Improved Portfolio Collateral satisfies the Credit Improved Criteria and is not objected to by the Holders of more than 60% in Aggregate Principal Amount of the Notes within forty-five (45) days of the date of such notice, or such later date as extended by the Trustee at the direction of the Servicer *provided*, that in making such determination to sell such item of Credit Improved Portfolio Collateral, a reduction in credit spread or an increase in Market Value of such item of Credit Improved Portfolio Collateral may only be utilized as corroboration or other bases for such judgment.

(e) Notwithstanding anything to the contrary set forth above, the Servicer may at any time direct the Trustee to sell any item of Portfolio Collateral that (i) was obtained as a result of any reorganization or restructuring of any Credit Risk Portfolio Collateral or other Portfolio Collateral of an issuer under financial distress, or (ii) does not comply with the criteria set forth in Section 12.2.

Notwithstanding anything in this Indenture to the contrary, no acquisition or disposition of Portfolio Collateral or other eligible asset (as defined in Rule 3a-7) shall be effected by or on behalf of the Issuer for the primary purpose of recognizing gains or decreasing losses resulting from market value changes.

Notwithstanding the forgoing, if there is no appointment of a successor Servicer with 90 days after the resignation or termination of the Servicer, any sales or disposition of Portfolio Collateral shall be limited to Credit Risk Portfolio Collateral and Defaulted Portfolio

Collateral and Equity Portfolio Collateral; *provided* that such restriction on the sale or disposition of Portfolio Collateral shall not apply if the Portfolio Collateral is being liquidated in whole or in part in connection with an acceleration or early termination of the Notes.

Section 12.2. <u>Eligibility Criteria and Replacement Restrictions</u>

Subject to Section 3.4 (with respect to Original Portfolio Collateral) in connection with dates occurring prior to the Effective Date, a security to be Granted to the Trustee after the Closing Date for inclusion in the Trust Estate as an item of Portfolio Collateral will be eligible for purchase by the Issuer and inclusion in the Trust Estate only if, as of the date of such Grant of such security the following conditions are met, as certified to the Trustee by Servicer Order, the Overcollateralization Tests, the Interest Coverage Test and the criteria set forth below in this Section 12.2 hereof are satisfied or if one of such tests or criteria is not satisfied, the degree of compliance with such tests or criteria would not be diminished except as otherwise required by Sections 11.3 and 12.4. In addition, if a Suspension Trigger Event is in effect, a majority of the Controlling Class may deliver notice to the Issuer directing the Issuer to suspend any purchases of additional items for inclusion in the Trust Estate as an item of Portfolio Collateral. Such suspension shall automatically terminate once a Suspension Trigger Event is no longer in effect.

(a) <u>Standard & Poor's CDO Monitor</u>. The Standard & Poor's CDO Monitor Test is satisfied. For purposes of the Standard & Poor's CDO Monitor Test, the "Standard & Poor's Rating" of any item of Portfolio Collateral or Eligible Investment shall be as set forth in <u>Schedule D</u> hereto. The Standard & Poor's CDO Monitor Test is not applicable and does not have to be satisfied or maintained when reinvesting the proceeds of Defaulted Portfolio Collateral or Credit Risk Portfolio Collateral.

(b) <u>Minimum Average Recovery Rate Test</u>. The Minimum Average Recovery Rate Test is satisfied.

(c) <u>Moody's Asset Correlation Test and Moody's Weighted Average Rating Test</u>. The Moody's Asset Correlation Test and the Moody's Weighted Average Rating Test are satisfied.

(d) Weighted Average Coupon Test; Weighted Average Margin Test; Weighted Average Life Requirement.

        (i)      The Weighted Average Coupon Test is satisfied.

        (ii)      The Weighted Average Margin Test is satisfied.

        (iii)      The Weighted Average Life Requirement is satisfied.

(e) <u>Limitation on Non-U.S. Debt</u>. After giving effect to the proposed purchase of such Portfolio Collateral:

        (i)      not more than 10% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors;

(ii)     not more than 10% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors in any single Group A Country;

(iii)     not more than 5% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors in all Group B Countries;

(iv)     not more than 2% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors in any single Group B Country;

(v)     not more than 2.5% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors in all jurisdictions that are not Group A Countries or Group B Countries;

(vi)     not more than 1% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors in any single jurisdiction that is not a Group A Country or Group B Country; and

(vii)     no Portfolio Collateral may consist of CLO Securities that are obligations of Non-U.S. Obligors.

(f) <u>Rating</u>.     After giving effect to the proposed purchase of any Portfolio Collateral: (i) at least 90% of the Aggregate Principal Amount of the Portfolio Collateral included in the Trust Estate must be obligations of issuers having at least one class of indebtedness actually rated by Moody's (either publicly or privately) and (ii) at least 90% of the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate must be obligations of issuers having at least one class of indebtedness actually rated by S&P (either publicly or privately).

(g) <u>CCC/Caa Portfolio Collateral Limitation</u>.     The proposed purchase of any Portfolio Collateral may not increase the Aggregate Principal Amount of CCC/Caa Portfolio Collateral in the Trust Estate to more than 5.0% of the Aggregate Par Amount; *provided* that the Issuer may purchase CCC/Caa Portfolio Collateral which would increase the Aggregate Principal Amount of CCC/Caa Portfolio Collateral in the Trust Estate above 5.0% of the Aggregate Par Amount with the proceeds of CCC/Caa Portfolio Collateral; and *provided further* that no CLO Securities may be included in the determination of this CCC/Caa Portfolio Collateral Limitation.

(h) <u>Limitation on CLO Securities</u>.     After giving effect to the proposed purchase of any Portfolio Collateral, (i) not more than 30% of the Aggregate Par Amount may be CLO Securities; (ii) not more than 10% of the Aggregate Par Amount may consist of CLO Securities that have a Moody's Rating below "Baa3" or an S&P Rating below "BBB-"; *provided* that not more than 2.0% of the Aggregate Par Amount may consist of a single CLO Security with such ratings; (iii) not more than 4.0% of the Aggregate Par Amount may consist of CLO Securities of a single manager which shall not be any of the Servicer Entities, and (iv) not more than 5.0% of the Aggregate Par Amount may consist of CLO Securities managed by any of the Servicer Entities; *provided* that not more than 1.5% of the Aggregate Par Amount may consist of CLO

Securities of a single issuer serviced or managed by the Servicer, and *provided further*, that no CLO Securities may be purchased after August 1, 2009 and after the expiration of the Revolving Period, unless an Extension shall occur in which case CLO Securities may be purchased during the full period of such Extension in accordance with all the criteria and restrictions provided herein that are applicable during the Revolving Period.

(i) <u>Limitation on Semiannual Portfolio Collateral</u>. After the Effective Date, after giving effect to the proposed purchase of any Portfolio Collateral, no more than 5% of the Aggregate Par Amount may include items of Portfolio Collateral that provide for the periodic payment in cash of interest less frequently than quarterly, but not less frequently than semiannually.

(j) <u>Limitation on Participations, Synthetic Securities and Non-U.S. Portfolio Loans</u>. After giving effect to the proposed purchase of any Substitute Portfolio Collateral or Additional Portfolio Collateral, no more than 20% of the Aggregate Par Amount may be Participations, Synthetic Securities, Securities Lending Agreements or Portfolio Loans that are obligations of non-U.S. entities which are not in a Group A Country. Further, no Participation may be purchased from any Selling Institution (including for this purpose the seller of any participation and the seller of any sub-participation) rated below "A" by S&P or "A2" by Moody's. In addition, the table below generally describes limitations on (i) the percentage of the Aggregate Par Amount which consist of Synthetic Securities related to the long-term debt rating of the Synthetic Security Counterparty, (ii) the percentage of the Aggregate Par Amount which consists of Participations related to the long-term debt rating of the related Selling Institution, and (iii) the limitations on the percentage of the Aggregate Par Amount which consists of Participations and Synthetic Securities in the aggregate related to the long-term debt rating of the Selling Institution or Synthetic Security Counterparty, as the case may be:

| Rating (S&P/Moody's) | Individual Synthetic Security Counterparty Limit | Individual Participation Selling Institution Limit | Aggregate Synthetic Security Counterparty and Participation Selling Institution Limit |
|---|---|---|---|
| AAA/Aaa | 20.0% | 20.0% | 20.0% |
| AA+/Aa1 | 10.0% | 10.0% | 20.0% |
| AA/Aa2 | 10.0% | 10.0% | 17.5% |
| AA-/Aa3 | 10.0% | 10.0% | 15.0% |
| A+/A1 | 5.0% | 5.0% | 10.0% |
| A/A2 | 5.0% | 5.0% | 7.5% |

*provided*, that no more than 3% of the Aggregate Par Amount may be Synthetic Securities consisting of Default Swaps. For purposes of the foregoing, the limitations shall be calculated separately for each of Standard & Poor's and Moody's and each such limitation must be satisfied.

(k) <u>Limitation on Fixed Rate Portfolio Collateral</u>. No more than 5% of the Aggregate Par Amount may be Fixed Rate Portfolio Collateral.

(l) <u>Portfolio Loans</u>. After giving effect to the proposed purchase of any Portfolio Collateral, (i) at least 70% of the Aggregate Principal Amount of the Portfolio Collateral included in the Trust Estate must be Portfolio Loans (including Synthetic Securities, the

Reference Obligations of which are loans); and (ii) not more than 10% of the Aggregate Principal Amount of the Portfolio Collateral included in the Trust Estate may be Portfolio Loans that are not Senior Secured Loans (including Synthetic Securities, the Reference Obligations of which are loans).

(m) <u>No Event of Default</u>. No Event of Default shall have occurred and be continuing.

(n) <u>Industry Category Concentration</u>. (i) No more than 8% of the Aggregate Par Amount is in any one Standard & Poor's Industry Category; *provided however*, in the case of three (3) Standard & Poor's Industry Categories, up to 12% of the Aggregate Par Amount may consist of items of Portfolio Collateral that are obligations of obligors in any one Standard & Poor's Industry Category, and (ii) no more than 32% of the Aggregate Par Amount may consist of items of Portfolio Collateral that are obligations of obligors in any three Standard & Poor's Industry Categories.

(o) <u>Original Issue Size</u>. After giving effect to the proposed purchase of any Portfolio Collateral, at least 80% of the Aggregate Principal Amount of the Portfolio Collateral included in the Trust Estate will be Portfolio Loans that are part of a senior credit facility whose aggregate original principal amount (whether or not funded and including all tranches thereunder) is not less than U.S.$100,000,000. No item of Portfolio Collateral included in the Trust Estate will be CLO Securities that are part of an issuer's aggregate issuance whose aggregate original principal amount (including all tranches thereunder) is less than U.S.$100,000,000. No item of Portfolio Collateral included in the Trust Estate will be Portfolio Loans that are part of a senior credit facility whose aggregate original principal amount (whether or not funded and including all tranches thereunder) is less than $50,000,000.

(p) <u>Issuer Concentration</u>. (i) After giving effect to the proposed purchase of any Portfolio Loan, no more than 1.50% of the Aggregate Par Amount may represent obligations of any single obligor, *provided* that obligations of not more than five obligors of Portfolio Loans may represent no more than 2.00% of the Aggregate Par Amount and (ii) after giving effect to the proposed purchase of any CLO Security, no more than 2.75% of the Aggregate Par Amount may represent obligations of any single obligor.

(q) <u>Limitations on Step-Up Bonds</u>. No more than 5.0% of the Aggregate Par Amount may include step-up bonds.

(r) <u>Delayed Drawdown Loans and Revolving Loans</u>. After giving effect to the proposed purchase of any Portfolio Collateral, no more than 5% of the Aggregate Par Amount may consist of Delayed Drawdown Loans and no more than 7.5% of the Aggregate Par Amount may consist of Revolving Loans; *provided* that no more than 10% of the Aggregate Par Amount may consist of Delayed Drawdown Loans and Revolving Loans in the aggregate.

(s) <u>DIP Loans</u>. No more than 5.0% of the Aggregate Par Amount may consist of DIP Loans. Each DIP Loan must be assigned a formal or estimated rating by Moody's and S&P.

(t) <u>Collateral Obligations Loaned under Securities Lending Agreements</u>.  No more than 15% of the Aggregate Par Amount may include Portfolio Collateral subject to any Securities Lending Agreement pursuant to Section 7.19.

(u) <u>PIK Bonds</u>.  No more than 30% of the Aggregate Par Amount may consist of PIK Bonds.

Notwithstanding anything to the contrary set forth in this Section 12.2, if the Portfolio Collateral to be purchased is to be purchased with the Collateral Disposition Proceeds of the disposition of one or more assets that is not an item of Credit Risk Portfolio Collateral, Defaulted Portfolio Collateral, Portfolio Collateral sold pursuant to a Portfolio Improvement Exchange or Portfolio Collateral that has become subject to withholding tax, the purchase of the proposed item of Portfolio Collateral must (i) restore compliance with a Collateral Quality Test, Interest Coverage Test, Overcollateralization Test or a concentration limitation set forth in this Section 12.2 (or bring the Portfolio Collateral closer to compliance with any such test or limitation) not then satisfied or (ii) on a net basis improve the quality of the Portfolio Collateral as measured by such Collateral Quality Tests, Interest Coverage Tests, Overcollateralization Tests and concentration limitations and (iii) in the case of each of clause (i) and clause (ii) without causing any other Collateral Quality Test, Interest Coverage Test, Overcollateralization Test or concentration limitation to be violated or significantly increasing the likelihood of such a violation in the future.

Notwithstanding the foregoing provisions of this Section 12.2 and Section 11.3, if the Issuer or the Servicer has previously entered into a commitment to purchase an item of Portfolio Collateral to be included in the Trust Estate and at the time of such commitment such item of Portfolio Collateral complied with the definition of Portfolio Collateral and each of the foregoing criteria in this Section 12.2, then the Issuer may consummate the purchase of such item of Portfolio Collateral notwithstanding that such item of Portfolio Collateral fails to comply with the definition of Portfolio Collateral and such criteria on the date of settlement, *provided that* the agreed to settlement date shall not be more than thirty (30) days after the commitment to acquire such item of Portfolio Collateral or, if settlement occurs more than 30 days following the commitment, such item of Portfolio Collateral satisfies the criteria of this Section 12.2 as of the date of settlement.

Notwithstanding the foregoing provisions of this Section 12.2 and Section 11.3, the Issuer or the Servicer on behalf of the Issuer shall be deemed to have purchased or sold (as the case may be) any Portfolio Collateral as of the date on which the Issuer delivers to the Trustee a commitment to purchase or sell (as the case may be) such items of Portfolio Collateral, in each case entitling the Issuer (or the Trustee as assignee thereof) to receive or sell (as the case may be), and requiring the purchaser to purchase (in the case of a sale), such Portfolio Collateral and, in such event, the Issuer shall be deemed to have purchased or sold (as the case may be) such Portfolio Collateral on such date.  Under the circumstances described in the immediately preceding sentence, if the transaction contemplated by the commitment referred to therein does not settle on or before the thirtieth (30th) day following the scheduled settlement date, the deemed purchase or sale shall be deemed not to have occurred.

Further, notwithstanding the foregoing provisions of this Section 12.2 and Section 11.3, any certifications or other documents required to be delivered by the Servicer or the Issuer in connection with the purchase or sale of any item of Portfolio Collateral during the Revolving Period may be delivered by the Issuer or the Servicer on the settlement date for such item of Portfolio Collateral even if such date occurs after the Revolving Period.

Section 12.3.  Sale of Portfolio Collateral Subject to Offer or Call

(a) The Servicer may only direct the Trustee to sell an item of Portfolio Collateral that is the subject of an Offer or call for redemption, if together with its direction to sell such security, the Servicer certifies to the Trustee that the sales price for such Security is equal to or greater than 1% less than the price available pursuant to such Offer or call and such sale will be treated as if the Offer or call were consummated for purposes of determining the Collections for the Due Period relating to the date on which such sale occurs.

(b) If an item of Portfolio Collateral becomes subject to an Exchange Offer after it has been purchased by the Issuer, the Servicer will be permitted to take such action with respect to the Underlying Instrument or the issuer thereof as may be required to convert such item of Portfolio Collateral into an item of Equity Portfolio Collateral.

Section 12.4.  Purchase of Substitute Portfolio Collateral

(a) Upon receipt by the Trustee of a Servicer Order with respect thereto, the Collateral Disposition Proceeds received during any Due Period during the Revolving Period may be paid out of the Collection Account, on any Business Day during such Due Period or the immediately succeeding Due Period, for the purpose of purchasing one or more items of Substitute Portfolio Collateral for inclusion in the Trust Estate in an amount not to exceed the amount of such proceeds and specified in such Servicer Order; *provided that* the Trustee shall have received (i) a certificate of the Servicer dated as of the date of the purchase and the Grant of such Substitute Portfolio Collateral to the effect that such purchase is in compliance with the requirements of this Section 12.4 and Section 12.5(a) hereof and (ii) the certificate required pursuant to Section 12.2 hereof.

(b) In addition to the requirements set forth in 12.4(a), in connection with Substitute Portfolio Collateral purchased with Collateral Disposition Proceeds from the sale of Defaulted Portfolio Collateral, each of the Overcollateralization Tests and the Interest Coverage Test are satisfied, in each case both before and after giving effect to such purchase.

(c) In connection with a sale of an item of Credit Improved Portfolio Collateral after the Revolving Period or the receipt of Collateral Principal Collections due to an unscheduled prepayment after the Revolving Period, the Servicer may enter into commitments to apply such Collateral Disposition Proceeds or such unscheduled prepayments (net of accrued interest and costs) to the purchase of Portfolio Loans as either Additional Portfolio Collateral or Substitute Portfolio Collateral having an Aggregate Principal Amount equal to or greater than the Principal Balance of the original item of Portfolio Collateral within 90 days of receipt of such proceeds, so long as the Servicer certifies as of the date of purchase that it reasonably believes at the time of such commitment that, after giving effect to such sale and subsequent purchase, (A)

each of the Overcollateralization Tests and the other collateral criteria described herein would be satisfied and the Interest Coverage Test was satisfied for the most recent Payment Date, (B) such Portfolio Loan to be purchased has a Moody's Rating equal to or higher than the Moody's Rating of the original item of Portfolio Collateral, (C) such Portfolio Loan to be purchased has an S&P Rating equal to or higher than the S&P Rating of the original item of Portfolio Collateral, (D) such Portfolio Loan to be purchased has a stated maturity on or prior to the final maturity of such original item of Portfolio Collateral and (E) neither Rating Agency has reduced or withdrawn (and not restored) the rating assigned by it on the Closing Date to any Class of Notes.

Section 12.5.  <u>Conditions Applicable to all Transactions Involving Purchases of Portfolio Collateral</u>

(a) Any transaction effected under this Article or under Sections 3.4, 10.2, 10.3, 11.3 or 12.4 hereof involving the Servicer and one or more Affiliates of the Servicer shall be conducted on an arm's-length basis.  Any such transaction effected with an Affiliate of the Servicer, the Issuer or the Trustee, shall be effected on terms as favorable to the Noteholders as would be the case if such Person were not so affiliated; *provided that* the Trustee shall have no responsibility to oversee compliance with this clause by the Issuer or Servicer.

(b) Upon any purchase or substitution pursuant to this Article or Sections 11.3, 12.3(b) or 12.4 hereof, each such Pledged Security shall be Delivered to the Trustee.

(c) The Issuer hereby represents and warrants and will certify to the Trustee in an Officer's Certificate as of the date of each purchase and Grant to the Trustee of each Portfolio Collateral pursuant to Section 11.3, Section 12.3(b) and Section 12.4 hereof:

(i)    the Issuer is the owner of such item of Portfolio Collateral and the Deposit free and clear of any liens, claims (including any adverse claims) or encumbrances of any nature whatsoever, except for those granted or expressly permitted pursuant to this Indenture and due bills, if any, with respect to interest, or a portion thereof, accrued on such Portfolio Collateral prior to the first payment date and owed by the Issuer to the seller of such Portfolio Collateral;

(ii)    the Issuer has acquired its ownership in such item of Portfolio Collateral and the Deposit in good faith without notice of any adverse claim, except as described in paragraph (i) above;

(iii)    the Issuer has Delivered such item of Portfolio Collateral to the Trustee and has not assigned, pledged or otherwise encumbered any interest in such Portfolio Collateral or the Deposit other than interests granted or expressly permitted pursuant to this Indenture;

(iv)    the Issuer has full right to Grant and does hereby Grant such item of Portfolio Collateral and the Deposit to the Trustee;

(v)    the information set forth with respect to such item of Portfolio Collateral in <u>Schedule A</u> hereto is correct; and

(vi)      such item of Portfolio Collateral satisfies the requirements of the definition of Portfolio Collateral.

Section 12.6.   Sale of Warrants

The Servicer may direct the Trustee in writing to sell, and the Trustee shall release from the lien of this Indenture and sell in the manner directed by the Servicer, any warrant that is part of a Unit at any time after such warrant becomes separately tradable.

Section 12.7.   Underlying Instruments

(a) With respect to each Portfolio Loan acquired by a Participation, the Issuer shall cause the Trustee to hold at its office in the State of New York an original executed Underlying Instrument entered into between the Issuer and the Selling Institution which, except in the case of a Portfolio Loan evidenced by an instrument (the original of which shall be delivered to the Trustee), may be a copy thereof, which may be sent by telecopier, certified by the Servicer or the Issuer as a true and accurate copy (which in the case of a Participation shall include the loan and security documentation with respect to the underlying loan) as provided to it by the Servicer, and, *provided that* the Trustee has sufficient advance notice of such transaction, the Trustee shall send a notice to the Selling Institution and the underlying obligor of such Floating Rate Portfolio Collateral on or prior to the Business Day on which such Floating Rate Portfolio Collateral is to be included in the Trust Estate.

(b) The Issuer (upon Servicer Order) may enter into any amendment of or supplement to any Underlying Instrument with respect to any item of Portfolio Collateral, without notice to or consent of any Noteholder, but with prior written notice to the Trustee, if the amendment or supplement is required (a) by the provisions of the Underlying Instrument or this Indenture, (b) to cure any ambiguity, inconsistency or formal defect or omission, (c) in connection with any authorized amendment of or supplement to this Indenture, or (d) to make any other change deemed necessary or beneficial by the Issuer (upon Servicer Order); *provided that*, unless such Portfolio Loan is in default, or default is reasonably foreseeable, after giving effect to such amendment or supplement, such item of Portfolio Collateral satisfies the definition of Portfolio Collateral hereunder.  The Issuer shall be under no obligation to enter into any such amendment or supplement, and the Servicer and the Issuer shall be under no obligation to provide any Person with any information related thereto (other than to confirm to the Trustee compliance with this Section), to the extent that the Servicer or the Issuer, as the case may be, believes in good faith that any action so taken is necessary in order not to violate any law, regulation or contractual arrangement.  The Servicer shall retain any appropriate records of such amendments.

(c) If an amendment of or supplement to any Underlying Instrument without any consent of Noteholders is not permitted by subsection (b), the Issuer may enter into, and the Trustee shall, as directed by the Issuer, accept, or if necessary consent to, such amendment or supplement, with at least 10 days' prior written notice to the Trustee and the Holders of the Notes, unless the Trustee and the Issuer have received notification by the more than 33-1/3% of the Aggregate Principal Amount of the Notes objecting to such amendment or supplement within 10 days of such notice.

(d) If the Servicer determines that any amendment to the Underlying Instrument of a DIP Loan materially affects the credit quality of such DIP Loan, the Servicer shall promptly notify the Rating Agencies of such amendment, prior to execution of such amendment.

Section 12.8.    Reserved

Section 12.9.    Reserved

Section 12.10.  Synthetic Securities; Strip Securities

For purposes of the eligibility criteria and related tests herein, a Synthetic Security will generally be included as an item of Portfolio Collateral having the maturity, interest rate and other payment characteristics of the Synthetic Security and not of the Reference Obligation (including characterization as either an item of Fixed Rate Portfolio Collateral or Floating Rate Portfolio Collateral) and, with respect to all other characteristics, will be included as an item of Portfolio Collateral having the relevant characteristics of the related Reference Obligation and not of the Synthetic Security.  The Servicer will notify Moody's and Standard & Poor's in writing or electronically with respect to each purchase of a Synthetic Security not later than the trade date for such Synthetic Security; except that, if, at any time, the rating by Moody's on any Class of Notes then rated by Moody's has been downgraded at least one rating sub-category (and has not been restored) or is put on credit watch (with negative implications), no Synthetic Security will be purchased by the Issuer for inclusion in the Trust Estate unless Moody's has received notice of such purchase and any information necessary to evaluate such purchase, receipt of which shall be acknowledged by a Vice President or more senior member of Moody's CDO Group, in writing or electronically, and after such receipt is acknowledged, either Moody's shall inform the Servicer that such purchase will not cause Moody's to withdraw or further downgrade any of the then-current ratings assigned by Moody's to any of the Notes within 10 Business Days, or after 10 Business Days the Servicer may assume that such purchase will not cause Moody's to withdraw or further downgrade any of the then-current ratings assigned by Moody's to any of the Notes.  If after the trade date for any Synthetic Security, there is any modification to the terms of such Synthetic Security, the Servicer will provide notice of such modification to Moody's and Standard & Poor's.  Further, unless otherwise agreed by Moody's or as otherwise contemplated in the definition of Synthetic Security in Section 1.1 hereof, upon maturity, acceleration or early termination of a Synthetic Security or the related Reference Obligation, the Issuer will accept only the Reference Obligation or the par amount thereof unless the Reference Obligation would be characterized as Credit Risk Portfolio Collateral, Defaulted Portfolio Collateral or Credit Improved Portfolio Collateral, in which case the Issuer may accept the current fair market value thereof, except in the event of the exercise of any put or call provision of the Synthetic Security or Reference Obligation, in which case the Issuer shall only accept the Reference Obligation or an amount greater than or equal to the par amount thereof, and the Issuer will take all commercially reasonable actions under the Synthetic Security to accomplish the foregoing.  Notwithstanding anything in this Indenture to the contrary, in connection with the acquisition of a Synthetic Security and in lieu of all or a portion of the purchase price for such Synthetic Security, the Issuer may grant the related Synthetic Security a first priority security interest in cash and Eligible Investments designated by the Issuer and the proceeds thereof, which may be released from the lien of the Indenture and deposited with such Synthetic Security Obligor (or an intermediary or agent therefor) and invested as provided by the

terms of such Synthetic Security, and the proceeds of which may be applied to make periodic payments under such Synthetic Security.  For purposes of this Indenture, the grant of such security interest shall be treated as the payment of a purchase price equal to the value of the cash and Eligible Investments granted, and the Issuer's obligation to make periodic payments under such Synthetic Security shall be disregarded.

Section 12.11.  Delayed Drawdown Loans and Revolving Loans

A Delayed Drawdown Loan will not be eligible for purchase by the Issuer for inclusion in the Trust Estate unless the related Underlying Instrument provides (i) that advances may be made for a period not to exceed one (1) year from the date of origination of the Delayed Drawdown Loan and in any event before the end of the Revolving Period; (ii) for a maximum amount that can be borrowed from the Issuer on one or more specified borrowing dates; (iii) that funds borrowed from the Issuer and subsequently repaid may not be reborrowed; and (iv) that the borrower is entitled to such additional advances only upon the achievement of financial performance or other objective criteria established at origination and set forth in such credit agreement.

In addition, simultaneously with the Issuer's purchase of any Delayed Drawdown Loan or Revolving Loan, the Issuer is required to deposit into the Loan Funding Account the full amount of any advances or delayed draws that may be required of the Issuer thereunder and principal repaid under any Revolving Loan is required to be deposited in the Loan Funding Account to the extent the Issuer's obligation to fund any future advances has not been irrevocably reduced.

ARTICLE XIII

MISCELLANEOUS

Section 13.1.   Form of Documents Delivered to Trustee

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Authorized Officer of the Issuer or the Servicer may be based, insofar as it relates to legal matters, upon an Opinion of Counsel or a certificate of or representations by such legal counsel, unless such Authorized Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous.  Any such certificate of an Authorized Officer of the Issuer or the Servicer, or Opinion of Counsel or certificate of or representations by such legal counsel may be based, insofar as it relates to factual matters, upon a certificate of opinion of, or representations by the Issuer, the Servicer or any other Person, stating that the information with respect to such factual matters is in the

possession of the Issuer, the Servicer or such other Person, unless such Authorized Officer of the Issuer or the Servicer or counsel knows that the certificate or opinion or representations with respect to such matters are erroneous. Any Opinion of Counsel may also be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Authorized Officer of the Issuer or the Servicer, stating that the information with respect to such matters is in the possession of the Issuer or the Servicer, unless such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Section 13.2. Acts of Noteholders

(a) Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Noteholders may be embodied in and evidenced by one or more instruments (which may be an electronic document, including but not limited to in the form of e-mail, to the extent permitted by applicable law) of substantially similar tenor signed by such Noteholders in person or by an agent or proxy duly appointed in writing (*provided* that no signature shall be required on electronic documents, including but not limited to in the form of e-mail); and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee, and, where it is hereby expressly required, to the Issuer. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Issuer, if made in the manner provided in this Section.

(b) The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner which the Trustee deems sufficient.

(c) The ownership of Notes shall be proved by the Note Register.

(d) Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Notes shall bind the Holder (and any transferee thereof) of every Note issued upon the registration thereof or in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Note.

Section 13.3. Notices, etc., to the Trustee, Issuer, Servicer, the Irish Paying Agent and Bear Stearns

Any request, demand, authorization, direction, notice, consent, waiver or other documents provided or permitted by this Indenture to be made upon, given or furnished to, or filed with the Trustee, the Issuer, the Servicer, Bear Stearns, the Irish Paying Agent or the Paying and Transfer Agent shall be sufficient for every purpose hereunder if in writing and mailed by first class mail, sent by overnight courier guaranteeing next day delivery or sent by facsimile transmission in legible form to the Trustee, the Issuer, the Servicer or Bear Stearns, as applicable, at the following addresses:

(1)    to the Trustee at its Corporate Trust Office or at any other address furnished in writing to the Issuer or the Noteholders by the Trustee (any request, direction, notice or other communication from the Servicer to the Trustee under Article XII hereof (other than required certification) may be by electronic mail, which shall be deemed to be in writing);

(2)    to the Issuer at the offices of Maples Finance Limited, P.O. Box 1093 GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands, Attention:  Directors, or at any other address previously furnished in writing to the Trustee by the Issuer;

(3)    to the Co-Issuer at c/o Donald J. Puglisi, 850 Library Avenue, Suite 204, City of Newark, County of New Castle, Delaware 19711, or at any other address previously furnished in writing to the Noteholders, the Trustee or the Issuer by the Co-Issuer;

(4)    to the Servicer at the offices of Highland Capital Management, LP, Two Galleria Tower, 13455 Noel Road, Suite 1300, Dallas, Texas 75240, Attention: [_____], or at any other address previously furnished in writing to the Noteholders, the Trustee or the Issuer by the Servicer;

(5)    to Bear Stearns at the offices of Bear, Stearns & Co. Inc., 383 Madison Avenue, 7th Floor, New York, New York 10179, Attention: CDO Group, or at any other address previously furnished in writing to the Trustee by Bear Stearns;

(6)    to the Irish Paying Agent at the offices of 3 George's Dock, International Financial Services Centre, Dublin, Ireland or at any other address previously furnished in writing to the Trustee by the Irish Paying Agent;

(7)    to the Paying and Transfer Agent at the offices of JPMorgan Chase Bank, National Association, at the Trustee's Corporate Trust Office;

(8)    to the Rating Agencies as described in Section 10.7 hereof; or

(9)    to the Repository at CDO Library c/o The Bond Market Association, 360 Madison Avenue (18th Floor), New York, NY 10017, Electronic mail address: admin@cdolibrary.com or at any other address previously furnished in writing to the Trustee by the operator of the Repository.

The Issuer hereby directs the Trustee and the Trustee agrees that, until it receives written notification from Ambac Assurance Corporation ("Ambac") or CIFG Services, Inc. ("CIFG"), as applicable, it shall deliver, or cause to be delivered, to Ambac and CIFG, at their respective addresses set forth below, a copy of each Monthly Report, Note Valuation Report, other report, accounting, request, demand, authorization, direction, order, notice, consent waiver or other action (each, a "Notice") delivered or required to be delivered to any Holder or any Rating Agency pursuant to this Indenture.  Any Notice shall be delivered to Ambac at One State Street Plaza, New York, New York 10004; Attention Portfolio Risk Management, facsimile

(212) 208-3509, e-mail sfcdsurv@ambac.com, or at any other address previously furnished to the Trustee by Ambac, not later than the first day on which such Notice is delivered to any Holder or Rating Agency. Any Notice shall be delivered to CIFG at 825 Third Avenue, 6th Floor, New York, New York 10022; Attention: Paul Kwiatkoski – Head of Surveillance, facsimile 212-909-3958, e-mail "surveillance@cifg.com" and "general.counsel@cifg.com", or at any other address previously furnished to the Trustee by CIFG, not later than the first day on which such Notice is delivered to any Holder or Rating Agency. Any document required to be delivered or made available to Ambac or CIFG may be made available by providing Ambac or CIFG, respectively, with access to a website containing such report in a format that permits the user to download the document as a pdf file.

Section 13.4.    Notices to Noteholders; Waiver

Where this Indenture provides for giving a copy of any report or notice to Noteholders (such report or notice a "notice") of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, to each Noteholder affected by such event, at its address as it appears on the Note Register, not later than the latest date, and not earlier than the earliest date, prescribed for the giving of such notice and so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent. In any case where notice to Noteholders is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Noteholder shall affect the sufficiency of such notice with respect to other Noteholders, and any notice which is mailed in the manner herein provided shall conclusively be presumed to have been duly given whether or not received. The Trustee shall provide notices directly to any beneficial holder of a Note that so identifies itself and requests receipt of such notices in writing to the Trustee.

Where this Indenture provides for notice in any manner, any such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Noteholders shall be filed with the Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

In the event that, by reason of the suspension of the regular mail service as a result of a strike, work stoppage or similar activity it shall be impractical to mail notice of any event to Noteholders when such notice is required to be given pursuant to any provision of this Indenture, then any manner of giving such notice as shall be satisfactory to the Trustee shall be deemed to be a sufficient giving of such notice.

Section 13.5.    Effect of Headings and Table of Contents

The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

Section 13.6.    Successors and Assigns

All covenants and agreements in this Indenture by the Co-Issuers shall bind its respective successors and assigns, whether so expressed or not.

Section 13.7.    Severability

In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 13.8.    Benefits of Indenture

Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the parties hereto and their successors hereunder, the Servicer and the Noteholders, any benefit or any legal or equitable right, remedy or claim under this Indenture.

The Servicer and its respective successors and assigns, shall each be third-party beneficiaries of the provisions of this Indenture, and shall be entitled to rely upon this Indenture and directly to enforce such provisions of this Indenture.

Section 13.9.    Reserved

Section 13.10. Governing Law; Submission to Jurisdiction; Waiver of Trial by Jury

(a) This Indenture, each indenture supplemental hereto and each Note shall be construed in accordance with and governed by the laws of the State of New York applicable to agreements made and to be performed therein.  The State of New York shall be the securities intermediary's jurisdiction of the Securities Intermediary for purposes of the UCC and the United States Regulations.

(b) Each of the Co-Issuers and the Trustee hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to the Notes or this Indenture, or for recognition or enforcement of any judgment, and each of the Co-Issuers and the Trustee hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court. Each of the Co-Issuers and the Trustee hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.  Each of the Co-Issuers and the Trustee irrevocably consents to the service of any and all process in any action or proceeding by the mailing or delivery of copies of such process to it at the office of its agent set forth in Section 13.3.  Each of the Co-Issuers and the Trustee agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c) EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS INDENTURE, ANY OTHER TRANSACTION DOCUMENTS OR ANY INSTRUMENT OR DOCUMENT DELIVERED HEREUNDER OR THEREUNDER.

US_EAST:6212215.13                                      191

Section 13.11. Counterparts

This instrument may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 13.12. No Issuer Office Within the United States

The Issuer (or the Servicer acting in the name or on behalf of the Issuer) shall not maintain an office located within the United States; *provided that* neither the performance by JPMorgan Chase Bank, National Association, as appointed agent for the Issuer of the Issuer's obligation to prepare reports under or pursuant to Article X hereof (and other services rendered by JPMorgan Chase Bank, National Association, pursuant to the Collateral Administration Agreement as described in Section 10.5(f) hereof) at and through the offices of JPMorgan Chase Bank, National Association in the United States nor the services rendered by the Servicer pursuant to the Servicing Agreement at its offices in the United States shall be a violation of this Section 13.12.

Section 13.13. Subordination

(a) Notwithstanding anything in this Indenture to the contrary, the Issuer and the Holders of the Notes agree:

(i)    for the benefit of the Holders of the Class A-1LA Notes, the Class X Notes and the Trustee that the Class A-1LB Notes, Class A-2L Notes, the Class A-3L Notes, the Class A-4L Notes, the Class B-1L Notes and the Issuer's rights in and to the Trust Estate (with respect to the Class A-1LA Notes, the "Senior Class A Subordinate Interests") shall be subordinate and junior to the Class A-1LA Notes and the Class X Notes and the Trustee to the extent and in the manner set forth herein, including but not limited to payment of principal of, and interest on, the Senior Class A Subordinate Interests, and that the lien of the Trustee with respect to the Senior Class A Subordinate Interests is subordinate to any lien of the Trustee in favor of the holders of Class A-1LA Notes; and

(ii)    for the benefit of the Holders of the Class A-1LB Notes and the Trustee that the Class A-3L Notes, the Class A-4L Notes, the Class B-1L Notes and the Issuer's rights in and to the Trust Estate (with respect to the Class A-1LB Notes, the "Class A-1LB Subordinate Interests") shall be subordinate and junior to the Class A-1LB Notes and the Trustee to the extent and in the manner set forth herein, including but not limited to payment of principal of, and interest on, the Class A-1LB Subordinate Interests, and that the lien of the Trustee with respect to the Class A-1LB Subordinate Interests is subordinate to any lien of the Trustee in favor of the holders of Class A-1LB Notes

(iii)    for the benefit of the Holders of the Class A-2L Notes and the Trustee that the Class A-3L Notes, the Class A-4L Notes, the Class B-1L Notes and the Issuer's rights in and to the Trust Estate (with respect to the Class A-2L Notes, the "Class A-2L Subordinate Interests") shall be subordinate and junior to the Class A-2L Notes and the Trustee to the extent and in the manner set forth herein, including but not limited to

payment of principal of, and interest on, the Class A-2L Subordinate Interests, and that the lien of the Trustee with respect to the Class A-2L Subordinate Interests is subordinate to any lien of the Trustee in favor of the holders of Class A-2L Notes; and

(iv)  for the benefit of the Holders of the Class A-3L Notes and the Trustee that the Class A-4L Notes and the Class B-1L Notes and the Issuer's rights in and to the Trust Estate (with respect to the Class A-3L Notes, the "Class A-3L Subordinate Interests") shall be subordinate and junior to the Class A-3L Notes and the Trustee to the extent and in the manner set forth herein, including but not limited to payment of principal of the Class A-3L Subordinate Interests, and that the lien of the Trustee with respect to the Class A-3L Subordinate Interests is subordinate to any lien of the Trustee in favor of the holders of Class A-3L Notes.

(v)  for the benefit of the Holders of the Class A-4L Notes and the Trustee that the Class B-1L Notes and the Issuer's rights in and to the Trust Estate (with respect to the Class A-4L Notes, the "Class A-4L Subordinate Interests") shall be subordinate and junior to the Class A-4L Notes and the Trustee to the extent and in the manner set forth herein, including but not limited to payment of principal of the Class A-4L Subordinate Interests, and that the lien of the Trustee with respect to the Class A-4L Subordinate Interests is subordinate to any lien of the Trustee in favor of the holders of Class A-4L Notes.

If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article V, the Notes shall be paid in the priority set forth in Section 11.1(d) hereof.

In addition to the foregoing:

(i)  the Holders of the Class A-1LB Notes agree, for the benefit of the Holders of the Class A-1LA Notes and the Class X Notes, not to cause the filing of a petition in bankruptcy against the Issuer for failure to pay amounts due under the Class A-1LB Notes or hereunder until the payment in full of the Class A-1LA Notes and the Class X Notes

(ii)  the Holders of the Class A-2L Notes agree, for the benefit of the Holders of the Class A-1LA Notes, the Class A-1LB Notes and the Class X Notes, not to cause the filing of a petition in bankruptcy against the Issuer for failure to pay amounts due under the Class A-2L Notes or hereunder until the payment in full of the Class A-1LA Notes, the Class A-1LB Notes and the Class X Notes;

(iii)  the Holders of the Class A-3L Notes agree, for the benefit of the Holders of the Senior Class A Notes, not to cause the filing of a petition in bankruptcy against the Issuer for failure to pay amounts due under the Class A-3L Notes or hereunder until the payment in full of the Senior Class A Notes; and

(iv)  the Holders of the Class A-4L Notes agree, for the benefit of the Holders of the Senior Class A Notes and the Class A-3L Notes, not to cause the filing of a petition

in bankruptcy against the Issuer for failure to pay amounts due under the Class A-4L Notes or hereunder until the payment in full of the Senior Class A Notes; (iv)

(v) the Holders of the Class B-1L Notes agree, for the benefit of the Holders of the Class A Notes, not to cause the filing of a petition in bankruptcy against the Issuer for failure to pay amounts due under the Class B-1L Notes or hereunder until the payment in full of the Class A Notes;

in each case, not before one year and one day, or, if longer, the applicable preference period then in effect, have elapsed since such payment.

If notwithstanding the provisions of this Indenture, any Holder of the Class B-1L Notes shall have received any payment or distribution in respect of the Class B-1L Notes contrary to the provisions of this Indenture, then unless and until the Class A Notes shall have been paid in full in accordance with this Indenture, such payment or distribution shall be received and held in trust for the benefit of, and shall immediately be paid over and delivered to, the Trustee, which shall pay and deliver the same to the Holders of the Class A Notes, in accordance with this Indenture.

(b) Each Holder of Class B-1L Notes agrees that such Holder shall not demand, accept, or receive any payment or distribution in respect of such Notes in violation of the provisions of this Indenture. Nothing in this Section shall affect the obligation of the Issuer to pay Holders of such Notes amounts owing in respect thereof.

(c) So long as any Class A Notes remain Outstanding to the extent it may lawfully do so, each Class B-1L Noteholder by its acceptance of a Class B-1L Note:

(i) agrees that it will not step up, plead, claim or in any manner whatsoever take advantage of, any appraisement, valuation, stay, extension or redemption laws, now or hereafter in force in any jurisdiction, which may delay, prevent or otherwise hinder (A) the performance, enforcement or foreclosure of this Indenture, (B) the sale of any of the Trust Estate, or (C) the putting of the purchaser or purchasers thereof into possession of such property immediately after the sale thereof;

(ii) waives all benefit or advantage of any such laws;

(iii) waives and releases all rights to have the Trust Estate marshaled upon any foreclosure, sale or other enforcement of this Indenture; and

(iv) consents and agrees that, subject to the terms of this Indenture, all the Collateral may at any such sale be sold by the Trustee as an entirety.

Section 13.14. Survival of Provisions

Notwithstanding the satisfaction and discharge of this Indenture, the rights and obligations of either Co-Issuer, the Trustee, the Noteholders and other secured parties hereunder under Sections 2.7(h), 2.10, 4.2, 5.19, 6.7, 6.13, 7.3, 7.6, 7.16, 11.1 and 13.15 hereof shall otherwise survive termination of the rights of the parties hereunder.

Section 13.15. Liability of Co-Issuers.

Notwithstanding any other terms of this Indenture, the Notes or any other agreement entered into between, inter alia, the Co-Issuers or otherwise, neither of the Co-Issuers shall have any liability whatsoever to the other Co-Issuer under this Indenture, the Notes, any such agreement or otherwise and, without prejudice to the generality of the foregoing, neither of the Co-Issuers shall be entitled to take any steps to enforce, or bring any action or proceeding, in respect of this Indenture, the Notes, any such agreement or otherwise against the other Co-Issuer. In particular, neither of the Co-Issuers shall be entitled to petition or take any other steps for the winding up or bankruptcy of the other Co-Issuer or shall have any claim in respect of any assets of the other Co-Issuer.

Section 13.16. Escheat.

In the absence of a written request from the Co-Issuers to return unclaimed funds to the Co-Issuers, the Trustee shall from time to time deliver all unclaimed funds to or as directed by applicable escheat authorities, as determined by the Trustee in its sole discretion, in accordance with the customary practices and procedures of the Trustee. Any unclaimed funds held by the Trustee pursuant to this section shall be held uninvested and without any liability for interest.

Section 13.17. Posting of Documents on Repository

Any document or report required to be delivered to the Repository or to be made available to the operator of the Repository pursuant to this Indenture shall be made available by providing the operator of the Repository with access to a website containing such document or report in a format that permits the user to download the document as a pdf file.

Section 13.18. Consent to Posting of Documents on Repository

The Issuer hereby consents to (a) the posting of the offering circular related to the Notes and this Indenture and the periodic reports to be delivered pursuant to this Indenture and any amendments or other modifications thereto on the Repository for use in the manner provided in the Repository, and (b) the display of its name on the Repository in connection therewith.

ARTICLE XIV

ASSIGNMENT OF SERVICING AGREEMENT

Section 14.1. Assignment of Servicing Agreement

(a) The Issuer, in furtherance of the covenants of this Indenture and as security for the Notes and the performance and observance of the provisions hereof, hereby assigns, transfers, conveys and sets over to the Trustee, for the benefit of the Noteholders and the other secured parties hereunder, all of the Issuer's estate, right, title and interest in, to and under the Servicing Agreement, including, without limitation, (i) the right to give all notices, consents and releases thereunder, (ii) the right to give all notices of termination and to take any legal action upon the breach of an obligation of the Servicer thereunder, including the commencement,

conduct and consummation of proceedings at law or in equity, (iii) the right to receive all notices, accountings, consents, releases and statements thereunder and (iv) the right to do any and all other things whatsoever that the Issuer is or may be entitled to do thereunder; *provided* so long as no Event of Default has occurred and is continuing hereunder, the Trustee hereby grants the Issuer a license to exercise all of the Issuer's rights pursuant to the Servicing Agreement without notice to or the consent of the Trustee (except as otherwise expressly required by this Indenture, including, without limitation, as set forth in paragraph (f) of this Section 14.1 hereof), which license shall be and is hereby deemed to be automatically revoked upon the occurrence of any Event of Default hereunder until such time, if any, as the Event of Default is cured or waived. The Trustee shall have no liability with respect to any act or failure to act by the Issuer under the Servicing Agreement (provided that this sentence shall not limit or relieve the Trustee from any responsibility it may have under this Indenture upon the occurrence of and during the continuance of any Event of Default).

(b) The assignment made hereby is executed as collateral security, and the execution and delivery hereby shall not in any way impair or diminish the obligations of the Issuer under the provisions of the Servicing Agreement, nor shall any of the obligations contained in the Servicing Agreement be imposed on the Trustee.

(c) Upon the retirement of the Notes and the release of the Trust Estate from the lien of this Indenture, this assignment and all rights herein assigned to the Trustee for the benefit of the Noteholders shall cease and terminate and all the estate, right, title and interest of the Trustee in, to and under the Servicing Agreement shall revert to the Issuer and no further instrument or act shall be necessary to evidence such termination and reversion.

(d) The Issuer represents that it has not executed any other assignment of the Servicing Agreement.

(e) The Issuer agrees that this assignment is irrevocable, and that it will not take any action which is inconsistent with this assignment or make any other assignment inconsistent herewith. The Issuer will, upon the request of the Trustee, execute all instruments of further assurance and all such supplemental instruments with respect to this assignment as the Trustee may specify.

(f) The Issuer hereby agrees, and hereby undertakes to obtain the agreement of the Servicer in the Servicing Agreement, to the following:

(1) The Servicer consents to, and agrees to perform, the provisions hereof applicable to the Servicer.

(2) The Servicer acknowledges that the Issuer is assigning all of its right, title and interest in, to and under the Servicing Agreement to the Trustee for the benefit of the Noteholders and the other Secured Parties hereunder.

(3) The Servicer shall deliver to the Trustee (at substantially the same time as delivered pursuant to the Servicing Agreement) duplicate original copies of all notices, statements, communications and instruments delivered or required to be delivered to the Issuer pursuant to the Servicing Agreement.

(4)     Except as set forth in the Servicing Agreement, neither the Issuer nor the Servicer will enter into any agreement amending, modifying or terminating the Servicing Agreement or selecting or consenting to a successor manager (other than an amendment or modification of the type that may be made to this Indenture without Holder consent), (a) without satisfying the Rating Condition and (b) so long as the Requisite Holders have not objected in writing to such amendment or modification within 30 days of notice thereof; and any such amendment, modification, termination, selection or consent (in each case, other than pursuant to the provisions of the Servicing Agreement) without confirmation by the Rating Agencies or if the Requisite Holders have objected shall be void; *provided that* the consent of Requisite Noteholders or confirmation by Moody's and S&P shall not be required for an amendment or modification to cure any ambiguity, to correct or supplement any provisions therein, to comply with any changes in law, or to make any other provisions with respect to matters or questions arising under the Servicing Agreement which shall not be inconsistent with the provisions thereof or of this Indenture, so long as such amendment or modification does not affect in any material respects the interests of any Noteholder (as evidenced by an Opinion of Counsel acceptable to the Trustee) and each of Moody's and S&P is notified in writing of such amendment or modification.  Notwithstanding the foregoing, nothing in this subsection shall limit, in any way, any of the rights or remedies available to the Servicer pursuant to the Servicing Agreement.

(5)     Except as set forth herein and in the Servicing Agreement, the Servicer shall continue to serve as Servicer under the Servicing Agreement notwithstanding that the Servicer shall not have received amounts due it under the Servicing Agreement because sufficient funds were not then available hereunder to pay such amounts in accordance with Article XI hereof, and agrees not to cause the filing of a petition in bankruptcy against the Issuer for any reason whatsoever, including without limitation the non-payment to the Servicer, until the payment in full of all Notes issued under this Indenture and the expiration of a period equal to one year and one day following all such payments; *provided that* nothing in this clause shall preclude, or be deemed to estop, the Servicer (A) from taking any action prior to the expiration of the aforementioned one year and one day period in (x) any case or proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer, as the case may be, or (y) any involuntary insolvency proceeding filed or commenced against the Issuer or the Co-Issuer, as the case may be, by a Person other than the Servicer or its Affiliates, or (B) from commencing against the Issuer or the Co-Issuer or any properties of the Issuer or the Co-Issuer any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceeding.  Notwithstanding the foregoing, nothing in this subsection shall limit, in any way, any of the rights or remedies available to the Servicer pursuant to the Servicing Agreement.

(6)     The Servicer will perform its obligations with respect to any conflict of interest in accordance with the applicable requirements of the Investment Advisers Act of 1940.

IN WITNESS WHEREOF, we have set our hands as of the 10th day of May, 2006.

EXECUTED AS A DEED BY
ROCKWALL CDO LTD., as Issuer


By: _____

Name: Wendy Ebanks
Title: Director


in the presence of:

_____
witness


ROCKWALL CDO (DELAWARE) CORP., as Co-Issuer


By: _____

Name:
Title:


JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION, as Trustee


By: _____

Name:
Title:


*Indenture*

IN WITNESS WHEREOF, we have set our hands as of the 10th day of May, 2006.

EXECUTED AS A DEED BY
ROCKWALL CDO LTD., as Issuer


By: _____
Name:
Title:


in the presence of:


_____
witness


ROCKWALL CDO (DELAWARE) CORP., as Co-
Issuer

By: _____
Name:   Donald J. Puglisi
Title:   President


JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION, as Trustee


By: _____
Name:
Title:


*Indenture*

IN WITNESS WHEREOF, we have set our hands as of the 10th day of May, 2006.

EXECUTED AS A DEED BY
ROCKWALL CDO LTD., as Issuer

By: _____
       Name:
       Title:

in the presence of:

_____
    witness

ROCKWALL CDO (DELAWARE) CORP., as Co-
    Issuer

By: _____
       Name:
       Title:

JPMORGAN CHASE BANK, NATIONAL
    ASSOCIATION, as Trustee

By: _____
       Name: BRUCE C. BOYD
       Title: VICE PRESIDENT

*Indenture*

JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION, as Securities Intermediary

By: _____
Name:     **BRUCE C. BOYD**
Title:    **VICE PRESIDENT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................... 1

GRANTING CLAUSES ......................................................................................... 1

ARTICLE I       DEFINITIONS................................................................................ 2

Section 1.1.    Definitions.......................................................................... 2
Section 1.2.    Other Definitional Provisions. ........................................... 61
Section 1.3.    Assumptions as to Portfolio Collateral and Trust Estate. ................ 61

ARTICLE II      THE NOTES................................................................................. 62

Section 2.1.    Forms Generally................................................................. 62
Section 2.2.    Authorized Amount. ........................................................... 66
Section 2.3.    Denominations; Extension of Revolving Period and Final Maturity.................................................................................. 66
Section 2.4.    Execution, Authentication, Delivery and Dating............... 70
Section 2.5.    Registration, Registration of Transfer and Exchange. ....... 71
Section 2.6.    Mutilated, Destroyed, Lost or Stolen Notes...................... 80
Section 2.7.    Payments on the Notes....................................................... 81
Section 2.8.    Persons Deemed Owners. ................................................... 84
Section 2.9.    Cancellation. ....................................................................... 84
Section 2.10.   Tax Purposes....................................................................... 85
Section 2.11.   Calculation Agent; Determination of LIBOR.................... 85
Section 2.12.   Option to Acquire Credit Enhancement............................. 86
Section 2.13.   Prescription. ....................................................................... 87

ARTICLE III     AUTHENTICATION AND DELIVERY OF NOTES................ 87

Section 3.1.    General Provisions. ............................................................ 87
Section 3.2.    Security for Notes. .............................................................. 88
Section 3.3.    Initial Deposit Redemption................................................ 90
Section 3.4.    Purchase of Portfolio Collateral between the Closing Date and the Effective Date; Effective Date Conditions................... 91
Section 3.5.    Intermediaries. ................................................................... 93

ARTICLE IV      SATISFACTION AND DISCHARGE....................................... 93

Section 4.1.    Satisfaction and Discharge of Indenture............................ 93
Section 4.2.    Application of Trust Money................................................ 94

ARTICLE V       REMEDIES................................................................................. 95

| Section 5.1. | Events of Default. | 95 |
| Section 5.2. | Acceleration of Maturity; Rescission and Annulment. | 96 |
| Section 5.3. | Proceedings. | 97 |
| Section 5.4. | Remedies. | 98 |
| Section 5.5. | Preservation of Trust Estate. | 99 |
| Section 5.6. | Trustee May File Proofs of Claim. | 99 |
| Section 5.7. | Trustee May Enforce Claims Without Possession of Notes. | 100 |
| Section 5.8. | Application of Money Collected. | 101 |
| Section 5.9. | Limitation on Suits. | 101 |
| Section 5.10. | Unconditional Rights of Noteholders to Receive Principal and Interest. | 101 |
| Section 5.11. | Restoration of Rights and Remedies. | 102 |
| Section 5.12. | Rights and Remedies Cumulative. | 102 |
| Section 5.13. | Delay or Omission Not Waiver. | 103 |
| Section 5.14. | Control by Noteholders. | 103 |
| Section 5.15. | Waiver of Past Defaults. | 103 |
| Section 5.16. | Undertaking for Costs. | 104 |
| Section 5.17. | Waiver of Stay or Execution Laws. | 104 |
| Section 5.18. | Sale of Trust Estate. | 104 |
| Section 5.19. | Action on Notes. | 105 |
| ARTICLE VI | THE TRUSTEE | 105 |
| Section 6.1. | Certain Duties and Responsibilities. | 105 |
| Section 6.2. | Notice of Default. | 107 |
| Section 6.3. | Certain Rights of Trustee. | 107 |
| Section 6.4. | Not Responsible for Recitals or Issuance of Notes. | 109 |
| Section 6.5. | May Hold Notes. | 109 |
| Section 6.6. | Money Held in Trust. | 110 |
| Section 6.7. | Compensation and Reimbursement. | 110 |
| Section 6.8. | Corporate Trustee Required; Eligibility. | 111 |
| Section 6.9. | Resignation and Removal; Appointment of Successor. | 112 |
| Section 6.10. | Acceptance of Appointment by Successor. | 113 |
| Section 6.11. | Merger, Conversion, Consolidation or Succession to Business of Trustee. | 113 |
| Section 6.12. | Certain Duties of Trustee Related to Delayed Payment of Proceeds. | 113 |
| Section 6.13. | Non-Petition. | 114 |
| Section 6.14. | Withholding. | 114 |
| Section 6.15. | The Securities Intermediary. | 115 |
| Section 6.16. | Eligible Investments. | 116 |
| Section 6.17. | Fiduciary For Noteholders; Agent for the Paying and Transfer Agent and the Servicer. | 116 |
| ARTICLE VII | COVENANTS | 117 |
| Section 7.1. | Payment of Principal and Interest. | 117 |

Section 7.2.    Maintenance of Office or Agency.................................................... 117
Section 7.3.    Money for Note Payments to Be Held in Trust. ............................... 117
Section 7.4.    Existence of Co-Issuers; Corporate Formalities. ............................. 117
Section 7.5.    Protection of Trust Estate.................................................................. 118
Section 7.6.    Opinions and Tax Certificates. ......................................................... 119
Section 7.7.    Performance of Obligations. ............................................................. 120
Section 7.8.    Negative Covenants. ......................................................................... 120
Section 7.9.    Statement as to Compliance.............................................................. 122
Section 7.10.   Issuer and Co-Issuer May Not Consolidate or Merge. .................... 122
Section 7.11.   No Other Business. ........................................................................... 122
Section 7.12.   Purchase of Notes. ............................................................................ 122
Section 7.13.   Notice of Rating................................................................................ 123
Section 7.14.   Process Agent. .................................................................................. 123
Section 7.15.   Additional Covenants. ...................................................................... 123
Section 7.16.   Representations and Warranties of the Co-Issuers. ........................ 124
Section 7.17.   Representations Relating to the Security Interests in the
               Collateral.......................................................................................... 126
Section 7.18.   No "Gross-up" Amounts. .................................................................. 128
Section 7.19.   Securities Lending. ........................................................................... 128

ARTICLE VIII    SUPPLEMENTAL INDENTURES ............................................... 131

Section 8.1.    Supplemental Indentures Without Consent of Noteholders............. 131
Section 8.2.    Supplemental Indentures with Consent of Noteholders.................. 133
Section 8.3.    Execution of Supplemental Indentures. ............................................ 136
Section 8.4.    Effect of Supplemental Indentures.................................................... 136
Section 8.5.    Reference in Notes to Supplemental Indentures............................... 136

ARTICLE IX     REDEMPTION; TERMINATION OF TRUST ......................................... 136

Section 9.1.    Optional Redemption. ....................................................................... 136
Section 9.2.    Mandatory Redemption. .................................................................... 138
Section 9.3.    Additional Collateral Deposit Requirement...................................... 139
Section 9.4.    Special Redemption; Amendment Buy-Out  .................................... 139
Section 9.5.    Tax Event Redemption. ..................................................................... 140
Section 9.6.    Notice to Trustee, Rating Agencies and the Servicer. ..................... 140
Section 9.7.    Notice of Optional Redemption and Tax Event Redemption by
               the Issuer.......................................................................................... 141
Section 9.8.    Deposit of Optional Redemption Price and Tax Event
               Redemption Price.............................................................................. 142
Section 9.9.    Notes Payable on Optional Redemption Date. ................................. 143
Section 9.10.   Notes Payable on Mandatory Redemption Date............................... 144
Section 9.11.   Notes Payable on Tax Event Redemption. ...................................... 144
Section 9.12.   Initial Deposit Redemption. .............................................................. 144
Section 9.13.   Reserved............................................................................................ 144
Section 9.14.   Notes Payable on Special Redemption Date..................................... 146

ARTICLE X        ACCOUNTS, ACCOUNTINGS AND RELEASES .................................... 146

    Section 10.1.        Collection of Money. ...................................................... 146
    Section 10.2.        Accounts. ........................................................................ 146
    Section 10.3.        Custody and Release of Portfolio Collateral.................... 152
    Section 10.4.        Reports of Trustee. ........................................................ 153
    Section 10.5.        Accountings. ................................................................... 154
    Section 10.6.        Reports by Independent Accountants. ............................. 162
    Section 10.7.        Reports to Rating Agencies. ........................................... 163

ARTICLE XI        APPLICATION OF MONIES .................................................... 164

    Section 11.1.        Disbursements of Monies from Collection Account. ...................... 164
    Section 11.2.        Mandatory Redemption With Respect to Overcollateralization Tests, Interest Coverage Test and Rating Confirmation Failure...... 171
    Section 11.3.        Purchase of Additional Portfolio Collateral..................................... 172
    Section 11.4.        Trust Account.................................................................... 173

ARTICLE XII        SALE OF PORTFOLIO COLLATERAL; SUBSTITUTION ................... 173

    Section 12.1.        Sale of Portfolio Collateral ................................................ 173
    Section 12.2.        Eligibility Criteria and Replacement Restrictions ........................... 175
    Section 12.3.        Sale of Portfolio Collateral Subject to Offer or Call........................ 180
    Section 12.4.        Purchase of Substitute Portfolio Collateral....................................... 180
    Section 12.5.        Conditions Applicable to all Transactions Involving Purchases of Portfolio Collateral .................................................. 181
    Section 12.6.        Sale of Warrants................................................................. 182
    Section 12.7.        Underlying Instruments .................................................... 182
    Section 12.8.        Reserved............................................................................ 183
    Section 12.9.        Reserved............................................................................ 183
    Section 12.10.        Synthetic Securities; Strip Securities .............................. 183
    Section 12.11.        Delayed Drawdown Loans and Revolving Loans .......................... 184

ARTICLE XIII        MISCELLANEOUS ................................................................. 185

    Section 13.1.        Form of Documents Delivered to Trustee ....................... 185
    Section 13.2.        Acts of Noteholders ......................................................... 185
    Section 13.3.        Notices, etc., to the Trustee, Issuer, Servicer, the Irish Paying Agent and Bear Stearns.................................................. 186
    Section 13.4.        Notices to Noteholders; Waiver....................................... 187
    Section 13.5.        Effect of Headings and Table of Contents....................... 187
    Section 13.6.        Successors and Assigns..................................................... 188
    Section 13.7.        Severability ...................................................................... 188
    Section 13.8.        Benefits of Indenture........................................................ 188
    Section 13.9.        Reserved............................................................................ 188
    Section 13.10.        Governing Law; Submission to Jurisdiction; Waiver of Trial by Jury........................................................................ 188
    Section 13.11.        Counterparts ..................................................................... 189

Section 13.12.    No Issuer Office Within the United States ...................................... 189
Section 13.13.    Subordination............................................................................... 189
Section 13.14.    Survival of Provisions................................................................... 192
Section 13.15.    Liability of Co-Issuers .................................................................. 192
Section 13.16.    Escheat ......................................................................................... 192
Section 13.17.    Posting of Documents on Repository ............................................ 192
Section 13.18.    Consent to Posting of Documents on Repository ........................... 192

ARTICLE XIV    ASSIGNMENT OF SERVICING AGREEMENT..................................... 193
Section 14.1.    Assignment of Servicing Agreement ............................................... 193

**ANNEXES**

**Annex A**    **Methodology for Calculating the Amount of an O/C Redemption**

**Annex B**    **Methodology for Calculating the Interest Coverage Test Redemption**

**Annex C**    **Methodology for Calculating the Amount Required to Satisfy the Additional Collateral Deposit Requirement**

**Annex D**    **Collateral Quality Formula**

**EXHIBITS**

**Exhibit A – Notes**

Exhibit A-1LA-1        Class A-1LA Temporary Regulation S Global Note

Exhibit A-1LB-1        Class A-1LB Temporary Regulation S Global Note

Exhibit A-2L-1         Class A-2L Temporary Regulation S Global Note

Exhibit A-3L-1         Class A-3L Temporary Regulation S Global Note

Exhibit A-4L-1         Class A-3L Temporary Regulation S Global Note

Exhibit A-1LA-2        Class A-1LA Permanent Regulation S Global Note

Exhibit A-1LB-2        Class A-1LB Permanent Regulation S Global Note

Exhibit A-2L-2         Class A-2L Permanent Regulation S Global Note

Exhibit A-3L-2         Class A-3L Permanent Regulation S Global Note

Exhibit A-4L-2         Class A-3L Permanent Regulation S Global Note

Exhibit A-1LA-3        Class A-1LA Rule 144A Global Note

Exhibit A-1LB-3        Class A-1LB Rule 144A Global Note

| | | |
|---|---|---|
| | Exhibit A-2L-3 | Class A-2L Rule 144A Global Note |
| | Exhibit A-3L-3 | Class A-3L Rule 144A Global Note |
| | Exhibit A-4L-3 | Class A-3L Rule 144A Global Note |
| | Exhibit A-1LA-4 | Class A-1LA Definitive Note |
| | Exhibit A-1LB-4 | Class A-1LB Definitive Note |
| | Exhibit A-2L-4 | Class A-2L Definitive Note |
| | Exhibit A-3L-4 | Class A-3L Definitive Note |
| | Exhibit A-4L-4 | Class A-3L Definitive Note |
| **Exhibit B** | **Class B Notes** | |
| | Exhibit B-1L-1 | Class B-1L Temporary Regulation S Global Note |
| | Exhibit B-1L-2 | Class B-1L Permanent Regulation S Global Note |
| | Exhibit B-1L-3 | Class B-1L Rule 144A Global Note |
| | Exhibit B-1L-4 | Class B-1L Definitive Note |
| **Exhibit C** | **Form of Investor Representation Letters** | |
| **Exhibit D** | **Form of Rule 144A Transfer Certificate** | |
| **Exhibit E** | **Form of Regulation S Transfer Certificate** | |
| **Exhibit F** | **Form of Exchange Certificate** | |
| **Exhibit G** | **Form of Non-U.S. Person Certificate** | |
| **Exhibit H** | **Form of Beneficial Owner Certificate** | |
| **Exhibit I** | **Form of Extension Notice** | |

US_EAST:6212215.13

**SCHEDULES**

| | |
|---|---|
| **Schedule A** | **Initial Portfolio Collateral** |
| **Schedule B** | **Standard & Poor's Industry Classification** |
| **Schedule C** | **S&P Minimum Average Recovery Rate** |
| **Schedule D** | **Rating Methodology for Standard & Poor's Rating** |
| **Schedule E** | **Moody's Correlation Factor Procedures** |
| **Schedule F** | **Moody's Weighted Average Rating Test Procedures** |
| **Schedule G** | **Forms of Opinions** |
| **Schedule H** | **Moody's Suggested Industry Classification** |
| **Schedule I** | **Weighted Average Life Table** |
| **Schedule J** | **Approved Pricing Services** |
| **Schedule K** | **Class X Amortization Schedule** |

**Schedule A**

Initial Portfolio Collateral

### Standard & Poor's Industry Classification

Corporate Obligations

| Asset Code | Asset Description | LOCAL | REGIONAL | GLOBAL |
|---|---|---|---|---|
| 0 | Zero Default Risk | | | X |
| 1 | Aerospace & Defense | | X | |
| 2 | Air transport | | | X |
| 3 | Automotive | | | X |
| 4 | Beverage & Tobacco | | X | |
| 5 | Radio & Television | | X | |
| 6 | Brokers, Dealers & Investment houses | X | | |
| 7 | Building & Development | X | | |
| 8 | Business equipment & services | | X | |
| 9 | Cable & satellite television | | X | |
| 10 | Chemicals & plastics | | | X |
| 11 | Clothing/textiles | | X | |
| 12 | Conglomerates | | | X |
| 13 | Containers & glass products | | X | |
| 14 | Cosmetics/toiletries | X | | |
| 15 | Drugs | | | X |
| 16 | Ecological services & equipment | | X | |
| 17 | Electronics/electrical | | | X |
| 18 | Equipment leasing | | X | |
| 19 | Farming/agriculture | X | | |
| 20 | Financial intermediaries | | X | |
| 21 | Food/drug retailers | X | | |
| 22 | Food products | | X | |
| 23 | Food service | | X | |
| 24 | Forest products | | | X |
| 25 | Health care | | X | |
| 26 | Home furnishings | X | | |
| 27 | Lodging & casinos | | X | |
| 28 | Industrial equipment | | X | |
| 29 | Insurance | X | | |
| 30 | Leisure goods/activities/movies | X | | |
| 31 | Nonferrous metals/minerals | | | X |
| 32 | Oil & gas | | | X |
| 33 | Publishing | X | | |
| 34 | Rail industries | | X | |
| 35 | Retailers (except food & drug) | X | | |
| 36 | Steel | | | X |
| 37 | Surface transport | X | | |

| 38 | Telecommunications | | | X |
|----|--------------------|---|---|---|
| 39 | Utilities | | X | |

## Corporate Structured Obligations

| Asset Code | Asset Description | LOCAL | REGIONAL | GLOBAL |
|------------|-------------------|-------|----------|--------|
| 50 | CDOs | | X | |

## Structured Obligations

| Asset Code | Asset Description |
|------------|-------------------|
| 51 | ABS Consumer |
| 52 | ABS Commercial |
| 53 | CMBS Diversified (Conduit and CTL) |
| 54 | CMBS (Large Loan, Single Borrower, and Single Property) |
| 55 | REITs and REOCs |
| 56 | RMBS A |
| 57 | RMBS B&C, HELs, HELOCs, and Tax Lien |
| 58 | Manufactured Housing |
| 59 | U.S. Agency (Explicitly Guaranteed) |
| 60 | Monoline/FER Guaranteed |
| 61 | Non-FER Company Guaranteed |
| 62 | FFELP Student Loans (Over 70% FFELP) |
| 63 | CLO of SME's |

B-2

<u>**Schedule C**</u>

<u>S&P Weighted Average Recovery Rate</u>

With respect to the CLO Securities, if the Portfolio Collateral is a Synthetic Security, the S&P Weighted Average Recovery Rate will be based on the Reference Obligation of such Synthetic Security.

With respect to the CLO Securities, if the Portfolio Collateral or Reference Obligation (other than an item of Portfolio Collateral guaranteed by a corporate guarantor or a monoline financial insurance company) is the senior-most tranche of securities issued by the issuer of such Portfolio Collateral:

| S&P Rating of Assets [*] | S&P Rating of Liabilities [**] | | | | | | |
|---|---|---|---|---|---|---|---|
| | AAA | AA | A | BBB | BB | B | CCC |
| "AAA" | 80.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| "AA-," "AA" or "AA+" | 70.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| "A-," "A" or "A+" | 60.0% | 65.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% |
| "BBB-," "BBB" or "BBB+" | 50.0% | 55.0% | 65.0% | 75.0% | 85.0% | 85.0% | 85.0% |

With respect to the CLO Securities, if the Portfolio Collateral or Reference Obligation (other than an item of Portfolio Collateral guaranteed by a corporate guarantor or a monoline financial insurance company) is not the senior-most tranche of securities issued by the issuer of such Portfolio Collateral:

| S&P Rating of Assets [*] | S&P Rating of Liabilities (%) [**] | | | | | | |
|---|---|---|---|---|---|---|---|
| | AAA | AA | A | BBB | BB | B | CCC |
| "AA-," "AA" or "AA+" | 55.0% | 65.0% | 75.0% | 80.0% | 80.0% | 80.0% | 80.0% |
| "A-," "A" or "A+" | 40.0% | 45.0% | 55.0% | 65.0% | 80.0% | 80.0% | 80.0% |
| "BBB-," "BBB" or "BBB+" | 30.0% | 35.0% | 40.0% | 45.0% | 50.0% | 60.0% | 70.0% |
| "BB-," "BB" or "BB+" | 10.0% | 10.0% | 10.0% | 25.0% | 35.0% | 40.0% | 50.0% |

---

[*]    Rating upon issuance of such item of Portfolio Collateral.
[**]    Current rating of the applicable Class of Notes.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| "B-," "B" or "B+" | 2.5% | 5.0% | 5.0% | 10.0% | 10.0% | 20.0% | 25.0% |
| "CCC+" and below | 0.0% | 0.0% | 0.0% | 0.0% | 2.5% | 5.0% | 5.0% |

**Schedule D**

**Rating Methodology for the Standard & Poor's Rating**

## S&P RATING

The S&P Rating of an item of Portfolio Collateral as of any date of determination shall be determined in accordance with the following methodology:

(i) If there is an issuer credit rating of the borrower of the item of Portfolio Collateral (the "Borrower"), or the guarantor who unconditionally and irrevocably guarantees the item of Portfolio Collateral (the "Guarantor") by S&P, the most current issuer credit rating for such Borrower or Guarantor;

(ii) (a) if there is not an issuer credit rating of the Borrower or its Guarantor by S&P, but there is a rating by S&P on a senior secured obligation of the Borrower or its Guarantor, then the S&P Rating of the item of Portfolio Collateral will be one subcategory below such rating; (b) if there is not a rating by S&P on a senior secured obligation of the Borrower or its Guarantor, but there is a rating by S&P on a senior unsecured obligation of the Borrower or its Guarantor, then the S&P Rating will be such rating; and (c) if there is not a rating by S&P on a senior obligation of the Borrower or its Guarantor, but there is a rating by S&P on a subordinated obligation of the Borrower or its Guarantor, then the S&P Rating will be two subcategories above such rating if such rating is "BBB-" or higher and will be one subcategory above such rating if such rating is "BB+" or lower;

(iii) if there is neither an issuer credit rating of the Borrower or its Guarantor by S&P nor a rating by S&P on an obligation of the Borrower or its Guarantor, then the S&P Rating may be determined using any one of the methods below:

(A) if an obligation of the Borrower or its Guarantor is publicly rated by Moody's, then the S&P Rating will be determined in accordance with the methodologies for establishing the Moody's Default Probability Rating, except that the S&P Rating of such obligation will be (1) one subcategory below the S&P equivalent of the rating assigned by Moody's if such security is rated "Baa3" or higher by Moody's and (2) two subcategories below the S&P equivalent of the rating assigned by Moody's if such security is rated "Ba1" or lower by Moody's; provided that item of Portfolio Collateral constituting no more than 5% of the Maximum Investment Amount (which concentration may be increased to 10% upon satisfaction of the Rating Condition with respect to S&P) may be given a S&P Rating based on a rating given by Moody's as provided in this subclause (a) (after giving effect to the addition of the relevant item of Portfolio Collateral, if applicable);

(B) if no other security or obligation of the Borrower or its Guarantor is rated by S&P or Moody's, then the Servicer may apply to S&P for a S&P credit rating estimate, which will be its S&P Rating; or

D-1

(C) (1) if such item of Portfolio Collateral (other than a Current-Pay Obligation) isnot rated by Moody's or S&P, no other security or obligation of the Borrower or its Guarantor is rated by S&P or Moody's and if the Servicer determines in its sole discretion based on information available to it after reasonable inquiry that such Borrower (x) is not subject to any bankruptcy or reorganization proceedings nor in default on any of its obligations (unless the subject of a good faith business dispute), (y) is a legally constituted corporate entity having the minimum legal, financial and operational infrastructure to carry on a definable business, deliver and sell a product or service and report its results in generally accepted accounting terms as verified by a reputable audit firm and (z) is not so vulnerable to adverse business, financial and economic conditions that default in its financial or other obligations is foreseeable in the near term if current operating trends continue, then the S&P Rating will be "B-"; provided that the Servicer must apply to S&P for a S&P credit rating on such Borrower within 30 days after the addition of the relevant item of Portfolio Collateral; provided, further, that items of Portfolio Collateral constituting no more than 5% of the Maximum Investment Amount may be given an S&P Rating based on this subclause (C) (after giving effect to the addition of the relevant item of Portfolio Collateral, if applicable) or (2) if such item of Portfolio Collateral is a Current-Pay Obligation and is not rated by Moody's or S&P and no other security or obligation of the Borrower or its Guarantor is rated by S&P or Moody's, then the S&P Rating will be "CCC-"; or

(iv)     if the item of Portfolio Collateral is a CLO Security (a) if the CLO Security has an S&P credit rating, then the S&P Rating shall be such credit rating; otherwise, (b) the S&P Rating shall be the written credit estimate issued by S&P for that item of Portfolio Collateral;

provided that if (i) the relevant Borrower or Guarantor or obligation is placed on any positive "credit watch" list by S&P, such rating will be increased by one rating subcategory or (ii) the relevant Borrower or Guarantor or obligation is placed on any negative "credit watch" list by S&P, such rating will be decreased by one rating subcategory.

Notwithstanding the foregoing, in the case of an  item of Portfolio Collateral that is a DIP Loan, the S&P Rating shall be (A) the rating assigned thereto by S&P if the rating is public, (B) the rating assigned by S&P if the rating is confidential, but only if all appropriate parties have provided written consent to its disclosure and use, (C) the rating assigned by S&P thereto through an estimated rating or (D) the rating assigned thereto by S&P in connection with the acquisition thereof upon the request of the Servicer. In the case of an item of Portfolio Collateral that is a PIK Security, Structured Finance Obligation or Synthetic Securities, the S&P Rating may not be determined pursuant to clause (iii)(A) above.

S&P Ratings for entities or obligations relevant hereunder other than Borrowers and items of Portfolio Collateral shall be determined in a corresponding manner.

**Schedule E**

Correlation Factor Procedures

The formula used to calculate the Correlation Factor shall be the formula delivered to the Servicer and the Trustee by Moody's.

**Schedule F**

Moody's Weighted Average Rating Factor Test Procedures

## CALCULATION OF WEIGHTED AVERAGE RATING

The "Weighted Average Rating" is determined by summing the products obtained by *multiplying* the principal amount of each item of Portfolio Collateral (excluding Defaulted Portfolio Collateral, but including Current Pay Obligations), *by* its Moody's Rating Factor, *dividing* such sum *by* the aggregate principal amount of all such securities (excluding Defaulted Portfolio Collateral, but including Current Pay Obligations) and rounding the result up to the nearest whole number. The "Moody's Rating Factor" relating to any Portfolio Collateral is the number set forth in the table below opposite the Rating of such Portfolio Collateral.

| Moody's Rating | Moody's Rating Factor | Moody's Rating | Moody's Rating Factor |
|---|---|---|---|
| Aaa | 1 | Ba1 | 940 |
| Aa1 | 10 | Ba2 | 1,350 |
| Aa2 | 20 | Ba3 | 1,766 |
| Aa3 | 40 | B1 | 2,220 |
| A1 | 70 | B2 | 2,720 |
| A2 | 120 | B3 | 3,490 |
| A3 | 180 | Caa1 | 4,770 |
| Baa1 | 260 | Caa2 | 6,500 |
| Baa2 | 360 | Caa3 | 8,070 |
| Baa3 | 610 | Ca | 10,000 |
|  |  | C | 10,000 |

For purposes of the Weighted Average Rating Test, any item of Portfolio Collateral issued or guaranteed by the United States government or any agency or instrumentality thereof is assigned a Moody's Rating Factor of 1. Short-term securities rated "P-1" will be assigned a Moody's Rating Factor equivalent to that of the senior unsecured rating of the issuer. Short-term securities rated "P-1" of an issuer that does not have such a senior unsecured rating will be assigned a Moody's Rating Factor of 120. For purposes of calculating the Weighted Average Rating and the Weighted Average Rating Test, no item of Defaulted Portfolio Collateral will be taken into account in either the denominator or numerator of such test.

The "Moody's Rating" of any item of Portfolio Collateral shall be determined pursuant to the following method:

(a)     Reserved.

(b)     With respect to any Portfolio Collateral that is a Moody's Senior-Secured Loan, the following:

(i)     if the borrower of such Portfolio Collateral, or a guarantor that unconditionally and irrevocably provides a guarantee solely for such Portfolio Collateral, has a Moody's corporate family rating, such rating (regardless of whether there is a published rating by Moody's on the Portfolio Collateral of such borrower held by the Issuer);

(ii)     if the borrower of such Portfolio Collateral does not have a Moody's corporate family rating, then the Moody's Rating of such Portfolio Collateral shall be deemed to be the rating thereof as may be assigned by Moody's upon the request of the Issuer or the Servicer;

(iii)     if the borrower of such Portfolio Collateral does not have a Moody's corporate family rating, but another security or obligation of the borrower is rated by Moody's and Moody's has not assigned a rating pursuant to subclause (ii) above, then the Moody's Rating of such Portfolio Collateral shall be determined in the following order: (a) if there is a rating on a senior unsecured obligation of the borrower, then the Moody's Rating of such Portfolio Collateral shall equal such rating; (b) if there is a rating on a senior secured obligation of the borrower, then the Moody's Rating of such Portfolio Collateral shall be one subcategory below such rating; or (c) if there is a rating on a subordinated obligation of the borrower, then the Moody's Rating of such Portfolio Collateral shall be one subcategory above such rating; or

(iv)     if such Portfolio Collateral is not rated by Moody's, and no other security or obligation of the borrower is rated by Moody's and neither the Issuer nor the Servicer obtains a Moody's Rating for such Portfolio Collateral pursuant to subclause (ii) above, then the Moody's Rating of such Portfolio Collateral may be determined using any one of the methods provided below (provided that no more than 5% of the Aggregate Principal Amount may have a Moody's Rating determined pursuant to subclauses (B), (C), (D) and (E) below):

(A)     (1)     if there is an issuer rating of the borrower by S&P (excluding a corporate credit estimate), then the Moody's Rating of such Portfolio Collateral shall be (a) one (1) subcategory below Moody's equivalent of such rating assigned by S&P if such rating is "BBB-" or higher by S&P and (b) two (2) subcategories below the Moody's equivalent of the rating assigned by S&P if such rating is "BB+" or lower by S&P; provided that no more than 10% of the Aggregate Principal Amount may be assigned a Moody's Rating as provided in this subclause (A) and clause (b)(iii);

(2)     if there is not an issuer rating of the borrower by S&P but a security or obligation of the borrower is rated by S&P (excluding a corporate credit estimate) (a "parallel security"), then the rating of such parallel security shall be determined in accordance with the methodology set forth in subclause (A)(1) above, and the Moody's Rating of such Portfolio Collateral shall be determined in accordance with the methodology set forth in clause (iii) above (for such purposes treating the parallel security as if it were rated by Moody's at the rating determined pursuant to this subclause (A)(2));

(B)     if the borrower of such Portfolio Collateral is a U.S. borrower and such Portfolio Collateral is a obligation of the borrower and (1) neither the borrower nor any of its Affiliates is subject to reorganization or bankruptcy proceedings, (2) no debt securities or obligations of the borrower are in default, (3) neither the borrower nor any of its Affiliates have defaulted on any debt during the past two (2) years, (4) the borrower has been in existence for the past five (5) years, (5) the borrower is current on any cumulative dividends, (6) the fixed-charge coverage ratio for the borrower exceeds 125% for each of the past two (2) fiscal years and for the most recent quarter, (7) the borrower had a net profit before tax in the past fiscal year and the most recent quarter, and (8) the annual financial statements of the borrower are unqualified and certified by a firm of independent accountants of international reputation, and quarterly statements are unaudited but signed by a corporate officer, the Moody's Rating of such Portfolio Collateral shall be "B3";

(C)     if the borrower of such Portfolio Collateral is a U.S. borrower and such Portfolio Collateral is a obligation of the borrower and (1) neither the borrower nor any of its Affiliates is subject to reorganization or bankruptcy proceedings and (2) no debt security or obligation of the borrower has been in default during the past two (2) years, the Moody's Rating of such Portfolio Collateral shall be "Caa2"; or

(D)     if any debt security or obligation of the borrower of such Portfolio Collateral has been in default during the past two (2) years, the Moody's Rating of such Portfolio Collateral shall be "Ca";

(c)     With respect to any Portfolio Collateral that is a Non Senior Secured Portfolio Loan, the following:

(i)     if such Portfolio Collateral is rated by Moody's, such rating;

(ii)     with respect to Portfolio Collateral issued by U.S. issuers if such Portfolio Collateral is not rated by Moody's but another security or obligation of the issuer is rated by Moody's, then the Moody's Rating of such Portfolio Collateral shall be determined as follows:

(A)     if there is a rating of an obligation of the issuer of the same priority, then the Moody's Rating of such Portfolio Collateral shall be such rating;

     (B)    if the rating is on a senior unsecured obligation of the issuer, then,

        (1)    if such Portfolio Collateral is a senior secured obligation of the issuer, then the Moody's Rating of such Portfolio Collateral shall be one subcategory above such rating, with a rating of "Aaa" remaining the same;

        (2)    if such rating is "B1" or higher and if such Portfolio Collateral is a subordinated obligation of the issuer, then the Moody's Rating of such Portfolio Collateral shall be two subcategories below such rating;

        (3)    if such rating is between "B2" and "Ca", inclusive, and if such Portfolio Collateral is a subordinated obligation of the issuer, then the Moody's Rating of such Portfolio Collateral shall be one subcategory below such rating; and

        (4)    if such rating is lower than "Ca" the Moody's Rating of such Portfolio Collateral shall be "C", if such Portfolio Collateral is a subordinated obligation of the issuer;

     (C)    if the rating is on a subordinated obligation of the issuer and if such Portfolio Collateral is a senior secured obligation of the issuer, then

        (1)    if the rating is "Baa3" or higher, the Moody's Rating of such Portfolio Collateral shall be one subcategory above such rating;

        (2)    if such rating is "B2" or higher but lower than "Baa3", the Moody's Rating of such Portfolio Collateral shall be two subcategories above such rating;

        (3)    if such rating is "B3", the Moody's Rating of such Portfolio Collateral shall be one subcategory above such rating; and

        (4)    if such rating is lower than "B3", the Moody's Rating of such Portfolio Collateral shall equal such rating;

     (D)    if there is a rating on a subordinated obligation of the issuer and if such Portfolio Collateral is a senior unsecured obligation of the issuer, then

        (1)    if such rating is "B3" or higher, the Moody's Rating of such Portfolio Collateral shall be one subcategory above such rating; and

        (2)    if such rating is lower than "B3", the Moody's Rating of such Portfolio Collateral shall equal such rating;

     (E)    if the rating is on a senior secured obligation of the issuer, then,

        (1)    if such rating is "Ca" or higher and such Portfolio Collateral is a senior unsecured obligation of the issuer, the Moody's Rating of such Portfolio Collateral shall be one subcategory below such rating;

(2)    if such rating is "Caa2" or higher and such Portfolio Collateral is a subordinated obligation of the issuer, the Moody's Rating of such Portfolio Collateral shall be two subcategories below such rating, and

(3)    if such rating is lower than "Caa2", the Moody's Rating of such Portfolio Collateral shall be "C";

(iii)    if such Portfolio Collateral is not rated by Moody's, and no other security or obligation of the issuer is rated by Moody's, then the Moody's Rating of such Portfolio Collateral may be determined using any one of the methods below:

(A)    (1)    if such Portfolio Collateral is rated by S&P (excluding a corporate credit estimate), then (a) if such rating is "BBB-" or higher, the Moody's Rating of such Portfolio Collateral shall be one subcategory below the Moody's equivalent of such rating assigned by S&P; and (b) if such rating is "BB+" or lower, the Moody's Rating of such Portfolio Collateral shall be two subcategories below the Moody's equivalent of such rating assigned by S&P; and

(2)    if such Portfolio Collateral is not rated by S&P but another security or obligation of the issuer is rated by S&P (excluding a corporate credit estimate) (a "parallel security"), then the Issuer or the Servicer on behalf of the Issuer may elect (a) first to establish the Moody's equivalent of the rating of such parallel security determined in accordance with the methodology set forth in clause (iii)(A)(1) above, in which case the Moody's Rating of the Portfolio Collateral shall be determined in accordance with the methodology set forth in clause (ii) above, treating the parallel security as if it were rated by Moody's at the rating determined pursuant to this subclause (2) or (b) to present such Portfolio Collateral to Moody's for an estimate of such Portfolio Collateral's rating factor as provided in clause (B) below;

(B)    if such Portfolio Collateral is not rated by Moody's and (x) no other security or obligation of the issuer is rated by Moody's or S&P, or (y) another security or obligation of the issuer is rated by S&P (excluding a corporate credit estimate) and the Issuer or the Servicer on behalf of the Issuer so elects as provided in clause (A)(2)(b) above, then the Issuer or the Servicer on behalf of the Issuer, may, within three (3) Business Days after the later of (a) the date on which the Issuer commits to purchase such Portfolio Collateral and (b) the date on which the Issuer is allocated a commitment to purchase such Portfolio Collateral, present such Portfolio Collateral to Moody's for an estimate of such Portfolio Collateral's rating factor, from which its corresponding Moody's Rating may be determined; provided that after such presentation and pending receipt from Moody's of such estimate, if the Servicer certifies to the Trustee that the Servicer believes that such estimate shall be at least "B3", then such Portfolio Collateral shall have a Moody's Rating of "B3"; and

(iv)    with respect to Portfolio Collateral that are Synthetic Securities, the Moody's Rating assigned in connection with the acquisition of such Synthetic Security.

(d)       Any item of Portfolio Collateral (other than CLO Securities) that is on any "credit watch" list with positive or negative implications by Moody's shall be deemed to have a rating one sub-category above or below, as the case may be, the actual rating of such item of Portfolio Collateral.   Any CLO Security with a Moody's rating of "Aaa" that is on any "credit watch" list with negative implications by Moody's shall be deemed to have a rating two sub-categories below the actual rating of such item of Portfolio Collateral.   Any CLO Security with a Moody's rating lower than "Aaa" that is on any "credit watch" list with positive or negative implications by Moody's shall be deemed to have a rating two sub-categories above or below, as the case may be, the actual rating of such item of Portfolio Collateral.

(e)       Any item of Portfolio Collateral that is a DIP Loan, shall be deemed to have a rating one sub-category below the actual rating of such item of Portfolio Collateral.

For the avoidance of doubt, all references to "obligor" or "borrower" in this Schedule F shall include such obligor or borrower and any guarantor of the obligations of such obligor or borrower under the applicable underlying instruments, and, for the purposes of determining the Moody's Rating of any item of Portfolio Collateral, the applicable Moody's Rating for such obligor or borrower shall be the rating of such obligor or borrower or of any guarantor of such obligor or borrower, whichever is higher.

**<u>Schedule G</u>**

<u>Forms of Opinions</u>

G-1

Moody's Suggested Industry Classification

| Idx | Industry |
|-----|----------|
| 1 | Aerospace & Defense |
| 2 | Automobile |
| 3 | Banking |
| 4 | Beverage, Food & Tobacco |
| 5 | Buildings & Real Estate |
| 6 | Chemicals, Plastics & Rubber |
| 7 | Containers, Packaging & Glass |
| 8 | Personal & Non-durable Consumer Projects (Manufacturing Only) |
| 9 | Diversified/Conglomerate Manufacturing |
| 10 | Diversified/Conglomerate Service |
| 11 | Diversified Natural Resources, Precious Metals & Minerals |
| 12 | Ecological |
| 13 | Electronics |
| 14 | Finance |
| 15 | Farming & Agriculture |
| 16 | Grocery |
| 17 | Healthcare, Education & Childcare |
| 18 | Home & Office Furnishings, Housewares & Durable Consumer Products |
| 19 | Hotels, Motels, Inns and Gaming |
| 20 | Insurance |
| 21 | Leisure, Amusement, Motion Pictures, Entertainment |
| 22 | Machinery (Non-agriculture, Non-construction, Non-electronic) |
| 23 | Mining, Steel, Iron & Non-precious Metals |
| 24 | Oil & Gas |
| 25 | Personal, Food & Misc. Services |
| 26 | Printing & Publishing |
| 27 | Cargo Transport |
| 28 | Retail Stores |
| 29 | Telecommunications |
| 30 | Textiles & Leather |
| 31 | Personal Transportation |
| 32 | Utilities |
| 33 | Broadcasting & Entertainment |

Weighted Average Life Table

| Due Period from Closing Date | Due Period from each Extension Effective Date | Maximum Weighted Average Life |
|---|---|---|
| First | not applicable | 8.00 years |
| Second | not applicable | 8.00 years |
| Third | not applicable | 8.00 years |
| Fourth | not applicable | 8.00 years |
| Fifth | First | 7.75 years |
| Sixth | Second | 7.50 years |
| Seventh | Third | 7.25 years |
| Eighth | Fourth | 7.00 years |
| Ninth | Fifth | 6.75 years |
| Tenth | Sixth | 6.50 years |
| Eleventh | Seventh | 6.25 years |
| Twelfth | Eighth | 6.00 years |
| Thirteenth | Ninth | 5.75 years |
| Fourteenth | Tenth | 5.50 years |
| Fifteenth | Eleventh | 5.25 years |
| Sixteenth | Twelfth | 5.00 years |
| Seventeenth | Thirteenth | 4.75 years |
| Eighteenth | Fourteenth | 4.50 years |
| Nineteenth | Fifteenth | 4.25 years |
| Twentieth and Thereafter | Sixteenth and Thereafter | 4.00 years |

US_EAST:6221071.7

Approved Pricing Services

**With Respect to Portfolio Loans:**

Loan Pricing Corporation
135 West 50th Street
New York, NY 10020
Tel: (212) 489-5455
http://www.loanpricing.com

Mark-it Partners
7 Times Square
Suite 2503
New York, NY 10036
Tel: (212) 931-4900
http://www.markit.com

## Class X Amortization Schedule

| Payment Date | Class X Principal Payment | Remaining Balance |
|---|---|---|
| 11/1/2006 | 0 | 14,000,000 |
| 2/1/2007 | 0 | 14,000,000 |
| 5/1/2007 | 0 | 14,000,000 |
| 8/1/2007 | 0 | 14,000,000 |
| 11/1/2007 | 583,333 | 13,416,667 |
| 2/1/2008 | 583,333 | 12,833,333 |
| 5/1/2008 | 583,333 | 12,250,000 |
| 8/1/2008 | 583,333 | 11,666,667 |
| 11/1/2008 | 583,333 | 11,083,333 |
| 2/1/2009 | 583,333 | 10,500,000 |
| 5/1/2009 | 583,333 | 9,916,667 |
| 8/1/2009 | 583,333 | 9,333,333 |
| 11/1/2009 | 583,333 | 8,750,000 |
| 2/1/2010 | 583,333 | 8,166,667 |
| 5/1/2010 | 583,333 | 7,583,333 |
| 8/1/2010 | 583,333 | 7,000,000 |
| 11/1/2010 | 583,333 | 6,416,667 |
| 2/1/2011 | 583,333 | 5,833,333 |
| 5/1/2011 | 583,333 | 5,250,000 |
| 8/1/2011 | 583,333 | 4,666,667 |
| 11/1/2011 | 583,333 | 4,083,333 |
| 2/1/2012 | 583,333 | 3,500,000 |
| 5/1/2012 | 583,333 | 2,916,667 |
| 8/1/2012 | 583,333 | 2,333,333 |
| 11/1/2012 | 583,333 | 1,750,000 |
| 2/1/2013 | 583,333 | 1,166,667 |
| 5/1/2013 | 583,333 | 583,333 |
| 8/1/2013 | 583,333 | 0 |

## Annex A
### Methodology for Calculating the Amount of an O/C Redemption

For any Payment Date with respect to which one or more of the Overcollateralization Tests are not satisfied, the amount (the "O/C Redemption Amount") of Available Adjusted Collateral Interest Collections or Available Adjusted Collateral Principal Collections (as applicable) to be applied to the payment of principal of the Class A Notes and the Class B-1L Notes as an O/C Redemption (pursuant to the relevant clause of Section 11.2) in order to satisfy such Overcollateralization Test(s) shall be calculated by the Issuer according to the following formula:

$$\text{If } I >= ((L \times R) - A) / (R); \text{ then}$$

$$\text{O/C Redemption Amount} = ((L \times R) - A) / (R); \text{ otherwise}$$

$$\text{O/C Redemption Amount} = I + (((L-I) \times R) - A) / (R - 1)$$

On any Payment Date with respect to which more than one of the Overcollateralization Tests is not satisfied:

(a)  the O/C Redemption Amount required to satisfy the Overcollateralization Test relating to the Class A Notes on such Payment Date shall be reduced by the amount of cash in the Collection Account that was applied to the making of an O/C Redemption that results from the failure of the Overcollateralization Test relating to the Class A Notes with respect to such Payment Date; and

(b)  the O/C Redemption Amount required to satisfy the Overcollateralization Test relating to the Class B-1L Notes on such Payment Date shall be reduced by the amount of cash in the Collection Account that was applied to the making of an O/C Redemption that results from the failure of the Overcollateralization Test or Tests relating to the Class A Notes with respect to such Payment Date.

For purposes of applying the foregoing formula:

(a)  Class A Note O/C Test Redemptions.  In connection with an O/C Redemption required to satisfy the Overcollateralization Test relating to the Class A Notes:

"L" (for "liabilities") shall be the Aggregate Principal Amount of the Class A Notes (including for this purpose any unpaid Periodic Rate Shortfall Amounts with respect to the Class A Notes) as of the related date of calculation;

"R" shall be the required Class A Overcollateralization Percentage;

"A" (for "assets") shall be the Aggregate Par Amount plus unpaid Purchased Accrued Interest as of the related date of calculation; and

"I" (for "interest collections")  shall be the amount of Collateral Interest Collections available to cure the Class A Overcollateralization Test.

(b)  Class B-1L Note O/C Test Redemptions.  In connection with an O/C Redemption required to satisfy the Overcollateralization Test relating to the Class B-1L Notes:

"<u>L</u>" (for "liabilities") shall be the Aggregate Principal Amount of the Class A Notes and the Class B-1L Notes (including for this purpose any unpaid Periodic Rate Shortfall Amounts with respect to the Class A Notes and the Class B-1L Notes) as of the related Calculation Date;

"<u>R</u>" shall be the required Class B-1L Overcollateralization Percentage;

"<u>A</u>" (for "assets") shall be the Aggregate Par Amount *plus* unpaid Purchased Accrued Interest *less* the Overcollateralization Haircut Amount as of the related date of calculation; and

"<u>I</u>" (for "interest collections")  shall be the amount of Collateral Interest Collections available to cure the Class B-1L Overcollateralization Test.

For purposes of making each of the foregoing calculations, the provisions in the Overcollateralization Ratio Adjustment definition shall apply.

## Annex B
### Methodology for Calculating the Interest Coverage Test Redemption

For any Payment Date with respect to which the Interest Coverage Test is not satisfied, the amount (the "O/C Redemption Amount") of Available Adjusted Collateral Interest Collections or Available Adjusted Collateral Principal Collections (as applicable) to be applied to the payment of principal of the Class A Notes as an O/C Redemption (pursuant to the relevant clause of Section 11.2) in order to satisfy such Interest Coverage Test shall be calculated by the Issuer according to the following formula:

$$\text{O/C Redemption Amount} = [L - 4 \times (I - PRA) / (R)]$$

For purposes of applying the foregoing formula:

(a)    I/C Test Redemptions.  In connection with an O/C Redemption required to satisfy the Interest Coverage Test:

"L" (for "liabilities") shall be the Aggregate Principal Amount of the Class A Notes (including for this purpose any unpaid Periodic Rate Shortfall Amounts with respect to the Class A Notes) as of the related Calculation Date;

"R" shall be the required Interest Coverage Ratio;

"PRA" – shall be the Periodic Reserve Amount (but not including amounts payable to the Class B-1L Notes);

"I" (for "interest collections") shall be the amount of Collateral Interest Collections as of any date plus Scheduled Distributions representing Collateral Interest Collections to be received during the next Due Period (plus, if the amount of Collateral Interest Collections is not calculated on a Calculation Date, Scheduled Distributions for the remainder of the then current Due Period) other than Collateral Interest Collections (including deferred interest thereon) scheduled to be received on any Pledged Security that is not paying or expected to pay current interest with respect to such Due Period, divided by two.

## Annex C
### Methodology for Calculating the Amount Required
### to Satisfy the Additional Collateral Deposit Requirement

For any Payment Date with respect to which the Additional Collateral Deposit Requirement is a positive number, the amount (the "Additional Coverage Amount") of Available Adjusted Collateral Interest Collections to be applied in accordance with the Indenture shall be calculated by the Issuer according to the following formula:

$$\text{Additional Coverage Amount} = (L \times R) - A$$

For purposes of applying the foregoing formula:

"L" (for "liabilities") shall be, as of the related Calculation Date, the Aggregate Principal Amount of the Class A Notes and the Class B-1L Notes plus any unpaid Periodic Rate Shortfall Amounts plus, if the amount determined under clause (2) under "Assets" below is a negative number, such amount (after giving effect to the amount to be applied to any O/C Redemption of the Class A Notes and the Class B-1L Notes to satisfy the Overcollateralization Tests and the Interest Coverage Test (if applicable) on the related Payment Date);

"R" shall be the percentage described in clause (b) of the definition of the Additional Collateral Deposit Requirement; and

"A" (for "assets") shall be the sum of:

(1)     the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate as of the related Calculation Date; *plus*

(2)     the sum of the Balance of Eligible Investments and cash in the Collection Account representing Collateral Principal Collections plus the Balance of Eligible Investments and cash in the Initial Deposit Account, if any, plus unpaid Purchased Accrued Interest as of such date; *less*

(3)     the Overcollateralization Haircut Amount (if any).

For purposes of making the foregoing calculations, no item of Equity Portfolio Collateral shall be included as Portfolio Collateral.  In addition for purposes of this requirement, (i) with respect to Defaulted Portfolio Collateral as to which there has occurred a payment default or an event of bankruptcy, only the portion equal to the lesser of (a) the Market Value of such item of Defaulted Portfolio Collateral and (b) the Applicable Percentage multiplied by the Principal Balance of such item of Portfolio Collateral, shall be included as Portfolio Collateral and (ii) with respect to items of Discount Portfolio Collateral, only an amount equal to the original purchase price of such item of Discount Portfolio Collateral shall be included as Portfolio Collateral.  For purposes of calculating the Additional Collateral Deposit Requirement, to the extent an item of Portfolio Collateral is considered Defaulted Portfolio Collateral, Discount Portfolio Collateral and/or is included in the Overcollateralization Haircut Amount, such item of Portfolio Collateral will not be discounted multiple times, but will be treated in the category that results in the largest discount to the par amount of the Portfolio Collateral.

## Annex D
### Collateral Quality Formula and Matrix

For purposes of calculating the Collateral Quality Formula, (i) the Moody's Asset Correlation Test will be the lesser of 4.0% and the Moody's Correlation Factor provided that it is a number greater than or equal to 3.0%, (ii) the Minimum Average Recovery Rate Test with respect to Moody's will be the lesser of 45.5% and Moody's Minimum Average Recovery Rate provided that it is a number greater than or equal to 40.0%, (iii) the Moody's Weighted Average Rating Test will be the greater of 1,500 and Moody's Weighted Average Rating provided that it is a number less than or equal to 2,500 and (iv) the Weighted Average Margin Test will be the greater of 1.50% and an amount equal to: ((a) 205.1213 *plus* (b) 1800.774 *times C plus* (c) 0.145185 *times* W *plus* (d) -733.949 *times* R where:

W = Moody's Weighted Average Rating
R = Moody's Minimum Average Recovery Rate
C = Moody's Correlation Factor

| Row | Maximum Moody's Correlation Factor | Maximum Moody's Weighted Average Rating | Minimum Weighted Average Margin | Moody's Minimum Average Recovery Rate |
|---|---|---|---|---|
| 1 | 3.00% | 1500 | 150 | 45.50% |
| 2 | 3.00% | 1500 | 175 | 40.90% |
| 3 | 3.25% | 1500 | 175 | 41.50% |
| 4 | 3.50% | 1500 | 175 | 42.15% |
| 5 | 3.75% | 1500 | 175 | 42.65% |
| 6 | 4.00% | 1500 | 175 | 43.15% |
| 7 | 3.00% | 1500 | 180 | 40.00% |
| 8 | 3.25% | 1500 | 183 | 40.00% |
| 9 | 3.50% | 1500 | 187 | 40.00% |
| 10 | 3.75% | 1500 | 190 | 40.00% |
| 11 | 4.00% | 1500 | 193 | 40.00% |
| 12 | 4.00% | 1545 | 200 | 40.00% |
| 13 | 4.00% | 1700 | 225 | 40.00% |
| 14 | 3.00% | 1750 | 217 | 40.00% |
| 15 | 3.25% | 1750 | 220 | 40.00% |
| 16 | 3.50% | 1750 | 225 | 40.00% |
| 17 | 3.75% | 1750 | 230 | 40.00% |
| 18 | 4.00% | 1750 | 233 | 40.00% |
| 19 | 4.00% | 1840 | 240 | 40.90% |
| 20 | 4.00% | 1855 | 250 | 40.00% |
| 21 | 4.00% | 1915 | 255 | 40.90% |
| 22 | 3.00% | 2000 | 215 | 45.50% |
| 23 | 3.00% | 2000 | 255 | 40.00% |
| 24 | 3.25% | 2000 | 260 | 40.00% |
| 25 | 3.50% | 2000 | 265 | 40.00% |
| 26 | 3.75% | 2000 | 270 | 40.00% |
| 27 | 4.00% | 2000 | 275 | 40.00% |
| 28 | 4.00% | 2000 | 275 | 40.00% |
| 29 | 3.15% | 2025 | 220 | 45.50% |

| | | | | |
|---|---|---|---|---|
| 30 | 3.00% | 2025 | 221 | 45.00% |
| 31 | 3.40% | 2025 | 232 | 44.50% |
| 32 | 3.25% | 2025 | 233 | 44.00% |
| 33 | 3.75% | 2030 | 235 | 45.00% |
| 34 | 4.00% | 2045 | 254 | 43.50% |
| 35 | 3.00% | 2050 | 221 | 45.50% |
| 36 | 3.25% | 2050 | 233 | 44.50% |
| 37 | 3.75% | 2050 | 234 | 45.50% |
| 38 | 3.00% | 2050 | 236 | 43.50% |
| 39 | 3.85% | 2050 | 240 | 45.00% |
| 40 | 3.00% | 2050 | 244 | 42.50% |
| 41 | 3.25% | 2050 | 249 | 42.50% |
| 42 | 3.50% | 2050 | 253 | 42.50% |
| 43 | 3.00% | 2075 | 225 | 45.45% |
| 44 | 3.25% | 2075 | 233 | 45.00% |
| 45 | 3.00% | 2075 | 238 | 43.75% |
| 46 | 3.90% | 2075 | 240 | 45.50% |
| 47 | 3.50% | 2075 | 262 | 42.00% |
| 48 | 3.75% | 2075 | 282 | 40.00% |
| 49 | 3.00% | 2100 | 228 | 45.50% |
| 50 | 3.50% | 2100 | 250 | 44.00% |
| 51 | 3.75% | 2100 | 254 | 44.00% |
| 52 | 3.25% | 2100 | 255 | 42.75% |
| 53 | 3.35% | 2100 | 255 | 42.90% |
| 54 | 3.00% | 2100 | 263 | 41.00% |
| 55 | 3.00% | 2120 | 252 | 42.15% |
| 56 | 3.25% | 2120 | 252 | 43.65% |
| 57 | 3.25% | 2120 | 260 | 41.50% |
| 58 | 3.50% | 2125 | 243 | 45.50% |
| 59 | 3.30% | 2125 | 245 | 44.50% |
| 60 | 3.65% | 2125 | 255 | 43.75% |
| 61 | 4.00% | 2125 | 255 | 44.75% |
| 62 | 3.00% | 2125 | 270 | 40.00% |
| 63 | 3.50% | 2125 | 270 | 41.25% |
| 64 | 3.00% | 2135 | 263 | 41.50% |
| 65 | 3.00% | 2135 | 273 | 40.00% |
| 66 | 3.20% | 2140 | 257 | 42.75% |
| 67 | 3.45% | 2145 | 247 | 45.00% |
| 68 | 3.00% | 2150 | 235 | 45.50% |
| 69 | 3.65% | 2150 | 250 | 44.95% |
| 70 | 3.50% | 2150 | 258 | 43.75% |
| 71 | 4.00% | 2150 | 278 | 42.00% |
| 72 | 3.50% | 2150 | 280 | 40.50% |
| 73 | 4.00% | 2150 | 300 | 40.00% |
| 74 | 3.35% | 2155 | 245 | 45.15% |
| 75 | 3.85% | 2155 | 261 | 43.85% |
| 76 | 3.20% | 2155 | 261 | 42.45% |
| 77 | 3.25% | 2160 | 245 | 45.00% |
| 78 | 3.75% | 2160 | 265 | 43.50% |
| 79 | 3.40% | 2160 | 271 | 41.65% |

| | | | | |
|---|---|---|---|---|
| 80 | 3.15% | 2165 | 241 | 45.30% |
| 81 | 3.30% | 2165 | 257 | 43.45% |
| 82 | 3.90% | 2165 | 281 | 41.65% |
| 83 | 3.45% | 2170 | 246 | 45.45% |
| 84 | 3.35% | 2170 | 250 | 44.65% |
| 85 | 3.80% | 2170 | 270 | 42.95% |
| 86 | 3.20% | 2170 | 272 | 41.05% |
| 87 | 3.00% | 2175 | 240 | 45.50% |
| 88 | 3.75% | 2175 | 253 | 45.25% |
| 89 | 3.50% | 2175 | 265 | 43.25% |
| 90 | 3.00% | 2175 | 270 | 40.75% |
| 91 | 4.00% | 2175 | 295 | 40.00% |
| 92 | 3.35% | 2180 | 255 | 44.25% |
| 93 | 3.25% | 2180 | 257 | 43.65% |
| 94 | 3.85% | 2180 | 280 | 41.95% |
| 95 | 3.55% | 2180 | 283 | 40.75% |
| 96 | 3.25% | 2185 | 251 | 44.60% |
| 97 | 3.70% | 2185 | 267 | 43.45% |
| 98 | 3.25% | 2185 | 272 | 42.00% |
| 99 | 3.40% | 2185 | 281 | 40.80% |
| 100 | 3.15% | 2190 | 245 | 45.25% |
| 101 | 3.95% | 2190 | 261 | 45.00% |
| 102 | 3.75% | 2190 | 265 | 44.00% |
| 103 | 3.15% | 2190 | 275 | 41.00% |
| 104 | 3.20% | 2195 | 247 | 45.15% |
| 105 | 3.75% | 2195 | 260 | 44.75% |
| 106 | 3.20% | 2195 | 269 | 42.15% |
| 107 | 3.50% | 2195 | 276 | 41.85% |
| 108 | 3.00% | 2200 | 242 | 45.50% |
| 109 | 3.30% | 2200 | 250 | 44.85% |
| 110 | 3.00% | 2200 | 263 | 42.50% |
| 111 | 4.00% | 2200 | 300 | 40.00% |
| 112 | 3.50% | 2210 | 267 | 43.25% |
| 113 | 3.00% | 2225 | 252 | 44.45% |
| 114 | 3.75% | 2225 | 258 | 45.50% |
| 115 | 3.00% | 2225 | 265 | 42.75% |
| 116 | 4.00% | 2230 | 293 | 41.45% |
| 117 | 3.20% | 2235 | 262 | 43.65% |
| 118 | 3.75% | 2240 | 265 | 45.15% |
| 119 | 3.00% | 2250 | 250 | 45.50% |
| 120 | 3.50% | 2250 | 258 | 45.50% |
| 121 | 3.15% | 2250 | 273 | 42.15% |
| 122 | 3.80% | 2250 | 273 | 44.20% |
| 123 | 3.00% | 2250 | 295 | 40.00% |
| 124 | 3.45% | 2250 | 295 | 40.00% |
| 125 | 3.25% | 2250 | 300 | 40.00% |
| 126 | 3.50% | 2250 | 300 | 40.75% |
| 127 | 3.75% | 2250 | 300 | 41.25% |
| 128 | 4.00% | 2250 | 300 | 42.00% |
| 129 | 3.00% | 2270 | 250 | 45.50% |

| | | | | |
|---|---|---|---|---|
| 130 | 4.00% | 2275 | 268 | 45.50% |
| 131 | 3.25% | 2275 | 269 | 43.85% |
| 132 | 3.50% | 2275 | 292 | 41.25% |
| 133 | 3.65% | 2280 | 270 | 44.70% |
| 134 | 3.45% | 2285 | 280 | 42.95% |
| 135 | 3.85% | 2290 | 271 | 45.25% |
| 136 | 3.15% | 2295 | 258 | 45.25% |
| 137 | 3.00% | 2300 | 263 | 44.25% |
| 138 | 3.50% | 2300 | 271 | 44.50% |
| 139 | 3.35% | 2300 | 286 | 42.05% |
| 140 | 4.00% | 2300 | 289 | 43.25% |
| 141 | 3.70% | 2300 | 295 | 41.75% |
| 142 | 3.35% | 2325 | 272 | 44.35% |
| 143 | 3.50% | 2325 | 294 | 41.75% |
| 144 | 3.25% | 2350 | 275 | 44.25% |
| 145 | 4.00% | 2350 | 289 | 44.25% |
| 146 | 3.50% | 2375 | 274 | 45.50% |
| 147 | 3.25% | 2375 | 283 | 43.50% |
| 148 | 3.50% | 2400 | 278 | 45.35% |
| 149 | 3.00% | 2400 | 297 | 41.50% |
| 150 | 3.00% | 2425 | 275 | 45.00% |
| 151 | 4.00% | 2450 | 300 | 45.50% |
| 152 | 3.50% | 2450 | 300 | 43.20% |
| 153 | 3.25% | 2475 | 281 | 45.50% |
| 154 | 3.75% | 2475 | 300 | 45.50% |
| 155 | 3.00% | 2500 | 300 | 44.00% |
| 156 | 3.25% | 2500 | 300 | 44.50% |
| 157 | 3.50% | 2500 | 300 | 45.25% |

**EXECUTION COPY**

**ROCKWALL CDO LTD.**

Issuer

**ROCKWALL CDO (DELAWARE) CORP.**

Co-Issuer

AND

**STATE STREET BANK AND TRUST**

Successor Trustee

**AMENDMENT NO. 1**

**TO**

**INDENTURE**

Dated as of October 2, 2007

_____

**COLLATERALIZED DEBT OBLIGATIONS**

_____

OHS West:260253246.4

**THIS AMENDMENT NO. 1 TO INDENTURE** (the "Amendment"), dated as of October 2, 2007, among Rockwall CDO Ltd. (the "Issuer"), Rockwall CDO (Delaware) Corp. (the "Co-Issuer") and State Street Bank and Trust, as successor in interest to Investors Bank & Trust Company (the "Successor Trustee"), hereby amends the Indenture, dated as of May 10, 2006, among the Issuer, the Co-Issuer and the Successor Trustee (the "Indenture").

<u>W I T N E S S E T H</u>

WHEREAS, the Issuer, the Co-Issuer and JPMorgan Chase Bank, National Association (the "Original Trustee") entered into the Indenture;

WHEREAS, the Issuer, the Co-Issuer and the Successor Trustee entered into the Supplemental Indenture No. 2007-1, dated as of June 8, 2007, which replaced the Original Trustee with the Successor Trustee;

WHEREAS, the Issuers and the Noteholders desire to amend certain definitions contained in the Indenture;

WHEREAS, Highland Capital Management, L.P. acts as Servicer with respect to the Collateral;

WHEREAS, Section 8.2 of the Indenture provides that the Indenture may be amended by the Issuer, Co-Issuer and the Trustee with the consent of the Servicer, the Requisite Noteholders adversely affected thereby and a Majority of Preferred Shares (as such term is defined in the Paying and Transfer Agency Agreement, dated as of May 10, 2006, among the Issuer and the Successor Trustee) affected thereby;

WHEREAS, the necessary consents pursuant to the preceding paragraph have been obtained;

WHEREAS, Section 8.2 of the Indenture provides that the Ratings Agencies shall confirm that this Amendment to the Indenture will not cause the rating of any Class of Notes to be reduced or withdrawn; and

WHEREAS, the Ratings Agencies have confirmed that this Amendment to the Indenture will not cause the rating of any Class of Notes to be reduced or withdrawn.

NOW, THEREFORE, the parties hereto agree as follows:

SECTION 1.   <u>Defined Terms</u>.

For purposes of this Amendment, all capitalized terms which are used but not otherwise defined herein shall have the respective meanings assigned to such terms in the Indenture.

SECTION 2.   Amendment.

Section 1.1 of the Indenture is hereby amended to replace in its entirety the definition of Servicing Fee Portion with the following:

"*Servicing Fee Portion*":  100% minus (a) for any Payment Date from the Closing Date until (and including) the Payment Date in February 2008, the Class II Preferred Share Percentage for such Payment Date and (b) for any other Payment Date, a percentage (between 0% and 100%) selected by the Servicer in its sole discretion and reported to the Trustee in writing on or before the related Determination Date; provided that, with respect to the Payment Date in May 2008, such percentage shall be a minimum of the product of (i) the Class II Preferred Share Percentage for such Payment Date and (ii) 3.3%.

SECTION 3.   Effect of Amendment.

Upon execution of this Amendment, the Indenture shall be, and be deemed to be, modified and amended in accordance herewith and the respective rights, limitations, obligations, duties, liabilities and immunities of the Issuer, Co-Issuer and the Successor Trustee shall hereafter be determined, exercised and enforced subject in all respects to such modifications and amendments, and all the terms and conditions of this Amendment shall be deemed to be part of the terms and conditions of the Indenture for any and all purposes.  Except as modified and expressly amended by this Amendment, the Indenture is in all respects ratified and confirmed, and all the terms, provisions and conditions thereof shall be and remain in full force and effect.

SECTION 4.   Binding Effect.

The provisions of this Amendment shall be binding upon and inure to the benefit of the Issuer, the Co-Issuer and the Successor Trustee and each of their respective successors and assigns.

SECTION 5.   GOVERNING LAW.

THIS AMENDMENT TO THE INDENTURE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO AGREEMENTS MADE AND TO BE PERFORMED THEREIN WITHOUT REFERENCE TO ITS CONFLICT OF LAW PROVISIONS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

SECTION 6.   Severability of Provisions.

If any one or more of the provisions or terms of this Amendment shall be for any reason whatsoever held invalid, then such provisions or terms shall be deemed severable from the remaining provisions or terms of this Amendment and shall in no way affect the validity or enforceability of the other provisions or terms of this Amendment.

SECTION 7.    <u>Section Headings</u>.

The section headings herein are for convenience of reference only, and shall not limit or otherwise affect the meaning hereof.

SECTION 8.    <u>Counterparts</u>.

This Amendment may be executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

[Signature pages follow]

IN WITNESS WHEREOF, the Issuer, Co-Issuer and the Successor Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized, all as of the day and year first above written.

ROCKWALL CDO LTD.,
as Issuer

By:_____

    Name:

    Title:

Guy Major
Director

ROCKWALL CDO (DELAWARE) CORP.,
as Co-Issuer

By:_____

    Name:

    Title:

STATE STREET BANK AND TRUST, as
Successor Trustee

By:_____

    Name:

    Title:

IN WITNESS WHEREOF, the Issuer, Co-Issuer and the Successor Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized, all as of the day and year first above written.

ROCKWALL CDO LTD.,
as Issuer

By:_____
    Name:
    Title:

ROCKWALL CDO (DELAWARE) CORP.,
as Co-Issuer

By:_____
    Name:   Donald J. Puglisi
    Title:   President

STATE STREET BANK AND TRUST, as
Successor Trustee

By:_____
    Name:
    Title:

IN WITNESS WHEREOF, the Issuer, Co-Issuer and the Successor Trustee have caused their names to be signed hereto by their respective officers thereunto duly authorized, all as of the day and year first above written.

ROCKWALL CDO LTD.,
as Issuer

By:_____
    Name:
    Title:

ROCKWALL CDO (DELAWARE) CORP.,
as Co-Issuer

By:_____
    Name:
    Title:

STATE STREET BANK AND TRUST, as Successor Trustee

By:_____
    Name:
    Title:    **Brian Peterson**
             **Director**

**CONSENTED AND AGREED TO BY**:

Name: _____ (Todd) Travers
Title: _CEO: CIO_____
E-mail address: tatravers @hcmlp.con
Aggregate Outstanding Amount/Face Amount of Class II
Preference Shares Held: 45,000,000_____
CUSIP/ISIN: ~~US3RUNMYRXXXX~~ 77426119

HIGHLAND CAPITAL MANAGEMENT, L.P., as
Servicer

By: _____
   Name:
   Title:           Todd Travers
               Senior Portfolio Manager
            Highland Capital Management, L.P.

*Execution Copy*

**ROCKWALL CDO II LTD.,**
**Issuer**

**ROCKWALL CDO II (DELAWARE) CORP.,**
**Co-Issuer**

**and**

**INVESTORS BANK & TRUST COMPANY,**
**as Trustee and as Securities Intermediary**

**INDENTURE**

**Dated as of May 9, 2007**

INDENTURE, dated as of May 9, 2007, among ROCKWALL CDO II LTD., an exempted limited liability company incorporated under the laws of the Cayman Islands (the "Company" and, together with its permitted successors and assigns, the "Issuer"), ROCKWALL CDO II (DELAWARE) CORP., a Delaware corporation (the "Co-Issuer" and, together with the Issuer, the "Co-Issuers") and INVESTORS BANK & TRUST COMPANY, as trustee (together with its permitted successors in the trusts hereunder, the "Trustee") and as Securities Intermediary.

PRELIMINARY STATEMENT

The Co-Issuers are duly authorized to execute and deliver this Indenture to provide for the Notes (other than the Class B-2L Notes and the Combination Notes) issuable as provided in this Indenture. The Issuer is also duly authorized to execute and deliver this Indenture to provide for the Class B-2L Notes and the Combination Notes issuable as provided in this Indenture. All representations, warranties, covenants and agreements made by the Co-Issuers herein are for the benefit and security of the Noteholders and the Trustee. The Co-Issuers are entering into this Indenture, and the Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

It is a condition of issuance of the Notes that the Class A-1LA Notes be rated "AAA" by Standard & Poor's and "Aaa" by Moody's, the Class A-1LB Notes be rated "AAA" by Standard & Poor's and "Aaa" by Moody's, the Class A-2L Notes be rated at least "AA" by Standard & Poor's and at least "Aa2" by Moody's, the Class A-3L Notes be rated at least "A" by Standard & Poor's and at least "A2" by Moody's, the Class B-1L Notes be rated at least "BBB" by Standard & Poor's and at least "Baa2" by Moody's, the Class B-2L Notes be rated at least "BB" by Standard & Poor's and at least "Ba2" by Moody's and the Combination Notes be rated at least "Baa2" by Moody's with respect to the Rated Balance and the Rated Coupon of the Combination Notes. With respect to the Notes, such ratings by Standard & Poor's address solely the likelihood of the timely payment of the Periodic Interest Amount (which consists of interest accrued on the Aggregate Principal Amount of each applicable Class of Notes at the Applicable Periodic Rate) and the ultimate payment of the Aggregate Principal Amount in the case of the Class A-1LA Notes, the Class A-1LB Notes and the Class A-2L Notes, and the ultimate payment of the Cumulative Interest Amount and the Aggregate Principal Amount in the case of the Class A-3L Notes, the Class B-1L Notes and the Class B-2L Notes. Such ratings by Moody's address the ultimate cash receipt of all required payments as provided by the governing documents, and are based on the expected loss to the Noteholders of each Class relative to the promise of receiving the present value of such payments. Notwithstanding the foregoing, the obligation to make any Extension Bonus Payment will not be rated by the Rating Agencies.

All things necessary to make this Indenture a valid agreement of the Co-Issuers in accordance with its terms have been done.

GRANTING CLAUSES

The Issuer hereby Grants to the Trustee, for the benefit and security of the Holders of the Notes (including the Combination Notes), the Trustee, the Paying and Transfer

1

Agent, the Default Swap Counterparties, each Hedge Counterparty, the Servicer, the Collateral Administrator and the Securities Intermediary (collectively, the "Secured Parties"), all of its right, title and interest, whether now owned or hereafter acquired, in, to and under the following: (a) the Initial Portfolio Collateral listed in Schedule A to this Indenture, all payments thereon or with respect thereto, all Portfolio Collateral (including all Original Portfolio Collateral, all Additional Portfolio Collateral and all Substitute Portfolio Collateral, whether or not any of the same may become at any time or times Defaulted Portfolio Collateral, Credit Risk Portfolio Collateral, Equity Portfolio Collateral or Credit Improved Portfolio Collateral) and all payments thereon or with respect thereto, (b) any Hedge Agreement and the Issuer's rights, remedies, powers, privileges and claims with respect to such Hedge Agreement as more fully described in Article XV herein, (c) the Servicing Agreement and the Issuer's rights, remedies, powers, privileges and claims under or with respect to the Servicing Agreement as set forth in Article XIV hereof, (c) the Collection Account, the Collateral Account, the Reserve Account, the Expense Reimbursement Account, the Closing Expense Account, the Initial Deposit Account, the Loan Funding Account, each Default Swap Collateral Account, each Default Swap Issuer Account, each Securities Lending Account, and all investment property, money, instruments and other property credited to or on deposit in such Accounts including, without limitation, the Eligible Investments, (d) all Securities Lending Agreements, all Default Swaps, all Synthetic Securities, the Default Swap Collateral, the Securities Lending Collateral, the trust accounts described Section 4.2 and in Section 11.4 , and all money, instruments, investment property, and other property on deposit therein or credited thereto, (e) all accounts, general intangibles, chattel paper, instruments, documents, money, deposit accounts, goods, letters of credit, letter-of-credit rights, oil, gas, and other minerals, and investment property, consisting of, arising from, or relating to any of the foregoing, (f) all other assets of the Issuer, including all accounts, chattel paper, deposit accounts, documents, general intangibles, goods, instruments, investment property, letter-of-credit rights, letters of credit, money, and oil, gas, and other minerals (other than the Preferred Shares Collection Account and all funds deposited therein or credited thereto, the Issuer's share capital on account of its ordinary issued shares and any transaction fee for issuing the Notes and the Preferred Shares, each held in its account in the Cayman Islands and any interest thereon) and all other property delivered to the Trustee (g) all proceeds, profits, rents, products, earnings, interest, dividends (whether in the form of cash, securities, instruments or other property) and distributions (whether of rights, options, stock, warrants, securities or other property) of or with respect to any of the foregoing, and (h) all proceeds of the foregoing; *provided* that such Grant shall not extend to any property, cash or other amounts specifically released from the lien of this Indenture or otherwise paid to the Issuer in accordance with the terms hereof; *and provided further that* the rights of each Default Swap Counterparty as a Secured Party shall be limited to only the related Default Swap Collateral, the related Default Swap Collateral Account, and the property credited thereto. The collateral described in the preceding sentence is referred to as the "Trust Estate." Such Grant is made, however, in trust, to secure the Notes (including the Combination Notes, but only to the extent of the Note Component) equally and ratably without prejudice, priority or distinction, except as expressly provided in this Indenture, between any Note or Combination Notes and any other Note or Combination Note by reason of difference in time of issuance or otherwise, and to secure in accordance with the priorities set forth in this Indenture (i) the payment of all amounts due on the Notes (including the Combination Notes, but only to the extent of the Note Component) in accordance with their terms, (ii) the payment of all other sums payable under this Indenture and

all amounts payable to the Servicer under the Servicing Agreement and to each Hedge Counterparty under the Hedge Agreements, and (iii) compliance with the provisions of this Indenture, each Hedge Agreement and the Servicing Agreement, all as provided in this Indenture.

The Trustee acknowledges such Grant, accepts the trusts hereunder and agrees to perform the duties herein in accordance with the provisions hereof.

ARTICLE I

DEFINITIONS

Section 1.1.    <u>Definitions</u>

Except as otherwise specified herein or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Indenture, and the definitions of such terms are equally applicable both to the singular and plural forms of such terms and, where applicable, to the masculine, feminine and neuter genders of such terms. Whenever any reference is made to an amount the determination of which is governed by Section 1.3 hereof, the provisions of Section 1.3 hereof shall be applicable to such determination or calculation, whether or not reference is specifically made to Section 1.3 hereof, unless some other method of calculation or determination is expressly specified in the particular provisions.

Unless the Combination Notes are explicitly addressed in the same context, references herein to Class B-1L Notes or Class I Preferred Shares shall include a reference to the Note Component and the Preferred Share Component, respectively, of the Combination Notes and references to the rights and obligations of the Holders of the Class B-1L Notes and the Class I Preferred Shares (including with respect to any payments, distributions or redemptions, as applicable, on or of the Class B-1L Notes or the Class I Preferred Shares or votes, notices or consents to be given by such Holders) include the rights and obligations of the Holders of the Combination Notes to the extent of the Note Component and Preferred Share Component, respectively. Unless the Combination Noteholders are explicitly addressed in the same context, references herein to Noteholders or Holders of Preferred Shares shall include a reference to the Combination Noteholders to the extent of the Note Component and Preferred Share Component, as applicable. Unless the Combination Noteholders are explicitly addressed in the same context, Combination Noteholders shall be entitled to participate in any vote or consent of, or any direction or objection by, the Noteholders, the Holders of the Class B-1L Notes or the Holders of the Class I Preferred Shares to the extent of the Note Component and Preferred Share Component, as applicable.

"<u>Account Income</u>":  Any interest or other earnings on funds in the Collection Account, the Initial Deposit Account, the Loan Funding Account or the Expense Reimbursement Account.

"<u>Accounts</u>": The meaning specified in Section 10.2 hereof.

"<u>Accrued Interest on Sale</u>": Interest accrued on an item of Portfolio Collateral at the time of sale or other disposition to the extent paid to the Issuer as part of the sale or other

disposition price of such item of Portfolio Collateral after deducting amounts representing Purchased Accrued Interest on such item of Portfolio Collateral.

"Accountants' Certificate": A certificate of a firm of Independent certified public accountants of national reputation in the United States of America appointed by the Issuer pursuant to Section 10.6(a) hereof.

"Additional Collateral Deposit Requirement": With respect to each Payment Date after the second Payment Date, the amount necessary such that (a) the sum of: (i) the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate as of the Calculation Date relating to such Payment Date, plus (ii) the sum of the Balance of Eligible Investments and cash in the Collection Account representing Collateral Principal Collections *plus* the Balance of Eligible Investments and cash in the Initial Deposit Account *plus* unpaid Purchased Accrued Interest as of such date, less (iii) the Overcollateralization Haircut Amount (if any), equals or exceeds: (b) 104.63% of the amount necessary, after giving effect to the amount applied to any O/C Redemption of the Notes to satisfy the Overcollateralization Tests and the Interest Coverage Test (if applicable) on such Payment Date, to repay the Aggregate Principal Amount of the Notes, including any Periodic Rate Shortfall Amounts. Notwithstanding the foregoing, if Additional Collateral Deposit Requirement is a positive number that is more than the amount available therefore in the priority of distributions set forth in Section 11.1, then the amount distributed with respect to the Additional Collateral Deposit Requirements shall be such lesser amount available.

For purposes of the Additional Collateral Deposit Requirement, no item of Equity Portfolio Collateral shall be included as Portfolio Collateral. In addition for purposes of this requirement, (i) with respect to Defaulted Portfolio Collateral as to which there has occurred a payment default or an event of bankruptcy, only the portion equal to the lesser of (a) the Market Value of such item of Defaulted Portfolio Collateral and (b) the Applicable Percentage multiplied by the Principal Balance of such item of Portfolio Collateral, shall be included as Portfolio Collateral and (ii) with respect to items of Discount Portfolio Collateral, only an amount equal to the original purchase price of such item of Discount Portfolio Collateral shall be included as Portfolio Collateral. For purposes of calculating the Additional Collateral Deposit Requirement, to the extent an item of Portfolio Collateral is considered Defaulted Portfolio Collateral, Discount Portfolio Collateral and/or is included in the Overcollateralization Haircut Amount, such item of Portfolio Collateral will not be discounted multiple times, but will be treated in the category that results in the largest discount to the par amount of the Portfolio Collateral.

"Additional Fee Amount": With respect to each Due Period, an amount equal to 0.25% per annum of the Quarterly Collateral Amount, calculated on the basis of a 360-day year and the actual number of days elapsed.

"Additional Issuance": The issuance and sale of Additional Preferred Shares by the Issuer at any time during the Revolving Period, the proceeds of which (net of any fees and expenses incurred in connection with the issuance thereof, including, without limitation, compensation payable to any Initial Purchasers or any placement agent for any services provided in connection therewith) are used to purchase additional eligible Portfolio Collateral (which may

include eligible Portfolio Collateral purchased from any Servicer Entity on an arms-length transaction basis); *provided* that (a) such Additional Issuance will be for an Additional Issuance Percentage; (b) such Additional Preferred Shares must be issued for a cash sales price (the net sale proceeds to be used to purchase eligible Portfolio Collateral (or, pending such application, deposited into the Collection Account and held in Eligible Investments)); (c) the terms (other than the date of issuance, the issue price, the date from which dividends will accrue and similar matters) of such Preferred Shares must be identical to the terms of the applicable Class of Preferred Shares; (d) the Holders of Preferred Shares must be notified in writing 30 days prior to such issuance; (e) the Servicer must consent to such Additional Issuance; and (f) Bear Stearns must be notified in writing at least 30 days prior to such issuance.

"Additional Issuance Percentage":  With respect to any Additional Issuance, a percentage specified by the Servicer of the original issue price of the Preferred Shares issued and Outstanding on the date of such Additional Issuance.

"Additional Portfolio Collateral":  Any and all items of Portfolio Collateral which are purchased pursuant to Section 11.3 hereof with Collections (other than Collateral Disposition Proceeds).

"Additional Preferred Shares": Any additional Preferred Shares issued after the Closing Date in accordance with the applicable terms hereof and the Paying and Transfer Agency Agreement.

"Additional Servicing Fee":  For any Payment Date, an amount equal to the sum of (a) product of (i) the Additional Fee Amount for such Payment Date and (ii) the Servicing Fee Portion for such Payment Date plus (b) on any Payment Date that any part of the Base Servicing Fee was not paid on the preceding Payment Date, interest on such unpaid amount in an amount equal to the product of (i) LIBOR for the applicable period plus 3.0% per annum and (ii) the actual number of days in such Due Period, divided by 360 plus (c) on any Payment Date that any part of the Additional Servicing Fee was not paid on the preceding Payment Date, such unpaid Additional Servicing Fee and interest on such unpaid amount in an amount equal to the product of (i) LIBOR for the applicable period plus 3.0% per annum and (ii) the actual number of days in such Due Period divided by 360; *provided* that in the event that the Servicer is removed or resigns, the amount of such fee accrued to the effective date of such removal or resignation will be payable to the Servicer on the next succeeding Payment Date or Payment Dates on which such amount may be paid, in accordance with Section 11.1 (*provided* that the payment of any fee payable pursuant to this proviso will be *pari passu* with the payment of any servicing fees to the then-current servicer).

"Adjusted Collateral Collections":  With respect to any Payment Date, the sum of (i) the Adjusted Collateral Interest Collections collected during the applicable Due Period, (ii) the Adjusted Collateral Principal Collections collected during the applicable Due Period and (iii) the available funds in the Expense Reimbursement Account, as each is determined as of the Calculation Date relating to such Payment Date.

"Adjusted Collateral Interest Collections":  With respect to any Payment Date, the Collateral Interest Collections collected during the applicable Due Period, as determined as of

the Calculation Date relating to such Payment Date, *plus* any amounts received from any Hedge Counterparty pursuant to the related Hedge Agreement, *less* the sum of (i) the amount of the Collateral Interest Collections paid to the Trustee and the Paying and Transfer Agent pursuant to Section 11.1(b) hereof with respect to such Payment Date, (ii) the amount of the Collateral Interest Collections paid to the Issuer or deposited in the Expense Reimbursement Account pursuant to Section 11.1(b) hereof with respect to such Payment Date, (iii) the amount of the Collateral Interest Collections paid to the Servicer and the Holders of the Class II Preferred Shares pursuant to Section 11.1(b) hereof with respect to such Payment Date and (iv) during any time prior to the Final Maturity Date, any Collateral Interest Collections attributable to the Collateral Purchase Amount held in the Collection Account pending application to purchase Portfolio Collateral.

"Adjusted Collateral Principal Collections":  With respect to any Payment Date, the Collateral Principal Collections collected during the applicable Due Period, as determined as of the Calculation Date relating to such Payment Date, *less* the sum of (i) the amount of the Collateral Principal Collections paid to the Trustee and the Paying and Transfer Agent pursuant to Section 11.1(b) hereof with respect to such Payment Date, (ii) the amount of Collateral Principal Collections paid to the Issuer or deposited in the Expense Reimbursement Account pursuant to Section 11.1(b) hereof with respect to such Payment Date, (iii) the amount of Collateral Principal Collections paid to the Servicer and the Holders of the Class II Preferred Shares pursuant to Section 11.1(b) hereof with respect to such Payment Date, (iv) any Collateral Disposition Proceeds released from the Collection Account for the purchase of Portfolio Collateral during the applicable Due Period pursuant to Section 10.2(e) hereof, and (v) during any time prior to the Final Maturity Date, any amount attributable to the Collateral Purchase Amount held in the Collection Account pending application to purchase Portfolio Collateral.

"Administration Agreement":  The Administration Agreement, dated as of May 9, 2007, between the Issuer and the Administrator.

"Administrator":  Maples Finance Limited, or any successor thereto appointed by the Issuer.

"Affiliate":  With respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person.  For the purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing; *provided* that (for the avoidance of doubt) the only Affiliate of the Issuer shall be the Co-Issuer and the only Affiliate of the Co-Issuer shall be the Issuer.

"Aggregate Base Fees and Expenses":  For any Payment Date, the total aggregate amount of fees and expenses payable pursuant to Section 11.1(b).

"Aggregate Par Amount":  With respect to any date of determination, the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate, including cash and

Eligible Investments representing Collateral Principal Collections on deposit in the Collection Account and the Initial Deposit Account.

"Aggregate Principal Amount":  With respect to any date of determination, when used with respect to the Portfolio Collateral, the aggregate Principal Balances of such items of Portfolio Collateral on such date of determination.  With respect to any date of determination, when used with respect to any Eligible Investments, the Balance of such Eligible Investments on such date of determination.  When used with respect to any Note or Class of Notes, as of any date of determination, the original principal amount of such Note or Class of Notes, as applicable, reduced by all prior payments, if any, made with respect to principal of such Note. When used with respect to the Notes in the aggregate, the sum of the Aggregate Principal Amount of each Class of the Outstanding Notes.  When used with respect to the Combination Note, as of any date of determination, the original principal amount of the Note Component reduced by all prior payments, if any, made with respect to principal of the Note Component plus the original Notional Amount of the Preferred Share Component, reduced by any payments that reduce the Notional Amount of the Preferred Share Component.

"Ambac":  Ambac Assurance Corporation.

"Amendment Buy-Out":  The purchase of all Notes and Preferred Shares of Non-Consenting Holders by the Amendment Buy-Out Purchaser pursuant to the exercise of the Amendment Buy-Out Option.

"Amendment Buy-Out Option":  As defined in Section 9.4(b).

"Amendment Buy-Out Purchase Price":  The price payable by the Amendment Buy-Out Purchaser for Notes or Preferred Shares purchased in an Amendment Buy-Out in an amount equal to (i) in the case of Notes, the Aggregate Principal Amount thereof, plus accrued and unpaid interest to the date of purchase payable to the Non-Consenting Holder (giving effect to all amounts paid to such Holder on such date) and plus any unpaid Extension Bonus Payment, and (ii) in the case of the Preferred Shares, an amount that, when taken together with all payments and distributions made in respect of such Preferred Shares since the Closing Date (and any amounts payable, if any to such Holder on the next succeeding Payment Date) would cause such Preferred Shares to have received (as of the date of purchase thereof) an Internal Rate of Return of 12.0% (assuming such date was a Payment Date); *provided* that,  after the date on which any Holder of Preferred Shares has received an Internal Rate of Return equal to or in excess of 12.0%, the Amendment Buy-Out Purchase Price for such Preferred Shares shall be equal to zero.

"Amendment Buy-Out Purchaser":  The Servicer (or any of its affiliates acting as principal or agent); *provided* that in the event that the Servicer elects not to purchase Notes or Preferred Shares from Holders pursuant to the Amendment Buy-Out, "Amendment Buy-Out Purchaser" shall mean one or more qualifying purchasers (which may include the Initial Purchasers or any of their affiliates acting as principal or agent) designated by the Servicer; *provided, howeve*r, none of the Servicer, the Initial Purchasers or any of their respective affiliates shall have any duty to act as an Amendment Buy-Out Purchaser.

"Amortization Period":  The period beginning on the day following the end of the Revolving Period and ending on the Payment Date upon which the Aggregate Principal Amount of the Notes is paid in full.

"Applicable Percentage":  The lesser of the Moody's Priority Category Recovery Rate and the S&P Priority Category Recovery Rate applicable to such item of Portfolio Collateral as specified in the tables below and in Schedule C hereto:

| Moody's Priority Category* | Moody's Priority Category Recovery Rate |
|---|---|
| Senior Secured Loans: | |
| +2 or more Rating Subcategories Difference | 60% |
| +1 Rating Subcategories Difference | 50% |
| 0 Rating Subcategories Difference | 45% |
| -1 Rating Subcategories Difference | 40% |
| -2 Rating Subcategories Difference | 30% |
| -3 or less Rating Subcategories Difference | 20% |
| DIP Loan (senior secured) | 50% |
| Non-Senior Secured Loans: | |
| +2 or more Rating Subcategories Difference | 45% |
| +1 Rating Subcategories Difference | 42.5% |
| 0 Rating Subcategories Difference | 40% |
| -1 Rating Subcategories Difference | 30% |
| -2 Rating Subcategories Difference | 15% |
| -3 or less Rating Subcategories Difference | 10% |
| Debt Securities | |
| +2 or more Rating Subcategories Difference | 40% |
| +1 Rating Subcategories Difference | 35% |
| 0 Rating Subcategories Difference | 30% |
| -1 Rating Subcategories Difference | 15% |
| -2 Rating Subcategories Difference | 10% |
| -3 or less Rating Subcategories Difference | 2% |

| Moody's Priority Category* | Moody's Priority Category Recovery Rate |
|---|---|
| Synthetic Securities | In the case of (i) any Synthetic Security under clause (A) or clause (B) of the definition thereof, the "Moody's Priority Category Recovery Rate" referred to in this clause for the related Reference Obligation (or deliverable obligation to the extent such deliverable obligation is not the Reference Obligation), (ii) any Synthetic Security under clause (C) of the definition thereof, the "Moody's Priority Category Recovery Rate" given by Moody's to such Synthetic Security at the time of acquisition of such Synthetic Security, and (iii) any Synthetic Security which has the ability to vary the nature of the deliverable obligation from the time of the initial acquisition, the "Moody's Priority Category Recovery Rate" given by Moody's to such Synthetic Security at such time. |

CLO Securities:

| Percentage of Total Capitalization | Moody's Default Probability Rating | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| Greater than 70% | 85.0% | 80.0% | 65.0% | 55.0% | 45.0% | 30.0% |
| Less than or equal to 70%, but greater than 10% | 75.0% | 70.0% | 60.0% | 50.0% | 40.0% | 25.0% |
| Less than or equal to 10%, but greater than 5% | 65.0% | 55.0% | 50.0% | 40.0% | 30.0% | 20.0% |
| Less than or equal to 5%, but greater than 2% | 55.0% | 45.0% | 40.0% | 35.0% | 25.0% | 10.0% |
| Less than or equal to 2% | 45.0% | 35.0% | 30.0% | 25.0% | 10.0% | 5.0% |

\* For purposes of the Moody's Priority Category, the classification of a Portfolio Loan shall be determined as of each date of determination.

| S&P Priority Category | S&P Priority Category Recovery Rate |
|---|---|
| S&P Senior Secured Portfolio Loans | As determined in accordance with Schedule C |
| Senior unsecured Portfolio Loans or S&P Second Lien Loans | As determined in accordance with Schedule C |
| Senior secured Debt Securities | As determined in accordance with Schedule C |
| Senior unsecured Debt Securities | As determined in accordance with Schedule C |
| Subordinated Debt Securities | As determined in accordance with Schedule C |
| Subordinated Portfolio Loans | As determined in accordance with Schedule C |
| DIP Loan* | As otherwise determined on a case-by-case basis by S&P. |
| Synthetic Securities | In the case of (i) any Synthetic Security under clause (A) or clause (B) of the definition thereof, the "S&P Priority Category Recovery Rate" referred to in this clause for the related Reference Obligation and (ii) any Synthetic Security under clause (C) of the definition thereof, the "S&P Priority Category Recovery Rate" given by Standard & Poor's to such Synthetic Security at the time of acquisition of such Synthetic Security. |
| Structured Finance Investments | As determined in accordance with Schedule C |

* DIP Loans shall be treated as S&P Senior Secured Portfolio Loans for purposes of determining the S&P Priority Category Recovery Rates therefor unless the Servicer requests an alternate determination of the S&P Priority Category Recovery Rate for a DIP Loan from S&P.

"Applicable Periodic Rate":  With respect to the Class A-1LA Notes and for each Periodic Interest Accrual Period, a *per annum* rate equal to 0.25% above LIBOR for such Periodic Interest Accrual Period.  With respect to the Class A-1LB Notes and for each Periodic Interest Accrual Period, a *per annum* rate equal to 0.55% above LIBOR for such Periodic Interest Accrual Period.  With respect to the Class A-2L Notes and for each Periodic Interest Accrual Period, a *per annum* rate equal to 0.70% above LIBOR for such Periodic Interest Accrual Period. With respect to the Class A-3L Notes and for each Periodic Interest Accrual Period, a *per annum* rate equal to 1.00% above LIBOR for such Periodic Interest Accrual Period. With respect to the Class B-1L Notes and for each Periodic Interest Accrual Period, a *per annum* rate equal to 2.25% above LIBOR for such Periodic Interest Accrual Period.  With respect to the Class B-2L Notes and for each Periodic Interest Accrual Period, a *per annum* rate equal to 4.25% above LIBOR for such Periodic Interest Accrual Period.

"Applicable Procedures":  The meaning specified in Section 2.5(b) hereof.

"Approved Pricing Service":  Any pricing service (including any of its successors and assigns) listed as an Approved Pricing Service in Schedule J or otherwise disclosed in writing by the Issuer to the Trustee and the Holders of the Notes and the Combination Notes, and not objected to by the Requisite Noteholders within 15 days of such disclosure, *provided* that the Rating Condition has been satisfied with respect to any pricing service not included on Schedule J.

"Ask-Side Market Value":  As of any Measurement Date, the market value determined by the Servicer and reported to the Trustee as an amount rather than as a percentage or fraction of par (expressed in Dollars) of any lent item of Portfolio Collateral based upon the Servicer's commercially reasonable judgment and based upon the following order of priority: (i) the average of the ask-side market prices obtained by the Servicer from three Independent broker-dealers active in the trading of such obligations or (ii) if the foregoing set of prices were not obtained, the higher of the ask-side market prices obtained by the Servicer from two Independent broker-dealers active in the trading of such obligations or (iii) if the foregoing sets of prices were not obtained, the average of the ask-side prices for the purchase of such item of Portfolio Collateral determined by an Approved Pricing Service (Independent from the Servicer) that derives valuations by polling broker-dealers (Independent from the Servicer); *provided* that if the Ask-Side Market Value of any lent item of Portfolio Collateral cannot be so determined then such item of Portfolio Collateral shall be deemed to have a Market Value equal to the outstanding principal balance thereof.

"Assumed Interest Rate":  A rate equal to LIBOR as of the most recent LIBOR Determination Date minus 0.25%, but not less than zero.

"Authenticating Agent":  An agent of the Trustee appointed by the Trustee pursuant to Section 2.4 to authenticate the Notes and the Combination Notes.

"Authorized Officer":  With respect to either of the Co-Issuers, any chairman, deputy chairman, president, vice president, managing director, secretary, director, treasurer or other officer thereof or any chairman, deputy chairman, president, vice president, secretary, director, treasurer or other officer of any duly appointed agent thereof who is authorized to act for the Issuer or the Co-Issuer, as the case may be, in matters relating to, and binding upon, such Issuer or the Co-Issuer.  With respect to the Servicer, any member, manager, officer, employee or agent of the Servicer, as applicable, who is authorized to act for the Servicer, in matters relating to, and binding upon, the Servicer, with respect to the subject matter of the request, certificate or order in question.  With respect to the Trustee or any other bank or trust company acting as trustee of any express trust or as custodian, a Responsible Officer.  Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any person to act, and such certification may be considered as in full force and effect until receipt by such other party of written notice to the contrary.

"Balance":  On any date, with respect to cash or Eligible Investments in the Collection Account, the Initial Deposit Account, the Loan Funding Account or the Expense Reimbursement Account, the aggregate (i) face amount or current balance, as the case may be, of cash, demand deposits, time deposits, certificates of deposit, bankers' acceptances, federal funds and commercial bank money market accounts; (ii) outstanding principal amount of interest-

bearing government and corporate securities; and (iii) purchase price of non-interest-bearing government and corporate securities, commercial paper and repurchase obligations.

"Bankruptcy Code": Title 11 of the United States Code (11 U.S.C. §§ 101 et seq.), as amended, and any successor statute and/or any bankruptcy, insolvency, reorganization or similar law enacted under the laws of the Cayman Islands.

"Base Fee Amount": With respect to each Due Period, an amount equal to 0.30% per annum of the Quarterly Collateral Amount, calculated on the basis of a 360-day year and the actual number of days elapsed.

"Base Servicing Fee": For any Payment Date, an amount equal to the product of (a) the Base Fee Amount for such Payment Date and (b) the Servicing Fee Portion for such Payment Date; *provided* that in the event that the Servicer is removed or resigns, the amount of such fee accrued to the effective date of such removal or resignation will be payable to the Servicer on the next succeeding Payment Date or Payment Dates on which such amount may be paid, in accordance with the priority of payments set forth in Section 11.1 (*provided* that the payment of any fee payable pursuant to this proviso will be *pari passu* with the payment of any servicing fees to the then-current servicer).

"B Rating Category": With respect to any item of Portfolio Collateral, such item of Portfolio Collateral having an S&P Rating of "B+", "B" or "B-" or a Moody's Rating of "B1", "B2" or "B3".

"BB Rating Category": With respect to any item of Portfolio Collateral, such item of Portfolio Collateral, having an S&P Rating of "BB+", "BB" or "BB-" or a Moody's Rating of "Ba1", "Ba2" or "Ba3".

"Bear Stearns": Bear, Stearns & Co. Inc., a Delaware corporation.

"Beneficial Owners": The meaning specified in the Investment Company Act and the rules and regulations promulgated thereunder.

"Business Day": Any day that is not a Saturday, Sunday or other day on which commercial banking institutions in the City of New York, the State of New York, or in the city in which the Corporate Trust Office is located, or, to the extent action is required of a Paying Agent or the Paying and Transfer Agent, including the Trustee, in the city of the place of payment, are authorized or obligated by law or executive order to be closed. To the extent action is required of the Irish Paying Agent, Dublin, Ireland shall be considered in determining "Business Day" for purposes of determining when such Irish Paying Agent action is required.

"Calculation Agent": The meaning specified in Section 2.11(a) hereof.

"Calculation Date": The last day of each Due Period.

"Cantor": Cantor Fitzgerald & Co.

"<u>Cap Agreement</u>":  The cap agreement entered into by the Issuer and the Cap Provider for the benefit of the Notes having a notional amount on each Payment Date equal to the Cap Notional Amount and providing for the payment by the Cap Provider to the Issuer on each such Payment Date of the Cap Payment, if any, with respect to such Payment Date, as amended or supplemented in accordance with the terms thereof.

"<u>Cap Notional Amount</u>": The notional amount of the Cap Agreement, which, with regard to each Payment Date commencing with the November 2007 Payment Date and ending with the August 2009 Payment Date, shall be as set forth in <u>Schedule K</u> hereto for the related Payment Date, and, with regard to all other Payment Dates, shall be an amount equal to zero.

"<u>Cap Payment</u>": The amount, if any, payable to the Issuer by the Cap Provider under the Cap Agreement on any Payment Date, being an amount equal to interest on the Cap Notional Amount at a per annum rate equal to the excess, if any, of LIBOR with respect to the related Periodic Interest Accrual Period over the Cap Strike Rate, calculated on the basis of a year of 360 days and the actual number of days elapsed.

"<u>Cap Provider</u>":  The counterparty to the Issuer under the Cap Agreement, initially Bear Stearns Capital Markets Inc.

"<u>Cap Strike Rate</u>": 6% per annum.

"<u>Cap Termination Amount</u>":  Any lump sum amount payable by the Issuer to the Cap Provider in connection with an "Event of Default" or a "Termination Event" under the Cap Agreement (as such terms are defined under the Cap Agreement), which lump sum amount is based upon, among other things, the notional amount of the Cap Agreement.

"<u>CCC/Caa Portfolio Collateral</u>": Portfolio Collateral (excluding Defaulted Portfolio Collateral) that has a Moody's Rating below "B3" or an S&P Rating below "B-".

"<u>CCC Rating Category</u>":  An item of Portfolio Collateral having a S&P Rating of "CCC+", "CCC" or "CCC-" or a Moody's Rating of "Caa1", "Caa2" or "Caa3".

"<u>CDS/TRS Termination Payment Amount</u>":  With respect to the Class A-1LA Noteholder in connection with an Optional Redemption, (i) on any Payment Date after the August 2010 Payment Date, an amount equal to the present value (calculated at LIBOR) of each of the remaining scheduled payments of interest up to (and including) the August 2011 Payment Date, calculated by multiplying, for each such remaining scheduled Payment Date, (a) the Applicable Periodic Rate for such Payment Date with respect to the Class A-1LA Notes net of LIBOR and (b) the Aggregate Principal Balance of the Class A-1LA Notes as of the Optional Redemption Date, and (ii) on or after the August 2011 Payment Date, zero.

"<u>Class</u>":  Any of the Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class B-1L Notes, the Class B-2L Notes and the Combination Notes.

"<u>Class A Notes</u>":  The Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes and the Class A-3L Notes.

"Class A Overcollateralization Percentage": 107.0% (for purposes of the Class A Overcollateralization Test).

"Class A Overcollateralization Ratio": As of any date of determination, the ratio (expressed as a percentage) obtained by dividing (a) the sum of (1) the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate as of such date, calculated in accordance with the Overcollateralization Ratio Adjustment, plus (2) the sum of the Balance of Eligible Investments and cash in the Collection Account, representing Collateral Principal Collections plus the Balance of Eligible Investments and cash in the Initial Deposit Account plus unpaid Purchased Accrued Interest, each as of such date by (b) the sum of the Aggregate Principal Amount of the Class A Notes (including for this purpose any unpaid Periodic Rate Shortfall Amounts with respect to such Classes of Notes not paid when due, until such amounts, if any, are paid in full) as of such date.

"Class A Overcollateralization Test": A test that will be satisfied on any date of determination if the Class A Overcollateralization Ratio is at least equal to the Class A Overcollateralization Percentage.

"Class A-1L Notes": The Class A-1LA Notes and the Class A-1LB Notes.

"Class A-1LA Notes": The U.S. $635,000,000 Class A-1LA Floating Rate Extendable Notes due August 2024 issued hereunder by the Co-Issuers and having the terms described herein.

"Class A-1LB Notes": The U.S. $115,000,000 Class A-1LB Floating Rate Extendable Notes due August 2024 issued hereunder by the Co-Issuers and having the terms described herein

"Class A-2L Notes": The U.S. $76,000,000 Class A-2L Floating Rate Extendable Notes due August 2024 issued hereunder by the Co-Issuers and having the terms described herein.

"Class A-3L Notes": The U.S. $48,000,000 Class A-3L Floating Rate Extendable Notes due August 2024 issued hereunder by the Co-Issuers and having the terms described herein.

"Class B Notes": The Class B-1L Notes and the Class B-2L Notes.

"Class B-1L Notes": The U.S. $36,000,000 Class B-1L Floating Rate Extendable Notes due August 2024 issued hereunder by the Co-Issuers and having the terms described herein.

"Class B-1L Overcollateralization Percentage": 106.0% (for purposes of the Class B-1L Overcollateralization Test).

"Class B-1L Overcollateralization Ratio": As of any date of determination, the ratio (expressed as a percentage) obtained by dividing (a) the sum of (1) the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate as of such date, calculated in accordance

with the Overcollateralization Ratio Adjustment, plus (2) the sum of the Balance of Eligible Investments and cash in the Collection Account, representing Collateral Principal Collections plus the Balance of Eligible Investments and cash in the Initial Deposit Account plus unpaid Purchased Accrued Interest, each as of such date by (b) the sum of the Aggregate Principal Amounts of the Class A Notes and the Class B-1L Notes (including for this purpose any unpaid Periodic Rate Shortfall Amounts with respect to such Classes of Notes not paid when due, until such amounts, if any, are paid in full) as of such date.

"Class B-1L Overcollateralization Test":  A test that will be satisfied as of any date of determination if the Class B-1L Overcollateralization Ratio is at least equal to the Class B-1L Overcollateralization Percentage.

"Class B-2L Notes":  The U.S. $26,000,000 Class B-2L Floating Rate Extendable Notes due August 2024 issued hereunder by the Co-Issuers and having the terms described herein.

"Class B-2L Overcollateralization Percentage":  103.63% (for purposes of the Class B-2L Overcollateralization Test).

"Class B-2L Overcollateralization Ratio": As of any date of determination, the ratio (expressed as a percentage) obtained by dividing (a) the sum of (1) the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate as of such date, calculated in accordance with the Overcollateralization Ratio Adjustment less the Overcollateralization Haircut Amount, if any, plus (2) the sum of the Balance of Eligible Investments and cash in the Collection Account, representing Collateral Principal Collections plus the Balance of Eligible Investments and cash in the Initial Deposit Account plus unpaid Purchased Accrued Interest, each as of such date by (b) the sum of the Aggregate Principal Amounts of the Class A Notes, the Class B-1L Notes and the Class B-2L Notes (including for this purpose any unpaid Periodic Rate Shortfall Amounts with respect to such Classes of Notes not paid when due, until such amounts, if any, are paid in full) as of such date.

If an item of Portfolio Collateral is both eligible to be included in the Overcollateralization Haircut Amount and is subject to an Overcollateralization Ratio Adjustment, for purposes of calculating the Class B-2L Overcollateralization Ratio, such item of Portfolio Collateral will not be discounted multiple times, but will be treated in the category that results in the largest discount to the par amount of such item of Portfolio Collateral.

"Class B-2L Overcollateralization Test":  A test that will be satisfied as of any date of determination if the Class B-2L Overcollateralization Ratio is at least equal to the Class B-2L Overcollateralization Percentage.

"Class I Preferred Shares":  The Class I Preferred Shares, par value $0.001 per share, issued by the Issuer; *provided* that any transfer of Class I Preferred Shares to HFP from any third party shall require the exchange and conversion of such Class I Preferred Shares into Class II Preferred Shares.

"Class II Preferred Share Dividend":  Class II Preferred Share Base Dividend, Class II Preferred Share Additional Dividend and Class II Preferred Share Supplemental Dividend.

"Class II Preferred Share Additional Dividend":  For any Payment Date, an amount equal to the sum of (a) the product of (i) the Additional Fee Amount for such Payment Date and (ii) the Class II Preferred Share Portion for such Payment Date plus (b) on any Payment Date that any part of the Class II Preferred Share Base Dividend was not paid on the preceding Payment Date, interest on such unpaid amount in an amount equal to the product of (i) LIBOR for the applicable period and (ii) the actual number of days in such Due Period, divided by 360 plus (c) on any Payment Date that any part of the Class II Preferred Share Additional Dividend was not paid on the preceding Payment Date, such unpaid Class II Preferred Share Additional Dividend and interest thereon in an amount equal to the product of (i) LIBOR for the applicable period and (ii) the actual number of days in such Due Period divided by 360.

"Class II Preferred Share Base Dividend":  For any Payment Date, an amount equal to the product of (a) the Base Fee Amount for such Payment Date and (b) the Class II Preferred Share Portion for such Payment Date.

"Class II Preferred Share Supplemental Dividend":  For any Payment Date, an amount equal to the product of (a) the Supplemental Fee Amount for such Payment Date and (b) the Class II Preferred Share Portion for such Payment Date.

"Class II Preferred Share Percentage":  For any Payment Date, a fraction, expressed as a percentage, the numerator of which is the number of Outstanding Class II Preferred Shares on the Calculation Date related to such Payment Date and the denominator of which is the total number of Outstanding Preferred Shares on such Calculation Date.

"Class II Preferred Share Portion":  For any Payment Date, 100% minus the Servicing Fee Portion for such Payment Date.

"Class II Preferred Shares":  The Class II Preferred Shares, par value $0.001 per share, issued by the Issuer and held by HFP; *provided* that any transfer of Class II Preferred Shares by HFP to any third party shall require the exchange and conversion of such shares into Class I Preferred Shares.

"Clearance System":  The Euroclear System or Clearstream or both.

"Clearstream":  Clearstream Banking, *société anonyme*.

"CLO Security":  A U.S. dollar-denominated collateralized loan obligation or a similar obligation that entitles the holders thereof to receive payments that depend (except for rights or other assets designed to assure the servicing or timely distribution of proceeds to holders of the CLO Securities) on the credit exposure to, or cash flow from, a portfolio of collateral of which at least 75% consists of commercial loans (including eligible synthetic securities whose reference obligations consist of commercial loans); *provided* that not more than 25% of the Aggregate Principal Amount of any CLO Security may be comprised of Synthetic

Securities; and *provided further* that each CLO Security must have a public or an estimated rating from each of the Rating Agencies.

"Closing Date":  May 9, 2007.

"Closing Expense Account":  The meaning specified in Section 10.2 hereof.

"Closing Expense Deposit":  The cash credited to the Closing Expense Account on the Closing Date pursuant to Section 3.2(f) hereof.

"Closing Expenses":  The meaning specified in Section 11.1(a) hereof.

"Code":  The United States Internal Revenue Code of 1986, as amended.

"Co-Issuer":  As defined in the first sentence of this Indenture.

"Co-Issuers":  The Issuer and the Co-Issuer.

"Collateral":  The Trust Estate.

"Collateral Account":  The meaning specified in Section 10.2 hereof.

"Collateral Administration Agreement":  The meaning specified in Section 10.5(g) hereof.

"Collateral Administrator":  The collateral administrator under the Collateral Administration Agreement, initially Investors Bank & Trust Company.

"Collateral Agent":  The meaning specified in the Paying and Transfer Agency Agreement.

"Collateral Disposition Proceeds":  All proceeds (including, to the extent so determined by the Servicer, any payments received in connection with a consent or similar solicitation and including any amounts received in connection with an item of Defaulted Portfolio Collateral up to an amount equal to, in the aggregate, the Principal Balance of such item of Defaulted Portfolio Collateral) received during a Due Period from the sale or other disposition of any Portfolio Collateral included in the Trust Estate, net of any reasonable amounts expended by the Trustee in connection with such sale or other disposition (including without limitation disposition proceeds from liquidation of the Trust Estate pursuant to Section 9.11).  Accrued interest may also be treated as Collateral Disposition Proceeds (y) to the extent necessary to pay for the principal amount of or accrued interest on Substitute Portfolio Collateral if the item of sold Portfolio Collateral paid interest before, and in the same Due Period as, the date of sale or (z) to the extent such amounts are Purchased Accrued Interest treated as Collateral Principal Collections hereunder.  Amounts received with respect to Equity Portfolio Collateral or in connection with a consent or similar solicitation shall be treated as Collateral Interest Collections to the extent such proceeds are in excess of the Principal Balance (determined immediately prior to such Portfolio Collateral becoming Equity Portfolio Collateral) of the Portfolio Collateral disposed of.

"Collateral Interest Collections":  With respect to any Payment Date, the sum of (without duplication) (i) all payments of interest with respect to any Portfolio Collateral (excluding accrued interest classified as Collateral Disposition Proceeds but including any other receipts of accrued interest (including Accrued Interest on Sale)  and, to the extent so determined by the Servicer, any payments (other than principal) received in connection with a consent or similar solicitation, fees received in connection with an amendment (but only to the extent such amendment does not result in diminishing the principal money terms of such item of Portfolio Collateral) and including any commitment, standby or similar fees with respect to the unfunded portion of the Issuer's commitment to make or otherwise fund advances with respect to a Delayed Drawdown Loan or a Revolving Loan which are received during the applicable Due Period, less any Retained Accrued Interest, (ii) the Account Income, if any, in the Collection Account, the Initial Deposit Account and the Loan Funding Account which is received during the applicable Due Period, as each is determined as of the Calculation Date relating to such Payment Date (including, without limitation, Account Income on funds on deposit in the Initial Deposit Account transferred to the Collection Account on the Effective Date pursuant to Section 3.3(a) hereof), (iii) on or after the Effective Date, any funds transferred by the Trustee from the Initial Deposit Account pursuant to Section 10.2(f) hereof, (iv) any amounts received, other than with respect to principal, from a Securities Lending Agreement, and (v) income on Eligible Investments in and/or the securities credited to the Default Swap Collateral Account (to the extent the Issuer is entitled to receive such income pursuant to the terms hereof).

"Collateral LIBOR":  With respect to any item of Portfolio Collateral, the London interbank offered rate for U.S. dollar deposits as determined under the terms of the related Underlying Instrument.

"Collateral Principal Collections":   With respect to any Payment Date, all payments of principal of (without duplication) any Portfolio Collateral (including (i) any remaining Deposit (but excluding any Account Income thereon and subject to Section 3.4(d) hereof) not applied to purchase Original Portfolio Collateral or to effect an Initial Deposit Redemption, (ii) any payment of Premium, (iii) to the extent so determined by the Servicer, any payments received in connection with a consent or similar solicitation, fees received in connection with an amendment and including principal received in connection with or any payments received with respect to an item of Credit Risk Portfolio Collateral in connection with any consent or similar solicitation, (iv) all proceeds received from the sale of any warrant (whether sold as part of a Unit or separately), (v) any Collateral Disposition Proceeds which are received during the applicable Due Period, as determined as of the Calculation Date relating to such Payment Date, (vi) amounts representing Purchased Accrued Interest, (vii) amounts transferred from the Loan Funding Account upon the sale or disposition of Delayed Drawdown Loans or Revolving Loans or upon the expiration of a drawdown or revolving period, (viii) funds (other than income thereon) transferred from a Default Swap Collateral Account to the Collection Account, (ix) any amounts received by the Issuer that do not qualify as Collateral Interest Collections (other than those standing to the credit of any Default Swap Collateral Account or Default Swap Issuer Account) and (x) on or after the Effective Date, any funds in the Initial Deposit Account not considered Collateral Interest Collections pursuant to Section 10.2(f) hereof).  Notwithstanding the foregoing, Collateral Principal Collections shall include (A) any other amounts not included in Collateral Interest Collections or Adjusted Collateral Interest Collections, (B) any payments received with respect to an item of Defaulted Portfolio Collateral

up to, in the aggregate, the Principal Balance of such item of Defaulted Portfolio Collateral and (C) any amounts recharacterized as Collateral Principal Collections in connection with any distribution of Payment Date Equity Securities.

"Collateral Purchase Amount":  With respect to any Payment Date, the aggregate amount of funds deposited into the Collection Account on such Payment Date pursuant to clause TENTH of Section 11.1(c)(i) and clause FOURTH of Section 11.1(c)(ii).

"Collateral Quality Formula":  The formula set forth in Annex D to be used to interpolate between values or rows of the criteria set forth in the Collateral Quality Matrix. For purposes of such calculation, (i) the Moody's Asset Correlation Test requirement in the applicable row of the Collateral Quality Matrix must be equal to or less than 5.5% and greater than or equal to 3.0%, (ii) the Moody's Weighted Average Recovery Rate requirement in the applicable row of the Collateral Quality Matrix must be less than or equal to 46.0% and greater than or equal to 36.5%, (iii) the Moody's Weighted Average Rating Test requirement in the applicable row of the Collateral Quality Matrix must be equal to or greater than 1500 and less than or equal to 2500 and (iv) the Weighted Average Margin requirement in the applicable row of the Collateral Quality Matrix must be equal to or greater than 1.6% and less than or equal to 3.05%.

"Collateral Quality Matrix":  For any date of determination, the row of the table set forth in Annex D that has been selected by the Servicer (in accordance with the procedures described in the next sentence) for use in determining the scores that are required to satisfy the Moody's Asset Correlation Test, the Minimum Average Recovery Rate Test with respect to Moody's, the Moody's Weighted Average Rating Test and the Weighted Average Margin Test. The Servicer may elect to (i) have a different row of the table set forth in Annex D apply and (ii) add additional rows to the table set forth in Annex D by interpolating using the Collateral Quality Formula (which may or may not include a combination of existing values), in each case upon providing written notice to the Issuer and the Trustee, so long as, immediately after giving effect to the change in rows, each of the Moody's Asset Correlation Test, the Minimum Average Recovery Rate Test with respect to Moody's, the Moody's Weighted Average Rating Test and the Weighted Average Margin Test will be satisfied according to the scores that are prescribed by the newly selected row and the Standard & Poor's CDO Monitor Test would have been satisfied as of the date of the most recent purchase or sale of an item of Portfolio Collateral had such test been calculated using the Current Portfolio, the Proposed Portfolio, and the S&P Scenario Loss Rate that was in effect immediately prior to such purchase or sale, but using the S&P Break-Even Loss Rate applicable to the Notes that would have been applicable after giving effect to the change in combinations; it being agreed that the Servicer shall be under no obligation to elect to change the Collateral Quality Matrix  In determining whether the criteria set forth in the Collateral Quality Matrix are satisfied, the Servicer may use the Collateral Quality Formula to interpolate between values of such criteria or may use any other method that is agreed by the Issuer and Moody's with written notice to the Trustee. If a new Standard & Poor's CDO Monitor is required in connection with selecting a new row of the matrix, the Servicer will give notice to S&P and the Trustee at least two weeks prior to the selection of such new row.

"<u>Collateral Quality Tests</u>": The Moody's Asset Correlation Test, the Minimum Average Recovery Rate Test, the Moody's Weighted Average Rating Test, the Moody's Weighted Average Rating Test for CLO Securities, the Weighted Average Coupon Test, the Weighted Average Margin Test, the Weighted Average Life Requirement and the Standard & Poor's CDO Monitor Test.

"<u>Collection Account</u>":  The meaning specified in Section 10.2 hereof.

"<u>Collections</u>":  With respect to any Payment Date, the sum of (i) the Collateral Interest Collections collected during the applicable Due Period and (ii) the Collateral Principal Collections collected during the applicable Due Period, as each is determined as of the Calculation Date relating to such Payment Date.

"<u>Combination Notes</u>"  The Combination Notes due August 2024 in the Aggregate Principal Amount of U.S.$10,000,000 and having the terms described in Section 2.2, 2.3 and Article XVI hereof.

"<u>Component</u>" or "<u>Component Security</u>": Each of the Note Component and the Preferred Share Component, individually or collectively, as the context may require.

"<u>Controlling Class</u>":  Shall mean the Class A-1LA Notes, so long as any Class A-1LA Notes are outstanding, then the Class A-1LB Notes, so long as any Class A-1LB Notes are Outstanding, then the Class A-2L Notes, so long as any Class A-2L Notes are Outstanding, then the Class A-3L Notes, so long as any Class A-3L Notes are Outstanding, then the Class B-1L Notes, so long as any Class B-1L Notes are Outstanding and then the Class B-2L Notes, so long as any Class B-2L Notes are Outstanding.

"<u>Corporate Trust Office</u>":  The principal corporate trust office of the Trustee currently located at Investors Bank & Trust Company, 200 Clarendon Street, Boston MA, 02116, Attention: CDO Services Group, or at such other address as the Trustee may designate by notice to the Noteholders, the Servicer, the Issuer and the Rating Agencies or the principal corporate trust office in the United States of any successor Trustee.

"<u>Coupon Adjustment</u>": To the extent the Weighted Average Coupon of the Fixed Rate Portfolio Collateral exceeds the percentage specified in the definition of Weighted Average Coupon Test, then the Weighted Average Margin Test (as specified in the row of the Collateral Quality Matrix then in effect), will be reduced by a per annum percentage equal to the product of (x) the amount by which the Weighted Average Coupon of the Fixed Rate Portfolio Collateral exceeds the percentage specified in the row of the Collateral Quality Matrix then in effect for such Weighted Average Coupon, times (y) a fraction, the numerator of which is the Aggregate Principal Amount of the Fixed Rate Portfolio Collateral and the denominator of which is the Aggregate Principal Amount of the Floating Rate Portfolio Collateral, times (z) 360/365.

To the extent the Weighted Average Margin of the Floating Rate Portfolio Collateral exceeds the percentage specified in the row of the Collateral Quality Matrix then in effect for such Weighted Average Margin, then the Weighted Average Coupon Test will be reduced by a per annum percentage equal to the product of (x) the amount by which the Weighted Average Margin exceeds the percentage specified in the current row of the Collateral

Quality Matrix, times (y) a fraction, the numerator of which is the Aggregate Principal Amount of the Floating Rate Portfolio Collateral and the denominator of which is the Aggregate Principal Amount of the Fixed Rate Portfolio Collateral, times (z) 365/360.

"Credit Improved Criteria":  Shall mean with respect to any item of Portfolio Collateral, in the Servicer's reasonable judgment, such item of Portfolio Collateral has significantly improved in credit quality, and:

(a)    Moody's, S&P or Fitch has placed such item of Portfolio Collateral or any other class of security issued together with such item of Portfolio Collateral (or, if such item of Portfolio Collateral is not rated, the issuer thereof) on its credit watch list (or similar list) with the potential for developing positive credit implications since the date the Issuer first acquired such item of Portfolio Collateral (and for so long as such item of Portfolio Collateral or issuer, as applicable, remains on such list) or there has been an upgrade in the rating of such item of Portfolio Collateral, issuer or other class of security issued together with such item of Portfolio Collateral, as applicable, by Moody's, S&P or Fitch by one or more subcategories from the rating of such item of Portfolio Collateral or issuer, as applicable, by Moody's, S&P or Fitch, as applicable, in effect on the date the Issuer first acquired such item of Portfolio Collateral;

(b)    with respect to a Portfolio Loan, since the date on which such Portfolio Loan was first acquired by the Issuer, has increased in price to 101.0% or more of its original purchase price or the spread of which over the related reference rate has been reduced, in each case, in accordance with its Underlying Instruments since the date on which such item of Portfolio Collateral was first acquired by the Issuer by 0.25% or more (in the case of an item of Portfolio Collateral with a spread over the related reference rate less than or equal to 2.00% at the time such item of Portfolio Collateral was first acquired by the Issuer) or 0.50% or more (in the case of an item of Portfolio Collateral with a spread over the related reference rate greater than 2.00% at the time such item of Portfolio Collateral was first acquired by the Issuer) for reasons primarily due to an improvement in the related borrower's financial ratios or financial results and not as a result of general market conditions; or

(c)    with respect to any item of Portfolio Collateral which is not a Portfolio Loan, an increase in the market price (expressed as a percentage of par value) since the date of purchase of such item of Portfolio Collateral which, compared to the change in the average market price of a representative sample (as determined by the Servicer) of other debt securities with similar terms and credit characteristics and that would be eligible to be pledged as Portfolio Collateral, is greater than 3.00% of the par value or more relative to such representative sample; or a decrease since the date of purchase of such item of Portfolio Collateral of more than 10.0% in the difference between the yield to worst call on such item of Portfolio Collateral compared to the yield on the relevant United States Treasury security;

*provided, however*, that the criteria in (b) and (c) above may be used only as corroboration of other bases for the Servicer's Judgment.

"Credit Improved Portfolio Collateral":  Any item of Portfolio Collateral which, (a) in the Servicer's commercially reasonable judgment consistent with the standard of care set forth in the Servicing Agreement (*provided,* that in forming such judgment a decrease in credit spread or an increase in Market Value of such item of Portfolio Collateral may only be utilized as corroboration of other bases of such judgment), has improved in credit quality or otherwise satisfies the Credit Improved Criteria or (b) is sold pursuant to a Portfolio Improvement Exchange.

"Credit Risk Criteria":  With respect to any item of Portfolio Collateral:

(a)     Moody's, Fitch or S&P has placed such item of Portfolio Collateral or any other class of security issued together with such item of Portfolio Collateral (or, if such item of Portfolio Collateral is not rated, the issuer thereof) on its credit watch list with the potential for developing negative credit implications (or similar list) since the date the Issuer first acquired such item of Portfolio Collateral (and for so long as such item of Portfolio Collateral or issuer, as applicable, remains on such list) or there has been a reduction in the rating of such item of Portfolio Collateral, issuer or other class of security issued together with such item of Portfolio Collateral, as applicable, by Moody's, Fitch or S&P, as applicable, by one or more subcategories from the rating of such item of Portfolio Collateral or issuer, as applicable, by Moody's, Fitch or S&P, as applicable, in effect on the date the Issuer first acquired such item of Portfolio Collateral;

(b)     which is a Portfolio Loan, the spread over the applicable reference rate has been increased in accordance with the related Underlying Instruments since the date on which such Portfolio Loan was first acquired by the Issuer by 0.50% or more (in the case of a Portfolio Loan with a spread over the applicable reference rate at the time such Portfolio Loan was first acquired by the Issuer less than or equal to 2.00%) or 0.75% or more (in the case of a Portfolio Loan with a spread over the applicable reference rate at the time such Portfolio Loan was first acquired by the Issuer greater than 2.00%) primarily due to a deterioration in the related borrower's financial ratios or financial results and not as a result of general market conditions; *provided, however*, that the criteria in this paragraph (b) may be used only as corroboration of other bases for the Servicer's judgment;

(c)     which is a CLO Security, a decline in the par amount of underlying collateral such that the aggregate par amount of the entire class of securities to which such item of Portfolio Collateral belongs and all other securities secured by the same pool of collateral and that rank senior in priority of payment to such class of securities exceeds the aggregate par amount of all collateral (excluding defaulted collateral) securing such securities; or

(d)     it is a Deferred Interest PIK Bond or a partial Deferred Interest PIK Bond.

"Credit Risk Portfolio Collateral":  Any item of Portfolio Collateral (other than an item of Defaulted Portfolio Collateral) which, in the Servicer's commercially reasonable business judgment consistent with the standard of care set forth in the Servicing Agreement (which judgment shall not be questioned as a result of subsequent events; *provided,* that in

forming such judgment an increase in credit spread or a decrease in Market Value of such item of Portfolio Collateral may only be utilized as corroboration of other bases of such judgment), (i) is likely to decline in credit quality and, with the passage of time, become Defaulted Portfolio Collateral, and (ii) if a Sales Restriction Condition has occurred, otherwise satisfies the Credit Risk Criteria.

"Cumulative Interest Amount": With respect to a Payment Date and any Class of Notes the applicable Periodic Interest Amount with respect to such Payment Date and the applicable Periodic Rate Shortfall Amount, if any, with respect to such Payment Date.

"Current Pay Obligation": An item of Portfolio Collateral that would otherwise be an item of Defaulted Portfolio Collateral but as to which (i) no interest or principal payments (including deferred interest) are due and payable that are unpaid and the Servicer reasonably expects that the issuer or obligor of such Portfolio Collateral will continue to make scheduled payments of interest thereon and principal thereof and will pay the principal thereof by maturity, (ii) if the issuer or obligor of such item of Portfolio Collateral is subject to a bankruptcy proceeding, a bankruptcy court has authorized the payment of interest due and payable on such item of Portfolio Collateral, and (iii) either (a) the Market Value of such item of Portfolio Collateral is equal to or greater than 80% of par and the Moody's Rating of such item of Portfolio Collateral is at least "Caa1", (b) the Market Value of such item of Portfolio Collateral is equal to or greater than 85% of par and the Moody's Rating of such item of Portfolio Collateral is at least "Caa2" (or, if the Moody's Rating has been withdrawn, the Moody's Rating of such item of Portfolio Collateral was at least "Caa2" prior to withdrawal) or (c) the Market Value of such item of Portfolio Collateral is equal to or greater than 80% of par and the Moody's Rating of such item of Portfolio Collateral is below "Caa2" (or, if the Moody's Rating has been withdrawn, the Moody's Rating of such item of Portfolio Collateral was below "Caa2") prior to withdrawal.

"Current Portfolio": Pledged Securities in the Trust Estate immediately prior to the sale, maturity or the other disposition of an item of Portfolio Collateral or immediately prior to the purchase of an item of Portfolio Collateral, as the case may be.

"Custodian": As such term is defined in Section 2.1(b) hereof.

"Debt Security": Interests in corporate and other debt securities, including senior secured rate floating notes (other than Eligible Investments, CLO Securities and Portfolio Loans), and, for the avoidance of doubt, Portfolio Loans shall not be considered Debt Securities.

"Default": Any event or condition the occurrence or existence of which, with the giving of notice or lapse of time or both, would become an Event of Default.

"Defaulted Portfolio Collateral": Any item of Portfolio Collateral (other than an item of Portfolio Collateral which is a DIP Loan, unless such item of Portfolio Collateral itself is in default since acquisition), including with respect to a Synthetic Security, the related Reference Obligation, with respect to which:

(i) the issuer thereof has defaulted in the payment of principal or interest (in respect of Portfolio Loans only, beyond five Business Days, *provided* the Servicer certifies in writing to the Trustee that it believes, in its reasonable business judgment, that

such delay is not credit related), unless, in the case of a failure of such issuer to make required interest payments, such issuer has resumed current cash payments of interest and paid in full all accrued and unpaid interest;

(ii)     such item of Portfolio Collateral is *pari passu* with or subordinated to other material indebtedness for borrowed money owing by the issuer thereof ("Other Indebtedness") and such issuer has defaulted in the payment of principal or interest (beyond any applicable grace or notice period and without regard to any waiver of such default) on such Other Indebtedness, unless, in the case of a failure of such issuer to make required interest payments, such issuer has resumed current cash payments of interest and has paid in full any accrued interest due and payable thereon;

(iii)     an Insolvency Event has occurred with respect to the issuer thereof;

(iv)     the Servicer has knowledge (or such rating information has been published) that the issuer thereof is rated "D" or "SD" by S&P (calculated in accordance with Schedule D) (or S&P has withdrawn its rating which prior to such withdrawal was "D" or "SD");

(v)     such item of Portfolio Collateral is a PIK Bond or Partial Deferred Interest Bond as to which the issuer thereof or obligor thereon (or, in the case of a Synthetic Security, the related Reference Obligor) has previously deferred or capitalized any interest due thereon for (a) the lesser of (i) 6 months and (ii) one Payment Date (except to the extent all interest so deferred or capitalized has subsequently been paid in full in cash, including interest thereon) if such item of Portfolio Collateral has a Moody's Rating below "Baa3" or (b) the lesser of (i) one year and (ii) two consecutive Payment Dates (except to the extent all interest so deferred or capitalized has subsequently been paid in full in cash, including interest thereon) if such item of Portfolio Collateral has a Moody's Rating of "Baa3" or greater;

(vi)     there has been proposed or effected any distressed exchange or other distressed debt restructuring where the issuer of such Portfolio Collateral has offered the debt holders a new security or package of securities that, in the commercially reasonable judgment of the Servicer amounts to a diminished financial obligation;

(vii)     such item of Portfolio Collateral is declared to be an item of Defaulted Portfolio Collateral by the Servicer, but only so long as it remains so designated by the Servicer in its sole discretion;

(viii)     such item of Portfolio Collateral is a CLO Security which is rated "CC" or below by S&P (or S&P has withdrawn its rating which prior to such withdrawal was rated "CC") or has a Moody's Rating of "Ca" or "C" or below;

(ix)     such item of Portfolio Collateral is a Participation that would, if the underlying loan were an item of Portfolio Collateral, be an item of Defaulted Portfolio Collateral under any of clauses (i) through (iii) above or with respect to which the Selling Institution has defaulted in the performance of any of its payment obligations under the Participation; or

(x)     such item of Portfolio Collateral is a Synthetic Security referencing a Reference Obligation that would, if the Reference Obligation were an item of Portfolio Collateral, be an item of Defaulted Portfolio Collateral under any of clauses (i) through (iv) above or with respect to which the Synthetic Security Counterparty has defaulted in the performance of any of its payment obligations under the Synthetic Security;

*provided* that any item of Portfolio Collateral that is classified as an item of "Defaulted Portfolio Collateral" will cease to be so classified if such item of Portfolio Collateral, at any date thereafter, (a) would not otherwise be classified as an item of Defaulted Portfolio Collateral in accordance with the definition of such term and (b) otherwise meets the collateral criteria described herein as of such date.

"Default Swap":  Any U.S. dollar denominated "pay as you go" credit default swap or total return swap with respect to a Reference Obligation, which the Issuer (directly or indirectly) purchased from or entered into with a Default Swap Counterparty, which contains equivalent probability of default, recovery upon default (or a specific percentage thereof), expected loss, maturity, interest rate and other non-credit characteristics as those of the related Reference Obligation (without taking account of such considerations as they relate to the Default Swap Counterparty); *provided* that (i) the Reference Obligation is a CLO Security, (ii) such Default Swap will not cause the Issuer to be treated as engaged in a trade or business in the United States for U.S. Federal income tax purposes or otherwise subject the Issuer to U.S. Federal income tax on a net income tax basis, (iii) either (a) amounts receivable by the Issuer are not expected to (based on the Servicer's determination, which may include consultation with counsel to the Issuer) be subject to U.S. or foreign withholding tax in respect of the Default Swap or (b) the Default Swap Counterparty is required to make "gross-up" payments pursuant to the related Underlying Instruments that cover the full amount of any such withholding tax on an after-tax basis (including any tax on such additional payments), (iv) the Issuer has caused to be deposited in a Default Swap Collateral Account an amount in cash at least equal to the aggregate of (or the amount required under the terms of the Synthetic Security to provide for) all further payments (contingent or otherwise) that the Issuer is or may be required to make to the Default Swap Counterparty under the Default Swap; (v) the agreement relating to such Default Swap contains "non-petition" provisions with respect to the Issuer and "limited recourse" provisions limiting the Default Swap Counterparty's rights in respect of the Default Swap Collateral to the funds and other property credited to the Default Swap Collateral Account related to such Default Swap; (vi) the notional amount of such Default Swap is equal to the principal amount of the Reference Obligation; (vii) the agreement relating to such Default Swap Collateral contains provisions to the effect that upon the occurrence of an "Event of Default" or "Termination Event" (other than an "Illegality" or "Tax Event"), if any, where the Default Swap Counterparty is the sole "Defaulting Party" or the sole "Affected Party" ("Event of Default," "Termination Event," "Illegality," "Tax Event," "Defaulting Party" or "Affected Party," as applicable, as such terms are defined in the ISDA Master Agreement relating to such Default Swap), (a) the Issuer may terminate its obligations under such Default Swap and upon such termination and payment of any termination amount payable under the Default Swap, any lien in favor of the Default Swap Counterparty over its related Default Swap Collateral Account will be terminated and (b) upon payment of any termination amount payable under the Default Swap, the Issuer will no longer be obligated to make any payments to the Default Swap Counterparty with respect to such Default Swap, (viii) any Default Swap shall be positively indexed to the related Reference Obligation on

no more than a one-to-one basis, (ix) if any Reference Obligation delivered pursuant to any Default Swap does not constitute Portfolio Collateral and it would cause any collateral quality test or concentration limitation not to be satisfied, such Reference Obligation shall be deemed Equity Portfolio Collateral, and (x) (a) such Default Swap shall be documented with a standard ISDA form master agreement, as modified by appropriate schedules and confirmations and (b) (1) such Default Swap is a Form-Approved Synthetic Security or (2) the Rating Condition has been satisfied with respect to the purchase of or entry into such Default Swap.

"Default Swap Collateral": Cash, securities or other collateral, meeting the definition of Eligible Investments, purchased or posted by the Issuer for the benefit of the Default Swap Counterparty in connection with the purchase of a Default Swap, including without limitation a payment of cash or delivery of securities by the Issuer.

"Default Swap Collateral Account": The account established pursuant to Section 10.2 hereof with the Securities Intermediary in the name of the Trustee.

"Default Swap Counterparty": Any entity, whose long term senior unsecured debt or derivatives counterparty rating shall be at least "A2" by Moody's and a long term rating of at least "A" or a short term rating of at least "A-1" by S&P, required to make payments on Synthetic Portfolio Collateral pursuant to the terms of such Default Swap or any guarantee thereof to the extent that a Reference Obligor makes payments on a related Reference Obligation.

"Default Swap Counterparty Termination Payment": An amount payable by the Issuer to a Default Swap Counterparty that is due following the designation of an "Early Termination Date" (as defined in the related credit default swap) (other than in respect of "Illegality" or a "Tax Event" (each as defined in the related credit default swap)), as to which the Default Swap Counterparty is the sole "Defaulting Party" or the sole "Affected Party" (as each such term is defined in the ISDA Master Agreement related to such Synthetic Security).

"Default Swap Issuer Account": The account established pursuant to Section 10.2 hereof with the Securities Intermediary in the name of the Trustee.

"Deferred Interest PIK Bond": As of any date of determination, any PIK Bond that is not an item of Defaulted Portfolio Collateral that has, in accordance with its terms, deferred or paid "in-kind" any amount of interest for a period equal to:

      (a)    in the case of an item of Portfolio Collateral that has a Moody's Rating below "Baa3" (or, if rated "Baa3," is on credit watch for possible downgrade) or, if rated by S&P, a rating by S&P below "BBB-" (or, if rated "BBB-," is on credit watch for possible downgrade), the shorter of one accrual period or six months; and

      (b)    in all other cases, the shorter of two accrual periods or twelve months;

and has not, as of such date of determination, resumed timely payment of current interest in cash and repaid all outstanding deferred or capitalized interest in cash. For the avoidance of doubt, an item of Portfolio Collateral will not constitute a Deferred Interest PIK Bond if it resumes timely payment of current interest in cash and repays all outstanding deferred or capitalized interest in

cash on the Payment Date immediately succeeding the end of the interest accrual period(s) set forth above.

"Definitive Notes": Registered definitive notes in substantially the form set forth in Exhibits A-1L-4, A-2L-4, A-3L-4, B-1L-4 and B-2L-4.

"Delayed Drawdown Loan": A Portfolio Loan that, pursuant to the related Underlying Instrument or Underlying Loan and Security Agreement and lender or lenders, would obligate the Issuer, if the Issuer were to become a lender thereunder by purchasing such Portfolio Loan for inclusion in the Trust Estate, to make or otherwise fund one or more future advances to the related borrower and meeting the criteria described in Section 3.4; *provided* that, if a Delayed Drawdown Loan has been drawn in full and there are no future advance obligations to the related borrower, such Portfolio Loan will no longer be considered a Delayed Drawdown Loan.

"Deliver" or "Delivery": The taking of the following steps by the Issuer:

(a) with respect to such of the Trust Estate as constitutes an instrument, causing the Trustee to take possession in the State of New York or the Commonwealth of Massachusetts of such instrument, indorsed to the Trustee or in blank by an effective indorsement;

(b) with respect to such of the Trust Estate as constitutes tangible chattel paper, goods, a negotiable document, or money, causing the Trustee to take possession in the State of New York or the Commonwealth of Massachusetts of such tangible chattel paper, goods, negotiable document, or money;

(c) with respect to such of the Trust Estate as constitutes a certificated security in bearer form, causing the Trustee to acquire possession in the State of New York or the Commonwealth of Massachusetts of the related security certificate;

(d) with respect to such of the Trust Estate as constitutes a certificated security in registered form, causing the Trustee to acquire possession in the State of New York or the Commonwealth of Massachusetts of the related security certificate, indorsed to the Trustee or in blank by an effective indorsement, or registered in the name of the Trustee, upon original issue or registration of transfer by the issuer of such certificated security;

(e) with respect to such of the Trust Estate as constitutes an uncertificated security, causing the issuer of such uncertificated security to register the Trustee as the registered owner of such uncertificated security;

(f) with respect to such of the Trust Estate as constitutes a security entitlement, causing the Securities Intermediary to indicate by book entry that the financial asset relating to such security entitlement has been credited to the appropriate Account;

(g) with respect to such of the Trust Estate as constitutes an account or a general intangible, (i) causing the account debtor for such account or general intangible to be notified of the grant to the Trustee of a security interest in such account or general intangible, (ii) causing to be taken any steps necessary to perfect a security interest in

such account or general intangible under the laws of the Cayman Islands, and (iii) causing to be filed with the District of Columbia Recorder of Deeds a properly completed UCC financing statement that names the Issuer as debtor and the Trustee as secured party and that covers such account or general intangible;

(h)     with respect to such of the Trust Estate as constitutes a deposit account, causing such deposit account to be maintained in the name of the Trustee and causing the bank with which such deposit account is maintained to agree in writing with the Trustee and the Issuer that (i) such bank will comply with instructions originated by the Trustee directing disposition of the funds in such deposit account without further consent of any other person or entity, (ii) such bank will not agree with any person or entity other than the Trustee to comply with instructions originated by any person or entity other than the Trustee, (iii) such deposit account and the property deposited therein will not be subject to any lien, claim, security interest, encumbrance, or right of set-off in favor of such bank or anyone claiming through it (other than the Trustee), (iv) such agreement will be governed by the laws of the State of New York, and (v) the State of New York will be the bank's jurisdiction of such bank for purposes of Article 9 of the UCC; or

(i)     in the case of each of paragraphs (a) through (h) above, such additional or alternative procedures as may hereafter become appropriate to perfect a security interest in such items of the Trust Estate in favor of the Trustee, consistent with applicable law or regulations.

In each case of Delivery contemplated herein, the Trustee shall make appropriate notations on its records indicating that such item of the Trust Estate is held by the Trustee pursuant to and as provided herein.

Effective upon Delivery of any item of the Trust Estate, the Trustee shall be deemed to have (i) represented that its purchase of such item of the Trust Estate is made in good faith, and without notice of any adverse claim thereto appearing on the face of such item (if in physical form) or otherwise known to a Responsible Officer of the Trustee; *provided* that such representation shall not impose any other affirmative duty or obligation upon the Trustee with regard to inquiry or investigation of, or constructive notice of, adverse claims; and (ii) acknowledged that it holds such item of the Trust Estate as Trustee hereunder for the benefit of the Holders of the Notes and the other Secured Parties.  Any additional or alternative procedures for accomplishing "Delivery" for purposes of paragraph (i) of this definition shall be permitted only upon delivery to the Trustee of an Opinion of Counsel to the effect that such procedures are appropriate to perfect a security interest in the applicable type of collateral in favor of the Trustee.

"Deposit":  The cash credited to the Initial Deposit Account on the Closing Date (or with respect to the Post-Closing Sale Collateral, within 10 days of the Closing Date) in accordance with Section 3.2(e) hereof, including any reimbursement for amounts withdrawn from the Initial Deposit Account pursuant to Section 10.2(f), and including the first interest payment received on each Portfolio Loan and on CLO Securities (other than certain CLO Securities, as indicated on Schedule A) purchased on the Closing Date.

"Deposit Account":  The meaning specified in Section 10.2 hereof.

"Depository":  With respect to the Regulation S Global Notes and the Rule 144A Global Notes, DTC, its nominees, and their respective successors.

"DIP Loan":  Any interest in a loan or financing facility (a) which at the time of purchase is an obligation of a debtor-in-possession pursuant to Section 364 of United States the Bankruptcy Code, (b) the terms of which have been approved by an order of a United States Bankruptcy Court, a United States District Court, or any other court of competent jurisdiction, the enforceability of which order is not subject to any pending contested matter or proceeding (as such terms are defined in the Federal Rules of Bankruptcy Procedure), (c) which has the priority allowed by either Section 364(c) or 364(d) of the Bankruptcy Code, (d) which pays interest in cash on a current basis, and (e) as to which the obligor has paid its most recent scheduled interest and principal payments (if any) and the Servicer reasonably expects that such obligor will continue to pay interest and principal payments.  For purposes hereof, a DIP Loan shall not be considered a Current Pay Obligation.  Any DIP Loan added as an item of Portfolio Collateral must be assigned a formal or estimated rating by Moody's and S&P.

"Discount Portfolio Collateral":  (a) Any Portfolio Loan (including a Synthetic Security, the Reference Obligation of which is a Portfolio Loan) which was purchased at a price less than 85% of the Principal Balance thereof, (b) any item of Portfolio Collateral which is a CLO Security (including a Synthetic Security, the Reference Obligation of which is a CLO Security) and which had a Moody's Rating of below "Aa3" at the time of purchase which was purchased at a price less than 80% of the Principal Balance thereof and (c) any item of Portfolio Collateral which is a CLO Security (including a Synthetic Security, the Reference Obligation of which is a CLO Security) and which had a Moody's Rating of "Aa3" or greater at the time of purchase which was purchased at a price less than 92% of the Principal Balance thereof; *provided* that (i) (x) any Portfolio Loan (including a Synthetic Security, the Reference Obligation of which is a Portfolio Loan) that would otherwise be considered Discount Portfolio Collateral, but that has a Market Value above 90% of its Principal Balance for 22 consecutive Business Days after being purchased by the Issuer, will no longer be considered Discount Portfolio Collateral, (y) any item of Portfolio Collateral which is a CLO Security (including a Synthetic Security, the Reference Obligation of which is a CLO Security) and which had a Moody's Rating of below "Aa3" at the time of purchase that would otherwise be considered Discount Portfolio Collateral, but that has a Market Value above 85% of its Principal Balance for 60 consecutive Business Days after being purchased by the Issuer, will no longer be considered Discount Portfolio Collateral, and (z) any item of Portfolio Collateral which is a CLO Security (including a Synthetic Security, the Reference Obligation of which is a CLO Security) and which had a Moody's Rating of "Aa3" or greater at the time of purchase that would otherwise be considered Discount Portfolio Collateral, but that has a Market Value above 95% of its Principal Balance for 60 consecutive days after being purchased by the Issuer will no longer be considered Discount Portfolio Collateral; and (ii) any item of Portfolio Collateral that is a Portfolio Loan (including a Synthetic Security, the Reference Obligation of which is a Portfolio Loan) that would otherwise be considered Discount Portfolio Collateral, but that is purchased with the proceeds of sale of an item of Portfolio Collateral that was not an item of Discount Portfolio Collateral at the time of its purchase, so long as such item of Portfolio Collateral (a) was purchased or committed to be purchased within five Business Days of such sale, (b) was purchased at a price (as a percentage

of par) equal to or greater than the sale price of the sold item of Portfolio Collateral, (c) was purchased at a purchase price not less than 65% of the Principal Balance thereof and (d) had a rating equal to or greater than the rating of the sold item of Portfolio Collateral, will not be considered Discount Portfolio Collateral. Notwithstanding the foregoing, at no time during the period commencing on the Closing Date through the Final Maturity Date, shall the Aggregate Principal Amount of all items of Discount Portfolio Collateral purchased pursuant to clause (ii) exceed in the aggregate 10% of the Required Portfolio Collateral Amount; *provided further that* no more than 3.5% of the Required Portfolio Collateral Amount of such 10% cumulative limitation may consist of CLO Securities; *provided further that*, if an item of Portfolio Collateral that is a Portfolio Loan purchased pursuant to clause (ii) above is repaid in full, is sold for a price equal to at least 97.5% of its unpaid Principal Balance or has a Market Value above 90% of its Principal Balance for at least 22 consecutive Business Days after being purchased, such item of Portfolio Collateral shall not be taken into account for purposes of the 10% limitation in clause (ii) above; *provided further that*, as of any date of determination, the Aggregate Principal Amount of items of Portfolio Collateral that are Portfolio Loans in the Trust Estate purchased pursuant to clause (ii) above, may not exceed (x) 5% of the Aggregate Par Amount or (y) if the weighted average purchase price of items of Portfolio Collateral that are Portfolio Loans purchased pursuant to clause (ii)(b) above is less than 75% as of such date of determination, 2.5% of the Aggregate Par Amount. In addition, when determining whether an Underlying Security purchased in combination with a Coupon Security constitutes, collectively, an item of Discount Portfolio Collateral, the sum of the total dollar purchase prices of such Underlying Security and Coupon Security divided by the face amount of the Underlying Security shall be used to determine whether such item of Portfolio Collateral is an item of Discount Portfolio Collateral.

"Distributable Equity Securities" Any and all Equity Portfolio Collateral, which cannot be sold by the Servicer as a result of the regulatory, market or other restrictions, as determined in good faith by the Servicer, and shall have the value as determined by an independent third party with relevant experience in making such valuation.

"Distribution Compliance Period": The period ending on the 40th day after the later of the conclusion of the offering of the Notes and the Closing Date.

"DTC": The Depository Trust Company, a New York corporation, or any successor thereto.

"Due Date": Each date on which a distribution or payment is due on a Pledged Security (which includes any Eligible Investment).

"Due Period": With respect to any Payment Date, the period beginning on the day following the last day of the immediately preceding Due Period (or, in the case of the Due Period that is applicable to the first Payment Date beginning on the Closing Date) and ending at the close of business on the seventh Business Day preceding such Payment Date. Amounts that would otherwise have been payable in respect of an item of Portfolio Collateral on the last day of a Due Period but for such day's not being designated a business day in the Underlying Instruments and/or as a result of a grace period for payment, if any, extending beyond the last day of a Due Period may, at the Collateral Manager's discretion, be considered included in

collections received during such Due Period provided that such amounts are received by the third Business Day immediately preceding the Payment Date.

"Effective Date":  The earlier of (i) the first date on which the Deposit has been applied to the purchase (or committed to the purchase) of Original Portfolio Collateral such that the Aggregate Principal Amount of the Portfolio Collateral (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any of the Original Portfolio Collateral on or before the Effective Date) is at least equal to the Required Portfolio Collateral Amount or (ii) November 1, 2007.

"Eligible Guarantor":  An entity that has credit ratings at least equal to the Moody's Required Ratings Threshold and S&P Approved Ratings Threshold.

"Eligible Guaranty":  An unconditional and irrevocable guaranty of all present and future payment obligations and obligations to post collateral of the related Hedge Counterparty or an Eligible Replacement to such Hedge Counterparty that is provided by an Eligible Guarantor as principal debtor rather than surety and that is directly enforceable by the Issuer, the form and substance of which guaranty are subject to satisfaction of the Rating Condition with respect to S&P.

"Eligible Investments": Any U.S. dollar denominated investment that is one or more of the following (including security entitlements with respect thereto):

(a)    direct registered obligations of, and registered obligations fully guaranteed by, the United States of America or any agency or instrumentality of the United States of America the obligations of which are backed by the full faith and credit of the United States of America or United States Security Entitlements (as defined in the Indenture) other than obligations or security entitlements of the Federal Home Loan Mortgage Corporation; *provided, however,* that, in the case of obligations or United States Security Entitlements that are rated, each such obligation shall, at the time of its inclusion in the Trust Estate, have a credit rating of "AA-" or better or "A-1+" or better, as applicable, by S&P (except that Eligible Investments in an amount up to 20% of the Aggregate Principal Amount of the Notes Outstanding may be rated "A-1") and "Aa3" or better (if such obligation has a long-term rating) or "P-1" or better by Moody's, and, in each case, is not put on credit watch (with negative implications);

(b)    demand and time deposits in, trust accounts with, and certificates of deposit of, any depository institution or trust company (including the Trustee) incorporated under the laws of the United States of America or any state thereof and subject to the supervision and examination by federal and/or state banking authorities so long as the commercial paper and/or debt obligations of such depository institution or trust company (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company) at the time of purchase or contractual commitment providing for such purchase have a credit rating of "AA-" or better, in the case of debt obligations, or "A-1+" or better, in the case of commercial paper, by S&P (except that Eligible Investments in an amount up to 20% of the

Aggregate Principal Amount of the Notes Outstanding may be rated "A-1") and "Aa3" or better (if such obligation has a long-term rating) or "P-1" or better by Moody's, and, in each case, is not put on credit watch (with negative implications)**;**

(c)    registered securities bearing interest or sold at a discount issued by any corporation incorporated under the laws of the United States of America or any state thereof that have a credit rating of  "AA-" or better by S&P and "Aa3" or better (if such obligation has a long-term rating) or "P-1" or better by Moody's at the time of such purchase or contractual commitment providing for such purchase, and, in each case, is not put on credit watch (with negative implications);

(d)    repurchase obligations with respect to any security described in clause (a) above, entered into with a depository institution or trust company (acting as principal) described in clause (b) above (including the Trustee) or entered into with a corporation (acting as principal) whose short-term debt has a credit rating of "A-1+" (except that Eligible Investments in an amount up to 20% of the Aggregate Principal Amount of the Notes Outstanding may be rated "A-1") or better by S&P and "Aa3" or better (if such obligation has a long-term rating) or "P-1" or better by Moody's at the time of purchase in the case of any repurchase obligation for a security having a maturity not more than 183 days from the date of its issuance or whose long-term debt has a credit rating of "AA-" or better by S&P and "Aa3" or better (if such obligation has a long-term rating) by Moody's at the time of purchase in the case of any repurchase obligation for a security having a maturity more than 183 days from the date of its issuance and, in each case, is not put on credit watch (with negative implications);

(e)    commercial paper having at the time of purchase a credit rating of "A-l+" (except that an amount up to 20% of the Aggregate Principal Amount of the Notes Outstanding may be rated "A-1") or better by S&P and "Aa3" or better (if such obligation has a long-term rating) or "P-1" or better by Moody's and that has a maturity of not more than 183 days from its date of issuance; *provided, however,* that in the case of commercial paper with a maturity of longer than 91 days, the issuer of such commercial paper (or, in the case of a principal depository institution in a holding company system, the holding company of such system), if rated by S&P, must have at the time of purchase a long-term credit rating of "AA-" or better by S&P and "Aa3" or better (if such obligation has a long-term rating) by Moody's and, in each case, is not put on credit watch (with negative implications);

(f)    off-shore money market funds, which funds have, at all times, the highest credit rating assigned to such investment category by S&P and Moody's; and

(g)    such other Eligible Investments acceptable to the Rating Agencies;

*provided, however,* that: (i) Eligible Investments purchased with funds in the Collection Account shall be held until maturity (or sold only for an amount at least equal to the par amount of such Eligible Investment) and shall include only such obligations or securities as mature no later than the Business Day prior to the next Payment Date and Eligible Investments purchased with funds in the Initial Deposit Account shall be held until maturity (or sold only for an amount at least

equal to the par amount of such Eligible Investment) and shall include only such obligations or securities as mature no later than the Business Day prior to the date expected to be used and in any event prior to the Initial Deposit Redemption Date; (ii) none of the foregoing obligations or securities shall constitute Eligible Investments if all, or substantially all, of the remaining amounts payable thereunder shall consist of interest and not principal payments; (iii) none of the S&P ratings required above shall have a subscript of "r", "t", "p", "pi" or "q"; (iv) none of the foregoing obligations or securities shall constitute Eligible Investments if such obligations or securities are mortgage-backed securities; (v) no such obligation may be margin stock, securities which have a mandatory or optional conversion to equity or securities which are subject to an Offer; (vi) no such obligation may have coupons or other payments that are subject to U.S. withholding tax or are subject to foreign withholding under the terms of the underlying instruments where the issuer is not required to make "gross-up" payments sufficient to cause the net amount to be received on the debt obligations to equal the amount that would have been paid had no such withholding tax applied and the acquisition (including manner of acquisition), ownership or disposition of no such obligation shall cause the Issuer to be engaged or deemed engaged in a U.S. trade or business for U.S. federal income tax purposes; and (vii) any such Eligible Investment purchased on the basis of S&P's short-term rating of "A-1" shall mature not later than thirty (30) days after the date of purchase. Eligible Investments may include those Eligible Investments with respect to which the Trustee or any of its Affiliates provide services or is the obligor or depository institution.

"Eligible Preferred Shares": The Preferred Shares excluding any Preferred Shares owned or controlled by any Servicer Entities in excess of the Original HFP Share Amount.

"Eligible Replacement": An entity that either (i) satisfies the S&P Approved Ratings Threshold and the Moody's Required Ratings Threshold or (ii) provides an Eligible Guaranty from an Eligible Guarantor.

"Equity Portfolio Collateral": Any security (or any other right, interest or property or security entitlement) which does not entitle the holder thereof to receive periodic payments of interest no less frequently than semiannually and one or more installments of principal, in cash and sufficient to retire in full the stated principal amount thereof on the stated maturity date therefor; *provided, however,* that such definition will not include warrants, profit participations or similar equity-based rights that are a component of a Unit to the extent that the Aggregate Principal Amount of Portfolio Collateral in the Trust Estate with a warrant, profit participation or similar equity-based right attached thereto as a component of a Unit does not exceed 10% of the Aggregate Principal Amount of all Pledged Securities in the Trust Estate.

"ERISA": The United States Employee Retirement Income Security Act of 1974, as amended from time to time.

"Euroclear Operator": Euroclear Bank S.A./N.V., as operator of the Euroclear System, and any successor thereto.

"Event of Default": The meaning specified in Section 5.1 hereof.

"Exchange Act":   The United States Securities Exchange Act of 1934, as amended.

"Exchange Certificate":   The certification delivered in the form of Exhibit F hereto.

"Exchange Offer": With respect to any item of Portfolio Collateral, (i) an offer by the issuer of such item of Portfolio Collateral or by any other Person made to all holders of such item of Portfolio Collateral to exchange such item of Portfolio Collateral held by them for an item of Equity Portfolio Collateral or other debt instruments that do not otherwise satisfy the definition of Portfolio Collateral or (ii) any solicitation by such issuer or other Person to amend, modify or waive any provision of such item of Portfolio Collateral or of the related Underlying Instrument, the effect of which would be to convert such item of Portfolio Collateral into an item of Equity Portfolio Collateral or other debt instruments that do not otherwise satisfy the definition of Portfolio Collateral.

"Excluded Accrued Interest":   With respect to any item of Initial Portfolio Collateral, any accrued and unpaid interest thereon (i) which was not included in the purchase price thereof that the Issuer paid on the Closing Date, and (ii) which will be paid by the Trustee from the Trust Estate, as instructed by Bear Stearns, in accordance with the terms of the Indenture.

"Expense Reimbursement Account":   The meaning specified in Section 10.2 hereof.

"Extended Final Maturity Date"   If a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Final Maturity Date (or, in the case of the first Extended Final Maturity Date, the Payment Date in August 2028).

"Extended Revolving Period End Date":   If an Extension has occurred, the sixteenth Payment Date after the then current Extended Revolving Period End Date (or, in the case of the first Extension, the Payment Date in August 2018).

"Extended Weighted Average Life Date": If a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Weighted Average Life Date (or, in the case of the first Extended Weighted Average Life Date, May 1, 2024).

"Extension": An extension of the Revolving Period, the Final Maturity Date of the Notes and the Weighted Average Life Test in accordance with the Indenture.

"Extension Bonus Payment": With respect to each Maturity Extension, a single payment to each applicable Noteholder as set forth in Sections 11.1(c) and (d) in an amount equal to (1) in the case of the Class A-1LA Notes, 0.25% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (2) in the case of the Class A-1LB Notes, 0.25% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (3) in the case of the Class A-2L Notes, 0.25% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable Extension Date, (4) in the case of the Class A-3L Notes, 0.25% of the Aggregate

Principal Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (5) in the case of the Class B-1L Notes, 0.25% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable Extension Effective Date and (6) in the case of the Class B-2L Notes, 0.25% of the Aggregate Principal Amount thereof held by such beneficial owner as of the applicable Extension Effective Date.

"Extension Bonus Eligibility Certification": With respect to each Maturity Extension and each beneficial owner of Notes other than Extension Sale Securities, the written certification by such beneficial owner acceptable to the Issuer to the effect that it held Notes other than Extension Sale Securities on the applicable Extension Effective Date, including the Aggregate Principal Amount thereof and wire transfer instructions for the Extension Bonus Payment and any required documentation thereunder.

"Extension Conditions": As defined under Section 2.3(d).

"Extension Determination Date": The 8th Business Day prior to each Extension Effective Date.

"Extension Effective Date": If an Extension has occurred, the sixteenth Payment Date after the then current Extension Effective Date (or, in the case of the first Extension Effective Date, the Payment Date in August 2014).

"Extension Notice": The notice given by the Issuer of its election to extend the Revolving Period substantially in the form of Exhibit I.

"Extension Purchase Price": The purchase price payable by the Extension Qualifying Purchasers for Extension Sale Securities in connection with each Maturity Extension, if any, in an amount equal to (i) in the case of the Notes, the Aggregate Principal Amount thereof, plus accrued and unpaid interest as of the applicable Extension Effective Date (giving effect to any amounts paid to the Holder on such date), (ii) in the case of the Preferred Shares, an amount that, when taken together with all payments and distributions made in respect of such Preferred Shares since the Closing Date would cause such Preferred Shares to have received (as of the date of purchase thereof) an Internal Rate of Return of 12.0% (assuming such purchase date was a Payment Date); *provided, however, that* if the applicable Extension Effective Date is on or after the date on which such Holders have received an Internal Rate of Return equal to or in excess of 12.0%, the applicable Extension Purchase Price for such Preferred Shares shall be zero.

"Extension Qualifying Purchasers": The Servicer (or any of its Affiliates acting as principal or agent); *provided* that in the event the Servicer elects not to purchase Securities from Holders pursuant to the Extension Conditions set forth in Section 2.3(d); "Extension Qualifying Purchasers" shall mean one or more qualifying purchasers (which may include the Initial Purchasers or any of their Affiliates acting as principal or agent) designated by the Servicer; *provided, however*, none of the Servicer, the Initial Purchasers, or any of their respective Affiliates shall have any duty to act as an Extension Qualifying Purchaser.

"Extension Sale Notice": Irrevocable notice given by any Holder of Notes and Preferred Shares of its intention to sell its Notes or Preferred Shares to an Extension Qualifying

Purchaser in the case of a Maturity Extension substantially in the form of Enclosure B to Exhibit I.

"Extension Sale Notice Period":  Within 30 days after the Issuer has delivered the Extension Notice.

"Extension Sale Securities":  Notes or Preferred Shares as to which an Extension Sale Notice has been duly given.

"Final Maturity Date":  With respect to each Class of Notes the Payment Date occurring in August 2024 or such earlier date on which the Aggregate Principal Amount of each Class of Notes is paid in full, including in connection with an Optional Redemption; *provided* that the "Final Maturity Date" with respect to the Notes will be extended to the applicable Extended Final Maturity Date upon the occurrence of a Maturity Extension.

"Firm Offer":  With respect to any Hedge Agreement, an offer which, when made, is capable of becoming legally binding upon acceptance.

"Fitch":  Fitch Ratings or any successor thereto.

"Fixed Amount":  As defined in the Cap Agreement.

"Fixed Rate Portfolio Collateral":  An item of Portfolio Collateral that bears interest at a fixed rate.

"Floating Rate Portfolio Collateral": An item of Portfolio Collateral that bears interest at a floating rate.

"Foreign Intermediaries": The meaning specified in Section 3.5 hereof.

"Form-Approved Hedge Agreement":  Any Hedge Agreement the documentation of which conforms (except for the amount and timing of payments, the notional amount, the effective date, the termination date and similar terms) in all material respects to a form with respect to which Rating Agency Confirmation was obtained prior to the entry into such Hedge Agreement, including any confirmation entered into after the Closing Date if conforming (except for permitted changes expressly contemplated by such form) in all material respects to those in effect on the Closing Date and any other Hedge Agreement conforming in all material respects (except for permitted changes expressly contemplated by such form) to a form with respect to which  Rating Agency Confirmation was obtained; *provided* that any material amendment or other modification (except for permitted changes expressly contemplated by such form) to the form of a Hedge Agreement shall require Rating Agency Confirmation; *provided, further* that each Rating Agency may revoke its consent to a Form-Approved Hedge Agreement upon 30 days' written notice to the Trustee and the Issuer

"Form-Approved Synthetic Security":  A Synthetic Security (a)(i) the Reference Obligation of which would be eligible for purchase by the Issuer as an item of Portfolio Collateral without any required action by the Rating Agencies or for which the Rating Condition has been satisfied or (ii) the Reference Obligation of which would satisfy clause (i) but for the

currency in which it is payable and such Synthetic Security is payable in U.S. Dollars, does not provide for physical settlement and does not expose the Issuer to currency risk, (b) the documentation of which conforms (but for the amount and timing of periodic payments, the name of the Reference Obligation, the notional amount, the effective date, the termination date and other similarly necessary changes) to a form in respect of which the Rating Condition has been satisfied for use in this transaction, (c) which provides that any "credit event" thereunder shall not include restructuring (other than modified restructuring as defined in the 2003 ISDA Credit Derivatives Definitions), repudiation, moratorium, obligation default or obligation acceleration unless such Synthetic Security may be settled only through a physical settlement of a deliverable obligation to the Issuer and not in cash, (d) which has been certified in writing by the Servicer to the Trustee and the Issuer as meeting the requirements of this definition and (e) for which the Issuer has provided the Rating Agencies notice of the purchase of such Synthetic Security no less than five Business Days prior to such purchase; *provided* that each Rating Agency may revoke its consent to a Form-Approved Synthetic Security upon 30 days' written notice to the Trustee and the Issuer.

"Global Note": A Temporary Regulation S Global Note, a Permanent Regulation S Global Note or a Rule 144A Global Note.

"Grant": To grant, bargain, sell, warrant, alienate, remise, demise, release, convey, assign, transfer, mortgage, pledge, grant a security interest in, create a right of set-off against, deposit, set over and confirm. A Grant of any item of the Trust Estate shall include all rights, powers and options (but none of the obligations) of the granting party thereunder, including without limitation the immediate and continuing right to claim for, collect, receive and receipt for principal and interest payments in respect of such item of the Trust Estate, and all other monies payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

"Group A Country": Australia, Canada, the United Kingdom, the Federal Republic of Germany or The Netherlands (so long as the U.S. dollar denominated sovereign debt obligations of such jurisdiction are rated at least "Aa2" by Moody's and the foreign currency issuer credit rating assigned by S&P to such jurisdiction is at least "AA" and, in each case, is not put on credit watch (with negative implications)).

"Group B Country": Austria, Belgium, Bermuda, Denmark, Finland, France, Ireland, Italy, Liechtenstein, Luxembourg, New Zealand, Norway, Portugal, Spain, Sweden or Switzerland or any other member state of the European Union (as of the Closing Date) identified from time to time by the Servicer and subject to the satisfaction of the Rating Condition with respect to each Rating Agency with respect thereto (so long as the U.S. dollar denominated sovereign debt obligations of such jurisdiction are rated at least "Aa2" by Moody's and the foreign currency issuer credit rating assigned by S&P to such jurisdiction is at least "AA" and, in each case, is not put on credit watch (with negative implications)).

"Hedge Agreement": Collectively, the Cap Agreement and each interest rate swap agreement, interest rate cap agreement, interest rate floor agreement, cash flow swap

agreement, coupon timing swap (including in each case related schedules, confirmations and credit support documents) or similar agreements entered into to hedge interest rate exposure or timing or accrual mismatches with respect to the Portfolio Collateral pursuant to Section 2.14.

"Hedge Counterparty": Collectively, the Cap Provider and each other institution with which the Issuer enters into a Hedge Agreement and, except with respect to the Cap Provider, with respect to which Rating Agency Confirmation is obtained, or any permitted assignees or successors thereof with respect to which Rating Agency Confirmation is obtained.

"HFP Shares": Preferred Shares beneficially owned or controlled by Highland Financial Partners, L.P., an affiliate of the Servicer.

"Holder" and "Noteholder": The Person in whose name a Note or a Combination Note is registered in the Note Register or, with respect to a Preferred Share Component of the Combination Notes, the Share Register.

"Indenture": This Indenture, as supplemented or amended in accordance with the terms hereof.

"Independent": When used with respect to any specified Person means such a Person who (a) is in fact independent of the Issuer and any other obligor upon the Notes and the Servicer or any Affiliate of the Issuer or such other obligor or the Servicer, (b) does not have any direct financial interest or any material indirect financial interest in the Issuer or in any such other obligor or the Servicer or in an Affiliate of the Issuer or such other obligor or the Servicer, and (c) is not connected with the Issuer or any such other obligor or the Servicer or any Affiliate of the Issuer or such other obligor or the Servicer as an officer, employee, promoter, underwriter, trustee, partner, director or Person performing similar functions. "Independent" when used with respect to any accountant may include an accountant who audits the books of such Person if in addition to satisfying the criteria set forth above the accountant is independent with respect to such Person within the meaning of Rule 101 of the Code of Ethics of the American Institute of Certified Public Accountants. Whenever it is provided herein that any Independent Person's opinion or certificate shall be furnished to the Trustee, such Person shall be appointed by Issuer Order and such opinion or certificate shall state that the signer has read this definition and that the signer is independent within the meaning thereof. Notwithstanding anything herein to the contrary, Bear Stearns shall be "Independent" for all purposes hereof.

"Initial Consent Period": The period of 15 Business Days from but excluding the date on which the Trustee provided notice of a proposed supplemental indenture pursuant to Section 82 hereof to the Holders of any Notes or Preferred Shares.

"Initial Deposit Redemption": A redemption of the Class A-1LA Notes pursuant to Section 3.3 hereof.

"Initial Deposit Redemption Amount": The meaning specified in Section 3.3.

"Initial Deposit Redemption Date": The November 2007 Payment Date.

"Initial Portfolio Collateral": The Portfolio Collateral that, in the case of CLO Securities, will be purchased on or prior to the Closing Date and, in the case of Portfolio Loans, will be purchased on or before the Closing Date or identified by the Issuer and for which commitments will be entered into on or prior to the Closing Date for purchase on or as soon as practicable after (not scheduled to exceed sixty (60) days after) the Closing Date with the net proceeds from the sale of the Notes and the net proceeds from the sale of the Preferred Shares on the Closing Date, which Initial Portfolio Collateral is set forth on Schedule A hereto.

"Initial Portfolio Collateral Amount": U.S. $900,000,000 (or such larger Aggregate Principal Amount of Portfolio Collateral as may be purchased on the Closing Date by the Issuer).

"Initial Purchaser Notes": Notes of any Class, if any, initially issued to or purchased by any Initial Purchaser or an Affiliate of any such Initial Purchaser on the Closing Date.

"Initial Purchasers": Each of Bear, Stearns & Co. Inc. and Cantor Fitzgerald & Co.

"Insolvency Event": With respect to any Person, means that:

(i)      an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (a) liquidation, reorganization or other relief in respect of such Person or its debts, or of all or substantially all of its assets, under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (b) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such Person or for all or substantially all of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 30 days; or an order or decree approving or ordering any of the foregoing shall be entered; or

(ii)      such Person shall (a) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (b) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (i) above, (c) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator or conservator or for all or substantially all of its assets, (d) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (e) make a general assignment for the benefit of creditors or (f) take any action for the purpose of effecting any of the foregoing.

"Institutional Accredited Investor":   An Institutional Investor that is also an "accredited investor" as defined in Rule 501(a)(1), (2), (3) or (7) under Regulation D.

"Institutional Investor": Any one of the following persons:  (i) any bank, trust company or national banking association, acting for its own account or in a fiduciary capacity, (ii) any charitable foundation or eleemosynary institution, (iii) any insurance company, (iv) any pension or retirement trust or fund for which any bank, trust company, national banking association or investment adviser registered under the Investment Advisers Act of 1940, as

amended from time to time, is acting as trustee or agent, or that manages its own assets, having funds of at least $5,000,000, (v) any investment company, as defined in the Investment Company Act, (vi) any college or university, (vii) any government or public employees' pension or retirement system, or any other governmental agency supervising the investment of public funds, or (viii) any corporation, limited liability company, business trust or partnership having total assets in excess of $5,000,000.

"Interest Coverage Ratio": with respect to any Payment Date after the second Payment Date, a number (expressed as a percentage) calculated by dividing (a) four times the amount by which (i) the Collateral Interest Collections received or scheduled to be received during the Due Period in which such calculation occurs (other than Collateral Interest Collections (including deferred interest thereon) scheduled to be received on any item of Portfolio Collateral that is not paying or expected to pay current interest), exceeds (ii) the Periodic Reserve Amount (excluding amounts payable on the Class B-1L Notes and the Class B-2L Notes) as of such Payment Date, by (b) the Aggregate Principal Amount of Class A Notes with respect to such Payment Date, as adjusted, to take into account any O/C Redemption to occur on the Payment Date related to such Due Period pursuant the Indenture pursuant to Section 11.2 hereof.

For purposes of calculating the Interest Coverage Ratio, any item of Portfolio Collateral as to which any interest or other payment thereon is subject to withholding tax or other deductions on account of tax of any jurisdiction, each such payment of interest or other payment thereon will be deemed to be payable net of such withholding tax or other deductions on account of tax unless, in the case of a withholding tax, the issuer thereof or obligor thereon is required to make additional payments to fully compensate the Issuer for such withholding taxes (including in respect of any such additional payments) and on any date of determination, the amount of any scheduled payment due on any future date will be assumed to be made net of any such uncompensated withholding tax or other deductions on account of tax based upon withholding or other applicable tax rates in effect on such date of determination.

"Interest Coverage Test": A test which is applicable on each Payment Date after the second Payment Date and will be satisfied as of such determination date if the Interest Coverage Ratio will be at least 1.5%.

"Internal Rate of Return": With respect to any Payment Date, the annualized discount rate at which the sum of the discounted values of the following cashflows is equal to zero, assuming discounting on a quarterly basis as of each Payment Date: (1) the Notional Amount of the Preferred Shares (which amount will be deemed to be negative for purposes of this calculation), (2) each distribution of Collateral Interest Collections made to the holders of the Preferred Shares on any prior Payment Date and, to the extent necessary to reach the applicable Internal Rate of Return, such Payment Date and (3) each distribution of Collateral Principal Collections made to the holders of the Preferred Shares on any prior Payment Date and, to the extent necessary to reach the applicable Internal Rate of Return, such Payment Date.

"Investment Company Act": The United States Investment Company Act of 1940, as amended from time to time.

"Investor Representation Letter":  A certificate delivered by a prospective transferee of a Note in the form of Exhibit C hereto.

"Irish Paying Agent":  RSM Robson Rhodes LLP, or any successors thereto.

"Issuer":  The meaning specified in the first sentence of this Indenture.

"Issuer Base Administrative Expenses":  With respect to any Payment Date, the administrative expenses paid or payable by the Issuer during the applicable Due Period, including, without limitation, taxes, government fees, indemnities, registered office fees and expenses for third party loan pricing services and accountants, if any, in the following order: (i) *pro rata*, taxes of the Co-Issuers, surveillance fees, shadow rating fees and credit estimate fees with respect to the Notes and any existing or potential Portfolio Collateral, if any, of the Rating Agencies; fees due to any Listing and Paying Agent; fees due to any stock exchange on which any Class of the Notes or the Preferred Shares are listed; governmental fees, registered office fees and any other fees which are deemed necessary by the Servicer for administration of the Trust Estate, and (ii) *pro rata* reimbursement of expenses (including indemnities) of the Servicer required to be paid pursuant to the Servicing Agreement, the Cap Provider required to be paid pursuant to the Cap Agreement, and all expenses of the Administrator, the Listing and Paying Agent, the Securities Intermediary (if not the same person as the Trustee), the accountants and any fiscal agent retained in connection with the issuance of income notes, if any, in which the primary collateral for such income notes are obligations of the Issuer and all other administrative expenses of the Co-Issuers, each as determined as of the Calculation Date relating to such Payment Date and as set forth in the related Note Valuation Report.

"Issuer Excess Administrative Expenses": With respect to any Payment Date, (i) the Trustee Administrative Expenses for the Due Period relating to such Payment Date in excess of the amount paid pursuant to Clause FIRST of Section 11.1(b) for the corresponding period, (ii) the Preferred Shares Administrative Expenses for the Due Period relating to such Payment Date in excess of the amount paid pursuant to clause FIRST of Section 11.1(b) for the corresponding period and (iii) the administrative expenses or other amounts (including indemnities) paid or payable by the Issuer during the applicable Due Period, as determined as of the Calculation Date relating to such Payment Date and as set forth in the related Note Valuation Report, in excess of the amount of the Issuer Base Administrative Expenses paid pursuant to Clause SECOND of Section 11.1(b).

"Issuer Order" and "Issuer Request":  A written order or request dated and signed in the name of the Issuer by an Authorized Officer of the Issuer or a Person designated in writing by an Authorized Officer of the Issuer.

"LIBOR":  For any Periodic Interest Accrual Period, the London interbank offered rate for three-month (or, for the period from the Closing Date to the November 2007 Payment Date, as described in Section 2.11 hereof) U.S. dollar deposits, as determined by the Calculation Agent in accordance with the provisions of Section 2.11 hereof.

"LIBOR Determination Date":  The second London Business Day prior to the commencement of a Periodic Interest Accrual Period.

"Loan Funding Account": The account specified in Section 10.2 as that maintained by the Trustee into which the Issuer shall remit the full amount of the Issuer's commitment to make or otherwise fund draws related to any Delayed Drawdown Loans or Revolving Loans in the Portfolio Collateral.

"London Business Day": Any day on which dealings in deposits in U.S. dollars are transacted in the London interbank market.

"Majority Noteholders": The Holders of more than 50% of the Aggregate Principal Amount of the Outstanding Notes, voting as a single class; *provided* that upon the occurrence of a Default or an Event of Default pursuant to Section 5.1 hereof, "Majority Noteholders" shall mean the Holders of more than 50% of the Controlling Class, voting together as a single class.

"Majority Preferred Shareholders": The Holders of more than 50% of the outstanding Preferred Shares.

"Mandatory Redemption": An O/C Redemption or a Rating Confirmation Failure Redemption.

"Mandatory Redemption Date": Any Payment Date on which an O/C Redemption or a Rating Confirmation Failure Redemption is required.

"Mandatory Redemption Price": When used with respect to an O/C Redemption or a Rating Confirmation Failure Redemption, an amount equal to the principal amount of the Notes being redeemed (or, in the case of the Class A-3L Notes, the Class B-1L Notes and the Class B-2L Notes, first to pay any Periodic Rate Shortfall Amount with respect to such Notes and then to pay principal).

"Market Value": On any date of determination with respect to an item of Portfolio Collateral, any of:

(a)     the average of the bid-side prices for the purchase of such item of Portfolio Collateral determined by an Approved Pricing Service that derives valuations by polling broker-dealers (Independent from the Servicer); or

(b)     the arithmetic average of bid-side quotations for the purchase of such item of Portfolio Collateral obtained by the Servicer from three or more broker-dealers (*provided* if upon reasonable efforts of the Servicer, quotations from three broker-dealers are not available, the lower of the quotations from two broker-dealers may be used), in each case, Independent from the Servicer, in the relevant market; *provided* that one such bid must be from a broker-dealer other than Bear Stearns or an Affiliate of Bear Stearns and any bid received from Bear Stearns or an Affiliate of Bear Stearns hereunder cannot be more than 10% higher than the next highest bid; and

(c)     if the determinations of the broker-dealers specified in the foregoing clauses (a) or (b) are not available (as reasonably determined by the Servicer) and so long as the Servicer is subject to the Investment Advisors Act of 1940, as amended, the lesser

of (A) the bid-side market value of such item of Portfolio Collateral as certified by the Servicer as consistent with reasonable and customary market practice and (B) the higher of (X) 70% of the Principal Balance of such item of Portfolio Collateral as of such date and (Y) the Principal Balance of such item of Portfolio Collateral as of such date multiplied by its S&P Priority Category Recovery Rate; *provided*, that, as of any date of determination (x) no more than 5.0% of the Aggregate Principal Amount of Portfolio Collateral may have market values determined in the manner provided in this clause (c) and (y) if the item of Portfolio Collateral constitutes collateral for any other issuer or account managed or serviced by the Servicer or its Affiliates, the Market Value of such item of Portfolio Collateral determined pursuant to this clause (c) shall be consistent with the market value applied by the Servicer or its Affiliates for such item of Portfolio Collateral for such for such other issuers or accounts; and

(d) if the market value cannot be determined in the manner described in clause (a), (b) or (c) above, an amount equal to the Principal Balance of the Portfolio Collateral as of such date multiplied by the Applicable Percentage for such item of Portfolio Collateral; *provided,* that if the market value cannot be determined in the manner described in clauses (a), (b) or (c) above for more than thirty (30) Business Days immediately following any date such market value is determined pursuant to this clause (d), then the market value of such item of Portfolio Collateral shall be automatically deemed to be zero following such 30-Business-Day period until the market value can be determined in the manner described in clause (a), (b) or (c) above as of any date of determination;

*provided* that (A) for purposes of determining Market Value, but subject to clause (b) hereof, Bear Stearns will be deemed to be Independent from the Servicer (*provided* that any quotes received from such entity will be on an arm's-length basis); (B) the Market Value of any item of Portfolio Collateral with respect to which the Issuer has entered into a commitment to sell but has not settled will be deemed to be the agreed sales price therefor (determined exclusive of accrued interest); and (C) the Market Value is determined only for purposes of compliance with covenants, coverage tests, overcollateralization tests, or any other requirements or tests set forth herein, or the determination of redemption prices.

"Maturity":  With respect to any Note or Combination Note, the date on which the Aggregate Principal Amount of such Note or Combination Note becomes due and payable as therein and herein provided, whether at the Final Maturity Date or by declaration of acceleration or otherwise.

"Maturity Extension":  As defined in Section 2.3(b) hereof.

"Minimum Average Recovery Rate Test": A test that will be satisfied with respect to Moody's, by application of the Collateral Quality Matrix and with respect to S&P, if the S&P Weighted Average Recovery Rate is initially greater than or equal to (i) with respect to the Class A-1LA Notes, 43.54%, (ii) with respect to the Class A-1LB Notes, 43.54%, (iii) with respect to the Class A-2L Notes 47.27%, (iv) with respect to the Class A-3L Notes, 51.00%, (v) with respect to the Class B-1L Notes, 55.46% and (vi) with respect to the Class B-2L Notes, 59.50%;

*provided* that such percentages may change from time to time to reflect the levels that correspond with the current S&P CDO Monitor.

"Monthly Report": The meaning specified in Section 10.5(a) hereof.

"Moody's": Moody's Investors Service, Inc. or any successor thereto.

"Moody's Approved Ratings Threshold": With respect to an entity (or its guarantor), (x) if such entity has both a long-term unsecured and unsubordinated debt rating or counterparty rating from Moody's and a short-term unsecured and unsubordinated debt rating from Moody's, a long-term unsecured and unsubordinated debt rating or counterparty rating from Moody's of at least "A2" and a short-term unsecured and unsubordinated debt rating from Moody's of at least "Prime-1", or (y) if such entity has only a long-term unsecured and unsubordinated debt rating or counterparty rating from Moody's, a long-term unsecured and unsubordinated debt rating or counterparty rating from Moody's of at least "A1".

"Moody's Asset Correlation Test" or "MAC Test": A test satisfied on each Measurement Date if the Moody's Correlation Factor on such Measurement Date (rounded up to the nearest whole number) is equal to or less than the designated Moody's Correlation Factor determined by application of the Collateral Quality Matrix.

"Moody's Correlation Factor": a single number determined by the Servicer in accordance with the correlation methodology provided to the Servicer and the Collateral Administrator by Moody's, and for which the number of assets represented by (N) on the calculation shall always equal 100.

"Moody's Default Probability Rating": For a Portfolio Loan which is (i) a Senior Secured Loan, the Moody's corporate family rating for the obligor of such Portfolio Loan and, if any such obligor does not have a Moody's corporate family rating, such rating will be determined in accordance with the methodology described in Schedule F or (ii) a Non-Senior Secured Loan, the Moody's senior unsecured rating for the obligor of such Portfolio Loan and, if any such obligor does not have a Moody's senior unsecured rating, such rating will be determined by reference to the Moody's long-term issuer rating of the obligor of such Portfolio loan and, if such obligor does not have a Moody's senior unsecured rating or a Moody's long-term issuer rating, such rating will be determined in accordance with the methodology described in Schedule F.

"Moody's Priority Category": Senior Secured Loans, Non-Senior Secured Loans, DIP Loans and/or Synthetic Securities.

"Moody's Priority Category Recovery Rate": For any item of Portfolio Collateral, the percentage specified in the definition of the term "Applicable Percentage" opposite the Moody's Priority Category of such item of Portfolio Collateral, taking into account the Rating Subcategories Difference applicable to such item of Portfolio Collateral.

"Moody's Rating": The rating determined in accordance with the methodology described in Schedule F.

"<u>Moody's Required Ratings Threshold</u>": With respect to an entity (or its guarantor), (x) if such entity has both a long-term unsecured and unsubordinated debt rating or counterparty rating from Moody's and a short-term unsecured and unsubordinated debt rating from Moody's, a long-term unsecured and unsubordinated debt rating or counterparty rating from Moody's of at least "A3" or a short-term unsecured and unsubordinated debt rating from Moody's of at least "Prime-2", or (y) if such entity has only a long-term unsecured and unsubordinated debt rating or counterparty rating from Moody's, a long-term unsecured and unsubordinated debt rating or counterparty rating from Moody's of at least "A3".

"<u>Moody's Second Level Downgrade</u>": Occurs when no Relevant Entity satisfies the Moody's Required Rating Threshold.

"<u>Moody's Weighted Average Rating</u>": Shall have the meaning set forth in <u>Schedule F</u>.

"<u>Moody's Weighted Average Rating Test</u>": A test that will be satisfied by application of the Collateral Quality Matrix.

"<u>Moody's Weighted Average Rating Test for CLO Securities</u>": Shall have the meaning set forth in <u>Schedule F</u>.

"<u>Moody's Weighted Average Recovery Rate</u>": The number obtained by summing the products obtained by multiplying the Principal Balance of each item of Portfolio Collateral (excluding Defaulted Portfolio Collateral) by the Applicable Percentage (according to the Moody's Priority Category) applicable to such item of Portfolio Collateral as set forth in the definition of "Applicable Percentage" above, dividing such sum by the Aggregate Principal Amount of all Portfolio Collateral, and rounding up to the fourth decimal place.

"<u>Non-Senior Secured Loan</u>": A Portfolio Loan that is not a Senior Secured Loan.

"<u>Non-Call Period</u>": The period beginning on the Closing Date and ending on August 1, 2010.

"<u>Non-Consenting Holder</u>": With respect to any supplemental indenture proposed pursuant to the Indenture that requires the consent of one or more Holders of the Notes or the Preferred Shares, any such Holder, or, in the case of Notes or Preferred Shares in global form, any beneficial owner, that either (i) has declared in writing that it will not consent to such supplemental indenture or (ii) has not consented to such supplemental indenture within 15 Business Days from the date on which the Trustee provided notice of such proposed supplemental indenture pursuant to the Indenture to such Holder or beneficial owner; *provided*, that in the case of the Non-Call Period, "Non-Consenting Holder" shall exclude any Holder of Class A-1LA Notes (unless such Holder has consented in writing to be designated as a Non-Consenting Holder) and the Amendment Buy-Out Option shall not be applicable to such Class A-1LA Notes.

"<u>Non-U.S. Obligor</u>": An issuer of or obligor on an item of Portfolio Collateral that is located outside the United States and is not a Permitted Non-U.S. Obligor.

"<u>Non-U.S. Person</u>": A Person who is not a U.S. Person.

"<u>Non-U.S. Person Certificate</u>": A certificate substantially in the form of <u>Exhibit G</u> hereto.

"<u>Note Component</u>": The Component of the Combination Note representing an interest in Class B-1L Notes having an initial Aggregate Principal Amount of U.S.$6,750,000.

"<u>Noteholder</u>" and "<u>Holder</u>": The Person in whose name a Note or a Combination Note is registered in the Note Register or, with respect to a Preferred Share Component of the Combination Notes, the Share Register.

"<u>Noteholder Report</u>": The meaning specified in Section 10.5(c) hereof.

"<u>Note Register</u>" and "<u>Note Registrar</u>": The respective meanings specified in Section 2.5 hereof.

"<u>Note Valuation Report</u>": The meaning specified in Section 10.5(b) hereof.

"<u>Notes</u>": The A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes, the Class B-1L Notes, the Combination Notes (to the extent of the Class Note Component) and the Class B-2L Notes.

"<u>Notice</u>": The meaning specified in Section 13.3 hereof.

"<u>Notional Amount</u>": When used with respect to the Preferred Shares, as of any date of determination, $1.00 per Preferred Share.

"<u>O/C Redemption</u>": The redemption of a Class or Classes of Notes (including, with respect to the Class B-1L Notes and the Class B-2L Notes, the applicable Periodic Rate Shortfall Amount, as set forth herein), to the extent necessary such that the Overcollateralization Tests and the Interest Coverage Test are satisfied, such tests to be calculated according to the method prescribed by <u>Annex A</u> and <u>Annex B</u>, respectively.

"<u>Offer</u>": With respect to any security, (a) any offer by the issuer of such security or by any other Person made to all of the holders of such class of security to purchase or otherwise acquire all such securities (other than pursuant to any redemption in accordance with the terms of the related Underlying Instruments) or to exchange such securities for any other security or other property or (b) any solicitation by the issuer of such security or any other Person to amend, modify or waive any provision of such security or any related Underlying Instrument.

"<u>Officer</u>": With respect to any corporation or company other than the corporation or company acting as Trustee, the Chief Executive Officer, the President, any Vice President, the Secretary or the Treasurer of such corporation or any other officer duly authorized by the Board of Directors; and with respect to the Trustee (and any other bank or trust company acting as trustee of an express trust or as custodian), any Responsible Officer thereof.

"Officer's Certificate":  A certificate signed on behalf of the Issuer, the Co-Issuer or the Servicer by an Authorized Officer of the Issuer, the Co-Issuer or the Servicer, as the case may be.

"Opinion of Counsel":  A written opinion, addressed to the Trustee (or on which the Trustee may rely) and in form and substance reasonably satisfactory to the Trustee, of an attorney at law admitted to practice before the highest court of any state of the United States or the District of Columbia or, with respect to matters relating to the laws of the Cayman Islands, the Cayman Islands, which attorney or attorneys may, except as otherwise expressly provided in this Indenture, be counsel for the Issuer, the Servicer or the Trustee and who shall be reasonably satisfactory to the Trustee.

"Optional Redemption":  The redemption of the Notes pursuant to an Optional Redemption by Liquidation or an Optional Redemption by Refinancing, as applicable.

"Optional Redemption by Liquidation":  A redemption of the Notes in whole pursuant to Section 9.1(a) hereof.

"Optional Redemption by Refinancing":  A redemption of the Notes in whole pursuant to Section 9.1(b) hereof.

"Optional Redemption Date":  The Payment Date fixed by the Issuer for an Optional Redemption, which shall be no earlier than the first Payment Date occurring in August 2010.

"Optional Redemption Price": With respect to each Class of Notes, an amount equal to the aggregate of (i) the Aggregate Principal Amount of such Class of Notes as of the Optional Redemption Date, (ii) the applicable Cumulative Interest Amount with respect to the Optional Redemption Date, (iii) any unpaid Extension Bonus Payments in respect of such Notes and (iv) the CDS/TRS Termination Payment Amount (only in connection with a redemption including the Class A-1LA Notes).

"Original HFP Share Amount": The amount of HFP Shares acquired by the Servicer Entities on the Closing Date.

"Original Portfolio Collateral":  The Portfolio Collateral, including the Initial Portfolio Collateral, purchased by the Issuer with the Deposit on or before the Effective Date and, in the case of Portfolio Loans, which will be identified by the Issuer and for which commitments will be entered into on or prior to the Effective Date for purchase on or as soon as practicable thereafter (but not scheduled to exceed sixty (60) days thereafter) pursuant to Section 3.4 hereof.

"Original Portfolio Collateral Criteria":  The requirements for the acquisition of Original Portfolio Collateral prior to the Effective Date, as set forth in Section 3.4 hereof.

"Outstanding":  With respect to the Preferred Shares or the Combination Notes (to the extent of the Preferred Share Component), as of the date of determination and subject to the proviso below, "Outstanding" refers to all Preferred Shares or Combination Notes issued and

indicated in the Share Register as outstanding. With respect to the Notes or the Combination Notes (to the extent of the Note Component), as of the date of determination, "Outstanding" refers to all Notes or Combination Notes theretofore authenticated and delivered under this Indenture except:

(i)  Notes or Combination Notes theretofore canceled by the Note Registrar or delivered (or to be delivered pursuant to Sections 2.9 or 9.8 hereof) to the Note Registrar for cancellation;

(ii)  Notes or Combination Notes or portions thereof for whose payment or redemption money in the necessary amount has been theretofore irrevocably deposited with the Trustee or any Paying Agent in trust for the Holders of such Notes or Combination Note; *provided* that, if such Notes or Combination Notes or portions thereof are to be redeemed, notice of such redemption has been duly given pursuant to this Indenture or provision therefor satisfactory to the Trustee has been made;

(iii)  Notes or Combination Notes in exchange for or in lieu of which other Notes or Combination Notes have been authenticated and delivered pursuant to this Indenture, unless proof satisfactory to the Trustee is presented that any such Notes or Combination Notes are held by a protected purchaser; and

(iv)  Notes or Combination Notes alleged to have been mutilated, destroyed, lost or stolen for which replacement Notes or Combination Notes have been issued as provided in Section 2.6 hereof;

*provided* that, in determining whether the Holders of the requisite Aggregate Principal Amount have given any request, demand, authorization, direction, notice, consent or waiver hereunder, Notes or Combination Notes owned by or pledged to the Issuer, the Trustee or any other obligor upon the Notes or Combination Notes or any Affiliate of the Issuer, the Trustee or of such other obligor, and solely for purposes of termination of the Servicer, the Servicer and any Affiliate thereof, shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Notes Combination Notes that a Responsible Officer of the Trustee has actual knowledge to be so owned or pledged shall be so disregarded.

"Overcollateralization Haircut Amount": With respect to any date of determination, an amount equal to the sum of:

(A)  the greatest of the following:

(a)  the product of (i) the applicable Overcollateralization Haircut Percentage multiplied by (ii) the Aggregate Principal Amount of all CLO Securities (other than Deferred Interest PIK Bonds and Defaulted Portfolio Collateral) on such date of determination that have an S&P Rating or a Moody's Rating within the CCC Rating Category;

(b)  the product of (i) the applicable Overcollateralization Haircut Percentage multiplied by (ii) the excess, if any, of (x) the Aggregate Principal

48

Amount of all CLO Securities included in the pledged Portfolio Collateral (other than Deferred Interest PIK Bonds and Defaulted Portfolio Collateral) on such date of determination that have an S&P Rating or a Moody's Rating within the B Rating Category or an S&P Rating or a Moody's Rating within the CCC Category over (y) 5.0% of the Aggregate Par Amount as of the date of determination; *provided* that at no time during the period commencing on the Closing Date through the Final Maturity Date, shall the Aggregate Principal Amount of all CLO Securities exempt from haircut based on subclause (y) above exceed in the aggregate 5.0% of the Required Portfolio Collateral Amount; and

(c)    the product of (i) the applicable Overcollateralization Haircut Percentage multiplied by (ii) the excess, if any, of (x) the Aggregate Principal Amount of all CLO Securities included in the pledged Portfolio Collateral (other than Deferred Interest PIK Bonds and Defaulted Portfolio Collateral) on such date of determination that have an S&P Rating or a Moody's Rating within the BB Rating Category, the B Rating Category or the CCC Rating Category over (y) 15.0% of the Aggregate Par Amount as of the date of determination;

*provided* that for the avoidance of doubt, for purposes of clauses (a), (b) and (c) above, the applicable Overcollateralization Haircut Percentage shall always be applied first to the lowest rated Portfolio Collateral that falls within such clause, then to the next lowest rated Portfolio Collateral, etc., so that the maximum applicable haircut shall be applied to the Portfolio Collateral;

plus

(B)    the product of (i) the applicable Overcollateralization Haircut Percentage multiplied by (ii) the excess, if any, of (x) the Aggregate Principal Amount of all Portfolio Loans included in the pledged Portfolio Collateral (other than Deferred Interest PIK Bonds and Defaulted Portfolio Collateral) on such date of determination that have an S&P Rating or a Moody's Rating within the CCC Rating Category over (y) 6.25% of the Aggregate Par Amount as of the date of determination.

"Overcollateralization Haircut Percentage": (i) With respect to CLO Securities with an S&P Rating or a Moody's Rating falling within the BB Rating Category, 10%, (ii) with respect to CLO Securities with an S&P Rating or a Moody's Rating falling within the B Rating Category, 20%, (iii) with respect to Portfolio Loans with an S&P Rating or a Moody's Rating falling within the CCC Rating Category, the greater of (x) 30% and (y) one minus the weighted average Market Value of all Portfolio Loans with an S&P Rating or a Moody's Rating falling within the CCC Rating Category and (iv) with respect to CLO Securities with an S&P Rating or a Moody's Rating falling within the CCC Rating Category, 50%.

"Overcollateralization Ratio": The Class A Overcollateralization Ratio, the Class B-1L Overcollateralization Ratio or the Class B-2L Overcollateralization Ratio, as the context may require.

"Overcollateralization Ratio Adjustment": For purposes of calculating the Overcollateralization Ratios (i) items of Equity Portfolio Collateral shall not be included as Portfolio Collateral, (ii) items of Deferred Interest PIK Bonds and Defaulted Portfolio Collateral shall be included at the lesser of (a) the Market Value of such item of Deferred Interest PIK Bonds, Defaulted Portfolio Collateral and (b) the Applicable Percentage for such item of Deferred Interest PIK Bonds and Defaulted Portfolio Collateral multiplied by its Principal Balance; *provided* that any Portfolio Loan that has been an item of Defaulted Portfolio Collateral for four years shall not be included as Portfolio Collateral and any CLO Security that has been an item of Defaulted Portfolio Collateral for three years shall not be included as Portfolio Collateral, (iii) with respect to items of Discount Portfolio Collateral, an amount equal to the original purchase price of such item of Discount Portfolio Collateral shall be included as Portfolio Collateral, (iv) to the extent the Aggregate Principal Amount of Current Pay Obligations exceeds 7.5% of the Aggregate Par Amount, such excess shall be included as Defaulted Portfolio Collateral and (v) items of Portfolio Collateral characterized as Current Pay Obligations in (iii) (c) of the Current Pay Obligation definition shall be included at 95% of the Market Value of such item of Portfolio Collateral. If an item of Portfolio Collateral could be classified in more than one of the categories set forth in clauses (i) through (iv), such item of Portfolio Collateral will not be discounted multiple times but will be treated in the applicable category that results in the largest discount to the par amount of such item of Portfolio Collateral. Notwithstanding the foregoing, there may be included as Portfolio Collateral (with respect to items (i) through (iv) above) such greater amount as confirmed by the Rating Agencies which will not result in a reduction or withdrawal of the then-current ratings assigned by them to any Class of the Notes.

"Overcollateralization Tests": With respect to any date of determination, tests met when the Class A Overcollateralization Ratio is at least equal to the Class A Overcollateralization Percentage, the Class B-1L Overcollateralization Ratio is at least equal to the Class B-1L Overcollateralization Percentage and the Class B-2L Overcollateralization Ratio is at least equal to the Class B-2L Overcollateralization Percentage, each relating to such date of determination.

"Partial Deferred Interest Bonds": Any debt obligation, with respect to which a portion of the interest thereon can be partially deferred without causing a payment default of such debt obligation under its underlying documents. For purposes of calculating the Weighted Average Coupon, the portion of interest that is deferrable with respect to any Partial Deferred Interest Bond will be assumed to be zero.

"Participation": With respect to any Portfolio Loan, a participation interest in a commercial loan purchased from a Selling Institution that does not entitle the holder thereof to direct rights against the obligor.

"Paying Agent": The Trustee, the Irish Paying Agent or any other depository institution or trust company authorized by the Co-Issuers pursuant hereto to pay principal of or any interest that may become payable on any Class of Notes on behalf of the Co-Issuers.

"Paying and Transfer Agency Agreement": The agreement dated as of the Closing Date between the Issuer and the Paying and Transfer Agent with respect to the Preferred Shares.

"Paying and Transfer Agent":  Investors Bank & Trust Company.

"Payment Date":    February, May, August and November of each year, commencing November 1, 2007 (or if any such date is not a Business Day, the next succeeding Business Day).

"Payment Date Equity Securities" shall mean, with respect to any Payment Date, Distributable Equity Securities that the Issuer, in its sole discretion but on the advice of the Servicer, elects to distribute in lieu of cash on such Payment Date to the Holders of Preferred Shares in accordance with the terms hereof.

"Periodic Interest Accrual Period":  With respect to any Payment Date, the period commencing on the prior Payment Date (or the Closing Date in the case of the first Payment Date) and ending on the day preceding such Payment Date.

"Periodic Interest Amount":  With respect to the Class A-1LA Notes and the Class A-1LB Notes on any Payment Date, the aggregate amount of interest accrued at the Applicable Periodic Rate during the related Periodic Interest Accrual Period on (i) with respect to the first Payment Date, the average daily Aggregate Principal Amount of such Class of Notes during such Periodic Interest Accrual Period, and (ii) thereafter, the Aggregate Principal Amount of such Class of Notes on the first day of such Periodic Interest Accrual Period (after giving effect to any payment of principal of such Class of Notes on such day). With respect to each other Class of Notes and any Payment Date, the aggregate amount of interest accrued at the Applicable Periodic Rate during the related Periodic Interest Accrual Period on the Aggregate Principal Amount of such Class on the first day of such Periodic Interest Accrual Period (after giving effect to any payment of principal of such Class of Notes on such date, including in connection with a redemption of a Class of Notes on any date during the related Periodic Interest Accrual Period).

"Periodic Rate Shortfall Amount":  With respect to each Class of Notes and any Payment Date, any shortfall or shortfalls in the payment of the Periodic Interest Amount on such Class of Notes with respect to any preceding Payment Date or Payment Dates, together with interest accrued thereon at the Applicable Periodic Rate (net of all Periodic Rate Shortfall Amounts, if any, paid with respect to such Class of Notes prior to such Payment Date).

"Periodic Reserve Amount": As of any date of determination, an amount equal to (a) the sum of (i) the Trustee Administrative Expenses and Preferred Shares Administrative Expenses payable on the next succeeding Payment Date; (ii) without duplication of amounts payable pursuant to clause (i) hereof, the Issuer Base Administrative Expenses payable on the next succeeding Payment Date; (iii) the Base Fee Amount payable on the next succeeding Payment Date; and (iv) the Cumulative Interest Amount for the Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes and the Class A-3L Notes, and the Periodic Interest Amount for the Class B-1L Notes and the Class B-2L Notes due on the next succeeding Payment Date, *minus* (b) amounts due from any Hedge Counterparty Provider on the next succeeding Payment Date.

"<u>Permanent Global Note</u>":  The Rule 144A Global Notes and the Permanent Regulation S Global Notes.

"<u>Permanent Regulation S Global Note</u>":  With respect to any Class, the permanent global note issued to Non-U.S. Persons in exchange for the Temporary Regulation S Global Note of such Class after the Distribution Compliance Period, the permanent global note substantially in the form attached hereto as <u>Exhibits A-1L-2</u>, <u>A-2L-2</u>, <u>A-3L-2</u>, <u>B-1L-2</u> and <u>B-2L-2</u>.

"<u>Permitted Non-U.S. Obligor</u>":  An issuer of or obligor on an item of Portfolio Collateral that is located in (a) a Group A Country or (b)(i) a Group B Country, (ii) any tax advantaged jurisdiction (including the Cayman Islands, Netherlands Antilles, Bermuda, Ireland, Luxembourg and the Channel Islands) or (iii) any tax advantaged jurisdiction or any tax neutral or other jurisdiction subject to Moody's and S&P confirming to the Issuer, the Trustee and the Servicer that an immediate withdrawal, reduction or other adverse action with respect to any then current rating (including any private or confidential rating) of any Class of Notes will not occur as a result of such obligor being a Permitted Non-U.S. Obligor, so long as the U.S. Dollar denominated sovereign debt obligations of such jurisdiction are rated at least "Aa2" by Moody's (unless (x) an obligor of such item of Portfolio Collateral is a corporation  for which  a major source of revenue is  from a jurisdiction rated at least "Aa2" by Moody's or (y) such item of the Portfolio Collateral is a CLO Security); *provided* that, with respect to the obligors of an item of Portfolio Collateral qualifying as Permitted Non-U.S. Obligors under this clause (b)(iii), at least 80% of such obligor's underlying assets must be domiciled in the United States or another Permitted Non-U.S. Obligor jurisdiction to so qualify as a Permitted Non-U.S. Obligor. For purposes of this definition, the Servicer may specify the location of a Permitted Non-U.S. Obligor to be the country in which at least 80% of such obligor's underlying assets are domiciled, if such assets are domiciled in the United States or another Permitted Non-U.S. Obligor jurisdiction; *provided* that the Aggregate Principal Amount of the Portfolio Collateral as to which the Servicer so specifies the location of a Permitted Non-U.S. Obligor may not exceed 5% of the Aggregate Par Amount.  If the location of a Permitted Non-U.S. Obligor is specified by the Servicer to be in a country other than where it is domiciled in accordance with the foregoing sentence, for purposes of the concentration limitations and collateral quality tests described herein, such item of Portfolio Collateral will be considered to be domiciled in the country so specified.

"<u>Permitted Transfer</u>":  A transfer by novation by a Hedge Counterparty to an entity (the "<u>Transferee</u>") of all, but not less than all, of such Hedge Counterparty's rights, liabilities, duties and obligations under related Hedge Agreement, as applicable, with respect to which transfer each of the following conditions is satisfied: (a) the Transferee is an Eligible Replacement that is a recognized dealer in interest rate derivatives or cashflow derivatives, as the case may be, (b) an "Event of Default" or "Termination Event" under such Hedge Agreement (as such terms are defined under the related Hedge Agreement) would not occur as a result of such transfer, (c) pursuant to a written instrument (the "<u>Transfer Agreement</u>"), the Transferee acquires and assumes all rights and obligations of such Hedge Counterparty under the related Hedge Agreement and the related "Transaction" (as defined in the related Hedge Agreement), (d) the related Hedge Counterparty will be responsible for any costs or expenses incurred in connection with such transfer (including any replacement cost of entering into a replacement transaction); (e) either (A) Moody's has been given prior written notice of such transfer and the Rating

Condition is satisfied with respect to S&P or (B) each Rating Agency has been given prior written notice of such transfer and such transfer is in connection with the assignment and assumption of this Agreement without modification of its terms, other than party names, dates relevant to the effective date of such transfer, tax representations and any other representations regarding the status of the substitute counterparty, notice information and account details and other similar provisions; and (f) such transfer otherwise complies with the terms of this Indenture.

"Person":  Any individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization, government or any agency or political subdivision thereof.

"PIK Bond": Any item of Portfolio Collateral that, pursuant to the terms of the related Underlying Instruments, permits the payment of interest thereon to be deferred and capitalized or otherwise provides that interest will accrue on such deferred interest or that issues identical securities in place of payments of interest in cash.

"Pledged Securities":  On any date of determination, the Portfolio Collateral and the Eligible Investments in the Trust Estate.

"Portfolio Collateral":  (I) Any United States dollar denominated commercial loan, including participation or assignment interests therein, in Registered form or Registered debt obligation (other than Eligible Investments) of any corporation, limited liability company, partnership, trust or other entity or of the United States government or any agency or instrumentality thereof or of any state or political subdivision or any agency or instrumentality thereof or of any sovereign issuer (including any security entitlement with respect thereto) and any United States Security Entitlement, which obligation, security entitlement or United States Security Entitlement, when Granted to the Trustee or committed to be purchased by the Issuer (with written notice to the Trustee):

(a)      is an "eligible asset" as defined in Rule 3a-7;

(b)      except as permitted under Section 12.10(b), provides for periodic payments of interest thereon in cash no less frequently than semiannually, or, in the case of Portfolio Loans, quarterly;

(c)      provides for a fixed amount of principal to be payable according to a fixed schedule or at maturity;

(d)      is not an item of Defaulted Portfolio Collateral, an item of Equity Portfolio Collateral, a margin stock or an item of Credit Risk Portfolio Collateral;

(e)      is not a zero-coupon bond, a bond that provides for a combination of no coupon and a fixed coupon, a step-up bond (except for step-up bonds providing for the payment of current interest at a rate no less than 5% *per annum* or Collateral LIBOR, if floating rate), other than with respect to the Initial Portfolio Collateral on the Closing Date, a Partial Deferred Interest Bond (except

for such bonds providing for the payment of current interest at a rate no less than 5% *per annum* or Collateral LIBOR, if floating rate);

(f) is not currently the subject of an Offer that would result in (i) the Issuer owning a security not meeting the requirements of Portfolio Collateral, not paying current interest, or, in the reasonable judgment of the Servicer, not expected to pay in full at maturity, or (ii) the Issuer receiving Eligible Investments or cash in a par amount less than that of the original security or the subject of an Exchange Offer;

(g) does not provide for conversion or exchange into equity capital at any time over its life (other than the exercise of any warrant, profit participation or other equity-like interest which is a component of a Unit);

(h) with respect to Portfolio Collateral which consists of Floating Rate Portfolio Collateral, has an interest rate which adjusts periodically in accordance with changes in one or more established indices at least one of which is the London interbank offered rate for one-, two-, three- or six-month U.S. dollar deposits and which adjusts at least semiannually or, with respect to items of Fixed Rate Portfolio Collateral, has an interest rate that remains constant until the maturity of such obligations or is a Reset Debt Security; *provided* that not more than 5.0% of the Aggregate Principal Amount of the Portfolio Collateral included in the Trust Estate may include items of Portfolio Collateral the interest rate on which adjusts in accordance with one or more indices that do not include the London interbank offered rate for one-, two-, three-, or six-month U.S. Dollar deposits;

(i) has coupon or other payments (other than commitment fees, facility fees or other similar fees) that are not subject to U.S. withholding tax and are not at time of purchase subject to foreign withholding tax unless the issuer of the security is required to make "gross-up" payments sufficient to cause the net amount to be received on the debt obligations to equal the amount that would have been paid had no such withholding tax applied;

(j) matures on or before August 1, 2024, or, if a Maturity Extension as occurred, the then applicable Extended Final Maturity Date, except that up to 5% of the Aggregate Par Amount may mature after such date but before 5 years after such date; *provided* that, with respect to Portfolio Loans, no more than 3% of the Aggregate Par Amount may mature after August 1, 2024, or, if a Maturity Extension as occurred, the then applicable Extended Final Maturity Date, but before two years after such date and no Portfolio Loans may mature after two years after such date;

(k) the terms of which do not, unless it is a Delayed Drawdown Loan or Revolving Loan, require the Holder to assume or otherwise undertake any funding obligations or liabilities (of a contingent nature or otherwise);

(l)      is payable only in United States dollars;

(m)     is not a Current Pay Obligation;

(n)     is not a Debt Security;

(o)     the S&P Rating of which does not include a subscript of "r", "t", "p", "pi" or "q" unless otherwise agreed to by Standard & Poor's in writing and a Moody's Rating that addresses the full amount of principal or interest indicated would be paid;

(p)     during the Revolving Period, CLO Security has a Moody's Rating of "Ba2" or higher and an S&P Rating of "BB" or higher and, after the Revolving Period, are not CLO Securities;

(q)     are not obligations of Non-U.S. Obligors;

(r)     are not a PIK Bond which is currently deferring interest payments or receiving payments in-kind pursuant to the terms of the Underlying Instrument; and

(s)     satisfies, together with the other Portfolio Collateral to be concurrently included in the Trust Estate, the other applicable criteria set forth in this Indenture, including the ratings guidelines and guidelines concerning issuer concentration and industry concentration; or

(II)    a Synthetic Security; *provided* that the Servicer concludes, based on advice of counsel, that the Synthetic Security is an "eligible asset" for purposes of Rule 3a-7.

"<u>Portfolio Improvement Exchange</u>":  The disposition, during the Revolving Period, of an item of Portfolio Collateral and corresponding acquisition of one or more items of Substitute Portfolio Collateral which in the aggregate will result in (i) the Collateral Quality Tests, the Interest Coverage Test, the Overcollateralization Tests and the other collateral criteria set forth in Section 12.2 being satisfied (or bring the total Portfolio Collateral closer to compliance with any such test or limitation) or if one or more of such Collateral Quality Tests, Interest Coverage Test, Overcollateralization Tests or collateral criteria set forth in Section 12.2 is not satisfied, the degree of compliance therewith would be improved and (ii) improving, on a net basis, the quality of the Portfolio Collateral as measured by such Collateral Quality Tests, Interest Coverage Test, Overcollateralization Tests and collateral criteria set forth in Section 12.2, and (iii) in the case of each of clause (i) and (ii) not causing any other Collateral Quality Tests, Interest Coverage Test, Overcollateralization Tests or collateral criteria set forth in Section 12.2, to be violated or significantly increase the likelihood of such violation in the future.

"<u>Portfolio Loan</u>":  Interests in commercial loans included in the Portfolio Collateral.

"Post-Closing Sale Collateral":  An asset acquired by the Issuer which as of the Closing Date has a commitment to be sold by the Issuer within 10 days of the Closing Date.

"Preferred Shares":  The 42,200,000 Class I Preferred Shares of the Issuer, par value U.S.$0.001 per share, and the 44,000,000 Class II Preferred Shares of the Issuer, par value U.S.$0.001 per share, that will be issued on the Closing Date pursuant to the Issuer's Memorandum of Association and Articles of Association and any further Preferred Shares issued from time to time by the Issuer.

"Preferred Shares Administrative Expenses":  With respect to any Payment Date (including without limitation the Final Maturity Date), the Paying and Transfer Agent's administrative fees and expenses (including any indemnities) for the Due Period relating to such Payment Date.

"Preferred Shares Collection Account":  The meaning set forth in the Paying and Transfer Agency Agreement.

"Preferred Share Component":  The component of the Combination Notes representing 3,250,000 Preferred Shares.

"Premium":  With respect to any item of Portfolio Collateral sold pursuant to the terms hereof or called pursuant to the terms thereof, the excess, if any, of (a) the sale or call price of such item of Portfolio Collateral less any accrued interest with respect to such item of Portfolio Collateral over (b) the Aggregate Principal Amount of such item of Portfolio Collateral.

"Principal Balance":  With respect to any Pledged Security, as of any date of determination, the outstanding principal amount of such Pledged Security, *provided* that (i) unless otherwise stated herein or in the Indenture, the "Principal Balance" of any Delayed Drawdown Loan or Revolving Loan shall refer to the sum of the outstanding aggregate principal amount of such Delayed Drawdown Loan or Revolving Loan *plus* the amount of the unfunded portion of the Issuer's commitment to make or otherwise fund advances related thereto (to the extent, and without duplication, of amounts on deposit in the Loan Funding Account available to fund such advances), (ii) the "Principal Balance" of any Synthetic Security shall be equal to (a) in the case of any Synthetic Security other than a Default Swap, the outstanding principal amount of the Reference Obligation or the notional amount of the Synthetic Security related thereto and (b) in the case of any Default Swap, the cash and the principal amount of the securities in the related Default Swap Collateral Account reduced by the amount of any payments due and payable to the Default Swap Counterparty by reason of the occurrence of one or more "credit events" or other similar circumstances to the extent such payments have not yet been made; and (iii) with respect to any item of Equity Portfolio Collateral, the "Principal Balance" shall equal zero.

"Proceedings":  Any suit in equity, action at law or other judicial or administrative proceeding.

"Proposed Portfolio":  The Aggregate Par Amount resulting from the sale, maturity or other disposition of an item of Portfolio Collateral or a proposed purchase of an item of Portfolio Collateral, as the case may be.

"Purchased Accrued Interest":  Interest accrued on or purchased with respect to an item of Portfolio Collateral as part of the price paid by the Issuer to acquire such item of Portfolio Collateral less any amount of Collateral Interest Collections applied by the Issuer to acquire such accrued interest at the time of purchase; *provided* that accrued interest on certain CLO Securities as indicated on Schedule A shall not constitute Purchased Accrued Interest.

"Qualified Institutional Buyer":  A "qualified institutional buyer" within the meaning of Rule 144A.

"Qualified Purchaser":  A "qualified purchaser" within the meaning of Section 3(c)(7) of the Investment Company Act.

"Quarterly Collateral Amount":  With respect to any Due Period, the average of (i) the Aggregate Par Amount of Portfolio Collateral and Eligible Investments on the first day of such Due Period and (ii) the Aggregate Par Amount of Portfolio Collateral and Eligible Investments on the last day of such Due Period.  For purposes of such amounts, Equity Portfolio Collateral and Defaulted Portfolio Collateral shall be excluded in calculating the Aggregate Par Amount of the Portfolio Collateral.

"Rating Agencies":  Standard & Poor's and Moody's, collectively.

"Rated Balance":  With respect to the Combination Notes, initially U.S. $10,000,000, reduced by all payments on account of the Rated Balance of the Combination Notes, as provided in Section 16.3.

"Rated Coupon":  Interest, at the rate of 1.00% per annum, on the Rated Balance of the Combination Notes.

"Rating Condition":  With respect to any Rating Agency and any action proposed to be taken under this Indenture, a condition that is satisfied when such Rating Agency has confirmed in writing to the Issuer, the Trustee and the Servicer that no withdrawal, reduction or suspension (and not restored) with respect to any then current rating, if any, by such Rating Agency (including any private or confidential rating) of any Class of Notes will occur as a result of such proposed action.

"Rating Confirmation":  Written confirmation from each of the Rating Agencies that it has not reduced or withdrawn (and not restored) the rating assigned by it on the Closing Date to any Class of Notes.

"Rating Confirmation Failure":  A failure to obtain Rating Confirmation by the 35th day after the Effective Date (or if such day is not a Business Day, the succeeding Business Day).

"Rating Confirmation Failure Redemption": The redemption of a Class or Classes of Notes, as a result of a Rating Confirmation Failure pursuant to Section 9.2.

"Rating Subcategories Difference":  The number of ratings subcategories difference between the rating by Moody's or, if not actually rated by Moody's, the Moody's

Rating, of an item of Portfolio Collateral and the Moody's Default Probability Rating of such item of Portfolio Collateral.

"Record Date":   With respect to any Payment Date, the Business Day immediately preceding such Payment Date; *provided however*, that if any Definitive Notes are issued, the Record Date for such Definitive Notes shall be fifteen calendar days preceding such Payment Date.

"Redemption Date Statement":  The meaning specified in Section 10.5(e) hereof.

"Redemption Record Date":  With respect to an Optional Redemption Date, a Special Redemption Date, a Tax Event Redemption Date or a Mandatory Redemption Date, the Business Day preceding such Optional Redemption Date, Special Redemption Date, Tax Event Redemption Date or Mandatory Redemption Date, and with respect to an Initial Deposit Redemption, the last day of the calendar month preceding the month in which the Initial Deposit Redemption Date occurs.

"Reference Banks":  Four major banks in the London interbank market selected by the Calculation Agent (after consultation with the Servicer).

"Reference Obligation":  A security or other debt obligation that satisfies the definition of Portfolio Collateral other than as to payment terms; *provided* that notwithstanding the definition thereof, a Reference Obligation may be a loan (but not a participation interest in a loan, except as permitted in the Indenture).

"Reference Obligor":  The obligor under a Reference Obligation.

"Refinancing":  The meaning specified in Section 9.1(b) hereof.

"Refinancing Date":  The meaning specified in Section 9.1(b) hereof.

"Refinancing Proceeds":  The meaning specified in Section 9.1(b) hereof.

"Registered":  When used with respect to any Portfolio Collateral or Eligible Investment, an instrument issued after July 18, 1984, that is in registered form for purposes of the Code.

"Regulation S":  Regulation S promulgated under the Securities Act.

"Regulation S Global Note":  Temporary Regulation S Global Notes, together with the Permanent Regulation S Global Notes.

"Regulation S Transferor Certificate":  A certificate substantially in the form of Exhibit E hereto.

"Relevant Date":  The Final Maturity Date, except that if the full amount payable on the Notes has not been duly received by the Trustee or Paying Agent on or prior to the Final

Maturity Date, the "Relevant Date" shall be the date on which such monies have been so received.

"Relevant Entity":  A Hedge Counterparty and any Eligible Guarantor under a related Eligible Guarantee.

"Required Portfolio Collateral Amount":  U.S. $1,000,000,000.

"Requisite Noteholders":  The Holders of at least 60% of the Aggregate Principal Amount of the Outstanding Notes (voting as a single class including the Combination Notes, to the extent of the Note Component); *provided* that (i) upon the occurrence of a Default or an Event of Default under this Indenture, "Requisite Noteholders" shall mean the Holders of at least 60% of the Aggregate Principal Amount of the Controlling Class, voting together as a single Class.  If the Person that is acting as Trustee hereunder is a Holder of any Note for its own account, such Person shall be excluded as a Holder for purposes of this definition in connection with the consent or approval by Noteholders of any supplemental indenture affecting the provisions hereof relating to the Trustee.

"Replacement Transaction":  With respect to any Terminated Transaction (as defined in a Hedge Agreement), a transaction or group of transactions that (i) would have the effect of preserving for the related Hedge Counterparty to such Hedge Agreement the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under such Hedge Agreement in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant "Early Termination Date" (as such term is defined in the related Hedge Agreement), have been required after that date, (ii) has terms which are substantially the same as the related Hedge Agreement, including, without limitation, rating triggers, and credit support documentation, as determined by the Issuer, in its sole discretion, acting in a commercially reasonable manner, and (iii) satisfies the Rating Condition.

"Reserve Account": The meaning specified in Section 10.2 hereof.

"Reserve Amount": A portion of the proceeds from the sale of the Notes in an amount equal to US$1,500,000 to fund a portion of the payments to be made on the first Payment Date in accordance with the Priority of Payments, and, any remaining funds, to fund any payments of interest or principal on the Notes or any distributions on the Preferred Shares as described in Section 11.1(b).

"Reset Debt Security":  An item of Portfolio Collateral bearing a rate of interest that varies periodically (including, without limitation, daily), which at the time of its inclusion in the Trust Estate has a minimum rate of interest of at least 5.0% *per annum* with respect to Fixed Rate Portfolio Collateral or Collateral LIBOR with respect to Floating Rate Portfolio Collateral, and which minimum interest rate is not subject to adjustment on or after its inclusion in the Trust Estate, pursuant to the terms of the related Underlying Instrument to a rate of interest which is lower than the rate of interest borne by such item of Portfolio Collateral on the date that such item of Portfolio Collateral was included in the Trust Estate.

"Responsible Officer":  When used with respect to the Trustee, any officer within the Corporate Trust Office (or any successor group of the Trustee) including any vice president, assistant vice president, assistant treasurer, assistant secretary, trust officer or any other officer of the Trustee customarily performing functions similar to those performed by the persons who at the time shall be such officers, respectively, or to whom any corporate trust matter is referred within the Corporate Trust Office because of his or her knowledge of and familiarity with the particular subject.

"Retained Accrued Interest"  Any accrued and unpaid interest with respect to any Portfolio Collateral which was not included in the purchase price for such collateral at the time of purchase.

"Revolving Loan": A Portfolio Loan that, pursuant to the agreement or instrument that governs the rights and obligations of the parties thereto, would obligate the Issuer, if the Issuer were to purchase such Portfolio Loan for inclusion in the Trust Estate, to make or otherwise fund one or more future advances to the related borrower.

"Revolving Period":  The period beginning on the Closing Date and ending on the earliest of (i) August 1, 2014 for Portfolio Loans or August 1, 2012 for CLO Securities or, in the case of an Extension, the Extended Revolving Period End Date; *provided* that Portfolio Loans and CLO Securities may be purchased for the period of any such Extension, and (ii) the occurrence and continuance of an Event of Default; *provided* that in no event shall date of termination of the Revolving Period be determined on the basis of the Market Value of the Portfolio Collateral.

"Rule 144A":  Rule 144A promulgated under the Securities Act.

"Rule 144A Global Note":  With respect to any Class (other than the Class B-2L Notes), the permanent global note issued to U.S. Persons.

"Rule 144A Transferor Certificate":  A certificate substantially in the form of Exhibit D hereto.

"Rule 3a-7":  Rule 3a-7 under the Investment Company Act.

"Sale":  The meaning specified in Section 5.18 hereof.

"Sale Restriction Condition":  Shall mean (x) with respect to sales of Credit Risk Portfolio Collateral, if the rating of the Class A-1LA Notes, the Class A-1LB or the Class A-2L Notes has been downgraded at least one rating sub-category below the original rating by Moody's (and such original rating has not been restored to the original rating) or the original rating of the Class A-3L Notes, the Class B-1L Notes or the Class B-2L Notes has been downgraded at least two rating sub-categories by Moody's (and has not been restored to a rating no more than one rating sub-category below the original rating of such Class of Notes), or if the Class A Overcollateralization Ratio is less than 90% of the Class A Overcollateralization Percentage or (y) with respect to sales of Credit Improved Portfolio Collateral, if the original rating of the Class A-1LA Notes, the Class A-1LB Notes or the Class A-2L Notes has been downgraded at least one rating sub-category by Moody's (and such original rating has not been

restored) or the original rating of the Class A-3L Notes, the Class B-1L Notes or the Class B-2L Notes has been downgraded at least two rating sub-categories by Moody's (and has not been restored to a rating no more than one rating sub-category below the original rating of such Class of Notes).

"Schedule of Portfolio Collateral":  The Initial Portfolio Collateral listed on Schedule A hereto, as amended from time to time to reflect Portfolio Collateral in the Trust Estate, including the inclusion of Portfolio Collateral purchased pursuant to Section 3.4(a) hereof, the inclusion of Additional Portfolio Collateral as provided in Section 11.3 hereof, the release of Portfolio Collateral pursuant to Article X hereof, and the inclusion of Substitute Portfolio Collateral as provided in Section 12.4 hereof.

"Scheduled Distribution":  With respect to any Pledged Security, for each Due Date after the date of determination, the scheduled payment of principal and/or interest due on such Due Date with respect to such Pledged Security, determined in accordance with the assumptions specified in Section 1.3 hereof.

"Secured Parties":  The meaning specified in the Granting Clauses hereof.

"Securities Act":  The United States Securities Act of 1933, as amended.

"Securities Intermediary":  The meaning specified in Section 6.15 hereof.

"Securities Lending Account":  The meaning specified in Section 10.2 hereof.

"Securities Lending Agreements": The meaning specified in Section 7.19 hereof.

"Securities Lending Collateral": The meaning specified in Section 7.19 hereof.

"Securities Lending Counterparty": The meaning specified in Section 7.19 hereof.

"Selling Institution": The seller of a Participation or, if applicable, its guarantor, which has a long-term senior unsecured debt rating of at least "A2" by Moody's and at least "A" by S&P at the time such Participation is committed to be acquired by the Issuer.

"Senior Class A Notes":  The Class A-1LA Notes, the Class A-1LB Notes and the Class A-2L Notes.

"Senior Class A Overcollateralization Ratio" With respect to a determination made as of any date of calculation, the ratio (expressed as a percentage) obtained by dividing (a) the sum of (1) the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate (other than items of Equity Portfolio Collateral, which shall not be included as Portfolio Collateral) as of such date, *plus* (2) the sum of the Balance of Eligible Investments and cash in the Collection Account representing Collateral Principal Collections plus the Balance of Eligible Investments and cash in the Initial Deposit Account plus unpaid Purchased Accrued Interest, each as of such date by (b) the sum of the Aggregate Principal Amount of the Senior Class A Notes (including for this purpose any Periodic Rate Shortfall Amounts with respect to such Class of Notes not paid when due, until such amounts, if any, are paid in full) as of such date.

"Senior Secured Loan": A loan that (i) is not (and by its terms is not permitted to become) subordinate in right of payment to any other debt for borrowed money incurred by the obligor under such loan and (ii) is secured by a valid first priority perfected security interest or lien on specified collateral securing the obligor's obligations under such Senior Secured Loan, which security interest or lien is not subordinate to the security interest or lien securing any other debt for borrowed money. For the avoidance of doubt, any second lien Portfolio Loan which has a Moody's obligation rating at least equal to the Moody's corporate family implied rating of such issuer, will be treated as Senior Secured Loan for the purposes of determining Moody's Priority Category Recovery Rate.

"Servicer": Highland Capital Management, L.P., unless and until a successor Person becomes the servicer pursuant to the provisions of the Servicing Agreement, and thereafter "Servicer" shall mean such successor Person.

"Servicer Entities": Collectively, the Servicer, entities affiliated with the Servicer or clients of the Servicer.

"Servicer Order" and "Servicer Request": A written order or request dated and signed in the name of the Servicer by an Authorized Officer of the Servicer.

"Servicing Agreement": The Servicing Agreement, dated as of the Closing Date, between the Issuer and the Servicer, and if amended as permitted therein and in Section 14.1(f), as so amended.

"Servicing Fee Portion": 100% minus (a) for any Payment Date prior to February 3, 2008, the Class II Preferred Share Percentage for such Payment Date and (b) for any other Payment Date, a percentage selected by the Servicer in its sole discretion.

"Share Register": The register maintained under the Paying and Transfer Agency Agreement for the Preferred Shares and any other shares of the Issuer.

"Share Registrar": Maples Finance Limited or any successor thereto appointed by the Issuer.

"Special Redemption": A redemption of the Notes pursuant to Section 9.4 hereof.

"Special Redemption Date": The Payment Date during the Revolving Period fixed by the Issuer for a Special Redemption.

"Special Redemption Price": When used with respect to a Special Redemption, an amount equal to the principal amount of the Notes being redeemed (or, in the case of the Class B-1L Notes and the Class B-2L Notes, first to pay any Periodic Rate Shortfall Amount with respect to such Notes and then to pay principal).

"Standby Directed Investment": Initially, Investors Bank & Trust overnight sweep account, "Investcash", or such other Eligible Investments as may be subsequently designated as the "Standby Eligible Investment" by written instruction of the Servicer to the Trustee.

"<u>Standard & Poor's</u>" or "<u>S&P</u>": Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or any successor thereto.

"<u>Standard & Poor's CDO Monitor</u>": The dynamic, analytical computer model developed by Standard & Poor's and used to estimate default risk of Portfolio Collateral and provided to the Servicer, the Issuer and the Trustee on or before the Effective Date, as it may be modified by Standard & Poor's in connection with its confirmation of the ratings of the Notes following the Closing Date.

"<u>Standard & Poor's CDO Monitor Test</u>": A test that is satisfied if, after giving effect to the sale of an item of Portfolio Collateral or the purchase of an item of Portfolio Collateral (or both), as the case may be (i) the S&P Loss Differential of the Proposed Portfolio is positive or (ii) the S&P Loss Differential of the Proposed Portfolio is greater than the S&P Loss Differential of the Current Portfolio.

"<u>Standard & Poor's Industry Category</u>": When used with respect to an item of Portfolio Collateral, any of the industry categories established by Standard & Poor's set forth in <u>Schedule B</u> hereto, and any additional categories that may be subsequently established by Standard & Poor's.

"<u>Standard & Poor's Preferred Format</u>": A Microsoft Excel file (or such other format agreed by Standard & Poor's) of the Standard & Poor's CDO Monitor input file and, with respect to each item of Portfolio Collateral, the name of each obligor thereon, the CUSIP number thereof (if applicable) and the Standard & Poor's Industry Category thereof.

"<u>Standard & Poor's Rating</u>" or "<u>S&P Rating</u>": The rating determined in accordance with the methodology described in <u>Schedule D</u>.

"<u>S&P Approved Ratings Threshold</u>": With respect to an entity (or its guarantor), a short-term unsecured and unsubordinated debt rating from S&P of at least "A-1", or, if such entity does not have a short-term unsecured and unsubordinated debt rating from S&P, a long-term unsecured and unsubordinated debt rating from S&P of at least "A+".

"<u>S&P Break-Even Loss Rate</u>": At any time, the maximum percentage of defaults which the Current Portfolio or the Proposed Portfolio, as applicable, can sustain, as determined by S&P through application of the Standard & Poor's CDO Monitor Test, which, after giving effect to S&P's assumptions on recoveries and timing and to the priority of payments, will result in sufficient funds remaining for the principal repayment of the Notes in full and the timely payment, as applicable, of interest on each Class of Notes.

"<u>S&P First Level Downgrade</u>": Occurs when no Relevant Entity satisfies the S&P Approved Rating Threshold.

"<u>S&P Loss Differential</u>": At any time, the rate calculated by subtracting the S&P Scenario Loss Rate from the S&P Break-Even Loss Rate at such time.

"S&P Priority Category":  Senior secured Portfolio Loans and Debt Securities, second lien Portfolio Loans, senior unsecured Portfolio Loans and Debt Securities, subordinated Portfolio Loans and Debt Securities, DIP Loans and Synthetic Securities.

"S&P Priority Category Recovery Rate":  For any item of Portfolio Collateral, the percentage specified in the definition of the term "Applicable Percentage" opposite the S&P Priority Category of item of Portfolio Collateral.

"S&P Required Ratings Threshold":  With respect to an entity (or its guarantor), a long-term unsecured and unsubordinated debt rating from S&P of at least "BBB-" or a short-term unsecured and unsubordinated debt rating from S&P of at least "A3".

"S&P Scenario Loss Rate":  At any time, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with a "AAA" rating of the Class A-1L Notes, a "AA" rating of the Class A-2L Notes, a "A" rating of the Class A-3L Notes, a "BBB" rating of the Class B-1L Notes and a "BB" rating of the Class B-2L Notes, in each case by Standard & Poor's, determined by application of the Standard & Poor's CDO Monitor at such time.

"S&P Second Level Downgrade":  Occurs when no Relevant Entity satisfies the S&P Required Rating Thresholds.

"S&P Weighted Average Recovery Rate": The number obtained by summing the products obtained by multiplying the Principal Balance of each item of Portfolio Collateral (excluding Defaulted Portfolio Collateral) by the Applicable Percentage (according to the S&P Priority Category) applicable to such item of Portfolio Collateral as set forth in the definition of "Applicable Percentage" above, dividing such sum by the Aggregate Principal Amount of all Portfolio Collateral (excluding Defaulted Portfolio Collateral), and rounding up to the fourth decimal place.

"Subsequent Delivery Date":  A date fixed by the Issuer for the delivery of an item of Portfolio Collateral to be included in the Trust Estate after the Effective Date.

"Substitute Portfolio Collateral":  An item of Portfolio Collateral that is Delivered to the Trustee under this Indenture as security for the Notes in accordance with Section 12.4 hereof.

"Supplemental Fee Amount":  The amount used to pay the Supplemental Servicing Fee pursuant to clause FIFTEENTH(a) of Section 11.1(c)(i) and clause FIFTEENTH(a) of Section 11.(d).

"Supplemental Servicing Fee":  For any Payment Date, an amount equal to the product of (a) the Supplemental Fee Amount for such Payment Date and (b) the Servicing Fee Portion for such Payment Date.

"Suspension Trigger Event":  As of any date of determination, (I) the ratio (expressed as a percentage) obtained by dividing (a) the sum of (1) the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate as of such date, calculated in accordance

with the Overcollateralization Ratio Adjustment less the Overcollateralization Haircut Amount, if any, plus (2) the sum of the Balance of Eligible Investments and cash in the Collection Account, representing Collateral Principal Collections plus the Balance of Eligible Investments and cash in the Initial Deposit Account plus unpaid Purchased Accrued Interest, each as of such date by (b) the sum of the Aggregate Principal Amount of the Class A-1L Notes (including for this purpose any unpaid Periodic Rate Shortfall Amounts with respect to such Classes of Notes not paid when due, until such amounts, if any, are paid in full) as of such date, is less than (II) 110%.

"Synthetic Security":  Any (I) U.S. dollar denominated swap transaction, security issued by a trust or similar vehicle or other asset purchased from or entered into by the Issuer with a Synthetic Security Counterparty the returns on which (as determined by the Servicer) are linked to the credit performance of a Reference Obligation, but which may provide for a different maturity, payment dates, interest rate, interest rate basis or other non-credit related terms than such Reference Obligation; *provided* that, (A) (i) such Synthetic Security will not require the Issuer to make any payment to the Synthetic Security Counterparty after the initial purchase of or entry into such Synthetic Security by the Issuer (other than payments to the Synthetic Security Counterparty from the Default Swap Collateral Account), (ii) the ownership of such Synthetic Security, based on the Servicer's determination (which may include consultation with counsel to the Issuer), is not expected to subject the Issuer to withholding tax unless the Synthetic Securities Counterparty is required to make "gross-up" payments sufficient to cause the net amount to be received by the Issuer in respect of such Synthetic Security to equal the amount that would have been paid had no such withholding tax applied, (iii) such Synthetic Security terminates on or prior to the redemption or repayment in full of the Reference Obligation, (iv) such Synthetic Security will not constitute a commodity option, leverage transaction or futures contract that is subject to the jurisdiction of the U.S. Commodity Futures Trading Commission, (v) the acquisition of such Synthetic Security would not cause the Issuer to be "engaged in a U.S. trade or business" for federal income tax purposes or otherwise to become subject to U.S. corporate net income tax, (vi) the Underlying Instrument with respect to such Synthetic Security is governed by the laws of the State of New York, contains a non-petition clause and a limited recourse clause, each as against the Issuer, and is documented with a standard ISDA form master agreement, as modified by appropriate schedules and confirmations and from time to time as determined by the Servicer based on industry practice, and (B) either (i) such Synthetic Security is a Form-Approved Synthetic Security or (ii) the Rating Condition has been satisfied with respect to the purchase of such Synthetic Security; *provided further*, that any Synthetic Security shall be positively indexed to the related Reference Obligation on no more than a one-to-one basis and (II) any Default Swap; *provided, however*, that, with respect to a Synthetic Security other than a Form-Approved Synthetic Security, a Majority of the Controlling Class shall have approved such Synthetic Security; *provided, further* that with respect to a Form-Approved Synthetic Security for which consent by the Rating Agencies to use the form in this transaction has been sought after the Closing Date, a Majority of the Controlling Class shall have consented to the use of such form.

"Synthetic Security Counterparty":  An entity which is required to make payments to the Issuer on a Synthetic Security to the extent that the issuer of the related Reference Obligation makes payments thereon pursuant to the terms of such Synthetic Security and any Default Swap Counterparty.

"<u>Tax Event Redemption</u>": A redemption of the Notes in whole pursuant to Section 9.5 hereof.

"<u>Tax Event Redemption Date</u>": The Payment Date fixed by the Issuer for a Tax Event Redemption.

"<u>Tax Event Redemption Price</u>": An amount equal to the aggregate of (i) the Aggregate Principal Amount of each Class of Notes as of the Tax Event Redemption Date and (ii) the applicable Cumulative Interest Amount with respect to each Class of Notes as of the Tax Event Redemption Date.

"<u>Temporary Regulation S Global Notes</u>": With respect to any Notes issued to Non-U.S. Persons that will be represented by a temporary global note, the temporary global note substantially in the form attached hereto as <u>Exhibits A-1L-1</u>, <u>A-2L-1</u>, <u>A-3L-1</u>, <u>B-1L-1</u> and <u>B-2L-1</u>.

"<u>Transaction Documents</u>": This Indenture, each Hedge Agreement, the Paying and Transfer Agency Agreement, the Servicing Agreement and the Collateral Administration Agreement.

"<u>Transfer Agent</u>": Any transfer agent appointed by the Issuer.

"<u>Transferor Certificates</u>": Collectively, the Regulation S Transferor Certificate and the Rule 144A Transferor Certificate.

"<u>Trust Estate</u>": The meaning specified in the Granting Clauses of this Indenture.

"<u>Trust Termination Date</u>": The date on which the obligations of the Issuer hereunder are terminated as set forth in Section 4.1 or Section 9.11 hereof.

"<u>Trustee</u>": As defined in the first sentence of this Indenture.

"<u>Trustee Administrative Expenses</u>": With respect to any Payment Date (including without limitation the Final Maturity Date), fees, expenses and other amounts (including indemnities) due or accrued and payable to the Trustee for the Due Period relating to such Payment Date, including, but not limited to, all amounts payable to the Trustee under Section 6.7 hereof and all fees and expenses pursuant to duties performed as Collateral Administrator and Paying and Transfer Agent, *provided* such payment pursuant to clause FIRST of Section 11.1(b) shall not exceed on such Payment Date one-quarter of 0.0275% of the Aggregate Par Amount as of the Calculation Date relating to such Payment Date (such amount subject to a minimum of U.S.$74,000 per annum), plus U.S.$7,500 per annum for payments of expenses and certain other amounts under Section 6.7, if any.

"<u>Trustee Fee Letter Agreement</u>": The Trustee fee letter agreement, dated as of April 23, 2007.

"<u>Trustee Payment-Related Event of Default</u>": An Event of Default caused solely by and based solely upon a failure to pay any amounts owing to the Trustee or the Paying and

Transfer Agent pursuant to Section 6.7 hereof or to the Paying and Transfer Agent pursuant to Section 11 of the Paying and Transfer Agency Agreement (other than the amount payable to the Trustee as its fee (but not expenses) under the Trustee Fee Letter Agreement).

"UCC": The New York Uniform Commercial Code.

"Underlying Instrument":  With respect to any item of Portfolio Collateral, any loan participation agreement, loan assignment agreement, indenture, pooling and servicing agreement, trust agreement, instrument, or other agreement pursuant to which such item of Portfolio Collateral has been created or issued or of which the holders of such item of Portfolio Collateral are the beneficiaries, and any instrument evidencing or constituting such item of Portfolio Collateral (in the case of Portfolio Collateral evidenced by or in the form of instruments).

"Underlying Loan and Security Agreement": Any agreement (other than an Underlying Instrument) which governs the terms of or guarantees or secures the obligations represented by any Portfolio Collateral or of which the holders of such Portfolio Collateral are the beneficiaries (which in the case of a Portfolio Loan which is a Participation shall include the loan and security documentation with respect to the underlying loan).

"Unit":  An item of Portfolio Collateral with a warrant, profit participation or other equity-based feature (including but not limited to convertible bonds) included as a component thereof which otherwise meets the requirements for Portfolio Collateral; *provided* that (i) the value of such warrant, profit participation or other equity-based feature at the time of purchase, as determined by the Servicer in good faith, is less than 2% of the purchase price of such item of Portfolio Collateral and (ii) such warrant, profit participation or other equity-like feature at the time of purchase shall not, relate to or be exchangeable for, margin stock.

"United States Regulations":  31 C.F.R. Part 357, Subpart B; 12 C.F.R. Part 615, Subparts O, R and S; 12 C.F.R. Part 987; 12 C.F.R. Part 1511; 24 C.F.R. Part 81, Subpart H; 31 C.F.R. Part 354; 18 C.F.R. Part 1314; and 24 C.F.R. Part 350.

"United States Security Entitlement":  A Security Entitlement as defined in a United States Regulation.

"Unregistered Securities":  The meaning specified in Section 5.18(c) hereof.

"Unscheduled Principal Proceeds":  Collateral Principal Collections received by the Issuer from an unscheduled prepayment, in whole or in part, by the obligor of an item of Portfolio Collateral prior to the stated maturity date of such item of Portfolio Collateral, including without limitation, any Collateral Disposition Proceeds received from the sale of any item of Portfolio Collateral received in an Offer, Exchange Offer or similar tender, whether such tender required action on the part of the Issuer or otherwise.

"USA PATRIOT Act":  The Uniting and Strengthening America By Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001.

"U.S. Person":

(i)     (a)     a citizen of the United States;

     (b)  a natural person who is a resident of the United States or a resident alien of the United States as defined by section 7701(b) of the Code;

     (c)  any partnership (unless otherwise provided in the regulations), corporation or other entity created, organized or incorporated in or under the laws of the United States, its states, territories or possessions, or the District of Columbia;

     (d)  any estate or trust as defined by section 7701(a)(30)(D) and (E) of the Code, respectively; or

(ii)     as defined in Regulation S, as the context may require.

"Waived Additional Servicing Fee":  As defined in Section 11.5.

"Waived Servicing Fees":  As defined in Section 11.5.

"Waived Supplemental Servicing Fee":  As defined in Section 11.5.

"Weighted Average Coupon": The amount (rounded up to the nearest 0.001%) determined by summing the products obtained by multiplying, for each item of Fixed Rate Portfolio Collateral then included in the Trust Estate (other than items of Defaulted Portfolio Collateral), the Principal Balance of such item of Portfolio Collateral and the stated rate of interest of such item of Portfolio Collateral and then dividing such sum by the Aggregate Principal Amount of all of the Fixed Rate Portfolio Collateral included in the Trust Estate (other than items of Defaulted Portfolio Collateral) as of such date of determination.

"Weighted Average Coupon Test":  A test that will be satisfied if the Weighted Average Coupon of the Fixed Rate Portfolio Collateral (after giving effect to any Coupon Adjustment) is at least equal to 7.5% per annum as of the date of determination (or such lower per annum rate that the Rating Agencies have confirmed would not result in a withdrawal or downgrade of any of the then current ratings assigned by them to the Notes).

"Weighted Average Life":  As of any date of determination, the amount determined by summing the products obtained by multiplying, for each item of Portfolio Collateral (other than items of Defaulted Portfolio Collateral) then included in the Trust Estate, the Principal Balance of such item of Portfolio Collateral and the Average Life (as such term is defined below) of such item of Portfolio Collateral as of such date of determination and then dividing such sum by the Aggregate Principal Amount of all of the Portfolio Collateral included in the Trust Estate as of such date of determination.  For any item of Portfolio Collateral (other than items of Defaulted Portfolio Collateral), the "Average Life" shall be equal to the number of years obtained by dividing (a) the Principal Balance of such item of Portfolio Collateral into (b) the sum of the products obtained by multiplying (i) the amount of each of the remaining, required principal payments on such item of Portfolio Collateral by (ii) the number of years

(calculated to the nearest one-twelfth) that will have elapsed between such date of determination and the making of such payment.

"Weighted Average Life Requirement": A test that will be satisfied on any date of determination if the Weighted Average Life on such date of all items of Portfolio Collateral (other than items of Defaulted Portfolio Collateral) is equal to or less than the number of years set forth in Schedule I hereto opposite the period set forth in Schedule I hereto in which such test is being measured. Notwithstanding the foregoing, the Weighted Average Life may vary from the restrictions set forth above, if the Rating Agencies have confirmed such variance would not result in a withdrawal or downgrade of any of the then current ratings assigned by them to the Notes.

"Weighted Average Margin": The amount (rounded up to the nearest 0.001%) equal to (i) the sum of the products obtained by multiplying the margin over Collateral LIBOR on each item of Floating Rate Collateral (other than items of Defaulted Portfolio Collateral) as of the date of calculation (which will be determined for items of Floating Rate Collateral that do not bear interest based on Collateral LIBOR by expressing the current interest rate on such Floating Rate Collateral as a margin above or below three-month LIBOR on the date of determination, which margin will be expressed as a negative number if such current interest rate is lower than three-month LIBOR) by the Principal Balance of such item of Floating Rate Collateral (other than items of Defaulted Portfolio Collateral) as of such date, divided by (ii) the Aggregate Principal Amount of all such Floating Rate Collateral (other than items of Defaulted Portfolio Collateral) on such date. For purposes of calculating the Weighted Average Margin for any Delayed Drawdown Loan or Revolving Loan, the principal balance representing the funded portion will be multiplied by the margin above Collateral LIBOR and the principal balance representing the unfunded portion will be multiplied by the commitment fee related thereto. If an item of Floating Rate Portfolio Collateral does not provide for Collateral LIBOR, the margin for this purpose shall be equal to the then applicable interest rate minus then current LIBOR. If an item of Floating Rate Portfolio Collateral has a Collateral LIBOR floor, the excess of such floor rate over Collateral LIBOR will be added to the margin above Collateral LIBOR for purposes of calculating the Weighted Average Margin of such item of Floating Rate Portfolio Collateral.

"Weighted Average Margin Test": A test that will be satisfied by application of the Collateral Quality Matrix, after giving effect to any Coupon Adjustment.

Section 1.2.  Other Definitional Provisions.

All references in this instrument to designated "Annexes," "Articles," "Sections," "Subsections" and other subdivisions are to the designated Annexes, Articles, Sections, Subsections and other subdivisions of this instrument as originally executed. The words "herein," "hereof," "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular Annex, Article, Section, Subsection or other subdivision. Unless the context otherwise requires, terms defined in the UCC and not otherwise defined in this Indenture shall have the meanings set forth in the UCC. Any reference herein to money or other property that is to be deposited in or is on deposit in a securities account shall also mean that such money or other property is to be credited to, or is credited to, such securities account.

Any reference herein to a "beneficial interest" in a security also shall mean, unless the context otherwise requires, a security entitlement with respect to such security, and any reference herein to a "beneficial owner" or "beneficial holder" of a security also shall mean, unless the context otherwise requires, the holder of a security entitlement with respect to such security.

Section 1.3.    Assumptions as to Portfolio Collateral and Trust Estate.

Except as otherwise expressly set forth herein, in connection with all calculations required to be made pursuant to this Indenture with respect to Scheduled Distributions on any Pledged Security, or any payments on any other assets included in the Trust Estate, and with respect to the income that can be earned on Scheduled Distributions on such Pledged Securities and on any other amounts that may be received for deposit in the Collection Account, the provisions set forth in this Section 1.3 shall apply.

All calculations with respect to Scheduled Distributions on the Pledged Securities shall be made on the basis of information as to the terms of each such Pledged Security and upon accounting of payments, if any, received on such Pledged Security that are furnished by or on behalf of the issuer of such Pledged Security and such information or report may be conclusively relied upon in making such calculations.

For each Due Period, the Scheduled Distributions on any Pledged Security (excluding any item of Defaulted Portfolio Collateral and Equity Portfolio Collateral, as to which Scheduled Distributions shall be assumed to be zero) shall be the amount required to be paid (including coupon payments, accrued interest, scheduled principal payments, if any, by way of sinking fund payments which are assumed to be on a *pro rata* basis or other scheduled amortization of principal (excluding any optional redemption), return of principal, and redemption premium, if any) that, if paid as scheduled, will be available in the Collection Account at the end of such Due Period.  For purposes of calculating interest on Pledged Securities that have a rate of interest which varies with an objective index, the interest to be received thereon shall be assumed to be equal to the interest that would be received on such Pledged Security if the rate of interest accruing on such Pledged Security on the date of determination were to remain constant for each succeeding Due Period.

Each Scheduled Distribution with respect to a Pledged Security shall be assumed to be received on the applicable Due Date, and each such Scheduled Distribution shall be assumed to be immediately deposited in the Collection Account and to earn interest at the Assumed Interest Rate.  All funds assumed to earn interest as provided herein shall be assumed to continue to earn interest at the applicable rate until the date on which they are required to be available in the Collection Account for application, in accordance with the terms hereof, to payment of principal of or interest on the Notes or other amounts payable or otherwise for application in accordance with the terms of this Indenture.

Notwithstanding anything to the contrary contained in this Indenture if the Trustee receives an Issuer Order or Issuer Request and also receives a Servicer Order or Servicer Request with respect to the same subject matter, the Issuer Order or Issuer Request, as the case

may be, shall supersede any such Servicer Order or Servicer Request and be the controlling order or request hereunder.

## ARTICLE II

## THE NOTES

Section 2.1. Forms Generally.

(a) The Notes, the Combination Notes and the Trustee's certificate of authentication thereon shall be in substantially the forms required by this article with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon, as may, consistently herewith, be determined by the Authorized Officer of the Issuer executing such Notes and Combination Notes as evidenced by such Authorized Officer's execution of such Notes and Combination Notes. Any portion of the text of any Note or Combination Note may be set forth on the reverse thereof, with an appropriate reference thereto on the face of the Note or Combination Note.

(b) Regulation S Notes. The Class A-1L Notes, the Class A-2L Notes, the Class A-3L Notes, the Class B-1L Notes, the Class B-2L Notes and the Combination Notes initially sold to Non-U.S. Persons in "offshore transactions" (within the meaning of Regulation S) shall be represented initially by single global notes (the "Temporary Regulation S Global Notes") in fully registered form without coupons, authenticated and delivered in substantially the forms attached hereto as Exhibit A-1L-1, Exhibit A-2L-1, Exhibit A-3L-1, Exhibit B-1L-1, Exhibit B-2L-1 and Exhibit C-1 respectively. The Issuer shall deposit such Notes and the Combination Notes on behalf of the subscribers for such Notes with the Trustee as custodian (in such capacity, the "Custodian") for the Depository, registered in the name of a nominee of the Depository, for the accounts of each of the Clearance Systems, for credit by the Clearance Systems to the respective accounts designated by the subscribers of such Notes or Combination Notes (or to such other accounts as they may direct) at each of the Clearance Systems. The Temporary Regulation S Global Notes shall be exchanged for interests in the Permanent Regulation S Global Notes as set forth below. The Permanent Regulation S Global Notes shall be substantially in the form set forth as Exhibit A-1L-2, Exhibit A-2L-2, Exhibit A-3L-2, Exhibit B-1L-2, Exhibit B-2L-2 and Exhibit C-2.

During the Distribution Compliance Period, beneficial interests in Class B-2L Notes and Combination Notes issued in the form of a Temporary Regulation S Global Note may be transferred for an interest in a Definitive Note of such Class pursuant to and as provided in Section 2.5(b), and after the expiration of the Distribution Compliance Period beneficial interests in the Temporary Regulation S Global Note of each Class shall be exchanged for a Permanent Regulation S Global Note for such Class pursuant to and as provided below.

Without unnecessary delay but in any event prior to the termination of the Distribution Compliance Period, the Issuer shall deliver to the Trustee or the Authenticating Agent the Permanent Regulation S Global Notes executed by the Co-Issuers. Upon the

termination of the Distribution Compliance Period any Notes or Combination Notes in the form of a Temporary Regulation S Global Note shall be surrendered by the Custodian to the Trustee, in each case as the Issuer's agent for such purpose (or, at the Authenticating Agent's option, the Custodian shall be instructed by the Authenticating Agent or the Trustee to endorse each such Temporary Regulation S Global Note to reduce the principal amount thereof), to be exchanged, in whole or from time to time in part, for a Permanent Regulation S Global Note without charge, and the Authenticating Agent shall authenticate and deliver to the Custodian for delivery in exchange for each such Temporary Regulation S Global Note or the portions thereof to be exchanged, an equal aggregate principal amount of a Permanent Regulation S Global Note, as shall be specified by the Custodian; *provided* that, upon such presentation by the Custodian: (i) the Trustee receives a certificate substantially in the form set forth in <u>Exhibit F</u> attached hereto, and signed by the respective Clearance System as to the portions of each Temporary Regulation S Global Note held for the respective accounts of such Clearance System, that it has received from each beneficial owner of the portion of each Temporary Regulation S Global Note then to be exchanged, written certification substantially to the effect set forth in <u>Exhibit G</u> attached hereto, with such changes therein as shall be approved by the Issuer, (ii) none of the Trustee or any Paying Agent have actual knowledge, nor have they received notification from the Issuer with respect to the original issuance and distribution of the Global Notes that such Person has actual knowledge, that such certificate is false, and (iii) the Trustee and any Paying Agent do not have a United States address as the address for payment to any Holder of the Permanent Regulation S Global Note issuable upon such exchange. Notwithstanding the foregoing, in the event of redemption in whole or acceleration of all or any part of the Notes prior to the termination of the Distribution Compliance Period, the Permanent Regulation S Global Notes will not be issuable in respect of the Temporary Regulation S Global Note or portion thereof, and payment thereon will be made as provided in the Temporary Regulation S Global Note. Any other Class of Note in the form of a Temporary Regulation S Global Note presented to the Trustee for a Permanent Regulation S Global Note shall be endorsed by the Trustee to reduce the principal amount thereof by the amount so exchanged, and shall then be returned to the Custodian, pending exchange of the remaining balance thereof pursuant to the terms hereof.

On each Payment Date, if any, that falls on or prior to the date on which all Temporary Regulation S Global Notes shall have been exchanged for Permanent Regulation S Global Notes (the "Exchange Date"), interest, if any, and principal on the Temporary Regulation S Global Notes shall be paid to the Custodian, acting on behalf of the Clearance System for the benefit of persons for whom the Clearance System holds the Temporary Regulation S Global Notes on each such Payment Date to the extent the Clearance System has delivered a certificate or certificates, appropriately completed and signed, in substantially the form set forth in <u>Exhibit F</u> attached hereto, which certificate or certificates shall be dated the relevant Payment Date and shall be delivered to the Custodian.

The Issuer will obtain from each Clearance System an agreement that it will credit principal and interest, if any, as of each Payment Date that falls on or prior to the termination of the Distribution Compliance Period, received in respect of each Temporary Regulation S Global Note to the respective accounts of the persons for whom the Clearance System holds a Temporary Regulation S Global Note on each such Payment Date, upon, and only upon, receipt of certificates from such account holders in substantially the form set forth in <u>Exhibit G</u> attached hereto to be dated on or before each relevant Payment Date (copies of such form being available

from the offices of Clearstream at 67, Boulevard Grande-Duchesse Charlotte, Luxembourg, the offices of Euroclear at 1 Boulevard du Roi Albert II, B-1210 Brussels, Belgium and each other Paying Agent of the Issuer).

Interest and principal payable prior to the Exchange Date in respect of any portion of any Temporary Regulation S Global Note representing Class B-2L Notes or Combination Notes as to which no certificate required by the third preceding paragraph hereof has been received from the Clearance System shall be held by the Trustee for payment together with delivery of Permanent Regulation S Global Notes upon receipt of the certification required hereby.

Upon any such exchange of a portion of any Temporary Regulation S Global Note for a Permanent Regulation S Global Note, the Custodian shall endorse (or, as provided above, the Trustee shall instruct the Custodian to endorse) such Temporary Regulation S Global Note to reflect the reduction of the principal amount evidenced thereby.

(c) Rule 144A Global Notes. The Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes and the Class B-1L Notes initially sold to U.S. Persons (within the meaning of Rule 144A) shall be represented by single global notes (the "Rule 144A Global Notes") in fully registered form without coupons, authenticated and delivered in substantially the forms attached hereto as Exhibit A-1L-3, Exhibit A-2L-3, Exhibit A-3L-3, and Exhibit B-1L-3 respectively, which the Issuer shall deposit on behalf of the subscribers for such Notes with the Custodian for the Depository and registered in the name of Cede & Co., the nominee of DTC. The Aggregate Principal Amount of each Rule 144A Global Note may from time to time be increased or decreased by adjustments made on the records of the Custodian for DTC or its nominees, as the case may be.

(d) Definitive Class B-2L Notes and Combination Notes. The Class B-2L Notes and the Combination Notes initially issued to U.S. Persons in transactions exempt from the registration requirements of the Securities Act shall be issued as definitive notes ("Definitive Notes") in fully registered form without coupons, authenticated and delivered in substantially the form attached hereto as Exhibit B-2L-4 and Exhibit C-4, respectively. On or prior to the Closing Date, the Issuer shall provide to the Trustee or Authenticating Agent (as applicable) an Issuer Order setting forth the amount of Class B-2L Notes and the Combination Notes (if any) to be issued on the Closing Date in the form of Definitive Notes and registration and delivery instructions (together with payment, taxpayer identification and other necessary information) for each of the Definitive Notes to be issued on the Closing Date. Interest and principal on the Definitive Notes will be paid to the registered holder thereof as indicated in the Note Register, and, in the case of the Preferred Share Component of the Combination Notes, the Share Register.

(e) Book-Entry Provisions. This Section 2.1(e) shall apply only to Regulation S Global Notes or Rule 144A Global Notes ("Global Notes") deposited with or on behalf of the Depositary. On or prior to the Closing Date, the Issuer shall provide (i) to the Trustee or Authenticating Agent (as applicable) an Issuer Order setting forth the amount of Notes (if any) to be issued on the Closing Date in the form of Temporary Regulation S Global Notes and Rule 144A Global Notes for each Class, and (ii) to the Depositary written instructions

listing the names and addresses of the initial beneficial owners of the Temporary Regulation S Global Notes and the Rule 144A Global Notes of each Class or of the Combination Notes (if any) and the amounts of their respective ownership interests (together with payment instructions, taxpayer information and such other information as DTC reasonably may require). A Temporary Regulation S Global Note may be initially issued for each Class with an outstanding principal balance of zero (and the same may be reduced to zero at any time during the Distribution Compliance Period without cancellation.

(f) Definitive Notes. If at any time (including without limitation during the Distribution Compliance Period) (i) the Temporary Regulation S Global Notes or the Permanent Regulation S Global Notes or any of them become immediately due and repayable pursuant to Article Five hereof or (ii) any of DTC, Euroclear or Clearstream (A) is closed for business for a continuous period of 14 days (other than by reason of holiday, statutory or otherwise) or (B) announces an intention permanently to cease business and no alternative clearance system satisfactory to the Issuer is available or (iii) as a result of any amendment to, or change in, the laws or regulations of the Cayman Islands or of any authority therein or thereof having power to tax or in the interpretation or administration of such laws or regulations which becomes effective on or after the Closing Date, the Issuer or any Paying Agent is or will be required to make any deduction or withholding from any payment in respect of the Notes which would not be required were the Notes in definitive registered form or (iv) the Issuer so elects by notice to the Noteholders and Euroclear or Clearstream, as the case may be, does not object (as determined by the Issuer), then the Issuer will issue Definitive Notes in exchange for and to the extent of such Global Notes within 30 days of the occurrence of the relevant event set forth in (i), (ii), (iii) or (iv) above.

If at any time (i) the Notes or any of them become immediately due and payable following an Event of Default hereunder or (ii) DTC notifies the Issuer or the Trustee in writing that it is unwilling or unable to discharge properly its responsibilities as a depository with respect to the Rule 144A Global Notes or it ceases to be a "clearing agency" registered under the Exchange Act, and the Issuer is unable to locate a qualified successor within 90 days after such notice, then the Issuer will issue Definitive Notes in exchange for and to the extent of such Rule 144A Global Notes within 30 days of the occurrence of the relevant event set forth in (i) or (ii) above.

The Issuer shall notify the Trustee forthwith upon the occurrence of any of the events referred to in the two immediately preceding paragraphs and the Issuer shall, unless the Trustee agrees otherwise, promptly give notice thereof and of its obligation to issue Definitive Notes to the Noteholders. Upon giving such notice, the Issuer promptly shall cause the Custodian, as the case may be, to present forthwith for exchange and surrender such Global Note to the Trustee, for cancellation, together with appropriate exchange, registration, payment and delivery instructions (identifying according to its records the beneficial holders to whom, and in the amounts, the Definitive Notes are to be registered and delivered), upon which the Trustee shall be entitled to rely conclusively. The Issuer shall prepare, execute and deliver to the Trustee at its specified office a sufficient number of duly executed Definitive Notes not later than the 20th day following the date of such notice, and the Trustee shall then promptly authenticate and deliver the appropriate number and amount of such Definitive Notes in accordance with the instructions received from the Custodian.

(g)  Form of Notes.  The Notes and the Combination Notes shall be typed, printed, lithographed or engraved or produced by any combination of these methods or may be produced in any other manner, all as determined by the Authorized Officers of the Issuer or Co-Issuers, as applicable, executing such Notes or Combination Notes, as evidenced by the Authorized Officers' execution of such Notes or Combination Notes.

Section 2.2.    Authorized Amount.

The aggregate principal amount of Class A-1LA Notes, the Class A-1LB Notes, Class A-2L Notes, Class A-3L Notes, Class B-1L Notes (including such Notes represented by the Note Component) and Class B-2L Notes that may be authenticated and delivered under this Indenture is limited to $635,000,000, $115,000,000, $76,000,000, $48,000,000, $36,000,000 and $26,000,000, respectively, except for Notes authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Notes pursuant to Section 2.5, 2.6 or 8.5 hereof.

The Combination Notes consisting of the Note Component representing an Aggregate Principal Amount of Class B-1L Notes of U.S. $6,750,000 (which is included in the Class B-1L Notes referred to in the immediately preceding paragraph) and the Preferred Share Component representing 3,250,000 Preferred Shares, shall be authenticated and delivered under this Indenture and shall have an initial Aggregate Principal Amount of U.S. $10,000,000.

Section 2.3.    Denominations; Extension of Revolving Period and Final Maturity.

(a)  Each Class of the Notes and the Combination Notes shall be issuable on the Closing Date in the forms set forth herein, without coupons, in minimum denominations of $200,000 and integral multiples of $1 in excess thereof (in each case expressed in terms of the stated or principal amounts thereof, as the case may be, at the Closing Date).

(b)  The Issuer, if directed by the Board Resolution of the Issuer at the request of the Servicer, shall be entitled on each Extension Effective Date to extend the Revolving Period to the applicable Extended Revolving Period End Date up to a maximum of four times (so that the Notes can only be extended to 2040) if (i) in the case of an Extension Effective Date occurring after the first Extension Effective Date, the Issuer has previously effected a Maturity Extension for each preceding Extension Effective Date in accordance with this Section 2.3, (ii) the Extension Conditions set forth in Section 2.3(d) are satisfied, (iii) the Issuer has given written notice to the Trustee of its election to extend the Revolving Period no later than 60 days and no earlier than 90 days prior to such Extension Effective Date and (iv) no Event of Default has occurred and is continuing.  If the Extension Conditions are satisfied, the Final Maturity Date of the Notes and the Combination Notes shall be automatically extended to the related Extended Final Maturity Date and the Weighted Average Life Test shall be automatically extended to the related Extended Weighted Average Life Date, without any requirement for approval or consent of any Holders of Notes, Combination Notes or Preferred Shares (other than as may be required pursuant to the Extension Conditions) or amendment or supplement to this Indenture or the Paying and Transfer Agency Agreement (the "Maturity Extension"); *provided* that the Issuer will not be permitted to effect more than four Maturity Extensions.

(c)   In the case of a Maturity Extension, any Holder or Beneficial Owner of Notes, Combination Notes or Preferred Shares wishing to sell such Notes, Combination Notes or Preferred Shares to an Extension Qualifying Purchaser pursuant to the Extension Conditions must provide the applicable Extension Sale Notice within the Extension Sale Notice Period pursuant to Section 2.3(d) (such Notes and Preferred Shares as to which an Extension Sale Notice has been duly given, "Extension Sale Securities").  Notwithstanding anything to the contrary herein, each Holder providing an Extension Sale Notice shall be deemed to agree that no Extension Sale Securities of any Holder shall be purchased unless all Extension Sale Securities of all Holders are purchased and settled at the applicable Extension Purchase Price on the applicable Extension Effective Date and the other Extension Conditions are satisfied as of such date.

(d)   The Maturity Extension shall be effective only if the following conditions (the "Extension Conditions") are satisfied:

(i)      the purchase of all Extension Sale Securities has been settled by the designated Extension Qualifying Purchasers at the applicable Extension Purchase Price as of the applicable Extension Effective Date;

(ii)      all such purchases of Extension Sale Securities individually and in the aggregate comply with the applicable transfer restrictions herein, in the Indenture and the Preferred Share Paying and Transfer Agency Agreement immediately after such purchase and the legends on such Notes, Combination Notes and Preferred Shares and all applicable law, rules and regulations (including, without limitation, rules, regulations and procedures of any applicable securities exchange, self-regulatory organization or clearing agency);

(iii)      the Rating Condition has been satisfied with respect to S&P (so long as any Notes are then rated by S&P) and (b) either (A) the Class B-2L Overcollateralization Ratio is at least 105% and the Collateral Quality Tests are satisfied as of the related Extension Determination Date and the Interest Coverage Test was satisfied on the immediately preceding Payment Date, the rating of each Class of Notes or Combination Notes by Moody's has not been downgraded, withdrawn or qualified from that in effect on the Closing Date (unless it subsequently has been reinstated to the rating assigned on the Closing Date) or (B) the Rating Condition has been satisfied with respect to Moody's (so long as any Notes or Combination Notes are then rated by Moody's); and

(iv)      (A) the Holders of 100% of the Outstanding Aggregate Principal Amount of the Class A-1LA Notes have delivered the Extension Sale Notice in the Extension Sale Notice Period or (B) if the Holders of 100% of the Outstanding Aggregate Principal Amount of the Class A-1LA Notes fail to deliver an Extension Sale Notice pursuant to the preceding clause (A), either (x) the Issuer, acting through the Servicer, notifies the Holders of the Class A-1LA Notes in writing not later than the last day of the Extension Sale Notice Period that such Class A-1LA Notes shall constitute "Extension Sale Securities" (as a result of which such Class A-1LA Notes must be purchased by an Extension Qualifying

Purchaser) or (y) the Holders of 100% of the Outstanding Aggregate Principal Amount of the Class A-1LA Notes have consented in writing to the Maturity Extension not later than the last day of the Extension Sale Notice Period; *provided* that if the Extension Conditions are not satisfied because the Holders of the Class A-1LA Notes have failed to deliver an Extension Sale Notice or have failed to provide their written consent to the related Maturity Extension, then the Servicer may extend the Extension Sale Notice Period by seven Business Days if the Servicer reasonably believes that it will receive such Extension Sale Notice or written consent within seven Business Days following the end of the Extension Sale Notice Period.

The Issuer, the Trustee and, by its acceptance of the Notes, Combination Notes or Preferred Shares, each Holder or Beneficial Owner of Notes, Combination Notes or Preferred Shares agrees that the Initial Purchasers or any placement agent shall not be responsible for causing the Extension Conditions to be satisfied and shall not be liable to any such person or Holder of Notes, Combination Notes or Preferred Shares (whether or not such Holder gave an Extension Sale Notice with respect to its Notes, Combination Notes or Preferred Shares) or to any other person if the Extension Conditions are not satisfied. Failure of the Extension Conditions to be satisfied shall not constitute a Default or Event of Default under this Indenture.

(e) The following procedure shall apply to effect any extension of the Revolving Period or the Maturity Date, pursuant to Section 2.3:

(i) No later than three Business Days following receipt by the Trustee of the notice given by the Issuer of its election to extend the Revolving Period (the "Extension Notice"), at the cost of the Issuer the Trustee shall deliver the Extension Notice to all Holders of Notes, Combination Notes and the Preferred Shares Paying and Transfer Agent (for forwarding to the Holders of the Preferred Shares and the Combination Notes with respect to the Preferred Share Component) and each Rating Agency (so long as any rated Notes, Combination Notes are Outstanding), and shall request the Rating Condition for the Maturity Extension from S&P, if applicable. Such Extension Notice shall include a statement to the effect that (i) no Extension Sale Notice delivered after the end of the Extension Sale Notice Period shall be effective and (ii) subject to Section 2.3(d)(iv)(B), only the Class A-1LA Notes for which an Extension Sale Notice has been delivered may be treated as Extension Sale Securities pursuant to the Extension Conditions (with the result that the Class A-1LA Notes must be purchased by an Extension Qualifying Purchaser).

(ii) Any Holder of Notes, Combination Notes or Preferred Shares may give irrevocable notice (an "Extension Sale Notice") within 30 days after the Trustee has delivered the Extension Notice (the "Extension Sale Notice Period") of its intention to sell its Notes, Combination Notes or Preferred Shares to an Extension Qualifying Purchaser in the case of a Maturity Extension. Any Extension Sale Notice received by the Trustee after the Extension Sale Notice Period shall be disregarded and deemed not to have been given. No Holder of Notes (other than the Class A-1LA Notes as described in clause (d)(iv) above) ,

Combination Notes or Preferred Shares that has not given such an Extension Sale Notice within the Extension Sale Notice Period shall be entitled to sell its Notes, Combination Notes or Preferred Shares to an Extension Qualifying Purchaser in connection with the Maturity Extension.

(iii)     If the Holders of 100% of the Outstanding Aggregate Principal Amount of the Class A-1LA Notes have not delivered the Extension Sale Notice to the Trustee by the 20th calendar day after the date of the Extension Notice, the Trustee shall notify the Holders of the Class A-1LA Notes of the date on which the Extension Sale Notice Period shall end and include a statement to the effect that (A) no Extension Sale Notice delivered after the end of the Extension Sale Notice Period shall be effective and (B) the Class A-1LA Notes for which no Extension Sale Notice has been delivered may be treated as Extension Sale Securities pursuant to clause (iv) of the Extension Conditions (as a result of which the Class A-1LA Notes must be purchased by an Extension Qualifying Purchaser).

(iv)     If clause (iii)(b)(A) of the Extension Conditions is not satisfied as of the applicable Extension Determination Date as determined by the Issuer (or its agent), the Trustee shall request the Rating Condition to be satisfied with respect to Moody's.

(v)     On the applicable Extension Determination Date, the Issuer (or its agent) shall confirm (A) whether or not Extension Qualifying Purchasers for all Extension Sale Securities have been designated to purchase such Notes, Combination Notes or Preferred Shares in compliance with all transfer restrictions in the Indenture and the legends on such Notes, Combination Notes or Preferred Shares and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency), (B) whether the requirements of clause (iii) of the Extension Conditions are satisfied as of the applicable Extension Determination Date and (C) whether all other Extension Conditions can be satisfied as of the applicable Extension Effective Date.

(vi)     On each Extension Effective Date, the Maturity Extension shall become effective hereunder; *provided* that all Extension Conditions set forth above are satisfied. No later than two Business Days after each Extension Effective Date, the Trustee based on a determination made by the Issuer, at the expense of the Co-Issuers, shall deliver a notice to all Holders of Notes and the Preferred Shares Paying and Transfer Agent (for forwarding to the Holders of Preferred Shares), the Servicer, Bear Stearns, each Rating Agency (so long as any rated Notes are Outstanding) and the Irish Stock Exchange (if and for so long as any Class of Notes is listed thereon) confirming whether or not the Maturity Extension became effective. If the Maturity Extension became effective, the Issuer shall make any required notifications thereof to the Depositary for any Notes subject to the Maturity Extension. None of Bear Stearns, the Servicer or

any of their respective Affiliates shall have any duty to act as an Extension Qualifying Purchaser.

(vii)    In the case of a Maturity Extension, each Holder of Notes (other than Extension Sale Securities) shall be entitled to receive an amount equal to the applicable Extension Bonus Payment to the extent of available funds and as provided in Section 11.1.  Holders of the Preferred Shares shall not be entitled to receive any Extension Bonus Payment.  The obligation to make any Extension Bonus Payment shall not be rated by Rating Agencies.

(f)    The Extension Bonus Payment shall be payable to any applicable qualifying Beneficial Owners who have provided the Trustee with an Extension Bonus Eligibility Certification on or before the 5th Business Day prior to the first Payment Date from and including each Extension Effective Date on which funds are available to be used for such purposes in accordance with Priority of Payments, but in any event, no later than the earlier of the Final Maturity Date and the date of redemption of the Notes.  Extension Bonus Payments which are not available to be paid on a Payment Date in accordance with the Priority of Payments on a Payment Date shall not be considered "due and payable" hereunder but are due and payable on the next Payment Date on which funds are due and payable.  The failure to pay any such Extension Bonus Payment on such date shall not be an Event of Default, unless the Issuer shall fail to pay in full such Extension Bonus Payment on the earlier of the Final Maturity Date and the date of redemption in full of the relevant Notes.  Unpaid Extension Bonus Payments shall not accrue interest.  Such amounts shall be paid, in the case of the Notes, to the accounts designated in the applicable Extension Bonus Eligibility Certification or, to the extent otherwise required by the rules of any applicable securities exchange or clearing agency, in a manner determined by the Issuer.

Section 2.4.    Execution, Authentication, Delivery and Dating.

The Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes and the Class B-1L Notes shall be executed on behalf of the Issuer, and the Class B-2L Notes and the Combination Notes (to the extent of the Note Component) shall be executed on behalf of the Issuer, by an Authorized Officer of each of the Issuer or the Co-Issuer, as applicable.  The signature of such Authorized Officers on the Notes or the Combination Notes may be manual or facsimile.

Notes or the Combination Notes bearing the manual or facsimile signature of an individual who was at any time the Authorized Officer of the Co-Issuers (as applicable) shall bind the applicable Co-Issuer, notwithstanding the fact that such individual has ceased to hold such office prior to the authentication and delivery of such Notes or Combination Notes or did not hold such office at the date of issuance of such Notes or Combination Notes.

At any time and from time to time after the execution and delivery of this Indenture, the Co-Issuers may deliver the Class A-1LA Notes, the Class A-1LB Notes, the Class A-2L Notes, the Class A-3L Notes and the Class B-1L Notes, and the Issuer may deliver the Class B-2L Notes and the Combination Notes, executed by the Co-Issuer (or the Issuer with respect to the Class B-2L Notes and the Combination Notes) to the Trustee for authentication

and the Trustee (or an Authenticating Agent on its behalf), upon Issuer Order, shall authenticate and deliver such Notes and the Combination Notes as provided in this Indenture and not otherwise.

Each Note or Combination Notes authenticated and delivered by the Trustee (or the Authenticating Agent) to or upon Issuer Order on the Closing Date shall be dated as of the Closing Date. All other Notes or Combination Notes that are authenticated after the Closing Date for any other purpose hereunder shall be dated the date of their authentication.

Notes or Combination Notes issued upon transfer, exchange or replacement of other Notes or Combination Notes shall be issued in authorized denominations reflecting the original aggregate stated or principal amount of the Notes or Combination Notes so transferred, exchanged or replaced, but shall represent only the stated or principal amount of the Notes so transferred, exchanged or replaced. If any Note or Combination Notes is divided into more than one Note or Combination Notes in accordance with this Article II, the stated or original principal amount of such Note or Combination Note shall be proportionately divided among the Notes or Combination Notes delivered in exchange therefor and shall be deemed to be the aggregate stated or original principal amount of such subsequently issued Notes or Combination Notes.

No Note or Combination Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Note or Combination Notes a certificate of authentication, substantially in the form provided for herein, executed by the Trustee (or Authenticating Agent, as provided below) by the manual signature of one of its Authorized Officers, and such certificate upon any Note or Combination Notes shall be conclusive evidence, and the only evidence, that such Note has been duly authenticated and delivered hereunder.

Upon the request of the Issuer, the Trustee shall and, at the election of the Trustee, the Trustee may, appoint one or more Authenticating Agents with power to act on its behalf and subject to its direction in the authentication of Notes or Combination Notes in connection with transfers and exchanges thereof hereunder as fully to all intents and purposes as though each such Authenticating Agent had been expressly authorized by this Indenture to authenticate the Notes; *provided* that any such appointment shall be upon terms and conditions reasonably acceptable to the Trustee (with respect to which the Trustee may require, among other things, appropriate indemnification for any damages, losses or reasonable costs arising from acts or omissions of such Authenticating Agent). For all purposes of this Indenture, the authentication of Notes or Combination Notes by an Authenticating Agent pursuant to this Section shall be deemed to be an authentication of such Notes "by the Trustee."

Investors Bank & Trust Company, is hereby appointed, at the request of the Issuer, as Authenticating Agent for purposes of authenticating Definitive Notes issued in exchange for beneficial interests in the Global Notes.

RSM Robson Rhodes LLP is hereby appointed, at the request of the Issuer, as the initial Irish Paying Agent with respect to the Notes.

Any corporation into which any Paying Agent, Transfer Agent or Authenticating Agent may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, consolidation or conversion to which any Paying Agent, Transfer Agent or Authenticating Agent shall be a party, or any corporation succeeding to the corporate trust business of any Paying Agent, Transfer Agent or Authenticating Agent, shall be the successor of such Paying Agent, Transfer Agent or Authenticating Agent hereunder, without the execution or filing of any further act on the part of the parties hereto or such Paying Agent, Transfer Agent or Authenticating Agent or such successor corporation.

Any Paying Agent, Transfer Agent or Authenticating Agent may at any time resign by giving written notice of resignation to the Trustee and the Issuer. The Trustee may at any time terminate the agency of any Paying Agent, Transfer Agent or Authenticating Agent by giving written notice of termination to such Paying Agent, Transfer Agent or Authenticating Agent and the Issuer.

The Trustee shall pay to any Paying Agent, Transfer Agent or Authenticating Agent reasonable compensation and shall reimburse each Paying Agent, Transfer Agent or Authenticating Agent for expenses reasonably incurred by such Paying Agent, Transfer Agent or Authenticating Agent in the performance of its duties as a Paying Agent, Transfer Agent or Authenticating Agent, in each case as and to the extent agreed upon between the Trustee and such Paying Agent, Transfer Agent or Authenticating Agent; *provided* that the Trustee shall be reimbursed for such fees and expenses pursuant to Section 6.7 and *provided further* that if the appointment of such Paying Agent, Transfer Agent or Authenticating Agent is at the election or request of the Issuer, the Trustee's obligation to make such payments shall be limited to amounts for which it is entitled to be reimbursed pursuant to Section 6.7(b) or (c). The provisions of Section 6.5 shall be applicable to any Paying Agent, Transfer Agent or Authenticating Agent.

Section 2.5. Registration, Registration of Transfer and Exchange.

(a) The Issuer shall cause to be kept a register (the "Note Register") in which, subject to such reasonable procedures as it may prescribe, the Issuer shall provide for the registration of the Notes and the Combination Notes and the registration of transfers of the Notes and the Combination Notes. The Trustee is hereby appointed "Note Registrar" for the purpose of registering and transferring the Notes and the Combination Notes as herein provided. The Note Registrar shall supply all relevant documents to the Share Registrar necessary for the Share Registrar to maintain the Share Register accordingly and the Share Registrar shall be able to rely upon such information provided by the Note Registrar without any liability on its part. For so long as a Combination Note is issued and outstanding, the Note Registrar shall cooperate with the Share Registrar as reasonably requested so as to ensure conformity of registrations and transfers of the Preferred Share Component of the Combination Note. The Issuer will notify the Trustee of any Notes or Combination Notes owned by or pledged to the Issuer or any of its Affiliates promptly upon the acquisition thereof or the creation of such pledge. So long as an Event of Default shall be continuing, the Note Registrar shall promptly, upon the written request of a Noteholder or holder of a Combination Note or a Preferred Share, but in no event later than five Business Days following such request, furnish such Noteholder or holder of a Combination Note or a Preferred Share with a list of all other Noteholders, holders of Combination Notes and

Preferred Shares (as applicable); *provided* that the Note Registrar shall have no liability to any person for furnishing the Note Register to any Noteholder or holder of a Combination Note or Preferred Share. The Note Registrar shall, upon request, furnish a copy of the Note Register to the Trustee and the Servicer.

Subject to the provisions of paragraphs (b), (c), (d), (e), (f) and (k) of this Section 2.5, upon surrender for registration of transfer of any Note or Combination Note, the Issuer and the Co-Issuer (as applicable) shall execute, and the Trustee or the Authenticating Agent shall authenticate and deliver, in the name of the designated transferee or transferees, one or more new Notes of the same Class or Combination Note, of any authorized denomination and of a like aggregate principal amount.

Subject to the provisions of paragraphs (b), (c), (d), (e), (f) and (k) of this Section 2.5, at the option of the Holder, Notes or Combination Notes may be exchanged for other Notes of the same Class or Combination Notes, as applicable, in any authorized denominations and of a like aggregate stated or principal amount, upon surrender of the Notes or Combination Notes to be exchanged at the office of the Trustee.  Whenever any Notes are so surrendered for exchange, the Issuer and the Co-Issuer (as applicable) shall execute, and the Trustee or the Authenticating Agent shall authenticate and deliver, the Notes that the Holder making the exchange is entitled to receive.

All Notes (with the exception of the Class B-2L Notes and the Combination Notes) issued upon any registration of transfer or exchange of Notes shall be the valid obligations of the Co-Issuers, and the Class B-2L Notes and the Combination Notes shall be the valid obligations of the Issuer, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Notes or the Combination Notes, as applicable, surrendered upon such registration of transfer or exchange.

Every Note or Combination Note presented or surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Co-Issuers (as applicable) and the Trustee duly executed by the Holder thereof or his attorney duly authorized in writing.

No service charge shall be made to a Holder for any registration of transfer or exchange of Notes or Combination Notes, but the Co-Issuers or the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with any registration of transfer or exchange of Notes or Combination Notes.

(b)  No Note or Combination Notes may be sold or transferred (including, without limitation by pledge or hypothecation) unless such sale or transfer is exempt from the registration requirements of the Securities Act and is exempt under applicable state securities laws.  No purported transfer of any interest in any Note or Combination Note or any portion thereof that is not made in accordance with this Section 2.5 shall be given effect by or be binding upon the Trustee or the Co-Issuers (as applicable) and any such purported transfer shall be null and void *ab initio* and vest in the transferee no rights against the Trustee, the Co-Issuers (as applicable) or the Trust Estate.

By its acceptance of a Note or Combination Note or a beneficial interest in a Note or Combination Note, each owner thereof will be deemed to have represented and agreed that transfer thereof is restricted and agrees that it shall transfer such Note or Combination Note or beneficial interest in such Note or Combination Note, only in accordance with the terms of this Indenture and such Note or Combination Note and in compliance with applicable law.

The applicable rules, regulations and procedures utilized or imposed by any Clearance System or DTC (collectively, "Applicable Procedures") shall be applicable to the Global Notes insofar as and to the extent beneficial interests in such Global Notes are held by the agent members of or participants in Euroclear, Clearstream or DTC, respectively.    Account holders or agent members of or participants in Euroclear, Clearstream and DTC shall have no rights under this Indenture with respect to such Global Notes and DTC (or its nominee) as registered Holder of any Global Notes may be treated by the Co-Issuers, the Trustee, the Note Registrar, the Authenticating Agent and any other Paying Agent (and any agent of any of the foregoing) as the owner of such Global Notes for all purposes whatsoever.    Notwithstanding the foregoing, nothing herein shall prevent the Co-Issuers, the Trustee, the Note Registrar, the Authenticating Agent or any Paying Agent from giving effect to any written certification, proxy or other authorization furnished by DTC or any Clearance System or impair, as between DTC, the Clearance System and its agent members or participants, the operation of customary practices governing the exercise of the rights of a Holder of any Notes.    Requests or directions from, or votes of, DTC, or any Clearance System with respect to any matter shall not be deemed inconsistent if made with respect to (or in separate proportions corresponding to) different beneficial owners.    None of the Trustee, the Transfer Agent, the Note Registrar, the Authenticating Agent nor the Paying Agent shall have any duty to monitor, maintain records concerning (or determine compliance with any of the restrictions on transfer set forth herein with respect to) owners of beneficial interests in the Global Notes.    None of the Trustee, the Transfer Agent, the Note Registrar, the Authenticating Agent nor the Paying Agent shall have any liability for the accuracy of the records of DTC or any Clearance System, or any actions or omissions of DTC or any Clearance System (or of the agent members of or participants in any Clearance System).

A Noteholder may transfer a Note or its beneficial interest in a Note only in accordance with the following provisions:

(i)    Definitive Note to Temporary Regulation S Global Note. To the extent permitted by the Applicable Procedures and subject to the provisions of Section 2.5, if a Holder of a Definitive Note of any Class wishes at any time to transfer its beneficial interest in such Definitive Note to a Non-U.S. Person during the Distribution Compliance Period, such Holder shall, subject to the provisions of this Section 2.5, transfer its interest in such Definitive Note for an equivalent beneficial interest in the Temporary Regulation S Global Note of the same Class. Upon (A) the surrender to the Trustee for cancellation of the Definitive Notes representing the beneficial interest to be so transferred and (B) the receipt by the Trustee and the Co-Issuers of (1) an Investor Representation Letter from such Noteholder's transferee, (2) a Regulation S Transferor Certificate from such Noteholder, and (3) a written order in accordance with the Applicable Procedures containing information regarding the Euroclear or Clearstream account to be

credited with the increase in the Regulation S Global Note and the name of such account, the Trustee shall cancel such Definitive Note and, concurrently with such cancellation, instruct the Custodian to adjust the Depository's position in the Temporary Regulation S Global Note of the same Class to reflect an increase of the Aggregate Principal Amount thereof by the same amount and to credit or cause to be credited to the account of the transferee a beneficial interest in such Temporary Regulation S Global Note equal to the Aggregate Principal Amount of the Definitive Note so cancelled. In the event of any partial transfer of an interest in a Definitive Note to a Temporary Regulation S Global Note, the Co-Issuers shall execute and provide to the Trustee, and the Trustee shall authenticate and return to the Holder, a Definitive Note evidencing the remaining balance thereof. After the Distribution Compliance Period, interests in any Definitive Notes may not be transferred or exchanged for interests in a Temporary Regulation S Global Note.

(ii)    <u>Definitive Note to Permanent Regulation S Global Note</u>. If a Holder of a Definitive Note wishes at any time after the Distribution Compliance Period to transfer its interest in such Definitive Note to a Non-U.S. Person, such Holder shall, subject to the provisions of this Section 2.5, transfer its interest in such Definitive Note for an equivalent beneficial interest in such Permanent Regulation S Global Note of the same Class. Upon (A) the surrender to the Trustee in the case of any Class of Notes or Combination Notes, of the Definitive Note representing the interest to be so transferred, for cancellation and (B) the receipt by the Trustee and the Co-Issuers of (1) an Investor Representation Letter from such Noteholder's transferee, (2) a Regulation S Transferor Certificate from such Noteholder and (3) a written order in accordance with the Applicable Procedures containing information regarding the Euroclear or Clearstream account to be credited with the increase in the Regulation S Global Note and the name of such account, the Trustee shall cancel such Definitive Note, and, concurrently with such cancellation instruct the Custodian to endorse the Permanent Regulation S Global Note to reflect an increase of the Aggregate Principal Amount thereof by the same amount and to credit or cause to be credited to the account of the transferee a beneficial interest in such Permanent Regulation S Global Note equal to the Aggregate Principal Amount of the Definitive Note so cancelled. In the event of any partial transfer of an interest in a Definitive Note to a Permanent Regulation S Global Note, the Co-Issuers or the Issuer, as applicable, shall execute and provide to the Trustee, and the Trustee shall authenticate and return to the Holder, a Definitive Note evidencing the remaining balance thereof (which Definitive Note shall be so mailed or otherwise delivered from a location outside the United States).

In respect of any transfers involving Combination Notes, the Note Registrar shall ensure that the Note Register is amended in respect of the Note Component of the Combination Notes and request the Share Registrar to amend the Share Register in respect of the Preferred Share Component of the Combination Notes.

(iii)     *Temporary Regulation S Global Note to Definitive Note or Rule 144A Global Note*. To the extent permitted by DTC, if a Holder of a beneficial interest in the Temporary Regulation S Global Note of a particular Class wishes at any time during the Distribution Compliance Period to transfer its beneficial interest in such Temporary Regulation S Global Note to a U.S. Person, such holder shall, subject to the provisions of this Section 2.5, transfer its beneficial interest in such Temporary Regulation S Global Note for an equivalent interest in a Rule 144A Global Note, or, in the case of a Class B-2L Note or a Combination Note, a Definitive Note.   Upon receipt by the Trustee of (A) a certificate substantially in the form of Exhibit G hereto and (B) a written order given in accordance with the Applicable Procedures, the Trustee shall instruct the Custodian to adjust the Depository's position in the Temporary Regulation S Global Note to reflect a reduction of the Aggregate Principal Amount thereof by the Aggregate Principal Amount of the beneficial interest thereof to be so transferred and concurrently with such reduction, in the case of a Rule 144A Global Note, instruct the Custodian to adjust the Depository's position in the Rule 144A Global Note of the same Class to reflect an increase of the Aggregate Principal Amount thereof by the same amount and to credit or cause to be credited to the account of the transferee a beneficial interest in such Rule 144A Global Note equal to the Aggregate Principal Amount of the Temporary Regulation S Global Note so reduced, and, in the case of a Definitive Note, the Co-Issuers shall execute and furnish to the Trustee, and the Trustee or the Authenticating Agent shall authenticate and deliver to such Holder, a Definitive Note in a principal amount equal to the amount of the reduction in the Aggregate Principal Amount of the Temporary Regulation S Global Note of such Class.

(iv)     *Transfer of Interests in a Definitive Note*. A Holder of a Definitive Note may at any time transfer its interest in such Definitive Note in accordance with this Section 2.5(b)(iv).  Any transfer of an interest in a Definitive Note to a Non-U.S. Person during the Distribution Compliance Period shall be made only pursuant to Section 2.5(b)(iii) above.  Otherwise the Trustee shall require, prior to any such transfer of a Definitive Note, receipt by the Trustee and the Co-Issuers of (A) an Investor Representation Letter from such Noteholder's transferee and (B) a Transferor Certificate from such Noteholder (which shall only be a Regulation S Transferor Certificate for transfers to Non-U.S. Persons during the Distribution Compliance Period).  Upon receipt of such letter and certificate, and surrender to the Trustee the Definitive Note representing the interest to be so transferred, the Trustee shall cancel such Definitive Note and the Co-Issuers shall execute and provide to the Trustee, and the Trustee or the Authenticating Agent shall authenticate and deliver, a Definitive Note to such transferee (and, in the event of a partial transfer, the Co-Issuers shall execute and provide to the Trustee, and the Trustee or the Authenticating Agent shall authenticate and deliver, a Definitive Note evidencing the remaining balance to the transferring Holder).

(v)     *Transfer of Interests in the Temporary Regulation S Global Note*. Transfers of beneficial interests in the Temporary Regulation S Global Note may only be made (A) in accordance with Section 2.5(b)(i) above or (B) by book-entry

transfer of beneficial interests in the Temporary Regulation S Global Note within the Clearance System (and subject to the Applicable Procedures) to Non-U.S. Persons in accordance with Regulation S in "offshore transactions" (as defined in Regulation S).

(vi)     <u>Transfer of Interests in a Permanent Regulation S Global Note</u>. If a Holder of a beneficial interest in the Permanent Regulation S Global Note wishes at any time to transfer its beneficial interest in such Permanent Regulation S Global Note to a U.S. Person, such Holder shall, subject to the provisions of this Section 2.5 and the Applicable Procedures, transfer its beneficial interest in such Permanent Regulation S Global Note for an equivalent interest in a Rule 144A Global Note or, in the case of the Class B-2L Notes or the Combination Note, a Definitive Note.  Upon receipt by the Trustee of (A) a certificate substantially in the form of <u>Exhibit G</u> hereto and (B) a written order given in accordance with the Applicable Procedures, the Trustee shall instruct the Custodian to adjust the Depository's position in the Permanent Regulation S Global Note to reflect a reduction of the Aggregate Principal Amount thereof by the Aggregate Principal Amount of the beneficial interest thereof to be so transferred and concurrently with such reduction, in the case of a Rule 144A Global Note, instruct the Custodian to adjust the Depository's position in the Rule 144A Global Note of the same Class to reflect an increase of the Aggregate Principal Amount thereof by the same amount and to credit or cause to be credited to the account of the transferee a beneficial interest in such Rule 144A Global Note equal to the Aggregate Principal Amount of the Permanent Regulation S Global Note so reduced, and, in the case of a Definitive Note, the Issuer shall execute and furnish to the Trustee (or Paying Agent, as directed by the Trustee) and the Trustee shall authenticate and deliver to such Holder a Definitive Note in the Aggregate Principal Amount equal to the amount of the reduction in the Aggregate Principal Amount of the Permanent Regulation S Global Note (which Definitive Note shall be mailed or otherwise delivered to such Holder from a location outside the United States).  Interests in any Permanent Regulation S Global Note shall not be exchanged for or transferred to a Definitive Note (except pursuant to the preceding sentence or Section 2.1, if applicable).

(vii)     <u>Transfer of Interest in a Rule 144A Global Note</u>. Subject to the provisions of Section 2.5(k), transfers of beneficial interests in a Rule 144A Global Note may only be made (A) in accordance with the provisions of this Section 2.5(b)(iv) or (B) by book-entry transfer of beneficial interests in a Rule 144A Global Note within DTC (and subject to the Applicable Procedures) and in accordance with the transfer restrictions contained in the legend on such Rule 144A Global Note.  If a Holder of a beneficial interest in a Rule 144A Global Note wishes to transfer its beneficial interest in such Rule 144A Global Note to a Non-U.S. Person, such holder shall, subject to the provisions of this Section 2.5 and the Applicable Procedures, transfer its beneficial interest in such Rule 144A Global Note for an equivalent interest in a Temporary Regulation S Global Note or a Permanent Regulation S Global Note, *provided* such transfer occurs after the Distribution Compliance Period.  Upon receipt by the Trustee of (A) a Regulation

S Transferor Certificate from such Noteholder and (B) a written order given in accordance with the DTC's Applicable Procedures, the Trustee shall instruct the Custodian to adjust the Depository's position in the Rule 144A Global Note to reflect a reduction of the Aggregate Principal Amount thereof by the Aggregate Principal Amount of the beneficial interest thereof to be so transferred and concurrently with such reduction, instruct the Custodian to adjust the Depository's position in such Temporary Regulation S Global Note or the Permanent Regulation S Global Note of the same Class to reflect an increase of the Aggregate Principal Amount thereof by the same amount and to credit or cause to be credited to the account of the transferee a beneficial interest in such Temporary Regulation S Global Note or Permanent Regulation S Global Note equal to the Aggregate Principal Amount of the Rule 144A Global Note so reduced.

(viii)   <u>Exchange of Combination Notes into Component Securities</u>. Subject to the provisions of Section 2.5(l), a Holder of a Combination Note may exchange all or a proportionate amount of each Component Security for (i) a Definitive Note of the Class B-1L Notes or for proportional interests in a Rule 144A Global Note or a Regulation S Global Note of the Class B-1L Note (in the Case of the Note Component) in the amount of the Aggregate Principal Amount of the applicable Note Component being exchanged, and (ii) a Class I Preferred Share certificate (in the case of the Preferred Share Component) representing the number of Class I Preferred Shares comprised in the Preferred Share Component being exchanged, in the manner specified in this Indenture.   Such exchange is subject to delivery to the Trustee, the Note Registrar, the Share Registrar and the Issuer of written certifications, substantially in the form of Exhibit B and Exhibit C or Exhibit D, as applicable, to the Paying and Transfer Agency Agreement at least 10 Business Days prior to the Payment Date on which such exchange shall become effective.

No Holder of the Combination Notes may exchange or transfer any Note Component or any Preferred Share Component thereof without also exchanging or transferring the proportionate amount of the Preferred Share Component or the Note Component being exchanged or transferred.

The Trustee, upon receipt of such duly completed certificate and such Combination Note, shall (i) cancel such Combination Note (or, by following the procedures of the Depository, decrease the Aggregate Principal Amount of such Combination Note), (ii) authenticate and deliver, without charge, Notes in (or, by following the procedures of the Depositary, increase the Aggregate Principal Amount of the applicable Global Note by) the same Aggregate Principal Amount as the Note Component surrendered for exchange and (iii) direct the Paying and Transfer Agent to deliver (in the case of a Preferred Share sold in reliance on Regulation S, by following the procedures of Euroclear and Clearstream for delivery to the account of the Holder of the Combination Notes) a certificate for the Class I Preferred Shares represented by the face amount of such Preferred Share Component surrendered for exchange.   Thereafter, the Holder of

a Combination Note (or a beneficial interest therein) exchanged hereunder shall become the Holder of the Class B-1L Notes and Class I Preferred Shares (or beneficial interests therein) received upon such an exchange. At any time the that the Combination Notes represent interests only in the Preferred Share Components, the Issuer will notify the holders of the Combination Notes and require the exchange of the Combination Notes for the Class I Preferred Shares.

Notwithstanding anything else in this Section 2.5, such Definitive Note or proportional interest in a Rule 144A Global Note or Regulation S Global Note, and such Preferred Share certificate (collectively, "Exchanged Interests") may be in a principal amount or number of shares, as the case may be, smaller than the authorized minimum otherwise applicable thereto; *provided* that the exchanging Holder of such Combination Note may not thereafter transfer any such Exchanged Interest except to a Person that, after giving effect to such transfer, would hold at least the authorized minimum principal amount or number of shares applicable to such Exchanged Interests.

No Holder of any Note or Preferred Share (including a Holder that receives such Note or Preferred Share upon exchange under this Section 2.5(b)(viii)) will have the right to exchange such Note or Preferred Share for a Combination Note.

At any time that the Combination Notes represent interests only in the Preferred Share Component, the Trustee, on behalf of the Issuer, shall send a notice to the Holders of the Combination Notes informing them that the Holders of the Combination Notes must deliver the Combination Notes to the Paying and Transfer Agent for exchange into the Class I Preferred Shares represented by the Preferred Share Component and, upon such delivery, the Paying and Transfer Agent, in accordance with the Paying and Transfer Agency Agreement, shall deliver a certificate representing such Preferred Shares to such Holders within five (5) Business Days of delivery to it of the Combination Notes.

No service charge shall be made for any exchange of Combination Notes into Component Securities, but the Trustee or the Paying and Transfer Agent may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

(ix) Initial Sale of Notes. Notwithstanding anything in clauses (i) through (viii) of this Section 2.5(b) to the contrary, in connection with any sale of Initial Purchaser Notes by any Initial Purchaser, no delivery of an Investor Representation Letter or a Transferor Certificate shall be required so long as each purchaser of Notes executes and delivers a transferee certificate acceptable to Bear Stearns (which certificate shall, in the case of any transfer pursuant to Sections 2.5(b)(i) or 2.5(b)(ii), identify each transferee of a beneficial interest in the Temporary Regulation S Global Note, including name, address, payment instructions, Taxpayer information and such other information as the Trustee

reasonably may require), which transferee certificate shall be delivered to the Trustee.

(x)     Securities Act.  No transfer of any Note or any beneficial interest in any Note shall be made unless such transfer (a) is made pursuant to an effective registration statement under the Securities Act and registration or qualification under applicable state securities laws or (b) is exempt from such registration or qualification requirements.

The Investor Representation Letters (and any alternative certification acceptable to Bear Stearns pursuant to clause (vi) above) and the Transferor Certificates furnished pursuant to this Section may be relied on conclusively by the Trustee in determining whether the provisions of this Section have been complied with.  None of the Issuer, the Co-Issuer, the Trustee or any other person shall be required to register the Notes under the Securities Act or any state securities laws.

(c)     (i)     Unless a prospective Holder of a Note (and each beneficial owner of an interest in a Global Note) otherwise provides another representation acceptable to each of the Trustee, the Servicer and the Issuer, each Holder of a Note other than a Class B-1L Note, a Class B-2L Note or a Combination Note (and each beneficial owner of an interest in a Class B-1L Note, a Class B-2L Note or a Combination Note in the form of a Global Note), by its purchase thereof, shall be deemed to have represented to the Issuer, the Servicer and the Trustee that (a) no part of the funds being used to pay the purchase price for such Notes constitutes an asset of any "employee benefit plan" (as defined in Section 3(3) of ERISA) or "plan" (as defined in Section 4975(e)(1) of the Code) that is subject to Title I of ERISA or Section 4975 of the Code (each a "Plan"), including assets held in an insurance company general account, or (b) if the funds being used to pay the purchase price for such Notes include assets of any Plan, an exemption to the prohibited transaction rules applies to the purchase and holding of such Notes.

(ii)     Each Holder of a Class B-1L Note shall be required (and each beneficial owner of an interest in a Class B-1L Note shall be deemed) to represent to the Issuer, the Servicer and the Trustee that either (a) the purchaser or transferee is not a Plan and is not acquiring the Class B-1L Note with assets of a Plan, (b) it is an insurance company and such funds include only assets of its general account, and its acquisition and holding of such Note are eligible for exemptive relief available under Section I of PTCE 95-60, or (c) the acquisition and holding of the Class B-1L Notes by the purchaser or transferee are eligible for the exemptive relief available under any of Section 408(b)(17) of ERISA or PTCE 96-23, 91-38, 90-1 or 84-14.

(iii)     Each Holder of a Class B-2L Note or a Combination Note shall be required (and each beneficial owner of an interest in a Class B-2L Note or a Combination Note in global form shall be deemed) to represent to the Issuer, the Servicer and the Trustee that either (a) no part of the funds being used to pay the

purchase price for such Note or Combination Note constitutes "plan assets" of any Plan or other "benefit plan investor" (as defined in Section 3(42) of ERISA) (a "<u>Benefit Plan Investor</u>"), or (b) if the funds being used to pay the purchase price for such Note or Combination Note include "plan assets" of any Plan or other Benefit Plan Investor, (1) it is purchasing the Class B-2L Notes or Combination Notes with assets of an "insurance company general account" within the meaning of PTCE 95-60, its purchase and holding of the Class B-2L Note or Combination Note are eligible for the exemptive relief available under Section I of PTCE 95-60, less than 25% of the assets of such insurance company general account constitute "plan assets" of Benefit Plan Investors, and if, after the initial acquisition of Class B-2L Notes or Combination Notes, during any calendar quarter 25% or more of the assets of such general account (as determined by such insurance company) constitute "plan assets" of Benefit Plan Investors and full exemptive relief from the prohibited transaction prohibitions of Section 406 of ERISA and Section 4975 of the Code is not available under Section 401(c) of ERISA and the regulations thereunder, then such investor will dispose of all of the Class B-2L Notes and Combination Notes then held in such general account by the end of the next following calendar quarter; or (2) its purchase and holding of the Class B-2L Note or a Combination Note are eligible for the exemptive relief available under any of Section 408(b)(17) of ERISA or PTCE 96-23, 91-38, 90-1 or 84-14. No purchase of a Class B-2L Note or a Combination Note by a Plan or a person investing on behalf of or with "plan assets" of a Benefit Plan Investor shall be allowed unless, after giving effect to such transfer and all other purchases occurring simultaneously with such transfer, less than 25% of each of the Class B-2L Notes or the Combination Notes and the Preferred Shares (excluding any such Note, Combination Notes or Preferred Shares held by the Servicer or its affiliates or clients) will be held by Benefit Plan Investors, and each potential Holder of a Class B-2L Note or a Combination Note will furnish to the Issuer and the Trustee information sufficient to ensure that this condition is met. Each potential Holder of a Class B-2L Note or a Combination Note will be required to represent and agree that it will not assign or transfer such Class B-2L Note or Combination Note unless (1) the proposed transferee or assignee delivers a letter to the Trustee evidencing its agreement to the foregoing ERISA representations and covenants with respect to its purchase, holding and transfer of such Class B-2L Note or Combination Note and (2) if the Holder (x) is not, and is not acting on behalf of a Benefit Plan Investor, the assignee or transferee will also not be a Benefit Plan Investor, or (y) is or is acting on behalf of an insurance company general account, the assignee or transferee will be accurately identified in such letter as either another insurance company general account or a person who is not and is not acting on behalf of a Benefit Plan Investor; or (z) is or is acting on behalf of or with "plan assets" of a Benefit Plan Investor (other than an insurance company general account), the assignee or transferee will be accurately identified in such letter as either an insurance company general account, another Benefit Plan Investor or a person who is not and is not acting on behalf of any Benefit Plan Investor; *provided* that for purposes of clauses (x), (y) and (z), a transfer by a Holder (the "<u>Transferring Holder</u>") to Bear Stearns in a secondary market

transaction and subsequent transfers by Bear Stearns to a Holder (the "Transferee Holder"), shall be deemed to be a transfer by the Transferring Holder to the Transferee Holder and Bear Stearns may therefore transfer such Notes to any potential Holder to whom the Transferring Holder would be permitted to transfer.

(d)     No Note or Combination Note shall be sold or transferred (including, without limitation, by pledge or hypothecation), except to Non-U.S. Persons in "offshore transactions" in accordance with Regulation S under the Securities Act, who, in the case of the Class B-2L Notes and the Combination Notes are also Qualified Institutional Buyers (or, solely in the case of a Holder purchasing Class B-2L Notes on the Closing Date, is an Institutional Accredited Investor), unless the purchaser or transferee is a Qualified Purchaser.  Notwithstanding anything to the contrary in this Indenture, no transfer of a Note or Combination Note may be made if such transfer would require registration of the Issuer or Co-Issuer under the Investment Company Act (subject, as regards the Trustee's duties, to Section 2.5(f) below).

(e)     At any time when the Issuer is not subject to Section 13 or 15(d) of the United States Securities Exchange Act of 1934, as amended, upon the request of any Noteholder, the Issuer shall promptly furnish to such Noteholder or to a prospective purchaser of any Note or Combination Note designated by such Noteholder, as the case may be, the information which the Issuer determines to be required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act ("Rule 144A Information") in order to permit compliance by such Noteholder with Rule 144A in connection with the resale of such Note or Combination Note by such Noteholder; *provided* that the Issuer shall not be required to provide audited financial statements more than once a year or to furnish Rule 144A Information in connection with any request made on or after the date that is three years from the later of (i) the date such Note or Combination Note (or any predecessor Note or Combination Note) was acquired from the Issuer or (ii) the date such Note or Combination Note (or any predecessor Note or Combination Note) was last acquired from an "affiliate" of the Issuer within the meaning of Rule 144A, in each case as determined by the Issuer.  Upon request by the Issuer, the Trustee shall cooperate with the Issuer in mailing or otherwise distributing (at the Issuer's expense) to such Noteholders or prospective purchasers, at and pursuant to the Issuer's written direction, the foregoing materials prepared and provided by the Issuer; *provided* that the Trustee shall be entitled to affix thereto or enclose therewith such disclaimers as the Trustee shall deem reasonably appropriate, at its discretion (such as, for example, a disclaimer that such Rule 144A Information was assembled by the Issuer and not by the Trustee, that the Trustee has not reviewed or verified the accuracy thereof, and that it makes no representation as to the sufficiency of such information under Rule 144A or for any other purpose).

(f)     The Trustee shall not be responsible for ascertaining whether any transfer complies with, or otherwise to monitor or determine compliance with, the requirements or terms of the Securities Act, applicable state securities laws, ERISA, the Code or the Investment Company Act; except that if a certificate is specifically required by the terms of this Section to be provided to the Trustee by a prospective transferee, transferor or the Issuer, the Trustee shall be under a duty to receive and examine the same to determine

whether it conforms substantially on its face to the applicable requirements of this Section.

(g)     If a Responsible Officer of the Trustee becomes aware that (i) a transfer or attempted or purported transfer of any Note or Combination Note or interest therein was consummated in compliance with the provisions of this Section 2.5 on the basis of a materially incorrect certification from the transferor or purported transferee, (ii) a transferee failed to deliver to the Trustee any certificate required to be delivered hereunder or (iii) the Holder of any Note or Combination Note or interest therein is in material breach of any representation or agreement set forth in any certificate or any deemed representation or agreement of such Holder, the Trustee will direct the Note Registrar not to register such attempted or purported transfer and if a transfer has been registered, such transfer shall be absolutely null and void *ab initio* and shall vest no rights in the purported transferee (such purported transferee, a "Disqualified Transferee") and the last preceding Holder of such Note or Combination Note that was not a Disqualified Transferee shall be restored to all rights as a Holder thereof retroactively to the date of transfer of such Note or Combination Note by such Holder.

(h)     For so long as one or more Global Notes are Outstanding:

(i)     the Trustee and its directors, officers, employees and agents may deal with the Depository, with respect to all Global Notes (the "Depository") for all purposes (including the making of distributions on, and the giving of notices with respect to, the Global Notes);

(ii)     unless otherwise provided herein, the rights of beneficial owner in a Global Note shall be exercised only through the respective Depository and shall be limited to those established by law and agreements between such beneficial owners and the respective Depository;

(iii)     for purposes of determining the identity of and Aggregate Principal Amount of Notes or Combination Notes beneficially owned by a Holder, the records of the Depository  shall be conclusive evidence of such identity and Aggregate Principal Amount and the Trustee may conclusively rely on such records when acting hereunder;

(iv)     the Depository will make book-entry transfers among the Depository participants of the Depository and will receive and transmit distributions of principal of and interest on the Global Notes to such Depository participants; and

(v)     the Depository participants of the Depository shall have no rights under this Indenture under or with respect to any of the Global Notes held on their behalf by the Depository, and the Depository may be treated by the Trustee and its agents, employees, officers and directors as the absolute owner of the Global Notes for all purposes whatsoever.

(i)     Each transferee of a Note (excluding any transferee of a Note (other than a Class B-2L Note transferred after the Closing Date or a Combination Note) who is a non-U.S. Person in an offshore transaction under Regulation S but including any transferee of a Class B-2L Note transferred after the Closing Date or a Combination Note who is a non-U.S. Person in an offshore transaction under Regulation S) or a Combination Note will be deemed to represent at time of transfer that the transferee is a Qualified Institutional Buyer and that (i) it is a Qualified Purchaser, (ii) it is not formed for the purpose of investing in the Notes or Combination Notes, unless each of its beneficial owners is a Qualified Purchaser, (iii) it is not a dealer described in paragraph (a)(1)(ii) of Rule 144A unless such transferee owns and invests on a discretionary basis at least U.S.$25 million in securities of issuers that are not affiliated persons of such dealer, (iv) it is not a plan referred to in paragraph (a)(1)(i)(D) or (E) of Rule 144A or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such plan, unless investment decisions are made solely by the fiduciary, trustee or sponsor of such plan, (v) it and each account for which it is purchasing is purchasing Notes or Combination Notes in at least the minimum denomination and (vi) it will provide written notice of the foregoing and any other applicable transfer restrictions to any transferee.

(j)     Any Note or Combination Note issued upon the transfer, exchange or replacement of Notes or Combination Notes shall bear such applicable legend set forth in the relevant Exhibit hereto unless there is delivered to the Trustee, Note Registrar and the Issuer such satisfactory evidence, which may include an Opinion of Counsel, as may be reasonably required by any of the Trustee, Note Registrar and the Issuer to the effect that (i) neither such applicable legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof comply with the provisions of Rule 144A and to ensure that neither of the Co-Issuers nor the Portfolio Collateral becomes an investment company required to be registered under the Investment Company Act, and (ii) the Co-Issuers and the Portfolio Collateral are exempt from registration under the Investment Company Act other than by reason of Section 3(c)(7) thereof. Upon provision of such satisfactory evidence, the Trustee, at the direction of the Issuer, shall authenticate and deliver Notes or Combination Notes that do not bear such applicable legend.

(k)     If, notwithstanding the restrictions set forth in this Section 2.5, either of the Co-Issuers determines that any beneficial owner or Holder of a Rule 144A Global Note (i) is a U.S. Person and (ii) is not (A) a Qualified Purchaser or (B) a company beneficially owned exclusively by Qualified Purchasers, the Co-Issuers may require, by notice to such beneficial owner or Holder, as the case may be, that such beneficial owner or Holder sell all of its right, title and interest to such Note or Combination Note (or interest therein) to a Person that is both (1) a Qualified Institutional Buyer and (2) a Qualified Purchaser or a company beneficially owned exclusively by Qualified Purchasers, with such sale to be effected within 30 days after notice of such sale requirement is given. If such beneficial owner or Holder fails to effect the transfer required within such 30-day period, (x) upon written direction from the Issuer, the Trustee shall, and is hereby irrevocably authorized by such beneficial owner or Holder, as the case may be, to cause its interest in such Note or Combination Note to be transferred in a commercially reasonable sale (conducted by the Trustee or by an investment banking firm selected by the Trustee and approved by the Issuer (whose fees are to be paid

exclusively from the proceeds of such sale)), in accordance with Section 9-504(3) of the UCC as applied to securities that are sold on a recognized market or that may decline speedily in value) to a Person that certifies to the Trustee and the Co-Issuers, in connection with such transfer, that such Person is both (1) a Qualified Institutional Buyer and (2) a Qualified Purchaser or a company beneficially owned exclusively by one or more Qualified Purchasers and (y) pending such transfer, no further payments will be made in respect of such Note or Combination Note (or beneficial interest therein) held by such Holder or beneficial owner.

(l) So long as Combination Notes represented by Regulation S Global Notes remain outstanding and are held by or on behalf of the Depository, transfers and exchanges of the interests in such Regulation S Global Notes shall only be made in accordance with Section 2.1 and 2.5 and any such transfers will be subject to the provisions of this Section 2.5(l). If a transfer of a beneficial interest in Regulation S Global Notes requires the Trustee to instruct the Depository to reduce or increase the Aggregate Principal Amount of Combination Notes that include the Preferred Share Component represented by the Regulation S Global Note, the Issuer shall cancel the Regulation S Global Note and issue a new Regulation S Global Note registered in the name of such Depository representing the Aggregate Principal Amount of the Combination Note after the transfer. The new Regulation S Global Note shall be deposited with the Depository. The Trustee shall ensure that the Note Register is amended, and shall notify the Share Registrar to amend the Share Register, to reflect the transfers of the Class B-1L Notes and Class I Preferred Shares, respectively, represented by the Combination Note in the form of the Regulation S Global Note. The Issuer is not required to issue a Regulation S Global Note at any time that the Aggregate Principal Amount of Combination Notes is zero.

Section 2.6. Mutilated, Destroyed, Lost or Stolen Notes or Combination Notes.

If (i) any mutilated Note or Combination Note is surrendered to the Trustee or the Issuer or the Trustee and the Issuer receive evidence to their reasonable satisfaction of the destruction, loss or theft of any Note or Combination Note, and (ii) in the case of a destroyed, lost, or stolen Note or Combination Note, there is delivered to the Issuer and the Trustee such security or indemnity as may be required by them to save each of them harmless (an unsecured indemnity agreement of an Institutional Investor organized under the laws of the United States or any State in the United States with a net worth at least equal to twice the amount of the security or indemnity being deemed sufficient to satisfy such security or indemnity requirement), then, in the absence of notice to the Co-Issuers or the Trustee that such Note or Combination Note has been acquired by a protected purchaser, the Co-Issuers shall execute and, upon a written request therefor by the Issuer, the Trustee shall authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Note or Combination Note, a new Note or Combination Note of the same Class, tenor and principal amount, bearing a number not contemporaneously outstanding. If, after the delivery of such new Note or Combination Note, a protected purchaser of the original Note or Combination Note in lieu of which such new Note or Combination Note was issued presents such original Note or Combination Note for payment, the Issuer and the Trustee shall be entitled to recover such new Note or Combination Note from the Person to whom it was delivered or any Person taking title therefrom, except a protected purchaser, and the

Issuer and the Trustee shall be entitled to recover upon the security or indemnity provided therefor to the extent of any loss, damage, cost or expense incurred by the Co-Issuers, or the Trustee, in connection therewith. If any such mutilated, destroyed, lost or stolen Note or Combination Note shall have become or shall be about to become due and payable in full, or shall have been called for redemption in full, instead of issuing a new Note, the Co-Issuers may pay such Note or Combination Note without surrender thereof, except that any mutilated Note or Combination Note shall be surrendered.

Upon the issuance of any new Note or Combination Note under this Section 2.6, the Issuer or the Trustee may require the payment of a sum sufficient to cover any tax or other governmental charge that may be imposed or any other reasonable expense in relation thereto.

Every new Note or Combination Note issued pursuant to this Section in lieu of any mutilated, destroyed, lost or stolen Note or Combination Note shall constitute an original additional contractual obligation of the Issuer, whether or not the mutilated, destroyed, lost or stolen Note or Combination Note shall be at any time enforceable by anyone, and shall be entitled to all the benefits of this Indenture equally and proportionately with any and all other Notes or Combination Notes of the same Class duly issued hereunder.

The provisions of this Section are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes or Combination Notes.

Section 2.7.    Payments on the Notes.

(a)    No principal will be payable in respect of the Class A-1L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of an Initial Deposit Redemption, an Optional Redemption, a Special Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-1L Notes as described herein. On each Payment Date with respect to the Amortization Period, the principal of the Class A-1L Notes will be payable (to the extent of funds available therefor and in the order of priority described herein) first to the Class A-1LA Notes and then to the Class A-1LB Notes, until the Payment Date on which the Aggregate Principal Amount of such Class A-1L Notes have been paid in full. The unpaid principal amount of the Class A-1L Notes shall accrue interest at the Applicable Periodic Rate for such Class from the Closing Date until such unpaid principal amount is paid in full and such accrued interest shall be payable on each Payment Date. To the extent there is any shortfall in the payment of accrued interest at the Applicable Periodic Rate on any Payment Date with respect to any of the Class A-1L Notes, the Periodic Rate Shortfall Amount will be paid (to the extent of available funds therefor and as described herein) on one or more subsequent Payment Dates after payment of the Periodic Interest Amount with respect to the Class A-1L Notes, unless earlier paid upon an Initial Deposit Redemption, an Optional Redemption, a Special Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-1L Notes as described herein. All outstanding principal of the Class A-1L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date.

(b)    No principal will be payable in respect of the Class A-2L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of a Special Redemption, an Optional Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-2L Notes, but only after the Aggregate Principal Amount of the Class A-1L Notes has been paid in full.  The unpaid principal amount of the Class A-2L Notes shall accrue interest at the Applicable Periodic Rate for such Class from the Closing Date until such unpaid principal amount is paid in full and such accrued interest shall be payable on each Payment Date.  To the extent there is any shortfall in the payment of accrued interest at the Applicable Periodic Rate on any Payment Date with respect to the Class A-2L Notes, the Periodic Rate Shortfall Amount will be paid (to the extent of available funds therefor and as described herein) on one or more subsequent Payment Dates after payment of the Periodic Interest Amount with respect to the Class A-2L Notes, unless earlier paid upon an Optional Redemption, a Special Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-2L Notes as described herein.  All outstanding principal of the Class A-2L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date.

(c)    No principal will be payable in respect of the Class A-3L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of a Special Redemption, an Optional Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-3L Notes, but only after the Aggregate Principal Amount of the Class A-1L Notes and the Class A-2L Notes have been paid in full.  The unpaid principal amount of the Class A-3L Notes shall accrue interest at the Applicable Periodic Rate for such Class from the Closing Date until such unpaid principal amount is paid in full and such accrued interest shall be payable on each Payment Date.  To the extent there is any shortfall in the payment of accrued interest at the Applicable Periodic Rate on any Payment Date with respect to the Class A-3L Notes, the Periodic Rate Shortfall Amount will be paid (to the extent of available funds therefor and as described herein) on one or more subsequent Payment Dates after payment of the Periodic Interest Amount with respect to the Class A-3L Notes, unless earlier paid upon an Optional Redemption, a Special Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class A-3L Notes as described herein.  All outstanding principal of the Class A-3L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date.

(d)    No principal will be payable in respect of the Class B-1L Notes (and principal collections on the Portfolio Collateral will be applied as described herein) during the Revolving Period, except in the event of a Special Redemption, an Optional Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class B-1L Notes, but only after the Aggregate Principal Amount of the Class A Notes have been paid in full.  The unpaid principal amount of the Class B-1L Notes shall accrue interest at the Applicable Periodic Rate for such Class from the Closing Date until such unpaid principal amount is paid in full and such accrued interest shall be payable on each Payment Date.  To the extent there is any shortfall in the payment of accrued interest at the Applicable Periodic Rate on any Payment Date with respect to the Class B-1L Notes, the Periodic Rate Shortfall Amount will be paid (to the extent of available funds therefor and as described herein) on one or more subsequent Payment Dates after payment of the Periodic Interest Amount with respect to the Class B-1L Notes, unless earlier paid upon an Optional Redemption, a Special Redemption, a Tax Event Redemption or a Mandatory

Redemption of the Class B-1L Notes as described herein. All outstanding principal of the Class B-1L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date.

(e)       Except in connection with the application of the Additional Collateral Deposit Requirement or upon the failure of the Class B-2L Overcollateralization Test, as described herein, no principal will be payable in respect of the Class B-2L Notes during the Revolving Period, except in the event of a Special Redemption, an Optional Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class B-2L Notes, but only after the Aggregate Principal Amount of the Class A Notes and Class B-1L Notes have been paid in full. The principal amount of the Class B-2L Notes shall be due and payable (to the extent of funds available therefore and in the order of priority as described herein) on each Payment Date during the Amortization Period, but only after the Aggregate Principal Amount of the Class A Notes and the Class B-1L Notes have been paid in full (except in connection with the application of the Additional Collateral Deposit Requirement or upon the failure of the Class B-2L Overcollateralization Test). The unpaid principal amount of the Class B-2L Notes shall accrue interest at the Applicable Periodic Rate for such Class from the Closing Date until such unpaid principal amount is paid in full and such accrued interest shall be payable on each Payment Date. To the extent there is any shortfall in the payment of accrued interest at the Applicable Periodic Rate on any Payment Date with respect to the Class B-2L Notes, the Periodic Rate Shortfall Amount will be paid (to the extent of available funds therefor and as described herein) on one or more subsequent Payment Dates after payment of the Periodic Interest Amount with respect to the Class B-2L Notes, unless earlier paid upon an Optional Redemption, a Special Redemption, a Tax Event Redemption or a Mandatory Redemption of the Class B-2L Notes as described herein. All outstanding principal of the Class B-2L Notes, together with the other amounts described herein, will be due and payable on the Final Maturity Date.

(f)       Payments in respect of the Combination Notes shall be made as set forth in Section 16.3 hereof.

(g)       Holders of the Notes of each Class as of the Record Date in respect of a Payment Date or as of the Redemption Record Date with respect to the Initial Deposit Redemption Date, an Optional Redemption Date, a Special Redemption Date, a Tax Event Redemption Date or a Mandatory Redemption Date, shall be entitled, to the extent provided for herein, to the interest accrued and payable and principal payable (or Initial Deposit Redemption Price, an Optional Redemption Price, a Special Redemption Price, a Tax Event Redemption Price or a Mandatory Redemption Price payable, as applicable) on such Payment Date or Redemption Record Date with respect to the Initial Deposit Redemption Date, an Optional Redemption Date, a Special Redemption Date, a Tax Event Redemption Date or a Mandatory Redemption Date. Payments of principal to Holders entitled thereto shall be made in the proportion that the Aggregate Principal Amount of the Notes of such Class registered in the name of each such Holder on such Record Date or Redemption Record Date with respect to the Initial Deposit Redemption Date, an Optional Redemption Date, a Special Redemption Date, a Tax Event Redemption Date or a Mandatory Redemption Date.

(h)      Interest accrued with respect to any Class of Notes shall be computed on the basis of a 360-day year and the actual number of days elapsed during each Periodic Interest Accrual Period.

(i)      Notwithstanding any other provision of this Indenture, the obligations of the Co-Issuers' under this Indenture and the payment of principal of, interest on and all other amounts payable on or in respect of the Class A-1L Notes, the Class A-2L Notes, the Class A-3L Notes and the Class B-1L Notes (including, with respect to the Class B-1L Notes, the Note Component) will constitute nonrecourse obligations of the Co-Issuers, and the payment of principal of, interest on and all other amounts payable on or in respect Class B-2L Notes will constitute nonrecourse obligations of the Issuer, payable solely from the Trust Estate. Having realized the Collateral and distributed the net proceeds thereof, in each case in accordance with this Indenture, neither the Trustee nor any holders of Notes or Combination Notes may take any further steps against the Co-Issuers to recover any sum still unpaid in respect of any claims under this Indenture or the Notes or Combination Notes issued under this Indenture and all claims against the Co-Issuers in respect of any such sum due but still unpaid shall be extinguished and shall not revive. Neither of the Co-Issuers, nor any of their respective agents, partners, beneficiaries, officers, directors, employees or any Affiliate of any of them or any of their respective successors or assigns shall be personally liable for any amounts payable, or performance due, under the Notes, Combination Notes or this Indenture. It is understood that the foregoing provisions of this paragraph shall not (A) prevent recourse to the Trust Estate for the sums due or to become due under any security, instrument or agreement which is part of the Trust Estate or (B) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Notes, Combination Notes or secured by this Indenture, but the same shall continue until paid or discharged or (C) constitute a waiver of an otherwise valid cause of action with respect to the performance of the Servicer's obligations as set forth in the Servicing Agreement or (D) constitute a waiver of any otherwise valid cause of action against the Co-Issuers wherein the loss complained of is directly attributable to the willful misconduct or fraud of the Co-Issuers in making their respective representations or warranties or the performance of their respective obligations under this Indenture or (E) limit the right of any person to name the Co-Issuers as parties defendant in any action, suit or in the exercise of any other remedy under the Notes, Combination Notes or in this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such person or entity.

Section 2.8.    <u>Persons Deemed Owners.</u>

The Co-Issuers, the Trustee, the Note Registrar and the Servicer, and any agent of the Co-Issuers, the Trustee, the Note Registrar and the Servicer shall treat the Person in whose name any Note or Combination Note is registered as it appears on the Note Register (or Share Register in the case of the Preferred Share Component of the Combination Notes) as the owner of such Note for the purpose of receiving payments on such Note or Combination Note, and for all other purposes whatsoever (whether or not such Note or Combination Note is overdue), and none of the Issuer, the Trustee, the Note Registrar or the Servicer, nor any agent of any of them, shall be affected by notice to the contrary.

Section 2.9.    Cancellation.

All Notes or Combination Notes surrendered for payment, registration of transfer, exchange or redemption, or deemed destroyed, lost or stolen, shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee and shall be promptly cancelled by it. No Notes or Combination Notes shall be authenticated in lieu of or in exchange for any Notes or Combination Notes cancelled as provided in this Section 2.9, except as expressly permitted by this Indenture. All cancelled Notes or Combination Notes held by the Trustee shall be destroyed or held by the Trustee in accordance with its standard retention policy unless the Issuer shall direct by an Issuer Order that they be returned to the Issuer.

Section 2.10.    Tax Purposes.

Each of the Co-Issuers shall, and each Holder by acceptance of its Note shall be deemed to have agreed to, treat the Notes as debt solely of the Issuer for United States federal income tax purposes and to treat the Preferred Shares as equity of the Issuer for United States federal income tax purposes.

Section 2.11.    Calculation Agent; Determination of LIBOR.

(a)    The Issuer hereby agrees that for so long as any of the Notes remain Outstanding, there will at all times be an agent appointed to calculate LIBOR in respect of each Periodic Interest Accrual Period in accordance with the terms of the Notes. The Issuer has initially appointed Investors Bank & Trust Company, as agent with respect to the determination of LIBOR (in such capacity, the "Calculation Agent"). The Calculation Agent may be removed by the Issuer at any time. If the Calculation Agent is unable or unwilling to act as such or is removed by the Issuer, or if the Calculation Agent fails to determine LIBOR for a Periodic Interest Accrual Period, the Issuer will promptly appoint as a replacement Calculation Agent a leading bank which is engaged in transactions in U.S. dollar deposits in the international U.S. dollar market and which does not control or is not controlled by or under common control with the Co-Issuers or their Affiliates. The Calculation Agent may not resign or be removed from its respective duties without a successor having been duly appointed.

(b)    The Calculation Agent shall determine LIBOR for each Periodic Interest Accrual Period in accordance with the following provisions:

On each LIBOR Determination Date, LIBOR shall equal the rate, as obtained by the Calculation Agent, for three-month U.S. dollar deposits which appears on Telerate Page 3750 (as reported by Bloomberg Financial Markets Commodities News) or such other page as may replace such Page 3750, as of 11:00 a.m. (London time) on such LIBOR Determination Date. Notwithstanding the foregoing, LIBOR for the initial Periodic Interest Accrual Period shall be determined through the use of straight-line interpolation by reference to two rates calculated in accordance with the provisions above, one of which shall be for five-month U.S. dollar deposits and the other of which shall be for six-month U.S. dollar deposits.

If, on any LIBOR Determination Date, such rate does not appear on Telerate Page 3750 (as reported by Bloomberg Financial Markets Commodities News) or such other page as may replace such Page 3750, the Calculation Agent shall determine the arithmetic mean of the

offered quotations of the Reference Banks (as defined below) to leading banks in the London interbank market for three-month (or five-month or six-month, as applicable) U.S. dollar deposits in an amount determined by the Calculation Agent by reference to requests for quotations as of approximately 11:00 a.m. (London time) on the LIBOR Determination Date made by the Calculation Agent to the Reference Banks. If, on any LIBOR Determination Date, at least two of the Reference Banks provide such quotations, LIBOR shall equal such arithmetic mean of such quotations. If, on any LIBOR Determination Date, only one or none of the Reference Banks provide such quotations, LIBOR shall be deemed to be the arithmetic mean of the offered quotations that leading banks in The City of New York selected by the Calculation Agent (after consultation with the Servicer) are quoting on the relevant LIBOR Determination Date for three-month (or five-month or six-month, as applicable) U.S. dollar deposits in an amount determined by the Calculation Agent that is representative of a single transaction in such market at such time by reference to the principal London offices of leading banks in the London interbank market; *provided* that, if the Calculation Agent is required but is unable to determine a rate in accordance with at least one of the procedures provided above, LIBOR shall be LIBOR as determined on the previous LIBOR Determination Date. As used herein, "Reference Banks" means four major banks in the London interbank market selected by the Calculation Agent (after consultation with the Servicer).

For purposes of any calculations referred to in this paragraph (b), all percentages resulting from such calculations will be rounded, if necessary, to the nearest one hundred-thousandth of a percentage point.

(c)     As soon as possible after 11:00 a.m. (New York time) on each LIBOR Determination Date, but in no event later than 11:00 a.m. (New York time) on the Business Day immediately following each LIBOR Determination Date, the Calculation Agent will notify the Issuer, the Trustee, the Irish Paying Agent (as long as any of the Notes are listed on the Irish Stock Exchange) and the Servicer of LIBOR for the next Periodic Interest Accrual Period. The Calculation Agent will also specify to the Issuer the quotations upon which LIBOR is based, and in any event the Calculation Agent shall notify the Issuer before 5:00 p.m. (New York time) on each LIBOR Determination Date that either: (i) it has determined or is in the process of determining LIBOR or (ii) it has not determined and is not in the process of determining LIBOR together with its reasons therefor.

(d)     Upon receipt of notice of LIBOR for each Periodic Interest Accrual Period from the Calculation Agent pursuant to subsection (c) of this Section 2.11, the Trustee shall determine the Applicable Periodic Rate with respect to the Notes for such Periodic Interest Accrual Period and notify the Irish Stock Exchange of the Applicable Periodic Rate for each Class of Note (as long as any of the Notes are listed on the Irish Stock Exchange).

(e)     The determination of LIBOR by the Calculation Agent and the Applicable Periodic Rate with respect to the Notes by the Trustee (in the absence of manifest error) shall be final and binding upon all parties.

Section 2.12.   Option to Acquire Credit Enhancement.

Holders of any Class of Notes may elect to acquire bond insurance, a surety bond or similar credit enhancement supporting the payment of principal and/or interest on such Class of Notes, on terms and conditions acceptable to such Holders and at the sole expense of such Holders.   Any Class of Notes subject to such enhancement will be designated pursuant to a supplemental indenture adopted pursuant to Section 8.1 as "Insured Notes" of such Class. Premiums for any such enhancement (together with any other amounts payable to the issuer of such bond insurance policy, surety bond or similar credit enhancement, including, without limitation, amounts payable to any such issuer to reimburse it for draws thereunder, together with interest thereon), and costs incurred by the Co-Issuers in connection with such enhancement will be payable from amounts otherwise payable to such Class of Insured Notes, or in such other manner chosen by such Holder (*provided* that any such payment does not adversely affect any other Noteholder or holder of a Preferred Share).  Any Insured Notes for substantially all other purposes will be treated as Notes of such Class, except that the issuer of the bond insurance policy, surety bond or other such credit enhancement will generally be deemed to be the Holder of the Notes of such Class, enhanced by such entity and will in such capacity be entitled to exercise the rights otherwise exercisable by Holders of such Notes.

Section 2.13.   Prescription.

Payment in respect of any Note will cease to be due if not paid to the Holder of such Note due to insufficient payment instructions from such Holder to the Trustee or the Paying Agent for a period of twenty years from the Relevant Date.

Section 2.14.   Hedge Agreements.

(a)     The Cap Agreement:

(i)     On the Closing Date, the Issuer shall execute and deliver the Cap Agreement.  The Issuer will make a single payment of the Fixed Amount to the Cap Provider on the Closing Date.

(ii)     If, by 4:00 p.m., New York City time, on (i) any Payment Date on which the Trustee has not received from the Cap Provider any amount due from the Cap Provider on such Payment Date, (ii) the Business Day following any such Payment Date if the Trustee has not yet received such amount due from the Cap Provider, (iii) the Business Day on which such failure to pay by the Cap Provider becomes an event of default under the Cap Agreement or (iv) the Business Day on which the Trustee receives from the Cap Provider such amount due, the Trustee shall give prompt written notice thereof to the Cap Provider, S&P and Moody's. If the Cap Agreement has been terminated (such termination being subject to a Rating Confirmation) without a replacement, and any Cap Termination Amount owed to the Cap Provider under the Cap Agreement, if any, have been paid, all rights and liens of the Cap Provider under this Indenture with respect to the Cap Agreement shall terminate and be of no further force and effect.  If after the Closing Date the credit rating of the Cap Provider is downgraded or withdrawn, a

101

Responsible Officer of the Trustee, upon having actual knowledge of such downgrade or withdrawal, shall provide written notice of such downgrade or withdrawal to the Rating Agencies.

(iii)     If, at any time, the Aggregate Principal Amount of the Notes is less than the Cap Notional Amount, the Trustee may, at the direction of the Issuer, sell the Issuer's right to receive payments with respect to the Cap Agreement, but only to the extent that the Cap Notional Amount exceeds the Aggregate Principal Balance of the Notes.   Proceeds from any such sale will be distributed as Collateral Interest Collections on the Payment Date relating to the Due Period in which such sale occurs.

(iv)     The Cap Agreement will provide that in the event that (a) a S&P First Level Downgrade occurs and is continuing, then within 30 days after such rating withdrawal or downgrade, the Cap Provider shall, subject to satisfaction of the Rating Condition with respect to S&P, at its own expense, either (i) procure a Permitted Transfer, (ii) obtain an Eligible Guaranty or (iii) post collateral in accordance with the Cap Agreement; (b) an S&P Second Level Downgrade occurs and is continuing, then within 10 Local Business Days (as defined in the Cap Agreement) after such rating withdrawal or downgrade, the Cap Provider shall, subject to satisfaction of the Rating Condition with respect to S&P, at its own expense, either (i) procure a Permitted Transfer or (ii) obtain an Eligible Guaranty; and (c) a Moody's Second Level Downgrade occurs and is continuing, the Cap Provider shall as soon as reasonably practicable thereafter, at its own expense and using commercially reasonable efforts, either (i) procure a Permitted Transfer or (ii) obtain an Eligible Guaranty.

(v)     The Cap Agreement also will provide that the following will constitute "Additional Termination Events" under the Cap Agreement upon the occurrence of which the Issuer will have the right (subject to a Rating Confirmation) to terminate the Cap Agreement:   (a) if a S&P First Level Downgrade has occurred and is continuing and the Cap Provider fails to take any action described in clause (a) in the preceding paragraph within the time period specified therein; (b) a S&P Second Level Downgrade has occurred and is continuing and the Cap Provider fails to take any action described in clause (b) in the preceding paragraph within the time period specified therein; (c)(i) a Moody's Second Level Downgrade has occurred and been continuing for 30 or more Local Business Days and (ii) the Cap Provider has failed to comply with or perform any obligation to be complied with or performed by the Cap Provider in accordance with the Cap Agreement; and (d)(i) a Moody's Second Level Downgrade has occurred and been continuing for 30 or more Local Business Days and (ii) either (I) at least one Eligible Replacement has made a Firm Offer to be the transferee or (II) at least one entity that satisfies the Moody's Approved Ratings Threshold has made a Firm Offer to provide an Eligible Guaranty in respect of all of the Cap Provider's present and future obligations under the Cap Agreement.

(vi)     In the event of any transfer, assignment or replacement of the Cap Agreement following the occurrence of a "Rating Agency Downgrade" under the Cap Agreement, the Issuer shall use (and cause its agents to use) reasonable commercial efforts to incur only reasonable costs and expenses in connection with such transfer, assignment or replacement including, without limitation, costs and expenses of legal counsel.

(b)     Other Hedge Agreements:

(i)     On and after the Closing Date, subject to the conditions specified in this Section 2.14(b), the Issuer may enter into additional Hedge Agreements (including, without limitation, interest rate swap, cap or floor agreements, basis swap agreements or, with respect to the Revolving Period only, timing swap agreements) to hedge interest rate exposure or payment timing or accrual mismatches attributable to the Portfolio Collateral, increase or reduce the notional amount of an existing Hedge Agreement, sell all or a portion of any Hedge Agreement or terminate any Hedge Agreement if (x) Rating Agency Confirmation has been obtained or (y) such Hedge Agreement is a Form-Approved Hedge Agreement; *provided, further,* that with respect to a Form-Approved Hedge Agreement for which consent by the Rating Agencies to use the form in this transaction has been sought after the Closing Date, a Majority of the Controlling Class shall have consented to the use of such form.

(ii)     Any termination or similar amount payable by a Hedge Counterparty to the Issuer upon any such reduction, increase, amendment, modification or termination pursuant to the related Hedge Agreement shall constitute Collateral Principal Collections in the Due Period in which such payment is received.  Any such amount payable by the Issuer to such Hedge Counterparty shall be payable in accordance with Section 11.1 hereof.  Any voluntary termination of a Hedge Agreement shall be subject to Rating Agency Confirmation.

(iii)     Each Hedge Agreement shall be required to contain limited recourse and non-petition provisions equivalent (*mutatis mutandis*) to those contained in this Indenture.

(iv)     Each Hedge Agreement shall provide that if the ratings of the related Hedge Counterparty or its guarantor, as applicable, are reduced to a level below the levels required in such Hedge Agreement, the related Hedge Counterparty (or guarantor, as applicable) shall be required to (x) provide credit support in order to collateralize its obligations under such Hedge Agreement, (y) provide a guarantee of its obligations under such Hedge Agreement from a guarantor having the required ratings or (z) assign such Hedge Agreement to an eligible assignee, in each case as provided in such Hedge Agreement.

(v)     Each Hedge Agreement shall provide that the Issuer may terminate such Hedge Agreement (whether or not the Notes have been paid in full prior to

such termination) if, among other things, any of the following events occurs: (w) the bankruptcy, insolvency, receivership, reorganization or similar events with respect to the a Hedge Counterparty, (x) failure of the related Hedge Counterparty to make any payment when due (subject to any applicable grace period), (y) a change in law making it illegal for the Issuer or the related Hedge Counterparty to be party to or perform its obligations under such Hedge Agreement or (z) the failure of the related Hedge Counterparty to take the action or actions required of it (including but not limited to those set forth in clause (iv) hereof) upon a reduction or withdrawal of the ratings of the related Hedge Counterparty or its guarantor below the levels specified in the Hedge Agreement. Each Hedge Agreement shall also provide that it may be terminated pursuant to its terms upon any redemption of the Notes in whole and may provide for the right of the related Hedge Counterparty to terminate such Hedge Agreement upon the occurrence of specified "events of default" or "termination events"; *provided* that no Hedge Agreement may provide for termination upon the occurrence of a Default or an Event of Default under Section 5.1 hereof unless any resulting acceleration of the Notes may no longer be rescinded pursuant to the terms of this Indenture.

(c)     The Trustee shall in accordance with each applicable Note Valuation Report pay on each Payment Date amounts due by the Issuer to any Hedge Counterparty under each Hedge Agreement in accordance with the Priority of Payments.

(d)     All termination or similar payments required to be paid by the Issuer under any Hedge Agreement  shall be payable only on a Payment Date in accordance with Section 11.1 hereof.  If a Hedge Counterparty is the sole "defaulting party" or sole "affected party" (as each such term is defined in the related Hedge Agreement), any such termination or similar payment shall be payable by the Issuer only on a subordinated basis in accordance with Section 11.1 hereof.  A Hedge Agreement may provide that interest shall accrue on any such subordinated termination or similar payment not paid in full on any Payment Date because insufficient funds are available for such payment on such Payment Date in accordance with Section 11.1.

(e)     In addition to the right of the Issuer to enter into additional Hedge Agreements after the Closing Date as set forth in clause (b) hereof, the Issuer may enter into one or more Hedge Agreements in substitution for any terminated Hedge Agreement on terms similar to those of the terminated Hedge Agreement.  Any costs attributable to such substitute Hedge Agreement in excess of the termination amounts or similar proceeds received by the Issuer upon termination of the terminated Hedge Agreement shall constitute Aggregate Base Fees and Expenses payable in accordance with Section 11.1 hereof.

(f)     Upon the failure of a Hedge Counterparty to pay to the Issuer when due any payment required to be made by such Hedge Counterparty under the related Hedge Agreement, the Issuer or Servicer on its behalf shall promptly make demand for such payment. If such payment is not received by the Business Day immediately following such demand, the Issuer shall provide telephonic notice (promptly confirmed in writing) of such failure to the Trustee and, if applicable, any guarantor of such Hedge Counterparty's obligations under the Hedge Agreement.  Upon receipt of such notice (or earlier, if the Trustee has actual knowledge of the failure), the Trustee shall demand payment by such Hedge Counterparty (or guarantor, if

applicable) by 12:30 p.m., New York time, on such day (or, if such demand is made after 11:30 a.m. on any day, by 12:30 p.m. on the next succeeding Business Day). The Trustee shall notify Noteholders if such Hedge Counterparty fails to make any required payment within two Business Days after demand by the Trustee therefor.

(g)     Any action provided for in this section to be undertaken by the Issuer with respect to a Hedge Agreement (including, without limitation, entering into, terminating or amending a Hedge Agreement or delivering any notice, demand, request, authorization, consent, waiver or other communication under a Hedge Agreement) may be taken by the Servicer pursuant to the authority granted to the Servicer under the Servicing Agreement.

ARTICLE III

AUTHENTICATION AND DELIVERY OF NOTES

Section 3.1.   General Provisions.

On the Closing Date, the Notes (with the exception of the Class B-2L Notes) shall be executed by the Co-Issuers, and the Class B-2L Notes and the Combination Notes shall be executed by the Issuer, and delivered to the Trustee for authentication and thereupon the same shall be authenticated and delivered by the Trustee upon the Issuer's written request and upon compliance with the conditions of Section 3.2 hereof, and upon receipt by the Trustee of the following:

(a)     an Officers' Certificate of the Co-Issuers evidencing the authorization of the execution, authentication (as applicable) and delivery of the Transaction Documents, the Notes (with the exception of the Class B-2L Notes) and specifying the Final Maturity Dates, the applicable principal or stated amounts and the interest rates and yields of each Class of Notes to be authenticated and delivered;

(b)     an Officers' Certificate of the Issuer evidencing the authorization of the execution, authentication and delivery of the Class B-2L Notes, the Combination Notes and the Preferred Shares and specifying the Final Maturity Date, the applicable principal or stated amount and the interest rate and yield of the Class B-2L Notes, the Combination Notes and the Preferred Shares;

(c)     an Opinion or Opinions of Counsel, dated the Closing Date, substantially in the form or forms attached hereto as Schedule G.

(d)     an Officer's Certificate or Certificates of the Co-Issuers stating that all representations and warranties of the Co-Issuers set forth in the Transaction Documents are true and correct and neither of the Co-Issuers is in Default under this Indenture, that no "Event of Default" or "Termination Event" exists under any Hedge Agreement and that the issuance of the Notes, the Combination Note and the Preferred Shares then applied for will not result in a breach of any of the terms, conditions or provisions of, or constitute a default under, any indenture or other agreement or instrument to which the Issuer or the Co-Issuer, as applicable, is a party or by which the Issuer or the Co-Issuer, as applicable, is bound, or any order of any court or administrative agency entered in any

proceeding to which the Issuer or the Co-Issuer, as applicable, is a party or by which the Issuer or the Co-Issuer, as applicable, is bound or to which the Issuer or the Co-Issuer, as applicable, is subject; and that all conditions precedent (other than the deposit of cash by the Trustee in the appropriate accounts as provided in Section 3.2(e), (f) and (g) hereof) provided in this Section 3.1 and all requirements under Section 3.2 hereof and all conditions precedent otherwise provided in this Indenture relating to the authentication and delivery of the Notes and the Combination Notes applied for have been complied with;

(e)    an Accountants' Certificate in form and substance acceptable to the Issuer and the Co-Issuer confirming that the Notes of each Class (including the Note Component with respect to the Combination Notes) will be retired by their Final Maturity Dates in accordance with the assumptions set forth in Section 1.3 hereof and specifying the procedures undertaken by them to review data and computations relating to the foregoing;

(f)    an executed counterpart of the Servicing Agreement, the Cap Agreement, the Paying and Transfer Agency Agreement and the Collateral Administration Agreement;

(g)    the Initial Portfolio Collateral as provided in Section 3.2(a) hereof;

(h)    an Issuer Request directing the Trustee to authenticate the Notes and the Combination Notes in the amounts set forth therein, registered in the name(s) set forth therein or as otherwise provided to the Trustee by the Issuer or at its direction, and to make delivery thereof to the Issuer or as it may otherwise direct therein;

(i)    an Officer's Certificate from the Servicer (i) confirming that Schedule A attached to this Indenture correctly lists the Initial Portfolio Collateral to be granted to the Trustee on the Closing Date (in the case of items of Debt Securities) or scheduled to be granted to the Trustee on or not later than thirty (30) days after the Closing Date (in the case of Portfolio Loans) pursuant to the Granting Clauses hereof and (ii) confirming such information with respect to each item of Initial Portfolio Collateral as the Issuer reasonably deems necessary to confirm that such item of Initial Portfolio Collateral, individually and in the aggregate, meets the requirements specified in this Indenture; and

(j)    such other documents as the Trustee may reasonably require.

Section 3.2.    Security for Notes.

On the Closing Date, the following conditions shall have been satisfied:

(a)    Delivery of Initial Portfolio Collateral.  The Initial Portfolio Collateral to be Granted to the Trustee on such Closing Date, in an amount at least equal to the Initial Portfolio Collateral Amount, shall have been Delivered to the Trustee (or, with respect to Portfolio Loans, trade confirmations, commitment letters, assignment documents or other documents evidencing a commitment to purchase by the Issuer of the Initial Portfolio

Collateral on or not later than thirty (30) days after the Closing Date shall have been delivered to the Trustee).

(b)     Certificate of the Issuer.  A certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, shall have been delivered to the Trustee to the effect, in the case of each item of Portfolio Collateral and the Deposit included in the Trust Estate on the Closing Date, that as of the Closing Date:

(i)     the Issuer is the owner of such item of Portfolio Collateral and the Deposit free and clear of any liens, claims (including any adverse claims) or encumbrances of any nature whatsoever, except for those granted or expressly permitted pursuant to this Indenture and due bills, if any, with respect to interest, or a portion thereof, accrued on such Portfolio Collateral prior to the first payment date and owed by the Issuer to the seller of such Portfolio Collateral;

(ii)     the Issuer has acquired its ownership in such item of Portfolio Collateral and the Deposit in good faith without notice of any adverse claim, except as described in paragraph (b)(i) above;

(iii)     the Issuer has Delivered such item of Portfolio Collateral to the Trustee and has not assigned, pledged or otherwise encumbered any interest in such Portfolio Collateral or the Deposit other than interests granted or expressly permitted pursuant to this Indenture;

(iv)     the Issuer has full right to Grant and does Grant pursuant to the Granting Clauses such item of Portfolio Collateral and the Deposit to the Trustee;

(v)     the information set forth with respect to such item of Portfolio Collateral in Schedule A hereto is correct;

(vi)     such item of Portfolio Collateral satisfies the requirements of the definition of Portfolio Collateral; and

(vii)     no such item of Portfolio Collateral is Discount Portfolio Collateral.

(c)     Rating Letters.  The Trustee shall have received written evidence that the Class A-1LA Notes have been rated "AAA" by Standard & Poor's and "Aaa" by Moody's, the Class A-1LB Notes have been rated "AAA" by Standard & Poor's and "Aaa" by Moody's, the Class A-2L Notes have been rated at least "AA" by Standard & Poor's and at least "Aa2" by Moody's, the Class A-3L Notes have been rated at least "A" by Standard & Poor's and at least "A2" by Moody's, the Class B-1L Notes have been rated "BBB" by Standard & Poor's and "Baa2" by Moody's, that the Class B-2L Notes have been rated "BB" by Standard & Poor's and "Ba2" by Moody's and the Combination Notes have been rated at least "Baa2" by Moody's as to the Rated Balance and the Rated Coupon of the Combination Notes.

(d)  Accounts.  The Collection Account, the Collateral Account, the Initial Deposit Account, the Reserve Account, the Expense Reimbursement Account, the Closing Expense Account, the Loan Funding Account, the Default Swap Collateral Account, the Default Swap Issuer Account and the Preferred Shares Collection Account shall have been established.

(e)  Initial Deposit Account.  The Issuer shall have delivered to the Trustee on the Closing Date cash in the amount of $22,356,921 representing the Deposit for inclusion in the Trust Estate and the Trustee shall have credited such cash to the Initial Deposit Account.

(f)  Expense Reimbursement Account; Closing Expense Deposit.  The Issuer shall have delivered to the Trustee on the Closing Date cash in the amount of at least $50,000 for inclusion in the Trust Estate and the Trustee shall have credited such cash to the Expense Reimbursement Account.  The Issuer shall have delivered to the Trustee on the Closing Date cash in the amount of $2,879,230 for inclusion in the Trust Estate, and the Trustee shall have credited such cash to the Closing Expense Account (the "Closing Expense Deposit") which, after payment of all closing expenses (according to the list delivered to the Trustee), shall be transferred to the Initial Deposit Account or the Collection Account and applied as set forth in Section 10.2(h).

(g)  Loan Funding Account.  The Issuer shall have delivered to the Trustee on the Closing Date cash in the amount of $6,213,244 which is equal to the Issuer's commitment to make or otherwise fund draws related to any Delayed Drawdown Loans or Revolving Loans in the Initial Portfolio Collateral and the Trustee shall have credited such cash to the Loan Funding Account.

Section 3.3.  Initial Deposit Redemption.

(a)  The Issuer shall use reasonable efforts to use on or prior to the Effective Date the available funds and Eligible Investments in the Initial Deposit Account (other than Account Income on funds on deposit in the Initial Deposit Account) to purchase additional Original Portfolio Collateral as permitted pursuant to Section 3.4 hereof taking into account the Initial Portfolio Collateral and Original Portfolio Collateral already purchased by the Issuer in the Trust Estate (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any of the Original Portfolio Collateral on or before the Effective Date).  If the remaining Deposit in the Initial Deposit Account as of the Effective Date equals or exceeds $2,000,000 and the Aggregate Principal Amount of the Original Portfolio Collateral (determined in accordance with the foregoing sentence) acquired or committed to be acquired by the Issuer is less than the Required Portfolio Collateral Amount (subject to the second paragraph of Section 3.4(a)), the Issuer shall cause an Initial Deposit Redemption to occur on the Initial Deposit Redemption Date by redeeming the Class A-1LA Notes in an aggregate amount equal to the excess of the Required Portfolio Collateral Amount over the par amount of Original Portfolio Collateral; *provided* that the amount applied to such Initial Deposit Redemption shall not exceed the remaining amount of the Deposit (the "Initial Deposit Redemption Amount").  No interest or other amount in excess of the Initial Deposit Redemption Amount, other than the Periodic Interest Amount with respect to

the Class A-1LA Notes through the Initial Deposit Redemption Date due on the next succeeding Payment Date, shall be payable on or in respect of the Class A-1LA redeemed in an Initial Deposit Redemption. If there is a Deposit in the Initial Deposit Account on the Effective Date but no Initial Deposit Redemption is required pursuant to the terms of this Section 3.3(a), the remaining Deposit in the Initial Deposit Account shall be transferred to the Collection Account on the Effective Date and shall, subject to Section 3.4(d), constitute Collateral Principal Collections. Account Income in the Initial Deposit Account shall be transferred to the Collection Account on the Effective Date and shall constitute Collateral Interest Collections.

(b)     If an Initial Deposit Redemption is required, the Issuer, not later than the third Business Day immediately following the Effective Date, shall notify the Trustee and each Rating Agency in writing that an Initial Deposit Redemption is required pursuant to Section 3.3(a) hereof and the amount of the Class A-1LA Notes required to be redeemed pursuant thereto.

(c)     Notice of an Initial Deposit Redemption shall be given by the Trustee by first-class mail, postage prepaid, mailed not less than ten calendar days prior to the Initial Deposit Redemption Date, to each Holder of the Class A-1LA Notes to be redeemed at the address for such Holder in the Note Register and so long as any Notes are listed on the Irish Stock Exchange, to the Irish Paying Agent. All notices of Initial Deposit Redemption shall state the Initial Deposit Redemption Date, the Redemption Record Date with respect thereto, the Aggregate Principal Amount of the Class A-1LA Notes to be redeemed, and that no interest or other amount in excess of the Initial Deposit Redemption Amount shall be payable on the amount of the Class A-1LA Notes to be redeemed.

(d)     If an Initial Deposit Redemption is required, all Eligible Investments in the Initial Deposit Account representing the Deposit not applied to the purchase of Portfolio Collateral on or before the Effective Date shall be liquidated on the Business Day immediately preceding the Initial Deposit Redemption Date and the proceeds thereof shall be held in the Initial Deposit Account. On the Initial Deposit Redemption Date, the Trustee shall withdraw from the Initial Deposit Account all funds therein and apply such funds to the payment of Holders of the Notes in an amount equal to the Initial Deposit Redemption Amount or to a deposit in the Collection Account, as applicable.

Section 3.4.     Purchase of Portfolio Collateral between the Closing Date and the Effective Date; Effective Date Conditions.

(a)     The Issuer may (i) purchase Original Portfolio Collateral on any Business Day during the period from and including the Closing Date to and including the Effective Date or (ii) enter into a commitment to purchase Original Portfolio Collateral on any Business Day during the period from and including the Closing Date to and including the Effective Date for purchase on or as soon as practicable thereafter (*provided* that the agreed to settlement date shall not be more than thirty (30) days after the Effective Date), in each case, for inclusion in the Trust Estate in an aggregate amount equal to the Deposit in the Initial Deposit Account. Upon receipt of a Servicer Order requesting the purchase of Original Portfolio Collateral the Trustee shall pay out of the Initial Deposit Account, during the period commencing on the Closing Date and

ending on the Effective Date, all or a portion of the funds available therein for the purpose of purchasing Original Portfolio Collateral.

No Original Portfolio Collateral may be purchased prior to the Effective Date unless immediately following the purchase of such item of Portfolio Collateral (as certified by Servicer Order), the remaining Deposit in the Initial Deposit Account, after giving effect to such purchase, is sufficient as of the date of determination to purchase Original Portfolio Collateral in an Aggregate Principal Amount at least equal to the Required Portfolio Collateral Amount for delivery into the Trust Estate (taking into account the Initial Portfolio Collateral and Original Portfolio Collateral already in the Trust Estate (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any of the Original Portfolio Collateral on or before the Effective Date)).

Notwithstanding the foregoing, or any other provision hereof, if the Issuer has previously entered into a commitment to purchase an item of Portfolio Collateral to be included in the Trust Estate, such commitment not to exceed thirty (30) days, and at the time of such commitment such an item of Portfolio Collateral complied with the definition of Portfolio Collateral and this Section 3.4(a), then the Issuer may consummate the purchase of such an item of Portfolio Collateral notwithstanding that such an item of Portfolio Collateral fails to comply with the definition of Portfolio Collateral and such criteria on the date of settlement.

(b) The Servicer shall cause to be delivered to the Trustee on the Effective Date an amended Schedule A to this Indenture listing all Original Portfolio Collateral (including the Initial Portfolio Collateral then in the Trust Estate) and all commitments to purchase Original Portfolio Collateral, which schedule shall supersede any prior Schedule A delivered to the Trustee.

(c) The Issuer will use its commercially reasonable efforts to purchase, or to enter into binding agreements to purchase, Original Portfolio Collateral by the Effective Date, that, including the Initial Portfolio Collateral, will satisfy, as of the Effective Date, the Collateral Quality Tests, the criteria set forth in Section 12.2 and the Overcollateralization Tests. Within 5 Business Days after the Effective Date, the Issuer or the Servicer (on behalf of the Issuer) shall request a Rating Confirmation on behalf of the Issuer and shall provide a report to the Rating Agencies identifying the Original Portfolio Collateral and the Issuer shall obtain and deliver to the Trustee and the Rating Agencies, together with the delivery of a report (and an electronic file of the Original Portfolio Collateral to S&P) substantially in the form of a Monthly Report as of the Effective Date, an Accountants' Certificate (a) confirming the maturity date, rating, spread, coupon and recovery rate for each item of Original Portfolio Collateral as of the Effective Date and the information provided by the Issuer with respect to every other asset included or to be included in the Trust Estate, by reference to such sources as shall be specified therein, (b) confirming that as of the Effective Date (1) each Overcollateralization Test is met; (2) the Aggregate Principal Amount of the Original Portfolio Collateral that the Issuer owned or committed to purchase as of the Effective Date is at least equal to the Required Portfolio Collateral Amount and (3) the Portfolio Collateral complies with all of the requirements of the Collateral Quality Tests and the criteria set forth in Section 12.2 and (c) specifying the procedures undertaken by them to review data and computations relating to the foregoing

statements.  If a Rating Confirmation Failure should occur, the Notes will be redeemed pursuant to Section 9.2 hereof.

(d)     Notwithstanding any provision in this Indenture to the contrary, if, on the Effective Date, the Aggregate Principal Amount of the Portfolio Collateral (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to the Original Portfolio Collateral on or prior to such time) exceeds the Required Portfolio Collateral Amount and there are funds remaining from the Deposit held in the Initial Deposit Account, the Servicer may direct the Trustee to transfer up to the least of (i) 25% of such funds and (iii) $1,000,000, to the Collection Account as additional Collateral Interest Collections; *provided* that the Overcollateralization Tests and the collateral criteria described herein are satisfied and the Interest Coverage Test for the most recent Payment Date was satisfied.  The remainder of the Deposit shall be transferred by the Trustee to the Collection Account to be applied as Collateral Principal Collections on the Payment Date immediately following the date of determination.

Section 3.5.    Intermediaries.

(a)     Notwithstanding anything herein to the contrary, to the extent any items of Portfolio Collateral issued by an issuer that is not the United States of America, an agency or instrumentality thereof, or some other U.S. Person (collectively, "Non-U.S. Portfolio Securities") are Granted to the Trustee, such Non-U.S. Portfolio Securities may be delivered to and held by the Trustee through one or more Foreign Sub-custodians or Foreign Clearance Systems (as those terms are defined in the Section below; collectively, "Foreign Intermediaries") if such Non-U.S. Portfolio Securities cannot be Delivered to the Trustee.

(b)     The Trustee, for the purpose of receiving and holding any Non-U.S. Portfolio Securities that cannot be Delivered to the Trustee, may appoint one or more banking or securities institutions located outside the United States (each a "Foreign Sub-custodian") and/or clearing agencies or systems located outside the United States (each, a "Foreign Clearance System"), including without limitation Euroclear and Clearstream.  With respect to Non-U.S. Portfolio Securities (and related cash) held through Foreign Intermediaries, such Foreign Intermediaries may be authorized to hold Non-U.S. Portfolio Securities in central securities depositories or clearing agencies in which such Foreign Intermediaries participate.

(c)     The Trustee's responsibility with respect to the selection or appointment of Foreign Intermediaries shall be limited to a duty to exercise reasonable care in the selection or retention of such Foreign Intermediaries in light of prevailing settlement and securities handling practices, procedures and controls in the relevant market and subject to Section 6.3 hereof; *provided* that the appointment of Euroclear or Clearstream to act as Foreign Intermediary shall be deemed to have been made in the exercise of due care.  With respect to any costs, expenses, damages, liabilities, or claims (including, without limitation, attorneys' and accountants' fees) incurred by the Issuer as a result of the acts or the failure to act by any Foreign Intermediaries, the Trustee shall take reasonable action to recover such costs, expenses, damages, liabilities, or claims from such Foreign Intermediaries; *provided* that the Trustee's sole liability in that regard shall be limited to amounts actually received by it from such Foreign Intermediaries (exclusive of related costs and expenses incurred by the Trustee).  The Trustee shall not be responsible or

liable for any failure or delay in the performance of its obligations under this Indenture arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including without limitation, acts of God; earthquakes or fires; floods, wars, civil or military disturbances; sabotage; epidemics; riots; interruptions, loss or malfunctions of utilities, computer (hardware or software) or communication service; accidents; labor disputes; acts of civil or military authority; governmental actions; or inability to obtain labor, material, equipment or transportation.

ARTICLE IV

SATISFACTION AND DISCHARGE

Section 4.1.    Satisfaction and Discharge of Indenture.

Provided no Event of Default has occurred and is continuing hereunder, this Indenture shall cease to be of further effect with respect to the Notes and the Combination Notes except as to (i) rights of registration of transfer and exchange, (ii) substitution of mutilated, destroyed, lost or stolen Notes or Combination Notes, (iii) rights of Noteholders to receive payments of principal thereof and interest thereon, as applicable, and any other amounts payable in respect thereof, (iv) the rights, obligations and immunities of the Trustee hereunder, and (v) the rights of Noteholders as beneficiaries hereof with respect to the property deposited with the Trustee and payable to all or any of them and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture when:

(1)    Either

(a)    all Notes and Combination Notes theretofore authenticated and delivered (other than (i) Notes and Combination Notes which have been destroyed, lost or stolen and which have been paid or replaced as provided in Section 2.6 hereof and (ii) Notes and Combination Notes for whose payment money has theretofore been deposited in trust and thereafter repaid to the Issuer or discharged from such trust, as provided in Section 7.3 hereof) have been delivered to the Trustee for cancellation; or

(b)    all Notes and Combination Notes not theretofore delivered to the Trustee for cancellation (i) have become due and payable, or (ii) will become due and payable at their Final Maturity Dates within one year;

and the Issuer, in the case of (b)(i) or (ii) above, has (x) irrevocably deposited or caused to be deposited with the Trustee in trust for such purpose, cash or Eligible Investments (any security satisfying the definition of Eligible Investments but for the maturity of such security shall for this purpose be deemed an Eligible Investment), the amount of cash and the Scheduled Distributions on any Eligible Investments being in an amount sufficient to pay and discharge the amount that equals the sum of the Cumulative Interest Amount on each Class of Notes to the date of such deposit or to the Final Maturity Date, as the case may be, and the Aggregate Principal Amount of each Class of Notes and Combination Notes not theretofore delivered to the Trustee for cancellation, in each case to the extent not previously paid and (y) delivered an Accountants'

Certificate to the Trustee confirming such calculations; *provided* that subsection (b) hereof shall not apply if an election to act in accordance with the provisions of Section 5.5 hereof shall have been made and not rescinded (except that the deposit of cash that would otherwise apply in the case of such subsection (b) shall nevertheless be required); *provided further* that any Eligible Investments deposited hereunder shall at the date of such deposit be rated no lower than the highest rating assigned to any of the Notes or the Combination Notes then outstanding;

(2) the Issuer has paid or caused to be paid all other sums payable hereunder and under each Hedge Agreement by the Issuer; and

(3) the Issuer has delivered to the Trustee an Officer's Certificate and an Opinion of Counsel each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture with respect to the Notes and the Combination Notes have been complied with.

Section 4.2. Application of Trust Money.

All monies deposited with the Trustee pursuant to Section 4.1 hereof shall be held in trust by the Trustee and applied by it, in accordance with the provisions of the Notes, the Combination Notes and this Indenture, to the payment to the Person entitled thereto of the principal and interest in accordance with Section 11.1 hereof for whose payment such money has been deposited with the Trustee, and such money shall be held in a non-interest bearing segregated trust account identified as being held in trust for the benefit of the Noteholders and subject to the lien of this Indenture. Except as specifically provided herein, the Trustee shall not be responsible for payment of interest upon any monies deposited with it.

ARTICLE V

REMEDIES

Section 5.1. Events of Default.

"Event of Default" means any one of the following events (whatever the reason for such Event of Default and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a) (i) default for a period of four Business Days or more (or, in the case of a default in payment due to an administrative error or omission by the Trustee, any Paying Agent or the Note Registrar, for a period of seven Business Days or more, *provided* that the Trustee has notified each Rating Agency in writing of any such administrative error or omission) in the payment of any amount payable in respect of any Note when due when funds in such amount are available for payment as provided herein, or (ii) the failure to apply funds which are available for payment in accordance with the priority of distribution set forth in Article XI hereof, which failure shall continue for a period of four Business Days (or, in the case of a default in payment due solely to an administrative error or omission by the Trustee, any Paying Agent or the Note Registrar, for a period of seven Business Days or more, *provided* that the Trustee has notified each

Rating Agency in writing of any such administrative error or omission), or (iii) default for a period of four Business Days or more (or, in the case of a default payment due to an administrative error or omission by the Trustee, any Paying Agent or the Note Registrar, for a period of seven Business Days or more, *provided* that the Trustee has notified each Rating Agency in writing of any such administrative error or omission) in the payment of the Periodic Interest Amount due on any Class of Senior Class A Notes, or, after the Senior Class A Notes are paid in full, the Periodic Interest Amount due on any Class A-3L Notes, or after the Class A Notes are paid in full, the Periodic Interest Amount due on any Class B-1L Notes, or after the Class A Notes and the Class B-1L Notes are paid in full, the Class B-2L Notes, on any Payment Date, or (iv) default in the payment of the Aggregate Principal Amount and the Cumulative Interest Amount, due on any Class of Notes on the Final Maturity Date; or

(b)     default in the performance or breach of any covenant, representation, warranty or other agreement of the Co-Issuers (or either one of them), other than compliance with the Overcollateralization Tests, the Interest Coverage Test or the criteria set forth in Section 12.2 hereof or a default in the performance or breach of a covenant, representation, warranty or other agreement which is specifically dealt with elsewhere in this Section or in Article VII hereof, or the failure of any representation or warranty of the Co-Issuers (or either one of them) made in this Indenture or in any certificate or other writing delivered pursuant hereto or in connection herewith to be correct in all material respects when the same shall have been made, in either case which materially and adversely affects the rights of any Class of Noteholders and continuance of such default, breach or failure for a period of 30 days after written notice thereof shall have been given to the Co-Issuers or the Servicer by the Trustee or to the Co-Issuers, the Servicer and the Trustee by the Majority Noteholders, specifying such default, breach or failure and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder; or

(c)     the entry of a decree or order by a court having jurisdiction in the premises adjudging either of the Co-Issuers as bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of either of the Co-Issuers under the Bankruptcy Code or any other applicable law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of either of the Co-Issuers or of any substantial part of their respective property, or ordering the winding up or liquidation of their respective affairs, and the continuance of any such decree, order, case or proceeding not dismissed, discharged or stayed and in effect for a period of 60 consecutive days; or

(d)     the institution by either of the Co-Issuers of proceedings to be adjudicated as bankrupt or insolvent, or the consent by either of them to the institution of bankruptcy or insolvency proceedings against either of them, or the filing by either of them of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Code or any other similar applicable law, or the consent by either of the Co-Issuers to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of either of the Co-Issuers or of any substantial part of their respective property, or to the ordering of the winding up or

liquidation of their respective affairs, or the making by either of them of an assignment for the benefit of creditors, or the admission by either of them in writing of its inability to pay its debts generally as they become due, or the taking of any action by either of the Co-Issuers in furtherance of any such action; or

(e)     either of the Co-Issuers or the pool of assets constituting the Trust Estate becomes required to register as an "investment company" under the Investment Company Act; or

(f)     the failure to maintain on any Calculation Date a Senior Class A Overcollateralization Ratio greater than or equal to 100%.

Section 5.2.    Acceleration of Maturity; Rescission and Annulment.

(a)     If an Event of Default (other than an Event of Default specified in Section 5.1(c) or (d)) with respect to the Notes occurs and is continuing, the Trustee may, with the consent of the Requisite Noteholders, and shall, at the written direction of the Requisite Noteholders, declare the principal of the Notes to be immediately due and payable, by a notice in writing to the Issuer and the Servicer.  If an Event of Default as specified in Section 5.1(c) or (d) occurs and is continuing, the principal of the Notes shall be and become immediately due and payable without the necessity of notice or any other action of any Person.  If the Notes are declared to be immediately due and payable or if an Event of Default specified in Section 5.1(c) or (d) hereof occurs, the Holders of each Class of Notes shall be entitled to receive, as applicable, and in the order of priority set forth in Section 11.1(d), the Cumulative Interest Amount and the Aggregate Principal Amount with respect thereto (in each case as calculated and accrued through the date of payment in full of the Aggregate Principal Amount of each Class of Notes), and the Servicer shall be entitled to receive the amounts payable to the Servicer under and in the order of priority set forth in Sections 11.1(b) and 11.1(d).

(b)     At any time after such a declaration of acceleration of maturity has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee as provided in this Article, the Requisite Noteholders, by written notice to the Trustee and the Co-Issuers, may rescind and annul such declaration and its consequences if:

(i)     the Issuer has paid or deposited with the Trustee a sum sufficient to pay:

(A)     all overdue amounts payable on or in respect of the Notes (other than amounts due solely as a result of the acceleration);

(B)     to the extent that payment of interest on such amount is lawful, interest on such overdue amounts at the Applicable Periodic Rate; and

(C)     all unpaid Trustee Administrative Expenses, Preferred Shares Administrative Expenses, Issuer Base Administrative Expenses, Issuer Excess Administrative Expenses, and other sums paid or advanced by the Trustee and the Paying and Transfer Agent hereunder and under the Paying and Transfer Agency Agreement and the reasonable compensation, expenses, disbursements

and advances of the Trustee and the Paying and Transfer Agent, their agents and counsel.

(ii)     the Trustee has (A) received written evidence that the sum paid or deposited with the Trustee by the Issuer pursuant to clause (i) above is sufficient, and (B) determined that all Events of Default, other than the nonpayment of such amount that has become due solely by such acceleration, have been (1) cured, and the Requisite Noteholders by written notice to the Trustee have agreed with such determination (which agreement shall not unreasonably be withheld), or (2) waived as provided in Section 5.15 hereof.

Section 5.3.     Proceedings.

If an Event of Default has occurred and is continuing and the Notes have been declared due and payable and such declaration and its consequences have not been rescinded and annulled, or at any time on or after the Final Maturity Date, the Trustee may in its discretion proceed to protect and enforce its rights and the rights of the Noteholders by such appropriate Proceedings, in its own name and as trustee of an express trust, as the Trustee shall deem most effective or as the Trustee may be directed in writing by the Requisite Noteholders to protect and enforce any such rights, whether for the specific enforcement of any covenant or agreement in this Indenture or in aid of the exercise of any power granted herein, or for collection of sums due and unpaid, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by this Indenture or by law, but subject, however, to the terms of Section 5.4 hereof. The reasonable compensation, costs, expenses, disbursements and advances incurred or paid by the Trustee, and its agents and counsel, in connection with any such Proceeding, including, without limitation, the exercise of any remedies pursuant to Section 5.4 hereof, shall be reimbursed to the Trustee pursuant to Section 6.7 hereof.

Section 5.4.     Remedies.

(a)     If the Notes have been declared due and payable and such declaration and its consequences have not been rescinded or annulled, or at any time on or after the Final Maturity Date, the Trustee may, after written notice to the Noteholders, and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent, and shall, upon written direction by the Requisite Noteholders, to the extent permitted by applicable law, do one or more of the following:

(i)     institute Proceedings for the collection of all amounts then payable on the Notes or under this Indenture, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Trust Estate securing the Notes monies adjudged due;

(ii)     institute Proceedings for the complete or partial foreclosure of this Indenture with respect to the Trust Estate securing the Notes;

(iii)     exercise any remedies of a secured party under the UCC including the sale or liquidation of the Trust Estate in accordance with Section 5.18 hereof and take any other appropriate action to protect and enforce the rights and remedies of the Trustee or the Holders of the Notes hereunder; or

(iv)    exercise any other rights and remedies that may be available at law or in equity;

*provided* that the Trustee may not sell or liquidate the Trust Estate, or any portion thereof, or any rights or interest therein, unless (x) in the case of an acceleration resulting from an Event of Default set forth in Section 5.1(a) hereof, or a sale or liquidation of any portion of the Trust Estate at or greater than its par value (*provided* that Defaulted Portfolio Collateral may be liquidated without reference to, or inclusion in the calculation of, such limitation), the Requisite Noteholders have so directed the Trustee in writing to sell or liquidate the Trust Estate or any portion thereof (y) in the case of an acceleration resulting from an Event of Default set forth in Section 5.1(f) hereof, the Holders of more than 50% of the Aggregate Principal Amount of the Outstanding Senior Class A Notes (or, if the Senior Class A Overcollateralization Ratio is less than 85%, then 60% of the Controlling Class) have so directed the Trustee in writing to sell or liquidate the Trust Estate or any portion thereof or (z) in the case of any other Event of Default or resulting sale or liquidation, 100% of the Noteholders have so directed the Trustee in writing to sell or liquidate the Trust Estate or any portion thereof; *provided further* that no Default Swap, Synthetic Security or Hedge Agreement may be terminated so long as a declaration of acceleration may be rescinded  or annulled pursuant to Section 5.2(b).  The Trustee shall send written notice to each of the Noteholders, with a copy to the Rating Agencies and so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent, of any proposed sale or liquidation of the Trust Estate together with a brief description thereof and such written notice shall be accompanied by an Accountant's Certificate (i) confirming the information with respect to such sale or liquidation (to the extent such accountants shall be able and willing to confirm such information) and (ii) specifying the procedures, if any, undertaken by them to review the data and computations relating to such sale or liquidation.  The cost of such Accountant's Certificate shall be reimbursed to the Trustee pursuant to Section 6.7 hereof.  If the applicable Noteholders direct any sale or liquidation of the Trust Estate, or any portion thereof, the Trustee shall sell or liquidate the Trust Estate, or portion, thereof, in accordance with Section 5.18 hereof at one or more public or private sales conducted in any manner permitted by law.

(b)    If an Event of Default as described in Section 5.1(b) hereof has occurred and is continuing, the Trustee may, after written notice to the Noteholders, with a copy to the Rating Agencies and each Hedge Counterparty, and so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent, and shall, upon written direction of the Requisite Noteholders, institute a Proceeding to compel performance of the covenant or to cure the representation or warranty, the breach of which gave rise to the Event of Default under such Section and enforce any decree or order arising from such Proceeding.

(c)    If an Event of Default described in Sections 5.1(a)(iii) or 5.1(a)(iv) hereof has occurred and is continuing, the Trustee shall, upon written direction of the Requisite Noteholders, terminate the services of the Servicer in accordance with the terms of the Servicing Agreement (subject to the term thereof regarding the appointment of a successor servicer).  In the event that such a direct to terminated the Servicer is given, the Trustee shall not be under any duty to appoint or cause the appointment of a successor Servicer or to perform or undertake any duties of the terminated Servicer.

Section 5.5.    <u>Preservation of Trust Estate.</u>

(a)    If an Event of Default has occurred and is continuing or if the Final Maturity Date has occurred and subject to Section 5.4 hereof, the Trustee shall retain the Trust Estate securing the Notes intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all accounts in respect of the Notes in accordance with the provisions of Sections 10.1, 10.2(a), 10.2(b) and 11.1 hereof (unless and until the Notes have been declared due and payable and the applicable Noteholders have directed the Trustee pursuant to Section 5.4(a) hereof to sell or liquidate the Trust Estate or any portion thereof). If the Notes have been declared due and payable pursuant to Section 5.2 hereof or if the Final Maturity Date has occurred, any such retention pursuant to this Section 5.5(a) may be rescinded at any time by written notice to the Trustee and the Co-Issuers from the applicable Noteholders directing the Trustee to sell or liquidate the Trust Estate or any portion thereof, in accordance with Section 5.4(a).

(b)    Nothing contained in Section 5.5(a) hereof shall be construed to require the Trustee to preserve the Trust Estate securing the Notes if prohibited by applicable law.

Section 5.6.    <u>Trustee May File Proofs of Claim.</u>

In case there shall be pending Proceedings relative to the Issuer or any other obligor upon the Notes under the Bankruptcy Code or any other applicable bankruptcy, insolvency or other similar law, or in case a receiver, assignee, trustee in bankruptcy, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Issuer or its property or such other obligor or its property, or in case of any other comparable Proceedings relative to the Issuer or other obligor, or in case of any voluntary dissolution, liquidation or winding-up of the Issuer, regardless of whether the principal of any Notes shall then be due and payable as therein expressed or by declaration or otherwise and regardless of whether the Trustee shall have made any demand pursuant to the provisions of Section 5.3 hereof, the Trustee is hereby entitled and empowered to, and may and at the direction of the Requisite Noteholders, shall, by intervention in such Proceedings or otherwise:

(i)    file one or more claims for the whole amount of principal and interest owing and unpaid in respect of the Notes, and to file such other papers or documents and take such other actions, including participating as a member, voting or otherwise, of any committee of creditors, as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made by the Trustee and each predecessor Trustee or any Noteholder, except as a result of negligence or bad faith) and of the Noteholders allowed in such Proceedings;

(ii)    unless prohibited by applicable law, upon direction of the Requisite Noteholders vote on behalf of the Holders of the Notes in any election of a trustee, a standby trustee, (or a person performing similar functions); and

(iii) collect and receive any monies or other property payable to or deliverable on any such claims, and distribute in accordance with Section 5.8 hereof all amounts received with respect to the claims of the Noteholders and the Trustee on their behalf; and any trustee, receiver, liquidator, custodian or other similar official is hereby authorized by each of the Noteholders to make payments to the Trustee, and, in the event that the Trustee shall consent to the making of payments directly to the Noteholders, to pay to the Trustee such amounts as shall be sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee and their respective agents, attorneys and counsel, and all other expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee or any Noteholder except as a result of negligence or bad faith.

Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Noteholder any plan of reorganization, arrangement, adjustment or compromise affecting the Notes or the rights of any Holder thereof, or to authorize the Trustee to vote in respect of the claim of any Noteholder in any such Proceeding except, as provided in subparagraph (ii) above, to vote for the election of a trustee in bankruptcy (or person performing similar functions) or to participate as a member of any committee of creditors.

In any Proceedings brought by the Trustee (and also any Proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party) the Trustee shall be held to represent all the Holders of the Notes subject to the provisions of this Indenture, and it shall not be necessary to make any Holders of the Notes parties to any such Proceedings.

Section 5.7.    Trustee May Enforce Claims Without Possession of Notes.

All rights of action and claims under this Indenture or the Notes may be prosecuted and enforced by the Trustee without the possession of any of the Notes or the production thereof in any Proceeding relating thereto, and any such Proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall be applied as set forth in Section 5.8 hereof.

Section 5.8.    Application of Money Collected.

Any money collected by or on behalf of the Trustee with respect to the Notes pursuant to this Article V (including all collections from, and proceeds of the sale or liquidation of, the Trust Estate) shall be applied at the date or dates fixed by the Trustee and in the same order as specified in Sections 11.1(b) and 11.1(d) hereof.

Section 5.9.    Limitation on Suits.

Except as otherwise provided in Section 5.10 hereof, no Holder of any Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy hereunder, unless:

(a)     such Holder has previously given written notice to the Trustee of a continuing Event of Default;

(b)     the Requisite Noteholders shall have made written request to the Trustee to institute Proceedings in respect of such Event of Default in its own name as Trustee hereunder;

(c)     such Holder or Holders have offered to the Trustee indemnity reasonably satisfactory to the Trustee against the costs, expenses and liabilities to be incurred by the Trustee in compliance with such request;

(d)     the Trustee for 30 days after its receipt of such notice, request and offer of such indemnity has failed to institute any such Proceedings; and

(e)     no direction inconsistent with such written request has been given to the Trustee during such 30-day period by the Requisite Noteholders;

it being understood and intended that no one or more Holders of Notes shall have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of Notes of the same Class or to obtain or to seek to obtain priority or preference over any other Holders of Notes of the same Class or to enforce any right under this Indenture, except in the manner herein provided and for the equal and ratable benefit of all the Holders of Notes of the same Class.

Section 5.10.   <u>Unconditional Rights of Noteholders to Receive Principal and Interest.</u>

Notwithstanding any other provision in this Indenture, but subject to the provisions of Sections 2.7 and 11.1 hereof, (a) the Holders of the Class A-1LA Notes shall have the right, which is absolute and unconditional, to receive an aggregate amount equal to the unpaid Periodic Rate Shortfall Amount, if any, the Aggregate Principal Amount of the Class A-1LA Notes and accrued and unpaid interest thereon at the Applicable Periodic Rate, as any such amounts become due and payable, (b) the Holders of the Class A-1LB Notes shall have the right, which is absolute and unconditional, to receive an aggregate amount equal to the unpaid Periodic Rate Shortfall Amount, if any, the Aggregate Principal Amount of the Class A-1LB Notes and accrued and unpaid interest thereon at the Applicable Periodic Rate, as any such amounts become due and payable, (c) the Holders of the Class A-2L Notes shall have the right, which is absolute and unconditional, to receive an aggregate amount equal to the unpaid Periodic Rate Shortfall Amount, if any, the Aggregate Principal Amount of the Class A-2L Notes and accrued and unpaid interest thereon at the Applicable Periodic Rate, as any such amounts become due and payable, (d) the Holders of the Class A-3L Notes shall have the right, which is absolute and unconditional, to receive an aggregate amount equal to the unpaid Periodic Rate Shortfall Amount, if any, the Aggregate Principal Amount of the Class A-3L Notes and accrued and unpaid interest thereon at the Applicable Periodic Rate, as any such amounts become due and payable, (e) the Holders of the Class B-1L Notes shall have the right, which is absolute and unconditional, to receive an aggregate amount equal to the unpaid Periodic Rate Shortfall Amount, if any, the Aggregate Principal Amount of the Class B-1L Notes and accrued and

unpaid interest thereon at the Applicable Periodic Rate, as any such amounts become due and payable, and (f) the Holders of the Class B-2L Notes shall have the right, which is absolute and unconditional, to receive an aggregate amount equal to the unpaid Periodic Rate Shortfall Amount, if any, the Aggregate Principal Amount of the Class B-2L Notes and the accrued and unpaid interest thereon at the Applicable Periodic Rate as any such amounts become due and payable. Furthermore, the Holder of any Note shall have the right, which is absolute and unconditional, to institute Proceedings for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder. Notwithstanding any other provision in this Section 5.10 or otherwise in this Indenture to the contrary, (i) Holders of the Class A-3L Notes shall have no right to institute Proceedings for the enforcement of any such payment until such time as no Senior Class A Notes remain Outstanding, (ii) Holders of the Class B-1L Notes shall have no right to institute Proceedings for the enforcement of any such payment until such time as no Class A Notes remain Outstanding, and (iii) Holders of the Class B-2L Notes shall have no right to institute Proceedings for the enforcement of any such payment until such time as no Class A Notes or Class B-1L Notes remain Outstanding, and, in each case, any such right to institute Proceedings shall be subject to the provisions of Section 5.9 hereof.

Section 5.11. Restoration of Rights and Remedies.

If the Trustee or any Noteholder has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to such Noteholder, then in every such case the Issuer, the Trustee and the Noteholder shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Trustee and the Noteholders shall continue as though no such Proceeding had been instituted.

Section 5.12. Rights and Remedies Cumulative.

No right or remedy herein conferred upon or reserved to the Trustee or to the Holders of the Notes is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing by law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

Section 5.13. Delay or Omission Not Waiver.

No delay or omission of the Trustee or of any Holder of any Note to exercise any right or remedy occurring upon any Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Every right and remedy given by this Article V or by law to the Trustee or to the Noteholders may be exercised from time to time, and as often as may be deemed expedient, by the Trustee or by the Noteholders, as the case may be.

Section 5.14.    Control by Noteholders.

Notwithstanding any other provision of this Indenture, the Requisite Noteholders, on behalf of the Holders of all the Notes, shall have the right (a) to cause the institution of and direct the time, method and place of conducting any Proceeding for any remedy available to the Trustee or (b) subject to Section 6.3(e) hereof, to direct the Trustee with respect to its exercise of any right, remedy, trust or power conferred on the Trustee; *provided* that:

(i)    such direction shall not be in conflict with any rule of law or with any express provision of this Indenture (including, without limitation, any provision hereof providing express personal protection to the Trustee or a limitation on the liability of the Co-Issuers as set forth in Section 2.7(i) hereof), and

(ii)    the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction; *provided* that*, subject to Section 6.1 hereof, the Trustee need not take any action that it reasonably determines might involve it in liability.

Section 5.15.    Waiver of Past Defaults.

Prior to the time a judgment or decree for payment of the money due has been obtained by the Trustee, the Requisite Noteholders may on behalf of the Holders of all the Notes waive any past Default and its consequences, with notice to the Rating Agencies, except a Default:

(a)    in the payment of the principal of or interest on any Note, or

(b)    in respect of a covenant or provision hereof that under Section 8.2 hereof cannot be modified or amended without the consent of the Holder of each Outstanding Note affected.

In the case of any such waiver, the Issuer, the Trustee and the Holders of the Notes shall be restored to their former positions and rights hereunder, respectively; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto. Upon such waiver, such Default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been cured, for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereon.

Section 5.16.    Undertaking for Costs.

All parties to this Indenture agree, and each Holder of any Note by his acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any suit for the enforcement of any right or remedy under this Indenture, or in any suit against the Trustee for any action taken, or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such suit, having due regard to the merits and good faith of the claims or defenses made by such party

litigant; but the provisions of this Section 5.16 shall not apply to any suit instituted by the Trustee, to any suit instituted by any Noteholder, or group of Noteholders, holding in the aggregate more than 10% in Aggregate Principal Amount of the Notes, or to any suit instituted by any Noteholder for the enforcement of the payment of the principal of or interest on any Note on or after the Final Maturity Date expressed in such Note.

Section 5.17.    Waiver of Stay or Execution Laws.

Each of the Co-Issuers covenants (to the extent that it may lawfully do so) that it will not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or execution law wherever enacted, including, but not limited to, filing a voluntary petition under the Bankruptcy Code now or at any time hereafter in force, which may affect the covenants or the performance of or the exercise of any remedies under this Indenture; and each of the Co-Issuers (to the extent that they may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it will not hinder, delay or impede the execution of any power herein granted to the Trustee or any Noteholder, but will suffer and permit the execution of every such power as though no such law had been enacted.

Section 5.18.    Sale of Trust Estate.

(a)    The power to effect any sale (a "Sale") of any portion of the Trust Estate pursuant to Section 5.4 and Section 5.5 hereof shall not be exhausted by any one or more Sales as to any portion of such Trust Estate remaining unsold, but shall continue unimpaired until the entire Trust Estate securing the Notes shall have been sold or all amounts payable on the Notes under this Indenture with respect thereto shall have been paid.  The costs of any such sale of the Trust Estate shall be reimbursable to the Trustee pursuant to Section 6.7 hereof.  The Trustee may, upon notice to the Noteholders, and so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent, and shall, upon direction of the Requisite Noteholders, postpone any Sale by public announcement made at the time of and place of such Sale.  The Trustee hereby expressly waives its right to any amount fixed by law as compensation for any Sale.

(b)    The Trustee may bid for and acquire any portion of the Trust Estate in connection with a Sale thereof on an arm's length basis to the extent not prohibited by applicable law, and may pay all or part of the purchase price by crediting against amounts owing on the Notes or other amounts secured by this Indenture, all or part of the net proceeds of such Sale after deducting the reasonable costs, charges and expenses incurred by the Trustee in connection with such Sale notwithstanding the provisions of Section 6.7 hereof.  The Notes need not be produced in order to complete any such Sale, or in order for the net proceeds of such Sale to be credited against amounts owing on the Notes.  The Trustee may hold, lease, operate, manage or otherwise deal with any property so acquired in any manner permitted by law in accordance with this Indenture.

(c)    If any portion of the Trust Estate consists of securities issued without registration under the Securities Act ("Unregistered Securities"), the Trustee may seek an Opinion of Counsel, or, if no such Opinion of Counsel can be obtained and with the consent of the Requisite Noteholders, seek a no-action position from the Securities and Exchange

Commission or any other relevant Federal or state regulatory authorities, regarding the legality of a public or private sale of such Unregistered Securities (the costs of which in each case, shall be reimbursable to the Trustee pursuant to Section 6.7 hereof).

(d)     The Trustee shall execute and deliver an appropriate instrument of conveyance transferring its interest in any portion of the Trust Estate in connection with a Sale thereof.  In addition, the Trustee is hereby irrevocably appointed the agent and attorney-in-fact of the Issuer to transfer and convey its interest in any portion of the Trust Estate in connection with a Sale thereof and to take all action necessary to effect such Sale.  No purchaser or transferee at such a Sale shall be bound to ascertain the Trustee's authority, inquire into the satisfaction of any conditions precedent or see to the application of any monies.

Section 5.19.    Action on Notes.

The Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture.  Neither the lien of this Indenture nor any rights or remedies of the Trustee or the Noteholders hereunder shall be impaired by the recovery of any judgment by the Trustee.

## ARTICLE VI

## THE TRUSTEE

Section 6.1.    Certain Duties and Responsibilities.

(a)     Except during the continuance of an Event of Default known to the Trustee (other than a Trustee Payment-Related Event of Default):

(1)     the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(2)     in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; *provided* that in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the same to determine whether or not they conform on their face to the requirements of this Indenture and shall promptly notify the party delivering the same if such certificate or opinion does not so conform.  If a corrected certificate or opinion shall not have been delivered to the Trustee within 15 days after such notice from the Trustee, the Trustee shall so notify the Noteholders.

(b)     In case an Event of Default (other than a Trustee Payment-Related Event of Default) of which the Trustee has actual knowledge has occurred and is continuing, the Trustee shall, prior to the receipt of directions, if any, from the Requisite Noteholders, exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and

skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs.

(c)     No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(1)     this subsection shall not be construed to limit the effect of subsection (a) of this Section;

(2)     the Trustee shall not be liable for any error of judgment made in good faith by a Responsible Officer, unless it shall be proven that the Trustee was negligent in ascertaining the pertinent facts;

(3)     the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Issuer or the Co-Issuer in accordance with this Indenture and/or the Requisite Noteholders (or Holders with such larger percentage as may be required by the terms hereof) relating to the time, method and place of conducting any Proceeding for any remedy available to the Trustee, or exercising any trust or power conferred upon the Trustee, under this Indenture;

(4)     no provision of this Indenture shall require the Trustee to expend or risk its own funds or incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers (unless such financial liabilities or exercise of any of its rights and powers relate to the performance of its ordinary services under this Indenture), if it shall have reasonable grounds for believing that repayment of such funds or indemnity satisfactory to it against such risk or liability is not reasonably assured to it (*provided* that the unsecured agreement of any Noteholder that is an Institutional Investor organized under the laws of the United States or any State in the United States shall constitute adequate assurance with respect to repayment and indemnity; *provided* that the aggregate net worth of the Institutional Investors providing such unsecured agreements shall be not less than $200,000,000); and

(5)     the Trustee shall not be liable to the Noteholders for any action taken or omitted by it at the direction of the Issuer, the Servicer and/or the Holders of the Notes under circumstances in which such direction is required or permitted by the terms of this Indenture.

(d)     Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Section 6.1 and Section 6.3 hereof.

(e)     The Trustee, promptly after receipt by a Responsible Officer, shall transmit by first class mail all Holders of Notes, as their names and addresses appear on the Note Register, all written communications that are required hereunder to be delivered to the Trustee and are received from or on behalf of the Issuer or the Servicer (excluding in the case of the Holders (i) information provided by the Trustee to the Issuer pursuant to Section 10.4 hereof, (ii) so long as no Event of Default (other than a Trustee Payment-Related Event of Default) has

occurred and is continuing, Servicer Orders received by the Trustee pursuant to Sections 10.2, 11.3 and 12.4 hereof, and (iii) Monthly Reports received pursuant to Section 10.5(a) hereof, unless, in any such case, requested by any Holder) and any notification or other communication received from any of the Rating Agencies stating that the rating of any Class of Notes has been, or will be, changed or withdrawn.

Section 6.2.    Notice of Default.

Promptly (and in no event later than 5 Business Days) after the occurrence of any Default or Event of Default of which a Responsible Officer of the Trustee has actual knowledge or after any declaration of acceleration has been made by or delivered to the Trustee pursuant to Section 5.2 hereof, the Trustee shall transmit by mail to the Rating Agencies, to all Holders of Notes, as their names and addresses appear on the Note Register, and to the Issuer, each Hedge Counterparty and the Servicer, notice of all Defaults or Events of Default hereunder of which a Responsible Officer of the Trustee has actual knowledge, unless such Default or Event of Default shall have been cured or waived.

Section 6.3.    Certain Rights of Trustee.

Except as otherwise provided in Section 6.1 hereof:

(a)    the Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or document (including but not limited to any reports prepared and delivered under Article X hereunder) believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties;

(b)    any request or direction of the Servicer mentioned herein shall be sufficiently evidenced by a Servicer Request or Servicer Order, as the context may require;

(c)    whenever in the administration of this Indenture the Trustee shall (i) deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon an Officer's Certificate or (ii) be required to determine the value of any Collateral or funds hereunder or the cash flows projected to be received therefrom, the Trustee may, in the absence of bad faith on its part, rely on reports of nationally recognized accounting firms or other persons qualified to provide the information required to make such determination including nationally recognized investment bankers and dealers in securities of the type being valued and securities quotation services;

(d)    as a condition to the taking or omitting of any action by it hereunder, the Trustee may consult with counsel and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith and in reliance thereon;

(e)    the Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Noteholders pursuant to this Indenture unless such Noteholders shall have offered to the Trustee security

reasonably satisfactory to it or indemnity against all costs, expenses and liabilities which might reasonably be incurred by it in compliance with such request or direction (an unsecured indemnity agreement of an Institutional Investor organized under the laws of the United States or any state in the United States shall be deemed sufficient; *provided* that the aggregate net worth of the Institutional Investors providing such unsecured agreements shall not be less than $200,000,000);

(f)     the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or documents received by it, but the Trustee, in its discretion, may and, upon written direction of the Majority Noteholders shall, make such further inquiry or investigation into such facts or matters as it may see fit or as it shall be directed, and the Trustee and any Noteholder (acting solely through the Trustee and at the expense of such Noteholder) shall be entitled, on reasonable prior request (which request shall include a statement of the purpose therefor) made in advance to the Issuer, the Trustee and the Servicer, to examine the books and records of the Issuer and the Servicer relating to the Trust Estate, personally or by agent or attorney during the Issuer's or the Servicer's normal business hours; *provided* that the Trustee or any such Noteholder shall, and shall cause its agents, to hold in confidence all such information, except (i) to the extent disclosure may be required by law, by any regulatory authority, the Transaction Documents or by the National Association of Insurance Commissioners, (ii) a Noteholder may disclose such information to any prospective transferee and to such Noteholder's and transferee's accountants, consultants, attorneys and similar agents; *provided* that all such persons agree in writing to hold such information as confidential and (iii) except to the extent that the Trustee, in its sole judgment, may determine that such disclosure is consistent with its obligations hereunder;

(g)     except as otherwise provided in Section 10.3(a), the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder;

(h)     to the extent permitted by applicable law, the Trustee shall not be required to give any bond or surety in respect of the execution of this Indenture or otherwise;

(i)     the Trustee shall not be deemed to have notice or knowledge of any matter unless a Responsible Officer within the Corporate Trust Office has actual knowledge thereof or unless written notice thereof is received by the Trustee at the Corporate Trust Office and such notice references the Notes generally, the Issuer or this Indenture. Whenever reference is made in this Indenture to a Default or an Event of Default such reference shall, insofar as determining any liability on the part of the Trustee is concerned, be construed to refer only to a Default or an Event of Default of which the Trustee is deemed to have knowledge in accordance with this paragraph;

(j)     the permissive right of the Trustee to take or refrain from taking any actions enumerated in this Indenture shall not be construed as a duty;

(k)     the Trustee shall not be liable for any action it takes, or omits to take, in good faith that it reasonably believes to be authorized or within its rights or powers hereunder;

(l)     the rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and to each Paying Agent, Paying and Transfer Agent, Authenticating Agent, Transfer Agent and Note Registrar;

(m)     the Trustee shall not be responsible for the accuracy of the books or records of, or acts or omissions of, the Depository, any Transfer Agent (other than the Trustee itself acting in that capacity), Clearstream, Euroclear, any Calculation Agent (other than the Trustee itself acting in that capacity) or any Paying Agent (other than the Trustee itself acting in that capacity); *provided*, the Trustee will make reasonable efforts to correct any errors they become aware of or to notify the appropriate parties of any errors they become aware of; and

(n)     the Trustee will not be liable for the actions or omissions of the Servicer, and without limiting the foregoing, the Trustee will not be under any obligation to monitor, evaluate or verify compliance by the Servicer with the terms hereof or the Servicing Agreement, or to verify or independently determine the accuracy of the information received by it from the Servicer (or from any selling institution, agent, bank, trustee or similar source) with respect to the Portfolio Collateral.

Section 6.4.     Not Responsible for Recitals or Issuance of Notes or the Combination Notes.

The recitals contained herein and in the Notes or the Combination Notes, other than the certificate of authentication thereon, shall be taken as the statements of the Issuer, and the Trustee assumes no responsibility for their correctness.  The Trustee makes no representation as to the validity or sufficiency of this Indenture, of the Trust Estate, or of the Notes and the Combination Notes.  The Trustee shall not be accountable for the use or application by the Issuer of the Notes, the Combination Notes or the Preferred Shares or the proceeds thereof.

Section 6.5.     May Hold Notes and Combination Notes.

(a)     Investors Bank & Trust Company, or any other Person that becomes Trustee hereunder, in any capacity, may become the owner or pledgee of Notes and Combination Notes, and may otherwise deal with the Issuer or any Affiliate thereof with the same rights it would have if it were not Trustee.

(b)     The Trustee and its Affiliates may invest in for their own account obligations or securities that would be appropriate for inclusion in the assets as Portfolio Collateral, and the Trustee in making those investments has no duty to act in a way that is favorable to the Issuer or the Holders of the Notes, the Combination Notes or the Preferred Shares.  The Trustee's Affiliates currently serve, and may in the future serve as investment advisor for other issuers of collateralized debt obligations.

(c)     The Trustee and its Affiliates are permitted to receive additional compensation that could be deemed to be in the Trustee's economic self interest for (i) serving as

investment advisor, administrator, shareholder, servicing agent, custodian or sub-custodian with respect to certain Eligible Investments, (ii) using Affiliates to effect transactions in certain Eligible Investments selected by the Servicer and (iii) effecting transactions in certain Eligible Investments. Such compensation shall not be an amount that is reimbursable or payable pursuant to this Indenture. All purchases of Eligible Investments shall be made in accordance with Section 10.2(b).

Section 6.6.    Money Held in Trust.

Money held by the Trustee in trust hereunder need not be segregated from other funds held by the Trustee in trust hereunder except to the extent required herein or required by law. The Trustee shall be under no liability for interest on any money received by it hereunder except as otherwise agreed upon with the Issuer and except to the extent of income or other gain on Eligible Investments which are deposits in, certificates of deposit of, or obligations of the Trustee in its commercial capacity and income or other gain actually received by the Trustee on Eligible Investments. Under no circumstances shall the Trustee be responsible for any losses on investments made in accordance with an Issuer Order or Servicer Order, unless such investment is made in an obligation of the Trustee in its corporate capacity.

Section 6.7.    Compensation and Reimbursement.

The Issuer agrees:

(a)    to pay the Trustee on each Payment Date (in accordance with the priority of payment provisions set forth in Section 11.1 hereof) compensation for all services rendered by it hereunder (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) in accordance with the Trustee Fee Letter Agreement;

(b)    except as otherwise expressly provided herein, to reimburse the Trustee (in accordance with the priority of payment provisions set forth in Section 11.1 hereof) in a timely manner upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee (as such or as Securities Intermediary) in accordance with any provision of this Indenture or in the enforcement of any provision hereof (including the reasonable compensation and the expenses and disbursements of its agents and counsel) and expenses related to the maintenance and administration of the Collateral; *provided* that any securities transaction charges to the extent included above shall, in the case of certain Eligible Investments specified by the Servicer, be waived in the event that any amounts are received by the Trustee during a Due Period from a financial institution in consideration of purchasing such Eligible Investments, except any such expense, disbursement or advance as may be attributable to the Trustee's negligence, willful misconduct or bad faith;

(c)    to reimburse the Trustee (in accordance with the priority of payment provisions set forth in Section 11.1 hereof) for its payment of the fees and expenses of any accounting firm or investment banking firm employed by the Trustee to perform the accounting required pursuant to Section 5.4, Section 5.5, Section 6.3(c) or Section 10.6 hereof and for its

payment of the fees and expenses of the Irish Paying Agent, Paying Agents or Authenticating Agents appointed by it at the request of the Issuer pursuant to Section 2.4;

(d)     to indemnify the Trustee, its directors, officers, employees and agents (in accordance with the priority of payment provisions set forth in Section 11.1 hereof) for, and to hold it harmless against, any loss, liability or expense (including without limitation reasonable attorney's fees and expenses) incurred without negligence, willful misconduct or bad faith arising out of or in connection with the acceptance or administration of this trust and the Transaction Documents, including the costs and expenses of defense against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder (including as Securities Intermediary); and

(e)     to pay the Trustee (in accordance with the priority of payment provisions set forth in Section 11.1 hereof) reasonable additional compensation together with its expenses (including reasonable attorneys' fees) for any collection action taken pursuant to Section 6.12 hereof.

Section 6.8.     Corporate Trustee Required; Eligibility.

(a)     There shall at all times be a Trustee hereunder which shall be a bank organized and doing business under the laws of the United States of America or of any State, authorized under such laws to exercise corporate trust powers, having a combined capital and surplus of at least $200,000,000, having a long-term unsecured debt rating of "BBB" or better by Standard & Poor's and "Baa1" or better by Moody's, and subject to supervision or examination by Federal or state authority. If such corporation publishes reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purposes of this Section 6.8, the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. In addition, the Trustee shall not be "affiliated" (as that term is defined in Rule 405 of the Securities Act) with the Co-Issuers or with any person involved in the organization or operation of the Co-Issuers and shall not offer or provide credit or credit enhancement to the Co-Issuers (as provided per Rule 3a-7). The Trustee shall be deemed to be in compliance with the preceding sentence so long as it is not affiliated (within the meaning of the preceding sentence) with (i) the Issuer or the Administrator, or (ii) the Co-Issuer or Puglisi & Associates, in each case based upon the Trustee's records and actual knowledge, unless otherwise expressly notified in writing by the Issuer, Co-Issuer or Servicer, such notice to include the identity of any other Person or Persons with whom the Trustee must not be affiliated for such purpose. If at any time the Trustee has received such notice, it shall resign immediately in the manner and with the effect hereinafter specified in this Article VI.

(b)     In addition to the requirements set forth in Section 6.8(a) hereof, any successor Trustee appointed pursuant to Section 6.9(c) hereof shall (i) have total assets of at least $10,000,000,000, (ii) have a long-term unsecured debt rating of "A" or better by Standard & Poor's and "A2" or better by Moody's and (iii) be regularly engaged in providing trustee services to issuers of collateralized loan obligations. The Trustee appointed on the Closing Date shall not be required to satisfy the requirements set forth in this Section 9.8(b).

Section 6.9.    Resignation and Removal; Appointment of Successor.

(a)    No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Article VI shall become effective until the acceptance of appointment by the successor Trustee under Section 6.10 hereof.  The indemnifications in favor of the Trustee in Section 6.7 hereof shall survive any resignation or removal (to the extent of any indemnified liabilities, costs, expenses and other amounts arising or incurred prior to, or arising out of actions or omissions occurring prior to, such resignation or removal).

(b)    The Trustee may resign at any time by giving written notice thereof to the Issuer, the Rating Agencies, the Noteholders and the Servicer, each Hedge Counterparty and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent.  Upon receiving such notice of resignation, the Issuer shall at the direction of its board of directors (with the written consent of the Servicer, not to be unreasonably withheld) promptly appoint a successor trustee or trustees by written instrument, in duplicate, executed by an Authorized Officer of the Issuer on behalf of the Issuer, one original copy of which shall be delivered to the Trustee so resigning and one original copy to the successor trustee or trustees, together with a copy to each Noteholder.  If no successor trustee shall have been appointed and an instrument of acceptance by a successor Trustee shall not have been delivered to the Trustee within 30 days after the giving of such notice of resignation, the resigning Trustee, or any Holder of a Note, may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(c)    Subject to Section 6.9(a) hereof, the Trustee may be removed at any time by the Issuer, at the direction of its board of directors, and shall be removed by the Issuer if at any time the Holders of more than 50% of the Aggregate Principal Amount of the Controlling Class have determined that the Trustee has been delinquent in the performance of its obligations under this Indenture and have notified the Issuer in advance of such determination.  In addition, subject to Section 6.9(a) hereof, if an Event of Default shall have occurred and be continuing, the Trustee may be removed by the Holders of more than 50% of the Aggregate Principal Amount of the Controlling Class.

(d)    The Issuer, at the direction of its board of directors, by Issuer Order, may also remove the Trustee and/or petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee, if at any time:

(i)    the Trustee shall cease to be eligible under Section 6.8 hereof and shall fail to resign after written request therefor by the Issuer or by the Requisite Noteholders, or

(ii)    the Trustee shall become incapable of acting or shall be adjudged bankrupt or insolvent or a receiver or liquidator of the Trustee or of its property shall be appointed or any public officer shall take charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation.

(e)     If the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of the Trustee for any cause, the Issuer, at the direction of its board of directors, by Issuer Order, shall (with the written consent of the Servicer, not to be unreasonably withheld) promptly appoint a successor Trustee.  If no successor Trustee shall have been so appointed by the Issuer and shall have accepted appointment in the manner hereinabove provided, any Noteholder may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(f)     The Issuer shall give prompt notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by giving facsimile notice of such event, confirmed by first-class mail, postage prepaid, to each Rating Agency, Bear Stearns, the Servicer and to the Holders of the Notes as their names and addresses appear in the Note Register.  Each notice shall include the name of the successor Trustee and the address of its Corporate Trust Office.

Section 6.10.   Acceptance of Appointment by Successor.

Every successor Trustee appointed hereunder shall be required to meet the eligibility requirements set forth in Section 6.8 hereof and shall execute, acknowledge and deliver to the Issuer and the retiring Trustee an instrument accepting such appointment, and thereupon the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts, duties and obligations of the retiring Trustee; but, on request of the Issuer, the successor Trustee or the Requisite Noteholders, such retiring Trustee shall, upon payment of its fees, expenses and indemnities then unpaid, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee.  The retiring Trustee shall promptly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder (subject to payment of amounts owing to it hereunder).  Upon request of any such successor Trustee, the Issuer shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts.

No appointment of a successor Trustee shall become effective until the date ten days after notice of such appointment has been given to each Noteholder, and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent.

Section 6.11.   Merger, Conversion, Consolidation or Succession to Business of Trustee.

Any corporation into which the Trustee may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Trustee shall be a party, or any corporation succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee hereunder; *provided* such corporation shall be otherwise qualified and eligible under this Article, without the execution or filing of any paper or any further act on the part of any of the parties hereto.  In case any Notes or Combination Notes have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to

such authenticating Trustee may adopt such authentication and deliver the Notes or Combination Notes so authenticated with the same effect as if such successor Trustee had itself authenticated such Notes or Combination Notes.

Section 6.12.    Certain Duties of Trustee Related to Delayed Payment of Proceeds.

If in any month the Trustee shall not have received a payment with respect to any Pledged Security on its Due Date, (a) the Trustee shall promptly notify the Issuer and the Servicer in writing and, (b) unless within three Business Days after such notice such payment shall have been received by the Trustee, or the Issuer shall have made provision for such payment satisfactory to the Trustee in accordance with Section 10.2(a) hereof, the Trustee shall request the issuer of such Pledged Security, the trustee under the related Underlying Instrument or paying agent designated by either of them, as the case may be, to make such payment as soon as practicable after such request but in no event later than three Business Days after the date of such request.  If such payment is not made within such time period, the Trustee shall take such action as the Servicer shall direct in writing; *provided* that any expenses incurred or to be incurred in taking any such action shall be deemed not to relate to the performance of "ordinary services" under clause (4) of Section 6.1(c) hereof.  Any such action shall be without prejudice to any right to claim a Default or Event of Default under this Indenture.  In the event that the Issuer or the Servicer requests a release of a Pledged Security and/or delivers Substitute Portfolio Collateral in connection with any such action under the Servicing Agreement, such release and/or substitution shall be subject to Section 10.3 hereof and Article XII of this Indenture as the case may be.  Notwithstanding any other provision hereof the Trustee shall deliver to the Issuer or its designee any payment with respect to any Pledged Security received after the Due Date thereof to the extent the Issuer previously made provisions for such payment satisfactory to the Trustee in accordance with this Section 6.12 and such payment shall not be deemed part of the Trust Estate.

Section 6.13.    Non-Petition.

None of the Trustee, the Secured Parties, the Noteholders, the beneficial owners of the Notes, or the Paying and Transfer Agent, shall cause or join in the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for any reason, including for the nonpayment to any such party of any amounts due hereunder or under the Paying and Transfer Agency Agreement or under the Notes, as applicable, until the expiration of the period which is one year and one day (or such longer preference period as may be in effect) after the final payment on the Notes; *provided, however,* nothing herein shall be deemed to prohibit the Trustee from filing proofs of claim for itself and on behalf of the Noteholders.

Section 6.14.    Withholding.

(a)    If any withholding tax is imposed on the Co-Issuers' payment (or allocations of income) to any Noteholder, such tax shall reduce the amount otherwise distributable to such Noteholder.  The Trustee is hereby authorized and directed to retain from amounts otherwise distributable to any Noteholder sufficient funds for the payment of any tax that is legally owed by the Trust Estate or the Co-Issuers (as directed to it in writing by the Co-Issuers) (but such authorization shall not prevent the Trustee from contesting any such tax in

appropriate Proceedings and withholding payment of such tax, if permitted by law, pending the outcome of such Proceedings), or that the Trustee may otherwise determine it is obligated to withhold under applicable law or regulation. The amount of any withholding tax imposed with respect to any Noteholder shall be treated as cash distributed to such Noteholder at the time it is withheld by the Trustee and remitted to the appropriate taxing authority. If there is a possibility that withholding tax is payable with respect to a distribution, the Trustee may in its sole discretion withhold such amounts in accordance with this Section 6.14 (a). If any Noteholder wishes to apply for a refund of any such withholding tax, the Trustee shall reasonably cooperate with such Noteholder in making such claim so long as such Noteholder agrees to reimburse the Trustee for any out-of-pocket expenses incurred. Nothing in this Section 6.14 shall be construed to impose upon the Trustee any obligation or duty to determine the tax liability or responsibilities of the Co-Issuers or the Trust Estate other than the duties required under applicable law, or otherwise to perform any related tax administration or return preparation or filing responsibilities, or to impose upon the Trustee any duty or obligation to commence Proceedings to contest any tax.

(b)     Each Holder shall timely furnish the Issuer or its agents any U.S. federal income tax form or certification (such as Internal Revenue Service ("IRS") Form W-8BEN (Certification of Foreign Status), Form W-8IMY (Certification of Foreign Intermediary Status), Form W-9 (Request for Taxpayer Identification Number and Certification) or Form W-8ECI (Certification of Foreign Person's Claim for Exemption from Withholding on Income Effectively Connected with Conduct of a U.S. Trade or Business) or any successors to such IRS forms) that the Issuer or its agents may reasonably request and shall update or replace such form or certification in accordance with its terms or its subsequent amendments.

Section 6.15.   The Securities Intermediary.

(a)     There shall at all times be a securities intermediary appointed for purposes of this Indenture (the "Securities Intermediary"). Investors Bank & Trust Company is hereby appointed as the initial Securities Intermediary hereunder and accepts such appointment.

(b)     The Securities Intermediary represents, warrants, and covenants, and the parties hereto agree, that at all times prior to the termination of this Indenture:

(i)     The Securities Intermediary shall be a corporation or national bank that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity hereunder.

(ii)     Each Account shall be an account to which financial assets may be credited and the Securities Intermediary shall treat the Trustee as entitled to exercise the rights that comprise such financial assets. The Securities Intermediary shall not change the name or the account number of any Account without the prior written consent of the Trustee.

(iii)     Each item of property credited to each Account shall be treated as a financial asset.

(iv)     The Securities Intermediary shall comply with entitlement orders originated by the Trustee without further consent by the Issuer or any other person or entity.

(v)     The Securities Intermediary shall not agree with any person or entity other than the Trustee that it will comply with entitlement orders originated by any person or entity other than the Trustee.

(vi)     The Securities Intermediary shall not be a party to any agreement that is inconsistent with the provisions of this Indenture. The Securities Intermediary shall not take any action inconsistent with the provisions of this Indenture applicable to it.

(vii)     Each item of property credited to each Account shall not be subject to any security interest, lien, claim, encumbrance, or right of setoff in favor of the Securities Intermediary or anyone claiming through the Securities Intermediary (other than the Trustee); *provided, however*, that the Securities Intermediary may set-off the face amount of any checks or other deposit items which have been credited to an Account but are subsequently returned unpaid because of uncollected or insufficient funds.

(viii)     For purposes of Article 8 of the UCC, the securities intermediary's jurisdiction of the Securities Intermediary with respect to the Collateral shall be the State of New York.

(c)     It is the intent of the Trustee, the Issuer, and the Co-Issuer that each Account shall be a securities account of the Trustee and not an account of the Issuer or the Co-Issuer.

(d)     Nothing herein shall imply or impose upon the Securities Intermediary any duties or obligations other than those expressly set forth herein and those applicable to a securities intermediary under the UCC. The Securities Intermediary shall be entitled to all of the protections available to a securities intermediary under the UCC. Without limiting the foregoing, nothing herein shall imply or impose upon the Securities Intermediary any duties of a fiduciary nature (such as, without limitation, the fiduciary duties of the Trustee hereunder).

(e)     The Securities Intermediary (i) shall satisfy the requirements of Section 6.8, and (ii) shall not be an Affiliate of the Issuer.

(f)     The Securities Intermediary may at any time resign by written notice to the Trustee and may at any time be removed by written notice from the Trustee. The Trustee shall appoint a successor Securities Intermediary that satisfies the provisions of Section 6.15(e). The Trustee shall cause (i) each Account to be established and maintained with such successor Securities Intermediary in accordance with the terms hereof, and (ii) the successor Securities Intermediary to execute and deliver to the parties hereto a written agreement in which it agrees to be the Securities Intermediary hereunder and to be bound by the provisions of this Indenture applicable to the Securities Intermediary. The duties and obligations of the retiring Securities

Intermediary hereunder shall remain in effect until each Account and all of the Collateral credited thereto have been transferred to the successor Securities Intermediary.

(g)     Any corporation into which the Securities Intermediary may be merged or converted or with which it may be consolidated, or any corporation resulting from any merger, consolidation or conversion to which the Securities Intermediary shall be a party, shall be the successor of the Securities Intermediary hereunder, without the execution or filing of any further document on the part of the parties hereto or such successor corporation.

(h)     Notwithstanding any other provision of this Section 6.15, each item of the Trust Estate that constitutes a general intangible (including any loan, or any participation or assignment therein, that constitutes a general intangible) shall be Delivered to the Trustee as provided in clause (g) of the Definition of "Delivery" and shall not be credited to any Account.

Section 6.16.   Eligible Investments.

Eligible Investments acquired with available funds in an Account shall be credited by the Trustee to such Account.

Section 6.17.   Fiduciary For Noteholders; Agent for the Other Secured Parties.

The Trustee shall not by reason of this Indenture be deemed to be acting as a fiduciary for the Secured Parties other than the Noteholders; *provided* that the foregoing shall not limit any of the express obligations of the Trustee under this Indenture.

ARTICLE VII

COVENANTS

Section 7.1.   Payment of Principal and Interest.

The Co-Issuers (as applicable) will duly and punctually pay the principal of, interest on and all other amounts payable on or in respect of the Notes and the Combination Notes in accordance with the terms of the Notes, the Combination Notes and this Indenture.

Section 7.2.   Maintenance of Office or Agency.

The Issuer will maintain an office or agency in the Borough of Manhattan, the City of New York, the State of New York, where Notes may be presented or surrendered for payment.  The Issuer hereby initially appoints the office of Investors Bank & Trust Company (the "New York Presenting Agent"), currently located at 33 Maiden Lane, 4th Floor, New York, NY 10038, Attention:  CDO Services (Rockwall CDO II Ltd.), as such office or agency.  The Trustee shall give prompt written notice to the Co-Issuers and the Noteholders of any change in the location of the New York Presenting Agent. Each New York Presenting Agent other than Investors Bank & Trust Company shall be a bank or trust company having a capital and surplus of not less than $100,000,000 and be registered as a transfer agent with the Securities and Exchange Commission.  If the location of the New York Presenting Agent changes and such

notice is not given or the Issuer fails to maintain any such office or agency, presentations and surrenders of the Notes may be made or served at the Corporate Trust Office.

Section 7.3.    Money for Note Payments to Be Held in Trust.

All payments of amounts due and payable with respect to any Notes that are to be made from amounts withdrawn from the Collection Account shall be made on behalf of the Issuer by the Trustee.

Section 7.4.    Existence of Co-Issuers; Corporate Formalities.

(a)    Each of the Co-Issuers will, to the maximum extent permitted by applicable law, maintain in full force and effect its existence, rights and franchises as a company or corporation incorporated or organized under the laws of the jurisdiction of its incorporation or organization, as the case may be, and will obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Indenture, the Notes, the Combination Notes or any of the Pledged Securities or other property included in the Trust Estate.  Each of the Co-Issuers shall comply with its charter documents and shall not amend its charter documents without the consent of the Requisite Noteholders if such amendment would have a material adverse effect on the rights of the Noteholders and, for so long as any Notes are then rated, shall notify the Rating Agencies of any amendment and shall not amend its charter document in any material way without satisfaction of the Rating Condition.

(b)    The Issuer shall ensure that all corporate or other formalities regarding its existence (including, to the extent required, holding, to the extent required, regular meetings of the board of directors and shareholders) are followed.  The Issuer shall not take any action, or conduct its affairs in a manner, that is likely to result in its separate existence being ignored or its assets and liabilities being substantively consolidated with any other Person in a bankruptcy, reorganization or other insolvency proceeding.  Without limiting the foregoing, (i) the Issuer shall not have any subsidiaries except the Co-Issuer and except as provided in Section 7.4(c), and (ii) the Issuer shall not (A) have any employees (other than its directors), (B) engage in any transaction with any shareholder that would constitute a conflict of interest, *provided, however,* that the entry into the Administration Agreement and the Paying and Transfer Agency Agreement with Maples Finance Limited shall not be deemed a conflict of interest or (C) pay dividends other than in accordance with the terms of this Indenture, its organizational documents, and with regard to its Preferred Shares, in accordance with the terms of the Paying and Transfer Agency Agreement.

(c)    In addition to the Co-Issuer, the Issuer may have as a subsidiary any entity that (x) meets the then-current general criteria of the Rating Agencies for bankruptcy remote entities, (y) is formed for the sole purpose of holding (1) stock of one or more corporations or other assets that are or may be treated as United States real property interests for purposes of Section 897 of the Code acquired or expected to be acquired in connection with a workout of an Asset (an "897 Subsidiary") or (2) equity interests in "partnerships" (within the meaning Section 7701(a)(2) of the Code), "grantor trusts" (within the meaning of the Code) or entities that are disregarded as separate from their owners for United States federal income tax purposes that are

or may be engaged or deemed to be engaged in a trade or business in the United States, in each case acquired or expected to be acquired in connection with a workout of an Asset (an "ETB Subsidiary") and (z) is a corporation for United States federal income tax purposes; *provided* that any 897 Subsidiary and ETB Subsidiary (i) will be wholly-owned by the Issuer, (ii) will not sell, transfer, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (or permit such to occur), any part of its assets, except in compliance with the Issuer's rights and obligations under this Indenture and with such subsidiary's constituent documents, (iii) will not have any subsidiaries, (iv) will not have any employees (other than directors to the extent they are employees) and will not conduct business under any name other than its own, (v) will not incur or guarantee any indebtedness, (vi) will include in its constituent documents a limitation on its business such that it may only engage in the acquisition of assets permitted under this Indenture and the disposition of such assets and the proceeds thereof to the Issuer (and activities ancillary thereto) and (vii) will distribute 100% of the proceeds of the assets acquired by it (net of applicable taxes and expenses payable by such subsidiary) to the Issuer.

Section 7.5.    Protection of Trust Estate.

(a)    The Issuer shall authorize, execute, deliver and file all such supplements and amendments hereto and all such financing statements, amendments of financing statements, continuation statements, instruments of further assurance and other instruments and shall take such other action as may be necessary or advisable to:

(i)    Grant more effectively all or any portion of the Trust Estate;

(ii)    maintain or preserve the lien of this Indenture or the priority thereof, or to carry out more effectively the purposes hereof;

(iii)    perfect, publish notice of, or protect the validity of any Grant made or to be made by this Indenture;

(iv)    enforce any of the Pledged Securities or other instruments or property included in the Trust Estate;

(v)    preserve and defend title to the Trust Estate and the rights therein of the Secured Parties against the claims of all other Persons; and

(vi)    pay any and all taxes levied or assessed upon all or any part of the Trust Estate.

The Issuer hereby authorizes the filing of financing statements (and amendments of financing statements and continuation statements) that name the Issuer as debtor and the Trustee as secured party and that cover all personal property of the Issuer. The Issuer also hereby ratifies its authorization of the filing of any such financing statements (or amendments of financing statements or continuation statements) that were filed prior to the execution hereof. The Issuer hereby designates the Trustee its agent and attorney-in-fact to take any action or authorize or execute any financing statement, amendment of financing statement, continuation statement or other instrument required pursuant to this Section 7.5; *provided* that such

appointment shall not impose upon the Trustee any of the Issuer's obligations under this Section 7.5.

Provided that the Trustee (on or before, promptly after, the Closing Date) has been provided with a complete and accurate copy of each such financial statement (which copy is stamped to reflect, or is accompanied by, the applicable filing information, including filing number, original date of filing and filing office), the Trustee shall give written notice to the Issuer and the Servicer of the pending expiration of the financing statement filed in connection with the closing of the transaction contemplated herein and any continuation statement relating thereto, no earlier than six months prior to the scheduled expiration date of such financing statement or continuation statement, as applicable, and no later than two months prior to such scheduled expiration date.

(b)    The Trustee shall not, except in accordance with the provisions of this Indenture, release any portion of the Trust Estate from the security interest and lien hereunder or remove any portion of the Trust Estate from the jurisdictions indicated in Section 10.3(a) hereof; *provided* that the Trustee shall be entitled to remove the Trust Estate or any portion thereof to a jurisdiction other than the applicable jurisdiction or jurisdictions indicated in Section 10.3(a) hereof if the Trustee shall have first obtained an Opinion of Counsel, at its own expense, to the effect that the lien and security interest created by this Indenture with respect to such property, including the perfection and priority thereof, will continue to be maintained after giving effect to such action, and *provided further* that the Trustee shall thereafter (for so long as such property continues to be so located in such other jurisdiction) obtain at its own expense an annual Opinion of Counsel, on or before the date specified in Section 7.6(a) hereof, confirming the matters required by such Section to the extent governed by the law of such other jurisdiction.

(c)    The Issuer shall pay or cause to be paid taxes, if any, levied on account of the beneficial ownership by the Issuer of any Pledged Securities.

(d)    The Issuer hereby represents and warrants that its registered office is, and always has been, in the Cayman Islands; it has never had any offices in the United States of America, and the only offices of any type it has ever had have been in the Cayman Islands.

Section 7.6.    Opinions and Tax Matters

(a)    On or before June 30 in each calendar year, commencing in 2008, the Issuer shall cause to be delivered to the Trustee an Opinion of Counsel (and the Trustee shall deliver copies of such to the Servicer and the Rating Agencies (other than S&P)), stating that, in the opinion of such counsel, as of the date of such opinion, the Indenture creates in favor of the Trustee a security interest in the Trust Estate and that such security interest is perfected.

(b)    If required to prevent the withholding and imposition of United States income tax, the Issuer shall deliver or cause to be delivered (as applicable) a United States Internal Revenue Service Form W-8BEN, or any successor form thereto, to each issuer of any Portfolio Collateral, each issuer of an Eligible Investment and each Synthetic Security Counterparty at the time such Portfolio Collateral or Eligible Investment is purchased by the

Issuer or the Synthetic Security is entered into by the Issuer and periodically thereafter (prior to the expiration of the Form previously provided).

(c)     The Issuer will take all actions necessary in order to permit any holder of a Preferred Share or any Holder of a Note that is or may reasonably be characterized as an equity interest in the Issuer for United States federal income tax purposes, upon request therefor, to make a "qualified electing fund" election for United States federal income tax purposes and to satisfy the ongoing requirements with respect to such an election.  Further, the Issuer will provide, upon the reasonable request of any holder of a Preferred Share or any such Holder of a Note that is or may reasonably be characterized as an equity interest in the Issuer for United States federal income tax purposes, any information the Issuer has available to it that assists such holders with regard to filing requirements such holders may have as a result of the controlled foreign corporation rules under the Code or pursuant to Section 6038, 6038B or 6046 of the Code.

(d)     The Issuer will not take the position that it is engaged in a United States trade or business for federal income tax purposes.

(e)     By its acceptance of a Note, each Holder and beneficial owner of a Note shall be deemed to have agreed (1) to provide the Issuer, upon request, with such information as may reasonably be requested by the Issuer (including but not limited to information relating to the beneficial owner of the Note) in connection with the Issuer's fulfillment of its tax reporting, notification, withholding and similar obligations arising under the Code (as amended from time to time) or the Transaction Documents; and (2) to treat the Issuer as not being engaged in the active conduct of a banking, financing, insurance or other similar business for purposes of 954(h)(2) of the Code

(f)      By its acceptance of a Note, each Holder and beneficial owner of a Note that is not a United States person (as defined in Section 7701(a)(30) of the Code) will be deemed to have represented that (x)  it is not a bank within the meaning of Section 881(c)(3)(A) of the Code or an affiliate of a bank or, alternatively, it is such a bank or an affiliate of a bank but it is eligible for benefits under an income tax treaty with the United States that eliminates U.S. federal income taxation of U.S. source interest not attributable to a permanent establishment in the United States and (y) it is not purchasing the Note in order to reduce its U.S. Federal income tax liability or pursuant to a tax avoidance plan within the meaning of Treas. Reg. 1.881-3(b).

(g)     Each of the Issuers and each Holder of a Note agrees that it does not intend for this Indenture to represent an agreement to enter into a partnership, a joint venture or any other business entity for United States federal income tax purposes, and none of such parties shall represent or otherwise hold themselves out to the IRS or other third parties as partners in a partnership or members of a joint venture or other business entity for United States federal income tax purposes. The Issuer will not elect for the Issuer to be treated as a partnership or disregarded entity for United States federal income tax purposes.

Section 7.7.    Performance of Obligations.

(a)    The Co-Issuers shall not take any action, and, where applicable, will not consent to any action proposed to be taken by others, that would release any Person from any of such Person's covenants or obligations under any instrument included in the Trust Estate, except in the case of enforcement action taken with respect to any Defaulted Portfolio Collateral in accordance with the provisions hereof and as otherwise required hereby.

(b)    The Co-Issuers may contract with other Persons, including Investors Bank & Trust Company, and the Servicer, for the performance by such Persons of the Issuer's obligations hereunder and under the Servicing Agreement.    Notwithstanding any such arrangement, the Issuer shall remain primarily liable with respect thereto.  With respect to any such contract, the performance of such obligations by such Persons shall be deemed to be performance of such obligations by the Issuer.

Section 7.8.    Negative Covenants.

(a)    The Issuer will not:

(1)    sell, transfer, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (or permit such to occur or suffer such to exist), any part of the Trust Estate, except as expressly permitted by this Indenture and the Servicing Agreement;

(2)    claim any credit on, or make any deduction from, the amount payable with respect to the Notes other than amounts withheld pursuant to Section 6.14 hereof, or assert any claim against any present or future Noteholder, by reason of the payment of any taxes levied or assessed upon any part of the Trust Estate;

(3)    incur or assume any indebtedness other than pursuant to this Indenture or the Paying and Transfer Agency Agreement, or incur, assume or guaranty the indebtedness of any Person, issue any additional class of securities or issue any additional shares, shares of stock or membership interests;

(4)    (A) permit the validity or effectiveness of this Indenture or any Grant hereunder to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to this Indenture or the Notes, except, in each case, as may be expressly permitted hereby, thereby, or by the Servicing Agreement, (B) permit any lien, charge, adverse claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden the Trust Estate or any part thereof, any interest therein or the proceeds thereof except as may be expressly permitted hereby, or (C) take any action that would permit the lien of this Indenture not to constitute a valid first priority perfected security interest in the Trust Estate except as may be expressly permitted hereby;

(5)    act as agent, negotiator or structurer with respect to any Portfolio Collateral, act as a participant in negotiating the terms of a primary loan agreement,

except to the extent provided in the Servicing Agreement, enter into a binding commitment to purchase any Portfolio Collateral prior to the issuance of such Portfolio Collateral or engage in any transaction or activity that would cause the Issuer to be treated as engaged in a trade or business in the United States within the meaning of section 864 of the Code;

(6)     change its name, its type or jurisdiction of organization, or its organizational identification number, unless it has first (i) made all filings and taken all actions in all relevant jurisdictions under the applicable Uniform Commercial Code and other applicable law as are necessary to continue and maintain the priority and perfection of the security interest of the Trustee in the Trust Estate, and (ii) delivered to the Trustee an Opinion of Counsel to the effect that all necessary filings have been made under the applicable Uniform Commercial Code in all relevant jurisdictions as are necessary to continue and maintain the perfection of the security interest of the Trustee in the Trust Estate;

(7)     enter into any agreements or amendments thereto unless such agreements and any amendments thereto contain "non-petition" and "limited recourse" provisions, except with respect to any agreements involving the purchase and sale of Portfolio Collateral having customary purchase or sale terms and documented with customary trading documentation;

(8)     enter into any agreements or amendments to the Transaction Documents with respect to the "non-petition" or "limited recourse" provisions without satisfying the Rating Condition; or

(9)     commingle any of the Collateral with the assets of any other Person, except as expressly permitted by this Indenture and the Servicing Agreement.

(b)     The Co-Issuer will not enter into any agreement, contract or indenture other than this Indenture and shall not incur or assume any indebtedness other than pursuant to or as may be expressly permitted by this Indenture, or incur, assume or guaranty the indebtedness of any Person.

(c)     The Trustee shall not sell, transfer, exchange or otherwise dispose of, or enter into or engage in any business with respect to, any part of the Trust Estate, except as expressly permitted by this Indenture or the Servicing Agreement.

(d)     Neither of the Co-Issuers shall to the maximum extent permitted by applicable law (i) commence any case, proceeding or other action under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have any order for relief entered with respect to it, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (ii) seek appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or make a general assignment for the benefit of its creditors; neither of the Co-Issuers shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set

forth above; and each of the Co-Issuers shall generally pay debts as they become due and not admit in writing its inability to pay its debts as they become due.

(e)     Except as permitted by Section 8.2 hereof, the Issuer shall not waive nor permit the amendment of Section 19 or Section 20 of the Servicing Agreement or Section 20 of the Paying and Transfer Agency Agreement.

Section 7.9.    Statement as to Compliance.

On or before July 31 following each calendar year, beginning in 2008, or immediately if there has been a Default under this Indenture, the Issuer shall deliver to the Trustee, and the Trustee in turn shall deliver a copy to the Rating Agencies (and any Noteholder upon receipt by the Trustee of a certificate in the form of Exhibit H), an Officer's Certificate of the Issuer stating that:

(1)     a review of the activities of the Issuer during such year and of the Issuer's performance under this Indenture has been made under his or her supervision; and

(2)     to the best of his or her knowledge, based on such review, the Issuer has fulfilled all of its obligations under this Indenture throughout such year without the occurrence of a Default, or, if there has been a Default hereunder, specifying each such Default known to him or her and the nature and status thereof, including any actions taken to remedy the same.

Section 7.10.    Issuer and Co-Issuer May Not Consolidate or Merge.

Neither the Issuer nor the Co-Issuer shall consolidate or merge with or into any other Person.

Section 7.11.    No Other Business.

Neither the Issuer nor the Co-Issuer shall engage in any business or activity other than (i) the issuance and redemption of the Notes, the Combination Notes and the Preferred Shares, the issuance and redemption of its ordinary shares, and acquiring, owning, managing, holding and pledging the Pledged Securities and any other instrument or property included in the Trust Estate and (ii) engaging in any other activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith.

Section 7.12.    Purchase of Notes.

Notwithstanding anything contained in this Indenture to the contrary, the Issuer may acquire Notes in open market or privately negotiated transactions or otherwise (and the Issuer shall give prompt written notice thereof to the Trustee): *provided* that so long as any Class A Notes are Outstanding, the Issuer shall not acquire any Class B Notes.  Any Notes acquired by the Issuer shall be delivered to the Trustee for cancellation.

Section 7.13.  Notice of Rating.

(a)    The Issuer shall use reasonable efforts to cause the payment of the Periodic Interest Amount and the Aggregate Principal Amount of the Class A-1LA Notes, the Class A-1LB Notes and the Class A-2L Notes to be rated by Standard & Poor's and Moody's (as applicable), the ultimate payment of the Cumulative Interest Amount and the Aggregate Principal Amount of the Class A-3L Notes, the Class B-1L Notes and the Class B-2L Notes to be rated by Standard & Poor's and Moody's and the payment of the Rated Balance and the Rated Coupon of the Combination Notes to be rated by Moody's.  Notwithstanding anything to the contrary contained herein, the failure by the Issuer to maintain a rating of each Class of the Class A Notes, the Class B Notes and the Combination Notes shall not constitute a Default or an Event of Default.

(b)    The Issuer shall promptly notify the Trustee in writing (and the Trustee shall promptly notify the Noteholders and the Servicer) if at any time the rating of any Class of Notes or Combination Notes has been, or the Issuer knows will be, changed or withdrawn.

Section 7.14.  Process Agent.

The Issuer irrevocably designates and appoints CT Corporation, 111 Eighth Avenue, New York, New York 10011, as its agent (the "Process Agent") for service of all process served in connection with this Indenture, such service being hereby acknowledged to be effective and binding service upon the Issuer in every respect.

Section 7.15.  Additional Covenants.

(a)    Each of the Co-Issuers shall comply with all applicable laws, rules, regulations, orders, writs, judgments, injunctions, decrees, determinations and awards (including, without limitation, any fiscal and accounting rules and regulations and any foreign or domestic law, rule or regulation), including, without limitation, in connection with the issuance, offer and sale of the Notes.

(b)    The Issuer shall give prompt notice in writing to the Trustee, the Servicer and the Rating Agencies, upon becoming aware of the occurrence of any Event of Default hereunder.

(c)    Each of the Co-Issuers shall take all reasonable actions necessary so as to be exempt from registration under the Investment Company Act.

(d)    The Co-Issuers shall take all reasonable actions necessary so as to exempt from registration the sale of Notes under the Securities Act or under any applicable United States state securities or "blue sky" laws.

(e)    Each of the Co-Issuers shall maintain all licenses, permits, charters and registrations which are material to the conduct of its business.

(f)     The Issuer shall maintain its corporate records and books of account outside of the United States separate from any other Person, including, without limitation, any Person which owns more than 50% of its equity securities.

(g)     Each of the Co-Issuers shall use its best efforts to minimize taxes and any other costs arising in connection with its activities.

(h)     Each of the Co-Issuers shall treat the purchase of Portfolio Collateral as a purchase for tax, accounting and reporting purposes.

(i)     Each of the Co-Issuers shall maintain at least one director who is Independent of the Issuer, the Co-Issuer, the Servicer and Bear Stearns.

(j)     Each of the Co-Issuers shall only conduct business in its own name as set forth in its organizational documents.

(k)     The Issuer shall cause each item of Collateral to be Delivered to the Trustee.

(l)     The Issuer shall cause the Schedule of Portfolio Collateral to at all times correctly list all Portfolio Collateral that is included in the Trust Estate, including all Initial Portfolio Collateral, all Original Portfolio Collateral, all Additional Portfolio Collateral, all Substitute Portfolio Collateral, all Defaulted Portfolio Collateral, all Credit Risk Portfolio Collateral, all Equity Portfolio Collateral and all Credit Improved Portfolio Collateral.  The Issuer shall cause Schedule A to be amended to reflect the inclusion of Portfolio Collateral purchased pursuant to Section 3.4(a) hereof, the inclusion of Additional Portfolio Collateral as provided in Section 11.3 hereof, the release of Portfolio Collateral pursuant to Article X hereof, and the inclusion of Substitute Portfolio Collateral as provided in Section 12.4 hereof.

Section 7.16.   Representations and Warranties of the Co-Issuers.

Each of the Co-Issuers represents and warrants to the Trustee with respect to itself, as of the Closing Date that:

(a)     Such Co-Issuer is a corporation duly incorporated or organized, as the case may be, validly existing and in good standing under the laws of the jurisdiction of its incorporation and in each jurisdiction where the conduct of its business requires such license, qualification or good standing, except where the failure to be so licensed or qualified or in good standing would not adversely affect the validity or enforceability of this Indenture or the other Transaction Documents to which it is a party, or the ability of such Co-Issuer to perform its obligations hereunder or thereunder.

(b)     Such Co-Issuer has the power and authority to execute and deliver the Transaction Documents and all other documents and agreements contemplated hereby and thereby to which it is a party, as well as to carry out the terms hereof and thereof.

(c)     Such Co-Issuer has taken all necessary action, including but not limited to all requisite corporate action, to authorize the execution, delivery and

performance of the Transaction Documents and all other documents and agreements contemplated hereby and thereby to which it is a party. When executed and delivered by such Co-Issuer and the other parties thereto, each of the Transaction Documents will constitute the legal, valid and binding obligation of such Co-Issuer enforceable in accordance with its terms subject, as to enforcement, to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect affecting the enforcement of creditors' rights in general, and except as such enforceability may be limited by general principles of equity (whether considered in a suit at law or in equity) and to the payment of stamp duty.

(d)     All authorizations, licenses, permits, certificates, franchises, consents, approvals and undertakings which are required to be obtained by such Co-Issuer under any applicable law which are material to (i) the conduct of its business, (ii) the ownership, use, operation or maintenance of its properties and (iii) the performance by such Co-Issuer of its obligations under or in connection with the Transaction Documents, the Notes and the Preferred Shares have been received and all such authorizations, licenses, permits, certificates, franchises, consents, approvals and undertakings are in full force and effect.

(e)     The execution, issuance and delivery of, and performance by such Co-Issuer of its respective obligations under the Transaction Documents and any and all instruments or documents required to be executed or delivered pursuant to or in connection herewith or therewith were and are within the powers of such Co-Issuer and will not violate any provision of any law, regulation, decree or governmental authorization applicable to such Co-Issuer, or its charter or by-laws or other organizational documents and will not violate or cause a default under any provision of any contract, agreement, mortgage, indenture or other undertaking to which such Co-Issuer is a party or which is binding upon such Co-Issuer or any of its property or assets, and will not result in the imposition or creation of any lien, charge, or encumbrance upon any of its properties or assets of such Co-Issuer pursuant to the provisions of any such contract, agreement, mortgage, indenture or undertaking, other than as specifically set forth herein.

(f)     There are no legal, governmental or regulatory Proceedings pending to which such Co-Issuer is a party or of which any of its property is the subject, which if determined adversely to such Co-Issuer would individually or in the aggregate have a material adverse effect on the performance by such Co-Issuer of the Transaction Documents or the consummation of the transactions contemplated hereunder or thereunder; and to the best of its knowledge, no such Proceedings are threatened or contemplated.

(g)     None of the Notes, Combination Notes nor the Preferred Shares are required to be registered pursuant to the Securities Act, such Co-Issuer is not required to be registered as an investment company pursuant to the Investment Company Act, and the Indenture is not required to be qualified under the Trust Indenture Act of 1939, as amended.

(h)     Except with respect to amounts owed under the Notes and the Preferred Shares and liabilities incurred in connection with the issuance of the Notes, the Preferred Shares and the Transaction Documents, such Co-Issuer has not incurred any indebtedness for borrowed money or any other material liabilities.

(i)     The Issuer has no subsidiaries other than the Co-Issuer or as permitted by Section 7.4(c) hereof.

(j)     The Issuer is not a securities intermediary, broker, or commodity intermediary as defined in the UCC, or a Participant as defined in the United States Regulations.

Section 7.17.   <u>Representations Relating to the Security Interests in the Collateral.</u>

(a)     The Issuer hereby represents that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and, with respect to Collateral Delivered after the Closing Date, be deemed to be repeated on the date on which such Collateral is Delivered as if made at and as of that time), with respect to the then existing Collateral:

(i)     The Issuer owns and has good and marketable title to such Collateral free and clear of any lien, claim or encumbrance of any person, other than such as are created under, or expressly permitted by, this Indenture.

(ii)     Other than the security interest granted to the Trustee pursuant to this Indenture and conveyances permitted by this Indenture, the Issuer has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed such Collateral. The Issuer has not authorized the filing of and is not aware of any financing statements against the Issuer that include a description of collateral covering such Collateral other than any financing statement relating to the security interest granted to the Trustee hereunder or that has been terminated. The Issuer is not aware of any judgment, Pension Benefit Guaranty Corporation or tax lien filings against the Issuer.

(iii)     Such Collateral is comprised of "instruments", "security entitlements", "general intangibles", "tangible chattel paper", "deposit accounts", "accounts", "certificated securities", "uncertificated securities" or "securities accounts" (each as defined in the applicable Uniform Commercial Code).

(iv)     All Accounts constitute "securities accounts" as defined in the applicable Uniform Commercial Code.

(v)     This Indenture creates a valid and continuing security interest (as defined in the applicable Uniform Commercial Code) in such Collateral in favor of the Trustee, which security interest is prior to all other liens and is enforceable as such against creditors of and purchasers from the Issuer except as expressly permitted under this Indenture.

(vi)     The Issuer has received all consents and approvals required by the terms of such Collateral to the transfer to the Trustee of its interest and rights in such Collateral hereunder.

(b)     The Issuer hereby represents that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and, with respect to Collateral Delivered after the Closing Date, be deemed to be repeated on the date on which such Collateral is Delivered as if made at and as of that time), with respect to the then existing Collateral that constitutes "securities accounts", the Indenture creates a valid and continuing security interest (as defined in the applicable Uniform Commercial Code) in the Accounts in favor of the Trustee, which security interest is perfected by control (as defined in the applicable Uniform Commercial Code) because the Trustee has control of each security entitlement carried in each Account.

(c)     The Issuer hereby represents that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and, with respect to Collateral Delivered after the Closing Date, be deemed to be repeated on the date on which such Collateral is Delivered as if made at and as of that time), with respect to the then existing Collateral that constitute "instruments":

(i)     All original executed copies of each promissory note or mortgage note that constitutes or evidences such instruments have been delivered to the Trustee and (ii) none of the promissory notes or the mortgage notes that constitute or evidence such instruments has any marks or notations indicating that it has been pledged, assigned or otherwise conveyed to any person other than the Trustee.

(d)     The Issuer hereby represents that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and, with respect to Collateral Delivered after the Closing Date, be deemed to be repeated on the date on which such Collateral is Delivered as if made at and as of that time), with respect to the then existing Collateral that constitute "security entitlements":

(i)     All of such security entitlements have been credited to one of the Accounts. The securities intermediary for each Account has agreed to treat all assets credited to such Account as "financial assets" within the meaning of the applicable Uniform Commercial Code.

(ii)     The Issuer has taken all steps necessary to cause the securities intermediary to identify in its records the Trustee as the person having a security entitlement against the securities intermediary in each of the Accounts.

(iii)     The Accounts are not in the name of any person other than the Trustee. The Issuer has not consented to the securities intermediary of any Account to comply with the entitlement order of any person other than the Trustee.

(e)     The Issuer hereby represents that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and, with respect to Collateral Delivered after the Closing Date, be deemed to be repeated on the date on which such

Collateral is Delivered as if made at and as of that time), with respect to the then existing Collateral that constitutes "general intangibles" or "accounts":

(i)     The Issuer has caused or will have caused, within ten days after the Closing Date, the filing of all appropriate financing statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect the security interest in such general intangibles or accounts granted to the Trustee hereunder.

(f)     The Issuer hereby represents that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and, with respect to Collateral Delivered after the Closing Date, be deemed to be repeated on the date on which such Collateral is Delivered as if made at and as of that time), with respect to the then existing Collateral that constitutes "tangible chattel paper":

(i)     (A) All original executed copies of each agreement that constitutes or evidences such tangible chattel paper have been delivered to the Trustee and (B) none of the agreements that constitute or evidence such tangible chattel paper has any marks or notations indicating that it has been pledged, assigned or otherwise conveyed to any person other than the Trustee.

(ii)     The Issuer has taken all steps necessary to perfect the security interest against the account debtor in the property securing the agreements that constitute such tangible chattel paper.

(g)     The Issuer hereby represents that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and, with respect to Collateral Delivered after the Closing Date, be deemed to be repeated on the date on which such Collateral is Delivered as if made at and as of that time), with respect to the then existing Collateral that constitutes "deposit accounts":

(i)     The Issuer has taken all steps necessary to cause the Trustee to become the account holder of such deposit accounts.

(ii)     Such deposit accounts are not in the name of any person other than the Trustee.  The Issuer has not consented to the bank maintaining any such deposit account to comply with the instructions of any person other than the Trustee.

(h)     The Issuer hereby represents that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and, with respect to Collateral Delivered after the Closing Date, be deemed to be repeated on the date on which such Collateral is Delivered as if made at and as of that time), with respect to the then existing Collateral that constitutes a certificated security, such certificated security has been delivered to the Trustee and, if in registered form, has been indorsed to the Trustee or in blank by an effective indorsement or has been registered in the name of the Trustee upon original issue or registration of transfer by the issuer of such certificated security.

(i)     The Issuer hereby represents that, as of the Closing Date (which representations and warranties shall survive the execution of this Indenture and, with respect to

Collateral Delivered after the Closing Date, be deemed to be repeated on the date on which such Collateral is Delivered as if made at and as of that time), with respect to the then existing Collateral that constitutes an uncertificated security, the issuer of such uncertificated security has registered the Trustee as the registered owner of such uncertificated security.

(j)     None of the provisions of this Section 7.17 shall be waived without the prior written confirmation from S&P that such waiver shall not result in a reduction or withdrawal of the then-current rating of any Class of Notes.

Section 7.18.    No "Gross-up" Amounts.

The Co-Issuers shall not be required to pay any "gross-up" or other additional amounts to the Holders of any Class of Notes because taxes or related amounts are required to be withheld from payments on the Notes or any payments to either of the Co-Issuers on any item of Portfolio Collateral or other assets of the Co-Issuers.

Section 7.19.    Securities Lending.

(a)     So long as no Event of Default is continuing and if after the completion of the transaction the limit in subsection 12.2(u) would be satisfied, the Servicer may cause Portfolio Collateral that are not Defaulted Portfolio Collateral to be lent for a term of 90 days or less to banks, broker-dealers, and other financial institutions (other than insurance companies) having long-term and short-term senior unsecured debt ratings or guarantors with ratings of at least "A1" (and not "A1" but on credit watch with negative implications) and "P-1" (and not on credit watch for possible downgrade) from Moody's and a long-term senior unsecured debt rating of at least "A+" from S&P (each, a "Securities Lending Counterparty") pursuant to one or more agreements (each, a "Securities Lending Agreement"); *provided* that Portfolio Collateral whose Market Value cannot be determined under clauses (a), (b) or (c) of that definition may not be lent pursuant to a Securities Lending Agreement; *provided, further*, that the gross income from all such transactions during any fiscal year shall not exceed 15% of the gross income of the Issuer for such fiscal year.  Upon receipt of an Issuer Order, the Trustee shall release any lent Portfolio Collateral to a Securities Lending Counterparty as directed by the Servicer. The Securities Lending Counterparties may be Affiliates of the Initial Purchasers or Affiliates of the Servicer. The duration of any Securities Lending Agreement shall not exceed the Final Maturity Date of the Notes.

(b)     Each Securities Lending Agreement shall be on market terms as determined by the Servicer (except as may be required below) and shall:

(i)     require that the Securities Lending Counterparty return to the Trustee debt obligations that are identical (in terms of issue and class) to the lent items of Portfolio Collateral;

(ii)     require that the Securities Lending Counterparty pay to the Trustee amounts equivalent to all interest and other payments that the owner of the lent items of Portfolio Collateral is entitled to for the period during which the Portfolio Collateral is lent and require that any such payments not be subject to withholding tax imposed by any jurisdiction unless the Securities Lending Counterparty is required under the Securities

Lending Agreement to make "gross-up" payments to the Issuer that cover the full amount of the withholding tax on an after-tax basis;

(iii)    require that the Rating Condition with respect to each Rating Agency shall be satisfied with respect to the execution of the Securities Lending Agreement;

(iv)    satisfy any other requirements of Section 1058 of the Code and the Treasury Regulations promulgated under it;

(v)    be governed by the laws of New York;

(vi)    permit the Issuer to assign its rights under the Securities Lending Agreement to the Trustee pursuant to this Indenture;

(vii)    provide for early termination and return of any lent item of Portfolio Collateral to the Issuer with no penalty if the Portfolio Collateral becomes Credit Risk Portfolio Collateral or is subject to redemption in accordance with its terms;

(viii)    provide for early termination and the delivery of any lent item of Portfolio Collateral with no penalty upon any redemption of the Notes in whole;

(ix)    require the Securities Lending Counterparty to post with the Trustee collateral consisting of Cash or direct registered debt obligations of the United States of America that have a maturity date no later than the Business Day preceding the stated termination date of the Securities Lending Agreement (the "Securities Lending Collateral") to secure its obligation to return the Portfolio Collateral;

(x)    provide that the value of Securities Lending Collateral shall be maintained at all times in an amount equal to at least 102% of the current Ask-Side Market Value (determined daily and monitored by the Servicer) of the lent Portfolio Collateral;

(xi)    the lent Portfolio Collateral shall be marked-to-market on a daily basis by the Servicer on the basis of their Market Value;

(xii)    the Collateral will include the Issuer's rights under the related Securities Lending Agreement as well as the lent Portfolio Collateral;

(xiii)    provide for early termination within 10 days, at the option of the Issuer and with respect to the return of any lent Portfolio Collateral to the Issuer, with no penalty, if the Securities Lending Counterparty is no longer in compliance with the requirements relating to the credit ratings of the Securities Lending Counterparty and the noncompliance is not cured as provided in this Indenture;

(xiv)    contain appropriate limited recourse and non-petition provisions that survive the termination of the agreement (to the extent the Issuer has contractual

payment obligations to the Securities Lending Counterparty) equivalent (*mutatis mutandis*) to those in this Indenture; and

(xv)     provide for the payment of a fee to the Issuer in consideration for the loan of Portfolio Collateral, at a rate as shall be negotiated with the Securities Lending Counterparty by the Servicer on behalf of the Issuer.

(c)     If either Moody's or S&P downgrades a Securities Lending Counterparty such that the Securities Lending Agreements to which the Securities Lending Counterparty is a party are no longer in compliance with the requirements relating to the credit ratings of the Securities Lending Counterparty, then the Servicer on behalf of the Issuer, within 10 days of the downgrade, shall

(i)     terminate its Securities Lending Agreements with the Securities Lending Counterparty unless a guarantor for the Securities Lending Counterparty's obligations under the Securities Lending Agreements has been obtained; or

(ii)     reduce the percentage of the Aggregate Principal Balance of the Portfolio Collateral lent to the downgraded Securities Lending Counterparty so that the Securities Lending Agreements to which the Securities Lending Counterparty is a party, together with all other Securities Lending Agreements, are in compliance with the requirements relating to the credit ratings of Securities Lending Counterparties; or

(iii)     take any other steps Moody's or S&P may require to cause the Securities Lending Counterparty's obligations under the Securities Lending Agreements to which the Securities Lending Counterparty is a party to be treated by Moody's or S&P, as the case may be, as if the obligations were owed by a counterparty having a rating at least equivalent to the rating that was assigned by Moody's or S&P, as the case may be, to the downgraded Securities Lending Counterparty before its being downgraded.

(d)     In connection with any such direction by the Servicer to enter into a Securities Lending Agreement, the Trustee may receive and rely on an Issuer Order to the effect that the Securities Lending Agreement, and its Securities Lending Counterparty, is each in compliance with the requirements of this Indenture (including the definition of "Securities Lending Counterparty"). The Issuer and the Trustee may enter into any Securities Lending Agreement at the instruction of the Servicer, and deliver and accept delivery and return of any Portfolio Collateral pursuant to the Securities Lending Agreement, or pursuant to instructions from the Servicer in connection with the Securities Lending Agreement. The Trustee may take any actions and exercise any rights and remedies under any Securities Lending Agreement that the Servicer instructs. The Trustee need not enter into any Securities Lending Agreement that would in its judgment, subject it to any liability, whether financial or otherwise, or cause it to incur or subject it to risk of any cost or disbursement for which it is not, in its judgment, adequately indemnified, or that would impose on it any obligations or administrative burdens that are unacceptable to it. The Servicer shall instruct the Trustee in writing with respect to the administration of any Securities Lending Agreement (including with respect to any default and the exercise of rights under it). The Trustee shall not have any responsibility for evaluating the

sufficiency, validity, or acceptability of any Securities Lending Agreement or for the qualifications or eligibility of any Securities Lending Counterparty. Nothing in this Indenture shall be construed to cause the Trustee to have any fiduciary duties to any Securities Lending Counterparty.

So long as any Portfolio Collateral is on loan pursuant to a Securities Lending Agreement, (a) the Trustee shall have no liability for any failure or inability on its part to receive any information or take any action with respect to the Portfolio Collateral because of its being on loan (including any failure to take action with respect to a notice of redemption, consent solicitation, exchange or tender offer, or similar corporate action), and (b) the lent Portfolio Collateral shall not be disqualified for return to the Trustee as an item of Portfolio Collateral by any change in circumstance or status during the time while on loan (including any change that would cause the Portfolio Collateral to be ineligible for purchase by the Issuer under this Indenture if applied to a proposed purchase of it in the open market at the time of its return from loan).

## ARTICLE VIII

## SUPPLEMENTAL INDENTURES

Section 8.1. <u>Supplemental Indentures Without Consent of Noteholders.</u>

Without the consent of the Holders of any Notes, but with the consent of the Servicer, each Hedge Counterparty (to the extent the amendment would have a material adverse effect on such Hedge Counterparty), the Co-Issuers and the Trustee, at any time, may enter into one or more indentures supplemental hereto, in form satisfactory to the Trustee, for any of the following purposes:

(1) to correct or amplify the description of any property at any time subject to the lien of this Indenture, or better to assure, convey and confirm unto the Trustee any property subject or required to be subjected to the lien of this Indenture, or to subject to the lien of this Indenture additional property;

(2) to evidence the succession of another Person to the Issuer or the Co-Issuer, and the assumption by any such successor of the covenants of the Issuer or the Co-Issuer contained herein and in the Notes or the Combination Notes;

(3) to add to the covenants of the Issuer, the Co-Issuer or the Trustee, for the benefit of the Holders of the Notes and the Combination Notes, or to surrender any right or power herein conferred upon the Issuer or the Co-Issuer;

(4) to Grant any property to the Trustee;

(5) to evidence and provide for the acceptance of appointment hereunder by a successor Trustee and to add to or change any of the provisions of this Indenture as shall be necessary to facilitate the administration of the Trust Estate by more than one Trustee, pursuant to the requirements of Section 6.9 or 6.10 hereof;

(6)    to cure any ambiguity, or to correct, modify or supplement any provision which is defective or inconsistent with any other provision herein;

(7)    to take any action necessary or helpful to prevent the Issuer or the Trustee from becoming subject to any withholding or other taxes or assessments or to reduce the risk that the Issuer will be engaged in a United States trade or business or that the Issuer (or the beneficial owners thereof) will be subject to United States income tax on a net income basis;

(8)    to correct any manifest error in any provision hereof upon receipt by the Trustee of written direction from the Issuer or Co-Issuer (as to which the Trustee may rely) describing in reasonable detail such error and the modification necessary to correct such error; or

(9)    to effectuate the provisions of Section 2.12 hereof *provided* that such amendment shall not, as evidenced by an Officer's Certificate of the Issuer, adversely affect in any material respect the interests of any Noteholder; or

(10)    to facilitate the delivery and maintenance of the Notes in accordance with the requirements of DTC, Euroclear or Clearstream;

(11)    to authorize the appointment of any listing agent, Transfer Agent, Paying Agent or additional registrar for any Class of Notes required or advisable in connection with the listing of the Notes on the Irish Stock Exchange or any other stock exchange and otherwise to amend this Indenture to incorporate any changes required or requested by any governmental authority, stock exchange authority, listing agent, Transfer Agent, Paying Agent or additional registrar for such Notes in connection therewith;

(12)    to modify the restrictions on and procedures for resale and other transfer of the Notes or the Combination Notes in accordance with any change in any applicable law or regulation (or the interpretation thereof) or to enable the Co-Issuers to rely upon any less restrictive exemption from registration under the Securities Act or the Investment Company Act or to remove restrictions on resale and transfer to the extent not required thereunder;

(13)    notwithstanding anything contained in clause (12), to modify the restrictions on, and procedures for, resale and transfer of the Notes in accordance with any change in ERISA;

(14)    evidence the addition of an additional issuer or of a wholly owned subsidiary of the Issuer that, in either case, will acquire securities from the Issuer and pledge its assets to secure the obligations of the Issuer secured by the Trust Estate, to the extent necessary to permit the Issuer to comply with the Bank Holding Company Act of 1956, as amended, and the rules and regulations thereunder or any other statute, rule or regulation applicable to the Issuer, and the assumption by any such additional issuer or subsidiary of the covenants and obligations of the Issuer in this Indenture; or

(15)    prevent the Issuer from becoming an "investment company" as defined in the Investment Company Act or better assure compliance with the requirements of Rule 3a-7 thereunder; *provided* that, with respect to this clause (15) only, as a condition to the effectiveness of any such supplemental indenture, each of the Issuer, the Trustee and Bear Stearns shall have (A) satisfied the Rating Condition with respect to such supplemental indenture and (B) received a customary, unqualified opinion of counsel from a nationally recognized law firm (which may be supported as to factual matters by any relevant certificates or other documents necessary or advisable in the judgment of counsel delivering such opinion) providing that, after giving effect to such supplemental indenture, the Issuer is exempt from registration as an "investment company" under the Investment Company Act;

*provided further* that (A) such amendment for any matters described in clauses (1) through (14) shall not, as evidenced by an Opinion of Counsel (which may be supported as to factual matters by any relevant certificates or other documents necessary or advisable in the judgment of counsel delivering such opinion), adversely affect in any material respect the interests of any Noteholder and (B) no amendment shall be made that would cause the Issuer to register as an "investment company" under the Investment Company Act.  The Trustee shall be entitled to receive and rely upon an opinion of counsel to the effect that a proposed supplemental indenture does not materially adversely affect the interests of the Noteholders of any Class of Notes or the interest of the Preferred Shareholders; *provided* that any such opinion of counsel may rely on an officer's certificate covering any relevant factual matters.

The Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations that may be therein contained.  At the cost of the Issuer, the Trustee shall provide to the Servicer, the Cap Provider and for so long as any Notes or Combination Notes are then rated, each Rating Agency then rating any Notes or Combination Notes a copy of any proposed supplemental indenture at least 10 days prior to the execution thereof by the Trustee and request written confirmation that the entering into of such supplemental indenture satisfies the Rating Condition. The Trustee shall not enter into any such supplemental indenture if such supplemental indenture does not satisfy the Rating Condition, and, as soon as practicable after the execution by the Trustee and the Issuer of any such supplemental indenture, the Issuer or the Trustee at the request of the Issuer shall provide to the Servicer, each Hedge Counterparty and each Rating Agency then rating any Notes or Combination Notes a copy of the executed supplemental indenture.

In addition, upon the proposal of the Servicer, on behalf of the Issuer, and subject to the consent of at least a Majority of the Eligible Preferred Shares of such proposal or at the direction of such Preferred Shares, the Co-Issuers and the Servicer, the Trustee and the Co-Issuers may enter into one or more supplemental indentures (i) in connection with an Optional Redemption by Refinancing involving the issuance of additional notes, to accommodate the issuance of such additional notes and to establish the terms thereof or (ii) in connection with an Optional Redemption by Refinancing involving secured loans, to accommodate borrowings under such secured loans and to establish the terms thereof; *provided* that, if a supplemental indenture is entered into in connection with the issuance of additional notes or incurrence of secured loans related to an Optional Redemption by Refinancing, such supplemental indenture

shall not be effective unless each of the Rating Agencies has (a) if additional notes are issued in substantially the same capital structure as the Notes issued on the Closing Date, (i) provided a Rating Confirmation and (ii) provided a rating to the additional notes to be issued or the secured loans to be incurred as agreed upon by the purchasers of such additional notes in such Optional Redemption by Refinancing or (b) in any other case, provided a rating to the additional notes to be issued or the secured loans to be incurred as agreed upon by the purchasers of such additional notes in such Optional Redemption by Refinancing.

Notwithstanding anything to the contrary contained herein (so long as the Rating Condition has been satisfied), with the consent of the Servicer and, except as provided in this Section 8.1, without the consent of the Holders of any Notes or the Holders of the Combination Notes or Preferred Shares, the Co-Issuers and the Trustee may enter into an indenture or indentures supplemental thereto (other than as may otherwise be permitted under this Indenture): (a) to add additional rows to the Collateral Quality Matrix (other than in accordance with clause (ii) of the second sentence of the definition of "Collateral Quality Matrix"); (b) to change the definition of Collateral Quality Formula (and any related definitions), (c) to change the definition of Weighted Average Life Requirement (and any related definitions), (d) to change the definition of Minimum Average Recovery Rate Test (and any related definitions) and (e) to change the definition of S&P CDO Monitor Test (and any related definitions); *provided* that the Trustee must receive the consent of a Majority of the Controlling Class with respect to any indenture or supplemental indenture with respect to items (a) (other than in accordance with clause (ii) of the second sentence of the definition of "Collateral Quality Matrix"), (b), (c), (d) and (e) above.

Section 8.2.　Supplemental Indentures with Consent of Noteholders.

With the consent of the Requisite Noteholders, the Servicer and the Holders of the Preferred Shares, to the extent described in the Paying and Transfer Agency Agreement, each Hedge Counterparty (to the extent the amendment would have a material adverse effect on each such Hedge Counterparty), the Co-Issuers and the Trustee may enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, this Indenture or of modifying in any manner the rights of the Holders of the Notes under this Indenture; *provided* that, notwithstanding any Amendment Buy-Out Option described in Section 9.4(b), no such supplemental indenture shall, without the consent of each Noteholder of each Class adversely affected thereby:

(1)　change the Final Maturity Date or Payment Date of any Note, or reduce the principal amount, notional principal amount or stated amount thereof, as the case may be, or the means of determining the Applicable Periodic Rate, the Optional Redemption Price, the Special Redemption Price, the Tax Event Redemption Price or the Mandatory Redemption Price, as applicable, with respect thereto, change the provisions of this Indenture relating to the application of proceeds of the Trust Estate to the payment of the Notes or the Combination Notes or change the jurisdiction where any Note or Combination Note is payable, or the coin or currency in which, any Note, Combination Note or any amount thereunder is payable, or impair the right to institute suit for the enforcement of any such payment on or after the maturity thereof;

(2)     reduce the percentage in Aggregate Principal Amount, the consent of the Holders of which is required for the execution of any such supplemental indenture, or the consent of the Holders of which is required for any waiver of compliance with certain provisions of this Indenture or certain Events of Default hereunder and their consequences provided for in this Indenture;

(3)     impair or adversely affect the Trust Estate except as otherwise permitted herein;

(4)     permit the creation of any lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Trust Estate or terminate the lien of this Indenture on any property at any time subject hereto (other than pursuant to the terms of this Indenture) or deprive the Holder of any Note or any other party expressly secured hereby of the security afforded by the lien of this Indenture;

(5)     reduce the percentage of the Aggregate Principal Amount of the Notes whose Holders must direct the Trustee to preserve the Trust Estate or must consent before any request is made to rescind the Trustee's election to preserve the Trust Estate pursuant to Section 5.5 hereof, or to sell or liquidate the Trust Estate pursuant to Section 5.4, 5.5 or 9.7 hereof or modify the requirement for consent of any other party to which the right to consent is expressly granted hereby;

(6)     modify any of the provisions of this Section or Section 5.15 hereof, except to increase any such percentage or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Note affected thereby;

(7)     modify the provisions of Article XI hereof or the definition of the term "Holder," "Noteholder," "Majority Noteholders," "Majority Preferred Shareholders," "Requisite Noteholders" or of the term "Outstanding";

(8)     amend any provision of this Indenture relating to the institution of proceedings for the Issuer or the Co-Issuer to be adjudicated as bankrupt or insolvent, or the consent by the Issuer or the Co-Issuer to the institution of bankruptcy or insolvency proceedings against it, or the filing with respect to the Issuer or the Co-Issuer of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Code or any other similar applicable law, or the consent by the Issuer or the Co-Issuer to the filing of any such petition as to the appointment of a receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, respectively;

(9)     amend any provision of this Indenture or other such document that provides that the obligations of the Co-Issuer or the Issuer, as the case may be, are non-recourse obligations of the Co-Issuer or the Issuer, respectively, payable solely from the Collateral in accordance with the terms hereof; or

(10)    modify any of the provisions of this Indenture in such a manner as to affect the calculation of the amount or timing of any payment of interest or principal

due on any Note or Combination Note on any Payment Date (including the calculation of any of the individual components of such calculation) or to affect the rights of the Holders of Notes or Combination Notes to the benefit of any provisions for the redemption of such Notes or Combination Notes contained herein.

With respect to any action that requires consent from 100% of the Noteholders, if any Noteholder has notified the Trustee in writing that pursuant to such Noteholder's organizational documents or other documents governing such Noteholder's actions, the Noteholder is not permitted to take any affirmative action approving, rejecting or otherwise acting upon any Issuer request under the Indenture, the failure by such Noteholder to consent to or reject any such requested action will be deemed a consent by such Noteholder to the requested action. In addition, any consent required from a Noteholder or a Holder of a Preferred Share may be evidenced by one or more instruments (which may be an electronic document, including, but not limited to, in the form of email, to the extent permitted by applicable law), signed by Noteholders or Holders of Preferred Shares in person or by agents duly appointed in writing (*provided* that no signature shall be required on electronic documents, including, but not limited to, in the form of email to the extent permitted by law).

Not later than 15 Business Days prior to the execution of any proposed supplemental indenture pursuant to this Section, the Trustee shall mail to the Servicer and, so long as any Notes or Combination Notes are then rated by any Rating Agency, to each such Rating Agency, a copy of such supplemental indenture and, if any Notes or Combination Notes are then rated, prior to the execution of the proposed supplemental indenture, the Rating Condition must be satisfied with respect to such supplemental indenture.

Except for any proposed amendment that would affect the terms of the Combination Notes as such, Holders of the Combination Notes shall be entitled to vote under this Section 8.2 only as Holders of the related Component Securities.

It shall not be necessary in connection with any consent of Noteholders under this Section for the Noteholders to approve the specific form of any proposed supplemental indenture, but it shall be sufficient if such consent shall approve the substance thereof.

In the event that any supplemental indenture is consented to by the Issuer, the Co-Issuer and 100% of the Aggregate Outstanding Amount of each Class of Notes and the Rating Condition is satisfied or is specifically waived by all consenting parties, all conditions precedent to the execution of such supplemental indenture shall be deemed satisfied, the execution of such supplemental indenture shall be authorized or permitted by this Indenture, and the Trustee shall execute and accept the additional trusts created by such supplemental indenture pursuant to this Article VIII or modification thereby of the trusts created by this Indenture without obtaining an Opinion of Counsel; *provided* that that the Trustee may, but shall not be obligated to, enter into any such supplemental indenture that affects the Trustee's own rights, duties or immunities under this Indenture or otherwise. The Servicer shall not be bound by any amendment or supplement to this Indenture that would reduce the rights, decrease the fees or other amounts payable to it under this Indenture or increase the duties or obligations of the Servicer unless the Servicer consents to it in writing, such consent not to be unreasonably withheld or delayed. The Servicer shall follow any amendment or supplement to this Indenture by which it is bound of which it has

received written notice from the time it receives a copy of the amendment from the Issuer or the Trustee.

Promptly after the execution by the Co-Issuers and the Trustee of any supplemental indenture pursuant to this Section 8.2, the Issuer or the Trustee at the request of the Issuer shall deliver to the Holders of the Notes, the Servicer, each Rating Agency then rating any Notes a copy thereof.

Section 8.3.    Execution of Supplemental Indentures.

In executing or accepting the additional trusts created by any supplemental indenture permitted by this Article VIII or the modifications thereby of the trusts created by this Indenture, the Trustee shall be entitled to receive, and (subject to Section 6.3(d) hereof) shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture, and that all conditions precedent applicable thereto under this Indenture have been satisfied. The Trustee may, but shall not be obligated to, enter into any such supplemental indenture which affects the Trustee's own rights, duties or immunities under this Indenture or otherwise.

Section 8.4.    Effect of Supplemental Indentures.

Upon the execution of any supplemental indenture under this Article VIII, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Notes and Combination Notes theretofore and thereafter authenticated and delivered hereunder shall be bound thereby.

Section 8.5.    Reference in Notes and Combination Notes to Supplemental Indentures.

Notes and Combination Notes authenticated and delivered after the execution of any supplemental indenture pursuant to this Article VIII may, and if required by the Trustee shall, bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture. If the Issuer shall so determine, new Notes and Combination Notes, so modified as to conform in the opinion of the Trustee and the Issuer to any such supplemental indenture, may be prepared and executed by the Issuer and authenticated and delivered by the Trustee in exchange for Outstanding Notes and Combination Notes.

## ARTICLE IX

## REDEMPTION; TERMINATION OF TRUST

Section 9.1.    Optional Redemption.

(a)    The Notes shall be redeemable, in whole but not in part, by the Co-Issuer or the Issuers, as applicable, at the direction of the Holders of at least 66-2/3% of the outstanding Eligible Preferred Shares on any Payment Date after the Non-Call Period at the Optional Redemption Price (such redemption of all the Notes, an "Optional Redemption by Liquidation"). No redemption pursuant to this Section 9.1(a) shall occur unless all Outstanding Notes are

redeemed, all payments, fees and expenses are paid in full on the date of such redemption, all amounts due to or advanced by any Hedge Counterparty under any Hedge Agreement have been paid or reimbursed and the applicable notice requirements provided in the Paying and Transfer Agency Agreement have been satisfied.

(b)     Any Class of Notes may be redeemed in whole but not in part, on any Payment Date after the Non-Call Period from the proceeds of a Refinancing (the "Refinancing Proceeds") with the consent of the Holders of at least a Majority of the Eligible Preferred Shares or at the direction of such Holders of Preferred Shares if the Servicer, on behalf of the Issuer, gives written notice thereof to the Holders of all the Preferred Shares (with a copy to the Trustee, the Paying and Transfer Agent and Rating Agencies) at least 30 days prior to the Payment Date fixed by the Issuer for such redemption (such date, the "Refinancing Date"), by obtaining a loan or an issuance of a replacement class of notes, the terms of which loan or issuance will be negotiated by, and acceptable to, the Servicer, on behalf of the Issuer, from one or more financial institutions or purchasers (which may include the Servicer or its Affiliates) selected by the Servicer (a refinancing provided to such loan or issuance, a "Refinancing" and a redemption of the Notes in connection with such Refinancing, an "Optional Redemption by Refinancing") and, if such Refinancing has not been directed by a Majority of the Eligible Preferred Shares, such proposal is approved such Majority of the Preferred Shares prior to the Refinancing Date.  The Issuer shall obtain a Refinancing only if the Servicer determines to its satisfaction (and so notifies the Trustee in writing) that: (i) the principal amount of any obligations providing the Refinancing is no greater than the principal amount of the Notes being redeemed plus the fees and administrative expenses of the Issuer related to the Refinancing; (ii) the stated maturity of the obligations providing the Refinancing is no earlier than the Stated Maturity of the Notes being redeemed; (iii) the interest rate payable in respect of the obligations providing the Refinancing is less than the interest rate payable on the Notes being redeemed; (iv) the agreements relating to the Refinancing contain non-recourse and non-petition provisions, investor qualification provisions and transfer restrictions equivalent to those applicable to the Notes being redeemed, as set forth in the Indenture; (v) the proceeds from the Refinancing will be at least sufficient to redeem the applicable Notes (at the Optional Redemption Price therefor) and to pay any fees and administrative expenses of the Issuer related to the Refinancing; (vi) the Refinancing Proceeds will be used (to the extent necessary) to redeem the applicable Notes; (vii) the Rating Condition for each Rating Agency shall be satisfied (other than with respect to the Notes being redeemed); (viii) the obligations providing the Refinancing are subject to the Priority of Payments and do not rank higher in priority pursuant to the Priority of Payments than the Class of Notes being redeemed; and (ix) the expenses in connection with the Refinancing have been paid or will be adequately provided for.  Any Refinancing Proceeds shall not constitute Collateral Interest Collections or Collateral Principal Collections but shall be applied directly on the related Refinancing Date pursuant to the Indenture to redeem the Notes being refinanced without regard to the Priority of Payments; *provided* that, to the extent that any Refinancing Proceeds are not applied to redeem the Notes being refinanced, such Refinancing Proceeds shall be treated as Collateral Principal Collections or, if the Rating Condition is satisfied with respect to such application, as Collateral Interest Collections.  None of the Co-Issuers, the Trustee or any other Person shall be liable to the Holders of the Preferred Shares for the failure to issue additional notes or to obtain secured loans.

(c)     The election of the Issuer to redeem any Notes pursuant to this Section 9.1 shall be set forth in an Issuer Order, given to the Trustee in accordance with Section 9.6 hereof, directing the Trustee to make the payment of the Optional Redemption Price for all (in the case of an Optional Redemption by Liquidation) or the selected Class (in the case of an Optional Redemption by Refinancing) of the Notes, as applicable, from funds in the Collection Account and/or from monies deposited with the Trustee by the Issuer pursuant to Section 9.8 hereof.

(d)     The Issuer shall, simultaneously with electing to redeem Notes under this Section 9.1, set the Optional Redemption Date and the Redemption Record Date for any redemption pursuant to this Section and give notice thereof to the Trustee pursuant to Section 9.6 hereof.

(e)     The Issuer shall have the option to withdraw the notice of redemption until (i) the earlier of the fifth Business Day prior to the proposed Optional Redemption Date and the date on which a forward purchase contract is entered into pursuant to Section 9.8 or (ii) the fifth Business Day prior to the proposed Refinancing Date, if (A) in the case of an Optional Redemption by Liquidation, the Servicer shall be unable to deliver the forward purchase contract which satisfies the terms of Section 9.8 to the Trustee, in form satisfactory to the Trustee or (B) in the case of an Optional Redemption by Refinancing, the Servicer does not make the determinations required pursuant to Section 9.1(b) or (C) in the case of any Optional Redemption, at least a Majority of the Eligible Preferred Shares direct such notice to be withdrawn, in each case by written notice to the Trustee, the Servicer, each Class of Notes and, for so long as any Class of Notes and the Rating Agencies is listed on any stock exchange and the rules of such stock exchange so require, to such stock exchange, on or prior to such earlier day.

(f)     On the Optional Redemption Date, the Optional Redemption Price shall be distributed pursuant to Section 11.1(d) after payment of all amounts required to be paid pursuant to Section 11.1(b).

Section 9.2.     Mandatory Redemption.

If either the Interest Coverage Test or the Overcollateralization Tests (other than with respect to a failure of the Class B-2L Overcollateralization Test) are not satisfied as of any applicable Calculation Date or a Rating Confirmation Failure occurs, all or a portion of the Notes shall be redeemed (or, in the case of the Class B-1L Notes and the Class B-2L Notes, any Periodic Rate Shortfall Amounts shall be paid and then the Notes shall be redeemed) by the Issuer, in the order set forth in Section 11.1 hereof, on the Payment Date immediately following such Calculation Date at the Mandatory Redemption Price (pursuant to the applicable provisions of Sections 11.1 and 11.2 hereof) in an amount sufficient such that the Interest Coverage Test and Overcollateralization Tests are satisfied or a Rating Confirmation is received, as applicable. The amount of any Mandatory Redemption hereunder shall be determined in accordance with the provisions of Section 11.2 hereof.  If on any Payment Date the Class B-2L Overcollateralization Test is not satisfied, 50% of available Interest Proceeds will be applied to pay principal on the Class B-2L Notes and 50% (or, after the Class B-2L Notes are paid in full, 100%) of available Interest Proceeds will be applied sequentially to pay principal on the Notes according to the priorities described herein until the Class B-2L Overcollateralization Test is satisfied. In

addition, Principal Proceeds will be applied sequentially to pay principal on the Notes, as set forth in clause SECOND of Section 11.1(c)(ii) and 11.1(c)(iii) herein.

Section 9.3. Additional Collateral Deposit Requirement.

On each Payment Date after the second Payment Date, the Additional Collateral Deposit Requirement shall be applied by the Issuer in the order set forth in Section 11.1 hereof.

Section 9.4. Special Redemption; Amendment Buy-Out

(a)     The Notes shall be redeemable in part on any Payment Date during the Revolving Period at the option of the Issuer, as directed by and at the discretion of the Servicer, to the extent more than U.S. $2,000,000 of Collateral Principal Collections held in the Collection Account are not applied to the purchase of Additional Portfolio Collateral satisfying the criteria contained in Section 11.3 hereof by the earlier of the last day of the next succeeding Due Period or the last day of the Revolving Period, in the order and priority set forth in Section 11.1 hereof.

(b)     In the case of any supplemental indenture pursuant to Section 8.2 that requires the consent of one or more Holders of Notes or Preferred Shares, the Amendment Buy-Out Purchaser shall have the right, but not the obligation, to purchase from Non-Consenting Holders (which shall not include any Holders of the Class A-1LA Notes unless such Holders consent to being designated as "Non-Consenting Holders," as described below) all Notes or Preferred Shares held by such Holders of the Class of Notes or Preferred Shares whose consent was solicited with respect to such supplemental indenture (the "Amendment Buy-Out Option") for the applicable Amendment Buy-Out Purchase Price; *provided, however*, that the Amendment Buy-Out Purchaser may not exercise the Amendment Buy-Out Option during the Non-Call Period in connection with a proposed amendment to reduce the rate of interest on any Security, as applicable, or to change the earliest date on which Notes of any Class or Preferred Shares may be redeemed at the option of the Issuer; *provided further*, that notwithstanding the definition of Non-Consenting Holder, any Holder of Notes (other than the Class A-1LA Notes) or Preferred Shares who fails to respond to any such consent solicitation shall be deemed to have consented to any such supplemental indenture.  Notwithstanding the foregoing, during the Non-Call Period, "Non-Consenting Holder" shall exclude any Holder of Class A-1LA Notes (unless such Holder has consented in writing to be designated as a Non-Consenting Holder) and the Amendment Buy-Out Option shall not be applicable to such Class A-1LA Notes.  If the Amendment Buy-Out Option is exercised, the Amendment Buy-Out Purchaser must purchase all such Notes or Preferred Shares of Non-Consenting Holders, regardless of the applicable percentage of the Aggregate Outstanding Amount of the Notes or Preferred Shares the consent of whose Holders is required for such supplemental indenture (an "Amendment Buy-Out").  By its acceptance of its Securities or Preferred Shares hereunder, each Holder of Notes or Preferred Shares agrees that if the Amendment Buy-Out Option is exercised, any Non-Consenting Holder will be required to sell its applicable Notes or Preferred Shares to the Amendment Buy-Out Purchaser.  Neither the Amendment Buy-Out Purchaser nor any other Person shall have any liability to any Holder or Beneficial Owner of Securities or Preferred Shares as a result of an election by the Amendment Buy-Out Purchaser not to exercise the Amendment Buy-Out Option.  For the avoidance of doubt, (i) nothing described above or in the Indenture shall in any way limit or restrict the rights of the Holders of the Class A-1LA Notes to consent or withhold their consent to a supplemental

indenture or to otherwise vote their interest both during and after the Non-Call Period and (ii) the Trustee shall have no responsibility for overseeing the Servicer's compliance with the Amendment Buy-Out provisions herein.

(c) All purchases made pursuant to an Amendment Buy-Out Option individually and in the aggregate must comply with the applicable transfer restrictions for the relevant Securities or Preferred Shares set forth herein and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency).

Section 9.5. <u>Tax Event Redemption.</u>

(a) The Notes shall be redeemable, in whole but not in part, by the Issuer at the direction of a Majority of the Preferred Shares or a Majority of the Controlling Class (but only if the Aggregate Principal Balance of Portfolio Collateral is less than 100% of the Class A-1L Notes) on any Payment Date at the Tax Event Redemption Price, if as a result of (i) change in tax law, rule or regulation or the interpretation thereof, the payments to be received on the Portfolio Collateral are reduced as a result of the imposition of withholding tax, (ii) the Issuer is otherwise subjected to tax such that the income of the Issuer is reduced in an amount determined by such holders of Preferred Shares to be material, (iii) (A) one or more items of Portfolio Collateral that were not subject to withholding tax when the Issuer committed to purchase them have become subject to withholding tax or the rate of withholding has increased on one or more items of Portfolio Collateral that were subject to withholding tax when the Issuer committed to purchase them and (B) in any Due Period the aggregate of the payments subject to withholding tax on new withholding tax obligations and the increase in payments subject to withholding tax on increased rate withholding tax obligations, in each case to the extent not "grossed-up" (on an after-tax basis) by the related obligor, represent 5% or more of Interest Proceeds for the Due Period, or (iv) (A) a Hedge Counterparty being required to deduct or withhold from any payment to the Issuer under the related Hedge Agreement for or on account of any tax for whatever reason and such obligor or Hedge Counterparty is not required to pay to the Issuer such additional amount as is necessary to ensure that the net amount actually received by the Issuer (free and clear of taxes, whether assessed against such obligor, such Hedge Counterparty or the Issuer) will equal the full amount that the Issuer would have received had no such deduction or withholding occurred or (B) the Issuer being required to pay to the Hedge Counterparty an additional amount for or on account of any tax for whatever reason, the Issuer does not receive the full amount under a Hedge Agreement that it would otherwise be entitled to receive, or (v) taxes, fees, assessments or other similar charges are imposed on the Issuer or the Co-Issuer in an aggregate amount in any 12-month period in excess of $2,000,000, other than liabilities for withholding taxes included in clause (iii) above. No redemption pursuant to this Section 9.5 shall occur unless all Outstanding Notes are redeemed, unless all payments, fees and expenses are paid in full on the date of such redemption, all amounts due to or advanced by any Hedge Counterparty under any Hedge Agreement have been paid or reimbursed and unless all other payments, fees and expenses are paid in full.

(b) The election of the Issuer to redeem any Notes pursuant to this Section 9.5 shall be set forth in an Issuer Order, given to the Trustee in accordance with Section 9.6 hereof, directing the Trustee to make the payment of the Tax Event Redemption Price from funds in the

Collection Account and/or from monies deposited with the Trustee by the Issuer pursuant to Section 9.8 hereof.

(c)     The Issuer shall, simultaneously with electing to redeem Notes under this Section 9.5, set the Tax Event Redemption Date and the Redemption Record Date for any redemption pursuant to this Section 9.5 and give notice thereof to the Trustee pursuant to Section 9.6 hereof.

(d)     The Issuer shall have the option to withdraw the notice of redemption until the earlier of the fifth Business Day prior to the proposed Tax Event Redemption Date and the date on which a forward purchase contract is entered into pursuant to Section 9.8(b) hereof by written notice to the Trustee and the Servicer on or prior to such earlier day.

(e)     On the Tax Redemption Date, the Tax Event Redemption Price shall be distributed pursuant to Section 11.1(d) hereof after payment of all amounts required to be paid pursuant to Section 11.1(b) hereof.

Section 9.6.     Notice to Trustee, Rating Agencies, the Hedge Counterparty and the Servicer.

(a)     The Issuer shall by Issuer Order, in connection with an Optional Redemption pursuant to Section 9.1 or a Tax Event Redemption pursuant to Section 9.5, not later than the twentieth Business Day immediately preceding the proposed Optional Redemption Date or Tax Event Redemption Date, as applicable, notify in writing the Trustee, each Hedge Counterparty, each Rating Agency then rating any Class of Notes and the Servicer of such proposed Optional Redemption Date or Tax Event Redemption Date, as applicable, and the proposed Redemption Record Date and Optional Redemption Price for each Class of Notes.

(b)     If any Mandatory Redemption is required pursuant to Section 9.2 hereof, the Issuer shall, not later than the third Business Day after the related Calculation Date, notify in writing the Trustee, each Rating Agency then rating any Class of Notes, the Hedge Counterparty, the Servicer and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent that such redemption is required and the amount of the Notes of each Class required to be redeemed pursuant to the provisions of Section 11.2 hereof.

(c)     If any Special Redemption is required pursuant to Section 9.4 hereof, the Issuer shall, not later than twentieth Business Day preceding the proposed Special Redemption Date, notify in writing the Trustee, each Rating Agency then rating any Class of Notes, the Hedge Counterparty,  the Servicer and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent that such proposed redemption is required and the amount of the Notes of each Class to be redeemed.

Section 9.7.     Notice of Optional Redemption and Tax Event Redemption by the Issuer.

(a)     If notice thereof has been received by the Trustee from the Issuer pursuant to Section 9.6 hereof, notice of an Optional Redemption shall be given by the Trustee by first-class mail, postage prepaid, mailed not less than twenty calendar days prior to the proposed

Redemption Record Date, to each Holder of Notes to be redeemed at the address in the Note Register (with a copy to the Rating Agencies at the addresses specified in Section 10.7 hereof), and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent.

All notices of Optional Redemption shall state: the proposed Optional Redemption Date; the proposed Redemption Record Date; and that on such proposed Optional Redemption Date, all Outstanding Notes are to be redeemed and paid in full and that applicable interest thereon shall cease to accrue on the date specified in the notice and the place where such Notes may be surrendered for payment of the Optional Redemption Price, which shall be the agency of the Trustee to be maintained as provided in Section 7.2 hereof; and that the Issuer may withdraw such election at any time on or prior to the earlier of the Business Day prior to such proposed Optional Redemption Date and the date before which a forward purchase contract is entered into pursuant to Section 9.8(a) hereof.

At the cost of the Issuer, the Trustee shall give notice of any withdrawal of the notice of redemption pursuant to Section 9.1(d) hereof (to the extent feasible) by overnight courier guaranteeing next day delivery, sent not later than the third Business Day prior to the previously proposed Optional Redemption Date, to each Holder of Notes to be redeemed at the address in the Note Register, and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent.

Notice of Optional Redemption of the Notes shall be given by the Issuer or, at the Issuer's request, by the Trustee in the name of the Issuer and at the expense of the Issuer. Failure to give notice of redemption or notice of withdrawal, or any defect therein, to any Holder of any Note shall not impair or affect the validity of the redemption of the Notes or give rise to any claim based upon such failure or defect.

(b) If notice thereof has been received by the Trustee from the Issuer pursuant to Section 9.6 hereof, notice of a Tax Event Redemption shall be given by the Trustee by first-class mail, postage prepaid, mailed not less than twenty calendar days prior to the proposed Redemption Record Date, to each Holder of Notes to be redeemed at the address in the Note Register (with a copy to the Rating Agencies at the addresses specified in Section 10.7 hereof), and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent.

All notices of a Tax Event Redemption shall state: the proposed Tax Event Redemption Date; the proposed Redemption Record Date; and that on such proposed Tax Event Redemption Date, all of the Notes (to the extent of the Aggregate Principal Amount) are to be redeemed and paid in full and that interest thereon shall cease to accrue on the date specified in the notice and the place where such Notes may be surrendered for payment of the Tax Event Redemption Price, which shall be the agency of the Trustee to be maintained as provided in Section 7.2 hereof; and that the Issuer may withdraw such election at any time on or prior to the earlier of the fifth Business Day prior to such proposed Tax Event Redemption Date and the date before which a forward purchase contract is entered into pursuant to Section 9.8(b) hereof.

At the cost of the Issuer, the Trustee shall give notice of any withdrawal of the notice of redemption pursuant to Section 9.5 hereof (to the extent feasible) by overnight courier guaranteeing next day delivery, sent not later than the third Business Day prior to the previously

proposed Tax Event Redemption Date, to each Holder of Notes to be redeemed at the address in the Note Register (with a copy to the Rating Agencies at the addresses specified in Section 10.7 hereof), and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent.

Notice of Tax Event Redemption of the Notes shall be given by the Issuer or, at the Issuer's request, by the Trustee in the name of the Issuer and at the expense of the Issuer. Failure to give notice of redemption or notice of withdrawal, or any defect therein, to any Holder of any Note shall not impair or affect the validity of the redemption of the Notes or the withdrawal thereof or give rise to any claim based upon such failure or defect.

Section 9.8.    Deposit of Optional Redemption Price and Tax Event Redemption Price.

(a)    In the case of an Optional Redemption, on or before the fifth Business Day preceding the proposed Optional Redemption Date contained in the notice of redemption as provided in Section 9.6 hereof, the Issuer shall deposit with the Trustee cash or Eligible Investments maturing no later than the Business Day prior to the Optional Redemption Date (unless such Eligible Investments are issued by the Person acting as Trustee, in which event they may mature on the Optional Redemption Date), or any combination thereof, in an amount sufficient to provide for payment of the Optional Redemption Price with respect to the Outstanding Notes and all amounts due under Sections 11.1(b) and 11.1(d) hereof. The Issuer may use all available funds in the Collection Account to provide for payment of the Optional Redemption Price in accordance with Section 11.1 hereof.   In the event that there are not sufficient available funds in the Collection Account as of the date the notice of redemption is sent out pursuant to Section 9.6 hereof to pay the Optional Redemption Price on the Optional Redemption Date in accordance with Sections 11.1(b) and 11.1(d) hereof, the Servicer shall give the Trustee written direction to sell Portfolio Collateral in an amount sufficient to provide available funds to pay the Optional Redemption Price in full pursuant to Sections 11.1(b) and 11.1(d) hereof, and shall give the Issuer written direction to enter into, as of a date which is not later than five (5) Business Days prior to the Optional Redemption Date, forward contracts (each of which shall provide for "payment versus delivery" and shall direct that payment be made to the Trustee) with a financial institution rated "A-1+" by Standard & Poor's and "P-1" by Moody's to sell such Portfolio Collateral for settlement at least three Business Days prior to the Optional Redemption Date, and shall provide a copy of such contract to the Trustee prior to such Business Day preceding such redemption date; and pursuant to such instruction, the Trustee shall release and sell such Portfolio Collateral for purposes of such redemption.  In determining whether the proceeds of any Optional Redemption will be sufficient to pay the Optional Redemption Price on the Optional Redemption Date, the Issuer and the Trustee may rely on the Market Value of the Portfolio Collateral when entering into any forward purchase agreements.

(b)    In the case of a Tax Event Redemption, on or before the fifth Business Day preceding the proposed Tax Event Redemption Date contained in the notice of redemption as provided in Section 9.6 hereof, the Issuer shall deposit with the Trustee cash or Eligible Investments maturing no later than the Business Day prior to the Tax Event Redemption Date (unless such Eligible Investments are issued by the Person acting as Trustee, in which event they may mature on the Tax Event Redemption Date), or any combination thereof, in an amount

sufficient to provide for payment of the Tax Event Redemption Price with respect to the Outstanding Notes and all amounts due under Sections 11.1(b) and 11.1(d) hereof. The Issuer may use all available funds in the Collection Account to provide for payment of the Tax Event Redemption Price in accordance with Section 11.1 hereof. In the event that there are not sufficient available funds in the Collection Account as of the date the notice of redemption is sent out pursuant to Section 9.6 hereof to pay the Tax Event Redemption Price on the Tax Event Redemption Date in accordance with Sections 11.1(b) and 11.1(d) hereof, the Servicer shall give the Trustee written direction to sell Portfolio Collateral in an amount sufficient to provide available funds to pay the Tax Event Redemption Price in full pursuant to Sections 11.1(b) and 11.1(d) hereof, and shall give the Issuer written direction to enter into, as of a date which is not later than five Business Days prior to the Tax Event Redemption Date, forward contracts (each of which shall provide for "payment versus delivery" and shall direct that payment be made to the Trustee) with a financial institution rated "A-1+" by Standard & Poor's and "P-1" by Moody's to sell such Portfolio Collateral for settlement at least three Business Days prior to the Tax Event Redemption Date, and shall provide a copy of such contract to the Trustee prior to such third Business Day preceding such redemption date; and pursuant to such instruction, the Trustee shall release and sell such Portfolio Collateral for purposes of such redemption.

Section 9.9.    Notes Payable on Optional Redemption Date.

In the event that notice of Optional Redemption pursuant to Section 9.1 hereof has been given as provided in Section 9.6 hereof and not withdrawn, all Outstanding Notes shall on the Optional Redemption Date become due and payable at the Optional Redemption Price, and (unless the Issuer shall default in the payment of the Optional Redemption Price) all Outstanding Notes shall cease to bear interest on the Optional Redemption Date. Each Holder shall present and surrender its Note at the place specified in the notice of Optional Redemption on or prior to such Optional Redemption Date; *provided* that if there is delivered to the Issuer and the Trustee such security or indemnity as may be required by them to save each of them harmless (an unsecured indemnity agreement of an Institutional Investor organized under the laws of the United States or any state in the United States with a net worth at least twice the amount of the security or indemnity being deemed sufficient to satisfy such security or indemnity requirement) and an undertaking thereafter to surrender such Note, then, in the absence of notice to the Issuer or the Trustee that the applicable Note has been acquired by a protected purchaser, such payment shall be made without presentation or surrender.

If any Note called for redemption shall not be so paid upon surrender thereof for Optional Redemption (or the delivery of the indemnity pursuant to the preceding paragraph), the principal shall, until paid, bear interest from the Optional Redemption Date at the Applicable Periodic Rate.

Section 9.10.    Notes Payable on Mandatory Redemption Date.

In the event of a Mandatory Redemption pursuant to Section 9.2 hereof, principal of the Notes (or, in the case of Class B-1L Notes and the Class B-2L Notes, any Periodic Rate Shortfall Amount and then any principal) in an amount determined pursuant to Section 11.2 hereof shall on the Mandatory Redemption Date become due and payable, and (unless the Issuer

shall default in the payment of the Mandatory Redemption Price) such amounts shall cease to bear interest on the Mandatory Redemption Date.

Section 9.11. Notes Payable on Tax Event Redemption.

In the event that notice of a Tax Event Redemption pursuant to Section 9.5 hereof has been given as provided in Section 9.6 hereof and not withdrawn, all Outstanding Notes shall on the Tax Event Redemption Date become due and payable at the Tax Event Redemption Price, and (unless the Issuer shall default in the payment of the Tax Event Redemption Price) all Outstanding Notes shall cease to bear interest on the Tax Event Redemption Date. Each Holder shall present and surrender its Note at the place specified in the notice of redemption on or prior to such Tax Event Redemption Date; *provided* that if there is delivered to the Issuer and the Trustee such security or indemnity as may be required by them to save each of them harmless (an unsecured indemnity agreement of an Institutional Investor organized under the laws of the United States or any state in the United States with a net worth at least twice the amount of the security or indemnity being deemed sufficient to satisfy such security or indemnity requirement) and an undertaking thereafter to surrender such Note, then, in the absence of notice to the Issuer or the Trustee that the applicable Note has been acquired by a bona fide purchaser, such payment shall be made without presentation or surrender.

If any Note called for a Tax Event Redemption shall not be so paid upon surrender thereof for a Tax Event Redemption (or the delivery of the indemnity pursuant to the preceding paragraph), the principal shall, until paid, bear interest from the Tax Event Redemption Date at the Applicable Periodic Rate.

Section 9.12. Initial Deposit Redemption.

The Class A-1LA Notes shall be subject to Initial Deposit Redemption pursuant to the terms of Section 3.3 hereof.

Section 9.13. Reserved.

Section 9.14. Notes Payable on Special Redemption Date.

In the event of a Special Redemption pursuant to Section 9.4 hereof, principal of the Notes (or, in the case of the Class B-1L Notes and the Class B-2L Notes, any Periodic Rate Shortfall Amount and then any principal) in an amount determined pursuant to Section 11.1 hereof shall on the Special Redemption Date become due and payable and (unless the Issuer shall default in the payment of the Special Redemption Price) such amounts shall cease to bear interest on the Special Redemption Date.

ARTICLE X

ACCOUNTS, ACCOUNTINGS AND RELEASES

Section 10.1.  Collection of Money.

Except as otherwise expressly provided herein, the Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all money and other property payable to or receivable by the Trustee pursuant to this Indenture, including all payments due on the Pledged Securities included in the Trust Estate, in accordance with the terms and conditions of such Pledged Securities.  The Trustee shall segregate and hold all such money and property received by it in trust for the Holders of the Notes and shall apply it as provided in this Indenture.

Section 10.2.  Accounts.

(a)  The Trustee shall, on or prior to the Closing Date, establish with the Securities Intermediary ten non-interest bearing segregated securities accounts (collectively, the "Accounts") which shall be designated as the "Collection Account," the "Collateral Account," the "Reserve Account," the "Initial Deposit Account," the "Expense Reimbursement Account," the "Loan Funding Account," the "Closing Expense Account," the "Securities Lending Account," the "Default Swap Collateral Account," and the "Default Swap Issuer Account," respectively, identified as held in trust for the benefit of the Noteholders and the applicable Secured Parties or, in the case of the Default Swap Collateral Account, as held in trust for the benefit of the related Default Swap Counterparty and, to the extent provided in this Indenture, the other Secured Parties. The Trustee may establish any number of sub-accounts to the Collection Account for its convenience in administering the Accounts and Trust Estate.

Each Account (including any sub-account) shall be a securities account established with the Securities Intermediary in the name of the Trustee in accordance with Section 6.15.

Pursuant to a Servicer Order, a Default Swap Collateral Account shall be established for each Default Swap.  The Trustee shall credit to each such Default Swap Collateral Account on the Closing Date or on the date any such Default Swap is entered into, as applicable, the amount required to secure the obligations of the Issuer in accordance with the terms of the related Default Swap, as directed by the Servicer, which amount shall be at least equal to the amount referred to in paragraph (iv) of the definition of Default Swap, such amounts to be credited to any such Default Swap Collateral Account shall be transferred by the Trustee from the Collection Account or the Initial Deposit Account, as directed by the Servicer.

Amounts credited to a Default Swap Collateral Account shall be maintained in accordance with the terms and provisions of the related Default Swap.  Amounts and property credited to a Default Swap Collateral Account shall be withdrawn by the Trustee and applied to the payment of any amounts payable by, or to the delivery of investment property deliverable by, the Issuer to the related Default Swap Counterparty, as directed by the Servicer, in accordance with the terms of such Default Swap.  Income received on amounts credited to a Default Swap

Collateral Account will be applied in accordance with the terms of the applicable Default Swap to the payment of any periodic amounts owed by the Issuer to the applicable Default Swap Counterparty on the date such amounts are due, as directed by the Servicer. After application of such amounts, any income then contained in such Default Swap Collateral Account will be withdrawn from such Account, upon direction of the Servicer, and credited to the Collection Account for distribution as Collateral Interest Collections. After payment of all amounts owing by the Issuer to a Default Swap Counterparty in accordance with the terms of the related Default Swap (other than any Default Swap Counterparty Termination Payment) the Trustee shall be directed by the Servicer to withdraw all funds and other property credited to the Default Swap Collateral Account related to such Default Swap and credit such funds and other property to the Collection Account, as Collateral Principal Collections (in the case of cash and Eligible Investments) and the Collateral Account (in the case of Portfolio Collateral and other financial assets) for application as Collateral Principal Collections (other than any income thereon which will be Collateral Interest Collections) in accordance with the terms of this Indenture. Any Default Swap Counterparty Termination Payments owed by the Issuer to the Default Swap Counterparty shall be paid solely from amounts available therefor under the priority of payment provisions described herein.

Except for interest on securities credited to a Default Swap Collateral Account payable to the Issuer as described pursuant to the preceding paragraph, funds and other property standing to the credit of a Default Swap Collateral Account will not be considered to be an asset of the Issuer for purposes of the Interest Coverage Test or the Overcollateralization Tests; *provided, however* that the Default Swap that relates to such Default Swap Collateral Account will be considered an asset of the Issuer for such purposes.

If the terms of any Default Swap require the Default Swap Counterparty to secure its obligations with respect to such Default Swap, upon Servicer Order the Trustee will cause to be established a Default Swap Issuer Account in respect of such Default Swap. The Trustee shall credit to any such Default Swap Issuer Account all funds and other property received from the applicable Default Swap Counterparty to secure the obligations of such Default Swap Counterparty in accordance with the terms of such Default Swap.

Funds and other property standing to the credit of any Default Swap Issuer Account will not be considered to be an asset of the Issuer for purposes of the Interest Coverage Test or the Overcollateralization Tests; *provided, however* that the Default Swap that relates to such Default Swap Issuer Account will be considered an asset of the Issuer for such purposes.

In accordance with the terms of the applicable Default Swap, funds and other property standing to the credit of the related Default Swap Issuer Account will be withdrawn by the Trustee, as directed by the Servicer, and applied to the payment of any amount owing by the related Default Swap Counterparty to the Issuer. After payment of all amounts owing by the Default Swap Counterparty to the Issuer in accordance with the terms of the related Default Swap, all funds and other property standing to the credit of the related Default Swap Issuer Account will be withdrawn from such Default Swap Issuer Account and paid or transferred to the related Default Swap Counterparty, as directed by the Servicer, in accordance with the applicable Default Swap.

The Collection Account shall be a segregated securities account (or, at the Trustee's option, may be comprised of two separate, segregated trust accounts, designated for the collection of Collateral Interest Collections and Collateral Principal Collections, respectively), to which money required to be credited to the Collection Account (and Eligible Investments in which such money may be held from time to time, which Eligible Investments shall be acquired and held pursuant to the terms of Section 6.16 hereof) shall be credited.

All Portfolio Collateral Delivered to the Trustee that consists of security entitlements shall be credited to the Collateral Account.

Pursuant to Servicer Order, on or before the date on which the Issuer enters into a Securities Lending Agreement and delivers a copy of it to the Trustee, the Trustee shall create a segregated securities account designated as the Securities Lending Account with respect to any such Securities Lending Agreement. All Securities Lending Collateral posted by any Securities Lending Counterparty and received by the Trustee in support of its respective obligation under a Securities Lending Agreement shall be immediately credited to the Securities Lending Account. The only permitted withdrawal from or application of funds credited to the Securities Lending Account shall be: (i) for application to obligations of the relevant Securities Lending Counterparty to the Issuer under a Securities Lending Agreement if the Securities Lending Agreement becomes subject to early termination or in the exercise of remedies under the related Securities Lending Agreement upon any "event of default" under and as defined in the related Securities Lending Agreement, including liquidating the related Securities Lending Collateral, or (ii) to return the Securities Lending Collateral to the relevant Securities Lending Counterparty when and as required by the relevant Securities Lending Agreement, in each case as directed by the Servicer.

Amounts credited to the Securities Lending Account shall be applied as provided in the preceding paragraph.  To the extent provided in a Securities Lending Agreement, earnings on amounts credited to the Securities Lending Account shall be payable by the Issuer to the related Securities Lending Counterparty, as directed by the Servicer.

Amounts credited to the Securities Lending Account shall not be considered an asset of the Issuer for the purposes of the Interest Coverage Test or the Overcollateralization Tests, but the loaned security or asset that relates to the Securities Lending Account shall be so considered an asset of the Issuer.

The Trustee shall credit to the Collection Account (i) all Collections received and (ii) all amounts otherwise received by it which are required to be credited thereto pursuant to this Indenture, including but not limited to, Section 10.3(e)(i) hereof.

The Trustee shall credit to the Initial Deposit Account (i) the Deposit received on the Closing Date for credit to the Initial Deposit Account pursuant to Section 3.2(e) hereof, (ii) all other amounts received by the Trustee which are required to be credited thereto pursuant to this Indenture, including but not limited to, Sections 3.2(e), 10.3(e)(ii) and 11.3 hereof and (iii) all proceeds received with respect to the sale of the Post-Closing Sale Collateral.

Upon the purchase of any item of Portfolio Collateral that is a Delayed Drawdown Loan or a Revolving Loan, the Trustee (as instructed by the Servicer) shall credit Collateral Principal Collections to the Loan Funding Account in an amount equal to the Issuer's maximum future funding obligations under the terms of such Delayed Drawdown Loan or Revolving Loan (as identified by the Servicer) and the Collateral Principal Collections so credited shall be considered part of the purchase price of such Delayed Drawdown Loan or Revolving Loan for purposes of Article XII hereof. When Collateral Principal Collections are received by the Trustee with respect to a Delayed Drawdown Loan or a Revolving Loan, the amount of such Collateral Principal Collections that may thereafter be re-borrowed under the terms of the Delayed Drawdown Loan or the Revolving Loan shall be credited to the Loan Funding Account.

The Trustee shall credit to the Expense Reimbursement Account (i) on the Closing Date the $50,000 received on the Closing Date for credit to the Expense Reimbursement Account pursuant to Section 3.2(f) hereof, (ii) all other amounts received by the Trustee which are required to be credited thereto from available amounts in the Collection Account pursuant to Section 11.1 hereof and (iii) all amounts received by it which are required to be credited thereto pursuant to Section 10.3(e)(iii) hereof.

Upon receipt, the Trustee shall credit to the Closing Expense Account on the Closing Date the amount specified pursuant to Section 3.2(f) hereof.

In addition, the Issuer may, but under no circumstances shall be required to, credit such monies to the Collection Account as it deems, in its sole discretion, to be advisable in the event that, but for such action, an Event of Default would occur.

All monies, instruments, investment property and other property credited to the Collection Account, the Initial Deposit Account, the Expense Reimbursement Account, the Loan Funding Account, the Closing Expense Account and the Reserve Account pursuant to this Indenture, and all Portfolio Collateral and other property credited to the Collateral Account, shall be held by the Trustee as part of the Trust Estate and shall be applied in the manner set forth herein.

The Trustee shall pay free and clear of the lien of the Indenture, upon receipt (or withdrawal from the Collection Account if previously credited thereto), all Retained Accrued Interest, as directed by Bear Stearns.

(b) Upon Servicer Order (which may be in the form of standing instructions) or, after the occurrence of an Event of Default upon written direction of the Requisite Noteholders, any portion of the monies in the Collection Account, the Initial Deposit Account, the Loan Funding Account, the Expense Reimbursement Account, Reserve Account and the Closing Expense Account in excess of $10,000 (in the aggregate) shall be applied by the Trustee as directed in such Servicer Order (or written direction of Requisite Noteholders, as the case may be) to purchase one or more Eligible Investments, *provided* that Eligible Investments in the Loan Funding Account are to mature no later than one Business Day after the date of such purchase. If the amount in such Accounts is equal to or less than $10,000, such amount shall remain therein and shall not be held in Eligible Investments. The Servicer and Issuer acknowledge that the

selection of Eligible Investments by the Servicer pursuant to the preceding sentence shall be subject to the availability of such Eligible Investment at the institution at which such Account is held. If, prior to the occurrence of an Event of Default, the Servicer shall not have given directions pursuant to this Section 10.2(b) with respect to any amounts in excess of $10,000 for one Business Day, the Trustee, unless otherwise directed in writing by the Issuer within one Business Day, shall invest such monies in Standby Directed Investments (which, in the case of Eligible Investments in the Loan Funding Account, are to mature no later than one Business Day after the date of such purchase). If, after the occurrence of an Event of Default, the Requisite Noteholders shall not have given directions pursuant to this Section 10.2(b) with respect to any amounts in excess of $10,000 for one Business Day, the Trustee shall apply such moneys as fully as practicable to purchase Standby Directed Investments and maturing not later than the earlier of (i) 30 days after the date of such purchase or (ii) the Business Day prior to the next Payment Date (or, in the case of Eligible Investments in the Initial Deposit Account, the Business Day prior to the Effective Date and in the case of Eligible Investments in the Loan Funding Account, one Business Day after the date of such purchase). All income or other gain from such Eligible Investments shall be credited to the Collection Account, the Initial Deposit Account, the Loan Funding Account, the Expense Reimbursement Account, the Reserve Account or the Closing Expense Account, as the case may be (for which the related purchase was made) and any loss resulting from such Eligible Investments shall be charged to the Collection Account, the Initial Deposit Account, the Loan Funding Account, the Expense Reimbursement Account, the Reserve Account or the Closing Expense Account, as the case may be (for which the related purchase was made). The Trustee shall not in any way be held liable by reason of any insufficiency in the Collection Account, the Initial Deposit Account, the Expense Reimbursement Account, the Loan Funding Account or the Closing Expense Account resulting from any loss on any Eligible Investment. Except as expressly provided herein, the Trustee shall be under no obligation to invest funds held hereunder.

(c)     Upon Servicer Order and subject to the provisions of Section 11.3 hereof, on any Business Day, the applicable portion of Collateral Interest Collections shall be released from the Collection Account as specified in such Servicer Order and applied by the Trustee in accordance with such Servicer Order in payment of one or more specified items of Additional Portfolio Collateral purchased in accordance with the provisions of Section 11.3 hereof.

(d)     Upon Servicer Order and subject to the provisions of Section 11.3 hereof on any Business Day all or a portion of the Collateral Principal Collections (other than Collateral Disposition Proceeds) shall be released from the Collection Account as specified in such Servicer Order and applied by the Trustee in accordance with such Servicer Order in payment of one or more specified items of Additional Portfolio Collateral purchased in accordance with the provisions of Section 11.3 hereof.

(e)     Upon Servicer Order and subject to the provisions of Section 12.4 hereof, on any Business Day all or a portion of the Collateral Disposition Proceeds shall be released from the Collection Account and applied by the Trustee in accordance with such Servicer Order in payment of one or more specified items of Substitute Portfolio Collateral purchased in accordance with the provisions of Section 12.4 hereof.

(f)     Upon Servicer Order and subject to the requirements of Section 3.4 hereof, between the Closing Date and the close of business on the Effective Date only, all or a portion of the Deposit available in the Initial Deposit Account shall be released from the Initial Deposit Account and applied by the Trustee in accordance with such Servicer Order in payment for Original Portfolio Collateral purchased in accordance with Section 3.4 hereof.  Upon Servicer Order, on the Effective Date and pursuant to Section 3.4(d), all Account Income credited to the Initial Deposit Account shall be released from the Initial Deposit Account and credited to the Collection Account to be applied as Collateral Interest Collections on the next Payment Date and the remainder of such funds shall be considered Collateral Principal Collections.

(g)     Upon Servicer Order on behalf of the Issuer, all or a portion of the funds available in the Expense Reimbursement Account shall be released from the Expense Reimbursement Account and applied by the Trustee to the payment to the Issuer for the purpose of paying on or prior to the next Payment Date following the date of delivery of such Servicer Order the Issuer Base Administrative Expenses, as specified therein, which are payable during the Due Period relating to such Payment Date.

(h)     On or before the first Payment Date, any remaining portion of the Closing Expense Deposit after the closing expenses have been paid in full, as confirmed by the Issuer, or Servicer on its behalf, (including any Account Income thereon) shall be transferred (i) upon receipt by the Trustee of a Servicer Order to the Initial Deposit Account (and be deemed to be part of the Deposit) or, after the Effective Date, to the Collection Account to be applied as Collateral Interest Collections or (ii) if no such Servicer Order has been received on the Business Day prior to the second Payment Date, to the Collection Account to be applied as Collateral Interest Collections.

(i)     Upon Servicer Order on behalf of the Issuer, all or a portion of the funds available in the Loan Funding Account shall be released from the Loan Funding Account and applied by the Trustee to fund amounts drawn under any Delayed Drawdown Loan or Revolving Loan and only funds in the Loan Funding Account shall be used for such purpose. In addition, upon Servicer Order on behalf of the Issuer, all or a portion of the funds available in the Loan Funding Account at any time in excess of the aggregate principal amount of commitments which may be drawn upon all Delayed Drawdown Loans and Revolving Loans in the Portfolio Collateral will be released from the Loan Funding Account and applied by the Trustee to the Collection Account to be applied as Collateral Principal Collections.

(j)     On or before the Closing Date, the Trustee shall establish with the Securities Intermediary a single, segregated securities account that shall be designated as the Reserve Account, that shall be held in trust in the name of the Trustee for the benefit of the applicable Secured Parties, and over which the Trustee shall have exclusive control and the sole right of withdrawal. On the Closing Date, the Trustee, at the direction of the Issuer, shall credit to the Reserve Account the Reserve Amount from the net proceeds of the Offering.  Amounts credited to the Reserve Account shall be applied pursuant to subclause (b) of this Section 10.2.

Section 10.3.   Custody and Release of Portfolio Collateral.

(a)      The Issuer shall cause each item of the Trust Estate to be Delivered, and the Trustee shall hold each item of the Trust Estate as Delivered, separate and apart from all other property held by the Trustee.  To the extent that such of the Trust Estate as constitutes a deposit account is maintained with Investors Bank & Trust Company, the parties hereto hereby make the agreements required pursuant to clause (h) of the definition of Delivery. Notwithstanding any other provision of this Indenture, the Trustee shall not hold any part of the Trust Estate through an agent or nominee except as expressly permitted by this Section 10.3(a). Each of the preceding requirements of this Section 10.3(a) is subject to the right of the Trustee to relocate the Trust Estate to another jurisdiction pursuant to and upon compliance with Section 7.5(b) hereof.

(b)      If no Event of Default has occurred and is continuing, the Servicer, by a Servicer Order delivered to the Trustee on or before the settlement date for any sale of an item of Portfolio Collateral, certifying that (i) it has determined that such Portfolio Collateral has become an item of Credit Risk Portfolio Collateral, an item of Credit Improved Portfolio Collateral, an item of Defaulted Portfolio Collateral, an item of Equity Portfolio Collateral or an item of Portfolio Collateral to be sold pursuant to Section 12.1(d) hereof and, in each case, the sale of such Portfolio Collateral is in compliance with Section 12.1 hereof or (ii) based upon receipt of an Issuer Order, on or after the Payment Date occurring in November 2011, the Collections from the sale of such Portfolio Collateral shall be used to effect an Optional Redemption in accordance with Section 9.1 hereof or (iii) based on receipt of an Issuer Order, the Collections from the sale of such Portfolio Collateral shall be used to effect a Tax Event Redemption in accordance with Section 9.5 hereof or (iv) it has determined that such Portfolio Collateral has become subject to withholding or similar tax and its sale is in compliance with Section 12.1 hereof, may direct the Trustee to release from the lien of this Indenture and deliver the Portfolio Collateral specified in such Servicer Order and, upon receipt of such Servicer Order, the Trustee shall release such Portfolio Collateral from such lien and deliver such Portfolio Collateral in accordance with the Servicer Order, in each case against receipt of sale proceeds therefor.

(c)      The Trustee on behalf of the Issuer shall notify the Servicer of any Portfolio Collateral for which the Trustee has received notice that such Portfolio Collateral is being redeemed or paid in full.  The Trustee, upon Servicer Order, shall release from the lien of this Indenture such Portfolio Collateral and shall deliver such Portfolio Collateral in accordance with the terms of the redemption or payment in full, in each case against receipt of the proceeds of the redemption price therefor or payment in full thereof.

(d)      The Trustee on behalf of the Issuer shall notify the Servicer of any Portfolio Collateral for which the Trustee has received notice that such Portfolio Collateral is subject to an Offer.  If no Event of Default has occurred and is continuing and subject to the provisions of Article XII hereof, the Servicer shall, by Servicer Order delivered to the Trustee on or before the date set for an exchange, tender or sale of such Portfolio Collateral, set forth in reasonable detail the procedure for response to such Offer and direct the Trustee to release from the lien of this Indenture such Portfolio Collateral in accordance with the terms of the Offer in each case against receipt of payment therefor.  Subject to the Trustee's timely receipt of such

direction from the Servicer, the Trustee shall be under no obligation to take any action in respect of such Offer.

(e)     (i)     The Trustee shall credit all proceeds received by it from the disposition of Portfolio Collateral to the Collection Account unless simultaneously applied to purchase in Substitute Portfolio Collateral (as directed by the Servicer). The Trustee shall also credit to the Collection Account (A) all Account Income with respect to the Collection Account, (B) all proceeds received by it from the disposition of an Eligible Investment in the Collection Account, (C) any portion of the Deposit remaining in the Initial Deposit Account on the Effective Date if an Initial Deposit Redemption is not required on such date, which shall be deemed Collateral Principal Collections; *provided* that, at the direction of the Servicer, up to 25% of such remaining Deposit may be deemed to be Collateral Interest Collections, pursuant to Section 3.4(d) hereof, and (D) upon Servicer Order pursuant to Section 10.2(f) hereof, all Account Income in the Initial Deposit Account on the Effective Date.

(ii)     The Trustee shall credit to the Initial Deposit Account all proceeds received by it from the disposition of an Eligible Investment in the Initial Deposit Account (subject, however, to the terms of Section 10.2(f) regarding the transfer of such Account Income to the Collection Account on the Effective Date).

(iii)     The Trustee shall credit to the Expense Reimbursement Account all Account Income with respect to the Expense Reimbursement Account and all proceeds received by it from the disposition of an Eligible Investment in the Expense Reimbursement Account.

(f)     The Trustee shall, at such time as there are no Notes Outstanding and all obligations of the Issuer under or pursuant to this Indenture have been satisfied, upon receipt of written notice from the Servicer that all amounts owing to the Servicer have been paid, release the Trust Estate from the lien of this Indenture.

Section 10.4.     Reports of Trustee.

Upon written request, the Trustee shall supply to the Issuer, Ambac and the Servicer at least three (3) Business Days prior to the date required hereunder for delivery of each Note Valuation Report and each Monthly Report, all information that it has received hereunder with respect to the Pledged Securities which is reasonably required for the preparation of the Note Valuation Report and Monthly Report; such information being in a Microsoft Excel format. The Trustee shall supply in a timely fashion to the Issuer, Bear Stearns, Ambac, each Hedge Counterparty and the Servicer any other information that the Issuer or the Servicer may reasonably request from time to time that is in the possession of the Trustee and required to be provided by Section 10.5 hereof. The Trustee shall promptly forward to the Issuer, Bear Stearns, Ambac and the Servicer copies of notices and other writings received by it from the issuer of any Pledged Security or from any clearing agency with respect to any Pledged Security advising the holders of such security of any rights that the holders might have with respect thereto (including, without limitation, notices of calls and redemptions) as well as all periodic financial reports received from such issuers and clearing agencies with respect to such issuers. Nothing in this

Section 10.4 hereof shall be construed to impose upon the Trustee, in such capacity, any duty to prepare any report or statement which the Issuer is required to prepare or provide under Section 10.5 hereof or to calculate, recalculate or verify any information required to be set forth in any such report or statement (other than information regularly maintained by the Trustee by reason of its acting as Trustee hereunder) prepared or required to be prepared by the Issuer or the Servicer. Nothing herein shall be construed to obligate the Trustee to disclose any information concerning its business or its operations which it reasonably considers confidential in nature.

On the date each Monthly Report is delivered or two Business Days prior to the Payment Date if with respect to a Note Valuation Report delivered in a month in which such Payment Date occurs, the Issuer shall cause to be promptly delivered to Standard & Poor's the Standard & Poor's CDO Monitor input file in the Standard & Poor's Preferred Format (*provided* that the specific parameters identified by Standard & Poor's have been delivered to the Issuer and the Trustee prior to the Closing Date and are limited to the scope herein stated) containing the Current Portfolio as of the date of determination and used to determine the S&P Scenario Loss Rate and the Schedule of Portfolio Collateral to Moody's in electronic format. In addition, the Issuer may provide any such reports in electronic form on a password-protected internet site or such other electronic format as the Issuer deems desirable.

Section 10.5.   Accountings.

(a)   Monthly.  Not later than the (i) the first day of each month (or if such day is not a Business Day on the next succeeding Business Day) for months where no Payment Date occurs or (ii) the related Payment Date, for months in which a Payment Date occurs, commencing in July 2007, the Issuer shall compile and provide, or procure the provision, to the Trustee, the Paying and Transfer Agent, each Noteholder or Beneficial Owner (upon receipt by the Trustee of a certificate in the form of Exhibit H and to any Servicer of such Noteholder or Beneficial Owner to whom such Noteholder or Beneficial Owner has in writing directed the Trustee to send a copy of such report), Bear Stearns, the Servicer, each Hedge Counterparty and each Rating Agency (but only so long as any Class of Notes is rated) a monthly report in a Microsoft Excel format (the "Monthly Report"), which shall contain the following information and instructions with respect to the Pledged Securities included in the Trust Estate, determined as of the seventh Business Day preceding either (i) the first day of such month (or if such day is not a Business Day on the next succeeding Business Day) or (ii) the Payment Date in months in which a Payment Date occurs (based in part on information provided by the Servicer):

(1)   the Aggregate Principal Amount of the Portfolio Collateral, the Principal Balance of each item of Portfolio Collateral, and the annual interest rate, maturity date, the designated seniority, and the LIN, or, with respect to Loan X Inc., the applicable ID (if either is used by the Servicer) or CUSIP Number of each item of Portfolio Collateral in the Trust Estate, as well as the rating by Standard & Poor's and the rating by Moody's (*provided* that any private confidential credit assessments, including estimated or shadow ratings, shall not be disclosed in any report issued and/or published to any party other than the Issuer, the Trustee and the Servicer) of such item of Portfolio Collateral determined according to the methods prescribed by Schedules D and F, respectively, and the Moody's corporate family rating, senior unsecured rating or long-

term issuer rating, as applicable, the Moody's Default Probability Rating and the notch difference, if any, of each item of Portfolio Collateral;

(2)     the Balance of the Eligible Investments in the Collection Account, the annual interest rate, maturity date, Principal Balance and issuer of each Eligible Investment in the Trust Estate, as well as the rating by Standard & Poor's and the rating by Moody's of such Eligible Investment;

(3)     the nature, source and amount of any Collections in the Collection Account, including the Collateral Interest Collections and Collateral Principal Collections received since the date of determination of the last Monthly Report (or since the Closing Date, in the case of the first such report);

(4)     the amount and identity of each item of Portfolio Collateral that was released for sale indicating the reason for such sale; and the amount and identity of each item of Portfolio Collateral that was Granted, since the date of determination of the last Monthly Report (or since the Closing Date, in the case of the first such report);

(5)     the identity, principal amount of and Market Value (segregating the Market Value determinations made by the Serving Entities) of each item of Portfolio Collateral in the Trust Estate which is an item of Defaulted Portfolio Collateral and Deferred Interest PIK Bond and the identity and principal amount of each item of Portfolio Collateral that became an item of Defaulted Portfolio Collateral, Deferred Interest PIK Bond or Equity Portfolio Collateral since the date of determination of the last Monthly Report (or since the Closing Date, in the case of the first such report);

(6)     the purchase price of each Pledged Security Granted and the sale price of each Pledged Security subject to a sale since the date of determination of the last Monthly Report (or since the Closing Date, in the case of the first such report); whether such Pledged Security is Portfolio Collateral or an Eligible Investment in the Collection Account;

(7)     (i) the identity, principal amount, Market Value, purchase price and percentage of the Aggregate Par Amount of each item of Portfolio Collateral included in the Trust Estate which is an item of Discount Portfolio Collateral, since the date of determination of the last Monthly Report (or since the Closing Date, in the case of the first such report) and (ii) the number of consecutive Business Days such item of Discount Portfolio Collateral has traded above (i) 90% of its Principal Balance with respect to Portfolio Loans and (ii) 85% of its Principal Balance with respect to Debt Securities;

(8)     after the Effective Date, the calculation of the Class A Overcollateralization Ratio, the Class B-1L Overcollateralization Ratio, the Class B-2L Overcollateralization Ratio and the Interest Coverage Ratio and the amount of any Additional Collateral Deposit Requirement and prior to the Effective Date and with respect to the Interest Coverage Ratio and the amount of any Additional Collateral Deposit Requirement, prior to the second Payment Date, listing such information as "not

applicable" and with respect to the Interest Coverage Ratio, in months other than months in which a Payment Date occurs, calculated in accordance with the second paragraph of the definition of the Interest Coverage Ratio and listing such results but marking them as "not applicable";

(9) information with respect to the Portfolio Collateral Granted to the Trustee since the date of determination of the last Monthly Report (or since the Closing Date, in the case of the first such report) reasonably necessary to determine whether the eligibility criteria set forth in Section 12.2 were satisfied (at the time of such grant);

(10) the percentage of the Aggregate Par Amount comprised of non-U.S. Portfolio Collateral and the rating of the sovereign country in which the issuer of such non-U.S. Portfolio Collateral is domiciled;

(11) the identity of and the Market Value of each item of Portfolio Collateral which is a Current Pay Obligation and the percentage of the Aggregate par Amount comprised of Current Pay Obligations;

(12) the percentage of Portfolio Loans for which a Facility Rating has been withdrawn by Moody's due to a restructuring of such Portfolio Loan;

(13) the Weighted Average Life, the Moody's Weighted Average Rating (determined in accordance with the procedures set forth in Schedule F), the Weighted Average Coupon of the Fixed Rate Portfolio Collateral and the Weighted Average Margin of the Floating Rate Portfolio Collateral, the S&P Weighted Average Recovery Rate and the Moody's Weighted Average Recovery Rate of the Portfolio Collateral, the Moody's Correlation Factor of the Portfolio Collateral, the Aggregate Principal Amount and percentage of the Aggregate Par Amount of Portfolio Collateral which consists of DIP Loans, Delayed Drawdown Loans, Revolving Loans and which has a Moody's Rating or Standard & Poor's Rating of "Caa1" or below or "CCC+" or below, respectively, other than Defaulted Portfolio Collateral, and the Applicable Percentage of each item of Portfolio Collateral;

(14) (a) the percentage of the Aggregate Par Amount consisting of obligations of issuers domiciled in a Group A Country, (b) the percentage of the Aggregate Par Amount consisting of obligations of issuers domiciled in a Group B Country and (c) the percentage of the Aggregate Par Amount consisting of obligations of issuers domiciled in any country other than the United States of America, a Group A Country or a Group B Country;

(15) the percentage of the Aggregate Par Amount consisting of Synthetic Securities including the identity of the Synthetic Security Obligors and the Reference Obligation and their rating, and the percentage of the Aggregate Par Amount consisting of Strip Securities;

(16) the Aggregate Principal Amount of the Portfolio Collateral and the percentage of the Aggregate Principal Amount of the Portfolio Collateral consisting of obligations maturing after August 1, 2024;

(17)    the par amount of all Portfolio Collateral included in the Trust Estate as of the Effective Date;

(18)    the results of the Standard & Poor's CDO Monitor determined in accordance with <u>Schedule D</u> hereto, whether the Standard & Poor's CDO Monitor Test is passed or failed and the S&P Break-Even Loss Rate and the S&P Scenario Loss Rate for each Class;

(19)    the Aggregate Principal Amount consisting of CLO Securities, including the Aggregate Principal Amount of each CLO Security with a Moody's Rating below "Baa3" or a Standard & Poor's Rating below "BBB-" and (b) the percentage of the Aggregate Par Amount of CLO Securities managed by any Servicer Entities; and

(20)    such other information as the Trustee or the Servicer may reasonably request.

Upon receipt of each Monthly Report, the Servicer shall compare the information contained therein and described in clauses (1) through (19) above to the information contained in its records with respect to the Collateral and shall, within three Business Days after receipt of each such Monthly Report, notify the Issuer, the Collateral Administrator (if different from the Trustee) and the Trustee in writing of any discrepancies between the information contained in the Monthly Report and the information maintained by the Servicer with respect to the Collateral. If any discrepancy exists, the Issuer and the Servicer shall attempt to resolve the discrepancy. If such discrepancy cannot be promptly resolved, the Trustee shall cause the Independent Accountants appointed by the Issuer pursuant to Section 10.6 hereof to review such Monthly Report and the Trustee's records to determine the cause of such discrepancy. If such review reveals an error in the Monthly Report or the Issuer's records, the Monthly Report or the Issuer's records shall be revised accordingly and, as so revised, shall be utilized in making all calculations pursuant to this Indenture. Each Rating Agency (in each case only so long as any Class of Notes is rated by it), Bear Stearns and the Servicer shall be notified in writing of any such revisions by the Trustee on behalf of the Issuer.

After the end of the Revolving Period, the Monthly Report shall also contain a statement to the effect that it is not unusual for the eligibility criteria set forth in Section 12.2 hereof not to be satisfied following the Revolving Period as the Portfolio Collateral matures or is otherwise disposed of and principal on the Notes is paid down.

(b)    <u>Payment Date Accounting</u>. With respect to each Calculation Date, the Issuer shall render or cause to be rendered an accounting (the "<u>Note Valuation Report</u>"), determined as of such Calculation Date, and delivered to the Trustee, the Paying and Transfer Agent, Bear Stearns, the Servicer, each Hedge Counterparty, the Collateral Administrator and each Rating Agency (but only so long as any Class of Notes is rated by it), not later than the Business Day prior to the Payment Date related to such Calculation Date. Upon receipt by the Trustee of a certificate in the form of Exhibit H, the Trustee shall make available the Note Valuation Report to the requesting Noteholder or Beneficial Owner. The Note Valuation Report shall contain the following information (based in part on information provided by the Servicer):

(1)     The Aggregate Principal Amount of the Portfolio Collateral as of the close of business on such Calculation Date, after giving effect to Collateral Principal Collections received during the related Due Period and applied to purchase Additional Portfolio Collateral or Substitute Portfolio Collateral in accordance with the provisions of this Indenture, the sale or other disposition of each item of Portfolio Collateral during such Due Period and the Grant in favor of the Trustee of each item of Substitute Portfolio Collateral and Additional Portfolio Collateral during such Due Period.

(2)     The Aggregate Principal Amount of the Class A-1LA Notes as of the Calculation Date and such Aggregate Principal Amount expressed as a percentage of the original Aggregate Principal Amount of the Class A-1LA Notes, and the amount of principal payments to be made on the Class A-1LA Notes on the Payment Date relating to such Calculation Date and the Aggregate Principal Amount of the Class A-1LA Notes after giving effect to such principal payments and expressed as a percentage of the original Aggregate Principal Amount of the Class A-1LA Notes.

(3)     The Aggregate Principal Amount of the Class A-1LB Notes as of the Calculation Date and such Aggregate Principal Amount expressed as a percentage of the original Aggregate Principal Amount of the Class A-1LB Notes, and the amount of principal payments to be made on the Class A-1LB Notes on the Payment Date relating to such Calculation Date and the Aggregate Principal Amount of the Class A-1LB Notes after giving effect to such principal payments and expressed as a percentage of the original Aggregate Principal Amount of the Class A-1LB Notes

(4)     The Aggregate Principal Amount of the Class A-2L Notes as of the Calculation Date and such Aggregate Principal Amount expressed as a percentage of the original Aggregate Principal Amount of the Class A-2L Notes, and the amount of principal payments to be made on the Class A-2L Notes on the Payment Date relating to such Calculation Date and the Aggregate Principal Amount of the Class A-2L Notes after giving effect to such principal payments and expressed as a percentage of the original Aggregate Principal Amount of the Class A-2L Notes.

(5)     The Aggregate Principal Amount of the Class A-3L Notes as of the Calculation Date and such Aggregate Principal Amount expressed as a percentage of the original Aggregate Principal Amount of the Class A-3L Notes, and the amount of principal payments to be made on the Class A-3L Notes on the Payment Date relating to such Calculation Date and the Aggregate Principal Amount of the Class A-3L Notes after giving effect to such principal payments and expressed as a percentage of the original Aggregate Principal Amount of the Class A-3L Notes.

(6)     The Aggregate Principal Amount of the Class B-1L Notes as of the Calculation Date and such Aggregate Principal Amount expressed as a percentage of the original Aggregate Principal Amount of the Class B-1L Notes, and the amount of principal payments to be made on the Class B-1L Notes on the Payment Date relating to such Calculation Date and the Aggregate Principal Amount of the Class B-1L Notes after giving effect to such principal payments and expressed as a percentage of the original Aggregate Principal Amount of the Class B-1L Notes.

(7)     The Aggregate Principal Amount of the Class B-2L Notes as of the Calculation Date and such Aggregate Principal Amount expressed as a percentage of the original Aggregate Principal Amount of the Class B-2L Notes, and the amount of principal payments to be made on the Class B-2L Notes on the Payment Date relating to such Calculation Date and the Aggregate Principal Amount of the Class B-2L Notes after giving effect to such principal payments and expressed as a percentage of the original Aggregate Principal Amount of the Class B-2L Notes.

(8)     The Periodic Interest Amount and the Periodic Rate Shortfall Amount, if any, for each Class of Notes (including the Note Component) for the Payment Date relating to such Calculation Date for the Payment Date relating to such Calculation Date and the Rated Balance and Rated Coupon (and any accrued and unpaid interest thereon) for the Combination Notes for the Payment Date relating to such Calculation Date.

(9)     The Aggregate Principal Amount of the Combination Notes as of the Calculation Date and such Aggregate Principal Amount expressed as a percentage of the original Aggregate Principal Amount of the Combination Notes and the amount of principal payments to be made on the Combination Notes on the Payment Date relating to such Calculation Date and the Aggregate Principal Amount of the Combination Notes after giving effect to such principal payments and expressed as a percentage of the original Aggregate Principal Amount of the Combination Notes.

(10)    The Rated Balance of the Combination Notes as of such Calculation Date and payments made on account of such Rated Balance on the Payment Date relating to such Calculation Date.

(11)    The Base Servicing Fee, the Additional Servicing Fee, the Supplemental Servicing Fee (if any), the Waived Servicing Fees (if any), the Trustee Administrative Expenses, the Preferred Shares Administrative Expenses, the Issuer Base Administrative Expenses, any replenishment of the Expense Reimbursement Account and the Issuer Excess Administrative Expenses, in each case including any amount with respect to any previous Payment Date that was not paid on a previous Payment Date relating to such Calculation Date on an itemized basis.

(12)    The amount of any payment to be received from any Hedge Counterparty on the Payment Date relating to such Calculation Date and any proceeds from the sale of the rights to such payment received during the Due Period relating to such Calculation Date.

(11)    For the Collection Account:

(a)     the Balance in the Collection Account as of such Calculation Date;

(b)     the amounts payable from the Collection Account pursuant to Article XI hereof on the Payment Date relating to such Calculation Date (in the aggregate and under each Section and subsection of Article XI hereof); and

(c) the Balance remaining in the Collection Account immediately after giving effect to all payments to be made on the Payment Date relating to such Calculation Date.

(12) For the Loan Funding Account, the Balance in the Loan Funding Account as of such Calculation Date, the amounts, if any, payable from the Loan Funding Account to fund amounts drawn under any Delayed Drawdown Loan or Revolving Loan with respect to such Calculation Date and the amount, if any, transferred from the Loan Funding Account to the Collection Account as Collateral Principal Collections with respect to such Calculation Date.

(13) (A) The Overcollateralization Ratios and the Interest Coverage Ratio (including a break-down of the components of such ratios) and the results of the Overcollateralization Tests, the Interest Coverage Test and the amount of any Additional Collateral Deposit Requirement (which shall not be reported on a pass/fail basis) as of the close of business on such Calculation Date (after giving effect to any payments to be made on the Payment Date relating to such Calculation Date, other than payments of the Mandatory Redemption Price with respect to an O/C Redemption, if any, made pursuant to Section 9.2 hereof and Section 11.2 hereof), (B) if the Interest Coverage Test or any Overcollateralization Test is not met, the amount of O/C Redemption of each Class of Notes on the related Payment Date pursuant to Section 9.2 hereof that would be necessary on the related Payment Date in order to cause the Interest Coverage Test or such Overcollateralization Test to be met (after giving effect to all payments to be made on such Payment Date), (C) the results of the Interest Coverage Test and the Overcollateralization Tests after giving effect to such O/C Redemptions pursuant to Section 9.2 hereof and the other payments, if any, to be made on such Payment Date, (D) if a Rating Confirmation Failure has occurred, the amount of Rating Confirmation Redemption of each Class of Notes on the related Payment Date pursuant to Section 9.2 hereof that would be necessary on the related Payment Date in order to receive a Rating Confirmation (after giving effect to all payments to be made on such Payment Date), and (E) if the Additional Collateral Deposit Requirement is not met, the amount of cash that would be necessary on the related Payment Date to be applied in accordance with Section 11.1 in order to cause the Additional Collateral Deposit Requirement to be met (after giving effect to all payments to be made on such Payment Date); *provided* that the Note Valuation Report need not contain information relating to the Interest Coverage Test or the Additional Collateral Deposit Requirement with respect to the first Calculation Date.

(c) Noteholder Report. With respect to each Calculation Date, the Issuer shall render or cause to be rendered an accounting (the "Noteholder Report"), determined as of such Calculation Date, and completed not later than the Business Day preceding the Payment Date relating to such Calculation Date. The Issuer shall deliver to the Trustee, each Noteholder or Beneficial Owner (upon receipt by the Trustee of a certificate in the form of Exhibit H), each Rating Agency (but only so long as any Class of Notes is rated by such Rating Agency), the Paying and Transfer Agent, each Hedge Counterparty and the Servicer, a copy of the Noteholder Report promptly after such completion no later than the tenth day after such Calculation Date. The Noteholder Report shall contain the information contained in Section 10.5(b)(1) through (12) and Section 10.5(a)(1) through (19).

Each Noteholder Report shall contain the following statement: "Each holder of a Note (excluding any holder of a Note (other than a Class B-2L Note transferred after the Closing Date or a Combination Note) issued pursuant to Regulation S but including any holder of a Class B-2L Note transferred after the Closing Date or a Combination Note issued pursuant to Regulation S) or a Combination Note or any interest therein is required at all times to be "Qualified Institutional Buyer" within the meaning of Rule 144A ("Rule 144A") under the U.S. Securities Act of 1933, as amended (the "Securities Act") who is also a "Qualified Purchaser" within the meaning of Section 3(c)(7) of the U.S. Investment Company Act of 1940, as amended (the "Investment Company Act") and each such holder (i) is not formed for the purpose of investing in the Notes (unless all of its beneficial owners are Qualified Purchasers), (ii) is not a dealer described in paragraph (a)(1)(ii) of Rule 144A (unless such holder owns and invests on a discretionary basis at least U.S. $25 million in securities of issuers that are not affiliated persons of such dealer), (iii) is not a plan referred to in paragraph (a)(1)(i)(D) or (E) of Rule 144A or a trust fund referred to in paragraph (a)(1)(i)(F) of Rule 144A that holds the assets of such plan (unless investment decisions are made solely by the fiduciary, trustee or sponsor of such plan), (iv) each account for which it is holds Notes is holding Notes in at least the minimum denomination set forth in the Indenture and (v) will provide written notice of the foregoing and any other applicable transfer restrictions to any transferee of a Note or any interest therein. The Notes (excluding Notes (other than Class B-2L Notes transferred after the Closing Date and Combination Notes) issued pursuant to Regulation S but including Class B-2L Notes transferred after the Closing Date and Combination Notes issued pursuant to Regulation S) and the Combination Notes and any interest therein may only be transferred to a transferee that can make the foregoing representations and the Co-Issuers have the right, at any time, to force any holder of a Note who is not a Qualified Institutional Buyer and a Qualified Purchaser to sell or redeem its Notes."

After the end of the Revolving Period, the Noteholder Report shall also contain a statement to the effect that it is not unusual for the eligibility criteria set forth in Section 12.2 hereof not to be satisfied following the Revolving Period as the Portfolio Collateral matures or is otherwise disposed of and principal on the Notes is paid down.

(d)     Payment Date Instructions.   The Note Valuation Report referred to in subsection (b) of this Section 10.5 shall constitute instructions to the Trustee to withdraw on the Payment Date relating to such Note Valuation Report the available funds from the Collection Account and make the payments set forth in the Note Valuation Report in the manner specified, and in accordance with the priorities established, in Article XI hereof.

(e)     Optional Redemption Instructions.   Not less than three Business Days after an Issuer Order electing an Optional Redemption of the Notes pursuant to Section 9.1 has been delivered to the Trustee, the Issuer shall compute the following information and provide such information in a statement (the "Redemption Date Statement") delivered to the Trustee, each Hedge Counterparty, the Servicer and the Rating Agencies:

(1)     the amounts payable to the Trustee, the Paying and Transfer Agent, the Issuer and the Servicer pursuant to Sections 11.1(b) and (d);

(2)     the amount in the Collection Account available for payment of the Optional Redemption Price; and

(3)     the Optional Redemption Price.

(f)     Tax Event Redemption Instructions.  Not later than three Business Days after an Issuer Order electing a Tax Event Redemption of the Notes Pursuant to Section 9.5 has been delivered to the Trustee, the Issuer shall compute the following information and provide such information in a statement (also, a "Redemption Date Statement") delivered to the Trustee, the Servicer and the Rating Agencies.

(1)     the amounts payable to the Trustee, the Issuer, the Paying and Transfer Agent and the Servicer pursuant to Sections 11.1(b) and (d);

(2)     the amount in the Collection Account available for payment of the Tax Event Redemption Price; and

(3) the Tax Event Redemption Price.

(g)     Appointment of Agent.  The Issuer may appoint an administrator or other agent to perform its obligations to provide reports pursuant to this Article X and certain calculations pursuant to Article XII.  Pursuant and subject to the terms of a collateral administration agreement (the "Collateral Administration Agreement") entered into or to be entered into among the Issuer, the Servicer and Investors Bank & Trust Company, the Issuer has appointed or shall appoint Investors Bank & Trust Company, as its initial agent for such purposes and Investors Bank & Trust Company, has accepted or shall accept such appointment and has agreed or shall agree to perform such obligations, as provided therein.

Section 10.6.   Reports by Independent Accountants.

(a)     The Issuer will appoint prior to the Effective Date, a nationally recognized firm of accountants as the firm or firms of Independent certified public accountants to prepare and deliver the reports or certificates of such accountants required by this Indenture.  Upon any resignation by, or removal of, such firm, the Issuer shall promptly appoint a successor thereto that shall also be a firm of Independent certified public accountants of recognized national reputation in the United States and for so long as any Notes are then rated, provide notice of such successor to each Rating Agency then rating any Notes.  If the Issuer shall not have appointed a successor within 30 days of any firm resigning from the position of Independent certified public accountants to the Issuer, the Trustee shall promptly appoint a successor firm of Independent certified public accountants of recognized national reputation in the United States and for so long as any Notes are then rated, provide notice of such successor to each Rating Agency then rating any Notes.  The fees of such Independent certified public accountants and its successor shall be payable by the Issuer.

(b)     On or before May 31 in 2008 and on or before May 31 in each year thereafter through 2012, the Issuer shall cause to be delivered to the Trustee, the Servicer and each Rating Agency, if any, then rating any Class of Notes a certificate (the "Accountants' Certificate") from the firm of Independent certified public accountants appointed by the Issuer

indicating (i) that such firm has reviewed the Note Valuation Reports and Redemption Date Statements relating to the Payment Dates in such period, (ii) that the calculations within such Note Valuation Reports and Redemption Date Statements have been performed in accordance with the applicable provisions of this Indenture (except as otherwise noted in a statement), (iii) the Aggregate Principal Amount of the Portfolio Collateral securing the Notes as of the Calculation Date relating to such Payment Dates and (iv) the procedures undertaken by such accountants to perform such calculations.  In the event such firm requires the Trustee to agree to the procedures performed by such firm, the Servicer shall direct the Trustee in writing to so agree; it being understood and agreed that the Trustee will deliver such letter agreement in conclusive reliance upon the direction of the Servicer, and the Trustee makes no independent inquiry or investigation as to, and shall have no obligation or liability in respect of the sufficiency, validity or correctness of such procedures.  Upon receipt by the Trustee of a certificate in the form of Exhibit H, the Trustee shall make available a copy of the Accountant's Certificate to the requesting Noteholder.

(c)     Beginning with the year 2008, on or before (i) January 31 of each year or, (ii) if later, on or before any date in each year on which any of the information described below is required to be delivered to the Noteholders under the Code or any other applicable law, but, in any case, not later than March 1 of each year, the Issuer shall cause each Paying Agent in the United States to prepare and deliver a Form 1099 to each Noteholder and the Issuer shall provide or cause to be provided such other information as is requested by a Noteholder, which is necessary to permit such Holder to prepare and file any applicable U.S. income tax returns related to the most recently ended calendar year.

Section 10.7.  Reports to Rating Agencies.

For so long as any Class of Notes is rated by a Rating Agency, the Issuer shall provide or cause to be provided to each Rating Agency then rating such Notes with a copy of each Monthly Report, each Note Valuation Report, each Noteholder Report, each Accountants' Certificate and any other notification delivered to any Noteholder pursuant to the provisions of this Indenture and with such additional information as such Rating Agency may from time to time reasonably request and the Issuer determines in its sole discretion may be obtained and provided without unreasonable burden or expense.  In addition, upon receipt of actual knowledge thereof, the Trustee shall send to each Rating Agency notice of any Default set forth in Section 5.1 hereof.  The Trustee will also give notice to the Rating Agencies, of any removal of the Servicer pursuant to Section 5.4(c).  In addition, the Servicer shall provide to the Rating Agencies those notices related to the Issuer's purchase of Synthetic Securities that are contemplated by Section 12.10 (which notices, in the case of notices provided by the Servicer to Moody's, shall be sent to the attention of a "Managing Director" of Moody's CBO/CLO Group); and, if Standard & Poor's or Moody's so requests and if such requesting party did not rate the related Synthetic Securities or Securities Lending Agreements, the Servicer shall also provide to such requesting party a copy of the transaction documents in its possession, relating to all Synthetic Securities or Securities Lending Agreements.  The Servicer shall also notify Standard & Poor's if more than 10% of the Aggregate Principal Amount of Portfolio Collateral are obligations of issuers domiciled outside the United States.  The address of Standard & Poor's for purposes of notices and reports hereunder shall be as follows:  55 Water Street, New York, New York 10041-0003, (email: cdo_surveillance@sandp.com), Attention: Structured Finance Ratings,

or such other address of which the Issuer is notified in writing by Standard & Poor's. The address of Moody's for purposes of notices and reports hereunder shall be as follows: 99 Church Street, New York, New York 10007, email: cdomonitoring@moodys.com, Attention: CBO Monitoring Group or such other address of which the Issuer is notified in writing by Moody's.

ARTICLE XI

APPLICATION OF MONIES

Section 11.1. Disbursements of Monies from Collection Account.

Except as otherwise set forth in Section 10.2 hereof, disbursements of monies from the Closing Expense Account and the Collection Account shall be made at the following times and in the following order of priority:

(a) On the Closing Date, the Trustee shall pay, from the funds in the Closing Expense Account, the fees, commissions and expenses associated with the Closing (collectively, "Closing Expenses") as set forth in an Issuer Order delivered to the Trustee on the Closing Date; *provided* that any such Closing Expenses may in the alternative be paid on any date after the Closing Date and prior to the Payment Date in November 2007 from the Closing Expense Deposit in the Closing Expense Account pursuant to an Issuer Order delivered to the Trustee (which shall state that the amounts called for to be paid therein are Closing Expenses). All payments pursuant to Section 11.1 hereof may be made from the United States. The Issuer may appoint an agent or agents for purposes of making payment of expenses, fees and commissions to be paid on its behalf from outside the United States pursuant hereto and (each such person shall be considered, a "Paying Agent" hereunder).

(b) On each Payment Date (including the Final Maturity Date and if funds become available after the Final Maturity Date, on any date after the Final Maturity Date) and in accordance with the Note Valuation Report for the Calculation Date immediately preceding such Payment Date, the Trustee shall withdraw from the Collection Account (to the extent of the available funds therein excluding therefrom (I) during the Revolving Period, any Collateral Disposition Proceeds received during the Due Period relating to such Calculation Date to be applied by the Trustee during the related Due Period or the immediately succeeding Due Period as set forth in Section 12.4 hereof and (II) during the Revolving Period or Amortization Period, Collateral Principal Collections in an aggregate amount equal to the agreed purchase prices for Additional Portfolio Collateral with respect to which the Issuer has entered into a commitment (as set forth in the notice from the Servicer to the Trustee) prior to the end of such Due Period for the purchase thereof, but has not settled such purchase by the end of such Due Period, as set forth in Section 11.3 hereof) an amount up to the Collateral Interest Collections and, to the extent the amount of the Collateral Interest Collections is not sufficient, an amount up to the Collateral Principal Collections, and payments received from any Hedge Counterparties under the Hedge Agreements, and shall make a disbursement in the following order of priority:

FIRST: To the Trustee for the payment in full of the Trustee Administrative Expenses for the related Due Period and any Trustee Administrative Expenses with respect to any previous Payment Date that were not paid on any previous Payment Date, and then to the Paying and Transfer Agent for the payment in full of the Preferred Shares Administrative Expenses for the related Due Period and any Preferred Shares Administrative Expenses with respect to any previous Payment Date that were not paid on any previous Payment Date;

SECOND: To the Issuer for the payment of Issuer Base Administrative Expenses with respect to the related Due Period and any Issuer Base Administrative Expenses with respect to a previous Payment Date that were not paid on a previous Payment Date;

THIRD: For the replenishment of the Expense Reimbursement Account up to an amount equal to U.S. $50,000 to the extent any amount therein has paid the Issuer Base Administrative Expenses for the related Due Period and to the extent any amount so paid for any prior Due Period has not been so replenished; *provided however*, notwithstanding anything to the contrary herein, the amounts set forth in clauses FIRST through this clause THIRD shall not exceed (i) $250,000 per annum plus (ii) the greater of $75,000 per annum and 0.0275% per annum of the Aggregate Par Amount on the related Calculation Date.

FOURTH: To the Servicer for the payment of the Base Servicing Fee with respect to such Payment Date and any Base Servicing Fee with respect to any previous Payment Date that was not paid on a previous Payment Date, and to the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Base Dividend then due and any Class II Preferred Share Base Dividend with respect to any previous Payment Date that was not paid on a previous Payment Date.

FIFTH: To each Hedge Counterparty for the payment of amounts due under any Hedge Agreement (excluding any termination payment due under any such Hedge Agreement in respect of which respective Hedge Counterparty is the sole "Defaulting Party" or sole "Affected Party" as such terms are defined under the related Hedge Agreement), if applicable.

Notwithstanding anything herein to the contrary, any amounts to be paid to the Paying and Transfer Agent in its capacity as paying and transfer agent for the Preferred Shares pursuant to the Indenture will be delivered by the Trustee to the Paying and Transfer Agent for deposit in the Preferred Shares Collection Account in accordance with the Paying and Transfer Agency Agreement.

On the first Payment Date, any funds included in the Reserve Amount that are remaining after the Aggregate Base Fees and Expenses set forth above have been paid, shall be distributed in full as Adjusted Collateral Interest Collections or Adjusted Collateral Principal

Collections in accordance with the Priority of Payments set forth below. The Servicer shall, in its sole discretion, determine the amount, if any, of the remaining Reserve Amount that shall constitute Adjusted Collateral Interest Collections, and the amount, if any, of the remaining Reserve Amount that shall constitute Adjusted Collateral Interest Collections.

(c)   On each Payment Date with respect to the **Revolving Period** and the **Amortization Period** in accordance with the Note Valuation Report for the Calculation Date immediately preceding such Payment Date, the Trustee shall withdraw from the Collection Account (to the extent of the available funds therein, excluding therefrom (I) during the Revolving Period or the Amortization Period, any Collateral Disposition Proceeds received during the Due Period relating to such Calculation Date to be applied by the Trustee during the related Due Period or the immediately succeeding Due Period as set forth in Section 12.4 hereof and (II) during the Revolving Period, Collateral Principal Collections in an aggregate amount equal to the agreed purchase prices for Additional Portfolio Collateral with respect to which the Issuer has entered into a commitment (as set forth in the notice from the Servicer to the Trustee) prior to the end of such Due Period for the purchase thereof, but has not settled such purchase by the end of such Due Period, as set forth in Section 11.3 hereof) an amount equal to the Adjusted Collateral Collections and shall make the following disbursements:

(i)   The Trustee shall apply such amounts constituting Adjusted Collateral Interest Collections (to the extent of available funds therefor) in the following order of priority:

FIRST:  To the payment, *pro rata*, to the Holders of the Class A-1LA Notes and the Class A-1LB Notes of an amount equal to the applicable Cumulative Interest Amount;

SECOND: To the payment to the Holders of the Class A-2L Notes of an amount equal to the applicable Cumulative Interest Amount;

THIRD:  To the payment to the Holders of the Class A-3L Notes of an amount equal to the applicable Cumulative Interest Amount;

FOURTH:   To the payment of principal as an O/C Redemption in the amount, if any, required to be paid in order to satisfy the Class A Overcollateralization Test and, on each Payment Date after the second Payment Date, the Interest Coverage Test, such amount to be paid first, to the Class A-1LA Notes; second, to the Class A-1LB Notes; third, to the Class A-2L Notes and fourth, to the Class A-3L Notes, in that order, until each such Class is paid in full, to the extent required to satisfy the Class A Overcollateralization Test and the Interest Coverage Test;

FIFTH: To the payment of the Cumulative Interest Amount with respect to the Class B-1L Notes and such Payment Date;

SIXTH: To the payment of principal as an O/C Redemption in the amount, if any, required to be paid in order to satisfy the Class B-1L Overcollateralization Test, such amount to be paid first, to the Class A-1LA Notes; second, to the Class A-1LB Notes; third, to the Class A-2L Notes; fourth, to the Class A-3L Notes; and fifth, to any Periodic Rate Shortfall Amount with respect to the Class B-1L Notes and then principal of the Class B-1L Notes, in that order, until each such Class is paid in full, to the extent required to satisfy the Class B-1L Overcollateralization Test;

SEVENTH: To the payment of the Cumulative Interest Amount with respect to the Class B-2L Notes and such Payment Date;

EIGHTH: During the Revolving Period, to the payment of principal as Rating Confirmation Failure Redemption, the amount, if any, required to be paid in order to receive a Rating Confirmation, such amount to be paid first, to the Class A-1LA Notes; second, to the Class A-1LB Notes; third, to the Class A-2L Notes; fourth, to the Class A-3L Notes; fifth, to any Periodic Rate Shortfall Amount with respect to the Class B-1L Notes and then to principal of the Class B-1L Notes; and sixth, to any Periodic Rate Shortfall Amount with respect to the Class B-2L Notes and then to principal of the Class B-2L Notes, in that order, until each such Class is paid in full, to the extent required to receive a Rating Confirmation;

NINTH: To the payment of principal as an O/C Redemption in the amount, if any, required to be paid in order to satisfy the Class B-2L Overcollateralization Test, such amount to be paid as follows: (a) 50% of available funds to the payment of principal on the Class B-2L Notes, and (b) 50% (or, after the Class B-2L Notes are paid in full, 100%) of available funds to the sequential payment of principal on the Notes, in amounts necessary to satisfy the Class B-2L Overcollateralization Test on such Payment Date;

TENTH: (I) During the Revolving Period, on each Payment Date after the second Payment Date to the extent of available funds, *pro rata*, an amount equal to 35% of the funds available up to the Additional Collateral Deposit Requirement to be deposited into the Collection Account and applied to pay principal of the Class B-2L Notes until such Class is paid in full and an amount equal to 65% (or, after the Class B-2L Notes are paid in full, 100%) of the funds available up to the Additional Collateral Deposit Requirement for the purchase of Additional Portfolio Collateral (other than CLO Securities), as directed by the Servicer or the Issuer, pursuant to Section 11.3 hereof during the immediately succeeding Due Period and (II) during the Amortization Period to the extent of available funds, *pro rata*, an amount equal to 35% of the funds available up to the Additional Collateral Deposit Requirement

to be deposited into the Collection Account and applied to pay principal of the Class B-1L Notes until such Class is paid in full and an amount equal to 65% (or, after the Class B-1L Notes are paid in full, 100%) of the funds available up to the Additional Collateral Deposit Requirement to the payment of principal of the Notes in the order of priority described in clause SECOND of Section 11.1(c)(ii) below;

ELEVENTH: To the payment to the Default Swap Counterparty or any Hedge Counterparty, any Default Swap Counterparty Termination Payment or any termination payment due under any Hedge Agreement in respect of which the related Hedge Counterparty is the sole "Defaulting Party" or sole "Affected Party" thereunder as such terms are defined under the related Hedge Agreement;

TWELFTH: To the payment, *first* (a) to the Servicer the Additional Servicing Fee with respect to such Payment Date and then any Additional Servicing Fee with respect to any previous Payment Date (excluding any portion thereof included in any Cumulative Deferred Additional Servicing Fees or in any Waived Additional Servicing Fees) that was not paid on a previous Payment Date; *provided however*, the Servicer may at its option waive all or any portion of such Additional Servicing Fee, such amount so waived (the "Waived Additional Servicing Fee") to be applied to the purchase of Additional Portfolio Collateral as directed by the Servicer pursuant to Section 11.3 hereof during the immediately succeeding Due Period, and (b) to the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Additional Dividend then due and unpaid and *second*, to the Holders of the Notes any due and unpaid Extension Bonus Payment;

THIRTEENTH: To the payment to the Issuer of Issuer Excess Administrative Expenses with respect to such Payment Date and any Issuer Excess Administrative Expenses with respect to any previous Payment Date that were not paid on a previous Payment Date;

FOURTEENTH: If the Internal Rate of Return of the Preferred Shares as of such Payment Date is less than 12%, to the pari passu payment to the Holders of all of the Preferred Shares, but only up to an amount that would cause the Internal Rate of Return of the Preferred Shares to equal 12%; and

FIFTEENTH: Any remaining amounts, (a) 20% to (x) the payment of the Supplemental Servicing Fee for such Payment Date (excluding any Current Deferred Supplemental Servicing Fees or any Waived Supplemental Servicing Fees), and (y) the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Supplemental Dividend then due

and unpaid, and (b) 80% to the Holders of the Preferred Shares in accordance with the Paying and Transfer Agency Agreement, as a dividend thereon or as a redemption payment on the Redemption Date, as applicable; *provided however,* the Servicer may at its option waive all or any portion of such Supplemental Servicing Fee, such amount so waived (the "Waived Supplemental Servicing Fee") to be applied to the purchase of Additional Portfolio Collateral as directed by the Servicer pursuant to Section 11.3 hereof during the immediately succeeding Due Period.

(ii)      During the **Revolving Period**, the Trustee shall apply the Adjusted Collateral Principal Collections (to the extent of available funds therefor) in the following order of priority:

FIRST: To the payment of the amounts described in clauses FIRST through EIGHTH of Section 11.1(c)(i) hereof with respect to Collateral Interest Collections and the Revolving Period, in the order described therein, in each case to the extent such amounts have not been paid from Adjusted Collateral Interest Collections with respect to such Payment Date; *provided however* that, with respect to clause THIRD of Section 11.1(c)(i) above, the Class A-3L Notes shall be entitled to receive an amount sufficient to pay the Periodic Rate Shortfall Amount due to the Class A-3L Notes for such Payment Date from Collateral Principal Collections but only to the extent this payment will not cause the failure of the Class B-1L Overcollateralization Test, with respect to clause FIFTH of Section 11.1(c)(i) above, the Class B-1L Notes shall be entitled to receive an amount sufficient to pay the Periodic Rate Shortfall Amount due to the Class B-1L Notes for such Payment Date from Collateral Principal Collections but only to the extent this payment will not cause the failure of the Class A Overcollateralization Test, and with respect to the payment described in clause SEVENTH of Section 11.1(c)(i) hereof, the Class B-2L Notes shall be entitled to receive an amount sufficient to pay the Periodic Rate Shortfall Amount due to the Class B-2L Notes for such Payment Date from Collateral Principal Collections, but only to the extent this payment will not cause the failure of the Class A Overcollateralization Test or the Class B-1L Overcollateralization Test;

SECOND: To the payment of principal as an O/C Redemption in the amount, if any, required to be paid in order to satisfy the Class B-2L Overcollateralization Test, such amount to be paid as follows: first, to the Class A-1LA Notes until the Aggregate Principal Amount thereof has been paid in full; second, to the Class A-1LB Notes until the Aggregate Principal Amount thereof has been paid in full; third, to the Class A-2L Notes until the Aggregate Principal Amount thereof has been paid in full; fourth, to the Class A-3L Notes until the Aggregate Principal Amount thereof has been paid in full; fifth, to any Periodic Rate Shortfall Amount with respect to the Class B-1L Notes and then to the Class B-1L Notes until the Aggregate Principal Amount thereof has been

paid in full; and sixth, to any Periodic Rate Shortfall Amount with respect to Class B-2L Notes and then to the Class B-2L Notes until the Aggregate Principal Amount thereof has been paid in full, in each case, to the extent such amounts have not been paid from Adjusted Collateral Interest Collections;

THIRD: To pay principal of the Notes in a Special Redemption, such amount to be paid first, (A) to the Class A-1LA Notes; second, to the Class A-1LB Notes; third, to the Class A-2L Notes; fourth, to the Class A-3L Notes; fifth, to any Periodic Rate Shortfall Amount with respect to the Class B-1L Notes and then to principal of the Class B-1L Notes; and sixth, to any Periodic Rate Shortfall Amount with respect to the Class B-2L Notes and then to principal of the Class B-2L Notes; and

FOURTH: As directed by the Servicer or the Issuer, to the purchase of Additional Portfolio Collateral meeting the specified requirements no later than the last day of the Due Period relating to the Payment Date following such Payment Date (or, if no such direction is given by the Servicer or the Issuer, deposited by the Trustee in the Collection Account, such amounts to be applied in the manner described herein).

(iii) During the **Amortization Period**, the Trustee shall apply the Adjusted Collateral Principal Collections (to the extent of available funds therefor and including for purposes of this Section 11.1(c)(iii) any Collateral Disposition Proceeds (other than Collateral Disposition Proceeds received in connection with the sale of an item of Credit Improved Portfolio Collateral to be reinvested pursuant to Section 12.4(a)) received during the Due Period relating to such Calculation Date to be applied by the Trustee as set forth in this Section 11.1(c)(iii)) in the following order of priority:

FIRST: To the payment of the amounts described in clauses FIRST through EIGHTH of Section 11.1(c)(i) hereof with respect to Collateral Interest Collections and the Revolving Period, in the order described therein, in each case to the extent such amounts have not been paid from Adjusted Collateral Interest Collections with respect to such Payment Date; *provided however* that, with respect to clause THIRD of Section 11.1(c)(i) above, the Class A-3L Notes shall be entitled to receive an amount sufficient to pay the Periodic Rate Shortfall Amount due to the Class A-3L Notes for such Payment Date from Collateral Principal Collections but only to the extent this payment will not cause the failure of the Class B-1L Overcollateralization Test, with respect to clause FIFTH of Section 11.1(c)(i) above, the Class B-1L Notes shall be entitled to receive an amount sufficient to pay the Periodic Rate Shortfall Amount due to the Class B-1L Notes for such Payment Date from Collateral Principal Collections but only to the extent this payment will not cause the failure of the Class A Overcollateralization Test, and with respect to the payment

described in clause SEVENTH of Section 11.1(c)(i) hereof, the Class B-2L Notes shall be entitled to receive an amount sufficient to pay the Periodic Rate Shortfall Amount due to the Class B-2L Notes for such Payment Date from Collateral Principal Collections, but only to the extent this payment will not cause the failure of the Class A Overcollateralization Test or the Class B-1L Overcollateralization Test;

SECOND: To the payment of principal as an O/C Redemption in the amount, if any, required to be paid in order to satisfy the Class B-2L Overcollateralization Test, such amount to be paid as follows: first, to the Class A-1LA Notes until the Aggregate Principal Amount thereof has been paid in full; second, to the Class A-1LB Notes until the Aggregate Principal Amount thereof has been paid in full; third, to the Class A-2L Notes until the Aggregate Principal Amount thereof has been paid in full; fourth, to the Class A-3L Notes until the Aggregate Principal Amount thereof has been paid in full; fifth, to any Periodic Rate Shortfall Amount with respect to the Class B-1L Notes and then to the Class B-1L Notes until the Aggregate Principal Amount thereof has been paid in full; and sixth, to any Periodic Rate Shortfall Amount with respect to Class B-2L Notes and then to the Class B-2L Notes until the Aggregate Principal Amount thereof has been paid in full, in each case, to the extent such amounts have not been paid from Adjusted Collateral Interest Collections;

THIRD: So long as no Event of Default has occurred and is continuing and as directed by the Servicer or the Issuer, to the purchase of Additional Portfolio Collateral from the proceeds of Collateral Principal Collections from any unscheduled prepayment or to the purchase of Substitute Portfolio Collateral from the sales proceeds of Credit Improved Portfolio Collateral, meeting the specified requirements with respect to the Amortization Period no later than ninety days after receipt of such amounts (or, if no such direction is given by the Servicer or the Issuer, deposited by the Trustee in the Collection Account, to be applied in the manner described herein); and

FOURTH: To pay the Notes as follows: first, to the Class A-1LA Notes until the Aggregate Principal Amount thereof has been paid in full; second, to the Class A-1LB Notes until the Aggregate Principal Amount thereof has been paid in full; third, to the Class A-2L Notes until the Aggregate Principal Amount thereof has been paid in full; fourth, to the Class A-3L Notes until the Aggregate Principal Amount thereof has been paid in full; fifth, to any Periodic Rate Shortfall Amount with respect to the Class B-1L Notes and then to principal of the Class B-1L Notes until the Aggregate Principal Amount thereof has been paid in full; and sixth, to any Periodic Rate Shortfall Amount with respect to Class B-2L Notes and then to principal of the Class B-2L Notes until the Aggregate Principal Amount thereof has been paid in full.

(d)     On the **Final Maturity Date** (including the Optional Redemption Date, the Tax Event Redemption Date or any other Payment Date on which the Aggregate Principal Amounts of the Notes is paid in full) and, if funds become available after the Final Maturity Date, on any other date after the Final Maturity Date, and in accordance with the Note Valuation Report for the Calculation Date immediately preceding such Payment Date (or in the case of an Optional Redemption or a Tax Event Redemption, in accordance with the related Redemption Date Statement), the Trustee shall withdraw from the Collection Account an amount equal to the Adjusted Collateral Collections (including Collateral Disposition Proceeds) and from the Loan Funding Account any amount on deposit therein and shall make the following disbursements in the following order of priority:

FIRST:  To the payment, first, *pro rata*, to the Holders of the Class A-1LA Notes and the Class A-1LB Notes of an amount equal to the applicable Cumulative Interest Amount, and second, if the Final Maturity Date is also an Optional Redemption Date, to pay the CDS/TRS Termination Payment Amount, if any, to the Class A-1LA Notes;

SECOND:  To the payment of principal of the Class A-1LA Notes in amounts not to exceed the Aggregate Principal Amounts of the Class A-1LA Notes, and then to the payment of principal of the Class A-1LB Notes in an amount not to exceed the Aggregate Principal Amount of the Class A-1LB Notes;

THIRD:  To the payment to the Holders of the Class A-2L Notes of an amount equal to the applicable Cumulative Interest Amount;

FOURTH:  To the payment of principal of the Class A-2L Notes in an amount not to exceed the Aggregate Principal Amount of the Class A-2L Notes;

FIFTH:  To the payment to the Holders of the Class A-3L Notes of an amount equal to the applicable Cumulative Interest Amount;

SIXTH:  To the payment of principal of the Class A-3L Notes in an amount not to exceed the Aggregate Principal Amount of the Class A-3L Notes;

SEVENTH:  To the payment of the Holders of the Class B-1L Notes of an amount equal to the applicable Cumulative Interest Amount;

EIGHTH:  To the payment of principal of the Class B-1L Notes in an amount not to exceed the Aggregate Principal Amount of the Class B-1L Notes;

NINTH:  To the payment of the Holders of the Class B-2L Notes of an amount equal to the applicable Cumulative Interest Amount;

TENTH: To the payment of principal of the Class B-2L Notes in an amount not to exceed the Aggregate Principal Amount of the Class B-2L Notes;

ELEVENTH: To the payment of any Default Swap Counterparty Termination Payments to the Default Swap Counterparty or any termination payment due under any Hedge Agreement to a Hedge Counterparty in respect of which such Hedge Counterparty is the sole "Defaulting Party" or sole "Affected Party" thereunder, as such terms are defined under the related Hedge Agreement;

TWELFTH: *First,* (a) to the Servicer the Additional Servicing Fee with respect to such Payment Date and then any Additional Servicing Fee with respect to any previous Payment Date (excluding any portion thereof included in any Waived Additional Servicing Fee) and (b) to the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Additional Dividend then due and unpaid and *second*, to the Holders of the Notes any due and unpaid Extension Bonus Payment;

THIRTEENTH: To the payment to the Issuer of amounts due the Issuer for Issuer Excess Administrative Expenses and any such amounts that were due on any prior Payment Date but remain unpaid;

FOURTEENTH: If the Internal Rate of Return of the Preferred Shares as of such Payment Date is less than 12%, to the pari passu payment to the Holders of all of the Preferred Shares, but only up to an amount that would cause the Internal Rate of Return of the Preferred Shares to equal 12%; and

FIFTEENTH: Any remaining amounts, (a) 20% to (x) the payment of the Supplemental Servicing Fee for such Payment Date (excluding any Waived Supplemental Servicing Fees), and (y) the Holders of the Class II Preferred Shares in accordance with the Paying and Transfer Agency Agreement, the Class II Preferred Share Supplemental Dividend then due and unpaid, and (b) 80% to the Holders of the Preferred Shares in accordance with the Paying and Transfer Agency Agreement, as a dividend thereon or as a redemption payment on the Redemption Date, as applicable.

The obligation to pay the foregoing amounts on the Final Maturity Date is absolute and unconditional, but recourse therefor will be limited to the Trust Estate.

(e) Notwithstanding anything in this Indenture to the contrary, with respect to Adjusted Collateral Collections held in the Collection Account in Eligible Investments pending application to purchase Portfolio Collateral, any such amounts not used to purchase Portfolio Collateral by the last day of the Due Period next succeeding

the Due Period in which such amounts were collected may be used to purchase Portfolio Collateral in subsequent Due Periods in accordance with Section 11.3 hereof (until otherwise applied pursuant to this Section 11.1).

(f)     Notwithstanding anything to the contrary in this Section 11.1, upon the direction of the Servicer (and in the time and manner directed by the Servicer), Payment Date Equity Securities may be distributed on any Payment Date, in lieu of cash on any Payment Date as follows:

(i)     Payment Date Equity Securities will be paid as Collateral Interest Collections in accordance with Section 11.1 with respect to the Preferred Shares, and upon such payment, the aggregate amount of Collateral Interest Collections distributable to the Holders of the Preferred Shares on such Payment Date will be reduced by the value of such Payment Date Equity Securities. Payment Date Equity Securities distributed on any Payment Date shall be distributed to the Holders of the Preferred Shares in the same manner as Collateral Interest Collections would be distributable to such Holders of Preferred Shares on such Payment Date and subject to the same restriction as to payment set out in the Paying and Transfer Agency Agreement.

(ii)     In calculating the amounts of Collateral Interest Collections and Collateral Principal Collections for such Payment Date, Collateral Interest Collections in an amount equal to the value of Payment Date Equity Securities distributed to the Holders of the Preferred Shares shall be recharacterized as Collateral Principal Collections and disbursed in accordance with Sections 11.1(b) and 11.1(c) of the Indenture.

Section 11.2.     Mandatory Redemption With Respect to Overcollateralization Tests, Interest Coverage Test and Rating Confirmation Failure

On any applicable Payment Date with respect to which an Overcollateralization Test (other than with respect to the failure of the Class B-2L Overcollateralization Test) or the Interest Coverage Test (as calculated in the Note Valuation Report for the Calculation Date immediately preceding such Payment Date), would not be met (but for this Section 11.2) or, during the Revolving Period, a Rating Confirmation Failure has occurred and is continuing, the Issuer shall redeem the Notes (or, in the case of the Class B-1L Notes and the Class B-2L Notes, pay any Periodic Rate Shortfall Amounts and then redeem the Notes pursuant to Section 9.2 hereof), and the Trustee shall pay to the Holders thereof (to be applied against the principal amount thereof) pursuant to the applicable provisions of Section 11.1 hereof, an aggregate amount necessary to cause each of the Overcollateralization Tests to be met as of such Calculation Date, in the case of the Interest Coverage Test, to cause such test to have been met as of such Calculation Date had such redemption been made on the immediately preceding Payment Date or to cause a Rating Confirmation to be received by the Issuer, as applicable.   On any applicable Payment Date the Class B-2L Overcollateralization Test is not satisfied, 50% of available Interest Proceeds will be applied to pay principal on the Class B-2L Notes and 50% (or, after the Class B-2L Notes are paid in full, 100%) of available Interest Proceeds will be applied sequentially to pay principal on the Notes according to the priorities described herein until the

Class B-2L Overcollateralization Test is satisfied. In addition, Principal Proceeds will be applied sequentially to pay principal on the Notes, as set forth in clause SECOND of Section 11.1(c)(i) and 11.1(c)(ii) herein.

Section 11.3. <u>Purchase of Additional Portfolio Collateral</u>

(a)     The Issuer may purchase Additional Portfolio Collateral on any Business Day during the Revolving Period for inclusion in the Trust Estate in an amount permitted pursuant to the applicable subsection of Section 11.1 hereof subject to the conditions set forth in this Section 11.3.   Upon receipt by the Trustee of a Servicer Order with respect thereto, Collateral Principal Collections (or Collateral Interest Collections deposited to the Collection Account pursuant to clause TENTH of Section 11.1(c)(i) or deposited to the Collection Account on account of any Waived Servicing Fees), collected during a Due Period (other than Collateral Disposition Proceeds) may be paid out of the Collection Account by the Trustee on any Business Day during such Due Period or the immediately succeeding Due Period for the purpose of purchasing such Additional Portfolio Collateral specified in such Servicer Order; *provided* that as of such date the following conditions shall have been satisfied:

(i)     the Balance of the Collection Account remaining after giving effect to any such purchase of Additional Portfolio Collateral shall equal or exceed the Periodic Reserve Amount with respect to the Payment Date relating to such Due Period as shown on the Note Valuation Report for the prior Payment Date;

(ii)     (1) each Overcollateralization Test and the Interest Coverage Test are satisfied and (2) the Collateral Quality Tests and the criteria set forth in Section 12.2 hereof are satisfied or if any of the Collateral Quality Tests or the criteria set forth in Section 12.2 is not satisfied, the degree of compliance with such criteria would not be diminished; *provided however*, with respect to Additional Portfolio Collateral purchased with Unscheduled Principal Proceeds, if any, if the Overcollateralization Tests or the Interest Coverage Test is not satisfied as set forth in clause (1), the degree of compliance with such tests would not be diminished; *provided, however*, that Additional Portfolio Collateral or Substitute Portfolio Collateral consisting of CLO Securities may not be purchased with available funds during the period from the August 2011 Payment Date through the August 2012 Payment Date unless each of the Class B-1L Overcollateralization Ratio and the Class B-2L Overcollateralization Ratio are at least equal to levels as of the Effective Date; and

(iii)     the Trustee shall have received (a) a certificate of the Servicer dated as of the date of the purchase and the Grant of such Additional Portfolio Collateral to the effect that such purchase is in compliance with the requirements of this Section 11.3 and Section 12.5(a) hereof, and (b) the certificate required pursuant to Section 12.2 hereof.

(b)     For purposes of calculating the Collections for this Section 11.3 (and the Balance in the Collection Account for purposes of subsection (a) hereof), Collections shall be deemed to include, as of any date of determination, the sum of 100% of all cash collections actually received in respect of the Portfolio Collateral during such Due Period as of such date of

determination and 100% of all Scheduled Distributions to be received (including those which are reasonably expected to be received) in respect of the Portfolio Collateral during such Due Period (excluding, however, any Scheduled Distributions to be received with respect to an item of Defaulted Portfolio Collateral or an item of Equity Portfolio Collateral during such Due Period).

Section 11.4.    Trust Account

All monies held by the Trustee in the Collection Account, the Initial Deposit Account, the Closing Expense Account, the Loan Funding Account or the Expense Reimbursement Account pursuant to the provisions of this Indenture, and not used to purchase Portfolio Collateral or Eligible Investments as herein provided, shall be deposited in one or more trust accounts, established in the name of the Trustee, as trustee of the trust created pursuant hereto for the benefit of the Holders of Notes and other Secured Parties hereunder; *provided* that to the extent funds deposited in such accounts exceed the amounts insured by the Federal Deposit Insurance Corporation, such excess shall be used to purchase Eligible Investments (pursuant to and as provided in Section 10.2 hereof). All monies held in the trust accounts described in the first sentence of this Section 11.4 shall be held as part of the Trust Estate subject to the provisions of this Indenture.

Section 11.5.    Waived Servicing Fees.

If the Trustee receives written notification from the Servicer at least four Business Days prior to any Payment Date (other than the Final Payment Date) that it has elected to waive any portion of its Additional Servicing Fee and/or Supplemental Servicing Fee, the Trustee shall waive the payment of all or a portion of any such fees payable to the Servicer on such Payment Date as set forth in such notice from the Servicer (any such waived amount on such Payment Date being the "Waived Additional Servicing Fee" or the "Waived Supplemental Servicing Fee", as applicable, and together, the "Waived Servicing Fees").  Any such Waived Servicing Fees shall be used to purchase Additional Portfolio Collateral as described in Section 11.3.  The Servicer shall have no interest in and no reimbursement rights with respect to any Waived Servicing Fees.

ARTICLE XII

SALE OF PORTFOLIO COLLATERAL; SUBSTITUTION

Section 12.1.    Sale of Portfolio Collateral

(a)    Provided that no Event of Default has occurred and is continuing and subject to the satisfaction of the conditions specified in Section 10.3 hereof and the restrictions in this Article, the Servicer may direct the Trustee, by Servicer Order, to sell, and the Trustee shall release (or cause to be released) from the lien of this Indenture and sell in the manner directed by the Servicer, any Defaulted Portfolio Collateral, Equity Portfolio Collateral, Credit Risk Portfolio Collateral or Credit Improved Portfolio Collateral (as described in such direction) so long as, with respect to an item of Credit Improved Portfolio Collateral or Credit Risk Portfolio Collateral, the Servicer certifies to the Trustee, as applicable, that:

(i)      in the case of an item of Credit Improved Portfolio Collateral (including in connection with a Portfolio Improvement Exchange), in writing before the sale, that the Servicer has identified one or more specific manners in which it will be able, in compliance with the criteria set forth in Section 12.2 and the other requirements of Article XII (and in connection with a Portfolio Improvement Exchange, the requirements set forth in the definition of such term), to cause the Issuer to purchase with the applicable Collateral Disposition Proceeds net of accrued interest and costs, no later than the end of the immediately succeeding Due Period (it being understood that such identification shall not be considered either a requirement or an assurance that any specified purchase will be consummated), one or more items of Substitute Portfolio Collateral having an Aggregate Principal Balance equal to or greater than the Principal Balance of such Credit Improved Portfolio Collateral; and

(ii)      in the case of an item of Credit Improved Portfolio Collateral, after giving effect to such sale and the subsequent purchase described in (a) above, the Servicer is required to certify that it reasonably believes that (x) either the Collateral Quality Tests and the criteria set forth in Section 12.2 hereof are satisfied or if one or more of such Collateral Quality Tests or criteria is not satisfied, the degree of compliance therewith would not be diminished and (y) either the Overcollateralization Tests and the Interest Coverage Test are satisfied or if any Overcollateralization Test or the Interest Coverage Test is not satisfied, the degree of compliance with such tests would not be diminished.

(b)      An item of Credit Risk Portfolio Collateral may be sold at any time, subject to the Sale Restriction Condition as set forth below.  Following any sale of a Credit Risk Portfolio Collateral pursuant to this Section 12.1(a), at the direction of the Servicer during the Revolving Period, the Issuer shall use commercially reasonable efforts to purchase additional Portfolio Collateral (to the extent the purchase is in the best interest of the Issuer) with an Aggregate Principal Amount at least equal to the sale proceeds received by the Issuer with respect to the Portfolio Collateral sold.  For this purpose, the Aggregate Principal Amount of any Revolving Loan or Delayed Drawdown Loan shall only include its funded amount.

(c)      Notwithstanding any term hereof to the contrary and *provided* that no Event of Default has occurred and is continuing and subject to compliance with the conditions specified in Section 10.3 hereof, any Portfolio Collateral may be sold upon delivery to the Trustee of a certificate of the Servicer to the effect that it has reasonably determined, which may be based upon the advice of an opinion of counsel (a copy of which opinion shall be included with such certificate), that such Portfolio Collateral is, or may become, subject to a withholding or other similar tax (or to an increased rate of withholding or other similar tax).  Further, notwithstanding anything to the contrary stated herein, the Servicer may direct the sale of an item of Portfolio Collateral that was CCC/Caa Portfolio Collateral or Discount Portfolio Collateral at the time of purchase only if it constitutes Credit Risk Portfolio Collateral or Defaulted Portfolio Collateral, is sold in connection with the Optional Redemption of Notes in whole or if the Servicer reasonably expects that the sale and any related purchase of Substitute Portfolio Collateral will restore compliance with any of the Interest Coverage Test, the criteria set forth in Section 12.2 or the Overcollateralization Tests that would be failed or not satisfied in the absence of such sale and purchase.

(d)     During any period after the first Due Period if a Sale Restriction Condition occurs, the Issuer shall send a notice to the Trustee and the Holders of the Notes to the effect that, for so long as the applicable Sale Restriction Condition exists, unless the Holders of at least 60% in Aggregate Principal Amount of the Notes elect to retain the guidelines in effect on the Closing Date for sales of an item of Credit Risk Portfolio Collateral or Credit Improved Portfolio Collateral, as applicable, (i) no item of Credit Risk Portfolio Collateral may be sold unless (A) the rating of the obligor or of any debt or securities issued by the obligor under such an item of Credit Risk Portfolio Collateral has been lowered, withdrawn or put on any "credit watch" list for possible downgrade (or similar list) with negative implications by S&P, Moody's or Fitch or (B) such an item of Credit Risk Portfolio Collateral satisfies the Credit Risk Criteria and is not objected to by the Holders of more than 60% in Aggregate Principal Amount of the Notes within forty-five (45) days of the date of such notice, or such later date as extended by the Trustee at the direction of the Servicer *provided* that in making such determination to sell an item of Credit Risk Portfolio Collateral, an increase in credit spread or a decrease in Market Value of such item of Credit Risk Portfolio Collateral may only be used as corroboration of other bases for such determination or (ii) no item of Credit Improved Portfolio Collateral may be sold unless such item of Credit Improved Portfolio Collateral satisfies the Credit Improved Criteria and is not objected to by the Holders of more than 60% in Aggregate Principal Amount of the Notes within forty-five (45) days of the date of such notice, or such later date as extended by the Trustee at the direction of the Servicer *provided*, that in making such determination to sell such item of Credit Improved Portfolio Collateral, a reduction in credit spread or an increase in Market Value of such item of Credit Improved Portfolio Collateral may only be utilized as corroboration or other bases for such judgment.

(e)     Notwithstanding anything to the contrary set forth above, the Servicer may at any time direct the Trustee to sell any item of Portfolio Collateral that (i) was obtained as a result of any reorganization or restructuring of any Credit Risk Portfolio Collateral or other Portfolio Collateral of an issuer under financial distress, or (ii) does not comply with the criteria set forth in Section 12.2.

Notwithstanding anything in this Indenture to the contrary, no acquisition or disposition of Portfolio Collateral or other eligible asset (as defined in Rule 3a-7) shall be effected by or on behalf of the Issuer for the primary purpose of recognizing gains or decreasing losses resulting from market value changes.

Notwithstanding the forgoing, if there is no appointment of a successor Servicer with 90 days after the resignation or termination of the Servicer, any sales or disposition of Portfolio Collateral shall be limited to Credit Risk Portfolio Collateral and Defaulted Portfolio Collateral and Equity Portfolio Collateral; *provided* that such restriction on the sale or disposition of Portfolio Collateral shall not apply if the Portfolio Collateral is being liquidated in whole or in part in connection with an acceleration or early termination of the Notes.

Section 12.2.   Eligibility Criteria and Replacement Restrictions

Subject to Section 3.4 (with respect to Original Portfolio Collateral) in connection with dates occurring prior to the Effective Date, a security to be Granted to the Trustee after the Closing Date for inclusion in the Trust Estate as an item of Portfolio Collateral will be eligible

for purchase by the Issuer and inclusion in the Trust Estate only if, as of the date of such Grant of such security the following conditions are met, as certified to the Trustee by Servicer Order, the Overcollateralization Tests, the Interest Coverage Test and the criteria set forth below in this Section 12.2 hereof are satisfied or if one of such tests or criteria is not satisfied, the degree of compliance with such tests or criteria would not be diminished except as otherwise required by Sections 11.3 and 12.4. In addition, if a Suspension Trigger Event is in effect, a majority of the Controlling Class may deliver notice to the Issuer directing the Issuer to suspend any purchases of additional items for inclusion in the Trust Estate as an item of Portfolio Collateral. Such suspension shall automatically terminate once a Suspension Trigger Event is no longer in effect.

(a) <u>Standard & Poor's CDO Monitor</u>. The Standard & Poor's CDO Monitor Test is satisfied. For purposes of the Standard & Poor's CDO Monitor Test, the "Standard & Poor's Rating" of any item of Portfolio Collateral or Eligible Investment shall be as set forth in <u>Schedule D</u> hereto. The Standard & Poor's CDO Monitor Test is not applicable and does not have to be satisfied or maintained when reinvesting the proceeds of Defaulted Portfolio Collateral or Credit Risk Portfolio Collateral.

(b) <u>Minimum Average Recovery Rate Test</u>. The Minimum Average Recovery Rate Test is satisfied.

(c) <u>Moody's Asset Correlation Test and Moody's Weighted Average Rating Test</u>. The Moody's Asset Correlation Test, the Moody's Weighted Average Rating Test and the Moody's Weighted Average Rating Test for CLO Securities are satisfied.

(d) Weighted Average Coupon Test; Weighted Average Margin Test; Weighted Average Life Requirement.

(i) The Weighted Average Coupon Test is satisfied.

(ii) The Weighted Average Margin Test is satisfied.

(iii) The Weighted Average Life Requirement is satisfied.

(e) <u>Limitation on Non-U.S. Debt</u>. After giving effect to the proposed purchase of such Portfolio Collateral:

(i) not more than 10% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors;

(ii) not more than 10% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors in any single Group A Country;

(iii) not more than 5% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors in all Group B Countries;

(iv)     not more than 2% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors in any single Group B Country;

(v)     not more than 2.5% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors in all jurisdictions that are not Group A Countries or Group B Countries; and

(vi)     not more than 1% of the Aggregate Par Amount may consist of items of Portfolio Loans that are obligations of Permitted Non-U.S. Obligors in any single jurisdiction that is not a Group A Country or Group B Country.

(f)     Rating.     After giving effect to the proposed purchase of any Portfolio Collateral: (i) at least 20% of the Aggregate Principal Amount of the Portfolio Collateral included in the Trust Estate must be obligations of issuers having at least one class of indebtedness actually rated by Moody's (either publicly or privately) and (ii) at least 90% of the Aggregate Principal Amount of the Portfolio Collateral in the Trust Estate must be obligations of issuers having at least one class of indebtedness actually rated by S&P (either publicly or privately).

(g)     CCC/Caa Portfolio Collateral Limitation.     The proposed purchase of any Portfolio Collateral may not increase the Aggregate Principal Amount of CCC/Caa Portfolio Collateral in the Trust Estate to more than 5% of the Aggregate Par Amount; *provided* that the Issuer may purchase CCC/Caa Portfolio Collateral which would increase the Aggregate Principal Amount of CCC/Caa Portfolio Collateral in the Trust Estate above 5% of the Aggregate Par Amount with the proceeds of CCC/Caa Portfolio Collateral; and *provided further* that no CLO Securities may be included in the determination of this CCC/Caa Portfolio Collateral Limitation.

(h)     Limitation on CLO Securities.     After giving effect to the proposed purchase of any Portfolio Collateral, (i) not more than 35% of the Aggregate Par Amount may be CLO Securities; (ii) not more than 10% of the Aggregate Par Amount may consist of CLO Securities that have a Moody's Rating below "Baa3" or an S&P Rating below "BBB-"; *provided* that not more than 2% of the Aggregate Par Amount may consist of a single CLO Security with such ratings; *provided further* that not more than 2.75% of the Aggregate Par Amount may consist of a single CLO Security having a Moody's Rating of "Baa3" or above or an S&P Rating of "BBB-" or above; (iii) not more than 4.0% of the Aggregate Par Amount may consist of CLO Securities of a single manager which shall not be any of the Servicer Entities, (iv) not more than 5.0% of the Aggregate Par Amount may consist of CLO Securities managed by any of the Servicer Entities; *provided* that not more than 1.5% of the Aggregate Par Amount may consist of CLO Securities of a single issuer serviced or managed by the Servicer, and (v) no more than 3% of the Aggregate Par Amount may consist of "pay as you go" Synthetic Securities; *provided further*, that no CLO Securities may be purchased after August 1, 2012 and after the expiration of the Revolving Period, unless an Extension shall occur in

which case CLO Securities may be purchased during the full period of such Extension in accordance with all the criteria and restrictions provided herein that are applicable during the Revolving Period.

(i)  Limitation on Semiannual Portfolio Collateral. After the Effective Date, after giving effect to the proposed purchase of any Portfolio Collateral, no more than 5% of the Aggregate Par Amount may include items of Portfolio Collateral that provide for the periodic payment in cash of interest less frequently than quarterly, but not less frequently than semiannually.

(j)  Limitation on Participations, Synthetic Securities and Non-U.S. Portfolio Loans. After giving effect to the proposed purchase of any Substitute Portfolio Collateral or Additional Portfolio Collateral, no more than 20% of the Aggregate Par Amount may be Participations, Synthetic Securities, Securities Lending Agreements or Portfolio Loans that are obligations of non-U.S. entities which are not in a Group A Country. Further, no Participation may be purchased from any Selling Institution (including for this purpose the seller of any participation and the seller of any sub-participation) rated below "A" by S&P or "A2" by Moody's. In addition, the table below generally describes limitations on (i) the percentage of the Aggregate Par Amount which consist of Synthetic Securities related to the long-term debt rating of the Synthetic Security Counterparty, (ii) the percentage of the Aggregate Par Amount which consists of Participations related to the long-term debt rating of the related Selling Institution, and (iii) the limitations on the percentage of the Aggregate Par Amount which consists of Participations and Synthetic Securities in the aggregate related to the long-term debt rating of the Selling Institution or Synthetic Security Counterparty, as the case may be:

| Rating (S&P/Moody's) | Individual Synthetic Security Counterparty Limit | Individual Participation Selling Institution Limit | Aggregate Synthetic Security Counterparty and Participation Selling Institution Limit | Securities Lending Counterparty |
|---|---|---|---|---|
| AAA/Aaa | 20% | 20% | 20% | 20% |
| AA+/Aa1 | 10% | 10% | 20% | 10% |
| AA/Aa2 | 10% | 10% | 17.5% | 10% |
| AA-/Aa3 | 10% | 10% | 15% | 10% |
| A+/A1 | 5% | 5% | 10% | 5% |
| A/A2 | 5% | 5% | 7.5% | 5% |

*provided*, that no more than 3% of the Aggregate Par Amount may be Synthetic Securities consisting of Default Swaps. For purposes of the foregoing, the limitations shall be calculated separately for each of Standard & Poor's and Moody's and each such limitation must be satisfied.

(k)  Limitation on Fixed Rate Portfolio Collateral. No more than 5% of the Aggregate Par Amount may be Fixed Rate Portfolio Collateral.

(l)  Portfolio Loans. After giving effect to the proposed purchase of any Portfolio Collateral, (i) at least 65% of the Aggregate Principal Amount of the Portfolio Collateral included in the Trust Estate must be Portfolio Loans (including

Synthetic Securities, the Reference Obligations of which are loans); and (ii) not more than 10% of the Aggregate Principal Amount of the Portfolio Collateral included in the Trust Estate may be Portfolio Loans that are not Senior Secured Loans (including Synthetic Securities, the Reference Obligations of which are loans).

(m)  No Event of Default.  No Event of Default shall have occurred and be continuing.

(n)  Industry Category Concentration.  (i) No more than 8% of the Aggregate Par Amount is in any one Standard & Poor's Industry Category; *provided however*, in the case of three (3) Standard & Poor's Industry Categories, up to 12% of the Aggregate Par Amount may consist of items of Portfolio Collateral that are obligations of obligors in any one Standard & Poor's Industry Category, and (ii) no more than 32% of the Aggregate Par Amount may consist of items of Portfolio Collateral that are obligations of obligors in any three Standard & Poor's Industry Categories.

(o)  Original Issue Size.  After giving effect to the proposed purchase of any Portfolio Collateral, at least 80% of the Aggregate Principal Amount of the Portfolio Collateral included in the Trust Estate will be Portfolio Loans and CLO Securities that are part of a senior credit facility whose aggregate original principal amount (whether or not funded and including all tranches thereunder) is not less than U.S.$100,000,000.  No item of Portfolio Collateral included in the Trust Estate will be CLO Securities that are part of an issuer's aggregate issuance whose aggregate original principal amount (including all tranches thereunder) is less than U.S.$100,000,000.  No item of Portfolio Collateral included in the Trust Estate will be Portfolio Loans that are part of a senior credit facility whose aggregate original principal amount (whether or not funded and including all tranches thereunder) is less than $50,000,000.

(p)  Issuer Concentration.  (i) After giving effect to the proposed purchase of any Portfolio Loan, no more than 1.5% of the Aggregate Par Amount may represent obligations of any single obligor, *provided* that obligations of not more than five obligors of Portfolio Loans may represent no more than 2.0% of the Aggregate Par Amount and (ii) after giving effect to the proposed purchase of any CLO Security, no more than 2.75% of the Aggregate Par Amount may represent obligations of any single obligor.

(q)  Limitations on Step-Up Bonds.  No more than 5% of the Aggregate Par Amount may include step-up bonds.

(r)  Delayed Drawdown Loans and Revolving Loans.  After giving effect to the proposed purchase of any Portfolio Collateral, no more than 5% of the Aggregate Par Amount may consist of Delayed Drawdown Loans and no more than 7.5% of the Aggregate Par Amount may consist of Revolving Loans; *provided* that no more than 10% of the Aggregate Par Amount may consist of Delayed Drawdown Loans and Revolving Loans in the aggregate.

(s) <u>DIP Loans</u>. No more than 5.0% of the Aggregate Par Amount may consist of DIP Loans. Each DIP Loan must be assigned a formal or estimated rating by Moody's and S&P.

(t) <u>Collateral Obligations Loaned under Securities Lending Agreements</u>. No more than 20% of the Aggregate Par Amount may include Portfolio Collateral subject to any Securities Lending Agreement pursuant to Section 7.19.

(u) <u>PIK Bonds</u>. No more than 35% of the Aggregate Par Amount may consist of PIK Bonds.

Notwithstanding anything to the contrary set forth in this Section 12.2, if the Portfolio Collateral to be purchased is to be purchased with the Collateral Disposition Proceeds of the disposition of one or more assets that is not an item of Credit Risk Portfolio Collateral, Defaulted Portfolio Collateral, Portfolio Collateral sold pursuant to a Portfolio Improvement Exchange or Portfolio Collateral that has become subject to withholding tax, the purchase of the proposed item of Portfolio Collateral must (i) restore compliance with a Collateral Quality Test, Interest Coverage Test, Overcollateralization Test or a concentration limitation set forth in this Section 12.2 (or bring the Portfolio Collateral closer to compliance with any such test or limitation) not then satisfied or (ii) on a net basis improve the quality of the Portfolio Collateral as measured by such Collateral Quality Tests, Interest Coverage Tests, Overcollateralization Tests and concentration limitations and (iii) in the case of each of clause (i) and clause (ii) without causing any other Collateral Quality Test, Interest Coverage Test, Overcollateralization Test or concentration limitation to be violated or significantly increasing the likelihood of such a violation in the future.

Notwithstanding the foregoing provisions of this Section 12.2 and Section 11.3, if the Issuer or the Servicer has previously entered into a commitment to purchase an item of Portfolio Collateral to be included in the Trust Estate and at the time of such commitment such item of Portfolio Collateral complied with the definition of Portfolio Collateral and each of the foregoing criteria in this Section 12.2, then the Issuer may consummate the purchase of such item of Portfolio Collateral notwithstanding that such item of Portfolio Collateral fails to comply with the definition of Portfolio Collateral and such criteria on the date of settlement, *provided* that the agreed to settlement date shall not be more than thirty (30) days after the commitment to acquire such item of Portfolio Collateral or, if settlement occurs more than 30 days following the commitment, such item of Portfolio Collateral satisfies the criteria of this Section 12.2 as of the date of settlement.

Notwithstanding the foregoing provisions of this Section 12.2 and Section 11.3, the Issuer or the Servicer on behalf of the Issuer shall be deemed, except for purposes of the Granting Clauses, to have purchased or sold (as the case may be) any Portfolio Collateral as of the date on which the Issuer delivers to the Trustee a commitment to purchase or sell (as the case may be) such items of Portfolio Collateral, in each case entitling the Issuer (or the Trustee as assignee thereof) to receive or sell (as the case may be), and requiring the purchaser to purchase (in the case of a sale), such Portfolio Collateral and, in such event, the Issuer shall be deemed to have purchased or sold (as the case may be) such Portfolio Collateral on such date. Under the circumstances described in the immediately preceding sentence, if the transaction contemplated

by the commitment referred to therein does not settle on or before the thirtieth (30th) day following the scheduled settlement date, the deemed purchase or sale shall be deemed not to have occurred.

Further, notwithstanding the foregoing provisions of this Section 12.2 and Section 11.3, any certifications or other documents required to be delivered by the Servicer or the Issuer in connection with the purchase or sale of any item of Portfolio Collateral during the Revolving Period may be delivered by the Issuer or the Servicer on the settlement date for such item of Portfolio Collateral even if such date occurs after the Revolving Period.

Section 12.3.   Sale of Portfolio Collateral Subject to Offer or Call

(a)     The Servicer may only direct the Trustee to sell an item of Portfolio Collateral that is the subject of an Offer or call for redemption, if together with its direction to sell such security, the Servicer certifies to the Trustee that the sales price for such Security is equal to or greater than 1% of the price available pursuant to such Offer or call and such sale will be treated as if the Offer or call were consummated for purposes of determining the Collections for the Due Period relating to the date on which such sale occurs.

(b)     If an item of Portfolio Collateral becomes subject to an Exchange Offer after it has been purchased by the Issuer, the Servicer will be permitted to take such action with respect to the Underlying Instrument or the issuer thereof as may be required to convert such item of Portfolio Collateral into an item of Equity Portfolio Collateral.

Section 12.4.   Purchase of Substitute Portfolio Collateral

(a)     Upon receipt by the Trustee of a Servicer Order with respect thereto, the Collateral Disposition Proceeds received during any Due Period during the Revolving Period may be paid out of the Collection Account, on any Business Day during such Due Period or the immediately succeeding Due Period, for the purpose of purchasing one or more items of Substitute Portfolio Collateral for inclusion in the Trust Estate in an amount not to exceed the amount of such proceeds and specified in such Servicer Order; *provided* that the Trustee shall have received (i) a certificate of the Servicer dated as of the date of the purchase and the Grant of such Substitute Portfolio Collateral to the effect that such purchase is in compliance with the requirements of this Section 12.4 and Section 12.5(a) hereof and (ii) the certificate required pursuant to Section 12.2 hereof.

(b)     In addition to the requirements set forth in 12.4(a), in connection with Substitute Portfolio Collateral purchased with Collateral Disposition Proceeds from the sale of Defaulted Portfolio Collateral, each of the Overcollateralization Tests and the Interest Coverage Test are satisfied, in each case both before and after giving effect to such purchase.

(c)     In connection with a sale of an item of Credit Improved Portfolio Collateral after the Revolving Period or the receipt of Collateral Principal Collections due to an unscheduled prepayment after the Revolving Period, the Servicer may enter into commitments to apply such Collateral Disposition Proceeds or such unscheduled prepayments (net of accrued interest and costs) to the purchase of Portfolio Loans as either Additional Portfolio Collateral or Substitute Portfolio Collateral having an Aggregate Principal Amount equal to or greater than the

Principal Balance of the original item of Portfolio Collateral within 90 days of receipt of such proceeds, so long as the Servicer certifies as of the date of purchase that it reasonably believes at the time of such commitment that, after giving effect to such sale and subsequent purchase, (A) each of the Overcollateralization Tests and the collateral criteria described in Section 12.2 would be satisfied and the Interest Coverage Test was satisfied for the most recent Payment Date, (B) such Portfolio Loan to be purchased has a Moody's Rating equal to or higher than the Moody's Rating of the original item of Portfolio Collateral, (C) such Portfolio Loan to be purchased has an S&P Rating equal to or higher than the S&P Rating of the original item of Portfolio Collateral, (D) such Portfolio Loan to be purchased has a stated maturity on or prior to the final maturity of such original item of Portfolio Collateral and (E) neither Rating Agency has reduced or withdrawn (and not restored) the rating assigned by it on the Closing Date to any Class of Notes.

Section 12.5. Conditions Applicable to all Transactions Involving Purchases of Portfolio Collateral

(a)     Any transaction effected under this Article or under Sections 3.4, 10.2, 10.3, 11.3 or 12.4 hereof involving the Servicer and one or more Affiliates of the Servicer shall be conducted on an arm's-length basis.  Any such transaction effected with an Affiliate of the Servicer, the Issuer or the Trustee, shall be effected on terms as favorable to the Noteholders as would be the case if such Person were not so affiliated; *provided* that the Trustee shall have no responsibility to oversee compliance with this clause by the Issuer or Servicer.

(b)     Upon any purchase or substitution pursuant to this Article or Sections 11.3, 12.3(b) or 12.4 hereof, each such Pledged Security shall be Delivered to the Trustee.

(c)     The Issuer hereby represents and warrants and will certify to the Trustee in an Officer's Certificate as of the date of each purchase and Grant to the Trustee of each Portfolio Collateral pursuant to Section 11.3, Section 12.3(b) and Section 12.4 hereof:

(i)     the Issuer is the owner of such item of Portfolio Collateral and the Deposit free and clear of any liens, claims (including any adverse claims) or encumbrances of any nature whatsoever, except for those granted or expressly permitted pursuant to this Indenture and due bills, if any, with respect to interest, or a portion thereof, accrued on such Portfolio Collateral prior to the first payment date and owed by the Issuer to the seller of such Portfolio Collateral;

(ii)     the Issuer has acquired its ownership in such item of Portfolio Collateral and the Deposit in good faith without notice of any adverse claim, except as described in paragraph (i) above;

(iii)     the Issuer has Delivered such item of Portfolio Collateral to the Trustee and has not assigned, pledged or otherwise encumbered any interest in such Portfolio Collateral or the Deposit other than interests granted or expressly permitted pursuant to this Indenture;

(iv)     the Issuer has full right to Grant and does Grant pursuant to the Granting Clauses such item of Portfolio Collateral and the Deposit to the Trustee;

(v)     the information set forth with respect to such item of Portfolio Collateral in Schedule A hereto is correct; and

(vi)     such item of Portfolio Collateral satisfies the requirements of the definition of Portfolio Collateral.

Section 12.6.   Sale of Warrants

The Servicer may direct the Trustee in writing to sell, and the Trustee shall release from the lien of this Indenture and sell in the manner directed by the Servicer, any warrant that is part of a Unit at any time after such warrant becomes separately tradable.

Section 12.7.   Underlying Instruments

(a)     With respect to each Portfolio Loan acquired by a Participation, the Issuer shall cause the Trustee to hold at its office in the State of New York or the Commonwealth of Massachusetts an original executed Underlying Instrument entered into between the Issuer and the Selling Institution which, except in the case of a Portfolio Loan evidenced by an instrument (the original of which shall be delivered to the Trustee), may be a copy thereof, which may be sent by telecopier, certified by the Servicer or the Issuer as a true and accurate copy (which in the case of a Participation shall include the loan and security documentation with respect to the underlying loan) as provided to it by the Servicer, and, *provided* that the Trustee has sufficient advance notice of such transaction, the Trustee shall send a notice of the assignment of such Participation to the Selling Institution and the underlying obligor of such Portfolio Loan on or prior to the Business Day on which such Portfolio Loan is to be included in the Trust Estate.

(b)     The Issuer (upon Servicer Order) may enter into any amendment of or supplement to any Underlying Instrument with respect to any item of Portfolio Collateral, without notice to or consent of any Noteholder, but with prior written notice to the Trustee, if the amendment or supplement is required (a) by the provisions of the Underlying Instrument or this Indenture, (b) to cure any ambiguity, inconsistency or formal defect or omission, (c) in connection with any authorized amendment of or supplement to this Indenture, or (d) to make any other change deemed necessary or beneficial by the Issuer (upon Servicer Order); *provided* that, unless such Portfolio Loan is in default, or default is reasonably foreseeable, after giving effect to such amendment or supplement, such item of Portfolio Collateral satisfies the definition of Portfolio Collateral hereunder.  The Issuer shall be under no obligation to enter into any such amendment or supplement, and the Servicer and the Issuer shall be under no obligation to provide any Person with any information related thereto (other than to confirm to the Trustee compliance with this Section), to the extent that the Servicer or the Issuer, as the case may be, believes in good faith that any action so taken is necessary in order not to violate any law, regulation or contractual arrangement.  The Servicer shall retain any appropriate records of such amendments.

(c)     If an amendment of or supplement to any Underlying Instrument without any consent of Noteholders is not permitted by subsection (b), the Issuer may enter into, and the Trustee shall, as directed by the Issuer, accept, or if necessary consent to, such amendment or supplement, with at least 10 days' prior written notice to the Trustee and the Holders of the

Notes, unless the Trustee and the Issuer have received notification by the more than 33-1/3% of the Aggregate Principal Amount of the Notes objecting to such amendment or supplement within 10 days of such notice.

(d)    If the Servicer determines that any amendment to the Underlying Instrument of a DIP Loan materially affects the credit quality of such DIP Loan, the Servicer shall promptly notify the Rating Agencies of such amendment, prior to execution of such amendment.

Section 12.8.    Synthetic Securities

For purposes of the eligibility criteria and related tests herein, a Synthetic Security will generally be included as an item of Portfolio Collateral having the maturity, interest rate and other payment characteristics of the Synthetic Security and not of the Reference Obligation (including characterization as either an item of Fixed Rate Portfolio Collateral or Floating Rate Portfolio Collateral) and, with respect to all other characteristics, will be included as an item of Portfolio Collateral having the relevant characteristics of the related Reference Obligation and not of the Synthetic Security. The Servicer will notify Moody's and Standard & Poor's in writing or electronically with respect to each purchase of a Synthetic Security not later than the trade date for such Synthetic Security; except that, if, at any time, the rating by Moody's on any Class of Notes then rated by Moody's has been downgraded at least one rating sub-category (and has not been restored) or is put on credit watch (with negative implications), no Synthetic Security will be purchased by the Issuer for inclusion in the Trust Estate unless Moody's has received notice of such purchase and any information necessary to evaluate such purchase, receipt of which shall be acknowledged by a Vice President or more senior member of Moody's CDO Group, in writing or electronically, and after such receipt is acknowledged, either Moody's shall inform the Servicer that such purchase will not cause Moody's to withdraw or further downgrade any of the then-current ratings assigned by Moody's to any of the Notes within 10 Business Days, or after 10 Business Days the Servicer may assume that such purchase will not cause Moody's to withdraw or further downgrade any of the then-current ratings assigned by Moody's to any of the Notes. If after the trade date for any Synthetic Security, there is any modification to the terms of such Synthetic Security, the Servicer will provide notice of such modification to Moody's and Standard & Poor's. Further, unless otherwise agreed by Moody's or as otherwise contemplated in the definition of Synthetic Security in Section 1.1 hereof, upon maturity, acceleration or early termination of a Synthetic Security or the related Reference Obligation, the Issuer will accept only the Reference Obligation or the par amount thereof unless the Reference Obligation would be characterized as Credit Risk Portfolio Collateral, Defaulted Portfolio Collateral or Credit Improved Portfolio Collateral, in which case the Issuer may accept the current fair market value thereof, except in the event of the exercise of any put or call provision of the Synthetic Security or Reference Obligation, in which case the Issuer shall only accept the Reference Obligation or an amount greater than or equal to the par amount thereof, and the Issuer will take all commercially reasonable actions under the Synthetic Security to accomplish the foregoing. Notwithstanding anything in this Indenture to the contrary, in connection with the acquisition of a Synthetic Security and in lieu of all or a portion of the purchase price for such Synthetic Security, the Issuer may grant the related Synthetic Security a first priority security interest in cash and Eligible Investments designated by the Issuer and the proceeds thereof, which may be released from the lien of the Indenture and deposited with such

Synthetic Security Obligor (or an intermediary or agent therefor) and invested as provided by the terms of such Synthetic Security, and the proceeds of which may be applied to make periodic payments under such Synthetic Security. For purposes of this Indenture, the grant of such security interest shall be treated as the payment of a purchase price equal to the value of the cash and Eligible Investments granted, and the Issuer's obligation to make periodic payments under such Synthetic Security shall be disregarded.

Section 12.9. Delayed Drawdown Loans and Revolving Loans

A Delayed Drawdown Loan will not be eligible for purchase by the Issuer for inclusion in the Trust Estate unless the related Underlying Instrument provides (i) that advances may be made for a period not to exceed one (1) year from the date of origination of the Delayed Drawdown Loan and in any event before the end of the Revolving Period; (ii) for a maximum amount that can be borrowed from the Issuer on one or more specified borrowing dates; (iii) that funds borrowed from the Issuer and subsequently repaid may not be reborrowed; and (iv) that the borrower is entitled to such additional advances only upon the achievement of financial performance or other objective criteria established at origination and set forth in such credit agreement.

In addition, simultaneously with the Issuer's purchase of any Delayed Drawdown Loan or Revolving Loan, the Issuer is required to deposit into the Loan Funding Account the full amount of any advances or delayed draws that may be required of the Issuer thereunder and principal repaid under any Revolving Loan is required to be deposited in the Loan Funding Account to the extent the Issuer's obligation to fund any future advances has not been irrevocably reduced.

ARTICLE XIII

MISCELLANEOUS

Section 13.1. Form of Documents Delivered to Trustee

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

Any certificate or opinion of an Authorized Officer of the Issuer or the Servicer may be based, insofar as it relates to legal matters, upon an Opinion of Counsel or a certificate of or representations by such legal counsel, unless such Authorized Officer knows, or in the exercise of reasonable care should know, that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous. Any such certificate of an Authorized Officer of the Issuer or the Servicer, or Opinion of Counsel or certificate of or representations by such legal counsel may be based, insofar as it relates to factual matters, upon a certificate of opinion of, or representations by the Issuer, the Servicer or

any other Person, stating that the information with respect to such factual matters is in the possession of the Issuer, the Servicer or such other Person, unless such Authorized Officer of the Issuer or the Servicer or counsel knows that the certificate or opinion or representations with respect to such matters are erroneous. Any Opinion of Counsel may also be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Authorized Officer of the Issuer or the Servicer, stating that the information with respect to such matters is in the possession of the Issuer or the Servicer, unless such counsel knows that the certificate or opinion or representations with respect to such matters are erroneous.

Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Section 13.2. Acts of Noteholders

(a)     Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Noteholders may be embodied in and evidenced by one or more instruments (which may be an electronic document, including but not limited to in the form of e-mail, to the extent permitted by applicable law) of substantially similar tenor signed by such Noteholders in person or by an agent or proxy duly appointed in writing (*provided* that no signature shall be required on electronic documents, including but not limited to in the form of e-mail); and, except as herein otherwise expressly provided, such action shall become effective when such instrument or instruments are delivered to the Trustee, and, where it is hereby expressly required, to the Issuer. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Issuer, if made in the manner provided in this Section.

(b)     The fact and date of the execution by any Person of any such instrument or writing may be proved in any manner which the Trustee deems sufficient.

(c)     The ownership of Notes and Combination Notes shall be proved by the Note Register.

(d)     Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Notes or Combination Note shall bind the Holder (and any transferee thereof) of every Note or Combination Note issued upon the registration thereof or in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Trustee or the Issuer in reliance thereon, whether or not notation of such action is made upon such Note or Combination Note.

Section 13.3. Notices, etc., to the Trustee, Issuer, Servicer, the Irish Paying Agent and Bear Stearns

Any request, demand, authorization, direction, notice, consent, waiver or other documents provided or permitted by this Indenture to be made upon, given or furnished to, or filed with the Trustee, the Issuer, the Servicer, Bear Stearns, the Irish Paying Agent or the Paying and Transfer Agent shall be sufficient for every purpose hereunder if in writing and mailed by first class mail, sent by overnight courier guaranteeing next day delivery or sent by facsimile

transmission in legible form to the Trustee, the Issuer, the Servicer or Bear Stearns, as applicable, at the following addresses:

(1)     to the Trustee at its Corporate Trust Office or at any other address furnished in writing to the Issuer or the Noteholders by the Trustee (any request, direction, notice or other communication from the Servicer to the Trustee under Article XII hereof (other than required certification) may be by electronic mail, which shall be deemed to be in writing);

(2)     to the Issuer at the offices of Maples Finance Limited, P.O. Box 1093 GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands, Attention:  Directors, or at any other address previously furnished in writing to the Trustee by the Issuer;

(3)     to the Co-Issuer at c/o Donald J. Puglisi, 850 Library Avenue, Suite 204, City of Newark, County of New Castle, Delaware 19711, or at any other address previously furnished in writing to the Noteholders, the Trustee or the Issuer by the Co-Issuer;

(4)     to the Servicer at the offices of Highland Capital Management, LP, Two Galleria Tower, 13455 Noel Road, Suite 1300, Dallas, Texas 75240, Attention: James Dondero, or at any other address previously furnished in writing to the Noteholders, the Trustee or the Issuer by the Servicer;

(5)     to Bear Stearns at the offices of Bear, Stearns & Co. Inc., 383 Madison Avenue, 7th Floor, New York, New York 10179, Attention: CDO Group, or at any other address previously furnished in writing to the Trustee by Bear Stearns;

(6)     to the Irish Paying Agent at the offices of 3 George's Dock, International Financial Services Centre, Dublin, Ireland or at any other address previously furnished in writing to the Trustee by the Irish Paying Agent;

(7)     to the Paying and Transfer Agent at the offices of Investors Bank & Trust Company, at the Trustee's Corporate Trust Office;

(8)     to the Rating Agencies as described in Section 10.7 hereof; or

(9)     to the Cap Provider as provided for in the Cap Agreement at Bear, Stearns & Co. Inc., 383 Madison Avenue, New York, New York 10179, Attention: Head of Interest Rate Derivatives Marketing, or at any such other address previously furnished in writing to the Trustee by the Cap Provider and to the address furnished by any subsequent Hedge Counterparty.

The Issuer hereby directs the Trustee and the Trustee agrees that, until it receives written notification from Ambac Assurance Corporation ("Ambac") to the contrary, it shall deliver, or cause to be delivered, to Ambac, at its addresses set forth below, a copy of each Monthly Report, Note Valuation Report, other report, accounting, request, demand, authorization, direction, order, notice, consent waiver or other action (each, a "Notice") delivered

or required to be delivered to any Holder or any Rating Agency pursuant to this Indenture. Any Notice shall be delivered to Ambac at One State Street Plaza, New York, New York 10004; Attention: Portfolio Risk Management, facsimile (212) 208-3509, e-mail sfcdsurv@ambac.com, or at any other address previously furnished to the Trustee by Ambac, not later than the first day on which such Notice is delivered to any Holder or Rating Agency. Any document required to be delivered or made available to Ambac may be made available by providing Ambac with access to a website containing such report in a format that permits the user to download the document as a pdf file.

Section 13.4.  Notices to Noteholders; Waiver

Where this Indenture provides for giving a copy of any report or notice to Noteholders (such report or notice a "notice") of any event, such notice shall be sufficiently given (unless otherwise herein expressly provided) if in writing and mailed, first-class postage prepaid, to each Noteholder affected by such event, at its address as it appears on the Note Register, not later than the latest date, and not earlier than the earliest date, prescribed for the giving of such notice and so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent. In any case where notice to Noteholders is given by mail, neither the failure to mail such notice, nor any defect in any notice so mailed, to any particular Noteholder shall affect the sufficiency of such notice with respect to other Noteholders, and any notice which is mailed in the manner herein provided shall conclusively be presumed to have been duly given whether or not received. The Trustee shall provide notices directly to any beneficial holder of a Note that so identifies itself and requests receipt of such notices in writing to the Trustee.

Where this Indenture provides for notice in any manner, any such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Noteholders shall be filed with the Trustee but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

In the event that, by reason of the suspension of the regular mail service as a result of a strike, work stoppage or similar activity it shall be impractical to mail notice of any event to Noteholders when such notice is required to be given pursuant to any provision of this Indenture, then any manner of giving such notice as shall be satisfactory to the Trustee shall be deemed to be a sufficient giving of such notice.

Section 13.5.  Effect of Headings and Table of Contents

The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

Section 13.6.  Successors and Assigns

All covenants and agreements in this Indenture by the Co-Issuers shall bind its respective successors and assigns, whether so expressed or not.

Section 13.7.   Severability

In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 13.8.   Benefits of Indenture

Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the parties hereto and their successors hereunder, each Hedge Counterparty, the Servicer and the Noteholders, any benefit or any legal or equitable right, remedy or claim under this Indenture.

The Servicer, the Hedge Counterparty and their respective successors and assigns, shall each be third-party beneficiaries of the provisions of this Indenture, and shall be entitled to rely upon this Indenture and directly to enforce such provisions of this Indenture.

Section 13.9.   Reserved

Section 13.10. Governing Law; Submission to Jurisdiction; Waiver of Trial by Jury

(a)     This Indenture, each indenture supplemental hereto and each Note (including the Note Component of the Combination Note) shall be construed in accordance with and governed by the laws of the State of New York applicable to agreements made and to be performed therein.  The State of New York shall be the securities intermediary's jurisdiction of the Securities Intermediary for purposes of the UCC and the United States Regulations.

(b)     Each of the Co-Issuers and the Trustee hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the Supreme Court of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to the Notes, the Combination Notes or this Indenture, or for recognition or enforcement of any judgment, and each of the Co-Issuers and the Trustee hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such New York State or, to the extent permitted by law, in such Federal court.  Each of the Co-Issuers and the Trustee hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.  Each of the Co-Issuers and the Trustee irrevocably consents to the service of any and all process in any action or proceeding by the mailing or delivery of copies of such process to it at the office of its agent set forth in Section 13.3.  Each of the Co-Issuers and the Trustee agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c)     EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS INDENTURE, ANY OTHER TRANSACTION

DOCUMENTS OR ANY INSTRUMENT OR DOCUMENT DELIVERED HEREUNDER OR THEREUNDER.

Section 13.11. Counterparts

This instrument may be executed in any number of counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

Section 13.12. No Issuer Office Within the United States

The Issuer (or the Servicer acting in the name or on behalf of the Issuer) shall not maintain an office located within the United States; *provided* that neither the performance by Investors Bank & Trust Company, as Trustee or use any of in any of its other capacities hereunder, or as appointed agent for the Issuer of the Issuer's obligation to prepare reports under or pursuant to Article X hereof (and other services rendered by Investors Bank & Trust Company, pursuant to the Collateral Administration Agreement as described in Section 10.5(f) hereof) at and through the offices of Investors Bank & Trust Company in the United States nor the services rendered by the Servicer pursuant to the Servicing Agreement at its offices in the United States shall be a violation of this Section 13.12.

Section 13.13. Subordination

(a)     Notwithstanding anything in this Indenture to the contrary, the Issuer and the Holders of the Notes agree:

(i)     for the benefit of the Holders of the Class A-1LA Notes and the Trustee, that the Class A-1LB Notes, Class A-2L Notes, the Class A-3L Notes, the Class B-1L Notes, the Class B-2L Notes and the Issuer's rights in and to the Trust Estate (with respect to the Class A-1LA Notes, the "Senior Class A Subordinate Interests") shall be subordinate and junior to the Class A-1LA Notes and the Trustee to the extent and in the manner set forth herein, including but not limited to payment of principal of, and interest on, the Senior Class A Subordinate Interests, and that the lien of the Trustee with respect to the Senior Class A Subordinate Interests is subordinate to any lien of the Trustee in favor of the holders of Class A-1LA Notes; and

(ii)     for the benefit of the Holders of the Class A-1LB Notes and the Trustee that the Class A-3L Notes, the Class B-1L Notes, the Class B-2L Notes and the Issuer's rights in and to the Trust Estate (with respect to the Class A-1LB Notes, the "Class A-1LB Subordinate Interests") shall be subordinate and junior to the Class A-1LB Notes and the Trustee to the extent and in the manner set forth herein, including but not limited to payment of principal of, and interest on, the Class A-1LB Subordinate Interests, and that the lien of the Trustee with respect to the Class A-1LB Subordinate Interests is subordinate to any lien of the Trustee in favor of the holders of Class A-1LB Notes; and

(iii)     for the benefit of the Holders of the Class A-2L Notes and the Trustee that the Class A-3L Notes, the Class B-1L Notes, the Class B-2L Notes and the

Issuer's rights in and to the Trust Estate (with respect to the Class A-2L Notes, the "Class A-2L Subordinate Interests") shall be subordinate and junior to the Class A-2L Notes and the Trustee to the extent and in the manner set forth herein, including but not limited to payment of principal of, and interest on, the Class A-2L Subordinate Interests, and that the lien of the Trustee with respect to the Class A-2L Subordinate Interests is subordinate to any lien of the Trustee in favor of the holders of Class A-2L Notes; and

(iv)     for the benefit of the Holders of the Class A-3L Notes and the Trustee that the Class B-1L Notes and the Class B-2L Notes and the Issuer's rights in and to the Trust Estate (with respect to the Class A-3L Notes, the "Class A-3L Subordinate Interests") shall be subordinate and junior to the Class A-3L Notes and the Trustee to the extent and in the manner set forth herein, including but not limited to payment of principal of the Class A-3L Subordinate Interests, and that the lien of the Trustee with respect to the Class A-3L Subordinate Interests is subordinate to any lien of the Trustee in favor of the holders of Class A-3L Notes.

(v)     for the benefit of the Holders of the Class B-1L Notes and the Trustee that the Class B-2L Notes and the Issuer's rights in and to the Trust Estate (with respect to the Class B-1L Notes, the "Class B-1L Subordinate Interests") shall be subordinate and junior to the Class B-1L Notes and the Trustee to the extent and in the manner set forth herein, including but not limited to payment of principal of the Class B-1L Subordinate Interests, and that the lien of the Trustee with respect to the Class A-4L Subordinate Interests is subordinate to any lien of the Trustee in favor of the holders of Class B-1L Notes.

If any Event of Default has not been cured or waived and acceleration occurs in accordance with Article V, the Notes shall be paid in the priority set forth in Section 11.1(d) hereof.

In addition to the foregoing:

(i)     the Holders of the Class A-2L Notes agree, for the benefit of the Holders of the Class A-1L Notes, not to cause the filing of a petition in bankruptcy against the Issuer for failure to pay amounts due under the Class A-2L Notes or hereunder until the payment in full of the Class A-1L Notes;

(ii)     the Holders of the Class A-3L Notes agree, for the benefit of the Holders of the Senior Class A Notes, not to cause the filing of a petition in bankruptcy against the Issuer for failure to pay amounts due under the Class A-3L Notes or hereunder until the payment in full of the Senior Class A Notes;

(iii)     the Holders of the Class B-1L Notes agree, for the benefit of the Holders of the Class A Notes, not to cause the filing of a petition in bankruptcy against the Issuer for failure to pay amounts due under the Class B-1L Notes or hereunder until the payment in full of the Class A Notes; and

(iv)     the Holders of the Class B-2L Notes agree, for the benefit of the Holders of the Class A Notes and the Class B-1L Notes, not to cause the filing of a

petition in bankruptcy against the Issuer for failure to pay amounts due under the Class B-2L Notes or hereunder until the payment in full of the Class A Notes and the Class B-1L Notes;

in each case, not before one year and one day, or, if longer, the applicable preference period then in effect, have elapsed since such payment.

If notwithstanding the provisions of this Indenture, any Holder of any Class B-1L Notes shall have received any payment or distribution in respect of such Class B-1L Notes contrary to the provisions of this Indenture, then unless and until the Class A Notes shall have been paid in full in accordance with this Indenture, such payment or distribution shall be received and held in trust for the benefit of, and shall immediately be paid over and delivered to, the Trustee, which shall pay and deliver the same to the Holders of the Class A Notes, in accordance with this Indenture.

(b)     Each Holder of Class B-1L Notes or Class B-2L Notes agrees that such Holder shall not demand, accept, or receive any payment or distribution in respect of such Notes in violation of the provisions of this Indenture. Nothing in this Section shall affect the obligation of the Issuer to pay Holders of such Notes amounts owing in respect thereof.

(c)     So long as any Class A Notes remain Outstanding to the extent it may lawfully do so, each Class B-1L Noteholder and Class B-2L Noteholder by its acceptance of a Class B-1L Note or a Class B-2L Note, respectively:

(i)     agrees that it will not step up, plead, claim or in any manner whatsoever take advantage of, any appraisement, valuation, stay, extension or redemption laws, now or hereafter in force in any jurisdiction, which may delay, prevent or otherwise hinder (A) the performance, enforcement or foreclosure of this Indenture, (B) the sale of any of the Trust Estate, or (C) the putting of the purchaser or purchasers thereof into possession of such property immediately after the sale thereof;

(ii)     waives all benefit or advantage of any such laws;

(iii)     waives and releases all rights to have the Trust Estate marshaled upon any foreclosure, sale or other enforcement of this Indenture; and

consents and agrees that, subject to the terms of this Indenture, all the Collateral may at any such sale be sold by the Trustee as an entirety.

Section 13.14.  Survival of Provisions

Notwithstanding the satisfaction and discharge of this Indenture, the rights and obligations of either Co-Issuer, the Trustee, the Noteholders and other secured parties hereunder under Sections 2.7(h), 2.10, 4.2, 5.19, 6.7, 6.13, 7.3, 7.6, 7.16, 11.1 and 13.15 hereof shall otherwise survive termination of the rights of the parties hereunder.

Section 13.15. Liability of Co-Issuers.

Notwithstanding any other terms of this Indenture, the Notes or any other agreement entered into between, inter alia, the Co-Issuers or otherwise, neither of the Co-Issuers shall have any liability whatsoever to the other Co-Issuer under this Indenture, the Notes, any such agreement or otherwise and, without prejudice to the generality of the foregoing, neither of the Co-Issuers shall be entitled to take any steps to enforce, or bring any action or proceeding, in respect of this Indenture, the Notes, any such agreement or otherwise against the other Co-Issuer. In particular, neither of the Co-Issuers shall be entitled to petition or take any other steps for the winding up or bankruptcy of the other Co-Issuer or shall have any claim in respect of any assets of the other Co-Issuer.

Section 13.16. Escheat.

In the absence of a written request from the Co-Issuers to return unclaimed funds to the Co-Issuers, the Trustee shall from time to time deliver all unclaimed funds to or as directed by applicable escheat authorities, as determined by the Trustee in its sole discretion, in accordance with the customary practices and procedures of the Trustee. Any unclaimed funds held by the Trustee pursuant to this section shall be held uninvested and without any liability for interest.

ARTICLE XIV

ASSIGNMENT OF THE SERVICING AGREEMENT

Section 14.1. Assignment of the Servicing Agreement

(a) The Issuer, in furtherance of the covenants of this Indenture and as security for the Notes and the performance and observance of the provisions hereof, has, pursuant to the Granting Clauses, assigned, transferred, conveyed and set over to the Trustee, for the benefit of the Noteholders and the other secured parties hereunder, all of the Issuer's right, title and interest in, to and under the Servicing Agreement, including, without limitation, (i) the right to give all notices, consents and releases thereunder, (ii) the right to give all notices of termination and to take any legal action upon the breach of an obligation of the Servicer thereunder, including the commencement, conduct and consummation of proceedings at law or in equity, (iii) the right to receive all notices, accountings, consents, releases and statements thereunder and (iv) the right to do any and all other things whatsoever that the Issuer is or may be entitled to do thereunder; *provided* so long as no Event of Default has occurred and is continuing hereunder, the Trustee hereby grants the Issuer a license to exercise all of the Issuer's rights pursuant to the Servicing Agreement without notice to or the consent of the Trustee (except as otherwise expressly required by this Indenture, including, without limitation, as set forth in paragraph (f) of this Section 14.1 hereof), which license shall be and is hereby deemed to be automatically revoked upon the occurrence of any Event of Default hereunder until such time, if any, as the Event of Default is cured or waived. The Trustee shall have no liability with respect to any act or failure to act by the Issuer under the Servicing Agreement (*provided* that this sentence shall not limit or relieve the Trustee from any responsibility it may have under this Indenture upon the occurrence of and during the continuance of any Event of Default).

(b)     The assignment made pursuant to the Granting Clauses is made as collateral security, and the shall not in any way impair or diminish the obligations of the Issuer under the provisions of the Servicing Agreement, nor shall any of the obligations contained in the Servicing Agreement be imposed on the Trustee.

(c)     Upon the retirement of the Notes and the release of the Trust Estate from the lien of this Indenture, the assignment pursuant to the Granting Clauses and all rights herein assigned to the Trustee for the benefit of the Noteholders shall cease and terminate and all the right, title and interest of the Trustee in, to and under the Servicing Agreement shall revert to the Issuer and no further instrument or act shall be necessary to evidence such termination and reversion.

(d)     The Issuer represents that it has not executed any other assignment of the Servicing Agreement.

(e)     The Issuer agrees that the assignment is irrevocable, and that it will not take any action which is inconsistent with such assignment or make any other assignment inconsistent therewith.  The Issuer will, upon the request of the Trustee, execute all instruments of further assurance and all such supplemental instruments with respect to this assignment as the Trustee may specify.

(f)     The Issuer hereby agrees, and hereby undertakes to obtain the agreement of the Servicer in the Servicing Agreement, to the following:

(1)     The Servicer consents to, and agrees to perform, the provisions hereof applicable to the Servicer.

(2)     The Servicer acknowledges that the Issuer is assigning all of its right, title and interest in, to and under the Servicing Agreement to the Trustee for the benefit of the Noteholders and the other Secured Parties hereunder.

(3)     The Servicer shall deliver to the Trustee (at substantially the same time as delivered pursuant to the Servicing Agreement) duplicate original copies of all notices, statements, communications and instruments delivered or required to be delivered to the Issuer pursuant to the Servicing Agreement.

(4)     Except as set forth in the Servicing Agreement, neither the Issuer nor the Servicer will enter into any agreement amending, modifying or terminating the Servicing Agreement or selecting or consenting to a successor manager (other than an amendment or modification of the type that may be made to this Indenture without Holder consent), (a) without satisfying the Rating Condition and (b) so long as the Requisite Holders have not objected in writing to such amendment or modification within 30 days of notice thereof; and any such amendment, modification, termination, selection or consent (in each case, other than pursuant to the provisions of the Servicing Agreement) without confirmation by the Rating Agencies or if the Requisite Holders have objected shall be void; *provided* that the consent of Requisite Noteholders or confirmation by Moody's and S&P shall not be required for an amendment or modification to cure any ambiguity, to correct or supplement any provisions therein, to

comply with any changes in law, or to make any other provisions with respect to matters or questions arising under the Servicing Agreement which shall not be inconsistent with the provisions thereof or of this Indenture, so long as such amendment or modification does not affect in any material respects the interests of any Noteholder (as evidenced by an Opinion of Counsel acceptable to the Trustee) and each of Moody's and S&P is notified in writing of such amendment or modification. Notwithstanding the foregoing, nothing in this subsection shall limit, in any way, any of the rights or remedies available to the Servicer pursuant to the Servicing Agreement.

(5)     Except as set forth herein and in the Servicing Agreement, the Servicer shall continue to serve as Servicer under the Servicing Agreement notwithstanding that the Servicer shall not have received amounts due it under the Servicing Agreement because sufficient funds were not then available hereunder to pay such amounts in accordance with Article XI hereof, and agrees not to cause the filing of a petition in bankruptcy against the Issuer for any reason whatsoever, including without limitation the non-payment to the Servicer, until the payment in full of all Notes issued under this Indenture and the expiration of a period equal to one year and one day following all such payments; *provided* that nothing in this clause shall preclude, or be deemed to estop, the Servicer (A) from taking any action prior to the expiration of the aforementioned one year and one day period in (x) any case or proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer, as the case may be, or (y) any involuntary insolvency proceeding filed or commenced against the Issuer or the Co-Issuer, as the case may be, by a Person other than the Servicer or its Affiliates, or (B) from commencing against the Issuer or the Co-Issuer or any properties of the Issuer or the Co-Issuer any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceeding.

(6)     The Servicer will perform its obligations with respect to any conflict of interest in accordance with the applicable requirements of the Investment Advisers Act of 1940.

ARTICLE XV

ASSIGNMENT OF THE HEDGE AGREEMENT

Section 15.1.   Assignment of the Hedge Agreements

(a)     Pursuant to the Granting Clauses, the Issuer has assigned, transferred, conveyed and set over to the Trustee, for the benefit of the Noteholders and the other Secured Parties hereunder, all of the Issuer's right, title and interest in, to and under each Hedge Agreement, including, without limitation, (i) all of the Issuer's interest in all securities, monies and proceeds held by the related Hedge Counterparty thereunder, (ii) the right to give all notices, consents and releases thereunder, (iii) the right to give all notices of termination and to take any legal action upon the breach of an obligation of the related Hedge Counterparty thereunder, including the commencement, conduct and consummation of proceedings at law or in equity, (iv) the right to receive all notices, accountings, consents, releases and statements thereunder and (v) the right to do any and all other things whatsoever that the Issuer is or may be entitled to do

thereunder; *provided* so long as no Event of Default has occurred and is continuing hereunder, the Trustee hereby grants the Issuer a license to exercise all of the Issuer's rights pursuant to the Hedge Agreement without notice to or the consent of the Trustee (except as otherwise expressly required by this Indenture), which license shall be and is hereby deemed to be automatically revoked upon the occurrence of any Event of Default hereunder until such time, if any, as the Event of Default is cured or waived. The Trustee shall have no liability with respect to any act or failure to act by the Issuer under any Hedge Agreement (*provided* that this sentence shall not limit or relieve the Trustee from any responsibility it may have under this Indenture upon the occurrence of and during the continuance of any Event of Default hereunder).

(b) The assignment made pursuant to the Granting Clauses is made as collateral security, and shall not in any way impair or diminish the obligations of the Issuer under the provisions of any Hedge Agreement, nor shall any of the obligations contained in any Hedge Agreement be imposed on the Trustee.

(c) Upon the retirement of the Notes and the release of the Trust Estate from the lien of this Indenture, all rights herein assigned to the Trustee for the benefit of the Noteholders and the other Secured Parties shall cease and terminate and all the right, title and interest of the Trustee in, to and under each Hedge Agreement shall revert to the Issuer and no further instrument or act shall be necessary to evidence such termination and reversion.

(d) The Issuer represents that the Issuer has not executed any other assignment of the Hedge Agreement.

(e) The Issuer agrees that the assignment set forth in the Granting Clauses is irrevocable, and that it will not take any action which is inconsistent with such assignment or make any other assignment inconsistent herewith. The Issuer will, upon the request of the Trustee, execute all instruments of further assurance and all such supplemental instruments with respect to such assignment as the Trustee may specify.

(f) The Issuer further agrees, with respect to the Hedge Agreement, as follows:

(1) The Issuer will obtain on or before the Closing Date the acknowledgement by each Hedge Counterparty that the Issuer is assigning all of its right, title and interest in, to and under the related Hedge Agreement to the Trustee for the benefit of the Noteholders and the other Secured Parties.

(2) Prior to the occurrence of an Event of Default the Issuer will deliver to the Trustee copies of all notices and communications delivered or required to be delivered to the Issuer pursuant to the related Hedge Agreement, but only if such notice or communication relates to any (i) default under, (ii) early termination of or (iii) amendment of, such Hedge Agreement.

(3) Subject to Section 2.14(d), the Issuer will not enter into any agreement amending, modifying or terminating a Hedge Agreement, without prior written consent of the Requisite Noteholders and written confirmation by the Rating Agencies that such amendment, modification or termination would not cause the ratings

of any Class of Notes to be reduced or withdrawn; *provided* (A) that the consent of Requisite Noteholders and confirmation by the Rating Agencies shall not be required for an amendment or modification to cure any ambiguity or to correct or supplement any provision with respect to matters or questions arising under such Hedge Agreement which shall not be inconsistent with the provisions thereof or of this Indenture, in each case so long as such amendment or modification does not adversely affect in any material respects the interests of any Noteholder (as evidenced by an Opinion of Counsel acceptable to the Trustee) and (B) neither the consent of the Requisite Noteholders, confirmation by the Rating Agencies nor an Opinion of Counsel shall be required with respect to any amendment or modification that either only corrects a manifest error or is principally and manifestly for the benefit of the Noteholders.

## ARTICLE XVI

## COMBINATION NOTES

Section 16.1.   Payments on Combination Notes.

Upon receipt by (i) the Trustee of any payment in respect of the Note Component, or by (ii) the Paying and Transfer Agent of any payment in respect of the Preferred Share Component, the Trustee or the Paying and Transfer Agent, as applicable, shall distribute such payment to the Holders of the Combination Notes by wire transfer to such accounts as the Holders may specify (in writing) to the Trustee and the Paying and Transfer Agent prior to the related Record Date.  Payments on the Preferred Share Component of the Combination Notes shall be deposited in the Preferred Shares Collection Account and distributed by the Paying and Transfer Agent to the Holders of the Combination Notes on each Payment Date subject to the provisions of the Paying and Transfer Agency Agreement.

Section 16.2.   Rights of Holders of the Combination Notes.

(a)     All rights ordinarily allocable to a Holder of a Component Security shall be exercised by the Holder of the Combination Notes, all payments to be made hereunder to a Holder of a Component Security shall be made by the Trustee or the Paying and Transfer Agent, as applicable, directly to such Holder of the Combination Notes, and the Holder of the Combination Notes shall have all the rights, as the Holder of the Component Securities, for all purposes hereunder.  All distributions to the Holder of the Combination Notes in respect of the Preferred Share Component shall be made in accordance with the provisions of the Paying and Transfer Agency Agreement.

(b)     Except as expressly provided herein, the Holders of the Combination Notes shall not be entitled to vote with respect to matters arising under this Indenture, the Paying and Transfer Agency Agreement or the Servicing Agreement except as Holders of the Component Securities.

(c)     All of the obligations of the Issuer under the Combination Notes (to the extent of the Note Component) are limited recourse obligations of the Issuer, payable solely from amounts paid in respect of the related Component Securities.  No Holder of a Combination Note

shall have any claim against the Co-Issuers or the Trustee for any amounts payable but not actually received by the Trustee in respect of any Component Security that is not a Note, and the claims and rights of a Holder of a Combination Note in respect of any amounts payable in respect of any Component Security that is a Note shall be identical to the claims and rights of a Holder of the same amount of such Component Security.

(d)     The Combination Notes represent interests in the related Component Securities.  Notwithstanding anything herein to the contrary, the Combination Notes do not represent an obligation of the Issuer separate from or in addition to the obligation of the Issuer with respect to the related Component Securities.

Section 16.3.     Application of Payments on the Combination Notes.

(a)     The Aggregate Principal Amount of the Combination Notes shall at all times equal the Aggregate Principal Amount of the Note Component plus the Notional Amount of the Preferred Share Component.  After issuance, the Aggregate Principal Amount of the Combination Note shall be reduced by the amount and to the extent the Aggregate Principal Amount of the Note Component or the Notional Amount of the Preferred Share Component is reduced.  When a payment causing the reduction of the Aggregate Principal Amount of the Class B-1L Notes is made, the Aggregate Principal Amount of the Note Component shall be reduced based on the proportion that the Note Component bears to the Class B-1L Notes.  When a payment causing the reduction of the Notional Amount of the Class I Preferred Shares is made, the Notional Amount of the Preferred Share Component shall be reduced based on the proportion that the Preferred Share Component bears to the Class I Preferred Shares.

(b)     Solely for purposes of determining the Rated Balance and the Rated Coupon of the Combination Notes (as applicable), all monies distributed to the Component Securities will be applied, first to interest accrued at the Rated Coupon (with interest thereon) for the related Periodic Interest Accrual Period (calculated on the basis of a 360-day year and the actual number of days elapsed during each Periodic Interest Accrual Period) and then to the Rated Balance, until the Rated Balance has been paid in full and thereafter any payment received will be deemed additional interest on the Combination Notes.  The Rated Coupon will accrue on the Rated Balance of the Combination Notes.

Section 16.4.     Mandatory Exchange of the Combination Notes

On any date the Issuer elects or the Trustee is instructed by the Issuer or Noteholders or the Holders of the Preferred Shares, as applicable, either to liquidate the Trust Estate, to redeem the Notes in whole pursuant to Article IX or to redeem the Class B-1L Notes pursuant to an Optional Redemption by Refinancing pursuant to Section 9.1(b), each Holder of a Combination Note shall surrender such Combination Note to the Trustee for exchange of such Combination Note for the corresponding Component Securities as provided in Section 2.5(b)(viii) hereof.   In connection with such exchange, the respective obligations and responsibilities of the Issuer and the Trustee created hereby with respect to the Combination Notes shall terminate and this Indenture shall cease to be of further effect with respect to the Combination Notes as provided in Section 4.1 hereof.

IN WITNESS WHEREOF, we have set our hands as of the 9th day of May, 2007.

EXECUTED AS A DEED BY
ROCKWALL CDO II LTD., as Issuer

By: _____
     Name:
     Title:

in the presence of:

_____
     witness

ROCKWALL CDO II (DELAWARE) CORP., as
Co-Issuer

By: _____
     Name:
     Title:

INVESTORS BANK & TRUST COMPANY, as
Trustee

By: _____
     Name:
     Title:

INVESTORS BANK & TRUST COMPANY, as Securities Intermediary

By: _____
     Name:
     Title:

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

GRANTING CLAUSES ......................................................................................... 1

ARTICLE I          DEFINITIONS ................................................................. 2
    Section 1.1.          Definitions ................................................................. 2
    Section 1.2.          Other Definitional Provisions. ................................. 61
    Section 1.3.          Assumptions as to Portfolio Collateral and Trust Estate ................... 61

ARTICLE II         THE NOTES ................................................................... 62
    Section 2.1.          Forms Generally ...................................................... 62
    Section 2.2.          Authorized Amount ................................................. 66
    Section 2.3.          Denominations; Extension of Revolving Period and Final Maturity. .......................................................... 66
    Section 2.4.          Execution, Authentication, Delivery and Dating. ............ 70
    Section 2.5.          Registration, Registration of Transfer and Exchange. ...... 71
    Section 2.6.          Mutilated, Destroyed, Lost or Stolen Notes or Combination Notes. ................................................. 80
    Section 2.7.          Payments on the Notes. ........................................... 81
    Section 2.8.          Persons Deemed Owners. ........................................ 84
    Section 2.9.          Cancellation. ......................................................... 84
    Section 2.10.         Tax Purposes. ........................................................ 85
    Section 2.11.         Calculation Agent; Determination of LIBOR ............... 85
    Section 2.12.         Option to Acquire Credit Enhancement. ..................... 86
    Section 2.13.         Prescription. ......................................................... 87

ARTICLE III        AUTHENTICATION AND DELIVERY OF NOTES ............... 87
    Section 3.1.          General Provisions. ................................................. 87
    Section 3.2.          Security for Notes. .................................................. 88
    Section 3.3.          Initial Deposit Redemption ...................................... 90
    Section 3.4.          Purchase of Portfolio Collateral between the Closing Date and the Effective Date; Effective Date Conditions. ................ 91
    Section 3.5.          Intermediaries. ...................................................... 93

ARTICLE IV         SATISFACTION AND DISCHARGE ................................. 93
    Section 4.1.          Satisfaction and Discharge of Indenture. ..................... 93
    Section 4.2.          Application of Trust Money. ..................................... 94

ARTICLE V          REMEDIES .................................................................... 95

Section 5.1.        Events of Default. ........................................................... 95
Section 5.2.        Acceleration of Maturity; Rescission and Annulment. .................... 96
Section 5.3.        Proceedings. .................................................................... 97
Section 5.4.        Remedies. ...................................................................... 98
Section 5.5.        Preservation of Trust Estate. ............................................... 99
Section 5.6.        Trustee May File Proofs of Claim. ......................................... 99
Section 5.7.        Trustee May Enforce Claims Without Possession of Notes. ........... 100
Section 5.8.        Application of Money Collected. .......................................... 101
Section 5.9.        Limitation on Suits. ......................................................... 101
Section 5.10.       Unconditional Rights of Noteholders to Receive Principal and
                    Interest. ...................................................................... 101
Section 5.11.       Restoration of Rights and Remedies. ...................................... 102
Section 5.12.       Rights and Remedies Cumulative. ......................................... 102
Section 5.13.       Delay or Omission Not Waiver. ........................................... 103
Section 5.14.       Control by Noteholders. .................................................... 103
Section 5.15.       Waiver of Past Defaults. ................................................... 103
Section 5.16.       Undertaking for Costs. ..................................................... 104
Section 5.17.       Waiver of Stay or Execution Laws. ....................................... 104
Section 5.18.       Sale of Trust Estate. ....................................................... 104
Section 5.19.       Action on Notes. ............................................................ 105

ARTICLE VI       THE TRUSTEE. .................................................................. 105

Section 6.1.        Certain Duties and Responsibilities. ...................................... 105
Section 6.2.        Notice of Default. ........................................................... 107
Section 6.3.        Certain Rights of Trustee. .................................................. 107
Section 6.4.        Not Responsible for Recitals or Issuance of Notes or
                    Combination Notes. ......................................................... 109
Section 6.5.        May Hold Notes or Combination Notes. .................................. 109
Section 6.6.        Money Held in Trust. ....................................................... 110
Section 6.7.        Compensation and Reimbursement. ...................................... 110
Section 6.8.        Corporate Trustee Required; Eligibility. ................................. 111
Section 6.9.        Resignation and Removal; Appointment of Successor. ................. 112
Section 6.10.       Acceptance of Appointment by Successor. ............................... 113
Section 6.11.       Merger, Conversion, Consolidation or Succession to Business
                    of Trustee. ................................................................... 113
Section 6.12.       Certain Duties of Trustee Related to Delayed Payment of
                    Proceeds. .................................................................... 113
Section 6.13.       Non-Petition. ............................................................... 114
Section 6.14.       Withholding. ................................................................ 114
Section 6.15.       The Securities Intermediary. .............................................. 115
Section 6.16.       Eligible Investments. ....................................................... 116
Section 6.17.       Fiduciary For Noteholders; Agent for the Paying and Transfer
                    Agent and the Servicer. ................................................... 116

ARTICLE VII      COVENANTS. .................................................................... 117

| Section 7.1. | Payment of Principal and Interest. | 117 |
|---|---|---|
| Section 7.2. | Maintenance of Office or Agency. | 117 |
| Section 7.3. | Money for Note Payments to Be Held in Trust. | 117 |
| Section 7.4. | Existence of Co-Issuers; Corporate Formalities. | 117 |
| Section 7.5. | Protection of Trust Estate. | 118 |
| Section 7.6. | Opinions and Tax Certificates. | 119 |
| Section 7.7. | Performance of Obligations. | 120 |
| Section 7.8. | Negative Covenants. | 120 |
| Section 7.9. | Statement as to Compliance. | 122 |
| Section 7.10. | Issuer and Co-Issuer May Not Consolidate or Merge. | 122 |
| Section 7.11. | No Other Business. | 122 |
| Section 7.12. | Purchase of Notes. | 122 |
| Section 7.13. | Notice of Rating. | 123 |
| Section 7.14. | Process Agent. | 123 |
| Section 7.15. | Additional Covenants. | 123 |
| Section 7.16. | Representations and Warranties of the Co-Issuers. | 124 |
| Section 7.17. | Representations Relating to the Security Interests in the Collateral. | 126 |
| Section 7.18. | No "Gross-up" Amounts. | 128 |
| Section 7.19. | Securities Lending. | 128 |

| ARTICLE VIII | SUPPLEMENTAL INDENTURES | 131 |
|---|---|---|
| Section 8.1. | Supplemental Indentures Without Consent of Noteholders. | 131 |
| Section 8.2. | Supplemental Indentures with Consent of Noteholders. | 133 |
| Section 8.3. | Execution of Supplemental Indentures. | 136 |
| Section 8.4. | Effect of Supplemental Indentures. | 136 |
| Section 8.5. | Reference in Notes and Combination Notes to Supplemental Indentures. | 136 |

| ARTICLE IX | REDEMPTION; TERMINATION OF TRUST | 136 |
|---|---|---|
| Section 9.1. | Optional Redemption. | 136 |
| Section 9.2. | Mandatory Redemption. | 138 |
| Section 9.3. | Additional Collateral Deposit Requirement. | 139 |
| Section 9.4. | Special Redemption; Amendment Buy-Out | 139 |
| Section 9.5. | Tax Event Redemption. | 140 |
| Section 9.6. | Notice to Trustee, Rating Agencies and the Servicer. | 140 |
| Section 9.7. | Notice of Optional Redemption and Tax Event Redemption by the Issuer. | 141 |
| Section 9.8. | Deposit of Optional Redemption Price and Tax Event Redemption Price. | 142 |
| Section 9.9. | Notes Payable on Optional Redemption Date. | 143 |
| Section 9.10. | Notes Payable on Mandatory Redemption Date. | 144 |
| Section 9.11. | Notes Payable on Tax Event Redemption. | 144 |
| Section 9.12. | Initial Deposit Redemption. | 144 |
| Section 9.13. | Reserved. | 144 |

Section 9.14. Notes Payable on Special Redemption Date. ................................ 146

ARTICLE X ACCOUNTS, ACCOUNTINGS AND RELEASES ................................ 146

Section 10.1. Collection of Money. .................................................. 146
Section 10.2. Accounts. ................................................................ 146
Section 10.3. Custody and Release of Portfolio Collateral. ................. 152
Section 10.4. Reports of Trustee. ..................................................... 153
Section 10.5. Accountings. ............................................................. 154
Section 10.6. Reports by Independent Accountants ............................ 162
Section 10.7. Reports to Rating Agencies. ....................................... 163

ARTICLE XI APPLICATION OF MONIES ................................................. 164

Section 11.1. Disbursements of Monies from Collection Account ...................... 164
Section 11.2. Mandatory Redemption With Respect to Overcollateralization Tests, Interest Coverage Test and Rating Confirmation Failure ..... 171
Section 11.3. Purchase of Additional Portfolio Collateral ................... 172
Section 11.4. Trust Account ............................................................. 173

ARTICLE XII SALE OF PORTFOLIO COLLATERAL; SUBSTITUTION ................... 173

Section 12.1. Sale of Portfolio Collateral ............................................ 173
Section 12.2. Eligibility Criteria and Replacement Restrictions ........................ 175
Section 12.3. Sale of Portfolio Collateral Subject to Offer or Call ..................... 180
Section 12.4. Purchase of Substitute Portfolio Collateral ................... 180
Section 12.5. Conditions Applicable to all Transactions Involving Purchases of Portfolio Collateral ................................................... 181
Section 12.6. Sale of Warrants .......................................................... 182
Section 12.7. Underlying Instruments ................................................ 182
Section 12.8. Reserved .................................................................... 183
Section 12.9. Reserved .................................................................... 183
Section 12.10. Synthetic Securities; Strip Securities ............................ 183
Section 12.11. Delayed Drawdown Loans and Revolving Loans .......................... 184

ARTICLE XIII MISCELLANEOUS ........................................................... 185

Section 13.1. Form of Documents Delivered to Trustee ....................... 185
Section 13.2. Acts of Noteholders ..................................................... 185
Section 13.3. Notices, etc., to the Trustee, Issuer, Servicer, the Irish Paying Agent and Bear Stearns ................................................. 186
Section 13.4. Notices to Noteholders; Waiver ..................................... 187
Section 13.5. Effect of Headings and Table of Contents ..................... 187
Section 13.6. Successors and Assigns ................................................ 188
Section 13.7. Severability ................................................................ 188
Section 13.8. Benefits of Indenture ................................................... 188
Section 13.9. Reserved .................................................................... 188

Section 13.10.    Governing Law; Submission to Jurisdiction; Waiver of Trial by Jury......188
Section 13.11.    Counterparts......189
Section 13.12.    No Issuer Office Within the United States......189
Section 13.13.    Subordination......189
Section 13.14.    Survival of Provisions......192
Section 13.15.    Liability of Co-Issuers......192
Section 13.16.    Escheat......192

ARTICLE XIV    ASSIGNMENT OF THE SERVICING AGREEMENT......193

Section 14.1.    Assignment of the Servicing Agreement......193

ARTICLE XV    ASSIGNMENT OF THE HEDGE AGREEMENT......193

Section 15.1.    Assignment of the Hedge Agreement......193

ARTICLE XVI    COMBINATION NOTES......193

Section 16.1.    Payments on Combination Notes......193
Section 16.2.    Rights of Holders of the Combination Notes......193
Section 16.3.    Application of Payments on the Combination Notes......193
Section 16.4.    Mandatory Exchange of the Combination Notes......193


ANNEXES

Annex A    Methodology for Calculating the Amount of an O/C Redemption

Annex B    Methodology for Calculating the Interest Coverage Test Redemption

Annex C    Methodology for Calculating the Amount Required to Satisfy the Additional Collateral Deposit Requirement

Annex D    Collateral Quality Formula

EXHIBITS

Exhibit A – Notes

Exhibit A-1LA-1    Class A-1LA Temporary Regulation S Global Note

Exhibit A-1LB-1    Class A-1LB Temporary Regulation S Global Note

Exhibit A-2L-1    Class A-2L Temporary Regulation S Global Note

Exhibit A-3L-1    Class A-3L Temporary Regulation S Global Note

Exhibit A-1LA-2    Class A-1LA Permanent Regulation S Global Note

|  |  |  |
|---|---|---|
| | Exhibit A-1LB-2 | Class A-1LB Permanent Regulation S Global Note |
| | Exhibit A-2L-2 | Class A-2L Permanent Regulation S Global Note |
| | Exhibit A-3L-2 | Class A-3L Permanent Regulation S Global Note |
| | Exhibit A-1LA-3 | Class A-1LA Rule 144A Global Note |
| | Exhibit A-1LB-3 | Class A-1LB Rule 144A Global Note |
| | Exhibit A-2L-3 | Class A-2L Rule 144A Global Note |
| | Exhibit A-3L-3 | Class A-3L Rule 144A Global Note |
| | Exhibit A-1LA-4 | Class A-1LA Definitive Note |
| | Exhibit A-1LB-4 | Class A-1LB Definitive Note |
| | Exhibit A-2L-4 | Class A-2L Definitive Note |
| | Exhibit A-3L-4 | Class A-3L Definitive Note |
| **Exhibit B** | **Class B Notes** | |
| | Exhibit B-1L-1 | Class B-1L Temporary Regulation S Global Note |
| | Exhibit B-2L-1 | Class B-2L Temporary Regulation S Global Note |
| | Exhibit B-1L-2 | Class B-1L Permanent Regulation S Global Note |
| | Exhibit B-2L-2 | Class B-2L Permanent Regulation S Global Note |
| | Exhibit B-1L-3 | Class B-1L Rule 144A Global Note |
| | Exhibit B-1L-4 | Class B-1L Definitive Note |
| | Exhibit B-2L-4 | Class B-2L Definitive Note |
| **Exhibit C** | **Combination Notes** | |
| | Exhibit C-1 | Temporary Regulation S Global Combination Note |
| | Exhibit C-2 | Permanent Regulation S Combination Note |
| | Exhibit C-4 | Definitive Combination Note |
| **Exhibit C** | **Form of Investor Representation Letters** | |
| **Exhibit D** | **Form of Rule 144A Transfer Certificate** | |
| **Exhibit E** | **Form of Regulation S Transfer Certificate** | |

**Exhibit F**        **Form of Exchange Certificate**

**Exhibit G**        **Form of Non-U.S. Person Certificate**

**Exhibit H**        **Form of Beneficial Owner Certificate**

**Exhibit I**        **Form of Extension Notice**

**SCHEDULES**

**Schedule A**        **Initial Portfolio Collateral**

**Schedule B**        **Standard & Poor's Industry Classification**

**Schedule C**        **S&P Applicable Percentages**

**Schedule D**        **Rating Methodology for Standard & Poor's Rating**

**Schedule E**        **Moody's Correlation Factor Procedures**

**Schedule F**        **Moody's Weighted Average Rating Test Procedures**

**Schedule G**        **Forms of Opinions**

**Schedule H**        **Moody's Suggested Industry Classification**

**Schedule I**        **Weighted Average Life Table**

**Schedule J**        **Approved Pricing Services**

**Schedule K**        **Cap Notional Amount**

**Execution Copy**

SOUTHFORK CLO LTD.
Issuer,

SOUTHFORK CLO CORP.
Co-Issuer,

ASSURED GUARANTY CORP.
Insurer,

and

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION
Trustee

INDENTURE

Dated as of March 15, 2005

COLLATERALIZED DEBT OBLIGATIONS

U.S.$52,000,000 Class A-1a Floating Rate Senior Secured Extendable Notes Due 2017
U.S.$7,000,000 Class A-1b Fixed Rate Senior Secured Extendable Notes Due 2017
U.S.$400,000,000 Class A-1g Floating Rate Senior Secured Extendable Notes Due 2017
U.S.$42,500,000 Class A-2 Floating Rate Senior Secured Extendable Notes Due 2017
U.S.$23,500,000 Class A-3a Floating Rate Senior Secured Extendable Notes Due 2017
U.S.$2,500,000 Class A-3b Fixed Rate Senior Secured Extendable Notes Due 2017
U.S.$39,000,000 Class B Floating Rate Senior Secured Deferrable Interest Extendable Notes Due 2017
U.S.$36,300,000 Class C Floating Rate Senior Secured Deferrable Interest Extendable Notes Due 2017
U.S.$6,000,000 Class 1 Extendable Composite Securities Due 2017

TABLE OF CONTENTS

*Page*

ARTICLE 1 DEFINITIONS ...................................................................... 3

Section 1.1.    Definitions.............................................................................3
Section 1.2.    Assumptions as to Pledged Obligations; Construction Conventions. ...............76
Section 1.3.    Rules of Interpretation. .........................................................78

ARTICLE 2 THE NOTES AND THE COMPOSITE SECURITIES .................................... 80

Section 2.1.    Forms Generally....................................................................80
Section 2.2.    Forms of Securities and Certificate of Authentication.....................80
Section 2.3.    Authorized Amount; Denominations. .....................................81
Section 2.4.    Extension of Reinvestment Period and Stated Maturity. ................82
Section 2.5.    Execution, Authentication, Delivery, and Dating. ..........................85
Section 2.6.    Registration, Registration of Transfer and Exchange. ....................86
Section 2.7.    Mutilated, Destroyed, Lost, or Stolen Securities. ..........................94
Section 2.8.    Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved; Withholding. ...............................95
Section 2.9.    Persons Considered Owners......................................................98
Section 2.10.   Cancellation. ........................................................................98
Section 2.11.   Definitive Securities...............................................................98
Section 2.12.   Securities Beneficially Owned by Persons Not QIB/QPs or Qualified Purchasers. ...............................................................99

ARTICLE 3 CONDITIONS PRECEDENT............................................................ 100

Section 3.1.    Conditions to Issuance of Securities on Closing Date. ...................100
Section 3.2.    Custodianship; Delivery of Collateral Obligations and Eligible Investments. .......................................................................104
Section 3.3.    Representations as to Collateral. ..............................................105

ARTICLE 4 SATISFACTION AND DISCHARGE...................................................... 107

Section 4.1.    Satisfaction and Discharge of Indenture. ...................................107
Section 4.2.    Application of Trust Money.....................................................109
Section 4.3.    Repayment of Monies Held by Paying Agent...............................109

ARTICLE 5 REMEDIES ........................................................................ 109

Section 5.1.    Events of Default. .................................................................109
Section 5.2.    Acceleration of Maturity; Rescission and Annulment. ...................111
Section 5.3.    Collection of Indebtedness and Suits for Enforcement by Trustee................112

i

Section 5.4.     Remedies. .................................................................................................114
Section 5.5.     Optional Preservation of Collateral. ...............................................................116
Section 5.6.     Trustee May Enforce Claims Without Possession of Securities. ....................118
Section 5.7.     Application of Money Collected. .....................................................................118
Section 5.8.     Limitation on Suits. .........................................................................................118
Section 5.9.     Unconditional Rights of Holders of Securities. ...............................................119
Section 5.10.    Restoration of Rights and Remedies. ...............................................................119
Section 5.11.    Rights and Remedies Cumulative. ...................................................................120
Section 5.12.    Delay or Omission Not Waiver. .......................................................................120
Section 5.13.    Control by Majority of the Controlling Class. .................................................120
Section 5.14.    Waiver of Past Defaults. ..................................................................................121
Section 5.15.    Undertaking for Costs. .....................................................................................121
Section 5.16.    Waiver of Stay or Extension Laws. ..................................................................122
Section 5.17.    Sale of Collateral. ............................................................................................122
Section 5.18.    Action on the Securities. ..................................................................................123
Section 5.19.    Direction by the Insurer. ..................................................................................123

ARTICLE 6 THE TRUSTEE ...............................................................................................123

Section 6.1.     Certain Duties and Responsibilities. ................................................................123
Section 6.2.     Notice of Default. .............................................................................................125
Section 6.3.     Certain Rights of Trustee. ................................................................................125
Section 6.4.     Not Responsible for Recitals or Issuance of Securities. ..................................127
Section 6.5.     May Hold Securities. ........................................................................................127
Section 6.6.     Money Held in Trust. .......................................................................................128
Section 6.7.     Compensation and Reimbursement. .................................................................128
Section 6.8.     Corporate Trustee Required; Eligibility. ..........................................................129
Section 6.9.     Resignation and Removal; Appointment of Successor. ...................................129
Section 6.10.    Acceptance of Appointment by Successor. ......................................................131
Section 6.11.    Merger, Conversion, Consolidation, or Succession to Business of
                 Trustee. .............................................................................................................131
Section 6.12.    Co-Trustees. .....................................................................................................131
Section 6.13.    Certain Duties of Trustee Related to Delayed Payment of Proceeds. ..............132
Section 6.14.    Authenticating Agents. .....................................................................................133
Section 6.15.    Fiduciary for Holders of Notes Only; Agent for Secured Parties. ..................133
Section 6.16.    Representations and Warranties of the Bank. ...................................................134
Section 6.17.    Additional Reporting Requirements. ................................................................134

ARTICLE 7 COVENANTS ..................................................................................................134

Section 7.1.     Payment of Principal and Interest. ...................................................................134
Section 7.2.     Maintenance of Office or Agency. ...................................................................135
Section 7.3.     Money for Note Payments to be Held in Trust. ...............................................135
Section 7.4.     Existence of Co-Issuers. ..................................................................................137

ii

Section 7.5.    Protection of Collateral. .................................................................138

Section 7.6.    Opinions as to Collateral. ...............................................................140

Section 7.7.    Performance of Obligations. ............................................................140

Section 7.8.    Negative Covenants. ........................................................................141

Section 7.9.    Notice of Default; Statement as to Compliance. ..............................142

Section 7.10.   Co-Issuers May Consolidate, etc., Only on Certain Terms.............142

Section 7.11.   Successor Substituted.......................................................................144

Section 7.12.   No Other Business. ..........................................................................144

Section 7.13.   Listing on Irish Stock Exchange. ....................................................145

Section 7.14.   Annual Rating Review. ....................................................................145

Section 7.15.   Reporting.........................................................................................146

Section 7.16.   Calculation Agent. ..........................................................................146

Section 7.17.   Certain Tax Matters. .......................................................................147

Section 7.18.   Securities Lending. ..........................................................................148

Section 7.19.   Purchase of Collateral Obligations; Ramp-Up Completion Date. ..151

Section 7.20.   Posting of Reports on Repository. ...................................................153

Section 7.21.   Secondary Risk Procedures..............................................................153


ARTICLE 8 SUPPLEMENTAL INDENTURES.................................................................. 154


Section 8.1.    Supplemental Indentures Without Consent of Holders....................154

Section 8.2.    Supplemental Indentures With Consent of Holders.........................157

Section 8.3.    Execution of Supplemental Indentures. ..........................................160

Section 8.4.    Effect of Supplemental Indentures; Certain Required Consents.....160

Section 8.5.    Reference in Securities to Supplemental Indentures........................160

Section 8.6.    Composite Securities. ......................................................................161


ARTICLE 9 REDEMPTION OF NOTES............................................................................ 161


Section 9.1.    Mandatory Redemption.....................................................................161

Section 9.2.    Optional Redemption. ......................................................................162

Section 9.3.    Redemption Procedures. ...................................................................163

Section 9.4.    Notes Payable on Redemption Date..................................................166

Section 9.5.    Special Redemption. .........................................................................166

Section 9.6.    Amendment Buy-Out.........................................................................167

Section 9.7.    Removal Buy-Out. .............................................................................167


ARTICLE 10 ACCOUNTS, ACCOUNTINGS, AND RELEASES ....................................... 168


Section 10.1.   Collection of Money. ........................................................................168

Section 10.2.   Collection Account. ..........................................................................168

Section 10.3.   Other Accounts. ...............................................................................170

Section 10.4.   Reinvestment of Funds in Accounts; Reports by Trustee. ...............174

Section 10.5.   Synthetic Security Counterparty Account........................................176

Section 10.6. Accountings. ...................................................................................177
Section 10.7. Release of Collateral. .......................................................................185
Section 10.8. Reports by Independent Accountants.................................................186
Section 10.9. Reports to Rating Agencies...............................................................187

ARTICLE 11 APPLICATION OF MONIES ................................................................. 187

Section 11.1. Disbursements of Monies from Payment Account. ...........................187
Section 11.2. Class 1 Component Distributions. ....................................................194

ARTICLE 12 SALE OF COLLATERAL OBLIGATIONS; PURCHASE OF COLLATERAL OBLIGATIONS194

Section 12.1. Sales of Collateral Obligations. .......................................................194
Section 12.2. Purchase of Collateral Obligations...................................................198
Section 12.3. Conditions Applicable to All Sale and Purchase Transactions. .......200
Section 12.4. Certain Determinations Relating to Collateral Obligations. ............200

ARTICLE 13 NOTEHOLDERS' RELATIONS ............................................................. 201

Section 13.1. Subordination. ..................................................................................201
Section 13.2. Standard of Conduct.........................................................................202

ARTICLE 14 MISCELLANEOUS .............................................................................. 203

Section 14.1. Form of Documents Delivered to Trustee.........................................203
Section 14.2. Acts of Noteholders, Composite Securityholders or Holders of Preference Shares..............................................................................203
Section 14.3. Notices, etc., to Certain Persons or Parties. ....................................204
Section 14.4. Notices to Holders, the Preference Shares Paying Agent; Waiver. ....206
Section 14.5. Effect of Headings and Table of Contents. ......................................207
Section 14.6. Successors and Assigns.....................................................................207
Section 14.7. Separability. .....................................................................................207
Section 14.8. Benefits of Indenture........................................................................208
Section 14.9. Legal Holidays. ................................................................................208
Section 14.10. Governing Law. ................................................................................208
Section 14.11. Submission to Jurisdiction. ..............................................................208
Section 14.12. Counterparts. ...................................................................................208
Section 14.13. Acts of Issuer. ..................................................................................209
Section 14.14. Consent of Posting of Documents on Repository. ...........................209
Section 14.15. Liability of Co-Issuers. ....................................................................209
Section 14.16. Indemnity of Co-Issuer. ...................................................................209

ARTICLE 15 ASSIGNMENT OF MANAGEMENT AGREEMENT; HEDGE AGREEMENTS ............. 209

Section 15.1. Assignment of Management Agreement.............................................209

iv

Section 15.2.    Hedge Agreements. .......................................................................................212

ARTICLE 16 THE POLICY ...................................................................................... 215

Section 16.1.    Miscellaneous. .................................................................................................215
Section 16.2.    Representative of the Noteholder of the Insured Notes. ................................216
Section 16.3.    Drawings under Policy. ...................................................................................216
Section 16.4.    Preference Claims and Insolvency Proceedings. ...........................................217
Section 16.5.    Subrogation. ....................................................................................................218
Section 16.6.    Policy Payment Account. ................................................................................219
Section 16.7.    Limited Recourse; Non-Petition. ....................................................................219
Section 16.8.    Termination of the Policy. ..............................................................................219
Section 16.9.    Termination Procedures. .................................................................................221

Schedules and Exhibits

Schedule 1    –    Collateral Obligations

Schedule 2    –    Moody's Industry Classification Group List

Schedule 3    –    S&P Industry Classifications

Schedule 4    –    Diversity Score Calculation

Schedule 5    –    Moody's Structured Finance Obligation Recovery Rates

Schedule 6    –    S&P Structured Finance Obligation Recovery Rates

Schedule 7    –    Certain Tax Provisions

Schedule 8    –    Certain Defined Terms Relating to S&P Rating and Moody's Rating

Exhibit A    –    Forms of Securities

    A-1    –    Form of Note

    A-2    –    Form of Composite Security

Exhibit B    –    Forms of Note and Composite Security Transfer and Exchange Certificates

    B-1    –    Form of Note Transferee Certificate

    B-2    –    Form of Regulation S Note Transferor Certificate

    B-3    –    Form of Non-Regulation S Note Transferor Certificate

    B-4    –    Form of Composite Security Transferee Certificate

    B-5    –    Form of Regulation S Composite Security Transferor Certificate

    B-6    –    Form of Non-Regulation S Composite Security Transferor Certificate

Exhibit C    –    Form of McKee Nelson LLP Opinion

Exhibit D    –    Form of Maples and Calder Opinion

Exhibit E    –    Form of Gardere Wynne Sewell LLP Opinion

Exhibit F    –    Form of Orrick, Herrington & Sutcliffe LLP Opinion

v

Exhibit G    –    Form of Securities Account Control Agreement

Exhibit H    –    Forms of Section 3(c)(7) Notices

    H-1    –    Form of Section 3(c)(7) Reminder Notice

    H-2    –    Form of Important Section 3(c)(7) Reminder Notice

Exhibit I    –    Form of Beneficial Owner Certificate

Exhibit J    –    Form of Extension Notice

INDENTURE, dated as of March 15, 2005, among SOUTHFORK CLO LTD. (the "*Issuer*"), SOUTHFORK CLO CORP. (the "*Co-Issuer*"), ASSURED GUARANTY CORP. (the "*Insurer*") and JPMORGAN CHASE BANK, NATIONAL ASSOCIATION, as trustee (together with its permitted successors, the "*Trustee*").

### PRELIMINARY STATEMENT

The Co-Issuers are duly authorized to execute and deliver this Indenture to provide for the Class A-1a Notes, the Class A-1b Notes, the Class A-1g Notes, the Class A-2 Notes, the Class A-3a Notes, the Class A-3b Notes, the Class B Notes and the Class C Notes issuable as provided in this Indenture and the Issuer is duly authorized to execute and deliver this Indenture to provide for the Composite Securities issuable as provided in this Indenture. All covenants and agreements made by the Co-Issuers in this Indenture are for the benefit and security of the Secured Parties. Concurrently with the execution of this Indenture and the issuance of the Securities and subject to the terms and conditions contained in the Insurance Agreement, the Insurer will issue and deliver to and in favor of the Trustee for the benefit of each Holder of the Insured Notes, the Policy, which, subject to certain terms and conditions contained therein (including that the Policy is not terminated in accordance with the terms hereof), unconditionally and irrevocably guarantees the Insured Amount to the Trustee for the benefit of the Holders of the Insured Notes to the extent such Insured Amounts become Due for Payment and are not paid as a result of Nonpayment by the Issuer. The Co-Issuers are entering into this Indenture, and the Trustee is accepting the trusts created by this Indenture, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

All things necessary to make this Indenture a valid agreement of the Co-Issuers in accordance with the agreement's terms have been done.

### GRANTING CLAUSES

The Issuer Grants to the Trustee, for the benefit and security of the Noteholders, the Composite Securityholders, the Insurer, the Trustee, the Portfolio Manager and each Hedge Counterparty (collectively, the "*Secured Parties*"), all of its right, title, and interest in, to, and under, in each case, whether now owned or existing, or hereafter acquired or arising:

> (a)     the Collateral Obligations (listed, as of the Closing Date, in <u>Schedule 1</u> to this Indenture and as such <u>Schedule 1</u> may be modified, amended and revised subsequent to the Closing Date by the Issuer) and all Workout Assets, including any part thereof which consists of general intangibles (as defined in the UCC) relating thereto, all payments made or to be made thereon or with respect thereto, and all Collateral Obligations and Workout Assets including any part thereof which consists of general intangibles (as defined in the UCC) relating thereto, which are delivered or credited to the Trustee, or for which a Security Entitlement is delivered or credited to the Trustee or which are credited to one or more of the Issuer Accounts on or after the Closing Date and all payments made or to be made thereon or with respect thereto;

> (b)     the Custodial Account, the Collection Account, the Payment Account, the Revolving Reserve Account, the Delayed Drawdown Reserve Account, the Interest Reserve Account, the Synthetic Security Collateral Account, the Hedge Counterparty Collateral Account, the Closing Date Expense Account, the Expense Reimbursement Account, and the Securities Lending Account (collectively, the "*Issuer Accounts*"),

Eligible Investments purchased with funds on deposit in the Issuer Accounts, and all income from the investment of funds in the Issuer Accounts;

(c) the Synthetic Security Counterparty Account (and together with the Issuer Accounts, the "**Accounts**") and assets included therein, subject to the terms of the related Synthetic Security (provided, however, that any such rights in any Synthetic Security Counterparty Account shall be held in trust by the Trustee (or Securities Intermediary) first to secure the Issuer's payment obligations to the relevant Synthetic Security Counterparty and second for the benefit of the Secured Parties);

(d) the Management Agreement, the Securities Lending Agreements, the Hedge Agreements as set forth in Article 15, the Collateral Administration Agreement and, solely for the benefit of the Holders of the Class A-1g Notes only, the Insurance Documents to the extent of any rights of the Issuer therein;

(e) all Cash or money delivered to the Trustee (or its bailee);

(f) all securities, investments and agreements of any nature in which the Issuer has an interest (except for securities and investments in the Issuer's bank account in the Cayman Islands), including any part thereof which consists of general intangibles (as defined in the UCC) relating thereto; and

(g) all proceeds with respect to the foregoing;

(all of the property and assets described in foregoing clauses (a) through (g), but excluding the Class 1 Collateral (as defined below) and the Excluded Property, the "**Collateral**").

The Issuer as a second and separate grant Grants to the Trustee, for the benefit and security solely of the Holders of the Class 1 Composite Securities (solely to the extent of their Class 1 Component), all of its right, title and interest in, to and under, in each case, whether now owned or existing, or hereafter acquired or arising, the Class 1 Component Account and any property of any type deposited into the Class 1 Component Account and all proceeds with respect to the foregoing (all of the foregoing, the "***Class 1 Collateral***").

These Grants are not intended to and do not transfer any liability under the Collateral, which liabilities shall remain the sole obligation of the Issuer. These Grants are made, however, in trust as separate trusts, to secure the Notes and the Class 1 Components in the case of the first grant, and only the Class 1 Components in the case of the second grant. Except as provided in Article 13 and the priorities set forth in the Priority of Payments and Section 11.2, the Notes and the Class 1 Components are secured by the first grant equally and ratably without prejudice, priority or distinction between any Note or Class 1 Component and any other Note or the Class 1 Component because of difference in time of issuance or otherwise. The Class 1 Components are secured by the second grant equally and ratably without prejudice, priority or distinction because of difference in time of issuance or otherwise. The Grants are made to secure, in accordance with the priorities in the Priority of Payments, Article 13 and Article 11.2, as applicable:

(i) the payment of all amounts due on the Notes and the Class 1 Components equally and ratably without prejudice, priority, or distinction between any Note or Class 1 Component and any other Note or Class 1 Component because of difference in time of issuance or otherwise, in accordance with their terms;

(ii)     the payment of all other sums payable under this Indenture (other than amounts payable in respect of the Preference Shares);

(iii)     the payment of all obligations owing by the Issuer under the Insurance Documents; and

(iv)     compliance with this Indenture;

(collectively, the "***Secured Obligations***"), all as provided in this Indenture.

The Trustee acknowledges the Grants, accepts the trusts under this Indenture in accordance with this Indenture, and agrees to perform its duties in this Indenture in accordance with the provisions hereof.

ARTICLE 1

DEFINITIONS

Section 1.1.     ***Definitions.***

Except as otherwise specified in this Indenture or as the context may otherwise require, the following terms have the respective meanings provided below for all purposes of this Indenture.  Payments or distributions made or to be made on the Composite Securities in respect of their Components are referred to as payments made or to be made on the Class 1 Components and the Preference Share Components, as the case may be.

Except as otherwise specified herein or as the context may otherwise require or dictate or unless the Composite Securities are explicitly addressed in the same context, (A) all references in this Indenture to the "Preference Shares" include the "Preference Share Component" of the Class 1 Composite Securities and (B) all references in this Indenture to the rights of the Holders of the Preference Shares (including with respect to any payments, distributions, redemptions, votes or consents to be given by such Holders) include the rights of the Holders of the Class 1 Composite Securities to the extent of the Preference Share Component of the Class 1 Composite Securities.

"***1940 Act***": The United States Investment Company Act of 1940, as amended.

"***A/B Exchange***": An exchange of one security (the "***A Security***") for another security (the "***B Security***") of the same issuer or issuers, which security shall have substantially identical terms to the A Security except that one or more transfer restrictions applicable to the A Security are inapplicable to the B Security.

"***Accounts***": The meaning specified in the Granting Clauses.

"***Accountants' Certificate***": An agreed upon procedures report of a firm of Independent certified public accountants of international reputation appointed by the Issuer pursuant to Section 10.8(a), which may be the firm of Independent accountants that performs certain accounting services for the Issuer or the Portfolio Manager.

"***Accredited Investor***": The meaning specified in Rule 501(a) of the Securities Act.

3

45824v26

"*Accrued Insurance Liabilities*": The meaning assigned to the term "Accrued Insurance Liabilities" in the Insurance Agreement.

"*Accrued Interest On Sale*": Interest accrued on a Collateral Obligation at the time of sale or other disposition to the extent paid to the Issuer as part of the sale or other disposition price of the Collateral Obligation after deduction of any amount representing Accrued Interest Purchased With Principal of the Collateral Obligation.

"*Accrued Interest Purchased With Principal*": (i) Interest accrued on or purchased with a Collateral Obligation as part of the price paid by the Issuer to acquire the Collateral Obligation less any amount of Interest Proceeds (applied as Interest Proceeds) applied by the Issuer to acquire the accrued interest at the time of purchase and (ii) interest accrued on a Warehoused Loan as part of the price paid by the Issuer to repurchase and terminate the related participation under the Warehouse Agreement.

"*Act*": The meaning specified in Section 14.2.

"*Administration Agreement*": The Administration Agreement, between the Issuer and the Administrator, providing for the administrative functions of the Issuer, as modified, amended, and supplemented and in effect from time to time.

"*Administrative Expense Cap*": An amount on any Payment Date equal to the excess of:

(a)     the sum of 0.05% of the Maximum Investment Amount on the related Determination Date plus $150,000, *over*

(b)     the sum of the amounts paid for Administrative Expenses in the twelve months preceding the current Payment Date.

"*Administrative Expenses*": Amounts due or accrued representing

(i)     tax preparation, filing, and registration fees or expenses and any other filing and registration fees owed by the Co-Issuers (including all filing, registration, and annual return fees payable to the Cayman Islands government and registered office fees);

(ii)     fees, indemnities and expenses of the Trustee (including all amounts under Section 6.7), the Administrator, the Preference Shares Paying Agent and the Collateral Administrator;

(iii)     fees, indemnities and expenses of the Co-Issuers and of accountants, agents, and counsel for either of the Co-Issuers;

(iv)     fees and expenses of the Rating Agencies in connection with any rating of the Securities owed by either Co-Issuer (including fees and expenses for surveillance, credit estimates, and other fees owing to the Rating Agencies);

(v)     expenses and indemnities (but not Management Fees) of the Portfolio Manager if payable under the Management Agreement;

(vi)     expenses and indemnities of the Insurer if payable under Section 4.2(a)(ii) and Section 4.3 of the Insurance Agreement;

(vii)     fees and expenses for third-party loan pricing services and accountants; and

(viii)     amounts due (other than indemnities) to any other person (except the Portfolio Manager) if specifically provided for in this Indenture, including fees or expenses in connection with any Securities Lending Agreement.

"*Administrator*":  Maples Finance Limited.

"*Affected Bank*":  A "bank" for purposes of Section 881 of the Code or an entity affiliated with such a bank that is neither (x) a "United States person" within the meaning of Section 7701(a)(30) of the Code (generally an entity created or organized in or under the laws of the United States or any state thereof or the District of Columbia) nor (y) entitled to the benefits of an income tax treaty with the United States under which withholding taxes on interest payments made by obligors resident in the United States to such bank are reduced to 0%.

"*Affiliate*" or "*Affiliated*":  With respect to a person,

(i)     any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, the person, or

(ii)     any other person who is a director, officer, or employee (A) of the person, (B) of any subsidiary or parent company of the person, or (C) of any person described in clause (i) above.

For the purposes of this definition, control of a person shall mean the power, direct or indirect,

(A)     to vote more than 50% of the securities having ordinary voting power for the election of directors of the person, or

(B)     to direct the corporate management and corporate policies of the person whether by contract or otherwise (this does not include the Management Agreement unless it is amended expressly to provide those services).

For the purpose of this definition, the Administrator and its Affiliates are neither Affiliates of nor Affiliated with the Co-Issuers and the Co-Issuers are neither Affiliates of nor Affiliated with the Administrator, or any of their Affiliates.

"*Agent Members*":  Members of, or participants in, a Depository.

"*Aggregate Outstanding Amount*":  When used with respect to any of the Notes as of any date, the aggregate principal amount of the Notes on that date.  When used with respect to the Preference Shares or the Preference Share Components as of any date, the number of such Preference Shares Outstanding on such date in respect of such Preference Shares or Preference Share Components.  When used with respect to any of the Class 1 Composite Securities, as of any date, the aggregate face amount of the Class 1 Composite Securities.

5

Except as otherwise provided herein:

      (a)     the Aggregate Outstanding Amount of the Class A-1a Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

      (b)     the Aggregate Outstanding Amount of the Class A-1b Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

      (c)     the Aggregate Outstanding Amount of the Class A-1g Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

      (d)     the Aggregate Outstanding Amount of the Class A-2 Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

      (e)     the Aggregate Outstanding Amount of the Class A-3a Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

      (f)     the Aggregate Outstanding Amount of the Class A-3b Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

      (g)     the Aggregate Outstanding Amount of the Class B Notes at any time shall include all Class B Deferred Interest attributed thereto; and

      (h)     the Aggregate Outstanding Amount of the Class C Notes at any time shall include all Class C Deferred Interest attributed thereto.

"*Aggregate Principal Balance*": When used with respect to the Pledged Obligations, the sum of the Principal Balances of all the Pledged Obligations. When used with respect to a portion of the Pledged Obligations, the term Aggregate Principal Balance means the sum of the Principal Balances of that portion of the Pledged Obligations.

"*Aggregate Purchase Price Amount*": When used with respect to the Pledged Obligations, the sum of the Purchase Price Amounts of all the Pledged Obligations. When used with respect to a portion of the Pledged Obligations, the term Aggregate Purchase Price Amount means the sum of the Purchase Price Amounts of that portion of the Pledged Obligations.

"*Allocable Principal Balance*": With respect to a Synthetic Security based upon or relating to a senior secured index investment providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time, the portion of the aggregate Principal Balance of such Synthetic Security that is allocable to each Reference Obligation comprising such index or indices based upon allocating the Principal Balance of such Synthetic Security among such Reference Obligations in the same proportion as each Reference Obligation bears to the aggregate Principal Balance of such Synthetic Security.

6

"*Amendment Buy-Out*": The meaning specified in Section 9.6(a).

"*Amendment Buy-Out Option*": The meaning specified in Section 9.6(a).

"*Amendment Buy-Out Purchase Price*": The purchase price payable by the Amendment Buy-Out Purchaser for Securities or Preference Shares purchased in an Amendment Buy-Out, if any, in an amount equal to (i) in the case of the Notes, the Aggregate Outstanding Amount thereof, plus accrued and unpaid interest (including Deferred Interest, if any) to the date of purchase payable to the Non-Consenting Holder (giving effect to any amounts paid to the Holder on such date), plus any unpaid Extension Bonus Payment plus, in the case of the Fixed Rate Notes, the applicable Make-Whole Premium, (ii) in the case of the Preference Shares, an amount that, when taken together with all payments and distributions made in respect of such Preference Shares since the Closing Date (and any amounts payable, if any, to the Non-Consenting Holder on the next succeeding Payment Date) would cause such Preference Shares to have received (as of the date of purchase thereof) a Preference Share Internal Rate of Return of 12.0% (assuming such purchase date was a Payment Date); provided, however, that in any Amendment Buy-Out from and after the date on which the Non-Consenting Holders of Preference Shares have received a Preference Share Internal Rate of Return equal to or in excess of 12.0%, the Amendment Buy-Out Purchase Price for such Preference Shares shall be zero and (iii) in the case of the Class 1 Composite Securities, the sum of (x) the amount that would be payable pursuant to the preceding clause (ii) in respect of the Preference Shares underlying the Class 1 Composite Security Preference Share Component, (y) the Treasury Strip Market Value and (z) the Composite Security Make-Up Amount.

"*Amendment Buy-Out Purchaser*": The Portfolio Manager (or any of its Affiliates acting as principal or agent); provided that in the event that the Portfolio Manager elects not to purchase Securities or Preference Shares from Holders pursuant to Section 9.6, "Amendment Buy-Out Purchaser" shall mean one or more qualifying purchasers (which may include the Initial Purchaser) or any of its Affiliates acting as principal or agent) designated by the Portfolio Manager; provided, however, none of the Portfolio Manager, the Initial Purchaser or any of their respective Affiliates shall have any duty to act as an Amendment Buy-Out Purchaser.

"*Applicable Issuers*" or "*Applicable Issuer*": With respect to the Senior Class A Notes, the Class A-2 Notes, the Class A-3 Notes, the Class B Notes and the Class C Notes, each of the Co-Issuers.  With respect to the Preference Shares and the Composite Securities, the Issuer only.

"*Applicable Note Interest Rate*": With respect to the Notes of any Class, the Note Interest Rate with respect to such Class.

"*Applicable Percentage*": The lesser of the Moody's Priority Category Recovery Rate and the S&P Priority Category Recovery Rate applicable to the Collateral Obligation as specified in the tables below.  High-Yield Bonds do not include Structured Finance Obligations for this purpose.

7

| Moody's Priority Category | Moody's Priority Category Recovery Rate |
|---|---|
| Synthetic Securities............................ | In the case of: |
| | (i) a Form-Approved Synthetic Security, the "Moody's Priority Category Recovery Rate" given by Moody's to the Form-Approved Synthetic Security at the time of approval of the Form-Approved Synthetic Security by Moody's, and |
| | (ii) any other Synthetic Security, the "Moody's Priority Category Recovery Rate" given by Moody's to the Synthetic Security at the time of acquisition of the Synthetic Security. |
| Structured Finance Obligations.......... | The Moody's Priority Category Recovery Rate determined in accordance with the Moody's Structured Finance Obligation Recovery Rates set forth in Schedule 5 by reference to the type of asset and its then Moody's Rating (or, with respect to assets to which that schedule does not apply, on a case-by-case basis in connection with the Grant of the relevant Collateral Obligation). |
| unsecured DIP Loans and any Collateral Obligations not covered above or below................................... | As determined by Moody's on a case-by-case basis |

For High-Yield Bonds, Moody's Senior Secured Loans and Moody's Non Senior Secured Loans, the relevant Moody's Priority Category Recovery Rate is the rate determined pursuant to the table below based on the number of rating subcategories difference between the High-Yield Bond's or Loan's Moody's Obligation Rating and its Moody's Default Probability Rating (for purposes of clarification, if the Moody's Obligation Rating is higher than the Moody's Default Probability Rating, the rating subcategories difference will be positive and if it is lower, negative):

| Number of Moody's Rating Subcategories Difference Between the Moody's Obligation Rating and the Moody's Default Probability Rating | Moody's Senior Secured Loans | Moody's Non Senior Secured Loans | High-Yield Bonds |
|---|---|---|---|
| +2 or more | 60.0% | 45.0% | 40.0% |
| +1 | 50.0% | 42.5% | 35.0% |
| 0 | 45.0% | 40.0% | 30.0% |
| -1 | 40.0% | 30.0% | 15.0% |
| -2 | 30.0% | 15.0% | 10.0% |
| -3 or less | 20.0% | 10.0% | 2.0% |

If no Moody's Priority Category Recovery Rate has been specifically assigned with respect to a Loan pursuant to the above table, and the Loan is a secured DIP Loan, the relevant Moody's Priority Category Recovery Rate is 50.0%.

8

| S&P Priority Category | S&P Priority Category Recovery Rate |
|---|---|
| Secured Loans other than Subordinated Lien Loans or DIP Loans................................................ | 52.0% |
| Senior Unsecured Loans .................... | 31.0% |
| Subordinated Lien Loans other than a DIP Loan........................................... | 18.0% |
| senior secured High-Yield Bonds (other than Structured Finance Obligations)........................................ | 44.0% |
| senior unsecured High-Yield Bonds (other than Structured Finance Obligations)........................................ | 30.0% |
| subordinated High-Yield Bonds (other than Structured Finance Obligations)........................................ | 18.0% |
| Structured Finance Obligations.......... | The S&P Priority Category Recovery Rate determined in accordance with the S&P Structured Finance Obligation Recovery Rates set forth in Schedule 6 by reference to the type of asset and its then S&P Rating (or, with respect to assets to which that table does not apply, on a case by case basis in connection with the Grant of the relevant Collateral Obligation). |
| Synthetic Securities............................ | As assigned by S&P on a case-by-case basis in connection with the Grant of the relevant Collateral Obligation. |
| DIP Loans and any Collateral Obligation not covered above ............ | As assigned by S&P on a case-by-case basis |

"***Approved Credit Support Document***": A security agreement in the form of the 1994 ISDA Credit Support Annex (ISDA Agreements Subject to New York Law Only), as modified by the Paragraph 13 thereto.

"***Approved Pricing Service***": Loan Pricing Corporation, Mark-It-Partners, Inc. or any other nationally recognized loan pricing service approved in writing by S&P.

"***Ask-Side Market Value***": As of any Measurement Date, the market value determined by the Portfolio Manager and reported to the Trustee as an amount rather than as a percentage or fraction of par (expressed in Dollars) of any lent Collateral Obligation based upon the Portfolio Manager's commercially reasonable judgment and based upon the following order of priority: (i) the average of the ask-side market prices obtained by the Portfolio Manager from three Independent broker-dealers active in the trading of such obligations or (ii) if the foregoing set of prices were not obtained, the higher of the ask-side market prices obtained by the Portfolio Manager from two Independent broker-dealers active in the trading of such obligations or (iii) if the foregoing sets of prices were not obtained, the average of the ask-side prices for the purchase of such Collateral Obligation determined by an Approved Pricing Service (Independent from the Portfolio Manager) that derives valuations by polling broker-dealers (Independent from the Portfolio Manager); provided that if the Ask-Side Market Value of any

9

lent Collateral Obligation cannot be so determined then such Collateral Obligation shall be deemed to have a Market Value equal to the outstanding principal balance thereof.

"***Assigned Moody's Rating***": The meaning set forth in <u>Schedule 8</u>.

"***Authenticating Agent***": With respect to the Securities, the Trustee or the person designated by the Trustee to authenticate the Securities on behalf of the Trustee pursuant to Section 6.14.

"***Authorized Officer***": With respect to the Issuer or the Co-Issuer, any Officer or agent who is authorized to act for the Issuer or the Co-Issuer, as applicable, in matters relating to, and binding on, the Issuer or the Co-Issuer. With respect to the Portfolio Manager, any managing member, Officer, manager, employee, partner or agent of the Portfolio Manager who is authorized to act for the Portfolio Manager in matters relating to, and binding on, the Portfolio Manager with respect to the subject matter of the request, certificate, or order in question. With respect to the Trustee or any other bank or trust company acting as trustee of an express trust or as custodian, a Trust Officer. Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any person to act, and the certification may be considered as in full force and effect until receipt by the other party of written notice to the contrary.

"***Average Life***": As of any Measurement Date with respect to any Collateral Obligation (other than any Defaulted Collateral Obligation), the quotient obtained by dividing:

    (i)     the sum of the products of:

        (A)     the number of years (rounded to the nearest hundredth) from the Measurement Date to the respective dates of each successive scheduled payment of principal of the Collateral Obligation, and

        (B)     the respective amounts of the successive scheduled payments of principal of the Collateral Obligation, *by*

    (ii)     the sum of all successive scheduled payments of principal of the Collateral Obligation.

"***Avoided Payment***": The meaning assigned to the term "Avoided Payment" in the Policy.

"***Bank***": JPMorgan Chase Bank, National Association, in its individual capacity and not as Trustee.

"***Bankruptcy Code***": The U.S. Bankruptcy Code, Title 11 of the United States Code.

"***Bankruptcy Law***": The Bankruptcy Code, Part V of the Companies Law (2004 Revision) of the Cayman Islands and the Bankruptcy Law (1997 Revision) of the Cayman Islands.

"***Beneficial Owner***": Any person owning an interest in a Global Security or Regulation S Global Preference Shares as reflected on the books of the Depository or on the books of an

10

Agent Member or on the books of an indirect participant for which an Agent Member acts as agent.

"***Benefit Plan Investor***": The meaning specified in the Plan Asset Regulations of the U.S. Department of Labor, 29 CFR 2510.3-101(f).

"***Board Resolution***": With respect to the Issuer, a resolution of the board of directors of the Issuer and, with respect to the Co-Issuer, a resolution of the board of directors of the Co-Issuer.

"***Business Day***": A day on which commercial banks and foreign exchange markets settle payments in New York City and any other city in which the Corporate Trust Office of the Trustee is located and, in the case of the final payment of principal of any Note or the final payment in respect of any Composite Security, the place of presentation of the Security designated by the Trustee. To the extent action is required of the Irish Listing and Paying Agent, Dublin, Ireland shall be considered in determining "Business Day" for purposes of determining when action by the Irish Listing and Paying Agent is required.

"***Buy-Out Amount***": The meaning set forth in the Management Agreement.

"***Calculation Agent***": The meaning specified in Section 7.16.

"***Cash***": Such coin or currency of the United States of America as at the time shall be legal tender for payment of all public and private debts.

"***CCC/Caa Collateral Obligations***": The Collateral Obligations (excluding any Defaulted Collateral Obligations) that on the relevant date have (i) a Moody's Rating below "B3" and/or (ii) an S&P Rating below "B-".

"***Certificate of Authentication***": The meaning specified in Section 2.1.

"***Certificated Composite Security***": The meaning specified in Section 2.2(d).

"***Certificated Preference Shares***": The meaning set forth in the Preference Shares Paying Agency Agreement.

"***Certificated Security (UCC)***": The meaning specified in Section 8-102(a)(4) of the UCC.

"***Class***": All of the Securities having the same priority and the same Stated Maturity and all of the Preference Shares. Unless otherwise expressly provided for herein: (i) the Class A-1a Notes, the Class A-1b Notes and the Class A-1g Notes shall be considered as being of the same Class and (ii) each of the Senior Class A Notes, the Class A-2 Notes and the A-3 Notes shall be separate Classes.

"***Class 1 Collateral***": The meaning specified in the Granting Clauses.

"***Class 1 Collateral Principal Balance***": The face value of the Treasury Strip at its maturity date.

11

"***Class 1 Component***": A Component representing the rights of the Holders of the Class 1 Composite Securities to receive the payments from the Class 1 Component Account upon any redemption of the Class 1 Component.

"***Class 1 Component Account***": The trust account established pursuant to Section 10.3(j).

"***Class 1 Composite Security***": The Class 1 Extendable Composite Securities issued by the Issuer pursuant to this Indenture and having the characteristics specified in Section 2.3.

"***Class 1 Composite Security Preference Share Component***": A Component of the Class1 Composite Securities representing an initial aggregate Face Amount of Preference Shares equal to $2,000,000. The number of Preference Shares to which the Class 1 Composite Security Preference Share Component relates is included in (and are not in addition to) the number of Preference Shares being issued by the Issuer on the Closing Date pursuant to its Memorandum and Articles of Association.

"***Class 1 Composite Security Rated Balance***": With respect to the rating of the Class 1 Composite Securities by Moody's, on the Closing Date $6,000,000 and on any date of determination thereafter, the initial Class 1 Composite Security Rated Balance *minus* the aggregate amount of all distributions paid to the Holders of the Class 1 Composite Securities in respect of its related Components on all prior Payment Dates pursuant to Section 11.1(a) and Section 11.2.

"***Class A Coverage Tests***": The Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class A Notes.

"***Class A Notes***": The Senior Class A Notes, the Class A-2 Notes and the Class A-3 Notes.

"***Class A-1a Notes***": The Class A-1a Floating Rate Senior Secured Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

"***Class A-1b Notes***": The Class A-1b Fixed Rate Senior Secured Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

"***Class A-1g Notes***": The Class A-1g Floating Rate Senior Secured Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

"***Class A-2 Notes***": The Class A-2 Floating Rate Senior Secured Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

"***Class A-3 Notes***": The Class A-3a Notes and the Class A-3b Notes.

"***Class A-3a Notes***": The Class A-3a Floating Rate Senior Secured Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

12

"***Class A-3b Notes***": The Class A-3b Fixed Rate Senior Secured Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

"***Class B Coverage Tests***": The Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class B Notes.

"***Class B Deferred Interest***": Deferred Interest with respect to the Class B Notes.

"***Class B Notes***": The Class B Senior Secured Deferrable Interest Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

"***Class C Coverage Tests***": The Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class C Notes.

"***Class C Deferred Interest***": Deferred Interest with respect to the Class C Notes.

"***Class C Notes***": The Class C Senior Secured Deferrable Interest Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

"***Class Scenario Loss Rate***": With respect to any Class of Notes rated by S&P, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with S&P's rating of the Class of Notes on the Closing Date, determined by application of the S&P CDO Monitor.

"***Clearing Agency***": An organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

"***Clearing Corporation***": The meaning specified in Section 8-102(a)(5) of the UCC.

"***Clearing Corporation Security***": A "security" (as defined in Section 8-102(a)(15) of the UCC) that (i) is a debt or equity security and (ii) is in the custody of or maintained on the books of a Clearing Corporation or its nominee.

"***Clearstream***": Clearstream Banking, société anonyme, a corporation organized under the laws of the Duchy of Luxembourg.

"***Closing Date***": March 15, 2005.

"***Closing Date Expense Account***": The trust account established pursuant to Section 10.3(g).

"***Co-Issuer***": The person named as such on the first page of this Indenture.

"***Co-Issuers***": The Issuer and the Co-Issuer.

"***Code***": The United States Internal Revenue Code of 1986, as amended.

"***Collateral***": The meaning specified in the Granting Clauses.

13

"***Collateral Administration Agreement***": The agreement dated as of the Closing Date among the Issuer, the Portfolio Manager, and the Collateral Administrator, as modified, amended, and supplemented and in effect from time to time.

"***Collateral Administrator***": The Bank in its capacity as collateral administrator under the Collateral Administration Agreement.

"***Collateral Assignment of Hedge Agreements***": With respect to each Hedge Agreement, the assignment of all of the Issuer's interest in the Hedge Agreement to the Trustee and acknowledged by the Hedge Counterparty to create a security interest therein in favor of the Trustee.

"***Collateral Obligation***": Any obligation or security that, when the Issuer commits to purchase (or otherwise acquire) the obligation or security, is a Loan, High-Yield Bond, Structured Finance Obligation, or Synthetic Security with a Reference Obligation that is a Loan, a Structured Finance Obligation, or High-Yield Bond that is:

(1) denominated and payable in U.S. Dollars and is not convertible by its obligor into any other currency;

(2) an obligation of an obligor Domiciled in an Eligible Country;

(3) an obligation that is eligible by its terms to be assigned to the Issuer and pledged by the Issuer to the Trustee for inclusion in the Collateral;

(4) not an exchangeable or convertible security that is exchangeable or convertible at the option of its issuer;

(5) not an equity security or a component of an equity security or a security that has a component that is an equity security (other than for avoidance of doubt, a pass-through trust certificate in a trust holding Collateral Obligations);

(6) not an obligation or security that has been called for redemption and is not an obligation or security that is the subject of an Offer other than a Permitted Offer or an exchange offer in which a security that is not registered under the Securities Act is exchanged for (i) a security that has substantially identical terms (except for transfer restrictions) but is registered under the Securities Act or (ii) a security that would otherwise qualify for purchase under Article 12;

(7) an obligation that (a) has a Moody's Rating (including any estimated or confidential rating which is in respect of the full obligation of the obligor and which is monitored) and (b) has an S&P Rating (including any confidential rating which is in respect of the full obligation of the obligor and which is monitored), which S&P Rating does not have a "p", "pi", "q", "r" or "t" subscript unless S&P otherwise authorizes in writing;

(8) an obligation that is a Finance Lease (if it is a lease) and the Rating Condition has been satisfied with respect to the acquisition thereof;

(9) an obligation that is not a Current-Pay Obligation, Non-Performing Collateral Obligation or Credit Risk Obligation and in the case of a Collateral

14

Obligation that has a Moody's Rating of "Caa1" or lower or an S&P Rating of "CCC+" or lower, an obligation for which the Portfolio Manager has certified in writing that such Collateral Obligation is not a Credit Risk Obligation;

(10)     an obligation that (unless it is a High-Yield Bond) is not subordinated by its terms to other indebtedness for borrowed money of the applicable issuer; provided that for the avoidance of doubt, this clause shall not prohibit the inclusion as Collateral Obligations of Subordinated Lien Loans;

(11)     an obligation that (i) (unless it is a PIK Security) bears simple interest payable in cash no less frequently than annually at a fixed or floating rate that is paid on a periodic basis on an unleveraged basis and, in the case of a floating rate, computed on a benchmark interest rate plus or minus a spread, if any (which may vary under the terms of the obligation) and (ii) provides for a fixed amount of principal payable in cash according to a fixed schedule (which may include optional call dates) or at maturity (or a fixed notional amount in the case of Synthetic Securities);

(12)     an obligation the payment or repayment of the principal, if any, of which is not an amount determined by reference to any formula or index or subject to any contingency under the terms thereof;

(13)     in the case of a Loan, an obligation that is part of, or a Participation in, a syndicated loan facility that provides for a commitment by the lenders, in the aggregate, of at least U.S.$100 million;

(14)     an obligation the portion of which to be acquired (including through a Synthetic Security with respect to the Reference Obligation) does not represent, directly or indirectly, more than a 25% interest in the obligation;

(15)     not an obligation with a maturity later than one year after the Stated Maturity of the Notes;

(16)     an obligation upon which no payments are subject to withholding tax imposed by any jurisdiction unless the obligor thereof or counterparty with respect thereto is required to make "gross-up" payments that cover the full amount of any such withholding tax on an after-tax basis (other than withholding taxes with respect to commitment fees associated with Collateral Obligations constituting Revolving Loans or Delayed Drawdown Loans);

(17)     not a Loan or Synthetic Security that would require the Issuer after its purchase of the Loan or Synthetic Security to advance any funds to the related borrower or Synthetic Security Counterparty or permit the borrower or Synthetic Security Counterparty to require that any future advances be made except for:

(A)     any Revolving Loan or Delayed Drawdown Loan if, simultaneously with its purchase of the Revolving Loan or Delayed Drawdown Loan, the Issuer deposits into the Revolving Reserve Account or the Delayed Drawdown Reserve Account, respectively, the maximum amount of any advances that may be required of the Issuer under the related Underlying Instrument (as provided in Section 10.3(b)), and

15

(B)     any Synthetic Security if, simultaneously with its purchase of the Synthetic Security, the Issuer posts cash collateral with (or for the benefit of) the Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into the Synthetic Security in an amount not exceeding the amount of any future advances;

(18)     if such obligation is a Structured Finance Obligation that is a collateralized loan obligation, such obligation:

(A)     has been assigned a rating by both Moody's and S&P;

(B)     has a Moody's Rating of "Ba3" or higher and an S&P Rating of "BB-" or higher; and

(C)     has not been placed on the watch list for possible downgrade by Moody's or S&P;

(19)     not a Loan that is an obligation of a debtor in possession or a trustee for a debtor in an insolvency proceeding other than a DIP Loan;

(20)     with respect to an obligation that provides for the payment of interest at a floating rate, an obligation for which such floating rate is determined by reference to the U.S. Dollar prime rate or other base rate, London interbank offered rate or similar interbank offered rate, commercial deposit rate or any other index that the Rating Condition with respect to each Rating Agency is satisfied with respect thereto;

(21)     in the case of a Synthetic Security, a Synthetic Security for which the counterparty or issuer, as the case may be, has a long-term senior unsecured rating by Moody's of at least "A3", and if rated "A3" by Moody's, such rating is not on watch for downgrade, and an issuer credit rating by S&P of at least "A-";

(22)     not an obligation that constitutes Margin Stock;

(23)     not a Zero-Coupon Security;

(24)     not an obligation that is currently deferring interest or paying interest "in kind" or otherwise has an interest "in kind" balance outstanding at the time of purchase, which interest is otherwise payable in cash, unless the Rating Condition has been satisfied with respect to the acquisition thereof;

(25)     not a security whose repayment is subject to substantial non-credit related risk as determined by the Portfolio Manager;

(26)     not an obligation the interest payments of which are scheduled to decrease (although interest payments may decrease due to unscheduled events such as a decrease if the index relating to a Floating Rate Obligation, the change from a default rate of interest to a non-default rate of interest or an improvement in the obligor's financial condition); and

16

(27)     not an obligation that will cause the Issuer, the Co-Issuer, or the pool of assets to be required to be registered as an investment company under the Investment Company Act.

The Treasury Strip shall not be a Collateral Obligation and it shall not be taken into account in any calculation involving Collateral Obligations.

Pursuant to the definition of "Synthetic Security", unless the Rating Condition is otherwise satisfied, any "deliverable obligation" that may be delivered to the Issuer as a result of the occurrence of any "credit event" must qualify (when the Issuer purchases the related Synthetic Security and when such "deliverable obligation" is delivered to the Issuer as a result of the occurrence of any "credit event") as a Collateral Obligation, except that such "deliverable obligation" may constitute a Defaulted Obligation when delivered upon a "credit event".

"*Collateral Quality Tests*": The Diversity Test, the Weighted Average Life Test, the Weighted Average Moody's Recovery Rate Test, the Weighted Average S&P Recovery Rate Test, the Weighted Average Fixed Rate Coupon Test, the Weighted Average Spread Test, the Weighted Average Rating Factor Test, and the S&P CDO Monitor Test.

"*Collection Account*": The trust account established pursuant to Section 10.2(a).

"*Commitment Amount*": With respect to any Revolving Loan or Delayed Drawdown Loan, the maximum aggregate outstanding principal amount (whether then funded or unfunded) of advances or other extensions of credit that the Issuer could be required to make to the borrower under its Underlying Instruments.

"*Commitment Reduction*": With respect to any Revolving Loan or Delayed Drawdown Loan, a permanent reduction (whether scheduled, mandatory, optional, or otherwise) in the related Commitment Amount.

"*Components*": The Preference Share Component and the Class 1 Component, as the context requires.

"*Composite Securities*": The Class 1 Composite Securities issued by the Issuer pursuant to this Indenture and having the characteristics specified in Section 2.3.

"*Composite Securityholder*": A Holder of Class 1 Composite Securities.

17

"**Composite Security Make-Up Amount**": In connection with determining the Amendment Buy-Out Purchase Price, the Extension Purchase Price or the Buy-Out Amount in respect of all or a portion of the Composite Securities, the greater of: (i) zero and (ii) the sum of (w) the initial principal amount of such Composite Securities as of the Closing Date <u>minus</u> (x) the aggregate of all payments and distributions made in respect of the Composite Securities since the Closing Date <u>minus</u> (y) any amount payable pursuant to clause (ii) of the definition of Amendment Buy-Out Purchase Price (for purposes of determining the Composite Security Make-Up Amount pursuant to clause (iii) of such definition), clause (ii) of the definition of Extension Purchase Price (for purposes of determining the Composite Security Make-Up Amount pursuant to clause (iii) of such definition) or clause (i) of the definition of Buy-Out Amount (for purposes of determining the Composite Security Make-Up Amount pursuant to clause (ii) of such definition) <u>less</u> (z) the Treasury Strip Market Value.

"**Composite Securities Payment Date**": The second Business Day after each Payment Date or, if such Payment Date coincides with the Stated Maturity, the Composite Securities Payment Date shall be such Payment Date.

"**Concentration Limitations**": The limit set forth below with respect to a particular type of Investment Obligation (measured by Aggregate Principal Balance) as a percentage of the Maximum Investment Amount:

|  |  | Percentage of the Maximum Investment Amount |
|---|---|---|
| (1) | Senior Secured Loans and Eligible Investments | ≥ 92.5% |
| (2) | unsecured Loans | ≤ 3.0% |
| (3) | Subordinated Lien Loans | ≤ 5.0% |
| (4) | Revolving Loans and Delayed Drawdown Loans | ≤ 15.0% |
| (5) | DIP Loans | ≤ 5.0% |
|  | (a) except that with a Rating Confirmation, DIP Loans may constitute up to the percentage of the Maximum Investment Amount specified in the right column | ≤ 7.5% |
| (6) | S&P Unrated DIP Loans | ≤ 2.5% |
| (7) | PIK Securities | ≤ 3.0% |
| (8) | High-Yield Bonds | ≤ 7.5% |
| (9) | Structured Finance Obligations | ≤ 7.5% |
| (10) | Structured Finance Obligations that are collateralized loan obligations | ≤ 2.5% |
| (11) | obligors Domiciled other than in the United States and Canada | ≤ 15.0% |
| (12) | obligors Domiciled in Canada or any single Moody's Group I Country | ≤ 10.0% |
| (13) | obligors Domiciled in any single Moody's Group II Country | ≤ 5.0% |

45824v26

| | | |
|---|---|---|
| (14) | obligors Domiciled in any single Moody's Group III Country | ≤ 2.5% |
| (15) | obligors organized in a Tax Advantaged Jurisdiction | ≤ 5.0% |
| (16) | same S&P Industry Classification | ≤ 8.0% |
| | (a) except that Investment Obligations belonging to two S&P Industry Classifications (not including Telecommunications) may each constitute up to the percentage of the Maximum Investment Amount specified in the right column | ≤ 10.0% |
| (17) | single issuer or any of its Affiliates (excluding Secondary Risk Counterparties) | ≤ 1.5% |
| | (a) except that up to each of five individual issuers (including any of their respective Affiliates but excluding issuers that the Portfolio Manager reasonably determines are Affiliated but are not dependent upon one another for credit support and are not dependent upon a Person by which they are commonly controlled for credit support) may each constitute up to the percentage of the Maximum Investment Amount specified in the right column | ≤ 2.0% |
| (18) | Fixed Rate Obligations | ≤ 7.5% |
| (19) | Pay interest less frequently than quarterly but no less frequently than annually | ≤ 7.5% |
| (20) | Synthetic Securities | ≤ 20.0% |
| | (a) except that Synthetic Securities that provide for settlement other than by physical delivery may not exceed the percentage of the Maximum Investment Amount specified in the right column | ≤ 5.0% |
| | (b) except that Synthetic Securities that reference a senior secured index investment providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time may not exceed the percentage of the Maximum Investment Amount specified in the right column | ≤ 5.0% |
| (21) | Participations (provided, that no Investment Obligations may be a Participation in a Participation) | ≤ 10.0% |
| (22) | Investment Obligations of which are (i) obligors Domiciled other than in the United States, (ii) Collateral Obligations lent under Securities Lending Agreements, (iii) Participations and (iv) Synthetic Securities, in the aggregate may not exceed the percentage of the Maximum Investment Amount specified in the right column | ≤ 20.0% |
| (23) | Investment Obligations of which are (i) obligors Domiciled other than in the United States, (ii) Collateral Obligations lent under Securities Lending Agreements, (iii) Participations and (iv) Synthetic Securities, entered into with, or issued by, a single Secondary Risk Counterparty | ≤ respective percentage in Secondary Risk Table under "Individual Counterparty Limit" for applicable rating* |

19

| (24) | Investment Obligations of which are (i) obligors Domiciled other than in the United States, (ii) Collateral Obligations lent under Securities Lending Agreements, (iii) Participations and (iv) Synthetic Securities, entered into with, or issued by, all Secondary Risk Counterparties | ≤ respective percentage in Secondary Risk Table under "Aggregate Counterparty Limit" for applicable rating** |
|---|---|---|
| (25) | Deep Discount Obligations | ≤ 5.0% |
| (26) | CCC/Caa Collateral Obligations | ≤ 7.5% |
| (27) | Long-Dated Collateral Obligations | ≤ 2.0% |
| (28) | Collateral Obligations lent under Securities Lending Agreements | ≤ 15.0% |
| (29) | Collateral Obligations providing for interest at a non-London interbank offered rate | ≤ 5.0% |

\* Applicable long-term unsecured rating by Moody's or S&P of such Secondary Risk Counterparty (using the limit for the lower of such ratings if different).

\*\* Long-term unsecured rating by Moody's or S&P at or below a level specified in the Secondary Risk Table (using the lower of such ratings for a Secondary Risk Counterparty, if different).

Subject to the rights in circumstances of the Portfolio Manager to determine otherwise as set out in Section 1.2(h), solely for the purpose of determining whether the Concentration Limitations are met, Eligible Investments and Cash will be treated as Senior Secured Loans and Floating Rate Obligations.

"*Controlling Class*": The Senior Class A Notes (voting together as a Class or group), so long as any Senior Class A Notes are Outstanding; then the Class A-2 Notes (voting together as a Class or group), so long as any Class A-2 Notes are Outstanding; then the Class A-3 Notes (voting together as a Class or group), so long as any Class A-3 Notes are Outstanding; then the Class B Notes (voting together as a Class or group), so long as any Class B Notes are Outstanding; and then the Class C Notes (voting together as a Class or group); provided, however, that notwithstanding the foregoing, so long as the Class A-1g Notes are Outstanding and the Policy has not been terminated in accordance with Section 16.8 or any Accrued Insurance Liabilities or Premium are due and owing to the Insurer, and no Insurer Default exists, then the "Controlling Class", the "Holders of not less than 25% of the Aggregate Outstanding Amount of the Controlling Class", the "Majority of the Controlling Class" or the "Super Majority of the Controlling Class" shall, for all purposes, be the Insurer, and the Insurer shall be entitled to exercise all of the rights of the Controlling Class, the Holders of not less than 25% of the Aggregate Outstanding Amount of the Controlling Class, the Majority of the Controlling Class or the Super Majority of the Controlling Class, as applicable, that are provided for herein. In addition to the foregoing, the Insurer's right to exercise all of the rights of the Controlling Class, the Holders of not less than 25% of the Aggregate Outstanding Amount of the Controlling Class, the Majority of the Controlling Class or the Super Majority of the Controlling Class, as applicable, shall be reinstated if a Preference Claim is made for as long as any such Preference Claim is pending during the applicable statutory preference period or, if the Insurer is required to pay the amount of any Avoided Payment, for so long as any Accrued Insurance Liabilities owing to the Insurer have not been paid in full.

"*Corporate Trust Office*": The corporate trust office of the Trustee at which the Trustee performs its duties under this Indenture, currently having an address of 600 Travis Street, 50th

20

Floor, Houston, Texas 77002, telecopy no. (713) 216-2101, Attention: Institutional Trust Services—Southfork CLO Ltd. or any other address the Trustee designates from time to time by notice to the Noteholders, the Portfolio Manager, the Preference Shares Paying Agent, the Insurer, the Issuer, and each Rating Agency or the principal corporate trust office of any successor Trustee.

"*Coverage Tests*": Collectively, the Class A Coverage Tests, the Class B Coverage Tests and the Class C Coverage Tests applicable as of any Measurement Date.

"*Credit Improved Obligation*": Any Collateral Obligation that in the commercially reasonable judgment of the Portfolio Manager, has improved in credit quality; provided, if a Credit Rating Event is in effect, such Collateral Obligation will be considered a Credit Improved Obligation only if:

(i)     the Collateral Obligation has been upgraded or has been put on credit watch list with the potential for developing positive credit implications by either of the Rating Agencies since the date the Issuer first acquired the Collateral Obligation under this Indenture,

(ii)     such Collateral Obligation has experienced a reduction in credit spread of (A) 0.25% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such decrease) less than or equal to 2.00%, (B) 0.375% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such decrease) greater than 2.00% but less than or equal to 4.00% or (C) 0.50% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such decrease) greater than 4.00%, in each case compared to the credit spread at the time such Collateral Obligation was acquired by the Issuer, determined by reference to an applicable index selected by the Portfolio Manager (such index selection subject to satisfaction of the Rating Condition with respect to Moody's),

(iii)     (x) in the case of a Loan, the Market Value of such Collateral Obligation has increased by at least 1.00% from the Market Value of such Collateral Obligation as of its date of acquisition, as determined by the Portfolio Manager (provided that this subclause (iii)(x) will be deemed satisfied if Market Value increases to 101%), or (y) in the case of a Bond, the Market Value of such Collateral Obligation has changed since its date of acquisition by a percentage more positive than the percentage change in the Merrill Lynch US High Yield Master II Index, Bloomberg ticker H0A0, plus 3.00%, over the same period, or

(iv)     a Super Majority of the Controlling Class have voted to suspend the limitations on a Collateral Obligation being a Credit Improved Obligation, and for each subsequent downgrade by Moody's after a vote to suspend the limitations pursuant to this clause (iv) has occurred, a Super Majority of the Controlling Class must again vote to suspend the limitations on the Collateral Obligation being a Credit Improved Obligation for this clause (iv) to remain applicable.

A Synthetic Security shall be considered a Credit Improved Obligation if:

(i)     the Synthetic Security itself is a Credit Improved Obligation or

21

(ii)     the Reference Obligation of the Synthetic Security would, if it were a Collateral Obligation, be a Credit Improved Obligation.

"*Credit Rating Event*": An event that is in effect if the rating by Moody's:

(i)     of the Senior Class A Notes, the Class A-2 Notes or the Class A-3 Notes (without giving effect to the Policy) has been withdrawn or is one or more rating sub-categories below its Initial Rating; or

(ii)     of the Class B Notes or the Class C Notes has been withdrawn or is two or more rating sub-categories below its respective Initial Rating.

For the purposes of this definition, any withdrawal or reduction in rating shall not be effective if after the withdrawal or reduction Moody's has upgraded the reduced or withdrawn rating to at least the Initial Rating in the case of the Senior Class A Notes, the Class A-2 Notes and the Class A-3 Notes (or the Initial Shadow Rating in the Class of the Class A-1g Notes), or to only one subcategory below their Initial Rating in the case of the Class B Notes and the Class C Notes.

"*Credit Risk Obligation*": Any Collateral Obligation (other than a Defaulted Collateral Obligation) that, in the commercially reasonable judgment of the Portfolio Manager, has a significant risk of declining in credit quality and, with a lapse of time, becoming a Defaulted Collateral Obligation.

So long as a Credit Rating Event is in effect, no Collateral Obligation shall be eligible to be a Credit Risk Obligation unless, as of the date of determination:

(i)     the Collateral Obligation has been downgraded or has been put on credit watch list with the potential for developing negative credit implications by either of the Rating Agencies since the date the Issuer first acquired the Collateral Obligation under this Indenture,

(ii)     such Collateral Obligation has experienced an increase in credit spread of (A) 0.25% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such increase) less than or equal to 2.00%, (B) 0.375% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such increase) greater than 2.00% but less than or equal to 4.00% or (C) 0.50% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such increase) greater than 4.00%, in each case compared to the credit spread at the time such Collateral Obligation was acquired by the Issuer, determined by reference to an applicable index selected by the Portfolio Manager (such index selection subject to satisfaction of the Rating Condition with respect to Moody's),

(iii)     (x) in the case of a Loan, the Market Value of such Collateral Obligation has decreased by at least 2.50% from the Market Value of such Collateral Obligation as of its date of acquisition, as determined by the Portfolio Manager, and (y) in the case of a Bond, the Market Value of such Collateral Obligation has changed since its date of acquisition by a percentage more negative, or less positive, as the case may be, than the percentage change in the Merrill Lynch US High Yield Master II Index, Bloomberg ticker H0A0, less 3.00%, over the same period, or

22

(iv)     a Super Majority of the Controlling Class have voted to suspend the limitations on a Collateral Obligation being a Credit Risk Obligation, and for each subsequent downgrade by Moody's after a vote to suspend the limitations pursuant to this clause (iv) has occurred, a Super Majority of the Controlling Class must again vote to suspend the limitations on the Collateral Obligation being a Credit Risk Obligation for this clause (iv) to remain applicable.

A Synthetic Security shall be considered a Credit Risk Obligation if:

(a)     the Synthetic Security itself is a Credit Risk Obligation, or

(b)     the Reference Obligation of the Synthetic Security would, if it were a Collateral Obligation, be a Credit Risk Obligation.

"**_Current-Pay Obligation_**": A Collateral Obligation as to which:

(i)     an Insolvency Event has occurred with respect to its obligor or as to which its obligor is rated "D" or "SD" by S&P or its obligor has previously been rated "CCC-" by S&P and the rating has been withdrawn,

(ii)     no default as to the payment of principal or interest with respect to the Collateral Obligation is then continuing and the Portfolio Manager has delivered to the Trustee an officer's certificate to the effect that the Portfolio Manager expects that the obligor will make payments on the Collateral Obligation as they become due,

(iii)     (A) if the rating by Moody's of the Collateral Obligation is at least "Caa1" (and not on credit watch with negative implications) the Market Value of the Collateral Obligation is at least equal to 80% of its Principal Balance or (B) if the rating by Moody's of the Collateral Obligation is less than "Caa1" or is "Caa1" and on credit watch with negative implications, the Market Value of the Collateral Obligation is at least equal to 85% of its Principal Balance,

(iv)     if an Insolvency Event has occurred with respect to the obligor of the Collateral Obligation, a bankruptcy court has authorized the payment of interest payable on the Collateral Obligation, and

(v)     the Portfolio Manager has designated in writing to the Trustee the Collateral Obligation as a Current-Pay Obligation.

If the Aggregate Principal Balance of Collateral Obligations that would otherwise be Current-Pay Obligations exceeds 5% of the Maximum Investment Amount, all or a portion of one or more Collateral Obligations that would otherwise be Current-Pay Obligations with an Aggregate Principal Balance equal to the amount of the excess shall not be Current-Pay Obligations (and will therefore be Defaulted Collateral Obligations).  The Portfolio Manager shall designate in writing to the Trustee the Collateral Obligations that shall not be Current-Pay Obligations pursuant to the preceding sentence as the Collateral Obligations (or portions thereof) that have the lowest Market Value on any applicable date of determination.

The Portfolio Manager may, by notice to the Issuer, the Trustee, and the Collateral Administrator, change the definition of "Current-Pay Obligation" or how Current-Pay

23

Obligations are treated in this Indenture, subject to the satisfaction of the Rating Condition with respect to each Rating Agency.

"***Current Portfolio***": At any time, the portfolio (measured by Aggregate Principal Balance) of Collateral Obligations, Principal Proceeds held as Cash on deposit in the Collection Account, and other Eligible Investments purchased with Principal Proceeds on deposit in the Collection Account that exists before the sale, maturity, or other disposition of a Collateral Obligation or before the acquisition of a Collateral Obligation, as the case may be.

"***Custodial Account***": The custodial account established in the name of the Trustee pursuant to Section 10.3(a).

"***Custodian***": The meaning specified in the first sentence of Section 3.2(a) with respect to items of collateral referred to therein, and each entity with which an Account is maintained, as the context may require, each of which shall be a Securities Intermediary.

"***Deep Discount Obligation***": Until the average Market Value Percentage of the Collateral Obligation, as determined daily for any period of 30 consecutive days, equals or exceeds 90%, any Collateral Obligation acquired by the Issuer for a Purchase Price less than 85% of its Principal Balance. For such purpose, the Market Value Percentage of a Collateral Obligation on a day that is not a Business Day shall be deemed to be the Market Value Percentage of the Collateral Obligation on the immediately preceding Business Day.

"***Default***": Any Event of Default or any occurrence that, with notice or the lapse of time or both, would become an Event of Default.

"***Defaulted Collateral Obligation***": Any Collateral Obligation or other obligation included in the Collateral:

      (i)      as to which there has occurred and is continuing a default with respect to the payment of interest or principal with respect to such Collateral Obligation, without giving effect to any applicable grace period or waiver (provided, that if the Portfolio Manager certifies to the Trustee in writing that such default is for non-credit related reasons, the related Collateral Obligation shall not be treated as a Defaulted Collateral Obligation under this clause (i) unless and until such default has continued for a period of three (3) consecutive business days), but, in any case, only until such default has been cured;

      (ii)      with respect to which there has been effected any distressed exchange or other debt restructuring where the obligor has offered the holders thereof a new security or instrument or package of securities or instruments that, in the commercially reasonable judgment of the Portfolio Manager, either (x) amounts to a diminished financial obligation or (y) has the sole purpose of enabling the obligor to avoid a default;

      (iii)      (1) that is *pari passu* with or subordinated to other indebtedness for borrowed money owing by its obligor ("***Other Indebtedness***"), (2) the obligor has defaulted in the payment of principal or interest (without regard to any applicable grace or notice period and without regard to any waiver of the default) on the Other Indebtedness, unless, in the case of a failure of the obligor to make required interest payments, the obligor has resumed current Cash payments of interest previously

scheduled and unpaid on the Other Indebtedness and has paid in full any accrued interest due and payable thereon, in which case the Collateral Obligation shall cease to be classified as a Defaulted Collateral Obligation and (3) the Portfolio Manager, provided that the related Collateral Obligation has not been downgraded after the default on such Other Indebtedness has occurred, determines (in its commercially reasonable judgment) that such Other Indebtedness is material;

(iv)     (other than a Current-Pay Obligation or a DIP Loan) as to which:

(A) an Insolvency Event has occurred with respect to its obligor, or

(B) the obligation is rated "D", "SD", "C" or "CC" by S&P or was so rated immediately prior to such rating being withdrawn, or has previously been rated "CCC-" or lower by S&P and the rating has been withdrawn;

(v)     if the Collateral Obligation is a Structured Finance Obligation, it is rated "CC" or below by S&P, or it was rated "C" or below by S&P but the rating has since been withdrawn, or it is rated "Ca" or below by Moody's, or it was rated "C" or below by Moody's but the rating has since been withdrawn;

(vi)     that is a Participation that would, if the underlying Loan were a Collateral Obligation, be a Defaulted Collateral Obligation under any of clauses (i) through (iv) above or with respect to which the Participating Institution has defaulted in the performance of any of its payment obligations under the Participation;

(vii)     that is a Synthetic Security referencing a Reference Obligation that would, if the Reference Obligation were a Collateral Obligation, be a Defaulted Collateral Obligation under any of clauses (i) through (v) above or with respect to which the Synthetic Security Counterparty has defaulted in the performance of any of its payment obligations under the Synthetic Security; provided, however, with respect to a Synthetic Security based upon or relating to a senior secured index investment providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time: (x) a determination whether the Reference Obligations upon which such Synthetic Security is based would, if such Reference Obligations were Collateral Obligations, be a Defaulted Collateral Obligation, shall be determined by treating such Synthetic Security as a direct investment by the Issuer in each of the Reference Obligations on which such Synthetic Security is based in an amount equal to the Allocable Principal Balance of such Reference Obligation and (y) the "Defaulted Collateral Obligation" for purposes of this clause (vii) shall be limited to the Allocable Principal Balance of each Reference Obligation that would, if the Reference Obligation were a Collateral Obligation, be a Defaulted Collateral Obligation under any of clauses (i) through (v) above;

(viii)     that is a Written-Down Obligation;

(ix)     that is a DIP Loan as to which an order has been entered converting the debtor's chapter 11 case to a case under chapter 7 of the Bankruptcy Code; or

(x)     that is declared to be a Defaulted Collateral Obligation by the Portfolio Manager.

Any Collateral Obligation that is classified as a Defaulted Collateral Obligation shall cease to be so classified if the Collateral Obligation, at any date thereafter,

(1)     would not otherwise be classified as a Defaulted Collateral Obligation in accordance with this definition; and

(2)     otherwise meets the Eligibility Criteria as of that date.

If any portion of a Collateral Obligation has a maturity later than one year after the Stated Maturity of the Notes due to a change in the payment schedule of the Collateral Obligation occurring after its acquisition by the Issuer, that portion of the Collateral Obligation shall be considered a Defaulted Collateral Obligation.

"***Defaulted Hedge Termination Payment***": Any termination payment required to be made by the Issuer to a Hedge Counterparty pursuant to a Hedge Agreement upon a termination of the Hedge Agreement in respect of which the Hedge Counterparty is the sole Defaulting Party or Affected Party (each as defined in the Hedge Agreements).

"***Defaulted Interest***": Any interest payable in respect of any Class of Notes that is not punctually paid or duly provided for on the applicable Payment Date or at Stated Maturity; provided that, any interest paid with the proceeds of the Policy shall not be treated for the purpose of this definition as paid or provided for.

"***Defaulted Interest Charge***": To the extent lawful, interest on any Defaulted Interest at the Default Interest Rate.

"***Default Interest Rate***": With respect to any specified Class of Notes, the per annum interest rate equal to the Note Interest Rate payable on the Notes of the Class.

"***Deferred Interest***": With respect to any specified Class of Deferred Interest Notes, the meaning specified in Section 2.8(a).

"***Deferred Interest Notes***": The Class B Notes and the Class C Notes.

"***Deficiency Amount***": The meaning specified in Section 16.3(a).

"***Deficiency Notice Date***": The meaning specified in Section 16.3(a).

"***Definitive Securities***": The meaning specified in Section 2.11(b).

"***Delayed Drawdown Loan***": A Loan or any Synthetic Security with a Reference Obligation that

(i)     requires the Issuer to make one or more future advances to the borrower under its Underlying Instruments,

(ii)     specifies a maximum amount that can be borrowed on one or more fixed borrowing dates, and

26

(iii)    does not permit the re-borrowing of any amount previously repaid.

A Loan or Synthetic Security shall only be considered to be a Delayed Drawdown Loan for so long as its unused commitment amount is greater than zero.

"*Delayed Drawdown Reserve Account*": The trust account established pursuant to Section 10.3(b).

"*Deliver*" or "*Delivered*" or "*Delivery*": The taking of the following steps:

(i)    in the case of each Certificated Security (UCC) (other than a Clearing Corporation Security), Instrument or Participation in which the underlying Loan is represented by an Instrument,

(A)    causing the delivery of such Certificated Security (UCC) or Instrument to the Custodian registered in the name of the Custodian or its affiliated nominee or endorsed to the Custodian or in blank,

(B)    causing the Custodian to continuously indicate on its books and records that such Certificated Security (UCC) or Instrument is credited to the applicable Account, and

(C)    causing the Custodian to maintain continuous possession of such Certificated Security (UCC) or Instrument;

(ii)    in the case of each Uncertificated Security (other than a Clearing Corporation Security),

(A)    causing such Uncertificated Security to be continuously registered on the books of the issuer thereof to the Custodian, and

(B)    causing the Custodian to continuously indicate on its books and records that such Uncertificated Security is credited to the applicable Account;

(iii)    in the case of each Clearing Corporation Security,

(A)    causing the relevant Clearing Corporation to credit such Clearing Corporation Security to the securities account of the Custodian, and

(B)    causing the Custodian to continuously indicate by on its books and records that such Clearing Corporation Security is credited to the applicable Account;

(iv)    in the case of each security issued or guaranteed by the United States of America or agency or instrumentality thereof and that is maintained in book-entry records of a Federal Reserve Bank ("*FRB*") (each such security, a "*Government Security*"),

(A)    causing the creation of a Security Entitlement to such Government Security by the credit of such Government Security to the securities account of the Custodian at such FRB, and

(B)     causing the Custodian to continuously indicate on its books and records that such Government Security is credited to the applicable Account;

(v)     in the case of each Security Entitlement not governed by clauses (i) through (iv) above,

(A)     causing a Securities Intermediary (x) to indicate on its books and records that the underlying Financial Asset has been credited to be the Custodian's securities account, (y) to receive a Financial Asset from a Securities Intermediary or acquiring the underlying Financial Asset for a Securities Intermediary, and in either case, accepting it for credit to the Custodian's securities account or (z) to become obligated under other law, regulation or rule to credit the underlying Financial Asset to a Security Intermediary's securities account,

(B)     causing such Securities Intermediary to make entries on its books and records continuously identifying such Security Entitlement as belonging to the Custodian and continuously indicating on its books and records that such Security Entitlement is credited to the Custodian's securities account, and

(C)     causing the Custodian to continuously indicate on its books and records that such Security Entitlement (or all rights and property of the Custodian representing such Security Entitlement) is credited to the applicable Account;

(vi)     in the case of cash or money,

(A)     causing the delivery of such cash or money to the Custodian,

(B)     causing the Custodian to treat such cash or money as a Financial Asset maintained by such Custodian for credit to the applicable Account in accordance with the provisions of Article 8 of the UCC, and

(C)     causing the Custodian to continuously indicate on its books and records that such cash or money is credited to the applicable Account; and

(v)     in the case of each general intangible (including any Participation in which neither the Participation nor the underlying Loan is represented by an Instrument),

(A)     causing the filing of a Financing Statement in the office of the Recorder of Deeds of the District of Columbia, Washington, DC, and

(B)     causing the registration of this Indenture in the Register of Mortgages of the Issuer at the Issuer's registered office in the Cayman Islands;

in addition, the Portfolio Manager on behalf of the Issuer will obtain any and all consents required by the underlying instruments relating to any such general intangibles for the transfer of ownership and/or pledge hereunder (except to the extent that the requirement for such consent is rendered ineffective under Section 9-406 of the UCC).

28

"***Depository***" or "***DTC***": The Depository Trust Company and its nominees.

"***Determination Date***": The last day of any Due Period.

"***DIP Loan***": Any Loan

(i)     that has a rating assigned by Moody's (or if the Loan does not have a rating assigned by Moody's, the Portfolio Manager has commenced the process of having a rating assigned by Moody's within five Business Days of the date the Loan is acquired by the Issuer) and a rating assigned by S&P (or if the Loan does not have a rating assigned by S&P, the Portfolio Manager has commenced the process of having a rating assigned by S&P within two Business Days of the date the Loan is acquired by the Issuer),

(ii)     that is an obligation of a debtor in possession as described in Section 1107 of the Bankruptcy Code or a trustee (if appointment of a trustee has been ordered pursuant to Section 1104 of the Bankruptcy Code) (a "***Debtor***") organized under the laws of the United States or any state of the United States, and

(iii)     the terms of which have been approved by a final order of the United States Bankruptcy Court, United States District Court, or any other court of competent jurisdiction, the enforceability of which order is not subject to any pending contested matter or proceeding (as those terms are defined in the Federal Rules of Bankruptcy Procedure) and which order provides that

(A)     the Loan is secured by liens on the Debtor's otherwise unencumbered assets pursuant to Section 364(c)(2) of the Bankruptcy Code,

(B)     the Loan is secured by liens of equal or senior priority on property of the Debtor's estate that is otherwise subject to a lien pursuant to Section 364(d) of the Bankruptcy Code,

(C)     the Loan is fully secured (based on a current valuation or appraisal report) by junior liens on the Debtor's encumbered assets, or

(D)     if any portion of the Loan is unsecured, the repayment of the Loan retains priority over all other administrative expenses pursuant to Section 364(c)(1) of the Bankruptcy Code (and in the case of this clause (D), before the acquisition of the Loan, the Rating Condition is satisfied with respect to each Rating Agency).

"***Discount Note***": Any Note that is treated as being issued with "original issue discount" within the meaning of Section 1271 through 1275 of the Code and Treasury Regulations promulgated thereunder.

"***Diversity Score***": A single number that indicates collateral concentration in terms of both issuer and industry concentration, calculated as set forth in Schedule 4 to this Indenture.

"***Diversity Test***": A test that will be satisfied as of any Measurement Date if the Diversity Score equals or exceeds the Minimum Diversity Score.

29

"**Dollar**" or "***U.S. Dollar***" or "***U.S.$***": A dollar or other equivalent unit in such coin or currency of the United States of America as at the time shall be legal tender for all debts, public and private.

"**Domicile**" or "***Domiciled***": With respect to each Collateral Obligation, (i) the jurisdiction of incorporation, organization or creation of the related obligor or (ii) in the case of a Collateral Obligation that would otherwise be considered to be domiciled pursuant to clause (i) in a Tax Advantaged Jurisdiction, the jurisdiction in which, in the commercially reasonable judgment of the Portfolio Manager, the related obligor conducts substantially all of its business operations and in which the assets primarily responsible for generating its revenues are located.

"***Due Date***": Each date on which any payment is due on a Pledged Obligation in accordance with its terms.

"***Due for Payment***": The meaning set forth in the Policy.

"***Due Period***": With respect to any Payment Date, for all purposes other than payments and receipts under Hedge Agreements, the period from the Business Day after the eighth Business Day before the previous Payment Date (or in the case of the first Payment Date, from the Closing Date) up to but excluding the Business Day after the eighth Business Day before the Payment Date (or in the case of the final Payment Date or any Payment Date that is a Redemption Date, through the Business Day before the Payment Date and for payments and receipts under Hedge Agreements the period from the day after the previous Payment Date (or in the case of the first Payment Date from the Closing Date) through the Payment Date).

"***Eligibility Criteria***": The meaning specified in Section 12.2(b).

"***Eligible Collateral***": Means: (i) Cash, (ii) U.S. Treasury obligations, (iii) U.S. agency obligations or (iv) commercial paper obligations rated at least "P-1" by Moody's (and not on watch for downgrade) and "A-1+" by S&P, in each case to collateralize fully on a mark-to-market basis the obligations of a Hedge Counterparty under the related Hedge Agreement.

"***Eligible Country***": The United States, Canada and any country classified by Moody's as a Moody's Group I Country, Moody's Group II Country or Moody's Group III Country; provided that such country has not imposed currency exchange controls.

"***Eligible Investments***": Any Dollar-denominated investment that, when it is pledged by the Issuer to the Trustee under this Indenture, is one or more of the following:

        (a)     Cash;

        (b)     direct Registered obligations of, and Registered obligations the timely payment of principal and interest on which is fully and expressly guaranteed by, the United States or any agency or instrumentality of the United States the obligations of which are expressly backed by the full faith and credit of the United States, which in each case are not zero coupon securities;

        (c)     demand and time deposits in, trust accounts, certificates of deposit payable within 91 days of issuance of, bankers' acceptances payable within 91 days of issuance issued by, or Federal funds sold by any depositary institution or trust company incorporated under the laws of the United States or any state thereof and subject to

30

supervision and examination by Federal and/or state banking authorities so long as the commercial paper and/or the debt obligations of such depository institution or trust company (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company), at the time of such investment or contractual commitment providing for such investment and throughout the term of the investment, have a credit rating of not less than "Aaa" by Moody's and "AAA" by S&P and in each case are not on watch for downgrade, or "P-1" by Moody's and "A-1+" by S&P in the case of commercial paper and short-term debt obligations; provided that in any case, the issuer thereof must have at the time of such investment a long-term credit rating of not less than "AA-" by S&P and "Aa3" by Moody's and a short-term rating of "A-1+" by S&P and "P-1" by Moody's, and if so rated, is not on watch for downgrade;

(d) commercial paper or other short-term obligations with a maturity of not more than 183 days from the date of such investment and having at the time of such investment a credit rating of at least "P-1" by Moody's and "A-1+" by S&P, provided, that, in any case, the issuer thereof must have at the time of such investment a long-term credit rating of not less than "Aa2" by Moody's, and if so rated, such rating is not on watch for downgrade.

(e) unleveraged repurchase obligations with respect to any security described in clause (b) above entered into with a U.S. federal or state depository institution or trust company (acting as principal) described in clause (c) above or entered into with a corporation (acting as principal) whose long-term credit rating is not less than "Aaa" by Moody's and "AAA" by S&P and in each case are not on watch for downgrade or whose short-term credit rating is "P-1" by Moody's and "A-1+" by S&P at the time of such investment and throughout the term of the investment; provided, that, if such repurchase obligation has a maturity of longer than 91 days, the counterparty thereto must also have at the time of such investment and throughout the term of the investment a long-term credit rating of not less than "Aa2" by Moody's and "AAA" by S&P, and if so rated, such rating is not on watch for downgrade;

(f) any money market fund or similar investment vehicle having at the time of investment therein and throughout the term of the investment a credit rating of "MR1+" by Moody's and "AAAm" by S&P; including any fund for which the Trustee or an Affiliate of the Trustee serves as an investment advisor, administrator, shareholder servicing agent, custodian or subcustodian, notwithstanding that (A) the Trustee or an Affiliate of the Trustee charges and collects fees and expenses from such funds for services rendered (provided that such charges, fees and expenses are on terms consistent with terms negotiated at arm's length) and (B) the Trustee charges and collects fees and expenses for services rendered, pursuant to this Indenture;

(g) a guaranteed reinvestment agreement from a bank (if treated as a deposit by such bank), insurance company or other corporation or entity organized under the laws of the United States or any state thereof (if treated as debt by such insurance company or other corporation or entity), providing for periodic payments thereunder during each Due Period; provided that each such agreement provides that it is terminable by the purchaser, without premium or penalty, in the event that the rating assigned to such agreement by either Moody's or S&P is at any time lower than the then current ratings assigned to the Senior Class A Notes, the Class A-2 Notes, the Class A-3 Notes, the Class B Notes or the Class C Notes; provided, further, that, at the time of

31

investment therein and throughout the term of the investment, the issuer of such agreement has a senior unsecured long-term debt rating, issuer rating or counterparty rating of at least "Aaa" by Moody's, a short-term debt rating of "P-1" by Moody's (and not on watch for downgrade), a short-term debt rating of at least "A-1+" by S&P and a long-term debt rating of at least "AAA" by S&P (and not on watch for downgrade); and

(h)     such other investments for which Rating Confirmation has been received;

and, in each case, with a stated maturity (giving effect to any applicable grace period) no later than the Business Day before the Payment Date next succeeding the date of the investment.

Eligible Investments on deposit in the Revolving Reserve Account, the Delayed Drawdown Reserve Account, or the Synthetic Security Collateral Account must have a stated maturity no later than one Business Day after the date of their purchase.

Eligible Investments may not include:

(1)     any interest-only security, any security purchased at a price in excess of 100% of its par value, or any security whose repayment is subject to substantial non-credit related risk as determined in the commercially reasonable judgment of the Portfolio Manager;

(2)     any security whose rating assigned by S&P includes the subscript "r," "t," "p," "pi," or "q";

(3)     any floating rate security whose interest rate is inversely or otherwise not proportionately related to an interest rate index or is calculated as other than the sum of an interest rate index plus a spread (which spread may be zero);

(4)     any security that is subject to an exchange or tender offer; or

(5)     any security that has payments subject to foreign or United States withholding tax.

Eligible Investments may include Eligible Investments for which the Trustee or an Affiliate of the Trustee provides services.  Eligible Investments may not include obligations principally secured by real property.

"***Emerging Market Security***": A security or obligation issued by a sovereign or non-sovereign issuer located in a country (excluding the Cayman Islands, Bermuda, the British Virgin Islands, the Netherlands Antilles, and the Channel Islands):

(i)     that is in Latin America, Asia, Africa, Eastern Europe, or the Caribbean, or

(ii)     the long-term foreign currency debt obligations of which are rated below "Aa2" or "Aa2" and on credit watch with negative implications by Moody's or the foreign currency issuer credit rating of which is below "AA" by S&P.

"***ERISA***": The U.S. Employee Retirement Income Security Act of 1974, as amended.

32

"***ERISA Plan***": Any (i) "employee benefit plan" (as defined in Section 3(3) of ERISA) which is subject to Title I of ERISA, (ii) "plan" (as defined in Section 4975(e)(1) of the Code) which is subject to Section 4975 of the Code and (iii) entity whose underlying assets include "plan assets" by reason of 29 CFR 2510.3-101 or otherwise.

"***Euroclear***": Euroclear Bank S.A./N.V., as operator of the Euroclear system.

"***Event of Default***": The meaning specified in Section 5.1.

"***Excess CCC/Caa Collateral Obligations***": The Principal Balance of all CCC/Caa Collateral Obligations in excess of 7.5% of the Maximum Investment Amount on the relevant Determination Date.

"***Exchange Act***": The United States Securities Exchange Act of 1934, as amended.

"***Excluded Property***": U.S.$250 (attributable to the issue and allotment of the Issuer Ordinary Shares) and a U.S.$250 transaction fee paid to the Issuer, the bank account in which those amounts are credited in the Cayman Islands and any interest earned on those amounts.

"***Expense Reimbursement Account***": The trust account established pursuant to Section 10.3(c).

"***Extended Reinvestment Period End Date***": If an Extension has occurred, the sixteenth Payment Date after the then current Extended Reinvestment Period End Date (or, in the case of the first Extension pursuant to Section 2.4, the Payment Date in May, 2016).

"***Extended Stated Maturity Date***": If a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Stated Maturity Date (or, in the case of the first Extended Stated Maturity Date, the Payment Date in February, 2021).

"***Extended Weighted Average Life Date***": If a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Weighted Average Life Date (or, in the case of the first Extended Weighted Average Life Date, March 15, 2018).

"***Extension***": An extension of the Reinvestment Period, the Stated Maturity of the Notes and the Weighted Average Life Test pursuant to Section 2.4.

"***Extension Bonus Payment***": With respect to each Maturity Extension, a single payment to each applicable beneficial owner and the Insurer set forth in Section 2.4(g), in an amount equal to (1) in the case of the Senior Class A Notes (other than the Class A-1g Notes), 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (2) in the case of the Class A-1g Notes, 0.125% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Date (provided, however, if the Policy has been terminated prior to or in connection with such Maturity Extension, each applicable beneficial owner of the Class A-1g Notes will instead receive an amount equal to 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Date), (3) to the Insurer, 0.125% of the Aggregate Outstanding Amount of the Class A-1g Notes as of the applicable Extension Date (provided, however, if the Policy has been terminated prior to or in connection with such Maturity Extension, the Insurer shall not be entitled to an Extension Bonus Payment pursuant to this clause (3)), (4) in the case of the Class A-2 Notes, 0.25% of the Aggregate Outstanding

33

Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (5) in the case of the Class A-3 Notes, 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (6) in the case of the Class B Notes, 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date and (7) in the case of the Class C Notes, 0.50% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date.

"***Extension Bonus Eligibility Certification***": With respect to each Maturity Extension and each beneficial owner of Notes other than Extension Sale Securities, the written certification by such beneficial owner acceptable to the Issuer to the effect that it held Notes other than Extension Sale Securities on the applicable Extension Effective Date, including the Aggregate Outstanding Amount thereof and wire transfer instructions for the Extension Bonus Payment and any required documentation thereunder.

"***Extension Conditions***": The meaning specified in Section 2.4.

"***Extension Determination Date***": The 8th Business Day prior to each Extension Effective Date.

"***Extension Effective Date***": If an Extension has occurred, the sixteenth Payment Date after the then current Extension Effective Date (or, in the case of the first Extension Effective Date, the Payment Date in May, 2010).

"***Extension Notice***": The meaning specified in Section 2.4.

"***Extension Purchase Price***": The purchase price payable by the Extension Qualifying Purchasers for Extension Sale Securities in connection with each Maturity Extension, if any, in an amount equal to (i) in the case of the Notes, the Aggregate Outstanding Amount thereof, plus accrued and unpaid interest (including Deferred Interest, if any) as of the applicable Extension Effective Date (giving effect to any amounts paid to the Holder on such date) plus, in the case of the Fixed Rate Notes, the applicable Make-Whole Premium, (ii) in the case of the Preference Shares, an amount that, when taken together with all payments and distributions made in respect of such Preference Shares since the Closing Date would cause such Preference Shares to have received (as of the date of purchase thereof) a Preference Share Internal Rate of Return of 12.0% (assuming such purchase date was a Payment Date); provided, however, that if the applicable Extension Effective Date is on or after the date on which such Holders have received a Preference Share Internal Rate of Return equal to or in excess of 12.0%, the applicable Extension Purchase Price for such Preference Shares shall be zero and (iii) in the case of the Class 1 Composite Securities, the sum of (x) the amount that would be payable pursuant to the preceding clause (ii) in respect of the Preference Shares underlying the Class 1 Composite Security Preference Share Component, (y) the Treasury Strip Market Value and (z) the Composite Security Make-Up Amount.

"***Extension Qualifying Purchasers***": The Portfolio Manager (or any of its Affiliates acting as principal or agent); provided that in the event the Portfolio Manager elects not to purchase Securities or Preference Shares from Holders pursuant to the Extension Conditions set forth in Section 2.4(c), "Extension Qualifying Purchasers" shall mean one or more qualifying purchasers (which may include the Initial Purchaser or any of its Affiliates acting as principal or agent) designated by the Portfolio Manager; provided, however, none of the Portfolio Manager,

the Initial Purchaser, or any of their respective Affiliates shall have any duty to act as an Extension Qualifying Purchaser.

"***Extension Sale Notice***":  The meaning specified in Section 2.4.

"***Extension Sale Notice Period***":  The meaning specified in Section 2.4.

"***Extension Sale Securities***":  The meaning specified in Section 2.4.

"***Face Amount***": With respect to any Preference Share, the amount set forth therein as the "face amount", which "face amount" thereof shall be $1,000 per Preference Share.

"***Finance Lease***": A lease agreement or other agreement entered into in connection with and evidencing a Leasing Finance Transaction.

"***Financial Asset***": The meaning specified in Section 8-102(a)(9) of the UCC.

"***Financing Statements***": Financing statements relating to the Collateral naming the Issuer as debtor and the Trustee on behalf of the Secured Parties as secured party and relating to the Class 1 Collateral naming the Issuer as debtor and the Trustee on behalf of the Holders of the Class 1 Composite Securities as secured party.

"***Fixed Rate Excess***": As of any Measurement Date, a fraction whose numerator is the product of:

>  (i) the greater of zero and the excess of the Weighted Average Fixed Rate Coupon for the Measurement Date over the minimum percentage specified to pass the Weighted Average Fixed Rate Coupon Test, and

>  (ii) the Aggregate Principal Balance of all Fixed Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date,

and whose denominator is the Aggregate Principal Balance of all Floating Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date.

In computing the Fixed Rate Excess on any Measurement Date, the Weighted Average Fixed Rate Coupon for the Measurement Date will be computed as if the Spread Excess were equal to zero.

"***Fixed Rate Notes***": The Class A-1b Notes and the Class A-3b Notes.

"***Fixed Rate Obligation***": Any Collateral Obligation that bears interest at a fixed rate, including a Collateral Obligation that does not bear interest on a floating rate index and whose interest rate is scheduled to increase one or more times over the life of the Collateral Obligation.

"***Floating Rate Obligation***": Any Collateral Obligation that bears interest based on a floating rate index.

"***Form-Approved Synthetic Security***": A Synthetic Security

(i)    (A)    each of the Reference Obligations of which satisfy the definition of "Collateral Obligation" and could be purchased by the Issuer without any required action by the Rating Agencies, without satisfaction of the Rating Condition or which the Rating Agencies have otherwise approved; or

(B)    each of the Reference Obligations of which would satisfy clause (A) above but for the currency in which the Reference Obligation is payable and the Synthetic Security is payable in Dollars, does not provide for physical settlement, and does not expose the Issuer to Dollar currency risk;

(ii)    the Synthetic Security Agreement of which conforms (but for the amount and timing of periodic payments, the name of the Reference Obligation, the notional amount, the effective date, the termination date, and other similar necessary changes) to a form that has been expressly identified and approved in writing in connection with a request under this Indenture by Moody's and S&P; and

(iii)    that is with a counterparty with respect to which the Rating Condition has been satisfied by each of Moody's and S&P prior to the acquisition of any such Form-Approved Synthetic Security, and such approval has not been withdrawn.

Moody's or S&P may at any time, by notice to the Portfolio Manager, withdraw its approval of any such form. A withdrawal of approval shall have no effect on any Synthetic Security acquired, entered into, or committed to before the date on which the Portfolio Manager receives the notice of withdrawal.

"***GAAP***": The meaning specified in Section 6.3(j).

"***Global Securities***": Any Regulation S Global Securities or Rule 144A Global Notes.

"***Grant***": To grant, bargain, sell, warrant, alienate, remise, demise, release, convey, assign, transfer, mortgage, pledge, create, and grant a security interest in and right of setoff against, deposit, set over, and confirm. A Grant of the Pledged Obligations, or of any other instrument, shall include all rights, powers, and options of the granting party thereunder, including the immediate continuing right to claim for, collect, receive, and receipt for principal and interest payments in respect of the Pledged Obligations, and all other monies payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

"***Hedge Agreements***": Collectively, all interest rate cap or interest rate swap agreements between the Issuer and any Hedge Counterparty, and any replacement agreement entered into pursuant to Section 15.2.

"***Hedge Counterparty***": JPMorgan Chase Bank, National Association or any other counterparty, to the extent that when the Issuer enters into any Hedge Agreement with JPMorgan Chase Bank, National Association or the other counterparty, JPMorgan Chase Bank, National Association or the other counterparty satisfies the requirements of Section 15.2(b)

(subject, in the case of any other counterparty, to satisfaction of the Rating Condition for each Rating Agency).

"*Hedge Counterparty Collateral Account*": The trust account established pursuant to Section 10.3(d).

"*Hedge Termination Receipt*": Any termination payment paid by the Hedge Counterparty to the Issuer upon any early termination of a Hedge Agreement with respect to which the Hedge Counterparty is the sole Defaulting Party or Affected Party (each as defined in the Hedge Agreements).

"*High-Yield Bond*": Any debt security other than a Loan, including any Structured Finance Obligation, that is either Registered or, if not Registered, (i) it is issued by an obligor that is not resident in the United States, (ii) the payments on it are not subject to United States withholding tax and (iii) it is held through a financial institution pursuant to the procedures described in Treasury Regulation section 1.165-12(c)(3).

"*Holder*": Of any Note or Composite Security, the person whose name appears on the Indenture Register as the registered holder of the Note or Composite Security; and of any Preference Share (including any Preference Share underlying the Preference Share Component), the person whose name appears in the Preference Share register related thereto as the registered holder of such Preference Share.

"*Important Section 3(c)(7) Reminder Notice*": A notice substantially in the form of Exhibit H-2.

"*Incentive Management Fee*": On each Payment Date, the fee payable to the Portfolio Manager in an amount equal to: (i) 20% of the remaining Interest Proceeds, if any, available after making the distributions on such Payment pursuant to Section 11.1(a)(i)(21) of the Priority of Payments and (ii) 20% of the remaining Principal Proceeds, if any, available for payment in respect of the Incentive Management Fee pursuant to Section 11.1(a)(ii)(6)(A) of the Priority of Payments and, if applicable, Section 11.1(a)(ii)(9) of the Priority of Payments.

"*Indemnification Agreement*": The Indemnification Agreement, dated as of the Closing Date, among the Issuer, the Insurer and J.P. Morgan Securities Inc., as modified, amended and supplemented and in effect from time to time.

"*Indenture*": This instrument as originally executed and, if from time to time supplemented or amended by one or more indentures supplemental to this Indenture entered into pursuant to this Indenture, as so supplemented or amended.

"*Indenture Register*": The meaning specified in Section 2.6(a).

"*Indenture Registrar*": The meaning specified in Section 2.6(a).

"*Independent*": As to any person, any other person (including, in the case of an accountant or lawyer, a firm of accountants or lawyers, and any member of the firm, or an investment bank and any member of the bank) who

(i)     does not have and is not committed to acquire any material direct or any material indirect financial interest in the person or in any Affiliate of the person, and

(ii)     is not connected with the person as an Officer, employee, promoter, underwriter, voting trustee, partner, director, or person performing similar functions.

"Independent" when used with respect to any accountant may include an accountant who audits the books of the person if in addition to satisfying the criteria above the accountant is independent with respect to the person within the meaning of Rule 101 of the Code of Ethics of the American Institute of Certified Public Accountants.

Whenever any Independent person's opinion or certificate is to be furnished to the Trustee or the Insurer, the opinion or certificate shall state that the signer has read this definition and that the signer is Independent within the meaning of this Indenture.

"*Initial Consent Period*": The period of 15 Business Days from but excluding the date on which the Trustee provided notice of a proposed supplemental indenture pursuant to Section 8.2(c) to the Holders of Securities and Preference Shares.

"*Initial Purchaser*": J.P. Morgan Securities Inc.

"*Initial Rating*": The ratings by Moody's and S&P with respect to each Class of Notes and the Composite Securities provided in the table in Section 2.3(a).

"*Initial Shadow Rating*": With respect to the Class A-1g Notes, that rating or ratings which reflects the ratings assigned to the Class A-1g Notes by Moody's and S&P on the Closing Date without giving effect to the Policy.

"*Insolvency Event*": With respect to any person, means that:

(i)     an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking:

(A)     liquidation, reorganization, or other relief in respect of the person or its debts, or of all or substantially all of its assets, under any bankruptcy, insolvency, receivership, or similar law now or hereafter in effect, or

(B)     the appointment of a receiver, trustee, custodian, sequestrator, conservator, or similar official for the person or for all or substantially all of its assets,

and, in any such case, the proceeding or petition shall continue undismissed for 30 days; or an order or decree approving or ordering any of the foregoing shall be entered, or

(ii)     the person shall:

(A)     voluntarily commence any proceeding or file any petition seeking liquidation, reorganization, or other relief under any bankruptcy, insolvency, receivership, or similar law now or hereafter in effect,

38

       (B)     consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (i) above,

       (C)     apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, or conservator or for all or substantially all of its assets,

       (D)     file an answer admitting the material allegations of a petition filed against it in any such proceeding, or

       (E)     make a general assignment for the benefit of creditors.

"***Insolvency Proceeding***": The meaning specified in Section 16.4(b).

"***Instrument***": The meaning specified in Section 9-102(a)(47) of the UCC.

"***Insurance Agreement***": The Insurance and Indemnity Agreement, dated as of the Closing Date, among the Issuer, the Co-Issuer and the Insurer, as modified, amended, and supplemented and in effect from time to time.

"***Insurance Documents***": The Policy, the Insurance Agreement, the Indemnification Agreement and the Premium Letter.

"***Insured Amount***": The meaning assigned to the term "Insured Amount" in the Policy.

"***Insured Notes***": The Class A-1g Notes.

"***Insurer***": As defined in the first sentence of this Indenture.

"***Insurer Default***": The occurrence and continuation of any one of the following events:

       (i)     the Insurer fails to make a payment required under the Policy in accordance with its terms;

       (ii)     the Insurer (A) files any petition or commences any case or Proceeding under any provision or chapter of the Bankruptcy Code or any other similar federal or state law relating to the insolvency, bankruptcy, rehabilitation, liquidation or reorganization, (B) makes a general assignment for the benefit of its creditors, or (C) has an order for relief entered against it under the Bankruptcy Code or any other similar federal or state law relating to insolvency, bankruptcy, rehabilitation, liquidation or reorganization which is final and nonappealable; or

       (iii)     a court of competent jurisdiction, the New York Department of Insurance or other competent regulatory authority enters a final and nonappealable order, judgment or decree (A) appointing a custodian, trustee, agent or receiver for the Insurer or for all or any material portion of its property or (B) authorizing the taking of possession by a custodian, trustee, agent or receiver of the Insurer (or the taking of possession of all or any material portion of the property of the Insurer).

"***Interest Coverage Ratio***": With respect to any specified Class of Notes (treating the Senior Class A Notes, the Class A-2 Notes and the Class A-3 Notes as one Class for this purpose) on any Measurement Date, the ratio calculated by dividing:

     (i)       the sum of:

          (A)      the Interest Proceeds received or scheduled to be received with respect to the Due Period in which the Measurement Date occurs, *minus*

          (B)      amounts payable under clauses (1), (2), (3) and (4) of Section 11.1(a)(i) on the related Payment Date, by:

     (ii)      the sum of:

          (A)      all accrued and unpaid interest on the specified Class of Notes and all Notes ranking senior to the Class (excluding any Deferred Interest) on the related Payment Date, *plus*

          (B)      any accrued and unpaid Premium on the related Payment Date.

For purposes of the Interest Coverage Ratio, only the amount of any interest payment (including any "gross up" payment) on any Collateral Obligation in excess of any withholding tax or other deductions on account of tax of any jurisdiction on any date of determination shall be included in Interest Proceeds.

     "***Interest Coverage Test***": A test the first Measurement Date for which will be on the second Payment Date and that is satisfied with respect to any specified Class of Notes (treating the Senior Class A Notes, the Class A-2 Notes and the Class A-3 Notes as one Class for this purpose) if, as of the second Payment Date and any Measurement Date thereafter on which any Notes remain Outstanding, the Interest Coverage Ratio equals or exceeds the applicable required level in the table below for the specified Class:

| Test | Required Level |
|---|---|
| Class A Interest Coverage Test | 120.00% |
| Class B Interest Coverage Test | 115.00% |
| Class C Interest Coverage Test | 110.00% |

     "***Interest Period***": Initially, the period from and including the Closing Date to but excluding the first Payment Date, and, thereafter, each successive period from and including each Payment Date to but excluding the following Payment Date; provided, however, that the "Payment Date" solely for purposes of determining the Interest Period for the Fixed Rate Notes will be the 1st day of each February, May, August and November, regardless of whether such day is a Business Day.

     "***Interest Proceeds***": With respect to any Due Period, the sum (without duplication) of all amounts received in Cash during the Due Period (or as otherwise specified below) by the Issuer with respect to the Collateral that are:

          (i)      payments of interest, fees, and commissions (excluding (A) Accrued Interest Purchased With Principal, (B) interest and dividends on Workout Assets, (C) fees and commissions from Defaulted Collateral Obligations, and (D) syndication and

other up-front fees and any up-front fixed payments received in connection with entering into a Synthetic Security);

(ii)    any portion of the Sale Proceeds of a Collateral Obligation (other than a Defaulted Collateral Obligation) representing Accrued Interest On Sale;

(iii)    all payments of principal on, or disposition proceeds from the sale of, Eligible Investments to the extent purchased with Interest Proceeds;

(iv)    payments with respect to the Hedge Agreements received on or before the related Payment Date (other than any amount payable thereunder because of any early termination or notional amount reduction), but not any Sale Proceeds from any of these instruments (except to the extent that they were purchased with Interest Proceeds);

(v)    all fees received pursuant to any Securities Lending Agreements;

(vi)    during the continuance of an "event of default" (under and as defined in the related Securities Lending Agreement), all interest received from the related Securities Lending Collateral;

(vii)    amounts in the Collection Account designated for distribution as Interest Proceeds pursuant to the Priority of Payments (including any amount transferred from the Interest Reserve Account);

(viii)    all earnings on amounts in the Delayed Drawdown Reserve Account and the Revolving Reserve Account deposited to the Collection Account in accordance with Section 10.3(b);

(ix)    amounts in the Expense Reimbursement Account on the Payment Date for the relevant Due Period; and

(x)    any recoveries (including interest) received on a Defaulted Collateral Obligation in excess of the principal balance of such Defaulted Collateral Obligation (as of the date the related Collateral Obligation became a Defaulted Collateral Obligation).

Interest Proceeds shall not include the Excluded Property and Interest Proceeds shall not include earnings on amounts on deposit in the Securities Lending Account to the extent the earnings are payable by the Issuer to a Securities Lending Counterparty.

If an Interim Ramp-Up Completion Date Failure has occurred and is continuing on the first Payment Date, all Interest Proceeds remaining after application of Interest Proceeds pursuant to clauses (1) through (20) of Section 11.1(a) shall be deemed to be Interest Proceeds received in the Due Period relating to the second Payment Date and not available for distribution on such first Payment Date.

Each reference in the definition of "Interest Proceeds" to a Collateral Obligation shall include a Collateral Obligation that has been loaned pursuant to a Securities Lending Agreement and Interest Proceeds shall include any amounts referred to in clauses (i) through (iii) above received by the Issuer in respect of the Collateral Obligation indirectly from the related Securities Lending Counterparty pursuant to the Securities Lending Agreement.

41

"*Interest Reserve Account*": The trust account established pursuant to Section 10.3(i).

"*Interim Ramp-Up Completion Date Failure*": The failure of the Issuer to satisfy the criteria set forth in Section 7.19(e) on or before July 1, 2005; notwithstanding the foregoing, if the Issuer receives a Rating Confirmation after an Interim Ramp-Up Completion Date Failure but before the first Payment Date, such Interim Ramp-Up Completion Date Failure shall not be deemed to have occurred.

"*Investment Criteria Adjusted Balance*": For any Collateral Obligation other than Deep Discount Obligations, its Principal Balance; and for any Deep Discount Obligation its Purchase Price; provided, however, that if any Excess CCC/Caa Collateral Obligations exist, the Investment Criteria Adjusted Balance for the Excess CCC/Caa Collateral Obligations shall be the lower of (i) the weighted average Market Value of all CCC/Caa Collateral Obligations, expressed as a percentage of their outstanding principal balances and (ii) the product of (a) 70% and (b) their respective Principal Balance.

"*Investment Obligation*": For a Collateral Obligation that is a Synthetic Security, the Reference Obligation of the Synthetic Security, and otherwise the Collateral Obligation.

"*Irish Listing and Paying Agent*": The meaning specified in Section 7.2.

"*Issuer*": The person named as such on the first page of this Indenture.

"*Issuer Accounts*": The meaning assigned in the Granting Clauses.

"*Issuer Order*" and "*Issuer Request*": A written order or request dated and signed in the name of the Issuer or the Co-Issuer by an Authorized Officer of the Issuer or the Co-Issuer, as applicable, or by the Portfolio Manager by an Authorized Officer of the Portfolio Manager, on behalf of the Issuer or the Co-Issuer.

"*Issuer Ordinary Shares*": The ordinary shares, par value $1.00 per share, of the Issuer which have been issued by the Issuer and are outstanding from time to time.

"*Junior Class*": With respect to a particular Class of Notes, each Class of Notes that is subordinated to that Class, as indicated in Section 13.1.

"*Knowledgeable Employee*": The meaning specified in Rule 3c-5 under the Investment Company Act.

"*Leasing Finance Transaction*": Any transaction pursuant to which the obligations of the lessee to pay rent or other amounts on a triple net basis under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, are required to be classified and accounted for as a capital lease on a balance sheet of such lessee under generally accepted accounting principles in the United States of America; but only if (a) such lease or other transaction provides for the unconditional obligation of the lessee to pay a stated amount of principal no later than a stated maturity date, together with interest thereon, and the payment of such obligation is not subject to any material non-credit related risk as determined by the Portfolio Manager, (b) the obligations of the lessee in respect of such lease or other transaction are fully secured, directly or indirectly, by the property that is the subject of such lease and (c) the interest held by the Issuer in respect of such lease or other transaction is treated as debt for U.S. federal income tax purposes.

42

"***LIBOR***": Determined by the Calculation Agent for any Interest Period, the offered rate, as determined by the Calculation Agent, for three month Dollar deposits that appears on Moneyline Telerate Page 3750 as reported on Bloomberg Financial Markets Commodities News (or a page that replaces Moneyline Telerate Page 3750 for the purpose of displaying comparable rates), as of 11:00 A.M. (London time) on the second Business Day before the first day of the relevant Interest Period.

If, on the second Business Day before the first day of any relevant Interest Period, that rate does not appear on Moneyline Telerate Page 3750 as reported on Bloomberg Financial Market Commodities News (or a page that replaces Moneyline Telerate Page 3750 for the purpose of displaying comparable rates), the Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks to prime banks in the London interbank market for three month Dollar deposits in Europe, by reference to requests by the Calculation Agent to four major banks in the London interbank market selected by the Calculation Agent (after consultation with the Portfolio Manager) (the "**Reference Banks**") for quotations as of approximately 11:00 A.M. (London time) on the second Business Day before the first day of the Interest Period. If at least two of the Reference Banks provide quotations as requested, LIBOR shall equal such arithmetic mean. If fewer than two Reference Banks provide quotations, LIBOR shall be the arithmetic mean of the offered quotations that leading banks in New York City selected by the Calculation Agent (after consultation with the Portfolio Manager) are quoting to the principal London offices of leading banks in the London interbank market on the second Business Day before the first day of the relevant Interest Period for three month Dollar deposits.

If the Calculation Agent is unable to determine a rate in accordance with any of the above procedures, LIBOR for the Interest Period shall be calculated on the last day of the Interest Period and shall be the arithmetic mean of the rate of interest for each day during the Interest Period determined by the Calculation Agent as being the rate of interest most recently announced by the Bank at its New York office as its base rate, prime rate, reference rate, or similar rate for Dollar loans (or if the Bank ceases to exist or is not quoting a base rate, prime rate, reference rate, or similar rate for Dollar loans, another major money center commercial bank in New York City selected by the Calculation Agent (after consultation with the Portfolio Manager)).

For the first Interest Period, LIBOR shall be determined based on the actual number of days in the Interest Period using straight-line interpolation of two rates calculated in accordance with the above procedure, except that instead of using three month deposits, one rate shall be determined using the period for which rates are obtainable next shorter than the Interest Period and the other rate shall be determined using the period for which rates are obtainable next longer than the Interest Period. All calculations shall be calculated to at least four decimal places and rounded to four decimal places.

"***Loan***": Any interest in a fully committed, senior secured, unsecured, or revolving loan (including loans involving credit linked deposits) that is acquired by assignment or by Participation (including any DIP Loan) that is either:

(i)      Registered, or

(ii)     issued by an obligor that is not resident in the United States:

43

(A)     whose payments are not subject to United States withholding tax; and

(B)     that is held through a financial institution pursuant to the procedures described in Treasury Regulation section 1.165-12(c)(3).

"*Long-Dated Collateral Obligation*": Any Collateral Obligation with a stated maturity later than the Stated Maturity of the Notes other than a Collateral Obligation with a stated maturity later than the Stated Maturities of the Notes that includes a "put" option to its obligor at a price of at least par payable on or before the Stated Maturity of the Notes.

"*Majority*": With respect to any Class or group of Notes or Composite Securities or the Preference Shares, the Holders of more than 50% of the Aggregate Outstanding Amount of that Class or group of Notes or Composite Securities or Preference Shares, as the case may be (treating the Senior Class A Notes, the Class A-2 Notes and the Class A-3 Notes as separate Classes). When used with respect to the Class A-1g Notes, the Insurer if the Insurer is the Controlling Class. When used with respect to the Controlling Class, the Insurer if the Insurer is the Controlling Class, and if the Insurer is not the Controlling Class, the Holders of more than 50% of the Aggregate Outstanding Amount of the Controlling Class.

"*Make-Whole Premium*": With respect to the Fixed Rate Notes, the premium payable to the Holders of the Fixed Rate Notes in connection with (i) an Optional Redemption of such Notes (other than in connection with a Tax Event), (ii) the purchase of such Notes that are Extension Sale Securities in connection with the Maturity Extension, if any, or (iii) the purchase of such Notes in connection with an Amendment Buy-Out, as applicable, in each case in an amount equal to the excess, if any, of (x) the present value (discounted to the Redemption Date, Extension Effective Date or date of Amendment Buy-Out, as applicable, using the Reinvestment Yield as the discount rate on a semi-annual basis using a 360-day year of twelve 30-day months) of the remaining payments of interest and principal due on the Fixed Rate Notes, assuming that the entire outstanding principal amount of the applicable Fixed Rate Notes will be paid at the end of the Remaining Life Date and that each intervening payment of interest on the Fixed Rate Notes will be made on the related Payment Date in its entirety (and therefore there is no Deferred Interest on the Fixed Rate Notes) over (y) the Aggregate Outstanding Amount of the applicable Fixed Rate Notes on the Redemption Date, Extension Effective Date or date of Amendment Buy-Out, as applicable; <u>provided</u> that, in no event shall any Make-Whole Premium be less than zero.

"*Management Agreement*": The Portfolio Management Agreement, dated as of the Closing Date, between the Issuer and the Portfolio Manager, as modified, amended, and supplemented and in effect from time to time.

"*Management Fee*": The Senior Management Fee, the Subordinated Management Fee, and the Incentive Management Fee. The Portfolio Manager may, in its sole discretion:

(i)     waive all or any portion of the Management Fee, any funds representing the waived Management Fees to be retained in the Collection Account for distribution as either Interest Proceeds or Principal Proceeds (as determined by the Portfolio Manager) pursuant to the Priority of Payments; or

(ii)     defer all or any portion of the Management Fee, any funds representing the deferred Management Fees to be retained in the Collection Account, when they will

44

become payable in the same manner and priority as their original characterization would have required unless deferred again.

"***Margin Stock***": "Margin Stock" as defined under Regulation U issued by the Board of Governors of the Federal Reserve System, including any debt security that is by its terms convertible into Margin Stock, but does not include any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation received pursuant to an offer by an issuer of a Defaulted Collateral Obligation.

"***Market Value***": As of any Measurement Date, the market value determined by the Portfolio Manager and reported to the Trustee as an amount rather than as a percentage or fraction of par (expressed in Dollars) of any Collateral Obligation based upon the Portfolio Manager's commercially reasonable judgment and based upon the following order of priority: (i) the average of the bid-side market prices obtained by the Portfolio Manager from three Independent broker-dealers active in the trading of such obligations or (ii) if the foregoing set of prices were not obtained, the lower of the bid-side market prices obtained by the Portfolio Manager from two Independent broker-dealers active in the trading of such obligations or (iii) if the foregoing sets of prices were not obtained, the average of the bid-side prices for the purchase of the Collateral Obligation determined by an Approved Pricing Service (Independent from the Portfolio Manager) that derives valuations by polling broker-dealers (Independent from the Portfolio Manager); provided that if a Market Value of any Collateral Obligation cannot be so determined for a period of 30 consecutive days then such Collateral Obligation shall be deemed to have a Market Value of zero; provided, further, that during such 30 day period, such Collateral Obligation shall be deemed to have a Market Value equal to the lower of (i) (if any) the Market Value of such Collateral Obligation as most recently determined by the Portfolio Manager in accordance with the foregoing and (ii) the current market value of such Collateral Obligation as determined by the Portfolio Manager in its commercially reasonable judgment; provided, further, that the maximum amount of Collateral Obligations having a Market Value assigned pursuant to the immediately preceding proviso shall be limited to 5.0% of the Maximum Investment Amount (and any amount in excess of 5.0% of the Maximum Investment Amount shall be deemed to have a Market Value of zero).

"***Market Value Percentage***": For any Collateral Obligation, the ratio obtained by dividing:

        (i)        the Market Value of the Collateral Obligation, *by*

        (ii)        the Principal Balance of the Collateral Obligation.

"***Maturity***": With respect to any Note, the date on which the unpaid principal of the Note becomes payable as provided in the Note or this Indenture, whether at the Stated Maturity or by declaration of acceleration, call for redemption, or otherwise.

"***Maturity Extension***": The meaning specified in Section 2.4.

"***Maximum Investment Amount***": An amount equal to:

        (i)        on any Measurement Date during the Ramp-Up Period, U.S.$663,000,000; and

        (ii)        on any Measurement Date after the Ramp-Up Completion Date:

45

(A)    the aggregate Principal Balance of all Collateral Obligations plus the aggregate outstanding principal amount of any Defaulted Collateral Obligations, *plus*

(B)    Cash representing Principal Proceeds on deposit in the Collection Account, *plus*

(C)    Eligible Investments (other than Cash) purchased by the Issuer with Principal Proceeds on deposit in the Collection Account.

"***Maximum Weighted Average Moody's Rating Factor***": As of any Measurement Date, a rate equal to the sum of (i) the number set forth in the column entitled "Maximum Weighted Average Moody's Rating Factor" in the Ratings Matrix based upon the applicable "row/column combination" chosen by the Portfolio Manager (or the interpolating between two adjacent rows and/or two adjacent columns, as applicable) plus (ii) the Recovery Rate Modifier.

"***Measurement Date***": Any date:

(i)    on which the Issuer commits to acquire or dispose of any Collateral Obligation,

(ii)    on which a Collateral Obligation becomes a Defaulted Collateral Obligation,

(iii)    that is a Determination Date,

(iv)    that is the Ramp-Up Completion Date, and

(v)    that is the date as of which the information in a Monthly Report is calculated pursuant to Section 10.6.

"***Memorandum and Articles of Association***": The memorandum and articles of association of the Issuer, as amended and restated before the Closing Date or in accordance with this Indenture.

"***Merging Entity***": The meaning specified in Section 7.10.

"***Minimum Diversity Score***":  As of any Measurement Date, a score equal to the number set forth in the column entitled "Minimum Diversity Score" in the Ratings Matrix based upon the applicable "row/column combination" chosen by the Portfolio Manager (or the interpolating between two adjacent rows and/or two adjacent columns, as applicable).

"***Minimum Weighted Average Spread***":  As of any Measurement Date, the spread equal to the percentage set forth in the row entitled "Minimum Weighted Average Spread" in the Ratings Matrix based upon the applicable "row/column combination" chosen by the Portfolio Manager (or the interpolating between two adjacent rows and/or two adjacent columns, as applicable).

"***Monthly Determination Date***": The meaning specified in Section 10.6(a).

"***Monthly Report***": The meaning specified in Section 10.6(a).

46

45824v26

"*Moody's*": Moody's Investors Service, Inc.

"*Moody's Default Probability Rating*": The meaning set forth in <u>Schedule 8</u>.

"*Moody's Equivalent Senior Unsecured Rating*": The meaning set forth in <u>Schedule 8</u>.

"*Moody's Group I Country*": Any of the following countries: Australia, the Netherlands, the United Kingdom and any country subsequently determined by Moody's to be a Moody's Group I Country.

"*Moody's Group II Country*": Any of the following countries: Germany, Ireland, Sweden, Switzerland and any country subsequently determined by Moody's to be a Moody's Group II Country.

"*Moody's Group III Country*": Any of the following countries: Austria, Belgium, Denmark, Finland, France, Iceland, Liechtenstein, Luxembourg, Norway, Spain and any country subsequently determined by Moody's to be a Moody's Group III Country.

"*Moody's Industry Classification*": The industry classifications in <u>Schedule 2</u> as modified, amended, and supplemented from time to time by Moody's.

"*Moody's Minimum Average Recovery Rate*": As of any Measurement Date, a rate equal to the number obtained by

(i)     summing the products obtained by multiplying the Principal Balance of each Collateral Obligation by its respective Moody's Priority Category Recovery Rate,

(ii)     dividing the sum determined pursuant to clause (i) above by the sum of the Aggregate Principal Balance of all Collateral Obligations, and

(iii)     rounding up to the first decimal place.

"*Moody's Non Senior Secured Loan*": Any Loan that is not a Moody's Senior Secured Loan.

"*Moody's Obligation Rating*": The meaning set forth in <u>Schedule 8</u>.

"*Moody's Priority Category*": Each type of Collateral Obligation specified in the definition of "Applicable Percentage" as a "Moody's Priority Category."

"*Moody's Priority Category Recovery Rate*": For any Collateral Obligation, the percentage specified in the definition of "Applicable Percentage" opposite the Moody's Priority Category of the Collateral Obligation.

"*Moody's Rating*": The meaning set forth in <u>Schedule 8</u>.

"***Moody's Rating Factor***": The number in the table below opposite the rating of the Collateral Obligation (excluding Synthetic Securities where an Assigned Moody's Rating is not available).

| Moody's Rating | Moody's Rating Factor | Moody's Rating | Moody's Rating Factor |
|---|---|---|---|
| Aaa | 1 | Ba1 | 940 |
| Aa1 | 10 | Ba2 | 1350 |
| Aa2 | 20 | Ba3 | 1766 |
| Aa3 | 40 | B1 | 2220 |
| A1 | 70 | B2 | 2720 |
| A2 | 120 | B3 | 3490 |
| A3 | 180 | Caa1 | 4770 |
| Baa1 | 260 | Caa2 | 6500 |
| Baa2 | 360 | Caa3 | 8070 |
| Baa3 | 610 | Ca or lower | 10000 |

The Moody's Rating Factor for Collateral Obligations that are Synthetic Securities shall be determined by Moody's and obtained by the Issuer or the Portfolio Manager on a case-by-case basis, unless there is an Assigned Moody's Rating available for such Collateral Obligation that is a Synthetic Security, in which case such Assigned Moody's Rating shall be used to compute the Moody's Rating Factor for such Collateral Obligation that is a Synthetic Security.

"***Moody's Senior Secured Loan***":

(a)    A Loan that:

(i)    is not (and cannot by its terms become) subordinate in right of payment to any other obligation of the obligor of the Loan,

(ii)    is secured by a valid first priority perfected security interest or lien in, to or on specified collateral securing the obligor's obligations under the Loan, and

(iii)    the value of the collateral securing the Loan together with other attributes of the obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service and other demands for that cash flow) is adequate (in the commercially reasonable judgment of the Portfolio Manager) to repay the Loan in accordance with its terms and to repay all other loans of equal seniority secured by a first lien or security interest in the same collateral, or

(b)    a Loan that:

(i)    is not (and cannot by its terms become) subordinate in right of payment to any other obligation of the obligor of the Loan, other than, with respect to a Loan

48

described in clause (a) above, with respect to the liquidation of such obligor or the collateral for such loan,

(ii) is secured by a valid second priority perfected security interest or lien in, to or on specified collateral securing the obligor's obligations under the Loan, and

(iii) the value of the collateral securing the Loan together with other attributes of the obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service and other demands for that cash flow) is adequate (in the commercially reasonable judgment of the Portfolio Manager) to repay the Loan in accordance with its terms and to repay all other loans of equal or higher seniority secured by a first or second lien or security interest in the same collateral,

(c) the Loan is not: (i) a DIP Loan, (ii) a Loan for which the security interest or lien (or the validity or effectiveness thereof) in substantially all of its collateral attaches, becomes effective, or otherwise "springs" into existence after the origination thereof, or (iii) a type of loan that Moody's has identified as having unusual terms and with respect to which its Moody's Recovery Rate has been or is to be determined on a case-by-case basis, and

(d) if the Loan has an Assigned Moody's Rating, such Assigned Moody's Rating is not lower that the senior implied Moody's rating of the related obligor.

"***Non-Call Period***": The period from the Closing Date to but not including the Payment Date in May, 2010.

"***Non-Consenting Holder***": With respect to any supplemental indenture pursuant to Section 8.2 that requires the consent of one or more Holders of Securities or Preference Shares, any Holder or, in the case of Securities or Preference Shares represented by Global Securities, any beneficial owner, that either (i) has declared in writing that it will not consent to such supplemental indenture or (ii) had not consented to such supplemental indenture within the applicable Initial Consent Period.

"***Nonpayment by the Issuer***": The meaning set forth in the Policy.

"***Non-Performing Collateral Obligation***": Any Defaulted Collateral Obligation and any PIK Security as to which its issuer or obligor has previously deferred or capitalized any interest due on it and all the interest so deferred or capitalized has not subsequently been paid in full in cash by:

(i) if the PIK Security has a Moody's Rating of "Baa3" (and not on credit watch with negative implications) or above or an S&P Rating of "BBB-" (and not on credit watch with negative implications) or above, the earlier of its second payment date or one year following the date of the initial deferral or capitalization of interest due on it, or

(ii) if the PIK Security has a Moody's Rating of "Baa3" and on credit watch with negative implications or below "Baa3," or an S&P Rating of "BBB-" and on credit watch with negative implications or below "BBB-," the earlier of its first payment date or six months following the date of the initial deferral or capitalization of interest due on it.

49

"***Non-Permitted Holder***": A Holder or beneficial owner of an interest in a Certificated Composite Security or Global Security that is a U.S. person and (i) is not a QIB/QP and that becomes the beneficial owner of an interest in a Rule 144A Global Note, (ii) with respect to the Composite Securities evidenced by a Certificated Composite Security, is not (x) a QIB/QP or (y) an Accredited Investor and a Qualified Purchaser or (iii) does not have an exemption available under the Securities Act.

"***Note Break-Even Loss Rate***": With respect to each Class of Notes that is rated by S&P, the maximum percentage of defaults that the Current Portfolio or Proposed Portfolio can sustain and nevertheless sufficient funds will remain for the payment of principal of the Class of Notes in full by its Stated Maturity and the timely payment of interest on the Senior Class A Notes, the Class A-2 Notes and the Class A-3 Notes and the ultimate payment of interest on the Class B Notes and the Class C Notes using S&P's assumptions on recoveries, defaults, and timing, and taking into account the Priority of Payments and the adjusted Weighted Average Spread level specified in the applicable row of the table below. The adjusted Weighted Average Spread as of any Measurement Date is the Weighted Average Spread as of the Measurement Date minus the amount of any Spread Excess added to the Weighted Average Fixed Rate Coupon as of the Measurement Date.

| Row | Adjusted Weighted Average Spread |
|-----|----------------------------------|
| 1 | Greater than or equal to 3.05% |
| 2 | Greater than or equal to 2.95% but less than 3.05% |
| 3 | Greater than or equal to 2.85% but less than 2.95% |
| 4 | Greater than or equal to 2.75% but less than 2.85% |
| 5 | Greater than or equal to 2.65% but less than 2.75% |
| 6 | Greater than or equal to 2.55% but less than 2.65% |
| 7 | Greater than or equal to 2.45% but less than 2.55% |

"***Note Class Loss Differential***": With respect to any Measurement Date and any Class of Notes that is rated by S&P, the rate calculated by subtracting the Class Scenario Loss Rate for the Class from the then-applicable Note Break-Even Loss Rate for the Class of Notes.

"***Noteholder***": A Holder of the Senior Class A Notes, the Class A-2 Notes, the Class A-3 Notes, the Class B Notes or the Class C Notes.

"***Note Interest Rate***": With respect to any specified Class of Notes, the per annum interest rate payable on the Notes of the Class with respect to each Interest Period equal to (i) in the case of the Notes (other than the Fixed Rate Notes), LIBOR for Eurodollar deposits for the applicable Interest Period plus the spread specified in the "Interest Rate" rows of the tables in Section 2.3 with respect to such Notes except in the first Interest Period and (ii) in the case of the Fixed Rate Notes, the rate specified for them in Section 2.3.

"***Note Payment Sequence***": The application of funds in the following order:

(1) to the Senior Class A Notes until the Senior Class A Notes have been fully redeemed (with each of the Senior Class A Notes being redeemed *pro rata* based

50

upon the outstanding principal amount of the Class A-1 Notes, the Class A-1b Notes and the Class A-1g Notes);

(2)    to the Class A-2 Notes until the Class A-2 Notes have been fully redeemed;

(3)    to the Class A-3 Notes until the Class A-3 Notes have been fully redeemed (with each of the Class A-3 Notes being redeemed *pro rata* based upon the outstanding principal amount of the Class A-3a Notes and the Class A-3b Notes);

(4)    to the Class B Notes until the Class B Notes have been fully redeemed; and

(5)    to the Class C Notes until the Class C Notes have been fully redeemed.

"*Notes*": The Senior Class A Notes, the Class A-2 Notes, the Class A-3 Notes, the Class B Notes and the Class C Notes authorized by, and authenticated and delivered under, this Indenture or any supplemental indenture.

"*Offer*": The meaning specified in Section 10.7(c).

"*Offering*": The offering of the Notes and the Composite Securities.

"*Offering Circular*": The final Offering Circular, dated March 9, 2005, prepared and delivered in connection with the offer and sale of the Notes, the Composite Securities and the Preference Shares.

"*Officer*": With respect to the Issuer and any corporation, any director, the Chairman of the board of directors, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer, or an Assistant Treasurer of the entity; with respect to the Co-Issuer and any corporation, any director, the Chairman of the board of directors, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer, or an Assistant Treasurer of the entity; with respect to any partnership, any of its general partners; and with respect to the Trustee, any Trust Officer.

"*Opinion of Counsel*": A written opinion addressed to the Trustee, the Insurer and each Rating Agency, in form and substance reasonably satisfactory to the Trustee and each Rating Agency, of an attorney at law (or law firm with one or more partners) reasonably satisfactory to the Trustee and admitted to practice before the highest court of any state of the United States or the District of Columbia (or the Cayman Islands, in the case of an opinion relating to the laws of the Cayman Islands), which attorney (or law firm) may, except as otherwise expressly provided in this Indenture, be counsel for the Portfolio Manager, the Issuer or the Co-Issuer. Whenever an Opinion of Counsel is required under this Indenture, the Opinion of Counsel may rely on opinions of other counsel who are so admitted and so satisfactory, which opinions of other counsel shall accompany the Opinion of Counsel and shall either be addressed to the Trustee and each Rating Agency or shall state that the Trustee and each Rating Agency may rely on it. An Opinion of Counsel may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion.

"*Optional Redemption*": A redemption of the Notes in accordance with Section 9.2.

"***Other Indebtedness***": The meaning specified in the definition of "Defaulted Collateral Obligation."

"***Outstanding***": With respect to:

(a)        the Notes and the Composite Securities or any specified Class, as of any date of determination, all of the Notes, all of the Composite Securities, or all of the Notes or Composite Securities of the specified Class, as the case may be, theretofore authenticated and delivered under this Indenture, except with respect to Notes and Composite Securities:

(i)        Securities canceled by the Indenture Registrar or delivered to the Indenture Registrar for cancellation;

(ii)        Notes for whose payment or redemption funds in the necessary amount have been theretofore irrevocably deposited with the Trustee or any Paying Agent in trust for their Holders pursuant to Section 4.1(a)(ii) and if the Notes are to be redeemed, notice of redemption has been duly given pursuant to this Indenture;

(iii)        Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture and Composite Securities in exchange for or in lieu of which other Composite Securities have been authenticated and delivered pursuant to this Indenture; and

(iv)        Securities alleged to have been destroyed, lost, or stolen for which replacement Securities have been issued as provided in Section 2.7, unless proof satisfactory to the Trustee is presented that any such Securities are held by a protected purchaser;

(b)        the Preference Shares, as of any date of determination, all of the Preference Shares theretofore issued under the Preference Share Documents and listed in the Preference Share register of the Issuer as outstanding;

provided that, in determining whether the Holders of the requisite Aggregate Outstanding Amount of the Notes, the Preference Shares or the Composite Securities have given any request, demand, authorization, direction, notice, consent, or waiver under this Indenture,

(1)        to the extent the Class A-1g Notes have been paid with proceeds of the Policy and subject to Section 16.5, such Class A-1g Notes shall continue to remain Outstanding for purposes of this Indenture until the Insurer has been paid as subrogee hereunder and reimbursed pursuant to the Insurance Agreement, as evidenced by a written notice from the Insurer delivered to the Trustee, and the Insurer shall be deemed the Holder thereof, to the extent of any payments thereon made by the Insurer;

(2)        Holders of Composite Securities, except to the extent otherwise expressly provided, will be entitled to vote with the Preference Shares to which the Preference Share Component of such Composite Securities relates, with a face amount equal to the aggregate Face Amount of the Preference Shares relating to such Preference Share Component; and

(3)        Notes, Composite Securities or Preference Shares owned or beneficially owned by the Issuer, the Co-Issuer, any Affiliate of either of them and

52

(only (x) with respect to any matter affecting its status as Portfolio Manager, or (y) in any matter respecting an acceleration of any Class of Notes or Composite Securities if the effect of the Portfolio Manager's action or inaction as a Holder of Notes, Composite Securities or Preference Shares would effectively prevent acceleration) the Portfolio Manager and its Affiliates shall be disregarded and not be Outstanding, except that, in determining whether the Trustee shall be protected in relying on any request, demand, authorization, direction, notice, consent, or waiver, only Notes, Composite Securities or Preference Shares that a Trust Officer of the Trustee has actual knowledge to be so owned or beneficially owned shall be so disregarded. Notes, Composite Securities or Preference Shares so owned or beneficially owned that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee the pledgee's right so to act with respect to the Notes, Composite Securities or Preference Shares and that the pledgee is not the Issuer, the Co-Issuer, the Portfolio Manager, the Preference Shares Paying Agent or any Affiliate of the Issuer or the Co-Issuer.

With respect to Components, as of any date of determination, all of the Components represented by Composite Securities that are Outstanding under this Indenture or the Preference Share Documents.

"*Overcollateralization Ratio*": With respect to any Class of Notes (treating the Senior Class A Notes, the Class A-2 Notes and the Class A-3 Notes as one Class for this purpose) on any Measurement Date, the ratio calculated by *dividing*:

(i)     the Overcollateralization Ratio Numerator; by

(ii)     the Aggregate Outstanding Amount of the Class of Notes and all Notes ranking senior to it together with any Deferred Interest on the Notes and all Notes ranking senior to it.

"*Overcollateralization Ratio Numerator*": On any date, the sum of:

(1)     the Aggregate Principal Balance of all Collateral Obligations (other than any Excess CCC/Caa Collateral Obligations, any Non-Performing Collateral Obligations, any Deep Discount Obligations, and any Collateral Obligations loaned pursuant to a Securities Lending Agreement with respect to which an "event of default" (under and as defined in the Securities Lending Agreement) is continuing); *plus*

(2)     unpaid Accrued Interest Purchased With Principal (excluding any unpaid Accrued Interest Purchased With Principal in respect of Non-Performing Collateral Obligations); *plus*

(3)     the Aggregate Principal Balance of any Eligible Investments that were purchased with Principal Proceeds and the amount of Principal Proceeds on deposit in the Collection Account; *plus*

(4)     the Aggregate Principal Balance of Eligible Investments on deposit in a Securities Lending Account that relate to a Securities Lending Agreement with respect to which an "event of default" (under and as defined in the Securities Lending Agreement) is continuing; *plus*

(5) with respect Collateral Obligation that are Non-Performing Collateral Obligations, Deep Discount Obligations or Excess CCC/Caa Collateral Obligations, the amount determined by using one of the following methods applicable to such type of Collateral Obligation; provided that if a Collateral Obligation falls within more than one of such types, the Issuer will be required to use the method that results in the smallest amount:

(A) with respect to any Excess CCC/Caa Collateral Obligations, an amount equal to the product of (i) the lower of (1) 70% and (2) the weighted average Market Value of all CCC/Caa Collateral Obligations, expressed as a percentage of their outstanding principal balances *multiplied* by (ii) the Excess CCC/Caa Collateral Obligations;

(B) with respect to any Non-Performing Collateral Obligations, the aggregate of the Applicable Collateral Obligation Amounts for all included Non-Performing Collateral Obligations (other than Defaulted Collateral Obligations that have been held by the Issuer for more than three years, which shall be deemed to be zero for purposes of this clause (B)); and

(C) with respect to any Deep Discount Obligations, the Aggregate Purchase Price Amount for all Deep Discount Obligations.

As used in this definition, "*Applicable Collateral Obligation Amount*" for any Non-Performing Collateral Obligation means:

(a) the lesser of:

(x) the Market Value Percentage of the Non-Performing Collateral Obligation; and

(y) the Applicable Percentage for the Non-Performing Collateral Obligation;

*multiplied* by:

(b) if the Non-Performing Collateral Obligation is:

(1) any Pledged Obligation other than those in clauses (2) through (4) below, the outstanding principal amount of the Pledged Obligation as of the relevant Measurement Date;

(2) a Synthetic Security, the notional amount specified in the Synthetic Security;

(3) any Revolving Loan or Delayed Drawdown Loan, its Principal Balance including any unfunded amount thereof (regardless of the nature of the contingency relating to the Issuer's obligation to fund the unfunded amount); and

(4) any PIK Security, its Principal Balance.

As used in the calculation of Market Value Percentage of the Non-Performing Collateral Obligation, the Principal Balance of any Defaulted Obligation shall be, if the Defaulted Obligation is:

        (i)      any Pledged Obligation other than those in clauses (ii) through (iv) below, the outstanding principal amount of the Pledged Obligation as of the relevant Measurement Date;

        (ii)      a Synthetic Security, the notional amount specified in the Synthetic Security;

        (iii)      any Revolving Loan or Delayed Drawdown Loan, its Principal Balance including any unfunded amount thereof (regardless of the nature of the contingency relating to the Issuer's obligation to fund the unfunded amount); and

        (iv)      any PIK Security, its Principal Balance.

"***Overcollateralization Test***": A test that is satisfied with respect to any Class of Notes (treating the Senior Class A Notes, the Class A-2 Notes and the Class A-3 Notes as one Class for this purpose) if, as of any Measurement Date, the Overcollateralization Ratio for the Class is at least equal to the required level for the specified Class indicated in the table below:

| Test | Required Level |
|---|---|
| Class A Overcollateralization Test | 113.40% |
| Class B Overcollateralization Test | 108.00% |
| Class C Overcollateralization Test | 106.30% |

"***Participating Institution***": An institution that creates a participation interest and that has a long-term senior unsecured rating by Moody's of at least "A3" (and if so rated by Moody's such rating is not on watch for possible downgrade) and an issuer credit rating by S&P of at least "A".

"***Participation***": A Loan acquired as a participation interest created by a Participating Institution.

"***Paying Agent***": Any person authorized by the Issuer to pay the principal of or interest on any Notes or to pay any amounts on any Composite Securities on behalf of the Issuer as specified in Section 7.2.

"***Payment Account***": The trust account established pursuant to Section 10.3(h).

"***Payment Date***": The first day of February, May, August and November in each year, commencing in August 2005 or, if any such day is not a Business Day, the next following Business Day, any other date on which the Notes are redeemed or paid before their Stated Maturity, and at the Stated Maturity for the Notes.

"***Permitted Offer***": An Offer pursuant to which the offeror offers to acquire a debt obligation (including a Collateral Obligation) in exchange solely for cash in an amount equal to or greater than the full face amount of the debt obligation plus any accrued and unpaid interest

and as to which the Portfolio Manager has determined in its commercially reasonable judgment that the offeror has sufficient access to financing to consummate the Offer.

"***PIK Security***": Any Collateral Obligation with respect to which its issuer or obligor may defer or capitalize interest due on the Collateral Obligation under the related Underlying Instruments.

"***Plan Asset Regulation***":  The regulation issued by the U.S. Department of Labor set forth at 29 CFR 2510.3-101 that, under specified circumstances, requires plan fiduciaries, and entities with certain specified relationships to an ERISA Plan, to "look through" investment vehicles (such as the Issuer) and treat as an "asset" of the plan each underlying investment made by such investment vehicle.

"***Pledged Obligations***": As of any date of determination, the Collateral Obligations, the Workout Assets, the Eligible Investments, and any other securities or obligations that have been Granted to the Trustee that form part of the Collateral.

"***Policy***":  The Financial Guaranty Insurance Policy of the Insurer with respect to the Insured Notes, including any endorsements thereto.

"***Policy Payment Account***":  The meaning specified in Section 16.6.

"***Portfolio Manager***": Highland Capital Management, L.P., and any successor Portfolio Manager pursuant to the Management Agreement.

"***Preference Claim***": The meaning specified in Section 16.4(b).

"***Preference Share Component***": The Class 1 Composite Security Preference Share Component.

"***Preference Share Distribution Account***": A segregated bank account established by the Preference Shares Paying Agent pursuant to the Preference Shares Paying Agency Agreement into which the Preference Shares Paying Agent will deposit all amounts received from the Issuer and payable to the Holders of the Preference Shares under the Priority of Payments.

"***Preference Share Documents***":  The Issuer's Memorandum and Articles of Association, the Preference Shares Paying Agency Agreement and the resolutions of the Issuer's Board of Directors authorizing the issuance of the Preference Shares passed on or before the Closing Date.

"***Preference Share Internal Rate of Return***": With respect to any Payment Date, the internal rate of return (computed using the "XIRR" function in Microsoft® Excel 2002 or an equivalent function in another software package), stated on a per annum basis, for the following cash flows, assuming all Preference Shares were purchased on the Closing Date at par:

> (i)  each distribution of Interest Proceeds made to the Holders of the Preference Shares on any prior Payment Date and, to the extent necessary to reach the applicable Preference Share Internal Rate of Return, the current Payment Date and

(ii)     each distribution of Principal Proceeds made to the Holders of the Preference Shares on any prior Payment Date and, to the extent necessary to reach the applicable Preference Share Internal Rate of Return, the current Payment Date.

For purposes of this definition, distributions in respect of the Preference Share Components shall be deemed to have been received by the Holders of the Composite Securities on the Payment Date preceding the related Composite Securities Payment Date.

"*Preference Shares*":  The Preference Shares issued by the Issuer pursuant to the Issuer's Memorandum and Articles of Association and the resolutions of the Issuer's Board of Directors authorizing the issuance of the Preference Shares passed on or before the Closing Date.

"*Preference Shares Distribution Amount*":  With respect to each Payment Date, an amount equal to 7.0% per annum of the Preference Shares Notional Amount (such Preference Shares Notional Amount reduced by any distribution prior to such Payment Date pursuant to Section 11.1(a)(ii) made in respect of the Preference Shares).  The Preference Shares Distribution Amount shall be calculated on the basis of a 360-day year consisting of twelve 30-day months.

"*Preference Shares Notional Amount*":  Means, $82,200,000.

"*Preference Shares Paying Agency Agreement*":  The Preference Shares Paying Agency Agreement, dated as of the Closing Date, by and between the Issuer and the Preference Shares Paying Agent, as amended from time to time in accordance with the terms thereof.

"*Preference Shares Paying Agent*":  JPMorgan Chase Bank, National Association, in its capacity as Preference Shares Paying Agent under the Preference Shares Paying Agency Agreement, unless a successor Person shall have become the preference shares paying agent pursuant to the applicable provisions of the Preference Shares Paying Agency Agreement, and thereafter "Preference Shares Paying Agent" shall mean such successor person.

"*Premium*":  The meaning assigned to the term "Premium" in the Premium Letter.

"*Premium Letter*":  The letter agreement, dated as of the Closing Date, between the Issuer and the Insurer in respect of the Premium payable by the Issuer in consideration of the issuance of the Policy.

"*Premium Rate*":  A per annum rate equal to the per annum rate at which the Premium accrues pursuant to the Premium Letter.

"*Principal Balance*": With respect to:

(i)     any Pledged Obligation other than those specifically covered in this definition, the outstanding principal amount of the Pledged Obligation as of the relevant Measurement Date;

(ii)     a Synthetic Security, the notional amount specified in the Synthetic Security;

(iii)    any Pledged Obligation in which the Trustee does not have a first priority perfected security interest, zero, except as otherwise expressly specified in this Indenture;

(iv)    any Defaulted Collateral Obligation, except as otherwise provided, zero;

(v)    any Collateral Obligation that has been loaned, its Principal Balance shall be reduced by the excess of the amount of collateral required over the actual Market Value of the collateral;

(vi)    any Revolving Loan or Delayed Drawdown Loan, its Principal Balance shall include any unfunded amount thereof (regardless of the nature of the contingency relating to the Issuer's obligation to fund the unfunded amount), except as otherwise expressly specified in this Indenture;

(vii)    any PIK Security, its Principal Balance shall not include any principal amount of the PIK Security representing previously deferred or capitalized interest; and

(viii)    any obligation or security that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation, zero.

"*Principal Proceeds*": With respect to any Due Period, all amounts received in Cash during the Due Period by the Issuer with respect to the Collateral that are not Interest Proceeds.

Principal Proceeds shall include any funds transferred from the Closing Date Expense Account and the Interest Reserve Account into the Collection Account pursuant to Section 10.2.

Principal Proceeds do not include the Excluded Property or earnings on amounts on deposit in the Securities Lending Account to the extent the earnings are payable by the Issuer to a Securities Lending Counterparty.

At any time when an "event of default" under a Securities Lending Agreement has occurred and is continuing, any payments received by the Issuer from the related Securities Lending Collateral shall be Principal Proceeds.

"*Priority Class*": With respect to any specified Class of Notes, each Class of Notes that ranks senior to that Class, as indicated in Section 13.1.

"*Priority of Payments*": The meaning specified in Section 11.1(a).

"*Proceeding*": Any suit in equity, action at law, or other judicial or administrative proceeding.

"*Proposed Portfolio*": As of any Measurement Date, the portfolio (measured by Aggregate Principal Balance) of Collateral Obligations and Principal Proceeds held as Cash on deposit in the Collection Account and other Eligible Investments purchased with Principal Proceeds on deposit in the Collection Account resulting from the sale, maturity, or other disposition of a Collateral Obligation or a proposed reinvestment in a Collateral Obligation, as the case may be.

45824v26

"***Purchase Agreement***": A purchase agreement dated March 14, 2005 among the Co-Issuers and J.P. Morgan Securities Inc. relating to the initial purchase of the Purchased Securities, as modified, amended and supplemented and in effect from time to time.

"***Purchased Securities***": The Notes, the Composite Securities and the portion of the Preference Shares, in each case purchased by the Initial Purchaser pursuant to the Purchase Agreement.

"***Purchase Price***": With respect to the purchase of any Collateral Obligation (other than any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation), the net purchase price paid by the Issuer for the Collateral Obligation. The net purchase price is determined by subtracting from the purchase price the amount of any Accrued Interest Purchased With Principal and any syndication and other upfront fees paid to the Issuer and by adding the amount of any related transaction costs (including assignment fees) paid by the Issuer to the seller of the Collateral Obligation or its agent.

"***Purchase Price Amount***": With respect to any Collateral Obligation on any date of determination, the product of (i) the Purchase Price (stated as a percentage) thereof and (ii) the Principal Balance thereof on such date.

"***QIB/QP***": Any person that, at the time of its acquisition of Notes or Composite Securities is both a Qualified Institutional Buyer and a Qualified Purchaser.

"***Qualified Equity Security***": Any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation that is stock or evidence of an interest in or a right to buy stock, or any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation but whose acquisition otherwise is a transaction in stocks or securities within the meaning of Section 864(b)(2)(A)(ii) of the Code and the regulations under the Code. Qualified Equity Securities do not include any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation and that will cause the Issuer to be treated as engaged in or having income from a United States trade or business for United States federal income tax purposes by virtue of its ownership or disposition of the obligation (without regard to the Issuer's other activities).

"***Qualified Institutional Buyer***": The meaning specified in Rule 144A under the Securities Act.

"***Qualified Purchaser***": The meaning specified in Section 2(a)(51) of the 1940 Act and Rule 2a51-2 under the 1940 Act.

"***Ramp-Up Completion Date***": The earlier of:

 (i) the Business Day after the 179th day after the Closing Date, and

 (ii) the first date on which the following conditions are satisfied:

  (x) (A) the Aggregate Principal Balance of the Collateral Obligations owned by the Issuer equals at least $663,000,000 or (B) the Aggregate Principal Balance of the Collateral Obligations purchased

(or committed to be purchased) by the Issuer with proceeds from the sale of the Securities (in each case in this clause (B), measured solely as of the date of purchase or commitment, as the case may be) equals at least $663,000,000 (for the avoidance of doubt, without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations on or before the Ramp-Up Completion Date); and

(y)     the Overcollateralization Ratio Numerator is at least $663,000,000.

"*Ramp-Up Period*": The period from and including the Closing Date to and including the Ramp-Up Completion Date.

"*Rating Agency*": Each of Moody's and S&P or, with respect to Pledged Obligations generally, if at any time Moody's or S&P ceases to provide rating services with respect to high yield debt securities, any other nationally recognized statistical rating organization selected by the Issuer and reasonably satisfactory to a Majority of each Class of Notes.  If at any time Moody's ceases to be a Rating Agency, references to rating categories of Moody's in this Indenture shall instead be references to the equivalent categories of the replacement rating agency as of the most recent date on which the replacement rating agency and Moody's published ratings for the type of security in respect of which the replacement rating agency is used.  If at any time S&P ceases to be a Rating Agency, references to rating categories of S&P in this Indenture shall instead be references to the equivalent categories of the replacement rating agency as of the most recent date on which the replacement rating agency and S&P published ratings for the type of security in respect of which the replacement rating agency is used.

"*Rating Condition*": With respect to any Rating Agency and any action taken or to be taken under this Indenture, a condition that is satisfied when the Rating Agency has confirmed to the Portfolio Manager (as agent for the Issuer) in writing that no withdrawal, reduction, suspension, or other adverse action with respect to any then current rating by it (including any private or confidential rating) of any Class of Notes (in the case of the Class A-1g Notes, without giving effect to the Policy) or Composite Securities will occur as a result of the action. The Rating Condition with respect to any Rating Agency shall be satisfied for all purposes of this Indenture at any time when no Outstanding Securities are rated by it.

"*Rating Confirmation*": Confirmation from each Rating Agency (and with respect to the Composite Securities, from Moody's only) that it has not reduced, suspended, or withdrawn the Initial Rating assigned by it to any Class of Notes or Composite Securities.

"*Rating Confirmation Failure*": A failure by the Issuer or the Portfolio Manager (on behalf of the Issuer) to obtain confirmation from S&P and written confirmation from Moody's that it has not reduced, suspended, or withdrawn its Initial Rating of each Class of Notes and Composite Securities and that it has not placed any Class of Notes or Composite Securities on credit watch with negative implications by the Business Day after the 29th day after the Ramp-Up Completion Date.

"*Ratings Matrix*": The "row/column combination" of the table below selected by the Portfolio Manager on the Closing Date to apply initially for purposes of the Diversity Test, the

60

Weighted Average Spread Test and the Weighted Average Rating Factor Test. Thereafter, on notice to the Trustee, the Portfolio Manager may select a different row of the Ratings Matrix to apply, or may interpolate between two adjacent rows and/or two adjacent columns, as applicable, on a straight-line basis and round the results to two decimal points.

| Minimum Weighted Average Spread | Minimum Diversity Score | | | | | | |
|---|---|---|---|---|---|---|---|
| | 50 | 55 | 60 | 65 | 70 | 75 | 80 |
| 2.45% | 2185 | 2220 | 2255 | 2290 | 2325 | 2360 | 2395 |
| 2.55% | 2245 | 2280 | 2315 | 2350 | 2385 | 2420 | 2455 |
| 2.65% | 2305 | 2340 | 2375 | 2410 | 2445 | 2480 | 2515 |
| 2.75% | 2365 | 2400 | 2435 | 2470 | 2505 | 2540 | 2575 |
| 2.85% | 2425 | 2460 | 2495 | 2530 | 2565 | 2600 | 2635 |
| 2.95% | 2485 | 2520 | 2555 | 2590 | 2625 | 2660 | 2695 |
| 3.05% | 2545 | 2580 | 2615 | 2650 | 2685 | 2720 | 2755 |
| Maximum Weighted Average Moody's Rating Factor | | | | | | | |

"*Recovery Rate Modifier*": As of any Measurement Date, the lesser of 60 and the product of:

(i) (a) the Moody's Minimum Average Recovery Rate minus the minimum percentage specified to pass the Weighted Average Moody's Recovery Rate Test (but not less than zero) multiplied by (b) 100; and

(ii) 40.

"*Record Date*": As to any Payment Date, the 15th day (whether or not a Business Day) before the Payment Date.

"*Redemption Date*": Any Payment Date specified for an Optional Redemption of Securities pursuant to Section 9.2.

"*Redemption Price*": With respect to any Note and any Optional Redemption pursuant to Section 9.2(a), an amount equal to:

(i) the outstanding principal amount of the portion of the Note being redeemed, plus

(ii) accrued interest on the Note (including any Defaulted Interest and interest on Defaulted Interest), plus

(iii) in the case of any Deferred Interest Note, the applicable Deferred Interest on the Note, plus

61

(iv)     in the case of the Fixed Rate Notes, the applicable Make-Whole Amount; plus

(v)     any unpaid Extension Bonus Payment in respect of the Note.

With respect to any Preference Share and any Optional Redemption pursuant to Section 9.2(b), "Redemption Price" means (i) at the direction of a Majority of the Preference Shares, the *pro rata* portion for such Preference Share of the entire remaining amount of available funds after all prior applications pursuant to the Priority of Payments or (ii) as specified by the unanimous direction of the Holders of the Preference Shares, in each case, as specified in Section 9.2(b).

With respect to any Class 1 Component and any Optional Redemption pursuant to Section 9.2, "Redemption Price" means the distribution in kind of the Treasury Strip provided for in Section 9.2(b).

"*Reference Obligation*": An obligation that would otherwise satisfy the definition of "Collateral Obligation" and on which a Synthetic Security is based.

"*Reference Obligor*": The obligor of a Reference Obligation.

"*Registered*": With respect to a Collateral Obligation or Eligible Investment, means that it is issued after July 18, 1984 and is in registered form within the meaning of Section 881(c)(2)(B)(i) of the Code and the United States Department of the Treasury ("Treasury") regulations promulgated thereunder.

"*Registered Office*": The registered office of the Issuer, which shall be located outside of the United States.

"*Regulation D*": Regulation D under the Securities Act.

"*Regulation S*": Regulation S under the Securities Act.

"*Regulation S Global Composite Security*": Any Composite Security issued in the form of a Regulation S Global Security.

"*Regulation S Global Note*": Any Note issued in the form of a Regulation S Global Security.

"*Regulation S Global Preference Share*":  The meaning set forth in the Preference Shares Paying Agency Agreement.

"*Regulation S Global Security*": The meaning specified in Section 2.2(b).

"*Reinvestment Overcollateralization Ratio*": As of any Measurement Date, the ratio obtained by dividing:

(i)     the Overcollateralization Ratio Numerator *by*

(ii)    the Aggregate Outstanding Amount of the Senior Class A Notes, the Class A-2 Notes, the Class A-3 Notes, the Class B Notes and the Class C Notes together with any Deferred Interest on any Class of Notes.

45824v26

"***Reinvestment Overcollateralization Test***": A test that is satisfied as of any Measurement Date during the Reinvestment Period on which Class C Notes remain Outstanding, if the Reinvestment Overcollateralization Ratio as of such Measurement Date is at least equal to 107.30%.

"***Reinvestment Period***": The period from the Closing Date through and including the first to occur of:

(i)     the Payment Date after the date that the Portfolio Manager notifies the Trustee, each Rating Agency, and the Administrator, in the sole discretion of the Portfolio Manager, that, in light of the composition of the Collateral, general market conditions, and other factors, investments in additional Collateral Obligations within the foreseeable future would either be impractical or not beneficial,

(ii)    the Payment Date in May, 2012 or, in the case of an Extension, the Extended Reinvestment Period End Date,

(iii)   the Payment Date on which all Notes are to be optionally redeemed or an earlier date after notice of an Optional Redemption chosen by the Portfolio Manager to facilitate the liquidation of the Collateral for the Optional Redemption, and

(iv)    the date on which the Reinvestment Period terminates or is terminated as a result of an Event of Default (subject to Section 5.2(b)).

"***Reinvestment Yield***":  With respect to the Fixed Rate Notes, the rate equal to the sum of (a)(i) for the Class A-1b Notes, 0.155% and (ii) for the Class A-3b Notes, 0.30% and (b) the applicable yield to maturity implied by (i) the yields reported, as of 10:00 a.m. (New York City time) on the tenth Business Day preceding the Redemption Date, Extension Effective Date or date of Amendment Buy-Out, as applicable, on "Notes/Bonds" section on the first page on the display designated as "Govt PX1" on Bloomberg Financial Markets Commodities News (or such other display as may replace such display) for actively traded U.S. Treasury securities (for the avoidance of doubt, excluding U.S. Treasury securities with option features, U.S. Treasury inflation securities and other markets) having a maturity as nearly as practicable equal to the Remaining Life Date or (ii) if such yields are not reported as of such time or the yields reported as of such time are not ascertainable, the Treasury Constant Maturity Series Yields reported, for the latest day for which such yields have been so reported as of the tenth Business Day preceding the Redemption Date, Extension Effective Date or date of Amendment Buy-Out, as applicable, in Federal Reserve Statistical Release H.15 (519) (or any comparable successor publication) for actively traded U.S. Treasury securities having a constant maturity as nearly as practicable equal to the Remaining Life Date; provided, however, if the maturity of the obligations used in the preceding clauses (i) and (ii) differ by more than one month from the Remaining Life Date, then the yield determined pursuant to the preceding clauses (i) and (ii) shall be determined by using linear interpolation between two maturities, one being the nearest maturity preceding the end of the Remaining Life Date and the other being the nearest maturity next succeeding the end of the Remaining Life Date.

"***Remaining Life Date***":  With respect of the Class A-1b Notes, June 1, 2013 and with respect of the Class A-3b Notes, September 1, 2015.

"***Removal Buy-Out***": The meaning specified in Section 9.7(a).

"***Removal Buy-Out Option***": The meaning specified in Section 9.7(a).

"***Removal Buy-Out Purchase Price***": The purchase price payable by the Removal Buy-Out Purchaser for the Class A-1g Notes purchased in an Removal Buy-Out, if any, in an amount equal to the Aggregate Outstanding Amount of such Class A-1g Notes, <u>plus</u> accrued and unpaid interest to the date of purchase payable to the Holder of such Class A-1g Notes (giving effect to any amounts paid to the Holder on such date).

"***Removal Buy-Out Purchaser***": The Portfolio Manager (or any of its Affiliates acting as principal or agent); <u>provided</u> that in the event that the Portfolio Manager elects not to purchase Class A-1g Notes from Holders pursuant to Section 9.7, "Removal Buy-Out Purchaser" shall mean one or more qualifying purchasers (which may include the Initial Purchaser) or any of its Affiliates acting as principal or agent) designated by the Portfolio Manager; <u>provided</u>, <u>however</u>, none of the Portfolio Manager, the Initial Purchaser or any of their respective Affiliates shall have any duty to act as an Removal Buy-Out Purchaser.

"***Replacement Hedge***": A replacement hedge agreement that qualifies to be a Hedge Agreement under this Indenture.

"***Repository***": The internet-based password protected electronic repository of transaction documents relating to privately offered and sold collateralized debt obligation securities located at "www.cdolibrary.com" operated by The Bond Market Association.

"***Required Rating***": The meaning specified in Section 15.2(b).

"***Revolving Loan***": A Loan or any Synthetic Security with a Reference Obligation (in each case excluding any Delayed Drawdown Loan) that requires the Issuer to make future advances to (or for the account of) the borrower under its Underlying Instruments (including any letter of credit for which the Issuer is required to reimburse the issuing bank for under it). A Loan or Synthetic Security shall only be considered to be a Revolving Loan for so long as its Commitment Amount is greater than zero.

"***Revolving Reserve Account***": The trust account established pursuant to Section 10.3(b).

"***Rule 144A***": Rule 144A under the Securities Act.

"***Rule 144A Global Note***": A Note issued in the form of a Rule 144A Global Security.

"***Rule 144A Global Securities***": The meaning specified in Section 2.2(c).

"***Rule 144A Information***": The meaning specified in Section 7.15.

"***S&P***": Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"***S&P CDO Monitor***": A dynamic, analytical computer model developed by S&P and provided to the Portfolio Manager and the Collateral Administrator to be used to calculate the default frequency in terms of the amount of debt assumed to default as a percentage of the original principal amount of the Collateral Obligations consistent with a specified benchmark rating level based on certain assumptions and S&P's proprietary corporate default studies. For

64

the purpose (and only for the purpose) of applying the S&P CDO Monitor to a portfolio of obligations, for each obligation in the portfolio, the rating of the obligation shall be its S&P Rating.

"**_S&P CDO Monitor Test_**": A test that will be satisfied as of any Measurement Date if, after giving effect to the sale of a Collateral Obligation or the purchase of a Collateral Obligation, each Note Class Loss Differential of the Proposed Portfolio is positive. The S&P CDO Monitor Test shall be considered to be improved if each Note Class Loss Differential of the Proposed Portfolio is at least equal to the corresponding Note Class Loss Differential of the Current Portfolio. The S&P CDO Monitor Test is not required to be satisfied or improved upon the sale of a Credit Risk Obligation and the reinvestment of the related Sale Proceeds in additional Collateral Obligations as provided in Section 12.1(a). For purposes of the S&P CDO Monitor Test,

> (i)     the S&P Rating of any S&P Unrated DIP Loan shall be "CCC-" and

> (ii)     the S&P Industry Classification for a Synthetic Security shall be that of the related Reference Obligation and not the Synthetic Security.

"**_S&P Industry Classification_**": The S&P Industry Classifications in Schedule 3 as modified, amended, and supplemented from time to time by S&P.

"**_S&P Minimum Average Recovery Rate_**": As of any Measurement Date, a rate equal to the number obtained by

> (i)     summing the products obtained by multiplying the Principal Balance of each Collateral Obligation by its respective S&P Priority Category Recovery Rate,

> (ii)     dividing the sum determined pursuant to clause (i) above by the sum of the Aggregate Principal Balance of all Collateral Obligations, and

> (iii)     rounding up to the first decimal place.

"**_S&P Priority Category_**": Each type of Collateral Obligation specified in the definition of "Applicable Percentage" as an "S&P Priority Category."

"**_S&P Priority Category Recovery Rate_**": For any Collateral Obligation, the percentage specified in the definition of "Applicable Percentage" opposite the S&P Priority Category of the Collateral Obligation.

"**_S&P Rating_**": The meaning set forth in Schedule 8.

"**_S&P Unrated DIP Loan_**": A DIP Loan acquired by the Issuer that does not have a rating assigned by S&P and for which the Portfolio Manager has commenced the process of having a rating assigned by S&P (as specified in the definition of "DIP Loan").

"**_Sale_**": The meaning specified in Section 5.17.

"**_Sale Proceeds_**": All proceeds received (including any proceeds received with respect to any associated interest rate swap or security providing fixed annuity payments ) with respect to Collateral Obligations or other Pledged Obligations as a result of their sales or other

dispositions less any reasonable expenses expended by the Portfolio Manager or the Trustee in connection with the sales or other dispositions, which shall be paid from such proceeds notwithstanding their characterization otherwise as Administrative Expenses.

"***Schedule of Collateral Obligations***": The Collateral Obligations listed on <u>Schedule 1</u>, which schedule shall include with respect to each listed Collateral Obligation:

       (A)    the name of the obligor and a unique Loan or other instrument identifier;

       (B)    the purchase price;

       (C)    the Principal Balance;

       (D)    the classification (including whether the Collateral Obligation is a Loan, a High-Yield Bond, a Synthetic Security, a Participation, a Structured Finance Obligation, a Revolving Loan, or a Delayed Drawdown Loan);

       (E)    the funded amount (stated as a percentage) in respect of a Collateral Obligation that is a Revolving Loan or a Delayed Drawdown Loan;

       (F)    the coupon or spread (as applicable);

       (G)    the Stated Maturity;

       (H)    the Moody's Rating;

       (I)    the S&P Rating; and

       (J)    the CUSIP and any ISIN, if applicable,

as the schedule may be amended from time to time to reflect the release of Collateral Obligations pursuant to Article 10 and the inclusion of Collateral Obligations as provided in Section 12.2.

"***Secondary Risk Counterparty***": Any obligor Domiciled other than in the United States, any Participating Institution, any Synthetic Security Counterparty, and any Securities Lending Counterparty.

"*Secondary Risk Table*": The table below:

| Long-Term Senior Unsecured Debt Rating of Secondary Risk Counterparty | | Individual Counterparty Limit | Aggregate Counterparty Limit |
|---|---|---|---|
| Moody's | S&P | | |
| Aaa | AAA | 20.0% | 20.0% |
| Aa1 | AA+ | 10.0% | 10.0% |
| Aa2 | AA | 10.0% | 10.0% |
| Aa3 | AA- | 10.0% | 10.0% |
| A1 | A+ | 5.0% | 10.0% |
| A2 or below | A or below | 0.0% | 0.0% |

If any Secondary Risk Counterparty's long-term senior unsecured debt rating or short-term rating is on credit watch for possible downgrade by Moody's or S&P, then for the purposes of the table above, its rating by the Rating Agency putting its rating on credit watch shall be one rating notch lower for that Rating Agency.

"*Section 3(c)(7)*": Section 3(c)(7) of the 1940 Act.

"*Section 3(c)(7) Reminder Notice*": A notice from the Issuer to the Noteholders (to be delivered in accordance with Sections 10.6(a) and (b)) substantially in the form of <u>Exhibit H-1</u>.

"*Secured Loan*": A Loan that (i) is not subordinated by its terms to other indebtedness of the borrower for borrowed money and (ii) is secured by a valid and perfected security interest in specified collateral.

"*Secured Obligations*": The meaning specified in the Granting Clauses.

"*Secured Parties*": The meaning specified in the Granting Clauses.

"*Securities*": The Notes and the Composite Securities.

"*Securities Act*": The United States Securities Act of 1933, as amended.

"*Securities Intermediary*": Any clearing corporation or any person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity.

"*Securities Lending Account*": The trust account established pursuant to Section 10.3(f).

"*Securities Lending Agreements*": The meaning specified in Section 7.18.

"*Securities Lending Collateral*": The meaning specified in Section 7.18.

"*Securities Lending Counterparty*": The meaning specified in Section 7.18.

"*Security Entitlement*": The meaning specified in Section 8-102(a)(17) of the UCC.

"*Selected Collateral Quality Tests*": The Weighted Average Moody's Recovery Rate Test, the Weighted Average Fixed Rate Coupon Test, the Weighted Average Spread Test, the Weighted Average Life Test (after taking into consideration any applicable Maturity Extension), the Weighted Average Rating Factor Test and the Diversity Test.

"*Senior Class A Notes*": The Class A-1a Notes, the Class A-1b Notes and the Class A-1g Notes.

"*Senior Management Fee*": A fee that accrues from the Closing Date payable to the Portfolio Manager in arrears on each Payment Date equal to 0.30% per annum of the Maximum Investment Amount if and to the extent funds are available for that purpose in accordance with the Priority of Payments. The Senior Management Fee shall be calculated on the basis of a 360-day year consisting of twelve 30-day months.

"*Senior Secured Loan*": A Secured Loan that is not subordinated by its terms to indebtedness of the borrower for borrowed money, trade claims, capitalized leases, or other similar obligations, with a first priority security interest in collateral.

"*Senior Unsecured Loan*": A Loan that is not (i) subordinated by its terms to indebtedness of the borrower for borrowed money and (ii) secured by a valid and perfected security interest in collateral.

"*Share Trustee*": Maples Finance Limited.

"*Special Redemption*": The meaning specified in Section 9.5.

"*Special Redemption Amount*": The meaning specified in Section 9.5.

"*Special Redemption Date*": The meaning specified in Section 9.5.

"*Spread Excess*": As of any Measurement Date, a fraction whose:

(i)     numerator is the product of:

(A)     the greater of zero and the excess of the Weighted Average Spread for the Measurement Date over the Minimum Weighted Average Spread specified in the applicable row of the Ratings Matrix, and

(B)     the Aggregate Principal Balance of all Floating Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date, and

(ii)     denominator is the Aggregate Principal Balance of all Fixed Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date.

In computing the Spread Excess on any Measurement Date, the Weighted Average Spread for the Measurement Date will be computed as if the Fixed Rate Excess were equal to zero.

68

"***Stated Maturity***": With respect to any Collateral Obligation, the maturity date specified in it or the applicable Underlying Instrument (or, if earlier, the first date on which any person may be required by the Issuer to repurchase the entire principal amount of the Collateral Obligation at or above par) and with respect to the Notes of any Class and the Composite Securities, the Payment Date in February, 2017 or, upon a Maturity Extension (if any), the applicable Extended Stated Maturity Date.  Unless otherwise specified, "Stated Maturity" means the Stated Maturity of the Notes and the Composite Securities.

"***Structured Finance Obligation***": Any obligation:

(i)        secured directly by, referenced to, or representing ownership of, a pool of receivables or other assets of U.S. obligors, or obligors organized or incorporated in Moody's Group I Countries, Moody's Group II Countries or Moody's Group III Countries, including portfolio credit default swaps, synthetic collateralized debt obligations, and collateralized debt obligations, but excludes:

(A)        residential mortgage-backed securities,

(B)        collateralized debt obligations backed by Emerging Market Securities,

(C)        collateralized debt obligations primarily backed by asset-backed securities,

(D)        market value collateralized debt obligations,

(E)        securities backed by "future flow" receivables,

(F)        net interest margin securitizations,

(G)        collateralized debt obligations backed by other collateralized debt obligations, and

(H)        collateralized debt obligations a significant portion of which are backed by Bonds;

(ii)        that has an S&P Rating and an S&P Priority Category Recovery Rate;

(iii)        that has a rating and a Moody's Priority Category Recovery Rate assigned by Moody's; and

(iv)        whose ownership or disposition (without regard to the Issuer's other activities) by the Issuer will not cause the Issuer to be treated as engaged in a U.S. trade or business for United States federal income tax purposes or otherwise subject the Issuer to net income taxes.

In connection with the purchase of a Structured Finance Obligation, the Portfolio Manager shall obtain from Moody's the applicable Moody's Priority Category Recovery Rate.

For purposes of the Diversity Test, multiple Structured Finance Obligations from CDOs managed by the same Portfolio Manager or multiple Structured Finance Obligations issued by the same master trust will be considered to be obligations of one issuer.

"*Subordinated Lien Loan*": A Secured Loan secured by a second (or lower) priority security interest in the relevant collateral.

"*Subordinated Management Fee*":   An amount equal to the sum of (i) a fee that accrues from the Closing Date payable to the Portfolio Manager in arrears on each Payment Date equal to 0.25% per annum of the Maximum Investment Amount if and to the extent funds are available for that purpose in accordance with the Priority of Payments, (ii) on any Payment Date that any part of the Senior Management Fee was not paid on the preceding Payment Date, an amount equal to interest on such unpaid amount at a rate of LIBOR for the applicable period plus 3.00% per annum and (iii) on any Payment Date that any part of the Subordinated Management Fee was not paid on the preceding Payment Date, an amount equal to interest on such unpaid amount at a rate of LIBOR for the applicable period plus 3.00% per annum.  The portion of the Subordinated Management Fee or Senior Management Fee, as applicable, in clauses (i) through (iii) above, as applicable, shall be calculated on the basis of a 360-day year consisting of twelve 30-day months.

"*Successor Entity*": The meaning specified in Section 7.10.

"*Super Majority*": With respect to any Class or group of Notes or Composite Securities, the Holders of more than 66⅔% of the Aggregate Outstanding Amount of that Class or group of Notes or Composite Securities, as the case may be.

"*Synthetic Security*": Any swap transaction, structured bond investment, credit linked note, or other derivative financial instrument relating to a debt instrument (but excluding any such instrument relating directly to a basket or portfolio of debt instruments) or an index or indices (such as the "SAMI" index published by Credit Suisse First Boston) in connection with a basket or portfolio of debt instruments or other similar instruments entered into by the Issuer with a Synthetic Security Counterparty that has in the Portfolio Manager's commercially reasonable judgment, equivalent expected loss characteristics (those characteristics, "*credit risk*") to those of the related Reference Obligations (taking account of those considerations as they relate to the Synthetic Security Counterparty), if (i) it is either a Form-Approved Synthetic Security or the Rating Condition for each Rating Agency is satisfied, and (ii) the Reference Obligations thereof have a weighted average Market Value of at least 80% at the time the Synthetic Security is entered into.

The maturity, interest rate, and other non-credit characteristics of a Synthetic Security may be different from the Reference Obligations to which the credit risk of the Synthetic Security relates.

No Synthetic Security shall require the Issuer to make any payment to the Synthetic Security Counterparty after its initial purchase other than any payments represented by the release of any cash collateral posted by the Issuer from the Collection Account to the Synthetic Security Counterparty Account simultaneously with the Issuer's purchase of or entry into the Synthetic Security in an amount not exceeding the amount of the posted cash collateral. Collateral may be posted only to a Synthetic Security Counterparty Account.  No Synthetic Security shall result in the Issuer being a "buyer" of credit protection.

45824v26

The term Synthetic Security shall not include any Structured Finance Obligation or any Participation, but the Reference Obligation of a Synthetic Security may be a Structured Finance Obligation.

Each Synthetic Security Agreement shall contain appropriate limited recourse and non-petition provisions (to the extent the Issuer has contractual payment obligations to the Synthetic Security Counterparty) equivalent (*mutatis mutandis*) to those contained in this Indenture.

The ownership or disposition of any Synthetic Security (without regard to the Issuer's other activities) must not cause the Issuer to be treated as engaged in a U.S. trade or business for United States federal income tax purposes or otherwise subject the Issuer to net income taxes.

Unless the Rating Condition is otherwise satisfied, any "deliverable obligation" that may be delivered to the Issuer as a result of the occurrence of any "credit event" under any proposed Synthetic Security must not provide that its transfer to the Issuer is subject to obtaining any consents and must qualify (when the Issuer purchases the related Synthetic Security and when such "deliverable obligation" is delivered to the Issuer as a result of the occurrence of any "credit event") as a Collateral Obligation and satisfy the Concentration Limitations under this Indenture, except that such "deliverable obligation" may constitute a Defaulted Obligation when delivered upon a "credit event and if the Reference Obligation of the Synthetic Security is a Senior Secured Loan then the "deliverable obligation" under the Synthetic Security must also be a Senior Secured Loan.

Synthetic Securities that are credit default swaps, credit linked notes, or other similar instruments may not provide for "restructuring" as a "credit event".

For purposes of the Coverage Tests and the Reinvestment Overcollateralization Test, unless the Rating Condition for each Rating Agency is satisfied in respect of any proposed alternative treatment, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not of the related Reference Obligations.

For purposes of the Collateral Quality Tests (other than the Diversity Test and the S&P Industry Classification with respect to the S&P CDO Monitor Test), a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not of the related Reference Obligations.

For purposes of calculating compliance with the Concentration Limitations other than limits relating to payment characteristics, and all related definitions, unless otherwise specified in this Indenture or by the Rating Agencies, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of its Reference Obligations and not the Synthetic Security. For purposes of calculating compliance with the Concentration Limitations relating to payment characteristics, and all related definitions, unless otherwise specified in this Indenture or by the Rating Agencies, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not its Reference Obligation.

With respect to a Synthetic Security based upon or relating to a senior secured index investment providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time, for purposes of: (i) calculating compliance with the Diversity Test, the S&P Industry Classification with respect to the S&P CDO Monitor Test, and the Concentration Limitations

71

(other than limits relating to payment characteristics and except for clauses 17 and 17(a) of the definition of "Concentration Limitations"), and all related definitions, and (ii) any other provision or definition of this Indenture involving a determination with respect to a Reference Obligation, the characteristics of such Reference Obligations shall be determined by treating such Synthetic Security as a direct investment by the Issuer in each such Reference Obligation in an amount equal to the Allocable Principal Balance of such Reference Obligation. In addition, each Reference Obligation under such Synthetic Security shall be assigned a Moody's Rating Factor equal to the sum of the Moody's Rating Factor of (i) the related Reference Obligor, (ii) the Synthetic Security Counterparty of such Synthetic Security and (iii) the Synthetic Security Collateral of such Synthetic Security. In addition, the Moody's Priority Category Rate in respect of a Synthetic Security referencing multiple Reference Obligations pursuant to this paragraph shall be the Moody's Priority Category Rate as assigned by Moody's to each Reference Obligation underlying such Synthetic Security. For the avoidance of doubt, Reference Obligations upon which a Synthetic Security is based as described in this paragraph must meet the definition of "Collateral Obligation" to the extent provided in this definition.

If the Rating Condition must be satisfied to execute the purchase of any Synthetic Security, the Portfolio Manager, on behalf of the Issuer, shall give each applicable Rating Agency not less than 5 days' prior notice of the purchase of or entry into any Synthetic Security.

"***Synthetic Security Agreement***": The documentation governing any Synthetic Security.

"***Synthetic Security Collateral***": With respect to any Synthetic Security, amounts posted to the Synthetic Security Collateral Account by the Synthetic Security Counterparty in support of its obligations under the Synthetic Security, including (i) all Eligible Investments or (ii) investments that satisfy the Rating Condition with respect to Moody's, in each case that mature no later than the Stated Maturity, in the Synthetic Security Collateral Account that are purchased with Synthetic Security Collateral.

"***Synthetic Security Collateral Account***": The trust account established pursuant to Section 10.3(e).

"***Synthetic Security Counterparty***": An entity required to make payments on a Synthetic Security to the extent that a Reference Obligor makes payments on a related Reference Obligation.

"***Synthetic Security Counterparty Account***": The trust account established pursuant to Section 10.5.

"***Tax Advantaged Jurisdiction***": One of the Cayman Islands, Bermuda, the Netherlands Antilles or the tax advantaged jurisdiction of the Channel Islands, or such other jurisdiction that the Rating Condition with respect to each Rating Agency is satisfied with respect thereto.

"***Tax Event***": An event that occurs if either:

(i) (A) one or more Collateral Obligations that were not subject to withholding tax when the Issuer committed to purchase them have become subject to withholding tax ("***New Withholding Tax Obligations***") or the rate of withholding has increased on one or more Collateral Obligations that were subject to withholding tax when the Issuer committed to purchase them ("***Increased Rate Withholding Tax Obligations***") and (B) in any Due Period, the aggregate of the payments subject to

withholding tax on New Withholding Tax Obligations and the increase in payments subject to withholding tax on Increased Rate Withholding Tax Obligations, in each case to the extent not "grossed-up" (on an after-tax basis) by the related obligor, represent 5% or more of Interest Proceeds for the Due Period; or

(ii)    taxes, fees, assessments, or other similar charges are imposed on the Issuer or the Co-Issuer in an aggregate amount in any twelve-month period in excess of U.S.$2,000,000, other than any deduction or withholding for or on account of any tax with respect to any payment owing in respect of any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation or Collateral Obligation.

"*Transaction Reports*": The meaning specified in Section 14.4.

"*Transfer Agent*": The person or persons, which may be the Issuer, authorized by the Issuer to exchange or register the transfer of Securities.

"*Transferee Certificate*": The meaning specified in Section 2.6(b).

"*Treasury Regulations*": The regulations, including proposed or temporary regulations, promulgated under the Code.  References herein to specific provisions of proposed or temporary regulations shall include analogous provisions of final Treasury Regulations or other successor Treasury Regulations.

"*Treasury Strip*":  The meaning specified in Section 10.3(j).

"*Treasury Strip Market Value*":  On any date of determination, the market value of the Treasury Strip underlying the applicable portion of the Class 1 Component of the Class 1 Composite Securities on such date, as determined in a commercially reasonable manner by the Portfolio Manager.

"*Trust Officer*": When used with respect to the Trustee, any officer in the Corporate Trust Office (or any successor group of the Trustee) including any director, vice president, assistant vice president, associate, or any other officer of the Trustee customarily performing functions similar to those performed by such officers in the Corporate Trust Office, or to whom any corporate trust matter is referred at the Corporate Trust Office because of his knowledge of and familiarity with the particular subject and having direct responsibility for the administration of this Indenture.

"*Trustee*": As defined in the first sentence of this Indenture.

"*UCC*": The Uniform Commercial Code as in effect in the State of New York, and as amended from time to time.

"*Uncertificated Security*": The meaning specified in Section 8-102(a)(18) of the UCC.

"*Underlying Instrument*": The loan agreement, indenture, credit agreement, or other agreement pursuant to which a Pledged Obligation has been issued or created and each other agreement that governs the terms of or secures the obligations represented by the Pledged Obligation or of which the holders of the Pledged Obligation are the beneficiaries.

"***Unregistered Securities***": The meaning specified in Section 5.17(c).

"***Unscheduled Principal Payments***": Any principal payments received with respect to a Collateral Obligation as a result of optional redemptions, exchange offers, tender offers, other payments or prepayments made at the option of the issuer thereof or that are otherwise not scheduled to be made thereunder.

"***U.S. Person***": A beneficial owner of a Security that is, for U.S. federal income tax purposes, a citizen or individual resident of the United States of America, an entity treated for United States federal income tax purposes as a corporation or a partnership created or organized in or under the laws of the United States of America or any state thereof or the District of Columbia, an estate the income of which is includable in gross income for U.S. federal income tax purposes regardless of its source, or a trust if, in general, a court within the United States of America is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all substantial decisions of such trust, and certain eligible trusts that have elected to be treated as United States persons.

"***Valuation Report***": The meaning specified in Section 10.6(b).

"***Warehouse Agreement***": The Warehouse Agreement, dated as of October 28, 2004, among JPMorgan Chase Bank, National Association (formerly known as JPMorgan Chase Bank), the Issuer, and the Portfolio Manager, as amended.

"***Warehoused Loans***": Loans acquired by the Issuer before the Closing Date pursuant to the Warehouse Agreement.

"***Weighted Average Fixed Rate Coupon***": As of any Measurement Date, the rate obtained by

(i)    multiplying the Principal Balance of each Collateral Obligation that is a Fixed Rate Obligation held by the Issuer as of the Measurement Date by the current per annum rate at which it pays interest, using only the effective after-tax interest rate determined by the Portfolio Manager on any Fixed Rate Obligation after taking into account any withholding tax or other deductions on account of tax of any jurisdiction and any gross-up paid by the obligor),

(ii)    summing the amounts determined pursuant to clause (i),

(iii)    dividing the sum by the Aggregate Principal Balance of all Collateral Obligations that are Fixed Rate Obligations held by the Issuer as of the Measurement Date, and

(iv)    if the result obtained in clause (iii) is less than the minimum percentage rate specified to satisfy the Weighted Average Fixed Rate Coupon Test, adding to the sum the amount of any Spread Excess as of the Measurement Date, but only to the extent required to satisfy the Weighted Average Fixed Rate Coupon Test.

"***Weighted Average Fixed Rate Coupon Test***": A test that is satisfied if, as of any Measurement Date, the Weighted Average Fixed Rate Coupon equals or exceeds 8.0%.

"*Weighted Average Life*": As of any Measurement Date, the number obtained by

(i)     summing the products obtained by multiplying

(A)     the Average Life at that time of each Collateral Obligation by

(B)     the Principal Balance at that time of the Collateral Obligation and

(ii)     dividing that sum by the Aggregate Principal Balance at that time of all Collateral Obligations.

"*Weighted Average Life Test*":  A test that will be satisfied as of any Measurement Date if the Weighted Average Life on that date of all Collateral Obligations is equal to or less than the number of years (including any fraction of a year) between such Measurement Date and March 15, 2014 or, in the case of a Maturity Extension, the Extended Weighted Average Life Date.

"*Weighted Average Moody's Rating Factor*": The summation of the products obtained by multiplying the Principal Balance of each Collateral Obligation (excluding Eligible Investments) by its respective Moody's Rating Factor, dividing that sum by the Aggregate Principal Balance of all Collateral Obligations (excluding Eligible Investments) and rounding the result up to the nearest whole number.

"*Weighted Average Moody's Recovery Rate Test*": A test that is satisfied as of any Measurement Date if the Moody's Minimum Average Recovery Rate is greater than or equal to 44.5%.

"*Weighted Average Rating Factor Test*": A test that is satisfied as of any Measurement Date if the Weighted Average Moody's Rating Factor of the Collateral Obligations (excluding Eligible Investments) as of such Measurement Date is less than or equal to the Maximum Weighted Average Moody's Rating Factor.

"*Weighted Average S&P Recovery Rate Test*": A test that is satisfied as of any Measurement Date if the S&P Minimum Average Recovery Rate is greater than or equal to 49.3%.

"*Weighted Average Spread*": As of any Measurement Date, a rate obtained by:

(i)     multiplying the Principal Balance of each Collateral Obligation that is a Floating Rate Obligation held by the Issuer as of the Measurement Date by the current per annum overall rate at which it pays interest, determined with respect to any Floating Rate Obligation that does not bear interest based on a three month London interbank offered rate, by expressing the current interest rate on the Floating Rate Obligation as a spread above a three month London interbank offered rate calculated in a manner consistent with the calculation of LIBOR,

(ii)     summing the amounts determined pursuant to clause (i),

(iii)     dividing that sum by the Aggregate Principal Balance of all Floating Rate Obligations held by the Issuer as of the Measurement Date, and

75

(iv)    if the result obtained in clause (iii) is less than the minimum percentage rate specified to pass the Weighted Average Spread Test, adding to that sum the amount of Fixed Rate Excess as of the Measurement Date.

For purposes of calculating the Weighted Average Spread, the Principal Balance of each Collateral Obligation that is a Revolving Loan or Delayed Drawdown Loan shall not include any of its unfunded amount.

"**_Weighted Average Spread Test_**": A test that is satisfied as of any Measurement Date if the Weighted Average Spread as of the Measurement Date equals or exceeds the Minimum Weighted Average Spread.

"**_Workout Assets_**": A Loan, High-Yield Bond, or Qualified Equity Security acquired in connection with the workout or restructuring of any Collateral Obligation that the Issuer does not advance any funds to purchase that does not qualify as a Collateral Obligation.

"**_Written-Down Obligation_**": As of any date of determination, any Structured Finance Obligation as to which the Issuer or the Portfolio Manager, on behalf of the Issuer, has been notified by the issuer of the Structured Finance Obligation that the Aggregate Principal Balance of the Structured Finance Obligation and all other Structured Finance Obligations secured by the same pool of collateral that rank *pari passu* with or senior in priority of payment to the Structured Finance Obligation exceeds the aggregate principal balance (including reserved interest or other amounts available for overcollateralization) of all collateral securing the Structured Finance Obligation and such other *pari passu* and senior Structured Finance Obligations (excluding defaulted collateral).

"**_Zero-Coupon Security_**":  A security that, at the time of determination, does not make periodic payments of interest.  A Zero-Coupon Security shall not include a security that is a PIK Security.

Section 1.2.    ***Assumptions as to Pledged Obligations; Construction Conventions.***

This Section 1.2 shall be applied in connection with all calculations required to be made pursuant to this Indenture:

- with respect to the scheduled payment of principal or interest on any Pledged Obligation, or any payments on any other assets included in the Collateral or the Class 1 Collateral,

- with respect to the sale of and reinvestment in Collateral Obligations,

- with respect to the income that can be earned on the scheduled payment of principal or interest on the Pledged Obligations and on any other amounts that may be received for deposit in the Collection Account, and

- with respect to the treatment of Collateral Obligations loaned pursuant to a Securities Lending Agreement.

The provisions of this Section 1.2 shall be applicable to any determination or calculation that is covered by this Section 1.2, whether or not reference is specifically made to

76

Section 1.2, unless some other method of calculation or determination is expressly specified in the particular provision.

(a)     All calculations with respect to the scheduled payment of principal or interest on the Pledged Obligations shall be made on the basis of information as to the terms of each Pledged Obligation and on reports of payments received on the Pledged Obligation that are furnished by or on behalf of the issuer of the Pledged Obligation and, to the extent they are not manifestly in error, the information or report may be conclusively relied on in making the calculations.

(b)     For each Due Period and as of any Measurement Date, the scheduled payment of principal or interest on any Pledged Obligation shall be the sum of

(i)     the total amount of payments and collections reasonably expected to be received during the Due Period in respect of the Pledged Obligation that, if paid as scheduled, will be available for payment on the Notes and of certain expenses of the Issuer and the Co-Issuer in the Collection Account at the end of the Due Period; and

(ii)     any such amounts received in prior Due Periods that were not disbursed on a previous Payment Date.

Except as provided in paragraph (h) below, a Non-Performing Collateral Obligation shall be assumed to have a scheduled payment of principal and interest of zero.

The total amount of payments and collections reasonably expected to be received includes the proceeds of the sale of the Pledged Obligation received and, in the case of sales which have not yet settled, to be received during the Due Period and not reinvested in additional Collateral Obligations (including any related deposit into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty, Securities Lending Counterparty, or Hedge Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security, Securities Lending Agreement, or Hedge Agreement) or Eligible Investments or retained in the Collection Account for subsequent reinvestment pursuant to Section 12.2.

(c)     For purposes of the applicable determinations required by Article 12 and the definition of "Interest Coverage Ratio," the expected interest on Collateral Obligations shall be calculated using their then current interest rates.

(d)     With respect to any Collateral Obligation, the date on which it "matures" (or its "maturity" date) shall be the earlier of

(i)     the stated maturity of the obligation or

(ii)     if the Issuer has the right to require the issuer or obligor of the Collateral Obligation to purchase, redeem, or retire the Collateral Obligation at a price of at least par on any one or more dates before its Stated Maturity (a "put right") and the Portfolio Manager certifies to the Trustee that it will cause the Issuer to direct the Trustee to exercise the put right on a date, the maturity date shall be the date specified in the certification.

(e)     For purposes of calculating compliance with the Collateral Quality Tests (other than the Diversity Test and the S&P Industry Classification with respect to the S&P CDO Monitor Test), the Coverage Tests, and the Reinvestment Overcollateralization Test and all related definitions, unless otherwise specified in this Indenture a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not of the Reference Obligation.  For purposes of calculating compliance with the Concentration Limits other than limits relating to payment characteristics, and all related definitions, unless otherwise specified in this Indenture or by the Rating Agencies, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of its Reference Obligations and not the Synthetic Security.  For purposes of calculating compliance with the Concentration Limits relating to payment characteristics, and all related definitions, unless otherwise specified in this Indenture or by the Rating Agencies, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not its Reference Obligations.

(f)     Any Collateral Obligation loaned to a Securities Lending Counterparty shall be included in the Collateral Quality Tests, the Coverage Tests, and the Reinvestment Overcollateralization Test and the Principal Balance of any Collateral Obligation loaned to a Securities Lending Counterparty shall be included in the Aggregate Principal Balance of Collateral Obligations, in each case unless an "event of default" (under and as defined in the related Securities Lending Agreement) is continuing.

(g)     If a Class of Notes ceases to be Outstanding, then any Coverage Test computed by reference to the Class of Notes (but not to any subordinate Class of Notes then Outstanding) shall cease to be of any force.

(h)     For purposes of calculating compliance with the Eligibility Criteria (other than the Weighted Average Life Test), at the direction of the Portfolio Manager by notice to the Trustee, during the Reinvestment Period any Eligible Investment representing Principal Proceeds received upon the maturity, redemption, sale, or other disposition of a Collateral Obligation (or, after the Reinvestment Period, in respect of Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Improved Obligations) shall be deemed to have the characteristics of the disposed Collateral Obligation until reinvested in an additional Collateral Obligation.  The calculations shall be based on the Principal Balance of the disposed Collateral Obligations except in the case of Defaulted Collateral Obligations and Credit Risk Securities, in which case the calculations will be based on the Principal Proceeds received on the disposition or sale of the Defaulted Collateral Obligation or Credit Risk Obligation.

Section 1.3.     ***Rules of Interpretation***.

Except as otherwise expressly provided in this Indenture or unless the context clearly requires otherwise:

(a)     Defined terms include, as appropriate, all genders and the plural as well as the singular.

(b)     References to designated articles, sections, subsections, exhibits, and other subdivisions of this Indenture, such as "Section 6.12 (a)," refer to the designated article, section, subsection, exhibit, or other subdivision of this Indenture as a whole and to all subdivisions of the designated article, section, subsection, exhibit, or other subdivision.  The words "herein,"

78

"hereof," "hereto," "hereunder," and other words of similar import refer to this Indenture as a whole and not to any particular article, section, exhibit, or other subdivision of this Indenture.

(c)     Any term that relates to a document or a statute, rule, or regulation includes any amendments, modifications, supplements, or any other changes that may have occurred since the document, statute, rule, or regulation came into being, including changes that occur after the date of this Indenture.  References to law are not limited to statutes.  Any reference to any person includes references to its successors and assigns.

(d)     Any party may execute any of the requirements under this Indenture either directly or through others, and the right to cause something to be done rather than doing it directly shall be implicit in every requirement under this Indenture.  Unless a provision is restricted as to time or limited as to frequency, all provisions under this Indenture are implicitly available and things may happen from time to time.

(e)     The term "including" and all its variations mean "including but not limited to." Except when used in conjunction with the word "either," the word "or" is always used inclusively (for example, the phrase "A or B" means "A or B or both," not "either A or B but not both").

(f)     A reference to "a thing" or "any of a thing" does not imply the existence or occurrence of the thing referred to even though not followed by "if any," and "any of a thing" is any and all of it.  A reference to the plural of anything as to which there could be either one or more than one does not imply the existence of more than one (for instance, the phrase "the obligors on a note" means "the obligor or obligors on a note").  "Until something occurs" does not imply that it must occur, and will not be modified by the word "unless." The word "due" and the word "payable" are each used in the sense that the stated time for payment has passed.  The word "accrued" is used in its accounting sense, i.e., an amount paid is no longer accrued.  In the calculation of amounts of things, differences and sums may generally result in negative numbers, but when the calculation of the excess of one thing over another results in zero or a negative number, the calculation is disregarded and an "excess" does not exist.  Portions of things may be expressed as fractions or percentages interchangeably.  The word "shall" is used in its imperative sense, as for instance meaning a party agrees to something or something must occur or exist.

(g)     All accounting terms used in an accounting context and not otherwise defined, and accounting terms partly defined in this Indenture, to the extent not completely defined, shall be construed in accordance with generally accepted accounting principles.  To the extent that the definitions of accounting terms in this Indenture are inconsistent with their meanings under generally accepted accounting principles, the definitions contained in this Indenture shall control.

(h)     In the computation of a period of time from a specified date to a later specified date or an open-ended period, the words "from" and "beginning" mean "from and including," the word "after" means "from but excluding," the words "to" and "until" mean "to but excluding," and the word "through" means "to and including." Likewise, in setting deadlines or other periods, "by" means "on or before." The words "preceding," "following," "before," "after," "next," and words of similar import, mean immediately preceding or following.  References to a month or a year refer to calendar months and calendar years.

(i)     Any reference to the enforceability of any agreement against a party means that it is enforceable against the party in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, and other similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(j)     Except when only the registered holder is recognized, such as in Section 2.9., references to Noteholders, holders, and the like refer equally to beneficial owners who have an interest in a Note but are not reflected in the Indenture Register as the owner.

## ARTICLE 2

### THE NOTES AND THE COMPOSITE SECURITIES

Section 2.1.     ***Forms Generally.***

The Notes, the Composite Securities, and the Trustee's or Authenticating Agent's certificate of authentication on them (the "***Certificate of Authentication***") shall be in substantially the forms required by this Article, with appropriate insertions, omissions, substitutions, and other variations required or permitted by this Indenture, and may have any letters, numbers, or other marks of identification and any legends or endorsements on them that are consistent with this Indenture, as determined by the Authorized Officers of the Issuer executing the Securities as evidenced by their execution of the Securities.

Section 2.2.     ***Forms of Securities and Certificate of Authentication.***

(a)     The Securities, including the Certificated Composite Securities, Regulation S Global Securities, Rule 144A Global Notes and Certificate of Authentication, shall be in the forms of the applicable portion of Exhibit A.

(b)     *Regulation S Global Securities.*  The Notes of each Class and the Composite Securities sold to non-U.S. persons in off-shore transactions in reliance on Regulation S shall each be represented by one or more global securities in definitive, fully registered form without interest coupons substantially in the form of the applicable portion of Exhibit A, including legends (the "***Regulation S Global Securities***").  The global securities shall be deposited on behalf of the subscribers for the Securities represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, the Depository for the respective accounts of Euroclear and Clearstream, duly executed by the Applicable Issuers and authenticated by the Trustee as hereinafter provided.  The aggregate principal amount of the Regulation S Global Securities may from time to time be increased or decreased by adjustments made on the records of the Trustee or the Depository or its nominee, as the case may be, as hereinafter provided.  As used above and in subsection (d) below, "U.S. person" and "off-shore transaction" have the meanings assigned to them in Regulation S.

(c)     *Rule 144A Global Securities.*  The Notes of each Class sold to U.S. persons that are QIB/QPs shall each be issued initially in the form of one permanent global note per Class in definitive, fully registered form without interest coupons substantially in the form of the applicable portion of Exhibit A, including legends (each, a "***Rule 144A Global Security***"), which shall be deposited on behalf of the subscribers for the Notes represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, the Depository, duly executed by the Applicable Issuers and authenticated by the Trustee as hereinafter provided. The aggregate principal amount of the Rule 144A Global Notes may from time to time be

80

increased or decreased by adjustments made on the records of the Trustee or the Depository or its nominee, as the case may be, as hereinafter provided.

(d)     *Certificated Composite Securities*.  The Composite Securities sold to U.S. persons that are either (x) QIB/QPs or (y) both Accredited Investors and Qualified Purchasers, shall be issued in the form of certificated securities in definitive, fully registered form without interest coupons substantially in the form of the applicable portion of Exhibit A (each, a "***Certificated Composite Security***"), which shall be registered in the name of their beneficial owner or a nominee of their beneficial owner, duly executed by the Issuer and authenticated by the Trustee as hereinafter provided.

(e)     *Book-Entry Provisions*.  This Section 2.2(e) shall apply only to Global Securities deposited with or on behalf of the Depository.  The "Operating Procedures of the Euroclear System" of Euroclear and the "Terms and Conditions Governing Use of Participants" of Clearstream, respectively, shall be applicable to the Regulation S Global Securities insofar as interests in the Global Securities are held by the Agent Members of Euroclear or Clearstream, as the case may be.

Agent Members shall have no rights under this Indenture with respect to any Global Security held on their behalf by the Trustee, as custodian for the Depository and the Depository may be treated by the Co-Issuers, the Trustee, and any agent of the Co-Issuers or the Trustee as the absolute owner of the Note for all purposes whatsoever.  Notwithstanding the foregoing, nothing in this Indenture shall prevent the Co-Issuers, the Trustee, or any agent of the Co-Issuers or the Trustee, from giving effect to any written certification, proxy, or other authorization furnished by the Depository or impair, as between the Depository and its Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Security.

Section 2.3.     ***Authorized Amount; Denominations.***

(a)     The aggregate principal amount of Notes that may be authenticated and delivered under this Indenture is limited to U.S.$602,800,000, except for Notes authenticated and delivered upon registration of, transfer of, or in exchange for, or in lieu of, other Notes pursuant to Section 2.6, 2.7, or 8.5.

The aggregate principal amount of Composite Securities that may be authenticated and delivered under this Indenture is limited to U.S.$6,000,000, except for Composite Securities authenticated and delivered upon registration of transfer of, or in exchange for, or in lieu of, other Composite Securities pursuant to Section 2.6, 2.7, or 8.5.

The Securities shall be divided into the following Classes, having the designations, original principal amounts and other characteristics as follows:

| Class | A-1a | A-1b | A-1g | A-2 | A-3a |
|---|---|---|---|---|---|
| Original Principal Amount | U.S.$52,000,000 | U.S.$7,000,000 | U.S.$400,000,000 | U.S.$42,500,000 | U.S.$23,500,000 |
| Interest Rate | LIBOR + 0.31% | 4.685% | LIBOR + 0.25%[1] | LIBOR + 0.50% | LIBOR + 0.60% |
| Initial Rating (Moody's/S&P) | Aaa/AAA | Aaa/AAA | Aaa/AAA | Aaa/AAA | Aa2/AA |

45824v26

| Class | A-3b | B | C | Class 1 Composite Securities[2] |
|---|---|---|---|---|
| Original Principal/Face Amount | U.S.$2,500,000 | U.S.$39,000,000 | U.S.$36,300,000 | U.S.$6,000,000[3] |
| Interest Rate | 5.068% | LIBOR + 1.05% | LIBOR + 2.10% | N/A |
| Initial Rating (Moody's/S&P) | Aa2/AA | A2/A | Baa2/BBB | Aaa/N/A[4] |

_____

| | |
|---|---|
| 1 | Upon the termination of the Policy pursuant to Section 16.8, the Interest Rate for the Class A-1g Notes shall be LIBOR + 0.25% + the Premium Rate. |
| 2 | The Class 1 Composite Securities shall consist of the Preference Share Component and the Class 1 Component. The portions of the interest in the Treasury Strip and the Preference Shares that comprise the Class 1 Composite Securities are not separately transferable. On each Composite Securities Payment Date, the Holders of the Class 1 Composite Securities will be entitled to receive the proceeds from the sale of the portion of the Treasury Strip with respect to such Composite Securities Payment Date and a pro rata share of the distribution on the Preference Shares on such date. No other payments will be made on the Class 1 Composite Securities. |
| 3 | The amount of the Composite Securities shown includes the Preference Share Component comprised of 2,000 Preference Shares. |
| 4 | The Class 1 Composite Securities are rated only as to the ultimate payment of their Class 1 Composite Security Rated Balance. |

(b)     The Class 1 Composite Securities have 2 Components, the Class 1 Component and the Preference Share Component. At issuance U.S.$6,000,000 original principal amount of Class 1 Composite Securities represents a Preference Share Component equal to 2,000 Preference Shares combined with the Class 1 Component.

(c)     The Notes will be issuable in minimum denominations of U.S.$250,000, and integral multiples of U.S.$1,000 in excess of that amount and the Composite Securities will be issuable in minimum denominations of U.S.$100,000, and integral multiples of U.S.$1,000 in excess of that amount.

(d)     The Issuer will also issue 82,200 Preference Shares pursuant to the Preference Share Documents, simultaneously with the issuance of the Notes and Composite Securities under this Indenture. The Preference Shares are not secured by the lien of this Indenture. Any payments made by the Trustee hereunder with respect to the Preference Shares will be released by the Trustee to the Preference Shares Paying Agent in accordance with the Priority of Payments for deposit into the Preference Shares Distribution Account for payment (subject to the laws of the Cayman Islands) to Holders of the Preference Shares as dividends or redemption price, as applicable.

Section 2.4.     ***Extension of Reinvestment Period and Stated Maturity.***

(a)     The Issuer, if directed by the Portfolio Manager, shall be entitled on each Extension Effective Date to extend the Reinvestment Period to the applicable Extended Reinvestment Period End Date if (i) in the case of an Extension Effective Date occurring after the first Extension Effective Date, the Issuer has previously affected a Maturity Extension for each preceding Extension Effective Date in accordance with this Section 2.4 and (ii) the Extension Conditions set forth in Section 2.4(c) are satisfied and the Issuer has given written notice of its election to extend the Reinvestment Period no later than 60 days and no earlier than 90 days prior to such Extension Effective Date. If the Extension Conditions are satisfied, the Stated Maturity of the Securities shall be automatically extended to the related Extended Stated Maturity Date and the Weighted Average Life Test shall be automatically extended to the related Extended Weighted Average Life Date, without any requirement for approval or consent

82

of any Holders of Securities or Preference Shares or amendment or supplement to this Indenture or the Preference Share Documents (the "***Maturity Extension***").

(b)    In the case of a Maturity Extension, any Holder of Notes, Composite Securities or Preference Shares wishing to sell such Securities or Preference Shares to an Extension Qualifying Purchaser pursuant to the Extension Conditions must provide the applicable Extension Sale Notice within the Extension Sale Notice Period pursuant to Section 2.4(d) (such Securities as to which an Extension Sale Notice has been duly given, "***Extension Sale Securities***").  Notwithstanding anything to the contrary herein, each Holder providing an Extension Sale Notice shall be deemed to agree that no Extension Sale Securities of any Holder shall be purchased unless all Extension Sale Securities of all Holders are purchased and settled at the applicable Extension Purchase Price on the applicable Extension Effective Date and the other Extension Conditions are satisfied as of such date.

(c)    The Maturity Extension shall be effective only if the following conditions (the "***Extension Conditions***") are satisfied:

(i)    the purchase of all Extension Sale Securities has been settled by the designated Extension Qualifying Purchasers at the applicable Extension Purchase Price as of the applicable Extension Effective Date;

(ii)    all such purchases of Extension Sale Securities individually and in the aggregate comply with the applicable transfer restrictions in this Indenture and the Preference Share Documents immediately after such purchase and the legends on such Securities or Preference Shares and all applicable law, rules and regulations (including, without limitation, rules, regulations and procedures of any applicable securities exchange, self-regulatory organization or clearing agency);

(iii)    (a) the Rating Condition has been satisfied with respect to S&P (so long as any Notes are then rated by S&P) and (b) either (i) all Coverage Tests and the Selected Collateral Quality Tests are satisfied as of the related Extension Determination Date, the rating of each Class of Securities by Moody's has not been downgraded, withdrawn or qualified from that in effect on the Closing Date (unless it subsequently has been reinstated to the rating assigned on the Closing Date) and the Overcollateralization Ratio Numerator is at least $663,000,000 or (ii) the Rating Condition has been satisfied with respect to Moody's (so long as any Securities are then rated by Moody's); and

(iv)    so long as the Insurer is the Controlling Class, the Portfolio Manager on behalf of the Issuer has obtained the Insurer's consent; provided, however, in the event that the Insurer does not consent to a Maturity Extension, the Holders of 100% of the Insured Notes (after giving effect to the sale of any Insured Notes which are Extension Sale Securities in connection with the proposed Maturity Extension) may, pursuant to Section 16.8, terminate the Policy, upon which, so long as clauses (i) through (iii) above have been satisfied, the Maturity Extension shall be effective.

The Issuer, the Trustee, the Insurer and, by its acceptance of the Securities or Preference Shares, each Holder of Securities or Preference Shares agrees that the Initial Purchaser shall not be responsible for causing the Extension Conditions to be satisfied and shall not be liable to any such person or Holder of Securities or Preference Shares (whether or not such Holder gave an Extension Sale Notice with respect to its Securities or Preference Shares)

83

or to any other person if the Extension Conditions are not satisfied. Failure of the Extension Conditions to be satisfied shall not constitute a Default or Event of Default under this Indenture.

(d)     Extension Procedure.

(i)     No later than three  Business Days following receipt by the Trustee of the notice given by the Issuer's election to extend the Reinvestment Period (the *"Extension Notice"*), the Trustee shall mail the Extension Notice to all Holders of Securities and the Preference Shares Paying Agent (for forwarding to the Holders of the Preference Shares) and each Rating Agency (so long as any rated Securities are Outstanding), in the form of Exhibit J, and shall request the Rating Condition for the Maturity Extension from S&P, if applicable;

(ii)     Any Holder of Securities or Preference Shares may give irrevocable notice (an *"Extension Sale Notice"*) within 30 days after the Trustee has mailed the Extension Notice (the *"Extension Sale Notice Period"*) of its intention to sell its Securities or Preference Shares to an Extension Qualifying Purchaser in the case of a Maturity Extension. Any Extension Sale Notice received by the Trustee after the Extension Sale Notice Period shall be disregarded and deemed not to have been given. No Holder of Securities or Preference Shares that has not given such an Extension Sale Notice within the Extension Sale Notice Period shall be entitled to sell its Securities or Preference Shares to an Extension Qualifying Purchaser in connection with the Maturity Extension; and

(iii)     If clause (iii)(b)(i) of the Extension Conditions is not satisfied as of the applicable Extension Determination Date as determined by the Issuer (or its agent), the Trustee shall request the Rating Condition to be satisfied with respect to Moody's.

(e)     On the applicable Extension Determination Date, the Issuer (or its agent) shall confirm (i) whether or not Extension Qualifying Purchasers for all Extension Sale Securities have been designated to purchase such Securities or Preference Shares in compliance with all transfer restrictions in this Indenture and the legends on such Securities or Preference Shares and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency), (ii) whether the requirements of clause (c)(iii) of the Extension Conditions are satisfied as of the applicable Extension Determination Date and (iii) whether all other Extension Conditions can be satisfied as of the applicable Extension Effective Date.

(f)     On each Extension Effective Date, the Maturity Extension shall automatically become effective under the terms of this Indenture; provided that all Extension Conditions set forth in clauses (a) and (c) above are satisfied. No later than two Business Days after each Extension Effective Date, the Trustee based on a determination made by the Issuer in consultation with the Portfolio Manager, at the expense of the Co-Issuers, shall mail a notice to all Holders of Securities, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Portfolio Manager, the Initial Purchaser, each Rating Agency (so long as any rated Securities are Outstanding) and the Irish Stock Exchange (if and for so long as any Class of Notes is listed thereon) confirming whether or not the Maturity Extension became effective. If the Maturity Extension became effective, the Issuer shall make any required notifications thereof to the Depositary for any Securities or Preference Shares subject to the Maturity Extension.

(g)     In the case of a Maturity Extension, each Holder of Notes (other than Extension Sale Securities) and the Insurer (so long as the Policy has not been terminated) shall be entitled to receive an amount equal to the applicable Extension Bonus Payment. Holders of Composite Securities and Preference Shares shall not be entitled to receive any Extension Bonus Payment.

The Extension Bonus Payment shall be payable to (i) any applicable qualifying beneficial owners who have provided the Trustee with an Extension Bonus Eligibility Certification and (ii) to the Insurer, on the first Payment Date from and including each Extension Effective Date on which funds are available to be used for such purposes in accordance with Priority of Payments, but in any event, no later than the earlier of the Stated Maturity and the date of redemption of the Notes. Extension Bonus Payments which are not available to be paid on a Payment Date in accordance with the Priority of Payments on a Payment Date shall not be considered "due and payable" hereunder. The failure to pay any such Extension Bonus Payment on such date shall not be an Event of Default, unless the Issuer shall fail to pay in full such Extension Bonus Payment on the earlier of the Stated Maturity and the date of redemption in full of the relevant Securities. Unpaid Extension Bonus Payments shall not accrue interest. Such amounts shall be paid: (i) in the case of the Notes, to the accounts designated in the applicable Extension Bonus Eligibility Certification or, to the extent otherwise required by the rules of any applicable securities exchange or clearing agency, in a manner determined by the Issuer and (ii) in the case of the Insurer, to the account specified in the Premium Letter or as otherwise directed by the Insurer in writing.

Section 2.5.     ***Execution, Authentication, Delivery, and Dating.***

The Securities shall be executed on behalf of each of the Applicable Issuers by one of their respective Authorized Officers. The signature of the Authorized Officer on the Securities may be manual or facsimile.

Securities bearing the manual or facsimile signatures of individuals who were at any time the Authorized Officers of the Issuer or the Co-Issuer, as applicable, shall bind the Issuer and the Co-Issuer, notwithstanding that any of them have ceased to hold their offices before the authentication and delivery of the Securities or did not hold their offices at the date of issuance of the Securities.

At any time and from time to time after the execution and delivery of this Indenture, the Issuer and the Co-Issuer may deliver Securities executed by the Applicable Issuers to the Trustee or the Authenticating Agent for authentication and the Trustee or the Authenticating Agent, upon Issuer Order, shall authenticate and deliver the Securities as provided in this Indenture and not otherwise.

Each Security authenticated and delivered by the Trustee or the Authenticating Agent upon Issuer Order on the Closing Date shall be dated as of the Closing Date. All other Securities that are authenticated after the Closing Date for any other purpose under this Indenture shall be dated the date of their authentication.

Securities issued upon transfer, exchange, or replacement of other Securities shall be issued in authorized denominations reflecting the original Aggregate Outstanding Amount of the Securities so transferred, exchanged, or replaced, but shall represent only the current outstanding principal amount of the Securities so transferred, exchanged, or replaced. If any Security is divided into more than one Security in accordance with this Article 2, the original principal amount of the Security shall be proportionately divided among the Securities delivered

in exchange for it and shall be the original aggregate principal amount of the subsequently issued Securities.

No Security shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on the Security a Certificate of Authentication executed by the Trustee or by the Authenticating Agent by the manual signature of one of their Authorized Officers, and that certificate on any Security shall be conclusive evidence, and the only evidence, that the Security has been duly authenticated and delivered under this Indenture.

Section 2.6.        ***Registration, Registration of Transfer and Exchange.***

(a)        The Issuer shall cause a register (the "***Indenture Register***") to be kept in which the Issuer shall provide for the registration of Securities and the registration of transfers of Securities.  The Trustee is hereby initially appointed "***Indenture Registrar***" for the purpose of registering Securities and transfers of the Securities as provided in this Indenture.  The Issuer may rely conclusively on any such information provided to it by the Trustee.  Upon any resignation or removal of the Indenture Registrar, the Issuer shall promptly appoint a successor and notify the Portfolio Manager of the appointment or, in the absence of such appointment, assume the duties of Indenture Registrar.  The Issuer shall cause the Composite Securities to be registered and recorded in the Indenture Register and, with respect to the Preference Share Component, in the Preference Share register.

If the Issuer appoints a person other than the Trustee to be Indenture Registrar, the Issuer will give the Trustee prompt written notice of the appointment of the Indenture Registrar and of the location, and any change in the location, of the Indenture Register.  The Trustee may inspect the Indenture Register at all reasonable times and obtain copies of it.  The Trustee may rely on a certificate executed on behalf of the Indenture Registrar by an Officer of the Indenture Registrar as to the names and addresses of the Holders of the Securities and the principal amounts and number of the Securities.

Upon surrender for registration of transfer of any Securities at the office or agency of the Co-Issuers to be maintained pursuant to Section 7.2, if the requirements of this Indenture are met the Applicable Issuers shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferees, new Securities of any authorized denomination and of a like original Aggregate Outstanding Amount.

At the option of its holder, Securities may be exchanged for Securities of like terms, in any authorized denominations and of like aggregate principal amount, upon surrender of the Securities to be exchanged at the office or agency of the Co-Issuers to be maintained pursuant to Section 7.2.  Whenever any Security is surrendered for exchange, the Applicable Issuers shall execute, and the Trustee shall authenticate and deliver, the Securities that the Noteholder or Composite Securityholder making the exchange is entitled to receive.

All Securities issued on any registration of transfer or exchange of Securities shall be the valid obligations of the Applicable Issuers evidencing the same obligations, and entitled to the same benefits under this Indenture, as the Securities surrendered for registration of transfer or exchange.

Every Security presented or surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Indenture Registrar duly executed by its holder or his attorney duly authorized in writing.

86

No Holder shall incur a service charge for any registration of transfer or exchange of Securities, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

(b)     No Security may be sold or transferred (including by pledge or hypothecation) unless the sale or transfer is exempt from the registration requirements of the Securities Act, is exempt from the registration requirements under applicable state securities laws, and will not cause either of the Co-Issuers to become subject to the requirement that it register as an investment company under the 1940 Act.  None of the Co-Issuers, the Trustee, or any other person shall have any obligation to register the Securities under the Securities Act or any state securities laws.

The Trustee shall require, before any registration of transfer of a Composite Security in which delivery is to be made in the form of a Certificated Composite Security, that the Holder's prospective transferee deliver to the Trustee and the Co-Issuers a certificate relating to the transfer in the form of the applicable portion of Exhibit B (each, a "***Transferee Certificate***").

(c)     (i)     No Note may be transferred, directly or indirectly, to a Benefit Plan Investor unless the purchaser's purchase, holding and disposition of a Note or any beneficial interest therein (x) will not constitute or result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code and (y) in the case of a governmental, church or other plan, will not result in a non-exempt violation of any substantially similar U.S. federal, state, local or non-U.S. law.

(ii)     No Composite Security may be transferred, directly or indirectly, to (i) an ERISA Plan or (ii) a Benefit Plan Investor that is not an ERISA Plan but whose purchase, holding or disposition of a Composite Security or any beneficial interest therein will result in a non-exempt violation of any federal, state, local or non-U.S. law substantially similar to Section 406 of ERISA or Section 4975 of the Code.

(d)     Neither the Trustee nor the Indenture Registrar shall be responsible for ascertaining whether any transfer complies with, or for otherwise monitoring or determining compliance with, the requirements or terms of the Securities Act, applicable state securities laws, ERISA, the Code or the 1940 Act; except that if a certificate or any other document is specifically required by this Section 2.6 to be provided to the Trustee by a prospective transferee, the Trustee shall be under a duty to receive and examine the same to determine whether it conforms substantially on its face to the applicable requirements of this Section 2.6.

Each Holder of a Class 1 Composite Security (other than a Regulation S Global Security) will be required to provide to the Issuer and the Trustee written certification in the form of the applicable portion of Exhibit B as to whether it is an Affected Bank and each subsequent transferee of a Regulation S Global Security will be deemed to represent to the Issuer and to the Trustee that it is not an Affected Bank.  No transfer of any Class 1 Composite Security to a transferee that has represented it is an Affected Bank will be effective, and the Trustee will not recognize any such transfer, unless such transfer is specifically authorized by the Issuer in writing; provided, however, that the Issuer shall authorize any such transfer if (x) such transfer would not cause more than 33 1/3% of the aggregate outstanding amount of the Preference Shares (including the Preference Share Components of the Class 1 Composite Securities) to be owned by Affected Banks or (y) the transferor is an Affected Bank previously approved by the Issuer.

(e)     For so long as any of the Securities are Outstanding, the Issuer shall not issue or register the transfer of any Issuer Ordinary Shares to U.S. persons and the Co-Issuer shall not issue or register the transfer of any of its shares of the Co-Issuer to U.S. persons.  As used in this subsection (e), "U.S. person" has the meaning assigned to it in Regulation S.

(f)     So long as a Global Security remains Outstanding and is held by or on behalf of the Depository, transfers of the Global Security, in whole or in part, shall only be made in accordance with Section 2.2(c) and this Section 2.6(f).

(i)     Subject to clauses (ii), (iii), and (iv) of this Section 2.6(f), transfers of a Global Security shall be limited to transfers of the Global Security in whole, but not in part, to nominees of the Depository.

(ii)     *Rule 144A Global Security to Regulation S Global Security.*  If a Holder of a beneficial interest in a Rule 144A Global Security deposited with the Depository wishes at any time to exchange its interest in the Rule 144A Global Security for an interest in the corresponding Regulation S Global Security, or to transfer its interest in the Rule 144A Global Security to a person who wishes to take delivery of it in the form of an interest in the corresponding Regulation S Global Security, the Holder may exchange or transfer the interest for an equivalent beneficial interest in the corresponding Regulation S Global Security (subject to the rules and procedures of the Depository) if the Holder after the exchange or transfer is not a U.S. person.

The Indenture Registrar shall instruct the Depository to reduce the principal amount of the Rule 144A Global Security and to increase the principal amount of the Regulation S Global Security by the aggregate principal amount of the beneficial interest in the Rule 144A Global Security to be exchanged, and to credit to the securities account of the person specified in the instructions a beneficial interest in the corresponding Regulation S Global Security equal to the reduction in the principal amount of the Rule 144A Global Security upon receipt by the Indenture Registrar of

(A)     instructions given in accordance with the Depository's procedures from an Agent Member directing the Indenture Registrar to credit a beneficial interest in the corresponding Regulation S Global Security, but not less than the minimum denomination applicable to the Holder's Securities, equal to the beneficial interest in the Rule 144A Global Security to be exchanged or transferred,

(B)     a written order given in accordance with the Depository's procedures containing information regarding the participant account of the Depository and the Euroclear or Clearstream account to be credited with the increase,

(C)     a certificate in the form of <u>Exhibit B-2</u> given by the Holder of the beneficial interest stating that the exchange or transfer of the interest has been made in compliance with the transfer restrictions applicable to the Global Securities, including that the Holder or the transferee, as applicable, is not a U.S. person, and that the transfer has been made pursuant to and in accordance with Regulation S, and

(D) in the case of a transfer, a certificate in the applicable form of Exhibit B given by the proposed transferee stating that it is not a U.S. person.

(iii) *Regulation S Global Security to Rule 144A Global Security*. If a Holder of a Note held as a beneficial interest in a Regulation S Global Security deposited with the Depository wishes at any time to exchange its interest in the Regulation S Global Security for an interest in the corresponding Rule 144A Global Security or to transfer its interest in the Regulation S Global Security to a person who wishes to take delivery of it in the form of an interest in the corresponding Rule 144A Global Security, the Holder may, subject to the rules and procedures of Euroclear, Clearstream, or the Depository, as the case may be, exchange or transfer, or cause the exchange or transfer of, the interest for an equivalent beneficial interest in the corresponding Rule 144A Global Security. Upon receipt by the Indenture Registrar of:

(A) instructions from Euroclear, Clearstream, or the Depository, as the case may be, directing the Indenture Registrar to cause to be credited a beneficial interest in the corresponding Rule 144A Global Security equal to the beneficial interest in the Regulation S Global Security, but not less than the minimum denomination applicable to the Holder's Securities, to be exchanged or transferred, the instructions to contain information regarding the participant account with the Depository to be credited with the increase,

(B) a certificate in the form of Exhibit B-3 given by the Holder of the beneficial interest and stating that, in the case of an exchange, the Holder is a Qualified Institutional Buyer and is also a Qualified Purchaser or, in the case of a transfer, the person transferring the interest in the Regulation S Global Security reasonably believes that the person acquiring the interest in a Rule 144A Global Security is a Qualified Institutional Buyer, is obtaining the beneficial interest in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction, and is also a Qualified Purchaser, and

(C) a certificate in the form of Exhibit B-1 given by the proposed transferee stating that it is both a Qualified Institutional Buyer and a Qualified Purchaser,

then the Indenture Registrar shall instruct the Depository to reduce the Regulation S Global Security by the aggregate principal amount of the beneficial interest in the Regulation S Global Security to be transferred or exchanged and the Indenture Registrar shall instruct the Depository, concurrently with the reduction, to credit to the securities account of the person specified in the instructions a beneficial interest in the corresponding Rule 144A Global Security equal to the reduction in the principal amount of the Regulation S Global Security.

(iv) *Regulation S Global Composite Security to Certificated Composite Security*. If a Holder of a beneficial interest in a Regulation S Global Composite Security wishes at any time to transfer its interest in such Global Security to a person who wishes to take delivery of it in the form of a Certificated Composite Security of the same Class, the Holder may, subject to the rules and procedures of Euroclear, Clearstream, or the Depository, as the case may be, transfer the interest for an

equivalent beneficial interest in one or more Certificated Composite Securities of the same Class as described below.  Upon receipt by the Indenture Registrar of:

(A) instructions given in accordance with the Depository's procedures from an Agent Member, or instructions from Euroclear, Clearstream, or the Depository, as the case may be, directing the Trustee to deliver one or more Certificated Composite Securities of the same Class, designating the registered name or names, address, payment instructions, the Class, and the number and principal amounts of the Certificated Composite Securities to be executed and delivered (the Class and the aggregate principal amounts of the Certificated Composite Securities being equal to the aggregate principal amount of such Global Security to be transferred), in authorized denominations,

(B) a certificate in the form of Exhibit B-6 given by the Holder of the beneficial interest and stating that the person transferring the interest in the Global Security reasonably believes that the person acquiring the interest in a Certificated Composite Security is either a Qualified Institutional Buyer or an Accredited Investor, is obtaining the beneficial interest in a transaction meeting the requirements of Rule 144A or in a transaction not requiring registration under the Securities Act and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction, and is also either (i) a Qualified Purchaser, (ii) a Knowledgeable Employee or (iii) an entity owned exclusively by Qualified Purchasers and/or Knowledgeable Employees, and

(C) a certificate in the applicable form of Exhibit B given by the transferee of the beneficial interest stating that it is both (x) either a Qualified Institutional Buyer or an Accredited Investor and (y) either (i) a Qualified Purchaser, (ii) Knowledgeable Employee or (iii) an entity owned exclusively by Qualified Purchasers and/or Knowledgeable Employees, and

then the Indenture Registrar shall instruct the Depository to reduce the applicable Global Security by the aggregate principal amount of the beneficial interest in the Global Security to be transferred and the Indenture Registrar shall record the transfer in the Indenture Register in accordance with Section 2.6(a) and authenticate and deliver one or more Certificated Composite Securities of the appropriate Class registered in the names specified in the certificate described in clause (B) above in principal amounts designated by the transferee (the aggregate of the amounts being equal to the beneficial interest in the Global Securities to be transferred) and in the minimum denominations and integral multiples in excess thereof as specified in Section 2.3.

If a Holder of a beneficial interest in a Regulation S Global Composite Security wishes at any time to exchange the interest in such Global Security for one or more Certificated Composite Securities of the same Class, the Holder may exchange the interest for an equivalent beneficial interest in one or more Certificated Composite Securities of the same Class as provided below.  Upon receipt by the Indenture Registrar of

(A) instructions given in accordance with the Depository's procedures from an Agent Member, or instructions from Euroclear,

90

Clearstream, or the Depository, as the case may be, directing the Trustee to deliver one or more Certificated Composite Securities and

(B)      written instructions from the Holder designating the registered name, address, and payment instructions of the Holder and the Class and the face amounts of the Certificated Composite Securities to be executed and delivered to the Holder (the Class and the aggregate face amounts of the Certificated Composite Securities being the same as the beneficial interest in the Global Security to be exchanged),

then the Indenture Registrar shall instruct the Depository to reduce the Global Security by the aggregate principal amount of the beneficial interest in the Global Security to be exchanged, shall record the exchange in the Indenture Register in accordance with Section 2.6(a), and authenticate and deliver one or more Certificated Composite Securities of the appropriate Class registered as specified in the instructions described in clause (A) above, in authorized denominations.

(v)      *Other Exchanges.*  If a Global Security is exchanged for Securities in definitive registered form without interest coupons pursuant to Section 2.11, the Securities may be exchanged for one another only in accordance with procedures substantially consistent with the provisions above (including certification requirements intended to insure that the transfers are made only to Holders who are QIB/QPs or are to non-U.S. persons, or otherwise comply with Regulation S, as the case may be), and as may be from time to time adopted by the Co-Issuers and the Trustee.

(g)      So long as a Certificated Composite Security remains Outstanding, transfers of a Certificated Composite Security, in whole or in part, shall only be made in accordance with this Section 2.6(g).

(i)      *Certificated Composite Security to Regulation S Global Composite Security.*  If a Holder of a Composite Security represented by a Certificated Composite Security wishes at any time to exchange the Certificated Composite Security for an interest in the corresponding Regulation S Global Composite Security, or to transfer the Certificated Composite Security to a person who wishes to take delivery of it in the form of an interest in the corresponding Regulation S Global Composite Security, the Holder may exchange or transfer the Security for an equivalent beneficial interest in the corresponding Regulation S Global Composite Security, if the proposed transferee or the person requesting the exchange, as applicable, is not a U.S. person.  Upon receipt by the Indenture Registrar of:

(A)      the Certificated Composite Security properly endorsed for the transfer, and written instructions from the Holder directing the Indenture Registrar to cause to be credited a beneficial interest in the Regulation S Global Composite Security of the same Class equal to the principal amount of the Certificated Composite Security,

(B)      a written order containing information regarding the Euroclear or Clearstream account to be credited with the increase,

(C)      a certificate in the form of Exhibit B-5, given by the Holder of the Certificated Composite Security stating that the exchange or transfer of the

91

interest has been made in compliance with the transfer restrictions applicable to the Regulation S Global Composite Security, including that the proposed transferee or the person requesting the exchange, as the case may be, is not a U.S. person and that the proposed transfer is being made pursuant to and in accordance with Regulation S, and

(D)     in the case of a transfer, a certificate in the appropriate form of Exhibit B given by the proposed transferee stating that it is not a U.S. person,

the Indenture Registrar shall cancel the Certificated Composite Security in accordance with Section 2.10, record the transfer in the Indenture Register in accordance with Section 2.6(a), and instruct the Depository to increase the principal amount of Regulation S Global Composite Security by the aggregate principal amount of the Certificated Composite Security to be exchanged or transferred, and to credit to the account of the person specified in the instructions a beneficial interest in the Regulation S Global Composite Security of the same Class equal to the amount specified in the instructions received pursuant to clause (A) above.

(ii)     *Certificated Composite Security to Certificated Composite Security.*  If a Holder of a Certificated Composite Security wishes at any time to transfer the Certificated Composite Security to a person who wishes to take delivery of it in the form of one or more Certificated Composite Securities of the same Class, the Holder may transfer the Security as provided below.  Upon receipt by the Indenture Registrar of

(A)     the Holder's Certificated Composite Security properly endorsed for the transfer, and

(B)     a certificate in the applicable form of Exhibit B given by the transferee of the Certificated Composite Security,

then the Indenture Registrar shall cancel the Certificated Composite Security in accordance with Section 2.10, record the transfer in the Indenture Register in accordance with Section 2.6(a), and upon execution by the Applicable Issuers authenticate and deliver one or more Certificated Composite Securities bearing the same designation as the Certificated Composite Securities endorsed for transfer, registered in the names specified in the assignment described in clause (A) above, in principal amounts designated by the transferee (the aggregate of the principal amounts being equal to the aggregate principal amount of the Certificated Composite Securities surrendered by the transferor), and in authorized denominations.

(iii)     *Exchange of Certificated Composite Securities.*  If a Holder of one or more Certificated Composite Securities wishes at any time to exchange the Certificated Composite Securities for one or more Certificated Composite Securities of the same Class of different face amounts, the Holder may exchange the Certificated Composite Security for Certificated Composite Securities bearing the same designation as the Certificated Composite Securities endorsed for exchange as provided below.  Upon receipt by the Applicable Issuers and the Indenture Registrar of (A) the Holder's Certificated Composite Securities properly endorsed for the exchange and (B) written instructions from the Holder designating the face amounts of the Certificated Composite Securities to be issued (the aggregate of the face amounts being equal to the

92

aggregate face amount of the Certificated Composite Securities surrendered for exchange), then the Indenture Registrar shall cancel the Certificated Composite Securities in accordance with Section 2.10, record the exchange in the Indenture Register in accordance with Section 2.6(a), and upon execution by the Applicable Issuers authenticate and deliver one or more Certificated Composite Securities bearing the same designation as the Certificated Composite Securities endorsed for exchange, registered in the same names as the Certificated Composite Securities surrendered by the Holder, in different face amounts designated by the Holder, and in authorized denominations.

(h)　　The Components of the Composite Securities, whether in the form of Certificated Preference Shares, Regulation S Global Preference Shares or the Treasury Strip, are not separately transferable.  For the avoidance of doubt, a Holder of a Class 1 Composite Security may not exchange its Class 1 Composite Security for proportional interests in the underlying securities represented by the Components thereof.

(i)　　If Securities are issued upon the transfer, exchange, or replacement of Securities bearing the applicable legends in the applicable <u>Exhibit A</u>, and if a request is made to remove the legend on the Securities, the legend shall not be removed unless the Trustee and the Applicable Issuers received satisfactory evidence, which may include an Opinion of Counsel acceptable to them, reasonably required by the Applicable Issuers (and which shall by its terms permit reliance by the Trustee), to the effect that neither the legend nor the restrictions on transfer in it are required to ensure that transfers of the Securities comply with the Securities Act, the 1940 Act, ERISA, and the Code.  Upon provision of satisfactory evidence, the Trustee or its Authenticating Agent, at the written direction of the Applicable Issuers shall, after due execution by the Applicable Issuers authenticate and deliver Securities that do not bear the applicable legend.

(j)　　Notwithstanding anything contained in this Section 2.6 to the contrary:

(i)　　<u>Restrictions on U.S. Transfers</u>.  Transfers of an interest in a Regulation S Global Security that are not made in an offshore transaction pursuant to Regulation S or are made to U.S. Persons, if such transferees take delivery in the form of an interest in a Rule 144A Global Note or a Certificated Composite Security, shall be limited to transfers made pursuant to the provisions of Section 2.6(f)(iii) and Section 2.6(f)(iv).

(ii)　　Beneficial interests in a Regulation S Global Security may only be held through Euroclear or Clearstream.

(k)　　Each person who becomes a beneficial owner of a Note or Composite Security evidenced by: (i) an interest in a Certificated Composite Security or Definitive Security, shall make the representations, warranties and agreements set forth in the applicable Transferee Certificate set forth in <u>Exhibit B</u> upon such person's purchase or other acquisition of the relevant Certificated Composite Security or Definitive Security and (ii) an interest in a Global Security, shall be deemed to make (or, in the case of a Class 1 Composite Security, represented by a Global Security purchased in the Offering of the Securities, will be required to make) the representations, warranties and agreements set forth in the applicable legends of the Securities set forth in <u>Exhibit A</u> hereto and in the applicable Transferee Certificate set forth in <u>Exhibit B</u> hereto upon such person's purchase or other acquisition of the relevant Global Security.

(l)     The aggregate principal amount of any Global Security may be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC for the Global Security, which adjustments shall be conclusive as to the aggregate principal amount of any Global Security.

(m)     Any purported transfer of a Security not in accordance with this Section 2.6 shall be null and void.

Section 2.7.     ***Mutilated, Destroyed, Lost, or Stolen Securities.***

If the Applicable Issuers, the Trustee, and the relevant Transfer Agent receive evidence to their satisfaction of the destruction, loss, or theft of any Security, and they receive the security or indemnity they require to hold each of them harmless, or if any mutilated Security is surrendered to a Transfer Agent, then, in the absence of notice to the Applicable Issuers, the Trustee, or the Transfer Agent that the Security has been acquired by a protected purchaser, the Applicable Issuers shall execute and the Trustee shall authenticate and deliver, in exchange for the mutilated, destroyed, lost, or stolen Security, a replacement Security, of like tenor and equal principal amount.

If, after delivery of the replacement Security or payment on it, a protected purchaser of the predecessor Security presents it for payment, transfer, or exchange, the Applicable Issuers, the Transfer Agent, and the Trustee may recover the replacement Security (or the payment on it) from the person to whom it was delivered or any person taking the replacement Note from the person to whom the replacement Note was delivered or any assignee of that person, except a protected purchaser, and may recover on the security or indemnity provided therefor to the extent of any loss, damage, cost, or expense incurred by the Applicable Issuers, the Trustee, and the Transfer Agent in connection with it.

If any mutilated, destroyed, lost, or stolen Security has become payable, the Applicable Issuers in their discretion may, instead of issuing a new Security pay the Security without requiring its surrender except that any mutilated Security shall be surrendered.

Upon the issuance of any new Security under this Section, the Applicable Issuers or the Trustee may require the payment by its holder of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with the issuance and any other expenses (including the fees and expenses of the Trustee) connected with it.

Every new Security issued pursuant to this Section in replacement for any mutilated, destroyed, lost, or stolen Security shall be an original additional contractual obligation of the Applicable Issuers and the new Security shall be entitled to all the benefits of this Indenture equally and proportionately with all other Securities of the same Class duly issued under this Indenture.

The provisions of this Section are exclusive and shall preclude (to the extent lawful) all other rights with respect to the replacement or payment of mutilated, destroyed, lost, or stolen Securities.

Section 2.8. ***Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved; Withholding.***

(a)     The Notes of each Class shall accrue interest during each Interest Period on their Aggregate Outstanding Amount (determined as of the first day of the Interest Period and after giving effect to any redemption or other payment of principal occurring on that day) at the Applicable Note Interest Rate.  Interest shall be payable in arrears on each Payment Date. Payment of interest on each Class of Notes shall be subordinated to the payments of interest on the related Priority Classes and other amounts in accordance with the Priority of Payments.

So long as any Priority Classes are Outstanding with respect to any Class of Deferred Interest Notes, any payment of interest due on the Class of Deferred Interest Notes that is not available to be paid ("***Deferred Interest***") in accordance with the Priority of Payments on any Payment Date shall not be considered "payable" for the purposes of this Indenture (and the failure to pay the interest shall not be an Event of Default) until the Payment Date on which the interest is available to be paid in accordance with the Priority of Payments.  Deferred Interest on any Class of Deferred Interest Notes shall be payable on the first Payment Date on which funds are available to be used for that purpose in accordance with the Priority of Payments.

Interest shall cease to accrue on each Note, or in the case of a partial repayment, on the part repaid, from the date of repayment or the respective Stated Maturity unless payment of principal is improperly withheld or unless there is some other default with respect to the payments of principal.

To the extent lawful and enforceable, interest on Deferred Interest with respect to any Class of Deferred Interest Notes shall accrue at the Note Interest Rate for the Class (and to the extent not paid as current interest on the Payment Date after the Interest Period in which it accrues, shall thereafter be additional Deferred Interest, until paid as provided in this Indenture.

(b)     The principal of each Note of each Class matures at par and is payable on the Payment Date that is the Stated Maturity for the Class of Notes, unless the unpaid principal of the Note becomes payable at an earlier date by declaration of acceleration, call for redemption, or otherwise.  Notwithstanding the foregoing, the payment of principal of each Class of Notes:

(i)     may only occur after principal on each Class of Notes that is a Priority Class with respect to the Class has been paid in full and

(ii)     is subordinated to the payment on each Payment Date of the principal and interest payable on the Priority Classes, and other amounts in accordance with the Priority of Payments.

(c)     Principal payments on the Notes shall be made in accordance with the Priority of Payments and Section 9.1.

(d)     As a condition to the payment of principal of and interest on any Security without the imposition of U.S. withholding tax, the Paying Agent shall require the previous delivery of appropriate properly completed and signed United States federal income tax certifications (generally, an Internal Revenue Service Form W-9 (or applicable successor form) in the case of a person that is a "United States person" within the meaning of Section 7701(a)(30) of the Code or an appropriate Internal Revenue Service Form W-8 (or applicable successor form) in the case of a person that is not a "United States person" within the meaning

95

of Section 7701(a)(30) of the Code) or any other certification acceptable to it to enable the Issuer, the Co-Issuer, the Trustee, and any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to deduct or withhold from payments on the Security under any present or future law of the United States or any present or future law of any political subdivision of the United States or taxing authority in the United States or to comply with any reporting or other requirements under any such law.

(e)     Payments in respect of interest on and principal of any Note shall be made by the Trustee, or by the Irish Listing and Paying Agent, if applicable, in U.S. Dollars to the Depository or its designee with respect to a Global Security and to the Holder or its nominee with respect to a Certificated Composite Security or a Definitive Security, by wire transfer, as directed by the Holder, in immediately available funds to a U.S. Dollar account maintained by the Depository or its nominee with respect to a Global Security, and to the Holder or its designee with respect to a Certificated Composite Security or a Definitive Security, in the case of a Certificated Composite Security or a Definitive Security, its holder has provided written wiring instructions to the Trustee and, if the payment is to be made by the Irish Listing and Paying Agent, the Irish Listing and Paying Agent, on or before the related Record Date. Payments in respect of interest on and principal of any Preference Share payable to the Preference Shares Paying Agent in accordance with the Priority of Payments for payments on the Preference Shares in accordance with the Preference Share Documents shall be payable by wire transfer in immediately available funds (or by internal transfer if the Trustee and the Preference Shares Paying Agent are the same Person) to the Preference Shares Distribution Account.

If appropriate instructions for the wire transfer are not received by the related Record Date, then the payment will be made by check drawn on a U.S. bank mailed to the address of the Holder in the Indenture Register. Upon final payment due on the Maturity of a Note, its holder shall present and surrender the Note at the office designated by the Trustee on or before the Maturity. If the Trustee and the Applicable Issuers have been furnished the security or indemnity they require to save each of them harmless and an undertaking thereafter to surrender the certificate, then, in the absence of notice to the Applicable Issuers or the Trustee that the applicable Note has been acquired by a protected purchaser, the final payment shall be made without presentation or surrender. In the case of Components to be redeemed, the related Composite Securities do not need to be surrendered at the office of any paying agent under this Indenture to receive the applicable Redemption Price. Neither the Co-Issuers, the Trustee, nor any Paying Agent shall have any responsibility or liability for any aspects of the records maintained by Euroclear, Clearstream, or any of the Agent Members relating to or for payments made thereby on account of beneficial interests in a Global Security.

In the case where any final payment of principal and interest is to be made on any Note (other than on its Stated Maturity and except as otherwise provided in this Indenture), the Trustee, in the name and at the expense of the Applicable Issuers shall, not more than 30 nor less than 10 days before the date on which the payment is to be made, mail (by first-class mail, postage prepaid) to the persons entitled thereto at their addresses appearing on the Indenture Register, a notice specifying the date on which the payment will be made, the amount of the payment per U.S.$100,000 original principal amount of Notes and the place where the Notes may be presented and surrendered for payment.

The final payment on any Composite Security shall be made only upon surrender of the certificate for the Composite Security to the Trustee at the office designated by the Trustee. If the Trustee and the Issuer have been furnished any security or indemnity they require to save

each of them harmless and an undertaking thereafter to surrender the certificate, then, in the absence of notice to the Issuer or the Trustee that the applicable certificate has been acquired by a protected purchaser, final payment shall be made without presentation or surrender of the applicable certificate.

(f)     Payments of principal to Holders of the Notes of each Class shall be made in the proportion that the Aggregate Outstanding Amount of the Notes of the Class registered in the name of each Holder on the applicable Record Date bears to the Aggregate Outstanding Amount of all Notes of the Class on the Record Date.

(g)     Interest accrued shall be calculated (i) in the case of the Notes (other than the Fixed Rate Notes) on the basis of the actual number of days elapsed in the applicable Interest Period divided by 360 and (ii) in the case of the Fixed Rate Notes on the basis of a 360-day year consisting of twelve 30-day months.

(h)     All reductions in the principal amount of a Security (or one or more predecessor Securities) effected by payments of installments of principal made on any Payment Date or Redemption Date shall be binding on all future Holders of the Security and of any Security issued upon the registration of its transfer, exchange, or replacement, whether or not the payment is noted on the Security.

(i)     Notwithstanding any other provision of this Indenture, the obligations of the Applicable Issuers under the Notes and the Class 1 Components and under this Indenture are limited recourse obligations of the Applicable Issuers payable solely from the Collateral and the Class 1 Collateral (as applicable) and following realization of the assets, application of their proceeds in accordance with this Indenture and the reduction of the proceeds of the Collateral to zero, all obligations of, and any claims against, the Co-Issuers under this Indenture or under the Securities or arising in connection therewith shall be extinguished and shall not thereafter revive. No recourse shall be had against any Officer, director, employee, shareholder, or incorporator of either of the Co-Issuers or their respective successors or assigns for any amounts payable under the Securities or this Indenture. The foregoing provisions of this paragraph (i) shall not (1) prevent recourse to the Collateral and the Class 1 Collateral (as applicable) for the sums due or to become due under any security, instrument, or agreement that is part of the Collateral or the Class 1 Collateral (as applicable) or (2) be a waiver, release, or discharge of any indebtedness or obligation evidenced by the Securities or secured by this Indenture until the Collateral or the Class 1 Collateral (as applicable) have been realized. The foregoing provisions of this paragraph (i) shall not limit the right of any person to name the Issuer or the Co-Issuer as a party defendant in any Proceeding or in the exercise of any other remedy under the Notes or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability is sought or (if obtained) enforced against the person.

(j)     If any withholding tax is imposed on the Issuer's payment (or allocations of income) under the Securities to any Noteholder or Composite Securityholder, as applicable, the tax shall reduce the amount otherwise distributable to the Noteholder or Composite Securityholder, as applicable. The Trustee is hereby authorized and directed to retain from amounts otherwise distributable to any Noteholder or Composite Securityholder sufficient funds for the payment of any tax that is legally owed, or required by law to be collected, by or on behalf of the Issuer (but the authorization shall not prevent the Trustee or the Issuer from contesting any such tax in appropriate proceedings and withholding payment of the tax, if permitted by law, pending the outcome of the proceedings). The amount of any withholding tax imposed with respect to any Noteholder or Composite Securityholder shall be treated as Cash

distributed to the Noteholder or Composite Securityholder when it is withheld by the Trustee and remitted to the appropriate taxing authority. If there is a possibility that withholding tax is payable with respect to a distribution, the Trustee may in its sole discretion withhold the amounts in accordance with this Section 2.8(j). If any Noteholder or Composite Securityholder wishes to apply for a refund of any such withholding tax, the Trustee shall reasonably cooperate with the Noteholder or Composite Securityholder in making the claim by providing information readily available to the Trustee so long as the Noteholder or Composite Securityholder agrees to reimburse the Trustee for any out-of-pocket expenses incurred and provides the Trustee with security reasonably acceptable to the Trustee assuring the reimbursement. The Trustee hereby provides notice to each Noteholder or Composite Securityholder that the failure by the Noteholder or Composite Securityholder to provide the Trustee with appropriate tax certifications may result in amounts being withheld from payments to the Noteholder or Composite Securityholder. Nothing in this Indenture shall impose an obligation on the part of the Trustee to determine the amount of any tax or withholding obligation on the part of the Issuer or in respect of the Securities.

Section 2.9.     ***Persons Considered Owners.***

The Issuer, the Co-Issuer, the Trustee, and any agent of the Co-Issuers or the Trustee may treat as the owner of the Security the person in whose name any Security is registered on the Indenture Register on the applicable Record Date for the purpose of receiving payments of principal of and interest on the Security and on any other date for all other purposes whatsoever (whether or not the Security is overdue), and neither the Issuer, the Co-Issuers, nor the Trustee nor any agent of the Issuer, the Co-Issuer, or the Trustee shall be affected by notice to the contrary. The Portfolio Manager shall notify the Trustee of any Affiliate of the Portfolio Manager that owns the Securities or Preference Shares.

Section 2.10.     ***Cancellation.***

All Securities surrendered for payment, registration of transfer, exchange, or redemption, or lost or stolen, shall be promptly canceled by the Trustee and may not be reissued or resold. No Securities shall be authenticated in lieu of or in exchange for any Securities canceled as provided in this Section 2.10, except as expressly permitted by this Indenture. All canceled Securities held by the Trustee shall be destroyed by the Trustee in accordance with its standard policy unless the Co-Issuers direct by an Issuer Order delivered to the Trustee prior to cancellation and destruction that they be returned to the Issuer.

Section 2.11.     ***Definitive Securities.***

(a)     A Global Security deposited with the Depository pursuant to Section 2.2 shall be transferred in the form of a Definitive Security to their beneficial owners only if the transfer complies with Section 2.6 and either

(i)     the Depository notifies the Co-Issuers that it is unwilling or unable to continue as Depository for the Global Security or

(ii)     if at any time the Depository ceases to be a Clearing Agency registered under the Exchange Act and, in each case, a successor depository is not appointed by the Co-Issuers within 90 days after the notice.

(b)     Any Global Security that is transferable in the form of a Definitive Security to its beneficial owners pursuant to this Section 2.11 shall be surrendered by the Depository to the office of the Trustee's agent located in the City of New York, New York as specified in Section 7.2 (or any other office designated by the Trustee) to be so transferred, in whole or from time to time in part, without charge, and the Applicable Issuers shall execute and the Trustee shall authenticate and deliver, upon the transfer of each portion of the Global Security, an equal aggregate principal amount of definitive physical certificates (pursuant to the instructions of the Depository) (each, a "*Definitive Security*") in authorized denominations. Any Definitive Security delivered in exchange for an interest in a Global Security, as applicable, shall, except as otherwise provided by Section 2.6(i), bear the legends in the applicable portion of Exhibit A and shall be subject to the transfer restrictions referred to in the legends.

(c)     The Holder of a Global Security may grant proxies and otherwise authorize any person, including Agent Members and persons that may hold interests through Agent Members, to take any action which a Holder is entitled to take under this Indenture or the Securities, as applicable.

(d)     Upon the occurrence of either of the events specified in Section 2.11(a)(i) and (ii), the Co-Issuers shall promptly make available to the Trustee a reasonable supply of Definitive Securities in definitive, fully registered form without interest coupons.

The Definitive Securities shall be in substantially the same form as the Global Securities, with any changes the Issuer and Trustee agree to and the Applicable Issuers shall execute, and the Trustee shall authenticate and deliver, in exchange therefor, the same aggregate principal amount of Definitive Securities of authorized denominations.

Section 2.12.     ***Securities Beneficially Owned by Persons Not QIB/QPs or Qualified Purchasers.***

(a)     Notwithstanding anything to the contrary elsewhere in this Indenture, any transfer of a beneficial interest in any (i) Global Security to a U.S. person (for purposes of this Section 2.12 as defined in Regulation S) that is not a QIB/QP or (ii) Certificated Composite Security to a U.S. person that is not an Accredited Investor and a Qualified Purchaser, and that is not in each case made pursuant to an applicable exemption under the Securities Act, shall be void and any such purported transfer of which the Issuer, the Co-Issuer, or the Trustee has notice may be disregarded by the Issuer, the Co-Issuer, and the Trustee for all purposes.

(b)     After discovery by the Issuer, the Co-Issuer, or the Trustee (and notice by the Trustee or the Co-Issuer to the Issuer, if either of them makes the discovery), that a person is a Non-Permitted Holder, the Issuer shall promptly send notice to the Non-Permitted Holder demanding that the Non-Permitted Holder transfer its interest to a person that is not a Non-Permitted Holder within 30 days of the date of the notice. If the Non-Permitted Holder fails to so transfer its Notes, Composite Securities, or interest in the Securities, without further notice to the Non-Permitted Holder, the Issuer may sell the Notes, Composite Securities, or interest in the Securities to a purchaser selected by the Issuer that is a not a Non-Permitted Holder on any terms the Issuer chooses. The Issuer, or the Trustee acting on behalf of the Issuer, may select the purchaser by soliciting bids (or by appointing an investment bank at the expense of the Issuer to solicit bids) from brokers or other market professionals that regularly deal in securities similar to the Securities, and selling the Securities, or interest in the Securities to the highest bidder. However, the Issuer or the Trustee may select a purchaser by any other means determined by it in its sole discretion. The Holder of each Security, the beneficial owner of

each interest in a Security, the Non-Permitted Holder, and each other person in the chain of title from the Holder or beneficial owner to the Non-Permitted Holder, by its acceptance of an interest in the Securities agrees to cooperate with the Issuer and the Trustee to effect the transfers. The proceeds of the sale, net of any commissions, expenses of the Trustee or otherwise, and taxes due in connection with the sale shall be remitted to the Non-Permitted Holder. The terms of any sale under this subsection shall be determined in the sole discretion of the Issuer (or the Trustee acting on its behalf), and the Issuer and the Trustee shall not be liable to any person having an interest in the Securities sold as a result of any such sale or the exercise of its discretion.

## ARTICLE 3

### CONDITIONS PRECEDENT

Section 3.1.    *Conditions to Issuance of Securities on Closing Date.*

The Securities to be issued on the Closing Date shall be executed by the Applicable Issuers and delivered to the Trustee for authentication and thereupon the same shall be authenticated and delivered by the Trustee upon Issuer Order and upon receipt by the Trustee of the following:

(i)    *Officers' Certificates of the Co-Issuers Regarding Corporate Matters*. An Officer's certificate of each of the Co-Issuers:

(A)    (1) evidencing (x) the authorization by Board Resolution of the execution and delivery of this Indenture and the Purchase Agreement and, in the case of the Issuer, the Management Agreement, the Preference Shares Paying Agency Agreement, the Collateral Administration Agreement, the Insurance Documents and the Hedge Agreements being entered into on or before the Closing Date (if any), and related transaction documents and (y) the execution, authentication, and delivery of the Notes and Composite Securities applied for by it and specifying the Stated Maturity, principal amount, and, with respect to the Notes, the Note Interest Rate of each Class of Notes to be authenticated and delivered and (2) evidencing the authorization by Board Resolution of the issuance, terms and number of Preference Shares issued on the Closing Date, and that each of the foregoing is in accordance with the terms of the Board Resolution, and

(B)    certifying that (1) the attached copy of the Board Resolution is an accurate copy, (2) the resolutions have not been rescinded and are in full force on and as of the Closing Date, and (3) the Officers authorized to execute and deliver the documents hold the offices and have the signatures indicated on the documents.

(ii)    *Governmental Approvals*.  From each of the Co-Issuers either:

(A)    a certificate of the Applicable Issuer or other official document evidencing the due authorization, approval, or consent of any governmental bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel of the Applicable Issuer that no other authorization, approval, or

100

consent of any governmental body is required for the valid issuance of the Securities applied for by it, or

(B)     an Opinion of Counsel of the Applicable Issuer that no authorization, approval, or consent of any governmental body is required for the valid issuance of the Securities except as have been given.

(iii)     *Co-Issuers' and Portfolio Manager's U.S. Counsel Opinion.*  An opinion of McKee Nelson LLP, special U.S. counsel to the Co-Issuers, and Orrick, Herrington & Sutcliffe LLP, counsel to the Portfolio Manager, including 10b-5 letter, dated the Closing Date, substantially in the forms of Exhibit C and Exhibit F.

(iv)     *Issuer's Cayman Counsel Opinion.*  An opinion of Maples and Calder, Cayman Islands counsel to the Issuer, dated the Closing Date, substantially in the form of Exhibit D.

(v)     *Trustee's Counsel Opinion.*  An opinion of Gardere Wynne Sewell LLP, counsel to the Trustee, dated the Closing Date, substantially in the form of Exhibit E.

(vi)     *Officers' Certificates of Co-Issuers Regarding Indenture.*  An Officer's certificate of each of the Co-Issuers stating that, to the best of the Officer's knowledge,

(A)     the Applicable Issuer is not in default under this Indenture and that the issuance of the Securities applied for by it will not result in a default or a breach of, or be a default under, its organizational documents, any indenture or other agreement or instrument to which it is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which it is a party or by which it may be bound or to which it may be subject;

(B)     all conditions precedent in this Indenture relating to the authentication and delivery of the Securities have been complied with; and

(C)     all expenses due or accrued with respect to the Offering or relating to actions taken on or in connection with the Closing Date have been paid or reserves therefor have been made.

The Officer's certificate of the Issuer shall also state that, to the best of the Officer's knowledge, all of its representations and warranties contained in this Indenture are accurate as of the Closing Date.

(vii)     *Hedge Agreements.*  Executed copies of the Hedge Agreements being entered into on or entered into before the Closing Date, if any.

(viii)     *Management Agreement.*  Executed copy of the Management Agreement.

(ix)     *Preference Shares.*  Copies of executed Preference Share certificates to be issued on the Closing Date.

(x)     *Preference Share Documents.*  An executed counterpart of each of the Preference Share Documents.

(xi)     *Collateral Administration Agreement*.  Executed copy of the Collateral Administration Agreement.

(xii)     *Insurance Documents.*  An executed counterpart of each of the Insurance Documents

(xiii)     *Grant of Collateral Obligations*.  Evidence of the Grant pursuant to the Granting Clauses of this Indenture of all of the Issuer's interest in the Collateral Obligations and the Treasury Strip pledged to the Trustee for inclusion in the Collateral and the Class 1 Collateral, as applicable, on the Closing Date and Delivery of the Collateral Obligations (including any promissory notes and all other Underlying Instruments related to them to the extent received by the Issuer) and the Treasury Strip to the Trustee or the Custodian as contemplated by Section 3.2.

(xiv)     *Certificate of the Portfolio Manager.*  A certificate of an Authorized Officer of the Portfolio Manager, dated as of the Closing Date, to the effect that, to the best knowledge of the Portfolio Manager, in the case of each Collateral Obligation pledged to the Trustee for inclusion in the Collateral, as the case may be, on the Closing Date and immediately before the delivery of the Collateral Obligation on the Closing Date:

(A)     the "row/column combination" of the table appearing in the definition of "Ratings Matrix" selected by the Portfolio Manager on the Closing Date;

(B)     the information with respect to the Collateral Obligation in the Schedule of Collateral Obligations is correct; and

(C)     the Collateral Obligation satisfies the requirements of the definition of "Collateral Obligation" and of Section 3.1(xxi)(B);

(xv)     *Rating Letters*.  An Officer's certificate of the Issuer to the effect that attached is an accurate copy of a letter signed by each Rating Agency and confirming that each Class of Securities rated by the Rating Agency has been assigned the applicable Initial Rating and that the ratings are in full force on the Closing Date.

(xvi)     *Accounts.*  Evidence that each of the Accounts has been established.

(xvii)     *Issuer Order for Deposit of Funds into Accounts*.  An Issuer Order signed in the name of the Issuer by an Authorized Officer of the Issuer, dated as of the Closing Date, authorizing the deposit of approximately U.S.$276,000,000 into the Collection Account for use pursuant to Section 7.19, the deposit of approximately U.S.$18,300,000 into the Closing Date Expense Account for use pursuant to Section 10.3(g) and the deposit of approximately U.S.$2,000,000 into the Interest Reserve Account for use pursuant to Section 10.3(i).

(xviii)  *Irish Listing*.  An Officer's certificate of the Issuer to the effect that application has been made to the Irish Stock Exchange to admit the Securities to the Daily Official List.

(xix)  *Issuer Order for Authentication of Securities*.  An Issuer Order signed in the name of the Issuer by an Authorized Officer of the Issuer, dated as of the Closing Date, directing the Trustee to authenticate the Securities in the amounts, in the registered names, and with the CUSIP numbers in the Issuer Order.

(xx)  *Accountants' Certificate.*  An Accountants' Certificate (A) confirming the information with respect to each Collateral Obligation on the Schedule of Collateral Obligations attached as Schedule 1, (B) confirming that the Aggregate Principal Balance of the Collateral Obligations that the Issuer has committed to purchase in accordance with customary settlement procedures in the relevant markets, is at least U.S.$497,250,000, that each Concentration Limitation is satisfied taking into account all of the Collateral Obligations acquired as of the Closing Date (including binding agreements to purchase Collateral Obligations in effect on the Closing Date), that the Weighted Average Spread Test is satisfied as of the Closing Date, that the Weighted Average Rating Factor Test is satisfied as of the Closing Date, that the Weighted Average Life Test is satisfied as of the Closing Date, that each Overcollateralization Test is satisfied as of the Closing Date, that the Weighted Average Moody's Recovery Rate Test is satisfied as of the Closing Date, that the Weighted Average S&P Recovery Rate Test is satisfied as of the Closing Date and that the Weighted Average Fixed Rate Coupon Test is satisfied as of the Closing Date and a calculation of the Diversity Score, (C) specifying the procedures undertaken by them to review data and computations relating to this Section 3.1(xx) and (D) confirming the weighted average purchase price of the Collateral Obligations.

(xxi)  *Certificate of the Issuer Regarding Collateral*.  A certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, to the effect that, to the knowledge of the Issuer, in the case of each Collateral Obligation pledged to the Trustee for inclusion in the Collateral, as the case may be, on the Closing Date and immediately before the delivery of the Collateral Obligation on the Closing Date:

(A)  the Issuer is the owner of the Collateral Obligation free of any liens, claims, or encumbrances of any nature whatsoever except for those that are being released on the Closing Date and except for those Granted pursuant to or permitted by this Indenture;

(B)  the Issuer has acquired its ownership in the Collateral Obligation in good faith without notice of any adverse claim, except as described in paragraph (A) above;

(C)  the Issuer has not assigned, pledged, or otherwise encumbered any interest in the Collateral Obligation (or, if any interest in the Collateral Obligation has been assigned, pledged, or otherwise encumbered, it has been released before the Closing Date or is being released on the Closing Date) other than interests Granted pursuant to or permitted by this Indenture;

(D)  the Issuer has full right to Grant a security interest in and assign and pledge the Collateral Obligation to the Trustee;

103

(E)     upon Grant by the Issuer, the Trustee has a first priority perfected security interest in the Collateral Obligations and the other Collateral; and

(F)     based solely on the Accountant's Certificate set forth in clause (xx) above, the weighted average purchase price of the Collateral Obligations in the Portfolio as of the Closing Date is at least 90% of the aggregate par amount thereof.

(xxii)   *Certificate of the Issuer Regarding Important Section 3(c)(7) Reminder Notice.*  A certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, to the effect that, on or prior to the Closing Date the Issuer provided to the Depository the Important Section 3(c)(7) Reminder Notice, substantially in the form of Exhibit H-2.

(xxiii)   *Other Documents.*  Any other documents the Trustee reasonably requires.  Nothing in this clause (xxiii) shall imply or impose a duty on the part of the Trustee to require any other documents.

Section 3.2.     ***Custodianship; Delivery of Collateral Obligations and Eligible Investments.***

(a)     The Portfolio Manager, on behalf of the Issuer, shall deliver or cause to be delivered to a custodian appointed by the Issuer, which shall be a Securities Intermediary (the "***Custodian***"), all Collateral in accordance with the definition of "Deliver."  Initially, the Custodian shall be JPMorgan Chase Bank, National Association.  Any successor custodian shall be a state or national bank or trust company that is not an Affiliate of the Issuer or the Co-Issuer and has capital and surplus of at least U.S.$200,000,000 and is a Securities Intermediary.  Subject to the limited right to relocate Pledged Obligations as provided in Section 7.5(b), the Trustee shall hold all Collateral Obligations, Eligible Investments, other investments purchased in accordance with this Indenture (other than Loans, Participations and general intangibles) and Cash in the relevant Account established and maintained pursuant to Article 10, as to which in each case the Trustee shall have entered into an agreement with the Custodian substantially in the form of Exhibit G providing, inter alia, that the establishment and maintenance of the Account shall be governed by the law of the State of New York.  Initially, the Custodian for each Account shall be JPMorgan Chase Bank, National Association.

(b)     Each time that the Issuer, or the Portfolio Manager on behalf of the Issuer, directs or causes the acquisition of any Collateral Obligation, Eligible Investment, or other investments, the Portfolio Manager (on behalf of the Issuer) shall, if the Collateral Obligation, Eligible Investment, or other investment is required to be, but has not already been, transferred to the relevant Account, cause the Collateral Obligation, Eligible Investment, or other investment to be Delivered to the Custodian to be held in the Custodial Account (or in the case of any such investment that is not a Collateral Obligation, in the Account in which the funds used to purchase the investment are held in accordance with Article 10) for the benefit of the Trustee in accordance with this Indenture.  The security interest of the Trustee in the funds or other property used in connection with the acquisition shall, immediately and without further action on the part of the Trustee, be released.  The security interest of the Trustee shall nevertheless come into existence and continue in the Collateral Obligation, Eligible Investment, or other investment so acquired, including all interests of the Issuer in to any contracts related to and proceeds of the Collateral Obligations, Eligible Investments, or other investments.

104

Section 3.3.        *Representations as to Collateral.*

(a)        The Issuer hereby represents and warrants to the Secured Parties as to the Collateral and to the Holders of the Class 1 Composite Securities as to the Class 1 Collateral as follows (which representations are repeated on each day on which the Issuer acquires new Collateral or new Class 1 Collateral):

(i)        This Indenture creates a valid and continuing security interest (as defined in the applicable Uniform Commercial Code) in the Collateral and the Class 1 Collateral in favor of the Trustee, which security interest is prior to all other liens, charges, claims, security interests, mortgages, and other encumbrances, and is enforceable as such as against creditors of and purchasers from the Issuer.

(ii)        The Issuer has good and marketable title to and is the owner of each item of Collateral and Class 1 Collateral free of any liens, claims, or encumbrances of any nature whatsoever except for liens (A) that are being released on the Closing Date and (B) granted pursuant to or permitted by this Indenture.

(iii)        The Issuer has not assigned, pledged, or otherwise encumbered any interest in the Collateral or the Class 1 Collateral (or, if any interest in the Collateral or the Class 1 Collateral has been assigned, pledged, or otherwise encumbered, it has been released before the Closing Date or is being released on the Closing Date) other than interests granted pursuant to or permitted by this Indenture.

(iv)        The Issuer has full right, and has received all consents and approvals required by the related Underlying Instruments, to grant a security interest in its rights in the Collateral and the Class 1 Collateral to the Trustee.

(v)        Each Collateral Obligation included in the Collateral satisfied the requirements of the definition of "Collateral Obligation" as of the date the Issuer committed to purchase the same or, in the case of the Warehoused Loans, as of the Closing Date.

(vi)        All Collateral Obligations, any obligation that at the time of acquisition, conversion, or exchange did not satisfy the requirements of a Collateral Obligation, and Eligible Investments (other than, in each case, "general intangibles" within the meaning of the applicable Uniform Commercial Code) have been and will have been credited to one of the Accounts.  The securities intermediary for each Account has agreed to treat all assets credited to the Accounts as "financial assets" within the meaning of the applicable Uniform Commercial Code.

(vii)        The Issuer has pledged to the Trustee all of the Issuer's interest in the Class 1 Collateral and each Collateral Obligation included in the Collateral pursuant to the Granting Clauses of this Indenture and has delivered the Class 1 Collateral and each Collateral Obligation (including any promissory note and all its other Underlying Instruments to the extent received by the Issuer) to the Trustee or the Custodian as contemplated by Section 3.2.

(viii)        Each of the Class 1 Collateral and the Collateral constitutes "general intangibles," "certificated securities," "instruments," "securities entitlements," "uncertificated securities," each within the meaning of the applicable Uniform

105

Commercial Code, or any other category of collateral under the applicable Uniform Commercial Code as to which the has complied with its obligations under Section 3.3(b).

(ix)     The Issuer has caused (or will have caused within 10 days following the Closing Date) the filing of appropriate financing statements in the proper filing offices in the appropriate jurisdictions under applicable law to perfect the security interest in the portion of the Collateral and the Class 1 Collateral pledged to the Trustee under this Indenture that may be perfected by the filing of financing statements.

(x)     The Issuer has not authorized the filing of and is not aware of any financing statements against the Issuer that include a description of collateral covering the Collateral or the Class 1 Collateral other than any financing statement (A) relating to the security interest granted to the Trustee under this Indenture, (B) that has been terminated, or (C) that names the Trustee as the secured party.  On the date of this Indenture, the Issuer is not aware of any judgment or Pension Benefit Guaranty Corporation or tax lien filings against the Issuer.

(xi)     The Issuer has delivered to the Trustee a fully executed agreement pursuant to which the securities intermediary for each Account has agreed to comply with all instructions originated by the Trustee relating to the Account without further consent by the Issuer.

(xii)     All original executed copies of each "instrument" (as defined in each applicable Uniform Commercial Code) that are or evidence the Collateral or the Class 1 Collateral have been delivered to the Custodian, to the extent received by the Issuer. The Issuer has received a written acknowledgment from the Custodian that the Custodian is holding all the instruments delivered to it that are or evidence the Collateral or the Class 1 Collateral solely on behalf and for the benefit of the Trustee. None of the instruments that are or evidence the Collateral or the Class 1 Collateral has any marks or notations indicating that they are then pledged or otherwise assigned to any person other than the Trustee.

(xiii)     The Accounts are not in the name of any person other than the Issuer or the Trustee.  The Issuer has not consented to the securities intermediary of any Account to comply with instructions of any person other than the Trustee.

(xiv)     All "certificated securities" (as defined in each applicable Uniform Commercial Code) that are or evidence the Collateral or the Class 1 Collateral have been delivered to the Custodian, to the extent received by the Issuer, registered in the name of the Custodian or indorsed to the Custodian.  The Issuer has received a written acknowledgment from the Custodian that the Custodian is holding all the certificated securities delivered to it that are or evidence the Collateral or the Class 1 Collateral solely on behalf and for the benefit of the Trustee.

(xv)     The Issuer has caused all "uncertificated securities" (as defined in each applicable Uniform Commercial Code) that are or evidence the Collateral or the Class 1 Collateral to be registered in the name of the Custodian.

(xvi)     Upon grant by the Issuer, the Trustee has a first priority perfected security interest in the Collateral and the Class 1 Collateral.

106

(b)     If the Issuer acquires Collateral or Class 1 Collateral that is not "general intangibles," "certificated securities," "instruments," "securities entitlements," "uncertificated securities," each within the meaning of the applicable Uniform Commercial Code, or another category of collateral under the applicable Uniform Commercial Code as to which the Issuer has complied with its obligations under this Section 3.3(b), then on or before the date on which the Issuer acquires the Collateral or the Class 1 Collateral, the Issuer (or the Portfolio Manager on behalf of the Issuer) shall notify S&P and the Trustee (for the benefit of the Secured Parties) of its acquisition or intended acquisition of the Collateral or the Class 1 Collateral and the Issuer shall represent to S&P and to the Trustee (for the benefit of the Secured Parties) as to the category of the Collateral or the Class 1 Collateral under the applicable Uniform Commercial Code and shall make any further representations as to the perfection and priority of the security interest in the Collateral Granted under this Indenture acceptable to S&P.

## ARTICLE 4

### SATISFACTION AND DISCHARGE

Section 4.1.     *Satisfaction and Discharge of Indenture.*

This Indenture shall be discharged and shall cease to be of further effect with respect to the Notes, the Composite Securities, the Class 1 Collateral and the Collateral except as to:

(i)     rights of registration of transfer and exchange,

(ii)     substitution of mutilated, destroyed, lost, or stolen Securities,

(iii)     rights of Holders of the Notes to receive payments of principal and interest on, or other amounts (including without limitation Extension Bonus Payments) owing in respect of, the Notes as provided in this Indenture, rights of Holders of the Class 1 Composite Securities to receive distributions with respect to the Class 1 Component as provided herein and rights of the Insurer to receive any such payments of principal and interest pursuant to Section 16.5,

(iv)     the rights, indemnities, and immunities of the Trustee under this Indenture and the obligations of the Trustee under Section 7.3 of this Indenture with respect to the holding and paying of unclaimed funds,

(v)     for so long as any Preference Shares remain Outstanding, any provisions hereof conferring any rights or remedies upon the Holders of the Preference Shares or the Preference Shares Paying Agent on behalf of the Holders of the Preference Shares, including but not limited to, the provisions of Articles 7, 8, 10, 11, 12, 14 and 15,

(vi)     for so long as any Preference Shares remain Outstanding, the provisions of Articles 10, 11 and 12 relating to the acquisition, retention, disbursement and reinvestment of Collateral,

(vi)     the rights, obligations, and immunities of the Portfolio Manager under this Indenture and under the Management Agreement,

(vii)    the rights, obligations, and immunities of the Insurer under this Indenture and under the Insurance Agreement, and

(viii)    the rights of Holders of the Notes as beneficiaries of this Indenture with respect to the property deposited with the Trustee and payable to any of them and the rights of the Holders of the Class 1 Composite Securities as beneficiaries of this Indenture with respect to the Class 1 Collateral (and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture),

when:

(a)    either:

(i)    all Securities theretofore authenticated and delivered to Noteholders and Composite Securityholders (other than (A) Securities that have been destroyed, lost, or stolen and which have been replaced or paid as provided in Section 2.7 and (B) Notes for whose payment money has theretofore irrevocably been deposited in trust and thereafter repaid to the Issuer or discharged from the trust, as provided in Section 7.3), have been delivered to the Trustee for cancellation; or

(ii)    all Securities not theretofore delivered to the Trustee for cancellation

(A)    have become payable, or

(B)    will become payable at their Stated Maturity within one year, or

(C)    are to be called for redemption pursuant to Article 9 under an arrangement satisfactory to the Trustee for the giving of notice of redemption by the Applicable Issuers pursuant to Section 9.3,

and the Issuer has irrevocably deposited with the Trustee, in trust for payment of the principal and interest on the Securities, Cash or non-callable obligations of the United States of America.  The Treasury Strip is the obligation that must be deposited and held in a segregated trust account with respect to the Class 1 Component, and when distribution is required, will be distributed in kind in complete satisfaction of all obligations to the Holders of the Class 1 Composite Securities for payment on their interest in the Class 1 Component (and the Class 1 Component shall not be entitled to any of the proceeds of any of the other obligations).  The obligations deposited under Section 4.1(a)(ii) with respect to the other Securities must be entitled to the full faith and credit of the United States of America or be debt obligations that are rated "Aaa" by Moody's and "AAA" by S&P, in an amount sufficient, as verified by a firm of Independent certified public accountants that are nationally recognized, to pay and discharge the entire indebtedness on the Securities not theretofore delivered to the Trustee for cancellation, for principal and interest to the date of the deposit (in the case of Securities that have become payable), or to the respective Stated Maturity or the respective Redemption Date, as the case may be, and the Issuer shall have Granted to the Trustee a valid perfected security interest in the Eligible Investment that is of first priority, free of any adverse claim, and shall have furnished an Opinion of Counsel with respect thereto.  Section 4.1(a)(ii) shall not apply if an election to act in accordance with

108

Section 5.5(a) been made and not rescinded. In addition, the Issuer shall cause delivery to the Trustee of an Opinion of Counsel of Independent U.S. tax counsel of nationally recognized standing in the United States experienced in such matters to the effect that the Holders of Notes would recognize no income, gain or loss for U.S. federal income tax purposes as a result of the deposit and satisfaction and discharge of this Indenture;

(b)　　the Issuer has paid all other sums then payable under this Indenture and the Insurance Agreement by the Issuer and no other amounts are scheduled to be payable by the Issuer; and

(c)　　the Co-Issuers have delivered to the Trustee Officer's certificates and an Opinion of Counsel, each stating that all conditions precedent in this Indenture provided for relating to the satisfaction and discharge of this Indenture have been complied with.

Notwithstanding the satisfaction and discharge of this Indenture, the rights and obligations of the Co-Issuers, the Trustee, the Portfolio Manager, the Insurer, and, if applicable, the Noteholders and the Composite Securityholders, as the case may be, under Sections 2.8, 4.2, 5.4(d), 5.9, 5.18, 6.6, 6.7, 7.1, 7.3, 13.1, and 14.14 shall survive.

Section 4.2.　　*Application of Trust Money.*

All monies deposited with the Trustee pursuant to Section 4.1 shall be held in trust for the person entitled to it and applied by the Trustee in accordance with the Securities and this Indenture, including the Priority of Payments, to the payment of principal and interest, either directly or through any Paying Agent, as the Trustee may determine. The money shall be held in a segregated non-interest bearing trust account identified as being held in trust for the benefit of the Secured Parties.

Section 4.3.　　*Repayment of Monies Held by Paying Agent.*

In connection with the satisfaction and discharge of this Indenture with respect to the Securities, all monies then held by any Paying Agent other than the Trustee under this Indenture shall, upon demand of the Co-Issuers, be paid to the Trustee to be held and applied pursuant to Section 7.3 and in accordance with the Priority of Payments and thereupon the Paying Agent shall be released from all further liability with respect to the monies.

## ARTICLE 5

### REMEDIES

Section 5.1.　　*Events of Default.*

"*Event of Default*," wherever used in this Indenture, means any one of the following events whatever the reason:

(a)　　a default for four Business Days in the payment of any interest on any Class of Notes (determined without giving effect to any payments made under the Policy) that is currently part of the Controlling Class when it becomes payable (or in the case of a default in payment due to an administrative error or omission by the Trustee, the Irish Listing and Paying Agent or the Indenture Registrar, after seven Business Days);

109

(b)     a default in the payment of principal of any Note (and any Make-Whole Premium, if applicable) (determined without giving effect to any payments made under the Policy) or any distribution with respect to the Class 1 Component under Section 11.2, when the same becomes payable, at its Stated Maturity or on the Redemption Date;

(c)     the failure on any Payment Date to disburse amounts available in the Payment Account in accordance with the Priority of Payments and the failure continues for 3 Business Days;

(d)     on any Measurement Date for so long as any Senior Class A Notes or Class A-2 Notes are Outstanding, the Overcollateralization Ratio Numerator is less than 102% of the Aggregate Outstanding Amount of the Senior Class A Notes and the Class A-2 Notes;

(e)     either of the Co-Issuers or the pool of Collateral becomes an investment company under the 1940 Act;

(f)     breach of any other covenant or other agreement of the Issuer or the Co-Issuer in this Indenture (other than any failure to satisfy any of the Collateral Quality Tests, any of the Concentration Limitations, any of the Coverage Tests, the Reinvestment Overcollateralization Test, or other covenants or agreements for which a specific remedy has been provided in this Section 5.1) in any material respect, or the failure of any representation or warranty of the Issuer or the Co-Issuer in this Indenture or in any certificate or other writing delivered pursuant thereto, or in connection therewith, to be correct in any material respect when made, and the breach or failure continues for 30 days after either of the Co-Issuers has actual knowledge of it or after notice to the Issuer, the Co-Issuer, and the Portfolio Manager by the Trustee or to the Issuer, the Co-Issuer, the Portfolio Manager, and the Trustee by the Holders of at least 25% of the Aggregate Outstanding Amount of the Controlling Class by registered or certified mail or overnight courier specifying the breach or failure and requiring it to be remedied and stating that the notice is a "Notice of Default" under this Indenture;

(g)     the entry of a decree or order by a court having competent jurisdiction adjudging the Issuer or the Co-Issuer as bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment, or composition of the Issuer or the Co-Issuer under the Bankruptcy Law or any other applicable law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, or ordering the winding up or liquidation of its affairs, and if the decree or order remains unstayed and in effect for 45 consecutive days;

(h)     the institution by the shareholders of the Issuer or the Co-Issuer of Proceedings to have the Issuer or Co-Issuer, as the case may be, adjudicated as bankrupt or insolvent, or the consent by the shareholders of the Issuer or the Co-Issuer to the institution of bankruptcy or insolvency Proceedings against the Issuer or Co-Issuer, or the filing by the Issuer or the Co-Issuer of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Law or any other similar applicable law, or the consent by the Issuer or the Co-Issuer to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee, or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, or the making by the Issuer or the Co-Issuer of an assignment for the benefit of creditors, or the admission by the Issuer or the Co-Issuer in writing of its inability to pay its debts generally as they become due, or the taking of any action by the Issuer or the Co-Issuer in furtherance of any such action;

110

(i)      one or more final judgments is rendered against the Issuer or the Co-Issuer that exceed in the aggregate U.S.$2,000,000 (or any lesser amount specified by any Rating Agency) and that remain unstayed, undischarged, and unsatisfied for 30 days after the judgments become nonappealable, unless adequate funds have been reserved or set aside for their payment, and unless (except as otherwise specified in writing by each Rating Agency) the Rating Condition with respect to each Rating Agency is satisfied with respect thereon; or

(j)      the occurrence of an "Event of Default" under (and defined in) the Insurance Agreement.

Section 5.2.      ***Acceleration of Maturity; Rescission and Annulment.***

(a)      If an Event of Default is continuing (other than (i) an Event of Default specified in Section 5.1(e), (g) or (h) or (ii) an Event of Default with respect to the Class 1 Component under Section 5.1(b)), the Trustee may, and upon the written direction of a Majority of the Controlling Class shall, declare the principal of all the Notes and the Class 1 Component to be immediately payable (and the Class 1 Composite Security Rated Balance shall become immediately payable) by notice to the Applicable Issuers, and upon that declaration the unpaid principal of all the Notes, together with all its accrued and unpaid interest (and any applicable Defaulted Interest Charge), and other amounts payable under this Indenture, shall become immediately payable.  The Reinvestment Period shall terminate upon a declaration of acceleration (subject to re-commencement pursuant to Section 5.2(b)).  If an Event of Default specified in Section 5.1(e), (g) or (h) occurs, all unpaid principal, together with all its accrued and unpaid interest (and any applicable Defaulted Interest Charge), of all the Notes and the Class 1 Component, and other amounts payable under this Indenture, shall automatically become payable (and the Class 1 Composite Security Rated Balance shall become immediately payable) without any declaration or other act on the part of the Trustee or any Noteholder and the Reinvestment Period shall terminate automatically (subject to re-commencement pursuant to Section 5.2(b)). If an Event of Default occurs with respect to the Class 1 Component under Section 5.1(b), a Majority of the Holders of the Class 1 Composite Securities may declare the Class 1 Component immediately payable by notice to the Issuer and the Class 1 Composite Security Rated Balance shall become immediately payable.  Payment of the Class 1 Composite Security Rated Balance when made shall be made to the Holders of the Class 1 Components as a distribution in kind of a *pro rata* share (based on the Class 1 Composite Security Rated Balance) of each item of the Class 1 Collateral.

(b)      At any time after the declaration of acceleration of maturity has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee, a Majority of the Controlling Class (or a Majority of the Holders of the Class 1 Composite Securities solely in respect of the acceleration of the Class 1 Component by the Majority of the Class 1 Component) by written notice to the Issuer, the Trustee and the Preference Shares Paying Agent, may rescind the declaration and its consequences if:

(i)      The Issuer or the Co-Issuer has paid or deposited with the Trustee a sum sufficient to pay:

(A)      all unpaid installments of interest and principal on the Notes then due or, in the case of acceleration of the Class 1 Component by the Majority of the Class 1 Component, all distributions with respect to the Class 1 Component under Section 11.2 (other than as a result of the acceleration);

(B)      to the extent that payment of the interest is lawful, interest on any Deferred Interest and Defaulted Interest at the Applicable Note Interest Rate or Default Interest Rate, as applicable;

(C)      all unpaid Accrued Insurance Liabilities and unpaid Premium;

(D)      all Administrative Expenses of the Co-Issuers and other sums paid or advanced by the Trustee under this Indenture;

(E)      all unpaid Senior Management Fees; and

(F)      all amounts then payable to any Hedge Counterparty; and

(ii)      The Trustee has determined that all Events of Default, other than the nonpayment of the interest on or principal of the Notes or, in the case of acceleration of the Class 1 Component by the Majority of the Class 1 Component, nonpayment of distributions with respect to the Class 1 Component under Section 11.2 that have become due solely by the acceleration, have been (A) cured, and a Majority of the Controlling Class (or a Majority of the Holders of the Class 1 Composite Securities solely in respect of the acceleration of the Class 1 Component) by written notice to the Trustee has agreed with that determination, or (B) waived as provided in Section 5.14.

If a declaration of acceleration is rescinded as described above:

(x)      the Reinvestment Period, if terminated by the declaration, shall re-commence on the date of the rescission (unless the Reinvestment Period would have otherwise terminated before that date pursuant to clauses (i), (ii), or (iii) of its definition); and

(y)      the Trustee shall preserve the Collateral and the Class 1 Collateral in accordance with this Indenture. If the preservation of the Collateral or the Class 1 Collateral is rescinded pursuant to Section 5.5, the Notes and the Class 1 Component may again be accelerated pursuant to Section 5.2(a), notwithstanding any previous rescission of a declaration of acceleration pursuant to this Section 5.2(b)).

No rescission shall affect any subsequent Default or impair any right resulting from the Default.

(c)      Notwithstanding anything in this Section 5.2 to the contrary, the Notes will not be subject to acceleration by the Trustee, a Majority of the Controlling Class, or any other Holders solely as a result of the failure to pay any amount due on Notes that are not of the Controlling Class.

Section 5.3.      ***Collection of Indebtedness and Suits for Enforcement by Trustee.***

The Applicable Issuers covenant that if a default occurs in the payment of any principal of or interest when payable on any Note (determined without giving effect to any payments made under the Policy) or the Class 1 Component, upon demand of the Trustee or the Holder of any affected Note or Class 1 Composite Securities, the Applicable Issuers shall pay to the Trustee, for the benefit of the Holder of the Note or the Class 1 Composite Securities, the whole amount then payable on the Note or the Class 1 Component for principal and interest with

interest on the overdue principal and, to the extent that payments of the interest shall be legally enforceable, on overdue installments of interest and all other amounts owing to the Holders of the Securities and the Insurer under this Indenture and the Insurance Agreement, at the Applicable Note Interest Rate or Default Interest Rate, as applicable, and, in addition, an amount sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements, and advances of the Trustee and the Holders and their agents and counsel.

If the Issuer or the Co-Issuer fails to pay those amounts immediately on demand, the Trustee, in its own name and as Trustee of an express trust, may, and shall at the direction of a Majority of the Controlling Class, institute a Proceeding for the collection of the sums due, may prosecute the Proceeding to judgment or final decree, and may enforce the same against the Applicable Issuers or any other obligor on the Notes or the Class 1 Component and collect the monies determined to be payable in the manner provided by law out of the Collateral.

If an Event of Default is continuing, the Trustee may, and shall upon written direction of a Majority of the Controlling Class, proceed to protect and enforce its rights and the rights of the Holders of the Securities by any appropriate Proceedings as is deemed most effective (if no direction is received by the Trustee) or as the Trustee may be directed by a Majority of the Controlling Class, to protect and enforce the rights of the Trustee and the Holders of the Securities, whether for the specific enforcement of any agreement in this Indenture or in aid of the exercise of any power granted in this Indenture, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by this Indenture or by law.  The reasonable compensation, costs, expenses, disbursements and advances incurred or paid by the Trustee and its agents and counsel, in connection with such Proceeding, including, without limitation, the exercise of any remedies pursuant to Section 5.4, shall be reimbursed to the Trustee pursuant to Section 6.7.

If any Proceedings are pending relating to the Issuer or the Co-Issuer or any other obligor on the Notes or the Class 1 Component under the Bankruptcy Law or any other applicable bankruptcy, insolvency, or other similar law, or if a receiver, assignee, or trustee in bankruptcy or reorganization, liquidator, sequestrator, or similar official has been appointed for or taken possession of the Issuer, the Co-Issuer, or their respective property or any other obligor on the Notes or its property, or if any other comparable Proceedings are pending relating to the Issuer, the Co-Issuer, or other obligor on the Notes or the Class 1 Component, or the creditors or property of the Issuer, the Co-Issuer, or other obligor on the Notes, the Trustee, regardless of whether the principal of any Notes is then payable by declaration or otherwise and regardless of whether the Trustee has made any demand pursuant to this Section 5.3, may, by intervention in the Proceedings or otherwise:

(a)     file and prove claims for the whole amount of principal and interest owing and unpaid in respect of the Notes and the Class 1 Component, and file any other papers or documents appropriate and take any other appropriate action (including sitting on a committee of creditors) to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys, and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee, except as a result of negligence or bad faith) and of the Holders of the Securities allowed in any Proceedings relating to the Issuer, the Co-Issuer, or other obligor on the Notes or to the creditors or property of the Issuer, the Co-Issuer, or other obligor on the Notes;

(b)      unless prohibited by applicable law, vote on behalf of the Holders of the Securities in any election of a trustee or a standby trustee in arrangement, reorganization, liquidation, or other bankruptcy or insolvency Proceedings or person performing similar functions in comparable Proceedings; and

(c)      collect and receive any monies or other property payable to or deliverable on any such claims, and distribute all amounts received with respect to the claims of the Holders of the Securities and of the Trustee on their behalf; and any trustee, receiver or liquidator, custodian, or other similar official is authorized by each of the Holders of the Securities to make payments to the Trustee, and, if the Trustee consents to making payments directly to the Holders of the Securities, to pay to the Trustee amounts sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee, and their respective agents, attorneys, and counsel, and all other reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee except as a result of negligence or bad faith.

Nothing in this Indenture shall authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of the Holder of any Security, any plan of reorganization, arrangement, adjustment, or composition affecting the Securities or any Holder of Securities, or to authorize the Trustee to vote on the claim of the Holder of any Security in any Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar person.

Notwithstanding anything in this Section 5.3 to the contrary, the Trustee may not sell or liquidate the Collateral or the Class 1 Collateral or institute Proceedings in furtherance of the sale or liquidation of the Collateral pursuant to this Section 5.3 except according to Section 5.5(a).

Section 5.4.    ***Remedies.***

(a)      If an Event of Default is continuing, and the Notes have been declared payable and the declaration and its consequences have not been rescinded, or at any time after the Stated Maturity, the Co-Issuers agree that the Trustee may, and shall, upon written direction of a Majority of the Controlling Class, to the extent permitted by applicable law, exercise one or more of the following rights:

(i)      institute Proceedings for the collection of all amounts then payable on the Notes or otherwise payable under this Indenture, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Collateral any monies adjudged due;

(ii)      sell or liquidate all or a portion of the Collateral or interests in it, at one or more public or private sales called and conducted in any manner permitted by law and in accordance with Section 5.17;

(iii)      institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to the Collateral;

(iv)      exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights of the Trustee and the Holders of the Securities under this Indenture; and

(v)      exercise any other rights that may be available at law or in equity;

114

*except* that the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance of the sale or liquidation of the Collateral pursuant to this Section 5.4 except according to Section 5.5(a).

If an Event of Default is continuing, and the Class 1 Component has been declared payable and the declaration and its consequences have not been rescinded, or at any time after the Stated Maturity, the Co-Issuers agree that the Trustee may, and shall, upon written direction of a Majority of the Class 1 Composite Securities, to the extent permitted by applicable law, exercise one or more of the following rights:

      (i)      institute Proceedings for the collection of all amounts then payable on the Class 1 Component or otherwise payable under this Indenture, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Class 1 Collateral any monies adjudged due;

      (ii)      sell or liquidate all or a portion of the Class 1 Collateral or interests in it, at one or more public or private sales called and conducted in any manner permitted by law and in accordance with Section 5.17;

      (iii)      institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to the Class 1 Collateral;

      (iv)      exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights of the Trustee and the Holders of the Securities under this Indenture; and

      (v)      exercise any other rights that may be available at law or in equity;

*except* that the Trustee may not sell or liquidate the Class 1 Collateral or institute Proceedings in furtherance of the sale or liquidation of the Class 1 Collateral pursuant to this Section 5.4 except according to Section 5.5(a).

The Trustee may, but need not, obtain at the Issuer's expense, and rely on an opinion of an Independent investment banking firm of national reputation with demonstrated capabilities in structuring and distributing securities similar to the Securities, which may be the Initial Purchaser, as to the feasibility of any action proposed to be taken in accordance with this Section 5.4 and as to the sufficiency of the proceeds and other amounts receivable with respect to the Collateral or the Class 1 Collateral to make the required payments of principal of and interest on the Securities, which opinion shall be conclusive evidence as to the feasibility or sufficiency.

      (b)      If an Event of Default as described in Section 5.1(f) is continuing the Trustee may, with the consent of, and shall, at the direction of, the Holders of not less than 25% of the Aggregate Outstanding Amount of the Controlling Class, institute a Proceeding solely to compel performance of the covenant or agreement or to cure the representation or warranty, the breach of which gave rise to the Event of Default under Section 5.1(f), and enforce any equitable decree or order arising from the Proceeding.

      (c)      Upon any sale, whether made under the power of sale given under this Indenture or by virtue of judicial Proceedings, any Holders or the Portfolio Manager (subject to the Management Agreement) may bid for and purchase any part of the Collateral and, upon

compliance with the terms of sale, may hold, retain, possess, or dispose of the Collateral in its or their own absolute right without accountability.

Upon any sale, whether made under the power of sale given under this Indenture or by virtue of judicial Proceedings, the receipt of the Trustee, or of the Officer making a sale under judicial Proceedings, shall be a sufficient discharge to the purchasers at any sale for their purchase money, and the purchasers shall not be obliged to see to its application.

Any sale, whether under any power of sale given under this Indenture or by virtue of judicial Proceedings, shall bind the Co-Issuers, the Trustee, and the Holders of the Securities, shall operate to divest all interest whatsoever, either at law or in equity, of each of them in the property sold, and shall be a perpetual bar, both at law and in equity, against each of them and their successors and assigns, and against all persons claiming through or under them.

(d) Notwithstanding any other provision of this Indenture, none of the Trustee, the Secured Parties, or the Holders of the Securities may, before the date that is one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes, institute against, or join any other person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium, or liquidation Proceedings, or other Proceedings under the Bankruptcy Law or any similar laws in any jurisdiction. Nothing in this Section 5.4 shall preclude the Trustee or any Secured Party (i) from taking any action before the expiration of that period in (A) any case or Proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer or (B) any involuntary insolvency Proceeding filed or commenced by a person other than a Secured Party, or (ii) from commencing against the Issuer or the Co-Issuer or any of its properties any legal action that is not a bankruptcy, reorganization, arrangement, insolvency, moratorium, or liquidation Proceeding.

Section 5.5.  ***Optional Preservation of Collateral.***

(a) Notwithstanding anything to the contrary in this Indenture, if an Event of Default has occurred and is continuing, the Trustee shall retain the Class 1 Collateral intact, collect, and cause the collection of the proceeds of the Class 1 Collateral and make and apply all payments and deposits and maintain all accounts in respect of the Class 1 Collateral and the Class 1 Components in accordance with Section 11.2 and Article 10 and shall not sell the Class 1 Collateral in any circumstances unless so directed by all of the Holders of the Class 1 Composite Securities, in which case the Trustee shall sell the Class 1 Collateral to the buyer identified by such Holders of the Class 1 Composite Securities.  Notwithstanding anything to the contrary in this Indenture, if an Event of Default is continuing, the Trustee shall retain the Collateral intact, collect, and cause the collection of the proceeds of the Collateral and make and apply all payments and deposits and maintain all accounts in respect of the Collateral and the Notes, and any Hedge Agreements (other than amounts received under a Hedge Agreement that are used in putting a Replacement Hedge in place), in accordance with the Priority of Payments and Article 10 and Article 12 unless:

(i) the Trustee determines that the anticipated net proceeds of a sale or liquidation of the Collateral would be sufficient to discharge in full the amounts then due and unpaid on the Notes for principal and interest (including Defaulted Interest and Deferred Interest and any interest on the Defaulted Interest and Deferred Interest), all Administrative Expenses, all other amounts (if any) then payable to the Hedge Counterparty by the Issuer (including any applicable termination payments) net of all amounts then payable to the Issuer by the Hedge Counterparty, all amounts owing by

116

the Issuer to the Insurer under the Insurance Agreement, and all other amounts then payable under clause (3) of Section 11.1(a)(i) and a Majority of the Controlling Class agrees with that determination; or

       (ii)     the Holders of a Super Majority of each of the Senior Class A Notes, the Class A-2 Notes, the Class A-3 Notes, the Class B Notes and the Class C Notes direct the sale and liquidation of the Collateral; provided, however, if an Event of Default specified in 5.1(d) occurs and if the Insurer is the Controlling Class, the Insurer shall have the sole right to direct the sale and liquidation of the Collateral under this clause (ii).

The Trustee shall give written notice of the retention of the Collateral to the Issuer with a copy to the Co-Issuer and the Portfolio Manager. So long as the Event of Default is continuing, any retention pursuant to this Section 5.5(a) may be rescinded at any time when the conditions specified in clause (i) or (ii) exist.

       (b)     Nothing contained in Section 5.5(a) shall be construed to require the Trustee to sell the Collateral if the conditions in clause (i) or (ii) of Section 5.5(a) are not satisfied. Nothing contained in Section 5.5(a) shall be construed to require the Trustee to preserve the Collateral or the Class 1 Collateral if prohibited by applicable law.

       (c)     In determining whether the condition specified in Section 5.5(a)(i) exists, the Trustee shall obtain bid prices with respect to each security contained in the Collateral from two nationally recognized dealers (or if there is only one market maker, that market maker and if there is no market maker, from a pricing service), at the time making a market in those securities, and shall compute the anticipated proceeds of sale or liquidation on the basis of the lower of the bid prices for each security. In addition, for the purposes of determining issues relating to the valuation of the Collateral, the satisfaction of the conditions specified in this Indenture, the execution of a sale or liquidation of the Collateral, and the execution of a sale or other liquidation of the Collateral in connection with a determination whether the condition specified in Section 5.5(a)(i) exists, the Trustee may retain, at the Issuer's expense, and rely on an opinion of an Independent investment banking firm of national reputation, which may be the Initial Purchaser.

The Trustee shall deliver to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Holders of the Securities, the Co-Issuers, the Insurer, the Portfolio Manager and the Hedge Counterparties a report stating the results of any determination required pursuant to Section 5.5(a)(i). The Trustee shall make the determinations required by Section 5.5(a)(i) after an Event of Default at the request of a Majority of the Controlling Class at any time during which the Trustee retains the Collateral pursuant to Section 5.5(a). The Trustee shall obtain (at the Issuer's expense) a letter of a firm of Independent certified public accountants confirming the accuracy of each calculation made by the Trustee pursuant to Section 5.5(a)(i) and certifying their conformity to the requirements of this Indenture.

       (d)     Notwithstanding anything in this Indenture to the contrary, the Trustee may not, and the Holders of the Notes representing the requisite percentage of the Aggregate Outstanding Amount of the Notes specified in Section 5.4 or 5.5, may not instruct the Trustee to sell or liquidate or (except in connection with the concurrent execution of a Replacement Hedge) terminate any Hedge Agreement during the continuance of an Event of Default until all

Collateral other than the Hedge Agreements has been sold or liquidated and its proceeds applied in accordance with this Indenture.

(e)     Collateral may not be sold or liquidated pursuant to Section 5.5(a)(i) after the last date on which the sale or liquidation is permitted under Section 5.5(a)(i) with respect to a determination made pursuant to Section 5.5(a)(i) (the last permitted date being determined by the Trustee under Section 5.5(a)(i)), unless a new determination is made in accordance with Section 5.5(a)(i) and the Collateral is sold or liquidated before the last sale date permitted in accordance with the new determination.

Section 5.6.     ***Trustee May Enforce Claims Without Possession of Securities.***

All rights of action and claims under this Indenture or under any of the Securities may be prosecuted and enforced by the Trustee without the possession of any of the Securities or their production in any trial or other Proceeding relating to them, and any Proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall be applied as provided in Section 5.7.

In any Proceedings brought by the Trustee (and any Proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party) the Trustee shall be held to represent all the Holders of the Securities.

Section 5.7.     ***Application of Money Collected.***

Any money collected by the Trustee with respect to the Notes pursuant to this Article 5 and any money that may then be held or subsequently received by the Trustee with respect to the Notes under this Indenture shall be applied, subject to Section 13.1 and in accordance with Section 11.1, at the dates fixed by the Trustee.

Any money collected by the Trustee with respect to the Class 1 Component pursuant to this Article 5 and any money that may then be held or subsequently received by the Trustee with respect to the Class 1 Component under this Indenture shall be applied in accordance with Section 11.2 at the dates fixed by the Trustee.

Section 5.8.     ***Limitation on Suits.***

No Holder of any Security shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy under this Indenture, unless:

(a)     the Holder has previously given to the Trustee written notice of an Event of Default;

(b)     the Holders of not less than 25% of the Aggregate Outstanding Amount of the Controlling Class or, in the case of acceleration of the Class 1 Component by the Majority of the Class 1 Component, the Class 1 Components, of the Class 1 Composite Securities shall have made written request to the Trustee to institute Proceedings with respect to the Event of Default in its own name as Trustee under this Indenture and the Holders have offered to the Trustee indemnity satisfactory to it against the expenses and liabilities to be incurred in compliance with the request;

45824v26

(c)    the Trustee for 30 days after its receipt of the notice, request, and offer of indemnity has failed to institute a Proceeding; and

(d)    no direction inconsistent with the written request has been given to the Trustee during the 30 day period by a Majority of the Controlling Class or, in the case of acceleration of the Class 1 Component by the Majority of the Class 1 Component, the Class 1 Components, of the Class 1 Composite Securities.

No one or more Holders of Securities have any right in any manner whatever by virtue of, or by availing of, any provision of this Indenture to affect the rights of any other Holders of Securities of the same Class  or to obtain or to seek to obtain priority or preference over any other Holders of the Securities of the same Class or to enforce any right under this Indenture, except in the manner provided in this Indenture and for the equal and ratable benefit of all the Holders of Securities of the same Class subject to and in accordance with Section 13.1 and the Priority of Payments or Section 11.2, as the case may be.

If the Trustee receives conflicting or inconsistent requests and indemnity from two or more groups of Holders of the Controlling Class, each representing less than a Majority of the Controlling Class, the Trustee shall take the action requested by the Holders of the largest percentage in Aggregate Outstanding Amount of the Controlling Class, notwithstanding any other provisions of this Indenture.

For the avoidance of doubt, this Section 5.8 shall not limit the right of the Insurer to exercise any rights or remedies that the Insurer may have pursuant to Section 16.2.

Section 5.9.    *Unconditional Rights of Holders of Securities.*

Notwithstanding any provision of this Indenture other than this Section 5.9 and Sections 2.8(i), 5.4(d), and 13.1, (i) the Holder of any Note and a Holder of the Class 1 Composite Securities shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on the Note or the Class 1 Component, as the case may be, as it comes due in accordance with the Priority of Payments or Section 11.2, as the case may be, and Section 13.1, and, subject to Section 5.8, to institute proceedings for the enforcement of any such payment, and that right shall not be impaired without the consent of the Holder; and (ii) the Insurer shall have the right, which is absolute and unconditional, to receive payment of all outstanding Accrued Insurance Liabilities in accordance with the Priority of Payments and Section 13.1, and subject to Section 5.8, to institute proceedings for the enforcement of any such payment, and that right shall not be impaired without the consent of the Insurer.  Holders of Notes ranking junior to Notes still Outstanding may not institute proceedings for the enforcement of any such payment until no Note ranking senior to their Note remains Outstanding, subject to Section 5.8, and shall not be impaired without the consent of any such Holder.  For so long as any Notes are Outstanding, the Preference Shares Paying Agent shall not be entitled to any payment of any amount for payments to the Holders of the Preference Shares pursuant to the Preference Shares Documents, to the extent legally permitted, on a claim against the Issuer unless there are sufficient funds to pay such amounts to the Preference Shares Paying Agent in accordance with the Priority of Payments.

Section 5.10.    *Restoration of Rights and Remedies.*

If the Trustee, the Insurer or the Holder of any Security has instituted any Proceeding to enforce any right under this Indenture and the Proceeding has been discontinued or abandoned

119

for any reason, or has been determined adversely to the Trustee, the Insurer or to the Holder, then, subject to any determination in the Proceeding, the Co-Issuers, the Trustee, the Insurer and the Holder shall be restored to their former positions under this Indenture, and thereafter all rights of the Trustee, the Insurer and the Holder shall continue as though no Proceeding had been instituted.

Section 5.11.    ***Rights and Remedies Cumulative.***

No right in this Indenture conferred on or reserved to the Trustee, the Insurer or to the Holders of Securities is intended to be exclusive of any other right, and every right shall, to the extent permitted by law, be cumulative and in addition to every other right given under this Indenture or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right under this Indenture, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right.

Section 5.12.    ***Delay or Omission Not Waiver.***

No delay or omission of the Trustee, the Insurer or the Holder of any Security to exercise any right accruing upon any Event of Default shall impair the right or be a waiver of the Event of Default or an acquiescence in it or of a subsequent Event of Default. Every right given by this Article 5 or by law to the Trustee, the Insurer or to the Holders of Securities may be exercised from time to time, and as often as deemed expedient, by the Trustee, the Insurer or by the applicable Holders.

Section 5.13.    ***Control by Majority of the Controlling Class.***

(a)    Notwithstanding any other provision of this Indenture, during the continuance of an Event of Default, a Majority of the Controlling Class, with respect to the Notes, or all of the Holders of the Class 1 Composite Securities, with respect to acceleration of the Class 1 Component by the Majority of the Class 1 Component, the Class 1 Components, may institute and direct the time, method, and place of conducting any Proceeding for any remedy available to the Trustee, or exercising any right of the Trustee with respect to the Notes or the Class 1 Components, as the case may be, if:

(i)    the direction does not conflict with any rule of law or with any express provision of this Indenture; and

(ii)    the Trustee has been indemnified to its reasonable satisfaction (and the Trustee need not take any action that it determines might involve it in liability unless it has received an indemnity against the liability).

Notwithstanding the foregoing, only a Majority of the Controlling Class may direct proceedings with respect to remedies specified in Section 5.4(a) or otherwise with respect to the Collateral, and only a Majority of the Class 1 Component may direct proceedings with respect to the remedies specified in Section 5.4(b) or otherwise with respect to the Class 1 Component.

(b)    The Trustee may take any other action deemed proper by the Trustee that is not inconsistent with a direction under Section 5.13(a). Subject to Section 6.1, the Trustee need not take any action that it determines might involve it in liability (unless the Trustee has received an indemnity against the liabilities reasonably satisfactory to it) and during the continuance of an Event of Default that has not been cured, or waived, the Trustee shall, before receiving

directions from a Majority of the Controlling Class or all of the Holders of the Class 1 Components, as the case may be, exercise the rights expressly vested in it by this Indenture and use the same degree of care and skill in their exercise with respect to the Event of Default as is required by Section 6.1(b).

(c)     Any direction to the Trustee to undertake a Sale of the Collateral or the Class 1 Collateral shall be in accordance with Section 5.4 or 5.5.

Section 5.14.     *Waiver of Past Defaults.*

Before a judgment or decree for payment of any money due has been obtained by the Trustee, as provided in this Article 5, a Majority of the Controlling Class may on behalf of the Holders of all the Notes, with respect to the Notes, or all of the Holders of the Class 1 Composite Securities, with respect to the Class 1 Components, waive any past Default and its consequences, except a Default:

(a)     in the payment of the principal or Redemption Price of any Note or the Class 1 Component, as the case may be, or in the payment of interest (including Defaulted Interest, Deferred Interest, and any interest on Defaulted Interest or Deferred Interest) on the Notes;

(b)     with respect to a provision of this Indenture that under Section 8.2 cannot be modified or amended without the waiver or consent of the Holder of each Outstanding Note or Class 1 Composite Security adversely affected by the modification or amendment;

(c)     in the payment of amounts due to the Portfolio Manager, the Trustee, the Insurer or the Hedge Counterparty, which may only be waived with the consent of the affected party; or

(d)     arising as a result of an Event of Default described in Section 5.1(e), (g) or (h).

Upon any such waiver, the Default shall cease to exist, and any Event of Default arising from it shall be cured, for every purpose of this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto.  The Trustee shall promptly give written notice of any such waiver to the Portfolio Manager, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and each Holder of Securities.

Section 5.15.     *Undertaking for Costs.*

All parties to this Indenture agree, and each Holder of any Note by its acceptance of its Note agrees, that in any suit for the enforcement of any right under this Indenture, or in any suit against the Trustee or the Portfolio Manager for any action taken or omitted by it as Trustee or for any action taken or omitted by the Portfolio Manager, as applicable, any court may in its discretion require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and that the court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant.  This Section 5.15 shall not apply to any suit instituted by the Trustee, the Portfolio Manager or the Insurer, to any suit instituted by any Holder, or group of Holders, of Notes holding in the aggregate more than 10% in Aggregate Outstanding Amount of the Controlling Class, or to any suit instituted by any Holder of Notes for the enforcement of the payment of the principal of or interest on any Note or any other

amount payable under this Indenture after the applicable Stated Maturity (or, in the case of redemption, after the applicable Redemption Date).

Section 5.16.    ***Waiver of Stay or Extension Laws.***

To the extent that they may lawfully do so, the Co-Issuers covenant that they will not at any time insist on, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any valuation, appraisement, redemption, or marshalling law or rights, in each case wherever enacted, now or at any time hereafter in force, that may affect the covenants, the performance of, or any remedies under this Indenture.  To the extent that they may lawfully do so, the Co-Issuers expressly waive all benefit or advantage of any such law or rights, and covenant that they shall not delay or impede the execution of any power in this Indenture granted to the Trustee or the Holders of the Securities but will permit the execution of every power as though the law had not been enacted or rights created.

Section 5.17.    ***Sale of Collateral.***

(a)    The power to effect any sale (a "***Sale***") of any portion of the Collateral or the Class 1 Collateral pursuant to Sections 5.4 and 5.5 shall not be exhausted by any one or more Sales as to any portion of the Collateral or the Class 1 Collateral remaining unsold, but shall continue unimpaired until the entire Collateral or the Class 1 Collateral is sold or all amounts secured by the Collateral or the Class 1 Collateral have been paid.  The Trustee may upon notice to the Holders of the Securities and the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), and shall, at the direction of a Majority of the Controlling Class with respect to Collateral and all of the Holders of the Class 1 Composite Securities with respect to the Class 1 Component, from time to time postpone any Sale by public announcement made at the time and place of the Sale.  The Trustee waives its rights to any amount fixed by law as compensation for any Sale.  The Trustee may deduct the reasonable expenses incurred by it in connection with a Sale from its proceeds notwithstanding Section 6.7.

(b)    The Trustee or the Insurer may bid for and acquire any portion of the Collateral or the Class 1 Collateral in connection with a public Sale of the Collateral or the Class 1 Collateral, and may pay all or part of the purchase price by crediting against amounts owing on the Notes in the case of the Collateral or the Class 1 Components in the case of the Class 1 Collateral or other amounts secured by the Collateral in the case of the Notes or the Class 1 Collateral in the case of the Class 1 Components all or part of the net proceeds of the Sale after deducting the reasonable expenses incurred by the Trustee in connection with the Sale notwithstanding Section 6.7.  The Securities need not be produced to complete any Sale, or for the net proceeds of the Sale to be credited against amounts owing on the Notes in the case of the Collateral or the Class 1 Components in the case of the Class 1 Collateral.  The Trustee or the Insurer may hold, lease, operate, manage, or otherwise deal with any property so acquired in any manner permitted by law in accordance with this Indenture.

(c)    If any portion of the Collateral or the Class 1 Collateral consists of securities issued without registration under the Securities Act ("***Unregistered Securities***"), the Trustee may seek an Opinion of Counsel, or, if no Opinion of Counsel can be obtained, seek a no action position from the Securities and Exchange Commission or any other relevant federal or state regulatory authorities, regarding the legality of a public or private Sale of the Unregistered Securities.

(d)     The Trustee shall execute and deliver an appropriate instrument of transfer transferring its interest in any portion of the Collateral or the Class 1 Collateral in connection with its Sale.  In addition, the Trustee is irrevocably appointed the agent and attorney-in-fact of the Issuer to transfer its interest in any portion of the Collateral or the Class 1 Collateral in connection with its Sale, and to take all action necessary to effect the Sale.  No purchaser or transferee at a Sale shall be bound to ascertain the Trustee's authority, to inquire into the satisfaction of any conditions precedent, or see to the application of any monies.

Section 5.18.    ***Action on the Securities.***

The Trustee's right to seek and recover judgment on the Notes, the Class 1 Component or under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture.  Neither the lien of this Indenture nor any rights or remedies of the Trustee, the Insurer or the Holders of the Securities shall be impaired by the recovery of any judgment by the Trustee against the Issuer or by the levy of any execution under the judgment on any portion of the Collateral or the Class 1 Collateral or on any of the assets of the Issuer or the Co-Issuer.

Section 5.19.    ***Direction by the Insurer.***

Notwithstanding anything contained herein to the contrary, if an Event of Default has occurred and is continuing, so long as the Insurer is the Controlling Class, the Insurer shall have the right (to the exclusion of the Holders of the Insured Notes) to direct the Trustee as to any and all remedies to be sought or taken on behalf of the Holders of the Insured Notes under this Indenture and the Trustee shall not exercise any such remedies unless directed by the Insurer to the extent the Holders of the Insured Notes could control the actions of the Trustee.  Each Holder of the Insured Notes shall be deemed to have consented to the Insurer's rights hereunder with respect to an Event of Default.  At such time as there exists and is continuing a Insurer Default, the Trustee shall not be bound to continue to comply with any term or condition of this Indenture that requires the consent of or approval or direction from the Insurer.

## ARTICLE 6

### THE TRUSTEE

Section 6.1.    ***Certain Duties and Responsibilities.***

(a)     Except during the continuance of an Event of Default:

(i)     the Trustee undertakes to perform the duties and only the duties specifically provided in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)     in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, on certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; the Trustee shall examine any certificates or opinions that by any provision of this Indenture are specifically required to be furnished to the Trustee to determine whether or not they substantially conform on their face to the requirements of this Indenture and shall promptly notify the party delivering the same if the certificate or opinion does not conform.  If a corrected form has not been delivered

123

to the Trustee within 15 days after the notice from the Trustee, the Trustee shall so notify the Holders of the Securities and the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares).

(b)    If the Trustee has actual knowledge that an Event of Default is continuing, the Trustee shall, before the receipt of directions from a Majority of the Controlling Class, exercise the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent person would use under the circumstances in the conduct of the person's own affairs.

(c)    No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(i)    this subsection shall not be construed to limit the effect of subsection (a) of this Section 6.1;

(ii)    the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer, unless it is proven that the Trustee was negligent in ascertaining the pertinent facts;

(iii)    the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Issuer or the Co-Issuer or the Portfolio Manager or in accordance with this Indenture or a Majority (or the other percentage required by this Indenture) of the Controlling Class (or other Class if required or permitted by this Indenture) or, with respect to the Class 1 Component, the Holders of the Class 1 Composite Securities relating to the time, method, and place of conducting any Proceeding for any remedy available to the Trustee, or exercising any trust or power conferred on the Trustee, under this Indenture; and

(iv)    no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any extraordinary financial liability in the performance of any of its duties under this Indenture, or in the exercise of any of its rights contemplated under this Indenture, if it has reasonable grounds for believing that repayment of the funds or indemnity satisfactory to it against the risk or liability is not reasonably assured to it; provided that the reasonable costs of performing its ordinary services under this Indenture shall not be deemed an "extraordinary financial liability" for purposes hereof.

(d)    For all purposes under this Indenture, the Trustee shall not have notice or knowledge of any Insurer Default or Event of Default described in Section 5.1(d) through 5.1(i) or any Default described in Section 5.1(e) through 5.1(j) unless a Trust Officer assigned to and working in the Corporate Trust Office has actual knowledge of it or unless written notice of any event that is in fact the an Event of Default or Default is received by the Trustee at the Corporate Trust Office, and the notice references the Notes or the Class 1 Component generally, the Issuer, the Co-Issuer, the Collateral, the Class 1 Collateral or this Indenture.  For purposes of determining the Trustee's responsibility and liability under this Indenture, whenever reference is made in this Indenture to an Event of Default or a Default, the reference shall be construed to refer only to an Event of Default or Default of which the Trustee has notice as described in this Section 6.1.

45824v26

(e)      Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to this Section 6.1 and Section 6.3.

Upon written request by the Insurer (so long as it is the Controlling Class), the Trustee shall, upon reasonable (but no less than three Business Day's) prior written notice to the Trustee, permit any representative of the Insurer, during the Trustee's normal business hours, to examine all books of account, records, reports and other papers of the Trustee relating to the Securities, to make copies and extracts therefrom (the reasonable out-of-pocket expenses incurred in making any such copies or extracts to be reimbursed to the Trustee by the Insurer) and to discuss the Trustee's actions, as such actions relate to the Trustee's duties with respect to the Securities, with the Trustee's officers and employees responsible for carrying out the Trustee's duties with respect to the Securities.

Section 6.2.      *Notice of Default.*

Promptly (and in no event later than five Business Days) after the occurrence of any Default known to the Trustee or after any declaration of acceleration has been made or delivered to the Trustee pursuant to Section 5.2, the Trustee shall transmit notice of all Defaults under this Indenture known to the Trustee, unless the Default has been cured or waived, and of the declaration by mail to the Portfolio Manager and the Co-Issuers, each Rating Agency, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and to all Holders of Securities, as their names and addresses appear on the Indenture Register, the Irish Stock Exchange, for so long as any Class of Securities is listed on the Irish Stock Exchange and so long as the rules of the exchange so require, and, upon written request therefor by a Beneficial Owner in the form of Exhibit I certifying that it is a Beneficial Owner, to the Beneficial Owner (or its designee).

Section 6.3.      *Certain Rights of Trustee.*

Except as otherwise provided in Section 6.1:

(a)      the Trustee may rely and shall be protected in acting or refraining from acting on any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, note, or other paper or document (including but not limited to any reports prepared and delivered under Article 10) believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)      any request or direction of the Issuer or the Co-Issuer mentioned in this Indenture shall be sufficiently evidenced by an Issuer Request or Issuer Order;

(c)      whenever in the administration of this Indenture the Trustee

(i)      deems it desirable that a matter be proved or established before taking, suffering, or omitting any action under this Indenture, the Trustee may, in the absence of bad faith on its part, rely on an Officer's certificate (unless other evidence is specifically prescribed in this Indenture) or

(ii)      is required to determine the value of, or any other matter with respect to, any Collateral or Class 1 Collateral or funds under this Indenture or the cash flows projected to be received therefrom, the Trustee may, in the absence of bad faith on its

125

part, rely on reports of nationally recognized accountants, investment bankers, or other persons qualified to provide the information required to make the determination, including nationally recognized dealers in securities of the type being valued and securities quotation services;

(d)     as a condition to taking or omitting to take any action under this Indenture, the Trustee may consult with counsel and the advice of the counsel or any Opinion of Counsel shall be full and complete authorization and protection with respect to any action taken or omitted by it under this Indenture in good faith and in reliance thereon;

(e)     the Trustee need not exercise any of the rights or powers vested in it by this Indenture at the request or direction of the Insurer or any of the Holders of the Securities pursuant to this Indenture, unless the Insurer or the Holders have offered to the Trustee security or indemnity satisfactory to it against the costs and liabilities that might reasonably be incurred by it in compliance with the request or direction;

(f)     the Trustee need not make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, note, or other paper or document, but the Trustee, in its discretion, may, and upon the written direction of a Majority of the Controlling Class or of a Rating Agency shall, make any the further inquiry or investigation into the facts or matters that it deems appropriate or as it is directed, and the Trustee shall be entitled, on reasonable prior notice to the Co-Issuers and the Portfolio Manager, to examine the books and records relating to the Notes, the Collateral and the Class 1 Collateral, personally or by agent or attorney, during the Co-Issuers' or the Portfolio Manager's normal business hours. The Trustee shall, and shall cause its agents to, hold in confidence all such information, except to the extent (i) disclosure may be required by law by any regulatory or administrative authority and (ii) that the Trustee, in its sole judgment, determines that disclosure is consistent with its obligations under this Indenture; provided, however, that the Trustee may disclose on a confidential basis any such information to its agents, attorneys and auditors and the Insurer in connection with the performance of its responsibilities hereunder;

(g)     the Trustee may execute any of the trusts or powers under this Indenture or perform any duties under this Indenture either directly or by or through agents or attorneys, and the Trustee shall not be responsible for any misconduct or negligence on the part of any non-Affiliated agent, or non-Affiliated attorney, appointed with due care by it under this Indenture; provided that, except with respect to any authentication agent, subcustodian or any agent or attorney appointed by the Trustee to comply with applicable law, the Trustee shall not delegate its obligations hereunder unless the Trustee shall have received the written consent (or deemed consent, as applicable) of the Insurer (so long as it is the Controlling Class) which consent shall not be unreasonably withheld; provided that, if the Trustee shall have provided written notice of any such proposed delegation to the Insurer and, within five Business Days thereof, the Insurer shall not have objected in writing to such delegation the Insurer shall be deemed to have consented to such delegation; provided, further, that so long as the Trustee shall have received, or shall be deemed to have received, the consent of the Insurer (so long as it is the Controlling Class), the Trustee shall not be responsible to the Insurer for any misconduct or negligence on the part of any agent or attorney appointed by it hereunder; provided, further, that, for the avoidance of doubt, the Trustee shall not be required to obtain the consent of the Insurer for the appointment of legal counsel, accountants or any other service provider which this Indenture permits the Trustee to appoint or rely upon, or that the Trustee deems advisable to perform its obligations hereunder.

126

(h)     the Trustee shall not be liable for any action it takes or omits to take in good faith that it reasonably believes to be authorized or within its rights or powers under this Indenture;

(i)     nothing in this Indenture shall be construed to impose an obligation on the Trustee to recalculate, evaluate, or verify any report, certificate, or information received from the Issuer or Portfolio Manager;

(j)     the Trustee may request and receive (and rely on) instruction from the Issuer, the Portfolio Manager, or the accountants identified in the Accountants' Certificate (and in the absence of its receipt of timely instruction from them, may obtain from an Independent accountant at the expense of the Issuer) as to the application of GAAP to the extent any defined term in this Indenture, or any calculation required to be made or determined by the Trustee under this Indenture, is dependent on or defined by reference to United States generally accepted accounting principles (*"GAAP"*), in any instance;

(k)     the permissive rights of the Trustee to take or refrain from taking any actions enumerated in this Indenture are not duties;

(l)     the Trustee is not responsible for the accuracy of the books and records of, or for any acts or omissions of, the Depository, any Transfer Agent, Custodian, Securities Intermediary, Collateral Administrator, Clearstream, Euroclear, Calculation Agent, or any Paying Agent (in each case, other than the Bank acting in that capacity);

(m)     in making or disposing of any investment permitted by this Indenture, the Trustee is authorized to deal with itself (in its individual capacity) or with any one or more of its Affiliates, whether it or the Affiliate is acting as a subagent of the Trustee or for any third person or dealing as principal for its own account.  If otherwise qualified, obligations of the Bank or any of its Affiliates shall qualify as Eligible Investments under this Indenture; and

(n)     if the Bank is also acting in the capacity of Paying Agent, Transfer Agent, Custodian, Calculation Agent, or Securities Intermediary under this Indenture, the rights protections, immunities, and indemnities afforded to the Trustee pursuant to this Article 6 shall also be afforded to the Bank acting in those capacities.

Section 6.4.     *Not Responsible for Recitals or Issuance of Securities.*

The recitals contained in this Indenture and in the Securities, other than the Certificate of Authentication, shall be taken as the statements of the Applicable Issuers.  The Trustee assumes no responsibility for their correctness.  The Trustee makes no representation as to the validity or sufficiency of this Indenture (except as may be made with respect to the validity of the Trustee's obligations under this Indenture), the Collateral, the Class 1 Collateral or the Securities.  The Trustee shall not be accountable for the use or application by the Co-Issuers of the Securities or their proceeds or any money paid to the Co-Issuers pursuant to this Indenture.

Section 6.5.     *May Hold Securities.*

The Trustee, any Paying Agent, Indenture Registrar, or any other agent of the Co-Issuers, in its individual or any other capacity, may become the owner or pledgee of Securities and may otherwise deal with the Co-Issuers or any of their Affiliates with the same rights it would have if it were not Trustee, Paying Agent, Indenture Registrar, or other agent.

45824v26

Section 6.6.        ***Money Held in Trust.***

Money held by the Trustee under this Indenture shall be held in trust to the extent required in this Indenture.  The Trustee shall be under no liability for interest on any money received by it under this Indenture except as otherwise agreed on with the Issuer and except to the extent of income or other gain on investments that are deposits in or certificates of deposit of the Bank in its commercial capacity and income or other gain actually received by the Trustee on Eligible Investments.  Under no circumstances shall the Trustee be responsible for any losses on investments made in accordance with an Issuer Order or a written order or request by the Portfolio Manager, unless such investment is made in an obligation of the Trustee in its corporate capacity.

Section 6.7.        ***Compensation and Reimbursement.***

(a)        The Issuer agrees:

(i)        to pay the Trustee on each Payment Date reasonable compensation for all services rendered by it under this Indenture in accordance with its letter agreement with the Trustee (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust);

(ii)        except as otherwise expressly provided in this Indenture or in its letter agreement with the Trustee, to reimburse the Trustee in a timely manner upon its request for all reasonable expenses, disbursements, and advances incurred or made by the Trustee in accordance with this Indenture (including securities transaction charges and the reasonable compensation and expenses and disbursements of its agents and legal counsel and of any accounting firm or investment banking firm employed by the Trustee pursuant to Section 5.4, 5.5, 10.5, or 10.7, except any such expense, disbursement, or advance attributable to its negligence, willful misconduct, or bad faith) but with respect to securities transaction charges, only to the extent they have not been waived during a Due Period due to the Trustee's receipt of a payment from a financial institution with respect to certain Eligible Investments, as specified by the Portfolio Manager;

(iii)        to indemnify the Trustee and its officers, directors, employees, and agents for any loss, liability, or expense incurred without negligence, willful misconduct, or bad faith on their part, arising out of or in connection with the acceptance or administration of this trust, including the costs and expenses of defending themselves (including reasonable attorney's fees and costs) against any claim or liability in connection with the exercise or performance of any of their powers or duties under this Indenture; and

(iv)        to pay the Trustee reasonable additional compensation together with its expenses (including reasonable counsel fees and costs) for any collection action taken pursuant to Section 6.13.

(b)        The Trustee shall receive amounts pursuant to this Section 6.7 as provided in Sections 11.1(a)(i) and (ii) but only to the extent that funds are available for their payment. Subject to Section 6.9, the Trustee shall continue to serve as Trustee under this Indenture notwithstanding the fact that the Trustee has not received amounts due to it under this Indenture. No direction by the Holders of the Securities shall affect the right of the Trustee to collect

128

amounts owed to it under this Indenture.  If on any date when a fee is payable to the Trustee pursuant to this Indenture insufficient funds are available for its payment any portion of a fee not so paid shall be deferred and payable on the next date on which a fee is payable and sufficient funds are available for it.

(c)     The Trustee agrees not to cause the filing of a petition in bankruptcy for the non-payment to the Trustee of any amounts provided by this Section 6.7 until at least one year and one day, or if longer the applicable preference period then in effect plus one day, after the payment in full of all Securities issued under this Indenture and the payment to the Preference Shares Paying Agent of all amounts payable with respect to the Preference Shares in accordance with the Priority of Payments.  Nothing in this Section 6.7(c) shall prohibit or otherwise prevent the Trustee from filing proofs of claim in any bankruptcy, insolvency or similar proceeding.

Section 6.8.     *Corporate Trustee Required; Eligibility.*

There shall at all times be a Trustee under this Indenture that is an Independent entity organized and doing business under the laws of the United States of America or of any state of the United States, authorized under those laws to exercise corporate trust powers, having a combined capital and surplus of at least U.S.$200,000,000, subject to supervision or examination by federal or state authority, having a rating of at least "Baa1" (and not on credit watch with negative implications) by Moody's and at least "BBB+" by S&P, and having an office within the United States.  If the Trustee publishes reports of condition at least annually, pursuant to law or to the requirements of its supervising or examining authority, then for the purposes of this Section 6.8, the combined capital and surplus of the Trustee shall be its combined capital and surplus in its most recent published report of condition.  For so long as the Insurer is the Controlling Class, upon written request by the Insurer, the Trustee shall provide copies of any such reports to the Insurer.  If at any time the Trustee ceases to be eligible in accordance with this Section 6.8, it shall resign immediately in the manner and with the effect specified in Section 6.9.

Section 6.9.     *Resignation and Removal; Appointment of Successor.*

(a)     No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Article 6 shall become effective until the acceptance of appointment by the successor Trustee under Section 6.10.  The indemnification in favor of the Trustee shall survive any resignation or removal of the Trustee.

(b)     The Trustee may resign at any time by giving not less than 30 days written notice to the Co-Issuers, the Portfolio Manager, the Holders of the Securities, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and each Rating Agency.  Upon receiving the notice of resignation, the Co-Issuers shall at the direction of a Majority of the Controlling Class promptly appoint a successor trustee satisfying the requirements of Section 6.8, by written instrument, in duplicate, executed by an Authorized Officer of the Issuer and an Authorized Officer of the Co-Issuer, one copy of which shall be delivered to the resigning Trustee and one copy to the successor Trustee, together with a copy to the Insurer, each Holder of Securities, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and the Portfolio Manager.  If no successor Trustee has been appointed and an instrument of acceptance by a successor Trustee has not been delivered to the Trustee within 60 days after the giving of the notice of resignation, the resigning Trustee, the Insurer or any Holder of a Security, on behalf of himself and all others similarly situated, may

129

petition any court of competent jurisdiction for the appointment of a successor Trustee satisfying the requirements of Section 6.8.

(c)     The Trustee may be removed (i) at any time by an Act of a Majority of each Class of Securities, (ii) at any time when an Event of Default is continuing by a Majority of the Controlling Class, or (iii) by order of a court of competent jurisdiction, delivered to the Trustee and to the Co-Issuers.

(d)     If at any time:

(i)     the Trustee ceases to be eligible under Section 6.8 and fails to resign after written request by the Co-Issuers or a Majority of the Controlling Class; or

(ii)     the Trustee becomes incapable of acting or is adjudged bankrupt or insolvent or a receiver or liquidator of the Trustee or of its property appointed or any public officer takes charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation, or liquidation,

then, in any such case (subject to Section 6.9(a)), (A) the Co-Issuers, by Issuer Order, may, and at the direction of a Majority of the Controlling Class shall, remove the Trustee, or (B) subject to Section 5.15, the Insurer or any Holder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)     If the Trustee is removed or becomes incapable of acting, or if a vacancy occurs in the office of the Trustee for any reason (other than resignation), the Co-Issuers, by Issuer Order or at the direction of a Majority of the Controlling Class, shall promptly appoint a successor Trustee.  If the Co-Issuers fail to appoint a successor Trustee within 60 days after the removal or incapability or the occurrence of the vacancy, a successor Trustee may be appointed by a Majority of the Controlling Class by written instrument delivered to the Issuer and the retiring Trustee.  The successor Trustee so appointed shall, upon its acceptance of its appointment, become the successor Trustee and supersede any successor Trustee proposed by the Co-Issuers.  If no successor Trustee has been so appointed by the Co-Issuers or a Majority of the Controlling Class and accepted appointment pursuant to Section 6.10, subject to Section 5.15, then the Trustee to be replaced, or any Holder, may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(f)     The Co-Issuers shall give prompt notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of the event by first-class mail, postage prepaid, to the Portfolio Manager, the Insurer, to each Rating Agency, to the Holders of Securities as their names and addresses appear in the Indenture Register and to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares).  Each notice shall include the name of the successor Trustee and the address of its Corporate Trust Office.  If the Co-Issuers fail to mail the notice within ten days after acceptance of appointment by the successor Trustee, the successor Trustee shall cause the notice to be given at the expense of the Co-Issuers.

Section 6.10.  *Acceptance of Appointment by Successor.*

Every successor Trustee appointed under this Indenture shall execute, acknowledge, and deliver to the Co-Issuers, the Insurer and the retiring Trustee an instrument accepting its appointment.  Upon delivery of the required instruments, the resignation or removal of the retiring Trustee shall become effective and the successor Trustee, without any further act, shall become vested with all the rights and obligations of the retiring Trustee; but, on request of the Co-Issuers, the Insurer or a Majority of any Class of Notes or the successor Trustee, the retiring Trustee shall, upon payment of any amounts then due to it, execute and deliver an instrument transferring to the successor Trustee all the rights and obligations of the retiring Trustee, and shall duly assign, transfer, and deliver to the successor Trustee all property and money held by the retiring Trustee under this Indenture.  Upon request of any successor Trustee, the Co-Issuers shall execute any instruments to more fully and certainly vest in and confirm to the successor Trustee all the rights and obligations of the Trustee under this Indenture.

No successor Trustee shall accept its appointment unless at the time of its acceptance the successor is qualified and eligible under Section 6.8 and either (a) each Rating Agency has been notified and the successor has long-term debt rated within the four highest rating categories by each Rating Agency, or (b) if not rated within the four highest categories by each Rating Agency, the Rating Condition with respect to each Rating Agency is satisfied with respect thereto.

Section 6.11.  *Merger, Conversion, Consolidation, or Succession to Business of Trustee.*

Any entity into which the Trustee may be merged or converted or with which it may be consolidated, or any entity resulting from any merger, conversion, or consolidation to which the Trustee is a party, or any entity succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee under this Indenture (and of the Bank under all of its other capacities under this Indenture, including as Custodian, Securities Intermediary, Indenture Registrar, and Paying Agent) without the execution or filing of any paper or any further act on the part of any of the parties hereto.  If any of the Securities have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion, or consolidation to the authenticating Trustee may adopt the authentication and deliver the Securities so authenticated with the same effect as if the successor Trustee had itself authenticated the Securities.

Section 6.12.  *Co-Trustees.*

At any time, to meet the legal requirements of any jurisdiction in which any part of the Collateral or the Class 1 Collateral may at the time be located, the Co-Issuers and the Trustee may appoint a co-trustee (subject to the approval of the Rating Agencies) to act jointly with the Trustee, with respect to all or any part of the Collateral or the Class 1 Collateral, with the power to file proofs of claim and take any other actions pursuant to Section 5.6 in this Indenture and to make claims and enforce rights of action on behalf of the Holders of the Securities and the, as the Holders themselves have the right to do, subject to the other provisions of this Section 6.12.

The Co-Issuers shall join with the Trustee in the execution, delivery, and performance of all instruments and agreements necessary or proper to appoint a co-trustee.  If the Co-Issuers do not join in the appointment within 15 days after they receive a request to do so, the Trustee may make the appointment.

Any instruments to more fully confirm a co-trustee's appointment shall, on request, be executed, acknowledged, and delivered by the Co-Issuers. The Co-Issuers agree to pay (but only from and to the extent of the Collateral), to the extent funds are available therefor under Section 11.1(a)(i)(1), any reasonable fees and expenses in connection with the appointment.

Every co-trustee shall, to the extent permitted by law, but to that extent only, be appointed subject to the following terms:

(a)      the Securities shall be authenticated and delivered and all rights and obligations under this Indenture in respect of the custody of securities, cash, and other personal property held by, or required to be deposited or pledged with, the Trustee under this Indenture, shall be exercised solely by the Trustee;

(b)      the rights and obligations conferred or imposed on the Trustee in respect of any property covered by the appointment of a co-trustee shall be conferred or imposed on and exercised or performed by the Trustee or by the Trustee and the co-trustee jointly as provided in the instrument appointing the co-trustee;

(c)      the Trustee at any time, by an instrument in writing executed by it, with the concurrence of the Co-Issuers evidenced by an Issuer Order, may accept the resignation of or remove any co-trustee appointed under this Section 6.12, and if an Event of Default is continuing, the Trustee shall have the power to accept the resignation of, or remove, any co-trustee without the concurrence of the Co-Issuers. A successor to any co-trustee so resigned or removed may be appointed in the manner provided in this Section 6.12;

(d)      no co-trustee under this Indenture shall be personally liable because of any act or omission of the Trustee under this Indenture;

(e)      the Trustee shall not be liable because of any act or omission of a co-trustee; and

(f)      any Act of Holders of Securities delivered to the Trustee shall be deemed to have been delivered to each co-trustee.

Section 6.13.   ***Certain Duties of Trustee Related to Delayed Payment of Proceeds.***

If in any month the Trustee has not received a payment with respect to any Pledged Obligation on its Due Date:

(a)      the Trustee shall promptly notify the Issuer and the Portfolio Manager in writing, and

(b)      unless the payment is received by the Trustee within three Business Days (or the end of the applicable grace period for the payment, if longer) after the notice, or unless the Issuer, in its absolute discretion (but only to the extent permitted by Section 10.2(a)), makes provision for the payment satisfactory to the Trustee in accordance with Section 10.2(a),

the Trustee shall request the issuer of the Pledged Obligation, the trustee under the related Underlying Instrument, or paying agent designated by either of them to make the payment as soon as practicable after the request but in no event later than three Business Days after the date

132

of the request. If the payment is not made within that time period, the Trustee, subject to clause (iv) of Section 6.1(c), shall take the action directed by the Portfolio Manager in writing. Any such action shall be without prejudice to any right to claim a Default or Event of Default under this Indenture. If the Issuer or the Portfolio Manager requests a release of a Pledged Obligation or delivers a Collateral Obligation in connection with any such action under the Management Agreement, the release or substitution shall be subject to Section 10.6 and Article 12. Notwithstanding any other provision of this Indenture, the Trustee shall deliver to the Issuer or its designee any payment with respect to any Pledged Obligation or any Collateral Obligation received after its Due Date to the extent the Issuer previously made provisions for the payment satisfactory to the Trustee in accordance with this Section 6.13 and the payment shall not be part of the Collateral.

Section 6.14.    *Authenticating Agents.*

Upon the request of the Co-Issuers, the Trustee shall, and if the Trustee so chooses the Trustee may, appoint one or more Authenticating Agents with power to act on its behalf and subject to its direction in the authentication of Securities in connection with issuance, transfers, and exchanges under Sections 2.4, 2.5, 2.6, 2.7, and 8.5, as fully to all intents and purposes as though each Authenticating Agent had been expressly authorized by those Sections to authenticate the Securities. For all purposes of this Indenture, the authentication of Securities by an Authenticating Agent pursuant to this Section 6.14 shall be the authentication of Securities "by the Trustee."

Any Authenticating Agent may at any time resign by giving written notice of resignation to the Trustee and the Issuer. The Trustee may at any time terminate the agency of any Authenticating Agent by giving written notice of termination to the Authenticating Agent and the Co-Issuers.

The Co-Issuers agree to pay to each Authenticating Agent from time to time reasonable compensation for its services, and reimbursement for its reasonable expenses relating to its services as an Administrative Expense; provided, however, that if the Trustee elects to appoint an Authenticating Agent without the approval or request of the Co-Issuers, then the Trustee shall pay such compensation and reimbursement. Sections 2.9, 6.4, and 6.5 shall be applicable to any Authenticating Agent.

Section 6.15.    *Fiduciary for Holders of Notes Only; Agent for Secured Parties.*

With respect to the security interest created under this Indenture, the delivery of any Pledged Obligation to the Trustee is to the Trustee as representative of the Holders of Notes or the Holders of the Class 1 Composite Securities, as the case may be, and agent for the other Secured Parties. In furtherance of the foregoing, the possession by the Trustee of any Pledged Obligation and the endorsement to or registration in the name of the Trustee of any Pledged Obligation (including as entitlement holder of the Custodial Account) are all undertaken by the Trustee in its capacity as representative of the Holders of Notes or the Holders of the Class 1 Composite Securities, as the case may be, and agent for the other Secured Parties. The Trustee shall owe no fiduciary duties to the Insurer other than as subrogee of the Noteholders; provided that, the foregoing shall not limit any of the express obligations of the Trustee under this Indenture.

Section 6.16.     ***Representations and Warranties of the Bank.***

The Bank represents and warrants as follows for the benefit of the Noteholders, the Composite Securityholders and the Insurer:

(a)     *Organization*.  The Bank has been duly organized and is validly existing as a national banking association and has the power to conduct its business and affairs as a trustee.

(b)     *Authorization; Binding Obligations*.  The Bank has the corporate power and authority to perform the duties and obligations of trustee under this Indenture.  The Bank has taken all necessary corporate action to authorize the execution, delivery, and performance of this Indenture, and all of the documents required to be executed by the Bank pursuant to this Indenture.  Upon execution and delivery by the Bank, this Indenture will be the valid and legally binding obligation of the Bank enforceable in accordance with its terms.

(c)     *Eligibility*.  The Bank is eligible under Section 6.8 to serve as Trustee under this Indenture.

Section 6.17.     ***Additional Reporting Requirements.***

If the Initial Purchaser elects to enter into a posting dealer agreement pursuant to Section 7.20, upon the effectiveness of the posting dealer agreement, the Issuer shall provide to The Bond Market Association certain documents for posting in the Repository as mutually agreed between the Portfolio Manager and the Initial Purchaser.

If the Initial Purchaser has entered into a posting dealer agreement, as promptly as possible following the execution of any supplemental indenture under Article 8, the Trustee at the expense of the Issuer shall deliver a copy of such supplemental indenture to the Repository in the manner described in Section 14.3(a)(viii).

## ARTICLE 7

### COVENANTS

Section 7.1.     ***Payment of Principal and Interest.***

The Applicable Issuers shall pay the principal of and interest on the Securities in accordance with the Securities and this Indenture.

The Issuer shall, subject to the Priority of Payments, reimburse the Co-Issuer for any amounts paid by the Co-Issuer pursuant to the Securities or this Indenture.  The Co-Issuer shall not reimburse the Issuer for any amounts paid by the Issuer pursuant to the Securities or this Indenture.

Amounts properly withheld under the Code or other applicable law by any person from a payment to any Holder shall be considered as having been paid by the applicable Issuers to the Holder for all purposes of this Indenture.

45824v26

Section 7.2.     *Maintenance of Office or Agency.*

The Co-Issuers appoint the Trustee as a Paying Agent for the payment of principal of and interest on the Notes and of the Class 1 Component.  The Co-Issuers appoint JPMorgan Chase Bank, National Association, 4 New York Plaza, Ground Floor, New York, NY 10004, Attn: ITS (Houston) Southfork CLO Ltd., as the Co-Issuers' agent where notices and demands on the Co-Issuers in respect of the Securities or this Indenture may be served and where Securities may be surrendered for registration of transfer or exchange.

The Co-Issuers may at any time and from time to time vary or terminate the appointment of any Paying Agent or appoint any additional agents for all of these purposes.

The Co-Issuers shall maintain in the Borough of Manhattan, The City of New York, an office or agency where notices and demands on the Co-Issuers in respect of the Securities and this Indenture may be served and an office or agency outside of the United States where Securities may be presented and surrendered for payment.

No paying agent shall be appointed in a jurisdiction that subjects payments on the Securities to withholding tax.

So long as any Class of Securities is listed on the Irish Stock Exchange and the rules of the exchange so require, the Co-Issuers shall maintain in Ireland a Paying Agent and an office or agency where notices and demands on the Co-Issuers in respect of the Securities and this Indenture may be served and where the Securities may be surrendered for registration of transfer or exchange.

The Co-Issuers appoint, for so long as any Class of Securities is listed on the Irish Stock Exchange, JP Morgan Bank (Ireland) PLC (the "***Irish Listing and Paying Agent***") as Listing Agent and as Paying Agent in Ireland with respect to the Securities, for the payment of principal and interest on the Securities and as the Co-Issuers' agent where notices and demands on the Co-Issuers in respect of the Securities or this Indenture may be served.  If the Irish Listing and Paying Agent is replaced at any time when any Class of Securities is listed on the Irish Stock Exchange, notice of the appointment of any replacement shall be given to the Company Announcements Office of the Irish Stock Exchange as promptly as practicable after the appointment.  The Co-Issuers shall give prompt written notice to the Trustee, each Rating Agency, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and the Holders of the Securities of the appointment or termination of any such agent and of the location and any change in the location of any such office or agency.

If at any time the Co-Issuers fail to maintain any required office or agency in the Borough of Manhattan, The City of New York, or outside the United States, or fail to furnish the Trustee with their addresses, notices and demands may be served on the Co-Issuers.

Section 7.3.     *Money for Note Payments to be Held in Trust.*

All payments of amounts payable with respect to any Securities that are to be made from amounts withdrawn from the Payment Account shall be made on behalf of the Applicable Issuers by the Trustee or a Paying Agent with respect to payments on the Securities.

When the Applicable Issuers have a Paying Agent that is not also the Indenture Registrar, they shall furnish no later than the fifth calendar day after each Record Date a list in

135

the form the Paying Agent reasonably requests, of the names and addresses of the Holders and of the certificate numbers of individual Securities held by each Holder.

Whenever the Applicable Issuers have a Paying Agent other than the Trustee, they shall, on or before the Business Day before each Payment Date or Redemption Date direct the Trustee to deposit on the Payment Date with the Paying Agent an aggregate sum sufficient to pay the amounts then becoming due (to the extent funds are then available for that purpose in the Payment Account), that sum to be held in trust for the benefit of the persons entitled to it and (unless the Paying Agent is the Trustee) the Co-Issuers shall promptly notify the Trustee of its action or failure so to act.  Any monies deposited with a Paying Agent (other than the Trustee) in excess of an amount sufficient to pay the amounts then becoming due on the Securities with respect to which the deposit was made shall be paid over by the Paying Agent to the Trustee for application in accordance with Article 10.

Additional or successor Paying Agents shall be appointed by Issuer Order with written notice of the appointment to the Trustee.  So long as Notes of any Class are rated by a Rating Agency any Paying Agent must either have a long-term debt rating of "Aa3" (and not on credit watch with negative implications) or higher by Moody's and "AA-" or higher by S&P or a short-term debt rating of "P-1" (and not on credit watch for possible downgrade) by Moody's and "A-1+" by S&P or the Rating Condition with respect to each Rating Agency must be satisfied with respect to its appointment.  If a successor Paying Agent ceases to have a long-term debt rating of "Aa3" (and not on credit watch with negative implications) or higher by Moody's and "AA-" or higher by S&P or a short-term debt rating of "P-1" (and not on credit watch for possible downgrade) by Moody's and a short-term debt rating of "A-1+" by S&P, the Co-Issuers shall promptly remove the Paying Agent and appoint a successor Paying Agent.  The Co-Issuers shall not appoint any Paying Agent that is not, at the time of the appointment, a depository institution or trust company subject to supervision and examination by federal or state or national banking authorities.  The Co-Issuers shall cause each Paying Agent other than the Trustee to execute and deliver to the Trustee an instrument in which the Paying Agent agrees with the Trustee, subject to this Section 7.3, that the Paying Agent will:

(i)      allocate all sums received for payment to the Holders of Securities for which it acts as Paying Agent on each Payment Date and any Redemption Date among the Holders in the proportion specified in the applicable report to the extent permitted by applicable law;

(ii)      hold all sums held by it for the payment of amounts due with respect to the Securities in trust for the benefit of the persons entitled to them until they are paid or otherwise disposed of as provided in this Indenture;

(iii)      immediately resign as a Paying Agent and forthwith pay to the Trustee all sums held by it in trust for the payment of Securities if at any time it ceases to meet the standards required to be met by a Paying Agent at the time of its appointment;

(iv)      immediately give the Trustee notice of any default by the Issuer or the Co-Issuer (or any other obligor on the Notes) in the making of any payment required to be made; and

(v)      during the continuance of any such default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by the Paying Agent.

To obtain the satisfaction and discharge of this Indenture or for any other purpose, the Co-Issuers may at any time pay, or by Issuer Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Co-Issuers or the Paying Agent, and, upon the payment by any Paying Agent to the Trustee, the Paying Agent shall be released from all further liability with respect to the money paid.

Any money deposited with a Paying Agent and not previously returned that remains unclaimed for 20 Business Days shall be returned to the Trustee. Except as otherwise required by applicable law, any money deposited with the Trustee or any Paying Agent in trust for the payment of the principal of or interest on any Security or with respect to the Class 1 Component and remaining unclaimed for two years after the principal or interest has become payable shall be paid to the Applicable Issuers. The Holder of the Security shall thereafter look only to the Applicable Issuers for payment of the amounts due to it as an unsecured general creditor and all liability of the Trustee or the Paying Agent with respect to that money (but only to the extent of the amounts so paid to the Applicable Issuers) shall thereupon cease. The Trustee or the Paying Agent, before being required to release any payment, may, but shall not be required to, adopt and employ, at the expense of the Applicable Issuers any reasonable means of notification of the release of the payment, including mailing notice of the release to Holders whose Securities have been called but have not been surrendered for redemption or whose right to or interest in monies payable but not claimed is determinable from the records of any Paying Agent, at the last address of record of each Holder.

Section 7.4. ***Existence of Co-Issuers.***

(a) The Issuer and the Co-Issuer shall maintain in full force their existence and rights as companies incorporated or organized under the laws of the Cayman Islands and the State of Delaware, respectively, and shall obtain and preserve their qualification to do business as foreign corporations in each jurisdiction in which the qualifications are necessary to protect the validity and enforceability of this Indenture, the Securities, the Preference Shares Paying Agency Agreement, the Preference Shares, any of the Collateral or any of the Class 1 Collateral.

However, the Issuer may change its jurisdiction of incorporation from the Cayman Islands to any other jurisdiction reasonably selected by the Issuer so long as:

(A) the Issuer has received a legal opinion (on which the Trustee may rely) to the effect that the change is not disadvantageous in any material respect to the Holders, the Portfolio Manager, the Insurer or any Hedge Counterparty,

(B) written notice of the change has been given by the Issuer to the Trustee, the Holders of the Securities, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Portfolio Manager, any Hedge Counterparty, the Insurer and each Rating Agency, and

(C) on or before the 15th Business Day following its receipt of the notice the Trustee has not received written notice from a Majority of the Controlling Class objecting to the change.

The Issuer may take any action required by this Indenture within the United States notwithstanding any provision of this Indenture requiring the Issuer to take the action outside of the United States so long as before taking the action the Issuer receives a legal opinion from nationally recognized legal counsel to the effect that it is not necessary to take the action outside

137

of the United States or any political subdivision of the United States to prevent the Issuer from becoming subject to any United States federal, state, or local withholding or other taxes.

(b)     The Issuer and the Co-Issuer shall ensure that all corporate or other formalities regarding their respective existences (including holding regular board of directors' and shareholders', or other similar, meetings to the extent required by applicable law) are followed. Neither the Issuer nor the Co-Issuer shall take any action, or conduct its affairs in a manner, that is likely to result in its separate existence being ignored or in its assets and liabilities being substantively consolidated with any other person in a bankruptcy, reorganization, or other insolvency proceeding.  Without limiting the foregoing,

(i)     the Issuer shall not have any subsidiaries other than the Co-Issuer,

(ii)     the Co-Issuer shall not have any subsidiaries,

(iii)     the Issuer shall maintain at all times at least one director who is Independent of the Portfolio Manager, the Trustee, and any of their respective Affiliates,

(iv)     the Issuer shall not commingle its funds with the funds of any other person, except as expressly permitted by this Indenture, and

(v)     except to the extent contemplated in the Management Agreement, the Administration Agreement, the Preference Shares Paying Agency Agreement and the declaration of trust by the Share Trustee, the Issuer and the Co-Issuer shall not:

(A)     have any employees (other than their respective directors),

(B)     engage in any transaction with any shareholder that would be a conflict of interest (the entry into the Administration Agreement with the Administrator shall not be deemed a conflict of interest), or

(C)     pay dividends in violation of this Indenture, the resolutions of its board of directors and the Preference Share Documents.

Section 7.5.     *Protection of Collateral.*

(a)     The Portfolio Manager on behalf of the Issuer will procure any action within the Portfolio Manager's control that is reasonably necessary to maintain the perfection and priority of the security interest of the Trustee in the Collateral or the Class 1 Collateral.  The Issuer from time to time (and promptly upon the request of the Insurer for so long as the Insurer is the Controlling Class) shall execute and deliver any supplements and amendments to this Indenture and shall execute and deliver any Financing Statements, continuation statements, instruments of further assurance, and other instruments and shall take any other action appropriate to secure the rights and remedies of the Secured Parties under this Indenture and to:

(i)     Grant more effectively all or any portion of the Collateral or the Class 1 Collateral;

(ii)     maintain or preserve the lien (and its priority) of this Indenture or to carry out more effectively the purposes of this Indenture;

(iii)     perfect, publish notice of, or protect the validity of any Grant made by this Indenture (including any actions appropriate as a result of changes in law);

(iv)     enforce any of the Pledged Obligations or other instruments or property included in the Collateral and the Class 1 Collateral;

(v)     preserve and defend title to the Collateral and the Class 1 Collateral and the rights of the Secured Parties in the Collateral and of the Holders of the Class 1 Composite Securities in the Class 1 Collateral against the claims of anyone; and

(vi)     pay when due all taxes levied or assessed on any part of the Collateral and the Class 1 Collateral.

The Issuer designates the Portfolio Manager as its agent and attorney in fact to execute any Financing Statement, continuation statement, and all other instruments, and take all other actions, required pursuant to this Section 7.5.

The Issuer authorizes the filing without the Issuer's signature a financing statement that names the Issuer as "debtor" and JPMorgan Chase Bank, National Association as "secured party" (with or without indicating its capacity as Trustee hereunder) and that describes the Collateral and the Class 1 Collateral as "all assets of the debtor, whether now owned or hereafter acquired and wherever located."

(b)     The Trustee shall not:

(i)     except in accordance with Section 10.6(a), (b), or (c), remove any portion of the Collateral or the Class 1 Collateral that consists of Cash or is evidenced by an instrument, certificate, or other writing:

(A)     from the jurisdiction in which it was held at the date the most recent Opinion of Counsel was delivered pursuant to Section 7.6 (or from the jurisdiction in which it was held as described in the Opinions of Counsel delivered at the Closing Date pursuant to Section 3.1(iii) if no Opinion of Counsel has yet been delivered pursuant to Section 7.6), or

(B)     from the possession of the person who held it (other than the Bank), or

(ii)     cause or permit ownership or the pledge of any portion of the Collateral or the Class 1 Collateral that consists of book-entry securities to be recorded on the books of a person (other than the Bank):

(A)     located in a different jurisdiction from the jurisdiction in which the ownership or pledge was recorded, or

(B)     other than the person on whose books the ownership or pledge was originally recorded, unless the Trustee shall have first received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to the property and its priority will continue to be maintained after giving effect to the change.

139

(c)     Without at least 30 days' prior written notice to the Trustee and the Portfolio Manager, the Issuer shall not change its "location" (as defined in Section 9-307 of the UCC) or change its name from the name shown on the signature pages of this Indenture.

(d)     The Issuer shall, subject to the Priority of Payments, enforce all of its material rights and remedies under the Management Agreement, the Collateral Administration Agreement, the Preference Shares Paying Agency Agreement, each Hedge Agreement and each Securities Lending Agreement.

(e)     The Issuer shall pay any taxes levied because any Pledged Obligations are owned by the Issuer.

(f)     The Portfolio Manager on behalf of the Issuer will either exercise the "put" option that prevents a Collateral Obligation from being a Long-Dated Collateral Obligation on the last available date before the Stated Maturity of the Securities or sell the Collateral Obligation for Sale Proceeds at least equal to the Principal Balance of the Collateral Obligation, in either case by the Stated Maturity of the Securities.

Section 7.6.     *Opinions as to Collateral.*

On or before May, 31 in each calendar year, commencing in 2006, the Issuer shall furnish to the Trustee, the Portfolio Manager, the Insurer and each Rating Agency an Opinion of Counsel from each relevant jurisdiction stating that, in the counsel's opinion, as of the date of the opinion, all actions necessary to maintain the lien and security interest created by this Indenture with respect to the Collateral and the Class 1 Collateral have been taken and that no further action (other than as specified in the opinion) needs to be taken for the continued effectiveness and perfection of the lien over the next year.  The opinion may be subject to customary assumptions and qualifications.

Section 7.7.     *Performance of Obligations.*

(a)     The Co-Issuers, each as to itself, shall not take any action, and shall use their reasonable commercial efforts not to permit any action to be taken by others, that would release any person from any of the person's covenants or obligations under any instrument included in the Collateral or the Class 1 Collateral, except in the case of enforcement action taken with respect to any Defaulted Collateral Obligation in accordance with this Indenture and actions by the Portfolio Manager under the Management Agreement and in conformity with this Indenture or as otherwise required by this Indenture.

(b)     The Applicable Issuers may, with the prior written consent of the Insurer, a Majority of each Class of Notes, a Majority of the Preference Shares and a Majority of the Class 1 Component (except in the case of the Management Agreement and the Collateral Administration Agreement as initially executed), contract with other persons (including the Portfolio Manager, the Trustee, and the Collateral Administrator) for the performance of actions and obligations to be performed by the Applicable Issuers under this Indenture. Notwithstanding any such arrangement, the Applicable Issuers shall remain primarily liable for performance under this Indenture.  The Applicable Issuers shall punctually perform, and use their reasonable commercial efforts to cause the Portfolio Manager, the Trustee, the Collateral Administrator, the Preference Shares Paying Agent and any other person to perform, all of their obligations in the Management Agreement, this Indenture, the Collateral Administration Agreement, the Preference Shares Paying Agency Agreement or any other agreement.

140

Section 7.8.    ***Negative Covenants.***

(a)    The Issuer shall not and, with respect to clauses (ii), (iii), (iv), and (vi), the Co-Issuer shall not, in each case from and after the Closing Date:

(i)    sell, transfer, assign, exchange, or otherwise dispose of, or pledge, mortgage, hypothecate, or otherwise encumber (or permit or suffer the sale, transfer, assignment, exchange, or other disposition of, or pledge, mortgage, hypothecation, or other encumbering of), any part of the Collateral or the Class 1 Collateral, except as expressly permitted by this Indenture and the Management Agreement;

(ii)    claim any credit on, make any deduction from, or, to the fullest extent permitted by applicable laws, dispute the enforceability of payment of the principal or interest (or any other amount) payable in respect of the Notes or the Class 1 Component (other than amounts withheld in accordance with the Code or any applicable laws of the Cayman Islands) or assert any claim against any present or future Holder of Notes because of the payment of any taxes levied or assessed on any part of the Collateral or the Class 1 Collateral;

(iii)    (A) incur or assume or guarantee any indebtedness, other than the Securities and this Indenture and the transactions contemplated by this Indenture (including, as contemplated hereby, entering into the Hedge Agreements and Securities Lending Agreements), or (B) issue any additional class of securities other than the Preference Shares issued on or before the Closing Date, except as otherwise permitted by the Preference Share Documents;

(iv)    (A) permit the validity or effectiveness of this Indenture or any Grant under this Indenture to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated, or discharged, or permit any person to be released from any covenants or obligations with respect to this Indenture or the Securities, except as may be expressly permitted by this Indenture or by the Management Agreement, (B) permit any lien, charge, adverse claim, security interest, mortgage, or other encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise on or burden any part of the Collateral or the Class 1 Collateral, any interest in it, or its proceeds of, or (C) take any action that would permit the lien of this Indenture not to be a valid first priority perfected security interest in the Collateral and the Class 1 Collateral;

(v)    amend the Management Agreement except pursuant to its terms and Section 15.1(f)(iv) or amend the Collateral Administration Agreement except pursuant to its terms unless the Rating Condition with respect to each Rating Agency is satisfied with respect to the amendment or enter into any waiver in respect of any of the foregoing agreements without providing written notice to each Rating Agency and the Trustee (and, with respect to the Collateral Administration Agreement, without the consent of the Trustee);

(vi)    to the extent permitted by applicable law, dissolve or liquidate in whole or in part, except as permitted under this Indenture;

(vii)    pay any dividends or other distributions other than in accordance with the Priority of Payments and the Preference Share Documents;

(viii)    conduct business under any name other than its own;

(ix)    have any employees (other than directors and officers to the extent they are employees); or

(x)    except for any Underlying Instrument and agreements involving the purchase or sale of Collateral Obligations having customary purchase or sale terms and documented with customary trading documentation (but not excepting any Synthetic Security or Hedge Agreement), enter into any agreement unless the agreement contains "non-petition" and "limited recourse" provisions.

(b)    Neither the Issuer nor the Trustee shall sell, transfer, exchange, or otherwise dispose of Collateral or Class 1 Collateral, or enter into an agreement or commitment to do so, or enter into or engage in any business with respect to any part of the Collateral or Class 1 Collateral, except as expressly permitted by this Indenture and, with respect to the Issuer, the Management Agreement.

(c)    The Co-Issuer shall not invest any of its assets in "securities" as the term is defined in the 1940 Act, and shall keep all of its assets in Cash.

(d)    Neither the Issuer nor the Co-Issuer shall use the proceeds of the Securities to buy or carry Margin Stock.

Section 7.9.    *Notice of Default; Statement as to Compliance.*

(a)    The Co-Issuers shall notify the Trustee, the Portfolio Manager, the Insurer, the Rating Agencies, and each Hedge Counterparty within 10 days of acquiring actual knowledge of Default.

(b)    On or before May, 31 in each calendar year commencing in 2006, the Issuer shall deliver to the Trustee (to be forwarded by the Trustee to the Portfolio Manager and each Holder of Securities making a written request therefor and, upon written request therefor by a Beneficial Owner in the form of Exhibit I certifying that it is a Beneficial Owner, to the Beneficial Owner (or its designee), the Insurer and each Rating Agency) a certificate of an Authorized Officer of the Issuer that, to the best knowledge of the Issuer, no Default exists, and has not existed since the date of the last certificate or, if a Default does then exist or had existed, specifying the same and its nature and status, including actions undertaken to remedy it, and that the Issuer has complied with all of its obligations under this Indenture or, if that is not the case, specifying those obligations with which it has not complied.

Section 7.10.    *Co-Issuers May Consolidate, etc., Only on Certain Terms.*

Neither the Issuer nor the Co-Issuer (the "***Merging Entity***") shall consolidate or merge with or into any other person or transfer or convey all or substantially all of its assets to any person, unless permitted by Cayman Islands law (in the case of the Issuer) or United States and Delaware law (in the case of the Co-Issuer) and unless:

(a)    the Merging Entity shall be the surviving corporation, or the person (if other than the Merging Entity) formed by the consolidation or into which the Merging Entity is merged or to which all or substantially all of the assets of the Merging Entity are transferred (the "***Successor Entity***"),

142

(i)        if the Merging Entity is the Issuer, is a company organized and existing under the laws of the Cayman Islands or another jurisdiction approved by a Majority of the Controlling Class (except that no approval shall be required in connection with any such transaction undertaken solely to effect a change in the jurisdiction of incorporation pursuant to Section 7.4), and

(ii)        in any case shall expressly assume, by an indenture supplemental to this Indenture, executed and delivered to the Trustee, the Insurer and each Noteholder and each Composite Securityholder, the due and punctual payment of all amounts on all Securities issued by the Merging Entity and the performance and observance of every covenant of this Indenture on its part to be performed or observed, all as provided in this Indenture;

(b)        each Rating Agency shall have been notified of the consolidation, merger, transfer, or conveyance and the Rating Condition with respect to each Rating Agency is satisfied with respect to the transaction;

(c)        if the Merging Entity is not the surviving corporation, the Successor Entity shall have agreed with the Trustee,

(i)        to observe the same legal requirements for the recognition of the formed or surviving corporation as a legal entity separate and apart from any of its Affiliates as are applicable to the Merging Entity with respect to its Affiliates,

(ii)        not to consolidate or merge with or into any other person or transfer or convey the Collateral or the Class 1 Collateral or all or substantially all of its assets to any other person except in accordance with this Section 7.10; and

(iii)        in any case shall expressly assume by an indenture supplemental to this Indenture, executed and delivered to the Trustee, the Insurer, each Noteholder, each Composite Securityholder and the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the due and punctual payment of all amounts on all Securities issued by the Merging Entity and the performance and observance of every covenant of this Indenture on its part to be performed or observed, all as provided in this Indenture;

(d)        if the Merging Entity is not the surviving corporation, the Successor Entity shall have delivered to the Trustee, the Insurer and each Rating Agency an Officer's certificate and an Opinion of Counsel each stating that it is duly organized, validly existing, and in good standing in the jurisdiction in which it is organized; that it has sufficient power and authority to assume the obligations in subsection (a) above and to execute and deliver an indenture supplemental to this Indenture for the purpose of assuming the obligations in subsection (a) above; that it has duly authorized the execution, delivery, and performance of an indenture supplemental to this Indenture for the purpose of assuming the obligations in subsection (a) above and that the supplemental indenture is its valid and legally binding obligation, enforceable in accordance with its terms, subject only to bankruptcy, reorganization, insolvency, moratorium, and other laws affecting the enforcement of creditors' rights generally and to general principles of equity; if the Merging Entity is the Issuer, that, following the event that causes the Successor Entity to become the successor to the Issuer, (i) the Successor Entity has title, free of any lien, security interest, or charge, other than the lien and security interest of this Indenture, to the Collateral and the Class 1 Collateral, and (ii) the lien of this Indenture

45824v26

continues to be effective in the Collateral and the Class 1 Collateral; and in each case as to any other matters the Trustee or any Noteholder or Composite Securityholder reasonably requires;

(e) after giving effect to the transaction, no Default or Event of Default shall be continuing;

(f) the Merging Entity shall have notified each Rating Agency of the consolidation, merger, transfer, or conveyance and shall have delivered to the Trustee, the Insurer, each Noteholder, each Composite Securityholder and the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) an Officer's certificate and an Opinion of Counsel each stating that the consolidation, merger, transfer, or conveyance and the supplemental indenture comply with this Article 7 and that all conditions precedent in this Article 7 relating to the transaction have been complied with and that no adverse tax consequences will result therefrom to the Holders of the Securities or Preference Shares or the Insurer;

(g) the Merging Entity shall have delivered to the Trustee and the Insurer an Opinion of Counsel stating that after giving effect to the transaction, neither of the Co-Issuers (or, if applicable, the Successor Entity) will be as an investment company under the 1940 Act; and

(h) after giving effect to the transaction, the outstanding stock of the Merging Entity (or, if applicable, the Successor Entity) will not be beneficially owned within the meaning of the 1940 Act by any U.S. Person.

Section 7.11.    *Successor Substituted.*

Upon any consolidation or merger, or transfer or conveyance of all or substantially all of the assets of the Issuer or the Co-Issuer, in accordance with Section 7.10 in which the Merging Entity is not the surviving corporation, the Successor Entity shall succeed to, and be substituted for, and may exercise every right of, the Merging Entity under this Indenture with the same effect as if the person had been named as the Issuer or the Co-Issuer, as the case may be, in this Indenture.  Upon any such consolidation, merger, transfer, or conveyance, the person named as the "Issuer" or the "Co-Issuer" in the first paragraph of this Indenture or any successor may be dissolved, wound up, and liquidated at any time thereafter, and the person thereafter shall be released from its liabilities as obligor and maker on all the Securities and from its obligations under this Indenture.

Section 7.12.    *No Other Business.*

(a) From and after the Closing Date, the Issuer shall not engage in any business or activity other than issuing and selling the Securities pursuant to this Indenture and the Preference Shares pursuant to the Preference Share Documents and acquiring, owning, holding, and pledging and selling Collateral Obligations and the other Collateral and the Class 1 Collateral in connection therewith, and shall not act as agent, negotiator or structurer with respect to any Collateral, act as a participant in negotiating terms of a primary loan agreement, enter into a binding commitment to purchase any Collateral prior to the issuance thereof or engage in any transaction or activity not permitted by Schedule 7 or which the Issuer knows would cause it to be treated as engaged in a trade or business in the United States within the meaning of Section 864 of the Code, and the Co-Issuer shall not engage in any business or activity other than issuing and selling the Notes to be issued by it pursuant to this Indenture and,

with respect to the Issuer and the Co-Issuer, other activities appropriate to accomplish the foregoing or incidental thereto or connected therewith.

(b)      In furtherance and not in limitation of clause (a) of this Section 7.12, the Issuer shall comply with all of the provisions set forth in <u>Schedule 7</u> hereto, unless, with respect to a particular transaction, the Issuer and the Trustee shall have received an opinion or advice of tax counsel of nationally recognized standing in the United States experienced in such matters that, under the relevant facts and circumstances with respect to such transaction, the Issuer's failure to comply with one or more of such provisions will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States within the meaning of Section 864 of the Code or otherwise to be subject to United States federal income tax on a net basis. The provisions set forth in <u>Schedule 7</u> hereto may be amended, eliminated or supplemented (without execution of a supplemental indenture) if the Issuer and the Trustee shall have received an opinion of tax counsel of nationally recognized standing in the United States experienced in such matters that the Issuer's compliance with such amended provisions or supplemental provisions or the Issuer's failure to comply with such provisions proposed to be eliminated, as the case may be, will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States within the meaning of Section 864 of the Code or otherwise to be subject to United States federal income tax on a net basis <u>provided</u>, <u>however</u>, that written notice of any such amendment, elimination or supplementation of or to the provisions of <u>Schedule 7</u> pursuant to this Section 7.12(b) shall be provided to the Insurer and each Rating Agency then rating any Outstanding Class of Securities within 90 days of any such amendment, elimination or supplementation. For the avoidance of doubt, in the event an opinion of tax counsel as described above has been obtained in accordance with the terms hereof, no consent of any Holder of the Securities or satisfaction of the Rating Condition shall be required in order to comply with this Section 7.12(b) in connection with the amendment, elimination or supplementation of any provision of <u>Schedule 7</u> contemplated by such opinion of tax counsel.

(c)      The Issuer and the Co-Issuer may amend, or permit the amendment of, their Memorandum and Articles or the Certificate of Incorporation and By-laws if the Rating Condition with respect to each Rating Agency is satisfied with respect to the amendment (but not otherwise).

Section 7.13.    ***Listing on Irish Stock Exchange.***

So long as any Securities remain Outstanding, the Co-Issuers shall use all reasonable efforts to obtain and maintain the listing of the Securities on the Irish Stock Exchange.

Section 7.14.    ***Annual Rating Review.***

So long as any Securities of any Class remain Outstanding, on or before May, 31 in each year commencing in 2006, the Co-Issuers shall obtain and pay for an annual review or ongoing surveillance of the rating of each Outstanding Class of Securities (including, in the case of the Insured Notes, the rating thereof without giving effect to the Policy) from each Rating Agency, as applicable. The Co-Issuers shall promptly notify the Trustee and the Portfolio Manager in writing (and the Trustee shall promptly provide a copy of the notice to the Holders of the Securities) and the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) if at any time the rating of any Class of Securities has been, or is known will be, changed or withdrawn.

Section 7.15. ***Reporting.***

At any time when the Co-Issuers are not subject to Section 13 or 15(d) of the Exchange Act and are not exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act, upon the request of a Holder or Beneficial Owner of any Note or a Holder of a Composite Security, the Co-Issuers shall promptly furnish "Rule 144A Information" to the Holder or Beneficial Owner, to a prospective purchaser of a Security designated by the Holder or Beneficial Owner or to the Trustee for delivery to the Holder or Beneficial Owner or a prospective purchaser designated by the Holder or Beneficial Owner, as the case may be, to permit compliance by the Holder or Beneficial Owner with Rule 144A under the Securities Act in connection with the resale of the Security by the Holder or Beneficial Owner. "***Rule 144A Information***" is the information specified pursuant to Rule 144A(d)(4) under the Securities Act.

Section 7.16. ***Calculation Agent.***

(a) The Issuer agrees that for so long as any floating rate Notes remain Outstanding an agent will always have been appointed (that does not control and is not controlled by or under common control with the Issuer or its Affiliates) to calculate LIBOR in respect of each Interest Period (the "***Calculation Agent***"). The Issuer has initially appointed the Trustee as Calculation Agent. The Issuer may remove the Calculation Agent at any time. If the Calculation Agent is unable or unwilling to act as such or is removed by the Issuer or if the Calculation Agent fails to determine any of the information required to be given to the Company Announcements Office of the Irish Stock Exchange, as described in subsection (b), in respect of any Interest Period, the Issuer or the Portfolio Manager (on its behalf) shall promptly appoint a replacement Calculation Agent. For so long as any Securities are listed on the Irish Stock Exchange and the rules of the exchange so require, notice of the appointment of any replacement Calculation Agent shall be given to the Company Announcements Office of the Irish Stock Exchange or the Irish Listing and Paying Agent as promptly as practicable after the appointment. The Calculation Agent may not resign its duties without a successor having been duly appointed.

(b) As soon as possible after 11:00 A.M., London time, on the second Business Day before the first day of each Interest Period, but in no event later than 11:00 A.M., London time, on the next Business Day, the Calculation Agent shall calculate the Note Interest Rate for each Class of floating rate Notes for the next Interest Period. The Calculation Agent shall communicate those rates and amounts to the Co-Issuers, the Trustee, the Insurer, each Paying Agent, the Portfolio Manager, Euroclear, Clearstream, the Depository, and, so long as any of the floating rate Notes are listed thereon and the rules of the exchange so require, the Irish Stock Exchange or the Listing Agent. In the latter case, the information shall be given to the Company Announcements Office of the Irish Stock Exchange or the Listing Agent as soon as possible after its determination. The Calculation Agent shall separately notify the Irish Stock Exchange or the Irish Listing and Paying Agent of the information. The Calculation Agent shall also specify to the Co-Issuers the quotations on which the foregoing rates are based, and in any event the Calculation Agent shall notify the Co-Issuers before 7:00 P.M., London time, on the second Business Day before the first day of each Interest Period that either:

(i) it has determined or is in the process of determining the Note Interest Rate for each Class of floating rate Notes, or

(ii) it has not determined and is not in the process of determining any such Note Interest Rate together with its reasons therefor.

45824v26

The Calculation Agent's determination of the foregoing rates for any Interest Period shall (in the absence of manifest error) be final and binding on all parties and the Holders and Beneficial Owners of the Preference Shares.

Section 7.17.    ***Certain Tax Matters.***

(a)    For United States federal income tax purposes, the Issuer shall treat the Preference Shares as equity and the Notes as debt. The Issuer shall treat the Composite Securities as consisting of Preference Shares corresponding to the Preference Share Component and representing an ownership interest in the Class 1 Collateral. Each Holder of a Note, by its acquisition of that Note, agrees to treat those Notes as debt for United States federal income tax purposes. Each Holder of a Composite Security, by its acquisition of the Composite Security, agrees to treat the Composite Securities as consisting of Preference Shares corresponding to corresponding to the Preference Share Component, and representing an ownership interest in the Class 1 Collateral and to treat the Preference Shares as equity in the Issuer for United States federal income tax purposes.

(b)    The Issuer will not elect to be treated as a partnership for U.S. federal income tax purposes.

(c)    The Issuer shall file, or cause to be filed, any tax returns, including information tax returns, required by any governmental authority; provided, however, that the Issuer shall not file, or cause to be filed, any income or franchise tax return in any state of the United States unless it shall have obtained an opinion of tax counsel of nationally recognized standing experienced in such matters prior to such filing that, under the laws of such jurisdiction, the Issuer is required to file such income or franchise tax return.

(d)    Upon the Trustee's receipt of a request of a Holder holding a Note that is issued with original issue discount for U.S. Federal income tax purposes for the information described in United States Treasury Regulations section 1.1275-3(b)(1) that is applicable to such Note that is issued with original issue discount for U.S. Federal income tax purposes, the Issuer will cause its independent accountants to provide promptly to the Trustee and such requesting Holder all of such information.

(e)    Notwithstanding any contrary agreement or understanding, the Portfolio Manager, the Co-Issuers, the Trustee, the Insurer and the Holders and beneficial owners of the Notes and Composite Securities (and each of their respective employees, representatives or other agents) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by this Indenture and all materials of any kind (including opinions or other tax analyses) that are provided to them relating to such tax treatment and tax structure. The foregoing provision shall apply from the beginning of discussions between the parties. For this purpose, the tax treatment of a transaction is the purported or claimed U.S. tax treatment of the transaction under applicable U.S. federal, state or local law, and the tax structure of a transaction is any fact that may be relevant to understanding the purported or claimed U.S. tax treatment of the transaction under applicable U.S. federal, state or local law.

(f)    The Issuer and each Holder and each beneficial owner of a Senior Class A Note, Class A-2 Note, Class A-3 Notes, Class B Note or Class C Note (as the case may be), by acceptance of its Senior Class A Note, Class A-2 Note, Class A-3 Notes, Class B Note or Class C Note (as the case may be), or its interest in a Senior Class A Note, Class A-2 Note, Class A-3

45824v26

Notes, Class B Note or Class C Note (as the case may be), as the case may be, shall be deemed to have agreed to treat, and shall treat, such Senior Class A Note, Class A-2 Note, Class A-3 Notes, Class B Note or Class C Note as debt of the Issuer for United States federal income tax purposes.

(g)    Each Holder and beneficial owner of a Note or Composite Security, by acceptance of its Note or Composite Security or its interest in a Note or Composite Security, shall be deemed to understand and acknowledge that failure to provide the Issuer, the Trustee or any Paying Agent with the applicable U.S. federal income tax certifications (generally, a United States Internal Revenue Service Form W-9 (or successor applicable form) in the case of a person that is a "United States person" within the meaning of Section 7701(a)(30) of the Code or an appropriate United States Internal Revenue Service Form W-8 (or successor applicable form) in the case of a person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code) may result in U.S. federal back-up withholding from payments in respect of such Note or Composite Security.

(h)    The Issuer shall cause its independent accountants, within 90 days after the end of each calendar year, to provide to each Holder of Securities and, upon written request therefor certifying that it is a holder of a beneficial interest in a Note or Composite Security, to such holder (or its designee), all information that a U.S. shareholder making a "qualified electing fund" election (as defined in the Code) with respect to the Notes is required to obtain from the Issuer for U.S. federal income tax purposes and a "PFIC Annual Information Statement" as described in United States Treasury Regulation section 1.1295-1(g)(1) (or any successor Treasury Regulation) (including all representations and statements required by such statement), and the Issuer will take or cause to be taken any other reasonable steps to facilitate such election by a Noteholder or Composite Securityholder or beneficial owner of Notes or Composite Securities.

(i)    If the Issuer is aware that it has purchased an interest in a "reportable transaction" within the meaning of Section 6011 of the Code, and a Holder of a Note or Composite Security requests information about any such transactions in which the Issuer is an investor, the Issuer shall provide such information it has reasonably available as soon as practicable after such request.

(j)    The Issuer shall provide, or cause to be provided, upon the request of a Noteholder or Composite Securityholder and, upon written request certifying that it is a holder of a beneficial interest in a Note or Composite Security, to such holder (or its designee), any information that a Holder or beneficial owner of Notes or Composite Securities reasonably requests to assist such Noteholder, Composite Securityholder or beneficial owner with regard to filing requirements the Noteholder, Composite Securityholder or beneficial owner of Notes or Composite Securities is required to satisfy as a result of the controlled foreign corporation rules under the Code.

(k)    The Issuer shall not conduct any business other than the business that the Issuer is permitted to conduct under this Agreement.

Section 7.18.    ***Securities Lending.***

(a)    So long as no Event of Default is continuing and if after the completion of the transaction the limit in clause (28) of the definition of "Concentration Limitations" would be satisfied, the Portfolio Manager may cause Collateral Obligations that are not Defaulted

Collateral Obligations to be lent for a term of 90 days or less to banks, broker-dealers, and other financial institutions (other than insurance companies) having long-term and short-term senior unsecured debt ratings or guarantors with ratings of at least "A1" (and not "A1" but on credit watch with negative implications) and "P-1" (and not on credit watch for possible downgrade) from Moody's and a long-term senior unsecured debt rating of at least "A" from S&P (each, a "***Securities Lending Counterparty***") pursuant to one or more agreements (each, a "***Securities Lending Agreement***"); <u>provided</u> that Collateral Obligations the Market Value of which cannot be determined under clause (i), (ii) or (iii) of that definition may not be lent pursuant to a Securities Lending Agreement. Upon receipt of an Issuer Order, the Trustee shall release any lent Collateral Obligations to a Securities Lending Counterparty as directed by the Portfolio Manager. The Securities Lending Counterparties may be Affiliates of the Initial Purchaser or Affiliates of the Portfolio Manager. The duration of any Securities Lending Agreement shall not exceed the Stated Maturity of the Securities.

(b)     Each Securities Lending Agreement shall be on market terms as determined by the Portfolio Manager (except as may be required below) and shall:

(i)     require that the Securities Lending Counterparty return to the Issuer debt obligations that are identical (in terms of issue and class) to the lent Collateral Obligations;

(ii)     require that the Securities Lending Counterparty pay to the Issuer amounts equivalent to all interest and other payments that the owner of the lent Collateral Obligation is entitled to for the period during which the Collateral Obligation is lent and require that any such payments not be subject to withholding tax imposed by any jurisdiction unless the Securities Lending Counterparty is required under the Securities Lending Agreement to make "gross-up" payments to the Issuer that cover the full amount of the withholding tax on an after-tax basis;

(iii)     require that the Rating Condition with respect to each Rating Agency shall be satisfied with respect to the execution of the Securities Lending Agreement;

(iv)     satisfy any other requirements of Section 1058 of the Code and the Treasury Regulations promulgated under it;

(v)     be governed by the laws of New York;

(vi)     permit the Issuer to assign its rights under the Securities Lending Agreement to the Trustee pursuant to this Indenture;

(vii)     provide for early termination and the delivery of any lent Collateral Obligation with no penalty if the Collateral Obligation becomes a Credit Risk Obligation or is subject to redemption in accordance with its terms;

(viii)     provide for early termination and the delivery of any lent Collateral Obligation with no penalty upon any redemption of the Securities in whole;

(ix)     require the Securities Lending Counterparty to post with the Trustee collateral consisting of cash or direct registered debt obligations of the United States of America that have a maturity date no later than the Business Day preceding the stated termination date of the Securities Lending Agreement (the "***Securities Lending***

*Collateral*") to secure its obligation to return the Collateral Obligations or in the alternative post the Securities Lending Collateral with a custodian for the benefit of the Issuer designated by the Securities Lending Counterparty that satisfies the requirements with respect to being a securities intermediary with respect to the posted collateral if that custodian would qualify to be a successor trustee under Section 6.8;

(x)    provide that the Securities Lending Collateral shall be maintained at all times in an amount equal to at least 102% of the current Ask-Side Market Value (determined daily and monitored by the Portfolio Manager) of the lent Collateral Obligations and if securities are delivered to the Trustee as security for the obligations of the Securities Lending Counterparty under the related Securities Lending Agreement, the Portfolio Manager on behalf of the Issuer will negotiate with the Securities Lending Counterparty a rate for the loan fee to be paid to the Issuer for lending the lent Collateral Obligations;

(xi)    the lent Collateral Obligations shall be marked-to-market on a daily basis by the Portfolio Manager on the basis of their Market Value;

(xii)    the Collateral will include the Issuer's rights under the related Securities Lending Agreement rather than the loaned Collateral Obligation;

(xiii)    provide for early termination within 10 days at the option of the Issuer and the delivery of any lent Collateral Obligation with no penalty if the Securities Lending Counterparty is no longer in compliance with the requirements relating to the credit ratings of the Securities Lending Counterparty and the noncompliance is not cured as provided in this Indenture; and

(xiv)    contain appropriate limited recourse and non-petition provisions (to the extent the Issuer has contractual payment obligations to the Securities Lending Counterparty) equivalent (*mutatis mutandis*) to those in this Indenture.

(c)    If either Moody's or S&P downgrades a Securities Lending Counterparty such that the Securities Lending Agreements to which the Securities Lending Counterparty is a party are no longer in compliance with the requirements relating to the credit ratings of the Securities Lending Counterparty, then the Portfolio Manager on behalf of the Issuer, within 10 days of the downgrade, shall

(i)    terminate its Securities Lending Agreements with the Securities Lending Counterparty unless a guarantor for the Securities Lending Counterparty's obligations under the Securities Lending Agreements has been obtained; or

(ii)    reduce the percentage of the Aggregate Principal Balance of the Collateral Obligations lent to the downgraded Securities Lending Counterparty so that the Securities Lending Agreements to which the Securities Lending Counterparty is a party, together with all other Securities Lending Agreements, are in compliance with the requirements relating to the credit ratings of Securities Lending Counterparties; or

(iii)    take any other steps Moody's or S&P may require to cause the Securities Lending Counterparty's obligations under the Securities Lending Agreements to which the Securities Lending Counterparty is a party to be treated by Moody's or S&P, as the case may be, as if the obligations were owed by a counterparty having a

45824v26

rating at least equivalent to the rating that was assigned by Moody's or S&P, as the case may be, to the downgraded Securities Lending Counterparty before its being downgraded.

(d)     In connection with any such direction by the Portfolio Manager to enter into a Securities Lending Agreement, the Trustee may receive and rely on an Issuer Order to the effect that the Securities Lending Agreement, and its Securities Lending Counterparty, is each in compliance with the requirements of this Indenture (including the definition of "Securities Lending Counterparty"). The Issuer and the Trustee may enter into any Securities Lending Agreement (and any related account control agreement) at the instruction of the Portfolio Manager, and deliver and accept delivery and return of any Collateral Obligations pursuant to the Securities Lending Agreement, or pursuant to instructions from the Portfolio Manager in connection with the Securities Lending Agreement. The Trustee may take any actions and exercise any rights and remedies under any Securities Lending Agreement that the Portfolio Manager instructs. The Trustee need not enter into any Securities Lending Agreement (or any related account control agreement) that would in its judgment, subject it to any liability, whether financial or otherwise, or cause it to incur or subject it to risk of any cost or disbursement for which it is not, in its judgment, adequately indemnified, or that would impose on it any obligations or administrative burdens that are unacceptable to it. The Portfolio Manager shall instruct the Trustee in writing with respect to the administration of any Securities Lending Agreement (including with respect to any default and the exercise of rights under it). The Trustee shall not have any responsibility for evaluating the sufficiency, validity, or acceptability of any Securities Lending Agreement or for the qualifications or eligibility of any Securities Lending Counterparty. Nothing in this Indenture shall be construed to cause the Trustee to have any fiduciary duties to any Securities Lending Counterparty.

So long as any Collateral Obligation is on loan pursuant to a Securities Lending Agreement,

(a)     the Trustee shall have no liability for any failure or inability on its part to receive any information or take any action with respect to the Collateral Obligation because of its being on loan (including any failure to take action with respect to a notice of redemption, consent solicitation, exchange or tender offer, or similar corporate action), and

(b)     the loaned Collateral Obligations shall not be disqualified for return to the Trustee as a Collateral Obligation by any change in circumstance or status during the time while on loan (including any change that would cause the Collateral Obligation to be ineligible for purchase by the Issuer under this Indenture if applied to a proposed purchase of it in the open market at the time of its return from loan).

Section 7.19.     ***Purchase of Collateral Obligations; Ramp-Up Completion Date.***

(a)     The Issuer shall use its best efforts to purchase Collateral Obligations on any Business Day during the Ramp-Up Period or enter into commitments to purchase Collateral Obligations on any Business Day during the Ramp-Up Period for purchase on or as soon as practicable thereafter (not to exceed 60 days thereafter), in each case, for inclusion in the Collateral so that each of the Aggregate Principal Balance of the Collateral Obligations and the Overcollateralization Ratio Numerator is at least $663,000,000.

(b)      No Collateral Obligations may be purchased prior to the Ramp-Up Completion Date unless immediately following the purchase of any Collateral Obligation (as certified by the Portfolio Manager in writing), the remaining funds in the Collection Account, after giving effect to such purchase, are sufficient as of the date of determination to purchase Collateral Obligations for inclusion in the Collateral so that each of the Aggregate Principal Balance of the Collateral Obligations and the Overcollateralization Ratio Numerator is at least $663,000,000 (taking into account the Collateral Obligations already part of the Collateral (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations on or before the Ramp-Up Completion Date)).

(c)      Notwithstanding the foregoing, or any other provision of this Indenture, if the Issuer has previously entered into a commitment to purchase a Collateral Obligation to be included in the Collateral, such commitment initially not to exceed 60 days, and at the time of the commitment the Collateral Obligation complied with the definition of "Collateral Obligation" and the requirements set forth in this Section 7.19, the Issuer may consummate the purchase of the Collateral Obligation notwithstanding that the Collateral Obligation fails to comply with the definition of "Collateral Obligation" and the requirements set out above on the date of settlement.

(d)      The Issuer will use commercially reasonable efforts to purchase, or to enter into binding agreements to purchase, Collateral Obligations by the Ramp-Up Completion Date, that, together with the Collateral Obligations purchased on or before the Closing Date and then held by the Issuer, will satisfy, as of the Ramp-Up Completion Date (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations on or before the Ramp-Up Completion Date), the Collateral Quality Tests, the Concentration Limitations, the criteria set forth in Section 12.2 of this Indenture and the Overcollateralization Tests.

(e)      On or prior to July 1, 2005, so long as the Ramp-Up Completion Date has not already occurred, the Portfolio Manager shall certify by an order of the Portfolio Manager delivered to the Issuer, the Trustee and Moody's that, as of such date: (i)(A) the Aggregate Principal Balance of the Collateral Obligations owned by the Issuer equals at least $575,000,000, or (B) the Aggregate Principal Balance of the Collateral Obligations purchased (or committed to be purchased) by the Issuer with proceeds from the sale of the Securities (in each case in this clause (B), measured solely as of the date of purchase or commitment, as the case may be) equals at least $575,000,000 (for the avoidance of doubt, without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations on or before the Ramp-Up Completion Date, (ii) the Diversity Score is equal to at least 45, (iii) the Weighted Average Rating Factor Test is satisfied and (iv) each of the Coverage Tests is satisfied.  If the Portfolio Manager is not able to certify each of the foregoing items, an Interim Ramp-Up Completion Date Failure shall occur.

(f)      Within 5 Business Days after the Ramp-Up Completion Date, the Issuer or the Portfolio Manager (on behalf of the Issuer) shall request a Rating Confirmation on behalf of the Issuer and shall provide a report to the Rating Agencies identifying the Collateral Obligations then included in the Collateral and the Issuer shall obtain and deliver to the Trustee, the Insurer and the Rating Agencies, together with the delivery of a report (and an electronic file of the Collateral Obligations to S&P) substantially in the form of a Monthly Report as of the Ramp-Up Completion Date, an Accountants' Certificate:

152

(i)    confirming the maturity date, rating, spread and recovery rate for each item of Original Collateral Obligations owned by the Issuer as of the Ramp-Up Completion Date and the information provided by the Issuer with respect to every other asset included in the Collateral, by reference to such sources as shall be specified therein;

(ii)    confirming that as of the Ramp-Up Completion Date:

(1)    each of the Coverage Tests are satisfied;

(2)    the Aggregate Principal Balance of Collateral Obligations that the Issuer owned or committed to purchase as of the Ramp-Up Completion Date is at least equal to the Maximum Investment Amount; and

(3)    the Collateral Obligations comply with all of the requirements of the Collateral Quality Tests and the Concentration Limitations and the criteria set forth in Section 12.2 of this Indenture; and

(iii)    specifying the procedures undertaken by them to review data and computations relating to the foregoing statements.

(g)    If a Rating Confirmation Failure occurs, the Notes will be redeemed pursuant to, and to the extent provided in, Section 9.1(a).

Section 7.20.    ***Posting of Reports on Repository.***

If the Initial Purchaser has entered into a posting dealer agreement with The Bond Market Association relating to the transactions contemplated by this Indenture, each of the Issuer, the Trustee and the Portfolio Manager acknowledges and agrees that each Monthly Report and Valuation Report shall be posted to the Repository for use in the manner provided in the Repository. In connection therewith, the Trustee at the expense of the Issuer agrees to make available in accordance with Section 14.3(a)(viii) each Monthly Report or Valuation Report to the operator of the Repository for posing on the Repository.

Section 7.21.    ***Secondary Risk Procedures.***

The Portfolio Manager shall notify S&P and request that S&P modify the S&P CDO Monitor accordingly if on any date (as disclosed in the most recent Monthly Report):

(a)    the Aggregate Principal Amount of all Collateral Obligations participated from or entered into with the same Secondary Risk Counterparty exceeds the percentage of the Maximum Investment Amount in the Secondary Risk Table opposite the long-term S&P credit rating of the Secondary Risk Counterparty under the caption "Individual Counterparty Limit," or

(b)    the Aggregate Principal Amount of all Collateral Obligations participated from or entered into with Secondary Risk Counterparties with the same long-term credit rating exceeds the percentage of the Maximum Investment Amount in the Secondary Risk Table opposite that rating under the caption "Aggregate Counterparty Limit" (excluding up to 5% by Aggregate Principal Amount of Synthetic Securities with respect to Collateral Obligations the Aggregate Counterparty Limit of which is 20% to the extent that (x) such exposure is fully

45824v26

collateralized with respect to principal and (y) the related Synthetic Security Counterparties are rated at least "A-1+" by S&P).

# ARTICLE 8

## SUPPLEMENTAL INDENTURES

Section 8.1.  ***Supplemental Indentures Without Consent of Holders.***

(a)  Without the consent of the Holders of any Securities or the Holders of any Preference Shares, when authorized by Board Resolutions, and subject to the requirement provided below in this Section 8.1 with respect to the ratings of any Class of Securities, the Co-Issuers and the Trustee may, and the Insurer shall, if it is not materially and adversely affected thereby (and will be bound by a standard of good faith and fair dealing in making such determination) execute one or more indentures supplemental to this Indenture, in form satisfactory to the Trustee, to:

(1)  evidence the succession of another person to the Issuer or the Co-Issuer and the assumption by the successor person of the obligations of the Issuer or the Co-Issuer in this Indenture and in the Securities;

(2)  add to the covenants of the Co-Issuers or the Trustee for the benefit of the Holders of the Securities or to surrender any right in this Indenture conferred on the Co-Issuers;

(3)  convey, transfer, assign, mortgage, or pledge any property to the Trustee, or add to the conditions, limitations, or restrictions on the authorized amount, terms, and purposes of the issue, authentication, and delivery of the Securities;

(4)  evidence and provide for the acceptance of appointment under this Indenture by a successor Trustee and to add to or change any of the provisions of this Indenture necessary to facilitate the administration of the trusts under this Indenture by more than one Trustee, pursuant to the requirements of Sections 6.9, 6.10, and 6.12;

(5)  correct or amplify the description of any property at any time subject to the lien of this Indenture, or to better assure, convey, and confirm to the Trustee any property subject or required to be subject to the lien of this Indenture (including all actions appropriate as a result of changes in law) or to subject to the lien of this Indenture any additional property;

(6)  modify the restrictions on and procedures for resales and other transfers of the Securities to reflect any changes in applicable law (or its interpretation) or to enable the Co-Issuers to rely on any less restrictive exemption from registration under the Securities Act or the 1940 Act or to remove restrictions on resale and transfer to the extent not required under this Indenture;

(7)  with the consent of the Portfolio Manager, to modify the restrictions on the sales of Collateral Obligations in Section 12.1 or the Eligibility Criteria in Section 12.2 (and the definitions related thereto) in a manner not materially adverse to the Holders of any Class of the Notes, the Composite Securities or the Preference Shares as evidenced by an Opinion of Counsel (which may be supported as to factual (including

154

financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) or a certificate of an officer of the Portfolio Manager to the effect that the modification would not be materially adverse to the Holders of any Class of the Notes, the Composite Securities or the Preference Shares;

(8)     make appropriate changes for any Class of Securities to be listed on an exchange other than the Irish Stock Exchange;

(9)     otherwise to correct any inconsistency or cure any ambiguity or errors in this Indenture;

(10)     accommodate the issuance of the Securities in book-entry form through the facilities of DTC or otherwise;

(11)     to take any appropriate action to prevent the Issuer, the Insurer, the Holders of Securities or Preference Shares, or the Trustee from becoming subject to withholding or other taxes, fees, or assessments or to prevent the Issuer from being treated as being engaged in a U.S. trade or business or otherwise being subject to U.S. federal, state, or local income tax on a net income basis, so long as the action will not cause the Insurer or the Holders of any Securities or Preference Shares to be adversely affected to any material extent by any change to the timing, character, or source of the income from the Securities or Preference Shares, as evidenced by an Opinion of Counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion);

(12)     to authorize the appointment of any listing agent, Transfer Agent, Paying Agent, or additional registrar for any Class of Securities appropriate in connection with the listing of any Class of Securities on the Irish Stock Exchange or any other stock exchange, and otherwise to amend this Indenture to incorporate any changes required or requested by any governmental authority, stock exchange authority, listing agent, Transfer Agent, Paying Agent, or additional registrar for any Class of Securities in connection with its appointment, so long as the supplemental indenture would not materially and adversely affect any Holder of Securities, as evidenced by an Opinion of Counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) or a certificate of an Authorized Officer of the Portfolio Manager, to the effect that the modification would not be materially adverse to the Holders of any Class of Securities;

(13)     to amend, modify, enter into, or accommodate the execution of any contract relating to a Synthetic Security (including posting collateral under a Synthetic Security Agreement);

(14)     to modify Section 3.3 to be consistent with applicable laws or Rating Agency requirements;

(15)     to evidence any waiver by any Rating Agency as to any requirement or condition, as applicable, of the Rating Agency set forth in this Indenture;

(16)     to facilitate the issuance of participation notes, combination notes, composite securities, and other similar securities;

(17)     to facilitate hedging transactions;

(18)     to facilitate the ability of the Issuer to lend collateral pursuant to a Securities Lending Agreement;

(19)     to modify any provision to facilitate an A/B Exchange, including to effect any serial designation relating to the exchange; or

(20)     with the consent of the Portfolio Manager, to enter into any additional agreements not expressly prohibited by this Indenture as well as any amendment, modification, or waiver if the Issuer determines that the amendment, modification, or waiver would not, upon or after becoming effective, materially and adversely affect the rights or interest of the Holders of any Class of Securities or the Holders of Preference Shares as evidenced by an Opinion of Counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) or a certificate of an officer of the Portfolio Manager to the effect that the modification would not be materially adverse to the Holders of any Class of Securities or the Holders of Preference Shares.

(b)     Without the consent of the Portfolio Manager, no supplemental indenture may be entered into that would reduce the rights, decrease the fees or other amounts payable to the Portfolio Manager under this Indenture or increase the duties or obligations of the Portfolio Manager.

(c)     The Trustee is authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations that may be in the agreements, but the Trustee shall not be obligated to enter into any such supplemental indenture that affects the Trustee's own rights, duties, liabilities, or immunities under this Indenture or otherwise, except to the extent required by law.  Unless notified by a Majority of any Class of the Securities or a Majority of the Holders of Preference Shares that the Class of Securities or Holders of Preference Shares would be materially and adversely affected, the Trustee may rely on a certificate of the Portfolio Manager and an Opinion of Counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) as to whether the interests of any Holder of Securities or Holder of Preference Shares would be materially and adversely affected by any such supplemental indenture.  The Trustee shall give notice of the proposed change to the Holders of Securities and to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) at least 15 Business Days before execution of any supplemental indenture by the Trustee (or 60 calendar days before execution, in the case of a supplemental indenture for the purpose described in paragraph (7) of Section 8.1(a), which shall be identified as such in a certificate of the Portfolio Manager delivered to the Trustee before the date on which such notice is required to be given).

(d)     If any Outstanding Securities are rated by a Rating Agency, the Trustee shall enter into a supplemental indenture pursuant to this Section 8.1 only if either (1) the Rating Condition with respect to each Rating Agency is satisfied with respect to the supplemental indenture or (2) the Portfolio Manager and the Holders of 100% in Aggregate Outstanding

156

Amount of each Class of Securities the ratings on which would be reduced or withdrawn consent to the supplemental indenture. Prior to the entry into any supplemental Indenture with respect to which a Rating Confirmation for one or more Classes of Notes or Composite Securities is not expected to be delivered, the Trustee shall provide written notice to each Holder of each Outstanding Note and each Holder of each Outstanding Composite Security informing them of such fact.

(e)     At the cost of the Co-Issuers, for so long as any Securities are Outstanding and rated by a Rating Agency, the Trustee shall provide to the Rating Agency, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and each Hedge Counterparty a copy of any proposed supplemental indenture pursuant to this Section at least 15 Business Days before its execution by the Trustee.

Section 8.2.     ***Supplemental Indentures With Consent of Holders.***

(a)     If the Rating Condition is satisfied with respect to each Rating Agency, the Trustee, the Insurer and the Co-Issuers may execute one or more indentures supplemental to this Indenture to add any provisions to, or change in any manner, or eliminate any of the provisions of, this Indenture or modify in any manner the rights of the Holders of the Securities under this Indenture with the consent of:

(1)     the Portfolio Manager if the supplemental indenture would reduce the rights, decrease the fees or other amounts payable to it under this Indenture or increase the duties or obligations of the Portfolio Manager;

(2)     a Majority of each Class of Notes adversely affected thereby, by Act of the Holders of each such Class of Notes;

(3)     a Majority of the Composite Securities adversely affected thereby, by Act of the Holders of the Composite Securities; and

(4)     a Majority of the Preference Shares adversely affected thereby.

Any proposed supplemental indenture that would also necessitate a change to the Memorandum and Articles of Association may only be made after a Special Resolution (as defined in the Memorandum and Articles of Association) has been passed to permit the Issuer's constitutional documents to be altered to conform them to the proposed change to this Indenture as certified to the Trustee by the Issuer.

Notwithstanding anything in this Indenture to the contrary, without the consent of the Holder of each Outstanding Note adversely affected thereby, the Holder of each Outstanding Composite Security adversely affected thereby and the Holder of each Preference Share adversely affected thereby, no supplemental indenture shall:

(i)     change the Stated Maturity of the principal of or the due date of any installment of interest on any Note or the Class 1 Component or of any payment to the Preference Shares Paying Agent for payment to the Holders of the Preference Shares Interests, reduce its principal amount or the rate of interest on it, or the Default Interest Rate or the Redemption Price with respect to any Note, the Class 1 Component or Preference Share, or change the earliest date on which Notes of any Class or Preference Share may be redeemed at the option of the Issuer, change the provisions of this

157

Indenture relating to the application of proceeds of any Collateral to the payment of principal of or interest on Notes and the application of proceeds of any Class 1 Collateral or Preference Share Component corresponding to their related Components, or to payment to the Preference Shares Paying Agent for payment to the Holders of the Preference Shares, or change any place where, or the coin or currency in which, Notes or their principal or interest are paid or impair the right to institute suit for the enforcement of any such payment on or after their Stated Maturity (or, in the case of redemption, on or after the applicable Redemption Date);

(ii)     reduce the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class or Composite Securities or Holders of Preference Shares whose consent is required for the authorization of any such supplemental indenture or for any waiver of compliance with certain provisions of this Indenture or certain defaults under this Indenture or their consequences provided for in this Indenture;

(iii)     permit the creation of any lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Collateral or the Class 1 Collateral or terminate the lien on any property at any time subject hereto or deprive the Holder of any Security of the security afforded by the lien of this Indenture;

(iv)     reduce the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class whose consent is required to request the Trustee to preserve the Collateral or the percentage of the Aggregate Outstanding Amount of Holders of Class 1 Composite Securities whose consent is required to request the Trustee to preserve the Class 1 Collateral or rescind the Trustee's election to preserve the Collateral or the Class 1 Collateral, as the case may be, pursuant to Section 5.5 or to sell or liquidate the Collateral or the Class 1 Collateral, as the case may be, pursuant to Section 5.4 or 5.5;

(v)     modify any of the provisions of this Section, or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Note, Preference Share and Composite Security affected thereby;

(vi)     modify the definition of "Outstanding," "Controlling Class," or "Majority," or the Priority of Payments in Section 11.1(a) or Section 13.1; or

(vii)     modify any of the provisions of this Indenture in such a manner as to affect the calculation of the amount of any payment of Redemption Price or of interest or principal on any Note or the Class 1 Component or any payment to the Preference Shares Paying Agent for the payment of dividends or other payments on the Preference Shares on any Payment Date (or, with respect to the Preference Share Components, the Composite Securities Payment Date) or to affect the rights of the Holders of Notes or Preference Shares or the Holders of the Class 1 Composite Securities to the benefit of any provisions for the redemption of the Notes, the Class 1 Component or the Preference Shares contained in this Indenture.

Prior to the entry into any supplemental indenture with respect to which a Rating Confirmation for one or more Classes of Notes or Composite Securities is not expected to be delivered, the Trustee shall provide written notice to each Holder of each Outstanding Note,

158

each Holder of each Outstanding Composite Security and the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) informing them of such fact.

(b)     At the cost of the Co-Issuers, for so long as any Securities are Outstanding and rated by a Rating Agency, the Trustee shall provide to the Rating Agency a copy of any proposed supplemental indenture pursuant to this Section at least 15 Business Days before its execution by the Trustee.

(c)     Not later than 15 Business Days prior to the execution of any proposed supplemental indenture pursuant to this Section 8.2, the Trustee, at the expense of the Co-Issuers, shall mail to the Holders of the Securities, the Portfolio Manager, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and each Rating Agency (so long as any rated Securities are Outstanding) a copy of such supplemental indenture and shall request any required consent from the applicable Holders of Securities or Preference Shares to be given within the Initial Consent Period.  Any consent given to a proposed supplemental indenture by the Holder of any Securities or Preference Shares, as applicable, shall be irrevocable and binding on all future Holders or beneficial owners of that Security or Preference Share, irrespective of the execution date of the supplemental indenture.  If the Holders of less than the required percentage of the Aggregate Outstanding Amount of the relevant Securities or Preference Shares consent to a proposed supplemental indenture within the Initial Consent Period, on the first Business Day after the Initial Consent Period, the Trustee shall notify the Issuer and the Portfolio Manager which Holders of Securities or Preference Shares have consented to the proposed supplemental indenture and, which Holders (and, to the extent such information is reasonably available to the Trustee, which beneficial owners) have not consented to the proposed supplemental indenture.  If it intends to exercise its Amendment Buy-Out Option pursuant to Section 9.6, the Amendment Buy-Out Purchaser shall so notify the Trustee (which notice shall designate a date for the Amendment Buy-Out to occur no earlier than 10 Business Days after the date of such notice) no later than five (5) Business Days after so being notified by the Trustee and the Trustee shall mail such notice to all Holders of Securities and the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares).  Any Non-Consenting Holder may give consent to the related proposed supplemental indenture until the 5th Business Day prior to the date of the Amendment Buy-Out designated by the Amendment Buy-Out Purchaser, and in such case shall cease to be a Non-Consenting Holder for purposes of the Amendment Buy-Out.  If the Amendment Buy-Out Purchaser exercises its Amendment Buy-Out Option and purchases the applicable Securities pursuant to Section 9.6 below, the Amendment Buy-Out Purchaser, as Holder or beneficial owner of the applicable Securities or Preference Shares, may consent to the related proposed supplemental indenture within five (5) Business Days of the Amendment Buy-Out.  In the event that the Insurer does not consent to the related proposed supplemental indenture but all of the Holders of the Notes whose consent is required have consented to such proposed supplemental indenture, the Holders of the Insured Notes may, pursuant to Section 16.8, terminate the Policy, upon which, the consent of the Insurer pursuant to this clause (c) shall no longer be required; provided, however, that no such amendment shall decrease the rights of the Insurer (including, but not limited to the right of the Insurer to be reimbursed for Accrued Insurance Liabilities) or increase the duties or obligations of the Insurer, in any case, that survive the termination of the Policy.

(d)     It shall not be necessary for any Act of Holders of Securities under this Section 8.2 to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if the Act or consent approves its substance.

45824v26

(e)      The Trustee, at the expense of the Co-Issuers, shall mail to the Holders of the Securities, the Portfolio Manager, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and each Rating Agency a copy of any supplemental indenture pursuant to this Section 8.2 promptly after its execution by the Co-Issuers and the Trustee.  Any failure of the Trustee to mail a copy of any supplemental indenture as provided in this Indenture, or any defect in the mailing, shall not in any way affect the validity of the supplemental indenture.

Section 8.3.      ***Execution of Supplemental Indentures.***

In executing or accepting the additional trusts created by any supplemental indenture permitted by this Article 8 or the modifications thereby of the trusts created by this Indenture, the Trustee may receive, and (subject to Sections 6.1 and 6.3) shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of the supplemental indenture is authorized or permitted by this Indenture and that all conditions precedent to the execution of such supplemental indenture have been satisfied.  The Trustee may, but shall not be obligated to, enter into any such supplemental indenture that affects the Trustee's own rights, duties, or immunities under this Indenture or otherwise.  The Portfolio Manager shall not be bound by any amendment or supplement to this Indenture that would reduce the rights, decrease the fees or other amounts payable to it under this Indenture or increase the duties or obligations of the Portfolio Manager unless the Portfolio Manager consents to it in writing, such consent not to be unreasonably withheld or delayed.  The Portfolio Manager shall follow any amendment or supplement to this Indenture by which it is bound of which it has received written notice from the time it receives a copy of the amendment from the Issuer or the Trustee.

Section 8.4.      ***Effect of Supplemental Indentures; Certain Required Consents.***

Upon the execution of any supplemental indenture under this Article 8, this Indenture shall be modified in accordance therewith, and the supplemental indenture shall form a part of this Indenture for all purposes; and the Insurer and every Holder of Securities and Preference Shares theretofore and thereafter authenticated and delivered under this Indenture shall be bound thereby.

Without the approval of each Hedge Counterparty to a then existing Hedge Agreement (so long as the Hedge Counterparty is not in default under any Hedge Agreement to which it is party), no supplemental indenture will be effective, and the Co-Issuers will not consent to any supplemental indenture, that would have a material adverse effect on the Hedge Counterparty. For purposes of this paragraph, any supplemental indenture will be deemed not to have a material adverse effect on the Hedge Counterparty if it does not object within 10 days of delivery of such supplemental indenture by the Trustee.

Section 8.5.      ***Reference in Securities to Supplemental Indentures.***

Securities authenticated and delivered after the execution of any supplemental indenture pursuant to this Article 8 may, and if required by the Trustee shall, bear a notice in form approved by the Trustee as to any matter provided for in the supplemental indenture.  If the Applicable Issuers shall so determine, new Notes and new Composite Securities, so modified as to conform in the opinion of the Trustee and the Co-Issuers to any such supplemental indenture, may be prepared and executed by the Applicable Issuers and authenticated and delivered by the Trustee in exchange for Outstanding Securities.

Section 8.6.    ***Composite Securities.***

For purposes of this Article 8, the Composite Securities shall only be adversely affected or materially and adversely affected, as the context requires, by any proposed supplemental indenture if the Composite Securities would suffer an adverse effect or material adverse effect, as the context requires, that does not arise directly from an adverse effect or material adverse effect suffered by the Preference Shares.

## ARTICLE 9

### REDEMPTION OF NOTES

Section 9.1.    ***Mandatory Redemption.***

(a)    If either (a) a Coverage Test is not met on any Determination Date or (b) a Rating Confirmation Failure occurs, principal payments on the Notes shall be made on the related Payment Date (without payment of any Redemption Price) in accordance with the Priority of Payments.

Upon receipt of notice of a Rating Confirmation Failure and if available Interest Proceeds and Principal Proceeds are insufficient to effect the redemption of the Notes, at par on any subsequent Payment Date in accordance with the Priority of Payments as and to the extent necessary for each of Moody's and S&P to confirm in writing the Initial Ratings assigned by it on the Closing Date to the Securities, then at the direction and in accordance with the instructions of the Portfolio Manager the Trustee shall sell Collateral Obligations so that the proceeds from the sale and all other funds available for the purpose in the Collection Account will be used to redeem the Notes and the Preference Shares (but only to the extent necessary for each of Moody's and S&P to confirm in writing the Initial Ratings assigned by it on the Closing Date to the Securities) and to pay all administrative and other fees, expenses, and obligations payable under the Priority of Payments. Any sale under this Section shall be conducted in such a manner that:

(i)    after giving effect to the sale each Overcollateralization Test is satisfied or, if any Overcollateralization Test is not satisfied, the extent of compliance with the Overcollateralization Test is not reduced,

(ii)    if the sale occurs on or after the second Payment Date, after giving effect to the sale each Interest Coverage Test is satisfied or, if any Interest Coverage Test is not satisfied, the extent of compliance with the Interest Coverage Test is not reduced, and

(iii)    after giving effect to the sale each Collateral Quality Test is satisfied or, if any Collateral Quality Test is not satisfied, the extent of compliance with the Collateral Quality Test is not reduced.

(b)    The Preference Shares will be redeemed in whole in accordance with the Priority of Payments and the Preference Share Documents on any Payment Date (or, with respect to the Preference Share Components, the Composite Securities Payment Date) on which a mandatory redemption of the Notes pursuant to Section 9.1(a) results in the payment in full of the Aggregate Outstanding Amount of each Class of Notes.

161

45824v26

Section 9.2.    ***Optional Redemption.***

(a)    Upon the occurrence of a Tax Event, or at any time after the Non-Call Period, the Notes shall be redeemed by the Applicable Issuers, in whole but not in part, on any Payment Date from Principal Proceeds and all other funds available for that purpose in the Collection Account, the Payment Account, the Interest Reserve Account, the Closing Date Expense Account, the Revolving Reserve Account, and the Delayed Drawdown Reserve Account at the direction of the Holders of at least 63% of the Aggregate Outstanding Amount of Preference Shares, which direction must be given to the Preference Shares Paying Agent, the Trustee, the Issuer, the Insurer and the Portfolio Manager not later than 45 days before the Payment Date on which the redemption is to be made, at the applicable Redemption Price (exclusive of installments of interest and principal maturing on or before that date, payment of which shall have been made or duly provided for, to the Holders of the Notes on relevant Record Dates or as otherwise provided in this Indenture).  All Notes must be simultaneously redeemed, and any termination payments pursuant to Hedge Agreements must be paid.

Upon receipt of a notice of redemption pursuant to this Section 9.2(a), the Portfolio Manager in its sole discretion will (subject to the standard of care specified in the Management Agreement), on behalf of the Issuer, direct the sale of the Collateral Obligations so that the proceeds from the sale and all other funds available for such purpose in the Collection Account, the Interest Reserve Account, the Closing Date Expense Account, the Revolving Reserve Account, and the Delayed Drawdown Reserve Account will be at least sufficient to redeem all of the Notes and to pay all administrative and other fees and expenses payable under the Priority of Payments without regard to any payment limitations.  If, in the Portfolio Manager's reasonable discretion, the sale would not be sufficient to redeem the Notes, and to pay the fees, expenses, and obligations, the Notes shall not be redeemed.

Upon any redemption pursuant to this Section 9.2(a), the Issuer shall, at least 30 days before the Redemption Date (unless the Trustee shall agree to a shorter notice period), notify the Trustee, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Insurer and each Rating Agency of the Redemption Date, the applicable Record Date, the principal amount of Notes to be redeemed on the Redemption Date, and the applicable Redemption Prices.

(b)    On any Payment Date on or after payment in full of the Notes, all administrative and other fees (without regard to any payment limitations) payable under the Priority of Payments (including the Senior Management Fee and the Subordinated Management Fee), all amounts owing under this Indenture and the Insurance Documents to the Insurer, and all amounts owing under this Indenture and any Hedge Agreement to any Hedge Counterparty have been discharged,

(i)    at the direction of a Majority of the Preference Shares, the Issuer shall cause the Trustee to make payments in redemption of all of the Preference Shares, in an aggregate amount equal to all of the proceeds from the sale or other disposition of all of the remaining Collateral less any fees and expenses owed by the Issuer (including the Redemption Price of any Notes being simultaneously redeemed), the aggregate amount to be distributed to the Preference Shares Paying Agent for distribution to the Holders of the Preference Shares *pro rata* in accordance with their respective holdings or

(ii)    at the unanimous direction of the Holders of the Preference Shares, voting as a single Class or group, the Issuer shall cause the Trustee to make payments in

45824v26

redemption of all or a directed portion (representing less than all) of the Preference Shares to the Preference Shares Paying Agent for distribution to the Holders of the Preference Shares based upon such direction.

Upon the occurrence of a redemption of the Preference Shares pursuant to this Section 9.2, in whole or in part, the Class 1 Components shall be redeemed by the Issuer, in whole but not in part, on the related Composite Securities Payment Date from the Class 1 Collateral available for that purpose in the Class 1 Component Account at the applicable Redemption Price. All Class 1 Components must be simultaneously redeemed. Upon any redemption of the Class 1 Components, the Holders of Class 1 Composite Securities shall receive the Redemption Price as a distribution in kind of a *pro rata* share (based on the Class 1 Composite Security Rated Balance) of each item of the Class 1 Collateral.

Upon a distribution pursuant to Section 9.2(b)(i), the Portfolio Manager will (subject to the standard of care specified in the Management Agreement), on behalf of the Issuer (and subject to Section 9.2(b)(ii)), direct the sale of all remaining Collateral Obligations. Upon a distribution pursuant to Section 9.2(b)(ii), the Portfolio Manager will effect the sale of Collateral Obligations in accordance with the unanimous direction of the Holders of the Preference Shares.

Section 9.3.      ***Redemption Procedures.***

(a)      Upon any redemption pursuant to Section 9.2, a notice of redemption shall be given by first-class mail, postage prepaid, mailed not later than 10 Business Days and not earlier than 30 days before the applicable Redemption Date, to the Insurer, each Holder of Notes to be redeemed, at the Holder's address in the Indenture Register or otherwise in accordance with the rules and procedures of DTC, Euroclear, and Clearstream, as applicable, to the Holders of the Composite Securities and to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), and (in the case of a redemption pursuant to Section 9.2(a)) to each Rating Agency. In addition, for so long as any Securities are listed on the Irish Stock Exchange and so long as the rules of the exchange so require, notice of redemption of Securities pursuant to Section 9.2 shall also be given to the Company Announcements Office of the Irish Stock Exchange.

(b)      All notices of redemption delivered pursuant to Section 9.3(a) shall state:

(i)      the applicable Redemption Date;

(ii)      the Redemption Price of the Notes or the Class 1 Component to be redeemed (in the case of a redemption pursuant to Section 9.2(a));

(iii)      in the case of a redemption pursuant to Section 9.2(a), that all of the Notes, are to be redeemed in full and that interest on the Notes to be redeemed shall cease to accrue on the Payment Date specified in the notice; and

(iv)      the places where Securities to be redeemed in whole are to be surrendered for payment of the Redemption Price, which shall be the office or agency of the Co-Issuers to be maintained as provided in Section 7.2 and, so long as any Securities to be redeemed are listed on the Irish Stock Exchange, the Irish Listing and Paying Agent.

Any such notice of redemption may be withdrawn by the Issuer up to the fourth Business Day before the scheduled Redemption Date by written notice to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Trustee, the Insurer and the Portfolio Manager only if:

> (A)     in the case of a redemption pursuant to Section 9.2(a), the Portfolio Manager does not deliver the sale agreement or certifications (described in Section 9.3(c) and 12.1(f)), as the case may be, in form satisfactory to the Trustee,

> (B)     in the case of a redemption pursuant to Section 9.2(a) or Section 9.2(b)(i), the Issuer receives the written direction of the Preference Shares to withdraw the notice of redemption delivered by a percentage of the Preference Shares requesting redemption under Section 9.2(a) or Section 9.2(b)(i), as applicable, and

> (C)     in the case of a redemption pursuant to Section 9.2(b)(ii), the Issuer receives the unanimous written direction of the Holders of the Preference Shares to withdraw the notice of redemption (and the Issuer hereby agrees for the benefit of the directing person to withdraw the applicable notice of redemption if it receives the written direction referred to in the preceding clause (B) or this clause (C)).

Notice of any withdrawal shall be sent, not later than the third Business Day before the scheduled Redemption Date (assuming that the Trustee has received timely written notice from the Issuer as provided above), by the Trustee, to each Holder of Securities scheduled to be redeemed at the Holder's address in the Indenture Register by overnight courier guaranteeing next day delivery (or, to the extent the address contained in the Indenture Register is not sufficient for that purpose, by first class mail) and the Preference Shares Paying Agent (for forwarding to each Holder of Preference Shares).  If the Issuer so withdraws any notice of redemption or is otherwise unable to complete any redemption of the Notes, the Sale Proceeds received from the sale of any Collateral Obligations sold pursuant to Sections 9.2 and 12.1(f) may, during the Reinvestment Period (and, in respect of Sale Proceeds from Credit Improved Obligations, after the Reinvestment Period) at the Portfolio Manager's discretion, be reinvested in accordance with the Eligibility Criteria.

Notice of redemption shall be given by the Co-Issuers or, upon an Issuer Order, by the Trustee in the name and at the expense of the Co-Issuers.  Failure to give notice of redemption, or any defect therein, to any Holder of any Security selected for redemption or the Preference Shares Paying Agent (for forwarding to each Holder of Preference Shares) shall not impair or affect the validity of the redemption of any other Securities or Preference Shares.

(c)     The Notes may not be redeemed pursuant to Section 9.2(a) unless either of the following conditions are satisfied:

> (i)     At least ten Business Days before the Redemption Date, the Portfolio Manager shall have furnished to the Trustee evidence (in form reasonably satisfactory to the Trustee) that the Issuer has entered into a binding agreements (with a financial or other institution or entity whose short-term unsecured debt obligations (other than obligations whose rating is based on the credit of a person other than the institution) have a credit rating of at least "A-1" from S&P and of "P-1" (and not on credit watch

45824v26

for possible downgrade) from Moody's (or to any other institution or entity if the Rating Condition with respect to Moody's is satisfied with respect to the other entity)) to sell to the financial or other institutions, not later than the Business Day before the Redemption Date in immediately available funds, all or part of the Collateral (directly or by participation or other arrangement) at a Purchase Price at least equal to an amount sufficient (together with any Cash and other Eligible Investments not subject to the agreements and maturing on or before the Redemption Date and any payments to be received with respect to the Hedge Agreements on or before the Redemption Date) to pay all administrative and other fees and expenses payable under the Priority of Payments without regard to any payment limitations (including the Senior Management Fee and the Subordinated Management Fee), all amounts owing under this Indenture and the Insurance Agreement to the Insurer, all amounts owing under the Hedge Agreements to the Hedge Counterparties, and to redeem the Notes on the Redemption Date at the applicable Redemption Prices; or

(ii)     Before entering into any binding agreement to sell all or a portion of the Collateral and selling or terminating any Hedge Agreement, the Portfolio Manager shall have certified that, in its commercially reasonable judgment, the settlement dates of the sales will be scheduled to occur on or before the Business Day before the Redemption Date and that the expected proceeds from the sales are to be delivered to the Trustee no later than the Business Day before the Redemption Date, in immediately available funds, in an amount (calculated as applicable in the manner provided below) sufficient (together with any Cash and other Eligible Investments not subject to the agreements and maturing on or before the Redemption Date and any payments to be received with respect to the Hedge Agreements on or before the Redemption Date) to pay all administrative and other fees and expenses payable under the Priority of Payments (including the Senior Management Fee and the Subordinated Management Fee), all amounts owing under this Indenture and the Insurance Documents to the Insurer, all amounts owing under the Hedge Agreements to the Hedge Counterparties, and to redeem the Notes on the Redemption Date at the applicable Redemption Prices. For purposes of this paragraph, the amount shall be calculated with respect to the classes of Collateral listed in the table below by multiplying the expected proceeds of sale of the Collateral by the indicated percentage in the table below.

|  |  | Number of Business Days Between Certification to the Trustee and Sale | | | |
|---|---|---|---|---|---|
|  |  | Same Day | 1 to 2 | 3 to 5 | 6 to 15 |
| 1 | Cash or other Eligible Investments | 100% | 100% | 100% | 100% |
| 2 | Loans (other than 5 below) | 100% | 93% | 92% | 88% |
| 3 | High-Yield Bonds (other than 5 below) and Structured Finance Obligations (in each case, other than 4 below) | 100% | 89% | 85% | 75% |
| 4 | High-Yield Bonds (other than 5 below) and Structured Finance Obligations, in each case with a Moody's Rating of "B3" and on credit watch with negative implications or below "B3" | 100% | 75% | 65% | 55% |
| 5 | Synthetic Securities | 100% | 65% | 55% | 35% |

165

|  | Number of Business Days Between |  |  |
|  | Certification to the Trustee and Sale |  |  |

| Same Day | 1 to 2 | 3 to 5 | 6 to 15 |

Any certification delivered pursuant to this Section 9.3(c) shall include (A) the prices of, and expected proceeds from, the sale of any Collateral Obligations, Eligible Investments, or Hedge Agreements and (B) all calculations required by this Section 9.3(c).

Section 9.4.    ***Notes Payable on Redemption Date.***

(a)    Notice of redemption pursuant to Section 9.3 having been given as aforesaid, the Notes to be redeemed shall, on the Redemption Date, become payable at the Redemption Price therein specified and from and after the Redemption Date (unless the Issuer shall default in the payment of the Redemption Price and accrued interest) the Notes shall cease to bear interest on the Redemption Date.  Upon final payment on a Note to be so redeemed, the Holder shall present and surrender the Note at the place specified in the notice of redemption on or before the Redemption Date unless the Co-Issuers, the Trustee and (in the case of the Class A-1g Notes) the Insurer, receive the security or indemnity required by them to save each of them harmless and an undertaking thereafter to surrender the Note, and in the absence of notice to the Co-Issuers, the Trustee and (in the case of the Class A-1g Notes) the Insurer, that the applicable Note has been acquired by a protected purchaser, the final payment shall be made without presentation or surrender.  If a Component is to be redeemed, the related Composite Security does not need to be surrendered at the office of any paying agent under this Indenture to receive the applicable Redemption Price.  Payments of interest on Notes so to be redeemed whose Stated Maturity is on or before the Redemption Date shall be payable to the Holders of the Notes, or one or more predecessor Notes, registered as such at the close of business on the relevant Record Date if the Record Date is a Business Day (or, if the Record Date is not a Business Day, the close of business on the Business Day before the Record Date) according to Section 2.8(e).

(b)    If any Note called for redemption is not paid on its surrender for redemption, its principal shall bear interest from the Redemption Date at the Applicable Note Interest Rate for each successive Interest Period the Note remains Outstanding if the reason for the non-payment is not the fault of the Holder of the Note.

Section 9.5.    ***Special Redemption.***

Principal payments on the Notes shall be made in whole or in part, at par, in accordance with the Priority of Payments if, at any time during the Reinvestment Period, the Portfolio Manager elects (subject to the Management Agreement) to notify the Trustee and each Rating Agency that it has been unable, for 45 consecutive Business Days, to identify additional Collateral Obligations that are deemed appropriate by the Portfolio Manager in its sole discretion and meet the Eligibility Criteria in sufficient amounts to permit the investment or reinvestment of all or a portion of the funds then in the Collection Account available to be invested in additional Collateral Obligations (a "***Special Redemption***").

On the first Payment Date following the Due Period for which the notice is effective (a "***Special Redemption Date***"), the funds in the Collection Account or the Payment Account representing Principal Proceeds that, by operation of the preceding paragraph, are not reinvested in additional Collateral Obligations (the "***Special Redemption Amount***") will be available to be

166

applied in accordance with the Priority of Payments under Section 11.1(a)(ii). Notice of payments pursuant to this Section 9.5 shall be given by first-class mail, postage prepaid, mailed not later than three Business Days before the applicable Special Redemption Date, to the Insurer and each Holder of Notes to be redeemed, at the Holder's address in the Indenture Register or otherwise in accordance with the rules and procedures of DTC. In addition, for so long as any Securities are listed on the Irish Stock Exchange and so long as the rules of the exchange so require, notice of redemption of Securities pursuant to Section 9.2 shall also be given to the Company Announcements Office of the Irish Stock Exchange.

Section 9.6.    ***Amendment Buy-Out.***

(a)    In the case of any supplemental indenture pursuant to Section 8.2 that requires the consent of one or more Holders of Securities or Preference Shares, the Amendment Buy-Out Purchaser shall have the right, but not the obligation, to purchase from Non-Consenting Holders all Securities or Preference Shares held by such Holders of the Class of Securities or Preference Shares whose consent was solicited with respect to such supplemental indenture (the ***"Amendment Buy-Out Option"***) for the applicable Amendment Buy-Out Purchase Price. If such option is exercised, the Amendment Buy-Out Purchaser must purchase all such Securities or Preference Shares of Non-Consenting Holders, regardless of the applicable percentage of the Aggregate Outstanding Amount of the Securities or Preference Shares the consent of whose Holders is required for such supplemental indenture (an ***"Amendment Buy-Out"***). By its acceptance of its Securities or Preference Shares hereunder, each Holder of Securities or Preference Shares agrees that if the Amendment Buy-Out Option is exercised, any Non-Consenting Holder will be required to sell its applicable Securities or Preference Shares to the Amendment Buy-Out Purchaser; provided that, if the solicited consent to a supplemental indenture only applies to one Component of a Composite Security, the Non-Consenting Holder will be required to sell, at the Non-Consenting Holder's option, its Composite Security as a whole. Neither the Amendment Buy-Out Purchaser nor any other Person shall have any liability to any Holder or beneficial owner of Securities or Preference Shares as a result of an election by the Amendment Buy-Out Purchaser not to exercise the Amendment Buy-Out Option.

(b)    All purchases made pursuant to an Amendment Buy-Out Option individually and in the aggregate must comply with the applicable transfer restrictions for the relevant Securities or Preference Shares set forth herein and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency).

Section 9.7.    ***Removal Buy-Out.***

(a)    In the case of any proposed removal of the Portfolio Manager relating to the occurrence of an Event of Default described in Section 5.1(d), pursuant to the first paragraph of Section 14 of the Management Agreement, the Removal Buy-Out Purchaser shall have the right, but not the obligation, to purchase from the Holders of the Class A-1g Notes, all Class A-1g Notes (the ***"Removal Buy-Out Option"***) for the applicable Removal Buy-Out Purchase Price. If such option is exercised, the Removal Buy-Out Purchaser must purchase all such Class A-1g Notes, regardless of the applicable percentage of the Aggregate Outstanding Amount of the Controlling Class required to remove the Portfolio Manager under the first paragraph of Section 14 of the Management Agreement (a ***"Removal Buy-Out"***). By its acceptance of the Class A-1g Notes hereunder, each Holder of Class A-1g Notes agrees that if the Removal Buy-Out Option is exercised, any Holder of Class A-1g Notes will be required to sell its applicable

45824v26

Class A-1g Notes to the Removal Buy-Out Purchaser. Neither the Removal Buy-Out Purchaser nor any other Person shall have any liability to any Holder or beneficial owner of Class A-1g Notes as a result of an election by the Removal Buy-Out Purchaser not to exercise the Removal Buy-Out Option.

(b) All purchases made pursuant to a Removal Buy-Out Option individually and in the aggregate must comply with the applicable transfer restrictions for the Class A-1g Notes set forth herein and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency).

(c) Upon the effectiveness of the Removal Buy-Out, the Removal Buy-Out Purchaser shall be deemed to have exercised its right, without any further action or notice to any Person, to terminate the Policy pursuant to Section 16.8 hereof.

ARTICLE 10

ACCOUNTS, ACCOUNTINGS, AND RELEASES

Section 10.1. **Collection of Money.**

Except as otherwise expressly provided in this Indenture, the Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all money and other property payable to or receivable by the Trustee pursuant to this Indenture, including all payments due on the Pledged Obligations, in accordance with the terms of the Pledged Obligations. The Trustee shall segregate and hold all money and property received by it in trust for the Secured Parties and shall apply it as provided in this Indenture. Any Account may contain any number of sub-accounts for the convenience of the Trustee or as required by the Portfolio Manager for convenience in administering the Accounts, the Collateral or the Class 1 Collateral.

Section 10.2. **Collection Account.**

(a) Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Collection Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties over which the Trustee shall have exclusive control and the sole right of withdrawal, and into which the Trustee shall from time to time deposit, in addition to the deposits required pursuant to Section 10.7(e), immediately upon the Trustee's receipt thereof:

(i) any funds transferred from (1) the Closing Date Expense Account pursuant to Section 10.3(g) or (2) the Interest Reserve Account pursuant to Section 10.3(i),

(ii) all Principal Proceeds (unless (1) simultaneously reinvested in Collateral Obligations in accordance with Article 12, (2) deposited into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or (3) posted by the Issuer as cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security or in Eligible Investments) received by the Trustee,

(iii)    all Interest Proceeds received by the Trustee (unless simultaneously reinvested in accrued interest in respect of Collateral Obligations in accordance with Article 12 or in Eligible Investments), and

(iv)    all other funds received by the Trustee and not excluded above.

In addition to the items described above, the Issuer may, but under no circumstances shall be required to, deposit from time to time any monies, securities and other instruments in the Collection Account it deems, in its sole discretion, to be advisable (and may designate any amounts deposited pursuant to this sentence as Principal Proceeds or Interest Proceeds in its discretion).  Any Principal Proceeds received during the Reinvestment Period, and Sale Proceeds from the sale of Credit Improved Obligations and Unscheduled Principal Payments received after the Reinvestment Period, which have not been reinvested in additional Collateral Obligations on the Business Day of receipt shall be deposited in the Collection Account and shall at the direction of the Portfolio Manager be applied to the purchase of additional Collateral Obligations in accordance with the Eligibility Criteria and the other requirements set forth herein or the purchase of Eligible Investments pending such investment or used to enter into additional Hedge Agreements or used in connection with a Special Redemption.  Principal Proceeds (other than Sale Proceeds from the sale of Credit Improved Obligations and Unscheduled Principal Payments) received after the Reinvestment Period shall be deposited into the Collection Account and applied to the purchase of Eligible Investments.  All monies deposited from time to time in the Collection Account pursuant to this Indenture shall be held by the Trustee as part of the Collateral and shall be applied to the purposes provided in this Indenture.  Amounts in the Collection Account shall be reinvested pursuant to Section 10.4(a).

(b)    Within one Business Day after receipt of any distribution or other proceeds of the Collateral that are not Cash, the Trustee shall so notify the Issuer and the Portfolio Manager.  Within five Business Days of receipt of the notice from the Trustee, the Portfolio Manager, on behalf of the Issuer, shall sell the distribution or other proceeds for Cash in an arm's length transaction to a person that is not the Portfolio Manager or an Affiliate of the Portfolio Manager and deposit its proceeds in the Collection Account.  The Issuer need not sell the distributions or other proceeds if it delivers an Issuer Order or an Officer's certificate to the Trustee and the Portfolio Manager certifying that the distributions or other proceeds are Collateral Obligations, Eligible Investments, or Workout Assets.

(c)    During the Reinvestment Period (or, in respect of Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Improved Obligations, after the Reinvestment Period), at the direction of the Portfolio Manager, the Issuer may by Issuer Order direct the Trustee to, and upon receipt of the Issuer Order the Trustee shall withdraw funds on deposit in the Collection Account representing Principal Proceeds (and, to the extent expressly provided in this Indenture, Interest Proceeds) and reinvest (or invest, in the case of funds referred to in Section 7.19) the funds in Collateral Obligations (including any related deposit into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security), in each case in accordance with the requirements of Article 12 and the Issuer Order.

(d)    At any time during or after the Reinvestment Period, at the direction of the Portfolio Manager, the Issuer may by Issuer Order direct the Trustee to, and upon receipt of the Issuer Order the Trustee shall, pay from amounts on deposit in the Collection Account on any Business Day during any Interest Period from Interest Proceeds only, any Administrative

169

Expenses that require payment before the next Payment Date to the extent that the amount of the payments does not exceed the aggregate amount that may be paid on the next Payment Date under, and at the level of priority specified by, Section 11.1(a)(i)(1).

(e)        The Trustee shall transfer to the Payment Account from the Collection Account for application pursuant to Section 11.1(a) or 11.2, as applicable, on or not later than the Business Day preceding each Payment Date, the amount set forth to be so transferred in the Valuation Report for the Payment Date.

Section 10.3.        *Other Accounts.*

(a)        *Custodial Account.*  Before the Closing Date, the Trustee shall establish a single, segregated trust account that shall be designated as the Custodial Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal, and into which the Trustee shall deposit the Collateral Obligations and other Collateral not deposited elsewhere in accordance with this Indenture (other than Loans, Participations and general intangibles, which in the case of Loans and Participations, shall be held by the Trustee as provided in Section 3.2). All assets or securities at any time on deposit in, or otherwise to the credit of, the Custodial Account shall be held in trust by the Trustee for the benefit of the Secured Parties.  The only permitted withdrawals from the Custodial Account shall be in accordance with this Indenture. The Co-Issuers shall not have any legal, equitable, or beneficial interest in the Custodial Account other than in accordance with Section 3.2 and the Priority of Payments.

(b)        *Revolving Reserve Account and Delayed Drawdown Reserve Account.*  Before the Closing Date, the Trustee shall establish (i) a single, segregated non-interest bearing trust account which shall be designated as the Revolving Reserve Account and (ii) a single, segregated non-interest bearing trust account that shall be designated as the Delayed Drawdown Reserve Account, each of which shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal.  Upon the purchase of any Collateral Obligation that is a Revolving Loan or Delayed Drawdown Loan, at the direction of the Portfolio Manager, the Trustee shall deposit Principal Proceeds into the Revolving Reserve Account, in the case of a Revolving Loan, and the Delayed Drawdown Reserve Account, in the case of a Delayed Drawdown Loan, each equal to the unfunded Commitment Amount of the Revolving Loan or Delayed Drawdown Loan, respectively, and the Principal Proceeds so deposited shall be considered part of the Purchase Price of the Revolving Loan or Delayed Drawdown Loan for purposes of Article 12.  At the direction of the Portfolio Manager at any time during or after the Reinvestment Period, the Trustee shall withdraw funds from the Revolving Reserve Account or the Delayed Drawdown Reserve Account to fund extensions of credit pursuant to Revolving Loans or Delayed Drawdown Loans, respectively.  In addition, to the extent that the Issuer receives proceeds of a repayment in respect of a Revolving Loan (except to the extent of any concurrent Commitment Reduction) at any time during or after the Reinvestment Period, the Trustee shall deposit the proceeds into the Revolving Reserve Account.  Upon the sale of a Revolving Loan or Delayed Drawdown Loan in whole or in part or the reduction in part or termination of the Issuer's commitment thereunder, an amount on deposit in the Revolving Reserve Account or the Delayed Drawdown Reserve Account, as the case may be, specified by the Portfolio Manager as being equal to:

(i)        the unfunded amount of the commitment (in the case of a sale in whole or a termination of the commitment),

(ii)     the proportionate amount of the amount on deposit (in the case of a sale in part), or

(iii)     the amount by which the commitment is reduced (in the case of a reduction thereof in part),

shall be transferred by the Trustee to the Collection Account as Principal Proceeds. Amounts on deposit in the Revolving Reserve Account or the Delayed Drawdown Reserve Account shall be reinvested pursuant to Section 10.4(b). All interest and other income from amounts in the Revolving Reserve Account and the Delayed Drawdown Reserve Account deposited to the Collection Account pursuant to Section 10.4(b) shall be considered Interest Proceeds in the Due Period in which they are so deposited.

(c)     *Expense Reimbursement Account*. Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Expense Reimbursement Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal. On any Payment Date and on any date between Payment Dates, the Trustee will apply amounts, if any, in the Expense Reimbursement Account to the payment of expenses and fees that must be paid between Payment Dates or that are due on that Payment Date under Section 11.1(a)(i)(1) and the Trustee shall on any Payment Date transfer to the Expense Reimbursement Account an amount equal to the excess, if any, of the Administrative Expense Cap over the amounts due under Section 11.1(a)(i)(1) to the Expense Reimbursement Account in accordance with Section 11.1(a)(i)(2). Funds in the Expense Reimbursement Account shall be invested in accordance with Section 10.4(a).

(d)     *Hedge Counterparty Collateral Account*. Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Hedge Counterparty Collateral Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties (other than the Hedge Counterparty pledging the Collateral), over which the Trustee shall have exclusive control, the sole right of withdrawal and a lien for the benefit of the Secured Parties. The Trustee shall deposit all collateral received from a Hedge Counterparty under any Hedge Agreement into the Hedge Counterparty Collateral Account. The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Hedge Counterparty Collateral Account shall be:

(i)     for application to obligations of the relevant Hedge Counterparty to the Issuer under a Hedge Agreement if the Hedge Agreement becomes subject to early termination, or

(ii)     to return collateral to the relevant Hedge Counterparty when and as required by the relevant Hedge Agreement, in each case as directed by the Portfolio Manager.

Amounts on deposit in the Hedge Counterparty Collateral Account shall be reinvested pursuant to Section 10.4(a) and shall not be considered an asset of the Issuer for the purposes of the Coverage Tests.

(e)     *Synthetic Security Collateral Account*. Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Synthetic Security Collateral Account, that shall be held in trust in the name of the Trustee

for the benefit of the Secured Parties over which the Trustee shall have exclusive control, the sole right of withdrawal, and a lien for the benefit of the Secured Parties. On or before the date on which the Issuer enters into a Synthetic Security and delivers a copy of it to the Trustee, the Trustee shall create a sub-account of the Synthetic Security Collateral Account with respect to the Synthetic Security.

All Synthetic Security Collateral posted by any Synthetic Security Counterparty in support of its respective obligation under a Synthetic Security shall be immediately deposited into the Synthetic Security Collateral Account and posted to the sub-account related to the Synthetic Security. On each day on which amounts are payable to the Issuer out of Synthetic Security Collateral, the Issuer by Issuer Order shall direct the Trustee to, and upon receipt of the Issuer Order, the Trustee shall, withdraw amounts on deposit in the Synthetic Security Collateral Account in an amount sufficient to make the payment as provided in the Issuer Order (including any total or partial release of Synthetic Security Collateral). The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Synthetic Security Collateral Account shall be (i) for application to the obligations of the relevant Synthetic Security Counterparty under a Synthetic Security Agreement or (ii) to return Synthetic Security Collateral to the relevant Synthetic Security Counterparty at the termination of the relevant Synthetic Security Agreement or as otherwise required by the Synthetic Security Agreement, in each case as directed by the Portfolio Manager.

Amounts on deposit in the Synthetic Security Collateral Account shall be reinvested pursuant to Section 10.4(b) and shall not be considered an asset of the Issuer for the purposes of the Coverage Tests.

(f) *Securities Lending Account.* Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Securities Lending Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control, the sole right of withdrawal, and a lien for the benefit of the Secured Parties. On or before the date on which the Issuer enters into a Securities Lending Agreement and delivers a copy of it to the Trustee, the Trustee shall create a sub-account of the Securities Lending Account with respect to the Securities Lending Agreement. All Securities Lending Collateral posted by any Securities Lending Counterparty in support of its respective obligation under a Securities Lending Agreement shall be immediately deposited into the Securities Lending Account and posted to the sub-account related to the Securities Lending Agreement. The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Securities Lending Account shall be:

(i) for application to obligations of the relevant Securities Lending Counterparty to the Issuer under a Securities Lending Agreement if the Securities Lending Agreement becomes subject to early termination or in the exercise of remedies under the related Securities Lending Agreement upon any "event of default" under and as defined in the related Securities Lending Agreement, including liquidating the related Securities Lending Collateral, or

(ii) to return the Securities Lending Collateral to the relevant Securities Lending Counterparty when and as required by the relevant Securities Lending Agreement, in each case as directed by the Portfolio Manager.

45824v26

Amounts on deposit in the Securities Lending Account shall be reinvested pursuant to Section 10.4(c). To the extent provided in a Securities Lending Agreement, earnings on amounts on deposit in the Securities Lending Account shall be payable by the Issuer to the related Securities Lending Counterparty.

Amounts on deposit in the Securities Lending Account shall not be considered an asset of the Issuer for the purposes of the Coverage Tests, but the loaned security or asset that relates to the Securities Lending Account shall be so considered an asset of the Issuer.

(g) *Closing Date Expense Account*. Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Closing Date Expense Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal. On the Closing Date, the Trustee, at the direction of the Issuer, shall deposit into the Closing Date Expense Account approximately U.S.$18,300,000 from the gross proceeds of the Offering. At any time before the earlier of (i) the Ramp-Up Completion Date and (ii) the Payment Date in November 2005, at the direction of the Portfolio Manager, the Issuer may by Issuer Order direct the Trustee to, and upon receipt of the Issuer Order the Trustee shall, pay from amounts on deposit in the Closing Date Expense Account any applicable fees and expenses of the Offering. On the Payment Date in November 2005, the Trustee shall transfer all funds on deposit in the Closing Date Expense Account to the Collection Account as Principal Proceeds and close the Closing Date Expense Account.

Amounts on deposit in the Closing Date Expense Account shall be reinvested pursuant to Section 10.4(a) and shall not be considered an asset of the Issuer for the purposes of the Coverage Tests.

(h) *Payment Account*. Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Payment Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal. The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Payment Account shall be to pay amounts due and payable on the Notes and Composite Securities in accordance with their terms and the provisions of this Indenture and to pay Administrative Expenses, Premium, Accrued Insurance Liabilities and other amounts specified in this Indenture, each in accordance with the Priority of Payments. The Co-Issuers shall not have any legal, equitable, or beneficial interest in the Payment Account other than in accordance with the Priority of Payments.

(i) *Interest Reserve Account*. Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Interest Reserve Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal. On the Closing Date, the Trustee, at the direction of the Issuer, shall deposit into the Interest Reserve Account approximately U.S.$2,000,000 from the gross proceeds of the Offering. At any time on or before the earlier of (i) the Ramp-Up Completion Date and (ii) the Payment Date in November 2005, at the direction of the Portfolio Manager, the Issuer may by Issuer Order direct the Trustee to, and upon receipt of the Issuer Order the Trustee shall, pay from amounts on deposit in the Interest Reserve Account an amount necessary such that the amounts referred to in Section 11.1(a)(i)(1) through (14) will be paid in full on each Payment Date occurring on or before the Payment Date in November 2005. On the Payment Date in

45824v26

November 2005, the Trustee shall transfer all funds on deposit in the Interest Reserve Account (after application of any monies therefrom on such date) to the Collection Account as Principal Proceeds and close the Interest Reserve Account. Amounts on deposit in the Interest Reserve Account shall be reinvested pursuant to Section 10.4(a).

(j)     *Class 1 Component Account*.  Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Class 1 Component Account, that shall be held in trust in the name of the Trustee for the benefit of the Holders of the Class 1 Composite Securities, over which the Trustee shall have exclusive control and the sole right of withdrawal, and into which the Trustee shall deposit the United States Treasury strip security maturing on November 15, 2016 paying a principal amount at maturity equal to the original principal amount of the Class 1 Composite Securities specified in Section 2.3 (the "***Treasury Strip***"), which Treasury Strip shall be delivered to the Trustee by the Issuer on the Closing Date.  All assets or securities at any time on deposit in, or otherwise to the credit of, the Class 1 Component Account shall be held in trust by the Trustee for the benefit of the Holders of the Class 1 Composite Securities.  The only permitted withdrawals from the Class 1 Component Account shall be in accordance with this Indenture.  None of the Co-Issuers, the Noteholders, the Holders of Preference Shares (other than the Holders of the Class 1 Composite Securities, to the extent of their Preference Share Components) or any other Secured Party shall have any legal, equitable, or beneficial interest in the Class 1 Component Account.

(k)     In addition to any deposit, withdrawal, transfer or other application of funds with respect to any Account set forth in this Section 10.3 or in Section 10.2, any deposit, withdrawal, transfer or other application of funds with respect to any Account authorized elsewhere in this Indenture is hereby authorized pursuant to this Section 10.3.

(l)     In order to comply with its obligations under the USA Patriot Act of 2001, if any, the Trustee shall be entitled to request and verify, and the Noteholders, beneficial owners, the Co-Issuers and other parties related to this Indenture shall be obligated to provide to the Trustee all the necessary information required by the USA Patriot Act of 2001.

Section 10.4.     ***Reinvestment of Funds in Accounts; Reports by Trustee.***

(a)     By Issuer Order (which may be in the form of standing instructions), at the direction of the Portfolio Manager, the Issuer shall at all times before an Event of Default occurs, direct the Trustee to, and, upon receipt of the Issuer Order, the Trustee shall, invest all funds on deposit in the Collection Account, the Hedge Counterparty Collateral Account, the Expense Reimbursement Account, the Closing Date Expense Account and the Interest Reserve Account as so directed in Eligible Investments having Stated Maturities no later than the Business Day before the next Payment Date.  All investments on any Business Day shall be subject to the timely receipt of the funds and the availability of any investments.  Before an Event of Default occurs, if the Issuer has not given investment directions, the Trustee shall seek instructions from the Portfolio Manager within three Business Days after transfer of any funds to the Collection Account, the Hedge Counterparty Collateral Account, the Expense Reimbursement Account, the Closing Date Expense Account or the Interest Reserve Account. If the Trustee does not receive written instructions from the Portfolio Manager within five Business Days after transfer of the funds to the account, it shall invest and reinvest the funds held in the account, as fully as practicable, but only in one or more Eligible Investments of the type described in clause (c) of the definition of "Eligible Investments" maturing no later than the Business Day before the next Payment Date.  After an Event of Default occurs, if the Issuer does not give investment directions to the Trustee for three consecutive days, the Trustee shall

174

invest and reinvest the monies as fully as practicable in Eligible Investments of the type described in clause (c) of the definition of "Eligible Investments" maturing not later than the earlier of (i) 30 days after the date of the investment or (ii) the Business Day before the next Payment Date. All interest and other income from the investments shall be deposited in the Collection Account, any gain realized from the investments shall be credited to the Collection Account, and any loss resulting from the investments shall be charged to the Collection Account. Subject to Section 6.6, the Trustee shall not in any way be held liable for the selection of investments or because of any insufficiency of the Collection Account, the Hedge Counterparty Collateral Account, the Expense Reimbursement Account, the Closing Date Expense Account or the Interest Reserve Account or any other account that results from any loss relating to any such investment.

(b) By Issuer Order (which may be in the form of standing instructions), at the direction of the Portfolio Manager, the Issuer shall at all times direct the Trustee to, and, upon receipt of the Issuer Order, the Trustee shall, invest all funds on deposit in the Revolving Reserve Account, the Delayed Drawdown Reserve Account, and the Synthetic Security Collateral Account in Eligible Investments having Stated Maturities not later than one Business Day after the date of their purchase. All investments on any Business Day shall be subject to the timely receipt of the funds and the availability of any investments. If before an Event of Default, the Issuer does not give investment directions, the Trustee shall seek instructions from the Portfolio Manager within three Business Days after transfer of any funds to the Revolving Reserve Account, the Delayed Drawdown Reserve Account, or the Synthetic Security Collateral Account. If the Trustee does not thereupon receive written instructions from the Portfolio Manager within five Business Days after transfer of the funds to the account, it shall invest and reinvest the funds held in the account, as fully as practicable, but only in one or more Eligible Investments of the type described in clause (e) of the definition of "Eligible Investments" that are overnight funds. If after an Event of Default, the Issuer does not give investment directions to the Trustee for three consecutive days, the Trustee shall invest and reinvest the monies as fully as practicable in Eligible Investments of the type described in clause (e) of the definition of "Eligible Investments" that are overnight funds. All interest and other income from the investments shall be deposited in the Collection Account, any gain realized from the investments shall be credited to the Collection Account, and any loss resulting from the investments shall be charged to the Collection Account.

(c) By Issuer Order (which may be in the form of standing instructions), at the direction of the Portfolio Manager, the Issuer shall at all times direct the Trustee to, and, upon receipt of the Issuer Order, the Trustee shall, invest all funds on deposit in the Securities Lending Account in Eligible Investments having Stated Maturities no later than the Business Day before the stated termination date of the related Securities Lending Agreement. All investments on any Business Day shall be subject to the timely receipt of the funds and the availability of any investments. The interest on the Eligible Investments shall be allocated between the Issuer and the Securities Lending Counterparty pursuant to the related Securities Lending Agreement. If before an Event of Default, the Issuer does not give investment directions, the Trustee shall seek instructions from the Portfolio Manager within three Business Days after transfer of any funds to the Securities Lending Account. If the Trustee does not thereupon receive written instructions from the Portfolio Manager within five Business Days after transfer of the funds to the account, it shall invest and reinvest the funds held in the account, as fully as practicable, but only in one or more Eligible Investments of the type described in clause (e) of the definition of "Eligible Investments" that mature no later than the Business Day before the stated termination date of the related Securities Lending Agreement. If after an Event of Default, the Issuer does not give investment directions to the Trustee for three

175

consecutive days, the Trustee shall invest and reinvest the monies as fully as practicable in Eligible Investments of the type described in clause (e) of the definition of "Eligible Investments" maturing no later than the Business Day before the stated termination date of the related Securities Lending Agreement. All interest and other income from the investments shall be deposited in the Collection Account, any gain realized from the investments shall be credited to the Collection Account, and any loss resulting from the investments shall be charged to the Collection Account.

(d)     The Trustee agrees to give the Issuer notice as soon as reasonably practicable if a Trust Officer obtains actual knowledge that any Account or any funds on deposit in any Account, or otherwise to the credit of an Account, shall become subject to any writ, order, judgment, warrant of attachment, execution, or similar process. All Accounts shall remain at all times with the Custodian or a financial institution having a long-term debt rating of at least "Baa1" (and not on credit watch with negative implications) by Moody's and at least "BBB+" by S&P and having combined capital and surplus of at least U.S.$200,000,000 that has entered into a securities account control agreement substantially in the form of Exhibit G.

(e)     The Trustee shall supply, in a timely fashion, to the Co-Issuers and the Portfolio Manager any information regularly maintained by the Trustee that the Co-Issuers or the Portfolio Manager may from time to time request with respect to the Pledged Obligations, the Accounts, the Class 1 Collateral and the Collateral and provide any other requested information reasonably available to the Trustee because of its acting as Trustee under this Indenture and required to be provided by Section 10.6, to permit the Portfolio Manager to perform its obligations under the Management Agreement or is required pursuant to the Insurance Agreement. The Trustee shall promptly forward to the Portfolio Manager copies of notices and other writings received by it from the issuer of any Collateral Obligation or from any Clearing Agency with respect to any Collateral Obligation which notices or writings advise the holders of the security of any rights that the holders might have with respect to the Collateral Obligation (including requests to vote with respect to amendments or waivers and notices of prepayments and redemptions) as well as all periodic financial reports received from the issuer and Clearing Agencies with respect to the issuer.

(f)     To the extent monies deposited in any Account exceed amounts insured by the Bank Insurance Fund or Savings Association Insurance Fund administered by the Federal Deposit Insurance Corporation, or any agencies succeeding to its insurance functions, and are not fully collateralized by direct obligations of the United States of America, the excess shall be invested in Eligible Investments as described above.

Section 10.5.     ***Synthetic Security Counterparty Account.***

(a)     To the extent that any Synthetic Security requires the Issuer to secure its obligations to the Synthetic Security Counterparty, the Issuer shall direct the Trustee and the Trustee shall establish a segregated non-interest bearing trust account for the Synthetic Security which shall be held in trust for the benefit of the related Synthetic Security Counterparty and over which the Trustee shall have exclusive control and the sole right of withdrawal in accordance with the applicable Synthetic Security and this Indenture (a "***Synthetic Security Counterparty Account***"). In the alternative, a Synthetic Security Counterparty Account may be established with a trustee designated by the Synthetic Security Counterparty if that trustee would qualify to be a successor trustee under Section 6.8 and the account satisfies the other requirements of this Section.

176

As directed in writing by the Portfolio Manager, the Trustee shall deposit (or deliver for deposit) into each Synthetic Security Counterparty Account all amounts or securities that are required to secure the obligations of the Issuer in accordance with the related Synthetic Security, including the entire notional amount of any Synthetic Security in the form of a credit default swap or other similar transaction. The Portfolio Manager shall direct any such deposit only during the Reinvestment Period and only to the extent that monies are available for the purchase of Collateral Obligations pursuant to this Indenture. Any income received on amounts in the Synthetic Security Counterparty Account shall, after application in accordance with the relevant Synthetic Security, be withdrawn from the Synthetic Security Counterparty Account and deposited in the Collection Account for distribution as Interest Proceeds.

(b)     As directed by the Portfolio Manager in writing and in accordance with the applicable Synthetic Security and this Indenture, amounts on deposit in a Synthetic Security Counterparty Account shall be invested in Synthetic Security Collateral.

(c)     In connection with the occurrence of a credit event or an event of default or a termination event (each as defined in the applicable Synthetic Security) under the related Synthetic Security, amounts in any Synthetic Security Counterparty Account shall be withdrawn by the Trustee (or the Trustee shall request their withdrawal) and applied toward the payment of any amounts payable by the Issuer to the related Synthetic Security Counterparty in accordance with the Synthetic Security, as directed by the Portfolio Manager in writing. Any excess amounts held in a Synthetic Security Counterparty Account, or held directly by a Synthetic Security Counterparty, after payment of all amounts owing from the Issuer to the related Synthetic Security Counterparty in accordance with the related Synthetic Security shall be withdrawn from the Synthetic Security Counterparty Account and deposited in the Collection Account for distribution as Principal Proceeds.

(d)     Amounts on deposit in any Synthetic Security Counterparty Account shall not be considered an asset of the Issuer for the purposes of the Coverage Tests, but the Synthetic Security that relates to the Synthetic Security Counterparty Account shall be so considered an asset of the Issuer (with the notional amount as the Principal Balance unless a default exists under the applicable Synthetic Security).

Section 10.6.     ***Accountings.***

(a)     *Monthly*.  Commencing the earlier of (a) the first full month after the Ramp-Up Completion Date and (b) the month ending June, 2005, (i) in the case of a month in which there is no Payment Date, not later than the eighth Business Day after the last calendar day of such month and (ii) in the case of a month in which there is a Payment Date, on such Payment Date, the Issuer shall cause to be compiled and provided to the Portfolio Manager, the Trustee, the Insurer, the Preference Shares Paying Agent (for forwarding to each Holder of Preference Shares), the Initial Purchaser, each Hedge Counterparty, the Rating Agencies, (if so requested by the Initial Purchaser) the Repository in accordance with Section 14.3(a)(viii) or each Holder of a Security who makes a written request therefor, and, upon written request therefor by a Beneficial Owner in the form of Exhibit I certifying that it is a Beneficial Owner, the Beneficial Owner (or its designee), a monthly report (the "***Monthly Report***").  Each Monthly Report shall be accompanied by a Section 3(c)(7) Reminder Notice.  The Monthly Report shall contain the following information, determined as of (1) in the case of a month in which there is no Payment Date, the last day of the applicable month and (2) in the case of a month in which there is a Payment Date, the Determination Date for such Payment Date, based in part on information provided by the Portfolio Manager (the "***Monthly Determination Date***"):

(i)     *Portfolio*:

    (A)     The Aggregate Principal Balance (and, in the case of a Revolving Loan or Delayed Drawdown Loan, its funded and unfunded amount), interest rate, Stated Maturity, and obligor of each Collateral Obligation;

    (B)     The stated principal balance of Defaulted Collateral Obligations;

    (C)     The identity of all Collateral Obligations and all obligations that at the time of acquisition, conversion, or exchange do not satisfy the requirements of a Collateral Obligation that were released for sale or other disposition (and, for each obligation sold, indicating whether sold as a Credit Risk Obligation, a Credit Improved Obligation, a Current-Pay Obligation, a Defaulted Collateral Obligation, a Workout Asset, or an obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation or whether sold in connection with any withholding tax pursuant to Section 12.1(e) or sold as a discretionary sale pursuant to Section 12.1(h)); and the identity of all Collateral Obligations that were acquired, in each case since the date of the previous Monthly Report;

    (D)     The obligor of each Workout Asset;

    (E)     The Purchase Price of each Collateral Obligation acquired, the sale price of each Collateral Obligation sold (or the adjusted purchase or sale price with respect to any exchange of securities requiring an allocation by the Portfolio Manager) since the date of the previous Monthly Report, and the gain or loss (measured against its Purchase Price) on each sale;

    (F)     The identity of each Collateral Obligation (1) that is a Defaulted Collateral Obligation, a Workout Asset or a PIK Security, and in the case of a PIK Security (i) the principal amount of previously deferred or capitalized interest and (ii) the change in the principal amount of previously deferred or capitalized interest since the most recent Monthly Report or (2) in respect of which an obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation has been received, in each case indicating the date of such default, as applicable, and reporting any Other Indebtedness, as defined in clause (ii) in the definition of "Defaulted Collateral Obligation," that the Portfolio Manager has determined not to be material;

    (G)     The S&P Industry Classification and the Moody's Industry Classification for each Collateral Obligation and the five highest concentrations of Collateral Obligations in the Moody's Industry Classification groups and the five highest concentrations of Collateral Obligations in the S&P Industry Classification groups;

    (H)     For each Collateral Obligation, the country of the obligor (and the related foreign currency debt rating) and, in the case of a country other than the United States of America, whether the obligor is Domiciled in a Moody's

178

Group I Country, Moody's Group II Country, or Moody's Group III Country and the percentage of the Aggregate Principal Balance of the Collateral Obligations issued by issuers in the applicable country;

(I)     For each Collateral Obligation, the Moody's Priority Category Recovery Rate and S&P Priority Category Recovery Rate;

(J)     For each Collateral Obligation, the S&P Rating, and if any S&P Rating for any Collateral Obligation in any Monthly Report is a credit estimate, "non-public" rating or "shadow" rating, the rating shall not be disclosed, but shall be replaced with an asterisk in the place of the applicable credit estimate, "non-public" rating or "shadow" rating;

(K)     For each Collateral Obligation, the Moody's Rating and the Moody's Rating Factor, determined, for this purpose, and set forth both with and without regard to whether the Collateral Obligation has been put on watch for possible upgrade or downgrade, and if any Moody's Rating for any Collateral Obligation in any Monthly Report is an "estimated" or "shadow" rating, the rating shall not be disclosed, but shall be replaced with an asterisk in the place of the applicable "estimated" or "shadow" rating;

(L)     The Aggregate Principal Balance of the Collateral Obligations that have a Moody's Rating of "Caa1" or lower;

(M)     The Aggregate Principal Balance of the Collateral Obligations that have an S&P Rating of "CCC+" or lower;

(N)     For each Collateral Obligation that is a Participation or a Synthetic Security or is loaned pursuant to a Securities Lending Agreement, the related Secondary Risk Counterparty and each Rating Agency's long-term unsecured debt rating of the Secondary Risk Counterparty;

(O)     Certain S&P benchmarks relating to the portfolio as provided by S&P in the S&P CDO Monitor, including (1) S&P Default Measure (Annualized Portfolio Default Rate), (2) S&P Variability Measure (Annualized Standard Deviation of Portfolio Default Rate), (3) S&P Correlation Measure (Ratio of Standard Deviation of Portfolio with Correlation to Standard Deviation of Portfolio without Correlation), and (4) Weighted Average Default Correlation;

(P)     The identity and Market Value of each Collateral Obligation whose Market Value (in the determination of the Overcollateralization Ratio Numerator) was determined pursuant to last proviso in the definition of "Market Value";

(Q)     The identity of each Collateral Obligation participated from or entered into with a Secondary Risk Counterparty; and

(R)     The identity of each Collateral Obligation owned by the Issuer that has not been disposed of within the time limits required by this Indenture.

179

(ii)     *Accounts*:

(A)     The amount of any proceeds in the Collection Account, distinguishing between amounts credited as Interest Proceeds, Principal Proceeds (excluding Uninvested Proceeds), and Uninvested Proceeds;

(B)     The amount of any Principal Proceeds in the Revolving Reserve Account;

(C)     The amount of any Principal Proceeds in the Delayed Drawdown Reserve Account;

(D)     The amount of any Principal Proceeds in the Synthetic Security Collateral Account;

(E)     The amount of any Principal Proceeds in the Securities Lending Account; and

(F)     The amount of any proceeds in the Hedge Counterparty Collateral Account;

(iii)     *Hedge Agreements*:

(A)     The outstanding notional amount of each Hedge Agreement; and

(B)     The amount scheduled to be received and paid by the Issuer pursuant to each Hedge Agreement on the next Payment Date (as specified by the calculation agent under each Hedge Agreement);

(iv)     *Coverage Tests, Collateral Quality Tests and Reinvestment Overcollateralization Test*:

(A)     The Overcollateralization Ratios and the Overcollateralization Ratios as of the Ramp-Up Completion Date; a statement as to whether each of the Overcollateralization Tests is satisfied and a statement as to whether the Reinvestment Overcollateralization Test is satisfied;

(B)     The Interest Coverage Ratios and, on and after the second Payment Date, a statement as to whether each of the Interest Coverage Tests is satisfied;

(C)     The Diversity Score and, on and after the Ramp-Up Completion Date, a statement as to whether the Diversity Test is satisfied;

(D)     The Weighted Average Life of the Collateral Obligations and, on and after the Ramp-Up Completion Date, a statement as to whether the Weighted Average Life Test is satisfied;

(E)     The Moody's Minimum Average Recovery Rate, the S&P Minimum Average Recovery Rate and, on and after the Ramp-Up Completion

180

Date, a statement as to whether the Weighted Average Moody's Recovery Rate Test with respect to the Moody's Minimum Average Recovery Rate and Weighted Average S&P Recovery Rate Test with respect to the S&P Minimum Average Recovery Rate is satisfied;

(F)　　The Weighted Average Fixed Rate Coupon of the Collateral Obligations and, on and after the Ramp-Up Completion Date, a statement as to whether the Weighted Average Fixed Rate Coupon Test is satisfied and a statement as to the amount of Spread Excess was used to satisfy the Weighted Average Fixed Rate Coupon Test;

(G)　　The Weighted Average Spread of the Collateral Obligations and, on and after the Ramp-Up Completion Date, a statement as to whether the Weighted Average Spread Test is satisfied and a statement as to the amount of Fixed Rate Excess was used to satisfy the Weighted Average Spread Test;

(H)　　The Weighted Average Moody's Rating Factor and, on and after the Ramp-Up Completion Date, a statement as to whether the Weighted Average Rating Factor Test is satisfied; and

(I)　　The S&P CDO Monitor Test and, on and after the Ramp-Up Completion Date, a statement as to whether the S&P CDO Monitor Test is satisfied and the Class Scenario Loss Rate and the then applicable Note Break-Even Loss Rate with respect to each Class of Notes that is rated by S&P and the adjusted Weighted Average Spread level determined as set forth in the definition of "Note Break-Even Loss Rate";

(v)　　*Concentration Limitations and Withholding Taxes*:

(A)　　The percentage of the Maximum Investment Amount itemized against each element of the Concentration Limitations and a statement as to whether each Concentration Limitation is satisfied; and

(B)　　Any withholding tax on payments under any Collateral Obligation;

(vi)　　*Securities Lending Agreements*:

(A)　　Each Collateral Obligation loaned or borrowed pursuant to a Securities Lending Agreement and the percentage of the Maximum Investment Amount that represents Collateral Obligations that are loaned or borrowed pursuant to Securities Lending Agreements; and

(B)　　With respect to each Securities Lending Agreement in effect as of the Monthly Determination Date, a list setting forth:

(1)　　for each Collateral Obligation loaned or borrowed under it as of the first day of the loan, (x) its Principal Balance, (y) its Market Value, and (z) its Principal Balance expressed as a percentage of the Maximum Investment Amount,

181

(2)      the term of the loan of the Collateral Obligation,

(3)      the expiration date of the Securities Lending Agreement,

(4)      the Moody's Rating and S&P Rating for each loaned or borrowed Collateral Obligation,

(5)      the principal amount of the related Securities Lending Collateral held in the Securities Lending Account, and

(6)      the Eligible Investments held as Securities Lending Collateral pursuant to the related Securities Lending Agreement; and

(vii)      Any other information the Trustee reasonably requests.

Upon receipt of each Monthly Report, the Trustee shall compare the information contained in the Monthly Report to the information contained in its records with respect to the Collateral and shall, within three Business Days after receipt of such Monthly Report, notify the Issuer, the Preference Shares Paying Agent and the Portfolio Manager if the information contained in the Monthly Report does not conform to the information maintained by the Trustee with respect to the Collateral, and shall detail any discrepancies.  In the event that any discrepancy exists, the Trustee, the Issuer, and the Portfolio Manager shall attempt to resolve the discrepancy.  If such discrepancy cannot be promptly resolved, the Trustee shall within five Business Days after notification of such discrepancy cause the Independent accountants appointed by the Issuer pursuant to Section 10.8 to review such Monthly Report and the Trustee's records to determine the cause of such discrepancy.  If such review reveals an error in the Monthly Report or the Trustee's records, the Monthly Report or the Trustee's records shall be revised accordingly and, as so revised, shall be used in making all calculations pursuant to this Indenture and notice of any error in the Monthly Report shall be sent as soon as practicable by the Issuer to all recipients of the report.  If the review by the Independent accountants does not resolve the discrepancy, the Trustee, upon receipt of an Officer's certificate of the Portfolio Manager certifying that, to the best knowledge of the Portfolio Manager, the information contained in the related Monthly Report is correct, shall conform the information it maintains to the Monthly Report received.

(b)      *Payment Date Accounting*.  The Issuer shall cause to be rendered an accounting report (the "***Valuation Report***"), determined as of the close of business on each Determination Date, and provided to the Portfolio Manager, the Trustee, the Insurer, the Preference Shares Paying Agent (for forwarding to each Holder of Preference Shares), the Issuer, the Initial Purchaser, each Hedge Counterparty, the Rating Agencies, each Noteholder, each Composite Securityholder, (if so requested by the Initial Purchaser) the Repository in accordance with Section 14.3(a)(viii), and upon written request therefor by a Beneficial Owner in the form of Exhibit I certifying that it is a Beneficial Owner and the Beneficial Owner (or its designee) not later than the second Business Day preceding the related Payment Date.  Each Valuation Report shall be accompanied by a Section 3(c)(7) Reminder Notice.  The Valuation Report shall contain the following information as of the related Payment Date (unless otherwise stated), based in part on information provided by the Portfolio Manager:

(i)      *Securities*:

45824v26

(A)     The amount of principal payments to be made on each Class of Notes and Composite Securities on the related Payment Date;

(B)     The Aggregate Outstanding Amount of each Class of Notes and Composite Securities after giving effect to any principal payments on the related Payment Date and, for each Class of Securities, the percentage of its initial Aggregate Outstanding Amount that amount represents;

(C)     For each Class of Securities, the percentage of the initial Aggregate Outstanding Amount of all of the Securities that its initial Aggregate Outstanding Amount represented and, after giving effect to any principal payments on the related Payment Date, the percentage of the Aggregate Outstanding Amount of all of the Securities that its Aggregate Outstanding Amount represents;

(D)     The interest payable in respect of each Class of Notes and Composite Securities on the related Payment Date (in the aggregate and by Class) and its calculation in reasonable detail;

(E)     For the Composite Securities its Class 1 Composite Security Rated Balance; and

(F)     The amounts to be paid, if any, to the Preference Shares Paying Agent for payments on the Preference Shares on the related Payment Date, showing separately the payments from Interest Proceeds and the payments from Principal Proceeds;

(ii)     *Payment Date Payments*:

(A)     The amounts to be distributed under each clause of Sections 11.1(a)(i), 11.1(a)(ii) and 11.2 itemized by clause, and to the extent applicable, by type of distribution under the clause; and

(B)     Any amounts payable under the Hedge Agreements by any Hedge Counterparty on or before the related Payment Date and its calculation in reasonable detail (as specified by the calculation agent under the Hedge Agreement);

(iii)     *Accounts*:

(A)     The amount of any proceeds in the Collection Account, distinguishing between amounts credited as Interest Proceeds, Principal Proceeds (excluding Uninvested Proceeds) and Uninvested Proceeds;

(B)     The amount in the Collection Account after all payments and deposits to be made on the related Payment Date, distinguishing between amounts credited as Interest Proceeds and as Principal Proceeds;

(C)     The amount of any Principal Proceeds in the Revolving Reserve Account;

       (D)     The amount of any Principal Proceeds in the Delayed Drawdown Reserve Account;

       (E)     The amount of any Principal Proceeds in the Synthetic Security Collateral Account;

       (F)     The amount of any Principal Proceeds in the Securities Lending Account;

       (G)     The amount in the Hedge Counterparty Collateral Account; and

       (H)     The amount in the Expense Reimbursement Account;

     (iv)     A notice setting forth LIBOR, as calculated by the Calculation Agent, for the next Interest Period and each Note Interest Rate for the next Payment Date; and

     (v)     Any other information the Trustee or the Insurer reasonably requests.

Upon receipt of each Valuation Report, the Trustee shall compare the information contained in the Valuation Report to the information contained in its records with respect to the Collateral and shall, within three Business Days after receipt of such Valuation Report, notify the Issuer, the Preference Shares Paying Agent and the Portfolio Manager if the information contained in the Valuation Report does not conform to the information maintained by the Trustee with respect to the Collateral, and shall detail any discrepancies. In the event that any discrepancy exists, the Trustee, the Issuer, and the Portfolio Manager shall attempt to resolve the discrepancy. If such discrepancy cannot be promptly resolved, the Trustee shall within five Business Days after notification of such discrepancy cause the Independent accountants appointed by the Issuer pursuant to Section 10.8 to review such Valuation Report and the Trustee's records to determine the cause of such discrepancy. If such review reveals an error in the Valuation Report or the Trustee's records, the Valuation Report or the Trustee's records shall be revised accordingly and, as so revised, shall be used in making all calculations pursuant to this Indenture and notice of any error in the Valuation Report shall be sent as soon as practicable by the Issuer to all recipients of such report. If the review by the Independent accountants does not resolve the discrepancy, the Trustee, upon receipt of an Officer's certificate of the Portfolio Manager certifying that, to the best knowledge of the Portfolio Manager, the information contained in the related Valuation Report is correct, shall conform the information it maintains to the Valuation Report received.

     (c)     *Failure to Provide Accounting*. If the Trustee shall not have received any accounting provided for in Section 10.6(b) on the first Business Day after the date on which the accounting is due to the Trustee, the Trustee shall notify the Issuer and the Portfolio Manager, and the Portfolio Manager shall use all reasonable efforts to cause the accounting to be made by the applicable Payment Date. To the extent the Trustee is required to provide any information or reports pursuant to this Section 10.6 as a result of the failure of the Issuer (or anyone acting on the Issuer's behalf) to provide the information or reports, the Trustee may retain an Independent certified public accountant in connection therewith and the reasonable costs incurred by the Trustee for the Independent certified public accountant shall be reimbursed pursuant to Section 6.7.

     (d)     *Irish Stock Exchange*. So long as any Class of Securities is listed on the Irish Stock Exchange: (i) the Trustee shall communicate to the Irish Stock Exchange the Aggregate

Outstanding Amount of each listed Class of Securities following each Payment Date and inform the Irish Stock Exchange if any such Class of Securities did not receive scheduled payments of principal or interest on the Payment Date; (ii) the Trustee shall inform the Irish Stock Exchange if the ratings assigned to the Securities are reduced or withdrawn and the information shall be given to the Company Announcements Office of the Irish Stock Exchange; and (iii) the Trustee shall inform the Irish Stock Exchange, in advance, of the Note Interest Rate for each such Class, as well as the exact date of the following Payment Date.

(e) *Quarterly Letter*. The Portfolio Manager shall provide a quarterly letter to the recipients of the Valuation Report highlighting events occurring during the related quarterly period within 30 days of the date of the delivery of the Valuation Report.

(f) *S&P CDO Monitor*. Before the Ramp-Up Completion Date and together with each Monthly Report, the Issuer shall provide to S&P an electronic copy of the S&P CDO Monitor input file.

(g) *Payments or Transfers from the Payment Account.* Each Valuation Report shall constitute instructions to the Trustee to withdraw on the related Payment Date from the Payment Account and pay or transfer amounts set forth in such Valuation Report in the manner specified and in accordance with the priority established in Section 11.1 hereof.

(h) *NAV Calculation.* The Trustee shall forward to the Portfolio Manager, the Preference Shares Paying Agent (for forwarding to each Holder of Preference Shares), the Initial Purchaser, each Hedge Counterparty, the Rating Agencies, (if so requested by the Initial Purchaser) the Repository in accordance with Section 14.3(a)(viii) or each Holder of a Security who makes a written request therefor, and, upon written request therefor by a Beneficial Owner in the form of <u>Exhibit I</u> certifying that it is a Beneficial Owner, the Beneficial Owner (or its designee), any net asset value report with respect to the Issuer which the Trustee receives from the asset value calculation agent appointed pursuant to Section 10.8(a) hereof.

Section 10.7.    ***Release of Collateral.***

(a) The Trustee shall present Collateral for redemption or payment in full in accordance with the terms of the Collateral upon receipt of an Issuer Order. If no Event of Default is continuing, the Issuer may, by Issuer Order executed by an Authorized Officer of the Portfolio Manager, delivered to the Trustee at least two Business Days before the settlement date for any sale of an obligation certifying that the sale of the Collateral is being made in accordance with Sections 12.1 and 12.3 and the sale complies with all applicable requirements of Section 12.1, direct the Trustee to release the Collateral and, upon receipt of the Issuer Order, the Trustee shall deliver any such Collateral, if in physical form, duly endorsed to the broker or purchaser designated in the Issuer Order or otherwise cause an appropriate transfer of it to be made, in each case against receipt of the sales price therefor as specified by the Portfolio Manager in the Issuer Order. The Trustee may deliver any such Collateral in physical form for examination pursuant to a bailee letter.

(b) If no Event of Default is continuing, the Trustee shall upon an Issuer Order executed by an Authorized Officer of the Portfolio Manager deliver any Pledged Obligation that is set for any mandatory call or redemption or payment in full to the appropriate paying agent on or before the date set for the call, redemption, or payment, in each case against receipt of its call or redemption price or payment in full and provide notice of it to the Portfolio Manager.

(c)    Upon receiving actual notice of any Offer, the Trustee on behalf of the Issuer shall notify the Portfolio Manager of any Collateral Obligation that is subject to a tender offer, voluntary redemption, exchange offer, conversion, or other similar action (an "*Offer*"). If no Event of Default is continuing, the Portfolio Manager may direct the Trustee to accept or participate in or decline or refuse to participate in the Offer and, in the case of acceptance or participation, to dispose of the Collateral Obligation in accordance with the Offer against receipt of payment for it. If the consideration to be received by the Issuer for the Collateral Obligation is other than Cash, the consideration must be a Collateral Obligation that would be eligible for purchase by the Issuer pursuant to Section 12.2 assuming for this purpose that the Issuer committed to purchase the same on the date on which the Issuer accepts the Offer.

(d)    Upon disposition by the Trustee of Collateral to any person against receipt of payment therefore as provided in any of the foregoing clauses (a), (b), or (c), the Collateral shall be free of the lien of this Indenture. The lien shall continue in the proceeds received from the disposition.

(e)    As provided in Section 10.2(b), the Trustee shall deposit any proceeds received by it from the disposition of a Pledged Obligation in the Collection Account, unless simultaneously applied to the purchase of additional Collateral Obligations (including any related deposit into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security) or Eligible Investments as permitted under and in accordance with the requirements of this Article 10 and Article 12.

(f)    The Trustee shall, upon receipt of an Issuer Order when no Securities are Outstanding and all obligations of the Co-Issuers under this Indenture have been satisfied, as evidenced by an Officer's Certificate or an Opinion of Counsel, release any remaining Collateral from the lien of this Indenture.

(g)    The Trustee shall release from the lien of this Indenture any Collateral that is provided directly to a Synthetic Securities Counterparty or deposited in a segregated account in accordance with Section 10.5. Any Collateral or proceeds received by or redeposited by the Issuer into the Collection Account in accordance with Section 10.5 shall again be subject to the lien of this Indenture.

Any collateral deposited in a segregated account in accordance with Section 10.3(d), (e), and (f) shall be subject to the lien of this Indenture for the benefit of the Secured Parties. Any collateral withdrawn by the Issuer in accordance with Section 10.3(d), (e), and (f) shall be released from the lien of this Indenture by the Trustee to the extent returned to the appropriate counterparty pursuant to Sections 10.3(d), (e), and (f).

Section 10.8.    *Reports by Independent Accountants.*

(a)    At the Closing Date, the Issuer, at the direction of the Portfolio Manager, shall appoint a firm of Independent certified public accountants of recognized international reputation for purposes of preparing and delivering the reports or certificates of the accountants required by this Indenture. Within 30 days of any resignation by the firm, the Issuer, at the direction of the Portfolio Manager, shall promptly appoint by Issuer Order delivered to the Trustee and each Rating Agency a successor firm that is a firm of Independent certified public accountants of recognized international reputation. If the Issuer, at the direction of the Portfolio Manager, fails

186

to appoint a successor to a firm of Independent certified public accountants which has resigned within 30 days after the resignation, the Trustee, in consultation with the Portfolio Manager, shall promptly appoint a successor firm of Independent certified public accountants of recognized international reputation. In addition, the Issuer shall appoint an net asset value calculation agent to prepare and deliver to the Trustee a net asset value report with respect to the Issuer. The fees of such Independent certified public accountants, the NAV calculation agent and their respective successors shall be payable by the Issuer as an Administrative Expense.

(b)     On or before May, 31 of each year commencing in 2006, the Issuer shall cause to be delivered to the Trustee, the Insurer, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Portfolio Manager or each Noteholder or Holder of Preference Shares upon written request therefor, upon written request therefor by a Beneficial Owner in the form of Exhibit I certifying that it is a Beneficial Owner, to the Beneficial Owner (or its designee) and each Rating Agency a statement from a firm of Independent certified public accountants indicating (i) that the firm has reviewed each Valuation Report received since the last review and applicable information from the Trustee, (ii) that the calculations within those Valuation Reports have been performed in accordance with the applicable provisions of this Indenture (except as otherwise noted in the statement), and (iii) the Aggregate Principal Balance of the Collateral Obligations owned by the Issuer as of the preceding Determination Date. If a conflict exists between the firm of Independent certified public accountants and the Issuer with respect to any matter in this Section 10.7, the determination by that firm of Independent public accountants shall be conclusive. The statement shall be in the form of an Accountant's Certificate issued to the Issuer, the form of which shall be agreed on by the Portfolio Manager on behalf of the Issuer.

(c)     Upon the written request of the Preference Shares Paying Agent or any Holder of Preference Shares, the Issuer shall cause the firm of Independent certified public accountants appointed pursuant to Section 10.7(a) to provide any Holder of Preference Shares with all information requested pursuant to Section 7.17(g) or provide the Issuer with any assistance required in its preparation.

Section 10.9.     ***Reports to Rating Agencies.***

In addition to the information and reports specifically required to be provided to each Rating Agency pursuant to this Indenture, the Issuer shall provide each Rating Agency with the Accountants' Certificates delivered to the Trustee under this Indenture, and such additional information as either Rating Agency may from time to time reasonably request. In addition, any notices of restructurings and amendments received by the Issuer or the Trustee in connection with the Issuer's ownership of a DIP Loan shall be delivered by the Issuer or the Trustee, as the case may be, promptly to the Rating Agencies.

## ARTICLE 11

### APPLICATION OF MONIES

Section 11.1.     ***Disbursements of Monies from Payment Account.***

(a)     Notwithstanding any other provision in this Indenture, but subject to the other subsections of this Section 11.1 and to Section 13.1, on each Payment Date, the Trustee shall disburse available amounts from the Payment Account as follows and for application by the Trustee in accordance with the following priorities (the "***Priority of Payments***"):

(i)        On each Payment Date, Interest Proceeds with respect to the related Due Period (other than Interest Proceeds previously used during such Due Period to purchase accrued interest in respect of Collateral Obligations or otherwise used as permitted by Section 10.2) shall be distributed in the following order of priority:

(1)        to the payment of any taxes and registration and filing fees owed by the Co-Issuers (without limit) and then to the payment of Administrative Expenses up to the Administrative Expense Cap as follows:

FIRST, in the following order of priority,

(i)        fees, expenses and indemnities of the Trustee; and then

(ii)        fees, expenses and indemnities of the Collateral Administrator; and then

(iii)        fees, expenses and indemnities of the Preference Shares Paying Agent; and

SECOND, in the following order of priority,

(x)        fees and expenses of the Administrator; and then

(y)        fees and expenses of the Co-Issuers (including fees and expenses of counsel and surveillance, credit estimate, and other fees owing to the Rating Agencies) and any other person (except the Portfolio Manager) if specifically provided for in this Indenture, and to the expenses (but not fees) of the Portfolio Manager if payable under the Management Agreement and to the fees, expenses and indemnities of the Insurer;

(2)        the excess, if any, of the Administrative Expense Cap over the amounts paid pursuant to clause (1) above to deposit into the Expense Reimbursement Account;

(3)        to the payment to the Portfolio Manager of any accrued and unpaid Senior Management Fee then payable;

(4)        to the payment of all amounts due to the Hedge Counterparties under the Hedge Agreements other than any Defaulted Hedge Termination Payments;

(5)

(A)        first, *pro rata* to the payment of accrued and unpaid interest on the Senior Class A Notes, accrued and unpaid Premium and any accrued and unpaid Defaulted Interest on, and any Defaulted Interest Charge with respect to, the Senior Class A Notes; provided, however, if the amounts available pursuant to this clause (A) are insufficient to pay the foregoing amounts in full, the amount available for distribution under this clause (A) shall be distributed *pro rata* based on the amounts owing to the Class A-1a Notes and the Class A-1b Notes, on the one hand, and to the amounts owing to the Class A-1g Notes and in respect of the Premium, on the other hand, with the amounts distributed to the Insurer and the Holders of the Class A-1g Notes being paid first to the

188

Insurer in respect of the Premium until paid in full and then in respect of amounts owing to the Class A-1g Notes; provided, further, that distributions in respect of the Class A-1a Notes and the Class A-1b Notes pursuant to this clause (5)(A) shall be made to the Holders thereof *pro rata* based upon the amount of accrued and unpaid interest and accrued and unpaid Defaulted Interest owing in respect of the Class A-1a Notes and the Class A-1b Notes;

(B) second, to the payment of Accrued Insurance Liabilities then payable under the Insurance Agreement;

(6) to the payment of accrued and unpaid interest on the Class A-2 Notes and any accrued and unpaid Defaulted Interest on, and any Defaulted Interest Charge with respect to, the Class A-2 Notes;

(7) to the payment of accrued and unpaid interest on the Class A-3 Notes and any accrued and unpaid Defaulted Interest on, and any Defaulted Interest Charge with respect to, the Class A-3 Notes (with distributions in respect of the Class A-3 Notes made to the Holders thereof *pro rata* based upon the amount of accrued and unpaid interest and accrued and unpaid Defaulted Interest owing in respect of the Class A-3a Notes and the Class A-3b Notes);

(8) if the Class A Coverage Tests are not satisfied on the related Determination Date, to the payment of principal of the Senior Class A Notes, the Class A-2 Notes and the Class A-3 Notes in the Note Payment Sequence in the amount necessary so that all of the Class A Coverage Tests would be met on such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied pursuant to this clause (8) before the application of any Principal Proceeds pursuant to Section 11.1(a)(ii)(1) on the current Payment Date);

(9) to the payment of accrued and unpaid interest on the Class B Notes (excluding Class B Deferred Interest, but including interest accrued for the preceding Interest Period on Class B Deferred Interest);

(10) if the Class B Coverage Tests are not satisfied on the related Determination Date, to the payment of principal of the Senior Class A Notes, the Class A-2 Notes, the Class A-3 Notes and the Class B Notes in the Note Payment Sequence and then to the payment of any Class B Deferred Interest, in each case in the amount necessary so that all of the Class B Coverage Tests would be met on such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied pursuant to this clause (10) before the application of any Principal Proceeds pursuant to Section 11.1(a)(ii)(2) on the current Payment Date) (with each of the Senior Class A Notes and the Class A-3 Notes being redeemed *pro rata* based upon the outstanding principal amount of the Class A-1a Notes, the Class A-1b Notes and the Class A-1g Notes (in the case of a redemption of the Senior Class A Notes) and the outstanding principal amount of the Class A-3a Notes and the Class A-3b Notes (in the case of a redemption of the Class A-3 Notes));

(11) to the payment of Class B Deferred Interest;

189

(12)     to the payment of accrued and unpaid interest on the Class C Notes (excluding Class C Deferred Interest but including interest accrued for the preceding Interest Period on Class C Deferred Interest);

(13)     if the Class C Coverage Tests are not satisfied on the related Determination Date or if a Rating Confirmation Failure exists on the Payment Date, to the payment of principal of the Notes in the Note Payment Sequence and then to the payment of the Class C Deferred Interest in the amount necessary so that all of the Class C Coverage Tests would be met on such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied pursuant to this clause (13) before the application of any Principal Proceeds pursuant to Section 11.1(a)(ii)(3) on the current Payment Date, unless a Rating Confirmation is obtained) (with each of the Senior Class A Notes and the Class A-3 Notes being redeemed *pro rata* based upon the outstanding principal amount of the Class A-1a Notes, the Class A-1b Notes and the Class A-1g Notes (in the case of a redemption of the Senior Class A Notes) and the outstanding principal amount of the Class A-3a Notes and the Class A-3b Notes (in the case of a redemption of the Class A-3 Notes));

(14)     to the payment of Class C Deferred Interest;

(15)     to deposit in the Collection Account as Principal Proceeds amounts representing Principal Proceeds previously used to pay amounts referred to in clauses (1), (3) through (7), (9), (11), (12) and (14) above and not previously restored to the Collection Account or, if not restored to the Collection Account, used to purchase Collateral Obligations;

(16)     during the Reinvestment Period, if the Reinvestment Overcollateralization Test is not satisfied on the related Determination Date, for deposit to the Collection Account as Principal Proceeds the lesser of (i) 50% of the remaining Interest Proceeds available after the payments pursuant to clause (15) above and (ii) the amount necessary to cause the Reinvestment Overcollateralization Test to be satisfied as of such Determination Date, after application of funds pursuant to Section 11.1(a)(ii)(1) on the current Payment Date;

(17)     first, to the payment to the Insurer of any remaining Administrative Expenses payable thereto and not paid under clause (1) above, and second, to the payment of any remaining Administrative Expenses not paid under clause (1) above in the respective priorities specified in clause (1);

(18)     to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment to the Holders of the Preference Shares, an amount not to exceed the Preference Shares Distribution Amount;

(19)     to the payment (i) first to the Portfolio Manager of accrued and unpaid Subordinated Management Fee then due and payable and (ii) to the Insurer (if entitled thereto) and to each Holder of Securities entitled thereto, the applicable Extension Bonus Payment pursuant to, and in accordance with, Section 2.4(g);

(20)     to the payment of any Defaulted Hedge Termination Payments;

(21)     to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment to the Holders of the Preference Shares until the Holders of the Preference Shares have realized a Preference Share Internal Rate of Return of 10.75%;

(22)     to the payment to the Portfolio Manager of the Incentive Management Fee, if applicable; and

(23)     any remaining Interest Proceeds, to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment to the Holders of the Preference Shares.

(ii)     On each Payment Date, Principal Proceeds with respect to the related Due Period other than:

(A)     Principal Proceeds previously reinvested in Collateral Obligations (including any related deposit into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security) or otherwise used as permitted by Section 10.2,

(B)     Principal Proceeds on deposit in the Revolving Reserve Account, the Delayed Drawdown Reserve Account, the Synthetic Security Collateral Account, or the Securities Lending Account, and

(C)     Principal Proceeds on deposit in the Collection Account in an aggregate amount equal to the agreed Purchase Prices for Collateral Obligations with respect to which the Issuer has entered into a commitment before the end of the Due Period for their purchase, but has not settled the purchase by the end of the Due Period,

shall be distributed in the following order of priority:

(1)     (x) first, to the payment of the amounts referred to in clauses (1) and (3) through (7) of Section 11.1(a)(i) (and in the same manner and order of priority) to the extent not previously paid in full thereunder and (y) second, to the payment of amounts referred to in clause (8) of Section 11.1(a)(i) to the extent not previously paid in full thereunder and to the extent necessary to cause the Class A Overcollateralization Test to be met as of the related Determination Date on a *pro forma* basis after giving effect to any payments made through this clause (1);

(2)     to the payment of the amounts referred to in clause (10) of Section 11.1(a)(i) to the extent not previously paid in full thereunder and to the extent necessary to cause the Class B Overcollateralization Test to be met as of the related Determination Date on a *pro forma* basis after giving effect to any payments made through this clause (2);

(3)     to the payment of the amounts referred to in clause (13) of Section 11.1(a)(i) to the extent not previously paid in full thereunder and to the extent necessary to cause the Class C Overcollateralization Test to be met as of the related Determination

191

Date on a *pro forma* basis after giving effect to any payments made through this clause (3);

(4)      to the payment of the amounts referred to in clauses (9) and (11) of Section 11.1(a)(i) (and in the same manner and order of priority) to the extent not previously paid in full thereunder, only to the extent that all of the Coverage Tests would be met on a *pro forma* basis after giving effect to any payments made through this clause (4);

(5)      to the payment of the amounts referred to in clauses (12) and (14) of Section 11.1(a)(i) (and in the same manner and order of priority) to the extent not previously paid in full thereunder, only to the extent that all of the Coverage Tests would be met on a *pro forma* basis after giving effect to any payments made through this clause (5);

(6)

(A)      if the Payment Date is a Redemption Date in the following order of priority: (i) to the payment in the Note Payment Sequence of the Redemption Prices of all of the Notes to be redeemed (with each of the Senior Class A Notes and the Class A-3 Notes being redeemed *pro rata* based upon the outstanding principal amount of the Class A-1a Notes, the Class A-1b Notes and the Class A-1g Notes (in the case of a redemption of the Senior Class A Notes) and the outstanding principal amount of the Class A-3a Notes and the Class A-3b Notes (in the case of a redemption of the Class A-3 Notes)), (ii) to the payment of the amounts referred to in clauses (17) through (22) of Section 11.1(a)(i) (and in the same manner and order of priority) to the extent not previously paid in full thereunder, and (iii) to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment to the Holders of the Preference Shares of the Redemption Price of any Preference Shares to be redeemed; and

(B)      if the Payment Date is a Special Redemption Date, to the payment in the Note Payment Sequence of principal of the Notes in an aggregate amount equal to the Special Redemption Amount, in each case until paid in full (with each of the Senior Class A Notes and the Class A-3 Notes being redeemed pro rata based upon the outstanding principal amount of the Class A-1a Notes, the Class A-1b Notes and the Class A-1g Notes (in the case of a redemption of the Senior Class A Notes) and the outstanding principal amount of the Class A-3a Notes and the Class A-3b Notes (in the case of a redemption of the Class A-3 Notes));

(7)      during the Reinvestment Period, all remaining Principal Proceeds to the acquisition of additional Collateral Obligations in accordance with the provisions of Section 7.19 and Article 12 (and, until so applied (including any related deposit into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security), to be deposited in the Collection Account as Principal Proceeds);

(8)    after the Reinvestment Period, (i) first, at the discretion of the Portfolio Manager (with respect to Unscheduled Principal Payments and Sale Proceeds from the sale of Credit Improved Obligations) to the purchase or funding of substitute Collateral Obligations in accordance with the Eligibility Criteria and the applicable provisions of this Indenture when appropriate Collateral Obligations are available, and until such time, to the Collection Account for the purchase of Eligible Investments; and (ii) second, to the payment in the Note Payment Sequence of principal of Notes until paid in full;

(9)    to the extent not previously paid in full under clause (6) above, after the Reinvestment Period, to the payment of the amounts referred to in clauses (17) through (22) of Section 11.1(a)(i) (and in the same manner and order of priority) to the extent not previously paid in full thereunder; and

(10)    after the Reinvestment Period to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment to the Holders of the Preference Shares.

Amounts referred to in clauses (9) and (12) of Section 11.1(a)(i), to the extent not previously paid in full thereunder, will be added to deferred interest for purposes of calculating the Coverage Tests in clauses (1), (2) and (3) of this Section 11.1(a)(ii).

(b)    If on any Payment Date the amount available in the Payment Account is insufficient to make the full amount of the disbursements required by the Valuation Report, the Trustee shall make the disbursements called for in the order and according to the priority under Section 11.1(a), subject to Section 13.1, to the extent funds are available therefor.

(c)    The Trustee shall remit funds to pay Administrative Expenses of the Issuer or the Co-Issuer in accordance with Section 11.1(a), to the extent available, to the Issuer, the Co-Issuer as directed and designated in an Issuer Order (which may be in the form of standing instructions) delivered to the Trustee no later than the Business Day before each Payment Date.

(d)    If the Hedge Counterparty defaults in the payment of its obligations to the Issuer under the respective Hedge Agreements on the date on which any payment is due thereunder, the Trustee shall make a demand on the Hedge Counterparty, or any guarantor, if applicable, demanding payment by 12:30 p.m., New York time, on that date.  The Trustee shall give notice to the Noteholders, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Portfolio Manager and each Rating Agency upon the continuing failure by the Hedge Counterparty to perform its obligations during the two Business Days following a demand made by the Trustee on, the Hedge Counterparty, and shall take the action with respect to the continuing failure as directed by the Portfolio Manager unless an Event of Default has occurred and is continuing in which case direction is to be taken pursuant to Section 5.13.

(e)    Except as otherwise expressly provided in Section 11.1(a) above, if on any Payment Date, the amount available in the Payment Account from amounts received in the related Due Period is insufficient to make the full amount of the disbursements required by any numbered or lettered paragraph or clause of Section 11.1(a) to different persons, the Trustee shall make the disbursements called for by the paragraph or clause ratably in accordance with the respective amounts of the disbursements then payable, subject to Section 13.1, to the extent funds are available therefor.

193

(f)  On each Payment Date on which distributions are made in respect of the Preference Shares, a portion of such payment will be allocated to the Class 1 Composite Securities in the proportion that the aggregate Face Amount of the Preference Share Component bears to the aggregate Face Amount of the Preference Shares.  The payment of distributions, redemption amounts and any other payments on the Class 1 Composite Securities will be distributed in the same manner as the Preference Shares to which the Preference Share Component relates, except that such payment will be made on the Composite Securities Payment Date.

Section 11.2.  ***Class 1 Component Distributions.***

(a)  On the first Business Day after each Payment Date, the Trustee shall make commercially reasonable efforts to sell a portion or all of the Treasury Strip held in the Class 1 Component Account on the customary open markets in accordance with customary industry standards.  The face amount of the Treasury Strip to be sold, if any, on the first Business Day after the relevant Payment Date shall be a calculated amount (rounded down to the nearest $1,000) equal to:

(i)  the sum of the distributions allocated to the Preference Share Component of the Class 1 Composite Securities under Sections 11.1(a)(i)(18), (21) and (23) and Sections 11.1(a)(ii)(6)(A), (9) and (10) on such Payment Date; divided by

(ii)  one minus the bid-side market price of the Treasury Strip on the first Business Day after such Payment Date expressed as a percentage.

No portion of the Treasury Strip may be sold, if after its sale, the Class 1 Collateral Principal Balance would not be greater than or equal to the Class 1 Composite Security Rated Balance.

(b)  On each Composite Securities Payment Date, the Trustee shall disburse (solely from amounts in the Class 1 Component Account attributable to the proceeds from the sale of the Treasury Strip pursuant to Section 11.2(a)) to the Holders of the Class 1 Composite Securities, *pro rata* based on their share of the Class 1 Composite Security Rated Balance, the proceeds from the sale of the Treasury Strip relating to such Composite Securities Payment Date pursuant to Section 11.2(a).

(c)  On each Composite Securities Payment Date following a redemption pursuant to Section 9.2(a), the Trustee shall disburse (solely from Class 1 Collateral held in the Class 1 Component Account) to the Holders of the Class 1 Composite Securities, *pro rata* based on their share of the Class 1 Composite Security Rated Balance, the Redemption Price of the Class 1 Component as a distribution in kind of each item of the Class 1 Collateral.

# ARTICLE 12

SALE OF COLLATERAL OBLIGATIONS;
PURCHASE OF COLLATERAL OBLIGATIONS

Section 12.1.  ***Sales of Collateral Obligations.***

Subject to the satisfaction of the conditions specified in Section 10.6, Section 12.1 and Section 12.3 and if no Event of Default is continuing as evidenced by an Officer's Certificate of the Portfolio Manager provided to the Trustee, the Issuer may, at the direction of the Portfolio

194

Manager, direct the Trustee to sell any Collateral Obligation or Workout Asset if the Portfolio Manager certifies to the Trustee that the sale meets the requirements of any one of paragraphs (a) through (i) of this Section 12.1. If the Issuer sells any Collateral Obligation or Workout Asset during the Reinvestment Period, the proceeds shall be reinvested in accordance with Section 12.2.

(a)      *Credit Risk Securities*.  At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Credit Risk Obligation at any time during or after the Reinvestment Period without restriction and the Trustee shall sell the Credit Risk Obligation in accordance with such direction.  Following any sale of a Credit Risk Obligation pursuant to this Section 12.1(a), at the direction of the Portfolio Manager during the Reinvestment Period, the Issuer shall use commercially reasonable efforts to purchase additional Collateral Obligations (to the extent the purchase is in the best interest of the Issuer) with an Aggregate Principal Balance at least equal to the Sale Proceeds received by the Issuer with respect to the Collateral Obligation sold.  For this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded amount.

(b)      *Credit Improved Obligations*.  At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Credit Improved Obligation if either:

(i)      during the Reinvestment Period, the Portfolio Manager believes before the sale that it will be able to cause the Issuer to reinvest its Sale Proceeds, in compliance with the Eligibility Criteria, in one or more additional Collateral Obligations with an Aggregate Principal Balance at least equal to the Investment Criteria Adjusted Balance of the Credit Improved Obligation by the end of the immediately succeeding Due Period (for this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded amount and Principal Balance shall include the principal balance of Collateral Obligations in which the Trustee does not have a first priority perfected security interest); or

(ii)      after the Reinvestment Period, the Sale Proceeds received in respect of the Credit Improved Obligation are at least equal to its Investment Criteria Adjusted Balance.  For this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded amount and Principal Balance shall include the principal balance of Collateral Obligations in which the Trustee does not have a first priority perfected security interest;

and the Trustee shall sell the Credit Improved Obligation in accordance with such direction.

(c)      *Non-Performing Collateral Obligations and Current-Pay Obligations*.  At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Non-Performing Collateral Obligation or Current-Pay Obligation at any time during or after the Reinvestment Period without restriction and the Trustee shall sell the Non-Performing Collateral Obligation or Current-Pay Obligation in accordance with such direction.  Non-Performing Collateral Obligations may be sold regardless of price.

(d)      *Non-qualifying Collateral Obligations*.  At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation at any time during or after the Reinvestment Period without restriction and the Trustee shall sell that obligation in accordance with such direction.

45824v26

(e) *Withholding Tax Sales*. At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Collateral Obligation subject to withholding tax at any time during or after the Reinvestment Period without restriction and the Trustee shall sell the Collateral Obligation in accordance with such direction.

(f) *Optional Redemption*. After the Issuer has notified the Trustee of an Optional Redemption of the Notes in accordance with Article 9, at the direction of the Portfolio Manager, the Issuer shall direct the Trustee to sell all or a portion of the Collateral Obligations as contemplated therein if (i) the requirements of Article 9 are satisfied and (ii) the Independent certified public accountants appointed pursuant to Section 10.7 have confirmed the calculations contained in any required certificate furnished by the Portfolio Manager pursuant to Section 9.3(c). After a Majority of the Preference Shares have directed an Optional Redemption of the Preference Shares in accordance with Section 9.2(b), at the direction of the Portfolio Manager, the Issuer shall direct the Trustee to sell all of the remaining Collateral Obligations (in the case of an Optional Redemption pursuant to Section 9.2(b)(i)) or a portion of the remaining Collateral Obligations in accordance with the unanimous directions of Holders of the Preference Shares (in the case of an Optional Redemption pursuant to Section 9.2(b)(ii)) and the Trustee shall sell the remaining Collateral Obligations in accordance with such direction.

(g) *Rating Confirmation Failure*. After the Portfolio Manager has received notice of a Rating Confirmation Failure and if available Interest Proceeds and Principal Proceeds are insufficient to effect the redemption of the Notes at par on any subsequent Payment Date in accordance with the Priority of Payments as and to the extent necessary for each of Moody's and S&P to confirm the Initial Ratings assigned by it on the Closing Date to the Securities, the Issuer may, at the direction of the Portfolio Manager, direct the Trustee to sell Collateral Obligations as contemplated in Section 9.1 and the Trustee shall sell the Collateral Obligations in accordance with such direction.

(h) *Discretionary Sales*. At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Collateral Obligation:

(i) at any time on or before the Ramp-Up Completion Date (without regard to any restriction specified in clause (ii) below); and

(ii) at any time after the Ramp-Up Completion Date if:

(A) after giving effect to the sale and the sale of any other Collateral Obligations whose sale is pending, the Aggregate Principal Balance of all Collateral Obligations sold pursuant to this Section 12.1(h)(ii) (in each case determined as of the date the direction to sell is given) is not greater than 20% of the Maximum Investment Amount as of January 1 of such calendar year (or, for the first calendar year, as of the Ramp-Up Completion Date); and

(B) during the Reinvestment Period the Portfolio Manager believes before the sale that it will be able to cause the Issuer within 30 days thereafter to reinvest or commit to reinvest its Sale Proceeds, in compliance with the Eligibility Criteria, in one or more additional Collateral Obligations with an Aggregate Principal Balance at least equal to the Investment Criteria Adjusted Balance of the Collateral Obligation (for this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded amount and Principal Balance shall include the principal balance of Collateral

196

Obligations in which the Trustee does not have a first priority perfected security interest);

and the Trustee shall sell the Collateral Obligations in accordance with such direction. However, if the rating by Moody's of any of the Senior Class A Notes (without giving effect to the Policy), the Class A-2 Notes or the Class A-3 Notes is one or more rating sub-categories below the Initial Rating of the Senior Class A Notes (without giving effect to the Policy), the Class A-2 Notes or the Class A-3 Notes or has been withdrawn or the rating by Moody's of the Class B Notes or the Class C Notes is two or more rating sub-categories below the Initial Rating of the Class B Notes or the Class C Notes or has been withdrawn, the Issuer shall not instruct the Trustee to sell any Collateral Obligations pursuant to this Section 12.1(h). This restriction may be waived by written consent of a Majority of the Controlling Class. For the purposes of this subsection (h), any withdrawal or reduction in rating shall not restrict the sale of any Collateral Obligations pursuant to this subsection (h) if after the withdrawal or reduction Moody's has upgraded the reduced or withdrawn rating to at least the Initial Rating in the case of the Senior Class A Notes (without giving effect to the Policy), the Class A-2 Notes and the Class A-3 Notes, or to only one subcategory below their Initial Rating in the case of the Class B Notes and the Class C Notes.

For the purposes of determining the percentage of Collateral Obligations sold during any period in Section 12.1(h)(ii):

(i)     the amount of any Collateral Obligation sold shall be reduced:

(A)     to the extent of any purchases of Collateral Obligations of the same obligor (that are *pari passu* with the sold Collateral Obligation) occurring within 30 Business Days of the sale (determined based on the date of any relevant trade confirmation or commitment letter) (but only for so long as (x) the Collateral Obligations purchased have not been downgraded by any of the Rating Agencies during the 30 Business Day period, (y) the Collateral Obligations have not been purchased from the Portfolio Manager or any of its Affiliates acting, in each case, as principal or from any funds or accounts advised or managed by the Portfolio Manager or any of its Affiliates, and (z) the purchase price of each Notes purchased Collateral Obligation must not exceed the sale price of the sold Collateral Obligation), and

(B)     to the extent of any purchases of Collateral Obligations permitted pursuant to Section 12.2(c); and

(ii)     any Synthetic Security based upon or relating to a senior secured index investment providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time that is invested into a substantially similar Synthetic Security but with a later maturity shall be treated as having been sold.

(i)     *Workout Assets*.  At the direction of the Portfolio Manager, the Issuer may direct the Trustee to sell any Workout Asset at any time during or after the Reinvestment Period without restriction and regardless of price and the Trustee shall sell the Workout Assets in accordance with such direction.

197

Section 12.2.    ***Purchase of Collateral Obligations.***

(a)     On any date during the Reinvestment Period (and, in respect of Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Improved Obligations, on any date after the Reinvestment Period), so long as no Event of Default is continuing, at the direction of the Portfolio Manager, the Issuer may direct the Trustee to invest or reinvest Principal Proceeds (together with Interest Proceeds, but only to the extent used to pay for accrued interest on Collateral Obligations) in Collateral Obligations (including any related deposit into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security) if the Portfolio Manager certifies to the Trustee that, to the best knowledge of the Portfolio Manager, the conditions specified in this Section 12.2 and Section 12.3 are met.

(b)     *Eligibility Criteria*.  No obligations may be purchased unless each of the conditions in the following clauses (i) through (xii) (the "***Eligibility Criteria***") is satisfied as evidenced by a certificate of the Portfolio Manager as of the date the Issuer commits to make the purchase, in each case after giving effect to the purchase and all other purchases and sales previously or simultaneously committed to:

(i)      the obligation is a Collateral Obligation;

(ii)     for any date occurring during the Reinvestment Period:

(A)     each Overcollateralization Test is satisfied and, if the commitment is made on or after the second Payment Date, each Interest Coverage Test is satisfied, or

(B)     if any such Coverage Test is not satisfied, both:

(1)     the extent of satisfaction of the Coverage Test is not reduced, and

(2)     the Collateral Obligation is being purchased with Principal Proceeds other than:

(x)     Principal Proceeds received in respect of a Defaulted Collateral Obligation, or

(y)     Principal Proceeds received in respect of a Workout Asset that has been received in exchange for a Defaulted Collateral Obligation;

(iii)    for any date occurring during the Reinvestment Period, the Diversity Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(iv)     for any date occurring during the Reinvestment Period, the Weighted Average Rating Factor Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

198

(v) for any date occurring during the Reinvestment Period, each of the limits in the definition of "Concentration Limitations" is satisfied or, if any such limit is not satisfied, the extent of satisfaction is not reduced;

(vi) for any date occurring during the Reinvestment Period, the Weighted Average Spread Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(vii) for any date occurring during the Reinvestment Period, the Weighted Average Fixed Rate Coupon Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(viii) for any date occurring during the Reinvestment Period, the Weighted Average Life Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(ix) for any date occurring during the Reinvestment Period, the Weighted Average Moody's Recovery Rate Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(x) for any date occurring during the Reinvestment Period, the Weighted Average S&P Recovery Rate Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(xi) for any date occurring during the Reinvestment Period, the S&P CDO Monitor Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced; provided, however, that this Eligibility Criterion (xi) shall not apply either to reinvestment of the proceeds from the sale of a Credit Risk Obligation, Non-Performing Collateral Obligation or Workout Asset or to the reinvestment of Principal Proceeds in respect of Defaulted Collateral Obligations; and

(xii) for any date occurring after the Reinvestment Period:

(A) each Coverage Test is satisfied and the extent of satisfaction is not reduced;

(B) each Collateral Quality Test is maintained or improved;

(C) each Concentration Limitation is maintained or improved;

(D) the maturity date of such Collateral Obligation will occur prior to the Stated Maturity of the Notes; and

(E) the S&P Rating of such Collateral Obligation is at least equal to the S&P Rating of the Collateral Obligation being the source of the Unscheduled Principal Payments or of the Credit Improved Obligation being the source of Sale Proceeds, as applicable.

(c) *Certain Permitted Exchanges*.

The Issuer may, at the direction of the Portfolio Manager, exchange a Collateral Obligation for another Collateral Obligation in an A/B Exchange.

(d)     *Certification by Portfolio Manager*.  Not later than the Business Day preceding the settlement date for any Collateral Obligation purchased after the Closing Date (but in any event no later than the release of Cash for the Purchase Price of the purchase), the Portfolio Manager shall deliver to the Trustee an Officer's certificate of the Portfolio Manager certifying that, to the best knowledge of the Portfolio Manager, the purchase complies with this Section 12.2 and with Section 12.3 (determined as of the date that the Issuer commits to make the purchase).

(e)     *Investment in Eligible Investments*.  Cash on deposit in the Collection Account may be invested at any time in Eligible Investments in accordance with Section 10.4(a) pending investment in Collateral Obligations.

Section 12.3.     ***Conditions Applicable to All Sale and Purchase Transactions.***

(a)     Any sale or purchase by the Issuer of a Collateral Obligation shall be conducted on an arm's length basis and, if effected with the Portfolio Manager or a person Affiliated with the Portfolio Manager or any fund or account for which the Portfolio Manager or an Affiliate of the Portfolio Manager acts as investment adviser, shall be effected in accordance with the requirements of Section 5 of the Management Agreement on terms no less favorable to the Issuer than would be the case if the person were not so Affiliated.  The Trustee shall have no responsibility to oversee compliance with this clause (a) by the other parties.

(b)     Upon any acquisition of any Collateral Obligation, all of the Issuer's interest in the Collateral Obligation shall be Granted to the Trustee pursuant to this Indenture.

Section 12.4.     ***Certain Determinations Relating to Collateral Obligations.***

(a)     Notwithstanding anything to the contrary contained in this Indenture, solely for the purpose of calculations in connection with the Eligibility Criteria, the Issuer or the Portfolio Manager on behalf of the Issuer shall be deemed to have purchased any Collateral Obligations as of the date on which the Issuer delivers to the Trustee a contract to purchase, a commitment letter, a confirmation or a due bill for such Collateral Obligation, in each case entitling the Issuer (or the Trustee as assignee thereof) to receive such Collateral Obligations and, in such event, the Issuer shall be deemed to have acquired, granted or delivered, as the case may be, such Collateral Obligations on such date.

(b)     Notwithstanding anything to the contrary contained in this Indenture, solely for the purpose of calculations in connection with the Eligibility Criteria, the Issuer or the Portfolio Manager on behalf of the Issuer shall be deemed to have sold any Collateral Obligations as of the date on which the Issuer delivers to the Trustee a contract to sell, a commitment letter, a confirmation or a due bill for such Collateral Obligation, in each case entitling the Issuer (or the Trustee as assignee thereof) to sell, and requiring the purchaser to purchase, such Collateral Obligations and, in such event, the Issuer shall be deemed to have sold such Collateral Obligations on such date.

(c)     Under the circumstances described in subsections (a) and (b) above, if the transaction contemplated by the contract, commitment letter, confirmation or due bill referred to therein does not settle on or before the 60th day following the scheduled settlement date (the

"**_Deadline_**"), the deemed purchase or sale shall be deemed not to have occurred; provided, however, that the Portfolio Manager shall have the right to extend the Deadline for an additional period (not to exceed an additional 60 days) by notice to the Trustee, which notice shall include the Portfolio Manager's certification to the effect that the Portfolio Manager believes that the settlement shall occur on or before the extended Deadline.

(d)     Scheduled distributions with respect to any Pledged Collateral Obligation shall be determined in accordance with the applicable provisions of this Indenture.

## ARTICLE 13

### NOTEHOLDERS' RELATIONS

Section 13.1.     **_Subordination._**

(a)     With respect to each Class of Notes and the Preference Shares, the Classes of Notes and the Preference Shares that are Priority Classes and Junior Classes are as follows:

| Class | Junior Classes | Priority Classes |
|---|---|---|
| Senior Class A | A-2, A-3, B, C, Preference Shares | None |
| A-2 | A-3, B, C, Preference Shares | Senior Class A |
| A-3 | B, C, Preference Shares | Senior Class A, A-2 |
| B | C, Preference Shares | Senior Class A, A-2, A-3 |
| C | Preference Shares | Senior Class A, A-2, A-3, B |
| Preference Shares | None* | Senior Class A, A-2, A-3, B, C |

_____

\*       The Preference Shares will be entitled to certain residual cashflow after payment of senior obligations in accordance with the Priority of Payments.

(b)     Anything in this Indenture or the Securities to the contrary notwithstanding, the Holders of each Class of Notes that is a Junior Class agree for the benefit of the Holders of the Notes of each Priority Class and (in the case of the Class A-1g Notes) the Insurer with respect to the Junior Class that the Junior Class shall be subordinate and junior to the Notes of each Priority Class to the extent and in the manner provided in this Indenture.  If any Event of Default has not been cured or waived and acceleration occurs and is continuing in accordance with Article 5, each Priority Class of Notes and all amounts owed by the Issuer to the Insurer hereunder or under the Insurance Agreement shall be paid in full in Cash (without giving effect to payments on the Policy) or, to the extent a Majority of the Class consents, other than in Cash, before any further payment or distribution is made on account of any Junior Class of Notes with respect to the Priority Class and each Class of Notes shall be paid in full in Cash or, to the extent a Majority of the Class consents, other than in Cash, before any further payment or distribution is made on account of the Preference Share Components.  The Holders of each

Junior Class of Notes agree, for the benefit of the Holders of the Notes of each Priority Class and (in the case of the Class A-1g Notes) the Insurer in respect of the Junior Class, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due to the Junior Class, of the Notes or each Class of Notes, as the case may be, or under this Indenture until the payment in full of the Priority Classes or all the Classes, as the case may be, and all amounts owed by the Issuer to the Insurer hereunder or under the Insurance Agreement, and not before one year and a day, or if longer, the applicable preference period then in effect, has elapsed since the payment.

(c)     If, notwithstanding the provisions of this Indenture, any Holder of Notes of any Junior Class has received any payment or distribution in respect of the Notes contrary to the provisions of this Indenture, then, until each Priority Class with respect to the Junior Class of Notes or each Class of Notes, as the case may be, and the Insurer has been paid in full in Cash or, to the extent a Majority of the Priority Class or the Class, as the case may be, consents, other than in Cash in accordance with this Indenture, the payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the Holders of the applicable Priority Classes of Notes or the Holders of all Classes of Notes, as the case may be, and the Insurer in accordance with this Indenture.  If any such payment or distribution is made other than in Cash, it shall be held by the Trustee as part of the Collateral and subject in all respects to this Indenture, including this Section 13.1.

(d)     Each Holder of Notes of any Junior Class agrees with all Holders of the applicable Priority Classes and the Insurer that the Holder of Junior Class Notes shall not demand, accept, or receive any payment or distribution in respect of the Notes in violation of this Indenture including this Section 13.1.  After a Priority Class and the Insurer has been paid in full, the Holders of the related Junior Class or Classes shall be fully subrogated to the rights of the Holders of the Priority Class and the Insurer.  Nothing in this Section 13.1 shall affect the obligation of the Issuer to pay Holders of any Junior Class of Notes.

(e)     Distributions to Holders of the Preference Shares are subordinate to distributions on the Notes and Preference Shares as described in the Priority of Payments.

(f)     The Management Fees shall have priority only to the extent provided in the Priority of Payments.

(g)     For purposes of subordination, the Composite Securities shall not be treated as a separate Class, but the Preference Share Component shall be treated as being *pari passu* with the Preference Shares.

Section 13.2.   ***Standard of Conduct.***

In exercising any of its or their voting rights, rights to direct and consent, or any other rights as a Noteholder or a Composite Securityholder under this Indenture, a Noteholder or a Composite Securityholder or the Insurer shall not have any obligation or duty to any person or to consider or take into account the interests of any person and shall not be liable to any person for any action taken by it or them or at its or their direction or any failure by it or them to act or to direct that an action be taken, without regard to whether the action or inaction benefits or adversely affects any Noteholder, Composite Securityholder, the Issuer, or any other person, except for any liability to which the Noteholder or Composite Securityholder or the Insurer may be subject to the extent the same results from the Noteholder's or Composite Securityholder 's

202

taking or directing an action, or failing to take or direct an action, in bad faith or in violation of the express terms of this Indenture.

## ARTICLE 14

### MISCELLANEOUS

Section 14.1.  **Form of Documents Delivered to Trustee.**

In any case where several matters are required to be certified by, or covered by an opinion of, any specified person, it is not necessary that all the matters be certified by, or covered by the opinion of, only one person, or that they be so certified or covered by only one document, but one such person may certify or give an opinion with respect to some matters and one or more other such persons as to other matters, and any such person may certify or give an opinion as to the matters in one or several documents.

Any certificate or opinion of an Officer of the Issuer, the Co-Issuer, or the Portfolio Manager may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless the Officer knows, or should know that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous.  Any such certificate of an Officer of the Issuer, Co-Issuer, or the Portfolio Manager or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, the Issuer, the Co-Issuer, the Portfolio Manager, or any other person, stating that the information with respect to the factual matters is in the possession of the Issuer, the Co-Issuer, the Portfolio Manager, or the other person, unless the Officer of the Issuer, Co-Issuer, or the Portfolio Manager or the counsel knows that the certificate or opinion or representations with respect to factual matters are erroneous.  Any Opinion of Counsel may also be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Officer of the Issuer or the Co-Issuer, stating that the information with respect to factual matters is in the possession of the Issuer or the Co-Issuer, unless the counsel knows that the certificate or opinion or representations with respect to factual matters are erroneous.

Where any person is required to make, give, or execute two or more applications, requests, consents, certificates, statements, opinions, or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever this Indenture provides that the absence of the continuation of a Default or Event of Default is a condition precedent to the taking of any action by the Trustee at the request or direction of either Co-Issuer, then notwithstanding that the satisfaction of the condition is a condition precedent to the Co-Issuer's right to make the request or direction, the Trustee shall be protected in acting in accordance with the request or direction if it does not have knowledge of the continuation of the Default or Event of Default as provided in Section 6.1(d).

Section 14.2.  **Acts of Noteholders, Composite Securityholders or Holders of Preference Shares.**

(a)      Any request, demand, authorization, direction, notice, consent, waiver, or other action provided by this Indenture to be given or taken by Noteholders or Holders of Preference Shares may be embodied in and evidenced by one or more instruments of substantially similar

45824v26

tenor signed by Noteholders or Holders of Preference Shares in person or by agents duly appointed in writing. Except as otherwise expressly provided in this Indenture the action shall become effective when the instruments are delivered to the Trustee (which instrument or instruments may be delivered through the Preference Shares Paying Agent, in the case of the Holders of the Preference Shares) and, if expressly required, to the Issuer. The instruments (and the action embodied in them) are referred to as the "*Act*" of the Noteholders or the Holders of Preference Shares signing the instruments. Proof of execution of any instrument or of a writing appointing an agent for a Noteholder or Holder of a Preference Share shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Issuer, if made in the manner provided in this Section.

(b)     The fact and date of the execution by any person of any instrument may be proved by an affidavit of a witness to the execution or the certificate of any notary public or other person authorized by law to acknowledge the execution of deeds. Any certificate on behalf of a jural entity executed by a person purporting to have authority to act on behalf of the jural entity shall itself be sufficient proof of the authority of the person executing it to act. The fact and date of the execution by any person of any instrument may also be proved in any other manner that the Trustee deems sufficient.

(c)     The Indenture Register shall prove the ownership of Securities and the principal amount and registered numbers of Securities and the number of Preference Shares held by and the number(s) of the Preference Share certificate(s) issued to, any Person shall be proved by the Preference Share register.

(d)     Any Act by the Holder of a Security shall bind every Holder of the same Security and every Security issued on its transfer or in exchange for it or in lieu of it, in respect of anything done, omitted, or suffered to be done by the Trustee or the Issuer in reliance on the Act, whether or not notation of the action is made on the Security or Preference Shares.

Section 14.3.     *Notices, etc., to Certain Persons or Parties.*

(a)     Any request, demand, authorization, direction, order, notice, consent, waiver, or Act of Noteholders or other documents provided or permitted by this Indenture to be made, given, or furnished to, or filed with:

(i)     the Trustee or Preference Shares Paying Agent shall be sufficient for every purpose under this Indenture if in writing and made, given, furnished, or filed to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery, or by telecopy in legible form, to the Trustee or Preference Shares Paying Agent addressed to it at its Corporate Trust Office, telecopy no. (713) 216-2101, or at any other address previously furnished in writing to the other parties hereto by the Trustee (any request, direction, order, notice or other communication from the Portfolio Manager to the Trustee under Article 12 (other than required certifications) may be by electronic mail, which shall be deemed to be in writing);

(ii)     the Co-Issuers shall be sufficient for every purpose under this Indenture (unless otherwise in this Indenture expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service, or by telecopy in legible form, to the Issuer addressed to it at c/o Maples Finance Limited, P.O. Box 1093 GT, Queensgate House, South Church Street, George Town, Grand Cayman,

45824v26

Cayman Islands, telecopy no. (345) 945-7100, Attention: The Directors, or to the Co-Issuer addressed to it at 1209 Orange Street, Wilmington, Delaware, 19801, Attention: Donald J. Puglisi, or at any other address previously furnished in writing to the other parties hereto by the Issuer or the Co-Issuer, as the case may be, with a copy to the Portfolio Manager at its address below;

(iii)     the Insurer shall be sufficient for every purpose under this Indenture if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service, or by telecopy in legible form, to the Insurer addressed to it at Assured Guaranty Corp., 1325 Avenue of the Americas, New York, New York 10019, telephone no. (212) 974-0199, telecopy no. (212) 581-3268, Attention: General Counsel and Attention: Chief Risk Officer, or at any other address previously furnished in writing to the other parties hereto;

(iv)     the Portfolio Manager shall be sufficient for every purpose under this Indenture if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service, or by telecopy in legible form, to the Portfolio Manager addressed to it at Two Galleria Tower, 13455 Noel Road, Suite 1300, Dallas, Texas 75240, telecopy no. (972) 628-4147, Attention: James Dondero, or at any other address previously furnished in writing to the other parties hereto;

(v)     J.P. Morgan Securities Inc. as the Initial Purchaser shall be sufficient for every purpose under this Indenture if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service, or by telecopy in legible form, addressed c/o J.P. Morgan Securities Inc., at 270 Park Avenue, New York, NY 10017, Attention: Structured Credit Products, or at any other address previously furnished in writing to the Co-Issuers, the Portfolio Manager, and the Trustee by an Officer of the Initial Purchaser;

(vi)     any Hedge Counterparty shall be sufficient for every purpose under this Indenture (unless otherwise in this Indenture expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered or sent by overnight courier service or by telecopy in legible form to the Hedge Counterparty addressed to it at the address specified in the relevant Hedge Agreement or at any other address previously furnished in writing to the Issuer or the Trustee by the Hedge Counterparty;

(vii)     the Rating Agencies shall be sufficient for every purpose under this Indenture (unless otherwise in this Indenture expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service, or by telecopy in legible form, to each Rating Agency addressed to it at Moody's Investors Service, Inc., 99 Church Street, New York, New York, 10007, Telecopy No. (212) 553-4170, cdomonitoring@moodys.com, Attention: CBO/CLO Monitoring and Standard & Poor's, 55 Water Street, 41st Floor, New York, New York 10041-0003, telecopy no. (212) 438-2664, Attention: Asset Backed-CBO/CLO Surveillance and each Monthly Report shall also be sent to S&P electronically to CDO_Surveillance@standardandpoors.com;

(viii)     the Administrator shall be sufficient for every purpose under this Indenture (unless otherwise in this Indenture expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service, or by facsimile in legible form, addressed to Maples Finance Limited, P.O. Box 1093 GT

Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands, telecopy no. (345) 945-7100, Attention: The Directors; or

(ix)      the Repository shall be sufficient for every purpose under this Indenture if delivered to the Repository at CDO Library, c/o The Bond Market Association, 360 Madison Avenue, 18th Floor, New York, New York 10017, electronic mail address: admin@cdolibrary.com. Any document required to be delivered or made available to the Repository by the Trustee may be made available by providing the operator of the Repository with access to a website containing such document in a format that permits the user to download the document as a pdf file.

(b)      If any provision in this Indenture calls for any notice or document to be delivered simultaneously to the Trustee and any other person, the Trustee's receipt of the notice or document shall entitle the Trustee to assume that the notice or document was delivered to the other person unless otherwise expressly specified in this Indenture.

Section 14.4.      *Notices to Holders, the Preference Shares Paying Agent; Waiver.*

Except as otherwise expressly provided in this Indenture, where this Indenture provides for notice to the Insurer, the Noteholders, the Composite Securityholders or the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) of any event,

(a)      the notice shall be sufficiently given to the Insurer, the Noteholders, the Composite Securityholders or the Preference Shares Paying Agent if in writing and mailed, first-class postage prepaid, to the Insurer, each Noteholder and Composite Securityholder affected by the event or the Preference Shares Paying Agent, at the address of the Insurer set forth in Section 14.3(a)(iii), at the address of the Holder as it appears in the Indenture Register or at the address of the Preference Shares Paying Agent supplied by the Preference Shares Paying Agent supplied by the Preference Shares Paying Agent to the Trustee, as applicable, not earlier than the earliest date and not later than the latest date, prescribed for the giving of the notice; and

(b)      the notice shall be in the English language.

Notices shall be deemed to have been given on the date of their mailing.

Notwithstanding clause (a), a Noteholder, Composite Securityholder or the Preference Shares Paying Agent may give the Trustee a written notice that it is requesting that notices to it be given by facsimile transmissions and stating the telecopy number for the transmission. Thereafter, the Trustee shall give notices to the Holder or the Preference Shares Paying Agent by facsimile transmission. If the notice also requests that notices be given by mail, then the notice shall also be given by mail in accordance with clause (a) above, as the case may be.

The Trustee shall deliver to the Holders of Notes any information or notice relating to this Indenture requested to be so delivered by at least 10% (by Aggregate Outstanding Amount) of the Holders of any Class of Notes at the expense of the Issuer. The Trustee shall deliver to the Preference Shares Paying Agent any information or notice that the Preference Shares Paying Agent certifies was requested to be so delivered by at least 10% (by Aggregate Outstanding Amount) of the Holders of the Preference Shares at the expenses of the Issuer.

Neither the failure to mail any notice, nor any defect in any notice so mailed, to any particular Noteholder, Composite Securityholder or the Preference Shares Paying Agent shall affect the sufficiency of the notice with respect to other Noteholders, Composite Securityholders or the Preference Shares Paying Agent.  If it is impracticable to give the notice by mail of any event to Noteholders, Composite Securityholders or the Preference Shares Paying Agent when the notice is required to be given pursuant to any provision of this Indenture because of the suspension of regular mail service as a result of a strike, work stoppage, or similar activity or because of any other cause, then the notification to Noteholders, Composite Securityholders or the Preference Shares Paying Agent as shall be made with the approval of the Trustee shall be a sufficient notification to the Holders for every purpose under this Indenture.

Where this Indenture provides for notice in any manner, the notice may be waived in writing by any person entitled to receive the notice, either before or after the event, and the waiver shall be the equivalent of the notice.  Waivers of notice by Noteholders, Composite Securityholders or the Preference Shares Paying Agent shall be filed with the Trustee but the filing shall not be a condition precedent to the validity of any action taken in reliance on the waiver.

So long as any Securities are listed on the Irish Stock Exchange and the rules of the exchange so require, all notices to Holders of the Securities or the Preference Shares Paying Agent (for forwarding to Holders of Preference Shares) shall also be given to the Company Announcements Office of the Irish Stock Exchange or the Irish Listing and Paying Agent.

The Issuer shall (and authorizes the Trustee to) deliver to J.P. Morgan Securities Inc. all periodic reports, notices, demands, and other written information delivered or received by the Issuer, the Portfolio Manager, trustees, paying agents, accountants, or other persons pursuant to this Indenture and other operative documentation relating to the Securities requested by J.P. Morgan Securities Inc. (collectively, the "***Transaction Reports***") and the Issuer consents to J.P. Morgan Securities Inc.'s providing Transaction Reports received by it to current and prospective investors in the Securities (including by means of electronic transmissions or posting the Transaction Reports on internet sites maintained by J.P. Morgan Securities Inc. or any of its affiliates).

Section 14.5.     *Effect of Headings and Table of Contents.*

The Article and Section headings in this Indenture and the Table of Contents are for convenience only and shall not affect the construction of this Indenture.

Section 14.6.     *Successors and Assigns.*

All covenants and agreements in this Indenture by the Co-Issuers shall bind their respective successors and assigns, whether so expressed or not.

Section 14.7.     *Separability.*

Except to the extent prohibited by applicable law, in case any provision in this Indenture, in the Securities shall be invalid, illegal, or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

45824v26

Section 14.8.    *Benefits of Indenture.*

Nothing in this Indenture or in the Securities, expressed or implied, shall give to any person, other than the parties hereto and their successors under this Indenture, the Portfolio Manager, the Insurer, the Noteholders, the Composite Securityholders, the Holders of Preference Shares or the Preference Shares Paying Agent any benefit or any legal or equitable right, remedy, or claim under this Indenture.

Section 14.9.    *Legal Holidays.*

If any Payment Date, Redemption Date, or Stated Maturity is not a Business Day, then notwithstanding any other provision of the Notes or this Indenture, payment need not be made on that date, but shall be made on the next Business Day with the same effect as if made on the nominal date of the Payment Date, Redemption Date, or Stated Maturity date, as the case may be, and except as provided in the definition of "Due Period," no interest shall accrue on the payment for the period beginning on the nominal date.

Section 14.10.    *Governing Law.*

(a)    THIS INDENTURE, EACH NOTE, AND EACH COMPOSITE SECURITY SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF STATE OF NEW YORK, WITHOUT REFERENCE TO ITS PROVISIONS THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

Section 14.11.    *Submission to Jurisdiction.*

The Co-Issuers and the Trustee hereby irrevocably submit to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan in The City of New York in any action or proceeding arising out of or relating to the Securities, the Preference Shares or this Indenture, and the Co-Issuers and the Trustee hereby irrevocably agree that all claims in respect of the action or proceeding may be heard and determined in the New York State or federal court.  The Co-Issuers and the Trustee hereby irrevocably waive, to the fullest extent that they may legally do so, the defense of an inconvenient forum to the maintenance of the action or proceeding.  The Co-Issuers and the Trustee irrevocably consent to the service of all process in any action or proceeding by the mailing or delivery of copies of the process to the Co-Issuers at the office of the Co-Issuers' agent in Section 7.2 and to the Trustee at the Corporate Trust Office.  The Co-Issuers and the Trustee agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Section 14.12.    *Counterparts.*

This Indenture may be executed in any number of copies, and by the different parties on the same or separate counterparts, each of which shall be considered to be an original instrument.

Section 14.13. **Acts of Issuer.**

Any request, demand, authorization, direction, notice, consent, waiver, or other action provided by this Indenture to be given or performed by the Issuer shall be effective if given or performed by the Issuer or by the Portfolio Manager on the Issuer's behalf.

Section 14.14. **Consent of Posting of Documents on Repository.**

The Issuer hereby consents to (a) the posting of the final Offering Circular, this Indenture and the periodic reports to be delivered pursuant to the transaction documents and any amendments or other modifications thereto on the Repository for use in the manner provided in the Repository; and (b) the display of its name on the Repository in connection therewith. Notwithstanding anything herein to the contrary, none of the Issuer, the Co-Issuer and the Trustee makes any representation or warranty to The Bond Market Association (or any successor thereto) or any affiliate thereof or any Person having or obtaining access to the information maintained in the Repository or to any of such Person's affiliates regarding the accuracy or completeness of any information, document, report or other communication transmitted to the Repository, and no Person having or obtaining access to the information maintained in the Repository shall have any rights under this Indenture or otherwise by reason of the transmission of any such information, document, report or other communication to the Repository.

Section 14.15. **Liability of Co-Issuers.**

Notwithstanding any other terms of this Indenture, the Notes, the Composite Securities, or any other agreement entered into by either of the Co-Issuers or otherwise, neither of the Co-Issuers shall have any liability whatsoever to the other of the Co-Issuers under this Indenture, the Notes, the Composite Securities, any other agreement, or otherwise. Without prejudice to the generality of the foregoing, neither of the Co-Issuers may take any action to enforce, or bring any action or proceeding, in respect of this Indenture, the Notes, the Composite Securities, any other agreement, or otherwise against the other of the Co- Issuers. In particular, neither of the Co-Issuers may petition or take any other steps for the winding up or bankruptcy of the other of the Co-Issuers and neither of the Co-Issuers shall have any claim with respect to any assets of the other of the Co-Issuers.

Section 14.16. **Indemnity of Co-Issuer.**

The Issuer agrees to indemnify the Co-Issuer for any payments that may become due from the Co-Issuer under Article 11 with respect to any Securities issued under this Indenture and any administrative, legal, or other costs incurred by the Co-Issuer in connection with those payments.

## ARTICLE 15

ASSIGNMENT OF MANAGEMENT AGREEMENT; HEDGE AGREEMENTS

Section 15.1. **Assignment of Management Agreement.**

(a)     The Issuer, in furtherance of the covenants of this Indenture and as security for the Notes and amounts payable to the Secured Parties under this Indenture and the performance and observance of the provisions of this Indenture, acknowledges that its Grant pursuant to the

first Granting Clause includes all of the Issuer's interest in the Management Agreement, including:

    (i)    the right to give all notices, consents, and releases under it,

    (ii)    the right to give all notices of termination pursuant to the Management Agreement and to take any legal action upon the breach of an obligation of the Portfolio Manager under it, including the commencement, conduct, and consummation of proceedings at law or in equity,

    (iii)    the right to receive all notices, accountings, consents, releases, and statements under it, and

    (iv)    the right to do all other things whatsoever that the Issuer is or may be entitled to do under it.

Notwithstanding anything in this Indenture to the contrary, the Trustee may not exercise any of the rights in (i) through (iv) above or that may otherwise arise as a result of the Grant until the occurrence of an Event of Default under this Indenture and the authority shall terminate when the Event of Default is cured or waived.

    (b)    The assignment made hereby is executed as security, and the execution and delivery hereby shall not in any way impair or diminish the obligations of the Issuer under the Management Agreement, nor shall any of the obligations contained in the Management Agreement be imposed on the Trustee.

    (c)    Upon the retirement of the Notes and the Class 1 Component and the release of the Collateral and the Class 1 Collateral from the lien of this Indenture, this assignment, and all rights in this Indenture assigned to the Trustee for the benefit of the Noteholders shall cease and terminate and all the interest of the Trustee in the Management Agreement shall revert to the Issuer and no further instrument or act shall be necessary to evidence the termination and reversion.

    (d)    The Issuer represents that the Issuer has not executed any other assignment of the Management Agreement.

    (e)    The Issuer agrees that this assignment is irrevocable, and that it shall not take any action that is inconsistent with this assignment or make any other assignment inconsistent herewith. The Issuer shall, from time to time upon the request of the Trustee, execute all instruments of further assurance and all such supplemental instruments with respect to this assignment as the Trustee may reasonably request.

    (f)    The Issuer agrees to obtain the agreement and consent of the Portfolio Manager in the Management Agreement to the following:

    (i)    The Portfolio Manager consents to this collateral assignment and agrees to perform any provisions of this Indenture made expressly applicable to the Portfolio Manager pursuant to the Management Agreement.

    (ii)    The Portfolio Manager acknowledges that the Issuer is collaterally assigning all of its interest in the Management Agreement to the Trustee for the benefit

of the Secured Parties and the Portfolio Manager agrees that all of the representations, covenants and agreements made by the Portfolio Manager in the Management Agreement are also for the benefit of the Secured Parties.

(iii)    The Portfolio Manager shall deliver to the Trustee duplicate original copies of all notices, statements, communications, and instruments delivered or required to be delivered to the Issuer pursuant to the Management Agreement (other than any of them delivered to the Issuer by the Trustee or the Collateral Administrator).

(iv)    Neither the Issuer nor the Portfolio Manager shall select or consent to a successor manager or enter into any agreement amending, modifying, or terminating the Management Agreement (other than an amendment or modification of the type that may be made to this Indenture without Holder consent) without obtaining the consents of the Insurer and Holders that would be required if an amendment or modification of the same type were being made to this Indenture and without the satisfaction of the Rating Condition with respect to each Rating Agency with respect thereto.

(v)    Except as otherwise provided in this Indenture and the Management Agreement, subject to the resignation rights of the Portfolio Manager pursuant to Section 12 of the Management Agreement, the Portfolio Manager shall continue to serve as Portfolio Manager under the Management Agreement notwithstanding that the Portfolio Manager shall not have received amounts due it under the Management Agreement because sufficient funds were not then available under this Indenture to pay the amounts pursuant to the Priority of Payments. The Portfolio Manager agrees not to cause the filing of a petition in bankruptcy against the Issuer for the nonpayment of the fees or other amounts payable by the Administrative Agent to the Portfolio Manager under the Management Agreement until the payment in full of all Notes issued under this Indenture and the payment to the Preference Shares Paying Agent of all amounts payable with respect to the Preference Shares in accordance with the Priority of Payments and the expiration of a period equal to the greater of (A) the applicable preference period plus one day or (B) one year and one day following the payment. Notwithstanding the foregoing, the Portfolio Manager may commence any legal action that is not a bankruptcy, insolvency, liquidation, or similar proceeding against the Issuer or the Co-Issuer or any of their properties and may take any action it deems appropriate at any time in any bankruptcy, insolvency, liquidation, or similar proceeding and any other Proceeding voluntarily commenced by the Issuer or the Co-Issuer or involuntarily commenced against the Issuer or the Co-Issuer by anyone other than the Portfolio Manager or any Affiliate of the Portfolio Manager.

(vi)    The Portfolio Manager irrevocably submits to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan in The City of New York in any action or proceeding arising out of or relating to the Notes, the Preference Shares or this Indenture, and the Portfolio Manager irrevocably agrees that all claims in respect of the action or proceeding may be heard and determined in the New York State or federal court. The Portfolio Manager irrevocably waives, to the fullest extent it may legally do so, the defense of an inconvenient forum to the maintenance of the action or proceeding. The Portfolio Manager irrevocably consents to the service of all process in any action or Proceeding by the mailing or delivery of copies of the process to it the address provided for in Section 14.3. The Portfolio Manager agrees that a final and non-appealable judgment by a court of competent jurisdiction in any such action or proceeding shall be conclusive and may be

enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(g)     Following the resignation or removal of the Portfolio Manager, the Issuer shall use its best efforts to appoint a successor Portfolio Manager, and the Issuer, the Trustee, and the resigning or removed Portfolio Manager shall take any action consistent with the Management Agreement and this Indenture applicable to the Portfolio Manager, necessary to effectuate any such succession.

Section 15.2.     *Hedge Agreements.*

(a)     At any time and from time to time after the Closing Date, the Issuer, at the direction of the Portfolio Manager, shall enter into the Hedge Agreements and shall assign its rights (but none of its obligations) under the Hedge Agreements to the Trustee pursuant to this Indenture and the Collateral Assignment of Hedge Agreements.  The Portfolio Manager, on behalf of the Issuer, shall obtain the approval of each new Hedge Agreement from each Hedge Counterparty to a then-existing Hedge Agreement.  The Trustee shall, on behalf of the Issuer and in accordance with the Valuation Report, pay amounts due to the Hedge Counterparties under the Hedge Agreements on any Payment Date in accordance with Section 11.1.

(b)     The Issuer shall not enter into any Hedge Agreement unless at the time of entering the Hedge Agreement the Hedge Counterparty has:

(i)     a debt rating by Moody's for long-term debt of "Aa3" (which rating of "Aa3" is not on credit watch for possible downgrade) or higher if the Hedge Counterparty has only a long-term rating; or a debt rating by Moody's for long-term debt of "A1" (which rating of "A1" is not on credit watch for possible downgrade) or higher and a debt rating by Moody's for short-term debt of "P-1" (which rating of "P-1" is not on credit watch for possible downgrade) if the Hedge Counterparty has both long-term and short-term ratings; and

(ii)     a short-term debt rating by S&P of not less than "A-1" or a long-term debt rating of not less than "A+" (the "*Required Rating*").

(c)     If at any time a Hedge Counterparty has:

(A)     no short-term Moody's rating and a long-term Moody's rating and that rating is below "Aa3" or is "Aa3" and has been placed on credit watch for possible downgrade by Moody's; or

(B)     both a short-term and long-term Moody's rating; and either:

(i)     the long-term Moody's rating is below "A1" or that rating is "A1" and has been placed on credit watch for possible downgrade by Moody's, or

(ii)     the short-term Moody's rating is below "P-1" or that rating is "P-1" and has been placed on credit watch for possible downgrade by Moody's

212

then the Hedge Counterparty shall be required, at its sole expense, to, within 30 days, either:

      (i)     post collateral with the Trustee to secure the Hedge Counterparty's obligations under the Hedge Agreement, in an amount and of the type sufficient to cause the Rating Condition with respect to Moody's to be satisfied;

      (ii)    obtain a guarantor whose short-term and long-term debt ratings equal or exceed the above criteria;

      (iii)   replace itself under the related or substantially equivalent Hedge Agreement with a substitute Hedge Counterparty whose short-term and long-term debt ratings equal or exceed the above criteria; or

      (iv)   take other actions to satisfy the Rating Condition with respect to Moody's;

(d)     If at any time the Hedge Counterparty has:

      (A)    no short-term Moody's rating and a long-term Moody's rating that is "A2" or below or has been suspended or withdrawn;

      (B)    both a short-term and long-term Moody's rating; and either:

      (i)     the long-term Moody's rating is "A3" or below or is suspended or withdrawn, or

      (ii)    the short-term Moody's rating is "P-2" or below, or

      (C)    a short-term debt rating by S&P below "A-1" or, if the Hedge Counterparty has no short-term rating by S&P, a long-term rating by S&P below "A+" or that has been suspended or withdrawn;

then the Hedge Counterparty shall be required, at its sole expense, to, within 30 days, either:

      (i)     post collateral as required by the Hedge Agreement to secure the Hedge Counterparty's obligations under the Hedge Agreement in an amount and of the type sufficient to cause the Rating Condition with respect to Moody's and S&P to be satisfied; or

      (ii)    (x)    obtain a guarantor that has a Required Rating and that will satisfy the Rating Condition with respect to S&P with respect to its appointment;

(y)      replace itself under the related or substantially equivalent Hedge Agreement with a substitute Hedge Counterparty that has a Required Rating and the appointment of which will satisfy the Rating Condition with respect to S&P; or

(z)      take such other actions to satisfy the Ratings Condition.

(e)      If the Issuer has the right under a Hedge Agreement at any time to demand that the related Hedge Counterparty deliver Eligible Collateral in accordance with an Approved Credit Support Document, the Issuer shall make the demand.

(f)      Any payments required to be made under the Hedge Agreements shall be made in accordance with the Priority of Payments.  Subordinated Defaulted Hedge Termination Payments shall be subordinate to interest and principal payments on the Notes and any other payments required to be made by the Issuer under the Hedge Agreements, but senior to distributions to Holders of the Preference Shares.

(g)      Except as provided in paragraph (h) of this Section 15.2, the Issuer, at the direction of the Portfolio Manager, shall, promptly following the early termination of a Hedge Agreement (other than on a Redemption Date) (but no later than 60 days after the early termination), at the expense of the Issuer and to the extent possible through application of Hedge Termination Receipts, enter into a Replacement Hedge, unless, in the exercise of the Portfolio Manager's commercially reasonable judgment, to do so would not be in the best interest of the Issuer and the Rating Condition with respect to each Rating Agency is satisfied with respect to the non-entry into the a Replacement Hedge.  In addition, a Replacement Hedge may not be entered into unless the Issuer provides the Rating Agencies with at least seven Business Days' prior written notice of its intention to enter into the agreement, together with its form and the Rating Condition with respect to each Rating Agency is satisfied with respect to the Replacement Hedge.  The Issuer shall use commercially reasonable efforts to cause the termination of a Hedge Agreement (other than a termination resulting from the bankruptcy, insolvency, or similar event with respect to the Hedge Counterparty) to become effective simultaneously with its entering into a Replacement Hedge.  To the extent that (i) the Portfolio Manager determines not to replace the Hedge Agreement and the Rating Condition with respect to each Rating Agency is satisfied with respect to the determination; or (ii) termination is occurring on a Redemption Date, the Hedge Termination Receipts shall become part of Principal Proceeds and be distributed in accordance with Section 11.1 on the next following Payment Date (or on the Redemption Date, if the Notes are redeemed on the Redemption Date).

(h)      Notwithstanding Section 15.2(g), the applicable requirements of Section 15.2(g) shall not have to be met if the Rating Condition with respect to each Rating Agency is otherwise satisfied with respect thereto.

(i)      The notional amounts of the Hedge Agreements outstanding at any time may be reduced or increased from time to time, by the Issuer, and the Hedge Agreements may be amended, modified, or terminated in accordance with the Hedge Agreements if the Rating Condition with respect to each Rating Agency is satisfied with respect to the reduction, increase, amendment, modification, or termination, as the case may be.

(j)        Each Hedge Agreement may be terminated pursuant to its terms upon an Optional Redemption of the Notes or an acceleration of maturity of the Notes after an Event of Default.  The Hedge Agreement will not be permitted to be terminated as the result of a Default or Event of Default unless any acceleration of maturity of the Notes resulting from the Event of Default is no longer permitted to be rescinded pursuant to this Indenture.

(k)        Except for Hedge Agreements entered into on or before the Closing Date, the Issuer shall not enter into any Hedge Agreement unless the Rating Condition with respect to each Rating Agency is satisfied.

## ARTICLE 16

### THE POLICY

Section 16.1.    ***Miscellaneous.***

(a)        So long as no Insurer Default shall have occurred and be continuing, (i) the Trustee shall provide the Insurer copies of each report, notice, Opinion of Counsel, officer's certificate, request for consent or request for amendment to any document related hereto that the Trustee is required to send to the Issuer, the Co-Issuer, any Holder of Securities, the Rating Agencies or the Portfolio Manager promptly upon the Trustee's production or receipt thereof (in each case, to the extent the Issuer is not expressly required to be provided such document directly or to the extent that another party is not responsible for delivery of such document directly to the Insurer), (ii) the Co-Issuers shall provide the Insurer copies of each report, notice, Issuer Order, Opinion of Counsel, officer's certificate, request for consent or request for amendment to any document related hereto that the Issuer is required to send to the Trustee, any Holder of Securities, the Rating Agencies or the Portfolio Manager promptly upon the Co-Issuers' production or receipt thereof (in each case, to the extent the Co-Issuers are not expressly required to be provided such document directly or to the extent that another party is not responsible for delivery of such document directly to the Insurer) and (iii) the Trustee shall forward to the Insurer upon receipt (x) a copy of any notice or order received from the Portfolio Manager pursuant to (A) clause (i) of the definition of "Reinvestment Period", (B) Section 7.19(e) and (C) Section 9.5 or (y) a copy of any instrument received from any Paying Agent pursuant to Section 7.3.  All references to the rights of the Insurer to act as the Controlling Class, the Majority of the Controlling Class and the Super Majority of the Controlling Class herein (including, with respect to any action proposed to be taken by the Trustee, the Issuer, the Co-Issuer, or any Person, any requirements that the consent or approval of the Insurer be obtained in connection with the taking of such action) shall exist only so long as (i) the Insured Notes are Outstanding or any Accrued Insurance Liabilities are due and owing to the Insurer (it being understood that such right shall be reinstated if an Avoided Payment is made for so long as any such Avoided Payment is pending during the applicable statutory preference period or, if the Insurer is required to pay the amount of any such Avoided Payment, for so long as any Accrued Insurance Liabilities owing to the Insurer have not been paid in full), (ii) no Insurer Default has occurred and is continuing and (iii) the Policy has not been delivered for cancellation in accordance with Sections 16.8 and 16.9.  The satisfaction of clauses (i), (ii) and (iii) of the foregoing sentence shall entitle the Insurer to exercise the rights of the Controlling Class, the Majority of the Controlling Class and the Super Majority of the Controlling Class and to take all such other action to grant or withhold consent to actions proposed to be taken by the Issuer or the Portfolio Manager on behalf of the Issuer to the extent expressly granted to the Controlling Class, the Majority of the Controlling Class and the Super Majority of the Controlling Class in this Indenture.  From and after the date on which the Policy expires in

45824v26

accordance with its terms and all Accrued Insurance Liabilities and any other amounts owing to the Insurer under this Indenture and the Insurance Documents have been paid in full, the Insurer shall have no rights or benefits as the Controlling Class, the Majority of the Controlling Class and the Super Majority of the Controlling Class hereunder.

(b)     So long as the conditions set forth in clauses (i), (ii) and (iii) of the second sentence of Section 16.1(a) are satisfied, the Insurer shall have the right to exercise all rights of the Holders of the Insured Notes hereunder or under the Management Agreement (other than the right to grant or withhold any consent under Section 8.2) without any consent of such Holders, and such Holders may exercise such rights (other than the right to grant or withhold any consent under Section 8.2) only with the prior written consent of the Insurer.

Section 16.2.     *Representative of the Noteholder of the Insured Notes.*

Notwithstanding anything contained herein to the contrary, if an Event of Default has occurred and is continuing, so long as the Insurer is the Controlling Class, the Insurer shall have the right (to the exclusion of the Holders of the Insured Notes) to direct the Trustee as to any and all remedies to be sought or taken on behalf of the Holders of the Insured Notes under this Indenture and the Trustee shall not exercise any such remedies unless directed by the Insurer to the extent the Holders of the Insured Notes could control the actions of the Trustee. Each Holder of an Insured Note shall be deemed to have consented to the Insurer's rights hereunder. At such time as there exists and is continuing an Insurer Default the Trustee shall not be bound to continue to comply with any term or condition of this Indenture that requires the consent of or approval or direction from the Insurer.

In addition, the Insurer may exercise any rights and remedies that are available to such Holders of Insured Notes at law or in equity on its own behalf as the representative of the Holders of the Insured Notes, including, without limitation, under the Securities Act and/or the Exchange Act at any time and without preconditions or the further consent of any such Holders of Insured Notes or the Trustee. All proceeds received by Holders of the Insured Notes arising out of any proceeding at law or equity conducted by the Insurer as representative of the Holders of the Insured Notes (including any settlement proceeds in respect of any such proceeding) shall be paid over by such Noteholders to the Trustee and shall be applied by the Trustee to (A) first, make a payment to the Insurer of any amount then due and payable under the Insurance Agreement and (B) second, redeem the Insured Notes at par plus accrued and unpaid interest thereon.

Section 16.3.     *Drawings under Policy.*

(a)     If by 11:00 a.m., on the date (a **"Deficiency Notice Date"**) that is the third Business Day prior to any Payment Date, the amount then on deposit and available for distribution (or scheduled to be on deposit and available for distribution on such a Payment Date) in the Collection Account is insufficient (based on the information set forth in the Valuation Report prepared as of the Determination Date related to such Payment Date) to pay the Insured Amount (as defined in the Policy) in respect of the Insured Notes on such Payment Date in accordance with the Priority of Payments (the amounts of such deficiency, the **"Deficiency Amount"**), the Trustee shall:

(i)     no later than 12:00 noon, New York City time, on the Deficiency Notice Date, give notice (which notice is in the appropriate form and delivered in the manner specified in the Policy) to the Insurer, specifying therein the Deficiency

216

Amount, and thereupon submit a notice of drawing under the Policy in such amount, all in accordance with the terms of this Indenture and in compliance with the terms of the Policy; and

(ii)     on the date on which the Trustee receives payment under the Policy from the Insurer (but not earlier than the applicable Payment Date) in respect of the Deficiency Amount (so long as such payment is received by the Trustee by 10:00 a.m., New York City time, on the applicable Payment Date), pay over to each Holder of an Insured Note, for application by such Holder to amounts due in respect of such Holder's Insured Notes due on the related Payment Date, such Holder's ratable share of the amounts so received by the Trustee.

Any payment by the Insurer under the Policy in respect of amounts due on the Insured Notes shall be applied solely to the payment of amounts due on the Insured Notes.

(b)     The Trustee agrees to furnish to the Insurer upon its reasonable request copies of the Trustee's records evidencing the payment of amounts due on the Insured Notes that have been made by the Trustee and subsequently recovered from Holders of the Insured Notes, and the dates on which such payments were made.

(c)     The Trustee shall be entitled to enforce on behalf of the Holders of the Insured Notes the obligations of the Insurer under the Policy.  Notwithstanding any other provision of this Indenture, the Holders of the Insured Notes are not entitled to make any claims under the Policy or institute proceedings directly against the Insurer.

(d)     Notwithstanding anything herein to the contrary, any payment of interest or principal with respect to the Insured Notes made by or on behalf of the Insurer shall not be deemed to be a payment made by the Issuer and shall remain due for payment until payments in respect of such amounts are made by the Issuer in accordance with the Priority of Payments. Subject to and conditional upon payment of any interest or principal with respect to the Insured Notes by or on behalf of the Insurer, the Trustee shall assign to the Insurer all rights to the payment of interest or principal on or with respect to the Insured Notes, which are then due for payment to the extent of all payments made by the Insurer, and the Insurer may exercise any option, vote, right or power to the extent it has made a principal payment pursuant to the Policy in addition to its other rights hereunder.  The Trustee and each Holder of an Insured Note by its purchase thereof agrees that the Insurer shall be subrogated to all of the rights to payment of such Holders or in relation thereto to the extent that any payment of principal or interest on or in respect of the Insured Notes was made to such Holders with payments made under the Policy by the Insurer.

Section 16.4.     ***Preference Claims and Insolvency Proceedings.***

(a)     In the event the Trustee receives a certified copy of an order of the appropriate court that an amount due on an Insured Note constitutes an Avoided Payment, unless the Policy has been terminated in accordance with Section 16.8, the Trustee shall so notify the Insurer, shall comply with the provisions of the Policy to obtain payment from the Insurer of such Avoided Payment, and shall, at the time it provides notice to the Insurer, notify the Holders of the Insured Notes that, in the event that any such Holder's payment is so recoverable, such Holder shall be entitled to payment pursuant to the terms of the Policy.  The Trustee shall furnish to the Insurer copies of its records evidencing the payments of amounts due on the Insured Notes, if any, that have been made by the Trustee and subsequently recovered from

217

Holders of such Notes, and the dates on which such payments were made. The Insurer, however, shall not be obligated to make any payment in respect of any Insured Amount representing a payment of principal avoided as preference prior to the time the Insurer would have been required to make payment in respect of such principal pursuant to the Policy. Pursuant to the terms of the Policy, the Insurer shall make such payment on behalf of such Holders to the receiver, conservator, debtor-in-possession or trustee in bankruptcy named in the Order (as defined in the Policy) and not to the Trustee or any such Holder directly (unless the Trustee or any such Holder, as the case may be, has previously paid such preference amount to the receiver, conservator, debtor-in-possession or trustee in bankruptcy named in such Order, in which case the Insurer shall make such payment to the Trustee or such Holder, as in the case may be, in accordance with the Policy for distribution to such Holder upon proof of such payment reasonably satisfactory to the Insurer). In the event the Policy is terminated in accordance with Section 16.8, the Insurer will have no further liability under the Policy or otherwise with respect to the Avoided Payment.

(b)     The Trustee shall promptly notify the Insurer of any proceeding or the institution of any action (of which the Trustee has actual knowledge) (i) seeking the avoidance as a preferential transfer under the Bankruptcy Code or other applicable bankruptcy, insolvency, receivership, rehabilitation or similar law (a **"Preference Claim"**) of any distribution made with respect to any amount due on an Insured Note or (ii) the commencement of any proceeding by or against the Issuer commenced under the Bankruptcy Code or other applicable bankruptcy, insolvency, receivership, rehabilitation or similar law (an **"Insolvency Proceeding"**). Each Holder of an Insured Note, by its purchase thereof, and the Trustee hereby agree that, so long as a Insurer Default shall not have occurred and be continuing, the Insurer may at any time during the continuation of any proceeding relating to a Preference Claim in respect of the Insured Notes or Insolvency Proceeding direct all matters relating to such Preference Claim or Insolvency Proceeding, as applicable, including, without limitation, (i) the direction of any appeal of any order relating to any such Preference Claim or Insolvency Proceeding, as applicable, and (ii) the posting of any surety or supersedeas performance bond pending any such appeal. In addition, and without limitation of the foregoing, as set forth in Section 16.5, the Insurer shall be subrogated to, and each Holder of the Insured Notes and the Trustee hereby delegates and assigns, to the fullest extent permitted by law, the rights of the Trustee and such Holder in the conduct of any proceeding with respect to such a Preference Claim or Insolvency Proceeding, as applicable, including, without limitation, all rights of any party to an adversary proceeding action with respect to any court order issued in connection with any such Preference Claim or Insolvency Proceeding, as applicable.

Section 16.5.     ***Subrogation.***

Anything in this Indenture to the contrary notwithstanding, any payment with respect to the principal of or interest on or with respect to the Insured Notes that is made with monies received pursuant to the terms of the Policy shall not be considered payment by the Issuer of the Insured Notes and shall not discharge the Issuer in respect of its obligation to make such payment. The Issuer and the Trustee acknowledge that, without the need for any further action on the part of the Insurer, the Issuer, the Trustee or any other Person, to the extent that the Insurer makes payment directly or indirectly on account of principal of or interest on or with respect to the Insured Notes to the Holders thereof, (i) the Insurer shall be fully subrogated to the rights of such Holders to receive such principal and interest from the Issuer and (ii) the Insurer shall be paid such principal and interest in its capacity as Holder of the Insured Notes but only from the sources and in the manner provided in this Indenture for the payment of such principal and interest in accordance with the Priority of Payments; provided, however, that such

subrogation rights shall terminate upon the termination of the Policy pursuant to Section 16.8(b).

Section 16.6.    *Policy Payment Account.*

The Trustee shall, on or prior to the Closing Date, establish in the name of the Trustee a single, segregated trust account which shall be designated as the Policy Payment Account (the "**Policy Payment Account**"), that shall be held in trust in the name of the Trustee for the benefit of the Holders of the Insured Notes, over which the Trustee shall have exclusive control and sole right of withdrawal.  The Trustee shall deposit all amounts received from the Insurer under the Policy in the Policy Payment Account.  Amounts held in the Policy Payment Account shall not be invested, unless otherwise instructed in writing by the Insurer.  The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Policy Payment Account shall be to make payments in respect of the amounts due on the Insured Notes on the related Payment Date in respect of which such funds are paid, to the extent such amounts are not paid pursuant to the Priority of Payments.  Any monies held in the Policy Payment Account after the distributions made pursuant to this Section 16.6 on any Payment Date shall promptly be remitted (but in no event later than two Business Days after such Payment Date) to the Insurer.

Section 16.7.    *Limited Recourse; Non-Petition.*

The Insurer hereby acknowledges and agrees that the Issuer's obligations under the Insurance Agreement and the Premium Letter shall be solely the obligations of the Issuer, and the Insurer shall not have any recourse to any director, officer, agent, member, limited partner, general partner or Affiliate of the Issuer with respect to any claims, losses, damages, liabilities, indemnities or other obligations in connection with any transactions contemplated thereby. Recourse in respect of any obligations of the Issuer under the Insurance Agreement and the Premium Letter shall be limited to the Collateral applied in accordance with the Priority of Payments and on the exhaustion thereof all claims against the Issuer thereunder or any transactions contemplated thereby shall be extinguished and shall not thereafter revive.  In addition, the Insurer agrees that it shall not institute against the Issuer any bankruptcy, insolvency, reorganization, receivership or similar proceeding so long as any Securities (including the Insured Notes) shall be Outstanding and there shall have elapsed one year plus one day or, if longer, the applicable preference period then in effect since the last day on which any Securities (including the Insured Notes) shall have been Outstanding; underlined provided that, the Insurer may become a party to and participate in any such proceeding applicable to the Issuer that is initiated by any Person that is not an Affiliate of the Insurer.  The agreements contained in this paragraph shall survive the termination of the Insurance Agreement and the Premium Letter and the payment of all obligations under this Indenture.

Section 16.8.    *Termination of the Policy.*

(a)       The Policy may be terminated on any Payment Date if: (x) after giving effect to all payments to be made on such Payment Date, all Accrued Insurance Liabilities and all Administrative Expenses payable to the Insurer accrued through the date of termination have been paid and all Premium accrued through such Payment Date has been paid and (y) any of the following events has occurred and is continuing on such date:

(i)       the Co-Issuers have elected to extend the Reinvestment Period pursuant to Section 2.4 and have satisfied all of the requirements related thereto (including each

219

of the Extension Conditions set forth in Section 2.4(c)), other than obtaining the consent of the Insurer to such Extension, and the Insurer has and continues to object to such Extension, and the Holders of 100% of the Insured Notes (after giving effect to the sale of any Insured Notes which are Extension Sale Securities in connection with the proposed Maturity Extension) consent to such termination in accordance with Section 16.9;

(ii)      the Co-Issuers have proposed to enter into a supplemental indenture pursuant to Article 8 and have satisfied all of the requirements for the effectiveness thereof, and the Insurer has and continues to object to such amendment and 100% of the Holders of the Insured Notes consent to such termination in accordance with Section 16.9; or

(iii)     the Removal Buy-Out Purchaser shall have purchased the Insured Notes for the applicable Removal Buy-Out Purchase Price pursuant to Section 9.7.

(b)      If none of the conditions set forth in clause (a)(i) through (iii) above are satisfied, the Policy may be terminated on any Business Day if 100% of the Holders of the Insured Notes consent to such termination in accordance with Section 16.9.

(c)      In connection with a termination of the Policy pursuant to Section 16.8(a), any Administrative Expenses payable to the Insurer arising after termination of the Policy shall remain payable from Interest Proceeds and Principal Proceeds in accordance with the Priority of Payments.  In connection with a termination of the Policy pursuant to Section 16.8(b), Premium through the date of termination of the Policy and all Administrative Expenses payable to the Insurer shall remain payable from Interest Proceeds and Principal Proceeds in accordance with the Priority of Payments.  In connection with a termination of the Policy pursuant to Section 16.8(b), the rights of the Insurer pursuant to Section 16.3(d) and Section 16.5 to be subrogated to the rights of the Holders of the Insured Notes to the extent of any payment of principal or interest on or with respect of the Insured Notes shall terminate, and the Holders of the Insured Notes shall be entitled to the payment of such interest or principal.  In connection with any termination of the Policy pursuant to this Section 16.8, the Insurer will continue to be entitled to any Extension Bonus Payment so long as such Extension Bonus Payment was due and payable prior to the termination of the Policy.

(d)      Upon termination of the Policy in accordance with the terms of this Section 16.8, (i) all rights of the Insurer to receive notices hereunder shall survive such termination and (ii) no provision hereof (including, without limitation, the Priority of Payments and this Section 16.8) may be amended or otherwise modified in any manner adverse to the Insurer without the prior written consent of the Insurer.

(e)      Upon termination of the Policy in accordance with the terms of this Section 16.8, the Insurer shall have no further liability for losses, claims, demands, damages, controversies, losses, costs and expenses of any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, under the Policy as of the date of such termination, whether such losses, claims, demands, damages, controversies, losses, costs and expenses occurred prior to or subsequent to the date of such termination, and whether in connection with an Avoided Payment or other amount that has been paid by the Issuer or the Insurer prior to or after termination of the Policy and subsequently is required to be returned as a preference or otherwise.

45824v26

Section 16.9.     ***Termination Procedures.***

(a)     If the Issuer or the Holders of at least 25% of the Aggregate Outstanding Amount of the Insured Notes wish to solicit the vote of the Holders of the Insured Notes in connection with a proposed termination of the Policy pursuant to Section 16.8, the Issuer or such Holders shall notify the Trustee at least 45 days prior to the proposed termination date (which in the case of a termination pursuant to Section 16.8(a) must be a Payment Date).  If the conditions for termination specified in Section 16.8 are satisfied as of the date of such notice (or are expected to be satisfied as of the proposed date of termination), as certified to the Trustee by an Issuer Order, the Trustee shall, promptly upon receipt thereof, notify the Issuer (in the case of notice to the Trustee by the requisite Holders of the Insured Notes), the Portfolio Manager, and the Insurer and shall send to all Holders of the Insured Notes (with a copy to the Issuer, the Portfolio Manager and the Insurer) a notice of proposed termination that shall state:

1.     the notice is being sent at the request of the Issuer or certain Holders of the Insured Notes (as applicable) who wish to solicit the vote of the Holders of the Insured Notes in connection with a termination of the Policy pursuant to Section 16.8;

2.     a copy of the Issuer Order stating that the proposed termination is pursuant to Section 16.8(a)(i), Section 16.8(a)(ii), Section 16.8(a)(iii) or Section 16.8(b), and any conditions to such proposed termination have been satisfied;

3.     the proposed date of termination (which in the case of a termination pursuant to Section 16.8(a) must be a Payment Date);

4.     that from and after termination of the Policy, the Insured Notes will bear interest at a rate of LIBOR + 0.25% + the Premium Rate; and

5.     that if the Policy is terminated, the Insurer shall have no further liability for losses, claims, demands, damages, controversies, losses, costs and expenses of any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, under the Policy as of the date of such termination, whether such losses, claims, demands, damages, controversies, losses, costs and expenses occurred prior to or subsequent to the date of such termination, and whether in connection with an Avoided Payment or other amount that has been paid by the Issuer or the Insurer prior to or after the termination of the Policy and subsequently is required to be returned as a preference or otherwise.

(b)     Each Holder of the Insured Notes that wishes to terminate the Policy must notify the Issuer and Trustee in writing of such determination within 10 Business Days after delivery of the notice of proposed termination.  If the Trustee and the Issuer have not received written notification from all of the Holders of the Insured Notes within 10 Business Days of delivery of notice of proposed termination, the solicitation of the vote of the Holders of the Notes will be deemed not to have succeeded.  The Trustee shall promptly forward to the Issuer, the Portfolio Manager and the Insurer the solicitation of votes received from the Holders of the Insured Notes.  If all Holders of the Insured Notes notify the Issuer and the Trustee that they wish to terminate the Policy, the Issuer shall issue an Issuer Order instructing the Trustee to:

1.     surrender the Policy to the Insurer for cancellation on the date of termination;

2.      promptly notify each Rating Agency of such termination; and

3.      execute, acknowledge and deliver (at the expense of Issuer) such other documents or instruments as the Insurer may reasonably request evidencing the termination of the Policy.

45824v26

IN WITNESS WHEREOF, we have set our hands as of the day and year first written above.

EXECUTED AS A DEED BY

**SOUTHFORK CLO LTD.,**
AS ISSUER

By:

Name: ~~Phillip Hinds~~
Title: Director

**SOUTHFORK CLO CORP.,**
AS CO-ISSUER

By:

Name: Donald J. Puglisi
Title: President

**ASSURED GUARANTY CORP.,**
AS INSURER

By:

Name:
Title:

**JPMORGAN CHASE BANK,**
**NATIONAL ASSOCIATION,**
AS TRUSTEE AND AS CUSTODIAN

By:

Name:
Title:

By:

Name:
Title:

45824

In Witness Whereof, we have set our hands as of the day and year first written above.

EXECUTED AS A DEED BY

**SOUTHFORK CLO LTD.,**
AS ISSUER

By: _____
    Name:
    Title:

**SOUTHFORK CLO CORP.,**
AS CO-ISSUER

By: _Donald J. Paglisi_
    Name: Donald J. Paglisi
    Title: President

**ASSURED GUARANTY CORP.,**
AS INSURER

By: _____
    Name:
    Title:

**JPMORGAN CHASE BANK,**
**NATIONAL ASSOCIATION,**
AS TRUSTEE AND AS CUSTODIAN

By: _____
    Name: Richard W. Johnson
    Title: Vice President

By: _____
    Name: Richard W. Johnson
    Title: Vice President

458241

IN WITNESS WHEREOF, we have set our hands as of the day and year first written above.

EXECUTED AS A DEED BY

**SOUTHFORK CLO LTD.,**
AS ISSUER

By: _____
      Name:
      Title:

**SOUTHFORK CLO CORP.,**
AS CO-ISSUER

By: _____
      Name:  Donald J. Puglisi
      Title:   President

**ASSURED GUARANTY CORP.,**
AS INSURER

By: _____
      Name:  Howard W. Albert
      Title:   Chief Underwriting & Risk
              Officer

**JPMORGAN CHASE BANK,**
**NATIONAL ASSOCIATION,**
AS TRUSTEE AND AS CUSTODIAN

By: _____
      Name:
      Title:

By: _____
      Name:
      Title:

45824

<u>Schedule 1</u>

**List of Collateral Obligations**

45824v26

<u>Schedule 2</u>

**Moody's Industry Classification Group List**

**Aerospace and Defense**: Major Contractor, Subsystems, Research, Aircraft Manufacturing, Arms, Ammunition

**Automobile**: Automotive Equipment, Auto-Manufacturing, Auto Parts Manufacturing, Personal Use Trailers, Motor Homes, Dealers

**Banking**: Bank Holding, Savings and Loans, Consumer Credit, Small Loan, Agency, Factoring, Receivables

**Beverage, Food and Tobacco**: Beer and Ale, Distillers, Wines and Liquors, Distributors, Soft Drink Syrup, Bottling, Bakery, Mill Sugar, Canned Foods, Corn Refiners, Dairy Products, Meat Products, Poultry Products, Snacks, Packaged Foods, Distributors, Candy, Gum, Seafood, Frozen Food, Cigarettes, Cigars, Leaf/Snuff, Vegetable Oil

**Buildings and Real Estate**: Brick, Cement, Climate Controls, Contracting, Engineering, Construction, Hardware, Forest Products (building-related only), Plumbing, Roofing, Wallboard, Real Estate, Real Estate Development, REITs, Land Development

**Chemicals, Plastics and Rubber**: Chemicals (non-agriculture), Industrial Gases, Sulfur, Plastics, Plastic Products, Abrasives, Coatings, Paints, Varnish, Fabricating

**Containers, Packaging and Glass**: Glass, Fiberglass, Containers made of: Glass, Metal, Paper, Plastic, Wood or Fiberglass

**Personal and Non Durable Consumer Products (Manufacturing Only)**: Soaps, Perfumes, Cosmetics, Toiletries, Cleaning Supplies, School Supplies

**Diversified/Conglomerate Manufacturing**

**Diversified/Conglomerate Service**

**Diversified Natural Resources, Precious Metals and Minerals**: Fabricating, Distribution, Mining and Sales

**Ecological**: Pollution Control, Waste Removal, Waste Treatment, Waste Disposal **Electronics**: Computer Hardware, Electric Equipment, Components, Controllers, Motors, Household Appliances, Information Service, Communication Systems, Radios, TVs, Tape Machines, Speakers, Printers, Drivers, Technology

**Finance**: Investment Brokerage, Leasing, Syndication, Securities

**Farming and Agriculture**: Livestock, Grains, Produce, Agricultural Chemicals, Agricultural Equipment, Fertilizers

**Grocery**: Grocery Stores, Convenience Food Stores

**Healthcare, Education and Childcare**: Ethical Drugs, Proprietary Drugs, Research, Health Care Centers, Nursing Homes, HMOs, Hospitals, Hospital Supplies, Medical Equipment

45824v26

**Home and Office Furnishings, Housedress, and Durable Consumer Products**: Carpets, Floor Coverings, Furniture, Cooking, Ranges

**Hotels, Motels, Inns and Gaming**

**Insurance**: Life, Property and Casualty, Broker, Agent, Surety

**Leisure, Amusement, Entertainment**: Boating, Bowling, Billiards, Musical Instruments, Fishing, Photo Equipment, Records, Tapes, Sports, Outdoor Equipment (camping), Tourism, Resorts, Games, Toy Manufacturing, Motion Picture Production, Theatres, Motion Picture Distribution

**Machinery (Non-Agriculture, Non-Construction, Non-Electronic)**: Industrial, Machine Tools, Steam Generators

**Mining, Steel, Iron and Non-Precious Metals**: Coal, Copper, Lead, Uranium, Zinc, Aluminum, Stainless Steel, Integrated Steel, Ore Production, Refractories, Steel Mill Machinery, Mini-Mills, Fabricating, Distribution and Sales

**Oil and Gas**: Crude Producer, Retailer, Well Supply, Service and Drilling

**Personal, Food and Miscellaneous**

**Printing and Publishing**: Graphic Arts, Paper, Paper Products, Business Forms, Magazines, Books, Periodicals, Newspapers, Textbooks

**Cargo Transport**: Rail, Shipping, Railroads, Rail-car Builders, Ship Builders, Containers, Container Builders, Parts, Overnight Mail, Trucking, Truck Manufacturing, Trailer Manufacturing, Air Cargo, Transport

**Retail Stores**: Apparel, Toy, Variety, Drugs, Department, Mail Order Catalogue, Showroom

**Structured Finance**

**Telecommunications**: Local, Long Distance, Independent, Telephone, Telegraph, Satellite, Equipment, Research, Cellular

**Textiles and Leather**: Producer, Synthetic Fiber, Apparel Manufacturer, Leather Shoes
**Personal Transportation**: Air, Bus, Rail, Car, Rental

**Utilities**: Electric, Water, Hydro Power, Gas, Diversified

**Broadcasting and Entertainment**: Recording Industry, Motion Exhibition Theatres, Motion Picture Production and Distribution, Radio, TV, Cable Broadcasting, Broadcasting Equipment

45824v26

<u>Schedule 3</u>

**S&P Industry Classifications**

<u>Corporate Obligations</u>

| | |
|---|---|
| 0. | Zero Default Risk |
| 1. | Aerospace & Defense |
| 2. | Air transport |
| 3. | Automotive |
| 4. | Beverage & Tobacco |
| 5. | Radio & Television |
| 6. | Brokerages, Dealers & Investment houses |
| 7. | Building & Development |
| 8. | Business equipment & services |
| 9. | Cable & satellite television |
| 10. | Chemical & plastics |
| 11. | Clothing/textiles |
| 12. | Conglomerates |
| 13. | Containers & glass products |
| 14. | Cosmetics/toiletries |
| 15. | Drugs |
| 16. | Ecological services & equipment |
| 17. | Electronics/electrical |
| 18. | Equipment leasing |
| 19. | Farming/agriculture |
| 20. | Financial Intermediaries |
| 21. | Food/drug retailers |
| 22. | Food products |
| 23. | Food service |
| 24. | Forest products |
| 25. | Health care |
| 26. | Home furnishings |
| 27. | Lodging & casinos |
| 28. | Industrial equipment |
| 29. | Insurance |
| 30. | Leisure goods/activities/movies |
| 31. | Nonferrous metals/minerals |
| 32. | Oil & gas |
| 33. | Publishing |
| 34. | Rail Industries |
| 35. | Retailers (except food & drug) |
| 36. | Steel |
| 37. | Surface transport |
| 38. | Telecommunications |
| 39. | Utilities |

<u>Corporate Structured Obligations</u>

| | |
|---|---|
| 50. | CDOs |

Structured Obligations

51.  ABS Consumer
52.  ABS Commercial
53,  CMBS Diversified (Conduit and CTL)
54.  CMBS (Large Loan, Single Borrower, and Single Property)
55.  REITs and REOCs
56.  RMBS A
57.  RMBS B&C, HELs, HELOCs, and Tax Lien
58.  Manufactured Housing
59.  U.S. Agency (Explicitly Guaranteed)
60.  Monoline/FER Guaranteed
61.  Non-FER Company Guaranteed
62.  FFELP Student Loans (Over 70% FFELP)
63.  CLO of SME's

45824v26

Schedule 4

**Diversity Score Calculation**

The Diversity Score for the Collateral Obligations is calculated by summing each of the Industry Diversity Scores, which are calculated as follows:

(i)      An "***Obligor Par Amount***" is calculated for each obligor represented in the Collateral Obligations (other than Defaulted Collateral Obligations) by summing the par amounts of all Collateral Obligations in the Collateral (other than Defaulted Collateral Obligations) issued by that obligor or any Affiliate of that obligor (other than obligors that the Portfolio Manager reasonably determines are Affiliated but are not dependent upon one another for credit support and are not dependent upon a Person by which they are commonly controlled for credit support).

(ii)     An "***Average Par Amount***" is calculated by summing the Obligor Par Amounts and dividing by the number of obligors represented. For purposes of calculating the number of issuers of the Collateral Obligations (other than Defaulted Collateral Obligations), any issuers Affiliated with one another shall be considered one issuer (other than obligors that the Portfolio Manager reasonably determines are Affiliated but are not dependent upon one another for credit support and are not dependent upon a Person by which they are commonly controlled for credit support).

(iii)    An "***Equivalent Unit Score***" is calculated for each obligor represented in the Collateral Obligations (other than Defaulted Collateral Obligations) by taking the lesser of (A) one and (B) the Obligor Par Amount for the obligor *divided* by the Average Par Amount. For purposes of calculating the Equivalent Unit Score, any issuers Affiliated with one another shall be considered one issuer (other than obligors that the Portfolio Manager reasonably determines are Affiliated but are not dependent upon one another for credit support and are not dependent upon a Person by which they are commonly controlled for credit support).

(iv)    An "***Aggregate Industry Equivalent Unit Score***" is then calculated for each of the Moody's industrial classification groups by summing the Equivalent Unit Scores for each obligor in the industry.

(v)     An "***Industry Diversity Score***" is then established by reference to the Diversity Score Table shown below for the related Aggregate Industry Equivalent Unit Score. If any Aggregate Industry Equivalent Unit Score falls between any two the scores then the applicable Industry Diversity Score shall be the lower of the two Industry Diversity Scores in the Diversity Score Table.

## DIVERSITY SCORE TABLE

| Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score |
|---|---|---|---|---|---|---|---|
| 0.0000 | 0.0000 | 5.0500 | 2.7000 | 10.1500 | 4.0200 | 15.2500 | 4.5300 |
| 0.0500 | 0.1000 | 5.1500 | 2.7333 | 10.2500 | 4.0300 | 15.3500 | 4.5400 |
| 0.1500 | 0.2000 | 5.2500 | 2.7667 | 10.3500 | 4.0400 | 15.4500 | 4.5500 |
| 0.2500 | 0.3000 | 5.3500 | 2.8000 | 10.4500 | 4.0500 | 15.5500 | 4.5600 |
| 0.3500 | 0.4000 | 5.4500 | 2.8333 | 10.5500 | 4.0600 | 15.6500 | 4.5700 |
| 0.4500 | 0.5000 | 5.5500 | 2.8667 | 10.6500 | 4.0700 | 15.7500 | 4.5800 |
| 0.5500 | 0.6000 | 5.6500 | 2.9000 | 10.7500 | 4.0800 | 15.8500 | 4.5900 |
| 0.6500 | 0.7000 | 5.7500 | 2.9333 | 10.8500 | 4.0900 | 15.9500 | 4.6000 |
| 0.7500 | 0.8000 | 5.8500 | 2.9667 | 10.9500 | 4.1000 | 16.0500 | 4.6100 |
| 0.8500 | 0.9000 | 5.9500 | 3.0000 | 11.0500 | 4.1100 | 16.1500 | 4.6200 |
| 0.9500 | 1.0000 | 6.0500 | 3.0250 | 11.1500 | 4.1200 | 16.2500 | 4.6300 |
| 1.0500 | 1.0500 | 6.1500 | 3.0500 | 11.2500 | 4.1300 | 16.3500 | 4.6400 |
| 1.1500 | 1.1000 | 6.2500 | 3.0750 | 11.3500 | 4.1400 | 16.4500 | 4.6500 |
| 1.2500 | 1.1500 | 6.3500 | 3.1000 | 11.4500 | 4.1500 | 16.5500 | 4.6600 |
| 1.3500 | 1.2000 | 6.4500 | 3.1250 | 11.5500 | 4.1600 | 16.6500 | 4.6700 |
| 1.4500 | 1.2500 | 6.5500 | 3.1500 | 11.6500 | 4.1700 | 16.7500 | 4.6800 |
| 1.5500 | 1.3000 | 6.6500 | 3.1750 | 11.7500 | 4.1800 | 16.8500 | 4.6900 |
| 1.6500 | 1.3500 | 6.7500 | 3.2000 | 11.8500 | 4.1900 | 16.9500 | 4.7000 |
| 1.7500 | 1.4000 | 6.8500 | 3.2250 | 11.9500 | 4.2000 | 17.0500 | 4.7100 |
| 1.8500 | 1.4500 | 6.9500 | 3.2500 | 12.0500 | 4.2100 | 17.1500 | 4.7200 |
| 1.9500 | 1.5000 | 7.0500 | 3.2750 | 12.1500 | 4.2200 | 17.2500 | 4.7300 |
| 2.0500 | 1.5500 | 7.1500 | 3.3000 | 12.2500 | 4.2300 | 17.3500 | 4.7400 |
| 2.1500 | 1.6000 | 7.2500 | 3.3250 | 12.3500 | 4.2400 | 17.4500 | 4.7500 |
| 2.2500 | 1.6500 | 7.3500 | 3.3500 | 12.4500 | 4.2500 | 17.5500 | 4.7600 |
| 2.3500 | 1.7000 | 7.4500 | 3.3750 | 12.5500 | 4.2600 | 17.6500 | 4.7700 |
| 2.4500 | 1.7500 | 7.5500 | 3.4000 | 12.6500 | 4.2700 | 17.7500 | 4.7800 |
| 2.5500 | 1.8000 | 7.6500 | 3.4250 | 12.7500 | 4.2800 | 17.8500 | 4.7900 |
| 2.6500 | 1.8500 | 7.7500 | 3.4500 | 12.8500 | 4.2900 | 17.9500 | 4.8000 |
| 2.7500 | 1.9000 | 7.8500 | 3.4750 | 12.9500 | 4.3000 | 18.0500 | 4.8100 |
| 2.8500 | 1.9500 | 7.9500 | 3.5000 | 13.0500 | 4.3100 | 18.1500 | 4.8200 |
| 2.9500 | 2.0000 | 8.0500 | 3.5250 | 13.1500 | 4.3200 | 18.2500 | 4.8300 |
| 3.0500 | 2.0333 | 8.1500 | 3.5500 | 13.2500 | 4.3300 | 18.3500 | 4.8400 |
| 3.1500 | 2.0667 | 8.2500 | 3.5750 | 13.3500 | 4.3400 | 18.4500 | 4.8500 |
| 3.2500 | 2.1000 | 8.3500 | 3.6000 | 13.4500 | 4.3500 | 18.5500 | 4.8600 |
| 3.3500 | 2.1333 | 8.4500 | 3.6250 | 13.5500 | 4.3600 | 18.6500 | 4.8700 |

| Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score |
|---|---|---|---|---|---|---|---|
| 3.4500 | 2.1667 | 8.5500 | 3.6500 | 13.6500 | 4.3700 | 18.7500 | 4.8800 |
| 3.5500 | 2.2000 | 8.6500 | 3.6750 | 13.7500 | 4.3800 | 18.8500 | 4.8900 |
| 3.6500 | 2.2333 | 8.7500 | 3.7000 | 13.8500 | 4.3900 | 18.9500 | 4.9000 |
| 3.7500 | 2.2667 | 8.8500 | 3.7250 | 13.9500 | 4.4000 | 19.0500 | 4.9100 |
| 3.8500 | 2.3000 | 8.9500 | 3.7500 | 14.0500 | 4.4100 | 19.1500 | 4.9200 |
| 3.9500 | 2.3333 | 9.0500 | 3.7750 | 14.1500 | 4.4200 | 19.2500 | 4.9300 |
| 4.0500 | 2.3667 | 9.1500 | 3.8000 | 14.2500 | 4.4300 | 19.3500 | 4.9400 |
| 4.1500 | 2.4000 | 9.2500 | 3.8250 | 14.3500 | 4.4400 | 19.4500 | 4.9500 |
| 4.2500 | 2.4333 | 9.3500 | 3.8500 | 14.4500 | 4.4500 | 19.5500 | 4.9600 |
| 4.3500 | 2.4667 | 9.4500 | 3.8750 | 14.5500 | 4.4600 | 19.6500 | 4.9700 |
| 4.4500 | 2.5000 | 9.5500 | 3.9000 | 14.6500 | 4.4700 | 19.7500 | 4.9800 |
| 4.5500 | 2.5333 | 9.6500 | 3.9250 | 14.7500 | 4.4800 | 19.8500 | 4.9900 |
| 4.6500 | 2.5667 | 9.7500 | 3.9500 | 14.8500 | 4.4900 | 19.9500 | 5.0000 |
| 4.7500 | 2.6000 | 9.8500 | 3.9750 | 14.9500 | 4.5000 | | |
| 4.8500 | 2.6333 | 9.9500 | 4.0000 | 15.0500 | 4.5100 | | |
| 4.9500 | 2.6667 | 10.0500 | 4.0100 | 15.1500 | 4.5200 | | |

231

45824v26

**Moody's Structured Finance Obligation Recovery Rates**

The Moody's Recovery Rate for a Structured Finance Obligation will be the applicable rate set forth below based on the appropriate sector as categorized by Moody's:

**Diversified Securities** primarily include (1) Automobile Securities; (2) Car Rental Receivable Securities; (3) Credit Card Securities; (4) Student Loan Securities

**Residential Securities** primarily include (1) Home Equity Loan Securities; (2) Manufactured Housing Securities; (3) Residential A Mortgage Securities; (4) Residential B/C Mortgage Securities

**Undiversified Securities** primarily include (1) CMBS Conduit; (2) CMBS Credit Tenant Lease; (3) CMBS Large Loan; (4) those ABS Sectors not included in Diversified Securities

**Collateralized Debt Obligations** include (1) High-diversity CDOs (Diversity Score in excess of 20); (2) Low-Diversity CDOs (Diversity Score of 20 or less)

## Diversified Securities

| % of Underlying Capital Structure (1) | Initial Rating of Structured Finance Obligation | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 85% | 80% | 70% | 60% | 50% | 40% |
| <=70% >10% | 75% | 70% | 60% | 50% | 40% | 30% |
| <=10% | 70% | 65% | 55% | 45% | 35% | 25% |

## Residential Securities

| % of Underlying Capital Structure (1) | Initial Rating of Structured Finance Obligation | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 85% | 80% | 65% | 55% | 45% | 30% |
| <=70% >10% | 75% | 70% | 55% | 45% | 35% | 25% |
| <=10% | 65% | 55% | 45% | 40% | 30% | 20% |

| | | | | | | |
|---|---|---|---|---|---|---|
| >5% | | | | | | |
| <=5% >2% | 55% | 45% | 40% | 35% | 25% | 15% |
| <=2% | 45% | 35% | 30% | 25% | 15% | 10% |

**Undiversified Securities**

| % of Underlying Capital Structure (1) | Initial Rating of Structured Finance Obligation | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 85% | 80% | 65% | 55% | 45% | 30% |
| <=70% >10% | 75% | 70% | 55% | 45% | 35% | 25% |
| <=10% >5% | 65% | 55% | 45% | 35% | 25% | 15% |
| <=5% >2% | 55% | 45% | 35% | 30% | 20% | 10% |
| <=2% | 45% | 35% | 25% | 20% | 10% | 5% |

**High Diversity Collateralized Debt Obligations**

| % of Underlying Capital Structure (1) | Initial Rating of Underlying Asset | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 85% | 80% | 65% | 55% | 45% | 30% |
| <=70% >10% | 75% | 70% | 60% | 50% | 40% | 25% |
| <=10% >5% | 65% | 55% | 50% | 40% | 30% | 20% |
| <=5% >2% | 55% | 45% | 40% | 35% | 25% | 10% |
| <=2% | 45% | 35% | 30% | 25% | 10% | 5% |

**Low Diversity Collateralized Debt Obligations**

45824v26

| % of Underlying Capital Structure (1) | Initial Rating of Underlying Asset | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 80% | 75% | 60% | 50% | 45% | 30% |
| <=70% >10% | 70% | 60% | 55% | 45% | 35% | 25% |
| <=10% >5% | 60% | 50% | 45% | 35% | 25% | 15% |
| <=5% >2% | 50% | 40% | 35% | 30% | 20% | 10% |
| <=2% | 30% | 25% | 20% | 15% | 7% | 4% |

(1) Initial par amount of tranche to which Structured Finance Obligation relates **divided by** initial par amount of total securities issued by Structured Finance Obligation issuer.

234

45824v26

Schedule 6

**S&P Structured Finance Obligation Recovery Rates***

The S&P Priority Category Recovery Rate for a Structured Finance Obligation will be the applicable rate set forth below based on the appropriate asset class and liability rating as categorized by S&P:

Senior Asset Class

| | Liability rating | | | | | | |
|---|---|---|---|---|---|---|---|
| | AAA | AA | A | BBB | BB | B | CCC |
| AAA | 80.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| AA | 70.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| A | 60.0% | 65.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% |
| BBB | 50.0% | 55.0% | 65.0% | 75.0% | 85.0% | 85.0% | 85.0% |

Junior Asset Class

| | Liability rating | | | | | | |
|---|---|---|---|---|---|---|---|
| | AAA | AA | A | BBB | BB | B | CCC |
| AAA | 55.0% | 65.0% | 75.0% | 80.0% | 80.0% | 80.0% | 80.0% |
| AA | 40.0% | 45.0% | 55.0% | 65.0% | 80.0% | 80.0% | 80.0% |
| A | 30.0% | 35.0% | 40.0% | 45.0% | 50.0% | 60.0% | 70.0% |
| BBB | 10.0% | 10.0% | 10.0% | 25.0% | 35.0% | 40.0% | 50.0% |
| B | 2.5% | 5.0% | 5.0% | 10.0% | 10.0% | 20.0% | 25.0% |
| CCC | 0.0% | 0.0% | 0.0% | 0.0% | 2.5% | 5.0% | 5.0% |

\*     This table shall not apply to project finance, future flows, synthetics, CDO repacks of ABS or CDOs, guaranteed ABS, distressed debt CDOs, synthetic CDOs, or emerging market CDOs.  Recovery rates for such Structured Finance Obligations will be assigned by S&P on a case-by-case basis.

45824v26

**Certain Tax Provisions**

**Certain Defined Terms Relating to S&P Rating and Moody's Rating**

*"Assigned Moody's Rating"*: The monitored publicly available rating or the monitored estimated rating expressly assigned to a debt obligation (or facility) by Moody's that addresses the full amount of the principal and interest promised.

"*Moody's Default Probability Rating*": With respect to any Collateral Obligation, as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

     (a)     with respect to a Moody's Senior Secured Loan:

          (i)     if the Loan's obligor has a senior implied rating from Moody's, such senior implied rating; and

          (ii)     if the preceding clause does not apply, the Moody's Obligation Rating of such Loan;

          (iii)     if the preceding clauses do not apply, the rating that is one subcategory above the Moody's Equivalent Senior Unsecured Rating;

     (b)     with respect to a Moody's Non Senior Secured Loan or a Bond, the Moody's Equivalent Senior Unsecured Rating of such Collateral Obligation;

     (c)     with respect to a Collateral Obligation that is a DIP Loan, the rating that is one rating subcategory below the Assigned Moody's Rating thereof;

     (d)     with respect to a Structured Finance Obligation, the Assigned Moody's Rating thereof (or, if the obligation does not have an Assigned Moody's Rating but has a rating by S&P, the rating that is the number of rating subcategories specified by Moody's below such S&P rating); and

     (e)     with respect to a Synthetic Security, the Assigned Moody's Rating thereof.

Notwithstanding the foregoing, if the Moody's rating or ratings used to determine the Moody's Default Probability Rating are on watch for downgrade or upgrade by Moody's, such rating or ratings will be adjusted down one subcategory (if on watch for downgrade) or up one subcategory (if on watch for upgrade).

"*Moody's Equivalent Senior Unsecured Rating*": With respect to any Collateral Obligation that is a Loan or bond and the obligor thereof, as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

     (a)     if the obligor has a senior unsecured obligation with an Assigned Moody's Rating, such Assigned Moody's Rating;

     (b)     if the preceding clause does not apply, the Moody's "Issuer Rating" for the obligor;

(c)     if the preceding clauses do not apply, but the obligor has a subordinated obligation with an Assigned Moody's Rating, then

(i)     if such Assigned Moody's Rating is at least "B3" (and, if rated "B3," not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one rating subcategory higher than such Assigned Moody's Rating, or

(ii)     if such Assigned Moody's Rating is less than "B3" (or rated "B3" and on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be such Assigned Moody's Rating;

(d)     if the preceding clauses do not apply, but the obligor has a senior secured obligation with an Assigned Moody's Rating, then:

(i)     if such Assigned Moody's Rating is at least "Caa3" (and, if rated "Caa3," not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one subcategory below such Assigned Moody's Rating, or

(ii)     if such Assigned Moody's Rating is less than "Caa3" (or rated "Caa3" and on watch for downgrade), then the Moody's Equivalent Senior Unsecured Rating shall be "C";

(e)     if the preceding clauses do not apply, but such obligor has a senior implied rating from Moody's, the Moody's Equivalent Senior Unsecured Rating shall be one rating subcategory below such senior implied rating;

(f)     if the preceding clauses do not apply, but the obligor has a senior unsecured obligation (other than a bank loan) with a monitored public rating from S&P (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), then the Moody's Equivalent Senior Unsecured Rating shall be:

(i)     one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher,

(ii)     two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower; or

(iii)     "B3" until the Issuer or the Portfolio Manager obtains an estimated rating from Moody's if (A) the Portfolio Manager certifies to the Trustee that in its commercially reasonable judgment, it believes an estimated rating equivalent to a rating no lower than "B3" will be assigned by Moody's and the Issuer or the Portfolio Manager on its behalf applies for an estimated rating from Moody's within five Business Days of the date of the commitment to purchase the Loan or Bond, (B) the aggregate Principal Balance of Collateral Obligations having an Assigned Moody's Rating pursuant to either this clause (f)(iii), or clauses (g)(iii) or (h)(iii) does not exceed 5% of the Maximum Investment Amount, and (C) all the Coverage Tests and the Collateral Quality Tests are satisfied;

(g)     if the preceding clauses do not apply, but the obligor has a subordinated obligation (other than a bank loan) with a monitored public rating from S&P (without any

postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the Assigned Moody's Rating shall be deemed to be:

> (i) one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher;

> (ii) two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower, and the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (c) above; or

> (iii) "B3" until the Issuer or the Portfolio Manager obtains an estimated rating from Moody's if (A) the Portfolio Manager certifies to the Trustee that in its commercially reasonable judgment, it believes an estimated rating equivalent to a rating not lower than "B3" will be assigned by Moody's and the Issuer or the Portfolio Manager on its behalf applies for an estimated rating from Moody's within five Business Days of the date of the commitment to purchase the Loan or Bond, (B) the aggregate Principal Balance of Collateral Obligations having an Assigned Moody's Rating pursuant to either this clause (g)(iii), or clauses (f)(iii) or (h)(iii) does not exceed 5% of the Maximum Investment Amount, and (C) all the Coverage Tests and the Collateral Quality Tests are satisfied;

(h) if the preceding clauses do not apply, but the obligor has a senior secured obligation with a monitored public rating from S&P (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the Assigned Moody's Rating shall be deemed to be:

> (i) one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher;

> (ii) two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower, and the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (d) above; or

> (iii) "B3" until the Issuer or the Portfolio Manager obtains an estimated rating from Moody's if (A) the Portfolio Manager certifies to the Trustee that in its commercially reasonable judgment, it believes an estimated rating equivalent to a rating not lower than "B3" will be assigned by Moody's and the Issuer or the Portfolio Manager on its behalf applies for an estimated rating from Moody's within five Business Days of the date of the commitment to purchase the Loan or Bond, (B) the aggregate Principal Balance of Collateral Obligations having an Assigned Moody's Rating pursuant to either this clause (h)(iii), or clauses (f)(iii) or (g)(iii) does not exceed 5% of the Maximum Investment Amount, and (C) all the Coverage Tests and the Collateral Quality Tests are satisfied;

(i) if the preceding clauses do not apply and each of the following clauses (i) through (viii) do apply, the Moody's Equivalent Senior Unsecured Rating will be "Caa1":

> (i) neither the obligor nor any of its Affiliates is subject to reorganization or bankruptcy proceedings,

> (ii) no debt securities or obligations of the obligor are in default,

(iii)    neither the obligor nor any of its Affiliates has defaulted on any debt during the preceding two years,

(iv)    the obligor has been in existence for the preceding five years,

(v)    the obligor is current on any cumulative dividends,

(vi)    the fixed-charge ratio for the obligor exceeds 125% for each of the preceding two fiscal years and for the most recent quarter,

(vii)    the obligor had a net profit before tax in the past fiscal year and the most recent quarter, and

(viii)   the annual financial statements of such obligor are unqualified and certified by a firm of Independent accountants of international reputation, and quarterly statements are unaudited but signed by a corporate officer;

(j)    if the preceding clauses do not apply but each of the following clauses (i) and (ii) do apply, the Moody's Equivalent Senior Unsecured Rating will be "Caa3":

(i)    neither the obligor nor any of its Affiliates is subject to reorganization or bankruptcy proceedings; and

(ii)    no debt security or obligation of such obligor has been in default during the past two years; and

(k)    if the preceding clauses do not apply and a debt security or obligation of the obligor has been in default during the past two years, the Moody's Equivalent Senior Unsecured Rating will be "Ca."

Notwithstanding the foregoing, not more than 10% of the Maximum Investment Amount may consist of Investment Obligations given a Moody's Equivalent Senior Unsecured Rating based on a rating given by S&P as provided in clauses (f), (g) and (h) above.

"*Moody's Obligation Rating*": With respect to any Collateral Obligation as of any date of determination, the rating determined in accordance with the following, in the following order of priority:

(a)    With respect to a Moody's Senior Secured Loan:

(i)    if it has an Assigned Moody's Rating, such Assigned Moody's Rating; or

(ii)    if the preceding clause does not apply, the rating that is one rating subcategory above the Moody's Equivalent Senior Unsecured Rating; and

(b)    With respect to a Moody's Non Senior Secured Loan or a Bond:

(i)    if it has an Assigned Moody's Rating, such Assigned Moody's Rating; or

(ii)    if the preceding clause does not apply, the Moody's Equivalent Senior Unsecured Rating; and

(c)    With respect to a Synthetic Security or a DIP Loan, the Assigned Moody's Rating thereof.

Notwithstanding the foregoing, if the Moody's rating or ratings used to determine the Moody's Default Probability Rating are on watch for downgrade or upgrade by Moody's, such rating or ratings will be adjusted down one subcategory (if on watch for downgrade) or up one subcategory (if on watch for upgrade).

"***Moody's Rating***": The Moody's Default Probability Rating; provided that, with respect to the Collateral Obligations generally, if at any time Moody's or any successor to it ceases to provide rating services, references to rating categories of Moody's in this Indenture shall be deemed instead to be references to the equivalent categories of any other nationally recognized investment rating agency selected by the Portfolio Manager, as of the most recent date on which such other rating agency and Moody's published ratings for the type of security in respect of which such alternative rating agency is used.

"***S&P Rating***": With respect to any Collateral Obligation, as of any date of determination, the rating determined in accordance with the following methodology:

(i)    If there is an issuer credit rating of the borrower of the Collateral Obligation (the "***Borrower***"), or the guarantor who unconditionally and irrevocably guarantees the Collateral Obligation (the "***Guarantor***") by S&P, the most current issuer credit rating for such Borrower or Guarantor;

(ii)    (a) if there is not an issuer credit rating of the Borrower or its Guarantor by S&P, but there is a rating by S&P on a senior secured obligation of the Borrower or its Guarantor, then the S&P Rating of the Collateral Obligation will be one subcategory below such rating; (b) if there is not a rating by S&P on a senior secured obligation of the Borrower or its Guarantor, but there is a rating by S&P on a senior unsecured obligation of the Borrower or its Guarantor, then the S&P Rating will be such rating; and (c) if there is not a rating by S&P on a senior obligation of the Borrower or its Guarantor, but there is a rating by S&P on a subordinated obligation of the Borrower or its Guarantor, then the S&P Rating will be two subcategories above such rating if such rating is "BBB-" or higher and will be one subcategory above such rating if such rating is "BB+" or lower; or

(iii)    if there is neither an issuer credit rating of the Borrower or its Guarantor by S&P nor a rating by S&P on an obligation of the Borrower or its Guarantor, then the S&P Rating may be determined using any one of the methods below:

(A)    if an obligation of the Borrower or its Guarantor is publicly rated by Moody's, then the S&P Rating will be determined in accordance with the methodologies for establishing the Moody's Default Probability Rating, except that the S&P Rating of such obligation will be (1) one subcategory below the S&P equivalent of the rating assigned by Moody's if such security is rated "Baa3" or higher by Moody's and (2) two subcategories below the S&P equivalent of the rating assigned by Moody's if such security is rated "Ba1" or

45824v26

lower by Moody's; provided that Collateral Obligations constituting no more than 10% of the Maximum Investment Amount may be given a S&P Rating based on a rating given by Moody's as provided in this subclause (a) (after giving effect to the addition of the relevant Collateral Obligation, if applicable);

(B)     if no other security or obligation of the Borrower or its Guarantor is rated by S&P or Moody's, then the Portfolio Manager may apply to S&P for a S&P credit rating estimate, which will be its S&P Rating; or

(C)     if such Collateral Obligation is not rated by Moody's or S&P, no other security or obligation of the Borrower or its Guarantor is rated by S&P or Moody's and if the Portfolio Manager determines in its sole discretion based on information available to it after reasonable inquiry that such Borrower (x) is not subject to any bankruptcy or reorganization proceedings nor in default on any of its obligations (unless the subject of a good faith business dispute), (y) is a legally constituted corporate entity having the minimum legal, financial and operational infrastructure to carry on a definable business, deliver and sell a product or service and report its results in generally accepted accounting terms as verified by a reputable audit firm and (z) is not so vulnerable to adverse business, financial and economic conditions that default in its financial or other obligations is foreseeable in the near term if current operating trends continue, then the S&P Rating will be "CCC-"; provided that the Portfolio Manager must apply to S&P for a S&P credit rating on such Borrower within 30 days after the addition of the relevant Collateral Obligation; provided, further, that Collateral Obligations constituting no more than 5% of the Maximum Investment Amount may be given an S&P Rating based on this subclause (c) (after giving effect to the addition of the relevant Collateral Obligation, if applicable);

provided that if (i) the relevant Borrower or Guarantor or obligation is placed on any positive "credit watch" list by S&P, such rating will be increased by one rating subcategory or (ii) the relevant Borrower or Guarantor or obligation is placed on any negative "credit watch" list by S&P, such rating will be decreased by one rating subcategory.

Notwithstanding the foregoing, in the case of a Collateral Obligation that is a DIP Loan, the S&P Rating shall be (A) the rating assigned thereto by S&P if the rating is public, (B) the rating assigned by S&P if the rating is confidential, but only if all appropriate parties have provided written consent to its disclosure and use, (C) the rating assigned by S&P thereto through an estimated rating or (D) the rating assigned thereto by S&P in connection with the acquisition thereof upon the request of the Portfolio Manager. In the case of a Collateral Obligation that is a PIK Security or Structured Finance Obligation, the S&P Rating may not be determined pursuant to clause (iii)(a) above.

S&P Ratings for entities or obligations relevant hereunder other than Borrowers and Collateral Obligations shall be determined in a corresponding manner.

<u>Exhibit A</u>

**Forms of Securities**

<u>Exhibit A-1</u>

**Form of Note**

<u>Exhibit A-2</u>

**Form of Composite Security**

**Form of Note and Composite Security Legends**

<u>Exhibit B</u>

**Forms of Note and Composite Security Transfer and Exchange Certificates**

<u>Exhibit B-1</u>

**Form of Note Transferee Certificate**

Exhibit B-2

**Form of Regulation S Note Transferor Certificate**

<u>Exhibit B-3</u>

**Form of Non-Regulation S Note Transferor Certificate**

<u>Exhibit B-4</u>

**Form of Composite Security Transferee Certificate**

45824v26

**Form of Regulation S Composite Security Transferor Certificate**

Exhibit B-6

**Form of Non-Regulation S Composite Security Transferor Certificate**

<u>Exhibit C</u>

**Form of McKee Nelson LLP Opinion**

Exhibit D

**Form of Maples and Calder Opinion**

**Form of Gardere Wynne Sewell LLP Opinion**

<u>Exhibit F</u>

**Form of Orrick, Herrington & Sutcliffe LLP Opinion**

**Form of Securities Account Control Agreement**

<u>Exhibit H</u>

**Forms of Section 3(c)(7) Notices**

Exhibit H-1

**Form of Section 3(c)(7) Reminder Notice**

**Form of Important Section 3(c)(7) Reminder Notice**

<u>Exhibit I</u>

**Form of Beneficial Owner Certificate**

<u>Exhibit J</u>

**Form of Extension Notice**

EXECUTION COPY

**Dated as of October 25, 2007**

**STRATFORD CLO LTD.**
Issuer,

**STRATFORD CLO LLC**
Co-Issuer,

**STATE STREET BANK AND TRUST COMPANY**
Trustee

---

**INDENTURE**

---

**FRESHFIELDS BRUCKHAUS DERINGER LLP**

# CONTENTS

**CLAUSE**                                                                                **PAGE**

1.      Definitions.................................................................................. 4

1.1 Definitions............................................................................... 4

1.2 Assumptions as to Pledged Obligations; Construction Conventions................... 97

1.3 Rules of Interpretation .......................................................... 100

2.      The Notes ............................................................................. 101

2.1 Forms Generally..................................................................... 101

2.2 Forms of Notes and Certificate of Authentication ............................... 102

2.3 Authorized Amount; Denominations................................................. 103

2.4 Extension of Replacement Period and Stated Maturity ......................... 104

2.5 Execution, Authentication, Delivery, and Dating............................... 107

2.6 Registration, Registration of Transfer and Exchange ......................... 108

2.7 Mutilated, Destroyed, Lost or Stolen Notes....................................... 113

2.8 Payment of Principal, Interest and Other Amounts; Rights Preserved; Withholding .................................................................... 114

2.9 Persons Considered Owners ..................................................... 118

2.10        Cancellation ................................................................. 118

2.11        Definitive Notes............................................................. 118

2.12        Notes Beneficially Owned by Non-Permitted Holders......................... 119

2.13        Tax Characterization ..................................................... 120

3.      Conditions Precedent ........................................................... 120

3.1 Conditions to Issuance of Notes on Closing Date ............................... 120

3.2 Custodianship; Delivery of Collateral Obligations and Eligible Investments ...................................................................... 125

3.3 Representations as to Collateral.................................................. 126

4.      Satisfaction and Discharge........................................................ 129

4.1 Satisfaction and Discharge of Indenture ....................................... 129

4.2 Application of Trust Money......................................................... 131

4.3 Repayment of Monies Held by Paying Agent ................................... 131

5.    Remedies ............................................................................................ 131

5.1 Events of Default ............................................................................. 131

5.2 Notice of Event of Default; Acceleration of Maturity; Rescission and Annulment .......................................................................................... 133

5.3 Collection of Indebtedness and Suits for Enforcement by Trustee .................... 134

5.4 Remedies ........................................................................................ 136

5.5 Optional Retention of Collateral ........................................................... 138

5.6 Trustee May Enforce Claims Without Possession of Notes ............................. 140

5.7 Application of Money Collected ........................................................... 141

5.8 Limitation on Suits ........................................................................... 141

5.9 Unconditional Rights of Noteholders ...................................................... 142

5.10    Restoration of Rights and Remedies ..................................................... 142

5.11    Rights and Remedies Cumulative ....................................................... 142

5.12    Delay or Omission Not Waiver .......................................................... 142

5.13    Control by Majority of the Controlling Class ......................................... 143

5.14    Waiver of Past Defaults .................................................................. 143

5.15    Undertaking for Costs .................................................................... 144

5.16    Waiver of Stay or Extension Laws ..................................................... 144

5.17    Sale of Collateral .......................................................................... 145

5.18    Action on the Notes ....................................................................... 145

6.    The Trustee ...................................................................................... 146

6.1 Certain Duties and Responsibilities ........................................................ 146

6.2 Notice of Default ............................................................................. 147

6.3 Certain Rights of Trustee .................................................................... 148

6.4 Not Responsible for Recitals or Issuance of the Notes .................................. 150

6.5 May Hold Notes .............................................................................. 150

6.6 Acquisition of Preference Shares .......................................................... 150

6.7 Money Held in Trust ......................................................................... 151

6.8 Compensation and Reimbursement ........................................................ 151

6.9 Corporate Trustee Required; Eligibility .................................................. 152

6.10    Resignation and Removal; Appointment of Successor ............................... 153

6.11    Acceptance of Appointment by Successor ............................................. 155

6.12       Merger, Conversion, Consolidation, or Succession to Business of Trustee155

6.13       Co-Trustees ........................................................................................ 156

6.14       Certain Duties of Trustee Related to Delayed Payment of Proceeds...... 157

6.15       Authenticating Agents ........................................................................ 157

6.16       Fiduciary for Noteholders Only; Agent for Secured Parties................... 158

6.17       Representations and Warranties of the Bank ......................................... 158

6.18       Withholding Tax Forms ...................................................................... 158

6.19       Withholding Tax ................................................................................ 159

7.       Covenants ........................................................................................... 160

7.1 Payment of Principal and Interest ................................................................ 160

7.2 Maintenance of Office or Agency................................................................. 160

7.3 Money for Note Payments to be Held in Trust ................................................ 161

7.4 Existence of Co-Issuers............................................................................... 163

7.5 Protection of Collateral ............................................................................... 164

7.6 Opinions as to Collateral.............................................................................. 166

7.7 Performance of Obligations ......................................................................... 166

7.8 Negative Covenants .................................................................................... 167

7.9 Notice of Default; Statement as to Compliance............................................... 169

7.10      Co-Issuers May Consolidate, etc. Only on Certain Terms .................... 169

7.11      Successor Substituted.......................................................................... 171

7.12      No Other Business ............................................................................. 171

7.13      Listing on Irish Stock Exchange .......................................................... 172

7.14      Annual Rating Review ........................................................................ 172

7.15      Reporting........................................................................................... 172

7.16      Calculation Agent .............................................................................. 173

7.17      Certain Tax Matters ........................................................................... 174

7.18      Securities Lending. ............................................................................. 175

7.19      Purchase of Collateral Obligations; Ramp-Up Completion Date ........... 178

7.20      Secondary Risk Procedures.................................................................. 180

7.21      Section 3(c)(7) Procedures .................................................................. 181

8.       Supplemental Indentures................................................................................ 182

8.1 Supplemental Indentures Without Consent of Holders ...................................... 182

8.2 Supplemental Indentures With Consent of Holders........................................... 186

8.3 Execution of Supplemental Indentures ............................................................. 189

8.4 Effect of Supplemental Indentures; Certain Required Consents ....................... 190

8.5 Reference in Notes to Supplemental Indentures................................................ 190

9.      Redemption of Notes ............................................................................................. 190

9.1 Mandatory Redemption ..................................................................................... 190

9.2 Optional Redemption ......................................................................................... 191

9.3 Optional Redemption Procedures ...................................................................... 193

9.4 Notes Payable on Redemption Date .................................................................. 196

9.5 Special Redemption ........................................................................................... 197

9.6 Amendment Buy-Out.......................................................................................... 198

9.7 Redemption by Refinancing ............................................................................... 198

10.     Accounts, Accountings, and Releases ................................................................. 201

10.1        Collection of Money ................................................................... 201

10.2        Collection Account ..................................................................... 202

10.3        Other Accounts ........................................................................... 204

10.4        Application of Funds in Accounts; Reports by Trustee.......... 210

10.5        Synthetic Security Counterparty Account .............................. 213

10.6        Accountings ................................................................................ 214

10.7        Release of Collateral.................................................................. 224

10.8        Reports by Independent Accountants ..................................... 225

10.9        Reports to Rating Agencies ...................................................... 226

11.     Application of Monies ............................................................................................ 226

11.1        Disbursements of Monies from Payment Account ................. 226

12.     Sale of Collateral Obligations; Purchase of Collateral Obligations................... 235

12.1        Sales of Collateral Obligations ................................................ 235

12.2        Purchase of Collateral Obligations ......................................... 239

12.3        Conditions Applicable to All Sale and Purchase Transactions.............. 242

12.4        Certain Determinations Relating to Collateral Obligations ................... 242

13.     Noteholders' Relations ........................................................................................ 243

13.1        Subordination............................................................................. 243

13.2    Standard of Conduct ................................................................. 245

14.    Miscellaneous ............................................................................. 245

14.1    Form of Documents Delivered to Trustee ............................... 245

14.2    Acts of Holders of Securities ................................................. 246

14.3    Notices, etc., to Certain Persons or Parties ............................ 247

14.4    Notices to Noteholders and the Preference Shares Paying Agent; Waiver 249

14.5    Effect of Headings and Table of Contents .............................. 250

14.6    Successors and Assigns ........................................................... 251

14.7    Separability ............................................................................. 251

14.8    Benefits of Indenture .............................................................. 251

14.9    Governing Law ........................................................................ 251

14.10   Submission to Jurisdiction ...................................................... 251

14.11   Counterparts ............................................................................ 252

14.12   Acts of Issuer .......................................................................... 252

14.13   Liability of Co-Issuers ............................................................ 252

14.14   Indemnity of Co-Issuer ........................................................... 252

15.    Assignment of Servicing Agreement; Hedge Agreements ................. 252

15.1    Assignment of Servicing Agreement; Amendment of Servicing Agreement .................................................................................. 252

15.2    Hedge Agreements .................................................................. 256

Schedules and Exhibits

| | | |
|---|---|---|
| Schedule 1 | – | Collateral Obligations |
| Schedule 2 | – | Moody's Industry Classification Group List |
| Schedule 3 | – | S&P Industry Classifications |
| Schedule 4 | – | Diversity Score Calculation |
| Schedule 5 | – | Moody's Structured Finance Obligation Recovery Rates |
| Schedule 6 | – | S&P Structured Finance Obligation Recovery Rates |
| Schedule 7 | – | Certain Defined Terms Relating to S&P Rating and Moody's Rating |
| Exhibit A | – | Forms of Notes |
| Exhibit B | – | Forms of Note Transfer and Exchange Certificates |
| B-1 | – | Form of Note Transferee Certificate |
| B-2 | – | Form of Note Transferor Certificate for Regulation S to Rule 144A Transfer |
| B-3 | – | Form of Note Transferor Certificate for Rule 144A to Regulation S Transfer |
| Exhibit C | – | Form of Freshfields Bruckhaus Deringer LLP Opinions |
| Exhibit D | – | Form of Maples and Calder Opinion |
| Exhibit E | – | Form of Nixon Peabody LLP Opinion |
| Exhibit F | – | Form of Orrick, Herrington & Sutcliffe LLP Opinion |
| Exhibit G | – | Forms of Section 3(c)(7) Notices |
| G-1 | – | Form of Section 3(c)(7) Reminder Notice |
| G-2 | – | Form of Important Section 3(c)(7) Reminder Notice |
| Exhibit H | – | Form of Beneficial Owner Certificate |
| Exhibit I | – | Form of Extension Notice |
| Exhibit J | – | Form of Insurer Notice |

**THIS INDENTURE**, dated as of October 25, 2007, among

(a)      **STRATFORD CLO LTD.** (the *Issuer*),

(b)      **STRATFORD CLO LLC** (the *Co-Issuer*) and

(c)      **STATE STREET BANK AND TRUST COMPANY**, as trustee (together with its permitted successors, the *Trustee*).

## PRELIMINARY STATEMENT

The Co-Issuers are duly authorized to execute and deliver this Indenture to provide for the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes, in each case issuable as provided in this Indenture. All covenants and agreements made by the Co-Issuers in this Indenture are for the benefit and security of the Secured Parties. The Co-Issuers are entering into this Indenture, and the Trustee is accepting the trusts created by this Indenture, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

All things necessary to make this Indenture a valid agreement of the Co-Issuers in accordance with the agreement's terms have been done.

## GRANTING CLAUSES

The Issuer Grants to the Trustee, for the benefit and security of the Noteholders, the Trustee, the Servicer, each Synthetic Security Counterparty and each Hedge Counterparty (and the Collateral Administrator and Preference Shares Paying Agent to the extent of Administrative Expenses payable to such parties as provided hereunder) (collectively, the *Secured Parties*), all of its right, title, and interest in, to, and under, in each case, whether now owned or existing, or hereafter acquired or arising:

(a)      the Collateral Obligations (listed, as of the Closing Date, in Schedule 1 to this Indenture and listed from time to time on such Schedule 1 as such Schedule 1 may be modified, amended and revised subsequent to the Closing Date by the Issuer) and all Workout Assets, including any part thereof which consists of general intangibles or supporting obligations (each as defined in the UCC) relating thereto, all payments made or to be made thereon or with respect thereto, and all Collateral Obligations and Workout Assets including any part thereof which consists of general intangibles (as defined in the UCC) relating thereto, which are delivered or credited to the Trustee, or for which a Security Entitlement is delivered or credited to the Trustee or which are credited to one or more of the Issuer Accounts on or after the Closing Date and all payments made or to be made thereon or with respect thereto;

(b)      the Custodial Account, the Collection Account, the Payment Account, the Synthetic Security Reserve Account, the Revolving Reserve Account, the Delayed

Drawdown Reserve Account, the Closing Date Expense Account, the Expense Reimbursement Account and the Securities Lending Account (collectively, the **Issuer Accounts**), Eligible Investments purchased with funds on deposit in the Issuer Accounts, and all income from funds in the Issuer Accounts;

(c)     the Issuer's rights with respect to the Synthetic Security Collateral Account, any Synthetic Security Counterparty Account and any Hedge Counterparty Collateral Account (and, together with the Issuer Accounts, the Class II Preference Share Special Payment Account and the Preference Shares Distribution Account, the **Accounts**);

(d)     the Issuer's rights under the Servicing Agreement, the Securities Lending Agreements, the Hedge Agreements and the Collateral Administration Agreement to the extent of any rights of the Issuer therein;

(e)     all Cash or money delivered to the Trustee (or its bailee);

(f)     all securities, investments, investment property, instruments, money, general intangibles, chattel paper and agreements of any nature in which the Issuer has an interest (except for money, securities and investments in the Issuer's bank account in the Cayman Islands), including any part thereof which consists of general intangibles or supporting obligations (each as defined in the UCC) relating thereto; and

(g)     all proceeds with respect to the foregoing;

(all of the property and assets described in foregoing clauses (a) through (g), but excluding the Excluded Property, the **Collateral**).  Notwithstanding the foregoing, the Collateral shall not include any Excluded Property.

Except to the extent otherwise provided in this Indenture, the Issuer does hereby constitute and irrevocably appoint the Trustee the true and lawful attorney of the Issuer, with full power (in the name of the Issuer or otherwise), to exercise all rights of the Issuer with respect to the Collateral held for the benefit and security of the Secured Parties and to ask, require, demand, receive, settle, compromise, compound and give acquittance for any and all moneys and claims for moneys due and to become due under or arising out of any of the Collateral held for the benefit and security of the Secured Parties, to endorse any checks or other instruments or orders in connection therewith and to file any claims or take any action or institute any proceedings which the Trustee may deem to be necessary or advisable in the premises.  The power of attorney granted pursuant to this Indenture and all authority hereby conferred are granted and conferred solely to protect the Trustee's interest in the Collateral held for the benefit and security of the Secured Parties and shall not impose any duty upon the Trustee to exercise any power.  This power of attorney shall be irrevocable as one coupled with an interest prior to the payment in full of all the obligations secured hereby.

Except to the extent otherwise provided in this Indenture, this Indenture shall constitute a security agreement under the laws of the State of New York applicable to agreements made and to be performed therein. Upon the occurrence of any Event of Default with respect to the Notes, and in addition to any other rights available under this Indenture or any other instruments included in the Collateral held for the benefit and security of the Secured Parties or otherwise available at law or in equity, the Trustee shall have all rights and remedies of a secured party on default under the laws of the State of New York and other applicable law to enforce the assignments and security interests contained herein and, in addition, shall have the right, subject to compliance with any mandatory requirements of applicable law, to sell or apply any rights and other interests assigned or pledged hereby in accordance with the terms hereof at public or private sale.

These Grants are not intended to and do not transfer any liability under the Collateral, which liabilities shall remain the sole obligation of the Issuer. These Grants are made, however, in trust as separate trusts, to secure the Notes. Except as provided in Section 13 and the priorities set forth in the Priority of Payments, the Notes are secured by the first grant equally and ratably without prejudice, priority or distinction between any Note and any other Note because of difference in time of issuance or otherwise. The Grants are made to secure, in accordance with the priorities in the Priority of Payments and Section 13:

> (i) the payment of all amounts due on the Notes equally and ratably without prejudice, priority or distinction between any Note and any other Note because of difference in time of issuance or otherwise, in accordance with their terms;
>
> (ii) the payment of all other sums payable under this Indenture (including Administrative Expenses payable to the Trustee, the Collateral Administrator and the Preference Shares Paying Agent, but other than amounts payable in respect of the Preference Shares);
>
> (iii) the payment of sums payable to any Hedge Counterparty under a Hedge Agreement;
>
> (iv) the payment of sums payable to the Servicer under the Servicing Agreement; and
>
> (v) compliance with this Indenture;

(collectively, the ***Secured Obligations***), all as provided in this Indenture.

The Trustee acknowledges the Grants, accepts the trusts under this Indenture in accordance with this Indenture, and agrees to perform its duties in this Indenture in accordance with the provisions hereof.

1.    DEFINITIONS

**1.1    Definitions**

Except as otherwise specified in this Indenture or as the context may otherwise require, the following terms have the respective meanings provided below for all purposes of this Indenture.

*A/B Exchange*:  An exchange of one security (the *A Security*) for another security (the *B Security*) of the same issuer or issuers, which security shall have substantially identical terms to the A Security except that one or more transfer restrictions applicable to the A Security are inapplicable to the B Security.

*Accounts*:  The meaning specified in the Granting Clauses.

*Accountants' Certificate*:  An agreed upon procedures report of a firm of Independent certified public accountants of international reputation appointed by the Issuer pursuant to Section 10.8(a), which may be the firm of Independent accountants that performs certain accounting services for the Issuer or the Servicer.

*Accrued Interest On Sale*:  Interest accrued on a Collateral Obligation at the time of sale or other disposition to the extent paid to the Issuer as part of the sale or other disposition price of the Collateral Obligation after deduction of any amount representing Accrued Interest Purchased With Principal of the Collateral Obligation.

*Accrued Interest Purchased With Principal*:  (i) interest accrued on or purchased with a Collateral Obligation as part of the price paid by the Issuer to acquire the Collateral Obligation less any amount of Interest Proceeds (applied as Interest Proceeds) applied by the Issuer to acquire the accrued interest at the time of purchase and (ii) interest accrued on a Loan that constitutes part of the price paid by the Issuer to repay loans made by the Pre-Closing Participant to finance the Issuer's pre-closing acquisition of such Loan.

*Act*: The meaning specified in Section 14.2.

*Administration Agreement*:  The Administration Agreement, between the Issuer and the Administrator, providing for the administrative functions of the Issuer, as modified, amended, and supplemented and in effect from time to time.

*Administrative Expense Cap*:  An amount on any Payment Date equal to the excess of:

(a)    the sum of 0.04% of the Maximum Amount on the related Determination Date plus U.S.$150,000, **over**

(b)    the sum of the amounts paid for Administrative Expenses in the twelve months preceding the current Payment Date.

*Administrative Expenses*:  Amounts due or accrued representing

(i)     tax preparation, filing, and registration fees or expenses and any other filing and registration fees owed by the Co-Issuers (including all filing, registration, and annual return fees payable to the Cayman Islands government and registered office fees);

(ii)    fees, indemnities and expenses of the Trustee (including all amounts under Section 6.8), the Administrator, the Preference Shares Paying Agent and the Collateral Administrator;

(iii)   fees, indemnities and expenses of the Co-Issuers and of accountants, agents, and counsel for either of the Co-Issuers;

(iv)    fees and expenses of the Rating Agencies in connection with any rating of the Collateral (requested by the Issuer or the Servicer) or the Notes owed by either Co-Issuer (including fees and expenses for ongoing surveillance, credit estimates and other fees owing to the Rating Agencies);

(v)     expenses and indemnities (but not Servicing Fees) of the Servicer if payable under the Servicing Agreement;

(vi)    fees, indemnities and expenses for third-party loan pricing services and accountants; and

(vii)   amounts due (including indemnities) to any other Person (except the Servicing Fees) if specifically provided for in this Indenture, including fees or expenses in connection with any Securities Lending Agreement.

*Administrator*:  Maples Finance Limited.

*Affected Class*:  Any Class of Notes that, as a result of the occurrence of a Tax Event, has received, or will receive less than the aggregate amount of principal and interest that would otherwise have been payable to such Class on the Payment Date related to the Due Period with respect to which such Tax Event occurs.

*Affiliate* or *Affiliated*:  With respect to a Person,

(i)     any other Person who, directly or indirectly, is in control of, or controlled by, or is under common control with, the Person; or

(ii)    any other Person who is a director, officer, or employee (A) of the Person, (B) of any subsidiary or parent company of the Person or (C) of any Person described in clause (i) above.

For the purposes of this definition, control of a Person shall mean the power, direct or indirect,

        (A)     to vote more than 50% of the securities having ordinary voting power for the election of directors of the Person; or

        (B)     to direct the corporate management and corporate policies of the Person whether by contract or otherwise (this does not include the Servicing Agreement unless it is amended expressly to provide those services).

For the purpose of this definition, the Administrator and its Affiliates are neither Affiliates of nor Affiliated with the Co-Issuers and the Co-Issuers are neither Affiliates of nor Affiliated with the Administrator, or any of their Affiliates.

***Agent Members***:  Members of, or participants in, a Depository.

***Aggregate Outstanding Amount***:  When used with respect to any of the Notes as of any date, the aggregate outstanding principal amount of such Notes on that date.  When used with respect to the Preference Shares as of any date, means the number of such Preference Shares Outstanding on such date.

Except as otherwise provided herein:

(a)     the Aggregate Outstanding Amount of the Class A-1 Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(b)     the Aggregate Outstanding Amount of the Class A-2 Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(c)     the Aggregate Outstanding Amount of the Class B Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(d)     the Aggregate Outstanding Amount of the Class C Notes at any time shall include all Class C Deferred Interest attributed thereto;

(e)     the Aggregate Outstanding Amount of the Class D Notes at any time shall include all Class D Deferred Interest attributed thereto; and

(f)     the Aggregate Outstanding Amount of the Class E Notes at any time shall include all Class E Deferred Interest attributed thereto.

***Aggregate Principal Balance***:  When used with respect to the Pledged Obligations, the sum of the Principal Balances of all the Pledged Obligations.  When used with respect to a portion of the Pledged Obligations, the term Aggregate Principal Balance means the sum of the Principal Balances of that portion of the Pledged Obligations.

***Aggregate Purchase Price Amount***: When used with respect to the Pledged Obligations, the sum of the Purchase Price Amounts of all the Pledged Obligations. When used with respect to a portion of the Pledged Obligations, the term Aggregate Purchase Price Amount means the sum of the Purchase Price Amounts of that portion of the Pledged Obligations.

***Allocable Principal Balance***: With respect to a Synthetic Security based upon or relating to a senior secured index providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time, the portion of the aggregate Principal Balance of such Synthetic Security that is allocable to each Reference Obligation comprising such index or indices based upon allocating the Principal Balance of such Synthetic Security among such Reference Obligations in the same proportion as each Reference Obligation bears to the aggregate Principal Balance of such Synthetic Security.

***Amendment Buy-Out***: The meaning specified in Section 9.6(a).

***Amendment Buy-Out Option***: The meaning specified in Section 9.6(a).

***Amendment Buy-Out Purchase Price***: The purchase price payable by the Amendment Buy-Out Purchaser for Securities purchased in an Amendment Buy-Out, if any, in an amount equal to (i) in the case of the Notes, the Aggregate Outstanding Amount thereof, **plus** accrued and unpaid interest (including Defaulted Interest and Deferred Interest, if any) as of the date of purchase payable to the Non-Consenting Holder (giving effect to any amounts paid to the Holder on such date), **plus** any unpaid Extension Bonus Payment, and (ii) in the case of the Preference Shares, an amount that, when taken together with all payments and distributions made in respect of such Preference Shares since the Closing Date (and any amounts payable, if any, to the Non-Consenting Holder on the next succeeding Payment Date) would cause such Preference Shares to have received (as of the date of purchase thereof) a Preference Share Internal Rate of Return of 12.0% (assuming such purchase date was a Payment Date); **provided**, **however**, that in any Amendment Buy-Out from and after the date on which the Non-Consenting Holders have received a Preference Share Internal Rate of Return equal to or in excess of 12.0%, the Amendment Buy-Out Purchase Price for such Preference Shares shall be zero.

***Amendment Buy-Out Purchaser***: The Servicer (or any of its Affiliates acting as principal or agent); **provided** that in the event that the Servicer elects not to purchase Securities from Holders pursuant to Section 9.6, "Amendment Buy-Out Purchaser" shall mean one or more qualifying purchasers (which may include the Initial Purchasers or any of their Affiliates acting as principal or agent) designated by the Servicer; **provided**, **however**, none of the Servicer, the Initial Purchasers or any of their respective Affiliates shall have any duty to act as an Amendment Buy-Out Purchaser.

***Applicable Issuers*** or ***Applicable Issuer***:  With respect to the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes, each of the Co-Issuers.  With respect to Preference Shares, the Issuer only.

***Applicable Note Interest Rate***:  With respect to the Notes of any Class, the Note Interest Rate with respect to such Class.

***Applicable Percentage***:  The lesser of the Moody's Priority Category Recovery Rate applicable to the Collateral Obligation and the S&P Recovery Rate applicable to the Collateral Obligation and the current S&P Rating of the Class A-1 Notes and the Class A-2 Notes.

***Approved Pricing Service***:  Loan Pricing Corporation, Mark-It-Partners, Inc. or any other nationally recognized loan pricing service approved in writing by S&P.

***Assigned Moody's Rating***:  The meaning set forth in Schedule 7.

***Authenticating Agent***:  With respect to the Notes, the Trustee or the person designated by the Trustee to authenticate the Notes on behalf of the Trustee pursuant to Section 6.15.

***Authorized Officer***:  With respect to the Issuer or the Co-Issuer, any Officer or agent who is authorized to act for the Issuer or the Co-Issuer as applicable, in matters relating to, and binding on, the Issuer or the Co-Issuer.  With respect to the Servicer, any managing member, Officer, manager, employee, partner or agent of the Servicer who is authorized to act for the Servicer in matters relating to, and binding on, the Servicer with respect to the subject matter of the request, certificate, or order in question.  With respect to the Trustee or any other bank or trust company acting as trustee of an express trust or as custodian, a Trust Officer.  Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any Person to act, and the certification may be considered as in full force and effect until receipt by the other party of written notice to the contrary.

***Average Life***:  As of any Measurement Date with respect to any Collateral Obligation (other than any Defaulted Collateral Obligation), the quotient obtained by dividing:

(i)     the sum of the products of:

    (A)     the number of years (rounded to the nearest hundredth) from the Measurement Date to the respective dates of each successive scheduled payment of principal of the Collateral Obligation, and

    (B)     the respective amounts of the successive scheduled payments of principal of the Collateral Obligation, *by*

(ii)    the sum of all successive scheduled payments of principal of the Collateral Obligation.

***Bank***:  State Street Bank and Trust Company, in its individual capacity and not as Trustee.

***Bankruptcy Code***:  The U.S. Bankruptcy Code, Title 11 of the United States Code.

***Bankruptcy Law***:  The Bankruptcy Code, Part V of the Companies Law (2007 Revision) of the Cayman Islands and the Bankruptcy Law (1997 Revision) of the Cayman Islands.

***Beneficial Owner***:  Any person owning an interest in a Global Note as reflected on the books of the Depository or on the books of an Agent Member or on the books of an indirect participant for which an Agent Member acts as agent.

***Benefit Plan Investor***:  Any (i) "employee benefit plan" within the meaning of Section 3(3) of ERISA, that is subject to Title I of ERISA, (ii) any "plan" described by Section 4975(e)(1) of the Code that is subject to Section 4975 of the Code, or an entity whose underlying assets include the assets of any plan described in (i) or (ii) by reason of such plan's investment in such entity.

***Board Resolution***:  With respect to the Issuer, a resolution of the board of directors of the Issuer and, with respect to the Co-Issuer, a resolution of the board of directors of the Co-Issuer.

***Bridge Loan***:  Any Loan that is incurred in connection with a merger, acquisition, consolidation, sale of all or substantially all of the assets of an entity, restructuring or similar transaction, which debt obligation by its terms is required to be repaid within one year of the incurrence thereof with proceeds from additional borrowings or other refinancings (other than any additional borrowing or refinancing if one or more financial institutions will have provided the issuer of or obligor on such debt obligation with a binding written commitment to provide the same).

***Business Day***:  A day on which commercial banks and foreign exchange markets settle payments in New York City and any other city in which the Corporate Trust Office of the Trustee is located and, in the case of the final payment of principal of any Note, the place of presentation of the Note designated by the Trustee; **provided**, **however**, that, for purposes of determining LIBOR, "Business Day" must also be a day on which dealings in deposits in Dollars are transacted in the London interbank market.  To the extent action is required of the Irish Paying Agent, Dublin, Ireland shall be considered in determining "Business Day" for purposes of determining when actions by the Irish Paying Agent are required.

***Calculation Agent***:  The meaning specified in Section 7.16.

***Caa1 Collateral Obligations***:  The Collateral Obligations (excluding any Defaulted Collateral Obligations) that on the relevant date have a Moody's Rating below "B3".

***Cash***:  Such coin or currency of the United States of America as at the time shall be legal tender for payment of all public and private debts.

***CCC+/Caa1 Collateral Obligations***:  The Collateral Obligations (excluding any Defaulted Collateral Obligations) that on the relevant date have (i) a Moody's Rating below "B3" and/or (ii) an S&P Rating below "B-".

***CCC+/Caa1 Excess Market Value Percentage***:  The percentage equivalent of a fraction, the numerator of which is the aggregate Market Value of CCC+/Caa1 Collateral Obligations (in order of ascending Market Value Percentage, starting with the CCC+/Caa1 Collateral Obligation with the lowest Market Value Percentage) with an aggregate Principal Balance equal to Excess CCC+/Caa1 Collateral Obligations and the denominator of which is an amount equal to the Excess CCC+/Caa1 Collateral Obligations.

***Certificate of Authentication***:  The meaning specified in Section 2.1.

***Certificated Preference Share***:  The meaning set forth in the Preference Shares Paying Agency Agreement.

***Certificated Security (UCC)***:  The meaning specified in Section 8-102(a)(4) of the UCC.

***Class***:  Each of the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D Notes, the Class E Notes and the Preference Shares.

***Class A S&P Minimum Weighted Average Recovery Rate Test***: A test that is satisfied as of any Measurement Date if the S&P Weighted Average Recovery Rate with respect to the Class A Notes is greater than or equal to S&P Minimum Weighted Average Recovery Rate with respect to the Class A Notes.

***Class A Notes***:  The Class A-1 Notes and the Class A-2 Notes.

***Class A Overcollateralization Ratio*** is the ratio calculated by **dividing**:

(i)      the Overcollateralization Ratio Numerator; **by**

(ii)      the Aggregate Outstanding Amount of the Class A Notes.

***Class A-1 Notes***:  The Class A-1 Floating Rate Senior Secured Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

***Class A-2 Notes***:  The Class A-2 Floating Rate Senior Secured Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

*Class A/B Coverage Tests*: The Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class A-1 Notes, the Class A-2 Notes and the Class B Notes.

*Class B Notes*: The Class B Floating Rate Senior Secured Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

*Class B S&P Minimum Weighted Average Recovery Rate Test*: A test that is satisfied as of any Measurement Date if the S&P Weighted Average Recovery Rate with respect to the Class B Notes is greater than or equal to S&P Minimum Weighted Average Recovery Rate with respect to the Class B Notes.

*Class C Coverage Tests*: The Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class C Notes.

*Class C Deferred Interest*: Deferred Interest with respect to the Class C Notes.

*Class C Notes*: The Class C Floating Rate Senior Secured Deferrable Interest Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

*Class C S&P Minimum Weighted Average Recovery Rate Test*: A test that is satisfied as of any Measurement Date if the S&P Weighted Average Recovery Rate with respect to the Class C Notes is greater than or equal to S&P Minimum Weighted Average Recovery Rate with respect to the Class C Notes.

*Class D Coverage Tests*: The Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class D Notes.

*Class D Deferred Interest*: Deferred Interest with respect to the Class D Notes.

*Class D Notes*: The Class D Floating Rate Senior Secured Deferrable Interest Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

*Class D S&P Minimum Weighted Average Recovery Rate Test*: A test that is satisfied as of any Measurement Date if the S&P Weighted Average Recovery Rate with respect to the Class D Notes is greater than or equal to S&P Minimum Weighted Average Recovery Rate with respect to the Class D Notes.

*Class E Coverage Test*: The Overcollateralization Test as applied with respect to the Class E Notes.

*Class E Deferred Interest*: Deferred Interest with respect to the Class E Notes.

***Class E Notes***:  The Class E Floating Rate Senior Secured Deferrable Interest Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

***Class E S&P Minimum Weighted Average Recovery Rate Test***: A test that is satisfied as of any Measurement Date if the S&P Weighted Average Recovery Rate with respect to the Class E Notes is greater than or equal to S&P Minimum Weighted Average Recovery Rate with respect to the Class E Notes.

***Class I Preference Shares***:  The Class I Preference Shares issued by the Issuer pursuant to the Issuer Charter and the resolutions of the Issuer's board of directors authorizing the issuance of the Preference Shares passed on or before the Closing Date.

***Class II Preference Share Percentage***:  For any Payment Date, a fraction, expressed as a percentage, the numerator of which is the number of Outstanding Class II Preference Shares on such Payment Date and the denominator of which is the total number of Outstanding Preference Shares on such Payment Date.

***Class II Preference Share Portion***:  For any Payment Date, 100% **minus** the Servicing Fee Portion for such Payment Date.

***Class II Preference Share Senior Special Payment***:  For any Payment Date, an amount equal to the product of (a) the Senior Servicing Fee for such Payment Date and (b) the Class II Preference Share Portion for such Payment Date.

***Class II Preference Share Special Payment***:  Collectively, the Class II Preference Share Senior Special Payment, the Class II Preference Share Subordinated Special Payment and the Class II Preference Share Supplemental Special Payment.

***Class II Preference Share Special Payment Account***:  The Securities Account established pursuant to Section 10.3(i).

***Class II Preference Share Subordinated Special Payment***:  For any Payment Date, an amount equal to the product of (a) the Subordinated Servicing Fee for such Payment Date and (b) the Class II Preference Share Portion for such Payment Date.

***Class II Preference Share Supplemental Special Payment***:  For any Payment Date, an amount equal to the product of (a) the Supplemental Servicing Fee for such Payment Date and (b) the Class II Preference Share Portion for such Payment Date.

***Class II Preference Shares***:  The Class II Preference Shares issued by the Issuer pursuant to the Issuer Charter and the resolutions of the Issuer's board of directors authorizing the issuance of the Preference Shares passed on or before the Closing Date.

***Class Scenario Loss Rate***: With respect to any Class of Notes rated by S&P, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as

applicable, consistent with S&P's rating of the Class of Notes on the Closing Date, determined by application of the S&P CDO Monitor.

***Clearing Agency***: An organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

***Clearing Corporation***: The meaning specified in Section 8-102(a)(5) of the UCC.

***Clearing Corporation Security***: A "security" (as defined in Section 8-102(a)(15) of the UCC) that (i) is a debt or equity security and (ii) is in the custody of or maintained on the books of a Clearing Corporation or its nominee.

***Clearstream***: Clearstream Banking, société anonyme, a corporation organized under the laws of the Duchy of Luxembourg.

***Closing Date***: October 25, 2007.

***Closing Date Expense Account***: The Securities Account established pursuant to Section 10.3(g).

***Co-Issuer***: The person named as such on the first page of this Indenture.

***Co-Issuers***: The Issuer and the Co-Issuer.

***Code***: The United States Internal Revenue Code of 1986, as amended.

***Collateral***: The meaning specified in the Granting Clauses.

***Collateral Administration Agreement***: The agreement dated as of the Closing Date among the Issuer, the Servicer, and the Collateral Administrator, as modified, amended and supplemented and in effect from time to time.

***Collateral Administrator***: State Street Bank and Trust Company, in its capacity as collateral administrator under the Collateral Administration Agreement.

***Collateral Assignment of Hedge Agreements***: With respect to each Hedge Agreement, the assignment of all of the Issuer's interest in the Hedge Agreement to the Trustee and acknowledged by the Hedge Counterparty to create a security interest therein in favor of the Trustee.

***Collateral Obligation***: Any obligation or security that, when the Issuer commits to purchase (or otherwise acquire) the obligation or security, is a Loan, High-Yield Bond, Structured Finance Obligation, or Synthetic Security with a Reference Obligation that is a Loan, a Structured Finance Obligation or High-Yield Bond that, in either case, is (or in the case of a Synthetic Security, the Reference Obligation is):

(1)     denominated and payable in U.S. Dollars and is not convertible by its obligor into any other currency;

(2)     an obligation of an obligor Domiciled in an Eligible Country;

(3)     an obligation that is eligible by its terms to be assigned to the Issuer and pledged by the Issuer to the Trustee for inclusion in the Collateral;

(4)     not an exchangeable or convertible security;

(5)     not an equity security or a warrant or a component of an equity security or a security that has a component that is an equity security (other than for avoidance of doubt, a pass-through trust certificate in a trust holding Collateral Obligations that is rated by a nationally recognized credit rating agency);

(6)     not an obligation or security that has been called for redemption and is not an obligation or security that is the subject of an Offer other than a Permitted Offer or an exchange offer in which a security that is not registered under the Securities Act is exchanged for (i) a security that has substantially identical terms (except for transfer restrictions) but is registered under the Securities Act or (ii) a security that would otherwise qualify for purchase under Section 12;

(7)     an obligation that (a) has a Moody's Rating (including any estimated or confidential rating which is in respect of the full obligation of the obligor and which is monitored) and (b) has an S&P Rating (including any confidential rating which is in respect of the full obligation of the obligor and which is monitored), which S&P Rating does not have a "p", "pi", "q", "r" or "t" subscript unless S&P otherwise authorizes in writing;

(8)     an obligation that is not a lease, unless it is a Finance Lease and the Rating Condition has been satisfied with respect to the acquisition thereof;

(9)     (a) an obligation that is not a Current-Pay Obligation, Non-Performing Collateral Obligation or Credit Risk Obligation and (b) in the case of a Collateral Obligation that has a Moody's Rating of "Caa1" or lower or an S&P Rating of "CCC+" or lower, an obligation for which the Servicer has certified in writing that such Collateral Obligation is not a Credit Risk Obligation;

(10)    an obligation that (unless it is a High-Yield Bond) is not subordinated by its terms to other indebtedness for borrowed money of the applicable issuer; **provided** that for the avoidance of doubt, this clause shall not prohibit the inclusion as Collateral Obligations of Subordinated Lien Loans or Second Lien Loans;

(11)    an obligation that (i) (unless it is a PIK Security) bears simple interest payable in cash no less frequently than annually at a fixed or floating rate that is paid on a periodic basis on an unleveraged basis and, in the case of a floating rate,

computed on a benchmark interest rate plus or minus a spread, if any (which may vary under the terms of the obligation) and (ii) provides for a fixed amount of principal payable in cash according to a fixed schedule (which may include optional call dates) or at maturity (or a fixed notional amount in the case of Synthetic Securities);

(12)   an obligation the payment or repayment of the principal, if any, of which is not an amount determined by reference to any formula or index or subject to any contingency under the terms thereof;

(13)   an obligation the portion of which to be acquired (or, in the case of a Synthetic Security, the Reference Obligation) does not represent, directly or indirectly, more than a 25% interest in the obligation;

(14)   not an obligation with a maturity later than two years after the Stated Maturity of the Notes;

(15)   an obligation or security all payments on and proceeds of will be received by the Issuer free and clear of withholding tax, other than (A) withholding tax as to which the obligor or issuer must make additional payments so that the net amount received by the Issuer after satisfaction of such tax is the amount due to the Issuer before the imposition of any withholding tax, (B) withholding taxes on commitment or facility fees associated with Collateral Obligations constituting Revolving Loans or Delayed Drawdown Loans or (C) withholding taxes on fees received on Synthetic Letters of Credit;

(16)   not an Unfunded Synthetic Security or a Loan that would require the Issuer after its purchase of the Loan to advance any funds to the related borrower or permit the borrower to require that any future advances be made unless

(A)   it is a Revolving Loan, Delayed Drawdown Loan or Synthetic Security, and

(B)   after giving effect to the acquisition thereof, (1) the sum of all amounts standing to the credit of the Synthetic Security Reserve Account, the Revolving Reserve Account and the Delayed Drawdown Reserve Account and any cash collateral posted with (or for the benefit of) any Synthetic Security Counterparty equals or exceeds (2) the maximum amount of any advances that may be required of the Issuer under the Underlying Instruments in respect of all Collateral Obligations that are Revolving Loans or Delayed Drawdown Loans and any amounts that could become payable by the Issuer in respect of all Collateral Obligations that are Unfunded Synthetic Securities;

(17)   if such obligation is a Structured Finance Obligation that is a collateralized loan obligation, such obligation:

    (A)    has been assigned a rating by both Moody's and S&P;

    (B)    has a Moody's Rating of "Ba3" or higher and an S&P Rating of "BB-" or higher; and

    (C)    has not been placed on the watch list for possible downgrade by Moody's or S&P;

(18)    not a Loan that is an obligation of a debtor in possession or a trustee for a debtor in an insolvency proceeding other than a DIP Loan;

(19)    with respect to an obligation that provides for the payment of interest at a floating rate, an obligation for which such floating rate is determined by reference to the U.S. Dollar prime rate or other base rate, London interbank offered rate or similar interbank offered rate, commercial deposit rate or any other index that the Rating Condition with respect to each Rating Agency is satisfied with respect thereto;

(20)    in the case of a Synthetic Security, the Synthetic Security is one for which the counterparty or issuer, as the case may be, has a short-term debt rating by Moody's of at least "P-1" or long-term senior unsecured rating by Moody's of at least "A3" and, if rated "A3" by Moody's, such rating is not on watch for downgrade, and an issuer credit rating by S&P of at least "AA-" or a short-term debt rating by S&P of at least "A-1+";

(21)    not an obligation that constitutes Margin Stock;

(22)    not a Zero-Coupon Security;

(23)    not an obligation that is currently deferring interest or paying interest "in kind" or otherwise has an interest "in kind" balance outstanding at the time of purchase, which interest is otherwise payable in cash;

(24)    not a security whose repayment is subject to substantial non-credit related risk as determined by the Servicer;

(25)    not an obligation the interest payments of which are scheduled to decrease (although interest payments may decrease due to unscheduled events such as a decrease of the index relating to a Floating Rate Obligation, the change from a default rate of interest to a non-default rate of interest or an improvement in the obligor's financial condition);

(26)    not an obligation that will cause the Issuer, the Co-Issuer, or the pool of assets to be required to be registered as an investment company under the Investment Company Act;

(27)    in the case of a Loan that involves Synthetic Letters of Credit, (a) the Issuer prefunds its obligations with respect to such Synthetic Letter of Credit by

delivering cash to the relevant issuing bank, agent bank or deposit bank and has no further obligation to make payments with respect to such Synthetic Letter of Credit, (b) the Issuer is not subject to market value risk with respect to any prefunded amounts and (c) the issuing bank, agent bank or deposit bank in respect of such Synthetic Letters of Credit has a short-term rating of at least "A-1" by S&P (or, if such issuing bank has no short-term rating from S&P, a long-term rating of at least "A+" by S&P);

(28)   an obligation that is Registered;

(29)   an obligation the acquisition (including the manner of acquisition), ownership, enforcement and disposition of which will not cause the Issuer to be treated as engaged in a U.S. trade or business for U.S. federal income tax purposes or otherwise to be subject to tax on a net income basis in any jurisdiction outside the Issuer's jurisdiction of incorporation;

(30)   in the case of an obligation that is a Synthetic Letter of Credit, the acquisition of such Synthetic Letter of Credit does not cause the Issuer to have entered into more than ten currently outstanding Synthetic Letters of Credit; and

(31)   in the case of an obligation that is a Synthetic Letter of Credit, (a) such obligation is acquired in connection with the acquisition of another obligation issued under the same credit facility that is not a Synthetic Letter of Credit (a ***Related Obligation***), (b) the amount of the Synthetic Letter of Credit acquired by the Issuer is not more than one-half of the amount of the Related Obligation acquired by the Issuer and (c) the proportionate amount of the Synthetic Letter of Credit acquired by the Issuer is not greater than the proportionate amount of such Related Obligation acquired under the relevant credit facility.

In the case of a Synthetic Security, in addition to the related Reference Obligation meeting the requirements above, the Synthetic Security itself must also meet the requirements of paragraphs (15), (28) and (29); **provided** that a Synthetic Security shall be deemed to meet the requirements of paragraph (28) if the terms of such Synthetic Security require prior written consent of the Issuer or counterparty, as relevant, prior to a transfer.

Pursuant to the definition of "Synthetic Security," unless the Rating Condition is otherwise satisfied, any "deliverable obligation" that may be delivered to the Issuer as a result of the occurrence of any "credit event" must qualify (when the Issuer purchases the related Synthetic Security and when such "deliverable obligation" is delivered to the Issuer as a result of the occurrence of any "credit event") as a Collateral Obligation, except that such "deliverable obligation" may constitute a Defaulted Collateral Obligation when delivered upon a "credit event."

***Collateral Quality Tests***:   The Diversity Test, the Weighted Average Life Test, the Weighted Average Moody's Recovery Rate Test, the S&P Minimum Weighted Average

Recovery Rate Test, the Weighted Average Fixed Rate Coupon Test, the Weighted Average Spread Test, the Weighted Average Rating Factor Test and the S&P CDO Monitor Test.

***Collection Account***:  The Securities Account established pursuant to Section 10.2(a).

***Concentration Limitations***:  The limit set forth below with respect to a particular type of Relevant Obligation (measured by Aggregate Principal Balance) as a percentage of the Maximum Amount:

|     |     | Percentage of the Maximum Amount |
| --- | --- | --- |
| (1) | Senior Secured Loans and Eligible Investments | ≥ 87.5% |
| (2) | unsecured Loans | ≤ 3.0% |
| (3) | Subordinated Lien Loans and Second Lien Loans | ≤ 10.0% |
| (4) | Revolving Loans and the unfunded portion of Delayed Drawdown Loan | ≤ 12.0 % |
| (5) | DIP Loans | ≤ 5.0% |
|     | (a)  except that with a Rating Confirmation, DIP Loans may constitute up to the percentage of the Maximum Amount specified in the right column | ≤ 7.5% |
|     | (b)  S&P Unrated DIP Loans | ≤ 2.5% |
| (6) | PIK Securities | ≤ 3.0% |
| (7) | High-Yield Bonds | ≤ 7.5% |
| (8) | Structured Finance Obligations | ≤ 10.0% |
|     | (a)  except that Structured Finance Obligations serviced by the Servicer may not exceed the percentage of the Maximum Amount specified in the right column | ≤ 2.5% |

| | | | |
|---|---|---|---|
| | (b) | except that a single issuer together with any of its Affiliates (excluding Secondary Risk Counterparties) of a Structured Finance Obligation may not exceed the percentage of the Maximum Amount specified in the right column | ≤ 3.0% |
| | (c) | except that Structured Finance Obligations that are (i) collateralized loan obligations primarily backed by other collateralized loan obligations and (ii) collateralized debt obligations primarily backed by one or more credit default swaps (i.e. "Synthetics CDOs") may not exceed the percentage of the Maximum Amount specified in the right column. | ≤ 3.0% |
| (9) | | Structured Finance Obligations that are collateralized loan obligations | ≤ 7.5% |
| (10) | | obligors Domiciled other than in the United States and Canada | ≤ 20.0% |
| | (a) | **provided** that obligors Domiciled other than in the United States may not exceed the percentage of the Maximum Amount specified in the right column | ≤ 25.0% |
| (11) | | obligors Domiciled in Canada or any single Moody's Group I Country | ≤ 10.0% |
| (12) | | obligors Domiciled in any single Moody's Group II Country | ≤ 5.0% |
| (13) | | obligors Domiciled in all Moody's Group II Countries in the aggregate | ≤ 10.0% |
| (14) | | obligors Domiciled in any single Moody's Group III Country | ≤ 2.5% |
| (15) | | obligors Domiciled in all Moody's Group III Countries in the aggregate | ≤ 5.0% |
| (16) | | obligors organized in a Tax Advantaged Jurisdiction | ≤ 10.0% |

| | | | |
|---|---|---|---|
| | (a) | except that obligors deriving a substantial portion of revenue from countries other than the United States or Canada may constitute up to the percentage of the Maximum Amount specified in the right column | ≤ 5.0% |
| (17) | same S&P Industry Classification | | ≤ 8.0% |
| | (a) | except that Relevant Obligations belonging to two S&P Industry Classifications may each constitute up to the percentage of the Maximum Amount specified in the right column | ≤ 12.0% |
| (18) | single obligor and any of its Affiliates (excluding Secondary Risk Counterparties) | | ≤ 1.5% |
| | (a) | except that up to each of five individual obligors and any of their Affiliates (excluding Secondary Risk Counterparties and any obligor under a DIP Loan) may each constitute up to the percentage of the Maximum Amount specified in the right column | ≤ 2.5% |
| (19) | Fixed Rate Obligations | | ≤ 5.0% |
| | (a) | except that with a Rating Confirmation from Moody's, Fixed Rate Obligations may constitute up to the percentage of the Maximum Amount specified in the right column | ≤ 7.5% |
| (20) | Pay interest less frequently than quarterly but no less frequently than semi-annually | | ≤ 7.0% |
| (21) | Pay interest less frequently than semi-annually but no less frequently than annually | | ≤ 3.0% |
| (22) | LCDS Securities or other Synthetic Securities | | ≤ 15.0% |
| | (a) | except that Synthetic Securities that provide for settlement other than by physical delivery may not exceed the percentage of the Maximum Amount specified in the right column | ≤ 5.0% |

| | | |
|---|---|---|
| (b) | except that Synthetic Securities that reference a senior secured index providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time may not exceed the percentage of the Maximum Amount specified in the right column | ≤ 5.0% |
| (23) | Participations (**provided** that no Relevant Obligations may be a Participation in a Participation) | ≤ 20.0% |
| (24) | Relevant Obligations of which are (i) Collateral Obligations lent under Securities Lending Agreements and (ii) Participations, in the aggregate may not exceed the percentage of the Maximum Amount specified in the right column | ≤ 20.0% |
| (25) | Relevant Obligations of which are (i) Collateral Obligations lent under Securities Lending Agreements and (ii) Participations, entered into with, or issued by, a single Secondary Risk Counterparty | ≤ respective percentage in Secondary Risk Table under "Individual Counterparty Limit" for applicable rating* |
| (26) | Relevant Obligations of which are (i) Collateral Obligations lent under Securities Lending Agreements and (ii) Participations, entered into with, or issued by, all Secondary Risk Counterparties | ≤ respective percentage in Secondary Risk Table under "Aggregate Counterparty Limit" for applicable rating** |
| (27) | Deep Discount Obligations | ≤ 7.5% |
| (28) | CCC+/Caa1 and below Collateral Obligations | ≤ 7.5% |
| (29) | Long-Dated Collateral Obligations | ≤ 2.0% |

| (30) | Collateral Obligations lent under Securities Lending Agreements | ≤ 15.0% |
|---|---|---|
| (31) | Collateral Obligations providing for interest at a non-London interbank offered rate (excluding, for the avoidance of doubt, the Unfunded Amount of any Revolving Loan or Delayed Drawdown Loan) | ≤ 5.0% |
| (32) | Collateral Obligations that are Loans that are part of a credit facility with a total global aggregate commitment amount of less than U.S.$100,000,000 | ≤ 10.0% |
| (33) | if such Relevant Obligations are Bridge Loans, (A) such obligations are rated by Moody's and S&P and (B) such Relevant Obligations may not exceed the percentage of the Maximum Amount specified in the right column | ≤ 5.0% |
| (34) | Relevant Obligations of which are Synthetic Letters of Credit | ≤ 5.0% |

\*      Applicable long-term unsecured rating by Moody's or S&P of such Secondary Risk Counterparty (using the limit for the lower of such ratings if different).

\*\*     Long-term unsecured rating by Moody's or S&P at or below a level specified in the Secondary Risk Table (using the lower of such ratings for a Secondary Risk Counterparty, if different).

Subject to the rights in certain circumstances of the Servicer to determine otherwise as set out in Section 1.2(h), solely for the purpose of determining whether the Concentration Limitations are met, Eligible Investments and Cash will be treated as Senior Secured Loans and Floating Rate Obligations.

***Consenting Holder of the Preference Shares***:  With respect to any Payment Date, a Holder of Preference Shares that has consented by delivering an irrevocable written notice to the Preference Shares Paying Agent to a distribution of Eligible Equity Securities in lieu of payment of Interest Proceeds on such Payment Date.

***Controlling Class***:  The Class A-1 Notes (voting together as a Class or group), so long as any Class A-1 Notes are Outstanding; then the Class A-2 Notes (voting together as a Class or group), so long as any Class A-2 Notes are Outstanding; then the Class B Notes (voting together as a Class or group), so long as any Class B Notes are Outstanding; then the Class C Notes (voting together as a Class or group), so long as any Class C Notes are Outstanding; then the Class D Notes (voting together as a Class or group), so long as any Class D Notes are Outstanding; and then the Class E Notes (voting together as a Class or group), so long as any Class E Notes are Outstanding.

***Corporate Trust Office***:  The corporate trust office of the Trustee at which the Trustee performs its duties under this Indenture, currently having an address of 200 Clarendon Street, Mail Code: EUC 108, Boston, MA 02116, telecopy no. (617) 351-4358, Attention: CDO Services Group, or any other address the Trustee designates from time to time by notice to the Noteholders, the Servicer, the Preference Shares Paying Agent, the Issuer, and each Rating Agency or the principal corporate trust office of any successor Trustee.

***Cov-lite loan***: A Loan that (i) does not contain any financial covenants or (ii) requires the borrower to comply with an Incurrence Covenant, but not with a Maintenance Covenant.

***Coverage Tests***:  Collectively, the Class A/B Coverage Tests, the Class C Coverage Tests, the Class D Coverage Tests and the Class E Coverage Test applicable as of any Measurement Date.

***Credit Improved Obligation***:  Any Collateral Obligation that (a) is sold pursuant to a Portfolio Improvement Exchange or (b) in the commercially reasonable judgment of the Servicer, has improved in credit quality; **provided** that, in forming such judgment, a reduction in credit spread or an increase in Market Value of such Collateral Obligation (whether as described in clauses (ii) or (iii) below or otherwise) may only be utilized as corroboration of other bases for such judgment; and **provided**, **further**, that, if a Credit Rating Event is in effect, such Collateral Obligation will be considered a Credit Improved Obligation only if in addition to the above:

(i) the Collateral Obligation has been upgraded or has been put on credit watch list with the potential for developing positive credit implications by either of the Rating Agencies since the date the Issuer first acquired the Collateral Obligation under this Indenture;

(ii) such Collateral Obligation has experienced a reduction in credit spread of (A) 0.25% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such decrease) less than or equal to 2.00%, (B) 0.375% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such decrease) greater than 2.00% but less than or equal to 4.00% or (C) 0.50% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such decrease) greater than 4.00%, in each case compared to the credit spread at the time such Collateral Obligation was acquired by the Issuer, determined by reference to an applicable index selected by the Servicer (such index selection subject to satisfaction of the Rating Condition with respect to Moody's);

(iii) (x) in the case of a Floating Rate Obligation, the Market Value of such Collateral Obligation has increased by at least 1.00% from the Market Value of such Collateral Obligation as of its date of acquisition, as determined by the Servicer (**provided** that this subclause (iii)(x) will be deemed satisfied if Market Value increases to 1.01%), or (y) in the case of a Fixed Rate Obligation, the Market Value of such Collateral Obligation has changed since its date of acquisition by a

percentage more positive than the percentage change in the Merrill Lynch US High Yield Master II Index, Bloomberg ticker H0A0, plus 3.00%, over the same period; or

(iv)     a Super Majority of the Controlling Class have voted to suspend the limitations on a Collateral Obligation being a Credit Improved Obligation, and for each subsequent downgrade by Moody's after a vote to suspend the limitations pursuant to this clause (iv) has occurred, a Super Majority of the Controlling Class must again vote to suspend the limitations on the Collateral Obligation being a Credit Improved Obligation for this clause (iv) to remain applicable.

A Synthetic Security shall be considered a Credit Improved Obligation if:

(i)      the Synthetic Security itself is a Credit Improved Obligation; or

(ii)     the Reference Obligation of the Synthetic Security would, if it were a Collateral Obligation, be a Credit Improved Obligation.

***Credit Rating Event***:   An event that is in effect if the rating by Moody's:

(i)      of the Class A-1 Notes or the Class A-2 Notes has been withdrawn or is one or more rating sub-categories below its Initial Rating; or

(ii)     of the Class B Notes, the Class C Notes, the Class D Notes or the Class E Notes has been withdrawn or is two or more rating sub-categories below its respective Initial Rating.

For the purposes of this definition, any withdrawal or reduction in rating shall not be effective if after the withdrawal or reduction Moody's has upgraded the reduced or withdrawn rating to at least the Initial Rating in the case of the Class A-1 Notes and the Class A-2 Notes, or to only one subcategory below their Initial Rating in the case of the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes.

***Credit Risk Obligation***:   Any Collateral Obligation (other than a Defaulted Collateral Obligation) that, in the commercially reasonable judgment of the Servicer, has significantly declined in credit quality and has a significant risk, with a lapse of time, of becoming a Defaulted Collateral Obligation; **provided** that in forming such judgment, an increase in credit spread or a decrease in Market Value of such Collateral Obligation (whether as described in clauses (ii) or (iii) below or otherwise) may only be utilized as corroboration of other bases for such judgment.

So long as a Credit Rating Event is in effect, no Collateral Obligation shall be eligible to be a Credit Risk Obligation unless in addition to the above, as of the date of determination:

(i)      the Collateral Obligation has been downgraded or has been put on credit watch list with the potential for developing negative credit implications by either of the

Rating Agencies since the date the Issuer first acquired the Collateral Obligation under this Indenture;

(ii)     such Collateral Obligation has experienced an increase in credit spread of (A) 0.25% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such increase) less than or equal to 2.00% , (B) 0.375% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such increase) greater than 2.00%, but less than or equal to 4.00% or (C) 0.50% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such increase) greater than 4.00%, in each case compared to the credit spread at the time such Collateral Obligation was acquired by the Issuer, determined by reference to an applicable index selected by the Servicer (such index selection subject to satisfaction of the Rating Condition with respect to Moody's);

(iii)    (x) in the case of a Floating Rate Obligation, the Market Value of such Collateral Obligation has decreased by at least 2.50% from the Market Value of such Collateral Obligation as of its date of acquisition, as determined by the Servicer, and (y) in the case of a Fixed Rate Obligation, the Market Value of such Collateral Obligation has changed since its date of acquisition by a percentage more negative, or less positive, as the case may be, than the percentage change in the Merrill Lynch US High Yield Master II Index, Bloomberg ticker H0A0, less 3.00%, over the same period; or

(iv)    a Super Majority of the Controlling Class have voted to suspend the limitations on a Collateral Obligation being a Credit Risk Obligation set forth in clauses (i), (ii) and (iii) above, and for each subsequent downgrade by Moody's after a vote to suspend the limitations pursuant to this clause (iv) has occurred, a Super Majority of the Controlling Class must again vote to suspend the limitations on the Collateral Obligation being a Credit Risk Obligation for this clause (iv) to remain applicable.

A Synthetic Security shall be considered a Credit Risk Obligation if:

(a)    the Synthetic Security itself is a Credit Risk Obligation; or

(b)    the Reference Obligation of the Synthetic Security would, if it were a Collateral Obligation, be a Credit Risk Obligation.

***Current-Pay Obligation***:  A Collateral Obligation as to which:

(i)    an Insolvency Event has occurred with respect to its obligor or as to which its obligor is rated "D" or "SD" by S&P or its obligor has previously been rated "CCC-" by S&P and the rating has been withdrawn;

(ii)     no default as to the payment of principal or interest with respect to the Collateral Obligation is then continuing and the Servicer has delivered to the Trustee an Officer's certificate to the effect that the Servicer expects that the obligor will make payments on the Collateral Obligation as they become due;

(iii)    (A) the rating by Moody's of the Collateral Obligation is at least "Caa1" (and not on credit watch with negative implications) or the rating by Moody's of the Collateral Obligation has been withdrawn but was at least "Caa1" (and not on credit watch with negative implications) immediately prior to the withdrawal and the Market Value of the Collateral Obligation is at least equal to 80% of its Principal Balance, (B) the rating by Moody's of the Collateral Obligation is "Caa1" (and on credit watch with negative implications) or "Caa2" (and not on credit watch with negative implications) and the Market Value of the Collateral Obligation is at least equal to 85% of its Principal Balance or (C) the rating by Moody's of the Collateral Obligation is less than "Caa2" but at least "Caa3" (and not on credit watch with negative implications) and the Market Value of the Collateral Obligation is at least equal to 90% of its Principal Balance;

(iv)    if an Insolvency Event has occurred with respect to the obligor of the Collateral Obligation, a bankruptcy court has authorized all payments of principal and interest payable on the Collateral Obligation; and

(v)     the Servicer has designated in writing to the Trustee the Collateral Obligation as a Current-Pay Obligation.

If the Aggregate Principal Balance of Collateral Obligations that would otherwise be Current-Pay Obligations exceeds 5% of the Maximum Amount, all or a portion of one or more Collateral Obligations that would otherwise be Current-Pay Obligations with an Aggregate Principal Balance equal to the amount of the excess shall not be Current-Pay Obligations (and will therefore be Defaulted Collateral Obligations). The Servicer shall designate in writing to the Trustee the Collateral Obligations that shall not be Current-Pay Obligations pursuant to the preceding sentence as the Collateral Obligations (or portions thereof) that have the lowest Market Value on any applicable date of determination.

The Servicer may, with the consent of a Majority of the Controlling Class, by notice to the Issuer, the Trustee, and the Collateral Administrator, change the definition of "Current-Pay Obligation" or how Current-Pay Obligations are treated in this Indenture, subject to the satisfaction of the Rating Condition with respect to each Rating Agency.

***Current Portfolio***:  At any time, the portfolio (measured by Aggregate Principal Balance) of Collateral Obligations, Principal Proceeds held as Cash on deposit in the Collection Account, and other Eligible Investments purchased with Principal Proceeds on deposit in the Collection Account that exists before the sale, maturity, or other disposition of a Collateral Obligation or before the acquisition of a Collateral Obligation, as the case may be.

*Custodial Account*: The custodial account established in the name of the Trustee pursuant to Section 10.3(a).

*Custodian*: The meaning specified in the first sentence of Section 3.2(a) with respect to items of collateral referred to therein, and each entity with which an Account is maintained, as the context may require, each of which shall be a Securities Intermediary.

*Deep Discount Obligation*: Until the average Market Value Percentage of the Collateral Obligation, as determined daily for any period of 30 consecutive days, equals or exceeds 90%, any Collateral Obligation acquired by the Issuer for a Purchase Price less than 85% of its Principal Balance. For such purpose, the Market Value Percentage of a Collateral Obligation on a day that is not a Business Day shall be deemed to be the Market Value Percentage of the Collateral Obligation on the immediately preceding Business Day.

*Default*: Any Event of Default or any occurrence that, with notice or the lapse of time or both, would become an Event of Default.

*Defaulted Collateral Obligation*: Any Collateral Obligation or other obligation included in the Collateral:

(i)     as to which there has occurred and is continuing a default with respect to the payment of interest or principal with respect to such Collateral Obligation, without giving effect to any applicable grace period or waiver (**provided** that if the Servicer certifies to the Trustee in writing that such default is for non-credit related reasons, the related Collateral Obligation shall not be treated as a Defaulted Collateral Obligation under this clause (i) unless and until such default has continued for a period of three (3) consecutive business days), but, in any case, only until such default has been cured;

(ii)    the maturity of all or a portion of the principal amount of such Collateral Obligation has been accelerated as a consequence of a default (other than any payment default) under the instruments evidencing or relating to such Collateral Obligation; unless such default or event of default has been fully cured or waived and is no longer continuing and such acceleration has been rescinded;

(iii)   with respect to which there has been effected any distressed exchange or other debt restructuring where the obligor has offered the Holders thereof a new security or instrument or package of securities or instruments that, in the commercially reasonable judgment of the Servicer, either (x) amounts to a diminished financial obligation or (y) has the sole purpose of enabling the obligor to avoid a default;

(iv)    (1) that is *pari passu* with or subordinated to other indebtedness for borrowed money owing by its obligor (**Other Indebtedness**) and (2) the obligor has defaulted in the payment of principal or interest (without regard to any applicable grace or notice period and without regard to any waiver of the default) on the

Other Indebtedness, unless, in the case of a failure of the obligor to make required interest payments, the obligor has resumed current Cash payments of interest previously scheduled and unpaid on the Other Indebtedness and has paid in full any accrued interest due and payable thereon, in which case the Collateral Obligation shall cease to be classified as a Defaulted Collateral Obligation;

(v)     (other than a Current-Pay Obligation or a DIP Loan) as to which:

    (A)     an Insolvency Event has occurred with respect to its obligor,

    (B)     the obligation is rated "D", "SD", "C" or "CC" by S&P or was so rated immediately prior to such rating being withdrawn, or has previously been rated "CCC-" or lower by S&P and the rating has been withdrawn; or,

    (C)     as to which the obligation is rated "D" or "LD" by Moody's or was so rated immediately prior to such rating being withdrawn;

(vi)     if the Collateral Obligation is a Structured Finance Obligation, it is rated "CC" or below by S&P, or it was rated "CC" or below by S&P but the rating has since been withdrawn, or it is rated "Ca" or below by Moody's, or it was rated "C" or below by Moody's but the rating has since been withdrawn;

(vii)     that is a Participation that would, if the underlying Loan were a Collateral Obligation, be a Defaulted Collateral Obligation under any of clauses (i) through (v) above or with respect to which the Participating Institution has defaulted in the performance of any of its payment obligations under the Participation;

(viii)     that is a Synthetic Security referencing a Reference Obligation that would, if the Reference Obligation were a Collateral Obligation, be a Defaulted Collateral Obligation under any of clauses (i) through (vi) above or with respect to which the Synthetic Security Counterparty has defaulted in the performance of any of its payment obligations under the Synthetic Security; **provided**, **however**, with respect to a Synthetic Security based upon or relating to a senior secured index providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time: (x) a determination whether the Reference Obligations upon which such Synthetic Security is based would, if such Reference Obligations were Collateral Obligations, be a Defaulted Collateral Obligation, shall be determined by treating such Synthetic Security as a direct interest of the Issuer in each of the Reference Obligations on which such Synthetic Security is based in an amount equal to the Allocable Principal Balance of such Reference Obligation and (y) the "Defaulted Collateral Obligation" for purposes of this clause (viii) shall be limited to the Allocable Principal Balance of each Reference Obligation that would, if the Reference Obligation were a Collateral Obligation, be a Defaulted Collateral Obligation under any of clauses (i) through (vi) above;

(ix)    that is a Written-Down Obligation;

(x)    that is a DIP Loan as to which an order has been entered converting the debtor's chapter 11 case to a case under chapter 7 of the Bankruptcy Code; or

(xi)    that is declared to be a Defaulted Collateral Obligation by the Servicer.

Any Collateral Obligation that is classified as a Defaulted Collateral Obligation shall cease to be so classified if the Collateral Obligation, at any date thereafter,

(1)    would not otherwise be classified as a Defaulted Collateral Obligation in accordance with this definition; and

(2)    otherwise meets the Eligibility Criteria as of that date.

If any portion of a Collateral Obligation has a maturity later than one year after the Stated Maturity of the Notes due to a change in the payment schedule of the Collateral Obligation occurring after its acquisition by the Issuer, that portion of the Collateral Obligation shall be considered a Defaulted Collateral Obligation.

***Defaulted Hedge Termination Payment***:  Any termination payment required to be made by the Issuer to a Hedge Counterparty pursuant to a Hedge Agreement upon a termination of the Hedge Agreement in respect of which the Hedge Counterparty is the sole Defaulting Party or Affected Party (each as defined in the Hedge Agreements).

***Defaulted Interest***:  Any interest payable in respect of any Class of Notes that is not punctually paid or duly provided for on the applicable Payment Date or at Stated Maturity.

***Defaulted Synthetic Termination Payment***:  With respect to any Synthetic Security, any termination payment (and any accrued interest thereon) payable by the Issuer pursuant to the Underlying Instruments relating thereto as a result of an "Event of Default" or "Termination Event" (other than an "Illegality" or "Tax Event") as to which the relevant Synthetic Security Counterparty is the "Defaulting Party" or the sole "Affected Party" (each as defined in such Underlying Instruments).  For the avoidance of doubt, any unpaid amounts owed to such Synthetic Security Counterparty independent of any such termination payment shall be deemed not to be part of the Defaulted Synthetic Termination Payment

***Defaulted Interest Charge***:  To the extent lawful, interest on any Defaulted Interest at the Default Interest Rate.

***Default Interest Rate***:  With respect to any specified Class of Notes, the per annum interest rate equal to the Note Interest Rate payable on the Notes of the Class.

***Deferred Interest***:  With respect to any specified Class of Deferred Interest Notes, the meaning specified in Section 2.8(a).

***Deferred Interest Notes***:  The Class C Notes, the Class D Notes and the Class E Notes.

***Deferred Interest PIK Security*** means a PIK Security (other than a Defaulted Collateral Obligation) (or any Synthetic Security the Reference Obligation of which is a PIK Security) with respect to which payment of interest either in whole or in part has been deferred or capitalized in an amount equal to the amount of interest payable in respect of the lesser of (a) two payment periods and (b) a period of one years, but only until such time as payment of interest on such PIK Security (or any Synthetic Security the Reference Obligation of which is a PIK Security) has resumed and all capitalized and deferred interest has been paid in accordance with the terms of the Underlying Instruments.

***Deficiency Amount***:  The meaning specified in Section 16.3(a).

***Deficiency Notice Date***:  The meaning specified in Section 16.3(a).

***Definitive Notes***:  The meaning specified in Section 2.11(b).

***Delayed Drawdown Loan***:  A Loan or any Synthetic Security with a Reference Obligation that

(i)      requires the Issuer to make one or more future advances to the borrower under its Underlying Instruments,

(ii)     specifies a maximum amount that can be borrowed on one or more fixed borrowing dates, and

(iii)    does not permit the re-borrowing of any amount previously repaid.

A Loan or Synthetic Security shall only be considered to be a Delayed Drawdown Loan for so long as its unused commitment amount is greater than zero and for purposes of the Concentration Limitations only unfunded portions will count as Delayed Drawdown Loans.

***Delayed Drawdown Reserve Account***:  The Securities Account established pursuant to Section 10.3(b).

***Deliver*** or ***Delivered*** or ***Delivery***:  The taking of the following steps:

(i)      in the case of each Certificated Security (UCC) (other than a Clearing Corporation Security) or Instrument,

(A)      causing the delivery of such Certificated Security (UCC) or Instrument to the Custodian registered in the name of the Custodian or endorsed, by an effective endorsement, to the Custodian or in blank,

(B)    causing the Custodian to continuously indicate on its books and records that such Certificated Security (UCC) or Instrument is credited to the applicable Account, and

(C)    causing the Custodian to maintain continuous possession of such Certificated Security (UCC) or Instrument;

(ii)    in the case of each Uncertificated Security (other than a Clearing Corporation Security),

(A)    causing such Uncertificated Security to be continuously registered on the books of the issuer thereof to the Custodian, and

(B)    causing the Custodian to continuously indicate on its books and records that such Uncertificated Security is credited to the applicable Account;

(iii)    in the case of each Clearing Corporation Security,

(A)    causing the relevant Clearing Corporation to credit such Clearing Corporation Security to the Securities Account of the Custodian, and

(B)    causing the Custodian to continuously indicate by on its books and records that such Clearing Corporation Security is credited to the applicable Account;

(iv)    in the case of each security issued or guaranteed by the United States of America or agency or instrumentality thereof and that is maintained in book-entry records of a Federal Reserve Bank (**FRB**) (each such security, a **Government Security**),

(A)    causing the creation of a Security Entitlement to such Government Security by the credit of such Government Security to the Securities Account of the Custodian at such FRB, and

(B)    causing the Custodian to continuously indicate on its books and records that such Government Security is credited to the applicable Account;

(v)    in the case of each Security Entitlement not governed by clauses (i) through (iv) above,

(A)    causing a Securities Intermediary (x) to indicate on its books and records that the underlying Financial Asset has been credited to be the Custodian's Securities Account, (y) to receive a Financial Asset from a Securities Intermediary or acquiring the underlying Financial Asset for a Securities Intermediary, and in either case, accepting it for credit to the Custodian's Securities Account or (z) to become obligated under other law, regulation or rule to credit the underlying Financial Asset to a Security Intermediary's Securities Account,

(B) causing such Securities Intermediary to make entries on its books and records continuously identifying such Security Entitlement as belonging to the Custodian and continuously indicating on its books and records that such Security Entitlement is credited to the Custodian's Securities Account, and

(C) causing the Custodian to continuously indicate on its books and records that such Security Entitlement (or all rights and property of the Custodian representing such Security Entitlement) is credited to the applicable Account;

(vi) in the case of cash or money,

(A) causing the delivery of such cash or money to the Custodian,

(B) causing the Custodian to treat such cash or money as a Financial Asset maintained by such Custodian for credit to the applicable Account in accordance with the provisions of Article 8 of the UCC, and

(C) causing the Custodian to continuously indicate on its books and records that such cash or money is credited to the applicable Account; and

(vii) in the case of each general intangible (including any Participation in which the Participation is not represented by an Instrument),

(A) causing the filing of a Financing Statement in the office of the Recorder of Deeds of the District of Columbia, Washington, DC, and

(B) causing the registration of this Indenture in the Register of Mortgages of the Issuer at the Issuer's registered office in the Cayman Islands;

in addition, the Servicer on behalf of the Issuer will obtain any and all consents required by the underlying agreements relating to any such general intangibles for the transfer of ownership to the Issuer and the pledge hereunder (except to the extent that the requirement for such consent is rendered ineffective under Section 9-406 of the UCC).

In addition to the methods specified above, any Collateral may be delivered in accordance with any other method specified in an Opinion of Counsel delivered to the Trustee as sufficient to establish a first priority perfected security (subject to customary exceptions and qualifications) interest therein.

*Depository* or *DTC*:  The Depository Trust Company and its nominees.

*Determination Date*:  The last day of any Due Period.

*DIP Loan*:  Any Loan:

(i) that has a rating assigned by Moody's (or if the Loan does not have a rating assigned by Moody's, the Servicer has commenced the process of having a rating assigned by Moody's within five Business Days of the date the Loan is acquired by the Issuer) and a rating assigned by S&P;

(ii) that is an obligation of a debtor in possession as described in Section 1107 of the Bankruptcy Code or a trustee (if appointment of a trustee has been ordered pursuant to Section 1104 of the Bankruptcy Code) (a ***Debtor***) organized under the laws of the United States or any state of the United States; and

(iii) the terms of which have been approved by a final order of the United States Bankruptcy Court, United States District Court, or any other court of competent jurisdiction, the enforceability of which order is not subject to any pending contested matter or proceeding (as those terms are defined in the Federal Rules of Bankruptcy Procedure) and which order provides that:

 (A) the Loan is secured by liens on the Debtor's otherwise unencumbered assets pursuant to Section 364(c)(2) of the Bankruptcy Code;

 (B) the Loan is secured by liens of equal or senior priority on property of the Debtor's estate that is otherwise subject to a lien pursuant to Section 364(d) of the Bankruptcy Code;

 (C) the Loan is fully secured (based on a current valuation or appraisal report) by junior liens on the Debtor's encumbered assets; or

 (D) if any portion of the Loan is unsecured, the repayment of the Loan retains priority over all other administrative expenses pursuant to Section 364(c)(1) of the Bankruptcy Code (and in the case of this clause (D), before the acquisition of the Loan, the Rating Condition is satisfied with respect to each Rating Agency).

***Discount Note***:  Any Note that is treated as being issued with "original issue discount" within the meaning of Section 1271 through 1275 of the Code and Treasury Regulations promulgated thereunder.

***Diversity Score***:  A single number that indicates collateral concentration in terms of both issuer and industry concentration, calculated as set forth in Schedule 4 to this Indenture.

***Diversity Test***:  A test that will be satisfied as of any Measurement Date if the Diversity Score equals or exceeds the Minimum Diversity Score.  For the purposes of calculating the Diversity Test, any Structured Finance Obligation that is (i) a collateralized loan obligation, (ii) any Synthetic Security with respect to which the Reference Obligation is a collateralized loan obligation or (iii) any Synthetic Security based upon or relating to a senior secured index providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the

principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time will be disregarded.

***Dollar*** or ***U.S. Dollar*** or ***U.S.$***:  A dollar or other equivalent unit in such coin or currency of the United States of America as at the time shall be legal tender for all debts, public and private.

***Domicile*** or ***Domiciled***:  With respect to each Collateral Obligation, the jurisdiction of incorporation, organization or creation of the related obligor.

***Due Date***:  Each date on which any payment is due on a Pledged Obligation in accordance with its terms.

***Due Period***:  With respect to any Payment Date, for all purposes other than payments and receipts under Hedge Agreements, the period from the Business Day after the eighth Business Day before the previous Payment Date (or in the case of the first Payment Date, from the Closing Date) up to but excluding the Business Day after the eighth Business Day before the Payment Date (or in the case of the final Payment Date or any Payment Date that is a Redemption Date, through the Business Day before the Payment Date and for payments and receipts under Hedge Agreements the period from the day after the previous Payment Date (or in the case of the first Payment Date from the Closing Date) through the Payment Date).

***Eligibility Criteria***:  The meaning specified in Section 12.2(b).

***Eligible Collateral***:  (i) Cash, (ii) U.S. Treasury obligations, (iii) U.S. agency obligations or (iv) commercial paper obligations rated at least "P-1" by Moody's (and not on watch for downgrade) and "A-1+" by S&P, in each case to collateralize fully on a mark-to-market basis the obligations of a Hedge Counterparty under the related Hedge Agreement.

***Eligible Country***:  (a) The United States, Canada and any country classified by Moody's as a Moody's Group I Country, Moody's Group II Country or Moody's Group III Country and, in each case, has an S&P foreign currency rating of at least "AA" and a Moody's foreign currency rating of at least "Aa2" and (b) any country that is in a Tax Advantaged Jurisdiction.

***Eligible Equity Security***:  An equity security acquired in connection with the workout or restructuring of any Collateral Obligation by, or on behalf of, the Issuer that (i) is publicly traded on an Established Securities Market or (ii) the Market Value of which is higher than the Principal Balance of the Collateral Obligation with respect to which such equity security has been acquired by the Issuer.

***Eligible Investments***:  Any Dollar-denominated obligation or asset that, when it is pledged by the Issuer to the Trustee under this Indenture, is one or more of the following:

(a)     Cash;

(b)     direct Registered obligations of, and Registered obligations the timely payment of principal and interest on which is fully and expressly guaranteed by, the United States or any agency or instrumentality of the United States the obligations of which are expressly backed by the full faith and credit of the United States, which in each case are not zero coupon securities;

(c)     demand and time deposits in, trust accounts, certificates of deposit payable within 91 days of issuance of, bankers' acceptances payable within 91 days of issuance issued by, or Federal funds sold by any depositary institution or trust company incorporated under the laws of the United States or any state thereof and subject to supervision and examination by Federal and/or state banking authorities so long as the commercial paper and/or the debt obligations of such depository institution or trust company (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company), at the time of such acquisition or contractual commitment providing for such acquisition and throughout the term thereof, have a credit rating of not less than "Aaa" by Moody's and "AAA" by S&P and in each case are not on watch for downgrade, or "P-1" by Moody's and "A-1+" by S&P in the case of commercial paper and short-term debt obligations; **provided** that in any case, the issuer thereof must have at the time of such acquisition a long-term credit rating of not less than "AA-" by S&P and "Aa3" by Moody's and a short-term rating of "A-1+" by S&P and "P-1" by Moody's, and if so rated, is not on watch for downgrade;

(d)     commercial paper or other short-term obligations with a maturity of not more than 183 days from the date of issuance and having at the time of such acquisition a credit rating of at least "P-1" by Moody's and "A-1+" by S&P; **provided** that, in any case, the issuer thereof must have at the time of such acquisition a long-term credit rating of not less than "Aa2" by Moody's and "AA-" by S&P, and if so rated, such rating is not on watch for downgrade;

(e)     unleveraged repurchase obligations with respect to any security described in clause (b) above entered into with a U.S. federal or state depository institution or trust company (acting as principal) described in clause (c) above or entered into with a corporation (acting as principal) whose long-term credit rating is not less than "Aaa" by Moody's and "AAA" by S&P and in each case are not on watch for downgrade or whose short-term credit rating is "P-1" by Moody's and "A-1+" by S&P at the time of such acquisition and throughout the term thereof; **provided** that, if such repurchase obligation has a maturity of longer than 91 days, the counterparty thereto must also have at the time of such acquisition and throughout the term thereof a long-term credit rating of not less than "Aa2" by Moody's and "AAA" by S&P, and if so rated, such rating is not on watch for downgrade;

(f)     any money market fund or similar vehicle having at the time of acquisition and throughout the term thereof a credit rating of "MR1+" by Moody's and "AAA" by S&P; including any fund for which the Trustee or an Affiliate of the Trustee serves as an investment adviser, administrator, shareholder servicing agent, custodian or subcustodian, notwithstanding that (A) the Trustee or an Affiliate of the Trustee charges and collects fees and expenses from such funds for services rendered (**provided** that such charges, fees and expenses are on terms consistent with terms negotiated at arm's length) and (B) the Trustee charges and collects fees and expenses for services rendered, pursuant to this Indenture;

(g)     a guaranteed reinvestment agreement from a bank (if treated as a deposit by such bank), insurance company or other corporation or entity organized under the laws of the United States or any state thereof (if treated as debt by such insurance company or other corporation or entity), providing for periodic payments thereunder during each Due Period; **provided** that each such agreement provides that it is terminable by the purchaser, without premium or penalty, in the event that the rating assigned to such agreement by either Moody's or S&P is at any time lower than the then current ratings assigned to the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D Notes or the Class E Notes; **provided**, **further**, that, at the time of acquisition and throughout the term thereof, the issuer of such agreement has a senior unsecured long-term debt rating, issuer rating or counterparty rating of at least "Aaa" by Moody's, a short-term debt rating of "P-1" by Moody's (and not on watch for downgrade), a short-term debt rating of at least "A-1+" by S&P and a long-term debt rating of at least "AAA" by S&P (and not on watch for downgrade); and

(h)     such other obligations or assets for which Rating Confirmation has been received;

and, in each case, with a stated maturity (giving effect to any applicable grace period) no later than the Business Day before the Payment Date next succeeding the date of acquisition.

Eligible Investments on deposit in the Synthetic Security Reserve Account, the Revolving Reserve Account, the Delayed Drawdown Reserve Account, or the Synthetic Security Collateral Account must have a stated maturity no later than one Business Day after the date of their purchase.

Eligible Investments may not include:

(1)     any interest-only security, any security purchased at a price in excess of 100% of its par value, any mortgage-backed security or any security whose repayment is subject to substantial non-credit related risk as determined in the commercially reasonable judgment of the Servicer;

(2)     any security whose rating assigned by S&P includes the subscript "r", "t", "p", "pi" or "q";

(3)     any floating rate security whose interest rate is inversely or otherwise not proportionately related to an interest rate index or is calculated as other than the sum of an interest rate index plus a spread (which spread may be zero);

(4)     any security that is subject to an exchange or tender offer; or

(5)     any security that has payments subject to foreign or United States withholding tax or the acquisition (including the manner of acquisition), ownership, enforcement or disposition of which will subject the Issuer to net income tax in any jurisdiction outside the Issuer's jurisdiction of incorporation.

Eligible Investments may include Eligible Investments for which the Trustee or an Affiliate of the Trustee is the issuer or depository institution or provides services. Eligible Investments may not include obligations principally secured by real property.

***Emerging Market Security***: A security or obligation issued by a sovereign or non-sovereign issuer located in a country (excluding the Cayman Islands, Bermuda, the British Virgin Islands, the Netherlands Antilles, and the Channel Islands):

(i)     that is in Latin America, Asia, Africa, Eastern Europe, or the Caribbean, or

(ii)     the long-term foreign currency debt obligations of which are rated below "Aa2" or "Aa2" and on credit watch with negative implications by Moody's or the foreign currency issuer credit rating of which is below "AA" by S&P.

***Entitlement Holder***: the meaning specified in Section 8-102(a)(7) of the UCC.

***ERISA***: The United States Employee Retirement Income Security Act of 1974, as amended.

***Established Securities Market***: Any national securities exchange registered under Section 6 of the Securities Exchange Act of 1934, as amended, or exempted from registration because of the limited volume of transaction; any foreign securities exchange that, under the laws of the jurisdiction where it is organized, satisfies regulatory requirements that are analogous to the regulatory requirements imposed under the Securities Exchange Act of 1934; any regional or local exchange; and any interdealer quotation system that regularly disseminates firm buy or sell quotations by identified brokers or dealers, by electronic means or otherwise.

***Euroclear***: Euroclear Bank S.A./N.V., as operator of the Euroclear system.

***Event of Default***: The meaning specified in Section 5.1.

***Excel Default Model Input File***: An electronic spreadsheet file in Microsoft excel format to be provided to S&P, which file shall include the balance of Cash and Eligible Investments in each account and the following information (to the extent such

information is not confidential) with respect to each Collateral Obligation and, in the case of a Synthetic Security, the related Reference Obligation:

(a)     the name and country of domicile of the issuer thereof and the particular obligation or security held by the Issuer,

(b)     the CUSIP or other applicable identification number associated with such Collateral Obligation and, in the case of a Synthetic Security, the related Reference Obligation,

(c)     the par value of such Collateral Obligation and, in the case of a Synthetic Security, the related Reference Obligation,

(d)     the type of obligation or security (including, by way of example, whether such Collateral Obligation and, in the case of a Synthetic Security, the related Reference Obligation is a bond, loan or asset-backed security), using such abbreviations as may be selected by the Trustee,

(e)     a description of the index or other applicable benchmark upon which the interest payable on such Collateral Obligation and, in the case of a Synthetic Security, the related Reference Obligation is based (including, by way of example, fixed rate, step-up rate, zero coupon and LIBOR),

(f)     the coupon (in the case of a Collateral Obligation and, in the case of a Synthetic Security, the related Reference Obligation which bears interest at a fixed rate) or the spread over the applicable index (in the case of a Collateral Obligation and, in the case of a Synthetic Security, the related Reference Obligation which bears interest at a floating rate),

(g)     the S&P Industry Classification for such Collateral Obligation and, in the case of a Synthetic Security, the related Reference Obligation,

(h)     the stated maturity date of such Collateral Obligation and, in the case of a Synthetic Security, the related Reference Obligation,

(i)     the S&P Rating of such Collateral Obligation and, in the case of a Synthetic Security, the related Reference Obligation or the issuer thereof, as applicable,

(j)     the applicable S&P Recovery Rate,

(k)     identification as a Cov-lite Loan or not, and

(l)     such other information as the Trustee may determine to include in such file.

***Excess CCC+/Caa1 Collateral Obligations***:  The Principal Balance of all CCC+/Caa1 Collateral Obligations in excess of 7.5% of the Maximum Amount on the relevant Determination Date.

*Exchange Act*:  The United States Securities Exchange Act of 1934, as amended.

*Excluded Property*:  (i) U.S.$1,000 (attributable to the issue and allotment of the Issuer Ordinary Shares) and a U.S.$1,000 transaction fee paid to the Issuer, the bank account in which those amounts are credited in the Cayman Islands and any interest earned on those amounts, (ii) any amounts credited to the Class II Preference Share Special Payment Account and the Preference Shares Distribution Account from time to time and (iii) any Margin Stock.

*Expense Reimbursement Account*:  The Securities Account established pursuant to Section 10.3(c).

*Extended Replacement Period End Date*:  If an Extension has occurred, the sixteenth Payment Date after the then current Extended Replacement Period End Date (or, in the case of the first Extension pursuant to Section 2.4, the Payment Date in November 2018); **provided** that the "Extended Replacement Period End Date" will in no event be a date later than the Payment Date in November 2030.

*Extended Scheduled Preference Shares Redemption Date*:  If a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Scheduled Preference Shares Redemption Date (or, in the case of the first Extended Scheduled Preference Shares Redemption Date, November 1, 2025); **provided** that the "Extended Scheduled Preference Shares Redemption Date" will in no event be a date later than the Payment Date in November 2037.

*Extended Stated Maturity Date*:  If a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Stated Maturity Date (or, in the case of the first Extended Stated Maturity Date, the Payment Date in November 2025); **provided** that the "Extended Stated Maturity Date" will in no event be a date later than the Payment Date in November 2037.

*Extended Weighted Average Life Date*:  If a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Weighted Average Life Date (or, in the case of the first Extended Weighted Average Life Date, November 1, 2021); **provided** that the "Extended Weighted Average Life Date" will in no event be a date later than the Payment Date in November 2033.

*Extension*:  An extension of the Replacement Period, the Stated Maturity of the Notes and the Weighted Average Life Test pursuant to Section 2.4.

*Extension Bonus Payment*:  With respect to each Maturity Extension, a single payment to each applicable beneficial owner set forth in Section 2.4(g), in an amount equal to (1) in the case of the Class A-1 Notes, 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (2) in the case of the Class A-2 Notes 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (3) in the case of the

Class B Notes 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (4) in the case of the Class C Notes, 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (5) in the case of the Class D Notes, 0.25% of the Aggregate Outstanding amount thereof held by such beneficial owner as of the applicable Extension Effective Date and (6) in the case of the Class E Notes, 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date.

***Extension Bonus Eligibility Certification***:  With respect to each Maturity Extension and each beneficial owner of Notes other than Extension Sale Securities, the written certification by such beneficial owner acceptable to the Issuer to the effect that it held Notes other than Extension Sale Securities on the applicable Extension Effective Date, including the Aggregate Outstanding Amount thereof in the case of the Notes and wire transfer instructions for the Extension Bonus Payment and any required documentation thereunder.

***Extension Conditions***:  The meaning specified in Section 2.4.

***Extension Determination Date***:  The eighth Business Day prior to each Extension Effective Date.

***Extension Effective Date***:  If an Extension has occurred, the sixteenth Payment Date after the then current Extension Effective Date (or, in the case of the first Extension Effective Date, the Payment Date in November 2012).

***Extension Notice***:  The meaning specified in Section 2.4.

***Extension Purchase Price***:  The purchase price payable by the Extension Qualifying Purchasers for Extension Sale Securities in connection with each Maturity Extension, if any, in an amount equal to (i) in the case of the Notes, the Aggregate Outstanding Amount thereof, **plus** accrued and unpaid interest (including Deferred Interest, if any) as of the applicable Extension Effective Date (giving effect to any amounts paid to the Holder on such date), and (ii) in the case of the Preference Shares, an amount that, when taken together with all payments and distributions made in respect of such Preference Shares since the Closing Date would cause such Preference Shares to have received (as of the date of purchase thereof) a Preference Share Internal Rate of Return of 12.0% (assuming such purchase date was a Payment Date); **provided**, **however**, that if the applicable Extension Effective Date is on or after the date on which such Holders have received a Preference Share Internal Rate of Return equal to or in excess of 12.0%, the applicable Extension Purchase Price for such Preference Shares shall be zero.

***Extension Qualifying Purchasers***:  The Servicer (or any of its Affiliates acting as principal or agent); **provided** that in the event that the Servicer elects not to purchase Extension Sale Securities from Holders pursuant to the Extension Conditions set forth in Section 2.4(c), "Extension Qualifying Purchasers" shall mean one or more qualifying

purchasers (which may include the Initial Purchasers or any of their Affiliates acting as principal or agent) designated by the Servicer; **provided**, **however**, none of the Servicer, the Initial Purchasers or any of their respective Affiliates shall have any duty to act as an Extension Qualifying Purchaser.

***Extension Sale Notice***:  The meaning specified in Section 2.4.

***Extension Sale Notice Period***:  The meaning specified in Section 2.4.

***Extension Sale Securities***:  The meaning specified in Section 2.4.

***Face Amount***:  With respect to any Preference Share, the amount set forth therein as the "face amount" thereof, which "face amount" shall be U.S.$1,000 per Preference Share.

***Finance Lease***:  A lease agreement or other agreement entered into in connection with and evidencing a Leasing Finance Transaction.

***Financial Asset***:  The meaning specified in Section 8-102(a)(9) of the UCC.

***Financing Statements***:  Financing statements relating to the Collateral naming the Issuer as debtor and the Trustee on behalf of the Secured Parties as secured party.

***Fixed Rate Excess***:  As of any Measurement Date, a fraction whose numerator is the product of:

(i)      the greater of zero and the excess of the Weighted Average Fixed Rate Coupon for the Measurement Date over the minimum percentage specified to pass the Weighted Average Fixed Rate Coupon Test; and

(ii)     the Aggregate Principal Balance of all Fixed Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date,

and whose denominator is the Aggregate Principal Balance of all Floating Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date.

In computing the Fixed Rate Excess on any Measurement Date, the Weighted Average Fixed Rate Coupon for the Measurement Date will be computed as if the Spread Excess were equal to zero.

***Fixed Rate Obligation***:  Any Collateral Obligation that bears interest at a fixed rate.

***Floating Rate Notes***:  The Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes.

***Floating Rate Obligation***:  Any Collateral Obligation that bears interest based on a floating rate index.

***Form-Approved Synthetic Security***:  A Synthetic Security:

(i)    (A)    each of the Reference Obligations of which satisfy the definition of "Collateral Obligation" and could be purchased by the Issuer without any required action by the Rating Agencies, without satisfaction of the Rating Condition or which the Rating Agencies have otherwise approved; or

        (B)    each of the Reference Obligations of which would satisfy clause (A) above but for the currency in which the Reference Obligation is payable and the Synthetic Security is payable in Dollars, does not provide for physical settlement, and does not expose the Issuer to Dollar currency risk;

(ii)    the Synthetic Security Agreement of which conforms (but for the amount and timing of periodic payments, the name of the Reference Obligation, the notional amount, the effective date, the termination date, and other similar necessary changes) to a form that has been expressly identified and approved in writing in connection with a request under this Indenture by Moody's and S&P;

(iii)    a copy of the Synthetic Security Agreement of which has been delivered to the Holders of the Class A Notes by the Trustee at the expense of the Co-Issuers and upon being furnished with a copy of the same by the Servicer; and

(iv)    that is with a counterparty with respect to which the Rating Condition has been satisfied by each of Moody's and S&P prior to the acquisition of any such Form-Approved Synthetic Security, and such approval has not been withdrawn.

Moody's or S&P may at any time, by notice to the Servicer, withdraw its approval of any such form.  A withdrawal of approval shall have no effect on any Synthetic Security acquired, entered into, or committed to before the date on which the Servicer receives the notice of withdrawal.

***Funded Amount***:  With respect to any Revolving Loan or Delayed Drawdown Loan at any time, the aggregate principal amount of advances or other extensions of credit made thereunder by the Issuer that are outstanding and have not been repaid at such time.

***GAAP***:  The meaning specified in Section 6.3(j).

***Global Notes***:  Any Regulation S Global Notes or Rule 144A Global Notes.

***Grant***:  To grant, bargain, sell, warrant, alienate, remise, demise, release, convey, assign, transfer, mortgage, pledge, create, and grant a security interest in and right of setoff against, deposit, set over, and confirm.  A Grant of the Pledged Obligations, or of any other instrument, shall include all rights, powers, and options of the granting party thereunder, including the immediate continuing right to claim for, collect, receive, and

receipt for principal and interest payments in respect of the Pledged Obligations, and all other monies payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

***Hedge Agreements***:  Collectively, all interest rate cap or interest rate swap agreements between the Issuer and any Hedge Counterparty, and any replacement agreement entered into pursuant to Section 15.2.

***Hedge Counterparty***:  Any counterparty, to the extent that when the Issuer enters into any Hedge Agreement with such counterparty, such counterparty satisfies the requirements of Section 15.2(c) (subject to satisfaction of the Rating Condition for each Rating Agency).

***Hedge Counterparty Collateral Account***:  The Securities Account established pursuant to Section 10.3(d).

***Hedge Termination Receipt***:  Any termination payment paid by the Hedge Counterparty to the Issuer upon any early termination of a Hedge Agreement with respect to which the Hedge Counterparty is the sole Defaulting Party or Affected Party (each as defined in the Hedge Agreements).

***HFP***:  Highland Financial Partners, L.P., an Affiliate of the Servicer.

***High-Yield Bond***:  Any debt security, other than a Loan or a Structured Finance Obligation, that is either Registered or, if not Registered, (i) it is issued by an obligor that is not resident in the United States, (ii) the payments on it are not subject to United States withholding tax and (iii) it is held through a financial institution pursuant to the procedures described in Treasury Regulation section 1.165-12(c)(3).

***Holder***:  Of any Note, the person whose name appears on the Indenture Register as the registered holder of the Note; and of any Preference Share, the person whose name appears in the Preference Share register related thereto as the registered holder of such Preference Share.

***Important Section 3(c)(7) Reminder Notice***:  A notice substantially in the form of Exhibit G-2.

***Incurrence Covenant***: A covenant by the borrower to comply with one or more financial covenants only upon the occurrence of certain actions of the borrower including, but not limited to, a debt issuance, dividend payment, share purchase, merger, acquisition or divestiture.

***Indenture***:   This instrument as originally executed and, if from time to time supplemented or amended by one or more indentures supplemental to this Indenture entered into pursuant to this Indenture, as so supplemented or amended.

***Indenture Register***:  The meaning specified in Section 2.6(a).

***Indenture Registrar***:  The meaning specified in Section 2.6(a).

***Independent***:  As to any person, any other person (including, in the case of an accountant or lawyer, a firm of accountants or lawyers, and any member of the firm, or an investment bank and any member of the bank) who

(i)      does not have and is not committed to acquire any material direct or any material indirect financial interest in the person or in any Affiliate of the person, and

(ii)     is not connected with the person as an Officer, employee, promoter, underwriter, voting trustee, partner, director, or person performing similar functions.

"Independent" when used with respect to any accountant may include an accountant who audits the books of the person if in addition to satisfying the criteria above the accountant is independent with respect to the person within the meaning of Rule 101 of the Code of Ethics of the American Institute of Certified Public Accountants.

Whenever any Independent person's opinion or certificate is to be furnished to the Trustee, the opinion or certificate shall state that the signer has read this definition and that the signer is Independent within the meaning of this Indenture.

***Initial Consent Period***:  The period of 15 Business Days from but excluding the date on which the Trustee mailed notice of a proposed supplemental indenture pursuant to Section 8.2(b) to the Holders of Securities.

***Initial Purchasers***:  CALYON and Calyon Securities (USA) Inc.

***Initial Rating***:  The ratings by Moody's and S&P with respect to each Class of Notes provided in the table in Section 2.3(a).

***Insolvency Event***:  With respect to any person, means that:

(i)      an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking:

(A)     liquidation, reorganization, or other relief in respect of the person or its debts, or of all or substantially all of its assets, under any bankruptcy, insolvency, receivership, or similar law now or hereafter in effect, or

(B)     the appointment of a receiver, trustee, custodian, sequestrator, conservator, or similar official for the person or for all or substantially all of its assets,

and, in any such case, the proceeding or petition shall continue undismissed for 30 days; or an order or decree approving or ordering any of the foregoing shall be entered, or

(ii)    the person shall:

    (A)    voluntarily commence any proceeding or file any petition seeking liquidation, reorganization, or other relief under any bankruptcy, insolvency, receivership, or similar law now or hereafter in effect,

    (B)    consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (i) above,

    (C)    apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, or conservator or for all or substantially all of its assets,

    (D)    file an answer admitting the material allegations of a petition filed against it in any such proceeding, or

    (E)    make a general assignment for the benefit of creditors.

***Insolvency Proceeding***:  The meaning specified in Section 16.4(b).

***Instrument***:  The meaning specified in Section 9-102(a)(47) of the UCC.

***Interest Coverage Ratio***:  With respect to any specified Class of Notes on any Measurement Date, the ratio calculated by dividing:

(i)    the sum of:

    (A)    the Interest Proceeds received or scheduled to be received with respect to the Due Period in which the Measurement Date occurs, **minus**

    (B)    amounts payable under clauses (1), (2), (3) and (4) of Section 11.1(a)(i) on the related Payment Date, by:

(ii)    all accrued and unpaid interest on the specified Class of Notes and all Notes ranking senior to the Class, including any Deferred Interest on the related Payment Date.

For purposes of the Interest Coverage Ratio, only the amount of any interest payment (including any "gross up" payment) on any Collateral Obligation in excess of any withholding tax or other deductions on account of tax of any jurisdiction on any date of determination shall be included in Interest Proceeds.

***Interest Coverage Test***:  A test the first Measurement Date for which will be on the second Payment Date and that is satisfied with respect to any specified Class of Notes if, as of the second Payment Date and any Measurement Date thereafter on which any Notes

remain Outstanding, the Interest Coverage Ratio equals or exceeds the applicable required level in the table below for the specified Class:

| Test | Required Level |
|---|---|
| Class A/B Interest Coverage Test | 120.0% |
| Class C Interest Coverage Test | 110.0% |
| Class D Interest Coverage Test | 106.0% |

**Interest Period**:  Initially, the period from and including the Closing Date to but excluding the first Payment Date, and, thereafter, each successive period from and including each Payment Date to but excluding the following Payment Date.

**Interest Proceeds**:  With respect to any Due Period, the sum (without duplication) of all amounts received in Cash during the Due Period (or as otherwise specified below) by the Issuer with respect to the Collateral that are:

(i)      payments of interest, fees, and commissions (excluding (A) Accrued Interest Purchased With Principal, (B) interest and dividends on Workout Assets, (C) interest, fees and commissions from Defaulted Collateral Obligations and Deferred Interest PIK Securities and (D) syndication and other up-front fees and any up-front fixed payments received in connection with entering into a Synthetic Security);

(ii)     any portion of the Sale Proceeds of a Collateral Obligation (other than a Defaulted Collateral Obligation) representing Accrued Interest On Sale;

(iii)    all payments of principal on, or disposition proceeds from the sale of, Eligible Investments to the extent purchased with Interest Proceeds;

(iv)     payments with respect to the Hedge Agreements received on or before the related Payment Date (other than any amount payable thereunder because of any early termination or notional amount reduction), but not any Sale Proceeds from any of these instruments (except to the extent that they were purchased with Interest Proceeds);

(v)      all fees received pursuant to any Securities Lending Agreements;

(vi)     amounts in the Collection Account designated for distribution as Interest Proceeds pursuant to the Priority of Payments;

(vii)    all earnings on amounts in the Synthetic Security Reserve Account, the Delayed Drawdown Reserve Account and the Revolving Reserve Account deposited to the Collection Account in accordance with Section 10.3(b);

(viii)   amounts in the Expense Reimbursement Account on the Payment Date for the relevant Due Period;

(ix)     any recoveries (including interest) received on a Defaulted Collateral Obligation or Deferred Interest PIK Securities in excess of the principal balance of such Defaulted Collateral Obligation or Deferred Interest PIK Securities (as of the date the related Collateral Obligation became a Defaulted Collateral Obligation); and

(x)      Principal Proceeds designated by the Servicer as Interest Proceeds prior to the Determination Date related to the first Payment Date in an aggregate amount not to exceed U.S.$2,000,000 in accordance with Section 10.2(f).

Interest Proceeds shall not include the Excluded Property and Interest Proceeds shall not include earnings on amounts on deposit in the Securities Lending Account to the extent the earnings are payable by the Issuer to a Securities Lending Counterparty.

Each reference in the definition of "Interest Proceeds" to a Collateral Obligation shall include a Collateral Obligation that has been loaned pursuant to a Securities Lending Agreement and Interest Proceeds shall include any amounts referred to in clauses (i) through (iii) above received by the Issuer in respect of the Collateral Obligation indirectly from the related Securities Lending Counterparty pursuant to the Securities Lending Agreement.

With respect to any Payment Date, Interest Proceeds in an amount equal to the Interest Proceeds due and payable on such Payment Date to the Consenting Holders of the Preference Shares with respect to such Payment Date that are distributed to such Holders by way of Eligible Equity Securities in lieu of Cash pursuant to Section 11.1(a)(i) will be treated for all purposes by the Issuer and the Servicer as Principal Proceeds.

**Interim Ramp-Up Test**: The test that is met as of the Interim Ramp-Up Test Date if the Issuer has acquired (or entered into commitments to acquire) Collateral Obligations satisfying the levels specified in the Interim Ramp-Up Test Date table in Section 7.19(g) with respect to the Moody's Weighted Average Recovery Rate, Diversity Score, Weighted Average Moody's Rating Factor, Weighted Average Spread and minimum Aggregate Principal Balance.

**Interim Ramp-Up Test Date**: The meaning specified in Section 7.19(g).

**Investment Company Act**:  The United States Investment Company Act of 1940, as amended.

**Irish Paying Agent**:  The meaning specified in Section 7.2.

***Issuer***:  The Person named as such on the first page of this Indenture.

***Issuer Accounts***:  The meaning assigned in the Granting Clauses.

***Issuer Charter*** means the Memorandum and Articles of Association of the Issuer, filed under the Companies Law (2007 Revision) of the Cayman Islands, as modified and supplemented and in effect from time to time.

***Issuer Order*** and ***Issuer Request***:  A written order or request dated and signed in the name of the Issuer or the Co-Issuer by an Authorized Officer of the Issuer or the Co-Issuer, as applicable, or by the Servicer by an Authorized Officer of the Servicer, on behalf of the Issuer or the Co-Issuer.

***Issuer Ordinary Shares***:  The ordinary shares, par value U.S.$1.00 per share, of the Issuer which have been issued by the Issuer and are outstanding from time to time.

***Junior Class***:  With respect to a particular Class of Notes, each Class of Notes that is subordinated to that Class, as indicated in Section 13.1.

***LCDS Security***: means a credit default swap the Reference Obligations of which are denominated and payable in U.S. Dollars.

***Leasing Finance Transaction***:  Any transaction pursuant to which the obligations of the lessee to pay rent or other amounts on a triple net basis under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, are required to be classified and accounted for as a capital lease on a balance sheet of such lessee under generally accepted accounting principles in the United States of America; but only if (a) such lease or other transaction provides for the unconditional obligation of the lessee to pay a stated amount of principal no later than a stated maturity date, together with interest thereon, and the payment of such obligation is not subject to any material non-credit related risk as determined by the Servicer, (b) the obligations of the lessee in respect of such lease or other transaction are fully secured, directly or indirectly, by the property that is the subject of such lease and (c) the interest held by the Issuer in respect of such lease or other transaction is treated as debt for U.S. federal income tax purposes.

***LIBOR***:  The offered rate, as determined by the Calculation Agent for any Interest Period, for three month Dollar deposits that appears on Reuters Screen LIBOR01 as reported on Bloomberg Financial Markets Commodities News (or a page that replaces Reuters Screen LIBOR01 for the purpose of displaying comparable rates), as of 11:00 A.M. (London time) on the second Business Day before the first day of the relevant Interest Period.

If, on the second Business Day before the first day of any relevant Interest Period, that rate does not appear on Reuters Screen LIBOR01 Page as reported on Bloomberg Financial Market Commodities News (or a page that replaces Reuters Screen LIBOR01

Page for the purpose of displaying comparable rates), the Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks to prime banks in the London interbank market for three month Dollar deposits in Europe, by reference to requests by the Calculation Agent to four major banks in the London interbank market selected by the Calculation Agent (after consultation with the Servicer) (the **Reference Banks**) for quotations as of approximately 11:00 A.M. (London time) on the second Business Day before the first day of the Interest Period. If at least two of the Reference Banks provide quotations as requested, LIBOR shall equal such arithmetic mean. If fewer than two Reference Banks provide quotations, LIBOR shall be the arithmetic mean of the offered quotations that one or more leading banks in New York City selected by the Calculation Agent (after consultation with the Servicer) are quoting to the principal London offices of leading banks in the London interbank market on the second Business Day before the first day of the relevant Interest Period for three month Dollar deposits.

If the Calculation Agent is unable to determine a rate in accordance with any of the above procedures, LIBOR for the Interest Period shall be calculated on the last day of the Interest Period and shall be the arithmetic mean of the rate of interest for each day during the Interest Period determined by the Calculation Agent as being the rate of interest most recently announced by the Bank at its New York office as its base rate, prime rate, reference rate, or similar rate for Dollar loans (or if the Bank ceases to exist or is not quoting a base rate, prime rate, reference rate, or similar rate for Dollar loans, another major money center commercial bank in New York City selected by the Calculation Agent (after consultation with the Servicer)).

For the first Interest Period and, unless the Maturity Extension occurs, the last Interest Period, LIBOR shall be determined based on the actual number of days in the Interest Period using straight-line interpolation of two rates calculated in accordance with the above procedure, except that instead of using three month deposits, one rate shall be determined using the period for which rates are obtainable next shorter than the Interest Period and the other rate shall be determined using the period for which rates are obtainable next longer than the Interest Period. All calculations shall be calculated to at least four decimal places and rounded to four decimal places.

**Loan**: Any interest in a fully committed, senior secured, unsecured, or revolving loan (including loans involving credit linked deposits and synthetic or prefunded letters of credit) that is acquired by assignment or by Participation (including any DIP Loan) that is either:

(i)      Registered; or

(ii)     issued by an obligor that is not resident in the United States:

        (A)     whose payments are not subject to United States withholding tax; and

(B)     that is held through a financial institution pursuant to the procedures described in Treasury Regulation section 1.165-12(c)(3).

***Long-Dated Collateral Obligation***:   Any Collateral Obligation with a stated maturity later than the Stated Maturity of the Notes other than a Collateral Obligation with a stated maturity later than the Stated Maturities of the Notes that includes a "put" option to its obligor at a price of at least par payable on or before the Stated Maturity of the Notes.

***Maintenance Covenant***: A covenant by the borrower to comply with one or more financial covenants during each reporting period, whether or not it has taken any specified action.

***Majority***:  With respect to any Class or group of Notes or Preference Shares, the Holders of more than 50% of the Aggregate Outstanding Amount of that Class or group of Notes or Preference Shares, as the case may be.

***Margin Stock***:   "Margin Stock" as defined under Regulation U issued by the Board of Governors of the Federal Reserve System, including any debt security that is by its terms convertible into Margin Stock, but does not include any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation received pursuant to an offer by an issuer of a Defaulted Collateral Obligation.

***Market Value***:   As of any Measurement Date, the market value determined by the Servicer and reported to the Trustee as an amount rather than as a percentage or fraction of par (expressed in Dollars) of any Collateral Obligation (or Eligible Equity Security, as applicable) based upon the following order of priority: (i) the average of the bid-side market prices obtained by the Servicer from three broker-dealers Independent from the Servicer and each other active in the trading of such obligations or (ii) if the foregoing set of prices were not obtained, the lower of the bid-side market prices obtained by the Servicer from two broker-dealers Independent from the Servicer and each other active in the trading of such obligations or (iii) if the foregoing sets of prices were not obtained, the average of the bid-side prices for the purchase of the Collateral Obligation (or Eligible Equity Security, as applicable) determined by an Approved Pricing Service (Independent from the Servicer) that derives valuations by polling broker-dealers (Independent from the Servicer).

If a Market Value of any Collateral Obligation cannot be so determined in accordance with the procedures set out in the preceding paragraph for a period of 30 consecutive days then such Collateral Obligation shall be deemed to have a Market Value of zero; **provided**, that during such 30-day period, such Collateral Obligation shall be deemed to have a Market Value equal to (a) the higher of (i) the S&P Recovery Rate for such Collateral Obligation with reference to the then current S&P Rating of the Class A-1 Notes (or the most senior Class of Notes Outstanding and rated by S&P) and (ii) 70% of the Principal Balance of such Collateral Obligation or (b) if the Servicer has determined in its commercially reasonable judgment that the Market Value of such Collateral Obligation is lower than the amount determined pursuant to clause (a), such amount to be

determined by the Servicer in its commercially reasonable judgment; **provided**, **further**, that the maximum amount of Collateral Obligations having a Market Value assigned pursuant to the immediately preceding proviso shall be limited to 5.0% of the Maximum Amount (and any amount in excess of 5.0% of the Maximum Amount shall be deemed to have a Market Value of zero). For the avoidance of doubt, the procedures set out in this paragraph shall not apply to determinations of Market Value of any Eligible Equity Securities or Current-Pay Obligations.

The Servicer is under no obligation to determine the Market Value of the Collateral Obligations other than as set forth in the Servicing Agreement or this Indenture or to comply with any of its duties as set forth in the Servicing Agreement or in this Indenture.

***Market Value Determination Date***: With respect to any distribution of Eligible Equity Securities, one Business Day prior to the date of the notice distributed by the Issuer to the Holders of the Preference Shares in connection with such distribution.

***Market Value Percentage***: For any Collateral Obligation, the ratio obtained by dividing:

(i)     the Market Value of the Collateral Obligation; *by*

(ii)    the Principal Balance of the Collateral Obligation.

***Maturity***: With respect to any Note, the date on which the unpaid principal of the Note becomes payable as provided in the Note or this Indenture, whether at the Stated Maturity or by declaration of acceleration, call for redemption, or otherwise.

***Maturity Extension***: The meaning specified in Section 2.4.

***Maximum Amount***: An amount equal to:

(i)     on any Measurement Date during the Ramp-Up Period, U.S.$687,400,000; and

(ii)    on any Measurement Date after the Ramp-Up Completion Date:

    (A)     the aggregate Principal Balance of all Collateral Obligations plus the aggregate outstanding principal amount of any Defaulted Collateral Obligations; **plus**

    (B)     Cash representing Principal Proceeds on deposit in the Collection Account; **plus**

    (C)     Eligible Investments (other than Cash) purchased by the Issuer with Principal Proceeds on deposit in the Collection Account.

***Maximum Weighted Average Moody's Rating Factor***: As of any Measurement Date, a rate equal to the number set forth in the column entitled "Maximum Weighted Average Moody's Rating Factor" in the Ratings Matrix based upon the applicable "row/column

combination" chosen by the Servicer (or the interpolation between two adjacent rows and/or two adjacent columns, as applicable).

***Measurement Date***:  Any date:

(i)      on which the Issuer commits to acquire or dispose of any Collateral Obligation;

(ii)     on which a Collateral Obligation becomes a Defaulted Collateral Obligation;

(iii)    that is a Determination Date;

(iv)    that is the Ramp-Up Completion Date;

(v)     that is the date as of which the information in a Monthly Report is calculated pursuant to Section 10.6;

(vi)    as reasonably requested by S&P; and,

(vii)   with respect to any distribution of Eligible Equity Securities only, that is the Market Value Determination Date with respect to such distribution of Eligible Equity Securities.

***Merging Entity***:  The meaning specified in Section 7.10.

***Minimum Diversity Score***:  As of any Measurement Date, a score equal to the number set forth in the column entitled "Minimum Diversity Score" in the Ratings Matrix based upon the applicable "row/column combination" chosen by the Servicer (or the interpolation between two adjacent rows and/or two adjacent columns, as applicable).

***Minimum Weighted Average Spread:***  As of any Measurement Date, the spread equal to the percentage set forth in the row entitled "Minimum Weighted Average Spread" in the Ratings Matrix based upon the applicable "row/column combination" chosen by the Servicer (or the interpolation between two adjacent rows and/or two adjacent columns, as applicable).

***Monthly Determination Date***:  The meaning specified in Section 10.6(a).

***Monthly Report***:  The meaning specified in Section 10.6(a).

***Moody's***:  Moody's Investors Service, Inc.

***Moody's Default Probability Rating***:  The meaning set forth in Schedule 7.

***Moody's Equivalent Senior Unsecured Rating***:  The meaning set forth in Schedule 7.

***Moody's Excess Weighted Average Recovery Rate***: the greater of (i) zero and (ii) the difference (if positive) between the Moody's Weighted Average Recovery Rate and 43.6%.

***Moody's Group I Country***: Any of the following countries: Australia, the Netherlands, the United Kingdom and any country subsequently determined by Moody's to be a Moody's Group I Country.

***Moody's Group II Country***: Any of the following countries: Germany, Ireland, Sweden, Switzerland and any country subsequently determined by Moody's to be a Moody's Group II Country.

***Moody's Group III Country***: Any of the following countries: Austria, Belgium, Denmark, Finland, France, Iceland, Liechtenstein, Luxembourg, Norway, Spain and any country subsequently determined by Moody's to be a Moody's Group III Country.

***Moody's Industry Classification***: The industry classifications in Schedule 2 as modified, amended, and supplemented from time to time by Moody's.

***Moody's Non Senior Secured Loan***: Any Loan that is not a Moody's Senior Secured Loan.

***Moody's Obligation Rating***: The meaning set forth in Schedule 7.

***Moody's Priority Category***: Each type of Collateral Obligation specified in the definition of "Moody's Priority Category Recovery Rate Matrix" as a "Moody's Priority Category."

***Moody's Priority Category Recovery Rate***: For any Collateral Obligation, the percentage specified in the definition of "Moody's Priority Category Recovery Rate Matrix" opposite the Moody's Priority Category of the Collateral Obligation.

***Moody's Priority Category Recovery Rate Matrix***:

| Moody's Priority Category | Moody's Priority Category Recovery Rate |
|---|---|
| Synthetic Securities............... | In the case of: |
| | (i) a Form-Approved Synthetic Security, the "Moody's Priority Category Recovery Rate" given by Moody's to the Form-Approved Synthetic Security at the time of approval of the Form-Approved Synthetic Security by Moody's, and |
| | (ii) any other Synthetic Security, the "Moody's Priority Category Recovery Rate" given by |

| Moody's Priority Category | Moody's Priority Category Recovery Rate |
|---|---|
| | Moody's to the Synthetic Security at the time of acquisition of the Synthetic Security. |
| Structured Finance Obligations............................ | The Moody's Priority Category Recovery Rate determined in accordance with the Moody's Structured Finance Obligation Recovery Rates set forth in Schedule 5 by reference to the type of asset and its then Moody's Rating (or, with respect to assets to which that schedule does not apply, on a case-by-case basis in connection with the Grant of the relevant Collateral Obligation). |
| unsecured DIP Loans and any Collateral Obligations not covered above or below ........ | As determined by Moody's on a case-by-case basis. |

For High-Yield Bonds, Moody's Senior Secured Loans and Moody's Non Senior Secured Loans, the relevant Moody's Priority Category Recovery Rate is the rate determined pursuant to the table below based on the number of rating subcategories difference between the High-Yield Bond's or Loan's Moody's Obligation Rating and its Moody's Default Probability Rating (for purposes of clarification, if the Moody's Obligation Rating is higher than the Moody's Default Probability Rating, the rating subcategories difference will be positive and if it is lower, negative):

| Number of Moody's Rating Subcategories Difference Between the Moody's Obligation Rating and the Moody's Default Probability Rating | Moody's Senior Secured Loans | Moody's Non Senior Secured Loans | High-Yield Bonds |
|---|---|---|---|
| +2 or more | 60.0% | 45.0% | 40.0% |
| +1 | 50.0% | 42.5% | 35.0% |
| 0 | 45.0% | 40.0% | 30.0% |
| -1 | 40.0% | 30.0% | 15.0% |
| -2 | 30.0% | 15.0% | 10.0% |
| -3 or less | 20.0% | 10.0% | 2.0% |

If no Moody's Priority Category Recovery Rate has been specifically assigned with respect to a Loan pursuant to the above table, and the Loan is a secured DIP Loan, the relevant Moody's Priority Category Recovery Rate is 50.0%.

***Moody's Rating***:  The meaning set forth in Schedule 7.

***Moody's Rating Factor***:  The number in the table below opposite the rating of the Collateral Obligation (excluding Synthetic Securities where an Assigned Moody's Rating is not available).

| Moody's Rating | Moody's Rating Factor | Moody's Rating | Moody's Rating Factor |
|---|---|---|---|
| Aaa | 1 | Ba1 | 940 |
| Aa1 | 10 | Ba2 | 1350 |
| Aa2 | 20 | Ba3 | 1766 |
| Aa3 | 40 | B1 | 2220 |
| A1 | 70 | B2 | 2720 |
| A2 | 120 | B3 | 3490 |
| A3 | 180 | Caa1 | 4770 |
| Baa1 | 260 | Caa2 | 6500 |
| Baa2 | 360 | Caa3 | 8070 |
| Baa3 | 610 | Ca or lower | 10000 |

The Moody's Rating Factor for Collateral Obligations that are Synthetic Securities shall be determined by Moody's and obtained by the Issuer or the Servicer on a case-by-case basis, unless (1) there is an Assigned Moody's Rating available for such Collateral Obligation that is a Synthetic Security, in which case such Assigned Moody's Rating shall be used to compute the Moody's Rating Factor for such Collateral Obligation that is a Synthetic Security, or (2) such Collateral Obligation is a Form-Approved Synthetic Security, in which case the Moody's Rating Factor given to such Collateral Obligation at the time of approval of the Form-Approved Synthetic Security shall be used to compute the Moody's Rating Factor for such Collateral Obligation that is a Synthetic Security.

The Moody's Rating Factor for any Collateral Obligation that is a Structured Finance Obligation shall be equal to: $\frac{A \times 55\%}{1 - B}$,

where: "$A$" means the number determined with respect to such Collateral Obligation pursuant to the table above; and

"$B$" means the Moody's Priority Category Recovery Rate with respect to such Collateral Obligation.

***Moody's Senior Secured Loan***:

(a)     a Loan that:

      (i)   is not (and cannot by its terms become) subordinate in right of payment to any other obligation of the obligor of the Loan;

      (ii)  is secured by a valid first priority perfected security interest or lien in, to or on specified collateral securing the obligor's obligations under the Loan; and

      (iii) the value of the collateral securing the Loan together with other attributes of the obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service and other demands for that cash flow) is adequate (in the commercially reasonable judgment of the Servicer) to repay the Loan in accordance with its terms and to repay all other loans of equal seniority secured by a first lien or security interest in the same collateral; or

(b)     a Loan that:

      (i)   is not (and cannot by its terms become) subordinate in right of payment to any other obligation of the obligor of the Loan, other than, with respect to a Loan described in clause (a) above, with respect to the liquidation of such obligor or the collateral for such loan;

      (ii)  is secured by a valid second or lower priority perfected security interest or lien in, to or on specified collateral securing the obligor's obligations under the Loan;

      (iii) the value of the collateral securing the Loan together with other attributes of the obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service and other demands for that cash flow) is adequate (in the commercially reasonable judgment of the Servicer) to repay the Loan in accordance with its terms and to repay all other loans of equal or higher seniority secured by a first or second lien or security interest in the same collateral; and

        (iv)  has been assigned a Moody's rating equal to or higher than Moody's corporate family rating for such obligor; and

(c)     the Loan is not: (i) a DIP Loan, (ii) a Loan for which the security interest or lien (or the validity or effectiveness thereof) in substantially all of its collateral attaches, becomes effective, or otherwise "springs" into existence after the origination thereof, or (iii) a type of loan that Moody's has identified as having unusual terms and with respect to which its Moody's Recovery Rate has been or is to be determined on a case-by-case basis.

***Moody's Weighted Average Rating Factor Recovery Rate Modifier***: the product of (i) the portion of the Moody's Excess Weighted Average Recovery Rate specified by the Servicer in a notice to the Trustee and (ii) 5250, **provided** that the sum of the amount specified in clause (i) of this definition and clause (i) of the definition of the "Moody's Weighted Average Spread Recovery Rate Modifier" cannot exceed the Moody's Excess Weighted Average Recovery Rate.

***Moody's Weighted Average Recovery Rate***:  As of any Measurement Date, a rate equal to the number obtained by:

(i)     summing the products obtained by multiplying the Principal Balance of each Collateral Obligation by its respective Moody's Priority Category Recovery Rate;

(ii)    dividing the sum determined pursuant to clause (i) above by the sum of the Aggregate Principal Balance of all Collateral Obligations; and

(iii)   rounding up to the first decimal place.

***Moody's Weighted Average Spread Recovery Rate Modifier***: the product of (i) the portion of the Moody's Excess Weighted Average Recovery Rate specified by the Servicer in a notice to the Trustee and (ii) 6.0%, **provided** that the sum of the amount specified in clause (i) of this definition and clause (i) of the definition of the "Moody's Weighed Average Rating Factor Recovery Rate Modifier" cannot exceed the Moody's Excess Weighted Average Recovery Rate.

***Non-Call Period***:  The period from the Closing Date to but not including the Payment Date in November 2010.

***Non-Consenting Holder***:  With respect to any supplemental indenture pursuant to Section 8.2 that requires the consent of one or more Holders of Securities, any Holder or, in the case of Securities represented by Global Notes, any beneficial owner, that either (i) has delivered to the Trustee a written notice that it will not consent to such supplemental indenture or (ii) had not consented to such supplemental indenture within the applicable Initial Consent Period.

***Non-Performing Collateral Obligation***: Any Defaulted Collateral Obligation and any PIK Security as to which its issuer or obligor has previously deferred or capitalized any interest due on it and all the interest so deferred or capitalized has not subsequently been paid in full in cash by:

(i) if the PIK Security has a Moody's Rating of "Baa3" (and not on credit watch with negative implications) or above or an S&P Rating of "BBB-" (and not on credit watch with negative implications) or above, the earlier of its second payment date or one year following the date of the initial deferral or capitalization of interest due on it, or

(ii) if the PIK Security has a Moody's Rating of "Baa3" and on credit watch with negative implications or below "Baa3", or an S&P Rating of "BBB-" and on credit watch with negative implications or below "BBB-", the earlier of its first payment date or six months following the date of the initial deferral or capitalization of interest due on it.

***Non-Permitted Holder***: (a) With respect to the Global Notes, a Holder or beneficial owner of an interest in a Global Note that is a U.S. person and (i) not a QIB/QP and that becomes the beneficial owner of an interest in a Rule 144A Global Note or (ii) does not have an exemption available under the Securities Act and (b) with respect to the Class E Notes, a Holder or beneficial owner of an interest in a Class E Note that is not a QIB/QP.

***Non-Permitted Benefit Plan Investor***: The meaning specified in the second paragraph of Section 2.6(c).

***Non-qualifying Collateral Obligation***: The meaning specified in Section 12.1(d).

***Note Break-Even Loss Rate***: With respect to each Class of Notes that is rated by S&P, the maximum percentage of defaults that the Current Portfolio or Proposed Portfolio can sustain and nevertheless sufficient funds will remain for the payment of principal of the Class of Notes in full by its Stated Maturity and the timely payment of interest on the Class A-1 Notes, the Class A-2 Notes and the Class B Notes and the ultimate payment of interest on the Class C Notes, the Class D Notes and the Class E Notes using S&P's assumptions on recoveries, defaults, and timing, and taking into account the Priority of Payments and the adjusted Weighted Average Spread level specified in the applicable row of the table below. The adjusted Weighted Average Spread as of any Measurement Date is the Weighted Average Spread as of the Measurement Date **minus** the amount of any Spread Excess added to the Weighted Average Fixed Rate Coupon as of the Measurement Date.

| Row | Adjusted Weighted Average Spread |
|:---:|:---|
| 1 | Greater than or equal to 3.20% |
| 2 | Greater than or equal to 3.10% but less than 3.20% |

| 3 | Greater than or equal to 3.00% but less than 3.10% |
| 4 | Greater than or equal to 2.90% but less than 3.00% |
| 5 | Greater than or equal to 2.80% but less than 2.90% |
| 6 | Greater than or equal to 2.70% but less than 2.80% |
| 7 | Greater than or equal to 2.60% but less than 2.70% |
| 8 | Greater than or equal to 2.50% but less than 2.60% |
| 9 | Greater than or equal to 2.40% but less than 2.50% |
| 10 | Greater than or equal to 2.30% but less than 2.40% |
| 11 | Greater than or equal to 2.20% but less than 2.30% |
| 12 | Greater than or equal to 2.10% but less than 2.20% |
| 13 | Greater than or equal to 2.00% but less than 2.10% |

***Note Class Loss Differential***:  With respect to any Measurement Date and any Class of Notes that is rated by S&P, the rate calculated by subtracting the Class Scenario Loss Rate for the Class from the then-applicable Note Break-Even Loss Rate for the Class of Notes.

***Noteholder***:  A Holder of the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D Notes or the Class E Notes.

***Note Interest Rate***:  With respect to any specified Class of Notes, the per annum interest rate payable on the Notes of the Class with respect to each Interest Period equal to LIBOR for Eurodollar deposits for the applicable Interest Period **plus** the spread specified in the "Interest Rate" rows of the tables in Section 2.3 with respect to such Notes except in the first Interest Period.

***Note Payment Sequence***:  The application of funds in the following order:

(1)     to the payment of principal of the Class A-1 Notes until the Class A-1 Notes have been fully redeemed;

(2)     to the Class A-2 Notes until the Class A-2 Notes have been fully redeemed;

(3)     to the Class B Notes until the Class B Notes have been fully redeemed;

(4)     to the Class C Notes until the Class C Notes have been fully redeemed;

(5)     to the Class D Notes until the Class D Notes have been fully redeemed; and

(6)     to the Class E Notes until the Class E Notes have been fully redeemed.

***Notes***:  The Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes authorized by, and authenticated and delivered under, this Indenture or any supplemental indenture.

***Notice of Refinancing***:  The meaning specified in Section 9.7.

***Objection Cut-Off Date***:  The meaning specified in Section 15.1(h)(ii).

***Offer***:  The meaning specified in Section 10.7(c).

***Offering***:  The offering of the Notes.

***Offering Memorandum***:  The final offering memorandum, dated October 22, 2007, prepared and delivered in connection with the offer and sale of the Securities.

***Officer***:  With respect to the Issuer and any corporation, any director, the Chairman of the board of directors, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer, or an Assistant Treasurer of the entity; with respect to the Co-Issuer and any corporation, any director, the Chairman of the board of directors, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer, or an Assistant Treasurer of the entity; with respect to any partnership, any of its general partners; and with respect to the Trustee, any Trust Officer.

***Opinion of Counsel***:  A written opinion addressed to the Trustee and each Rating Agency, in form and substance reasonably satisfactory to the Trustee and each Rating Agency, of an attorney at law (or law firm with one or more partners) reasonably satisfactory to the Trustee and admitted to practice before the highest court of any state of the United States or the District of Columbia (or the Cayman Islands, in the case of an opinion relating to the laws of the Cayman Islands), which attorney (or law firm) may, except as otherwise expressly provided in this Indenture, be counsel for the Servicer, the Issuer or the Co-Issuer.  Whenever an Opinion of Counsel is required under this Indenture, the Opinion of Counsel may rely on opinions of other counsel who are so admitted and so satisfactory, which opinions of other counsel shall accompany the Opinion of Counsel and shall either be addressed to the Trustee and each Rating Agency or shall state that the Trustee and each Rating Agency may rely on it.  An Opinion of Counsel may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion.

***Optional Redemption***:  A redemption of the Notes in accordance with Section 9.2.

***Other Indebtedness***:  The meaning specified in the definition of "Defaulted Collateral Obligation."

***Outstanding***:  With respect to:

(a)      the Notes or any specified Class, as of any date of determination, all of the Notes or all of the Notes of the specified Class, as the case may be, theretofore authenticated and delivered under this Indenture, except with respect to Notes:

        (i)     Notes canceled by the Indenture Registrar or delivered to the Indenture Registrar for cancellation;

        (ii)    Notes for whose payment or redemption funds in the necessary amount have been theretofore irrevocably deposited with the Trustee or any Paying Agent in trust for their Holders pursuant to Section 4.1(a)(ii) and if the Notes are to be redeemed, notice of redemption has been duly given pursuant to this Indenture;

        (iii)   Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture; and

        (iv)   Notes alleged to have been destroyed, lost, or stolen for which replacement Notes have been issued as provided in Section 2.7, unless proof satisfactory to the Trustee is presented that any such Notes are held by a protected purchaser; and

(b)      the Preference Shares, as of any date of determination, all of the Preference Shares theretofore issued under the Preference Share Documents and listed in the Preference Share register of the Issuer as outstanding;

**provided** that, in determining whether the Holders of the requisite Aggregate Outstanding Amount of the Securities have given any request, demand, authorization, direction, notice, consent or waiver under this Indenture, the Securities owned or beneficially owned by the Issuer, the Co-Issuer, any Affiliate of either of them and, with respect to any matter affecting its status as Servicer or appointment of a replacement Servicer or relating to an acceleration of any Class of Notes if the effect of the Servicer's action or inaction as a Holder of Securities would effectively prevent acceleration, the Servicer, its Affiliates and any account over which the Servicer or its Affiliates have discretionary voting authority (other than, with respect to Notes or Class II Preference Shares, HFP or any of its subsidiaries; **provided** that, with respect to the voting authority of Notes or Class II Preference Shares owned by HFP or any of its subsidiaries, such vote shall not be excluded only if such vote is determined by a vote of the majority of the "independent directors" (determined in accordance with the governing documents of HFP or such subsidiaries and certified in writing to the Trustee or the Preference Shares Paying Agent, as applicable, by any of the "independent directors" of HFP) of HFP or such subsidiaries) shall be disregarded and not be Outstanding, except that, in determining whether the Trustee shall be protected in relying on any request, demand, authorization, direction, notice, consent or waiver, only Securities that a Trust Officer of the Trustee (or with respect to the Preference Shares, only Preference Shares that an authorized officer of the Preference Shares Paying Agent) has actual knowledge to be so owned or beneficially owned shall be so disregarded. Securities so owned or beneficially

owned that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee or the Preference Shares Paying Agent, as applicable, the pledgee's right so to act with respect to the Securities and that the pledgee is independent from the Issuer, the Co-Issuer, the Servicer, the Trustee and the Preference Shares Paying Agent.

***Overcollateralization Ratio***:  With respect to any Class of Notes on any Measurement Date, the ratio calculated by **dividing**:

(i)      the Overcollateralization Ratio Numerator; **by**

(ii)     the Aggregate Outstanding Amount of such Class of Notes and all Notes ranking senior to it (excluding any Deferred Interest on such Notes and all Notes ranking senior to such Notes).

***Overcollateralization Ratio Numerator***:  On any date, the sum of:

(1)      the Aggregate Principal Balance of all Collateral Obligations (other than any Excess CCC+/Caa1 Collateral Obligations, any Non-Performing Collateral Obligations, any Deep Discount Obligations, and any Collateral Obligations loaned pursuant to a Securities Lending Agreement with respect to which an "event of default" (under and as defined in the Securities Lending Agreement) is continuing); **plus**

(2)      unpaid Accrued Interest Purchased With Principal (excluding any unpaid Accrued Interest Purchased With Principal in respect of Non-Performing Collateral Obligations); **plus**

(3)      the Aggregate Principal Balance of any Eligible Investments that were purchased with Principal Proceeds and the amount of Principal Proceeds on deposit in the Collection Account; **plus**

(4)      the Aggregate Principal Balance of Eligible Investments on deposit in a Securities Lending Account that relate to a Securities Lending Agreement with respect to which an "event of default" (under and as defined in the Securities Lending Agreement) is continuing; **plus**

(5)      with respect to Collateral Obligations that are Non-Performing Collateral Obligations, Deep Discount Obligations or Excess CCC+/Caa1 Collateral Obligations, the amount determined by using one of the following methods applicable to such type of Collateral Obligation; **provided** that if a Collateral Obligation falls within more than one of such types, the Issuer will be required to use the method that results in the smallest amount:

(A)      with respect to any Excess CCC+/Caa1 Collateral Obligations, an amount equal to the product of (i) the CCC+/Caa1 Excess Market Value

Percentage, **multiplied by** (ii) the Excess CCC+/Caa1 Collateral Obligations;

(B)     with respect to any Non-Performing Collateral Obligations, the aggregate of the Applicable Collateral Obligation Amounts for all included Non-Performing Collateral Obligations (other than Defaulted Collateral Obligations that have been held by the Issuer for more than three years, which shall be deemed to be zero for purposes of this clause (B)); and

(C)     with respect to any Deep Discount Obligations, the Aggregate Purchase Price Amount for all Deep Discount Obligations.

As used in this definition, ***Applicable Collateral Obligation Amount*** for any Non-Performing Collateral Obligation means:

(a)     the lesser of:

(x)  the Market Value Percentage of the Non-Performing Collateral Obligation; and

(y)  the Applicable Percentage for the Non-Performing Collateral Obligation;

**multiplied by**:

(b)     if the Non-Performing Collateral Obligation is:

(1)     any Pledged Obligation other than those in clauses (2) through (4) below, the outstanding principal amount of the Pledged Obligation as of the relevant Measurement Date;

(2)     a Synthetic Security, the notional amount specified in the Synthetic Security;

(3)     any Revolving Loan or Delayed Drawdown Loan, its Principal Balance including any Unfunded Amount thereof (regardless of the nature of the contingency relating to the Issuer's obligation to fund the Unfunded Amount); and

(4)     any PIK Security, its Principal Balance.

As used in the calculation of Market Value Percentage of the Non-Performing Collateral Obligation, the Principal Balance of any Defaulted Collateral Obligation shall be, if the Defaulted Collateral Obligation is:

(i)     any Pledged Obligation other than those in clauses (ii) through (iv) below, the outstanding principal amount of the Pledged Obligation as of the relevant Measurement Date;

(ii)     a Synthetic Security, the notional amount specified in the Synthetic Security;

(iii)    any Revolving Loan or Delayed Drawdown Loan, its Principal Balance including any Unfunded Amount thereof (regardless of the nature of the contingency relating to the Issuer's obligation to fund the Unfunded Amount); and

(iv)    any PIK Security, its Principal Balance.

***Overcollateralization Test***:  A test that is satisfied with respect to any Class of Notes if, as of any Measurement Date, the Overcollateralization Ratio for the Class is at least equal to the required level for the specified Class indicated in the table below:

| Test | Required Level |
|---|---|
| Class A/B Overcollateralization Test | 112.14% |
| Class C Overcollateralization Test | 107.59% |
| Class D Overcollateralization Test | 105.79% |
| Class E Overcollateralization Test | 103.91% |

***Participating Institution***:  An institution that creates a participation interest and that has a long-term senior unsecured rating by Moody's of at least "A3" (and if so rated by Moody's such rating is not on watch for possible downgrade) and an issuer credit rating by S&P of at least "A".

***Participation***:  A Loan (including a Loan involving Synthetic Letters of Credit if structured like a Participation) acquired as a participation interest created by a Participating Institution.

***Paying Agent***:  Any Person authorized by the Issuer to pay the principal of or interest on any Notes on behalf of the Issuer as specified in Section 7.2.  (For the avoidance of doubt, this does not include the Irish Paying Agent).

***Payment Account***:  The Securities Account established pursuant to Section 10.3(h).

***Payment Date***:  The first day of February, May, August and November in each year, commencing May 2008 or, if any such day is not a Business Day, the next following Business Day, any other date on which the Notes are redeemed or paid before their Stated Maturity, and at the Stated Maturity for the Notes.

***Permitted Offer***:  An Offer pursuant to which the offeror offers to acquire a debt obligation (including a Collateral Obligation) in exchange solely for cash in an amount equal to or greater than the full face amount of the debt obligation plus any accrued and

unpaid interest and as to which the Servicer has determined in its commercially reasonable judgment that the offeror has sufficient access to financing to consummate the Offer.

***Person***:   An individual, corporation (including a business trust), partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated association or government or any agency or political subdivision thereof.

***PIK Cash-Pay Interest***:   As to any PIK Security, the portion of interest required to be paid in cash (and not permitted to be added to the balance of such PIK Security or otherwise deferred and accrued) thereon pursuant to the terms of the related Underlying Instruments.

***PIK Security***:   Any loan or debt obligation on which any portion of the interest accrued for a specified period of time or until the maturity thereof is, or at the option of the obligor may be, added to the principal balance of such loan or debt obligation or otherwise deferred rather than being paid in cash, **provided** that such loan or debt obligation shall not be a PIK Security if the portion, if any, of such interest required pursuant to the terms of the related Underlying Instruments to be paid in Cash would result in the outstanding principal amount of such loan or debt obligation having an effective rate of PIK Cash-Pay Interest at least equal to (i) if such loan or debt obligation is a fixed rate loan or debt obligation, 4% per annum, or (ii) if such loan or debt obligation is a floating rate loan or debt obligation, LIBOR.

***Plan Asset Regulation***:   The regulation issued by the United States Department of Labor and found at 29 C.F.R. Section 2510.3-101.

***Pledged Obligations***:   As of any date of determination, the Collateral Obligations, the Workout Assets, the Eligible Investments, and any other securities or obligations that have been Granted to the Trustee that form part of the Collateral.

***Portfolio Improvement Exchange***:   The disposition, during the Replacement Period, of a Collateral Obligation and corresponding acquisition of one or more Collateral Obligations which in the aggregate will result in (i) the Collateral Quality Tests, the Interest Coverage Test, the Overcollateralization Tests and the Concentration Limitations herein being satisfied (or bring the total portfolio of Collateral Obligations closer to compliance with any such test or limitation) or if one or more of such Collateral Quality Tests, Interest Coverage Test, Overcollateralization Test or Concentration Limitations are not satisfied, the degree of compliance therewith would be improved and (ii) improving, on a net basis, the quality of the total portfolio of Collateral Obligations as measured by such Collateral Quality Tests, Interest Coverage Test, Overcollateralization Test and Concentration Limitations and (iii) in the case of each of clause (i) and (ii), any other Collateral Quality Tests, Interest Coverage Tests, Overcollateralization Tests or Concentration Limitations not being violated or the likelihood of such violation in the future not being significantly increased.

***Pre-Closing Participant***: An Affiliate of the Initial Purchasers that is financing the Issuer's pre-closing acquisition of Collateral Obligations.

***Preference Shares Distribution Account***: A segregated bank account established by the Preference Shares Paying Agent pursuant to the Preference Shares Paying Agency Agreement into which the Preference Shares Paying Agent will deposit all amounts received from the Issuer and payable to the Holders of the Preference Shares under the Priority of Payments.

***Preference Share Documents***: The Issuer Charter, the Preference Shares Paying Agency Agreement and the resolutions of the Issuer's board of directors authorizing the issuance of the Preference Shares passed on or before the Closing Date.

***Preference Share Internal Rate of Return***: With respect to any Payment Date, the internal rate of return (computed using the "XIRR" function in Microsoft® Excel 2002 or an equivalent function in another software package), stated on a per annum basis, for the following cash flows, assuming all Preference Shares are purchased on the Closing Date at their Face Amount:

(i)     each distribution of Interest Proceeds made to the Holders of the Preference Shares (excluding any Class II Preference Share Special Payment distributed to the Holders of the Class II Preference Shares) on any prior Payment Date and, to the extent necessary to reach the applicable Preference Share Internal Rate of Return, the current Payment Date and

(ii)    each distribution of Principal Proceeds made to the Holders of the Preference Shares (excluding any Class II Preference Share Special Payment distributed to the Holders of the Class II Preference Shares) on any prior Payment Date and, to the extent necessary to reach the applicable Preference Share Internal Rate of Return, the current Payment Date.

***Preference Shares***: The Class I Preference Shares and the Class II Preference Shares.

***Preference Shares Notional Amount***: As of the Closing Date, U.S.$63,000,000, and thereafter as increased each time additional Preference Shares are issued in accordance with the Preference Share Documents.

***Preference Shares Paying Agency Agreement***: The Preference Shares Paying Agency Agreement, dated as of the Closing Date, by and between the Issuer, the Preference Shares Paying Agent and the Share Registrar, as amended from time to time in accordance with the terms thereof.

***Preference Shares Paying Agent***: State Street Bank and Trust Company, in its capacity as Preference Shares Paying Agent under the Preference Shares Paying Agency Agreement, unless a successor Person shall have become the preference shares paying agent pursuant to the applicable provisions of the Preference Shares Paying Agency

Agreement, and thereafter "Preference Shares Paying Agent" shall mean such successor Person.

***Principal Balance***:  With respect to:

(i)     any Pledged Obligation other than those specifically covered in this definition, the outstanding principal amount of the Pledged Obligation as of the relevant Measurement Date;

(ii)    a Synthetic Security, the notional amount specified in the Synthetic Security;

(iii)   any Pledged Obligation in which the Trustee does not have a first priority perfected security interest, zero, except as otherwise expressly specified in this Indenture;

(iv)    any Defaulted Collateral Obligation, except as otherwise provided, zero;

(v)     any Collateral Obligation that has been loaned, its Principal Balance shall be reduced by the excess of the amount of collateral required over the actual Market Value of the collateral;

(vi)    any Revolving Loan or Delayed Drawdown Loan, its Principal Balance shall include the Unfunded Amount thereof (regardless of the nature of the contingency relating to the Issuer's obligation to fund the Unfunded Amount), except as otherwise expressly specified in this Indenture;

(vii)   any PIK Security, its Principal Balance shall not include any principal amount of the PIK Security representing previously deferred or capitalized interest; and

(viii)  any Qualified Equity Security and obligation or security that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation, zero.

***Principal Proceeds***:  With respect to any Due Period, all amounts received in Cash during the Due Period by the Issuer with respect to the Collateral that are not Interest Proceeds.

Principal Proceeds shall include any funds transferred from the Closing Date Expense Account into the Collection Account pursuant to Section 10.2.

Principal Proceeds do not include the Excluded Property or earnings on amounts on deposit in the Securities Lending Account to the extent the earnings are payable by the Issuer to a Securities Lending Counterparty.

At any time when an "event of default" under a Securities Lending Agreement has occurred and is continuing, any payments received by the Issuer from the related Securities Lending Collateral shall be Principal Proceeds.

***Priority Class***:  With respect to any specified Class of Notes, each Class of Notes that ranks senior to that Class, as indicated in Section 13.1.

***Priority of Payments***:  The meaning specified in Section 11.1(a).

***Proceeding***:  Any suit in equity, action at law, or other judicial or administrative proceeding.

***Proposed Portfolio***:  As of any Measurement Date, the portfolio (measured by Aggregate Principal Balance) of Collateral Obligations and Principal Proceeds held as Cash on deposit in the Collection Account and other Eligible Investments purchased with Principal Proceeds on deposit in the Collection Account resulting from the sale, maturity, or other disposition of a Collateral Obligation or a proposed purchase of a Collateral Obligation, as the case may be.

***Purchase Agreement***:  A purchase agreement dated as of the Closing Date among the Co-Issuers and the Initial Purchasers, relating to the purchase of the Notes and the Class I Preference Shares, as modified, amended and supplemented and in effect from time to time.

***Purchase Criteria Adjusted Balance***:  For any Collateral Obligation other than Deep Discount Obligations, its Principal Balance; and for any Deep Discount Obligation its Purchase Price; **provided**, **however**, that if any Excess CCC+/Caa1 Collateral Obligations exist, the Purchase Criteria Adjusted Balance for the Excess CCC+/Caa1 Collateral Obligations shall be the lower of (i) the weighted average Market Value of all CCC+/Caa1 Collateral Obligations, expressed as a percentage of their outstanding principal balances and (ii) the product of (a) 70% and (b) their respective Principal Balance.

***Purchase Price***:  With respect to the purchase of any Collateral Obligation (other than any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation), the net purchase price paid by the Issuer for the Collateral Obligation.  The net purchase price is determined by subtracting from the purchase price the amount of any Accrued Interest Purchased With Principal and any syndication and other upfront fees paid to the Issuer and by adding the amount of any related transaction costs (including assignment fees) paid by the Issuer to the seller of the Collateral Obligation or its agent.

***Purchase Price Amount***:  With respect to any Collateral Obligation on any date of determination, the product of (i) the Purchase Price (stated as a percentage) thereof and (ii) the Principal Balance thereof on such date.

***QIB/QP***:  Any Person that, at the time of its acquisition of Notes is both a Qualified Institutional Buyer and a Qualified Purchaser.

***Qualified Equity Security***:  Any obligation that at the time of acquisition, conversion or exchange does not satisfy the requirements of a Collateral Obligation that is stock or evidence of an interest in or a right to buy stock, or any obligation that at the time of acquisition, conversion or exchange does not satisfy the requirements of a Collateral Obligation but whose acquisition otherwise is a transaction in stocks or securities within the meaning of Section 864(b)(2)(A)(ii) of the Code and the regulations under the Code. Qualified Equity Securities do not include any obligation that at the time of acquisition, conversion or exchange does not satisfy the requirements of a Collateral Obligation and that will cause the Issuer to be treated as engaged in or having income from a United States trade or business for United States federal income tax purposes by virtue of its ownership or disposition of the obligation (without regard to the Issuer's other activities).

***Qualified Institutional Buyer***:  The meaning specified in Rule 144A under the Securities Act.

***Qualified Purchaser***:  The meaning specified in Section 2(a)(51) of the Investment Company Act and Rule 2a51-2 under the Investment Company Act (including entities owned exclusively by Qualified Purchasers).

***Ramp-Up Completion Date***:  The earlier of:

(i)     the Business Day after the 90th day after the Closing Date, and

(ii)    the first date on which the following conditions are satisfied:

(x)     (A) the Aggregate Principal Balance of the Collateral Obligations owned by the Issuer equals at least U.S.$687,400,000 or (B) the Aggregate Principal Balance of the Collateral Obligations purchased (or committed to be purchased) by the Issuer with proceeds from the sale of the Notes (in each case in this clause (B), measured solely as of the date of purchase or commitment, as the case may be) equals at least U.S.$687,400,000 (for the avoidance of doubt, without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations on or before the Ramp-Up Completion Date); and

(y)     the Overcollateralization Ratio Numerator is at least U.S.$687,400,000.

***Ramp-Up Notice***:  The meaning specified in Section 7.19(e).

***Ramp-Up Period***:  The period from and including the Closing Date to and including the Ramp-Up Completion Date.

***Rating Agency***:  Each of Moody's and S&P or, with respect to Pledged Obligations generally, if at any time Moody's or S&P ceases to provide rating services with respect to high yield debt securities, any other nationally recognized statistical rating organization

selected by the Issuer and reasonably satisfactory to a Majority of each Class of Notes. If at any time Moody's ceases to be a Rating Agency, references to rating categories of Moody's in this Indenture shall instead be references to the equivalent categories of the replacement rating agency as of the most recent date on which the replacement rating agency and Moody's published ratings for the type of security in respect of which the replacement rating agency is used. If at any time S&P ceases to be a Rating Agency, references to rating categories of S&P in this Indenture shall instead be references to the equivalent categories of the replacement rating agency as of the most recent date on which the replacement rating agency and S&P published ratings for the type of security in respect of which the replacement rating agency is used.

*Rating Condition*:  With respect to any Rating Agency and any action taken or to be taken under this Indenture, a condition that is satisfied when the Rating Agency has confirmed to the Servicer (as agent for the Issuer) in writing that no withdrawal, reduction, suspension, or other adverse action with respect to any then current rating (determined in accordance with then current methodology) by it (including any private or confidential rating) of any Class of Notes will occur as a result of the action. The Rating Condition with respect to any Rating Agency shall be satisfied for all purposes of this Indenture at any time when no Outstanding Notes are rated by it.

*Rating Confirmation*:  Confirmation in writing from each Rating Agency that it has not reduced, suspended, or withdrawn the Initial Rating assigned by it to any Class of Notes; **provided** that in the case of Refinancing Notes, a Moody's rating will be obtained for such Refinancing Notes and a Rating Confirmation with respect to such Refinancing Notes shall mean (i) with respect to S&P, confirmation in writing from S&P that the rating of each Class of Refinancing Notes will be no lower than the rating on each corresponding Class of Notes subject to such Refinancing and (ii) with respect to Moody's, that the Moody's rating of each Class of Refinancing Notes will be no lower than the rating on each corresponding Class of Notes subject to such Refinancing; provided further that if the terms of such Refinancing Notes are the same as the terms of the corresponding Class of Notes subject to Refinancing (other than with respect to the coupon thereof), it is expected that the cost of obtaining such rating from Moody's shall be no more than the cost of obtaining a Rating Confirmation.

*Rating Confirmation Failure*: The meaning specified in Section 7.19(f).

*Ratings Matrix*: means the table below.

The "row/column combination" of the table below selected by the Servicer on the Closing Date to apply initially for purposes of the Diversity Test, the Weighted Average Spread Test and the Weighted Average Rating Factor Test. Thereafter, on notice to the Trustee, the Servicer may select a different row of the Ratings Matrix to apply, or may interpolate between two adjacent rows and/or two adjacent columns, as applicable, on a straight-line basis and round the results to two decimal points.

| | **Minimum Diversity Score** | | | | | |
| | 55 | 60 | 65 | 70 | 75 | 80 |
|---|---|---|---|---|---|---|
| 220 | 1975 | 1995 | 2020 | 2040 | 2055 | 2070 |
| 225 | 2010 | 2035 | 2060 | 2080 | 2095 | 2105 |
| 230 | 2045 | 2075 | 2095 | 2115 | 2130 | 2145 |
| 235 | 2065 | 2110 | 2135 | 2155 | 2170 | 2185 |
| 240 | 2090 | 2150 | 2175 | 2195 | 2210 | 2225 |
| 245 | 2110 | 2170 | 2205 | 2230 | 2250 | 2260 |
| 250 | 2125 | 2190 | 2235 | 2270 | 2285 | 2300 |
| 255 | 2145 | 2205 | 2255 | 2300 | 2325 | 2340 |
| 260 | 2165 | 2225 | 2280 | 2320 | 2360 | 2380 |
| 265 | 2190 | 2245 | 2295 | 2345 | 2380 | 2410 |
| 270 | 2210 | 2270 | 2320 | 2360 | 2405 | 2435 |
| 275 | 2230 | 2290 | 2335 | 2385 | 2420 | 2455 |
| 280 | 2250 | 2305 | 2360 | 2405 | 2440 | 2480 |
| 285 | 2270 | 2325 | 2375 | 2420 | 2460 | 2500 |
| 290 | 2285 | 2345 | 2395 | 2440 | 2480 | 2520 |
| 295 | 2305 | 2365 | 2415 | 2460 | 2500 | 2535 |
| 300 | 2325 | 2380 | 2435 | 2480 | 2520 | 2555 |
| 305 | 2345 | 2400 | 2455 | 2500 | 2540 | 2570 |
| 310 | 2365 | 2420 | 2470 | 2515 | 2555 | 2590 |
| 315 | 2385 | 2435 | 2490 | 2535 | 2570 | 2610 |
| 320 | 2400 | 2455 | 2505 | 2550 | 2590 | 2630 |

*(Row labels 220–320 under "Minimum Weighted Average Spread (bps)"; column label "Maximum Weighted Average Moody's Rating Factor")*

**Minimum Weighted Average Spread (bps)**

**Maximum Weighted Average Moody's Rating Factor**

*Record Date*:  As to any Payment Date, the 15th day (whether or not a Business Day) before the Payment Date.

*Redemption Date*:  Any Payment Date specified for an Optional Redemption of Notes pursuant to Section 9.2 or the redemption of a Class of Notes in connection with a Refinancing pursuant to Section 9.7.

*Redemption Price*:  With respect to any Note and any Optional Redemption pursuant to Section 9.2(a) or any redemption by Refinancing pursuant to Section 9.7(a), an amount equal to:

(i)      the outstanding principal amount of the portion of the Note being redeemed; **plus**

(ii)     accrued interest on such Class of Notes (including any Defaulted Interest and interest on Defaulted Interest); **plus**

(iii)    in the case of any Deferred Interest Note, the applicable Deferred Interest on such Class of Notes; **plus**

(iv)     any unpaid Extension Bonus Payment in respect of such Class of Notes.

With respect to any Preference Share and any Optional Redemption pursuant to Section 9.2(b), "Redemption Price" means (i) at the direction of a Majority of the Preference Shares, the *pro rata* portion for such Preference Share of the entire remaining amount of available funds after all prior applications pursuant to the Priority of Payments or (ii) as specified by the unanimous direction of the Holders of the Preference Shares, in each case, as specified in Section 9.2(b).

***Reference Obligation***:  An obligation that would otherwise satisfy the definition of "Collateral Obligation" and on which a Synthetic Security is based; **provided** that no Reference Obligation shall be a Synthetic Security.

***Refinancing***:  The meaning specified in Section 9.7.

***Refinancing Date***:  The meaning specified in Section 9.7.

***Refinancing Notes***:  The meaning specified in Section 9.7.

***Refinancing Price***:  With respect to any Class of Notes that is subject to a Refinancing, an amount equal to the Redemption Price thereof.

***Refinancing Proceeds***:  The proceeds from any refinancing permitted under this Indenture.

***Reference Obligor***:  The obligor of a Reference Obligation.

***Registered***:  Means in registered form for U.S. federal income tax purposes and issued after July 18, 1984, **provided**, that a certificate of interest in a grantor trust for U.S. federal income tax purposes shall not be treated as Registered unless each of the obligations or securities held by the trust was issued after that date.

***Registered Office***:  The registered office of the Issuer, which shall be located outside of the United States.

***Regulation D***:  Regulation D under the Securities Act.

***Regulation S***:  Regulation S under the Securities Act.

***Regulation S Global Note***:  The meaning specified in Section 2.2(b).

***Regulation S Note***:  The meaning specified in Section 2.2(b).

***Relevant Obligation***:  For a Collateral Obligation that is a Synthetic Security, the Reference Obligation of the Synthetic Security and otherwise the Collateral Obligation.

***Replacement Hedge***:  A replacement hedge agreement that qualifies to be a Hedge Agreement under this Indenture.

***Replacement Period***:  The period from the Closing Date through and including the first to occur of:

(i)  the Payment Date after the date that the Servicer notifies the Trustee, each Rating Agency, and the Administrator, in the sole discretion of the Servicer, that, in light of the composition of the Collateral, general market conditions, and other factors, the acquisition of additional Collateral Obligations within the foreseeable future would either be impractical or not beneficial,

(ii)  the Payment Date in November 2014 or, in the case of an Extension, the Extended Replacement Period End Date,

(iii)  the Payment Date on which all Notes are to be optionally redeemed or an earlier date after notice of an Optional Redemption chosen by the Servicer to facilitate the liquidation of the Collateral for the Optional Redemption, and

(iv)  the date on which the Replacement Period terminates or is terminated as a result of an Event of Default (subject to Section 5.2(c)).

***Required Redemption Percentage***:  With respect to (a) any Optional Redemption resulting from a Tax Event, the Holders of at least 51% of the Aggregate Outstanding Amount of any Affected Class or at least 66⅔% of the Aggregate Outstanding Amount of the Preference Shares and (b) any other Optional Redemption, a Majority of the Preference Shares.

***Required Rating***:  The meaning specified in Section 15.2(c).

***Retention Overcollateralization Ratio***:  As of any Measurement Date, the ratio obtained by dividing:

(i)  the Overcollateralization Ratio Numerator **by**

(ii)  the Aggregate Outstanding Amount of the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes, excluding any Deferred Interest on any Class of Notes.

***Retention Overcollateralization Test***:  A test that is satisfied as of any Measurement Date during the Replacement Period on which any Notes remain Outstanding, if the Retention Overcollateralization Ratio as of such Measurement Date is at least equal to 104.91%.

***Revolving Loan***:  A Loan or any Synthetic Security with a Reference Obligation (in each case excluding any Delayed Drawdown Loan) that requires the Issuer to make future advances to (or for the account of) the borrower under its Underlying Instruments.  A Loan or Synthetic Security shall only be considered to be a Revolving Loan for so long as its commitment amount is greater than zero.

***Revolving Reserve Account***:  The Securities Account established pursuant to Section 10.3(b).

***Rule 3a-7***:  Rule 3a-7 under the Investment Company Act.

***Rule 144A***:  Rule 144A under the Securities Act.

***Rule 144A Global Note***:  The meaning specified in Section 2.2(c).

***Rule 144A Information***:  The meaning specified in Section 7.15.

***S&P***:  Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

***S&P CDO Monitor***:  A dynamic, analytical computer model developed by S&P (and as may be modified by S&P from time to time) and provided to the Servicer and the Collateral Administrator to be used to calculate the default frequency in terms of the amount of debt assumed to default as a percentage of the original principal amount of the Collateral Obligations consistent with a specified benchmark rating level based on certain assumptions and S&P's proprietary corporate default studies.  For the purpose (and only for the purpose) of applying the S&P CDO Monitor to a portfolio of obligations, for each obligation in the portfolio, the rating of the obligation shall be its S&P Rating.

***S&P CDO Monitor Test***:  A test that is satisfied as of any Measurement Date if, after giving effect to the sale of a Collateral Obligation or the purchase of a Collateral Obligation, each Note Class Loss Differential of the Proposed Portfolio is positive.  The S&P CDO Monitor Test shall be considered to be improved if each Note Class Loss Differential of the Proposed Portfolio is at least equal to the corresponding Note Class Loss Differential of the Current Portfolio.  The S&P CDO Monitor Test is not required to be satisfied or improved upon the sale of a Credit Risk Obligation and the application of the related Sale Proceeds to purchase additional Collateral Obligations as provided in Section 12.1(a).  For purposes of the S&P CDO Monitor Test,

(i)      the S&P Rating of any S&P Unrated DIP Loan shall be "CCC-" and

(ii)     the S&P Industry Classification for a Synthetic Security shall be that of the related Reference Obligation and not the Synthetic Security.

***S&P CRR:***  With respect to any Collateral Obligation, a corporate recovery rate assigned by S&P to such Collateral Obligation.

***S&P CRR Recovery Rate***:  With respect to any Collateral Obligation to which S&P has assigned a S&P CRR, the recovery rate determined in accordance with the definition of S&P Recovery Rate.

***S&P Industry Classification***:  The S&P Industry Classifications in Schedule 3 as modified, amended, and supplemented from time to time by S&P.

***S&P Minimum Weighted Average Recovery Rate***: With respect to each Class of Note shall be the rate specified in the table below applicable to such Class of Notes in the row elected by the Servicer from time to time with five Business Days' prior notification to the Trustee and Standard & Poor's; **provided** that such election shall not be effective unless after giving effect to such election, the S&P CDO Monitor test is satisfied.

| Rating of Class of Notes | Class A S&P Minimum Weighted Average Recovery Rate | Class B S&P Minimum Weighted Average Recovery Rate | Class C S&P Minimum Weighted Average Recovery Rate | Class D S&P Minimum Weighted Average Recovery Rate | Class E S&P Minimum Weighted Average Recovery Rate |
|---|---|---|---|---|---|
| **Row** | | | (%) | | |
| 1 | 50 | 52 | 54.5 | 57 | 60 |
| 2 | 51 | 53 | 55.5 | 58 | 61 |
| 3 | 52 | 54 | 56.5 | 59 | 62 |
| 4 | 53 | 55 | 57.5 | 60 | 63 |
| 5 | 54 | 56 | 58.5 | 61 | 64 |
| 6 | 55 | 57 | 59.5 | 62 | 65 |
| 7 | 56 | 58 | 60.5 | 63 | 66 |
| 8 | 57 | 59 | 61.5 | 64 | 67 |
| 9 | 58 | 60 | 62.5 | 65 | 68 |
| 10 | 59 | 61 | 63.5 | 66 | 69 |
| 11 | 60 | 62 | 64.5 | 67 | 70 |
| 12 | 61 | 63 | 65.5 | 68 | 71 |
| 13 | 62 | 64 | 66.5 | 69 | 72 |
| 14 | 63 | 65 | 67.5 | 70 | 73 |
| 15 | 64 | 66 | 68.5 | 71 | 74 |
| 16 | 65 | 67 | 69.5 | 72 | 75 |
| 17 | 66 | 68 | 70.5 | 73 | 76 |

| 18 | 67 | 69 | 71.5 | 74 | 77 |
| 19 | 68 | 70 | 72.5 | 75 | 78 |
| 20 | 69 | 71 | 73.5 | 76 | 79 |
| 21 | 70 | 72 | 74.5 | 77 | 80 |
| 22 | 71 | 73 | 75.5 | 78 | 81 |
| 23 | 72 | 74 | 76.5 | 79 | 82 |

***S&P Minimum Weighted Average Recovery Rate Test***: A test that is satisfied as of any Measurement Date if the Class A S&P Minimum Weighted Average Recovery Rate Test, Class B S&P Minimum Weighted Average Recovery Rate Test, Class C S&P Minimum Weighted Average Recovery Rate Test, Class D S&P Minimum Weighted Average Recovery Rate Test and the Class E S&P Minimum Weighted Average Recovery Rate Test is satisfied.

***S&P Rating***:  The meaning set forth in Schedule 7.

***S&P Rating Confirmation***:  Confirmation in writing from S&P that it has not reduced, suspended, or withdrawn the Initial Rating assigned by it to any Class of Notes.

***S&P Recovery Rate:***  As of any date of determination, with respect to any Collateral Obligation, the percentage for such Collateral Obligation set forth in (x) the applicable table below, (y) the row in such table opposite the S&P CRR (or, if the relevant assets have no S&P CRR, the senior secured recovery rating, the U.S. loan recovery rating or the CDO liability rating, as applicable) of such Collateral Obligation (or, in the case of a Form-Approved Synthetic Security, the Reference Obligation unless otherwise specified by S&P) and (z) the column in such table below the initial S&P Rating of the respective Class of Notes; **provided**, however that (i) with respect to a DIP Loan or a Synthetic Security (other than a Form-Approved Synthetic Security), the S&P Recovery Rate shall be the recovery rate assigned by S&P and with respect to a Structured Finance Obligation the S&P Recovery Rate shall be the recovery rate determined by reference to Table V or Table VI below, as applicable and (ii) the Issuer or the Servicer may request the assignment of a recovery rate from S&P with respect to any Collateral Obligation, any such assignment by S&P to be in writing (electronic or otherwise).

**Table I (if the Collateral Obligation has a S&P CRR):  Recovery Rates For Assets With Corporate Recovery Ratings**

| Rating of Class of | AAA | AA | A | BBB | BB | B & CCC |
|---|---|---|---|---|---|---|

**Notes***

| S&P CRR | | | | (%) | | |
|---|---|---|---|---|---|---|
| 1+ | 100 | 100 | 100 | 100 | 100 | 100 |
| 1 | 92 | 94 | 96 | 98 | 100 | 100 |
| 2 | 78 | 81 | 84 | 87 | 90 | 90 |
| 3 | 58 | 61 | 64 | 67 | 70 | 70 |
| 4 | 38 | 41 | 44 | 47 | 50 | 50 |
| 5 | 16 | 20 | 24 | 27 | 30 | 30 |
| 6 | 6 | 7 | 8 | 9 | 10 | 10 |

————————————————

\* As of the Closing Date.

**Table II (if the Collateral Obligation is a Senior Unsecured Loan and has no S&P CRR, but other senior secured corporate debt of the same obligor has a S&P CRR):  U.S. and Canada Recovery Rates of Corporate Senior Unsecured Debt If Senior Secured Debt Has A Recovery Rating**

| Rating of Class of Notes* | AAA | AA | A | BBB | BB | B & CCC |
|---|---|---|---|---|---|---|
| Senior secured recovery ratings | | | (%) | | | |
| 1+ | 53 | 55 | 57 | 59 | 61 | 61 |
| 1 | 48 | 50 | 52 | 54 | 56 | 56 |
| 2 | 43 | 45 | 47 | 49 | 51 | 51 |
| 3 | 39 | 41 | 43 | 45 | 47 | 47 |
| 4 | 22 | 24 | 26 | 28 | 30 | 30 |
| 5 | 8 | 10 | 12 | 14 | 15 | 15 |
| 6 | 4 | 4 | 4 | 4 | 4 | 4 |

————————————————

\* As of the Closing Date.

**Table III (if the Collateral Obligation is a subordinated obligation and has no S&P CRR, but other senior secured corporate debt of the same obligor has a S&P CRR):  U.S. and Canada Recovery Rates of Corporate Subordinated Debt If Senior Secured Debt Has A Recovery Rating**

| Rating of Class of Notes* | AAA | AA | A | BBB | BB | B & CCC |
|---|---|---|---|---|---|---|

| **Senior secured recovery ratings** | | | | **(%)** | | |
|---|---|---|---|---|---|---|
| 1+ | 25 | 25 | 25 | 25 | 25 | 25 |
| 1 | 22 | 22 | 22 | 22 | 22 | 22 |
| 2 | 20 | 20 | 20 | 20 | 20 | 20 |
| 3 | 20 | 20 | 20 | 20 | 20 | 20 |
| 4 | 10 | 10 | 10 | 10 | 10 | 10 |
| 5 | 5 | 5 | 5 | 5 | 5 | 5 |
| 6 | 2 | 2 | 2 | 2 | 2 | 2 |

———————————————

\* As of the Closing Date.

**Table IV (if none of Table I, Table II or Table III is applicable):  S&P's U.S. and Canada Tiered Corporate Recovery Rates (for Collateral Obligations that do not have a S&P CRR)**

| **Rating of Class of Notes\*** | **AAA** | **AA** | **A** | **BBB** | **BB** | **B & CCC** |
|---|---|---|---|---|---|---|
| **U.S. loan recovery rates** | | | | **(%)** | | |
| Senior Secured Loans | 56 | 60 | 64 | 67 | 70 | 70 |
| Senior Secured Loan that is a Cov-Lite Loan | 51 | 54 | 57 | 60 | 63 | 63 |
| Senior Unsecured Loans and Second Lien Loans | 40 | 42 | 44 | 46 | 48 | 48 |
| Subordinated Lien Loans | 22 | 22 | 22 | 22 | 22 | 22 |
| Senior Secured Bonds | 48 | 49 | 50 | 51 | 52 | 52 |
| Unsecured Bonds | 38 | 41 | 42 | 44 | 45 | 45 |
| Subordinated Bonds | 19 | 19 | 19 | 19 | 19 | 19 |

———————————————

\* As of the Closing Date.

\*\* The Aggregate Principal Balance of all Second Lien Loans without a S&P CRR (excluding any Defaulted Collateral Obligations) that, in the aggregate, represent up to 15% of the Maximum Amount will have the S&P Recovery Rate specified for Second Lien Loans in the table above. The Aggregate Principal Balance of all Second Lien Loans without a S&P CRR (excluding any Defaulted Collateral Obligations) in excess of 15% of the Maximum Amount will have the S&P Recovery Rate specified for Subordinated Lien Loans in the table above.

**Table V (if the Structured Finance Obligation is the senior-most tranche of securities issued by the issuer of, or obligor on, such Structured Finance Obligation):  S&P's Ratings of Collateral Obligations at the Date of Issuance**

| Rating of Class of Notes* | AAA | AA | A | BBB | BB | B | CCC |
|---|---|---|---|---|---|---|---|
| **Recovery Rate by S&P's Rating of Class of Notes on the Applicable Measurement Date** | | | | | | | |
| AAA | 80.00% | 85.00% | 90.00% | 90.00% | 90.00% | 90.00% | 90.00% |
| AA | 70.00% | 75.00% | 85.00% | 90.00% | 90.00% | 90.00% | 90.00% |
| A | 60.00% | 65.00% | 75.00% | 85.00% | 90.00% | 90.00% | 90.00% |
| BBB | 50.00% | 55.00% | 65.00% | 75.00% | 85.00% | 85.00% | 85.00% |
| BB | 45.00% | 50.00% | 55.00% | 65.00% | 75.00% | 75.00% | 75.00% |
| B | 25.00% | 30.00% | 50.00% | 55.00% | 65.00% | 65.00% | 50.00% |
| CCC | 0.00% | 0.00% | 0.00% | 0.00% | 5.00% | 10.00% | 10.00% |

_____

* As of the Closing Date.

**Table VI (if the Structured Finance Obligation is not the senior-most tranche of securities issued by the issuer of, or obligor on, such Structured Finance Obligation):  S&P's Ratings of Collateral Obligations at the Date of Issuance**

| Rating of Class of Notes* | AAA | AA | A | BBB | BB | B | CCC |
|---|---|---|---|---|---|---|---|
| **Recovery Rate by S&P's Rating of Class of Notes on the Applicable Measurement Date** | | | | | | | |
| AAA | 65.00% | 70.00% | 80.00% | 85.00% | 85.00% | 85.00% | 85.00% |
| AA | 55.00% | 65.00% | 75.00% | 80.00% | 80.00% | 80.00% | 80.00% |
| A | 40.00% | 45.00% | 55.00% | 65.00% | 80.00% | 80.00% | 80.00% |
| BBB | 30.00% | 35.00% | 40.00% | 45.00% | 50.00% | 60.00% | 70.00% |
| BB | 10.00% | 10.00% | 10.00% | 25.00% | 35.00% | 40.00% | 50.00% |
| B | 2.50% | 5.00% | 5.00% | 10.00% | 10.00% | 20.00% | 25.00% |
| CCC | 0.00% | 0.00% | 0.00% | 0.00% | 2.50% | 5.00% | 5.00% |

_____

* As of the Closing Date.

**Table VII: European Tiered Corporate Recovery Rates (By Asset Class And CDO Liability Rating)**

| Rating of Class of Notes* CDO liability rating | AAA | AA | A | BBB | BB | B & CCC |
|---|---|---|---|---|---|---|
| **Senior secured loans (%)** | | | | | | |
| Group A | 68 | 73 | 78 | 81 | 85 | 85 |
| Group B | 56 | 60 | 64 | 67 | 70 | 70 |
| Group C | 48 | 51 | 55 | 57 | 60 | 60 |
| **Senior Secured Loan that is a Cov-Lite Loan (%)** | | | | | | |
| Group A | 61 | 66 | 70 | 73 | 77 | 77 |
| Group B | 50 | 54 | 58 | 60 | 63 | 63 |
| Group C | 43 | 46 | 49 | 52 | 54 | 54 |
| **Mezz./second-lien/senior unsecured loans (%)** | | | | | | |
| Group A | 45 | 47 | 50 | 52 | 54 | 54 |
| Group B | 40 | 42 | 44 | 46 | 48 | 48 |
| Group C | 35 | 37 | 39 | 40 | 42 | 42 |
| **Subordinated loans (%)** | | | | | | |
| Group A | 20 | 20 | 20 | 20 | 20 | 20 |
| Group B | 20 | 20 | 20 | 20 | 20 | 20 |
| Group C | 17 | 17 | 17 | 17 | 17 | 17 |
| **Senior secured bonds (%)** | | | | | | |
| Group A | 60 | 61 | 62 | 63 | 64 | 64 |
| Group B | 48 | 49 | 50 | 51 | 52 | 52 |
| Group C | 43 | 44 | 45 | 46 | 47 | 47 |
| **Senior unsecured bonds (%)** | | | | | | |
| Group A | 40 | 42 | 44 | 46 | 48 | 48 |
| Group B | 38 | 41 | 42 | 44 | 45 | 45 |
| Group C | 32 | 35 | 36 | 38 | 39 | 40 |
| **Subordinated bonds (%)** | | | | | | |
| Group A | 18 | 18 | 18 | 18 | 18 | 18 |
| Group B | 18 | 18 | 18 | 18 | 18 | 18 |
| Group C | 15 | 15 | 15 | 15 | 15 | 15 |

_____

\* As of the Closing Date.
\*\* Group A: U.K., Ireland, Finland, Denmark, South Africa, Australia, New Zealand and The Netherlands. Group B: Belgium, Germany, Austria, Spain, Portugal, Luxembourg, Switzerland, Sweden, Norway, Hong Kong and Singapore. Group C: France, Italy, Greece, Japan, Korea and Taiwan.

**Table VIII: Group A Europe and Asia Recovery If Senior Secured Debt Has A Recovery Rating**

| Rating of Class of Notes* | AAA | AA | A | BBB | BB | B & CCC |
|---|---|---|---|---|---|---|
| **CDO liability rating** | | | | | | |
| **Senior unsecured debt** | Recovery ratings of senior secured (%) | | | | | |
| 1+ | 65 | 68 | 71 | 73 | 76 | 76 |
| 1 | 57 | 60 | 63 | 65 | 68 | 68 |
| 2 | 50 | 53 | 55 | 57 | 59 | 59 |
| 3 | 42 | 45 | 47 | 49 | 51 | 51 |
| 4 | 18 | 18 | 18 | 18 | 18 | 18 |
| 5 | 8 | 8 | 8 | 8 | 8 | 8 |
| 6 | 4 | 4 | 4 | 4 | 4 | 4 |
| **Subordinated debt** | Recovery ratings of senior secured (%) | | | | | |
| 1+ | 22 | 22 | 22 | 22 | 22 | 22 |
| 1 | 20 | 20 | 20 | 20 | 20 | 20 |
| 2 | 18 | 18 | 18 | 18 | 18 | 18 |
| 3 | 18 | 18 | 18 | 18 | 18 | 18 |
| 4 | 9 | 9 | 9 | 9 | 9 | 9 |
| 5 | 4 | 4 | 4 | 4 | 4 | 4 |
| 6 | 2 | 2 | 2 | 2 | 2 | 2 |

_____

\* As of the Closing Date.

**Table IX: Group B Europe and Asia Recovery If Senior Secured Debt Has A Recovery Rating**

| Rating of Class of Notes* | AAA | AA | A | BBB | BB | B & CCC |
|---|---|---|---|---|---|---|
| **CDO liability rating** | | | | | | |
| **Senior unsecured debt** | Recovery ratings of senior secured (%) | | | | | |
| 1+ | 53 | 55 | 57 | 59 | 61 | 61 |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | 48 | 50 | 52 | 54 | 56 | 56 |
| 2 | 43 | 45 | 47 | 49 | 51 | 51 |
| 3 | 39 | 41 | 43 | 45 | 47 | 47 |
| 4 | 18 | 18 | 18 | 18 | 18 | 18 |
| 5 | 8 | 8 | 8 | 8 | 8 | 8 |
| 6 | 4 | 4 | 4 | 4 | 4 | 4 |
| **Subordinated debt** | **Recovery ratings of senior secured (%)** | | | | | |
| 1+ | 22 | 22 | 22 | 22 | 22 | 22 |
| 1 | 20 | 20 | 20 | 20 | 20 | 20 |
| 2 | 18 | 18 | 18 | 18 | 18 | 18 |
| 3 | 18 | 18 | 18 | 18 | 18 | 18 |
| 4 | 9 | 9 | 9 | 9 | 9 | 9 |
| 5 | 4 | 4 | 4 | 4 | 4 | 4 |
| 6 | 2 | 2 | 2 | 2 | 2 | 2 |

———————————————

\* As of the Closing Date.

**Table X: Group C Europe and Asia Recovery If Senior Secured Debt Has A Recovery Rating**

| Rating of Class of Notes* | AAA | AA | A | BBB | BB | B & CCC |
|---|---|---|---|---|---|---|
| **CDO liability rating** | | | | | | |
| **Senior unsecured debt** | **Recovery ratings of senior secured (%)** | | | | | |
| 1+ | 45 | 46 | 48 | 49 | 51 | 51 |
| 1 | 41 | 43 | 44 | 46 | 47 | 48 |
| 2 | 37 | 39 | 41 | 42 | 44 | 44 |
| 3 | 33 | 36 | 37 | 39 | 40 | 41 |
| 4 | 16 | 16 | 16 | 16 | 16 | 16 |
| 5 | 6 | 6 | 6 | 6 | 6 | 6 |
| 6 | 3 | 3 | 3 | 3 | 3 | 3 |
| **Subordinated debt** | **Recovery ratings of senior secured (%)** | | | | | |
| 1+ | 20 | 20 | 20 | 20 | 20 | 20 |
| 1 | 17 | 17 | 17 | 17 | 17 | 17 |
| 2 | 15 | 15 | 15 | 15 | 15 | 15 |
| 3 | 15 | 15 | 15 | 15 | 15 | 15 |
| 4 | 8 | 8 | 8 | 8 | 8 | 8 |
| 5 | 3 | 3 | 3 | 3 | 3 | 3 |
| 6 | 1 | 1 | 1 | 1 | 1 | 1 |

———————————————

\* As of the Closing Date.

In all recovery rate tables above, Note rating categories below "AAA" include rating subcategories (for example, the "AA" column also applies to Notes rated "AA+" and "AA-").

***S&P Unrated DIP Loan***: A DIP Loan acquired by the Issuer that does not have a rating assigned by S&P and for which the Servicer has commenced the process of having a rating assigned by S&P (as specified in the definition of "DIP Loan").

***S&P Weighted Average Recovery Rate***: means, as of any Measurement Date, the number, expressed as a percentage, obtained for each Class of Notes according to the rating assigned to such Class of Notes by Standard & Poor's by:

(a)     summing the products obtained by multiplying the Principal Balance of each Collateral Obligation by its respective S&P Recovery Rate;

(b)     dividing the sum determined pursuant to clause (i) above by the sum of the Aggregate Principal Balance of all Collateral Obligations; and

(c)     rounding up to the first decimal place.

***Sale***: The meaning specified in Section 5.17.

***Sale Proceeds***: All proceeds received (including any proceeds received with respect to any associated interest rate swap or security providing fixed annuity payments ) with respect to Collateral Obligations or other Pledged Obligations as a result of their sales or other dispositions less any reasonable expenses expended by the Servicer or the Trustee in connection with the sales or other dispositions, which shall be paid from such proceeds notwithstanding their characterization otherwise as Administrative Expenses.

***Schedule of Collateral Obligations***: The Collateral Obligations listed on Schedule 1, which schedule shall include with respect to each listed Collateral Obligation:

(A)     the name of the obligor and a unique Loan or other instrument identifier;

(B)     the purchase price;

(C)     the Principal Balance;

(D)     the classification (including whether the Collateral Obligation is a Loan, a High-Yield Bond, a Synthetic Security, a Participation, a Structured Finance Obligation, a Revolving Loan or a Delayed Drawdown Loan);

(E)     the funded amount (stated as a percentage) in respect of a Collateral Obligation that is a Revolving Loan or a Delayed Drawdown Loan;

(F)     the coupon or spread (as applicable);

(G)     the Stated Maturity;

(H)     the Moody's Rating;

(I)     the S&P Rating; and

(J)     the CUSIP and any ISIN, if applicable,

as the schedule may be amended from time to time to reflect the release of Collateral Obligations pursuant to Section 10 and the inclusion of Collateral Obligations as provided in Section 12.2.

***Scheduled Preference Shares Redemption Date***:  November 1, 2021.

***Second Lien Loan***:  A Loan that (i) is not (and cannot by its terms become) subordinated in right of payment to any other obligation of the obligor of the Loan other than a Senior Secured Loan with respect to the liquidation of such obligor or the collateral for such Loan, (ii) is secured by a valid second priority perfected security interest in or lien on specified collateral securing the obligor's obligations under the Loan, which specified collateral does not consist solely of common stock or shares issued by the obligor or any of its Affiliates or intangible assets and (iii) if such Loan does not have an S&P Recovery Rate assigned as part of a credit estimate, so long as such credit estimate is in effect, then, solely for purposes of determining the S&P Recovery Rate for such Loan, in the Servicer's commercially reasonable judgment (with such judgment being made in good faith by the Servicer at the time of such Loan's purchase), the specified collateral for such Loan has a value not less than the outstanding Principal Amount of all debt senior to such Loan plus the S&P Recovery Rate applicable to such Loan, which value may be derived from, among other things, the enterprise value of the issuer of such Loans (**provided** that the provisions of the clause (iii) may be amended at any time, subject to Rating Confirmation from S&P, or in order to conform to S&P's then-current criteria for such Loans).

***Secondary Risk Counterparty***:  Any Participating Institution and any Securities Lending Counterparty.

***Secondary Risk Table***:  With respect to Moody's, the table below:

| Long-Term Senior Unsecured Debt Rating of Secondary Risk Counterparty | Individual Counterparty Limit | Aggregate Counterparty Limit |
|---|---|---|
| Aaa or below | 20.0% | 20.0% |
| Aa1 or below | 10.0% | 10.0% |
| Aa2 or below | 10.0% | 10.0% |

| | | |
|---|---|---|
| Aa3 or below | 10.0% | 10.0% |
| A1 or below | 5.0% | 10.0% |
| A2 or below | 0.0% | 0.0% |

With respect to S&P, the table below:

| Long-Term Senior Unsecured Debt Rating of Secondary Risk Counterparty | Individual Counterparty Limit | Aggregate Counterparty Limit |
|---|---|---|
| AAA | 20.0% | 20.0% |
| AA+/AA/AA- | 10.0% | 20.0% |
| A+ | 5.0% | 20.0% |
| A or below | 0.0% | 0.0% |

If any Secondary Risk Counterparty's long-term senior unsecured debt rating or short-term rating is on credit watch for possible downgrade by Moody's or S&P, then for the purposes of the table above, its rating by the Rating Agency putting its rating on credit watch shall be one rating notch lower for that Rating Agency.

*Section 3(c)(7)*:  Section 3(c)(7) of the Investment Company Act.

*Section 3(c)(7) Reminder Notice*:  A notice from the Issuer to the Noteholders (to be delivered in accordance with Sections 10.6(a) and (b)) substantially in the form of Exhibit G-1.

*Secured High-Yield Bond*:  A High-Yield Bond that is secured by a valid and perfected security interest in specified collateral.

*Secured Loan*:  A Loan that is secured by a valid and perfected security interest in specified collateral.

*Secured Obligations*:  The meaning specified in the Granting Clauses.

*Secured Parties*:  The meaning specified in the Granting Clauses.

*Securities*:  The Notes and the Preference Shares.

*Securities Account*: The meaning specified in Section 8-501(a) of the UCC.

*Securities Act*:  The United States Securities Act of 1933, as amended.

*Securities Intermediary*:  Any clearing corporation or any Person, including a bank or broker, that in the ordinary course of its business maintains Securities Accounts for others and is acting in that capacity.

***Securities Lending Account***:  The Securities Account established pursuant to Section 10.3(f).

***Securities Lending Agreements***:  The meaning specified in Section 7.18.

***Securities Lending Collateral***:  The meaning specified in Section 7.18.

***Securities Lending Counterparty***:  The meaning specified in Section 7.18.

***Security Entitlement***:  The meaning specified in Section 8-102(a)(17) of the UCC.

***Selected Collateral Quality Tests***:  The Weighted Average Moody's Recovery Rate Test, the Weighted Average Fixed Rate Coupon Test, the Weighted Average Spread Test, the Weighted Average Life Test (after taking into consideration any applicable Maturity Extension), the Weighted Average Rating Factor Test and the Diversity Test.

***Senior Secured High-Yield Bond***:  A Secured High-Yield Bond that is not subordinated by its terms to indebtedness of the borrower for borrowed money, trade claims, capitalized leases, or other similar obligations, with a first priority security interest in collateral that in the opinion of the Servicer has value at least equal to the amount of the High-Yield Bond.

***Senior Secured Loan***:  A Secured Loan that is not subordinated by its terms to indebtedness of the borrower for borrowed money, trade claims, capitalized leases, or other similar obligations, with a valid and perfected first priority security interest in collateral that in the opinion of the Servicer has value at least equal to the amount of the Loan **plus** the aggregate outstanding balances of all other loans of equal or higher seniority secured by the same collateral and that is not a DIP Loan.

***Senior Servicing Fee***:  A fee that accrues from the Closing Date payable to the Servicer in arrears on each Payment Date equal to 0.30% *per annum* of the Maximum Amount if and to the extent funds are available for that purpose in accordance with the Priority of Payments.  The Senior Servicing Fee shall be calculated on the basis of a 360-day year consisting of twelve 30-day months.

***Senior Unsecured High-Yield Bond***:  A High-Yield Bond that is not (i) subordinated by its terms to indebtedness of the borrower for borrowed money and (ii) secured by a valid and perfected security interest in collateral.

***Senior Unsecured Loan***:  A Loan that is not a Senior Secured Loan and is not (i) subordinated by its terms to indebtedness of the borrower for borrowed money and (ii) secured by a valid and perfected security interest in collateral.

***Servicer***:  Highland Capital Management, L.P., and any successor Servicer pursuant to the Servicing Agreement.

***Servicing Agreement***:  The Servicing Agreement, dated as of the Closing Date, between the Issuer and the Servicer, as modified, amended, and supplemented and in effect from time to time.

***Servicing Fee Portion***:  100% **minus** a percentage (between 0% and 100%) selected by the Servicer in its sole discretion and reported to the Trustee in writing on or before the related Determination Date, **provided** that, with respect to the Payment Date in May 2008, such percentage shall, at a minimum, include amounts that would otherwise constitute a portion (representing the Class II Preference Share Percentage) of the Servicing Fees that have accrued from the Closing Date to February 3, 2008.

***Servicing Fees***:  Collectively, the Senior Servicing Fee, the Subordinated Servicing Fee and the Supplemental Servicing Fee.

***Share Trustee***:  Maples Finance Limited.

***Share Registrar***:  Maples Finance Limited or any successor thereto.

***Special Redemption***:  The meaning specified in Section 9.5.

***Special Redemption Amount***:  The meaning specified in Section 9.5.

***Special Redemption Date***:  The meaning specified in Section 9.5.

***Spread Excess***:  As of any Measurement Date, a fraction whose:

(i)     numerator is the product of:

    (A)     the greater of zero and the excess of the Weighted Average Spread for the Measurement Date over the Minimum Weighted Average Spread specified in the applicable row of the Ratings Matrix, and

    (B)     the Aggregate Principal Balance of all Floating Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date, and

(ii)     denominator is the Aggregate Principal Balance of all Fixed Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date.

In computing the Spread Excess on any Measurement Date, the Weighted Average Spread for the Measurement Date will be computed as if the Fixed Rate Excess were equal to zero.

***Stated Maturity***:  With respect to any Collateral Obligation, the maturity date specified in it or the applicable Underlying Instrument (or, if earlier, the first date on which any Person may be required by the Issuer to repurchase the entire principal amount of the

Collateral Obligation at or above par) and with respect to the Notes of any Class, November 1, 2021 or, upon a Maturity Extension (if any), the applicable Extended Stated Maturity Date. Unless otherwise specified, "Stated Maturity" means the Stated Maturity of the Notes.

***Structured Finance Obligation***: Any obligation (other than the Notes or any other security or obligation issued by the Issuer):

(i)    secured directly by, referenced to, or representing ownership of, a pool of receivables or other assets of U.S. obligors, or obligors organized or incorporated in Moody's Group I Countries, Moody's Group II Countries, Moody's Group III Countries or Tax Advantaged Jurisdictions, including portfolio credit default swaps and collateralized debt obligations, but excludes:

   (A)    asset-backed securities;

   (B)    collateralized debt obligations backed by Emerging Market Securities;

   (C)    collateralized debt obligations primarily backed by asset-backed securities;

   (D)    market value collateralized debt obligations;

   (E)    securities backed by "future flow" receivables;

   (F)    securities backed by "trust preferred securities;"

   (G)    net interest margin securitizations;

   (H)    collateralized debt obligations a significant portion of which are backed by bonds; and

   (I)    obligations secured directly by, referenced to, or representing ownership of, a pool of receivables or other assets where the obligors with respect to such receivables or other assets are non-corporate credit risks; provided that, for the avoidance of doubt, collateralized loan obligations shall not be excluded by this clause (I);

(ii)    that has an S&P Rating;

(iii)    that has a rating and a Moody's Priority Category Recovery Rate assigned by Moody's; and

(iv)    whose ownership or disposition (without regard to the Issuer's other activities) by the Issuer will not cause the Issuer to be treated as engaged in a U.S. trade or business for United States federal income tax purposes or otherwise subject the Issuer to net income taxes.

In connection with the purchase of a Structured Finance Obligation, the Servicer shall obtain from Moody's the applicable Moody's Priority Category Recovery Rate.

For purposes of the Diversity Test, multiple Structured Finance Obligations from CDOs serviced by the same Servicer or multiple Structured Finance Obligations issued by the same master trust will be considered to be obligations of one issuer.

*Subordinated High-Yield Bond*:  A Secured High-Yield Bond secured by a second (or lower) priority security interest in the relevant collateral.

*Subordinated Lien Loan*:  A Secured Loan (other than a Second Lien Loan) secured by a second (or lower) priority security interest in the relevant collateral.

*Subordinated Servicing Fee*:  An amount equal to the sum of (i) a fee that accrues from the Closing Date payable to the Servicer in arrears on each Payment Date equal to 0.25% per annum of the Maximum Amount if and to the extent funds are available for that purpose in accordance with the Priority of Payments and (ii) on any Payment Date that any part of the Subordinated Servicing Fee was not paid on the preceding Payment Date, an amount equal to interest on such unpaid amount at a rate of LIBOR for the applicable period **plus** 3.00% per annum. The portion of the Subordinated Servicing Fee in clauses (i) and (ii) above, as applicable, shall be calculated on the basis of a 360-day year consisting of twelve 30-day months.

*Successor Entity*:  The meaning specified in Section 7.10.

*Super Majority*:  With respect to any Class or group of Notes or Preference Shares, the Holders of more than 66⅔% of the Aggregate Outstanding Amount of that Class or group of Notes or Preference Shares, as the case may be.

*Supplemental Servicing Fee*:  On each Payment Date, the fee payable to the Servicer in an amount equal to: (i) 20% of the remaining Interest Proceeds, if any, available after making the distributions on such Payment Date pursuant to Section 11.1(a)(i)(23) of the Priority of Payments and (ii) 20% of the remaining Principal Proceeds, if any, available for payment in respect of the Supplemental Servicing Fee pursuant to Section 11.1(a)(ii)(C)(11)(A) of the Priority of Payments and, if applicable, Section 11.1(a)(ii)(C)(14) of the Priority of Payments.

*Synthetic Letter of Credit*: An obligation that is a synthetic or pre-funded letter of credit or includes or supports a letter of credit.

*Synthetic Security*:  Any swap transaction (including any LCDS Security), structured bond, credit linked note or other derivative financial instrument providing non-leveraged credit exposure to a debt instrument (but excluding any such instrument relating directly to a basket or portfolio of debt instruments) or an index or indices (such as the "SAMI" index published by Credit Suisse Securities (USA) LLC) in connection with a basket or portfolio of debt instruments or other similar instruments entered into by the Issuer with a

Synthetic Security Counterparty that has in the Servicer's commercially reasonable judgment, equivalent expected loss characteristics (those characteristics, ***credit risk***) to those of the related Reference Obligations (taking account of those considerations as they relate to the Synthetic Security Counterparty), if (i) it is either a Form-Approved Synthetic Security or the Rating Condition for each Rating Agency is satisfied, and (ii) the Reference Obligations thereof have a Market Value equal to at least 85% of the Principal Balance of the Reference Obligation at the time the Synthetic Security is entered into.

Each Synthetic Security that is a credit default swap the Reference Obligation of which are Loans shall require each such Reference Obligation to be denominated and payable in U.S. Dollars.

The maturity, interest rate, and other non-credit characteristics of a Synthetic Security may be different from the Reference Obligations to which the credit risk of the Synthetic Security relates.

No Synthetic Security shall result in the Issuer being a "buyer" of credit protection.

The term Synthetic Security shall not include any Structured Finance Obligation or any Participation, but the Reference Obligation of a Synthetic Security may be a Structured Finance Obligation.

Each Synthetic Security Agreement shall contain appropriate limited recourse and non-petition provisions (to the extent the Issuer has contractual payment obligations to the Synthetic Security Counterparty) equivalent (*mutatis mutandis*) to those contained in this Indenture.

The ownership or disposition of any Synthetic Security (without regard to the Issuer's other activities) must not cause the Issuer to be treated as engaged in a U.S. trade or business for United States federal income tax purposes or otherwise subject the Issuer to net income taxes.

Unless the Rating Condition is otherwise satisfied, any "deliverable obligation" that may be delivered to the Issuer as a result of the occurrence of any "credit event" under any proposed Synthetic Security must not provide that its transfer to the Issuer is subject to obtaining any consents and must qualify (when the Issuer purchases the related Synthetic Security and when such "deliverable obligation" is delivered to the Issuer as a result of the occurrence of any "credit event") as a Collateral Obligation and satisfy the Concentration Limitations under this Indenture, except that such "deliverable obligation" may constitute a Defaulted Collateral Obligation when delivered upon a "credit event" and if the Reference Obligation of the Synthetic Security is a Senior Secured Loan then the "deliverable obligation" under the Synthetic Security must also be a Senior Secured Loan.

No Synthetic Security may provide for any event other than bankruptcy or a failure to pay as a "credit event."

No Synthetic Security shall provide for termination by the Synthetic Security Counterparty at any time (i) after a declaration of acceleration of Maturity of the Notes has been made upon the occurrence of an Event of Default, unless such declaration and its consequences may no longer be rescinded and annulled in accordance with Section 5.2(c) and liquidation of the Collateral has begun or (ii) upon an Optional Redemption, unless the third Business Day before the scheduled Redemption Date has passed and no notice of withdrawal has been issued.

For purposes of the Coverage Tests and the Retention Overcollateralization Test, unless the Rating Condition for each Rating Agency is satisfied in respect of any proposed alternative treatment, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not of the related Reference Obligations.

For purposes of the Collateral Quality Tests (other than the Diversity Test and the S&P Industry Classification with respect to the S&P CDO Monitor Test), a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not of the related Reference Obligations.

For purposes of calculating compliance with the Concentration Limitations other than limits relating to payment characteristics, and all related definitions, unless otherwise specified in this Indenture or by the Rating Agencies, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of its Reference Obligations and not the Synthetic Security. For purposes of calculating compliance with the Concentration Limitations relating to payment characteristics, and all related definitions, unless otherwise specified in this Indenture or by the Rating Agencies, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not its Reference Obligation.

With respect to a Synthetic Security based upon or relating to a senior secured index providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time, for purposes of: (i) calculating compliance with the Diversity Test, the S&P Industry Classification with respect to the S&P CDO Monitor Test, and the Concentration Limitations (other than limits relating to payment characteristics and except for clauses (17) and (17)(a) of the definition of "Concentration Limitations"), and all related definitions, and (ii) any other provision or definition of this Indenture involving a determination with respect to a Reference Obligation, the characteristics of such Reference Obligations shall be determined by treating such Synthetic Security as a direct interest of the Issuer in each such Reference Obligation in an amount equal to the Allocable Principal Balance of such Reference Obligation. In addition, each Reference Obligation under such Synthetic Security shall be assigned a Moody's Rating Factor

equal to the sum of the Moody's Rating Factor of (i) the related Reference Obligor, (ii) the Synthetic Security Counterparty of such Synthetic Security and (iii) the Synthetic Security Collateral of such Synthetic Security. In addition, the Moody's Priority Category Rate in respect of a Synthetic Security referencing multiple Reference Obligations pursuant to this paragraph shall be the Moody's Priority Category Rate as assigned by Moody's to each Reference Obligation underlying such Synthetic Security. For the avoidance of doubt, Reference Obligations upon which a Synthetic Security is based as described in this paragraph must meet the definition of "Collateral Obligation" to the extent provided in this definition.

If the Rating Condition must be satisfied to execute the purchase of any Synthetic Security, the Servicer, on behalf of the Issuer, shall give each applicable Rating Agency not less than five days' prior notice of the purchase of or entry into any Synthetic Security.

*Synthetic Security Agreement*:  The documentation governing any Synthetic Security.

*Synthetic Security Collateral*:  With respect to any Synthetic Security, amounts posted to the Synthetic Security Collateral Account by the Synthetic Security Counterparty in support of its obligations under the Synthetic Security, including (i) all Eligible Investments that mature no later than the Stated Maturity or (ii) floating rate credit card securitizations that are rated "Aaa" by Moody's and "AAA" by S&P, (that mature no later than the Stated Maturity) in the Synthetic Security Collateral Account that are purchased with Synthetic Security Collateral; provided that any amounts described in clause (ii) above shall be hedged by a guaranteed investment contract or a total return swap which shall be subject to Rating Confirmation by S&P.

*Synthetic Security Collateral Account*:  The Securities Account established pursuant to Section 10.3(e).

*Synthetic Security Counterparty*:  An entity required to make payments on a Synthetic Security to the extent that a Reference Obligor makes payments on a related Reference Obligation.

*Synthetic Security Counterparty Account*:  The Securities Account established pursuant to Section 10.5.

*Synthetic Security Reserve Account*:  The Securities Account established pursuant to Section 10.3(k).

*Tax Advantaged Jurisdiction*:  One of the Cayman Islands, Bermuda, the Netherlands Antilles or the tax advantaged jurisdiction of the Channel Islands, or such other jurisdiction that the Rating Condition with respect to each Rating Agency is satisfied with respect thereto; **provided** that any Tax Advantaged Jurisdiction that is the jurisdiction of organization of an obligor of a Collateral Obligation other than obligors that are special purpose vehicles or issuers of Structured Finance Obligations shall have a Moody's

foreign currency rating of at least "Aa2" and a S&P foreign currency rating of at least "AA-".

***Tax Event***: An event that occurs if:

(i)      (A) one or more Collateral Obligations that were not subject to withholding tax when the Issuer committed to purchase them have become subject to withholding tax (***New Withholding Tax Obligations***) (other than a withholding tax on fees received with respect to a letter of credit) or the rate of withholding has increased on one or more Collateral Obligations that were subject to withholding tax when the Issuer committed to purchase them (***Increased Rate Withholding Tax Obligations***) and (B) in any Due Period, the aggregate of the payments subject to withholding tax on New Withholding Tax Obligations and the increase in payments subject to withholding tax on Increased Rate Withholding Tax Obligations, in each case to the extent not "grossed-up" (on an after-tax basis) by the related obligor, represent 5% or more of Interest Proceeds for the Due Period;

(ii)     taxes, fees, assessments, or other similar charges are imposed on the Issuer or the Co-Issuer in an aggregate amount in any twelve-month period in excess of U.S.$2,000,000, other than any deduction or withholding for or on account of any tax with respect to any payment owing in respect of any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation; or

(iii)    if the Issuer is at the time treated as a pass-through entity for U.S. federal income tax purposes, investors in the Preference Shares who are non-U.S. Persons not otherwise subject to U.S. net income tax are or have become subject to U.S. net income taxation in respect of income of the Issuer in an amount in excess of 10% of the net income of the Issuer in any twelve-month period.

***Tax Opinion of Counsel***: A written opinion addressed to the Issuer (a copy of which will be provided to the Trustee) and, if requested, each Rating Agency that has made such request, in form and substance reasonably satisfactory to the Trustee and each Rating Agency, issued by a nationally recognized law firm reasonably satisfactory to the Trustee, which law firm is experienced in the relevant areas of tax law, and which law firm may be counsel for the Servicer or the Issuer.

***Transaction Reports***: The meaning specified in Section 14.4.

***Transfer Agent***: The Person or Persons, which may be the Issuer, authorized by the Issuer to exchange or register the transfer of Notes.

***Transferee Certificate***: A certificate substantially in the form of Exhibit B-1, duly completed as appropriate.

***Treasury Regulations***: The regulations, including proposed or temporary regulations, promulgated under the Code. References herein to specific provisions of proposed or temporary regulations shall include analogous provisions of final Treasury Regulations or other successor Treasury Regulations.

***Trust Officer***: When used with respect to the Trustee, any officer in the Corporate Trust Office (or any successor group of the Trustee) including any director, vice president, assistant vice president, associate, or any other officer of the Trustee customarily performing functions similar to those performed by such officers in the Corporate Trust Office, or to whom any corporate trust matter is referred at the Corporate Trust Office because of his knowledge of and familiarity with the particular subject and having direct responsibility for the administration of this Indenture.

***Trustee***: As defined in the first sentence of this Indenture.

***UCC***: The Uniform Commercial Code as in effect in the State of New York, and as amended from time to time.

***Uncertificated Security***: The meaning specified in Section 8-102(a)(18) of the UCC.

***Underlying Instrument***: The loan agreement, indenture, credit agreement, or other agreement pursuant to which a Pledged Obligation has been issued or created and each other agreement that governs the terms of or secures the obligations represented by the Pledged Obligation or of which the holders of the Pledged Obligation are the beneficiaries.

***Unfunded Amount***: With respect to any Revolving Loan or any Delayed Drawdown Loan at any time, the excess, if any, of (a) the commitment amount thereof over (b) the Funded Amount thereof.

***Unfunded Synthetic Security***: A Synthetic Security with respect to which the Issuer has an obligation to make payments after it acquires such Synthetic Security.

***Unregistered Securities***: The meaning specified in Section 5.17(c).

***Unscheduled Principal Payments***: Any principal payments received with respect to a Collateral Obligation as a result of optional redemptions, exchange offers, tender offers, other payments or prepayments made at the option of the issuer thereof or that are otherwise not scheduled to be made thereunder.

***Valuation Report***: The meaning specified in Section 10.6(b).

***Weighted Average Fixed Rate Coupon***: As of any Measurement Date, the rate obtained by:

(i)     multiplying the Principal Balance of each Collateral Obligation that is a Fixed Rate Obligation held by the Issuer as of the Measurement Date by the current per

annum rate at which it pays interest (other than, with respect to Collateral Obligations that are not PIK Securities, any interest that is not required to be paid in Cash and may be deferred), using only the effective after-tax interest rate determined by the Servicer on any Fixed Rate Obligation after taking into account any withholding tax or other deductions on account of tax of any jurisdiction and any gross-up paid by the obligor);

(ii)     summing the amounts determined pursuant to clause (i);

(iii)    dividing the sum by the Aggregate Principal Balance of all Collateral Obligations that are Fixed Rate Obligations held by the Issuer as of the Measurement Date; and

(iv)    if the result obtained in clause (iii) is less than the minimum percentage rate specified to satisfy the Weighted Average Fixed Rate Coupon Test, adding to the sum the amount of any Spread Excess as of the Measurement Date, but only to the extent required to satisfy the Weighted Average Fixed Rate Coupon Test.

***Weighted Average Fixed Rate Coupon Test***:  A test that is satisfied if, as of any Measurement Date, the Weighted Average Fixed Rate Coupon equals or exceeds 7.5%.

***Weighted Average Life***:  As of any Measurement Date, the number obtained by

(i)     summing the products obtained by multiplying

(A)     the Average Life at that time of each Collateral Obligation by

(B)     the Principal Balance at that time of the Collateral Obligation and

(ii)    dividing that sum by the Aggregate Principal Balance at that time of all Collateral Obligations.

***Weighted Average Life Test***:  A test that is satisfied as of any Measurement Date if the Weighted Average Life on that date of all Collateral Obligations is equal to or less than the greater of (a) the number of years (including any fraction of a year) between such Measurement Date and November 1, 2017 or, in the case of a Maturity Extension, the Extended Weighted Average Life Date and (b) 3.0 years.

***Weighted Average Moody's Rating Factor***:  The summation of the products obtained by multiplying the Principal Balance of each Collateral Obligation (excluding Eligible Investments) by its respective Moody's Rating Factor, dividing that sum by the Aggregate Principal Balance of all Collateral Obligations (excluding Eligible Investments) and rounding the result up to the nearest whole number.

***Weighted Average Moody's Recovery Rate Test***:  A test that is satisfied as of any Measurement Date if the Moody's Weighted Average Recovery Rate is greater than or equal to 43.6 %.

***Weighted Average Rating Factor Test***: A test that is satisfied as of any Measurement Date if the Weighted Average Moody's Rating Factor of the Collateral Obligations (excluding Eligible Investments) as of such Measurement Date is less than or equal to (x) the Maximum Weighted Average Moody's Rating Factor **plus** (y) the Moody's Weighted Average Rating Factor Recovery Rate Modifier.

***Weighted Average Spread***: As of any Measurement Date, a rate obtained by:

(i)    **multiplying** the Principal Balance of each Collateral Obligation that is a Floating Rate Obligation held by the Issuer as of the Measurement Date by the current per annum contract spread at which it pays interest (which (w) for PIK Securities for which interest has been deferred or capitalized, will be deemed to be zero, (x) for Collateral Obligations that would be PIK Securities but for the proviso in the definition thereof, will be deemed to be equal to the effective rate of PIK Cash-Pay Interest applicable thereto, (y) for any Revolving Loan or Delayed Draw Loan, will be the per annum contract spread for the Funded Amount thereof and the rate of the commitment fee and such other fees payable to the Issuer for any Unfunded Amount thereof, and (z) for any Synthetic Letter of Credit, will be the all-in rate (including any fees (net of any taxes required to be paid by the Issuer under this Indenture) payable to the Issuer by the underlying obligor **minus** the applicable LIBOR, calculated net of any taxes that could be, or have been, withheld in respect thereof (unless the payer is obligated to indemnify the Issuer for any taxes so withheld) determined with respect to any Floating Rate Obligation that does not bear interest based on a London interbank offered rate, by expressing the current interest rate on the Floating Rate Obligation as a spread above a three month London interbank offered rate calculated in a manner consistent with the calculation of LIBOR;

(ii)   **summing** the amounts determined pursuant to clause (i);

(iii)  **dividing** that sum **by** the Aggregate Principal Balance of all Floating Rate Obligations held by the Issuer as of the Measurement Date; and

(iv)   if the result obtained in clause (iii) is less than the minimum percentage rate specified to pass the Weighted Average Spread Test, **adding** to that sum the amount of Fixed Rate Excess as of the Measurement Date.

***Weighted Average Spread Test***: A test that is satisfied as of any Measurement Date if the Weighted Average Spread as of the Measurement Date equals or exceeds (x) the Minimum Weighted Average Spread **minus** (y) the Moody's Weighted Average Spread Recovery Modifier.

***Workout Assets***: A Loan, High-Yield Bond, or Qualified Equity Security acquired in connection with the workout or restructuring of any Collateral Obligation that the Issuer does not advance any funds to purchase that does not qualify as a Collateral Obligation.

***Written-Down Obligation***:  As of any date of determination, any Structured Finance Obligation as to which the Issuer or the Servicer, on behalf of the Issuer, has been notified by the issuer of the Structured Finance Obligation that the Aggregate Principal Balance of the Structured Finance Obligation and all other Structured Finance Obligations secured by the same pool of collateral that rank *pari passu* with or senior in priority of payment to the Structured Finance Obligation exceeds the aggregate principal balance (including reserved interest or other amounts available for overcollateralization) of all collateral securing the Structured Finance Obligation and such other *pari passu* and senior Structured Finance Obligations (excluding defaulted collateral).

***Zero-Coupon Security***:  A security that, at the time of determination, does not make periodic payments of interest.  A Zero-Coupon Security shall not include a security that is a PIK Security.

## 1.2    Assumptions as to Pledged Obligations; Construction Conventions

This Section 1.2 shall be applied in connection with all calculations required to be made pursuant to this Indenture:

- with respect to the scheduled payment of principal or interest on any Pledged Obligation, or any payments on any other assets included in the Collateral,

- with respect to the sale of and acquisition of Collateral Obligations,

- with respect to the income that can be earned on the scheduled payment of principal or interest on the Pledged Obligations and on any other amounts that may be received for deposit in the Collection Account, and

- with respect to the treatment of Collateral Obligations loaned pursuant to a Securities Lending Agreement.

The provisions of this Section 1.2 shall be applicable to any determination or calculation that is covered by this Section 1.2, whether or not reference is specifically made to Section 1.2, unless some other method of calculation or determination is expressly specified in the particular provision.

(a)    All calculations with respect to the scheduled payment of principal or interest on the Pledged Obligations shall be made on the basis of information as to the terms of each Pledged Obligation and on reports of payments received on the Pledged Obligation that are furnished by or on behalf of the issuer of the Pledged Obligation and, to the extent they are not manifestly in error, the information or report may be conclusively relied on in making the calculations.

(b)    For each Due Period and as of any Measurement Date, the scheduled payment of principal or interest on any Pledged Obligation shall be the sum of

    (i)   the total amount of payments and collections reasonably expected to be received during the Due Period in respect of the Pledged Obligation that, if paid as scheduled, will be available for payment on the Notes and of certain expenses of the Issuer and the Co-Issuer in the Collection Account at the end of the Due Period; and

    (ii)  any such amounts received in prior Due Periods that were not disbursed on a previous Payment Date.

Except as provided in paragraph (h) below, a Non-Performing Collateral Obligation shall be assumed to have a scheduled payment of principal and interest of zero.

The total amount of payments and collections reasonably expected to be received includes the proceeds of the sale of the Pledged Obligation received and, in the case of sales which have not yet settled, to be received during the Due Period and not used to purchase additional Collateral Obligations (including any related deposit into the Synthetic Security Reserve Account, the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty, Securities Lending Counterparty, or Hedge Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security, Securities Lending Agreement, or Hedge Agreement) or Eligible Investments or retained in the Collection Account for subsequent application thereof to purchase additional Collateral Obligations pursuant to Section 12.2.

(c)    For purposes of the applicable determinations required by Section 12 and the definition of "Interest Coverage Ratio," the expected interest on Collateral Obligations shall be calculated using their then current interest rates.

(d)    With respect to any Collateral Obligation, the date on which it "matures" (or its "maturity" date) shall be the earlier of

    (i)   the stated maturity of the obligation or

    (ii)  if the Issuer has the right to require the issuer or obligor of the Collateral Obligation to purchase, redeem, or retire the Collateral Obligation at a price of at least par on any one or more dates before its Stated Maturity (a "put right") and the Servicer certifies to the Trustee that it will cause the Issuer to direct the Trustee to exercise the put right on a date, the maturity date shall be the date specified in the certification.

(e)    For purposes of calculating compliance with the Collateral Quality Tests (other than the Diversity Test and the S&P Industry Classification with respect to the S&P CDO Monitor Test), the Coverage Tests, and the Retention Overcollateralization Test and all related definitions, unless otherwise specified in this Indenture a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not of the Reference

Obligation. For purposes of calculating compliance with the Concentration Limitations other than limits relating to payment characteristics, and all related definitions, unless otherwise specified in this Indenture or by the Rating Agencies, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of its Reference Obligations and not the Synthetic Security. For purposes of calculating compliance with the Concentration Limitations relating to payment characteristics, and all related definitions, unless otherwise specified in this Indenture or by the Rating Agencies, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not its Reference Obligations.

(f)     Any Collateral Obligation loaned to a Securities Lending Counterparty shall be included in the Collateral Quality Tests, the Coverage Tests, and the Retention Overcollateralization Test and the Principal Balance of any Collateral Obligation loaned to a Securities Lending Counterparty shall be included in the Aggregate Principal Balance of Collateral Obligations, in each case unless an "event of default" (under and as defined in the related Securities Lending Agreement) is continuing.

(g)     If a Class of Notes ceases to be Outstanding, then any Coverage Test computed by reference to the Class of Notes (but not to any subordinate Class of Notes then Outstanding) shall cease to be of any force.

(h)     For purposes of calculating compliance with the Eligibility Criteria (other than the Weighted Average Life Test), at the direction of the Servicer by notice to the Trustee, during the Replacement Period any Eligible Investment representing Principal Proceeds received upon the maturity, redemption, sale, or other disposition of a Collateral Obligation (or, after the Replacement Period, in respect of Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Risk Obligations and Credit Improved Obligations) shall be deemed to have the characteristics of the disposed Collateral Obligation until used to purchase an additional Collateral Obligation. The calculations shall be based on the Principal Balance of the disposed Collateral Obligations except in the case of Defaulted Collateral Obligations and Credit Risk Securities, in which case the calculations will be based on the Principal Proceeds received on the disposition or sale of the Defaulted Collateral Obligation or Credit Risk Obligation.

(i)     The calculation on any Coverage Test on any Determination Date shall be made by giving effect to all payments to be made pursuant to all subclauses of the Priority of Payments as applicable, payable on the Payment Date following such Determination Date. In addition no Principal Proceeds will be used to pay a subordinated Class on a Payment Date if, after giving effect to such payment, any Coverage Test of a more senior Class of Notes is failing on such Payment Date or would fail as a result of such application of the Principal Proceeds on such Payment Date.

### 1.3 Rules of Interpretation

Except as otherwise expressly provided in this Indenture or unless the context clearly requires otherwise:

(a)      Defined terms include, as appropriate, all genders and the plural as well as the singular.

(b)      References to designated articles, sections, subsections, exhibits, and other subdivisions of this Indenture, such as "Section 6.13 (a)", refer to the designated article, section, subsection, exhibit, or other subdivision of this Indenture as a whole and to all subdivisions of the designated article, section, subsection, exhibit, or other subdivision. The words "herein", "hereof", "hereto", "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular article, section, exhibit, or other subdivision of this Indenture.

(c)      Any term that relates to a document or a statute, rule, or regulation includes any amendments, modifications, supplements, or any other changes that may have occurred since the document, statute, rule, or regulation came into being, including changes that occur after the date of this Indenture. References to law are not limited to statutes. Any reference to any Person includes references to its successors and assigns.

(d)      Any party may execute any of the requirements under this Indenture either directly or through others, and the right to cause something to be done rather than doing it directly shall be implicit in every requirement under this Indenture. Unless a provision is restricted as to time or limited as to frequency, all provisions under this Indenture are implicitly available and things may happen from time to time.

(e)      The term "including" and all its variations mean "including but not limited to." Except when used in conjunction with the word "either", the word "or" is always used inclusively (for example, the phrase "A or B" means "A or B or both", not "either A or B but not both").

(f)      A reference to "a thing" or "any of a thing" does not imply the existence or occurrence of the thing referred to even though not followed by "if any", and "any of a thing" is any and all of it. A reference to the plural of anything as to which there could be either one or more than one does not imply the existence of more than one (for instance, the phrase "the obligors on a note" means "the obligor or obligors on a note"). "Until something occurs" does not imply that it must occur, and will not be modified by the word "unless." The word "due" and the word "payable" are each used in the sense that the stated time for payment has passed. The word "accrued" is used in its accounting sense, i.e., an amount paid is no longer accrued. In the calculation of amounts of things, differences and sums may generally result in negative numbers, but when the calculation of the excess of

one thing over another results in zero or a negative number, the calculation is disregarded and an "excess" does not exist. Portions of things may be expressed as fractions or percentages interchangeably. The word "shall" is used in its imperative sense, as for instance meaning a party agrees to something or something must occur or exist.

(g)     All accounting terms used in an accounting context and not otherwise defined, and accounting terms partly defined in this Indenture, to the extent not completely defined, shall be construed in accordance with generally accepted accounting principles. To the extent that the definitions of accounting terms in this Indenture are inconsistent with their meanings under generally accepted accounting principles, the definitions contained in this Indenture shall control.

(h)     In the computation of a period of time from a specified date to a later specified date or an open-ended period, the words "from" and "beginning" mean "from and including", the word "after" means "from but excluding," the words "to" and "until" mean "to but excluding", and the word "through" means "to and including." Likewise, in setting deadlines or other periods, "by" means "on or before." The words "preceding", "following", "before", "after", "next" and words of similar import, mean immediately preceding or following. References to a month or a year refer to calendar months and calendar years.

(i)     Any reference to the enforceability of any agreement against a party means that it is enforceable against the party in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, and other similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(j)     Except when only the registered Holder is recognized, such as in Section 2.9., references to Noteholders, Holders, and the like refer equally to beneficial owners who have an interest in a Note but are not reflected in the Indenture Register as the owner.

## 2.     THE NOTES

## 2.1     Forms Generally

The Notes and the Trustee's or Authenticating Agent's certificate of authentication on them (the **Certificate of Authentication**) shall be in substantially the forms required by this Section, with appropriate insertions, omissions, substitutions, and other variations required or permitted by this Indenture, and may have any letters, numbers, or other marks of identification and any legends or endorsements on them that are consistent with this Indenture, as determined by the Authorized Officers of the Issuer executing the Notes as evidenced by their execution of the Notes.

**2.2**    **Forms of Notes and Certificate of Authentication**

(a)    The Notes, including the Regulation S Global Notes, Rule 144A Global Notes and Certificate of Authentication, shall be in the forms of the applicable portion of Exhibit A.

(b)    **Regulation S Global Notes.** The Notes of each Class sold to non-U.S. persons in off-shore transactions in reliance on Regulation S shall each be represented by one or more global notes in definitive, fully registered form without interest coupons substantially in the form of the applicable portion of Exhibit A, including legends (the ***Regulation S Global Notes***). The global notes shall be deposited on behalf of the subscribers for the Notes represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, the Depository for the respective accounts of Euroclear and Clearstream, duly executed by the Applicable Issuers and authenticated by the Trustee as hereinafter provided. The aggregate principal amount of the Regulation S Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee or the Depository or its nominee, as the case may be, as hereinafter provided. As used above and in subsection (d) below, "U.S. person" and "off-shore transaction" have the meanings assigned to them in Regulation S.

(c)    **Rule 144A Global Notes.** The Notes of each Class initially sold to U.S. persons that are Qualified Institutional Buyers and Qualified Purchasers shall each be issued initially in the form of one permanent global note per Class in definitive, fully registered form without interest coupons substantially in the form of the applicable portion of Exhibit A, including legends (each, a ***Rule 144A Global Note***), which shall be deposited on behalf of the subscribers for the Notes represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, the Depository, duly executed by the Applicable Issuers and authenticated by the Trustee as hereinafter provided. The aggregate principal amount of the Rule 144A Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee or the Depository or its nominee, as the case may be, as hereinafter provided.

(d)    **Book-Entry Provisions.** This Section 2.2(d) shall apply only to Global Notes deposited with or on behalf of the Depository. The "Operating Procedures of the Euroclear System" of Euroclear and the "Terms and Conditions Governing Use of Participants" of Clearstream, respectively, shall be applicable to the Regulation S Global Notes insofar as interests in the Global Notes are held by the Agent Members of Euroclear or Clearstream, as the case may be.

Agent Members shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Trustee, as custodian for the Depository and the Depository may be treated by the Co-Issuers, the Trustee, and any agent of the Co-Issuers or the Trustee as the absolute owner of the Note for all purposes whatsoever. Notwithstanding the foregoing, nothing in this Indenture shall

prevent the Co-Issuers, the Trustee, or any agent of the Co-Issuers or the Trustee, from giving effect to any written certification, proxy, or other authorization furnished by the Depository or impair, as between the Depository and its Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Note.

**2.3    Authorized Amount; Denominations**

(a)    The aggregate principal amount of Notes that may be authenticated and delivered under this Indenture is limited to U.S.$637,000,000, except for Notes authenticated and delivered upon registration of, transfer of, or in exchange for, or in lieu of, other Notes pursuant to Section 2.6, 2.7, or 8.5.

(b)    The Notes shall be divided into the following Classes, having the designations, original principal amounts and other characteristics as follows:

| Class | A-1 | A-2 | B | C | D | E |
|---|---|---|---|---|---|---|
| Original Principal Amount | U.S.$417,200,000 | U.S.$104,300,000 | U.S.$41,300,000 | U.S.$37,100,000 | U.S.$16,100,000 | U.S.$21,000,000 |
| Interest Rate | LIBOR + 0.32% | LIBOR + 0.60% | LIBOR + 1.00% | LIBOR + 2.00% | LIBOR + 3.50% | LIBOR + 4.00% |
| Initial Rating (Moody's/S&P) | Aaa/AAA | Aaa/AAA | Aa2/AA | A2/A | Baa2/BBB | Baa3/BBB- |

(c)    The Notes will be issuable in minimum denominations of U.S.$250,000, and integral multiples of U.S.$1,000 in excess of that amount.

(d)    The Issuer will also issue 17,500 Class I Preference Shares and 45,500 Class II Preference Shares pursuant to the Preference Share Documents, simultaneously with the issuance of the Notes under this Indenture.  At any time during the Replacement Period, the Issuer may issue and sell additional Preference Shares and use the proceeds from such issuance and sale to purchase additional Collateral Obligations or as otherwise permitted under the Preference Share Documents and this Indenture pursuant to Section 6 of the Preference Shares Paying Agency Agreement.  The Preference Shares are not secured by the lien of this Indenture. Any payments made by the Trustee hereunder with respect to the Preference Shares (other than, as and to the extent described herein, the Class II Preference Share Special Payments) will be released by the Trustee to the Preference Shares Paying Agent on each Payment Date in accordance with the Priority of Payments for deposit into the Preference Shares Distribution Account for payment, subject to Cayman Islands law, to Holders of the Preference Shares as dividends or Redemption Price, as applicable.

**2.4     Extension of Replacement Period and Stated Maturity**

(a)     The Issuer, if directed by the Servicer, shall be entitled on each Extension Effective Date to extend the Replacement Period to the applicable Extended Replacement Period End Date up to a maximum of four times if (i) in the case of an Extension Effective Date occurring after the first Extension Effective Date, the Issuer has previously effected a Maturity Extension for each preceding Extension Effective Date in accordance with this Section 2.4 and (ii) the Extension Conditions set forth in Section 2.4(c) are satisfied and the Issuer has given written notice of its election to extend the Replacement Period to the Trustee no later than 60 days and no earlier than 90 days prior to such Extension Effective Date.  If the Extension Conditions are satisfied, the Stated Maturity of the Notes shall be automatically extended to the related Extended Stated Maturity Date and the Weighted Average Life Test shall be automatically extended to the related Extended Weighted Average Life Date, without any requirement for approval or consent of any Holders of Notes or Preference Shares or amendment or supplement to this Indenture or the Preference Share Documents (the ***Maturity Extension***); **provided** that the Issuer will not be permitted to effect more than four Maturity Extensions.

(b)     In the case of a Maturity Extension, any Holder of Securities wishing to sell such Securities to an Extension Qualifying Purchaser pursuant to the Extension Conditions must provide the applicable Extension Sale Notice within the Extension Sale Notice Period pursuant to Section 2.4(d) (such Securities as to which an Extension Sale Notice has been duly given, ***Extension Sale Securities***). Notwithstanding anything to the contrary herein, in connection with an Extension Sale, all, but not part, of the Extension Sale Securities shall be purchased and settled at the applicable Extension Purchase Price on the applicable Extension Effective Date.

(c)     The Maturity Extension shall be effective only if the following conditions (the ***Extension Conditions***) are satisfied:

(i)     the purchase of all Extension Sale Securities has been settled by the designated Extension Qualifying Purchasers at the applicable Extension Purchase Price as of the applicable Extension Effective Date;

(ii)     all such purchases of Extension Sale Securities individually and in the aggregate comply with the applicable transfer restrictions in this Indenture and the Preference Share Documents immediately after such purchase and the legends on such Extension Sale Securities and all applicable law, rules and regulations (including, without limitation, rules, regulations and procedures of any applicable securities exchange, self-regulatory organization or clearing agency);

    (iii)  (a) the Rating Condition has been satisfied with respect to S&P (so long as any Notes are then rated by S&P) and (b) the Rating Condition has been satisfied with respect to Moody's (so long as any Notes are then rated by Moody's);

    (iv)  the Issuer has not effected more than three prior Extensions; and

    (v)  such extension is not effected for the primary purpose of decreasing losses or recognizing gains resulting from market value changes.

The Issuer, the Trustee and, by its acceptance of the Notes, each Noteholder agrees that neither of the Initial Purchasers shall be responsible for causing the Extension Conditions to be satisfied and neither of the Initial Purchasers shall be liable to any such Person or Noteholders (whether or not such Holder gave an Extension Sale Notice with respect to its Notes) or to any other Person if the Extension Conditions are not satisfied. Failure of the Extension Conditions to be satisfied shall not constitute a Default or Event of Default under this Indenture.

(d)    Extension Procedure.

    (i)  Not later than three Business Days following receipt by the Trustee of the notice given by the Issuer of its election to extend the Replacement Period (the **Extension Notice**), the Trustee shall mail the Extension Notice to all Noteholders, the Preference Shares Paying Agent (for forwarding to the Holders of the Preference Shares) and each Rating Agency (so long as any rated Notes are Outstanding), in the form of Exhibit I, and shall request the Rating Confirmation for the Maturity Extension from each Rating Agency, if applicable;

    (ii)  Any Holder of the Securities may deliver an irrevocable notice (an **Extension Sale Notice**) to the Issuer and the Trustee within 30 days after the Trustee has mailed the Extension Notice (the **Extension Sale Notice Period**) of its intention to sell all or a portion of its Securities to an Extension Qualifying Purchaser in the case of a Maturity Extension. Any Extension Sale Notice received by the Trustee after the Extension Sale Notice Period shall be disregarded and deemed not to have been given. No Holder of the Securities that has not delivered such an Extension Sale Notice within the Extension Sale Notice Period shall be entitled to sell its Securities to an Extension Qualifying Purchaser in connection with the Maturity Extension; and

    (iii)  If clause (iii)(b) of the Extension Conditions is not satisfied as of the applicable Extension Determination Date as determined by the Issuer (or its agent), the Trustee shall request the Rating Condition to be satisfied with respect to Moody's.

(e)     On the applicable Extension Determination Date, the Issuer (or its agent) shall confirm (i) whether or not Extension Qualifying Purchasers for all Extension Sale Securities have been designated to purchase such Extension Sale Securities in compliance with all transfer restrictions in this Indenture and the Preference Share Documents and the legends on such Extension Sale Securities and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency), (ii) whether the requirements of clause (c)(iii) of the Extension Conditions are satisfied as of the applicable Extension Determination Date and (iii) whether all other Extension Conditions can be satisfied as of the applicable Extension Effective Date.

(f)     On each Extension Effective Date, the Maturity Extension shall automatically become effective under the terms of this Indenture; **provided** that all Extension Conditions set forth in clauses (a) and (c) above are satisfied (as certified to the Trustee by a certificate of an Authorized Officer of the Issuer).  No later than two Business Days after each Extension Effective Date, the Trustee based on a determination made by the Issuer in consultation with the Servicer, at the expense of the Co-Issuers, shall mail a notice to all Noteholders, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Servicer, the Initial Purchasers, each Rating Agency (so long as any rated Notes are Outstanding) and the Irish Stock Exchange (if and for so long as any Class of Notes is listed thereon) confirming whether or not the Maturity Extension became effective.  If the Maturity Extension became effective, the Issuer shall make any required notifications thereof to the Depository for any Notes subject to the Maturity Extension.

(g)     In the case of a Maturity Extension, each Noteholder, other than a Holder of Extension Sale Securities, shall be entitled to receive an amount equal to the applicable Extension Bonus Payment.  Holders of Preference Shares shall not be entitled to receive any Extension Bonus Payment.

The Extension Bonus Payment shall be payable to any applicable qualifying beneficial owners who have provided the Trustee with an Extension Bonus Eligibility Certification on the first Payment Date from and including each Extension Effective Date on which funds are available to be used for such purposes in accordance with Priority of Payments, but in any event, no later than the earlier of the Stated Maturity and the date of redemption of the Notes. Extension Bonus Payments which are not available to be paid on a Payment Date in accordance with the Priority of Payments shall not be considered "due and payable" hereunder.  The failure to pay any such Extension Bonus Payment on such date shall not be an Event of Default, unless the Issuer shall fail to pay in full such Extension Bonus Payment on the earlier of the Stated Maturity and the date of redemption in full of the relevant Securities.  Unpaid Extension Bonus Payments shall not accrue interest.  Such amounts shall be paid, in the case of the Notes, to the accounts designated in the applicable Extension Bonus Eligibility

Certification or, to the extent otherwise required by the rules of any applicable securities exchange or clearing agency, in a manner determined by the Issuer.

(h) If any Holder of Class II Preference Shares delivers an Extension Sale Notice notifying the Issuer and the Trustee of its intention to sell all or a portion of its Class II Preference Shares, such Holder will sell such Class II Preference Shares to the Extension Qualifying Purchaser and such Preference Shares will be redesignated as Class I Preference Shares.

## 2.5 Execution, Authentication, Delivery, and Dating

The Notes shall be executed on behalf of each of the Applicable Issuers by one of their respective Authorized Officers. The signature of the Authorized Officer on the Notes may be manual or facsimile.

Notes bearing the manual or facsimile signatures of individuals who were at any time the Authorized Officers of the Issuer or the Co-Issuer, as applicable, shall bind the Issuer and the Co-Issuer, notwithstanding that any of them have ceased to hold their offices before the authentication and delivery of the Notes or did not hold their offices at the date of issuance of the Notes.

At any time and from time to time after the execution and delivery of this Indenture, the Co-Issuers may deliver the Notes, in each case executed by the Applicable Issuers to the Trustee or the Authenticating Agent for authentication and the Trustee or the Authenticating Agent, upon Issuer Order, shall authenticate and deliver the Notes as provided in this Indenture and not otherwise.

Each Note authenticated and delivered by the Trustee or the Authenticating Agent upon Issuer Order on the Closing Date shall be dated as of the Closing Date. All other Notes that are authenticated after the Closing Date for any other purpose under this Indenture shall be dated the date of their authentication.

Notes issued upon transfer, exchange, or replacement of other Notes shall be issued in authorized denominations reflecting the original Aggregate Outstanding Amount of the Notes so transferred, exchanged, or replaced, but shall represent only the current outstanding principal amount of the Notes so transferred, exchanged, or replaced. If any Note is divided into more than one Note in accordance with this Section 2, the original principal amount of the Note shall be proportionately divided among the Notes delivered in exchange for it and shall be the original aggregate principal amount of the subsequently issued Notes.

No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on the Note a Certificate of Authentication executed by the Trustee or by the Authenticating Agent by the manual signature of one of their Authorized Officers, and that certificate on any Note shall be conclusive evidence, and

the only evidence, that the Note has been duly authenticated and delivered under this Indenture.

**2.6    Registration, Registration of Transfer and Exchange**

(a)      The Issuer shall cause a register (the ***Indenture Register***) to be kept in which the Issuer shall provide for the registration of Notes and the registration of transfers of Notes.  The Trustee is hereby initially appointed "Indenture Registrar" for the purpose of registering Notes and transfers of the Notes as provided in this Indenture.  The Issuer may rely conclusively on any such information provided to it by the Trustee.  Upon any resignation or removal of the Indenture Registrar, the Issuer shall promptly appoint a successor and notify the Servicer of the appointment or, in the absence of such appointment, assume the duties of Indenture Registrar.

If the Issuer appoints a Person other than the Trustee to be Indenture Registrar, the Issuer will give the Trustee prompt written notice of the appointment of the Indenture Registrar and of the location, and any change in the location, of the Indenture Register.  The Trustee may inspect the Indenture Register at all reasonable times and obtain copies of it.  The Trustee may rely on a certificate executed on behalf of the Indenture Registrar by an Officer of the Indenture Registrar as to the names and addresses of the Noteholders and the principal amounts and number of the Notes.

Upon surrender for registration of transfer of any Notes at the office or agency of the Applicable Issuers to be maintained pursuant to Section 7.2, if the requirements of this Indenture are met the Applicable Issuers shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferees, new Notes of any authorized denomination and of a like original Aggregate Outstanding Amount.

At the option of their Holder, Notes may be exchanged for Notes of like terms, in any authorized denominations and of like aggregate principal amount, upon surrender of the Notes to be exchanged at the office or agency of the Applicable Issuers to be maintained pursuant to Section 7.2.  Whenever any Note is surrendered for exchange, the Applicable Issuers shall execute, and the Trustee shall authenticate and deliver, the Notes that the Noteholder making the exchange is entitled to receive.

All Notes issued on any registration of transfer or exchange of Notes shall be the valid obligations of the Applicable Issuers evidencing the same obligations and entitled to the same benefits under this Indenture as the Notes surrendered for registration of transfer or exchange.

Every Note presented or surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by a written instrument of transfer in form

satisfactory to the Indenture Registrar duly executed by its Holder or his attorney duly authorized in writing.

No Holder shall incur a service charge for any registration of transfer or exchange of the Notes, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

(b)     No Note may be sold or transferred (including by pledge or hypothecation) unless the sale or transfer is exempt from the registration requirements of the Securities Act, is exempt from the registration requirements under applicable state securities laws, and will not cause either of the Co-Issuers to become subject to the requirement that it register as an investment company under the Investment Company Act. None of the Co-Issuers, the Trustee or any other Person shall have any obligation to register the Notes under the Securities Act or any state securities laws.

(c)     (i)     No Note or interest therein may be transferred to any purchaser or transferee if such purchase, holding and disposition of such Note would result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental, foreign or church plan, any federal, state, foreign or local law that is substantially similar to Section 406 of ERISA or Section 4975 of the Code).

        (ii)     Any person described in paragraph (i) above is referred to herein as a "Non-Permitted Benefit Plan Investor." Any transfer of a beneficial interest to a Non-Permitted Benefit Plan Investor shall be void and any such purported transfer of which the Issuer, the Co-Issuer or the Trustee has notice may be disregarded by the Issuer, the Co-Issuer and the Trustee for all purposes.

(d)     None of the Trustee, the Share Registrar or the Indenture Registrar shall be responsible for ascertaining whether any transfer complies with, or for otherwise monitoring or determining compliance with, the requirements or terms of the Securities Act, applicable state securities laws, ERISA, the Code or the Investment Company Act; except that if a certificate or any other document is specifically required by this Section 2.6 to be provided to the Trustee or such Registrar by a prospective transferee, the Trustee and such Registrar, as applicable, shall be under a duty to receive and examine the same to determine whether it conforms substantially on its face to the applicable requirements of this Section 2.6.

(e)     For so long as any of the Notes are Outstanding, the Issuer shall not issue or register the transfer of any Issuer Ordinary Shares to U.S. persons and the Co-Issuer shall not issue or register the transfer of any of its shares of the Co-Issuer to U.S. persons. As used in this subsection (e), "U.S. person" has the meaning assigned to it in Regulation S.

(f)    So long as a Global Note remains Outstanding and is held by or on behalf of the Depository, transfers of the Global Note, in whole or in part, shall only be made in accordance with Section 2.2(c), Section 2.6(c) and this Section 2.6(f).

    (i)    Subject to clauses (ii), (iii) and (iv) of this Section 2.6(f), transfers of a Global Note shall be limited to transfers of the Global Note in whole, but not in part, to nominees of the Depository.

    (ii)    **Rule 144A Global Note to Regulation S Global Note.**  If a Holder of a beneficial interest in a Rule 144A Global Note deposited with the Depository wishes at any time to exchange its interest in the Rule 144A Global Note for an interest in the corresponding Regulation S Global Note, or to transfer its interest in the Rule 144A Global Note to a Person who wishes to take delivery of it in the form of an interest in the corresponding Regulation S Global Note, the Holder may exchange or transfer the interest for an equivalent beneficial interest in the corresponding Regulation S Global Note (subject to the rules and procedures of the Depository) if the Holder after the exchange or transfer is not a U.S. person.

The Indenture Registrar shall instruct the Depository to reduce the principal amount of the Rule 144A Global Note and to increase the principal amount of the Regulation S Global Note by the aggregate principal amount of the beneficial interest in the Rule 144A Global Note to be exchanged, and to credit to the Securities Account of the Person specified in the instructions a beneficial interest in the corresponding Regulation S Global Note equal to the reduction in the principal amount of the Rule 144A Global Note upon receipt by the Indenture Registrar of

    (A)    instructions given in accordance with the Depository's procedures from an Agent Member directing the Indenture Registrar to credit a beneficial interest in the corresponding Regulation S Global Note, but not less than the minimum denomination applicable to the Holder's Notes, equal to the beneficial interest in the Rule 144A Global Note to be exchanged or transferred,

    (B)    a written order given in accordance with the Depository's procedures containing information regarding the participant account of the Depository and the Euroclear or Clearstream account to be credited with the increase,

    (C)    a certificate in the form of Exhibit B-3 given by the Holder of the beneficial interest stating that the exchange or transfer of the interest has been made in compliance with the transfer restrictions applicable to the Global Notes, including that the Holder or the transferee, as applicable, is not a U.S. person, and that the transfer

has been made pursuant to and in accordance with Regulation S, and

(D)     in the case of a transfer, a certificate in the applicable form of Exhibit B-1 given by the proposed transferee stating that it is not a U.S. person.

(iii)   **Regulation S Global Note to Rule 144A Global Note.**  If a Holder of a Note held as a beneficial interest in a Regulation S Global Note deposited with the Depository wishes at any time to exchange its interest in the Regulation S Global Note for an interest in the corresponding Rule 144A Global Note or to transfer its interest in the Regulation S Global Note to a Person who wishes to take delivery of it in the form of an interest in the corresponding Rule 144A Global Note, the Holder may, subject to the rules and procedures of Euroclear, Clearstream or the Depository, as the case may be, exchange or transfer, or cause the exchange or transfer of, the interest for an equivalent beneficial interest in the corresponding Rule 144A Global Note.  Upon receipt by the Indenture Registrar of:

(A)     instructions from Euroclear, Clearstream or the Depository, as the case may be, directing the Indenture Registrar to cause to be credited a beneficial interest in the corresponding Rule 144A Global Note equal to the beneficial interest in the Regulation S Global Note, but not less than the minimum denomination applicable to the Holder's Notes, to be exchanged or transferred, the instructions to contain information regarding the participant account with the Depository to be credited with the increase,

(B)     a certificate in the form of Exhibit B-2 given by the Holder of the beneficial interest and stating that, in the case of an exchange, the Holder is a Qualified Institutional Buyer and a Qualified Purchaser or, in the case of a transfer, the Person transferring the interest in the Regulation S Global Note reasonably believes that the Person acquiring the interest in a Rule 144A Global Note is a Qualified Institutional Buyer, is obtaining the beneficial interest in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction, and a Qualified Purchaser, and

(C)     a certificate in the form of Exhibit B-1 given by the proposed transferee stating that it is a QIB/QP,

the Indenture Registrar shall instruct the Depository to reduce the Regulation S Global Note by the aggregate principal amount of the beneficial interest in the Regulation S Global Note to be transferred or

exchanged and the Indenture Registrar shall instruct the Depository, concurrently with the reduction, to credit to the Securities Account of the Person specified in the instructions a beneficial interest in the corresponding Rule 144A Global Note equal to the reduction in the principal amount of the Regulation S Global Note.

(iv) **Other Exchanges.** If a Global Note is exchanged for Notes in definitive registered form without interest coupons pursuant to Section 2.11, the Notes may be exchanged for one another only in accordance with procedures substantially consistent with the provisions above (including certification requirements intended to insure that the transfers are made only to Holders who are QIB/QPs or non-U.S. persons, or otherwise comply with Regulation S, as the case may be), and as may be from time to time adopted by the Co-Issuers and the Trustee.

(g) [Reserved]

(h) If the Notes are issued upon the transfer, exchange, or replacement of Notes bearing the applicable legends in the applicable forms in Exhibit A, as applicable, and if a request is made to remove the legend on the Notes, the legend shall not be removed unless the Trustee and the Applicable Issuers received satisfactory evidence, which may include an Opinion of Counsel acceptable to them, reasonably required by the Applicable Issuers (and which shall by its terms permit reliance by the Trustee), to the effect that neither the legend nor the restrictions on transfer in it are required to ensure that transfers of the Notes comply with the Securities Act, the Investment Company Act, ERISA and the Code. Upon provision of satisfactory evidence, the Trustee or its Authenticating Agent, at the written direction of the Applicable Issuers shall, after due execution by the Applicable Issuers authenticate and deliver Notes that do not bear the applicable legend.

(i) Notwithstanding anything contained in this Section 2.6 to the contrary:

(i) **Restrictions on U.S. Transfers.** Transfers of an interest in a Regulation S Global Note that are not made in an offshore transaction pursuant to Regulation S or are made to U.S. persons, if such transferees take delivery in the form of an interest in a Rule 144A Global Note, shall be limited to transfers made pursuant to the provisions of Section 2.6(f)(iii) and Section 2.6(f)(iv).

(ii) Beneficial interests in a Regulation S Global Note may only be held through Euroclear or Clearstream.

(j) Each Person who becomes a beneficial owner of a Note evidenced by: (A) an interest in a Definitive Note, shall make the representations, warranties and agreements set forth in the applicable Transferee Certificate set forth in Exhibit B-

1 upon such Person's purchase or other acquisition of the relevant Definitive Note and (B) an interest in a Global Note, shall be deemed to make the representations, warranties and agreements set forth in the applicable legends of the Notes set forth in Exhibit A hereto and in the applicable Transferee Certificate set forth in Exhibit B-1 hereto upon such Person's purchase or other acquisition of the relevant Global Note.

(k)     The aggregate principal amount of any Global Note may be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC for the Global Note, which adjustments shall be conclusive as to the aggregate principal amount of any Global Note.

(l)     Any purported transfer of a Note not in accordance with this Section 2.6 shall be null and void.

## 2.7     Mutilated, Destroyed, Lost or Stolen Notes

If the Applicable Issuers, the Trustee, and the relevant Transfer Agent receive evidence to their satisfaction of the destruction, loss or theft of any Note, and they receive the security or indemnity they require to hold each of them harmless, or if any mutilated Note is surrendered to a Transfer Agent, then, in the absence of notice to the Applicable Issuers, the Trustee, or the Transfer Agent that the Note has been acquired by a protected purchaser, the Applicable Issuers shall execute and the Trustee shall authenticate and deliver to the Holder, in exchange for the mutilated, destroyed, lost, or stolen Note, a replacement Note, of like tenor and equal principal or face amount.

If, after delivery of the replacement Note or payment on it, a protected purchaser of the predecessor Note presents it for payment, transfer, or exchange, the Applicable Issuers, the Transfer Agent, and the Trustee may recover the replacement Note (or the payment on it) from the Person to whom it was delivered or any Person taking the replacement Note from the Person to whom the replacement Note was delivered or any assignee of that Person, except a protected purchaser, and may recover on the security or indemnity provided therefor to the extent of any loss, damage, cost, or expense incurred by the Applicable Issuers, the Trustee, and the Transfer Agent in connection with it.

If the final payment in respect of any mutilated, destroyed, lost, or stolen Note has become payable, the Applicable Issuers in their discretion may, instead of issuing a new Note pay the Note without requiring its surrender except that any mutilated Note shall be surrendered.

Upon the issuance of any new Note under this Section, the Applicable Issuers or the Trustee may require the payment by its holder of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with the issuance and any other expenses (including the fees and expenses of the Trustee) connected with it.

Every new Note issued pursuant to this Section in replacement for any mutilated, destroyed, lost, or stolen Note shall be an original additional contractual obligation of the Applicable Issuers and the new Note shall be entitled to all the benefits of this Indenture equally and proportionately with all other Notes of the same Class duly issued under this Indenture, as applicable.

The provisions of this Section are exclusive and shall preclude (to the extent lawful) all other rights with respect to the replacement or payment of mutilated, destroyed, lost, or stolen Notes.

**2.8    Payment of Principal, Interest and Other Amounts; Rights Preserved; Withholding**

(a)     The Notes of each Class shall accrue interest during each Interest Period on their Aggregate Outstanding Amount (determined as of the first day of the Interest Period and after giving effect to any redemption or other payment of principal occurring on that day) at the Applicable Note Interest Rate.  Interest shall be payable in arrears on each Payment Date.  Payment of interest on each Class of Notes shall be subordinated to the payments of interest on the related Priority Classes and other amounts in accordance with the Priority of Payments.

So long as any Priority Classes are Outstanding, with respect to any Class of Deferred Interest Notes, any payment of interest due on the Class of Deferred Interest Notes that is not available to be paid (***Deferred Interest***) in accordance with the Priority of Payments on any Payment Date shall not be considered "payable" for the purposes of this Indenture (and the failure to pay the interest shall not be an Event of Default) until the Payment Date on which the interest is available to be paid in accordance with the Priority of Payments.  Deferred Interest on any Class of Deferred Interest Notes shall be payable on the first Payment Date on which funds are available to be used for that purpose in accordance with the Priority of Payments.

Interest shall cease to accrue on each Note, or in the case of a partial repayment, on the part repaid, from the date of repayment or its Stated Maturity unless payment of principal is improperly withheld or unless there is some other default with respect to the payments of principal.

To the extent lawful and enforceable, interest on Deferred Interest with respect to any Class of Deferred Interest Notes shall accrue at the Note Interest Rate for the Class (and to the extent not paid as current interest on the Payment Date after the Interest Period in which it accrues, shall thereafter be additional Deferred Interest, until paid as provided in this Indenture).

(b)     The principal of each Note of each Class matures at par and is payable on the Payment Date that is the Stated Maturity for the Class of Notes, unless the unpaid principal of the Note becomes payable at an earlier date by declaration of

acceleration, call for redemption, or otherwise. Notwithstanding the foregoing, the payment of principal of each Class of Notes:

    (i)    may only occur after principal on each Class of Notes that is a Priority Class with respect to the Class has been paid in full; and

    (ii)    is subordinated to the payment on each Payment Date of the principal and interest payable on the Priority Classes, and other amounts in accordance with the Priority of Payments;

**provided** that, notwithstanding the foregoing, Interest Proceeds may be used to pay principal of the Class E Notes on any Payment Date to the extent necessary to satisfy the Class E Coverage Test.

(c)    Principal payments on the Notes shall be made in accordance with the Priority of Payments and Section 9.1.

(d)    As a condition to the payment of principal of and interest on any Note without the imposition of U.S. withholding tax, the Paying Agent shall require the previous delivery of appropriate properly completed and signed original forms United States federal income tax certifications (generally, an Internal Revenue Service Form W-9 (or applicable successor form) in the case of a Person that is a "United States person" within the meaning of Section 7701(a)(30) of the Code or an appropriate Internal Revenue Service Form W-8 (or applicable successor form) in the case of a Person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code) or any other certification acceptable to it to enable the Issuer, the Co-Issuer, the Trustee, and any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to deduct or withhold from payments on the Note under any present or future law of the United States or any present or future law of any political subdivision of the United States or taxing authority in the United States or to comply with any reporting or other requirements under any such law.

(e)    Payments in respect of interest on and principal of any Note shall be made by the Trustee in U.S. Dollars to the Depository or its designee with respect to a Global Note and to the Holder or its nominee with respect to a Definitive Note, by wire transfer, as directed by the Holder, in immediately available funds to a U.S. Dollar account maintained by the Depository or its nominee with respect to a Global Note, and to the Holder or its designee with respect to a Definitive Note. In the case of a Definitive Note, its Holder has provided written wiring instructions to the Trustee and, if the payment with respect to a Definitive Note is to be made by the Irish Paying Agent, the Irish Paying Agent, on or before the related Record Date.

If appropriate instructions for the wire transfer are not received by the related Record Date, then the payment will be made by check drawn on a U.S. bank

mailed to the address of the Holder in the Indenture Register. Upon final payment due on the Maturity of a Note, its Holder shall present and surrender the Note at the office designated by the Trustee on or before the Maturity. If the Trustee and the Applicable Issuers have been furnished the security or indemnity they require to save each of them harmless and an undertaking thereafter to surrender the certificate, then, in the absence of notice to the Applicable Issuers or the Trustee that the applicable Note has been acquired by a protected purchaser, the final payment shall be made without presentation or surrender. Neither the Co-Issuers, the Trustee, the Share Registrar nor any Paying Agent shall have any responsibility or liability for any aspects of the records maintained by Euroclear, Clearstream, or any of the Agent Members relating to or for payments made thereby on account of beneficial interests in a Global Note.

In the case where any final payment of principal and interest is to be made on any Note (other than on its Stated Maturity and except as otherwise provided in this Indenture), the Trustee, in the name and at the expense of the Applicable Issuers shall, not more than 30 nor less than ten days before the date on which the payment is to be made, mail (by first-class mail, postage prepaid) to the Persons entitled thereto at their addresses appearing on the Indenture Register, a notice specifying the date on which the payment will be made, the amount of the payment per U.S.$100,000 original principal amount of Notes and the place where the Notes may be presented and surrendered for payment. If the Trustee and the Issuer have been furnished any security or indemnity they require to save each of them harmless and an undertaking thereafter to surrender the certificate, then, in the absence of notice to the Issuer or the Trustee that the applicable certificate has been acquired by a protected purchaser, final payment shall be made without presentation or surrender of the applicable certificate.

(f)    Payments of principal to Holders of the Notes of each Class shall be made in the proportion that the Aggregate Outstanding Amount of the Notes of the Class registered in the name of each Holder on the applicable Record Date bears to the Aggregate Outstanding Amount of all Notes of the Class on the Record Date.

(g)    Interest accrued shall be calculated on the basis of the actual number of days elapsed in the applicable Interest Period **divided by** 360.

(h)    All reductions in the principal amount of a Note (or one or more predecessor Notes) effected by payments of installments of principal made on any Payment Date or Redemption Date shall be binding on all future Holders of the Note and of any Note issued upon the registration of its transfer, exchange, or replacement, whether or not the payment is noted on the Note.

(i)    Notwithstanding any other provision of this Indenture, the obligations of the Co-Issuer under the Notes and under this Indenture are non-recourse obligations, and the obligations of the Issuer under the Notes and under this Indenture are limited recourse obligations payable solely from the Collateral and following realization

of the assets, application of their proceeds in accordance with this Indenture and the reduction of the proceeds of the Collateral to zero, all obligations of, and any claims against, the Co-Issuers under this Indenture or under the Notes or arising in connection therewith shall be extinguished and shall not thereafter revive. No recourse shall be had against any Officer, director, employee, shareholder, or incorporator of either of the Co-Issuers or their respective successors or assigns for any amounts payable under the Notes or this Indenture. The foregoing provisions of this paragraph (i) shall not (1) prevent recourse to the Collateral for the sums due or to become due under any security, instrument, or agreement that is part of the Collateral or (2) be a waiver, release, or discharge of any indebtedness or obligation evidenced by the Notes or secured by this Indenture until the Collateral have been realized. The foregoing provisions of this paragraph (i) shall not limit the right of any Person to name the Issuer or the Co-Issuer as a party defendant in any Proceeding or in the exercise of any other remedy under the Notes or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability is sought or (if obtained) enforced against the person.

(j)     If any withholding tax is imposed on the Issuer's payment (or allocations of income) under the Notes to any Noteholder, the tax shall reduce the amount otherwise distributable to the Noteholder. The Trustee is hereby authorized and directed to retain from amounts otherwise distributable to any Noteholder sufficient funds for the payment of any tax that is legally owed, or required by law to be collected, by or on behalf of the Issuer (but the authorization shall not prevent the Trustee or the Issuer from contesting any such tax in appropriate proceedings and withholding payment of the tax, if permitted by law, pending the outcome of the proceedings). The amount of any withholding tax imposed with respect to any Noteholder shall be treated as Cash distributed to the Noteholder when it is withheld by the Trustee and remitted to the appropriate taxing authority. If there is a possibility that withholding tax is payable with respect to a distribution, the Trustee may in its sole discretion withhold the amounts in accordance with this Section 2.8(j). If any Noteholder wishes to apply for a refund of any such withholding tax, the Trustee shall reasonably cooperate with the Noteholder in making the claim by providing information readily available to the Trustee so long as the Noteholder agrees to reimburse the Trustee for any out-of-pocket expenses incurred and provides the Trustee with security reasonably acceptable to the Trustee assuring the reimbursement. The Trustee hereby provides notice to each Noteholder that the failure by the Noteholder to provide the Trustee with appropriate tax certifications may result in amounts being withheld from payments to the Noteholder. Nothing in this Indenture shall impose an obligation on the part of the Trustee to determine the amount of any tax or withholding obligation on the part of the Issuer or in respect of the Notes.

**2.9    Persons Considered Owners**

The Issuer, the Co-Issuer, the Trustee, and any agent of the Co-Issuers or the Trustee shall treat as the owner of the Note the Person in whose name any Note is registered on the Indenture Register on the applicable Record Date for the purpose of receiving payments on the Note and on any other date for all other purposes whatsoever (whether or not the Note is overdue), and neither the Issuer, the Co-Issuer nor the Trustee nor any agent of the Issuer, the Co-Issuer or the Trustee shall be affected by notice to the contrary.  Pursuant to the Servicing Agreement, the Servicer will notify the Trustee and the Share Registrar of any Affiliate of the Servicer that owns any of the Securities.

**2.10    Cancellation**

All Notes surrendered for payment, registration of transfer, exchange, or redemption, or lost or stolen, shall be promptly canceled by the Trustee and may not be reissued or resold.  No Notes shall be authenticated in lieu of or in exchange for any Notes canceled as provided in this Section 2.10, except as expressly permitted by this Indenture.  All canceled Notes held by the Trustee shall be destroyed by the Trustee in accordance with its standard policy unless the Applicable Issuers direct by an Issuer Order delivered to the Trustee prior to cancellation and destruction that they be returned to the Issuer.

**2.11    Definitive Notes**

(a)    A Global Note deposited with the Depository pursuant to Section 2.2 shall be transferred in the form of a Definitive Note to its beneficial owners only if the transfer complies with Section 2.6 and either

(i)    the Depository notifies the Co-Issuers that it is unwilling or unable to continue as Depository for the Global Note or

(ii)    if at any time the Depository ceases to be a Clearing Agency registered under the Exchange Act and, in each case, a successor depository is not appointed by the Co-Issuers within 90 days after the notice.

(b)    Any Global Note that is transferable in the form of a Definitive Note to its beneficial owners pursuant to this Section 2.11 shall be surrendered by the Depository to the office of the Trustee's agent located in the City of New York, New York as specified in Section 7.2 (or any other office designated by the Trustee) to be so transferred, in whole or from time to time in part, without charge, and the Applicable Issuers shall execute and the Trustee shall authenticate and deliver, upon the transfer of each portion of the Global Note, an equal aggregate principal amount of definitive physical certificates (pursuant to the instructions of the Depository) (each, a ***Definitive Note***) in authorized denominations.  Any Definitive Note delivered in exchange for an interest in a Global Note, as applicable, shall, except as otherwise provided by Section 2.6(j),

bear the legends in the applicable portion of Exhibit A and shall be subject to the transfer restrictions referred to in the legends.

(c) The Holder of a Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder is entitled to take under this Indenture or the Notes, as applicable.

(d) Upon the occurrence of either of the events specified in Section 2.11(a)(i) and (ii), the Co-Issuers shall promptly make available to the Trustee a reasonable supply of Definitive Notes in definitive, fully registered form without interest coupons.

The Definitive Notes shall be in substantially the same form as the Global Notes, with any changes the Issuer and Trustee agree to and the Applicable Issuers shall execute, and the Trustee shall authenticate and deliver, in exchange therefor, the same aggregate principal amount of Definitive Notes of authorized denominations.

**2.12    Notes Beneficially Owned by Non-Permitted Holders**

(a) Notwithstanding anything to the contrary elsewhere in this Indenture, any transfer of a beneficial interest in any Global Note to a U.S. person (for purposes of this Section 2.12 as defined in Regulation S) that is not a QIB/QP and that is not made pursuant to an applicable exemption under the Securities Act shall be void and any such purported transfer of which the Issuer, the Co-Issuer or the Trustee has notice may be disregarded by the Issuer, the Co-Issuer and the Trustee for all purposes.

(b) After discovery by the Issuer, the Co-Issuer or the Trustee (and notice by the Trustee or the Co-Issuer to the Issuer, if either of them makes the discovery) that a Person is a Non-Permitted Holder, the Issuer shall promptly send notice to the Non-Permitted Holder demanding that the Non-Permitted Holder transfer its interest to a Person that is not a Non-Permitted Holder within 30 days of the date of the notice. If the Non-Permitted Holder fails to so transfer its Notes or interest in the Notes without further notice to the Non-Permitted Holder, the Issuer may sell the Notes or interest in the Notes to a purchaser selected by the Issuer that is a not a Non-Permitted Holder on any terms the Issuer chooses. The Issuer, or the Trustee acting on behalf of the Issuer, may select the purchaser by soliciting bids (or by appointing an investment bank at the expense of the Issuer to solicit bids) from brokers or other market professionals that regularly deal in securities similar to the Notes, and selling the Notes, or interest in the Notes to the highest bidder. However, the Issuer or the Trustee may select a purchaser by any other means determined by it in its sole discretion. The Holder of each Note, the beneficial owner of each interest in a Note, the Non-Permitted Holder, and each other Person in the chain of title from the Holder or beneficial owner to the Non-Permitted Holder, by its acceptance of an interest in the Notes agrees to cooperate with the

Issuer and the Trustee to effect the transfers. The proceeds of the sale, net of any commissions, expenses of the Trustee or otherwise, and taxes due in connection with the sale shall be remitted to the Non-Permitted Holder. The terms of any sale under this subsection shall be determined in the sole discretion of the Issuer (or the Trustee acting on its behalf), and the Issuer and the Trustee shall not be liable to any Person having an interest in the Notes sold as a result of any such sale or the exercise of its discretion.

**2.13    Tax Characterization**

The Issuer agrees and each registered holder and beneficial owner, by accepting a Note, agrees to treat the Notes as debt instruments of the Issuer only for accounting, financial reporting and U.S. federal and, to the extent permitted by law, state and local income and franchise tax purposes, to report all income (or loss) in accordance with such treatment and not to take any action inconsistent with such treatment unless otherwise required by any relevant taxing authority.

**3.    CONDITIONS PRECEDENT**

**3.1    Conditions to Issuance of Notes on Closing Date**

(a)    The Notes to be issued on the Closing Date shall be executed by the Applicable Issuers and delivered to the Trustee for authentication and thereupon the same shall be authenticated and delivered by the Trustee upon Issuer Order and upon receipt by the Trustee of the following:

    (i)    Officers' Certificates of the Co-Issuers Regarding Corporate Matters. An Officer's certificate of each of the Co-Issuers:

        (A)    (1) evidencing (x) the authorization by Board Resolution of the execution and delivery of this Indenture and the Purchase Agreement and, in the case of the Issuer, the Servicing Agreement, the Preference Shares Paying Agency Agreement, the Collateral Administration Agreement and the Hedge Agreements being entered into on or before the Closing Date (if any), and related transaction documents and (y) the execution, authentication and delivery of the Notes applied for by it and specifying the Stated Maturity, principal amount and the Note Interest Rate of each applicable Class of Notes to be authenticated and delivered and (2) with respect to the Issuer only, evidencing the authorization by Board Resolution of the issuance, terms and number of Preference Shares issued on the Closing Date, and that each of the foregoing is in accordance with the terms of the Board Resolution, and

        (B)    certifying that (1) the attached copy of the Board Resolution is an accurate copy, (2) the resolutions have not been rescinded and are

in full force on and as of the Closing Date and (3) the Officers authorized to execute and deliver the documents hold the offices and have the signatures indicated on the documents.

(ii) **Governmental Approvals.**  From each of the Co-Issuers either:

    (A)    a certificate of the Applicable Issuer or other official document evidencing the due authorization, approval or consent of any governmental bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel of the Applicable Issuer that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Notes applied for by it, or

    (B)    an Opinion of Counsel of the Applicable Issuer that no authorization, approval, or consent of any governmental body is required for the valid issuance of the Notes except as have been given; **provided** that the opinions of Freshfields Bruckhaus Deringer LLP and Maples and Calder, substantially in the forms of Exhibit C and Exhibit D, respectively, shall satisfy this clause (B).

(iii) **Co-Issuers' and Servicer's U.S. Counsel Opinion.**  Opinions of Freshfields Bruckhaus Deringer LLP, special U.S. counsel to the Co-Issuers, and an opinion of Orrick, Herrington & Sutcliffe LLP, counsel to the Servicer, dated the Closing Date, substantially in the forms of Exhibit C and Exhibit F.

(iv) **Issuer's Cayman Counsel Opinion.**  An opinion of Maples and Calder, Cayman Islands counsel to the Issuer, dated the Closing Date, substantially in the form of Exhibit D.

(v) **Trustee's Counsel Opinion.**  An opinion of Nixon Peabody LLP, counsel to the Trustee, dated the Closing Date, substantially in the form of Exhibit E.

(vi) **Officers' Certificates of Co-Issuers Regarding Indenture.**  An Officer's certificate of each of the Co-Issuers stating that, to the best of the Officer's knowledge,

    (A)    the Applicable Issuer is not in default under this Indenture and that the issuance of the Notes applied for by it will not result in a default or a breach of, or be a default under, its organizational documents, any indenture or other agreement or instrument to which it is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which

it is a party or by which it may be bound or to which it may be subject;

(B)    all conditions precedent in this Indenture relating to the authentication and delivery of the applicable Notes have been complied with; and

(C)    all expenses due or accrued with respect to the Offering or relating to actions taken on or in connection with the Closing Date have been paid or reserves therefor have been made.

The Officer's certificate of the Issuer shall also state that, to the best of the Officer's knowledge, all of its representations and warranties contained in this Indenture are accurate as of the Closing Date.

(vii)  **Hedge Agreements.**  Executed copies of the Hedge Agreements being entered into on or entered into before the Closing Date, if any.

(viii)  **Servicing Agreement.**  Executed copy of the Servicing Agreement.

(ix)  **Preference Shares.**  Copies of executed Preference Share certificates to be issued on the Closing Date.

(x)  **Preference Share Documents.**  An executed counterpart of the Preference Shares Paying Agency Agreement.

(xi)  **Collateral Administration Agreement.**  Executed copy of the Collateral Administration Agreement.

(xii)  **Grant of Collateral Obligations.**  Evidence of the Grant pursuant to the Granting Clauses of this Indenture of all of the Issuer's interest in the Collateral Obligations pledged to the Trustee for inclusion in the Collateral, on the Closing Date and Delivery of the Collateral Obligations (including any promissory notes and all other Underlying Instruments related to them to the extent received by the Issuer) to the Trustee or the Custodian as contemplated by Section 3.2.

(xiii)  **Certificate of the Servicer.**  A certificate of an Authorized Officer of the Servicer, dated as of the Closing Date, to the effect that, to the best knowledge of the Servicer, in the case of each Collateral Obligation pledged to the Trustee for inclusion in the Collateral, as the case may be, on the Closing Date and immediately before the delivery of the Collateral Obligation on the Closing Date:

(A)    the "row/column combination" of the table appearing in the definition of "Ratings Matrix" selected by the Servicer on the Closing Date;

    (B)    the information with respect to the Collateral Obligation in the Schedule of Collateral Obligations is correct; and

    (C)    the Collateral Obligation satisfies the requirements of the definition of "Collateral Obligation" and of Section 3.1(a)(xix)(B);

(xiv)    **Rating Letters.**  An Officer's certificate of the Issuer to the effect that attached is an accurate copy of a letter signed by each Rating Agency and confirming that each Class of Notes rated by the Rating Agency has been assigned the applicable Initial Rating and that the ratings are in full force on the Closing Date.

(xv)    **Accounts.**  Evidence that each of the Accounts has been established.

(xvi)    **Issuer Order for Deposit of Funds into Accounts.**  An Issuer Order signed in the name of the Issuer by an Authorized Officer of the Issuer, dated as of the Closing Date, authorizing the deposit of at least U.S.$103,000,000 into the Collection Account for use pursuant to Section 7.19 and the deposit of at least U.S.$2,136,313 into the Closing Date Expense Account for use pursuant to Section 10.3(g).

(xvii)    **Irish Listing.**  An Officer's certificate of the Issuer to the effect that application has been made to the Irish Stock Exchange to admit the Notes to the Official List.

(xviii)    **Issuer Order for Authentication of Notes.**  An Issuer Order signed in the name of the Issuer by an Authorized Officer of the Issuer, dated as of the Closing Date, directing the Trustee to authenticate the Notes in the amounts, in the registered names and with the CUSIP numbers in the Issuer Order.

(xix)    **Accountants' Certificate.**  An Accountants' Certificate satisfactory to the Issuer (A) confirming the information with respect to each Collateral Obligation on the Schedule of Collateral Obligations attached as Schedule 1, (B) confirming that the Aggregate Principal Balance of the Collateral Obligations that the Issuer has purchased or committed to purchase in accordance with customary settlement procedures in the relevant markets, is approximately U.S.$659,000,000, (C) specifying the procedures undertaken by them to review data and computations relating to this Section 3.1(a)(xix) and (D) confirming the weighted average purchase price of the Collateral Obligations.

(xx)    **Certificate of the Issuer Regarding Collateral.**  A certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, to the effect that, to the knowledge of the Issuer, in the case of each Collateral Obligation pledged to the Trustee for inclusion in the Collateral, as the

case may be, on the Closing Date and immediately before the delivery of the Collateral Obligation on the Closing Date:

(A)    the Issuer is the owner of the Collateral Obligation free of any liens, claims, or encumbrances of any nature whatsoever except for those that are being released on the Closing Date and except for those Granted pursuant to or permitted by this Indenture;

(B)    the Issuer has acquired its ownership in the Collateral Obligation in good faith without notice of any adverse claim, except as described in paragraph (A) above;

(C)    the Issuer has not assigned, pledged or otherwise encumbered any interest in the Collateral Obligation (or, if any interest in the Collateral Obligation has been assigned, pledged or otherwise encumbered, it has been released before the Closing Date or is being released on the Closing Date) other than interests Granted pursuant to or permitted by this Indenture;

(D)    the Issuer has full right to Grant a security interest in and assign and pledge the Collateral Obligation to the Trustee;

(E)    upon Grant by the Issuer, the Trustee has a first priority perfected security interest in the Collateral Obligations and the other Collateral; and

(F)    based solely on the Accountant's Certificate set forth in clause (xix) above, the weighted average purchase price of the Collateral Obligations in the Collateral as of the Closing Date is at least 90% of the aggregate par amount thereof.

(xxi)    **Certificate of the Issuer Regarding Important Section 3(c)(7) Reminder Notice.**  A certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, to the effect that, on or prior to the Closing Date the Issuer provided to the Depository the Important Section 3(c)(7) Reminder Notice, substantially in the form of Exhibit G-2.

(xxii)    **Other Documents.**  Any other documents the Trustee reasonably requires. Nothing in this clause (xxii) shall imply or impose a duty on the part of the Trustee to require any other documents.

(b)    Any Refinancing Note may be issued from time to time pursuant to Section 9.7 hereof.  Any such Refinancing Notes shall be executed by the Applicable Issuer and delivered to the Trustee for authentication, and thereupon shall be authenticated and delivered by the Trustee upon and pursuant to Issuer Order delivered to the Trustee, together with delivery to the Trustee by the Issuer of an

Opinion of Counsel to the effect that (A) such Refinancing Notes are duly authorized and validly issued by the Applicable Issuer pursuant to the Indenture, constituting the legal, valid and binding obligation of such Applicable Issuer, enforceable against such Issuer in accordance with its terms and (B) all conditions precedent under this Indenture, if any, applicable to the issuance, authentication and delivery of such Notes, have been satisfied.

**3.2** **Custodianship; Delivery of Collateral Obligations and Eligible Investments**

(a)     The Servicer, on behalf of the Issuer, shall deliver or cause to be delivered to a custodian appointed by the Issuer, which shall be a Securities Intermediary (the ***Custodian***), all Collateral in accordance with the definition of "Deliver." Initially, the Custodian shall be State Street Bank and Trust Company. Any successor custodian shall be a state or national bank or trust company that is not an Affiliate of the Issuer or the Co-Issuer, has a short-term rating of at least "A-1" by S&P (or a long-term rating of at least "A+" by S&P if such institution has no short-term rating) and has combined capital and surplus of at least U.S.$200,000,000 and is a Securities Intermediary. Subject to the limited right to relocate Pledged Obligations as provided in Section 7.5(b), the Trustee shall hold all Collateral Obligations, Eligible Investments, other assets purchased in accordance with this Indenture (other than Loans, Participations and general intangibles) and Cash in the relevant Account established and maintained pursuant to Section 10, as to which in each case the Trustee shall have entered into a Securities Account control agreement with the Custodian in accordance with Section 8 of the UCC providing, *inter alia*, that the establishment and maintenance of the Account shall be governed by the law of the State of New York.

(b)     Each time that the Issuer, or the Servicer on behalf of the Issuer, directs or causes the acquisition of any Collateral Obligation, Eligible Investment or other assets, the Servicer (on behalf of the Issuer) shall, if the Collateral Obligation, Eligible Investment or other asset is required to be, but has not already been, transferred to the relevant Account, cause the Collateral Obligation, Eligible Investment or other asset to be Delivered to the Custodian to be held in the Custodial Account (or in the case of any such asset that is not a Collateral Obligation, in the Account in which the funds used to purchase the asset are held in accordance with Section 10) for the benefit of the Trustee in accordance with this Indenture. The security interest of the Trustee in the funds or other property used in connection with the acquisition shall, immediately and without further action on the part of the Trustee, be released. The security interest of the Trustee shall nevertheless come into existence and continue in the Collateral Obligation, Eligible Investment or other asset so acquired, including all interests of the Issuer in to any contracts related to and proceeds of the Collateral Obligations, Eligible Investments or other assets.

**3.3**     **Representations as to Collateral**

(a)     The Issuer hereby represents and warrants to the Secured Parties as to the Collateral as follows (which representations are repeated on each day on which the Issuer acquires new Collateral):

    (i)     This Indenture creates a valid and continuing security interest (as defined in the applicable Uniform Commercial Code) in the Collateral in favor of the Trustee, which security interest is prior to all other liens, charges, claims, security interests, mortgages and other encumbrances, and is enforceable as such as against creditors of and purchasers from the Issuer.

    (ii)     Except for any Securities Lending Collateral and Synthetic Securities Collateral, the Issuer has good and marketable title to and is the owner of each item of Collateral free of any liens, claims, or encumbrances of any nature whatsoever except for liens (A) that are being released on the Closing Date and (B) granted pursuant to or permitted by this Indenture. The Issuer has a first priority security interest in all Securities Lending Collateral to secure all obligations of Securities Lending Counterparty under the Securities Lending Agreement and a first priority interest in all Synthetic Securities Collateral to secure all obligations of Synthetic Security Counterparty under the Synthetic Securities Agreement.

    (iii)     The Issuer has not assigned, pledged or otherwise encumbered any interest in the Collateral (or, if any interest in the Collateral has been assigned, pledged or otherwise encumbered, it has been released before the Closing Date or is being released on the Closing Date) other than interests granted pursuant to or permitted by this Indenture.

    (iv)     The Issuer has full right, and has received all consents and approvals required by the related Underlying Instruments, to grant a security interest in its rights in the Collateral to the Trustee.

    (v)     Each Collateral Obligation included in the Collateral satisfied the requirements of the definition of "Collateral Obligation" as of the date the Issuer committed to purchase the same or, in the case of the Loans with respect to which loans were made by Pre-Closing Participant and repaid by the Issuer on the Closing Date, as of the Closing Date.

    (vi)     All Collateral Obligations, any obligation that at the time of acquisition, conversion or exchange did not satisfy the requirements of a Collateral Obligation, and Eligible Investments (other than, in each case, "general intangibles" within the meaning of the applicable Uniform Commercial Code) have been and will have been credited to one of the Accounts. The securities intermediary for each Account has agreed to treat all assets

credited to the Accounts as "financial assets" within the meaning of the applicable Uniform Commercial Code.

(vii) The Issuer has pledged to the Trustee all of the Issuer's interest in each Collateral Obligation included in the Collateral pursuant to the Granting Clauses of this Indenture and has delivered each Collateral Obligation (including any promissory note and all its other Underlying Instruments to the extent received by the Issuer) to the Trustee or the Custodian as contemplated by Section 3.2.

(viii) Each of the Collateral constitutes "general intangibles," "certificated securities," "instruments," "securities entitlements," "uncertificated securities," "chattel paper" or Securities Accounts, each within the meaning of the applicable Uniform Commercial Code, or any other category of collateral under the applicable Uniform Commercial Code as to which the Issuer has complied with its obligations under Section 3.2(b).

(ix) The Issuer has caused (or will have caused within 30 days following the Closing Date) the filing of appropriate financing statements in the proper filing offices in the appropriate jurisdictions under applicable law to perfect the security interest in the portion of the Collateral pledged to the Trustee under this Indenture that may be perfected by the filing of financing statements.

(x) The Issuer has not authorized the filing of and is not aware of any financing statements against the Issuer that include a description of collateral covering the Collateral other than any financing statement (A) relating to the security interest granted to the Trustee under this Indenture, (B) that has been terminated or (C) that names the Trustee as the secured party. On the date of this Indenture, the Issuer is not aware of any judgment or Pension Benefit Guaranty Corporation or tax lien filings against the Issuer.

(xi) The Issuer has delivered to the Trustee a fully executed agreement pursuant to which the securities intermediary for each Account has agreed to comply with all instructions originated by the Trustee relating to the Account without further consent by the Issuer.

(xii) All original executed copies of each "instrument" (as defined in each applicable Uniform Commercial Code) that are or evidence the Collateral have been delivered to the Custodian, to the extent received by the Issuer. The Issuer has received confirmation from the Custodian that the Custodian has credited the instruments to one of the Accounts. None of the instruments that are or evidence the Collateral has any marks or notations indicating that they are then pledged or otherwise assigned to any Person other than the Trustee.

(xiii)   The Accounts are not in the name of any Person other than the Issuer or the Trustee.  The Issuer has not consented to the securities intermediary of any Account to comply with instructions of any Person other than the Trustee.

(xiv)   All "certificated securities" (as defined in each applicable Uniform Commercial Code) that are or evidence the Collateral have been delivered to the Custodian, to the extent received by the Issuer, registered in the name of the Custodian or indorsed to the Custodian.  The Issuer has received confirmation from the Custodian that the Custodian has credited such certificated securities to one of the Accounts.

(xv)   The Issuer has caused all "uncertificated securities" (as defined in each applicable Uniform Commercial Code) that are or evidence the Collateral to be registered in the name of the Custodian.

(xvi)   Upon grant by the Issuer, the Trustee has a first priority perfected security interest in the Collateral.

The parties to this Indenture shall not waive any of the representations in this Section 3.3, unless the Rating Condition is satisfied in connection with such waiver. The Issuer shall provide each of the Rating Agencies with prompt written notice of any breach of the representations contained in this Section 3.3 upon becoming aware thereof, and shall not waive a breach of any of the representations in this Section 3.3, unless the Rating Condition is satisfied (as determined after any adjustment or withdrawal of the ratings following notice of such breach) in connection with such waiver.

If the Issuer acquires Collateral that is not "general intangibles," "certificated securities," "instruments," Securities Accounts, "chattel paper," "securities entitlements" or "uncertificated securities," each within the meaning of the applicable Uniform Commercial Code, or another category of collateral under the applicable Uniform Commercial Code as to which the Issuer has complied with its obligations under this Section 3.3(b), then on or before the date on which the Issuer acquires the Collateral, the Issuer (or the Servicer on behalf of the Issuer) shall notify S&P and the Trustee (for the benefit of the Secured Parties) of its acquisition or intended acquisition of the Collateral and the Issuer shall represent to S&P and to the Trustee (for the benefit of the Secured Parties) as to the category of the Collateral under the applicable Uniform Commercial Code and shall make any further representations as to the perfection and priority of the security interest in the Collateral Granted under this Indenture acceptable to S&P.

4.     SATISFACTION AND DISCHARGE

**4.1    Satisfaction and Discharge of Indenture**

This Indenture shall be discharged and shall cease to be of further effect with respect to the Notes and the Collateral except as to:

> (i)    rights of registration of transfer and exchange,
>
> (ii)    substitution of mutilated, destroyed, lost or stolen Notes,
>
> (iii)    rights of Noteholders to receive payments of principal or interest on, or other amounts (including without limitation Extension Bonus Payments) owing in respect of, the Notes as provided in this Indenture,
>
> (iv)    the rights, indemnities, and immunities of the Trustee under this Indenture and the obligations of the Trustee under Section 7.3 of this Indenture with respect to the holding and paying of unclaimed funds,
>
> (v)    for so long as any Preference Shares remain Outstanding, any provisions hereof conferring any rights or remedies upon the Holders of the Preference Shares or the Preference Shares Paying Agent on behalf of the Holders of the Preference Shares, including but not limited to, the provisions of Sections 7, 8, 10, 11, 12, 14 and 15,
>
> (vi)    for so long as any Preference Shares remain Outstanding, the provisions of Sections 10, 11 and 12 relating to the acquisition, retention and disbursement of Collateral,
>
> (vii)    the rights, obligations, and immunities of the Servicer under this Indenture and under the Servicing Agreement, and
>
> (viii)    the rights of Noteholders as beneficiaries of this Indenture with respect to the property deposited with the Trustee and payable to any of them (and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture),

when:

(a)    either:

> (i)    all Notes theretofore authenticated and delivered to Holders of Notes (other than (A) Notes that have been destroyed, lost or stolen and which have been replaced or paid as provided in Section 2.7 and (B) Notes for whose payment money has theretofore irrevocably been deposited in trust

and thereafter repaid to the Issuer or discharged from the trust, as provided in Section 7.3), have been delivered to the Trustee for cancellation; or

(ii) all Notes not theretofore delivered to the Trustee for cancellation

    (A)    have become payable, or

    (B)    will become payable at their Stated Maturity within one year, or

    (C)    are to be called for redemption pursuant to Section 9 under an arrangement satisfactory to the Trustee for the giving of notice of redemption by the Applicable Issuers pursuant to Section 9.3,

and the Issuer has irrevocably deposited with the Trustee, in trust for payment of the principal and interest on the Notes, Cash or non-callable obligations of the United States of America. The obligations deposited under Section 4.1(a)(ii) with respect to the other Notes must be entitled to the full faith and credit of the United States of America or be debt obligations that are rated "Aaa" by Moody's and "AAA" by S&P, in an amount sufficient, as verified by a firm of Independent certified public accountants that are nationally recognized, to pay and discharge the entire indebtedness on the Notes not theretofore delivered to the Trustee for cancellation, for principal and interest to the date of the deposit (in the case of Notes that have become payable), or to the respective Stated Maturity or the respective Redemption Date, as the case may be, and the Issuer shall have Granted to the Trustee a valid perfected security interest in the Eligible Investment that is of first priority, free of any adverse claim, and shall have furnished an Opinion of Counsel with respect thereto. Section 4.1(a)(ii) shall not apply if an election to act in accordance with Section 5.5(a) has been made and not rescinded. In addition, the Issuer shall cause delivery to the Trustee of a Tax Opinion of Counsel to the effect that the Noteholders would recognize no income, gain or loss for U.S. federal income tax purposes as a result of the deposit and satisfaction and discharge of this Indenture;

(b) the Issuer has paid all other sums then payable under this Indenture by the Issuer and no other amounts are scheduled to be payable by the Issuer; and

(c) the Co-Issuers have delivered to the Trustee Officer's certificates and an Opinion of Counsel, each stating that all conditions precedent in this Indenture provided for relating to the satisfaction and discharge of this Indenture have been complied with.

Notwithstanding the satisfaction and discharge of this Indenture, the rights and obligations of the Co-Issuers, the Trustee, the Servicer and, if applicable, the

Noteholders, as the case may be, under Sections 2.8, 4.2, 5.4(d), 5.9, 5.18, 6.7, 6.8, 7.1, 7.3, 13.1 and 14.13 shall survive.

## 4.2 Application of Trust Money

All monies deposited with the Trustee pursuant to Section 4.1 shall be held in trust for the Person entitled to it and applied by the Trustee in accordance with the Notes and this Indenture, including the Priority of Payments, to the payment of principal and interest, either directly or through any Paying Agent, as the Trustee may determine. The money shall be held in a segregated Securities Account identified as being held in trust for the benefit of the Secured Parties.

## 4.3 Repayment of Monies Held by Paying Agent

In connection with the satisfaction and discharge of this Indenture with respect to the Notes, all monies then held by any Paying Agent other than the Trustee under this Indenture shall, upon demand of the Co-Issuers, be paid to the Trustee to be held and applied pursuant to Section 7.3 and in accordance with the Priority of Payments and thereupon the Paying Agent shall be released from all further liability with respect to the monies.

## 5. REMEDIES

## 5.1 Events of Default

*Event of Default*, wherever used in this Indenture, means any one of the following events whatever the reason:

(a)     a default for four Business Days in the payment of any interest on the Class A-1 Notes, the Class A-2 Notes or the Class B Notes, or, if no Class A-1 Notes, Class A-2 Notes or Class B Notes are Outstanding, a default in the payment of any interest on the Controlling Class, in each case, when it becomes payable (or in the case of a default in payment due to an administrative error or omission by the Trustee, the Irish Paying Agent or the Indenture Registrar, after seven Business Days);

(b)     a default in the payment of principal (including Deferred Interest) of any Note, when the same becomes payable, at its Stated Maturity or on the Redemption Date;

(c)     the failure on any Payment Date to disburse amounts available in the Payment Account in accordance with the Priority of Payments and the failure continues for three Business Days;

(d)     on any Measurement Date for so long as any Class A-1 Notes or Class A-2 Notes are Outstanding, the Class A Overcollateralization Ratio is less than 100%;

(e)     either of the Co-Issuers or the pool of Collateral becomes an investment company under the Investment Company Act;

(f)     breach of any other covenant or other agreement of the Issuer or the Co-Issuer in this Indenture (other than any failure to satisfy any of the Collateral Quality Tests, any of the Concentration Limitations, any of the Coverage Tests, the Retention Overcollateralization Test, or other covenants or agreements for which a specific remedy has been provided in this Section 5.1) in any material respect, or the failure of any representation or warranty of the Issuer or the Co-Issuer in this Indenture or in any certificate or other writing delivered pursuant thereto, or in connection therewith, to be correct in any material respect when made, and the breach or failure continues for 30 days after either of the Co-Issuers has actual knowledge of it or after notice to the Issuer, the Co-Issuer, and the Servicer by the Trustee or to the Issuer, the Co-Issuer, the Servicer, and the Trustee by the Holders of at least 25% of the Aggregate Outstanding Amount of the Controlling Class by registered or certified mail or overnight courier specifying the breach or failure and requiring it to be remedied and stating that the notice is a "Notice of Default" under this Indenture;

(g)     the entry of a decree or order by a court having competent jurisdiction adjudging the Issuer or the Co-Issuer as bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment, or composition of the Issuer or the Co-Issuer under the Bankruptcy Law or any other applicable law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, or ordering the winding up or liquidation of its affairs, and if the decree or order remains unstayed and in effect for 45 consecutive days;

(h)     the institution by the shareholders of the Issuer or the Co-Issuer of Proceedings to have the Issuer or Co-Issuer, as the case may be, adjudicated as bankrupt or insolvent, or the consent by the shareholders of the Issuer or the Co-Issuer to the institution of bankruptcy or insolvency Proceedings against the Issuer or Co-Issuer, or the filing by the Issuer or the Co-Issuer of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Law or any other similar applicable law, or the consent by the Issuer or the Co-Issuer to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee, or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, or the making by the Issuer or the Co-Issuer of an assignment for the benefit of creditors, or the admission by the Issuer or the Co-Issuer in writing of its inability to pay its debts generally as they become due, or the taking of any action by the Issuer or the Co-Issuer in furtherance of any such action; or

(i)     one or more final judgments is rendered against the Issuer or the Co-Issuer that exceed in the aggregate U.S.$2,000,000 and that remain unstayed, undischarged,

and unsatisfied for 30 days after the judgments become nonappealable, unless adequate funds have been reserved or set aside for their payment.

**5.2    Notice of Event of Default; Acceleration of Maturity; Rescission and Annulment**

(a)    Upon the occurrence of an Event of Default, the Trustee shall give prompt (and in no event later than five Business Days after becoming aware of such event) notice thereof to the Noteholders.

(b)    If an Event of Default is continuing (other than an Event of Default specified in Section 5.1(e), (g) or (h)), the Trustee may, with consent of the Majority of the Controlling Class, and shall, upon the written direction of a Majority of the Controlling Class, declare the principal of all the Notes to be immediately payable by notice to the Applicable Issuers and the Noteholders, and upon that declaration the unpaid principal of all the Notes, together with all its accrued and unpaid interest (and any applicable Defaulted Interest Charge), and other amounts payable under this Indenture, shall become immediately payable.    The Replacement Period shall terminate upon a declaration of acceleration (subject to re-commencement pursuant to Section 5.2(c)).  If an Event of Default specified in Section 5.1(e), (g) or (h) occurs, all unpaid principal, together with all its accrued and unpaid interest (and any applicable Defaulted Interest Charge), of all the Notes, and other amounts payable under this Indenture, shall automatically become payable without any declaration or other act on the part of the Trustee or any Noteholder and the Replacement Period shall terminate automatically (subject to re-commencement pursuant to Section 5.2(c)).

(c)    At any time after the declaration of acceleration of maturity has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee, a Majority of the Controlling Class by written notice to the Issuer, the Trustee and the Preference Shares Paying Agent may rescind the declaration and its consequences:

(i)    The Issuer or the Co-Issuer has paid or deposited with the Trustee a sum sufficient to pay:

(A)    all unpaid installments of interest and principal on the Notes then due;

(B)    to the extent that payment of the interest is lawful, interest on any Deferred Interest and Defaulted Interest at the Applicable Note Interest Rate or Default Interest Rate, as applicable;

(C)    all Administrative Expenses of the Co-Issuers and other sums paid or advanced by the Trustee under this Indenture;

       (D)      all unpaid Senior Servicing Fees;

       (E)      all amounts then payable to any Hedge Counterparty; and

   (ii)   The Trustee has determined that all Events of Default, other than the non-payment of the interest on or principal of the Notes, have been (A) cured, and a Majority of the Controlling Class by written notice to the Trustee has agreed with that determination, or (B) waived as provided in Section 5.14.

No such rescission shall affect any subsequent Default or impair any right consequent thereon. The Issuer shall not terminate any Hedge Agreement at any time after a declaration of acceleration of Maturity of the Notes has been made, unless such declaration and its consequences may no longer be rescinded and annulled in accordance with this Section 5.2(c) and liquidation of the Collateral has begun.

If a declaration of acceleration is rescinded as described above:

   (x)      the Replacement Period, if terminated by the declaration, shall re-commence on the date of the rescission (unless the Replacement Period would have otherwise terminated before that date pursuant to clauses (i), (ii), or (iii) of its definition); and

   (y)      the Trustee shall retain the Collateral in accordance with this Indenture. If the retention of the Collateral is rescinded pursuant to Section 5.5, the Notes may again be accelerated pursuant to Section 5.2(b), notwithstanding any previous rescission of a declaration of acceleration pursuant to this Section 5.2(c).

No rescission shall affect any subsequent Default or impair any right resulting from the Default.

(d)      Notwithstanding anything in this Section 5.2 to the contrary, the Notes will not be subject to acceleration by the Trustee, a Majority of the Controlling Class or any other Holders solely as a result of the failure to pay any amount due on Notes that are not of the Controlling Class.

**5.3**      **Collection of Indebtedness and Suits for Enforcement by Trustee**

The Applicable Issuers covenant that if a default occurs in the payment of any principal of or interest when payable on any Note, upon demand of the Trustee or the Holder of any affected Note, the Applicable Issuers shall pay to the Trustee, for the benefit of the Holder of the Note, the whole amount then payable on the Note for principal and interest with interest on the overdue principal and, to the extent that payments of the interest shall be legally enforceable, on overdue installments of interest and all other amounts owing to

the Noteholders under this Indenture, at the Applicable Note Interest Rate or Default Interest Rate, as applicable, and, in addition, an amount sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee and the Holders and their agents and counsel.

If the Issuer or the Co-Issuer fails to pay those amounts immediately on demand, the Trustee, in its own name and as Trustee of an express trust, may, with the consent of the Majority of the Controlling Class, and shall at the written direction of a Majority of the Controlling Class (subject to Section 6.3(e)), institute a Proceeding for the collection of the sums due, may prosecute the Proceeding to judgment or final decree, and may enforce the same against the Applicable Issuers or any other obligor on the Notes and collect the monies determined to be payable in the manner provided by law out of the Collateral.

If an Event of Default is continuing, the Trustee may, with the consent of the Majority of the Controlling Class, and shall upon written direction of a Majority of the Controlling Class (subject to Section 6.3(e)), proceed to protect and enforce its rights and the rights of the Noteholders by any appropriate Proceedings as is deemed most effective (if no direction is received by the Trustee) or as the Trustee may be directed by a Majority of the Controlling Class, to protect and enforce the rights of the Trustee and the Noteholders, whether for the specific enforcement of any agreement in this Indenture or in aid of the exercise of any power granted in this Indenture, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by this Indenture or by law. The reasonable compensation, costs, expenses, disbursements and advances incurred or paid by the Trustee and its agents and counsel, in connection with such Proceeding, including, without limitation, the exercise of any remedies pursuant to Section 5.4, shall be reimbursed to the Trustee pursuant to Section 6.8.

If any Proceedings are pending relating to the Issuer or the Co-Issuer or any other obligor on the Notes under the Bankruptcy Law or any other applicable bankruptcy, insolvency or other similar law, or if a receiver, assignee, or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official has been appointed for or taken possession of the Issuer, the Co-Issuer or their respective property or any other obligor on the Notes or its property, or if any other comparable Proceedings are pending relating to the Issuer, the Co-Issuer or other obligor on the Notes, or the creditors or property of the Issuer, the Co-Issuer or other obligor on the Notes, the Trustee, regardless of whether the principal of any Notes is then payable by declaration or otherwise and regardless of whether the Trustee has made any demand pursuant to this Section 5.3, may, by intervention in the Proceedings or otherwise:

(a)     file and prove claims for the whole amount of principal and interest owing and unpaid in respect of the Notes, and file any other papers or documents appropriate and take any other appropriate action (including sitting on a committee of creditors) to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys, and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor

Trustee, except as a result of negligence or bad faith) and of the Noteholders allowed in any Proceedings relating to the Issuer, the Co-Issuer, or other obligor on the Notes or to the creditors or property of the Issuer, the Co-Issuer or other obligor on the Notes;

(b)   unless prohibited by applicable law, vote on behalf of the Noteholders in any election of a trustee or a standby trustee in arrangement, reorganization, liquidation or other bankruptcy or insolvency Proceedings or Person performing similar functions in comparable Proceedings; and

(c)   collect and receive any monies or other property payable to or deliverable on any such claims, and distribute all amounts received with respect to the claims of the Noteholders and of the Trustee on their behalf; and any trustee, receiver or liquidator, custodian or other similar official is authorized by each of the Noteholders to make payments to the Trustee, and, if the Trustee consents to making payments directly to the Noteholders, to pay to the Trustee amounts sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee, and their respective agents, attorneys, and counsel, and all other reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee except as a result of negligence or bad faith.

Nothing in this Indenture shall authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of the Holder of any Note, any plan of reorganization, arrangement, adjustment or composition affecting the Notes or any Noteholder, or to authorize the Trustee to vote on the claim of the Holder of any Note in any Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar Person.

Notwithstanding anything in this Section 5.3 to the contrary, the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance of the sale or liquidation of the Collateral pursuant to this Section 5.3 except according to Section 5.5(a).

**5.4    Remedies**

(a)   If an Event of Default is continuing, and the Notes have been declared payable and the declaration and its consequences have not been rescinded, or at any time after the Stated Maturity, the Co-Issuers agree that the Trustee may, with the consent of the Majority of the Controlling Class, and shall, upon written direction of a Majority of the Controlling Class (subject to Section 6.3(e)), to the extent permitted by applicable law, exercise one or more of the following rights:

   (i)   institute Proceedings for the collection of all amounts then payable on the Notes or otherwise payable under this Indenture, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Collateral any monies adjudged due;

    (ii)   sell or liquidate all or a portion of the Collateral or interests in it, at one or more public or private sales called and conducted in any manner permitted by law and in accordance with Section 5.17;

    (iii)   institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to the Collateral;

    (iv)   exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights of the Trustee and the Noteholders under this Indenture; and

    (v)   exercise any other rights that may be available at law or in equity;

*except* that the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance of the sale or liquidation of the Collateral pursuant to this Section 5.4 except according to Section 5.5(a).

(b)    If an Event of Default as described in Section 5.1(f) is continuing the Trustee may, with the consent of, and shall, at the written direction of, the Holders of not less than 25% of the Aggregate Outstanding Amount of the Controlling Class, subject to Section 5.8 (and subject to Section 6.3(e)), institute a Proceeding solely to compel performance of the covenant or agreement or to cure the representation or warranty, the breach of which gave rise to the Event of Default under Section 5.1(f), and enforce any equitable decree or order arising from the Proceeding.

(c)    Upon any sale, whether made under the power of sale given under this Indenture or by virtue of judicial Proceedings, any Holders or the Servicer (subject to the Servicing Agreement) may bid for and purchase any part of the Collateral and, upon compliance with the terms of sale, may hold, retain, possess, or dispose of the Collateral in its or their own absolute right without accountability.

    Upon any sale, whether made under the power of sale given under this Indenture or by virtue of judicial Proceedings, the receipt of the Trustee, or of the Officer making a sale under judicial Proceedings, shall be a sufficient discharge to the purchasers at any sale for their purchase money, and the purchasers shall not be obliged to see to its application.

    Any sale, whether under any power of sale given under this Indenture or by virtue of judicial Proceedings, shall bind the Co-Issuers, the Trustee and the Noteholders, shall operate to divest all interest whatsoever, either at law or in equity, of each of them in the property sold, and shall be a perpetual bar, both at law and in equity, against each of them and their successors and assigns, and against all Persons claiming through or under them.

(d)    Notwithstanding any other provision of this Indenture, none of the Trustee, the Secured Parties or the Noteholders may, before the date that is one year and one

day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes, institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium, or liquidation Proceedings, or other Proceedings under the Bankruptcy Law or any similar laws in any jurisdiction. Nothing in this Section 5.4 shall preclude the Trustee or any Secured Party (i) from taking any action before the expiration of that period in (A) any case or Proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer or (B) any involuntary insolvency Proceeding filed or commenced by a Person other than a Secured Party or (ii) from commencing against the Issuer or the Co-Issuer or any of its properties any legal action that is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceeding.

**5.5     Optional Retention of Collateral**

(a)     Notwithstanding anything to the contrary in this Indenture, if an Event of Default is continuing, the Trustee shall retain the Collateral, collect, and cause the collection of the proceeds of the Collateral and make and apply all payments and deposits and maintain all accounts in respect of the Collateral and the Notes, and any Hedge Agreements (other than amounts received under a Hedge Agreement that are used in putting a Replacement Hedge in place), in accordance with the Priority of Payments and Section 10 and Section 12 unless:

(i)     the Trustee, in consultation with the Servicer, determines that the anticipated net proceeds of a sale or liquidation of the Collateral would be sufficient to discharge in full the amounts then due and unpaid on the Notes for principal and interest (including Defaulted Interest and Deferred Interest and any interest on the Defaulted Interest and Deferred Interest), all Administrative Expenses, all other amounts (if any) then payable to the Hedge Counterparty by the Issuer (including any applicable termination payments) net of all amounts then payable to the Issuer by the Hedge Counterparty and all other amounts then payable under clause (3) of Section 11.1(a)(i) and a Majority of the Controlling Class agrees with that determination;

(ii)     the Holders of a Super Majority of each of the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes direct the sale and liquidation of the Collateral; or

(iii)     the Class A/B Overcollateralization Ratio is less than 90% and the Holders of a Majority of the Class A-1 Notes, the Class A-2 Notes and the Class B Notes voting together as a single Class direct the sale and liquidation of the Collateral; **provided** that upon such direction, the Trustee shall (x) first sell or liquidate any Collateral for which either (A) two or more bid-side prices have been determined by an Approved Pricing Service or (B) bid-side prices have been obtained from at least two nationally recognized

broker-dealers selected by a Majority of the Controlling Class and (y) thereafter shall sell or liquidate such remaining Collateral to the extent such Collateral can be liquidated or sold in accordance with the Indenture and applicable law; provided that any Collateral consisting of equity securities or Defaulted Collateral Obligations shall not be subject to sale or liquidation pursuant to this clause (iii).

If any Collateral is sold in accordance with clause (a)(iii)(x) above and Highland Capital Management, L.P. is the Servicer, the Servicer shall have the exclusive right to purchase such Collateral for the first two Business Days from the date the last of such bid-prices was determined by an Approved Pricing Service or obtained from a nationally recognized broker-dealer selected by a Majority of the Controlling Class with respect to such Collateral at a price equal to the highest bid-price for such Collateral that was determined by an Approved Pricing Service or obtained from a nationally recognized broker-dealer selected by a Majority of the Controlling Class and, thereafter, the Trustee may sell such Collateral to other parties in accordance with the terms hereof; **provided** that, in any such case, such sale to the Servicer or to any other party is effected in compliance with applicable law, including all notice and other provisions under the UCC.

The Trustee shall give written notice of the retention of the Collateral to the Issuer with a copy to the Co-Issuer and the Servicer. So long as the Event of Default is continuing, any retention pursuant to this Section 5.5(a) may be rescinded at any time when the conditions specified in clause (i) or (ii) exist.

(b)     Nothing contained in Section 5.5(a) shall be construed to require the Trustee to sell the Collateral if the conditions in clause (i) or (ii) of Section 5.5(a) are not satisfied. Nothing contained in Section 5.5(a) shall be construed to require the Trustee to retain the Collateral if prohibited by applicable law.

(c)     In determining whether the condition specified in Section 5.5(a)(i) exists, the Trustee, in consultation with the Servicer, shall obtain bid prices with respect to each security contained in the Collateral from two nationally recognized dealers (or if there is only one market maker, that market maker and if there is no market maker, from a pricing service) selected and specified by the Servicer to the Trustee in writing, at the time making a market in those securities, and shall compute the anticipated proceeds of sale or liquidation on the basis of the lower of the bid prices for each security. In addition, for the purposes of determining issues relating to the valuation of the Collateral, the satisfaction of the conditions specified in this Indenture, the execution of a sale or liquidation of the Collateral, and the execution of a sale or other liquidation of the Collateral in connection with a determination whether the condition specified in Section 5.5(a)(i) exists, the Trustee may retain, at the Issuer's expense, and rely on an opinion of an Independent investment banking firm of national reputation, which may be either of the Initial Purchasers.

The Trustee shall deliver to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Noteholders, the Co-Issuers, the Servicer and the Hedge Counterparties a report stating the results of any determination required pursuant to Section 5.5(a)(i). The Trustee shall make the determinations required by Section 5.5(a)(i) after an Event of Default at the written request of a Majority of the Controlling Class at any time during which the Trustee retains the Collateral pursuant to Section 5.5(a) (**provided** that to the extent any such request is made more than once per fiscal quarter, the Trustee may require that such determination be at the expense of such requesting Holders). The Trustee shall obtain (at the Issuer's expense) a letter of a firm of Independent certified public accountants confirming the accuracy of each calculation made by the Trustee pursuant to Section 5.5(a)(i) and certifying their conformity to the requirements of this Indenture.

(d)     Notwithstanding anything in this Indenture to the contrary, the Trustee may not, and the Noteholders representing the requisite percentage of the Aggregate Outstanding Amount of the Notes specified in Section 5.4 or 5.5, may not instruct the Trustee to sell or liquidate or (except in connection with the concurrent execution of a Replacement Hedge) terminate any Hedge Agreement during the continuance of an Event of Default until all Collateral other than the Hedge Agreements has been sold or liquidated and its proceeds applied in accordance with this Indenture.

(e)     Collateral may not be sold or liquidated pursuant to Section 5.5(a)(i) after the last date on which the sale or liquidation is permitted under Section 5.5(a)(i) with respect to a determination made pursuant to Section 5.5(a)(i) (the last permitted date being determined by the Trustee under Section 5.5(a)(i)), unless a new determination is made in accordance with Section 5.5(a)(i) and the Collateral is sold or liquidated before the last sale date permitted in accordance with the new determination.

## 5.6     Trustee May Enforce Claims Without Possession of Notes

All rights of action and claims under this Indenture or under any of the Notes may be prosecuted and enforced by the Trustee without the possession of any of the Notes or their production in any trial or other Proceeding relating to them, and any Proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall be applied as provided in Section 5.7.

In any Proceedings brought by the Trustee (and any Proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party) the Trustee shall be held to represent all the Noteholders.

**5.7**     **Application of Money Collected**

Any money collected by the Trustee with respect to the Notes pursuant to this Section 5 and any money that may then be held or subsequently received by the Trustee with respect to the Notes under this Indenture shall be applied, subject to Section 13.1 and in accordance with Section 11.1, at the dates fixed by the Trustee.

**5.8**     **Limitation on Suits**

No Holder of any Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy under this Indenture, unless:

(a)     the Holder has previously given to the Trustee written notice of an Event of Default;

(b)     the Holders of not less than 25% of the Aggregate Outstanding Amount of the Controlling Class shall have made written request to the Trustee to institute Proceedings with respect to the Event of Default in its own name as Trustee under this Indenture and the Holders have offered to the Trustee indemnity satisfactory to it against the expenses and liabilities to be incurred in compliance with the request;

(c)     the Trustee for 30 days after its receipt of the notice, request and offer of indemnity has failed to institute a Proceeding; and

(d)     no direction inconsistent with the written request has been given to the Trustee during the 30 day period by a Majority of the Controlling Class.

No Noteholder shall have any right in any manner whatsoever by virtue of, or by availing of, any provision of this Indenture to affect the rights of any other Noteholders of the same Class or to obtain or to seek to obtain priority or preference over any other Holders of Notes of the same Class or to enforce any right under this Indenture, except in the manner provided in this Indenture and for the equal and ratable benefit of all the Holders of Notes of the same Class subject to and in accordance with Section 13.1 and the Priority of Payments or Section 11.2, as the case may be.

If the Trustee receives conflicting or inconsistent requests and indemnity from two or more groups of Holders of the Controlling Class, each representing less than a Majority of the Controlling Class pursuant to this Section 5.8, the Trustee shall take the action requested by the Holders of the largest percentage in Aggregate Outstanding Amount of the Controlling Class, notwithstanding any other provisions of this Indenture but subject to Section 6.3(e).

**5.9    Unconditional Rights of Noteholders**

Notwithstanding any provision of this Indenture other than this Section 5.9 and Sections 2.8(i), 5.4(d), and 13.1, the Holder of any Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on the Note  as it comes due in accordance with the Priority of Payments and Section 13.1, and, subject to Section 5.8, to institute proceedings for the enforcement of any such payment, and that right shall not be impaired without the consent of the Holder.  Noteholders ranking junior to Notes still Outstanding may not institute proceedings for the enforcement of any such payment until no Note ranking senior to their Note remains Outstanding, subject to Section 5.8. For so long as any Notes are Outstanding, the Preference Shares Paying Agent shall not be entitled to any payment of any amount for payments to the Holders of the Preference Shares pursuant to the Preference Share Documents, to the extent legally permitted, on a claim against the Issuer unless there are sufficient funds to pay such amounts to the Preference Shares Paying Agent in accordance with the Priority of Payments.

**5.10    Restoration of Rights and Remedies**

If the Trustee or the Holder of any Note has instituted any Proceeding to enforce any right under this Indenture and the Proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to the Holder, then, subject to any determination in the Proceeding, the Co-Issuers, the Trustee and the Holder shall be restored to their former positions under this Indenture, and thereafter all rights of the Trustee and the Holder shall continue as though no Proceeding had been instituted.

**5.11    Rights and Remedies Cumulative**

No right in this Indenture conferred on or reserved to the Trustee or to the Noteholders is intended to be exclusive of any other right, and every right shall, to the extent permitted by law, be cumulative and in addition to every other right given under this Indenture or now or hereafter existing at law or in equity or otherwise.  The assertion or employment of any right under this Indenture, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right.

**5.12    Delay or Omission Not Waiver**

No delay or omission of the Trustee or the Holder of any Note to exercise any right accruing upon any Event of Default shall impair the right or be a waiver of the Event of Default or an acquiescence in it or of a subsequent Event of Default.  Every right given by this Section 5 or by law to the Trustee or to the Noteholders may be exercised from time to time, and as often as deemed expedient, by the Trustee or by the applicable Noteholders.

**5.13    Control by Majority of the Controlling Class**

(a)    Notwithstanding any other provision of this Indenture, during the continuance of an Event of Default, a Majority of the Controlling Class may institute and direct the time, method and place of conducting any Proceeding for any remedy available to the Trustee, or exercising any right of the Trustee with respect to the Notes if:

  (i)    the direction does not conflict with any rule of law or with any express provision of this Indenture; and

  (ii)    the Trustee has been indemnified to its reasonable satisfaction (and the Trustee need not take any action that it determines might involve it in liability unless it has received an indemnity against the liability).

  Notwithstanding the foregoing, only a Majority of the Controlling Class may direct proceedings with respect to remedies specified in Section 5.4(a) or otherwise with respect to the Collateral.

(b)    The Trustee may take any other action deemed proper by the Trustee that is not inconsistent with a direction under Section 5.13(a).  Subject to Section 6.1, the Trustee need not take any action that it determines might involve it in liability or expense (unless the Trustee has received an indemnity against the liabilities and expenses reasonably satisfactory to it) and during the continuance of an Event of Default that has not been cured, or waived, the Trustee shall, before receiving directions from a Majority of the Controlling Class, exercise the rights expressly vested in it by this Indenture and use the same degree of care and skill in their exercise with respect to the Event of Default as is required by Section 6.1(b).

(c)    Any direction to the Trustee to undertake a Sale of the Collateral shall be in accordance with Section 5.4 or 5.5.

**5.14    Waiver of Past Defaults**

Before a judgment or decree for payment of any money due has been obtained by the Trustee, as provided in this Section 5, a Majority of the Controlling Class may on behalf of the Holders of all the Notes, with respect to the Notes waive any past Default and its consequences, except a Default:

(a)    in the payment of the principal or Redemption Price of any Note or in the payment of interest (including Defaulted Interest, Deferred Interest, and any interest on Defaulted Interest or Deferred Interest) on the Notes;

(b)    with respect to a provision of this Indenture that under Section 8.2 cannot be modified or amended without the waiver or consent of the Holder of each Outstanding Note adversely affected by the modification or amendment;

(c)    in the payment of amounts due to the Servicer, the Trustee or the Hedge Counterparty, which may only be waived with the consent of the affected party; or

(d)    arising as a result of an Event of Default described in Section 5.1(e), (g) or (h).

Upon any such waiver, the Default shall cease to exist, and any Event of Default arising from it shall be cured, for every purpose of this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto. The Trustee shall promptly give written notice of any such waiver to the Servicer, S&P, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and each Noteholder.

## 5.15    Undertaking for Costs

All parties to this Indenture agree, and each Holder of any Note by its acceptance of its Note agrees, that in any suit for the enforcement of any right under this Indenture, or in any suit against the Trustee or the Servicer for any action taken or omitted by it as Trustee or for any action taken or omitted by the Servicer, as applicable, any court may in its discretion require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and that the court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 5.15 shall not apply to any suit instituted by the Trustee or the Servicer, to any suit instituted by any Holder, or group of Holders, of Notes holding in the aggregate more than 10% in Aggregate Outstanding Amount of the Controlling Class, or to any suit instituted by any Noteholder for the enforcement of the payment of the principal of or interest on any Note or any other amount payable under this Indenture after the applicable Stated Maturity (or, in the case of redemption, after the applicable Redemption Date).

## 5.16    Waiver of Stay or Extension Laws

To the extent that they may lawfully do so, the Co-Issuers covenant that they will not at any time insist on, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any valuation, appraisement, redemption, or marshalling law or rights, in each case wherever enacted, now or at any time hereafter in force, that may affect the covenants, the performance of, or any remedies under this Indenture. To the extent that they may lawfully do so, the Co-Issuers expressly waive all benefit or advantage of any such law or rights, and covenant that they shall not delay or impede the execution of any power in this Indenture granted to the Trustee or the Noteholders but will permit the execution of every power as though the law had not been enacted or rights created.

## 5.17    Sale of Collateral

(a)     The power to effect any sale (a ***Sale***) of any portion of the Collateral pursuant to Sections 5.4 and 5.5 shall not be exhausted by any one or more Sales as to any portion of the Collateral remaining unsold, but shall continue unimpaired until the entire Collateral is sold or all amounts secured by the Collateral have been paid. The Trustee may upon notice to the Noteholders and the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), and shall, at the direction of a Majority of the Controlling Class with respect to Collateral, from time to time postpone any Sale by public announcement made at the time and place of the Sale.  The Trustee waives its rights to any amount fixed by law as compensation for any Sale.  The Trustee may deduct the reasonable expenses (including the reasonable fees and expenses of its agents and attorneys) incurred by it in connection with a Sale from its proceeds notwithstanding Section 6.8.

(b)     The Trustee may bid for and acquire any portion of the Collateral in connection with a public Sale of the Collateral, and may pay all or part of the purchase price by crediting against amounts owing on the Notes or other amounts secured by the Collateral all or part of the net proceeds of the Sale after deducting the reasonable expenses incurred by the Trustee in connection with the Sale notwithstanding Section 6.8.  The Notes need not be produced to complete any Sale, or for the net proceeds of the Sale to be credited against amounts owing on the Notes.  The Trustee may hold, lease, operate, manage or otherwise deal with any property so acquired in any manner permitted by law in accordance with this Indenture.

(c)     If any portion of the Collateral consists of securities issued without registration under the Securities Act (***Unregistered Securities***), the Trustee may seek an Opinion of Counsel, or, if no Opinion of Counsel can be obtained, seek a no action position from the Securities and Exchange Commission or any other relevant federal or state regulatory authorities, regarding the legality of a public or private Sale of the Unregistered Securities.

(d)     The Trustee shall execute and deliver an appropriate instrument of transfer transferring its interest in any portion of the Collateral in connection with its Sale. In addition, the Trustee is irrevocably appointed the agent and attorney-in-fact of the Issuer to transfer its interest in any portion of the Collateral in connection with its Sale, and to take all action necessary to effect the Sale.  No purchaser or transferee at a Sale shall be bound to ascertain the Trustee's authority, to inquire into the satisfaction of any conditions precedent, or see to the application of any monies.

## 5.18    Action on the Notes

The Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture.  Neither the lien of this Indenture nor any rights or

remedies of the Trustee or the Noteholders shall be impaired by the recovery of any judgment by the Trustee against the Issuer or by the levy of any execution under the judgment on any portion of the Collateral or on any of the assets of the Issuer or the Co-Issuer.

6.      THE TRUSTEE

**6.1     Certain Duties and Responsibilities**

(a)     Except during the continuance of an Event of Default known to the Trustee:

      (i)     the Trustee undertakes to perform the duties and only the duties specifically provided in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

      (ii)     in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, on certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; the Trustee shall examine any certificates or opinions that by any provision of this Indenture are specifically required to be furnished to the Trustee to determine whether or not they substantially conform on their face to the requirements of this Indenture and shall promptly notify the party delivering the same if the certificate or opinion does not conform.  If a corrected form has not been delivered to the Trustee within 15 days after the notice from the Trustee, the Trustee shall so notify the Noteholders and the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares).

(b)     If the Trustee has actual knowledge that an Event of Default is continuing, the Trustee shall, before the receipt of directions from a Majority of the Controlling Class, exercise the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent Person would use under the circumstances in the conduct of the Person's own affairs.

(c)     No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

      (i)     this subsection shall not be construed to limit the effect of subsection (a) of this Section 6.1;

      (ii)     the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer, unless it is proven that the Trustee was negligent in ascertaining the pertinent facts;

      (iii)   the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Issuer or the Co-Issuer or the Servicer in accordance with this Indenture or a Majority (or the other percentage required or permitted by this Indenture) of the Controlling Class (or other Class if required or permitted by this Indenture) relating to the time, method, and place of conducting any Proceeding for any remedy available to the Trustee, or exercising any trust or power conferred on the Trustee, under this Indenture; and

      (iv)   no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties under this Indenture, or in the exercise of any of its rights contemplated under this Indenture, if it has reasonable grounds for believing that repayment of the funds or indemnity satisfactory to it against the risk or liability is not reasonably assured to it; **provided** that the reasonable costs of performing its ordinary services under this Indenture shall not be deemed a "financial liability" for purposes hereof.

(d)     For all purposes under this Indenture, the Trustee shall not have notice or knowledge of any Event of Default described in Section 5.1(d) through 5.1(i) or any Default described in Section 5.1(e) through 5.1(i) unless a Trust Officer assigned to and working in the Corporate Trust Office has actual knowledge of it or unless written notice of any event that is in fact the an Event of Default or Default is received by the Trustee at the Corporate Trust Office, and the notice references the Notes generally, the Issuer, the Co-Issuer, the Collateral or this Indenture.  For purposes of determining the Trustee's responsibility and liability under this Indenture, whenever reference is made in this Indenture to an Event of Default or a Default, the reference shall be construed to refer only to an Event of Default or Default of which the Trustee has notice as described in this Section 6.1.

(e)     Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to this Section 6.1 and Section 6.3.

## 6.2    Notice of Default

Promptly (and in no event later than five Business Days) after the occurrence of any Default known to the Trustee or after any declaration of acceleration has been made or delivered to the Trustee pursuant to Section 5.2, the Trustee shall transmit notice of all Defaults under this Indenture known to the Trustee, unless the Default has been cured or waived, and of the declaration by mail to the Servicer and the Co-Issuers, each Rating Agency, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and to all Noteholders, as their names and addresses appear on the Indenture Register, the Irish Stock Exchange, for so long as any Class of Notes is listed on the Irish Stock Exchange and so long as the rules of the exchange so require, and, upon written

request therefor by a Beneficial Owner in the form of Exhibit H certifying that it is a Beneficial Owner, to the Beneficial Owner (or its designee).

**6.3    Certain Rights of Trustee**

Except as otherwise provided in Section 6.1:

(a)    the Trustee may rely and shall be protected in acting or refraining from acting on any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, note, or other paper or document (including but not limited to any reports prepared and delivered under Section 10) believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)    any request or direction of the Issuer or the Co-Issuer mentioned in this Indenture shall be sufficiently evidenced by an Issuer Request or Issuer Order;

(c)    whenever in the administration of this Indenture the Trustee

(i)    deems it desirable that a matter be proved or established before taking, suffering, or omitting any action under this Indenture, the Trustee may, in the absence of bad faith on its part, rely on an Officer's certificate (unless other evidence is specifically prescribed in this Indenture) or

(ii)    is required to determine the value of, or any other matter with respect to, any Collateral or funds under this Indenture or the cash flows projected to be received therefrom, the Trustee may, in the absence of bad faith on its part, rely on reports of nationally recognized accountants, investment bankers or other persons qualified to provide the information required to make the determination, including nationally recognized dealers in securities of the type being valued and securities quotation services;

(d)    as a condition to taking or omitting to take any action under this Indenture, the Trustee may consult with counsel and the advice of the counsel or any Opinion of Counsel shall be full and complete authorization and protection with respect to any action taken or omitted by it under this Indenture in good faith and in reliance thereon;

(e)    the Trustee need not exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Noteholders (or other Person authorized or permitted hereby to give such direction) pursuant to this Indenture, unless such Holders (or such Person, as the case may be) have offered to the Trustee security or indemnity satisfactory to it against the costs and liabilities that might reasonably be incurred by it in compliance with the request or direction;

(f)    the Trustee need not make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request,

direction, consent, order, note or other paper or document, but the Trustee, in its discretion, may, and upon the written direction of a Majority of the Controlling Class, subject to Section 6.3(e), shall, make any the further inquiry or investigation into the facts or matters that it deems appropriate or as it is directed, and the Trustee shall be entitled, on reasonable prior notice to the Co-Issuers and the Servicer, to examine the books and records relating to the Notes, the Collateral, personally or by agent or attorney, during the Co-Issuers' or the Servicer's normal business hours. The Trustee shall, and shall cause its agents to, hold in confidence all such information, except to the extent (i) disclosure may be required by law by any regulatory or administrative authority and (ii) that the Trustee, in its sole judgment, determines that disclosure is consistent with its obligations under this Indenture; **provided**, **however**, that the Trustee may disclose on a confidential basis any such information to its agents, attorneys and auditors in connection with the performance of its responsibilities hereunder;

(g) the Trustee may execute any of the trusts or powers under this Indenture or perform any duties under this Indenture either directly or by or through agents or attorneys, and the Trustee shall not be responsible for any misconduct or negligence on the part of any non-Affiliated agent, or non-Affiliated attorney, appointed with due care by it under this Indenture;

(h) the Trustee shall not be liable for any action it takes or omits to take in good faith that it reasonably believes to be authorized or within its rights or powers under this Indenture;

(i) nothing in this Indenture shall be construed to impose an obligation on the Trustee to recalculate, evaluate, or verify any report, certificate or information received from the Issuer or Servicer;

(j) the Trustee may request and receive (and rely on) instruction from the Issuer, the Servicer, or the accountants identified in the Accountants' Certificate (and in the absence of its receipt of timely instruction from them, may obtain from an Independent accountant at the expense of the Issuer) as to the application of GAAP to the extent any defined term in this Indenture, or any calculation required to be made or determined by the Trustee under this Indenture, is dependent on or defined by reference to United States generally accepted accounting principles (*GAAP*), in any instance;

(k) the permissive rights of the Trustee to take or refrain from taking any actions enumerated in this Indenture are not duties;

(l) the Trustee is not responsible for the accuracy of the books and records of, or for any acts or omissions of, the Depository, any Transfer Agent, Custodian, Securities Intermediary, Collateral Administrator, Clearstream, Euroclear, Calculation Agent or any Paying Agent (in each case, other than the Bank acting in that capacity);

(m)      in purchasing or disposing of any asset permitted by this Indenture, the Trustee is authorized to deal with itself (in its individual capacity) or with any one or more of its Affiliates, whether it or the Affiliate is acting as a subagent of the Trustee or for any third Person or dealing as principal for its own account. If otherwise qualified, obligations of the Bank or any of its Affiliates shall qualify as Eligible Investments under this Indenture; and

(n)      if the Bank is also acting in the capacity of Paying Agent, Transfer Agent, Custodian, Calculation Agent or Securities Intermediary under this Indenture, the rights protections, immunities, and indemnities afforded to the Trustee pursuant to this Section 6 shall also be afforded to the Bank acting in those capacities.

### 6.4     Not Responsible for Recitals or Issuance of the Notes

The recitals contained in this Indenture and in the Notes, other than the Certificate of Authentication, shall be taken as the statements of the Applicable Issuers. The Trustee assumes no responsibility for their correctness. The Trustee makes no representation as to the validity or sufficiency of this Indenture (except as may be made with respect to the validity of the Trustee's obligations under this Indenture), the Collateral or the Notes. The Trustee shall not be accountable for the use or application by the Co-Issuers of the Notes or their proceeds or any money paid to the Co-Issuers pursuant to this Indenture.

### 6.5     May Hold Notes

(a)      The Trustee, any Paying Agent, Indenture Registrar or any other agent of the Co-Issuers, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Co-Issuers or any of their Affiliates with the same rights it would have if it were not Trustee, Paying Agent, Indenture Registrar or other agent.

### 6.6     Acquisition of Preference Shares

The Trustee, in its individual or any other capacity, agrees that after the initial distribution of the Preference Shares, neither the Trustee nor any of its affiliates (as defined in the Plan Asset Regulation) will acquire any Preference Shares (including pursuant to a Maturity Extension, a Refinancing and the Amendment Buy-Out Option) unless such acquisition would not, as determined by the Trustee in reliance on representations made in the applicable transfer certificates with respect thereto, result in persons that have represented that they are Benefit Plan Investors owning 25% or more of the Aggregate Outstanding Amount of any of the Class I Preference Shares or the Class II Preference Shares immediately after such acquisition (determined in accordance with Section 3(42) of ERISA, this Indenture and the Preference Share Documents). Any Preference Shares held as principal by the Trustee or any of its affiliates shall be disregarded and shall not be treated as outstanding for purposes of determining compliance with such 25% limitation to the extent that such person has represented that it is not a Benefit Plan Investor.

**6.7    Money Held in Trust**

Money held by the Trustee under this Indenture shall be held in trust to the extent required in this Indenture.  The Trustee shall be under no liability for interest on any money received by it under this Indenture except as otherwise agreed on with the Issuer and except to the extent of income or other gain on assets that are deposits in or certificates of deposit of the Bank in its commercial capacity and income or other gain actually received by the Trustee on Eligible Investments.  Under no circumstances shall the Trustee be responsible for any losses on assets purchased in accordance with an Issuer Order or a written order or request by the Servicer, unless such asset is purchased in an obligation of the Trustee in its corporate capacity.

**6.8    Compensation and Reimbursement**

(a)    The Issuer agrees:

   (i)    to pay the Trustee on each Payment Date reasonable compensation for all services rendered by it under this Indenture in accordance with its letter agreement with the Trustee (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust);

   (ii)    except as otherwise expressly provided in this Indenture or in its letter agreement with the Trustee, to reimburse the Trustee in a timely manner upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with this Indenture (including securities transaction charges and the reasonable compensation and expenses and disbursements of its agents and legal counsel and of any accounting firm or investment banking firm employed by the Trustee pursuant to Section 5.4, 5.5, 10.5 or 10.7, except any such expense, disbursement or advance attributable to its negligence, willful misconduct or bad faith) but with respect to securities transaction charges, only to the extent they have not been waived during a Due Period due to the Trustee's receipt of a payment from a financial institution with respect to certain Eligible Investments, as specified by the Servicer;

   (iii)    to indemnify the Trustee and its officers, directors, employees and agents for any loss, liability or expense  (including reasonable attorney's fees and costs) incurred without negligence, willful misconduct or bad faith on their part, arising out of or in connection with the acceptance or administration of this Indenture or the performance of its duties hereunder, including the costs and expenses of defending themselves against any claim or liability in connection with the exercise or performance of any of their powers or duties under this Indenture; and

(iv)    to pay the Trustee reasonable additional compensation together with its expenses (including reasonable counsel fees and costs) for any collection action taken pursuant to Section 6.14.

(b)    The Trustee shall receive amounts pursuant to this Section 6.8 as provided in Sections 11.1(a)(i) and (ii) but only to the extent that funds are available for their payment.  Subject to Section 6.10, the Trustee shall continue to serve as Trustee under this Indenture notwithstanding the fact that the Trustee has not received amounts due to it under this Indenture.  No direction by the Noteholders shall affect the right of the Trustee to collect amounts owed to it under this Indenture. If on any date when a fee is payable to the Trustee pursuant to this Indenture insufficient funds are available for its payment any portion of a fee not so paid shall be deferred and payable on the next date on which a fee is payable and sufficient funds are available for it.

(c)    The Trustee agrees not to cause the filing of a petition in bankruptcy for the non-payment to the Trustee of any amounts provided by this Section 6.8 until at least one year and one day, or if longer the applicable preference period then in effect plus one day, after the payment in full of all Notes issued under this Indenture and the payment to the Preference Shares Paying Agent of all amounts payable with respect to the Preference Shares in accordance with the Priority of Payments. Nothing in this Section 6.8(c) shall prohibit or otherwise prevent the Trustee from filing proofs of claim in any bankruptcy, insolvency or similar proceeding.

(d)    The indemnification set forth in this Section 6.8 shall survive the termination of this Indenture.

## 6.9    Corporate Trustee Required; Eligibility

There shall at all times be a Trustee under this Indenture that is an Independent "bank" (within the meaning of the Investment Company Act) organized and doing business under the laws of the United States of America or of any state of the United States, authorized under those laws to exercise corporate trust powers, having a combined capital and surplus of at least U.S.$200,000,000, subject to supervision or examination by federal or state banking authority, having a rating of at least "Baa1" (and not on credit watch with negative implications) by Moody's and at least "BBB+" by S&P, and having an office within the United States.  In addition, the Trustee shall not be "affiliated" (within the meaning of Rule 405 under the Securities Act) with either of the Co-Issuers or any person involved in the organization or operation of either of the Co-Issuers and shall not provide credit or credit enhancement to either of the Co-Issuers; provided that the requirements of the preceding sentence shall be met if (a) the Trustee is not "affiliated" (as defined in the preceding sentence) with the Issuer, the Co-Issuer, the Administrator or the Share Registrar, (b) neither the Trustee nor the Issuer has actual knowledge, or has received written notice, that the Trustee is "affiliated" (as defined in the preceding sentence) with any person involved with the organization or operation of either of the Co-Issuers, and (c) the Trustee has not provided and does not provide credit or credit enhancement to either

of the Co-Issuers. For purposes of the preceding clause (b), (i) the "actual knowledge" of the Trustee shall mean (x) its knowledge of those persons who have been expressly identified in writing to it by either or both of the Co-Issuers, or the Servicer on their behalf or (y) any persons otherwise actually known to a Responsible Officer of the Trustee, in either case, to be a person involved with the organization or operation either of the Co-Issuers, without any duty of independent inquiry or investigation on the part of the Trustee, and (ii) unless and except to the extent it has been otherwise expressly notified in writing by the Issuer, or the Servicer on its behalf , the Trustee shall be entitled to presume that the Issuer has no knowledge of such an affiliation. If the Trustee publishes reports of condition at least annually, pursuant to law or to the requirements of its supervising or examining authority, then for the purposes of this Section 6.9, the combined capital and surplus of the Trustee shall be its combined capital and surplus in its most recent published report of condition. If at any time the Trustee ceases to be eligible in accordance with this Section 6.9, it shall resign immediately in the manner and with the effect specified in Section 6.10.

**6.10    Resignation and Removal; Appointment of Successor**

(a)    No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Section 6 shall become effective until the acceptance of appointment by the successor Trustee under Section 6.11. The indemnification in favor of the Trustee shall survive any resignation or removal of the Trustee.

(b)    The Trustee may resign at any time by giving not less than 30 days' written notice to the Co-Issuers, the Servicer, the Noteholders, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and each Rating Agency. Upon receiving the notice of resignation, the Co-Issuers shall by Board Resolution (or, if an Event of Default shall have occurred and be continuing, at the direction of a Majority of the Controlling Class) promptly appoint a successor trustee satisfying the requirements of Section 6.9, by written instrument, in duplicate, executed by an Authorized Officer of the Issuer and an Authorized Officer of the Co-Issuer, one copy of which shall be delivered to the resigning Trustee and one copy to the successor Trustee, together with a copy to each Noteholder, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and the Servicer. If no successor Trustee has been appointed and an instrument of acceptance by a successor Trustee has not been delivered to the Trustee within 60 days after the giving of the notice of resignation, the resigning Trustee or any Noteholder, on behalf of himself and all others similarly situated, may petition any court of competent jurisdiction for the appointment of a successor Trustee satisfying the requirements of Section 6.9.

(c)    The Trustee may be removed (i) at any time by the Co-Issuers as directed by Board Resolution (or, if an Event of Default shall have occurred and be continuing, by an Act of a Majority of the Controlling Class) or (ii) by order of a court of competent jurisdiction, delivered to the Trustee and to the Co-Issuers.

(d)      If at any time:

    (i)      the Trustee ceases to be eligible under Section 6.9 and fails to resign after written request by the Co-Issuers or a Majority of the Controlling Class; or

    (ii)      the Trustee becomes incapable of acting or is adjudged bankrupt or insolvent or a receiver or liquidator of the Trustee or of its property appointed or any public officer takes charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then, in any such case (subject to Section 6.10(a)), (A) the Co-Issuers, by Issuer Order (as directed by Board Resolution), may, and at the direction of a Majority of the Controlling Class shall, remove the Trustee or (B) subject to Section 5.15, or any Holder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)      If the Trustee is removed or becomes incapable of acting, or if a vacancy occurs in the office of the Trustee for any reason (other than resignation), the Co-Issuers, by Issuer Order (as directed by Board Resolution) or at the direction of a Majority of the Controlling Class, shall promptly appoint a successor Trustee.  If the Co-Issuers fail to appoint a successor Trustee within 60 days after the removal or incapability or the occurrence of the vacancy, a successor Trustee may be appointed by a Majority of the Controlling Class by written instrument delivered to the Issuer and the retiring Trustee.  The successor Trustee so appointed shall, upon its acceptance of its appointment, become the successor Trustee and supersede any successor Trustee proposed by the Co-Issuers.  If no successor Trustee has been so appointed by the Co-Issuers or a Majority of the Controlling Class and accepted appointment pursuant to Section 6.11, subject to Section 5.15, then the Trustee to be replaced, or any Holder, may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(f)      The Co-Issuers shall give prompt notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of the event by first-class mail, postage prepaid, to the Servicer, to each Rating Agency, to the Noteholders as their names and addresses appear in the Indenture Register and to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares).  Each notice shall include the name of the successor Trustee and the address of its Corporate Trust Office.  If the Co-Issuers fail to mail the notice within 10 days after acceptance of appointment by the successor Trustee, the successor Trustee shall cause the notice to be given at the expense of the Co-Issuers.

(g)     If the Trustee resigns or is removed hereunder, unless and except to the extent otherwise expressly agreed by it in writing (which shall include agreement over terms of compensation), the Bank likewise shall automatically and immediately be declared to have resigned or been removed, as the case may be, in all other capacities in which it serves hereunder, and as Collateral Administrator under the Collateral Administration Agreement and Preference Shares Paying Agent under the Preference Shares Paying Agency Agreement, and the acceptance of appointment by the Person serving as successor Trustee shall constitute an acceptance of appointment by it in each such other capacity.

## 6.11    Acceptance of Appointment by Successor

Every successor Trustee appointed under this Indenture shall execute, acknowledge, and deliver to the Co-Issuers and the retiring Trustee an instrument accepting its appointment. Upon delivery of the required instruments, the resignation or removal of the retiring Trustee shall become effective and the successor Trustee, without any further act, shall become vested with all the rights and obligations of the retiring Trustee; but, on request of the Co-Issuers or a Majority of any Class of Notes or the successor Trustee, the retiring Trustee shall, upon payment of any amounts then due to it, execute and deliver an instrument transferring to the successor Trustee all the rights and obligations of the retiring Trustee, and shall duly assign, transfer and deliver to the successor Trustee all property and money held by the retiring Trustee under this Indenture.  Upon request of any successor Trustee, the Co-Issuers shall execute any instruments to more fully and certainly vest in and confirm to the successor Trustee all the rights and obligations of the Trustee under this Indenture.

No successor Trustee shall accept its appointment unless at the time of its acceptance the successor is qualified and eligible under Section 6.9 and either (a) each Rating Agency has been notified and the successor has long-term debt rated within the four highest rating categories by each Rating Agency, or (b) if not rated within the four highest categories by each Rating Agency, the Rating Condition with respect to each Rating Agency is satisfied with respect thereto.

## 6.12    Merger, Conversion, Consolidation, or Succession to Business of Trustee

Any entity into which the Trustee may be merged or converted or with which it may be consolidated, or any entity resulting from any merger, conversion or consolidation to which the Trustee is a party, or any entity succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee under this Indenture (and of the Bank under all of its other capacities under this Indenture, including as Custodian, Securities Intermediary, Indenture Registrar and Paying Agent) without the execution or filing of any paper or any further act on the part of any of the parties hereto. If any of the Notes have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to the authenticating Trustee may adopt the authentication and deliver the Notes so authenticated with the same effect as if the successor Trustee had itself authenticated the Notes.

### 6.13 Co-Trustees

At any time, to meet the legal requirements of any jurisdiction in which any part of the Collateral may at the time be located, the Co-Issuers and the Trustee may appoint a co-trustee (subject to the approval of the Rating Agencies) to act jointly with the Trustee, with respect to all or any part of the Collateral, with the power to file proofs of claim and take any other actions pursuant to Section 5.6 in this Indenture and to make claims and enforce rights of action on behalf of the Noteholders, as the Holders themselves have the right to do, subject to the other provisions of this Section 6.13.

The Co-Issuers shall join with the Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to appoint a co-trustee. If the Co-Issuers do not join in the appointment within 15 days after they receive a request to do so, the Trustee may make the appointment.

Any instruments to more fully confirm a co-trustee's appointment shall, on request, be executed, acknowledged and delivered by the Co-Issuers. The Co-Issuers agree to pay (but only from and to the extent of the Collateral), to the extent funds are available therefor under Section 11.1(a)(i)(1), any reasonable fees and expenses in connection with the appointment.

Every co-trustee shall, to the extent permitted by law, but to that extent only, be appointed subject to the following terms:

(a)     the Notes shall be authenticated and delivered and all rights and obligations under this Indenture in respect of the custody of securities, cash and other personal property held by, or required to be deposited or pledged with, the Trustee under this Indenture, shall be exercised solely by the Trustee;

(b)     the rights and obligations conferred or imposed on the Trustee in respect of any property covered by the appointment of a co-trustee shall be conferred or imposed on and exercised or performed by the Trustee or by the Trustee and the co-trustee jointly as provided in the instrument appointing the co-trustee;

(c)     the Trustee at any time, by an instrument in writing executed by it, with the concurrence of the Co-Issuers evidenced by an Issuer Order, may accept the resignation of or remove any co-trustee appointed under this Section 6.13, and if an Event of Default is continuing, the Trustee shall have the power to accept the resignation of, or remove, any co-trustee without the concurrence of the Co-Issuers. A successor to any co-trustee so resigned or removed may be appointed in the manner provided in this Section 6.13;

(d)     no co-trustee under this Indenture shall be personally liable because of any act or omission of the Trustee under this Indenture;

(e)     the Trustee shall not be liable because of any act or omission of a co-trustee; and

(f)     any Act of Noteholders delivered to the Trustee shall be deemed to have been delivered to each co-trustee.

## 6.14    Certain Duties of Trustee Related to Delayed Payment of Proceeds

If in any month the Trustee has not received a payment with respect to any Pledged Obligation on its Due Date:

(a)     the Trustee shall promptly notify the Issuer and the Servicer in writing, and

(b)     unless the payment is received by the Trustee within three Business Days (or the end of the applicable grace period for the payment, if longer) after the notice, or unless the Issuer, in its absolute discretion (but only to the extent permitted by Section 10.2(a)), makes provision for the payment satisfactory to the Trustee in accordance with Section 10.2(a), the Trustee shall request the issuer of the Pledged Obligation, the trustee under the related Underlying Instrument, or paying agent (save for the Irish Paying Agent) designated by either of them to make the payment as soon as practicable after the request but in no event later than three Business Days after the date of the request.  If the payment is not made within that time period, the Trustee, subject to clause (iv) of Section 6.1(c), shall take the action directed by the Servicer in writing.  Any such action shall be without prejudice to any right to claim a Default or Event of Default under this Indenture.  If the Issuer or the Servicer requests a release of a Pledged Obligation or delivers a Collateral Obligation in connection with any such action under the Servicing Agreement, the release or substitution shall be subject to Section 10.6 and Section 12.   Notwithstanding any other provision of this Indenture, the Trustee shall deliver to the Issuer or its designee any payment with respect to any Pledged Obligation or any Collateral Obligation received after its Due Date to the extent the Issuer previously made provisions for the payment satisfactory to the Trustee in accordance with this Section 6.14 and the payment shall not be part of the Collateral.

## 6.15    Authenticating Agents

Upon the request of the Co-Issuers, the Trustee shall, and if the Trustee so chooses the Trustee may, appoint one or more Authenticating Agents with power to act on its behalf and subject to its direction in the authentication of the Notes in connection with issuance, transfers, and exchanges under Sections 2.4, 2.5, 2.6, 2.7, and 8.5, as fully to all intents and purposes as though each Authenticating Agent had been expressly authorized by those Sections to authenticate the Notes.   For all purposes of this Indenture, the authentication of Notes by an Authenticating Agent pursuant to this Section 6.15 shall be the authentication of the Notes "by the Trustee."

Any Authenticating Agent may at any time resign by giving written notice of resignation to the Trustee and the Issuer.  The Trustee may at any time terminate the agency of any

Authenticating Agent by giving written notice of termination to the Authenticating Agent and the Co-Issuers.

The Co-Issuers agree to pay to each Authenticating Agent from time to time reasonable compensation for its services, and reimbursement for its reasonable expenses relating to its services as an Administrative Expense; **provided**, **however**, that if the Trustee elects to appoint an Authenticating Agent without the approval or request of the Co-Issuers, then the Trustee shall pay such compensation and reimbursement. Sections 2.9, 6.4, and 6.5 shall be applicable to any Authenticating Agent.

### 6.16    Fiduciary for Noteholders Only; Agent for Secured Parties

With respect to the security interest created under this Indenture, the delivery of any Pledged Obligation to the Trustee is to the Trustee as representative of the Noteholders and agent for the other Secured Parties. In furtherance of the foregoing, the possession by the Trustee of any Pledged Obligation and the endorsement to or registration in the name of the Trustee of any Pledged Obligation (including as Entitlement Holder of the Custodial Account) are all undertaken by the Trustee in its capacity as representative of the Noteholders and agent for the other Secured Parties.

### 6.17    Representations and Warranties of the Bank

The Bank represents and warrants as follows for the benefit of the Noteholders:

(a)    **Organization.** The Bank has been duly organized and is validly existing as a Massachusetts trust company and has the power to conduct its business and affairs as a trustee.

(b)    **Authorization; Binding Obligations.** The Bank has the corporate power and authority to perform the duties and obligations of trustee under this Indenture. The Bank has taken all necessary corporate action to authorize the execution, delivery and performance of this Indenture, and all of the documents required to be executed by the Bank pursuant to this Indenture. Upon execution and delivery by the Bank, this Indenture will be the valid and legally binding obligation of the Bank enforceable in accordance with its terms.

(c)    **Eligibility.** The Bank is eligible under Section 6.9 to serve as Trustee under this Indenture.

### 6.18    Withholding Tax Forms

The Issuer hereby agrees to deliver or cause to be delivered, a United States Internal Revenue Service Form W-8BEN (or successor form thereto) or any other appropriate tax certificates to the relevant issuer of its Collateral Obligations and issuer of its Eligible Investments at the time such Collateral Obligations or Eligible Investments are purchased by the Issuer and thereafter as required under the relevant law. In addition, the Issuer

hereby agrees to deliver, and the Issuer shall be required to deliver, United States Internal Revenue Service Forms W-8BEN (or successor form thereto) and other appropriate United States tax forms as may be required by the Hedge Counterparty, to the Hedge Counterparty at the time the Hedge Agreement is entered into and thereafter prior to the expiration or obsolescence of such form, and shall take any other action appropriate to prevent withholding or backup withholding tax on the Hedge Agreements. The Issuer shall represent, to the Hedge Counterparty in the master agreement, confirmation or schedule to the Hedge Agreement, that the Issuer is a "non-U.S. branch" of a foreign person as that term is used in section 1.1441-4(a)(3)(ii) of the United States Treasury Regulations and a "foreign person" as that term is used in Section 1.6041-4(a)(4) of the United States Treasury Regulations. The Issuer will request that the Hedge Counterparty provide the Issuer a United States Internal Revenue Service Forms W-9 or W-8, as applicable, together with any required attachments, at the time the Hedge Agreement is entered into and thereafter prior to the expiration or obsolescence of such form.

## 6.19    Withholding Tax

If any withholding tax is imposed on the Issuer's payment under the Notes or otherwise to any Noteholder, such tax shall reduce the amount of such payment otherwise distributable to such Noteholder or Beneficial Owner. The Trustee or the applicable paying agent is hereby authorized and directed to retain from amounts otherwise distributable to any Noteholder sufficient funds for the payment of any tax that is legally owed by the Issuer (but such authorization shall not prevent the Trustee from contesting any such tax in appropriate proceedings and withholding payment of such tax, if permitted by law, pending the outcome of such proceedings) and to remit such amounts to the appropriate taxing authorities. The amount of any withholding tax imposed with respect to any Noteholder or Beneficial Owner shall be treated as Cash distributed to such Noteholder or Beneficial Owner at the time it is withheld by the Trustee. If there is a possibility that withholding tax is payable with respect to a distribution, the Trustee may in its sole discretion withhold such amounts in accordance with this Section 6.18. If any Noteholder or Beneficial Owner wishes to apply for a refund of any such withholding tax, the Trustee shall reasonably cooperate with such Noteholder or Beneficial Owner in making such claim so long as such Noteholder or Beneficial Owner agrees to reimburse the Trustee for any out-of-pocket expenses incurred. Failure of a Holder of a Note to provide the Trustee or any Paying Agent and the Issuer with appropriate tax certificates may result in amounts being withheld from the payment to such Holders. Nothing herein shall impose an obligation on the part of the Trustee to determine the amount of any tax or withholding obligation on the part of the Issuer or in respect of the Notes. Amounts withheld pursuant to applicable tax laws shall be considered as having been paid by the Issuer as provided in Section 7.1.

**7.** **COVENANTS**

**7.1** **Payment of Principal and Interest**

The Applicable Issuers shall pay the principal of and interest on the Notes in accordance with the Notes and this Indenture.

The Issuer shall, subject to the Priority of Payments, reimburse the Co-Issuer for any amounts paid by the Co-Issuer pursuant to the Notes or this Indenture. The Co-Issuer shall not reimburse the Issuer for any amounts paid by the Issuer pursuant to the Notes or this Indenture.

Amounts properly withheld under the Code or other applicable law by any Person from a payment to any Holder shall be considered as having been paid by the Applicable Issuers to the Holder for all purposes of this Indenture.

**7.2** **Maintenance of Office or Agency**

The Co-Issuers appoint the Trustee as a Paying Agent for the payment of principal of and interest on the Notes. The Co-Issuers appoint State Street Bank and Trust Company, 200 Clarendon Street, Mailcode EUC 108, Boston, MA 02116, Attn: CDO Services Group, as the Co-Issuers' agent where notices and demands on the Co-Issuers in respect of the Notes or this Indenture may be served and where the Notes may be surrendered for registration of transfer or exchange.

The Co-Issuers may at any time and from time to time vary or terminate the appointment of any Paying Agent or appoint any additional agents for all of these purposes.

The Co-Issuers hereby appoint Corporation Service Company with an address at 1133 Avenue of the Americas, Suite 3100, New York, New York 10036, as the Co-Issuers' agent where service of any and all process in any action or Proceeding may be delivered.

No paying agent shall be appointed in a jurisdiction that subjects payments on the Notes to withholding tax.

So long as any Class of Notes is listed on the Irish Stock Exchange and the rules of the exchange so require, the Co-Issuers shall maintain in Ireland a Paying Agent.

The Co-Issuers appoint, for so long as any Class of Notes is listed on the Irish Stock Exchange, Maples Finance Dublin (the "***Irish Paying Agent***") as Paying Agent in Ireland with respect to the Notes. If the Irish Paying Agent is replaced at any time when any Class of Notes is listed on the Irish Stock Exchange, notice of the appointment of any replacement shall be given to the Company Announcements Office of the Irish Stock Exchange as promptly as practicable after the appointment. The Co-Issuers shall give prompt written notice to the Trustee, each Rating Agency, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and the Holders of the Notes

of the appointment or termination of any such agent and of the location and any change in the location of any such office or agency.

If at any time the Co-Issuers fail to maintain any required office or agency in the Borough of Manhattan, The City of New York, or outside the United States, or fail to furnish the Trustee with their addresses, notices and demands may be served on the Co-Issuers.

**7.3      Money for Note Payments to be Held in Trust**

All payments of amounts payable with respect to any Notes that are to be made from amounts withdrawn from the Payment Account shall be made on behalf of the Applicable Issuers by the Trustee or a Paying Agent with respect to payments on the Notes.

When the Applicable Issuers have a Paying Agent that is not also the Indenture Registrar, they shall furnish not later than the fifth calendar day after each Record Date a list in the form the Paying Agent reasonably requests, of the names and addresses of the Holders and of the certificate numbers of individual Notes held by each Holder.

Whenever the Applicable Issuers have a Paying Agent other than the Trustee, they shall, on or before the Business Day before each Payment Date or Redemption Date direct the Trustee to deposit on the Payment Date with the Paying Agent an aggregate sum sufficient to pay the amounts then becoming due (to the extent funds are then available for that purpose in the Payment Account), that sum to be held in trust for the benefit of the Persons entitled to it and (unless the Paying Agent is the Trustee) the Co-Issuers shall promptly notify the Trustee of its action or failure so to act. Any monies deposited with a Paying Agent (other than the Trustee) in excess of an amount sufficient to pay the amounts then becoming due on the Notes with respect to which the deposit was made shall be paid over by the Paying Agent to the Trustee for application in accordance with Section 10.

Additional or successor Paying Agents shall be appointed by Issuer Order with written notice of the appointment to the Trustee. So long as Notes of any Class are rated by a Rating Agency any Paying Agent must either have a long-term debt rating of "Aa3" (and not on credit watch with negative implications) or higher by Moody's and "AA-" or higher by S&P or a short-term debt rating of "P-1" (and not on credit watch for possible downgrade) by Moody's and "A-1+" by S&P or the Rating Condition with respect to each Rating Agency must be satisfied with respect to its appointment. If a successor Paying Agent ceases to have a long-term debt rating of "Aa3" (and not on credit watch with negative implications) or higher by Moody's and "AA-" or higher by S&P or a short-term debt rating of "P-1" (and not on credit watch for possible downgrade) by Moody's and a short-term debt rating of "A-1+" by S&P, the Co-Issuers shall promptly remove the Paying Agent and appoint a successor Paying Agent. The Co-Issuers shall not appoint any Paying Agent that is not, at the time of the appointment, a depository institution or trust company subject to supervision and examination by federal or state or national banking authorities. The Co-Issuers shall cause each Paying Agent other than the Trustee

to execute and deliver to the Trustee an instrument in which the Paying Agent agrees with the Trustee, subject to this Section 7.3, that the Paying Agent will:

   (i)   allocate all sums received for payment to the Noteholders for which it acts as Paying Agent on each Payment Date and any Redemption Date among the Holders in the proportion specified in the applicable report to the extent permitted by applicable law;

   (ii)   hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the Persons entitled to them until they are paid or otherwise disposed of as provided in this Indenture;

   (iii)   immediately resign as a Paying Agent and forthwith pay to the Trustee all sums held by it in trust for the payment of the Notes if at any time it ceases to meet the standards required to be met by a Paying Agent at the time of its appointment;

   (iv)   immediately give the Trustee notice of any default by the Issuer or the Co-Issuer (or any other obligor on the Notes) in the making of any payment required to be made; and

   (v)   during the continuance of any such default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by the Paying Agent.

To obtain the satisfaction and discharge of this Indenture or for any other purpose, the Co-Issuers may at any time pay, or by Issuer Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Co-Issuers or the Paying Agent, and, upon the payment by any Paying Agent to the Trustee, the Paying Agent shall be released from all further liability with respect to the money paid.

Any money deposited with a Paying Agent and not previously returned that remains unclaimed for 15 Business Days shall be returned to the Trustee. Except as otherwise required by applicable law, any money deposited with the Trustee or any Paying Agent in trust for the payment of the principal of or interest on any Note and remaining unclaimed for two years after the principal or interest has become payable shall be paid to the Applicable Issuers. The Noteholder shall thereafter look only to the Applicable Issuers for payment of the amounts due to it as an unsecured general creditor and all liability of the Trustee or the Paying Agent with respect to that money (but only to the extent of the amounts so paid to the Applicable Issuers) shall thereupon cease. The Trustee or the Paying Agent, before being required to release any payment, may, but shall not be required to, adopt and employ, at the expense of the Applicable Issuers any reasonable means of notification of the release of the payment, including mailing notice of the release to Holders whose Notes have been called but have not been surrendered for redemption or whose right to or interest in monies payable but not claimed is

determinable from the records of any Paying Agent, at the last address of record of each Holder.

**7.4    Existence of Co-Issuers**

(a)     The Issuer and the Co-Issuer shall maintain in full force their existence and rights as companies incorporated or organized under the laws of the Cayman Islands and the State of Delaware, respectively, and shall obtain and preserve their qualification to do business as foreign corporations (or, in the case of the Co-Issuer, as a limited liability company) in each jurisdiction in which the qualifications are necessary to protect the validity and enforceability of this Indenture, the Notes, the Preference Shares Paying Agency Agreement and any of the Collateral.

However, the Issuer may change its jurisdiction of incorporation from the Cayman Islands to any other jurisdiction reasonably selected by the Issuer so long as:

(A)    the Issuer has received a legal opinion (on which the Trustee may rely) to the effect that the change is not disadvantageous in any material respect to the Holders, the Servicer or any Hedge Counterparty,

(B)    written notice of the change has been given by the Issuer to the Trustee, the Noteholders, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Servicer, any Hedge Counterparty and each Rating Agency,

(C)    on or before the 15th Business Day following its receipt of the notice the Trustee has not received written notice from a Majority of the Controlling Class objecting to the change,

(D)    the Rating Condition with respect to S&P is satisfied, and

(E)    the Issuer shall cause to be delivered to the Trustee an Opinion of Counsel stating that, in such counsel's opinion, all necessary filings, if any, and other necessary actions, if any, have been taken to maintain the effectiveness of the perfection of the security interest granted in the Collateral hereunder immediately after such change in the Issuer's jurisdiction of incorporation.

(b)     The Issuer and the Co-Issuer shall ensure that all corporate or other formalities regarding their respective existences (including holding regular board of directors', shareholders', independent managers' or other similar, meetings to the extent required by applicable law) are followed. Neither the Issuer nor the Co-Issuer shall take any action or conduct its affairs in a manner that is likely to result

in its separate existence being ignored or in its assets and liabilities being substantively consolidated with any other Person in a bankruptcy, reorganization or other insolvency proceeding. Without limiting the foregoing,

   (i)   Except as may be provided in Annex 1 to the Servicing Agreement, the Issuer shall not have any subsidiaries (other than the Co-Issuer),

   (ii)   the Co-Issuer shall not have any subsidiaries,

   (iii)   the Issuer shall maintain at all times at least one director who is Independent of the Servicer, the Trustee and any of their respective Affiliates,

   (iv)   the Issuer shall not commingle its funds with the funds of any other Person, except as expressly permitted by this Indenture, and

   (v)   except to the extent contemplated in the Servicing Agreement, the Administration Agreement, the Preference Shares Paying Agency Agreement and the declaration of trust by the Share Trustee, the Issuer and the Co-Issuer shall not:

       (A)   engage in any transaction with any shareholder that would be a conflict of interest (the entry into the Administration Agreement with the Administrator shall not be deemed a conflict of interest), or

       (B)   pay dividends in violation of this Indenture, the resolutions of its board of directors and the Preference Share Documents.

**7.5    Protection of Collateral**

(a)    The Servicer on behalf of the Issuer will procure any action within the Servicer's control that is reasonably necessary to maintain the perfection and priority of the security interest of the Trustee in the Collateral. The Issuer from time to time shall execute and deliver any supplements and amendments to this Indenture and shall execute and deliver any Financing Statements, continuation statements, instruments of further assurance, and other instruments and shall take any other action appropriate to secure the rights and remedies of the Secured Parties under this Indenture and to:

   (i)   Grant more effectively all or any portion of the Collateral;

   (ii)   maintain or preserve the lien (and its priority) of this Indenture or to carry out more effectively the purposes of this Indenture;

      (iii)    perfect, publish notice of, or protect the validity of, any Grant made by this Indenture (including any actions appropriate as a result of changes in law);

      (iv)    enforce any of the Pledged Obligations or other instruments or property included in the Collateral;

      (v)    preserve and defend title to the Collateral and the rights of the Secured Parties in the Collateral against the claims of anyone; and

      (vi)    pay when due all taxes levied or assessed on any part of the Collateral.

The Issuer designates the Servicer as its agent and attorney in fact to execute any Financing Statement, continuation statement, and all other instruments, and take all other actions, required pursuant to this Section 7.5.

The Issuer authorizes the filing without the Issuer's signature a financing statement that names the Issuer as "debtor" and State Street Bank and Trust Company as "secured party" (with or without indicating its capacity as Trustee hereunder) and that describes the Collateral as "all assets of the debtor, whether now owned or hereafter acquired and wherever located."

(b)    The Trustee shall not:

      (i)    except in accordance with Section 10.6(a), (b) or (c), remove any portion of the Collateral that consists of Cash or is evidenced by an instrument, certificate or other writing:

          (A)    from the jurisdiction in which it was held at the date the most recent Opinion of Counsel was delivered pursuant to Section 7.6 (or from the jurisdiction in which it was held as described in the Opinions of Counsel delivered at the Closing Date pursuant to Section 3.1(a)(iii) if no Opinion of Counsel has yet been delivered pursuant to Section 7.6), or

          (B)    from the possession of the Person who held it (other than the Bank), or

      (ii)    cause or permit ownership or the pledge of any portion of the Collateral that consists of book-entry securities to be recorded on the books of a Person (other than the Bank):

          (A)    located in a different jurisdiction from the jurisdiction in which the ownership or pledge was recorded, or

          (B)    other than the Person on whose books the ownership or pledge was originally recorded, unless (in the case of any of the actions

described in clauses (i) or (ii) of this Section 7.5(b)) the Trustee shall have first received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to the property and its priority will continue to be maintained after giving effect to the change.

(c)     Without at least 30 days' prior written notice to the Trustee and the Servicer, the Issuer shall not change its "location" (as defined in Section 9-307 of the UCC) or change its name from the name shown on the signature pages of this Indenture.

(d)     The Issuer shall, subject to the Priority of Payments, enforce all of its material rights and remedies under the Servicing Agreement, the Collateral Administration Agreement, the Preference Shares Paying Agency Agreement, each Hedge Agreement and each Securities Lending Agreement.

(e)     The Issuer shall pay any taxes levied because any Pledged Obligations are owned by the Issuer.

(f)     The Servicer on behalf of the Issuer will either exercise the "put" option that prevents a Collateral Obligation from being a Long-Dated Collateral Obligation on the last available date before the Stated Maturity of the Notes or sell the Collateral Obligation for Sale Proceeds at least equal to the Principal Balance of the Collateral Obligation, in either case by the Stated Maturity of the Notes.

## 7.6    Opinions as to Collateral

On or before November 1 in each calendar year, commencing in 2008, the Issuer shall furnish to the Trustee and each of the Rating Agencies, an Opinion of Counsel stating that in the opinion of such counsel as of the date of such opinion under the District of Columbia Uniform Commercial Code, the UCC financing statement(s) filed in connection with the lien and security interests created by this Indenture shall remain effective and no additional financing statements, continuation statements or amendments with respect to such financing statement(s) shall be required to be filed in the District of Columbia from the date thereof through the next twelve months to maintain the perfection of the security interest of this Indenture under the District of Columbia Uniform Commercial Code.

## 7.7    Performance of Obligations

(a)     The Co-Issuers, each as to itself, shall not take any action, and shall use their reasonable commercial efforts not to permit any action to be taken by others, that would release any Person from any of the Person's covenants or obligations under any instrument included in the Collateral, except in the case of enforcement action taken with respect to any Defaulted Collateral Obligation in accordance with this Indenture and actions by the Servicer under the Servicing Agreement and in conformity with this Indenture or as otherwise required by this Indenture.

(b)    The Applicable Issuers may, with the prior written consent of a Majority of each Class of Notes and a Majority of the Preference Shares (except in the case of the Servicing Agreement and the Collateral Administration Agreement as initially executed), contract with other Persons (including the Servicer, the Trustee and the Collateral Administrator) for the performance of actions and obligations to be performed by the Applicable Issuers under this Indenture.  Notwithstanding any such arrangement, the Applicable Issuers shall remain primarily liable for performance under this Indenture.  The Applicable Issuers shall punctually perform, and use their reasonable commercial efforts to cause the Servicer, the Trustee, the Collateral Administrator, the Preference Shares Paying Agent and any other Person to perform, all of their obligations in the Servicing Agreement, this Indenture, the Collateral Administration Agreement, the Preference Shares Paying Agency Agreement or any other agreement.

## 7.8   Negative Covenants

(a)    The Issuer shall not and, with respect to clauses (ii), (iii), (iv), (vi) and (ix), the Co-Issuer shall not, in each case from and after the Closing Date:

    (i)    sell, transfer, assign, exchange, or otherwise dispose of, or pledge, mortgage, hypothecate, or otherwise encumber (or permit or suffer the sale, transfer, assignment, exchange, or other disposition of, or pledge, mortgage, hypothecation, or other encumbering of), any part of the Collateral, except as expressly permitted by this Indenture and the Servicing Agreement;

    (ii)    claim any credit on, make any deduction from, or, to the fullest extent permitted by applicable laws, dispute the enforceability of payment of the principal or interest (or any other amount) payable in respect of the Notes (other than amounts withheld in accordance with the Code or any applicable laws of the Cayman Islands) or assert any claim against any present or future Noteholder because of the payment of any taxes levied or assessed on any part of the Collateral;

    (iii)    (A) incur or assume or guarantee any indebtedness, other than the Notes and this Indenture and the transactions contemplated by this Indenture (including a Refinancing in accordance with Section 9.7 and including, as contemplated hereby, entering into the Hedge Agreements and Securities Lending Agreements) or (B) issue any additional class of securities other than the Preference Shares issued on or before the Closing Date, except as otherwise permitted by the Preference Share Documents;

    (iv)    (A) permit the validity or effectiveness of this Indenture or any Grant under this Indenture to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated, or discharged or permit any Person to be released from any covenants or obligations with

respect to this Indenture or the Notes, except as may be expressly permitted by this Indenture or by the Servicing Agreement, (B) permit any lien, charge, adverse claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise on or burden any part of the Collateral, any interest in it, or its proceeds of or (C) take any action that would permit the lien of this Indenture not to be a valid first priority perfected security interest in the Collateral;

(v)    amend the Servicing Agreement except pursuant to its terms and Section 15.1(h) or amend the Collateral Administration Agreement except pursuant to its terms unless the Rating Condition with respect to each Rating Agency is satisfied with respect to the amendment or enter into any waiver in respect of any of the foregoing agreements without providing written notice to each Rating Agency and the Trustee (and, with respect to the Collateral Administration Agreement, without the consent of the Trustee);

(vi)    to the extent permitted by applicable law, dissolve or liquidate in whole or in part, except as permitted under this Indenture;

(vii)    pay any dividends or other distributions other than in accordance with the Priority of Payments and the Preference Share Documents;

(viii)    conduct business under any name other than its own;

(ix)    have any employees (other than directors and officers to the extent they are employees);

(x)    except for any Underlying Instrument and agreements involving the purchase or sale of Collateral Obligations having customary purchase or sale terms and documented with customary trading documentation (but not excepting any Synthetic Security or Hedge Agreement), enter into any agreement unless the agreement contains "non-petition" and "limited recourse" provisions and shall not amend such "non-petition" and "limited recourse" provisions without prior Rating Confirmation; or

(xi)    operate so as to be subject to U.S. federal income taxes on its net income except as a result of ownership of Eligible Equity Securities, securities or other consideration received in an exchange or Defaulted Collateral Obligations pending their sale in accordance with Section 12.1.

(b)    Neither the Issuer nor the Trustee shall sell, transfer, exchange or otherwise dispose of Collateral, or enter into an agreement or commitment to do so, or enter into or engage in any business with respect to any part of the Collateral, except as

expressly permitted by this Indenture and, with respect to the Issuer, the Servicing Agreement.

(c) The Co-Issuer shall not invest any of its assets in "securities" as the term is defined in the Investment Company Act, and shall keep all of its assets in Cash.

(d) Neither the Issuer nor the Co-Issuer shall use the proceeds of the Notes to buy or carry Margin Stock.

**7.9    Notice of Default; Statement as to Compliance**

(a) The Co-Issuers shall notify the Trustee, the Servicer, the Rating Agencies and each Hedge Counterparty in writing within 10 days of acquiring actual knowledge of Default.

(b) On or before September 15 in each calendar year, commencing in 2008, the Issuer shall deliver to the Trustee (to be forwarded by the Trustee to the Servicer and each Noteholder making a written request therefor and, upon written request therefor by a Beneficial Owner in the form of Exhibit H certifying that it is a Beneficial Owner, to the Beneficial Owner (or its designee) and each Rating Agency) a certificate of an Authorized Officer of the Issuer that, to the best knowledge of the Issuer, no Default exists, and has not existed since the date of the last certificate or, if a Default does then exist or had existed, specifying the same and its nature and status, including actions undertaken to remedy it, and that the Issuer has complied with all of its obligations under this Indenture or, if that is not the case, specifying those obligations with which it has not complied.

**7.10    Co-Issuers May Consolidate, etc. Only on Certain Terms**

Neither the Issuer nor the Co-Issuer (the **_Merging Entity_**) shall consolidate or merge with or into any other Person or transfer or convey all or substantially all of its assets to any Person, unless permitted by Cayman Islands law (in the case of the Issuer) or United States and Delaware law (in the case of the Co-Issuer) and unless:

(a) the Merging Entity shall be the surviving corporation, or the Person (if other than the Merging Entity) formed by the consolidation or into which the Merging Entity is merged or to which all or substantially all of the assets of the Merging Entity are transferred (the **_Successor Entity_**),

(i) if the Merging Entity is the Issuer, is a company organized and existing under the laws of the Cayman Islands or another jurisdiction approved by a Majority of the Controlling Class (except that no approval shall be required in connection with any such transaction undertaken solely to effect a change in the jurisdiction of incorporation pursuant to Section 7.4), and

    (ii)   in any case shall expressly assume, by an indenture supplemental to this Indenture, executed and delivered to the Trustee and each Noteholder, the due and punctual payment of all amounts on all Notes issued by the Merging Entity and the performance and observance of every covenant of this Indenture on its part to be performed or observed, all as provided in this Indenture;

(b)    each Rating Agency shall have been notified of the consolidation, merger, transfer, or conveyance and the Rating Condition with respect to each Rating Agency is satisfied with respect to the transaction;

(c)    if the Merging Entity is not the surviving corporation, the Successor Entity shall have agreed with the Trustee,

    (i)   to observe the same legal requirements for the recognition of the formed or surviving corporation as a legal entity separate and apart from any of its Affiliates as are applicable to the Merging Entity with respect to its Affiliates,

    (ii)   not to consolidate or merge with or into any other Person or transfer or convey the Collateral or all or substantially all of its assets to any other Person except in accordance with this Section 7.10; and

    (iii)   in any case shall expressly assume by an indenture supplemental to this Indenture, executed and delivered to the Trustee, each Noteholder and the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the due and punctual payment of all amounts on all the Notes issued by the Merging Entity and the performance and observance of every covenant of this Indenture on its part to be performed or observed, all as provided in this Indenture;

(d)    if the Merging Entity is not the surviving corporation, the Successor Entity shall have delivered to the Trustee and each Rating Agency an Officer's certificate and an Opinion of Counsel each stating that it is duly organized, validly existing, and in good standing in the jurisdiction in which it is organized; that it has sufficient power and authority to assume the obligations in subsection (a) above and to execute and deliver an indenture supplemental to this Indenture for the purpose of assuming the obligations in subsection (a) above; that it has duly authorized the execution, delivery, and performance of an indenture supplemental to this Indenture for the purpose of assuming the obligations in subsection (a) above and that the supplemental indenture is its valid and legally binding obligation, enforceable in accordance with its terms, subject only to bankruptcy, reorganization, insolvency, moratorium, and other laws affecting the enforcement of creditors' rights generally and to general principles of equity; if the Merging Entity is the Issuer, that, following the event that causes the Successor Entity to become the successor to the Issuer, (i) the Successor Entity has title, free of any

lien, security interest, or charge, other than the lien and security interest of this Indenture, to the Collateral, and (ii) the lien of this Indenture continues to be effective in the Collateral; and in each case as to any other matters the Trustee or any Noteholder reasonably requires;

(e)     after giving effect to the transaction, no Default or Event of Default shall be continuing;

(f)     the Merging Entity shall have notified each Rating Agency of the consolidation, merger, transfer or conveyance and shall have delivered to the Trustee, each Noteholder and the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) an Officer's certificate and an Opinion of Counsel each stating that the consolidation, merger, transfer or conveyance and the supplemental indenture comply with this Section 7 and that all conditions precedent in this Section 7 relating to the transaction have been complied with and shall have obtained a Tax Opinion of Counsel that no adverse tax consequences will result therefrom to the Holders of the Securities;

(g)     the Merging Entity shall have delivered to the Trustee an Opinion of Counsel stating that after giving effect to the transaction, neither of the Co-Issuers (or, if applicable, the Successor Entity) will be required to register as an investment company under the Investment Company Act; and

(h)     after giving effect to the transaction, the outstanding stock of the Merging Entity (or, if applicable, the Successor Entity) will not be beneficially owned within the meaning of the Investment Company Act by any U.S. person.

**7.11     Successor Substituted**

Upon any consolidation or merger, or transfer or conveyance of all or substantially all of the assets of the Issuer or the Co-Issuer, in accordance with Section 7.10 in which the Merging Entity is not the surviving corporation, the Successor Entity shall succeed to, and be substituted for, and may exercise every right of, the Merging Entity under this Indenture with the same effect as if the Person had been named as the Issuer or the Co-Issuer, as the case may be, in this Indenture. Upon any such consolidation, merger, transfer or conveyance, the Person named as the "Issuer" or the "Co-Issuer" in the first paragraph of this Indenture or any successor may be dissolved, wound up and liquidated at any time thereafter, and the Person thereafter shall be released from its liabilities as obligor and maker on all the Notes and from its obligations under this Indenture.

**7.12     No Other Business**

(a)     From and after the Closing Date, the Issuer shall not engage in any business or activity other than (i) acquisition and disposition of Collateral Obligations and Eligible Investments solely for its own account, (ii) entering into, and performing its obligations under, the Indenture, the Preference Share Documents, any Hedge

Agreements, the Securities Lending Agreements, the Servicing Agreement, the Collateral Administration Agreement and the Administration Agreement, (iii) the issuance and sale of the Securities and the Issuer Ordinary Shares, (iv) the pledge of the Collateral as security for its obligations in respect of the Notes and any Hedge Agreements, (v) entering into certain pre-closing warehousing arrangements and the agreements relating thereto, (vi) owning all of the membership interests in the Co-Issuer and (vii) undertaking certain other activities incidental to the foregoing. The Co-Issuer shall not engage in any business or activity other than issuing and selling the Notes to be issued by it pursuant to this Indenture and, with respect to the Issuer and the Co-Issuer, other activities appropriate to accomplish the foregoing or incidental thereto or connected therewith.

(b)     The Issuer and the Co-Issuer may amend, or permit the amendment of, their Memorandum and Articles or the Certificate of Incorporation and By-laws (or, in the case of the Co-Issuer, the certificate of formation and limited liability company agreement) if the Rating Condition with respect to each Rating Agency is satisfied with respect to the amendment (but not otherwise).

### 7.13    Listing on Irish Stock Exchange

So long as any Notes remain Outstanding, the Co-Issuers shall use all reasonable efforts to obtain and maintain the listing of the Notes on the regulated market of the ISE; **provided** that the Co-Issuers will not be required to maintain a listing on a stock exchange in the European Union if compliance with requirements of the European Commission on a member state becomes burdensome in the sole judgment of the Servicer.

### 7.14    Annual Rating Review

So long as any Notes of any Class remain Outstanding, on or before May in each year commencing in 2008, the Co-Issuers shall obtain and pay for an annual review or ongoing surveillance of the rating of each Outstanding Class of Notes from each Rating Agency, as applicable. The Co-Issuers shall promptly notify the Trustee and the Servicer in writing (and the Trustee shall promptly provide a copy of the notice to the Noteholders) and the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) if at any time the rating of any Class of Notes has been, or is known will be, changed or withdrawn.

### 7.15    Reporting

At any time when the Co-Issuers are not subject to Section 13 or 15(d) of the Exchange Act and are not exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act, upon the request of a Holder or Beneficial Owner of any Note, the Co-Issuers shall promptly furnish "Rule 144A Information" to the Holder or Beneficial Owner, to a prospective purchaser of a Note designated by the Holder or Beneficial Owner or to the

Trustee for delivery to the Holder or Beneficial Owner or a prospective purchaser designated by the Holder or Beneficial Owner, as the case may be, to permit compliance by the Holder or Beneficial Owner with Rule 144A under the Securities Act in connection with the resale of the Note by the Holder or Beneficial Owner. ***Rule 144A Information*** is the information specified pursuant to Rule 144A(d)(4) under the Securities Act.

### 7.16   Calculation Agent

(a)   The Issuer agrees that for so long as any Floating Rate Notes remain Outstanding an agent will always have been appointed (that does not control and is not controlled by or under common control with the Issuer or its Affiliates) to calculate LIBOR in respect of each Interest Period (the ***Calculation Agent***).  The Issuer has initially appointed the Trustee as Calculation Agent.  The Issuer may remove the Calculation Agent at any time.  If the Calculation Agent is unable or unwilling to act as such or is removed by the Issuer or if the Calculation Agent fails to determine any of the information required to be given to the Company Announcements Office of the Irish Stock Exchange, as described in subsection (b), in respect of any Interest Period, the Issuer or the Servicer (on its behalf) shall promptly appoint a replacement Calculation Agent.  For so long as any Floating Rate Notes are listed on the Irish Stock Exchange and the rules of the exchange so require, notice of the appointment of any replacement Calculation Agent shall be given to the Company Announcements Office of the Irish Stock Exchange as promptly as practicable after the appointment.  The Calculation Agent may not resign its duties without a successor having been duly appointed.

(b)   As soon as possible after 11:00 A.M., London time, on the second Business Day before the first day of each Interest Period, but in no event later than 11:00 A.M., London time, on the next Business Day, the Calculation Agent shall calculate the Note Interest Rate for each Class of Floating Rate Notes for the next Interest Period.  The Calculation Agent shall communicate those rates and amounts to the Co-Issuers, the Trustee, each Paying Agent, the Servicer, Euroclear, Clearstream, the Depository, and, so long as any of the Floating Rate Notes are listed thereon and the rules of the exchange so require, the Irish Stock Exchange.  In the latter case, the information shall be given to the Company Announcements Office of the Irish Stock Exchange as soon as possible after its determination.  The Calculation Agent shall separately notify the Irish Stock Exchange of the information.  The Calculation Agent shall also specify to the Co-Issuers the quotations on which the foregoing rates are based, and in any event the Calculation Agent shall notify the Co-Issuers before 7:00 P.M., London time, on the second Business Day before the first day of each Interest Period that either:

   (i)   it has determined or is in the process of determining the Note Interest Rate for each Class of Floating Rate Notes, or

(ii)   it has not determined and is not in the process of determining any such Note Interest Rate together with its reasons therefor.

The Calculation Agent's determination of the foregoing rates for any Interest Period shall (in the absence of manifest error) be final and binding on all parties and the Holders and Beneficial Owners of the Preference Shares.

**7.17    Certain Tax Matters**

(a)   The Issuer, the Co-Issuer, the Trustee agree, and each registered Holder and Beneficial Owner of Notes, by accepting a Note, agrees to treat such Notes as indebtedness solely of the Issuer and not of the Co-Issuer for accounting, financial reporting and U.S. federal, and, to the extent permitted by law, state and local income tax purposes, to report all income (or loss) in accordance with such treatment and not to take any action inconsistent with such treatment unless otherwise required by any relevant taxing authority.

(b)   The Issuer agrees not to take any action to be treated as other than a corporation for U.S. federal income tax purposes.

(c)   The Issuer and Co-Issuer shall file, or cause to be filed, any tax returns, including information tax returns, required by any governmental authority.

(d)   The Issuer shall not file, or cause to be filed, any income or franchise tax return in any state of the United States unless the Issuer shall have obtained a Tax Opinion of Counsel prior to such filing that, under the laws of such jurisdiction, the Issuer is required to file such income or franchise tax return.

(e)   The Issuer shall not become the owner of any asset if the acquisition (including the manner thereof), ownership or disposition of such asset (without regard to the other activities of the Issuer) would cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for U.S. federal income tax purposes, except as a result of ownership of Eligible Equity Securities, securities or other consideration received in an exchange or Defaulted Collateral Obligations pending their sale in accordance with Section 12.1.

(f)   The Issuer will treat each purchase of Collateral Obligations and Eligible Investments as a "purchase" for tax accounting and reporting purposes.

(g)   Each of the Issuers and the Trustee agrees that it does not intend for this Indenture to represent an agreement to enter into a partnership, a joint venture or any other business entity for U.S. federal income tax purposes.  The Issuers and the Trustee shall not represent or otherwise hold themselves out to the United States Internal Revenue Service or other third parties as partners in a partnership or members of a joint venture or other business entity for U.S. federal income tax purposes.

(h)     If the Issuer or Servicer becomes aware that withholding of United States income tax is required with respect to fees associated with the Synthetic Letters of Credit included in the Collateral and such taxes are not being withheld by an agent for the relevant syndicate of lenders, the Issuer shall cause such taxes to be paid.

**7.18    Securities Lending.**

(a)     So long as no Event of Default is continuing and if after the completion of the transaction the limit in clause (30) of the definition of "Concentration Limitations" would be satisfied, the Servicer may cause Collateral Obligations that are not Defaulted Collateral Obligations to be lent for a term of 90 days or less to banks, broker-dealers and other financial institutions (other than insurance companies) having long-term and short-term senior unsecured debt ratings or guarantors with ratings of at least "A1" (and not "A1" but on credit watch with negative implications) and "P-1" (and not on credit watch for possible downgrade) from Moody's and a long-term senior unsecured debt rating of at least "A" or a short-term senior unsecured debt rating of at least "A-1" from S&P (each, a ***Securities Lending Counterparty***) pursuant to one or more agreements (each, a ***Securities Lending Agreement***); **provided** that Collateral Obligations the Market Value of which cannot be determined under clause (i), (ii) or (iii) of that definition may not be lent pursuant to a Securities Lending Agreement.  Upon receipt of an Issuer Order, the Trustee shall release any lent Collateral Obligations to a Securities Lending Counterparty as directed by the Servicer.  The Securities Lending Counterparties may be Affiliates of the Initial Purchasers or Affiliates of the Servicer.  The duration of any Securities Lending Agreement shall not exceed the Stated Maturity of the Notes.

(b)     Each Securities Lending Agreement shall be on market terms as determined by the Servicer (except as may be required below) and shall:

   (i)     require that the Securities Lending Counterparty return to the Issuer debt obligations that are identical (in terms of issue and class) to the lent Collateral Obligations;

   (ii)    require that the Securities Lending Counterparty pay to the Issuer amounts equivalent to all interest and other payments that the owner of the lent Collateral Obligation is entitled to for the period during which the Collateral Obligation is lent and require that any such payments not be subject to withholding tax imposed by any jurisdiction unless the Securities Lending Counterparty is required under the Securities Lending Agreement to make "gross-up" payments to the Issuer that cover the full amount of the withholding tax on an after-tax basis;

   (iii)   require that the Rating Condition with respect to each Rating Agency shall be satisfied with respect to the execution of the Securities Lending Agreement;

(iv)    satisfy any other requirements of Section 1058 of the Code and the Treasury Regulations promulgated under it;

(v)    be governed by the laws of New York;

(vi)    permit the Issuer to assign its rights under the Securities Lending Agreement to the Trustee pursuant to this Indenture;

(vii)    provide for early termination and the delivery of any lent Collateral Obligation with no penalty if the Collateral Obligation becomes a Credit Risk Obligation or is subject to redemption in accordance with its terms;

(viii)    provide for early termination and the delivery of any lent Collateral Obligation with no penalty upon any redemption of the Notes in whole;

(ix)    require the Securities Lending Counterparty to post with the Trustee collateral consisting of cash or direct registered debt obligations of the United States of America that have a maturity date no later than the Business Day preceding the stated termination date of the Securities Lending Agreement (the "*Securities Lending Collateral*") to secure its obligation to return the Collateral Obligations or in the alternative post the Securities Lending Collateral with a custodian for the benefit of the Issuer designated by the Securities Lending Counterparty that satisfies the requirements with respect to being a securities intermediary with respect to the posted collateral if that custodian would qualify to be a successor trustee under Section 6.9;

(x)    provide that the Securities Lending Collateral shall be maintained as provided in the related Securities Lending Agreement and if securities are delivered to the Trustee as security for the obligations of the Securities Lending Counterparty under the related Securities Lending Agreement, the Servicer on behalf of the Issuer will negotiate with the Securities Lending Counterparty a rate for the loan fee to be paid to the Issuer for lending the lent Collateral Obligations;

(xi)    the lent Collateral Obligations shall be marked-to-market on a daily basis by the Servicer on the basis of their Market Value;

(xii)    the Collateral will include the Issuer's rights under the related Securities Lending Agreement rather than the loaned Collateral Obligation;

(xiii)    provide for early termination within ten days at the option of the Issuer and the delivery of any lent Collateral Obligation with no penalty if the Securities Lending Counterparty is no longer in compliance with the requirements relating to the credit ratings of the Securities Lending

Counterparty and the noncompliance is not cured as provided in this Indenture; and

(xiv) contain appropriate limited recourse and non-petition provisions (to the extent the Issuer has contractual payment obligations to the Securities Lending Counterparty) equivalent (*mutatis mutandis*) to those in this Indenture.

(c) If either Moody's or S&P downgrades a Securities Lending Counterparty such that the Securities Lending Agreements to which the Securities Lending Counterparty is a party are no longer in compliance with the requirements relating to the credit ratings of the Securities Lending Counterparty, then the Servicer on behalf of the Issuer shall take such steps as provided in the related Securities Lending Agreements.

(d) In connection with any such direction by the Servicer to enter into a Securities Lending Agreement, the Trustee may receive and rely on an Issuer Order to the effect that the Securities Lending Agreement, and its Securities Lending Counterparty, is each in compliance with the requirements of this Indenture (including the definition of "Securities Lending Counterparty"). The Issuer and the Trustee may enter into any Securities Lending Agreement (and any related account control agreement) at the instruction of the Servicer, and deliver and accept delivery and return of any Collateral Obligations pursuant to the Securities Lending Agreement, or pursuant to instructions from the Servicer in connection with the Securities Lending Agreement. The Trustee may take any actions and exercise any rights and remedies under any Securities Lending Agreement that the Servicer instructs. The Trustee need not enter into any Securities Lending Agreement (or any related account control agreement) that would in its judgment, subject it to any liability, whether financial or otherwise, or cause it to incur or subject it to risk of any cost or disbursement for which it is not, in its judgment, adequately indemnified, or that would impose on it any obligations or administrative burdens that are unacceptable to it. The Servicer shall instruct the Trustee in writing with respect to the administration of any Securities Lending Agreement (including with respect to any default and the exercise of rights under it). The Trustee shall not have any responsibility for evaluating the sufficiency, validity or acceptability of any Securities Lending Agreement or for the qualifications or eligibility of any Securities Lending Counterparty. Nothing in this Indenture shall be construed to cause the Trustee to have any fiduciary duties to any Securities Lending Counterparty.

So long as any Collateral Obligation is on loan pursuant to a Securities Lending Agreement,

(e) the Trustee shall have no liability for any failure or inability on its part to receive any information or take any action with respect to the Collateral Obligation because of its being on loan (including any failure to take action with respect to a

notice of redemption, consent solicitation, exchange or tender offer, or similar corporate action), and

(f) the loaned Collateral Obligations shall not be disqualified for return to the Trustee as a Collateral Obligation by any change in circumstance or status during the time while on loan (including any change that would cause the Collateral Obligation to be ineligible for purchase by the Issuer under this Indenture if applied to a proposed purchase of it in the open market at the time of its return from loan).

## 7.19 Purchase of Collateral Obligations; Ramp-Up Completion Date

(a) The Issuer shall use its best efforts to purchase Collateral Obligations on any Business Day during the Ramp-Up Period or enter into commitments to purchase Collateral Obligations on any Business Day during the Ramp-Up Period for purchase on or as soon as practicable thereafter (not to exceed 60 days thereafter), in each case, for inclusion in the Collateral so that each of the Aggregate Principal Balance of the Collateral Obligations and the Overcollateralization Ratio Numerator with respect to the Class A-1 Notes, the Class A-2 Notes and the Class B Notes is at least U.S.$687,400,000.

(b) No Collateral Obligations may be purchased prior to the Ramp-Up Completion Date unless immediately following the purchase of any Collateral Obligation (as certified by the Servicer in writing), the remaining funds in the Collection Account, after giving effect to such purchase, are sufficient as of the date of determination to purchase Collateral Obligations for inclusion in the Collateral so that each of the Aggregate Principal Balance of the Collateral Obligations and the Overcollateralization Ratio Numerator with respect to the Class A-1 Notes, the Class A-2 Notes and the Class B Notes is at least U.S.$687,400,000 (taking into account the Collateral Obligations already part of the Collateral (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations on or before the Ramp-Up Completion Date)).

(c) Notwithstanding the foregoing, or any other provision of this Indenture, if the Issuer has previously entered into a commitment to purchase a Collateral Obligation to be included in the Collateral, such commitment initially not to exceed 60 days, and at the time of the commitment the Collateral Obligation complied with the definition of "Collateral Obligation" and the requirements set forth in this Section 7.19, the Issuer may consummate the purchase of the Collateral Obligation notwithstanding that the Collateral Obligation fails to comply with the definition of "Collateral Obligation" and the requirements set out above on the date of settlement.

(d) The Issuer will use commercially reasonable efforts to purchase, or to enter into binding agreements to purchase, Collateral Obligations by the Ramp-Up Completion Date, that, together with the Collateral Obligations purchased on or

before the Closing Date and then held by the Issuer, will satisfy, as of the Ramp-Up Completion Date (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations on or before the Ramp-Up Completion Date), the Collateral Quality Tests, the Concentration Limitations, the criteria set forth in Section 12.2 of this Indenture and the Overcollateralization Tests.

(e)     No later than five Business Days after the Ramp-Up Completion Date, the Issuer shall notify each of the Rating Agencies in writing of the occurrence of the Ramp-Up Completion Date (each, a "***Ramp-Up Notice***") and request in writing that each of S&P and Moody's confirm in writing prior to the Determination Date related to the first Payment Date that it has not reduced or withdrawn the Initial Ratings; **provided**, that the Issuer shall not be required to request a Rating Confirmation from Moody's if, by the Determination Date related to the first Payment Date Moody's has received an Accountants' Certificate confirming (i) the Issuer is in compliance with each of the Collateral Quality Tests, the Coverage Tests and the Concentration Limitations and (ii) the Aggregate Principal Balance of the Collateral Obligations that the Issuer owns or has committed to purchase is at least equal to U.S.$687,400,000.  In connection with such request or, in the case of Moody's, in lieu of such request, the Issuer shall provide a report to the Rating Agencies identifying the Collateral Obligations then included in the Collateral and the Issuer shall obtain and deliver to the Trustee and the Rating Agencies, together with the delivery of a report (and, with respect to S&P, an Excel Default Model Input File and, with respect to each Collateral Obligation, the name of the obligor thereon and the CUSIP number thereof (if applicable)) substantially in the form of a Monthly Report as of the Ramp-Up Completion Date, an Accountants' Certificate confirming:

   (i)     confirming the maturity date, rating, spread and recovery rate for each item of Original Collateral Obligations owned by the Issuer as of the Ramp-Up Completion Date and the information provided by the Issuer with respect to every other asset included in the Collateral, by reference to such sources as shall be specified therein;

   (ii)     confirming that as of the Ramp-Up Completion Date:

      (1)     each of the Coverage Tests are satisfied;

      (2)     the Aggregate Principal Balance of Collateral Obligations that the Issuer owned or committed to purchase as of the Ramp-Up Completion Date is at least equal to the Maximum Amount; and

        (3) the Collateral Obligations comply with all of the requirements of the Collateral Quality Tests and the Concentration Limitations; and

    (iii) specifying the procedures undertaken by them to review data and computations relating to the foregoing statements.

(f) Any failure by the Issuer to obtain a Rating Confirmation pursuant to Section 7.19(e) above shall be a Rating Confirmation Failure (a "***Rating Confirmation Failure***"*)* and will thereafter be deemed to be continuing until the first date thereafter on which the Trustee shall have received evidence of confirmation of the Initial Ratings, on which date it shall be deemed to have been cured. If a Rating Confirmation Failure occurs, the Notes will be redeemed pursuant to, and to the extent provided in, Section 9.1(a).

(g) On the date occurring 45 days after the Closing Date (the ***Interim Ramp-Up Test Date***), the Servicer, on behalf of the Issuer, shall submit to Moody's a statement showing compliance with the Interim Ramp-Up Test specified in the Interim Ramp-Up Test table below. Should the results of any such Interim Ramp-Up Test fail to comply with the levels established for such Interim Ramp-Up Test Date by the Servicer on behalf of the Issuer, and that are acceptable to Moody's, the Issuer shall discuss a plan with Moody's for achieving compliance with such tests by the Ramp-Up Completion Date at the levels required on the Ramp-Up Completion Date.

**Interim Ramp-Up Test**

| Minimum Moody's Weighted Average Recovery Rate | Minimum Diversity Score | Maximum Weighted Average Moody's Rating Factor | Minimum Weighted Average Spread | Minimum Aggregate Principal Balance |
|---|---|---|---|---|
| 46% | 60 | 2550 | 250 | U.S.$666,800,000 |

**7.20 Secondary Risk Procedures**

The Servicer shall notify S&P and request that S&P modify the S&P CDO Monitor accordingly if on any date (as disclosed in the most recent Monthly Report):

(a) the Aggregate Principal Amount of all Collateral Obligations participated from or entered into with the same Secondary Risk Counterparty exceeds the percentage of the Maximum Amount in the Secondary Risk Table opposite the long-term

S&P credit rating of the Secondary Risk Counterparty under the caption "Individual Counterparty Limit," or

(b)    the Aggregate Principal Amount of all Collateral Obligations participated from or entered into with Secondary Risk Counterparties with the same long-term credit rating exceeds the percentage of the Maximum Amount in the Secondary Risk Table opposite that rating under the caption "Aggregate Counterparty Limit" (excluding up to 5.0% by Aggregate Principal Amount of Synthetic Securities with respect to Collateral Obligations the Aggregate Counterparty Limit of which is 20.0% to the extent that (x) such exposure is fully collateralized with respect to principal and (y) the related Synthetic Security Counterparties are rated at least "A-1+" by S&P).

### 7.21 Section 3(c)(7) Procedures

In addition to the notices required to be given under Section 10.6 hereof, the Issuer shall take the following actions to ensure compliance with the requirements of Section 3(c)(7) of the Investment Company Act (**provided** that such procedures and disclosures may be revised by the Issuer to be consistent with generally accepted practice for compliance with the requirements of Section 3(c)(7) of the Investment Company Act):

(a)    **Section 3(c)(7) Notice to Investors.** The Issuer shall (i) request the Depository to cause, and cooperate with the Depository in causing, the Depository's security description and delivery order to include a "3(c)(7) marker" and the Depository's user manual to contain an accurate description of the restrictions on the holding and transfer of the Notes due to the Issuer's reliance on the exclusion to registration provided by Section 3(c)(7) of the Investment Company Act, (ii) request that the Depository send, and cooperate with the Depository in causing the Depository to send, to its Agent Members (x) the Important Section 3(c)(7) Reminder Notice substantially in the form of Exhibit G-2 in connection with the initial offering of the Notes and (y) the Section 3(c)(7) Reminder Notice substantially in the form of Exhibit G-1 as set forth in Section 10.6(b) and (iii) request that the Depository cause, and cooperate with the Depository in causing, the Depository's Reference Directory to include each Class of Notes (and the applicable CUSIP numbers for the Notes) in the listing of 3(c)(7) issues together with an attached description of the limitations as to the distribution, purchase, sale and holding of the Notes.

(b)    **CUSIP Numbers.** The Issuer shall (a) request of S&P, and shall cooperate with S&P to ensure that all CUSIP numbers identifying the Notes shall have a "fixed field" attached thereto that contains "3c7" and "144A" indicators and (b) take steps to cause the Initial Purchasers and any market makers to require that all "confirms" of trades of the Notes contain CUSIP numbers with such "fixed field" identifiers.

(c) **Bloomberg and other Third-Party Vendor Screens.** The Issuer shall use all reasonable efforts to cause the Bloomberg screen or screens containing information about the Notes to include the following language: (a) the "Note Box" on the bottom of the "Security Display" page describing the Notes shall state: "Iss'd Under 144A/3(c)(7)," (b) the "Security Display" page shall have the flashing red indicator "See Other Available Information" and (c) the indicator shall link to the "Additional Security Information" page, which shall state that the securities are "being offered in reliance on the exemption from registration under Rule 144A of the Securities Act, to persons who are both (x) qualified institutional buyers (as defined in Rule 144A under the Securities Act) and (y) qualified purchasers (as defined under Section 3(c)(7) under the Investment Company Act)." The Issuer shall use all reasonable efforts to require that any other third-party vendor screens containing information about the Notes include substantially similar language to clauses (a) through (c) above.

8. **SUPPLEMENTAL INDENTURES**

8.1 **Supplemental Indentures Without Consent of Holders**

(a) Without the consent of the Holders of any Securities (other than with respect to the consent of the Majority of the Controlling Class specified in clause (15) below), any Hedge Counterparty (except to the extent such consent is required under the applicable Hedge Agreement) or any Synthetic Security Counterparty (except to the extent such consent is required under the applicable Synthetic Security Agreement), when authorized by Board Resolutions, and subject to the requirement provided below in this Section 8.1 with respect to the ratings of any Class of Notes, the Co-Issuers and the Trustee may, if, with respect to any matters described in clauses (1) through (23) below, the interests of the Holders of the Securities (except, in the case of clause (12) below, any Holders of Notes subject to the applicable Refinancing) are not materially and adversely affected thereby (the Co-Issuers and the Trustee will be bound by a standard of good faith and fair dealing in making such determination, subject to the terms of this Indenture) execute one or more indentures supplemental to this Indenture, in form satisfactory to the Trustee, to:

(1) evidence the succession of another Person to the Issuer or the Co-Issuer and the assumption by the successor Person of the obligations of the Issuer or the Co-Issuer in this Indenture and in the Securities;

(2) add to the covenants of the Co-Issuers or the Trustee for the benefit of the Noteholders or to surrender any right in this Indenture conferred on the Co-Issuers;

(3) convey, transfer, assign, mortgage or pledge any property to the Trustee, or add to the conditions, limitations, or restrictions on the authorized

amount, terms, and purposes of the issue, authentication and delivery of the Notes;

(4)     evidence and provide for the acceptance of appointment under this Indenture by a successor Trustee and to add to or change any of the provisions of this Indenture necessary to facilitate the administration of the trusts under this Indenture by more than one Trustee, pursuant to the requirements of Sections 6.10, 6.11, and 6.13;

(5)     correct or amplify the description of any property at any time subject to the lien of this Indenture, or to better assure, convey, and confirm to the Trustee any property subject or required to be subject to the lien of this Indenture (including all actions appropriate as a result of changes in law) or to subject to the lien of this Indenture any additional property;

(6)     cause any provision of this Indenture to conform to, or be consistent with, the statements made with respect to such provision in the Offering Memorandum;

(7)     modify the restrictions on and procedures for resales and other transfers of the Notes to reflect any changes in applicable law (or its interpretation) or to enable the Co-Issuers to rely on any less restrictive exemption from registration under the Securities Act (including, without limitation, to add provisions for resales and transfers of the Preference Shares under Regulation S) or the Investment Company Act or to remove restrictions on resale and transfer to the extent not required under this Indenture;

(8)     with the consent of the Servicer, modify (A) the restrictions on the sales of Collateral Obligations in Section 12.1 or (B) with the consent of the Majority of the Controlling Class (which consent shall not be unreasonably withheld), the Eligibility Criteria in Section 12.2 (and the definitions related thereto); **provided** that, for the avoidance of doubt, the consent of a Majority of the Controlling Class shall not be required if such amendment also satisfies the requirements of clause (24) below;

(9)     make appropriate changes for any Class of Notes to be listed on an exchange other than the Irish Stock Exchange;

(10)    otherwise to correct any inconsistency or cure any ambiguity or errors in this Indenture;

(11)    accommodate the issuance of the Notes in book-entry form through the facilities of DTC or otherwise;

(12)    to accommodate a Refinancing effected pursuant to and in compliance with Section 9.7; provided that no Holders of Notes or Preference Shares

are materially adversely affected thereby, other than Holders of Notes subject to such Refinancing;

(13) to avoid the imposition of tax on the net income of the Issuer or of withholding tax on any payment to the Issuer;

(14) authorize the appointment of any listing agent, Transfer Agent, Paying Agent or additional registrar for any Class of Notes appropriate in connection with the listing of any Class of Notes on the Irish Stock Exchange or any other stock exchange, and otherwise to amend this Indenture to incorporate any changes required or requested by any governmental authority, stock exchange authority, listing agent, Transfer Agent, Paying Agent or additional registrar for any Class of Notes in connection with its appointment, so long as the supplemental indenture would not materially and adversely affect any Noteholder, as evidenced by an Opinion of Counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) or a certificate of an Authorized Officer of the Servicer, to the effect that the modification would not be materially adverse to the Holders of any Class of Notes;

(15) with the consent of the Majority of the Controlling Class, amend, modify, enter into or accommodate the execution of any contract relating to a Synthetic Security (including posting collateral under a Synthetic Security Agreement) if such particular action is not otherwise permitted under the Indenture;

(16) modify Section 3.3 to be consistent with applicable laws or Rating Agency requirements;

(17) evidence any waiver by any Rating Agency as to any requirement or condition, as applicable, of the Rating Agency set forth in this Indenture;

(18) facilitate the issuance of participation notes, combination notes, composite securities and other similar securities;

(19) facilitate hedging transactions;

(20) facilitate the ability of the Issuer to lend collateral pursuant to a Securities Lending Agreement;

(21) modify any provision to facilitate an A/B Exchange, including to effect any serial designation relating to the exchange;

(22)    with the consent of the Servicer, enter into any additional agreements not expressly prohibited by this Indenture as well as any amendment, modification, or waiver if the Issuer determines that the amendment, modification, or waiver would not, upon or after becoming effective, materially and adversely affect the rights or interest of the Holders of any Class of Securities as evidenced by an Opinion of Counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) or a certificate of an officer of the Servicer to the effect that the modification would not be materially adverse to the Holders of any Class of Securities; provided that, for the avoidance of doubt, this clause (22) shall not permit the Co-Issuers and the Trustee to effect any amendment that expressly requires the consent of the Majority of the Controlling Class without such consent;

(23)    provide for the issuance of additional Preference Shares to the extent permitted by the Preference Share Documents and to extend to such additional Preference Shares the benefits applicable to the Preference Shares under the Indenture and the Preference Share Documents; or

(24)    prevent the Issuer from becoming an "investment company" as defined in the Investment Company Act or to better assure compliance with the requirements of Rule 3a-7 and/or to remove transfer restrictions and other requirements relating to Section 3(c)(7);

**provided** that, as a condition to the effectiveness of any such supplemental indenture, each of the Issuer, the Trustee and the Servicer shall have received (A) a Rating Confirmation with respect to such supplemental indenture and (B) a customary opinion of counsel (which may be supported as to factual matters by any relevant certificates or other documents necessary or advisable in the judgment of counsel delivering such opinion) from a nationally recognized law firm providing that, after giving effect to such supplemental indenture, the Issuer is exempt from registration as an "investment company" under the Investment Company Act in reliance on the exemption provided by Rule 3a-7.

(b)    Without the consent of the Servicer, no supplemental indenture may be entered into that would reduce the rights, decrease the fees or other amounts payable to the Servicer under this Indenture or increase the duties or obligations of the Servicer.

(c)    The Trustee is authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations that may be in the agreements, but the Trustee shall not be obligated to enter into any such supplemental indenture that affects the Trustee's own rights, duties, liabilities or immunities under this Indenture or otherwise, except to the extent required by law. Unless notified by a Majority of any Class of Notes or a Majority of the

Preference Shares that Holders of the Class of the Notes or Holders of the Preference Shares would be materially and adversely affected, the Trustee may rely on a certificate of the Servicer and an Opinion of Counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) as to whether the interests of any Holder of Securities would be materially and adversely affected by any such supplemental indenture.

(d)     If any Outstanding Notes are rated by a Rating Agency, the Trustee shall enter into a supplemental indenture pursuant to this Section 8.1 only if either (1) the Rating Condition with respect to each Rating Agency is satisfied with respect to the supplemental indenture or (2) the Servicer and the Holders of 100% in Aggregate Outstanding Amount of each Class of Notes the ratings on which would be reduced or withdrawn consent to the supplemental indenture. Prior to the entry into any supplemental Indenture with respect to which a Rating Confirmation for one or more Classes of Notes is not expected to be delivered, the Trustee shall provide written notice to each Holder of each Outstanding Note informing them of such fact.

(e)     At the cost of the Co-Issuers, the Trustee shall mail to the Noteholders, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), each Rating Agency (for so long as any Notes are Outstanding and rated by a Rating Agency) and each Hedge Counterparty a copy of any such proposed supplemental indenture pursuant to this Section at least 15 Business Days before its execution by the Trustee (or 60 calendar days before execution in the case of a supplemental indenture for the purpose described in paragraph (8) of Section 8.1(a), which shall be identified as such in a certificate of the Servicer delivered to the Trustee before the date on which such notice is required to be given).

## 8.2     Supplemental Indentures With Consent of Holders

(a)     If the Rating Condition is satisfied with respect to each Rating Agency, the Trustee and the Co-Issuers may execute one or more indentures supplemental to this Indenture to add any provisions to, or change in any manner, or eliminate any of the provisions of, this Indenture or modify in any manner the rights of the Noteholders under this Indenture with the consent of:

(1)     the Servicer if the supplemental indenture would reduce the rights, decrease the fees or other amounts payable to it under this Indenture or increase the duties or obligations of the Servicer;

(2)     a Majority of each Class of Notes adversely affected thereby, by Act of the Holders of each such Class of Notes;

(3)     a Majority of the Preference Shares adversely affected thereby;

      (4)     each Hedge Counterparty (if such consent is required pursuant to the applicable Hedge Agreement); and

      (5)     each Synthetic Security Counterparty (if such consent is required pursuant to the applicable Synthetic Security Agreement).

Any proposed supplemental indenture that would also necessitate a change to the Issuer Charter may only be made after a Special Resolution (as defined in the Issuer Charter) has been passed to permit the Issuer's constitutional documents to be altered to conform them to the proposed change to this Indenture as certified to the Trustee by the Issuer.

Notwithstanding anything in this Indenture to the contrary, without the consent of the Holder of each Outstanding Note adversely affected thereby and the Holder of each Preference Share adversely affected thereby, no supplemental indenture shall:

      (i)     change the Stated Maturity of the principal of or the due date of any installment of interest on any Note or of any payment to the Preference Shares Paying Agent for payment to the Holders of the Preference Shares (other than in the case of any Maturity Extension in connection with an extension of the Replacement Period as described in Section 2.4), reduce the principal amount or the rate of interest on any Note, or the Default Interest Rate or the Redemption Price with respect to any Note or Preference Share, or change the earliest date on which Notes of any Class or Preference Share may be redeemed at the option of the Issuer, change the provisions of this Indenture relating to the application of proceeds of any Collateral to the payment of principal of or interest on Notes, or to payment to the Preference Shares Paying Agent for payment to the Holders of the Preference Shares, or change any place where, or the coin or currency in which, Notes or their principal or interest are paid or impair the right to institute suit for the enforcement of any such payment on or after their Stated Maturity (or, in the case of redemption, on or after the applicable Redemption Date);

      (ii)     reduce the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class or Holders of Preference Shares whose consent is required for the authorization of any such supplemental indenture or for any waiver of compliance with certain provisions of this Indenture or certain defaults under this Indenture or their consequences provided for in this Indenture;

      (iii)     permit the creation of any lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Collateral or terminate the lien on any property at any time subject hereto or deprive the Holder of any Note of the security afforded by the lien of this Indenture;

(iv) reduce the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class whose consent is required to request the Trustee to retain the Collateral or rescind the Trustee's election to retain the Collateral, pursuant to Section 5.5 or to sell or liquidate the Collateral, pursuant to Section 5.4 or 5.5;

(v) modify any of the provisions of this Section, or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Note and Preference Share affected thereby;

(vi) modify the definition of "Outstanding," "Controlling Class," or "Majority," or the Priority of Payments in Section 11.1(a) or Section 13.1; or

(vii) modify any of the provisions of this Indenture in such a manner as to affect the calculation of the amount of any payment of Redemption Price or of interest or principal on any Note or any payment to the Preference Shares Paying Agent for the payment of dividends or other payments on the Preference Shares on any Payment Date or to affect the rights of the Holders of the Securities to the benefit of any provisions for the redemption of the Notes or the Preference Shares contained in this Indenture.

(b) Not later than 15 Business Days prior to the execution of any proposed supplemental indenture pursuant to this Section 8.2, the Trustee, at the expense of the Co-Issuers, shall mail to the Noteholders, the Servicer, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), each Hedge Counterparty, each Synthetic Security Counterparty (to the extent required by the terms of the related Synthetic Security) and each Rating Agency (for so long as any Notes are Outstanding and rated by a Rating Agency) a copy of such proposed supplemental indenture and shall request any required consent from the applicable Holders of Securities to be given within the Initial Consent Period. Any consent given to a proposed supplemental indenture by the Holder of any Securities, as applicable, shall be irrevocable and binding on all future Holders or beneficial owners of that Security, irrespective of the execution date of the supplemental indenture. If the Holders of less than the required percentage of the Aggregate Outstanding Amount of the relevant Securities consent to a proposed supplemental indenture within the Initial Consent Period, on the first Business Day after the Initial Consent Period, the Trustee shall notify the Issuer and the Servicer which Holders of Securities have consented to the proposed supplemental indenture and, which Holders (and, to the extent such information is reasonably available to the Trustee, which beneficial owners) have not consented to the proposed supplemental indenture. If it intends to exercise its Amendment Buy-Out Option pursuant to Section 9.6, the Amendment Buy-Out Purchaser shall so notify the Trustee and S&P (which notice shall designate a date for the

Amendment Buy-Out to occur no earlier than 10 Business Days after the date of such notice) no later than five Business Days after the Servicer is so notified by the Trustee and the Trustee shall promptly mail such notice to all Noteholders and the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares). Any Non-Consenting Holder may give consent to the related proposed supplemental indenture until the 5th Business Day prior to the date of the Amendment Buy-Out designated by the Amendment Buy-Out Purchaser, and in such case shall cease to be a Non-Consenting Holder for purposes of the Amendment Buy-Out. If the Amendment Buy-Out Purchaser exercises its Amendment Buy-Out Option and purchases the applicable Securities pursuant to Section 9.6 below, the Amendment Buy-Out Purchaser, as Holder or beneficial owner of the applicable Securities, may consent to the related proposed supplemental indenture within five Business Days of the Amendment Buy-Out.

(c)     It shall not be necessary for any Act of Noteholders under this Section 8.2 to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if the Act or consent approves its substance.

(d)     The Trustee, at the expense of the Co-Issuers, shall mail to the Noteholders, the Servicer, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), each Hedge Counterparty, each Synthetic Security Counterparty and each Rating Agency a copy of any supplemental indenture pursuant to this Section 8.2 promptly after its execution by the Co-Issuers and the Trustee. Any failure of the Trustee to mail a copy of any supplemental indenture as provided in this Indenture, or any defect in the mailing, shall not in any way affect the validity of the supplemental indenture.

**8.3     Execution of Supplemental Indentures**

In executing or accepting the additional trusts created by any supplemental indenture permitted by this Section 8 or the modifications thereby of the trusts created by this Indenture, the Trustee may receive, and (subject to Sections 6.1 and 6.3) shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of the supplemental indenture is authorized or permitted by this Indenture and that all conditions precedent to the execution of such supplemental indenture have been satisfied. In the event that any supplemental indenture is consented to by the Issuer, the Co-Issuer and 100% of the Aggregate Outstanding Amount of each Class of Notes and the Rating Condition is satisfied or is specifically waived by all consenting parties, all conditions precedent to the execution of such supplemental indenture shall be deemed satisfied, the execution of such supplemental indenture shall be authorized or permitted by this Indenture, and the Trustee shall execute and accept the additional trusts created by such supplemental indenture pursuant to this Section 8 or modification thereby of the trusts created by this Indenture without obtaining an Opinion of Counsel; **provided** that the Trustee may, but shall not be obligated to, enter into any such supplemental indenture that affects the Trustee's own rights, duties or immunities under this Indenture or otherwise. The Servicer shall not be bound by any amendment or supplement to this

Indenture that would reduce the rights, decrease the fees or other amounts payable to it under this Indenture or increase the duties or obligations of the Servicer unless the Servicer consents to it in writing, such consent not to be unreasonably withheld or delayed. The Servicer shall follow any amendment or supplement to this Indenture by which it is bound of which it has received written notice from the time it receives a copy of the amendment from the Issuer or the Trustee.

## 8.4    Effect of Supplemental Indentures; Certain Required Consents

Upon the execution of any supplemental indenture under this Section 8, this Indenture shall be modified in accordance therewith, and the supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Notes theretofore and thereafter authenticated and delivered under this Indenture shall be bound thereby.

Any supplemental indenture that would necessitate a change to the Issuer Charter may only be made after a Special Resolution (as defined in the Issuer Charter) has been passed to permit the Issuer Charter to be altered to conform with such proposed amendment.

## 8.5    Reference in Notes to Supplemental Indentures

Notes authenticated and delivered after the execution of any supplemental indenture pursuant to this Section 8 may, and if required by the Trustee shall, bear a notice in form approved by the Trustee as to any matter provided for in the supplemental indenture. If the Applicable Issuers shall so determine, new Notes, so modified as to conform in the opinion of the Trustee and the Co-Issuers to any such supplemental indenture, may be prepared and executed by the Applicable Issuers and authenticated and delivered by the Trustee in exchange for Outstanding Notes.

## 9.    REDEMPTION OF NOTES

## 9.1    Mandatory Redemption

(a)    If either (a) a Coverage Test is not met on any Determination Date or (b) a Rating Confirmation Failure occurs, principal payments on the Notes shall be made on the related Payment Date (without payment of any Redemption Price) in accordance with the Priority of Payments.

Upon receipt of notice of a Rating Confirmation Failure and if available Interest Proceeds and Principal Proceeds are insufficient to effect the redemption of the Notes, at par on any subsequent Payment Date in accordance with the Priority of Payments as and to the extent necessary for each of Moody's and S&P to confirm in writing the Initial Ratings assigned by it on the Closing Date to the Notes, then at the direction and in accordance with the instructions of the Servicer the Trustee shall sell Collateral Obligations so that the proceeds from the sale and all other funds available for the purpose in the Collection Account will be used to redeem the Notes and the Preference Shares (but only to the extent necessary for each of

Moody's and S&P to confirm in writing the Initial Ratings assigned by it on the Closing Date to the Notes) and to pay all administrative and other fees, expenses and obligations payable under the Priority of Payments. Any sale under this Section shall be conducted in such a manner that:

    (i)    after giving effect to the sale each Overcollateralization Test is satisfied or, if any Overcollateralization Test is not satisfied, the extent of compliance with the Overcollateralization Test is not reduced,

    (ii)    if the sale occurs on or after the second Payment Date, after giving effect to the sale each Interest Coverage Test is satisfied or, if any Interest Coverage Test is not satisfied, the extent of compliance with the Interest Coverage Test is not reduced, and

    (iii)    after giving effect to the sale each Collateral Quality Test is satisfied or, if any Collateral Quality Test is not satisfied, the extent of compliance with the Collateral Quality Test is not reduced.

(b)    The Preference Shares will be redeemed in whole in accordance with the Priority of Payments and the Preference Share Documents on any Payment Date on which a mandatory redemption of the Notes pursuant to Section 9.1(a) results in the payment in full of the Aggregate Outstanding Amount of each Class of Notes.

**9.2    Optional Redemption**

(a)    Upon the occurrence of a Tax Event, or at any time after the Non-Call Period, the Notes shall be redeemed by the Applicable Issuers, in whole but not in part, on any Payment Date from Principal Proceeds and all other funds available for that purpose in the Collection Account, the Payment Account, the Closing Date Expense Account, the Synthetic Security Reserve Account, the Revolving Reserve Account and the Delayed Drawdown Reserve Account at the direction of the applicable Required Redemption Percentage, which direction must be given to the Preference Shares Paying Agent, the Trustee, the Issuer and the Servicer not later than 45 days before the Payment Date on which the redemption is to be made, at the applicable Redemption Price (exclusive of installments of interest and principal maturing on or before that date, payment of which shall have been made or duly provided for, to the Noteholders on relevant Record Dates or as otherwise provided in this Indenture). All Notes must be simultaneously redeemed, and any termination payments pursuant to Hedge Agreements must be paid.

In the event that the Preference Shares Paying Agent, the Trustee and the Issuer receive notice directing an optional redemption from any one or more Holders of Preference Shares holding less than a Majority of the Preference Shares, the Preference Shares Paying Agent shall, within five Business Days of receipt of such notice, notify the Holders of the Preference Shares (i) of the receipt of such

notice and (ii) that any Holder of Preference Shares may join in directing an optional redemption by notifying the Issuer, the Trustee and the Preference Shares Paying Agent in writing within five Business Days after such Holder's receipt of the Preference Shares Paying Agent's Notice.

Upon receipt of a notice of redemption pursuant to the first paragraph of this Section 9.2(a), the Servicer in its sole discretion will (subject to the standard of care specified in the Servicing Agreement), on behalf of the Issuer, direct the sale of the Collateral Obligations so that the proceeds from the sale and all other funds available for such purpose in the Collection Account, the Closing Date Expense Account, the Synthetic Security Reserve Account, the Revolving Reserve Account and the Delayed Drawdown Reserve Account will be at least sufficient to redeem all of the Notes and to pay all administrative and other fees and expenses payable under the Priority of Payments without regard to any payment limitations. If, in the Servicer's reasonable discretion, the sale would not be sufficient to redeem the Notes, and to pay the fees, expenses and obligations, the Notes shall not be redeemed.

Upon any redemption pursuant to this Section 9.2(a), the Issuer shall, at least 30 days before the Redemption Date (unless the Trustee shall agree to a shorter notice period), notify the Trustee, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and each Rating Agency of the Redemption Date, the applicable Record Date, the principal amount of Notes to be redeemed on the Redemption Date and the applicable Redemption Prices.

(b) On any Payment Date on or after payment in full of the Notes, all administrative and other fees (without regard to any payment limitations) payable under the Priority of Payments (including the Senior Servicing Fee and the Subordinated Servicing Fee), all amounts owing under this Indenture and all amounts owing under this Indenture and any Hedge Agreement to any Hedge Counterparty have been discharged,

(i) at the direction of a Majority of the Preference Shares, the Issuer shall cause the Trustee to make payments in redemption of all of the Preference Shares, in an aggregate amount equal to all of the proceeds from the sale or other disposition of all of the remaining Collateral less any fees and expenses owed by the Issuer (including the Redemption Price of any Notes being simultaneously redeemed), the aggregate amount to be distributed to the Preference Shares Paying Agent for distribution to the Holders of the Preference Shares *pro rata* in accordance with their respective holdings or

(ii) at the unanimous direction of the Holders of the Preference Shares, voting as a single Class or group, the Issuer shall cause the Trustee to make payments in redemption of all or a directed portion (representing less than all) of the Preference Shares to the Preference Shares Paying Agent for

distribution to the Holders of the Preference Shares based upon such direction.

Upon a distribution pursuant to Section 9.2(b)(i), the Servicer will (subject to the standard of care specified in the Servicing Agreement), on behalf of the Issuer (and subject to Section 9.2(b)(ii)), direct the sale of all remaining Collateral Obligations. Upon a distribution pursuant to Section 9.2(b)(ii), the Servicer will effect the sale of Collateral Obligations in accordance with the unanimous direction of the Holders of the Preference Shares.

**9.3     Optional Redemption Procedures**

(a)     Upon any redemption pursuant to Section 9.2, the Trustee shall give notice of a redemption by first-class mail, postage prepaid, mailed not later than 10 Business Days and not earlier than 30 days before the applicable Redemption Date, to each Holder of Notes to be redeemed, at the Holder's address in the Indenture Register or otherwise in accordance with the rules and procedures of DTC, Euroclear, and Clearstream, as applicable, to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and (in the case of a redemption pursuant to Section 9.2(a)) to each Rating Agency. In addition, for so long as any Notes are listed on the Irish Stock Exchange and so long as the rules of the exchange so require, notice of redemption of Notes pursuant to Section 9.2 shall also be given to the Company Announcements Office of the Irish Stock Exchange.

(b)     All notices of redemption delivered pursuant to Section 9.3(a) shall state:

    (i)     the applicable Redemption Date;

    (ii)    the Redemption Price of the Notes to be redeemed (in the case of a redemption pursuant to Section 9.2(a));

    (iii)   in the case of a redemption pursuant to Section 9.2(a), that all of the Notes, are to be redeemed in full and that interest on the Notes to be redeemed shall cease to accrue on the Payment Date specified in the notice; and

    (iv)    the places where the Notes to be redeemed in whole are to be surrendered for payment of the Redemption Price, which shall be the office or agency of the Co-Issuers to be maintained in the Borough of Manhattan as provided in Section 7.2 and the Corporate Trust Office or other office designated by the Trustee for surrender).

Any such notice of redemption may be withdrawn by the Issuer up to the fourth Business Day before the scheduled Redemption Date by written notice to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Trustee and the Servicer only if:

(A)    in the case of a redemption pursuant to Section 9.2(a), the Servicer does not deliver the sale agreement or certifications (described in Section 9.3(c) and 12.1(f)), as the case may be, in form satisfactory to the Trustee,

(B)    in the case of a redemption pursuant to Section 9.2(a) or Section 9.2(b)(i), the Issuer receives the written direction of the Majority of the Preference Shares (or, in the case of an Optional Redemption of the Notes resulting from a Tax Event, the Affected Class) to withdraw the notice of redemption delivered by a percentage of the Preference Shares (or, in the case of an Optional Redemption of the Notes resulting from a Tax Event, the Affected Class) requesting redemption under Section 9.2(a) or Section 9.2(b)(i), as applicable, or

(C)    in the case of a redemption pursuant to Section 9.2(b)(ii), the Issuer receives the unanimous written direction of the Holders of the Preference Shares to withdraw the notice of redemption (and the Issuer hereby agrees for the benefit of the directing Holders to withdraw the applicable notice of redemption if it receives the written direction referred to in the preceding clause (B) or this clause (C)).

Notice of any withdrawal shall be sent, not later than the third Business Day before the scheduled Redemption Date (assuming that the Trustee has received timely written notice from the Issuer as provided above), by the Trustee, to each Noteholder scheduled to be redeemed at the Holder's address in the Indenture Register by overnight courier guaranteeing next day delivery (or, to the extent the address contained in the Indenture Register is not sufficient for that purpose, by first class mail) and the Preference Shares Paying Agent (for forwarding to each Holder of Preference Shares).  If the Issuer so withdraws any notice of redemption or is otherwise unable to complete any redemption of the Notes, the Sale Proceeds received from the sale of any Collateral Obligations sold pursuant to Sections 9.2 and 12.1(f) may, during the Replacement Period (and, in respect of Sale Proceeds from Credit Risk Obligations and Credit Improved Obligations, after the Replacement Period) at the Servicer's discretion, be used to purchase replacement Collateral Obligations in accordance with the Eligibility Criteria.

Notice of redemption shall be given by the Co-Issuers or, upon an Issuer Order, by the Trustee in the name and at the expense of the Co-Issuers.  Failure to give notice of redemption, or any defect therein, to any Holder of any Notes selected for redemption or the Preference Shares Paying Agent (for forwarding to each Holder of Preference Shares) shall not impair or affect the validity of the redemption of any other Securities.

(c)     The Notes may not be redeemed pursuant to Section 9.2(a) unless either of the following conditions is satisfied:

(i)     At least 10 Business Days before the Redemption Date, the Servicer shall have furnished to the Trustee evidence (in form reasonably satisfactory to the Trustee) that the Issuer has entered into a binding agreement (with (x) a financial or other institution or entity whose short-term unsecured debt obligations (other than obligations whose rating is based on the credit of a Person other than the institution) have a credit rating of at least "A-1" from S&P and of "P-1" (and not on credit watch for possible downgrade) from Moody's, (y) any other entity that has the benefit of a credit facility, a warehouse agreement, a liquidity facility or a similar arrangement with a financial or other institution or entity that satisfies the criteria in sub-clause (x) above and such financial or other institution or entity irrevocably agrees to fund the purchase of all or part of the Collateral as set forth herein or (z) any other institution or entity if the Rating Condition with respect to Moody's is satisfied with respect to the other entity) to sell to the financial or other institutions, not later than the Business Day before the Redemption Date in immediately available funds, all or part of the Collateral (directly or by participation or other arrangement) at a Purchase Price at least equal to an amount sufficient (together with any Cash and other Eligible Investments not subject to the agreements and maturing on or before the Redemption Date and any payments to be received with respect to the Hedge Agreements on or before the Redemption Date) to pay all administrative and other fees and expenses payable under the Priority of Payments without regard to any payment limitations (including the Senior Servicing Fee and the Subordinated Servicing Fee), all amounts owing under this Indenture, all amounts owing under the Hedge Agreements to the Hedge Counterparties, and to redeem the Notes on the Redemption Date at the applicable Redemption Prices; or

(ii)    Before entering into any binding agreement to sell all or a portion of the Collateral and selling or terminating any Hedge Agreement, the Servicer shall have certified that, in its commercially reasonable judgment, the settlement dates of the sales will be scheduled to occur on or before the Business Day before the Redemption Date and that the expected proceeds from the sales are to be delivered to the Trustee no later than the Business Day before the Redemption Date, in immediately available funds, in an amount (calculated as applicable in the manner provided below) sufficient (together with any Cash and other Eligible Investments not subject to the agreements and maturing on or before the Redemption Date and any payments to be received with respect to the Hedge Agreements on or before the Redemption Date) to pay all administrative and other fees and expenses payable under the Priority of Payments (including the Senior Servicing Fee and the Subordinated Servicing Fee), all amounts owing

under this Indenture, all amounts owing under the Hedge Agreements to the Hedge Counterparties, and to redeem the Notes on the Redemption Date at the applicable Redemption Prices. For purposes of this paragraph, the amount shall be calculated with respect to the classes of Collateral listed in the table below by multiplying the expected proceeds of sale of the Collateral by the indicated percentage in the table below. For the avoidance of doubt, no Hedge Agreement shall be sold or terminated unless the third Business Day before the scheduled Redemption Date has passed and no notice of withdrawal has been issued.

| | | Number of Business Days Between Certification to the Trustee and Sale | | | |
|---|---|---|---|---|---|
| | | Same Day | 1 to 2 | 3 to 5 | 6 to 15 |
| 1 | Cash or other Eligible Investments | 100% | 100% | 100% | 100% |
| 2 | Loans (other than 5 below) | 100% | 93% | 92% | 88% |
| 3 | High-Yield Bonds (other than 5 below) and Structured Finance Obligations (in each case, other than 4 below) | 100% | 89% | 85% | 75% |
| 4 | High-Yield Bonds (other than 5 below) and Structured Finance Obligations, in each case with a Moody's Rating of "B3" and on credit watch with negative implications or below "B3" | 100% | 75% | 65% | 55% |
| 5 | Synthetic Securities | 100% | 65% | 55% | 35% |

Any certification delivered pursuant to this Section 9.3(c) shall include (A) the prices of, and expected proceeds from, the sale of any Collateral Obligations, Eligible Investments, or Hedge Agreements and (B) all calculations required by this Section 9.3(c).

**9.4    Notes Payable on Redemption Date**

(a)    Notice of redemption pursuant to Section 9.3 having been given as aforesaid, the Notes to be redeemed shall, on the Redemption Date, become payable at the Redemption Price therein specified and from and after the Redemption Date (unless the Issuer shall default in the payment of the Redemption Price and accrued interest) the Notes shall cease to bear interest on the Redemption Date. Upon final payment on a Note to be so redeemed, the Holder shall present and

surrender the Note at the place specified in the notice of redemption on or before the Redemption Date unless the Co-Issuers and the Trustee receive the security or indemnity required by them to save each of them harmless and an undertaking thereafter to surrender the Note, and in the absence of notice to the Co-Issuers and the Trustee, that the applicable Note has been acquired by a protected purchaser, the final payment shall be made without presentation or surrender. Payments of interest on Notes so to be redeemed whose Stated Maturity is on or before the Redemption Date shall be payable to the Noteholders, or one or more predecessor Notes, registered as such at the close of business on the relevant Record Date if the Record Date is a Business Day (or, if the Record Date is not a Business Day, the close of business on the Business Day before the Record Date) according to Section 2.8(e).

(b)     If any Note called for redemption is not paid on its surrender for redemption, its principal shall bear interest from the Redemption Date at the Applicable Note Interest Rate for each successive Interest Period the Note remains Outstanding if the reason for the non-payment is not the fault of the Holder of the Note.

## 9.5     Special Redemption

Principal payments on the Notes shall be made in whole or in part, at par, in accordance with the Priority of Payments if, at any time during the Replacement Period, the Servicer elects (subject to the Servicing Agreement) to notify the Trustee and each Rating Agency that it has been unable, for 45 consecutive Business Days, to identify additional or replacement Collateral Obligations that are deemed appropriate by the Servicer in its sole discretion and meet the Eligibility Criteria in sufficient amounts to permit the application of all or a portion of the funds then in the Collection Account available to be used to purchase additional or replacement Collateral Obligations (a "*Special Redemption*").

On the first Payment Date following the Due Period for which the notice is effective (a "*Special Redemption Date*"), the funds in the Collection Account or the Payment Account representing Principal Proceeds that, by operation of the preceding paragraph, are not used to purchase additional Collateral Obligations (the "*Special Redemption Amount*") will be available to be applied in accordance with the Priority of Payments under Section 11.1(a)(ii). Notice of payments pursuant to this Section 9.5 shall be given by first-class mail, postage prepaid, mailed not later than three Business Days before the applicable Special Redemption Date, to each Holder of Notes to be redeemed, at the Holder's address in the Indenture Register or otherwise in accordance with the rules and procedures of DTC. In addition, for so long as any Notes are listed on the Irish Stock Exchange and so long as the rules of the exchange so require, notice of redemption of Notes pursuant to Section 9.2 shall also be given to the Company Announcements Office of the Irish Stock Exchange.

### 9.6 Amendment Buy-Out

(a)     In the case of any supplemental indenture pursuant to Section 8.2 that requires the consent of one or more Holders of Securities, the Amendment Buy-Out Purchaser shall have the right, but not the obligation, to purchase from Non-Consenting Holders all Securities held by such Holders whose consent was solicited with respect to such supplemental indenture (the "*Amendment Buy-Out Option*") for the applicable Amendment Buy-Out Purchase Price; **provided**, that the Amendment Buy-Out Purchaser may not exercise the Amendment Buy-Out Option during the Non-Call Period in connection with a proposed amendment to reduce the rate of interest on any Note or to change the earliest date on which Notes of any Class or Preference Shares may be redeemed at the option of the Issuer. If such option is exercised, the Amendment Buy-Out Purchaser must purchase all such Securities of Non-Consenting Holders for the applicable Amendment Buy-Out Purchase Price, regardless of the applicable percentage of the Aggregate Outstanding Amount of the Securities the consent of whose Holders is required for such supplemental indenture (an "*Amendment Buy-Out*"). By its acceptance of its Securities hereunder, each Holder of Securities agrees that if the Amendment Buy-Out Option is exercised, any Non-Consenting Holder will be required to sell its applicable Securities to the Amendment Buy-Out Purchaser; **provided** that if any Non-Consenting Holder holds Class II Preference Shares, such Non-Consenting Holder will sell such Class II Preference Shares to the Amendment Buy-Out Purchaser and such Preference Shares will be redesignated as Class I Preference Shares. Neither the Amendment Buy-Out Purchaser nor any other Person shall have any liability to any Holder or beneficial owner of Securities as a result of an election by the Amendment Buy-Out Purchaser not to exercise the Amendment Buy-Out Option.

(b)     All purchases made pursuant to an Amendment Buy-Out Option individually and in the aggregate must comply with the applicable transfer restrictions for the relevant Securities set forth herein and in the Preference Share Documents, and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency).

### 9.7 Redemption by Refinancing

(a)     On any Payment Date after the Non-Call Period, any Class of the Notes may be redeemed in whole, but not in part from Refinancing Proceeds if the Servicer, on behalf of the Issuer, proposes to the Holders of the Preference Shares in writing (by notice to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares)) with a copy to the Trustee and the Rating Agencies, at least 30 days prior to the Payment Date for such redemption (such date, the "*Refinancing Date*"), to redeem such Notes in accordance with this Section 9.7 (a "*Notice of Refinancing*"), which notice shall, among other things, specify the Refinancing Date and the Class of Notes to be Refinanced. Such redemption shall

be effected by the Issuer obtaining a loan or an issuance of a replacement class of notes ("**_Refinancing Notes_**"), the terms of which loan or issuance will be negotiated by the Servicer, on behalf of the Issuer, from one or more financial institutions or purchasers (which may include the Servicer or its Affiliates) selected by the Servicer (a refinancing provided pursuant to such loan or issuance, a "**_Refinancing_**"), and provided that (i) such proposal is approved by a Majority of the Preference Shares (voting as a single class) at least 15 days prior to the Refinancing Date and (ii) the Servicer completes such Refinancing and causes the Refinancing Proceeds to be deposited with the Trustee (in immediately available funds) no later than the close of the Business Day immediately preceding the Refinancing Date.

(b)    The Issuer shall obtain a Refinancing only if the Servicer determines and certifies to the Trustee that:

    (i)    a Rating Confirmation has been obtained from each Rating Agency for each class of Refinancing Notes and each Class of Notes not subject to Refinancing;

    (ii)    the proceeds from the Refinancing will be at least sufficient to pay the Refinancing Price plus any Administrative Expenses of the Issuer related to the Refinancing;

    (iii)    the interest rate payable in respect of the obligations providing the Refinancing is less than the interest rate payable on the Notes being refinanced;

    (iv)    the principal amount of any obligations providing the Refinancing is no greater than the principal amount of the Notes being redeemed with the proceeds of such obligations;

    (v)    the stated maturity of the obligations providing the Refinancing is no earlier than the stated maturity of the Notes being refinanced;

    (vi)    the Refinancing Proceeds will be used (to the extent necessary) to redeem the applicable Notes;

    (vii)    the agreements relating to the Refinancing contain limited recourse, non-recourse and non-petition provisions, investor qualification provisions and transfer restrictions equivalent to those applicable to the Notes being redeemed, as set forth herein;

    (viii)    the obligations providing the Refinancing are subject to the Priority of Payments and do not rank higher in priority pursuant to the Priority of Payments than the Class of Notes being redeemed; and

(ix)   the expenses in connection with the Refinancing have been paid or will be adequately provided for.

(c)   The Trustee shall be entitled to receive, and (subject to Sections 6.1 and 6.3 hereof) shall be fully protected in relying upon an Opinion of Counsel stating that the Refinancing is permitted by this Indenture and that all conditions precedent thereto have been complied with.

(d)   Any Refinancing Proceeds will not constitute Interest Proceeds or Principal Proceeds but will be applied directly on the related Refinancing Date pursuant to this Indenture to redeem the Notes being refinanced and pay Administrative Expenses in connection with the Refinancing without regard to the Priority of Payments; **provided** that to the extent that any Refinancing Proceeds exceed the amount necessary to redeem the Notes being refinanced (and any associated Administrative Expenses), such excess Refinancing Proceeds will be treated as Principal Proceeds.

(e)   If notice of consent by a Majority of the Preference Shares to a Refinancing has been received by the Trustee from the Servicer pursuant to Section 9.7(a) no later than 15 days prior to the Refinancing Date, notice of a Refinancing shall be given by the Trustee by first class mail, postage prepaid, mailed not less than 10 Business Days prior to the proposed Refinancing Date, to each Holder of Notes of the Class to be refinanced at the address in the Indenture Register (with a copy to the Servicer) and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent.

All Notices of Refinancing shall state:

(i)   the proposed Refinancing Date, which shall be the applicable Redemption Date in respect of the Notes being redeemed;

(ii)   the Refinancing Price, which shall be the applicable Redemption Price in respect of the Notes being redeemed;

(iii)   that on such proposed Refinancing Date such Notes will be refinanced and redeemed in full, and that, provided that the Refinancing Proceeds have been deposited with the Trustee for any such payment in full, interest on such Notes being redeemed shall cease to accrue on such date; and

(iv)   the place or places where such Notes are to be surrendered for payment of the Refinancing Price which, if not stated, shall be the office or agency of any paying agent (save for the Irish Paying Agent) as provided in Section 7.2.

**provided** that no such Notice of Refinancing shall be sent if either (a) the Servicer has withdrawn its consent to such Refinancing or (b) the consent of a

Majority of the Holders of Preference Shares to such Refinancing has not been obtained.

(f)     Notice of Refinancing shall be given by the Trustee at the expense of the Issuer. Failure to give a Notice of Refinancing, or any defect therein, to any Holder of any Note selected for Refinancing shall not impair or affect the validity of the Refinancing or give rise to any claim based upon such failure or defect.

(g)     Any Notice of Refinancing may be withdrawn by the Servicer, on behalf of the Issuer, on or prior to the fourth Business Day prior to the scheduled Refinancing Date by written notice to the Trustee, the Paying Agent, the Preference Shares Paying Agent, the Rating Agencies and the Holders of the Preference Shares. Upon receipt of such notice of withdrawal, the Trustee shall send such notice to the Holders of Notes and, if applicable, the Irish Paying Agent.

(h)     If a Notice of Refinancing pursuant to Section 9.7(a) has been given as provided herein and not withdrawn, the Notes to be refinanced shall on the Refinancing Date become due and payable at the Refinancing Price.  Each Holder of such Notes shall present and surrender its Note at the place specified in the Notice of Refinancing on or prior to such Refinancing Date; **provided** that if there is delivered to the Issuer and the Trustee such security or indemnity as may be required by them to save each of them harmless and an undertaking thereafter to surrender such Note, then, in the absence of notice to the Issuer and the Trustee that the applicable Note has been acquired by a bona fide purchaser, such final payment shall be made without presentation or surrender.

(i)     If any Class of Notes called for Refinancing shall not be so paid upon surrender thereof for Refinancing (or the delivery of the indemnity pursuant to the preceding paragraph) the principal shall, until paid, bear interest from the Refinancing Date at the applicable Interest Rate for each successive Payment Date with respect to which such Note remains Outstanding.

## 10.     ACCOUNTS, ACCOUNTINGS, AND RELEASES

### 10.1     Collection of Money

Except as otherwise expressly provided in this Indenture, the Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all money and other property payable to or receivable by the Trustee pursuant to this Indenture, including all payments due on the Pledged Obligations, in accordance with the terms of the Pledged Obligations.  The Trustee shall segregate and hold all money and property received by it in trust for the Secured Parties and shall apply it as provided in this Indenture.  Any Account may contain any number of sub-accounts for the convenience of the Trustee or as required by the Servicer for convenience in administering the Accounts, the Collateral.

**10.2**    **Collection Account**

(a)    Before the Closing Date, the Trustee shall establish a single, segregated Securities Account that shall be designated as the Collection Account, that shall be held in trust in the name of the Trustee as Entitlement Holder for the benefit of the Secured Parties over which the Trustee shall have exclusive control and the sole right of withdrawal, and into which the Trustee shall from time to time deposit, in addition to the deposits required pursuant to Section 10.7(e), immediately upon the Trustee's receipt thereof:

    (i)    any funds transferred from the Closing Date Expense Account pursuant to Section 10.3(g),

    (ii)    all Principal Proceeds (unless (1) simultaneously used to purchase Collateral Obligations in accordance with Section 12, (2) deposited into the Synthetic Security Reserve Account, the Revolving Reserve Account or the Delayed Drawdown Reserve Account or (3) posted by the Issuer as cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security or in Eligible Investments) received by the Trustee,

    (iii)    all Interest Proceeds received by the Trustee (unless simultaneously used to purchase accrued interest in respect of Collateral Obligations in accordance with Section 12 or in Eligible Investments), and

    (iv)    all other funds received by the Trustee from the Collateral and not excluded above.

In addition to the items described above, the Issuer may, but under no circumstances shall be required to, deposit from time to time any monies, securities and other instruments in the Collection Account it deems, in its sole discretion, to be advisable (and may designate any amounts deposited pursuant to this sentence as Principal Proceeds or Interest Proceeds in its discretion). Any Principal Proceeds received during the Replacement Period, and Sale Proceeds from the sale of Credit Improved Obligations and Unscheduled Principal Payments received after the Replacement Period, which have not been used to purchase additional Collateral Obligations on the Business Day of receipt shall be deposited in the Collection Account and shall at the direction of the Servicer be applied to the purchase of additional Collateral Obligations in accordance with the Eligibility Criteria and the other requirements set forth herein or the purchase of Eligible Investments pending such application or used to enter into additional Hedge Agreements or used in connection with a Special Redemption. Principal Proceeds (other than Sale Proceeds from the sale of Credit Improved Obligations, Credit Risk Obligations and Unscheduled Principal Payments) received after the Replacement Period shall be deposited into the Collection Account and applied to the purchase of Eligible Investments. All monies deposited from time to time in

the Collection Account pursuant to this Indenture shall be held by the Trustee as part of the Collateral and shall be applied to the purposes provided in this Indenture. Amounts in the Collection Account shall be held pursuant to Section 10.4(a).

(b)     Within one Business Day after receipt of any distribution or other proceeds of the Collateral that are not Cash, the Trustee shall so notify the Issuer and the Servicer. Within five Business Days of receipt of the notice from the Trustee, the Servicer, on behalf of the Issuer, shall sell the distribution or other proceeds for Cash in an arm's length transaction to a Person that is not the Servicer or an Affiliate of the Servicer and deposit its proceeds in the Collection Account. The Issuer need not sell the distributions or other proceeds if it delivers an Issuer Order or an Officer's certificate to the Trustee and the Servicer certifying that the distributions or other proceeds are Collateral Obligations, Eligible Investments, or Workout Assets.

(c)     During the Replacement Period (or, in respect of Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Risk Obligations and Credit Improved Obligations, after the Replacement Period), at the direction of the Servicer, the Issuer may by Issuer Order direct the Trustee to, and upon receipt of the Issuer Order the Trustee shall withdraw funds on deposit in the Collection Account representing Principal Proceeds (and, to the extent expressly provided in this Indenture, Interest Proceeds) and apply the funds to purchase Collateral Obligations (including any related deposit into the Synthetic Security Reserve Account, the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security), in each case in accordance with the requirements of Section 12 and the Issuer Order.

(d)     At any time during or after the Replacement Period, at the direction of the Servicer, the Issuer may by Issuer Order direct the Trustee to, and upon receipt of the Issuer Order the Trustee shall, pay from amounts on deposit in the Collection Account on any Business Day during any Interest Period from Interest Proceeds only, any Administrative Expenses that require payment before the next Payment Date to the extent that the amount of the payments does not exceed the aggregate amount that may be paid on the next Payment Date under, and at the level of priority specified by, Section 11.1(a)(i)(1); **provided** that the Trustee shall be entitled (but not required), without liability on its part, to refrain from making such a requested payment of an Administrative Expense on a day other than a Payment Date if in the reasonable determination of the Trustee the payment of such amount would leave insufficient funds available to pay in full each of the items described in said Section 11.1(a)(i)(1) in amounts reasonably anticipated by the Trustee to be payable thereunder on the next Payment Date (taking into account the Administrative Expense Cap) or that would result in payments being made that are not in accordance with the Priority of Payments.

(e)     The Trustee shall transfer to the Payment Account from the Collection Account for application pursuant to Section 11.1(a) or 11.2, as applicable, on or not later than the Business Day preceding each Payment Date, the amount set forth to be so transferred in the Valuation Report for the Payment Date.

(f)     On the Determination Date related to the first Payment Date, and at the option of the Servicer, Principal Proceeds in the Collection Account in an amount not to exceed U.S.$2,000,000 may be designated as Interest Proceeds for distribution on the first Payment Date in accordance with the Priority of Payments to the extent such funds are not required to be applied to cure a Rating Confirmation Failure or applied to a Special Redemption.

**10.3    Other Accounts**

(a)     **Custodial Account.** Before the Closing Date, the Trustee shall establish a single, segregated Securities Account that shall be designated as the Custodial Account, that shall be held in trust in the name of the Trustee as Entitlement Holder for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal, and into which the Trustee shall deposit the Collateral Obligations and other Collateral not deposited elsewhere in accordance with this Indenture (other than Loans, Participations and general intangibles, which in the case of Loans and Participations, shall be held by the Trustee as provided in Section 3.2).  All assets or securities at any time on deposit in, or otherwise to the credit of, the Custodial Account shall be held in trust by the Trustee for the benefit of the Secured Parties.  The only permitted withdrawals from the Custodial Account shall be in accordance with this Indenture.  The Co-Issuers shall not have any legal, equitable, or beneficial interest in the Custodial Account other than in accordance with Section 3.2 and the Priority of Payments.

(b)     **Revolving Reserve Account and Delayed Drawdown Reserve Account.** Before the Closing Date, the Trustee shall establish (i) a single, segregated Securities Account which shall be designated as the Revolving Reserve Account and (ii) a single, segregated Securities Account that shall be designated as the Delayed Drawdown Reserve Account, each of which shall be held in trust in the name of the Trustee as Entitlement Holder for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal.  Upon the purchase of any Collateral Obligation that is a Revolving Loan or Delayed Drawdown Loan, at the direction of the Servicer, the Trustee shall deposit Principal Proceeds into the Revolving Reserve Account, in the case of a Revolving Loan, and the Delayed Drawdown Reserve Account, in the case of a Delayed Drawdown Loan, each equal to the unfunded commitment amount of the Revolving Loan or Delayed Drawdown Loan, respectively, and the Principal Proceeds so deposited shall be considered part of the Purchase Price of the Revolving Loan or Delayed Drawdown Loan for purposes of Section 12.  At the direction of the Servicer at any time during or after the Replacement Period, the Trustee shall withdraw funds from the Revolving Reserve Account or the Delayed

Drawdown Reserve Account to fund extensions of credit pursuant to Revolving Loans or Delayed Drawdown Loans, respectively. In addition, to the extent that the Issuer receives proceeds of a repayment in respect of a Revolving Loan at any time during or after the Replacement Period, the Trustee shall deposit the proceeds into the Revolving Reserve Account. Upon the sale of a Revolving Loan or Delayed Drawdown Loan in whole or in part or the reduction in part or termination of the Issuer's commitment thereunder, an amount on deposit in the Revolving Reserve Account or the Delayed Drawdown Reserve Account, as the case may be, specified by the Servicer as being equal to:

(i) the unfunded amount of the commitment (in the case of a sale in whole or a termination of the commitment),

(ii) the proportionate amount of the amount on deposit (in the case of a sale in part), or

(iii) the amount by which the commitment is reduced (in the case of a reduction thereof in part),

shall be transferred by the Trustee to the Collection Account as Principal Proceeds. Amounts on deposit in the Revolving Reserve Account or the Delayed Drawdown Reserve Account shall be held pursuant to Section 10.4(b). All interest and other income from amounts in the Revolving Reserve Account and the Delayed Drawdown Reserve Account deposited to the Collection Account pursuant to Section 10.4(b) shall be considered Interest Proceeds in the Due Period in which they are so deposited.

(c) **Expense Reimbursement Account.** Before the Closing Date, the Trustee shall establish a single, segregated Securities Account that shall be designated as the Expense Reimbursement Account, that shall be held in trust in the name of the Trustee as Entitlement Holder for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal. On any Payment Date and on any date between Payment Dates, the Trustee will apply amounts, if any, in the Expense Reimbursement Account to the payment of expenses and fees that must be paid between Payment Dates or that are due on that Payment Date under Section 11.1(a)(i)(1) and the Trustee shall on any Payment Date transfer to the Expense Reimbursement Account an amount equal to the excess, if any, of the Administrative Expense Cap over the amounts due under Section 11.1(a)(i)(1) to the Expense Reimbursement Account in accordance with Section 11.1(a)(i)(2). Funds in the Expense Reimbursement Account shall be applied in accordance with Section 10.4(a).

(d) **Hedge Counterparty Collateral Account.** Before the Closing Date, the Trustee shall establish a single, segregated Securities Account that shall be designated as the Hedge Counterparty Collateral Account, that shall be held in trust in the name of the Trustee as Entitlement Holder for the benefit of the Secured Parties (other

than the Hedge Counterparty pledging the Collateral), over which the Trustee shall have exclusive control, the sole right of withdrawal and a lien for the benefit of the Secured Parties. The Trustee shall deposit all collateral received from a Hedge Counterparty under any Hedge Agreement into the Hedge Counterparty Collateral Account. The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Hedge Counterparty Collateral Account shall be:

  (i) for application to obligations of the relevant Hedge Counterparty to the Issuer under a Hedge Agreement if the Hedge Agreement becomes subject to early termination, or

  (ii) to return collateral to the relevant Hedge Counterparty when and as required by the relevant Hedge Agreement, in each case as directed by the Servicer.

Amounts on deposit in the Hedge Counterparty Collateral Account shall be held pursuant to Section 10.4(a) and shall not be considered an asset of the Issuer for the purposes of the Coverage Tests.

(e)     **Synthetic Security Collateral Account.**  Before the Closing Date, the Trustee shall establish a single, segregated Securities Account that shall be designated as the Synthetic Security Collateral Account, that shall be held in trust in the name of the Trustee as Entitlement Holder for the benefit of the Secured Parties over which the Trustee shall have exclusive control, the sole right of withdrawal, and a lien for the benefit of the Secured Parties. On or before the date on which the Issuer enters into a Synthetic Security and delivers a copy of it to the Trustee, the Trustee shall create a sub-account of the Synthetic Security Collateral Account with respect to the Synthetic Security.

All Synthetic Security Collateral posted by any Synthetic Security Counterparty in support of its respective obligation under a Synthetic Security shall be immediately deposited into the Synthetic Security Collateral Account and posted to the sub-account related to the Synthetic Security. On each day on which amounts are payable to the Issuer out of Synthetic Security Collateral, the Issuer by Issuer Order shall direct the Trustee to, and upon receipt of the Issuer Order, the Trustee shall, withdraw amounts on deposit in the Synthetic Security Collateral Account in an amount sufficient to make the payment as provided in the Issuer Order (including any total or partial release of Synthetic Security Collateral). The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Synthetic Security Collateral Account shall be (i) for application to the obligations of the relevant Synthetic Security Counterparty under a Synthetic Security Agreement or (ii) to return Synthetic Security Collateral to the relevant Synthetic Security Counterparty at the termination of the relevant Synthetic Security Agreement or as otherwise required by the Synthetic Security Agreement, in each case as directed by the Servicer.

Amounts on deposit in the Synthetic Security Collateral Account shall be held pursuant to Section 10.4(b) and shall not be considered an asset of the Issuer for the purposes of the Coverage Tests.

(f) **Securities Lending Account.** Before the Closing Date, the Trustee shall establish a single, segregated Securities Account that shall be designated as the Securities Lending Account, that shall be held in trust in the name of the Trustee as Entitlement Holder for the benefit of the Secured Parties, over which the Trustee shall have exclusive control, the sole right of withdrawal, and a lien for the benefit of the Secured Parties. On or before the date on which the Issuer enters into a Securities Lending Agreement and delivers a copy of it to the Trustee, the Trustee shall create a sub-account of the Securities Lending Account with respect to the Securities Lending Agreement. All Securities Lending Collateral posted by any Securities Lending Counterparty in support of its respective obligation under a Securities Lending Agreement shall be immediately deposited into the Securities Lending Account and posted to the sub-account related to the Securities Lending Agreement. The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Securities Lending Account shall be:

  (i) for application to obligations of the relevant Securities Lending Counterparty to the Issuer under a Securities Lending Agreement if the Securities Lending Agreement becomes subject to early termination or in the exercise of remedies under the related Securities Lending Agreement upon any "event of default" under and as defined in the related Securities Lending Agreement, including liquidating the related Securities Lending Collateral, or

  (ii) to return the Securities Lending Collateral to the relevant Securities Lending Counterparty when and as required by the relevant Securities Lending Agreement, in each case as directed by the Servicer.

Amounts on deposit in the Securities Lending Account shall be held pursuant to Section 10.4(c). To the extent provided in a Securities Lending Agreement, earnings on amounts on deposit in the Securities Lending Account shall be payable by the Issuer to the related Securities Lending Counterparty.

Amounts on deposit in the Securities Lending Account shall not be considered an asset of the Issuer for the purposes of the Coverage Tests, but the loaned security or asset that relates to the Securities Lending Account shall be so considered an asset of the Issuer.

(g) **Closing Date Expense Account.** Before the Closing Date, the Trustee shall establish a single, segregated Securities Account that shall be designated as the Closing Date Expense Account, that shall be held in trust in the name of the Trustee as Entitlement Holder for the benefit of the Secured Parties, over which

the Trustee shall have exclusive control and the sole right of withdrawal. On the Closing Date, the Trustee, at the direction of the Issuer, shall deposit into the Closing Date Expense Account approximately U.S.$2,136,313 from the gross proceeds of the Offering. At any time before the Payment Date in August 2008, at the direction of the Servicer, the Issuer may by Issuer Order direct the Trustee to, and upon receipt of the Issuer Order the Trustee shall, pay from amounts on deposit in the Closing Date Expense Account any applicable fees and expenses of the Offering. On the Payment Date in August 2008 (or, at the discretion of the Servicer, on the Payment Date in May 2008), at the direction of the Servicer in its sole discretion, the Trustee shall transfer all funds on deposit in the Closing Date Expense Account to the Collection Account as Interest Proceeds or Principal Proceeds and close the Closing Date Expense Account.

Amounts on deposit in the Closing Date Expense Account shall be held pursuant to Section 10.4(a) and shall not be considered an asset of the Issuer for the purposes of the Coverage Tests.

(h)     **Payment Account.** Before the Closing Date, the Trustee shall establish a single, segregated Securities Account that shall be designated as the Payment Account, that shall be held in trust in the name of the Trustee as Entitlement Holder for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal. The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Payment Account shall be to pay amounts due and payable on the Notes in accordance with their terms and the provisions of this Indenture and to pay Administrative Expenses and other amounts specified in this Indenture, each in accordance with the Priority of Payments. The Co-Issuers shall not have any legal, equitable, or beneficial interest in the Payment Account other than in accordance with the Priority of Payments.

(i)     **Class II Preference Share Special Payment Account.** Before the Closing Date, the Trustee shall establish a single, segregated Securities Account that shall be designated as the Class II Preference Share Special Payment Account, that shall be held in trust in the name of the Trustee as Entitlement Holder for the benefit of Holders of the Class II Preference Shares, over which the Trustee shall have exclusive control and the sole right of withdrawal. On each Payment Date, to the extent of available funds in accordance with the Priority of Payments, the Trustee will deposit into the Class II Preference Share Special Payment Account amounts equal to the Class II Preference Share Special Payments. With respect to any Payment Date, the Servicer may, in its sole discretion, at any time waive a portion (or all) of the Subordinated Servicing Fee or Supplemental Servicing Fees then due and payable, in which event, an amount equal to such waived portion will be paid by the Trustee on behalf of the Issuer to the Preference Shares Paying Agent for payment, subject to the laws of the Cayman Islands (as provided in the Preference Shares Paying Agency Agreement), for payment *pro rata* to the Holders of the Class II Preference Shares as Class II Preference Share Special

Payments, **provided** that with respect to the Payment Date in May 2008 such Class II Preference Share Special Payments will, at a minimum, include amounts that would otherwise constitute a portion (representing the Class II Preference Share Percentage) of the Servicing Fees that have accrued from the Closing Date to February 3, 2008. For purposes of any calculation under the Indenture and the Servicing Agreement, the Servicer will be deemed to have received the Servicing Fee in an amount equal to the sum of the Servicing Fee actually paid to the Servicer and the amount distributed to the Holders of the Class II Preference Shares as Class II Preference Share Special Payments.

(j)     [Reserved]

(k)     **Synthetic Security Reserve Account**. Before the Closing Date, the Trustee shall establish a single, segregated Securities Account that shall be designated as the Synthetic Security Reserve Account, which shall be held in trust in the name of the Trustee as Entitlement Holder for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal. Upon the entry into any Unfunded Synthetic Security, at the direction of the Servicer, the Trustee shall deposit Principal Proceeds into the Synthetic Security Reserve Account equal to the unfunded commitment amount of the Unfunded Synthetic Security, and the Principal Proceeds so deposited shall be considered part of the Purchase Price of the Unfunded Synthetic Security for purposes of Section 12. At the direction of the Servicer at any time during or after the Replacement Period, the Trustee shall withdraw funds from Synthetic Security Reserve Account to fund the Issuer's payment obligations under the Unfunded Synthetic Securities. Upon the sale of an Unfunded Synthetic Security in whole or in part or the reduction in part or termination of the Issuer's commitment thereunder, an amount on deposit in the Synthetic Security Reserve Account specified by the Servicer as being equal to (i) the proportionate amount of the amount on deposit (in the case of a sale in part) or (ii) the amount by which the commitment is reduced (in the case of a reduction thereof in part), shall be transferred by the Trustee to the Collection Account as Principal Proceeds.

Amounts on deposit in the Synthetic Security Reserve Account will be held in Eligible Investments with Stated Maturities as directed by the Servicer (which may be in the form of standing instructions) not later than the Business Day after the date of their purchase. All interest and other income from amounts in the Synthetic Security Reserve Account deposited to the Collection Account pursuant to Section 10.4(b) shall be considered Interest Proceeds in the Due Period in which they are so deposited.

(l)     In addition to any deposit, withdrawal, transfer or other application of funds with respect to any Account set forth in this Section 10.3 or in Section 10.2, any deposit, withdrawal, transfer or other application of funds with respect to any Account authorized elsewhere in this Indenture is hereby authorized pursuant to this Section 10.3.

(m) In order to comply with its obligations under the USA Patriot Act of 2001, if any, the Trustee shall be entitled to request and verify, and the Noteholders, beneficial owners, the Co-Issuers and other parties related to this Indenture shall be obligated to provide to the Trustee all the necessary information required by the USA Patriot Act of 2001.

**10.4    Application of Funds in Accounts; Reports by Trustee**

(a) By Issuer Order (which may be in the form of standing instructions), at the direction of the Servicer, the Issuer shall at all times before an Event of Default occurs, direct the Trustee to, and, upon receipt of the Issuer Order, the Trustee shall, apply all funds on deposit in the Collection Account, the Hedge Counterparty Collateral Account, the Expense Reimbursement Account and the Closing Date Expense Account as so directed in Eligible Investments having Stated Maturities no later than the Business Day before the next Payment Date. All applications on any Business Day shall be subject to the timely receipt of the funds and the availability of any Eligible Investments. Before an Event of Default occurs, if the Issuer has not given directions, the Trustee shall seek instructions from the Servicer within three Business Days after transfer of any funds to the Collection Account, the Hedge Counterparty Collateral Account, the Expense Reimbursement Account or the Closing Date Expense Account. If the Trustee does not receive written instructions from the Servicer within five Business Days after transfer of the funds to the account, it shall apply the funds held in the account, as fully as practicable, but only in one or more Eligible Investments of the type described in clause (c) of the definition of "Eligible Investments" maturing no later than the Business Day before the next Payment Date. After an Event of Default occurs, if the Issuer does not give directions to the Trustee for three consecutive days, the Trustee shall apply the monies as fully as practicable in the Bank's "LMCS" account (or successor account) or, if the Servicer shall subsequently so direct by standing written instruction to the Trustee, such other Eligible Investments of the type described in clause (c) of the definition of "Eligible Investments" as shall be designated in such standing instruction maturing not later than the earlier of (i) 30 days after the date of the application or (ii) the Business Day before the next Payment Date. All interest and other income from such Eligible Investments shall be deposited in the Collection Account, any gain realized from such Eligible Investments shall be credited to the Collection Account, and any loss resulting from such Eligible Investments shall be charged to the Collection Account. Subject to Section 6.7, the Trustee shall not in any way be held liable for the selection of Eligible Investments or because of any insufficiency of the Collection Account, the Hedge Counterparty Collateral Account, the Expense Reimbursement Account or the Closing Date Expense Account or any other account that results from any loss relating to any such Eligible Investment.

(b) By Issuer Order (which may be in the form of standing instructions), at the direction of the Servicer, the Issuer shall at all times direct the Trustee to, and,

upon receipt of the Issuer Order, the Trustee shall, apply all funds on deposit in the Synthetic Security Reserve Account, the Revolving Reserve Account, the Delayed Drawdown Reserve Account, and the Synthetic Security Collateral Account in Eligible Investments having Stated Maturities not later than one Business Day after the date of their purchase. All applications on any Business Day shall be subject to the timely receipt of the funds and the availability of any Eligible Investments. If before an Event of Default, the Issuer does not give directions, the Trustee shall seek instructions from the Servicer within three Business Days after transfer of any funds to the Synthetic Security Reserve Account, the Revolving Reserve Account, the Delayed Drawdown Reserve Account, or the Synthetic Security Collateral Account. If the Trustee does not thereupon receive written instructions from the Servicer within five Business Days after transfer of the funds to the account, it shall apply the funds held in the account, as fully as practicable, but only in the Bank's "LMCS" account (or successor account), or if the Servicer shall subsequently so direct by standing written instruction to the Trustee, such other Eligible Investments of the type described in clause (e) of the definition of "Eligible Investments" that are overnight funds, as shall be designated in such standing instruction. If after an Event of Default, the Issuer does not give directions to the Trustee for three consecutive days, the Trustee shall apply the monies as fully as practicable in the Bank's "LMCS" account (or successor account), or if the Servicer shall subsequently so direct by standing written instruction to the Trustee, such other Eligible Investments of the type described in clause (e) of the definition of "Eligible Investments" that are overnight funds, as shall be designated in such standing instruction. All interest and other income from such Eligible Investments shall be deposited in the Collection Account, any gain realized from such Eligible Investments shall be credited to the Collection Account, and any loss resulting from such Eligible Investments shall be charged to the Collection Account.

(c)    By Issuer Order (which may be in the form of standing instructions), at the direction of the Servicer, the Issuer shall at all times direct the Trustee to, and, upon receipt of the Issuer Order, the Trustee shall, apply all funds on deposit in the Securities Lending Account in Eligible Investments having Stated Maturities no later than the Business Day before the stated termination date of the related Securities Lending Agreement. All applications on any Business Day shall be subject to the timely receipt of the funds and the availability of any Eligible Investments. The interest on the Eligible Investments shall be allocated between the Issuer and the Securities Lending Counterparty pursuant to the related Securities Lending Agreement. If before an Event of Default, the Issuer does not give directions, the Trustee shall seek instructions from the Servicer within three Business Days after transfer of any funds to the Securities Lending Account. If the Trustee does not thereupon receive written instructions from the Servicer within five Business Days after transfer of the funds to the account, it shall apply the funds held in the account, as fully as practicable, but only in the Bank's

"LMCS" account (or successor account), or if the Servicer shall subsequently so direct by standing written instruction to the Trustee, such other Eligible Investments of the type described in clause (e) of the definition of "Eligible Investments" that mature no later than the Business Day before the stated termination date of the related Securities Lending Agreement. If after an Event of Default, the Issuer does not give directions to the Trustee for three consecutive days, the Trustee shall apply the monies as fully as practicable in the Bank's "LMCS" account (or successor account), or if the Servicer shall subsequently so direct by standing written instruction to the Trustee, such other Eligible Investments of the type described in clause (e) of the definition of "Eligible Investments" maturing no later than the Business Day before the stated termination date of the related Securities Lending Agreement. All interest and other income from such Eligible Investments shall be deposited in the Collection Account, any gain realized from such Eligible Investments shall be credited to the Collection Account, and any loss resulting from such Eligible Investments shall be charged to the Collection Account.

(d)     The Trustee agrees to give the Issuer notice as soon as reasonably practicable if a Trust Officer obtains actual knowledge that any Account or any funds on deposit in any Account, or otherwise to the credit of an Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. All Accounts shall remain at all times with the Custodian or a federal or state-chartered depository institution having (x) a long-term debt rating of at least "Baa1" (and not on credit watch with negative implications) by Moody's, (y) a short-term rating of at least "A-1" by S&P (or a long-term rating of at least "A+" by S&P if such institution has no short-term rating) and (z) combined capital and surplus of at least U.S.$200,000,000 that has entered into one or more securities account control agreements in accordance with Section 8 of the UCC; **provided**, **however**, that (i) with respect to the Synthetic Security Collateral Account, the Synthetic Security Counterparty shall be a party to such control agreement and shall consent to the Trustee's control of such Synthetic Security Collateral Account, (ii) with respect to the Securities Lending Account, the Securities Lender shall be a party to such control agreement and shall consent to the Trustee's control of such Securities Lending Account and (iii) with respect to each Hedge Counterparty Collateral Account, the related Hedge Counterparty shall be a party to such control agreement and shall consent to the Trustee's control of such Hedge Counterparty Collateral Account.

(e)     The Trustee shall supply, in a timely fashion, to the Co-Issuers and the Servicer any information regularly maintained by the Trustee that the Co-Issuers or the Servicer may from time to time request with respect to the Pledged Obligations, the Accounts and the Collateral and provide any other requested information reasonably available to the Trustee because of its acting as Trustee under this Indenture and required to be provided by Section 10.6, to permit the Servicer to perform its obligations under the Servicing Agreement. The Trustee shall

promptly forward to the Servicer copies of notices and other writings received by it from the issuer of any Collateral Obligation or from any Clearing Agency with respect to any Collateral Obligation which notices or writings advise the holders of the security of any rights that the holders might have with respect to the Collateral Obligation (including requests to vote with respect to amendments or waivers and notices of prepayments and redemptions) as well as all periodic financial reports received from the issuer and Clearing Agencies with respect to the issuer.

(f)     To the extent monies deposited in any Account exceed amounts insured by the Bank Insurance Fund or Savings Association Insurance Fund administered by the Federal Deposit Insurance Corporation or any agencies succeeding to its insurance functions, and are not fully collateralized by direct obligations of the United States of America, the excess shall be invested in Eligible Investments as provided in the applicable provisions of this Section 10.4.

**10.5    Synthetic Security Counterparty Account**

(a)     To the extent that any Synthetic Security requires the Issuer to secure its obligations to the related Synthetic Security Counterparty, the Issuer shall direct the Trustee and the Trustee shall establish a segregated Securities Account which shall be held in the name of the Trustee as Entitlement Holder for such Synthetic Security Counterparty and over which the Trustee shall have exclusive control and the sole right of withdrawal, acting at the direction of the Synthetic Security Counterparty, in accordance with the applicable Synthetic Security and this Indenture (a ***Synthetic Security Counterparty Account***).  In the alternative, a Synthetic Security Counterparty Account may be established with a trustee designated by the Synthetic Security Counterparty if that trustee would qualify to be a successor trustee under Section 6.9 and the account satisfies the other requirements of this Section.

As directed in writing by the Servicer, the Trustee shall deposit (or deliver for deposit) into each Synthetic Security Counterparty Account all amounts or securities that are required to secure the obligations of the Issuer in accordance with the related Synthetic Security, such deposit to be made from funds held in the Collection Account and available for the purchase of Collateral Obligations hereunder (as instructed by the Servicer).  The Servicer shall direct any such deposit only during the Replacement Period and only to the extent that monies are available for the purchase of Collateral Obligations pursuant to this Indenture. Any income received on amounts in the Synthetic Security Counterparty Account shall, after application in accordance with the relevant Synthetic Security (as instructed by the Servicer), be withdrawn from the Synthetic Security Counterparty Account and deposited in the Collection Account for distribution as Interest Proceeds.

(b)     As directed by the Servicer in writing and in accordance with the applicable Synthetic Security and this Indenture, amounts on deposit in a Synthetic Security Counterparty Account shall be held in Synthetic Security Collateral.

(c)     In connection with the occurrence of a credit event or an event of default or a termination event (each as defined in the applicable Synthetic Security) under the related Synthetic Security, amounts in any Synthetic Security Counterparty Account shall be withdrawn by the Trustee (or the Trustee shall request their withdrawal) and applied toward the payment of any amounts payable by the Issuer to the related Synthetic Security Counterparty (other than any Defaulted Synthetic Termination Payments) in accordance with the Synthetic Security, as directed by the Servicer in writing.  Any excess amounts held in a Synthetic Security Counterparty Account, or held directly by a Synthetic Security Counterparty, after payment of all amounts owing from the Issuer to the related Synthetic Security Counterparty in accordance with the related Synthetic Security (as instructed by the Servicer) shall be withdrawn from the Synthetic Security Counterparty Account and deposited in the Collection Account for distribution as Principal Proceeds.

(d)     Amounts on deposit in any Synthetic Security Counterparty Account shall not be considered an asset of the Issuer for the purposes of the Coverage Tests, but the Synthetic Security that relates to the Synthetic Security Counterparty Account shall be so considered an asset of the Issuer (with the notional amount as the Principal Balance unless a default exists under the applicable Synthetic Security).

**10.6    Accountings**

(a)     **Monthly.**  Commencing the earlier of (a) the first full month after the Ramp-Up Completion Date and (b) the month ending December 2007, (i) in the case of a month in which there is no Payment Date, not later than the eighth Business Day after the last calendar day of such month and (ii) in the case of a month in which there is a Payment Date, on such Payment Date, the Issuer shall cause to be compiled and provided to the Servicer, the Trustee, the Preference Shares Paying Agent (for forwarding to each Holder of Preference Shares), the Initial Purchasers, each Hedge Counterparty, the Rating Agencies, (if so requested by the Initial Purchasers) or each Holder of a Note who makes a written request therefor, and, upon written request therefor by a Beneficial Owner in the form of Exhibit H certifying that it is a Beneficial Owner, the Beneficial Owner (or its designee), a monthly report (the ***Monthly Report***).  Each Monthly Report shall be accompanied by a Section 3(c)(7) Reminder Notice.  The Monthly Report shall contain the following information, determined as of (1) in the case of a month in which there is no Payment Date, the last day of the applicable month and (2) in the case of a month in which there is a Payment Date, the Determination Date for such Payment Date, based in part on information provided by the Servicer (the ***Monthly Determination Date***):

(i)    Collateral:

    (A)    The Aggregate Principal Balance (and, in the case of a Revolving Loan or Delayed Drawdown Loan, its funded and unfunded amount), interest rate, Stated Maturity and obligor of each Collateral Obligation;

    (B)    The stated principal balance of Defaulted Collateral Obligations;

    (C)    The identity of all Collateral Obligations and all obligations that at the time of acquisition, conversion or exchange do not satisfy the requirements of a Collateral Obligation that were released for sale or other disposition (and, for each obligation sold, indicating whether sold as a Credit Risk Obligation, a Credit Improved Obligation, a Current-Pay Obligation, a Defaulted Collateral Obligation, a Workout Asset or an obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation or whether sold in connection with any withholding tax pursuant to Section 12.1(e) or sold as a discretionary sale pursuant to Section 12.1(h)); and the identity of all Collateral Obligations that were acquired, in each case since the date of the previous Monthly Report;

    (D)    The obligor of each Workout Asset;

    (E)    The Purchase Price of each Collateral Obligation acquired, the sale price of each Collateral Obligation sold (or the adjusted purchase or sale price with respect to any exchange of securities requiring an allocation by the Servicer) since the date of the previous Monthly Report on each sale;

    (F)    The identity of each Collateral Obligation (1) that is a Defaulted Collateral Obligation, a Workout Asset or a PIK Security, and in the case of a PIK Security (i) the principal amount of previously deferred or capitalized interest and (ii) the change in the principal amount of previously deferred or capitalized interest since the most recent Monthly Report or (2) in respect of which an obligation that at the time of acquisition, conversion or exchange does not satisfy the requirements of a Collateral Obligation has been received, in each case indicating the date of such default, as applicable, and reporting any Other Indebtedness, as defined in clause (ii) in the definition of "Defaulted Collateral Obligation," that the Servicer has determined not to be material;

    (G)    The S&P Industry Classification and the Moody's Industry Classification for each Collateral Obligation and the five highest

concentrations of Collateral Obligations in the Moody's Industry Classification groups and the five highest concentrations of Collateral Obligations in the S&P Industry Classification groups;

(H)  For each Collateral Obligation, the country of the obligor (and the related foreign currency debt rating) and, in the case of a country other than the United States of America, whether the obligor is Domiciled in a Moody's Group I Country, Moody's Group II Country, or Moody's Group III Country and the percentage of the Aggregate Principal Balance of the Collateral Obligations issued by issuers in the applicable country;

(I)  For each Collateral Obligation, the Moody's Priority Category Recovery Rate and S&P Recovery Rate;

(J)  For each Collateral Obligation, the S&P Rating, and if any S&P Rating for any Collateral Obligation in any Monthly Report is a credit estimate, "non-public" rating or "shadow" rating, the rating shall not be disclosed, but shall be replaced with an asterisk in the place of the applicable credit estimate, "non-public" rating or "shadow" rating;

(K)  For each Collateral Obligation, the Moody's Rating and the Moody's Rating Factor, determined, for this purpose, and set forth both with and without regard to whether the Collateral Obligation has been put on watch for possible upgrade or downgrade, and if any Moody's Rating for any Collateral Obligation in any Monthly Report is an "estimated" or "shadow" rating, the rating shall not be disclosed, but shall be replaced with an asterisk in the place of the applicable "estimated" or "shadow" rating;

(L)  The Aggregate Principal Balance of the Collateral Obligations that have a Moody's Rating of "Caa1" or lower;

(M)  The Aggregate Principal Balance of the Collateral Obligations that have an S&P Rating of "CCC+" or lower;

(N)  For each Collateral Obligation that is a Participation or a Synthetic Security or is loaned pursuant to a Securities Lending Agreement, the related Secondary Risk Counterparty and each Rating Agency's long-term unsecured debt rating of the Secondary Risk Counterparty;

(O)  Certain S&P benchmarks relating to the portfolio as provided by S&P in the S&P CDO Monitor regardless whether or not the S&P CDO Monitor passes or fails, including (1) S&P Default Measure

(Annualized Portfolio Default Rate), (2) S&P Variability Measure (Annualized Standard Deviation of Portfolio Default Rate), (3) S&P Correlation Measure (Ratio of Standard Deviation of Portfolio with Correlation to Standard Deviation of Portfolio without Correlation) and (4) Weighted Average Default Correlation;

(P)    The identity and Market Value of each Collateral Obligation whose Market Value (in the determination of the Overcollateralization Ratio Numerator) was determined pursuant to last proviso in the definition of "Market Value;"

(Q)    The identity of each Structured Finance Obligation serviced by the Servicer and the Aggregate Principal Balance of all such Collateral Obligations;

(R)    The identity of each Collateral Obligation participated from or entered into with a Secondary Risk Counterparty;

(S)    (1) the Aggregate Principal Balance of all Cov-lite Loans and (2) the identify of each Collateral Obligation that is a Cov-lite Loan; and

(T)    The identity of each Collateral Obligation owned by the Issuer that has not been disposed of within the time limits required by this Indenture.

(ii)  Accounts:

(A)    The amount of any proceeds in the Collection Account, distinguishing between amounts credited as Interest Proceeds, Principal Proceeds (excluding unapplied proceeds), and unapplied proceeds;

(B)    The amount of any Principal Proceeds in the Revolving Reserve Account;

(C)    The amount of any Principal Proceeds in the Delayed Drawdown Reserve Account;

(D)    The amount of any Principal Proceeds in the Synthetic Security Reserve Account;

(E)    The amount of any Principal Proceeds in the Synthetic Security Collateral Account;

    (F)      The amount of any Principal Proceeds in the Securities Lending Account;

    (G)      The amount in the Hedge Counterparty Collateral Account; and

    (H)      The amount in the Expense Reimbursement Account.

  (iii)  Hedge Agreements:

    (A)      The outstanding notional amount of each Hedge Agreement; and

    (B)      The amount scheduled to be received and paid by the Issuer pursuant to each Hedge Agreement on the next Payment Date (as specified by the calculation agent under each Hedge Agreement);

  (iv)  Coverage Tests, Collateral Quality Tests and Retention Overcollateralization Test:

    (A)      The Overcollateralization Ratios and the Overcollateralization Ratios as of the Ramp-Up Completion Date; a statement as to whether each of the Overcollateralization Tests is satisfied and a statement as to whether the Retention Overcollateralization Test is satisfied;

    (B)      The Interest Coverage Ratios and, on and after the second Payment Date, a statement as to whether each of the Interest Coverage Tests is satisfied;

    (C)      The Diversity Score and, on and after the Ramp-Up Completion Date, a statement as to whether the Diversity Test is satisfied;

    (D)      The Weighted Average Life of the Collateral Obligations and, on and after the Ramp-Up Completion Date, a statement as to whether the Weighted Average Life Test is satisfied;

    (E)      The Moody's Weighted Average Recovery Rate, the S&P Recovery Rate and, on and after the Ramp-Up Completion Date, a statement as to whether the Weighted Average Moody's Recovery Rate Test with respect to the Moody's Weighted Average Recovery Rate and S&P Minimum Weighted Average Recovery Rate Test with respect to the S&P Recovery Rate is satisfied;

    (F)      The Weighted Average Fixed Rate Coupon of the Collateral Obligations and, on and after the Ramp-Up Completion Date, a statement as to whether the Weighted Average Fixed Rate Coupon Test is satisfied and a statement as to the amount of Spread Excess

was used to satisfy the Weighted Average Fixed Rate Coupon Test;

(G)    The Weighted Average Spread of the Collateral Obligations and, on and after the Ramp-Up Completion Date, a statement as to whether the Weighted Average Spread Test is satisfied and a statement as to the amount of Fixed Rate Excess was used to satisfy the Weighted Average Spread Test;

(H)    The Weighted Average Moody's Rating Factor and, on and after the Ramp-Up Completion Date, a statement as to whether the Weighted Average Rating Factor Test is satisfied; and

(I)    The S&P CDO Monitor Test and, on and after the Ramp-Up Completion Date, a statement as to whether the S&P CDO Monitor Test is satisfied and the Class Scenario Loss Rate and the then applicable Note Break-Even Loss Rate with respect to each Class of Notes that is rated by S&P and the adjusted Weighted Average Spread level determined as set forth in the definition of "Note Break-Even Loss Rate;"

(v)    Concentration Limitations and Withholding Taxes:

(A)    The percentage of the Maximum Amount itemized against each element of the Concentration Limitations and a statement as to whether each Concentration Limitation is satisfied; and

(B)    Any withholding tax on payments under any Collateral Obligation;

(vi)    Securities Lending Agreements:

(A)    Each Collateral Obligation loaned or borrowed pursuant to a Securities Lending Agreement and the percentage of the Maximum Amount that represents Collateral Obligations that are loaned or borrowed pursuant to Securities Lending Agreements; and

(B)    With respect to each Securities Lending Agreement in effect as of the Monthly Determination Date, a list setting forth:

(1)    for each Collateral Obligation loaned or borrowed under it as of the first day of the loan, (x) its Principal Balance, (y) its Market Value and (z) its Principal Balance expressed as a percentage of the Maximum Amount,

(2)    the term of the loan of the Collateral Obligation,

(3)    the expiration date of the Securities Lending Agreement,

(4) the Moody's Rating and S&P Rating for each loaned or borrowed Collateral Obligation,

(5) the principal amount of the related Securities Lending Collateral held in the Securities Lending Account, and

(6) the Eligible Investments held as Securities Lending Collateral pursuant to the related Securities Lending Agreement; and

(vii) Any other information the Trustee reasonably requests.

Upon receipt of each Monthly Report, the Trustee shall compare the information contained in the Monthly Report to the information contained in its records with respect to the Collateral and shall, within three Business Days after receipt of such Monthly Report, notify the Issuer, the Preference Shares Paying Agent and the Servicer if the information contained in the Monthly Report does not conform to the information maintained by the Trustee with respect to the Collateral, and shall detail any discrepancies. In the event that any discrepancy exists, the Trustee, the Issuer, and the Servicer shall attempt to resolve the discrepancy. If such discrepancy cannot be promptly resolved, the Trustee shall within five Business Days after notification of such discrepancy cause the Independent accountants appointed by the Issuer pursuant to Section 10.8 to review such Monthly Report and the Trustee's records to determine the cause of such discrepancy. If such review reveals an error in the Monthly Report or the Trustee's records, the Monthly Report or the Trustee's records shall be revised accordingly and, as so revised, shall be used in making all calculations pursuant to this Indenture and notice of any error in the Monthly Report shall be sent as soon as practicable by the Issuer to all recipients of the report. If the review by the Independent accountants does not resolve the discrepancy, the Trustee, upon receipt of an Officer's certificate of the Servicer certifying that, to the best knowledge of the Servicer, the information contained in the related Monthly Report is correct, shall conform the information it maintains to the Monthly Report received.

(b) **Payment Date Accounting.** The Issuer shall cause to be rendered an accounting report (the "*Valuation Report*"), determined as of the close of business on each Determination Date, and provided to the Servicer, the Trustee, the Preference Shares Paying Agent (for forwarding to each Holder of Preference Shares), the Issuer, the Initial Purchasers, each Hedge Counterparty, the Rating Agencies and each Noteholder (if so requested by the Initial Purchasers), the Depository (with instructions to forward it to each of its Agent Members who are Noteholders), and upon written request therefor by a Beneficial Owner in the form of Exhibit H certifying that it is a Beneficial Owner and the Beneficial Owner (or its designee) not later than the second Business Day preceding the related Payment Date. Each Valuation Report shall be accompanied by a Section 3(c)(7) Reminder Notice. The Valuation Report shall contain the following information as of the related

Payment Date (unless otherwise stated), based in part on information provided by the Servicer:

   (i)  Notes:

      (A)  The amount of principal payments to be made on each Class of Notes on the related Payment Date;

      (B)  The Aggregate Outstanding Amount of each Class of Notes after giving effect to any principal payments on the related Payment Date and, for each Class of Notes, the percentage of its initial Aggregate Outstanding Amount that amount represents;

      (C)  For each Class of Notes, the percentage of the initial Aggregate Outstanding Amount of all of the Notes that its initial Aggregate Outstanding Amount represented and, after giving effect to any principal payments on the related Payment Date, the percentage of the Aggregate Outstanding Amount of all of the Notes that its Aggregate Outstanding Amount represents;

      (D)  The interest payable in respect of each Class of Notes on the related Payment Date (in the aggregate and by Class) and its calculation in reasonable detail; and

      (E)  The amounts to be paid, if any, to the Preference Shares Paying Agent for payments on the Preference Shares on the related Payment Date, showing separately the payments from Interest Proceeds and the payments from Principal Proceeds;

  (ii)  Payment Date Payments:

      (A)  The amounts to be distributed under each clause of Sections 11.1(a)(i), 11.1(a)(ii) and 11.2 itemized by clause, and to the extent applicable, by type of distribution under the clause; and

      (B)  Any amounts payable under the Hedge Agreements by any Hedge Counterparty on or before the related Payment Date and its calculation in reasonable detail (as specified by the calculation agent under the Hedge Agreement);

 (iii)  Accounts:

      (A)  The amount of any proceeds in the Collection Account, distinguishing between amounts credited as Interest Proceeds, Principal Proceeds (excluding unapplied proceeds) and unapplied proceeds;

      (B)    The amount in the Collection Account after all payments and deposits to be made on the related Payment Date, distinguishing between amounts credited as Interest Proceeds and as Principal Proceeds;

      (C)    The amount of any Principal Proceeds in the Revolving Reserve Account;

      (D)    The amount of any Principal Proceeds in the Delayed Drawdown Reserve Account;

      (E)    The amount of any Principal Proceeds in the Synthetic Security Reserve Account;

      (F)    The amount of any Principal Proceeds in the Synthetic Security Collateral Account;

      (G)    The amount of any Principal Proceeds in the Securities Lending Account;

      (H)    The amount in the Hedge Counterparty Collateral Account; and

      (I)    The amount in the Expense Reimbursement Account.

(iv)   A notice setting forth LIBOR, as calculated by the Calculation Agent, for the next Interest Period and each Note Interest Rate for the next Payment Date; and

(v)   Any other information the Trustee reasonably requests.

Upon receipt of each Valuation Report, the Trustee shall compare the information contained in the Valuation Report to the information contained in its records with respect to the Collateral and shall, within three Business Days after receipt of such Valuation Report, notify the Issuer, the Preference Shares Paying Agent and the Servicer if the information contained in the Valuation Report does not conform to the information maintained by the Trustee with respect to the Collateral, and shall detail any discrepancies. In the event that any discrepancy exists, the Trustee, the Issuer, and the Servicer shall attempt to resolve the discrepancy.  If such discrepancy cannot be promptly resolved, the Trustee shall within five Business Days after notification of such discrepancy cause the Independent accountants appointed by the Issuer pursuant to Section 10.8 to review such Valuation Report and the Trustee's records to determine the cause of such discrepancy.  If such review reveals an error in the Valuation Report or the Trustee's records, the Valuation Report or the Trustee's records shall be revised accordingly and, as so revised, shall be used in making all calculations pursuant to this Indenture and notice of any error in the Valuation Report shall be sent as soon as practicable by

the Issuer to all recipients of such report. If the review by the Independent accountants does not resolve the discrepancy, the Trustee, upon receipt of an Officer's certificate of the Servicer certifying that, to the best knowledge of the Servicer, the information contained in the related Valuation Report is correct, shall conform the information it maintains to the Valuation Report received.

(c) **Failure to Provide Accounting.** If the Trustee shall not have received any accounting provided for in Section 10.6(b) on the first Business Day after the date on which the accounting is due to the Trustee, the Trustee shall notify the Issuer and the Servicer, and the Servicer shall use all reasonable efforts to cause the accounting to be made by the applicable Payment Date. To the extent the Trustee is required to provide any information or reports pursuant to this Section 10.6 as a result of the failure of the Issuer (or anyone acting on the Issuer's behalf) to provide the information or reports, the Trustee may retain an Independent certified public accountant in connection therewith and the reasonable costs incurred by the Trustee for the Independent certified public accountant shall be reimbursed pursuant to Section 6.8.

(d) **Irish Stock Exchange.** So long as any Class of Notes is listed on the Irish Stock Exchange: (i) the Trustee shall communicate to the Irish Stock Exchange the Aggregate Outstanding Amount of each listed Class of Notes following each Payment Date and inform the Irish Stock Exchange if any such Class of Notes did not receive scheduled payments of principal or interest on the Payment Date; (ii) the Trustee shall inform the Irish Stock Exchange if the ratings assigned to the Notes are reduced or withdrawn and the information shall be given to the Company Announcements Office of the Irish Stock Exchange; and (iii) the Trustee shall inform the Irish Stock Exchange, in advance, of the Note Interest Rate for each such Class, as well as the exact date of the following Payment Date.

(e) **Quarterly Letter.** The Servicer shall provide a quarterly letter to the recipients of the Valuation Report highlighting events occurring during the related quarterly period within 30 days of the date of the delivery of the Valuation Report.

(f) **S&P CDO Monitor**. On or after the Ramp-Up Completion Date and together with each Monthly Report and Valuation Report, the Issuer shall provide to S&P the Excel Default Model Input File via e-mail and, with respect to each Collateral Obligation, the name of the obligor thereon and the CUSIP number thereof (if applicable).

(g) **Payments or Transfers from the Payment Account**. Each Valuation Report shall constitute instructions to the Trustee to withdraw on the related Payment Date from the Payment Account and pay or transfer amounts set forth in such Valuation Report in the manner specified and in accordance with the priority established in Section 11.1 hereof.

**10.7    Release of Collateral**

(a)     The Trustee shall present Collateral for redemption or payment in full in accordance with the terms of the Collateral upon receipt of an Issuer Order.  If no Event of Default is continuing, the Issuer may, by Issuer Order executed by an Authorized Officer of the Servicer, delivered to the Trustee at least two Business Days before the settlement date for any sale of an obligation certifying that the sale of the Collateral is being made in accordance with Sections 12.1 and 12.3 and the sale complies with all applicable requirements of Section 12.1, direct the Trustee to release the Collateral and, upon receipt of the Issuer Order, the Trustee shall deliver any such Collateral, if in physical form, duly endorsed to the broker or purchaser designated in the Issuer Order or otherwise cause an appropriate transfer of it to be made, in each case against receipt of the sales price therefor as specified by the Servicer in the Issuer Order.  The Trustee may deliver any such Collateral in physical form for examination pursuant to a bailee letter.

(b)     The Trustee shall, upon an Issuer Order executed by an Authorized Officer of the Servicer, deliver any Pledged Obligation that is set for any mandatory call or redemption or payment in full to the appropriate paying agent (other than the Irish Listing Agent) on or before the date set for the call, redemption or payment, in each case against receipt of its call or redemption price or payment in full and provide notice of it to the Servicer.

(c)     Upon receiving actual notice of any Offer, the Trustee on behalf of the Issuer shall notify the Servicer of any Collateral Obligation that is subject to a tender offer, voluntary redemption, exchange offer, conversion or other similar action (an "*Offer*").  If no Event of Default is continuing, the Servicer may direct the Trustee (and if an Event of Default is continuing, the Servicer may advise, and the Trustee may, in consultation with the Servicer, decide) to accept or participate in or decline or refuse to participate in the Offer and, in the case of acceptance or participation, to dispose of the Collateral Obligation in accordance with the Offer against receipt of payment for it.  If the consideration to be received by the Issuer for the Collateral Obligation is other than Cash, the consideration must be a Collateral Obligation that would be eligible for purchase by the Issuer pursuant to Section 12.2 assuming for this purpose that the Issuer committed to purchase the same on the date on which the Issuer accepts the Offer.

(d)     Upon disposition by the Trustee of Collateral to any Person against receipt of payment therefore as provided in any of the foregoing clauses (a), (b) or (c), the Collateral shall be free of the lien of this Indenture.  The lien shall continue in the proceeds received from the disposition.

(e)     As provided in Section 10.2(b), the Trustee shall deposit any proceeds received by it from the disposition of a Pledged Obligation in the Collection Account, unless simultaneously applied to the purchase of additional Collateral Obligations (including any related deposit into the Synthetic Security Reserve Account, the

Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security) or Eligible Investments as permitted under and in accordance with the requirements of this Section 10 and Section 12.

(f)     The Trustee shall, upon receipt of an Issuer Order when no Notes are Outstanding and all obligations of the Co-Issuers under this Indenture have been satisfied, as evidenced by an Officer's certificate or an Opinion of Counsel, release any remaining Collateral from the lien of this Indenture.

(g)     The Trustee shall release from the lien of this Indenture any Collateral that is provided directly to a Synthetic Security Counterparty or deposited in a segregated account in accordance with Section 10.5. Any Collateral or proceeds received by or redeposited by the Issuer into the Collection Account in accordance with Section 10.5 shall again be subject to the lien of this Indenture.

Any collateral deposited in a segregated account in accordance with Section 10.3(d), (e), and (f) shall be subject to the lien of this Indenture for the benefit of the Secured Parties. Any collateral withdrawn by the Issuer in accordance with Section 10.3(d), (e), and (f) shall be released from the lien of this Indenture by the Trustee to the extent returned to the appropriate counterparty pursuant to Sections 10.3(d), (e) and (f).

**10.8    Reports by Independent Accountants**

(a)     At the Closing Date, the Issuer, at the direction of the Servicer, shall appoint a firm of Independent certified public accountants of recognized international reputation for purposes of preparing and delivering the reports or certificates of the accountants required by this Indenture. Within 30 days of any resignation by the firm, the Issuer, at the direction of the Servicer, shall promptly appoint by Issuer Order delivered to the Trustee and each Rating Agency a successor firm that is a firm of Independent certified public accountants of recognized international reputation. If the Issuer, at the direction of the Servicer, fails to appoint a successor to a firm of Independent certified public accountants which has resigned within 30 days after the resignation, the Trustee, in consultation with the Servicer, shall promptly appoint a successor firm of Independent certified public accountants of recognized international reputation. The fees of such Independent certified public accountants and their successors shall be payable by the Issuer as an Administrative Expense.

(b)     On or before October 15 of each year commencing in 2008, the Issuer shall cause to be delivered to the Trustee, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Servicer or each Noteholder or Holder of Preference Shares upon written request therefor, upon written request therefor by a Beneficial Owner in the form of Exhibit H certifying that it is a Beneficial

Owner, to the Beneficial Owner (or its designee) and each Rating Agency a statement from a firm of Independent certified public accountants indicating (i) that the firm has reviewed each Valuation Report received since the last review and applicable information from the Trustee, (ii) that the calculations within those Valuation Reports have been performed in accordance with the applicable provisions of this Indenture (except as otherwise noted in the statement) and (iii) the Aggregate Principal Balance of the Collateral Obligations owned by the Issuer as of the preceding Determination Date. If a conflict exists between the firm of Independent certified public accountants and the Issuer with respect to any matter in this Section 10.8, the determination by that firm of Independent public accountants shall be conclusive. The statement shall be in the form of an Accountant's Certificate issued to the Issuer, the form of which shall be agreed on by the Servicer on behalf of the Issuer.

(c) Upon the written request of the Preference Shares Paying Agent or any Holder of Preference Shares, the Issuer shall cause the firm of Independent certified public accountants appointed pursuant to Section 10.8(a) to provide any Holder of Preference Shares with all information requested pursuant to Section 7.17(g) or provide the Issuer with any assistance required in its preparation.

## 10.9 Reports to Rating Agencies

In addition to the information and reports specifically required to be provided to each Rating Agency pursuant to this Indenture, the Issuer shall provide each Rating Agency with the Accountants' Certificates delivered to the Trustee under this Indenture, and such additional information as either Rating Agency may from time to time reasonably request. In addition, any notices of restructurings and amendments received by the Issuer or the Trustee in connection with the Issuer's ownership of a DIP Loan shall be delivered by the Servicer (on behalf of the Issuer) or the Trustee, as the case may be, promptly to the Rating Agencies.

## 11. APPLICATION OF MONIES

## 11.1 Disbursements of Monies from Payment Account

(a) Notwithstanding any other provision in this Indenture, but subject to the other subsections of this Section 11.1 and to Section 13.1, on each Payment Date, the Trustee shall disburse available amounts from the Payment Account as follows and for application by the Trustee in accordance with the following priorities (the "*Priority of Payments*"):

    (i) On each Payment Date, Interest Proceeds with respect to the related Due Period (other than Interest Proceeds previously used during such Due Period to purchase accrued interest in respect of Collateral Obligations or otherwise used as permitted by Section 10.2) shall be distributed in the following order of priority:

(1)  to the payment of any taxes and registration and filing fees owed by the Co-Issuers (without limit) and then to the payment of Administrative Expenses up to the Administrative Expense Cap as follows:

*first*, in the following order of priority,

(i)  fees, expenses and indemnities of the Trustee; and then

(ii)  fees, expenses and indemnities of the Collateral Administrator; and then

(iii)  fees, expenses and indemnities of the Preference Shares Paying Agent; and

*second*, in the following order of priority,

(i)  fees and expenses of the Administrator; and then

(ii)  fees and expenses of the Co-Issuers (including fees and expenses of counsel and ongoing surveillance, credit estimate, and other fees owing to the Rating Agencies) and any other Person (except the Servicer) if specifically provided for in this Indenture, and to the expenses (but not fees) of the Servicer if payable under the Servicing Agreement;

(2)  the excess, if any, of the Administrative Expense Cap over the amounts paid pursuant to clause (1) above to deposit into the Expense Reimbursement Account;

(3)  first, to deposit in the Class II Preference Share Special Payment Account for payment in accordance with Section 10.3(i) an amount equal to the product of (i) the Class II Preference Share Portion for such Payment Date, if any, and (ii) any accrued and unpaid Senior Servicing Fee then due and payable and second, to the payment to the Servicer of an amount equal to the difference between (i) the accrued and unpaid Senior Servicing Fee as of such Payment Date and (ii) the amount deposited to the Class II Preference Share Special Payment Account in accordance with the preceding clause;

(4)     to the payment of all amounts due to the Hedge Counterparties under the Hedge Agreements (if any) other than any Defaulted Hedge Termination Payments;

(5)     to the payment of accrued and unpaid interest on the Class A-1 Notes, and any accrued and unpaid Defaulted Interest on, and any Defaulted Interest Charge with respect to, the Class A-1 Notes;

(6)     to the payment of accrued and unpaid interest on the Class A-2 Notes, and any accrued and unpaid Defaulted Interest on, and any Defaulted Interest Charge with respect to, the Class A-2 Notes;

(7)     to the payment of accrued and unpaid interest on the Class B Notes, and any accrued and unpaid Defaulted Interest on, and any Defaulted Interest Charge with respect to, the Class B Notes;

(8)     if the Class A/B Coverage Tests are not satisfied on the related Determination Date, to the payment of principal of the Class A Notes and the Class B Notes in accordance with the Note Payment Sequence, in each case, in the amount necessary so that all of the Class A/B Coverage Tests would be met on such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied pursuant to this clause (8) before the application of any Principal Proceeds pursuant to Section 11.1(a)(ii)(C)(1) on the current Payment Date);

(9)     to the payment of accrued and unpaid interest on the Class C Notes (excluding Class C Deferred Interest, but including interest accrued for the preceding Interest Period on Class C Deferred Interest);

(10)    if the Class C Coverage Tests are not satisfied on the related Determination Date, to the payment of principal of the Class A Notes, the Class B Notes and the Class C Notes in accordance with the Note Payment Sequence, in each case in the amount necessary so that all of the Class C Coverage Tests would be met on such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied

pursuant to this clause (10) before the application of any Principal Proceeds pursuant to Section 11.1(a)(ii)(C)(3) on the current Payment Date);

(11) to the payment of Class C Deferred Interest;

(12) to the payment of accrued and unpaid interest on the Class D Notes (excluding Class D Deferred Interest but including interest accrued for the preceding Interest Period on Class D Deferred Interest);

(13) if the Class D Coverage Tests are not satisfied on the related Determination Date, to the payment of principal of the Class A Notes, the Class B Notes, the Class C Notes and the Class D Notes in accordance with the Note Payment Sequence, in each case in the amount necessary so that all of the Class D Coverage Tests would be met on such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied pursuant to this clause (13) before the application of any Principal Proceeds pursuant to Section 11.1(a)(ii)(C)(6) on the current Payment Date);

(14) to the payment of Class D Deferred Interest;

(15) to the payment of accrued and unpaid interest on the Class E Notes (excluding Class E Deferred Interest but including interest accrued for the preceding Interest Period on Class E Deferred Interest);

(16) if the Class E Coverage Test is not satisfied on the related Determination Date, to the payment of principal of the Class E Notes in the amount necessary so that the Class E Coverage Test would be met on such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full;

(17) to the payment of Class E Deferred Interest;

(18) if a Rating Confirmation Failure exists on the Payment Date, to the payment of principal of the Class A Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes in accordance with the Note Payment Sequence, in each case in the amount necessary so that a

Rating Confirmation is obtained, or until paid in full (Interest Proceeds to be applied pursuant to this clause (18) before the application of any Principal Proceeds pursuant to Section 11.1(a)(ii)(C)(10) on the current Payment Date);

(19) during the Replacement Period, if the Retention Overcollateralization Test is not satisfied on the related Determination Date, for deposit to the Collection Account as Principal Proceeds 50% of the remaining Interest Proceeds available after the payments pursuant to clause (18) above (or, if the amount necessary to cause the Retention Overcollateralization Test to be satisfied as of such Determination Date is less than 50% of such remaining Interest Proceeds, such necessary amount);

(20) to the payment of any remaining Administrative Expenses not paid under clause (1) above in the respective priorities specified in clause (1);

(21) first, to deposit in the Class II Preference Share Special Payment Account for payment in accordance with Section 10.3(i) an amount equal to the product of (i) the Class II Preference Share Portion for such Payment Date, if any, and (ii) any accrued and unpaid Subordinated Servicing Fee then due and payable and second, to the payment (pro rata according to the amounts payable under clauses (x) and (y) below) to: (x) the Servicer of an amount equal to the difference between (i) the accrued and unpaid Subordinated Servicing Fee as of such Payment Date and (ii) the amount deposited to the Class II Preference Share Special Payment Account in accordance with the preceding clause; and (y) pro rata to each Noteholder entitled thereto, the applicable Extension Bonus Payment pursuant to, and in accordance with, Section 2.4(g);

(22) to the payment *pari passu* of any (x) Defaulted Hedge Termination Payments and (y) Defaulted Synthetic Termination Payments;

(23) to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment *pro rata* to the Holders of Preference Shares until the Holders of the Preference Shares have realized a Preference Share Internal Rate of Return of 12.0%;

(24) first, to deposit in the Class II Preference Share Special Payment Account for payment in accordance with Section 10.3(i) of an amount equal to the product of (i) the Class II Preference Share Portion for such Payment Date, if any, and (ii) the Supplemental Servicing Fee, if applicable and second, to the payment to the Servicer of an amount equal to the difference between (i) the accrued and unpaid Supplemental Servicing Fee as of such Payment Date and (ii) the amount deposited to the Class II Preference Share Special Payment Account in accordance with the preceding clause; and

(25) any remaining Interest Proceeds, to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment pro rata to the Holders of the Preference Shares;

**provided** that, in lieu of payment of Interest Proceeds referred to under clauses (23) and (25) above, in whole or in part on any Payment Date, the Servicer, on behalf of the Issuer, shall have the right to direct the Trustee to distribute any Eligible Equity Securities *pro rata* to the Consenting Holders of the Preference Shares with respect to such Payment Date to the extent that the Market Value of such Eligible Equity Securities (determined by the Servicer as of the relevant Market Value Determination Date) is equal to or lower than the aggregate amount of Interest Proceeds that would otherwise be due and payable on such Payment Date to such Consenting Holders of the Preference Shares. Interest Proceeds in an amount equal to the Market Value of such Eligible Equity Securities (determined by the Servicer as of the relevant Market Value Determination Date) distributed to the Consenting Holders of the Preference Shares with respect to any such Payment Date shall be treated for all purposes by the Issuer and the Servicer as Principal Proceeds available for distribution in accordance with Priority of Payments on the relevant Payment Date. The amount of Interest Proceeds available on the relevant Payment Date shall be reduced and the amount of Principal Proceeds available on the relevant Payment Date shall be increased accordingly.

(ii) On each Payment Date, Principal Proceeds with respect to the related Due Period other than:

(A)     Principal Proceeds previously used to purchase Collateral Obligations (including any related deposit into the Synthetic Security Reserve Account, the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security) or otherwise used as permitted by Section 10.2,

(B)     Principal Proceeds on deposit in the Synthetic Security Reserve Account, the Revolving Reserve Account, the Delayed Drawdown Reserve Account, the Synthetic Security Collateral Account, or the Securities Lending Account, and

(C)     Principal Proceeds on deposit in the Collection Account in an aggregate amount equal to the agreed Purchase Prices for Collateral Obligations with respect to which the Issuer has entered into a commitment before the end of the Due Period for their purchase, but has not settled the purchase by the end of the Due Period, shall be distributed in the following order of priority:

(1)     (x) first, to the payment of the amounts referred to in clauses (1) through (7) of Section 11.1(a)(i) (and in the same manner and order of priority) to the extent not previously paid in full thereunder and (y) second, to the payment of amounts referred to in clause (8) of Section 11.1(a)(i) to the extent not previously paid in full thereunder and to the extent necessary to cause the Class A/B Overcollateralization Test to be met as of the related Determination Date on a *pro forma* basis after giving effect to any payments made through this clause (1), or until such amounts are paid in full;

(2)     to the payment of the amounts referred to in clause (9) of Section 11.1(a)(i) to the extent not previously paid in full thereunder; **provided** that after giving effect to such payment, each Coverage Test will be satisfied on a *pro forma* basis;

(3)     to the payment of the amounts referred to in clause (10) of Section 11.1(a)(i) to the extent not previously paid in full thereunder and to the extent necessary to cause the Class C Overcollateralization Test to be met as of the related Determination Date on a *pro forma* basis after giving effect to any payments made through this clause (3) or until such amounts are paid in full;

(4)    to the payment of the amounts referred to in clause (11) of Section 11.1(a)(i) to the extent not previously paid in full thereunder; **provided** that after giving effect to such payment, each Coverage Test will be satisfied on a *pro forma* basis;

(5)    to the payment of the amounts referred to in clause (12) of Section 11.1(a)(i) to the extent not previously paid in full thereunder; **provided** that after giving effect to such payment, each Coverage Test will be satisfied on a *pro forma* basis;

(6)    to the payment of the amounts referred to in clause (13) of Section 11.1(a)(i) to the extent not previously paid in full thereunder and to the extent necessary to cause the Class D Overcollateralization Test to be met as of the related Determination Date on a *pro forma* basis after giving effect to any payments made through this clause (6) or until such amounts are paid in full;

(7)    to the payment of the amounts referred to in clause (14) of Section 11.1(a)(i) to the extent not previously paid in full thereunder; **provided** that after giving effect to such payment, each Coverage Test will be satisfied on a *pro forma* basis;

(8)    to the payment of the amounts referred to in clause (15) of Section 11.1(a)(i) to the extent not previously paid in full thereunder; **provided** that after giving effect to such payment, each Coverage Test will be satisfied on a *pro forma* basis;

(9)    to the payment of the amounts referred to in clause (17) of Section 11.1(a)(i) to the extent not previously paid in full thereunder; **provided** that after giving effect to such payment, each Coverage Test will be satisfied on a *pro forma* basis;

(10)    to the payment of the amounts referred to in clause (18) of Section 11.1(a)(i) to the extent not previously paid in full thereunder;

(11)    (A)    if the Payment Date is a Redemption Date in the following order of priority: (i) to the payment of the Redemption Prices of all of the Notes to be redeemed (sequentially, in direct order of seniority), (ii) to the

payment of the amounts referred to in clauses (20) through (24) of Section 11.1(a)(i) (and in the same manner and order of priority) to the extent not previously paid in full thereunder and (iii) to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment to the Holders of the Preference Shares of the Redemption Price of any Preference Shares to be redeemed; and

(B) if the Payment Date is a Special Redemption Date, to the payment of principal of the Notes (sequentially, in direct order of seniority) in an aggregate amount equal to the Special Redemption Amount, in each case until paid in full;

(12) during the Replacement Period, all remaining Principal Proceeds to the acquisition of additional Collateral Obligations in accordance with the provisions of Section 7.19 and Section 12 (and, until so applied (including any related deposit into the Synthetic Security Reserve Account, the Revolving Reserve Account or the Delayed Drawdown Reserve Account or (if so required by the terms of the related Synthetic Security) a Synthetic Security Counterparty Account) or until so applied, to the Collection Account to be held as Principal Proceeds);

(13) after the Replacement Period, (i) *first*, at the discretion of the Servicer (with respect to Unscheduled Principal Payments and Sale Proceeds from the sale of Credit Improved Obligations) to the purchase or funding of additional or replacement Collateral Obligations in accordance with the Eligibility Criteria and the applicable provisions of this Indenture when appropriate Collateral Obligations are available, and until such time, to the Collection Account for the purchase of Eligible Investments; and (ii) *second*, to the payment of principal of Notes (sequentially, in direct order of seniority) until paid in full;

(14) to the extent not previously paid in full under clause (12) above, after the Replacement Period, to the payment of the amounts referred to in clauses (20) through (24) of Section 11.1(a)(i) (and in the same manner and order of priority) to the extent not previously paid in full thereunder; and

      (15)    after the Replacement Period to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment *pro rata* to the Holders of the Preference Shares.

(b)      If on any Payment Date the amount available in the Payment Account is insufficient to make the full amount of the disbursements required by the Valuation Report, the Trustee shall make the disbursements called for in the order and according to the priority under Section 11.1(a), subject to Section 13.1, to the extent funds are available therefor.

(c)      The Trustee shall remit funds to pay Administrative Expenses of the Issuer or the Co-Issuer in accordance with Section 11.1(a), to the extent available, to the Issuer, the Co-Issuer as directed and designated in an Issuer Order (which may be in the form of standing instructions) delivered to the Trustee no later than the Business Day before each Payment Date.

(d)      If the Hedge Counterparty defaults in the payment of its obligations to the Issuer under the respective Hedge Agreements on the date on which any payment is due thereunder, the Trustee shall make a demand on the Hedge Counterparty, or any guarantor, if applicable, demanding payment by 12:30 P.M., New York time, on that date. The Trustee shall give notice to the Noteholders, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Servicer and each Rating Agency upon the continuing failure by the Hedge Counterparty to perform its obligations during the two Business Days following a demand made by the Trustee on, the Hedge Counterparty, and shall take the action with respect to the continuing failure as directed by the Servicer (subject to Section 6.1(c)(iv)) unless an Event of Default has occurred and is continuing in which case direction is to be taken pursuant to Section 5.13.

(e)      Except as otherwise expressly provided in Section 11.1(a) above, if on any Payment Date, the amount available in the Payment Account from amounts received in the related Due Period is insufficient to make the full amount of the disbursements required by any numbered or lettered paragraph or clause of Section 11.1(a) to different Persons, the Trustee shall make the disbursements called for by the paragraph or clause ratably in accordance with the respective amounts of the disbursements then payable, subject to Section 13.1, to the extent funds are available therefor.

## 12.    SALE OF COLLATERAL OBLIGATIONS; PURCHASE OF COLLATERAL OBLIGATIONS

### 12.1    Sales of Collateral Obligations

Subject to the satisfaction of the conditions specified in Section 10.6, Section 12.1 and Section 12.3 and if no Event of Default is continuing as evidenced by an Officer's

certificate of the Servicer provided to the Trustee, the Issuer may, at the direction of the Servicer, direct the Trustee to sell any Collateral Obligation or Workout Asset if the Servicer certifies to the Trustee that the sale meets the requirements of any one of paragraphs (a) through (i) of this Section 12.1. If the Issuer sells any Collateral Obligation or Workout Asset during the Replacement Period, the proceeds shall be applied in accordance with Section 12.2.

(a)     **Credit Risk Obligations.** At the direction of the Servicer, the Issuer may direct the Trustee to sell any Credit Risk Obligation at any time during or after the Replacement Period without restriction and the Trustee shall sell the Credit Risk Obligation in accordance with such direction. Following any sale of a Credit Risk Obligation pursuant to this Section 12.1(a), at the direction of the Servicer during the Replacement Period, the Issuer shall use commercially reasonable efforts to purchase additional Collateral Obligations (to the extent the purchase is in the best interest of the Issuer) meeting the Eligibility Criteria with an Aggregate Principal Balance at least equal to the Sale Proceeds received by the Issuer with respect to the Collateral Obligation sold. For this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its Funded Amount.

(b)     **Credit Improved Obligations.** At the direction of the Servicer, the Issuer may direct the Trustee to sell any Credit Improved Obligation if either:

(i)     during the Replacement Period, the Servicer has identified in writing before the sale one or more specific manners in which it will be able, in compliance with the Eligibility Criteria and the requirements set forth in Section 12.1(i), to cause the Issuer to use the Sale Proceeds (it being understood that such identification shall not be considered either a requirement or an assurance that any specified purchase will be consummated) to purchase one or more additional Collateral Obligations with an Aggregate Principal Balance at least equal to the Purchase Criteria Adjusted Balance of the Credit Improved Obligation by the end of the immediately succeeding Due Period (for this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its Funded Amount and Principal Balance shall include the principal balance of Collateral Obligations in which the Trustee does not have a first priority perfected security interest) which in aggregate will result in (i) the Collateral Quality Tests, the Interest Coverage Tests, the Overcollateralization Tests and the Concentration Limitations herein being satisfied or if one or more of such Collateral Quality Tests, Interest Coverage Tests, Overcollateralization Tests or Concentration Limitations are not satisfied, the degree of compliance therewith being improved, (ii) the quality of the total portfolio of Collateral Obligations as measured by such Collateral Quality Tests, Interest Coverage Tests, Overcollateralization Tests and Concentration Limitations being improved on a net basis in the commercially reasonable judgment of the Servicer

and (iii) in the case of each of clause (i) and (ii), any other Collateral Quality Tests, Interest Coverage Tests, Overcollateralization Tests or Concentration Limitations not being violated or, in the commercially reasonable judgment of the Servicer, the likelihood of such violation in the future not being significantly increased; and

    (ii)    after the Replacement Period, the Sale Proceeds received in respect of the Credit Improved Obligation are at least equal to its Purchase Criteria Adjusted Balance. For this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its Funded Amount and Principal Balance shall include the principal balance of Collateral Obligations in which the Trustee does not have a first priority perfected security interest;

and the Trustee shall sell the Credit Improved Obligation in accordance with such direction.

(c)    **Non-Performing Collateral Obligations.** At the direction of the Servicer, the Issuer may direct the Trustee to sell any Non-Performing Collateral Obligation at any time during or after the Replacement Period without restriction and the Trustee shall sell the Non-Performing Collateral Obligation in accordance with such direction. Non-Performing Collateral Obligations may be sold regardless of price.

(d)    **Non-qualifying Collateral Obligations.** At the direction of the Servicer, the Issuer may direct the Trustee to sell any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation (the "***Non-qualifying Collateral Obligation***") at any time during or after the Replacement Period without restriction and the Trustee shall sell that obligation in accordance with such direction.

(e)    **Withholding Tax Sales.** At the direction of the Servicer, the Issuer may direct the Trustee to sell any Collateral Obligation subject to withholding tax at any time during or after the Replacement Period without restriction and the Trustee shall sell the Collateral Obligation in accordance with such direction.

(f)    **Optional Redemption.** After the Issuer has notified the Trustee of an Optional Redemption of the Notes in accordance with Section 9, at the direction of the Servicer, the Issuer shall direct the Trustee to sell all or a portion of the Collateral Obligations as contemplated therein if (i) the requirements of Section 9 are satisfied and (ii) the Independent certified public accountants appointed pursuant to Section 10.7 have confirmed the calculations contained in any required certificate furnished by the Servicer pursuant to Section 9.3(c). After a Majority of the Preference Shares have directed an Optional Redemption of the Preference Shares in accordance with Section 9.2(b), at the direction of the Servicer, the Issuer shall direct the Trustee to sell all of the remaining Collateral Obligations (in

the case of an Optional Redemption pursuant to Section 9.2(b)(i)) or a portion of the remaining Collateral Obligations in accordance with the unanimous directions of Holders of the Preference Shares (in the case of an Optional Redemption pursuant to Section 9.2(b)(ii)) and the Trustee shall sell the remaining Collateral Obligations in accordance with such direction.

(g)     **Rating Confirmation Failure.**  After the Servicer has received notice of a Rating Confirmation Failure and if available Interest Proceeds and Principal Proceeds are insufficient to effect the redemption of the Notes at par on any subsequent Payment Date in accordance with the Priority of Payments as and to the extent necessary for each of Moody's and S&P to confirm the Initial Ratings assigned by it on the Closing Date to the Securities, the Issuer may, at the direction of the Servicer, direct the Trustee to sell Collateral Obligations as contemplated in Section 9.1 and the Trustee shall sell the Collateral Obligations in accordance with such direction.

(h)     **Workout Assets.**  At the direction of the Servicer, the Issuer may direct the Trustee to sell any Workout Asset at any time during or after the Replacement Period without restriction and regardless of price and the Trustee shall sell the Workout Assets in accordance with such direction.

(i)     **Supervening Requirement.**  Notwithstanding anything herein to the contrary, the Issuer (at the direction of the Servicer or otherwise) shall not acquire or dispose of a Collateral Obligation or other eligible asset (as defined in Rule 3a-7) for the primary purpose of recognizing gains or decreasing losses resulting from market value changes.  For the avoidance of doubt, the Issuer, at the direction of the Servicer or otherwise, may direct the Trustee to sell any CCC+/Caa1 Collateral Obligation or Deep Discount Obligation only (a) if it constitutes a Credit Risk Obligation or Non-Performing Collateral Obligation or (b) in connection with the Optional Redemption as set out in paragraph (f) above.  The Trustee shall have no obligation to monitor compliance by the Issuer or the Servicer with respect to the requirement set out in this paragraph (i).

(j)     **Tax Sales**.     The Issuer must sell (not merely hedge) any Eligible Equity Security or security or other consideration that is received in an exchange and any Defaulted Collateral Obligation or any other obligation or security that in each case does not comply with paragraphs (15), (28) or (29) of the definition of Collateral Obligation not later than five Business Days after the Issuer's receipt thereof (or within five Business Days of such later date as such security may first be sold of in accordance with its terms and applicable law).

Notwithstanding the foregoing, the Issuer (or the Servicer on its behalf) shall not direct the Trustee to sell any Collateral Obligation (other than the sale of a Credit Risk Obligation or a Non-Performing Collateral Obligation pursuant to a sale that meets the requirements in paragraph (a) or (c) above, as applicable) following receipt by the Servicer of notice of removal pursuant to Section 14 of the

Servicing Agreement until a successor Servicer is appointed pursuant to Section 12 of the Servicing Agreement.

**12.2  Purchase of Collateral Obligations**

(a)  On any date during the Replacement Period (and, in respect of Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Risk Obligations and Credit Improved Obligations, on any date after the Replacement Period), so long as no Event of Default is continuing, at the direction of the Servicer, the Issuer may direct the Trustee to apply Principal Proceeds (together with Interest Proceeds, but only to the extent used to pay for accrued interest on Collateral Obligations) to purchase Collateral Obligations (including any related deposit into the Synthetic Security Reserve Account, the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security) if the Servicer certifies to the Trustee that, to the best knowledge of the Servicer, the conditions specified in this Section 12.2 and Section 12.3 are met.

(b)  **Eligibility Criteria.**  No obligations may be purchased unless each of the conditions in the following clauses (i) through (xii) (the "*Eligibility Criteria*") is satisfied as evidenced by a certificate of the Servicer as of the date the Issuer commits to make the purchase, in each case after giving effect to the purchase and all other purchases and sales previously or simultaneously committed to:

  (i)  the obligation is a Collateral Obligation;

  (ii)  for any date occurring during the Replacement Period:

    (A)  each Overcollateralization Test is satisfied and, if the commitment is made on or after the second Payment Date, each Interest Coverage Test is satisfied, or

    (B)  if any such Coverage Test is not satisfied, both:

      (1)  the extent of satisfaction of the Coverage Test is not reduced, and

      (2)  the Collateral Obligation is being purchased with Principal Proceeds other than:

        (x)  Principal Proceeds received in respect of a Defaulted Collateral Obligation, or

        (y)  Principal Proceeds received in respect of a Workout Asset that has been received in exchange for a Defaulted Collateral Obligation;

(iii) for any date occurring during the Replacement Period, the Diversity Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(iv) for any date occurring during the Replacement Period, the Weighted Average Rating Factor Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced; **provided** that the Weighted Average Moody's Rating Factor does not exceed 2750 or, if the Weighted Average Moody's Rating Factor exceeds 2750 prior to giving effect to such purchase or sale, the Weighted Average Moody's Rating Factor is not increased;

(v) for any date occurring during the Replacement Period, each of the limits in the definition of "Concentration Limitations" is satisfied or, if any such limit is not satisfied, the extent of satisfaction is not reduced;

(vi) for any date occurring during the Replacement Period, the Weighted Average Spread Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(vii) for any date occurring during the Replacement Period, the Weighted Average Fixed Rate Coupon Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(viii) for any date occurring during the Replacement Period, the Weighted Average Life Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(ix) for any date occurring during the Replacement Period, the Weighted Average Moody's Recovery Rate Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(x) for any date occurring during the Replacement Period, the S&P Minimum Weighted Average Recovery Rate Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(xi) for any date occurring during the Replacement Period, the S&P CDO Monitor Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced; **provided**, **however**, that this Eligibility Criterion (xi) shall not apply either to the application of the proceeds from the sale of a Credit Risk Obligation, Non-Performing Collateral Obligation or Workout Asset or to the application of Principal Proceeds in respect of Defaulted Collateral Obligations; and

(xii) for any date occurring after the Replacement Period:

(A) each Coverage Test is satisfied and the extent of satisfaction is not reduced;

(B)    each Collateral Quality Test is satisfied or, in the case of the Diversity Test and the Weighted Average Moody's Recovery Rate Test, maintained or improved; *provided* that if the Weighted Average Moody's Rating Factor exceeds 2750 prior to giving effect to such purchase or sale, the Weighted Average Moody's Rating Factor is not increased and the Weighted Average Rating Factor Test is satisfied;

(C)    each Concentration Limitation is maintained or improved and the Aggregate Principal Balance of all CCC+/Caa1 Collateral Obligations do not exceed 7.5% of the Maximum Amount;

(D)    the S&P Rating of such Collateral Obligation is at least equal to the S&P Rating of the Collateral Obligation being the source of the Unscheduled Principal Payments or of the Credit Risk Obligations or Credit Improved Obligation being the source of Sale Proceeds, as applicable;

(E)    the current Moody's Rating on the Class A-1 Notes and the Class A-2 Notes is "Aaa" and the current Moody's Ratings on the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes are no lower than one subcategory below their Initial Rating; and

(F)    the Stated Maturity of such Collateral Obligation is equal to or earlier than the Stated Maturity of the Collateral Obligation being the source of the Unscheduled Principal Payments or of the Credit Risk Obligations or Credit Improved Obligation being the source of Sale Proceeds, as applicable.

Notwithstanding the foregoing, the Issuer (or the Servicer on its behalf) shall not direct the Trustee to purchase any Collateral Obligation following receipt by the Servicer of notice of removal pursuant to Section 14 of the Servicing Agreement until a successor Servicer is appointed pursuant Section 12 of the Servicing Agreement.

(c)    **Certain Permitted Exchanges.**  The Issuer may, at the direction of the Servicer, exchange a Collateral Obligation for another Collateral Obligation in an A/B Exchange.

(d)    **Certification by Servicer.**  Not later than the Business Day preceding the settlement date for any Collateral Obligation purchased after the Closing Date (but in any event no later than the release of Cash for the Purchase Price of the purchase), the Servicer shall deliver to the Trustee an Officer's certificate of the Servicer certifying that, to the best knowledge of the Servicer, the purchase

complies with this Section 12.2 and with Section 12.3 (determined as of the date that the Issuer commits to make the purchase).

(e)     **Eligible Investments.**  Cash on deposit in the Collection Account may be held at any time in Eligible Investments in accordance with Section 10.4(a) pending the application thereof to purchase Collateral Obligations.

**12.3     Conditions Applicable to All Sale and Purchase Transactions**

(a)     Any sale or purchase by the Issuer of a Collateral Obligation shall be conducted on an arm's length basis and, if effected with the Servicer or a Person Affiliated with the Servicer or any fund or account for which the Servicer or an Affiliate of the Servicer acts as investment adviser, shall be effected in accordance with the requirements of Section 5 of the Servicing Agreement on terms no less favorable to the Issuer than would be the case if the Person were not so Affiliated.  The Trustee shall have no responsibility to oversee compliance with this clause (a) by the other parties.

(b)     Upon any acquisition of any Collateral Obligation, all of the Issuer's interest in the Collateral Obligation shall be Granted to the Trustee pursuant to this Indenture.

(c)     Notwithstanding the other provisions of this Section 12, the Issuer (or the Servicer on its behalf) shall not direct the Trustee to sell or purchase any Collateral Obligation (other than the sale of a Credit Risk Obligation or a Non-Performing Collateral Obligation pursuant to Section 12.1(a) or (c), as applicable) following receipt by the Servicer of notice of removal pursuant to Section 14 of the Servicing Agreement until a successor Servicer is appointed pursuant to Section 12(e) of the Servicing Agreement.

**12.4     Certain Determinations Relating to Collateral Obligations**

(a)     Notwithstanding anything to the contrary contained in this Indenture, solely for the purpose of calculations in connection with the Eligibility Criteria, the Issuer or the Servicer on behalf of the Issuer shall be deemed to have purchased any Collateral Obligations as of the date on which the Issuer enters into a contract to purchase, a commitment letter, a confirmation or a due bill for such Collateral Obligation, in each case entitling the Issuer (or the Trustee as assignee thereof) to receive such Collateral Obligations and, in such event, the Issuer shall be deemed to have acquired, granted or delivered, as the case may be, such Collateral Obligations on such date.

(b)     Notwithstanding anything to the contrary contained in this Indenture, solely for the purpose of calculations in connection with the Eligibility Criteria, the Issuer or the Servicer on behalf of the Issuer shall be deemed to have sold any Collateral Obligations as of the date on which the Issuer enters into a contract to sell, a commitment letter, a confirmation or a due bill for such Collateral Obligation, in

each case entitling the Issuer (or the Trustee as assignee thereof) to sell, and requiring the purchaser to purchase, such Collateral Obligations and, in such event, the Issuer shall be deemed to have sold such Collateral Obligations on such date.

(c)    Under the circumstances described in subsections (a) and (b) above, if the transaction contemplated by the contract, commitment letter, confirmation or due bill referred to therein does not settle on or before the 60th day following the scheduled settlement date (the "***Deadline***"), the deemed purchase or sale shall be deemed not to have occurred; **provided**, **however**, that the Servicer shall have the right to extend the Deadline for an additional period (not to exceed an additional 60 days) by notice to the Trustee, which notice shall include the Servicer's certification to the effect that the Servicer believes that the settlement shall occur on or before the extended Deadline.

(d)    Scheduled distributions with respect to any Pledged Collateral Obligation shall be determined in accordance with the applicable provisions of this Indenture.

## 13.    NOTEHOLDERS' RELATIONS

### 13.1    Subordination

(a)    With respect to each Class of Notes and the Preference Shares, the Classes of Notes and the Preference Shares that are Priority Classes and Junior Classes are as follows:

| Class | Junior Classes | Priority Classes |
|:---:|:---:|:---:|
| A-1 | A-2, B, C, D, E, Preference Shares* | None |
| A-2 | B, C, D, E, Preference Shares* | A-1 |
| B | C, D, E, Preference Shares* | A-1, A-2 |
| C | D, E, Preference Shares* | A-1, A-2, B |
| D | E, Preference Shares* | A-1, A-2, B, C |
| E | Preference Shares* | A-1, A-2, B, C, D |
| Preference Shares | None** | A-1, A-2, B, C, D, E |

\*      Other than with respect to the Class II Preference Share Special Payments, which may be payable to the Holders of the Class II Preference Shares as set forth herein and will have priority to the extent provided in the Priority of Payments.

\*\*     The Preference Shares will be entitled to certain residual cash flow after payment of senior obligations in accordance with the Priority of Payments.

(b)      Anything in this Indenture or the Notes to the contrary notwithstanding, the Holders of each Class of Notes that is a Junior Class agree for the benefit of the Holders of Notes of each Priority Class with respect to the Junior Class that the Junior Class shall be subordinate and junior to the Notes of each Priority Class to the extent and in the manner provided in this Indenture. If any Event of Default has not been cured or waived and acceleration occurs and is continuing in accordance with Section 5, each Priority Class of Notes shall be paid in full in Cash or, to the extent a Majority of each Class consents, other than in Cash, before any further payment or distribution is made on account of any Junior Class of Notes with respect to the Priority Class. The Holders of each Junior Class of Notes agree, for the benefit of the Holders of Notes of each Priority Class in respect of the Junior Class, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due to the Junior Class, of the Notes or each Class of Notes, as the case may be, or under this Indenture until the payment in full of the Priority Classes or all the Classes, as the case may be, and not before one year and a day, or if longer, the applicable preference period then in effect, has elapsed since the payment.

(c)      If, notwithstanding the provisions of this Indenture, any Holder of Notes of any Junior Class has received any payment or distribution in respect of the Notes contrary to the provisions of this Indenture, then, until each Priority Class with respect to the Junior Class of Notes or each Class of Notes, as the case may be, has been paid in full in Cash or, to the extent a Majority of the Priority Class or the Class, as the case may be, consents, other than in Cash in accordance with this Indenture, the payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the Holders of the applicable Priority Classes of Notes or the Holders of all Classes of Notes, as the case may be, in accordance with this Indenture. If any such payment or distribution is made other than in Cash, it shall be held by the Trustee as part of the Collateral and subject in all respects to this Indenture, including this Section 13.1.

(d)      Each Holder of Notes of any Junior Class agrees with all Holders of the applicable Priority Classes that the Holder of Junior Class Notes shall not demand, accept, or receive any payment or distribution in respect of the Notes in violation of this Indenture including this Section 13.1. After a Priority Class has been paid in full, the Holders of Notes of the related Junior Class or Classes shall

be fully subrogated to the rights of the Holders of the Priority Class. Nothing in this Section 13.1 shall affect the obligation of the Issuer to pay Holders of any Junior Class of Notes.

(e) Distributions to Holders of the Preference Shares (other than, as and to the extent described herein, the Class II Preference Share Special Payments) are subordinate to distributions on the Notes as described in the Priority of Payments.

(f) The Servicing Fees shall have priority only to the extent provided in the Priority of Payments.

## 13.2 Standard of Conduct

In exercising any of its or their voting rights, rights to direct and consent, or any other rights as a Noteholder under this Indenture, a Noteholder shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or them or at its or their direction or any failure by it or them to act or to direct that an action be taken, without regard to whether the action or inaction benefits or adversely affects any Noteholder, the Issuer or any other Person, except for any liability to which the Noteholder may be subject to the extent the same results from the Noteholder's taking or directing an action, or failing to take or direct an action, in bad faith or in violation of the express terms of this Indenture.

## 14. MISCELLANEOUS

## 14.1 Form of Documents Delivered to Trustee

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all the matters be certified by, or covered by the opinion of, only one Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to the matters in one or several documents.

Any certificate or opinion of an Officer of the Issuer, the Co-Issuer or the Servicer may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless the Officer knows, or should know that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous. Any such certificate of an Officer of the Issuer, Co-Issuer or the Servicer or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, the Issuer, the Co-Issuer, the Servicer or any other Person, stating that the information with respect to the factual matters is in the possession of the Issuer, the Co-Issuer, the Servicer or the other Person, unless the Officer of the Issuer, Co-Issuer or the Servicer or the counsel knows that the certificate or opinion or representations with respect to factual matters are erroneous. Any Opinion of Counsel may also be based, insofar as it relates to factual matters, upon a

certificate or opinion of, or representations by, an Officer of the Issuer or the Co-Issuer, stating that the information with respect to factual matters is in the possession of the Issuer or the Co-Issuer, unless the counsel knows that the certificate or opinion or representations with respect to factual matters are erroneous.

Where any Person is required to make, give, or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever this Indenture provides that the absence of the continuation of a Default or Event of Default is a condition precedent to the taking of any action by the Trustee at the request or direction of either Co-Issuer, then notwithstanding that the satisfaction of the condition is a condition precedent to the Co-Issuer's right to make the request or direction, the Trustee shall be protected in acting in accordance with the request or direction if it does not have knowledge of the continuation of the Default or Event of Default as provided in Section 6.1(d).

## 14.2    Acts of Holders of Securities

(a)    Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders of Securities may be embodied in and evidenced by one or more instruments (which may be an electronic document, including, but not limited, to in the form of e-mail, to the extent permitted by applicable law) of substantially similar tenor signed by Holders of Securities in Person or by agents duly appointed in writing (**provided** that no signature shall be required on electronic documents, including, but not limited to, in the form of e-mail to the extent permitted by law). Except as otherwise expressly provided in this Indenture, the action shall become effective when the instruments are delivered to the Trustee (which instrument or instruments may be delivered through the Preference Shares Paying Agent, in the case of the Holders of the Preference Shares) and, if expressly required, to the Issuer. The instruments (and the action embodied in them) are referred to as the "***Act***" of the Holders of Securities signing the instruments. Proof of execution of any instrument or of a writing appointing an agent for a Holder of a Security shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Issuer, if made in the manner provided in this Section.

(b)    The fact and date of the execution by any Person of any instrument may be proved by an affidavit of a witness to the execution or the certificate of any notary public or other Person authorized by law to acknowledge the execution of deeds. Any certificate on behalf of a jural entity executed by a Person purporting to have authority to act on behalf of the jural entity shall itself be sufficient proof of the authority of the Person executing it to act. The fact and date of the execution by any Person of any instrument may also be proved in any other manner that the Trustee deems sufficient.

(c)     The Indenture Register shall prove the ownership of the Notes and the principal amount and registered numbers of Notes and the number of Preference Shares held by and the number(s) of the Preference Share certificate(s) issued to, any Person shall be proved by the Preference Share register.

(d)     Any Act by the Holder of a Security shall bind every Holder of the same Security and every Security issued on its transfer or in exchange for it or in lieu of it, in respect of anything done, omitted or suffered to be done by the Trustee or the Issuer in reliance on the Act, whether or not notation of the action is made on the Securities.

**14.3    Notices, etc., to Certain Persons or Parties**

(a)     Any request, demand, authorization, direction, order, notice, consent, waiver, or Act of Holders of Securities or other documents provided or permitted by this Indenture to be made, given, or furnished to, or filed with:

   (i)     the Trustee or Preference Shares Paying Agent shall be sufficient for every purpose under this Indenture if in writing and made, given, furnished, or filed to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery, or by telecopy in legible form, to the Trustee or Preference Shares Paying Agent addressed to it at, 200 Clarendon Street, Mail Code EUC 108, Boston, MA 02116, telecopy no. (617) 351-4358, Attention: CDO Services Group, or at any other address previously furnished in writing to the other parties hereto by the Trustee (any request, direction, order, notice or other communication from the Servicer to the Trustee under Section 12 (other than required certifications) may be by electronic mail, which shall be deemed to be in writing);

   (ii)    the Co-Issuers shall be sufficient for every purpose under this Indenture (unless otherwise in this Indenture expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service, or by telecopy in legible form, to the Issuer addressed to it at c/o Maples Finance Limited, P.O. Box 1093GT, Boundary Hall, Cricket Square, George Town, Grand Cayman, Cayman Islands, telecopy no. (345) 945-7100, Attention: The Directors—Stratford CLO Ltd., or at any other address previously furnished in writing to the other parties hereto by the Issuer or the Co-Issuer, as the case may be, with a copy to the Servicer at its address below;

   (iii)   the Servicer shall be sufficient for every purpose under this Indenture if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service, or by telecopy in legible form, to the Servicer addressed to it at Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas 75240, telecopy no. (972) 628-4147, Attention: James

Dondero, or at any other address previously furnished in writing to the other parties hereto;

(iv) the Initial Purchasers shall be sufficient for every purpose under this Indenture if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service, or by telecopy in legible form, to the Initial Purchasers addressed to them at 1301 Avenue of the Americas, New York, NY 10019, telecopy no. (212) 526-6713, Attention: Credit Markets & CDOs, or at any other address previously furnished in writing to the Co-Issuers, the Servicer, and the Trustee by an Officer of either Initial Purchaser, as the case may be

(v) any Hedge Counterparty shall be sufficient for every purpose under this Indenture (unless otherwise in this Indenture expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered or sent by overnight courier service or by telecopy in legible form to the Hedge Counterparty addressed to it at the address specified in the relevant Hedge Agreement or at any other address previously furnished in writing to the Issuer or the Trustee by the Hedge Counterparty;

(vi) the Rating Agencies shall be sufficient for every purpose under this Indenture (unless otherwise in this Indenture expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service, or by telecopy in legible form, to each Rating Agency addressed to it at Moody's Investors Service, Inc., 99 Church Street, New York, New York, 10007, Telecopy No. (212) 553-4170, cdomonitoring@moodys.com, Attention: CBO/CLO Monitoring and Standard & Poor's, 55 Water Street, 41st Floor, New York, New York 10041-0003, telecopy no. (212) 438-2664, Attention: Asset Backed-CBO/CLO Surveillance and each Monthly Report and Valuation Report, together with the Excel Default Model Input File in each case, shall also be sent to S&P electronically to CDO_Surveillance@standardandpoors.com (**provided** that the request for rating confirmation pursuant to Section 7.19(e) shall be addressed to CDOEffectiveDatePortfolios@standardandpoors.com) ; or

(vii) the Administrator shall be sufficient for every purpose under this Indenture (unless otherwise in this Indenture expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service, or by facsimile in legible form, addressed to c/o Maples Finance Limited, P.O. Box 1093GT, Boundary Hall, Cricket Square, George Town, Grand Cayman, Cayman Islands, telecopy no. (345) 945-7100, Attention: The Directors—Stratford CLO Ltd.

(b) If any provision in this Indenture calls for any notice or document to be delivered simultaneously to the Trustee and any other Person, the Trustee's receipt of the

notice or document shall entitle the Trustee to assume that the notice or document was delivered to the other Person unless otherwise expressly specified in this Indenture.

(c)     Any Holder or beneficial owner of any Class A-1 Notes or Class A-2 Notes may elect to acquire bond insurance, a surety bond, a credit default swap or similar credit enhancement supporting the payment of principal and/or interest on such Class A-1 Notes or Class A-2 Notes, as applicable, on terms and conditions acceptable to such Holder or beneficial owner and at the sole expense of such Holder or beneficial owner.  On or after any such acquisition, such Holder or beneficial owner may deliver notice (and if from a beneficial owner, any such notice shall include certification that such owner is a beneficial owner of the Class A-1 Notes or Class A-2 Notes, as applicable) to the Trustee in substantially the form of Exhibit J specifying the name and contact information of the insurer, surety, credit protection seller or enhancer of such Class A-1 Notes or Class A-2 Notes, as applicable (each, an "***Insurer***").  After receipt of any such notice (in the form of Exhibit J) by the Trustee, the Trustee shall copy the related Insurer on all notices, reports or other documents delivered to the Noteholders.

### 14.4     Notices to Noteholders and the Preference Shares Paying Agent; Waiver

Except as otherwise expressly provided in this Indenture, where this Indenture provides for notice to the Noteholders or the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) of any event,

(a)     the notice shall be sufficiently given to the Noteholders or the Preference Shares Paying Agent if in writing and mailed, first-class postage prepaid, each Noteholder affected by the event or the Preference Shares Paying Agent, at the address of the Holder as it appears in the Indenture Register or at the address of the Preference Shares Paying Agent supplied by the Preference Shares Paying Agent to the Trustee, as applicable, not earlier than the earliest date and not later than the latest date, prescribed for the giving of the notice; and

(b)     the notice shall be in the English language.

Notices shall be deemed to have been given on the date of their mailing.

Notwithstanding clause (a), a Noteholder or the Preference Shares Paying Agent may give the Trustee a written notice that it is requesting that notices to it be given by facsimile transmissions and stating the telecopy number for the transmission.  Thereafter, the Trustee shall give notices to the Holder or the Preference Shares Paying Agent by facsimile transmission.  If the notice also requests that notices be given by mail, then the notice shall also be given by mail in accordance with clause (a) above, as the case may be.

The Trustee shall deliver to the Noteholders any information in its possession or notice received by it and relating to this Indenture requested to be so delivered by at least 10% (by Aggregate Outstanding Amount) of the Holders of any Class of Notes at the expense of the Issuer. The Trustee shall deliver to the Preference Shares Paying Agent any information in its possession or notice received by it, and relating to the Indenture that the Preference Shares Paying Agent certifies was requested to be so delivered by at least 10% (by Aggregate Outstanding Amount) of the Holders of the Preference Shares at the expense of the Issuer.

Neither the failure to mail any notice, nor any defect in any notice so mailed, to any particular Noteholder or the Preference Shares Paying Agent shall affect the sufficiency of the notice with respect to other Noteholders or the Preference Shares Paying Agent. If it is impracticable to give the notice by mail of any event to Noteholders or the Preference Shares Paying Agent when the notice is required to be given pursuant to any provision of this Indenture because of the suspension of regular mail service as a result of a strike, work stoppage or similar activity or because of any other cause, then the notification to Noteholders or the Preference Shares Paying Agent as shall be made with the approval of the Trustee shall be a sufficient notification to the Holders for every purpose under this Indenture.

Where this Indenture provides for notice in any manner, the notice may be waived in writing by any Person entitled to receive the notice, either before or after the event, and the waiver shall be the equivalent of the notice. Waivers of notice by Noteholders or the Preference Shares Paying Agent shall be filed with the Trustee but the filing shall not be a condition precedent to the validity of any action taken in reliance on the waiver.

So long as any Notes are listed on the Irish Stock Exchange and the rules of the exchange so require, all notices to Noteholders or the Preference Shares Paying Agent (for forwarding to Holders of Preference Shares) shall also be given to the Irish Paying Agent for publication in the Company Announcements Office of the Irish Stock Exchange.

The Issuer shall (and authorizes the Trustee to) deliver to the Initial Purchasers all periodic reports, notices, demands, and other written information delivered or received by the Issuer, the Servicer, trustees, paying agents, accountants, or other Persons pursuant to this Indenture and other operative documentation relating to the Notes requested by the Initial Purchasers (collectively, the "***Transaction Reports***") and the Issuer consents to the Initial Purchasers providing Transaction Reports received by it to current and prospective investors in the Notes (including by means of electronic transmissions or posting the Transaction Reports on internet sites maintained by the Initial Purchasers or any of their Affiliates).

## 14.5    Effect of Headings and Table of Contents

The Section headings in this Indenture and the Table of Contents are for convenience only and shall not affect the construction of this Indenture.

### 14.6 Successors and Assigns

All covenants and agreements in this Indenture by the Co-Issuers shall bind their respective successors and assigns, whether so expressed or not.

### 14.7 Separability

Except to the extent prohibited by applicable law, in case any provision in this Indenture, in the Notes shall be invalid, illegal, or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

### 14.8 Benefits of Indenture

Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the parties hereto and their successors under this Indenture, the Servicer, the Noteholders, the Holders of Preference Shares or the Preference Shares Paying Agent any benefit or any legal or equitable right, remedy or claim under this Indenture.

### 14.9 Governing Law

This Indenture and each Note shall be construed in accordance with, and this Indenture and each Note and all matters arising out of or relating in any way whatsoever (whether in contract, tort or otherwise) to this Indenture and each Note shall be governed by, the law of the State of New York.

### 14.10 Submission to Jurisdiction

The Co-Issuers and the Trustee hereby irrevocably submit to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan in The City of New York in any action or proceeding arising out of or relating to the Securities or this Indenture, and the Co-Issuers and the Trustee hereby irrevocably agree that all claims in respect of the action or proceeding may be heard and determined in the New York State or federal court. The Co-Issuers and the Trustee hereby irrevocably waive, to the fullest extent that they may legally do so, the defense of an inconvenient forum to the maintenance of the action or proceeding. The Co-Issuers and the Trustee irrevocably consent to the service of all process in any action or proceeding by the mailing or delivery of copies of the process to the Co-Issuers at the office of State Street Bank and Trust Company (to the attention of State Street Bank and Trust Company, Trustee for Stratford CLO Ltd.) set out in Section 7.2. The Co-Issuers and the Trustee agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

### 14.11  Counterparts

This Indenture may be executed in any number of copies, and by the different parties on the same or separate counterparts, each of which shall be considered to be an original instrument.

### 14.12  Acts of Issuer

Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or performed by the Issuer shall be effective if given or performed by the Issuer or by the Servicer on the Issuer's behalf.

### 14.13  Liability of Co-Issuers

Notwithstanding any other terms of this Indenture, the Notes or any other agreement entered into by either of the Co-Issuers or otherwise, neither of the Co-Issuers shall have any liability whatsoever to the other of the Co-Issuers under this Indenture, the Notes, any other agreement, or otherwise.  Without prejudice to the generality of the foregoing, neither of the Co-Issuers may take any action to enforce, or bring any action or proceeding, in respect of this Indenture, the Notes, any other agreement, or otherwise against the other of the Co- Issuers.  In particular, neither of the Co-Issuers may petition or take any other steps for the winding up or bankruptcy of the other of the Co-Issuers and neither of the Co-Issuers shall have any claim with respect to any assets of the other of the Co-Issuers.

### 14.14  Indemnity of Co-Issuer

The Issuer agrees to indemnify the Co-Issuer for any payments that may become due from the Co-Issuer under Section 11 with respect to any Notes issued under this Indenture and any administrative, legal, or other costs incurred by the Co-Issuer in connection with those payments.

### 15.  ASSIGNMENT OF SERVICING AGREEMENT; HEDGE AGREEMENTS

### 15.1  Assignment of Servicing Agreement; Amendment of Servicing Agreement

(a)     The Issuer, in furtherance of the covenants of this Indenture and as security for the Notes and amounts payable to the Secured Parties under this Indenture and the performance and observance of the provisions of this Indenture, acknowledges that its Grant pursuant to the first Granting Clause includes all of the Issuer's interest in the Servicing Agreement, including:

   (i)     the right to give all notices, consents and releases under it,

   (ii)    the right to give all notices of termination pursuant to the Servicing Agreement and to take any legal action upon the breach of an obligation of

the Servicer under it, including the commencement, conduct and consummation of proceedings at law or in equity,

 (iii) the right to receive all notices, accountings, consents, releases and statements under it, and

 (iv) the right to do all other things whatsoever that the Issuer is or may be entitled to do under it.

Notwithstanding anything in this Indenture to the contrary, the Trustee may not exercise any of the rights in (i) through (iv) above or that may otherwise arise as a result of the Grant until the occurrence of an Event of Default under this Indenture and the authority shall terminate when the Event of Default is cured or waived.

(b) The assignment made hereby is executed as security, and the execution and delivery hereby shall not in any way impair or diminish the obligations of the Issuer under the Servicing Agreement, nor shall any of the obligations contained in the Servicing Agreement be imposed on the Trustee.

(c) Upon the retirement of the Notes and the release of the Collateral from the lien of this Indenture, this assignment, and all rights in this Indenture assigned to the Trustee for the benefit of the Noteholders shall cease and terminate and all the interest of the Trustee in the Servicing Agreement shall revert to the Issuer and no further instrument or act shall be necessary to evidence the termination and reversion.

(d) The Issuer represents that the Issuer has not executed any other assignment of the Servicing Agreement.

(e) The Issuer agrees that this assignment is irrevocable, and that it shall not take any action that is inconsistent with this assignment or make any other assignment inconsistent herewith. The Issuer shall, from time to time upon the request of the Trustee, execute all instruments of further assurance and all such supplemental instruments with respect to this assignment as the Trustee may reasonably request.

(f) The Issuer agrees to obtain the agreement and consent of the Servicer in the Servicing Agreement to the following:

 (i) the Servicer consents to this collateral assignment and agrees to perform any provisions of this Indenture made expressly applicable to the Servicer pursuant to the Servicing Agreement.

 (ii) the Servicer acknowledges that the Issuer is collaterally assigning all of its interest in the Servicing Agreement to the Trustee for the benefit of the Secured Parties and the Servicer agrees that all of the representations,

covenants and agreements made by the Servicer in the Servicing Agreement are also for the benefit of the Secured Parties.

(iii) the Servicer shall deliver to the Trustee duplicate original copies of all notices, statements, communications and instruments delivered or required to be delivered to the Issuer pursuant to the Servicing Agreement (other than any of them delivered to the Issuer by the Trustee or the Collateral Administrator).

(iv) the procedure for amending the Servicing Agreement as set forth in Section 15.1(h) below.

(v) except as otherwise provided in this Indenture and the Servicing Agreement, subject to the resignation rights of the Servicer pursuant to Section 12 of the Servicing Agreement, the Servicer shall continue to serve as Servicer under the Servicing Agreement notwithstanding that the Servicer shall not have received amounts due it under the Servicing Agreement because sufficient funds were not then available under this Indenture to pay the amounts pursuant to the Priority of Payments. The Servicer agrees not to cause the filing of a petition in bankruptcy against the Issuer for the nonpayment of the fees or other amounts payable by the Administrative Agent to the Servicer under the Servicing Agreement until the payment in full of all Notes issued under this Indenture and the payment to the Preference Shares Paying Agent of all amounts payable with respect to the Preference Shares in accordance with the Priority of Payments and the expiration of a period equal to the greater of (A) the applicable preference period plus one day or (B) one year and one day following the payment. Notwithstanding the foregoing, the Servicer may commence any legal action that is not a bankruptcy, insolvency, liquidation or similar proceeding against the Issuer or the Co-Issuer or any of their properties and may take any action it deems appropriate at any time in any bankruptcy, insolvency, liquidation or similar proceeding and any other Proceeding voluntarily commenced by the Issuer or the Co-Issuer or involuntarily commenced against the Issuer or the Co-Issuer by anyone other than the Servicer or any Affiliate of the Servicer.

(vi) the Servicer irrevocably submits to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan in The City of New York in any action or proceeding arising out of or relating to the Notes, the Preference Shares or this Indenture, and the Servicer irrevocably agrees that all claims in respect of the action or proceeding may be heard and determined in the New York State or federal court. The Servicer irrevocably waives, to the fullest extent it may legally do so, the defense of an inconvenient forum to the maintenance of the action or proceeding. The Servicer irrevocably consents to the service of all process in any action or proceeding by the mailing or delivery of copies

of the process to it the address provided for in Section 14.3. The Servicer agrees that a final and non-appealable judgment by a court of competent jurisdiction in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(g)  Following the resignation or removal of the Servicer, the Issuer shall use its best efforts to appoint a successor Servicer, and the Issuer, the Trustee, and the resigning or removed Servicer shall take any action consistent with the Servicing Agreement and this Indenture applicable to the Servicer, necessary to effectuate any such succession.

(h)  (i)  The Issuer may, at the request of the Servicer, enter into an amendment or modification of the Servicing Agreement from time to time, without the consent of the Holders of the Securities and without regard to whether or not the interests of the Holders of the Securities are adversely affected thereby; **provided** that, with respect to any such amendment or modification, (a) a Rating Condition is satisfied and (b) a Majority of the Controlling Class of Notes or a Majority of the Holders of the Preference Shares have not objected in writing to such amendment or modification prior to the relevant Objection Cut-Off Date (as defined below).

(ii)  If at any time the Servicer desires to amend or modify the Servicing Agreement, the Servicer shall notify the Issuer and the Trustee, providing details of such proposed amendment or modification. Not later than five Business Days after receipt of such notice, the Trustee shall mail such notice to (a) each Noteholder at such Holder's address in the Indenture Register or otherwise in accordance with the rules and procedures of the Depository, Euroclear and Clearstream, as applicable, (b) to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and (c) to each Rating Agency. If any Holder of the Controlling Class of Notes or any Holder of the Preference Shares notifies, by delivering a written notice to the Trustee within 35 days after the Trustee has mailed such notice, that it objects to such proposed amendment or modification, the Trustee shall, within two Business Days after receiving such notice of objection, mail a notice of the receipt of such objection to the Issuer, the Servicer and other Holders of the Controlling Class of Notes and other Holders of the Preference Shares. Each Holder of the Controlling Class of Notes and each Holder of the Preference Shares that also wishes to object to such amendment or modification must, by delivering a written notice, so notify the Trustee within seven Business Days after the Trustee has mailed such notice of the receipt of such objection (the last day of such seven Business Day period, the ***Objection Cut-Off Date***). If a Majority of either the Controlling Class of Notes or the Preference Shares notifies the Trustee in writing on or before the Objection Cut-Off Date that they object

to the proposed amendment or modification to the Servicing Agreement, such amendment or modification shall not be made.

**15.2 Hedge Agreements**

(a) At any time and from time to time on or after the Closing Date, the Issuer, at the direction of the Servicer and with the consent of a Majority of the Controlling Class, shall enter into the Hedge Agreements and shall assign its rights (but none of its obligations) under the Hedge Agreements to the Trustee pursuant to this Indenture. The Trustee shall, on behalf of the Issuer and in accordance with the Valuation Report, pay amounts due to the Hedge Counterparties under the Hedge Agreements on any Payment Date in accordance with Section 11.1. The Issuer shall not enter into any Hedge Agreement the payments from which are subject to withholding tax unless the Issuer is not required to make additional payments to the Hedge Counterparty on account of amounts withheld and the Hedge Counterparty is required to make additional payments so that the net amount received by the Issuer after satisfaction of such tax is the amount due to the Issuer before the imposition of withholding tax. The Issuer shall not enter into any Hedge Agreement the entry into, performance or termination of which would subject the Issuer to net income tax in any jurisdiction outside of the Issuer's jurisdiction of incorporation.

(b) If at any time a Hedge Counterparty does not have the Required Rating, then the Hedge Counterparty shall be required to post collateral, obtain a guarantor, replace itself with a substitute Hedge Counterparty or take such other measures as specified in the applicable Hedge Agreement that has been entered into according to Section 15.2(i) below.

(c) Whenever the Issuer enters into a Hedge Agreement, the Hedge Counterparty thereto shall comply with the then currently applicable rating criteria of each Rating Agency from time to time (the ***Required Rating***).

(d) Any payments required to be made under the Hedge Agreements shall be made in accordance with the Priority of Payments. Subordinated Defaulted Hedge Termination Payments shall be subordinate to interest and principal payments on the Notes and any other payments required to be made by the Issuer under the Hedge Agreements, but senior to distributions to Holders of the Preference Shares.

(e) Except as provided in paragraph (i) of this Section 15.2, the Issuer, at the direction of the Servicer, shall, promptly following the early termination of a Hedge Agreement (other than on a Redemption Date) (but no later than 60 days after the early termination), and to the extent possible through application of Hedge Termination Receipts, enter into a Replacement Hedge, unless, in the exercise of the Servicer's commercially reasonable judgment, to do so would not be in the best interest of the Issuer and the Rating Condition with respect to each Rating

Agency is satisfied with respect to the non-entry into the a Replacement Hedge. In addition, a Replacement Hedge may not be entered into unless the Issuer provides the Rating Agencies with at least seven Business Days' prior written notice of its intention to enter into the agreement, together with its form and the Rating Condition with respect to each Rating Agency is satisfied with respect to the Replacement Hedge. The Issuer shall use commercially reasonable efforts to cause the termination of a Hedge Agreement (other than a termination resulting from the bankruptcy, insolvency, or similar event with respect to the Hedge Counterparty) to become effective simultaneously with its entering into a Replacement Hedge. To the extent that (i) the Servicer determines not to replace the Hedge Agreement and the Rating Condition with respect to each Rating Agency is satisfied with respect to the determination or (ii) termination is occurring on a Redemption Date, the Hedge Termination Receipts shall become part of Principal Proceeds and be distributed in accordance with Section 11.1 on the next following Payment Date (or on the Redemption Date, if the Notes are redeemed on the Redemption Date).

(f)     Notwithstanding Section 15.2(f), the applicable requirements of Section 15.2(f) shall not have to be met if the Rating Condition with respect to each Rating Agency is otherwise satisfied with respect thereto.

(g)     The notional amounts of the Hedge Agreements outstanding at any time may be reduced or increased from time to time, by the Issuer, and the Hedge Agreements may be amended, modified or terminated in accordance with the Hedge Agreements if the Rating Condition with respect to each Rating Agency is satisfied with respect to the reduction, increase, amendment, modification or termination, as the case may be.

(h)     Each Hedge Agreement may be terminated pursuant to its terms by the Hedge Counterparty upon an Optional Redemption of the Notes, (but only after the applicable notice of redemption may no longer be withdrawn pursuant to Section 9.03) an acceleration of maturity of the Notes followed by the liquidation of any or all of the Collateral after an Event of Default or the entry into certain amendments to the Indenture without the consent of the Hedge Counterparty. The Hedge Agreement will not be permitted to be terminated by the Issuer as the result of a Default or Event of Default unless any acceleration of maturity of the Notes resulting from the Event of Default is no longer permitted to be rescinded pursuant to this Indenture.

(i)     Except for Hedge Agreements entered into on or before the Closing Date, the Issuer shall not enter into any Hedge Agreement unless the Rating Condition with respect to each Rating Agency is satisfied.

**IN WITNESS WHEREOF**, we have set our hands as of the day and year first written above.

Executed as a Deed by

**STRATFORD CLO LTD.,**
   as Issuer


By:  _____
        Name:
        Title:


Witness:_____
Name:
Occupation:
Address:



**STRATFORD CLO LLC,**
   as Co-Issuer


By:  _____
        Name:
        Title:



**STATE STREET BANK AND TRUST COMPANY,**
   as Trustee and as Custodian


By:  _____
        Name:
        Title:

[INDENTURE]

## SCHEDULE 1

## List of Collateral Obligations

## Stratford CLO, LTD.
### Schedule 1

| Issuer | Asset | Commitment | Spread | Maturity | Moody's DPR | Moody's Obligation Rating | S&P Rating |
|---|---|---|---|---|---|---|---|
| 401 North Wabash Venture LLC | Loan | 3,000,000 | 3.75% | 6/7/2008 | Ba3 | Ba3 | B |
| Acquireco LLC (Telesat) | Delayed Draw Term Loan B | 236,220 | 3.00% | 10/9/2014 | B2 | B1 | B+ |
| Acquireco LLC (Telesat) | Term Loan B | 2,763,780 | 3.00% | 10/9/2014 | B2 | B1 | B+ |
| Acument Global Technologies, Inc. (fka TFS Acquisition) | Term Loan | 990,000 | 3.50% | 8/11/2013 | B2 | B2 | B+ |
| Advanced Lighting Technologies, Inc. | Deferred Draw Term Loan (First Lien) | 272,727 | 2.75% | 6/1/2013 | B2 | B1 | B |
| Advanced Lighting Technologies, Inc. | Second Lien Term Loan Note | 1,000,000 | 6.00% | 6/1/2014 | B2 | Caa1 | B |
| Advanced Lighting Technologies, Inc. | Term Loan (First Lien) | 1,221,136 | 2.75% | 6/1/2013 | B2 | B1 | B |
| Affinia Group Inc. | Tranche B Term Loan | 951,885 | 3.00% | 11/30/2011 | B2 | Ba3 | B+ |
| AIMCO Properties, L.P. | 400MM Term Loan | 3,166,667 | 1.50% | 3/22/2011 | Baa3 | Baa3 | BB+ |
| Alliance Imaging, Inc. | Tranche C1 Term Loan | 899,531 | 2.50% | 12/29/2011 | B1 | Ba3 | B+ |
| Alon USA Energy, Inc. | Edgington Facility | 109,722 | 2.25% | 6/22/2013 | B2 | B1 | B+ |
| Alon USA Energy, Inc. | Paramount Facility | 877,778 | 2.25% | 6/22/2013 | B2 | B1 | B+ |
| American Achievement Corp. | Tranche B Term Loan | 3,362,008 | 2.25% | 3/25/2011 | B2 | Ba2 | B |
| American Airlines, Inc. | Term 2 Advance | 3,482,322 | 2.00% | 12/17/2010 | B2 | Ba3 | B |
| Aramark Canada Ltd. | Canadian Term Loan | 985,038 | 2.00% | 1/26/2014 | B1 | Ba3 | B+ |
| Aramark Corporation | LC Facility Letter of Credit | 260,091 | 2.00% | 1/26/2014 | B1 | Ba3 | B+ |
| Aramark Corporation | U.S. Term Loan | 3,639,114 | 2.00% | 1/26/2014 | B1 | Ba3 | B+ |
| Arrowhead General Insurance Agency, Inc. | First Lien Term Loan | 5,975,526 | 3.00% | 8/8/2012 | B2 | B2 | B |
| Astoria Generating Company Acquisitions, LLC | First Lien Term Loan B | 939,757 | 2.00% | 2/23/2013 | B1 | B1 | B+ |
| AWAS Capital, Inc. | Loan (First Lien) | 2,400,495 | 1.75% | 3/15/2013 | B2 | B2 | B+ |
| BakerCorp. | Tranche C Term Loan | 1,995,000 | 2.25% | 5/8/2014 | B2 | B1 | B |
| Berry Plastics Holding Corporation | Term C Loan | 497,500 | 2.00% | 4/3/2015 | B3 | Ba3 | B |
| Berry Plastics Holding Corporation | Term C Loan | 1,492,500 | 2.00% | 4/3/2015 | B3 | Ba3 | B |
| Big West Oil, LLC | Delayed Advance Loan | 2,200,000 | 2.25% | 5/15/2014 | B1 | B1 | B+ |
| Big West Oil, LLC | Initial Advance Loan | 1,790,000 | 2.25% | 5/15/2014 | B1 | B1 | B+ |
| BioTech Research Labs/Philosophy Merger Sub, Inc | Term Loan (First Lien) | 2,979,200 | 2.00% | 3/16/2014 | B2 | B1 | B |
| Birds Eye Foods, Inc. | Tranche B Term Loan | 3,446,667 | 1.75% | 3/22/2013 | B1 | B1 | B+ |
| Blockbuster Inc. | Tranche B Term Loan | 1,235,147 | 4.25% | 8/20/2011 | Caa1 | B3 | B- |
| Bresnan Communications, LLC | Additional Term Loan B (First Lien) | 2,500,000 | 2.00% | 6/30/2013 | B2 | B2 | B+ |
| Brickman Group Holdings, Inc. | Tranche B Term Loan | 1,487,513 | 2.00% | 1/23/2014 | B2 | Ba3 | B+ |
| Burlington Coat Factory Warehouse Corporation | Term Loan | 6,909,414 | 2.25% | 5/28/2013 | B2 | B2 | B |
| Calpine Corporation | First Priority Term Loan | 12,945,000 | 2.25% | 3/29/2009 | B1 | B1 | B+ |
| Caritor, Inc. | Closing Date Term Loan | 10,236,977 | 2.25% | 6/4/2013 | B1 | B1 | BB- |
| Caritor, Inc. | Synthetic LC Loan | 767,442 | 2.25% | 6/4/2013 | B1 | B1 | BB- |
| Celanese US Holdings LLC | Term Loan | 5,472,500 | 1.75% | 4/2/2014 | Ba3 | Ba3 | BB |
| Cequel Communications, LLC (aka Cebridge) | 2nd Lien Tr A TL (Cash Pay) | 1,000,000 | 4.50% | 5/5/2014 | B2 | Caa1 | B+ |
| Cequel Communications, LLC (aka Cebridge) | Term Loan | 6,965,000 | 2.00% | 11/5/2013 | B2 | B1 | B+ |
| CHG Companies Inc. / CHG Medical Staffing Inc. | First Lien Term Loan B | 3,168,020 | 2.50% | 12/20/2012 | B1 | Ba3 | B |
| CHG Companies Inc. / CHG Medical Staffing Inc. | Second Lien Term Loan | 2,000,000 | 6.00% | 12/20/2013 | B1 | B3 | B |
| CHG Companies Inc. / CHG Medical Staffing Inc. | Synthetic LOC Loan (First Lien) | 800,000 | 2.50% | 12/20/2012 | B1 | Ba3 | B |
| Chiquita Brands L.L.C. | Term C Loan | 1,000,000 | 3.00% | 6/28/2012 | B3 | B3 | B |
| Clarke American Corp. | Tranche B Term Loan | 1,000,000 | 2.50% | 6/30/2014 | B2 | B1 | B+ |
| CNOVA 2007-2A | Floating - 10/2021 - C - 19964QAD8 | 2,500,000 | 2.25% | 10/15/2021 | A2 | A2 | A |
| CNOVA 2007-2A | Floating - 10/2021 - D - 19964QAE6 | 1,500,000 | 4.50% | 10/15/2021 | Baa2 | Baa2 | BBB |
| Compass Minerals Group, Inc. | Term Loan | 786,496 | 1.50% | 12/22/2012 | Ba3 | Ba2 | BB- |
| Conseco, Inc | New Term Loan | 5,939,963 | 2.00% | 10/10/2013 | Ba3 | Ba3 | B+ |
| Consolidated Communications, Inc. | New Term D Loan | 2,688,125 | 1.75% | 10/14/2011 | B1 | Ba3 | BB- |
| Corel Corporation/Corel US Holdings, LLC | Term Loan | 2,940,300 | 4.00% | 5/2/2012 | B3 | B3 | B |
| Crescent Resources, LLC | Term Loan | 2,000,000 | 3.00% | 9/7/2012 | Ba2 | Ba2 | BB |
| Cricket Communications, Inc. (aka Leap Wireless) | Revolver | 1,000,000 | 2.00% | 6/16/2011 | B2 | Ba2 | B- |
| Cricket Communications, Inc. (aka Leap Wireless) | Term Loan | 7,924,812 | 2.25% | 6/16/2013 | B2 | Ba2 | B- |
| Custom Building Products, Inc. | Term Loan (First Lien) | 1,652,244 | 2.25% | 10/20/2011 | B1 | B1 | B |
| CW Media Holdings Inc | Tranche B Term Loan | 5,000,000 | 3.25% | 2/15/2015 | B1 | Ba1 | B |
| D&E Communications, Inc. | Term Loan B | 2,924,839 | 1.75% | 12/31/2011 | Ba3 | Ba2 | BB+ |
| Delphi Corporation | Tranche B Loan | 2,000,000 | 2.25% | 12/31/2007 | Ba1 | Ba1 | BB- |
| Delta Air Lines, Inc. | Second Lien Term Loan | 3,000,000 | 3.25% | 4/30/2014 | B2 | B2 | B |
| Dex Media East LLC | New Tranche B Term Loan | 398,920 | 1.50% | 5/8/2009 | B1 | Ba1 | Ba1 |
| Discovery Communications Holding, LLC | Term B Loan | 6,982,500 | 2.00% | 5/14/2014 | Ba2 | B1 | BB- |
| Dole Food Company, Inc. | Credit-Linked Deposit | 94,306 | 2.00% | 4/12/2013 | B2 | Ba3 | B |
| Dole Food Company, Inc. | Tranche B Term Loan | 209,006 | 2.00% | 4/12/2013 | B2 | Ba3 | B |
| DS Waters of America, Inc. | Term Loan | 1,985,000 | 2.25% | 10/27/2012 | B3 | Baa3 | B |
| EL AD IDB Las Vegas LLC | Tranche A1 | 2,000,000 | 2.75% | 8/10/2008 | B3 | B3 | B |
| Emerson Reinsurance Ltd. | Series A Loan | 3,900,000 | 1.75% | 12/15/2011 | A2 | A2 | A- |
| Emerson Reinsurance Ltd. | Series B Loan | 1,500,000 | 3.00% | 12/15/2011 | Baa3 | Baa3 | BBB |
| Emerson Reinsurance Ltd. | Series C Loan | 600,000 | 5.25% | 12/15/2011 | Ba2 | Ba2 | BB |
| Ferro Corporation | Term Loan | 1,584,830 | 2.00% | 6/6/2012 | B1 | B1 | B+ |
| Flag Luxury Properties Holdings, LLC | First Lien Facility | 1,363,541 | 4.25% | 3/21/2011 | B2 | B1 | B |
| FleetCor Technologies Operating Company, LLC | Tranche 1 Term Loan | 2,487,500 | 2.25% | 4/30/2013 | B1 | Ba3 | B+ |
| FleetCor Technologies Operating Company, LLC | Tranche 2 Term Loan | 500,000 | 2.25% | 4/30/2013 | B1 | Ba3 | B+ |
| Foamex L.P. | Loan (First Lien) | 1,951,588 | 2.25% | 2/12/2013 | B2 | B1 | B |
| Fontainebleau Las Vegas, LLC | Delayed Draw Term Loan | 2,000,000 | 3.25% | 6/6/2014 | B2 | B1 | B |
| Fontainebleau Las Vegas, LLC | Initial Term Loan | 4,000,000 | 3.25% | 6/6/2014 | B2 | B1 | B |
| Ford Motor Company | Term Loan | 7,917,613 | 3.00% | 12/16/2013 | B3 | Baa3 | B |
| Freeport-McMoRan Copper & Gold Inc. | 8.375% - 04/2017 - 35671DAS4 | 1,000,000 | 8.38% | 4/1/2017 | Ba3 | Ba3 | BB+ |
| Freeport-McMoRan Copper & Gold Inc. | Floating - 04/2015 - 35671DAT2 | 1,000,000 | 3.25% | 4/1/2015 | Ba3 | Ba3 | BB+ |
| Freescale Semiconductor, Inc. | Term Loan | 1,985,000 | 1.75% | 11/29/2013 | Ba3 | Baa3 | B+ |
| Gambro Holding AB | Facility B2 | 1,329,356 | 2.50% | 6/5/2014 | B2 | B2 | B+ |
| Gambro Holding AB | Facility C2 | 1,329,356 | 3.00% | 6/5/2015 | B2 | B2 | B+ |
| Generac Acquisition Corp. | First Lien Term Loan | 990,000 | 2.50% | 11/10/2013 | B2 | B1 | B |
| Generac Acquisition Corp. | Second Lien Term Loan | 2,500,000 | 6.00% | 5/10/2014 | B2 | Caa1 | B |
| General Motors Corporation | Secured Term Loan | 1,985,000 | 2.38% | 11/29/2013 | B3 | Ba3 | B+ |
| Genoa Healthcare Group, LLC | Revolver | 1,000,000 | 3.00% | 8/10/2010 | B2 | Ba3 | B |
| Georgia Gulf Corp. | Term Loan | 611,787 | 2.50% | 10/3/2013 | B1 | Ba2 | B |
| Georgia-Pacific LLC | Term B Loan | 1,965,000 | 1.75% | 12/20/2012 | Ba3 | Ba2 | BB- |
| Ginn LA Conduit Lender, Inc. | First Lien Tranche A Credit-Linked Deposit | 1,574,127 | 3.50% | 6/8/2011 | Caa2 | Caa1 | CCC+ |
| Ginn LA Conduit Lender, Inc. | First Lien Tranche B Term Loan | 3,393,232 | 3.50% | 6/8/2011 | Caa2 | Caa1 | CCC+ |
| Graceway Pharmaceuticals, LLC | Term B Loan (First Lien) | 10,816,667 | 2.75% | 5/3/2012 | B2 | Ba3 | B+ |
| Graham Packaging Company, L.P. | New Term Loan | 2,000,000 | 2.25% | 10/7/2011 | B2 | B1 | B |
| Gray Television, Inc. | Term Loan B - DD | 4,000,000 | 1.50% | 12/31/2014 | Ba3 | Ba3 | B |
| Greerwood Racing Inc. | Term Loan | 3,970,000 | 2.25% | 11/28/2011 | B2 | B2 | B+ |
| Hanesbrands Inc. | Term B Loan | 2,181,250 | 1.75% | 9/5/2013 | Ba3 | Ba2 | B+ |
| Hargray Acquisition Co./DPC Acquisition LLC/HCP Acquisition | Second Lien Term Loan | 1,000,000 | 5.50% | 1/29/2015 | B2 | Caa1 | B |
| Hawker Beechcraft Acquisition Company LLC | LC Facility Deposit | 468,085 | 2.00% | 3/26/2014 | B2 | Ba3 | B+ |
| Hawker Beechcraft Acquisition Company LLC | Term Loan | 5,504,255 | 2.00% | 3/26/2014 | B2 | Ba3 | B+ |
| HCA Inc. | Tranche B Term Loan | 2,917,569 | 2.25% | 11/18/2013 | B2 | Ba3 | B+ |
| Health Management Associates, Inc | Term B Loan | 2,487,500 | 1.75% | 2/28/2014 | Ba3 | Ba2 | B+ |
| Healthcare Partners, LLC | New Term Loan | 928,571 | 1.75% | 10/31/2013 | B1 | Ba3 | BB |
| HealthSouth Corporation | Term Loan | 293,331 | 2.50% | 3/10/2013 | B3 | B2 | B |
| Helix Energy Solutions Group, Inc. | Term Loan | 9,880,285 | 2.00% | 7/1/2013 | B2 | B1 | BB- |
| HUB International Limited | Delay Draw Term Loan | 183,263 | 2.50% | 6/13/2014 | B3 | Ba3 | B |
| HUB International Limited | Initial Term Loan | 816,737 | 2.50% | 6/13/2014 | B3 | Ba3 | B |
| IAP Worldwide Services, Inc. | Term Loan (First-Lien) | 989,924 | 6.25% | 12/30/2012 | B3 | Ba3 | CCC- |
| IM US Holdings, LLC (Inverness Medical) | Term Loan (Second Lien) | 1,000,000 | 4.25% | 6/26/2015 | B2 | Caa1 | B+ |

| Issuer | Asset | Commitment | Spread | Maturity | Moody's DPR | Moody's Obligation Rating | S&P Rating |
|---|---|---|---|---|---|---|---|
| Insight Midwest Holdings, LLC | B Term Loan | 2,000,000 | 1.75% | 4/7/2014 | B1 | Ba3 | B+ |
| Integra Telecom Holdings, Inc. | Term Loan | 4,000,000 | 4.25% | 8/31/2013 | B3 | Ba3 | B- |
| Interstate Fibernet, Inc. | Term Loan (First Lien) | 2,000,000 | 4.00% | 7/31/2013 | B3 | B2 | B- |
| Iowa Telecommunications Services, Inc. | Tranche B | 1,500,000 | 1.75% | 11/23/2011 | Ba3 | Ba3 | BB- |
| Jarden Corporation | Term Loan B1 | 1,284,073 | 1.75% | 1/24/2012 | B1 | Ba3 | B+ |
| Kenan Advantage Group, Inc. | Incremental Term Loan | 982,508 | 3.00% | 12/16/2011 | B3 | B3 | B+ |
| KKR 2007 - AA | Floating - 10/2017 - C - 482486AE7 | 4,000,000 | 2.65% | 10/31/2017 | A2 | A2 | A |
| Knology, Inc. | Term Loan | 4,987,500 | 2.25% | 6/30/2012 | B2 | B2 | B |
| Kuilima Resort Company (Turtle Bay) | First Lien Term Loan | 9,138,805 | 2.75% | 9/30/2010 | B2 | B1 | B- |
| Kyle Acquisition Group, LLC | Facility B | 4,386,758 | 3.50% | 7/20/2008 | Ba3 | Ba3 | BB |
| Kyle Acquisition Group, LLC | Facility C | 613,242 | 3.50% | 7/20/2010 | Ba3 | Ba3 | BB |
| LNR Property Corporation | Initial Tranche B Term Loan | 5,000,000 | 2.75% | 7/12/2011 | B2 | B2 | B+ |
| LPL Holdings, Inc. | Tranche D Term Loan | 3,813,729 | 2.00% | 6/28/2013 | B1 | B1 | B |
| Macerich Partnership, L.P., The | Term Loan | 666,667 | 1.50% | 4/26/2010 | Ba1 | Ba1 | BBB- |
| Mach Gen, LLC | Revolver | 2,000,000 | 2.25% | 2/22/2012 | B2 | B2 | B |
| Mach Gen, LLC | Synthetic L/C Loan (First Lien) | 374,147 | 2.00% | 2/22/2013 | B2 | B2 | B |
| Mach Gen, LLC | Term B Loan (First Lien) | 3,589,624 | 2.00% | 2/22/2014 | B2 | B2 | B |
| Maritime Telecommunications Network, Inc. | Term Loan (First Lien) | 1,461,154 | 2.75% | 5/11/2012 | B2 | B2 | B |
| Matrix Acquisition Corp. (MacDermid, Incorporated) | Tranche B Term Loan | 1,990,000 | 2.00% | 4/12/2014 | B2 | B1 | B |
| Maxum Petroleum, Inc. (f/k/a Global Petroleum, Inc.) | Term Loan | 987,500 | 4.50% | 9/18/2013 | B2 | B2 | B |
| MCC Iowa LLC (Mediacom Broadband Group) | Tranche A Term Loan | 504,167 | 1.50% | 3/31/2010 | B1 | Ba3 | BB- |
| Mediacom Illinois, LLC (fka Mediacom Communications, LLC) | Tranche C Term Loan | 5,071,978 | 1.75% | 1/31/2015 | B1 | Ba3 | BB- |
| Merrill Communications LLC | Loan (Second Lien) | 1,000,000 | 6.50% | 11/15/2013 | B1 | B3 | B+ |
| Metro-Goldwyn-Mayer Inc. | Tranche B Term Loan | 7,680,867 | 3.25% | 4/8/2012 | Ba3 | Ba3 | CCC+ |
| Metro-Goldwyn-Mayer Inc. | Tranche B-1 Term Loan | 2,487,500 | 3.25% | 4/8/2012 | Ba3 | Ba3 | CCC+ |
| MetroPCS Wireless, Inc. | New Tranche B Term Loan | 8,910,000 | 2.25% | 11/4/2013 | B2 | Ba3 | B- |
| Mirant North America, LLC | Term Loan | 2,058,185 | 1.75% | 1/3/2013 | B2 | Ba3 | B |
| MultiPlan, Inc. | Term B Loan | 1,432,131 | 2.50% | 4/12/2013 | B2 | B1 | B+ |
| MultiPlan, Inc. | Term Loan | 2,130,562 | 2.50% | 4/12/2013 | B2 | B1 | B+ |
| NES Rentals Holdings, Inc. | Permanent Term Loan (Second-Lien) | 3,000,000 | 6.75% | 7/20/2013 | B3 | Caa1 | B |
| New Aster S.A.R.L. (Flint Group) | Term Loan B9 (USD) | 4,000,000 | 2.25% | 12/31/2012 | Ba3 | Ba3 | B |
| NewPage Corporation | New Term Loan | 2,861,882 | 2.25% | 5/2/2011 | B1 | Ba2 | B |
| Newpark Resources, Inc. | Facility | 2,221,933 | 3.00% | 8/18/2011 | B1 | B2 | B+ |
| Nortek, Inc. | Term Loan | 992,327 | 2.25% | 8/27/2011 | Ba2 | Ba2 | B |
| Northwest Airlines, Inc. | Term Loan | 10,207,000 | 2.00% | 8/21/2013 | B1 | Ba3 | B+ |
| November 2005 Land Investors, LLC (North Las Vegas Consor | Loan (Second Lien) | 1,100,000 | 7.00% | 5/9/2012 | B2 | Caa1 | BB- |
| NRG Energy, Inc. | Credit-Linked Deposit | 1,867,232 | 1.75% | 2/1/2013 | Ba3 | Ba1 | B+ |
| NRG Energy, Inc. | Term Loan | 4,486,460 | 1.75% | 2/1/2013 | Ba3 | Ba1 | B+ |
| NRG Holdings, Inc. | Term Loan | 3,000,000 | 2.50% | 6/8/2014 | Ba3 | B2 | B+ |
| Nuvox, Inc. | Tranche B Term Loan | 997,500 | 3.25% | 5/31/2014 | B2 | B2 | B |
| Orex Carestream Finance LP | Term Loan (First Lien) | 10,000,000 | 2.00% | 4/30/2013 | B1 | Ba2 | B+ |
| Orbitz Worldwide, Inc. | Term Loan | 4,500,000 | 3.00% | 7/25/2014 | B2 | B2 | B |
| OSHKOSH TRUCK CORPORATION | Term B Loan | 2,468,750 | 1.75% | 12/6/2013 | Ba3 | Ba3 | BB |
| OSI Restaurant Partners, LLC | Incremental Term Loan | 5,014,201 | 2.25% | 6/14/2014 | B2 | B1 | B |
| OSI Restaurant Partners, LLC | Pre-Funded RC Loan | 385,159 | 2.25% | 6/14/2013 | B2 | B1 | B |
| PBM Holdings, Inc. | Term Loan | 945,556 | 2.50% | 9/28/2012 | B2 | B1 | B |
| Penton Media, Inc. | Loan (Second Lien) | 2,000,000 | 5.00% | 2/1/2014 | B2 | Caa1 | B |
| Penton Media, Inc. | Term Loan (First Lien) | 1,000,000 | 2.25% | 2/1/2013 | B2 | B2 | B |
| PGT Industries, Inc. | First Lien Tranche A-2 Term Loan | 3,927,789 | 3.00% | 2/14/2012 | B2 | B2 | B |
| Pharmaceutical Holdings Corp. | Loan | 3,900,000 | 3.25% | 1/30/2012 | B2 | B2 | B+ |
| Physiotherapy Associates, Inc. / Benchmark Medical, Inc. | Term Loan | 1,995,000 | 3.00% | 6/28/2013 | B2 | B1 | B |
| Physiotherapy Associates, Inc. / Benchmark Medical, Inc. | Term Loan (Second Lien) | 1,000,000 | 6.50% | 12/31/2013 | B2 | Caa1 | B |
| Pinnacle Foods Finance LLC | Term Loan | 7,980,000 | 2.75% | 4/2/2014 | B3 | B2 | B |
| Polypore, Inc. | US$ Term Loan | 1,995,000 | 2.25% | 7/3/2014 | B3 | Ba3 | B |
| Port Barre Investments, LLC, d/b/a Bobcat Gas Storage | Term B Loan | 1,000,000 | 2.13% | 9/8/2014 | B2 | B2 | B |
| Prestige Brands, Inc. | Tranche B Loan | 584,249 | 2.25% | 4/6/2011 | B1 | Ba3 | Ba3 |
| RCN Corporation | Initial Term Loan | 3,000,000 | 2.25% | 4/25/2014 | B1 | B1 | B- |
| ReAble Therapeutics Finance, LLC (Encore Medical) | Term Loan (New) | 1,980,005 | 2.50% | 11/4/2013 | B3 | B1 | B |
| Realogy Corporation | Delayed Draw Term B Loan (Funded) | 3,000,000 | 3.00% | 10/10/2013 | B3 | Ba3 | B+ |
| Reliant Pharmaceuticals, Inc. | Delayed Draw Term Loan | 833,023 | 3.25% | 3/31/2012 | B2 | B2 | B+ |
| Reliant Pharmaceuticals, Inc. | Initial Term Loan | 3,146,977 | 3.25% | 3/31/2012 | B2 | B2 | B+ |
| Rental Service Corporation | Second Lien Initial Term Loan | 5,178,164 | 3.50% | 11/30/2013 | B2 | B3 | B+ |
| Rexair LLC | First Lien Term Loan | 4,740,983 | 4.25% | 6/30/2010 | B1 | B1 | B |
| Rhodes Companies, LLC, The | First Lien Term Loan | 3,646,528 | 3.50% | 11/21/2010 | B2 | B2 | B |
| Roofing Supply Group, LLC | First Lien Term Loan | 990,000 | 4.00% | 8/24/2013 | B2 | B2 | B |
| Sabre Inc. | Initial Term Loan | 6,802,653 | 2.00% | 9/30/2014 | B2 | B1 | B+ |
| Sally Holdings LLC | Term B Loan | 5,840,000 | 2.50% | 11/18/2013 | B2 | B2 | B |
| Secure Computing Corporation | Term Loan | 1,244,444 | 3.25% | 8/31/2013 | B2 | B2 | B+ |
| Select Medical Corporation | Tranche B Term Loan | 975,000 | 2.00% | 2/24/2012 | B2 | Ba3 | B |
| Smurfit-Stone Container Enterprises, Inc. | Deposit Funded Commitment | 378,430 | -0.10% | 11/1/2010 | B2 | Ba2 | B |
| Smurfit-Stone Container Enterprises, Inc. | Tranche B | 533,785 | 2.00% | 11/1/2011 | B2 | Ba2 | B |
| Smurfit-Stone Container Enterprises, Inc. | Tranche C | 806,309 | 2.00% | 11/1/2011 | B2 | Ba2 | B |
| Solo Cup Company | Term Loan | 903,077 | 3.50% | 2/27/2011 | B3 | B1 | CCC+ |
| Solutia Inc. | Dip Add-on Term Loan B | 2,835,414 | 3.00% | 3/31/2008 | B2 | B3 | BB |
| Solvest, Ltd. (Dole) | Tranche C Term Loan | 696,687 | 2.00% | 4/12/2013 | B2 | Ba3 | B |
| Spirit Aerosystems, Inc. (fka Mid-Western Aircraft Systems,Inc | Term Loan | 6,823,929 | 1.75% | 9/30/2013 | Ba3 | Ba3 | B+ |
| Spirit Finance Corporation | Loan | 10,000,000 | 3.00% | 8/1/2013 | B1 | B2 | BB- |
| Sports Authority, Inc., The | Term Loan B | 3,950,000 | 2.25% | 5/3/2013 | B2 | B2 | B |
| Standard Pacific Corp. | Term Loan B | 1,800,000 | 1.75% | 5/5/2013 | Ba3 | Ba3 | BB |
| Stiefel Laboratories, Inc. | Delayed Draw Term Loan | 1,290,409 | 2.25% | 12/28/2013 | B1 | B1 | B+ |
| Stiefel Laboratories, Inc. | Initial Term Loan (First Lien) | 1,687,091 | 2.25% | 12/28/2013 | B1 | B1 | B+ |
| Stile U.S. Acquisition Corp. (aka Masonite) | US Term Loan | 975,000 | 2.00% | 4/6/2013 | B2 | B1 | B+ |
| Stratos Global Corporation/Stratos Funding LP | Term B Facility | 1,237,500 | 2.75% | 2/13/2012 | B1 | Ba2 | B+ |
| SunGard Data Systems Inc (Solar Capital Corp) | Term Loan B | 2,481,250 | 2.00% | 2/28/2014 | B2 | Ba3 | B+ |
| Sunshine Acquisition Limited (aka HIT Entertainment) | Term Facility | 984,937 | 2.00% | 3/20/2012 | B1 | B1 | B |
| Supervalu Inc. | Term Loan B | 1,970,000 | 1.50% | 6/2/2012 | Ba3 | Ba3 | BBB- |
| Talecris Biotherapeutics Holdings Corp. | First Lien Term Loan | 9,925,000 | 3.50% | 12/6/2013 | B2 | B2 | B+ |
| Tamarack Resort LLC | Tranche A Credit-Linked Deposit | 1,691,549 | -0.10% | 5/19/2011 | B2 | B2 | B+ |
| Tamarack Resort LLC | Tranche B Term Loan | 2,499,264 | 3.25% | 5/19/2011 | B2 | B2 | B+ |
| Targa Resources, Inc. | Synthetic L/C Loan | 1,351,691 | 2.00% | 10/31/2012 | B1 | Ba3 | BB |
| Targa Resources, Inc. | Term Loan | 5,519,403 | 2.00% | 10/31/2012 | B1 | Ba3 | BB |
| Time Warner Telecom Holdings Inc. | Term Loan B Loan | 992,500 | 2.00% | 1/7/2013 | B2 | Ba2 | B |
| Total Safety U.S., Inc. | Tranche B Term Loan (First Lien) | 1,985,000 | 3.00% | 12/8/2012 | B2 | B2 | B |
| Totes Isotoner Corporation | First Lien Term Loan | 995,000 | 2.50% | 1/31/2013 | B2 | B2 | B |
| Totes Isotoner Corporation | Loan (Second Lien) | 2,000,000 | 6.00% | 1/31/2014 | B2 | Caa1 | B |
| Travelport LLC (F/K/A Travelport Inc.) | Delayed Draw Term Loan | 5,596,000 | 2.25% | 8/23/2013 | B2 | Ba3 | B+ |
| Travelport LLC (F/K/A Travelport Inc.) | Original Post-First Amendment and Restater | 420,459 | 2.25% | 8/23/2013 | B2 | Ba3 | B+ |
| Travelport LLC (F/K/A Travelport Inc.) | Tranche B Dollar Term Loan | 3,737,129 | 2.25% | 8/23/2013 | B2 | Ba3 | B+ |
| Tribune Company | Initial Tranche B Advance | 7,581,000 | 3.00% | 5/19/2014 | B1 | Ba3 | B+ |
| Tribune Company | Tranche X Advance | 5,040,000 | 2.50% | 5/18/2009 | B1 | Ba2 | B |
| Triumph Healthcare Second Holdings, LLC | Term Loan (First Lien) | 997,484 | 3.00% | 7/28/2013 | B2 | B2 | B+ |
| Triumph Healthcare Second Holdings, LLC | Term Loan (Second Lien) | 1,000,000 | 8.00% | 7/28/2014 | B2 | Caa1 | B |
| TRU 2005 RE Holding Co. I, LLC | Loan | 6,000,000 | 3.00% | 12/9/2008 | B2 | B2 | B |
| Trump Entertainment Resorts Holdings, L.P. | Term C-1 Facility | 730,344 | 2.50% | 5/20/2012 | B3 | Ba3 | B |
| Trump Entertainment Resorts Holdings, L.P. | Term C-2 Facility | 730,344 | 2.50% | 5/20/2012 | B3 | Ba3 | B |
| Trussway Industries, Inc. | Revolver | 1,000,000 | 2.75% | 5/31/2009 | B2 | B1 | B- |
| Trussway Industries, Inc. | Term Loan | 987,137 | 3.50% | 5/31/2009 | B2 | B1 | B- |
| Tube City IMS Corporation | Credit-Linked Deposit | 108,108 | 2.25% | 1/25/2014 | B1 | Ba3 | B+ |

| Issuer | Asset | Commitment | Spread | Maturity | Moody's DPR | Moody's Obligation Rating | S&P Rating |
|---|---|---|---|---|---|---|---|
| Tube City IMS Corporation | First Lien Term Loan | 887,432 | 2.25% | 1/25/2014 | B1 | Ba3 | B+ |
| United Components, Inc. | Tranche D Term Loan | 493,182 | 2.00% | 6/30/2012 | B3 | Ba3 | B |
| United Rentals, Inc. | Initial Term Loan | 488,782 | 2.00% | 2/14/2011 | B2 | Ba2 | B+ |
| United Rentals, Inc. | Tranche B Credit-Linked Deposit | 223,629 | 2.25% | 2/14/2011 | B2 | Ba2 | B+ |
| Univision Communications Inc. | Delayed Draw Term Loan | 285,235 | 2.25% | 9/29/2014 | B1 | Ba3 | B |
| Univision Communications Inc. | Initial Term Loan | 11,597,315 | 2.25% | 9/29/2014 | B1 | Ba3 | B |
| UPC Financing Partnership | N Facility | 4,000,000 | 1.75% | 12/31/2014 | Ba3 | Ba3 | B |
| US Airways Group, Inc. | Loan | 2,000,000 | 2.50% | 3/23/2014 | B3 | B2 | B- |
| Valleycrest Companies LLC (VCC Holdco II Inc.) | New Term Loan | 4,975,000 | 2.00% | 10/4/2013 | B1 | B1 | B+ |
| Verint Systems Inc. | Term Loan | 4,692,308 | 2.75% | 5/27/2014 | B3 | B3 | B |
| Virgin Media Investment Holdings Limited (fka NTL) | B4 Facility | 2,500,000 | 2.00% | 9/3/2012 | Ba3 | Ba2 | B |
| VML US Finance LLC (aka Venetian Macau) | New Project Term Loan | 500,000 | 2.25% | 5/25/2013 | B1 | B1 | BB- |
| VML US Finance LLC (aka Venetian Macau) | Term B Delayed Draw Project Loan | 1,955,376 | 2.25% | 5/25/2012 | B1 | B1 | BB- |
| VML US Finance LLC (aka Venetian Macau) | Term B Funded Project Loan | 1,644,624 | 2.25% | 5/25/2013 | B1 | B1 | BB- |
| Vought Aircraft Industries, Inc. | Term Loan | 649,412 | 2.50% | 12/22/2011 | B2 | Ba2 | B- |
| WAICCS Las Vegas 3 LLC | Loan (First Lien) | 4,000,000 | 3.50% | 8/1/2008 | B3 | B1 | B |
| WAICCS Las Vegas 3 LLC | Loan (Second Lien) | 1,500,000 | 9.00% | 8/1/2008 | B3 | Caa2 | B |
| Warner Chilcott Company, Inc. | Tranche B Acquisition Date Term Loan | 8,049,025 | 2.00% | 1/18/2012 | B1 | Ba3 | B+ |
| Warner Chilcott Corporation | Tranche C Acquisition Date Term Loan | 2,401,501 | 2.00% | 1/18/2012 | B1 | Ba3 | B+ |
| Water PIK, Inc. | Loan (First Lien) | 3,990,000 | 3.25% | 6/15/2013 | B3 | B1 | B- |
| West Corporation | Term B-2 Loan | 6,935,094 | 2.38% | 10/24/2013 | B2 | B1 | B+ |
| WideOpenWest Finance , LLC | Term Loan (First Lien) | 4,000,000 | 2.50% | 6/30/2014 | B3 | B2 | B- |
| Wimar Opco LLC (Tropicana) | Term Loan | 2,369,112 | 2.25% | 1/3/2012 | B2 | Ba3 | B |
| WM. Bolthouse Farms, Inc. | Second Lien Term Loan | 1,250,000 | 5.50% | 12/16/2013 | B2 | Caa1 | B |
| WM. Bolthouse Farms, Inc. | Term Loan (First Lien) | 5,560,076 | 2.25% | 12/17/2012 | B2 | Ba3 | B |
| WMG Acquisitions Corporation | Term Loan | 2,912,903 | 2.00% | 2/28/2011 | Ba3 | Ba2 | B+ |
| WP Evenflo Acquisition, Inc. | First Lien Term Loan | 1,500,000 | 2.50% | 2/7/2013 | B2 | B1 | B- |
| Yell Group Plc | Facility B1 | 3,000,000 | 2.00% | 10/27/2012 | Ba3 | Ba3 | BB- |
| Yellowstone Mountain Club, LLC | Loan (First Lien) | 4,400,113 | 2.38% | 9/30/2010 | B1 | B1 | B+ |

659,783,813

## SCHEDULE 2

### Moody's Industry Classification Group List

***Aerospace and Defense***: Major Contractor, Subsystems, Research, Aircraft Manufacturing, Arms, Ammunition.

***Automobile***: Automotive Equipment, Auto-Manufacturing, Auto Parts Manufacturing, Personal Use Trailers, Motor Homes, Dealers.

***Banking***: Bank Holding, Savings and Loans, Consumer Credit, Small Loan, Agency, Factoring, Receivables.

***Beverage, Food and Tobacco***: Beer and Ale, Distillers, Wines and Liquors, Distributors, Soft Drink Syrup, Bottling, Bakery, Mill Sugar, Canned Foods, Corn Refiners, Dairy Products, Meat Products, Poultry Products, Snacks, Packaged Foods, Distributors, Candy, Gum, Seafood, Frozen Food, Cigarettes, Cigars, Leaf/Snuff, Vegetable Oil.

***Buildings and Real Estate***: Brick, Cement, Climate Controls, Contracting, Engineering, Construction, Hardware, Forest Products (building-related only), Plumbing, Roofing, Wallboard, Real Estate, Real Estate Development, REITs, Land Development.

***Chemicals, Plastics and Rubber***: Chemicals (non-agriculture), Industrial Gases, Sulfur, Plastics, Plastic Products, Abrasives, Coatings, Paints, Varnish, Fabricating.

***Containers, Packaging and Glass***: Glass, Fiberglass, Containers made of: Glass, Metal, Paper, Plastic, Wood or Fiberglass.

***Personal and Non Durable Consumer Products (Manufacturing Only)***: Soaps, Perfumes, Cosmetics, Toiletries, Cleaning Supplies, School Supplies.

***Diversified/Conglomerate Manufacturing***

***Diversified/Conglomerate Service***

***Diversified Natural Resources, Precious Metals and Minerals***: Fabricating, Distribution, Mining and Sales.

***Ecological***: Pollution Control, Waste Removal, Waste Treatment, Waste Disposal.

***Electronics***: Computer Hardware, Electric Equipment, Components, Controllers, Motors, Household Appliances, Information Service, Communication Systems, Radios, TVs, Tape Machines, Speakers, Printers, Drivers, Technology.

***Finance***: Investment Brokerage, Leasing, Syndication, Securities.

***Farming and Agriculture***: Livestock, Grains, Produce, Agricultural Chemicals, Agricultural Equipment, Fertilizers.

***Grocery***: Grocery Stores, Convenience Food Stores.

***Healthcare, Education and Childcare***: Ethical Drugs, Proprietary Drugs, Research, Health Care Centers, Nursing Homes, HMOs, Hospitals, Hospital Supplies, Medical Equipment.

***Home and Office Furnishings, Housedress, and Durable Consumer Products***: Carpets, Floor Coverings, Furniture, Cooking, Ranges.

***Hotels, Motels, Inns and Gaming***

***Insurance***: Life, Property and Casualty, Broker, Agent, Surety.

***Leisure, Amusement, Entertainment***: Boating, Bowling, Billiards, Musical Instruments, Fishing, Photo Equipment, Records, Tapes, Sports, Outdoor Equipment (camping), Tourism, Resorts, Games, Toy Manufacturing, Motion Picture Production, Theatres, Motion Picture Distribution.

***Machinery (Non-Agriculture, Non-Construction, Non-Electronic)***: Industrial, Machine Tools, Steam Generators.

***Mining, Steel, Iron and Non-Precious Metals***: Coal, Copper, Lead, Uranium, Zinc, Aluminum, Stainless Steel, Integrated Steel, Ore Production, Refractories, Steel Mill Machinery, Mini-Mills, Fabricating, Distribution and Sales.

***Oil and Gas***: Crude Producer, Retailer, Well Supply, Service and Drilling.

***Personal, Food and Miscellaneous***

***Printing and Publishing***: Graphic Arts, Paper, Paper Products, Business Forms, Magazines, Books, Periodicals, Newspapers, Textbooks.

***Cargo Transport***: Rail, Shipping, Railroads, Rail-car Builders, Ship Builders, Containers, Container Builders, Parts, Overnight Mail, Trucking, Truck Manufacturing, Trailer Manufacturing, Air Cargo, Transport.

***Retail Stores***: Apparel, Toy, Variety, Drugs, Department, Mail Order Catalogue, Showroom.

***Structured Finance***

***Telecommunications***: Local, Long Distance, Independent, Telephone, Telegraph, Satellite, Equipment, Research, Cellular.

***Textiles and Leather***: Producer, Synthetic Fiber, Apparel Manufacturer, Leather Shoes.

***Personal Transportation*** Air, Bus, Rail, Car, Rental.

***Utilities***: Electric, Water, Hydro Power, Gas, Diversified.

***Broadcasting and Entertainment***: Recording Industry, Motion Exhibition Theatres, Motion Picture Production and Distribution, Radio, TV, Cable Broadcasting, Broadcasting Equipment.

## SCHEDULE 3

## S&P Industry Classifications

<u>Corporate Obligations</u>

0.  Zero Default Risk
1.  Aerospace & Defense
2.  Air transport
3.  Automotive
4.  Beverage & Tobacco
5.  Radio & Television
6.  Brokerages, Dealers & Investment houses
7.  Building & Development
8.  Business equipment & services
9.  Cable & satellite television
10. Chemical & plastics
11. Clothing/textiles
12. Conglomerates
13. Containers & glass products
14. Cosmetics/toiletries
15. Drugs
16. Ecological services & equipment
17. Electronics/electrical
18. Equipment leasing
19. Farming/agriculture
20. Financial Intermediaries
21. Food/drug retailers
22. Food products
23. Food service
24. Forest products
25. Health care
26. Home furnishings
27. Lodging & casinos
28. Industrial equipment
29. Insurance
30. Leisure goods/activities/movies
31. Nonferrous metals/minerals
32. Oil & gas
33. Publishing
34. Rail Industries
35. Retailers (except food & drug)
36. Steel
37. Surface transport
38. Telecommunications
39. Utilities

Corporate Structured Obligations

50.    CDOs

Structured Obligations

51.    ABS Consumer
52.    ABS Commercial
53.    CMBS Diversified (Conduit and CTL)
54.    CMBS (Large Loan, Single Borrower, and Single Property)
55.    REITs and REOCs
56.    RMBS A
57.    RMBS B&C, HELs, HELOCs, and Tax Lien
58.    Manufactured Housing
59.    U.S. Agency (Explicitly Guaranteed)
60.    Monoline/FER Guaranteed
61.    Non-FER Company Guaranteed
62.    FFELP Student Loans (Over 70% FFELP)
63.    CLO of SME's

US318495

## SCHEDULE 4

### Diversity Score Calculation

The Diversity Score for the Collateral Obligations is calculated by summing each of the Industry Diversity Scores, which are calculated as follows

(i)     An ***Obligor Par Amount*** is calculated for each obligor represented in the Collateral Obligations (other than Defaulted Collateral Obligations) by summing the par amounts of all Collateral Obligations in the Collateral (other than Defaulted Collateral Obligations) issued by that obligor or any Affiliate of that obligor (other than obligors that the Servicer reasonably determines are Affiliated but are not dependent upon one another for credit support and are not dependent upon a Person by which they are commonly controlled for credit support).

(ii)    An ***Average Par Amount*** is calculated by summing the Obligor Par Amounts and dividing by the number of obligors represented.  For purposes of calculating the number of issuers of the Collateral Obligations (other than Defaulted Collateral Obligations), any issuers Affiliated with one another shall be considered one issuer (other than obligors that the Servicer reasonably determines are Affiliated but are not dependent upon one another for credit support and are not dependent upon a Person by which they are commonly controlled for credit support).

(iii)   An ***Equivalent Unit Score*** is calculated for each obligor represented in the Collateral Obligations (other than Defaulted Collateral Obligations) by taking the lesser of (A) one and (B) the Obligor Par Amount for the obligor **divided by** the Average Par Amount.  For purposes of calculating the Equivalent Unit Score, any issuers Affiliated with one another shall be considered one issuer (other than obligors that the Servicer reasonably determines are Affiliated but are not dependent upon one another for credit support and are not dependent upon a Person by which they are commonly controlled for credit support).

(iv)    An ***Aggregate Industry Equivalent Unit Score*** is then calculated for each of the Moody's industrial classification groups by summing the Equivalent Unit Scores for each obligor in the industry.

(v)     An ***Industry Diversity Score*** is then established by reference to the Diversity Score Table shown below for the related Aggregate Industry Equivalent Unit Score.  If any Aggregate Industry Equivalent Unit Score falls between any two the scores then the applicable Industry Diversity Score shall be the lower of the two Industry Diversity Scores in the Diversity Score Table.

The Diversity Score for any Structured Finance Obligation that is (i) a collateralized loan obligation, (ii) any Synthetic Security with respect to which the Reference Obligation is a collateralized loan obligation or (iii) any Synthetic Security based upon or relating to a senior secured index providing non-leveraged credit exposure to a basket of credit default

swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time, is equal to zero.

## DIVERSITY SCORE TABLE

| Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score |
|---|---|---|---|---|---|---|---|
| 0.0000 | 0.0000 | 5.0500 | 2.7000 | 10.1500 | 4.0200 | 15.2500 | 4.5300 |
| 0.0500 | 0.1000 | 5.1500 | 2.7333 | 10.2500 | 4.0300 | 15.3500 | 4.5400 |
| 0.1500 | 0.2000 | 5.2500 | 2.7667 | 10.3500 | 4.0400 | 15.4500 | 4.5500 |
| 0.2500 | 0.3000 | 5.3500 | 2.8000 | 10.4500 | 4.0500 | 15.5500 | 4.5600 |
| 0.3500 | 0.4000 | 5.4500 | 2.8333 | 10.5500 | 4.0600 | 15.6500 | 4.5700 |
| 0.4500 | 0.5000 | 5.5500 | 2.8667 | 10.6500 | 4.0700 | 15.7500 | 4.5800 |
| 0.5500 | 0.6000 | 5.6500 | 2.9000 | 10.7500 | 4.0800 | 15.8500 | 4.5900 |
| 0.6500 | 0.7000 | 5.7500 | 2.9333 | 10.8500 | 4.0900 | 15.9500 | 4.6000 |
| 0.7500 | 0.8000 | 5.8500 | 2.9667 | 10.9500 | 4.1000 | 16.0500 | 4.6100 |
| 0.8500 | 0.9000 | 5.9500 | 3.0000 | 11.0500 | 4.1100 | 16.1500 | 4.6200 |
| 0.9500 | 1.0000 | 6.0500 | 3.0250 | 11.1500 | 4.1200 | 16.2500 | 4.6300 |
| 1.0500 | 1.0500 | 6.1500 | 3.0500 | 11.2500 | 4.1300 | 16.3500 | 4.6400 |
| 1.1500 | 1.1000 | 6.2500 | 3.0750 | 11.3500 | 4.1400 | 16.4500 | 4.6500 |
| 1.2500 | 1.1500 | 6.3500 | 3.1000 | 11.4500 | 4.1500 | 16.5500 | 4.6600 |
| 1.3500 | 1.2000 | 6.4500 | 3.1250 | 11.5500 | 4.1600 | 16.6500 | 4.6700 |
| 1.4500 | 1.2500 | 6.5500 | 3.1500 | 11.6500 | 4.1700 | 16.7500 | 4.6800 |
| 1.5500 | 1.3000 | 6.6500 | 3.1750 | 11.7500 | 4.1800 | 16.8500 | 4.6900 |
| 1.6500 | 1.3500 | 6.7500 | 3.2000 | 11.8500 | 4.1900 | 16.9500 | 4.7000 |

| Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score |
|---|---|---|---|---|---|---|---|
| 1.7500 | 1.4000 | 6.8500 | 3.2250 | 11.9500 | 4.2000 | 17.0500 | 4.7100 |
| 1.8500 | 1.4500 | 6.9500 | 3.2500 | 12.0500 | 4.2100 | 17.1500 | 4.7200 |
| 1.9500 | 1.5000 | 7.0500 | 3.2750 | 12.1500 | 4.2200 | 17.2500 | 4.7300 |
| 2.0500 | 1.5500 | 7.1500 | 3.3000 | 12.2500 | 4.2300 | 17.3500 | 4.7400 |
| 2.1500 | 1.6000 | 7.2500 | 3.3250 | 12.3500 | 4.2400 | 17.4500 | 4.7500 |
| 2.2500 | 1.6500 | 7.3500 | 3.3500 | 12.4500 | 4.2500 | 17.5500 | 4.7600 |
| 2.3500 | 1.7000 | 7.4500 | 3.3750 | 12.5500 | 4.2600 | 17.6500 | 4.7700 |
| 2.4500 | 1.7500 | 7.5500 | 3.4000 | 12.6500 | 4.2700 | 17.7500 | 4.7800 |
| 2.5500 | 1.8000 | 7.6500 | 3.4250 | 12.7500 | 4.2800 | 17.8500 | 4.7900 |
| 2.6500 | 1.8500 | 7.7500 | 3.4500 | 12.8500 | 4.2900 | 17.9500 | 4.8000 |
| 2.7500 | 1.9000 | 7.8500 | 3.4750 | 12.9500 | 4.3000 | 18.0500 | 4.8100 |
| 2.8500 | 1.9500 | 7.9500 | 3.5000 | 13.0500 | 4.3100 | 18.1500 | 4.8200 |
| 2.9500 | 2.0000 | 8.0500 | 3.5250 | 13.1500 | 4.3200 | 18.2500 | 4.8300 |
| 3.0500 | 2.0333 | 8.1500 | 3.5500 | 13.2500 | 4.3300 | 18.3500 | 4.8400 |
| 3.1500 | 2.0667 | 8.2500 | 3.5750 | 13.3500 | 4.3400 | 18.4500 | 4.8500 |
| 3.2500 | 2.1000 | 8.3500 | 3.6000 | 13.4500 | 4.3500 | 18.5500 | 4.8600 |
| 3.3500 | 2.1333 | 8.4500 | 3.6250 | 13.5500 | 4.3600 | 18.6500 | 4.8700 |
| 3.4500 | 2.1667 | 8.5500 | 3.6500 | 13.6500 | 4.3700 | 18.7500 | 4.8800 |
| 3.5500 | 2.2000 | 8.6500 | 3.6750 | 13.7500 | 4.3800 | 18.8500 | 4.8900 |
| 3.6500 | 2.2333 | 8.7500 | 3.7000 | 13.8500 | 4.3900 | 18.9500 | 4.9000 |
| 3.7500 | 2.2667 | 8.8500 | 3.7250 | 13.9500 | 4.4000 | 19.0500 | 4.9100 |
| 3.8500 | 2.3000 | 8.9500 | 3.7500 | 14.0500 | 4.4100 | 19.1500 | 4.9200 |
| 3.9500 | 2.3333 | 9.0500 | 3.7750 | 14.1500 | 4.4200 | 19.2500 | 4.9300 |

US318495

| Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score | Aggregate Industry Equivalent Unit Score | Diversity Score |
|---|---|---|---|---|---|---|---|
| 4.0500 | 2.3667 | 9.1500 | 3.8000 | 14.2500 | 4.4300 | 19.3500 | 4.9400 |
| 4.1500 | 2.4000 | 9.2500 | 3.8250 | 14.3500 | 4.4400 | 19.4500 | 4.9500 |
| 4.2500 | 2.4333 | 9.3500 | 3.8500 | 14.4500 | 4.4500 | 19.5500 | 4.9600 |
| 4.3500 | 2.4667 | 9.4500 | 3.8750 | 14.5500 | 4.4600 | 19.6500 | 4.9700 |
| 4.4500 | 2.5000 | 9.5500 | 3.9000 | 14.6500 | 4.4700 | 19.7500 | 4.9800 |
| 4.5500 | 2.5333 | 9.6500 | 3.9250 | 14.7500 | 4.4800 | 19.8500 | 4.9900 |
| 4.6500 | 2.5667 | 9.7500 | 3.9500 | 14.8500 | 4.4900 | 19.9500 | 5.0000 |
| 4.7500 | 2.6000 | 9.8500 | 3.9750 | 14.9500 | 4.5000 | | |
| 4.8500 | 2.6333 | 9.9500 | 4.0000 | 15.0500 | 4.5100 | | |
| 4.9500 | 2.6667 | 10.0500 | 4.0100 | 15.1500 | 4.5200 | | |

US318495

## SCHEDULE 5

### Moody's Structured Finance Obligation Recovery Rates

The Moody's Recovery Rate for a Structured Finance Obligation will be the applicable rate set forth below based on the appropriate sector as categorized by Moody's

**Diversified Securities** primarily include (1) Automobile Securities; (2) Car Rental Receivable Securities; (3) Credit Card Securities; (4) Student Loan Securities

**Residential Securities** primarily include (1) Home Equity Loan Securities; (2) Manufactured Housing Securities; (3) Residential A Mortgage Securities; (4) Residential B/C Mortgage Securities

**Undiversified Securities** primarily include (1) CMBS Conduit; (2) CMBS Credit Tenant Lease; (3) CMBS Large Loan; (4) those ABS Sectors not included in Diversified Securities

**Collateralized Debt Obligations** include (1) High-diversity CDOs (Diversity Score in excess of 20); (2) Low-Diversity CDOs (Diversity Score of 20 or less)

### Diversified Securities

| % of Underlying Capital Structure (1) | Initial Rating of Structured Finance Obligation | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 85% | 80% | 70% | 60% | 50% | 40% |
| <=70% >10% | 75% | 70% | 60% | 50% | 40% | 30% |
| <=10% | 70% | 65% | 55% | 45% | 35% | 25% |

**Residential Securities**

| % of Underlying Capital Structure (1) | Initial Rating of Structured Finance Obligation | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 85% | 80% | 65% | 55% | 45% | 30% |
| <=70% >10% | 75% | 70% | 55% | 45% | 35% | 25% |
| <=10% >5% | 65% | 55% | 45% | 40% | 30% | 20% |
| <=5% >2% | 55% | 45% | 40% | 35% | 25% | 15% |
| <=2% | 45% | 35% | 30% | 25% | 15% | 10% |

**Undiversified Securities**

| % of Underlying Capital Structure (1) | Initial Rating of Structured Finance Obligation | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 85% | 80% | 65% | 55% | 45% | 30% |
| <=70% >10% | 75% | 70% | 55% | 45% | 35% | 25% |
| <=10% >5% | 65% | 55% | 45% | 35% | 25% | 15% |
| <=5% >2% | 55% | 45% | 35% | 30% | 20% | 10% |
| <=2% | 45% | 35% | 25% | 20% | 10% | 5% |

**High Diversity Collateralized Debt Obligations**

| % of Underlying Capital Structure (1) | Initial Rating of Underlying Asset | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 85% | 80% | 65% | 55% | 45% | 30% |
| <=70% >10% | 75% | 70% | 60% | 50% | 40% | 25% |
| <=10% >5% | 65% | 55% | 50% | 40% | 30% | 20% |
| <=5% >2% | 55% | 45% | 40% | 35% | 25% | 10% |
| <=2% | 45% | 35% | 30% | 25% | 10% | 5% |

**Low Diversity Collateralized Debt Obligations**

| % of Underlying Capital Structure (1) | Initial Rating of Underlying Asset | | | | | |
|---|---|---|---|---|---|---|
| | Aaa | Aa | A | Baa | Ba | B |
| >70% | 80% | 75% | 60% | 50% | 45% | 30% |
| <=70% >10% | 70% | 60% | 55% | 45% | 35% | 25% |
| <=10% >5% | 60% | 50% | 45% | 35% | 25% | 15% |
| <=5% >2% | 50% | 40% | 35% | 30% | 20% | 10% |
| <=2% | 30% | 25% | 20% | 15% | 7% | 4% |

(1) Initial par amount of tranche to which Structured Finance Obligation relates **divided by** initial par amount of total securities issued by Structured Finance Obligation issuer.

# SCHEDULE 6

## S&P Structured Finance Obligation Recovery Rates*

|  | RATING OF A CLASS OF NOTES AT THE TIME OF COMMITMENT TO PURCHASE | | | | | | |
|---|---|---|---|---|---|---|---|
| **Structured Finance Obligation Rating\*** | | | | | | | |
| Senior Asset Class | AAA | AA | A | BBB | BB | B | CCC |
| AAA | 80.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| AA | 70.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% | 90.0% |
| A | 60.0% | 65.0% | 75.0% | 85.0% | 90.0% | 90.0% | 90.0% |
| BBB | 50.0% | 55.0% | 65.0% | 75.0% | 85.0% | 85.0% | 85.0% |
| | | | | | | | |
| Junior Asset Class | | | | | | | |
| | AAA | AA | A | BBB | BB | B | CCC |
| AAA | 65.0% | 70.0% | 80.0% | 85.0% | 85.0% | 85.0% | 85.0% |
| AA | 55.0% | 65.0% | 75.0% | 80.0% | 80.0% | 80.0% | 80.0% |
| A | 40.0% | 45.0% | 55.0% | 65.0% | 80.0% | 80.0% | 80.0% |
| BBB | 30.0% | 35.0% | 40.0% | 45.0% | 50.0% | 60.0% | 70.0% |
| BB | 10.0% | 10.0% | 10.0% | 25.0% | 35.0% | 40.0% | 50.0% |
| B | 2.5% | 5.0% | 5.0% | 10.0% | 10.0% | 20.0% | 25.0% |
| CCC | 0.0% | 0.0% | 0.0% | 0.0% | 2.5% | 5.0% | 5.0% |

\*       If the Structured Finance Obligation is (x) a collateralized debt obligation backed by project finance securities, asset-backed securities, structured finance or real estate securities, distressed debt or other collateralized debt obligations; (y) a market value collateralized debt obligation; or (z) a synthetic collateralized debt obligation, the recovery rate will be assigned by S&P at the time of acquisition.

## SCHEDULE 7

### Certain Defined Terms Relating to S&P Rating and Moody's Rating

*Assigned Moody's Rating*: The monitored publicly available rating or the monitored estimated rating expressly assigned to a debt obligation (or facility) by Moody's that addresses the full amount of the principal and interest promised.

*Moody's Default Probability Rating*: With respect to any Collateral Obligation as of any date of determination, the rating determined in accordance with the following, in the following order of priority

(a)     with respect to a Moody's Senior Secured Loan:

     (i)   if the Loan's obligor has a corporate family rating from Moody's, such corporate family rating; and

     (ii)  if the preceding clause does not apply, the Moody's Obligation Rating of such Loan;

     (iii) if the preceding clauses do not apply, the rating that is one subcategory above the Moody's Equivalent Senior Unsecured Rating;

(b)     with respect to a Moody's Non Senior Secured Loan or a Bond, the Moody's Equivalent Senior Unsecured Rating of such Collateral Obligation;

(c)     with respect to a Collateral Obligation that is a DIP Loan, the rating that is one rating subcategory below the Assigned Moody's Rating thereof;

(d)     with respect to a Structured Finance Obligation, the Assigned Moody's Rating thereof or, if the obligation does not have an Assigned Moody's Rating but has a rating by S&P, then the Moody's Default Probability Rating shall be

     (i)   one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher, or

     (ii)  two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower; and

(e)     with respect to a Synthetic Security, the Assigned Moody's Rating thereof.

Notwithstanding the foregoing, if the Moody's rating or ratings used to determine the Moody's Default Probability Rating are on watch for downgrade or upgrade by Moody's, such rating or ratings will be adjusted down (if on watch for downgrade) (i) with respect to any Collateral Obligation other than Structured Finance Obligations, one subcategory and (ii) with respect to any Structured Finance Obligation, two subcategories or adjusted up (if on watch for upgrade) (i) with respect to any Collateral Obligation other than

Structured Finance Obligations, one subcategory and (ii) with respect to any Structured Finance Obligation, two subcategories. For purposes of any calculation under this Indenture, if a Moody's Default Probability Rating is withdrawn by Moody's with respect to a Collateral Obligation, the Issuer will continue using the latest Moody's Default Probability Rating available immediately prior to such withdrawal until a bankruptcy event occurs with respect to such Collateral Obligation.

***Moody's Equivalent Senior Unsecured Rating***: With respect to any Collateral Obligation that is a Loan or bond and the obligor thereof, as of any date of determination, the rating determined in accordance with the following, in the following order of priority

(a)    if the obligor has a senior unsecured obligation with an Assigned Moody's Rating, such Assigned Moody's Rating;

(b)    if the preceding clause does not apply, the Moody's "Issuer Rating" for the obligor;

(c)    if the preceding clauses do not apply, but the obligor has a subordinated obligation with an Assigned Moody's Rating, then

(i)    if such Assigned Moody's Rating is at least "B3" (and, if rated "B3", not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one rating subcategory higher than such Assigned Moody's Rating, or

(ii)    if such Assigned Moody's Rating is less than "B3" (or rated "B3" and on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be such Assigned Moody's Rating;

(d)    if the preceding clauses do not apply, but the obligor has a senior secured obligation with an Assigned Moody's Rating, then

(i)    if such Assigned Moody's Rating is at least "Caa3" (and, if rated "Caa3", not on watch for downgrade), the Moody's Equivalent Senior Unsecured Rating shall be the rating which is one subcategory below such Assigned Moody's Rating, or

(ii)    if such Assigned Moody's Rating is less than "Caa3" (or rated "Caa3" and on watch for downgrade), then the Moody's Equivalent Senior Unsecured Rating shall be "C";

(e)    if the preceding clauses do not apply, but such obligor has a corporate family rating from Moody's, the Moody's Equivalent Senior Unsecured Rating shall be one rating subcategory below such corporate family rating;

(f)    if the preceding clauses do not apply, but the obligor has a senior unsecured obligation (other than a bank loan) with a monitored public rating from S&P

(without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), then the Moody's Equivalent Senior Unsecured Rating shall be

    (i)  one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher,

    (ii)  two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower; or

    (iii)  "B3" until the Issuer or the Servicer obtains an estimated rating from Moody's if (A) the Servicer certifies to the Trustee that in its commercially reasonable judgment, it believes an estimated rating equivalent to a rating no lower than "B3" will be assigned by Moody's and the Issuer or the Servicer on its behalf applies for an estimated rating from Moody's within five Business Days of the date of the commitment to purchase the Loan or Bond, (B) the aggregate Principal Balance of Collateral Obligations having an Assigned Moody's Rating pursuant to either this clause (f)(iii), or clause (g)(iii) or (h)(iii) does not exceed 5% of the Maximum Amount, and (C) all the Coverage Tests and the Collateral Quality Tests are satisfied;

(g)    if the preceding clauses do not apply, but the obligor has a subordinated obligation (other than a bank loan) with a monitored public rating from S&P (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the Assigned Moody's Rating shall be deemed to be

    (i)  one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher;

    (ii)  two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower, and the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (c) above; or

    (iii)  "B3" until the Issuer or the Servicer obtains an estimated rating from Moody's if (A) the Servicer certifies to the Trustee that in its commercially reasonable judgment, it believes an estimated rating equivalent to a rating not lower than "B3" will be assigned by Moody's and the Issuer or the Servicer on its behalf applies for an estimated rating from Moody's within five Business Days of the date of the commitment to purchase the Loan or Bond, (B) the aggregate Principal Balance of Collateral Obligations having an Assigned Moody's Rating pursuant to either this clause (g)(iii), or clauses (f)(iii) or (h)(iii) does not exceed 5% of the Maximum Amount, and (C) all the Coverage Tests and the Collateral Quality Tests are satisfied;

(h)    if the preceding clauses do not apply, but the obligor has a senior secured obligation with a monitored public rating from S&P (without any postscripts, asterisks or other qualifying notations, that addresses the full amount of principal and interest promised), the Assigned Moody's Rating shall be deemed to be

    (i)    one rating subcategory below the Moody's equivalent of such S&P rating if it is "BBB–" or higher;

    (ii)    two rating subcategories below the Moody's equivalent of such S&P rating if it is "BB+" or lower, and the Moody's Equivalent Senior Unsecured Rating shall be determined pursuant to clause (d) above; or

    (iii)    "B3" until the Issuer or the Servicer obtains an estimated rating from Moody's if (A) the Servicer certifies to the Trustee that in its commercially reasonable judgment, it believes an estimated rating equivalent to a rating not lower than "B3" will be assigned by Moody's and the Issuer or the Servicer on its behalf applies for an estimated rating from Moody's within two Business Days of the date of the commitment to purchase the Loan or Bond, (B) the aggregate Principal Balance of Collateral Obligations having an Assigned Moody's Rating pursuant to either this clause (h)(iii), or clauses (f)(iii) or (g)(iii) does not exceed 5% of the Maximum Amount, and (C) all the Coverage Tests and the Collateral Quality Tests are satisfied;

(i)    if the preceding clauses do not apply and each of the following clauses (i) through (viii) do apply, the Moody's Equivalent Senior Unsecured Rating will be "Caa1"

    (i)    neither the obligor nor any of its Affiliates is subject to reorganization or bankruptcy proceedings,

    (ii)    no debt securities or obligations of the obligor are in default,

    (iii)    neither the obligor nor any of its Affiliates has defaulted on any debt during the preceding two years,

    (iv)    the obligor has been in existence for the preceding five years,

    (v)    the obligor is current on any cumulative dividends,

    (vi)    the fixed-charge ratio for the obligor exceeds 125% for each of the preceding two fiscal years and for the most recent quarter,

    (vii)    the obligor had a net profit before tax in the past fiscal year and the most recent quarter, and

(ix) the annual financial statements of such obligor are unqualified and certified by a firm of Independent accountants of international reputation, and quarterly statements are unaudited but signed by a corporate officer;

(j) if the preceding clauses do not apply but each of the following clauses (i) and (ii) do apply, the Moody's Equivalent Senior Unsecured Rating will be "Caa3"

(i) neither the obligor nor any of its Affiliates is subject to reorganization or bankruptcy proceedings; and

(ii) no debt security or obligation of such obligor has been in default during the past two years; and

(k) if the preceding clauses do not apply and a debt security or obligation of the obligor has been in default during the past two years, the Moody's Equivalent Senior Unsecured Rating will be "Ca."

Notwithstanding the foregoing, not more than 10% of the Maximum Amount may consist of Relevant Obligations given a Moody's Equivalent Senior Unsecured Rating based on a rating given by S&P as provided in clauses (f), (g) and (h) above.

***Moody's Obligation Rating***: With respect to any Collateral Obligation as of any date of determination, the rating determined in accordance with the following, in the following order of priority

(a) With respect to a Moody's Senior Secured Loan

(i) if it has an Assigned Moody's Rating, such Assigned Moody's Rating; or

(ii) if the preceding clause does not apply, the rating that is one rating subcategory above the Moody's Equivalent Senior Unsecured Rating; and

(b) With respect to a Moody's Non Senior Secured Loan or a Bond

(i) if it has an Assigned Moody's Rating, such Assigned Moody's Rating; or

(ii) if the preceding clause does not apply, the Moody's Equivalent Senior Unsecured Rating; and

(c) With respect to a Synthetic Security or a DIP Loan, the Assigned Moody's Rating thereof.

Notwithstanding the foregoing, if the Moody's rating or ratings used to determine the Moody's Obligation Rating are on watch for downgrade or upgrade by Moody's, such rating or ratings will be adjusted down one subcategory (if on watch for downgrade) or up one subcategory (if on watch for upgrade).

***Moody's Rating***: The Moody's Default Probability Rating; **provided** that, with respect to the Collateral Obligations generally, if at any time Moody's or any successor to it ceases to provide rating services, references to rating categories of Moody's in this Indenture shall be deemed instead to be references to the equivalent categories of any other nationally recognized investment rating agency selected by the Servicer, as of the most recent date on which such other rating agency and Moody's published ratings for the type of security in respect of which such alternative rating agency is used. If no other security or obligation of the Borrower or its Guarantor is rated by S&P or Moody's, then the Servicer may apply to Moody's for a Moody's credit rating estimate, which will be its Moody's Rating; **provided** that, on or prior to each one-year anniversary of the acquisition of any such Collateral Obligation, the Issuer shall submit to Moody's a request for a Moody's credit rating estimate for such Collateral Obligation, which shall be its Moody's Rating, together with all information reasonably required by Moody's to perform such estimate.

***S&P Rating***: With respect to any Collateral Obligation, as of any date of determination, the rating determined in accordance with the following methodology

  (i) If there is an issuer credit rating of the borrower of the Collateral Obligation (the ***Borrower***), or the guarantor who unconditionally and irrevocably guarantees the Collateral Obligation (the ***Guarantor***) by S&P, the most current issuer credit rating for such Borrower or Guarantor (**provided** that with respect to any private or confidential rating, a consent has been granted by such Borrower or Guarantor and a copy of such consent shall be provided to S&P indicating that the issuer can rely on such private or confidential rating);

  (ii) (a) if there is not an issuer credit rating of the Borrower or its Guarantor by S&P, but there is a rating by S&P on a senior secured obligation of the Borrower or its Guarantor, then the S&P Rating of the Collateral Obligation will be one subcategory below such rating; (b) if there is not a rating by S&P on a senior secured obligation of the Borrower or its Guarantor, but there is a rating by S&P on a senior unsecured obligation of the Borrower or its Guarantor, then the S&P Rating will be such rating; and (c) if there is not a rating by S&P on a senior obligation of the Borrower or its Guarantor, but there is a rating by S&P on a subordinated obligation of the Borrower or its Guarantor, then the S&P Rating will be two subcategories above such rating if such rating is "BBB-" or higher and will be one subcategory above such rating if such rating is "BB+" or lower (**provided** that with respect to any private or confidential rating, a consent has been granted by such Borrower or Guarantor and a copy of such consent shall be provided to S&P indicating that the issuer can rely on such private or confidential rating); or

  (iii) if there is neither an issuer credit rating of the Borrower or its Guarantor by S&P nor a rating by S&P on an obligation of the Borrower or its

Guarantor, then the S&P Rating may be determined using any one of the methods below

(A)    if an obligation of the Borrower or its Guarantor is publicly rated by Moody's, then the S&P Rating will be determined in accordance with the methodologies for establishing the Moody's Default Probability Rating, except that the S&P Rating of such obligation will be (1) one subcategory below the S&P equivalent of the rating assigned by Moody's if such security is rated "Baa3" or higher by Moody's and (2) two subcategories below the S&P equivalent of the rating assigned by Moody's if such security is rated "Bal" or lower by Moody's; **provided** that Collateral Obligations constituting no more than 10% of the Maximum Amount may be given a S&P Rating based on a rating given by Moody's as provided in this subclause (a) (after giving effect to the addition of the relevant Collateral Obligation, if applicable);

(B)    if no other security or obligation of the Borrower or its Guarantor is rated by S&P or Moody's, then the Servicer may apply to S&P for a S&P credit rating estimate, which will be its S&P Rating; **provided** that, prior to or on acquisition of any such Collateral Obligation and on or prior to each one year anniversary of the acquisition of such Collateral Obligation, the Issuer shall submit to S&P a request for a S&P credit rating estimate for such Collateral Obligation, which shall be its S&P Rating, together with all information reasonably required by S&P to perform such estimate; or

(C)    if such Collateral Obligation is not rated by Moody's or S&P, no other security or obligation of the Borrower or its Guarantor is rated by S&P or Moody's and if the Servicer determines in its sole discretion based on information available to it after reasonable inquiry that such Borrower (1) is not subject to any bankruptcy or reorganization proceedings nor in default on any of its obligations (unless the subject of a good faith business dispute), (2) is a legally constituted corporate entity having the minimum legal, financial and operational infrastructure to carry on a definable business, deliver and sell a product or service and report its results in generally accepted accounting terms as verified by a reputable audit firm and (3) is not so vulnerable to adverse business, financial and economic conditions that default in its financial or other obligations is foreseeable in the near term if current operating trends continue, then the S&P Rating will be the rating determined by the Servicer, using its commercially reasonable judgment, to be applicable for such Collateral Obligation during such time as the credit estimate is pending; **provided** that (x) if the Issuer submits

all information reasonably required by S&P to perform such estimate within 30 days upon acquisition of any such Collateral Obligation, the aforementioned rating determined by the Servicer will apply until S&P assigns a different rating, (y) if the Issuer does not submits all information reasonably required by S&P to perform such estimate within 30 days upon acquisition of any such Collateral Obligation and if, upon the 90th day following the acquisition of such Collateral Obligation (which 90-day period will be extended by S&P upon request by the Servicer so long as the Servicer has applied to S&P for a S&P credit rating and has provided all the information necessary for S&P to provide a credit rating to such Collateral Obligation prior to or upon acquisition of the such Collateral Obligation), S&P has not assigned a credit rating to such Collateral Obligation, then such Collateral Obligation shall be treated by the Issuer as having a rating of "CCC-" and (z) Collateral Obligations constituting no more than 5% of the Maximum Amount may be given an S&P Rating based on this subclause (c) (after giving effect to the addition of the relevant Collateral Obligation, if applicable);

**provided** that if (i) the relevant Borrower or Guarantor or obligation is placed on any positive "credit watch" list by S&P, such rating will be increased by one rating subcategory or (ii) the relevant Borrower or Guarantor or obligation is placed on any negative "credit watch" list by S&P, such rating will be decreased by one rating subcategory.

Notwithstanding the foregoing, in the case of a Collateral Obligation that is a DIP Loan, the S&P Rating shall be (A) the rating assigned thereto by S&P if the rating is public, (B) the rating assigned by S&P if the rating is confidential, but only if all appropriate parties have provided written consent to its disclosure and use, (C) the rating assigned by S&P thereto through an estimated rating or (D) the rating assigned thereto by S&P in connection with the acquisition thereof upon the request of the Servicer. In the case of a Collateral Obligation that is a PIK Security, Structured Finance Obligation or Synthetic Securities, the S&P Rating may not be determined pursuant to clause (iii)(A) above.

S&P Ratings for entities or obligations relevant hereunder other than Borrowers and Collateral Obligations shall be determined in a corresponding manner.

**EXHIBIT A**

**Form of Note**

## EXHIBIT B-1

## Form of Note Transferee Certificate

## EXHIBIT B-2

**Form of Note Transferor Certificate for Regulation S to Rule 144A Transfer**

**EXHIBIT B-3**

**Form of Note Transferor Certificate for Rule 144A to Regulation S Transfer**

# EXHIBIT C

## Form of Freshfields Bruckhaus Deringer LLP Opinion

# EXHIBIT D

## Form of Maples and Calder Opinion

# EXHIBIT E

## Form of Nixon Peabody LLP Opinion

**EXHIBIT F**

**Form of Orrick, Herrington & Sutcliffe LLP Opinion**

# EXHIBIT G

## Forms of Section 3(c)(7) Notices

# EXHIBIT G-1

## Form of Section 3(c)(7) Reminder Notice

**EXHIBIT G-2**

**Form of Important Section 3(c)(7) Reminder Notice**

**EXHIBIT H**

**Form of Beneficial Owner Certificate**

**EXHIBIT I**

**Form of Extension Notice**

US318495

## EXHIBIT J

## Form of Insurer Notice

US318495

*EXECUTION VERSION*
*1295285 v14*

---

VALHALLA CLO, LTD.,

Issuer

VALHALLA CLO, INC.,

Co-Issuer

and

JPMORGAN CHASE BANK,

Trustee and Securities Intermediary

INDENTURE

Dated as of

August 18, 2004

---

Table of Contents

Page

ARTICLE I
DEFINITIONS; INTERPRETATION AND ASSUMPTION

| | | |
|---|---|---|
| SECTION 1.1 | Definitions | 3 |
| SECTION 1.2 | Interpretation | 3 |
| SECTION 1.3 | Assumptions as to Eligible Investments and the Swap Agreement | 4 |

ARTICLE II
THE NOTES

| | | |
|---|---|---|
| SECTION 2.1 | Forms Generally | 5 |
| SECTION 2.2 | Form of Notes and Certificate of Authentication | 5 |
| SECTION 2.3 | Authorized Amount; Maturity Date; Classification and Priority of Notes; Interest Rate; and Denomination | 7 |
| SECTION 2.4 | Issuance of Securities | 8 |
| SECTION 2.5 | Book-Entry Securities | 9 |
| SECTION 2.6 | Registration of Transfer and Exchange of Securities; Restriction on Transfer | 12 |
| SECTION 2.7 | Mutilated, Destroyed, Lost or Stolen Notes | 25 |
| SECTION 2.8 | Payments on the Notes | 26 |
| SECTION 2.9 | Persons Deemed Owners | 29 |
| SECTION 2.10 | Cancellation of Notes | 29 |
| SECTION 2.11 | Swap Counterparty, Reference Portfolio Manager and Initial Purchaser as Noteholders | 29 |
| SECTION 2.12 | Treatment of Senior Notes | 29 |
| SECTION 2.13 | No Gross Up | 30 |
| SECTION 2.14 | Redemption of Notes | 30 |
| SECTION 2.15 | Maturity; Extension of Maturity | 31 |
| SECTION 2.16 | Class Q-1 Securities | 33 |
| SECTION 2.17 | Class Q-2 Securities | 37 |

ARTICLE III
CONDITIONS PRECEDENT TO THE ISSUANCE OF SECURITIES

| | | |
|---|---|---|
| SECTION 3.1 | Conditions Precedent | 47 |
| SECTION 3.2 | Security for the Notes | 49 |
| SECTION 3.3 | Custodianship; Delivery of Eligible Investments | 50 |
| SECTION 3.4 | The Swap Agreement | 51 |

i

Page

ARTICLE IV
SATISFACTION AND DISCHARGE

SECTION 4.1    Satisfaction and Discharge of Indenture ............................................ 52

SECTION 4.2    Application of Trust Funds ................................................................ 52

ARTICLE V
DEFAULT AND REMEDIES

SECTION 5.1    Events of Default ............................................................................. 53

SECTION 5.2    Rights of Swap Counterparty upon Event of Default ....................... 55

SECTION 5.3    Acceleration of Maturity; Rescission and Annulment ...................... 55

SECTION 5.4    Remedies .......................................................................................... 56

SECTION 5.5    Retention of Trust Estate ................................................................. 56

SECTION 5.6    Trustee May File Proofs of Claim .................................................... 58

SECTION 5.7    Trustee May Enforce Claims Without Possession of Notes ............. 59

SECTION 5.8    Priority of Payment on Acceleration ................................................ 59

SECTION 5.9    Limitation of Suits .......................................................................... 60

SECTION 5.10   Rights of Noteholders to Receive Principal and Interest .................. 61

SECTION 5.11   Restoration of Rights and Remedies ................................................ 62

SECTION 5.12   Rights and Remedies Cumulative .................................................... 62

SECTION 5.13   Delay or Omission Not a Waiver ..................................................... 62

SECTION 5.14   Control by Noteholders ................................................................... 62

SECTION 5.15   Waiver of Past Defaults ................................................................... 63

SECTION 5.16   Undertaking for Costs ...................................................................... 63

SECTION 5.17   Waiver of Stay or Extension Laws .................................................. 64

SECTION 5.18   Action on Notes ............................................................................... 64

SECTION 5.19   Performance and Enforcement of Certain Obligations ..................... 64

SECTION 5.20   Sale of Trust Estate ......................................................................... 65

ARTICLE VI
THE TRUSTEE

SECTION 6.1    Duties of Trustee ............................................................................. 66

SECTION 6.2    Rights of Trustee ............................................................................. 67

SECTION 6.3    Trustee May Own Notes .................................................................. 70

SECTION 6.4    Trustee's Disclaimer ....................................................................... 70

SECTION 6.5    Notice of Defaults; Events of Default and Acceleration .................. 71

Page

SECTION 6.6    Compensation; Reimbursement; Indemnity ..................................... 71

SECTION 6.7    Resignation and Removal of Trustee; Appointment of Successor ............................................................................................ 72

SECTION 6.8    Merger or Consolidation of Trustee .................................................. 74

SECTION 6.9    Appointment of Co-Trustee or Separate Trustee ............................. 74

SECTION 6.10   Eligibility; Disqualification .............................................................. 76

SECTION 6.11   Representations and Warranties of Trustee ...................................... 76

SECTION 6.12   Certain Duties of Trustee Related to Delayed Payment of Proceeds ........................................................................................... 76

SECTION 6.13   Withholding; Tax Forms .................................................................... 77

SECTION 6.14   Fiduciary for Noteholders Only; Agent for Other Secured Parties ............................................................................................... 77

SECTION 6.15   Assignment of Rights; Not Assumption of Duties ........................... 78

ARTICLE VII
COVENANTS

SECTION 7.1    Payments on Securities ...................................................................... 78

SECTION 7.2    Maintenance of Office or Agency ..................................................... 78

SECTION 7.3    Money for Payments to Be Held in Trust ......................................... 78

SECTION 7.4    Existence of Issuers .......................................................................... 79

SECTION 7.5    Protection of Trust Estate ................................................................. 80

SECTION 7.6    Opinions as to Trust Estate and Tax Certificates ............................. 82

SECTION 7.7    Performance of Obligations .............................................................. 82

SECTION 7.8    Negative Covenants .......................................................................... 82

SECTION 7.9    Statement as to Compliance .............................................................. 85

SECTION 7.10   Consolidation of Issuers ................................................................... 85

SECTION 7.11   Successor Substituted ....................................................................... 87

SECTION 7.12   No Other Business ............................................................................ 87

SECTION 7.13   Purchase of Notes and Class Q Securities ....................................... 88

SECTION 7.14   Additional Covenants ....................................................................... 88

SECTION 7.15   Representations and Warranties of the Issuers ................................ 89

SECTION 7.16   Certain Tax Matters ......................................................................... 90

SECTION 7.17   DTC Actions ..................................................................................... 91

SECTION 7.18   Bloomberg Screens, Etc ................................................................... 91

SECTION 7.19   CUSIP ................................................................................................ 92

Page

| | | |
|---|---|---|
| SECTION 7.20 | Legends | 92 |
| SECTION 7.21 | Regulation S Transfers | 92 |
| SECTION 7.22 | Listing Agent | 93 |
| SECTION 7.23 | Security Interest Representations and Warranties | 93 |
| SECTION 7.24 | Financing Statements; Registration | 95 |
| SECTION 7.25 | Reaffirmation of Rating; Annual Rating Review | 95 |
| SECTION 7.26 | Amendment of the Swap Agreement | 95 |

ARTICLE VIII
TRUST ACCOUNTS; DISTRIBUTIONS

| | | |
|---|---|---|
| SECTION 8.1 | Collection of Money | 97 |
| SECTION 8.2 | Collection Account and Expense Reserve Account | 97 |
| SECTION 8.3 | Collateral Account | 98 |
| SECTION 8.4 | Investment of Moneys | 99 |
| SECTION 8.5 | Status of Account; Securities Intermediary | 100 |
| SECTION 8.6 | Priority of Payments | 102 |
| SECTION 8.7 | Monthly Reports | 107 |
| SECTION 8.8 | Payment Date Valuation Reports | 111 |
| SECTION 8.9 | Reports by Independent Accountants | 114 |
| SECTION 8.10 | Posting of Reports on Repository at Option of the Initial Purchaser | 115 |
| SECTION 8.11 | Notices to Rating Agencies | 115 |

ARTICLE IX
SUPPLEMENTAL INDENTURES

| | | |
|---|---|---|
| SECTION 9.1 | Supplemental Indentures Without Consent of Noteholders | 115 |
| SECTION 9.2 | Supplemental Indentures With Consent of Noteholders | 116 |
| SECTION 9.3 | Execution of Supplemental Indentures | 119 |
| SECTION 9.4 | Effect of Supplemental Indentures | 119 |
| SECTION 9.5 | Reference in Notes to Supplemental Indentures | 119 |
| SECTION 9.6 | Amendment Buy-Out | 120 |

ARTICLE X
OTHER AGENTS

| | | |
|---|---|---|
| SECTION 10.1 | Paying Agents | 121 |
| SECTION 10.2 | Irish Transfer Agent | 122 |
| SECTION 10.3 | Indenture Calculation Agent | 122 |

Page

SECTION 10.4 Other Capacities ................................................................ 123

SECTION 10.5 Certain Actions with Respect to the Reference Portfolio
Manager ............................................................................... 123

SECTION 10.6 Process Agents .................................................................. 124

ARTICLE XI
MISCELLANEOUS

SECTION 11.1 Form of Documents Delivered to Trustee ........................ 124

SECTION 11.2 Acts of Securityholders.................................................... 125

SECTION 11.3 Notices, etc., to Trustee, Issuers and Rating Agencies ... 125

SECTION 11.4 Notices to Holders of the Notes; Waiver ......................... 127

SECTION 11.5 Consent to Posting of Documents on Repository at the Option
of Initial Purchaser ............................................................ 127

SECTION 11.6 Posting of Documents on Repository .............................. 127

SECTION 11.7 Effect of Headings and Table of Contents....................... 127

SECTION 11.8 Successors and Assigns.................................................... 128

SECTION 11.9 Separability ...................................................................... 128

SECTION 11.10 Benefits of Indenture....................................................... 128

SECTION 11.11 Governing Law ................................................................ 128

SECTION 11.12 Submission to Jurisdiction; Waiver of Jury Trial ........... 128

SECTION 11.13 Counterparts .................................................................... 129

SECTION 11.14 Recording of Indenture ................................................... 129

SECTION 11.15 No Recourse..................................................................... 129

SECTION 11.16 No Petition ....................................................................... 130

SECTION 11.17 Priority of Payments ....................................................... 130

SECTION 11.18 Beneficiaries .................................................................... 130

Schedule A    Definitions

Exhibits

INDENTURE, dated as of August 18, 2004 (as amended, supplemented or modified from time to time, this "Indenture"), among VALHALLA CLO, LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands (the "Issuer"), VALHALLA CLO, INC., a Delaware corporation (the "Co-Issuer" and, together with the Issuer, the "Issuers") and JPMORGAN CHASE BANK, a banking corporation organized under the laws of New York (the "Trustee").

Each party agrees as follows for the benefit of the other parties and for the benefit of the Noteholders and the Swap Counterparty.

## PRELIMINARY STATEMENT

The Issuers are duly authorized to execute and deliver this Indenture to provide for the issuance of the Notes, the Class Q-1 Securities and the Class Q-2 Securities, in each case as provided in this Indenture. All covenants and agreements made by the Issuers herein are for the benefit and security of the Noteholders, the Swap Counterparty, the Collateral Administrator and the Trustee (collectively, the "Secured Parties"). The Issuers are entering into this Indenture, and the Trustee is accepting the trusts created hereby, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

All things necessary to make this Indenture a valid agreement of the Issuers in accordance with its terms have been done.

## GRANT OF SECURITY INTEREST

The Issuer hereby grants to the Trustee, for the benefit and security of the Secured Parties, a first priority security interest in all of its right, title and interest in, to and under, in each case, whether now owned or hereafter acquired or arising, all property (other than Excluded Property and the Class Q-2 Securities Collateral (except such described in clause (iii) of the definition thereof at any time prior to the time at which such property is required to be applied to the payment of the Income Notes represented by the Class Q-2 Collateral Asset A)) of any type or nature owned by it or in which the Issuer has an interest, including all accounts, chattel paper, deposit accounts, financial assets, general intangibles, instruments, investment property, letter-of-credit rights and other supporting obligations, and specifically including: (i) each of the Collateral Account, the Collection Account, the Expense Reserve Account, any subaccounts thereof and all financial assets credited to, and amounts on deposit or credit balances carried in, each of them from time to time; (ii) all rights of the Issuer under the Swap Agreement and the Swap Guarantee, including payments made by the Swap Counterparty or the Swap Guarantor thereunder; (iii) all rights of the Issuer under the Collateral Administration Agreement; (iv) all Eligible Investments purchased with funds on deposit in any Trust Account and all income or other proceeds from the investment of funds therein; (v) all cash and Money delivered to the Trustee (directly or through the Securities Intermediary); and (vi) all proceeds, accessions, profits, income, benefits, substitutions and replacements, whether voluntary or involuntary, of and to any of the property of the Issuer described in the preceding clauses (collectively, the "Trust Estate").

Such aforementioned grants are made, however, in trust, to secure, in accordance with the priorities set forth in the Priority of Payments, the Notes equally and ratably without prejudice, priority or distinction, except as expressly otherwise provided in this Indenture, between any Note and any other Note by reason of difference in time of issuance or otherwise, and to secure, in accordance with the priorities set forth in the Priority of Payments, (i) the payment of all amounts payable by the Issuer under the Swap Agreement, (ii) the payment of all amounts due on the Notes in accordance with their terms and (iii) the payment of all amounts payable by the Issuers under this Indenture and compliance by the Issuers with the other provisions hereof, all as provided in this Indenture.

In addition, the Issuer hereby grants to the Trustee, solely for the benefit and security of the Holders of the Class Q-2 Securities, a first priority security interest in all of its right, title and interest in, to and under, in each case whether now owned or hereafter acquired or arising, the Class Q-2 Securities Collateral. Such grants are made, however, in trust, to secure, in accordance with the priorities set forth in the Class Q-2 Priority of Payments, the Class Q-2 Securities equally and ratably without prejudice, priority or distinction, except as expressly otherwise provided in this Indenture, between any Class Q-2 Security and any other Class Q-2 Security by reason of difference in time of issuance or otherwise, and to secure, in accordance with the priorities set forth in the Class Q-2 Priority of Payments, the payment of all amounts due on the Class Q-2 Securities in accordance with their terms.

Except to the extent otherwise provided in this Indenture, this Indenture shall constitute a security agreement under the laws of the State of New York applicable to agreements made and to be performed therein. Upon the occurrence of any Event of Default with respect to the Notes or the occurrence of any Class Q-2 Event of Default with respect to the Class Q-2 Securities, and in addition to any other rights available under this Indenture or any other instruments included in the Trust Estate held for the benefit and security of the Secured Parties, or included in the Class Q-2 Securities Collateral held for the benefit and security of the Holders of Class Q-2 Securities, or otherwise available at law or in equity, the Trustee, for the benefit of the Secured Parties or for the benefit of the Holders of Class Q-2 Securities, as applicable, shall have all rights and remedies of a secured party on default under the laws of the State of New York and other applicable law to enforce the assignments and security interests contained herein and, in addition, shall have the right, subject to compliance with any mandatory requirements of applicable law, to sell or apply any rights and other interests assigned or pledged hereby in accordance with the terms hereof at public or private sale.

It is expressly agreed that, anything herein contained to the contrary notwithstanding, the Issuer shall remain liable under any instruments included in the Trust Estate or the Class Q-2 Securities Collateral to perform all the obligations assumed by it thereunder, all in accordance with and pursuant to the terms and provisions thereof, and, except as otherwise expressly provided herein or agreed by the Trustee, the Trustee shall not have any obligations or liabilities under such instruments by reason of or arising out of this Indenture, nor shall the Trustee be required or obligated in any manner to perform or fulfill any obligation of the Issuer under or pursuant to such instruments or to make any payment, to make any inquiry as to the nature or sufficiency of any payment received by it, to present or file any claim or to take any action to collect or enforce the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times, except as provided herein.

2

The Trustee acknowledges the grants of the security interests provided above, accepts the trusts hereunder in accordance with the provisions hereof and agrees to perform the duties herein pursuant to and in accordance with the terms of this Indenture.

ARTICLE I

DEFINITIONS; INTERPRETATION AND ASSUMPTION

SECTION 1.1    Definitions.

Capitalized terms not otherwise defined herein (including in the Preliminary Statement and granting clauses hereof) have the respective meanings set forth in the Schedule of Definitions attached hereto as Schedule A, unless otherwise noted.  Unless otherwise defined herein, terms (whether or not capitalized) defined in the UCC are used herein (including in the granting clauses hereof) as therein defined.  Capitalized terms used in Sections 8.7, 8.8 and 8.9 and in Schedule A that are not defined herein have the meanings specified in the Swap Agreement.

SECTION 1.2    Interpretation.

Unless otherwise indicated in this Indenture:

(a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein);

(b) all references to an "Article," "Section," "Schedule" or "Exhibit" are to an Article or Section hereof or to a Schedule or an Exhibit attached hereto;

(c) defined terms in the singular shall include the plural and vice versa, and the masculine, feminine or neuter gender shall include all genders;

(d) the words "hereof," "herein" and "hereunder" and other words of similar import when used in this Indenture shall refer to this Indenture as a whole and not to any particular provision of this Indenture;

(e) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation;"

(f) all time references used herein shall refer to Eastern Standard Time or Eastern Daylight Savings Time, whichever is then in effect;

(g) the word "dollar" and the symbols "US$" and "$" shall mean the lawful currency from time to time of the United States of America; and

3

(h) for purposes of any calculation or determination hereunder, the result of which is expressed as a percentage, such result shall be rounded to the nearest .00001%, unless otherwise specified herein.

SECTION 1.3        Assumptions as to Eligible Investments and the Swap Agreement.

Except as otherwise expressly set forth herein, the provisions set forth in this Section 1.3 shall be applied in connection with all calculations required to be made pursuant to this Indenture with respect to distributions on any Eligible Investment, or any payments under the Swap Agreement or on any other assets included in the Trust Estate or the Class Q-2 Securities Collateral, and with respect to the income that may be earned on distributions on such Eligible Investments and on any other amounts that may be received for deposit in the Trust Accounts or the Class Q-2 Securities Collateral Account.

(a) All calculations with respect to distributions in respect of the Eligible Investments and payments with respect to the Securities shall be made by the Issuer or its agent, based upon the assumptions that (i) no Eligible Investment will default or be sold and the Swap Counterparty will make the payments required to be made by it under the Swap Agreement in accordance with its terms and (ii) no optional redemption of any Eligible Investment will occur except for those that have actually occurred or as to which irrevocable notice from the obligor of the Eligible Investment to the Issuer thereof shall have been given.

(b) For each Periodic Interest Accrual Period, the distributions on any Eligible Investment shall be the sum of (i) the total amount of payments and collections in respect of such Eligible Investment at the current interest rate and other terms applicable thereto, that, if paid as scheduled, will be available in the Trust Accounts at the end of such period for distribution in accordance with Section 8.6 (or will be available in the Class Q-2 Securities Collateral Account at the end of such period for distribution in accordance with Section 2.17(d), as applicable), plus (ii) any such amounts received in prior such periods that were not disbursed on a previous Payment Date.

(c) With respect to any Eligible Investment as to which any interest or other payment thereon is subject to any withholding tax, each distribution thereon shall, for purposes of the Coverage Tests (for Eligible Investments in the Trust Accounts) or the Class Q-2A Coverage Test (for Eligible Investment in the Class Q-2 Securities Collateral Account), be deemed to be payable net of such withholding tax unless the issuer thereof or obligor thereon is required to make additional payments to fully compensate the Issuers for such withholding taxes (including in respect of any such additional payments). On any date of determination, the amount of any scheduled distribution on the Eligible Investments due on any future date shall be assumed to be made net of any such uncompensated withholding tax based upon applicable withholding tax rates in effect on such date of determination.

4

ARTICLE II

THE NOTES

SECTION 2.1    Forms Generally.

The Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C-1 Notes, the Class C-2 Notes, the Income Notes, the Class Q-1 Securities, the Class Q-2A Securities and the Class Q-2B Securities and the Trustee's certificate of authentication thereon (the "Certificate of Authentication") shall be substantially in the forms required by this Article II, with such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Indenture and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon as may, consistently herewith, be determined and authorized by the Authorized Officers executing and authenticating such Notes, Class Q-1 Securities or Class Q-2 Securities, as evidenced by their execution and authentication thereof. Any portion of the text of any Note, Class Q-1 Security or Class Q-2 Security may be set forth on the reverse thereof, with an appropriate reference thereto on the face of the Note, Class Q-1 Security or Class Q-2 Security.

SECTION 2.2    Form of Notes and Certificate of Authentication.

(a) The Senior Notes shall be issued initially as global notes and the form of the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C-1 Notes and the Class C-2 Notes issued as Temporary Regulation S Global Notes, Regulation S Global Notes or Rule 144A Global Notes, including the Certificate of Authentication, shall be as set forth respectively as Exhibits A1-1, A1-2, A1-3, A2-1, A2-2, A2-3, B-1, B-2, B-3, C1-1, C1-2, C1-3, C2-1, C2-2, and C2-3 hereto.

(b)    (i)    Temporary Regulation S Global Notes and Regulation S Global Notes.  The Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C-1 Notes and the Class C-2 Notes initially sold to non-U.S. Persons (as defined in Regulation S) in offshore transactions in reliance on Regulation S shall be initially issued in the form of one or more temporary global notes in definitive, fully registered form without interest coupons with the applicable legends substantially as set forth in the form of Exhibits A1-1, A2-1, B-1, C1-1 and C2-1, hereto, respectively (each, a "Temporary Regulation S Global Note"), and, on or after the Exchange Date, upon certification in accordance with Rule 903(b)(3)(ii)(B) from the Depositary, Euroclear and Clearstream that the beneficial interests in such Temporary Regulation S Global Notes are owned by Persons who are non-U.S. Persons, shall be exchangeable for interests in one or more permanent global notes of the same Class in definitive, fully registered form without interest coupons with the applicable legends substantially as set forth in the form of Exhibits A1-2, A2-2, B-2, C1-2 and C2-2, hereto, respectively (each, a "Regulation S Global Note"), which Temporary Regulation S Global Notes and Regulation S Global Notes shall be deposited on behalf of the subscribers for such Notes represented thereby with the Trustee as custodian for DTC, the initial Depositary, and registered in the name of Cede & Co., as nominee of DTC, for the respective accounts of Euroclear and Clearstream, duly executed by the Issuers and authenticated by the Trustee as hereinafter

5

provided. The Aggregate Principal Amount of the Temporary Regulation S Global Notes and the Regulation S Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee or the Depositary or its nominee, as the case may be, as hereinafter provided.

(ii) <u>Rule 144A Global Notes</u>. The Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C-1 Notes and the Class C-2 Notes initially sold in the United States or to U.S. Persons pursuant to Rule 144A under the Securities Act shall be issued in the form of one or more permanent global notes in definitive, fully registered form without interest coupons with the applicable legends substantially as set forth in the form of <u>Exhibits A1-3</u>, <u>A2-3</u>, <u>B-3</u>, <u>C1-3</u>, and <u>C2-3</u>, respectively (each, a "Rule 144A Global Note"), which shall be deposited with the Trustee as custodian for DTC and registered in the name of Cede & Co., as nominee of DTC, duly executed by the Issuers and authenticated by the Trustee as hereinafter provided. The Aggregate Principal Amount of the Rule 144A Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee or the Depositary or its nominee, as the case may be, as hereinafter provided.

(c) All Income Notes shall be issued in the form of certificated Notes in definitive, physical certificates in fully registered form without interest coupons with the applicable legends substantially as set forth in the form of <u>Exhibit IN-Certificated</u> (each a "<u>Certificated Income Note</u>"), which shall be registered in the name of the beneficial owner or a nominee thereof, duly executed by the Issuer and authenticated by the Trustee as hereinafter provided.

(d) The terms and provisions contained in the Securities shall constitute, and are hereby expressly made, a part of this Indenture, and the Issuers and the Trustee, by their execution and delivery of this Indenture, and the Holders of Securities, by their acceptance of the Securities, expressly agree to such terms and provisions and to be bound thereby. To the extent any provision of any Security conflicts with the express provisions of this Indenture, the provisions of this Indenture shall govern and be controlling.

(e) The Certificated Income Notes, the Certificated Class Q-1 Securities, the Certificated Class Q-2 Securities, the Global Notes (including the Class Q-1 Temp Reg S Global Securities and the Class Q-1 Reg S Global Securities) or any definitive notes issued in accordance with Section 2.5(d) and (e) shall be typewritten on bond paper or safety paper, printed, lithographed, engraved or produced by any combinations of these methods, with or without steel engraved borders.

(f) Except as provided in Sections 2.5(d) and (e), owners of beneficial interests in Global Notes will not be entitled to receive physical delivery of definitive Notes; <u>provided</u>, that transferees of Class Q-1 Reg S Global Securities will receive physical delivery of definitive Securities as provided in Section 2.16(c)(iii).

SECTION 2.3     Authorized Amount; Maturity Date; Classification and Priority of Notes; Interest Rate; and Denomination.

(a) The maximum Aggregate Principal Amount of the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C-1 Notes, the Class C-2 Notes and the Income Notes that may be authenticated and delivered under this Indenture is limited to U.S. $62,000,000, U.S. $56,000,000, U.S. $39,500,000, U.S. $21,000,000, U.S. $5,000,000 and U.S.  $82,000,000 respectively, except for Notes authenticated and delivered upon registration of transfer of, in exchange for, or in lieu of other Notes pursuant to Sections 2.5, 2.6, 2.7, 9.5 or 9.6.  The Maturity Date for each Class of Notes is August 1, 2016, or, if the maturity is extended pursuant to Section 2.15 hereof, August 1, 2020. Notwithstanding anything to the contrary herein, the Aggregate Principal Amount of the Income Notes includes the U.S. 25,000,000 Aggregate Principal Amount of Income Notes Delivered to the Class Q-2 Securities Collateral Account on the Closing Date, which shall be deemed to have been issued for all purposes of this Indenture.

(b) The Notes will be issued in Classes, denominated as Class A-1 Floating Rate Senior Extendable Notes (the "Class A-1 Notes"), Class A-2 Floating Rate Senior Extendable Notes (the "Class A-2 Notes"), Class B Floating Rate Deferrable Senior Subordinate Extendable Notes (the "Class B Notes"), Class C-1 Floating Rate Deferrable Senior Subordinate Extendable Notes (the "Class C-1 Notes"), Class C-2 Fixed Rate Deferrable Senior Subordinate Extendable Notes (the "Class C-2 Notes") and Extendable Income Notes (the "Income Notes").  The Income Notes will be subordinate in payment priority hereunder to the Senior Notes. The Class C-1 Notes and the Class C-2 Notes will rank pari passu with each other and (except in certain cases where the Diversion Test is not satisfied) will be subordinate in payment priority hereunder to the Class B Notes, and  to the Class A-2 Notes and to the Class A-1 Notes.  The Class B Notes will be subordinate in payment priority hereunder (except in certain cases where the Diversion Test is not satisfied) to the Class A-2 Notes and to the Class A-1 Notes.  The Class A-2 Notes will be subordinate in payment priority hereunder to the Class A-1 Notes.

(c) The Senior Notes will accrue interest at the following rates:

| Class of Notes | Interest Rate |
| --- | --- |
| Class A-1 Notes | LIBOR + 0.70% per annum |
| Class A-2 Notes | LIBOR + 0.80% per annum |
| Class B Notes | LIBOR + 1.40% per annum |
| Class C-1 Notes | LIBOR + 2.60% per annum |
| Class C-2 Notes | 7.53% per annum |

(d) Each Class of Notes, whether issued in definitive or global form, shall be issuable and transferable in minimum denominations of U.S. $500,000 and integral multiples of U.S. $1,000 in excess thereof.  The denominations of the Notes authorized to be issued under this Section 2.4(d) are referred to herein in each case as "Authorized Denominations" and are expressed in terms of the principal amounts thereof at the date of issuance.  After issuance, any

Note may fail to be in an Authorized Denomination due to the repayment of principal thereof in accordance with the Priority of Payments or any other applicable provision hereof, and after such repayment the "Authorized Denomination" of any such Note, for purposes of this Indenture, shall mean the original Authorized Denomination reduced by any such repayment.

(e) The Notes will be subject to redemption prior to the Maturity Date solely as provided in Section 2.14.

SECTION 2.4    Issuance of Securities.

(a) The Securities shall be executed on behalf of the Issuer and, in the case of the Senior Notes only, the Co-Issuer by Authorized Officers thereof. The signature of any such Authorized Officers on the Securities may be manual or facsimile.

(b) Securities bearing the manual or facsimile signature of individuals who were Authorized Officers at the time when such signatures shall have been affixed shall bind the Issuer and the Co-Issuer, as applicable, notwithstanding that such individuals or any of them shall have ceased to hold such office prior to the authentication and delivery of such Securities or did not hold such office at the date of issuance of such Securities.

(c) On the Closing Date and from time to time after the execution and delivery of this Indenture, the applicable Issuers shall deliver the Securities executed by such Issuers to the Trustee for authentication; and the Trustee shall authenticate and deliver such Securities as provided in this Indenture and not otherwise.

Each Security authenticated and delivered by the Trustee on the Closing Date shall be dated as of the Closing Date. All other Securities that are authenticated after the Closing Date for any other purpose under this Indenture shall be dated the date of their authentication.

(d) Subject to the second sentence hereof, Securities issued upon transfer, exchange or replacement of other Securities shall be issued in Authorized Denominations reflecting the original Aggregate Principal Amount of the Securities so transferred, exchanged or replaced, but shall represent only the Outstanding Aggregate Principal Amount of the Securities so transferred. If any Security is divided into more than one Security in accordance with this Article II, the original Aggregate Principal Amount of such Security shall be appropriately divided among the Securities delivered in exchange therefor in denominations specified by the Holders thereof; provided, that each Security is in an Authorized Denomination and the Aggregate Principal Amount of each Security is in the aggregate equal to the original Aggregate Principal Amount of such divided Security.

No Security shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on such Security a Certificate of Authentication, substantially in the form provided for herein, executed by the Trustee by the manual signature of one of its Responsible Officers, and such certificate upon any Security shall be conclusive evidence, and the only evidence, that such Security has been duly authenticated and delivered hereunder.

SECTION 2.5    Book-Entry Securities.

(a) In the case of the Senior Notes, Class Q-1 Temp Reg S Global Securities and Class Q-1 Reg S Global Securities, unless and until definitive Securities have been issued in accordance with Section 2.5(d) and (e) (i) such Securities, upon original issuance, shall be book-entry Securities ("Book-Entry Securities"), (ii) the Depositary with respect to such Book-Entry Securities shall be DTC or such successor Depositary named in accordance with Section 2.5(c) below and (iii) such Book-Entry Securities shall be maintained on the book-entry deposit system of the Depositary in accordance with the procedures established by the Depositary.  Each Class of the Book-Entry Securities shall be represented by a Global Note or Global Notes, which shall at all times be registered on the records of the Trustee and the Registrar in name of the Depositary or its nominee.  With respect to the Book-Entry Securities:

(i)    the provisions of this Section 2.5(a) shall be in full force and effect and with respect to the Senior Notes represented by Global Notes, to the extent that the provisions of this Section 2.5(a) conflict with any other provisions of this Indenture, the provisions of this Section 2.5(a) shall control;

(ii)    the beneficial ownership of such Book-Entry Securities will be evidenced solely through the book-entry record system maintained by the Depositary (by book-entries made in the records of the Depositary, or the records of a Person or entity maintaining an account with the Depositary (either as a Participant or as an Indirect Participant, in accordance with the rules of the Depositary)) and the holdings of Book-Entry Securities of customers (including Indirect Participants) of Participants will not be known to the Trustee, the Issuer, the Co-Issuer or the Depositary;

(iii)    the beneficial owners of such Book-Entry Securities will not be recognized by the Trustee or by the Issuers as "Holders of the Securities" or "Securityholders" as such terms are used herein and beneficial owners will only be able to exercise the rights of the Holders of the Securities indirectly through the Depositary and its Participants and Indirect Participants and shall be subject to any agreements between such beneficial owners and the Depositary and/or its Participants and/or Indirect Participants; provided, that the registered Holder of a Global Note may grant proxies and otherwise authorize any person, including agent members and Persons that may hold interests through agent members, to take any action that a Holder is entitled to take under this Indenture or the Securities;

(iv)    with respect to Senior Notes represented by Global Notes only, transfers of beneficial ownership of such Book-Entry Securities shall be made on the books and records of the Depositary and/or its Participants and/or Indirect Participants;

(v)    beneficial ownership and with respect to Senior Notes represented by Global Notes only transfers of beneficial ownership of such Book-Entry Securities shall be governed by the rules of the Depositary;

(vi)    the Issuers and the Trustee may deal with the Depositary as the sole holder of record of such Book-Entry Securities for all purposes, including exercising

9

the rights of the Holders of the Securities under this Indenture, and requests and directions for and votes of the Depositary (or its Participants) will not be deemed inconsistent if they are made with respect to different beneficial owners; all references in this Indenture to actions taken by the Holders of the Securities refer to actions taken by the Depositary upon instructions of its Participants and/or Indirect Participants;

(vii)    neither the Issuers nor the Trustee will have responsibility or liability for any aspect of the records of the Depositary, any Participant or any Indirect Participant relating to the beneficial ownership of the Book-Entry Securities;

(viii)    the Issuers and the Trustee may rely and shall be fully protected in relying upon information furnished by the Depositary with respect to its Participants and by Participants with respect to the beneficial owners of the Securities;

(ix)    all payments due on account of or with respect to such Book-Entry Securities shall be made to the Depositary as provided herein, and neither the Issuer, the Co-Issuer, the Trustee nor any agent of any of them shall have any responsibility or liability for the disbursement of such payments by the Depositary or any Participant or Indirect Participant to beneficial owners of Securities;

(x)    such Book-Entry Securities may not be exchanged for definitive Notes except under circumstances set forth in Sections 2.5(d) and (e), provided that upon transfers of Class Q-1 Temp Reg S Global Securities and Class Q-1 Reg S Global Securities physical definitive Securities will be delivered to the transferee as provided in Section 2.16(c)(iii); and

(xi)    insofar as interests in the Global Notes are held by the agent members of Euroclear or Clearstream, the provisions of the "Operating Procedures of the Euroclear System" and the "Terms and Conditions Governing Use of Participants" of Euroclear and Clearstream, respectively, or any successors thereto shall be applicable. Account holders or participants in Euroclear and Clearstream shall have no rights under this Indenture with respect to such Book-Entry Securities, and the registered nominee of the Depositary will be treated by the Trustee and any agent of the Trustee as the owner of the Global Note or Notes for all purposes whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Trustee or any agent of the Trustee from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and Euroclear, Clearstream and their respective agent members, the operation of customary practices governing the exercise of the rights of a Holder of any Note.

(b) The Issuers shall execute and deliver initially the Global Notes registered in the name of DTC or Cede & Co., as DTC's nominee, and the Trustee shall hold such Global Notes as custodian for DTC or pursuant to DTC's instructions, if any.

Notwithstanding anything in this Indenture to the contrary, members of, or Participants in, the Depositary as well as any other Persons on whose behalf such Participants may act (including Euroclear and Clearstream and account holders and participants therein) shall

have no rights under this Indenture with respect to any Global Note held on their behalf or for their benefit by the Depositary, and the Depositary may be treated by the Issuers or the Trustee and any agent of the Issuers or the Trustee as the absolute owner of such Global Note or Global Notes for all purposes whatsoever. Upon the issuance of any Global Note, the Registrar or its duly appointed agent shall record the Depositary's nominee as the registered holder of such Global Note on the Securities Register.

(c) The Issuers may from time to time select a new entity to act as Depositary with respect to the Book-Entry Securities, and if such selection is made, the Issuers shall promptly give the Trustee notice to such effect identifying the new Depositary and the Issuers shall cause the Global Notes to be delivered to the Trustee for cancellation and immediately thereupon, in accordance with Sections 2.4 and 2.6, the Issuers shall execute and deliver to the Trustee and the Trustee shall authenticate, register and deliver to the successor Depositary, or retain as custodian for the successor Depositary, one or more successor Global Notes. Appropriate changes may be made in the form of such Global Notes to reflect the selection of the new Depositary.

(d) Notwithstanding anything to the contrary in paragraphs (a) and (c) above, if, with respect to the Book-Entry Securities, (i)(A) the Depositary notifies the Trustee in writing that it is unwilling or unable to continue as Depositary for the Notes or the Depositary, Euroclear or Clearstream ceases to be a "clearing agency" (as defined in the Exchange Act) registered under the Exchange Act and (B) a successor depository or clearing agency is not appointed by the Trustee within 90 days after receiving such notice; (ii) as a result of any amendment to or change in the laws or regulations of the Cayman Islands, or of any authority therein having power to tax, or in the interpretation or administration of such laws or regulations that become effective on or after the Closing Date, the Issuer, the Trustee, or any Paying Agent is required to make any deduction or withholding from any payment in respect of the Global Notes which would not be required if such Notes were not represented by a global note; or (iii) any Event of Default (as defined in Section 5.1) has occurred and is continuing (and has not been waived); the Trustee shall execute an agreement with the Issuers amending this Indenture pursuant to Section 9.1 for the purpose of terminating the book entry deposit system and substituting definitive Notes for the Global Notes. Such agreement shall provide for the form and terms of such definitive Notes and the place and manner in which a Noteholder may obtain possession of such definitive Notes; provided, that in no event may holders of beneficial interests in the Temporary Regulation S Global Notes or Class Q-1 Temp Reg S Global Securities receive definitive Notes pursuant to this provision prior to the Exchange Date and each such holder must certify to the Issuers and the Trustee that it is a non-U.S. Person. Such agreement shall also provide the procedures for registration of transfer or exchange of such definitive Notes, as well as such other provisions as the Issuer, the Co-Issuer and the Trustee may agree shall be necessary or appropriate to effect the substitution of definitive Notes for Global Notes and to modify the provisions of this Indenture to provide for the use of definitive Notes in lieu of a book-entry deposit system.

(e) Upon the occurrence of any of the events described in paragraph (d) above, the Trustee shall notify all Holders of the Global Notes and shall advise such Holders of the Global Notes of the procedure by which the Global Notes shall be exchanged for definitive Notes. Each beneficial owner of Global Notes shall be entitled, at no cost to it, to have registered in the name of the beneficial owner of Global Notes one or more definitive Notes

11

representing the same aggregate principal amount of Notes of the relevant Class as its beneficial interest in the related Global Note. Upon the occurrence of any such event, (i) the Trustee at the expense of the Issuer shall obtain from the Depositary a listing of the Participants then holding Book-Entry Securities on the records of the Depositary and (ii) upon surrender by the Depositary to the Trustee of the Global Notes for each Class, the Trustee shall cancel such Global Notes and the Issuers shall execute and deliver to such Participants definitive Notes representing in the aggregate the identical Aggregate Principal Amount of beneficial interests in the Global Notes held by such Participants on the records of the Depositary, registered in such names as such Participants shall have provided to the Trustee; provided, however, that the Trustee shall not register any such definitive Note or deliver any such definitive Note to a Participant unless and until such Participant shall have provided to the Trustee a certification acceptable to the Trustee that such registration instructions were given, and delivery of such definitive Note will be made, in accordance with the directions of the beneficial owners of Notes represented by such Participant. Neither the Issuers nor the Trustee shall be liable for any delay in delivery of such registration instructions by any Participant and each of them may conclusively rely on, and shall be protected in relying on, (i) information contained in the Participant listing provided by the Depositary regarding the names of the Participants holding beneficial interests in the Global Notes and the Aggregate Principal Amount of Notes represented by the beneficial interests in the Global Notes held by each such Participant, and (ii) the foregoing registration instructions and certifications provided by each such Participant with respect to definitive Notes representing the same Aggregate Principal Amounts of definitive Notes as the beneficial interests in the Global Notes stated to be held by such Participant in such Participant listing. If definitive Notes are issued, the Issuer will publish in the Republic of Ireland thereafter information explaining the payment, transfer and exchange procedures for the definitive Notes. The Trustee shall recognize the registered holders of the definitive Notes as Holders of the Notes hereunder. The Registrar shall reflect on its records the issuance of definitive Notes in exchange for the Global Notes.

(f) In the event that definitive Notes are not issued to each beneficial owner promptly after an event described in Section 2.5(d), the Issuers expressly acknowledge, with respect to the rights of any Holder of the Notes to pursue a remedy pursuant to Article V hereof, the right of any beneficial owner of Notes to pursue such remedy with respect to the portion of the Global Notes that represents such beneficial owner's Notes as if such definitive notes had been issued.

SECTION 2.6    Registration of Transfer and Exchange of Securities; Restriction on Transfer.

(a) The Issuers shall cause to be kept a securities register (the "Securities Register") for the Securities in which, subject to such reasonable regulations as they may prescribe, the Issuers shall provide for the registration of the Holders of the Securities and the registration of transfers of the Securities. The Trustee is hereby appointed to be the initial securities registrar (in such capacity, the "Registrar") for the purpose of registering the Securities and the registration of transfers and exchanges of Securities. Upon the resignation of any Registrar, the Issuers shall promptly appoint a successor thereto. The Trustee may prescribe reasonable procedures for carrying out its function as Registrar that do not conflict with the procedures established by the Issuer. In all events, the Trustee shall be entitled to maintain at its Corporate Trust Office within the United States such books and records as it may deem

necessary or appropriate in respect of the performance of its function as Registrar. In the event that the Trustee is no longer acting in the capacity of the Registrar, the Trustee shall promptly inform any such successor Registrar of any transfer of record ownership of a Security so that the successor Registrar may register the same in the Securities Register; and upon request at any time the Registrar shall provide to the Trustee or the Issuers a current list of the Holders of the Securities as reflected in the Securities Register. The Issuer shall notify the Trustee of any Securities owned by or pledged to the Issuer or any of its Affiliates promptly upon the acquisition thereof or the creation of such pledge.

Subject to the provisions of this Section 2.6, at the option of a Holder, Securities may be exchanged for other Securities of the same Class, in any Authorized Denominations and of a like Aggregate Principal Amount, upon surrender of the Securities to be exchanged at the Corporate Trust Office of the Trustee. Whenever any Securities are so surrendered for exchange, the applicable Issuer shall execute, and the Trustee shall authenticate and deliver, the Securities that the Holder of Securities making the exchange is entitled to receive. Notwithstanding the foregoing, an interest in a Global Note may be transferred or exchanged for an interest in another Global Note or in definitive Notes only in the limited circumstances set forth in this Section or in Section 2.5(c), 2.5(d), 2.5(e) and 2.16 hereof.

No service charge shall be made for any registration of transfer or exchange of Securities or beneficial interest therein, but the Issuers, the Trustee or the Registrar may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with any transfer or exchange of Securities or any beneficial interest therein, other than exchanges not involving any transfer.

All Securities issued and authenticated upon any registration of transfer or exchange shall be the valid obligations of the applicable Issuers, evidencing the same debt, and entitled to the same benefits under this Indenture, as the Securities surrendered upon such registration of transfer or exchange.

Every Security presented or surrendered for registration of transfer or exchange shall be duly endorsed or be accompanied by a written instrument of transfer or exchange substantially in the form of Exhibit D hereto in form satisfactory to the applicable Issuers and the Trustee duly executed by the Holder thereof or its attorney duly authorized in writing.

The preceding provisions of this Section 2.6 notwithstanding, the Issuers shall not be required to transfer or make exchanges, and the Registrar need not register transfers or exchanges, of Securities that are due for repayment within fifteen (15) days of submission to the Trustee for transfer or exchange.

(b) No Security may be sold or transferred (including, without limitation, by mortgage, charge, pledge or hypothecation) unless such sale or transfer is exempt from or not subject to the registration requirements of the Securities Act, would not require the registration of the Issuers under the Investment Company Act, is exempt under applicable state or foreign securities laws and is in compliance with the terms of this Indenture. No Security may be offered, sold or delivered at any time within the United States or to, or for the benefit of, U.S. Persons except in accordance with (i) Rule 144A under the Securities Act, to Persons who are

both Qualified Institutional Buyers and Qualified Purchasers (or, solely in the case of Income Notes, in accordance with an exemption from registration under the Securities Act to Persons who are both Accredited Investors and Qualified Purchasers) and (ii) the provisions of this Article II.  In addition, no Security or any beneficial interest therein may be offered, sold or delivered at any time within the United States or to, or for the benefit of, U.S. Persons unless such person (A) was not formed for the purpose of investing in the Securities, (B) has received the necessary consent from its beneficial owners if the purchaser is a private investment company formed before April 30, 1996, (C) is not a broker-dealer that owns and invests on a discretionary basis less than $25,000,000 in securities of unaffiliated issuers, (D) is not a partnership, common trust fund, special trust, pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants, as applicable, may designate the particular investments to be made, (E) is acquiring its Securities in a transaction that may be affected without loss of any applicable Investment Company Act exemption, (F) will provide notice to any subsequent transferee of the transfer restrictions applicable to such Securities under the Indenture or provided in the legend set forth on such Securities, (G) will hold and transfer its beneficial interest only in a principal amount of not less than the applicable Authorized Denomination and (H) will provide the Issuer from time to time such information as it may reasonably request in order to ascertain compliance with this paragraph (b).  The Securities may be sold in offshore transactions to non-U.S. Persons in reliance on Regulation S under the Securities Act.  None of the Issuers, the Trustee or any other Person may register the Securities under the Securities Act or any state or foreign  securities laws.

(c) Upon the request of any Holder of a Security (or beneficial owner of a Security), the Issuers shall promptly furnish to such Holder (or beneficial owner of a Security) or to a prospective purchaser of any Security designated by such Holder (or beneficial owner of a Security), as the case may be, the information which the Issuers determine to be required to be delivered pursuant to Rule 144A(d)(4) under the Securities Act ("Rule 144A Information"), in order to permit compliance by such Holder with Rule 144A in connection with the resale of such Security by such Securityholder.  Upon request by the applicable Issuers, the Trustee shall cooperate with such Issuers in mailing or otherwise distributing (at the expense of the Issuers) to such Holders of the Securities (or beneficial owners of Securities) or prospective purchasers, at and pursuant to the written direction of such Issuers, the foregoing materials prepared and provided by the Issuers; provided, however, that the Trustee shall be entitled to affix thereto or enclose therewith such disclaimers as the Trustee shall deem reasonably appropriate, at its discretion (such as, for example, a disclaimer to the effect that such Rule 144A Information was assembled by the Issuers and not by the Trustee, that the Trustee has not reviewed or verified the accuracy thereof, and that it makes no representation as to the sufficiency of such information under Rule 144A or for any other purpose).

(d) The Trustee shall not be responsible for ascertaining whether any transfer complies with, or for otherwise monitoring or determining compliance with, the requirements or terms of the Securities Act, Investment Company Act, applicable state securities laws, ERISA or the Code; except that if a Transfer Letter or a Transferee Certificate or other letter or certificate is specifically required by the terms of this Section 2.6, Section 2.16 or 2.17 to be provided to the Trustee (including in its capacity as Registrar) by a transferor or prospective transferee, as applicable, the Trustee shall be under a duty to receive and examine the same to determine whether it conforms substantially on its face to the applicable requirements of such Section.

(e) For so long as any of the Securities are Outstanding, the Issuer shall not issue or permit the transfer of any Ordinary Shares of the Issuer to U.S. Persons.

(f) So long as any Global Note remains Outstanding and is held by or on behalf of the Depositary, transfers of a beneficial interest in a Global Note in whole or in part, shall only be made in accordance with this Section 2.6(f).

(i) <u>Transfer of Interest in Rule 144A Global Note for Interest in Temporary Regulation S Global Note or Regulation S Global Note</u>. Subject to the provisions of this Section 2.6 and the Applicable Procedures, a holder of a beneficial interest in a Rule 144A Global Note may at any time transfer all or a portion of its beneficial interest in such Rule 144A Global Note to a Person who wishes to take delivery thereof in the form of an equivalent interest in a corresponding Temporary Regulation S Global Note or Regulation S Global Note of the same Class in an offshore transaction in accordance with Rule 903 or 904 of Regulation S; <u>*provided*</u> that the remaining principal amount of the beneficial interest of such holder in the Rule 144A Global Note shall either equal zero or be in an Authorized Denomination. Upon the receipt by the Trustee of (A) instructions given in accordance with the Applicable Procedures from a Participant directing the Registrar to credit or cause to be credited a beneficial interest in the corresponding Temporary Regulation S Global Note or Regulation S Global Note in an amount equal to the beneficial interest in such Rule 144A Global Note, in an Authorized Denomination, to be exchanged or transferred, such instructions to contain information regarding the Euroclear or Clearstream account to be credited with such increase and (B) a Transfer Letter substantially in the form of <u>Exhibit E-1</u> attached hereto given by the transferor of such beneficial interest stating, among other things, that the exchange or transfer of such interest has been made in compliance with the transfer restrictions applicable to the Global Notes, including that the transferee is not a U.S. Person, and pursuant to and in accordance with Regulation S, then the Registrar shall instruct the Depositary to reduce the principal amount of such Rule 144A Global Note by the Aggregate Principal Amount of the beneficial interest in the Rule 144A Global Note to be transferred, record the transfer in the Securities Register in accordance with Section 2.5(a) and instruct the Depositary concurrently with such reduction to increase the Aggregate Principal Amount of the Temporary Regulation S Global Note or the Regulation S Global Note, as the case may be, by the Aggregate Principal Amount of the beneficial interest in the Rule 144A Global Note to be transferred, and to credit or cause to be credited to the account of the Person specified in such instructions a beneficial interest in the corresponding Temporary Regulation S Global Note or the Regulation S Global Note equal to the reduction in the Aggregate Principal Amount of the Rule 144A Global Note. In no event shall Persons hold interests in the Temporary Regulation S Notes or Regulation S Global Notes through Participants of DTC other than such Participants maintaining positions on behalf of Euroclear or Clearstream.

(ii) <u>Transfer of Interest in Temporary Regulation S Global Note or Regulation S Global Note for Interest in Rule 144A Global Note</u>. Subject to the provisions of this Section 2.6 and the Applicable Procedures, a holder of a beneficial interest in a Temporary Regulation S Global Note or Regulation S Global Note may

transfer at any time all or a portion of its beneficial interest in such Temporary Regulation S Global Note or Regulation S Global Note in accordance with Rule 144A under the Securities Act to a Person who takes delivery thereof in the form of an interest in the corresponding Rule 144A Global Note; provided, that the remaining principal amount of such holder's beneficial interest in the Temporary Regulation S Global Note or Regulation S Global Note shall either equal zero or be in an Authorized Denomination. Upon receipt by the Trustee of (A) instructions from Euroclear, Clearstream or the Depositary, as the case may be, directing the Registrar to cause to be credited a beneficial interest in the corresponding Rule 144A Global Note in an amount equal to the beneficial interest in such Temporary Regulation S Global Note or Regulation S Global Note, but not less than an Authorized Denomination, to be exchanged or transferred, such instructions to contain information regarding the participant account with the Depositary to be credited with such increase and (B) a Transfer Letter substantially in the form of Exhibit E-2 attached hereto given by the transferor of such beneficial interest stating, among other things, that such holder reasonably believes that the proposed transferee is both (i) a Qualified Institutional Buyer and (ii) a Qualified Purchaser, then Euroclear, Clearstream or the Registrar, as the case may be, shall instruct the Depositary to reduce such Temporary Regulation S Global Note or Regulation S Global Note by the Aggregate Principal Amount of the beneficial interest in the Temporary Regulation S Global Note or Regulation S Global Note to be transferred, and the Registrar shall record the transfer in the Securities Register in accordance with Section 2.5(a) and the Registrar shall then instruct the Depositary concurrently with such reduction, to increase the Aggregate Principal Amount of the Rule 144A Global Note by the Aggregate Principal Amount of the beneficial interest in the Regulation S Global Note or Temporary Regulation S Global Note, as the case may be, to be transferred, and to credit or cause to be credited to the account of the Person specified in such instructions, a beneficial interest in the Rule 144A Global Note equal to the reduction in the Aggregate Principal Amount of the Temporary Regulation S Global Note or Regulation S Global Note.

(iii)    Transfer of Interest in Rule 144A Global Note for Interest in Rule 144A Global Note.  Transfers of interests in a Rule 144A Global Note to transferees maintaining a beneficial interest in such Global Note may only be made in accordance with the provisions of this Indenture, will be effected by book-entry transfer of beneficial interests effected on the records of the Depositary and may be made only to a Person whom the transferor reasonably believes is a Qualified Institutional Buyer and a Qualified Purchaser in a transaction exempt under Rule 144A from the registration requirements of the Securities Act and in accordance with any applicable securities laws of any state of the United States.  Each transferee of a Rule 144A Global Note or beneficial interest therein will be deemed to have made the representations and agreements set forth in Section 2.6(g).

(iv)    Transfer of Interest in Temporary Regulation S Global Note or Regulation S Global Note for Interest in Temporary Regulation S Global Note or Regulation S Global Note.  Transfers of interests in a Temporary Regulation S Global Note or Regulation S Global Note to transferees maintaining a beneficial interest in such Global Note may only be made in accordance with the provisions of this Indenture, will be effected by book-entry transfer of beneficial interests within the Clearance Systems

(and subject to the Applicable Procedures) and may be made only to non-U.S. Persons who acquire the interests in offshore transactions in compliance with Regulation S. In no event shall Persons hold an interest in Temporary Regulation S Global Notes or Regulation S Global Notes through Participants of DTC other than such Participants maintaining positions on behalf of Euroclear or Clearstream. Each transferee of Temporary Regulation S Global Notes or Regulation S Global Notes or beneficial interest therein will be deemed to have made the representations and agreements set forth in Section 2.6(h).

(g) Each transferee of a Rule 144A Global Note or beneficial interest therein will be deemed to have represented and agreed as follows:

(i)     It (A) is a Qualified Institutional Buyer and is acquiring the Notes in reliance on the exemption from Securities Act registration provided by Rule 144A thereunder, (B) is a Qualified Purchaser and (C) understands the Notes will bear the legend set forth in the Indenture and be represented by one or more Rule 144A Global Notes. In addition, it represents and warrants that it (1) was not formed for the purpose of investing in the Notes, (2) has received the necessary consent from its beneficial owners if the purchaser is a private investment company formed before April 30, 1996, (3) is not a broker-dealer that owns and invests on a discretionary basis less than $25,000,000 in securities of unaffiliated issuers, (4) is not a partnership, common trust fund, or special trust, pension, profit sharing or other retirement trust fund or plan in which the partners, beneficiaries or participants, as applicable, may designate the particular investments to be made, (5) is acquiring its Notes in a transaction that may be effected without loss of any applicable Investment Company Act exemption, (6) will provide notice to any subsequent transferee of the transfer restrictions applicable to such Notes under the Indenture or provided in such legend, (7) will hold and transfer its beneficial interest only in a principal amount of not less than the applicable Authorized Denomination, and (8) will provide the Issuer from time to time such information as it may reasonably request in order to ascertain compliance with this paragraph (i).

(ii)     The Notes are being purchased or transferred in accordance with the transfer restrictions set forth in this Indenture and pursuant to an exemption from Securities Act registration, and in accordance with applicable state securities laws or securities laws of any other relevant jurisdiction. It understands that the Notes have been offered only in a transaction not involving any public offering in the United States within the meaning of the Securities Act, the Notes have not been and will not be registered under the Securities Act or any state securities laws, and, if in the future it decides to offer, resell, pledge or otherwise transfer the Notes, such Notes may be offered, resold, pledged or otherwise transferred only in accordance with an exemption from registration under such laws and pursuant to the provisions of the Indenture and the legend on such Notes. In particular, it understands that interests in the Notes may be transferred only to (a) a Qualified Purchaser that is a Qualified Institutional Buyer or (b) a person that is not a "U.S. person" as defined in Regulation S under the Securities Act. Transferees who reside in certain states or jurisdictions may be subject to additional suitability standards and/or specific holding periods before the Notes may be resold or otherwise transferred.

It acknowledges that no representation is made as to the availability of any exemption under the Securities Act or any state securities laws for resale of the Notes.

(iii)    In connection with the purchase of the Notes (*provided* that no such representations in clauses (A), (B) or (C) below are made with respect to the Reference Portfolio Manager or its Affiliates by the Reference Portfolio Manager or any Affiliate of the Reference Portfolio Manager or by any account managed or advised by the Reference Portfolio Manager or any such Affiliate of the Reference Portfolio Manager: (A) it understands that none of the Issuers, the Reference Portfolio Manager, the Swap Counterparty, the Swap Guarantor, the Initial Purchaser, the Placement Agent, the Collateral Administrator or any of their respective Affiliates is acting as a fiduciary or financial or investment adviser for such beneficial owner; (B) such beneficial owner is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the Issuers, the Reference Portfolio Manager, the Swap Counterparty, the Swap Guarantor, the Initial Purchaser, the Placement Agent, the Trustee, the Collateral Administrator or any of their respective Affiliates, agents and independent contractors in their capacities as such other than any statements, if any, of such person in a current offering circular for the Notes; (C) such beneficial owner has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisers to the extent it has deemed necessary and has made its own investment decisions based upon its own judgment and upon any advice from such advisers as it has deemed necessary and not upon any view expressed by the Issuers, the Reference Portfolio Manager, the Swap Counterparty, the Swap Guarantor, the Initial Purchaser, the Placement Agent, the Trustee, the Collateral Administrator or any of their respective Affiliates, agents and independent contractors in their capacities as such; (D) such beneficial owner's purchase of the Notes will comply with all applicable laws in any jurisdiction in which it resides or is located; (E) such beneficial owner is acquiring the Notes as principal solely for its own account for investment and not with a view to the resale, distribution or other disposition thereof in violation of the Securities Act; (F) such beneficial owner has made investments prior to the date hereof and was not formed solely for the purpose of investing in the Notes; (G) such beneficial owner shall not hold any Notes for the benefit of any other person, it shall at all times be the sole beneficial owner thereof for purposes of the Investment Company Act and all other purposes and it shall not sell participation interests in the Notes or enter into any other arrangement pursuant to which any other Person shall be entitled to a beneficial interest in the distributions on the Notes; (H) all Securities (together with any other securities of the Issuers) purchased and held directly or indirectly by such beneficial owner constitute in the aggregate an investment of no more than 40% of its assets or capital; and (I) it is a sophisticated investor and is purchasing the Notes with a full understanding of all of the terms, conditions and risks thereof, and it is capable of assuming and willing to assume those risks.

(iv)    On each day from the date on which such beneficial owner acquires its interest in the Notes through and including the date on which such beneficial owner disposes of its interest in such Notes, either (A) such beneficial owner is not a Plan, an entity whose underlying assets include the assets of any Plan by reason of Department of Labor regulation Section 2510.3-101 or otherwise, or a governmental plan

that is subject to any federal, state or local law which is substantially similar to the provisions of Section 406 of ERISA or Section 4975 of the Code or (B) such beneficial owner's purchase, holding and disposition of such Notes (or interest therein) will not constitute or result in a prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental plan, any substantially similar federal, state or local law) for which an exemption is not available, all of the conditions of which are satisfied.

(v)     It understands that the Indenture permits the Issuer to demand that any holder of a beneficial interest in a Rule 144A Global Note who is determined not to be a Qualified Institutional Buyer and a Qualified Purchaser sell the Notes (A) to a person who is both a Qualified Institutional Buyer and a Qualified Purchaser in a transaction meeting the requirements of Rule 144A or (B) to a Person who will take delivery of the holder's interest in the Rule 144A Global Note in the form of an interest in a Temporary Regulation S Global Note or Regulation S Global Note, as applicable, and who is not a U.S. Person in a transaction meeting the requirements of Regulation S and, if such holder does not comply with such demand within 30 days thereof, the Issuer may cause such holder of the beneficial interest to sell such holder's interest in the Note on such terms as the Issuer may choose.

(vi)     It understands that in the case of any supplemental indenture to this Indenture or Swap Agreement Amendment that requires consent of one or more Holders of the Notes, this Indenture permits the Amendment Buy-Out Purchaser to purchase the beneficial interest in the Notes from any Non-consenting Holder thereof at the applicable Amendment Buy-Out Purchase Price; and such Non-consenting Holder will be required to sell its beneficial interest in this Notes to the Amendment Buy-Out Purchaser at such price.

(vii)     It understands that the maturity of the Notes is subject to an extension of four years to August 1, 2020 without consent of any holders of Securities at the option of the Swap Counterparty if certain conditions are satisfied.

(viii)     It acknowledges that it is its intent and that it understands it is the intent of the Issuer that, for purposes of U.S. federal income, state and local income and franchise tax and any other income taxes, the Issuer will be treated as a corporation, the Senior Notes will be treated as indebtedness of the Issuer, and the Income Notes will be treated as equity in the Issuer; it agrees to such treatment and agrees to take no action inconsistent with such treatment.

(ix)     It is not purchasing the Notes in order to reduce any United States federal income tax liability or pursuant to a tax avoidance plan. In the case of a transferee that is a bank (as defined in Section 881(c)(3)(a) of the Code) or an Affiliate of such a bank, the transferee (a) is acquiring the Notes as a capital markets investment and will not for any purpose treat the assets of the Issuer as loans acquired in its banking business, and (b) has not proposed or identified, and will not propose or identify, any security or loan for inclusion in the Reference Portfolio.

(x)     In the case of any transferee that is not a United States person (as defined in Section 7701(a)(30) of the Code), the transferee is not a bank (as defined in Section 881(c)(3)(a) of the Code) or an Affiliate of such a bank, unless the transferee is a person that is eligible for benefits under an income tax treaty with the United States that eliminates United States federal income taxation of United States source interest not attributable to a permanent establishment in the United States.

(xi)     It acknowledges that the Reference Portfolio Manager will act solely on behalf of the Swap Counterparty and will not act or be deemed to act on behalf of, or have any contractual relationship with, the Issuer or the Holder of Securities.

(xii)     It is aware that, except as otherwise provided in the Indenture, the Notes being sold to it will be represented by one or more Global Notes, and that beneficial interests therein may be held only through the Depositary.

(xiii)     It acknowledges that no governmental agency has passed upon the Notes or made any finding or determination as to the fairness of an investment in the Notes.

(xiv)     It acknowledges that certain persons or organizations will perform services on behalf of the Issuers and will receive fees and/or compensation for performing such services as described in the Offering Circular and Indenture.

(xv)     It acknowledges that the Notes do not represent deposits with or other liabilities or obligations of, and are not guaranteed or endorsed by, the Swap Counterparty, the Swap Guarantor, the Placement Agent, the Initial Purchaser, the Reference Portfolio Manager, the Trustee, the Collateral Administrator or any of their respective affiliates or any entity related to any of them or any other holder of Notes.  It acknowledges that none of such persons will, in any way, be responsible for or stand behind the value or the performance of the Notes or the assets held by the Issuer.  It acknowledges that purchase of Notes involves investment risks including possible delay in payment of distributions and loss of income and principal invested.

(xvi)     It understands that the Issuers, the Trustee, the Swap Counterparty, the Swap Guarantor, the Reference Portfolio Manager, the Initial Purchaser, the Collateral Administrator, and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

(h) Each transferee of a Temporary Regulation S Global Note or a Regulation S Global Note or a beneficial interest therein will be deemed to have made the representations set forth in Sections 2.6(g)(ii), (iii), (iv), (vi), (vii), (viii), (ix), (xi), (xii), (xiii), (xiv), and (xv), and in addition to have represented and agreed that:

(i)     It is aware that the sale of Notes to it is being made in reliance on the exemption from registration provided by Regulation S and understands that the Notes offered in reliance on Regulation S will bear the legend set forth on Exhibits A1-1, A2-1, B1-1, B2-1, C1-1 and C2-1 or A1-2, A2-2, B-2, C1-2 and C2-2 as the case may be, to this Indenture.  It and each beneficial owner of its Notes is not, and will not be, a U.S. Person

20

as defined in Regulation S under the Securities Act, and its purchase of the Notes will comply with all applicable laws in any jurisdiction in which it resides or is located. In addition, it represents and warrants that it will provide notice to any subsequent transferee of the transfer restrictions provided in such legend and in the Indenture and will provide the Issuer from time to time such information as it may reasonably request in order to ascertain compliance with this subclause (i).

(ii)     It understands that the Indenture permits the Issuer to demand that any holder of a beneficial interest in a Temporary Regulation S Global Note or Regulation S Global Note who is determined not to have acquired such beneficial interest in compliance with the requirements of Regulation S or who is a U.S Person sell such beneficial interest (A) to a Person who is not a U.S. Person in a transaction meeting the requirements of Regulation S or (B) to a Person who will take delivery of the beneficial interest of such holder in the Temporary Regulation S Global Notes or Regulation S Global Notes in the form of an interest in a Rule 144A Global Note, who is both a Qualified Institutional Buyer and a Qualified Purchaser in a transaction meeting the requirements of Rule 144A and, if the holder does not comply with such demand within 30 days thereof, the Issuer may cause the holder to sell its beneficial interest on such terms as the Issuer may choose.

(iii)     Such beneficial owner is aware that, except as otherwise provided in the Indenture, the Notes being sold to it will be represented (A) initially, by one or more Temporary Regulation S Global Notes and (B) after the Exchange Date, by one or more Regulation S Global Notes, and that beneficial interests therein may be held only through Euroclear or Clearstream.

(iv)     A holder of a beneficial interest in a Temporary Regulation S Global Note must provide Euroclear or Clearstream or the participant organization through which it holds such interest, as applicable, with a certificate certifying that the beneficial owner of the interest in the Temporary Regulation S Global Note is a non-U.S. Person, and Euroclear or Clearstream, as applicable, must provide to the Trustee a certificate to such effect, prior to (A) the payment of interest or principal with respect to the beneficial interest of such holder in the Temporary Regulation S Global Note and (B) any exchange of such beneficial interest for a beneficial interest in a Regulation S Global Note.

(v)     It understands that any resale or other transfer of beneficial interests in a Temporary Regulation S Global Note or Regulation S Global Note to U.S. Persons shall not be permitted.

(vi)     It will hold and transfer its beneficial interest in any Note only in the applicable Authorized Denomination.

(vii)     It understands that the Issuers, the Trustee, the Swap Counterparty, the Reference Portfolio Manager, the Initial Purchaser, the Placement Agent, the Collateral Administrator and their respective counsel will rely upon the accuracy and truth of the foregoing representations, and it hereby consents to such reliance.

(i) Transfers and exchanges of Certificated Income Notes, in whole or in part, shall only be made in accordance with this Section 2.6(i).

(i) Each initial purchaser and, after the Closing Date, each Person that becomes a Holder of Income Notes shall be required to deliver to the Trustee a Transferee Certificate (with appropriate modifications acceptable to the Issuer and the Trustee, including in the case of a transfer that is a mortgage, charge, pledge or hypothecation) in which it shall represent, warrant and agree as set forth therein.

(ii) If a Holder of an Income Note wishes at any time to transfer such Income Note, such Holder may transfer or cause the transfer of such Income Notes represented by one or more Certificated Income Notes as provided below. Upon receipt by the Trustee of (A) such Holder's Certificated Income Note properly endorsed for assignment to the transferee, (B) a Transferee Certificate provided by the transferee of such Certificated Income Note and (C) in the case of a transfer to an Accredited Investor that is not a Qualified Institutional Buyer, if requested by the Issuer, an Opinion of Counsel addressed to the Issuer and the Trustee to the effect that such transfer may be made pursuant to an exemption from registration under the Securities Act and any applicable state securities laws, then the Trustee shall cancel such Certificated Income Note in accordance with Section 2.10, cause the Registrar to record the transfer in the Securities Register in accordance with Section 2.6(a) and upon execution by the Issuer authenticate and deliver one or more Certificated Income Notes registered in the names specified in the assignment described in clause (A) above, in principal amounts designated by the transferee (the aggregate of such principal amounts being equal to the aggregate principal of the Certificated Income Notes transferred by the transferor), and in Authorized Denominations. After giving effect to such transfer, the Trustee shall deliver Certificated Income Notes to the transferor representing the principal amount of the Income Notes represented by the cancelled Certificated Income Note(s) (prior to such transfer) that was retained by such transferor. Any purported transfer of a Certificated Income Note not in accordance with this Section 2.6(i) and Section 2.6(n) shall be null and void ab initio and shall not be given effect for any purpose hereunder.

(iii) If a Holder of one or more Certificated Income Notes wishes at any time to exchange any or all such Certificated Income Notes for one or more Certificated Income Notes representing in the aggregate the same principal amount of Income Notes as are represented by the Certificated Income Notes to be exchanged, such Holder may exchange or cause the exchange of such Certificated Income Note(s) as provided below. Upon receipt by the Trustee of (A) such Holder's Certificated Income Notes properly endorsed for such exchange and (B) written instructions from such Holder designating the number and principal amounts of the Certificated Income Notes to be issued (the aggregate of such principal amounts being equal to the aggregate principal amount of the Certificated Income Notes surrendered for exchange), then the Trustee shall cancel such Certificated Income Notes in accordance with Section 2.10, cause the Registrar to record the exchange in the Securities Register in accordance with Section 2.6(a) and upon execution by the Issuer authenticate and deliver one or more Certificated Income Notes, registered in the same names as the Certificated Income Notes surrendered by such

22

Holder, in the principal amounts designated by such Holder, and in Authorized Denominations.

(j) The Trustee, the Registrar and the Issuers may (absent actual knowledge to the contrary) conclusively rely on, and assume the continuing accuracy of, the certifications contained in a Transfer Letter, Transferee Certificate, Class Q-1 Certificated Transfer Letter, Class Q-2A Certificated Transfer Letter or Class Q-2B Certificated Transfer Letter or other applicable letter delivered (or, if applicable, the representations set forth in Sections 2.6(g) and (h) and deemed to have made by the transferee) in connection with the purchase or transfer, as applicable, of any Securities or beneficial interests in any Securities and shall have no obligation to investigate the truth and correctness thereof or to verify that any transfer satisfies the requirements of this Section 2.6, Section 2.16(c) or Section 2.17(j), as applicable. In every instance, the Registrar shall also be entitled (but is not under a duty) to require an Opinion of Counsel from any prospective transferee to the effect that such proposed transfer is in compliance with this Section 2.6, Section 2.16(c) or Section 2.17(j), as applicable.

(k) If Securities are issued upon the transfer, exchange or replacement of Securities bearing the applicable legends set forth in the Exhibits hereto, and if a request is made to remove such applicable legend on such Securities, the Securities so issued shall bear such applicable legend, or such applicable legend shall not be removed, as the case may be, unless there is delivered to the Trustee and the Issuers such satisfactory evidence, which may include an Opinion of Counsel acceptable to them, as may be reasonably required by the Issuers (and which shall by its terms permit reliance by the Trustee), to the effect that neither such applicable legend nor the restrictions on transfer set forth therein are required to ensure that transfers thereof comply with the provisions of the Securities Act, the Investment Company Act, ERISA, the Code or other applicable law. Upon provision of such satisfactory evidence, the Trustee, at the written direction of the Issuers shall, after due execution by the Issuers, authenticate and deliver Securities that do not bear such applicable legend.

(l) So long as a Temporary Regulation S Global Note or Regulation S Global Note remains Outstanding, transfers of beneficial interests therein shall only be made in accordance with this Section 2.6. On or after the Exchange Date, interests in a Temporary Regulation S Global Note or Class Q-1 Temp Reg S Global Security may be exchanged for interests in the corresponding Regulation S Global Note or Class Q-1 Reg S Global Security, as the case may be, in the form of Exhibit A1-2, A2-2, B1-2, B2-2, C1-2, C2-2 or Q1-2 hereto, as the case may be. Any such Regulation S Global Note or Class Q-1 Reg S Global Security shall be so issued and delivered in exchange for only that portion of the Temporary Regulation S Global Note or Class Q-1 Temp Reg S Global Security, as the case may be, in respect of which there shall have been presented to the Depositary by Euroclear or Clearstream through its agent members, as the case may be, a certification to the effect that it has received from or in respect of Persons entitled to an interest (as shown by its records) therein, a certification that the beneficial interests in such Temporary Regulation S Global Note or Class Q-1 Temp Reg S Global Security, as the case may be, are owned by Persons who are non-U.S. Persons.

(m) <u>Invalid Transfers</u>. If a Responsible Officer of the Trustee has actual knowledge that (i) a transfer or attempted or purported transfer of any beneficial interest in any Note was consummated in violation of the provisions of this Indenture or on the basis of a

23

materially incorrect certification from the transferor or purported transferor or transferee or purported transferee, (ii) the holder of a beneficial interest in such Note failed to deliver to the Trustee the Transfer Letter or Transferee Certificate, if applicable, required to be delivered hereunder or (iii) the holder of any beneficial interest in a Note is in material breach of any representation or agreement set forth in the Transfer Letter or Transferee Certificate, if applicable, or any deemed representation or agreement of such holder of any beneficial interest in a Note, the Trustee will not register such attempted or purported transfer. If any such transfer has been registered, such transfer shall be absolutely null and void *ab initio* and shall vest no rights in the purported transferee (such purported transferee, a "Disqualified Transferee") and the last preceding beneficial owner that was not a Disqualified Transferee shall be restored to all rights as a beneficial owner thereof retroactively to the date of purported transfer of such Note by such beneficial owner (unless any applicable provisions of the rules of the Irish Stock Exchange provide otherwise); provided, however, that this provision shall not be interpreted to confer on any of the Issuer, the Co-Issuer, the Trustee or any Paying Agent any rights against Euroclear or Clearstream to require that Euroclear or Clearstream reverse or rescind any trade completed in accordance with the rules of Euroclear or Clearstream. In furtherance of the foregoing, (a) either of the Issuers shall be entitled to demand that a transferee of a beneficial interest in the Senior Notes that (i) acquired an interest in a Rule 144A Global Note but is not a Qualified Purchaser and a Qualified Institutional Buyer, or (ii) acquired an interest in a Temporary Regulation S Global Note or a Regulation S Global Note but is determined not to have acquired such interest in compliance with Regulation S or is a U.S. Person sell such Notes to a purchaser qualified under this Indenture to purchase such beneficial interest in the Notes and if the transferee does not comply with such demand within 30 days thereof, the Issuer or the Co-Issuer, may sell or cause such transferee to sell such interest of the transferee in the Note to a permitted transferee under this Indenture on such terms as the Issuer or Co-Issuer may choose; and (b) the Issuer shall be entitled to demand that a transferee of a Certificated Income Note that (i) is not both (A) a Qualified Purchaser and (B) a Qualified Institutional Buyer or an Accredited Investor or (ii) is determined not to have acquired such Certificated Income Notes in compliance with Regulation S sell such Certificated Income Notes to a purchaser qualified under this Section 2.6 to purchase such Certificated Income Notes and if the transferee does not comply with such demand within 30 days thereof, the Issuer may sell or cause such transferee to sell such interest of the transferee in the Note to a permitted transferee under this Indenture on such terms as the Issuer may choose.

(n) Notwithstanding anything to the contrary herein, no purchase by or proposed transfer to any person of Income Notes will be permitted, and the Trustee shall not register or permit the registration of any such purchase or transfer, if Holders of the Income Notes that have represented that they are Benefit Plan Investors would own 25% or more of the Aggregate Principal Amount of the Income Notes (excluding Income Notes in the form of the Class Q-1 Income Note Component, Income Notes represented by the Class Q-2 Collateral Asset A and Income Notes held by Controlling Persons) immediately after such purchase or transfer. Notwithstanding anything to the contrary herein, no purchase by or proposed transfer to any person of Class Q-1 Securities or Class Q-2B Securities will be permitted, if such person has represented that it is a Benefit Plan Investor, and the Trustee shall not register or permit the registration of any such purchase or transfer to a Person that has represented that it is a Benefit Plan Investor.

(o)     If any Person shall become the beneficial owner of an interest in any ERISA Restricted Note who has made an ERISA-related representation required by this Indenture that is subsequently shown to be false or misleading (any such person a "Non-Permitted ERISA Holder"), the Issuer shall, promptly after discovery that such person is a Non-Permitted ERISA Holder by the Issuer or the Trustee (and notice by the Trustee or the Co-Issuer to the Issuer, if either of them makes the discovery), send notice to such Non-Permitted ERISA Holder demanding that such Non-Permitted ERISA Holder transfer all or any portion of ERISA Restricted Note held by such Person to a Person that is not a Non-Permitted ERISA Holder within 30 days of the date of such notice.  If such Non-Permitted ERISA Holder fails to so transfer such ERISA Restricted Note the Issuer shall have the right, without further notice to the Non-Permitted ERISA Holder, to sell such ERISA Restricted Note or interest in such ERISA Restricted Note to a purchaser selected by the Issuer that is not a Non-Permitted ERISA Holder on such terms as the Issuer may choose. The Holder of each ERISA Restricted Note, the Non-Permitted ERISA Holder and each other Person in the chain of title from the Holder to the Non-Permitted ERISA Holder, by its acceptance of an interest in the ERISA Restricted Notes agrees to cooperate with the Issuer and the Trustee to effect such transfers.  The proceeds of such sale, net of any commissions, expenses and taxes due in connection with such sale shall be remitted to the Non-Permitted ERISA Holder.  The terms and conditions of any sale under this subsection shall be determined in the sole discretion of the Issuer, and the Issuer shall not be liable to any Person having an interest in the ERISA Restricted Notes sold as a result of any such sale or the exercise of such discretion.

SECTION 2.7     Mutilated, Destroyed, Lost or Stolen Notes.

(a)     If (i) any mutilated Note is surrendered to the Trustee, or the Trustee receives evidence to its satisfaction of the destruction, loss or theft of any Note, and (ii) there is delivered to the Trustee and the Issuers such security or indemnity as may be reasonably required by the Trustee and the Issuers to hold the Issuers and the Trustee harmless, then, in the absence of notice to the Issuers, the Registrar or the Trustee that such Note has been acquired by a protected purchaser, the Issuers shall execute and the Trustee shall authenticate and deliver, in exchange for or in lieu of any such mutilated, destroyed, lost or stolen Note, a replacement Note of the same Class of a like Aggregate Principal Amount, registered in the same manner, dated the date of its authentication, bearing interest from the date to which interest has been paid on the mutilated, defaced, destroyed, lost or stolen Note and bearing a number not contemporaneously outstanding; provided, however, that if any such destroyed, lost or stolen Note, but not a mutilated Note, shall have become or within seven (7) days shall be due and payable, instead of issuing a replacement Note, the Issuers may pay to the Holder of such destroyed, lost or stolen Note the amount payable thereunder when so due or payable without surrender thereof.

(b) If, after the delivery of a replacement Note or payment in respect of a destroyed, lost or stolen Note pursuant to subsection (a), a protected purchaser of the original Note in lieu of which such replacement Note was issued presents for payment, transfer or exchange such original Note, the Issuers and the Trustee shall be entitled to recover such replacement Note (or such payment) from (i) any Person to which it was delivered; (ii) the Person taking such replacement Note from the Person to which such replacement Note was delivered; or (iii) any assignee of such Person, except a protected purchaser, and the Issuers and the Trustee shall be entitled to recover upon the security or indemnity provided therefor to the

25

extent of any loss, damage, cost or expense incurred by the Issuers or the Trustee in connection therewith.

(c) In connection with the issuance of any replacement Note under this Section 2.7, the Issuers may require the payment by the Holder of such Note of a sum sufficient to cover any tax or other governmental charge that may be imposed in relation thereto and any other reasonable expenses (including all fees and expenses of the Trustee) connected therewith.

(d) Any duplicate Note issued pursuant to this Section 2.7 in replacement for any mutilated, destroyed, lost or stolen Note shall constitute an original additional contractual obligation of the Issuers, whether or not the mutilated, destroyed, lost or stolen Note shall be found at any time or be enforced by any Person, and shall be entitled to all the benefits of this Indenture equally and proportionately with any and all other Notes of the applicable Class duly issued hereunder.

(e) The provisions of this Section 2.7 are exclusive and shall preclude (to the extent lawful) all other rights and remedies with respect to the replacement or payment of mutilated, destroyed, lost or stolen Notes.

SECTION 2.8     Payments on the Notes.

(a) Each Class of Senior Notes shall accrue interest on the Aggregate Principal Amount thereof during each Periodic Interest Accrual Period at the applicable Interest Rate specified in Section 2.3. Subject to the availability of funds in the Trust Estate and to Section 8.6, payments of Periodic Interest shall be paid on each Class of Senior Notes on each Payment Date through the Maturity Date (or, if earlier, the date of redemption or repayment in full of such Class of Notes). In the event that the principal of any of the Senior Notes is not paid in full on the Maturity Date, no interest will accrue on the unpaid principal amount of any Senior Note subsequent to the Maturity Date. So long as any more senior Class of Notes is then Outstanding, any payment of interest due on Class B Notes, Class C-1 Notes or Class C-2 Notes which is not available to be paid ("Deferred Interest" with respect to such Notes) in accordance with Section 8.6 on any Payment Date shall not be considered "due and payable" hereunder (and so long as any more senior Class of Notes is then Outstanding, the failure to pay such interest shall not be an Event of Default unless the Issuer shall fail to pay in full such interest on the earlier of the Maturity Date and the date of redemption in full of the relevant Notes). Deferred Interest on any such Class of Notes shall be payable on the first Payment Date on which funds are available to be used for such purposes in accordance with Section 8.6, but in any event, no later than the earlier of the Maturity Date and such date of redemption. To the extent lawful and enforceable, interest on Deferred Interest with respect to any such Class of Notes shall accrue at the applicable Interest Rate for such Class until paid as provided herein. The Income Notes shall not accrue interest at a stated rate but on each Payment Date shall be entitled to distributions solely to the extent of available funds therefor pursuant to Section 8.6.

(b) The principal amount of the Notes of each Class shall be due and payable in accordance with Section 8.6 on the Maturity Date unless the unpaid principal of the Notes becomes due and payable at an earlier date upon a declaration of acceleration in accordance with Section 5.3, redemption in accordance with Section 2.14 or otherwise. If the unpaid principal

26

amount of the Notes shall become due and payable upon a declaration of acceleration, the Trustee shall make payments in respect of the principal and interest of the Notes as provided in Section 5.8.

(c) The Issuers shall require any certification from Holders necessary to permit the Issuer, the Trustee or any Paying Agent (A) to make payments to the Holders or others, or to receive payments on Eligible Investments or from the Swap Counterparty or others, without, or at a reduced rate of, withholding, (B) to determine their duties and liabilities with respect to any taxes or other charges that they may be required to deduct or withhold from payments made by or on behalf of the Issuer under any present or future law, rule, regulation or interpretation of the United States or the Cayman Islands or of any political subdivision thereof or taxing authority therein or to comply with any reporting or other requirement under any such law or regulation and (C) to comply with any filing, reporting or other requirement under any present or future law, rule, regulation or interpretation of any taxing authority or any political subdivision thereof to avoid the imposition of withholding or deduction of taxes or other charges on payments received by or on behalf of the Issuer, including (i) with respect to a Holder that is a U.S. person for U.S. federal income tax purposes, either a taxpayer identification number or proof of exemption from backup withholding (which shall be deemed satisfied by the delivery of a properly completed and signed Internal Revenue Service Form W-9 (or applicable successor form)) or (ii) with respect to a Holder that is not a U.S. person for U.S. federal income tax purposes, the delivery of a properly completed and signed Internal Revenue Service Form W-8BEN or W-8IMY with appropriate attachments (or in either case the applicable successor form).

(d) Except as otherwise provided herein, payments in respect of interest on and principal of and any other amounts payable, if any, on or in respect of any Note shall be payable by wire transfer in immediately available funds to a United States dollar account maintained at a bank by the Depositary or its nominee with respect to any Global Note and to the Holder or its designee with respect to a definitive Note or a Certificated Income Note shall be payable in accordance with wiring instructions provided to the Trustee or any Paying Agent; provided, that if appropriate instructions for any such wire transfer are not received at least fifteen (15) Business Days prior to the relevant Payment Date, then such payment shall be made by check drawn on a United States bank mailed to the address of the Holder specified in the Securities Register as of the Record Date applicable to such Payment Date. Upon final payment due on the Maturity Date of a Note, the Holder thereof shall present and surrender such Note at the Corporate Trust Office or as otherwise designated by the Trustee for such purpose on or prior to such date; provided, however, that if the Issuers and the Trustee shall have been furnished such security or indemnity as may be required by them to save each of them harmless and an undertaking thereafter to surrender such Note, then, in the absence of notice to the Issuers or the Trustee that the applicable Note has been acquired by a protected purchaser, such final payment shall be made without presentation or surrender. None of the Issuers, the Trustee, any Paying Agent, the Initial Purchaser, the Placement Agent, the Swap Counterparty, the Reference Portfolio Manager or any of their respective Affiliates will have any responsibility or liability for any aspects of the records maintained by Euroclear, Clearstream, the Depositary or any of the Participants or Indirect Participants or their respective participants relating to or for payments made thereby on account of beneficial interests in a Global Note.

(e) Except as otherwise provided herein, interest, principal and other amounts, if any, payable in respect of the Securities of any Class on any Payment Date or the Maturity Date or Class Q-2 Maturity Date, as applicable, shall be paid to the Holders of the Securities of such Class as of the related Record Date.

(f) Interest on the Class A-1 Notes, Class A-2 Notes, Class B Notes, the Class C-1 Notes and the Class Q-2A Securities shall be computed for each Periodic Interest Accrual Period on the basis of a 360-day year and the actual number of days in such Periodic Interest Accrual Period. Interest on the Class C-2 Notes shall be computed for each Periodic Interest Accrual Period on the basis of a 360-day year consisting of twelve 30-day months.

(g) If any Payment Date or the Maturity Date or the Class Q-2 Maturity Date, as applicable, or any other date for the payment of the principal of, or interest on, or any other amount payable on or in respect of, any Security is not a Business Day, then payment need not be made on such date, but shall be made on the next succeeding Business Day with the same force and effect as if made on the nominal date of any such Payment Date or Maturity Date or the Class Q-2 Maturity Date, as applicable, or any other date for the payment of the principal of, or interest on, or any other amount payable on or in respect of, any Security, as the case may be. In the case of the Class A-1 Notes, Class A-2 Notes, Class B Notes and Class C-1 Notes and the Class Q-2A Securities, interest shall accrue on such payment for the period from or after any such nominal date to the next succeeding Business Day and be payable on such Business Day as provided in the definitions of Periodic Interest for such Classes, and in the case of the Class C-2 Notes, no interest shall accrue on such payment for the period from and after any such nominal date to the next succeeding Business Day.

(h) Principal of, interest on and all other amounts payable on or in respect of the Notes or pursuant to this Indenture (other than amounts payable on Class Q-2 Securities, which shall be subject to the limited recourse provision in Section 2.17(i)) shall constitute limited recourse obligations of the Issuer and, in the case of the Senior Notes, non-recourse obligations of the Co-Issuer, payable solely from and to the extent of the Trust Estate, and following the liquidation of the Trust Estate and the application of the proceeds thereof as provided herein, all obligations of each of the Issuers and any claims against either of the Issuers shall be extinguished and shall not thereafter revive.  Neither of the Issuers, the Swap Counterparty, the Reference Portfolio Manager, the Trustee, the Collateral Administrator, nor any of their respective agents, partners, beneficiaries, officers, directors, employees or any Affiliate of any of them or any of their respective successors or assigns shall be personally liable for any amounts payable, or performance due, under the Notes or this Indenture.  It is understood that the foregoing provisions of this paragraph shall not (i) prevent recourse to the Trust Estate for the sums due or to become due under any security, instrument or agreement for which the Trust Estate is security, or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Notes or secured by this Indenture until all items in the Trust Estate have been liquidated and applied to the payment of the obligations, whereupon any outstanding indebtedness or obligation shall be extinguished.  It is further understood that the foregoing provisions of this paragraph shall not limit the right of any Person to name the Issuers as parties defendant in any action or suit or in the exercise of any other remedy under the Notes or in this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal

liability shall be asked for or (if obtained) enforced against any such Person or entity. The provisions of this Section 2.8(h) shall survive the termination of this Indenture.

(i) For so long as any of the Securities are listed on any stock exchange, to the extent required by the rules of such stock exchange, either of the Issuers or the Trustee shall notify such stock exchange in the event that the Securities do not receive scheduled payments of principal or interest on any Payment Date or the Maturity Date.

(j) Subject to the foregoing provisions of this Section 2.8 and the provisions of Sections 2.6, 2.7, 2.16 and 2.17, as applicable, each Security delivered under this Indenture and upon registration of transfer of or in exchange for or in lieu of any other Security shall carry the rights of unpaid interest, principal and other applicable amounts that were carried by such other Security.

SECTION 2.9    Persons Deemed Owners.

Except as may be otherwise expressly agreed, prior to due presentment for registration of transfer of any Note, the Issuers and the Trustee, and any agent of the Issuers or the Trustee, shall treat the Person in whose name any Note is registered as it appears on the Securities Register (with respect to payments only, as of the applicable Record Date) as the owner of such Note for the purpose of receiving payments of principal, interest and distributions on such Note and for all other purposes whatsoever (whether or not such Note is overdue), and none of the Issuer, the Co-Issuer, the Trustee, or any agent of any of them, shall be affected by notice to the contrary. The Depositary shall be deemed the owner of the Global Notes, and owners of beneficial interests in Global Notes shall not be considered the owners of any Notes for the purpose of receiving notices.

SECTION 2.10    Cancellation of Notes.

All Notes surrendered for payment, exchange or registration of transfer shall, if surrendered to any Person other than the Trustee, be delivered to the Trustee and shall be promptly canceled by the Trustee. Either of the Issuers may at any time deliver to the Trustee for cancellation any Notes previously authenticated and delivered hereunder which the Issuer or Co-Issuer, as applicable, may have acquired in any manner whatsoever, and all Notes so delivered shall be promptly canceled by the Trustee. No Notes shall be authenticated in lieu of or in exchange for any Notes canceled as provided in this Section 2.10, except as expressly permitted by this Indenture. All canceled Notes may be held or disposed of by the Trustee in accordance with its standard retention or disposal policy as in effect at the time unless the Issuer shall direct the Trustee that they be returned to the Issuers; provided, however, that such direction is timely and the Notes have not been previously disposed of by the Trustee.

SECTION 2.11    Swap Counterparty, Reference Portfolio Manager and Initial Purchaser as Holders.

Without limiting provisions hereof relating to the purchase of any Securities in connection with an Amendment Buy-Out pursuant to Section 9.6 or a Maturity Extension pursuant to Section 2.15 of this Indenture, each of the Swap Counterparty, the Reference Portfolio Manager and the Initial Purchaser and their respective Affiliates, in its individual or

any other capacity, may become an owner of the Securities (provided that such transactions are conducted on an arm's-length basis) and may otherwise deal with the Issuers or their respective Affiliates with the same rights that it would have if it were not the Swap Counterparty, the Reference Portfolio Manager, the Initial Purchaser or such an Affiliate.

SECTION 2.12    Treatment of Senior Notes.

The Issuer and each Holder of a Senior Note or beneficial owner of an interest in a Senior Note, by acquiring any Senior Note or interest therein, (i) expresses its intention that the Senior Notes be treated as evidencing indebtedness, which indebtedness is solely of the Issuer and (ii) unless otherwise required in a final determination by appropriate taxing authorities, agrees to treat the Senior Notes as indebtedness solely of the Issuer, in each case for the purpose of United States federal income taxes, state and local income and franchise taxes and any other taxes imposed upon, measured by or based upon gross or net income.

SECTION 2.13    No Gross Up.

The Issuers shall not be obligated to pay any additional amounts to the Holders or the beneficial owners of the Notes as a result of any withholding or deduction for, or on account of, any present or future taxes, duties, assessments or government charges with respect to the Notes.

SECTION 2.14    Redemption of Notes.

(a) On each Payment Date following the Ramp-up End Date for which a Coverage Test was not met as of the related Determination Date, principal payments on the Senior Notes will be made in accordance with the Priority of Payments.

(b) On each Payment Date, principal payments on the Senior Notes will be made in accordance with the Principal Priority of Payments to the extent of any Note Redemption Amounts for such Payment Date.

(c) In the event that any Rating Agency has not confirmed in writing the rating in effect on the Closing Date of any Class of Notes as of the 30th day following the Ramp-up End Date, principal payments on the Senior Notes will be made on subsequent Payment Dates in accordance with the Priority of Payments until each such rating is confirmed.

(d) If an Indenture Tax Event has occurred and is continuing, at the direction of Holders of a majority of the Aggregate Principal Amount of the Income Notes, the Issuers shall redeem (a "Tax Redemption") the Outstanding Notes on the Payment Date next following receipt of such direction (or, if such direction is received less than 45 Business Days prior to a Payment Date, on the next Payment Date thereafter) by the Trustee (the "Tax Redemption Date"), in the case of the Senior Notes at a price of par plus any accrued and unpaid interest thereon (including any Deferred Interest) to the redemption date; provided that the Swap Counterparty has consented to such redemption in its sole discretion and the Issuers have sufficient funds, after liquidation of Eligible Investments in the Trust Accounts pursuant to Section 8.3, to permit the payment of all Administrative Expenses and Subordinated Administrative Expenses and all Accrued Swap Liabilities as of the Tax Redemption Date and

30

the repayment in full of the Aggregate Principal Amount of all Classes of Senior Notes then Outstanding and all accrued and unpaid interest (including any Deferred Interest) with respect thereto in accordance with the Priority of Payments and all other amounts ranking senior to the Income Notes payable pursuant to the Priority of Payments. The Issuer shall provide the Rating Agencies and the Investment Agreement Counterparty prior notice of any redemption pursuant to this Section 2.14(d).

(e) After the date that is five and a half years following the Closing Date, at the direction of Holders of at least 66-2/3% in Aggregate Principal Amount of the Income Notes, the Issuers shall redeem (an "Optional Redemption") the Aggregate Principal Amount of all Outstanding Notes, in the case of the Senior Notes at par plus any accrued and unpaid interest (including any Deferred Interest) thereon to the redemption date plus, in the case of the Class C-2 Notes, the applicable Make-whole Premium on the Payment Date next following receipt of such direction by the Trustee (or, if such direction is received less than 45 Business Days prior to a Payment Date, on the next Payment Date thereafter) (the "Optional Redemption Date"); provided that the Issuers shall not so redeem the Notes unless the Issuers will have sufficient funds, after liquidation of Eligible Investments in the Trust Accounts pursuant to Section 8.3, to permit the payment of all Administrative Expenses and Subordinated Administrative Expenses and all Accrued Swap Liabilities as of the Optional Redemption Date (calculated taking into account all accrued and unpaid Base Amount, Subordinate Amount and Incentive Amount for such Optional Redemption Date to the extent provided in the Swap Agreement) and the repayment in full of the Aggregate Principal Amount of all Classes of Senior Notes then Outstanding and all accrued and unpaid interest (including any Deferred Interest) and any applicable Make-whole Premium with respect thereto in accordance with the Priority of Payments. The Issuer shall provide the Rating Agencies and the Investment Agreement Counterparty prior notice of any redemption pursuant to this Section 2.14(e).

SECTION 2.15    Maturity; Extension of Maturity.

The Maturity Date for each Class of Notes and the Class Q-1 Securities is August 1, 2016, unless extended in accordance with this Section 2.15.

(a) If the Swap Termination Date is extended pursuant to the Swap Agreement, on the Extension Effective Date, the Maturity Date of the Notes and the Class Q-1 Securities shall be automatically extended for four years, to August 1, 2020, without any requirement for approval or consent of any Holders of Securities or amendment or supplement to this Indenture; provided that the Extension Conditions are satisfied (the "Maturity Extension").

(b) In the case of a Maturity Extension, any Holder of Notes or Class Q-1 Securities wishing to sell such Securities to an Extension Qualifying Purchaser pursuant to the Extension Conditions must provide the applicable Extension Sale Notice within the Extension Sale Notice Period pursuant to subsection (e) below (such Securities as to which an Extension Sale Notice has been duly given, "Extension Sale Securities"). Notwithstanding anything to the contrary herein, each Holder providing an Extension Sale Notice shall be deemed to agree that no Extension Sale Securities of any Holder shall be purchased unless all Extension Sale Securities of all Holders are purchased and settled at the applicable Extension Purchase Price on the Extension Effective Date and the other Extension Conditions are satisfied as of such date.

31

(c) <u>Extension Conditions</u>. The Maturity Extension shall be effective only if the following conditions (the "<u>Extension Conditions</u>") are satisfied:

(i)     The purchase of all Extension Sale Securities has been settled by the designated Extension Qualifying Purchasers at the applicable Extension Purchase Price as of the Extension Effective Date;

(ii)     All such purchases of Extension Sale Securities individually and in the aggregate comply with the applicable transfer restrictions in this Indenture (including, without limitation, the restriction that such Securities may not be purchased (x) in the case of the Class Q-1 Securities by any Person that is a Benefit Plan Investor and (y) in the case of the Income Notes, if Holders of the Income Notes that have represented that they are Benefit Plan Investors would own 25% or more of the Aggregate Principal Amount of the Income Notes (excluding Income Notes in the form of the Class Q-1 Income Note Component, Income Notes represented by the Class Q-2 Collateral Asset A and Income Notes held by Controlling Persons) immediately after such purchase and the legends on such Securities and all applicable law, rules and regulations (including, without limitation, rules, regulations and procedures of any applicable securities exchange, self-regulatory organization or clearing agency); and

(iii)     (a) Rating Confirmation has been obtained from S&P (so long as any Securities are then rated by S&P) (which confirmation shall be based on S&P's applicable rating criteria and models pursuant to which the applicable Securities were rated by S&P as of the Closing Date) and (b) either (i) all Coverage Tests and clauses 17, 18 and 22 of the Reference Portfolio Criteria are satisfied as of the Extension Determination Date and the rating of each Class of Senior Notes by Moody's has not been downgraded, withdrawn or qualified from that in effect on the Closing Date (unless it subsequently has been reinstated to the rating assigned on the Closing Date) or (ii) Rating Confirmation has been obtained from Moody's (so long as any Securities are then rated by Moody's).

The Issuer, the Trustee and, by its acceptance of the Securities, each Holder of Securities agrees that the Swap Counterparty shall not be responsible for causing the Extension Conditions to be satisfied and shall not be liable to any such Person or Holder of Securities (whether or not such Holder gave an Extension Sale Notice with respect to its Securities) or to any other Person if the Extension Conditions are not satisfied. Failure of the Extension Conditions to be satisfied shall not constitute a Default or Event of Default under this Indenture or a Swap Event of Default.

(d) <u>Extension Procedure</u>.

(i)     No later than three (3) Business Days following receipt by the Trustee of the notice given by the Swap Counterparty of the Swap Counterparty's election to extend the Swap Termination Date (the "<u>Extension Notice</u>"), the Trustee shall mail the Extension Notice to all Holders of Securities and each Rating Agency (so long as any rated Securities are Outstanding), in the form of <u>Exhibit N</u>, and shall request Rating Confirmation for the Maturity Extension from S&P, if applicable;

32

(ii)      Any Holder of Securities may give irrevocable notice (an "Extension Sale Notice") within 30 days after the Trustee has mailed the Extension Notice (the "Extension Sale Notice Period") of its intention to sell its Securities to an Extension Qualifying Purchaser in the case of a Maturity Extension. Any Extension Sale Notice received by the Trustee after the Extension Sale Notice Period shall be disregarded and deemed not to have been given. No Holder of Securities that has not given such an Extension Sale Notice within the Extension Sale Notice Period shall be entitled to sell its Securities to an Extension Qualifying Purchaser in connection with the Maturity Extension; and

(iii)      If clause (iii)(b)(i) of the Extension Conditions is not satisfied as of the Extension Determination Date as determined by the Issuer (or its agent), the Trustee shall request Rating Confirmation from Moody's, if applicable.

(e) On the Extension Determination Date, the Issuer (or its agent) shall confirm (i) whether or not Extension Qualifying Purchasers for all Extension Sale Securities have been designated to purchase such Securities in compliance with all transfer restrictions in this Indenture and the legends on such Securities and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency), (ii) whether the requirements of clause (c)(iii) of the Extension Conditions are satisfied as of the Extension Determination Date and (iii) whether all other Extension Conditions can be satisfied as of the Extension Effective Date.

(f) On the Extension Effective Date, the Maturity Extension shall automatically become effective under the terms of this Indenture, provided that all Extension Conditions set forth in clause (c) above are satisfied. No later than 2 Business Days after the Extension Effective Date, the Trustee, at the expense of the Issuers, shall mail a notice to all Holders of Securities, the Swap Counterparty, the Reference Portfolio Manager, the Investment Agreement Counterparty, each Rating Agency (so long as any rated Securities are Outstanding) and the Irish Stock Exchange (if and for so long as any Class of Securities is listed thereon) confirming whether or not the Maturity Extension became effective. If the Maturity Extension became effective, the Issuer shall make any required notifications thereof to the Depositary for any Securities subject to the Maturity Extension.

(g) In the case of a Maturity Extension, each Holder of Senior Notes (including in the form of the Class Q-1 Senior Note Component) other than Extension Sale Securities shall be entitled to receive an amount equal to the applicable Extension Bonus Payment. Holders of Income Notes shall not be entitled to receive any Extension Bonus Payment.

The Extension Bonus Payment on any such Class of Senior Notes shall be payable to any applicable qualifying beneficial owners who have provided the Trustee with an Extension Bonus Eligibility Certification, on the first Payment Date from and including the Extension Effective Date on which funds are available to be used for such purposes in accordance with Section 8.6, but in any event, no later than the earlier of the Maturity Date and the date of redemption of such Notes. Extension Bonus Payments which are not available to be paid on a Payment Date in accordance with Section 8.6 on a Payment Date shall not be considered "due and payable" hereunder. The failure to pay any such Extension Bonus Payment

33

on such date shall not be an Event of Default, unless the Issuer shall fail to pay in full such Extension Bonus Payment on the earlier of the Maturity Date and the date of redemption in full of the relevant Securities. Unpaid Extension Bonus Payments shall not accrue interest. Such amounts shall be paid to the accounts designated in the applicable Extension Bonus Eligibility Certification or, to the extent otherwise required by the rules of any applicable securities exchange or clearing agency, in a manner determined by the Issuer.

SECTION 2.16    Class Q-1 Securities.

The provisions of this Section 2.16 shall apply only to the Class Q-1 Securities and shall override any contrary or inconsistent provisions of this Indenture. Subject to the foregoing sentence, the other provisions of Article II shall apply to the Class Q-1 Securities to the same extent as the Notes.

(a)    In addition to the Classes of Notes set forth in Section 2.3, the Issuer will issue the Class Q-1 Extendable Securities (the "Class Q-1 Securities"). The maximum initial stated amount of the Class Q-1 Securities that may be executed and delivered under this Indenture is limited to U.S.$ 10,000,000. The Aggregate Principal Amounts of the Components of the Class Q-1 Securities are included in, and are not in addition to, the Aggregate Principal Amounts of the Class C-2 Notes and the Income Notes as set forth in Section 2.3.

(b)    All Class Q-1 Securities initially sold in the United States or to U.S. Persons pursuant to Rule 144A under the Securities Act will be issued and may be transferred in the form of certificates (each a "Certificated Class Q-1 Security") in definitive, physical certificates in fully registered form, registered in the name of the beneficial owner thereof or its nominee and in the form of Exhibit Q-1 Certificated hereto. All Class Q-1 Securities initially sold to non-U.S. Persons (as defined in Regulation S) in offshore transactions in reliance on Regulation S will be issued in the form of a temporary global security (the "Class Q-1 Temp Reg S Global Security") in the form of Exhibit Q-1 Temp Reg S, and on or after the Exchange Date, shall be exchangeable for interests in a permanent global security (a "Class Q-1 Reg S Global Security") in the form of Exhibit Q-1 Reg S, subject to the provisions of Sections 2.2, 2.5 and 2.6 to the same extent as other Temporary Regulation S Global Notes and Regulation S Global Notes (but subject to clause (c) below with respect to transfers of any interest therein). Class Q-1 Securities shall only be issued and held in minimum denominations (an "Authorized Class Q-1 Denomination") such that the Class Q-1 Senior Note Component and the Class Q-1 Income Note Component thereof is in an Authorized Denomination, which shall mean that the Authorized Class Q-1 Denomination shall be $1,000,000 in stated amount (consisting of $500,000 Aggregate Principal Amount of the Class Q-1 Senior Note Component and $500,000 Aggregate Principal Amount of the Class Q-1 Income Note Component).

(c)    No transfer of a Class Q-1 Security will be permitted to a person that would not be permitted to acquire the Class C-2 Notes and Income Notes comprising the Components of the Class Q-1 Security under this Indenture.

(i)    Certificated Class Q-1 Security to Certificated Class Q-1 Security. Each purchaser or transferee of a Certificated Class Q-1 Security will be required to provide to the Trustee a properly completed certificate in the form of Exhibit Q-1

Certificated Transfer Letter.  If a Holder of a Certificated Class Q-1 Security wishes at any time to transfer such Certificated Class Q-1 Security, such Holder may transfer or cause the transfer of such Certificated Class Q-1 Security as follows:  Upon receipt by the Registrar of (A) such Holder's Certificated Class Q-1 Security properly endorsed for assignment to the transferee and (B) a properly completed certificate by the transferee in the form of Exhibit Q-1 Certificated Transfer Letter, and any other documentation as may be required thereunder, the Trustee will cancel such Certificated Class Q-1 Security in accordance with this Indenture, cause the Registrar to record the transfer in the Securities Register and, upon execution by the Issuer, deliver to the transferee one or more Certificated Class Q-1 Securities in the aggregate stated amount transferred and in the Authorized Class Q-1 Denomination.  Notwithstanding anything to the contrary herein, no purchase or proposed transfer of Class Q-1 Securities will be permitted, and the Trustee shall not register or permit the registration of any such purchase or transfer, to a Person that has represented that it is a Benefit Plan Investor.  Any purported transfer in violation of this provision shall be null and void *ab initio*.

    (ii)  Class Q-1 Reg S Global Security to Certificated Class Q-1 Security. If a holder of a beneficial interest in Class Q-1 Securities in the form of a Class Q-1 Temp Reg S Global Security or Class Q-1 Reg S Global Security wishes at any time to transfer its interest in such Security, the transferee must take delivery thereof in the form of a Certificated Class Q-1 Security. Such Holder may, subject to the rules and procedures of the Depositary, transfer or cause the transfer of such interest for an equivalent interest in one or more such Certificated Class Q-1 Securities as described below.  Upon receipt by the Registrar of (A) instructions given in accordance with the Applicable Procedures from a Participant, directing the Registrar to deliver one or more such Certificated Class Q-1 Securities, designating the registered name or names, address, payment instructions, and the number and stated amount (and Aggregate Principal Amount of the related Components) of such Certificated Class Q-1 Securities to be executed and delivered (the aggregate stated amount of such Certificated Class Q-1 Notes being equal to the aggregate stated amount of the interest in the Class Q-1 Temp Reg S Global Security or Class Q-1 Reg S Global Security to be transferred), in Authorized Class Q-1 Denominations and (B) a properly completed certificate by the transferee in the form of Exhibit Q-1 Certificated Transfer Letter, and any other documentation as may be required thereunder, then the Registrar will instruct the Depositary to reduce, or cause to be reduced, the applicable Class Q-1 Temp Reg S Global Security or Class Q-1 Reg S Global Security by the aggregate stated amount of the beneficial interest in such Class Q-1 Temp Reg S Global Security or Class Q-1 Reg S Global Security to be transferred and the Registrar shall record the transfer in the Securities Register and authenticate and deliver one or more Certificated Class Q-1 Securities registered in the names specified in the certificate described in clause (B) above in the stated amount designated by the transferee (the aggregate of such stated amount being equal to the beneficial interest in the Class Q-1 Temp Reg S Global Securities or Class Q-1 Reg S Global Securities to be transferred) and in the applicable Authorized Class Q-1 Denomination. Any purported transfer in violation of this provision shall be null and void *ab initio*.

(iii)   No Transfer to Class Q-1 Reg S Global Security. Certificated Class Q-1 Securities may not be transferred or exchanged for Class Q-1 Securities in the form of Class Q-1 Temp Reg S Global Securities or Class Q-1 Reg S Global Securities.

(d)     Except as otherwise provided herein, the rights and obligations of Holders of the Class Q-1 Securities shall consist solely of the rights and obligations of Holders of the applicable Components.  References herein to the rights and obligations of the Holders of Class C-2 Notes, Class C Notes or Income Notes include the rights and obligations of the Holders of Class Q-1 Securities to the extent of the applicable Components.

(i)     On each date on which payments are made with respect to the Class C-2 Notes or Income Notes, a portion of such payment or distribution shall be allocated to the Class Q-1 Securities in the proportion that the Aggregate Principal Amount of Notes comprising the applicable Component thereof bears to the Aggregate Principal Amount of the related Class of Notes as a whole (including the related Components) and in accordance with the applicable terms and conditions hereof.  No other amounts shall be payable in respect of the Class Q-1 Securities.

(ii)    The Holders of Class Q-1 Securities will be entitled to voting rights based on the voting rights of the respective underlying Class C-2 Notes or Income Notes related to any applicable Component in the proportion that the Aggregate Principal Amount of such Class C-2 Notes or Income Notes bears to the Aggregate Principal Amount of all Class C-2 Notes or Income Notes (including such Component), as applicable.  Except as expressly provided herein, the Holders of the Class Q-1 Securities shall not be entitled to voting rights as a separate class.  Additionally, the Holders of Class Q-1 Securities shall not be entitled to direct the Trustee pursuant to this Indenture except in the capacity as Holders of Class C-2 Notes or Income Notes to the extent of their interest in any applicable Component.

(e)     A Holder of a Class Q-1 Security may exchange all or a proportionate amount of each Component for proportionate interests in the Class C-2 Notes and Income Notes, as applicable, that comprise such Components, subject to the Authorized Denominations for the Notes and the Authorized Class Q-1 Denomination and, in the manner provided in Sections 2.2, 2.5 and 2.6 hereof, in the case of the Class C-2 Senior Note Component, for transfer of beneficial interests to a Rule 144A Global Note, Regulation S Global Note or Temporary Regulation S Global Note, and in the case of the Class Q-1 Income Note Component, for transfer of a Certificated Income Note.  The Trustee, upon surrender of a Certificated Class Q-1 Security for such an exchange, shall simultaneously convert the constituent Components into the Class C-2 Notes and Income Notes comprising such Components, as applicable, and effect such exchange. Thereafter, the Holder of the Class Q-1 Security so exchanged will be the Holder of an interest in the Class C-2 Notes and the Income Notes received upon such an exchange.  No Holder of Class C-2 Notes or Income Notes (including following such an exchange) will be entitled to exchange such Notes for a Class Q-1 Security.  No service charge shall be made for any such exchange of Class Q-1 Securities, but the Issuer or the Trustee may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with such exchange. Each Holder of a Class Q-1 Security, by its acceptance thereof, acknowledges that upon any such exchange, the rating of such Class Q-1 Security by any Rating Agency may not apply to the

36

Securities received in such exchange. Upon the exchange of all outstanding Class Q-1 Securities pursuant to this provision, the Issuer will notify each Rating Agency then rating the Class Q-1 Securities.

(f)     The Class Q-1 Nominal Rate is the rate per annum at which interest is stated to be payable on the Class Q-1 Securities solely for purposes of calculating the Class Q-1 Nominal Principal, and does not limit the entitlement of Holders of the Class Q-2 Securities to receive Class Q-1 Excess Distributions.

Each Holder of a Class Q-1 Security, by its acquisition thereof, acknowledges that the rating of the Class Q-1 Securities by Moody's addresses solely the return of the Class Q-1 Rated Principal.

(g)     For purposes of Section 2.12, references to "Senior Notes" shall, with respect to the Class Q-1 Securities, be deemed to refer only to the Class Q-1 Senior Note Component.

(h)     If a Responsible Officer of the Trustee has actual knowledge that (i) a transfer or attempted or purported transfer of any interest in any Class Q-1 Security was consummated in violation of this Indenture or on the basis of a materially incorrect certification from the transferee or purported transferee, (ii) the transferee or the purported transferee failed to deliver to the Trustee the certificate in the form of Exhibit Q-1 Certificated Transfer Letter or other purchaser letter or certificate or any other documentation required to be delivered thereunder or hereunder or (iii) the transferee or purported transferee is in material breach of any representation or agreement set forth in the certificate in the form of Exhibit Q-1 Certificated Transfer Letter or other purchaser letter or certificate or in this Indenture, the Trustee will not register such attempted or purported transfer. If any such transfer has been registered, such transfer shall be absolutely null and void *ab initio* and shall vest no rights in the purported transferee (such purported transferee, a "Disqualified Transferee") and the last preceding owner that was not a Disqualified Transferee shall be restored to all rights as a owner thereof retroactively to the date of purported transfer of such Class Q-1 Security by such owner. In furtherance of the foregoing, the Issuer shall be entitled to demand that a transferee of a Class Q-1 Security that (i) acquired an interest in a Class Q-1 Security in reliance on Rule 144A but is not a Qualified Purchaser and a Qualified Institutional Buyer, or (ii) acquired an interest in a Class Q-1 Security in reliance on Regulation S but is determined not to have acquired such interest in compliance with Regulation S or is a U.S. Person sell such Class Q-1 Securities to a purchaser qualified under this Indenture to purchase such Class Q-1 Securities and if the transferee does not comply with such demand within 30 days thereof, the Issuer may sell or cause such transferee to sell such interest of the transferee in the Class Q-1 Security to a permitted transferee under this Indenture on such terms as the Issuer may choose.

SECTION 2.17     Class Q-2 Securities.

The provisions of this Section 2.17 shall apply only to the Class Q-2 Securities and shall override any contrary or inconsistent provisions of this Indenture. Subject to the foregoing sentence, the other provisions of Article II shall apply to the Class Q-2 Securities to the same extent as the Notes.

(a) <u>Authorized Amount; Maturity Date; Denomination</u>.

In addition to the Classes of Notes set forth in Section 2.3 and the Class Q-1 Securities set forth in Section 2.16, the Issuer will issue Class Q-2A Securities and Class Q-2B Securities (collectively, the "<u>Class Q-2 Securities</u>"). The maximum Aggregate Principal Amount of the Class Q-2A Securities and the Class Q-2B Securities that may be executed, authenticated and delivered under this Indenture is limited to U.S. $7,200,000 and U.S. $40,000,000, respectively. The maturity date for the Class Q-2 Securities (the "<u>Class Q-2 Maturity Date</u>") is April 28, 2034. The Class Q-2A Securities will be issuable and transferable in minimum denominations of U.S.$500,000 and integral multiples of U.S. $1,000 in excess thereof. The Class Q-2B Securities will be issuable and transferable in minimum denominations of U.S.$1,000,000 and integral multiples of U.S. $1,000 in excess thereof.

(b) <u>Form of Class Q-2 Securities</u>.

All Class Q-2 Securities shall be issued in the form of certificated securities (each a "<u>Certificated Class Q-2 Security</u>") in definitive, physical certificates in fully registered form without interest coupons with the applicable legends set forth in the form of <u>Exhibit Certificated Class Q-2A</u> and <u>Exhibit Certificated Class Q-2B</u> hereto, as appropriate, which shall be registered in the name of the beneficial owner or a nominee thereof, duly executed by the Issuer and authenticated by the Trustee as provided in Article II of this Indenture.

(c) <u>Payments on the Class Q-2 Securities</u>.

(i) The Class Q-2A Securities shall accrue interest on the Aggregate Principal Amount thereof during each Periodic Interest Accrual Period at a rate equal to LIBOR plus 0.50% per annum (the "<u>Class Q-2A Interest Rate</u>"). Subject to the availability of funds in the Class Q-2 Securities Collateral Account and to clause (d) below, payments of interest shall be paid on the Class Q-2A Securities on each Payment Date through and including the Class Q-2 Maturity Date (or, if earlier, the date of redemption or repayment in full of the Class Q-2A Securities). In the event that the principal of the Class Q-2A Securities is not paid in full on the Class Q-2 Maturity Date, no interest will accrue on the unpaid principal amount thereof subsequent to the Class Q-2 Maturity Date. Any payment of interest due on Class Q-2A Securities which is not available to be paid ("<u>Class Q-2A Deferred Interest</u>") in accordance with clause (d) on any Payment Date shall not be considered "due and payable" hereunder and the failure to pay such interest shall not be a Class Q-2 Event of Default. Class Q-2A Deferred Interest shall be payable on the first Payment Date on which funds are available to be used for such purposes in accordance with clause (d) below. To the extent lawful and enforceable, interest on Class Q-2A Deferred Interest shall accrue at the applicable Class Q-2A Interest Rate until paid as provided herein.

(ii) The Class Q-2B Securities shall not accrue interest at a stated rate but on each Payment Date shall be entitled to distributions solely to the extent of available funds therefor pursuant to clause (d) below.

38

(iii)   The Aggregate Principal Amount of the Class Q-2A Securities shall be due and payable in accordance with clause (d) below on the Class Q-2 Maturity Date unless paid earlier as provided pursuant to clause (d) below.

(d)   Class Q-2 Priority of Payments.

(i)   Class Q-2 Payment Date Priority of Payments. On each Payment Date, the Trustee shall distribute the Class Q-2 Payment Date Proceeds in the Class Q-2 Securities Collateral Account to make the following payments in the following order of priority (the "Class Q-2 Payment Date Priority of Payments"):

(A)   to the Holders of the Class Q-2A Securities, the Class Q-2A Interest Amount;

(B)   to the Holders of the Class Q-2A Securities, any Class Q-2A Deferred Interest;

(C)   to the Holders of the Class Q-2A Securities, the Aggregate Principal Amount of the Class Q-2A Securities; and

(D)   the remainder to the Holders of the Class Q-2B Securities (the "Net Class Q-2B Periodic Return Amount").

(ii)   Class Q-2B Target Amount.  On each Payment Date, the Trustee shall distribute from Class Q-2 Gross Proceeds other than the Class Q-2 Payment Date Proceeds to the Holder of Class Q-2B Securities the Class Q-2B Target Amount, if any, for such date.

(iii)   Class Q-2 Maturity Date Priority of Payments. On the Class Q-2 Maturity Date, the Trustee will distribute any Class Q-2 Collateral Asset B Proceeds and any other amounts on deposit in the Class Q-2 Securities Collateral Account to make the following payments in the following order of priority (the "Class Q-2 Maturity Date Priority of Payments"):

(A)   to the Holders of the Class Q-2A Securities, the Aggregate Principal Amount of the Class Q-2A Securities, any accrued and unpaid Class Q-2A Interest Amount and any Class Q-2A Deferred Interest; provided that no more than $7,200,000 shall be payable pursuant to this clause (A) from Class Q-2 Collateral Asset B Proceeds; and

(B)   the remainder to the Holders of the Class Q-2B Securities (the "Final Class Q-2B Distribution Amount").

(e)   Class Q-2 Securities Collateral Account.

(i)   The Trustee shall, on or prior to the Closing Date, establish a segregated trust account in the name of the Trustee for the benefit of the Holders of Class Q-2 Securities, which shall be designated as the Valhalla CLO, Ltd. – Class Q-2

Securities Collateral Account (the "Class Q-2 Securities Collateral Account"). All moneys credited from time to time to the Class Q-2 Securities Collateral Account shall be held by the Trustee as part of the Class Q-2 Securities Collateral and shall be applied for the purposes provided herein.

(ii)     On the Closing Date, the Issuer shall cause to be Delivered to the Class Q-2 Securities Collateral Account (i) the Class Q-2 Collateral Asset A and (ii) the Class Q-2 Collateral Asset B.

(iii)     Except as otherwise expressly provided in this Indenture, the Trustee shall deposit into the Class Q-2 Securities Collateral Account promptly upon receipt from time to time, all proceeds from the Class Q-2 Collateral Assets, including, without limitation, distributions on the Class Q-2 Collateral Asset A and any proceeds from the sale, redemption or maturity of all or portions of the Class Q-2 Collateral Assets.

(iv)     The Trustee shall have the right to establish such subaccounts within the Class Q-2 Securities Collateral Account as the Trustee may deem necessary or appropriate for convenience in administering the Class Q-2 Securities Collateral.

(v)     The Trustee shall invest moneys held from time to time in the Class Q-2 Securities Collateral Account in one or more Eligible Investments pursuant to the following sentence, if the Class Q-2A Securities are then Outstanding, and otherwise pursuant to the unanimous written direction of the Holders of the Class Q-2B Securities (which may be in the form of standing instructions).  If the Class Q-2A Securities are then Outstanding, or if the Trustee does not receive such written directions within three days of receipt of uninvested moneys (whether by reason of a new deposit of moneys or payments in respect of, or realized upon the maturity of, existing Eligible Investments), the Trustee shall invest such moneys in the JPMorgan Fleming US Dollar Liquidity Fund 6052, provided such fund then meets the requirements of the definition of Eligible Investments, and if such fund then does not meet such requirement, an Eligible Investment that meets the requirements of clause (a) of the definition of Eligible Investments; provided further, that any Eligible Investment in the Class Q-2 Securities Collateral Account shall be required to mature on or before the Business Day prior to the next Payment Date. Each Eligible Investment (other than any Eligible Investment constituting a general intangible, a deposit account or an account) made using money credited to the Class Q-2 Securities Collateral Account shall be credited to the Class Q-2 Securities Collateral Account, and any income or other gain therefrom shall be credited to, and any loss resulting therefrom shall be charged to, the same Class Q-2 Securities Collateral Account.  Any Eligible Investments constituting general intangibles, deposit accounts and accounts shall be Delivered to the Trustee.  The Trustee shall not be liable by reason of any investment loss realized in connection with any Eligible Investment.

(vi)     Section 8.5 shall be applicable to the Class Q-2 Securities Collateral Account with references to a "Trust Account" thereunder being deemed to refer to the Class Q-2 Securities Collateral Account.

40

(f)  Rights with respect to the Class Q-2 Collateral Asset A.

(i)  With respect to any matter under this Indenture as to which the Holders of Income Notes are entitled to vote or give any consent or direction, the Trustee shall follow the direction of the Holders of a majority of the Aggregate Principal Amount of the Class Q-2B Securities for purposes of voting or giving such consent or direction for the Income Notes represented by the Class Q-2 Collateral Asset A.  The Holders of Class Q-2 Securities shall not otherwise be entitled to direct the Trustee with respect to the Trust Estate pursuant to this Indenture.

(ii)  If as a result of any action pursuant to clause (i) the Holder of the Income Notes represented by the Class Q-2 Collateral Asset A would constitute a Non-consenting Holder, the Amendment Buy-Out Purchaser will be entitled to purchase the Income Notes represented by the Class Q-2 Collateral Asset A in accordance with Section 9.6 hereof, and the proceeds of such purchase shall be credited to the Class Q-2 Securities Collateral Account for distribution on the next succeeding Payment Date pursuant to subsection (d) above. The Class Q-2 Securities themselves shall not be subject to an Amendment Buy-Out pursuant to Section 9.6.

(iii)  Without limiting clause (i), in the case of the Maturity Extension, if any, pursuant to Section 2.15, the Holders of a majority of the Aggregate Principal Amount of the Class Q-2B Securities shall be entitled to direct the Trustee to provide an Extension Sale Notice with respect to the Income Notes represented by the Class Q-2 Collateral Asset A.  Any proceeds from an Extension Sale with respect to the Income Notes represented by the Class Q-2 Collateral Asset A shall be credited to the Class Q-2 Securities Collateral Account for distribution on the applicable Payment Date pursuant to subsection (d) above.

(g)  Liquidation of Class Q-2 Collateral Asset A.

If the Class Q-2A Coverage Test is not satisfied on any date of determination (as determined by the Trustee in consultation with the Swap Counterparty or an affiliate of the Swap Counterparty designated by the Swap Counterparty) following the Closing Date, at the unanimous direction of the Holders of the Class Q-2A Securities, the Issuer shall cause the Trustee to liquidate the Class Q-2 Collateral Asset A and credit the proceeds thereof to the Class Q-2 Securities Collateral Account for distribution in accordance with clause (d) above upon receipt of such proceeds as though the date of receipt thereof were a Payment Date.

(h)  Exchange of Class Q-2B Securities.

On any Business Day on and after the date on which the Class Q-2A Securities are redeemed or repaid in full, any Holder of a Class Q-2B Security may exchange all but not less than all of its Class Q-2B Securities for its applicable pro rata share of the Class Q-2 Collateral Asset A (subject to the provisions of 2.6(i)(A) regarding acquiring Income Notes in the form of a Certificated Income Note) and the Class Q-2 Collateral Asset B (subject to any restrictions on transfer with respect thereto) and any proceeds thereof in the Class Q-2 Securities Collateral Account.  The Trustee, upon surrender of a Certificated Class Q-2B Security by a

Holder for such an exchange, shall simultaneously convert the applicable portion of the Class Q-2 Collateral Asset A into Certificated Income Notes and transfer the applicable portion of the Class Q-2 Collateral Asset B to such Holder in accordance with standard settlement procedures for assets of that type and effect such exchange. Thereafter, the Holder of the Class Q-2B Security so exchanged will be the Holder of the Income Notes received upon such an exchange for purposes of this Indenture. No Holder of Income Notes (including following such an exchange) or CGMHI Notes will be entitled to exchange any such notes for a Class Q-2B Security. No service charge shall be made for any such exchange of Class Q-2B Securities, but the Issuer or the Trustee may require payment of a sum sufficient to cover any tax or governmental charge that may be imposed in connection with such exchange.

(i) <u>Limited Recourse</u>.

Principal of, interest on and all other amounts payable on or in respect of the Class Q-2 Securities shall constitute limited recourse obligations of the Issuer and be payable solely from and to the extent of the Class Q-2 Securities Collateral, and following the liquidation of the Class Q-2 Securities Collateral and the application of the proceeds thereof as provided herein, all obligations of the Issuer and any claims against the Issuer shall be extinguished and shall not thereafter revive. Neither of the Issuers, the Swap Counterparty, the Reference Portfolio Manager, the Trustee, the Collateral Administrator, nor any of their respective agents, partners, beneficiaries, officers, directors, employees or any Affiliate of any of them or any of their respective successors or assigns shall be personally liable for any amounts payable, or performance due, under the Class Q-2 Securities or this Indenture. It is understood that the foregoing provisions of this paragraph shall not (i) prevent recourse to the Class Q-2 Securities Collateral for the sums due or to become due under any security, instrument or agreement for which the Class Q-2 Securities Collateral is security, or (ii) constitute a waiver, release or discharge of any indebtedness or obligation evidenced by the Class Q-2 Securities or secured by this Indenture until all items in the Class Q-2 Securities Collateral have been liquidated and applied to the payment of the obligations, whereupon any outstanding indebtedness or obligation shall be extinguished. It is further understood that the foregoing provisions of this paragraph shall not limit the right of any Person to name the Issuers as parties defendant in any action or suit or in the exercise of any other remedy under the Class Q-2 Securities or in this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability shall be asked for or (if obtained) enforced against any such Person or entity. The provisions of this Section 2.17(i) shall survive the termination of this Indenture.

(j) <u>Transfer of Class Q-2 Securities</u>.

(i) Each purchaser or transferee of a Certificated Class Q-2 Security will be required to provide to the Trustee a properly completed certificate in the form of <u>Exhibit Q-2A Certificated Transferee Letter</u> or in the form of <u>Exhibit Q-2B Certificated Transferee Letter</u>, as applicable. Certificated Class Q-2B Securities may only be purchased by or transferred to a Person that is not a U.S. Person in a transaction meeting the requirements of Regulation S and that is an "eligible contract participant" as defined in Section 1a(12) of the U.S. Commodity Exchange Act.

(ii)     If a Holder of a Certificated Class Q-2 Security wishes at any time to transfer such Certificated Class Q-2 Security, such Holder may transfer or cause the transfer of such Certificated Class Q-2 Security as follows:  Upon receipt by the Registrar of (A) such Holder's Certificated Class Q-2 Security properly endorsed for assignment to the transferee and (B) a properly completed certificate by the transferee in the form of Exhibit Q-2A Certificated Transferee Letter or Exhibit Q-2B Certificated Transferee Letter, as applicable, and any other documentation as may be required thereunder, the Trustee will cancel such Certificated Class Q-2 Security in accordance with this Indenture, cause the Registrar to record the transfer in the Securities Register and, upon execution by the Issuer, deliver to the transferee one or more Certificated Class Q-2 Securities in the aggregate stated amount transferred and in the applicable authorized denomination.  Notwithstanding anything to the contrary herein, no purchase or proposed transfer of Class Q-2B Securities will be permitted, and the Trustee shall not register or permit the registration of any such purchase or transfer, to a Person that has represented that it is a Benefit Plan Investor.  Any purported transfer in violation of this provision shall be null and void *ab initio.*

(iii)     No transfer of a Class Q-2B Security will be permitted to a person that would not be permitted to acquire the Income Notes represented by the Class Q-2 Collateral Asset A under this Indenture.

(iv)     If a Responsible Officer of the Trustee has actual knowledge that (i) a transfer or attempted or purported transfer of any interest in any Class Q-2 Security was consummated in violation of this Indenture or on the basis of a materially incorrect certification from the transferee or purported transferee, (ii) the transferee or the purported transferee failed to deliver to the Trustee the certificate in the form of Exhibit Q-2A Certificated Transferee Letter or Exhibit Q-2B Certificated Transferee Letter, as applicable, or any other documentation required to be delivered thereunder or hereunder or (iii) the transferee or purported transferee is in material breach of any representation or agreement set forth in the certificate in the form of Exhibit Q-2 Certificated Transferee Letter or Exhibit Q-2 Certificated Transferee Letter, as applicable, or in this Indenture, the Trustee will not register such attempted or purported transfer.  If any such transfer has been registered, such transfer shall be absolutely null and void *ab initio* and shall vest no rights in the purported transferee (such purported transferee, a "Disqualified Transferee") and the last preceding owner that was not a Disqualified Transferee shall be restored to all rights as a owner thereof retroactively to the date of purported transfer of such Class Q-2 Security by such  owner.   In furtherance of the foregoing, the Issuer shall be entitled to demand that (i) a transferee of a Class Q-2A Security that acquired an interest in a Class Q-2A Security in reliance on Rule 144A but is not a Qualified Purchaser and a Qualified Institutional Buyer, or (ii) a transferee of a Class Q-2A Security or Class Q-2B Security that acquired an interest in such Class Q-2 Security in reliance on Regulation S but is determined not to have acquired such interest in compliance with Regulation S or is a U.S. Person sell such Class Q-2 Securities to a purchaser qualified under this Indenture to purchase such Class Q-2 Securities and if the transferee does not comply with such demand within 30 days thereof, the Issuer may sell or cause such transferee to sell such interest of the transferee in the Class Q-2 Security to a permitted transferee under this Indenture on such terms as the Issuer may choose.

43

(k)     Prior to the issuance of the Class Q-2 Securities pursuant to this Indenture, the Trustee shall, in addition to the other conditions precedent set forth in this Indenture, have received:

(i)     The Grant pursuant to the granting clause hereof of all of the Issuer's right, title and interest in and to the Class Q-2 Securities Collateral securing the Class Q-2 Securities and delivery of such Class Q-2 Securities Collateral to the Trustee or its nominee, which, if any Class Q-2 Collateral is held through an intermediary shall be deemed to have occurred upon receipt of evidence satisfactory to the Trustee that on or before the Closing Date, the Issuer shall have purchased or entered into agreements to purchase such Class Q-2 Securities Collateral and that such Class Q-2 Securities Collateral has been credited by the Securities Intermediary to the Class Q-2 Securities Collateral Account.

(ii)     A certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, to the effect of Section 3.2(b) with respect to each Class Q-2 Collateral Asset pledged to the Trustee for inclusion in the Class Q-2 Securities Collateral.

(l)     Section 3.3 shall be applicable to the Class Q-2 Securities Collateral (including Eligible Investments on deposit in the Class Q-2 Securities Collateral Account) and the Class Q-2 Securities Collateral Account; provided, that references to (x) Pledged Securities shall be to the Class Q-2 Securities Collateral other than the Class Q-2 Securities Collateral Account and (y) Trust Account shall be to the Class Q-2 Securities Collateral Account.

(m)     Class Q-2 Events of Default.

(i)     For the purposes of this Indenture, a "Class Q-2 Event of Default" wherever used herein, means any one of the following events (whatever the reason for such Class Q-2 Event of Default, and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(A)     a default in the payment, when due and payable, of any Periodic Interest on the Class Q-2A Securities, which default shall continue for a period of five days (provided that the failure to pay Periodic Interest on the Class Q-2A Securities because insufficient funds are available in accordance with the Class Q-2 Priority of Payments will not constitute a Class Q-2 Event of Default);

(B)     a default in the payment of principal of any Class Q-2 Security on the Maturity Date; provided that, in the case of a default in such payment due solely to an administrative error or omission by the Trustee or any Paying Agent, such default continues for a period of five days;

(C)     a failure to apply, within five days following any Payment Date or Class Q-2 Maturity Date, available amounts in accordance with Section 2.17(d) or a default in payment solely due to an administrative error or omission by the Trustee, which default continues for a period of five days;

(D)     either of the Issuers or the Class Q-2 Securities Collateral becomes an investment company required to be registered under the Investment Company Act;

(E)     except as otherwise provided in this Section 2.17(m), a default in any respect in the performance, or a breach of any covenant, warranty or other agreement of the Issuers in this Indenture, or the failure of any representation or warranty of the Issuers made in this Indenture or in any certificate or other writing delivered pursuant hereto or in connection herewith to be correct in all respects when the same shall have been made, which default, breach or failure would have a material adverse effect on the Holders of the Class Q-2 Securities and continuance of such default, breach or failure for a period of 30 calendar days after written notice shall have been given to the Issuers by the Trustee or to the Issuers and the Trustee by the Class Q-2 Requisite Securityholders specifying such default, breach or failure and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder; and

(F)     an Event of Default pursuant to 5.1(h) or (i) has occurred.

(ii)     <u>Acceleration of Maturity; Rescission and Annulment</u>.

(A)     If a Class Q-2 Event of Default (other than a Class Q-2 Event of Default specified in clause (i)(D) or (F) hereof) occurs and is continuing, the Trustee shall, at the written direction of Class Q-2 Requisite Securityholders, declare the principal of and any accrued interest on the Class Q-2A Securities to be immediately due and payable, by a notice in writing to the Issuers and the Swap Counterparty, with a copy to the Rating Agencies, and the Reference Portfolio Manager.  In the absence of any such written direction, the Trustee shall take no action.  If a Class Q-2 Event of Default of the type described in clause (i)(D) or (F) occurs, the principal of and accrued interest on the Class Q-2A Securities automatically shall become immediately due and payable without any action of the Trustee or any other Person.

(B)     At any time after such a declaration of acceleration of maturity has been made and before a judgment or decree for payment of the amounts due has been obtained by the Trustee as provided in this clause (m), the Class Q-2 Requisite Securityholders, may rescind and annul such declaration and its consequences by written notice to the Trustee and the Issuers, if (a) the Issuer has paid or deposited with the Trustee a sum sufficient to pay (x) all overdue amounts payable on or in respect of the Class Q-2 Securities (other than amounts due solely as a result of the acceleration); (y) to the extent that payment of interest on such amount is lawful, interest on such overdue amounts at the Class Q-2A Interest Rate (in the case of the Class Q-2A Securities); and (z) (i) the reasonable compensation, expenses, disbursement and advances of the Trustee, its agents and counsel in connection with such Class Q-2 Event of Default and (ii) unpaid Class Q-2 Administrative Expenses, and (b) the Trustee has determined that all Class Q-2 Events of Default, other than the nonpayment of such amount that has become due solely by such acceleration, have been cured, and the Class Q-2 Requisite Securityholders by written notice to the Trustee have agreed with such determination (which agreement shall not unreasonably be withheld), or waived as provided in Section 5.15.

(C) No such rescission shall affect any subsequent Class Q-2 Event of Default or impair any rights consequent thereon.

(iii) <u>Priority of Payment on Acceleration</u>

Upon the acceleration of the Class Q-2A Securities (whether or not the Trustee sells or liquidates the Class Q-2 Securities Collateral), the moneys in the Class Q-2 Securities Collateral Account will thereafter be applied in accordance with the Class Q-2 Priority of Payments pursuant to Section 2.17(d).

Upon the acceleration of the Class Q-2A Securities, if the Class Q-2 Securities Collateral has not been sold or liquidated, the funds in the Class Q-2 Securities Collateral Account, if any, will be applied in accordance with the Class Q-2 Priority of Payments pursuant to Section 2.17(d) on each Payment Date. If the Class Q-2 Securities Collateral is sold or liquidated, a final distribution will be made pursuant thereto on the first Business Day following the last day on which an item of the Class Q-2 Securities Collateral is sold or liquidated (and no interim distributions will be made on any date (including on any Payment Date) during the sale or liquidation process).

The Trustee may fix a record date and payment date for any payment to Holders of Class Q-2 Securities pursuant to this Section 2.17(m)(iii). At least fifteen (15) days before such record date, the Trustee shall mail to each Holder of a Class Q-2 Security a notice that states the record date, the payment date and the amount to be paid.

(iv) <u>Remedies</u>. The provision of Sections 5.4, 5.5, 5.6, 5.7, 5.9, 5.10, 5.11, 5.12, 5.13, 5.14, 5.15, 5.16, 5.17, 5.18 and 5.20 with the following modifications shall be applicable solely with respect to the Class Q-2 Securities Collateral and the Class Q-2 Securities: (A) references to (1) the Trust Estate shall be to the Class Q-2 Securities Collateral, (2) Event of Default shall be to Class Q-2 Event of Default, (3) the Collection Account shall be to cash in the Class Q-2 Securities Collateral Account; (4) Sections 5.8 and 8.6 with respect to a Class Q-2 Event of Default shall be to Section 2.17(d), (5) Secured Parties shall be to the Holders of Class Q-2 Securities, (6) Requisite Noteholders shall be to Class Q-2 Requisite Securityholders; and the most senior Class of Notes shall be to the Class Q-2A Securities so long as any Class Q-2A Securities are Outstanding and thereafter to the Class Q-2B Securities, (7) the Notes shall be to the Class Q-2 Securities, (8) Noteholders shall be to the Holders of Class Q-2 Securities, (9) the Maturity Date shall be to the Class Q-2 Maturity Date, (10) the Senior Notes shall be to the Class Q-2A Securities, (11) the Income Notes shall be to the Class Q-2B Securities and (12) the Swap Counterparty (except in Section 5.20(b)), Swap Agreement, Accrued Swap Liabilities, Swap Event of Default, Base Amount and Subordinate Amount shall be disregarded and "other Secured Party" shall be disregarded; (B) (1) the reference in Section 5.5(a)(i) to Administrative Expenses shall be to Class Q-2 Administrative Expense, (2) Section 5.5(a)(ii) shall not be applicable, and (3) Section 5.5(a)(iii) shall be replaced with "the Class Q-2 Requisite Securityholders direct the Trustee at any time following the acceleration of the Class Q-2 Securities to sell or liquidate the Class Q-2 Securities Collateral"; and (C) the second sentence of Section 5.5(c) shall not be applicable.

46

Nothing in this provision shall affect the rights of the Holders of Notes pursuant to Article V of this Indenture. Notwithstanding anything to the contrary herein, no Holder of Class Q-2 Securities will be entitled (i) to direct the Trustee or exercise any right or remedy or bring any proceeding with respect to the Trust Estate pursuant to this Indenture other than through and solely to the extent of the rights pertaining to the Class Q-2 Collateral Asset A under this Indenture or (ii) while the Notes are Outstanding, to bring any Proceeding against the Issuer other than solely in respect of the Class Q-2 Securities Collateral. For the avoidance of doubt, so long as the Notes are Outstanding, any such Proceeding with respect to the Class Q-2 Securities Collateral shall not include any bankruptcy or similar proceedings. The costs of any Proceedings by Holders of Class Q-2 Securities and the costs, charges and expenses incurred by the Trustee in connection with any sale or liquidation of the Class Q-2 Securities Collateral pursuant to this provision shall not be payable from the Trust Estate (except to the extent included in the Class Q-2 Securities Collateral pursuant to the definition thereof).

(n)    Rights of Trustee with respect to Class Q-2 Securities Collateral.

Except as provided in Section 6.1, with respect to the security interests created in the Class Q-2 Securities Collateral hereunder, the pledge of any item of property of the Class Q-2 Securities Collateral to the Trustee is to the Trustee as representative of the Holders of the Class Q-2 Securities. In furtherance of the foregoing, the possession by the Trustee of any item of property of the Class Q-2 Securities Collateral and the endorsement to or registration in the name of the Trustee of any item of property of the Class Q-2 Securities Collateral (including without limitation as entitlement holder of the Class Q-2 Securities Collateral Account) are all undertaken by the Trustee in its capacity as representative of the Holders of the Class Q-2 Securities. With respect to the security interest created in the Class Q-2 Securities Collateral hereunder, the Delivery of any part of the Class Q-2 Securities Collateral to the Trustee is to the Trustee as fiduciary of the Holders of Class Q-2 Securities; in furtherance of the foregoing, the possession by the Trustee of any part of the Class Q-2 Securities Collateral and the endorsement to or registration in the name of the Trustee of any part of the Class Q-2 Securities Collateral (including without limitation as entitlement holder of the Class Q-2 Securities Collateral Account) are all undertaken by the Trustee in its capacity as fiduciary of the Holders of the Class Q-2 Securities.

(o)    Protection of Class Q-2 Securities Collateral.

The provisions of Sections 7.5, 7.6 and 7.7 shall be applicable to the Class Q-2 Securities Collateral and the rights therein of the Holders of Class Q-2 Securities with the following modifications: references to (1) the Trust Estate shall be to the Class Q-2 Securities Collateral, (2) the Trust Accounts shall be to Class Q-2 Securities Collateral Account; (3) Article VII shall be to Section 2.17(d) and Section 5.8 shall be to Section 2.17(m)(iii), (4) the Secured Parties shall be to the Holders of Class Q-2 Securities, (5) the Notes shall be to the Class Q-2 Securities, (6) the Pledged Securities shall be to the Eligible Investments credited to the Class Q-2 Securities Collateral Account and (7) the Swap Counterparty shall be disregarded.

(p)    Class Q-2 Administrative Expenses.

47

Following the redemption in full of the Notes and Class Q-1 Securities and the liquidation and distribution of the Trust Estate, if the Class Q-2B Securities are then Outstanding, the Holders of Class Q-2B Securities shall either (i) exchange such Class Q-2B Securities pursuant to subsection (h) above or (ii) enter into an arrangement with the Issuer satisfactory to the Issuer for the payment of Class Q-2 Administrative Expenses (and shall be deemed to have elected clause (i) if an arrangement pursuant to clause (ii) has not been entered into within a reasonable time of such redemption, liquidation and distribution).

## ARTICLE III

## CONDITIONS PRECEDENT TO THE ISSUANCE OF SECURITIES

SECTION 3.1     Conditions Precedent.

On the Closing Date, the appropriate Global Notes, Certificated Income Notes, Certificated Class Q-1 Securities, Class Q-1 Reg S Global Securities and Certificated Class Q-2 Securities shall be executed by the applicable Issuers and delivered to the Trustee for authentication on behalf of the applicable Issuers, and thereupon the same shall be authenticated and delivered by the Trustee upon receipt by the Trustee of the following:

(a) an Officer's Certificate of each of the Issuers (i) evidencing the authorization of the execution and delivery of this Indenture, the Purchase Agreement and the Senior Notes, and specifying the original Aggregate Principal Amount and applicable Interest Rate of each Class of Senior Notes to be authenticated and delivered, (ii) evidencing the authorization of the execution and delivery, in the case of the Issuer, of the Swap Agreement, the Collateral Administration Agreement, the Investment Agreement, the Income Notes (specifying the Aggregate Principal Amount thereof to be authenticated and delivered), the Class Q-1 Securities (specifying the initial stated amount to be authenticated and delivered and nominal rate thereof), the Class Q-2A Securities (specifying the original Aggregate Principal Amount to be authenticated and delivered and Class Q-2A Interest Rate) and the Class Q-2B Securities (specifying the Aggregate Principal Amount thereof to be authenticated and delivered) and (iii) certifying that (A) the attached copy of the resolutions of the board of directors of the Issuer or the Co-Issuer, as applicable, is a true and complete copy thereof, (B) such resolutions have not been rescinded and are in full force and effect on and as of the Closing Date and (C) the Authorized Officers authorized to execute and deliver such documents hold the offices and have the signatures indicated thereon;

(b) either (i) a certificate of each of the Issuer and the Co-Issuer or other official document evidencing the due authorization, approval or consent of any governmental body or bodies, at the time having jurisdiction in the premises and the approval of which is required for the valid issuance of the Securities issued by it, or to the effect that no authorization, approval or consent of any governmental body is required for the valid issuance of such Securities or (ii) an Opinion of Counsel satisfactory in form and substance to the Trustee to the effect that no such authorization, approval or consent of any governmental body is required for the valid issuance of the Securities, as appropriate;

48

(c) opinions of Cleary, Gottlieb, Steen & Hamilton, special U.S. counsel to the Issuers, dated the Closing Date, substantially in the form of <u>Exhibit F</u> attached hereto;

(d) an opinion of Walkers, Cayman Islands counsel to the Issuer, dated the Closing Date, substantially in the form of <u>Exhibit G</u> attached hereto;

(e) an opinion of in-house counsel to the Swap Counterparty, dated the Closing Date, substantially in the form of <u>Exhibit H</u> attached hereto;

(f) an opinion of Gardere Wynne Sewell, counsel to the Trustee, dated the Closing Date, substantially in the form of <u>Exhibit I</u> hereto;

(g) an opinion of Orrick, Herrington & Sutcliffe LLP, counsel to the Reference Portfolio Manager, dated the Closing Date, substantially in the form of <u>Exhibit J</u> hereto;

(h) an Officer's Certificate or Certificates stating that neither of the Issuers is in Default and that the issuance of the Senior Notes and, in the case of the Issuer, the Income Notes, the Class Q-1 Securities and the Class Q-2 Securities, will not result in a breach of any of the terms, conditions or provisions of, or constitute a default under, the organizational documents and any indenture or other agreement or instrument to which the Issuer or the Co-Issuer, as applicable, is a party or by which the Issuer or the Co-Issuer, as applicable, is bound, or any order of any court or administrative agency entered in any Proceeding to which the Issuer or the Co-Issuer, as applicable, is a party or by which the Issuer or the Co-Issuer, as applicable, is bound or to which the Issuer or the Co-Issuer, as applicable, is subject; and that all conditions precedent provided in this Article III, and all conditions precedent otherwise provided in this Indenture relating to the issuance, authentication and delivery of the Notes, the Class Q-1 Securities and the Class Q-2 Securities have been complied with;

(i) a statement from the Independent Accountants in form and substance acceptable to the Issuer and the Swap Counterparty with a copy to the Trustee, the Reference Portfolio Manager and Moody's (i) confirming the information with respect to each Initial Reference Obligation set forth on Annex I to the Swap Agreement and (ii) providing calculations of each of the Reference Portfolio Criteria and of each Overcollateralization Test and specifying the procedures undertaken by them to review data and computations relating to the foregoing;

(j) fully executed counterparts of the Swap Agreement, the Swap Guarantee, the Reference Portfolio Management Agreement, the Collateral Administration Agreement, the Investment Agreement, the Investment Agreement Guaranty and the Administration Agreement;

(k) an Issuer Order to the Trustee directing it to authenticate the Notes, the Class Q-1 Securities and the Class Q-2 Securities, in the amounts set forth therein, and to register the Notes, the Class Q-1 Securities and the Class Q-2 Securities in the name(s) set forth therein or as otherwise provided therein, and to make delivery thereof to the Issuer or as it may otherwise direct therein;

(l) a letter signed by Moody's confirming that the Class A-1 Notes have been rated "Aaa" by Moody's, the Class A-2 Notes have been rated "Aa2" by Moody's, the Class B Notes have been rated "A2" by Moody's, the Class C-1 Notes and the Class C-2 Notes have been

49

rated "Baa2" by Moody's, the Class Q-1 Securities have been rated "Baa2" by Moody's (subject to the limitations on such rating for the Class Q-1 Securities set forth in such letter) and that such ratings are in full force and effect on the Closing Date;

(m) a letter signed by Standard & Poor's confirming that the Class A-1 Notes have been rated "AAA" by Standard & Poor's, the Class A-2 Notes have been rated "AA" by Standard & Poor's, the Class B Notes have been rated "A" by Standard & Poor's, the Class C-1 Notes, the Class C-2 Notes have been rated "BBB" by Standard & Poor's, and that such ratings are in full force and effect on the Closing Date;

(n) evidence of the establishment of the Trust Accounts and the execution and delivery of the Account Agreement; and

(o) the delivery to the Trustee of a certificate, duly executed by an Authorized Officer of the Issuer, providing for the disposition of the proceeds of the issuance of the Notes, dated the Closing Date.

SECTION 3.2    Security for the Notes.

Prior to the issuance of the Notes pursuant to this Indenture, the Trustee shall, in addition to the other conditions precedent set forth herein, have received the following:

(a) Grant of Eligible Investments.  The Grant pursuant to the granting clause hereof of all of the Issuer's right, title and interest in and to the Eligible Investments securing the Notes and delivery of such Eligible Investments to the Trustee or its nominee, which, if any such Eligible Investments are held through an intermediary shall be deemed to have occurred upon receipt of evidence satisfactory to the Trustee that on or before the Closing Date, the Issuer shall have purchased or entered into agreements to purchase Eligible Investments having an aggregate principal balance equal to or greater than $247,500,000, and that such Eligible Investments have been credited by the Securities Intermediary to a Trust Account.

(b) Certificate of the Issuer.  A certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, to the effect that, in the case of each Eligible Investment pledged to the Trustee for inclusion in the Trust Estate on the Closing Date and immediately prior to the delivery thereof on the Closing Date:

(i)    the Issuer is the owner of such Eligible Investment free and clear of any liens, claims or encumbrances of any nature whatsoever except for those which are being released on the Closing Date and except for those Granted pursuant to this Indenture;

(ii)    the Issuer has acquired its ownership in such Eligible Investment in good faith without notice of any adverse claim, except as described in paragraph (i) above;

(iii)    the Issuer has not assigned, pledged or otherwise encumbered any interest in such Eligible Investment (or, if any such interest has been assigned, pledged or

otherwise encumbered, it has been released) other than interests Granted pursuant to this Indenture;

(iv)     the Issuer has full right to Grant a security interest in and assign and pledge such Eligible Investment to the Trustee;

(v)     the Eligible Investments included in the Trust Estate satisfy the requirements of the definition of Eligible Investment and of Section 3.2(a); and

(vi)     upon Grant by the Issuer, the Trustee has a first priority security interest in the Trust Estate.

SECTION 3.3     Custodianship; Delivery of Eligible Investments.

(a) Subject to the limited right to relocate Pledged Securities set forth in Section 7.5(b), the Trustee shall hold all Pledged Securities purchased in accordance with this Indenture in the relevant Trust Account established and maintained pursuant to Article VIII, as to which in each case the Trustee shall have entered into an Account Agreement, providing, *inter alia*, that the establishment and maintenance of such Trust Account will be governed by a law of a jurisdiction satisfactory to the Issuer and the Trustee and such jurisdiction will be the securities intermediary's jurisdiction for purposes of Articles 8 of the UCC and the bank's jurisdiction for purposes of Article 9 of the UCC.

(b) Each time that the Issuer shall direct or cause the acquisition of any Eligible Investment, the Issuer shall, if such Eligible Investment has not already been transferred to the relevant Trust Account, cause such Eligible Investment to be Delivered.  The security interest of the Trustee in the funds or other property utilized in connection with such acquisition shall, immediately and without further action on the part of the Trustee, thereupon be released.  The security interest of the Trustee shall nevertheless come into existence and continue in such Eligible Investment so acquired, including all rights of the Issuer in and to any contracts related to and proceeds of such Eligible Investment.

(c)     Notwithstanding any of the foregoing, any Delivery shall include the taking of such steps as are necessary to ensure that all payments with respect to any item of the Trust Estate shall be made directly to the Trustee for credit to a Trust Account.

SECTION 3.4     The Swap Agreement.

(a) On the Closing Date, the Issuer shall enter into the Swap Agreement with the Swap Counterparty. The Swap Agreement shall terminate, or may be terminated, in accordance with its terms, whether or not the Notes of any Class have been paid in full prior to such termination.  If the Swap Agreement has been terminated early while any Class of Notes remains Outstanding, except as provided in paragraphs (b) and (c) below, the Issuer shall use its best efforts to enter into a substitute swap agreement on similar terms to the extent that the Issuer has adequate funds and is otherwise able to enter into such an agreement.

(b) If at any time the Swap Agreement becomes subject to early termination due to the occurrence of a Swap Event of Default with respect to the Swap Counterparty or a Swap

Additional Termination Event with respect to which the Swap Counterparty is the affected party thereunder, the Issuer and the Trustee, upon written direction of the Requisite Noteholders, shall take such actions (following the expiration of any applicable grace period) to enforce the rights of the Issuer and the Trustee under the Swap Agreement and this Indenture as may be permitted by the terms of the Swap Agreement and consistent with the terms hereof. In such case, subject to paragraph (c) below, the Issuer shall apply the proceeds of any such actions (including, without limitation, the proceeds of the liquidation of any collateral pledged by the Swap Counterparty) to enter into a replacement swap agreement on substantially identical terms or on such other terms for which the Issuer receives Rating Confirmation (and with respect to which the Reference Portfolio Manager may, but is not obligated to, propose a replacement swap counterparty); provided that such replacement swap agreement has been approved by both (i) the Holders of a majority of the Aggregate Principal Amount of the Senior Notes (voting together as a single class), and (ii) the Holders of a majority of the Aggregate Principal Amount of the Income Notes. Any costs attributable to entering into a replacement swap agreement which exceed the amount of any termination payment received from the Swap Counterparty upon the termination of the Swap Agreement or to the extent not paid by the Swap Counterparty, shall be borne solely by the Issuer and shall constitute Administrative Expenses payable in accordance with Section 8.6. If any such termination payment received from the Swap Counterparty exceeds the costs attributable to entering into a replacement Swap Agreement, the excess amount will be deposited into the Collateral Account and applied in accordance with Section 8.6(b).

(c) Notwithstanding anything to the contrary herein, if the Swap Agreement has been terminated and the Notes have been accelerated in accordance with Section 5.3, no substitute Swap Agreement will be entered into, and any proceeds received from the Swap Counterparty upon termination of the Swap Agreement will be distributed in accordance with Section 5.8.

## ARTICLE IV

## SATISFACTION AND DISCHARGE

SECTION 4.1    Satisfaction and Discharge of Indenture.

This Indenture shall be discharged and shall cease to be of further effect (A) with respect to the obligations of the Issuers under the Securities and the Trust Estate securing the obligations of the Issuers under the Securities and (B) with respect to the obligations of the Issuer under the Class Q-2 Securities and the Class Q-2 Securities Collateral securing the obligations of the Issuer under the Class Q-2 Securities, in either case except as to (i) rights of registration of transfer and exchange of Securities, (ii) substitution or replacement of mutilated, destroyed, lost or stolen Securities, (iii) rights of the Swap Counterparty and the Holders and beneficial owners of the Securities to receive payment as provided herein (including as provided in Section 8.6), (iv) the rights, obligations and immunities of the Trustee hereunder, and the obligations of the Trustee with respect to any funds or obligations deposited with the Trustee and (v) the rights of Secured Parties as beneficiaries hereof with respect to the property deposited with the Trustee (other than the Class Q-2 Securities Collateral) and payable to all or any of them and the rights of the Holders of Class Q-2 Securities with respect to the Class Q-2 Securities Collateral; and the

Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture, when:

(a) all Securities theretofore authenticated and delivered (other than (A) Securities that have been mutilated, destroyed, lost or stolen and that have been replaced or paid as provided in Section 2.7 hereof and (B) Securities for whose payment money has theretofore irrevocably been deposited in trust and thereafter repaid to the Issuer or discharged from such trust, as provided in Section 7.3(c)) have been delivered to the Trustee for cancellation;

(b) the Issuer has paid or caused to be paid all sums payable hereunder (including amounts payable pursuant to the Swap Agreement and the Collateral Administration Agreement) and no other amounts will become due and payable by the Issuers;

(c) the Issuers have delivered to the Trustee and the Swap Counterparty Officer's Certificates and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to the satisfaction and discharge of this Indenture have been complied with; and

(d) the Swap Agreement has been terminated.

Notwithstanding the satisfaction and discharge of this Indenture, the rights and obligations of the Issuers, the Trustee and, if applicable, the Holders of the Securities, as the case may be, under Articles 2 and 8 and under Sections 4.2, 5.10, 5.18, 6.1, 6.2, 6.6, 7.1, 7.3, and 11.16 shall continue.

SECTION 4.2    Application of Trust Funds.

All funds deposited with the Trustee pursuant to Section 4.1 hereof shall be held in trust by the Trustee and applied by it, in accordance with the provisions of the Securities and this Indenture, including Section 8.6 and Section 2.17(d), to the payment, either directly or through any Paying Agent as the Trustee may determine, to the Persons entitled thereto, and such funds shall be held (i) in a segregated trust account identified as being held in trust for the benefit of the Secured Parties and (ii) in a segregated trust account identified as being held in trust for the benefit of the Holders of the Class Q-2 Securities, as applicable. Except as specifically provided herein, the Trustee shall not be responsible for payment of interest upon any funds deposited with it.

ARTICLE V

DEFAULT AND REMEDIES

SECTION 5.1    Events of Default.

For the purposes of this Indenture, "Event of Default" wherever used herein, means any one of the following events (whatever the reason for such Event of Default, and whether it shall be voluntary or involuntary or be effected by operation of law or pursuant to any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(a) a default in the payment, when due and payable, of any Periodic Interest on any Class of Senior Notes, which default in each case shall continue for a period of five days; provided that (except on the Maturity Date and the date of redemption in full of the Class B Notes or Class C Notes), the failure to pay Periodic Interest on the Class B Notes, Class C-1 Notes or Class C-2 Notes, as the case may be, because insufficient funds are available in accordance with the Priority of Payments will not constitute an Event of Default so long as any more senior Class of Notes then remains Outstanding;

(b) a default in the payment of principal of any Senior Note (and any Make-whole Premium, if applicable) on the Maturity Date, Optional Redemption Date or Tax Redemption Date; provided that, in the case of a default in such payment due solely to an administrative error or omission by the Trustee or any Paying Agent, such default continues for a period of five days;

(c) a default in the payment of any net amounts owed by the Issuer to the Swap Counterparty under the Swap Agreement, which default shall continue for a period of two Business Days; provided that the failure to pay any amount payable to the Swap Counterparty pursuant to Section 8.6(a)(xiii) or (xv) or Section 8.6(b)(xvi) or (xvii) because insufficient funds are available in accordance with such Priority of Payments will not constitute an Event of Default, so long as any Senior Notes are then Outstanding;

(d) a failure to apply, within five days following any Payment Date or Maturity Date, Optional Redemption Date or Tax Redemption Date, available amounts in accordance with the Payment Date Priority of Payments or Principal Priority of Payments, as applicable, set forth under Section 8.6 or a default in payment solely due to an administrative error or omission by the Trustee, which default continues for a period of five days;

(e) the early termination of the Swap Agreement and the failure by the Issuer to enter into a replacement Swap Agreement within 60 days of such termination;

(f) either of the Issuers or the Trust Estate becomes an investment company required to be registered under the Investment Company Act;

(g) except as otherwise provided in this Section 5.1, a default in any respect in the performance, or a breach of any covenant, warranty or other agreement of the Issuers in this Indenture, or the failure of any representation or warranty of the Issuers made in this Indenture or in any certificate or other writing delivered pursuant hereto or in connection herewith to be correct in all respects when the same shall have been made, which default, breach or failure would have a material adverse effect on the Holders or beneficial owners of the Notes and continuance of such default, breach or failure for a period of 30 calendar days after written notice shall have been given to the Issuers and the Swap Counterparty by the Trustee or to the Issuers, the Swap Counterparty and the Trustee by the Holders of more than 25% of the Aggregate Principal Amount of the Senior Notes specifying such default, breach or failure and requiring it to be remedied and stating that such notice is a "Notice of Default" hereunder;

(h) the entry of a decree or order by a court having jurisdiction in the premises adjudging either the Issuer or the Co-Issuer as bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect

of either the Issuer or the Co-Issuer under any applicable Bankruptcy Law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of either the Issuer or the Co-Issuer or of any substantial part of their respective property, or ordering the winding up or liquidation of their affairs, and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive calendar days; or

(i) the institution by either the Issuer or the Co-Issuer of proceedings to be adjudicated as bankrupt or insolvent, or the consent by either the Issuer or the Co-Issuer to the institution of bankruptcy or insolvency proceedings against it, or the filing by either the Issuer or the Co-Issuer of a petition or answer or consent seeking reorganization or relief under any Bankruptcy Law, or the consent by either the Issuer or the Co-Issuer to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee or sequestrator (or other similar official) of either the Issuer or the Co-Issuer or of any substantial part of their respective property, or to the ordering of the winding up or liquidation of their affairs, or the making by either the Issuer or the Co-Issuer of an assignment for the benefit of creditors, or the admission by either the Issuer or the Co-Issuer in writing of its inability to pay its debts generally as they become due, or the taking of any action by either the Issuer or the Co-Issuer in furtherance of any such action.

SECTION 5.2    Rights of Swap Counterparty upon Event of Default.  Unless (a) the Swap Agreement has been terminated and all amounts owed to the Swap Counterparty have been paid in full, or (b) a Swap Event of Default has occurred and is continuing as to which the Swap Counterparty is the defaulting party while any Senior Notes are Outstanding, the Swap Counterparty shall have the rights set forth under Sections 5.3, 5.5 and 5.15 upon the occurrence of an Event of Default hereunder.

SECTION 5.3    Acceleration of Maturity; Rescission and Annulment.

(a) If an Event of Default (other than an Event of Default specified in Section 5.1(f), (h) or (i) hereof) occurs and is continuing, the Trustee shall, at the written direction of the Requisite Noteholders or the Swap Counterparty (unless the Swap Agreement has been terminated and all amounts owed to the Swap Counterparty thereunder have been paid in full or a Swap Event of Default as to which the Swap Counterparty is the defaulting party has occurred and is continuing while any Senior Notes are Outstanding), declare the principal of and any accrued interest on the Notes to be immediately due and payable, by a notice in writing to the Issuers and the Swap Counterparty (if the declaration was made at the direction of the Requisite Noteholders), with a copy to the Rating Agencies, the Investment Agreement Counterparty and the Reference Portfolio Manager.  In the absence of any such written direction, the Trustee shall take no action.  If an Event of Default of the type described in clause 5.1(f), (h) or (i) occurs, the principal of and accrued interest on the Notes automatically shall become immediately due and payable without any action of the Trustee or any other Person.

(b) At any time after such a declaration of acceleration of maturity has been made and before a judgment or decree for payment of the amounts due has been obtained by the Trustee as provided in this Article V, the Requisite Noteholders, with the written consent of the Swap Counterparty (unless the Swap Agreement has been terminated and all amounts owed to the Swap Counterparty thereunder have been paid in full or a Swap Event of Default as to which

the Swap Counterparty is the defaulting party has occurred and is continuing while any Senior Notes are Outstanding), may rescind and annul such declaration and its consequences by written notice to the Trustee and the Issuers, if:

        (i)      the Issuer has paid or deposited with the Trustee a sum sufficient to pay:

        (A)      all overdue amounts payable on or in respect of the Notes (other than amounts due solely as a result of the acceleration) and the Swap Agreement;

        (B)      to the extent that payment of interest on such amount is lawful, interest on such overdue amounts at the applicable Interest Rate (in the case of the Senior Notes) and the applicable default rate under the Swap Agreement (in the case of the Swap Agreement);

        (C)      all unpaid Administrative Expenses and the reasonable compensation, expenses, disbursements and advances of the Trustee, its agents and counsel; and

        (ii)      the Trustee has determined that all Events of Default, other than the nonpayment of such amount that has become due solely by such acceleration, have been cured, and the Requisite Noteholders by written notice to the Trustee have agreed with such determination (which agreement shall not unreasonably be withheld), or waived as provided in Section 5.15.

(c) No such rescission shall affect any subsequent Event of Default or impair any rights consequent thereon.

SECTION 5.4    Remedies.

If an Event of Default shall have occurred and be continuing, and the Notes have been declared or have become due and payable and such declaration and its consequences have not been rescinded and annulled, or at any time on or after the Maturity Date, subject to the provisions of Section 5.5, and provided that adequate provision is made for the payment of any expenses incurred by the Trustee in accordance with Section 6.6, the Trustee shall, upon written direction by the Requisite Noteholders, do one or more of the following:

(a) institute Proceedings for the collection of all amounts then payable on the Notes or under this Indenture, whether by declaration or otherwise, enforce any judgment obtained and collect from the Trust Estate moneys adjudged due;

(b) sell all or a portion of the Trust Estate or rights of interest therein at one or more public or private sales called and conducted in any manner permitted by law and in accordance with Section 5.20;

(c) institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to the Trust Estate;

(d) exercise any remedies of a secured party under the applicable UCC and take any other appropriate action to protect and enforce the rights and remedies of the Trustee or the Noteholders hereunder; or

(e) exercise any other rights and remedies that may be available at law or in equity.

SECTION 5.5    Retention of Trust Estate.

(a) If an Event of Default has occurred and is continuing, the Trustee shall retain the Trust Estate intact, collect and cause the collection of the proceeds thereof and make and apply all payments and deposits and maintain all amounts in respect of the Trust Estate and the Notes in accordance with the terms of this Indenture (including paying all amounts owed by the Issuer under the Swap Agreement); provided, that if the Notes have been declared or have become due and payable pursuant to Section 5.3, the Trustee shall apply any moneys in the Collection Account pursuant to Section 5.8.  The Trustee shall not sell or liquidate the Trust Estate pursuant to Section 5.4 unless the Notes have been declared or have become due and payable pursuant to Section 5.3 or following the Maturity Date and one of the following conditions exists:

(i)    The Trustee determines that the anticipated net proceeds of a sale or liquidation of the Trust Estate would be sufficient to pay (a) to the appropriate Persons any accrued and unpaid Administrative Expenses, (b) to the Swap Counterparty all Accrued Swap Liabilities and (c) to the Holders of the Senior Notes the principal of and interest accrued on the Senior Notes to the date of acceleration.  The Trustee shall make or cause to be made the calculation required by this paragraph promptly after the acceleration of the Notes and on each monthly anniversary thereafter.  In the event that the conditions of this clause (i) are satisfied, the Trustee shall promptly effect the sale or liquidation of the Trust Estate and apply the proceeds as described in Section 5.8;

(ii)    Unless the Swap Agreement has been terminated and the Swap Counterparty has been paid in full the amount owed to it thereunder or unless a Swap Event of Default as to which the Swap Counterparty is the defaulting party has occurred and is continuing while any Senior Notes are Outstanding, the Swap Counterparty at any time following the acceleration of the Notes directs the Trustee to sell or liquidate the Trust Estate; or

(iii)    If the Swap Agreement has been terminated and the Swap Counterparty has been paid in full the amount owed to it thereunder or if a Swap Event of Default as to which the Swap Counterparty is the defaulting party has occurred and is continuing while any Senior Notes are Outstanding, the Requisite Noteholders direct the Trustee at any time following the acceleration of the Notes to sell or liquidate the Trust Estate.

For purposes of (i) and (iii), the amounts due and payable under the Swap Agreement will be calculated taking into account the amount of any accrued and unpaid Base Amount, Subordinate Amount and Incentive Amount, in each case as provided in the Swap Agreement.

(b) Nothing contained in Section 5.5(a) shall be construed to require the Trustee to preserve the Trust Estate securing the obligations of the Issuer under the Notes if prohibited by applicable law.

(c) In determining whether the condition specified in Section 5.5(a)(i) exists, the Trustee shall obtain bid prices with respect to each asset in the Trust Estate from two nationally recognized dealers at the time making a market in such assets or similar assets, specified by the Swap Counterparty in writing so long as the Swap Agreement has not been terminated and additional amounts payable to the Swap Counterparty thereunder have been paid in full and otherwise selected by the Requisite Noteholders, and shall compute the anticipated proceeds of sale or liquidation on the basis of the lower of such bid prices for each such asset.  In the case of each calculation made by the Trustee pursuant to Section 5.5(a)(i), the Trustee shall obtain a letter of an independent certified public accountant of national standing confirming the accuracy of the computations of the Trustee and certifying their conformity to the requirements of this Indenture.

The Trustee shall deliver to the Noteholders (with a copy to the Swap Counterparty and the Reference Portfolio Manager) a report stating the results of any determination required pursuant to Section 5.5(a)(i) no later than ten (10) days after making such determination but in any case after such sale or liquidation.

SECTION 5.6    Trustee May File Proofs of Claim.

(a) In case there shall be pending Proceedings relative to the Issuer, the Co-Issuer or any other obligor upon the Notes under any Bankruptcy Law, or in case a receiver, assignee or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official shall have been appointed for or taken possession of the Issuer, the Co-Issuer or their respective property or such other obligor or its property, or in case of any other comparable Proceedings relative to the Issuer, the Co-Issuer or such other obligor, or in case of any voluntary dissolution, liquidation or winding up of the Issuer, the Co-Issuer or such other obligor, regardless of whether the principal of any Notes shall then be due and payable as therein expressed or by declaration or otherwise and regardless of whether the Trustee shall have made any demand pursuant to the provisions of Section 5.3, the Trustee shall be entitled and empowered to, by intervention in such Proceedings or otherwise:

(i)    file and prove a claim or claims for the whole amount of principal and interest owing and unpaid in respect of the Senior Notes and any distributions owed with respect to the Income Notes, and file such other papers or documents and take such other action, including participating as a member, voting or otherwise, of any committee of creditors, as may be necessary or advisable in order to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys and counsel, and for reimbursement of all reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee or any Secured Party, except as a result of negligence or bad faith) and of the Secured Parties allowed in any Proceedings relative to the Issuer, the Co-Issuer or other obligor upon the Notes or to the creditors or property of the Issuer, the Co-Issuer or such other obligor;

58

(ii)     unless otherwise directed by the Requisite Noteholders, or prohibited by applicable law and regulations, vote on behalf of the Holders of the Notes in any election of a trustee or a standby trustee in arrangement, reorganization, liquidation or other bankruptcy or insolvency Proceedings or person performing similar functions in comparable Proceedings; and

(iii)     collect and receive any moneys or other property payable to or deliverable on any such claims, and distribute in accordance with Section 5.8 all amounts received with respect to the claims of the Secured Parties and of the Trustee on their behalf; and any trustee, receiver, liquidator, custodian or other similar official is hereby authorized by each of the Holders of the Notes and the other Secured Parties to make payments to the Trustee, and, in the event that the Trustee shall consent to the making of payments directly to the Secured Parties, to pay to the Trustee such amounts as shall be sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee and their respective agents and counsel, and all other reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee or any Holder of a Note or other Secured Party except as a result of negligence or bad faith of the Trustee.

(b) Nothing herein contained shall be deemed to authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of any Holder of a Note or any other Secured Party any plan of reorganization, arrangement, adjustment or compromise affecting the Notes or the rights of any Holder thereof or any other Secured Party, or to authorize the Trustee to vote in respect of the claim of any Holder of a Note or any other Secured Party in any such Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar person or to participate as a member of any committee of creditors.

(c) In any Proceedings brought by the Trustee (and also any Proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party) the Trustee shall be held to represent all the Holders of the Notes and all other Secured Parties subject to the provisions of this Indenture, and it shall not be necessary to make any Holders of the Notes or any other Secured Party parties to any such Proceedings.

SECTION 5.7     Trustee May Enforce Claims Without Possession of Notes.

All rights of action and claims under this Indenture or the Notes may be prosecuted and enforced by the Trustee without the possession of any of the Notes or the production thereof in any Proceeding relating thereto, and any such Proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall be applied as set forth in Section 5.8 hereof.

SECTION 5.8     Priority of Payment on Acceleration.

Upon the acceleration of the Notes (whether or not the Trustee sells or liquidates the Trust Estate), the moneys in the Collection Account (and the moneys in all of the Trust Accounts, in the case of a complete liquidation of the Trust Estate) will thereafter be applied in

the following order of priority, with each priority being fully paid prior to such proceeds being used to pay any lower priority (subject to Section 5.5):

(a) to the payment of any accrued and unpaid Administrative Expenses (in the order set forth in the definition thereof) in an amount not exceeding the Expense Cap Amount;

(b) to the Swap Counterparty, any accrued and unpaid Accrued Swap Liabilities, except any Swap Termination Payment due to the Swap Counterparty upon the early termination of the Swap Agreement as a result of a Swap Event of Default as to which the Swap Counterparty is the defaulting party or as a result of a Swap Additional Termination Event;

(c) after acceleration of the Notes but before the sale or liquidation of the Trust Estate, to the Collateral Account, to the extent required to maintain the same ratio between the Aggregate Reference Value and the sum of (i) Eligible Investments and (ii) moneys credited to the Collateral Account as the ratio in effect on the Closing Date between the Swap Notional Amount and the net proceeds realized from the sale of the Securities that were deposited into the Collateral Account;

(d) to the Holders of the Class A-1 Notes, first accrued and unpaid interest on the Class A-1 Notes to the date of acceleration and then the Aggregate Principal Amount of the Class A-1 Notes;

(e) to the Holders of the Class A-2 Notes, first accrued and unpaid interest on the Class A-2 Notes to the date of acceleration and then the Aggregate Principal Amount of the Class A-2 Notes;

(f) to the Holders of the Class B Notes, first, accrued and unpaid interest (including Deferred Interest) on the Class B Notes and then, the Aggregate Principal Amount of the Class B Notes;

(g) first, on a pro rata basis, to the Holders of the Class C-1 Notes, accrued and unpaid interest (including Deferred Interest) on the Class C-1 Notes and to the Holders of the Class C-2 Notes, accrued and unpaid interest (including Deferred Interest) on the Class C-2 Notes, to the date of acceleration and then, on a pro rata basis, to the Holders of the Class C-1 Notes, the Aggregate Principal Amount of the Class C-1 Notes and to the Holders of the Class C-2 Notes, the Aggregate Principal Amount of the Class C-2 Notes;

(h) to the Swap Counterparty, any Swap Termination Payment due to the Swap Counterparty, to the extent not paid pursuant to clause (b) above;

(i) to the payment first, of any accrued and unpaid Administrative Expenses (in the order set forth in the definition thereof) to the extent not paid pursuant to clause (a) above and then, any accrued and unpaid Subordinated Administrative Expenses;

(j) to the payment of any unpaid Extension Bonus Payments (i) first, to the applicable Holders of Class A-1 Notes, (ii) then, to the applicable Holders of Class A-2 Notes, (iii) then, to the applicable Holders of Class B Notes, and (iv) then, on a pro rata basis, to the applicable Holders of Class C-1 Notes and the applicable Holders of Class C-2 Notes; and

(k) to the Holders of the Income Notes, any remaining funds.

Upon the acceleration of the Notes, if the Trust Estate has not been sold or liquidated, the funds in the Collection Account, if any, will be applied in accordance with the above priority of payments on each Payment Date.  If the Trust Estate is sold or liquidated, a final distribution will be made pursuant thereto on the first Business Day following the last day on which an item of the Trust Estate is sold or liquidated (and no interim distributions will be made on any date  (including on any Payment Date) during the sale or liquidation process).

The Trustee may fix a record date and payment date for any payment to Noteholders pursuant to this Section 5.8.  At least fifteen (15) days before such record date, the Trustee shall mail to each Holder of a Note a notice that states the record date, the payment date and the amount to be paid.

SECTION 5.9    Limitation of Suits.

No Holder of any Note shall have any right to institute any Proceeding, judicial or otherwise, with respect to this Indenture, or to appoint a receiver or trustee, or to seek any other remedy hereunder, unless:

(a) such Holder has previously given written notice to the Trustee of a continuing Event of Default;

(b) the Holders of at least 25% of the Aggregate Principal Amount of the most senior Class of Notes then Outstanding have made written request to the Trustee to institute such Proceeding in respect of such Event of Default in its own name as Trustee hereunder;

(c) such Holder or Holders have offered to the Trustee indemnity or security reasonably satisfactory to the Trustee in form and substance against the costs, expenses and liabilities to be incurred in complying with such request;

(d) the Trustee, for 30 days after its receipt of such notice, request and offer of indemnity or security, has failed to institute such Proceedings; and

(e) if Holders of 50% or less of the Aggregate Principal Amount of the most senior Class of Notes have requested initiation of proceedings, no written direction inconsistent with such written request has been given to the Trustee during such 30-day period by the Holders of at least 25% of the Aggregate Principal Amount of the most senior Class of Notes then Outstanding;

it being understood and intended that no one or more Holders of the Notes shall have any right in any manner whatever by virtue of, or by availing itself of, any provision of this Indenture to affect, disturb or prejudice the rights of any other Holders of the same Class or to obtain or to seek to obtain priority or preference over any other such Holders of the same Class (except as otherwise contemplated by this Indenture) or to enforce any right under this Indenture, except in the manner herein provided and for the equal, ratable and common benefit of all such Holders of the same Class, and provided that any such Proceedings will be subject to the limitations on the liquidation of the Trust Estate described in Section 5.5.  Subject to the provisions hereof, for the

61

protection and enforcement of the provisions of this Section 5.9, each and every Holder shall be entitled to such relief as can be given either at law or in equity.

Notwithstanding any other provisions of this Indenture, if the Trustee shall receive conflicting or inconsistent requests and indemnity from two or more groups of Holders of the most senior Class of Notes then Outstanding under this Section 5.9, each representing 50% or less of the Aggregate Principal Amount of the Notes of that Class, the Trustee shall not take any action.

Notwithstanding anything to the contrary herein, no Holder of Income Notes shall be entitled to institute Proceedings or to seek any other remedy hereunder unless all of the Senior Notes have been redeemed in full and the Swap Agreement has been terminated and any amounts owed to the Swap Counterparty thereunder have been paid in full.

SECTION 5.10    Rights of Noteholders to Receive Principal and Interest.

(a) Notwithstanding any other provision in this Indenture, but subject to the provisions of Sections 2.3(b), 2.8, 5.2, 5.5, 5.8, and 8.6 hereof, the Holder of any Senior Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on such Note as such principal and interest become due and payable in accordance with Sections 2.8, 5.8 and 8.6 and, subject to Sections 5.2, 5.5 and 5.9, to institute Proceedings for the enforcement of any such payment, and such right shall not be impaired without the consent of such Holder.

(b) If collections in respect of the Trust Estate are insufficient to make payments on the Notes, no other assets will be available for payment of the deficiency following realization on the Trust Estate, and the obligations of the Issuers to pay any deficiency shall be extinguished and shall not thereafter revive.

SECTION 5.11    Restoration of Rights and Remedies.

If the Trustee, any Holder of any Note or any other Secured Party has instituted any Proceeding to enforce any right or remedy under this Indenture and such Proceeding has been discontinued or abandoned for any reason or has been determined adversely to the Trustee, to such Holder of a Note or to such other Secured Party, then and in every such case the Issuer, the Co-Issuer, the Trustee, the Holders of the Notes and such other Secured Parties shall, subject to any determination in such Proceeding, be restored severally and respectively to their former positions hereunder, and thereafter all rights and remedies of the Trustee, the Holders of the Notes and such other Secured Parties shall continue as though no such Proceeding has been instituted.

SECTION 5.12    Rights and Remedies Cumulative.

No right or remedy herein conferred upon or reserved to the Swap Counterparty, the Trustee or to the Holders of the Notes is intended to be exclusive of any other right or remedy, and every right and remedy shall, to the extent permitted by law, be cumulative and in addition to every other right and remedy given hereunder or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right or remedy hereunder, or

otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right or remedy.

SECTION 5.13     Delay or Omission Not a Waiver.

No delay or omission of the Swap Counterparty, the Trustee or any Holder of a Note to exercise any right or remedy accruing upon an Event of Default shall impair any such right or remedy or constitute a waiver of any such Event of Default or an acquiescence therein. Subject to Section 5.2, every right and remedy given by this Article V or by law to the Swap Counterparty, the Trustee or to the Holders of the Notes may be exercised from time to time, and as often as may be deemed expedient, by the Swap Counterparty, the Trustee or by the Holders of the Notes, as the case may be.

SECTION 5.14     Control by Noteholders.

Notwithstanding any other provision of this Indenture, but subject to Section 5.2 and Section 5.5, the Requisite Noteholders shall have the right (a) to cause the institution of and direct the time, method and place of conducting any Proceeding for any remedy available to the Trustee or (b) subject to Section 6.2(e), to direct the Trustee with respect to its exercise of any right, remedy, trust or power conferred on the Trustee; provided, that:

(a) such direction shall not be in conflict with any rule of law or with any express provision of this Indenture (including without limitation, any provision hereof which expressly provides for a greater percentage of any Class of Notes or an additional Class of Notes to effect an action hereunder and any provision providing express personal protection to the Trustee or a limitation on the liability of the Issuer as set forth in Section 2.8(h) hereof); and

(b) the Trustee may take any other action deemed proper by the Trustee that is not inconsistent with such direction; provided, however, that, subject to Section 6.1, the Trustee need not take any action that it reasonably determines might involve it in liability (unless the Trustee has received reasonably satisfactory indemnity or security against such liability as set forth herein). During the continuance of an Event of Default that has not been cured, the Trustee shall, prior to the receipt of directions, if any, from the Swap Counterparty or Requisite Noteholders, as applicable, or any other relevant Noteholders, exercise such of the rights and powers expressly vested in it by this Indenture and use the same degree of care and skill in their exercise, with respect to such Event of Default, as is required by Section 6.1(f) hereof.

SECTION 5.15     Waiver of Past Defaults.

(a) Prior to the declaration of the acceleration of the maturity of the Notes as provided in Section 5.3 and subject to the provisions of Section 5.2, the Requisite Noteholders and the Swap Counterparty may jointly waive any past Default or Event of Default and its consequences except a Default (or an Event of Default arising from such Default) (i) in the payment of principal of or interest on any of the Notes or (ii) in respect of a covenant or provision hereof which cannot be modified or amended without the consent of all of the affected Noteholders. In the case of any such waiver, the Issuer, the Co-Issuer, the Trustee and the Noteholders shall be restored to their former positions and rights hereunder, respectively.

(b) Upon any such waiver, such Default shall cease to exist and be deemed to have been cured and not to have occurred, and any Event of Default arising therefrom shall be deemed to have been cured and not have occurred, for every purpose of this Indenture; but no such waiver shall extend to any subsequent or other Default or Event of Default or impair any right consequent thereto. The Trustee shall promptly give written notice of any such waiver to the Swap Counterparty, the Reference Portfolio Manager, each Rating Agency and the Investment Agreement Counterparty.

SECTION 5.16    Undertaking for Costs.

All parties to this Indenture agree, and each Holder of any Note by such Holder's acceptance thereof shall be deemed to have agreed, that any court may in its discretion require, in any Proceeding for the enforcement of any right or remedy under this Indenture, or in any Proceeding against the Trustee for any action taken, suffered or omitted by it as Trustee, the filing by any party litigant in such Proceeding of an undertaking to pay the reasonable costs of such Proceeding and that such court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in such Proceeding, having due regard to the merits and good faith of the claims or defenses made by such party litigant; provided, that the provisions of this Section 5.16 shall not apply to:

(a) any Proceeding instituted by the Trustee;

(b) any Proceeding instituted by any Holder of a Note, or group of Holders of the Notes, in each case holding in the aggregate more than 10% of the Aggregate Principal Amount of the Notes; or

(c) any Proceeding instituted by any Holder of a Note for the enforcement of the payment of principal of or interest on any Note on or after the respective due dates expressed in such Note and in this Indenture.

SECTION 5.17    Waiver of Stay or Extension Laws.

Each of the Issuer and the Co-Issuer covenants (to the extent that it may lawfully do so) that it shall not at any time insist upon, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law wherever enacted, now or at any time hereafter in force, that may affect the covenants or the performance of or the exercise of any remedies under this Indenture. Each of the Issuer and the Co-Issuer (to the extent that it may lawfully do so) hereby expressly waives all benefit or advantage of any such law, and covenants that it shall not hinder, delay or impede the execution of any power herein granted to the Trustee, any Noteholder or the Swap Counterparty, but shall suffer and permit the execution of every such power as though no such law had been enacted.

SECTION 5.18    Action on Notes.

The Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking, obtaining or application of any other relief under or with respect to this Indenture. Neither the lien of this Indenture nor any rights or remedies of the Trustee, the Holders of the Notes or any other Secured Party shall be impaired by the

recovery of any judgment by the Trustee against the Issuer, the Co-Issuer or the Swap Counterparty or by the levy of any execution under such judgment upon any portion of the assets of the Issuer, the Co-Issuer or the Swap Counterparty.

SECTION 5.19    Performance and Enforcement of Certain Obligations.

(a) Promptly following a request from the Trustee to do so, the Issuer agrees to take all such lawful action as the Trustee may request to compel or secure the performance and observance by the Swap Counterparty or Swap Guarantor of its obligations to the Issuer under or in connection with the Swap Agreement or Swap Guarantee, as applicable, in accordance with the terms thereof, and to exercise any and all rights, remedies, powers and privileges lawfully available to the Issuer under or in connection with the Swap Agreement or the Swap Guarantee to the extent and in the manner directed by the Trustee, including the transmission of notices of default on the part of the Swap Counterparty or Swap Guarantor thereunder, and the institution of Proceedings to compel or secure performance by the Swap Counterparty of its obligations under the Swap Agreement or Swap Guarantor, as applicable.

(b) If an Event of Default has occurred and is continuing, the Trustee may, and, at the direction (which direction shall be in writing) of the Holders of a majority of the Aggregate Principal Amount of the Senior Notes, voting together, shall, subject to the right of the Trustee to receive indemnity or security in accordance with Section 6.2(e) or otherwise hereunder against costs, expenses and liabilities in form and substance reasonably satisfactory to the Trustee and subject to Section 5.14, exercise all rights, remedies, powers, privileges and claims of the Issuer against the Swap Counterparty and the Swap Guarantor, under or in connection with the Swap Agreement or Swap Guarantee, as applicable, including the right or power to take any action to compel or secure performance or observance by the Swap Counterparty and the Swap Guarantor of its obligations to the Issuer (or to the Trustee) thereunder and to give any consent, request, notice, direction, approval, extension or waiver under the Swap Agreement or Swap Guarantee, as applicable, and any right of the Issuer to take such action shall be suspended.

SECTION 5.20    Sale of Trust Estate.

(a) In effecting any sale or liquidation of the Trust Estate pursuant to Section 5.4 or 5.5 (a "Sale"), the Trustee may retain an independent investment banking firm of national reputation to assist it in effecting such sale or liquidation. The power to effect any Sale of any portion of the Trust Estate pursuant to Section 5.4 and Section 5.5 hereof shall not be exhausted by any one or more Sales as to any portion of such Trust Estate remaining unsold, but shall continue unimpaired until the entire Trust Estate shall have been sold or all amounts payable on the Notes under this Indenture with respect thereto shall have been paid. The Trustee may, upon giving notice on behalf of the Issuer to the Holders of the Notes and the Swap Counterparty, and shall, upon written direction of the Requisite Noteholders (or the Swap Counterparty, if the sale was directed by the Swap Counterparty pursuant to Section 5.5(a)(ii)) from time to time, postpone any Sale by public announcement made at the time of and place of such Sale. The Trustee hereby expressly waives its right to any amount fixed by law as compensation for any Sale; provided, that the Trustee shall be authorized to deduct the reasonable costs, charges and expenses incurred by it (including any fees and expenses incurred in obtaining a letter under Section 5.5(c) hereof) in connection with any Sale from the proceeds thereof notwithstanding the

65

provisions of Section 6.6 hereof, but without duplication of amounts payable as Administrative Expenses.

(b) The Trustee, the Swap Counterparty and the Reference Portfolio Manager and their respective Affiliates may bid for and acquire for cash any portion of the Trust Estate in connection with a Sale thereof to the extent not prohibited by applicable law, and may pay all or part of the purchase price by crediting against amounts owing on any Notes it holds or other amounts owed to it and secured by this Indenture, to the extent such amounts would have been owing on such obligations in accordance with Section 5.8 or Section 8.6, all or part of the net proceeds of such Sale after deducting the reasonable costs, charges and expenses incurred by the Trustee in connection with such Sale (including any fees and expenses incurred in obtaining a letter under Section 5.5(c) hereof). The Notes need not be produced in order to complete any such Sale, or in order for the net proceeds of such Sale to be credited against amounts owing on the Notes. The Trustee may hold, lease, operate, manage or otherwise deal with any property so acquired in any manner permitted by law in accordance with this Indenture.

(c) If any portion of the Trust Estate consists of securities issued without registration under the Securities Act ("Unregistered Securities"), the Trustee may seek an Opinion of Counsel, or, if no such Opinion of Counsel can be obtained and with the written consent of the Requisite Noteholders and the Swap Counterparty, seek a no-action position from the Securities and Exchange Commission or any other relevant federal or state regulatory authorities, regarding the legality of a public or private sale of such Unregistered Securities, the cost of which in each case shall be reimbursable to the Trustee in accordance with the terms of this Indenture.

(d) The Trustee shall execute and deliver an appropriate instrument of conveyance transferring its interest in any portion of the Trust Estate in connection with a Sale thereof. In addition, the Trustee is hereby irrevocably appointed the agent and attorney-in-fact of the Issuer to transfer and convey its interest in any portion of the Trust Estate in connection with a Sale thereof and to take all action necessary to effect such Sale. No purchaser or transferee at such a Sale shall be bound to ascertain the authority of the Trustee, inquire into the satisfaction of any conditions precedent or see to the application of any moneys.

ARTICLE VI

THE TRUSTEE

SECTION 6.1    Duties of Trustee.

(a) Subject to Section 6.1(f) below, the Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and no implied covenants or obligations shall be read into this Indenture against the Trustee.

(b) Subject to Section 6.1(f) below, in the absence of bad faith, willful misconduct, negligence or reckless disregard of obligations on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed

therein, upon certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; provided, however, that in the case of any such certificates or opinions which by any provision hereof are specifically required to be furnished to the Trustee, the Trustee shall be under a duty to examine the certificates and opinions to determine whether or not they conform on their face to the requirements of this Indenture, and shall promptly, but in any event within three (3) Business Days in the case of a certificate delivered by the Swap Counterparty, notify the party delivering the same if such certificate or opinion does not so conform. If a corrected certificate or opinion shall not have been delivered to the Trustee within 15 days after such notice from the Trustee, the Trustee shall so notify the Holders of the Notes.

(c) No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(i) this Section 6.1(c) does not limit the effect of Section 6.1(a) or (b);

(ii) the Trustee shall not be liable for an error of judgment made in good faith by a Responsible Officer unless the Trustee was negligent in ascertaining the pertinent facts; and

(iii) the Trustee shall not be liable with respect to any action it takes or omits to take in good faith in accordance with the direction of the Issuer, the Co-Issuer, the Requisite Noteholders (or Holders with such larger percentage, or other Class, as may be required by the terms hereof) or the Swap Counterparty pursuant to this Indenture or the Swap Agreement (or the Reference Portfolio Manager on behalf of the Swap Counterparty pursuant to the Swap Agreement), or in exercising any trust or power conferred upon the Trustee under this Indenture.

(d) No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers, if it shall have reasonable grounds to believe that repayment of such funds or adequate indemnity or security against such risk or liability is not reasonably assured to it unless such risk or liability relates to the performance of its ordinary services, including under Article 5, under this Indenture. Anything in this Indenture to the contrary notwithstanding, in no event shall the Trustee be liable under this Indenture for special, indirect or consequential loss or damage of any kind whatsoever (including but not limited to lost profits), even if the Trustee has been advised of the likelihood of such loss or damage and regardless of the form of action.

(e) The Trustee shall not be liable for interest on any money received by it.

(f) In case an Event of Default or Class Q-2 Event of Default known to a Responsible Officer of the Trustee has occurred and is continuing, the Trustee shall, prior to the receipt of written directions, if any, in the case of an Event of Default, from the Swap Counterparty or the Requisite Noteholders and in the case of a Class Q-2 Event of Default, from the Class Q-2 Requisite Securityholders, exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise as a prudent person would

67

exercise or use under the circumstances in the conduct of its own affairs; provided, that, in the case of an Event of Default, so long as the Swap Agreement is in effect, the Trustee shall not take any action under this subsection prior to receipt of such directions with respect to an Event of Default (other than to provide notice thereof as provided in Section 6.5) without the prior consent of the Swap Counterparty.

(g) Whether or not therein expressly so provided, every provision of this Indenture relating to the Trustee shall be subject to the provisions of this Section 6.1 and Section 6.2.

SECTION 6.2    Rights of Trustee.

Except as otherwise provided in Section 6.1:

(a) the Trustee may rely and shall be protected in acting or refraining from acting upon any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper or document believed by it in good faith to be genuine and to have been signed or presented by the proper party or parties;

(b) any request, consent or direction of the Issuer mentioned herein shall be sufficiently evidenced by an Issuer Order, and any request, consent or direction from the Swap Counterparty mentioned herein shall be sufficiently evidenced by a written request or direction from, or consented to or approved by, an authorized officer of the Swap Counterparty;

(c) whenever in the administration of this Indenture the Trustee shall (i) deem it desirable that a matter be proved or established prior to taking, suffering or omitting any action hereunder, the Trustee (unless other evidence be herein specifically prescribed) may, in the absence of bad faith on its part, rely upon an Officer's Certificate or (ii) be required to determine the value of any asset of the Trust Estate or the Class Q-2 Securities Collateral or funds hereunder or the cash flows projected to be received therefrom, the Trustee may, in the absence of bad faith on its part and unless other evidence be herein specifically prescribed, rely on reports of nationally recognized accounting firms or other persons qualified to provide the information required to make such determination including nationally or internationally recognized dealers in securities of the type being valued and securities quotation services;

(d) as a condition to the taking or omitting of any action by it hereunder, the Trustee may consult with counsel and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted by it hereunder in good faith in reliance thereon; provided, however, that with respect to any payment required to be made to the Swap Counterparty hereunder or under the Swap Agreement, the Trustee shall act in accordance with the direction provided by the Swap Counterparty pursuant to Section 8.3, without first obtaining an Opinion of Counsel. The Trustee shall have no liability for any action, or failure to act, in accordance with the direction provided by the Swap Counterparty pursuant to Section 8.3;

(e) the Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Indenture or to honor the request or direction of any of the Holders of the Notes (or any request or direction of the Swap Counterparty, in the case of any provision hereof

68

which entitles the Swap Counterparty to make such request or give such direction) pursuant to this Indenture unless such parties shall have offered to the Trustee reasonable security or indemnity against all costs, expenses and liabilities which might reasonably be incurred by it in compliance with such request or direction;

(f) the Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, note or other paper documents, but the Trustee, in its discretion, may and, upon written direction of the Requisite Noteholders or the Swap Counterparty shall, make such further inquiry or investigation into such facts or matters as it may see fit or as it shall be directed at the sole expense of the Issuer and the Trustee shall incur no additional liability of any kind by reason of such inquiry or investigation. Upon the occurrence and continuation of an Event of Default or Class Q-2 Event of Default, as applicable, the Trustee, the Swap Counterparty (or its agent) and any Holder or beneficial owner of a Note or Class Q-1 Security (or Class Q-2 Security, as applicable) shall be entitled (but not obligated), on reasonable prior request (which request shall include a statement of the purpose therefor) made in advance to the Issuer to examine the books and records relating to the Trust Estate (or Class Q-2 Securities Collateral, as applicable) of the Issuer personally or by agent or attorney during normal business hours; provided, that the Trustee, the Swap Counterparty or any such Holder or beneficial owner shall, and shall cause its agents, to hold in confidence all such information, except as otherwise required pursuant to this Indenture or to the extent disclosure may be required by law or by any regulatory or judicial authority and, in the case of the Trustee, to the extent the Trustee, in its sole judgment, may determine that such disclosure is consistent with its obligations hereunder;

(g) the Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Trustee may employ or retain such accountants, appraisers or other experts or advisers as it may reasonably require for the purpose of determining and discharging its rights and duties hereunder; and the Trustee shall not be responsible for any misconduct or negligence on the part of any non-affiliated agent or adviser appointed or retained or any non-affiliated attorney appointed, with due care by it hereunder;

(h) the Trustee shall not be deemed to have notice or knowledge of any matter (other than an Event of Default described in Sections 5.1(a)-(d)) unless a Responsible Officer within the corporate trust department of the Trustee has actual knowledge thereof or unless written notice thereof is received by the Trustee at its Corporate Trust Office and such notice references the Notes generally, either of the Issuers or this Indenture. Whenever reference is made in this Indenture to an Event of Default or Class Q-2 Event of Default, such reference shall, insofar as determining any liability on the part of the Trustee is concerned, be construed to refer only to an Event of Default or a Class Q-2 Event of Default of which the Trustee is deemed to have knowledge in accordance with this paragraph;

(i) except as expressly set forth herein, the Trustee shall not be obligated to monitor, evaluate, verify or otherwise determine or compel compliance by the Swap Counterparty or any Paying Agent (to the extent the Trustee is not serving as the exclusive Paying Agent) with the requirements, terms or conditions of this Indenture or the Swap

69

Agreement, as applicable; provided, however, that the Trustee shall be obligated to ensure that all duties appointed to it by the Issuer shall be executed as set forth in this Indenture. The Trustee shall have no liability for the acts or omissions of the Swap Counterparty or any Paying Agent appointed under or pursuant to this Indenture, and shall be under no obligation to verify independently the accuracy of the information it receives from the Swap Counterparty or the Reference Portfolio Manager on behalf of the Swap Counterparty with respect to the Reference Portfolio;

(j) the Trustee shall have no obligation or responsibility for the accuracy of the records of the Depositary, any Clearing Corporation (including Euroclear or Clearstream) or any non-Affiliated Securities Intermediary and shall have no liability for the acts or omissions of the Depositary, any Clearing Corporation (including Euroclear or Clearstream) or any non-Affiliated Securities Intermediary;

(k) with respect to the security interests in the Trust Estate created hereunder, the pledge of any item of property of the Trust Estate to the Trustee is to the Trustee as representative of the Holders of the Notes and as agent for the other Secured Parties. In furtherance of the foregoing, the possession by the Trustee of any item of property of the Trust Estate and the endorsement to or registration in the name of the Trustee of any item of property of the Trust Estate (including without limitation as entitlement holder of the Collateral Account) are all undertaken by the Trustee in its capacity as representative of the Holders of the Notes and as agent for the other Secured Parties;

(l) the Trustee shall not be under any obligation or duty to become a party to, or to review or evaluate the terms of (or have responsibility for the sufficiency of) any agreement executed pursuant to this Indenture, including but not limited to the Swap Agreement and the Investment Agreement;

(m) the terms of the Swap Agreement shall expressly permit and acknowledge the collateral assignment and pledge by the Issuer of its rights and interests thereunder to the Trustee pursuant to the Indenture; and shall expressly provide that such assignment and pledge is made for collateral security only and shall not impose upon, or be deemed to transfer to (or constitute an assumption by) the Trustee, any liabilities or obligations of the Issuer to the Swap Counterparty;

(n) the Trustee shall not be liable for any action it takes or omits to take in good faith that it reasonably and, after the occurrence and during the continuance of a Default (subject to Section 6.1(f)), prudently believes to be authorized or within its discretion, rights or powers hereunder;

(o) to the extent any defined term hereunder, or any calculation required to be made or determined by the Trustee hereunder, is dependent upon or defined by reference to U.S. generally accepted accounting principles, the Trustee shall be entitled to request and receive (and conclusively rely upon) instruction from the Issuer or the Independent Accountants (and in the absence of its receipt of timely instruction therefrom, shall be entitled to obtain the same directly from an independent accountant at the expense of the Issuer) as to the application of U.S. generally accepted accounting principles in such connection, in any instance;

(p) to the extent permitted by applicable law, the Trustee shall not be required to give any bond or surety in respect of the execution of this Indenture or otherwise; and

(q) the enumeration of any permissible right or power herein available to the Trustee shall not be construed to be the imposition of a duty.

SECTION 6.3    Trustee May Own Notes.

The Trustee in its individual or any other capacity may become the owner or pledgee of Notes and may otherwise deal with the Issuer and the Co-Issuer, the Swap Counterparty or any of their respective Affiliates with the same rights it would have if it were not Trustee. Any Paying Agent, Registrar, co-registrar or co-paying agent may do the same with like rights.

SECTION 6.4    Trustee's Disclaimer.

The Trustee shall not be responsible for and, except as set forth in Section 6.11, makes no representations as to the validity or adequacy of this Indenture, the other Basic Documents, the Notes or any related documents.  It shall not be accountable for the use by the Issuers of the proceeds from the Notes, it shall not be responsible for any statement of the Issuer in this Indenture or in any document issued in connection with the sale of the Notes or in the Notes other than the Certificate of Authentication of the Trustee and it shall in no event assume or incur any liability, duty or obligation to any Holder of a Note, other than as expressly provided in this Indenture or by law.  Under no circumstances shall the Trustee be liable for indebtedness evidenced by or arising under any of the Basic Documents, including the amounts payable on the Notes.

SECTION 6.5    Notice of Defaults; Events of Default and Acceleration.

Promptly (and in no event later than three (3) Business Days) after the occurrence of any Default or Event of Default  or any Class Q-2 Event of Default, in each case known to a Responsible Officer of the Trustee or after any declaration of acceleration has been made by or delivered to the Trustee pursuant to Sections 5.3 or 2.17(m)(ii) hereof, the Trustee shall mail to the Rating Agencies, the Reference Portfolio Manager, the Swap Counterparty, the Investment Agreement Counterparty and each Holder of a Security notice of the Default or Event of Default or Class Q-2 Event of Default, as applicable (unless such Default or Event of Default or Class Q-2 Event of Default shall have been cured or waived, in which case notice of the Default or Event of Default or Class Q-2 Event of Default, as applicable, and that it has been cured or waived shall be promptly provided to each such Person) or notice of any declaration of acceleration.  In addition, if and for so long as any Class of the Securities is listed on the Irish Stock Exchange and so long as the rules of such Stock Exchange so require, notices to the Holders of such Securities shall also be given by publication in the Irish Stock Exchange's Daily Official List.

SECTION 6.6     Compensation; Reimbursement; Indemnity.

(a)   The Issuer agrees:

(i)     to pay the Trustee on each Payment Date the Trustee Fee (which Trustee Fee shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust);

(ii)     except as otherwise expressly provided herein, to reimburse the Trustee in a timely manner upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture or in the enforcement of any provision hereof (including securities transaction charges and the reasonable compensation and the expenses incurred by the Trustee including, without limitation, any legal counsel, investment banking firm, accounting firm or any other agent employed by the Trustee pursuant to this Indenture and reasonable disbursements of its agents and counsel, except any such expense, disbursement or advance as may be attributable to its negligence, willful misconduct or bad faith) and expenses related to the maintenance and administration of the Trust Estate;

(iii)     to pay or to reimburse the Trustee for its payment of the fees of any accounting firm or investment banking firm employed by the Trustee as provided herein;

(iv)     to indemnify fully and hold harmless each of the Trustee, its directors, officers, employees and agents for, and to hold each of them harmless against, any claims, loss, liability, damages, costs or expense (including without limitation reasonable counsel fees and expenses) incurred without negligence, willful misconduct or bad faith arising out of or in connection with the acceptance or administration of this trust, including the costs and expenses of defense against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder; and

(v)     to pay the Trustee reasonable additional compensation together with its expenses (including reasonable counsel fees) for any collection action taken pursuant to Section 6.12 hereof.

(b)   If on any date when a fee or expense shall be payable to the Trustee pursuant to this Indenture insufficient funds are available for the payment thereof in accordance with Section 8.6, any portion of a fee or expense not so paid shall be deferred and payable on such later date on which a fee or expense shall be payable and sufficient funds are available therefor in accordance with Section 8.6 and the failure to pay such amount will not, by itself, constitute an Event of Default. Subject to Section 6.7 hereof, the Trustee shall continue to serve as Trustee under this Indenture regardless of whether it has received amounts due it hereunder, and the Trustee hereby agrees not to cause the filing of a petition in bankruptcy against the Issuer for the nonpayment to the Trustee of any amounts provided by this Section 6.6 until at least one year and one day (or, if longer, the applicable preference period then in effect as confirmed by an Opinion of Counsel provided to the Trustee), after the termination of this Indenture.   No

direction by any Holders of the Notes or the Swap Counterparty shall affect the right of the Trustee to collect amounts owed to it under this Indenture.

(c) When the Trustee incurs expenses or renders services in connection with an Event of Default specified in Section 5.1(h) or Section 5.1(i), the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable Bankruptcy Law.

SECTION 6.7    Resignation and Removal of Trustee; Appointment of Successor.

(a) No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Article VI shall become effective until the acceptance of appointment by the successor Trustee under this Section. The indemnifications in favor of the Trustee in Section 6.6 hereof shall survive any resignation or removal (to the extent of any indemnified liabilities, costs, expenses and other amounts arising or incurred prior to, or arising out of actions or omissions occurring prior to, the effectiveness of such resignation or removal) and the termination of this Indenture.

(b) The Trustee may resign at any time by giving 30 days' prior written notice thereof to the Issuers, the Holders of the Notes, the Swap Counterparty, the Reference Portfolio Manager and each Rating Agency.

(c) The Trustee may be removed at any time by the Requisite Noteholders, with the consent of the Swap Counterparty (such consent not to be unreasonably withheld) (or, following the Maturity Date and distribution of the Trust Estate, the Class Q-2 Requisite Securityholders), upon written notice thereof to the Trustee, the Issuers, each Rating Agency, the Reference Portfolio Manager and the Swap Counterparty.

(d) If at any time:

(i)    the Trustee shall cease to be eligible under Section 6.10 hereof and shall fail to resign after written request therefor by the Issuers or by the Requisite Noteholders;

(ii)    the Trustee shall become incapable of acting;

(iii)    a court having jurisdiction in the premises in respect of the Trustee in an involuntary case or proceeding under federal or state banking or bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law, shall have entered a decree or order granting relief or appointing a receiver, liquidator, assignee, custodian, trustee, conservator, sequestrator or similar official for the Trustee or for any substantial part of the Trustee's property, or ordering the winding-up or liquidation of the Trustee's affairs, provided any such decree or order shall have continued unstayed and in effect for a period of 30 consecutive days; or

(iv)    the Trustee commences a voluntary case under any federal or state banking or bankruptcy laws, as now or hereafter constituted, or any other applicable

federal or state bankruptcy, insolvency or other similar law, or consents to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, conservator, sequestrator or other similar official for the Trustee or for any substantial part of the Trustee's property, or makes any assignment for the benefit of its creditors or fails generally to pay, or admits in writing its inability to pay, its debts as such debts become due or takes any corporate action in furtherance of any of the foregoing;

then, in any such case, (A) the Issuers, by an Issuer Order, may remove the Trustee, and the Trustee hereby agrees to resign immediately in the manner and with the effect provided in this Section 6.7, or (B) any Noteholder or the Swap Counterparty may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e) If the Trustee shall resign, be removed or become incapable of acting, or if a vacancy shall occur in the office of the Trustee for any reason, the Issuers shall promptly appoint a successor Trustee by written instrument, in duplicate, executed by an Authorized Officer of each of the Issuers on behalf of the Issuers, one original copy of which shall be delivered to the Trustee so resigning and one original copy to the successor Trustee, together with a copy to each Noteholder, the Swap Counterparty, the Reference Portfolio Manager and the Rating Agencies; provided, that such successor Trustee shall be appointed, only upon the written consent of the Requisite Noteholders and the Swap Counterparty and provided, further, that the Issuer received Rating Confirmation for such appointment. If no successor Trustee shall have been appointed and an instrument of acceptance by a successor Trustee shall not have been delivered to the resigning Trustee within 30 days after the giving of such notice of resignation, the retiring or resigning Trustee, the Swap Counterparty or any Holder of a Note, may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(f) The Issuers shall give prompt notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of such event by first-class mail, postage prepaid, to the Reference Portfolio Manager, the Swap Counterparty, each Rating Agency and to the Holders of the Notes as their names and addresses appear in the Securities Register. Each notice shall include the name of the successor Trustee and the address of its Corporate Trust Office.

(g) Every successor Trustee appointed hereunder shall be required to meet the eligibility requirements set forth in Section 6.10 and shall execute, acknowledge and deliver to the Issuers and the retiring Trustee an instrument accepting such appointment, and thereupon the resignation or removal of the retiring Trustee shall become effective and such successor Trustee, without any further act, deed or conveyance, shall become vested with all the rights, powers, trusts, duties and obligations of the retiring Trustee; but, on request of the Issuers, the successor Trustee, the Swap Counterparty or the Requisite Noteholders, such retiring Trustee shall, upon payment of its fees and expenses then unpaid, execute and deliver an instrument transferring to such successor Trustee all the rights, powers and trusts of the retiring Trustee, and shall duly assign, transfer and deliver to such successor Trustee all property and money held by such retiring Trustee hereunder.

(h) Upon request of any such successor Trustee, the Issuers shall execute any and all instruments for more fully and certainly vesting in and confirming to such successor Trustee all such rights, powers and trusts. Upon acceptance of appointment by a successor Trustee as provided in this Section, the Issuers shall mail notice thereof by first-class mail, postage prepaid, to the Holders of the Notes at their last addresses appearing upon the Securities Register, the Rating Agencies, the Swap Counterparty, the Reference Portfolio Manager and the Investment Agreement Counterparty. If the Issuers fail to mail such notice within ten days after acceptance of appointment by the successor Trustee, the successor Trustee shall cause such notice to be mailed at the expense of the Issuers.

SECTION 6.8    Merger or Consolidation of Trustee.

Any Person into which the Trustee may be merged or with which it may be consolidated, or any Person resulting from any merger or consolidation to which the Trustee shall be a party, or any Person succeeding to all or substantially all the corporate trust business of the Trustee, shall be the successor of the Trustee under this Indenture (provided, however, that such Person shall be eligible under the provisions of Section 6.10) without the execution or filing of any instrument or any further act on the part of any of the parties to this Indenture, anything in this Indenture to the contrary notwithstanding.

SECTION 6.9    Appointment of Co-Trustee or Separate Trustee.

(a) Notwithstanding any other provision of this Indenture, at any time, for the purpose of meeting any legal requirement of any jurisdiction in which any part of the Issuer's assets may at the time be located, the Trustee shall have the power and may execute and deliver all instruments to appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees, of all or any part of the Issuer's assets, and to vest in such Person or Persons in such capacity and for the benefit of the Noteholders and the other Secured Parties, such title to the Issuer's assets, or any part hereof, and, subject to the other provisions of this Section 6.9, such powers, duties, obligations, rights and trusts as the Trustee may consider necessary or desirable. No co-trustee or separate trustee hereunder shall be required to meet the terms of eligibility as a successor trustee under Section 6.10 and no notice to Noteholders of the appointment of any co-trustee or separate trustee shall be required under Section 6.7.

(b) Every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i)    all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such rights, powers, duties and obligations (including the holding of title to the assets of the Issuer or any portion thereof in any such jurisdiction) shall be exercised and performed singly by such separate trustee or co-trustee but solely at the direction of the Trustee;

75

(ii)    no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder; and

(iii)    the Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

(c) Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the separate trustees and co-trustees, as effectively as if given to each of them. Every instrument appointing any separate trustee or co-trustee shall refer to this Indenture and the conditions of this Article VI. Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Indenture, specifically including every provision of this Indenture relating to the conduct of, affecting the liability of, or affording protection to, the Trustee. Every such instrument shall be filed with the Trustee.

(d) Any separate trustee or co-trustee may at any time constitute the Trustee, its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Indenture on its behalf and in its name. If any separate trustee or co-trustee shall die, become incapable of acting, resign or be removed, all of its estates, properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without the appointment of a new or successor trustee.

SECTION 6.10    <u>Eligibility; Disqualification</u>.

The Trustee shall (a) be a Person organized and doing business under the laws of the United States of America or of any state thereof, (b) be authorized under such laws to exercise corporate trust powers, (c) have an office in the United States, (d) have a combined capital and surplus of at least $200,000,000 and be subject to supervision or examination by federal or state authorities, and (e) have (or have a parent which has) a long-term unsecured debt or deposit rating of at least "Baa1" by Moody's and "BBB+" by Standard & Poor's. If such Person shall publish reports of condition at least annually, pursuant to law or to the requirements of the aforesaid supervising or examining authority, then for the purpose of this Section 6.10, the combined capital and surplus of such Person shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition so published. If at any time the Trustee shall cease to be eligible in accordance with the provisions of this Section 6.10, the Trustee shall resign immediately in the manner and with the effect specified in Section 6.7.

SECTION 6.11    <u>Representations and Warranties of Trustee</u>.

The Trustee, in its individual capacity, represents and warrants as of the Closing Date that:

(a) it is a banking corporation duly organized and validly existing under the laws of the State of New York;

(b) it has full corporate trust power, authority and legal right to execute, deliver and perform its obligations under this Indenture, and has taken all necessary action to authorize

76

the execution, delivery and performance by it of this Indenture, the Account Agreement and the Investment Agreement;

(c) neither the execution, delivery and performance by it of this Indenture nor the consummation of the transactions contemplated by this Indenture shall violate any provision of its corporate charter or by-laws; and

(d) this Indenture has been duly executed and delivered by it and constitutes its legal, valid and binding agreement, enforceable against it in accordance with its terms, subject, as to enforcement, to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect affecting the enforcement of creditors' rights in general and except as such enforceability may be limited by general principles of equity (whether considered in a Proceeding at law or in equity).

SECTION 6.12    Certain Duties of Trustee Related to Delayed Payment of Proceeds.

In the event that in any month the Trustee shall not have received a payment under the Swap Agreement when due or with respect to any Pledged Security on its due date, the Trustee shall promptly notify the Swap Counterparty and the Reference Portfolio Manager in writing and, unless (a) such payment shall subsequently have been received by the Trustee or (b) the Issuers make or cause to be made provisions for such payment satisfactory to the Trustee within three Business Days after such notice, shall request the Swap Counterparty, in the case of the Swap Agreement, or the obligor or issuer of such Pledged Security, the agent or trustee under the related underlying instrument or paying agent designated by any of them, as applicable, to make such payment as soon as practicable after such request but in no event later than three Business Days after the date of such request. In the event that such payment is not made within such time period, the Trustee shall take such action as the Requisite Noteholders (or, unless the Swap Agreement has been terminated and all amounts owed to the Swap Counterparty have been paid, the Swap Counterparty in the case of failure to receive payments in respect of the Pledged Securities) shall reasonably direct in writing (provided, however, that the Trustee shall not be obligated to take any action, including commencement of any legal proceeding, unless it shall have received reasonably satisfactory indemnification or security against expenses and liabilities that may be associated therewith). Any such action shall be without prejudice to any right to claim a Default or Event of Default under this Indenture. Notwithstanding any other provision hereof, the Trustee shall deliver to the Issuers or their designee any payment with respect to the Swap Agreement or any Pledged Security received after the due date thereof to the extent the Issuers previously made provisions for such payment satisfactory to the Trustee in accordance with this Section 6.12, and such payment shall not be deemed part of the Trust Estate.

SECTION 6.13    Withholding; Tax Forms.

(a) If any withholding tax is imposed on the payment (or allocations of income) under the Securities by the Issuers to any Holder of a Security, such tax shall reduce the amount otherwise distributable to such Holder. The Trustee is hereby authorized and directed to retain from amounts otherwise distributable to any Holder of a Security sufficient moneys for the payment of any withholding tax that is legally owed by the Issuers (but such authorization shall not prevent the Trustee from contesting any such tax in appropriate Proceedings and withholding

77

payment of such tax, if permitted by law, pending the outcome of such Proceedings). The amount of any withholding tax imposed with respect to any Holder of a Security shall be treated as cash distributed to such Holder at the time it is withheld by the Trustee and remitted to the appropriate taxing authority. If there is a possibility that withholding tax is payable with respect to a distribution, the Trustee may in its sole discretion withhold such amounts in accordance with this Section 6.13. If any Holder of a Security wishes to apply for a refund of any such withholding tax, the Trustee shall provide to such Holder any information with respect to such withholding tax reasonably available to the Trustee so long as such Holder agrees to reimburse the Trustee for any out-of-pocket expenses incurred. Nothing herein shall impose an obligation on the part of the Trustee to determine the amount of any tax or withholding obligation on the part of the Issuers.

(b)     The Issuer shall prepare and file or deliver, or cause to be prepared, filed and delivered, any income tax, franchise tax, information or withholding tax or other tax returns or forms that are required to be filed with or provided to any tax authority, to the Holders or with or to any other person by or on behalf of the Issuer or the Co-Issuer.

SECTION 6.14     Fiduciary for Noteholders Only; Agent for Other Secured Parties.

With respect to the security interest created in the Trust Estate hereunder, the Delivery of any part of the Trust Estate to the Trustee is to the Trustee as fiduciary of the Noteholders and as agent for the other Secured Parties; in furtherance of the foregoing, the possession by the Trustee of any part of the Trust Estate and the endorsement to or registration in the name of the Trustee of any part of the Trust Estate (including without limitation as entitlement holder of the Collateral Account) are all undertaken by the Trustee in its capacity as fiduciary of the Noteholders and agent for the other Secured Parties.

SECTION 6.15     Assignment of Rights; Not Assumption of Duties.

Anything herein contained to the contrary notwithstanding, (a) each of the Issuers shall remain liable under this Indenture and each of the documents contemplated herein and related hereto to which it is a party to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Indenture had not been executed, (b) the exercise by the Trustee, any Noteholder or Noteholders or any other Secured Party of any of their rights, remedies or powers hereunder shall not release the Issuers from any of their duties or obligations under each of such documents to which they are parties and (c) neither the Noteholders nor the Trustee or any other Secured Parties shall have any obligation or liability under any of such documents to which one or both of the Issuers are parties by reason of or arising out of this Indenture, nor shall the Noteholders, the other Secured Parties or the Trustee be obligated to perform any of the obligations or duties of the Issuers thereunder or, except as expressly provided herein with respect to the Trustee, to take any action to collect or enforce any claim for payment assigned hereunder or otherwise.

ARTICLE VII

COVENANTS

SECTION 7.1        Payments on Securities.

        The Issuers will duly and punctually pay the principal of and interest on the Securities, and all other amounts payable on or in respect of the Securities, in accordance with the terms of the Securities and this Indenture.  Amounts properly withheld under the Code (or any successor statute), and under the laws of any State or other jurisdiction by any Person from a payment to any Holder of a Security of the principal of or interest on the Securities shall be considered as having been paid by the Issuers to the Holder of a Security for all purposes of this Indenture and the Securities.

SECTION 7.2        Maintenance of Office or Agency.

        The Trustee will maintain an office or agency in the Borough of Manhattan, The City of New York, the State of New York, where Securities may be presented or surrendered for payment.  The Trustee hereby initially designates the Corporate Trust Office as such office or agency.  The Trustee will give prompt written notice to the Issuers and the Holders of the Securities of any change in the location of any such office or agency in New York City.

SECTION 7.3        Money for Payments to Be Held in Trust.

        (a)  All payments of amounts due and payable under this Indenture with respect to the Securities, and payments to be made hereunder with respect to the Swap Agreement, shall be made on behalf of the Issuer by the Trustee or another Paying Agent, in each case from amounts deposited with the Trustee or Paying Agent, as the case may be, by or on behalf of the Issuers for such purpose.

        (b)  The Issuers may at any time, for the purpose of obtaining the satisfaction and discharge of this Indenture or for any other purpose, by Issuer Order direct any Paying Agent to pay to the Trustee all sums held in trust by such Paying Agent, together with any instructions that accompanied the deposit of such sums, with such sums to be held by the Trustee upon the same terms as those upon which the sums were held by such Paying Agent; and upon such payment and delivery by any Paying Agent to the Trustee, such Paying Agent shall be released from all further liability with respect to such money.

        (c)  The Trustee shall give written notice to the Issuers of any money held by the Trustee or any Paying Agent for the payment of any amount due with respect to any Security and remaining unclaimed for two years after such amount has become due and payable and, subject to applicable abandoned property laws, upon written request of the Issuer such amount shall be deemed discharged from any trust and be paid to the Issuer; and the Holder of such Security shall thereafter look only to the Issuer for payment thereof (but only to the extent of the amounts so paid to the Issuer), and all liability of the Trustee or such Paying Agent with respect to such funds shall thereupon cease; provided, however, that the Trustee or such Paying Agent, before being required to make any such payment to the Issuer, shall (i) at the expense of the Issuer cause to be published once, in a newspaper published in the English language, customarily

79

published on each Business Day and of general circulation in New York City, and, in accordance with Section 11.4, in the Irish Stock Exchange's Daily Official List, notice that such money remains unclaimed and that, after a date specified therein, which shall not be less than thirty (30) days from the date of such publication, any unclaimed balance of such money then remaining shall be repaid to the Issuer and (ii) mail notice of such repayment to the Holders of the Securities whose right or interest in moneys due and payable but not claimed is determinable from the records of the Trustee or of any Paying Agent, at the last address of record for each such Holder. The Trustee may also adopt and employ, at the expense of the Issuer, any other reasonable means of notification of such repayment.

(d) If and to the extent any funds shall be delivered to it from time to time pursuant to this Indenture for the purpose of making payments on or in respect of the Securities, the Trustee shall be entitled to establish a segregated account for the purpose of holding and disbursing such funds. The Trustee shall have no obligation to invest or pay interest on any such funds held by it (except as and to the extent otherwise expressly provided herein).

SECTION 7.4    Existence of Issuers.

(a) Each of the Issuers will maintain in full force and effect its existence, rights and franchises as a company or corporation incorporated under the laws of the jurisdiction of its incorporation and will obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Indenture, the Securities or any of the Pledged Securities or other property included in the Trust Estate or in the Class Q-2 Securities Collateral; provided, however, that, subject to Cayman Islands law, the Issuer shall be entitled to change its jurisdiction of incorporation from the Cayman Islands to any other jurisdiction (other than the United States or any state or political subdivision thereof or therein) reasonably selected by the Issuer so long as (i) the Issuer determines such change is not disadvantageous in any material respect to the Issuer, the Holders of the Securities or any other Secured Party, (ii) written notice of such change shall have been given by the Issuer to the Trustee, the Reference Portfolio Manager, the Swap Counterparty, the Noteholders and the Rating Agencies at least thirty (30) Business Days prior to such change of jurisdiction, (iii) on or prior to the fifteenth Business Day following such notice the Trustee shall not have received written notice from the Holders of a majority of the Aggregate Principal Amount of each Class of Senior Notes, or the Holders of a majority of the Aggregate Principal Amount of the Income Notes, or the Swap Counterparty, objecting to such change, and (iv) such change shall not cause the Issuer to be in violation of United States or Cayman Islands law. Each of the Issuers shall comply with its organizational documents and shall not amend its organizational documents in any manner that would have a material adverse effect on the rights of the Swap Counterparty or the Holders of any Class of Notes. The Board of Directors of each of the Issuers will at all times have at least one member who is Independent of the Swap Counterparty and the Reference Portfolio Manager. The Issuer shall be entitled to take any action required by this Indenture within the United States, notwithstanding any provision of this Indenture requiring the Issuer to take such action outside of the United States, so long as prior to taking any such action the Issuer receives a legal Opinion of Tax Counsel to the effect that it is not necessary to take such action outside the United States or any political subdivision thereof in order to prevent the Issuer from becoming subject to any United States federal, state or local income or withholding taxes.

80

(b) The Issuer and the Co-Issuer shall ensure that all corporate or other formalities regarding their respective existences (including holding regular meetings of the board of directors and shareholders, or other similar meetings) are followed. Neither the Issuer nor the Co-Issuer shall take any action, or conduct its affairs in a manner, that is likely to result in its separate existence being ignored or in its assets and liabilities being substantively consolidated with any other Person in a bankruptcy, reorganization or other insolvency proceedings. Without limiting the foregoing, (i) neither the Issuer nor the Co-Issuer shall have any subsidiaries and (ii) the Issuer and the Co-Issuer shall not (A) have any employees (other than their respective officers and directors) or (B) engage in any transaction with any shareholder that would constitute a conflict of interest (provided that the Administration Agreement shall not be deemed to be a transaction that would constitute such a conflict of interest).

(c) The Issuer shall notify the Rating Agencies of any amendment of any of the organizational documents of the Issuers and of any redemption in full of any Class of Notes.

SECTION 7.5    Protection of Trust Estate.

(a) The Issuer shall from time to time execute, deliver and file all such supplements and amendments hereto and all such financing statements, continuation statements, instruments of further assurance and other instruments and shall take such other action as may be necessary or advisable (including, without limitation, causing the registration of this Indenture in the Register of Mortgages of the Issuer at the Issuer's Registered Office in the Cayman Islands) to secure the rights and remedies of the Secured Parties, including to:

(i)    Grant more effectively all or any portion of the Trust Estate;

(ii)    maintain, preserve and perfect the validity of any Grant made or to be made by this Indenture or to carry out more effectively the purposes hereof;

(iii)    perfect, publish notice of, or protect the validity of any Grant made or to be made by this Indenture (including, without limitation, any and all actions necessary or desirable as a result of changes in law or regulation);

(iv)    enforce the Swap Agreement and any of the Pledged Securities or any other instruments or property included in the Trust Estate;

(v)    preserve and defend title to the Trust Estate and the rights therein of the Trustee, the Swap Counterparty, the Collateral Administrator and the Holders of the Notes in such Trust Estate against the claims of all other Persons; and

(vi)    pay or cause to be paid any and all taxes levied or assessed upon all or any part of the Trust Estate.

The Issuer hereby designates the Trustee its agent and attorney-in-fact to execute and file (i) a financing statement in connection with the Grant pursuant to this Indenture identifying as collateral "all assets in which the Issuer now or hereafter has rights," and (ii) any other financing statement, continuation statement or other instrument necessary or desirable under this section; provided, however, that the Trustee shall be under no obligation to prepare,

81

execute or file any such financing statement, continuation statement or other instrument and that such appointment shall not impose upon the Trustee any of the Issuer's obligations under this Section 7.5.

(b) The Trustee shall not, except in accordance with Article VIII and Section 5.8, permit the removal of any portion of the Trust Estate or transfer any such property from a Trust Account to which it is credited, or cause or permit any change in the manner of Delivery of any Pledged Securities, if after giving effect thereto the jurisdiction governing the perfection of the Trustee's security interest in such Pledged Securities is different from the jurisdiction governing perfection at the time of delivery of the most recent Opinion of Counsel pursuant to Section 7.6(a) (or, if no Opinion of Counsel has yet been delivered pursuant to Section 7.6(a), the Opinion of Counsel delivered at the Closing Date pursuant to Section 3.1), unless the Trustee shall have received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to such property will continue to be maintained after giving effect to such action or actions.

(c) The Issuer shall pay or cause to be paid taxes, if any, levied on account of the beneficial ownership by the Issuer of any Pledged Securities.

(d) Without at least thirty (30) days prior written notice to the Trustee, the Issuer shall not change its name, or the name under which it does business, from the name shown on the signature page hereof.

SECTION 7.6    Opinions as to Trust Estate and Tax Certificates.

(a) On or before July 31st in each calendar year commencing in 2005, the Issuer shall cause to be delivered to the Trustee (with a copy to each Rating Agency, the Swap Counterparty and the Reference Portfolio Manager) an Opinion of Counsel with respect to the laws of the State of New York, stating that, in the opinion of such counsel, as of the date of such opinion, (i) the security interest in the Trust Estate created by this Indenture is perfected and, with respect to certain portions of the Trust Estate, of the first priority (subject to reasonable assumptions and qualifications as applicable), and (ii) no further action (other than as specified in such opinion) is required to be taken (under the UCC and applicable federal regulation as in effect on such date) to ensure the continued perfection of such security interest during the succeeding year.

(b) If required to prevent the withholding and imposition of U.S. federal income tax, the Issuer shall deliver or cause to be delivered a United States Internal Revenue Service Form W-8BEN (or any successor thereto) to each issuer of a Pledged Security in the Trust Estate at the time such Pledged Security is purchased by the Issuer and as necessary thereafter. The Issuer similarly shall comply with any information reporting or certification procedures imposed by any state, local or non-U.S. tax law as a precondition to an exemption from, or reduction in the rate of, the withholding and imposition of any tax in respect of a Pledged Security in the Trust Estate.

SECTION 7.7    Performance of Obligations.

(a) Each of the Issuers shall not take any action and shall not consent to any action proposed to be taken by others that would release any Person from any of such Person's covenants or obligations under any instrument or agreement included in the Trust Estate, except in accordance with the provisions hereof.

(b) Either or both Issuers may contract with other Persons, including the Collateral Administrator, for the performance by such Persons of the obligations of either or both Issuers hereunder. Notwithstanding any such arrangement, the Issuers shall remain primarily liable with respect thereto. With respect to any such contract, the performance of such obligations by such Persons shall be deemed to be performance of such obligations by the Issuer or Co-Issuer, as applicable, and the Issuer or Co-Issuer, as applicable, will perform punctually, and will use its best efforts to cause such Persons, to perform punctually their obligations hereunder.

SECTION 7.8    Negative Covenants.

(a) The Issuer will not, and with respect to clauses (ii), (iv), (vi), (vii), (x) and (xii), the Co-Issuer will not:

(i)    sell, transfer, exchange or otherwise dispose of, or pledge, mortgage, hypothecate or otherwise encumber (or permit such to occur or suffer such to exist), any part of the Trust Estate or the Class Q-2 Securities Collateral, except as expressly permitted by this Indenture and the Swap Agreement;

(ii)    claim any credit on, or make any deduction from or dispute the enforceability of, the amount payable with respect to the Securities other than amounts withheld in accordance with the Code or any applicable laws of the Cayman Islands, or assert any claim against any present or future Holder of the Securities, by reason of the payment of any taxes levied or assessed upon any part of the Trust Estate or the Class Q-2 Securities Collateral, as applicable;

(iii)    (A)    incur or assume any indebtedness other than pursuant to this Indenture (including trade debt incidental to the performance of the respective obligations of the Issuers hereunder), (B) incur, assume or guarantee the indebtedness of any other Person or (C) issue any additional shares other than the Ordinary Shares authorized to be issued as of the Closing Date;

(iv)    (A)    permit the validity or effectiveness of this Indenture or any grant hereunder to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations with respect to this Indenture or the Securities, except, in each case, as may be expressly permitted hereby or thereby, (B) create, permit or suffer to exist any lien, charge, adverse claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise upon or burden the Trust Estate or the Class Q-2 Securities Collateral, or any part thereof or any interest therein or the proceeds thereof, or (C) take

83

any action that would permit the lien of this Indenture not to constitute a valid first priority perfected security interest in the Trust Estate or the Class Q-2 Securities Collateral;

(v)     directly or through any other Person, engage in any activity that could cause it to be a dealer in securities or to be deemed to be engaged in a finance or lending business for United States federal income tax purposes;

(vi)     (A) commence any case, proceeding or other action under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have any order for relief entered with respect to it, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seek appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or make a general assignment for the benefit of its creditors;

(vii)     amend the "non petition" or "limited recourse" provisions of any of the Basic Documents;

(viii)     enter into any agreement or contract with any Person unless such contract or agreement contains "limited recourse" provisions and such  Person agrees that, prior to the date that is one year and one day after all of the related obligations of the Issuer have been paid in full (or, if longer, the applicable preference period under applicable insolvency law), such Person shall not take any action or institute any proceeding against the Issuer under any insolvency law applicable to the Issuer or which would be reasonably likely to cause the Issuer to be subject to, or seek the protection of, any such insolvency law; provided, however, that such Person shall be permitted to become a party to and to participate in any Proceeding or action under any such insolvency law that is initiated by any Person other than one of its Affiliates;

(ix)     declare or pay dividends or other distributions in respect of, or redeem or otherwise purchase, any equity interest of the Issuer, other than as contemplated by this Indenture, or authorize, issue or sell any additional equity interest of the Issuer;

(x)     take any action that could cause the Issuer, the Co-Issuer, the Trust Estate or the Class Q-2 Securities Collateral to be required to (A) register as an "investment company" under the Investment Company Act or (B) register any of the issued and outstanding securities of the Issuer or Co-Issuer under the Securities Act or any United States or state securities law;

(xi)     designate an Early Termination Date (as defined in the Swap Agreement) other than by reason of a Swap Event of Default or amend the Swap Agreement in any material respect, unless the Issuer receives Rating Confirmation for such designation or amendment; or

(xii)     have any employees (except for officers and directors); or

(xiii)    commingle its Cash with that of any other Person.

(b) The Issuers shall not enter into any agreement, contract or indenture other than the Basic Documents or in connection with the transactions contemplated by this Indenture; shall not incur or assume any indebtedness other than pursuant to this Indenture (including trade debt incidental to the performance of the respective obligations of the Issuers hereunder), or incur, assume or guarantee the indebtedness of any other Person; and shall not own any securities at any time, other than as contemplated by this Indenture and the Swap Agreement.  For purposes of this paragraph (b), "security" means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security (including a certificate of deposit) or on any group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

(c) The Trustee shall not sell, transfer, exchange or otherwise dispose of, or enter into or engage in any business with respect to, any part of the Trust Estate or the Class Q-2 Securities Collateral, except as expressly permitted by this Indenture and except for administrative services performed for the Issuers relating to their administrative duties as contemplated herein.

SECTION 7.9     Statement as to Compliance.

On or before May 31st in each calendar year, beginning May 31st, 2005, or immediately if there has been a Default or Event of Default or Class Q-2 Event of Default under this Indenture, the Issuer shall deliver to the Trustee (who shall deliver a copy to the Swap Counterparty and the Reference Portfolio Manager) an Officer's Certificate stating, as to each signer thereof, that:

(a) a review of the activities of the Issuer during the preceding calendar year and of its performance under this Indenture has been made under his or her supervision; and

(b) to the best of such signer's knowledge, based on such review, there did not exist, as of a date no more than five days prior to the date of the certificate, nor had there existed at any time prior thereto since the date of the last certificate (or in the case of the first such certificate, since the Closing Date), any Event of Default or Class Q-2 Event of Default under this Indenture or any Swap Event of Default or Swap Termination Event with respect to the Issuer under the Swap Agreement or, if such event did then exist or had existed, specifying the same and the nature and the status thereof, including actions undertaken to remedy the same, and that the Issuer has complied with all of its obligations under this Indenture and the Swap Agreement since the date of the last certificate (or in the case of the first such certificate, since

the Closing Date), or if such is not the case, specifying those obligations with which it has not complied.

SECTION 7.10    Consolidation of Issuers.

(a) The Issuer shall not consolidate or merge with or into any other Person or transfer or convey all or substantially all of its assets to any Person, unless permitted by Cayman Islands law and unless:

(i)      the Issuer shall be the surviving entity, or the Person (if other than the Issuer) formed by such consolidation or into which the Issuer is merged or to which all or substantially all of the assets of the Issuer are transferred or conveyed shall be an exempted company incorporated with limited liability and existing under the laws of the Cayman Islands or such other jurisdiction outside the United States as may be approved by the Holders of a majority of the Aggregate Principal Amount of each Class of Notes; provided, that no such approval shall be required in connection with any such transaction undertaken solely to effect a change in the jurisdiction of organization pursuant to Section 7.4 (any such jurisdiction or any jurisdictions approved pursuant to the preceding clause, "Permitted Other Jurisdictions"), and shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee, each Holder of a Note and the other Secured Parties, the due and punctual payment of the principal of and interest on all Notes and all payments under the Swap Agreement and the performance of every covenant of this Indenture on the part of the Issuer to be performed or observed, all as provided herein;

(ii)      each Rating Agency shall have received written notification of such consolidation, merger, transfer or conveyance and shall have given a Rating Confirmation with respect to such transaction;

(iii)      immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing;

(iv)      the Issuer shall have delivered to the Trustee, each Holder of a Note and the Swap Counterparty an Officer's Certificate and an Opinion of Tax Counsel each stating that such consolidation, merger, transfer or conveyance and such supplemental indenture comply with this Section 7.10, that all conditions precedent in this Section 7.10 relating to such transaction have been complied with and that (A) no gain or loss will be recognized for United States federal, Cayman Islands and the Permitted Other Jurisdiction, if any, income tax purposes by the Holders of the Securities or the Swap Counterparty solely as a result therefrom, (B) neither payments on the Swap Agreement nor the net income of the Issuer or the surviving entity shall become subject to United States federal income tax (whether imposed by withholding or otherwise) solely as a result therefrom, (C) no change in the characterization of the Notes as indebtedness for United States federal income tax purposes will result therefrom and (D) neither the Trust Estate, nor the Class Q-2 Securities Collateral, nor the surviving entity (if applicable) shall become subject to income taxes or other applicable taxes solely as a

86

result therefrom that would reduce in any manner the payments on the Securities or the amount of funds available for such payment;

(v) the Issuer shall have delivered to the Trustee an Opinion of Counsel stating that after giving effect to such transaction, neither of the Issuers will be required to register as an investment company under the Investment Company Act; and

(vi) after giving effect to such transaction, no Ordinary Shares will be beneficially owned by U.S. Persons.

(b) The Co-Issuer shall not consolidate or merge with or into any other Person or transfer or convey all or substantially all of its assets to any Person, unless:

(i) the Co-Issuer shall be the surviving corporation, or the Person (if other than the Co-Issuer) formed by such consolidation or into which the Co-Issuer is merged or to which all or substantially all of the assets of the Co-Issuer are transferred or conveyed shall expressly assume, by an indenture supplemental hereto, executed and delivered to the Trustee, the due and punctual payment of the principal of and interest on all Notes and the performance of every covenant of this Indenture on the part of the Co-Issuer to be performed or observed, all as provided herein;

(ii) each Rating Agency shall have received written notification of such consolidation, merger, transfer or conveyance and shall have given a Rating Confirmation for such transaction;

(iii) immediately after giving effect to such transaction, no Default or Event of Default shall have occurred and be continuing;

(iv) the Co-Issuer shall have delivered to the Trustee and each Holder of a Note an Officer's Certificate and an Opinion of Tax Counsel each stating that such consolidation, merger, transfer or conveyance and such supplemental indenture comply with this Section 7.10, that all conditions precedent in this Section 7.10 relating to such transaction have been complied with and that (A) no gain or loss will be recognized for United States federal, Cayman Islands and the Permitted Other Jurisdiction, if any, income tax purposes by the Holders of the Securities or the Swap Counterparty solely as a result therefrom, (B) neither payments on the Swap Agreement nor the net income of the Co-Issuer or the surviving entity shall become subject to United States federal income tax (whether imposed by withholding or otherwise) solely as a result therefrom, (C) no change in the characterization of the Notes as indebtedness for United States federal income tax purposes will result therefrom and (D) neither the Trust Estate, nor the Class Q-2 Securities Collateral, nor the surviving entity (if applicable) shall become subject to income taxes or other applicable taxes solely as a result therefrom that would reduce in any manner the payments on the Securities or the amount of funds available for such payment;

(v) the Co-Issuer shall have delivered to the Trustee an Opinion of Counsel stating that after giving effect to such transaction, neither of the Issuers will be required to register as an investment company under the Investment Company Act; and

(vi)    after giving effect to such transaction, none of its common stock will be beneficially owned by U.S. Persons.

SECTION 7.11    Successor Substituted.

Upon any consolidation or merger, or transfer or conveyance of all or substantially all of the assets of the Issuer, in accordance with Section 7.10, the Person formed by or surviving such consolidation or merger (if other than the Issuer or the Co-Issuer, as applicable), or the Person to which such transfer or conveyance is made, shall succeed to, and be substituted for, and may exercise every right and power of, and shall be bound by each obligation or covenant of, the Issuer or Co-Issuer, as applicable, under this Indenture with the same effect as if such Person had been named as the Issuer or Co-Issuer, as applicable, herein. In the event of any such consolidation, merger, transfer or conveyance, the Person named as the "Issuer" or "Co-Issuer", as applicable, in the first paragraph of this Indenture or any successor which shall theretofore have become such in the manner prescribed in this Article VII may be dissolved, wound-up and liquidated at any time thereafter, and such Person thereafter shall be released from its liabilities as obligor and maker on all the Notes and from its obligations under this Indenture.

SECTION 7.12    No Other Business.

(a) The Issuer shall not engage in any business or activity other than (i) issuing and selling its Ordinary Shares, (ii) issuing and selling the Notes, (iii) issuing and selling the Class Q-1 Securities and the Class Q-2 Securities, (iv) entering into the Swap Agreement and engaging in the activities permitted thereunder, (v) entering into the Collateral Administration Agreement, (vi) the acquisition and disposition of Eligible Investments and Class Q-2 Securities Collateral and (vii) engaging in other activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith.  The Issuer shall provide prior written notice to each Rating Agency of any proposed amendment to its Articles and shall not amend its Articles unless it has received Rating Confirmation for such amendment.

(b) The Co-Issuer shall not engage in any business or activity other than issuing and redeeming its common stock, issuing the Senior Notes, and engaging in any other activities that are necessary, suitable or convenient to accomplish the foregoing or are incidental thereto or connected therewith.  The Co-Issuer shall provide prior written notice to each Rating Agency of any proposed amendment to its Certificate of Incorporation or bylaws and shall not amend such documents unless it has received Rating Confirmation for such amendment.

SECTION 7.13    Purchase of Notes and Class Q Securities.

Notwithstanding anything contained in this Indenture to the contrary, the Issuer may acquire Securities in open market or privately negotiated transactions or otherwise (and the Issuer shall give prompt written notice thereof to the Trustee); provided, however, that it has received Rating Confirmation for such acquisition; provided, further that, the Issuer shall not acquire Notes of any Class if Notes of a more senior Class are then outstanding.  Any Securities acquired by the Issuer shall be delivered to the Trustee for cancellation.  Any Securities acquired in accordance with this Section 7.13 must be acquired at a price less than par.

SECTION 7.14    Additional Covenants.

(a) Each of the Issuers shall comply with all applicable laws, rules, regulations, orders, writs, judgments, injunctions, decrees, determinations and awards (including, without limitation, any fiscal and accounting rules and regulations and any foreign or domestic law, rule or regulation), including, without limitation, in connection with the issuance, offer and sale of the Notes.

(b) In addition to the notices to be provided under Section 8.11, the Issuers shall give prompt notice in writing to the Trustee, the Reference Portfolio Manager, the Swap Counterparty, the Investment Agreement Counterparty and each Rating Agency upon becoming aware of the occurrence of any Default or Event of Default under this Indenture (or waiver thereof) or any default under any other Basic Document or the Account Agreement (or waiver thereof).

(c) Each of the Issuers shall comply with the terms and conditions of the Basic Documents to which it is a party or by which it is bound.  Each of the Issuers shall take all actions as may be necessary to ensure that all of its representations and warranties made pursuant to the Basic Documents are true and correct as of the date hereof and thereof and continue to be true and correct for so long as any Notes are Outstanding.  Each of the Issuers further agrees not to authorize or otherwise to permit the Collateral Administrator to act in contravention of the representations, warranties and agreements of the Collateral Administrator under the Collateral Administration Agreement.

(d) To the extent it may lawfully do so, each of the Issuers on behalf of itself agrees it will not (i) commence any case, proceeding or other action under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have any order for relief entered with respect to it, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts; (ii) seek appointment of a receiver, trustee, custodian or other similar official for it or for all or any substantial part of its assets, or make a general assignment for the benefit of its creditors; or (iii) take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth above; and each of the Issuers shall generally pay its debts as they become due and not admit in writing its inability to pay its debts as they become due.

(e) So long as any Class of Securities listed on the Irish Stock Exchange is Outstanding, the Issuers shall (i) use all reasonable efforts to maintain the listing of such Class of Securities on the Irish Stock Exchange; provided, however, that the Issuer will not be required to maintain a listing on the Irish Stock Exchange or any other E.U. stock exchange if compliance with requirements of the European Commission or a relevant Member State becomes burdensome in the sole judgment of the Swap Counterparty, (ii) notify the Irish Stock Exchange if the rating assigned to any Class of Securities has been qualified, downgraded or withdrawn; and (iii) make available for inspection at the office of the Trustee copies of their respective Articles, bylaws, and resolutions authorizing the issuance of the Notes and this Indenture.

(f) Each Issuer shall only conduct business in its own name as set forth in its organizational documents.

SECTION 7.15    <u>Representations and Warranties of the Issuers</u>.

(a) Each of the Issuers represents and warrants as to itself that it is a company or corporation duly incorporated, validly existing and in good standing under the laws of the jurisdiction of its incorporation and in each jurisdiction where the conduct of its business requires such license, qualification or good standing, except where the failure to be so licensed or qualified or in good standing would not adversely affect the validity or enforceability of the Basic Documents to which it is a party, or the ability of the Issuer or Co-Issuer, as the case may be, to perform its obligations hereunder or thereunder.

(b) Each of the Issuers represents and warrants as to itself that it has the power and authority to execute and deliver the Basic Documents and all other documents and agreements contemplated hereby and thereby to which it is a party, as well as to carry out the terms hereof and thereof.

(c) Each of the Issuers represents and warrants as to itself that it has taken all necessary action, including but not limited to all requisite corporate action, to authorize the execution, delivery and performance of the Basic Documents and all other documents and agreements contemplated hereby and thereby to which it is a party.  When executed and delivered by the Issuer or Co-Issuer, as the case may be, and in the case of the Securities, authenticated by the Trustee as provided herein, assuming due authorization, execution, delivery and/or authentication by each other party thereto, each of the Basic Documents to which it is a party will constitute the legal, valid and binding obligation of the Issuer or Co-Issuer, as the case may be, enforceable in accordance with its terms subject, as to enforcement, to applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect affecting the enforcement of creditors' rights in general and except as such enforceability may be limited by general principles of equity (whether considered in a Proceeding at law or in equity).

(d) Each of the Issuers represents and warrants as to itself that all authorizations, licenses, permits, certificates, franchises, consents, approvals and undertakings which are required to be obtained by it under any applicable law which are material to (i) the conduct of its business, (ii) the ownership, use, operation or maintenance of its properties or (iii) the performance by the Issuer or Co-Issuer, as the case may be, of its obligations under or in connection with the Basic Documents to which it is a party, have been received and all such authorizations, licenses, permits, certificates, franchises, consents, approvals and undertakings are in full force and effect.

(e) Each of the Issuers represents and warrants as to itself that the execution, issuance and delivery of, and performance by it of its obligations under, the Basic Documents and any and all instruments or documents required to be executed or delivered pursuant hereto or thereto or in connection herewith or therewith to which it is a party were and are within its powers, and will not violate any provision of any law, regulation, decree or governmental authorization applicable to it, or its Articles, or Certificate of Incorporation and By-laws, as the

90

case may be, and will not violate or cause a default under any provision of any contract, agreement, mortgage, indenture or other undertaking to which it is a party or which is binding upon it or any of its property or assets, and will not result in the imposition or creation of any lien, charge, or encumbrance upon any of its properties or assets, pursuant to the provisions of any such contract, agreement, mortgage, indenture or undertaking, other than as specifically set forth herein.

(f)  Each of the Issuers represents and warrants as to itself that there are no legal, governmental or regulatory proceedings pending to which it is a party or of which any of its property is the subject, which if determined adversely to it, would individually or in the aggregate have a material adverse effect on the performance by it, of the Basic Documents to which it is a party or the consummation of the transactions contemplated hereunder or thereunder, and to the best of its knowledge, no such proceedings are threatened or contemplated.

(g) Each of the Issuers represents and warrants as to itself that the Securities issued by it are not required to be registered pursuant to the Securities Act, it is not required to be registered as an investment company pursuant to the Investment Company Act and this Indenture is not required to be qualified under the Trust Indenture Act of 1939, as amended.

SECTION 7.16    Certain Tax Matters.

(a)  The Issuer shall not file, or cause to be filed, any income or franchise tax return in any state of the United States unless it shall have obtained an Opinion of Counsel prior to such filing that, under the laws of such jurisdiction, the Issuer is required to file such income or franchise tax return.

(b)  The Issuer will not file with the Internal Revenue Service an election to be treated as a partnership for U.S. federal income tax purposes.

(c)  The Issuer shall take reasonable steps so as to avoid the acquisition and ownership of "U.S. real property interests," within the meaning of section 897 of the Code, and interests in trusts or partnerships (or similar "pass-through entities") that are engaged in the conduct of a trade or business within the United States for United States federal income tax purposes.

(d)  The Issuers do not intend for this Indenture to represent an agreement to enter into a partnership, a joint venture or any other business entity for U.S. federal tax purposes.  The Issuers will not represent or otherwise hold themselves out to the Internal Revenue Service or other third parties as partners in a partnership or members of a joint venture or other business entity for U.S. federal tax purposes.

SECTION 7.17    DTC Actions.

The Issuers shall direct DTC to take the following steps in connection with the Global Notes:

(a) The Issuers shall direct DTC to include the "3c7" marker in the DTC 20-character security descriptor and the 48-character additional descriptor for the Rule 144A Global Notes in order to indicate that sales are limited to Qualified Purchasers that are Qualified Institutional Buyers.

(b) The Issuers shall direct DTC to cause each physical DTC delivery order ticket delivered by DTC to purchasers to contain the 20-character security descriptor and shall direct DTC to cause each DTC delivery order ticket delivered by DTC to purchasers in electronic form to contain the "3c7" indicator and the related user manual for participants.

(c) On or prior to the Closing Date, the Issuers will instruct DTC to send the "Important Notice to DTC Participants," in substantially the form of Exhibit K hereto, to all Participants.

(d) The Issuers will request that DTC include the Rule 144A Global Notes in DTC's "Reference Directory" of Section 3(c)(7) offerings.

(e) Upon the request of the Trustee or the Swap Counterparty, the Issuer shall request DTC to deliver a list of all Participants holding an interest in the Rule 144A Global Notes.

SECTION 7.18    Bloomberg Screens, Etc.

The Issuers will from time to time request all applicable third-party vendors to include on screens maintained by such vendors appropriate legends regarding Rule 144A, Regulation S and Section 3(c)(7) restrictions on the Global Notes. Without limiting the foregoing, the Issuer will request that Bloomberg, L.P. include the following on each Bloomberg screen containing information about the Notes as applicable:

(a) The bottom of the "Security Display" pages describing the Rule 144A Global Notes should state: "Iss'd Under 144A/3c7."

(b) The bottom of the "Security Display" page describing the Regulation S Global Notes or Class Q-1 Reg S Global Securities should state: "Iss'd Under Reg S."

(c) The "Security Display" page should have a flashing red indicator stating "Additional Note Pg."

(d) Such indicator for the Rule 144A Global Notes should link to an "Additional Security Information" page, which should state that the Rule 144A Global Notes "are being offered in reliance on the exemption from registration under Rule 144A of the Securities Act to persons that are both (A) "Qualified Institutional Buyers" (as defined in Rule 144A under the Securities Act) and (B) "Qualified Purchasers" (as defined under Section 3(c)(7) of the Investment Company Act)."

(e) Such indicator for the Regulation S Global Notes or Class Q-1 Reg S Global Securities should link to an "Additional Security Information" page, which should state that the

92

such securities "are being offered to non-U.S. Persons in reliance on the exemption from registration under Regulation S of the Securities Act in offshore transactions."

(f) The "Disclaimer" pages for the Notes should state that the Notes "will not be and have not been registered under the Securities Act, and neither the Issuer nor the Co-Issuer has been registered under the Investment Company Act and these securities may not be offered or sold in the United States absent registration or an applicable exemption from registration requirements and any such offer or sale of these securities must be in accordance with Section 3(c)(7) of the Investment Company Act."

SECTION 7.19    CUSIP.

The Issuers will cause each "CUSIP" or "CINS" number obtained for a Note to have an attached "fixed field" that contains "3c7" and "144A" or "Reg S" indicators, as applicable.

SECTION 7.20    Legends.

The Issuers will not remove the legends set forth on the Securities in the forms set forth in Exhibits A1-1, A2-1, B1-1, B2-1, C1-1, C2-1, A1-2, A2-2, B1-2, B2-2, C1-2, C2-2, A1-3, A2-3, B1-3 , B2-3, C1-3, C2-3, IN-1, Q1-A and Q-2A hereto at any time except as provided in Section 2.6(k).

SECTION 7.21    Regulation S Transfers.

The Issuers will not participate directly or through agents, and will direct the Initial Purchaser not to participate, in any sale or transfer of Temporary Regulation S Global Notes or Regulation S Global Notes (or a beneficial interest therein) to a U.S. Person unless such person is acquiring a beneficial interest in a Rule 144A Global Note.

SECTION 7.22    Listing Agent.

As long as any Securities are listed on the Irish Stock Exchange and the rules of such Exchange shall so require, the Issuers shall maintain a listing agent (a "Listing Agent"), a paying agent and a transfer agent with an office in Dublin, Ireland.  The Issuers hereby initially appoint the NCB Stockbrokers as listing agent for Securities listed on the Irish Stock Exchange and initially appoint an Irish paying agent and transfer agent for such Securities as provided in Sections 10.1 and 10.2, respectively, of this Indenture.  If the Issuers appoint a new Listing Agent, the Issuers will publish the change, with such publication expected to be made in the *Daily Official List* of the Irish Stock Exchange.

SECTION 7.23    Security Interest Representations and Warranties.

(a) The Issuer hereby represents and warrants as of the Closing Date as follows:

(i)    The Issuer owns the Trust Estate and the Class Q-2 Securities Collateral free and clear of any lien, claim or encumbrance of any person, other than such as are created under, this Indenture.

93

(ii)     Except as expressly permitted by this Indenture, other than the assignment and security interest granted to the Trustee pursuant to this Indenture, the Issuer has not pledged, assigned, sold, granted a security interest in, or otherwise conveyed any of the Trust Estate or the Class Q-2 Securities Collateral.  The Issuer has not authorized the filing of and is not aware of any financing statements against the Issuer that includes a description of the Trust Estate or Class Q-2 Securities Collateral or any portion thereof other than any financing statement relating to the security interest granted to the Trustee hereunder or that has been terminated.  The Issuer is not aware of any judgment, Pension Benefit Guaranty Corporation or tax lien filings against the Issuer.

(iii)     The Issuer has received all consents and approvals required by the terms of any item in the Trust Estate and the Class Q-2 Securities Collateral to transfer to the Trustee its interest and rights in such item in the Trust Estate or Class Q-2 Securities Collateral, as applicable, hereunder, except to the extent that any requirement for consent or approval is rendered ineffective under the applicable Uniform Commercial Code.

(iv)     This Indenture creates a valid and continuing security interest (as defined in the applicable Uniform Commercial Code) (x) in the Trust Estate in favor of the Trustee for the benefit of the Secured Parties, and (y) in the Class Q-2 Securities Collateral in favor of the Trustee for the benefit of the Holders of Class Q-2 Securities, which security interest in either case is prior to all other liens and is enforceable as such against creditors of and purchasers from the Issuer;

(v)     The Trust Estate and the Class Q-2 Securities Collateral is comprised of "instruments," "security entitlements," "general intangibles," "securities accounts," "certificated securities," "deposit accounts", "accounts", "chattel paper", financial assets", "letter of credit rights" and/or "uncertificated securities" (each as defined in the applicable Uniform Commercial Code).

(vi)     With respect to instruments contained in the Trust Estate or the Class Q-2 Securities Collateral (other than instruments evidencing obligations underlying participations), all original executed copies of each instrument that constitutes or evidences the instruments have been delivered to the Securities Intermediary to be held as a financial asset (within the meaning of the applicable Uniform Commercial Code). None of the instruments have any marks or notations indicating that they have been pledged, assigned or otherwise conveyed to any Person other than the Securities Intermediary.

(vii)     All Eligible Investments consisting of instruments, security entitlements, certificated securities and uncertificated securities owned by the Issuer and contained in the Trust Estate or the Class Q-2 Securities Collateral (other than instruments evidencing obligations underlying participations) have been credited to one of the Trust Accounts or the Class Q-2 Securities Collateral Account, as applicable.  The Securities Intermediary has agreed to treat all assets credited to the Trust Accounts or the Class Q-2 Securities Collateral Account as financial assets within the meaning of the applicable Uniform Commercial Code.

(viii)   The Issuer has taken all steps necessary to cause the securities intermediary to identify in its records the Trustee as the person having the security entitlement against the securities intermediary in each of the Trust Accounts and the Class Q-2 Securities Collateral Account.   The Trust Accounts and the Class Q-2 Securities Collateral Account are not in the name of any person other than the Issuer or the Trustee.  The Issuer has not consented to the Securities Intermediary to comply with entitlement orders or other instructions of any person other than the Trustee.

(ix)   The Issuer has caused or will have caused, within ten Business Days of the Closing Date, the filing of all appropriate financing statements in the proper filing office in the appropriate jurisdictions under applicable law in order to perfect the security interest in the Trust Estate and the Class Q-2 Securities Collateral granted to the Trustee hereunder.

(x)   All certificated securities (other than a Clearing Corporation Security) have been delivered to the Securities Intermediary to be held as a financial asset and have been endorsed to the Securities Intermediary or in blank or have been registered in the name of the Securities Intermediary upon original issue or registration of transfer by the issuer of such certificated security.

(b) The representations and warranties set forth in this Section 7.23 shall survive the execution of this Indenture and shall be deemed to be repeated on each date on which any item of property is added to the Trust Estate or the Class Q-2 Securities Collateral, as applicable, as if made at and as of that time.  The representations and warranties set forth herein may not be waived without receipt of a written Rating Confirmation for such waiver (provided that in the case of the Class Q-2 Securities Collateral, Rating Confirmation shall only be required so long as any Class Q-2 Securities are rated and only from the Rating Agency then rating such Class Q-2 Securities) and, in the case of the Trust Estate only, consent by the Swap Counterparty.  This Section 7.23 may not be amended without the written consent of each of the Rating Agencies.

SECTION 7.24   Financing Statements; Registration.

The Issuer shall cause a financing statement describing the Trust Estate and the Class Q-2 Securities Collateral by use of the words "all assets in which the Debtor now or hereafter has rights" and naming the Issuer as "Debtor" and the Trustee as secured party to be filed by or on behalf of the Issuer in the applicable jurisdiction, which is the District of Columbia, within ten (10) days of the Closing Date.  The Issuer shall take all actions necessary to continue and maintain the effectiveness of such financing statement and shall notify the Rating Agencies and Trustee in writing 30 days prior to any change in the Issuer's name, identity, corporate structure, jurisdiction of incorporation or location of its chief executive office.  The Issuer shall not authorize the filing of any financing statements naming it as debtor other than financing statements in favor of the Trustee. The Issuer shall cause the registration of this Indenture in the Register of Mortgages of the Issuer at the Issuer's Registered Office in the Cayman Islands.

SECTION 7.25    Reaffirmation of Rating; Annual Rating Review.

(a)    On or before the Ramp-up End Date, the Issuers shall request each Rating Agency in writing to confirm its rating of each Class of Senior Notes and request Moody's to confirm its rating of the Class Q-1 Securities, in each case within 30 days after the end of the Ramp-up Period.

(b)    The Issuers shall pay for continuous rating surveillance by S&P of the Senior Notes rated by S&P and by Moody's of the Senior Notes and the Class Q-1 Securities rated by Moody's, so long as any of such Securities remain Outstanding.  The Issuers shall promptly notify the Trustee in writing (which shall promptly notify the Securityholders, the Swap Counterparty, the Reference Portfolio Manager, the Collateral Administrator and the Investment Agreement Counterparty) if at any time the rating of any Class of Senior Notes or Class Q-1 Securities has been, or is known will be, qualified, downgraded or withdrawn.

SECTION 7.26    Amendment of the Swap Agreement.

The Issuer shall not enter into any amendment to the Swap Agreement (a "Swap Agreement Amendment") except in accordance with this Section 7.26.

(a)    Without the consent of the Holders of the Notes, the Issuer and the Swap Counterparty at any time and from time to time, may amend the Swap Agreement, in order to:

(i)    cure any ambiguity, or correct, modify or supplement any provision thereof which is defective or inconsistent with any other provision therein or of the Offering Circular;

(ii)    take any action necessary or helpful to prevent the Issuer from becoming subject to any withholding or other taxes or assessments or to reduce the risk that the Issuer will be engaged in a United States trade or business or otherwise subject to United States federal income tax on a net income basis; or

(iii)    amend, modify or change any test or requirement of any Rating Agency under the Swap Agreement where such amendment, modification or change has been specified or authorized by such Rating Agency (and notice thereof has been provided to the Trustee, the Swap Counterparty and Reference Portfolio Manager);

(b) Except as provided in subsection (a), the Issuer shall not enter into an amendment to the Swap Agreement without the consent of the Holders of a majority of the Aggregate Principal Amount of each Class of Notes.

(c) Not later than 15 Business Days prior to the execution of any proposed Swap Agreement Amendment, subject to subsection (b), the Issuer shall cause the Trustee to be provided, and the Trustee, at the expense of the Issuers, shall mail to the Holders of Securities, the Swap Counterparty, the Reference Portfolio Manager, the Investment Agreement Counterparty and each Rating Agency (so long as any rated Securities are Outstanding) a copy of such proposed Swap Agreement Amendment, and shall request any consent required pursuant to subsection (b) above from the applicable Holders of Securities to be given within the Initial

Consent Period. Any consent given to a proposed amendment to the Swap Agreement by the Holder of any Securities shall be irrevocable and binding on all future Holders and beneficial owners of that Security, irrespective of the execution date of the Swap Agreement Amendment. If Holders of less than the required percentage of the Aggregate Principal Amount of the relevant Securities consent to a proposed Swap Agreement Amendment within the Initial Consent Period, on the first Business Day after the Initial Consent Period, the Trustee shall notify the Issuer, the Swap Counterparty, the Amendment Buy-Out Purchaser and the Reference Portfolio Manager which Holders of Securities have consented to the proposed Swap Agreement Amendment, and which Holders and, to the extent such information is reasonably available to the Trustee, which beneficial owners have not consented to the proposed Swap Agreement Amendment. If it intends to exercise its Amendment Buy-Out Option pursuant to Section 9.6, the Amendment Buy-Out Purchaser shall so notify the Trustee (which notice shall designate a date for the Amendment Buy-Out to occur no earlier than ten Business Days after the date of such notice) no later than five (5) Business Days after so being notified by the Trustee and the Trustee shall mail such notice to all Holders of Securities. Any Non-consenting Holder may give consent to the related proposed Swap Agreement Amendment until the 5th Business Day prior to the date of the Amendment Buy-Out designated by the Amendment Buy-Out Purchaser, and in such case shall cease to be a Non-consenting Holder for purposes of the related Amendment Buy-Out. If the Amendment Buy-Out Purchaser exercises its Amendment Buy-Out Option and purchases the applicable Securities pursuant to Section 9.6 below, the Amendment Buy-Out Purchaser as Holder or beneficial owner of the applicable Securities may consent to the related proposed Swap Agreement Amendment within five (5) Business Days of the Amendment Buy-Out.

(d) It shall not be necessary in connection with any consent of the Holders of any Securities under this Section 7.26 for such Holders to approve the specific form of any proposed amendment, but it shall be sufficient if such consent shall approve the substance thereof.

(e) Promptly after the execution by the Issuer of any Swap Agreement Amendment in accordance with this Section 7.26, the Issuer shall cause to be provided to the Trustee, and the Trustee, at the expense of the Issuers, shall mail to the Holders of the Securities, the Reference Portfolio Manager, the Swap Counterparty, the Irish Stock Exchange (if and for so long as any Class of Securities is listed thereon), the Investment Agreement Counterparty and each Rating Agency (so long as any rated Securities are Outstanding) a copy thereof.

## ARTICLE VIII

## TRUST ACCOUNTS; DISTRIBUTIONS

SECTION 8.1    Collection of Money.

Except as otherwise expressly provided herein, the Trustee may demand payment or delivery of, and shall receive and (subject to the terms hereof) collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all money and other property payable to or receivable by the Trustee pursuant to this Indenture, including all payments due in respect of the Swap Agreement and the Pledged Securities, in accordance with the terms and conditions hereof and of the Swap Agreement and the Pledged Securities, and the Trustee shall segregate and hold all such money and property received by it in trust for the benefit of the

Secured Parties and shall apply it as provided in this Indenture. In determining the amount of moneys in any trust account at any time, the Trustee shall assume that all of the Eligible Investments are sold or liquidated at market value on the date of determination. The Trustee shall have the right to establish such subaccounts within the accounts described below as the Trustee may deem necessary or appropriate for convenience in administering the Trust Estate.

SECTION 8.2    Collection Account and Expense Reserve Account.

(a) The Trustee shall, on or prior to the Closing Date, establish a segregated trust account in the name of the Trustee for the benefit of the Secured Parties which shall be designated as the "Valhalla CLO, Ltd.–Collection Account" (the "Collection Account"). All moneys credited from time to time to the Collection Account pursuant to this Indenture shall be held by the Trustee as part of the Trust Estate and shall be applied for the purposes provided herein.

(b) Except as otherwise expressly provided in this Indenture, the Trustee shall deposit into the Collection Account promptly upon receipt from time to time, (i) the net amount, if any, paid by the Swap Counterparty for any Payment Date in respect of the Adjusted Reference Portfolio Return Amount and the Fixed Amount, (ii) except as provided in Section 8.3, any Swap Termination Payment paid by the Swap Counterparty in connection with the termination of the Swap Agreement, and (iii) all amounts transferred to the Collection Account pursuant to Section 8.3 and subsection (e) hereof.

(c) On each Payment Date, the Trustee shall distribute applicable Payment Date Proceeds in the Collection Account pursuant to the Payment Date Priority of Payments set forth in Section 8.6(a).

(d) On the Maturity Date and on any Payment Date on which Notes are redeemed pursuant to Section 2.14(b), (d) or (e) or an Income Note Principal Distribution Amount is to be paid, the Trustee, shall in addition to its obligations under clause (c), distribute applicable moneys in the Collection Account pursuant to the Principal Priority of Payments set forth in Section 8.6(b).

(e) The Trustee shall, on or prior to the Closing Date, establish a segregated trust account in the name of the Trustee for the benefit of the Secured Parties which shall be designated as the "Valhalla CLO, Ltd.–Expense Reserve Account" (the "Expense Reserve Account"). On the Closing Date, the Issuer will deposit $17,376,625 in the Expense Reserve Account. On any Business Day from and including the Closing Date to but excluding the last Business Day prior to the first Payment Date, the Trustee shall, upon the written direction of the Initial Purchaser, apply funds from the Expense Reserve Account to pay expenses of the Issuers incurred in connection with the establishment of the Issuers, the structuring and consummation of the offering and the transactions contemplated thereby and the issuance of the Securities. Any funds remaining in the Expense Reserve Account on the last Business Day prior to the first Payment Date will be deposited without further direction by or consent of any Person on such day in the Collection Account for distribution on the first Payment Date in accordance with the Payment Date Priority of Payments and the Expense Reserve Account will be closed. Amounts on deposit in the Expense Reserve Account will be invested in the JPMorgan Fleming US Dollar

Liquidity Fund 6052; provided that such fund then meets the requirements of the definition of Eligible Investment. Any income or other gain from Eligible Investments credited to the Expense Reserve Account shall be credited to, and any loss resulting therefrom shall be charged to, the same Expense Reserve Account.

SECTION 8.3    Collateral Account.

(a) The Trustee shall, on or prior to the Closing Date, establish a segregated trust account in the name of the Trustee for the benefit of the Secured Parties which shall be designated as the "Valhalla CLO, Ltd.–Collateral Account" (the "Collateral Account"). The Issuer shall deposit with the Trustee, and upon receipt the Trustee shall cause to be credited to the Collateral Account, the net proceeds of the Securities (excluding amounts deposited in the Expense Reserve Account pursuant to 8.2(e)). In addition, the Trustee shall deposit into the Collateral Account to the extent received from time to time (i) interest and dividends received in respect of Eligible Investments credited to the Collateral Account and (ii) amounts to be deposited in the Collateral Account pursuant to Section 3.4(b). In addition, on each Payment Date, an amount equal to the Quarterly Aggregate Increase Amount, if any, for such date, will be deposited in the Collateral Account in accordance with the Priority of Payments.

(b) On each Payment Date other than the Maturity Date, Optional Redemption Date or Tax Redemption Date, the Trustee shall transfer from the Collateral Account to the Collection Account (i) an amount equal to the investment income received on the Eligible Investments in the Collateral Account during the related Periodic Interest Accrual Period and (ii) other amounts in the Collateral Account that constitute Payment Date Proceeds for such Payment Date or that are to be disbursed in accordance with the Principal Priority of Payments on such Payment Date.

(c) On the Maturity Date, Optional Redemption Date or Tax Redemption Date, the Trustee shall transfer to the Collection Account all of the moneys in the Collateral Account following sale or liquidation of Eligible Investments pursuant to clause (e).

(d) In the event of the early termination of the Swap Agreement, the Trustee shall apply amounts in the Collateral Account to pay to the Swap Counterparty any Swap Termination Payment owed to it pursuant to the Swap Agreement on the applicable Early Termination Date (as defined in the Swap Agreement), provided that any Swap Termination Payment due to the Swap Counterparty as a result of a Swap Event of Default as to which the Swap Counterparty is the defaulting party or a Swap Additional Termination Event as to which the Swap Counterparty is the affected party will be paid on the next Payment Date in accordance with Section 8.6.

(e) The Trustee shall sell, liquidate or make withdrawals from Eligible Investments in the Trust Accounts to the extent necessary to make any of the payments set forth in paragraphs (b), (c) or (d) above. Any such sales or liquidation shall be made at the direction of the Swap Counterparty (or the direction of the Reference Portfolio Manager on behalf of the Swap Counterparty); provided that the Swap Counterparty (or the Reference Portfolio Manager on its behalf) shall not be entitled to give such direction if (i) a Swap Event of Default as to which the Swap Counterparty is the defaulting party has occurred and is continuing, (ii) a Swap Additional Termination Event has occurred and is continuing or (iii) the Swap Agreement has

99

been terminated and all amounts owed to the Swap Counterparty thereunder have been paid in full, in each of which cases the Requisite Noteholders shall be entitled to give such direction.

SECTION 8.4    Investment of Moneys.

(a) Except as provided in Section 8.2(e), the Trustee shall invest moneys held from time to time in each Trust Account pursuant to (b) below in one or more Eligible Investments pursuant to the written direction of the Swap Counterparty as Secured Party (or the Reference Portfolio Manager on its behalf) (which may be in the form of standing instructions); provided, that the Swap Counterparty (or the Reference Portfolio Manager on its behalf) shall not be entitled to give such direction if (i) a Swap Event of Default as to which the Swap Counterparty is the defaulting party has occurred and is continuing, (ii) a Swap Additional Termination Event has occurred and is continuing or (iii) the Swap Agreement has been terminated and all amounts owed to the Swap Counterparty thereunder have been paid in full, in each of which cases the Requisite Noteholders shall be entitled to give such direction. If the Trustee does not receive such written directions within three days of receipt of uninvested moneys (whether by reason of a new deposit of moneys or payments in respect of, or realized upon the maturity of, existing Eligible Investments), the Trustee shall invest such moneys in Eligible Investments described in clause (a) of the definition thereof. If a written direction with respect to an investment is not received by the Trustee by 11:00 a.m. (New York City time) on any Business Day, the Trustee shall use its best efforts to effect the investment thereof on such date, but in no event later than the next Business Day. The Trustee shall not be obligated to pay interest on any uninvested moneys. Each Eligible Investment other than any Eligible Investment constituting a general intangible, a deposit account or an account shall be credited to the Trust Account to which the moneys used to make such Eligible Investment were credited, and any income or other gain therefrom shall be credited to, and any loss resulting therefrom shall be charged to, the same Trust Account. Any Eligible Investments constituting general intangibles, deposit accounts and accounts shall be Delivered to the Trustee. The Trustee shall not be liable by reason of any investment loss realized in connection with any Eligible Investment.

(b) The Eligible Investments in the Collateral Account and the Collection Account shall be required to mature and be payable as follows:

(i)    The Collateral Account. The Eligible Investments in the Collateral Account (other than the Investment Agreement) shall be required to mature on or before the Business Day prior to the next Payment Date. The initial Eligible Investments in the Collateral Account shall be the Investment Agreement which the Issuer and the Trustee, as requested and directed hereby by the Issuer, will enter into on the Closing Date. The Trustee shall not acquire any replacement Eligible Investments therefor unless the Trustee shall have received Rating Confirmation for any such replacement Eligible Investments. The Trustee shall notify each Rating Agency of any replacement guarantee under the Investment Agreement or any failure by the counterparty to the Investment Agreement to post collateral when required to do so thereunder. The Trustee will perform the functions assigned to the Trustee under the Investment Agreement; provided that the Trustee shall exercise remedies in the event of a default thereunder, or give or withhold (i) any consent of the Trustee to a replacement collateral agent under the Investment Agreement or (ii) approval to a transfer of the Investment Agreement or

100

withdrawal of the balance of the investment in the case of a downgrade of the Investment Agreement Counterparty, in each case as directed in writing by or on behalf of the Swap Counterparty as a Secured Party under this Indenture (unless the Swap Agreement has been terminated and all amounts owed thereunder to the Swap Counterparty have been paid in full, in which case as directed by the Requisite Noteholders). Additional amounts deposited in the Collateral Account from time to time (including the Quarterly Aggregate Increase Amounts, if any) shall be invested in the Investment Agreement to the extent permitted thereunder.

(ii)     <u>The Collection Account</u>.     The Eligible Investments in the Collection Account at any time shall be required to mature on or before the Business Day prior to the next Payment Date.

(c) During the term of the Investment Agreement, if there is a replacement of the guarantee or the guarantor pursuant thereto, the Trustee will request Rating Confirmation with respect to such change in guarantee or guarantor, as the case may be.

SECTION 8.5     <u>Status of Account; Securities Intermediary</u>.

(a) Each of the Collection Account, the Expense Reserve Account and the Collateral Account (collectively, the "Trust Accounts") shall be at all times an Eligible Account at an Eligible Institution established as a "securities account" with a "securities intermediary" (each of the foregoing terms in quotations is used as defined in the UCC (and, if different, the Uniform Commercial Code in the securities intermediary's jurisdiction as set forth in the Account Agreement) pursuant to an agreement or arrangement causing the institution with which such securities account is maintained to maintain such securities account in accordance with the Account Agreement. The Trustee is appointed as the initial Securities Intermediary hereunder and the Trustee accepts such appointment.

(b) The Securities Intermediary shall and JPMorgan Chase Bank as initial Securities Intermediary does represent and warrant that it is as of the date it accepts such appointment and shall be for so long as it is the Securities Intermediary hereunder, a corporation or bank that in the ordinary course of business maintains securities accounts for others and is acting in that capacity hereunder. The Trustee shall ensure that each Securities Intermediary with which a Trust Account is maintained, and JPMorgan Chase Bank as initial Securities Intermediary, does (i) agree with the parties hereto that each of the Trust Accounts shall be an account to which "financial assets" may be credited, (ii) undertake to treat the Trustee as the sole "entitlement holder" for each of the Trust Accounts, (iii) agree with the parties hereto that cash balances in each Trust Account and all other property credited to each Trust Account shall constitute "financial assets" and (iv) agree with the parties hereto that the "Securities Intermediary's jurisdiction" shall be the State of New York (it being understood that each of the foregoing terms in quotations is used as defined in the UCC) and that the establishment and maintenance of each Trust Account will be governed by the law of the State of New York. Each of the accounts shall be a segregated account in the name of the Trustee, and all Eligible Investments shall be Delivered to the Securities Intermediary in accordance with the definition given to that term in this Indenture.

(c) The Securities Intermediary shall and JPMorgan Chase Bank as initial Securities Intermediary does:

(i)     covenant that it will not take any action concerning the Trust Accounts that is inconsistent with the provisions of this Indenture;

(ii)     represent and covenant that it is not and will not be as long as it is the Securities Intermediary hereunder a party to any agreement concerning a Trust Account that is inconsistent with the provisions of this Indenture; and

(iii)     agree that any item of property credited to a Trust Account shall not be subject to any security interest, lien, or right of setoff in favor of the Securities Intermediary, or to the extent within the Securities Intermediary's control, anyone claiming through the Securities Intermediary (other than the Trustee) other than (A) amounts due to the Securities Intermediary in respect of customary fees and expenses for the routine maintenance and operation of the Trust Accounts, (B) the face amount of any checks which have been credited to the Trust Accounts but are subsequently returned unpaid because of uncollected or insufficient funds and (C) any overdraft or advance in respect of the settlement of investments acquired for credit to such account.

(d) The Securities Intermediary may at any time resign by notice to the Trustee, may at any time be removed by notice from the Trustee, and shall be removed by notice from the Trustee within 10 days after the Trustee has actual notice that any Trust Account is no longer an Eligible Account with such Securities Intermediary, that the Securities Intermediary is no longer an Eligible Institution, or that the Securities Intermediary no longer satisfies the requirements of this Indenture. Upon such resignation or removal, the Trustee shall appoint a successor Securities Intermediary satisfying the requirements of this Indenture and shall cause the Trust Accounts to be established and maintained with such successor Securities Intermediary in accordance with the terms hereof, and the responsibilities and duties of the retiring Securities Intermediary hereunder shall remain in effect until all of the Trust Estate credited to the Trust Accounts has been transferred to such successor.

SECTION 8.6     Priority of Payments.

(a) On each Payment Date, the Trustee shall distribute Payment Date Proceeds in the Collection Account in the following order of priority (the "Payment Date Priority of Payments"):

(i)     to the payment of any accrued and unpaid Administrative Expenses (in the order set forth in the definition thereof) up to the Expense Cap Amount;

(ii)     (x) to the Swap Counterparty, the net amount, if any, payable to the Swap Counterparty under the Swap Agreement on such date in respect of the Adjusted Reference Portfolio Return Amount, the Fixed Amount and any Swap Termination Payment due to the Swap Counterparty (except any Swap Termination Payment due to the Swap Counterparty upon the early termination of the Swap Agreement as a result of a Swap Event of Default as to which the Swap Counterparty is the defaulting party or as a result of a Swap Additional Termination Event, and excluding

any Swap Termination Payment previously paid pursuant to Section 8.3), and any such net amounts not paid from prior Payment Dates and (y) to the Collateral Account, an amount equal to the Quarterly Aggregate Increase Amount, if any, for such Payment Date;

(iii)     to the Holders of Class A-1 Notes, the Class A-1 Interest Amount;

(iv)     to the Holders of Class A-2 Notes, the Class A-2 Interest Amount;

(v)     following the Ramp-up End Date, if any Class A-1 Notes or Class A-2 Notes are then Outstanding and if either the Class A OC Test or the Class A Interest Coverage Test is not satisfied as of the related Determination Date, to the Holders of the Class A-1 Notes, the Aggregate Principal Amount of the Class A-1 Notes, and, following the redemption of all Class A-1 Notes, to the Holders of the Class A-2 Notes, the Aggregate Principal Amount of the Class A-2 Notes, such that such tests are satisfied as of the related Determination Date;

(vi)     to the Holders of the Class B Notes, the Class B Interest Amount;

(vii)     following the Ramp-up End Date, if any Class A-1 Notes, Class A-2 Notes or Class B Notes are then Outstanding and if either the Class B OC Test or the Class B Interest Coverage Test is not satisfied as of the related Determination Date, to the Holders of the Class A-1 Notes, the Aggregate Principal Amount of the Class A-1 Notes, and following the redemption of all Class A-1 Notes, to the Holders of the Class A-2 Notes, the Aggregate Principal Amount of the Class A-2 Notes, and following the redemption of all Class A-2 Notes, to the Holders of the Class B Notes, first, all accrued and unpaid Deferred Interest with respect to the Class B Notes and then, the Aggregate Principal Amount of the Class B Notes, such that such tests are satisfied as of the related Determination Date;

(viii)     to the Holders of the Class B Notes, all accrued and unpaid Deferred Interest with respect to the Class B Notes;

(ix)     on a pro rata basis, to the Holders of the Class C-1 Notes, the Class C-1 Interest Amount and to the Holders of the Class C-2 Notes, the Class C-2 Interest Amount;

(x)     following the Ramp-up End Date, if any Class A-1 Notes, Class A-2 Notes, Class B Notes or Class C Notes are then Outstanding and if either the Class C OC Test or the Class C Interest Coverage Test is not satisfied as of the related Determination Date, to the Holders of the Class A-1 Notes, the Aggregate Principal Amount of the Class A-1 Notes, and following the redemption of all Class A-1 Notes, to the Holders of the Class A-2 Notes, the Aggregate Principal Amount of the Class A-2 Notes, and following the redemption of all Class A-2 Notes, to the Holders of the Class B Notes, first, all accrued and unpaid Deferred Interest with respect to the Class B Notes and then, the Aggregate Principal Amount of the Class B Notes, and following the redemption of all Class B Notes, first, on a pro rata basis, to the Holders of the Class C-1 Notes, all accrued and unpaid Deferred Interest with respect to the Class C-1 Notes and to

103

the Holders of the Class C-2 Notes, all accrued and unpaid Deferred Interest with respect to the Class C-2 Notes and then, on a pro rata basis, to the Holders of the Class C-1 Notes, the Aggregate Principal Amount of the Class C-1 Notes and to the Holders of the Class C-2 Notes, the Aggregate Principal Amount of the Class C-2 Notes, such that such tests are satisfied as of the related Determination Date;

(xi)     on a pro rata basis, to the Holders of the Class C-1 Notes, all accrued and unpaid Deferred Interest with respect to the Class C-1 Notes and to the Holders of the Class C-2 Notes, all accrued and unpaid Deferred Interest with respect to the Class C-2 Notes;

(xii)    in the event that either Rating Agency has not confirmed in writing its rating in effect on the Closing Date on each Class of Senior Notes as of the 30th day following the Ramp-up End Date, to the Holders of the Class A-1 Notes, the Aggregate Principal Amount of the Class A-1 Notes and, following the redemption of all Class A-1 Notes, to the Holders of the Class A-2 Notes, the Aggregate Principal Amount of the Class A-2 Notes and, following the redemption of all Class A-2 Notes, to the Holders of the Class B Notes, first, all accrued and unpaid Deferred Interest with respect to the Class B Notes and then, the Aggregate Principal Amount of the Class B Notes, and following the redemption of all Class B Notes, first, on a pro rata basis, to the Holders of the Class C-1 Notes all accrued and unpaid Deferred Interest with respect to the Class C-1 Notes and to the Holders of the Class C-2 Notes all accrued and unpaid Deferred Interest with respect to the Class C-2 Notes and then, on a pro rata basis, to the Holders of the Class C-1 Notes, the Aggregate Principal Amount of the Class C-1 Notes and to the Holders of the Class C-2 Notes, the Aggregate Principal Amount of the Class C-2 Notes, until each such rating is confirmed;

(xiii)   to the Swap Counterparty, any Swap Termination Payment due to it upon the early termination of the Swap Agreement as a result of a Swap Event of Default as to which the Swap Counterparty is the defaulting party or as a result of a Swap Additional Termination Event, and excluding any Swap Termination Payment previously paid pursuant to Section 8.3;

(xiv)    following the Ramp-up End Date, if any Class B Notes or Class C Notes are then Outstanding and if the Diversion Test is not satisfied as of the related Determination Date, an amount equal to 50% of the remaining Payment Date Proceeds, (i) first, on a pro rata basis, to the Holders of the Class B Notes, all accrued and unpaid Deferred Interest with respect to the Class B Notes, to the Holders of the Class C-1 Notes, all accrued and unpaid Deferred Interest with respect to the Class C-1 Notes and to the Holders of the Class C-2 Notes, all accrued and unpaid Deferred Interest with respect to the Class C-2 Notes, and (ii) then, on a pro rata basis, to the Holders of the Class B Notes, the Aggregate Principal Amount of the Class B Notes, to the Holders of the Class C-1 Notes, the Aggregate Principal Amount of the Class C-1 Notes and to the Holders of the Class C-2 Notes, the Aggregate Principal Amount of the Class C-2 Notes;

(xv)     to the payment first of any accrued and unpaid Administrative Expenses (in the order set forth in the definition thereof) to the extent not paid pursuant to

clause (i) above and then, to the payment of any accrued and unpaid Subordinated Administrative Expenses;

(xvi) to the payment of any unpaid Extension Bonus Payments (i) first, to the applicable Holders of Class A-1 Notes, (ii) then, to the applicable Holders of Class A-2 Notes, (iii) then, to the applicable Holders of Class B Notes, and (iv) then, on a pro rata basis, to the applicable Holders of Class C-1 Notes and the applicable Holders of Class C-2 Notes; and

(xvii) the remainder, to the Holders of the Income Notes (the "Net Income Note Periodic Return Amount").

(b) On (A) the Maturity Date, the Optional Redemption Date or the Tax Redemption Date and (B) each other Payment Date on which Senior Notes are to be redeemed pursuant to Section 2.14(b) or, after all Senior Notes are redeemed, an Income Note Principal Distribution Amount is to be paid on the Income Notes, the Trustee will distribute the principal proceeds of Eligible Investments (after payment of any amounts payable therefrom pursuant to the Payment Date Priority of Payments and, in the case of clause (B), using principal proceeds in an amount not to exceed the Note Redemption Amount for such date), and in the case of the Maturity Date, the Optional Redemption Date or the Tax Redemption Date, any other amounts on deposit in the Trust Accounts to make the following payments in the following order of priority (the "Principal Priority of Payments"):

(i) to the payment of any accrued and unpaid Administrative Expenses (in the order set forth in the definition thereof) up to the Expense Cap Amount, to the extent not paid pursuant to the Payment Date Priority of Payments;

(ii) to the Swap Counterparty, the net amount, if any, payable to the Swap Counterparty under the Swap Agreement on such date in respect of the Adjusted Reference Portfolio Return Amount, the Fixed Amount, and any Swap Termination Payment due to the Swap Counterparty (except any Swap Termination Payment due to the Swap Counterparty upon the early termination of the Swap Agreement as a result of a Swap Event of Default as to which the Swap Counterparty is the defaulting party or as a result of a Swap Additional Termination Event), and any such net amounts not paid from prior Payment Dates, in any case to the extent not paid pursuant to the Payment Date Priority of Payments or Section 8.3;

(iii) to the Holders of the Class A-1 Notes, any accrued and unpaid Class A-1 Interest Amount, to the extent not paid pursuant to the Payment Date Priority of Payments;

(iv) to the Holders of the Class A-2 Notes, any accrued and unpaid Class A-2 Interest Amount, to the extent not paid pursuant to the Payment Date Priority of Payments;

(v) following the Ramp-up End Date, if any Class A-1 Notes or Class A-2 Notes are then Outstanding and if either the Class A OC Test or the Class A Interest Coverage Test is not satisfied as of the related Determination Date, to the Holders of the

Class A-1 Notes, the Aggregate Principal Amount of the Class A-1 Notes and, following the redemption of all Class A-1 Notes, to the Holders of the Class A-2 Notes, the Aggregate Principal Amount of the Class A-2 Notes, such that such tests are satisfied as of the related Determination Date;

(vi)     to the Holders of the Class B Notes, any accrued and unpaid Class B Interest Amount, to the extent not paid pursuant to the Payment Date Priority of Payments;

(vii)     following the Ramp-up End Date, if any Class A-1 Notes, Class A-2 Notes or Class B Notes are then Outstanding and if either the Class B OC Test or the Class B Interest Coverage Test is not satisfied as of the related Determination Date, to the Holders of the Class A-1 Notes, the Aggregate Principal Amount of the Class A-1 Notes, and following the redemption of all Class A-1 Notes, to the Holders of the Class A-2 Notes, the Aggregate Principal Amount of the Class A-2 Notes, and following the redemption of all Class A-2 Notes, to the Holders of the Class B Notes, first, all accrued and unpaid Deferred Interest with respect to the Class B Notes and then, the Aggregate Principal Amount of the Class B Notes, such that such tests are satisfied as of the related Determination Date;

(viii)     on a pro rata basis, to the Holders of the Class C-1 Notes, the accrued and unpaid Class C-1 Interest Amount and to the Holders of the Class C-2 Notes, the accrued and unpaid Class C-2 Interest Amount, to the extent not paid pursuant to the Payment Date Priority of Payments;

(ix)     following the Ramp-up End Date, if any Class A-1 Notes, Class A-2 Notes, Class B Notes or Class C Notes are then Outstanding and if either the Class C OC Test or the Class C Interest Coverage Test is not satisfied as of the related Determination Date, to the Holders of the Class A-1 Notes, the Aggregate Principal Amount of the Class A-1 Notes, and following the redemption of all Class A-1 Notes, to the Holders of the Class A-2 Notes, the Aggregate Principal Amount of the Class A-2 Notes, and following the redemption of all Class A-2 Notes, to the Holders of the Class B Notes, first, all accrued and unpaid Deferred Interest with respect to the Class B Notes and then, the Aggregate Principal Amount of the Class B Notes, and following the redemption of all Class B Notes, first, on a pro rata basis, to the Holders of the Class C-1 Notes all accrued and unpaid Deferred Interest with respect to the Class C-1 Notes and to the Holders of the Class C-2 Notes all accrued and unpaid Deferred Interest with respect to the Class C-2 Notes and then, on a pro rata basis, to the Holders of the Class C-1 Notes, the Aggregate Principal Amount of the Class C-1 Notes and to the Holders of the Class C-2 Notes, the Aggregate Principal Amount of the Class C-2 Notes, such that such tests are satisfied as of the related Determination Date;

(x)     to the Holders of the Class A-1 Notes, the Aggregate Principal Amount of the Class A-1 Notes;

(xi)     to the Holders of the Class A-2 Notes, the Aggregate Principal Amount of the Class A-2 Notes;

106

(xii)    to the Holders of the Class B Notes, any accrued and unpaid Deferred Interest with respect to the Class B Notes, to the extent not paid pursuant to the Payment Date Priority of Payments;

(xiii)   to the Holders of the Class B Notes, the Aggregate Principal Amount of the Class B Notes;

(xiv)   on a pro rata basis, to the Holders of the Class C-1 Notes, any accrued and unpaid Deferred Interest with respect to the Class C-1 Notes and to the Holders of the Class C-2 Notes, any accrued and unpaid Deferred Interest with respect to the Class C-2 Notes, to the extent not paid pursuant to the Payment Date Priority of Payments;

(xv)    on a pro rata basis, to the Holders of the Class C-1 Notes, the Aggregate Principal Amount of the Class C-1 Notes and to the Holders of the Class C-2 Notes, the Aggregate Principal Amount of the Class C-2 Notes, and, in the case of the Optional Redemption Date, the Make-whole Premium in respect of the Class C-2 Notes;

(xvi)   to the Swap Counterparty, any Swap Termination Payment due to it upon the early termination of the Swap Agreement as a result of a Swap Event of Default as to which the Swap Counterparty is the defaulting party or as a result of a Swap Additional Termination Event, to the extent not paid pursuant to the Payment Date Priority of Payments or Section 8.3;

(xvii)  to the payment first of accrued and unpaid Administrative Expenses (in the order set forth in the definition thereof) to the extent not paid pursuant to clause (i) above or pursuant to the Payment Date Priority of Payments and then, to the payment of accrued and unpaid Subordinated Administrative Expenses to the extent not paid pursuant to the Payment Date Priority of Payments;

(xviii) to the payment of any unpaid Extension Bonus Payments (i) first, to the applicable Holders of Class A-1 Notes, (ii) then, to the applicable Holders of Class A-2 Notes, (iii) then, to the applicable Holders of Class B Notes, and (iv) then, on a pro rata basis, to the applicable Holders of Class C-1 Notes and the applicable Holders of Class C-2 Notes, to the extent not paid pursuant to the Payment Date Priority of Payments; and

(xix)   to the Holders of the Income Notes, (a) on any Payment Date (other than the Maturity Date, the Optional Redemption Date or the Tax Redemption Date), the remainder, as an Income Note Principal Distribution Amount (the "Income Note Principal Distribution Amount") or (b) on the Maturity Date, the Optional Redemption Date or the Tax Redemption Date, the remainder (the "Final Income Note Distribution Amount").

(c) Anything in this Article VIII to the contrary notwithstanding, upon the occurrence of any Event of Default and the acceleration of the Notes pursuant to Article V hereof, moneys collected or received by the Trustee shall be distributed as provided in Section 5.8 hereof.

(d) For purposes of any paragraph of the Priority of Payments that requires funds to be applied if one or more specified Coverage Tests are not satisfied to the extent necessary to cause such Coverage Tests to be satisfied, satisfaction of such Coverage Tests will be determined as of the related Determination Date giving effect to all payments to be made on the applicable Payment Date prior to the payment of amounts under the applicable paragraph (and for this purpose, all payments made on any Payment Date pursuant to Section 8.6(a) will be deemed made prior to all payments, if any, made on such date pursuant to Section 8.6(b)). Pro rata payments of principal among pari passu Classes of Notes will be based upon the principal amount of such Notes outstanding on the date of payment, and pro rata payments of interest among pari passu Classes of Notes shall be based upon the amount of interest payable on such Notes on the date of payment. Payments with respect to any Class of Notes will be made to all Holders of Notes of such Class on a pro rata basis based on each Holder's holding of such Notes. Pro rata payments of Extension Bonus Payments among Holders of pari passu Classes of Notes shall be based upon the amount of Extension Bonus Payments payable to such Holders on the date of payment. Payments of Extension Bonus Payments will be made to the Holders to which they are payable on a pro rata basis based on each such Holder's holding of the applicable Notes with respect to which the Extension Bonus Payment is determined.

SECTION 8.7     Monthly Reports.

Not later than the 10th Business Day after the Monthly Report Determination Date, commencing in November 2004, the Issuer or its agent will compile and provide to the Trustee, the Swap Counterparty, the Reference Portfolio Manager, the Investment Agreement Counterparty, the Rating Agencies and the Holders of the Securities a report (the "Monthly Report"); provided, that no Monthly Report shall have to be delivered in any month in which a Payment Date Valuation Report is being delivered.  Each Monthly Report shall contain the following information with respect to the calendar month in which the Monthly Report Determination Date falls:

(a) Sources and uses of funds during the calendar month:

(i)     earnings received on Eligible Investments;

(ii)     the Adjusted Reference Portfolio Return Amount payable from or to the Swap Counterparty, if any;

(iii)     a calculation in reasonable detail of the Fixed Amount; and

(iv)     any other payments made or received during such calendar month.

(b) Collection Account Information:

(i)     the amount of funds and Eligible Investments credited to the Collection Account as of the first day of the calendar month; and

(ii)     the amount of funds and Eligible Investments credited to the Collection Account as of the last day of the calendar month.

108

(c) Expense Reserve Account Information:

(i) the amount of funds and investments credited to the Expense Reserve Account as of the first day of the calendar month; and

(ii) the amount of funds and investments credited to the Expense Reserve Account as of the last day of the calendar month.

(d) Collateral Account Information:

(i) the amount of funds and Eligible Investments credited to the Collateral Account as of the first day of the calendar month;

(ii) the amount of funds, if any, deposited into the Collateral Account during the calendar month;

(iii) the amount of funds, if any, withdrawn from the Collateral Account during the calendar month; and

(iv) the amount of funds and Eligible Investments credited to the Collateral Account as of the last day of the calendar month.

(e) Class Q-2 Securities Collateral Account Information:

(i) the amount of funds and Eligible Investments credited to the Class Q-2 Securities Collateral Account as of the first day of the calendar month;

(ii) the amount of funds, if any, deposited into the Class Q-2 Securities Collateral Account during the calendar month;

(iii) the amount of funds, if any, withdrawn from the Class Q-2 Securities Collateral Account during the calendar month; and

(iv) the amount of funds and Eligible Investments credited to the Class Q-2 Securities Collateral Account as of the last day of the calendar month.

(f) Coverage Tests:

(i) the Overcollateralization Ratios as of the last day of the preceding calendar month and as of the last day of the calendar month, and the components thereof;

(ii) the Interest Coverage Ratios as of the last day of the preceding calendar month and as of the last day of the calendar month, and the components thereof;

(iii) the Class Q-2A Coverage Ratio as of the last day of the preceding calendar month and as of the last day of the calendar month, and the components thereof; and

109

(iv)    a statement as to whether each of the Coverage Tests and the Class Q-2A Coverage Test has been satisfied.

(g) Eligible Investments:  with respect to each Eligible Investment credited to the Collateral Account, as of the last day of the calendar month, its principal balance or maturity value, its interest rate, stated maturity, issuer, rating by Moody's and rating by Standard & Poor's (including whether such rating is on watch for downgrade or upgrade).

(h) Information regarding the Reference Portfolio (as of the Monthly Report Determination Date):

(i)    the identity of each Reference Entity and Reference Obligation;

(ii)    the Reference Obligation Calculation Amount and the Reference Value of each Reference Obligation in the Reference Portfolio, and the Aggregate Reference Obligation Calculation Amount and the Aggregate Reference Value;

(iii)    the current Moody's Rating and Standard & Poor's Rating of each Reference Obligation and Underlying Obligation;

(iv)    the Weighted Average Rating of the Reference Obligations in the Reference Portfolio and the maximum allowed by the Reference Portfolio Criteria;

(v)    the Diversity Score for the Reference Portfolio and the minimum allowed by the Reference Portfolio Criteria;

(vi)    whether any Reference Obligation is on watch for a rating upgrade or downgrade;

(vii)    the current spread payable for each Reference Obligation and the commitment fee on the undrawn portion thereof, if any;

(viii)    a reasonably detailed calculation of the Reference Portfolio Criteria, including the methodology used to calculate the Reference Portfolio Criteria, and evidence of compliance with the Reference Portfolio Criteria;

(ix)    a statement as to whether each of the Reference Portfolio Criteria has or has not been satisfied;

(x)    the level of funding of any Reference Obligations that are Revolving Loans;

(xi)    the weighted average Reference Price of all Reference Obligations;

(xii)    the weighted average credit spread of all Reference Obligations (including for funded and unfunded portions thereof); and

(xiii)    the five Moody's Industry Classification Groups representing the highest concentration of Reference Obligations by Reference Obligation Calculation Amount, and the portion of the Portfolio Calculation Amount represented by each such group.

(i)  Defaulted Reference Obligations:

(i)    the identity of each Defaulted Reference Obligation and the corresponding Reference Obligation Calculation Amount and Reference Price, as well as the aggregate Reference Obligation Calculation Amount for all Defaulted Reference Obligations;

(ii)    the date of the Credit Event;

(iii)    the type of Credit Event;

(iv)    the Market Value of each Defaulted Reference Obligation; and

(v)    the weighted average Reference Price of all Defaulted Reference Obligations.

(j)  Modification Activity (during the calendar month):

(i)    the identity of each Reference Obligation (and whether the obligation is a Credit Risk Obligation, Credit Improved Obligation or other) that was removed (including the Removal Date), or with respect to which an Amortization occurred, its corresponding Reference Obligation Calculation Amount, the relevant Final Price (in the case of a removal) and the related Obligation Value Increase Amount or Obligation Value Reduction Amount, as applicable;

(ii)    the identity, Addition Date, Reference Entity, Reference Price, Reference Obligation Calculation Amount and Reference Value of each Reference Obligation added to the Reference Portfolio; and

(iii)    the Accrued Increase/Reduction Amount.

At least four Business Days prior to the date on which such report must be delivered, the Issuer or its agent shall provide a copy of the proposed Monthly Report to the Trustee, the Swap Counterparty and the Reference Portfolio Manager.  Upon receipt of such proposed Monthly Report, the Trustee and the Reference Portfolio Manager on behalf of the Swap Counterparty will compare the information contained therein to the information contained in their respective records with respect to the Trust Estate and the Class Q-2 Securities Collateral and the Reference Portfolio and shall, within three Business Days after receipt of such proposed Monthly Report, notify the Issuer or its agent and each other if the information contained in the proposed Monthly Report does not conform to the information maintained by such party with respect to the Trust Estate and the Class Q-2 Securities Collateral and the Reference Portfolio, and detail any discrepancies.  In the event that any discrepancy exists, the Issuer or its agent, the Trustee, and the Reference Portfolio Manager shall attempt to promptly resolve the discrepancy.

111

If such discrepancy cannot be promptly resolved on such third Business Day, the Trustee shall within two Business Days thereafter cause Independent Accountants to be appointed to review such proposed Monthly Report and the records of the Trustee and the Reference Portfolio Manager, as applicable, to determine the cause of such discrepancy. If such review reveals an error in the proposed Monthly Report or the Trustee's or Reference Portfolio Manager's records, the proposed Monthly Report or the Trustee's or Reference Portfolio Manager's records, as the case may be, shall be revised accordingly and, as so revised, shall be utilized in making all further calculations. Pursuant to the Reference Portfolio Management Agreement, the Reference Portfolio Manager has agreed to provide, or cause to be provided, on behalf of the Swap Counterparty, to the Collateral Administrator and/or the Independent Accountants access to all information in the possession of the Reference Portfolio Manager relating to the Reference Portfolio for purposes of compiling (or providing information required for) the Monthly Report.

SECTION 8.8    Payment Date Valuation Reports.

With respect to each Payment Date (and the Maturity Date) the Issuer or its agent shall render an accounting with respect to the Trust Estate, the Class Q-2 Securities Collateral and Reference Portfolio (each such accounting, a "Payment Date Valuation Report"), and provide such Payment Date Valuation Report no later than the related Payment Date (and the Maturity Date) to the Trustee, the Swap Counterparty, the Reference Portfolio Manager, the Investment Agreement Counterparty, the Independent Accountants, the Rating Agencies and the Holders of the Securities (and upon request to the Trustee by a beneficial owner of a Security, to such beneficial owner). The Payment Date Valuation Report shall contain the following information with respect to the related Payment Date determined as of the Determination Date:

(a) Calculation of certain amounts (including shortfalls from prior Payment Dates):

(i)    as of the Determination Date, a calculation in reasonable detail of the Overcollateralization Ratios and the Interest Coverage Ratios and a statement as to whether each Coverage Test has or has not been satisfied, and if any Coverage Test has not been satisfied, the amount required for the payment of the Aggregate Principal Amount of each relevant Class of Notes in order to achieve compliance for each such Coverage Test;

(ii)    the applicable interest rate in respect of each Class of Notes for such Payment Date and the amount of interest payable for each Class of Notes on such Payment Date;

(iii)    the amount of Administrative Expenses (in the categories set forth in the definition thereof) and the Expense Cap Amount for such Payment Date;

(iv)    the amount of any Accrued Swap Liabilities payable on such Payment Date;

(v)    the Base Amount, Subordinate Amount and Incentive Amount for such Payment Date;

(vi) the amount of any principal payable in respect of any Class of Notes and the Aggregate Principal Amount of each Class of Notes;

(vii) with respect to the Class Q Securities, (A) the stated amount of the Class Q-1 Securities, (B) the Class Q-1 Nominal Principal (and, after the Class Q-1 Nominal Principal has been reduced to $1,000, any amount in excess of the Class Q-1 Nominal Interest, as "additional return on capital" with respect to the Class Q-1 Securities), (C) the Class Q-1 Rated Principal, (D) the Class Q-1 Nominal Interest, (E) the Class Q-1 Excess Distribution, (F) the applicable interest rate in respect of the Class Q-2A Securities and the amount of interest payable for the Class Q-2A Securities on such Payment Date, (G) the amount of any principal payable in respect of the Class Q-2A Securities and the Aggregate Principal Amount of the Class Q-2A Securities, (H) the distributions, if any, in respect of the Class Q-2B Securities for such Payment Date and for the preceding Payment Date, (I) as of the Determination Date, a calculation in reasonable detail of the Class Q-2A Coverage Ratio and a statement as to whether the Class Q-2A Coverage Test has been satisfied and the amount that would be required for the payment of the Aggregate Principal Amount of the Class Q-2A Securities in order to achieve compliance with the Class Q-2A Coverage Test, (J) amounts in the Class Q-2 Securities Collateral Account applied in accordance with the Class Q-2 Priority of Payments, and (K) the amount of funds available in the Class Q-2 Securities Collateral Account as of the first day of the preceding Collection Period and the balance therein remaining on the last day of such preceding Collection Period;

(viii) the distributions, if any, in respect of the Income Notes for such Payment Date and for the preceding Payment Date; and

(viii) the Outstanding Premium for that Payment Date.

(b) Application of amounts in the Collection Account in accordance with the Payment Date Priority of Payments: the amount of funds available in the Collection Account as of the first day of the preceding Collection Period and the balance therein remaining on the last day of such preceding Collection Period.

(c) Application of amounts in the Expense Reserve Account

(d) Application of amounts in the Collateral Account:

(i) the amount of funds and Eligible Investments credited to the Collateral Account as of the first day of the preceding Collection Period;

(ii) the application of such funds during such Collection Period; and

(iii) the balance of funds and Eligible Investments credited to the Collateral Account as of the last day of such Collection Period.

(e) For the Reference Portfolio:

(i)     the Aggregate Reference Obligation Calculation Amount and Aggregate Reference Value of the Reference Obligations in the Reference Portfolio as of the close of business on the related Determination Date, after giving effect to any removals or additions of Reference Obligations during such Collection Period;

(ii)     the Reference Obligation Calculation Amounts of the Reference Obligations under the Swap Agreement;

(iii)     the amount due and received under the Swap Agreement from the Swap Counterparty during the Collection Period;

(iv)     the identity of each Defaulted Reference Obligation in the Reference Portfolio; and

(v)     the Quarterly Aggregate Increase Amount, the Quarterly Aggregate Reduction Amount, and the Quarterly Amortization Increase Amount

(f)     The information required to be contained in a Monthly Report pursuant to Section 8.7 determined as of the Determination Date.

At least four Business Days prior to the date on which such report must be delivered, the Issuer or its agent shall provide a copy of the proposed Payment Date Valuation Report to the Trustee, the Reference Portfolio Manager and the Swap Counterparty. Upon receipt of such proposed Payment Date Valuation Report, the Trustee and the Reference Portfolio Manager on behalf of the Swap Counterparty shall compare the information contained therein to the information contained in their respective records with respect to the Trust Estate and the Class Q-2 Securities Collateral and the Reference Portfolio and shall, within three Business Days after receipt of such Payment Date Valuation Report, notify the Issuer or its agent and each other if the information contained in the proposed Payment Date Valuation Report does not conform to the information maintained by such party with respect to the Trust Estate and the Class Q-2 Securities Collateral and the Reference Portfolio, and detail any discrepancies. In the event that any discrepancy exists, the Issuer or its agent, the Trustee and the Reference Portfolio Manager shall attempt to promptly resolve the discrepancy. If such discrepancy cannot be promptly resolved on such third Business Day, the Trustee shall within two Business Days thereafter cause the Independent Accountants to be appointed to review such proposed Payment Date Valuation Reports and the records of the Trustee and the Reference Portfolio Manager, as applicable, to determine the cause of such discrepancy. If such review reveals an error in the proposed Payment Date Valuation Report or the Trustee's or Reference Portfolio Manager's records, the proposed Payment Date Valuation Report or Trustee's or Reference Portfolio Manager's records, as the case may be, shall be revised accordingly and, as so revised, shall be utilized in making all further calculations. Pursuant to the Reference Portfolio Management Agreement, the Reference Portfolio Manager has agreed to provide, or cause to be provided, on behalf of the Swap Counterparty, to the Collateral Administrator and/or the Independent Accountants access to all information in the possession of the Reference Portfolio Manager

114

relating to the Reference Portfolio for purposes of compiling (or providing information required for) the Payment Date Valuation Report.

In addition to the foregoing information, each Payment Date Valuation Report shall include a Reminder Notice substantially in the form set forth in Exhibit M hereto (a "Reminder Notice").

SECTION 8.9    Reports by Independent Accountants.

(a) On or before the Closing Date, the Issuer shall appoint a firm of independent certified public accountants of recognized national reputation approved as of such date by the Swap Counterparty (the "Independent Accountants"). Upon any resignation by such firm or removal of such firm, the Issuer shall promptly appoint a successor thereto (with the consent of the Swap Counterparty) that shall also be a firm of independent certified public accountants of recognized national reputation. If the Issuer shall fail to appoint a successor to the Independent Accountants upon their resignation or removal within 15 days after such resignation or removal, the Trustee shall promptly notify the Issuer and the Swap Counterparty of such failure in writing. If the Issuer shall not have appointed a successor within ten days thereafter, the Trustee shall promptly appoint (with the consent of the Swap Counterparty) a successor firm of independent certified public accountants of recognized national reputation with such fees and expenses to be paid as an Administrative Expense.

(b) No later than 30 calendar days following the Ramp-up End Date, the Issuer shall cause to be delivered to the Trustee, Swap Counterparty, Rating Agencies and Reference Portfolio Manager a statement from the Independent Accountants as to whether the Reference Portfolio complied with the Reference Portfolio Criteria as of the Ramp-up End Date (and if not, specifying the respects in which it did not).

SECTION 8.10    Posting of Reports on Repository at Option of the Initial Purchaser. The Issuer acknowledges and agrees that, to the extent requested by the Initial Purchaser, the Issuer shall post each Monthly Report and Payment Date Valuation Report to the Repository for use in the manner provided in the Repository. In connection therewith, the Issuer agrees, upon the request of the Initial Purchaser, to deliver or otherwise make available each Monthly Report and Payment Date Valuation Report to the Repository in the manner provided in Section 11.6 for posting on the Repository.

SECTION 8.11    Notices to Rating Agencies.

In addition to the information and reports specifically required to be provided to the Rating Agencies pursuant to the terms of this Indenture (including pursuant to Section 7.14, 8.7 and 8.8), the Issuer shall provide or cause to be provided to the Rating Agencies (i) written notice of any amendment, modification, termination or assignment of any Basic Document, the Administration Agreement, the Reference Portfolio Management Agreement or the Note Purchase Agreement and of resignation, termination or removal of any party thereto, (ii) notice of the redemption in full of any Class of Securities then rated by such Rating Agency, (iii) any report provided to the Holders of Securities pursuant to this Indenture and (iv) such additional information as the Rating Agencies may from time to time reasonably request in connection with

their ratings of the Senior Notes and the Class Q-1 Securities and the Issuer (or its agent) determines in its sole discretion may be obtained and provided without unreasonable burden or expense.

## ARTICLE IX

## SUPPLEMENTAL INDENTURES

SECTION 9.1    Supplemental Indentures Without Consent of Noteholders.

Without the consent of the Holders of the Notes but with the consent of the Swap Counterparty, the Issuers and the Trustee, at any time and from time to time, may enter into one or more indentures supplemental hereto, in form satisfactory to the Trustee, in order to:

(a) evidence the succession of any Person to either the Issuer or Co-Issuer and the assumption by any such successor of the covenants of the Issuer or Co-Issuer in the Securities and the Indenture or to change the name of either of the Issuers;

(b) provide for definitive Notes as contemplated by Section 2.5(d) and (e);

(c) add to the covenants of the Issuers for the benefit of the Holders of the Securities or the Swap Counterparty;

(d) pledge any additional property to or with the Trustee;

(e) evidence and provide for the acceptance of appointment by a successor trustee and to add to or change any of the provisions of this Indenture as shall be necessary to facilitate the administration of the Trust Estate or the Class Q-2 Securities Collateral by more than one trustee;

(f) correct or amplify the description of any property at any time subject to the lien of this Indenture;

(g) cure any ambiguity, or correct, modify or supplement any provision hereof which is defective or inconsistent with any other provision herein or in the Offering Circular;

(h) make any change required by the Irish Stock Exchange (so long as any of the Securities are listed thereon), or any other stock exchange on which any Class of Securities is listed in order to permit or maintain the listing of the Securities thereon;

(i) modify transfer restrictions on any Securities so long as any such modifications comply with the Securities Act, the Investment Company Act, ERISA and other applicable laws and any additional transfer restrictions imposed are reasonably necessary to comply with such laws (or any applicable exemption therefrom);

(j) take any action necessary or helpful to prevent the Issuer or the Trustee from becoming subject to any withholding or other taxes or assessments or to reduce the risk that the

Issuer will be engaged in a United States trade or business or otherwise subject to United States federal income tax on a net income basis;

(k) provide for additional or modified reports to Holders of Securities; or

(l) amend, modify or change any test or requirement of any Rating Agency hereunder where such amendment, modification or change has been specified or authorized by such Rating Agency (and notice thereof has been provided to the Trustee, Swap Counterparty and Reference Portfolio Manager);

provided, that, in each case, the Trustee shall have received Rating Confirmation for such supplemental indenture; provided, further, that the Trustee may, with the consent of the Holders of 100% of the Aggregate Principal Amount of each Class of Senior Notes and Class Q-1 Securities affected thereby and with the consent of the Swap Counterparty, enter into any such supplemental indenture notwithstanding any qualification, downgrade or withdrawal of the then-current ratings of any such Class of Senior Notes or Class Q-1 Securities.

The Trustee is hereby authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations that may be contained therein.

SECTION 9.2    Supplemental Indentures With Consent of Noteholders.

(a) With the consent of the Holders of a majority of the Aggregate Principal Amount of each Class of Notes adversely affected thereby, and the consent of the Swap Counterparty and Rating Confirmation for such action, the Issuers and the Trustee may enter into an indenture or indentures supplemental hereto for the purpose of adding any provisions to, or changing in any manner or eliminating any of the provisions of, this Indenture or of modifying in any manner the rights of the Holders of the Notes under this Indenture; provided, that the Issuers and the Trustee may, with the consent of Holders of 100% of the Aggregate Principal Amount of each Class of Senior Notes and the Class Q-1 Securities affected thereby, enter into any supplemental indenture notwithstanding that either Rating Agency has stated that such supplemental indenture will result in a qualification, withdrawal or downgrade of its then-current ratings of such Class of Senior Notes or Class Q-1 Securities. However, without the consent of the Swap Counterparty if adversely affected thereby and the Holders of each Outstanding Security adversely affected thereby and without Rating Confirmation for such supplemental indenture or a waiver of such Rating Confirmation by the Holders whose consent is required for such supplemental indenture, no supplemental indenture may:

(i)    change the maturity of any Security or the principal of, or the interest on any Senior Note or Class Q-2A Security or reduce the principal amount thereof or the rate of interest thereon or change the time or amount of any other amount payable in respect of any Security;

(ii)    reduce the percentage of the Aggregate Principal Amount of Securities, the consent of the Holders of which is required for the authorization of any supplemental indenture or for any waiver of compliance with certain provisions of this Indenture;

117

    (iii) permit the creation of any lien ranking prior to or on parity with the lien of this Indenture with respect to any part of the Trust Estate or the Class Q-2 Securities Collateral or terminate the lien of this Indenture except as otherwise permitted by the Indenture;

    (iv) reduce the percentage of the Aggregate Principal Amount of Notes or Class Q-2 Securities, as applicable, held by the Holders of the Notes or Class Q-2 Securities, as applicable, whose consent is required to direct the Trustee to liquidate the Trust Estate (or modify the provisions of this Indenture relating to the Swap Counterparty's authority with respect to any such liquidation) or Class Q-2 Securities Collateral, as applicable;

    (v) modify any of the provisions of this Indenture with respect to supplemental indentures or waiver of Events of Default or Class Q-2 Events of Default and their consequences except to increase the percentage of the Aggregate Principal Amount of Notes or Class Q-2 Securities, as applicable, the consent of the Holders of which is required for any such action or to provide that other provisions of the Indenture cannot be modified or waived without the consent of the Holders of each Outstanding Note (or each Outstanding Class Q-2 Security, as applicable) affected thereby;

    (vi) modify the provisions of the Priority of Payments, the Class Q-2 Priority of Payments or the definitions of the terms "Holder" or "Outstanding;" or

    (vii) modify any of the provisions of the Indenture in such a manner as to affect the calculation of the amount of any payment of principal of or interest on or other amount payable in respect of any Security or to affect the right of the Holders of the Securities to the benefit of any provisions for the payment of such Securities contained therein.

    (b) No supplemental indenture may modify the terms of the Class Q-1 Securities, the Class Q-2A Securities or the Class Q-2B Securities as such in a manner that would adversely affect the Class Q-1 Securities, the Class Q-2A Securities or the Class Q-2B Securities without the prior written consent of a majority of the stated amount of the Class Q-1 Securities, aggregate principal amount of the Class Q-2A Securities or Class Q-2B Securities, as applicable, or the consent of the Holders of each Outstanding Class Q-2 Security adversely affected thereby as set forth above.  Except for any proposed such supplement that would affect the terms of the Class Q-1 Securities, Class Q-2A Securities or the Class Q-2B Securities as such or as provided in subsection (a) above, Holders of Class Q-1 Securities, Class Q-2A Securities and Class Q-2B Securities shall be entitled to vote under this Section 9.2 only (i) in the case of the Class Q-1 Securities, as Holders of the respective related Components and (ii) in the case of the Class Q-2 Securities, pursuant to Section 2.17(f) with respect to the Income Notes represented by the Class Q-2 Collateral Asset A.

    (c) Any supplemental indenture that in the good faith determination of the Swap Counterparty materially adversely affects its rights or duties or creates, supplements, modifies, limits or eliminates any provision of the Indenture affecting the discretion, judgment, conduct, care or role of the Reference Portfolio Manager, including the Coverage Tests and provisions

relating to calculations with respect to the Reference Portfolio, the Swap Counterparty's or the Reference Portfolio Manager's obligations or liabilities, fees or expenses payable by or reimbursable to it or the Reference Portfolio Manager, or otherwise adversely affects it or the Reference Portfolio Manager, will be deemed to adversely affect the Swap Counterparty and therefore will not be effective without the prior consent of the Swap Counterparty.

(d) Not later than 15 Business Days prior to the execution of any proposed supplemental indenture pursuant to this Section, the Trustee at the expense of the Issuers shall mail to the Holders of Securities, the Swap Counterparty, the Reference Portfolio Manager, the Investment Agreement Counterparty and each Rating Agency (so long as any rated Securities are Outstanding) a copy of such supplemental indenture and shall, (1) request Rating Confirmation from each Rating Agency, as applicable, and (2) request any required consent from the applicable Holders of Securities to be given within the Initial Consent Period. Any consent given to a proposed supplemental indenture by the Holder of any Securities shall be irrevocable and binding on all future Holders or beneficial owners of that Security, irrespective of the execution date of the supplemental indenture. If Holders of less than the required percentage of the Aggregate Principal Amount of the relevant Securities consent to a proposed supplemental indenture within the Initial Consent Period, on the first Business Day after the Initial Consent Period, the Trustee shall notify the Issuer, the Swap Counterparty and the Reference Portfolio Manager which Holders of Securities have consented to the proposed supplemental indenture, and, which Holders and, to the extent such information is reasonably available to the Trustee, which beneficial owners have not consented to the proposed supplemental indenture. If it intends to exercise its Amendment Buy-Out Option pursuant to  Section 9.6, the Amendment Buy-Out Purchaser shall so notify the Trustee (which notice shall designate a date for the Amendment Buy-Out to occur no earlier than ten Business Days after the date of such notice) no later than five (5) Business Days after so being notified by the Trustee and the Trustee shall mail such notice to all Holders of Securities. Any Non-consenting Holder may give consent to the related proposed supplemental indenture until the 5th Business Day prior to the date of the Amendment Buy-Out designated by the Amendment Buy-Out Purchaser, and in such case shall cease to be a Non-consenting Holder for purposes of the related Amendment Buy-Out. If the Amendment Buy-Out Purchaser exercises its Amendment Buy-Out Option and purchases the applicable Securities  pursuant to Section 9.6 below, the Amendment Buy-Out Purchaser as Holder or beneficial owner of the applicable Securities may consent to the related proposed indenture within five (5) Business Days of the Amendment Buy-Out.

(e) The Trustee may, consistent with an Opinion of Counsel, determine whether or not the Holders of any Notes would be adversely affected by any supplemental indenture. Such determination shall be conclusive and binding on all present and future Holders. The Trustee shall not be liable for any such determination made in good faith and in reliance in good faith upon an Opinion of Counsel delivered to the Trustee as described in Section 9.3 hereof.

(f) It shall not be necessary in connection with any consent of the Holders of the Securities under this Section 9.2 for such Holders to approve the specific form of any proposed supplemental indenture, but it shall be sufficient if such consent shall approve the substance thereof.

(g) Promptly after the execution by the Issuers and the Trustee of any supplemental indenture pursuant to this Section 9.2, the Trustee, at the expense of the Issuers, shall mail to the Holders of the Securities, the Reference Portfolio Manager, the Swap Counterparty, the Irish Stock Exchange (if and for so long as any Class of Securities is listed thereon), the Investment Agreement Counterparty and each Rating Agency (so long as any rated Securities are Outstanding) a copy thereof.

SECTION 9.3    Execution of Supplemental Indentures.

In executing or accepting the additional trusts created by any supplemental indenture permitted by this Article IX or the modifications thereby of the trusts created by this Indenture, the Trustee shall be entitled to receive, and (subject to Sections 6.1 and 6.2) shall be fully protected in relying in good faith upon, an Opinion of Counsel stating that the execution of such supplemental indenture is authorized or permitted by this Indenture, and that all conditions precedent applicable thereto under this Indenture have been satisfied.  The Trustee may, but shall not be obligated to, enter into any such supplemental indenture which affects the Trustee's own rights, duties or immunities under this Indenture or otherwise. If requested by the Initial Purchaser, following the execution of any supplemental indenture under this Article 9, the Issuer shall deliver a copy of such supplemental indenture to the Repository for posting on the Repository in the manner described in Section 11.6.

SECTION 9.4    Effect of Supplemental Indentures.

Upon the execution of any supplemental indenture under this Article IX, this Indenture shall be modified in accordance therewith, and such supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Securities theretofore and thereafter authenticated and delivered hereunder shall be bound thereby.

SECTION 9.5    Reference in Notes to Supplemental Indentures.

Securities executed, authenticated and delivered after the execution of any supplemental indenture pursuant to this Article IX may, and if required by the Trustee shall, bear a notation in form approved by the Trustee as to any matter provided for in such supplemental indenture.  If the Issuers shall so determine, new Securities, so modified as to conform in the opinion of the Trustee and the Issuers to any such supplemental indenture, may be prepared and executed by the Issuers and authenticated and delivered by the Trustee in exchange for Outstanding Securities.

SECTION 9.6    Amendment Buy-Out.

(a) In the case of any supplemental indenture pursuant to Section 9.2 above or a Swap Agreement Amendment pursuant to Section 7.26(b) of this Indenture, in each case that requires the consent of one or more Holders of Notes or Class Q-1 Securities, the Amendment Buy-Out Purchaser shall have the right, but not the obligation, to purchase from Non-consenting Holders all Securities held by such Holders of the Class of Securities whose consent was solicited with respect to such supplemental indenture or Swap Agreement Amendment, as applicable (the "Amendment Buy-Out Option") for the applicable Amendment Buy-Out Purchase Price. If such option is exercised, the Amendment Buy-Out Purchaser must purchase

all such Securities of Non-consenting Holders, regardless of the applicable percentage of the Aggregate Principal Amount of the Securities the consent of whose Holders is required for such supplemental indenture or Swap Agreement Amendment, as applicable (an "Amendment Buy-Out"). By its acceptance of its Securities hereunder, each Holder of Securities agrees that if the Amendment Buy-Out Option is exercised, any Non-consenting Holder will be required to sell its applicable Securities to the Amendment Buy-Out Purchaser; provided that if the solicited consent to a supplemental indenture only applies to one Component of a Class Q-1 Security, the Non-consenting Holder will be required to sell, at the Non-consenting Holder's option, its Class Q-1 Security as a whole or solely the affected Component. The Class Q-2 Securities themselves shall not be subject to an Amendment Buy-Out; provided that the Income Notes represented by the Class Q-2 Collateral Asset A shall be subject to an Amendment Buy-Out as provided in Section 2.17(f)(iii). Neither the Swap Counterparty, nor the Amendment Buy-Out Purchaser nor any other Person shall have any liability to any Holder or beneficial owner of Securities as a result of an election by the Amendment Buy-Out Purchaser not to exercise the Amendment Buy-Out Option.

(b) All purchases made pursuant to an Amendment Buy-Out Option individually and in the aggregate must comply with the applicable transfer restrictions for the relevant Securities set forth herein (including, without limitation, the restriction that such Securities may not be purchased (x) in the case of the Class Q-1 Securities, by any Person that is a Benefit Plan Investor and (x) in the case of the Income Notes, if Holders of the Income Notes that have represented that they are Benefit Plan Investors would own 25% or more of the Aggregate Principal Amount of the Income Notes (excluding Income Notes in the form of the Class Q-1 Income Note Component, Income Notes represented by the Class Q-2 Collateral Asset A and Income Notes held by Controlling Persons) immediately after such purchase) and the legends on such Securities and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency).

ARTICLE X

OTHER AGENTS

SECTION 10.1    Paying Agents.

(a) The Issuers hereby appoint the Trustee and, solely with respect to any Securities listed on the Irish Stock Exchange, the Listing Agent, as Paying Agents.

(b) The Issuers may vary or terminate the appointment of any Paying Agent and/or appoint additional Paying Agents, including, without limitation, as may be required under the rules of the Irish Stock Exchange. Notice of any such variation, termination or appointment, and of any changes in the specified offices, shall be given by the Issuers to the Trustee, the Holders of the Securities, the Swap Counterparty and the Rating Agencies in the manner described in Sections 11.3 and 11.4.

(c) The Issuers will cause each Paying Agent (other than the Trustee and the Listing Agent to the extent the Securities (a) settle through DTC, Euroclear or Clearstream or (b)

121

are not listed on the Irish Stock Exchange) to execute and deliver to the Trustee and the Issuers an instrument in which each such Paying Agent shall agree with the Issuers that such Paying Agent will:

(i)  pay to the Holders of the Securities all amounts due and payable to the extent sufficient funds have been provided therefor by the Issuers or the Trustee;

(ii)  hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the Persons entitled thereto until such sums shall be paid to such Persons or otherwise disposed of as herein provided and pay such sums to such Persons as herein provided;

(iii)  maintain such records as may reasonably be requested by the Issuers or the Trustee, and furnish such copies thereof as the Trustee may require;

(iv)  abide by all provisions of this Indenture relating to the duties and responsibilities of the Paying Agent;

(v)  notify the Trustee, the Swap Counterparty and the Holders of the Notes of any default by the Issuers, and such Paying Agent shall be required to account to the Trustee on all disbursements made by such Paying Agent;

(vi)  immediately resign as a Paying Agent and pay to the Trustee all sums held by it in trust for the payment of Notes if at any time it ceases to meet the eligibility requirements required to be met by a Paying Agent in effect at the time of determination; and

(vii)  comply with all requirements of the Code applicable to it with respect to the withholding from any payments made by it on any Notes of any applicable withholding taxes imposed thereon, required to be withheld and with respect to any applicable reporting requirements imposed upon and applicable to it under the Code in connection therewith.

(d) The eligibility requirements for a Paying Agent shall be the same as those relating to the Trustee in Section 6.10.

(e) After an Event of Default, the Trustee may require that all funds held by Paying Agents be paid over to the Trustee.

SECTION 10.2    Irish Transfer Agent.

So long as any Securities are listed on the Irish Stock Exchange, the Issuers shall maintain a transfer agent with an office in Ireland, as an agent for the registration of transfers of such Notes (the "Irish Transfer Agent"). The Issuers hereby initially appoint the Listing Agent as the Irish Transfer Agent. If the Issuer appoints a new Transfer Agent, the Issuer will publish notice of the change in an Authorized Newspaper as promptly as practicable after such appointment.

SECTION 10.3    Indenture Calculation Agent.

(a) The Issuers hereby agree that for so long as any of the Class A-1 Notes, Class A-2 Notes, Class B Notes, Class C-1 Notes and Class Q-2A Notes remain Outstanding there will at all times be an agent appointed to calculate LIBOR in respect of each Periodic Interest Accrual Period in accordance with the terms of this Section 10.3 (the "Indenture Calculation Agent"). The Issuers hereby initially appoint the Trustee as Indenture Calculation Agent for purposes of determining LIBOR for each Periodic Interest Accrual Period, and the Trustee, by executing and delivering this Indenture, hereby acknowledges and accepts such appointment.  The Indenture Calculation Agent may be removed by the Issuer at any time.  If the Indenture Calculation Agent is unable or unwilling to act as such or is removed by the Issuer, or if the Indenture Calculation Agent fails to determine any applicable Interest Rate or the amount of interest payable on each such Class of Securities for any Periodic Interest Accrual Period, the Issuer will promptly appoint as a replacement Indenture Calculation Agent a leading bank which is engaged in transactions in U.S. Dollar deposits in the London interbank market and which is not an Affiliate of the Issuers.  The Indenture Calculation Agent may not resign its duties without a successor having been duly appointed.  If no successor Indenture Calculation Agent is appointed within thirty (30) days after giving notice of resignation, the resigning Indenture Calculation Agent, the Swap Counterparty, the Holders of a majority of the Aggregate Principal Amount of the Senior Notes or any Holder of a Senior Note or Class Q-2A Security, on behalf of itself and all others similarly situated, may petition a court of competent jurisdiction for the appointment of a successor Indenture Calculation Agent. The Issuer shall notify the Rating Agencies of the appointment of any replacement Indenture Calculation Agent.

(b) As soon as reasonably possible after 11:00 a.m. (London time) on each LIBOR Determination Date, but in no event later than 11:00 a.m. (London time) on the Business Day immediately following each LIBOR Determination Date, the Indenture Calculation Agent will calculate the Class A-1 Interest Rate, the Class A-2 Interest Rate, the Class B Interest Rate, the Class C-1 Interest Rate and the Class Q-2A Interest Rate for the related Periodic Interest Accrual Period and the amount of interest for such Periodic Interest Accrual Period payable in respect of each U.S. $100,000 by Aggregate Principal Amount of each such Class of Securities (rounded to the nearest cent, with half a cent being rounded upward) on such related Payment Date and cause the same to be provided to the Issuers, the Swap Counterparty, the Reference Portfolio Manager, the Trustee, the Investment Agreement Counterparty, the Paying Agents, the Irish Stock Exchange (if and for so long as any Class of Securities is listed thereon), and, if applicable, Euroclear and Clearstream.  The Indenture Calculation Agent will also specify to the Issuers the quotations upon which the applicable Interest Rate for each such Class of Securities is based, and in any event, the Indenture Calculation Agent shall notify the Issuers before 5:00 p.m. (London time) on each LIBOR Determination Date that either: (i) it has determined or is in the process of determining the applicable Interest Rate and the Periodic Interest for each such Class of Securities, or (ii) it has not determined and is not in the process of determining the applicable Interest Rate and the Periodic Interest for each such Class of Securities, together with its reasons therefor.  The determination of the applicable Interest Rate for each such Class of Securities by the Indenture Calculation Agent shall (in the absence of manifest error) be final and binding upon all parties.

SECTION 10.4    Other Capacities.

To the extent that the Trustee is acting as Registrar, Paying Agent, Securities Intermediary or Indenture Calculation Agent or other capacity hereunder, the rights, privileges and indemnities set forth in Article VI shall also apply to the Trustee acting in each such capacity.

SECTION 10.5    Certain Actions with Respect to the Reference Portfolio Manager.

(a) At the direction of the Holders of at least 66 2/3% (in Aggregate Principal Amount) of the Income Notes and at least 66 2/3% (in Aggregate Principal Amount) of each Class of Senior Notes, the Issuer will request the Swap Counterparty under the Swap Agreement to remove the Reference Portfolio Manager without cause in accordance with the Reference Portfolio Management Agreement. The Issuer will request the Swap Counterparty under the Swap Agreement to remove the Reference Portfolio Manager for cause in accordance with the Reference Portfolio Management Agreement upon the vote of the Holders of at least $66^2/_3\%$ (in Aggregate Principal Amount) of each Class of Senior Notes and at least $66^2/_3\%$ (in Aggregate Principal Amount) of the Income Notes. The Issuer shall notify the Rating Agencies of any such request.

(b) If the Swap Counterparty consults with the Issuer as to the appointment of a replacement Reference Portfolio Manager under the Reference Portfolio Management Agreement, the Issuer shall follow the direction of the Holders of a majority in Aggregate Principal Amount of the Income Notes; provided that the Issuer shall not follow such direction as to any replacement Reference Portfolio Manager, if the Holders of at least $66^2/_3\%$ of the Aggregate Principal Amount of each Class of Senior Notes object to such replacement Reference Portfolio Manager.

(c) Notwithstanding Section 2.11, for purposes of voting under this Section 10.5 only, Securities beneficially owned by the Reference Portfolio Manager or any of its Affiliates or by an account or fund for which the Reference Portfolio Manager or its Affiliate acts as investment manager with discretionary authority shall be disregarded and deemed not to be Outstanding.

(d) The Issuer shall notify the holders of Securities of any resignation, removal or replacement of the Reference Portfolio Manager or any assignment of the Reference Portfolio Management Agreement, and if it receives notice from the Swap Counterparty of the occurrence of an event that constitutes cause for removing the Reference Portfolio Manager under the Reference Portfolio Management Agreement.

SECTION 10.6    Process Agents.

The Issuer shall designate and appoint Corporation Service Company as its agent (the "Process Agent") in New York for service of all process. The Process Agent may be served in any legal suit, action or Proceeding arising with respect to this Indenture, the Swap Agreement or the Notes or the transactions contemplated hereby or thereby, such service being hereby acknowledged to be effective and binding service in every respect.

The Co-Issuer shall designate and appoint Corporation Service Company as its agent in New York for service of all process. The Process Agent may be served in any legal suit, action or Proceeding arising with respect to this Indenture or the Notes or the transactions contemplated hereby or thereby, such service being hereby acknowledged to be effective and binding service in every respect.

ARTICLE XI

MISCELLANEOUS

SECTION 11.1    Form of Documents Delivered to Trustee.

(a) In any case where several matters are required to be certified by, or covered by an opinion of any specified Person, it is not necessary that all such matters be certified by, or covered by the opinion of, only one such Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such Persons as to other matters, and any such Person may certify or give an opinion as to such matters in one or several documents.

(b) Any certificate or opinion of an Authorized Officer of each of the Issuers may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by counsel, unless such officer knows, or in the exercise of reasonable care should know, that such certificate or opinion or representations with respect to the matters upon which this certificate or opinion is based are erroneous. Any certificate of an Authorized Officer or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an officer or officers of the Issuer, the Co-Issuer or any other Person, as the case may be, stating that the information with respect to such factual matters is in the possession of the Issuer, the Co-Issuer or such other Person, unless such Authorized Officer or counsel knows, or in the exercise of reasonable care should know, that such certificate or opinion or representations with respect to such matters are erroneous.

(c) Where any Person is required to make, give or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

(d) Whenever in this Indenture, in connection with any application or certificate or report to the Trustee, it is provided that the Issuer or the Co-Issuer shall deliver any document as a condition of the granting of such application, or as evidence of compliance of the Issuer or the Co-Issuer with any term hereof, it is intended that the truth and accuracy at the time of the granting of such application or at the effective date of such certificate or report (as the case may be) of the facts and opinions stated in such document shall in such case be conditions precedent to the right of the Issuer or the Co-Issuer to have such application granted or to the sufficiency of such certificate or report. The foregoing shall not, however, be construed to affect the Trustee's right to rely upon the truth and accuracy of any statement or opinion contained in any such document as provided in Article VI.

125

SECTION 11.2    Acts of Securityholders.

(a) Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by the Holders of the Securities may be embodied in and evidenced by one or more instruments of substantially similar tenor signed by such Holders in person or by agents duly appointed in writing; and except as herein otherwise expressly provided such action shall become effective when such instrument or instruments are delivered to the Trustee, and, where it is hereby expressly required, to the Issuer. Such instrument or instruments (and the action embodied therein and evidenced thereby) are herein sometimes referred to as the "Act" of the Holders of the Securities signing such instrument or instruments. Proof of execution of any such instrument or of a writing appointing any such agent shall be sufficient for any purpose of this Indenture and (subject to Section 6.1) conclusive in favor of the Trustee and the Issuer, if made in the manner provided in this Section 11.2.

(b) The fact and date of the execution by any person of any such instrument or writing may be proved in any manner that the Trustee deems sufficient.

(c) The ownership of Securities shall be proved by the Securities Register.

(d) Any request, demand, authorization, direction, notice, consent, waiver or other action by the Holder of any Securities shall bind the Holder (and any transferee thereof) of every Note issued upon the registration thereof or in exchange therefor or in lieu thereof, in respect of anything done, omitted or suffered to be done by the Trustee, the Issuer or the Co-Issuer in reliance thereon, whether or not notation of such action is made upon such Note.

SECTION 11.3    Notices, etc., to Trustee, Issuers and Rating Agencies.

Any request, demand, authorization, direction, notice, consent, waiver of any Person, or any Act of the Holders of the Securities or other documents provided or permitted by this Indenture to be made upon, given or furnished to or filed with:

(a) The Trustee by any Holder of the Securities, or by the Issuer or the Co-Issuer or other Person shall be sufficient for every purpose hereunder if made, given, furnished or filed in writing to or with the Trustee at its Corporate Trust Office, Attention: Corporate Trust Administration; with such request, demand, authorization, direction, notice, consent, waiver or other communication or document to the Trustee to be deemed effective only upon actual receipt thereof at the Corporate Trust Office;

(b) The Issuer or the Co-Issuer by the Trustee or by any Holder of the Securities shall be sufficient for every purpose hereunder if in writing and either sent by electronic facsimile transmission (with hard copy to follow via first class mail) or mailed, by certified mail, return receipt requested to the Issuer, at: Valhalla CLO, Ltd., c/o Walkers SPV Limited, P.O. Box 908GT, Walker House, Mary Street, George Town, Grand Cayman, Cayman Islands, Attention: The Directors, facsimile: (345) 945-4757, or to the Co-Issuer, at: Valhalla CLO, Inc., c/o Puglisi & Associates, 850 Library Avenue, Suite 204, Newark, DE 19711, facsimile: (302) 738-7210, or at any other address previously furnished in writing to the Trustee by the Issuer or the Co-Issuer. Each of the Issuer and the Co-Issuer shall promptly transmit any notice

received by it from the Noteholders to the Trustee, the Swap Counterparty and the Reference Portfolio Manager.

(c) Notices required to be given to the Rating Agencies by the Issuer, the Co-Issuer or the Trustee shall be in writing, personally delivered, sent by electronic facsimile transmission (with hard copy to follow via first class mail) or mailed by certified mail, return receipt requested to: (i) Moody's Investors Service, Inc., CDO Group, 99 Church Street, New York, New York, 10007, electronic copy to CDOmonitoring@moodys.com, facsimile: (212) 553-4170, Attention: CBO/CLO Monitoring, and (ii) Standard & Poor's, 55 Water Street, 40th Floor, New York, New York 10041-0003, electronic copy to CDO_surveillance@sandp.com, facsimile: (212) 438-2665, or at such other addresses as shall be designated by written notice to the other parties. Where this Indenture provides for notice to the Rating Agencies, failure to give such notice shall not affect any other rights or obligations created hereunder, and shall not under any circumstance constitute an Event of Default.

(d) Notices required to be given to the Trustee or the Holders of the Securities shall also be required to be given to the Administrator, the Swap Counterparty and the Reference Portfolio Manager.

(e) Notices required to be given to the Swap Counterparty shall be sent to: Citigroup Financial Products Inc., 390 Greenwich Street, 4th Floor, New York, New York 10013, Attention: Doug Warren, telephone: 212-723-6118, facsimile: 212-723-8578, with a copy to: Legal Department, 77 Water Street, 9th Floor, New York, New York 10004, Attention: Department Head, facsimile: (212) 657-1452.

(f) Notices required to be given to the Reference Portfolio Manager shall be sent to: Highland Capital Management, L.P., 13455 Noel Road, Suite 1300, Dallas, Texas 75240, Attention: Todd Travers, Telephone Number: 972-628-4100, Fax Number: 972-628-4147.

(g) Notices required to be given to the Investment Agreement Counterparty shall be sent to its address as set forth in, or pursuant to, the Investment Agreement and, if at any time the Investment Agreement Guarantor is not an affiliate of the Investment Agreement Counterparty, with a copy to the Investment Agreement Guarantor sent to its address as set forth in, or pursuant to, the Investment Agreement.

SECTION 11.4    Notices to Holders of the Notes; Waiver.

Where this Indenture provides for notice to the Holders of the Notes of any event, such notice shall be given through the Depositary or its nominee as the registered holder of the Notes by first class mail, postage prepaid, at the address appearing on the Securities Register. In addition, so long as any of the Securities are listed on the Irish Stock Exchange and so long as the rules of such Exchange so require, notice to the Holders of the Securities shall also be given by publication in the Irish Stock Exchange's Daily Official List. The Trustee shall forward all notices to the Listing Agent for publication.

Where this Indenture provides for notice in any manner, any such notice may be waived in writing by any Person entitled to receive such notice, either before or after the event, and such waiver shall be the equivalent of such notice. Waivers of notice by Noteholders shall

127

be filed with the Trustee, but such filing shall not be a condition precedent to the validity of any action taken in reliance upon such waiver.

SECTION 11.5 <u>Consent to Posting of Documents on Repository at the Option of Initial Purchaser</u>.

Each of the Issuers hereby consents, at the option of the Initial Purchaser, to (a) the posting of the Offering Circular, this Indenture (collectively, the "<u>Transaction Documents</u>") and the Monthly Reports and the Payment Date Valuation Reports to be delivered pursuant to the Transaction Documents and any amendments or other modifications thereto on the Repository for use in the manner provided in the Repository; and (b) the display of its name on the Repository in connection therewith.

SECTION 11.6 <u>Posting of Documents on Repository</u>.

Any document requested by the Initial Purchaser to be delivered to the Repository by the Issuer pursuant to this Indenture shall be delivered to the Repository by electronic mail as a pdf (portable document format) file to the following address (or such other address or such other manner as may be specified in writing from time to time by the operator of the Repository to the Issuer):

> CDO Library
> c/o The Bond Market Association
> 360 Madison Avenue (18th Floor)
> New York, NY 10017
> Electronic mail address: admin@cdolibrary.com

SECTION 11.7 <u>Effect of Headings and Table of Contents</u>.

The Article and Section headings herein and the Table of Contents are for convenience only and shall not affect the construction hereof.

SECTION 11.8 <u>Successors and Assigns</u>.

(a) All covenants and agreements in this Indenture and the Notes by the Issuer or the Co-Issuer shall bind its successors and assigns, whether so expressed or not.

(b) All covenants and agreements of the Trustee in this Indenture shall bind its successors and assigns, whether so expressed or not.

SECTION 11.9 <u>Separability</u>.

In case any provision in this Indenture or in the Notes shall be invalid, illegal or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired.

SECTION 11.10 <u>Benefits of Indenture</u>.

Nothing in this Indenture or in the Notes, express or implied, shall give to any Person, other than the parties hereto and their successors hereunder, the Holders of the Notes and the Swap Counterparty and the parties specified in Section 11.18, any benefit or any legal or equitable right, remedy or claim under this Indenture.

SECTION 11.11 <u>Governing Law</u>.

THIS INDENTURE, EACH NOTE, EACH CLASS Q SECURITY AND EACH COMPONENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES HEREUNDER SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS.

SECTION 11.12 <u>Submission to Jurisdiction; Waiver of Jury Trial</u>.

THE PARTIES HERETO IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF ANY NEW YORK STATE OR FEDERAL COURT SITTING IN THE BOROUGH OF MANHATTAN IN THE CITY OF NEW YORK IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE NOTES, AND SUCH PARTIES HEREBY IRREVOCABLY AGREE THAT ALL CLAIMS IN RESPECT OF SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE OR FEDERAL COURT. THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE, TO THE FULLEST EXTENT THAT THEY MAY LEGALLY DO SO, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING AND IRREVOCABLY WAIVE ANY AND ALL RIGHTS TO TRIAL BY JURY IN ANY SUCH ACTION OR PROCEEDING. THE PARTIES HERETO IRREVOCABLY CONSENT TO THE SERVICE OF ANY AND ALL PROCESS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OR DELIVERY OF COPIES OF SUCH PROCESS TO THE ADDRESS SPECIFIED FOR NOTICES IN THIS AGREEMENT. THE PARTIES HERETO AGREE THAT A FINAL NON-APPEALABLE JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

To the extent that either of the Issuers has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution, or otherwise) with respect to its obligations hereunder, each waives such immunity to the extent permitted by applicable law.

SECTION 11.13 <u>Counterparts</u>.

This Indenture may be executed in counterparts, each of which so executed shall be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

SECTION 11.14   Recording of Indenture.

If this Indenture at any time becomes subject to recording in any appropriate public recording offices, such recording is to be effected by the Issuer and at its expense accompanied by an Opinion of Counsel to the effect that such recording is necessary either for the protection of any of the Secured Parties or Holders of Class Q-2 Securities or for the enforcement of any right or remedy granted to the Trustee under this Indenture.

SECTION 11.15   No Recourse.

No recourse may be taken, directly or indirectly, with respect to the obligations of the Issuer or the Co-Issuer, as applicable, in respect of the Securities or under this Indenture or any certificate or other writing delivered in connection herewith or therewith, against:

(a) the Trustee, the Securities Intermediary or the Collateral Administrator in their individual capacities;

(b) any shareholder or any incorporator or past or present officer or director of the Issuer or the Co-Issuer;

(c) any Holder of a Security;

(d) the Swap Counterparty;

(e) the Administrator;

(f) the Initial Purchaser;

(g) the Reference Portfolio Manager;

(h) the Indenture Calculation Agent

(i) the Investment Agreement Counterparty;

(j) the Investment Agreement Guarantor; or

(k) any Affiliate, partner, owner, beneficiary, agent, officer, director, employee or agent of the foregoing, or any holder of a beneficial interest in the Issuer, the Co-Issuer, the Administrator or the Trustee or of any successor or assign of the Administrator or the Trustee in its individual capacity, except that any such partner, owner or beneficiary shall be fully liable, to the extent provided by applicable law, for any unpaid consideration for stock, unpaid capital contribution or failure to pay any installment or call owing to such entity;

except in each case, as any such person may have expressly agreed (it being understood that the Administrator, the Trustee and the Securities Intermediary have no such obligations in their individual capacities other than JPMorgan Chase Bank with respect to any representations or warranties made in its individual capacity hereunder).

SECTION 11.16    <u>No Petition</u>.

The Trustee, by entering into this Indenture, and each Holder of a Security by its acceptance of such Security, hereby covenants and agrees that each shall not, prior to the date which is one year (or the then applicable preference period in the relevant jurisdiction) and one day after the termination of this Indenture with respect to the Securities pursuant to Section 4.1, acquiesce, petition or otherwise invoke or cause the Issuer to invoke the process of any court or government authority for the purpose of commencing or sustaining a case against the Issuer or the Co-Issuer under any United States federal or state bankruptcy, insolvency or similar law (in any applicable jurisdiction) or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Issuer or any substantial part of its property, or making a general assignment for the benefit of creditors, or ordering the winding up or liquidation of the affairs of the Issuer or for the purpose of collecting any of the Trustee's fees and expenses.

SECTION 11.17    <u>Priority of Payments</u>.

Notwithstanding anything herein to the contrary, all payments to be made in accordance with the terms hereof, including without limitation all payments in respect of the Notes and the Class Q-1 Securities and the fees and expenses of the Trustee, shall be paid on the dates, and shall be subject to the priorities, prescribed in Article V and Article VIII of this Indenture or, in the case of payments on the Class Q-2 Securities, as provided in Section 2.17 of this Indenture.

SECTION 11.18    <u>Beneficiaries</u>.

The Holders of the Securities, the Swap Counterparty, the other Secured Parties and the Amendment Buy-Out Purchaser are third party beneficiaries hereunder.

IN WITNESS WHEREOF, the Issuer, the Co-Issuer and the Trustee have caused this Indenture to be duly executed by their respective officers, thereunto duly authorized, all as of the day and year first above written.

Executed as a Deed by:

VALHALLA CLO, LTD., as Issuer

By:_____
Name:
Title: Director

In the presence of:_____
Witness Name:

VALHALLA CLO, INC., as Co-Issuer

By:_____
Name:
Title:

JPMORGAN CHASE BANK,
as Trustee and Securities Intermediary

By:        _____
Name:
Title:

132

Schedule A

SCHEDULE OF DEFINITIONS

Set forth below are definitions of certain defined terms used in this Indenture.

"Account Agreement":  An agreement substantially in the form set forth in Exhibit L hereto.

"Accredited Investor":  An "accredited investor" as defined in Rule 501(a) under the Securities Act.

"Accrual Date":  The meaning specified in the Swap Agreement.

"Accrued Increase/Reduction Amount": For a Measurement Date, an amount (which may be negative) equal to (a) the sum of all Obligation Value Increase Amounts (other than as a result of Amortizations) for Reference Obligations for which the Accrual Date occurred on or prior to such date and on or following the preceding Determination Date minus (b) the sum of all Obligation Value Reduction Amounts (including as a result of Amortizations) for Reference Obligations for which the Accrual Date occurred on or prior to such date and on or following the preceding Determination Date.

"Accrued Swap Liabilities":  With respect to any date of determination, the sum of (i) all amounts payable to the Swap Counterparty under the Swap Agreement as of such date of determination and (ii) all amounts payable to the Swap Counterparty under the Swap Agreement on any prior date and unpaid as of such date of determination, in each case other than amounts that constitute Administrative Expenses.

"Adjusted Reference Portfolio Return Amount":  The meaning specified in the Swap Agreement.

"Administration Agreement":  The Administration Agreement, dated as of the Closing Date, between the Administrator and the Issuer in respect of certain corporate and administrative services provided to the Issuer by the Administrator.

"Administrative Expenses":  Amounts due from or accrued for the account of the Issuers with respect to any Payment Date (and, to the extent not paid, from prior Payment Dates) to, in the following order of priority, (i) any Person in respect of any governmental fee, charge or tax (including all filing, registration and annual return fees payable to the Cayman Islands' government and registered office fees); (ii) the Trustee for the Trustee Fee and Trustee Expenses; (iii) the Collateral Administrator for the Collateral Administrator Fee and Collateral Administrator Expenses; (iv) the Administrator as provided in the Administration Agreement; and (v) on a *pari passu* basis, (A) the Independent Accountants, agents and counsel of the Issuers for fees and expenses (including, without limitation, tax reports); (B) any other Person in respect of any other expenses permitted under the Indenture and the documents delivered pursuant to or in connection with the Indenture, the Collateral Administration Agreement and the Securities; (C) any other Person in respect of any other expenses of the Issuers including, without limitation,

A-1

fees, expenses or amounts for which the Swap Counterparty is entitled to indemnification from the Issuer under the Swap Agreement, (D) the Rating Agencies for any fees (including on-going monitoring fees and credit estimates) due and payable with respect to their respective rating of the Securities; (E) expenses and other amounts for which the Swap Counterparty is obligated to reimburse or pay the Reference Portfolio Manager under the Reference Portfolio Management Agreement; and (F) expenses for which the Swap Counterparty is entitled to reimbursement in connection with the transfer of its rights and obligations to a replacement swap counterparty or certain other actions upon a downgrade of it or the Swap Guarantor when required to do so under the Swap Agreement, in the case of this clause (F) in an amount not to exceed $50,000 in any calendar year; provided, however, that Administrative Expenses shall not include any amounts due or accrued with respect to actions taken on or prior to the Closing Date, which amounts shall be payable only from the Expense Reserve Account pursuant to Section 8.2(e).

"Administrator":  Walkers SPV Limited or any successor appointed by the Issuer.

"Affiliate":  With respect to any specified Person, any other Person controlling or controlled by or under common control with such specified Person.  For the purposes of this definition, "control," when used with respect to any specified Person, means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.  For purposes of this definition, (a) the management of an account by one Person for the benefit of any other Person shall not constitute "control" of such other Person and (b) with respect to the Issuer, "Affiliate" does not include Walkers SPV Limited or any entities which Walkers SPV Limited controls or administers.

"Aggregate Principal Amount":  With respect to any date of determination, (a) when used with respect to any Class or Classes of Notes as a whole (or any specified Notes or Components of any such Class), the original principal amount of such Class or Classes (or of such specified Notes or Component, as applicable) reduced, in the case of the Senior Notes only, by all prior payments, if any, made with respect to the principal of such Class or Classes (or such Senior Notes or Class Q-1 Senior Note Component, as applicable), (b) when used with respect to all of the Senior Notes, the sum of (i) the Aggregate Principal Amount of the Class A-1 Notes, (ii) the Aggregate Principal Amount of the Class A-2 Notes, (iii) the Aggregate Principal Amount of the Class B Notes, (iv) the Aggregate Principal Amount of the Class C-1 Notes and (v) the Aggregate Principal Amount of the Class C-2 Notes,  (c) when used with respect to all of the Notes, the sum of (i) the Aggregate Principal Amount of the Senior Notes and (ii) the Aggregate Principal Amount of the Income Notes, (d) when used with respect to the Class Q-2A Securities (or any specified Class Q-2A Securities), the original principal amount of the Class Q-2A Securities (or of such specified Class Q-2A Securities) reduced by all prior payments, if any, made with respect to the principal of the Class Q-2A Securities (or of such specified Class Q-2A Securities) and (e) when used with respect to the Class Q-2B Securities (or any specified Class Q-2B Securities), the original principal amount of the Class Q-2B Securities (or of such specified Class Q-2B Securities).

"Aggregate Reference Obligation Calculation Amount":  The meaning specified in the Swap Agreement.

"Aggregate Reference Value":  The meaning specified in the Swap Agreement.

"Amendment Buy-Out":  The meaning specified in Section 9.6(a).

"Amendment Buy-Out Option":  The meaning specified in Section 9.6(a).

"Amendment Buy-Out Purchase Price":  The purchase price payable by the Amendment Buy-Out Purchaser for Securities purchased in an Amendment Buy-Out, if any, in an amount equal to (i) in the case of the Senior Notes, the Aggregate Principal Amount thereof, plus accrued interest (including Deferred Interest, if any) to the date of purchase which is not otherwise paid or payable to the Non-consenting Holder, plus any unpaid Extension Bonus Payment, plus, in the case of the Class C-2 Notes, the applicable Make-whole Premium, (ii) in the case of the Income Notes, an amount that, together with any amounts paid to the Non-consenting Holder with respect to those Income Notes from the Closing Date to and including the purchase date (and any amounts payable, if any, to the Non-consenting Holder on the next succeeding Payment Date) shall result in an internal rate of return with respect to those Income Notes of 18% per annum, provided, however, that in any Amendment Buy-Out from and after the date on which the Non-consenting Holders of Income Notes have received an internal rate of return equal to or in excess of 18% per annum, the purchase price for Income Notes shall be zero and (iii) in the case of the Class Q-1 Securities, based on the respective purchase prices for the relevant Class Q-1 Senior Note Component and the Class Q-1 Income Note Component thereof.

"Amendment Buy-Out Purchaser":  Citigroup Global Markets Inc. ("CGMI"), or an Affiliate thereof designated by the Swap Counterparty, or a Person designated by CGMI or such Affiliate.

"Applicable Procedures":  The procedures of the Depositary, Euroclear and Clearstream applicable to the exchange or transfer of an interest in the Global Notes.

"Articles":  The Articles of Association and the Memorandum of Association of the Issuer, as each may be amended and restated from time to time.

"Authorized Class Q-1 Denomination": The meaning specified in Section 2.16(b).

"Authorized Denomination":  The meaning specified in Section 2.3(d) hereof.

"Authorized Newspaper":  A major newspaper in the official language of the country of publication customarily published at least once a day for at least five days in each calendar week.

"Authorized Officer":  With respect to the Issuer or the Co-Issuer, any director or officer thereof or of any other Person who is authorized, by power-of-attorney or otherwise, to act for the Issuer or Co-Issuer, as the case may be, in matters relating to the Issuer or Co-Issuer, as the case may be.

"Bankruptcy Law":  Title 11 of the United States Code (11 U.S.C. §§ 101 et seq.), as amended, any successor statute thereto, any federal or state bankruptcy, insolvency,

reorganization or similar law, or any bankruptcy, insolvency, reorganization or similar law enacted under the laws of the Cayman Islands or of any other applicable jurisdiction.

"Base Amount":  The meaning specified in the Swap Agreement.

"Basic Documents":  The Indenture, the Swap Agreement, the Collateral Administration Agreement and the Investment Agreement.

"Benefit Plan Investor": (i) An employee benefit plan as defined in Section 3(3) of ERISA, whether or not such plan is subject to Title I of ERISA, (ii) a plan described in Section 4975(e)(1) of the Code, whether or not subject to Section 4975 of the Code, or (iii) an entity whose underlying assets include "plan assets" by reason of U.S. Department of Labor regulation Section 2510.3-101 or otherwise.

"Book-Entry Securities":  The meaning specified in Section 2.5(a).

"Business Day":  Any day that is not a Saturday, Sunday or other day on which commercial banking institutions in New York, New York, Cayman Islands, Dublin, Ireland or the city in which the Corporate Trust Office of the Trustee is located, are authorized or obligated by law or executive order to be closed.

"Cede":  Cede & Co.

"Certificate of Authentication":  The meaning specified in Section 2.1.

"Certificated Class Q-1 Securities":  The meaning specified in Section 2.16(b).

"Certificated Class Q-2 Security": The meaning specified in Section 2.17(b).

"Certificated Class Q-2B Security":  The meaning specified in Section 2.17(b).

"Certificated Income Note": The meaning specified in Section 2.2(c).

"CGMHI Notes":  U.S. $ 40,000,000 0% EMTNs Due 2034 issued by Citigroup Global Markets Holdings Inc. constituting the Class Q-2 Collateral Asset B.

"Class":  When referring to the Notes, Class A-1 Notes, Class A-2 Notes, Class B Notes, Class C-1 Notes, Class C-2 Notes and/or Income Notes, as appropriate. When referring to the Class Q Securities, the Class Q-1 Securities, the Class Q-2A Securities and/or the Class Q-2B Securities, as appropriate.  When referring to the Securities, any Class of Notes or Class Q Securities, as appropriate.

"Class A Interest Coverage Ratio":  With respect to a Measurement Date, (a) the greater of (i) zero and (ii) Net Interest Coverage Proceeds for such date, divided by (b) the sum of the Class A-1 Interest Amount and the Class A-2 Interest Amount for the next following Payment Date.

"Class A Interest Coverage Test": A test which will be deemed satisfied as of any Measurement Date on which any of the Class A-1 Notes or Class A-2 Notes are Outstanding if the Class A Interest Coverage Ratio for such date equals or exceeds 110%.

"Class A OC Test": A test which will be deemed satisfied as of any Measurement Date on which any of the Class A-1 Notes or Class A-2 Notes are Outstanding if the Class A Overcollateralization Ratio for such date equals or exceeds 157%.

"Class A Overcollateralization Ratio": With respect to a Measurement Date, the quotient obtained by dividing (a) the OC Base Amount as of such date by (b) the sum of (x) the Aggregate Principal Amount of the Class A-1 Notes and (y) the Aggregate Principal Amount of the Class A-2 Notes as of such date.

"Class A-1 Interest Amount" With respect to a Payment Date, (a) the product of (i) the Aggregate Principal Amount of the Class A-1 Notes as of the beginning of the relevant Periodic Interest Accrual Period plus the amount of any unpaid Class A-1 Interest Amount after the prior Payment Date, (ii) the Class A-1 Interest Rate for such period, (iii) the actual number of days in such period and (iv) 1/360 plus (b) the amount of any unpaid Class A-1 Interest Amount after the prior Payment Date.

"Class A-1 Interest Rate": The interest rate specified for the Class A-1 Notes in Section 2.3(c).

"Class A-1 Notes": The meaning specified in Section 2.3(b).

"Class A-2 Interest Amount" With respect to a Payment Date, (a) the product of (i) the Aggregate Principal Amount of the Class A-2 Notes as of the beginning of the relevant Periodic Interest Accrual Period plus the amount of any unpaid Class A-2 Interest Amount after the prior Payment Date, (ii) the Class A-2 Interest Rate for such period, (iii) the actual number of days in such period and (iv) 1/360 plus (b) the amount of any unpaid Class A-2 Interest Amount after the prior Payment Date.

"Class A-2 Interest Rate": The interest rate specified for the Class A-2 Notes in Section 2.3(c).

"Class A-2 Notes": The meaning specified in Section 2.3(b).

"Class B Interest Amount": With respect to a Payment Date, the product of (i) the Aggregate Principal Amount of the Class B Notes as of the beginning of the relevant Periodic Interest Accrual Period plus the aggregate Deferred Interest with respect to the Class B Notes after the preceding Payment Date, (ii) the Class B Interest Rate for such period, (iii) the actual number of days in such period and (iv) 1/360.

"Class B Interest Coverage Ratio": With respect to a Measurement Date, (a) the greater of (i) zero and (ii) Net Interest Coverage Proceeds for such date, divided by (b) the sum of the Class A-1 Interest Amount, the Class A-2 Interest Amount and the Class B Interest Amount for the next following Payment Date.

A-5

"Class B Interest Coverage Test": A test which will be deemed satisfied as of any Measurement Date on which any of the Class A-1 Notes, Class A-2 Notes or Class B Notes are Outstanding if the Class B Interest Coverage Ratio for such date equals or exceeds 105%.

"Class B Interest Rate": The interest rate specified for the Class B Notes in Section 2.3(c).

"Class B Notes": The meaning specified in Section 2.3(b).

"Class B OC Test": A test which will be deemed satisfied as of any Measurement Date on which any Class A-1 Notes, Class A-2 Notes or Class B Notes are Outstanding if the Class B Overcollateralization Ratio for such date equals or exceeds 133%.

"Class B Overcollateralization Ratio": With respect to a Measurement Date, the quotient obtained by dividing (a) the OC Base Amount as of such date by (b) the sum of the Aggregate Principal Amounts of the Class A-1 Notes, the Class A-2 Notes and the Class B Notes (together with any Deferred Interest with respect to the Class B Notes) as of such date.

"Class C Interest Coverage Ratio": With respect to a Measurement Date, (a) the greater of (i) zero and (ii) the Net Interest Coverage Proceeds for such date, divided by (b) the sum of the Class A-1 Interest Amount, the Class A-2 Interest Amount, the Class B Interest Amount, the Class C-1 Interest Amount and the Class C-2 Interest Amount for the next following Payment Date.

"Class C Interest Coverage Test": A test which will be deemed satisfied as of any Measurement Date on which any of the Class A-1 Notes, Class A-2 Notes, Class B Notes, Class C-1 Notes or Class C-2 Notes are Outstanding if the Class C Interest Coverage Ratio for such date equals or exceeds 100%.

"Class C OC Test": A test which will be deemed satisfied as of any Measurement Date on which any Class A-1 Notes, Class A-2 Notes, Class B Notes, Class C-1 Notes or Class C-2 Notes are Outstanding if the Class C Overcollateralization Ratio for such date equals or exceeds 116%.

"Class C Overcollateralization Ratio": With respect to a Measurement Date, the quotient obtained by dividing (a) the OC Base Amount as of such date by (b) the sum of the Aggregate Principal Amounts of the Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C-1 Notes and the Class C-2 Notes (together with any Deferred Interest with respect to the Class B Notes and the Class C Notes) as of such date.

"Class C Notes": The Class C-1 Notes and the Class C-2 Notes, collectively.

"Class C-1 Interest Amount": With respect to a Payment Date, the product of (i) the Aggregate Principal Amount of the Class C-1 Notes as of the beginning of the relevant Periodic Interest Accrual Period plus the aggregate Deferred Interest with respect to the Class C-1 Notes after the preceding Payment Date, (ii) the Class C-1 Interest Rate for such period, (iii) the actual number of days in such period and (iv) 1/360.

A-6

"Class C-1 Interest Rate":  The interest rate specified for the Class C-1 Notes in Section 2.3(c).

"Class C-1 Notes":  The meaning specified in Section 2.3(b).

"Class C-2 Interest Amount":  With respect to a Payment Date, interest accrued for the relevant Periodic Interest Accrual Period on an amount equal to the Aggregate Principal Amount of the Class C-2 Notes as of the beginning of the relevant Periodic Interest Accrual Period plus the aggregate Deferred Interest with respect to the Class C-2 Notes after the preceding Payment Date, at a rate equal to the Class C-2 Interest Rate for such period, calculated on the basis of a 360-day year consisting of twelve 30-day months.

"Class C-2 Interest Rate":  The interest rate specified for the Class C-2 Notes in Section 2.3(c).

"Class C-2 Notes":  The meaning specified in Section 2.3(b).

"Class Q-1 Excess Distribution":  For any Payment Date, an amount equal to the excess, if any, of any amounts paid or distributed with respect to the Class Q-1 Securities over the amount of Q-1 Nominal Interest for the related Periodic Interest Accrual Period.

"Class Q-1 Income Note Component": The U.S. $5,000,000 Aggregate Principal Amount of Income Notes comprising the Income Note Component of the Class Q-1 Securities.

"Class Q-1 Nominal Interest":  For a Periodic Interest Accrual Period, interest accrued on the Class Q-1 Nominal Principal for such period at the Class Q-1 Nominal Rate calculated on the basis of a 360-day year consisting of twelve 30-day months.

"Class Q-1 Nominal Principal":  For the first Periodic Interest Accrual Period, $10,000,000, and for any Periodic Interest Accrual Period thereafter, the Class Q-1 Nominal Principal for the prior Periodic Interest Accrual Period minus the amount of the Class Q-1 Excess Distribution, if any, for the Payment Date occurring at the beginning of such current Periodic Interest Accrual Period, but in no event shall the Class Q-1 Nominal Principal be less than $1,000.

"Class Q-1 Nominal Rate":  2.00% per annum.

"Class Q-1 Rated Principal":  For the first Periodic Interest Accrual Period, $10,000,000, and for any Periodic Interest Accrual Period thereafter, the Class Q-1 Rated Principal for the prior Periodic Interest Accrual Period minus any amount paid or distributed with respect to the Class Q-1 Securities for the Payment Date occurring at the beginning of such current Periodic Interest Accrual Period, but in no event shall the Class Q-1 Rated Principal be less than $1.

"Class Q-1 Reg S Global Security":  The meaning specified in Section 2.16(b).

"Class Q-1 Securities":  The U.S.$ 10,000,000 Class Q-1 Extendable Securities comprised of the Class Q-1 Senior Note Component and the Class Q-1 Income Note Component.

A-7

"Class Q-1 Senior Note Component": The U.S. $5,000,000 initial Aggregate Principal Amount of Class C-2 Notes comprising the Senior Note Component of the Class Q-1 Securities.

"Class Q-1 Temp Reg S Global Security": The meaning specified in Section 2.16(b).

"Class Q-2 Administrative Expenses": Any Administrative Expenses accrued while any Class Q-2 Securities remain Outstanding but after the redemption in full of all Senior Notes, Class Q-1 Securities and Income Notes and liquidation and distribution of the Trust Estate.

"Class Q-2 Collateral Asset A": U.S.$ 25,000,000 Aggregate Principal Amount of Income Notes Delivered to the Class Q-2 Securities Collateral Account on the Closing Date.

"Class Q-2 Collateral Asset A Proceeds": With respect to any Payment Date, the sum of (i) all amounts distributed with respect to the Income Notes represented by the Class Q-2 Collateral Asset A for such date and (ii) any amounts received by the Trustee with respect to the sale or redemption of the Class Q-2 Collateral Asset A hereunder, in each case from and after the preceding Payment Date and on or prior to such date.

"Class Q-2 Collateral Asset B": U.S. $ 40,000,000 0% EMTNs Due 2034 issued by Citigroup Global Markets Holdings Inc. ("CGMHI Notes") Delivered to the Class Q-2 Securities Collateral Account on the Closing Date, and any conversion or exchange proceeds thereof.

"Class Q-2 Collateral Asset B Proceeds": Any sales proceeds, conversion or exchange proceeds or maturity proceeds of the Class Q-2 Collateral Asset B.

"Class Q-2 Collateral Assets": Collectively, the Class Q-2 Collateral Asset A and the Class Q-2 Collateral Asset B.

"Class Q-2 Gross Proceeds": As defined in the definition of "Class Q-2 Payment Date Proceeds."

"Class Q-2 Maturity Date": April 28, 2034.

"Class Q-2 Maturity Date Priority of Payments": The meaning specified in Section 2.17(d)(iii).

"Class Q-2 Payment Date Priority of Payments": The meaning specified in Section 2.17(d)(i).

"Class Q-2 Payment Date Proceeds": With respect to any Payment Date, (i) the sum of (a) the Class Q-2 Collateral Asset A Proceeds for such Payment Date and (b) interest and dividends received with respect to Eligible Investments on deposit in the Class Q-2 Securities Collateral Account (collectively, "Class Q-2 Gross Proceeds") minus (ii) the Class Q-2B Target Amount for such Payment Date.

A-8

"Class Q-2 Priority of Payments": Collectively, the payment priorities set forth in Section 2.17(d).

"Class Q-2 Requisite Securityholders": The Holders of at least 66 2/3% of the Aggregate Principal Amount of (a) the Class Q-2A Securities so long as any Class Q-2A Securities are Outstanding, and (b) thereafter the Class Q-2B Securities.

"Class Q-2 Securities": The Class Q-2A Securities and the Class Q-2B Securities, collectively.

"Class Q-2 Securities Collateral": Collectively, (i) Class Q-2 Collateral Asset A, (ii) Class Q-2 Collateral Asset B, (iii) the portion of the Trust Estate that in accordance with the provisions in this Indenture is required to be applied to payment of the Income Notes represented by the Class Q-2 Collateral Asset A, at any time on and after such property is required to be applied to the payment of the Income Notes represented thereby, (iv) the Class Q-2 Securities Collateral Account, any subaccounts thereof and all financial assets credited to, and amounts on deposit or credit balances carried in, the Class Q-2 Securities Collateral Account from time to time, (v) all Eligible Investments purchased with funds on deposit in the Class Q-2 Securities Collateral Account and all income and other proceeds from the investment of funds therein; and (vi) all proceeds, accessions, profits, income, benefits, substitutions and replacements, whether voluntary or involuntary, of and to any of the property described in the preceding clauses.

"Class Q-2 Securities Collateral Account": The meaning specified in Section 2.17(c).

"Class Q-2A Coverage Ratio": With respect to any date of determination, the quotient obtained by dividing (a) the market value of Class Q-2 Collateral Asset A as of such date by (b) sum of the Aggregate Principal Amount of the Class Q-2A Securities plus Class Q-2A Deferred Interest, if any, as of such date.

"Class Q-2A Coverage Test": A test which will be deemed satisfied as of any date of determination on which any Class Q-2A Securities are Outstanding, if the Class Q-2A Coverage Ratio for such date equals or exceeds 2.25.

"Class Q-2A Deferred Interest": The meaning specified in Section 2.17(c)(i).

"Class Q-2A Interest Amount": With respect to a Payment Date, the product of (i) the Aggregate Principal Amount of the Class Q-2A Securities as of the beginning of the relevant Periodic Interest Accrual Period, plus the aggregate Class Q-2 Deferred Interest after the preceding Payment Date, (ii) the Class Q-2A Interest Rate for such period, (iii) the actual number of days in such period and (iv) 1/360.

"Class Q-2A Interest Rate": The meaning specified in Section 2.17(c).

"Class Q-2A Securities": The U.S.$7,200,000 Class Q-2A Securities Due 2034.

"Class Q-2B Securities": The U.S.$40,000,000 Class Q-2B Securities Due 2034.

A-9

"Class Q-2B Target Amount":  With respect to any Payment Date, an amount equal to the lesser of (i) the Class Q-2 Gross Proceeds for such date and (ii) the product of (a) the Aggregate Principal Amount of the Class Q-2B Securities and (b) 1% per annum for the related Periodic Interest Accrual Period, calculated on the basis of a 360-day year consisting of twelve 30-day months.

"Clearance Systems":  Euroclear and Clearstream.

"Clearing Corporation":  (i) Clearstream, (ii) DTC, (iii) Euroclear and (iv) any entity included within the meaning of "clearing corporation" under the UCC.

"Clearing Corporation Security":  An Eligible Investment that is a Financial Asset that is (i) in bearer form or (ii) registered in the name of a Clearing Corporation or the nominee of such Clearing Corporation and, if a Certificated Security, is held in the custody of such Clearing Corporation.

"Clearstream":  Clearstream Banking, société anonyme, a corporation organized under the laws of the Grand Duchy of Luxembourg, or any successor thereto.

"Closing Date": August 18, 2004.

"Code":  The U.S. Internal Revenue Code of 1986, as amended, and any successor statute thereto.

"Co-Issuer":  Valhalla CLO, Inc., a Delaware corporation.

"Collateral": The Trust Estate.

"Collateral Account":  The account created and designated as the "Valhalla CLO, Ltd. – Collateral Account" under Section 8.3.

"Collateral Administration Agreement":  The collateral administration agreement, dated as of the Closing Date, among the Issuer, the Collateral Administrator, the Swap Counterparty and the Reference Portfolio Manager.

"Collateral Administrator":  JPMorgan Chase Bank, as collateral administrator under the Collateral Administration Agreement and its permitted successors.

"Collateral Administrator Expenses":  With respect to any Payment Date (including the Maturity Date), an amount equal to the sum of all amounts incurred by or otherwise owing to the Collateral Administrator in the related Collection Period in accordance with the Collateral Administration Agreement other than the Collateral Administrator Fee.

"Collateral Administrator Fee":  With respect to any Payment Date (including the Maturity Date), the amount set forth in or determined pursuant to the Collateral Administration Agreement.

"Collection Account": The account created and designated as the "Valhalla CLO, Ltd. – Collection Account" under Section 8.2(a).

"Collection Period": The meaning specified in the Swap Agreement.

"Commission": The United States Securities and Exchange Commission.

"Components": The Class Q-1 Senior Note Component and the Class Q-1 Income Note Component.

"Controlling Person": A Person (other than a Benefit Plan Investor) that has discretionary authority or control with respect to the assets of the Issuers or that provides investment advice for a fee (direct or indirect) with respect to such assets (or any "affiliate" of such a Person (as defined in Department of Labor regulation Section 2510.3-101(f)(3))).

"Corporate Trust Office": With respect to the Trustee means the principal office of the Trustee at which, at any particular time, its corporate trust business shall be principally administered, which office as of the date of the execution of this Indenture is located at 600 Travis Street, 50th Floor, Houston, Texas 77002, Attention: Institutional Trust Services – Valhalla CLO, Ltd., telephone number (713) 216-4181, or at such other address as the Trustee may designate in writing from time to time by notice to the Holders of Notes, the Swap Counterparty, the Issuer and the Investment Agreement Counterparty, or the principal office of any successor Trustee (the address of which the successor Trustee will notify the Holders of Notes, the Swap Counterparty, the Issuer and the Investment Agreement Counterparty in writing).

"Coverage Tests": The Interest Coverage Tests and the Overcollateralization Tests.

"Credit Event": The meaning specified in the Swap Agreement.

"Default": Any event or condition the occurrence or existence of which would, with the giving of notice or lapse of time or both, become an Event of Default.

"Default Adjustment": (a) On any date of determination with respect to any Defaulted Reference Obligation or any Deferring PIK Obligation that has been a Defaulted Reference Obligation or Deferring PIK Obligation, as applicable, for no more than one month as of such date of determination: (1) the Reference Value of such Defaulted Reference Obligation or Deferring PIK Obligation, minus (2) the product of (x) the lesser of (i) the Moody's Recovery Rate for such Defaulted Reference Obligation or Deferring PIK Obligation (or such lower recovery rate that the Reference Portfolio Manager determines is appropriate during such month) and (ii) the S&P Recovery Rate for such Defaulted Reference Obligation or Deferring PIK Obligation and (y) the Reference Obligation Calculation Amount of such Defaulted Reference Obligation or Deferring PIK Obligation. On any date of determination with respect to any Defaulted Reference Obligation or Deferring PIK Obligation that has been a Defaulted Reference Obligation or Deferring PIK Obligation for longer than one month but less than three years as of such date of determination: (1) the Reference Value of such Defaulted Reference Obligation or Deferring PIK Obligation minus (2) the lesser of (A) the Market Value of such

A-11

Defaulted Reference Obligation or Deferring PIK Obligation, as determined by the Reference Portfolio Manager and (B) the product of (x) the lesser of (i) the Moody's Recovery Rate for such Defaulted Reference Obligation or Deferring PIK Obligation and (ii) the S&P Recovery Rate for such Defaulted Reference Obligation or Deferring PIK Obligation and (y) the Reference Obligation Calculation Amount of such Defaulted Reference Obligation or Deferring PIK Obligation. On any date of determination with respect to any Defaulted Reference Obligation or Deferring PIK Obligation that has been a Defaulted Reference Obligation or Deferring PIK Obligation for three years or more as of such date of determination, the Reference Value thereof;

(b) To the extent a Defaulted Reference Obligation or Deferring PIK Obligation is converted or exchanged into an Equity Security, for so long as such Equity Security remains part of the Reference Portfolio, the Default Adjustment shall equal the applicable Reference Value; and

(c) In no event will the Default Adjustment be less than zero.

"Defaulted Reference Obligation": The meaning specified in the Swap Agreement.

"Deferred Interest": The amount of any interest that is not paid on the Class B Notes, Class C-1 Notes or Class C-2 Notes as a result of insufficient funds in accordance with the Priority of Payments.

"Deferring PIK Obligation": (i) Any Reference Obligation (other than a Structured Finance Obligation) that is a PIK Obligation in respect of which interest has been deferred or capitalized (and not subsequently paid) and (ii) any Reference Obligation that is a Structured Finance Obligation and a PIK Obligation (a) rated "Baa3" or higher by Moody's, in respect of which interest has been deferred or capitalized for at least two or more full interest periods or one year, whichever is less (and not subsequently paid) or (b) rated lower than "Baa3" by Moody's, in respect of which interest has been deferred or capitalized for one or more full interest periods or six months, whichever is less (and not subsequently paid).

"Deliver", "Delivered" or "Delivery": When used with respect to the Trust Estate or the Class Q-2 Securities Collateral means the taking of the following steps by the Issuer:

(a) in the case of each Certificated Security or Instrument (other than a Clearing Corporation Security or an Instrument referred to in clause (g) below), (A) causing the delivery of such Certificated Security or Instrument to the Securities Intermediary registered in the name of the Securities Intermediary or its affiliated nominee or endorsed to the Securities Intermediary or in blank, (B) causing the Securities Intermediary to continuously identify on its books and records that such Certificated Security or Instrument is credited to the relevant Trust Account or Class Q-2 Securities Collateral Account, as applicable, and (C) causing the Securities Intermediary to maintain continuous possession of such Certificated Security or Instrument;

(b) in the case of each Uncertificated Security (other than a Clearing Corporation Security), (A) causing such Uncertificated Security to be continuously registered on the books of the obligor thereof to the Securities Intermediary and (B)

causing the Securities Intermediary to continuously identify on its books and records that such Uncertificated Security is credited to the relevant Trust Account or Class Q-2 Securities Collateral Account, as applicable;

(c)     in the case of each Clearing Corporation Security, causing (A) the relevant Clearing Corporation to continuously credit such Clearing Corporation Security to the securities account of the Securities Intermediary at such Clearing Corporation and (B) the Securities Intermediary to continuously identify on its books and records that such Clearing Corporation Security is credited to the relevant Trust Account or Class Q-2 Securities Collateral Account, as applicable;

(d)     in the case of any Financial Asset that is maintained in book-entry form on the records of a FRB, causing (A) the continuous crediting of such Financial Asset to a securities account of the Securities Intermediary at any FRB and (B) the Securities Intermediary to continuously identify on its books and records that such Financial Asset is credited to the relevant Trust Account or Class Q-2 Securities Collateral Account, as applicable;

(e)     in the case of each Financial Asset not covered by the foregoing clauses (a) through (d), causing the transfer of such Financial Asset to the Securities Intermediary in accordance with applicable law and regulation and causing the Securities Intermediary to continuously credit such Financial Asset to the relevant Trust Account or Class Q-2 Securities Collateral Account, as applicable;

(f)     in the case of each general intangible (including any participation interest that is not, or the debt underlying which is not, evidenced by an Instrument or Certificated Security), notifying the obligor thereunder of the Grant to the Trustee (unless no applicable law requires such notice);

(g)     in the case of each participation interest in a loan as to which the underlying debt is represented by an Instrument, obtaining the acknowledgment of the Person in possession of such Instrument (which may not be the Issuer) that it holds the Issuer's interest in such Instrument solely on behalf and for the benefit of the Trustee;

(h)     in the case of any "deposit account" as defined in Article 9 of the UCC, causing the institution with which such deposit account is maintained to maintain such deposit account in accordance with the Account Agreement; and

(i)     in the case of any "securities account" causing the institution with which such securities account is maintained to maintain such securities account in accordance with the Account Agreement.

"Depositary":  The Depository Trust Company, its nominees and their respective successors, including any depository selected pursuant to Section 2.5.

"Determination Date":  With respect to a Payment Date, the eighth Business Day preceding such Payment Date; provided that the final Determination Date will be the last day of the final Collection Period.

"Diversion Test": A test which will be deemed satisfied as of any Determination Date related to any Payment Date following the Ramp-up End Date, if the Class C OC Test is satisfied as of such date, measured for this purpose as of the applicable Determination Date without giving effect to any payments made on the related Payment Date (including those made pursuant to any clause of the Priority of Payments ranking prior to the clause that provides for payments if the Diversion Test is not satisfied).

"Dollar" or "U.S. $" or "$":  a dollar of the United States of America.

"DTC":  The Depository Trust Company or its successor.

"Eligible Account":  Either (a) a domestic segregated account with an Eligible Institution or (b) a domestic segregated trust account with the corporate trust department of a depository institution organized under the laws of the United States of America or any one of the states thereof or the District of Columbia (or any domestic branch of a foreign bank), having corporate trust powers and acting as trustee for funds deposited in such account, so long as any of the securities of such depository institution shall have a credit rating from a nationally recognized statistical rating organization in one of its generic rating categories which signifies investment grade (e.g., in the case of S&P, "BBB-" or higher).

"Eligible Institution":  A depository institution organized under the laws of the United States of America or any one of the states thereof or the District of Columbia (or any domestic branch of a foreign bank), including the Trustee, (i) which has either (A) a long-term unsecured debt rating of "AA-," "Aa3" or its equivalent from a nationally recognized statistical rating organization or (B) a certificate of deposit rating of at least "A-1," "P-1" or its equivalent from a nationally recognized statistical rating organization or any other long-term, short-term or certificate of deposit rating acceptable to the Requisite Noteholders and the Swap Counterparty, (ii) whose deposits are insured by the Federal Deposit Insurance Corporation and (iii) whose combined capital and surplus is at least U.S. $200,000,000.

"Eligible Investments":  Any U.S. Dollar-denominated investment (other than obligations of the Swap Counterparty or any of its Affiliates) that is one or more of the following (and may include investments for which the Swap Counterparty, the Trustee and/or their respective Affiliates provide services but may not include investments for which the Reference Portfolio Manager provides services):

(a)  cash;

(b)  direct registered obligations of, and registered obligations the timely payment of principal and interest on which is fully and expressly guaranteed by, the United States or any agency or instrumentality of the United States the obligations of which are expressly backed by the full faith and credit of the United States, which in each case are not zero coupon securities;

(c)  demand and time deposits in, trust accounts, certificates of deposit payable within 91 days of issuance of, bankers' acceptances payable within 91 days of issuance issued by, or Federal funds sold by any depositary institution or trust company incorporated under the laws of the United States or any state thereof and subject to supervision and examination by Federal and/or state banking authorities so long as the commercial paper and/or the debt

obligations of such depository institution or trust company (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company), at the time of such investment or contractual commitment providing for such investment and throughout the term of the investment, have a credit rating of not less than "Aaa" by Moody's and "AAA" by Standard & Poor's and in each case are not on watch for downgrade, or "P-1" by Moody's and "A-1+" by Standard & Poor's in the case of commercial paper and short-term debt obligations; provided that in any case, the issuer thereof must have at the time of such investment a long-term credit rating of not less than "AA-" by Standard & Poor's and "Aa3" by Moody's and a short-term rating of "A-1+" by Standard & Poor's and "P-1" by Moody's, and if so rated, is not on watch for downgrade;

(d) commercial paper or other short-term obligations with a maturity of not more than 91 days from the date of issuance and having at the time of such investment a credit rating of at least "P-1" by Moody's and "A-1+" by Standard & Poor's, provided, that, in any case, the issuer thereof must have at the time of such investment a long-term credit rating of not less than "Aa2" by Moody's, and if so rated, such rating is not on watch for downgrade.

(e) unleveraged repurchase obligations with respect to any security described in clause (b) above entered into with a U.S. federal or state depository institution or trust company (acting as principal) described in clause (c) above or entered into with a corporation (acting as principal) whose long-term credit rating is not less than "Aaa" by Moody's and "AAA" by Standard & Poor's and in each case are not on watch for downgrade or whose short-term credit rating is "P-1" by Moody's and "A-1+" by Standard & Poor's at the time of such investment and throughout the term of the investment; provided, that, if such repurchase obligation has a maturity of longer than 91 days, the counterparty thereto must also have at the time of such investment and throughout the term of the investment a long-term credit rating of not less than "Aa2" by Moody's and "AAA" by Standard & Poor's, and if so rated, such rating is not on watch for downgrade;

(f) any money market fund or similar investment vehicle having at the time of investment therein and throughout the term of the investment a credit rating of "MR1+" by Moody's and "AAAm" by Standard & Poor's; including any fund for which the Trustee or an Affiliate of the Trustee serves as an investment advisor, administrator, shareholder servicing agent, custodian or subcustodian, notwithstanding that (A) the Trustee or an Affiliate of the Trustee charges and collects fees and expenses from such funds for services rendered (provided that such charges, fees and expenses are on terms consistent with terms negotiated at arm's length) and (B) the Trustee charges and collects fees and expenses for services rendered, pursuant to this Indenture;

(g) a guaranteed reinvestment agreement from a bank (if treated as a deposit by such bank), insurance company or other corporation or entity organized under the laws of the United States or any state thereof (if treated as debt by such insurance company or other corporation or entity), providing for periodic payments thereunder during each Collection Period; provided that each such agreement provides that it is terminable by the purchaser, without premium or penalty, in the event that the rating assigned to such agreement by either Moody's or Standard & Poor's is at any time lower than the then current ratings assigned to any Class of Senior Notes; provided, further, that, at the time of investment therein and throughout the term of

the investment, the issuer of such agreement has a senior unsecured long-term debt rating, issuer rating or counterparty rating of at least "Aaa" by Moody's, a short-term debt rating of "P-1" by Moody's (and not on watch for downgrade), a short-term debt rating of at least "A-1+" by Standard & Poor's and a long-term debt rating of at least "AAA" by Standard & Poor's (and not on watch for downgrade);

(h) the Investment Agreement (together with the Investment Agreement Guaranty or any other guaranty in respect thereof); and

(i) such other investments for which Rating Confirmation has been received;

*provided* that the Eligible Investments in the Collateral Account (except the Investment Agreement) shall be required to mature on or before the Business Day prior to the next Payment Date, and Eligible Investments in the Collection Account shall be required to mature on or before the Business Day prior to the next Payment Date; provided, further that each Eligible Investment must bear a stated rate of interest and any floating rate of interest must reset on or prior to the next Payment Date of the Notes; provided, further that each Eligible Investment provides, at the time of purchase, solely for payments that will not be subject to withholding tax unless the issuer or obligor (and the guarantor, if any) of the security or obligation is required to make "gross-up" payments that cover the full amount of any such withholding tax (or return the invested amount at par); provided, further that ownership of such Eligible Investments will not subject the Issuer or Co-Issuer to net income tax in any jurisdiction where it would not otherwise be subject to tax; provided, further that Eligible Investments may not include (a) any interest-only security, any security purchased at a price in excess of 100% of the par value thereof, any security the repayment of which is subject to substantial non-credit related risk as determined in the business judgment of the Swap Counterparty (or the Reference Portfolio Manager on its behalf) or any security that has a rating assigned by S&P that contains an "r", "t", "p", "pi" or "q" subscript, (b) any floating rate security the interest rate with respect to which is inversely or otherwise not proportionately related to an interest rate index or is calculated as other than the sum of an interest rate index plus a spread or (c) any security subject to a tender offer, voluntary redemption, exchange offer, conversion or other similar action.

"Equity Security": The meaning specified in the Swap Agreement.

"ERISA": The U.S. Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto.

"ERISA Restricted Notes": The Income Notes, the Class Q-1 Securities and the Class Q-2B Securities.

"Euroclear": Euroclear Bank S.A./N.V., as operator of the Euroclear System, or any successor thereto.

"Event of Default": The meaning specified in Section 5.1.

"Exchange Act": The U.S. Securities Exchange Act of 1934, as amended.

"<u>Exchange Date</u>": The first Business Day following the 40th day after the later of the Closing Date and the commencement of the offering of the Notes.

"<u>Excluded Property</u>": Collectively, $1,000 the Issuer received in connection with the issuance of the Ordinary Shares of the Issuer and $1,000 the Issuer received as a fee for issuing the Securities, and the income thereon and the bank account in which such monies are held.

"<u>Expense Cap Amount</u>": With respect to any Payment Date, an amount not to exceed: (a) with respect to Administrative Expenses specified in clause (v)(F) of the definition of "Administrative Expenses" herein, U.S. $50,000 per annum (pro rated for the related Periodic Interest Accrual Period), minus the amount of Administrative Expenses specified in clause (v)(F) paid during the Periodic Interest Accrual Period immediately preceding such Payment Date and (b) with respect to all other Administrative Expenses in the aggregate, 0.04% of the Swap Notional Amount <u>plus</u> $150,000 per annum (pro rated for the related Periodic Interest Accrual Period), minus the amount of Administrative Expenses (other than those specified in clause (v)(F) thereof) paid during the Periodic Interest Accrual Period immediately preceding such Payment Date.

"<u>Expense Reserve Account</u>": The account created and designated as the "Valhalla CLO, Ltd. – Expense Reserve Account" under Section 8.2(e).

"<u>Extension Bonus Eligibility Certification</u>": With respect to a Maturity Extension and each beneficial owner of Senior Notes (including in the form of the Class Q-1 Senior Note Component) other than Extension Sale Securities, the written certification by such beneficial owner acceptable to the Trustee to the effect that it held Senior Notes (including in the form of the Class Q-1 Senior Note Component) other than Extension Sale Securities on the Extension Effective Date, including the Aggregate Principal Amount thereof and wire transfer instructions for the Extension Bonus Payment and any required documentation thereunder.

"<u>Extension Bonus Payment</u>": With respect to a Maturity Extension, a single payment to each applicable beneficial owner set forth in Section 2.15(g) in an amount equal to (1) in the case of the Class A-1 Notes, 0.25% of the Aggregate Principal Amount thereof held by such beneficial owner as of the Extension Effective Date, (2) in the case of the Class A-2 Notes, 0.25% of the Aggregate Principal Amount thereof held by such beneficial owner as of the Extension Effective Date, (3) in the case of the Class B Notes, 0.25% of the Aggregate Principal Amount thereof held by such beneficial owner as of the Extension Effective Date and (4) in the case of the Class C Notes, 0.50% of the Aggregate Principal Amount thereof held by such beneficial owner as of the Extension Effective Date.

"<u>Extension Conditions</u>": The meaning specified in Section 2.15(c).

"<u>Extension Determination Date</u>": The 8th Business Day prior to the Extension Effective Date.

"<u>Extension Effective Date</u>": The Payment Date in August 2009.

"<u>Extension Notice</u>": The meaning specified in Section 2.15(d).

A-17

"Extension Qualifying Purchasers":  One or more qualifying purchasers (which may include the Swap Counterparty or any of its Affiliates acting as principal or agent) designated by the Swap Counterparty (or its Affiliate) to purchase Securities from Holders pursuant to the Extension Conditions set forth in Section 2.15(c).

"Extension Purchase Price":  The purchase price payable by the Extension Qualifying Purchasers for Extension Sale Securities in connection with the Maturity Extension, if any, in an amount equal to (a) in the case of the Senior Notes, the Aggregate Principal Amount thereof, plus accrued and unpaid interest (including Deferred Interest, if any) as of the Extension Effective Date (giving effect to any amounts paid to the Holder on such date), plus, in the case of the Class C-2 Notes, the applicable Make-whole Premium, (b) in the case of the Income Notes, an amount that, together with any amounts paid to the Holders with respect to those Income Notes from the Closing Date to and including the Extension Effective Date, shall result in an internal rate of return with respect to those Income Notes of 18% per annum, provided, however, that if the Extension Effective Date is on or after the date on which such Holders have received an internal rate of return equal to or in excess of 18% per annum, the applicable Extension Purchase Price for Income Notes shall be zero and (c) in the case of the Class Q-1 Securities, an amount determined based on the respective purchase prices for the relevant Class Q-1 Senior Note Component and the Class Q-1 Income Note Component thereof.

"Extension Sale Notice":  The meaning specified in Section 2.15(d)(iii).

"Extension Sale Notice Period":  The meaning specified in Section 2.15(d)(iii).

"Extension Sale Securities": The meaning specified in Section 2.15(b).

"Final Class Q-2B Distribution Amount":  The meaning specified in Section 2.17(iii)(B).

 "Final Income Note Distribution Amount":  The meaning specified in Section 8.6(b)(xix).

"Fixed Amount":  The meaning specified in the Swap Agreement.

"FRB":  Any Federal Reserve Bank.

"Global Notes":  The Regulation S Global Notes, the Rule 144A Global Notes and the Temporary Regulation S Global Notes (and, unless the context otherwise requires, the Class Q-1 Temp Reg S Global Securities and the Class Q-1 Reg S Global Securities).

"Grant":  means to grant, bargain, sell, warrant, alienate, remise, demise, release, convey, assign, transfer, mortgage, pledge, create and grant a security interest in and right of set-off against, deposit, set over and confirm.  A Grant shall include all rights, powers and options (but none of the obligations) of the granting party thereunder, including without limitation the immediate continuing right to claim for, collect and receive principal and interest payments in respect of the subject property, and all other Monies payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to

do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

"Holder": With respect to any Note, Class Q-1 Security or Class Q-2 Security, the Person in whose name such Note or Class Q Security is registered in the Securities Register. "Noteholder" and "Securityholder" will have corresponding meanings.

"Incentive Amount": The meaning specified in the Swap Agreement.

"Income Note Principal Distribution Amount": The meaning specified in Section 8.6(b)(xix).

"Income Notes": The meaning specified in Section 2.3(b).

"Indenture Calculation Agent": The meaning specified in Section 10.3.

"Indenture Tax Event": Either (i) the adoption of, or a change in, any tax statute (including the Code), treaty, regulation (whether temporary or final), rule, ruling, practice, procedure or judicial decision or interpretation which results or will result in withholding tax payments in an amount in excess of 10% of the net income of the Issuer during the Collection Period as a result of the imposition of withholding tax on payments to the Issuer with respect to which the obligors are not required to make gross-up payments that cover the full amount of such withholding taxes on an after-tax basis or (ii) a final determination by the Internal Revenue Service or a court of competent jurisdiction or an opinion of nationally recognized tax counsel experienced in such matters acceptable to the Swap Counterparty and the Reference Portfolio Manager to the effect that the Issuer is or has become subject to taxation in an amount in excess of 10% of the net income of the Issuer during the Collection Period, whether as a result of being deemed to be engaged in the conduct of a trade or business within the United States for U.S. federal income tax purposes or otherwise.

"Independent": As to any Person, any other Person (including, in the case of an accountant, or lawyer, a firm of accountants or lawyers and any member thereof) who (i) does not have and is not committed to acquire any material direct or any material indirect financial interest in such Person or in any Affiliate of such Person, and (ii) is not connected with such Person as an officer, employee, promoter, underwriter, voting trustee, partner, director or Person performing similar functions.

"Independent Accountants": The meaning specified in Section 8.9.

"Indirect Participant": A Person who holds an interest in a Global Note through a Participant.

"Initial Consent Period": The period of 15 Business Days from but excluding the date on which the Trustee mailed (i) a proposed supplemental indenture pursuant to Section 9.2(d) or (ii) a proposed amendment to the Swap Agreement pursuant to Section 7.26(c), as applicable, in either case to the Holders of Securities.

"Initial Purchaser": With respect to the Senior Notes, the Class Q-1 Securities and the Class Q-2A Securities, Citigroup Global Markets Inc. The term "initial purchaser" (lower case) refers to the initial purchasers of the Notes, Class Q-1 Securities and Class Q-2 Securities from the Initial Purchaser or through the Placement Agent, as applicable.

"Initial Reference Obligations": The Reference Obligations included in the Reference Portfolio under the Swap Agreement as of the Closing Date.

"Instrument": The meaning given to such term in the UCC.

"Interest Coverage Ratios": The Class A Interest Coverage Ratio, the Class B Interest Coverage Ratio and the Class C Interest Coverage Ratio.

"Interest Coverage Tests": The Class A Interest Coverage Test, the Class B Interest Coverage Test and the Class C Interest Coverage Test.

"Interest Rate": The Class A-1 Interest Rate, the Class A-2 Interest Rate, the Class B Interest Rate, the Class C-1 Interest Rate and the Class C-2 Interest Rate, as the context requires.

"Investment Agreement": The investment agreement (No. 000441) dated as of the Closing Date among the Investment Agreement Counterparty, the Issuer and the Trustee, as may be amended, supplemented and/or otherwise modified and in effect from time to time in accordance with the terms thereof.

"Investment Agreement Counterparty": From time to time, the "Provider" specified in the Investment Agreement, which initially shall be FSA Capital Management Services LLC, a Delaware limited liability company.

"Investment Agreement Guarantor": From time to time, the "Guarantor," if any, specified in the Investment Agreement, which initially shall be Financial Security Assurance Inc., a New York stock insurance company.

"Investment Agreement Guaranty": From time to time, the "Guaranty" in effect, if any, specified in the Investment Agreement, such instrument initially being the Financial Guaranty Insurance Policy, including Endorsement No. 1 thereto (Policy No. No. 90365-N), dated the Closing Date, issued by the initial Investment Agreement Guarantor.

"Investment Company Act": The U.S. Investment Company Act of 1940, as amended.

"Irish Transfer Agent": The meaning specified in Section 10.2.

"ISDA": The International Swaps and Derivatives Association, Inc.

"Issuer": Valhalla CLO, Ltd., an exempted company incorporated with limited liability under the laws of the Cayman Islands, and its permitted successors and assigns.

"Issuer Order":  A written order signed in the name of the Issuer by any one of its Authorized Officers and delivered to the Trustee.

"Issuers":  The Issuer and the Co-Issuer.  References to "such Issuer," "the applicable Issuer" and the like shall be references to either the Issuer or the Co-Issuer, as the context requires.

"LIBOR":  As determined by the Indenture Calculation Agent with respect to each Periodic Interest Accrual Period other than the first Periodic Interest Accrual Period, the rate for three-month U.S. Dollar deposits in Europe which appears on Telerate Page 3750 (as defined in the Annex to the 2000 ISDA Definitions) as reported by Bloomberg Financial Markets Commodities News, or such page as may replace such Telerate Page 3750, as of 11:00 a.m. (London time) on the related LIBOR Determination Date; provided, that if, on any LIBOR Determination Date, such rate does not appear on Telerate Page 3750, or such page as may replace such Telerate Page 3750, the Indenture Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks to leading banks in the London interbank market for three-month U.S. Dollar deposits in Europe in an amount determined by the Indenture Calculation Agent by reference to requests for quotations as of approximately 11:00 a.m. (London time) on the relevant LIBOR Determination Date.  If, on any LIBOR Determination Date, at least two of the Reference Banks provide such quotations, LIBOR shall equal such arithmetic mean of such quotations.  If, on any LIBOR Determination Date, only one or none of the Reference Banks provides such quotations, LIBOR shall be deemed to be the arithmetic mean of the offered quotations that leading banks in the City of New York selected by the Indenture Calculation Agent are quoting on the relevant LIBOR Determination Date for three-month U.S. Dollar deposits in Europe in an amount determined by the Indenture Calculation Agent by reference to the principal London offices of leading banks in the London interbank market; provided, however, that if the Indenture Calculation Agent is required but is unable to determine a rate in accordance with at least one of the procedures provided above, LIBOR shall be determined by the Indenture Calculation Agent in a commercially reasonable manner.

LIBOR for the Periodic Interest Accrual Period beginning on the Closing Date will be 1.88230% per annum.

"LIBOR Determination Date":  The second London Business Day prior to the commencement of a Periodic Interest Accrual Period.

"Listing Agent":  The meaning specified in Section 7.22.

"London Business Day":  Any Business Day on which commercial banks are open for dealings in deposits in U.S. Dollars in the London interbank market.

 "Make-whole Premium": With respect to the Class C-2 Notes, the premium payable to the Holders of the Class C-2 Notes in connection with (i) an Optional Redemption of such Notes, (ii) the purchase of such Notes that are Extension Sale Securities in connection with the Maturity Extension, if any, or (iii) the purchase of such Notes in connection with an Amendment Buy-Out, as applicable, in each case in an amount equal to the excess, if any, of (x) the present value (discounted to the Optional Redemption Date, Extension Effective Date or date

A-21

of Amendment Buy-Out, as applicable, using the Reinvestment Yield as the discount rate on a semi-annual basis using a 360-day year of twelve 30-day months) of the remaining payments of interest and principal due on the Class C-2 Notes, assuming that the entire outstanding principal amount of the applicable Class C-2 Notes will be paid on the Payment Date occurring in November 2013 and that each intervening payment of interest on the Class C-2 Notes will be made on the related Payment Date in its entirety (and therefore there is no Deferred Interest on the Class C-2 Notes) over (y) the Aggregate Principal Amount of the applicable Class C-2 Notes on the Optional Redemption Date, Extension Effective Date or date of Amendment Buy-Out, as applicable; provided that in no event shall any Make-whole Premium be less than zero.

"Market Value":  The meaning specified in the Swap Agreement.

"Maturity Date":  August 1, 2016, or, in the case of a Maturity Extension pursuant to Section 2.15, August 1, 2020.

"Maturity Extension":  The meaning specified in Section 2.15(a) hereof.

"Measurement Date":  Any of (a) the date of any addition or removal of a Reference Obligation under the Swap Agreement, (b) each Determination Date, (c) each Monthly Report Determination Date and (d) with reasonable prior written notice to the Issuer, the Reference Portfolio Manager and the Trustee, any Business Day that a Rating Agency or the Swap Counterparty requests to be a "Measurement Date;" provided that, if any such date would otherwise fall on a day that is not a Business Day, the relevant Measurement Date will be the immediately following Business Day.

"Money":  The meaning specified in Section 1-201(24) of the UCC.

"Monthly Report":  The meaning specified in Section 8.7.

"Monthly Report Determination Date": The 15th day of each calendar month (other than the month immediately preceding the month in which a Payment Date occurs).

"Moody's":  Moody's Investors Service, Inc. or any successor thereto.

"Moody's Rating":  The meaning specified in the Swap Agreement.

"Moody's Recovery Rate":  The meaning specified in the Swap Agreement.

"Net Class Q-2B Periodic Return Amount":  The meaning specified in Section 2.17(d)(i)(D).

"Net Income Note Periodic Return Amount":  The meaning specified in Section 8.6(a)(xvii).

"Net Interest Coverage Proceeds":  With respect to any Measurement Date, (i) the amount of Payment Date Proceeds for the next following Payment Date plus (ii) the sum of the Subordinate Amount and the Incentive Amount, if any, for such Payment Date minus (iii) the amounts payable under Sections 8.6(a)(i) and (ii) for such Payment Date.  For purposes of

calculating Net Interest Coverage Proceeds on a Measurement Date other than a Determination Date, the amounts described above will be determined assuming that the composition of the Reference Portfolio and Eligible Investments will not change prior to the next Determination Date, that there will be no unscheduled Administrative Expenses after such Measurement Date and prior to the next Determination Date and that no interest will be payable on any Reference Obligation that is a Defaulted Reference Obligation or Deferring PIK Obligation.

"Non-consenting Holder": With respect to any supplemental indenture pursuant to Section 9.2 or amendment to the Swap Agreement pursuant to Section 7.26(a), in each case that requires the consent of one or more Holders of Securities, any Holder or, in the case of Securities represented by Global Notes, any beneficial owner, that either (i) has declared in writing that it will not consent to such supplemental indenture or amendment to the Swap Agreement, as applicable, or (ii) had not consented to such supplemental indenture or amendment to the Swap Agreement, as applicable, within the applicable Initial Consent Period.

"Non-Permitted ERISA Holder": The meaning specified in Section 2.6(o).

"Note Purchase Agreement": The agreement between the Initial Purchaser and the Issuers, dated as of the Business Day preceding the Closing Date.

"Note Redemption Amount": With respect to a Payment Date after the end of the Portfolio Modification Period, the Swap Reduction Amount under the Swap Agreement (plus any Quarterly Aggregate Increase Amount, but minus any Quarterly Aggregate Reduction Amount) for such date (but only to the extent the aggregate of such amounts for such Payment Date and prior Payment Dates exceeds $648,000,000.

"Notes": The Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C-1 Notes, the Class C-2 Notes and the Income Notes, collectively.

"Obligation Value Increase Amount": The meaning specified in the Swap Agreement.

"Obligation Value Reduction Amount": The meaning specified in the Swap Agreement.

"OC Base Amount": As of any Measurement Date, the aggregate principal amount of all Eligible Investments in the Collateral Account (other than those representing an investment of interest proceeds of Eligible Investments) as of such date plus the Accrued Increase/Reduction Amount as of such date minus the sum of (1) an amount equal to the aggregate of the Default Adjustments for all Defaulted Reference Obligations and Deferring PIK Obligations as of such date and (2) the Outstanding Premium as of such date.

"Offering Circular": The final offering circular, dated August 17, 2004, with respect to the offering of the Securities, as amended, supplemented or otherwise modified.

"Officer's Certificate": A certificate signed on behalf of the Issuer or the Co-Issuer by any Authorized Officer and delivered to the Trustee. Unless otherwise specified, any

reference in this Indenture to an Officer's Certificate shall be to an Officer's Certificate signed by any Authorized Officer.

"Opinion of Counsel":  A written opinion, unless otherwise specified herein addressed to the Trustee, the Swap Counterparty and each Rating Agency and in form and substance reasonably satisfactory to the Trustee, each Rating Agency and the Swap Counterparty, of an attorney at law admitted to practice before the highest court of any state of the United States or the District of Columbia (or the Cayman Islands or other relevant jurisdiction, in the case of an opinion relating to the laws of the Cayman Islands or such jurisdiction), which attorney may, except as otherwise expressly provided in the Indenture, be counsel for the Issuer or the Trustee.

"Opinion of Tax Counsel":  An Opinion of Counsel of a nationally recognized tax law firm experienced in the matters addressed in the Opinion.

"Optional Redemption":  The meaning specified in Section 2.14(e).

"Optional Redemption Date":  The meaning specified in Section 2.14(e).

"Ordinary Shares":  1,000 voting ordinary shares, par value U.S. $1.00 per share, of the Issuer.

"Outstanding":  (a) With respect to the Notes, as of any date of determination, "Outstanding" refers to all Notes theretofore authenticated and delivered under this Indenture other than Notes cancelled, redeemed, exchanged or replaced in accordance with the terms of this Indenture and (b) with respect to the Class Q Securities, as of any date of determination, "Outstanding" refers to any and all Class Q Securities theretofore issued and paid for under this Indenture other than the Class Q Securities cancelled, redeemed, exchanged or replaced in accordance with the terms of this Indenture.

"Outstanding Premium":  The meaning specified in the Swap Agreement.

"Overcollateralization Ratios":  The Class A Overcollateralization Ratio, the Class B Overcollateralization Ratio and the Class C Overcollateralization Ratio, collectively.

"Overcollateralization Tests":  The Class A OC Test, the Class B OC Test and the Class C OC Test.

"Participant":  With respect to the Depositary, Euroclear or Clearstream, a Person who has an account with the Depositary, Euroclear or Clearstream, respectively (and, with respect to DTC, shall include Participants holding securities positions on behalf of Euroclear and Clearstream).

"Paying Agent":  The Trustee and, so long as any Securities are listed on the Irish Stock Exchange, the Listing Agent or any other Person appointed pursuant to Section 10.1 that meets the eligibility standards for the Trustee specified in Section 6.10 and is authorized by the Issuer and the Co-Issuer to make payments of amounts on the Notes on behalf of the Issuer.

"Payment Date":  With respect to a Class of Notes, the 1st day of each February, May, August and November commencing on and including February 1, 2005 (or if any such day is not a Business Day, the first Business Day thereafter), and ending on and including the earlier of the final redemption date for such Class and the Maturity Date.

"Payment Date Priority of Payments":  The meaning specified in Section 8.6(a).

"Payment Date Proceeds":  With respect to a Payment Date, the total of (i) the net amount, if any, paid by the Swap Counterparty in respect of the Adjusted Reference Portfolio Return Amount and the Fixed Amount for such Payment Date, (ii) interest and dividends received with respect to Eligible Investments in the Trust Accounts (including interest and dividends received on amounts on deposit in the Collateral Account) during the related Periodic Interest Accrual Period, (iii) on the first Payment Date only, all amounts deposited into the Collection Account from the Expense Reserve Account pursuant to Section 8.2(e), and (iv) principal proceeds of Eligible Investments and other amounts on deposit in the Collateral Account, but in the case of this clause (iv) only (A) to the extent of the Quarterly Aggregate Reduction Amount, if any, for that date, and (B) without duplication of clause (A), to the extent other funds are not otherwise available (but in the case of  (B) solely for purposes of making payments pursuant to clauses (ii) and (xiii) of the Payment Date Priority of Payments (provided, that no amount pursuant to this clause (iv) will be used to make payments as provided in clause (xiii) of the Payment Date Priority of Payments unless all of the Senior Notes have been retired)).

"Payment Date Valuation Report":  The meaning specified in Section 8.8.

"Periodic Interest":  The Class A-1 Interest Amount, the Class A-2 Interest Amount, the Class B Interest Amount, the Class C-1 Interest Amount, the Class C-2 Interest Amount and the Class Q-2A Interest Amount, as the context may require.

"Periodic Interest Accrual Period":  (a) With respect to the initial Payment Date, the period from and including the Closing Date to but excluding the initial Payment Date, and (b) with respect to each Payment Date thereafter, the period from and including the preceding Payment Date to but excluding such Payment Date; provided that in the case of the Class C-2 Notes, the Periodic Interest Accrual Period will not be adjusted in the event a scheduled Payment Date would otherwise occur on a day that is not a Business Day.

"Person":  Any individual, corporation, partnership, limited liability partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated organization or government or any agency or political subdivision thereof.

"PIK Obligation": The meaning specified in the Swap Agreement.

"Placement Agent":  Citigroup Global Markets Inc.

"Plan":  Any (a) "employee benefit plan" (as defined in Section 3(3) of ERISA) subject to the provisions of Title I of ERISA, (b) "plan" (as defined in Section 4975(e)(1) of the Code) subject to the provisions of Section 4975 of the Code or (c) entity whose underlying assets

include "plan assets" by reason of Department of Labor regulation Section 2510.3-101 or otherwise.

"Pledged Securities":  As of any date, the Eligible Investments credited to any of the Trust Accounts.

"Portfolio Modification Period":  The meaning specified in the Swap Agreement.

"Principal Priority of Payments":  The meaning specified in Section 8.6(b).

"Priority of Payments":  The Payment Date Priority of Payments and the Principal Priority of Payments.

"Proceeding":  Any suit in equity, action at law or other judicial or administrative proceeding.

"Qualified Institutional Buyer":  A "qualified institutional buyer" as defined in Rule 144A(a)(1) under the Securities Act.

"Qualified Purchaser":  A "qualified purchaser" for purposes of Section 3(c)(7) of the Investment Company Act.

"Quarterly Aggregate Increase Amount":  The meaning specified in the Swap Agreement.

"Quarterly Aggregate Reduction Amount":  The meaning specified in the Swap Agreement.

"Quarterly Amortization Increase Amount":  The meaning specified in the Swap Agreement.

"Ramp-up End Date":  The meaning specified in the Swap Agreement.

"Ramp-up Period":  The meaning specified in the Swap Agreement.

"Rating Agency":  Either of Moody's or Standard & Poor's; "Rating Agencies" shall mean Moody's and Standard & Poor's, collectively.

"Rating Confirmation": With respect to any specified action, the written confirmation by both Rating Agencies, or if expressly stated, by a specified Rating Agency, that such Rating Agency will not qualify, downgrade or withdraw its then-current respective rating of any Class of Senior Notes or the Class Q-1 Securities solely as a result of such action.

"Record Date":  With respect to a Payment Date or Maturity Date or the Class Q-2 Maturity Date, as applicable, the close of business on the fifteenth day prior to such date, or if such day is not a Business Day, the close of business on the next Business Day.

"Reference Banks":  With respect to the determination of LIBOR by the Indenture Calculation Agent, any four major banks in the London interbank market selected by the Indenture Calculation Agent for such purpose.

"Reference Obligation":  The meaning specified in the Swap Agreement.

"Reference Obligation Calculation Amount":  The meaning specified in the Swap Agreement.

"Reference Obligation Eligibility Criteria":  The meaning specified in the Swap Agreement.

"Reference Portfolio": The meaning specified in the Swap Agreement.

"Reference Portfolio Criteria":  The meaning specified in the Swap Agreement.

"Reference Portfolio Management Agreement":  The Reference Portfolio Management Agreement, dated as of the Closing Date, between the Swap Counterparty and the Reference Portfolio Manager.

"Reference Portfolio Manager":  Highland Capital Management, L.P. and its approved successors and assigns.

"Reference Value":  The meaning specified in the Swap Agreement.

"Registrar":  The meaning specified in Section 2.6(a).

"Regulation S":  Regulation S promulgated under the Securities Act.

"Regulation S Global Note":  The meaning set forth in Section 2.2(b)(i).

"Reinvestment Yield": With respect to the Class C-2 Notes, the rate equal to the sum of (a) 1.30% and (b) the applicable yield to maturity implied by (i) the yields reported, as of 10:00 a.m. (New York City time) on the tenth Business Day preceding the Optional Redemption Date, Extension Effective Date or date of Amendment Buy-Out, as applicable, on the display designated as "Govt PX1" on Bloomberg Financial Markets Commodities News (or such other display as may replace such display) for actively traded U.S. Treasury securities having a maturity as nearly as practicable equal to the Payment Date occurring in November 2013 or (ii) if such yields are not reported as of such time or the yields reported as of such time are not ascertainable, the Treasury Constant Maturity Series Yields reported, for the latest day for which such yields have been so reported as of the tenth Business Day preceding the Optional Redemption Date, Extension Effective Date or date of Amendment Buy-Out, as applicable, in Federal Reserve Statistical Release H.15 (519) (or any comparable successor publication) for actively traded U.S. Treasury securities having a constant maturity as nearly as practicable equal to the Payment Date occurring in November 2013.

"Reminder Notice":  The meaning specified in Section 8.8.

"Repository":  The internet-based password protected electronic repository of transaction documents relating to privately offered and sold collateralized debt obligation securities located at www.cdolibrary.com. or successors thereto.

"Requisite Noteholders":  The holders of 66 2/3% or more of the Aggregate Principal Amount of (a) the Class A-1 Notes, so long as any Class A-1 Notes remain Outstanding, (b) thereafter the Class A-2 Notes, so long as any Class A-2 Notes remain Outstanding, (c) thereafter the Class B Notes, so long as any Class B Notes remain Outstanding, (d) thereafter the Class C-1 Notes and the Class C-2 Notes (voting as a single class), so long as any Class C Notes remain Outstanding, and (e) thereafter the Income Notes, so long as any Income Notes remain Outstanding.

"Responsible Officer":  With respect to the Trustee, any officer within the Corporate Trust Office of the Trustee who is responsible for the administration of this Indenture, including any Vice President, Assistant Vice President, Assistant Treasurer, Trust Officer, or any other officer of the Trustee customarily performing functions similar to those performed by any of the above designated officers and also, with respect to a particular matter, any other officer within the Corporate Trust Office to whom such matter is referred because of such officer's knowledge of and familiarity with the particular subject.

"Rule 144A":  Rule 144A under the Securities Act.

"Rule 144A Global Note":  The meaning specified in Section 2.2(b)(ii).

"Rule 144A Information":  The meaning specified in Section 2.6(c).

"Sale":  The meaning specified in Section 5.2.

"Secured Parties":  The meaning specified in the Preliminary Statement to this Indenture.

"Securities":  Collectively, the Notes, the Class Q-1 Securities and the Class Q-2 Securities.

"Securities Act":  The U.S. Securities Act of 1933, as amended.

"Securities Intermediary":  The entity maintaining a Trust Account pursuant to an Account Agreement.

"Securities Register":  The meaning specified in Section 2.6(a).

"Senior Notes":  The Class A-1 Notes, the Class A-2 Notes, the Class B Notes, the Class C-1 Notes and the Class C-2 Notes, collectively

"Share Trustee":  Walkers SPV Limited and its permitted successors.

"Standard & Poor's" or "S&P":  Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., or any successor thereto.

"S&P Recovery Rate":  The meaning specified in the Swap Agreement.

"Structured Finance Obligation": The meaning specified in the Swap Agreement.

"Subordinate Amount":  The meaning specified in the Swap Agreement.

"Subordinated Administrative Expenses": Technology expenses of the Swap Counterparty and its Affiliates in connection with transactions contemplated hereby and by the Swap Agreement not to exceed $50,000 in any calendar year; provided, however, that Subordinated Administrative Expenses shall not include any amounts due or accrued with respect to actions taken on or prior to the Closing Date which amounts shall be payable only from the Expense Reserve Account pursuant to Section 8.2(e).

"Swap Additional Termination Event":  An "Additional Termination Event" or a "Tax Event Upon Merger" under the Swap Agreement as to which the Swap Counterparty is the affected party.

"Swap Agreement":  The portfolio swap agreement entered into by the Issuer with the Swap Counterparty, dated as of the Closing Date, which will be documented on the standard form of the 2002 ISDA Master Agreement published by ISDA, as supplemented by the schedule thereto and related documents, and a confirmation for the portfolio swap transaction thereunder, together with the annexes thereto evidencing the Reference Portfolio, as amended or supplemented from time to time.

"Swap Agreement Amendment":  The meaning specified in Section 7.26.

"Swap Counterparty":  Citigroup Financial Products Inc., or any successor thereto.

"Swap Event of Default":  An "Event of Default" under the Swap Agreement.

"Swap Guarantee": The Guarantee, dated as of the Closing Date by the Swap Guarantor in favor of the Issuer with respect to the Swap Agreement.

"Swap Guarantor": Citigroup Global Markets Holdings Inc. or any successor thereto.

"Swap Reduction Amount":  The meaning specified in the Swap Agreement.

"Swap Termination Date":  The meaning specified in the Swap Agreement.

"Swap Termination Event":  A "Termination Event" under the Swap Agreement.

"Swap Termination Payment":  The amount, if any, payable by the Issuer or the Swap Counterparty to the other party in respect of an Early Termination Date under the Swap Agreement (as defined therein).

"Tax Redemption":  The meaning specified in Section 2.14(d).

A-29

"Tax Redemption Date":  The meaning specified in Section 2.14(d).

"Temporary Regulation S Global Note":  The meaning specified in Section 2.2(b)(i).

"Transferee Certificate": The Transferee Certificate with respect to the Income Notes substantially in the form of Exhibit IN-2 hereto.

"Transfer Letter":  The Transfer Letter substantially in the form of Exhibit E-1 or Exhibit E-2 hereto, as applicable.

"Trust Accounts":  The Collection Account, the Expense Reserve Account and the Collateral Account, collectively.

"Trust Estate":  The meaning set forth under "Grant of Security Interest" on page 1 of this Indenture.

"Trustee":  JPMorgan Chase Bank, as trustee under this Indenture and its permitted successors.

"Trustee Expenses":  With respect to any Payment Date (including without limitation the Maturity Date), an amount equal to the sum of all amounts incurred by or otherwise owing to the Trustee hereunder in any Collection Period in accordance with the Indenture other than the Trustee Fee.

"Trustee Fee":  With respect to any Payment Date, the amount separately agreed to by the Issuer and the Trustee in that certain letter dated as of the Closing Date.

"UCC":  The Uniform Commercial Code as in effect from time to time in the State of New York.

"U.S. Person":  The meaning assigned to such term in Regulation S under the Securities Act.

CONSENTED TO BY:

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**
as Reference Portfolio Manager
By: Strand Advisors, Inc., its general partner

By: _____

Name: James Dondero
Title:  President

CONSENTED TO BY:

**CITIGROUP FINANCIAL PRODUCTS INC.,**
as Swap Counterparty

By: _____
        Mitali Sohoni
      Name:
      Title:

# WESTCHESTER CLO, LTD.
Issuer,

# WESTCHESTER CLO CORP.
Co-Issuer,

and

# INVESTORS BANK & TRUST COMPANY
Trustee

## INDENTURE

Dated as of May 31, 2007

## COLLATERALIZED DEBT OBLIGATIONS

U.S.$570,500,000 Class A-1-A Floating Rate Senior Secured Extendable Notes Due 2022
U.S.$142,500,000 Class A-1-B Floating Rate Senior Secured Extendable Notes Due 2022
U.S.$80,000,000 Class B Floating Rate Senior Secured Extendable Notes Due 2022
U.S.$53,500,000 Class C Floating Rate Senior Secured Deferrable Interest Extendable Notes Due 2022
U.S.$36,000,000 Class D Floating Rate Senior Secured Deferrable Interest Extendable Notes Due 2022
U.S.$37,500,000 Class E Floating Rate Senior Secured Deferrable Interest Extendable Notes Due 2022

TABLE OF CONTENTS

*Page*

ARTICLE 1 DEFINITIONS.................................................................................................... 3

Section 1.1.    Definitions. ........................................................................................ 3
Section 1.2.    Assumptions as to Pledged Obligations; Construction Conventions................ 77
Section 1.3.    Rules of Interpretation. ..................................................................... 79

ARTICLE 2 THE NOTES ................................................................................................... 80

Section 2.1.    Forms Generally. .............................................................................. 80
Section 2.2.    Forms of Notes and Certificate of Authentication........................................... 80
Section 2.3.    Authorized Amount; Denominations.................................................... 81
Section 2.4.    Extension of Replacement Period and Stated Maturity. ...................................... 82
Section 2.5.    Execution, Authentication, Delivery, and Dating.............................................. 84
Section 2.6.    Registration, Registration of Transfer and Exchange....................................... 85
Section 2.7.    Mutilated, Destroyed, Lost or Stolen Notes. ..................................................... 90
Section 2.8.    Payment of Principal and Interest and Other Amounts; Principal and Interest
               Rights Preserved; Withholding........................................................................... 90
Section 2.9.    Persons Considered Owners. ............................................................. 93
Section 2.10.   Cancellation......................................................................................... 93
Section 2.11.   Definitive Notes................................................................................... 94
Section 2.12.   Notes Beneficially Owned by Non-Permitted Holders. .................................... 94
Section 2.13    Tax Purposes ..................................................................................... 95

ARTICLE 3 CONDITIONS PRECEDENT ............................................................................. 95

Section 3.1.    Conditions to Issuance of Notes on Closing Date. ........................................... 95
Section 3.2.    Custodianship; Delivery of Collateral Obligations and Eligible Investments. . 99
Section 3.3.    Representations as to Collateral. .................................................... 100

ARTICLE 4 SATISFACTION AND DISCHARGE ....................................................................... 102

Section 4.1.    Satisfaction and Discharge of Indenture......................................................... 102
Section 4.2.    Application of Trust Money. .............................................................. 103
Section 4.3.    Repayment of Monies Held by Paying Agent. ................................................. 104

ARTICLE 5 REMEDIES..................................................................................................... 104

Section 5.1.    Events of Default. .............................................................................. 104
Section 5.2.    Notice of Event of Default; Acceleration of Maturity; Rescission and
               Annulment. ...................................................................................... 105
Section 5.3.    Collection of Indebtedness and Suits for Enforcement by Trustee. ............... 106

i

Section 5.4.      Remedies. ..................................................................................................... 108
Section 5.5.      Optional Retention of Collateral........................................................................ 109
Section 5.6.      Trustee May Enforce Claims Without Possession of Notes. .......................... 111
Section 5.7.      Application of Money Collected. ....................................................................... 111
Section 5.8.      Limitation on Suits. ........................................................................................... 111
Section 5.9.      Unconditional Rights of Noteholders. ............................................................... 112
Section 5.10.     Restoration of Rights and Remedies.................................................................. 112
Section 5.11.     Rights and Remedies Cumulative....................................................................... 112
Section 5.12.     Delay or Omission Not Waiver. ........................................................................ 113
Section 5.13.     Control by Majority of the Controlling Class.................................................... 113
Section 5.14.     Waiver of Past Defaults..................................................................................... 113
Section 5.15.     Undertaking for Costs........................................................................................ 114
Section 5.16.     Waiver of Stay or Extension Laws. ................................................................... 114
Section 5.17.     Sale of Collateral. .............................................................................................. 114
Section 5.18.     Action on the Notes. .......................................................................................... 115

ARTICLE 6 THE TRUSTEE .......................................................................................................... 115

Section 6.1.      Certain Duties and Responsibilities................................................................... 115
Section 6.2.      Notice of Default. .............................................................................................. 117
Section 6.3.      Certain Rights of Trustee................................................................................... 117
Section 6.4.      Not Responsible for Recitals or Issuance of the Notes...................................... 119
Section 6.5.      May Hold Notes. ................................................................................................ 119
Section 6.6.      Acquisition of Class E Notes and Preference Shares. ...................................... 119
Section 6.7.      Money Held in Trust.......................................................................................... 119
Section 6.8.      Compensation and Reimbursement. .................................................................. 119
Section 6.9.      Corporate Trustee Required; Eligibility. ........................................................... 120
Section 6.10.     Resignation and Removal; Appointment of Successor. .................................... 121
Section 6.11.     Acceptance of Appointment by Successor. ....................................................... 122
Section 6.12.     Merger, Conversion, Consolidation, or Succession to Business of Trustee.... 123
Section 6.13.     Co-Trustees........................................................................................................ 123
Section 6.14.     Certain Duties of Trustee Related to Delayed Payment of Proceeds. ............. 124
Section 6.15.     Authenticating Agents....................................................................................... 124
Section 6.16.     Fiduciary for Noteholders Only; Agent for Secured Parties............................ 125
Section 6.17.     Representations and Warranties of the Bank..................................................... 125
Section 6.18.     Additional Reporting Requirements................................................................... 125
Section 6.19.     Withholding Tax Forms...................................................................................... 125

ARTICLE 7 COVENANTS ............................................................................................................ 126

Section 7.1.      Payment of Principal and Interest...................................................................... 126
Section 7.2.      Maintenance of Office or Agency. .................................................................... 126
Section 7.3.      Money for Note Payments to be Held in Trust.................................................. 127

ii

Section 7.4. Existence of Co-Issuers. .................................................................. 128
Section 7.5. Protection of Collateral. ................................................................. 130
Section 7.6. Opinions as to Collateral. ............................................................... 131
Section 7.7. Performance of Obligations. ........................................................... 131
Section 7.8. Negative Covenants. ...................................................................... 132
Section 7.9. Notice of Default; Statement as to Compliance. ............................. 133
Section 7.10. Co-Issuers May Consolidate, etc. Only on Certain Terms. ............. 133
Section 7.11. Successor Substituted. .................................................................... 135
Section 7.12. No Other Business. ......................................................................... 135
Section 7.13. Listing on Irish Stock Exchange. .................................................... 136
Section 7.14. Annual Rating Review. .................................................................... 136
Section 7.15. Reporting. ....................................................................................... 136
Section 7.16. Calculation Agent. .......................................................................... 137
Section 7.17. Certain Tax Matters. ....................................................................... 137
Section 7.18. Securities Lending. ......................................................................... 138
Section 7.19. Purchase of Collateral Obligations; Ramp-Up Completion Date. .................. 141
Section 7.20. Posting of Reports on Repository. ................................................... 143
Section 7.21. Secondary Risk Procedures. ........................................................... 143
Section 7.22. Section 3(c)(7) Procedures. ............................................................ 143

ARTICLE 8 SUPPLEMENTAL INDENTURES .................................................................. 144

Section 8.1. Supplemental Indentures Without Consent of Holders. ................... 144
Section 8.2. Supplemental Indentures With Consent of Holders. ....................... 147
Section 8.3. Execution of Supplemental Indentures. .......................................... 149
Section 8.4. Effect of Supplemental Indentures; Certain Required Consents. .................. 150
Section 8.5. Reference in Notes to Supplemental Indentures. ............................ 150

ARTICLE 9 REDEMPTION OF NOTES .......................................................................... 150

Section 9.1. Mandatory Redemption. .................................................................. 150
Section 9.2. Optional Redemption. ..................................................................... 151
Section 9.3. Optional Redemption Procedures. ................................................... 152
Section 9.4. Notes Payable on Redemption Date. ............................................... 155
Section 9.5. Special Redemption. ........................................................................ 155
Section 9.6. Amendment Buy-Out. ...................................................................... 156
Section 9.7. Redemption by Refinancing. ........................................................... 156

ARTICLE 10 ACCOUNTS, ACCOUNTINGS, AND RELEASES ....................................... 159

Section 10.1. Collection of Money. ....................................................................... 159
Section 10.2. Collection Account. ......................................................................... 159
Section 10.3. Other Accounts. .............................................................................. 160

iii

Section 10.4.    Application of Funds in Accounts; Reports by Trustee.................................. 165

Section 10.5.    Synthetic Security Counterparty Account. ..................................................... 167

Section 10.6.    Accountings. ................................................................................................... 168

Section 10.7.    Release of Collateral. ...................................................................................... 175

Section 10.8.    Reports by Independent Accountants. ............................................................. 176

Section 10.9.    Reports to Rating Agencies. ............................................................................ 177

ARTICLE 11 APPLICATION OF MONIES ................................................................................... 177

Section 11.1.    Disbursements of Monies from Payment Account. ......................................... 177

ARTICLE 12 SALE OF COLLATERAL OBLIGATIONS; PURCHASE OF COLLATERAL OBLIGATIONS 183

Section 12.1.    Sales of Collateral Obligations. ....................................................................... 183

Section 12.2.    Purchase of Collateral Obligations. ................................................................. 185

Section 12.3.    Conditions Applicable to All Sale and Purchase Transactions........................ 188

Section 12.4.    Certain Determinations Relating to Collateral Obligations. ............................ 188

ARTICLE 13 NOTEHOLDERS' RELATIONS ................................................................................ 189

Section 13.1.    Subordination. ................................................................................................. 189

Section 13.2.    Standard of Conduct. ....................................................................................... 190

ARTICLE 14 MISCELLANEOUS ................................................................................................. 190

Section 14.1.    Form of Documents Delivered to Trustee. ...................................................... 190

Section 14.2.    Acts of Holders of Securities. .......................................................................... 191

Section 14.3.    Notices, etc., to Certain Persons or Parties...................................................... 192

Section 14.4.    Notices to Noteholders and the Preference Shares Paying Agent; Waiver. ... 194

Section 14.5.    Effect of Headings and Table of Contents........................................................ 195

Section 14.6.    Successors and Assigns. ................................................................................... 195

Section 14.7.    Separability....................................................................................................... 195

Section 14.8.    Benefits of Indenture. ...................................................................................... 195

Section 14.9.    Governing Law. ................................................................................................ 195

Section 14.10.   Submission to Jurisdiction............................................................................... 196

Section 14.11.   Counterparts. ................................................................................................... 196

Section 14.12.   Acts of Issuer. .................................................................................................. 196

Section 14.13.   Consent of Posting of Documents on Repository............................................ 196

Section 14.14.   Liability of Co-Issuers...................................................................................... 196

Section 14.15.   Indemnity of Co-Issuer..................................................................................... 197

ARTICLE 15 ASSIGNMENT OF SERVICING AGREEMENT; HEDGE AGREEMENTS .................... 197

Section 15.1.    Assignment of Servicing Agreement; Amendment of Servicing Agreement. 197

iv

Section 15.2.    Hedge Agreements. ........................................................................ 199

Schedules and Exhibits

Schedule 1    –    Collateral Obligations
Schedule 2    –    Moody's Industry Classification Group List
Schedule 3    –    S&P Industry Classifications
Schedule 4    –    Diversity Score Calculation
Schedule 5    –    Moody's Structured Finance Obligation Recovery Rates
Schedule 6    –    S&P Structured Finance Obligation Recovery Rates
Schedule 7    –    Certain Defined Terms Relating to S&P Rating and Moody's Rating
Exhibit A    –    Forms of Notes
    A-1    –    Form of Senior Note
    A-2    –    Form of Class E Note
Exhibit B    –    Forms of Senior Note Transfer and Exchange Certificates
    B-1    –    Form of Senior Note Transferee Certificate
    B-2    –    Form of Senior Note Transferor Certificate for Regulation S to Rule 144A Transfer
    B-3    –    Form of Senior Note Transferor Certificate for Rule 144A to Regulation S Transfer
    B-4    –    Form of Class E Note Transferee Certificate
Exhibit C    –    Form of Latham & Watkins LLP Opinions
Exhibit D    –    Form of Maples and Calder Opinion
Exhibit E    –    Form of Nixon Peabody LLP Opinion
Exhibit F    –    Form of Orrick, Herrington & Sutcliffe LLP Opinion
Exhibit G    –    Forms of Section 3(c)(7) Notices
    G-1    –    Form of Section 3(c)(7) Reminder Notice
    G-2    –    Form of Important Section 3(c)(7) Reminder Notice
Exhibit H    –    Form of Beneficial Owner Certificate
Exhibit I    –    Form of Extension Notice
Exhibit J    –    Form of Insurer Notice
Exhibit K    –    Form of Class A Note

v

INDENTURE, dated as of May 31, 2007, among WESTCHESTER CLO, LTD. (the "*Issuer*"), WESTCHESTER CLO CORP. (the "*Co-Issuer*") and INVESTORS BANK & TRUST COMPANY, as trustee (together with its permitted successors, the "*Trustee*").

PRELIMINARY STATEMENT

The Co-Issuers are duly authorized to execute and deliver this Indenture to provide for the Class A-1-A Notes, the Class A-1-B Notes, the Class B Notes, the Class C Notes and the Class D Notes and the Issuer is duly authorized to execute and deliver this Indenture to provide for the Class E Notes, in each case issuable as provided in this Indenture. All covenants and agreements made by the Co-Issuers in this Indenture are for the benefit and security of the Secured Parties. The Co-Issuers are entering into this Indenture, and the Trustee is accepting the trusts created by this Indenture, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged.

All things necessary to make this Indenture a valid agreement of the Co-Issuers in accordance with the agreement's terms have been done.

GRANTING CLAUSES

The Issuer Grants to the Trustee, for the benefit and security of the Noteholders, the Trustee, the Servicer and each Hedge Counterparty (and the Collateral Administrator and Preference Shares Paying Agent to the extent of Administrative Expenses payable to such parties as provided hereunder) (collectively, the "*Secured Parties*"), all of its right, title, and interest in, to, and under, in each case, whether now owned or existing, or hereafter acquired or arising:

(a) the Collateral Obligations (listed, as of the Closing Date, in Schedule 1 to this Indenture and listed from time to time on such Schedule 1 as such Schedule 1 may be modified, amended and revised subsequent to the Closing Date by the Issuer) and all Workout Assets, including any part thereof which consists of general intangibles or supporting obligations (each as defined in the UCC) relating thereto, all payments made or to be made thereon or with respect thereto, and all Collateral Obligations and Workout Assets including any part thereof which consists of general intangibles (as defined in the UCC) relating thereto, which are delivered or credited to the Trustee, or for which a Security Entitlement is delivered or credited to the Trustee or which are credited to one or more of the Issuer Accounts on or after the Closing Date and all payments made or to be made thereon or with respect thereto;

(b) the Custodial Account, the Collection Account, the Payment Account, the Revolving Reserve Account, the Delayed Drawdown Reserve Account, the Interest Reserve Account, the Closing Date Expense Account, the Expense Reimbursement Account and the Securities Lending Account (collectively, the "*Issuer Accounts*"), Eligible Investments purchased with funds on deposit in the Issuer Accounts, and all income from funds in the Issuer Accounts;

(c) the Synthetic Security Counterparty Account (and, together with the Issuer Accounts, the Synthetic Security Collateral Account, the Class II Preference Share Special Payment Account and the Hedge Counterparty Collateral Account, the "*Accounts*") and assets included therein, subject to the terms of the related Synthetic Security (provided, however, that any such rights in any Synthetic Security Counterparty Account shall be held in trust by the Trustee (or Securities Intermediary) first to secure the Issuer's payment obligations to the relevant Synthetic Security Counterparty and second for the benefit of the Secured Parties);

(d) the Servicing Agreement, the Synthetic Security Collateral Account, the Securities Lending Agreements and all Securities Lending Collateral and the Securities Lending Account, the

Hedge Agreements as set forth in Article 15 and all Collateral securing the Hedge Counterparty's obligations thereunder including, without limitation, the Hedge Counterparty Collateral Account, the Collateral Administration Agreement to the extent of any rights of the Issuer therein;

(e) all Cash or money delivered to the Trustee (or its bailee);

(f) all securities, investments, investment property, instruments, money, general intangibles, chattel paper and agreements of any nature in which the Issuer has an interest (except for money, securities and investments in the Issuer's bank account in the Cayman Islands), including any part thereof which consists of general intangibles or supporting obligations (each as defined in the UCC) relating thereto; and

(g) all proceeds with respect to the foregoing;

(all of the property and assets described in foregoing clauses (a) through (g), but excluding the Excluded Property, the "*Collateral*"). Notwithstanding the foregoing, the Collateral shall not include any Excluded Property.

These Grants are not intended to and do not transfer any liability under the Collateral, which liabilities shall remain the sole obligation of the Issuer. These Grants are made, however, in trust as separate trusts, to secure the Notes. Except as provided in Article 13 and the priorities set forth in the Priority of Payments, the Notes are secured by the first grant equally and ratably without prejudice, priority or distinction between any Note and any other Note because of difference in time of issuance or otherwise. The Grants are made to secure, in accordance with the priorities in the Priority of Payments and Article 13:

(i) the payment of all amounts due on the Notes equally and ratably without prejudice, priority or distinction between any Note and any other Note because of difference in time of issuance or otherwise, in accordance with their terms;

(ii) the payment of all other sums payable under this Indenture (other than amounts payable in respect of the Preference Shares);

(iii) the payment of sums payable to any Hedge Counterparty under a Hedge Agreement;

(iv) the payment of sums payable to the Servicer under the Servicing Agreement; and

(v) compliance with this Indenture;

(collectively, the "*Secured Obligations*"), all as provided in this Indenture.

The Trustee acknowledges the Grants, accepts the trusts under this Indenture in accordance with this Indenture, and agrees to perform its duties in this Indenture in accordance with the provisions hereof.

## ARTICLE 1

### DEFINITIONS

Section 1.1.    *Definitions.*

Except as otherwise specified in this Indenture or as the context may otherwise require, the following terms have the respective meanings provided below for all purposes of this Indenture.

"*A/B Exchange*": An exchange of one security (the "*A Security*") for another security (the "*B Security*") of the same issuer or issuers, which security shall have substantially identical terms to the A Security except that one or more transfer restrictions applicable to the A Security are inapplicable to the B Security.

"*Accounts*": The meaning specified in the Granting Clauses.

"*Accountants' Certificate*": An agreed upon procedures report of a firm of Independent certified public accountants of international reputation appointed by the Issuer pursuant to Section 10.8(a), which may be the firm of Independent accountants that performs certain accounting services for the Issuer or the Servicer.

"*Accrued Interest On Sale*": Interest accrued on a Collateral Obligation at the time of sale or other disposition to the extent paid to the Issuer as part of the sale or other disposition price of the Collateral Obligation after deduction of any amount representing Accrued Interest Purchased With Principal of the Collateral Obligation.

"*Accrued Interest Purchased With Principal*": (i) interest accrued on or purchased with a Collateral Obligation as part of the price paid by the Issuer to acquire the Collateral Obligation less any amount of Interest Proceeds (applied as Interest Proceeds) applied by the Issuer to acquire the accrued interest at the time of purchase and (ii) interest accrued on a Loan that constitutes part of the price paid by the Issuer to repay loans made by the Pre-Closing Parties to finance the Issuer's pre-closing acquisition of such Loan.

"*Act*": The meaning specified in Section 14.2.

"*Administration Agreement*": The Administration Agreement, between the Issuer and the Administrator, providing for the administrative functions of the Issuer, as modified, amended, and supplemented and in effect from time to time.

"*Administrative Expense Cap*": An amount on any Payment Date equal to the excess of:

(a)    the sum of 0.04% of the Maximum Amount on the related Determination Date plus $150,000, *over*

(b)    the sum of the amounts paid for Administrative Expenses in the twelve months preceding the current Payment Date.

"*Administrative Expenses*": Amounts due or accrued representing

(i)    tax preparation, filing, and registration fees or expenses and any other filing and registration fees owed by the Co-Issuers (including all filing, registration, and annual return fees payable to the Cayman Islands government and registered office fees);

3

(ii) fees, indemnities and expenses of the Trustee (including all amounts under Section 6.8), the Administrator, the Preference Shares Paying Agent and the Collateral Administrator;

(iii) fees, indemnities and expenses of the Co-Issuers and of accountants, agents, and counsel for either of the Co-Issuers;

(iv) fees and expenses of the Rating Agencies in connection with any rating of the Collateral (requested by the Issuer or the Servicer) or the Notes owed by either Co-Issuer (including fees and expenses for ongoing surveillance, credit estimates and other fees owing to the Rating Agencies);

(v) expenses and indemnities (but not Servicing Fees) of the Servicer if payable under the Servicing Agreement;

(vi) fees, indemnities and expenses for third-party loan pricing services and accountants; and

(vii) amounts due (other than indemnities) to any other Person (except the Servicer) if specifically provided for in this Indenture, including fees or expenses in connection with any Securities Lending Agreement.

"*Administrator*": Maples Finance Limited.

"*Affected Class*": Any Class of Notes that, as a result of the occurrence of a Tax Event, has received, or will receive less than the aggregate amount of principal and interest that would otherwise have been payable to such Class on the Distribution Date related to the Due Period with respect to which such Tax Event occurs.

"*Affiliate*" or "*Affiliated*": With respect to a Person,

(i) any other Person who, directly or indirectly, is in control of, or controlled by, or is under common control with, the Person; or

(ii) any other Person who is a director, officer, or employee (A) of the Person, (B) of any subsidiary or parent company of the Person or (C) of any Person described in clause (i) above.

For the purposes of this definition, control of a Person shall mean the power, direct or indirect,

(A) to vote more than 50% of the securities having ordinary voting power for the election of directors of the Person; or

(B) to direct the corporate management and corporate policies of the Person whether by contract or otherwise (this does not include the Servicing Agreement unless it is amended expressly to provide those services).

For the purpose of this definition, the Administrator and its Affiliates are neither Affiliates of nor Affiliated with the Co-Issuers and the Co-Issuers are neither Affiliates of nor Affiliated with the Administrator, or any of their Affiliates.

"*Agent Members*": Members of, or participants in, a Depository.

4

"***Aggregate Outstanding Amount***": When used with respect to any of the Notes as of any date, the aggregate principal amount of such Notes on that date. When used with respect to the Preference Shares as of any date, means the number of such Preference Shares Outstanding on such date.

Except as otherwise provided herein:

(a)     the Aggregate Outstanding Amount of the Class A-1-A Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(b)     the Aggregate Outstanding Amount of the Class A-1-B Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(c)     the Aggregate Outstanding Amount of the Class B Notes at any time shall include any Defaulted Interest in respect thereof and (to the extent not included in any such Defaulted Interest) accrued interest on such Defaulted Interest;

(d)     the Aggregate Outstanding Amount of the Class C Notes at any time shall include all Class C Deferred Interest attributed thereto;

(e)     the Aggregate Outstanding Amount of the Class D Notes at any time shall include all Class D Deferred Interest attributed thereto; and

(f)     the Aggregate Outstanding Amount of the Class E Notes at any time shall include all Class E Deferred Interest attributed thereto.

"***Aggregate Principal Balance***": When used with respect to the Pledged Obligations, the sum of the Principal Balances of all the Pledged Obligations. When used with respect to a portion of the Pledged Obligations, the term Aggregate Principal Balance means the sum of the Principal Balances of that portion of the Pledged Obligations.

"***Aggregate Purchase Price Amount***": When used with respect to the Pledged Obligations, the sum of the Purchase Price Amounts of all the Pledged Obligations. When used with respect to a portion of the Pledged Obligations, the term Aggregate Purchase Price Amount means the sum of the Purchase Price Amounts of that portion of the Pledged Obligations.

"***Allocable Principal Balance***": With respect to a Synthetic Security based upon or relating to a senior secured index providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time, the portion of the aggregate Principal Balance of such Synthetic Security that is allocable to each Reference Obligation comprising such index or indices based upon allocating the Principal Balance of such Synthetic Security among such Reference Obligations in the same proportion as each Reference Obligation bears to the aggregate Principal Balance of such Synthetic Security.

"***Amendment Buy-Out***": The meaning specified in Section 9.6(a).

"***Amendment Buy-Out Option***": The meaning specified in Section 9.6(a).

"***Amendment Buy-Out Purchase Price***": The purchase price payable by the Amendment Buy-Out Purchaser for Securities purchased in an Amendment Buy-Out, if any, in an amount equal

to (i) in the case of the Notes, the Aggregate Outstanding Amount thereof, plus accrued and unpaid interest (including Deferred Interest, if any) as of the date of purchase payable to the Non-Consenting Holder (giving effect to any amounts paid to the Holder on such date), plus any unpaid Extension Bonus Payment, plus in the case of the CDS/TRS Purchaser, the applicable CDS/TRS Termination Payment Amount, and (ii) in the case of the Preference Shares, an amount that, when taken together with all payments and distributions made in respect of such Preference Shares since the Closing Date (and any amounts payable, if any, to the Non-Consenting Holder on the next succeeding Payment Date) would cause such Preference Shares to have received (as of the date of purchase thereof) a Preference Share Internal Rate of Return of 12.0% (assuming such purchase date was a Payment Date); provided, however, that in any Amendment Buy-Out from and after the date on which the Non-Consenting Holders have received a Preference Share Internal Rate of Return equal to or in excess of 12.0%, the Amendment Buy-Out Purchase Price for such Preference Shares shall be zero.

"*Amendment Buy-Out Purchaser*": The Servicer (or any of its Affiliates acting as principal or agent); provided that in the event that the Servicer elects not to purchase Securities from Holders pursuant to Section 9.6, "Amendment Buy-Out Purchaser" shall mean one or more qualifying purchasers (which may include the Initial Purchasers or any of their Affiliates acting as principal or agent) designated by the Servicer; provided, however, none of the Servicer, the Initial Purchasers or any of their respective Affiliates shall have any duty to act as an Amendment Buy-Out Purchaser.

"*Applicable Discount Rate*": For purposes of determining the CDS/TRS Termination Payment Amount with respect to the CDS/TRS Purchaser in connection with an Amendment Buy-Out, USD-LIBOR-BBA, as defined in the Annex to the 2000 ISDA Definitions as determined by the CDS/TRS Purchaser on the Business Day preceding the date of purchase of the applicable Notes from the CDS/TRS Purchaser in connection with such Amendment Buy-Out.

"*Applicable Issuers*" or "*Applicable Issuer*": With respect to the Class A-1-A Notes, the Class A-1-B Notes, the Class B Notes, the Class C Notes and the Class D Notes, each of the Co-Issuers. With respect to the Class E Notes and the Preference Shares, the Issuer only.

"*Applicable Note Interest Rate*": With respect to the Notes of any Class, the Note Interest Rate with respect to such Class.

"*Applicable Percentage*": The lesser of the Moody's Priority Category Recovery Rate applicable to the Collateral Obligation and the S&P Recovery Rate applicable to the Collateral Obligation and the current S&P Rating of the Class A Notes.

"*Approved Credit Support Document*": A security agreement in the form of the 1994 ISDA Credit Support Annex (ISDA Agreements Subject to New York Law Only), as modified by Paragraph 13 thereto.

"*Approved Pricing Service*": Loan Pricing Corporation, Mark-It-Partners, Inc. or any other nationally recognized loan pricing service approved in writing by S&P.

"*Ask-Side Market Value*": As of any Measurement Date, the market value determined by the Servicer and reported to the Trustee as an amount rather than as a percentage or fraction of par (expressed in Dollars) of any lent Collateral Obligation based upon the Servicer's commercially reasonable judgment and based upon the following order of priority: (i) the average of the ask-side market prices obtained by the Servicer from three Independent broker-dealers active in the trading of such obligations which are also Independent from the Servicer or (ii) if the foregoing set of prices could not be obtained, the higher of the ask-side market prices obtained by the Servicer from two Independent broker-dealers active in the trading of such obligations are also Independent from the

6

Servicer or (iii) if the foregoing sets of prices could not be obtained, the average of the ask-side prices for the purchase of such Collateral Obligation determined by an Approved Pricing Service (Independent from the Servicer) that derives valuations by polling broker-dealers (Independent from the Servicer); provided that if the Ask-Side Market Value of any lent Collateral Obligation cannot be so determined then such Collateral Obligation shall be deemed to have a Market Value equal to the outstanding principal balance thereof.

"*Assigned Moody's Rating*": The meaning set forth in Schedule 7.

"*Authenticating Agent*": With respect to the Notes, the Trustee or the person designated by the Trustee to authenticate the Notes on behalf of the Trustee pursuant to Section 6.15.

"*Authorized Officer*": With respect to the Issuer or the Co-Issuer, as applicable, any Officer or agent who is authorized to act for the Issuer or the Co-Issuer as applicable, in matters relating to, and binding on, the Issuer or the Co-Issuer. With respect to the Servicer, any managing member, Officer, manager, employee, partner or agent of the Servicer who is authorized to act for the Servicer in matters relating to, and binding on, the Servicer with respect to the subject matter of the request, certificate, or order in question. With respect to the Trustee or any other bank or trust company acting as trustee of an express trust or as custodian, a Trust Officer. Each party may receive and accept a certification of the authority of any other party as conclusive evidence of the authority of any Person to act, and the certification may be considered as in full force and effect until receipt by the other party of written notice to the contrary.

"*Average Life*": As of any Measurement Date with respect to any Collateral Obligation (other than any Defaulted Collateral Obligation), the quotient obtained by dividing:

(i)      the sum of the products of:

(A)     the number of years (rounded to the nearest hundredth) from the Measurement Date to the respective dates of each successive scheduled payment of principal of the Collateral Obligation, and

(B)     the respective amounts of the successive scheduled payments of principal of the Collateral Obligation, *by*

(ii)     the sum of all successive scheduled payments of principal of the Collateral Obligation.

"*Bank*": Investors Bank & Trust Company, in its individual capacity and not as Trustee.

"*Bankruptcy Code*": The U.S. Bankruptcy Code, Title 11 of the United States Code.

"*Bankruptcy Law*": The Bankruptcy Code, Part V of the Companies Law (2004 Revision) of the Cayman Islands and the Bankruptcy Law (1997 Revision) of the Cayman Islands.

"*Beneficial Owner*": Any person owning an interest in a Global Note as reflected on the books of the Depository or on the books of an Agent Member or on the books of an indirect participant for which an Agent Member acts as agent.

"*Benefit Plan Investor*": Any (i) "employee benefit plan" within the meaning of Section 3(3) of ERISA, that is subject to Title I of ERISA, (ii) any "plan" described by Section 4975(e)(1) of the Code that is subject to Section 4975 of the Code, or an entity whose underlying assets include the assets of any plan described in (i) or (ii) by reason of such plan's investment in such entity.

7

"***Board Resolution***": With respect to the Issuer, a resolution of the board of directors of the Issuer and, with respect to the Co-Issuer, a resolution of the board of directors of the Co-Issuer.

"***Business Day***": A day on which commercial banks and foreign exchange markets settle payments in New York City and any other city in which the Corporate Trust Office of the Trustee is located and, in the case of the final payment of principal of any Note, the place of presentation of the Note designated by the Trustee; provided, however, that, for purposes of determining LIBOR, "Business Day" must also be a day on which dealings in deposits in Dollars are transacted in the London interbank market. To the extent action is required of the Irish Paying Agent, Dublin, Ireland shall be considered in determining "Business Day" for purposes of determining when actions by the Irish Paying Agent are required.

"***Calculation Agent***": The meaning specified in Section 7.16.

"***Caa1 Collateral Obligations***": The Collateral Obligations (excluding any Defaulted Collateral Obligations) that on the relevant date have a Moody's Rating below "B3".

"***Cash***": Such coin or currency of the United States of America as at the time shall be legal tender for payment of all public and private debts.

"***CCC+/Caa1 Collateral Obligations***": The Collateral Obligations (excluding any Defaulted Collateral Obligations) that on the relevant date have (i) a Moody's Rating below "B3" and/or (ii) an S&P Rating below "B-".

"***CCC+/Caa1 Excess Market Value Percentage***": The percentage equivalent of a fraction, the numerator of which is the aggregate Market Value of CCC+/Caa1 Collateral Obligations (in order of ascending Market Value Percentage, starting with the CCC+/Caa1 Collateral Obligation with the lowest Market Value Percentage) with an aggregate Principal Balance equal to Excess CCC+/Caa1 Collateral Obligations and the denominator of which is an amount equal to the Excess CCC+/Caa1 Collateral Obligations.

"***CDS/TRS Purchaser***": Lehman Brothers Special Financing Inc. as a Holder or a beneficial owner of certain of the Notes at the Closing Date that has entered into either a credit default swap or a total return swap with respect to such Notes and has provided the Issuer and the Trustee with a written certification (which shall include wiring instructions for the CDS/TRS Purchaser) regarding its entry into such swap in a form reasonably acceptable to the Issuer (or the Servicer on behalf of the Issuer).

"***CDS/TRS Termination Payment Amount***": With respect to the CDS/TRS Purchaser in connection with an Amendment Buy-Out, (i) on any Payment Date prior to the May 2011 Payment Date, an amount equal to the present value of the Fixed Amounts with respect to the CDS/TRS Purchaser and each Fixed Rate Payor Calculation Period until the last Fixed Rate Calculation Period, discounting each Fixed Amount from the Payment Date following the end of each such Fixed Rate Payor Calculation Period to the date of purchase of the applicable Notes at the Applicable Discount Rate, and (ii) on any Payment Date on and after the May 2011 Payment Date, zero; provided that, in the case of clause (i), the CDS/TRS Termination Payment Amount shall be calculated by the Servicer and subject to the approval of the CDS/TRS Purchaser.

"***Certificate of Authentication***": The meaning specified in Section 2.1.

"***Certificated Class E Note***": The meaning set forth in Section 2.2(e).

"***Certificated Preference Share***": The meaning set forth in the Preference Shares Paying Agency Agreement.

"***Certificated Security (UCC)***": The meaning specified in Section 8-102(a)(4) of the UCC.

"***Class***": All of the Notes having the same priority and the same Stated Maturity and all of the Preference Shares.

"***Class A Allocation***": means, with respect to payments of principal of the Class A Notes, the application of proceeds sequentially, *first*, to the Class A-1-A Notes until the Class A-1-A have been fully redeemed, and, *second*, to the Class A-1-B Notes until the Class A-1-B Notes have been fully redeemed.

"***Class A Notes***": The Class A-1-A Notes and the Class A-1-B Notes.

"***Class A-1-A Notes***": The Class A-1-A Floating Rate Senior Secured Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

"***Class A-1-B Notes***": The Class A-1-B Floating Rate Senior Secured Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

"***Class A/B Coverage Tests***": The Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class A-1-A Notes, the Class A-1-B Notes and the Class B Notes.

"***Class B Notes***": The Class B Floating Rate Senior Secured Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

"***Class C Coverage Tests***": The Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class C Notes.

"***Class C Deferred Interest***": Deferred Interest with respect to the Class C Notes.

"***Class C Notes***": The Class C Floating Rate Senior Secured Deferrable Interest Extendable Notes issued by the Co-Issuers pursuant to this Indenture and having the characteristics specified in Section 2.3.

"***Class D Coverage Tests***": The Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class D Notes.

"***Class D Deferred Interest***": Deferred Interest with respect to the Class D Notes.

"***Class D Notes***": The Class D Floating Rate Senior Secured Deferrable Interest Extendable Notes issued by the Issuer pursuant to this Indenture and having the characteristics specified in Section 2.3.

"***Class E Coverage Tests***": The Overcollateralization Test and the Interest Coverage Test, each as applied with respect to the Class E Notes.

"***Class E Deferred Interest***": Deferred Interest with respect to the Class E Notes.

9

"***Class E Notes***": The Class E Floating Rate Senior Secured Deferrable Interest Extendable Notes issued by the Issuer pursuant to this Indenture and having the characteristics specified in Section 2.3.

"***Class I Preference Shares***": The Class I Preference Shares issued by the Issuer pursuant to the Issuer's Memorandum and Articles of Association and the resolutions of the Issuer's board of directors authorizing the issuance of the Preference Shares passed on or before the Closing Date.

"***Class II Preference Share Percentage***": For any Payment Date, a fraction, expressed as a percentage, the numerator of which is the number of Outstanding Class II Preference Shares on such Payment Date and the denominator of which is the total number of Outstanding Preference Shares on such Payment Date.

"***Class II Preference Share Portion***": For any Payment Date, 100% minus the Servicing Fee Portion for such Payment Date.

"***Class II Preference Share Senior Special Payment***": For any Payment Date, an amount equal to the product of (a) the Senior Servicing Fee for such Payment Date and (b) the Class II Preference Share Portion for such Payment Date.

"***Class II Preference Share Special Payment***": Collectively, the Class II Preference Share Senior Special Payment, the Class II Preference Share Subordinated Special Payment and the Class II Preference Share Supplemental Special Payment.

"***Class II Preference Share Special Payment Account***": The trust account established pursuant to Section 10.3(j).

"***Class II Preference Share Subordinated Special Payment***": For any Payment Date, an amount equal to the product of (a) the Subordinated Servicing Fee for such Payment Date and (b) the Class II Preference Share Portion for such Payment Date.

"***Class II Preference Share Supplemental Special Payment***": For any Payment Date, an amount equal to the product of (a) the Supplemental Servicing Fee for such Payment Date and (b) the Class II Preference Share Portion for such Payment Date.

"***Class II Preference Shares***": The Class II Preference Shares issued by the Issuer pursuant to the Issuer's Memorandum and Articles of Association and the resolutions of the Issuer's board of directors authorizing the issuance of the Preference Shares passed on or before the Closing Date.

"***Class Scenario Loss Rate***": With respect to any Class of Notes rated by S&P, an estimate of the cumulative default rate for the Current Portfolio or the Proposed Portfolio, as applicable, consistent with S&P's rating of the Class of Notes on the Closing Date, determined by application of the S&P CDO Monitor.

"***Clearing Agency***": An organization registered as a "clearing agency" pursuant to Section 17A of the Exchange Act.

"***Clearing Corporation***": The meaning specified in Section 8-102(a)(5) of the UCC.

"***Clearing Corporation Security***": A "security" (as defined in Section 8-102(a)(15) of the UCC) that (i) is a debt or equity security and (ii) is in the custody of or maintained on the books of a Clearing Corporation or its nominee.

10

"***Clearstream***": Clearstream Banking, société anonyme, a corporation organized under the laws of the Duchy of Luxembourg.

"***Closing Date***": May 31, 2007.

"***Closing Date Expense Account***": The trust account established pursuant to Section 10.3(g).

"***Co-Issuer***": The person named as such on the first page of this Indenture.

"***Co-Issuers***": The Issuer and the Co-Issuer.

"***Code***": The United States Internal Revenue Code of 1986, as amended.

"***Collateral***": The meaning specified in the Granting Clauses.

"***Collateral Acquisition Agreement***": The agreement dated as of the Closing Date between the Issuer and the Servicer, as modified, amended and supplemented and in effect from time to time.

"***Collateral Administration Agreement***": The agreement dated as of the Closing Date among the Issuer, the Servicer, and the Collateral Administrator, as modified, amended and supplemented and in effect from time to time.

"***Collateral Administrator***": Investors Bank & Trust Company, in its capacity as collateral administrator under the Collateral Administration Agreement.

"***Collateral Assignment of Hedge Agreements***": With respect to each Hedge Agreement, the assignment of all of the Issuer's interest in the Hedge Agreement to the Trustee and acknowledged by the Hedge Counterparty to create a security interest therein in favor of the Trustee.

"***Collateral Obligation***": Any obligation or security that, when the Issuer commits to purchase (or otherwise acquire) the obligation or security, is a Loan, High-Yield Bond, Structured Finance Obligation, or Synthetic Security with a Reference Obligation that is a Loan, a Structured Finance Obligation or High-Yield Bond that is:

    (1)    denominated and payable in U.S. Dollars and is not convertible by its obligor into any other currency;

    (2)    an obligation of an obligor Domiciled in an Eligible Country;

    (3)    an obligation that is eligible by its terms to be assigned to the Issuer and pledged by the Issuer to the Trustee for inclusion in the Collateral;

    (4)    not an exchangeable or convertible security;

    (5)    not an equity security or a component of an equity security or a security that has a component that is an equity security (other than for avoidance of doubt, a pass-through trust certificate in a trust holding Collateral Obligations that is rated by a nationally-recognized credit rating agency);

    (6)    not an obligation or security that has been called for redemption and is not an obligation or security that is the subject of an Offer other than a Permitted Offer or an exchange offer in which a security that is not registered under the Securities Act is

11

exchanged for (i) a security that has substantially identical terms (except for transfer restrictions) but is registered under the Securities Act or (ii) a security that would otherwise qualify for purchase under Article 12;

(7)     an obligation that (a) has a Moody's Rating (including any estimated or confidential rating which is in respect of the full obligation of the obligor and which is monitored) and (b) has an S&P Rating (including any confidential rating which is in respect of the full obligation of the obligor and which is monitored), which S&P Rating does not have a "p", "pi", "q", "r" or "t" subscript unless S&P otherwise authorizes in writing;

(8)     an obligation that is a Finance Lease (if it is a lease) and the Rating Condition has been satisfied with respect to the acquisition thereof;

(9)     (a) an obligation that is not a Current-Pay Obligation, Non-Performing Collateral Obligation or Credit Risk Obligation and (b) in the case of a Collateral Obligation that has a Moody's Rating of "Caa1" or lower or an S&P Rating of "CCC+" or lower, an obligation for which the Servicer has certified in writing that such Collateral Obligation is not a Credit Risk Obligation;

(10)     an obligation that (unless it is a High-Yield Bond) is not subordinated by its terms to other indebtedness for borrowed money of the applicable issuer; provided that for the avoidance of doubt, this clause shall not prohibit the inclusion as Collateral Obligations of Subordinated Lien Loans or Second Lien Loans;

(11)     an obligation that (i) (unless it is a PIK Security) bears simple interest payable in cash no less frequently than annually at a fixed or floating rate that is paid on a periodic basis on an unleveraged basis and, in the case of a floating rate, computed on a benchmark interest rate plus or minus a spread, if any (which may vary under the terms of the obligation) and (ii) provides for a fixed amount of principal payable in cash according to a fixed schedule (which may include optional call dates) or at maturity (or a fixed notional amount in the case of Synthetic Securities);

(12)     an obligation the payment or repayment of the principal, if any, of which is not an amount determined by reference to any formula or index or subject to any contingency under the terms thereof;

(13)     an obligation the portion of which to be acquired (including through a Synthetic Security with respect to the Reference Obligation) does not represent, directly or indirectly, more than a 25% interest in the obligation;

(14)     not an obligation with a maturity later than two years after the Stated Maturity of the Notes;

(15)     an obligation upon which no payments are subject to withholding tax imposed by any jurisdiction unless the obligor thereof or counterparty with respect thereto is required to make "gross-up" payments that cover the full amount of any such withholding tax on an after-tax basis (other than withholding taxes with respect to commitment fees, facility fees or other similar fees);

(16)     not a Loan or Synthetic Security that would require the Issuer after its purchase of the Loan or Synthetic Security to advance any funds to the related borrower or Synthetic Security Counterparty or permit the borrower or Synthetic Security Counterparty to require that any future advances be made except for:

12

(A)     any Revolving Loan or Delayed Drawdown Loan if, simultaneously with its purchase of the Revolving Loan or Delayed Drawdown Loan, the Issuer deposits into the Revolving Reserve Account or the Delayed Drawdown Reserve Account, respectively, the maximum amount of any advances that may be required of the Issuer under the related Underlying Instrument (as provided in Section 10.3(b)), and

(B)     any Synthetic Security if, simultaneously with its purchase of the Synthetic Security, the Issuer posts cash collateral with (or for the benefit of) the Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into the Synthetic Security in an amount not exceeding the amount of any future advances;

(17)     if such obligation is a Structured Finance Obligation that is a collateralized loan obligation, such obligation:

(A)     has been assigned a rating by both Moody's and S&P;

(B)     has a Moody's Rating of "Ba3" or higher and an S&P Rating of "BB-" or higher; and

(C)     has not been placed on the watch list for possible downgrade by Moody's or S&P;

(18)     not a Loan that is an obligation of a debtor in possession or a trustee for a debtor in an insolvency proceeding other than a DIP Loan;

(19)     with respect to an obligation that provides for the payment of interest at a floating rate, an obligation for which such floating rate is determined by reference to the U.S. Dollar prime rate or other base rate, London interbank offered rate or similar interbank offered rate, commercial deposit rate or any other index that the Rating Condition with respect to each Rating Agency is satisfied with respect thereto;

(20)     in the case of a Synthetic Security, the Synthetic Security is one for which the counterparty or issuer, as the case may be, has a short-term debt rating by Moody's of at least "P-1" or long-term senior unsecured rating by Moody's of at least "A3" and, if rated "A3" by Moody's, such rating is not on watch for downgrade, and an issuer credit rating by S&P of at least "AA-" or a short term debt rating by S&P of at least "A-1+";

(21)     not an obligation that constitutes Margin Stock;

(22)     not a Zero-Coupon Security;

(23)     not an obligation that is currently deferring interest or paying interest "in kind" or otherwise has an interest "in kind" balance outstanding at the time of purchase, which interest is otherwise payable in cash, unless the Rating Condition has been satisfied with respect to the acquisition thereof;

(24)     not a security whose repayment is subject to substantial non-credit related risk as determined by the Servicer;

(25)     not an obligation the interest payments of which are scheduled to decrease (although interest payments may decrease due to unscheduled events such as a decrease of

13

the index relating to a Floating Rate Obligation, the change from a default rate of interest to a non-default rate of interest or an improvement in the obligor's financial condition); and

(26) not an obligation that will cause the Issuer, the Co-Issuer, or the pool of assets to be required to be registered as an investment company under the Investment Company Act.

Pursuant to the definition of "Synthetic Security," unless the Rating Condition is otherwise satisfied, any "deliverable obligation" that may be delivered to the Issuer as a result of the occurrence of any "credit event" must qualify (when the Issuer purchases the related Synthetic Security and when such "deliverable obligation" is delivered to the Issuer as a result of the occurrence of any "credit event") as a Collateral Obligation, except that such "deliverable obligation" may constitute a Defaulted Collateral Obligation when delivered upon a "credit event."

"***Collateral Quality Tests***": The Diversity Test, the Weighted Average Life Test, the Weighted Average Moody's Recovery Rate Test, the Weighted Average S&P Recovery Rate Test, the Weighted Average Fixed Rate Coupon Test, the Weighted Average Spread Test, the Weighted Average Rating Factor Test and the S&P CDO Monitor Test.

"***Collection Account***": The trust account established pursuant to Section 10.2(a).

"***Commitment Amount***": With respect to any Revolving Loan or Delayed Drawdown Loan, the maximum aggregate outstanding principal amount (whether then funded or unfunded) of advances or other extensions of credit that the Issuer could be required to make to the borrower under its Underlying Instruments.

"***Commitment Reduction***": With respect to any Revolving Loan or Delayed Drawdown Loan, a permanent reduction (whether scheduled, mandatory, optional, or otherwise) in the related Commitment Amount.

"***Concentration Limitations***": The limit set forth below with respect to a particular type of Relevant Obligation (measured by Aggregate Principal Balance) as a percentage of the Maximum Amount:

|     |                                                                                                                         | Percentage of the Maximum Amount |
| --- | ----------------------------------------------------------------------------------------------------------------------- | --------------------------------- |
| (1) | Senior Secured Loans and Eligible Investments                                                                           | ≥ 87.5%                           |
| (2) | unsecured Loans                                                                                                         | ≤ 3.0%                            |
| (3) | Subordinated Lien Loans and Second Lien Loans                                                                           | ≤ 10.0%                           |
| (4) | Revolving Loans and the unfunded portion of Delayed Drawdown Loans                                                      | ≤ 12.0%                           |
| (5) | DIP Loans                                                                                                               | ≤ 5.0%                            |
|     | (a) except that with a Rating Confirmation, DIP Loans may constitute up to the percentage of the Maximum Amount specified in the right column | ≤ 7.5%                            |
| (6) | S&P Unrated DIP Loans                                                                                                   | ≤ 2.5%                            |
| (7) | PIK Securities                                                                                                          | ≤ 3.0%                            |
| (8) | High-Yield Bonds                                                                                                        | ≤ 7.5%                            |

14

| (9) | Structured Finance Obligations | | ≤ 10.0% |
|---|---|---|---|
| | (a) | except that Structured Finance Obligations serviced by the Servicer may not exceed the percentage of the Maximum Amount specified in the right column | ≤ 2.5% |
| | (b) | except that a single issuer together with any of its Affiliates (excluding Secondary Risk Counterparties) of a Structured Finance Obligation may not exceed the percentage of the Maximum Amount specified in the right column | ≤ 3.0% |
| | (c) | except that Structured Finance Obligations that are (i) collateralized debt obligations primarily backed by other collateralized debt obligations and (ii) collateralized debt obligations primarily backed by one or more credit default swaps (i.e., "Synthetics CDOs") may not exceed the percentage of the Maximum Amount specified in the right column | ≤ 3.0% |
| (10) | Structured Finance Obligations that are collateralized loan obligations | | ≤ 7.5% |
| (11) | obligors Domiciled other than in the United States and Canada | | ≤ 20.0% |
| (12) | obligors Domiciled in Canada or any single Moody's Group I Country | | ≤ 10.0% |
| (13) | obligors Domiciled in any single Moody's Group II Country | | ≤ 5.0% |
| (14) | obligors Domiciled in all Moody's Group II Countries in the aggregate | | ≤ 10.0% |
| (15) | obligors Domiciled in any single Moody's Group III Country | | ≤ 2.5% |
| (16) | obligors Domiciled in all Moody's Group III Countries in the aggregate | | ≤ 5.0% |
| (17) | obligors organized in a Tax Advantaged Jurisdiction | | ≤ 5.0% |
| (18) | same S&P Industry Classification | | ≤ 8.0% |
| | (a) | except that Relevant Obligations belonging to two S&P Industry Classifications may each constitute up to the percentage of the Maximum Amount specified in the right column | ≤ 12.0% |
| (19) | single obligor and any of its Affiliates (excluding Secondary Risk Counterparties) | | ≤ 1.5% |
| | (a) | except that up to each of five individual obligors and any of their Affiliates (excluding Secondary Risk Counterparties and any obligor under a DIP Loan) may each constitute up to the percentage of the Maximum Amount specified in the right column | ≤ 2.5% |
| (20) | Fixed Rate Obligations | | ≤ 5.0% |
| | (a) | except that with a Rating Confirmation from Moody's, Fixed Rate Obligations may constitute up to the percentage of the Maximum Amount specified in the right column | ≤ 7.5% |
| (21) | Pay interest less frequently than quarterly but no less frequently than semi-annually | | ≤ 7.5% |
| (22) | Pay interest less frequently than semi-annually but no less frequently than annually | | ≤ 3.0% |

| (23) | Synthetic Securities | | ≤ 20.0% |
|---|---|---|---|
| | (a) | except that Synthetic Securities that provide for settlement other than by physical delivery may not exceed the percentage of the Maximum Amount specified in the right column | ≤ 5.0% |
| | (b) | except that Synthetic Securities that reference a senior secured index providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time may not exceed the percentage of the Maximum Amount specified in the right column | ≤ 5.0% |
| (24) | Participations (provided that no Relevant Obligations may be a Participation in a Participation) | | ≤ 20.0% |
| (25) | Relevant Obligations of which are (i) obligors Domiciled other than in the United States, (ii) Collateral Obligations lent under Securiities Lending Agreements, (iii) Participations and (iv) Synthetic Securities, in the aggregate may not exceed the percentage of the Maximum Amount specified in the right column | | ≤ 20.0% |
| (26) | Relevant Obligations of which are (i) obligors Domiciled other than in the United States, (ii) Collateral Obligations lent under Securities Lending Agreements, (iii) Participations and (iv) Synthetic Securities, entered into with, or issued by, a single Secondary Risk Counterparty | | ≤ respective percentage in Secondary Risk Table under "Individual Counterparty Limit" for applicable rating* |
| (27) | Relevant Obligations of which are (i) obligors Domiciled other than in the United States, (ii) Collateral Obligations lent under Securities Lending Agreements, (iii) Participations and (iv) Synthetic Securities, entered into with, or issued by, all Secondary Risk Counterparties | | ≤ respective percentage in Secondary Risk Table under "Aggregate Counterparty Limit" for applicable rating** |
| (28) | Deep Discount Obligations | | ≤ 7.5% |
| (29) | CCC+/Caa1 and below Collateral Obligations | | ≤ 7.5% |
| (30) | Long-Dated Collateral Obligations | | ≤ 2.0% |
| (31) | Collateral Obligations lent under Securities Lending Agreements | | ≤ 15.0% |
| (32) | Collateral Obligations providing for interest at a non-London interbank offered rate (excluding, for the avoidance of doubt, the unfunded amount of any Revolving Loan or Delayed Drawdown Loan) | | ≤ 5.0% |
| (33) | Collateral Obligations that are Loans that are part of a credit facility with a total global aggregate commitment amount of less than $75,000,000 | | ≤ 10.0% |

\* Applicable long-term unsecured rating by Moody's or S&P of such Secondary Risk Counterparty (using the limit for the lower of such ratings if different).

\*\* Long-term unsecured rating by Moody's or S&P at or below a level specified in the Secondary Risk Table (using the lower of such ratings for a Secondary Risk Counterparty, if different).

Subject to the rights in certain circumstances of the Servicer to determine otherwise as set out in Section 1.2(h), solely for the purpose of determining whether the Concentration Limitations

16

are met, Eligible Investments and Cash will be treated as Senior Secured Loans and Floating Rate Obligations.

"*Consenting Holder of the Preference Shares*": With respect to any Payment Date, a Holder of Preference Shares that has consented by delivering an irrevocable written notice to the Preference Shares Paying Agent to a distribution of Eligible Equity Securities in lieu of payment of Interest Proceeds on such Payment Date.

"*Controlling Class*": The Class A-1-A Notes and the Class A-1-B Notes (voting together as a Class or group), so long as any Class A-1-A Notes or Class A-1-B Notes are Outstanding; then the Class B Notes (voting together as a Class or group), so long as any Class B Notes are Outstanding; then the Class C Notes (voting together as a Class or group), so long as any Class C Notes are Outstanding; then the Class D Notes (voting together as a Class or group), so long as any Class D Notes are Outstanding; and then the Class E Notes (voting together as a Class or group), so long as any Class E Notes are Outstanding.

"*Controlling Person*": The meaning specified in Section 2.6(c).

"*Corporate Trust Office*": The corporate trust office of the Trustee at which the Trustee performs its duties under this Indenture, currently having an address of 200 Clarendon Street, Mail Code: EUC 108, Boston, MA 02116 telecopy no. (617) 351-4358, Attention: CDO Services Group, or any other address the Trustee designates from time to time by notice to the Noteholders, the Servicer, the Preference Shares Paying Agent, the Issuer, and each Rating Agency or the principal corporate trust office of any successor Trustee.

"*Coverage Tests*": Collectively, the Class A/B Coverage Tests, the Class C Coverage Tests, the Class D Coverage Tests and the Class E Coverage Tests applicable as of any Measurement Date.

"*Credit Improved Obligation*": Any Collateral Obligation that (a) is sold pursuant to a Portfolio Improvement Exchange or (b) in the commercially reasonable judgment of the Servicer, has improved in credit quality; provided that, in forming such judgment, a reduction in credit spread or an increase in Market Value of such Collateral Obligation (whether as described in clauses (ii) or (iii) below or otherwise) may only be utilized as corroboration of other bases for such judgment; and provided, further, that, if a Credit Rating Event is in effect, such Collateral Obligation will be considered a Credit Improved Obligation only if in addition to the above:

     (i)     the Collateral Obligation has been upgraded or has been put on credit watch list with the potential for developing positive credit implications by either of the Rating Agencies since the date the Issuer first acquired the Collateral Obligation under this Indenture;

     (ii)     such Collateral Obligation has experienced a reduction in credit spread of (A) 0.25% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such decrease) less than or equal to 2.00%, (B) 0.375% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such decrease) greater than 2.00% but less than or equal to 4.00% or (C) 0.50% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such decrease) greater than 4.00%, in each case compared to the credit spread at the time such Collateral Obligation was acquired by the Issuer, determined by reference to an applicable index selected by the Servicer (such index selection subject to satisfaction of the Rating Condition with respect to Moody's);

     (iii)     (x) in the case of a Loan, the Market Value of such Collateral Obligation has increased by at least 1.00% from the Market Value of such Collateral Obligation as of its date of

17

acquisition, as determined by the Servicer (provided that this subclause (iii)(x) will be deemed satisfied if Market Value increases to 1.01%), or (y) in the case of a Bond, the Market Value of such Collateral Obligation has changed since its date of acquisition by a percentage more positive than the percentage change in the Merrill Lynch US High Yield Master II Index, Bloomberg ticker H0A0, plus 3.00%, over the same period; or

(iv)     a Super Majority of the Controlling Class have voted to suspend the limitations on a Collateral Obligation being a Credit Improved Obligation, and for each subsequent downgrade by Moody's after a vote to suspend the limitations pursuant to this clause (iv) has occurred, a Super Majority of the Controlling Class must again vote to suspend the limitations on the Collateral Obligation being a Credit Improved Obligation for this clause (iv) to remain applicable.

A Synthetic Security shall be considered a Credit Improved Obligation if:

(i)     the Synthetic Security itself is a Credit Improved Obligation; or

(ii)     the Reference Obligation of the Synthetic Security would, if it were a Collateral Obligation, be a Credit Improved Obligation.

"*Credit Rating Event*": An event that is in effect if the rating by Moody's:

(i)     of the Class A-1-A Notes or the Class A-1-B Notes has been withdrawn or is one or more rating sub-categories below its Initial Rating; or

(ii)     of the Class B Notes, the Class C Notes, the Class D Notes or the Class E Notes has been withdrawn or is two or more rating sub-categories below its respective Initial Rating.

For the purposes of this definition, any withdrawal or reduction in rating shall not be effective if after the withdrawal or reduction Moody's has upgraded the reduced or withdrawn rating to at least the Initial Rating in the case of the Class A-1-A Notes and the Class A-1-B Notes, or to only one subcategory below their Initial Rating in the case of the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes.

"*Credit Risk Obligation*": Any Collateral Obligation (other than a Defaulted Collateral Obligation) that, in the commercially reasonable judgment of the Servicer, has significantly declined in credit quality and has a significant risk, with a lapse of time, of becoming a Defaulted Collateral Obligation; provided that in forming such judgment, an increase in credit spread or a decrease in Market Value of such Collateral Obligation (whether as described in clauses (ii) or (iii) below or otherwise) may only be utilized as corroboration of other bases for such judgment.

So long as a Credit Rating Event is in effect, no Collateral Obligation shall be eligible to be a Credit Risk Obligation unless in addition to the above, as of the date of determination:

(i)     the Collateral Obligation has been downgraded or has been put on credit watch list with the potential for developing negative credit implications by either of the Rating Agencies since the date the Issuer first acquired the Collateral Obligation under this Indenture;

(ii)     such Collateral Obligation has experienced an increase in credit spread of (A) 0.25% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such increase) less than or equal to 2.00%, (B) 0.375% or more (on an absolute rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such increase) greater than 2.00% but less than or equal to 4.00% or (C) 0.50% or more (on an absolute

18

NY\1257964.27

rather than a relative basis) in the case of a Collateral Obligation with a spread (prior to such increase) greater than 4.00%, in each case compared to the credit spread at the time such Collateral Obligation was acquired by the Issuer, determined by reference to an applicable index selected by the Servicer (such index selection subject to satisfaction of the Rating Condition with respect to Moody's);

(iii)     (x) in the case of a Loan, the Market Value of such Collateral Obligation has decreased by at least 2.50% from the Market Value of such Collateral Obligation as of its date of acquisition, as determined by the Servicer, and (y) in the case of a Bond, the Market Value of such Collateral Obligation has changed since its date of acquisition by a percentage more negative, or less positive, as the case may be, than the percentage change in the Merrill Lynch US High Yield Master II Index, Bloomberg ticker H0A0, less 3.00%, over the same period; or

(iv)     a Super Majority of the Controlling Class have voted to suspend the limitations on a Collateral Obligation being a Credit Risk Obligation set forth in clauses (i), (ii) and (iii) above, and for each subsequent downgrade by Moody's after a vote to suspend the limitations pursuant to this clause (iv) has occurred, a Super Majority of the Controlling Class must again vote to suspend the limitations on the Collateral Obligation being a Credit Risk Obligation for this clause (iv) to remain applicable.

A Synthetic Security shall be considered a Credit Risk Obligation if:

(a)     the Synthetic Security itself is a Credit Risk Obligation; or

(b)     the Reference Obligation of the Synthetic Security would, if it were a Collateral Obligation, be a Credit Risk Obligation.

"*Current-Pay Obligation*": A Collateral Obligation as to which:

(i)     an Insolvency Event has occurred with respect to its obligor or as to which its obligor is rated "D" or "SD" by S&P or its obligor has previously been rated "CCC-" by S&P and the rating has been withdrawn;

(ii)     no default as to the payment of principal or interest with respect to the Collateral Obligation is then continuing and the Servicer has delivered to the Trustee an Officer's certificate to the effect that the Servicer expects that the obligor will make payments on the Collateral Obligation as they become due;

(iii)     (A) if the rating by Moody's of the Collateral Obligation is at least "Caa1" (and not on credit watch with negative implications) the Market Value of the Collateral Obligation is at least equal to 80% of its Principal Balance or (B) if the rating by Moody's of the Collateral Obligation is less than "Caa1" or is "Caa1" and on credit watch with negative implications, the Market Value of the Collateral Obligation is at least equal to 85% of its Principal Balance;

(iv)     if an Insolvency Event has occurred with respect to the obligor of the Collateral Obligation, a bankruptcy court has authorized all payments of principal and interest payable on the Collateral Obligation; and

(v)     the Servicer has designated in writing to the Trustee the Collateral Obligation as a Current-Pay Obligation.

If the Aggregate Principal Balance of Collateral Obligations that would otherwise be Current-Pay Obligations exceeds 5% of the Maximum Amount, all or a portion of one or more

19

Collateral Obligations that would otherwise be Current-Pay Obligations with an Aggregate Principal Balance equal to the amount of the excess shall not be Current-Pay Obligations (and will therefore be Defaulted Collateral Obligations). The Servicer shall designate in writing to the Trustee the Collateral Obligations that shall not be Current-Pay Obligations pursuant to the preceding sentence as the Collateral Obligations (or portions thereof) that have the lowest Market Value on any applicable date of determination.

The Servicer may, with the consent of a Majority of the Controlling Class, by notice to the Issuer, the Trustee, and the Collateral Administrator, change the definition of "Current-Pay Obligation" or how Current-Pay Obligations are treated in this Indenture, subject to the satisfaction of the Rating Condition with respect to each Rating Agency.

"*Current Portfolio*": At any time, the portfolio (measured by Aggregate Principal Balance) of Collateral Obligations, Principal Proceeds held as Cash on deposit in the Collection Account, and other Eligible Investments purchased with Principal Proceeds on deposit in the Collection Account that exists before the sale, maturity, or other disposition of a Collateral Obligation or before the acquisition of a Collateral Obligation, as the case may be.

"*Custodial Account*": The custodial account established in the name of the Trustee pursuant to Section 10.3(a).

"*Custodian*": The meaning specified in the first sentence of Section 3.2(a) with respect to items of collateral referred to therein, and each entity with which an Account is maintained, as the context may require, each of which shall be a Securities Intermediary.

"*Deep Discount Obligation*": Until the average Market Value Percentage of the Collateral Obligation, as determined daily for any period of 30 consecutive days, equals or exceeds 90%, any Collateral Obligation acquired by the Issuer for a Purchase Price less than 85% of its Principal Balance. For such purpose, the Market Value Percentage of a Collateral Obligation on a day that is not a Business Day shall be deemed to be the Market Value Percentage of the Collateral Obligation on the immediately preceding Business Day.

"*Default*": Any Event of Default or any occurrence that, with notice or the lapse of time or both, would become an Event of Default.

"*Defaulted Collateral Obligation*": Any Collateral Obligation or other obligation included in the Collateral:

(i)     as to which there has occurred and is continuing a default with respect to the payment of interest or principal with respect to such Collateral Obligation, without giving effect to any applicable grace period or waiver (provided that if the Servicer certifies to the Trustee in writing that such default is for non-credit related reasons, the related Collateral Obligation shall not be treated as a Defaulted Collateral Obligation under this clause (i) unless and until such default has continued for a period of three (3) consecutive business days), but, in any case, only until such default has been cured;

(ii)     the maturity of all or a portion of the principal amount of such Collateral Obligation has been accelerated as a consequence of a default (other than any payment default) under the instruments evidencing or relating to such Collateral Obligation; unless such default or event of default has been fully cured or waived and is no longer continuing and such acceleration has been rescinded;

20

(iii)     with respect to which there has been effected any distressed exchange or other debt restructuring where the obligor has offered the holders thereof a new security or instrument or package of securities or instruments that, in the commercially reasonable judgment of the Servicer, either (x) amounts to a diminished financial obligation or (y) has the sole purpose of enabling the obligor to avoid a default;

(iv)     (1) that is *pari passu* with or subordinated to other indebtedness for borrowed money owing by its obligor ("***Other Indebtedness***"), (2) the obligor has defaulted in the payment of principal or interest (without regard to any applicable grace or notice period and without regard to any waiver of the default) on the Other Indebtedness, unless, in the case of a failure of the obligor to make required interest payments, the obligor has resumed current Cash payments of interest previously scheduled and unpaid on the Other Indebtedness and has paid in full any accrued interest due and payable thereon, in which case the Collateral Obligation shall cease to be classified as a Defaulted Collateral Obligation and (3) the Servicer, provided that the related Collateral Obligation has not been downgraded after the default on such Other Indebtedness has occurred, determines (in its commercially reasonable judgment) that such Other Indebtedness is material;

(v)     (other than a Current-Pay Obligation or a DIP Loan) as to which:

(A) an Insolvency Event has occurred with respect to its obligor,

(B) the obligation is rated "D", "SD", "C" or "CC" by S&P or was so rated immediately prior to such rating being withdrawn, or has previously been rated "CCC-" or lower by S&P and the rating has been withdrawn, or

(C) the obligation is rated "D" by Moody's or was so rated immediately prior to such rating being withdrawn;

(vi)     if the Collateral Obligation is a Structured Finance Obligation, it is rated "CC" or below by S&P, or it was rated "CC" or below by S&P but the rating has since been withdrawn, or it is rated "Ca" or below by Moody's, or it was rated "C" or below by Moody's but the rating has since been withdrawn;

(vii)     that is a Participation that would, if the underlying Loan were a Collateral Obligation, be a Defaulted Collateral Obligation under any of clauses (i) through (v) above or with respect to which the Participating Institution has defaulted in the performance of any of its payment obligations under the Participation;

(viii)     that is a Synthetic Security referencing a Reference Obligation that would, if the Reference Obligation were a Collateral Obligation, be a Defaulted Collateral Obligation under any of clauses (i) through (vi) above or with respect to which the Synthetic Security Counterparty has defaulted in the performance of any of its payment obligations under the Synthetic Security; provided, however, with respect to a Synthetic Security based upon or relating to a senior secured index providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time: (x) a determination whether the Reference Obligations upon which such Synthetic Security is based would, if such Reference Obligations were Collateral Obligations, be a Defaulted Collateral Obligation, shall be determined by treating such Synthetic Security as a direct interest of the Issuer in each of the Reference Obligations on which such Synthetic Security is based in an amount equal to the Allocable Principal Balance of such Reference Obligation and (y) the "Defaulted Collateral Obligation" for purposes of this clause (viii) shall be limited to the Allocable Principal Balance of

21

NY\1257964.27

each Reference Obligation that would, if the Reference Obligation were a Collateral Obligation, be a Defaulted Collateral Obligation under any of clauses (i) through (vi) above;

      (ix)    that is a Written-Down Obligation;

      (x)    that is a DIP Loan as to which an order has been entered converting the debtor's chapter 11 case to a case under chapter 7 of the Bankruptcy Code; or

      (xi)    that is declared to be a Defaulted Collateral Obligation by the Servicer.

Any Collateral Obligation that is classified as a Defaulted Collateral Obligation shall cease to be so classified if the Collateral Obligation, at any date thereafter,

      (1)    would not otherwise be classified as a Defaulted Collateral Obligation in accordance with this definition; and

      (2)    otherwise meets the Eligibility Criteria as of that date.

If any portion of a Collateral Obligation has a maturity later than one year after the Stated Maturity of the Notes due to a change in the payment schedule of the Collateral Obligation occurring after its acquisition by the Issuer, that portion of the Collateral Obligation shall be considered a Defaulted Collateral Obligation.

"*Defaulted Hedge Termination Payment*": Any termination payment required to be made by the Issuer to a Hedge Counterparty pursuant to a Hedge Agreement upon a termination of the Hedge Agreement in respect of which the Hedge Counterparty is the sole Defaulting Party or Affected Party (each as defined in the Hedge Agreements).

"*Defaulted Interest*": Any interest payable in respect of any Class of Notes that is not punctually paid or duly provided for on the applicable Payment Date or at Stated Maturity.

"*Defaulted Interest Charge*": To the extent lawful, interest on any Defaulted Interest at the Default Interest Rate.

"*Default Interest Rate*": With respect to any specified Class of Notes, the per annum interest rate equal to the Note Interest Rate payable on the Notes of the Class.

"*Deferred Interest*": With respect to any specified Class of Deferred Interest Notes, the meaning specified in Section 2.8(a).

"*Deferred Interest Notes*": The Class C Notes, the Class D Notes and the Class E Notes.

"*Deficiency Amount*": The meaning specified in Section 16.3(a).

"*Deficiency Notice Date*": The meaning specified in Section 16.3(a).

"*Definitive Notes*": The meaning specified in Section 2.11(b).

"*Delayed Drawdown Loan*": A Loan or any Synthetic Security with a Reference Obligation that

      (i)    requires the Issuer to make one or more future advances to the borrower under its Underlying Instruments,

      (ii)     specifies a maximum amount that can be borrowed on one or more fixed borrowing dates, and

      (iii)    does not permit the re-borrowing of any amount previously repaid.

A Loan or Synthetic Security shall only be considered to be a Delayed Drawdown Loan for so long as its unused commitment amount is greater than zero and for purposes of the Concentration Limitations only unfunded portions will count as Delayed Drawdown Loans.

"***Delayed Drawdown Reserve Account***": The trust account established pursuant to Section 10.3(b).

"***Deliver***" or "***Delivered***" or "***Delivery***": The taking of the following steps:

      (i)     in the case of each Certificated Security (UCC) (other than a Clearing Corporation Security) or Instrument,

         (A)    causing the delivery of such Certificated Security (UCC) or Instrument to the Custodian registered in the name of the Custodian or endorsed, by an effective endorsement, to the Custodian or in blank,

         (B)    causing the Custodian to continuously indicate on its books and records that such Certificated Security (UCC) or Instrument is credited to the applicable Account, and

         (C)    causing the Custodian to maintain continuous possession of such Certificated Security (UCC) or Instrument;

      (ii)    in the case of each Uncertificated Security (other than a Clearing Corporation Security),

         (A)    causing such Uncertificated Security to be continuously registered on the books of the issuer thereof to the Custodian, and

         (B)    causing the Custodian to continuously indicate on its books and records that such Uncertificated Security is credited to the applicable Account;

      (iii)   in the case of each Clearing Corporation Security,

         (A)    causing the relevant Clearing Corporation to credit such Clearing Corporation Security to the securities account of the Custodian, and

         (B)    causing the Custodian to continuously indicate by on its books and records that such Clearing Corporation Security is credited to the applicable Account;

      (iv)    in the case of each security issued or guaranteed by the United States of America or agency or instrumentality thereof and that is maintained in book-entry records of a Federal Reserve Bank ("***FRB***") (each such security, a "***Government Security***"),

         (A)    causing the creation of a Security Entitlement to such Government Security by the credit of such Government Security to the securities account of the Custodian at such FRB, and

23

(B) causing the Custodian to continuously indicate on its books and records that such Government Security is credited to the applicable Account;

(v) in the case of each Security Entitlement not governed by clauses (i) through (iv) above,

(A) causing a Securities Intermediary (x) to indicate on its books and records that the underlying Financial Asset has been credited to be the Custodian's securities account, (y) to receive a Financial Asset from a Securities Intermediary or acquiring the underlying Financial Asset for a Securities Intermediary, and in either case, accepting it for credit to the Custodian's securities account or (z) to become obligated under other law, regulation or rule to credit the underlying Financial Asset to a Security Intermediary's securities account,

(B) causing such Securities Intermediary to make entries on its books and records continuously identifying such Security Entitlement as belonging to the Custodian and continuously indicating on its books and records that such Security Entitlement is credited to the Custodian's securities account, and

(C) causing the Custodian to continuously indicate on its books and records that such Security Entitlement (or all rights and property of the Custodian representing such Security Entitlement) is credited to the applicable Account;

(vi) in the case of cash or money,

(A) causing the delivery of such cash or money to the Custodian,

(B) causing the Custodian to treat such cash or money as a Financial Asset maintained by such Custodian for credit to the applicable Account in accordance with the provisions of Article 8 of the UCC, and

(C) causing the Custodian to continuously indicate on its books and records that such cash or money is credited to the applicable Account; and

(vii) in the case of each general intangible (including any Participation in which the Participation is not represented by an Instrument),

(A) causing the filing of a Financing Statement in the office of the Recorder of Deeds of the District of Columbia, Washington, DC, and

(B) causing the registration of this Indenture in the Register of Mortgages of the Issuer at the Issuer's registered office in the Cayman Islands;

in addition, the Servicer on behalf of the Issuer will obtain any and all consents required by the underlying agreements relating to any such general intangibles for the transfer of ownership to the Issuer and the pledge hereunder (except to the extent that the requirement for such consent is rendered ineffective under Section 9-406 of the UCC).

In addition to the methods specified above, any Collateral may be delivered in accordance with any other method specified in an Opinion of Counsel delivered to the Trustee as sufficient to establish a first priority perfected security (subject to customary exceptions and qualifications) interest therein.

24

"***Depository***" or "***DTC***": The Depository Trust Company and its nominees.

"***Determination Date***": The last day of any Due Period.

"***DIP Loan***": Any Loan:

(i) that has a rating assigned by Moody's (or if the Loan does not have a rating assigned by Moody's, the Servicer has commenced the process of having a rating assigned by Moody's within five Business Days of the date the Loan is acquired by the Issuer) and a rating assigned by S&P (or if the Loan does not have a rating assigned by S&P, the Servicer has commenced the process of having a rating assigned by S&P within two Business Days of the date the Loan is acquired by the Issuer);

(ii) that is an obligation of a debtor in possession as described in Section 1107 of the Bankruptcy Code or a trustee (if appointment of a trustee has been ordered pursuant to Section 1104 of the Bankruptcy Code) (a "***Debtor***") organized under the laws of the United States or any state of the United States; and

(iii) the terms of which have been approved by a final order of the United States Bankruptcy Court, United States District Court, or any other court of competent jurisdiction, the enforceability of which order is not subject to any pending contested matter or proceeding (as those terms are defined in the Federal Rules of Bankruptcy Procedure) and which order provides that:

(A) the Loan is secured by liens on the Debtor's otherwise unencumbered assets pursuant to Section 364(c)(2) of the Bankruptcy Code;

(B) the Loan is secured by liens of equal or senior priority on property of the Debtor's estate that is otherwise subject to a lien pursuant to Section 364(d) of the Bankruptcy Code;

(C) the Loan is fully secured (based on a current valuation or appraisal report) by junior liens on the Debtor's encumbered assets; or

(D) if any portion of the Loan is unsecured, the repayment of the Loan retains priority over all other administrative expenses pursuant to Section 364(c)(1) of the Bankruptcy Code (and in the case of this clause (D), before the acquisition of the Loan, the Rating Condition is satisfied with respect to each Rating Agency).

"***Discount Note***": Any Note that is treated as being issued with "original issue discount" within the meaning of Section 1271 through 1275 of the Code and Treasury Regulations promulgated thereunder.

"***Diversity Score***": A single number that indicates collateral concentration in terms of both issuer and industry concentration, calculated as set forth in <u>Schedule 4</u> to this Indenture.

"***Diversity Test***": A test that will be satisfied as of any Measurement Date if the Diversity Score equals or exceeds the Minimum Diversity Score. For the purposes of calculating the Diversity Test, any Structured Finance Obligation that is (i) a collateralized loan obligation, (ii) any Synthetic Security with respect to which the Reference Obligation is a collateralized loan obligation or (iii) any Synthetic Security based upon or relating to a senior secured index providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time will be disregarded.

25

"*Dollar*" or "*U.S. Dollar*" or "*U.S.$*": A dollar or other equivalent unit in such coin or currency of the United States of America as at the time shall be legal tender for all debts, public and private.

"*Domicile*" or "*Domiciled*": With respect to each Collateral Obligation, (i) the jurisdiction of incorporation, organization or creation of the related obligor or (ii) in the case of a Collateral Obligation that would otherwise be considered to be domiciled pursuant to clause (i) in a Tax Advantaged Jurisdiction, the jurisdiction in which, in the commercially reasonable judgment of the Servicer, the related obligor conducts substantially all of its business operations and in which the assets primarily responsible for generating its revenues are located.

"*Due Date*": Each date on which any payment is due on a Pledged Obligation in accordance with its terms.

"*Due Period*": With respect to any Payment Date, for all purposes other than payments and receipts under Hedge Agreements, the period from the Business Day after the eighth Business Day before the previous Payment Date (or in the case of the first Payment Date, from the Closing Date) up to but excluding the Business Day after the eighth Business Day before the Payment Date (or in the case of the final Payment Date or any Payment Date that is a Redemption Date, through the Business Day before the Payment Date and for payments and receipts under Hedge Agreements the period from the day after the previous Payment Date (or in the case of the first Payment Date from the Closing Date) through the Payment Date).

"*Eligibility Criteria*": The meaning specified in Section 12.2(b).

"*Eligible Collateral*": (i) Cash, (ii) U.S. Treasury obligations, (iii) U.S. agency obligations or (iv) commercial paper obligations rated at least "P-1" by Moody's (and not on watch for downgrade) and "A-1+" by S&P, in each case to collateralize fully on a mark-to-market basis the obligations of a Hedge Counterparty under the related Hedge Agreement.

"*Eligible Country*": The United States, Canada and any country classified by Moody's as a Moody's Group I Country, Moody's Group II Country or Moody's Group III Country and, in each case, has an S&P foreign currency rating of at least "AA" and a Moody's foreign currency rating of at least "Aa2".

"*Eligible Equity Security*": An equity security acquired in connection with the workout or restructuring of any Collateral Obligation by, or on behalf of, the Issuer that (i) is publicly traded on an Established Securities Market or (ii) the Market Value of which is higher than the Principal Balance of the Collateral Obligation with respect to which such equity security has been acquired by the Issuer.

"*Eligible Investments*": Any Dollar-denominated obligation or asset that, when it is pledged by the Issuer to the Trustee under this Indenture, is one or more of the following:

(a)     Cash;

(b)     direct Registered obligations of, and Registered obligations the timely payment of principal and interest on which is fully and expressly guaranteed by, the United States or any agency or instrumentality of the United States the obligations of which are expressly backed by the full faith and credit of the United States, which in each case are not zero coupon securities;

26

(c) demand and time deposits in, trust accounts, certificates of deposit payable within 91 days of issuance of, bankers' acceptances payable within 91 days of issuance issued by, or Federal funds sold by any depositary institution or trust company incorporated under the laws of the United States or any state thereof and subject to supervision and examination by Federal and/or state banking authorities so long as the commercial paper and/or the debt obligations of such depository institution or trust company (or, in the case of the principal depository institution in a holding company system, the commercial paper or debt obligations of such holding company), at the time of such acquisition or contractual commitment providing for such acquisition and throughout the term thereof, have a credit rating of not less than "Aaa" by Moody's and "AAA" by S&P and in each case are not on watch for downgrade, or "P-1" by Moody's and "A-1+" by S&P in the case of commercial paper and short-term debt obligations; provided that in any case, the issuer thereof must have at the time of such acquisition a long-term credit rating of not less than "AA-" by S&P and "Aa3" by Moody's and a short-term rating of "A-1+" by S&P and "P-1" by Moody's, and if so rated, is not on watch for downgrade;

(d) commercial paper or other short-term obligations with a maturity of not more than 183 days from the date of issuance and having at the time of such acquisition a credit rating of at least "P-1" by Moody's and "A-1+" by S&P; provided that, in any case, the issuer thereof must have at the time of such acquisition a long-term credit rating of not less than "Aa2" by Moody's and "AA-" by S&P, and if so rated, such rating is not on watch for downgrade;

(e) unleveraged repurchase obligations with respect to any security described in clause (b) above entered into with a U.S. federal or state depository institution or trust company (acting as principal) described in clause (c) above or entered into with a corporation (acting as principal) whose long-term credit rating is not less than "Aaa" by Moody's and "AAA" by S&P and in each case are not on watch for downgrade or whose short-term credit rating is "P-1" by Moody's and "A-1+" by S&P at the time of such acquisition and throughout the term thereof; provided that, if such repurchase obligation has a maturity of longer than 91 days, the counterparty thereto must also have at the time of such acquisition and throughout the term thereof a long-term credit rating of not less than "Aa2" by Moody's and "AAA" by S&P, and if so rated, such rating is not on watch for downgrade;

(f) any money market fund or similar vehicle having at the time of acquisition and throughout the term thereof a credit rating of "MR1+" by Moody's and "AAA" by S&P; including any fund for which the Trustee or an Affiliate of the Trustee serves as an investment adviser, administrator, shareholder servicing agent, custodian or subcustodian, notwithstanding that (A) the Trustee or an Affiliate of the Trustee charges and collects fees and expenses from such funds for services rendered (provided that such charges, fees and expenses are on terms consistent with terms negotiated at arm's length) and (B) the Trustee charges and collects fees and expenses for services rendered, pursuant to this Indenture;

(g) a guaranteed reinvestment agreement from a bank (if treated as a deposit by such bank), insurance company or other corporation or entity organized under the laws of the United States or any state thereof (if treated as debt by such insurance company or other corporation or entity), providing for periodic payments thereunder during each Due Period; provided that each such agreement provides that it is terminable by the purchaser, without premium or penalty, in the event that the rating assigned to such agreement by either Moody's or S&P is at any time lower than the then current ratings assigned to the Class A-1-A Notes, the Class A-1-B Notes, the Class B Notes, the Class C Notes, the Class D Notes or the Class E Notes; provided, further, that, at the time of acquisition and

27

throughout the term thereof, the issuer of such agreement has a senior unsecured long-term debt rating, issuer rating or counterparty rating of at least "Aaa" by Moody's, a short-term debt rating of "P-1" by Moody's (and not on watch for downgrade), a short-term debt rating of at least "A-1+" by S&P and a long-term debt rating of at least "AAA" by S&P (and not on watch for downgrade); and

      (h)     such other obligations or assets for which Rating Confirmation has been received;

and, in each case, with a stated maturity (giving effect to any applicable grace period) no later than the Business Day before the Payment Date next succeeding the date of acquisition.

Eligible Investments on deposit in the Revolving Reserve Account, the Delayed Drawdown Reserve Account, or the Synthetic Security Collateral Account must have a stated maturity no later than one Business Day after the date of their purchase.

Eligible Investments may not include:

      (1)     any interest-only security, any security purchased at a price in excess of 100% of its par value, any mortgage-backed security or any security whose repayment is subject to substantial non-credit related risk as determined in the commercially reasonable judgment of the Servicer;

      (2)     any security whose rating assigned by S&P includes the subscript "r", "t", "p", "pi" or "q";

      (3)     any floating rate security whose interest rate is inversely or otherwise not proportionately related to an interest rate index or is calculated as other than the sum of an interest rate index plus a spread (which spread may be zero);

      (4)     any security that is subject to an exchange or tender offer; or

      (5)     any security that has payments subject to foreign or United States withholding tax.

Eligible Investments may include Eligible Investments for which the Trustee or an Affiliate of the Trustee is the issuer or depository institution or provides services. Eligible Investments may not include obligations principally secured by real property.

"***Emerging Market Security***": A security or obligation issued by a sovereign or non-sovereign issuer located in a country (excluding the Cayman Islands, Bermuda, the British Virgin Islands, the Netherlands Antilles, and the Channel Islands):

      (i)     that is in Latin America, Asia, Africa, Eastern Europe, or the Caribbean, or

      (ii)     the long-term foreign currency debt obligations of which are rated below "Aa2" or "Aa2" and on credit watch with negative implications by Moody's or the foreign currency issuer credit rating of which is below "AA" by S&P.

"***ERISA***": The United States Employee Retirement Income Security Act of 1974, as amended.

"***Established Securities Market***": Any national securities exchange registered under Section 6 of the Securities Exchange Act of 1934, as amended, or exempted from registration because of the limited volume of transaction; any foreign securities exchange that, under the laws of the jurisdiction

where it is organized, satisfies regulatory requirements that are analogous to the regulatory requirements imposed under the Securities Exchange Act of 1934; any regional or local exchange; and any interdealer quotation system that regularly disseminates firm buy or sell quotations by identified brokers or dealers, by electronic means or otherwise.

"*Euroclear*": Euroclear Bank S.A./N.V., as operator of the Euroclear system.

"*Event of Default*": The meaning specified in Section 5.1.

"*Excel Default Model Input File*": An electronic spreadsheet file in Microsoft excel format to be provided to S&P, which file shall include the balance of Cash and Eligible Investments in each account and the following information (to the extent such information is not confidential) with respect to each Collateral Obligation:

(a) the name and country of domicile of the issuer thereof and the particular obligation or security held by the Issuer,

(b) the CUSIP or other applicable identification number associated with such Collateral Obligation,

(c) the par value of such Collateral Obligation,

(d) the type of obligation or security (including, by way of example, whether such Collateral Obligation is a bond, loan or asset-backed security), using such abbreviations as may be selected by the Trustee,

(e) a description of the index or other applicable benchmark upon which the interest payable on such Collateral Obligation is based (including, by way of example, fixed rate, step-up rate, zero coupon and LIBOR),

(f) the coupon (in the case of a Collateral Obligation which bears interest at a fixed rate) or the spread over the applicable index (in the case of a Collateral Obligation which bears interest at a floating rate),

(g) the S&P Industry Classification for such Collateral Obligation,

(h) the stated maturity date of such Collateral Obligation,

(i) the S&P Rating of such Collateral Obligation or the issuer thereof, as applicable,

(j) the applicable S&P Recovery Rate, and

(k) such other information as the Trustee may determine to include in such file.

"*Excess CCC+/Caa1 Collateral Obligations*": The Principal Balance of all CCC+/Caa1 Collateral Obligations in excess of 7.5% of the Maximum Amount on the relevant Determination Date.

"*Exchange Act*": The United States Securities Exchange Act of 1934, as amended.

"*Excluded Property*": (i) U.S.$1,000 (attributable to the issue and allotment of the Issuer Ordinary Shares) and a U.S.$1,000 transaction fee paid to the Issuer, the bank account in which those amounts are credited in the Cayman Islands and any interest earned on those amounts, (ii) any

29

amounts credited to the Class II Preference Share Special Payment Account and the Preference Share Distribution Account from time to time and (iii) any Margin Stock.

"*Expense Reimbursement Account*": The trust account established pursuant to Section 10.3(c).

"*Extended Replacement Period End Date*":  If an Extension has occurred, the sixteenth Payment Date after the then current Extended Replacement Period End Date (or, in the case of the first Extension pursuant to Section 2.4, the Payment Date in August 2018); provided that the "Extended Replacement Period End Date" will in no event be a date later than the Payment Date in August, 2030.

"*Extended Scheduled Preference Shares Redemption Date*": If a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Scheduled Preference Shares Redemption Date (or, in the case of the first Extended Scheduled Preference Shares Redemption Date, August 1, 2026); provided that the "Extended Scheduled Preference Shares Redemption Date" will in no event be a date later than the Payment Date in August, 2038.

"*Extended Stated Maturity Date*":  If a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Stated Maturity Date (or, in the case of the first Extended Stated Maturity Date, the Payment Date in August, 2026); provided that the "Extended Stated Maturity Date" will in no event be a date later than the Payment Date in August, 2038.

"*Extended Weighted Average Life Date*":  If a Maturity Extension has occurred, the sixteenth Payment Date after the then current Extended Weighted Average Life Date (or, in the case of the first Extended Weighted Average Life Date, August 1, 2021); provided that the "Extended Weighted Average Life Date" will in no event be a date later than the Payment Date in August, 2033.

"*Extension*":  An extension of the Replacement Period, the Stated Maturity of the Notes and the Weighted Average Life Test pursuant to Section 2.4.

"*Extension Bonus Payment*":  With respect to each Maturity Extension, a single payment to each applicable beneficial owner set forth in Section 2.4(g), in an amount equal to (1) in the case of the Class A-1-A Notes, 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (2) in the case of the Class A-1-B Notes 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (3) in the case of the Class B Notes 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (4) in the case of the Class C Notes, 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date, (5) in the case of the Class D Notes, 0.25% of the Aggregate Outstanding amount thereof held by such beneficial owner as of the applicable Extension Effective Date and (6) in the case of the Class E Notes, 0.25% of the Aggregate Outstanding Amount thereof held by such beneficial owner as of the applicable Extension Effective Date.

"*Extension Bonus Eligibility Certification*": With respect to each Maturity Extension and each beneficial owner of Notes other than Extension Sale Securities, the written certification by such beneficial owner acceptable to the Issuer to the effect that it held Notes other than Extension Sale Securities on the applicable Extension Effective Date, including the Aggregate Outstanding Amount thereof in the case of the Notes and wire transfer instructions for the Extension Bonus Payment and any required documentation thereunder.

"***Extension Conditions***": The meaning specified in Section 2.4.

"***Extension Determination Date***": The 8th Business Day prior to each Extension Effective Date.

"***Extension Effective Date***": If an Extension has occurred, the sixteenth Payment Date after the then current Extension Effective Date (or, in the case of the first Extension Effective Date, the Payment Date in May 2012).

"***Extension Notice***": The meaning specified in Section 2.4.

"***Extension Purchase Price***": The purchase price payable by the Extension Qualifying Purchasers for Extension Sale Securities in connection with each Maturity Extension, if any, in an amount equal to (i) in the case of the Notes, the Aggregate Outstanding Amount thereof, plus accrued and unpaid interest (including Deferred Interest, if any) as of the applicable Extension Effective Date (giving effect to any amounts paid to the Holder on such date), and (ii) in the case of the Preference Shares, an amount that, when taken together with all payments and distributions made in respect of such Preference Shares since the Closing Date would cause such Preference Shares to have received (as of the date of purchase thereof) a Preference Share Internal Rate of Return of 12.0% (assuming such purchase date was a Payment Date); provided, however, that if the applicable Extension Effective Date is on or after the date on which such Holders have received a Preference Share Internal Rate of Return equal to or in excess of 12.0%, the applicable Extension Purchase Price for such Preference Shares shall be zero.

"***Extension Qualifying Purchasers***": The Servicer (or any of its Affiliates acting as principal or agent); provided that in the event that the Servicer elects not to purchase Extension Sale Securities from Holders pursuant to the Extension Conditions set forth in Section 2.4(c), "Extension Qualifying Purchasers" shall mean one or more qualifying purchasers (which may include the Initial Purchasers or any of their Affiliates acting as principal or agent) designated by the Servicer; provided, however, none of the Servicer, the Initial Purchasers or any of their respective Affiliates shall have any duty to act as an Extension Qualifying Purchaser.

"***Extension Sale Notice***": The meaning specified in Section 2.4.

"***Extension Sale Notice Period***": The meaning specified in Section 2.4.

"***Extension Sale Securities***": The meaning specified in Section 2.4.

"***Face Amount***": With respect to any Preference Share, the amount set forth therein as the "face amount" thereof, which "face amount" shall be $1,000 per Preference Share.

"***Finance Lease***": A lease agreement or other agreement entered into in connection with and evidencing a Leasing Finance Transaction.

"***Financial Asset***": The meaning specified in Section 8-102(a)(9) of the UCC.

"***Financing Statements***": Financing statements relating to the Collateral naming the Issuer as debtor and the Trustee on behalf of the Secured Parties as secured party.

"***Fixed Amount***": With respect to the CDS/TRS Purchaser and each applicable Fixed Rate Payor Calculation Period, the product of (i) the applicable Fixed Rate Payor Calculation Amount with respect to the CDS/TRS Purchaser, (ii) the applicable Fixed Rate with respect to the CDS/TRS

Purchaser and (iii) a fraction the numerator of which is the actual number of days in such Fixed Rate Payor Calculation Period and the denominator of which is 360.

"*Fixed Rate*": With respect to the CDS/TRS Purchaser, the spread over LIBOR of the applicable Note Interest Rate for the Class of Notes held by the CDS/TRS Purchaser with respect to which the CDS/TRS Purchaser has entered into a credit default swap or a total return swap, as the case may be.

"*Fixed Rate Excess*": As of any Measurement Date, a fraction whose numerator is the product of:

      (i) the greater of zero and the excess of the Weighted Average Fixed Rate Coupon for the Measurement Date over the minimum percentage specified to pass the Weighted Average Fixed Rate Coupon Test; and

      (ii) the Aggregate Principal Balance of all Fixed Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date,

and whose denominator is the Aggregate Principal Balance of all Floating Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date.

In computing the Fixed Rate Excess on any Measurement Date, the Weighted Average Fixed Rate Coupon for the Measurement Date will be computed as if the Spread Excess were equal to zero.

"*Fixed Rate Obligation*": Any Collateral Obligation that bears interest at a fixed rate.

"*Fixed Rate Payor Calculation Amount*": With respect to the CDS/TRS Purchaser for purposes of calculating the applicable CDS/TRS Termination Payment Amount, the Aggregate Outstanding Amount of the Notes held by the CDS/TRS Purchaser as of the date of purchase of such Notes in an Amendment Buy-Out (in each case, after giving effect to any principal amounts paid to the CDS/TRS Purchaser on such date).

"*Fixed Rate Payor Calculation Period*": With respect to the CDS/TRS Purchaser for purposes of calculating the applicable CDS/TRS Termination Payment Amount, initially, the period from and including the date of purchase of such Notes in an Amendment Buy-Out to but excluding the immediately succeeding Payment Date, and, thereafter, each successive period from and including each Payment Date to but excluding the following Payment Date; provided that the last Fixed Rate Payor Calculation Period shall end on the May 2011 Payment Date.

"*Floating Rate Notes*": The Class A-1-A Notes, the Class A-1-B Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes.

"*Floating Rate Obligation*": Any Collateral Obligation that bears interest based on a floating rate index.

32

**"*Form-Approved Synthetic Security*"**: A Synthetic Security:

    (i)    (A)    each of the Reference Obligations of which satisfy the definition of "Collateral Obligation" and could be purchased by the Issuer without any required action by the Rating Agencies, without satisfaction of the Rating Condition or which the Rating Agencies have otherwise approved; or

    (B)    each of the Reference Obligations of which would satisfy clause (A) above but for the currency in which the Reference Obligation is payable and the Synthetic Security is payable in Dollars, does not provide for physical settlement, and does not expose the Issuer to Dollar currency risk;

    (ii)    the Synthetic Security Agreement of which conforms (but for the amount and timing of periodic payments, the name of the Reference Obligation, the notional amount, the effective date, the termination date, and other similar necessary changes) to a form that has been expressly identified and approved in writing in connection with a request under this Indenture by Moody's and S&P;

    (iii)    a copy of the Synthetic Security Agreement of which has been delivered to the Holders of the Class A-1-A Notes and the Class A-1-B Notes by the Trustee at the expense of the Co-Issuers and upon being furnished with a copy of the same by the Servicer; and

    (iv)    that is with a counterparty with respect to which the Rating Condition has been satisfied by each of Moody's and S&P prior to the acquisition of any such Form-Approved Synthetic Security, and such approval has not been withdrawn.

Moody's or S&P may at any time, by notice to the Servicer, withdraw its approval of any such form. A withdrawal of approval shall have no effect on any Synthetic Security acquired, entered into, or committed to before the date on which the Servicer receives the notice of withdrawal.

**"*FSA*"**: The meaning specified in Section 14.3(d).

**"*Funded Amount*"**: With respect to any Revolving Loan or Delayed Drawdown Loan at any time, the aggregate principal amount of advances or other extensions of credit made thereunder by the Issuer that are outstanding and have not been repaid at such time.

**"*GAAP*"**: The meaning specified in Section 6.3(j).

**"*Global Notes*"**: Any Regulation S Global Notes or Rule 144A Global Notes.

**"*Grant*"**: To grant, bargain, sell, warrant, alienate, remise, demise, release, convey, assign, transfer, mortgage, pledge, create, and grant a security interest in and right of setoff against, deposit, set over, and confirm. A Grant of the Pledged Obligations, or of any other instrument, shall include all rights, powers, and options of the granting party thereunder, including the immediate continuing right to claim for, collect, receive, and receipt for principal and interest payments in respect of the Pledged Obligations, and all other monies payable thereunder, to give and receive notices and other communications, to make waivers or other agreements, to exercise all rights and options, to bring Proceedings in the name of the granting party or otherwise, and generally to do and receive anything that the granting party is or may be entitled to do or receive thereunder or with respect thereto.

33

NY\1257964.27

"***Hedge Agreements***": Collectively, all interest rate cap or interest rate swap agreements between the Issuer and any Hedge Counterparty, and any replacement agreement entered into pursuant to Section 15.2.

"***Hedge Counterparty***": Any counterparty, to the extent that when the Issuer enters into any Hedge Agreement with such counterparty, such counterparty satisfies the requirements of Section 15.2(b) (subject to satisfaction of the Rating Condition for each Rating Agency).

"***Hedge Counterparty Collateral Account***": The trust account established pursuant to Section 10.3(d).

"***Hedge Termination Receipt***": Any termination payment paid by the Hedge Counterparty to the Issuer upon any early termination of a Hedge Agreement with respect to which the Hedge Counterparty is the sole Defaulting Party or Affected Party (each as defined in the Hedge Agreements).

"***HFP***": Highland Financial Partners, L.P., an Affiliate of the Servicer.

"***High-Yield Bond***": Any debt security, other than a Loan or a Structured Finance Obligation, that is either Registered or, if not Registered, (i) it is issued by an obligor that is not resident in the United States, (ii) the payments on it are not subject to United States withholding tax and (iii) it is held through a financial institution pursuant to the procedures described in Treasury Regulation section 1.165-12(c)(3).

"***Holder***": Of any Note, the person whose name appears on the Indenture Register as the registered holder of the Note; and of any Preference Share, the person whose name appears in the Preference Share register related thereto as the registered holder of such Preference Share.

"***Important Section 3(c)(7) Reminder Notice***": A notice substantially in the form of Exhibit G-2.

"***Indenture***": This instrument as originally executed and, if from time to time supplemented or amended by one or more indentures supplemental to this Indenture entered into pursuant to this Indenture, as so supplemented or amended.

"***Indenture Register***": The meaning specified in Section 2.6(a).

"***Indenture Registrar***": The meaning specified in Section 2.6(a).

"***Independent***": As to any person, any other person (including, in the case of an accountant or lawyer, a firm of accountants or lawyers, and any member of the firm, or an investment bank and any member of the bank) who

(i)      does not have and is not committed to acquire any material direct or any material indirect financial interest in the person or in any Affiliate of the person, and

(ii)     is not connected with the person as an Officer, employee, promoter, underwriter, voting trustee, partner, director, or person performing similar functions.

"Independent" when used with respect to any accountant may include an accountant who audits the books of the person if in addition to satisfying the criteria above the accountant is independent with respect to the person within the meaning of Rule 101 of the Code of Ethics of the American Institute of Certified Public Accountants.

34

Whenever any Independent person's opinion or certificate is to be furnished to the Trustee, the opinion or certificate shall state that the signer has read this definition and that the signer is Independent within the meaning of this Indenture.

"*Initial Consent Period*": The period of 15 Business Days from but excluding the date on which the Trustee mailed notice of a proposed supplemental indenture pursuant to Section 8.2(b) to the Holders of Securities.

"*Initial Purchasers*": Lehman Brothers Inc. and Lehman Brothers International (Europe).

"*Initial Rating*": The ratings by Moody's and S&P with respect to each Class of Notes provided in the table in Section 2.3(a).

"*Insolvency Event*": With respect to any person, means that:

    (i)    an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking:

        (A)    liquidation, reorganization, or other relief in respect of the person or its debts, or of all or substantially all of its assets, under any bankruptcy, insolvency, receivership, or similar law now or hereafter in effect, or

        (B)    the appointment of a receiver, trustee, custodian, sequestrator, conservator, or similar official for the person or for all or substantially all of its assets,

and, in any such case, the proceeding or petition shall continue undismissed for 30 days; or an order or decree approving or ordering any of the foregoing shall be entered, or

    (ii)    the person shall:

        (A)    voluntarily commence any proceeding or file any petition seeking liquidation, reorganization, or other relief under any bankruptcy, insolvency, receivership, or similar law now or hereafter in effect,

        (B)    consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (i) above,

        (C)    apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, or conservator or for all or substantially all of its assets,

        (D)    file an answer admitting the material allegations of a petition filed against it in any such proceeding, or

        (E)    make a general assignment for the benefit of creditors.

"*Insolvency Proceeding*": The meaning specified in Section 16.4(b).

"*Institutional Accredited Investor*": An institutional accredit investor as defined in clause (1), (2), (3) or (7) of Rule 501(a) under Regulation D under the Securities Act.

"*Instrument*": The meaning specified in Section 9-102(a)(47) of the UCC.

"***Interest Coverage Ratio***": With respect to any specified Class of Notes on any Measurement Date, the ratio calculated by dividing:

    (i)     the sum of:

           (A)    the Interest Proceeds received or scheduled to be received with respect to the Due Period in which the Measurement Date occurs, <u>minus</u>

           (B)    amounts payable under clauses (1), (2), (3) and (4) of Section 11.1(a)(i) on the related Payment Date, by:

    (ii)    all accrued and unpaid interest on the specified Class of Notes and all Notes ranking senior to the Class, including any Deferred Interest on the related Payment Date.

For purposes of the Interest Coverage Ratio, only the amount of any interest payment (including any "gross up" payment) on any Collateral Obligation in excess of any withholding tax or other deductions on account of tax of any jurisdiction on any date of determination shall be included in Interest Proceeds.

"***Interest Coverage Test***": A test the first Measurement Date for which will be on the second Payment Date and that is satisfied with respect to any specified Class of Notes if, as of the second Payment Date and any Measurement Date thereafter on which any Notes remain Outstanding, the Interest Coverage Ratio equals or exceeds the applicable required level in the table below for the specified Class:

| Test | Required Level |
|------|----------------|
| Class A/B Interest Coverage Test | 120.0% |
| Class C Interest Coverage Test | 110.0% |
| Class D Interest Coverage Test | 106.0% |
| Class E Interest Coverage Test | 105.0% |

"***Interest Period***": Initially, the period from and including the Closing Date to but excluding the first Payment Date, and, thereafter, each successive period from and including each Payment Date to but excluding the following Payment Date.

"***Interest Proceeds***": With respect to any Due Period, the sum (without duplication) of all amounts received in Cash during the Due Period (or as otherwise specified below) by the Issuer with respect to the Collateral that are:

    (i)    payments of interest, fees, and commissions (excluding (A) Accrued Interest Purchased With Principal, (B) interest and dividends on Workout Assets, (C) fees and commissions from Defaulted Collateral Obligations, and (D) syndication and other up-front fees and any up-front fixed payments received in connection with entering into a Synthetic Security);

    (ii)    any portion of the Sale Proceeds of a Collateral Obligation (other than a Defaulted Collateral Obligation) representing Accrued Interest On Sale;

    (iii)    all payments of principal on, or disposition proceeds from the sale of, Eligible Investments to the extent purchased with Interest Proceeds;

36

(iv)    payments with respect to the Hedge Agreements received on or before the related Payment Date (other than any amount payable thereunder because of any early termination or notional amount reduction), but not any Sale Proceeds from any of these instruments (except to the extent that they were purchased with Interest Proceeds);

(v)    all fees received pursuant to any Securities Lending Agreements;

(vi)    amounts in the Collection Account designated for distribution as Interest Proceeds pursuant to the Priority of Payments (including any amount transferred from the Interest Reserve Account);

(vii)    all earnings on amounts in the Delayed Drawdown Reserve Account and the Revolving Reserve Account deposited to the Collection Account in accordance with Section 10.3(b);

(viii)    amounts in the Expense Reimbursement Account on the Payment Date for the relevant Due Period; and

(ix)    . any recoveries (including interest) received on a Defaulted Collateral Obligation in excess of the principal balance of such Defaulted Collateral Obligation (as of the date the related Collateral Obligation became a Defaulted Collateral Obligation and excluding from such principal balance any deferred interest on Defaulted Collateral Obligations that are PIK Securities).

Interest Proceeds shall not include the Excluded Property and Interest Proceeds shall not include earnings on amounts on deposit in the Securities Lending Account to the extent the earnings are payable by the Issuer to a Securities Lending Counterparty.

Each reference in the definition of "Interest Proceeds" to a Collateral Obligation shall include a Collateral Obligation that has been loaned pursuant to a Securities Lending Agreement and Interest Proceeds shall include any amounts referred to in clauses (i) through (iii) above received by the Issuer in respect of the Collateral Obligation indirectly from the related Securities Lending Counterparty pursuant to the Securities Lending Agreement.

With respect to any Payment Date, Interest Proceeds in an amount equal to the Interest Proceeds due and payable on such Payment Date to the Consenting Holders of the Preference Shares with respect to such Payment Date that are distributed to such Holders by way of Eligible Equity Securities in lieu of Cash pursuant to Section 11.1(a)(i) will be treated for all purposes by the Issuer and the Servicer as Principal Proceeds.

"*Interest Reserve Account*": The trust account established pursuant to Section 10.3(i).

"*Investment Company Act*": The United States Investment Company Act of 1940, as amended.

"*Irish Paying Agent*": The meaning specified in Section 7.2.

"*Issuer*": The Person named as such on the first page of this Indenture.

"*Issuer Accounts*": The meaning assigned in the Granting Clauses.

"*Issuer Order*" and "*Issuer Request*": A written order or request dated and signed in the name of the Issuer or the Co-Issuer by an Authorized Officer of the Issuer or the Co-Issuer, as applicable, or by the Servicer by an Authorized Officer of the Servicer, on behalf of the Issuer or the Co-Issuer.

37

"***Issuer Ordinary Shares***": The ordinary shares, par value $1.00 per share, of the Issuer which have been issued by the Issuer and are outstanding from time to time.

"***Junior Class***": With respect to a particular Class of Notes, each Class of Notes that is subordinated to that Class, as indicated in Section 13.1.

"***Leasing Finance Transaction***": Any transaction pursuant to which the obligations of the lessee to pay rent or other amounts on a triple net basis under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, are required to be classified and accounted for as a capital lease on a balance sheet of such lessee under generally accepted accounting principles in the United States of America; but only if (a) such lease or other transaction provides for the unconditional obligation of the lessee to pay a stated amount of principal no later than a stated maturity date, together with interest thereon, and the payment of such obligation is not subject to any material non-credit related risk as determined by the Servicer, (b) the obligations of the lessee in respect of such lease or other transaction are fully secured, directly or indirectly, by the property that is the subject of such lease and (c) the interest held by the Issuer in respect of such lease or other transaction is treated as debt for U.S. federal income tax purposes.

"***LIBOR***": The offered rate, as determined by the Calculation Agent for any Interest Period, for three month Dollar deposits that appears on Reuters Screen LIBOR01 Page as reported on Bloomberg Financial Markets Commodities News (or a page that replaces Reuters Screen LIBOR01 Page for the purpose of displaying comparable rates), as of 11:00 A.M. (London time) on the second Business Day before the first day of the relevant Interest Period.

If, on the second Business Day before the first day of any relevant Interest Period, that rate does not appear on Reuters Screen LIBOR01 Page as reported on Bloomberg Financial Market Commodities News (or a page that replaces Reuters Screen LIBOR01 Page for the purpose of displaying comparable rates), the Calculation Agent shall determine the arithmetic mean of the offered quotations of the Reference Banks to prime banks in the London interbank market for three month Dollar deposits in Europe, by reference to requests by the Calculation Agent to four major banks in the London interbank market selected by the Calculation Agent (after consultation with the Servicer) (the "**Reference Banks**") for quotations as of approximately 11:00 A.M. (London time) on the second Business Day before the first day of the Interest Period. If at least two of the Reference Banks provide quotations as requested, LIBOR shall equal such arithmetic mean. If fewer than two Reference Banks provide quotations, LIBOR shall be the arithmetic mean of the offered quotations that one or more leading banks in New York City selected by the Calculation Agent (after consultation with the Servicer) are quoting to the principal London offices of leading banks in the London interbank market on the second Business Day before the first day of the relevant Interest Period for three month Dollar deposits.

If the Calculation Agent is unable to determine a rate in accordance with any of the above procedures, LIBOR for the Interest Period shall be calculated on the last day of the Interest Period and shall be the arithmetic mean of the rate of interest for each day during the Interest Period determined by the Calculation Agent as being the rate of interest most recently announced by the Bank at its New York office as its base rate, prime rate, reference rate, or similar rate for Dollar loans (or if the Bank ceases to exist or is not quoting a base rate, prime rate, reference rate, or similar rate for Dollar loans, another major money center commercial bank in New York City selected by the Calculation Agent (after consultation with the Servicer)).

For the first Interest Period and, unless the Maturity Extension occurs, the last Interest Period, LIBOR shall be determined based on the actual number of days in the Interest Period using straight-line interpolation of two rates calculated in accordance with the above procedure, except that instead of using three month deposits, one rate shall be determined using the period for which

38

rates are obtainable next shorter than the Interest Period and the other rate shall be determined using the period for which rates are obtainable next longer than the Interest Period. All calculations shall be calculated to at least four decimal places and rounded to four decimal places.

"***Loan***": Any interest in a fully committed, senior secured, unsecured, or revolving loan (including loans involving credit linked deposits and synthetic letters of credit) that is acquired by assignment or by Participation (including any DIP Loan) that is either:

        (i)      Registered; or

        (ii)     issued by an obligor that is not resident in the United States:

              (A)     whose payments are not subject to United States withholding tax; and

              (B)     that is held through a financial institution pursuant to the procedures described in Treasury Regulation section 1.165-12(c)(3).

"***Long-Dated Collateral Obligation***": Any Collateral Obligation with a stated maturity later than the Stated Maturity of the Notes other than a Collateral Obligation with a stated maturity later than the Stated Maturities of the Notes that includes a "put" option to its obligor at a price of at least par payable on or before the Stated Maturity of the Notes.

"***Majority***": With respect to any Class or group of Notes or Preference Shares, the Holders of more than 50% of the Aggregate Outstanding Amount of that Class or group of Notes or Preference Shares, as the case may be.

"***Margin Stock***": "Margin Stock" as defined under Regulation U issued by the Board of Governors of the Federal Reserve System, including any debt security that is by its terms convertible into Margin Stock, but does not include any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation received pursuant to an offer by an issuer of a Defaulted Collateral Obligation.

"***Market Value***": As of any Measurement Date, the market value determined by the Servicer and reported to the Trustee as an amount rather than as a percentage or fraction of par (expressed in Dollars) of any Collateral Obligation (or Eligible Equity Security, as applicable) based upon the following order of priority: (i) the average of the bid-side market prices obtained by the Servicer from three Independent broker-dealers active in the trading of such obligations or (ii) if the foregoing set of prices were not obtained, the lower of the bid-side market prices obtained by the Servicer from two Independent broker-dealers active in the trading of such obligations or (iii) if the foregoing sets of prices were not obtained, the average of the bid-side prices for the purchase of the Collateral Obligation (or Eligible Equity Security, as applicable) determined by an Approved Pricing Service (Independent from the Servicer) that derives valuations by polling broker-dealers (Independent from the Servicer).

If a Market Value of any Collateral Obligation cannot be so determined in accordance with the procedures set out in the preceding paragraph for a period of 30 consecutive days then such Collateral Obligation shall be deemed to have a Market Value of zero; provided, that during such 30 day period, such Collateral Obligation shall be deemed to have a Market Value equal to (a) the higher of (i) the S&P Recovery Rate for such Collateral Obligation and the then current S&P Rating of the Class A-1-A Notes and (ii) 70% of the Principal Balance of such Collateral Obligation or (b) if the Servicer has determined in its commercially reasonable judgment that the Market Value of such Collateral Obligation is lower than the amount determined pursuant to clause (a), such amount

39

to be determined by the Servicer in its commercially reasonable judgment; provided, further, that the maximum amount of Collateral Obligations having a Market Value assigned pursuant to the immediately preceding proviso shall be limited to 5.0% of the Maximum Amount (and any amount in excess of 5.0% of the Maximum Amount shall be deemed to have a Market Value of zero). For the avoidance of doubt, the procedures set out in this paragraph shall not apply to determinations of Market Value of any Eligible Equity Securities or Current Pay Obligations.

The Servicer is under no obligation to determine the Market Value of the Collateral Obligations other than as set forth in the Servicing Agreement or this Indenture or to comply with any of its duties as set forth in the Servicing Agreement or in this Indenture.

"***Market Value Determination Date***": With respect to any distribution of Eligible Equity Securities, one Business Day prior to the date of the notice distributed by the Issuer to the Holders of the Preference Shares in connection with such distribution.

"***Market Value Percentage***": For any Collateral Obligation, the ratio obtained by dividing:

(i)     the Market Value of the Collateral Obligation; *by*

(ii)     the Principal Balance of the Collateral Obligation.

"***Maturity***": With respect to any Note, the date on which the unpaid principal of the Note becomes payable as provided in the Note or this Indenture, whether at the Stated Maturity or by declaration of acceleration, call for redemption, or otherwise.

"***Maturity Extension***": The meaning specified in Section 2.4.

"***Maximum Amount***": An amount equal to:

(i)     on any Measurement Date during the Ramp-Up Period, U.S.$981,300,000; and

(ii)     on any Measurement Date after the Ramp-Up Completion Date:

(A)     the aggregate Principal Balance of all Collateral Obligations plus the aggregate outstanding principal amount of any Defaulted Collateral Obligations; *plus*

(B)     Cash representing Principal Proceeds on deposit in the Collection Account; *plus*

(C)     Eligible Investments (other than Cash) purchased by the Issuer with Principal Proceeds on deposit in the Collection Account.

"***Maximum Weighted Average Moody's Rating Factor***": As of any Measurement Date, a rate equal to the sum of (i) the number set forth in the column entitled "Maximum Weighted Average Moody's Rating Factor" in the Ratings Matrix based upon the applicable "row/column combination" chosen by the Servicer (or the interpolation between two adjacent rows and/or two adjacent columns, as applicable) plus (ii) the Recovery Rate Modifier.

"***Measurement Date***": Any date:

(i)     on which the Issuer commits to acquire or dispose of any Collateral Obligation;

(ii)     on which a Collateral Obligation becomes a Defaulted Collateral Obligation;

(iii)    that is a Determination Date;

(iv)    that is the Ramp-Up Completion Date;

(v)     that is the date as of which the information in a Monthly Report is calculated pursuant to Section 10.6; and,

with respect to any distribution of Eligible Equity Securities only,

(vi)    that is the Market Value Determination Date with respect to such distribution of Eligible Equity Securities.

*"Memorandum and Articles of Association"*: The memorandum and articles of association of the Issuer, as amended and restated before the Closing Date or in accordance with this Indenture.

*"Merging Entity"*: The meaning specified in Section 7.10.

*"Minimum Diversity Score"*: As of any Measurement Date, a score equal to the number set forth in the column entitled "Minimum Diversity Score" in the Ratings Matrix based upon the applicable "row/column combination" chosen by the Servicer (or the interpolating between two adjacent rows and/or two adjacent columns, as applicable).

*"Minimum Weighted Average Spread"*: As of any Measurement Date, the spread equal to the percentage set forth in the row entitled "Minimum Weighted Average Spread" in the Ratings Matrix based upon the applicable "row/column combination" chosen by the Servicer (or the interpolating between two adjacent rows and/or two adjacent columns, as applicable).

*"Monthly Determination Date"*: The meaning specified in Section 10.6(a).

*"Monthly Report"*: The meaning specified in Section 10.6(a).

*"Moody's"*: Moody's Investors Service, Inc.

*"Moody's Default Probability Rating"*: The meaning set forth in Schedule 7.

*"Moody's Equivalent Senior Unsecured Rating"*: The meaning set forth in Schedule 7.

*"Moody's Group I Country"*: Any of the following countries: Australia, the Netherlands, the United Kingdom and any country subsequently determined by Moody's to be a Moody's Group I Country.

*"Moody's Group II Country"*: Any of the following countries: Germany, Ireland, Sweden, Switzerland and any country subsequently determined by Moody's to be a Moody's Group II Country.

*"Moody's Group III Country"*: Any of the following countries: Austria, Belgium, Denmark, Finland, France, Iceland, Liechtenstein, Luxembourg, Norway, Spain and any country subsequently determined by Moody's to be a Moody's Group III Country.

*"Moody's Industry Classification"*: The industry classifications in Schedule 2 as modified, amended, and supplemented from time to time by Moody's.

41

"***Moody's Minimum Average Recovery Rate***": As of any Measurement Date, a rate equal to the number obtained by:

(i)     summing the products obtained by multiplying the Principal Balance of each Collateral Obligation by its respective Moody's Priority Category Recovery Rate;

(ii)    dividing the sum determined pursuant to clause (i) above by the sum of the Aggregate Principal Balance of all Collateral Obligations; and

(iii)   rounding up to the first decimal place.

"***Moody's Non Senior Secured Loan***": Any Loan that is not a Moody's Senior Secured Loan.

"***Moody's Obligation Rating***": The meaning set forth in Schedule 7.

"***Moody's Priority Category***": Each type of Collateral Obligation specified in the definition of "Moody's Priority Category Recovery Rate Matrix" as a "Moody's Priority Category."

"***Moody's Priority Category Recovery Rate***": For any Collateral Obligation, the percentage specified in the definition of "Moody's Priority Category Recovery Rate Matrix" opposite the Moody's Priority Category of the Collateral Obligation.

"***Moody's Priority Category Recovery Rate Matrix***":

| Moody's Priority Category | Moody's Priority Category Recovery Rate |
|---|---|
| Synthetic Securities | In the case of: |
| | (i) a Form-Approved Synthetic Security, the "Moody's Priority Category Recovery Rate" given by Moody's to the Form-Approved Synthetic Security at the time of approval of the Form-Approved Synthetic Security by Moody's, and |
| | (ii) any other Synthetic Security, the "Moody's Priority Category Recovery Rate" given by Moody's to the Synthetic Security at the time of acquisition of the Synthetic Security. |
| Structured Finance Obligations | The Moody's Priority Category Recovery Rate determined in accordance with the Moody's Structured Finance Obligation Recovery Rates set forth in Schedule 5 by reference to the type of asset and its then Moody's Rating (or, with respect to assets to which that schedule does not apply, on a case-by-case basis in connection with the Grant of the relevant Collateral Obligation). |
| unsecured DIP Loans and any Collateral Obligations not covered above or below | As determined by Moody's on a case-by-case basis. |

For High-Yield Bonds, Moody's Senior Secured Loans and Moody's Non Senior Secured Loans, the relevant Moody's Priority Category Recovery Rate is the rate determined pursuant to the table below based on the number of rating subcategories difference between the High-Yield Bond's or Loan's Moody's Obligation Rating and its Moody's Default Probability Rating (for purposes of clarification, if the Moody's Obligation Rating is higher than the Moody's Default Probability Rating, the rating subcategories difference will be positive and if it is lower, negative):

42

| Number of Moody's Rating Subcategories Difference Between the Moody's Obligation Rating and the Moody's Default Probability Rating | Moody's Senior Secured Loans | Moody's Non Senior Secured Loans | High-Yield Bonds |
|---|---|---|---|
| +2 or more | 60.0% | 45.0% | 40.0% |
| +1 | 50.0% | 42.5% | 35.0% |
| 0 | 45.0% | 40.0% | 30.0% |
| -1 | 40.0% | 30.0% | 15.0% |
| -2 | 30.0% | 15.0% | 10.0% |
| -3 or less | 20.0% | 10.0% | 2.0% |

If no Moody's Priority Category Recovery Rate has been specifically assigned with respect to a Loan pursuant to the above table, and the Loan is a secured DIP Loan, the relevant Moody's Priority Category Recovery Rate is 50.0%.

"*Moody's Rating*": The meaning set forth in Schedule 7.

"*Moody's Rating Factor*": The number in the table below opposite the rating of the Collateral Obligation (excluding Synthetic Securities where an Assigned Moody's Rating is not available).

| Moody's Rating | Moody's Rating Factor | Moody's Rating | Moody's Rating Factor |
|---|---|---|---|
| Aaa | 1 | Ba1 | 940 |
| Aa1 | 10 | Ba2 | 1350 |
| Aa2 | 20 | Ba3 | 1766 |
| Aa3 | 40 | B1 | 2220 |
| A1 | 70 | B2 | 2720 |
| A2 | 120 | B3 | 3490 |
| A3 | 180 | Caa1 | 4770 |
| Baa1 | 260 | Caa2 | 6500 |
| Baa2 | 360 | Caa3 | 8070 |
| Baa3 | 610 | Ca or lower | 10000 |

The Moody's Rating Factor for Collateral Obligations that are Synthetic Securities shall be determined by Moody's and obtained by the Issuer or the Servicer on a case-by-case basis, unless (1) there is an Assigned Moody's Rating available for such Collateral Obligation that is a Synthetic Security, in which case such Assigned Moody's Rating shall be used to compute the Moody's Rating Factor for such Collateral Obligation that is a Synthetic Security, or (2) such Collateral Obligation is a Form-Approved Synthetic Security, in which case the Moody's Rating Factor given to such Collateral Obligation at the time of approval of the Form-Approved Synthetic Security shall be used to compute the Moody's Rating Factor for such Collateral Obligation that is a Synthetic Security.

43

The Moody's Rating Factor for any Collateral Obligation that is a Structured Finance Obligation shall be equal to: $\dfrac{A \times 55\%}{1-B}$,

where: "$A$" means the number determined with respect to such Collateral Obligation pursuant to the table above; and

"$B$" means the Moody's Priority Category Recovery Rate with respect to such Collateral Obligation.

**"*Moody's Senior Secured Loan*"**:

(a) a Loan that:

    (i) is not (and cannot by its terms become) subordinate in right of payment to any other obligation of the obligor of the Loan;

    (ii) is secured by a valid first priority perfected security interest or lien in, to or on specified collateral securing the obligor's obligations under the Loan; and

    (iii) the value of the collateral securing the Loan together with other attributes of the obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service and other demands for that cash flow) is adequate (in the commercially reasonable judgment of the Servicer) to repay the Loan in accordance with its terms and to repay all other loans of equal seniority secured by a first lien or security interest in the same collateral; or

(b) a Loan that:

    (i) is not (and cannot by its terms become) subordinate in right of payment to any other obligation of the obligor of the Loan, other than, with respect to a Loan described in clause (a) above, with respect to the liquidation of such obligor or the collateral for such loan;

    (ii) is secured by a valid second priority perfected security interest or lien in, to or on specified collateral securing the obligor's obligations under the Loan;

    (iii) the value of the collateral securing the Loan together with other attributes of the obligor (including, without limitation, its general financial condition, ability to generate cash flow available for debt service and other demands for that cash flow) is adequate (in the commercially reasonable judgment of the Servicer) to repay the Loan in accordance with its terms and to repay all other loans of equal or higher seniority secured by a first or second lien or security interest in the same collateral; and

    (iv) has been assigned a Moody's rating equal to or higher than Moody's corporate family rating for such obligor; and

(c) the Loan is not: (i) a DIP Loan, (ii) a Loan for which the security interest or lien (or the validity or effectiveness thereof) in substantially all of its collateral attaches, becomes effective, or otherwise "springs" into existence after the origination thereof, or (iii) a type of loan that Moody's has identified as having unusual terms and with respect to which its Moody's Recovery Rate has been or is to be determined on a case-by-case basis.

44

"***Non-Call Period***": The period from the Closing Date to but not including the Payment Date in May 2011.

"***Non-Consenting Holder***": With respect to any supplemental indenture pursuant to Section 8.2 that requires the consent of one or more Holders of Securities, any Holder or, in the case of Securities represented by Global Notes, any beneficial owner, that either (i) has delivered to the Trustee a written notice that it will not consent to such supplemental indenture or (ii) had not consented to such supplemental indenture within the applicable Initial Consent Period.

"***Non-Performing Collateral Obligation***": Any Defaulted Collateral Obligation and any PIK Security as to which its issuer or obligor has previously deferred or capitalized any interest due on it and all the interest so deferred or capitalized has not subsequently been paid in full in cash by:

(i)    if the PIK Security has a Moody's Rating of "Baa3" (and not on credit watch with negative implications) or above or an S&P Rating of "BBB-" (and not on credit watch with negative implications) or above, the earlier of its second payment date or one year following the date of the initial deferral or capitalization of interest due on it, or

(ii)    if the PIK Security has a Moody's Rating of "Baa3" and on credit watch with negative implications or below "Baa3", or an S&P Rating of "BBB-" and on credit watch with negative implications or below "BBB-", the earlier of its first payment date or six months following the date of the initial deferral or capitalization of interest due on it.

"***Non-Permitted Holder***": (a) With respect to the Global Notes, a Holder or beneficial owner of an interest in a Global Note that is a U.S. person and (i) not a QIB/QP and that becomes the beneficial owner of an interest in a Rule 144A Global Note or (ii) does not have an exemption available under the Securities Act and (b) with respect to the Class E Notes, a Holder or beneficial owner of an interest in a Class E Note that is not a QIB/QP.

"***Non-Permitted Benefit Plan Investor***": The meaning specified in the second paragraph of Section 2.6(c).

"***Non-qualifying Collateral Obligation***": The meaning specified in Section 12.1(d).

"***Note Break-Even Loss Rate***": With respect to each Class of Notes that is rated by S&P, the maximum percentage of defaults that the Current Portfolio or Proposed Portfolio can sustain and nevertheless sufficient funds will remain for the payment of principal of the Class of Notes in full by its Stated Maturity and the timely payment of interest on the Class A-1-A Notes, the Class A-1-B Notes and the Class B Notes and the ultimate payment of interest on the Class C Notes, the Class D Notes and the Class E Notes using S&P's assumptions on recoveries, defaults, and timing, and taking into account the Priority of Payments and the adjusted Weighted Average Spread level specified in the applicable row of the table below. The adjusted Weighted Average Spread as of any Measurement Date is the Weighted Average Spread as of the Measurement Date minus the amount of any Spread Excess added to the Weighted Average Fixed Rate Coupon as of the Measurement Date.

45

| Row | Adjusted Weighted Average Spread |
|---|---|
| 1 | Greater than or equal to 3.00% |
| 2 | Greater than or equal to 2.90% but less than 3.00% |
| 3 | Greater than or equal to 2.80% but less than 2.90% |
| 4 | Greater than or equal to 2.70% but less than 2.80% |
| 5 | Greater than or equal to 2.60% but less than 2.70% |
| 6 | Greater than or equal to 2.50% but less than 2.60% |
| 7 | Greater than or equal to 2.40% but less than 2.50% |
| 8 | Greater than or equal to 2.30% but less than 2.40% |
| 9 | Greater than or equal to 2.20% but less than 2.30% |

"*Note Class Loss Differential*": With respect to any Measurement Date and any Class of Notes that is rated by S&P, the rate calculated by subtracting the Class Scenario Loss Rate for the Class from the then-applicable Note Break-Even Loss Rate for the Class of Notes.

"*Noteholder*": A Holder of the Class A-1-A Notes, the Class A-1-B Notes, the Class B Notes, the Class C Notes, the Class D Notes or the Class E Notes.

"*Note Interest Rate*": With respect to any specified Class of Notes, the per annum interest rate payable on the Notes of the Class with respect to each Interest Period equal to LIBOR for Eurodollar deposits for the applicable Interest Period plus the spread specified in the "Interest Rate" rows of the tables in Section 2.3 with respect to such Notes except in the first Interest Period.

"*Note Payment Sequence*": The application of funds in the following order:

    (1)    to the Class A Notes until the Class A Notes have been fully redeemed (provided that amounts allocated to payment of principal of the Class A Notes shall be paid in accordance with the Class A Allocation);

    (2)    to the Class B Notes until the Class B Notes have been fully redeemed;

    (3)    to the Class C Notes until the Class C Notes have been fully redeemed;

    (4)    to the Class D Notes until the Class D Notes have been fully redeemed; and

    (5)    to the Class E Notes until the Class E Notes have been fully redeemed.

"*Notes*": The Senior Notes and the Class E Notes authorized by, and authenticated and delivered under, this Indenture or any supplemental indenture.

"*Notice of Refinancing*": The meaning specified in Section 9.7.

"*Objection Cut-Off Date*": The meaning specified in Section 15.1(h)(ii).

"*Offer*": The meaning specified in Section 10.7(c).

"*Offering*": The offering of the Notes.

46

"*Offering Memorandum*": The final offering memorandum, dated May 30, 2007, prepared and delivered in connection with the offer and sale of the Securities.

"*Officer*": With respect to the Issuer and any corporation, any director, the Chairman of the board of directors, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer, or an Assistant Treasurer of the entity; with respect to the Co-Issuer and any corporation, any director, the Chairman of the board of directors, the President, any Vice President, the Secretary, an Assistant Secretary, the Treasurer, or an Assistant Treasurer of the entity; with respect to any partnership, any of its general partners; and with respect to the Trustee, any Trust Officer.

"*Opinion of Counsel*": A written opinion addressed to the Trustee and each Rating Agency, in form and substance reasonably satisfactory to the Trustee and each Rating Agency, of an attorney at law (or law firm with one or more partners) reasonably satisfactory to the Trustee and admitted to practice before the highest court of any state of the United States or the District of Columbia (or the Cayman Islands, in the case of an opinion relating to the laws of the Cayman Islands), which attorney (or law firm) may, except as otherwise expressly provided in this Indenture, be counsel for the Servicer, the Issuer or the Co-Issuer. Whenever an Opinion of Counsel is required under this Indenture, the Opinion of Counsel may rely on opinions of other counsel who are so admitted and so satisfactory, which opinions of other counsel shall accompany the Opinion of Counsel and shall either be addressed to the Trustee and each Rating Agency or shall state that the Trustee and each Rating Agency may rely on it. An Opinion of Counsel may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion.

"*Optional Redemption*": A redemption of the Notes in accordance with Section 9.2.

"*Other Indebtedness*": The meaning specified in the definition of "Defaulted Collateral Obligation."

"*Outstanding*": With respect to:

(a)        the Notes or any specified Class, as of any date of determination, all of the Notes or all of the Notes of the specified Class, as the case may be, theretofore authenticated and delivered under this Indenture, except with respect to Notes:

(i)        Notes canceled by the Indenture Registrar or delivered to the Indenture Registrar for cancellation;

(ii)       Notes for whose payment or redemption funds in the necessary amount have been theretofore irrevocably deposited with the Trustee or any Paying Agent in trust for their Holders pursuant to Section 4.1(a)(ii) and if the Notes are to be redeemed, notice of redemption has been duly given pursuant to this Indenture;

(iii)      Notes in exchange for or in lieu of which other Notes have been authenticated and delivered pursuant to this Indenture; and

(iv)      Notes alleged to have been destroyed, lost, or stolen for which replacement Notes have been issued as provided in Section 2.7, unless proof satisfactory to the Trustee is presented that any such Notes are held by a protected purchaser; and

(b)        the Preference Shares, as of any date of determination, all of the Preference Shares theretofore issued under the Preference Share Documents and listed in the Preference Share register of the Issuer as outstanding;

47

provided that, in determining whether the Holders of the requisite Aggregate Outstanding Amount of the Securities have given any request, demand, authorization, direction, notice, consent or waiver under this Indenture, the Securities owned or beneficially owned by the Issuer, the Co-Issuer, any Affiliate of either of them and, with respect to any matter affecting its status as Servicer or appointment of a replacement Servicer or relating to an acceleration of any Class of Notes if the effect of the Servicer's action or inaction as a Holder of Securities would effectively prevent acceleration, the Servicer, its Affiliates and any account over which the Servicer or its Affiliates have discretionary voting authority (other than, with respect to Notes or Class II Preference Shares, HFP or any of its subsidiaries; provided that, with respect to the voting authority of Notes or Class II Preference Shares owned by HFP or any of its subsidiaries, such vote shall not be excluded only if such vote is determined by a vote of the majority of the "independent directors" (determined in accordance with the governing documents of HFP or such subsidiaries and certified in writing to the Trustee or the Preference Shares Paying Agent, as applicable, by any of the "independent directors" of HFP) of HFP or such subsidiaries) shall be disregarded and not be Outstanding, except that, in determining whether the Trustee shall be protected in relying on any request, demand, authorization, direction, notice, consent or waiver, only Securities that a Trust Officer of the Trustee (or with respect to the Preference Shares, only Preference Shares that an authorized officer of the Preference Shares Paying Agent) has actual knowledge to be so owned or beneficially owned shall be so disregarded. Securities so owned or beneficially owned that have been pledged in good faith may be regarded as Outstanding if the pledgee establishes to the satisfaction of the Trustee or the Preference Shares Paying Agent, as applicable, the pledgee's right so to act with respect to the Securities and that the pledgee is independent from the Issuer, the Co-Issuer, the Servicer, the Trustee and the Preference Shares Paying Agent.

"*Overcollateralization Ratio*": With respect to any Class of Notes on any Measurement Date, the ratio calculated by *dividing*:

      (i)     the Overcollateralization Ratio Numerator; by

      (ii)    the Aggregate Outstanding Amount of the Class of Notes and all Notes ranking senior to it (excluding any Deferred Interest on the Notes and all Notes ranking senior to it).

"*Overcollateralization Ratio Numerator*": On any date, the sum of:

      (1)    the Aggregate Principal Balance of all Collateral Obligations (other than any Excess CCC+/Caa1 Collateral Obligations, any Non-Performing Collateral Obligations, any Deep Discount Obligations, and any Collateral Obligations loaned pursuant to a Securities Lending Agreement with respect to which an "event of default" (under and as defined in the Securities Lending Agreement) is continuing); *plus*

      (2)    unpaid Accrued Interest Purchased With Principal (excluding any unpaid Accrued Interest Purchased With Principal in respect of Non-Performing Collateral Obligations); *plus*

      (3)    the Aggregate Principal Balance of any Eligible Investments that were purchased with Principal Proceeds and the amount of Principal Proceeds on deposit in the Collection Account; *plus*

      (4)    the Aggregate Principal Balance of Eligible Investments on deposit in a Securities Lending Account that relate to a Securities Lending Agreement with respect to which an "event of default" (under and as defined in the Securities Lending Agreement) is continuing; *plus*

      (5)    with respect to Collateral Obligations that are Non-Performing Collateral Obligations, Deep Discount Obligations or Excess CCC+/Caa1 Collateral Obligations, the amount

48

determined by using one of the following methods applicable to such type of Collateral Obligation; provided that if a Collateral Obligation falls within more than one of such types, the Issuer will be required to use the method that results in the smallest amount:

(A)     with respect to any Excess CCC+/Caa1 Collateral Obligations, an amount equal to the product of (i) the CCC+/Caa1 Excess Market Value Percentage, multiplied by (ii) the Excess CCC+/Caa1 Collateral Obligations;

(B)     with respect to any Non-Performing Collateral Obligations, the aggregate of the Applicable Collateral Obligation Amounts for all included Non-Performing Collateral Obligations (other than Defaulted Collateral Obligations that have been held by the Issuer for more than three years, which shall be deemed to be zero for purposes of this clause (B)); and

(C)     with respect to any Deep Discount Obligations, the Aggregate Purchase Price Amount for all Deep Discount Obligations.

As used in this definition, "*Applicable Collateral Obligation Amount*" for any Non-Performing Collateral Obligation means:

(a)     the lesser of:

(x)     the Market Value Percentage of the Non-Performing Collateral Obligation; and

(y)     the Applicable Percentage for the Non-Performing Collateral Obligation;

multiplied by:

(b)     if the Non-Performing Collateral Obligation is:

(1)     any Pledged Obligation other than those in clauses (2) through (4) below, the outstanding principal amount of the Pledged Obligation as of the relevant Measurement Date;

(2)     a Synthetic Security, the notional amount specified in the Synthetic Security;

(3)     any Revolving Loan or Delayed Drawdown Loan, its Principal Balance including any unfunded amount thereof (regardless of the nature of the contingency relating to the Issuer's obligation to fund the unfunded amount); and

(4)     any PIK Security, its Principal Balance.

As used in the calculation of Market Value Percentage of the Non-Performing Collateral Obligation, the Principal Balance of any Defaulted Collateral Obligation shall be, if the Defaulted Collateral Obligation is:

(i)     any Pledged Obligation other than those in clauses (ii) through (iv) below, the outstanding principal amount of the Pledged Obligation as of the relevant Measurement Date;

49

(ii)     a Synthetic Security, the notional amount specified in the Synthetic Security;

(iii)     any Revolving Loan or Delayed Drawdown Loan, its Principal Balance including any unfunded amount thereof (regardless of the nature of the contingency relating to the Issuer's obligation to fund the unfunded amount); and

(iv)     any PIK Security, its Principal Balance.

"*Overcollateralization Test*": A test that is satisfied with respect to any Class of Notes if, as of any Measurement Date, the Overcollateralization Ratio for the Class is at least equal to the required level for the specified Class indicated in the table below:

| Test | Required Level |
|---|---|
| Class A/B Overcollateralization Test | 112.4% |
| Class C Overcollateralization Test | 106.6% |
| Class D Overcollateralization Test | 106.1% |
| Class E Overcollateralization Test | 102.3% |

"*Participating Institution*": An institution that creates a participation interest and that has a long-term senior unsecured rating by Moody's of at least "A3" (and if so rated by Moody's such rating is not on watch for possible downgrade) and an issuer credit rating by S&P of at least "A".

"*Participation*": A Loan acquired as a participation interest created by a Participating Institution.

"*Paying Agent*": Any Person authorized by the Issuer to pay the principal of or interest on any Notes on behalf of the Issuer as specified in Section 7.2.

"*Payment Account*": The trust account established pursuant to Section 10.3(h).

"*Payment Date*": The first day of February, May, August and November in each year, commencing in November 2007 or, if any such day is not a Business Day, the next following Business Day, any other date on which the Notes are redeemed or paid before their Stated Maturity, and at the Stated Maturity for the Notes.

"*Permitted Offer*": An Offer pursuant to which the offeror offers to acquire a debt obligation (including a Collateral Obligation) in exchange solely for cash in an amount equal to or greater than the full face amount of the debt obligation plus any accrued and unpaid interest and as to which the Servicer has determined in its commercially reasonable judgment that the offeror has sufficient access to financing to consummate the Offer.

"*Person*": An individual, corporation (including a business trust), partnership, limited liability company, joint venture, association, joint stock company, trust (including any beneficiary thereof), unincorporated association or government or any agency or political subdivision thereof.

"*PIK Cash-Pay Interest*": As to any PIK Security, the portion of interest required to be paid in cash (and not permitted to be added to the balance of such PIK Security or otherwise deferred and accrued) thereon pursuant to the terms of the related Underlying Instruments.

50

"***PIK Security***": Any loan or debt obligation on which any portion of the interest accrued for a specified period of time or until the maturity thereof is, or at the option of the obligor may be, added to the principal balance of such loan or debt obligation or otherwise deferred rather than being paid in cash, <u>provided</u> that such loan or debt obligation shall not be a PIK Security if the portion, if any, of such interest required pursuant to the terms of the related Underlying Instruments to be paid in Cash would result in the outstanding principal amount of such loan or debt obligation having an effective rate of PIK Cash-Pay Interest at least equal to (i) if such loan or debt obligation is a fixed rate loan or debt obligation, 4% per annum, or (ii) if such loan or debt obligation is a floating rate loan or debt obligation, LIBOR.

"***Plan Asset Regulation***": The regulation issued by the United States Department of Labor and found at 29 C.F.R. Section 2510.3-101.

"***Pledged Obligations***": As of any date of determination, the Collateral Obligations, the Workout Assets, the Eligible Investments, and any other securities or obligations that have been Granted to the Trustee that form part of the Collateral.

"***Portfolio Improvement Exchange***": The disposition, during the Replacement Period, of a Collateral Obligation and corresponding acquisition of one or more Collateral Obligations which in the aggregate will result in (i) the Collateral Quality Tests, the Interest Coverage Test, the Overcollateralization Tests and the Concentration Limitations herein being satisfied (or bring the total portfolio of Collateral Obligations closer to compliance with any such test or limitation) or if one or more of such Collateral Quality Tests, Interest Coverage Test, Overcollateralization Test or Concentration Limitations are not satisfied, the degree of compliance therewith would be improved and (ii) improving, on a net basis, the quality of the total portfolio of Collateral Obligations as measured by such Collateral Quality Tests, Interest Coverage Test, Overcollateralization Test and Concentration Limitations and (iii) in the case of each of clause (i) and (ii), any other Collateral Quality Tests, Interest Coverage Tests, Overcollateralization Tests or Concentration Limitations not being violated or the likelihood of such violation in the future not being significantly increased.

"***Pre-Closing Party***": One or more Affiliates of the Initial Purchasers that financed the Issuer's pre-closing acquisition of Collateral Obligations.

"***Preference Share Distribution Account***": A segregated bank account established by the Preference Shares Paying Agent pursuant to the Preference Shares Paying Agency Agreement into which the Preference Shares Paying Agent will deposit all amounts received from the Issuer and payable to the Holders of the Preference Shares under the Priority of Payments.

"***Preference Share Documents***": The Issuer's Memorandum and Articles of Association, the Preference Shares Paying Agency Agreement and the resolutions of the Issuer's board of directors authorizing the issuance of the Preference Shares passed on or before the Closing Date.

"***Preference Share Internal Rate of Return***": With respect to any Payment Date, the internal rate of return (computed using the "XIRR" function in Microsoft® Excel 2002 or an equivalent function in another software package), stated on a per annum basis, for the following cash flows, assuming all Preference Shares are purchased on the Closing Date at their Face Amount:

(i)      each distribution of Interest Proceeds made to the Holders of the Preference Shares (excluding any Class II Preference Share Special Payment distributed to the Holders of the Class II Preference Shares) on any prior Payment Date and, to the extent necessary to reach the applicable Preference Share Internal Rate of Return, the current Payment Date and

51

(ii)     each distribution of Principal Proceeds made to the Holders of the Preference Shares (excluding any Class II Preference Share Special Payment distributed to the Holders of the Class II Preference Shares) on any prior Payment Date and, to the extent necessary to reach the applicable Preference Share Internal Rate of Return, the current Payment Date.

"*Preference Shares*": The Class I Preference Shares and the Class II Preference Shares.

"*Preference Shares Notional Amount*": As of the Closing Date, $80,000,000, and thereafter as increased each time additional Preference Shares are issued in accordance with the Preference Share Documents.

"*Preference Shares Paying Agency Agreement*": The Preference Shares Paying Agency Agreement, dated as of the Closing Date, by and between the Issuer and the Preference Shares Paying Agent, as amended from time to time in accordance with the terms thereof.

"*Preference Shares Paying Agent*":  Investors Bank & Trust Company, in its capacity as Preference Shares Paying Agent under the Preference Shares Paying Agency Agreement, unless a successor Person shall have become the preference shares paying agent pursuant to the applicable provisions of the Preference Shares Paying Agency Agreement, and thereafter "Preference Shares Paying Agent" shall mean such successor Person.

"*Principal Balance*": With respect to:

(i)     any Pledged Obligation other than those specifically covered in this definition, the outstanding principal amount of the Pledged Obligation as of the relevant Measurement Date;

(ii)     a Synthetic Security, the notional amount specified in the Synthetic Security;

(iii)     any Pledged Obligation in which the Trustee does not have a first priority perfected security interest, zero, except as otherwise expressly specified in this Indenture;

(iv)     any Defaulted Collateral Obligation, except as otherwise provided, zero;

(v)     any Collateral Obligation that has been loaned, its Principal Balance shall be reduced by the excess of the amount of collateral required over the actual Market Value of the collateral;

(vi)     any Revolving Loan or Delayed Drawdown Loan, its Principal Balance shall include any unfunded amount thereof (regardless of the nature of the contingency relating to the Issuer's obligation to fund the unfunded amount), except as otherwise expressly specified in this Indenture;

(vii)   . any PIK Security, its Principal Balance shall not include any principal amount of the PIK Security representing previously deferred or capitalized interest; and

(viii)     any Qualified Equity Security and any obligation or security that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation, zero.

52

"***Principal Proceeds***": With respect to any Due Period, all amounts received in Cash during the Due Period by the Issuer with respect to the Collateral that are not Interest Proceeds.

Principal Proceeds shall include any funds transferred from the Closing Date Expense Account and the Interest Reserve Account into the Collection Account pursuant to Section 10.2.

Principal Proceeds do not include the Excluded Property or earnings on amounts on deposit in the Securities Lending Account to the extent the earnings are payable by the Issuer to a Securities Lending Counterparty.

At any time when an "event of default" under a Securities Lending Agreement has occurred and is continuing, any payments received by the Issuer from the related Securities Lending Collateral shall be Principal Proceeds.

"***Priority Class***": With respect to any specified Class of Notes, each Class of Notes that ranks senior to that Class, as indicated in Section 13.1.

"***Priority of Payments***": The meaning specified in Section 11.1(a).

"***Proceeding***": Any suit in equity, action at law, or other judicial or administrative proceeding.

"***Proposed Portfolio***": As of any Measurement Date, the portfolio (measured by Aggregate Principal Balance) of Collateral Obligations and Principal Proceeds held as Cash on deposit in the Collection Account and other Eligible Investments purchased with Principal Proceeds on deposit in the Collection Account resulting from the sale, maturity, or other disposition of a Collateral Obligation or a proposed purchase of a Collateral Obligation, as the case may be.

"***Purchase Agreement***": A purchase agreement dated May 31, 2007 among the Co-Issuers and the Initial Purchasers, relating to the purchase of the Notes and the Class I Preference Shares, as modified, amended and supplemented and in effect from time to time.

"***Purchase Criteria Adjusted Balance***": For any Collateral Obligation other than Deep Discount Obligations, its Principal Balance; and for any Deep Discount Obligation its Purchase Price; provided, however, that if any Excess CCC+/Caa1 Collateral Obligations exist, the Purchase Criteria Adjusted Balance for the Excess CCC+/Caa1 Collateral Obligations shall be the lower of (i) the weighted average Market Value of all CCC+/Caa1 Collateral Obligations, expressed as a percentage of their outstanding principal balances and (ii) the product of (a) 70% and (b) their respective Principal Balance.

"***Purchase Price***": With respect to the purchase of any Collateral Obligation (other than any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation), the net purchase price paid by the Issuer for the Collateral Obligation. The net purchase price is determined by subtracting from the purchase price the amount of any Accrued Interest Purchased With Principal and any syndication and other upfront fees paid to the Issuer and by adding the amount of any related transaction costs (including assignment fees) paid by the Issuer to the seller of the Collateral Obligation or its agent.

"***Purchase Price Amount***": With respect to any Collateral Obligation on any date of determination, the product of (i) the Purchase Price (stated as a percentage) thereof and (ii) the Principal Balance thereof on such date.

"***QIB/QP***": Any Person that, at the time of its acquisition of Notes is both a Qualified Institutional Buyer and a Qualified Purchaser.

"***Qualified Equity Security***": Any obligation that at the time of acquisition, conversion or exchange does not satisfy the requirements of a Collateral Obligation that is stock or evidence of an interest in or a right to buy stock, or any obligation that at the time of acquisition, conversion or exchange does not satisfy the requirements of a Collateral Obligation but whose acquisition otherwise is a transaction in stocks or securities within the meaning of Section 864(b)(2)(A)(ii) of the Code and the regulations under the Code. Qualified Equity Securities do not include any obligation that at the time of acquisition, conversion or exchange does not satisfy the requirements of a Collateral Obligation and that will cause the Issuer to be treated as engaged in or having income from a United States trade or business for United States federal income tax purposes by virtue of its ownership or disposition of the obligation (without regard to the Issuer's other activities).

"***Qualified Institutional Buyer***": The meaning specified in Rule 144A under the Securities Act.

"***Qualified Purchaser***": The meaning specified in Section 2(a)(51) of the Investment Company Act and Rule 2a51-2 under the Investment Company Act (including entities owned exclusively by Qualified Purchasers).

"***Ramp-Up Completion Date***": The earlier of:

>    (i)    the Business Day after the 90th day after the Closing Date, and

>    (ii)    the first date on which the following conditions are satisfied:

>>    (x) (A) the Aggregate Principal Balance of the Collateral Obligations owned by the Issuer equals at least U.S.$981,300,000 or (B) the Aggregate Principal Balance of the Collateral Obligations purchased (or committed to be purchased) by the Issuer with proceeds from the sale of the Notes (in each case in this clause (B), measured solely as of the date of purchase or commitment, as the case may be) equals at least U.S.$981,300,000 (for the avoidance of doubt, without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations on or before the Ramp-Up Completion Date); and

>>    (y)    the Overcollateralization Ratio Numerator is at least U.S.$981,300,000.

"***Ramp-Up Notice***": The meaning specified in Section 7.19(e).

"***Ramp-Up Period***": The period from and including the Closing Date to and including the Ramp-Up Completion Date.

"***Rating Agency***": Each of Moody's and S&P or, with respect to Pledged Obligations generally, if at any time Moody's or S&P ceases to provide rating services with respect to high yield debt securities, any other nationally recognized statistical rating organization selected by the Issuer and reasonably satisfactory to a Majority of each Class of Notes. If at any time Moody's ceases to be a Rating Agency, references to rating categories of Moody's in this Indenture shall instead be references to the equivalent categories of the replacement rating agency as of the most recent date on which the replacement rating agency and Moody's published ratings for the type of security in

respect of which the replacement rating agency is used. If at any time S&P ceases to be a Rating Agency, references to rating categories of S&P in this Indenture shall instead be references to the equivalent categories of the replacement rating agency as of the most recent date on which the replacement rating agency and S&P published ratings for the type of security in respect of which the replacement rating agency is used.

"*Rating Condition*": With respect to any Rating Agency and any action taken or to be taken under this Indenture, a condition that is satisfied when the Rating Agency has confirmed to the Servicer (as agent for the Issuer) in writing that no withdrawal, reduction, suspension, or other adverse action with respect to any then current rating by it (including any private or confidential rating) of any Class of Notes will occur as a result of the action. The Rating Condition with respect to any Rating Agency shall be satisfied for all purposes of this Indenture at any time when no Outstanding Notes are rated by it.

"*Rating Confirmation*": Confirmation in writing from each Rating Agency that it has not reduced, suspended, or withdrawn the Initial Rating assigned by it to any Class of Notes; *provided* however, that in the case of Refinancing Notes, a Moody's rating will be obtained for such Refinancing Notes and a Rating Confirmation with respect to such Refinancing Notes shall mean (i) with respect to S&P, confirmation in writing from S&P that the rating of each Class of Refinancing Notes will be no lower than the rating on each corresponding Class of Notes subject to such Refinancing and (ii) with respect to Moody's, that the Moody's rating of each Class of Refinancing Notes will be no lower than the rating on each corresponding Class of Notes subject to such Refinancing; *provided further* that if the terms of such Refinancing Notes are the same as the terms of the corresponding Class of Notes subject to Refinancing (other than with respect to the coupon thereof), it is expected that the cost of obtaining such rating from Moody's shall be no more than the cost of obtaining a Rating Confirmation.

"*Rating Confirmation Failure*": The meaning specified in Section 7.19(f) hereof.

"*Ratings Matrix*": The "row/column combination" of the table below selected by the Servicer on the Closing Date to apply initially for purposes of the Diversity Test, the Weighted Average Spread Test and the Weighted Average Rating Factor Test. Thereafter, on notice to the Trustee, the Servicer may select a different row of the Ratings Matrix to apply, or may interpolate between two adjacent rows and/or two adjacent columns, as applicable, on a straight-line basis and round the results to two decimal points.

| Minimum Weighted Average Spread | Minimum Diversity Score | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 55 | 60 | 65 | 70 | 75 | 80 | 85 | 90 |
| 2.20% | 2185 | 2230 | 2275 | 2320 | 2365 | 2395 | 2430 | 2455 |
| 2.30% | 2230 | 2275 | 2320 | 2365 | 2410 | 2445 | 2480 | 2500 |
| 2.40% | 2275 | 2320 | 2365 | 2410 | 2455 | 2490 | 2525 | 2550 |
| 2.50% | 2320 | 2365 | 2410 | 2455 | 2500 | 2535 | 2570 | 2595 |
| 2.60% | 2370 | 2415 | 2460 | 2505 | 2550 | 2585 | 2620 | 2645 |
| 2.70% | 2425 | 2470 | 2515 | 2560 | 2605 | 2640 | 2675 | 2700 |
| 2.80% | 2480 | 2525 | 2570 | 2615 | 2660 | 2695 | 2730 | 2755 |
| 2.90% | 2535 | 2580 | 2625 | 2670 | 2715 | 2750 | 2785 | 2810 |
| 3.00% | 2570 | 2635 | 2680 | 2725 | 2770 | 2805 | 2820 | 2845 |
| Maximum Weighted Average Moody's Rating Factor | | | | | | | | |

55

"***Recovery Rate Modifier***": As of any Measurement Date, the lesser of 60 and the product of:

    (i)    (a) the Moody's Minimum Average Recovery Rate minus the minimum percentage specified to pass the Weighted Average Moody's Recovery Rate Test (but not less than zero) multiplied by (b) 100; and

    (ii)    40.

"***Record Date***": As to any Payment Date, the 15th day (whether or not a Business Day) before the Payment Date.

"***Redemption Date***": Any Payment Date specified for an Optional Redemption of Notes pursuant to Section 9.2 or the redemption of a Class of Notes in connection with a Refinancing pursuant to Section 9.7.

"***Redemption Price***": With respect to any Note and any Optional Redemption pursuant to Section 9.2(a) or any redemption by Refinancing pursuant to Section 9.7(a), an amount equal to:

    (i)    the outstanding principal amount of the portion of the Note being redeemed; plus

    (ii)    accrued interest on the Note (including any Defaulted Interest and interest on Defaulted Interest); plus

    (iii)    in the case of any Deferred Interest Note, the applicable Deferred Interest on the Note; plus

    (iv)    any unpaid Extension Bonus Payment in respect of the Note.

With respect to any Preference Share and any Optional Redemption pursuant to Section 9.2(b), "Redemption Price" means (i) at the direction of a Majority of the Preference Shares, the *pro rata* portion for such Preference Share of the entire remaining amount of available funds after all prior applications pursuant to the Priority of Payments or (ii) as specified by the unanimous direction of the Holders of the Preference Shares, in each case, as specified in Section 9.2(b).

"***Reference Obligation***": An obligation that would otherwise satisfy the definition of "Collateral Obligation" and on which a Synthetic Security is based; provided that no Reference Obligation shall be a Synthetic Security.

"***Refinancing***": The meaning specified in Section 9.7.

"***Refinancing Date***": The meaning specified in Section 9.7.

"***Refinancing Notes***": The meaning specified in Section 9.7.

"***Refinancing Price***": With respect to any Class of Notes that is subject to a Refinancing, an amount equal to the Redemption Price thereof.

"***Refinancing Proceeds***": The proceeds from any refinancing permitted under this Indenture.

"***Reference Obligor***": The obligor of a Reference Obligation.

"***Registered***": With respect to a Collateral Obligation or Eligible Investment, means that it is issued after July 18, 1984 and is in registered form within the meaning of Section 881(c)(2)(B)(i) of the Code and the United States Department of the Treasury ("Treasury") regulations promulgated thereunder.

"***Registered Office***": The registered office of the Issuer, which shall be located outside of the United States.

"***Regulation D***": Regulation D under the Securities Act.

"***Regulation S***": Regulation S under the Securities Act.

"***Regulation S Global Note***": The meaning specified in Section 2.2(b).

"***Relevant Obligation***": For a Collateral Obligation that is a Synthetic Security, the Reference Obligation of the Synthetic Security and otherwise the Collateral Obligation.

"***Replacement Hedge***": A replacement hedge agreement that qualifies to be a Hedge Agreement under this Indenture.

"***Replacement Period***": The period from the Closing Date through and including the first to occur of:

(i)     the Payment Date after the date that the Servicer notifies the Trustee, each Rating Agency, and the Administrator, in the sole discretion of the Servicer, that, in light of the composition of the Collateral, general market conditions, and other factors, the acquisition of additional Collateral Obligations within the foreseeable future would either be impractical or not beneficial,

(ii)    the Payment Date in August 2014 or, in the case of an Extension, the Extended Replacement Period End Date,

(iii)   the Payment Date on which all Notes are to be optionally redeemed or an earlier date after notice of an Optional Redemption chosen by the Servicer to facilitate the liquidation of the Collateral for the Optional Redemption, and

(iv)    the date on which the Replacement Period terminates or is terminated as a result of an Event of Default (subject to Section 5.2(c)).

"***Repository***": The internet-based password protected electronic repository of transaction documents relating to privately offered and sold collateralized debt obligation securities located at "www.cdolibrary.com" operated by The Bond Market Association.

"***Required Redemption Percentage***": With respect to (a) any Optional Redemption resulting from a Tax Event, the Holders of at least 66⅔% of the Aggregate Outstanding Amount of any Affected Class or at least 66⅔% of the Aggregate Outstanding Amount of the Preference Shares and (b) any other Optional Redemption, a Majority of the Preference Shares.

"***Required Rating***": The meaning specified in Section 15.2(b).

57

"***Retention Overcollateralization Ratio***": As of any Measurement Date, the ratio obtained by dividing:

(i)       the Overcollateralization Ratio Numerator *by*

(ii)      the Aggregate Outstanding Amount of the Class A-1-A Notes, the Class A-1-B Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes, excluding any Deferred Interest on any Class of Notes.

"***Retention Overcollateralization Test***": A test that is satisfied as of any Measurement Date during the Replacement Period on which any Notes remain Outstanding, if the Retention Overcollateralization Ratio as of such Measurement Date is at least equal to 103.3%.

"***Revolving Loan***": A Loan or any Synthetic Security with a Reference Obligation (in each case excluding any Delayed Drawdown Loan) that requires the Issuer to make future advances to (or for the account of) the borrower under its Underlying Instruments (including any letter of credit for which the Issuer is required to reimburse the issuing bank for under it). A Loan or Synthetic Security shall only be considered to be a Revolving Loan for so long as its Commitment Amount is greater than zero.

"***Revolving Reserve Account***": The trust account established pursuant to Section 10.3(b).

"***Rule 3a-7***": Rule 3a-7 under the Investment Company Act.

"***Rule 144A***": Rule 144A under the Securities Act.

"***Rule 144A Global Note***": The meaning specified in Section 2.2(c).

"***Rule 144A Information***": The meaning specified in Section 7.15.

"***S&P***": Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"***S&P CDO Monitor***": A dynamic, analytical computer model developed by S&P (and as may be modified by S&P from time to time) and provided to the Servicer and the Collateral Administrator to be used to calculate the default frequency in terms of the amount of debt assumed to default as a percentage of the original principal amount of the Collateral Obligations consistent with a specified benchmark rating level based on certain assumptions and S&P's proprietary corporate default studies. For the purpose (and only for the purpose) of applying the S&P CDO Monitor to a portfolio of obligations, for each obligation in the portfolio, the rating of the obligation shall be its S&P Rating.

"***S&P CDO Monitor Test***": A test that is satisfied as of any Measurement Date if, after giving effect to the sale of a Collateral Obligation or the purchase of a Collateral Obligation, each Note Class Loss Differential of the Proposed Portfolio is positive. The S&P CDO Monitor Test shall be considered to be improved if each Note Class Loss Differential of the Proposed Portfolio is at least equal to the corresponding Note Class Loss Differential of the Current Portfolio. The S&P CDO Monitor Test is not required to be satisfied or improved upon the sale of a Credit Risk Obligation and the application of the related Sale Proceeds to purchase additional Collateral Obligations as provided in Section 12.1(a). For purposes of the S&P CDO Monitor Test,

(i)      the S&P Rating of any S&P Unrated DIP Loan shall be "CCC-" and

(ii) the S&P Industry Classification for a Synthetic Security shall be that of the related Reference Obligation and not the Synthetic Security.

"**S&P CRR**": With respect to any Collateral Obligation, a corporate recovery rate assigned by S&P to such Collateral Obligation.

"**S&P CRR Recovery Rate**" With respect to any Collateral Obligation to which S&P has assigned a S&P CRR, the recovery rate determined in accordance with the definition of S&P Recovery Rate.

"***S&P Industry Classification***": The S&P Industry Classifications in Schedule 3 as modified, amended, and supplemented from time to time by S&P.

"***S&P Rating***": The meaning set forth in Schedule 7.

"***S&P Rating Confirmation***": Confirmation in writing from S&P that it has not reduced, suspended, or withdrawn the Initial Rating assigned by it to any Class of Notes.

"***S&P Recovery Rate***": As of any date of determination, with respect to any Collateral Obligation, the percentage for such Collateral Obligation set forth in (x) the applicable table below, (y) the row in such table opposite the S&P CRR (or, if the relevant assets have no S&P CRR, the senior secured recovery rating, the U.S. loan recovery rating or the CDO liability rating, as applicable) of such Collateral Obligation (or, in the case of a Form-Approved Synthetic Security, the Reference Obligation unless otherwise specified by S&P) and (z) the column in such table below the initial S&P Rating of the respective Class of Notes; provided, however that (i) with respect to a DIP Loan or a Synthetic Security (other than a Form-Approved Synthetic Security), the S&P Recovery Rate shall be the recovery rate assigned by S&P and with respect to a Structured Finance Obligation the S&P Recovery Rate shall be the recovery rate determined by reference to Table V or Table VI below, as applicable and (ii) the Issuer or the Servicer may request the assignment of a recovery rate from S&P with respect to any Collateral Obligation, any such assignment by S&P to be in writing (electronic or otherwise).

**Table I (if the Collateral Obligation has a S&P CRR): Recovery Rates For Assets With Corporate Recovery Ratings**

| Rating of Class of Notes* | AAA | AA | A | BBB | BB | B & CCC |
|---|---|---|---|---|---|---|
| **S&P CRR** | | | **(%)** | | | |
| 1+ | 100 | 100 | 100 | 100 | 100 | 100 |
| 1 | 92 | 93 | 94 | 96 | 98 | 100 |
| 2 | 84 | 86 | 88 | 90 | 92 | 94 |
| 3 | 60 | 63 | 65 | 69 | 72 | 74 |
| 4 | 40 | 42 | 44 | 46 | 48 | 48 |
| 5 | 16 | 17 | 19 | 21 | 23 | 24 |

* As of the Closing Date.

59

**Table II (if the Collateral Obligation is a Senior Unsecured Loan and has no S&P CRR, but other senior secured corporate debt of the same obligor has a S&P CRR): U.S. Recovery Rates of Corporate Senior Unsecured Debt If Senior Secured Debt Has A Recovery Rating**

| Rating of Class of Notes* | AAA | AA | A | BBB | BB | B & CCC |
|---|---|---|---|---|---|---|
| Senior secured recovery ratings | | | | (%) | | |
| 1+ | 53 | 55 | 57 | 59 | 61 | 61 |
| 1 | 48 | 50 | 52 | 54 | 56 | 56 |
| 2 | 43 | 45 | 47 | 49 | 51 | 51 |
| 3 | 39 | 41 | 43 | 45 | 47 | 47 |
| 4 | 20 | 20 | 20 | 20 | 20 | 20 |
| 5 | 10 | 10 | 10 | 10 | 10 | 10 |

\* As of the Closing Date.

**Table III (if the Collateral Obligation is a subordinated obligation and has no S&P CRR, but other senior secured corporate debt of the same obligor has a S&P CRR): U.S. Recovery Rates of Corporate Subordinated Debt If Senior Secured Debt Has A Recovery Rating**

| Rating of Class of Notes* | AAA | AA | A | BBB | BB | B & CCC |
|---|---|---|---|---|---|---|
| Senior secured recovery ratings | | | | (%) | | |
| 1+ | 25 | 25 | 25 | 25 | 25 | 25 |
| 1 | 22 | 22 | 22 | 22 | 22 | 22 |
| 2 | 20 | 20 | 20 | 20 | 20 | 20 |
| 3 | 20 | 20 | 20 | 20 | 20 | 20 |
| 4 | 10 | 10 | 10 | 10 | 10 | 10 |
| 5 | 5 | 5 | 5 | 5 | 5 | 5 |

\* As of the Closing Date.

NY\1257964.27

**Table IV (if none of Table I, Table II or Table III is applicable): S&P's U.S. Tiered Corporate Recovery Rates (for Collateral Obligations that do not have a S&P CRR)**

| Rating of Class of Notes* | AAA | AA | A | BBB | BB | B & CCC |
|---|---|---|---|---|---|---|
| **U.S. loan recovery rates** | | | | (%) | | |
| Senior Secured Loans | 56 | 60 | 64 | 67 | 70 | 70 |
| Senior Unsecured Loans and Second Lien Loans | 40 | 42 | 44 | 46 | 48 | 48 |
| Subordinated Loans | 22 | 22 | 22 | 22 | 22 | 22 |
| Senior Secured Notes | 48 | 49 | 50 | 51 | 52 | 52 |
| Unsecured Bonds | 38 | 41 | 42 | 44 | 45 | 45 |
| Subordinated Bonds | 19 | 19 | 19 | 19 | 19 | 19 |

* As of the Closing Date.

** The Aggregate Principal Balance of all Second Lien Loans without a S&P CRR (excluding any Defaulted Collateral Obligations) that, in the aggregate, represent up to 15% of the Maximum Amount will have the S&P Recovery Rate specified for Second Lien Loans in the table above. The Aggregate Principal Balance of all Second Lien Loans without a S&P CRR (excluding any Defaulted Collateral Obligations) in excess of 15% of the Maximum Amount will have the S&P Recovery Rate specified for Subordinated Loans in the table above.

**Table V (if the Structured Finance Obligation is the senior-most tranche of securities issued by the issuer of, or obligor on, such Structured Finance Obligation): S&P's Ratings of Collateral Obligations at the Date of Issuance**

| Rating of Class of Notes* | AAA | AA | A | BBB | BB | B | CCC |
|---|---|---|---|---|---|---|---|
| **Recovery Rate by S&P's Rating of Class of Notes on the Applicable Measurement Date** | | | | | | | |
| AAA | 80.00% | 85.00% | 90.00% | 90.00% | 90.00% | 90.00% | 90.00% |
| AA | 70.00% | 75.00% | 85.00% | 90.00% | 90.00% | 90.00% | 90.00% |
| A | 60.00% | 65.00% | 75.00% | 85.00% | 90.00% | 90.00% | 90.00% |
| BBB | 50.00% | 55.00% | 65.00% | 75.00% | 85.00% | 85.00% | 85.00% |
| BB | 45.00% | 50.00% | 55.00% | 65.00% | 75.00% | 75.00% | 75.00% |
| B | 25.00% | 30.00% | 50.00% | 55.00% | 65.00% | 65.00% | 50.00% |
| CCC | 0.00% | 0.00% | 0.00% | 0.00% | 5.00% | 10.00% | 10.00% |

61

\* As of the Closing Date.

**Table VI (if the Structured Finance Obligation is not the senior-most tranche of securities issued by the issuer of, or obligor on, such Structured Finance Obligation): S&P's Ratings of Collateral Obligations at the Date of Issuance**

| Rating of Class of Notes* | AAA | AA | A | BBB | BB | B | CCC |
|---|---|---|---|---|---|---|---|
| **Recovery Rate by S&P's Rating of Class of Notes on the Applicable Measurement Date** | | | | | | | |
| AAA | 65.00% | 70.00% | 80.00% | 85.00% | 85.00% | 85.00% | 85.00% |
| AA | 55.00% | 65.00% | 75.00% | 80.00% | 80.00% | 80.00% | 80.00% |
| A | 40.00% | 45.00% | 55.00% | 65.00% | 80.00% | 80.00% | 80.00% |
| BBB | 30.00% | 35.00% | 40.00% | 45.00% | 50.00% | 60.00% | 70.00% |
| BB | 10.00% | 10.00% | 10.00% | 25.00% | 35.00% | 40.00% | 50.00% |
| B | 2.50% | 5.00% | 5.00% | 10.00% | 10.00% | 20.00% | 25.00% |
| CCC | 0.00% | 0.00% | 0.00% | 0.00% | 2.50% | 5.00% | 5.00% |

\* As of the Closing Date.

**Table VII: European Tiered Corporate Recovery Rates (By Asset Class And CDO Liability Rating)**

| Rating of Class of Notes* | AAA | AA | A | BBB | BB | B & CCC |
|---|---|---|---|---|---|---|
| **CDO liability rating** | | | | | | |
| **Senior secured loans (%)** | | | | | | |
| Group A | 68 | 73 | 78 | 81 | 85 | 85 |
| Group B | 56 | 60 | 64 | 67 | 70 | 70 |
| Group C | 48 | 51 | 55 | 57 | 60 | 60 |
| **Mezz./second-lien/senior unsecured loans (%)** | | | | | | |
| Group A | 45 | 47 | 50 | 52 | 54 | 54 |
| Group B | 40 | 42 | 44 | 46 | 48 | 48 |
| Group C | 35 | 37 | 39 | 40 | 42 | 42 |
| **Subordinated loans (%)** | | | | | | |

62

| | | | | | | |
|---|---|---|---|---|---|---|
| Group A | 20 | 20 | 20 | 20 | 20 | 20 |
| Group B | 20 | 20 | 20 | 20 | 20 | 20 |
| Group C | 17 | 17 | 17 | 17 | 17 | 17 |
| **Senior secured bonds (%)** | | | | | | |
| Group A | 60 | 61 | 62 | 63 | 64 | 64 |
| Group B | 48 | 49 | 50 | 51 | 52 | 52 |
| Group C | 43 | 44 | 45 | 46 | 47 | 47 |
| **Senior unsecured bonds (%)** | | | | | | |
| Group A | 40 | 42 | 44 | 46 | 48 | 48 |
| Group B | 38 | 41 | 42 | 44 | 45 | 45 |
| Group C | 32 | 35 | 36 | 38 | 39 | 40 |
| **Subordinated bonds (%)** | | | | | | |
| Group A | 18 | 18 | 18 | 18 | 18 | 18 |
| Group B | 18 | 18 | 18 | 18 | 18 | 18 |
| Group C | 15 | 15 | 15 | 15 | 15 | 15 |

---

\* As of the Closing Date.
\*\* Group A: U.K., Ireland, South Africa, and The Netherlands. Group B: Belgium, Germany, Austria, Spain, Portugal, Luxembourg, Denmark, Sweden, Norway, and Finland. Group C: France, Italy, Greece, and Switzerland.

**Table VIII: Group A European Recovery If Senior Secured Debt Has A Recovery Rating**

| Rating of Class of Notes* CDO liability rating Mezz. loans/second- lien/senior unsecured loans | AAA | AA | A | BBB | BB | B & CCC |
|---|---|---|---|---|---|---|
| | | | Recovery ratings of senior secured (%) | | | |
| 1+ | 65 | 68 | 71 | 73 | 76 | 76 |
| 1 | 57 | 60 | 63 | 65 | 68 | 68 |
| 2 | 50 | 53 | 55 | 57 | 59 | 59 |
| 3 | 42 | 45 | 47 | 49 | 51 | 51 |
| 4 | 18 | 18 | 18 | 18 | 18 | 18 |
| 5 | 8 | 8 | 8 | 8 | 8 | 8 |
| **Subordinated loans** | | | Recovery ratings of senior secured (%) | | | |
| 1+ | 22 | 22 | 22 | 22 | 22 | 22 |
| 1 | 20 | 20 | 20 | 20 | 20 | 20 |
| 2 | 18 | 18 | 18 | 18 | 18 | 18 |
| 3 | 18 | 18 | 18 | 18 | 18 | 18 |
| 4 | 9 | 9 | 9 | 9 | 9 | 9 |
| 5 | 4 | 4 | 4 | 4 | 4 | 4 |

63

* As of the Closing Date.

**Table IX: Group B European Recovery If Senior Secured Debt Has A Recovery Rating**

| Rating of Class of Notes* | AAA | AA | A | BBB | BB | B & CCC |
|---|---|---|---|---|---|---|
| CDO liability rating Mezz. loans/second-lien/senior unsecured loans | Recovery ratings of senior secured (%) | | | | | |
| 1+ | 53 | 55 | 57 | 59 | 61 | 61 |
| 1 | 48 | 50 | 52 | 54 | 56 | 56 |
| 2 | 43 | 45 | 47 | 49 | 51 | 51 |
| 3 | 39 | 41 | 43 | 45 | 47 | 47 |
| 4 | 18 | 18 | 18 | 18 | 18 | 18 |
| 5 | 8 | 8 | 8 | 8 | 8 | 8 |
| **Subordinated loans** | Recovery ratings of senior secured (%) | | | | | |
| 1+ | 22 | 22 | 22 | 22 | 22 | 22 |
| 1 | 20 | 20 | 20 | 20 | 20 | 20 |
| 2 | 18 | 18 | 18 | 18 | 18 | 18 |
| 3 | 18 | 18 | 18 | 18 | 18 | 18 |
| 4 | 9 | 9 | 9 | 9 | 9 | 9 |
| 5 | 4 | 4 | 4 | 4 | 4 | 4 |

* As of the Closing Date.

**Table X: Group C European Recovery If Senior Secured Debt Has A Recovery Rating**

| Rating of Class of Notes* | AAA | AA | A | BBB | BB | B & CCC |
|---|---|---|---|---|---|---|
| CDO liability rating Mezz. loans/second-lien/senior unsecured loans | Recovery ratings of senior secured (%) | | | | | |
| 1+ | 45 | 46 | 48 | 49 | 51 | 51 |
| 1 | 41 | 43 | 44 | 46 | 47 | 48 |
| 2 | 37 | 39 | 41 | 42 | 44 | 44 |
| 3 | 33 | 36 | 37 | 39 | 40 | 41 |

64

| | | | | | | |
|---|---|---|---|---|---|---|
| 4 | 16 | 16 | 16 | 16 | 16 | 16 |
| 5 | 6 | 6 | 6 | 6 | 6 | 6 |
| **Subordinated loans** | Recovery ratings of senior secured (%) | | | | | |
| 1+ | 20 | 20 | 20 | 20 | 20 | 20 |
| 1 | 17 | 17 | 17 | 17 | 17 | 17 |
| 2 | 15 | 15 | 15 | 15 | 15 | 15 |
| 3 | 15 | 15 | 15 | 15 | 15 | 15 |
| 4 | 8 | 8 | 8 | 8 | 8 | 8 |
| 5 | 3 | 3 | 3 | 3 | 3 | 3 |

\* As of the Closing Date.

In all recovery rate tables above, Note rating categories below "AAA" include rating subcategories (for example, the "AA" column also applies to Notes rated "AA+" and "AA-").

"*S&P Unrated DIP Loan*": A DIP Loan acquired by the Issuer that does not have a rating assigned by S&P and for which the Servicer has commenced the process of having a rating assigned by S&P (as specified in the definition of "DIP Loan").

"*Sale*": The meaning specified in Section 5.17.

"*Sale Proceeds*": All proceeds received (including any proceeds received with respect to any associated interest rate swap or security providing fixed annuity payments ) with respect to Collateral Obligations or other Pledged Obligations as a result of their sales or other dispositions less any reasonable expenses expended by the Servicer or the Trustee in connection with the sales or other dispositions, which shall be paid from such proceeds notwithstanding their characterization otherwise as Administrative Expenses.

"*Schedule of Collateral Obligations*": The Collateral Obligations listed on Schedule 1, which schedule shall include with respect to each listed Collateral Obligation:

(A)     the name of the obligor and a unique Loan or other instrument identifier;

(B)     the purchase price;

(C)     the Principal Balance;

(D)     the classification (including whether the Collateral Obligation is a Loan, a High-Yield Bond, a Synthetic Security, a Participation, a Structured Finance Obligation, a Revolving Loan or a Delayed Drawdown Loan);

(E)     the funded amount (stated as a percentage) in respect of a Collateral Obligation that is a Revolving Loan or a Delayed Drawdown Loan;

(F)     the coupon or spread (as applicable);

(G)     the Stated Maturity;

(H)     the Moody's Rating;

65

(I)    the S&P Rating; and

(J)    the CUSIP and any ISIN, if applicable,

as the schedule may be amended from time to time to reflect the release of Collateral Obligations pursuant to Article 10 and the inclusion of Collateral Obligations as provided in Section 12.2.

"*Scheduled Preference Shares Redemption Date*": August 1, 2022.

"*Second Lien Loan*": A Loan that (i) is not (and cannot by its terms become) subordinated in right of payment to any other obligation of the obligor of the Loan other than a Senior Secured Loan with respect to the liquidation of such obligor or the collateral for such Loan, (ii) is secured by a valid second priority perfected security interest in or lien on specified collateral securing the obligor's obligations under the Loan, which specified collateral does not consist solely of common stock or shares issued by the obligor or any of its Affiliates or intangible assets and (iii) if such Loan does not have an S&P Recovery Rate assigned as part of a credit estimate, so long as such credit estimate is in effect, then, solely for purposes of determining the S&P Recovery Rate for such Loan, in the Servicer's commercially reasonable judgment (with such judgment being made in good faith by the Servicer at the time of such Loan's purchase), the specified collateral for such Loan has a value not less than the outstanding Principal Amount of all debt senior to such Loan plus the S&P Recovery Rate applicable to such Loan, which value may be derived from, among other things, the enterprise value of the issuer of such Loans (provided that the provisions of the clause (iii) may be amended at any time, subject to Rating Confirmation from S&P, or in order to conform to S&P's then-current criteria for such Loans).

"*Secondary Risk Counterparty*": Any obligor Domiciled other than in the United States, any Participating Institution, any Synthetic Security Counterparty, and any Securities Lending Counterparty.

"*Secondary Risk Table*": With respect to Moody's, the table below:

| Long-Term Senior Unsecured Debt Rating of Secondary Risk Counterparty | Individual Counterparty Limit | Aggregate Counterparty Limit |
|---|---|---|
| Aaa | 20.0% | 20.0% |
| Aa1 | 10.0% | 10.0% |
| Aa2 | 10.0% | 10.0% |
| Aa3 | 10.0% | 10.0% |
| A1 | 5.0% | 10.0% |
| A2 or below | 0.0% | 0.0% |

With respect to S&P, the table below:

66

| Long-Term Senior Unsecured Debt Rating of Secondary Risk Counterparty | Individual Counterparty Limit | Aggregate Counterparty Limit |
|---|---|---|
| AAA | 20.0% | 20.0% |
| AA+/AA/AA- | 10.0% | 20.0% |
| A+ | 5.0% | 20.0% |
| A or below | 0.0% | 0.0% |

If any Secondary Risk Counterparty's long-term senior unsecured debt rating or short-term rating is on credit watch for possible downgrade by Moody's or S&P, then for the purposes of the table above, its rating by the Rating Agency putting its rating on credit watch shall be one rating notch lower for that Rating Agency.

"*Section 3(c)(7)*": Section 3(c)(7) of the Investment Company Act.

"*Section 3(c)(7) Reminder Notice*": A notice from the Issuer to the Noteholders (to be delivered in accordance with Sections 10.6(a) and (b)) substantially in the form of Exhibit G-1.

"*Secured High-Yield Bond*": A High-Yield Bond that is secured by a valid and perfected security interest in specified collateral.

"*Secured Loan*": A Loan that is secured by a valid and perfected security interest in specified collateral.

"*Secured Obligations*": The meaning specified in the Granting Clauses.

"*Secured Parties*": The meaning specified in the Granting Clauses.

"*Securities*": The Notes and the Preference Shares.

"*Securities Act*": The United States Securities Act of 1933, as amended.

"*Securities Intermediary*": Any clearing corporation or any Person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity.

"*Securities Lending Account*": The trust account established pursuant to Section 10.3(f).

"*Securities Lending Agreements*": The meaning specified in Section 7.18.

"*Securities Lending Collateral*": The meaning specified in Section 7.18.

"*Securities Lending Counterparty*": The meaning specified in Section 7.18.

"*Security Entitlement*": The meaning specified in Section 8-102(a)(17) of the UCC.

"*Selected Collateral Quality Tests*": The Weighted Average Moody's Recovery Rate Test, the Weighted Average Fixed Rate Coupon Test, the Weighted Average Spread Test, the Weighted Average Life Test (after taking into consideration any applicable Maturity Extension), the Weighted Average Rating Factor Test and the Diversity Test.

NY\1257964.27

*"**Senior Notes**"*: The Class A-1-A Notes, the Class A-1-B Notes, the Class B Notes, the Class C Notes and the Class D Notes authorized by, and authenticated and delivered under, this Indenture or any supplemental indenture.

*"**Senior Secured High-Yield Bond**"*: A Secured High-Yield Bond that is not subordinated by its terms to indebtedness of the borrower for borrowed money, trade claims, capitalized leases, or other similar obligations, with a first priority security interest in collateral that in the opinion of the Servicer has value at least equal to the amount of the High-Yield Bond.

*"**Senior Secured Loan**"*: A Secured Loan that is not subordinated by its terms to indebtedness of the borrower for borrowed money, trade claims, capitalized leases, or other similar obligations, with a valid and perfected first priority security interest in collateral that in the opinion of the Servicer has value at least equal to the amount of the Loan and that is not a DIP Loan.

*"**Senior Servicing Fee**"*: A fee that accrues from the Closing Date payable to the Servicer in arrears on each Payment Date equal to 0.30% per annum of the Maximum Amount if and to the extent funds are available for that purpose in accordance with the Priority of Payments. The Senior Servicing Fee shall be calculated on the basis of a 360-day year consisting of twelve 30-day months.

*"**Senior Unsecured High-Yield Bond**"*: A High-Yield Bond that is not (i) subordinated by its terms to indebtedness of the borrower for borrowed money and (ii) secured by a valid and perfected security interest in collateral.

*"**Senior Unsecured Loan**"*: A Loan that is not a Senior Secured Loan and is not (i) subordinated by its terms to indebtedness of the borrower for borrowed money and (ii) secured by a valid and perfected security interest in collateral.

*"**Servicer**"*: Highland Capital Management, L.P., and any successor Servicer pursuant to the Servicing Agreement.

*"**Servicing Agreement**"*: The Servicing Agreement, dated as of the Closing Date, between the Issuer and the Servicer, as modified, amended, and supplemented and in effect from time to time.

*"**Servicing Fee Portion**"*: 100% minus (a) for any Payment Date from the Closing Date until (and including) the Payment Date in February 2008, the Class II Preference Share Percentage for such Payment Date and (b) for any other Payment Date, a percentage (between 0% and 100%) selected by the Servicer in its sole discretion and reported to the Trustee in writing on or before the related Determination Date; *provided* that, with respect to the Payment Date in May 2008, such percentage shall be a minimum of the product of (i) the Class II Preference Share Percentage for such Payment Date and (ii) 3.3%.

*"**Servicing Fees**"*: Collectively, the Senior Servicing Fee, the Subordinated Servicing Fee and the Supplemental Servicing Fee.

*"**Share Trustee**"*: Maples Finance Limited.

*"**Share Registrar**"*: Maples Finance Limited or any successor thereto.

*"**Special Redemption**"*: The meaning specified in Section 9.5.

*"**Special Redemption Amount**"*: The meaning specified in Section 9.5.

*"**Special Redemption Date**"*: The meaning specified in Section 9.5.

NY\1257964.27

"***Spread Excess***": As of any Measurement Date, a fraction whose:

    (i)    numerator is the product of:

        (A)    the greater of zero and the excess of the Weighted Average Spread for the Measurement Date over the Minimum Weighted Average Spread specified in the applicable row of the Ratings Matrix, and

        (B)    the Aggregate Principal Balance of all Floating Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date, and

    (ii)    denominator is the Aggregate Principal Balance of all Fixed Rate Obligations (excluding any Non-Performing Collateral Obligations) held by the Issuer as of the Measurement Date.

In computing the Spread Excess on any Measurement Date, the Weighted Average Spread for the Measurement Date will be computed as if the Fixed Rate Excess were equal to zero.

"***Stated Maturity***": With respect to any Collateral Obligation, the maturity date specified in it or the applicable Underlying Instrument (or, if earlier, the first date on which any Person may be required by the Issuer to repurchase the entire principal amount of the Collateral Obligation at or above par) and with respect to the Notes of any Class, August 1, 2022 or, upon a Maturity Extension (if any), the applicable Extended Stated Maturity Date. Unless otherwise specified, "Stated Maturity" means the Stated Maturity of the Notes.

"***Structured Finance Obligation***": Any obligation (other than the Notes or any other security or obligation issued by the Issuer):

    (i)    secured directly by, referenced to, or representing ownership of, a pool of receivables or other assets of U.S. obligors, or obligors organized or incorporated in Moody's Group I Countries, Moody's Group II Countries, Moody's Group III Countries or Tax Advantaged Jurisdictions, including portfolio credit default swaps and collateralized debt obligations, but excludes:

        (A)    residential mortgage-backed securities;

        (B)    collateralized debt obligations backed by Emerging Market Securities;

        (C)    collateralized debt obligations primarily backed by asset-backed securities;

        (D)    market value collateralized debt obligations;

        (E)    securities backed by "future flow" receivables;

        (F)    securities backed by "trust preferred securities;"

        (G)    net interest margin securitizations;

        (H)    collateralized debt obligations a significant portion of which are backed by bonds; and

69

(I)     obligations secured directly by, referenced to, or representing ownership of, a pool of receivables or other assets where the obligors with respect to such receivables or other assets are non-corporate credit risks; *provided* that, for the avoidance of doubt, collateralized loan obligations shall not be excluded by this clause (I);

(ii)     that has an S&P Rating;

(iii)     that has a rating and a Moody's Priority Category Recovery Rate assigned by Moody's; and

(iv)     whose ownership or disposition (without regard to the Issuer's other activities) by the Issuer will not cause the Issuer to be treated as engaged in a U.S. trade or business for United States federal income tax purposes or otherwise subject the Issuer to net income taxes.

In connection with the purchase of a Structured Finance Obligation, the Servicer shall obtain from Moody's the applicable Moody's Priority Category Recovery Rate.

For purposes of the Diversity Test, multiple Structured Finance Obligations from CDOs serviced by the same Servicer or multiple Structured Finance Obligations issued by the same master trust will be considered to be obligations of one issuer.

"*Subordinated High-Yield Bond*": A Secured High-Yield Bond secured by a second (or lower) priority security interest in the relevant collateral.

"*Subordinated Lien Loan*": A Secured Loan (other than a Second Lien Loan) secured by a second (or lower) priority security interest in the relevant collateral.

"*Subordinated Servicing Fee*":  An amount equal to the sum of (i) a fee that accrues from the Closing Date payable to the Servicer in arrears on each Payment Date equal to 0.25% per annum of the Maximum Amount if and to the extent funds are available for that purpose in accordance with the Priority of Payments and (ii) on any Payment Date that any part of the Subordinated Servicing Fee was not paid on the preceding Payment Date, an amount equal to interest on such unpaid amount at a rate of LIBOR for the applicable period plus 3.00% per annum. The portion of the Subordinated Servicing Fee in clauses (i) and (ii) above, as applicable, shall be calculated on the basis of a 360-day year consisting of twelve 30-day months.

"*Successor Entity*": The meaning specified in Section 7.10.

"*Super Majority*": With respect to any Class or group of Notes or Preference Shares, the Holders of more than 66⅔% of the Aggregate Outstanding Amount of that Class or group of Notes or Preference Shares, as the case may be.

"*Supplemental Servicing Fee*":  On each Payment Date, the fee payable to the Servicer in an amount equal to: (i) 20% of the remaining Interest Proceeds, if any, available after making the distributions on such Payment Date pursuant to Section 11.1(a)(i)(22) of the Priority of Payments and (ii) 20% of the remaining Principal Proceeds, if any, available for payment in respect of the Supplemental Servicing Fee pursuant to Section 11.1(a)(ii)(12)(A) of the Priority of Payments and, if applicable, Section 11.1(a)(ii)(15) of the Priority of Payments.

"*Synthetic Security*": Any swap transaction, structured bond, credit linked note or other derivative financial instrument providing non-leveraged credit exposure to a debt instrument (but

70

excluding any such instrument relating directly to a basket or portfolio of debt instruments) or an index or indices (such as the "SAMI" index published by Credit Suisse Securities (USA) LLC) in connection with a basket or portfolio of debt instruments or other similar instruments entered into by the Issuer with a Synthetic Security Counterparty that has in the Servicer's commercially reasonable judgment, equivalent expected loss characteristics (those characteristics, "***credit risk***") to those of the related Reference Obligations (taking account of those considerations as they relate to the Synthetic Security Counterparty), if (i) it is either a Form-Approved Synthetic Security or the Rating Condition for each Rating Agency is satisfied, and (ii) the Reference Obligations thereof have a Market Value equal to at least 85% of the Principal Balance of the Reference Obligation at the time the Synthetic Security is entered into.

Each Synthetic Security that is a credit default swap the Reference Obligations of which are Loans shall require each such Reference Obligation to be denominated and payable in U.S. Dollars.

The maturity, interest rate, and other non-credit characteristics of a Synthetic Security may be different from the Reference Obligations to which the credit risk of the Synthetic Security relates.

No Synthetic Security may require the Issuer to make any payment to the Synthetic Security Counterparty after its initial purchase other than any payments represented by the release of any cash collateral posted by the Issuer from the Collection Account to the Synthetic Security Counterparty Account simultaneously with the Issuer's purchase of or entry into the Synthetic Security in an amount not exceeding the amount of the posted cash collateral. Collateral may be posted only to a Synthetic Security Counterparty Account. No Synthetic Security shall result in the Issuer being a "buyer" of credit protection.

The term Synthetic Security shall not include any Structured Finance Obligation or any Participation, but the Reference Obligation of a Synthetic Security may be a Structured Finance Obligation.

Each Synthetic Security Agreement shall contain appropriate limited recourse and non-petition provisions (to the extent the Issuer has contractual payment obligations to the Synthetic Security Counterparty) equivalent (*mutatis mutandis*) to those contained in this Indenture.

The ownership or disposition of any Synthetic Security (without regard to the Issuer's other activities) must not cause the Issuer to be treated as engaged in a U.S. trade or business for United States federal income tax purposes or otherwise subject the Issuer to net income taxes.

Unless the Rating Condition is otherwise satisfied, any "deliverable obligation" that may be delivered to the Issuer as a result of the occurrence of any "credit event" under any proposed Synthetic Security must not provide that its transfer to the Issuer is subject to obtaining any consents and must qualify (when the Issuer purchases the related Synthetic Security and when such "deliverable obligation" is delivered to the Issuer as a result of the occurrence of any "credit event") as a Collateral Obligation and satisfy the Concentration Limitations under this Indenture, except that such "deliverable obligation" may constitute a Defaulted Collateral Obligation when delivered upon a "credit event" and if the Reference Obligation of the Synthetic Security is a Senior Secured Loan then the "deliverable obligation" under the Synthetic Security must also be a Senior Secured Loan.

No Synthetic Security may provide for any event other than bankruptcy or a failure to pay as a "credit event."

No Synthetic Security shall provide for termination by the Synthetic Security Counterparty at any time (i) after a declaration of acceleration of Maturity of the Notes has been made upon the occurrence of an Event of Default, unless such declaration and its consequences may no longer be

71

rescinded and annulled in accordance with Section 5.2(c) and liquidation of the Collateral has begun or (ii) upon an Optional Redemption, unless the third Business Day before the scheduled Redemption Date has passed and no notice of withdrawal has been issued.

For purposes of the Coverage Tests and the Retention Overcollateralization Test, unless the Rating Condition for each Rating Agency is satisfied in respect of any proposed alternative treatment, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not of the related Reference Obligations.

For purposes of the Collateral Quality Tests (other than the Diversity Test and the S&P Industry Classification with respect to the S&P CDO Monitor Test), a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not of the related Reference Obligations.

For purposes of calculating compliance with the Concentration Limitations other than limits relating to payment characteristics, and all related definitions, unless otherwise specified in this Indenture or by the Rating Agencies, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of its Reference Obligations and not the Synthetic Security. For purposes of calculating compliance with the Concentration Limitations relating to payment characteristics, and all related definitions, unless otherwise specified in this Indenture or by the Rating Agencies, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not its Reference Obligation.

With respect to a Synthetic Security based upon or relating to a senior secured index providing non-leveraged credit exposure to a basket of credit default swaps referencing a diversified group of Reference Obligations, with respect to which the principal or notional amount of the credit exposure to any single Reference Obligation does not increase over time, for purposes of: (i) calculating compliance with the Diversity Test, the S&P Industry Classification with respect to the S&P CDO Monitor Test, and the Concentration Limitations (other than limits relating to payment characteristics and except for clauses 17 and 17(a) of the definition of "Concentration Limitations"), and all related definitions, and (ii) any other provision or definition of this Indenture involving a determination with respect to a Reference Obligation, the characteristics of such Reference Obligations shall be determined by treating such Synthetic Security as a direct interest of the Issuer in each such Reference Obligation in an amount equal to the Allocable Principal Balance of such Reference Obligation. In addition, each Reference Obligation under such Synthetic Security shall be assigned a Moody's Rating Factor equal to the sum of the Moody's Rating Factor of (i) the related Reference Obligor, (ii) the Synthetic Security Counterparty of such Synthetic Security and (iii) the Synthetic Security Collateral of such Synthetic Security. In addition, the Moody's Priority Category Rate in respect of a Synthetic Security referencing multiple Reference Obligations pursuant to this paragraph shall be the Moody's Priority Category Rate as assigned by Moody's to each Reference Obligation underlying such Synthetic Security. For the avoidance of doubt, Reference Obligations upon which a Synthetic Security is based as described in this paragraph must meet the definition of "Collateral Obligation" to the extent provided in this definition.

If the Rating Condition must be satisfied to execute the purchase of any Synthetic Security, the Servicer, on behalf of the Issuer, shall give each applicable Rating Agency not less than five days' prior notice of the purchase of or entry into any Synthetic Security.

"*Synthetic Security Agreement*": The documentation governing any Synthetic Security.

"*Synthetic Security Collateral*": With respect to any Synthetic Security, amounts posted to the Synthetic Security Collateral Account by the Synthetic Security Counterparty in support of its obligations under the Synthetic Security, including (i) all Eligible Investments that mature no later

72

than the Stated Maturity or (ii) floating rate credit card securitizations that are rated "Aaa" by Moody's and "AAA" by S&P that mature no later than the Stated Maturity in the Synthetic Security Collateral Account that are purchased with Synthetic Security Collateral; *provided* that any amounts described in clause (ii) above shall be hedged by a guaranteed investment contract or a total return swap which shall be subject to Rating Confirmation by S&P.

"*Synthetic Security Collateral Account*": The trust account established pursuant to Section 10.3(e).

"*Synthetic Security Counterparty*": An entity required to make payments on a Synthetic Security to the extent that a Reference Obligor makes payments on a related Reference Obligation.

"*Synthetic Security Counterparty Account*": The trust account established pursuant to Section 10.5.

"*Tax Advantaged Jurisdiction*": One of the Cayman Islands, Bermuda, the Netherlands Antilles or the tax advantaged jurisdiction of the Channel Islands, or such other jurisdiction that the Rating Condition with respect to each Rating Agency is satisfied with respect thereto; *provided* that any Tax Advantaged Jurisdiction that is the jurisdiction of organization of an obligor of a Collateral Obligation other than obligors that are special purpose vehicles or issuers of Structured Finance Obligations shall have a Moody's foreign currency rating of at least "Aa2" and a S&P foreign currency rating of at least "AA-".

"*Tax Event*": An event that occurs if either:

(i)      (A) one or more Collateral Obligations that were not subject to withholding tax when the Issuer committed to purchase them have become subject to withholding tax ("*New Withholding Tax Obligations*") or the rate of withholding has increased on one or more Collateral Obligations that were subject to withholding tax when the Issuer committed to purchase them ("*Increased Rate Withholding Tax Obligations*") and (B) in any Due Period, the aggregate of the payments subject to withholding tax on New Withholding Tax Obligations and the increase in payments subject to withholding tax on Increased Rate Withholding Tax Obligations, in each case to the extent not "grossed-up" (on an after-tax basis) by the related obligor, represent 5% or more of Interest Proceeds for the Due Period; or

(ii)     taxes, fees, assessments, or other similar charges are imposed on the Issuer or the Co-Issuer in an aggregate amount in any twelve-month period in excess of U.S.$2,000,000, other than any deduction or withholding for or on account of any tax with respect to any payment owing in respect of any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation or Collateral Obligation.

"*Tax Opinion of Counsel*": A written opinion addressed to the Issuer (a copy of which will be provided to the Trustee) and, if requested, each Rating Agency that has made such request, in form and substance reasonably satisfactory to the Trustee and each Rating Agency, issued by a nationally recognized law firm reasonably satisfactory to the Trustee, which law firm is experienced in the relevant areas of tax law, and which law firm may be counsel for the Servicer or the Issuer.

"*Transaction Reports*": The meaning specified in Section 14.4.

"*Transfer Agent*": The Person or Persons, which may be the Issuer, authorized by the Issuer to exchange or register the transfer of Notes.

73

"*Transferee Certificate*": A certificate substantially in the form of, with respect to the Senior Notes, Exhibit B-1 or, with respect to the Class E Notes, Exhibit B-4 attached hereto, duly completed as appropriate.

"*Treasury Regulations*": The regulations, including proposed or temporary regulations, promulgated under the Code. References herein to specific provisions of proposed or temporary regulations shall include analogous provisions of final Treasury Regulations or other successor Treasury Regulations.

"*Trust Officer*": When used with respect to the Trustee, any officer in the Corporate Trust Office (or any successor group of the Trustee) including any director, vice president, assistant vice president, associate, or any other officer of the Trustee customarily performing functions similar to those performed by such officers in the Corporate Trust Office, or to whom any corporate trust matter is referred at the Corporate Trust Office because of his knowledge of and familiarity with the particular subject and having direct responsibility for the administration of this Indenture.

"*Trustee*": As defined in the first sentence of this Indenture.

"*UCC*": The Uniform Commercial Code as in effect in the State of New York, and as amended from time to time.

"*Uncertificated Security*": The meaning specified in Section 8-102(a)(18) of the UCC.

"*Underlying Instrument*": The loan agreement, indenture, credit agreement, or other agreement pursuant to which a Pledged Obligation has been issued or created and each other agreement that governs the terms of or secures the obligations represented by the Pledged Obligation or of which the holders of the Pledged Obligation are the beneficiaries.

"*Unfunded Amount*": With respect to any Revolving Loan or any Delayed Drawdown Loan at any time, the excess, if any, of (a) the Commitment Amount over (b) the Funded Amount thereof.

"*Unregistered Securities*": The meaning specified in Section 5.17(c).

"*Unscheduled Principal Payments*": Any principal payments received with respect to a Collateral Obligation as a result of optional redemptions, exchange offers, tender offers, other payments or prepayments made at the option of the issuer thereof or that are otherwise not scheduled to be made thereunder.

"*U.S. Person*": A beneficial owner of a Security that is, for U.S. federal income tax purposes, a citizen or individual resident of the United States of America, an entity treated for United States federal income tax purposes as a corporation or a partnership created or organized in or under the laws of the United States of America or any state thereof or the District of Columbia, an estate the income of which is includable in gross income for U.S. federal income tax purposes regardless of its source, or a trust if, in general, a court within the United States of America is able to exercise primary supervision over its administration and one or more U.S. Persons have the authority to control all substantial decisions of such trust, and certain eligible trusts that have elected to be treated as U.S. Persons.

"*Valuation Report*": The meaning specified in Section 10.6(b).

"*Weighted Average Fixed Rate Coupon*": As of any Measurement Date, the rate obtained by:

74

(i)     multiplying the Principal Balance of each Collateral Obligation that is a Fixed Rate Obligation held by the Issuer as of the Measurement Date by the current per annum rate at which it pays interest (other than, with respect to Collateral Obligations that are not PIK Securities, any interest that is not required to be paid in Cash and may be deferred), using only the effective after-tax interest rate determined by the Servicer on any Fixed Rate Obligation after taking into account any withholding tax or other deductions on account of tax of any jurisdiction and any gross-up paid by the obligor);

(ii)     summing the amounts determined pursuant to clause (i);

(iii)     dividing the sum by the Aggregate Principal Balance of all Collateral Obligations that are Fixed Rate Obligations held by the Issuer as of the Measurement Date; and

(iv)     if the result obtained in clause (iii) is less than the minimum percentage rate specified to satisfy the Weighted Average Fixed Rate Coupon Test, adding to the sum the amount of any Spread Excess as of the Measurement Date, but only to the extent required to satisfy the Weighted Average Fixed Rate Coupon Test.

"*Weighted Average Fixed Rate Coupon Test*": A test that is satisfied if, as of any Measurement Date, the Weighted Average Fixed Rate Coupon equals or exceeds 7.5%.

"*Weighted Average Life*": As of any Measurement Date, the number obtained by

(i)     summing the products obtained by multiplying

(A)     the Average Life at that time of each Collateral Obligation by

(B)     the Principal Balance at that time of the Collateral Obligation and

(ii)     dividing that sum by the Aggregate Principal Balance at that time of all Collateral Obligations.

"*Weighted Average Life Test*":  A test that is satisfied as of any Measurement Date if the Weighted Average Life on that date of all Collateral Obligations is equal to or less than the greater of (a) the number of years (including any fraction of a year) between such Measurement Date and August 1, 2017 or, in the case of a Maturity Extension, the Extended Weighted Average Life Date and (b) 3 years.

"*Weighted Average Moody's Rating Factor*": The summation of the products obtained by multiplying the Principal Balance of each Collateral Obligation (excluding Eligible Investments) by its respective Moody's Rating Factor, dividing that sum by the Aggregate Principal Balance of all Collateral Obligations (excluding Eligible Investments) and rounding the result up to the nearest whole number.

"*Weighted Average Moody's Recovery Rate Test*": A test that is satisfied as of any Measurement Date if the Moody's Minimum Average Recovery Rate is greater than or equal to 43.3%.

"*Weighted Average Rating Factor Test*": A test that is satisfied as of any Measurement Date if the Weighted Average Moody's Rating Factor of the Collateral Obligations (excluding Eligible Investments) as of such Measurement Date is less than or equal to the Maximum Weighted Average Moody's Rating Factor.

"***Weighted Average S&P Recovery Rate Test***": A test that is satisfied as of any Measurement Date if the S&P Recovery Rate for each Class of Notes is greater than or equal to: (i) with respect to the Class A Notes, 63.0%; (ii) with respect to the Class B Notes, 65.0%; (iii) with respect to the Class C Notes, 67.0%; (iv) with respect to the Class D Notes, 69.0% and (v) with respect to the Class E Notes, 72.0%.

"***Weighted Average Spread***": As of any Measurement Date, a rate obtained by:

(i)     multiplying the Principal Balance of each Collateral Obligation that is a Floating Rate Obligation held by the Issuer as of the Measurement Date by the current per annum contract spread at which it pays interest (which (w) for PIK Securities for which interest has been deferred or capitalized, will be deemed to be zero, (x) for Collateral Obligations that would be PIK Securities but for the proviso in the definition thereof, will be deemed to be equal to the effective rate of PIK Cash-Pay Interest applicable thereto, (y) for any Revolving Loan or Delayed Draw Loan, will be the per annum contract spread for the Funded Amount thereof and the rate of the commitment fee and such other fees payable to the Issuer for any Unfunded Amount thereof and (z) for any synthetic letter of credit, will be the all-in rate (including any fees payable to the Issuer by the underlying obligor) minus the applicable LIBOR), determined with respect to any Floating Rate Obligation that does not bear interest based on a London interbank offered rate, by expressing the current interest rate on the Floating Rate Obligation as a spread above a three month London interbank offered rate calculated in a manner consistent with the calculation of LIBOR;

(ii)     summing the amounts determined pursuant to clause (i);

(iii)     dividing that sum by the Aggregate Principal Balance of all Floating Rate Obligations held by the Issuer as of the Measurement Date; and

(iv)     if the result obtained in clause (iii) is less than the minimum percentage rate specified to pass the Weighted Average Spread Test, adding to that sum the amount of Fixed Rate Excess as of the Measurement Date.

"***Weighted Average Spread Test***": A test that is satisfied as of any Measurement Date if the Weighted Average Spread as of the Measurement Date equals or exceeds the Minimum Weighted Average Spread.

"***Workout Assets***": A Loan, High-Yield Bond, or Qualified Equity Security acquired in connection with the workout or restructuring of any Collateral Obligation that the Issuer does not advance any funds to purchase that does not qualify as a Collateral Obligation.

"***Written-Down Obligation***": As of any date of determination, any Structured Finance Obligation as to which the Issuer or the Servicer, on behalf of the Issuer, has been notified by the issuer of the Structured Finance Obligation that the Aggregate Principal Balance of the Structured Finance Obligation and all other Structured Finance Obligations secured by the same pool of collateral that rank *pari passu* with or senior in priority of payment to the Structured Finance Obligation exceeds the aggregate principal balance (including reserved interest or other amounts available for overcollateralization) of all collateral securing the Structured Finance Obligation and such other *pari passu* and senior Structured Finance Obligations (excluding defaulted collateral).

"***Zero-Coupon Security***":  A security that, at the time of determination, does not make periodic payments of interest.  A Zero-Coupon Security shall not include a security that is a PIK Security.

76

Section 1.2.    ***Assumptions as to Pledged Obligations; Construction Conventions.***

This Section 1.2 shall be applied in connection with all calculations required to be made pursuant to this Indenture:

- with respect to the scheduled payment of principal or interest on any Pledged Obligation, or any payments on any other assets included in the Collateral,

- with respect to the sale of and acquisition of Collateral Obligations,

- with respect to the income that can be earned on the scheduled payment of principal or interest on the Pledged Obligations and on any other amounts that may be received for deposit in the Collection Account, and

- with respect to the treatment of Collateral Obligations loaned pursuant to a Securities Lending Agreement.

The provisions of this Section 1.2 shall be applicable to any determination or calculation that is covered by this Section 1.2, whether or not reference is specifically made to Section 1.2, unless some other method of calculation or determination is expressly specified in the particular provision.

(a)    All calculations with respect to the scheduled payment of principal or interest on the Pledged Obligations shall be made on the basis of information as to the terms of each Pledged Obligation and on reports of payments received on the Pledged Obligation that are furnished by or on behalf of the issuer of the Pledged Obligation and, to the extent they are not manifestly in error, the information or report may be conclusively relied on in making the calculations.

(b)    For each Due Period and as of any Measurement Date, the scheduled payment of principal or interest on any Pledged Obligation shall be the sum of

(i)    the total amount of payments and collections reasonably expected to be received during the Due Period in respect of the Pledged Obligation that, if paid as scheduled, will be available for payment on the Notes and of certain expenses of the Issuer and the Co-Issuer in the Collection Account at the end of the Due Period; and

(ii)    any such amounts received in prior Due Periods that were not disbursed on a previous Payment Date.

Except as provided in paragraph (h) below, a Non-Performing Collateral Obligation shall be assumed to have a scheduled payment of principal and interest of zero.

The total amount of payments and collections reasonably expected to be received includes the proceeds of the sale of the Pledged Obligation received and, in the case of sales which have not yet settled, to be received during the Due Period and not used to purchase additional Collateral Obligations (including any related deposit into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty, Securities Lending Counterparty, or Hedge Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security, Securities Lending Agreement, or Hedge Agreement) or Eligible Investments or retained in the Collection Account for subsequent application thereof to purchase additional Collateral Obligations pursuant to Section 12.2.

77

(c)     For purposes of the applicable determinations required by Article 12 and the definition of "Interest Coverage Ratio," the expected interest on Collateral Obligations shall be calculated using their then current interest rates.

(d)     With respect to any Collateral Obligation, the date on which it "matures" (or its "maturity" date) shall be the earlier of

(i)     the stated maturity of the obligation or

(ii)     if the Issuer has the right to require the issuer or obligor of the Collateral Obligation to purchase, redeem, or retire the Collateral Obligation at a price of at least par on any one or more dates before its Stated Maturity (a "put right") and the Servicer certifies to the Trustee that it will cause the Issuer to direct the Trustee to exercise the put right on a date, the maturity date shall be the date specified in the certification.

(e)     For purposes of calculating compliance with the Collateral Quality Tests (other than the Diversity Test and the S&P Industry Classification with respect to the S&P CDO Monitor Test), the Coverage Tests, and the Retention Overcollateralization Test and all related definitions, unless otherwise specified in this Indenture a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not of the Reference Obligation. For purposes of calculating compliance with the Concentration Limitations other than limits relating to payment characteristics, and all related definitions, unless otherwise specified in this Indenture or by the Rating Agencies, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of its Reference Obligations and not the Synthetic Security. For purposes of calculating compliance with the Concentration Limitations relating to payment characteristics, and all related definitions, unless otherwise specified in this Indenture or by the Rating Agencies, a Synthetic Security shall be included as a Collateral Obligation having the characteristics of the Synthetic Security and not its Reference Obligations.

(f)     Any Collateral Obligation loaned to a Securities Lending Counterparty shall be included in the Collateral Quality Tests, the Coverage Tests, and the Retention Overcollateralization Test and the Principal Balance of any Collateral Obligation loaned to a Securities Lending Counterparty shall be included in the Aggregate Principal Balance of Collateral Obligations, in each case unless an "event of default" (under and as defined in the related Securities Lending Agreement) is continuing.

(g)     If a Class of Notes ceases to be Outstanding, then any Coverage Test computed by reference to the Class of Notes (but not to any subordinate Class of Notes then Outstanding) shall cease to be of any force.

(h)     For purposes of calculating compliance with the Eligibility Criteria (other than the Weighted Average Life Test), at the direction of the Servicer by notice to the Trustee, during the Replacement Period any Eligible Investment representing Principal Proceeds received upon the maturity, redemption, sale, or other disposition of a Collateral Obligation (or, after the Replacement Period, in respect of Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Risk Obligations and Credit Improved Obligations) shall be deemed to have the characteristics of the disposed Collateral Obligation until used to purchase an additional Collateral Obligation. The calculations shall be based on the Principal Balance of the disposed Collateral Obligations except in the case of Defaulted Collateral Obligations and Credit Risk Securities, in which case the calculations will be based on the Principal Proceeds received on the disposition or sale of the Defaulted Collateral Obligation or Credit Risk Obligation.

78

(i)    The calculation on any Coverage Test on any Determination Date shall be made by giving effect to all payments to be made pursuant to all subclauses of the Priority of Payments as applicable, payable on the Payment Date following such Determination Date. In addition no Principal Proceeds will be used to pay a subordinated Class on a Payment Date if, after giving effect to such payment, any Coverage Test of a more senior Class of Notes is failing on such Payment Date or would fail as a result of such application of the Principal Proceeds on such Payment Date.

Section 1.3.    *Rules of Interpretation.*

Except as otherwise expressly provided in this Indenture or unless the context clearly requires otherwise:

(a)    Defined terms include, as appropriate, all genders and the plural as well as the singular.

(b)    References to designated articles, sections, subsections, exhibits, and other subdivisions of this Indenture, such as "Section 6.13 (a)", refer to the designated article, section, subsection, exhibit, or other subdivision of this Indenture as a whole and to all subdivisions of the designated article, section, subsection, exhibit, or other subdivision. The words "herein", "hereof", "hereto", "hereunder" and other words of similar import refer to this Indenture as a whole and not to any particular article, section, exhibit, or other subdivision of this Indenture.

(c)    Any term that relates to a document or a statute, rule, or regulation includes any amendments, modifications, supplements, or any other changes that may have occurred since the document, statute, rule, or regulation came into being, including changes that occur after the date of this Indenture. References to law are not limited to statutes. Any reference to any Person includes references to its successors and assigns.

(d)    Any party may execute any of the requirements under this Indenture either directly or through others, and the right to cause something to be done rather than doing it directly shall be implicit in every requirement under this Indenture. Unless a provision is restricted as to time or limited as to frequency, all provisions under this Indenture are implicitly available and things may happen from time to time.

(e)    The term "including" and all its variations mean "including but not limited to." Except when used in conjunction with the word "either", the word "or" is always used inclusively (for example, the phrase "A or B" means "A or B or both", not "either A or B but not both").

(f)    A reference to "a thing" or "any of a thing" does not imply the existence or occurrence of the thing referred to even though not followed by "if any", and "any of a thing" is any and all of it. A reference to the plural of anything as to which there could be either one or more than one does not imply the existence of more than one (for instance, the phrase "the obligors on a note" means "the obligor or obligors on a note"). "Until something occurs" does not imply that it must occur, and will not be modified by the word "unless." The word "due" and the word "payable" are each used in the sense that the stated time for payment has passed. The word "accrued" is used in its accounting sense, i.e., an amount paid is no longer accrued. In the calculation of amounts of things, differences and sums may generally result in negative numbers, but when the calculation of the excess of one thing over another results in zero or a negative number, the calculation is disregarded and an "excess" does not exist. Portions of things may be expressed as fractions or percentages interchangeably. The word "shall" is used in its imperative sense, as for instance meaning a party agrees to something or something must occur or exist.

79

(g)     All accounting terms used in an accounting context and not otherwise defined, and accounting terms partly defined in this Indenture, to the extent not completely defined, shall be construed in accordance with generally accepted accounting principles. To the extent that the definitions of accounting terms in this Indenture are inconsistent with their meanings under generally accepted accounting principles, the definitions contained in this Indenture shall control.

(h)     In the computation of a period of time from a specified date to a later specified date or an open-ended period, the words "from" and "beginning" mean "from and including", the word "after" means "from but excluding," the words "to" and "until" mean "to but excluding", and the word "through" means "to and including." Likewise, in setting deadlines or other periods, "by" means "on or before." The words "preceding", "following", "before", "after", "next" and words of similar import, mean immediately preceding or following. References to a month or a year refer to calendar months and calendar years.

(i)     Any reference to the enforceability of any agreement against a party means that it is enforceable against the party in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, and other similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(j)     Except when only the registered holder is recognized, such as in Section 2.9., references to Noteholders, holders, and the like refer equally to beneficial owners who have an interest in a Note but are not reflected in the Indenture Register as the owner.

## ARTICLE 2

### THE NOTES

Section 2.1.     ***Forms Generally.***

The Notes and the Trustee's or Authenticating Agent's certificate of authentication on them (the "***Certificate of Authentication***") shall be in substantially the forms required by this Article, with appropriate insertions, omissions, substitutions, and other variations required or permitted by this Indenture, and may have any letters, numbers, or other marks of identification and any legends or endorsements on them that are consistent with this Indenture, as determined by the Authorized Officers of the Issuer executing the Notes as evidenced by their execution of the Notes.

Section 2.2.     ***Forms of Notes and Certificate of Authentication.***

(a)     The Senior Notes, including the Regulation S Global Notes, Rule 144A Global Notes and Certificate of Authentication, shall be in the forms of the applicable portion of Exhibit A-1.

(b)     *Regulation S Global Notes.* The Senior Notes of each Class sold to non-U.S. persons in off-shore transactions in reliance on Regulation S shall each be represented by one or more global notes in definitive, fully registered form without interest coupons substantially in the form of the applicable portion of Exhibit A-1, including legends (the "***Regulation S Global Notes***"). The global notes shall be deposited on behalf of the subscribers for the Senior Notes represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, the Depository for the respective accounts of Euroclear and Clearstream, duly executed by the Applicable Issuers and authenticated by the Trustee as hereinafter provided. The aggregate principal amount of the Regulation S Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee or the Depository or its nominee, as the case may be, as hereinafter

80

provided. As used above and in subsection (d) below, "U.S. person" and "off-shore transaction" have the meanings assigned to them in Regulation S.

(c)     *Rule 144A Global Notes.* The Senior Notes of each Class initially sold to U.S. persons that are Qualified Institutional Buyers (or, solely in the case of certain Holders purchasing Class E Notes on the Closing Date, Institutional Accredited Investors) and Qualified Purchasers shall each be issued initially in the form of one permanent global note per Class in definitive, fully registered form without interest coupons substantially in the form of the applicable portion of Exhibit A-1, including legends (each, a "***Rule 144A Global Note***"), which shall be deposited on behalf of the subscribers for the Senior Notes represented thereby with the Trustee as custodian for, and registered in the name of a nominee of, the Depository, duly executed by the Applicable Issuers and authenticated by the Trustee as hereinafter provided. The aggregate principal amount of the Rule 144A Global Notes may from time to time be increased or decreased by adjustments made on the records of the Trustee or the Depository or its nominee, as the case may be, as hereinafter provided.

(d)     *Book-Entry Provisions.* This Section 2.2(d) shall apply only to Global Notes deposited with or on behalf of the Depository. The "Operating Procedures of the Euroclear System" of Euroclear and the "Terms and Conditions Governing Use of Participants" of Clearstream, respectively, shall be applicable to the Regulation S Global Notes insofar as interests in the Global Notes are held by the Agent Members of Euroclear or Clearstream, as the case may be.

Agent Members shall have no rights under this Indenture with respect to any Global Note held on their behalf by the Trustee, as custodian for the Depository and the Depository may be treated by the Co-Issuers, the Trustee, and any agent of the Co-Issuers or the Trustee as the absolute owner of the Senior Note for all purposes whatsoever. Notwithstanding the foregoing, nothing in this Indenture shall prevent the Co-Issuers, the Trustee, or any agent of the Co-Issuers or the Trustee, from giving effect to any written certification, proxy, or other authorization furnished by the Depository or impair, as between the Depository and its Agent Members, the operation of customary practices governing the exercise of the rights of a Holder of any Senior Note.

(e)     The Class E Notes shall be issued in the form of one or more certificated Class E Notes in definitive, fully registered form without interest coupons substantially in the form of Exhibit A-2, including legends (each, a "***Certificated Class E Note***"), which shall be registered in the name of the owner thereof.

Section 2.3.     ***Authorized Amount; Denominations.***

(a)     The aggregate principal amount of Notes that may be authenticated and delivered under this Indenture is limited to U.S.$920,000,000, except for Notes authenticated and delivered upon registration of, transfer of, or in exchange for, or in lieu of, other Notes pursuant to Section 2.6, 2.7, or 8.5.

(b)     The Notes shall be divided into the following Classes, having the designations, original principal amounts and other characteristics as follows:

81

| Class | A-1-A | A-1-B | B | C | D | E |
|---|---|---|---|---|---|---|
| Original Principal Amount | $570,500,000 | $142,500,000 | $80,000,000 | $53,500,000 | $36,000,000 | $37,500,000 |
| Interest Rate | LIBOR + 0.225% | LIBOR + 0.340% | LIBOR + 0.440% | LIBOR + 0.850% | LIBOR + 2.350% | LIBOR + 4.300% |
| Initial Rating (Moody's/S&P) | Aaa/AAA | Aaa/AAA | Aa2/AA | A2/A | Baa2/BBB | Ba2/BB |

(c)     The Notes will be issuable in minimum denominations of U.S.$250,000, and integral multiples of U.S.$1,000 in excess of that amount.

(d)     The Issuer will also issue 39,000 Class I Preference Shares and 41,000 Class II Preference Shares pursuant to the Preference Share Documents, simultaneously with the issuance of the Notes under this Indenture. At any time during the Replacement Period, the Issuer may issue and sell additional Preference Shares and use the proceeds from such issuance and sale to purchase additional Collateral Obligations or as otherwise permitted under the Preference Share Documents and this Indenture pursuant to Section 6 of the Preference Shares Paying Agency Agreement. The Preference Shares are not secured by the lien of this Indenture. Any payments made by the Trustee hereunder with respect to the Preference Shares (other than, as and to the extent described herein, the Class II Preference Share Special Payments) will be released by the Trustee to the Preference Shares Paying Agent on each Payment Date in accordance with the Priority of Payments for deposit into the Preference Shares Distribution Account for payment, subject to Cayman Islands law, to Holders of the Preference Shares as dividends or Redemption Price, as applicable.

Section 2.4.     *Extension of Replacement Period and Stated Maturity.*

(a)     The Issuer, if directed by the Servicer, shall be entitled on each Extension Effective Date to extend the Replacement Period to the applicable Extended Replacement Period End Date up to a maximum of four times if (i) in the case of an Extension Effective Date occurring after the first Extension Effective Date, the Issuer has previously effected a Maturity Extension for each preceding Extension Effective Date in accordance with this Section 2.4 and (ii) the Extension Conditions set forth in Section 2.4(c) are satisfied and the Issuer has given written notice of its election to extend the Replacement Period to the Trustee no later than 60 days and no earlier than 90 days prior to such Extension Effective Date. If the Extension Conditions are satisfied, the Stated Maturity of the Notes shall be automatically extended to the related Extended Stated Maturity Date and the Weighted Average Life Test shall be automatically extended to the related Extended Weighted Average Life Date, without any requirement for approval or consent of any Holders of Notes or Preference Shares or amendment or supplement to this Indenture or the Preference Share Documents (the "*Maturity Extension*"); provided that the Issuer will not be permitted to effect more than four Maturity Extensions.

(b)     In the case of a Maturity Extension, any Holder of Securities wishing to sell such Securities to an Extension Qualifying Purchaser pursuant to the Extension Conditions must provide the applicable Extension Sale Notice within the Extension Sale Notice Period pursuant to Section 2.4(d) (such Securities as to which an Extension Sale Notice has been duly given, "*Extension Sale Securities*"). Notwithstanding anything to the contrary herein, in connection with an Extension Sale, all, but not part, of the Extension Sale Securities shall be purchased and settled at the applicable Extension Purchase Price on the applicable Extension Effective Date.

82

(c)     The Maturity Extension shall be effective only if the following conditions (the "*Extension Conditions*") are satisfied:

(i)     the purchase of all Extension Sale Securities has been settled by the designated Extension Qualifying Purchasers at the applicable Extension Purchase Price as of the applicable Extension Effective Date;

(ii)     all such purchases of Extension Sale Securities individually and in the aggregate comply with the applicable transfer restrictions in this Indenture and the Preference Share Documents immediately after such purchase and the legends on such Extension Sale Securities and all applicable law, rules and regulations (including, without limitation, rules, regulations and procedures of any applicable securities exchange, self-regulatory organization or clearing agency);

(iii)     (a) the Rating Condition has been satisfied with respect to S&P (so long as any Notes are then rated by S&P) and (b) the Rating Condition has been satisfied with respect to Moody's (so long as any Notes are then rated by Moody's);

(iv)     the Issuer has not effected more than three prior Extensions; and

(v)     such extension is not effected for the primary purpose of decreasing losses or recognizing gains resulting from market value changes.

The Issuer, the Trustee and, by its acceptance of the Notes, each Noteholder agrees that neither of the Initial Purchasers shall be responsible for causing the Extension Conditions to be satisfied and neither of the Initial Purchasers shall be liable to any such Person or Noteholders (whether or not such Holder gave an Extension Sale Notice with respect to its Notes) or to any other Person if the Extension Conditions are not satisfied. Failure of the Extension Conditions to be satisfied shall not constitute a Default or Event of Default under this Indenture.

(d)     Extension Procedure.

(i)     Not later than three Business Days following receipt by the Trustee of the notice given by the Issuer of its election to extend the Replacement Period (the "*Extension Notice*"), the Trustee shall mail the Extension Notice to all Noteholders, the Preference Shares Paying Agent (for forwarding to the Holders of the Preference Shares) and each Rating Agency (so long as any rated Notes are Outstanding), in the form of Exhibit I, and shall request the Rating Confirmation for the Maturity Extension from each Rating Agency, if applicable;

(ii)     Any Holder of the Securities may deliver an irrevocable notice (an "*Extension Sale Notice*") to the Issuer and the Trustee within 30 days after the Trustee has mailed the Extension Notice (the "*Extension Sale Notice Period*") of its intention to sell all or a portion of its Securities to an Extension Qualifying Purchaser in the case of a Maturity Extension. Any Extension Sale Notice received by the Trustee after the Extension Sale Notice Period shall be disregarded and deemed not to have been given. No Holder of the Securities that has not delivered such an Extension Sale Notice within the Extension Sale Notice Period shall be entitled to sell its Securities to an Extension Qualifying Purchaser in connection with the Maturity Extension; and

(iii)     If clause (iii)(b) of the Extension Conditions is not satisfied as of the applicable Extension Determination Date as determined by the Issuer (or its agent), the Trustee shall request the Rating Condition to be satisfied with respect to Moody's.

83

(e)     On the applicable Extension Determination Date, the Issuer (or its agent) shall confirm (i) whether or not Extension Qualifying Purchasers for all Extension Sale Securities have been designated to purchase such Extension Sale Securities in compliance with all transfer restrictions in this Indenture and the Preference Share Documents and the legends on such Extension Sale Securities and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency), (ii) whether the requirements of clause (c)(iii) of the Extension Conditions are satisfied as of the applicable Extension Determination Date and (iii) whether all other Extension Conditions can be satisfied as of the applicable Extension Effective Date.

(f)     On each Extension Effective Date, the Maturity Extension shall automatically become effective under the terms of this Indenture; provided that all Extension Conditions set forth in clauses (a) and (c) above are satisfied (as certified to the Trustee by a certificate of an Authorized Officer of the Issuer). No later than two Business Days after each Extension Effective Date, the Trustee based on a determination made by the Issuer in consultation with the Servicer, at the expense of the Co-Issuers, shall mail a notice to all Noteholders, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Servicer, the Initial Purchasers, each Rating Agency (so long as any rated Notes are Outstanding) and the Irish Stock Exchange (if and for so long as any Class of Senior Notes is listed thereon) confirming whether or not the Maturity Extension became effective. If the Maturity Extension became effective, the Issuer shall make any required notifications thereof to the Depository for any Notes subject to the Maturity Extension.

(g)     In the case of a Maturity Extension, each Noteholder, other than a Holder of Extension Sale Securities, shall be entitled to receive an amount equal to the applicable Extension Bonus Payment. Holders of Preference Shares shall not be entitled to receive any Extension Bonus Payment.

The Extension Bonus Payment shall be payable to any applicable qualifying beneficial owners who have provided the Trustee with an Extension Bonus Eligibility Certification on the first Payment Date from and including each Extension Effective Date on which funds are available to be used for such purposes in accordance with Priority of Payments, but in any event, no later than the earlier of the Stated Maturity and the date of redemption of the Notes. Extension Bonus Payments which are not available to be paid on a Payment Date in accordance with the Priority of Payments shall not be considered "due and payable" hereunder. The failure to pay any such Extension Bonus Payment on such date shall not be an Event of Default, unless the Issuer shall fail to pay in full such Extension Bonus Payment on the earlier of the Stated Maturity and the date of redemption in full of the relevant Securities. Unpaid Extension Bonus Payments shall not accrue interest. Such amounts shall be paid, in the case of the Notes, to the accounts designated in the applicable Extension Bonus Eligibility Certification or, to the extent otherwise required by the rules of any applicable securities exchange or clearing agency, in a manner determined by the Issuer.

(h)     If any Holder of Class II Preference Shares delivers an Extension Sale Notice notifying the Issuer and the Trustee of its intention to sell all or a portion of its Class II Preference Shares, such Holder will sell such Class II Preference Shares to the Extension Qualifying Purchaser and such Preference Shares will be redesignated as Class I Preference Shares.

## Section 2.5.     *Execution, Authentication, Delivery, and Dating.*

The Notes shall be executed on behalf of each of the Applicable Issuers by one of their respective Authorized Officers. The signature of the Authorized Officer on the Notes may be manual or facsimile.

84

Notes bearing the manual or facsimile signatures of individuals who were at any time the Authorized Officers of the Issuer or the Co-Issuer, as applicable, shall bind the Issuer and the Co-Issuer, notwithstanding that any of them have ceased to hold their offices before the authentication and delivery of the Notes or did not hold their offices at the date of issuance of the Notes.

At any time and from time to time after the execution and delivery of this Indenture, the Co-Issuers may deliver the Senior Notes and the Issuer may deliver the Class E Notes, in each case executed by the Applicable Issuers to the Trustee or the Authenticating Agent for authentication and the Trustee or the Authenticating Agent, upon Issuer Order, shall authenticate and deliver the Notes as provided in this Indenture and not otherwise.

Each Note authenticated and delivered by the Trustee or the Authenticating Agent upon Issuer Order on the Closing Date shall be dated as of the Closing Date. All other Notes that are authenticated after the Closing Date for any other purpose under this Indenture shall be dated the date of their authentication.

Notes issued upon transfer, exchange, or replacement of other Notes shall be issued in authorized denominations reflecting the original Aggregate Outstanding Amount of the Notes so transferred, exchanged, or replaced, but shall represent only the current outstanding principal amount of the Notes so transferred, exchanged, or replaced. If any Note is divided into more than one Note in accordance with this Article 2, the original principal amount of the Note shall be proportionately divided among the Notes delivered in exchange for it and shall be the original aggregate principal amount of the subsequently issued Notes.

No Note shall be entitled to any benefit under this Indenture or be valid or obligatory for any purpose, unless there appears on the Note a Certificate of Authentication executed by the Trustee or by the Authenticating Agent by the manual signature of one of their Authorized Officers, and that certificate on any Note shall be conclusive evidence, and the only evidence, that the Note has been duly authenticated and delivered under this Indenture.

Section 2.6.  *Registration, Registration of Transfer and Exchange.*

(a)     The Issuer shall cause a register (the "*Indenture Register*") to be kept in which the Issuer shall provide for the registration of Notes and the registration of transfers of Notes. The Trustee is hereby initially appointed "*Indenture Registrar*" for the purpose of registering Notes and transfers of the Notes as provided in this Indenture. The Issuer may rely conclusively on any such information provided to it by the Trustee. Upon any resignation or removal of the Indenture Registrar, the Issuer shall promptly appoint a successor and notify the Servicer of the appointment or, in the absence of such appointment, assume the duties of Indenture Registrar.

If the Issuer appoints a Person other than the Trustee to be Indenture Registrar, the Issuer will give the Trustee prompt written notice of the appointment of the Indenture Registrar and of the location, and any change in the location, of the Indenture Register. The Trustee may inspect the Indenture Register at all reasonable times and obtain copies of it. The Trustee may rely on a certificate executed on behalf of the Indenture Registrar by an Officer of the Indenture Registrar as to the names and addresses of the Noteholders and the principal amounts and number of the Notes.

Upon surrender for registration of transfer of any Notes at the office or agency of the Applicable Issuers to be maintained pursuant to Section 7.2, if the requirements of this Indenture are met the Applicable Issuers shall execute, and the Trustee shall authenticate and deliver, in the name of the designated transferees, new Notes of any authorized denomination and of a like original Aggregate Outstanding Amount.

85

At the option of their Holder, Notes may be exchanged for Notes of like terms, in any authorized denominations and of like aggregate principal amount, upon surrender of the Notes to be exchanged at the office or agency of the Applicable Issuers to be maintained pursuant to Section 7.2. Whenever any Note is surrendered for exchange, the Applicable Issuers shall execute, and the Trustee shall authenticate and deliver, the Notes that the Noteholder making the exchange is entitled to receive.

All Notes issued on any registration of transfer or exchange of Notes shall be the valid obligations of the Applicable Issuers evidencing the same obligations and entitled to the same benefits under this Indenture as the Notes surrendered for registration of transfer or exchange.

Every Note presented or surrendered for registration of transfer or exchange shall be duly endorsed, or be accompanied by a written instrument of transfer in form satisfactory to the Indenture Registrar duly executed by its holder or his attorney duly authorized in writing.

No Holder shall incur a service charge for any registration of transfer or exchange of the Notes, but the Trustee may require payment of a sum sufficient to cover any tax or other governmental charge payable in connection therewith.

(b)     No Note may be sold or transferred (including by pledge or hypothecation) unless the sale or transfer is exempt from the registration requirements of the Securities Act, is exempt from the registration requirements under applicable state securities laws, and will not cause either of the Co-Issuers to become subject to the requirement that it register as an investment company under the Investment Company Act. None of the Co-Issuers, the Trustee or any other Person shall have any obligation to register the Notes under the Securities Act or any state securities laws.

(c)     (i)     No Note or interest therein may be transferred to any purchaser or transferee unless such purchase, holding and disposition of such Note will not result in a non-exempt prohibited transaction under Section 406 of ERISA or Section 4975 of the Code (or, in the case of a governmental, foreign or church plan, any federal, state, foreign or local law that is substantially similar to Section 406 of ERISA or Section 4975 of the Code).

(ii)     No person shall be permitted to acquire any Class E Note if such acquisition would result in persons who have represented that they are Benefit Plan Investors owning 25% or more of the aggregate outstanding amount of the Class E Notes immediately after such sale or transfer (excluding, as described below, for purposes of such determination any Class E Notes held by any Controlling Person (as defined below) and its affiliates (as defined below)) determined in accordance with Section 3(42) of ERISA. Under the Plan Asset Regulation, an "affiliate" of a person includes any person, directly or indirectly through one or more intermediaries, controlling, controlled by or under common control with the person, and "control" with respect to a person other than an individual, means the power to exercise a controlling influence over the management or policies of such person. In making the 25% determination, Class E Notes held by any person (other than a Benefit Plan Investor) that has discretionary authority or control with respect to the assets of the Issuer or a person who provides investment advice for a fee (direct or indirect) with respect to the assets of the Issuer or any affiliate of any such person (any such person, a "*Controlling Person*") (such as the Class E Notes held by the Servicer or its affiliates) will be disregarded and not treated as outstanding.

(iii)     Any person described in paragraph (i) and (ii) above is referred to herein as a "*Non-Permitted Benefit Plan Investor*." Any transfer of a beneficial interest to a Non-Permitted Benefit Plan Investor shall be void and any such purported transfer of which the

86

Issuer, the Co-Issuer or the Trustee has notice may be disregarded by the Issuer, the Co-Issuer and the Trustee for all purposes.

(d)     None of the Trustee, the Share Registrar or the Indenture Registrar shall be responsible for ascertaining whether any transfer complies with, or for otherwise monitoring or determining compliance with, the requirements or terms of the Securities Act, applicable state securities laws, ERISA, the Code or the Investment Company Act; except that if a certificate or any other document is specifically required by this Section 2.6 to be provided to the Trustee or such Registrar by a prospective transferee, the Trustee and such Registrar, as applicable, shall be under a duty to receive and examine the same to determine whether it conforms substantially on its face to the applicable requirements of this Section 2.6.

(e)     For so long as any of the Notes are Outstanding, the Issuer shall not issue or register the transfer of any Issuer Ordinary Shares to U.S. persons and the Co-Issuer shall not issue or register the transfer of any of its shares of the Co-Issuer to U.S. persons. As used in this subsection (e), "U.S. person" has the meaning assigned to it in Regulation S.

(f)     So long as a Global Note remains Outstanding and is held by or on behalf of the Depository, transfers of the Global Note, in whole or in part, shall only be made in accordance with Section 2.2(c), Section 2.6(c) and this Section 2.6(f).

(i)     Subject to clauses (ii), (iii) and (iv) of this Section 2.6(f), transfers of a Global Note shall be limited to transfers of the Global Note in whole, but not in part, to nominees of the Depository.

(ii)     *Rule 144A Global Note to Regulation S Global Note.* If a Holder of a beneficial interest in a Rule 144A Global Note deposited with the Depository wishes at any time to exchange its interest in the Rule 144A Global Note for an interest in the corresponding Regulation S Global Note, or to transfer its interest in the Rule 144A Global Note to a Person who wishes to take delivery of it in the form of an interest in the corresponding Regulation S Global Note, the Holder may exchange or transfer the interest for an equivalent beneficial interest in the corresponding Regulation S Global Note (subject to the rules and procedures of the Depository) if the Holder after the exchange or transfer is not a U.S. person.

The Indenture Registrar shall instruct the Depository to reduce the principal amount of the Rule 144A Global Note and to increase the principal amount of the Regulation S Global Note by the aggregate principal amount of the beneficial interest in the Rule 144A Global Note to be exchanged, and to credit to the securities account of the Person specified in the instructions a beneficial interest in the corresponding Regulation S Global Note equal to the reduction in the principal amount of the Rule 144A Global Note upon receipt by the Indenture Registrar of

(A)     instructions given in accordance with the Depository's procedures from an Agent Member directing the Indenture Registrar to credit a beneficial interest in the corresponding Regulation S Global Note, but not less than the minimum denomination applicable to the Holder's Senior Notes, equal to the beneficial interest in the Rule 144A Global Note to be exchanged or transferred,

(B)     a written order given in accordance with the Depository's procedures containing information regarding the participant account of the Depository and the Euroclear or Clearstream account to be credited with the increase,

        (C)     a certificate in the form of <u>Exhibit B-3</u> given by the Holder of the beneficial interest stating that the exchange or transfer of the interest has been made in compliance with the transfer restrictions applicable to the Global Notes, including that the Holder or the transferee, as applicable, is not a U.S. person, and that the transfer has been made pursuant to and in accordance with Regulation S, and

        (D)     in the case of a transfer, a certificate in the applicable form of <u>Exhibit B-1</u> given by the proposed transferee stating that it is not a U.S. person.

        (iii)    *Regulation S Global Note to Rule 144A Global Note.* If a Holder of a Senior Note held as a beneficial interest in a Regulation S Global Note deposited with the Depository wishes at any time to exchange its interest in the Regulation S Global Note for an interest in the corresponding Rule 144A Global Note or to transfer its interest in the Regulation S Global Note to a Person who wishes to take delivery of it in the form of an interest in the corresponding Rule 144A Global Note, the Holder may, subject to the rules and procedures of Euroclear, Clearstream or the Depository, as the case may be, exchange or transfer, or cause the exchange or transfer of, the interest for an equivalent beneficial interest in the corresponding Rule 144A Global Note. Upon receipt by the Indenture Registrar of:

        (A)     instructions from Euroclear, Clearstream or the Depository, as the case may be, directing the Indenture Registrar to cause to be credited a beneficial interest in the corresponding Rule 144A Global Note equal to the beneficial interest in the Regulation S Global Note, but not less than the minimum denomination applicable to the Holder's Senior Notes, to be exchanged or transferred, the instructions to contain information regarding the participant account with the Depository to be credited with the increase,

        (B)     a certificate in the form of <u>Exhibit B-2</u> given by the Holder of the beneficial interest and stating that, in the case of an exchange, the Holder is a Qualified Institutional Buyer and a Qualified Purchaser or, in the case of a transfer, the Person transferring the interest in the Regulation S Global Note reasonably believes that the Person acquiring the interest in a Rule 144A Global Note is a Qualified Institutional Buyer, is obtaining the beneficial interest in a transaction meeting the requirements of Rule 144A and in accordance with any applicable securities laws of any state of the United States or any other jurisdiction, and a Qualified Purchaser, and

        (C)     a certificate in the form of <u>Exhibit B-1</u> given by the proposed transferee stating that it is a QIB/QP,

the Indenture Registrar shall instruct the Depository to reduce the Regulation S Global Note by the aggregate principal amount of the beneficial interest in the Regulation S Global Note to be transferred or exchanged and the Indenture Registrar shall instruct the Depository, concurrently with the reduction, to credit to the securities account of the Person specified in the instructions a beneficial interest in the corresponding Rule 144A Global Note equal to the reduction in the principal amount of the Regulation S Global Note.

        (iv)    *Other Exchanges.* If a Global Note is exchanged for Senior Notes in definitive registered form without interest coupons pursuant to Section 2.11, the Senior Notes may be exchanged for one another only in accordance with procedures substantially consistent with the provisions above (including certification requirements intended to insure

that the transfers are made only to Holders who are QIB/QPs or non-U.S. persons, or otherwise comply with Regulation S, as the case may be), and as may be from time to time adopted by the Co-Issuers and the Trustee.

(g)    So long as the Class E Notes remain Outstanding transfers of such Class E Notes shall only be made in accordance with Section 2.6(c) and this Section 2.6(g) upon receipt by the Indenture Registrar of a certificate in the form of Exhibit B-4 given by the proposed transferee stating that it is a QIB/QP and containing other representations, warranties and agreements of such transferee.

(h)    If the Notes are issued upon the transfer, exchange, or replacement of Notes bearing the applicable legends in the applicable forms in Exhibit A, as applicable, and if a request is made to remove the legend on the Notes, the legend shall not be removed unless the Trustee and the Applicable Issuers received satisfactory evidence, which may include an Opinion of Counsel acceptable to them, reasonably required by the Applicable Issuers (and which shall by its terms permit reliance by the Trustee), to the effect that neither the legend nor the restrictions on transfer in it are required to ensure that transfers of the Notes comply with the Securities Act, the Investment Company Act, ERISA and the Code. Upon provision of satisfactory evidence, the Trustee or its Authenticating Agent, at the written direction of the Applicable Issuers shall, after due execution by the Applicable Issuers authenticate and deliver Notes that do not bear the applicable legend.

(i)    Notwithstanding anything contained in this Section 2.6 to the contrary:

(i)    Restrictions on U.S. Transfers. Transfers of an interest in a Regulation S Global Note that are not made in an offshore transaction pursuant to Regulation S or are made to U.S. Persons, if such transferees take delivery in the form of an interest in a Rule 144A Global Note, shall be limited to transfers made pursuant to the provisions of Section 2.6(f)(iii) and Section 2.6(f)(iv).

(ii)    Beneficial interests in a Regulation S Global Note may only be held through Euroclear or Clearstream.

(j)    (i)    Each Person who becomes a beneficial owner of a Senior Note evidenced by: (A) an interest in a Definitive Note, shall make the representations, warranties and agreements set forth in the applicable Transferee Certificate set forth in Exhibit B-1 upon such Person's purchase or other acquisition of the relevant Definitive Note and (B) an interest in a Global Note, shall be deemed to make the representations, warranties and agreements set forth in the applicable legends of the Notes set forth in Exhibit A-1 hereto and in the applicable Transferee Certificate set forth in Exhibit B-1 hereto upon such Person's purchase or other acquisition of the relevant Global Note.

(ii)    Each Person who becomes a beneficial owner of a Class E Note shall make the representations, warranties and agreements set forth in the Transferee Certificate set forth in Exhibit B-4 upon such Person's purchase or other acquisition of such Class E Note.

(k)    The aggregate principal amount of any Global Note may be increased or decreased by adjustments made on the records of the Trustee, as custodian for DTC for the Global Note, which adjustments shall be conclusive as to the aggregate principal amount of any Global Note.

(l)    Any purported transfer of a Note not in accordance with this Section 2.6 shall be null and void.

Section 2.7.     *Mutilated, Destroyed, Lost or Stolen Notes.*

If the Applicable Issuers, the Trustee, and the relevant Transfer Agent receive evidence to their satisfaction of the destruction, loss or theft of any Note, and they receive the security or indemnity they require to hold each of them harmless, or if any mutilated Note is surrendered to a Transfer Agent, then, in the absence of notice to the Applicable Issuers, the Trustee, or the Transfer Agent that the Note has been acquired by a protected purchaser, the Applicable Issuers shall execute and the Trustee shall authenticate and deliver, in exchange for the mutilated, destroyed, lost, or stolen Note, a replacement Note, of like tenor and equal principal or face amount.

If, after delivery of the replacement Note or payment on it, a protected purchaser of the predecessor Note presents it for payment, transfer, or exchange, the Applicable Issuers, the Transfer Agent, and the Trustee may recover the replacement Note (or the payment on it) from the Person to whom it was delivered or any Person taking the replacement Note from the Person to whom the replacement Note was delivered or any assignee of that Person, except a protected purchaser, and may recover on the security or indemnity provided therefor to the extent of any loss, damage, cost, or expense incurred by the Applicable Issuers, the Trustee, and the Transfer Agent in connection with it.

If the final payment in respect of any mutilated, destroyed, lost, or stolen Note has become payable, the Applicable Issuers in their discretion may, instead of issuing a new Note pay the Note without requiring its surrender except that any mutilated Note shall be surrendered.

Upon the issuance of any new Note under this Section, the Applicable Issuers or the Trustee may require the payment by its holder of a sum sufficient to cover any tax or other governmental charge that may be imposed in connection with the issuance and any other expenses (including the fees and expenses of the Trustee) connected with it.

Every new Note issued pursuant to this Section in replacement for any mutilated, destroyed, lost, or stolen Note shall be an original additional contractual obligation of the Applicable Issuers and the new Note shall be entitled to all the benefits of this Indenture equally and proportionately with all other Notes of the same Class duly issued under this Indenture, as applicable.

The provisions of this Section are exclusive and shall preclude (to the extent lawful) all other rights with respect to the replacement or payment of mutilated, destroyed, lost, or stolen Notes.

Section 2.8.     *Payment of Principal and Interest and Other Amounts; Principal and Interest Rights Preserved; Withholding.*

(a)     The Notes of each Class shall accrue interest during each Interest Period on their Aggregate Outstanding Amount (determined as of the first day of the Interest Period and after giving effect to any redemption or other payment of principal occurring on that day) at the Applicable Note Interest Rate. Interest shall be payable in arrears on each Payment Date. Payment of interest on each Class of Notes shall be subordinated to the payments of interest on the related Priority Classes and other amounts in accordance with the Priority of Payments.

So long as any Priority Classes are Outstanding with respect to any Class of Deferred Interest Notes, any payment of interest due on the Class of Deferred Interest Notes that is not available to be paid ("*Deferred Interest*") in accordance with the Priority of Payments on any Payment Date shall not be considered "payable" for the purposes of this Indenture (and the failure to pay the interest shall not be an Event of Default) until the Payment Date on which the interest is available to be paid in accordance with the Priority of Payments. Deferred Interest on any Class of

90

Deferred Interest Notes shall be payable on the first Payment Date on which funds are available to be used for that purpose in accordance with the Priority of Payments.

Interest shall cease to accrue on each Note, or in the case of a partial repayment, on the part repaid, from the date of repayment or its Stated Maturity unless payment of principal is improperly withheld or unless there is some other default with respect to the payments of principal.

To the extent lawful and enforceable, interest on Deferred Interest with respect to any Class of Deferred Interest Notes shall accrue at the Note Interest Rate for the Class (and to the extent not paid as current interest on the Payment Date after the Interest Period in which it accrues, shall thereafter be additional Deferred Interest, until paid as provided in this Indenture).

(b)      The principal of each Note of each Class matures at par and is payable on the Payment Date that is the Stated Maturity for the Class of Notes, unless the unpaid principal of the Note becomes payable at an earlier date by declaration of acceleration, call for redemption, or otherwise. Notwithstanding the foregoing, the payment of principal of each Class of Notes:

(i)      may only occur after principal on each Class of Notes that is a Priority Class with respect to the Class has been paid in full; and

(ii)      is subordinated to the payment on each Payment Date of the principal and interest payable on the Priority Classes, and other amounts in accordance with the Priority of Payments;

provided that, notwithstanding the foregoing, Interest Proceeds may be used to pay principal of the Class E Notes on any Payment Date to the extent necessary to satisfy the Class E Coverage Tests.

(c)      Principal payments on the Notes shall be made in accordance with the Priority of Payments and Section 9.1.

(d)      As a condition to the payment of principal of and interest on any Note without the imposition of U.S. withholding tax, the Paying Agent shall require the previous delivery of appropriate properly completed and signed original forms United States federal income tax certifications (generally, an Internal Revenue Service Form W-9 (or applicable successor form) in the case of a Person that is a "United States person" within the meaning of Section 7701(a)(30) of the Code or an appropriate Internal Revenue Service Form W-8 (or applicable successor form) in the case of a Person that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code) or any other certification acceptable to it to enable the Issuer, the Co-Issuer, the Trustee, and any Paying Agent to determine their duties and liabilities with respect to any taxes or other charges that they may be required to deduct or withhold from payments on the Note under any present or future law of the United States or any present or future law of any political subdivision of the United States or taxing authority in the United States or to comply with any reporting or other requirements under any such law.

(e)      Payments in respect of interest on and principal of any Note shall be made by the Trustee, or by the Irish Paying Agent, if applicable, in U.S. Dollars to the Depository or its designee with respect to a Global Note and to the Holder or its nominee with respect to a Definitive Note and a Class E Note, by wire transfer, as directed by the Holder, in immediately available funds to a U.S. Dollar account maintained by the Depository or its nominee with respect to a Global Note, and to the Holder or its designee with respect to a Definitive Note and a Class E Note. In the case of a Definitive Note and a Class E Note, its Holder has provided written wiring instructions to the

91

Trustee and, if the payment with respect to a Definitive Note is to be made by the Irish Paying Agent, the Irish Paying Agent, on or before the related Record Date.

If appropriate instructions for the wire transfer are not received by the related Record Date, then the payment will be made by check drawn on a U.S. bank mailed to the address of the Holder in the Indenture Register. Upon final payment due on the Maturity of a Note, its Holder shall present and surrender the Note at the office designated by the Trustee on or before the Maturity. If the Trustee and the Applicable Issuers have been furnished the security or indemnity they require to save each of them harmless and an undertaking thereafter to surrender the certificate, then, in the absence of notice to the Applicable Issuers or the Trustee that the applicable Note has been acquired by a protected purchaser, the final payment shall be made without presentation or surrender. Neither the Co-Issuers, the Trustee, the Share Registrar nor any Paying Agent shall have any responsibility or liability for any aspects of the records maintained by Euroclear, Clearstream, or any of the Agent Members relating to or for payments made thereby on account of beneficial interests in a Global Note.

In the case where any final payment of principal and interest is to be made on any Note (other than on its Stated Maturity and except as otherwise provided in this Indenture), the Trustee, in the name and at the expense of the Applicable Issuers shall, not more than 30 nor less than 10 days before the date on which the payment is to be made, mail (by first-class mail, postage prepaid) to the Persons entitled thereto at their addresses appearing on the Indenture Register, a notice specifying the date on which the payment will be made, the amount of the payment per U.S.$100,000 original principal amount of Notes and the place where the Notes may be presented and surrendered for payment. If the Trustee and the Issuer have been furnished any security or indemnity they require to save each of them harmless and an undertaking thereafter to surrender the certificate, then, in the absence of notice to the Issuer or the Trustee that the applicable certificate has been acquired by a protected purchaser, final payment shall be made without presentation or surrender of the applicable certificate.

(f)     Payments of principal to Holders of the Notes of each Class shall be made in the proportion that the Aggregate Outstanding Amount of the Notes of the Class registered in the name of each Holder on the applicable Record Date bears to the Aggregate Outstanding Amount of all Notes of the Class on the Record Date.

(g)     Interest accrued shall be calculated on the basis of the actual number of days elapsed in the applicable Interest Period divided by 360.

(h)     All reductions in the principal amount of a Note (or one or more predecessor Notes) effected by payments of installments of principal made on any Payment Date or Redemption Date shall be binding on all future Holders of the Note and of any Note issued upon the registration of its transfer, exchange, or replacement, whether or not the payment is noted on the Note.

(i)     Notwithstanding any other provision of this Indenture, the obligations of the Co-Issuer under the Senior Notes and under this Indenture are non-recourse obligations, and the obligations of the Issuer under the Notes and under this Indenture are limited recourse obligations payable solely from the Collateral and following realization of the assets, application of their proceeds in accordance with this Indenture and the reduction of the proceeds of the Collateral to zero, all obligations of, and any claims against, the Co-Issuers under this Indenture or under the Notes or arising in connection therewith shall be extinguished and shall not thereafter revive. No recourse shall be had against any Officer, director, employee, shareholder, or incorporator of either of the Co-Issuers or their respective successors or assigns for any amounts payable under the Notes or this Indenture. The foregoing provisions of this paragraph (i) shall not (1) prevent recourse to the Collateral for the sums due or to become due under any security, instrument, or agreement that is

92

part of the Collateral or (2) be a waiver, release, or discharge of any indebtedness or obligation evidenced by the Notes or secured by this Indenture until the Collateral have been realized. The foregoing provisions of this paragraph (i) shall not limit the right of any Person to name the Issuer or the Co-Issuer as a party defendant in any Proceeding or in the exercise of any other remedy under the Notes or this Indenture, so long as no judgment in the nature of a deficiency judgment or seeking personal liability is sought or (if obtained) enforced against the person.

(j)     If any withholding tax is imposed on the Issuer's payment (or allocations of income) under the Notes to any Noteholder, the tax shall reduce the amount otherwise distributable to the Noteholder. The Trustee is hereby authorized and directed to retain from amounts otherwise distributable to any Noteholder sufficient funds for the payment of any tax that is legally owed, or required by law to be collected, by or on behalf of the Issuer (but the authorization shall not prevent the Trustee or the Issuer from contesting any such tax in appropriate proceedings and withholding payment of the tax, if permitted by law, pending the outcome of the proceedings). The amount of any withholding tax imposed with respect to any Noteholder shall be treated as Cash distributed to the Noteholder when it is withheld by the Trustee and remitted to the appropriate taxing authority. If there is a possibility that withholding tax is payable with respect to a distribution, the Trustee may in its sole discretion withhold the amounts in accordance with this Section 2.8(j). If any Noteholder wishes to apply for a refund of any such withholding tax, the Trustee shall reasonably cooperate with the Noteholder in making the claim by providing information readily available to the Trustee so long as the Noteholder agrees to reimburse the Trustee for any out-of-pocket expenses incurred and provides the Trustee with security reasonably acceptable to the Trustee assuring the reimbursement. The Trustee hereby provides notice to each Noteholder that the failure by the Noteholder to provide the Trustee with appropriate tax certifications may result in amounts being withheld from payments to the Noteholder. Nothing in this Indenture shall impose an obligation on the part of the Trustee to determine the amount of any tax or withholding obligation on the part of the Issuer or in respect of the Notes.

Section 2.9.     *Persons Considered Owners.*

The Issuer, the Co-Issuer, the Trustee, and any agent of the Co-Issuers or the Trustee may treat as the owner of the Note the Person in whose name any Note is registered on the Indenture Register on the applicable Record Date for the purpose of receiving payments on the Note and on any other date for all other purposes whatsoever (whether or not the Note is overdue), and neither the Issuer, the Co-Issuer nor the Trustee nor any agent of the Issuer, the Co-Issuer or the Trustee shall be affected by notice to the contrary. Pursuant to the Servicing Agreement, the Servicer will notify the Trustee and the Share Registrar of any Affiliate of the Servicer that owns any of the Securities.

Section 2.10.     *Cancellation.*

All Notes surrendered for payment, registration of transfer, exchange, or redemption, or lost or stolen, shall be promptly canceled by the Trustee and may not be reissued or resold. No Notes shall be authenticated in lieu of or in exchange for any Notes canceled as provided in this Section 2.10, except as expressly permitted by this Indenture. All canceled Notes held by the Trustee shall be destroyed by the Trustee in accordance with its standard policy unless the Applicable Issuers direct by an Issuer Order delivered to the Trustee prior to cancellation and destruction that they be returned to the Issuer.

Section 2.11.   *Definitive Notes.*

(a)     A Global Note deposited with the Depository pursuant to Section 2.2 shall be transferred in the form of a Definitive Note to its beneficial owners only if the transfer complies with Section 2.6 and either

(i)     the Depository notifies the Co-Issuers that it is unwilling or unable to continue as Depository for the Global Note or

(ii)    if at any time the Depository ceases to be a Clearing Agency registered under the Exchange Act and, in each case, a successor depository is not appointed by the Co-Issuers within 90 days after the notice.

(b)     Any Global Note that is transferable in the form of a Definitive Note to its beneficial owners pursuant to this Section 2.11 shall be surrendered by the Depository to the office of the Trustee's agent located in the City of New York, New York as specified in Section 7.2 (or any other office designated by the Trustee) to be so transferred, in whole or from time to time in part, without charge, and the Applicable Issuers shall execute and the Trustee shall authenticate and deliver, upon the transfer of each portion of the Global Note, an equal aggregate principal amount of definitive physical certificates (pursuant to the instructions of the Depository) (each, a *"Definitive Note"*) in authorized denominations. Any Definitive Note delivered in exchange for an interest in a Global Note, as applicable, shall, except as otherwise provided by Section 2.6(j), bear the legends in the applicable portion of Exhibit A-1 and shall be subject to the transfer restrictions referred to in the legends.

(c)     The Holder of a Global Note may grant proxies and otherwise authorize any Person, including Agent Members and Persons that may hold interests through Agent Members, to take any action which a Holder is entitled to take under this Indenture or the Senior Notes, as applicable.

(d)     Upon the occurrence of either of the events specified in Section 2.11(a)(i) and (ii), the Co-Issuers shall promptly make available to the Trustee a reasonable supply of Definitive Notes in definitive, fully registered form without interest coupons.

The Definitive Notes shall be in substantially the same form as the Global Notes, with any changes the Issuer and Trustee agree to and the Applicable Issuers shall execute, and the Trustee shall authenticate and deliver, in exchange therefor, the same aggregate principal amount of Definitive Notes of authorized denominations.

Section 2.12.   *Notes Beneficially Owned by Non-Permitted Holders.*

(a)     Notwithstanding anything to the contrary elsewhere in this Indenture, (i) any transfer of a beneficial interest in any Global Note to a U.S. person (for purposes of this Section 2.12 as defined in Regulation S) that is not a QIB/QP and that is not made pursuant to an applicable exemption under the Securities Act and (ii) any transfer of a beneficial interest in any Class E Note to a Person that is not a QIB/QP, shall be void and any such purported transfer of which the Issuer, the Co-Issuer or the Trustee has notice may be disregarded by the Issuer, the Co-Issuer and the Trustee for all purposes.

(b)     After discovery by the Issuer, the Co-Issuer or the Trustee (and notice by the Trustee or the Co-Issuer to the Issuer, if either of them makes the discovery) that a Person is a Non-Permitted Holder, the Issuer shall promptly send notice to the Non-Permitted Holder demanding that the Non-Permitted Holder transfer its interest to a Person that is not a Non-Permitted Holder within

94

30 days of the date of the notice. If the Non-Permitted Holder fails to so transfer its Notes or interest in the Notes without further notice to the Non-Permitted Holder, the Issuer may sell the Notes or interest in the Notes to a purchaser selected by the Issuer that is a not a Non-Permitted Holder on any terms the Issuer chooses. The Issuer, or the Trustee acting on behalf of the Issuer, may select the purchaser by soliciting bids (or by appointing an investment bank at the expense of the Issuer to solicit bids) from brokers or other market professionals that regularly deal in securities similar to the Notes, and selling the Notes, or interest in the Notes to the highest bidder. However, the Issuer or the Trustee may select a purchaser by any other means determined by it in its sole discretion. The Holder of each Note, the beneficial owner of each interest in a Note, the Non-Permitted Holder, and each other Person in the chain of title from the Holder or beneficial owner to the Non-Permitted Holder, by its acceptance of an interest in the Notes agrees to cooperate with the Issuer and the Trustee to effect the transfers. The proceeds of the sale, net of any commissions, expenses of the Trustee or otherwise, and taxes due in connection with the sale shall be remitted to the Non-Permitted Holder. The terms of any sale under this subsection shall be determined in the sole discretion of the Issuer (or the Trustee acting on its behalf), and the Issuer and the Trustee shall not be liable to any Person having an interest in the Notes sold as a result of any such sale or the exercise of its discretion.

## Section 2.13    *Tax Purposes*

The Issuer agrees, and each Holder and each beneficial owner of a Note, by acceptance of its Note or its interest in a Note, as the case may be, shall be deemed to have agreed, to treat, and shall treat, such Note as unconditional debt of the Issuer for tax, accounting and financial reporting purposes.

## ARTICLE 3

### CONDITIONS PRECEDENT

## Section 3.1.    *Conditions to Issuance of Notes on Closing Date.*

(a)    The Notes to be issued on the Closing Date shall be executed by the Applicable Issuers and delivered to the Trustee for authentication and thereupon the same shall be authenticated and delivered by the Trustee upon Issuer Order and upon receipt by the Trustee of the following:

(i)    *Officers' Certificates of the Co-Issuers Regarding Corporate Matters.* An Officer's certificate of each of the Co-Issuers:

(A)    (1) evidencing (x) the authorization by Board Resolution of the execution and delivery of this Indenture and the Purchase Agreement and, in the case of the Issuer, the Servicing Agreement, the Preference Shares Paying Agency Agreement, the Collateral Administration Agreement and the Hedge Agreements being entered into on or before the Closing Date (if any), and related transaction documents and (y) the execution, authentication and delivery of the Notes applied for by it and specifying the Stated Maturity, principal amount and the Note Interest Rate of each applicable Class of Notes to be authenticated and delivered and (2) with respect to the Issuer only, evidencing the authorization by Board Resolution of the issuance, terms and number of Preference Shares issued on the Closing Date, and that each of the foregoing is in accordance with the terms of the Board Resolution, and

95

(B)     certifying that (1) the attached copy of the Board Resolution is an accurate copy, (2) the resolutions have not been rescinded and are in full force on and as of the Closing Date and (3) the Officers authorized to execute and deliver the documents hold the offices and have the signatures indicated on the documents.

(ii)     *Governmental Approvals.* From each of the Co-Issuers either:

(A)     a certificate of the Applicable Issuer or other official document evidencing the due authorization, approval or consent of any governmental bodies, at the time having jurisdiction in the premises, together with an Opinion of Counsel of the Applicable Issuer that no other authorization, approval or consent of any governmental body is required for the valid issuance of the Notes applied for by it, or

(B)     an Opinion of Counsel of the Applicable Issuer that no authorization, approval, or consent of any governmental body is required for the valid issuance of the Notes except as have been given; provided that the opinions of Latham & Watkins, LLP and Maples and Calder, substantially in the forms of Exhibit C and Exhibit D, respectively, shall satisfy this clause (B).

(iii)     *Co-Issuers' and Servicer's U.S. Counsel Opinion.* Opinions of Latham & Watkins LLP, special U.S. counsel to the Co-Issuers, and an opinion of Orrick, Herrington & Sutcliffe LLP, counsel to the Servicer, dated the Closing Date, substantially in the forms of Exhibit C and Exhibit F.

(iv)     *Issuer's Cayman Counsel Opinion.* An opinion of Maples and Calder, Cayman Islands counsel to the Issuer, dated the Closing Date, substantially in the form of Exhibit D.

(v)     *Trustee's Counsel Opinion.* An opinion of Nixon Peabody LLP, counsel to the Trustee, dated the Closing Date, substantially in the form of Exhibit E.

(vi)     *Officers' Certificates of Co-Issuers Regarding Indenture.* An Officer's certificate of each of the Co-Issuers stating that, to the best of the Officer's knowledge,

(A)     the Applicable Issuer is not in default under this Indenture and that the issuance of the Notes applied for by it will not result in a default or a breach of, or be a default under, its organizational documents, any indenture or other agreement or instrument to which it is a party or by which it is bound, or any order of any court or administrative agency entered in any Proceeding to which it is a party or by which it may be bound or to which it may be subject;

(B)     all conditions precedent in this Indenture relating to the authentication and delivery of the applicable Notes have been complied with; and

(C)     all expenses due or accrued with respect to the Offering or relating to actions taken on or in connection with the Closing Date have been paid or reserves therefor have been made.

The Officer's certificate of the Issuer shall also state that, to the best of the Officer's knowledge, all of its representations and warranties contained in this Indenture are accurate as of the Closing Date.

96

(vii)   *Hedge Agreements.* Executed copies of the Hedge Agreements being entered into on or entered into before the Closing Date, if any.

(viii)   *Servicing Agreement.* Executed copy of the Servicing Agreement.

(ix)   *Preference Shares.* Copies of executed Preference Share certificates to be issued on the Closing Date.

(x)   *Preference Share Documents.* An executed counterpart of the Preference Shares Paying Agency Agreement.

(xi)   *Collateral Administration Agreement.* Executed copy of the Collateral Administration Agreement.

(xii)   *Grant of Collateral Obligations.* Evidence of the Grant pursuant to the Granting Clauses of this Indenture of all of the Issuer's interest in the Collateral Obligations pledged to the Trustee for inclusion in the Collateral, on the Closing Date and Delivery of the Collateral Obligations (including any promissory notes and all other Underlying Instruments related to them to the extent received by the Issuer) to the Trustee or the Custodian as contemplated by Section 3.2.

(xiii)   *Certificate of the Servicer.* A certificate of an Authorized Officer of the Servicer, dated as of the Closing Date, to the effect that, to the best knowledge of the Servicer, in the case of each Collateral Obligation pledged to the Trustee for inclusion in the Collateral, as the case may be, on the Closing Date and immediately before the delivery of the Collateral Obligation on the Closing Date:

(A)   the "row/column combination" of the table appearing in the definition of "Ratings Matrix" selected by the Servicer on the Closing Date;

(B)   the information with respect to the Collateral Obligation in the Schedule of Collateral Obligations is correct; and

(C)   the Collateral Obligation satisfies the requirements of the definition of "Collateral Obligation" and of Section 3.1(a)(xx)(B);

(xiv)   *Rating Letters.* An Officer's certificate of the Issuer to the effect that attached is an accurate copy of a letter signed by each Rating Agency and confirming that each Class of Notes rated by the Rating Agency has been assigned the applicable Initial Rating and that the ratings are in full force on the Closing Date.

(xv)   *Accounts.* Evidence that each of the Accounts has been established.

(xvi)   *Issuer Order for Deposit of Funds into Accounts.* An Issuer Order signed in the name of the Issuer by an Authorized Officer of the Issuer, dated as of the Closing Date, authorizing the deposit of at least U.S.$71,908,337 into the Collection Account for use pursuant to Section 7.19, the deposit of at least U.S.$2,024,384 into the Closing Date Expense Account for use pursuant to Section 10.3(g) and the deposit of at least U.S.$2,500,000 into the Interest Reserve Account for use pursuant to Section 10.3(i).

(xvii)   *Irish Listing.* An Officer's certificate of the Issuer to the effect that application has been made to the Irish Stock Exchange to admit the Senior Notes to the Official List.

97

(xviii)  *Issuer Order for Authentication of Notes*.  An Issuer Order signed in the name of the Issuer by an Authorized Officer of the Issuer, dated as of the Closing Date, directing the Trustee to authenticate the Notes in the amounts, in the registered names and with the CUSIP numbers in the Issuer Order.

(xix)  *Accountants' Certificate*.  An Accountants' Certificate satisfactory to the Issuer (A) confirming the information with respect to each Collateral Obligation on the Schedule of Collateral Obligations attached as Schedule 1, (B) confirming that the Aggregate Principal Balance of the Collateral Obligations that the Issuer has purchased or committed to purchase in accordance with customary settlement procedures in the relevant markets, is approximately U.S.$981,300,000, that each Concentration Limitation is satisfied taking into account all of the Collateral Obligations acquired as of the Closing Date (including binding agreements to purchase Collateral Obligations in effect on the Closing Date), that the Weighted Average Spread Test is satisfied as of the Closing Date, that the Weighted Average Rating Factor Test is satisfied as of the Closing Date, that the Weighted Average Life Test is satisfied as of the Closing Date, that each Overcollateralization Test is satisfied as of the Closing Date, that the Weighted Average Moody's Recovery Rate Test is satisfied as of the Closing Date, that the Weighted Average S&P Recovery Rate Test is satisfied as of the Closing Date and that the Weighted Average Fixed Rate Coupon Test is satisfied as of the Closing Date and a calculation of the Diversity Score, (C) specifying the procedures undertaken by them to review data and computations relating to this Section 3.1(a)(xix) and (D) confirming the weighted average purchase price of the Collateral Obligations.

(xx)  *Certificate of the Issuer Regarding Collateral*.  A certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, to the effect that, to the knowledge of the Issuer, in the case of each Collateral Obligation pledged to the Trustee for inclusion in the Collateral, as the case may be, on the Closing Date and immediately before the delivery of the Collateral Obligation on the Closing Date:

(A)  the Issuer is the owner of the Collateral Obligation free of any liens, claims, or encumbrances of any nature whatsoever except for those that are being released on the Closing Date and except for those Granted pursuant to or permitted by this Indenture;

(B)  the Issuer has acquired its ownership in the Collateral Obligation in good faith without notice of any adverse claim, except as described in paragraph (A) above;

(C)  the Issuer has not assigned, pledged or otherwise encumbered any interest in the Collateral Obligation (or, if any interest in the Collateral Obligation has been assigned, pledged or otherwise encumbered, it has been released before the Closing Date or is being released on the Closing Date) other than interests Granted pursuant to or permitted by this Indenture;

(D)  the Issuer has full right to Grant a security interest in and assign and pledge the Collateral Obligation to the Trustee;

(E)  upon Grant by the Issuer, the Trustee has a first priority perfected security interest in the Collateral Obligations and the other Collateral; and

(F)  based solely on the Accountant's Certificate set forth in clause (xix) above, the weighted average purchase price of the Collateral Obligations in

the Collateral as of the Closing Date is at least 90% of the aggregate par amount thereof.

(xxi) *Certificate of the Issuer Regarding Important Section 3(c)(7) Reminder Notice.* A certificate of an Authorized Officer of the Issuer, dated as of the Closing Date, to the effect that, on or prior to the Closing Date the Issuer provided to the Depository the Important Section 3(c)(7) Reminder Notice, substantially in the form of Exhibit I-2.

(xxii) *Other Documents.* Any other documents the Trustee reasonably requires. Nothing in this clause (xxii) shall imply or impose a duty on the part of the Trustee to require any other documents.

(b)   Any Refinancing Note may be issued from time to time pursuant to Section 9.7 hereof. Any such Refinancing Notes shall be executed by the Applicable Issuer and delivered to the Trustee for authentication, and thereupon shall be authenticated and delivered by the Trustee upon and pursuant to Issuer Order delivered to the Trustee, together with delivery to the Trustee by the Issuer of an Opinion of Counsel to the effect that (A) such Refinancing Notes are duly authorized and validly issued by the Applicable Issuer pursuant to the Indenture, constituting the legal, valid and binding obligation of such Applicable Issuer, enforceable against such Issuer in accordance with its terms and (B) all conditions precedent under this Indenture, if any, applicable to the issuance, authentication and delivery of such Notes, have been satisfied.

Section 3.2.    *Custodianship; Delivery of Collateral Obligations and Eligible Investments.*

(a)   The Servicer, on behalf of the Issuer, shall deliver or cause to be delivered to a custodian appointed by the Issuer, which shall be a Securities Intermediary (the "*Custodian*"), all Collateral in accordance with the definition of "Deliver." Initially, the Custodian shall be Investors Bank & Trust Company. Any successor custodian shall be a state or national bank or trust company that is not an Affiliate of the Issuer or the Co-Issuer, has a long-term debt rating of at least "BBB+" by S&P and has capital and surplus of at least U.S.$200,000,000 and is a Securities Intermediary. Subject to the limited right to relocate Pledged Obligations as provided in Section 7.5(b), the Trustee shall hold all Collateral Obligations, Eligible Investments, other assets purchased in accordance with this Indenture (other than Loans, Participations and general intangibles) and Cash in the relevant Account established and maintained pursuant to Article 10, as to which in each case the Trustee shall have entered into a securities account control agreement with the Custodian in accordance with Article 8 of the UCC providing, *inter alia*, that the establishment and maintenance of the Account shall be governed by the law of the State of New York.

(b)   Each time that the Issuer, or the Servicer on behalf of the Issuer, directs or causes the acquisition of any Collateral Obligation, Eligible Investment or other assets, the Servicer (on behalf of the Issuer) shall, if the Collateral Obligation, Eligible Investment or other asset is required to be, but has not already been, transferred to the relevant Account, cause the Collateral Obligation, Eligible Investment or other asset to be Delivered to the Custodian to be held in the Custodial Account (or in the case of any such asset that is not a Collateral Obligation, in the Account in which the funds used to purchase the asset are held in accordance with Article 10) for the benefit of the Trustee in accordance with this Indenture. The security interest of the Trustee in the funds or other property used in connection with the acquisition shall, immediately and without further action on the part of the Trustee, be released. The security interest of the Trustee shall nevertheless come into existence and continue in the Collateral Obligation, Eligible Investment or other asset so acquired, including all interests of the Issuer in to any contracts related to and proceeds of the Collateral Obligations, Eligible Investments or other assets.

99

Section 3.3.     ***Representations as to Collateral.***

(a)     The Issuer hereby represents and warrants to the Secured Parties as to the Collateral as follows (which representations are repeated on each day on which the Issuer acquires new Collateral):

(i)     This Indenture creates a valid and continuing security interest (as defined in the applicable Uniform Commercial Code) in the Collateral in favor of the Trustee, which security interest is prior to all other liens, charges, claims, security interests, mortgages and other encumbrances, and is enforceable as such as against creditors of and purchasers from the Issuer.

(ii)     Except for any Securities Lending Collateral and Synthetic Securities Collateral, the Issuer has good and marketable title to and is the owner of each item of Collateral free of any liens, claims, or encumbrances of any nature whatsoever except for liens (A) that are being released on the Closing Date and (B) granted pursuant to or permitted by this Indenture. The Issuer has a first priority security interest in all Securities Lending Collateral to secure all obligations of Securities Lending Counterparty under the Securities Lending Agreement and a first priority interest in all Synthetic Securities Collateral to secure all obligations of Synthetic Security Counterparty under the Synthetic Securities Agreement.

(iii)     The Issuer has not assigned, pledged or otherwise encumbered any interest in the Collateral (or, if any interest in the Collateral has been assigned, pledged or otherwise encumbered, it has been released before the Closing Date or is being released on the Closing Date) other than interests granted pursuant to or permitted by this Indenture.

(iv)     The Issuer has full right, and has received all consents and approvals required by the related Underlying Instruments, to grant a security interest in its rights in the Collateral to the Trustee.

(v)     Each Collateral Obligation included in the Collateral satisfied the requirements of the definition of "Collateral Obligation" as of the date the Issuer committed to purchase the same or, in the case of the Loans with respect to which loans were made by Pre-Closing Parties and repaid by the Issuer on the Closing Date, as of the Closing Date.

(vi)     All Collateral Obligations, any obligation that at the time of acquisition, conversion or exchange did not satisfy the requirements of a Collateral Obligation, and Eligible Investments (other than, in each case, "general intangibles" within the meaning of the applicable Uniform Commercial Code) have been and will have been credited to one of the Accounts. The securities intermediary for each Account has agreed to treat all assets credited to the Accounts as "financial assets" within the meaning of the applicable Uniform Commercial Code.

(vii)     The Issuer has pledged to the Trustee all of the Issuer's interest in each Collateral Obligation included in the Collateral pursuant to the Granting Clauses of this Indenture and has delivered each Collateral Obligation (including any promissory note and all its other Underlying Instruments to the extent received by the Issuer) to the Trustee or the Custodian as contemplated by Section 3.2.

(viii)     Each of the Collateral constitutes "general intangibles," "certificated securities," "instruments," "securities entitlements," "uncertificated securities," "chattel paper" or "securities accounts," each within the meaning of the applicable Uniform

100

Commercial Code, or any other category of collateral under the applicable Uniform Commercial Code as to which the Issuer has complied with its obligations under Section 3.3(b).

(ix)     The Issuer has caused (or will have caused within 10 days following the Closing Date) the filing of appropriate financing statements in the proper filing offices in the appropriate jurisdictions under applicable law to perfect the security interest in the portion of the Collateral pledged to the Trustee under this Indenture that may be perfected by the filing of financing statements.

(x)     The Issuer has not authorized the filing of and is not aware of any financing statements against the Issuer that include a description of collateral covering the Collateral other than any financing statement (A) relating to the security interest granted to the Trustee under this Indenture, (B) that has been terminated or (C) that names the Trustee as the secured party. On the date of this Indenture, the Issuer is not aware of any judgment or Pension Benefit Guaranty Corporation or tax lien filings against the Issuer.

(xi)     The Issuer has delivered to the Trustee a fully executed agreement pursuant to which the securities intermediary for each Account has agreed to comply with all instructions originated by the Trustee relating to the Account without further consent by the Issuer.

(xii)     All original executed copies of each "instrument" (as defined in each applicable Uniform Commercial Code) that are or evidence the Collateral have been delivered to the Custodian, to the extent received by the Issuer. The Issuer has received confirmation from the Custodian that the Custodian has credited the instruments to one of the Accounts. None of the instruments that are or evidence the Collateral has any marks or notations indicating that they are then pledged or otherwise assigned to any Person other than the Trustee.

(xiii)     The Accounts are not in the name of any Person other than the Issuer or the Trustee. The Issuer has not consented to the securities intermediary of any Account to comply with instructions of any Person other than the Trustee.

(xiv)     All "certificated securities" (as defined in each applicable Uniform Commercial Code) that are or evidence the Collateral have been delivered to the Custodian, to the extent received by the Issuer, registered in the name of the Custodian or indorsed to the Custodian. The Issuer has received confirmation from the Custodian that the Custodian has credited such certificated securities to one of the Accounts.

(xv)     The Issuer has caused all "uncertificated securities" (as defined in each applicable Uniform Commercial Code) that are or evidence the Collateral to be registered in the name of the Custodian.

(xvi)     Upon grant by the Issuer, the Trustee has a first priority perfected security interest in the Collateral.

The parties to this Indenture shall not waive any of the representations in this Section 3.3, unless the Rating Condition is satisfied in connection with such waiver. The Issuer shall provide each of the Rating Agencies with prompt written notice of any breach of the representations contained in this Section 3.3 upon becoming aware thereof, and shall not waive a breach of any of the representations in this Section 3.3, unless the Rating Condition is satisfied (as determined after

101

any adjustment or withdrawal of the ratings following notice of such breach) in connection with such waiver.

    If the Issuer acquires Collateral that is not "general intangibles," "certificated securities," "instruments," "securities accounts," "chattel paper," "securities entitlements" or "uncertificated securities," each within the meaning of the applicable Uniform Commercial Code, or another category of collateral under the applicable Uniform Commercial Code as to which the Issuer has complied with its obligations under this Section 3.3(b), then on or before the date on which the Issuer acquires the Collateral, the Issuer (or the Servicer on behalf of the Issuer) shall notify S&P and the Trustee (for the benefit of the Secured Parties) of its acquisition or intended acquisition of the Collateral and the Issuer shall represent to S&P and to the Trustee (for the benefit of the Secured Parties) as to the category of the Collateral under the applicable Uniform Commercial Code and shall make any further representations as to the perfection and priority of the security interest in the Collateral Granted under this Indenture acceptable to S&P.

# ARTICLE 4

## SATISFACTION AND DISCHARGE

Section 4.1.   *Satisfaction and Discharge of Indenture.*

    This Indenture shall be discharged and shall cease to be of further effect with respect to the Notes and the Collateral except as to:

    (i)  rights of registration of transfer and exchange,

    (ii)  substitution of mutilated, destroyed, lost or stolen Notes,

    (iii)  rights of Noteholders to receive payments of principal and interest on, or other amounts (including without limitation Extension Bonus Payments) owing in respect of, the Notes as provided in this Indenture,

    (iv)  the rights, indemnities, and immunities of the Trustee under this Indenture and the obligations of the Trustee under Section 7.3 of this Indenture with respect to the holding and paying of unclaimed funds,

    (v)  for so long as any Preference Shares remain Outstanding, any provisions hereof conferring any rights or remedies upon the Holders of the Preference Shares or the Preference Shares Paying Agent on behalf of the Holders of the Preference Shares, including but not limited to, the provisions of Articles 7, 8, 10, 11, 12, 14 and 15,

    (vi)  for so long as any Preference Shares remain Outstanding, the provisions of Articles 10, 11 and 12 relating to the acquisition, retention and disbursement of Collateral,

    (vi)  the rights, obligations, and immunities of the Servicer under this Indenture and under the Servicing Agreement, and

    (vii)  the rights of Noteholders as beneficiaries of this Indenture with respect to the property deposited with the Trustee and payable to any of them (and the Trustee, on demand of and at the expense of the Issuer, shall execute proper instruments acknowledging satisfaction and discharge of this Indenture),

when:

(a)     either:

(i)     all Notes theretofore authenticated and delivered to Holders of Notes (other than (A) Notes that have been destroyed, lost or stolen and which have been replaced or paid as provided in Section 2.7 and (B) Notes for whose payment money has theretofore irrevocably been deposited in trust and thereafter repaid to the Issuer or discharged from the trust, as provided in Section 7.3), have been delivered to the Trustee for cancellation; or

(ii)     all Notes not theretofore delivered to the Trustee for cancellation

(A)     have become payable, or

(B)     will become payable at their Stated Maturity within one year, or

(C)     are to be called for redemption pursuant to Article 9 under an arrangement satisfactory to the Trustee for the giving of notice of redemption by the Applicable Issuers pursuant to Section 9.3,

and the Issuer has irrevocably deposited with the Trustee, in trust for payment of the principal and interest on the Notes, Cash or non-callable obligations of the United States of America. The obligations deposited under Section 4.1(a)(ii) with respect to the other Notes must be entitled to the full faith and credit of the United States of America or be debt obligations that are rated "Aaa" by Moody's and "AAA" by S&P, in an amount sufficient, as verified by a firm of Independent certified public accountants that are nationally recognized, to pay and discharge the entire indebtedness on the Notes not theretofore delivered to the Trustee for cancellation, for principal and interest to the date of the deposit (in the case of Notes that have become payable), or to the respective Stated Maturity or the respective Redemption Date, as the case may be, and the Issuer shall have Granted to the Trustee a valid perfected security interest in the Eligible Investment that is of first priority, free of any adverse claim, and shall have furnished an Opinion of Counsel with respect thereto. Section 4.1(a)(ii) shall not apply if an election to act in accordance with Section 5.5(a) has been made and not rescinded. In addition, the Issuer shall cause delivery to the Trustee of a Tax Opinion of Counsel to the effect that the Noteholders would recognize no income, gain or loss for U.S. federal income tax purposes as a result of the deposit and satisfaction and discharge of this Indenture;

(b)     the Issuer has paid all other sums then payable under this Indenture by the Issuer and no other amounts are scheduled to be payable by the Issuer; and

(c)     the Co-Issuers have delivered to the Trustee Officer's certificates and an Opinion of Counsel, each stating that all conditions precedent in this Indenture provided for relating to the satisfaction and discharge of this Indenture have been complied with.

Notwithstanding the satisfaction and discharge of this Indenture, the rights and obligations of the Co-Issuers, the Trustee, the Servicer and, if applicable, the Noteholders, as the case may be, under Sections 2.8, 4.2, 5.4(d), 5.9, 5.18, 6.7, 6.8, 7.1, 7.3, 13.1 and 14.13 shall survive.

Section 4.2.     *Application of Trust Money.*

All monies deposited with the Trustee pursuant to Section 4.1 shall be held in trust for the Person entitled to it and applied by the Trustee in accordance with the Notes and this Indenture,

103

including the Priority of Payments, to the payment of principal and interest, either directly or through any Paying Agent, as the Trustee may determine. The money shall be held in a segregated non-interest bearing trust account identified as being held in trust for the benefit of the Secured Parties.

Section 4.3.     ***Repayment of Monies Held by Paying Agent.***

In connection with the satisfaction and discharge of this Indenture with respect to the Notes, all monies then held by any Paying Agent other than the Trustee under this Indenture shall, upon demand of the Co-Issuers, be paid to the Trustee to be held and applied pursuant to Section 7.3 and in accordance with the Priority of Payments and thereupon the Paying Agent shall be released from all further liability with respect to the monies.

# ARTICLE 5

## REMEDIES

Section 5.1.     ***Events of Default.***

"***Event of Default***," wherever used in this Indenture, means any one of the following events whatever the reason:

(a)     a default for four Business Days in the payment of any interest on the Class A Notes or the Class B Notes, or, if no Class A Notes or Class B Notes are Outstanding, a default in the payment of any interest on the Controlling Class, in each case, when it becomes payable (or in the case of a default in payment due to an administrative error or omission by the Trustee, the Irish Paying Agent or the Indenture Registrar, after seven Business Days);

(b)     a default in the payment of principal (including Deferred Interest) of any Note, when the same becomes payable, at its Stated Maturity or on the Redemption Date;

(c)     the failure on any Payment Date to disburse amounts available in the Payment Account in accordance with the Priority of Payments and the failure continues for three Business Days;

(d)     on any Measurement Date for so long as any Class A-1-A Notes, Class A-1-B Notes or Class B Notes are Outstanding, the Class A/B Overcollateralization Ratio is less than 100%;

(e)     either of the Co-Issuers or the pool of Collateral becomes an investment company under the Investment Company Act;

(f)     breach of any other covenant or other agreement of the Issuer or the Co-Issuer in this Indenture (other than any failure to satisfy any of the Collateral Quality Tests, any of the Concentration Limitations, any of the Coverage Tests, the Retention Overcollateralization Test, or other covenants or agreements for which a specific remedy has been provided in this Section 5.1) in any material respect, or the failure of any representation or warranty of the Issuer or the Co-Issuer in this Indenture or in any certificate or other writing delivered pursuant thereto, or in connection therewith, to be correct in any material respect when made, and the breach or failure continues for 30 days after either of the Co-Issuers has actual knowledge of it or after notice to the Issuer, the Co-Issuer, and the Servicer by the Trustee or to the Issuer, the Co-Issuer, the Servicer, and the Trustee by the Holders of at least 25% of the Aggregate Outstanding Amount of the Controlling Class by

104

registered or certified mail or overnight courier specifying the breach or failure and requiring it to be remedied and stating that the notice is a "Notice of Default" under this Indenture;

(g)    the entry of a decree or order by a court having competent jurisdiction adjudging the Issuer or the Co-Issuer as bankrupt or insolvent, or approving as properly filed a petition seeking reorganization, arrangement, adjustment, or composition of the Issuer or the Co-Issuer under the Bankruptcy Law or any other applicable law, or appointing a receiver, liquidator, assignee, or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, or ordering the winding up or liquidation of its affairs, and if the decree or order remains unstayed and in effect for 45 consecutive days;

(h)    the institution by the shareholders of the Issuer or the Co-Issuer of Proceedings to have the Issuer or Co-Issuer, as the case may be, adjudicated as bankrupt or insolvent, or the consent by the shareholders of the Issuer or the Co-Issuer to the institution of bankruptcy or insolvency Proceedings against the Issuer or Co-Issuer, or the filing by the Issuer or the Co-Issuer of a petition or answer or consent seeking reorganization or relief under the Bankruptcy Law or any other similar applicable law, or the consent by the Issuer or the Co-Issuer to the filing of any such petition or to the appointment of a receiver, liquidator, assignee, trustee, or sequestrator (or other similar official) of the Issuer or the Co-Issuer or of any substantial part of its property, or the making by the Issuer or the Co-Issuer of an assignment for the benefit of creditors, or the admission by the Issuer or the Co-Issuer in writing of its inability to pay its debts generally as they become due, or the taking of any action by the Issuer or the Co-Issuer in furtherance of any such action; or

(i)    one or more final judgments is rendered against the Issuer or the Co-Issuer that exceed in the aggregate U.S.$2,000,000 and that remain unstayed, undischarged, and unsatisfied for 30 days after the judgments become nonappealable, unless adequate funds have been reserved or set aside for their payment.

Section 5.2.    *Notice of Event of Default; Acceleration of Maturity; Rescission and Annulment.*

(a)    Upon the occurrence of an Event of Default, the Trustee shall give prompt (and in no event later than five Business Days after becoming aware of such event) notice thereof to the Noteholders.

(b)    If an Event of Default is continuing (other than an Event of Default specified in Section 5.1(e), (g) or (h)), the Trustee may, with consent of the Majority of the Controlling Class, and shall, upon the written direction of a Majority of the Controlling Class, declare the principal of all the Notes to be immediately payable by notice to the Applicable Issuers and the Noteholders, and upon that declaration the unpaid principal of all the Notes, together with all its accrued and unpaid interest (and any applicable Defaulted Interest Charge), and other amounts payable under this Indenture, shall become immediately payable. The Replacement Period shall terminate upon a declaration of acceleration (subject to re-commencement pursuant to Section 5.2(c)). If an Event of Default specified in Section 5.1(e), (g) or (h) occurs, all unpaid principal, together with all its accrued and unpaid interest (and any applicable Defaulted Interest Charge), of all the Notes, and other amounts payable under this Indenture, shall automatically become payable without any declaration or other act on the part of the Trustee or any Noteholder and the Replacement Period shall terminate automatically (subject to re-commencement pursuant to Section 5.2(c)).

(c)    At any time after the declaration of acceleration of maturity has been made and before a judgment or decree for payment of the money due has been obtained by the Trustee, a Majority of the Controlling Class by written notice to the Issuer, the Trustee and the Preference Shares Paying Agent may rescind the declaration and its consequences:

105

(i)     The Issuer or the Co-Issuer has paid or deposited with the Trustee a sum sufficient to pay:

(A)     all unpaid installments of interest and principal on the Notes then due;

(B)     to the extent that payment of the interest is lawful, interest on any Deferred Interest and Defaulted Interest at the Applicable Note Interest Rate or Default Interest Rate, as applicable;

(C)     all Administrative Expenses of the Co-Issuers and other sums paid or advanced by the Trustee under this Indenture;

(D)     all unpaid Senior Servicing Fees;

(E)     all amounts then payable to any Hedge Counterparty; and

(ii)     The Trustee has determined that all Events of Default, other than the non-payment of the interest on or principal of the Notes, have been (A) cured, and a Majority of the Controlling Class by written notice to the Trustee has agreed with that determination, or (B) waived as provided in Section 5.14.

No such rescission shall affect any subsequent Default or impair any right consequent thereon. The Issuer shall not terminate any Hedge Agreement at any time after a declaration of acceleration of Maturity of the Notes has been made, unless such declaration and its consequences may no longer be rescinded and annulled in accordance with this Section 5.2(c) and liquidation of the Collateral has begun.

If a declaration of acceleration is rescinded as described above:

(x)     the Replacement Period, if terminated by the declaration, shall re-commence on the date of the rescission (unless the Replacement Period would have otherwise terminated before that date pursuant to clauses (i), (ii), or (iii) of its definition); and

(y)     the Trustee shall retain the Collateral in accordance with this Indenture. If the retention of the Collateral is rescinded pursuant to Section 5.5, the Notes may again be accelerated pursuant to Section 5.2(b), notwithstanding any previous rescission of a declaration of acceleration pursuant to this Section 5.2(c).

No rescission shall affect any subsequent Default or impair any right resulting from the Default.

(d)     Notwithstanding anything in this Section 5.2 to the contrary, the Notes will not be subject to acceleration by the Trustee, a Majority of the Controlling Class or any other Holders solely as a result of the failure to pay any amount due on Notes that are not of the Controlling Class.

Section 5.3.     *Collection of Indebtedness and Suits for Enforcement by Trustee.*

The Applicable Issuers covenant that if a default occurs in the payment of any principal of or interest when payable on any Note, upon demand of the Trustee or the Holder of any affected Note, the Applicable Issuers shall pay to the Trustee, for the benefit of the Holder of the Note, the whole amount then payable on the Note for principal and interest with interest on the overdue principal and, to the extent that payments of the interest shall be legally enforceable, on overdue

106

installments of interest and all other amounts owing to the Noteholders under this Indenture, at the Applicable Note Interest Rate or Default Interest Rate, as applicable, and, in addition, an amount sufficient to cover the costs and expenses of collection, including the reasonable compensation, expenses, disbursements and advances of the Trustee and the Holders and their agents and counsel.

If the Issuer or the Co-Issuer fails to pay those amounts immediately on demand, the Trustee, in its own name and as Trustee of an express trust, may (after giving prior written notice to the Controlling Class and absent the Trustee having received a written direction to the contrary from the Controlling Class), and shall at the written direction of a Majority of the Controlling Class (subject to Section 6.3(e)), institute a Proceeding for the collection of the sums due, may prosecute the Proceeding to judgment or final decree, and may enforce the same against the Applicable Issuers or any other obligor on the Notes and collect the monies determined to be payable in the manner provided by law out of the Collateral.

If an Event of Default is continuing, the Trustee may (after giving prior written notice to the Controlling Class and absent the Trustee having received a written direction to the contrary from the Controlling Class), and shall upon written direction of a Majority of the Controlling Class (subject to Section 6.3(e)), proceed to protect and enforce its rights and the rights of the Noteholders by any appropriate Proceedings as is deemed most effective (if no direction is received by the Trustee) or as the Trustee may be directed by a Majority of the Controlling Class, to protect and enforce the rights of the Trustee and the Noteholders, whether for the specific enforcement of any agreement in this Indenture or in aid of the exercise of any power granted in this Indenture, or to enforce any other proper remedy or legal or equitable right vested in the Trustee by this Indenture or by law. The reasonable compensation, costs, expenses, disbursements and advances incurred or paid by the Trustee and its agents and counsel, in connection with such Proceeding, including, without limitation, the exercise of any remedies pursuant to Section 5.4, shall be reimbursed to the Trustee pursuant to Section 6.8.

If any Proceedings are pending relating to the Issuer or the Co-Issuer or any other obligor on the Notes under the Bankruptcy Law or any other applicable bankruptcy, insolvency or other similar law, or if a receiver, assignee, or trustee in bankruptcy or reorganization, liquidator, sequestrator or similar official has been appointed for or taken possession of the Issuer, the Co-Issuer or their respective property or any other obligor on the Notes or its property, or if any other comparable Proceedings are pending relating to the Issuer, the Co-Issuer or other obligor on the Notes, or the creditors or property of the Issuer, the Co-Issuer or other obligor on the Notes, the Trustee, regardless of whether the principal of any Notes is then payable by declaration or otherwise and regardless of whether the Trustee has made any demand pursuant to this Section 5.3, may, by intervention in the Proceedings or otherwise:

(a) file and prove claims for the whole amount of principal and interest owing and unpaid in respect of the Notes, and file any other papers or documents appropriate and take any other appropriate action (including sitting on a committee of creditors) to have the claims of the Trustee (including any claim for reasonable compensation to the Trustee and each predecessor Trustee, and their respective agents, attorneys, and counsel, and for reimbursement of all expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee, except as a result of negligence or bad faith) and of the Noteholders allowed in any Proceedings relating to the Issuer, the Co-Issuer, or other obligor on the Notes or to the creditors or property of the Issuer, the Co-Issuer or other obligor on the Notes;

(b) unless prohibited by applicable law, vote on behalf of the Noteholders in any election of a trustee or a standby trustee in arrangement, reorganization, liquidation or other bankruptcy or insolvency Proceedings or Person performing similar functions in comparable Proceedings; and

107

(c)     collect and receive any monies or other property payable to or deliverable on any such claims, and distribute all amounts received with respect to the claims of the Noteholders and of the Trustee on their behalf; and any trustee, receiver or liquidator, custodian or other similar official is authorized by each of the Noteholders to make payments to the Trustee, and, if the Trustee consents to making payments directly to the Noteholders, to pay to the Trustee amounts sufficient to cover reasonable compensation to the Trustee, each predecessor Trustee, and their respective agents, attorneys, and counsel, and all other reasonable expenses and liabilities incurred, and all advances made, by the Trustee and each predecessor Trustee except as a result of negligence or bad faith.

Nothing in this Indenture shall authorize the Trustee to authorize or consent to or vote for or accept or adopt on behalf of the Holder of any Note, any plan of reorganization, arrangement, adjustment or composition affecting the Notes or any Noteholder, or to authorize the Trustee to vote on the claim of the Holder of any Note in any Proceeding except, as aforesaid, to vote for the election of a trustee in bankruptcy or similar Person.

Notwithstanding anything in this Section 5.3 to the contrary, the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance of the sale or liquidation of the Collateral pursuant to this Section 5.3 except according to Section 5.5(a).

Section 5.4.     *Remedies.*

(a)     If an Event of Default is continuing, and the Notes have been declared payable and the declaration and its consequences have not been rescinded, or at any time after the Stated Maturity, the Co-Issuers agree that the Trustee may (after giving prior written notice to the Controlling Class and absent the Trustee having received a written direction to the contrary from the Controlling Class), and shall, upon written direction of a Majority of the Controlling Class (subject to Section 6.3(e)), to the extent permitted by applicable law, exercise one or more of the following rights:

(i)     institute Proceedings for the collection of all amounts then payable on the Notes or otherwise payable under this Indenture, whether by declaration or otherwise, enforce any judgment obtained, and collect from the Collateral any monies adjudged due;

(ii)     sell or liquidate all or a portion of the Collateral or interests in it, at one or more public or private sales called and conducted in any manner permitted by law and in accordance with Section 5.17;

(iii)     institute Proceedings from time to time for the complete or partial foreclosure of this Indenture with respect to the Collateral;

(iv)     exercise any remedies of a secured party under the UCC and take any other appropriate action to protect and enforce the rights of the Trustee and the Noteholders under this Indenture; and

(v)     exercise any other rights that may be available at law or in equity;

*except* that the Trustee may not sell or liquidate the Collateral or institute Proceedings in furtherance of the sale or liquidation of the Collateral pursuant to this Section 5.4 except according to Section 5.5(a).

(b)     If an Event of Default as described in Section 5.1(f) is continuing the Trustee may, with the consent of, and shall, at the direction of, the Holders of not less than 25% of the Aggregate Outstanding Amount of the Controlling Class, subject to Section 5.8, institute a Proceeding solely to

108

compel performance of the covenant or agreement or to cure the representation or warranty, the breach of which gave rise to the Event of Default under Section 5.1(f), and enforce any equitable decree or order arising from the Proceeding.

(c)     Upon any sale, whether made under the power of sale given under this Indenture or by virtue of judicial Proceedings, any Holders or the Servicer (subject to the Servicing Agreement) may bid for and purchase any part of the Collateral and, upon compliance with the terms of sale, may hold, retain, possess, or dispose of the Collateral in its or their own absolute right without accountability.

Upon any sale, whether made under the power of sale given under this Indenture or by virtue of judicial Proceedings, the receipt of the Trustee, or of the Officer making a sale under judicial Proceedings, shall be a sufficient discharge to the purchasers at any sale for their purchase money, and the purchasers shall not be obliged to see to its application.

Any sale, whether under any power of sale given under this Indenture or by virtue of judicial Proceedings, shall bind the Co-Issuers, the Trustee and the Noteholders, shall operate to divest all interest whatsoever, either at law or in equity, of each of them in the property sold, and shall be a perpetual bar, both at law and in equity, against each of them and their successors and assigns, and against all Persons claiming through or under them.

(d)     Notwithstanding any other provision of this Indenture, none of the Trustee, the Secured Parties or the Noteholders may, before the date that is one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes, institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium, or liquidation Proceedings, or other Proceedings under the Bankruptcy Law or any similar laws in any jurisdiction. Nothing in this Section 5.4 shall preclude the Trustee or any Secured Party (i) from taking any action before the expiration of that period in (A) any case or Proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer or (B) any involuntary insolvency Proceeding filed or commenced by a Person other than a Secured Party or (ii) from commencing against the Issuer or the Co-Issuer or any of its properties any legal action that is not a bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation Proceeding.

Section 5.5.     *Optional Retention of Collateral.*

(a)     Notwithstanding anything to the contrary in this Indenture, if an Event of Default is continuing, the Trustee shall retain the Collateral, collect, and cause the collection of the proceeds of the Collateral and make and apply all payments and deposits and maintain all accounts in respect of the Collateral and the Notes, and any Hedge Agreements (other than amounts received under a Hedge Agreement that are used in putting a Replacement Hedge in place), in accordance with the Priority of Payments and Article 10 and Article 12 unless:

(i)     the Trustee, in consultation with the Servicer, determines that the anticipated net proceeds of a sale or liquidation of the Collateral would be sufficient to discharge in full the amounts then due and unpaid on the Notes for principal and interest (including Defaulted Interest and Deferred Interest and any interest on the Defaulted Interest and Deferred Interest), all Administrative Expenses, all other amounts (if any) then payable to the Hedge Counterparty by the Issuer (including any applicable termination payments) net of all amounts then payable to the Issuer by the Hedge Counterparty and all other amounts then payable under clause (3) of Section 11.1(a)(i) and a Majority of the Controlling Class agrees with that determination; or

(ii)      the Holders of a Super Majority of each of the Class A-1-A Notes, the Class A-1-B Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes direct the sale and liquidation of the Collateral; or

(iii)     the Class A/B Overcollateralization Ratio is less than 90% and the Holders of a Majority of the Controlling Class direct the sale and liquidation of the Collateral; *provided* that upon such direction by the Controlling Class, the Trustee shall (x) first sell or liquidate any Collateral for which either (A) two or more bid-side prices have been determined by an Approved Pricing Service or (B) bid-side prices have been obtained from at least two nationally recognized broker-dealers selected by a Majority of the Controlling Class and (y) thereafter shall sell or liquidate such remaining Collateral to the extent such Collateral can be liquidated or sold in accordance with the Indenture and applicable law; provided that any Collateral consisting of equity securities or Defaulted Collateral Obligations shall not be subject to sale or liquidation pursuant to this clause (iii).

If any Collateral is sold in accordance with clause (a)(iii)(x) above and Highland Capital Management, L.P. is the Servicer, the Servicer shall have the exclusive right to purchase such Collateral for the first two Business Days from the date the last of such bid-prices was determined by an Approved Pricing Service or obtained from a nationally recognized broker-dealer selected by a Majority of the Controlling Class with respect to such Collateral at a price equal to the highest bid-price for such Collateral that was determined by an Approved Pricing Service or obtained from a nationally recognized broker-dealer selected by a Majority of the Controlling Class and, thereafter, the Trustee may sell such Collateral to other parties in accordance with the terms hereof; *provided* that, in any such case, such sale to the Servicer or to any other party is effected in compliance with applicable law, including all notice and other provisions under the UCC.

The Trustee shall give written notice of the retention of the Collateral to the Issuer with a copy to the Co-Issuer and the Servicer. So long as the Event of Default is continuing, any retention pursuant to this Section 5.5(a) may be rescinded at any time when the conditions specified in clause (i) or (ii) exist.

(b)     Nothing contained in Section 5.5(a) shall be construed to require the Trustee to sell the Collateral if the conditions in clause (i) or (ii) of Section 5.5(a) are not satisfied. Nothing contained in Section 5.5(a) shall be construed to require the Trustee to retain the Collateral if prohibited by applicable law.

(c)     In determining whether the condition specified in Section 5.5(a)(i) exists, the Trustee, in consultation with the Servicer, shall obtain bid prices with respect to each security contained in the Collateral from two nationally recognized dealers (or if there is only one market maker, that market maker and if there is no market maker, from a pricing service) selected and specified by the Servicer to the Trustee in writing, at the time making a market in those securities, and shall compute the anticipated proceeds of sale or liquidation on the basis of the lower of the bid prices for each security. In addition, for the purposes of determining issues relating to the valuation of the Collateral, the satisfaction of the conditions specified in this Indenture, the execution of a sale or liquidation of the Collateral, and the execution of a sale or other liquidation of the Collateral in connection with a determination whether the condition specified in Section 5.5(a)(i) exists, the Trustee may retain, at the Issuer's expense, and rely on an opinion of an Independent investment banking firm of national reputation, which may be either of the Initial Purchasers.

The Trustee shall deliver to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Noteholders, the Co-Issuers, the Servicer and the Hedge Counterparties a report stating the results of any determination required pursuant to Section 5.5(a)(i). The Trustee shall make the determinations required by Section 5.5(a)(i) after an Event of Default at the request of a Majority of the Controlling Class at any time during which the Trustee retains the

110

Collateral pursuant to Section 5.5(a). The Trustee shall obtain (at the Issuer's expense) a letter of a firm of Independent certified public accountants confirming the accuracy of each calculation made by the Trustee pursuant to Section 5.5(a)(i) and certifying their conformity to the requirements of this Indenture.

(d)     Notwithstanding anything in this Indenture to the contrary, the Trustee may not, and the Noteholders representing the requisite percentage of the Aggregate Outstanding Amount of the Notes specified in Section 5.4 or 5.5, may not instruct the Trustee to sell or liquidate or (except in connection with the concurrent execution of a Replacement Hedge) terminate any Hedge Agreement during the continuance of an Event of Default until all Collateral other than the Hedge Agreements has been sold or liquidated and its proceeds applied in accordance with this Indenture.

(e)     Collateral may not be sold or liquidated pursuant to Section 5.5(a)(i) after the last date on which the sale or liquidation is permitted under Section 5.5(a)(i) with respect to a determination made pursuant to Section 5.5(a)(i) (the last permitted date being determined by the Trustee under Section 5.5(a)(i)), unless a new determination is made in accordance with Section 5.5(a)(i) and the Collateral is sold or liquidated before the last sale date permitted in accordance with the new determination.

Section 5.6.     *Trustee May Enforce Claims Without Possession of Notes.*

All rights of action and claims under this Indenture or under any of the Notes may be prosecuted and enforced by the Trustee without the possession of any of the Notes or their production in any trial or other Proceeding relating to them, and any Proceeding instituted by the Trustee shall be brought in its own name as trustee of an express trust, and any recovery of judgment shall be applied as provided in Section 5.7.

In any Proceedings brought by the Trustee (and any Proceedings involving the interpretation of any provision of this Indenture to which the Trustee shall be a party) the Trustee shall be held to represent all the Noteholders.

Section 5.7.     *Application of Money Collected.*

Any money collected by the Trustee with respect to the Notes pursuant to this Article 5 and any money that may then be held or subsequently received by the Trustee with respect to the Notes under this Indenture shall be applied, subject to Section 13.1 and in accordance with Section 11.1, at the dates fixed by the Trustee.

Section 5.8.     *Limitation on Suits.*

No Holder of any Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture, or for the appointment of a receiver or trustee, or for any other remedy under this Indenture, unless:

(a)     the Holder has previously given to the Trustee written notice of an Event of Default;

(b)     the Holders of not less than 25% of the Aggregate Outstanding Amount of the Controlling Class shall have made written request to the Trustee to institute Proceedings with respect to the Event of Default in its own name as Trustee under this Indenture and the Holders have offered to the Trustee indemnity satisfactory to it against the expenses and liabilities to be incurred in compliance with the request;

111

(c)     the Trustee for 30 days after its receipt of the notice, request and offer of indemnity has failed to institute a Proceeding; and

(d)     no direction inconsistent with the written request has been given to the Trustee during the 30 day period by a Majority of the Controlling Class.

No Noteholder shall have any right in any manner whatsoever by virtue of, or by availing of, any provision of this Indenture to affect the rights of any other Noteholders of the same Class or to obtain or to seek to obtain priority or preference over any other Holders of Notes of the same Class or to enforce any right under this Indenture, except in the manner provided in this Indenture and for the equal and ratable benefit of all the Holders of Notes of the same Class subject to and in accordance with Section 13.1 and the Priority of Payments or Section 11.2, as the case may be.

If the Trustee receives conflicting or inconsistent requests and indemnity from two or more groups of Holders of the Controlling Class, each representing less than a Majority of the Controlling Class, the Trustee shall take the action requested by the Holders of the largest percentage in Aggregate Outstanding Amount of the Controlling Class, notwithstanding any other provisions of this Indenture but subject to Section 6.3(e).

Section 5.9.     *Unconditional Rights of Noteholders.*

Notwithstanding any provision of this Indenture other than this Section 5.9 and Sections 2.8(i), 5.4(d), and 13.1, the Holder of any Note shall have the right, which is absolute and unconditional, to receive payment of the principal of and interest on the Note as it comes due in accordance with the Priority of Payments and Section 13.1, and, subject to Section 5.8, to institute proceedings for the enforcement of any such payment, and that right shall not be impaired without the consent of the Holder. Noteholders ranking junior to Notes still Outstanding may not institute proceedings for the enforcement of any such payment until no Note ranking senior to their Note remains Outstanding, subject to Section 5.8, and shall not be impaired without the consent of any such Holder. For so long as any Notes are Outstanding, the Preference Shares Paying Agent shall not be entitled to any payment of any amount for payments to the Holders of the Preference Shares pursuant to the Preference Share Documents, to the extent legally permitted, on a claim against the Issuer unless there are sufficient funds to pay such amounts to the Preference Shares Paying Agent in accordance with the Priority of Payments.

Section 5.10.     *Restoration of Rights and Remedies.*

If the Trustee or the Holder of any Note has instituted any Proceeding to enforce any right under this Indenture and the Proceeding has been discontinued or abandoned for any reason, or has been determined adversely to the Trustee or to the Holder, then, subject to any determination in the Proceeding, the Co-Issuers, the Trustee and the Holder shall be restored to their former positions under this Indenture, and thereafter all rights of the Trustee and the Holder shall continue as though no Proceeding had been instituted.

Section 5.11.     *Rights and Remedies Cumulative.*

No right in this Indenture conferred on or reserved to the Trustee or to the Noteholders is intended to be exclusive of any other right, and every right shall, to the extent permitted by law, be cumulative and in addition to every other right given under this Indenture or now or hereafter existing at law or in equity or otherwise. The assertion or employment of any right under this Indenture, or otherwise, shall not prevent the concurrent assertion or employment of any other appropriate right.

112

Section 5.12.    *Delay or Omission Not Waiver.*

No delay or omission of the Trustee or the Holder of any Note to exercise any right accruing upon any Event of Default shall impair the right or be a waiver of the Event of Default or an acquiescence in it or of a subsequent Event of Default. Every right given by this Article 5 or by law to the Trustee or to the Noteholders may be exercised from time to time, and as often as deemed expedient, by the Trustee or by the applicable Noteholders.

Section 5.13.    *Control by Majority of the Controlling Class.*

(a)    Notwithstanding any other provision of this Indenture, during the continuance of an Event of Default, a Majority of the Controlling Class may institute and direct the time, method and place of conducting any Proceeding for any remedy available to the Trustee, or exercising any right of the Trustee with respect to the Notes if:

(i)    the direction does not conflict with any rule of law or with any express provision of this Indenture; and

(ii)    the Trustee has been indemnified to its reasonable satisfaction (and the Trustee need not take any action that it determines might involve it in liability unless it has received an indemnity against the liability).

Notwithstanding the foregoing, only a Majority of the Controlling Class may direct proceedings with respect to remedies specified in Section 5.4(a) or otherwise with respect to the Collateral.

(b)    The Trustee may take any other action deemed proper by the Trustee that is not inconsistent with a direction under Section 5.13(a). Subject to Section 6.1, the Trustee need not take any action that it determines might involve it in liability or expense (unless the Trustee has received an indemnity against the liabilities and expenses reasonably satisfactory to it) and during the continuance of an Event of Default that has not been cured, or waived, the Trustee shall, before receiving directions from a Majority of the Controlling Class, exercise the rights expressly vested in it by this Indenture and use the same degree of care and skill in their exercise with respect to the Event of Default as is required by Section 6.1(b).

(c)    Any direction to the Trustee to undertake a Sale of the Collateral shall be in accordance with Section 5.4 or 5.5.

Section 5.14.    *Waiver of Past Defaults.*

Before a judgment or decree for payment of any money due has been obtained by the Trustee, as provided in this Article 5, a Majority of the Controlling Class may on behalf of the Holders of all the Notes, with respect to the Notes waive any past Default and its consequences, except a Default:

(a)    in the payment of the principal or Redemption Price of any Note or in the payment of interest (including Defaulted Interest, Deferred Interest, and any interest on Defaulted Interest or Deferred Interest) on the Notes;

(b)    with respect to a provision of this Indenture that under Section 8.2 cannot be modified or amended without the waiver or consent of the Holder of each Outstanding Note adversely affected by the modification or amendment;

113

(c)     in the payment of amounts due to the Servicer, the Trustee or the Hedge Counterparty, which may only be waived with the consent of the affected party; or

(d)     arising as a result of an Event of Default described in Section 5.1(e), (g) or (h).

Upon any such waiver, the Default shall cease to exist, and any Event of Default arising from it shall be cured, for every purpose of this Indenture, but no such waiver shall extend to any subsequent or other Default or impair any right consequent thereto. The Trustee shall promptly give written notice of any such waiver to the Servicer, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and each Noteholder.

Section 5.15.     *Undertaking for Costs.*

All parties to this Indenture agree, and each Holder of any Note by its acceptance of its Note agrees, that in any suit for the enforcement of any right under this Indenture, or in any suit against the Trustee or the Servicer for any action taken or omitted by it as Trustee or for any action taken or omitted by the Servicer, as applicable, any court may in its discretion require the filing by any party litigant in the suit of an undertaking to pay the costs of the suit, and that the court may in its discretion assess reasonable costs, including reasonable attorneys' fees, against any party litigant in the suit, having due regard to the merits and good faith of the claims or defenses made by the party litigant. This Section 5.15 shall not apply to any suit instituted by the Trustee or the Servicer, to any suit instituted by any Holder, or group of Holders, of Notes holding in the aggregate more than 10% in Aggregate Outstanding Amount of the Controlling Class, or to any suit instituted by any Noteholder for the enforcement of the payment of the principal of or interest on any Note or any other amount payable under this Indenture after the applicable Stated Maturity (or, in the case of redemption, after the applicable Redemption Date).

Section 5.16.     *Waiver of Stay or Extension Laws.*

To the extent that they may lawfully do so, the Co-Issuers covenant that they will not at any time insist on, or plead, or in any manner whatsoever claim or take the benefit or advantage of, any stay or extension law or any valuation, appraisement, redemption, or marshalling law or rights, in each case wherever enacted, now or at any time hereafter in force, that may affect the covenants, the performance of, or any remedies under this Indenture. To the extent that they may lawfully do so, the Co-Issuers expressly waive all benefit or advantage of any such law or rights, and covenant that they shall not delay or impede the execution of any power in this Indenture granted to the Trustee or the Noteholders but will permit the execution of every power as though the law had not been enacted or rights created.

Section 5.17.     *Sale of Collateral.*

(a)     The power to effect any sale (a "*Sale*") of any portion of the Collateral pursuant to Sections 5.4 and 5.5 shall not be exhausted by any one or more Sales as to any portion of the Collateral remaining unsold, but shall continue unimpaired until the entire Collateral is sold or all amounts secured by the Collateral have been paid. The Trustee may upon notice to the Noteholders and the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), and shall, at the direction of a Majority of the Controlling Class with respect to Collateral, from time to time postpone any Sale by public announcement made at the time and place of the Sale. The Trustee waives its rights to any amount fixed by law as compensation for any Sale. The Trustee may deduct the reasonable expenses (including the reasonable fees and expenses of its agents and attorneys) incurred by it in connection with a Sale from its proceeds notwithstanding Section 6.8.

114

(b)     The Trustee may bid for and acquire any portion of the Collateral in connection with a public Sale of the Collateral, and may pay all or part of the purchase price by crediting against amounts owing on the Notes or other amounts secured by the Collateral all or part of the net proceeds of the Sale after deducting the reasonable expenses incurred by the Trustee in connection with the Sale notwithstanding Section 6.8. The Notes need not be produced to complete any Sale, or for the net proceeds of the Sale to be credited against amounts owing on the Notes. The Trustee may hold, lease, operate, manage or otherwise deal with any property so acquired in any manner permitted by law in accordance with this Indenture.

(c)     If any portion of the Collateral consists of securities issued without registration under the Securities Act ("*Unregistered Securities*"), the Trustee may seek an Opinion of Counsel, or, if no Opinion of Counsel can be obtained, seek a no action position from the Securities and Exchange Commission or any other relevant federal or state regulatory authorities, regarding the legality of a public or private Sale of the Unregistered Securities.

(d)     The Trustee shall execute and deliver an appropriate instrument of transfer transferring its interest in any portion of the Collateral in connection with its Sale. In addition, the Trustee is irrevocably appointed the agent and attorney-in-fact of the Issuer to transfer its interest in any portion of the Collateral in connection with its Sale, and to take all action necessary to effect the Sale. No purchaser or transferee at a Sale shall be bound to ascertain the Trustee's authority, to inquire into the satisfaction of any conditions precedent, or see to the application of any monies.

Section 5.18.     *Action on the Notes.*

The Trustee's right to seek and recover judgment on the Notes or under this Indenture shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Indenture. Neither the lien of this Indenture nor any rights or remedies of the Trustee or the Noteholders shall be impaired by the recovery of any judgment by the Trustee against the Issuer or by the levy of any execution under the judgment on any portion of the Collateral or on any of the assets of the Issuer or the Co-Issuer.

## ARTICLE 6

### THE TRUSTEE

Section 6.1.     *Certain Duties and Responsibilities.*

(a)     Except during the continuance of an Event of Default known to the Trustee:

(i)     the Trustee undertakes to perform the duties and only the duties specifically provided in this Indenture, and no implied covenants or obligations shall be read into this Indenture against the Trustee; and

(ii)     in the absence of bad faith on its part, the Trustee may conclusively rely, as to the truth of the statements and the correctness of the opinions expressed therein, on certificates or opinions furnished to the Trustee and conforming to the requirements of this Indenture; the Trustee shall examine any certificates or opinions that by any provision of this Indenture are specifically required to be furnished to the Trustee to determine whether or not they substantially conform on their face to the requirements of this Indenture and shall promptly notify the party delivering the same if the certificate or opinion does not conform. If a corrected form has not been delivered to the Trustee within 15 days after the

115

notice from the Trustee, the Trustee shall so notify the Noteholders and the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares).

(b) If the Trustee has actual knowledge that an Event of Default is continuing, the Trustee shall, before the receipt of directions from a Majority of the Controlling Class, exercise the rights and powers vested in it by this Indenture, and use the same degree of care and skill in its exercise, as a prudent Person would use under the circumstances in the conduct of the Person's own affairs.

(c) No provision of this Indenture shall be construed to relieve the Trustee from liability for its own negligent action, its own negligent failure to act or its own willful misconduct, except that:

(i) this subsection shall not be construed to limit the effect of subsection (a) of this Section 6.1;

(ii) the Trustee shall not be liable for any error of judgment made in good faith by a Trust Officer, unless it is proven that the Trustee was negligent in ascertaining the pertinent facts;

(iii) the Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Issuer or the Co-Issuer or the Servicer in accordance with this Indenture or a Majority (or the other percentage required or permitted by this Indenture) of the Controlling Class (or other Class if required or permitted by this Indenture) relating to the time, method, and place of conducting any Proceeding for any remedy available to the Trustee, or exercising any trust or power conferred on the Trustee, under this Indenture; and

(iv) no provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties under this Indenture, or in the exercise of any of its rights contemplated under this Indenture, if it has reasonable grounds for believing that repayment of the funds or indemnity satisfactory to it against the risk or liability is not reasonably assured to it; provided that the reasonable costs of performing its ordinary services under this Indenture shall not be deemed a "financial liability" for purposes hereof.

(d) For all purposes under this Indenture, the Trustee shall not have notice or knowledge of any Event of Default described in Section 5.1(d) through 5.1(i) or any Default described in Section 5.1(e) through 5.1(i) unless a Trust Officer assigned to and working in the Corporate Trust Office has actual knowledge of it or unless written notice of any event that is in fact the an Event of Default or Default is received by the Trustee at the Corporate Trust Office, and the notice references the Notes generally, the Issuer, the Co-Issuer, the Collateral or this Indenture. For purposes of determining the Trustee's responsibility and liability under this Indenture, whenever reference is made in this Indenture to an Event of Default or a Default, the reference shall be construed to refer only to an Event of Default or Default of which the Trustee has notice as described in this Section 6.1.

(e) Whether or not therein expressly so provided, every provision of this Indenture relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to this Section 6.1 and Section 6.3.

116

Section 6.2.    *Notice of Default.*

Promptly (and in no event later than five Business Days) after the occurrence of any Default known to the Trustee or after any declaration of acceleration has been made or delivered to the Trustee pursuant to Section 5.2, the Trustee shall transmit notice of all Defaults under this Indenture known to the Trustee, unless the Default has been cured or waived, and of the declaration by mail to the Servicer and the Co-Issuers, each Rating Agency, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and to all Noteholders, as their names and addresses appear on the Indenture Register, the Irish Stock Exchange, for so long as any Class of Senior Notes is listed on the Irish Stock Exchange and so long as the rules of the exchange so require, and, upon written request therefor by a Beneficial Owner in the form of Exhibit H certifying that it is a Beneficial Owner, to the Beneficial Owner (or its designee).

Section 6.3.    *Certain Rights of Trustee.*

Except as otherwise provided in Section 6.1:

(a)    the Trustee may rely and shall be protected in acting or refraining from acting on any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, note, or other paper or document (including but not limited to any reports prepared and delivered under Article 10) believed by it to be genuine and to have been signed or presented by the proper party or parties;

(b)    any request or direction of the Issuer or the Co-Issuer mentioned in this Indenture shall be sufficiently evidenced by an Issuer Request or Issuer Order;

(c)    whenever in the administration of this Indenture the Trustee

(i)    deems it desirable that a matter be proved or established before taking, suffering, or omitting any action under this Indenture, the Trustee may, in the absence of bad faith on its part, rely on an Officer's certificate (unless other evidence is specifically prescribed in this Indenture) or

(ii)    is required to determine the value of, or any other matter with respect to, any Collateral or funds under this Indenture or the cash flows projected to be received therefrom, the Trustee may, in the absence of bad faith on its part, rely on reports of nationally recognized accountants, investment bankers or other persons qualified to provide the information required to make the determination, including nationally recognized dealers in securities of the type being valued and securities quotation services;

(d)    as a condition to taking or omitting to take any action under this Indenture, the Trustee may consult with counsel and the advice of the counsel or any Opinion of Counsel shall be full and complete authorization and protection with respect to any action taken or omitted by it under this Indenture in good faith and in reliance thereon;

(e)    the Trustee need not exercise any of the rights or powers vested in it by this Indenture at the request or direction of any of the Noteholders pursuant to this Indenture, unless the Holders have offered to the Trustee security or indemnity satisfactory to it against the costs and liabilities that might reasonably be incurred by it in compliance with the request or direction;

(f)    the Trustee need not make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, note or other paper or document, but the Trustee, in its discretion, may, and upon the written

117

direction of a Majority of the Controlling Class, subject to Section 6.3(e), shall, make any the further inquiry or investigation into the facts or matters that it deems appropriate or as it is directed, and the Trustee shall be entitled, on reasonable prior notice to the Co-Issuers and the Servicer, to examine the books and records relating to the Notes, the Collateral, personally or by agent or attorney, during the Co-Issuers' or the Servicer's normal business hours. The Trustee shall, and shall cause its agents to, hold in confidence all such information, except to the extent (i) disclosure may be required by law by any regulatory or administrative authority and (ii) that the Trustee, in its sole judgment, determines that disclosure is consistent with its obligations under this Indenture; provided, however, that the Trustee may disclose on a confidential basis any such information to its agents, attorneys and auditors in connection with the performance of its responsibilities hereunder;

(g)     the Trustee may execute any of the trusts or powers under this Indenture or perform any duties under this Indenture either directly or by or through agents or attorneys, and the Trustee shall not be responsible for any misconduct or negligence on the part of any non-Affiliated agent, or non-Affiliated attorney, appointed with due care by it under this Indenture;

(h)     the Trustee shall not be liable for any action it takes or omits to take in good faith that it reasonably believes to be authorized or within its rights or powers under this Indenture;

(i)     nothing in this Indenture shall be construed to impose an obligation on the Trustee to recalculate, evaluate, or verify any report, certificate or information received from the Issuer or Servicer;

(j)     the Trustee may request and receive (and rely on) instruction from the Issuer, the Servicer, or the accountants identified in the Accountants' Certificate (and in the absence of its receipt of timely instruction from them, may obtain from an Independent accountant at the expense of the Issuer) as to the application of GAAP to the extent any defined term in this Indenture, or any calculation required to be made or determined by the Trustee under this Indenture, is dependent on or defined by reference to United States generally accepted accounting principles (**"GAAP"**), in any instance;

(k)     the permissive rights of the Trustee to take or refrain from taking any actions enumerated in this Indenture are not duties;

(l)     the Trustee is not responsible for the accuracy of the books and records of, or for any acts or omissions of, the Depository, any Transfer Agent, Custodian, Securities Intermediary, Collateral Administrator, Clearstream, Euroclear, Calculation Agent or any Paying Agent (in each case, other than the Bank acting in that capacity);

(m)     in purchasing or disposing of any asset permitted by this Indenture, the Trustee is authorized to deal with itself (in its individual capacity) or with any one or more of its Affiliates, whether it or the Affiliate is acting as a subagent of the Trustee or for any third Person or dealing as principal for its own account. If otherwise qualified, obligations of the Bank or any of its Affiliates shall qualify as Eligible Investments under this Indenture; and

(n)     if the Bank is also acting in the capacity of Paying Agent, Transfer Agent, Custodian, Calculation Agent or Securities Intermediary under this Indenture, the rights protections, immunities, and indemnities afforded to the Trustee pursuant to this Article 6 shall also be afforded to the Bank acting in those capacities.

Section 6.4. ***Not Responsible for Recitals or Issuance of the Notes.***

The recitals contained in this Indenture and in the Notes, other than the Certificate of Authentication, shall be taken as the statements of the Applicable Issuers. The Trustee assumes no responsibility for their correctness. The Trustee makes no representation as to the validity or sufficiency of this Indenture (except as may be made with respect to the validity of the Trustee's obligations under this Indenture), the Collateral or the Notes. The Trustee shall not be accountable for the use or application by the Co-Issuers of the Notes or their proceeds or any money paid to the Co-Issuers pursuant to this Indenture.

Section 6.5. ***May Hold Notes.***

(a) The Trustee, any Paying Agent, Indenture Registrar or any other agent of the Co-Issuers, in its individual or any other capacity, may become the owner or pledgee of Notes and may otherwise deal with the Co-Issuers or any of their Affiliates with the same rights it would have if it were not Trustee, Paying Agent, Indenture Registrar or other agent.

Section 6.6. ***Acquisition of Class E Notes and Preference Shares.***

The Trustee, in its individual or any other capacity, agrees that after the initial distribution of the Class E Notes and the Preference Shares, neither the Trustee nor any of its affiliates (as defined in the Plan Asset Regulation) will acquire any Class E Notes or Preference Shares (including pursuant to a Maturity Extension, a Refinancing and the Amendment Buy-Out Option) unless such acquisition would not, as determined by the Trustee in reliance on representations made in the applicable transfer certificates with respect thereto, result in persons that have represented that they are Benefit Plan Investors owning 25% or more of the aggregate outstanding amount of any of the Class E Notes, the Class I Preference Shares or the Class II Preference Shares immediately after such acquisition (determined in accordance with Section 3(42) of ERISA, this Indenture and the Preference Share Documents). Any Class E Notes or Preference Shares held as principal by the Trustee or any of its affiliates shall be disregarded and shall not be treated as outstanding for purposes of determining compliance with such 25% limitation to the extent that such person has represented that it is not a Benefit Plan Investor.

Section 6.7. ***Money Held in Trust.***

Money held by the Trustee under this Indenture shall be held in trust to the extent required in this Indenture. The Trustee shall be under no liability for interest on any money received by it under this Indenture except as otherwise agreed on with the Issuer and except to the extent of income or other gain on assets that are deposits in or certificates of deposit of the Bank in its commercial capacity and income or other gain on assets actually received by the Trustee on Eligible Investments. Under no circumstances shall the Trustee be responsible for any losses on assets purchased in accordance with an Issuer Order or a written order or request by the Servicer, unless such asset is purchased in an obligation of the Trustee in its corporate capacity.

Section 6.8. ***Compensation and Reimbursement.***

(a) The Issuer agrees:

(i) to pay the Trustee on each Payment Date reasonable compensation for all services rendered by it under this Indenture in accordance with its letter agreement with the Trustee (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust);

119

(ii)     except as otherwise expressly provided in this Indenture or in its letter agreement with the Trustee, to reimburse the Trustee in a timely manner upon its request for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with this Indenture (including securities transaction charges and the reasonable compensation and expenses and disbursements of its agents and legal counsel and of any accounting firm or investment banking firm employed by the Trustee pursuant to Section 5.4, 5.5, 10.5 or 10.7, except any such expense, disbursement or advance attributable to its negligence, willful misconduct or bad faith) but with respect to securities transaction charges, only to the extent they have not been waived during a Due Period due to the Trustee's receipt of a payment from a financial institution with respect to certain Eligible Investments, as specified by the Servicer;

(iii)     to indemnify the Trustee and its officers, directors, employees and agents for any loss, liability or expense  (including reasonable attorney's fees and costs) incurred without negligence, willful misconduct or bad faith on their part, arising out of or in connection with the acceptance or administration of this trust, including the costs and expenses of defending themselves against any claim or liability in connection with the exercise or performance of any of their powers or duties under this Indenture; and

(iv)     to pay the Trustee reasonable additional compensation together with its expenses (including reasonable counsel fees and costs) for any collection action taken pursuant to Section 6.14.

(b)     The Trustee shall receive amounts pursuant to this Section 6.8 as provided in Sections 11.1(a)(i) and (ii) but only to the extent that funds are available for their payment. Subject to Section 6.10, the Trustee shall continue to serve as Trustee under this Indenture notwithstanding the fact that the Trustee has not received amounts due to it under this Indenture. No direction by the Noteholders shall affect the right of the Trustee to collect amounts owed to it under this Indenture. If on any date when a fee is payable to the Trustee pursuant to this Indenture insufficient funds are available for its payment any portion of a fee not so paid shall be deferred and payable on the next date on which a fee is payable and sufficient funds are available for it.

(c)     The Trustee agrees not to cause the filing of a petition in bankruptcy for the non-payment to the Trustee of any amounts provided by this Section 6.8 until at least one year and one day, or if longer the applicable preference period then in effect plus one day, after the payment in full of all Notes issued under this Indenture and the payment to the Preference Shares Paying Agent of all amounts payable with respect to the Preference Shares in accordance with the Priority of Payments. Nothing in this Section 6.8(c) shall prohibit or otherwise prevent the Trustee from filing proofs of claim in any bankruptcy, insolvency or similar proceeding.

Section 6.9.     *Corporate Trustee Required; Eligibility.*

There shall at all times be a Trustee under this Indenture that is an Independent "bank" (within the meaning of the Investment Company Act) organized and doing business under the laws of the United States of America or of any state of the United States, authorized under those laws to exercise corporate trust powers, having a combined capital and surplus of at least U.S.$200,000,000, subject to supervision or examination by federal or state banking authority, having a rating of at least "Baa1" (and not on credit watch with negative implications) by Moody's and at least "BBB+" by S&P, and having an office within the United States. In addition, the Trustee shall not be "affiliated" (within the meaning of Rule 405 under the Securities Act) with either of the Co-Issuers or any person involved in the organization or operation of either of the Co-Issuers and shall not provide credit or credit enhancement to either of the Co-Issuers; *provided* that the requirements of the preceding sentence shall be met if (a) the Trustee is not "affiliated" (as defined in the preceding

120

sentence) with the Issuer, the Co-Issuer, the Administrator or the Share Registrar, (b) neither the Trustee nor the Issuer has actual knowledge, or has received written notice, that the Trustee is "affiliated" (as defined in the preceding sentence) with any person involved with the organization or operation of either of the Co-Issuers, and (c) the Trustee has not provided and does not provide credit or credit enhancement to either of the Co-Issuers. For purposes of the preceding clause (b), (i) the "actual knowledge" of the Trustee shall mean (x) its knowledge of those persons who have been expressly identified in writing to it by either or both of the Co-Issuers, or the Servicer on their behalf or (y) any persons otherwise actually known to a Responsible Officer of the Trustee, in either case, to be a person involved with the organization or operation either of the Co-Issuers, without any duty of independent inquiry or investigation on the part of the Trustee, and (ii) unless and except to the extent it has been otherwise expressly notified in writing by the Issuer , or the Servicer on its behalf , the Trustee shall be entitled to presume that the Issuer has no knowledge of such an affiliation. If the Trustee publishes reports of condition at least annually, pursuant to law or to the requirements of its supervising or examining authority, then for the purposes of this Section 6.9, the combined capital and surplus of the Trustee shall be its combined capital and surplus in its most recent published report of condition. If at any time the Trustee ceases to be eligible in accordance with this Section 6.9, it shall resign immediately in the manner and with the effect specified in Section 6.10.

Section 6.10.   ***Resignation and Removal; Appointment of Successor.***

(a)     No resignation or removal of the Trustee and no appointment of a successor Trustee pursuant to this Article 6 shall become effective until the acceptance of appointment by the successor Trustee under Section 6.11. The indemnification in favor of the Trustee shall survive any resignation or removal of the Trustee.

(b)     The Trustee may resign at any time by giving not less than 30 days' written notice to the Co-Issuers, the Servicer, the Noteholders, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and each Rating Agency. Upon receiving the notice of resignation, the Co-Issuers shall by Board Resolution (or, if an Event of Default shall have occurred and be continuing, at the direction of a Majority of the Controlling Class) promptly appoint a successor trustee satisfying the requirements of Section 6.9, by written instrument, in duplicate, executed by an Authorized Officer of the Issuer and an Authorized Officer of the Co-Issuer, one copy of which shall be delivered to the resigning Trustee and one copy to the successor Trustee, together with a copy to each Noteholder, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and the Servicer. If no successor Trustee has been appointed and an instrument of acceptance by a successor Trustee has not been delivered to the Trustee within 60 days after the giving of the notice of resignation, the resigning Trustee or any Noteholder, on behalf of himself and all others similarly situated, may petition any court of competent jurisdiction for the appointment of a successor Trustee satisfying the requirements of Section 6.9.

(c)     The Trustee may be removed (i) at any time by the Co-Issuers as directed by Board Resolution (or, if an Event of Default shall have occurred and be continuing, by an Act of a Majority of the Controlling Class) or (ii) by order of a court of competent jurisdiction, delivered to the Trustee and to the Co-Issuers.

(d)     If at any time:

(i)     the Trustee ceases to be eligible under Section 6.9 and fails to resign after written request by the Co-Issuers or a Majority of the Controlling Class; or

(ii)     the Trustee becomes incapable of acting or is adjudged bankrupt or insolvent or a receiver or liquidator of the Trustee or of its property appointed or any public

121

> officer takes charge or control of the Trustee or of its property or affairs for the purpose of rehabilitation, conservation or liquidation,

then, in any such case (subject to Section 6.10(a)), (A) the Co-Issuers, by Issuer Order (as directed by Board Resolution), may, and at the direction of a Majority of the Controlling Class shall, remove the Trustee or (B) subject to Section 5.15, or any Holder may, on behalf of itself and all others similarly situated, petition any court of competent jurisdiction for the removal of the Trustee and the appointment of a successor Trustee.

(e)     If the Trustee is removed or becomes incapable of acting, or if a vacancy occurs in the office of the Trustee for any reason (other than resignation), the Co-Issuers, by Issuer Order (as directed by Board Resolution) or at the direction of a Majority of the Controlling Class, shall promptly appoint a successor Trustee. If the Co-Issuers fail to appoint a successor Trustee within 60 days after the removal or incapability or the occurrence of the vacancy, a successor Trustee may be appointed by a Majority of the Controlling Class by written instrument delivered to the Issuer and the retiring Trustee. The successor Trustee so appointed shall, upon its acceptance of its appointment, become the successor Trustee and supersede any successor Trustee proposed by the Co-Issuers. If no successor Trustee has been so appointed by the Co-Issuers or a Majority of the Controlling Class and accepted appointment pursuant to Section 6.11, subject to Section 5.15, then the Trustee to be replaced, or any Holder, may, on behalf of himself and all others similarly situated, petition any court of competent jurisdiction for the appointment of a successor Trustee.

(f)     The Co-Issuers shall give prompt notice of each resignation and each removal of the Trustee and each appointment of a successor Trustee by mailing written notice of the event by first-class mail, postage prepaid, to the Servicer, to each Rating Agency, to the Noteholders as their names and addresses appear in the Indenture Register and to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares). Each notice shall include the name of the successor Trustee and the address of its Corporate Trust Office. If the Co-Issuers fail to mail the notice within 10 days after acceptance of appointment by the successor Trustee, the successor Trustee shall cause the notice to be given at the expense of the Co-Issuers.

Section 6.11.     *Acceptance of Appointment by Successor.*

Every successor Trustee appointed under this Indenture shall execute, acknowledge, and deliver to the Co-Issuers and the retiring Trustee an instrument accepting its appointment. Upon delivery of the required instruments, the resignation or removal of the retiring Trustee shall become effective and the successor Trustee, without any further act, shall become vested with all the rights and obligations of the retiring Trustee; but, on request of the Co-Issuers or a Majority of any Class of Notes or the successor Trustee, the retiring Trustee shall, upon payment of any amounts then due to it, execute and deliver an instrument transferring to the successor Trustee all the rights and obligations of the retiring Trustee, and shall duly assign, transfer and deliver to the successor Trustee all property and money held by the retiring Trustee under this Indenture. Upon request of any successor Trustee, the Co-Issuers shall execute any instruments to more fully and certainly vest in and confirm to the successor Trustee all the rights and obligations of the Trustee under this Indenture.

No successor Trustee shall accept its appointment unless at the time of its acceptance the successor is qualified and eligible under Section 6.9 and either (a) each Rating Agency has been notified and the successor has long-term debt rated within the four highest rating categories by each Rating Agency, or (b) if not rated within the four highest categories by each Rating Agency, the Rating Condition with respect to each Rating Agency is satisfied with respect thereto.

NY\1257964.27

Section 6.12. *Merger, Conversion, Consolidation, or Succession to Business of Trustee.*

Any entity into which the Trustee may be merged or converted or with which it may be consolidated, or any entity resulting from any merger, conversion or consolidation to which the Trustee is a party, or any entity succeeding to all or substantially all of the corporate trust business of the Trustee, shall be the successor of the Trustee under this Indenture (and of the Bank under all of its other capacities under this Indenture, including as Custodian, Securities Intermediary, Indenture Registrar and Paying Agent) without the execution or filing of any paper or any further act on the part of any of the parties hereto. If any of the Notes have been authenticated, but not delivered, by the Trustee then in office, any successor by merger, conversion or consolidation to the authenticating Trustee may adopt the authentication and deliver the Notes so authenticated with the same effect as if the successor Trustee had itself authenticated the Notes.

Section 6.13. *Co-Trustees.*

At any time, to meet the legal requirements of any jurisdiction in which any part of the Collateral may at the time be located, the Co-Issuers and the Trustee may appoint a co-trustee (subject to the approval of the Rating Agencies) to act jointly with the Trustee, with respect to all or any part of the Collateral, with the power to file proofs of claim and take any other actions pursuant to Section 5.6 in this Indenture and to make claims and enforce rights of action on behalf of the Noteholders, as the Holders themselves have the right to do, subject to the other provisions of this Section 6.13.

The Co-Issuers shall join with the Trustee in the execution, delivery and performance of all instruments and agreements necessary or proper to appoint a co-trustee. If the Co-Issuers do not join in the appointment within 15 days after they receive a request to do so, the Trustee may make the appointment.

Any instruments to more fully confirm a co-trustee's appointment shall, on request, be executed, acknowledged and delivered by the Co-Issuers. The Co-Issuers agree to pay (but only from and to the extent of the Collateral), to the extent funds are available therefor under Section 11.1(a)(i)(1), any reasonable fees and expenses in connection with the appointment.

Every co-trustee shall, to the extent permitted by law, but to that extent only, be appointed subject to the following terms:

(a)     the Notes shall be authenticated and delivered and all rights and obligations under this Indenture in respect of the custody of securities, cash and other personal property held by, or required to be deposited or pledged with, the Trustee under this Indenture, shall be exercised solely by the Trustee;

(b)     the rights and obligations conferred or imposed on the Trustee in respect of any property covered by the appointment of a co-trustee shall be conferred or imposed on and exercised or performed by the Trustee or by the Trustee and the co-trustee jointly as provided in the instrument appointing the co-trustee;

(c)     the Trustee at any time, by an instrument in writing executed by it, with the concurrence of the Co-Issuers evidenced by an Issuer Order, may accept the resignation of or remove any co-trustee appointed under this Section 6.13, and if an Event of Default is continuing, the Trustee shall have the power to accept the resignation of, or remove, any co-trustee without the concurrence of the Co-Issuers. A successor to any co-trustee so resigned or removed may be appointed in the manner provided in this Section 6.13;

123

(d)     no co-trustee under this Indenture shall be personally liable because of any act or omission of the Trustee under this Indenture;

(e)     the Trustee shall not be liable because of any act or omission of a co-trustee; and

(f)     any Act of Noteholders delivered to the Trustee shall be deemed to have been delivered to each co-trustee.

Section 6.14.     ***Certain Duties of Trustee Related to Delayed Payment of Proceeds.***

If in any month the Trustee has not received a payment with respect to any Pledged Obligation on its Due Date:

(a)     the Trustee shall promptly notify the Issuer and the Servicer in writing, and

(b)     unless the payment is received by the Trustee within three Business Days (or the end of the applicable grace period for the payment, if longer) after the notice, or unless the Issuer, in its absolute discretion (but only to the extent permitted by Section 10.2(a)), makes provision for the payment satisfactory to the Trustee in accordance with Section 10.2(a),

the Trustee shall request the issuer of the Pledged Obligation, the trustee under the related Underlying Instrument, or paying agent designated by either of them to make the payment as soon as practicable after the request but in no event later than three Business Days after the date of the request. If the payment is not made within that time period, the Trustee, subject to clause (iv) of Section 6.1(c), shall take the action directed by the Servicer in writing. Any such action shall be without prejudice to any right to claim a Default or Event of Default under this Indenture. If the Issuer or the Servicer requests a release of a Pledged Obligation or delivers a Collateral Obligation in connection with any such action under the Servicing Agreement, the release or substitution shall be subject to Section 10.6 and Article 12. Notwithstanding any other provision of this Indenture, the Trustee shall deliver to the Issuer or its designee any payment with respect to any Pledged Obligation or any Collateral Obligation received after its Due Date to the extent the Issuer previously made provisions for the payment satisfactory to the Trustee in accordance with this Section 6.14 and the payment shall not be part of the Collateral.

Section 6.15.     ***Authenticating Agents.***

Upon the request of the Co-Issuers, the Trustee shall, and if the Trustee so chooses the Trustee may, appoint one or more Authenticating Agents with power to act on its behalf and subject to its direction in the authentication of the Notes in connection with issuance, transfers, and exchanges under Sections 2.4, 2.5, 2.6, 2.7, and 8.5, as fully to all intents and purposes as though each Authenticating Agent had been expressly authorized by those Sections to authenticate the Notes. For all purposes of this Indenture, the authentication of Notes by an Authenticating Agent pursuant to this Section 6.15 shall be the authentication of the Notes "by the Trustee."

Any Authenticating Agent may at any time resign by giving written notice of resignation to the Trustee and the Issuer. The Trustee may at any time terminate the agency of any Authenticating Agent by giving written notice of termination to the Authenticating Agent and the Co-Issuers.

The Co-Issuers agree to pay to each Authenticating Agent from time to time reasonable compensation for its services, and reimbursement for its reasonable expenses relating to its services as an Administrative Expense; provided, however, that if the Trustee elects to appoint an Authenticating Agent without the approval or request of the Co-Issuers, then the Trustee shall pay

124

such compensation and reimbursement. Sections 2.9, 6.4, and 6.5 shall be applicable to any Authenticating Agent.

### Section 6.16. *Fiduciary for Noteholders Only; Agent for Secured Parties.*

With respect to the security interest created under this Indenture, the delivery of any Pledged Obligation to the Trustee is to the Trustee as representative of the Noteholders and agent for the other Secured Parties. In furtherance of the foregoing, the possession by the Trustee of any Pledged Obligation and the endorsement to or registration in the name of the Trustee of any Pledged Obligation (including as entitlement holder of the Custodial Account) are all undertaken by the Trustee in its capacity as representative of the Noteholders and agent for the other Secured Parties.

### Section 6.17. *Representations and Warranties of the Bank.*

The Bank represents and warrants as follows for the benefit of the Noteholders:

(a)      *Organization.* The Bank has been duly organized and is validly existing as a national banking association and has the power to conduct its business and affairs as a trustee.

(b)      *Authorization; Binding Obligations.* The Bank has the corporate power and authority to perform the duties and obligations of trustee under this Indenture. The Bank has taken all necessary corporate action to authorize the execution, delivery and performance of this Indenture, and all of the documents required to be executed by the Bank pursuant to this Indenture. Upon execution and delivery by the Bank, this Indenture will be the valid and legally binding obligation of the Bank enforceable in accordance with its terms.

(c)      *Eligibility.* The Bank is eligible under Section 6.9 to serve as Trustee under this Indenture.

### Section 6.18. *Additional Reporting Requirements.*

If either of the Initial Purchasers elects to enter into a posting dealer agreement pursuant to Section 7.20, upon the effectiveness of the posting dealer agreement, the Issuer shall provide to The Bond Market Association certain documents for posting in the Repository as mutually agreed between the Servicer and such Initial Purchaser.

If either of the Initial Purchasers has entered into a posting dealer agreement, as promptly as possible following the execution of any supplemental indenture under Article 8, the Trustee at the expense of the Issuer shall deliver a copy of such supplemental indenture to the Repository in the manner described in Section 14.3(a)(ix).

### Section 6.19. *Withholding Tax Forms.*

The Issuer hereby agrees to deliver or cause to be delivered, a United States Internal Revenue Service Form W-8BEN (or successor form thereto) or any other appropriate tax certificates to the relevant issuer of its Collateral Obligations and issuer of its Eligible Investments at the time such Collateral Obligations or Eligible Investments are purchased by the Issuer and thereafter as required under the relevant law. In addition, the Issuer hereby agrees to deliver, and the Issuer shall be required to deliver, United States Internal Revenue Service Forms W-8BEN (or successor form thereto) and other appropriate United States tax forms as may be required by the Hedge Counterparty, to the Hedge Counterparty at the time the Hedge Agreement is entered into and thereafter prior to the expiration or obsolescence of such form, and shall take any other action appropriate to prevent withholding or backup withholding tax on the Hedge Agreements. The Issuer

125

shall represent, to the Hedge Counterparty in the master agreement, confirmation or schedule to the Hedge Agreement, that the Issuer is a "non-U.S. branch" of a foreign person as that term is used in section 1.1441-4(a)(3)(ii) of the United States Treasury Regulations and a "foreign person" as that term is used in Section 1.6041-4(a)(4) of the United States Treasury Regulations. The Issuer will request that the Hedge Counterparty provide the Issuer a United States Internal Revenue Service Forms W-9 or W-8, as applicable, together with any required attachments, at the time the Hedge Agreement is entered into and thereafter prior to the expiration or obsolescence of such form.

# ARTICLE 7

## COVENANTS

### Section 7.1. *Payment of Principal and Interest.*

The Applicable Issuers shall pay the principal of and interest on the Notes in accordance with the Notes and this Indenture.

The Issuer shall, subject to the Priority of Payments, reimburse the Co-Issuer for any amounts paid by the Co-Issuer pursuant to the Senior Notes or this Indenture. The Co-Issuer shall not reimburse the Issuer for any amounts paid by the Issuer pursuant to the Notes or this Indenture.

Amounts properly withheld under the Code or other applicable law by any Person from a payment to any Holder shall be considered as having been paid by the Applicable Issuers to the Holder for all purposes of this Indenture.

### Section 7.2. *Maintenance of Office or Agency.*

The Co-Issuers appoint the Trustee as a Paying Agent for the payment of principal of and interest on the Notes. The Co-Issuers appoint Investors Bank & Trust Company, 200 Clarendon Street, Mailcode EUC 108, Boston, MA 02116, Attn: CDO Services Group, as the Co-Issuers' agent where notices and demands on the Co-Issuers in respect of the Notes or this Indenture may be served and where the Notes may be surrendered for registration of transfer or exchange.

The Co-Issuers may at any time and from time to time vary or terminate the appointment of any Paying Agent or appoint any additional agents for all of these purposes.

The Co-Issuers shall maintain in the Borough of Manhattan, The City of New York, an office or agency where notices and demands on the Co-Issuers in respect of the Notes and this Indenture may be served, which office will initially be the office of Investors Bank & Trust Company, an Affiliate of the Trustee, located at 33 Maiden Lane, 4th Floor, New York, NY 10038, and an office or agency outside of the United States where the Notes may be presented and surrendered for payment.

No paying agent shall be appointed in a jurisdiction that subjects payments on the Notes to withholding tax.

So long as any Class of Senior Notes is listed on the Irish Stock Exchange and the rules of the exchange so require, the Co-Issuers shall maintain in Ireland a Paying Agent and an office or agency where notices and demands on the Co-Issuers in respect of the Senior Notes and this

126

Indenture may be served and where the Senior Notes may be surrendered for registration of transfer or exchange.

The Co-Issuers appoint, for so long as any Class of Senior Notes is listed on the Irish Stock Exchange, AIB International Financial Services Ltd. (the "***Irish Paying Agent***") as Paying Agent in Ireland with respect to the Senior Notes, for the payment of principal, interest and other distributions on the Senior Notes and as the Co-Issuers' agent where notices and demands on the Co-Issuers in respect of the Senior Notes or this Indenture may be served. If the Irish Paying Agent is replaced at any time when any Class of Senior Notes is listed on the Irish Stock Exchange, notice of the appointment of any replacement shall be given to the Company Announcements Office of the Irish Stock Exchange as promptly as practicable after the appointment. The Co-Issuers shall give prompt written notice to the Trustee, each Rating Agency, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and the Holders of the Senior Notes of the appointment or termination of any such agent and of the location and any change in the location of any such office or agency.

If at any time the Co-Issuers fail to maintain any required office or agency in the Borough of Manhattan, The City of New York, or outside the United States, or fail to furnish the Trustee with their addresses, notices and demands may be served on the Co-Issuers.

Section 7.3.     ***Money for Note Payments to be Held in Trust.***

All payments of amounts payable with respect to any Notes that are to be made from amounts withdrawn from the Payment Account shall be made on behalf of the Applicable Issuers by the Trustee or a Paying Agent with respect to payments on the Notes.

When the Applicable Issuers have a Paying Agent that is not also the Indenture Registrar, they shall furnish not later than the fifth calendar day after each Record Date a list in the form the Paying Agent reasonably requests, of the names and addresses of the Holders and of the certificate numbers of individual Notes held by each Holder.

Whenever the Applicable Issuers have a Paying Agent other than the Trustee, they shall, on or before the Business Day before each Payment Date or Redemption Date direct the Trustee to deposit on the Payment Date with the Paying Agent an aggregate sum sufficient to pay the amounts then becoming due (to the extent funds are then available for that purpose in the Payment Account), that sum to be held in trust for the benefit of the Persons entitled to it and (unless the Paying Agent is the Trustee) the Co-Issuers shall promptly notify the Trustee of its action or failure so to act. Any monies deposited with a Paying Agent (other than the Trustee) in excess of an amount sufficient to pay the amounts then becoming due on the Notes with respect to which the deposit was made shall be paid over by the Paying Agent to the Trustee for application in accordance with Article 10.

Additional or successor Paying Agents shall be appointed by Issuer Order with written notice of the appointment to the Trustee. So long as Notes of any Class are rated by a Rating Agency any Paying Agent must either have a long-term debt rating of "Aa3" (and not on credit watch with negative implications) or higher by Moody's and "AA-" or higher by S&P or a short-term debt rating of "P-1" (and not on credit watch for possible downgrade) by Moody's and "A-1+" by S&P or the Rating Condition with respect to each Rating Agency must be satisfied with respect to its appointment. If a successor Paying Agent ceases to have a long-term debt rating of "Aa3" (and not on credit watch with negative implications) or higher by Moody's and "AA-" or higher by S&P or a short-term debt rating of "P-1" (and not on credit watch for possible downgrade) by Moody's and a short-term debt rating of "A-1+" by S&P, the Co-Issuers shall promptly remove the Paying Agent and appoint a successor Paying Agent. The Co-Issuers shall not appoint any Paying Agent that is not, at the time of the appointment, a depository institution or trust company subject to supervision

127

and examination by federal or state or national banking authorities. The Co-Issuers shall cause each Paying Agent other than the Trustee to execute and deliver to the Trustee an instrument in which the Paying Agent agrees with the Trustee, subject to this Section 7.3, that the Paying Agent will:

(i)     allocate all sums received for payment to the Noteholders for which it acts as Paying Agent on each Payment Date and any Redemption Date among the Holders in the proportion specified in the applicable report to the extent permitted by applicable law;

(ii)    hold all sums held by it for the payment of amounts due with respect to the Notes in trust for the benefit of the Persons entitled to them until they are paid or otherwise disposed of as provided in this Indenture;

(iii)   immediately resign as a Paying Agent and forthwith pay to the Trustee all sums held by it in trust for the payment of the Notes if at any time it ceases to meet the standards required to be met by a Paying Agent at the time of its appointment;

(iv)    immediately give the Trustee notice of any default by the Issuer or the Co-Issuer (or any other obligor on the Notes) in the making of any payment required to be made; and

(v)     during the continuance of any such default, upon the written request of the Trustee, forthwith pay to the Trustee all sums so held in trust by the Paying Agent.

To obtain the satisfaction and discharge of this Indenture or for any other purpose, the Co-Issuers may at any time pay, or by Issuer Order direct any Paying Agent to pay, to the Trustee all sums held in trust by the Co-Issuers or the Paying Agent, and, upon the payment by any Paying Agent to the Trustee, the Paying Agent shall be released from all further liability with respect to the money paid.

Any money deposited with a Paying Agent and not previously returned that remains unclaimed for 20 Business Days shall be returned to the Trustee. Except as otherwise required by applicable law, any money deposited with the Trustee or any Paying Agent in trust for the payment of the principal of or interest on any Note and remaining unclaimed for two years after the principal or interest has become payable shall be paid to the Applicable Issuers. The Noteholder shall thereafter look only to the Applicable Issuers for payment of the amounts due to it as an unsecured general creditor and all liability of the Trustee or the Paying Agent with respect to that money (but only to the extent of the amounts so paid to the Applicable Issuers) shall thereupon cease. The Trustee or the Paying Agent, before being required to release any payment, may, but shall not be required to, adopt and employ, at the expense of the Applicable Issuers any reasonable means of notification of the release of the payment, including mailing notice of the release to Holders whose Notes have been called but have not been surrendered for redemption or whose right to or interest in monies payable but not claimed is determinable from the records of any Paying Agent, at the last address of record of each Holder.

Section 7.4.    *Existence of Co-Issuers.*

(a)     The Issuer and the Co-Issuer shall maintain in full force their existence and rights as companies incorporated or organized under the laws of the Cayman Islands and the State of Delaware, respectively, and shall obtain and preserve their qualification to do business as foreign corporations in each jurisdiction in which the qualifications are necessary to protect the validity and enforceability of this Indenture, the Notes, the Preference Shares Paying Agency Agreement and any of the Collateral.

NY\1257964.27

However, the Issuer may change its jurisdiction of incorporation from the Cayman Islands to any other jurisdiction reasonably selected by the Issuer so long as:

(A)     the Issuer has received a legal opinion (on which the Trustee may rely) to the effect that the change is not disadvantageous in any material respect to the Holders, the Servicer or any Hedge Counterparty,

(B)     written notice of the change has been given by the Issuer to the Trustee, the Noteholders, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Servicer, any Hedge Counterparty and each Rating Agency, and

(C)     on or before the 15th Business Day following its receipt of the notice the Trustee has not received written notice from a Majority of the Controlling Class objecting to the change.

The Issuer may take any action required by this Indenture within the United States notwithstanding any provision of this Indenture requiring the Issuer to take the action outside of the United States so long as before taking the action the Issuer receives a Tax Opinion of Counsel to the effect that it is not necessary to take the action outside of the United States or any political subdivision of the United States to prevent the Issuer from becoming subject to any United States federal, state, or local withholding or other taxes.

(b)     The Issuer and the Co-Issuer shall ensure that all corporate or other formalities regarding their respective existences (including holding regular board of directors' and shareholders', or other similar, meetings to the extent required by applicable law) are followed. Neither the Issuer nor the Co-Issuer shall take any action or conduct its affairs in a manner that is likely to result in its separate existence being ignored or in its assets and liabilities being substantively consolidated with any other Person in a bankruptcy, reorganization or other insolvency proceeding. Without limiting the foregoing,

(i)     the Issuer shall not have any subsidiaries,

(ii)     the Co-Issuer shall not have any subsidiaries,

(iii)     the Issuer shall maintain at all times at least one director who is Independent of the Servicer, the Trustee and any of their respective Affiliates,

(iv)     the Issuer shall not commingle its funds with the funds of any other Person, except as expressly permitted by this Indenture, and

(v)     except to the extent contemplated in the Servicing Agreement, the Administration Agreement, the Preference Shares Paying Agency Agreement and the declaration of trust by the Share Trustee, the Issuer and the Co-Issuer shall not:

(A)     engage in any transaction with any shareholder that would be a conflict of interest (the entry into the Administration Agreement with the Administrator shall not be deemed a conflict of interest), or

(B)     pay dividends in violation of this Indenture, the resolutions of its board of directors and the Preference Share Documents.

129

Section 7.5. ***Protection of Collateral.***

(a)     The Servicer on behalf of the Issuer will procure any action within the Servicer's control that is reasonably necessary to maintain the perfection and priority of the security interest of the Trustee in the Collateral. The Issuer from time to time shall execute and deliver any supplements and amendments to this Indenture and shall execute and deliver any Financing Statements, continuation statements, instruments of further assurance, and other instruments and shall take any other action appropriate to secure the rights and remedies of the Secured Parties under this Indenture and to:

(i)     Grant more effectively all or any portion of the Collateral;

(ii)     maintain or preserve the lien (and its priority) of this Indenture or to carry out more effectively the purposes of this Indenture;

(iii)     perfect, publish notice of, or protect the validity of, any Grant made by this Indenture (including any actions appropriate as a result of changes in law);

(iv)     enforce any of the Pledged Obligations or other instruments or property included in the Collateral;

(v)     preserve and defend title to the Collateral and the rights of the Secured Parties in the Collateral against the claims of anyone; and

(vi)     pay when due all taxes levied or assessed on any part of the Collateral.

The Issuer designates the Servicer as its agent and attorney in fact to execute any Financing Statement, continuation statement, and all other instruments, and take all other actions, required pursuant to this Section 7.5.

The Issuer authorizes the filing without the Issuer's signature a financing statement that names the Issuer as "debtor" and Investors Bank & Trust Company as "secured party" (with or without indicating its capacity as Trustee hereunder) and that describes the Collateral as "all assets of the debtor, whether now owned or hereafter acquired and wherever located."

(b)     The Trustee shall not:

(i)     except in accordance with Section 10.6(a), (b) or (c), remove any portion of the Collateral that consists of Cash or is evidenced by an instrument, certificate or other writing:

(A)     from the jurisdiction in which it was held at the date the most recent Opinion of Counsel was delivered pursuant to Section 7.6 (or from the jurisdiction in which it was held as described in the Opinions of Counsel delivered at the Closing Date pursuant to Section 3.1(a)(iii) if no Opinion of Counsel has yet been delivered pursuant to Section 7.6), or

(B)     from the possession of the Person who held it (other than the Bank), or

(ii)     cause or permit ownership or the pledge of any portion of the Collateral that consists of book-entry securities to be recorded on the books of a Person (other than the Bank):

130

(A)      located in a different jurisdiction from the jurisdiction in which the ownership or pledge was recorded, or

(B)      other than the Person on whose books the ownership or pledge was originally recorded, unless the Trustee shall have first received an Opinion of Counsel to the effect that the lien and security interest created by this Indenture with respect to the property and its priority will continue to be maintained after giving effect to the change.

(c)      Without at least 30 days' prior written notice to the Trustee and the Servicer, the Issuer shall not change its "location" (as defined in Section 9-307 of the UCC) or change its name from the name shown on the signature pages of this Indenture.

(d)      The Issuer shall, subject to the Priority of Payments, enforce all of its material rights and remedies under the Servicing Agreement, the Collateral Administration Agreement, the Preference Shares Paying Agency Agreement, each Hedge Agreement and each Securities Lending Agreement.

(e)      The Issuer shall pay any taxes levied because any Pledged Obligations are owned by the Issuer.

(f)      The Servicer on behalf of the Issuer will either exercise the "put" option that prevents a Collateral Obligation from being a Long-Dated Collateral Obligation on the last available date before the Stated Maturity of the Notes or sell the Collateral Obligation for Sale Proceeds at least equal to the Principal Balance of the Collateral Obligation, in either case by the Stated Maturity of the Notes.

Section 7.6.      *Opinions as to Collateral.*

On or before June 1 in each calendar year, commencing in 2008, the Issuer shall furnish to the Trustee and each of the Rating Agencies, an Opinion of Counsel stating that in the opinion of such counsel as of the date of such opinion under the District of Columbia Uniform Commercial Code, the UCC financing statement(s) filed in connection with the lien and security interests created by this Indenture shall remain effective and no additional financing statements, continuation statements or amendments with respect to such financing statement(s) shall be required to be filed in the District of Columbia from the date thereof through the next twelve months to maintain the perfection of the security interest of this Indenture under the District of Columbia Uniform Commercial Code.

Section 7.7.      *Performance of Obligations.*

(a)      The Co-Issuers, each as to itself, shall not take any action, and shall use their reasonable commercial efforts not to permit any action to be taken by others, that would release any Person from any of the Person's covenants or obligations under any instrument included in the Collateral, except in the case of enforcement action taken with respect to any Defaulted Collateral Obligation in accordance with this Indenture and actions by the Servicer under the Servicing Agreement and in conformity with this Indenture or as otherwise required by this Indenture.

(b)      The Applicable Issuers may, with the prior written consent of a Majority of each Class of Notes and a Majority of the Preference Shares (except in the case of the Servicing Agreement and the Collateral Administration Agreement as initially executed), contract with other Persons (including the Servicer, the Trustee and the Collateral Administrator) for the performance of actions and obligations to be performed by the Applicable Issuers under this Indenture.

NY\1257964.27

Notwithstanding any such arrangement, the Applicable Issuers shall remain primarily liable for performance under this Indenture. The Applicable Issuers shall punctually perform, and use their reasonable commercial efforts to cause the Servicer, the Trustee, the Collateral Administrator, the Preference Shares Paying Agent and any other Person to perform, all of their obligations in the Servicing Agreement, this Indenture, the Collateral Administration Agreement, the Preference Shares Paying Agency Agreement or any other agreement.

Section 7.8.    *Negative Covenants.*

(a)     The Issuer shall not and, with respect to clauses (ii), (iii), (iv), (vi) and (ix), the Co-Issuer shall not, in each case from and after the Closing Date:

(i)     sell, transfer, assign, exchange, or otherwise dispose of, or pledge, mortgage, hypothecate, or otherwise encumber (or permit or suffer the sale, transfer, assignment, exchange, or other disposition of, or pledge, mortgage, hypothecation, or other encumbering of), any part of the Collateral, except as expressly permitted by this Indenture and the Servicing Agreement;

(ii)     claim any credit on, make any deduction from, or, to the fullest extent permitted by applicable laws, dispute the enforceability of payment of the principal or interest (or any other amount) payable in respect of the Notes (other than amounts withheld in accordance with the Code or any applicable laws of the Cayman Islands) or assert any claim against any present or future Noteholder because of the payment of any taxes levied or assessed on any part of the Collateral;

(iii)     (A) incur or assume or guarantee any indebtedness, other than the Notes and this Indenture and the transactions contemplated by this Indenture (including a Refinancing in accordance with Section 9.7 and including, as contemplated hereby, entering into the Hedge Agreements and Securities Lending Agreements) or (B) issue any additional class of securities other than the Preference Shares issued on or before the Closing Date, except as otherwise permitted by the Preference Share Documents;

(iv)     (A) permit the validity or effectiveness of this Indenture or any Grant under this Indenture to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated, or discharged or permit any Person to be released from any covenants or obligations with respect to this Indenture or the Notes, except as may be expressly permitted by this Indenture or by the Servicing Agreement, (B) permit any lien, charge, adverse claim, security interest, mortgage or other encumbrance (other than the lien of this Indenture) to be created on or extend to or otherwise arise on or burden any part of the Collateral, any interest in it, or its proceeds of or (C) take any action that would permit the lien of this Indenture not to be a valid first priority perfected security interest in the Collateral;

(v)     amend the Servicing Agreement except pursuant to its terms and Section 15.1(h) or amend the Collateral Administration Agreement except pursuant to its terms unless the Rating Condition with respect to each Rating Agency is satisfied with respect to the amendment or enter into any waiver in respect of any of the foregoing agreements without providing written notice to each Rating Agency and the Trustee (and, with respect to the Collateral Administration Agreement, without the consent of the Trustee);

(vi)     to the extent permitted by applicable law, dissolve or liquidate in whole or in part, except as permitted under this Indenture;

132

(vii) pay any dividends or other distributions other than in accordance with the Priority of Payments and the Preference Share Documents;

(viii) conduct business under any name other than its own;

(ix) have any employees (other than directors and officers to the extent they are employees); or

(x) except for any Underlying Instrument and agreements involving the purchase or sale of Collateral Obligations having customary purchase or sale terms and documented with customary trading documentation (but not excepting any Synthetic Security or Hedge Agreement), enter into any agreement unless the agreement contains "non-petition" and "limited recourse" provisions and shall not amend such "non-petition" and "limited recourse" provisions without prior Rating Confirmation.

(b) Neither the Issuer nor the Trustee shall sell, transfer, exchange or otherwise dispose of Collateral, or enter into an agreement or commitment to do so, or enter into or engage in any business with respect to any part of the Collateral, except as expressly permitted by this Indenture and, with respect to the Issuer, the Servicing Agreement.

(c) The Co-Issuer shall not invest any of its assets in "securities" as the term is defined in the Investment Company Act, and shall keep all of its assets in Cash.

(d) Neither the Issuer nor the Co-Issuer shall use the proceeds of the Notes to buy or carry Margin Stock.

Section 7.9. *Notice of Default; Statement as to Compliance.*

(a) The Co-Issuers shall notify the Trustee, the Servicer, the Rating Agencies and each Hedge Counterparty within 10 days of acquiring actual knowledge of Default.

(b) On or before May 15 in each calendar year, commencing in 2008, the Issuer shall deliver to the Trustee (to be forwarded by the Trustee to the Servicer and each Noteholder making a written request therefor and, upon written request therefor by a Beneficial Owner in the form of Exhibit H certifying that it is a Beneficial Owner, to the Beneficial Owner (or its designee) and each Rating Agency) a certificate of an Authorized Officer of the Issuer that, to the best knowledge of the Issuer, no Default exists, and has not existed since the date of the last certificate or, if a Default does then exist or had existed, specifying the same and its nature and status, including actions undertaken to remedy it, and that the Issuer has complied with all of its obligations under this Indenture or, if that is not the case, specifying those obligations with which it has not complied.

Section 7.10. *Co-Issuers May Consolidate, etc. Only on Certain Terms.*

Neither the Issuer nor the Co-Issuer (the "*Merging Entity*") shall consolidate or merge with or into any other Person or transfer or convey all or substantially all of its assets to any Person, unless permitted by Cayman Islands law (in the case of the Issuer) or United States and Delaware law (in the case of the Co-Issuer) and unless:

(a) the Merging Entity shall be the surviving corporation, or the Person (if other than the Merging Entity) formed by the consolidation or into which the Merging Entity is merged or to which all or substantially all of the assets of the Merging Entity are transferred (the "*Successor Entity*"),

133

(i)      if the Merging Entity is the Issuer, is a company organized and existing under the laws of the Cayman Islands or another jurisdiction approved by a Majority of the Controlling Class (except that no approval shall be required in connection with any such transaction undertaken solely to effect a change in the jurisdiction of incorporation pursuant to Section 7.4), and

(ii)      in any case shall expressly assume, by an indenture supplemental to this Indenture, executed and delivered to the Trustee and each Noteholder, the due and punctual payment of all amounts on all Notes issued by the Merging Entity and the performance and observance of every covenant of this Indenture on its part to be performed or observed, all as provided in this Indenture;

(b)      each Rating Agency shall have been notified of the consolidation, merger, transfer, or conveyance and the Rating Condition with respect to each Rating Agency is satisfied with respect to the transaction;

(c)      if the Merging Entity is not the surviving corporation, the Successor Entity shall have agreed with the Trustee,

(i)      to observe the same legal requirements for the recognition of the formed or surviving corporation as a legal entity separate and apart from any of its Affiliates as are applicable to the Merging Entity with respect to its Affiliates,

(ii)      not to consolidate or merge with or into any other Person or transfer or convey the Collateral or all or substantially all of its assets to any other Person except in accordance with this Section 7.10; and

(iii)      in any case shall expressly assume by an indenture supplemental to this Indenture, executed and delivered to the Trustee, each Noteholder and the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the due and punctual payment of all amounts on all the Notes issued by the Merging Entity and the performance and observance of every covenant of this Indenture on its part to be performed or observed, all as provided in this Indenture;

(d)      if the Merging Entity is not the surviving corporation, the Successor Entity shall have delivered to the Trustee and each Rating Agency an Officer's certificate and an Opinion of Counsel each stating that it is duly organized, validly existing, and in good standing in the jurisdiction in which it is organized; that it has sufficient power and authority to assume the obligations in subsection (a) above and to execute and deliver an indenture supplemental to this Indenture for the purpose of assuming the obligations in subsection (a) above; that it has duly authorized the execution, delivery, and performance of an indenture supplemental to this Indenture for the purpose of assuming the obligations in subsection (a) above and that the supplemental indenture is its valid and legally binding obligation, enforceable in accordance with its terms, subject only to bankruptcy, reorganization, insolvency, moratorium, and other laws affecting the enforcement of creditors' rights generally and to general principles of equity; if the Merging Entity is the Issuer, that, following the event that causes the Successor Entity to become the successor to the Issuer, (i) the Successor Entity has title, free of any lien, security interest, or charge, other than the lien and security interest of this Indenture, to the Collateral, and (ii) the lien of this Indenture continues to be effective in the Collateral; and in each case as to any other matters the Trustee or any Noteholder reasonably requires;

(e)      after giving effect to the transaction, no Default or Event of Default shall be continuing;

134

(f)     the Merging Entity shall have notified each Rating Agency of the consolidation, merger, transfer or conveyance and shall have delivered to the Trustee, each Noteholder and the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) an Officer's certificate and an Opinion of Counsel each stating that the consolidation, merger, transfer or conveyance and the supplemental indenture comply with this Article 7 and that all conditions precedent in this Article 7 relating to the transaction have been complied with and shall have obtained a Tax Opinion of Counsel that no adverse tax consequences will result therefrom to the Holders of the Securities;

(g)     the Merging Entity shall have delivered to the Trustee an Opinion of Counsel stating that after giving effect to the transaction, neither of the Co-Issuers (or, if applicable, the Successor Entity) will be required to register as an investment company under the Investment Company Act; and

(h)     after giving effect to the transaction, the outstanding stock of the Merging Entity (or, if applicable, the Successor Entity) will not be beneficially owned within the meaning of the Investment Company Act by any U.S. Person.

Section 7.11.   *Successor Substituted.*

Upon any consolidation or merger, or transfer or conveyance of all or substantially all of the assets of the Issuer or the Co-Issuer, in accordance with Section 7.10 in which the Merging Entity is not the surviving corporation, the Successor Entity shall succeed to, and be substituted for, and may exercise every right of, the Merging Entity under this Indenture with the same effect as if the Person had been named as the Issuer or the Co-Issuer, as the case may be, in this Indenture. Upon any such consolidation, merger, transfer or conveyance, the Person named as the "Issuer" or the "Co-Issuer" in the first paragraph of this Indenture or any successor may be dissolved, wound up and liquidated at any time thereafter, and the Person thereafter shall be released from its liabilities as obligor and maker on all the Notes and from its obligations under this Indenture.

Section 7.12.   *No Other Business.*

(a)     From and after the Closing Date, the Issuer shall not engage in any business or activity other than issuing and selling the Notes pursuant to this Indenture and the Preference Shares pursuant to the Preference Share Documents and acquiring, owning, holding, and pledging and selling Collateral Obligations and the other Collateral in connection therewith, and shall not act as agent, negotiator or structurer with respect to any Collateral, act as a participant in negotiating terms of a primary loan agreement, enter into a binding commitment to purchase any Collateral prior to the issuance thereof or engage in any transaction or activity not permitted by the Collateral Acquisition Agreement or which the Issuer knows would cause it to be treated as engaged in a trade or business in the United States within the meaning of the Code or subject the Issuer's income to taxation on a net basis in any jurisdiction, and the Co-Issuer shall not engage in any business or activity other than issuing and selling the Notes to be issued by it pursuant to this Indenture and, with respect to the Issuer and the Co-Issuer, other activities appropriate to accomplish the foregoing or incidental thereto or connected therewith.

(b)     In furtherance and not in limitation of clause (a) of this Section 7.12, the Issuer shall comply with all of the provisions set forth in the Collateral Acquisition Agreement, unless, with respect to a particular transaction, it obtains written advice of Latham & Watkins LLP or a Tax Opinion of Counsel that, under the relevant facts and circumstances with respect to such transaction, the Issuer's failure to comply with one or more of such provisions will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States within the meaning of the Code or otherwise to be subject to United States federal income tax on a net basis.

135

The provisions set forth in the Collateral Acquisition Agreement may be amended, eliminated or supplemented (without execution of a supplemental indenture) if the Issuer obtains written advice of Latham & Watkins LLP or a Tax Opinion of Counsel that the Issuer's compliance with such amended provisions or supplemental provisions or the Issuer's failure to comply with such provisions proposed to be eliminated, as the case may be, will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States within the meaning of the Code or otherwise to be subject to United States federal income tax on a net basis and, at the request of the Issuer, the Trustee is hereby authorized to enter into any amendment of the Collateral Acquisition Agreement under such circumstances; provided, however, that written notice of any such amendment, elimination or supplementation of or to the provisions of the Collateral Acquisition Agreement pursuant to this Section 7.12(b) shall be provided to each Rating Agency then rating any Outstanding Class of Notes within 90 days of any such amendment, elimination or supplementation. For the avoidance of doubt, in the event written advice of Latham & Watkins LLP or a Tax Opinion of Counsel as described above has been obtained in accordance with the terms hereof, no consent of any Noteholder or satisfaction of the Rating Condition shall be required in order to comply with this Section 7.12(b) in connection with the amendment, elimination or supplementation of any provision of the Collateral Acquisition Agreement contemplated by such written advice or opinion.

(c)     The Issuer and the Co-Issuer may amend, or permit the amendment of, their Memorandum and Articles or the Certificate of Incorporation and By-laws if the Rating Condition with respect to each Rating Agency is satisfied with respect to the amendment (but not otherwise).

Section 7.13.     *Listing on Irish Stock Exchange.*

So long as any Senior Notes remain Outstanding, the Co-Issuers shall use all reasonable efforts to obtain and maintain the listing of the Senior Notes on the regulated market of the ISE; provided that the Co-Issuers will not be required to maintain a listing on a stock exchange in the European Union if compliance with requirements of the European Commission on a member state becomes burdensome in the sole judgment of the Servicer.

Section 7.14.     *Annual Rating Review.*

So long as any Notes of any Class remain Outstanding, on or before May 1 in each year commencing in 2008, the Co-Issuers shall obtain and pay for an annual review or ongoing surveillance of the rating of each Outstanding Class of Notes from each Rating Agency, as applicable. The Co-Issuers shall promptly notify the Trustee and the Servicer in writing (and the Trustee shall promptly provide a copy of the notice to the Noteholders) and the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) if at any time the rating of any Class of Notes has been, or is known will be, changed or withdrawn.

Section 7.15.     *Reporting.*

At any time when the Co-Issuers are not subject to Section 13 or 15(d) of the Exchange Act and are not exempt from reporting pursuant to Rule 12g3-2(b) under the Exchange Act, upon the request of a Holder or Beneficial Owner of any Note, the Co-Issuers shall promptly furnish "Rule 144A Information" to the Holder or Beneficial Owner, to a prospective purchaser of a Note designated by the Holder or Beneficial Owner or to the Trustee for delivery to the Holder or Beneficial Owner or a prospective purchaser designated by the Holder or Beneficial Owner, as the case may be, to permit compliance by the Holder or Beneficial Owner with Rule 144A under the Securities Act in connection with the resale of the Note by the Holder or Beneficial Owner. "*Rule 144A Information*" is the information specified pursuant to Rule 144A(d)(4) under the Securities Act.

136

Section 7.16.    *Calculation Agent.*

(a)    The Issuer agrees that for so long as any Floating Rate Notes remain Outstanding an agent will always have been appointed (that does not control and is not controlled by or under common control with the Issuer or its Affiliates) to calculate LIBOR in respect of each Interest Period (the "*Calculation Agent*"). The Issuer has initially appointed the Trustee as Calculation Agent. The Issuer may remove the Calculation Agent at any time. If the Calculation Agent is unable or unwilling to act as such or is removed by the Issuer or if the Calculation Agent fails to determine any of the information required to be given to the Company Announcements Office of the Irish Stock Exchange, as described in subsection (b), in respect of any Interest Period, the Issuer or the Servicer (on its behalf) shall promptly appoint a replacement Calculation Agent. For so long as any Floating Rate Notes are listed on the Irish Stock Exchange and the rules of the exchange so require, notice of the appointment of any replacement Calculation Agent shall be given to the Company Announcements Office of the Irish Stock Exchange as promptly as practicable after the appointment. The Calculation Agent may not resign its duties without a successor having been duly appointed.

(b)    As soon as possible after 11:00 A.M., London time, on the second Business Day before the first day of each Interest Period, but in no event later than 11:00 A.M., London time, on the next Business Day, the Calculation Agent shall calculate the Note Interest Rate for each Class of Floating Rate Notes for the next Interest Period. The Calculation Agent shall communicate those rates and amounts to the Co-Issuers, the Trustee, each Paying Agent, the Servicer, Euroclear, Clearstream, the Depository, and, so long as any of the Floating Rate Notes are listed thereon and the rules of the exchange so require, the Irish Stock Exchange. In the latter case, the information shall be given to the Company Announcements Office of the Irish Stock Exchange as soon as possible after its determination. The Calculation Agent shall separately notify the Irish Stock Exchange of the information. The Calculation Agent shall also specify to the Co-Issuers the quotations on which the foregoing rates are based, and in any event the Calculation Agent shall notify the Co-Issuers before 7:00 P.M., London time, on the second Business Day before the first day of each Interest Period that either:

(i)    it has determined or is in the process of determining the Note Interest Rate for each Class of Floating Rate Notes, or

(ii)    it has not determined and is not in the process of determining any such Note Interest Rate together with its reasons therefor.

The Calculation Agent's determination of the foregoing rates for any Interest Period shall (in the absence of manifest error) be final and binding on all parties and the Holders and Beneficial Owners of the Preference Shares.

Section 7.17.    *Certain Tax Matters.*

(a)    For United States federal income tax purposes, the Issuer shall treat the Preference Shares as equity and the Notes as debt. Each Holder of a Note, by its acquisition of that Note, agrees to treat those Notes as debt for United States federal income tax purposes.

(b)    The Issuer will not make an election to be treated as a partnership for U.S. federal income tax purposes, and will take all necessary actions to maintain its status as a corporation for U.S. federal income tax purposes.

137

(c)     The Issuer shall file, or cause to be filed, any tax returns, including information tax returns, required by any governmental authority; provided, however, that the Issuer shall not file, or cause to be filed, any income or franchise tax return in any state of the United States unless it shall have obtained a Tax Opinion of Counsel prior to such filing that, under the laws of such jurisdiction, the Issuer is required to file such income or franchise tax return.

(d)     In order to ensure the Holders' and Beneficial Owners' acquisition of the Notes pursuant to this Indenture are not treated as offered under conditions of confidentiality, the Holders and Beneficial Owners of the Notes (and each of their respective employees, representatives or other agents) are hereby permitted to disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the transactions contemplated by this Agreement (including the ownership and disposition of the Notes). For this purpose, the tax treatment of a transaction is the purported or claimed U.S. federal income or state and local tax treatment of the transaction, and the tax structure of a transaction is any fact that may be relevant to understanding the purported or claimed U.S. federal income or state and local tax treatment of the transaction.

(e)     If the Issuer is aware that it has purchased an interest in a "reportable transaction" within the meaning of Section 6011 of the Code, and a Noteholder requests information about any such transactions in which the Issuer is a purchaser, the Issuer shall provide such information it has reasonably available as soon as practicable after such request.

(f)     The Issuer shall not conduct any business other than the business that the Issuer is permitted to conduct under this Indenture and the Preference Shares Paying Agency Agreement.

(g)     The Issuer shall provide, upon the request by a Holder of Class E Notes, such information for the purposes of allowing such Holder to make a protective "qualifying electing fund" election. The Issuer shall provide, upon request of a Holder of Class E Notes, any information that such Holder reasonably requests to assist such Holder with regard to any filing requirements the Holder may have as a result of the controlled foreign corporation rules under the Code. Upon written request by the Independent accountants, the Indenture Registrar shall provide to the Independent accountants that information contained in the Indenture Register requested by the Independent accountants to comply with this Section 7.17.

(h)     The Issuer will treat each purchase of Collateral Obligations and Eligible Investments as a "purchase" for tax accounting and reporting purposes.

(i)     Each of the Issuers and the Trustee agrees that it does not intend for this Indenture to represent an agreement to enter into a partnership, a joint venture or any other business entity for U.S. federal income tax purposes. The Issuers and the Trustee shall not represent or otherwise hold themselves out to the United States Internal Revenue Service or other third parties as partners in a partnership or members of a joint venture or other business entity for U.S. federal income tax purposes.

Section 7.18.     *Securities Lending.*

(a)     So long as no Event of Default is continuing and if after the completion of the transaction the limit in clause (31) of the definition of "Concentration Limitations" would be satisfied, the Servicer may cause Collateral Obligations that are not Defaulted Collateral Obligations

138

to be lent for a term of 90 days or less to banks, broker-dealers and other financial institutions (other than insurance companies) having long-term and short-term senior unsecured debt ratings or guarantors with ratings of at least "A1" (and not "A1" but on credit watch with negative implications) and "P-1" (and not on credit watch for possible downgrade) from Moody's and a long-term senior unsecured debt rating of at least "A" or a short-term senior unsecured debt rating of at least "A-1" from S&P (each, a "***Securities Lending Counterparty***") pursuant to one or more agreements (each, a "***Securities Lending Agreement***"); provided that Collateral Obligations the Market Value of which cannot be determined under clause (i), (ii) or (iii) of that definition may not be lent pursuant to a Securities Lending Agreement. Upon receipt of an Issuer Order, the Trustee shall release any lent Collateral Obligations to a Securities Lending Counterparty as directed by the Servicer. The Securities Lending Counterparties may be Affiliates of the Initial Purchasers or Affiliates of the Servicer. The duration of any Securities Lending Agreement shall not exceed the Stated Maturity of the Notes.

(b)     Each Securities Lending Agreement shall be on market terms as determined by the Servicer (except as may be required below) and shall:

(i)     require that the Securities Lending Counterparty return to the Issuer debt obligations that are identical (in terms of issue and class) to the lent Collateral Obligations;

(ii)     require that the Securities Lending Counterparty pay to the Issuer amounts equivalent to all interest and other payments that the owner of the lent Collateral Obligation is entitled to for the period during which the Collateral Obligation is lent and require that any such payments not be subject to withholding tax imposed by any jurisdiction unless the Securities Lending Counterparty is required under the Securities Lending Agreement to make "gross-up" payments to the Issuer that cover the full amount of the withholding tax on an after-tax basis;

(iii)     require that the Rating Condition with respect to each Rating Agency shall be satisfied with respect to the execution of the Securities Lending Agreement;

(iv)     satisfy any other requirements of Section 1058 of the Code and the Treasury Regulations promulgated under it;

(v)     be governed by the laws of New York;

(vi)     permit the Issuer to assign its rights under the Securities Lending Agreement to the Trustee pursuant to this Indenture;

(vii)     provide for early termination and the delivery of any lent Collateral Obligation with no penalty if the Collateral Obligation becomes a Credit Risk Obligation or is subject to redemption in accordance with its terms;

(viii)     provide for early termination and the delivery of any lent Collateral Obligation with no penalty upon any redemption of the Notes in whole;

(ix)     require the Securities Lending Counterparty to post with the Trustee collateral consisting of cash or direct registered debt obligations of the United States of America that have a maturity date no later than the Business Day preceding the stated termination date of the Securities Lending Agreement (the "***Securities Lending Collateral***") to secure its obligation to return the Collateral Obligations or in the alternative post the Securities Lending Collateral with a custodian for the benefit of the Issuer designated by the Securities Lending Counterparty that satisfies the requirements with respect to being a

139

securities intermediary with respect to the posted collateral if that custodian would qualify to be a successor trustee under Section 6.9;

(x)     provide that the Securities Lending Collateral shall be maintained at all times in an amount equal to at least 102% of the current Ask-Side Market Value (determined daily and monitored by the Servicer) of the lent Collateral Obligations and if securities are delivered to the Trustee as security for the obligations of the Securities Lending Counterparty under the related Securities Lending Agreement, the Servicer on behalf of the Issuer will negotiate with the Securities Lending Counterparty a rate for the loan fee to be paid to the Issuer for lending the lent Collateral Obligations;

(xi)     the lent Collateral Obligations shall be marked-to-market on a daily basis by the Servicer on the basis of their Market Value;

(xii)     the Collateral will include the Issuer's rights under the related Securities Lending Agreement rather than the loaned Collateral Obligation;

(xiii)     provide for early termination within 10 days at the option of the Issuer and the delivery of any lent Collateral Obligation with no penalty if the Securities Lending Counterparty is no longer in compliance with the requirements relating to the credit ratings of the Securities Lending Counterparty and the noncompliance is not cured as provided in this Indenture; and

(xiv)     contain appropriate limited recourse and non-petition provisions (to the extent the Issuer has contractual payment obligations to the Securities Lending Counterparty) equivalent (*mutatis mutandis*) to those in this Indenture.

(c)     If either Moody's or S&P downgrades a Securities Lending Counterparty such that the Securities Lending Agreements to which the Securities Lending Counterparty is a party are no longer in compliance with the requirements relating to the credit ratings of the Securities Lending Counterparty, then the Servicer on behalf of the Issuer, within 10 days of the downgrade, shall

(i)     terminate its Securities Lending Agreements with the Securities Lending Counterparty unless a guarantor with the required ratings for the Securities Lending Counterparty's obligations under the Securities Lending Agreements has been obtained; or

(ii)     reduce the percentage of the Aggregate Principal Balance of the Collateral Obligations lent to the downgraded Securities Lending Counterparty so that the Securities Lending Agreements to which the Securities Lending Counterparty is a party, together with all other Securities Lending Agreements, are in compliance with the requirements relating to the credit ratings of Securities Lending Counterparties; or

(iii)     take any other steps Moody's or S&P may require to cause the Securities Lending Counterparty's obligations under the Securities Lending Agreements to which the Securities Lending Counterparty is a party to be treated by Moody's or S&P, as the case may be, as if the obligations were owed by a counterparty having a rating at least equivalent to the rating that was assigned by Moody's or S&P, as the case may be, to the downgraded Securities Lending Counterparty before its being downgraded.

(d)     In connection with any such direction by the Servicer to enter into a Securities Lending Agreement, the Trustee may receive and rely on an Issuer Order to the effect that the Securities Lending Agreement, and its Securities Lending Counterparty, is each in compliance with the requirements of this Indenture (including the definition of "Securities Lending Counterparty").

140

The Issuer and the Trustee may enter into any Securities Lending Agreement (and any related account control agreement) at the instruction of the Servicer, and deliver and accept delivery and return of any Collateral Obligations pursuant to the Securities Lending Agreement, or pursuant to instructions from the Servicer in connection with the Securities Lending Agreement. The Trustee may take any actions and exercise any rights and remedies under any Securities Lending Agreement that the Servicer instructs. The Trustee need not enter into any Securities Lending Agreement (or any related account control agreement) that would in its judgment, subject it to any liability, whether financial or otherwise, or cause it to incur or subject it to risk of any cost or disbursement for which it is not, in its judgment, adequately indemnified, or that would impose on it any obligations or administrative burdens that are unacceptable to it. The Servicer shall instruct the Trustee in writing with respect to the administration of any Securities Lending Agreement (including with respect to any default and the exercise of rights under it). The Trustee shall not have any responsibility for evaluating the sufficiency, validity or acceptability of any Securities Lending Agreement or for the qualifications or eligibility of any Securities Lending Counterparty. Nothing in this Indenture shall be construed to cause the Trustee to have any fiduciary duties to any Securities Lending Counterparty.

So long as any Collateral Obligation is on loan pursuant to a Securities Lending Agreement,

(a)     the Trustee shall have no liability for any failure or inability on its part to receive any information or take any action with respect to the Collateral Obligation because of its being on loan (including any failure to take action with respect to a notice of redemption, consent solicitation, exchange or tender offer, or similar corporate action), and

(b)     the loaned Collateral Obligations shall not be disqualified for return to the Trustee as a Collateral Obligation by any change in circumstance or status during the time while on loan (including any change that would cause the Collateral Obligation to be ineligible for purchase by the Issuer under this Indenture if applied to a proposed purchase of it in the open market at the time of its return from loan).

Section 7.19.   *Purchase of Collateral Obligations; Ramp-Up Completion Date.*

(a)     The Issuer shall use its best efforts to purchase Collateral Obligations on any Business Day during the Ramp-Up Period or enter into commitments to purchase Collateral Obligations on any Business Day during the Ramp-Up Period for purchase on or as soon as practicable thereafter (not to exceed 60 days thereafter), in each case, for inclusion in the Collateral so that each of the Aggregate Principal Balance of the Collateral Obligations and the Overcollateralization Ratio Numerator with respect to the Class A Notes and the Class B Notes is at least U.S.$981,300,000.

(b)     No Collateral Obligations may be purchased prior to the Ramp-Up Completion Date unless immediately following the purchase of any Collateral Obligation (as certified by the Servicer in writing), the remaining funds in the Collection Account, after giving effect to such purchase, are sufficient as of the date of determination to purchase Collateral Obligations for inclusion in the Collateral so that each of the Aggregate Principal Balance of the Collateral Obligations and the Overcollateralization Ratio Numerator with respect to the Class A Notes and the Class B Notes is at least U.S.$981,300,000 (taking into account the Collateral Obligations already part of the Collateral (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations on or before the Ramp-Up Completion Date)).

(c)     Notwithstanding the foregoing, or any other provision of this Indenture, if the Issuer has previously entered into a commitment to purchase a Collateral Obligation to be included

141

in the Collateral, such commitment initially not to exceed 60 days, and at the time of the commitment the Collateral Obligation complied with the definition of "Collateral Obligation" and the requirements set forth in this Section 7.19, the Issuer may consummate the purchase of the Collateral Obligation notwithstanding that the Collateral Obligation fails to comply with the definition of "Collateral Obligation" and the requirements set out above on the date of settlement.

(d)     The Issuer will use commercially reasonable efforts to purchase, or to enter into binding agreements to purchase, Collateral Obligations by the Ramp-Up Completion Date, that, together with the Collateral Obligations purchased on or before the Closing Date and then held by the Issuer, will satisfy, as of the Ramp-Up Completion Date (without giving effect to any reductions of that amount that may have resulted from scheduled principal payments, principal prepayments or dispositions made with respect to any Collateral Obligations on or before the Ramp-Up Completion Date), the Collateral Quality Tests, the Concentration Limitations, the criteria set forth in Section 12.2 of this Indenture and the Overcollateralization Tests.

(e)     No later than five Business Days after the Ramp-Up Completion Date, the Issuer shall notify each of the Rating Agencies in writing of the occurrence of the Ramp-Up Completion Date (each, a "***Ramp-Up Notice***") and request in writing that each of S&P and Moody's confirm in writing within 25 days of delivery of such Ramp-Up Notice that it has not reduced or withdrawn the Initial Ratings; *provided,* however, that the Issuer shall not be required to request a Rating Confirmation from Moody's if, as of the Ramp-Up Completion Date Moody's has received an Accountants' Certificate confirming (i) the Issuer is in compliance with each of the Collateral Quality Tests, the Coverage Tests and the Concentration Limitations and (ii) the Aggregate Principal Balance of the Collateral Obligations that the Issuer owns or has committed to purchase is at least equal to $981,300,000. In connection with such request or, in the case of Moody's, in lieu of such request, the Issuer shall provide a report to the Rating Agencies identifying the Collateral Obligations then included in the Collateral and the Issuer shall obtain and deliver to the Trustee and the Rating Agencies, together with the delivery of a report (and, with respect to S&P, an Excel Default Model Input File and, with respect to each Collateral Obligation, the name of the obligor thereon and the CUSIP number thereof (if applicable)) substantially in the form of a Monthly Report as of the Ramp-Up Completion Date, an Accountants' Certificate confirming:

(i)     confirming the maturity date, rating, spread and recovery rate for each item of Original Collateral Obligations owned by the Issuer as of the Ramp-Up Completion Date and the information provided by the Issuer with respect to every other asset included in the Collateral, by reference to such sources as shall be specified therein;

(ii)     confirming that as of the Ramp-Up Completion Date:

(1)     each of the Coverage Tests are satisfied;

(2)     the Aggregate Principal Balance of Collateral Obligations that the Issuer owned or committed to purchase as of the Ramp-Up Completion Date is at least equal to the Maximum Amount; and

(3)     the Collateral Obligations comply with all of the requirements of the Collateral Quality Tests and the Concentration Limitations; and

(iii)     specifying the procedures undertaken by them to review data and computations relating to the foregoing statements.

(f)     Any failure by the Issuer to obtain a Ratings Confirmation pursuant to Section 7.19(e) above shall be a Rating Confirmation Failure (a "***Rating Confirmation Failure.***" If a

Rating Confirmation Failure occurs, the Notes will be redeemed pursuant to, and to the extent provided in, Section 9.1(a).

Section 7.20.  **Posting of Reports on Repository.**

If either of the Initial Purchasers has entered into a posting dealer agreement with The Bond Market Association relating to the transactions contemplated by this Indenture, each of the Issuer, the Trustee and the Servicer acknowledges and agrees that each Monthly Report and Valuation Report may be posted to the Repository for use in the manner provided in the Repository.  In connection therewith, the Trustee, at the expense of the Issuer, agrees to make available in accordance with Section 14.3(a)(ix) each Monthly Report or Valuation Report to the operator of the Repository for posting on the Repository.  Such Initial Purchaser will notify the Trustee, the Co-Issuers and the Servicer upon entering into a posting dealer agreement.

Section 7.21.  **Secondary Risk Procedures.**

The Servicer shall notify S&P and request that S&P modify the S&P CDO Monitor accordingly if on any date (as disclosed in the most recent Monthly Report):

(a)  the Aggregate Principal Amount of all Collateral Obligations participated from or entered into with the same Secondary Risk Counterparty exceeds the percentage of the Maximum Amount in the Secondary Risk Table opposite the long-term S&P credit rating of the Secondary Risk Counterparty under the caption "Individual Counterparty Limit," or

(b)  the Aggregate Principal Amount of all Collateral Obligations participated from or entered into with Secondary Risk Counterparties with the same long-term credit rating exceeds the percentage of the Maximum Amount in the Secondary Risk Table opposite that rating under the caption "Aggregate Counterparty Limit" (excluding up to 5% by Aggregate Principal Amount of Synthetic Securities with respect to Collateral Obligations the Aggregate Counterparty Limit of which is 20% to the extent that (x) such exposure is fully collateralized with respect to principal and (y) the related Synthetic Security Counterparties are rated at least "A-1+" by S&P).

Section 7.22.  **Section 3(c)(7) Procedures.**

In addition to the notices required to be given under Section 10.6 hereof, the Issuer shall take the following actions to ensure compliance with the requirements of Section 3(c)(7) of the Investment Company Act (provided that such procedures and disclosures may be revised by the Issuer to be consistent with generally accepted practice for compliance with the requirements of Section 3(c)(7) of the Investment Company Act):

(a)  *Section 3(c)(7) Notice to Investors*.  The Issuer shall (i) request the Depository to cause, and cooperate with the Depository in causing, the Depository's security description and delivery order to include a "3(c)(7) marker" and the Depository's user manual to contain an accurate description of the restrictions on the holding and transfer of the Notes due to the Issuer's reliance on the exclusion to registration provided by Section 3(c)(7) of the Investment Company Act, (ii) request that the Depository send, and cooperate with the Depository in causing the Depository to send, to its Agent Members (x) the Important Section 3(c)(7) Reminder Notice substantially in the form of Exhibit G-2 in connection with the initial offering of the Notes and (y) the Section 3(c)(7) Reminder Notice substantially in the form of Exhibit G-1 as set forth in Section 10.6(b) and (iii) request that the Depository cause, and cooperate with the Depository in causing, the Depository's Reference Directory to include each Class of Notes (and the applicable CUSIP numbers for the Notes) in the listing of 3(c)(7) issues together with an attached description of the limitations as to the distribution, purchase, sale and holding of the Notes.

143

(b)     *CUSIP Numbers.*  The Issuer shall (a) request of S&P, and shall cooperate with S&P to ensure that all CUSIP numbers identifying the Notes shall have a "fixed field" attached thereto that contains "3c7" and "144A" indicators and (b) take steps to cause the Initial Purchasers and any market makers to require that all "confirms" of trades of the Notes contain CUSIP numbers with such "fixed field" identifiers.

(c)     *Bloomberg and other Third-Party Vendor Screens.*  The Issuer shall use all reasonable efforts to cause the Bloomberg screen or screens containing information about the Notes to include the following language: (a) the "Note Box" on the bottom of the "Security Display" page describing the Notes shall state: "Iss'd Under 144A/3(c)(7)," (b) the "Security Display" page shall have the flashing red indicator "See Other Available Information" and (c) the indicator shall link to the "Additional Security Information" page, which shall state that the securities are "being offered in reliance on the exemption from registration under Rule 144A of the Securities Act, to persons who are both (x) qualified institutional buyers (as defined in Rule 144A under the Securities Act) and (y) qualified purchasers (as defined under Section 3(c)(7) under the Investment Company Act)." The Issuer shall use all reasonable efforts to require that any other third-party vendor screens containing information about the Notes include substantially similar language to clauses (a) through (c) above.

# ARTICLE 8

## SUPPLEMENTAL INDENTURES

Section 8.1.     ***Supplemental Indentures Without Consent of Holders.***

(a)     Without the consent of the Holders of any Securities (other than with respect to the consent of the Majority of the Controlling Class specified in clause (15) below),  when authorized by Board Resolutions, and subject to the requirement provided below in this Section 8.1 with respect to the ratings of any Class of Notes, the Co-Issuers and the Trustee may, if, with respect to any matters described in clauses (1) through (23) below, the interests of the Holders of the Securities (except, in the case of clause (12) below, any Holders of Notes subject to the applicable Refinancing) are not materially and adversely affected thereby (the Co-Issuers and the Trustee will be bound by a standard of good faith and fair dealing in making such determination) execute one or more indentures supplemental to this Indenture, in form satisfactory to the Trustee, to:

(1)     evidence the succession of another Person to the Issuer or the Co-Issuer and the assumption by the successor Person of the obligations of the Issuer or the Co-Issuer in this Indenture and in the Securities;

(2)     add to the covenants of the Co-Issuers or the Trustee for the benefit of the Noteholders or to surrender any right in this Indenture conferred on the Co-Issuers;

(3)     convey, transfer, assign, mortgage or pledge any property to the Trustee, or add to the conditions, limitations, or restrictions on the authorized amount, terms, and purposes of the issue, authentication and delivery of the Notes;

(4)     evidence and provide for the acceptance of appointment under this Indenture by a successor Trustee and to add to or change any of the provisions of this Indenture necessary to facilitate the administration of the trusts under this Indenture by more than one Trustee, pursuant to the requirements of Sections 6.10, 6.11, and 6.13;

(5)     correct or amplify the description of any property at any time subject to the lien of this Indenture, or to better assure, convey, and confirm to the Trustee any property

144

subject or required to be subject to the lien of this Indenture (including all actions appropriate as a result of changes in law) or to subject to the lien of this Indenture any additional property;

(6) cause any provision of this Indenture to conform to, or be consistent with, the statements made with respect to such provision in the Offering Memorandum;

(7) modify the restrictions on and procedures for resales and other transfers of the Notes to reflect any changes in applicable law (or its interpretation) or to enable the Co-Issuers to rely on any less restrictive exemption from registration under the Securities Act (including, without limitation, to add provisions for resales and transfers of the Class E Notes and/or Preference Shares under Regulation S) or the Investment Company Act or to remove restrictions on resale and transfer to the extent not required under this Indenture;

(8) with the consent of the Servicer, modify (A) the restrictions on the sales of Collateral Obligations in Section 12.1 or (B) with the consent of the Majority of the Controlling Class (which consent shall not be unreasonably withheld), the Eligibility Criteria in Section 12.2 (and the definitions related thereto); provided that, for the avoidance of doubt, the consent of a Majority of the Controlling Class shall not be required if such amendment also satisfies the requirements of clause (24) below;

(9) make appropriate changes for any Class of Senior Notes to be listed on an exchange other than the Irish Stock Exchange;

(10) otherwise to correct any inconsistency or cure any ambiguity or errors in this Indenture;

(11) accommodate the issuance of the Senior Notes in book-entry form through the facilities of DTC or otherwise;

(12) to accommodate a Refinancing effected pursuant to and in compliance with Section 9.7; provided that no Holders of Notes or Preference Shares are materially adversely affected thereby, other than Holders of Notes subject to such Refinancing;

(13) take any appropriate action to prevent the Issuer, the Holders of the Securities, or the Trustee from becoming subject to withholding or other taxes, fees, or assessments or to prevent the Issuer from being treated as being engaged in a U.S. trade or business or otherwise being subject to income tax on a net income basis, so long as the action will not cause the Holders of any Securities to be adversely affected to any material extent by any change to the timing, character, or source of the income from the Securities, as evidenced by a Tax Opinion of Counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion);

(14) authorize the appointment of any listing agent, Transfer Agent, Paying Agent or additional registrar for any Class of Notes appropriate in connection with the listing of any Class of Senior Notes on the Irish Stock Exchange or any other stock exchange, and otherwise to amend this Indenture to incorporate any changes required or requested by any governmental authority, stock exchange authority, listing agent, Transfer Agent, Paying Agent or additional registrar for any Class of Notes in connection with its appointment, so long as the supplemental indenture would not materially and adversely affect any Noteholder, as evidenced by an Opinion of Counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and

145

other documents necessary or advisable in the judgment of counsel delivering the opinion) or a certificate of an Authorized Officer of the Servicer, to the effect that the modification would not be materially adverse to the Holders of any Class of Notes;

(15) with the consent of the Majority of the Controlling Class, amend, modify, enter into or accommodate the execution of any contract relating to a Synthetic Security (including posting collateral under a Synthetic Security Agreement) if such particular action is not otherwise permitted under the Indenture;

(16) modify Section 3.3 to be consistent with applicable laws or Rating Agency requirements;

(17) evidence any waiver by any Rating Agency as to any requirement or condition, as applicable, of the Rating Agency set forth in this Indenture;

(18) facilitate the issuance of participation notes, combination notes, composite securities and other similar securities;

(19) facilitate hedging transactions;

(20) facilitate the ability of the Issuer to lend collateral pursuant to a Securities Lending Agreement;

(21) modify any provision to facilitate an A/B Exchange, including to effect any serial designation relating to the exchange;

(22) with the consent of the Servicer, enter into any additional agreements not expressly prohibited by this Indenture as well as any amendment, modification, or waiver if the Issuer determines that the amendment, modification, or waiver would not, upon or after becoming effective, materially and adversely affect the rights or interest of the Holders of any Class of Securities as evidenced by an Opinion of Counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) or a certificate of an officer of the Servicer to the effect that the modification would not be materially adverse to the Holders of any Class of Securities; provided that, for the avoidance of doubt, this clause (22) shall not permit the Co-Issuers and the Trustee to effect any amendment that expressly requires the consent of the Majority of the Controlling Class without such consent;

(23) provide for the issuance of additional Preference Shares to the extent permitted by the Preference Share Documents and to extend to such additional Preference Shares the benefits applicable to the Preference Shares under the Indenture and the Preference Share Documents; or

(24) prevent the Issuer from becoming an "investment company" as defined in the Investment Company Act or to better assure compliance with the requirements of Rule 3a-7 and/or to remove transfer restrictions and other requirements relating to Section 3(c)(7); provided that, as a condition to the effectiveness of any such supplemental indenture, each of the Issuer, the Trustee and the Servicer shall have received (A) a Rating Confirmation with respect to such supplemental indenture and (B) a customary opinion of counsel (which may be supported as to factual matters by any relevant certificates or other documents necessary or advisable in the judgment of counsel delivering such opinion) from a nationally recognized law firm providing that, after giving effect to such supplemental

146

indenture, the Issuer is exempt from registration as an "investment company" under the Investment Company Act in reliance on the exemption provided by Rule 3a-7.

(b)     Without the consent of the Servicer, no supplemental indenture may be entered into that would reduce the rights, decrease the fees or other amounts payable to the Servicer under this Indenture or increase the duties or obligations of the Servicer.

(c)     The Trustee is authorized to join in the execution of any such supplemental indenture and to make any further appropriate agreements and stipulations that may be in the agreements, but the Trustee shall not be obligated to enter into any such supplemental indenture that affects the Trustee's own rights, duties, liabilities or immunities under this Indenture or otherwise, except to the extent required by law. Unless notified by a Majority of any Class of Notes or a Majority of the Preference Shares that Holders of the Class of the Notes or Holders of the Preference Shares would be materially and adversely affected, the Trustee may rely on a certificate of the Servicer and an Opinion of Counsel (which may be supported as to factual (including financial and capital markets) matters by any relevant certificates and other documents necessary or advisable in the judgment of counsel delivering the opinion) as to whether the interests of any Holder of Securities would be materially and adversely affected by any such supplemental indenture.

(d)     If any Outstanding Notes are rated by a Rating Agency, the Trustee shall enter into a supplemental indenture pursuant to this Section 8.1 only if either (1) the Rating Condition with respect to each Rating Agency is satisfied with respect to the supplemental indenture or (2) the Servicer and the Holders of 100% in Aggregate Outstanding Amount of each Class of Notes the ratings on which would be reduced or withdrawn consent to the supplemental indenture. Prior to the entry into any supplemental Indenture with respect to which a Rating Confirmation for one or more Classes of Notes is not expected to be delivered, the Trustee shall provide written notice to each Holder of each Outstanding Note informing them of such fact.

(e)     At the cost of the Co-Issuers, the Trustee shall mail to the Noteholders, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), each Rating Agency (for so long as any Notes are Outstanding and rated by a Rating Agency) and each Hedge Counterparty a copy of any such proposed supplemental indenture pursuant to this Section at least 15 Business Days before its execution by the Trustee (or 60 calendar days before execution in the case of a supplemental indenture for the purpose described in paragraph (8) of Section 8.1(a), which shall be identified as such in a certificate of the Servicer delivered to the Trustee before the date on which such notice is required to be given).

Section 8.2.     *Supplemental Indentures With Consent of Holders.*

(a)     If the Rating Condition is satisfied with respect to each Rating Agency, the Trustee and the Co-Issuers may execute one or more indentures supplemental to this Indenture to add any provisions to, or change in any manner, or eliminate any of the provisions of, this Indenture or modify in any manner the rights of the Noteholders under this Indenture with the consent of:

(1)     the Servicer if the supplemental indenture would reduce the rights, decrease the fees or other amounts payable to it under this Indenture or increase the duties or obligations of the Servicer;

(2)     a Majority of each Class of Notes adversely affected thereby, by Act of the Holders of each such Class of Notes; and

(3)     a Majority of the Preference Shares adversely affected thereby.

147

Any proposed supplemental indenture that would also necessitate a change to the Memorandum and Articles of Association may only be made after a Special Resolution (as defined in the Memorandum and Articles of Association) has been passed to permit the Issuer's constitutional documents to be altered to conform them to the proposed change to this Indenture as certified to the Trustee by the Issuer.

Notwithstanding anything in this Indenture to the contrary, without the consent of the Holder of each Outstanding Note adversely affected thereby and the Holder of each Preference Share adversely affected thereby, no supplemental indenture shall:

(i)     change the Stated Maturity of the principal of or the due date of any installment of interest on any Note or of any payment to the Preference Shares Paying Agent for payment to the Holders of the Preference Shares (other than in the case of any Maturity Extension in connection with an extension of the Replacement Period as described in Section 2.4), reduce the principal amount or the rate of interest on any Note, or the Default Interest Rate or the Redemption Price with respect to any Note or Preference Share, or change the earliest date on which Notes of any Class or Preference Share may be redeemed at the option of the Issuer, change the provisions of this Indenture relating to the application of proceeds of any Collateral to the payment of principal of or interest on Notes, or to payment to the Preference Shares Paying Agent for payment to the Holders of the Preference Shares, or change any place where, or the coin or currency in which, Notes or their principal or interest are paid or impair the right to institute suit for the enforcement of any such payment on or after their Stated Maturity (or, in the case of redemption, on or after the applicable Redemption Date);

(ii)    reduce the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class or Holders of Preference Shares whose consent is required for the authorization of any such supplemental indenture or for any waiver of compliance with certain provisions of this Indenture or certain defaults under this Indenture or their consequences provided for in this Indenture;

(iii)   permit the creation of any lien ranking prior to or on a parity with the lien of this Indenture with respect to any part of the Collateral or terminate the lien on any property at any time subject hereto or deprive the Holder of any Note of the security afforded by the lien of this Indenture;

(iv)    reduce the percentage of the Aggregate Outstanding Amount of Holders of Notes of each Class whose consent is required to request the Trustee to retain the Collateral or rescind the Trustee's election to retain the Collateral, pursuant to Section 5.5 or to sell or liquidate the Collateral, pursuant to Section 5.4 or 5.5;

(v)     modify any of the provisions of this Section, or to provide that certain other provisions of this Indenture cannot be modified or waived without the consent of the Holder of each Outstanding Note and Preference Share affected thereby;

(vi)    modify the definition of "Outstanding," "Controlling Class," or "Majority," or the Priority of Payments in Section 11.1(a) or Section 13.1; or

(vii)   modify any of the provisions of this Indenture in such a manner as to affect the calculation of the amount of any payment of Redemption Price or of interest or principal on any Note or any payment to the Preference Shares Paying Agent for the payment of dividends or other payments on the Preference Shares on any Payment Date or to affect the

148

rights of the Holders of the Securities to the benefit of any provisions for the redemption of the Notes or the Preference Shares contained in this Indenture.

(b)    Not later than 15 Business Days prior to the execution of any proposed supplemental indenture pursuant to this Section 8.2, the Trustee, at the expense of the Co-Issuers, shall mail to the Noteholders, the Servicer, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and each Rating Agency (for so long as any Notes are Outstanding and rated by a Rating Agency) a copy of such proposed supplemental indenture and shall request any required consent from the applicable Holders of Securities to be given within the Initial Consent Period. Any consent given to a proposed supplemental indenture by the Holder of any Securities, as applicable, shall be irrevocable and binding on all future Holders or beneficial owners of that Security, irrespective of the execution date of the supplemental indenture. If the Holders of less than the required percentage of the Aggregate Outstanding Amount of the relevant Securities consent to a proposed supplemental indenture within the Initial Consent Period, on the first Business Day after the Initial Consent Period, the Trustee shall notify the Issuer and the Servicer which Holders of Securities have consented to the proposed supplemental indenture and, which Holders (and, to the extent such information is reasonably available to the Trustee, which beneficial owners) have not consented to the proposed supplemental indenture. If it intends to exercise its Amendment Buy-Out Option pursuant to Section 9.6, the Amendment Buy-Out Purchaser shall so notify the Trustee (which notice shall designate a date for the Amendment Buy-Out to occur no earlier than 10 Business Days after the date of such notice) no later than five Business Days after the Servicer is so notified by the Trustee and the Trustee shall promptly mail such notice to all Noteholders and the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares). Any Non-Consenting Holder may give consent to the related proposed supplemental indenture until the 5th Business Day prior to the date of the Amendment Buy-Out designated by the Amendment Buy-Out Purchaser, and in such case shall cease to be a Non-Consenting Holder for purposes of the Amendment Buy-Out. If the Amendment Buy-Out Purchaser exercises its Amendment Buy-Out Option and purchases the applicable Securities pursuant to Section 9.6 below, the Amendment Buy-Out Purchaser, as Holder or beneficial owner of the applicable Securities, may consent to the related proposed supplemental indenture within five Business Days of the Amendment Buy-Out.

(c)    It shall not be necessary for any Act of Noteholders under this Section 8.2 to approve the particular form of any proposed supplemental indenture, but it shall be sufficient if the Act or consent approves its substance.

(d)    The Trustee, at the expense of the Co-Issuers, shall mail to the Noteholders, the Servicer, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and each Rating Agency a copy of any supplemental indenture pursuant to this Section 8.2 promptly after its execution by the Co-Issuers and the Trustee. Any failure of the Trustee to mail a copy of any supplemental indenture as provided in this Indenture, or any defect in the mailing, shall not in any way affect the validity of the supplemental indenture.

Section 8.3.    *Execution of Supplemental Indentures.*

In executing or accepting the additional trusts created by any supplemental indenture permitted by this Article 8 or the modifications thereby of the trusts created by this Indenture, the Trustee may receive, and (subject to Sections 6.1 and 6.3) shall be fully protected in relying upon, an Opinion of Counsel stating that the execution of the supplemental indenture is authorized or permitted by this Indenture and that all conditions precedent to the execution of such supplemental indenture have been satisfied. In the event that any supplemental indenture is consented to by the Issuer, the Co-Issuer and 100% of the Aggregate Outstanding Amount of each Class of Notes and the Rating Condition is satisfied or is specifically waived by all consenting parties, all conditions precedent to the execution of such supplemental indenture shall be deemed satisfied, the execution

149

of such supplemental indenture shall be authorized or permitted by this Indenture, and the Trustee shall execute and accept the additional trusts created by such supplemental indenture pursuant to this Article 8 or modification thereby of the trusts created by this Indenture without obtaining an Opinion of Counsel; provided that the Trustee may, but shall not be obligated to, enter into any such supplemental indenture that affects the Trustee's own rights, duties or immunities under this Indenture or otherwise. The Servicer shall not be bound by any amendment or supplement to this Indenture that would reduce the rights, decrease the fees or other amounts payable to it under this Indenture or increase the duties or obligations of the Servicer unless the Servicer consents to it in writing, such consent not to be unreasonably withheld or delayed. The Servicer shall follow any amendment or supplement to this Indenture by which it is bound of which it has received written notice from the time it receives a copy of the amendment from the Issuer or the Trustee. The Trustee shall deliver any such amendment or supplement to the Repository in accordance with Section 6.18.

Section 8.4.    *Effect of Supplemental Indentures; Certain Required Consents.*

Upon the execution of any supplemental indenture under this Article 8, this Indenture shall be modified in accordance therewith, and the supplemental indenture shall form a part of this Indenture for all purposes; and every Holder of Notes theretofore and thereafter authenticated and delivered under this Indenture shall be bound thereby.

Without the approval of each Hedge Counterparty to a then existing Hedge Agreement (so long as the Hedge Counterparty is not in default under any Hedge Agreement to which it is party), no supplemental indenture will be effective, and the Co-Issuers will not consent to any supplemental indenture, that would have a material adverse effect on the Hedge Counterparty. For purposes of this paragraph, any supplemental indenture will be deemed not to have a material adverse effect on the Hedge Counterparty if it does not object within 10 days of delivery of such supplemental indenture by the Trustee.

Any supplemental indenture that would necessitate a change to the Memorandum and Articles of Association may only be made after a Special Resolution (as defined in the Memorandum and Articles of Association) has been passed to permit the Memorandum and Articles of Association to be altered to conform with such proposed amendment.

Section 8.5.    *Reference in Notes to Supplemental Indentures.*

Notes authenticated and delivered after the execution of any supplemental indenture pursuant to this Article 8 may, and if required by the Trustee shall, bear a notice in form approved by the Trustee as to any matter provided for in the supplemental indenture. If the Applicable Issuers shall so determine, new Notes, so modified as to conform in the opinion of the Trustee and the Co-Issuers to any such supplemental indenture, may be prepared and executed by the Applicable Issuers and authenticated and delivered by the Trustee in exchange for Outstanding Notes.

# ARTICLE 9

## REDEMPTION OF NOTES

Section 9.1.    *Mandatory Redemption.*

(a)    If either (a) a Coverage Test is not met on any Determination Date or (b) a Rating Confirmation Failure occurs, principal payments on the Notes shall be made on the related Payment Date (without payment of any Redemption Price) in accordance with the Priority of Payments.

150

Upon receipt of notice of a Rating Confirmation Failure and if available Interest Proceeds and Principal Proceeds are insufficient to effect the redemption of the Notes, at par on any subsequent Payment Date in accordance with the Priority of Payments as and to the extent necessary for each of Moody's and S&P to confirm in writing the Initial Ratings assigned by it on the Closing Date to the Notes, then at the direction and in accordance with the instructions of the Servicer the Trustee shall sell Collateral Obligations so that the proceeds from the sale and all other funds available for the purpose in the Collection Account will be used to redeem the Notes and the Preference Shares (but only to the extent necessary for each of Moody's and S&P to confirm in writing the Initial Ratings assigned by it on the Closing Date to the Notes) and to pay all administrative and other fees, expenses and obligations payable under the Priority of Payments. Any sale under this Section shall be conducted in such a manner that:

(i)     after giving effect to the sale each Overcollateralization Test is satisfied or, if any Overcollateralization Test is not satisfied, the extent of compliance with the Overcollateralization Test is not reduced,

(ii)    if the sale occurs on or after the second Payment Date, after giving effect to the sale each Interest Coverage Test is satisfied or, if any Interest Coverage Test is not satisfied, the extent of compliance with the Interest Coverage Test is not reduced, and

(iii)   after giving effect to the sale each Collateral Quality Test is satisfied or, if any Collateral Quality Test is not satisfied, the extent of compliance with the Collateral Quality Test is not reduced.

(b)     The Preference Shares will be redeemed in whole in accordance with the Priority of Payments and the Preference Share Documents on any Payment Date on which a mandatory redemption of the Notes pursuant to Section 9.1(a) results in the payment in full of the Aggregate Outstanding Amount of each Class of Notes.

Section 9.2.     *Optional Redemption.*

(a)     Upon the occurrence of a Tax Event, or at any time after the Non-Call Period, the Notes shall be redeemed by the Applicable Issuers, in whole but not in part, on any Payment Date from Principal Proceeds and all other funds available for that purpose in the Collection Account, the Payment Account, the Interest Reserve Account, the Closing Date Expense Account, the Revolving Reserve Account and the Delayed Drawdown Reserve Account at the direction of the applicable Required Redemption Percentage, which direction must be given to the Preference Shares Paying Agent, the Trustee, the Issuer and the Servicer not later than 45 days before the Payment Date on which the redemption is to be made, at the applicable Redemption Price (exclusive of installments of interest and principal maturing on or before that date, payment of which shall have been made or duly provided for, to the Noteholders on relevant Record Dates or as otherwise provided in this Indenture). All Notes must be simultaneously redeemed, and any termination payments pursuant to Hedge Agreements must be paid.

In the event that the Preference Shares Paying Agent, the Trustee and the Issuer receive notice directing an optional redemption from any one or more Holders of Preference Shares holding less than a Majority of the Preference Shares, the Preference Shares Paying Agent shall, within five Business Days of receipt of such notice, notify the Holders of the Preference Shares (i) of the receipt of such notice and (ii) that any Holder of Preference Shares may join in directing an optional redemption by notifying the Issuer, the Trustee and the Preference Shares Paying Agent in writing within five Business Days after such Holder's receipt of the Preference Shares Paying Agent's Notice.

151

Upon receipt of a notice of redemption pursuant to the first paragraph of this Section 9.2(a), the Servicer in its sole discretion will (subject to the standard of care specified in the Servicing Agreement), on behalf of the Issuer, direct the sale of the Collateral Obligations so that the proceeds from the sale and all other funds available for such purpose in the Collection Account, the Interest Reserve Account, the Closing Date Expense Account, the Revolving Reserve Account and the Delayed Drawdown Reserve Account will be at least sufficient to redeem all of the Notes and to pay all administrative and other fees and expenses payable under the Priority of Payments without regard to any payment limitations. If, in the Servicer's reasonable discretion, the sale would not be sufficient to redeem the Notes, and to pay the fees, expenses and obligations, the Notes shall not be redeemed.

Upon any redemption pursuant to this Section 9.2(a), the Issuer shall, at least 30 days before the Redemption Date (unless the Trustee shall agree to a shorter notice period), notify the Trustee, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and each Rating Agency of the Redemption Date, the applicable Record Date, the principal amount of Notes to be redeemed on the Redemption Date and the applicable Redemption Prices.

(b)     On any Payment Date on or after payment in full of the Notes, all administrative and other fees (without regard to any payment limitations) payable under the Priority of Payments (including the Senior Servicing Fee and the Subordinated Servicing Fee), all amounts owing under this Indenture and all amounts owing under this Indenture and any Hedge Agreement to any Hedge Counterparty have been discharged,

(i)     at the direction of a Majority of the Preference Shares, the Issuer shall cause the Trustee to make payments in redemption of all of the Preference Shares, in an aggregate amount equal to all of the proceeds from the sale or other disposition of all of the remaining Collateral less any fees and expenses owed by the Issuer (including the Redemption Price of any Notes being simultaneously redeemed), the aggregate amount to be distributed to the Preference Shares Paying Agent for distribution to the Holders of the Preference Shares *pro rata* in accordance with their respective holdings or

(ii)     at the unanimous direction of the Holders of the Preference Shares, voting as a single Class or group, the Issuer shall cause the Trustee to make payments in redemption of all or a directed portion (representing less than all) of the Preference Shares to the Preference Shares Paying Agent for distribution to the Holders of the Preference Shares based upon such direction.

Upon a distribution pursuant to Section 9.2(b)(i), the Servicer will (subject to the standard of care specified in the Servicing Agreement), on behalf of the Issuer (and subject to Section 9.2(b)(ii)), direct the sale of all remaining Collateral Obligations. Upon a distribution pursuant to Section 9.2(b)(ii), the Servicer will effect the sale of Collateral Obligations in accordance with the unanimous direction of the Holders of the Preference Shares.

Section 9.3.     ***Optional Redemption Procedures.***

(a)     Upon any redemption pursuant to Section 9.2, the Trustee shall give notice of a redemption by first-class mail, postage prepaid, mailed not later than 10 Business Days and not earlier than 30 days before the applicable Redemption Date, each Holder of Notes to be redeemed, at the Holder's address in the Indenture Register or otherwise in accordance with the rules and procedures of DTC, Euroclear, and Clearstream, as applicable, to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and (in the case of a redemption pursuant to Section 9.2(a)) each Rating Agency. In addition, for so long as any Senior Notes are listed on the Irish Stock Exchange and so long as the rules of the exchange so require, notice of redemption of

Senior Notes pursuant to Section 9.2 shall also be given to the Company Announcements Office of the Irish Stock Exchange.

    (b)    All notices of redemption delivered pursuant to Section 9.3(a) shall state:

        (i)    the applicable Redemption Date;

        (ii)    the Redemption Price of the Notes to be redeemed (in the case of a redemption pursuant to Section 9.2(a));

        (iii)    in the case of a redemption pursuant to Section 9.2(a), that all of the Notes, are to be redeemed in full and that interest on the Notes to be redeemed shall cease to accrue on the Payment Date specified in the notice; and

        (iv)    the places where the Notes to be redeemed in whole are to be surrendered for payment of the Redemption Price, which shall be the office or agency of the Co-Issuers to be maintained as provided in Section 7.2 and, so long as any Senior Notes to be redeemed are listed on the Irish Stock Exchange, and the Irish Paying Agent.

Any such notice of redemption may be withdrawn by the Issuer up to the fourth Business Day before the scheduled Redemption Date by written notice to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Trustee and the Servicer only if:

        (A)    in the case of a redemption pursuant to Section 9.2(a), the Servicer does not deliver the sale agreement or certifications (described in Section 9.3(c) and 12.1(f)), as the case may be, in form satisfactory to the Trustee,

        (B)    in the case of a redemption pursuant to Section 9.2(a) or Section 9.2(b)(i), the Issuer receives the written direction of the Majority of the Preference Shares (or, in the case of an Optional Redemption of the Notes resulting from a Tax Event, the Affected Class) to withdraw the notice of redemption delivered by a percentage of the Preference Shares (or, in the case of an Optional Redemption of the Notes resulting from a Tax Event, the Affected Class) requesting redemption under Section 9.2(a) or Section 9.2(b)(i), as applicable, or

        (C)    in the case of a redemption pursuant to Section 9.2(b)(ii), the Issuer receives the unanimous written direction of the Holders of the Preference Shares to withdraw the notice of redemption (and the Issuer hereby agrees for the benefit of the directing Holders to withdraw the applicable notice of redemption if it receives the written direction referred to in the preceding clause (B) or this clause (C)).

Notice of any withdrawal shall be sent, not later than the third Business Day before the scheduled Redemption Date (assuming that the Trustee has received timely written notice from the Issuer as provided above), by the Trustee, to each Noteholder scheduled to be redeemed at the Holder's address in the Indenture Register by overnight courier guaranteeing next day delivery (or, to the extent the address contained in the Indenture Register is not sufficient for that purpose, by first class mail) and the Preference Shares Paying Agent (for forwarding to each Holder of Preference Shares). If the Issuer so withdraws any notice of redemption or is otherwise unable to complete any redemption of the Notes, the Sale Proceeds received from the sale of any Collateral Obligations sold pursuant to Sections 9.2 and 12.1(f) may, during the Replacement Period (and, in respect of Sale Proceeds from Credit Risk Obligations and Credit Improved Obligations, after the Replacement

153

Period) at the Servicer's discretion, be used to purchase replacement Collateral Obligations in accordance with the Eligibility Criteria.

Notice of redemption shall be given by the Co-Issuers or, upon an Issuer Order, by the Trustee in the name and at the expense of the Co-Issuers. Failure to give notice of redemption, or any defect therein, to any Holder of any Notes selected for redemption or the Preference Shares Paying Agent (for forwarding to each Holder of Preference Shares) shall not impair or affect the validity of the redemption of any other Securities.

(c)     The Notes may not be redeemed pursuant to Section 9.2(a) unless either of the following conditions is satisfied:

(i)     At least 10 Business Days before the Redemption Date, the Servicer shall have furnished to the Trustee evidence (in form reasonably satisfactory to the Trustee) that the Issuer has entered into a binding agreement (with a financial or other institution or entity whose short-term unsecured debt obligations (other than obligations whose rating is based on the credit of a Person other than the institution) have a credit rating of at least "A-1" from S&P and of "P-1" (and not on credit watch for possible downgrade) from Moody's (or to any other institution or entity if the Rating Condition with respect to Moody's is satisfied with respect to the other entity)) to sell to the financial or other institutions, not later than the Business Day before the Redemption Date in immediately available funds, all or part of the Collateral (directly or by participation or other arrangement) at a Purchase Price at least equal to an amount sufficient (together with any Cash and other Eligible Investments not subject to the agreements and maturing on or before the Redemption Date and any payments to be received with respect to the Hedge Agreements on or before the Redemption Date) to pay all administrative and other fees and expenses payable under the Priority of Payments without regard to any payment limitations (including the Senior Servicing Fee and the Subordinated Servicing Fee), all amounts owing under this Indenture, all amounts owing under the Hedge Agreements to the Hedge Counterparties, and to redeem the Notes on the Redemption Date at the applicable Redemption Prices; or

(ii)     Before entering into any binding agreement to sell all or a portion of the Collateral and selling or terminating any Hedge Agreement, the Servicer shall have certified that, in its commercially reasonable judgment, the settlement dates of the sales will be scheduled to occur on or before the Business Day before the Redemption Date and that the expected proceeds from the sales are to be delivered to the Trustee no later than the Business Day before the Redemption Date, in immediately available funds, in an amount (calculated as applicable in the manner provided below) sufficient (together with any Cash and other Eligible Investments not subject to the agreements and maturing on or before the Redemption Date and any payments to be received with respect to the Hedge Agreements on or before the Redemption Date) to pay all administrative and other fees and expenses payable under the Priority of Payments (including the Senior Servicing Fee and the Subordinated Servicing Fee), all amounts owing under this Indenture, all amounts owing under the Hedge Agreements to the Hedge Counterparties, and to redeem the Notes on the Redemption Date at the applicable Redemption Prices. For purposes of this paragraph, the amount shall be calculated with respect to the classes of Collateral listed in the table below by multiplying the expected proceeds of sale of the Collateral by the indicated percentage in the table below. For the avoidance of doubt, no Hedge Agreement shall be sold or terminated unless the third Business Day before the scheduled Redemption Date has passed and no notice of withdrawal has been issued.

154

NY\1257964.27

|   |   | Number of Business Days Between Certification to the Trustee and Sale | | | |
|---|---|:---:|:---:|:---:|:---:|
|   |   | Same Day | 1 to 2 | 3 to 5 | 6 to 15 |
| 1 | Cash or other Eligible Investments | 100% | 100% | 100% | 100% |
| 2 | Loans (other than 5 below) | 100% | 93% | 92% | 88% |
| 3 | High-Yield Bonds (other than 5 below) and Structured Finance Obligations (in each case, other than 4 below) | 100% | 89% | 85% | 75% |
| 4 | High-Yield Bonds (other than 5 below) and Structured Finance Obligations, in each case with a Moody's Rating of "B3" and on credit watch with negative implications or below "B3" | 100% | 75% | 65% | 55% |
| 5 | Synthetic Securities | 100% | 65% | 55% | 35% |

Any certification delivered pursuant to this Section 9.3(c) shall include (A) the prices of, and expected proceeds from, the sale of any Collateral Obligations, Eligible Investments, or Hedge Agreements and (B) all calculations required by this Section 9.3(c).

Section 9.4.   ***Notes Payable on Redemption Date.***

(a)     Notice of redemption pursuant to Section 9.3 having been given as aforesaid, the Notes to be redeemed shall, on the Redemption Date, become payable at the Redemption Price therein specified and from and after the Redemption Date (unless the Issuer shall default in the payment of the Redemption Price and accrued interest) the Notes shall cease to bear interest on the Redemption Date. Upon final payment on a Note to be so redeemed, the Holder shall present and surrender the Note at the place specified in the notice of redemption on or before the Redemption Date unless the Co-Issuers and the Trustee receive the security or indemnity required by them to save each of them harmless and an undertaking thereafter to surrender the Note, and in the absence of notice to the Co-Issuers and the Trustee, that the applicable Note has been acquired by a protected purchaser, the final payment shall be made without presentation or surrender. Payments of interest on Notes so to be redeemed whose Stated Maturity is on or before the Redemption Date shall be payable to the Noteholders, or one or more predecessor Notes, registered as such at the close of business on the relevant Record Date if the Record Date is a Business Day (or, if the Record Date is not a Business Day, the close of business on the Business Day before the Record Date) according to Section 2.8(e).

(b)     If any Note called for redemption is not paid on its surrender for redemption, its principal shall bear interest from the Redemption Date at the Applicable Note Interest Rate for each successive Interest Period the Note remains Outstanding if the reason for the non-payment is not the fault of the Holder of the Note.

Section 9.5.   ***Special Redemption.***

Principal payments on the Notes shall be made in whole or in part, at par, in accordance with the Priority of Payments if, at any time during the Replacement Period, the Servicer elects (subject to the Servicing Agreement) to notify the Trustee and each Rating Agency that it has been unable, for 45 consecutive Business Days, to identify additional or replacement Collateral Obligations that are deemed appropriate by the Servicer in its sole discretion and meet the Eligibility

NY\1257964.27

Criteria in sufficient amounts to permit the application of all or a portion of the funds then in the Collection Account available to be used to purchase additional or replacement Collateral Obligations (a "*Special Redemption*").

On the first Payment Date following the Due Period for which the notice is effective (a "*Special Redemption Date*"), the funds in the Collection Account or the Payment Account representing Principal Proceeds that, by operation of the preceding paragraph, are not used to purchase additional Collateral Obligations (the "*Special Redemption Amount*") will be available to be applied in accordance with the Priority of Payments under Section 11.1(a)(ii). Notice of payments pursuant to this Section 9.5 shall be given by first-class mail, postage prepaid, mailed not later than three Business Days before the applicable Special Redemption Date, to each Holder of Notes to be redeemed, at the Holder's address in the Indenture Register or otherwise in accordance with the rules and procedures of DTC. In addition, for so long as any Senior Notes are listed on the Irish Stock Exchange and so long as the rules of the exchange so require, notice of redemption of Senior Notes pursuant to Section 9.2 shall also be given to the Company Announcements Office of the Irish Stock Exchange.

Section 9.6.    *Amendment Buy-Out.*

(a)    In the case of any supplemental indenture pursuant to Section 8.2 that requires the consent of one or more Holders of Securities, the Amendment Buy-Out Purchaser shall have the right, but not the obligation, to purchase from Non-Consenting Holders all Securities held by such Holders whose consent was solicited with respect to such supplemental indenture (the "*Amendment Buy-Out Option*") for the applicable Amendment Buy-Out Purchase Price; provided, however, that the Amendment Buy-Out Purchaser may not exercise the Amendment Buy-Out Option during the Non-Call Period in connection with a proposed amendment to reduce the rate of interest on any Note or to change the earliest date on which Notes of any Class or Preference Shares may be redeemed at the option of the Issuer. If such option is exercised, the Amendment Buy-Out Purchaser must purchase all such Securities of Non-Consenting Holders for the applicable Amendment Buy-Out Purchase Price, regardless of the applicable percentage of the Aggregate Outstanding Amount of the Securities the consent of whose Holders is required for such supplemental indenture (an "*Amendment Buy-Out*"). By its acceptance of its Securities hereunder, each Holder of Securities agrees that if the Amendment Buy-Out Option is exercised, any Non-Consenting Holder will be required to sell its applicable Securities to the Amendment Buy-Out Purchaser; provided that if any Non-Consenting Holder holds Class II Preference Shares, such Non-Consenting Holder will sell such Class II Preference Shares to the Amendment Buy-Out Purchaser and such Preference Shares will be redesignated as Class I Preference Shares. Neither the Amendment Buy-Out Purchaser nor any other Person shall have any liability to any Holder or beneficial owner of Securities as a result of an election by the Amendment Buy-Out Purchaser not to exercise the Amendment Buy-Out Option.

(b)    All purchases made pursuant to an Amendment Buy-Out Option individually and in the aggregate must comply with the applicable transfer restrictions for the relevant Securities set forth herein and in the Preference Share Documents, and all applicable laws, rules and regulations (including, without limitation, any rules, regulations and procedures of any securities exchange, self-regulatory organization or clearing agency).

Section 9.7.    *Redemption by Refinancing.*

(a)    On any Payment Date after the Non-Call Period, any Class of the Notes may be redeemed in whole, but not in part from Refinancing Proceeds if the Servicer, on behalf of the Issuer, proposes to the Holders of the Preference Shares in writing (by notice to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares)) with a copy to the Trustee and the Rating Agencies, at least 30 days prior to the Payment Date for such redemption

156

(such date, the "***Refinancing Date***"), to redeem such Notes in accordance with this Section 9.7 (a "***Notice of Refinancing***"), which notice shall, among other things, specify the Refinancing Date and the Class of Notes to be Refinanced. Such redemption shall be effected by the Issuer obtaining a loan or an issuance of a replacement class of notes ("***Refinancing Notes***"), the terms of which loan or issuance will be negotiated by the Servicer, on behalf of the Issuer, from one or more financial institutions or purchasers (which may include the Servicer or its Affiliates) selected by the Servicer (a refinancing provided pursuant to such loan or issuance, a "***Refinancing***"), and provided that (i) such proposal is approved by a Majority of the Preference Shares (voting as a single class) at least 15 days prior to the Refinancing Date and (ii) the Servicer completes such Refinancing and causes the Refinancing Proceeds to be deposited with the Trustee (in immediately available funds) no later than the close of the Business Day immediately preceding the Refinancing Date.

(b)     The Issuer shall obtain a Refinancing only if the Servicer determines and certifies to the Trustee that:

(i)     a Rating Confirmation has been obtained from each Rating Agency for each class of Refinancing Notes and each Class of Notes not subject to Refinancing;

(ii)     the proceeds from the Refinancing will be at least sufficient to pay the Refinancing Price plus any Administrative Expenses of the Issuer related to the Refinancing;

(iii)     the interest rate payable in respect of the obligations providing the Refinancing is less than the interest rate payable on the Notes being refinanced;

(iv)     the principal amount of any obligations providing the Refinancing is no greater than the principal amount of the Notes being redeemed with the proceeds of such obligations;

(v)     the stated maturity of the obligations providing the Refinancing is no earlier than the stated maturity of the Notes being refinanced;

(vi)     the Refinancing Proceeds will be used (to the extent necessary) to redeem the applicable Notes;

(vii)     the agreements relating to the Refinancing contain limited recourse, non-recourse and non-petition provisions, investor qualification provisions and transfer restrictions equivalent to those applicable to the Notes being redeemed, as set forth herein;

(viii)     the obligations providing the Refinancing are subject to the Priority of Payments and do not rank higher in priority pursuant to the Priority of Payments than the Class of Notes being redeemed; and

(ix)     the expenses in connection with the Refinancing have been paid or will be adequately provided for.

(c)     The Trustee shall be entitled to receive, and (subject to Sections 6.1 and 6.3 hereof) shall be fully protected in relying upon an Opinion of Counsel stating that the Refinancing is permitted by this Indenture and that all conditions precedent thereto have been complied with.

(d)     Any Refinancing Proceeds will not constitute Interest Proceeds or Principal Proceeds but will be applied directly on the related Refinancing Date pursuant to this Indenture to redeem the Notes being refinanced and pay Administrative Expenses in connection with the Refinancing without regard to the Priority of Payments; provided that to the extent that any Refinancing Proceeds exceed the amount necessary to redeem the Notes being refinanced (and any

157

associated Administrative Expenses), such excess Refinancing Proceeds will be treated as Principal Proceeds.

(e)     If notice of consent by a Majority of the Preference Shares to a Refinancing has been received by the Trustee from the Servicer pursuant to Section 9.7(a) no later than 15 days prior to the Refinancing Date, notice of a Refinancing shall be given by the Trustee by first class mail, postage prepaid, mailed not less than 10 Business Days prior to the proposed Refinancing Date, to each Holder of Notes of the Class to be refinanced at the address in the Indenture Register (with a copy to the Servicer) and, so long as any Class of Notes is listed on the Irish Stock Exchange, the Irish Paying Agent.

All Notices of Refinancing shall state:

(i)     the proposed Refinancing Date, which shall be the applicable Redemption Date in respect of the Notes being redeemed;

(ii)     the Refinancing Price, which shall be the applicable Redemption Price in respect of the Notes being redeemed;

(iii)     that on such proposed Refinancing Date such Notes will be refinanced and redeemed in full, and that, provided that the Refinancing Proceeds have been deposited with the Trustee for any such payment in full, interest on such Notes being redeemed shall cease to accrue on such date; and

(iv)     the place or places where such Notes are to be surrendered for payment of the Refinancing Price which, if not stated, shall be the office or agency of any paying agent as provided in Section 7.2.

provided that no such Notice of Refinancing shall be sent if either (a) the Servicer has withdrawn its consent to such Refinancing or (b) the consent of a Majority of the Holders of Preference Shares to such Refinancing has not been obtained.

(f)     Notice of Refinancing shall be given by the Trustee at the expense of the Issuer. Failure to give a Notice of Refinancing, or any defect therein, to any Holder of any Note selected for Refinancing shall not impair or affect the validity of the Refinancing or give rise to any claim based upon such failure or defect.

Any Notice of Refinancing may be withdrawn by the Servicer, on behalf of the Issuer, on or prior to the fourth Business Day prior to the scheduled Refinancing Date by written notice to the Trustee, the Paying Agent, the Preference Shares Paying Agent, the Rating Agencies and the Holders of the Preference Shares. Upon receipt of such notice of withdrawal, the Trustee shall send such notice to the Holders of Notes and, if applicable, the Irish Paying Agent.

(g)     If a Notice of Refinancing pursuant to Section 9.7(a) has been given as provided herein and not withdrawn, the Notes to be refinanced shall on the Refinancing Date become due and payable at the Refinancing Price. Each Holder of such Notes shall present and surrender its Note at the place specified in the Notice of Refinancing on or prior to such Refinancing Date; provided that if there is delivered to the Issuer and the Trustee such security or indemnity as may be required by them to save each of them harmless and an undertaking thereafter to surrender such Note, then, in the absence of notice to the Issuer and the Trustee that the applicable Note has been acquired by a bona fide purchaser, such final payment shall be made without presentation or surrender.

(h)     If any Class of Notes called for Refinancing shall not be so paid upon surrender thereof for Refinancing (or the delivery of the indemnity pursuant to the preceding paragraph) the principal shall, until paid, bear interest from the Refinancing Date at the applicable Interest Rate for each successive Payment Date with respect to which such Note remains Outstanding.

158

## ARTICLE 10

### ACCOUNTS, ACCOUNTINGS, AND RELEASES

Section 10.1.    *Collection of Money.*

Except as otherwise expressly provided in this Indenture, the Trustee may demand payment or delivery of, and shall receive and collect, directly and without intervention or assistance of any fiscal agent or other intermediary, all money and other property payable to or receivable by the Trustee pursuant to this Indenture, including all payments due on the Pledged Obligations, in accordance with the terms of the Pledged Obligations. The Trustee shall segregate and hold all money and property received by it in trust for the Secured Parties and shall apply it as provided in this Indenture. Any Account may contain any number of sub-accounts for the convenience of the Trustee or as required by the Servicer for convenience in administering the Accounts, the Collateral.

Section 10.2.    *Collection Account.*

(a)    Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Collection Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties over which the Trustee shall have exclusive control and the sole right of withdrawal, and into which the Trustee shall from time to time deposit, in addition to the deposits required pursuant to Section 10.7(e), immediately upon the Trustee's receipt thereof:

(i)    any funds transferred from (1) the Closing Date Expense Account pursuant to Section 10.3(g) or (2) the Interest Reserve Account pursuant to Section 10.3(i),

(ii)    all Principal Proceeds (unless (1) simultaneously used to purchase Collateral Obligations in accordance with Article 12, (2) deposited into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or (3) posted by the Issuer as cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security or in Eligible Investments) received by the Trustee,

(iii)    all Interest Proceeds received by the Trustee (unless simultaneously used to purchase accrued interest in respect of Collateral Obligations in accordance with Article 12 or in Eligible Investments), and

(iv)    all other funds received by the Trustee from the Collateral and not excluded above.

In addition to the items described above, the Issuer may, but under no circumstances shall be required to, deposit from time to time any monies, securities and other instruments in the Collection Account it deems, in its sole discretion, to be advisable (and may designate any amounts deposited pursuant to this sentence as Principal Proceeds or Interest Proceeds in its discretion). Any Principal Proceeds received during the Replacement Period, and Sale Proceeds from the sale of Credit Improved Obligations and Unscheduled Principal Payments received after the Replacement Period, which have not been used to purchase additional Collateral Obligations on the Business Day of receipt shall be deposited in the Collection Account and shall at the direction of the Servicer be applied to the purchase of additional Collateral Obligations in accordance with the Eligibility Criteria and the other requirements set forth herein or the purchase of Eligible Investments pending such application or used to enter into additional Hedge Agreements or used in connection with a

159

Special Redemption. Principal Proceeds (other than Sale Proceeds from the sale of Credit Improved Obligations, Credit Risk Obligations and Unscheduled Principal Payments) received after the Replacement Period shall be deposited into the Collection Account and applied to the purchase of Eligible Investments. All monies deposited from time to time in the Collection Account pursuant to this Indenture shall be held by the Trustee as part of the Collateral and shall be applied to the purposes provided in this Indenture. Amounts in the Collection Account shall be held pursuant to Section 10.4(a).

(b)     Within one Business Day after receipt of any distribution or other proceeds of the Collateral that are not Cash, the Trustee shall so notify the Issuer and the Servicer. Within five Business Days of receipt of the notice from the Trustee, the Servicer, on behalf of the Issuer, shall sell the distribution or other proceeds for Cash in an arm's length transaction to a Person that is not the Servicer or an Affiliate of the Servicer and deposit its proceeds in the Collection Account. The Issuer need not sell the distributions or other proceeds if it delivers an Issuer Order or an Officer's certificate to the Trustee and the Servicer certifying that the distributions or other proceeds are Collateral Obligations, Eligible Investments, or Workout Assets.

(c)     During the Replacement Period (or, in respect of Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Risk Obligations and Credit Improved Obligations, after the Replacement Period), at the direction of the Servicer, the Issuer may by Issuer Order direct the Trustee to, and upon receipt of the Issuer Order the Trustee shall withdraw funds on deposit in the Collection Account representing Principal Proceeds (and, to the extent expressly provided in this Indenture, Interest Proceeds) and apply the funds to purchase Collateral Obligations (including any related deposit into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security), in each case in accordance with the requirements of Article 12 and the Issuer Order.

(d)     At any time during or after the Replacement Period, at the direction of the Servicer, the Issuer may by Issuer Order direct the Trustee to, and upon receipt of the Issuer Order the Trustee shall, pay from amounts on deposit in the Collection Account on any Business Day during any Interest Period from Interest Proceeds only, any Administrative Expenses that require payment before the next Payment Date to the extent that the amount of the payments does not exceed the aggregate amount that may be paid on the next Payment Date under, and at the level of priority specified by, Section 11.1(a)(i)(1).

(e)     The Trustee shall transfer to the Payment Account from the Collection Account for application pursuant to Section 11.1(a) or 11.2, as applicable, on or not later than the Business Day preceding each Payment Date, the amount set forth to be so transferred in the Valuation Report for the Payment Date.

Section 10.3.  *Other Accounts.*

(a)     *Custodial Account.*  Before the Closing Date, the Trustee shall establish a single, segregated trust account that shall be designated as the Custodial Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal, and into which the Trustee shall deposit the Collateral Obligations and other Collateral not deposited elsewhere in accordance with this Indenture (other than Loans, Participations and general intangibles, which in the case of Loans and Participations, shall be held by the Trustee as provided in Section 3.2). All assets or securities at any time on deposit in, or otherwise to the credit of, the Custodial Account shall be held in trust by the Trustee for the benefit of the Secured Parties. The only permitted withdrawals from the Custodial

160

Account shall be in accordance with this Indenture. The Co-Issuers shall not have any legal, equitable, or beneficial interest in the Custodial Account other than in accordance with Section 3.2 and the Priority of Payments.

(b) *Revolving Reserve Account and Delayed Drawdown Reserve Account.* Before the Closing Date, the Trustee shall establish (i) a single, segregated non-interest bearing trust account which shall be designated as the Revolving Reserve Account and (ii) a single, segregated non-interest bearing trust account that shall be designated as the Delayed Drawdown Reserve Account, each of which shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal. Upon the purchase of any Collateral Obligation that is a Revolving Loan or Delayed Drawdown Loan, at the direction of the Servicer, the Trustee shall deposit Principal Proceeds into the Revolving Reserve Account, in the case of a Revolving Loan, and the Delayed Drawdown Reserve Account, in the case of a Delayed Drawdown Loan, each equal to the unfunded Commitment Amount of the Revolving Loan or Delayed Drawdown Loan, respectively, and the Principal Proceeds so deposited shall be considered part of the Purchase Price of the Revolving Loan or Delayed Drawdown Loan for purposes of Article 12. At the direction of the Servicer at any time during or after the Replacement Period, the Trustee shall withdraw funds from the Revolving Reserve Account or the Delayed Drawdown Reserve Account to fund extensions of credit pursuant to Revolving Loans or Delayed Drawdown Loans, respectively. In addition, to the extent that the Issuer receives proceeds of a repayment in respect of a Revolving Loan (except to the extent of any concurrent Commitment Reduction) at any time during or after the Replacement Period, the Trustee shall deposit the proceeds into the Revolving Reserve Account. Upon the sale of a Revolving Loan or Delayed Drawdown Loan in whole or in part or the reduction in part or termination of the Issuer's commitment thereunder, an amount on deposit in the Revolving Reserve Account or the Delayed Drawdown Reserve Account, as the case may be, specified by the Servicer as being equal to:

(i) the unfunded amount of the commitment (in the case of a sale in whole or a termination of the commitment),

(ii) the proportionate amount of the amount on deposit (in the case of a sale in part), or

(iii) the amount by which the commitment is reduced (in the case of a reduction thereof in part),

shall be transferred by the Trustee to the Collection Account as Principal Proceeds. Amounts on deposit in the Revolving Reserve Account or the Delayed Drawdown Reserve Account shall be held pursuant to Section 10.4(b). All interest and other income from amounts in the Revolving Reserve Account and the Delayed Drawdown Reserve Account deposited to the Collection Account pursuant to Section 10.4(b) shall be considered Interest Proceeds in the Due Period in which they are so deposited.

(c) *Expense Reimbursement Account.* Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Expense Reimbursement Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal. On any Payment Date and on any date between Payment Dates, the Trustee will apply amounts, if any, in the Expense Reimbursement Account to the payment of expenses and fees that must be paid between Payment Dates or that are due on that Payment Date under Section 11.1(a)(i)(1) and the Trustee shall on any Payment Date transfer to the Expense Reimbursement Account an amount equal to the excess, if any, of the Administrative Expense Cap over the amounts due under Section 11.1(a)(i)(1) to the Expense Reimbursement Account in accordance with Section

161

11.1(a)(i)(2). Funds in the Expense Reimbursement Account shall be applied in accordance with Section 10.4(a).

(d) *Hedge Counterparty Collateral Account.* Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Hedge Counterparty Collateral Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties (other than the Hedge Counterparty pledging the Collateral), over which the Trustee shall have exclusive control, the sole right of withdrawal and a lien for the benefit of the Secured Parties. The Trustee shall deposit all collateral received from a Hedge Counterparty under any Hedge Agreement into the Hedge Counterparty Collateral Account. The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Hedge Counterparty Collateral Account shall be:

(i) for application to obligations of the relevant Hedge Counterparty to the Issuer under a Hedge Agreement if the Hedge Agreement becomes subject to early termination, or

(ii) to return collateral to the relevant Hedge Counterparty when and as required by the relevant Hedge Agreement, in each case as directed by the Servicer.

Amounts on deposit in the Hedge Counterparty Collateral Account shall be held pursuant to Section 10.4(a) and shall not be considered an asset of the Issuer for the purposes of the Coverage Tests.

(e) *Synthetic Security Collateral Account.* Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Synthetic Security Collateral Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties over which the Trustee shall have exclusive control, the sole right of withdrawal, and a lien for the benefit of the Secured Parties. On or before the date on which the Issuer enters into a Synthetic Security and delivers a copy of it to the Trustee, the Trustee shall create a sub-account of the Synthetic Security Collateral Account with respect to the Synthetic Security.

All Synthetic Security Collateral posted by any Synthetic Security Counterparty in support of its respective obligation under a Synthetic Security shall be immediately deposited into the Synthetic Security Collateral Account and posted to the sub-account related to the Synthetic Security. On each day on which amounts are payable to the Issuer out of Synthetic Security Collateral, the Issuer by Issuer Order shall direct the Trustee to, and upon receipt of the Issuer Order, the Trustee shall, withdraw amounts on deposit in the Synthetic Security Collateral Account in an amount sufficient to make the payment as provided in the Issuer Order (including any total or partial release of Synthetic Security Collateral). The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Synthetic Security Collateral Account shall be (i) for application to the obligations of the relevant Synthetic Security Counterparty under a Synthetic Security Agreement or (ii) to return Synthetic Security Collateral to the relevant Synthetic Security Counterparty at the termination of the relevant Synthetic Security Agreement or as otherwise required by the Synthetic Security Agreement, in each case as directed by the Servicer.

Amounts on deposit in the Synthetic Security Collateral Account shall be held pursuant to Section 10.4(b) and shall not be considered an asset of the Issuer for the purposes of the Coverage Tests.

(f) *Securities Lending Account.* Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Securities

162

Lending Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control, the sole right of withdrawal, and a lien for the benefit of the Secured Parties. On or before the date on which the Issuer enters into a Securities Lending Agreement and delivers a copy of it to the Trustee, the Trustee shall create a sub-account of the Securities Lending Account with respect to the Securities Lending Agreement. All Securities Lending Collateral posted by any Securities Lending Counterparty in support of its respective obligation under a Securities Lending Agreement shall be immediately deposited into the Securities Lending Account and posted to the sub-account related to the Securities Lending Agreement. The only permitted withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Securities Lending Account shall be:

(i) for application to obligations of the relevant Securities Lending Counterparty to the Issuer under a Securities Lending Agreement if the Securities Lending Agreement becomes subject to early termination or in the exercise of remedies under the related Securities Lending Agreement upon any "event of default" under and as defined in the related Securities Lending Agreement, including liquidating the related Securities Lending Collateral, or

(ii) to return the Securities Lending Collateral to the relevant Securities Lending Counterparty when and as required by the relevant Securities Lending Agreement, in each case as directed by the Servicer.

Amounts on deposit in the Securities Lending Account shall be held pursuant to Section 10.4(c). To the extent provided in a Securities Lending Agreement, earnings on amounts on deposit in the Securities Lending Account shall be payable by the Issuer to the related Securities Lending Counterparty.

Amounts on deposit in the Securities Lending Account shall not be considered an asset of the Issuer for the purposes of the Coverage Tests, but the loaned security or asset that relates to the Securities Lending Account shall be so considered an asset of the Issuer.

(g) *Closing Date Expense Account.* Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Closing Date Expense Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal. On the Closing Date, the Trustee, at the direction of the Issuer, shall deposit into the Closing Date Expense Account approximately U.S.$2,024,384 from the gross proceeds of the Offering. At any time before the Payment Date in February 2008, at the direction of the Servicer, the Issuer may by Issuer Order direct the Trustee to, and upon receipt of the Issuer Order the Trustee shall, pay from amounts on deposit in the Closing Date Expense Account any applicable fees and expenses of the Offering. On the Payment Date in February 2008 (or, at the discretion of the Servicer, on the Payment Date in November 2007), at the direction of the Servicer in its sole discretion, the Trustee shall transfer all funds on deposit in the Closing Date Expense Account to the Collection Account as Interest Proceeds or Principal Proceeds and close the Closing Date Expense Account.

Amounts on deposit in the Closing Date Expense Account shall be held pursuant to Section 10.4(a) and shall not be considered an asset of the Issuer for the purposes of the Coverage Tests.

(h) *Payment Account.* Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Payment Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal. The only permitted

163

NY\1257964.27

withdrawal from or application of funds on deposit in, or otherwise to the credit of, the Payment Account shall be to pay amounts due and payable on the Notes in accordance with their terms and the provisions of this Indenture and to pay Administrative Expenses and other amounts specified in this Indenture, each in accordance with the Priority of Payments. The Co-Issuers shall not have any legal, equitable, or beneficial interest in the Payment Account other than in accordance with the Priority of Payments.

(i)     *Interest Reserve Account.* Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Interest Reserve Account, that shall be held in trust in the name of the Trustee for the benefit of the Secured Parties, over which the Trustee shall have exclusive control and the sole right of withdrawal. On the Closing Date, the Trustee, at the direction of the Issuer, shall deposit into the Interest Reserve Account approximately U.S.$2,500,000 from the gross proceeds of the Offering. At any time before the Payment Date in February 2008, at the direction of the Servicer, the Issuer may by Issuer Order direct the Trustee to, and upon receipt of the Issuer Order the Trustee shall transfer any funds on deposit in the Interest Reserve Account to the Collection Account as Interest Proceeds or Principal Proceeds. On the Payment Date in February 2008 (or, at the discretion of the Servicer, on the Payment Date in November 2007), at the direction of the Servicer in its sole discretion, the Trustee shall transfer all funds on deposit in the Interest Reserve Account (after application of any monies therefrom on such date) to the Collection Account as Interest Proceeds or Principal Proceeds and close the Interest Reserve Account. Amounts on deposit in the Interest Reserve Account shall be held pursuant to Section 10.4(a).

(j)     *Class II Preference Share Special Payment Account.* Before the Closing Date, the Trustee shall establish a single, segregated non-interest bearing trust account that shall be designated as the Class II Preference Share Special Payment Account, that shall be held in trust in the name of the Trustee for the benefit of Holders of the Class II Preference Shares, over which the Trustee shall have exclusive control and the sole right of withdrawal. On each Payment Date, to the extent of available funds in accordance with the Priority of Payments, the Trustee will deposit into the Class II Preference Share Special Payment Account amounts equal to the Class II Preference Share Special Payments. The Servicer has agreed to waive amounts, which would otherwise be payable to the Servicer as Servicing Fees, on each Payment Date prior to February 3, 2008 and an amount equal to such waived amounts will be distributed by the Trustee to the Preference Shares Paying Agent, subject to the laws of the Cayman Islands, for payment *pro rata* to the Holders of the Class II Preference Shares as Class II Preference Share Special Payments. With respect to any Payment Date after February 3, 2008, the Servicer may, in its sole discretion, at any time waive a portion (or all) of the Servicing Fees then due and payable, in which event, an amount equal to such waived portion will be paid by the Trustee to the Preference Shares Paying Agent, subject to the laws of the Cayman Islands, for payment *pro rata* to the Holders of the Class II Preference Shares as Class II Preference Share Special Payments; *provided* that with respect to the Payment Date in May 2008 such Class II Preference Share Special Payments will, at a minimum, include amounts that would otherwise constitute a portion (representing the Class II Preference Share Percentage) of the Servicing Fees that have accrued from the Payment Date in February 2008 through February 3, 2008. For purposes of any calculation under the Indenture and the Servicing Agreement, the Servicer will be deemed to have received the Servicing Fee in an amount equal to the sum of the Servicing Fee actually paid to the Servicer and the amount distributed to the Holders of the Class II Preference Shares as Class II Preference Share Special Payments.

(k)     In addition to any deposit, withdrawal, transfer or other application of funds with respect to any Account set forth in this Section 10.3 or in Section 10.2, any deposit, withdrawal, transfer or other application of funds with respect to any Account authorized elsewhere in this Indenture is hereby authorized pursuant to this Section 10.3.

164

(l)     In order to comply with its obligations under the USA Patriot Act of 2001, if any, the Trustee shall be entitled to request and verify, and the Noteholders, beneficial owners, the Co-Issuers and other parties related to this Indenture shall be obligated to provide to the Trustee all the necessary information required by the USA Patriot Act of 2001.

Section 10.4.     *Application of Funds in Accounts; Reports by Trustee.*

(a)     By Issuer Order (which may be in the form of standing instructions), at the direction of the Servicer, the Issuer shall at all times before an Event of Default occurs, direct the Trustee to, and, upon receipt of the Issuer Order, the Trustee shall, apply all funds on deposit in the Collection Account, the Hedge Counterparty Collateral Account, the Expense Reimbursement Account, the Closing Date Expense Account and the Interest Reserve Account as so directed in Eligible Investments having Stated Maturities no later than the Business Day before the next Payment Date. All applications on any Business Day shall be subject to the timely receipt of the funds and the availability of any Eligible Investments. Before an Event of Default occurs, if the Issuer has not given directions, the Trustee shall seek instructions from the Servicer within three Business Days after transfer of any funds to the Collection Account, the Hedge Counterparty Collateral Account, the Expense Reimbursement Account, the Closing Date Expense Account or the Interest Reserve Account. If the Trustee does not receive written instructions from the Servicer within five Business Days after transfer of the funds to the account, it shall apply the funds held in the account, as fully as practicable, but only in one or more Eligible Investments of the type described in clause (c) of the definition of "Eligible Investments" maturing no later than the Business Day before the next Payment Date. After an Event of Default occurs, if the Issuer does not give directions to the Trustee for three consecutive days, the Trustee shall apply the monies as fully as practicable in Eligible Investments of the type described in clause (c) of the definition of "Eligible Investments" maturing not later than the earlier of (i) 30 days after the date of the application or (ii) the Business Day before the next Payment Date. All interest and other income from such Eligible Investments shall be deposited in the Collection Account, any gain realized from such Eligible Investments shall be credited to the Collection Account, and any loss resulting from such Eligible Investments shall be charged to the Collection Account. Subject to Section 6.7, the Trustee shall not in any way be held liable for the selection of Eligible Investments or because of any insufficiency of the Collection Account, the Hedge Counterparty Collateral Account, the Expense Reimbursement Account, the Closing Date Expense Account or the Interest Reserve Account or any other account that results from any loss relating to any such Eligible Investment.

(b)     By Issuer Order (which may be in the form of standing instructions), at the direction of the Servicer, the Issuer shall at all times direct the Trustee to, and, upon receipt of the Issuer Order, the Trustee shall, apply all funds on deposit in the Revolving Reserve Account, the Delayed Drawdown Reserve Account, and the Synthetic Security Collateral Account in Eligible Investments having Stated Maturities not later than one Business Day after the date of their purchase. All applications on any Business Day shall be subject to the timely receipt of the funds and the availability of any Eligible Investments. If before an Event of Default, the Issuer does not give directions, the Trustee shall seek instructions from the Servicer within three Business Days after transfer of any funds to the Revolving Reserve Account, the Delayed Drawdown Reserve Account, or the Synthetic Security Collateral Account. If the Trustee does not thereupon receive written instructions from the Servicer within five Business Days after transfer of the funds to the account, it shall apply the funds held in the account, as fully as practicable, but only in one or more Eligible Investments of the type described in clause (e) of the definition of "Eligible Investments" that are overnight funds. If after an Event of Default, the Issuer does not give directions to the Trustee for three consecutive days, the Trustee shall apply the monies as fully as practicable in Eligible Investments of the type described in clause (e) of the definition of "Eligible Investments" that are overnight funds. All interest and other income from such Eligible Investments shall be deposited in the Collection Account, any gain realized from such Eligible Investments shall be

165

credited to the Collection Account, and any loss resulting from such Eligible Investments shall be charged to the Collection Account.

(c)     By Issuer Order (which may be in the form of standing instructions), at the direction of the Servicer, the Issuer shall at all times direct the Trustee to, and, upon receipt of the Issuer Order, the Trustee shall, apply all funds on deposit in the Securities Lending Account in Eligible Investments having Stated Maturities no later than the Business Day before the stated termination date of the related Securities Lending Agreement. All applications on any Business Day shall be subject to the timely receipt of the funds and the availability of any Eligible Investments. The interest on the Eligible Investments shall be allocated between the Issuer and the Securities Lending Counterparty pursuant to the related Securities Lending Agreement. If before an Event of Default, the Issuer does not give directions, the Trustee shall seek instructions from the Servicer within three Business Days after transfer of any funds to the Securities Lending Account. If the Trustee does not thereupon receive written instructions from the Servicer within five Business Days after transfer of the funds to the account, it shall apply the funds held in the account, as fully as practicable, but only in one or more Eligible Investments of the type described in clause (e) of the definition of "Eligible Investments" that mature no later than the Business Day before the stated termination date of the related Securities Lending Agreement. If after an Event of Default, the Issuer does not give directions to the Trustee for three consecutive days, the Trustee shall apply the monies as fully as practicable in Eligible Investments of the type described in clause (e) of the definition of "Eligible Investments" maturing no later than the Business Day before the stated termination date of the related Securities Lending Agreement. All interest and other income from such Eligible Investments shall be deposited in the Collection Account, any gain realized from such Eligible Investments shall be credited to the Collection Account, and any loss resulting from such Eligible Investments shall be charged to the Collection Account.

(d)     The Trustee agrees to give the Issuer notice as soon as reasonably practicable if a Trust Officer obtains actual knowledge that any Account or any funds on deposit in any Account, or otherwise to the credit of an Account, shall become subject to any writ, order, judgment, warrant of attachment, execution or similar process. All Accounts shall remain at all times with the Custodian or a financial institution having a long-term debt rating of at least "Baa1" (and not on credit watch with negative implications) by Moody's and at least "BBB+" by S&P and having combined capital and surplus of at least U.S.$200,000,000 that has entered into one or more securities account control agreements in accordance with Article 8 of the UCC; provided, however, that (i) with respect to the Synthetic Security Collateral Account, the Synthetic Security Counterparty shall be a party to such control agreement and shall consent to the Trustee's control of such Synthetic Security Collateral Account, (ii) with respect to the Securities Lending Account, the Securities Lender shall be a party to such control agreement and shall consent to the Trustee's control of such Securities Lending Account and (iii) with respect to each Hedge Counterparty Collateral Account, the related Hedge Counterparty shall be a party to such control agreement and shall consent to the Trustee's control of such Hedge Counterparty Collateral Account.

(e)     The Trustee shall supply, in a timely fashion, to the Co-Issuers and the Servicer any information regularly maintained by the Trustee that the Co-Issuers or the Servicer may from time to time request with respect to the Pledged Obligations, the Accounts and the Collateral and provide any other requested information reasonably available to the Trustee because of its acting as Trustee under this Indenture and required to be provided by Section 10.6, to permit the Servicer to perform its obligations under the Servicing Agreement. The Trustee shall promptly forward to the Servicer copies of notices and other writings received by it from the issuer of any Collateral Obligation or from any Clearing Agency with respect to any Collateral Obligation which notices or writings advise the holders of the security of any rights that the holders might have with respect to the Collateral Obligation (including requests to vote with respect to amendments or waivers and notices of

166

prepayments and redemptions) as well as all periodic financial reports received from the issuer and Clearing Agencies with respect to the issuer.

(f)     To the extent monies deposited in any Account exceed amounts insured by the Bank Insurance Fund or Savings Association Insurance Fund administered by the Federal Deposit Insurance Corporation or any agencies succeeding to its insurance functions, and are not fully collateralized by direct obligations of the United States of America, the excess shall be held in Eligible Investments as described above.

Section 10.5.     *Synthetic Security Counterparty Account.*

(a)     To the extent that any Synthetic Security requires the Issuer to secure its obligations to the Synthetic Security Counterparty or to the extent that any Synthetic Security has an unfunded amount payable by the Issuer that does not by its terms require collateral, the Issuer shall direct the Trustee and the Trustee shall establish a segregated non-interest bearing trust account for the Synthetic Security which shall be held in trust for the benefit of the related Synthetic Security Counterparty and over which the Trustee shall have exclusive control and the sole right of withdrawal in accordance with the applicable Synthetic Security and this Indenture (a "*Synthetic Security Counterparty Account*"). In the alternative, a Synthetic Security Counterparty Account may be established with a trustee designated by the Synthetic Security Counterparty if that trustee would qualify to be a successor trustee under Section 6.9 and the account satisfies the other requirements of this Section.

As directed in writing by the Servicer, the Trustee shall deposit (or deliver for deposit) into each Synthetic Security Counterparty Account all amounts or securities that are required to secure the obligations of the Issuer in accordance with the related Synthetic Security and, without duplication, an amount equal to the unfunded amount of a Synthetic Security, including the entire notional amount of any Synthetic Security in the form of a credit default swap or other similar transaction. The Servicer shall direct any such deposit only during the Replacement Period and only to the extent that monies are available for the purchase of Collateral Obligations pursuant to this Indenture. Any income received on amounts in the Synthetic Security Counterparty Account shall, after application in accordance with the relevant Synthetic Security, be withdrawn from the Synthetic Security Counterparty Account and deposited in the Collection Account for distribution as Interest Proceeds.

(b)     As directed by the Servicer in writing and in accordance with the applicable Synthetic Security and this Indenture, amounts on deposit in a Synthetic Security Counterparty Account shall be held in Synthetic Security Collateral.

(c)     In connection with the occurrence of a credit event or an event of default or a termination event (each as defined in the applicable Synthetic Security) under the related Synthetic Security, amounts in any Synthetic Security Counterparty Account shall be withdrawn by the Trustee (or the Trustee shall request their withdrawal) and applied toward the payment of any amounts payable by the Issuer to the related Synthetic Security Counterparty in accordance with the Synthetic Security, as directed by the Servicer in writing. Any excess amounts held in a Synthetic Security Counterparty Account, or held directly by a Synthetic Security Counterparty, after payment of all amounts owing from the Issuer to the related Synthetic Security Counterparty in accordance with the related Synthetic Security shall be withdrawn from the Synthetic Security Counterparty Account and deposited in the Collection Account for distribution as Principal Proceeds.

(d)     Amounts on deposit in any Synthetic Security Counterparty Account shall not be considered an asset of the Issuer for the purposes of the Coverage Tests, but the Synthetic Security that relates to the Synthetic Security Counterparty Account shall be so considered an asset of the

Issuer (with the notional amount as the Principal Balance unless a default exists under the applicable Synthetic Security).

Section 10.6. *Accountings.*

     (a)    *Monthly*. Commencing the earlier of (a) the first full month after the Ramp-Up Completion Date and (b) the month ending September 2007, (i) in the case of a month in which there is no Payment Date, not later than the eighth Business Day after the last calendar day of such month and (ii) in the case of a month in which there is a Payment Date, on such Payment Date, the Issuer shall cause to be compiled and provided to the Servicer, the Trustee, the Preference Shares Paying Agent (for forwarding to each Holder of Preference Shares), the Initial Purchasers, each Hedge Counterparty, the Rating Agencies, (if so requested by the Initial Purchasers) the Repository in accordance with Section 14.3(a)(ix) or each Holder of a Note who makes a written request therefor, and, upon written request therefor by a Beneficial Owner in the form of Exhibit H certifying that it is a Beneficial Owner, the Beneficial Owner (or its designee), a monthly report (the "***Monthly Report***"). Each Monthly Report shall be accompanied by a Section 3(c)(7) Reminder Notice. The Monthly Report shall contain the following information, determined as of (1) in the case of a month in which there is no Payment Date, the last day of the applicable month and (2) in the case of a month in which there is a Payment Date, the Determination Date for such Payment Date, based in part on information provided by the Servicer (the "***Monthly Determination Date***"):

         (i)    *Collateral*:

            (A)    The Aggregate Principal Balance (and, in the case of a Revolving Loan or Delayed Drawdown Loan, its funded and unfunded amount), interest rate, Stated Maturity and obligor of each Collateral Obligation;

            (B)    The stated principal balance of Defaulted Collateral Obligations;

            (C)    The identity of all Collateral Obligations and all obligations that at the time of acquisition, conversion or exchange do not satisfy the requirements of a Collateral Obligation that were released for sale or other disposition (and, for each obligation sold, indicating whether sold as a Credit Risk Obligation, a Credit Improved Obligation, a Current-Pay Obligation, a Defaulted Collateral Obligation, a Workout Asset or an obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation or whether sold in connection with any withholding tax pursuant to Section 12.1(e) or sold as a discretionary sale pursuant to Section 12.1(h)); and the identity of all Collateral Obligations that were acquired, in each case since the date of the previous Monthly Report;

            (D)    The obligor of each Workout Asset;

            (E)    The Purchase Price of each Collateral Obligation acquired, the sale price of each Collateral Obligation sold (or the adjusted purchase or sale price with respect to any exchange of securities requiring an allocation by the Servicer) since the date of the previous Monthly Report on each sale;

            (F)    The identity of each Collateral Obligation (1) that is a Defaulted Collateral Obligation, a Workout Asset or a PIK Security, and in the case of a PIK Security (i) the principal amount of previously deferred or capitalized interest and (ii) the change in the principal amount of previously deferred or capitalized interest since the most recent Monthly Report or (2) in respect of which an obligation that

168

at the time of acquisition, conversion or exchange does not satisfy the requirements of a Collateral Obligation has been received, in each case indicating the date of such default, as applicable, and reporting any Other Indebtedness, as defined in clause (ii) in the definition of "Defaulted Collateral Obligation," that the Servicer has determined not to be material;

(G)     The S&P Industry Classification and the Moody's Industry Classification for each Collateral Obligation and the five highest concentrations of Collateral Obligations in the Moody's Industry Classification groups and the five highest concentrations of Collateral Obligations in the S&P Industry Classification groups;

(H)     For each Collateral Obligation, the country of the obligor (and the related foreign currency debt rating) and, in the case of a country other than the United States of America, whether the obligor is Domiciled in a Moody's Group I Country, Moody's Group II Country, or Moody's Group III Country and the percentage of the Aggregate Principal Balance of the Collateral Obligations issued by issuers in the applicable country;

(I)     For each Collateral Obligation, the Moody's Priority Category Recovery Rate and S&P Recovery Rate;

(J)     For each Collateral Obligation, the S&P Rating, and if any S&P Rating for any Collateral Obligation in any Monthly Report is a credit estimate, "non-public" rating or "shadow" rating, the rating shall not be disclosed, but shall be replaced with an asterisk in the place of the applicable credit estimate, "non-public" rating or "shadow" rating;

(K)     For each Collateral Obligation, the Moody's Rating and the Moody's Rating Factor, determined, for this purpose, and set forth both with and without regard to whether the Collateral Obligation has been put on watch for possible upgrade or downgrade, and if any Moody's Rating for any Collateral Obligation in any Monthly Report is an "estimated" or "shadow" rating, the rating shall not be disclosed, but shall be replaced with an asterisk in the place of the applicable "estimated" or "shadow" rating;

(L)     The Aggregate Principal Balance of the Collateral Obligations that have a Moody's Rating of "Caa1" or lower;

(M)     The Aggregate Principal Balance of the Collateral Obligations that have an S&P Rating of "CCC+" or lower;

(N)     For each Collateral Obligation that is a Participation or a Synthetic Security or is loaned pursuant to a Securities Lending Agreement, the related Secondary Risk Counterparty and each Rating Agency's long-term unsecured debt rating of the Secondary Risk Counterparty;

(O)     Certain S&P benchmarks relating to the portfolio as provided by S&P in the S&P CDO Monitor regardless whether or not the S&P CDO Monitor passes or fails, including (1) S&P Default Measure (Annualized Portfolio Default Rate), (2) S&P Variability Measure (Annualized Standard Deviation of Portfolio Default Rate), (3) S&P Correlation Measure (Ratio of Standard Deviation of

169

Portfolio with Correlation to Standard Deviation of Portfolio without Correlation) and (4) Weighted Average Default Correlation;

(P)     The identity and Market Value of each Collateral Obligation whose Market Value (in the determination of the Overcollateralization Ratio Numerator) was determined pursuant to last proviso in the definition of "Market Value;"

(Q)     The identity of each Collateral Obligation participated from or entered into with a Secondary Risk Counterparty; and

(R)     The identity of each Collateral Obligation owned by the Issuer that has not been disposed of within the time limits required by this Indenture.

(ii)     *Accounts*:

(A)     The amount of any proceeds in the Collection Account, distinguishing between amounts credited as Interest Proceeds, Principal Proceeds (excluding unapplied proceeds), and unapplied proceeds;

(B)     The amount of any Principal Proceeds in the Revolving Reserve Account;

(C)     The amount of any Principal Proceeds in the Delayed Drawdown Reserve Account;

(D)     The amount of any Principal Proceeds in the Synthetic Security Collateral Account;

(E)     The amount of any Principal Proceeds in the Securities Lending Account; and

(F)     The amount of any proceeds in the Hedge Counterparty Collateral Account;

(iii)     *Hedge Agreements*:

(A)     The outstanding notional amount of each Hedge Agreement; and

(B)     The amount scheduled to be received and paid by the Issuer pursuant to each Hedge Agreement on the next Payment Date (as specified by the calculation agent under each Hedge Agreement);

(iv)     *Coverage Tests, Collateral Quality Tests and Retention Overcollateralization Test*:

(A)     The Overcollateralization Ratios and the Overcollateralization Ratios as of the Ramp-Up Completion Date; a statement as to whether each of the Overcollateralization Tests is satisfied and a statement as to whether the Retention Overcollateralization Test is satisfied;

170

(B)     The Interest Coverage Ratios and, on and after the second Payment Date, a statement as to whether each of the Interest Coverage Tests is satisfied;

(C)     The Diversity Score and, on and after the Ramp-Up Completion Date, a statement as to whether the Diversity Test is satisfied;

(D)     The Weighted Average Life of the Collateral Obligations and, on and after the Ramp-Up Completion Date, a statement as to whether the Weighted Average Life Test is satisfied;

(E)     The Moody's Minimum Average Recovery Rate, the S&P Recovery Rate and, on and after the Ramp-Up Completion Date, a statement as to whether the Weighted Average Moody's Recovery Rate Test with respect to the Moody's Minimum Average Recovery Rate and Weighted Average S&P Recovery Rate Test with respect to the S&P Recovery Rate is satisfied;

(F)     The Weighted Average Fixed Rate Coupon of the Collateral Obligations and, on and after the Ramp-Up Completion Date, a statement as to whether the Weighted Average Fixed Rate Coupon Test is satisfied and a statement as to the amount of Spread Excess was used to satisfy the Weighted Average Fixed Rate Coupon Test;

(G)     The Weighted Average Spread of the Collateral Obligations and, on and after the Ramp-Up Completion Date, a statement as to whether the Weighted Average Spread Test is satisfied and a statement as to the amount of Fixed Rate Excess was used to satisfy the Weighted Average Spread Test;

(H)     The Weighted Average Moody's Rating Factor and, on and after the Ramp-Up Completion Date, a statement as to whether the Weighted Average Rating Factor Test is satisfied; and

(I)     The S&P CDO Monitor Test and, on and after the Ramp-Up Completion Date, a statement as to whether the S&P CDO Monitor Test is satisfied and the Class Scenario Loss Rate and the then applicable Note Break-Even Loss Rate with respect to each Class of Notes that is rated by S&P and the adjusted Weighted Average Spread level determined as set forth in the definition of "Note Break-Even Loss Rate;"

(v)     *Concentration Limitations and Withholding Taxes*:

(A)     The percentage of the Maximum Amount itemized against each element of the Concentration Limitations and a statement as to whether each Concentration Limitation is satisfied; and

(B)     Any withholding tax on payments under any Collateral Obligation;

(vi)     *Securities Lending Agreements*:

(A)     Each Collateral Obligation loaned or borrowed pursuant to a Securities Lending Agreement and the percentage of the Maximum Amount that

171

represents Collateral Obligations that are loaned or borrowed pursuant to Securities Lending Agreements; and

(B) With respect to each Securities Lending Agreement in effect as of the Monthly Determination Date, a list setting forth:

(1) for each Collateral Obligation loaned or borrowed under it as of the first day of the loan, (x) its Principal Balance, (y) its Market Value and (z) its Principal Balance expressed as a percentage of the Maximum Amount,

(2) the term of the loan of the Collateral Obligation,

(3) the expiration date of the Securities Lending Agreement,

(4) the Moody's Rating and S&P Rating for each loaned or borrowed Collateral Obligation,

(5) the principal amount of the related Securities Lending Collateral held in the Securities Lending Account, and

(6) the Eligible Investments held as Securities Lending Collateral pursuant to the related Securities Lending Agreement; and

(vii) Any other information the Trustee reasonably requests.

Upon receipt of each Monthly Report, the Trustee shall compare the information contained in the Monthly Report to the information contained in its records with respect to the Collateral and shall, within three Business Days after receipt of such Monthly Report, notify the Issuer, the Preference Shares Paying Agent and the Servicer if the information contained in the Monthly Report does not conform to the information maintained by the Trustee with respect to the Collateral, and shall detail any discrepancies. In the event that any discrepancy exists, the Trustee, the Issuer, and the Servicer shall attempt to resolve the discrepancy. If such discrepancy cannot be promptly resolved, the Trustee shall within five Business Days after notification of such discrepancy cause the Independent accountants appointed by the Issuer pursuant to Section 10.8 to review such Monthly Report and the Trustee's records to determine the cause of such discrepancy. If such review reveals an error in the Monthly Report or the Trustee's records, the Monthly Report or the Trustee's records shall be revised accordingly and, as so revised, shall be used in making all calculations pursuant to this Indenture and notice of any error in the Monthly Report shall be sent as soon as practicable by the Issuer to all recipients of the report. If the review by the Independent accountants does not resolve the discrepancy, the Trustee, upon receipt of an Officer's certificate of the Servicer certifying that, to the best knowledge of the Servicer, the information contained in the related Monthly Report is correct, shall conform the information it maintains to the Monthly Report received.

(b) *Payment Date Accounting.* The Issuer shall cause to be rendered an accounting report (the "***Valuation Report***"), determined as of the close of business on each Determination Date, and provided to the Servicer, the Trustee, the Preference Shares Paying Agent (for forwarding to each Holder of Preference Shares), the Issuer, the Initial Purchasers, each Hedge Counterparty, the Rating Agencies and each Noteholder (if so requested by the Initial Purchasers) the Repository in accordance with Section 14.3(a)(ix), the Depository (with instructions to forward it to each of its Agent Members who are Noteholders), and upon written request therefor by a Beneficial Owner in the form of Exhibit H certifying that it is a Beneficial Owner and the Beneficial Owner (or its designee) not later than the second Business Day preceding the related Payment Date. Each

172

Valuation Report shall be accompanied by a Section 3(c)(7) Reminder Notice. The Valuation Report shall contain the following information as of the related Payment Date (unless otherwise stated), based in part on information provided by the Servicer:

        (i)     *Notes*:

              (A)     The amount of principal payments to be made on each Class of Notes on the related Payment Date;

              (B)     The Aggregate Outstanding Amount of each Class of Notes after giving effect to any principal payments on the related Payment Date and, for each Class of Notes, the percentage of its initial Aggregate Outstanding Amount that amount represents;

              (C)     For each Class of Notes, the percentage of the initial Aggregate Outstanding Amount of all of the Notes that its initial Aggregate Outstanding Amount represented and, after giving effect to any principal payments on the related Payment Date, the percentage of the Aggregate Outstanding Amount of all of the Notes that its Aggregate Outstanding Amount represents;

              (D)     The interest payable in respect of each Class of Notes on the related Payment Date (in the aggregate and by Class) and its calculation in reasonable detail; and

              (E)     The amounts to be paid, if any, to the Preference Shares Paying Agent for payments on the Preference Shares on the related Payment Date, showing separately the payments from Interest Proceeds and the payments from Principal Proceeds;

        (ii)    *Payment Date Payments*:

              (A)     The amounts to be distributed under each clause of Sections 11.1(a)(i), 11.1(a)(ii) and 11.2 itemized by clause, and to the extent applicable, by type of distribution under the clause; and

              (B)     Any amounts payable under the Hedge Agreements by any Hedge Counterparty on or before the related Payment Date and its calculation in reasonable detail (as specified by the calculation agent under the Hedge Agreement);

        (iii)   *Accounts*:

              (A)     The amount of any proceeds in the Collection Account, distinguishing between amounts credited as Interest Proceeds, Principal Proceeds (excluding unapplied proceeds) and unapplied proceeds;

              (B)     The amount in the Collection Account after all payments and deposits to be made on the related Payment Date, distinguishing between amounts credited as Interest Proceeds and as Principal Proceeds;

              (C)     The amount of any Principal Proceeds in the Revolving Reserve Account;

173

(D)     The amount of any Principal Proceeds in the Delayed Drawdown Reserve Account;

(E)     The amount of any Principal Proceeds in the Synthetic Security Collateral Account;

(F)     The amount of any Principal Proceeds in the Securities Lending Account;

(G)     The amount in the Hedge Counterparty Collateral Account; and

(H)     The amount in the Expense Reimbursement Account;

(iv)     A notice setting forth LIBOR, as calculated by the Calculation Agent, for the next Interest Period and each Note Interest Rate for the next Payment Date; and

(v)     Any other information the Trustee reasonably requests.

Upon receipt of each Valuation Report, the Trustee shall compare the information contained in the Valuation Report to the information contained in its records with respect to the Collateral and shall, within three Business Days after receipt of such Valuation Report, notify the Issuer, the Preference Shares Paying Agent and the Servicer if the information contained in the Valuation Report does not conform to the information maintained by the Trustee with respect to the Collateral, and shall detail any discrepancies. In the event that any discrepancy exists, the Trustee, the Issuer, and the Servicer shall attempt to resolve the discrepancy. If such discrepancy cannot be promptly resolved, the Trustee shall within five Business Days after notification of such discrepancy cause the Independent accountants appointed by the Issuer pursuant to Section 10.8 to review such Valuation Report and the Trustee's records to determine the cause of such discrepancy. If such review reveals an error in the Valuation Report or the Trustee's records, the Valuation Report or the Trustee's records shall be revised accordingly and, as so revised, shall be used in making all calculations pursuant to this Indenture and notice of any error in the Valuation Report shall be sent as soon as practicable by the Issuer to all recipients of such report. If the review by the Independent accountants does not resolve the discrepancy, the Trustee, upon receipt of an Officer's certificate of the Servicer certifying that, to the best knowledge of the Servicer, the information contained in the related Valuation Report is correct, shall conform the information it maintains to the Valuation Report received.

(c)     *Failure to Provide Accounting.* If the Trustee shall not have received any accounting provided for in Section 10.6(b) on the first Business Day after the date on which the accounting is due to the Trustee, the Trustee shall notify the Issuer and the Servicer, and the Servicer shall use all reasonable efforts to cause the accounting to be made by the applicable Payment Date. To the extent the Trustee is required to provide any information or reports pursuant to this Section 10.6 as a result of the failure of the Issuer (or anyone acting on the Issuer's behalf) to provide the information or reports, the Trustee may retain an Independent certified public accountant in connection therewith and the reasonable costs incurred by the Trustee for the Independent certified public accountant shall be reimbursed pursuant to Section 6.8.

(d)     *Irish Stock Exchange.* So long as any Class of Senior Notes is listed on the Irish Stock Exchange: (i) the Trustee shall communicate to the Irish Stock Exchange the Aggregate Outstanding Amount of each listed Class of Senior Notes following each Payment Date and inform the Irish Stock Exchange if any such Class of Senior Notes did not receive scheduled payments of principal or interest on the Payment Date; (ii) the Trustee shall inform the Irish Stock Exchange if the ratings assigned to the Senior Notes are reduced or withdrawn and the information shall be given

174

to the Company Announcements Office of the Irish Stock Exchange; and (iii) the Trustee shall inform the Irish Stock Exchange, in advance, of the Note Interest Rate for each such Class, as well as the exact date of the following Payment Date.

(e) *Quarterly Letter*. The Servicer shall provide a quarterly letter to the recipients of the Valuation Report highlighting events occurring during the related quarterly period within 30 days of the date of the delivery of the Valuation Report.

(f) *S&P CDO Monitor*. On or after the Ramp-Up Completion Date and together with each Monthly Report, the Issuer shall provide to S&P the Excel Default Model Input File and, with respect to each Collateral Obligation, the name of the obligor thereon and the CUSIP number thereof (if applicable).

(g) *Payments or Transfers from the Payment Account*. Each Valuation Report shall constitute instructions to the Trustee to withdraw on the related Payment Date from the Payment Account and pay or transfer amounts set forth in such Valuation Report in the manner specified and in accordance with the priority established in Section 11.1 hereof.

Section 10.7. *Release of Collateral.*

(a) The Trustee shall present Collateral for redemption or payment in full in accordance with the terms of the Collateral upon receipt of an Issuer Order. If no Event of Default is continuing, the Issuer may, by Issuer Order executed by an Authorized Officer of the Servicer, delivered to the Trustee at least two Business Days before the settlement date for any sale of an obligation certifying that the sale of the Collateral is being made in accordance with Sections 12.1 and 12.3 and the sale complies with all applicable requirements of Section 12.1, direct the Trustee to release the Collateral and, upon receipt of the Issuer Order, the Trustee shall deliver any such Collateral, if in physical form, duly endorsed to the broker or purchaser designated in the Issuer Order or otherwise cause an appropriate transfer of it to be made, in each case against receipt of the sales price therefor as specified by the Servicer in the Issuer Order. The Trustee may deliver any such Collateral in physical form for examination pursuant to a bailee letter.

(b) The Trustee shall, upon an Issuer Order executed by an Authorized Officer of the Servicer, deliver any Pledged Obligation that is set for any mandatory call or redemption or payment in full to the appropriate paying agent on or before the date set for the call, redemption or payment, in each case against receipt of its call or redemption price or payment in full and provide notice of it to the Servicer.

(c) Upon receiving actual notice of any Offer, the Trustee on behalf of the Issuer shall notify the Servicer of any Collateral Obligation that is subject to a tender offer, voluntary redemption, exchange offer, conversion or other similar action (an "*Offer*"). If no Event of Default is continuing, the Servicer may direct the Trustee (and if an Event of Default is continuing, the Servicer may advise, and the Trustee may, in consultation with the Servicer, decide) to accept or participate in or decline or refuse to participate in the Offer and, in the case of acceptance or participation, to dispose of the Collateral Obligation in accordance with the Offer against receipt of payment for it. If the consideration to be received by the Issuer for the Collateral Obligation is other than Cash, the consideration must be a Collateral Obligation that would be eligible for purchase by the Issuer pursuant to Section 12.2 assuming for this purpose that the Issuer committed to purchase the same on the date on which the Issuer accepts the Offer.

(d) Upon disposition by the Trustee of Collateral to any Person against receipt of payment therefore as provided in any of the foregoing clauses (a), (b) or (c), the Collateral shall be

175

free of the lien of this Indenture. The lien shall continue in the proceeds received from the disposition.

(e)     As provided in Section 10.2(b), the Trustee shall deposit any proceeds received by it from the disposition of a Pledged Obligation in the Collection Account, unless simultaneously applied to the purchase of additional Collateral Obligations (including any related deposit into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security) or Eligible Investments as permitted under and in accordance with the requirements of this Article 10 and Article 12.

(f)     The Trustee shall, upon receipt of an Issuer Order when no Notes are Outstanding and all obligations of the Co-Issuers under this Indenture have been satisfied, as evidenced by an Officer's certificate or an Opinion of Counsel, release any remaining Collateral from the lien of this Indenture.

(g)     The Trustee shall release from the lien of this Indenture any Collateral that is provided directly to a Synthetic Security Counterparty or deposited in a segregated account in accordance with Section 10.5. Any Collateral or proceeds received by or redeposited by the Issuer into the Collection Account in accordance with Section 10.5 shall again be subject to the lien of this Indenture.

Any collateral deposited in a segregated account in accordance with Section 10.3(d), (e), and (f) shall be subject to the lien of this Indenture for the benefit of the Secured Parties. Any collateral withdrawn by the Issuer in accordance with Section 10.3(d), (e), and (f) shall be released from the lien of this Indenture by the Trustee to the extent returned to the appropriate counterparty pursuant to Sections 10.3(d), (e) and (f).

Section 10.8.     *Reports by Independent Accountants.*

(a)     At the Closing Date, the Issuer, at the direction of the Servicer, shall appoint a firm of Independent certified public accountants of recognized international reputation for purposes of preparing and delivering the reports or certificates of the accountants required by this Indenture. Within 30 days of any resignation by the firm, the Issuer, at the direction of the Servicer, shall promptly appoint by Issuer Order delivered to the Trustee and each Rating Agency a successor firm that is a firm of Independent certified public accountants of recognized international reputation. If the Issuer, at the direction of the Servicer, fails to appoint a successor to a firm of Independent certified public accountants which has resigned within 30 days after the resignation, the Trustee, in consultation with the Servicer, shall promptly appoint a successor firm of Independent certified public accountants of recognized international reputation. The fees of such Independent certified public accountants and their successors shall be payable by the Issuer as an Administrative Expense.

(b)     On or before May 15 of each year commencing in 2008, the Issuer shall cause to be delivered to the Trustee, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Servicer or each Noteholder or Holder of Preference Shares upon written request therefor, upon written request therefor by a Beneficial Owner in the form of Exhibit H certifying that it is a Beneficial Owner, to the Beneficial Owner (or its designee) and each Rating Agency a statement from a firm of Independent certified public accountants indicating (i) that the firm has reviewed each Valuation Report received since the last review and applicable information from the Trustee, (ii) that the calculations within those Valuation Reports have been performed in accordance with the applicable provisions of this Indenture (except as otherwise noted in the statement) and (iii) the Aggregate Principal Balance of the Collateral Obligations owned by the Issuer as of the preceding Determination Date. If a conflict exists between the firm of Independent

176

certified public accountants and the Issuer with respect to any matter in this Section 10.7, the determination by that firm of Independent public accountants shall be conclusive. The statement shall be in the form of an Accountant's Certificate issued to the Issuer, the form of which shall be agreed on by the Servicer on behalf of the Issuer.

(c)     Upon the written request of the Preference Shares Paying Agent or any Holder of Preference Shares, the Issuer shall cause the firm of Independent certified public accountants appointed pursuant to Section 10.7(a) to provide any Holder of Preference Shares with all information requested pursuant to Section 7.17(g) or provide the Issuer with any assistance required in its preparation.

Section 10.9.     ***Reports to Rating Agencies.***

In addition to the information and reports specifically required to be provided to each Rating Agency pursuant to this Indenture, the Issuer shall provide each Rating Agency with the Accountants' Certificates delivered to the Trustee under this Indenture, and such additional information as either Rating Agency may from time to time reasonably request. In addition, any notices of restructurings and amendments received by the Issuer or the Trustee in connection with the Issuer's ownership of a DIP Loan shall be delivered by the Servicer (on behalf of the Issuer) or the Trustee, as the case may be, promptly to the Rating Agencies.

## ARTICLE 11

### APPLICATION OF MONIES

Section 11.1.     ***Disbursements of Monies from Payment Account.***

(a)     Notwithstanding any other provision in this Indenture, but subject to the other subsections of this Section 11.1 and to Section 13.1, on each Payment Date, the Trustee shall disburse available amounts from the Payment Account as follows and for application by the Trustee in accordance with the following priorities (the "***Priority of Payments***"):

(i)     On each Payment Date, Interest Proceeds with respect to the related Due Period (other than Interest Proceeds previously used during such Due Period to purchase accrued interest in respect of Collateral Obligations or otherwise used as permitted by Section 10.2) shall be distributed in the following order of priority:

(1)     to the payment of any taxes and registration and filing fees owed by the Co-Issuers (without limit) and then to the payment of Administrative Expenses up to the Administrative Expense Cap as follows:

FIRST, in the following order of priority,

(i)     fees, expenses and indemnities of the Trustee; and then

(ii)     fees, expenses and indemnities of the Collateral Administrator; and then

(iii)     fees, expenses and indemnities of the Preference Shares Paying Agent; and

SECOND, in the following order of priority,

177

NY\1257964.27

(x)    fees and expenses of the Administrator; and then

(y)    fees and expenses of the Co-Issuers (including fees and expenses of counsel and ongoing surveillance, credit estimate, and other fees owing to the Rating Agencies) and any other Person (except the Servicer) if specifically provided for in this Indenture, and to the expenses (but not fees) of the Servicer if payable under the Servicing Agreement;

(2)    the excess, if any, of the Administrative Expense Cap over the amounts paid pursuant to clause (1) above to deposit into the Expense Reimbursement Account;

(3)    FIRST, to deposit in the Class II Preference Share Special Payment Account for payment in accordance with Section 10.3(j) an amount equal to the product of (i) the Class II Preference Share Portion for such Payment Date, if any, and (ii) any accrued and unpaid Senior Servicing Fee then due and payable and SECOND, to the payment to the Servicer of an amount equal to the difference between (i) the accrued and unpaid Senior Servicing Fee as of such Payment Date and (ii) the amount deposited to the Class II Preference Share Special Payment Account in accordance with the preceding clause;

(4)    to the payment of all amounts due to the Hedge Counterparties under the Hedge Agreements (if any) other than any Defaulted Hedge Termination Payments;

(5)    to the payment of accrued and unpaid interest on the Class A-1-A Notes and the Class A-1-B Notes, and any accrued and unpaid Defaulted Interest on, and any Defaulted Interest Charge with respect to, the Class A-1-A Notes and the Class A-1-B Notes, in each case, *pro rata* in proportion to the respective amounts of interest, Defaulted Interest and Defaulted Interest Charge then due on each such Class;

(6)    to the payment of accrued and unpaid interest on the Class B Notes, and any accrued and unpaid Defaulted Interest on, and any Defaulted Interest Charge with respect to, the Class B Notes;

(7)    if the Class A/B Coverage Tests are not satisfied on the related Determination Date, to the payment of principal of the Class A-1-A Notes, the Class A-1-B Notes and the Class B Notes in the Note Payment Sequence, in each case, in the amount necessary so that all of the Class A/B Coverage Tests would be met on such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied pursuant to this clause (7) before the application of any Principal Proceeds pursuant to Section 11.1(a)(ii)(1) on the current Payment Date);

(8)    to the payment of accrued and unpaid interest on the Class C Notes (excluding Class C Deferred Interest, but including interest accrued for the preceding Interest Period on Class C Deferred Interest);

(9)    if the Class C Coverage Tests are not satisfied on the related Determination Date, to the payment of principal of the Class A-1-A Notes, the Class A-1-B Notes, the Class B Notes and the Class C Notes in the Note Payment Sequence, in each case in the amount necessary so that all of the Class C Coverage Tests would be met on such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied pursuant to this clause (9) before the application of any Principal Proceeds pursuant to Section 11.1(a)(ii)(3) on the current Payment Date);

178

(10)     to the payment of Class C Deferred Interest;

(11)     to the payment of accrued and unpaid interest on the Class D Notes (excluding Class D Deferred Interest but including interest accrued for the preceding Interest Period on Class D Deferred Interest);

(12)     if the Class D Coverage Tests are not satisfied on the related Determination Date, to the payment of principal of the Class A-1-A Notes, the Class A-1-B Notes, the Class B Notes, the Class C Notes and the Class D Notes in the Note Payment Sequence, in each case in the amount necessary so that all of the Class D Coverage Tests would be met on such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied pursuant to this clause (12) before the application of any Principal Proceeds pursuant to Section 11.1(a)(ii)(6) on the current Payment Date);

(13)     to the payment of Class D Deferred Interest;

(14)     to the payment of accrued and unpaid interest on the Class E Notes (excluding Class E Deferred Interest but including interest accrued for the preceding Interest Period on Class E Deferred Interest);

(15)     if the Class E Coverage Tests are not satisfied on the related Determination Date and all of the Class A/B Coverage Tests and the Class C Coverage Tests are satisfied on such Determination Date, to the payment of principal of the Class E Notes in the amount necessary so that all of the Class E Coverage Tests would be met on such Determination Date on a *pro forma* basis after giving effect to any payments in reduction of the principal of Notes made through this clause, or until paid in full (Interest Proceeds to be applied pursuant to this clause (15) before the application of any Principal Proceeds pursuant to Section 11.1(a)(ii)(9) on the current Payment Date);

(16)     to the payment of Class E Deferred Interest;

(17)     if a Rating Confirmation Failure exists on the Payment Date, to the payment of principal of the Class A-1-A Notes, the Class A-1-B Notes, the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes in the Note Payment Sequence, in each case in the amount necessary so that a Rating Confirmation is obtained, or until paid in full (Interest Proceeds to be applied pursuant to this clause (17) before the application of any Principal Proceeds pursuant to Section 11.1(a)(ii)(11) on the current Payment Date);

(18)     during the Replacement Period, if the Retention Overcollateralization Test is not satisfied on the related Determination Date, for deposit to the Collection Account as Principal Proceeds 50% of the remaining Interest Proceeds available after the payments pursuant to clause (17) above (or, if the amount necessary to cause the Retention Overcollateralization Test to be satisfied as of such Determination Date is less than 50% of such remaining Interest Proceeds, such necessary amount);

(19)     to the payment of any remaining Administrative Expenses not paid under clause (1) above in the respective priorities specified in clause (1);

(20)     FIRST, to deposit in the Class II Preference Share Special Payment Account for payment in accordance with Section 10.3(j) an amount equal to the product of (i) the Class II Preference Share Portion for such Payment Date, if any, and (ii) any accrued and unpaid Subordinated Servicing Fee then due and payable and SECOND, to the payment (*pro*

*rata* according to the amounts payable under clauses (x) and (y) below) to: (x) the Servicer of an amount equal to the difference between (i) the accrued and unpaid Subordinated Servicing Fee as of such Payment Date and (ii) the amount deposited to the Class II Preference Share Special Payment Account in accordance with the preceding clause; and (y) *pro rata* to each Noteholder entitled thereto, the applicable Extension Bonus Payment pursuant to, and in accordance with, Section 2.4(g);

   (21) to the payment of any Defaulted Hedge Termination Payments;

   (22) to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment *pro rata* to the Holders of Preference Shares until the Holders of the Preference Shares have realized a Preference Share Internal Rate of Return of 12.0%;

   (23) FIRST, to deposit in the Class II Preference Share Special Payment Account for payment in accordance with Section 10.3(j) of an amount equal to the product of (i) the Class II Preference Share Portion for such Payment Date, if any, and (ii) the Supplemental Servicing Fee, if applicable and SECOND, to the payment to the Servicer of an amount equal to the difference between (i) the accrued and unpaid Supplemental Servicing Fee as of such Payment Date and (ii) the amount deposited to the Class II Preference Share Special Payment Account in accordance with the preceding clause; and

   (24) any remaining Interest Proceeds, to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment *pro rata* to the Holders of the Preference Shares;

   provided that, in lieu of payment of Interest Proceeds referred to under clauses (22) and (24) above, in whole or in part on any Payment Date, the Servicer, on behalf of the Issuer, shall have the right to direct the Trustee to distribute any Eligible Equity Securities *pro rata* to the Consenting Holders of the Preference Shares with respect to such Payment Date to the extent that the Market Value of such Eligible Equity Securities (determined by the Servicer as of the relevant Market Value Determination Date) is equal to or lower than the aggregate amount of Interest Proceeds that would otherwise be due and payable on such Payment Date to such Consenting Holders of the Preference Shares. Interest Proceeds in an amount equal to the Market Value of such Eligible Equity Securities (determined by the Servicer as of the relevant Market Value Determination Date) distributed to the Consenting Holders of the Preference Shares with respect to any such Payment Date shall be treated for all purposes by the Issuer and the Servicer as Principal Proceeds available for distribution in accordance with Priority of Payments on the relevant Payment Date. The amount of Interest Proceeds available on the relevant Payment Date shall be reduced and the amount of Principal Proceeds available on the relevant Payment Date shall be increased accordingly.

   (ii) On each Payment Date, Principal Proceeds with respect to the related Due Period other than:

   (A) Principal Proceeds previously used to purchase Collateral Obligations (including any related deposit into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security) or otherwise used as permitted by Section 10.2,

(B)     Principal Proceeds on deposit in the Revolving Reserve Account, the Delayed Drawdown Reserve Account, the Synthetic Security Collateral Account, or the Securities Lending Account, and

(C)     Principal Proceeds on deposit in the Collection Account in an aggregate amount equal to the agreed Purchase Prices for Collateral Obligations with respect to which the Issuer has entered into a commitment before the end of the Due Period for their purchase, but has not settled the purchase by the end of the Due Period,

shall be distributed in the following order of priority:

(1)     (x) FIRST, to the payment of the amounts referred to in clauses (1) through (6) of Section 11.1(a)(i) (and in the same manner and order of priority) to the extent not previously paid in full thereunder and (y) SECOND, to the payment of amounts referred to in clause (7) of Section 11.1(a)(i) to the extent not previously paid in full thereunder and to the extent necessary to cause the Class A/B Overcollateralization Test to be met as of the related Determination Date on a *pro forma* basis after giving effect to any payments made through this clause (1), or until such amounts are paid in full;

(2)     to the payment of the amounts referred to in clause (8) of Section 11.1(a)(i) to the extent not previously paid in full thereunder;

(3)     to the payment of the amounts referred to in clause (9) of Section 11.1(a)(i) to the extent not previously paid in full thereunder and to the extent necessary to cause the Class C Overcollateralization Test to be met as of the related Determination Date on a *pro forma* basis after giving effect to any payments made through this clause (3), or until such amounts are paid in full;

(4)     to the payment of the amounts referred to in clause (10) of Section 11.1(a)(i) to the extent not previously paid in full thereunder;

(5)     to the payment of the amounts referred to in clause (11) of Section 11.1(a)(i) to the extent not previously paid in full thereunder;

(6)     to the payment of the amounts referred to in clause (12) of Section 11.1(a)(i) to the extent not previously paid in full thereunder and to the extent necessary to cause the Class D Overcollateralization Test to be met as of the related Determination Date on a *pro forma* basis after giving effect to any payments made through this clause (6), or until such amounts are paid in full;

(7)     to the payment of the amounts referred to in clause (13) of Section 11.1(a)(i) to the extent not previously paid in full thereunder;

(8)     to the payment of the amounts referred to in clause (14) of Section 11.1(a)(i) to the extent not previously paid in full thereunder;

(9)     to the payment of the amounts referred to in clause (15) of Section 11.1(a)(i) (regardless whether or not the conditions of sub-clause (i) of such clause (15) are satisfied) to the extent not previously paid in full thereunder and to the extent necessary to cause the Class E Overcollateralization Test to be met as of the related Determination Date on a *pro forma* basis after giving effect to any payments made through this clause (9), or until such amounts are paid in full;

181

(10)    to the payment of the amounts referred to in clause (16) of Section 11.1(a)(i) to the extent not previously paid in full thereunder;

(11)    to the payment of the amounts referred to in clause (17) of Section 11.1(a)(i) to the extent not previously paid in full thereunder;

(12)

(A)    if the Payment Date is a Redemption Date in the following order of priority: (i) to the payment in the Note Payment Sequence of the Redemption Prices of all of the Notes to be redeemed, (ii) to the payment of the amounts referred to in clauses (19) through (23) of Section 11.1(a)(i) (and in the same manner and order of priority) to the extent not previously paid in full thereunder and (iii) to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment to the Holders of the Preference Shares of the Redemption Price of any Preference Shares to be redeemed; and

(B)    if the Payment Date is a Special Redemption Date, to the payment in the Note Payment Sequence of principal of the Notes in an aggregate amount equal to the Special Redemption Amount, in each case until paid in full;

(13)    during the Replacement Period, all remaining Principal Proceeds to the acquisition of additional Collateral Obligations in accordance with the provisions of Section 7.19 and Article 12 (and, until so applied (including any related deposit into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security), to be deposited in the Collection Account as Principal Proceeds);

(14)    after the Replacement Period, (i) FIRST, at the discretion of the Servicer (with respect to Unscheduled Principal Payments and Sale Proceeds from the sale of Credit Improved Obligations) to the purchase or funding of additional or replacement Collateral Obligations in accordance with the Eligibility Criteria and the applicable provisions of this Indenture when appropriate Collateral Obligations are available, and until such time, to the Collection Account for the purchase of Eligible Investments; and (ii) SECOND, to the payment in the Note Payment Sequence of principal of Notes until paid in full;

(15)    to the extent not previously paid in full under clause (12) above, after the Replacement Period, to the payment of the amounts referred to in clauses (19) through (23) of Section 11.1(a)(i) (and in the same manner and order of priority) to the extent not previously paid in full thereunder; and

(16)    after the Replacement Period to the Preference Shares Paying Agent, on behalf of the Issuer, for deposit into the Preference Shares Distribution Account for payment *pro rata* to the Holders of the Preference Shares.

(b)    If on any Payment Date the amount available in the Payment Account is insufficient to make the full amount of the disbursements required by the Valuation Report, the Trustee shall make the disbursements called for in the order and according to the priority under Section 11.1(a), subject to Section 13.1, to the extent funds are available therefor.

(c)     The Trustee shall remit funds to pay Administrative Expenses of the Issuer or the Co-Issuer in accordance with Section 11.1(a), to the extent available, to the Issuer, the Co-Issuer as directed and designated in an Issuer Order (which may be in the form of standing instructions) delivered to the Trustee no later than the Business Day before each Payment Date.

(d)     If the Hedge Counterparty defaults in the payment of its obligations to the Issuer under the respective Hedge Agreements on the date on which any payment is due thereunder, the Trustee shall make a demand on the Hedge Counterparty, or any guarantor, if applicable, demanding payment by 12:30 P.M., New York time, on that date. The Trustee shall give notice to the Noteholders, the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares), the Servicer and each Rating Agency upon the continuing failure by the Hedge Counterparty to perform its obligations during the two Business Days following a demand made by the Trustee on, the Hedge Counterparty, and shall take the action with respect to the continuing failure as directed by the Servicer unless an Event of Default has occurred and is continuing in which case direction is to be taken pursuant to Section 5.13.

(e)     Except as otherwise expressly provided in Section 11.1(a) above, if on any Payment Date, the amount available in the Payment Account from amounts received in the related Due Period is insufficient to make the full amount of the disbursements required by any numbered or lettered paragraph or clause of Section 11.1(a) to different Persons, the Trustee shall make the disbursements called for by the paragraph or clause ratably in accordance with the respective amounts of the disbursements then payable, subject to Section 13.1, to the extent funds are available therefor.

## ARTICLE 12

### SALE OF COLLATERAL OBLIGATIONS; PURCHASE OF COLLATERAL OBLIGATIONS

Section 12.1.    *Sales of Collateral Obligations.*

Subject to the satisfaction of the conditions specified in Section 10.6, Section 12.1 and Section 12.3 and if no Event of Default is continuing as evidenced by an Officer's certificate of the Servicer provided to the Trustee, the Issuer may, at the direction of the Servicer, direct the Trustee to sell any Collateral Obligation or Workout Asset if the Servicer certifies to the Trustee that the sale meets the requirements of any one of paragraphs (a) through (i) of this Section 12.1. If the Issuer sells any Collateral Obligation or Workout Asset during the Replacement Period, the proceeds shall be applied in accordance with Section 12.2.

(a)     *Credit Risk Obligations.* At the direction of the Servicer, the Issuer may direct the Trustee to sell any Credit Risk Obligation at any time during or after the Replacement Period without restriction and the Trustee shall sell the Credit Risk Obligation in accordance with such direction. Following any sale of a Credit Risk Obligation pursuant to this Section 12.1(a), at the direction of the Servicer during the Replacement Period, the Issuer shall use commercially reasonable efforts to purchase additional Collateral Obligations (to the extent the purchase is in the best interest of the Issuer) meeting the Eligibility Criteria with an Aggregate Principal Balance at least equal to the Sale Proceeds received by the Issuer with respect to the Collateral Obligation sold. For this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded amount.

(b)     *Credit Improved Obligations.* At the direction of the Servicer, the Issuer may direct the Trustee to sell any Credit Improved Obligation if either:

183

(i)     during the Replacement Period, the Servicer has identified in writing before the sale one or more specific manners in which it will be able, in compliance with the Eligibility Criteria and the requirements set forth in Section 12.1(i), to cause the Issuer to use the Sale Proceeds (it being understood that such identification shall not be considered either a requirement or an assurance that any specified purchase will be consummated) to purchase one or more additional Collateral Obligations with an Aggregate Principal Balance at least equal to the Purchase Criteria Adjusted Balance of the Credit Improved Obligation by the end of the immediately succeeding Due Period (for this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded amount and Principal Balance shall include the principal balance of Collateral Obligations in which the Trustee does not have a first priority perfected security interest) which in aggregate will result in (i) the Collateral Quality Tests, the Interest Coverage Tests, the Overcollateralization Tests and the Concentration Limitations herein being satisfied or if one or more of such Collateral Quality Tests, Interest Coverage Tests, Overcollateralization Tests or Concentration Limitations are not satisfied, the degree of compliance therewith being improved, (ii) the quality of the total portfolio of Collateral Obligations as measured by such Collateral Quality Tests, Interest Coverage Tests, Overcollateralization Tests and Concentration Limitations being improved on a net basis in the commercially reasonable judgment of the Servicer and (iii) in the case of each of clause (i) and (ii), any other Collateral Quality Tests, Interest Coverage Tests, Overcollateralization Tests or Concentration Limitations not being violated or, in the commercially reasonable judgment of the Servicer, the likelihood of such violation in the future not being significantly increased; and

(ii)     after the Replacement Period, the Sale Proceeds received in respect of the Credit Improved Obligation are at least equal to its Purchase Criteria Adjusted Balance. For this purpose, the Principal Balance of any Revolving Loan or Delayed Drawdown Loan shall only include its funded amount and Principal Balance shall include the principal balance of Collateral Obligations in which the Trustee does not have a first priority perfected security interest;

and the Trustee shall sell the Credit Improved Obligation in accordance with such direction.

(c)     *Non-Performing Collateral Obligations.* At the direction of the Servicer, the Issuer may direct the Trustee to sell any Non-Performing Collateral Obligation at any time during or after the Replacement Period without restriction and the Trustee shall sell the Non-Performing Collateral Obligation in accordance with such direction. Non-Performing Collateral Obligations may be sold regardless of price.

(d)     *Non-qualifying Collateral Obligations.* At the direction of the Servicer, the Issuer may direct the Trustee to sell any obligation that at the time of acquisition, conversion, or exchange does not satisfy the requirements of a Collateral Obligation (the "***Non-qualifying Collateral Obligation***") at any time during or after the Replacement Period without restriction and the Trustee shall sell that obligation in accordance with such direction.

(e)     *Withholding Tax Sales.* At the direction of the Servicer, the Issuer may direct the Trustee to sell any Collateral Obligation subject to withholding tax at any time during or after the Replacement Period without restriction and the Trustee shall sell the Collateral Obligation in accordance with such direction.

(f)     *Optional Redemption.* After the Issuer has notified the Trustee of an Optional Redemption of the Notes in accordance with Article 9, at the direction of the Servicer, the Issuer shall direct the Trustee to sell all or a portion of the Collateral Obligations as contemplated therein if

184

(i) the requirements of Article 9 are satisfied and (ii) the Independent certified public accountants appointed pursuant to Section 10.7 have confirmed the calculations contained in any required certificate furnished by the Servicer pursuant to Section 9.3(c). After a Majority of the Preference Shares have directed an Optional Redemption of the Preference Shares in accordance with Section 9.2(b), at the direction of the Servicer, the Issuer shall direct the Trustee to sell all of the remaining Collateral Obligations (in the case of an Optional Redemption pursuant to Section 9.2(b)(i)) or a portion of the remaining Collateral Obligations in accordance with the unanimous directions of Holders of the Preference Shares (in the case of an Optional Redemption pursuant to Section 9.2(b)(ii)) and the Trustee shall sell the remaining Collateral Obligations in accordance with such direction.

(g)     *Rating Confirmation Failure.* After the Servicer has received notice of a Rating Confirmation Failure and if available Interest Proceeds and Principal Proceeds are insufficient to effect the redemption of the Notes at par on any subsequent Payment Date in accordance with the Priority of Payments as and to the extent necessary for each of Moody's and S&P to confirm the Initial Ratings assigned by it on the Closing Date to the Securities, the Issuer may, at the direction of the Servicer, direct the Trustee to sell Collateral Obligations as contemplated in Section 9.1 and the Trustee shall sell the Collateral Obligations in accordance with such direction.

(h)     *Workout Assets.* At the direction of the Servicer, the Issuer may direct the Trustee to sell any Workout Asset at any time during or after the Replacement Period without restriction and regardless of price and the Trustee shall sell the Workout Assets in accordance with such direction.

(i)     *Supervening Requirement.* Notwithstanding anything herein to the contrary, the Issuer (at the direction of the Servicer or otherwise) shall not acquire or dispose of a Collateral Obligation or other eligible asset (as defined in Rule 3a-7) for the primary purpose of recognizing gains or decreasing losses resulting from market value changes. For the avoidance of doubt, the Issuer, at the direction of the Servicer or otherwise, may direct the Trustee to sell any CCC+/Caa1 Collateral Obligation or Deep Discount Obligation only (a) if it constitutes Credit Risk Obligation or Non-Performing Collateral Obligation or (b) in connection with the Optional Redemption as set out in paragraph (f) above. The Trustee shall have no obligation to monitor compliance by the Issuer or the Servicer with respect to the requirement set out in this paragraph (i).

Notwithstanding the foregoing, the Issuer (or the Servicer on its behalf) shall not direct the Trustee to sell any Collateral Obligation (other than the sale of a Credit Risk Obligation or a Non-Performing Collateral Obligation pursuant to a sale that meets the requirements in paragraph (a) or (c) above, as applicable) following receipt by the Servicer of notice of removal pursuant to Section 14 of the Servicing Agreement until a successor Servicer is appointed pursuant to Section 12 of the Servicing Agreement.

Section 12.2.     *Purchase of Collateral Obligations.*

(a)     On any date during the Replacement Period (and, in respect of Principal Proceeds constituting Unscheduled Principal Payments and Sale Proceeds from Credit Risk Obligations and Credit Improved Obligations, on any date after the Replacement Period), so long as no Event of Default is continuing, at the direction of the Servicer, the Issuer may direct the Trustee to apply Principal Proceeds (together with Interest Proceeds, but only to the extent used to pay for accrued interest on Collateral Obligations) to purchase Collateral Obligations (including any related deposit into the Revolving Reserve Account or the Delayed Drawdown Reserve Account or the posting by the Issuer of cash collateral with (or for the benefit of) a Synthetic Security Counterparty simultaneously with the Issuer's purchase of or entry into a Synthetic Security) if the Servicer certifies to the Trustee that, to the best knowledge of the Servicer, the conditions specified in this Section 12.2 and Section 12.3 are met.

185

(b)     *Eligibility Criteria*. No obligations may be purchased unless each of the conditions in the following clauses (i) through (xii) (the "***Eligibility Criteria***") is satisfied as evidenced by a certificate of the Servicer as of the date the Issuer commits to make the purchase, in each case after giving effect to the purchase and all other purchases and sales previously or simultaneously committed to:

(i)     the obligation is a Collateral Obligation;

(ii)     for any date occurring during the Replacement Period:

(A)     each Overcollateralization Test is satisfied and, if the commitment is made on or after the second Payment Date, each Interest Coverage Test is satisfied, or

(B)     if any such Coverage Test is not satisfied, both:

(1)     the extent of satisfaction of the Coverage Test is not reduced, and

(2)     the Collateral Obligation is being purchased with Principal Proceeds other than:

(x)     Principal Proceeds received in respect of a Defaulted Collateral Obligation, or

(y)     Principal Proceeds received in respect of a Workout Asset that has been received in exchange for a Defaulted Collateral Obligation;

(iii)     for any date occurring during the Replacement Period, the Diversity Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(iv)     for any date occurring during the Replacement Period, the Weighted Average Rating Factor Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced; *provided* that the Weighted Average Moody's Rating Factor does not exceed 2750 or, if the Weighted Average Moody's Rating Factor exceeds 2750 prior to giving effect to such purchase or sale, the Weighted Average Moody's Rating Factor is not increased;

(v)     for any date occurring during the Replacement Period, each of the limits in the definition of "Concentration Limitations" is satisfied or, if any such limit is not satisfied, the extent of satisfaction is not reduced;

(vi)     for any date occurring during the Replacement Period, the Weighted Average Spread Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(vii)     for any date occurring during the Replacement Period, the Weighted Average Fixed Rate Coupon Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(viii)     for any date occurring during the Replacement Period, the Weighted Average Life Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

186

(ix)    for any date occurring during the Replacement Period, the Weighted Average Moody's Recovery Rate Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(x)    for any date occurring during the Replacement Period, the Weighted Average S&P Recovery Rate Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced;

(xi)    for any date occurring during the Replacement Period, the S&P CDO Monitor Test is satisfied or, if not satisfied, the extent of satisfaction is not reduced; provided, however, that this Eligibility Criterion (xi) shall not apply either to the application of the proceeds from the sale of a Credit Risk Obligation, Non-Performing Collateral Obligation or Workout Asset or to the application of Principal Proceeds in respect of Defaulted Collateral Obligations; and

(xii)    for any date occurring after the Replacement Period:

(A)    each Coverage Test is satisfied and the extent of satisfaction is not reduced;

(B)    each Collateral Quality Test (other than the Weighted Average Rating Factor Test) is maintained or improved and the Weighted Average Rating Factor Test is satisfied; *provided* that the Weighted Average Moody's Rating Factor does not exceed 2750 or, if the Weighted Average Moody's Rating Factor exceeds 2750 prior to giving effect to such purchase or sale, the Weighted Average Moody's Rating Factor is not increased and the Weighted Average Rating Factor Test is satisfied;

(C)    each Concentration Limitation is maintained or improved and the Aggregate Principal Balance of all CCC+/Caa1 Collateral Obligations do not exceed 7.5% of the Maximum Amount;

(D)    the Weighted Average Life Test is satisfied;

(E)    the S&P Rating of such Collateral Obligation is at least equal to the S&P Rating of the Collateral Obligation being the source of the Unscheduled Principal Payments or of the Credit Risk Obligations or Credit Improved Obligation being the source of Sale Proceeds, as applicable; and

(F)    the current Moody's Rating on the Class A-1-A Notes and the Class A-1-B Notes is "Aaa" and the current Moody's Ratings on the Class B Notes, the Class C Notes, the Class D Notes and the Class E Notes are no lower than one subcategory below their Initial Rating.

Notwithstanding the foregoing, the Issuer (or the Servicer on its behalf) shall not direct the Trustee to purchase any Collateral Obligation following receipt by the Servicer of notice of removal pursuant to Section 14 of the Servicing Agreement until a successor Servicer is appointed pursuant Section 12 of the Servicing Agreement.

(c)    *Certain Permitted Exchanges.* The Issuer may, at the direction of the Servicer, exchange a Collateral Obligation for another Collateral Obligation in an A/B Exchange.

187

(d)     *Certification by Servicer.*  Not later than the Business Day preceding the settlement date for any Collateral Obligation purchased after the Closing Date (but in any event no later than the release of Cash for the Purchase Price of the purchase), the Servicer shall deliver to the Trustee an Officer's certificate of the Servicer certifying that, to the best knowledge of the Servicer, the purchase complies with this Section 12.2 and with Section 12.3 (determined as of the date that the Issuer commits to make the purchase).

(e)     *Eligible Investments.*  Cash on deposit in the Collection Account may be held at any time in Eligible Investments in accordance with Section 10.4(a) pending the application thereof to purchase Collateral Obligations.

Section 12.3.     ***Conditions Applicable to All Sale and Purchase Transactions.***

(a)     Any sale or purchase by the Issuer of a Collateral Obligation shall be conducted on an arm's length basis and, if effected with the Servicer or a Person Affiliated with the Servicer or any fund or account for which the Servicer or an Affiliate of the Servicer acts as investment adviser, shall be effected in accordance with the requirements of Section 5 of the Servicing Agreement on terms no less favorable to the Issuer than would be the case if the Person were not so Affiliated.  The Trustee shall have no responsibility to oversee compliance with this clause (a) by the other parties.

(b)     Upon any acquisition of any Collateral Obligation, all of the Issuer's interest in the Collateral Obligation shall be Granted to the Trustee pursuant to this Indenture.

(c)     Notwithstanding the other provisions of this Article 12, the Issuer (or the Servicer on its behalf) shall not direct the Trustee to sell or purchase any Collateral Obligation (other than the sale of a Credit Risk Obligation or a Non-Performing Collateral Obligation pursuant to Section 12.1(a) or (c), as applicable) following receipt by the Servicer of notice of removal pursuant to Section 14 of the Servicing Agreement until a successor Servicer is appointed pursuant to Section 12(e) of the Servicing Agreement.

Section 12.4.     ***Certain Determinations Relating to Collateral Obligations.***

(a)     Notwithstanding anything to the contrary contained in this Indenture, solely for the purpose of calculations in connection with the Eligibility Criteria, the Issuer or the Servicer on behalf of the Issuer shall be deemed to have purchased any Collateral Obligations as of the date on which the Issuer enters into a contract to purchase, a commitment letter, a confirmation or a due bill for such Collateral Obligation, in each case entitling the Issuer (or the Trustee as assignee thereof) to receive such Collateral Obligations and, in such event, the Issuer shall be deemed to have acquired, granted or delivered, as the case may be, such Collateral Obligations on such date.

(b)     Notwithstanding anything to the contrary contained in this Indenture, solely for the purpose of calculations in connection with the Eligibility Criteria, the Issuer or the Servicer on behalf of the Issuer shall be deemed to have sold any Collateral Obligations as of the date on which the Issuer enters into a contract to sell, a commitment letter, a confirmation or a due bill for such Collateral Obligation, in each case entitling the Issuer (or the Trustee as assignee thereof) to sell, and requiring the purchaser to purchase, such Collateral Obligations and, in such event, the Issuer shall be deemed to have sold such Collateral Obligations on such date.

(c)     Under the circumstances described in subsections (a) and (b) above, if the transaction contemplated by the contract, commitment letter, confirmation or due bill referred to therein does not settle on or before the 60th day following the scheduled settlement date (the "***Deadline***"), the deemed purchase or sale shall be deemed not to have occurred; provided, however, that the Servicer shall have the right to extend the Deadline for an additional period (not to exceed

188

an additional 60 days) by notice to the Trustee, which notice shall include the Servicer's certification to the effect that the Servicer believes that the settlement shall occur on or before the extended Deadline.

(d)     Scheduled distributions with respect to any Pledged Collateral Obligation shall be determined in accordance with the applicable provisions of this Indenture.

## ARTICLE 13

### NOTEHOLDERS' RELATIONS

Section 13.1.     *Subordination.*

(a)     With respect to each Class of Notes and the Preference Shares, the Classes of Notes and the Preference Shares that are Priority Classes and Junior Classes are as follows:

| Class | Junior Classes | Priority Classes |
|---|---|---|
| A-1-A* | A-1-B, B, C, D, E, Preference Shares** | None |
| A-1-B* | B, C, D, E, Preference Shares** | A-1-A |
| B | C, D, E, Preference Shares** | A |
| C | D, E, Preference Shares** | A, B |
| D | E, Preference Shares** | A, B, C |
| E | Preference Shares** | A, B, C, D |
| Preference Shares | None*** | A, B, C, D, E |

\*     The payment of interest on the Class A-1-A Notes and the Class A-1-B Notes shall rank *pari passu*, and the Class A-1-A Notes and the Class A-1-B Notes will be allocated principal payments on each Payment Date in accordance with the Class A Allocation.

\*\*     Other than with respect to the Class II Preference Share Special Payments, which may be payable to the Holders of the Class II Preference Shares as set forth herein and will have priority to the extent provided in the Priority of Payments.

\*\*\*     The Preference Shares will be entitled to certain residual cash flow after payment of senior obligations in accordance with the Priority of Payments.

(b)     Anything in this Indenture or the Notes to the contrary notwithstanding, the Holders of each Class of Notes that is a Junior Class agree for the benefit of the Holders of Notes of each Priority Class with respect to the Junior Class that the Junior Class shall be subordinate and junior to the Notes of each Priority Class to the extent and in the manner provided in this Indenture. If any Event of Default has not been cured or waived and acceleration occurs and is continuing in accordance with Article 5, each Priority Class of Notes shall be paid in full in Cash or, to the extent a Majority of each Class consents, other than in Cash, before any further payment or distribution is made on account of any Junior Class of Notes with respect to the Priority Class. The Holders of each Junior Class of Notes agree, for the benefit of the Holders of Notes of each Priority Class in respect of the Junior Class, not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer for failure to pay to them amounts due to the Junior Class, of the Notes or each Class of

189

Notes, as the case may be, or under this Indenture until the payment in full of the Priority Classes or all the Classes, as the case may be, and not before one year and a day, or if longer, the applicable preference period then in effect, has elapsed since the payment.

(c)     If, notwithstanding the provisions of this Indenture, any Holder of Notes of any Junior Class has received any payment or distribution in respect of the Notes contrary to the provisions of this Indenture, then, until each Priority Class with respect to the Junior Class of Notes or each Class of Notes, as the case may be, has been paid in full in Cash or, to the extent a Majority of the Priority Class or the Class, as the case may be, consents, other than in Cash in accordance with this Indenture, the payment or distribution shall be received and held in trust for the benefit of, and shall forthwith be paid over and delivered to, the Trustee, which shall pay and deliver the same to the Holders of the applicable Priority Classes of Notes or the Holders of all Classes of Notes, as the case may be, in accordance with this Indenture. If any such payment or distribution is made other than in Cash, it shall be held by the Trustee as part of the Collateral and subject in all respects to this Indenture, including this Section 13.1.

(d)     Each Holder of Notes of any Junior Class agrees with all Holders of the applicable Priority Classes that the Holder of Junior Class Notes shall not demand, accept, or receive any payment or distribution in respect of the Notes in violation of this Indenture including this Section 13.1. After a Priority Class has been paid in full, the Holders of Notes of the related Junior Class or Classes shall be fully subrogated to the rights of the Holders of the Priority Class. Nothing in this Section 13.1 shall affect the obligation of the Issuer to pay Holders of any Junior Class of Notes.

(e)     Distributions to Holders of the Preference Shares (other than, as and to the extent described herein, the Class II Preference Share Special Payments) are subordinate to distributions on the Notes as described in the Priority of Payments.

(f)     The Servicing Fees shall have priority only to the extent provided in the Priority of Payments.

Section 13.2.     ***Standard of Conduct.***

In exercising any of its or their voting rights, rights to direct and consent, or any other rights as a Noteholder under this Indenture, a Noteholder shall not have any obligation or duty to any Person or to consider or take into account the interests of any Person and shall not be liable to any Person for any action taken by it or them or at its or their direction or any failure by it or them to act or to direct that an action be taken, without regard to whether the action or inaction benefits or adversely affects any Noteholder, the Issuer or any other Person, except for any liability to which the Noteholder may be subject to the extent the same results from the Noteholder's taking or directing an action, or failing to take or direct an action, in bad faith or in violation of the express terms of this Indenture.

# ARTICLE 14

## MISCELLANEOUS

Section 14.1.     ***Form of Documents Delivered to Trustee.***

In any case where several matters are required to be certified by, or covered by an opinion of, any specified Person, it is not necessary that all the matters be certified by, or covered by the opinion of, only one Person, or that they be so certified or covered by only one document, but one such Person may certify or give an opinion with respect to some matters and one or more other such

190

Persons as to other matters, and any such Person may certify or give an opinion as to the matters in one or several documents.

Any certificate or opinion of an Officer of the Issuer, the Co-Issuer or the Servicer may be based, insofar as it relates to legal matters, upon a certificate or opinion of, or representations by, counsel, unless the Officer knows, or should know that the certificate or opinion or representations with respect to the matters upon which his certificate or opinion is based are erroneous. Any such certificate of an Officer of the Issuer, Co-Issuer or the Servicer or Opinion of Counsel may be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, the Issuer, the Co-Issuer, the Servicer or any other Person, stating that the information with respect to the factual matters is in the possession of the Issuer, the Co-Issuer, the Servicer or the other Person, unless the Officer of the Issuer, Co-Issuer or the Servicer or the counsel knows that the certificate or opinion or representations with respect to factual matters are erroneous. Any Opinion of Counsel may also be based, insofar as it relates to factual matters, upon a certificate or opinion of, or representations by, an Officer of the Issuer or the Co-Issuer, stating that the information with respect to factual matters is in the possession of the Issuer or the Co-Issuer, unless the counsel knows that the certificate or opinion or representations with respect to factual matters are erroneous.

Where any Person is required to make, give, or execute two or more applications, requests, consents, certificates, statements, opinions or other instruments under this Indenture, they may, but need not, be consolidated and form one instrument.

Whenever this Indenture provides that the absence of the continuation of a Default or Event of Default is a condition precedent to the taking of any action by the Trustee at the request or direction of either Co-Issuer, then notwithstanding that the satisfaction of the condition is a condition precedent to the Co-Issuer's right to make the request or direction, the Trustee shall be protected in acting in accordance with the request or direction if it does not have knowledge of the continuation of the Default or Event of Default as provided in Section 6.1(d).

Section 14.2.    *Acts of Holders of Securities.*

(a)    Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or taken by Holders of Securities may be embodied in and evidenced by one or more instruments (which may be an electronic document, including, but not limited, to in the form of e-mail, to the extent permitted by applicable law) of substantially similar tenor signed by Holders of Securities in Person or by agents duly appointed in writing (provided that no signature shall be required on electronic documents, including, but not limited to, in the form of e-mail to the extent permitted by law). Except as otherwise expressly provided in this Indenture, the action shall become effective when the instruments are delivered to the Trustee (which instrument or instruments may be delivered through the Preference Shares Paying Agent, in the case of the Holders of the Preference Shares) and, if expressly required, to the Issuer. The instruments (and the action embodied in them) are referred to as the *"Act"* of the Holders of Securities signing the instruments. Proof of execution of any instrument or of a writing appointing an agent for a Holder of a Security shall be sufficient for any purpose of this Indenture and conclusive in favor of the Trustee and the Issuer, if made in the manner provided in this Section.

(b)    The fact and date of the execution by any Person of any instrument may be proved by an affidavit of a witness to the execution or the certificate of any notary public or other Person authorized by law to acknowledge the execution of deeds. Any certificate on behalf of a jural entity executed by a Person purporting to have authority to act on behalf of the jural entity shall itself be sufficient proof of the authority of the Person executing it to act. The fact and date of the execution by any Person of any instrument may also be proved in any other manner that the Trustee deems sufficient.

191

(c)     The Indenture Register shall prove the ownership of the Notes and the principal amount and registered numbers of Notes and the number of Preference Shares held by and the number(s) of the Preference Share certificate(s) issued to, any Person shall be proved by the Preference Share register.

(d)     Any Act by the Holder of a Security shall bind every Holder of the same Security and every Security issued on its transfer or in exchange for it or in lieu of it, in respect of anything done, omitted or suffered to be done by the Trustee or the Issuer in reliance on the Act, whether or not notation of the action is made on the Securities.

Section 14.3.     *Notices, etc., to Certain Persons or Parties.*

(a)     Any request, demand, authorization, direction, order, notice, consent, waiver, or Act of Holders of Securities or other documents provided or permitted by this Indenture to be made, given, or furnished to, or filed with:

(i)     the Trustee or Preference Shares Paying Agent shall be sufficient for every purpose under this Indenture if in writing and made, given, furnished, or filed to and mailed, by certified mail, return receipt requested, hand delivered, sent by overnight courier service guaranteeing next day delivery, or by telecopy in legible form, to the Trustee or Preference Shares Paying Agent addressed to it at, 200 Clarendon Street, Mail Code EUC 108, Boston, MA 02116, telecopy no. (617) 351-4358, Attention: CDO Services Group, or at any other address previously furnished in writing to the other parties hereto by the Trustee (any request, direction, order, notice or other communication from the Servicer to the Trustee under Article 12 (other than required certifications) may be by electronic mail, which shall be deemed to be in writing);

(ii)     the Co-Issuers shall be sufficient for every purpose under this Indenture (unless otherwise in this Indenture expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service, or by telecopy in legible form, to the Issuer addressed to it at c/o Maples Finance Limited, P.O. Box 1093GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands, telecopy no. (345) 945-7100, Attention: the Directors—Westchester CLO, Ltd., or at any other address previously furnished in writing to the other parties hereto by the Issuer or the Co-Issuer, as the case may be, with a copy to the Servicer at its address below;

(iii)     the Servicer shall be sufficient for every purpose under this Indenture if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service, or by telecopy in legible form, to the Servicer addressed to it at Two Galleria Tower, 13455 Noel Road, Suite 800, Dallas, Texas 75240, telecopy no. (972) 628-4147, Attention: James Dondero, or at any other address previously furnished in writing to the other parties hereto;

(iv)     the Initial Purchasers shall be sufficient for every purpose under this Indenture if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service, or by telecopy in legible form, to the Initial Purchasers addressed to them at 745 Seventh Ave., New York, New York 10019, telecopy no. (212) 526-6713, Attention: CDO Banking, or at any other address previously furnished in writing to the Co-Issuers, the Servicer, and the Trustee by an Officer of either Initial Purchaser, as the case may be

(v)     any Hedge Counterparty shall be sufficient for every purpose under this Indenture (unless otherwise in this Indenture expressly provided) if in writing and mailed,

192

first-class postage prepaid, hand delivered or sent by overnight courier service or by telecopy in legible form to the Hedge Counterparty addressed to it at the address specified in the relevant Hedge Agreement or at any other address previously furnished in writing to the Issuer or the Trustee by the Hedge Counterparty;

(vi)     the Rating Agencies shall be sufficient for every purpose under this Indenture (unless otherwise in this Indenture expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service, or by telecopy in legible form, to each Rating Agency addressed to it at Moody's Investors Service, Inc., 99 Church Street, New York, New York, 10007, Telecopy No. (212) 553-4170, cdomonitoring@moodys.com, Attention: CBO/CLO Monitoring and Standard & Poor's, 55 Water Street, 41st Floor, New York, New York 10041-0003, telecopy no. (212) 438-2664, Attention: Asset Backed-CBO/CLO Surveillance and each Monthly Report shall also be sent to S&P electronically to CDO_Surveillance@standardandpoors.com;

(vii)     the Administrator shall be sufficient for every purpose under this Indenture (unless otherwise in this Indenture expressly provided) if in writing and mailed, first-class postage prepaid, hand delivered, sent by overnight courier service, or by facsimile in legible form, addressed to Maples Finance Limited, P.O. Box 1093GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands, telecopy no. (345) 945-7100, Attention: the Directors—Westchester CLO, Ltd.; or

(viii)     the Repository shall be sufficient for every purpose under this Indenture if delivered to the Repository at CDO Library, c/o The Bond Market Association, 360 Madison Avenue, 18th Floor, New York, New York 10017, electronic mail address: admin@cdolibrary.com. Any document required to be delivered or made available to the Repository by the Trustee may be made available by providing the operator of the Repository with access to a website containing such document in a format that permits the user to download the document as a pdf file.

(b)     If any provision in this Indenture calls for any notice or document to be delivered simultaneously to the Trustee and any other Person, the Trustee's receipt of the notice or document shall entitle the Trustee to assume that the notice or document was delivered to the other Person unless otherwise expressly specified in this Indenture.

(c)     Any Holder or beneficial owner of any Class A-1-A Notes or Class A-1-B Notes may elect to acquire bond insurance, a surety bond, a credit default swap or similar credit enhancement supporting the payment of principal and/or interest on such Class A-1-A Notes or Class A-1-B Notes, as applicable, on terms and conditions acceptable to such Holder or beneficial owner and at the sole expense of such Holder or beneficial owner. On or after any such acquisition, such Holder or beneficial owner may deliver notice (and if from a beneficial owner, any such notice shall include certification that such owner is a beneficial owner of the Class A-1-A Notes or Class A-1-B Notes, as applicable) to the Trustee in substantially the form of Exhibit J specifying the name and contact information of the insurer, surety, credit protection seller or enhancer of such Class A-1-A Notes or Class A-1-B Notes, as applicable (each, an "*Insurer*"). After receipt of any such notice (in the form of Exhibit J) by the Trustee, the Trustee shall copy the related Insurer on all notices, reports or other documents delivered to the Noteholders.

(d)     Unless notified to the contrary by Financial Security Assurance Inc. ("*FSA*") or unless FSA is no longer to direct the vote of at least the Super Majority of the Class A-1-A Notes, each of the parties hereto agrees that, so long as any Class A-1-A Notes are Outstanding, FSA shall be entitled to receive, and shall be distributed, all reports, notices, certificates, statements and other information (including access to the Trustee's password protected website)

193

that are required to be delivered to any Holder of the Class A-1-A Notes (or that any Holder of the Class A-1-A Notes is entitled to request) at the same time and in the same manner as such reports, notices, certificates, statements and other information are delivered to each such Holder of Class A-1-A Notes, at the following address (or at any other address furnished in writing from time to time by FSA to the parties hereto): Financial Security Assurance Inc., 31 West 52nd Street, New York, NY 10019, Attention: CDO Surveillance, telephone no.: (212) 826-0100; electronic mail: cdoreport@fsa.com, facsimile no.: (212) 339-3581. For the avoidance of doubt, FSA shall be entitled to request directly that the parties hereto provide it with such reports, notices, certificates, statements and other information that are required to be delivered to any Holder of the Class A-1-A Notes (or that any Holder of the Class A-1-A Notes is entitled to request).

Section 14.4.    *Notices to Noteholders and the Preference Shares Paying Agent; Waiver.*

Except as otherwise expressly provided in this Indenture, where this Indenture provides for notice to the Noteholders or the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) of any event,

(a)    the notice shall be sufficiently given to the Noteholders or the Preference Shares Paying Agent if in writing and mailed, first-class postage prepaid, each Noteholder affected by the event or the Preference Shares Paying Agent, at the address of the Holder as it appears in the Indenture Register or at the address of the Preference Shares Paying Agent supplied by the Preference Shares Paying Agent to the Trustee, as applicable, not earlier than the earliest date and not later than the latest date, prescribed for the giving of the notice; and

(b)    the notice shall be in the English language.

Notices shall be deemed to have been given on the date of their mailing.

Notwithstanding clause (a), a Noteholder or the Preference Shares Paying Agent may give the Trustee a written notice that it is requesting that notices to it be given by facsimile transmissions and stating the telecopy number for the transmission. Thereafter, the Trustee shall give notices to the Holder or the Preference Shares Paying Agent by facsimile transmission. If the notice also requests that notices be given by mail, then the notice shall also be given by mail in accordance with clause (a) above, as the case may be.

The Trustee shall deliver to the Noteholders any information or notice relating to this Indenture requested to be so delivered by at least 10% (by Aggregate Outstanding Amount) of the Holders of any Class of Notes at the expense of the Issuer. The Trustee shall deliver to the Preference Shares Paying Agent any information or notice that the Preference Shares Paying Agent certifies was requested to be so delivered by at least 10% (by Aggregate Outstanding Amount) of the Holders of the Preference Shares at the expense of the Issuer.

Neither the failure to mail any notice, nor any defect in any notice so mailed, to any particular Noteholder or the Preference Shares Paying Agent shall affect the sufficiency of the notice with respect to other Noteholders or the Preference Shares Paying Agent. If it is impracticable to give the notice by mail of any event to Noteholders or the Preference Shares Paying Agent when the notice is required to be given pursuant to any provision of this Indenture because of the suspension of regular mail service as a result of a strike, work stoppage or similar activity or because of any other cause, then the notification to Noteholders or the Preference Shares Paying Agent as shall be made with the approval of the Trustee shall be a sufficient notification to the Holders for every purpose under this Indenture.

Where this Indenture provides for notice in any manner, the notice may be waived in writing by any Person entitled to receive the notice, either before or after the event, and the waiver shall be the equivalent of the notice. Waivers of notice by Noteholders or the Preference Shares Paying Agent shall be filed with the Trustee but the filing shall not be a condition precedent to the validity of any action taken in reliance on the waiver.

So long as any Senior Notes are listed on the Irish Stock Exchange and the rules of the exchange so require, all notices to Noteholders or the Preference Shares Paying Agent (for forwarding to Holders of Preference Shares) shall also be given to the Irish Paying Agent for publication in the Company Announcements Office of the Irish Stock Exchange.

The Issuer shall (and authorizes the Trustee to) deliver to the Initial Purchasers all periodic reports, notices, demands, and other written information delivered or received by the Issuer, the Servicer, trustees, paying agents, accountants, or other Persons pursuant to this Indenture and other operative documentation relating to the Notes requested by the Initial Purchasers (collectively, the "*Transaction Reports*") and the Issuer consents to the Initial Purchasers providing Transaction Reports received by it to current and prospective investors in the Notes (including by means of electronic transmissions or posting the Transaction Reports on internet sites maintained by the Initial Purchasers or any of their Affiliates).

Section 14.5.    *Effect of Headings and Table of Contents.*

The Article and Section headings in this Indenture and the Table of Contents are for convenience only and shall not affect the construction of this Indenture.

Section 14.6.    *Successors and Assigns.*

All covenants and agreements in this Indenture by the Co-Issuers shall bind their respective successors and assigns, whether so expressed or not.

Section 14.7.    *Separability.*

Except to the extent prohibited by applicable law, in case any provision in this Indenture, in the Notes shall be invalid, illegal, or unenforceable, the validity, legality, and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

Section 14.8.    *Benefits of Indenture.*

Nothing in this Indenture or in the Notes, expressed or implied, shall give to any Person, other than the parties hereto and their successors under this Indenture, the Servicer, the Noteholders, the Holders of Preference Shares or the Preference Shares Paying Agent any benefit or any legal or equitable right, remedy or claim under this Indenture.

Section 14.9.    *Governing Law.*

THIS INDENTURE AND EACH NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF STATE OF NEW YORK, WITHOUT REFERENCE TO ITS PROVISIONS THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.

195

NY\1257964.27

Section 14.10.  *Submission to Jurisdiction.*

The Co-Issuers and the Trustee hereby irrevocably submit to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan in The City of New York in any action or proceeding arising out of or relating to the Securities or this Indenture, and the Co-Issuers and the Trustee hereby irrevocably agree that all claims in respect of the action or proceeding may be heard and determined in the New York State or federal court. The Co-Issuers and the Trustee hereby irrevocably waive, to the fullest extent that they may legally do so, the defense of an inconvenient forum to the maintenance of the action or proceeding. The Co-Issuers and the Trustee irrevocably consent to the service of all process in any action or proceeding by the mailing or delivery of copies of the process to the Co-Issuers at the office of Investors Bank & Trust Company (to the attention of Investors Bank & Trust Company, Trustee for Westchester CLO, Ltd.) set out in Section 7.2. The Co-Issuers and the Trustee agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

Section 14.11.  *Counterparts.*

This Indenture may be executed in any number of copies, and by the different parties on the same or separate counterparts, each of which shall be considered to be an original instrument.

Section 14.12.  *Acts of Issuer.*

Any request, demand, authorization, direction, notice, consent, waiver or other action provided by this Indenture to be given or performed by the Issuer shall be effective if given or performed by the Issuer or by the Servicer on the Issuer's behalf.

Section 14.13.  *Consent of Posting of Documents on Repository.*

The Issuer hereby consents to (a) the posting of the final Offering Memorandum, this Indenture and the periodic reports to be delivered pursuant to the transaction documents and any amendments or other modifications thereto on the Repository for use in the manner provided in the Repository and (b) the display of its name on the Repository in connection therewith. Notwithstanding anything herein to the contrary, none of the Issuer, the Co-Issuer and the Trustee makes any representation or warranty to The Bond Market Association (or any successor thereto) or any affiliate thereof or any Person having or obtaining access to the information maintained in the Repository or to any of such Person's affiliates regarding the accuracy or completeness of any information, document, report or other communication transmitted to the Repository, and no Person having or obtaining access to the information maintained in the Repository shall have any rights under this Indenture or otherwise by reason of the transmission of any such information, document, report or other communication to the Repository.

Section 14.14.  *Liability of Co-Issuers.*

Notwithstanding any other terms of this Indenture, the Notes or any other agreement entered into by either of the Co-Issuers or otherwise, neither of the Co-Issuers shall have any liability whatsoever to the other of the Co-Issuers under this Indenture, the Notes, any other agreement, or otherwise. Without prejudice to the generality of the foregoing, neither of the Co-Issuers may take any action to enforce, or bring any action or proceeding, in respect of this Indenture, the Notes, any other agreement, or otherwise against the other of the Co- Issuers. In particular, neither of the Co-Issuers may petition or take any other steps for the winding up or bankruptcy of the other of the Co-Issuers and neither of the Co-Issuers shall have any claim with respect to any assets of the other of the Co-Issuers.

Section 14.15. *Indemnity of Co-Issuer.*

The Issuer agrees to indemnify the Co-Issuer for any payments that may become due from the Co-Issuer under Article 11 with respect to any Notes issued under this Indenture and any administrative, legal, or other costs incurred by the Co-Issuer in connection with those payments.

## ARTICLE 15

### ASSIGNMENT OF SERVICING AGREEMENT; HEDGE AGREEMENTS

Section 15.1. *Assignment of Servicing Agreement; Amendment of Servicing Agreement.*

(a) The Issuer, in furtherance of the covenants of this Indenture and as security for the Notes and amounts payable to the Secured Parties under this Indenture and the performance and observance of the provisions of this Indenture, acknowledges that its Grant pursuant to the first Granting Clause includes all of the Issuer's interest in the Servicing Agreement, including:

(i) the right to give all notices, consents and releases under it,

(ii) the right to give all notices of termination pursuant to the Servicing Agreement and to take any legal action upon the breach of an obligation of the Servicer under it, including the commencement, conduct and consummation of proceedings at law or in equity,

(iii) the right to receive all notices, accountings, consents, releases and statements under it, and

(iv) the right to do all other things whatsoever that the Issuer is or may be entitled to do under it.

Notwithstanding anything in this Indenture to the contrary, the Trustee may not exercise any of the rights in (i) through (iv) above or that may otherwise arise as a result of the Grant until the occurrence of an Event of Default under this Indenture and the authority shall terminate when the Event of Default is cured or waived.

(b) The assignment made hereby is executed as security, and the execution and delivery hereby shall not in any way impair or diminish the obligations of the Issuer under the Servicing Agreement, nor shall any of the obligations contained in the Servicing Agreement be imposed on the Trustee.

(c) Upon the retirement of the Notes and the release of the Collateral from the lien of this Indenture, this assignment, and all rights in this Indenture assigned to the Trustee for the benefit of the Noteholders shall cease and terminate and all the interest of the Trustee in the Servicing Agreement shall revert to the Issuer and no further instrument or act shall be necessary to evidence the termination and reversion.

(d) The Issuer represents that the Issuer has not executed any other assignment of the Servicing Agreement.

(e) The Issuer agrees that this assignment is irrevocable, and that it shall not take any action that is inconsistent with this assignment or make any other assignment inconsistent herewith. The Issuer shall, from time to time upon the request of the Trustee, execute all instruments of further

197

assurance and all such supplemental instruments with respect to this assignment as the Trustee may reasonably request.

(f) The Issuer agrees to obtain the agreement and consent of the Servicer in the Servicing Agreement to the following:

(i) the Servicer consents to this collateral assignment and agrees to perform any provisions of this Indenture made expressly applicable to the Servicer pursuant to the Servicing Agreement.

(ii) the Servicer acknowledges that the Issuer is collaterally assigning all of its interest in the Servicing Agreement to the Trustee for the benefit of the Secured Parties and the Servicer agrees that all of the representations, covenants and agreements made by the Servicer in the Servicing Agreement are also for the benefit of the Secured Parties.

(iii) the Servicer shall deliver to the Trustee duplicate original copies of all notices, statements, communications and instruments delivered or required to be delivered to the Issuer pursuant to the Servicing Agreement (other than any of them delivered to the Issuer by the Trustee or the Collateral Administrator).

(iv) the procedure for amending the Servicing Agreement as set forth in Section 15.1(h) below.

(v) except as otherwise provided in this Indenture and the Servicing Agreement, subject to the resignation rights of the Servicer pursuant to Section 12 of the Servicing Agreement, the Servicer shall continue to serve as Servicer under the Servicing Agreement notwithstanding that the Servicer shall not have received amounts due it under the Servicing Agreement because sufficient funds were not then available under this Indenture to pay the amounts pursuant to the Priority of Payments. The Servicer agrees not to cause the filing of a petition in bankruptcy against the Issuer for the nonpayment of the fees or other amounts payable by the Administrative Agent to the Servicer under the Servicing Agreement until the payment in full of all Notes issued under this Indenture and the payment to the Preference Shares Paying Agent of all amounts payable with respect to the Preference Shares in accordance with the Priority of Payments and the expiration of a period equal to the greater of (A) the applicable preference period plus one day or (B) one year and one day following the payment. Notwithstanding the foregoing, the Servicer may commence any legal action that is not a bankruptcy, insolvency, liquidation or similar proceeding against the Issuer or the Co-Issuer or any of their properties and may take any action it deems appropriate at any time in any bankruptcy, insolvency, liquidation or similar proceeding and any other Proceeding voluntarily commenced by the Issuer or the Co-Issuer or involuntarily commenced against the Issuer or the Co-Issuer by anyone other than the Servicer or any Affiliate of the Servicer.

(vi) the Servicer irrevocably submits to the non-exclusive jurisdiction of any New York State or federal court sitting in the Borough of Manhattan in The City of New York in any action or proceeding arising out of or relating to the Notes, the Preference Shares or this Indenture, and the Servicer irrevocably agrees that all claims in respect of the action or proceeding may be heard and determined in the New York State or federal court. The Servicer irrevocably waives, to the fullest extent it may legally do so, the defense of an inconvenient forum to the maintenance of the action or proceeding. The Servicer irrevocably consents to the service of all process in any action or proceeding by the mailing or delivery of copies of the process to it the address provided for in Section 14.3. The Servicer agrees that a final and non-appealable judgment by a court of competent

198

jurisdiction in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(g) Following the resignation or removal of the Servicer, the Issuer shall use its best efforts to appoint a successor Servicer, and the Issuer, the Trustee, and the resigning or removed Servicer shall take any action consistent with the Servicing Agreement and this Indenture applicable to the Servicer, necessary to effectuate any such succession.

(h) (i) The Issuer may, at the request of the Servicer, enter into an amendment or modification of the Servicing Agreement from time to time, without the consent of the Holders of the Securities and without regard to whether or not the interests of the Holders of the Securities are adversely affected thereby; provided that, with respect to any such amendment or modification, (a) a Rating Condition is satisfied and (b) a Majority of the Controlling Class of Notes or a Majority of the Holders of the Preference Shares have not objected in writing to such amendment or modification prior to the relevant Objection Cut-Off Date (as defined below).

(ii) If at any time the Servicer desires to amend or modify the Servicing Agreement, the Servicer shall notify the Issuer and the Trustee, providing details of such proposed amendment or modification. Not later than five Business Days after receipt of such notice, the Trustee shall mail such notice to (a) each Noteholder at such Holder's address in the Indenture Register or otherwise in accordance with the rules and procedures of the Depository, Euroclear and Clearstream, as applicable, (b) to the Preference Shares Paying Agent (for forwarding to the Holders of Preference Shares) and (c) to each Rating Agency. If any Holder of the Controlling Class of Notes or any Holder of the Preference Shares notifies, by delivering a written notice to the Trustee within 35 days after the Trustee has mailed such notice, that it objects to such proposed amendment or modification, the Trustee shall, within two Business Days after receiving such notice of objection, mail a notice of the receipt of such objection to the Issuer, the Servicer and other Holders of the Controlling Class of Notes and other Holders of the Preference Shares. Each Holder of the Controlling Class of Notes and each Holder of the Preference Shares that also wishes to object to such amendment or modification must, by delivering a written notice, so notify the Trustee within seven Business Days after the Trustee has mailed such notice of the receipt of such objection (the last day of such seven Business Day period, the "*Objection Cut-Off Date*"). If a Majority of either the Controlling Class of Notes or the Preference Shares notifies the Trustee in writing on or before the Objection Cut-Off Date that they object to the proposed amendment or modification to the Servicing Agreement, such amendment or modification shall not be made.

Section 15.2. *Hedge Agreements.*

(a) At any time and from time to time on or after the Closing Date, the Issuer, at the direction of the Servicer and with the consent of a Majority of the Controlling Class, shall enter into the Hedge Agreements and shall assign its rights (but none of its obligations) under the Hedge Agreements to the Trustee pursuant to this Indenture. The Trustee shall, on behalf of the Issuer and in accordance with the Valuation Report, pay amounts due to the Hedge Counterparties under the Hedge Agreements on any Payment Date in accordance with Section 11.1.

(b) The Issuer shall not enter into any Hedge Agreement unless at the time of entering the Hedge Agreement the Hedge Counterparty has:

(i) a debt rating by Moody's for long-term debt of "A1" or higher if the Hedge Counterparty has only a long-term rating; or a debt rating by Moody's for long-term debt of

199

"A2" or higher and a debt rating by Moody's for short-term debt of "P-1" if the Hedge Counterparty has both long-term and short-term ratings; and

(ii)     a short-term debt rating by S&P of not less than "A-1" or, if the Hedge Counterparty does not have a short-term debt rating by S&P, a long-term debt rating of not less than "A+" (the ***Required Rating***").

(c)     If at any time a Hedge Counterparty does not have the Required Rating, then the Hedge Counterparty shall be required, at its sole expense, to, within the applicable period specified in the related Hedge Agreement, either:

(i)     post collateral with the Trustee to secure the Hedge Counterparty's obligations under the Hedge Agreement, in an amount and of the type specified under the relevant Hedge Agreement (which such Hedge Agreement shall specify that the sufficiency of collateral to be posted shall be subject to Rating Confirmation by S&P); <u>provided</u> that the Hedge Counterparty shall, at the time such collateral is first posted, deliver to the Issuer, the Trustee and the Rating Agencies an Opinion of Counsel of nationally recognized standing in the jurisdiction in which the Hedge Counterparty is incorporated confirming that such collateral will be available in a timely manner upon a bankruptcy of the Hedge Counterparty;

(ii)     obtain a guarantor that has a short-term debt rating by S&P of not less than "A-1" and otherwise has the Required Rating, subject to satisfaction of the Rating Condition; or

(iii)     replace itself under the related or substantially equivalent Hedge Agreement with a substitute Hedge Counterparty that has the Required Rating, subject to the satisfaction of the Rating Condition.

<u>provided</u> that failure to take any such steps set forth under paragraphs (i) through (iii) above within 30 days shall be treated as an "Additional Termination Event" under such Hedge Agreement.

(d)     If at any time the Hedge Counterparty has (x) no short-term Moody's rating and a long-term Moody's that is below "A3" or (y) both a short-term and long-term Moody's rating and either the long-term Moody's rating that is below "A3" or the short-term Moody's rating that is below "P-2", then the Hedge Counterparty shall be required, at its sole expense, to, within the applicable period specified in the related Hedge Agreement, either:

(i)     obtain a guarantor that has the Required Rating, subject to satisfaction of the Rating Condition; or

(ii)     replace itself under the related or substantially equivalent Hedge Agreement with a substitute Hedge Counterparty that has the Required Rating, subject to satisfaction of the Rating Condition;

<u>provided</u> that failure to take any such steps set forth under paragraphs (i) and (ii) above shall be treated as an "Additional Termination Event" under such Hedge Agreement.

(e)     If at any time the Hedge Counterparty has a long-term unsecured debt rating by S&P below "BBB-", then the Hedge Counterparty shall be required, within 10 days, to replace itself under the related or substantially equivalent Hedge Agreement with a substitute Hedge Counterparty

200

that has the Required Rating, subject to satisfaction of the Rating Condition; provided that failure to do so shall be treated as an "Additional Termination Event" under such Hedge Agreement.

(f)     Whenever the Issuer enters into a Hedge Agreement, the Hedge Counterparty thereto shall comply with the then currently applicable rating criteria of each Rating Agency from time to time.

(g)     If the Issuer has the right under a Hedge Agreement at any time to demand that the related Hedge Counterparty deliver Eligible Collateral in accordance with an Approved Credit Support Document, the Issuer shall make the demand.

(h)     Any payments required to be made under the Hedge Agreements shall be made in accordance with the Priority of Payments. Subordinated Defaulted Hedge Termination Payments shall be subordinate to interest and principal payments on the Notes and any other payments required to be made by the Issuer under the Hedge Agreements, but senior to distributions to Holders of the Preference Shares.

(i)     Except as provided in paragraph (i) of this Section 15.2, the Issuer, at the direction of the Servicer, shall, promptly following the early termination of a Hedge Agreement (other than on a Redemption Date) (but no later than 60 days after the early termination), and to the extent possible through application of Hedge Termination Receipts, enter into a Replacement Hedge, unless, in the exercise of the Servicer's commercially reasonable judgment, to do so would not be in the best interest of the Issuer and the Rating Condition with respect to each Rating Agency is satisfied with respect to the non-entry into a Replacement Hedge. In addition, a Replacement Hedge may not be entered into unless the Issuer provides the Rating Agencies with at least seven Business Days' prior written notice of its intention to enter into the agreement, together with its form and the Rating Condition with respect to each Rating Agency is satisfied with respect to the Replacement Hedge. The Issuer shall use commercially reasonable efforts to cause the termination of a Hedge Agreement (other than a termination resulting from the bankruptcy, insolvency, or similar event with respect to the Hedge Counterparty) to become effective simultaneously with its entering into a Replacement Hedge. To the extent that (i) the Servicer determines not to replace the Hedge Agreement and the Rating Condition with respect to each Rating Agency is satisfied with respect to the determination or (ii) termination is occurring on a Redemption Date, the Hedge Termination Receipts shall become part of Principal Proceeds and be distributed in accordance with Section 11.1 on the next following Payment Date (or on the Redemption Date, if the Notes are redeemed on the Redemption Date).

(j)     Notwithstanding Section 15.2(i), the applicable requirements of Section 15.2(i) shall not have to be met if the Rating Condition with respect to each Rating Agency is otherwise satisfied with respect thereto.

(k)     The notional amounts of the Hedge Agreements outstanding at any time may be reduced or increased from time to time, by the Issuer, and the Hedge Agreements may be amended, modified or terminated in accordance with the Hedge Agreements if the Rating Condition with respect to each Rating Agency is satisfied with respect to the reduction, increase, amendment, modification or termination, as the case may be.

(l)     Each Hedge Agreement may be terminated pursuant to its terms by the Hedge Counterparty upon an Optional Redemption of the Notes (but only after the applicable notice of redemption may no longer be withdrawn pursuant to Section 9.03), an acceleration of maturity of the Notes followed by the liquidation of any or all of the Collateral after an Event of Default or the entry into certain amendments to the Indenture without the consent of the Hedge Counterparty. The Hedge Agreement will not be permitted to be terminated by the Issuer as the result of a Default or

201

Event of Default unless any acceleration of maturity of the Notes resulting from the Event of Default is no longer permitted to be rescinded pursuant to this Indenture.

(m)     Except for Hedge Agreements entered into on or before the Closing Date, the Issuer shall not enter into any Hedge Agreement unless the Rating Condition with respect to each Rating Agency is satisfied.

202

IN WITNESS WHEREOF, we have set our hands as of the day and year first written above.

EXECUTED AS A DEED BY

**WESTCHESTER CLO, LTD.,**
AS ISSUER

By:

Name: **Chris Marett**

Title: Director

**WESTCHESTER CLO CORP.,**
AS CO-ISSUER

By:

Name:

Title:

**INVESTORS BANK & TRUST COMPANY,**
AS TRUSTEE AND AS CUSTODIAN

By:

Name:

Title:

[Indenture]

IN WITNESS WHEREOF, we have set our hands as of the day and year first written above.

EXECUTED AS A DEED BY

**WESTCHESTER CLO, LTD.,**
AS ISSUER

By: _____

       Name:
       Title:

**WESTCHESTER CLO CORP.,**
AS CO-ISSUER

By: _____

       Name: Donald J. Puglisi
       Title: President

**INVESTORS BANK & TRUST COMPANY,**
AS TRUSTEE AND AS CUSTODIAN

By: _____

       Name:
       Title:

[Indenture]

IN WITNESS WHEREOF, we have set our hands as of the day and year first written above.

EXECUTED AS A DEED BY

**WESTCHESTER CLO, LTD.,**
AS ISSUER

By: _____

       Name:
       Title:

**WESTCHESTER CLO CORP.,**
AS CO-ISSUER

By: _____

       Name:
       Title:

**INVESTORS BANK & TRUST COMPANY,**
AS TRUSTEE AND AS CUSTODIAN

By: _____

       Name: Brian Peterson
       Title: Director

[Indenture]