# CRESCENT®

**OFFICE LEASE**

**BETWEEN**

**CRESCENT TC INVESTORS, L.P.**

**("LANDLORD")**

**AND**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

**("TENANT")**

## TABLE OF CONTENTS

PAGE

| | | |
|---|---|---|
| 1. | Basic Lease Information | 1 |
| 2. | Lease Grant | 2 |
| 3. | Term; Adjustment of Commencement Date; Early Access. | 3 |
| 4. | Rent. | 4 |
| 5. | Tenant's Use of Premises. | 9 |
| 6. | Security Deposit. | 10 |
| 7. | Services to be Furnished by Landlord. | 11 |
| 8. | Use of Electrical Services by Tenant. | 12 |
| 9. | Repairs and Alterations. | 13 |
| 10. | Entry by Landlord | 15 |
| 11. | Assignment and Subletting. | 16 |
| 12. | Liens. | 18 |
| 13. | Indemnity | 18 |
| 14. | Insurance. | 14 |
| 15. | Mutual Waiver of Subrogation | 19 |
| 16. | Casualty Damage. | 19 |
| 17. | Condemnation | 21 |
| 18. | Events of Default | 21 |
| 19. | Remedies. | 22 |
| 20. | Limitation of Liability. | 24 |
| 21. | No Waiver | 24 |
| 22. | Tenant's Right to Possession | 24 |
| 23. | Relocation | 24 |
| 24. | Holding Over | 24 |
| 25. | Subordination to Mortgages; Estoppel Certificate | 25 |
| 26. | Attorneys' Fees | 25 |
| 27. | Notice | 25 |
| 28. | Reserved Rights | 25 |
| 29. | Surrender of Premises | 26 |
| 30. | Hazardous Materials. | 27 |
| 31. | Miscellaneous. | 27 |

### EXHIBITS AND RIDERS:

| | |
|---|---|
| EXHIBIT A-1 | OUTLINE AND LOCATION OF PREMISES |
| EXHIBIT A-2 | LEGAL DESCRIPTION OF PROPERTY |
| EXHIBIT B | RULES AND REGULATIONS |
| EXHIBIT C | COMMENCEMENT LETTER |
| EXHIBIT D | WORK LETTER |
| EXHIBIT E | PARKING AGREEMENT |
| EXHIBIT F | FORM OF SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT |
| | |
| EXHIBIT G | FORM OF LETTER OF CREDIT |
| RIDER NO. 1 | OPTIONS TO EXTEND |



## OFFICE LEASE

This Office Lease (this *"Lease"*) is entered into by and between CRESCENT TC INVESTORS, L.P., a Delaware limited partnership (*"Landlord"*), and HIGHLAND CAPITAL MANAGEMENT, L.P., a Delaware limited partnership (*"Tenant"*), and shall be effective as of the date set forth below Landlord's signature (the *"Effective Date"*).

1. **Basic Lease Information**. The key business terms used in this Lease are defined as follows:

   A. *"Building"*: The building commonly known as The Crescent® and located at 100, 200 and 300 Crescent Court, Dallas, Dallas County, Texas.

   B. *"Rentable Square Footage of the Building"* is agreed and stipulated to be 1,134,826 square feet.

   C. *"Premises"*: The area shown on **Exhibit A-1** to this Lease. The Premises are located on floor 7 of 200 and 300 Crescent Court and known as suite number 700. The *"Rentable Square Footage of the Premises"* is deemed to be 43,515 square feet. If the Premises include, now or hereafter, one or more floors in their entirety, all corridors and restroom facilities located on such full floor(s) shall be considered part of the Premises. Landlord and Tenant stipulate and agree that the Rentable Square Footage of the Building and the Rentable Square Footage of the Premises are correct and shall not be remeasured. Landlord represents that the Rentable Square Footage of the Building and the Premises has been determined in accordance with ANSI/BOMA Z65.1-1996 standards.

   D. *"Base Rent"*:

   | Period | | | Annual Rate Per Square Foot | Monthly Base Rent |
   |---|---|---|---|---|
   | 1/1/12 | through | 4/30/12 | $0 | $0 |
   | 5/1/12 | through | 4/30/13 | $32.65 | $118,397.05 |
   | 5/1/13 | through | 4/30/14 | $33.65 | $122,023.30 |
   | 5/1/14 | through | 4/30/16 | $33.95 | $123,111.18 |
   | 5/1/16 | through | 4/30/19 | $34.95 | $126,737.43 |
   | 5/1/19 | through | 4/30/20 | $35.95 | $130,363.68 |
   | 5/1/20 | through | 4/30/22 | $36.00 | $130,545.00 |

   E. *"Tenant's Pro Rata Share"*: The percentage equal to the Rentable Square Footage of the Premises divided by the Rentable Square Footage of the Building.

   F. *"Base Year"* for Operating Expenses: 2012.

   G. *"Tax Base Year"*: 2012.

   H. *"Term"*: The period of approximately 124 months starting on the Commencement Date, subject to the provisions of **Article 3**, and other terms of this Lease.

   I. *"Commencement Date"*: January 1, 2012.

   J. *"Security Deposit"*: $118,397.05.

   K. *"Guarantor(s)"*: None.

   L. *"Business Day(s)"*: Monday through Friday of each week, exclusive of New Year's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, the day after Thanksgiving and Christmas Day (*"Holidays"*). Landlord may designate up to two (2) additional Holidays per calendar year, provided that the additional Holidays are commonly recognized by a majority of other Comparable Buildings (hereinafter defined).

   M. *"Law(s)"*: All applicable statutes, codes, ordinances, orders, rules and regulations of any municipal or governmental entity, now or hereafter adopted, including the Americans with



Disabilities Act and any other law pertaining to disabilities and architectural barriers (collectively, "*ADA*"), and all laws pertaining to the environment, including the Comprehensive Environmental Response, Compensation and Liability Act, as amended, 42 U.S.C. §9601 et seq. ("*CERCLA*"), and all restrictive covenants existing of record and all rules and requirements of any existing association or improvement district affecting the Property.

N. "*Normal Business Hours*": 7:00 A.M. to 7:00 P.M. on Business Days and 8:00 A.M. to 1:00 P.M. on Saturdays, exclusive of Holidays.

O. "*Notice Addresses*":

*Tenant*: On or after the Commencement Date, notices shall be sent to Tenant at the Premises, Attention: Chief Operating Officer, *with a copy to*: Robert Deptula, Transwestern, 5001 Spring Valley Road, Suite 600W, Dallas, Texas 75244. Prior to the Commencement Date, notices shall be sent to Tenant at the following address:

| | |
|---|---|
| 13455 Noel Road | *With a copy to:* |
| Suite 800 | |
| Dallas, Texas 75240 | Robert Deptula |
| Attn: Chief Financial | Transwestern |
| Officer | 5001 Spring Valley Road |
| Phone #: (972) 628-4132 | Suite 600W |
| Fax #: (972) 628-4147 | Dallas, Texas 75244 |

| *Landlord:* | *With a copy to:* | *And to:* |
|---|---|---|
| 200 Crescent Court | 200 Crescent Court | 777 Main Street |
| Suite 250 | Suite 250 | Suite 2000 |
| Dallas, Texas 75201 | Dallas, Texas 75201 | Fort Worth, Texas 76102 |
| Attn: Property Manager | Attn: Senior Vice President, | Attn: Legal Department |
| Phone #: (214) 880-4500 | Property Management | Phone #: (817) 321-2100 |
| Fax #: (214) 880-4506 | Phone: (214) 880-4545 | Fax #: (817) 321-2080 |
| | Fax: (214) 880-4547 | |

Rent (defined in **Section 4.A**) is payable to the order of Crescent TC Investors, L.P. at the following address: Post Office Box 841772, Dallas, Texas 75284-1772 or by wire transfer to Bank of America (Dallas, Texas), for further credit to ABA #026009593, Account #004795847668, Reference: Highland Capital Management, L.P./The Crescent®.

P. "*Other Defined Terms*": In addition to the terms defined above, an index of some of the other defined terms used in the text of this Lease is set forth below, with a cross-reference to the paragraph in this Lease in which the definition of such term can be found:

| | |
|---|---|
| Affiliate ..........11.E | Monetary Default ..........18.A |
| Alterations ..........9.C(1) | Mortgage ..........25 |
| Audit Election Period ..........4.G | Mortgagee ..........25 |
| Cable ..........9.A | Operating Expenses ..........4.D |
| Claims ..........13 | Permitted Transfer ..........11.E |
| Collateral ..........19.E | Permitted Use ..........5.A |
| Commencement Date ..........3.A | Prime Rate ..........19.B |
| Common Areas ..........2 | Property ..........2 |
| Completion Estimate ..........16.B | Provider ..........7.C |
| Contamination ..........30.C | Relocated Premises ..........23 |
| Costs of Reletting ..........19.B | Relocation Date ..........23 |
| Excess Operating Expenses ..........4.B | Rent ..........4.A |
| Excess Tax Expenses ..........4.H | Service Failure ..........7.B |
| Expiration Date ..........3.A | Special Installations ..........29 |
| Force Majeure ..........31.C | Taking ..........17 |
| Hazardous Material ..........30.C | Tax Expenses ..........4.H |
| Landlord Parties ..........13 | Tenant Parties ..........13 |
| Landlord's Rental Damages ..........19.B | Tenant's Insurance ..........14.A |
| Leasehold Improvements ..........29 | Tenant's Property ..........14.A |
| Minor Alteration ..........9.C(1) | Tenant's Removable Property ..........29 |



Time Sensitive Default .......................... 18.B  Work Letter............................................3.C
Transfer.................................................11.A

2.    **Lease Grant**. Landlord leases the Premises to Tenant and Tenant leases the Premises from Landlord, together with the right in common with others to use any portions of the Property (defined below) that are designated by Landlord for the common use of tenants and others, such as sidewalks, common corridors, vending areas, lobby areas and, with respect to multi-tenant floors, restrooms and elevator foyers (the "*Common Areas*"). Tenant, its permitted subtenants and their employees, licensees and guests, shall have access to the Premises at all times, 24 hours per day, every day of the year, subject to reasonable access procedures required by Landlord, the Building Rules and Regulations and other limitations set forth in this Lease. "*Property*" means the Building and the parcel(s) of land on which it is located as more fully described on **Exhibit A-2**, together with all the Building garages and other buildings and improvements located on such land.

3.    **Term; Adjustment of Commencement Date; Delivery**.

     **A.**    **Term**. This Lease shall govern the relationship between Landlord and Tenant with respect to the Premises from the Effective Date through the last day of the Term specified in **Section 1.H** (the "*Expiration Date*"), unless terminated early in accordance with this Lease. The Term of this Lease (as specified in **Section 1.H**) shall commence on the "*Commencement Date*", which shall be January 1, 2012. Tenant shall have the right to occupy the Premises from and after the Delivery Date subject to all of the terms and conditions of this Lease, except that Tenant shall not be required to pay Base Rent, but shall pay electrical costs and parking charges for any occupancy for the purpose of conducting business from the Premises prior to the Commencement Date. Landlord and Tenant agree that for the purpose of the preceding sentence, Tenant's occupancy for the following purposes shall not be deemed to be occupancy for the purpose of conducting business from the Premises: (i) constructing or otherwise performing the Tenant Work, (ii) installing Tenant's furniture, fixtures, cabling and equipment, and (iii) testing Tenant's data and communication systems. If Landlord is delayed in delivering possession of the Premises or any other space due to any reason, including without limitation the holdover or unlawful possession of such space by any third party, such delay shall not be a default by Landlord, render this Lease void or voidable, or otherwise render Landlord liable for damages, except as expressly set forth herein. Promptly after the Commencement Date, Landlord shall prepare and deliver to Tenant a commencement letter agreement substantially in the form attached as **Exhibit C**. If such commencement letter is not either executed by Tenant or returned to Landlord with comments within 30 days after delivery of same by Landlord, then Tenant shall be deemed to have agreed with the matters set forth therein. Notwithstanding any other provision of this Lease to the contrary, if the Expiration Date would otherwise occur on a date other than the last day of a calendar month, then the Term shall be automatically extended to include the last day of such calendar month, which shall become the Expiration Date.

     **B.**    **Construction Supervision**. Landlord agrees to supervise the Tenant Work performed pursuant to the Work Letter, which shall be executed by Tenant and Crescent Property Services, Inc., as construction manager, contemporaneously with execution of this Lease. In consideration of such agreement, Tenant shall pay Landlord a "*Construction Supervisory Fee*" equal to 1.5% of the aggregate contract price for the Tenant Work, which may be paid from the unused portion of the Reimbursement Allowance (if any); provided, however, in no event shall the Construction Supervisory Fee exceed $29,350.00.

     **C.**    **Acceptance of Premises**. Subject to Landlord's obligation to perform the Landlord Work pursuant to the Work Letter, the Premises are accepted by Tenant in "as is" condition and configuration subject to any latent defects in the Premises of which Tenant notifies Landlord within one year after the Commencement Date (excluding latent defects in work performed by Tenant Parties (defined below) pursuant to a separate work letter agreement (the "*Work Letter*"), if any, attached as **Exhibit D**). Subject to Landlord's obligation to perform the Landlord Work pursuant to the Work Letter, Tenant hereby agrees that the Premises are in good order and satisfactory condition and that, except as otherwise expressly set forth in this Lease, there are no representations or warranties of any kind, express or implied, by Landlord regarding the Premises, the Building or the Property.

     **D.**    **Delivery of Premises prior to Commencement Date**. Landlord will deliver the Premises to Tenant (the actual date of delivery, the "*Delivery Date*") with the Landlord Work



complete within 90 days of the full execution of the Lease (the *"Outside Delivery Date"*). Notwithstanding the foregoing, if for any reason (including Force Majeure) other than delay caused by Tenant, Landlord does not deliver possession of the Premises with the Landlord Work complete on or before the Outside Delivery Date, Tenant, as Tenant's sole and exclusive remedy, shall be entitled to one (1) day of abatement of Base Rent (commencing after expiration of the initial four month Base Rent abatement provided in **Section 1.D** and if applicable, the 17.5 month Base Rent abatement in lieu of the Refurbishment Allowance, and if applicable, the credit against Base Rent provided for in **Section 31.S** of the Lease) for each day after the Outside Delivery Date that the Premises are not delivered to Tenant in the condition required hereunder until the Delivery Date.

      **E.**    **Early Termination**. Tenant shall have the option to terminate this Lease effective as of April 30, 2019 (the *"Termination Date"*), provided Tenant gives notice thereof to Landlord not later than April 30, 2018 and provided that Tenant is not in default under the Lease at the time of the giving of such notice or the Termination Date. Notwithstanding anything to the contrary contained in the immediately preceding sentence, in the event Tenant is in default under the Lease on the Termination Date or upon delivery of the Termination Notice, Landlord shall notify Tenant in writing of such default, and Tenant shall be granted an amount of time to cure such default equal to the cure period applicable to the default, or if no cure period is specified, the applicable cure period shall be deemed to be 5 days. In the event Tenant is in default as of the Termination Date, the Termination Date shall be extended by the applicable cure period. In the event Tenant fails to cure such default during the applicable cure period, this termination option shall be null and void and the Lease shall continue in full force and effect as if Tenant had not delivered the Termination Notice to Landlord. Additionally, Tenant's right to terminate hereunder is conditioned upon the payment in full by Tenant of (1) all Rent through and including the Termination Date, (2) the sum equal to 3 times the Base Rent payable for the month of April, 2019, and (3) the unamortized cost (using an amortization rate of 8%) of all tenant improvement allowances (whether used toward the Tenant Work or as a credit against Rent), leasing commissions, club memberships and legal fees actually paid or provided by Landlord in connection with the Lease, as the same may be modified or amended (collectively, the *"Termination Payment"*). The Termination Payment must be paid on or before the Termination Date. Landlord shall provide Tenant with an amortization schedule showing the calculation of the Termination Payment within thirty (30) days after receipt of Tenant's written request for such a schedule from time to time and the Termination Payment (calculated as of the Commencement Date) shall be set forth in the commencement letter. After Landlord's receipt of the full Termination Payment, neither party shall have any rights, liabilities or obligations under this Lease for the period accruing after the Termination Date, except (i) Tenant shall surrender the Premises in the condition required under this Lease, and (ii) those which, by the provisions of this Lease, expressly survive the termination of this Lease.

4.    **Rent**.

      **A.**    **Payments**. As consideration for this Lease, commencing on the Commencement Date, Tenant shall pay Landlord, without any demand, setoff or deduction, except as expressly set forth herein, the total amount of Base Rent, Tenant's Pro Rata Share of Excess Operating Expenses (defined in **Section 4.B**), Tenant's Pro Rata Share of Excess Tax Expenses (defined in **Section 4.H**) and any and all other sums payable by Tenant under this Lease (all of which are sometimes collectively referred to as *"Rent"*). Tenant shall pay and be liable for Tenant's allocable portion of all rental, gross receipts, sales and use, or other taxes, if any, imposed upon or measured by rents, receipts or income attributable to ownership, use, occupancy, rental, leasing, operation or possession of the Property, other than Landlord's estate, income or franchise taxes.. The monthly Base Rent, Tenant's Pro Rata Share of Excess Operating Expenses and Tenant's Pro Rata Share of Excess Tax Expenses shall be due and payable in advance on the first day of each calendar month without notice or demand, provided that the installment of Base Rent for the first full calendar month of the Term shall be payable upon the execution of this Lease by Tenant. All other items of Rent shall be due and payable by Tenant on or before 30 days after billing by Landlord. All payments of Rent shall be by good and sufficient check or by other means (such as automatic debit or electronic transfer) acceptable to Landlord. If the Term commences on a day other than the first day of a calendar month, the monthly Base Rent and Tenant's Pro Rata Share of any Excess Operating Expenses for the month shall be prorated on a daily basis based on a 365 day calendar year, and such prorated amount shall be due and payable on the first day of the month following the Commencement Date. Landlord's acceptance of less than the correct amount of Rent shall be considered a payment on account of the earliest Rent due. No endorsement or statement on a check or letter accompanying a check or payment shall be considered an accord and satisfaction, and either party may accept such



check or payment without such acceptance being considered a waiver of any rights such party may have under this Lease or applicable Law. Furthermore, Landlord shall have the right to return or refuse acceptance of any payments made to Landlord's lockbox address after an event of default has occurred. Tenant's covenant to pay Rent is independent of every other covenant in this Lease.

**B.** **Excess Operating Expenses.** Tenant shall pay Tenant's Pro Rata Share of the amount, if any, by which Operating Expenses (defined in **Section 4.D**) for each calendar year during the Term exceed Operating Expenses for the Base Year (the *"Excess Operating Expenses"*). Notwithstanding the foregoing, Tenant's Pro Rata Share of Controllable Expenses (defined below) shall not increase by more than 5% over Tenant's Pro Rata Share of Controllable Expenses in the previous calendar year, including the Base Year, on a non-cumulative, compounded basis. The term *"Controllable Expenses"* means all Operating Expenses excluding expenses relating to the cost of utilities, insurance, real estate taxes and assessments, and other expenses not within Landlord's control arising from increases to minimum wage laws or other similar legal requirements. If Operating Expenses in any calendar year decrease below the amount of Operating Expenses for the Base Year, Tenant's Pro Rata Share of Excess Operating Expenses for that calendar year shall be $0. In no event shall Base Rent be reduced if Operating Expenses for any calendar year are less than Operating Expenses for the Base Year. On or about January 1 of each calendar year, Landlord shall provide Tenant with a good faith estimate of the Excess Operating Expenses for such calendar year during the Term. On or before the first day of each month, Tenant shall pay to Landlord a monthly installment equal to one-twelfth of Tenant's Pro Rata Share of Landlord's estimate of the Excess Operating Expenses. If Landlord determines that its good faith estimate of the Excess Operating Expenses was incorrect, Landlord may provide Tenant with a revised estimate. After its receipt of the revised estimate, Tenant's monthly payments shall be based upon the revised estimate. If Landlord does not provide Tenant with an estimate of the Excess Operating Expenses by January 1 of a calendar year, Tenant shall continue to pay monthly installments based on the most recent estimate(s) until Landlord provides Tenant with the new estimate. Upon delivery of the new estimate, an adjustment shall be made for any month for which Tenant paid monthly installments based on the same year's prior incorrect estimate(s). Tenant shall pay Landlord the amount of any underpayment within 30 days after receipt of the new estimate. Any overpayment shall be credited against the next sums due and owing by Tenant or, *if no further Rent is due*, refunded directly to Tenant within 30 days of determination. The obligation of Tenant to pay for Excess Operating Expenses as provided herein shall survive the expiration or earlier termination of this Lease, except as provided in **Section 4.C** below.

**C.** **Reconciliation of Operating Expenses.** Within 120 days after the end of each calendar year or as soon thereafter as is practicable, Landlord shall furnish Tenant with a statement of the actual Operating Expenses and Excess Operating Expenses for such calendar year. If the most recent estimated Excess Operating Expenses paid by Tenant for such calendar year are more than the actual Excess Operating Expenses for such calendar year, Landlord shall apply any overpayment by Tenant against Rent due or next becoming due; provided, if the Term expires before the determination of the overpayment, Landlord shall, within 30 days of determination, refund any overpayment to Tenant after first deducting the amount of Rent due. If the most recent estimated Excess Operating Expenses paid by Tenant for the prior calendar year are less than the actual Excess Operating Expenses for such year, Tenant shall pay Landlord, within 30 days after its receipt of the statement of Operating Expenses, any underpayment for the prior calendar year. Notwithstanding anything to the contrary contained herein, in the event Landlord fails to charge to Tenant any item of Operating Expenses on or before December 31 of the year following the calendar year (the *"Inclusion Year"*) for which such item should have been included in Operating Expenses, Landlord waives its right to collect such item from Tenant for the Inclusion Year only. The foregoing waiver shall not apply to installments or amortization payments which may be allocated to years following the Inclusion Year.

**D.** **Operating Expenses Defined.** *"Operating Expenses"* means all costs and expenses incurred or accrued in each calendar year in connection with the ownership, operation, maintenance, management, repair and protection of the Property which are directly attributable or reasonably allocable to the Building, including Landlord's personal property used in connection with the Property and including all costs and expenditures relating to the following:

(1) Operation, maintenance, repair and replacements of any part of the Property, including the mechanical, electrical, plumbing, HVAC, vertical transportation, fire prevention and warning and access control systems; materials and supplies (such as light bulbs and ballasts);



equipment and tools; floor, wall and window coverings; personal property; required or beneficial easements; and related service agreements and rental expenses.

(2) Administrative and management costs and fees, including accounting, information and professional services (except for negotiations and disputes with specific tenants not affecting other parties), provided that the management fee shall not exceed 3% of gross revenues for the Property ; management office(s); and wages, salaries, benefits, reimbursable expenses and taxes (or allocations thereof) for full and part time personnel involved in operation, maintenance and management at or below the level of regional property manager.

(3) Janitorial service; window cleaning; waste disposal; gas, water and sewer and other utility charges (including add-ons); and landscaping, including all applicable tools and supplies.

(4) Property, liability and other insurance coverages carried by Landlord, including deductibles and risk retention programs and a proportionate allocation of the cost of blanket insurance policies maintained by Landlord and/or its Affiliates (defined below). Landlord agrees to maintain deductibles which are consistent with those maintained by Comparable Landlords (hereinafter defined) owning Comparable Portfolios (hereinafter defined) using sound business judgment, and in any event, the amount of Landlord's property insurance deductible for purposes of this Lease shall be capped at $100,000.00. A "**Comparable Landlord**" shall mean a reasonably prudent commercial office building landlord comparable to Landlord and its Affiliates owning a commercial office building portfolio comparable to that owned by Landlord and its Affiliates in quantity, size, type and quality (a "**Comparable Portfolio**").

(5) Compliance with Laws, including license, permit and inspection fees (but not in duplication of capital expenditures amortized as provided in **Section 4.D(8)**); and all expenses and fees, including attorneys' fees and court or other venue of dispute resolution costs, incurred in negotiating or contesting real estate taxes or the validity and/or applicability of any governmental enactments which may affect Operating Expenses; provided Landlord shall credit against Operating Expenses any refunds received from such negotiations or contests to the extent originally included in Operating Expenses (less Landlord's costs).

(6) Building safety services, to the extent provided or contracted for by Landlord.

(7) Goods and services purchased from Landlord's subsidiaries and Affiliates to the extent the cost of same is generally consistent with rates charged by unaffiliated third parties for similar goods and services.

(8) Amortization of capital expenditures incurred: (a) to conform with Laws which are amended, become effective, or are interpreted or enforced differently, after the date of this Lease; (b) to provide or maintain building standards (other than building standard tenant improvements); or (c) with the intention of promoting safety or reducing or controlling increases in Operating Expenses, such as lighting retrofit and installation of energy management systems. Such expenditures shall be amortized uniformly over the following periods of time (together with interest on the unamortized balance at the Prime Rate (defined in **Section 19.B**) as of the date incurred plus 2%): for building improvements, the shorter of 10 years or the estimated useful life of the improvement; and for all other items, 3 years for expenditures under $50,000 and 5 years for expenditures in excess of $50,000. Notwithstanding the foregoing, Landlord may elect to amortize capital expenditures under this subsection over a longer period of time based upon (i) the purpose and nature of the expenditure, (ii) the relative capital burden on the Property, (iii) for cost savings projects, the anticipated payback period, and (iv) otherwise in accordance with sound real estate accounting principles consistently applied.

During the Term, Landlord will allocate Operating Expenses for the Property to the Building on a consistent basis from year to year.

**E. Exclusions from Operating Expenses**. Operating Expenses exclude the following expenditures:

(1) Leasing commissions, attorneys' fees and other expenses related to leasing tenant space and constructing improvements for the sole benefit of an individual tenant (including any costs incurred in connection with alterations required to conform with Laws which are amended,



become effective, or are interpreted or enforced differently, after the date of this Lease on any single tenant floor of the Building).

(2) Goods and services furnished to an individual tenant of the Building which are above building standard or which are separately reimbursable directly to Landlord in addition to Excess Operating Expenses.

(3) Repairs, replacements and general maintenance paid by insurance proceeds (or which would have been paid by insurance proceeds had Landlord maintained the insurance required to be maintained by Landlord under this Lease) or condemnation proceeds or another tenant (outside of Operating Expenses) or responsible third party.

(4) Except as provided in **Section 4.D(8)**, depreciation, amortization, interest payments on any encumbrances on the Property and the cost of capital improvements, additions or replacements.

(5) Costs of installing any specialty service, such as an observatory, broadcasting facility, luncheon club, or athletic or recreational club.

(6) Expenses for repairs or maintenance related to the Property which have been reimbursed to Landlord pursuant to warranties or service contracts.

(7) Costs (other than maintenance costs) of any art work (such as sculptures or paintings) used to decorate the Building.

(8) Principal and interest payments on indebtedness secured by liens against the Property, or costs of refinancing such indebtedness.

(9) Rental, gross receipts, sales and use, or other taxes, if any, imposed upon or measured by rents, receipts or income attributable to ownership, use, occupancy, rental, leasing, operation or possession of the Property which have been paid by tenants pursuant to **Section 4.A**.

(10) Tax Expenses which are paid or payable separately pursuant to **Section 4.H**.

(11) Electrical service costs paid or payable separately pursuant to **Section 4.I**.

(12) Salaries of officers and executives of Landlord, except as included in **Section 4.D(2)**.

(13) Expenses incurred in leasing or procuring new tenants, including advertising and marketing expenses and expenses for preparation of leases or renovating space for new tenants, rent allowances, lease takeover costs, payment of moving costs and similar costs and expenses.

(14) The cost of any work or service performed for any tenant (including Tenant) at such tenant's cost.

(15) Costs incurred as a result of the gross negligence or willful misconduct by Landlord or its agents.

(16) Costs, penalties and fines incurred due to the violation by Landlord or any other tenant of the Building of Laws, or the terms and conditions of any lease pertaining to the Building, except such as may be incurred by Landlord in contesting in good faith the alleged violation.

(17) Landlord's general overhead and general administrative expenses except as provided in **Section 4.D(2)**.

(18) Goods and services purchased from Landlord's subsidiaries and Affiliates to the extent the cost of same is not generally consistent with rates charged by unaffiliated third parties for similar goods and services.

(19) Compensation paid to clerks, attendants or other persons in commercial concessions other than the Parking Facilities (such as a snack bar, restaurant or newsstand).



(20) Costs incurred for use of any portion of the Property for special events or private events.

(21) All costs arising from the release, removal or remediation (including encapsulation) of Hazardous Materials in or about the Premises, the Building or the Property, including, without limitation, Hazardous Materials in the ground water or soil, unless caused by the acts or omissions of any Tenant Party.

(22) Charitable or political contributions.

(23) Rental loss, bad debt or capital expenditure reserve accounts (other than escrow accounts for the payment of property taxes and insurance premiums).

(24) Any portion of Landlord's insurance premiums resulting from a specific use by another tenant.

(25) Rent paid under any ground lease.

(26) Rental of items which if purchased would constitute a capital expenditure which could not be included in Operating Expenses pursuant to **Section 4.D(8)** above.

**F.** **Proration of Operating Expenses; Adjustments**. If Landlord incurs Operating Expenses for the Property together with one or more other buildings or properties, whether pursuant to a reciprocal easement agreement, common area agreement or otherwise, the shared costs and expenses shall be equitably prorated and apportioned by Landlord between the Property and the other buildings or properties. If the Building is not 100% occupied during any calendar year or partial calendar year or if Landlord is not supplying services to 100% of the total Rentable Square Footage of the Building at any time during a calendar year or partial calendar year, Operating Expenses shall be determined as if the Building had been 100% occupied and Landlord had been supplying services to 100% of the Rentable Square Footage of the Building during that calendar year. If Tenant pays for Tenant's Pro Rata Share of Excess Operating Expenses based on increases over a "*Base Year*" and Operating Expenses for a calendar year are determined as provided in the prior sentence, Operating Expenses for the Base Year shall also be determined as if the Building had been 100% occupied and Landlord had been supplying services to 100% of the Rentable Square Footage of the Building. The extrapolation of Operating Expenses under this Section shall be performed by Landlord by adjusting the cost of those components of Operating Expenses that are impacted by changes in the occupancy of the Building.

**G.** **Audit Rights**. Within 90 days after Landlord furnishes its statement of actual Operating Expenses for any calendar year (including the Base Year) (the "*Audit Election Period*"), Tenant may, at its expense, elect to audit Landlord's Operating Expenses for such calendar year only, subject to the following conditions: (1) there is no uncured event of default under this Lease; (2) the audit shall be prepared by an independent certified public accounting firm of recognized national standing; (3) in no event shall any audit be performed by a firm retained on a "contingency fee" basis; (4) the audit shall commence within 30 days after Landlord makes Landlord's books and records available to Tenant's auditor (which books and records shall be made available within 30 days after Landlord's receipt of written notice from Tenant exercising such audit right) and shall conclude within 60 days after commencement; (5) the audit shall be conducted during Landlord's normal business hours at the location where Landlord maintains its books and records and shall not unreasonably interfere with the conduct of Landlord's business; (6) Tenant and its accounting firm shall treat any audit in a confidential manner and shall each execute Landlord's confidentiality agreement for Landlord's benefit prior to commencing the audit; and (7) the accounting firm's audit report shall, at no charge to Landlord, be submitted in draft form for Landlord's review and comment before the final approved audit report is delivered to Landlord, and any reasonable comments by Landlord shall be incorporated into the final audit report. This paragraph shall not be construed to limit, suspend, or abate Tenant's obligation to pay Rent when due, including estimated Excess Operating Expenses. Landlord shall credit any overpayment determined by the final approved audit report against the next Rent due and owing by Tenant or, if no further Rent is due, refund such overpayment directly to Tenant within 30 days of determination. Likewise, Tenant shall pay Landlord any underpayment determined by the final approved audit report within 30 days of determination. The foregoing obligations shall survive the expiration or termination of this Lease. If Tenant does not give written notice of its election to audit Landlord's Operating Expenses during the Audit Election Period, Landlord's Operating Expenses for the applicable calendar year shall be



deemed approved for all purposes, and Tenant shall have no further right to review or contest the same. The right to audit granted hereunder is personal to the initial Tenant named in this Lease and to any assignee under a Permitted Transfer (defined below) and shall not be available to any subtenant under a sublease of the Premises.

**H.    Tax Expenses.** In addition to the Excess Operating Expenses, and as a separate obligation, Tenant shall pay Tenant's Pro Rata Share of the amount, if any, by which Tax Expenses (defined below) for each calendar year during the Term (after the Tax Base Year) exceed Tax Expenses for the Tax Base Year (the "*Excess Tax Expenses*"). "*Tax Expenses*" shall mean real estate taxes, assessments, excises, association dues, fees, levies, charges and other taxes of every kind and nature whatsoever, general and special, extraordinary and ordinary, foreseen and unforeseen, including interest on installment payments, which may be levied or assessed against or arise in connection with ownership, use, occupancy, rental, leasing, operation or possession of the Property, or paid as rent under any ground lease. Tax Expenses shall include, without limitation: (i) any tax on the rent or other revenue from the Property, or any portion thereof, or as against the business of owning or leasing the Property, or any portion thereof, including any business, gross margins, or similar tax payable by Landlord which is attributable to rent or other revenue derived from the Property, (ii) any assessment, tax, fee, levy, or charge allocable to or measured by the area of the Premises or the Rent payable hereunder, (iii) personal property taxes for property that is owned by Landlord and used in connection with the operation, maintenance and repair of the Property, (iv) any assessment, tax, fee, levy or charge, upon this transaction or any document to which Tenant is a party, creating or transferring an interest or an estate in the Premises, and (v) any assessment, tax, fee, levy or charge substituted, in whole or in part, for a tax previously in existence, or assessed in lieu of a tax increase. Tax Expenses shall not include Landlord's estate, excise, income or franchise taxes (except to the extent provided above). Tenant shall, with each monthly payment of Base Rent, pay Landlord's estimate of Tenant's Pro Rata Share of Excess Tax Expenses in the same manner as provided for Operating Expenses in **Sections 4.B, C,** and **F**. Additionally, the provisions of **Sections 4.B, C,** and **F** applicable to Operating Expenses and Excess Operating Expenses shall be equally applicable to Tax Expenses and Excess Tax Expenses respectively.

**I.    Electrical Costs.** In addition to the Excess Operating Expenses, and as a separate obligation, commencing on the Commencement Date, Tenant shall pay Landlord Tenant's Pro Rata Share of the following costs incurred by Landlord which are directly attributable or reasonably allocable to the Building: (1) electrical services used in the operation, maintenance and use of the Property; (2) sales, use, excise and other taxes assessed by governmental authorities on electrical services supplied to the Property; and (3) other actual costs of providing electrical services to the Property, other than capital expenditures which may only be included in Operating Expenses to the extent allowable pursuant to **Section 4.D(8)** above; provided that the costs described above shall not include the cost of electricity for above Building Standard electrical consumption or the cost of electricity incurred to provide overtime HVAC to specific tenants of the Property. Tenant shall, with each monthly payment of Base Rent, pay Landlord's estimate of Tenant's Pro Rata Share of such electrical service costs in the same manner as provided for Operating Expenses in **Sections 4.B, C,** and **F**. Notwithstanding anything to the contrary contained herein, in the event Landlord fails to charge to Tenant any electrical costs described in this **Section 4.I** on or before December 31 of the year following the Inclusion Year for which such costs should have been charged, Landlord waives its right to collect such costs from Tenant for the Inclusion Year only.

**5.    Tenant's Use of Premises.**

**A.    Permitted Uses.** The Premises shall be used only for general office use including general office use related to retail banking (the "*Permitted Use*") and for no other use whatsoever. Tenant shall not use or permit the use of the Premises for any purpose which is illegal, creates obnoxious odors (including tobacco smoke), noises or vibrations, is dangerous to persons or property, could increase Landlord's insurance costs, or which, in Landlord's reasonable opinion, unreasonably disturbs any other tenants of the Building or interferes with the operation or maintenance of the Property or any work by Landlord or its contractors in the Premises. Except as provided below, the following uses are expressly prohibited in the Premises: schools, government offices or agencies; personnel agencies; collection agencies; credit unions; data processing, telemarketing or reservation centers; medical treatment and health care; radio, television or other telecommunications broadcasting; restaurants and other retail; customer service offices of a public utility company; or any other purpose which would, in Landlord's reasonable opinion, impair the reputation or quality of the Building, overburden any of the Building systems, Common Areas or parking facilities (including any use which would create a population density in the Premises which

The Crescent®/Highland Capital Management, L.P.
6080490v.5 126597/00001                                                -9-



is in excess of a density of one person for every 250 rentable square feet in the Premises), impair Landlord's efforts to lease space or otherwise interfere with the operation of the Property. Notwithstanding the foregoing, the following ancillary uses are permitted in the Premises only so long as they do not, in the aggregate, occupy more than 10% of the Rentable Square Footage of the Premises or any single floor (whichever is less): (1) the following services provided by Tenant exclusively to its employees: schools, training and other educational services; credit unions; and similar employee services; and (2) the following services directly and exclusively supporting Tenant's business: telemarketing; reservations; storage; data processing; debt collection; and similar support services.

**B.      Compliance with Laws.** Tenant shall comply with all Laws regarding the operation of Tenant's business and the use, condition, configuration and occupancy of the Premises and Tenant's use of the Common Areas (except to the extent any such compliance is Landlord's obligation as set forth in this Lease). Tenant, within 10 days after receipt, shall provide Landlord with copies of any notices Tenant receives regarding a violation or alleged or potential violation of any Laws applicable to the Premises. Tenant shall comply with the rules and regulations of the Building attached as **Exhibit B** and such other reasonable rules and regulations (or modifications thereto) adopted by Landlord from time to time and provided to Tenant in writing; provided that such other rules or modifications thereto do not adversely affect Tenant's rights or obligations under this Lease. Such rules and regulations will be applicable to all tenants of the Building and will be applied in an equitable manner as determined by Landlord. Tenant shall also cause its agents, contractors, subcontractors, employees, customers, and subtenants to comply with all rules and regulations. Notwithstanding anything in this Lease to the contrary, as between Landlord and Tenant: (i) Tenant shall bear the risk of complying with the ADA in the Premises (other than those aspects of the Premises for which Landlord is responsible to maintain); and (ii) Landlord shall bear the risk of complying with the ADA in the Common Areas (subject to reimbursement as set forth in **Section 4.D**).

**C.      Tenant's Security Responsibilities.** Tenant shall (1) lock the doors to the Premises when not occupied and take other reasonable steps to secure the Premises and the personal property of all Tenant Parties (defined in **Article 13**) and any of Tenant's transferees, contractors or licensees in the Common Areas and parking facilities of the Building and Property, from unlawful intrusion, theft, fire and other hazards; (2) keep and maintain in good working order all security and safety devices installed in the Premises by or for the benefit of Tenant (such as locks, smoke detectors and burglar alarms, but excluding fire and life safety systems required to be maintained by Landlord hereunder); and (3) reasonably cooperate with Landlord and other tenants in the Building on Building safety matters. Tenant acknowledges that any security or safety measures employed by Landlord are for the protection of Landlord's own interests; that Landlord is not a guarantor of the security or safety of the Tenant Parties or their property; and that such security and safety matters are the responsibility of Tenant and the local law enforcement authorities.

6.      **Security Deposit.** The Security Deposit shall be delivered to Landlord on or before December 31, 2011 and shall be held by Landlord (without liability for interest, except to the extent required by Law) as security for the performance of Tenant's obligations under this Lease. Tenant's failure to deliver the Security Deposit to Landlord on or before December 31, 2011 shall be a Monetary Default, subject to any applicable notice and cure period. The Security Deposit is not an advance payment of Rent or a measure of Tenant's liability for damages. Landlord may, from time to time while an event of default remains uncured, without prejudice to any other remedy, use all or a portion of the Security Deposit to satisfy past due Rent, cure any uncured default by Tenant, or repay Landlord for damages and charges for which Tenant is legally liable under this Lease or resulting from Tenant's breach of this Lease. If Landlord uses the Security Deposit, Tenant shall on demand restore the Security Deposit to its original amount and such use by Landlord of the Security Deposit shall not constitute a cure of the existing event of default until such time as the entire amount owing to Landlord is paid in full and the Security Deposit is fully restored. Provided that no event of default exists hereunder, Landlord shall return any unapplied portion of the Security Deposit to Tenant within 30 days after the later to occur of: (A) the date Tenant surrenders possession of the Premises to Landlord in accordance with this Lease; or (B) the Expiration Date. Tenant does hereby authorize Landlord to withhold from the Security Deposit all amounts allowed by Law and the amount reasonably anticipated by Landlord to be owed by Tenant as a result of an underpayment of Tenant's Pro Rata Share of any Excess Operating Expenses for the final year of the Term provided that Landlord delivers to Tenant a calculation of such withholding prior to the date Landlord is required to return the Security Deposit to Tenant. To the fullest extent permitted by applicable Law,



Tenant agrees that the provisions of this **Article 6** shall supersede and replace all statutory rights of Tenant under applicable Law regarding the retention, application or return of security deposits. If Landlord transfers its interest in the Premises, Landlord shall assign the Security Deposit to the transferee and, following the assignment and the delivery to Tenant of an acknowledgement of the transferee's responsibility for the Security Deposit if required by Law, Landlord shall have no further liability for the return of the Security Deposit. Landlord shall not be required to keep the Security Deposit separate from its other accounts.

7.    **Services Furnished by Landlord.**

    **A.**    **Standard Services.** Subject to the provisions of this Lease, Landlord agrees to furnish (or cause a third party provider to furnish) the following services to Tenant at all times during the Term (except as expressly set forth below):

        (1)    Water service for use in the lavatories and water fountains on each floor on which the Premises are located.

        (2)    Heat and air conditioning in season during Normal Business Hours, at such temperatures and in such amounts as required by governmental authority or as Landlord determines are standard for the Building, but in no event shall standards be less than the standards of Comparable Buildings. Tenant, upon such notice as is reasonably required by Landlord, and subject to the capacity of the Building systems, may request HVAC service during hours other than Normal Business Hours. Tenant shall pay Landlord the standard charge for the additional service as determined by Landlord from time to time based on Landlord's actual, out-of-pocket incremental costs of providing such service, without markup for profit. The current charge for such after-hours HVAC service is $25.00 per hour, per floor. Notwithstanding anything to the contrary contained in the foregoing, Tenant will receive up to 248 hours of after-hours HVAC per calendar year at no cost to Tenant. Notwithstanding anything to the contrary contained herein, in the event Landlord fails o bill Tenant for any after-hours HVAC service on or before December 31 of the calendar year following the calendar year in which such services were rendered, Landlord waives it right to collect from Tenant the cost of such after-hours HVAC service.

        (3)    Maintenance and repair of the Property as described in **Section 9.B**.

        (4)    Janitorial service five days per week (excluding Holidays), as determined by Landlord, but in no event shall such janitorial service be at levels less than the janitorial services provided in Comparable Buildings. If Tenant's use of the Premises, floor covering or other improvements requires special services in excess of the standard services for the Building, Tenant shall pay the additional cost attributable to the special services.

        (5)    Elevator service, subject to proper authorization and Landlord's policies and procedures for use of the elevator(s) in the Building.

        (6)    Exterior window washing at such intervals as determined by Landlord.

        (7)    Electricity to the Premises for general office use, in accordance with and subject to the terms and conditions in **Article 8** and electric lighting service for all public areas and special service areas of the Building in the manner and to the extent in keeping with the standards of other Comparable Buildings.

        (8)    On-site building safety personnel services consistent with Comparable Buildings (defined below), subject to the provisions of **Section 5.C**.

        (9)    Replacement of Building standard light bulbs and fluorescent tubes.

        (10)    Pest control/extermination service for the Common Areas on a level in keeping with the standards of Comparable Buildings.

        (11)    Access to and use of the Premises 24 hours a day, 365 days a year (subject to the provisions of this Lease with respect to casualty and condemnation) for the conduct of Tenant's business therein; provided, however, during periods after Normal Business Hours, Landlord may establish reasonable rules and regulations in connection with such access, such as requiring Tenant's employees to sign in at the lobby desk, etc. ("***Tenant's Access and Use***").



The above-described services shall be subject to reasonable changes by Landlord so long as such services are comparable to those provided in other comparable Class AA office buildings in the Uptown submarket of Dallas, Texas, which have 10 or more floors and were built during or after 2006 ("*Comparable Buildings*") during the Term (and any renewals or extensions thereof).

**B.** **Service Interruptions.** For purposes of this Lease, a "*Service Failure*" shall mean any interruption, suspension or termination of services being provided to Tenant by Landlord or by third-party providers, whether engaged by Tenant or pursuant to arrangements by such providers with Landlord, which are due to (1) the application of Laws; (2) the failure, interruption or malfunctioning of any electrical or mechanical equipment, utility or other service to the Building or Property; (3) the performance of repairs, *maintenance, improvements or alterations; or* (4) the occurrence of any other event or cause whether or not within the reasonable control of Landlord. No Service Failure shall render Landlord liable to Tenant, constitute a constructive eviction of Tenant, give rise to an abatement of Rent, or relieve Tenant from the obligation to fulfill any covenant or agreement. In no event shall Landlord be liable to Tenant for any loss or damage, including the theft of Tenant's Property (defined in Article 14), arising out of or in connection with any Service Failure or the failure of any Building safety services, personnel or equipment. Notwithstanding the foregoing, Landlord and Tenant agree that there are certain services without which Tenant cannot occupy the Premises for the purposes for which same were leased. Such services are HVAC service in accordance with the requirements above, water and sanitary sewer service, electrical service, access to the Building, any of the life-safety systems at the Property required for Tenant's occupancy of the Premises, and elevator service (not less than 2 cabs for each elevator bank serving the Premises running at all times) (the "*Essential Services*"). In the event any one or more of the Essential Services is not provided to the Premises or in the event Tenant's Access and Use is denied or interfered with, and the unavailability of such Essential Service(s) or the denial or interference with Tenant's Access and Use renders all or a portion of the Premises unfit for occupancy for the Permitted Use ("*Untenantable*") for a continuous period of five (5) consecutive Business Days, or for more than twenty (20) Business Days in the aggregate in any one calendar year, and such failure or interruption in Essential Services was not caused by a Tenant Party, then, from and after the expiration of the applicable period until such Essential Service(s) and/or Tenant's Access and Use is/are restored (as Tenant's sole and exclusive remedy), the Rent with respect to that portion of the Premises rendered Untenantable shall abate (such abatement in Base Rent, the "*Untenantability Rent Abatement*"). Notwithstanding the foregoing, such Untenantability Rent Abatement shall be contingent upon Tenant delivering notice (the "*Failure Notice*") of such failure to provide Essential Service(s) or denial or interruption of Tenant's Access and Use to Landlord, and the periods set forth in this **Section 7.B** shall commence on the day after Landlord receives such Failure Notice. In the event the Essential Services or Tenant's Access and Use are/is not provided as a result of a fire or other casualty to the Building, **Article 16** of this Lease shall apply in lieu of this paragraph.

**C.** **Third Party Services.** If Tenant desires any service which Landlord has not specifically agreed to provide in this Lease, such as private security systems or telecommunications services serving the Premises, Tenant shall procure such service directly from a reputable third party service provider ("*Provider*") for Tenant's own account. Tenant shall require each Provider to comply with the Building's rules and regulations, all Laws, and Landlord's reasonable policies and practices for the Building. Tenant acknowledges Landlord's current policy that requires all Providers utilizing any area of the Property outside the Premises to be approved by Landlord and to enter into a written agreement acceptable to Landlord prior to gaining access to, or making any installations in or through, such area. Accordingly, Tenant shall give Landlord written notice sufficient for such purposes.

**8.** **Use of Electrical Services by Tenant.**

**A.** **Landlord's Electrical Service.** Subject to the terms of this Lease, Landlord shall furnish the following electrical service to the Premises in accordance with and subject to the following parameters ("*Tenant's Electrical Standard*"): (i) the total connected electrical load of all electrical equipment, including lighting (but excluding the Building HVAC system and other Building systems), serving the Premises shall equal an average of 6 watts multiplied by the Rentable Square Footage of the Premises delivered through the electrical riser to the electrical room on the floor where the Premises are located; (ii) the connected electrical load for lighting shall comply with the National Electric Code, as revised from time to time, and all other applicable Laws; (iii) emergency power shall be limited to egress lighting only and at Landlord's option shall be provided by Tenant's battery backup fixtures or Landlord's emergency power system; and (iv) no electrical equipment shall exceed the safe and lawful capacity of the existing electrical circuit(s) and facilities



serving the Premises. Landlord may, at any time and from time to time, calculate Tenant's actual electrical consumption in the Premises by a survey conducted by a reputable consultant selected by Landlord, and if Tenant is use of electrical service in the Premises exceeds Tenant's Electrical Standard, then the reasonable cost of such survey shall be all at Tenant's expense. The cost of any electrical consumption in excess of Tenant's Electrical Standard shall be paid by Tenant in accordance with **Section 8.D.** The furnishing of electrical services to the Premises shall be subject to the rules, regulations and practices of the supplier of such electricity and of any municipal or other governmental authority regulating the business of providing electrical utility service. Landlord shall not be liable or responsible to Tenant for any loss, damage or expense which Tenant may sustain or incur if either the quantity or character of the electrical service is changed or is no longer available or no longer suitable for Tenant's requirements.

     **B.**    <u>Selection of Electrical Service Provider</u>. Landlord shall have and retain the sole right to select the provider of electrical services to the Building and/or the Property. To the fullest extent permitted by Law, Landlord shall have the continuing right to change such utility provider. All charges and expenses incurred by Landlord (other than capital expenditures which may only be included in Operating Expenses to the extent allowable pursuant to **Section 4.D(8)** above) due to any such changes in electrical services, including maintenance, repairs, installation and related costs, shall be included in the electrical services costs referenced in **Section 4.I**, unless paid directly by Tenant.

     **C.**    <u>Submetering</u>. Landlord shall have the continuing right, upon 30 days written notice, to install a submeter for the Premises at Tenant's expense, but such expense shall only be charged to Tenant if Tenant's electrical consumption, including lighting, exceeds Tenant's Electrical Standard. Notwithstanding anything to the contrary contained herein, Tenant shall be required to install a submeter to measure electricity usage for computer server rooms and any above Building standard HVAC units in the Premises. The cost of such submeters required by this **Section 8.C** shall be paid by Tenant, but may be paid out of the Reimbursement Allowance to the extent sufficient funds are available. If submetering is installed for the Premises, Landlord may charge for Tenant's actual electrical consumption monthly in arrears for the kilowatt hours used, a rate per kilowatt hour equal to that charged to Landlord by the provider of electrical service to the Building during the same period of time along with any other out-of-pocket related costs paid by Landlord for such electrical consumption, except as to electricity directly purchased by Tenant from third party providers after obtaining Landlord's consent to the same. In the event Landlord is unable to determine the exact kilowatt hourly charge during the period of time, Landlord shall use the average kilowatt hourly charge to the Building for the first billing cycle ending after the period of time in question. In the event the Premises are submetered, Tenant shall remain obligated to pay Tenant's Pro Rata Share of the cost of electrical services provided to the Common Areas, service areas and the central plant as provided in **Section 4.I**; provided that all electrical services to any other leasable space in the Building shall be excluded from the cost of electrical services paid by Tenant.

     **D.**    <u>Excess Electrical Service</u>. If Tenant requests permission to consume excess electrical service above Tenant's Electrical Standard, Landlord may refuse to consent or may condition consent upon conditions that Landlord reasonably elects (including the installation of utility service upgrades, meters, submeters, air handlers or cooling units). The costs of any approved additional consumption (to the extent permitted by Law), installation and maintenance shall be paid by Tenant.

9.    <u>**Repairs and Alterations**</u>.

     **A.**    <u>Tenant's Repair Obligations</u>. Tenant shall keep the Premises in good condition and repair, ordinary wear and tear excepted. Tenant's repair obligations include, without limitation, repairs to: (1) floor covering and/or raised flooring; (2) interior partitions; (3) doors; (4) the interior side of demising walls; (5) electronic, phone and data cabling and related equipment (collectively, "*Cable*") that is installed by or for the benefit of Tenant whether located in the Premises or in other portions of the Building; (6) supplemental air conditioning units, private showers and kitchens, including hot water heaters, plumbing, dishwashers, ice machines and similar facilities serving Tenant exclusively; (7) phone rooms used exclusively by Tenant; (8) Alterations (defined below) performed by contractors retained by Tenant, including related HVAC balancing; and (9) all of Tenant's furnishings, trade fixtures, equipment and inventory. Prior to performing any such repair obligation (other than repairs to Tenant's furnishings, trade fixtures, equipment or inventory), Tenant shall give written notice to Landlord describing the necessary maintenance or repair. Upon receipt of such notice, Landlord may elect either to perform any of the maintenance or repair obligations



specified in such notice (provided Landlord's charge for such work is competitive with the fees charged for comparable work by contractors performing work in the uptown Dallas, Texas area who are similarly experienced in comparable work), or require that Tenant perform such obligations by using contractors approved by Landlord. In the event Landlord elects to perform the maintenance or repair obligations as provided in the preceding sentence, Tenant shall not be liable for any bodily injury or death caused by Landlord's contractors performing such maintenance or repair obligations notwithstanding anything to the contrary contained in **Article 13**. All work shall be performed at Tenant's expense in accordance with the rules and procedures described in **Section 9.C** below. If Tenant fails to commence to make any repairs to the Premises for more than 15 days after notice from Landlord (except in the event Landlord has elected to perform such repairs) (although notice shall not be required if there is an emergency) and thereafter diligently pursue the completion of such repairs, Landlord may, in addition to any other remedy available to Landlord, upon notice to Tenant, make the repairs, and Tenant shall pay to Landlord the reasonable cost of the repairs within 30 days after receipt of an invoice, together with an administrative charge in an amount equal to 10% of the cost of the repairs.

**B.** **Landlord's Repair Obligations**. Landlord shall keep and maintain in good repair and working order and make replacements of, repairs to and perform maintenance upon: (1) structural elements of the Building; (2) standard mechanical (including HVAC), electrical, plumbing and fire/life safety systems serving the Building generally; (3) Common Areas, including the Parking Facilities as defined in **Exhibit E**; (4) the roof of the Building; (5) exterior windows, window gaskets and skin of the Building; and (6) elevators serving the Building, in the manner and to the extent in keeping with the standards of other Comparable Buildings. Landlord shall promptly make repairs (taking into account the nature and urgency of the repair) for which Landlord is responsible. Subject to **Article 15**, if any of the foregoing maintenance or repair is necessitated due to the acts or omissions of any Tenant Party (defined in **Article 13**), excepting ordinary wear and tear, Tenant shall pay the reasonable costs of such repairs or maintenance to Landlord within 30 days after receipt of an invoice, together with an administrative charge in an amount equal to 10% of the cost of the repairs. Tenant shall not be liable for any bodily injury or death caused by Landlord's contractors performing any such maintenance or repair obligations notwithstanding anything to the contrary contained in **Article 13**

**C.** **Alterations**.

(1) *When Consent Is Required*. Tenant shall not make alterations, additions or improvements to the Premises or install any Cable in the Premises or other portions of the Building (collectively, "*Alterations*") without first obtaining the written consent of Landlord in each instance, which consent shall not be unreasonably withheld, conditioned or delayed. However, Landlord's consent shall not be required for any Alteration that satisfies all of the following criteria (a "*Minor Alteration*"): (a) is of a cosmetic nature such as painting, wallpapering, hanging pictures and installing carpeting; (b) is not visible from outside the Premises or Building; (c) will not affect the systems or structure of the Building; and (d) does not require work to be performed inside the walls or above the ceiling of the Premises.

(2) *Requirements For All Alterations, Including Minor Alterations*. Prior to starting work on any Alteration, Tenant shall furnish to Landlord for review and approval: plans and specifications; names of proposed contractors (provided that Landlord may designate specific contractors with respect to Building systems); copies of contracts (provided that Tenant shall not be required to provide such copies for Minor Alterations); and evidence of contractors' and subcontractors' insurance. Prior to the commencement of any Alterations, including Minor Alterations, Tenant shall deliver to Landlord all applicable building permits and approvals required for such construction. In the event Landlord fails to respond with its approval or disapproval within 10 Business Days after Landlord's receipt of Tenant's request for approval and all information required pursuant to this subsection, Tenant may deliver to Landlord a second written request for approval, which request shall state in bold, conspicuous and all capital letters "**LANDLORD'S RESPONSE IS REQUIRED WITHIN 5 BUSINESS DAYS OR PLANS WILL BE DEEMED APPROVED**". In the event Landlord fails to respond to such notice within 5 Business Days after Landlord's receipt thereof, the applicable Alterations shall be deemed approved. Changes to the plans and specifications must also be submitted to Landlord for its approval. Some of the foregoing requirements may be waived by Landlord for the performance of specific Minor Alterations; provided that such waiver is obtained in writing prior to the commencement of such Minor Alterations. Landlord's waiver on one occasion shall not waive Landlord's right to enforce such requirements on any other occasion. Alterations shall be constructed in a good and workmanlike



manner using materials of a quality that is at least equal to the quality designated by Landlord as the minimum standard for the Building. Landlord may designate reasonable rules, regulations and procedures for the performance of Alterations in the Building and, to the extent reasonably necessary to avoid disruption to the occupants of the Building, shall have the right to designate the time when Alterations may be performed. Tenant shall reimburse Landlord within 30 days after receipt of an invoice for reasonable out-of-pocket sums paid by Landlord for third party examination of Tenant's plans for Alterations. In addition, within 30 days after receipt of an invoice from Landlord, Tenant shall pay to Landlord a fee equal to 5% of the total cost of such Alterations (excluding Minor Alterations) for Landlord's oversight and coordination of any Alterations. No later than 30 days after completion of the Alterations, Tenant shall furnish "as-built" plans (which shall not be required for Minor Alterations), full and final blanket waiver of liens from the general contractor performing the Alterations, receipts and bills covering all labor and materials. Tenant shall assure that the Alterations comply with all insurance requirements and Laws.

(3) *Landlord's Liability For Alterations*. Landlord's approval of an Alteration shall not be a representation by Landlord that the Alteration complies with applicable Laws or will be adequate for Tenant's use. Tenant acknowledges that Landlord is not an architect or engineer, and that the Alterations will be designed and/or constructed using independent architects, engineers and contractors. Accordingly, Landlord does not guarantee or warrant that the applicable construction documents will comply with Laws or be free from errors or omissions, or that the Alterations will be free from defects, and Landlord will have no liability therefor.

(4) *Ownership of Improvements*. All Alterations or other improvements and alterations made to the Premises by Landlord or Tenant after the Delivery Date shall be deemed the property of Tenant during the Term of this Lease but shall become the property of Landlord upon the expiration or earlier termination of the Lease or Tenant's right to possession. Tenant shall be entitled to claim the depreciation with respect to any Alterations and other improvements made to the Premises to the extent paid for by Tenant, including, if applicable the Tenant Work.

10.     **Entry by Landlord**. Landlord, its agents, contractors and representatives may enter the Premises to inspect or show the Premises, to clean and make repairs, alterations or additions to the Premises, and to conduct or facilitate repairs, alterations or additions to any portion of the Building, including other tenants' premises. Except in emergencies or to provide janitorial and other Building services after Normal Business Hours, Landlord shall provide Tenant with reasonable prior notice of entry into the Premises, which may be given orally and which shall be given to an employee of Tenant with the title of Manager or above. Landlord agrees to exercise commercially reasonable good faith efforts (a) to prosecute completion of any work within the Premises diligently, (b) to minimize interference with Tenant's use, access, occupancy and quiet enjoyment of the Premises, (c) to protect Tenant's property located in the Premises from damage (provided Landlord shall not be responsible for any damage to Tenant's property as provided in **Article 15** below), and (d) to the extent any such access or work will materially interfere with Tenant's use of the Premises, except in the event of an emergency, to perform the same after Normal Business Hours. Landlord shall have the right to temporarily close all or a portion of the Premises to perform repairs, alterations and additions, if reasonably necessary for the protection and safety of Tenant and its employees. Except in emergencies, Landlord will not close the Premises if the work can reasonably be completed on weekends and after Normal Business Hours; provided, however, that Landlord is not required to conduct work on weekends or after Normal Business Hours if such work can be conducted without closing the Premises and without materially interfering with Tenant's use of the Premises. Entry by Landlord for any such purposes shall not constitute a constructive eviction or entitle Tenant to an abatement or reduction of Rent, except as provided in **Section 7.B**. Notwithstanding anything to the contrary contained herein, Tenant shall have the right to designate certain areas of the Premises as *"Secured Areas"* should Tenant require such areas for the purpose of securing certain valuable property or confidential information. Landlord shall not have access to such Secured Areas except (i) in the event of an emergency, in which case, Landlord may use whatever means necessary to access such Secured Areas, at no expense to Landlord, and (ii) in the event of a Landlord or Mortgagee inspection, in which case Landlord shall provide 48 hours prior written notice to Tenant of the date and time of such inspection. Landlord shall not be required to provide janitorial or other services to the Secured Areas which services require Landlord's employees or agents to have access to such Secured Areas.



11. **Assignment and Subletting**.

    A.   **Landlord's Consent Required**. Subject to the remaining provisions of this **Article 11**, but notwithstanding anything to the contrary contained elsewhere in this Lease, Tenant shall not assign, transfer or encumber any interest in this Lease (either absolutely or collaterally) or sublease or allow any third party to use any portion of the Premises (collectively or individually, a "***Transfer***") without the prior written consent of Landlord, which consent shall not be unreasonably withheld, delayed or conditioned. Without limitation, Tenant agrees that Landlord's consent shall not be considered unreasonably withheld or conditioned if: (1) the proposed transferee's financial condition does not meet the criteria Landlord uses to select Building tenants having similar leasehold obligations; (2) the proposed transferee is a governmental organization or present occupant of the Property, or Landlord is otherwise engaged in lease negotiations with the proposed transferee for other premises in the Property; (3) any uncured event of default exists under this Lease (or Landlord has delivered notice of a condition that exists which, with the passage of time, would become an event of default); (4) any portion of the Building or Premises would likely become subject to additional or different Laws as a consequence of the proposed Transfer; (5) the proposed transferee's use of the Premises conflicts with the Permitted Use or any exclusive usage rights granted to any other tenant in the Building; (6) the use, nature, business, activities or reputation in the business community of the proposed transferee (or its principals, employees or invitees) does not meet Landlord's standards for Building tenants; (7) either the Transfer or any consideration payable to Landlord in connection therewith adversely affects any pension fund or ERISA qualification tests applicable to Landlord or its Affiliates; (8) the proposed transferee is or has been involved in litigation with Landlord or any of its Affiliates; or (9) Landlord determines, in its sole discretion, that the proposed Transfer would be detrimental to Landlord's business or the operation of the Building. Tenant shall not be entitled to receive monetary damages based upon a claim that Landlord unreasonably withheld its consent to a proposed Transfer and Tenant's sole remedy shall be an action to enforce any such provision through specific performance or declaratory judgment. Any attempted Transfer in violation of this Article is voidable at Landlord's option. Notwithstanding anything to the contrary set forth herein, Landlord consents to the use and occupancy of up to 1,000 rentable square feet of the Premises by Reserve Aid Texas, a Texas non-profit corporation.

    B.   **Consent Parameters/Requirements**. As part of Tenant's request for, and as a condition to, Landlord's consent to a Transfer, Tenant shall provide Landlord with financial statements for the proposed transferee, a complete copy (unexecuted) of the proposed assignment or sublease and other contractual documents, and such other information as Landlord may reasonably request. Landlord agrees to consent to or reject Tenant's proposed Transfer, or elect to terminate the Lease (or portion thereof) as provided below, within 21 days after receipt of Tenant's notification and all of the information required pursuant to this **Section 11.B**. If Landlord fails to either consent or reject Tenant's proposed Transfer, or elect to terminate the Lease, within such 21 day period, Tenant shall have the right to send Landlord a second written request for consent which includes a statement in bold, all capital-letters that "**LANDLORD'S FAILURE TO RESPOND TO THIS NOTICE WITHIN 10 BUSINESS DAYS SHALL BE DEEMED APPROVAL OF THE PROPOSED TRANSFER**". If Landlord fails to respond to such second request within 10 Business Days, the applicable Transfer shall be deemed approved. Landlord shall have the right (but not the obligation) to terminate this Lease as of the date the Transfer would have been effective ("***Landlord Termination Date***") with respect to the portion of the Premises which Tenant desires to sublease, except in connection with a Permitted Sublease, provided Landlord shall have no such termination right in the event of an assignment. Landlord shall provide written notice to Tenant of its election to terminate this Lease ("***Landlord's Termination Notice***"). Tenant shall have the right to withdraw its request for Landlord's consent to the proposed Transfer ("***Withdrawal Right***"), provided Tenant exercises such Withdrawal Right within 5 Business Days after receipt of Landlord's Termination Notice. If Tenant timely exercises its Withdrawal Right, the Lease shall continue in full force and effect as if Tenant had not requested Landlord's consent to the proposed Transfer. If Tenant does not timely exercise its Withdrawal Right, Tenant shall vacate such portion of the Premises by the Landlord Termination Date and upon Tenant's vacating such portion of the Premises, the Rent and other charges payable shall be proportionately reduced. Consent by Landlord to one or more Transfer(s) shall not operate as a waiver of Landlord's rights to approve any subsequent Transfers. In no event shall any Transfer, Permitted Transfer or Permitted Sublease release or relieve Tenant from any obligation under this Lease, nor shall the acceptance of Rent from any assignee, subtenant or occupant constitute a waiver or release of Tenant from any of its obligations or liabilities under this Lease. Tenant shall pay Landlord a review fee of $1000 for Landlord's review of any Permitted Transfer or requested Transfer, provided if Landlord's actual, reasonable, out-of-pocket costs and



expenses (including reasonable attorney's fees) exceed $1000, Tenant shall reimburse Landlord for its actual reasonable costs and expenses in lieu of a fixed review fee.

   **C.    Payment to Landlord**.  Except as set forth below, if the aggregate consideration paid to a Tenant Party for a Transfer which is a sublease (other than a Permitted Transfer or a Permitted Sublease) exceeds that payable by Tenant under this Lease (prorated according to the transferred interest), Tenant shall pay Landlord 50% of such excess (after deducting therefrom reasonable leasing commissions and reasonable costs of tenant improvements paid to unaffiliated third parties in connection with the sublease, with proof of same provided to Landlord). Tenant shall pay Landlord for Landlord's share of any excess within 30 days after Tenant's receipt of such excess consideration. If any uncured event of default exists under this Lease, Landlord may require that all sublease payments be made directly to Landlord, in which case Tenant shall receive a credit against Rent in the amount of any payments received, but not to exceed the amount payable by Tenant under this Lease.

   **D.    Change in Control of Tenant**.  Except for a Permitted Transfer, if Tenant is a corporation, limited liability company, partnership, or similar entity, and if the entity which owns or controls a majority of the voting shares/rights in Tenant at any time sells or disposes of such majority of voting shares/rights, or changes its identity for any reason (including a merger, consolidation or reorganization), such change of ownership or control shall constitute a Transfer. The foregoing shall not apply so long as, both before and after the Transfer, Tenant is an entity whose outstanding stock is listed on a recognized U.S. securities exchange, or if at least 80% of its voting stock is owned by another entity, the voting stock of which is so listed; provided, however, that Tenant shall give Landlord written notice at least 30 days prior to the effective date of such change in ownership or control.

   **E.    No Consent Required**.  Tenant may assign its entire interest under this Lease to its Affiliate (defined below) or to a successor to Tenant by purchase, merger, consolidation or reorganization without the consent of Landlord, provided that all of the following conditions are satisfied in Landlord's reasonable discretion (a *"Permitted Transfer"*): (1) no uncured event of default exists under this Lease; (2) Tenant's successor shall own all or substantially all of the assets of Tenant; (3) such Affiliate or Tenant's successor shall have a net worth which is at least equal to Tenant's net worth at the date of this Lease; (4) no portion of the Building or Premises would likely become subject to additional or different Laws as a consequence of the proposed Transfer; (5) such Affiliate's or Tenant's successor's use of the Premises shall not conflict with the Permitted Use or any exclusive usage rights granted to any other tenant in the Building; (6) neither the Transfer nor any consideration payable to Landlord in connection therewith adversely affects any pension fund or ERISA qualification tests applicable to Landlord or its Affiliates; (7) such Affiliate or Tenant's successor is not and has not been involved in litigation with Landlord or any of Landlord's Affiliates; and (8) Tenant shall give Landlord written notice at least 30 days prior to the effective date of the proposed Transfer, along with all applicable documentation and other information necessary for Landlord to determine that the requirements of this **Section 11.E** have been satisfied, including if applicable, the qualification of such proposed transferee as an Affiliate of Tenant. Landlord shall notify Tenant within 21 days after receipt of such documentation if the requirements of this **Section 11.E** have not been satisfied. Provided that Tenant's notice, which includes the documentation and other information described in (8) above, includes a statement in bold, all capital letters that **"LANDLORD'S FAILURE TO RESPOND TO THIS NOTICE WITHIN 21 DAYS SHALL BE DEEMED APPROVAL"**, Landlord's failure to respond to such notice shall be deemed Landlord's agreement that the Transfer satisfies the requirements of this **Section 11.E** to be a Permitted Transfer. The term *"Affiliate"* means any person or entity controlling, controlled by or under common control with Tenant or Landlord, as applicable, and with respect to Tenant, any entity controlled by James D. Dondero. If requested by Landlord, Tenant's Affiliate or successor shall sign a commercially reasonable form of assumption agreement.

   **F.    Permitted Subleases**.  Notwithstanding anything to the contrary set forth in this **Article 11**, Tenant may sublease the Premises, or any portion thereof, up to 15,000 rentable square feet in the aggregate, to its Affiliate or to any entity owned by funds managed by Tenant (a *"Portfolio Company"*) without the consent of Landlord, provided that all of the following conditions are satisfied in Landlord's reasonable discretion (a *"Permitted Sublease"*): (1) no uncured event of default exists under this Lease; (2) no portion of the Building or Premises would likely become subject to additional or different Laws as a consequence of the proposed sublease; (3) such Affiliate's or Portfolio Company's use of the Premises shall not conflict with the Permitted Use or any exclusive usage rights granted to any other tenant in the Building; (4) neither the sublease nor



any consideration payable to Landlord in connection therewith adversely affects any pension fund or ERISA qualification tests applicable to Landlord or its Affiliates; (5) such Affiliate or Portfolio Company is not and has not been involved in litigation with Landlord or any of Landlord's Affiliates within the past 2 years; and (6) Tenant shall give Landlord written notice at least 30 days prior to the effective date of the proposed sublease, along with all applicable documentation and other information necessary for Landlord to determine that the requirements of this **Section 11.F** have been satisfied, including the qualification of such proposed transferee as an *Affiliate of Tenant* or a Portfolio Company. Landlord shall notify Tenant within 15 days after receipt of such documentation if the requirements of this **Section 11.F** have not been satisfied. Provided that Tenant's notice, which includes the documentation and other information described in (6) above, includes a statement in bold, all capital letters that **"LANDLORD'S FAILURE TO RESPOND TO THIS NOTICE WITHIN 15 DAYS SHALL BE DEEMED APPROVAL"**, Landlord's failure to respond to such notice shall be deemed Landlord's agreement that the sublease satisfies the requirements of this **Section 11.F** to be a Permitted Sublease.

12.     **Liens.** Tenant shall not permit mechanic's or other liens to be placed upon the Property, Premises or Tenant's leasehold interest in connection with any work or service done or purportedly done by or for the benefit of Tenant (other than work performed by, or at the direction of, Landlord). If a lien is so placed, Tenant shall, within 30 days of notice from Landlord of the filing of the lien, fully discharge the lien by settling the claim which resulted in the lien or by bonding or insuring over the lien in the manner prescribed by the applicable lien Law. If Tenant fails to discharge the lien within said 30 day period, then, in addition to any other right or remedy of Landlord, Landlord may bond or insure over the lien or otherwise discharge the lien. Tenant shall, within 30 days after receipt of an invoice from Landlord, reimburse Landlord for any amount paid by Landlord, including reasonable attorneys' fees, to bond or insure over the lien or discharge the lien.

13.     **Indemnity.** Subject to **Article 15**, Tenant shall hold Landlord, its trustees, Affiliates, subsidiaries, members, principals, beneficiaries, partners, officers, directors, shareholders, employees, Mortgagee(s) (defined in **Article 25**) and agents (including the manager of the Property) (collectively, *"Landlord Parties"*) harmless from, and indemnify and defend such parties against, all liabilities, obligations, damages, penalties, claims, actions, costs, charges and expenses, including reasonable attorneys' fees and other professional fees that may be imposed upon, incurred by or asserted against any of such indemnified parties (each a *"Claim"* and collectively *"Claims"*) that arise out of or in connection with any damage or injury occurring in the Premises or in any other portion of the Property leased or licensed by Tenant from time to time, except to the extent caused by the gross negligence or willful misconduct of a Landlord Party. Provided the Named Additional Insureds (as defined in **Section 14.A** below) are properly named as additional insureds in the policies required to be carried under this Lease, and except as otherwise expressly provided in this Lease, the indemnity set forth in the preceding sentence shall be limited to the greater of (A) $5,000,000, and (B) the aggregate amount of general/umbrella liability insurance actually carried by Tenant. Subject to **Section 9.B** and **Articles 15** and **20**, Landlord shall hold Tenant, its trustees, members, principals, beneficiaries, partners, officers, directors, shareholders, employees and agents (collectively, *"Tenant Parties"*) harmless from, and indemnify and defend such parties against, all Claims that arise out of or in connection with any damage or injury occurring in or on the Property (excluding the Premises and other portions of the Property leased or licensed by Tenant), except to the extent caused by the gross negligence or willful misconduct of a Tenant Party, to the same extent the Tenant Parties would have been covered had they been named as additional insureds on the commercial general liability insurance policy required to be carried by Landlord under this Lease. The indemnity set forth in the preceding sentence shall be limited to the amount of $5,000,000.

14.     **Insurance.**

    A.     **Tenant's Insurance.** Tenant shall maintain the following insurance (*"Tenant's Insurance"*), at its sole cost and expense: (1) commercial general liability insurance applicable to the Premises and its appurtenances providing, on an occurrence basis, a per occurrence limit of no less than $1,000,000; (2) causes of loss-special form (formerly "all risk") property insurance covering all leasehold improvements and Tenant's trade fixtures, equipment, furniture and other personal property within the Premises (*"Tenant's Property"*) in the amount of the full replacement cost thereof; (3) business income (formerly "business interruption") insurance written on an actual loss sustained form or with sufficient limits to address reasonably anticipated business interruption losses; (4) business automobile liability insurance to cover all owned, hired and nonowned automobiles owned or operated by Tenant providing a minimum combined single limit of $1,000,000; (5) workers' compensation insurance as required by the state in which the Premises is



located and in amounts as may be required by applicable statute (provided, however, if no workers' compensation insurance is statutorily required, Tenant shall carry workers' compensation insurance in a minimum amount of $500,000); (6) employer's liability insurance in an amount of at least $500,000 per occurrence; and (7) umbrella liability insurance that follows form in excess of the limits specified in (1), (4) and (6) above, of no less than $4,000,000 per occurrence and in the aggregate. Any company underwriting any of Tenant's Insurance shall have, according to *A.M. Best Insurance Guide*, a Best's rating of not less than A- and a Financial Size Category of not less than VIII. All commercial general liability, business automobile liability and umbrella liability insurance policies shall name Landlord (or any successor), Landlord's property manager, Landlord's Mortgagee (if any), and other reasonable designees of Landlord as the interest of such designees shall appear (collectively, the "*Named Additional Insureds*"), as "additional insureds" and shall be primary with Landlord's policy being secondary with respect to the Premises and noncontributory. All policies of Tenant's Insurance shall contain endorsements that the insurer(s) shall endeavor to give, and Tenant shall give, Landlord and its designees at least 30 days' advance written notice of any change, cancellation, termination or lapse of insurance. Tenant shall provide Landlord with a certificate of insurance and all required endorsements evidencing Tenant's Insurance prior to the earlier to occur of the Commencement Date or the date Tenant is provided access to the Premises for any reason, and upon renewals at least 10 days prior to the expiration of the insurance coverage. All of Tenant's Insurance policies, endorsements and certificates will be on forms and with deductibles and self-insured retention, if any, reasonably acceptable to Landlord. The limits of Tenant's insurance shall not limit Tenant's liability under this Lease. If Tenant fails to maintain the insurance required in this **Section 14.A**, or to provide to Landlord evidence of the same when required herein, and such failure continues for a period of 5 Business Days after written notice from Landlord, such failure shall be deemed to be a Time Sensitive Default.

      **B.**    **Landlord's Insurance**. Landlord shall maintain: (1) commercial general liability insurance applicable to the Property which provides, on an occurrence basis, a minimum combined single limit of no less than $5,000,000 (coverage in excess of $1,000,000 may be provided by way of an umbrella/excess liability policy); and (2) causes of loss-special form (formerly "all risk") property insurance on the Building in the amount of the replacement cost thereof, as reasonably estimated by Landlord. The foregoing insurance and any other insurance carried by Landlord may be effected by a policy or policies of blanket insurance and shall be for the sole benefit of Landlord and under Landlord's sole control. Consequently, Tenant shall have no right or claim to any proceeds thereof or any other rights thereunder.

15.    **Mutual Waiver of Subrogation**. Notwithstanding anything in this Lease to the contrary, Tenant waives, and shall cause its insurance carrier(s) and any party claiming through or under such carrier(s), by way of subrogation or otherwise, to waive any and all rights of recovery, Claim, action or causes of action against all Landlord Parties for any loss or damage to Tenant's business, any loss of use of the Premises, and any loss, theft or damage to Tenant's Property (including Tenant's automobiles or the contents thereof), **INCLUDING ALL RIGHTS (BY WAY OF SUBROGATION OR OTHERWISE) OF RECOVERY, CLAIMS, ACTIONS OR CAUSES OF ACTION ARISING OUT OF THE NEGLIGENCE OF ANY LANDLORD PARTY**, which loss or damage is (or would have been, had the insurance required by this Lease been maintained) covered by insurance. In addition, Landlord shall cause its insurance carrier(s) and any other party claiming through or under such carrier(s), by way of subrogation or otherwise, to waive any and all rights of recovery, Claim, action or causes of action against all Tenant Parties for any loss of or damage to or loss of use of the Building, the Property, any additions or improvements to the Building or the Property, or any contents thereof, **INCLUDING ALL RIGHTS (BY WAY OF SUBROGATION OR OTHERWISE) OF RECOVERY, CLAIMS, ACTIONS OR CAUSES OF ACTION ARISING OUT OF THE NEGLIGENCE OF ANY TENANT PARTY,** which loss or damage is (or would have been, had the insurance required by this Lease been maintained) covered by insurance. In addition, Landlord and Tenant each hereby waive any right of subrogation and right of recovery or cause of action for injury including death or disease to respective employees of either as covered by Worker's Compensation (or which would have been covered if Tenant or Landlord as the case may be, was carrying Worker's Compensation insurance as required by applicable Law).

16.    **Casualty Damage**.

      **A.**    **Repair or Termination by Landlord**. If all or any part of the Premises are damaged by fire or other casualty, Tenant shall immediately notify Landlord in writing. Landlord shall have the right to terminate this Lease if: (1) the Building shall be damaged so that, in Landlord's judgment, substantial alteration or reconstruction of the Building shall be required (whether or not



the Premises have been damaged) and Landlord elects not to restore the Building; (2) Landlord is not permitted by Law to rebuild the Building in substantially the same form as existed before the fire or casualty; (3) the Premises have been materially damaged and there is less than 2 years of the Term remaining on the date of the casualty and Tenant does not exercise any remaining option to renew this Lease within 30 days thereafter; (4) any Mortgagee requires that the insurance proceeds be applied to the payment of the mortgage debt and (a) Landlord does not have the right under its loan agreement to require that such proceeds be made available for the repair or reconstruction of the Building, and (b) Landlord elects not to restore the Building; or (5) an uninsured loss of the Building occurs notwithstanding Landlord's compliance with **Section 14.B** above and Landlord elects not to restore the Building. Landlord may exercise its right to terminate this Lease by notifying Tenant in writing within 90 days after the date of the casualty. If Landlord does not terminate this Lease under this **Section 16.A**, Landlord shall commence and proceed with reasonable diligence to repair and restore the Building to substantially the same condition as existed immediately prior to the date of damage and to restore the Premises to a shell condition with all Building systems serving the Premises being restored. Tenant shall be responsible for the restoration of all leasehold improvements to the Premises, at Tenant's cost, to the same condition as existed immediately prior to the date of damage. However, in no event shall Landlord be required to spend more than the insurance proceeds received by Landlord. Notwithstanding the foregoing, if Landlord elects to *repair and restore the Property, Landlord* will reconstruct the Building and Building systems, but not the leasehold improvements existing in the Premises as of the date of damage, even though the cost thereof shall exceed the insurance proceeds received by Landlord. To the extent Tenant's parking rights described in **Exhibit E** attached to this Lease are damaged by any fire or other casualty, Landlord will either (i) replace such parking damaged by the casualty, or (ii) provide Tenant with reasonable alternative parking in a manner as near as reasonably possible to the parking rights granted to Tenant under **Exhibit E** if restoring such original parking area is not reasonably possible.

     **B.**   **Timing for Repair; Termination by Either Party**. If all or any portion of the Premises is damaged as a result of fire or other casualty, or access thereto or occupancy thereof is not permitted (including without limitation failure of elevator service if the Premises is above the fifth floor), Landlord shall, within 60 days after the date of the damage, cause an architect or general contractor selected by Landlord to provide Landlord and Tenant with a written estimate of the amount of time required to substantially complete the repair and restoration of the Premises, using standard working methods (*"**Completion Estimate**"*). If the Completion Estimate indicates that the Premises cannot be made tenantable within 240 days from the date of damage, then regardless of anything in **Section 16.A** above to the contrary, either party shall have the right to terminate this Lease by giving written notice to the other of such election within 20 days after receipt of the Completion Estimate. Tenant, however, shall not have the right to terminate this Lease if the fire or casualty was caused by the gross negligence or intentional misconduct of any of the Tenant Parties. If neither party terminates this Lease under this **Section 16.B**, then Landlord shall repair and restore the Premises in accordance with, and subject to the limitations of, **Section 16.A**. If neither Landlord nor Tenant have the right to terminate this Lease or elect not to terminate this Lease pursuant to the foregoing, and if the time it takes to restore the Premises to substantially its condition immediately prior to the fire or other casualty, or to restore access thereto or occupancy thereof, exceeds 240 days after the date of such casualty, or the deadline set forth in the Completion Estimate, whichever is greater (provided that neither the 240 day period nor the deadline in the Completion Estimate shall be extended for events of Force Majeure), then Tenant shall have the option to terminate this Lease by giving Landlord 60 days prior written notice after the expiration of such 240 day period or the deadline set forth in the Completion Estimate, whichever is applicable provided that Landlord has not completed the restoration work during such additional 60-day period. Any Rent paid by Tenant for a period beyond the date of termination of this Lease or for any period of abatement shall be promptly refunded by Landlord to Tenant.

     **C.**   **Abatement**. In the event a material portion of the Premises is damaged as a result of a fire or other casualty, or access thereto or occupancy thereof is not permitted, the Rent shall abate for the portion of the Premises that is not usable by Tenant in the ordinary course of Tenant's business until substantial completion of the repairs and restoration required to be made by Landlord pursuant to **Section 16.A** plus a period not to exceed sixty (60) days for Tenant to perform such repairs as may be necessary to put the Premises in the condition it was in prior to the casualty. Tenant, however, shall not be entitled to such abatement if the fire or other casualty was caused by the gross negligence or intentional misconduct of any of the Tenant Parties. Landlord shall not be liable for any loss or damage to Tenant's Property or to the business of Tenant resulting in any way from the fire or other casualty or from the repair and restoration of the damage. Landlord and



Tenant hereby waive the provisions of any Law relating to the matters addressed in this Article, and agree that their respective rights for damage to or destruction of the Premises shall be those specifically provided in this Lease.

17. **Condemnation**. Either party may terminate this Lease if the whole or any material part of the Premises are taken or condemned for any public or quasi-public use under Law, by eminent domain or private purchase in lieu thereof (a "*Taking*"). Landlord shall also have the right to terminate this Lease if there is a Taking of any portion of the Building or Property which would leave the remainder of the Building unsuitable for use as an office building in a manner comparable to the Building's use prior to the Taking. In order to exercise its right to terminate this Lease under this **Article 17**, Landlord or Tenant, as the case may be, must provide written notice of termination to the other within 45 days after the terminating party first receives notice of the Taking. Any such termination shall be effective as of the date the physical taking of the Premises or the portion of the Building or Property occurs. If this Lease is not terminated, the Rentable Square Footage of the Building, the Rentable Square Footage of the Premises and Tenant's Pro Rata Share shall, if applicable, be appropriately adjusted by Landlord. In addition, all Rent and other charges payable hereunder for any portion of the Premises taken or condemned shall be abated during the unexpired Term effective when the physical taking of the portion of the Premises occurs. All compensation awarded for a Taking, or sale proceeds, shall be the property of Landlord, any right to receive compensation or proceeds being expressly waived by Tenant. However, Tenant may file a separate claim at its sole cost and expense for Tenant's Property (excluding above building standard leasehold improvements) and Tenant's reasonable relocation expenses, provided the filing of such claim does not diminish the award which would otherwise be receivable by Landlord.

18. **Events of Default**. Tenant shall be considered to be in default under this Lease upon the occurrence of any of the following events of default:

    **A.** Tenant's failure to pay when due all or any portion of the Rent ("*Monetary Default*"); provided that the first two (2) such failures during any consecutive 12 month period shall not be Monetary Defaults.

    **B.** Tenant's failure to perform any of the obligations of Tenant in the manner set forth in **Articles 14, 24** or **25** after expiration of any applicable cure periods (a "*Time Sensitive Default*") as set forth in this Lease which are specifically designated to be a Time Sensitive Default.

    **C.** Tenant's failure (other than a Monetary Default or a Time Sensitive Default) to comply with any term, provision or covenant of this Lease, if the failure is not cured within 30 days after written notice to Tenant. However, if Tenant's failure to comply cannot reasonably be cured within 30 days, Tenant shall be allowed additional time (not to exceed an additional 30 days) as is reasonably necessary to cure the failure so long as: (1) Tenant commences to cure the failure within the 30 day period following Landlord's initial written notice, and (2) Tenant diligently pursues a course of action that will cure the failure and bring Tenant back into compliance with this Lease. However, if Tenant's failure to comply creates a hazardous condition, the failure must be cured immediately upon notice to Tenant. In addition, if Landlord provides Tenant with notice of Tenant's failure to comply with the same specific term, provision or covenant of this Lease on more than 2 occasions during any 12 month period, Tenant's subsequent violation of the same term, provision or covenant shall, at Landlord's option, be deemed an incurable event of default by Tenant.

    **D.** Tenant or any Guarantor becomes insolvent, files a petition for protection under the U.S. Bankruptcy Code (or similar Law) or a petition is filed against Tenant or any Guarantor under such Laws and is not dismissed within 45 days after the date of such filing, makes a transfer in fraud of creditors or makes an assignment for the benefit of creditors, or admits in writing its inability to pay its debts when due.

    **E.** The leasehold estate is taken by process or operation of Law.

    **F.** In the case of any ground floor or retail tenant, Tenant does not take possession of, or abandons or vacates all or a substantial portion of the Premises.

    **G.** Tenant is in default beyond any notice and cure period under any other lease or agreement with Landlord in connection with the Property (excluding any agreements which are exhibits to this Lease).



19. **Remedies**.

A. **Landlord's Remedies**. Upon any default, Landlord shall have the right without notice or demand (except as provided in **Article 18**) to pursue any of its rights and remedies at Law or in equity, including any one or more of the following remedies:

(1) Terminate this Lease;

(2) Re-enter the Premises, change locks, alter security devices and lock out Tenant or terminate Tenant's right of possession of the Premises without terminating this Lease, and without complying with applicable Law, the benefits of which are waived by Tenant to the fullest extent permitted by applicable Law;

(3) Remove and store, at Tenant's expense, all the property in the Premises using such lawful force as may be necessary;

(4) Cure such event of default for Tenant at Tenant's expense (plus a 10% administrative fee);

(5) Withhold or suspend payment of sums Landlord would otherwise be obligated to pay to Tenant under this Lease or any other agreement;

(6) Require all future payments to be made by cashier's check, money order or wire transfer after the first time any check is returned for insufficient funds, or the second time any sum due hereunder is more than 5 days late; provided, however, if Tenant timely pays all Rent payments for a period of 12 consecutive months thereafter, Tenant shall once again be entitled to make Rent payments by check until any check is returned for insufficient funds;

(7) Apply any Security Deposit as permitted under this Lease; and/or

(8) Recover such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable Law, including any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of events would be likely to result therefrom.

B. **Measure of Damages**.

(1) *Calculation*. If Landlord either terminates this Lease or terminates Tenant's right to possession of the Premises, Tenant shall immediately surrender and vacate the Premises and pay Landlord on demand: (a) all Rent accrued through the end of the month in which the termination becomes effective; (b) interest on all unpaid Rent from the date due at a rate equal to the lesser of 18% per annum or the highest interest rate permitted by applicable Law; (c) all expenses reasonably incurred by Landlord in enforcing its rights and remedies under this Lease, including all reasonable legal expenses; (d) Costs of Reletting (defined below); and (e) all Landlord's Rental Damages (defined below). In the event that Landlord relets the Premises for an amount greater than the Rent due during the Term, Tenant shall not receive a credit for any such excess; however the excess shall be applied against the Costs of Reletting and other damages which Landlord is entitled to recover under this Lease.

(2) *Definitions*. *"Costs of Reletting"* shall include commercially reasonable costs, losses and expenses incurred by Landlord in reletting all or any portion of the Premises including, without limitation, the cost of removing and storing Tenant's furniture, trade fixtures, equipment, inventory or other property, repairing and/or demolishing the Premises, removing and/or replacing Tenant's signage and other fixtures, making the Premises ready for a new tenant, including the cost of advertising, commissions, architectural fees, legal fees and leasehold improvements, and any allowances and/or concessions provided by Landlord. *"Landlord's Rental Damages"* shall mean the total Rent which Landlord would have received under this Lease (had Tenant made all such Lease payments as required) for the remainder of the Term minus the fair rental value of the Premises for the same period, or, if the Premises are relet, the actual rental value (not to exceed the Rent due during the Term), both discounted to present value at the Prime Rate (defined below) in effect upon the date of determination. For purposes hereof, the *"Prime Rate"* shall be the per annum interest rate publicly announced by a federally insured bank selected by Landlord in the state in which the Building is located as such bank's prime or base rate.



(3) *Landlord's Alternative Calculation.* Because future market rental rates, and the costs or time involved in reletting may be uncertain and difficult to determine at the time of Tenant's default, the parties agree that Landlord may in its sole discretion elect to recover, in lieu of calculating damages under **Section 19.B(1)(d)** and **(e)** above (but without limiting damages under **Section 19.B(1)(a) and (b)** above), the sum of (a) the unamortized portion of all costs, losses and expenses incurred by Landlord as a result of entering into the Lease, and (b) 25% of the total nominal Rent which Landlord would have received under this Lease (had Tenant made all such Rent payments as required) for the remainder of the Term, which the parties agree is a fair and reasonable estimate of Landlord's Rental Damages and the Costs of Reletting.

**C.** **Tenant Not Relieved from Liabilities.** Unless expressly provided in this Lease, the repossession or re-entering of all or any part of the Premises or Landlord's exercise of any other remedy either as provided herein or otherwise, shall not relieve Tenant of its liabilities and obligations under this Lease including, without limitation, Tenant's liability for the payment of Rent or any other damages Landlord may incur by reason of Tenant's breach. In addition, Tenant shall not be relieved of its liabilities under this Lease, nor be entitled to any damages hereunder, based upon minor or immaterial errors in the exercise of Landlord's remedies. No right or remedy of Landlord shall be exclusive of any other right or remedy. Each right and remedy shall be cumulative and in addition to any other right and remedy now or subsequently available to Landlord at Law or in equity. If Tenant fails to pay any amount when due hereunder (after the expiration of any applicable cure period), Landlord shall be entitled to receive interest on any unpaid item of Rent from the date initially due (without regard to any applicable grace period) at a rate equal to the lesser of 18% per annum or the highest rate permitted by Law. In addition, if Tenant fails to pay any item or installment of Rent when due (after the expiration of any applicable cure period), Tenant shall pay Landlord a one-time administrative fee equal to 5% of the past due Rent (except that the administrative fee for the first such late payment in any consecutive 12 month period shall be waived so long as such payment is made within 5 Business Days after receipt of notice of non-payment from Landlord). However, in no event shall the charges permitted under this **Section 19.C** or elsewhere in this Lease, to the extent they are considered interest under applicable Law, exceed the maximum lawful rate of interest. If any payment by Tenant of an amount deemed to be interest results in Tenant having paid any interest in excess of that permitted by Law, then it is the express intent of Landlord and Tenant that all such excess amounts theretofore collected by Landlord be credited against the other amounts owing by Tenant under this Lease. Receipt by Landlord of Tenant's keys to the Premises shall not constitute an acceptance or surrender of the Premises. **NOTWITHSTANDING ANY OTHER PROVISION OF THIS LEASE TO THE CONTRARY, TENANT SHALL HOLD LANDLORD PARTIES HARMLESS FROM AND INDEMNIFY AND DEFEND SUCH PARTIES AGAINST, ALL CLAIMS THAT ARISE OUT OF OR IN CONNECTION WITH A BREACH OF THIS LEASE, SPECIFICALLY INCLUDING ANY VIOLATION OF APPLICABLE LAWS OR CONTAMINATION (DEFINED IN ARTICLE 30) CAUSED BY A TENANT PARTY.**

**D.** **Mitigation of Damages.** Upon termination of Tenant's right to possess the Premises, Landlord shall, only to the extent required by Law, use objectively reasonable efforts to mitigate damages by reletting the Premises. Landlord shall not be deemed to have failed to do so if Landlord refuses to lease the Premises to a prospective new tenant with respect to whom Landlord would be entitled to withhold its consent pursuant to **Section 11.A**, or who (1) is a parent, subsidiary or other Affiliate of Tenant; (2) is not acceptable to any Mortgagee of Landlord; (3) requires improvements to the Premises to be made at Landlord's expense in excess of amounts then quoted by Landlord for tenant improvement allowances in the Building; or (4) is unwilling to accept lease terms then proposed by Landlord, including: (a) leasing for a shorter or longer term than remains under this Lease; (b) re-configuring or combining the Premises with other space, (c) taking all or only a part of the Premises; and/or (d) changing the use of the Premises. Notwithstanding Landlord's duty to mitigate its damages as provided herein, Landlord shall not be obligated (i) to give any priority to reletting Tenant's space in connection with its leasing of space in the Building or any complex of which the Building is a part, or (ii) to accept below market rental rates for the Premises or any rate that would negatively impact the market rates for the Building. To the extent that Landlord is required by applicable Law to mitigate damages, Tenant must plead and prove by clear and convincing evidence that Landlord failed to so mitigate in accordance with the provisions of this **Section 19.D**, and that such failure resulted in an avoidable and quantifiable detriment to Tenant.

**E.** **Landlord's Lien.** Landlord hereby *waives all contractual, statutory and constitutional liens upon Tenant's property that it may otherwise be entitled to by virtue of this Lease.*



F. **Landlord Defaults and Tenant Remedies**. Except as otherwise provided in this Lease and specifically subject to **Section 3.C** and **Article 20**, if Landlord fails in the performance of any of Landlord's obligations under this Lease and such failure continues for 30 days after Landlord's receipt of written notice thereof from Tenant (or an additional reasonable time after such receipt if (i) such failure cannot be cured within such 30 day period, and (ii) Landlord commences curing such failure within such 30 day period and thereafter diligently pursues the curing of such failure), then Tenant shall be entitled to exercise any remedies that Tenant may have at law or in equity.

20. **Limitation of Liability**. Notwithstanding anything to the contrary contained in this Lease, the liability of Landlord (and of any successor Landlord) to Tenant (or any person or entity claiming by, through or under Tenant) shall be limited to the interest of Landlord in the Property (including net rents, net sales proceeds, and insurance and condemnation proceeds therefrom that are not paid to Landlord's Mortgagee). Tenant shall look solely to Landlord's interest in the Property for the recovery of any judgment or award against Landlord. No Landlord Party shall be personally liable for any judgment or deficiency. Before filing suit for an alleged default by Landlord, Tenant shall give Landlord and the Mortgagee(s) (defined in **Article 25**) whom Tenant has been notified hold Mortgages (defined in **Article 25**) on the Property, Building or Premises, notice and reasonable time to cure the alleged default. Tenant hereby waives all claims against all Landlord Parties for consequential, special or punitive damages allegedly or actually suffered by any Tenant Parties, including lost profits and business interruption. Likewise, Landlord hereby waives all Claims against all Tenant Parties for consequential, special or punitive damages allegedly or actually suffered by any Landlord Parties, including lost profits and business interruption, except as expressly provided in **Article 24** below.

21. **No Waiver**. Neither party's failure to declare a default immediately upon its occurrence or delay in taking action for a default shall constitute a waiver of the default, nor shall it constitute an estoppel. Neither party's failure to enforce its rights for a default shall constitute a waiver of that party's rights regarding any subsequent default.

22. **Tenant's Right to Possession**. Provided Tenant pays the Rent and fully performs all of its other covenants and agreements under this Lease, Tenant shall have the right to occupy the Premises without hindrance from Landlord or any person lawfully claiming through Landlord, subject to the terms of this Lease, all Mortgages, insurance requirements and applicable Law. This covenant and all other covenants of Landlord shall be binding upon Landlord and its successors only during its or their respective periods of ownership of the Building, and shall not be a personal covenant of any Landlord Parties.

23. **Relocation**. Intentionally deleted.

24. **Holding Over**. Except for any permitted occupancy by Tenant under **Article 29**, if Tenant or any party claiming by, through or under Tenant fails to surrender the Premises at the expiration or earlier termination of this Lease, the continued occupancy of the Premises shall be that of a tenancy at sufferance. Tenant shall pay an amount (on a per month basis without reduction for partial months during the holdover) equal to the greater of: (A) 200% of the Base Rent and 100% of Tenant's Pro Rata Share of Excess Operating Expenses and Tenant's Pro Rata Share of Excess Tax Expenses due for the period immediately preceding the holdover; or (B) 200% of the fair market gross rental for the Premises; provided, however, so long as no other uncured event of default exists under the Lease, for the first 60 days of any such holdover Tenant shall pay only 150% of such greater amount. Tenant shall otherwise continue to be subject to all of Tenant's obligations under this Lease. No holdover by Tenant or payment by Tenant after the expiration or early termination of this Lease shall be construed to extend the Term or prevent Landlord from immediate recovery of possession of the Premises by summary proceedings or otherwise. In addition to the payment of the amounts provided above, if Landlord is unable to deliver possession of the Premises to a new tenant, or to perform improvements for a new tenant, as a result of Tenant's holdover and Tenant fails to vacate the Premises within 30 days after Landlord notifies Tenant of Landlord's inability to deliver possession, or perform improvements, such failure shall constitute a Time Sensitive Default hereunder; and notwithstanding any other provision of this Lease to the contrary, TENANT SHALL BE LIABLE TO LANDLORD FOR, AND SHALL PROTECT LANDLORD FROM AND INDEMNIFY AND DEFEND LANDLORD AGAINST, ALL LOSSES AND DAMAGES, INCLUDING ANY CLAIMS MADE BY ANY SUCCEEDING TENANT RESULTING FROM SUCH FAILURE TO VACATE, AND ANY CONSEQUENTIAL DAMAGES THAT LANDLORD SUFFERS FROM THE HOLDOVER.



25.     **Subordination to Mortgages; Estoppel Certificate**. Tenant accepts this Lease subject and subordinate to any mortgage(s), deed(s) of trust, ground lease(s) or other lien(s) now or subsequently affecting the Premises, the Building or the Property, and to renewals, modifications, refinancings and extensions thereof (collectively, a "*Mortgage*"). The party having the benefit of a Mortgage shall be referred to as a "*Mortgagee*." This clause shall be self-operative, but within 30 days after receipt of a request from a Mortgagee, Tenant shall execute a commercially reasonable subordination agreement in favor of the Mortgagee. In lieu of having the Mortgage be superior to this Lease, a Mortgagee shall have the right at any time to subordinate its Mortgage to this Lease. If requested by a successor-in-interest to all or a part of Landlord's interest in this Lease, Tenant shall, without charge, attorn to the successor-in-interest. Tenant shall, within 15 days after receipt of a written request from Landlord, execute and deliver an estoppel certificate to those parties as are reasonably requested by Landlord (including a Mortgagee or prospective purchaser). The estoppel certificate shall include a statement certifying that this Lease is unmodified (except as identified in the estoppel certificate) and in full force and effect, describing the dates to which Rent and other charges have been paid, representing that, to the best of Tenant's knowledge, there is no default (or stating with specificity the nature of the alleged default) and certifying other factual matters with respect to this Lease that may reasonably be requested. Tenant's failure to provide any estoppel certificate within the 15 day period specified above, and the continuation of such failure for a period of 5 days after Landlord delivers a second written notice requesting same, shall constitute a Time Sensitive Default under this Lease. Within 30 days after the execution of this Lease, Landlord shall obtain a non-disturbance agreement from Landlord's Mortgagee on such Mortgagee's standard form, a copy of which is attached hereto as **Exhibit F**. In addition, Landlord shall, obtain a non-disturbance agreement for the benefit of Tenant from any future Mortgagee of the Property, on such Mortgagee's form. Landlord shall pay the standard fee charged by Landlord's Mortgagee for obtaining a non-disturbance agreement on such Mortgagee's standard form. However, any additional cost charged by Landlord's Mortgagee for the negotiation of the terms of such agreement shall be paid by Tenant.

26.     **Attorneys' Fees**. If either party institutes a suit against the other for violation of or to enforce any covenant or condition of this Lease, or if either party intervenes in any suit in which the other is a party to enforce or protect its interest or rights, the prevailing party shall be entitled to all of its costs and expenses, including reasonable attorneys' fees. The term "prevailing party" is defined to mean the party who obtains a determination of wrongful conduct by the other party regardless of whether actual damages are awarded.

27.     **Notice**. If a demand, request, approval, consent or notice (collectively, a "*notice*") shall or may be given to either party by the other, the notice shall be in writing and delivered by hand or sent by registered or certified mail with return receipt requested, or sent by overnight or same day courier service, or sent by facsimile, at the party's respective Notice Address(es) set forth in **Article 1**, except that if Tenant has vacated the Premises (or if the Notice Address for Tenant is other than the Premises, and Tenant has vacated such address) without providing Landlord a new Notice Address, Landlord may serve notice in any manner described in this Article or in any other manner permitted by Law. Each notice shall be deemed to have been received or given on the earlier to occur of actual delivery (which, in the case of delivery by facsimile, shall be deemed to occur at the time of delivery indicated on the electronic confirmation of the facsimile if before 5:00 p.m. Dallas, Texas time on Business Days, and if after 5:00 p.m. Dallas, Texas time on Business Days, or any time on Holidays or on weekends, then at 8:00 a.m. on the next Business Day) or the date on which delivery is first refused, or, if Tenant has vacated the Premises or the other Notice Address of Tenant without providing a new Notice Address, 3 days after notice is deposited in the U.S. mail or with a courier service in the manner described above. Either party may, at any time, change its Notice Address by giving the other party written notice of the new address in the manner described in this Article.

28.     **Reserved Rights**. This Lease does not grant any rights to light or air over or about the Building. Landlord excepts and reserves exclusively to itself the use of: (A) roofs (except as otherwise set forth herein), (B) telephone, electrical and janitorial closets, (C) equipment rooms, Building risers or similar areas that are used by Landlord for the provision of Building services, (D) rights to the land and improvements below the floor of the Premises, (E) the improvements and air rights above the Premises, (F) the improvements and air rights outside the demising walls of the Premises, (G) the areas within the Premises used for the installation of utility lines and other installations serving occupants of the Building, and (H) any other areas designated from time to time by Landlord as service areas of the Building. Tenant shall not have the right to install or operate any equipment producing radio frequencies, electrical or electromagnetic output or other signals, noise or



emissions in or from the Building without the prior written consent of Landlord. To the extent permitted by applicable Law, Landlord reserves the right to restrict and control the use of such equipment. Landlord has the right to change the Building's name or address. Landlord also has the right to make such other changes to the Property and Building as Landlord deems appropriate; provided that except as may be required by applicable Laws, Landlord shall not be entitled to make alterations to Premises. Additionally, except as may be required by applicable Laws, Landlord shall not be entitled to make alterations to other portions of the Building that materially and adversely impair Tenant's rights or materially and adversely increases Tenant's obligations under this Lease, nor shall Landlord be entitled to make any changes to the Common Areas that materially and adversely impact direct access to the Premises or materially and adversely impact Tenant's specifically designated parking areas provided for in **Exhibit E** of this Lease. Landlord shall also have the right (but not the obligation) to temporarily close the Building if Landlord reasonably determines that there is an imminent danger of significant damage to the Building or of personal injury to Landlord's employees or the occupants of the Building. The circumstances under which Landlord may temporarily close the Building shall include, without limitation, electrical interruptions, hurricanes and civil disturbances. A closure of the Building under such circumstances shall not constitute a constructive eviction nor entitle Tenant to an abatement or reduction of Rent, except as otherwise provided in **Section 7.B**.

29. **Surrender of Premises**. All improvements made to the Premises after the Delivery Date (collectively, "*Leasehold Improvements*") shall be owned by Tenant during the Term of this Lease but shall become the property of Landlord upon the expiration or earlier termination of the Lease or Tenant's right to possession, and shall remain upon the Premises without compensation to Tenant. At the expiration or earlier termination of this Lease or Tenant's right of possession, Tenant shall remove Tenant's Removable Property (defined below) from the Premises, and quit and surrender the Premises to Landlord, broom clean, and in good order, condition and repair, ordinary wear and tear excepted. As used herein, the term "*Tenant's Removable Property*" shall mean: (A) any Leasehold Improvements that are installed by or for the benefit of Tenant and, in Landlord's reasonable judgment, are of a nature that would require removal and repair costs that are materially in excess of the removal and repair costs associated with standard office improvements, such as, without limitation, raised floor, UPS systems, back-up generators, and supplemental HVAC units ("*Special Installations*"); and (B) Tenant's personal property; provided that Tenant's Removable Property shall not include, and Tenant shall not be obligated to remove from the Premises or the Property any conduit, wiring or cabling installed by Tenant in the Building shafts, risers, or conduits. Notwithstanding the foregoing, Landlord may, in Landlord's sole discretion and at no cost to Landlord, require Tenant to leave any of its Special Installations in the Premises. Landlord shall notify Tenant in writing at the time of Landlord's approval of Tenant's Plans (defined in the Work Letter), or at the time of approval of plans submitted to Landlord by Tenant in connection with Alterations, whether any Leasehold Improvements to be constructed in the Premises constitute Special Installations. If Tenant fails to remove any of Tenant's Removable Property (other than Special Installations which Landlord has designated to remain in the Premises) within 2 days after the termination of this Lease or of Tenant's right to possession, Landlord, at Tenant's sole cost and expense, shall be entitled (but not obligated) to remove and store Tenant's Removable Property. Landlord shall not be responsible for the value, preservation or safekeeping of Tenant's Removable Property. Tenant shall pay Landlord, upon demand, the expenses and storage charges incurred for Tenant's Removable Property. To the fullest extent permitted by applicable Law, any unused portion of Tenant's Security Deposit may be applied to offset Landlord's costs set forth in the preceding sentence. In addition, if Tenant fails to remove Tenant's Removable Property from the Premises or storage, as the case may be, within 30 days after written notice, Landlord may deem all or any part of Tenant's Removable Property to be abandoned, and title to Tenant's Removable Property (except with respect to any Hazardous Material [defined in **Article 30**]) shall be deemed to be immediately vested in Landlord. Except for Special Installations designated by Landlord to remain in the Premises, Tenant's Removable Property shall be removed by Tenant before the Expiration Date; provided that upon Landlord's prior written consent (which must be requested by Tenant at least 30 days in advance of the Expiration Date and which shall not be unreasonably withheld), Tenant may remain in the Premises for up to 5 days after the Expiration Date for the sole purpose of removing Tenant's Removable Property. Tenant's possession of the Premises for such purpose shall be subject to all of the terms and conditions of this Lease, including the obligation to pay Base Rent and Tenant's Pro Rata Share of Excess Operating Expenses on a per diem basis at the rate in effect for the last month of the Term. In the event this Lease is terminated prior to the Expiration Date, Tenant's Removable Property (except for Special Installations designated by Landlord to remain in the Premises) shall be removed by Tenant on or before 10 days after such



earlier date of termination. Tenant shall repair damage caused by the installation or removal of Tenant's Removable Property.

30. **Hazardous Materials**.

A. **Restrictions**. No Hazardous Material (defined below) (except for *de minimis* quantities of household cleaning products and office supplies used in the ordinary course of Tenant's business at the Premises and that are used, kept and disposed of in compliance with Laws) shall be brought upon, used, kept or disposed of in or about the Premises or the Property by any Tenant Parties or any of Tenant's transferees, contractors or licensees without Landlord's prior written consent, which consent may be withheld in Landlord's sole and absolute discretion. Tenant's request for such consent shall include a representation and warranty by Tenant that the Hazardous Material in question (1) is necessary in the ordinary course of Tenant's business, and (2) shall be used, kept and disposed of in compliance with all Laws.

B. **Remediation**. Tenant shall, at its expense, use commercially reasonable efforts to monitor the Premises for the presence of Hazardous Materials or conditions which may reasonably give rise to Contamination (defined below) and promptly notify Landlord if it suspects Contamination in the Premises. Any remediation of Contamination caused by a Tenant Party or its contractors or invitees which is required by Law or which is deemed necessary by Landlord, in Landlord's opinion, shall be performed by Landlord and Tenant shall reimburse Landlord for the cost thereof, plus a 10% administrative fee. In no event will Tenant be responsible for any Hazardous Materials or Contamination existing in the Property as of the Effective Date of this Lease, nor any Hazardous Materials or Contamination subsequently found in the Property, unless the Hazardous Materials and/or Contamination was caused or introduced by a Tenant Party. In the event that Hazardous Materials are discovered in the Premises during the performance of the Tenant Work, and such Hazardous Materials were not caused or introduced by a Tenant Party (including being specified in the Construction Documents prepared by Tenant's architect, Landlord will cause such Hazardous Materials to be remediated, encapsulated, or otherwise handled, at Landlord's expense, within the time frames and parameters required by Law.

C. **Definitions**. For purposes of this Article 30, a "*Hazardous Material*" is any substance the presence of which requires, or may hereafter require, notification, investigation or remediation under any Laws or which is now or hereafter defined, listed or regulated by any governmental authority as a "hazardous waste", "extremely hazardous waste", "solid waste", "toxic substance", "hazardous substance", "hazardous material" or "regulated substance", or otherwise regulated under any Laws. "*Contamination*" means the existence or any release or disposal of a Hazardous Material or biological or organic contaminant, including any such contaminant which adversely impacts air quality, such as mold, fungi or other bacterial agents, in, on, under, at or from the Premises, the Building or the Property which may result in any liability, fine, use restriction, cost recovery lien, remediation requirement, or other government or private party action or imposition affecting any Landlord Party. For purposes of this Lease, claims arising from Contamination shall include diminution in value, restrictions on use, adverse impact on leasing space, and all costs of site investigation, remediation, removal and restoration work, including response costs under CERCLA and similar statutes.

D. **Reports, Surveys and Acceptance of Premises**. All current surveys or reports prepared for the Property regarding the presence of Hazardous Materials (if any) in the Building are available for inspection by Tenant in the office of the property manager upon execution of Landlord's standard form of confidentiality agreement. With respect to Hazardous Materials, Tenant hereby (1) accepts full responsibility for reviewing any such surveys and reports and satisfying itself prior to the execution of this Lease as to the acceptability of the Premises under **Section 3.B** above, and (2) acknowledges and agrees that this provision satisfies all notice requirements under applicable Law, provided that the foregoing shall not relieve Landlord of its obligations under **Section 30.B**. In the event Tenant performs or causes to be performed any test on or within the Premises for the purpose of determining the presence of a Hazardous Material, Tenant shall obtain Landlord's prior written consent and use a vendor approved by Landlord for such testing. In addition, Tenant shall provide to Landlord a copy of such test within 10 days of Tenant's receipt.

31. **Miscellaneous**.

A. **Governing Law; Jurisdiction and Venue; Severability; Paragraph Headings**. This Lease and the rights and obligations of the parties shall be interpreted, construed and enforced



in accordance with the Laws of the state in which the Property is located. All obligations under this Lease are performable in the county or other jurisdiction where the Property is located, which shall be venue for all legal actions. If any term or provision of this Lease shall be invalid or unenforceable, then such term or provision shall be automatically reformed to the extent necessary to render such term or provision enforceable, without the necessity of execution of any amendment or new document. The remainder of this Lease shall not be affected, and each remaining and reformed provision of this Lease shall be valid and enforced to the fullest extent permitted by Law. The headings and titles to the Articles and Sections of this Lease are for convenience only and shall have no effect on the interpretation of any part of this Lease. The words "include", "including" and similar words will not be construed restrictively to limit or exclude other items not listed.

      **B.**    **Recording**. Tenant shall not record this Lease or any memorandum without Landlord's prior written consent.

      **C.**    **Force Majeure**. Whenever a period of time is prescribed for the taking of an action by Landlord or Tenant, the period of time for the performance of such action shall be extended by the number of days that the performance is actually delayed due to strikes, acts of God, shortages of labor or materials, war, terrorist attacks (including bio-chemical attacks), civil disturbances and other causes beyond the reasonable control of the performing party ("*Force Majeure*"). However, events of Force Majeure shall not extend any period of time for the payment of Rent or other sums payable by either party or any period of time for the written exercise of an option or right by either party.

      **D.**    **Transferability; Release of Landlord**. Landlord shall have the right to transfer and assign, in whole or in part, all of its rights and obligations under this Lease and in the Building and/or Property, and upon such transfer Landlord shall be released from any further obligations arising hereunder after the date of the transfer, provided the successor in interest assumes in writing all obligations of Landlord hereunder from and after the date of such transfer, and Tenant agrees to look solely to the successor in interest of Landlord for the performance of such obligations, provided the successor in interest assumes in writing all obligations of Landlord hereunder from and after the date of such transfer.

      **E.**    **Brokers**. Tenant represents that it has dealt directly with and only with Transwestern (whose commission shall be paid by Landlord pursuant to a separate written agreement) in connection with this Lease. TENANT AND LANDLORD SHALL EACH INDEMNIFY THE OTHER AGAINST ALL COSTS, EXPENSES, ATTORNEYS' FEES, LIENS AND OTHER LIABILITY FOR COMMISSIONS OR OTHER COMPENSATION CLAIMED BY ANY BROKER OR AGENT CLAIMING THE SAME BY, THROUGH OR UNDER THE INDEMNIFYING PARTY, OTHER THAN THE BROKER(S) SPECIFICALLY IDENTIFIED ABOVE.

      **F.**    **Authority; Joint and Several Liability**. Landlord covenants, warrants and represents that each individual executing, attesting and/or delivering this Lease on behalf of Landlord is authorized to do so on behalf of Landlord, this Lease is binding upon and enforceable against Landlord, and Landlord is duly organized and legally existing in the state of its organization and is qualified to do business in the state in which the Premises are located. Similarly, Tenant covenants, warrants and represents that each individual executing, attesting and/or delivering this Lease on behalf of Tenant is authorized to do so on behalf of Tenant, this Lease is binding upon and enforceable against Tenant; and Tenant is duly organized and legally existing in the state of its organization and is qualified to do business in the state in which the Premises are located. If there is more than one Tenant, or if Tenant is comprised of more than one party or entity, the obligations imposed upon Tenant shall be joint and several obligations of all the parties and entities. Notices, payments and agreements given or made by, with or to any one person or entity shall be deemed to have been given or made by, with and to all of them.

      **G.**    **Time is of the Essence; Relationship; Successors and Assigns**. Time is of the essence with respect to each party's performance of its respective obligations and the exercise of any expansion, renewal or extension rights or other options granted to Tenant. This Lease shall create only the relationship of landlord and tenant between the parties, and not a partnership, joint venture or any other relationship. This Lease and the covenants and conditions in this Lease shall inure only to the benefit of and be binding only upon Landlord and Tenant and their permitted successors and assigns.

      **H.**    **Survival of Obligations**. The expiration of the Term, whether by lapse of time or otherwise, shall not relieve either party of any obligations which accrued prior to or which may



continue to accrue after the expiration or early termination of this Lease. Without limiting the scope of the prior sentence, it is agreed that Tenant's and Landlord's obligations under **Sections 4.A, 4.B, and 4.C,** and under **Articles 8 and 13,** and Tenant's obligations under **Articles 6, 12, 19, 24, 29 and 30** shall survive the expiration or early termination of this Lease.

   **I.     Binding Effect**. Landlord has delivered a copy of this Lease to Tenant for Tenant's review only, and the delivery of it does not constitute an offer to Tenant or an option. This Lease shall not be effective against any party hereto until an original copy of this Lease has been signed by such party and delivered to the other party.

   **J.     Full Agreement; Amendments**. This Lease contains the parties' entire agreement regarding the subject matter hereof. All understandings, discussions, and agreements previously made between the parties, written or oral, are superseded by this Lease, and neither party is relying upon any warranty, statement or representation not contained in this Lease. This Lease may be modified only by a written agreement signed by Landlord and Tenant. The exhibits and riders attached hereto are incorporated herein and made a part of this Lease for all purposes.

   **K.     Tax Waiver**. Tenant waives all rights pursuant to all Laws to contest any taxes or other levies or protest appraised values or receive notice of reappraisal regarding the Property (including Landlord's personalty), irrespective of whether Landlord contests same.

   **L.     Prohibited Persons and Transactions**. Tenant represents to Landlord: (i) that neither Tenant nor any person or entity that directly owns a 10% or greater equity interest in it, nor any of its officers, directors or managing members, is a person or entity with whom U.S. persons or entities are restricted from doing business under *regulations of the Office of Foreign Asset Control* (*"OFAC"*) of the Department of the Treasury (including those named on OFAC's Specially Designated and Blocked Persons List) or under Executive Order 13224 (the *"Executive Order"*) signed on September 24, 2001, and entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism", or other Laws (each such person, a *"Prohibited Person"*), (ii) that Tenant's activities do not violate the International Money Laundering Abatement and Anti-Terrorist Financing Act of 2001, or the regulations or orders promulgated thereunder, as they may be amended from time to time, or other anti-money laundering Laws (the *"Anti-Money Laundering Laws"*), and (iii) that throughout the Term of this Lease Tenant shall comply with the Executive Order and with the Anti-Money Laundering Laws. Landlord represents to Tenant: (i) that neither Landlord nor any person or entity that directly owns a 10% or greater equity interest in it, nor any of its officers, directors or managing members, is a Prohibited Person, and (ii) that throughout the Term of this Lease, Landlord shall comply with the Executive Order and with the Anti-Money Laundering Laws, if, when and to the extent Landlord may become subject to the Anti-Money Laundering Laws.

   **M.     Method of Calculation**. Tenant is knowledgeable and experienced in commercial transactions and does hereby acknowledge and agree that the provisions of this Lease for determining charges and amounts payable by Tenant are commercially reasonable and valid and constitute satisfactory methods for determining such charges and amounts as required by Section 93.012 of the Texas Property Code. **Tenant further voluntarily and knowingly waives (to the fullest extent permitted by applicable Law) all rights and benefits of Tenant under such section, as it now exists or as it may be hereafter amended or succeeded.**

   **N.     Waiver of Consumer Rights**. **Tenant hereby waives all its rights under the Texas Deceptive Trade Practices - Consumer Protection Act, Section 17.41 et seq. of the Texas Business and Commerce Code, a law that gives consumers special rights and protections. After consultation with an attorney of Tenant's own selection, Tenant voluntarily adopts this waiver.**

   **O.     ERISA Matters**. Tenant represents that as of the Effective Date (1) neither Tenant nor any entity controlling or controlled by Tenant owns a 5% or more interest (within the meaning of Prohibited Transaction Class Exemption 84-14) in JPMorgan Chase Bank, N.A. (*"JPMorgan"*) or, to Tenant's actual knowledge (after having used reasonable efforts to ascertain the accuracy of such information), any of JPMorgan's affiliates, and (2) neither JPMorgan, nor, to Tenant's actual knowledge (after having used reasonable efforts to ascertain the accuracy of such information), any of its affiliates, owns a 5% or more interest in Tenant or any entity controlling or controlled by Tenant.



**P.** **Telecommunications License Agreement.** Landlord and Tenant agree that, subject to availability, Tenant shall have the right to request space available for Tenant on the roof of the Building for the installation of certain telecommunications equipment (the "*Telecommunications Equipment*"), and riser space for the installation of fiber to connect to the Premises, subject to the provisions of this **Section 31.P.** In no event shall any equipment extend beyond fifty (50) inches from the deck of the roof. In the event that no such space is available at the time of Tenant's request, Landlord will have no obligation to make any such space available. In the event that such space is available at the time of Tenant's request, the following provisions shall apply with respect to any such Telecommunications Equipment. The quantity, type, size, electrical and transmission capacity, location and other variables regarding such Telecommunications Equipment shall be subject to Landlord's prior approval. The Telecommunications Equipment shall be installed in a good and workmanlike manner, in compliance with all Laws, and at Tenant's sole cost and expense, and Tenant shall be responsible for all upkeep and replacement of the same, all at Tenant's sole cost and expense. Without limiting the generality of the foregoing, Tenant shall execute Landlord's then current form of license agreement concerning use of the area so designated for installation of the Telecommunications Equipment, and Landlord expressly reserves the right to charge Tenant monthly license fees for the use of any such space at Landlord's then quoted rates. Currently, the standard license fees range from $250.00 per month to $1,250.00 per month depending on the size of the equipment and the amount of roof space required. Landlord will not charge for Tenant for the riser space used to connect fiber to the Premises.

**Q.** **Expansion Terms.** Any additional space in the Building leased by Tenant prior to the first anniversary of the Commencement Date of this Lease, shall be on the then-existing terms and conditions applicable to the initial Premises under this Lease (including any escalations in Base Rent and any remaining abatement of Base Rent), except that the Reimbursement Allowance will be prorated to reflect the remaining Term.

**R.** **Club Memberships.** If Tenant desires to purchase one or more memberships in The Crescent® Club or The Spa at The Crescent® (each being a "*Club*") during the Term, Landlord will pay the initiation fees directly to the applicable Club(s) in connection with up to 14 Club memberships. Other than the initiation fees, all monthly dues and charges (including applicable state and local taxes) incurred by Tenant or any other person in connection with the use of such memberships shall be solely the responsibility of Tenant. Use of the foregoing memberships shall be subject to the Club rules and regulations and the continued existence of the applicable Club.

**S.** **Credit Enhancements.** In order to guarantee the obligations of Tenant under this Lease, Tenant shall deliver to Landlord, on or before December 31, 2011 (unless otherwise specified below), at Tenant's option, one of the following:

(i) A fully executed copy of an extension agreement for Tenant's loan revolver facility;

(ii) The amount of $462,642.20 in cash, which shall be paid to Landlord on or before May 2, 2011, and which amount represents approximately 50% of Landlord's out-of-pocket costs associated with this Lease. Provided no event of default exists under the Lease beyond any applicable notice and cure period, Landlord will credit the $462,642.20 against the Base Rent next due and owing under the Lease after the expiration of the initial four month Base Rent abatement provided in **Section 1.D** and, if applicable, the 17.5 month Base Rent abatement in lieu of the Reimbursement Allowance;

(iii) an irrevocable, unconditional letter of credit in the amount of $1,500,000.00 (the "*Initial Letter of Credit*") for a term expiring no sooner than December 31, 2012. Tenant's failure to deliver the Initial Letter of Credit on or before December 31, 2011 shall be a Time Sensitive Default. The Initial Letter of Credit and any Replacement Letter of Credit, may hereinafter sometimes be referred to generally as a "*Letter of Credit*". The Letter of Credit shall be addressed to Landlord (and/or any other beneficiary designated by Landlord), issued in a form and substance similar to that attached hereto as **Exhibit G** and by a financial institution approved by Landlord, in Landlord's sole discretion, and shall be transferable one or more times by Landlord without the consent of Tenant. Landlord hereby approves of NexBank, SSB as the issuer of the Letter of Credit. Landlord shall have the continuous right throughout the Term to revoke its approval of the financial institution issuing the Letter of Credit and require Tenant to obtain a replacement Letter of Credit from a financial institution approved by Landlord, in Landlord's sole discretion, within 10 Business Days after written notice by Landlord. In addition, in the event the financial institution providing the



Letter of Credit is ever placed in receivership, becomes insolvent or is closed by the FDIC, Tenant shall as soon as reasonably practicable and without notice from Landlord, obtain a replacement Letter of Credit from a financial institution approved by Landlord, in Landlord's sole discretion. In the event that the term of the Letter of Credit obtained by Tenant is less than the term required in this subparagraph, Tenant shall provide to Landlord, thirty (30) days prior to the expiration of the term of the Letter of Credit, a substitute Letter of Credit, in form, scope, and substance satisfactory to Landlord, all in its sole discretion, for the duration of the required term. Tenant agrees to pay upon Landlord's request, any and all costs or fees charged in connection with the Letter of Credit that arise due to: (1) Landlord's sale or transfer of all or any portion of the Building or Property; or (2) the addition, deletion, or modification of any beneficiary under the Letter of Credit. The bank issuing the Letter of Credit shall have banking offices in the city in which the Building is located, at which offices the Letter of Credit may be drawn. Tenant agrees that upon any default by Tenant under the terms and provisions of this Lease, including the failure of Tenant to timely deliver any replacement Letter of Credit (which failure shall constitute a Time Sensitive Default hereunder), Landlord shall have the right to receive payment under any Letter of Credit of the entire amount of such Letter of Credit at such time, and any such amounts received by Landlord shall be held by Landlord and applied in accordance with this Lease in the same manner as a Security Deposit. No later than thirty (30) days prior to the expiration of the Initial Letter of Credit, Tenant shall furnish to Landlord, a replacement letter of credit in an amount equal to $1,000,000.00, identical in form and terms (except as to amount) to the Initial Letter of Credit, but expiring no sooner than one (1) year after the expiration date of the Initial Letter of Credit (the "*First Replacement Letter of Credit*"). No later than thirty (30) days prior to the expiration of the First Replacement Letter of Credit, Tenant shall furnish to Landlord, a replacement letter of credit in an amount equal to $500,000.00, identical in form and terms (except as to amount) to the Initial Letter of Credit, but expiring no sooner than one (1) year after the expiration date of the First Replacement Letter of Credit (the "*Second Replacement Letter of Credit*"). Each replacement Letter of Credit shall be issued by a financial institution approved by Landlord, in Landlord's sole discretion. Subject to the provisions set forth below, Landlord shall at all times during the Term, hold a Letter of Credit in the amounts described above. Notwithstanding the foregoing, provided that between the Effective Date and the date of expiration of the Second Replacement Letter of Credit no uncured event of default shall have occurred hereunder, at the time of expiration of the Second Replacement Letter of Credit Tenant shall not be required to replace the Second Replacement Letter of Credit. If, at any time that any Letter of Credit is in effect as provided herein there shall occur an event of default (which remains uncured after the expiration of any applicable notice and cure periods), Tenant shall have no further right to reduce the amounts of the Letters of Credit as set forth above, but shall replace each Letter of Credit with a replacement Letter of Credit in an amount equal to the amount of the Letter of Credit in effect at the time of the default, which Letter of Credit shall remain in effect for the entire Term of the Lease, and any further extensions thereof. Any reduction in the Letter of Credit amount permitted above or any extension of the term of the Letter of Credit shall be accomplished by Tenant providing Landlord with either a substitute Letter of Credit in the reduced amount or extended term or an amendment to the existing Letter of Credit, as may be the policy of the issuer; or

(iv)    in the event Tenant elects to fund the Tenant Work entirely, a Letter of Credit in the amount of $462,642.20, subject to the same terms and conditions as provided in subparagraph (iii) above except that the term of such Letter of Credit shall expire no sooner than May 31, 2014, subject to extension due to the occurrence of an event of default (which remains uncured after the expiration of any applicable notice and cure periods) as provided in subparagraph (iii) above.

[Remainder of page intentionally left blank]

Landlord and Tenant have executed this Lease as of the Effective Date specified below Landlord's signature.

**LANDLORD**:

CRESCENT TC INVESTORS, L.P.,
a Delaware limited partnership

By:    Crescent TCI GP, LLC,
       a Delaware limited liability company,
       its general partner

By:    _____
Name:  John L. Zogg, Jr.
Title: Executive Vice President Leasing

Effective Date: 4 / 20 _____, 2011

**TENANT**:

HIGHLAND CAPITAL MANAGEMENT, L.P.,
a Delaware limited partnership

By:    Strand Advisors, Inc., its general partner

By:    _____
Name:  Jim Dondero
Title: President

## EXHIBIT A-1

### OUTLINE AND LOCATION OF PREMISES



# SUITE 700
## 200 & 300 CRESCENT COURT
## 43,515 RSF

## EXHIBIT A-2

## LEGAL DESCRIPTION OF PROPERTY

Being a tract or parcel of land situated in the City of Dallas, Dallas County, Texas and being all of Lot 1A, Block 2/948 of The Crescent, an addition to the City of Dallas as recorded in Volume 83134, Page 5645 of the Deed Records of Dallas County, Texas, and being more particularly described as follows:

BEGINNING at a 1/2" iron rod with yellow plastic cap stamped "RLG" found for corner at the intersection of the northeasterly cut-off line between the easterly right-of-way line of Cedar Springs Road (65 feet from center line) and the northerly right-of-way line of Pearl Street;

THENCE North 03°42'10" West along said easterly line of Cedar Springs Road a distance of 197.34 feet to an iron rod and an angle point;

THENCE in an easterly and northeasterly direction leaving said easterly line of Cedar Springs Road and along a curve to the left whose chord bears North 65°23'58" East having a radius of 767.38 feet, a central angle of 44°02'24" and an arc length of 589.84 feet to a point for corner in the southwesterly line of Maple Avenue;

THENCE South 45°30'10" East along the said southwesterly line of Maple Avenue, a distance of 252.08 feet to an iron rod for corner at the intersection of said southwesterly line of Maple Avenue and the southwesterly cut-off line between the said southwesterly line of Maple Avenue and the westerly right-of-way line of McKinney Avenue (variable width);

THENCE South 15°10'40" East along the said cut-off line a distance of 17.26 feet to an 1/2" iron rod with yellow plastic cap stamped "RLG" found for corner in the said westerly right-of-way line of McKinney Avenue;

THENCE South 15°08'50" West continuing along said westerly line of McKinney Avenue a distance of 280.77 feet to a chisel mark for corner at the intersection of the northwesterly cut-off line between the westerly line of McKinney Avenue and the northerly right-of-way line of Pearl Street;

THENCE South 65°29'45" West along said cut-off line a distance of 12.76 feet to a chisel mark for corner at the intersection of said cut-off line and the northerly line of Pearl Street (100 feet wide at this point) and the beginning of a curve to the left;

THENCE in a northwesterly direction along said northerly line of Pearl Street and along said curve to the left whose chord bears North 76°43'23" West, having a radius of 586.11 feet, a central angle of 24°09'34" and an arc length of 247.14 feet to a 1/2" iron rod with yellow plastic cap stamped "RLG" found at the end of said curve to the left;

THENCE North 88°48'10" West continuing along said northerly line of Pearl Street a distance of 54.66 feet to a 1/2" iron rod with yellow plastic cap stamped "RLG" found at the beginning of a curve to the left;

THENCE continuing along said northerly line of Pearl Street in a westerly and southwesterly direction along said curve to the left, having a radius of 597.32 feet, a central angle of 08°37'00" and an arc length of 89.83 feet to a chisel mark at the end of said curve to the left;

THENCE South 82°34'50" West continuing along said northerly line of Pearl Street a distance of 218.03 feet to a chisel mark for corner at the intersection of the northeasterly cut-off line between said northerly line of Pearl Street (96 feet wide at this point) and said easterly line of Cedar Springs Road;

THENCE North 50°33'40" West along said cut-off line a distance of 13.68 feet to the POINT OF BEGINNING and containing 193,582 square feet or 4.4440 acres, more or less.



## EXHIBIT B

## RULES AND REGULATIONS

1.      Sidewalks, halls, passageways, exits, entrances, elevators, escalators, stairways, and other common areas shall not be obstructed by Tenant or used by Tenant for any purpose other than for ingress to and egress from the Premises. Landlord shall in all cases retain the right to control and prevent access thereto by all persons whose presence, in the judgment of the Landlord, shall be prejudicial to the safety, character, reputation or interests of the Building, including its tenants and occupants. Nothing shall be swept or thrown into the corridors, halls, elevators or stairways.

2.      No sign, placard, picture, name, advertisement or notice (a "Sign") visible from the exterior of the Premises shall be inscribed, painted, affixed, installed or displayed by Tenant without the prior written consent of Landlord. Absent any such consent, Landlord shall have the right to remove any Sign without notice to and at the expense of Tenant. Any such consent shall be deemed to relate to only the particular Sign so consented to by Landlord and shall not be construed as dispensing with the necessity of obtaining the prior written consent of Landlord with respect to any other Sign. All approved Signs or lettering on doors and walls shall be inscribed, painted, affixed, installed, printed or otherwise displayed, at the expense of Tenant, by a person approved by Landlord and in a manner or style acceptable to Landlord.

3.      No curtains, draperies, blinds, shutters, shades, screens or other coverings, awnings, hangings or decorations shall be installed or used in connection with any window or door of the Premises without the prior written consent of Landlord, except for normal and customary interior decorations to the Premises not visible from the exterior of the Building. In any event, any such items shall be installed so as to face the interior surface of the standard window treatment established by Landlord and shall in no way be visible from the exterior of the Building. No articles shall be placed or kept on the windowsills or any terraces so as to be visible from the exterior of the Building. No articles shall be placed against glass partitions or doors which might appear unsightly from the outside the Premises. No sashes, sash doors, skylights, windows or doors that reflect or admit light or air into the halls, passageways or other public places in the Building shall be covered or obstructed by Tenant without the prior written consent of Landlord.

4.      Tenant shall not employ or permit any person(s) other than the janitorial contractor of the Landlord to clean the Premises without the prior written consent of Landlord. In the event of any permitted person being employed by Tenant to do janitorial work, while in the Building and outside of the Premises such person(s) shall be subject to the control and direction of the Building's management office (not as an agent or servant of Landlord); however, Tenant shall in all cases be responsible for the acts of such person(s).

5.      Tenant and its employees, upon daily departure, shall cause (a) the doors of the Premises to be securely locked, and (b) to the extent practical shut off all faucets, valves and other control apparatuses to water and other resources, so as to prevent waste or damage. With the exception of permitting ingress and egress to the Building, Tenant shall keep doors(s) to the Building's corridors on multi-tenant floors of the Building closed at all times.

6.      Tenant shall not waste electricity, water, heating, air-conditioning or any other resources and shall cooperate fully with Landlord to assure the most effective utilization of such Building resources. Tenant shall not attempt to adjust any Building resource controls other than any thermostats specifically installed for Tenant's use. No heating, air-conditioning unit or other similar apparatus shall be installed or used by Tenant without the prior written consent of Landlord.

7.      Tenant shall not alter any lock or access device, nor shall Tenant install any new or additional lock, access device or bolt on any door of the Premises without the prior written consent of Landlord. In the event of any permitted installation, Tenant shall in each case furnish Landlord with a key for any such lock or device.

8.      Landlord shall furnish Tenant, at no cost to Tenant, two (2) keys to the Premises. Tenant shall pay a reasonable charge for any additional keys furnished by Landlord. Landlord will provide Building one access card to each employee officing at the Premises free of charge. Tenant shall pay Landlord's standard fee for any replacement access cards. Tenant shall not make or have made copies of any keys or card-keys furnished by Landlord. Tenant shall, upon the expiration or



sooner termination of its tenancy, deliver to Landlord all of such keys and card-keys, together with any of the keys relating to the Premises including, but not limited to, all keys to any vaults or safes which remain on the Premises. In the event of the loss of any keys furnished by Landlord to Tenant, Tenant shall pay Landlord (a) the cost thereof (less any deposit paid by Tenant) or (b) the cost of changing the subject lock(s) or access device(s) if Landlord deems it necessary to make such change.

9.      The toilet rooms, toilets, urinals, washbowls, plumbing fixtures and any other Building apparatus shall not be used for any purpose other than that for which they were constructed; and no foreign substance of any kind shall be thrown therein. Any loss, cost or expense relating to any breakage, stoppage or damage resulting from any violation of this rule shall be borne by Tenant.

10.     Tenant shall not permit any cooking on the Premises (except that private, non commercial use by Tenant and its employees of Underwriters' Laboratory-approved equipment for the preparation of coffee, tea, hot chocolate and similar beverages, and for the heating of foods, shall be permitted; provided that such equipment is used in accordance with all applicable federal, state and city laws, codes, ordinances, rules and regulations). The Premises shall not be used for lodging or sleeping purposes. If the Premises becomes infested with vermin or pests, Tenant, at its sole cost and expense, shall have such pests exterminated by Landlord approved exterminators.

11.     All tenants will refer any contractors, contractor's representatives and installation technicians rendering any services to them to Landlord for Landlord's supervision and approval prior to commencement of any work.

12.     Tenant shall not install any radio or television antenna, loudspeaker or other device on the  roof or exterior of the Building without Landlord's prior consent. Tenant shall not interfere with any radio or television broadcast or reception from within the Building.

13.     The freight elevator shall be available for use by Tenant, subject to reasonable scheduling by Landlord. No furniture, freight, equipment, materials, supplies, packages, merchandise or other property shall be received in the Building or carried up or down the elevators, except between such hours and in such elevators designated by Landlord. Any deliveries, removals or relocations of large, bulky or voluminous items, such as furniture, office machinery and equipment, etc., can only be made after obtaining approval from the Landlord, which approval shall not be unreasonably withheld or delayed. The tenants assume all risks of damage to articles moved and injury to persons engaged in such movement, including without limitation damages and injury to equipment, property and personnel of Landlord resulting from acts in connection with such delivery, removal or relocation. All damages done to the Building by the installation or removal of any tenant's property or caused by any tenant's property within the Building, shall be repaired at the expense of such tenant.

14.     Tenant shall not place a load upon any floor of the Premises which exceeds the load per square foot the floor was designed to carry, or any load allowed by law. Landlord shall have the right to prescribe the weight, size and position of safes, any library or other shelving, furniture or other heavy equipment brought into the Building, and Tenant shall bear the reasonable fees of any structural engineer hired by Landlord in connection therewith. Safes or other heavy objects shall, if considered necessary to Landlord, stand on wood strips of such thickness as determined by Landlord to be necessary to properly distribute the weight thereof. Landlord shall not be responsible for loss of or damage to any such safes or other heavy objects for any cause; all damages done to the Building by moving or maintaining of any such items shall be repaired at the expense of Tenant.

15.     No machinery other than the kind considered usual and standard for general office use shall be operated by any tenant in its leased area without the prior written consent of Landlord. Business machines or mechanical equipment of Tenant, which causes noise or vibration that may be transmitted to the structure of the Building or any space therein to such a degree objectionable to Landlord or any other tenants or occupants of the Building, shall be placed and maintained by Tenant, at Tenant's expense, on vibration eliminators or other devices sufficient to eliminate such noise or vibration. Tenant shall bear the reasonable fees of any acoustical or structural engineer hired by Landlord in connection therewith.

16.     Tenant shall not mark, drive nails or screws, or drill into the partitions, ceilings or floors of the Premises or in any way deface the Premises except for normal and customary interior decorations.



17. Tenant shall not install, maintain or operate on the Premises any vending machine without the prior written consent of Landlord, which consent shall not be unreasonably withheld so long as the vending machine is for the sole use of Tenant's employees.

18. No animals (other than those assisting the handicapped), including reptiles, birds, fish (or aquariums), or other non-human, non-plant living things or organic Christmas décor of any kind shall be allowed in the Building.

19. There shall not be used in the Building any hand trucks, except those equipped with rubber tires and side guards, or any other material handling equipment, except as approved in advance in writing by Landlord. No scooters, roller skates, roller blades, bicycles, and no other vehicles of any kind shall be brought into and operated within the Property. Bicycles and vehicles may only be parked in areas designated for such purpose.

20. Tenant shall store all of its trash and garbage within the interior of the Premises. No materials shall be placed in the Building's trash boxes or receptacles if such material is of such a nature that it may not be disposed of in the ordinary and customary manner, or if such an act would violate any law or ordinance governing such removal and disposal.

21. Canvassing, soliciting, distributing of handbills or any other written material, and peddling in the Building are prohibited; Tenant shall cooperate to prevent such activity. Tenant shall not engage in office-to-office solicitation of business from other tenants or occupants of the Building.

22. Landlord reserves the right to exclude or to expel from the Building any person who, in Landlord's judgment, is intoxicated or under the influence of liquor or drugs, or who is in violation of any of these Rules and Regulations.

23. Tenant shall comply with all safety, fire protection and evacuation procedures and regulations established by Landlord or any governmental agency. No firearms or weapons of any kind are allowed within the Premises or the Building.

24. No tenant shall invite to its premises, or permit the visit of, persons in such numbers or under such conditions to interfere with the use and enjoyment of any of the plazas, entrances, corridors, escalators, elevators, and other facilities of the Building by other tenants.

25. Landlord will not be responsible for lost or stolen personal property, money or jewelry from any tenant's Premises or public or common areas regardless of whether such loss occurs when the area is locked against entry or not, except as may be otherwise set forth in the Lease. Tenant assumes any and all responsibility for protecting the Premises from theft, robbery and pilferage by taking necessary steps including, but not limited to, keeping doors locked and other means of entry to the Premises closed.

26. Any additional or special requirements of Tenant shall be attended to only upon application to the office of the Building by an authorized individual. Employees of Landlord shall not perform any work or do anything outside of the regular duties unless under special instructions from Landlord. No such employees shall admit any person (Tenant or otherwise) to any office without specific instructions from Landlord.

27. Landlord may waive any of these Rules and Regulations for the benefit of any particular tenant or occupant of the Building in any particular instance; however, no such waiver by Landlord shall be construed as a waiver of these Rules and Regulations with respect to any other tenant or occupant thereof. Any revised rules and regulations, when made and written notice thereof is given to a tenant, shall be binding upon it in like manner as if originally herein prescribed.

28. Landlord shall provide and maintain an alphabetical directory board for all tenants (including Tenant and Tenant's third party occupants) in the main lobby of the Building.

29. All mail chutes located in the Building shall be available for use by Landlord and all tenants of the Building according to the rules of the United States Postal Service.

These Rules and Regulations are provided as a general guideline. Please refer to your Lease Agreement for information specific to your tenancy.



**EXHIBIT C**

**COMMENCEMENT LETTER**

Re:     Office Lease dated ·_____, 2011 (the *"Lease"*) between CRESCENT TC
INVESTORS, L.P. (*"Landlord"*) and HIGHLAND CAPITAL MANAGEMENT, L.P.
(*"Tenant"*) for the Premises, the Rentable Square Footage of which is 43,515 square feet,
located on the 7th floor of The Crescent®. Unless otherwise specified, all capitalized terms
used herein shall have the same meanings as in the Lease.

Landlord and Tenant agree that:

Tenant has accepted possession of the Premises. The Premises are usable by Tenant as intended;
Landlord has no further obligation to perform any construction, and Tenant acknowledges that both
the Building and the Premises are satisfactory in all respects.

The Commencement Date of the Lease is _____, 2012.

The Expiration Date of the Lease is the last day of _____, _____.

Tenant's Address at the Premises after the Commencement Date is:

```
          _____
          _____
          _____
          Attention:_____
          Phone:_____
          Fax:_____
```

The Termination Fee as of the date hereof is $_____.

All other terms and conditions of the Lease are ratified and acknowledged to be unchanged.

        EXECUTED as of _____, 20__.

                              {ATTACH APPROPRIATE
                              SIGNATURES}

## EXHIBIT D

## WORK LETTER

    This *Work Letter is attached as an Exhibit to an Office Lease* (the *"Lease"*) between CRESCENT TC INVESTORS, L.P., as Landlord, and HIGHLAND CAPITAL MANAGEMENT, L.P., as Tenant, for the Premises, the Rentable Square Footage of which is 43,515 square feet, located on the 7th floor of the Building. Unless otherwise specified, all capitalized terms used in this Work Letter shall have the same meanings as in the Lease. In the event of any conflict between the Lease and this Work Letter, the latter shall control. Pursuant to the terms of the Property Management Agreement executed by Landlord and Crescent Property Services, Inc. (*"CPS"*), CPS has agreed to perform certain obligations as Landlord's agent and on Landlord's behalf, including the obligations set forth below.

    **1.    Construction.** Tenant agrees to construct leasehold improvements (the *"Tenant Work"*) in a good and workmanlike manner in and upon the Premises, at Tenant's sole cost and expense, in accordance with the following provisions. Prior to the commencement of the Tenant Work, Tenant shall submit to CPS for CPS's approval complete plans and specifications for the construction of the Tenant Work (*"Tenant's Plans"*). Within 10 days after receipt of Tenant's Plans, CPS shall review and either approve or disapprove Tenant's Plans, which approval shall not be unreasonably withheld. If CPS disapproves Tenant's Plans, or any portion thereof, CPS shall notify Tenant thereof and of the revisions CPS requires before CPS will approve Tenant's Plans and Tenant shall submit to CPS, for CPS's review and approval, plans and specifications incorporating the required revisions. The final plans and specifications approved by CPS are hereinafter referred to as the *"Approved Construction Documents"*. Tenant will employ experienced, licensed contractors, architects, engineers, subcontractors and other consultants, approved by CPS (which approval shall not be unreasonably withheld or delayed), to construct the Tenant Work and will require in the applicable contracts that such parties (a) carry insurance in such amounts and types of coverages as are reasonably required by Landlord, and (b) design and construct the Tenant Work in a good and workmanlike manner and in compliance with all Laws. Notwithstanding the immediately preceding sentence to the contrary, Tenant must employ subcontractors from CPS's approved subcontractor list for mechanical, electrical, plumbing and fire/life safety work. Unless otherwise agreed to in writing by CPS and Tenant, all work involved in the construction and installation of the Tenant Work shall be carried out by Tenant's contractor under the sole direction of Tenant, in compliance with all Building rules and regulations and in such a manner so as not to unreasonably interfere with or disturb the operations, business, use and enjoyment of the Property by other tenants in the Building or the structural calculations for imposed loads. Tenant shall obtain from its contractors and provide to CPS a list of all subcontractors providing labor or materials in connection with any portion of the Tenant Work prior to commencement of the Tenant Work. Tenant warrants that the design, construction and installation of the Tenant Work shall conform to the requirements of all applicable Laws, including building, plumbing and electrical codes and the requirements of any authority having jurisdiction over, or with respect to, such Tenant Work, failing which, Tenant shall cause the same to comply, at Tenant's sole cost and expense. Upon completion of the Tenant Work, Tenant shall provide CPS with electronic and as-built drawings, at no cost to CPS or Landlord.

    **2.    Costs.** Subject to the terms and conditions of this Paragraph 2, Landlord will provide Tenant with an allowance (the *"Reimbursement Allowance"*) to be applied towards the cost of constructing the Tenant Work.

    (A)    Landlord's obligation to reimburse Tenant for Tenant's construction of the Tenant Work shall be: (i) limited to actual costs incurred by Tenant in its construction of the Tenant Work; (ii) limited to an amount up to, but not exceeding, $47.50 multiplied by the Rentable Square Footage of the Premises; and (iii) conditioned upon Landlord's receipt of written notice (which notice shall be accompanied by invoices and documentation set forth in subparagraph 2(B) below) from Tenant that all Tenant Work has been completed and accepted by Tenant. The cost of (a) all space planning, design, consulting or review services and construction drawings, (b) extension of electrical wiring from Landlord's designated location(s) to the Premises, (c) purchasing and installing all building equipment for the Premises (including any submeters and other above building standard electrical equipment approved by CPS), (d) required metering, re-circuiting or re-wiring for metering, equipment rental, engineering design services, consulting services, studies, construction services, cost of billing and collections, (e) materials and labor, and (f) an asbestos survey of the Premises if required by applicable Law, shall all be included in the cost of the Tenant Work and may



be paid out of the Reimbursement Allowance, to the extent sufficient funds are available for such purpose. Tenant acknowledges that an asbestos survey will probably be required by applicable Law and that the time required for such asbestos surveys should be incorporated in Tenant's construction planning. Any reimbursement obligation of Landlord under this Work Letter shall be applied solely to the purposes specified above, as allocated, within 360 days after the Effective Date or be forfeited with no further obligation on the part of Landlord. Notwithstanding anything to the contrary contained in the foregoing, Tenant may elect to fund the Tenant Work and forego the entire Reimbursement Allowance in which event Tenant will receive an abatement against Base Rent for a period of 17.5 months commencing on May 1, 2012 and Landlord will have no obligation to pay the Reimbursement Allowance hereunder.

(B)     Landlord shall pay the Reimbursement Allowance to Tenant within thirty-one (31) days following Landlord's receipt of (i) third-party invoices for all costs incurred by Tenant in constructing and completing all Tenant Work; (ii) evidence that Tenant has paid the invoices for all such costs; and (iii) lien waivers from any contractor or supplier who has constructed or supplied materials for all Tenant Work. If the costs incurred by Tenant in constructing the Tenant Work exceed the Reimbursement Allowance, then Tenant shall pay all such excess costs and Tenant agrees to keep the Premises and the Property free from any liens arising out of the non-payment of such costs. In the event Tenant elects to fund the Tenant Work and take the Base Rent abatement in lieu of the Reimbursement Allowance, Tenant shall be required to submit to Landlord a copy of the contract with the general contractor and a final lien waiver from the general contractor upon the completion of the Tenant Work.

(C)     All installations and improvements now or hereafter placed in the Premises shall be for Tenant's account and at Tenant's cost. Tenant shall pay separately assessed ad valorem taxes thereon and increased insurance solely attributable thereto, which cost shall be payable by Tenant to Landlord as additional Rent within 30 days after receipt of an invoice therefor. Tenant's failure to pay such cost shall constitute an event of default under the Lease, subject to applicable notice and cure period.

3.     **ADA Compliance.** Landlord shall, as an Operating Expense, be responsible for ADA compliance for the core areas of the Building (including elevators, Common Areas and service areas), the Property's parking facilities, the Building standard restrooms located on the floors on which the Premises are located, and all points of access into the Property; provided that Operating Expenses shall not include any costs to bring any such areas into compliance with ADA or other applicable Laws in existence and applicable to the Property on the Effective Date. Tenant shall, at its expense, be responsible for ADA compliance in the Premises, including any restrooms other than the Building standard restrooms. The Building standard restrooms shall be the two (2) restrooms located in the core area of each floor of the Building. Notwithstanding the preceding sentence to the contrary, Landlord will deliver the Building standard restrooms in the Premises in compliance with ADA applicable to new construction without the benefit of any grandfathering provisions as of the Delivery Date and shall be responsible for any future ADA compliance in such restrooms as an Operating Expense. Neither Landlord nor CPS shall be responsible for determining whether Tenant is a public accommodation under ADA or whether the Approved Construction Documents comply with ADA requirements. Such determinations, if desired by Tenant, shall be the sole responsibility of Tenant. CPS's approval of the Approved Construction Documents shall not be deemed a statement of compliance with applicable Laws, nor of the accuracy, adequacy, appropriateness, functionality or quality of the improvements to be made according to the Approved Construction Documents.

4.     **Oversight and Coordination.** Construction of the Tenant Work shall be subject to oversight and coordination by CPS, but such oversight and coordination shall not subject CPS or Landlord to any liability to Tenant, Tenant's contractors or any other person. CPS has the right to inspect construction of the Tenant Work from time to time. Within 30 days following the date of invoice, which shall not be given until completion of the Tenant Work, Tenant shall, for oversight and coordination of the construction of the Tenant Work, pay Landlord a Construction Supervisory Fee equal to 1.5% of the aggregate contract price for the Tenant Work; provided, however, in no event shall the Construction Supervisory Fee exceed $29,350.00. Tenant's failure to pay such fee when due shall constitute an event of default under the Lease, subject to applicable notice and cure periods. Landlord and CPS approve of Tenant's use of Transwestern Project Management Services to oversee the Tenant Work on behalf of Tenant.



5. **Landlord's Base Building Work**. On or before the Outside Delivery Date , Landlord will, at its sole cost and expense, (a) repair or replace all damaged exterior window coverings, which are damaged at any time prior to the Delivery Date, and (b) remove the existing interior staircase between the 6th and 7th floor of the Building and seal the penetration located within the Premises (collectively, the "*Landlord Work*").

6. **Assumption of Risk and Waiver**. TENANT HEREBY ASSUMES ANY AND ALL RISKS INVOLVED WITH RESPECT TO THE TENANT WORK AND HEREBY RELEASES AND DISCHARGES CPS AND ALL LANDLORD PARTIES FROM ANY AND ALL LIABILITY OR LOSS, DAMAGE OR INJURY SUFFERED OR INCURRED BY TENANT OR THIRD PARTIES IN ANY WAY ARISING OUT OF OR IN CONNECTION WITH THE TENANT WORK.

7. **Tenant Changes**. At any time after the Approved Construction Documents are approved by CPS and thereafter throughout Tenant's prosecution of the Tenant Work, Tenant shall be permitted to direct changes in the Tenant Work (each a "*Tenant Change Order*") (it being agreed, however, that Tenant must obtain CPS's consent before prosecuting any Tenant Change Order that results in a charge of $2,500.00 or more (each, a "*Material Tenant Change Order*")). Within seven (7) days after its receipt of any proposed Material Tenant Change Order, CPS shall give its written approval thereto, which approval shall not be unreasonably withheld, or provide Tenant with reasonable specificity of CPS's objections thereto. Upon its receipt of any objections from CPS, Tenant, if it wishes to pursue such Material Tenant Change Order, shall submit such revisions or modifications to CPS. Within five (5) days following receipt by CPS of such revisions or modifications, CPS shall give its written approval thereto or shall request other revisions or modifications therein (but relating only to the extent Tenant has failed to comply with CPS's earlier requests). The preceding two sentences shall be implemented repeatedly until CPS gives its written approval to the Material Tenant Change Order in question. Once approved by CPS, a Material Tenant Change Order shall become part of the Approved Construction Documents and the work shown on such Material Tenant Change Order shall be part of the Tenant Work.

8. **Cooperation**. CPS and/or Landlord, if applicable, at Tenant's expense, shall reasonably cooperate with Tenant's efforts to obtain any permits, certificates or final approvals in connection with any portion of the Tenant Work including, without limitation, executing and delivering any documents or instruments that CPS or Landlord is required to sign and which are reasonably required by Tenant in connection therewith. Except for the Construction Supervisory Fee, Landlord and CPS shall not be entitled to impose upon Tenant any charges or fees of any kind (including, without limitation, charges or fees for profit, overhead or supervision, or for the use of the Building's freight elevator) in connection with any Tenant Work.

[Remainder of page intentionally left blank]



**CPS**:

CRESCENT PROPERTY SERVICES, INC.,
a Delaware corporation

By:_____
Name:_____
Title:_____

**TENANT**:

HIGHLAND CAPITAL MANAGEMENT, L.P.,
a Delaware limited partnership

By:     Strand Advisors, Inc., its general partner

By:_____
Name:_____
Title:_____

AGREED, ACKNOWLEDGED AND ACCEPTED
by Landlord as of the _20_ day of _April_, 2011:

CRESCENT TC INVESTORS, L.P.,
a Delaware limited partnership

By:     Crescent TCI GP, LLC,
        a Delaware limited liability company,
        its general partner

By:_____
Name:_____
Title:_____

**EXHIBIT E**

**PARKING AGREEMENT**

This Parking Agreement (the "*Agreement*") is attached as an Exhibit to an Office Lease (the "*Lease*") between CRESCENT TC INVESTORS, L.P., as Landlord, and HIGHLAND CAPITAL MANAGEMENT, L.P., as Tenant, for the Premises, the Rentable Square Footage of which is 43,515 square feet, located on the 7th floor of the Building. Unless otherwise specified, all capitalized terms used in this Agreement shall have the same meanings as in the Lease.

1.      As of the date Tenant occupies the Premises for the conduct of its business operations therein, Tenant shall have the right to lease up to 135 permits allowing access to unreserved spaces in parking facilities which Landlord provides for the use of tenants and occupants of the Building (the "*Parking Facilities*"). Tenant shall have the right to convert up to 18 of such unreserved permits to reserved parking permits allowing access to reserved parking spaces on the second level of the Parking Facilities. Upon 30 days prior written notice to Tenant, which notice shall not be given before November 1, 2012 unless Landlord requires the applicable parking spaces in connection with a lease of the 15th floor of 200 Crescent Court, Landlord may redistribute up to 45 of Tenant's unreserved parking spaces (the "*Redistributed Spaces*") to the garage for The Crescent® Atrium (the "*Atrium Garage*"). During the Term (including any renewal or extension), Tenant shall pay Landlord's quoted monthly contract rate (as set from time to time) for each unreserved and reserved permit, plus any taxes thereon. The current monthly contract rate for each reserved parking permit is $180.00 plus tax. The current monthly contract rate for each unreserved parking permit is $90.00 plus tax for the Parking Facilities, and $65.00 plus tax for the Atrium Garage. Notwithstanding anything to the contrary contained in the foregoing, the monthly contract rates specified for each reserved and unreserved parking permit above shall be fixed for the first three (3) years of the initial Term.

2.      Tenant shall at all times comply with all Laws respecting the use of the Parking Facilities. Landlord reserves the right to adopt, modify, and enforce reasonable rules and regulations governing the use of the Parking Facilities or the Property, from time to time, including any key-card, sticker, or other identification or entrance systems and hours of operations. Landlord may refuse to permit any person who violates such rules and regulations to park in the Parking Facilities, and any violation of the rules and regulations shall subject the automobile in question to removal from the Parking Facilities.

3.      Tenant may validate visitor parking by such method or methods as Landlord may approve, at the validation rate (as set from time to time) generally applicable to visitor parking. Unless specified to the contrary above, the parking spaces for the parking permits provided hereunder shall be provided on an unreserved, "first-come, first-served" basis. Tenant acknowledges that Landlord has arranged or may arrange for the Parking Facilities to be operated by an independent contractor, un- affiliated with Landlord. In such event, Tenant acknowledges that Landlord shall have no liability for claims arising through acts or omissions of such independent contractor. Landlord shall have no liability whatsoever for any damage to vehicles or any other items located in or about the Parking Facilities, and in all events, Tenant agrees to seek recovery from its insurance carrier and to require Tenant's employees to seek recovery from their respective insurance carriers for payment of any property damage sustained in connection with any use of the Parking Facilities. Landlord reserves the right to assign specific parking spaces, and to reserve parking spaces for visitors, small cars, handicapped persons and for other tenants, guests of tenants or other parties, with assigned and/or reserved spaces. Such reserved spaces may be relocated as determined by Landlord from time to time, and Tenant and persons designated by Tenant hereunder shall not park in any such assigned or reserved parking spaces. Landlord also reserves the right to close all or any portion of the Parking Facilities, at its discretion or if required by casualty, strike, condemnation, repair, alteration, act of God, Laws, or other reason beyond Landlord's reasonable control; provided, however, that except for matters beyond Landlord's reasonable control, any such closure shall be temporary in nature. If Tenant's use of any parking permit is precluded for any reason, Tenant's sole remedy for any period during which Tenant's use of any parking permit is precluded shall be abatement of parking charges for such precluded permits. Tenant shall not assign its rights under this Agreement except in connection with a Permitted Transfer, a Permitted Sublease or a Transfer approved by Landlord.



4.    Tenant's failure to pay for any of the above-referenced parking permits constitute an event of default under the Lease, subject to applicable notice and cure periods. In the event of any failure to comply with any provision of this Agreement, Landlord shall have the right to deny parking rights to any person violating the terms of this Agreement or the rules and regulations governing parking at the Property.



## EXHIBIT F

## FORM OF SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

THIS AGREEMENT is made and entered into as of the date set forth below by and between _____, ("Tenant"); _____, ("Landlord"); and Bank of America, N.A., as successor by merger to LaSalle Bank, N.A., as Trustee for the registered holders of Greenwich Capital Commercial Funding Corp., Commercial Mortgage Trust 2005-GG3, Commercial Mortgage Pass-Through Certificates, Series 2005-GG3, whose Master Servicer is Midland Loan Services, Inc. (collectively, "Lender"), as follows:

### RECITALS

LENDER is now the holder of a Mortgage or Deed of Trust, which secures or will secure a Note in the original principal amount of $_____. The Mortgage or Deed of Trust and any other security instruments, executed by the Landlord in favor of Lender, encumber the real property, together with the buildings and improvements on that property, described as "Exhibit A", which is attached to this document; and

TENANT is the holder of a lease (the "Lease") dated _____ from Landlord, further amended by instrument(s) dated _____ (such lease, together with the amendments referenced above, are collectively referred to as "the Lease") covering certain premises more particularly described in the Lease (referred to later as the "Leased Premises"); and

TENANT, LANDLORD AND LENDER desire to confirm their understanding with respect to the Lease and the Mortgage or Deed of Trust;

ACCORDINGLY, in consideration of the mutual covenants and agreements contained in this instrument, Tenant, Landlord and Lender agree and covenant as follows:

1. Now and at all times in the future, the Lease and the rights of the Tenant shall be subject and subordinate to the above Mortgage or Deed of Trust, and to all renewals, modifications or extensions of that Mortgage. However, such renewals, modifications and extensions shall be subject and entitled to the benefits of the terms of this Agreement.

2. So long as Tenant is not in default in the payment of rent or in Tenant's performance of any of the terms, covenants or conditions of the Lease (beyond any period given Tenant to cure such default):

a) Lender shall not diminish nor interfere with Tenant's possession of the Leased Premises, or Tenant's rights and privileges under the Lease or lease renewals, modifications or extensions that may be affected in accordance with any options under the Lease.

b) Tenant's occupancy of the Leased Premises shall not be disturbed, affected or impaired by Lender during the term of the Lease or any such renewals, modifications or extensions of the Lease.

c) Tenant, or any leasehold mortgagee of Tenant ("Tenant's Mortgagee") shall not be named or joined in any action or proceeding brought by lender to enforce any of its rights in the event of default under the Note, Mortgage (or Deed of Trust), unless such joinder be required by law for effecting those remedies available under the security instruments. Such joinder would ONLY be for the purposes of effecting those remedies, but not for the purpose of terminating the Lease or affecting Tenant's right to possession.

d) If the interests of Landlord shall be transferred to and owned by Lender by reason of foreclosure or other proceedings or by any other manner, and Lender succeeds to the interests of the Landlord under the Lease, Tenant shall be bound to Lender under all of the terms, covenants and conditions of the Lease for the balance of the term remaining and for any extensions or renewals which may be effected in accordance with any option granted in the Lease, with the same force and effect as if Lender were the Landlord under the Lease.



Tenant agrees to attorn to Lender as its Landlord, such attornment to be effective and self-operative without the execution of any further instruments on the part of any of the parties to this Agreement immediately upon Lender succeeding to the interest of the Landlord under the Lease. The respective rights and obligations of Tenant and Lender upon such attornment, to the extent of the then remaining balance of the term of the Lease and any such extensions and renewals, shall be and are the same as now set forth. The parties' intent is to incorporate the Lease in this Agreement by reference with the same force and effect as if set forth at length in this Agreement.

3. During the period of Lender's ownership of Landlord's interest in the Lease, Tenant and Tenant's Mortgagee shall have the same remedies against Lender for the breach of an agreement contained in the Lease that Tenant and Tenant's Mortgagee would have had against the Landlord if Lender had not succeeded to Landlord's interest; provided, however, that even though provisions in the Lease may be to the contrary, Lender shall not be:

(a) liable for any act or omission of any prior landlord arising under the Lease (including the Landlord) or subject to any offsets, defenses or counterclaims which Tenant may have against any prior landlord arising under the Lease (including the Landlord); or,

(b) bound by any rents or additional rent which Tenant might have paid for more than the current month to any prior landlord (including the Landlord); or

(c) bound by any amendment or modification of the Lease made without its consent; or,

(d) liable for any security deposited under the Lease unless such security has been physically delivered to Lender.

Provided, however, that the Lender shall not be relieved from responsibility for failure to perform any obligation under the Lease which, although such failure may have begun prior to Lender succeeding to Landlord's interest, thereafter continues. In such event, Lender's responsibility shall be determined as if the failure had first arisen upon the day Landlord's title to the Subject Property succeeds to Lender.

4. Tenant shall promptly notify Lender of any default, act or omission of Landlord which would give Tenant the right, immediately or after the lapse of a period of time, to cancel or terminate the Lease or to claim a partial or total eviction ("a Landlord Default"). In the event of a Landlord Default, the Tenant shall not exercise any rights available to it until it has given written notice of such Landlord Default to Lender; and Lender has failed within thirty (30) days after Lender receives such notice, to cure or remedy the Landlord Default. If the same can not be reasonably remedied within such thirty-day period, then Lender shall have a reasonable period for remedying such Landlord Default. However, in any event, Lender's time to cure such default shall not be less than the period of time the Landlord would be entitled to cure such default pursuant to the terms of the Lease. Lender shall have no obligation under this paragraph to remedy any Landlord Default.

5. The terms "holder of a mortgage" and "Lender" or any similar term in this document or in the Lease shall be deemed to include Lender and any of its successors or assigns, including anyone who shall have succeeded to Landlord's interests by, through or under foreclosure of the Mortgage or Deed of Trust, or by deed in lieu of such foreclosure or otherwise.

6. The Landlord has assigned or will assign to Lender all of Landlord's right, title and interest in the Lease by an Assignment of Rents and Leases ("Rent Assignment"). If in the future there is a default by the Landlord in the performance and observance of the terms of the Note or Mortgage or Deed of Trust, the Lender may, at its option under the Rent Assignment, require that all rents and all other payments due under the Lease be paid directly to Lender. Upon notification to that effect by the Lender to the Landlord and the Tenant, the Landlord HEREBY IRREVOCABLY AUTHORIZES AND DIRECTS the Tenant and the Tenant agrees to pay any payments due under the terms of the Lease to the Lender. Such payments shall constitute payments under the terms of the Lease and Landlord shall have no claim against Tenant by reason of such payments made to Lender. Tenant shall make such payments to Lender regardless of any right of setoff, counterclaim or other defense that Tenant may have against Landlord. Neither the Rent Assignment nor its



implementation shall diminish any obligation of the Landlord under the Lease or impose any such obligations on the Lender.

7.  Any notice, or request or other communication required by this Agreement to be given shall be in writing and shall be: (a) personally delivered; or, (b) sent via nationally recognized overnight courier; or, (c) transmitted by postage prepaid registered or certified mail, return receipt requested. All such notices, requests or other communications shall be addressed to Tenant, Landlord or Lender at the addresses set forth below or such other address as the parties shall in like manner designate. All such notices and requests shall be deemed to have been given on the first to occur of: (i) the actual date received, or (ii) the date of delivery if personally delivered; or (iii) five (5) days following posting if transmitted by mail.

If to Tenant:

If to Landlord:

If to Lender:

    Midland Loan Services, Inc.
    10851 Mastin Blvd., Suite 700
    Overland Park, KS 66210
    Attention: _____, Asset Manager

8.  This Agreement may NOT be modified except by a written agreement signed by the parties or their respective successors in interest. This Agreement shall inure to the benefit of and be binding upon the parties, their successors and assigns.

IN RATIFICATION OF THIS AGREEMENT, the parties have placed their signatures and seals below, by and through their duly authorized officers on this date, _____, 2011.

"LENDER"

Bank of America, N.A., as successor by merger to LaSalle Bank, N.A as Trustee for the registered holders of Greenwich Capital Commercial Funding Corp., Commercial Mortgage Trust 2005-GG3, Commercial Mortgage Pass-Through Certificates, Series 2005-GG3, by and through its Master Servicer, Midland Loan Services, Inc.

By _____

    Bradley J. Hauger
    Senior Vice President and
    Servicing Officer

STATE OF KANSAS     )
                      ) ss.
COUNTY OF JOHNSON  )

On this _____ day of _____, 2010, before me, a Notary Public in and for the State of Kansas, personally appeared Bradley J. Hauger, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person who executed this instrument, on oath stated that he was authorized to execute the instrument, and acknowledged that he is the Senior Vice President and Servicing Officer of Midland Loan Services, Inc., to be the free and voluntary act and deed of said company for the uses and purposes mentioned in the instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal the day and year first above written.

(seal)

_____

_____
(Print Name)
NOTARY PUBLIC in and for the State of Kansas.

My appointment expires _____



"TENANT"

By_____

Its_____


STATE OF _____)
                                )  ss.
COUNTY OF _____)

      On this _____ day of _____, 2010, before me, a Notary Public in and for the State of _____, personally appeared _____personally known to me (or proved to me on the basis of satisfactory evidence) to be the person who executed this instrument, on oath stated that he/she was authorized to execute the instrument, and acknowledged that he/she is the _____ of _____ _____, to be the free and voluntary act and deed of said _____ for the uses and purposes mentioned in the instrument.

      IN WITNESS WHEREOF, I have hereunto set my hand and official seal the day and year first above written.


(seal)                          _____

                                _____
                                (Print Name)
                                NOTARY PUBLIC in and for the State of
                                _____.


My appointment expires _____

"LANDLORD"

By_____

Its_____


STATE OF _____)
                                                    ) ss.
COUNTY OF _____)

On this _____ day of _____, 2010, before me, a Notary Public in and for the State of _____, personally appeared _____ personally known to me (or proved to me on the basis of satisfactory evidence) to be the person who executed this instrument, on oath stated that he/she was authorized to execute the instrument, and acknowledged that he/she is the _____ of _____ _____, to be the free and voluntary act and deed of said _____ for the uses and purposes mentioned in the instrument.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal the day and year first above written.


(seal)                                        _____

                                                 _____
                                                 (Print Name)
                                                 NOTARY PUBLIC in and for the State of
                                                 _____.


My appointment expires _____



## EXHIBIT G

## FORM OF LETTER OF CREDIT

Irrevocable Standby Letter of Credit No._____

| | |
|---|---|
| Place and Date of Issue: | Date and Place of Expiry: |
| _____, Texas,_____, 201__ | _____, 201__ in _____, Texas |
| Applicant: | Advising Bank: |
| _____ | Not Applicable |
| _____ | |
| _____ | |
| Beneficiary: | Amount: USD_____ |
| Crescent TC Investors, L.P. | (_____ Thousand and no/100 ) |
| 777 Main Street, Suite 2000 | |
| Fort Worth, Texas 76102 | |
| Attn: C. Robert Baird | |

Gentlemen:

We hereby establish our Irrevocable Letter of Credit in your favor available by Beneficiary's sight drafts drawn on _____ accompanied by the original of this Letter of Credit and the following document:

Written statement executed by any officer of Beneficiary, that (i) an event of default by Applicant exists under that certain Office Lease between Applicant and _____, dated_____, 201__ (as amended to date, the "Lease"), and (ii) such default exists beyond any applicable cure period provided in the Lease for such default, if any.

Special Conditions:

Draft must be marked: "Drawn under _____ Letter of Credit No. _____."

We hereby engage with you that all drafts drawn under and in compliance with all the terms and conditions of this Letter of Credit will be duly honored if drawn and presented for payment between the hours of 8:00 am and 4:00 pm Monday through Friday on a day when _____ is open for business at _____, Dallas, Texas _____ on or before the expiration of this Letter of Credit.

This Letter of Credit is subject to the International Standby Practices – ISP98, as the same may be revised from time to time.

This Letter of Credit may be transferred by Beneficiary to one or more subsequent owners of the real property which is the subject of the Lease.

(Name of Bank)

By:
Name:
Title:

## RIDER NO. 1

### OPTIONS TO EXTEND

**A.** **Renewal Period.** Tenant may, at its option, extend the Term for two renewal periods of five years each (the "*Renewal Periods*") by written notice to Landlord (the "*Renewal Notice*") given no earlier than 15 nor later than 9 months prior to the expiration of the Term (or the prior Renewal Period, as applicable), provided that at the time of such notice and at the commencement of such Renewal Period, (i) Tenant remains in occupancy of the Premises, and (ii) no uncured event of default exists under the Lease. The Base Rent payable during the Renewal Period shall be at the Market Rental Rate (hereinafter defined) for the Premises. Except as provided in this **Rider No. 1**, all terms and conditions of the Lease shall continue to apply during the Renewal Period, except that Tenant shall have no further Option to Extend the Term of the Lease after the second Renewal Period.

**B.** **Acceptance.** Within 30 days of the Renewal Notice, Landlord shall notify Tenant of the Base Rent for such Renewal Period (the "*Rental Notice*"). Tenant may accept the terms set forth in the Rental Notice by written notice (the "*Acceptance Notice*") to Landlord given within 15 days after receipt of the Rental Notice. If Tenant timely delivers its Acceptance Notice, Landlord and Tenant shall, promptly upon receipt thereof, execute a lease amendment confirming the Base Rent and other terms applicable during the Renewal Period; provided that the execution of such lease amendment shall not be required to extend the Term of the Lease upon the terms contained in the Rental Notice, it being the intent of the parties that Tenant's Acceptance Notice is binding and irrevocable, except as otherwise provided herein. If Tenant fails timely to either (i) deliver its Acceptance Notice or (ii) request supporting documentation regarding Landlord's determination of the Market Rental Rate set forth in the Rental Notice within 15 days after Tenant's receipt of the Rental Notice, then this Option to Extend shall automatically expire and be of no further force or effect. In addition, this Option to Extend shall terminate upon assignment of this Lease or subletting of all or more than 25% of the Premises in the aggregate, other than pursuant to a Permitted Transfer or a Permitted Sublease.

**C.** **Market Rental Rate.** The "*Market Rental Rate*" is the rate (or rates) a willing tenant would pay and a willing landlord would accept for a comparable transaction (e.g., renewal, expansion, relocation, etc., as applicable, in comparable space in the Building) as of the commencement date of the applicable term, neither being under any compulsion to lease and both having reasonable knowledge of the relevant facts, considering the highest and most profitable use if offered for lease in the open market with a reasonable period of time in which to consummate a transaction. In calculating the Market Rental Rate, all relevant factors will be taken into account, including the location and quality of the Building, the Base Year, the Tax Base Year, lease term, amenities of the Property, condition of the space and any concessions and allowances commonly being offered by Landlord for comparable transactions in the Building. The parties agree that the best evidence of the Market Rental Rate will be the rate then charged for comparable transactions in the Building. Tenant shall be entitled to receive allowances and other concessions considered in connection with Landlord's determination of the Market Rental Rate.

**D.** **Supporting Documentation.** If Tenant timely requests supporting documentation regarding Landlord's determination of the Market Rental Rate set forth in the Rental Notice, Landlord shall within ten (10) Business Days thereafter deliver to Tenant the terms of all renewals entered into for the Building within the preceding six (6) month period for space, the Rentable Square Footage of which is not less than 75% and not more than 125% of the Rentable Square Footage of the Premises existing at such time (the "*Comparable Lease Information*"). The Comparable Lease Information shall include the Rentable Area of the space leased, the lease term, the tenant finish allowance (or cost of improvements to be paid for by Landlord), parking rental, free rent, brokerage fees and all other concessions granted by Landlord in connection with such lease or amendment. If the Market Rental Rate set forth in the Rental Notice results in a net effective rate per rentable square foot to Landlord of more than one hundred three percent (103%) of the net effective rate per rentable square foot of the average of the renewals described in the Comparable Lease Information, considering all of the economic terms of such comparable transactions, respectively, including, without limitation, the net rent, any tax or expense escalation or other financial escalation, the amount of brokerage commissions paid and any financial concessions, Landlord shall deliver to Tenant within ten (10) days after delivery of the Comparable Lease Information a revised determination of the Market Rental Rate for the applicable Renewal Period which does not result in a net effective rate per rentable square foot of the Premises of more than one hundred three percent (103%) of the net



effective rate per rentable square foot of the average of the renewals described in the Comparable Lease Information. If Tenant desires to exercise the renewal option based on the revised Market Rental Rate, Tenant shall notify Landlord of Tenant's exercise of such option within fifteen (15) days after Tenant's receipt of the revised Market Rental Rate.

## CRESCENT GENERAL
## DISTRIBUTION MEMO FOR
## LEASES AND RELATED DOCUMENTS



**Pdf Sent**
4·26·11

DATE: 4/20/11      ☐ No Original Available because:

FORM SUBMITTED/PREPARED BY: Carmella Henson

NAME OF RESPONSIBLE CRESCENT SIGNATORY: John Zogg

BUILDING NAME: The Crescent

TENANT: Highland Capital

DOCUMENT: Office Lease      DATED: 4/20/11

RECEIVED
APR 26 2011
By

☑ Crescent Corporate Records (one [1] original with Lease Approval Form, and Security Instrument[s] attached) – Attn: Records Manager for imaging and distribution as follows:

    ☐ Electronic copy to the appropriate law firm, as follows:
        ☐ Colorado Properties: Ms. Louise Staab at Robinson Waters & O'Dorisio, P.C. Denver, Colorado
        ☐ Houston Properties: Kurt Nondorf, Jackson Walker, L.L.P., Houston, Texas
        ☐ Las Vegas Properties: Steve Rice, Rice, Silbey, Reuther & Sullivan LLP, Las Vegas, Nevada
        ☐ All Other Properties: Susan Halsey, Jackson Walker, L.L.P., Fort Worth, Texas
    ☐ Link to location on $C^2$ to Leasing Agent:
    ☐ Link to location on $C^2$ to Crescent Corporate Finance Department Accounting Manager(s):
    ☐ Link to location on $C^2$ to Property Accountant: for input into CTI
    ☐ Link to location on $C^2$ to Treasury (only when there is a Letter of Credit)
    ☐ One (1) copy (including black-line if required) to lender (if, and in the format, required)
    ☐ One (1) copy (including black-line if required) to each JV partner (if, and in the format, required)

☑ Leasing Agent : Tony Click (two [2] originals)
For copying and distribution as follows:

    ☑ One (1) original to tenant
    ☐ One (1) original to leasing agent's lease files
    ☐ One (1) copy to each outside leasing broker, as needed:

**[NOTE:** FOR COMMISSION AGREEMENTS, ONLY THE OUTSIDE BROKER GETS AN ORIGINAL; NO COPIES ARE DISTRIBUTED TO ANY OTHER OUTSIDE PARTIES, INCLUDING THE TENANT.]

☑ Property Manager: Don Vardell (one [1] original) for Building Files