**CROWE & DUNLEVY, P.C.**
Vickie Driver
2525 McKinnon Street, Suite 425
Dallas, TX 75201
214-420-2142
Vickie.driver@crowedunlevy.com

**DEBEVOISE & PLIMPTON LLP**
M. Natasha Labovitz (admitted *pro hac vice*)
Erica S. Weisgerber (admitted *pro hac vice*)
Daniel E. Stroik (admitted *pro hac vice*)
919 Third Avenue
New York, NY 10022
212-909-6000
nlabovitz@debevoise.com
eweisgerber@debevoise.com
destroik@debevoise.com

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

------------------------------------------------------------------- x
                                                                     :
In re:                                                               :    Chapter 11
                                                                     :
**HIGHLAND CAPITAL MANAGEMENT, L.P.,**                                :    Case No. 19-34054
                                                                     :
                    Debtor.                                          :
                                                                     :
                                                                     :
                                                                     :
------------------------------------------------------------------- x

## APPENDIX TO HARBOURVEST REPLY IN SUPPORT OF DEBTOR'S
## MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENT WITH
## HARBOURVEST AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

**Appendix to HarbourVest Reply in Support of Debtor's Motion for Entry of
an Order Approving Settlement with HarbourVest and Authorizing Actions
Consistent Therewith**

## TABLE OF CONTENTS

### Foreign Cases

Exhibit A, *Carlyle Capital Corp. Ltd. v Conway & Others*, Royal Court of Guernsey, 4
September 2017, Judgment 38/2017 ............................................................................. 1
Exhibit B, *Re Bird Precision Bellows Ltd.* (1985) 3 All ER 523 ..................................... 24
Exhibit C, *Re Little Olympian Each-Ways Ltd.* (1994) 2 BCLC 420 .............................. 47
Exhibit D, *Arnold v Britton* [2015] UKSC 36 [2015] AC 1619 ..................................... 63
Exhibit E, *In the matter of the C Trust* [2013] GLR 105 ............................................... 94
Exhibit F, *In the matter of the Internine and the Intertraders Trusts* [2005] JLR 236 ............. 110
Exhibit G, *Federal Republic of Nigeria v JP Morgan Chase Bank NA* [2019] EWHC 347 ...... 135

### Other Sources

Exhibit H, Findings of Fact & Conclusions of L. in Supp. of Ord. for Relief Issued After
Trial on Contested Involuntary Bankr. Pets., *In re Acis Capital Mgmt., L.P.*, No. 18-
30264-sgj11, (Bankr. N.D. Tex. Apr. 13, 2018), ECF No. 118 ............................... 153
Exhibit I, Bench Ruling & Mem. Of L. in Supp. of: (A) Final Approval of Disclosure
Statement; & (B) Confirmation of Ch. 11 Tr.'s Third Am. Joint Plan, *In re Acis
Capital Mgmt.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. Jan. 31, 2019), ECF No. 827 .......... 207
Exhibit J, Joint Obj. of Alleged Debtors to Emergency Mot. of Petitioning Creditor to
Abrogate or Modify 11 U.S.C. § 303(F), Prohibit Transfer of Assets, and Impose, Inter
Alia, 11 U.S.C. § 363, In re Acis Capital Mgmt, L.P. No. 18-30264-sgj11 (Bankr. N.D.
Tex. Feb. 5, 2018), ECF No. 16 ................................................................................... 255
Exhibit K, Transcript of Hearing held on February 7, 2018, No. 18-30264-sgj11 (Bankr.
N.D. Tex. Feb. 12, 2018), ECF No. 28 ...................................................................... 289
Exhibit L, Transcript of Hearing held on March 23, 2018, No. 18-30264-sgj11 (Bankr.
N.D. Tex. Mar. 27, 2018), ECF No. 99 ...................................................................... 306
Exhibit M, Mot. for 2004 Exam. of Investor in Highland CLO Funding, Ltd. and Certain
Affiliates Thereof, *In re Acis Capital Mgmt., L.P*., No. 18-30264-sgj11 (Bankr. N.D.
Tex. Oct. 10, 2018). .................................................................................................... 313
Exhibit N, Order Transferring Venue of this Case to the United States Bankruptcy Court
for the Northern District of Texas, In Re Highland Capital Mgmt, L.P., No. 19-12239-
css (Bankr. D. Del. Dec. 4, 2019), ECF No. 184 ...................................................... 342
Exhibit O, Email from H. Bradley Eden to D. Willard, dated August 15, 2017 ...................... 345

Exhibit P, Highland Legal Summaries, attachment to Email from H. Bradley Eden to D. Willard, dated August 15, 2017 .......................................................................................... 347

Exhibit Q, Email from H. Covitz to D. Willard, M. Pugatch, and N. Bellisario, dated Nov. 29, 2017.................................................................................................................................. 351

Exhibit R, Articles of Incorporation of Highland CLO Funding, Ltd., Registered on March 30, 2015 and adopted by special resolution passed on November 15, 2017 **[TO BE OFFERED UNDER SEAL]**. ...................................................................................... 354

Exhibit S, November 15, 2017 Highland CLO Funding, Ltd. Offering Memorandum **[TO BE OFFERED UNDER SEAL]** ....................................................................................... 356

Exhibit T, November 15, 2017 Members Agreement between Highland CLO Funding, Ltd., the Members party thereto, and Highland HCF Advisor, Ltd **[TO BE OFFERED UNDER SEAL]**................................................................................................................... 358

3

## EXHIBIT A



**Carlyle Capital Corporation Limited v Conway Others**
Royal Court
4th September 2017

**JUDGMENT
38/2017**

Action for damages/financial contribution

# IN THE ROYAL COURT OF GUERNSEY

## (ORDINARY DIVISION)

### CIVIL ACTION NO. 1510

**BETWEEN:**

(1)  **CARLYLE CAPITAL CORPORATION LIMITED (IN LIQUIDATION)**

(2) **ALAN JOHN ROBERTS, NEIL MATHER, ADRIAN JOHN DENIS RABET,**
solely in their capacity as Joint Liquidators
of Carlyle Capital Corporation Limited (In Liquidation)

**Plaintiffs**

**-AND-**

(1)  **WILLIAM ELIAS CONWAY JR**

(2)  **JAMES H. HANCE JR**

(3)  **JOHN CRUMPTON STOMBER**

(4)  **MICHAEL J. ZUPON**

(5)  **ROBERT BARCLAY ALLARDICE III**

(6)  **HARVEY JAY SARLES**

(7)  **JOHN LEONARD LOVERIDGE**

(8)  **CARLYLE INVESTMENT MANAGEMENT LLC**

(9)  **TC GROUP LLC**

(10) **TCG HOLDINGS LLC**

**Defendants**

**Before: Her Hon Hazel Marshall QC, Lieutenant Bailiff**

| | |
|---|---|
| **Counsel for the Plaintiffs:** | **Advocates J M Wessels & Abel R Lyall** |
| **Counsel for the First to Fourth Defendants:** | **Advocates I C Swan, Anna Guggenheim** |
| | **& Bryan de Verneuil-Smith** |
| **Counsel for the Fifth to Seventh Defendants:** | **Advocate Gareth Bell** |
| **Counsel  for the Eight to Tenth Defendants:** | **Advocate Simon Davies** |

**Dates of hearing:**   20th – 24th and 27th – 30th June,
4th – 7th, 11th – 14th, 18th – 21st and 25th – 28th July,

1st, 8th – 11th, 15th – 18th, 22nd – 24th and 30th August,
12th – 15th, 19th – 22nd, 26th, 27th and 30th September,
3rd – 5th, 10th – 12th, 26th and 27th October,
9th and 28th – 30th November,
1st, 2nd, and 6th – 9th December 2016.

**Judgment handed down on: 4th September 2017**

**Cases, Texts and Legislation referred to:**

**1.     Legislation**

**(a)     Guernsey**

The Companies (Guernsey) Law 1994, ss 67b 67C, 67F, 94, 95, 106, 117
The Companies (Amendment) (Guernsey) Law 1996
The Royal Court (Reform) (Guernsey) Law 2008 s 113
The Companies (Guernsey) Law 2008, ss 131, 132, 157, 407, 422, 434, 522, 527
The Evidence in Civil Proceedings (Guernsey and Alderney) Law 2009, ss 1-4

The Royal Court Civil Rules 2007, r 10
The Companies (Transitional Provisions) Regulations 2008. reg 10
The Evidence in Civil Proceedings (Guernsey and Alderney) Rules 2011, rr 2, 8

**(b)     England and Wales**

Companies Act 1862 s 80
Companies Act 1907 s 28
Companies Act 1948 ss 333, 455
Companies Act 1985 ss 518, 741
Insolvency Act 1986 ss 123, 214, 212
Companies Act 2006 s 250

**2.     Cases**

**(a)     Guernsey**

*Carlyle Capital Corpn Ltd (in Liq) v Conway and others* (Guernsey Judgment 29/2011)
*Carlyle Capital Corpn Ltd (in Liq) v Conway* (2011-12) GLR 562 (CA)
*Emerald Bay Worldwide Ltd v Barclays Wealth Directors (Guernsey) Limited* (2014) (CA. No 02/2014)
*Flightlease Holdings (Guernsey) Ltd v Flightlease (Ireland) Limited* [2009-2010] GLR 38
*In re Montenegro Investments Limited (in administration)* 2013 GLR 345
*Investec Trust (Guernsey) Ltd v Glenalla Properties Ltd* (2015)(CA. No 35/2015)
*Perpetual Media Capital Ltd v Enevoldsen* (2014) GLR 57 (CA)
*Romain Zaleski v GM Trustees Ltd* (2015) (Guernsey Judgment 42/2015)
*Savile AD4 Limited v Marlborough Trust Company Limited* (2016) (Guernsey Judgment 3/2016)

**(b)     England and Wales**

*Aberdeen Railway Co v Blaikie Brothers* (1854) 17D (HL) 20
*AIB Group (UK) plc v Mark Redler & Co Solicitors* [2015] AC 1503
*Armory v Delamirie,* (1722) 93 ER 664
*Bilta (UK) Ltd v Nazir (No 2)* [2016] AC 1
*Bishopsgate Investment Management Ltd v Maxwell (No 1)* [1994] 1 All ER 261
*BNY Ltd v Eurosail* [2013] 1 WLR 1408

© Royal Court of Guernsey

711. The Plaintiffs have further and more detailed arguments with regard to the precise or possible application of the terms of the various exoneration and indemnity clauses, upon their true construction, and they have also raised arguments as to the extent to which Article 174(2) of CCC's Articles might be void for being contrary to public policy. Again, these arguments were not gone into in oral submissions at the trial in the interests of time. If they require consideration, then that will be better and more effectively done in the light of relevant findings of detailed fact, rather than at the level of legal principles. I will again, therefore, revert to these points only if and when necessary, and will invite further argument if I think appropriate.

   (iii)    *Statutory discretion*

712. Lastly, for the sake of completeness, I record that the Defendants would, if ultimately necessary, seek to invoke the court's statutory discretion under s 522 of the 2008 Companies Law, to excuse a director from liability on the grounds that he "*acted honestly and reasonably and .... ought fairly to be excused*". (There appears to have been no equivalent provision in the 1994 Companies Law, but the court's powers here depend on the law in force when it comes to make its decision.) This is again, obviously, a provision which would require to be applied in the context of detailed findings of fact, and I will accordingly defer any consideration of it until it may be appropriate.

**(7)    The Entity Defendants as Directors**

713. The first seven Defendants are individuals who were formally appointed directors of CCC, as its first directors, in accordance with its Articles of Association. The Plaintiffs' claims are made against them as such. The Entity Defendants were not appointed directors of CCC. The Plaintiffs nonetheless claim that, on the facts of this case, they each can and should be held liable as if they had been validly appointed directors of CCC, on the basis that they were, in Guernsey law, either *de facto* directors of CCC or "shadow" directors of CCC, and that they therefore owed to CCC the same duties as if they had been duly appointed directors. There is little or no Guernsey law on this topic, but there is a large body at least of English law on the requirements for making out either qualification.

**(a)  *De facto* directors**

714. The term "*de facto* director" does not appear in Guernsey company legislation. The material Law in this case is the 1994 Companies Law, as amended in 1996. This was the Law in force at the time of the events complained of; the 2008 Companies Law did not come into effect until 1st July 2008.

   Section 117 of the 1994 Companies Law provides that

      "*In this Law unless the context otherwise requires,*

       *.... 'director' means a person occupying the position of director, by whatever name called*".

715. This is slightly different from s.131 of the 2008 Companies Law, and indeed from all the recent English Acts at the time – the Companies Act 1948 s 455(1), Companies Act 1985 s

741(1) and Companies Act 2006, s 250. In all of these the definition is inclusive, rather than exhaustive, as exemplified by s. 131 of the 2008 Companies Law, which reads:

> "*In this Law "director" <u>includes</u> an alternate director and any person occupying the position of director, by whatever name called."* (emphasis added).

716. On a straightforward reading, s. 117 therefore deals only with nomenclature, making it clear that a company officer is to be treated as a "director" if he functions as such, even if he has a different official title. It does not refer to persons acting with no official position or title at all. However, since the thrust of s. 117 is that liability in the eyes of the law arises from *"occupying the position of 'director'"* (ie carrying out the functions of a director) an appropriately purposive construction suggests that the definition covers persons acting as a director but with no title at all, ie no formal appointment to any office. I would so read it, and I therefore conclude that the minor difference in wording between s. 117 of the 1994 Companies Law and s 131 of the 2008 Companies Law is not of significance for this case, and neither, here, is the fact that the 1994 Companies Law, though modelled on the English statute, used this slightly different wording. In particular, I am satisfied that English authority provides useful assistance as to the scope of de facto directorship under the 1994 Companies Law.

717. The concept of a *de facto* director in English law was first recognised, in the 19th century, in the case of a person who had acted as a company director, but whose appointment was defective. Such a person could not escape responsibility as a director of the company by relying on the invalidity of his appointment. He had acted as a director *de facto*.

718. The first English case to extend the concept beyond this, to a person who had never even purportedly been appointed as a director of the company, appears to have been *Re Lo-Line Electric Motors Ltd* [1988] Ch 477. The defendant there had never been formally appointed, but was found to have been held out by the *de iure* directors of the company as being a director, and he had behaved as such. He was held to be a *de facto* director. This led Millett J (as he then was) in *Re Hydrodan (Corby) Limited* [1994] 2 BCLC 180, to explain the concept in the following terms:

> "...*a de facto director is a person who assumes to act as a director. He is held out as a director by the company, and claims and purports to be a director although never actually or validly appointed as such. To establish that a person was a de facto director of a company it is necessary to plead and prove that <u>he undertook functions in relation to the company which could properly be discharged only by a director.</u> It is not sufficient to show that he was concerned in the management of the company's affairs or undertook tasks in relation to its business which can properly be performed by a manager below board level."* (emphasis added).

719. The concept was later extended yet again to include persons who were not even held out by the company as directors but who purported to act as directors of the company with no authority at all. It thus extends to those who "interfere" in the company's affairs.

720. All this shows, though, that the focus is on the defendant's acts. The reason for imposing liability is that those who in fact act as company directors should be held responsible as such. However, the extension simply to those who meddle brings a need to define and delimit the factual basis which does import liability. Thus, in the passage of Millett J's judgment cited

above, the passage emphasised is of central importance. The principle is that liability as a director is incurred by a defendant for doing acts, in relation to the company, which could be properly done <u>only by a director</u>. It is therefore necessary to decide if that condition is made out by identifying what acts can only be done by a director in the particular company. This requires investigating and identifying the corporate governance structure of the company, so as to see whether the relevant acts of the defendant are "directorial" (as I shall now refer to them) in that context.

721. Jumping slightly ahead, the most recent English case in which the authorities with regard to *de facto* directorship have been reviewed is *Smithton Ltd v Naggar* [2014] EWCA Civ 939, relied on by the Plaintiffs. Arden LJ there synthesised the cases, concluding that

> *"where a person had never been even invalidly appointed a director, it was necessary to examine the governance system of the company in order to assess whether he acted as a director".*

At [35] – [42] she set out a series of practical points material to determining whether a person was a *de facto* director. I distil those which are material to this case, as follows;

(i) A party may be a *de facto* director even if there is no invalid appointment; the question is whether he carried out the function, and thus assumed responsibility to act as, a director;

(ii) To answer that question, the court may have to determine in what capacity the alleged director was acting;

(iii) The court will in general <u>also</u> have to determine the corporate governance structure of the company, (which can and will vary from company to company), so as to decide whether, in relation to the company's business the defendant's acts were "directorial" in nature; it is important that a first instance judge make findings in this regard;

(iv) The court is required to look at what the party actually did and not any job title he had;

(v) The test is objective; neither the party's intention, nor his belief that he was or was not acting as a director, is of any relevance;

(vi) The test is fact and circumstance dependent. It may be appropriate to look at the party's actions "in the round" but equally, in an exceptional case even a single act may be taken to constitute a person a *de facto* director; and

(vii) Whether the company held the party out as being a director would be a relevant factor; whether third parties regarded him as being a director may be material evidence.

722. I will adopt and apply these principles. I also add my own comments and emphasis to them, being points which I derive from looking at the authorities generally.

723. First, and as to (iii) above, in *Holland v HMRC* [2010] UKSC 51, Lord Collins observed at [91] that

> *"it is just as difficult to define "corporate governance" as it is to identify those activities which are essentially the sole responsibility of a director or board of directors"* .

724. It seems to me that these are two ways of stating what is really the same test. Once one finds "directorial" acts, then whether one describes these as rendering the actor part of the corporate governance structure of the company, or whether one simply says that he must be taken to have assumed the functions of a director by so acting, is simply a matter of language.

725. Also as to (iii), the qualification noted by Millett J in *Hydrodan* remains; the test requires the finding of actual "directorial" acts on the part of the defendant and merely being involved in the management of the company, or exercising a degree of influence over its decision making, is not in itself enough, although in the former case it may become enough if there is no other person involved in the management of the company in practice. That, however, is not this case.

726. Next, because liability as a *de facto* director is brought upon a defendant as the legal consequence of his own acts and their being found to be "directorial acts", it is imposed only in respect of such directorial acts; a "*de facto* director" does not automatically become responsible for the totality of the company's acts or activities.

727. Identifying what are or are not "directorial" acts in any particular case may not be easy. At the company's inception, all its powers to act are vested in its directors (by whatever name called) as a result of company legislation and the particular company's articles of association. Subsequently, such powers can be delegated, to a greater or lesser degree. In the case of a small and simple company, authority to act for the company and deal with its assets may well remain with its directors, both at the high level of strategic decision-making and the low level of everyday decisions and acts of implementation. In the case of companies with large enterprises, employees, advisers and agents will be engaged to carry out the more everyday work, and where the nature of the business is complex or requires expertise, others may be involved in high level decision-making or activities. The structure will vary with the particular needs of the company and the particular skills of the directors. Insofar as the directors delegate active functions, their involvement will then, quite properly, become more supervisory than operational, although a residue of supervisory function will always remain at the core and be non-delegable. Therefore, whilst decisions within the retained area(s) of control remaining with the directors will certainly be "directorial" in nature, how far, within the spectrum of possible structures, actual delegation of power to act may have gone can differ from company to company, and will be fact-specific. Whilst the authorities acknowledge the difficulty of generally identifying what are or are not "directorial" acts in respect of a company, it seems to me that, in practice and like the proverbial elephant, one is likely to be able to recognise such an act in context, even if one cannot easily define it.

728. Thus far, however, the cases have been concerned only with holding a natural person to be a *de facto* director of a company. What is here alleged is that another corporate entity should be held to have been a *de facto* director of a company, and this adds yet another dimension to the concept of a *de facto* director.

729. The important case of *Holland v HMRC* [2010] UKSC 51 illustrates the analytical issues which have to be grappled with when the factual situation extends to corporate entities. In simple terms, in *Holland,* the subject company (S) was owned by another company (H) which

was in turn owned by Mr Holland with his wife, and Mr Holland was the sole director of company H. The sole director of company S was company H. The issue was whether, through being the sole director of Company H which was the corporate director of Company S, and carrying out acts on behalf of Company S, Mr Holland had been a *de facto* director of Company S, so as to incur personal liability for an undoubted misapplication of Company S's funds. It was held by the majority of the Supreme Court (led by Lord Collins) that Mr Holland was not a *de facto* director of Company S, even though every decision of Company S was actually taken by him and implemented by him. This was because he was to be taken to have done those acts as the appropriate organ of, or agent for, Company H, the *de iure* corporate director. His acts were therefore the acts of Company H.

730. This decision was driven by respect for the distinction between the legal personality of a company and its owners, and a reluctance to pierce the corporate veil, (see [25]), influenced by the fact that company legislation permitted one company to be a director of another company. The dissenting minority, (led by Lord Hope) agreed that merely being a director of a corporate director (H) of a company (S) did not *ipso facto* render that person a *de facto* director of company S, and that something "more" (compare *Hydrodan* (above) at p 184B) was required. However, they considered that the extensive nature of the acts actually performed by Mr Holland in regard to Company S did amount to that something "more", and they would have found him to be a *de facto* director.

731. On any basis, though, the entire Supreme Court plainly felt it right to reject, as an acceptable basis for the imposition of liability, an impressionistic "broad brush" argument that Mr Holland was "really" a director of the subject company, in the sense that he was its directing mind in a generalised way. All members tested the position by a principled legal analysis of the corporate structures which had been set up, and the position, authority and pertinent acts of the defendant which were claimed to have made him a *de facto* director. (It is to be borne in mind that no argument as to Mr Holland's being a _shadow_ director of Company S arose in this case.)

732. I do not overlook that the reasoning in the *Holland* case may well have been influenced by the particular development of English law as regards the use of corporate directors. English company law had expressly provided that a corporation could be the director of a company in the Companies Act 1985, but it had intervened again in the Companies Act 2006 (s.155(1)) to decree that a company must have at least one natural person as a director. This was to avoid the unacceptable consequence that a company might have no natural person who could be held accountable for misapplication of its assets.

733. No such developments have featured in Guernsey law, at any rate at the time with which I am concerned. Corporate directors were (and still are) permitted, by the combined effects of s 117 of the 1994 Companies Law quoted above and the Interpretation (Guernsey) Law 1948, which enacts that unless the context otherwise requires, a reference in any enactment to a "person" means either a natural or a legal person. It follows that the actual decision in *Holland*, which would not be binding on this court, might be inappropriate in a Guernsey law context. I can see that it also might be thought that there was some force in the minority approach in that case.

734. However, this is not a point which arises for decision here. The actual decision in *Holland* is not directly material to this case, because there the claim was to hold an individual liable as a

*de facto* director because of his own personal acts, whereas here the claim is the reverse; it is to hold another <u>company</u> liable as a *de facto* director because of the acts of individuals associated with that company.

735. What is to be derived from *Holland*, and other cases such as *Kuwait Asia Bank EC v National Mutual Life Nominees Ltd* [1991] 1 AC 187 (which decides that a party with the power to appoint a director to a company does not thereby become liable for the acts of such director, whether vicariously as his employer, or at all), is the importance of the capacity in which a natural person is acting, for the purpose of the correct legal analysis of the overall situation.

736. It is material in at least two different ways. The first is the requirement already noted that the relevant act within the subject company must be an act required to be done by someone with the capacity of a director. If the defendant could have carried out the acts in question in some other capacity, either because they were not acts which only a director could carry out *(Hydrodan)* or because the defendant enjoyed some other capacity in which he could properly do them *(Holland)*, then the defendant is not a *de facto* director.

737. The second is that, since a corporate entity can only act through a natural person, where it is sought to make a corporate entity liable as a *de facto* director, one must find not only directorial acts done by the relevant natural person on behalf of the subject company, but also that that natural person was carrying out those acts as agent of the corporate entity sought to be made liable as its *de facto* director. Not only that, but it seems to me that, analysing the authorities, he must be found to be doing so <u>only</u> in such capacity.

738. It follows, in my judgment, that it will be well-nigh impossible to fix a corporate entity with liability as a *de facto* director of another company through the acts of any individual who was a *de iure* director of that other company at the time. That individual will obviously be carrying out "directorial acts" in his capacity as a director of the company, and not as agent for the targeted defendant.

**(b)** **Shadow directors**

739. The term "shadow director" is found in the 1994 Companies Law only through having been introduced by amendment in 1996. It was introduced, though, only for the purpose of the new section 67C, which relates to wrongful trading:-

> "67C ….(7) *In this section* "director" includes a shadow director, which means a person in accordance with whose directions or instructions the directors of the company are accustomed to act" (emphasis added).

740. It follows that the Plaintiffs can certainly invoke the doctrine of shadow directorship against the Entity Defendants with regard to their wrongful trading claims. The question whether they can do so with regard to their claims based on the general fiduciary duties or duties of skill and care owed by a director to his company is not so clear.

741. The concept of the "shadow director" was enacted into Guernsey law more broadly in the 2008 Companies Law (see s. 132), but that was, of course, only as from 1st July 2008, and even then the enactment did not extend the term "director" as used in the Companies Law generally to include a "shadow director" as there defined. Rather, it enacted that where the term "shadow director" was itself used in the 2008 Companies Law, this meant a "*person in accordance with*

*whose directions or instructions the directors of the company are accustomed to act*", and in s 132(3) it specifically extended the meaning of the word "director" in particular sections of the Law (ss 160 and 162-4, which have no relevance here) to include a "shadow director", as so defined.

742. Thus, in both the 1994 Law and the 2008 Law, the operation of the defined concept of a "shadow director" is confined to the two situations, first where that term is actually used in the Law itself, and second where it is specifically directed to be treated as if it had been used. These situations do not include the operation of the company director's fiduciary duties or duties of skill and care, neither of which is actually laid down in the Companies Laws at all. Neither Law enacted that wherever the term "director" was being used or applied in the Law, it included a shadow director.

743. The significance of this is that liability as a *de facto* director of a company applies because the office of a "director" in company law has been held, by judicial interpretation of that term (in English law but with Guernsey law reasonably following suit), to extend to a person who acts as a director of a company in actual fact, even though not as of right. However, liability as a shadow director is not the result of judicial interpretation, but of legislative enactment. It is therefore confined to the cases stipulated by the enactment.

744. It consequently seems to me, that it is only if the concept of *de facto* directorship <u>itself</u> could be extended to include the shadow directorship situation that this would enable a finding of liability for breach of fiduciary duty or of duty of skill and care to be made against a shadow director. This would be a perfectly reasonable interpretation. The basis for imposing liability on persons as *de facto* directors of companies is that of imposing duties and responsibilities to the company on those who are in practice taking the operative decisions on its behalf. This principle can be applied just as readily to the shadow director situation as it does to the conventional *de facto* director situation.

745. If it were open to me to do so, I would readily construe the Guernsey Companies Laws to the effect that a person could "occupy the position of director" of a company by issuing directions or instructions to its *de iure* directors which those directors were accustomed to act upon, and thus that person would be a director of the company, in any material respect according to the facts.

746. However, albeit with reluctance and on balance, I do not think that doing so is open to me. It seems to me that the terms of the Companies Laws - and it is even more clear in the 2008 Law - treat the concept of shadow directorship and the situation giving rise to it as being a separate and distinct concept in its own right. The legislature has then prescribed the situations in which the situation of a person falling within that concept is to be taken to impose director's liabilities or duties, initially on a very limited basis in 1996, and subsequently in a wider range of situations in 2008. That being the case, it seems to me that the legislature has to be taken to have intended those situations to be exhaustive with regard to shadow directorship, and that in enacting those express provisions it was implicitly ruling that the term "director" did not, itself, extend to them. The consequence is that the legislation seems to me to have ruled out any permissible judicial extension of the principles of *de facto* directorship to include shadow directorship.

747. It would follow that liability as a shadow director in Guernsey law applies only where the applicable Companies Law directly stipulates. I would hold, therefore, that the allegation of

shadow directorship against the Entity Defendants is available only in respect of the Plaintiffs' claim for wrongful trading. However, I have to consider the legal principles regarding a shadow director for the purpose of the wrongful trading claim in any event. I therefore do so generally and what I say below are my findings on the scope of the concept of shadow directorship in Guernsey law, whether its application is limited as just discussed or not.

748.  First, a minor point of construction. Under the 2008 Companies Law, the definition of a shadow director was extended by adding the further qualification that a person was

> *"not to be regarded as a shadow director by reason only that the directors act on advice given by him in a professional capacity"* (s. 132(2)).

749.  I do not think this makes any substantive difference to the meaning of the concept under s 67 of the 1994 Companies Law as amended. In my judgment, this qualification is really implicit in the original wording, not least because "advice" and "directions or instructions" are different things. I accept that "advice" could conceivably be rendered in such a way that it could fairly be characterised as either "directions" or "instructions". However, that would be a matter of fact to be proved, and does not mean that advice generally is to be taken as falling naturally within such a description.

750.  I do not think that I was urged by Advocate Wessels to infer, from the introduction of this qualification on 1st July 2008, that prior to that time a professional adviser in Guernsey on whose advice directors of a company would generally act was to be taken to be a shadow director of the company, but I would in any event decline to do so. To do so would, in my judgment, be attributing far too much inferential weight to amendments to companies legislation which were probably inserted for the avoidance of doubt, and would in fact be contrary to what I have indicated I would regard as the natural meaning of the words in context, according to their obvious policy intention.

751.  I approach the matter, therefore, on the basis that the court is looking for "directions" or "instructions", even though it would not be precluded from finding, on appropriate facts, that communications which were termed "advice" nonetheless fell into those categories in substance.

752.  Once again, the English case of *Re Hydrodan (Corby) Ltd* (above) provides a useful starting point for formulating the appropriate test. Millett J, at p 183 c-e, and having emphasised the contrast with a *de facto* director, (in that the former openly acts as a director, whereas the latter claims not to be a director at all), determined that the statutory definition required proof of

> *"(1) who are the directors of the company, whether de facto or de jure; (2), that the defendant directed those directors how to act in relation to the company or that he was one of the persons who did so; (3) that those directors acted in accordance with such directions; and (4) that they were accustomed so to act. What is needed is first, a board of directors claiming and purporting to act as such; and secondly, a pattern of behaviour in which the board did not exercise any discretion or judgment of its own, but acted in accordance with the directions of others."*

753.  Later English authority has established that it is not necessary for all the directors to act in accordance with the relevant directions or instructions; a governing majority will suffice: see *Ultraframe (UK) Ltd v Fielding* [2005] EWHC 1638 at [1272]. It is also not necessary that

an alleged shadow director should control all the decisions of the directors, or all the company's field of activities: *Secretary of State for Industry v Deverell* [2001] Ch 340 per Morritt LJ. There must, though, be actual "acts" by the Board which are being controlled in the manner described, because this is what is stated in the statutory definition. There must also be a pre-existing pattern of such allegedly controlled acting. This is necessary in order to satisfy the requirement of "being accustomed": see *Ultraframe* (above) at [1277-8].

754. The essence of this concept is that the alleged shadow director is, in reality, the actual director or the "directing mind" of the company in the relevant respects, (ie the offending acts of the *de jure* – or it could even be: *de facto* - directors), because those who are actually carrying out the particular offending acts are merely the conduits of his wishes and decisions.

755. Lewison J in *Ultraframe* expressed some reservations as to the extent of fiduciary duties properly imposed on shadow directors, since they would usually be incurring liability precisely because they would be operating with a conflict of interest as regards another person or entity (at [1290]). I would decline to follow that dictum on any basis, though, for being what I would regard as an unguarded comment, since the whole point of imposing liability for shadow directorship is precisely to hold liable the persons who are in fact directing a company's affairs contrary to what would otherwise be its directors' duties. Fortunately, in *Vivendi SA v Richards*, [2013]EWHC 3006, Newey J clarified the position sensibly, concluding that shadow directors did owe fiduciary duties to the company, and that

> "*A shadow director can, I think reasonably be expected to act in the company's interests rather than his own separate interests when giving such* [sc. such as the directors will be accustomed to act upon] *directions and instructions." [143].*

756. Once again, though, discussion of this topic shows the need for careful analysis of what is actually going on in substance, especially as regards defendants with a potential conflict of interest. This is highlighted by some of the examples considered in *Ultraframe*, which discuss (see [1266-9]) the position of funders, lenders, suppliers, etc, who may be able to dictate the actions of the company to its board because of the strength of their commercial negotiating position. Lewison J accepted and endorsed the view that doing so would not make that counterparty a shadow director of the company. He also accepted that a creditor of the company is entitled to protect his own interests as creditor without necessarily becoming a shadow director of the company. This is a realistic approach and, on a more general plane, it underlines that the courts will be careful, in making judgments in the context of commercial matters, to give appropriate recognition to the realities of the business world. Such recognition, together with the exception of trusted professional advisers from liability, emphasises both the focus of the policy that imposes liabilities on shadow directors, and that any finding is dependent on facts.

757. Advocate Wessels took me to *Secretary of State for Industry v Deverell* (above) as his principal authority and as epitomising the test for shadow directorship. Morritt LJ summarised his conclusions at [35] in five propositions:

> "...(1) *The definition of a shadow director is to be construed in the normal way.........it should not be strictly construed.........*
>
> "(2) *The purpose of the legislation is to identify those, other than professional advisers, with real influence in the corporate affairs of the company. But it is not necessary*

> *that such influence should be exercised over the whole field of its corporate activities……*

> *"(3) Whether any particular communication from the alleged shadow director, whether by words or conduct, is to be classified as a direction or instruction must be objectively ascertained by the court in the light of all the evidence. In that connection I do not accept that it is necessary to prove the understanding or expectation of either giver or receiver. In many, if not most, cases it will suffice to prove the communication and its consequence. Evidence of such understanding or expectation may be relevant but it cannot be conclusive. Certainly the label attached by either or both parties then or thereafter cannot be more than a factor in considering whether the communication came within the statutory description of direction or instruction.*

> *"(4) Non-professional advice may come within that statutory description. The proviso excepting advice given in a professional capacity appears to assume that advice generally is or may be included. Moreover the concepts of "direction" and "instruction" do not exclude the concept of "advice" for all three share the common feature of "guidance".*

> *"(5) It will, no doubt, be sufficient to show that in the face of "directions or instructions" from the alleged shadow director the properly appointed directors or some of them cast themselves in a subservient role or surrendered their respective discretions. But I do not consider that it is necessary to do so in all cases. Such a requirement would be to put a gloss on the statutory requirement that the board are "accustomed to act" "in accordance with" such directions or instructions…..a qualification beyond that justified by the statutory language."*

758.   I would broadly accept these propositions but with the following qualification.

759.   First, I do not think that Mr Wessels sought to argue that the "real influence" referred to in proposition (2) can be viewed as either an accurate paraphrase for, or an alternative expression of, the qualifying test for being a shadow director contained in the statutory definition itself. i.e. the requirement of there being "directions or instructions." If he did, so, then I reject that argument. In my judgment, it is not available, certainly not insofar as it is inconsistent with the actual words of the statute. A test of "real influence" is not only not the statutory requirement, but is both so vague as to be unworkable, and departs too far from the essence of the concept, which is that a "shadow" director is a person who is, in reality, running the company in the relevant respect, albeit doing so through the actions of others who compliantly do his will. It may be possible that a person who has serious influence on the affairs of the company because his views or advice are habitually sought and acted on out of deference could fall within the definition of shadow director, but that would depend on whether the circumstances justified the relevant findings of fact as to the communications amounting to "directions or instructions".

760.   Second, I do not understand Morritt LJ to be saying, in proposition (3), that "directions or instructions" can arise without the intention and objective of, at least, the alleged giver of the instructions being that the Board should act in accordance with his expressed wishes. If he is so saying, then I respectfully disagree. There is a difference of quality between advice, even if forcefully expressed, and a direction or instruction, and that difference is that the maker of the communication is doing so with the intention of procuring a result for his own ends. Of

course, that state of mind may be capable of being inferred from indirect evidence in the usual way, but it does not seem to me that the statute authorises dispensing with such a finding. The statute requires a finding that the *de iure* directors were accustomed to act in accordance with the "directions or instructions" of the alleged shadow director and not merely in accordance with his presumed wishes or interests.

761. Third, I note, and Mr Wessels accepted, that the requirement to find "directions or instructions" requires the finding of <u>actual communications</u>, from the alleged shadow director to the Board Members, which constitute "directions or instructions". This is plain from Morritt LJ's proposition No (3). Such a finding is, of course, a matter of evidence and subject to the usual processes of pleading and proof. Again, though, it cannot simply be glossed over or assumed as part of some postulated bigger picture. Any inference that there were "directions or instructions" must be made as a finding of actual fact, justified, on balance of probability by evidence.

762. Fourth, it is clear from the cases such as *Kuwait Asia Bank,* (above) that the element of influence or even control over a company's affairs which arises from either holding its shares, or having control over the employment position of its directors, is not sufficient on its own to constitute a party – generally there a company, - a shadow director. This underlines, again, the need for proof of the factual situation which constitutes shadow directorship, and that mere allegation of a relationship of influence, or similar, is not enough.

763. Fifth, and at the risk of stating the obvious, if it is sought to make a corporate entity liable as a shadow director, then it is necessary to find directions or instructions in the form of communications issued by that entity. Since a corporate entity can only act by human agency, then even if actual communications by a human being can be pointed to, issues of the capacity in which those communications were made will still need to be examined, to decide whether the communication was actually that of the corporate entity. In other words, any "directions or instructions" will have to be established to be *those of the corporate entity,* and this also requires affirmative proof on the evidence. This is not surprising, as the actual director of the company will already be liable, and fixing a shadow director with liability is an extension of liabilities arising out of the corporate structure.

764. Finally I make some general observations. There has been dispute in the English cases as to whether the concepts of *de facto* and shadow directorships are or are not mutually exclusive. In my judgment, and for the reasons given by Millet J in *Re Hydrodan* (above), logic dictates that they have to be, certainly now that statute has intervened to delimit the concept and application of the liability of shadow directors as discussed at the beginning of this section. In this situation, it may be possible to be a shadow director and a de facto director at the same time, but <u>not</u> in respect of the same acts, because the test for each basis of liability is materially different. A *de facto* director is fixed with liability because of what he does. A shadow director is fixed with liability because of what he procures. Fortunately this seems more of an academic dispute than one of real consequence. I have indicated above the extent to which I am concerned with it here.

765. Again, and although not bearing directly on the facts of *de facto* or shadow directorships, it is helpful context, in my judgment, to keep in mind that a party which is entitled to appoint a director to the board of another company does not *ipso facto* become either a shadow, or a *de facto*, director of the company. Whether he (or it) does so has to be judged on the basis of the

actual facts; for example, he is plainly more likely to do so if he is in fact able to appoint a majority of the Board. However, the position in law is that by appointing another person as a director of a company, the appointor is taken to authorise the appointee to perform conscientiously the duties of such a director, and therefore to exercise his own judgement and to act in what he perceives to be the best interests of the company, rather than those of his appointor. The appointee becomes agent of the company and not of his appointor.

766. As mentioned in relation to *de facto* directors, if a company which is entitled to appoint a director to the Board of another company appoints one of its own employees, then even though the employee carries out his directorial functions as part of his employment duties, the employer is not vicariously liable *ipso facto* for the acts of the employee as such director: see. *Kuwait Asia Bank EC v National Mutual Life Nominees Ltd* [1991] 1 AC 187 (PC) – an instructive and useful case on the position of nominee directors and the proper scope of duties thereby owed. Once again, this principle recognises that the office of director imposes freestanding personal and independent liabilities on the party holding that office, regardless of the origins of his appointment. Of course, if the actual facts demonstrated that the employee director had been following instructions issued to him by his employer, then the situation would be different.

767. Insofar as the foregoing points are not of direct relevance to this case, I find them to provide helpful guidance as to the proper approach to the concept of shadow directorship as it does come to be applied in this case. To distil the essential points for the present case:-

> (i) To fix any of the Entity Defendants with liability as a shadow director of CCC the Plaintiffs need to prove that the actual directors (*de iure* or possibly *de facto* if already found) were accustomed to act in accordance with "directions or instructions" given by that corporate entity. This requires proof, on the evidence in the usual way, of actual directions or instructions.

> (ii) "The directors" would include a relevant voting majority of the board of directors.

> (iii) It is insufficient to establish one instance only of obedience to such direction or instruction; there has to be a series of such acts so as to prove the requirement of being "accustomed" so to act. However, that does not necessarily have to be on the same subject matter, and in an appropriate case, relatively minimal evidence of previous biddability might well suffice.

## 6.    The issues to be determined

768. Having now determined the law which I will be applying, it is convenient to marshal the issues which, in consequence, arise for determination, before turning to the evidence and the witnesses.

769. Turning to the allegations in the case, the Defendants say that they have identified 187 separate allegations of breach of duty pleaded against them in the Cause, although I confess that I have not counted them. They appear (from the Defendants' comments on the unagreed "Concise List of Issues" referred to below) to be the total number of sub-paragraph allegations contained in Paragraphs 263C-263H, 308D-308J, 339B-339G, 367D-367I, 369T-369Y, 390B-390G, and finally 417, 418B-E, 418I-418L, 419, 422 and 424B-424E of the Amended Cause.

2508. As already observed there is no claim in wrongful trading with regard to this period. However, in my judgment, CCC never reached a point where it was unable to meet its debts, even as "they fell due", before the time of the sudden avalanche of margin calls which were prompted by the brewing liquidity crisis of March 2008. Carlyle was not pressing for payment of the loans it had made. CCC always succeeded in obtaining financing as required up to that time and it paid all margin calls up to that date. Also, in my judgment, there was no point prior to the point when they actually did so that the Directors of CCC ought to have concluded that CCC stood no reasonable prospect of continuing to do so and thus avoiding insolvent liquidation. Whilst this may be a very sudden change of fortune, the evidence shows that, in the financial markets, fortunes can indeed change that quickly.

**Final Conclusions as regards the individual Defendants and CIM as investment manager**

2509. It follows from the above that, in dismissing the Plaintiffs' claims against the individual Defendants for breaches of duty and in relation to CIM for breach of contract/tort in this period, I have now dismissed all such claims in the action.

### 15. The Claims: Liability of the Entity Defendants as de facto or shadow directors.

2510. I have so far not considered at all the allegations of liability made against the Eighth to Tenth Defendants other than to dismiss the claims of breach of contract or negligence *qua* investment manager against CIM, and I now turn to these.

**Preliminary – limits of case**

2511. Paragraph 80 of the Cause is the foundation paragraph for the Plaintiffs' claims against the Entity Defendants. Within it, though, the Plaintiffs asserted, not just a claim founded on allegations of *de facto* and/or shadow directorship, but also (it appeared) an additional basis of claim, namely that the matters complained of amounted to breaches of "*other duties*" owed to CCC arising out of the nature of the relationship between the Entity Defendants and CCC, as asserted in paragraphs 76 and 77 of the Cause. Those paragraphs contained allegations, first of "*pervasive control*" of CCC by the Entity Defendants and second of a "relationship of trust and confidence" between CCC and the Entity Defendants. From this, it appeared that the Plaintiffs might be intending to argue some other grounds for imposing liability on one or other of the Entity Defendants outside the two recognised concepts of *de facto* or shadow directorship; the second phrase, in particular, is usually found in the pleading of a cause of action based on undue influence.

2512. However, in answer to a specific query from the bench as to whether this was so, Advocate Wessels confirmed that it was not. Following their closing submissions, the Plaintiffs expressly confirmed in writing that as against the Entity Defendants, their claims against TCG and Holdings rested entirely on the allegation that those Defendants were either *de facto* or shadow directors of CCC and thus themselves owed to CCC the various duties of directors. They alleged no other grounds of claim against TCG and Holdings, although as against CIM, they alleged both those bases of claim and also the further or alternative claims of breach of contract and/or non-contractual negligence.

2513. Turning, therefore to the claims based on *de facto* or shadow directorship, in my judgment these claims fail against each of these Entity Defendants *in limine*. The factual requirements

for such liability are simply not made out on the evidence before me, and are scarcely even pleaded.

**The pleaded claims of de facto and shadow directorship**

2514. The basic pleading of the Plaintiffs' case appears at Paragraph 80 of the Amended Cause:

> "80. *Carlyle each controlled the affairs of CCC and performed functions properly discharged by a director of CCC and/or was part of CCC's corporate governing structure, such that each of Carlyle and CIM was a de facto director under Guernsey Law. Further or alternatively, the majority of the directors of CCC took direction from and were accustomed to act in accordance with the directions of Carlyle and CIM such that each of Carlyle and CIM was a shadow director of CCC under Guernsey Law."*

2515. The authorities show that the "*and/or*" in the first sentence above cannot stand except as "*and*". The test for *de facto* directorship is emphatically what the defendant actually did, and merely "being" part of the corporate governing structure is not enough.

2516. A more technical point is that the term "Carlyle" as used in the Cause is stated to be a "*collective*" reference to Holdings and TCG. I doubt whether a joint directorship is possible even in theory. In my judgment a cause of action alleging either shadow or *de facto* directorship has to be made against a single individual. I will, though, benevolently treat the "collective" definition as being disjunctive, and the allegations of *de facto* or shadow directorship as being made separately against each of TCG and Holdings.

2517. I have already referred to the pattern of the Cause in making the same general allegations against groups of Defendants in respect of the times in point, but in places with further elaborations particularly relevant to that group. In the case of the Entity Defendants (referred to in the Cause as "*Carlyle and CIM*") the extra allegation is generally a reference to the claim of the "pervasive control" of CCC exercised by Carlyle and/or CIM. These allegations are ultimately found in Paragraphs 412R to 412ZF of the Amended Cause, where the complaints against CIM, TCG and Holdings are collected under the side heading "*Carlyle and CIM's pervasive control of CCC*". Attempting brevity, I summarise these paragraphs here.

2518. The Plaintiffs initially recite the ownership relations between the Founders and the Entity Defendants, and set out the circumstances of the appointment of the various personnel who actually conducted CCC's affairs day to day, in particular Mr Stomber and Messrs Greenwood, Trozzo, Rella and Green. They stress the instrumentality of "the Founders" (in places "*on behalf of*" Carlyle and/or CIM) in setting up these structures. They also stress the practical power of the Founders over the employment position of each of such senior personnel.

2519. A specific allegation of the shadow directorship of the Entity Defendants is made at Paragraph 412Z, and matters relied on for this then follow. First, at paragraph 412ZA, the Plaintiffs plead 14 individual written statements made by Mr Stomber between November 2006 and 14th March 2008, which they say show that Mr Stomber *"at all material times"* acted "*in accordance with Carlyle's wishes and its interests and ...primarily to protect and advance the interests and reputation of Carlyle*". These might be argued to show a mindset of servility, or even sycophancy, on Mr Stomber's part, but they do not even mention any directions or instructions from an Entity Defendant.

2520. The Plaintiffs next plead the provisions in CCC's Articles of Association which confide special powers of approval to a majority of the Independent Directors as previously noted, and they plead in Paragraph 412ZD that in exercising those powers, rather than exercising their own independent judgement and responsibility the three Independent Directors were instead

> *"accustomed to act in accordance with the directions and instructions of Carlyle, expressed through communications made by persons acting for and on behalf of, or alternatively in the interests of, Carlyle".*

2521. One can just about extract from this an assertion of the giving of instructions or directions (to the Independent Directors, therefore) by a person acting on the authority of TCG or Holdings, but it does not condescend to the necessary identification of the giver of the instructions or the alleged material instructions themselves. This could, though, be remedied by the four matters which are then pleaded as founding this allegation. They are

> i. *"as a consistent course of conduct ...acceding unquestioningly to requests"* (maker not specified) for approval to reductions/suspensions in CCC's key risk management measures (including the minimum liquidity cushion),
>
> ii. *"acceding unquestioningly"* to Mr Conway's alleged *"decision"* to refrain from selling RMBS,
>
> iii. *"acceding unquestioningly"* to Mr Conway's alleged *"decision"* and/or Mr Stomber's *"recommendation"* not to seek to raise additional equity capital,

and lastly

> iv. refraining from requiring more frequent Board meetings and instead simply *"permitting Carlyle and CIM to operate CCC as they saw fit"* - particularly as regards continuing to operate without maintaining a minimum liquidity cushion as a known *"fundamental"* element of CCC's business model.

None of the above however is an allegation of a direction or instruction from TCG or Holdings being followed, whether customarily or otherwise, by Messrs Allardice, Sarles and Loveridge.

2522. The Plaintiffs next plead (Paragraph 412ZE) that *"Carlyle and CIM, through the Founders and Senior Carlyle Personnel, controlled and directed the affairs of CCC"* in that they

> *"1. regularly undertook functions in relation to CCC which could only be properly discharged by a director, and formed part of CCC's corporate governance structure; and/or*
>
> *2. exercised a degree of control over the business and affairs of CCC that was at least on an equal footing with that exercised by its de jure directors; and/or*
>
> *3. were held out to, and regarded by, CCC's shareholders and creditors as part of the corporate governance structure of CCC, and responsible for its success; and/or*
>
> *4. were the substantial or predominant influence in directing the affairs of CCC."*

2523. Although sounding initially like an allegation of shadow directorship, the details only mention aspects of *de facto* directorship in (1) and (3), but even none of these allegations is specific; they ring more of a submission than statements of fact and are mostly mere assertion. They do not plead specifically any fact capable of bringing home liability to any of the Entity Defendants arising from having acted as either a shadow or *de facto* director of CCC in any material respect in this action. A finding of *de facto* directorship has to be founded on proof of the doing of a <u>specific</u> (offending) "directorial act" by the relevant defendant, and a finding of shadow directorship has to be based on proof of actual directions or instructions given by the defendant.

2524. This could, again, be cured by further particulars, and the Plaintiffs do indeed go on to plead further matters at Paragraph 412 ZF, although they do this as "*further or alternatively*" rather than as particulars of Paragraph 412E. They plead here that Carlyle and CIM

> "*through the Founders and Senior Carlyle Personnel, controlled and directed the affairs of CCC*",

listing 16 individual occasions of such alleged control or direction between the inception and the demise of CCC, in which Messrs Rubenstein, Mayrhof, Buser, Nachtwey, Harris, Ms Cosiol or unspecified senior Carlyle personnel, sometimes in conjunction with Mr Conway, took some step in relation to CCC's affairs. There is no need to recite all of them, but as a flavour, they include matters as diverse as seeking investment in CCC, forming plans in case its IPO did not proceed, overseeing CCC's publicity materials, dealing with CCC's funding counterparties and auditors, and receiving or making reports on CCC's affairs. However, only one such allegation is in respect of a matter which is alleged to have caused loss to CCC. This is at Paragraph 412ZF.5, which cites the familiar decision not to sell RMBS (etc) in August 2007, and the potential provision of a further loan from Carlyle to CCC in September 2007, but pleads that these were decisions of Mr Conway, acquiesced in by the other *de iure* directors of CCC. Mr Conway was, of course, a *de iure* director of CCC. Thus, this allegation neither alleges any "directorial acts" of CCC effected by personnel who were agents of an Entity Defendant, nor the communication of any "direction or instruction" to a *de iure* director of CCC by an Entity Defendant.

2525. The next material Paragraphs of the Cause are those at 419 – 421, in a section headed "*CIM's wrongful conduct*". There is first pleaded against CIM, 21 matters of conduct each said to be reckless, grossly negligent (or negligent), wilful misconduct, and a breach of the fiduciary "*or other*" obligations owed by it to CCC, and then, at Paragraph 420, it is pleaded that

> "*as a shadow and/or de facto director of CCC... , CIM owed the same <u>fiduciary</u> duties to CCC...*"

as its actual directors owed, and that CIM breached these, through the conduct pleaded, not (oddly enough) in para 419, but in Paragraphs 417.4 -417.24 and 418A- 418N - even though these are allegations of misconduct by the individual directors, of whom at least three, the Independent Directors, had nothing to do with CIM. On close and laborious examination, none of these alleged facts is anything which could be argued to have been done by CIM otherwise than as part of its functions as CCC's investment manager, or amounted to "directions or instructions" to the directors of CCC rather than being professional advice.

2526. In Paragraphs 422 - 424, the Plaintiffs then plead exactly the same matters as those previously pleaded in Paragraphs 419-421 against CIM, but now against "*Carlyle*", and the same points arise.

2527. In Paragraphs 424A –G, under the heading "*Additional particulars of breach by Carlyle and CIM*" the Plaintiffs then repeat a large number of earlier paragraphs of the Cause and allege, at intricate length, that the breaches of various fiduciary duties and duties of skill and care pleaded previously in those paragraphs were also breaches of such duties owed by CIM and "Carlyle". Again, it does not seem to me that these paragraphs contain allegations of the facts necessary to constitute either *de facto* or shadow directorship, as recognised in law.

2528. It thus seems to me that the Cause barely pleads a sustainable basis for a claim that the Entity Defendants incurred liability as either *de facto* or shadow directors of CCC for the breaches of duty alleged to have caused CCC loss. However, as the nature of the claim is reasonably apparent, I go on to consider what are the requirements for any such claim, and whether these can be made out on the evidence in the trial.

**De facto directorship – discussion and conclusion**

2529. This is not a case of acting under an invalid appointment: none of the Entity Defendants was purportedly appointed a director of CCC.

2530. Nor is it a case of CCC having held out TCG or Holdings (or CIM) as a director despite the fact that they were not, with TCG or Holdings or CIM having joined in and purported to act as a director. Although such holding out is pleaded in respect of TCG and Holdings, there is no evidence of this even on a general basis, and certainly none in respect of the only material allegations of breach of duty, ie those alleged to give rise to the loss suffered by CCC.

2531. The type of *de facto* directorship alleged here is the third category of *de facto* directorship, identified above under Legal Principles, ie that of interference. It requires that the Entity Defendants can be shown to have meddled in the affairs of CCC by <u>themselves</u> carrying out acts which only a director of CCC had power to carry out, and which were culpable on the part of a director of CCC in the ways pleaded. To be a qualifying act, for the purpose of founding proof of *de facto* directorship in this case, the relevant act must satisfy four criteria. It must be

    (i)    an act carried out on behalf of CCC, that only a *de iure* director of CCC could perform,

    (ii)    an act carried out by the relevant entity sought to be fixed with liability (ie by a human actor who is either an empowered officer, or the duly authorised agent, of that entity, and for that purpose),

    (iii)    an act which the relevant actor could not be legitimately doing in a capacity other than that of a director of CCC,

and, in addition, in order to give rise to liability

    (iv)    an act which was in some way causative of the damage to CCC of which complaint is made.

2532. Leaving aside the fourth requirement for the moment, as regards TCG and Holdings, there is no acknowledgment of the first three criteria in the pleading, and there is neither pleading, nor evidence, to show how it is maintained that the only actions which are claimed to have caused actual loss to CCC, namely the decisions not to sell RMBS or seek to raise further equity capital from July 2007 onwards, were carried out <u>by</u> TCG or Holdings, as a matter of fact. Certainly facts demonstrating the necessary authority from TCG or Holdings to the person(s) who actually did any such material acts would have been pleaded and proved. There is nothing approaching this.

2533. Even overlooking the absence of a properly pleaded case on the pleadings, but applying the correct legal principles to the evidence in this case, I find the allegations of the *de facto* directorship of CCC, whether by CIM, TCG or Holdings to be unsubstantiated. The allegation is little more than assertion, founded totally on the argument that the relationship of TCG and Holdings (or CIM) to CCC should be characterised as one of "control", and arguing that "therefore" any material decision or act of CCC or its Board can be regarded as being "really" that of TCG or Holdings (or CIM). That is neither principled, nor is it the law.

2534. The short point is that the only decisions which are alleged to have caused loss to CCC are the decisions made at various points between July 2007 and March 2008 not to sell RMBS (or not to try to raise equity capital) but instead to hold on to those assets and to continue the necessary borrowings to do so, and, on the evidence, those decisions were taken or endorsed, and the implementation of those acts was authorised, by the *de iure* directors of CCC. Even if the scope of relevant decisions is extended to include such ancillary matters as authorising the suspension of the Investment Guidelines, those decisions were also still taken by the *de iure* directors of CCC.

2535. There is no evidence of any such decision being taken by anyone in the capacity of agent for TCG or Holdings. Whilst it might be argued that some such decisions were taken or implemented by CIM, such acts were properly done in CIM's capacity as investment manager for CCC, appointed under the IMA. They are plainly referable to that status; they are not CIM's officiously assuming the functions of a director of CCC.

2536. Even where distinctions in capacity might begin to become blurred in practice (I note, for example, that Mr Green resigned from CIM, and thus what was effectively his position as CFO of CCC at the end of January 2008 shortly before the end of the material time, and the result was that Mr Buser of TCG rendered more assistance to the operations of CCC in his place), that makes no difference to the fundamental point that to make out *de facto* director liability it would be necessary to prove that an individual acting on behalf of TCG or Holdings did material acts on behalf of CCC which could only have been done by a director of CCC. I was in fact not even addressed on the basis that there were any such examples in the evidence. The whole pattern of the Plaintiffs' submissions in this regard was simply reliance and emphasis on the strength of the alleged "pervasiveness" of the Carlyle ethos and influence in the running of CCC's affairs, and that this somehow made TCG or Holdings tantamount to directors of CCC, such that they could be called *de facto* directors of CCC. An alternative submission was that as Mr Stomber and Mr Conway, in particular, failed themselves (it is said), to distinguish the capacities in which they might be acting, that opened up the door to treat their acts as being carried out on behalf of TCG, or Holdings (or I think, CIM), simply because they had authority to act on behalf of those entities (Mr Conway) or were effectively employed by those entities

(Mr Stomber, even though that proposition is not really accurate as he was employed by CGEC). In my judgment that simply is not enough.

2537. In their closing submissions, the Plaintiffs argue that "*the appropriate inference to be drawn*" from the evidence (including, they say, the absence of any evidence given by any other Carlyle/CIM personnel who had involvement in CCC's affairs beyond those called by the Defendants) is that

> "*…the Defendants, the Senior Carlyle Personnel and CCC's authorised Officers were acting concurrently on behalf of Carlyle, CIM and CCC at all relevant times*".

2538. This vague and broad brush approach is neither correct as a matter of legal analysis of the facts, nor is it a permissible basis of liability. I unhesitatingly reject it.

2539. Thus the allegation of *de facto* directorship of CCC made against the Entity Defendants, in respect of the acts which are material to the alleged causing of damage to CCC therefore fails on this fundamental point of evidence.

**Shadow directorship – discussion and conclusions**

2540. As regards the allegation that CIM, TCG or Holdings was a shadow director of CCC in respect of any material decision, I find that the Plaintiffs' case also fails.

2541. The key point here, in my judgment, is that the Plaintiffs must identify some "directions or instructions" emanating from the relevant entity and in accordance with which the actual directors of CCC (or, if applicable, the relevant voting majority of such directors) was "accustomed to act". As the entities sought to be made liable are corporate entities, CIM, TCG or Holdings, it is therefore _their_ directions or instructions which have to be proved. This requires a finding against either CIM, TCG or Holdings that _that entity_ gave directions or instructions to the directors of CCC, or the relevant majority of them, in respect of any relevant act and such that there is a discernible pattern of those directors "doing as they were told" by CIM, TCG or Holdings rather than exercising their own judgment in respect of the relevant act or aspect of CCC's business. This in turn means proving the communication of relevant "directions or instructions" by some person who was doing so in the capacity of either the appropriate organ or a duly authorised officer or agent of the entity (CIM, TCG or Holdings) in question.

2542. Again, taking TCG and Holdings first, the Plaintiffs have not, it seems to me, even focused on making out this requirement as a matter of evidence. No evidence has been adduced or elicited, of any material "directions or instructions" being given to the Directors of CCC with regard to any of the decisions or failings complained of by any person, let alone any person shown to be acting in that regard on behalf of and with the authority of TCG or Holdings. Neither is there any evidence of conduct from which it might be properly inferred as a fact that directions or instructions were being given by either TCG or Holdings to CCC's directors (or to any material group of them such as "Allardice, Sarles and Loveridge"), and in accordance with which they were "accustomed to act". Indeed, I do not think that it was ever suggested to any of the last three directors that they were acting on directions or instructions at all, as contrasted with it being suggested that they exercised no independent judgement and unquestioningly did what either Mr Stomber or (as the allegation more often is) Mr Conway requested, proposed or recommended. That is not the same thing.

2543. I have already noted when considering legal principles that the authorities show that the mere fact of holding a company's shares, or a majority of them, is insufficient to constitute an entity a shadow director of the relevant company. Thus, even if the voting shares in CCC were to be treated as held by either TCG or Holdings, that would not justify a finding of shadow directorship.

2544. There is, I find, no evidence sufficient to found a conclusion that the *de iure* Directors of CCC (or a relevant majority of them) were accustomed to act in accordance with instructions or directions given by TCG or Holdings, let alone that they did so act in the respects which are alleged to have caused CCC loss. There is no evidence of actual directions or instructions. Mere influence is insufficient, even if it is considerable, and "control" would likewise only be sufficient if it manifested itself in the form of the necessary pattern of instructions given and customary compliance. None of that is made out here.

2545. Moving to CIM, since CIM was CCC's investment adviser, it is necessary to consider in what capacity any communications to CCC's directors which are established as being from CIM were given and whether they were, in substance, advice being given in a professional capacity or, rather, "directions or instructions" as to how to act. I have no hesitation in finding that any such communications were the former. Even assuming that communications from Mr Stomber to the other directors of CCC were to be treated as coming from CIM, rather than (as I would have thought more reasonable) from CCC's own CEO director, there is, once again, simply no evidence to support the proposition that Mr Stomber was conveying CIM's "directions or instructions" to the directors of CCC, as contrasted with CIM's investment advice.

### Final Conclusions as regards the Entity Defendants as directors

2546. For all the above reasons, therefore, the claims against the Entity Defendants based on allegations of their *de facto* or shadow directorships of CCC fail completely.

2547. As the Plaintiffs' claims against the Entity Defendants have now become defined, my conclusions on this aspect of the claim are sufficient to dispose of all claims which have been maintained against TCG and Holdings. The Plaintiffs' action against those entities will therefore be dismissed. As regards CIM, they dispose of the claims founded on *de facto* or shadow directorship. The Claims against CIM made on the basis of breach of contract or negligence have been considered above.

## 16. Causation and Quantum

### Preliminary

2548. The arguments in this case have never got as far as any detailed consideration of damages calculations. It has not been worth doing so in advance of findings of fact which would enable a properly focused exercise to take place.

2549. Because I have held that the Defendants committed no breach of duty (and nor, consequently, misfeasance) and were not guilty of wrongful trading, it is strictly unnecessary for me to deal with issues of damage and quantum. The question is therefore whether I should nonetheless consider these points in case this matter goes further (to use the traditional phrase).

# EXHIBIT B

of the house will of course be an important factor in many cases. But in
other cases, contributions by way of the labour or other unquantifiable
actions of the claimant will also be relevant.

Taking into account the fact that the house was intended to be the
joint property, the contributions to the common expenditure and the
payment of the fire insurance moneys into the joint account, I agree that
the plaintiff is entitled to a half interest in the house.

A

B

> *Appeal allowed with costs.*
> *Order for costs not to be enforced
> without leave of court.*
> *Plaintiff to have half beneficial interest
> in house pending sale and in net
> proceeds of sale when house sold.*
> *Legal aid taxation of both parties
> costs.*
> *Leave to appeal refused.*

C

Solicitors: *Livingston Solomon; Singh Karran & Co., Southall,
Middlesex.*

D

S. H.

———

E

[COURT OF APPEAL]

*In re* BIRD PRECISION BELLOWS LTD.

F

1985 July 1, 2, 3   Oliver and Purchas L.JJ.

> *Company—Oppression—Conduct of affairs—Quasi-partnership private
> company—Exclusion of two directors from participation—Order
> for purchase by majority of minority shares—Price to be
> determined by court—Whether shares to be valued pro rata or at
> market value as minority holding—Companies Act 1980 (c. 22),
> s. 75(1)(3)(4)(d)*

G

The company was formed in August 1975 in order to
combine B.'s expertise in the manufacturing of precision bellows
with the general experience of A. and N. in financial, commercial
and industrial matters. At the first meeting of directors A. was
appointed chairman, N. was appointed financial director and
company secretary, neither of them receiving remuneration as
directors, and B. was appointed as managing director, with a
yearly salary. The company's capital was so arranged that the
petitioners, A. and N. and N.'s family, held 26 per cent. of the
issued share capital. Restrictions were placed by the articles of

H

A    association on the transfer of shares. Between 1975 and mid-1980 the company's affairs worked smoothly, and the company began to prosper, but thereafter the relationship of mutual confidence became impaired and in April 1981, at an extraordinary general meeting, A. and N. were removed as directors. The petitioners presented their petition, under section 75 of the Companies Act 1980,[1] for an order that their shares should be purchased by the respondent majority shareholders at

B    their fair value. Vinelott J. ordered, by consent, pursuant to section 75 of the Act that the majority shareholders should purchase the petitioners' shares "at such price as the court shall hereafter determine." The order gave liberty to all parties to apply for, inter alia, "directions as to the payment of the purchase price and interest if appropriate." On the hearing to determine the appropriate purchase price of the shares Nourse J.

C    found that the company constituted a quasi-partnership and that the exclusion of A. and N. from the company had been unjustified and amounted to conduct unfairly prejudicial to the petitioners' interests; and he held that, that being so, the fair basis for valuing the petitioners' shares was to fix the price pro rata according to the value of the shares of the company as a whole without any discount because they represented a minority holding. The judge further held that the petitioners were not

D    entitled to interest on the purchase price for any period before it had been determined.

    On appeal by the majority shareholders and cross-appeal by the petitioners on the issue of interest:—

    *Held*, (1) dismissing the appeal, that section 75 of the Companies Act 1980 conferred on the court a wide discretion to do what was fair and equitable in all the circumstances so as to put right the unfair prejudice to a petitioner and cure it for the

E    future; that that discretion extended to the terms of an order for the purchase of a petitioner's shares under section 75(4)(*d*), so that the proper price for a petitioner's shareholding was the price which the court, pursuant to that discretion, determined to be proper in all the circumstances of the case; that, on its true construction, the consent order entitled the court to exercise in full its discretion under section 75; and that, in so doing, the

F    judge was right in concluding that it was appropriate to treat the company as a quasi-partnership and value its shares as a whole and the petitioners paid the proportionate part of that value which corresponded to their shareholding and not its market value as a minority shareholding (post, pp. 669D–F, G–H, 673H–674B, 677F, 678F–H, 679B–C).

    *Scottish Co-operative Wholesale Society Ltd. v. Meyer* [1959] A.C. 324, H.L.(Sc.); *In re Jermyn Street Turkish Baths Ltd.*

G    [1970] 1 W.L.R. 1194 and *In re Westbourne Galleries Ltd.* [1973] A.C. 360, H.L.(E.) applied.

    (2) Dismissing the cross-appeal, that the liberty to apply for directions in the consent order was provided to enable the court to order payment of interest on the purchase price after the court had fixed the price should it remain unpaid; and that, accordingly, the judge was right in rejecting the claim for

H    interest (post, pp. 677C–E, F, 679C, D–F).

    Decision of Nourse J. [1984] Ch. 419; [1984] 2 W.L.R. 869; [1984] 3 All E.R. 444 affirmed.

[1] Companies Act 1980, s. 75: see post, p. 665D–F.

The following cases are referred to in the judgment:

*Dean v. Prince* [1954] Ch. 409; [1954] 2 W.L.R. 538; [1954] 1 All E.R. 749, C.A.

*Jermyn Street Turkish Baths Ltd., In re* [1970] 1 W.L.R. 1194; [1970] 3 All E.R. 57

*Scottish Co-operative Wholesale Society Ltd. v. Meyer* [1959] A.C. 324; [1958] 3 W.L.R. 404; [1958] 3 All E.R. 66, H.L.(Sc.)

*Westbourne Galleries Ltd., In re* [1973] A.C. 360; [1972] 2 W.L.R. 1289; [1972] 2 All E.R. 492, H.L.(E.)

The following additional cases were cited in argument:

*Company (No. 002567 of 1982), In re A* [1983] 1 W.L.R. 927; [1983] 2 All E.R. 854

*House Property & Investment Co. Ltd. v. James Walker, Goldsmith and Silversmith Ltd.* [1948] 1 K.B. 257; [1947] 2 All E.R. 789

*Purcell v. F.C. Trigell Ltd.* [1971] 1 Q.B. 358; [1970] 3 W.L.R. 884; [1970] 3 All E.R. 671, C.A.

*Sudbrook Trading Estate Ltd. v. Eggleton* [1983] 1 A.C. 444; [1982] 3 W.L.R. 315; [1982] 3 All E.R. 1, H.L.(E.)

*Talbot v. Talbot* [1968] Ch. 1; [1967] 3 W.L.R. 438; [1967] 2 All E.R. 920, C.A.

*Ward v. James* [1966] 1 Q.B. 273; [1965] 2 W.L.R. 455; [1965] 1 All E.R. 563, C.A.

*Westminster Property Group Plc., In re* [1985] 1 W.L.R. 676; [1985] 2 All E.R. 426, C.A.

APPEAL from Nourse J.

The respondents, Philip Arthur Bird, Mrs. E. M. Bird, Stanley Rowden and Pipe-Chem Holdings Ltd., to a petition dated 12 October 1981 by Ernest Armstrong Stanley David Nin, his wife Edith Nin and his three children, appealed from the judgment of Nourse J. dated 28 October 1983 whereby the judge determined, pursuant to section 75 of the Companies Act 1980, that the fair price at which the respondents, as majority shareholders ("the majority shareholders"), should buy the petitioners' shares in Bird Precision Bellows Ltd. was £18·25 per share, making a total price of £142,350. The majority shareholders sought an order that a fair price at which they ought to purchase the petitioners' shares should be determined at £10·04 per share, making a total price of £78,312.

The grounds of appeal were that (1) the judge was wrong in law in disregarding the market price of the shares (which, according to the evidence of both valuers was to be fixed by taking the value of the company as a whole, calculating the pro rata price for the shares in question, and discounting the price by 45 per cent.) by reason of the fact that, as the judge decided, the company was a quasi-partnership; (2) the judge failed to take account of the parties' rights as set out in the articles of association of the company which provided the only, or the only fair, basis for valuing the shares, and which basis would have produced a value of £10·04 per share; (3) the judge made a distinction which was valid neither in law nor in logic between the fair value to be ascribed to the petitioners' shares if they wished to sell their shares voluntarily (when a discount was to be applied) and if they wished to

A    sell their shares because they had been unfairly prejudiced by the way in which the company was run (when no discount was to be applied); (4) if that distinction was correct, the judge was wrong in law in applying it to the present case (i) in the light of the compromise of the petition by the parties without any admission of any oppression or unfair prejudice or any ground entitling the petitioners to present a petition, and (ii) in which the company was a respondent; (5) in failing to apply the discount

B    to the price of the shares in accordance with the evidence of both parties' valuers, and in the circumstances of the instant case, the judge was effectively giving damages to the petitioners, notwithstanding that (a) he had no power so to do in the absence of evidence to the effect that the value of the company had been reduced by any acts of the majority shareholders, (b) the petitioners, by their counsel, at the outset

C    of the hearing before the judge, abandoned any claim for damages and (c) the petition had been compromised without any admission of wrongdoing by the majority shareholders or any of them, and the judge's function merely involved determination of a price; (6) the judge failed to determine a fair price for what was effectively a piece of property in the hands of the petitioners, but rather sought to compensate them for some uncertain and unqualified loss; and (7) in the light of the

D    judge's findings as to the petitioners' conduct, alternatively Mr. Nin's conduct, in relation to an agreement as to the sale of Pipe-Chem (Holdings) Ltd.'s shares in the company, the judge was wrong in failing to apply a discount on the basis that the petitioners had constructively offered their shares, or Mr. Nin had constructively offered his shares, for sale or on the basis that by reason of such conduct, it would be

E    unfair not to apply a discount.

     By a respondent's notice dated 29 December 1983 the petitioners sought to have the judge's order affirmed on the following additional grounds that (1) on the true construction of the articles of association of the company the value to be attributed to a share of the company was a rateable proportion of the value of the shares of the company as a whole; (2) a valuation of shares pursuant to section 75 of the Act of 1980 should not be less favourable to the petitioners than a valuation pursuant to the articles; (3) the consent order dated 23 November 1981

F    precluded the majority shareholders from contending that that was not an appropriate case for relief under the section and/or from relying on the petitioners' conduct.

     The petitioners further contended, by way of cross-appeal, that in

G    addition to £18·25 per share awarded to them they should be awarded interest, or its equivalent, on the total purchase price of £142,350 at the short term investment rate from time to time from 23 November 1981 until payment (or at such other rate and for such other period as the Court of Appeal should think fit) and that the judge was wrong to refuse to make such an award in his further judgment given on 25 November 1983.

H    The grounds of the cross-appeal were that (1) the judge failed to exercise his discretion to award interest, or its equivalent; (2) the judge should have held (in so far as he did not) that the court had power to award interest, or its equivalent, under section 75 of the Act of 1980 and

should further have held that it was appropriate to award interest, or its
equivalent, at the rate and over the period aforesaid; (3) the judge
wrongly characterised the petitioners' claim for interest, or its equivalent,
as "damages;" (4) the judge wrongly held that the majority shareholders
might not have had sufficient opportunity to deal with the claim for
interest, or its equivalent, having regard to (a) the liberty to apply
reserved to the parties in the order of 23 November 1981, (b) the fact
that the hearing as regards interest was adjourned and that the majority
shareholders took the opportunity to adduce evidence on that point
either during the trial itself or at the adjourned hearing and (as regards
the adjourned hearing) did so; (5) the sum awarded to the petitioners,
amounting to £142,350, was in excess of any offer the majority
shareholders had made and in particular exceeded the sums of
(a) £120,000, which the petitioners had been prepared to accept in
satisfaction of all or any claims prior even to the commencement of
proceedings herein, and (b) £115,000, offered by the majority
shareholders in full settlement prior to the hearings.

The facts are stated in the judgment of Oliver L.J.

*Charles Sparrow Q.C.* and *I. E. Jacob* for the appellant majority
shareholders. There is, here, an agreement between the parties clothed
in the consent order: *Purcell v. F. C. Trigell Ltd.* [1971] 1 Q.B. 358.
Since that order the case has depended on the true interpretation of that
agreement which provides directly and simply for the purchase of the
minority shares by the majority shareholders. "Purchase" is an ordinary
word and courts have consistently given to its ordinary meaning which is
"purchase for an ordinary and reasonable price." The courts have
assessed reasonable price as a fair price and fair valuation: *Sudbrook
Trading Estate Ltd. v. Eggleton* [1983] 1 A.C. 444; *In re Westminster
Property Group Plc.* [1985] 1 W.L.R. 676 and *Talbot v. Talbot* [1968]
Ch. 1.

Nourse J. expressly held [1984] Ch. 419, 426F, that there was no
"rule of universal application" that the value of a minority holding had
always to be fixed pro rata according to the value of the company's
shares as a whole or that the price of a minority holding had always to
be discounted. It follows, therefore, that such valuation should be,
throughout, an exercise of expert principles that determine value as a
fact and the judge was wrong in regarding this issue as "a question of
law to be decided by the court:" [1984] Ch. 419, 436A. He was also
wrong to regard such valuation as involving a "discounted" price. The
valuation for which the majority shareholders contend does not involve
"discounting" a price. It is directed to ascertaining a price of the
minority shareholding: *In re A Company (No. 002567 of 1982)* [1983] 1
W.L.R. 927. It is true that the court has power to make an order for
compensation. Such an order has to be to compensate for some loss:
*Scottish Co-operative Wholesale Society Ltd. v. Meyer* [1959] A.C. 324.
The order, here, is not an order of that nature.

As to valuation, the judge found that the petitioners did not deserve
their exclusion from the company's management. It does not necessarily

A follow that the measure of valuation should be valuation of the company's shares as a whole. That approach is inconsistent with ascertaining the actual value of the particular minority. It would amount to an extra element of consideration to the purchase price and is outside the consent order. [Reference was made to *In re Jermyn Street Turkish Baths Ltd.* [1970] 1 W.L.R. 1194.]

B *William Stubbs Q.C.* and *Charles Purle* for the petitioners. Vinelott J.'s order dated 23 November 1981 gave the court a complete discretion as to the criteria to be adopted for determining the price to be paid for the petitioners' shares. There is no justification for reading any limitation into the order. It was, in fact, a consent order and was expressly stated to be made "pursuant to section 75." In order to have jurisdiction to make any order under the section the court had to be satisfied that the

C petition is well founded: see section 75(3). Thus, the consent by the majority shareholders to the making of the order necessarily involved the admission by them that the petition was well founded, that is to say, there had been unfair prejudice to the interests of the petitioners. The express reference in the order of Vinelott J. to section 75 also confirms the intention that under section 75(4)(*d*) in determining the price to be paid for the petitioners' shares, the court was to have an unfettered

D discretion to impose upon the parties whatever settlement the court considered just and equitable. Accordingly, Nourse J. was to fix what he regarded to be a fair price on the basis of a rateable part of the value of the company's total issued share capital. [Reference was made *Ward v. James* [1966] 1 Q.B. 273.]

An appellate court will only interfere with the exercise of this

E discretion if it was plainly wrong. That general principle also applies to appeal on the question of valuation. [Reference was made to *Scottish Co-operative Wholesale Society Ltd. v. Meyer* [1959] A.C. 324.] Nourse J. was not wrong. He postulated a general rule that where in the case of a quasi-partnership company, a minority shareholder's interest have been unfairly prejudiced by the manner in which the affairs of the company have been conducted by the majority and an order under

F section 75(4)(*d*) for the purchase of the minority shareholder's interests is made then the correct course is to fix the price pro rata according to the value of the shares as a whole and without any discount. In the context of section 75 the expression "just and equitable" is very wide: see Lord Wilberforce in *In re Westbourne Galleries Ltd.* [1973] A.C. 360, 374–375, 379, about the same words in section 222(*f*) of the

G Companies Act 1948. The nature of the just and equitable solution to be imposed under section 75(4)(*d*) of the Act of 1980 cannot depend merely on objective concepts of value. It is appropriate for the court to take into account the underlying nature of the company, the agreed basis on which it was established by the shareholders, and of the conduct of the parties prior to the presentation of the petition. Only by doing this can the court enable a minority shareholder to obtain a

H proper price for his shareholding: see Lord Cross of Chelsea in *In re Westbourne Galleries Ltd.* [1973] A.C. 360, 385. *Scottish Co-operative Wholesale Society Ltd. v. Meyer* [1959] A.C. 324 also supports Nourse J.'s approach.

Nourse J. appears to be of the view [1984] Ch. 419, 431G–H, that, even outside the context of an order under section 75, the fair price, payable for shares in a quasi-partnership, would normally be a pro rata one. That view is correct. The pro rata basis is the normal basis provided for in articles of partnership in respect of a voluntary retirement, and is also the basis often adopted in quasi-partnership companies where, as not infrequently happens, the quasi-partners make express contractual provisions. Such an approach is consistent with that adopted by the House of Lords to quasi-partnerships in *In re Westbourne Galleries Ltd.* [1973] A.C. 360.

If it is accepted that the court has a very wide discretion under section 75(4)(*d*) of the Act of 1980 it can fix a higher price than that which, under the relevant company's pre-emption articles, a majority would be required to pay on a transfer notice voluntarily given by the minority. As a general rule however it cannot be right for the price so fixed to be lower than the price payable under the articles. On the true construction of the pre-emption provisions of the company's article 21 any valuation by the auditor must be a pro rata valuation: *Dean v. Prince* [1954] Ch. 409, 427–428, 430–431.

On cross-appeal, section 75(3) of the Act of 1980 gives power to the court to grant such relief as it thinks fit. That power is wide enough to cover the award of interest on the purchase price of the shares to the shareholders whose shares are being bought under a court order. Nourse J. was wrong not to award such interest. [Reference was made to *House Property & Investment Co. Ltd. v. James Walker, Goldsmith and Silversmith Ltd.* [1948] 1 K.B. 257.] Furthermore, Vinelott J's order, on its true construction, gives liberty to apply in effect for all the things the petitioners complained of, including the question of damage caused to them.

*Sparrow Q.C.* in reply. Section 75(3) of the Act of 1980 cannot apply unless the court is satisfied that the petition under the section is well founded. The order of 23 November 1981 was a consent order without any admission on the part of the majority shareholders that the petition was well founded. The subsection, thus, cannot be invoked. The petitioners cannot be entitled to interest for a further reason that there was no principal until the price was fixed by the court and, thus, no interest can be charged on it.

OLIVER L.J. This is an appeal against an order of Nourse J. made on 28 October 1983 determining, pursuant to an order previously made by Vinelott J. on 23 November 1981, that shares in a private company which were to be purchased by the appellants in this appeal, who were the respondents to a petition, at a price of £18·25 each. I read at this stage only the last three lines of the judge's judgment [1984] Ch. 419, 436:

"I value the shares of the company as a whole at £547,500. I determine the price at which the respondents are jointly and severally to purchase the shares of the petitioners at £18·25 each."

The way in which this matter came before the court was this. The company was a private company, Bird Precision Bellows Ltd., which

A had been incorporated in 1975. The petitioners, Mr. Armstrong and Mr. Nin, were the holders of some 7,800 shares out of the total issued capital of 30,000 shares. The judge found that the company had been incorporated in the first instance as a sort of quasi-partnership between the petitioners and the respondents who were the majority shareholders, for the exploitation of certain processes with which the principal shareholder, Mr. Bird, was very much concerned and in which he was

B very expert. The two petitioners were there substantially, I think, in the role of consultants and gave their services to the company in the early stages of its career at very much less than the value which was properly to be attributed to those services.

It is unnecessary to go in any great depth into the facts. The parties fell out in August 1981. The petitioners were then removed from the

C board of directors of the company and in October 1981 they presented a petition under section 75 of the Companies Act 1980, in which they claimed that they should be bought out. There was also at that stage, although it was subsequently dropped by amendment, an alternative claim to have the company wound up.

I think I should read the material parts of section 75, because that section has some bearing on what subsequently occurred:

D
"(1) Any member of a company may apply to the court by petition for an order under this section on the ground that the affairs of the company are being or have been conducted in a manner which is unfairly prejudicial to the interests of some part of the members (including at least himself) or that any actual or proposed act or omission of the company (including an act or omission on its

E behalf) is or would be so prejudicial. . . . (3) If the court is satisfied that a petition under this section is well founded it may make such order as it thinks fit for giving relief in respect of the matters complained of. (4) Without prejudice to the generality of subsection (3) above, an order under this section may"—and then there are various things which can be done, terminating with—"(d) provide

F for the purchase of the shares of any members of the company by other members or by the company itself and, in the case of a purchase by the company itself, the reduction of the company's capital accordingly."

What happened in this case was that there appears to have been considerable correspondence between the parties with regard to the

G possibility that the majority shareholders should buy out the petitioners and there was some disagreement as to how the price of a purchase ought to be arrived at. Ultimately, when the matter came before the Companies Court, as it did on 23 November 1981, it was dealt with by agreement and a consent order (although it is not expressed as such) was made by Vinelott J. on that day. The order recites the petition and the evidence which had been filed on it up to that point, and it went on:

H
"This court doth order pursuant to section 75 of the Companies Act 1980 that the respondents"—and then it names them—"do jointly and severally purchase the 3,900"—it is common ground that that was a mistake for 7,800—"shares of the company registered in the

name of the petitioners"—and then it names the petitioners—"at
such price as the court shall hereafter determine provided that such
purchases may subject to the approval of this court be effected by
means of a reduction of the share capital of the company. And it is
ordered that on the question of the appropriate purchase price for
the said shares the evidence of the petitioners be filed within 14
days of the date of this order the evidence of the respondents be
filed within 21 days thereafter discovery by exchange of lists do take
place on or before 11 January 1982 with inspection within 14 days
thereafter and exchange of reports by experts within 28 days after
inspection."

There is a paragraph as regards costs, which I need not read, which
provides in effect that the respondents, the majority shareholders,
should pay the petitioners' costs of the petition down to and including
the foot of the order. Then there is a final paragraph:

"Liberty to all parties to apply (1) for further and better particulars
of the allegations in the affidavits (2) for directions as to the
payment of the purchase price and interest if appropriate and (3)
generally."

Following that order there was a substantial amount of evidence filed;
experts were engaged and their reports were, as I understand it, duly
exchanged and the matter came on for hearing before Nourse J. It
appears to have proceeded, up to the date of the hearing before
Vinelott J. and at least for a month or so thereafter, with commendable
celerity, but thereafter it adopted a somewhat molasses-like speed, and
it finally terminated in the matter coming before the court on 25
November 1983. The judge, having considered all the evidence and the
reports of the valuers, concluded in the way which I have read [1984]
Ch. 419, 436. The basis of the judge's valuation is to be found in two
passages from the judgment, at pp. 429 and 430: and there is a further
passage at p. 431. The judge said, at pp. 429–430:

"Although both sections 210"—which of course was the predecessor
of section 75—"and 75 are silent on the point, it is axiomatic that a
price fixed by the court must be fair. While that which is fair may
often be generally predicated in regard to matters of common
occurrence, it can never be conclusively judged in regard to a
particular case until the facts are known. The general observations
which I will presently attempt in relation to a valuation of shares by
the court under section 75 are therefore subject to that important
reservation. Broadly speaking, shares in a small private company
are acquired either by allotment on its incorporation or by transfer
or devolution at some later date. In the first category it is a matter
of common occurrence for a company to be incorporated in order
to acquire an existing business or to start a new one, and in either
event for it to be a vehicle for the conduct of a business carried on
by two or more shareholders which they could, had they wished,
have carried on in partnership together. Although it has been
pointed out on the high authority to which I will soon refer that the

A    description may be confusing, it is often convenient and it is certainly usual to describe that kind of company as a quasi-partnership. In the second category, irrespective of the nature of the company, it is a matter of common occurrence that a shareholder to acquire shares from another at a price which is discounted because they represent a minority holding. It seems to me that some general observations can usefully be made in regard to each of

B    these examples."

Nourse J. then referred to the well known passage from the speech of Lord Wilberforce in *In re Westbourne Galleries Ltd.* [1973] A.C. 360, 379, and went on:

"His Lordship, having observed that it is not enough that the company is a small one, or a private company, identified three
C    typical elements, one, or probably more, of which will characterise the company as a quasi-partnership. They are, first, an association formed or continued on the basis of a personal relationship involving mutual confidence; secondly, an agreement or understanding that all or some of the shareholders shall participate in the conduct of the business; and, thirdly, restrictions on share transfers. No doubt
D    these three elements are the most familiar, and perhaps the most important, but they were not intended to be exhaustive. In my view there may be other typical and important elements, in particular the provision of capital by all or some of the participants."

Next comes a passage which I think has assumed some importance in the argument, so perhaps it is worth reading:

E    "I would expect that in a majority of cases where purchase orders are made under section 75 in relation to quasi-partnerships the vendor is unwilling in the sense that the sale has been forced upon him. Usually he will be a minority shareholder whose interests have been unfairly prejudiced by the manner in which the affairs of the company have been conducted by the majority. On the assumption
F    that the unfair prejudice has made it no longer tolerable for him to retain his interest in the company, a sale of his shares will invariably be his only practical way out short of a winding up. In that kind of case it seems to me that it would not merely not be fair, but most unfair, that he should be bought out on the fictional basis applicable to a free election to sell his shares in accordance with the company's articles of association, or indeed on any other basis which involved
G    a discounted price. In my judgment the correct course would be to fix the price pro rata according to the value of the shares as a whole and without any discount, as being the only fair method of compensating an unwilling vendor of the equivalent of a partnership share. Equally, if the order provided, as it did in *In re Jermyn Street Turkish Baths Ltd.* [1970] 1 W.L.R. 1194, for the purchase of the
H    shares of the delinquent majority, it would not merely not be fair, but most unfair, that they should receive a price which involved an element of premium."

Then, Nourse J. said, at p. 431:

668
Oliver L.J. In re Bird Precision Ltd. (C.A.) [1986]

"Next, I must consider the example from the second category of cases in which, broadly speaking, shares in a small private company are acquired. It is not of direct relevance for present purposes, but I mention it briefly in order finally to refute the suggestion that there is any rule of universal application to questions of this kind. In the case of the shareholder who acquires shares from another at a price which is discounted because they represent a minority it is to my mind self-evident that there cannot be any universal or even a general rule that he should be bought out under section 75 on a more favourable basis, even in a case where his predecessor has been a quasi-partner in a quasi-partnership. He might himself have acquired the shares purely for investment and played no part in the affairs of the company. In that event it might well be fair—I do not know—that he should be bought out on the same basis as he himself had bought, even though his interests had been unfairly prejudiced in the meantime. A fortiori, there could be no universal or even a general rule in a case where the company had never been a quasi-partnership in the first place."

Nourse J. said, in summary, that there is no general rule and then comes the passage to which particular criticism has been directed:

"On the other hand, there is a general rule in a case where the company is at the material time a quasi-partnership and the purchase order is made in respect of the shares of a quasi-partner. Although I have taken the case where there has in fact been unfairly prejudicial conduct on the part of the majority as being the state of affairs most likely to result in a purchase order, I am of the opinion that the same consequences ought usually to follow in a case like the present where there has been an agreement for the price to be determined by the court without any admission as to such conduct. It seems clear to me that, even without such conduct, that is, in general, the fair basis of valuation in a quasi-partnership case, and that it should be applied in this case unless the respondents have established that the petitioners acted in such a way as to deserve their exclusion from the company."

The judge went on to conclude that the petitioners had not in fact deserved their exclusion on the facts of this case.

I have read those passages because they serve to indicate the approach of the judge to the problem with which he was confronted under the terms of the order. That approach has been criticised by Mr. Sparrow on two grounds: first of all, on the general ground that it was a wrong order in any event, or a wrong approach in any event, under section 75; and, secondly, on the ground that it was a wrong order, or a wrong approach, having regard to the specific terms of the consent order in this case which, as Mr. Sparrow rightly says, has to be looked at as a contract between the parties agreeing to the consent order.

What Mr. Sparrow suggests is this. I take the two points which he makes in inverse order, that is to say, I am taking his second point first. He suggests that an order made under section 75(4) is simply an order for a purchase, without any discretion in the court to give directions

A  which might have the effect of increasing or reducing the value of the shares in the open market, as shares in a private company. If the shares with which the purchase order is concerned are a majority holding, they are to be valued as such; if they are a minority holding they are to be valued as such, and in his submission the court is not entitled to look behind the company and to reflect, in the order for purchase or for sale, the actual relationship between the parties. According to this approach,

B  any agreement which has been made between the parties as to the basis upon which they were to participate in the company's affairs, or as to the way in which the company's affairs were to be conducted, any contribution which the petitioner may have made to the company's success, any absence of any contribution at all by the respondent, apart from the mere fact of his shareholding, is to be ignored. The court, in

C  other words, is to be rigidly restricted, if it is to make an order under section 75(4)(*d*) at all, to making an order for a purchase at a market price of the holding being purchased, to be arrived at only by the ordinary valuation principles, which will take into account the proportionate size of the holding in relation to the issued capital as a whole and to the control of the company.

D  For my part I find myself quite unable to accept this submission. It seems to me that the whole framework of the section, and of such of the authorities as we have seen, which seem to me to support this, is to confer on the court a very wide discretion to do what is considered fair and equitable in all the circumstances of the case, in order to put right and cure for the future the unfair prejudice which the petitioner has suffered at the hands of the other shareholders of the company; and I

E  find myself quite unable to accept that that discretion in some way stops short when it comes to the terms of the order for purchase in the manner in which the price is to be assessed. It has been pointed out, and I mention it again, that section 75(4) is merely a collection of possible methods of giving effect to section 75(3), and it is expressed to be without prejudice to the generality of subsection (3), which gives the court a very wide discretion as to the granting of relief in general terms

F  in respect of the matters of which complaint has been made.

We have been referred to the speech of Lord Cross of Chelsea in *In re Westbourne Galleries Ltd.* [1973] A.C. 360, 385, where he said in a very short passage, to which Mr. Stubbs drew attention:

"What the minority shareholder in cases of this sort really wants is not to have the company wound up—which may prove an

G  unsatisfactory remedy—but to be paid a proper price for his shareholding."

It is on the question of a "proper" price that the parties here divide. So, Mr. Sparrow's second submission, which I have dealt with first, I find myself quite unable to accept. In my judgment, the "proper" price is the price which the court in its discretion determines to be proper having

H  regard to all the circumstances of the case.

I come now to Mr. Sparrow's first submission, namely, that as a matter of interpretation of the order which, as he says and as I mention again, is a consent order, there is to be implied a contractual obligation

that the shares should be purchased at the market value as a minority    A
holding. The basis for this submission is that the consequence which I
have outlined is one which flowed simply from the use in the order of
the word "purchase;" and it is said that "purchase" ordinarily means
purchase at market value, and therefore one reads into the order the
words "a purchase at market value to be determined by the court." I
confess that I am entirely unable to see why that should be. In my
judgment, "purchase" ordinarily means no more than purchase for a    B
money consideration; what that consideration is is at large and the order
is one which only makes sense, and indeed can only be given any
operative life, if the purchase price is fixed in the exercise of the full
discretion vested in the court by section 75. The court has no jurisdiction,
as it seems to me, to act as a sort of arbitrator between experts, and if
Vinelott J. had been told that that was what was intended, and that all    C
that was intended was simply that there should be submitted to the court
the decision of the issue of what was the market value of the petitioners'
holding, I confess that I doubt very much whether he would have made
the order in that form, or indeed would have considered that he had any
jurisdiction to do so.

    Essentially what is suggested is that in assessing the price Nourse J.    D
was wrong to consider the evidence which had been filed in support of
the petition, and indeed subsequently, or to enter into any consideration
of the merits of the case, the inception of the relationships between the
parties and so on. I would find that a difficult submission to accept in
any event, but the submission might have had more force, I think, if, as
might at first be supposed from the terms of the order, the court was
simply being asked to embark on an inquiry into the value of the shares    E
on the assumption that it had been conceded in some unspecified way
that the petitioners had been subjected to unfair prejudice and that it
was therefore irrelevant to consider the manner in which they had in
fact been unfairly prejudiced.

    But it is the majority shareholders' own case, and it was so put to
the judge, that no such admission had in fact been made. As I have
pointed out, the terms of section 75(3) are perfectly clear. They simply    F
provide that if the court is satisfied that a petition under this section is
well founded, it may make such order as it thinks fit for giving relief in
respect of the matters complained of. If of course it is not so satisfied,
then it has no jurisdiction to give the relief which is referred to in
section 75(3) or in section 75(4). As it seems to me, this only has to be
read for it to be seen straight away that the court, in making a valuation    G
of the shares, can only do so if it is satisfied that the petition is well
founded.

    The judge therefore had to go into these questions, because it was
expressly said that there was no admission of any unfair prejudice, and
so the judge had to go into the question of whether there had been
unfair prejudice to the petitioners and how it had taken place, in order
to see whether he had any jurisdiction at all to embark on the inquiry    H
which he was invited to undertake. The judge referred to the question
of whether he ought to inquire into these matters as follows [1984] Ch.
419, 426:

A   "The first question which arose was whether the respondents, by consenting to the order of 23 November 1981 and, I suppose, by agreeing to pay the petitioners' costs to date, had effectively admitted that they had been conducting the affairs of the company in a manner unfairly prejudicial to the petitioners as members. There was some disagreement between counsel as to what was or was not said on the respondents' side at the hearing before

B   Vinelott J., but on what I saw and heard I was satisfied that there had been no admission to that effect. The respondents had merely agreed to buy out the petitioners at a price to be determined by the court. Assuming that unfair prejudice might sometimes affect the price which ought to be paid for the shares, I was nevertheless unable to see how, in the absence of some explicit statement of the

C   respondents' position, they could be taken to have made any admission as to that matter."

He went on, at p. 427:

  "It was unfortunate that the hopes and expectations of both sides for a shorter hearing should have been disappointed, but that was made inevitable by my decision on the first of the preliminary points

D   and by the positions which the parties adopted in regard to the second and third. I myself suggested certain ways in which the hearing might be shortened by agreement, but without success. In future, parties who wish to limit the issues or the evidence in a case of this kind would be well advised to go further than a mere agreement that the price of the shares shall be determined by the

E   court."

Then he said, at p. 434:

  "I have to say that I regard the evidence of both Mr. Bird and Mr. Rowden on the bribery question as having been extremely unsatisfactory. If it had been necessary for me to make any finding on that question, I would have rejected their evidence in its entirety

F   and accepted that of Mr. Nin and Mr. Armstrong. Having said that, I do not think that it is either necessary or desirable that I should go into this or any of the many other matters which were made the subject of allegations and counter allegations between the parties, both at the time and in evidence in this court. Having considered all the material evidence, I am satisfied that the exclusion of Mr. Armstrong and Mr. Nin was wrongful and that in that and certain

G   other respects into which I need not go, the affairs of the company were conducted in a manner unfairly prejudicial to the interests of them and the other petitioners as members. That finding, although strictly speaking unnecessary on the view which I take of the case, is one which I feel that I ought to make, if only in fairness to Mr. Armstrong and Mr. Nin and after a full and exhaustive investigation

H   of the merits."

If I have any criticism of the judge's judgment, it is only that he based his inquiry on the supposition that the merits might affect only the question of the basis of the valuation of the shares, as indeed in my

judgment they clearly can. But it was, I think, much more fundamental than that. Unless unfair prejudice was proved, the court was simply being asked to undertake a sort of arbitration in vacuo, which it had no jurisdiction to do. It seems to me quite unarguable that the judge, having perforce considered the merits and having heard evidence from the parties, should be expected, or indeed required, by the terms of this order, then to put that entirely out of his mind when it came to the question of the terms of the purchase.

    We have been referred to a number of authorities, first of all to a decision of Pennycuick J. in *In re Jermyn Street Turkish Baths Ltd.* [1970] 1 W.L.R. 1194, 1208, and I read an extract from his judgment:

> "Section 210 gives the court an unlimited judicial discretion to make such order as it thinks fit with a view to bringing to an end the matters complained of, including an order for buying out one faction by the other. It is not disputed on behalf of the respondents that in prescribing the basis on which the price of such a sale is to be calculated the court can in effect provide compensation for whatever injury has been inflicted by the oppressors."

In *Scottish Co-operative Wholesale Society Ltd. v. Meyer* [1959] A.C. 324, 369, Lord Denning said:

> "One of the most useful orders mentioned in the section—which will enable the court to do justice to the injured shareholders—is to order the oppressor to buy their shares at a fair price: and a fair price would be, I think, the value which the shares would have had at the date of the petition, if there had been no oppression. Once the oppressor has bought the shares, the company can survive. It can continue to operate. That is a matter for him. It is, no doubt, true that an order of this kind gives to the oppressed shareholders what is in effect money compensation for the injury done to them: but I see no objection to this. The section gives a large discretion to the court and it is well exercised in making an oppressor make compensation to those who have suffered at his hands."

What I think is being suggested here is that these citations in some way support the arguments of the majority shareholders, because it is said that what in effect the judge was seeking to do was to compensate the oppressed shareholders, and that that was not within the terms of the order. I do not read what the judge did as doing that at all. Speaking for myself, I have been quite unable to see why these two authorities should be supposed to support the arguments which the majority shareholders have advanced. They seem to me to be entirely against them because, as it seems to me, they indicate as clearly as can be the wide discretion which the court has in directing the basis on which shares should be valued for the purpose of a purchase ordered under this section. It may be true that it can be compensatory, but what the court is required to do, in the exercise of its very wide discretion, is that which is just and equitable between the parties.

    It does not seem to me in any event that the matter ends simply with the mere fact that the order, to be effective as an order under section 75

A   necessarily has to invoke the discretionary jurisdiction of the court, because there are in fact, as it seems to me, positive pointers in the order that that is exactly what was intended.

Going back to the terms of the order, it starts with the words "this court doth order pursuant to section 75 of the Companies Act 1980." I have already said that I do not for a moment think that the mere use of the word "purchase" which then follows—"that the respondents . . . do

B   jointly and severally purchase"—contains any implication at all that they should purchase necessarily at market value. It seems to me that quite the contrary is imported by the words "pursuant to section 75." What they are doing is purchasing pursuant to section 75, and it is pursuant to that section that the court is to determine price. That brings in, as it seems to me, by necessary implication the general discretion of the court

C   to do what is fair and equitable.

Secondly, one wonders, if all that was being asked for was an order for purchase at market price, what the purpose was, as Mr. Stubbs says, of involving the court in the matter at all. A market price could quite easily be determined outside the court by arbitration, or by submitting the matter to two valuers and their umpire. It seems to me to be quite evident from the first paragraph of the order that what was intended was

D   that the matter should be approached in the full sense as an application under section 75 of the Act, and that the court was expected, in arriving at the price to be paid, to take into account all the circumstances of the case.

That, as it seems to me, is underlined by the next part of the order, where it goes on with the question of the "appropriate" purchase price

E   for the shares, and proceeds with directions as to evidence. The evidence is quite clearly intended to be general evidence with regard to all the circumstances—there are provisions for discovery. So far as the accountancy aspect is concerned, that is dealt with by the last words of this section of the order: "and exchange of reports by experts within 28 days after inspection." So quite clearly, as it seems to me, the whole concept of the order was that there would be a full investigation into the

F   circumstances, with evidence filed on both sides, and, indeed, that is what took place.

Finally we come to the liberty to apply:

"Liberty to all parties to apply (1) for further and better particulars of the allegations in the affidavits (2) for directions as to the payment of the purchase price and interest if appropriate and

G   (3) generally."

So the parties were to have liberty to apply for further and better particulars, and again it seems to me that that could only be on the footing that the judge was to inquire fully into the circumstances of the case and into the affidavits that were directed to be filed.

Speaking for myself, I am quite satisfied, as a matter of construction

H   of the terms of the order, that the judge was entitled to exercise in full his discretion under section 75(3) and (4). Those subsections give him a very wide discretion, and I am quite satisfied that no ground has been shown for interference by this court with the actual manner in which the

judge in fact exercised the discretion which was vested in him by the   A
section, and by which he concluded that this was a quasi-partnership
case, and that being so it would be appropriate that the shares of the
company should be valued as a whole and that the petitioners should
then simply be paid the proportionate part of that value which was
represented by their shareholding, without there being made a discount
for the fact that this was a minority shareholding.

In my judgment, the judge was perfectly entitled to arrive at the   B
conclusion at which he did. I think that I myself, certainly on a reading
of the judgment and on such material as we have had, would not have
come to any other conclusion, and I am fortified in the view that I have
taken by an additional point which Mr. Stubbs takes on the articles of
association of the company. This company, as one might expect, had
articles of association which contained a pre-emption provision in the   C
ordinary form. It was one which had this perhaps unusual feature, that it
had a specific provision relating to the way in which a transfer notice
was to be treated. I can read the relevant paragraphs very simply; it is
the usual form of article which enables shares to be transferred to other
members, or to members of their family, and then provides that apart
from that no share shall be transferred until the pre-emption rights have
been exhausted. Article 21(c) provides:   D

"Except where the transfer is made pursuant to subarticle (a)
hereof, the person proposing to transfer any share (hereinafter
called 'the proposing transferor') shall give notice in writing
(hereinafter called 'the transfer notice') to the company that he
desires to transfer the same, and such notice shall specify the sum
he fixes as the fair value, and shall constitute the company his agent   E
for the sale of the share to any member of the company (or to any
person selected by the directors as one whom it is desirable in the
interests of the company to admit to membership) at the price so
fixed or, at the option of the purchaser, at the fair value to be fixed
by the auditor in accordance with subarticle (e) of this article."

Then there is this important sentence: "The transfer notice may include   F
two or more shares, and in such case shall operate as if it were a
separate notice in respect of each." In paragraph (e) we have the
valuation:

"In case any difference arises between the proposing transferor and
the purchaser as to the fair value of a share the auditor shall, on the
application of either party, certify in writing the sum which in his   G
opinion is the fair value, and such sum shall be deemed to be the
fair value, and in so certifying the auditor shall be considered to be
acting as an expert and not as an arbitrator; and accordingly the
Arbitration Act 1950 shall not apply."

Mr. Stubbs has referred us to two passages in *Dean v. Prince* [1954] Ch.
409. Denning L.J. said, at pp. 427–428:   H

"*The right to control the company.* Harman J. said that the auditor
should have taken into account the fact that the 140 shares were a
majority holding and would give a purchaser the right to control the

A company. I do not think that the auditor was bound to take that fact into account. Test it this way: Supposing it had been Prince who had died, leaving only 30 shares. Those 30 shares, being a minority holding, would fetch nothing in the open market. But does that mean that the other directors would be entitled to take his shares for nothing? Surely not. No matter which director it was who happened to die, his widow should be entitled to the same price per

B share, irrespective of whether her husband's holding was large or small. It seems to me that the fair thing to do would be to take the whole 200 shares of the company and see what they were worth, and then pay the widow a sum appropriate to her husband's holding. At any rate if the auditor was of opinion that that was a fair method, no one can say that he was wrong. The right way to

C see what the whole 200 shares were worth, would be to see what the business itself was worth: and that is what the auditor proceeded to do."

Wynn-Parry J. refers to a particular article in the company's articles in these terms, at pp. 430–431:

D "'the fair value shall be the auditor's valuation of the current worth of the company's shares.' That language appears to me to preclude the auditor from placing any extra value on a block of shares because it constitutes, or will in the hands of the particular transferee constitute, a controlling interest."

It is of course true that in the instant case the articles did not contain that rather important provision; but they did have this extraordinary

E provision for each share to be treated separately, as if it had been comprised in a separate transfer notice. As I have said, one does not have an express provision to value the company's shares as a whole, but one has an express provision that, if a transfer notice is given in respect of more than one share, it is to be treated as a separate notice in respect of each. So the valuer has, theoretically, to go through the

F process of ascertaining the value separately in relation to each share concerned, and I am bound to say that it is difficult to see then how there could be any room for any account to be taken of whether the shares comprised in a transfer notice as a whole formed a minority or a majority holding. Without expressing any concluded view on the matter, I am very much inclined to the view that the valuation of a share under the pre-emption articles in this case ought to be on the

G same basis as that held by this court to be appropriate in *Dean v. Prince* [1954] Ch. 409, and that if the valuer was unwise enough to give his reasons for valuation, and to indicate that in those reasons he had taken into account the fact that all the shares which were being offered by all the deemed separate transfer notices together constituted a majority or minority holding, I think his valuation could be upset.

H But, as I say, it is unnecessary to express any concluded view on the matter, because in a sense this is a makeweight submission. If it is right it would, to say the least, have a very odd result if the effect of an order designed to enable the court to do what is just and equitable between the parties under section 75 should result in a minority

holding being bought out at a price which is less than that which it   A
would be expected to achieve on a sale under the articles of
association.

For all the reasons I have given, therefore, I have no hesitation in
dismissing the appeal.

I turn now to the petitioners' cross-appeal, which arises in this way.
Under the last paragraph of the order there was liberty to apply in
relation to interest and, the judge having determined the price at which   B
the shares were to be bought out, application was then made for an
award of interest on the amount of the purchase price when ascertained,
as from a date which I think was not actually specified at that time,
because argument then proceeded as to whether in principle interest
could or could not be awarded. That argument was adjourned and it
came before the judge again on 25 November 1983, when he determined   C
that there could be no award of interest on the purchase money.

The petitioners challenge that, and they seek an order that interest
should be paid up to 9 December 1983. There was, as the result of a
hearing before the judge, an agreed order as to the way in which,
subject to this appeal, the purchase was to be carried into effect, and
that provided for interest; no question of interest arises after 9 December
1983. But by their notice of cross-appeal the petitioners asked for   D
interest, either from 31 August 1980 or, if that is rejected, from the date
of the presentation of the petition, which was 12 October 1981; or, if
that is rejected, from the date of the judge's order; or again, if that be
wrong, from Vinelott J.'s order, and if that be wrong, from 7 August
1981, when the petitioners were removed from the board.

The judge rejected the claim on two grounds. First of all it was   E
argued that, although it was conceded, I think, that there was no
orthodox ground for payment of interest, nevertheless interest could be
paid under the general discretion which is contained in section 75(3), in
effect as a means of awarding damages in respect of matters which had
occurred in the course of the carrying on of the company's business
constituting the unfair prejudice. The judge rejected that, saying [1984]
Ch. 419, 437:   F

"I have never heard of interest being payable before there is an
obligation to pay principal. On analysis, it appears that what Mr.
Purle is really saying is that the court has power under section 75(3)
to award something equivalent to interest. That must, I think, be
damages for loss of the use of the purchase moneys during a period
when they ought to have been in hand. As will appear, the view   G
which I take of this case makes it unnecessary for me to express a
view on that point and I do not do so."

He then went on to what was the real ground of his decision:

"In the present case there was an agreement that the respondents
should buy out the petitioners on a certain basis, i.e., at such
price as the court should determine. That price was held to be a   H
sum equivalent to the fair value of the shares. There was no
agreement that the price should bear interest from some date
prior to its determination or, indeed, from any date. An agreed

A   liberty to apply for directions as to the payment of interest, if
    appropriate, is not an agreement that the price should bear
    interest. There was no agreement that the petitioners should
    receive damages for loss of the use of the purchase moneys.
    Moreover, even if, which I emphatically refute, such an agreement
    could be implied, it is far too late to make that claim. A claim for
    damages, even of that limited character, would have entitled the
B   respondents to adduce evidence and make submissions to the
    effect that the petitioners' loss was by no means what it might
    have seemed. Mr. Purle says that the order has not yet been
    drawn up. That may be so, but it is no reason for allowing the
    petitioners to re-open the trial under the guise of a claim for
    interest. I am of the clear opinion that there is no case for
C   interest, or so-called interest, before judgment in the present
    case, and I therefore do not propose to enter into any questions
    of date or rate."

    Mr. Stubbs, on behalf of the petitioners, has submitted that the true
construction of the order, in giving liberty to apply for interest, is giving
liberty to apply on the hearing before the judge, in effect for damages
D   for all the things of which the petitioners complain and that therefore
the judge was wrong in refusing to entertain, as he did, the claim as
being in effect a sort of disguised claim for damages.
    I find myself quite unable to accept that submission. It seems to me
as plain as can be that the liberty to apply for directions as to payment
of interest on the purchase price was simply inserted for the purpose of
E   enabling the court, when it fixed the terms of the purchase, to provide,
if the purchase price was not paid, for interest to be paid on it as from a
certain date. It seems to me that the judge was perfectly right in
refusing to allow any question to be ventilated as to the payment of
interest, as it were, in lieu of damages. I would therefore dismiss the
cross-appeal.
    So in my judgment the appeal fails, and so does the cross-appeal.
F

    PURCHAS L.J.   I agree that this appeal should be dismissed. Out of
respect to the able argument of Mr. Sparrow, I propose to add a few
words of my own.
    The short issue raised is whether, in valuing the shares that were to
be transferred, the valuer should apply a discount in recognition of the
G   fact that the holdings being transferred were minority holdings in the
company. The starting point is an order made by Vinelott J. on 23
November 1981. The material parts of that order have already been
cited by Oliver L.J., but I propose for the sake of convenience to repeat
the critical words only:

    "This court doth order pursuant to section 75 of the Companies Act
H   1980 that the respondents"—who are there named—"do jointly and
    severally purchase the [7,800 shares] of the company registered in
    the name of the petitioners . . . at such price as the court shall
    hereafter determine . . ."

Mr. Sparrow submits that the phrase "at such price as the court shall hereafter determine" can only mean the price, being the fair market price, which would have been agreed between a willing buyer and a willing seller in the open market, including the discount which stems from the very nature of the holding being sold. It must ignore the concept of the authority to which Oliver L.J. has already referred in *Dean v. Prince* [1954] Ch. 409.

It would also exclude the basis upon which the powers under section 75 of the Act of 1980 arise as defined in subsection (1), and further would exclude the whole basis upon which the parties came together in the commercial enterprise and upon which the petitioners accepted their respective minority shareholdings. The judge found that the basis of this was fairly described as a "quasi-partnership" as considered in the leading case, *In re Westbourne Galleries Ltd.* [1973] A.C. 360 and in particular in the part of the speech of Lord Wilberforce, at p. 379.

Mr. Sparrow submits that to do otherwise would in effect be to award compensation either in respect of the prejudicial conduct which was the basis, albeit not admitted by the majority shareholders, of the jurisdiction under section 75, and/or the determination of the quasi-partnership; that is, the loss of the continuing rights, if they were of any value, attributable to the minority shareholders for the loss of their future participation.

Mr. Sparrow submitted that to grant such an extra element of consideration to the purchase price would therefore be outside the terms of the consent order itself. Put another way, his submission was that under the terms of that consent order the function of the judge, or the court, envisaged in the future by that order, would be merely one of an arbitrator, namely, to determine the quantum of the price regardless of the other aspects which would be considered by the court were it acting in the ordinary way under the provisions of section 75 of the Act.

I think Mr. Sparrow conceded that had this petition been fought through, rather than concluded, partly at least, by consent under the provisions of section 75, and particularly subsection (3), the relief ordered by the court in its discretion could have been such as to effect the transfer of shares as a consideration valued on a pro rata distribution of the whole value of the company. But whether he made that concession or not, I am for my part quite unable to make the distinction which Mr. Sparrow attempted to import into the existence of the consent order in the terms restricting the power of the court to section 75(4) as Mr. Sparrow would interpret that section; that is, the purchase of the shares at a market value.

I agree with all that has been said by Oliver L.J., that the effect of section 75(4) is merely to expand the wide powers granted under section 75(3), and not in any way to restrict them. Moreover, the use of the expression in the consent order "the purchase of the shares" is not, in my judgment, intended in any way to restrict the powers otherwise enjoyed by the court. If it were, as Mr. Stubbs has submitted and as Oliver L.J. has already commented, the purpose of the order and the purpose of the future involvement of the court would be negatived.

A    In my judgment, the proper interpretation of this order importing, as it does, the consent between the parties was to leave in the discretion of the court the full jurisdiction which it would have enjoyed had the matter been fought, and the effect of the consent order was merely to exclude the earlier part of the process under section 75 and to select the means by which' the court, being certainly hypothetically satisfied of the sound basis of the petition for this purpose—and of course, that is

B    the only basis upon which the court could act—that it would chose the particular course provided by section 75(4)(d) to give relief in the terms of section 75(3) in respect of the matters complained of in the petition.

For those reasons, in my judgment, the judge was right to accept the submission that the powers were unfettered and that, therefore, taking into account the quasi-partnership nature of the interests held by the petitioners in this particular instance, the method of valuation should be

C    on a pro rata basis.

For these reasons and those already given by Oliver L.J., I agree that this appeal should be dismissed.

I also agree that, so far as the cross-appeal is concerned, that also should be dismissed. I echo only the words of the judge [1984] Ch. 419, 437:

D        "The first point to be made is that in a normal section 75 case, where there has been no agreement of any kind, I cannot see how there can be any question of interest being payable before a purchase order is made,"

and the order is not complete in this case until the judgment of the court, which is the judgment at present under appeal.

The reliance placed by Mr. Stubbs on the final paragraph of the

E    order made by Vinelott J., in my judgment, takes his submission no further. The liberty to apply which was given to all parties was clearly for the further carrying out of the order, and certainly could not form the basis of a jurisdiction, or a consent, on the part of the parties that the court should proceed to calculate an award of interest as a matter of general jurisdiction.

For those reasons I also agree that the cross-appeal should be

F    dismissed.

*Appeal and cross-appeal dismissed.*
*Petitioners' appeal on costs below*
*allowed so that they were entitled*
*to costs of hearing before Nourse J.*
*Costs of appeal and cross-appeal to*
G        *be taxed. Appellants to pay five-*
*sixths of petitioners' costs.*
*Leave to appeal refused.*

*Solicitors: Goldberg Blackburn & Howards, Manchester; Knight and Sons, Newcastle under Lyme.*

H                                                    A. R.

**<u>EXHIBIT C</u>**

# Re Little Olympian Each-Ways Ltd

*a*

CHANCERY DIVISION
LINDSAY J
28 MARCH, 20, 21 APRIL, 5 MAY 1994

*Minority oppression – Appropriate parties to the petition – Jurisdiction of the court to make an order against a non-member – Companies Act 1985, ss 459, 461.*

*b*

The petitioner was a preference shareholder in the respondent company. The petitioner alleged that the affairs of the company had been conducted in a manner which was unfairly prejudicial to its interest as a member. Broadly it claimed that the company's business had been transferred to Newco at a gross undervalue. Initially there were six respondents to the petition. As a result of discovery, it was shown that the business of Newco had been transferred to Star Vacations Ltd (Star) which in turn had transferred it to Owners Abroad Group plc (OAG). In the present proceedings leave was sought to add OAG as respondents to the petition. The relief sought was inter alia that OAG should with the other respondents purchase the shares of the petitioner. The question before the court was twofold: (a) whether the court had jurisdiction to join OAG in that OAG was not a member of the company and was not alleged to be a wrongdoer (*the jurisdiction point*), and (b) if the court did have such jurisdiction, whether this was an appropriate case in which it should exercise it to join Newco (*the discretion point*).

*c*

*d*

*e*

**Held** – As regards the *jurisdiction point*, the court had jurisdiction and as regards the *discretion point*, this was not an appropriate case in which the jurisdiction should be exercised.

(1) The language of ss 459 and 461 conferred the widest jurisdiction on the court as regards parties against whom relief could be sought. In an appropriate case, relief can be sought against a non-member, or against a person not involved in the conduct complained of (at least if that person could be affected by the relief sought), and in appropriate cases a person could be made a respondent even though no relief was sought against that person. However, the court could strike out a petition, even against a person who had been involved in the allegedly unfairly prejudicial conduct, if no remedy was sought against that person. There may be circumstances where the prospects of an order being made were perfectly hopeless and hence where it would be an abusive use of the process to require the respondent to remain as such or to be added as such.

*f*

*g*

*h*

(2) On the facts, no court would make the buy-out order sought against OAG and accordingly the court would not exercise its discretion to join OAG as a respondent.

**Cases referred to in judgment**
*Aiden Shipping Co Ltd v Interbulk Ltd, The Vimeira* [1986] 2 All ER 409, [1986] 1 AC 965, [1986] 2 WLR 1051, HL.
*Baltic Real Estate Ltd, Re, (No 1)* [1993] BCLC 498.

*i*

*a*
*BSB Holdings Ltd, Re* [1993] BCLC 246.
*Bovey Hotel Ventures Ltd, Re* (31 July 1981, unreported), Slade J.
*Company, Re a (No 005287 of 1985)* [1986] BCLC 68.
*Company, Re a (No 007281 of 1986)* [1987] BCLC 593.
*Noble (RA) & Sons (Clothing) Ltd, Re* [1983] BCLC 273.

### Application

*b*
The petitioner, Supreme Travel Ltd, who had, on 30 August 1991, presented
a petition under s 459 of the Companies Act 1985 in the matter of Little
Olympian Each-Ways Ltd (the company) against various respondents, applied
to the court to amend its petition to add, as eighth respondent, Owners
Abroad Group plc (OAG), the amended petition claiming, inter alia, by way
of relief, an order that the respondents, including OAG, should buy the
*c*
petitioners' preference shares in the company on described bases. OAG had
never been a shareholder in, or a director, nor manager or person responsible
for the conduct of the company whose affairs were said to have been
conducted in a manner unfairly prejudicial to the interests of the petitioner,
nor was it alleged to be a wrongdoer. The facts are set out in the judgment.

*d*
*Robin Potts QC* and *David Mabb* (instructed by *Withers*) for the petitioner.
*Richard Snowden* (instructed by *Taylor Joynson Garrett*) for the respondents.
*Charles Aldous QC* and *Alastair Walton* (instructed by *Herbert Smith*) for
   OAG.

*e*
                                           *Cur adv vult*

5 May 1994. The following judgment was delivered.

**LINDSAY J.** I have before me an application which, amongst other issues,
raises questions as to the boundaries of ss 459 and 461 of the Companies Act
*f*
1985. A petitioner under a s 459 petition seeks here to amend its petition to
add a respondent and to include amongst the relief sought an order against
that new respondent, Owners Abroad Group Plc (OAG). OAG has never
been a shareholder in, nor a director or manager or person responsible for the
conduct of, the company whose affairs are said to have been conducted in a
manner unfairly prejudicial to the interest of the petitioner. Nor is OAG
*g*
alleged to be a wrongdoer. None the less, if the relief claimed were to be
granted, OAG would become obliged, with others, to buy from the petitioner
the petitioner's shares in that company. Does s 459 confer a jurisdiction so
broad that such an order could be made against such a respondent? Even if
it does, should leave for such joinder and amendment here be granted?
*h*
   I shall first outline the position as it is before the amendment which is
sought. On 30 August 1991, Supreme Travel Ltd, a company incorporated
in Jersey (the petitioner) presented a petition to the Companies Court under
s 459 of the Companies Act 1985 in the matter of Little Olympian Each-Ways
Ltd (the company). The company was incorporated under the Companies
Act 1948 and its registered office is in London. The petitioner describes itself
*i*
in the petition as holding 1,017,472 preference shares in the capital of
the company and as having held the same for more than the necessary six
months.

The original petition was relatively short – some nine pages. It described the only shareholders of ordinary shares in the company as being Olympic Vacations Ltd (OVL) (51%) and a Mr George Michalias (49%) and said that _a_ the company and OVL were members of a group of companies known as the Olympic Holidays Group, of which the ultimate holding company was said to be Star Vacation Ltd (Star), a company incorporated in Cyprus. The directors of the company were described as being Mr Pyliotis, Mr Michalias and Mr Christoforou, each of whom was a director of OVL. It is not _b_ necessary for me to set out, even in summary, all the matters complained of in the original petition but, in outline, one material complaint ran as follows:

(1) on 24 November 1990 2,448,000 preference shares in the company were transferred to a company referred to as Newco, which was owned by Star and Mr Christoforou;

(2) on 21 March 1991 at an extraordinary general meeting of the company _c_ it was purportedly approved that the business and goodwill of the company should be transferred to Newco in return for which Newco would take over the company's liabilities and would be obliged to pay the company £1;

(3) that resolution was implemented on 30 April 1991;

(4) the company was thereafter left as a shell. It ceased to trade;

(5) the consideration given by Newco was grossly inadequate; _d_

(6) there were breaches of pre-emption provisions which should have operated in the petitioner's favour as a holder of existing preference shares and breaches, too, of provisions requiring notice to have been given to the petitioner of the extraordinary general meeting;

(7) those and other matters led to an allegation that the affairs of the _e_ company had been conducted in a manner unfairly prejudicial to the interests of the petitioner.

The petition was intended to be served on the company itself, on OVL, on the three individuals I have mentioned – Mr Michalias, Mr Pyliotis and Mr Christoforou (referred to as the trio) and also on Olympic Holdings Ltd, the name assumed by Newco, but which I shall continue to call Newco. _f_

In due course affidavits were sworn in support of and in opposition to the petition and there was a very substantial discovery. The story emerging from this mass of paper was, the petitioner began to see, a story going well beyond the bare bones of the original petition. For various reasons, counsel originally instructed by the petitioner could not continue with their case and a new team, Mr Potts QC and Mr Mabb were instructed in their place to consider _g_ the mass of new information.

In the result, on 1 March 1994 a summons was issued by the petitioner addressed to the six persons on whom the original petition had been served (whom I shall call together the original respondents), who appear before me by Mr Snowden. The summons asks, inter alia, that the petitioner should _h_ have leave to amend the petition by adding Star as a seventh respondent and OAG as eighth respondent. Leave is sought for a comprehensive amendment to the petition. The proposed amended petition is now a creature of some 94 pages in length. Again, I do not need to summarise all of it but the story now alleged (so far as material for immediate purposes) alleges far more complicated wrongdoings than the relatively simple sale of the company's assets to Newco _i_ for what was said to be the grossly inadequate consideration of £1 plus assumption by Newco of the company's liability as alleged in the original

petition. In broadest outline the most material allegations in the amended petition (as I shall call it for convenience, although leave to amend is not yet given and is resisted) are as follows:

a

(i) the company of whom the trio were directors sold the business and goodwill of the company for a grossly inadequate consideration to Newco, a company of which the trio were directors, and the capital of which was owned by Star, a company in which the trio were shareholders;

b

(ii) the company was thus reduced to a shell and the shares in it not held by the petitioner were next sold for £1 to Star;

(iii) Star then sold the shares in Newco (which by then represented the value of the erstwhile business and goodwill of the company and, says the petitioner, nothing else) to OAG for a variable price likely to reach £10m.

The basic complaints in the original petition remain. The petitioner is left

c

with a holding in a shell company whilst the trio and some others have shared a substantial jackpot no part of which has come to the petitioner. Leaving aside how far various heads of relief asked for need to be alternative to one another, the amended petition claims by way of relief, inter alia, that the respondents (that is to say including OAG) should buy the petitioner's preference shares in the company on described bases which I apprehend are

d

intended to reflect the true value of the shares had there been no wrongdoing; that Newco, now a subsidiary of OAG, should account for certain benefits to the company as constructive trustee; that Newco should make certain payments to the company and that the transfer of assets from the company to Newco should be declared voidable.

e

The first question I have to decide is whether, as Mr Potts and Mr Mabb argue for the petitioner, the court has *jurisdiction* to add OAG as the eighth respondent. It is common ground OAG is not a member of the company but it is, urges Mr Potts, a person against whom relief is properly sought in the amended petition. It is, he says, also a person involved in the misdeeds alleged in the amended petition and a person affected by the relief claimed against

f

others in the amended petition in that the position of its wholly-owned subsidiary Newco would be radically affected were the relief there claimed against Newco, or even some of it, to be granted. If I have the jurisdiction to add OAG, then the question becomes whether I should, in the exercise of the discretion conferred on me by the rules as to amendment and as to the joinder of parties, exercise it to join OAG and to allow the amendment against OAG.

g

Mr Aldous QC and Mr Walton for OAG argue that the court does not have the necessary jurisdiction and further, even if it had, that in point of discretion the joinder and amendment so far as concerns OAG should be refused.

I shall first look at the question as to jurisdiction and, initially, shall do so without reference to the authorities that have been cited to me. The relevant

h

sections are ss 459 and 461 of the 1985 Act. I shall not set out either in full. I go first to s 461 which begins by conferring on the court by sub-s (1) a power to give relief in very wide terms. If the court is satisfied that the petition under s 459 is well founded, then 'it may make such order as it thinks fit for giving relief in respect of the matters complained of.'

The relief does not, for example, necessarily have to compensate for or

i

prohibit the recurrence of the matters complained of. The only nexus required between relief and complaint is that the former has to be 'in respect of' the latter.

Then s 461(2) opens with the words 'Without prejudice to the generality of sub-s (1) the court's order may' and it goes on in paras (a) to (d) to give examples of relief within the wider generality which is not to be prejudiced. *a* Mr Potts argues that the two sections, ss 459 and 461, read together are an example of a practice exemplified by the provisions considered in the well known case of *Aiden Shipping Co Ltd v Interbulk Ltd, The Vimeira* [1986] 2 All ER 409, [1986] 1 AC 965 whereby Parliament confers an exceptionally wide jurisdiction and leaves it to the courts or to a rule-making body or to *b* both to find for themselves boundaries, not to the jurisdiction proper, but, by way of the exercise of the discretion in individual cases, to the areas in which and the manner in which, in practice, the jurisdiction would be likely, save in exceptional circumstances, to lead to relief.

I do not think it profitable to determine how far *Aiden Shipping Co Ltd v Interbulk Ltd* is or is not a wholly acceptable analogy but I do see force in *c* Mr Potts' submission which, in my view, is supported also by the legislative history of s 459 and its predecessors. As to that history, a precursor of s 459, s 210 of the Companies Act 1948, was reported on in 1960 by the Jenkins Committee as appearing not to have produced the results expected of it, and it was given in evidence to that committee that the section needed amendment *d* if effective protection was to be given to minorities in the circumstances in which it had been intended that it should be (see the Jenkins Report 1960, para 200).

Section 210 was then superseded by s 75 of the Companies Act 1980, but s 75, which required that the prejudice should be suffered by 'some part of the members', inevitably led to doubts and discussion as to whether the *e* section afforded relief in cases where the prejudice was suffered by the whole membership. There was thus, once again, the need to widen the statutory provision. Although the width of the jurisdiction conferred by ss 459 and 461 is, of course, a matter of the construction of the language Parliament has used, the earlier sequences of statutory provision, construction by the court, a dawning recognition of shortcomings later followed by a statutory extension *f* is at least consistent with there having been engendered in the legislature by 1985 a sense that the thing to do was to give a very wide jurisdiction and to let the courts get on with it.

The broad provisions of the Companies (Unfair Prejudice Applications) Proceedings Rules 1986, SI 1986/2000 are examples of the same view. In relation to who is to be respondent, those rules provide that on the return date *g* 'the court shall give such directions as it thinks appropriate with respect to ... (a) service of the petition on any person' (see r 5) and for a day upon which 'unless the court otherwise directs, the petitioner and any respondent ... shall attend before the registrar ... for directions to be given in relation to the procedure on the petition.' (see r 3(3)). *h*

The impression given both in the sections and in the rules is that the greatest possible flexibility was intended by the legislature to be given to the courts. Thus s 459 does not, for example, require that it is by a respondent or by the respondents to the petition that the company's affairs are being or have been conducted in the manner complained of. It does not require that the respondents to the petition should be limited to members of the company *i* or to its directors or to those conducting its affairs and, of course, it is a familiar practice that the company itself should be a respondent (see r 4(1)).

*a*  I am unable to find in s 459 itself any language which points to who may be, who has to be or who cannot be respondents to a petition under its terms. Those are subjects which it does not attempt to address.

*b*  Mr Aldous and Mr Snowden argue that some restrictions in the jurisdiction have to be read in. For example, they say that there is no jurisdiction to require a person to be a respondent where no relief is claimed against him and where he is not affected by any relief which is sought. A distinction needs to be drawn, says Mr Aldous, between the conduct and position of those who are in control of the company or who are members, on the one hand, and, on the other, the position and conduct of third parties, 'outsiders', as he calls them, in respect of whom the company has no cause of action and whose involvement may be no more than that, innocent of any intent to prejudice anyone and innocent also of any foresight that anyone might be prejudiced,

*c*  they are, as third parties, concerned in the activity complained of as being prejudicial. That some distinctions will in some cases need to be drawn is, I accept, likely enough, but I cannot find any warrant in the language of ss 459 and 461 for introducing them as matters of jurisdiction.

*d*  Leaving aside what the authorities I next turn to require of me, I do not feel able to decline the joinder of OAG and to refuse the proposed amendment of the petition against OAG on the ground that the petition, if so amended, would be trespassing outside the statutory jurisdiction. It may be material to add that a decision to exclude as a matter of jurisdiction would have the result not only of excluding respondents, such as OAG, who wish not to be joined, but also of excluding those who, in a corresponding position, would wish to

*e*  be joined as, or to continue as, respondents.

I now turn to the authorities cited to find out what guidance I am given. First in time of the cases cited to me was *Re RA Noble & Sons (Clothing) Ltd* [1983] BCLC 273 per Nourse J. It was cited by Mr Aldous only so as to lead to the citation in it (at 290) from *Re Bovey Hotel Ventures Ltd* (31 July 1981, unreported) of a passage in which Slade J held, in relation to s 75 of the 1980

*f*  Act, that the test of unfairness was an objective one; it was not necessary for the petitioner to show that those who had de facto control of the company acted in the conscious knowledge that what they were doing or omitting to do was unfair to the petitioner. Mr Aldous argues that it would be remarkable if a person, a stranger to the company, could properly find himself a respondent to a s 459 petition without, as *Re Bovey Hotel Ventures*

*g*  *Ltd* indicates, the least conscious knowledge that he was being, or was likely to be, unfair to anyone, but simply because he was involved in some transaction which was unfairly prejudicial to the petitioner. I see the force of that but, as I have said, I cannot find any words, either in or necessarily to be implied into ss 459 and 461, which would aid in excluding a respondent

*h*  as a matter of jurisdiction in such a case. Whilst I would not quarrel with a line of *Re Bovey Hotel Ventures Ltd*, I do not see it as restrictive of the jurisdiction conferred by s 459.

The next authority was *Re a company (No 005287 of 1985)* [1986] BCLC 68, a decision of Hoffmann J in a case where the erstwhile controlling shareholder of the company, H, sought to strike out a petition which was

*i*  under s 459 and, alternatively, for the winding up of the company. H had, it was alleged, conducted the company in breach of his fiduciary duties and in a manner unfairly prejudicial to the petitioners. Negotiations began before

[1994] 2 BCLC 420

a petition was presented but, when it was found that H had transferred his
shares to an offshore company, the petitioners then issued their petition under
s 459 requiring H to account for payments of company money made without    *a*
authority. The petitioners found a little later that H had left this jurisdiction
and had sold the company's assets for cash. The petitioners then sought to
make amendments to the petition and to include a request for an order that
H and the offshore company should jointly and severally buy the petitioners'
shares. Unabashed, H argued that in respect of the original relief it was only    *b*
the offshore company that should have been respondent (see at 70). There
was no justification, he argued, for extending relief to relief against persons,
the company itself apart, who had ceased to be members (see at 71), but the
petitioner could, it was argued, proceed against H by derivative shareholders'
action. Hoffmann J thought that would be inconvenient, and he went on to
say (at 71):    *c*

'I would be reluctant to come to the conclusion that this form of
duplication was necessary unless it was clear that the jurisdiction under
ss 459 and 461 did not permit the whole matter to be dealt with on the
petition. It seems to me that although it is true that s 461(2) shows that
the normal order under s 461 will be an order against the company or    *d*
another member, there is no reason why the words of s 461(1) should
not be given their full effect and allow the court to give relief in respect
of a complaint that the company's affairs have been conducted in a
manner unfairly prejudicial to the interests of members, even when this
would involve giving relief against a respondent who is no longer a    *e*
member. For that reason, I am not willing to strike out H as a party to
the petition.'

Turning to H's opposition to the buy-out relief sought to be added by
amendment and in response to H's argument that no such order could be    *f*
made against a non-member, Hoffmann J said (at 71):

'Section 461(2)(d), which I have already read, provides for such an
order being made against members of the company but says nothing
about the order being made against a non-member. Counsel for the
petitioners, on the other hand, says that there are cases in which a person    *g*
may be, for the purposes of giving relief, identified with a company
which he controls and that it may be possible to obtain an order to that
effect against H either under the broad jurisdiction of s 461(1) or by
identifying H with the Gibraltarian company [the offshore company I
have mentioned]. It is not necessary for me to express any view on
whether that can be done because I do not think it would be right to    *h*
strike out the paragraph seeking such relief unless I was satisfied that the
possibility of obtaining it was perfectly hopeless. I do not feel in a
position at the moment to say that and I do not think it would prejudice
H very greatly if the paragraph seeking that relief were to remain in the
petition, given that in the light of the conclusion to which I have already    *i*
come he will remain as a respondent to the petition in respect of the relief
sought under para 2.'

a
It is notable that, despite his reading ss 459 and 461 together (he speaks (at 71) of 'the jurisdiction under ss 459 and 461') Hoffmann J sees no reason why the words of s 461(1) should not be given their full effect. Mr Aldous can point to the judge's more cautious approach to the buy-out jurisdiction but, even there, where he is saying 'I do not think it would be right to strike out . . . relief unless I was satisfied that the possibility of obtaining it was perfectly hopeless' his words look to me more the language of a judge who

b
considered that there might well be jurisdiction (but one which it was urged was hopeless in point of its exercise) rather than that of a judge who is indicating his concluded views on whether or not there was a jurisdiction.

Mr Aldous points to the facts that H had been a controller of the company, a person responsible for the unfair conduct alleged, had been a member of the company, was personally accused of wrongdoing and could have been the

c
object of a derivative action. I can see that *Re a company (No 005287 of 1985)* thus falls well short of deciding the case before me but I nonetheless attach some importance to the fact that Hoffmann J, upon his reading the two sections together, had seen no reason why the words of s 461(1) should not be given their full effect and accordingly had permitted the addition of a claim for a buy-out against a non-member.

d
Next in time was *Re a company (No 007281 of 1986)* [1987] BCLC 593, a decision of Vinelott J. An investment company, 3i, which had provided working capital, held cumulative convertible participating preferred ordinary shares and cumulative redeemable preference shares in the company. The company's articles had elaborate provisions as to pre-emption rights. One of

e
the directors was voted off the board. He found the other directors had set up a rival group of companies and had stripped the company of its assets, so he presented a petition under s 459. 3i was a respondent to the petition notwithstanding that it was not said that it had taken any part in or had been concerned in any way in the unfairly prejudicial conduct. No relief was sought against it. The primary relief sought was the purchase of the petitioner's

f
shares by the three other directors but the petition asked, alternatively, for such other relief under s 461 as the court should think just. Vinelott J held that as 3i was a member of the company and was affected by the relief sought in that an order for a buy-out by the three directors of the petitioner's shares would override 3i's pre-emption rights, it was right that it should remain a respondent. He said ([1987] BCLC 593 at 598-599:

g

'A petition under s 459 is not analogous to litigation in which the issues raised affect only those against whom allegations are made by the plaintiff. A closer analogy is an administration action, where all beneficiaries having an interest in the relief sought should be made

h
parties or represented. The practice that has so far been followed in the Companies Court is to require that all members of the company whose interests would have been affected by the misconduct alleged or who would be affected by an order made by the court under the very wide powers conferred by s 461 are to be made respondents to a petition or served with it. In practice, this means that in the case of a small, private

i
company every member ought to be joined.'

Then, a little later he said ([1987] BCLC 593 at 599):

'In my judgment, 3i is clearly affected by the relief sought in the petition which, amongst other things, would override its rights under the pre-emption provisions. 3i also has voting control over the company in general meeting, and would be directly concerned if any order were made regulating the future conduct of the company pending the acquisition of the petitioner's shares. In these circumstances I think that 3i was properly made a respondent and should not now be struck out.'

Mr Aldous is, of course, able to stress that there 3i was, firstly, a member of the company and, secondly, a person affected by the relief claimed. But the case does show that it is not a necessary condition of joinder that a respondent should have been involved in any way as a wrongdoer in the events complained of.

In *Re BSB Holdings Ltd* [1993] BCLC 246 a similar problem came again before Vinelott J. The petitioner complained that the business of 'Holdings', the company in which it held shares, had been hived down to B Sky B which was at first a wholly owned subsidiary of Holdings but which later then passed into the control and ownership of the respondents in a way which was alleged unfairly to prejudice the petitioner. The petitioner sought an order that the respondents, or some of them, should transfer their shares in B Sky B back to Holdings or direct to the petitioner. No relief was sought against B Sky B itself, which was not a member of Holdings, and it applied that the petition should be struck out as against it.

The 3i case was cited to Vinelott J who took the view that, despite B Sky B not being a member of Holdings, it was clearly affected by the relief sought in that the order sought was that there should be a transfer and registration of its shares. The body of its corporators would change (see [1993] BCLC 246 at 253). But the judge added that its joinder could be justified on another ground, namely that it was directly concerned in the transactions of which complaint was made (see [1993] BCLC 246 at 254). It was a party, and a necessary party, to one of the agreements which was complained of. Vinelott J held that B Sky B was properly joined because it was an actor and played a central role in the transactions of which complaint was made (see [1993] BCLC 246 at 255).

Finally on the authorities, in *Re Baltic Real Estate Ltd (No 1)* [1993] BCLC 498 Knox J had before him an application in relation to a s 459 petition of a majority (51%) shareholder in a company. The second and third respondents to the petition were the former directors of that company who, the petitioner alleged, had committed breaches of fiduciary duty as directors. The second and third respondents were also its former shareholders as to 49% but had held their shares only briefly before transferring them to the fourth and fifth respondents (persons out of the jurisdiction, not served by the time of the hearing before Knox J and in respect of whom leave to serve out was needed). There were allegations that the fourth and fifth respondents, the registered holders of the 49%, were either controlled by the second and third respondents or held the 49% of the shares in the company in trust for the second and third respondents. The petitioner sought as his principal relief an order that the second and third respondents, alternatively the fourth and fifth respondents, should be ordered to sell or procure the sale of the 49% of the shares in the

company registered in the name of the fourth and fifth respondents to the petitioner at such price as the court should think fit.

a    It was argued on behalf of the second and third respondents that as they were not present members they were not proper respondents and, as they were not parties to the relief sought either, the petition should be struck out as against them as not disclosing any reasonable cause of action and as being an abuse of process. That argument succeeded not, as I see it, because the second and third respondents were not members of the company, but

b  because, as Knox J put it (at 502):

> 'It seems to me that the proper parties to this relief are the shareholders in whom the shares in question are vested and with whom the court, in dealing with the rights of members, is primarily concerned.'

c

There is no discussion in the judgment of the jurisdiction under s 459. Knox J plainly took the view that the fact (as alleged) that the fourth and fifth respondents were but trustees for the second and third respondents or were controlled by the second and third respondents was not, on its own, enough to justify the second and third respondents, being necessary parties. But there

d  were some other arguments which Knox J indicated had failed to persuade him that the second and third respondents should continue to be respondents. Firstly, that they were the persons against whom the breach of duty was alleged and, secondly, that, under the rubric of 'such other relief as the court should think fit', the relief eventually granted by the court might be other than

e  the sale of shares to the petitioner, which was the principal relief sought, and might more involve the second and third respondents than would that sale.

That concludes a look at the authorities cited to me. Whilst I would be very willing to following a pattern that emerged from the earlier cases at first instance, I do not regard any clear pattern as having yet emerged, and I have certainly found nothing conclusive that suggests that the words of ss 459 and

f   461 should not be given their full effect. From the existing authorities cited it can be seen that in an appropriate case relief can be sought against a non-member other than the company itself, or against a person not involved in the acts complained of (at least if that person would be affected by the relief sought) and that a person against whom no relief is in terms sought cannot necessarily escape being a respondent, whilst, on other facts, it can be right

g  to strike out a petition, even as against those whose acts are complained of, so long as no relief is sought against such a person.

This summary suggests to me that in point of jurisdiction the wide language of ss 459 and 461 is not to be cut down. None the less, cases may arise where, notwithstanding that the claim cannot be clearly said to be

h  outside that wide jurisdiction, the likelihood of the court's discretion being exercised so as to lead to relief against, or relief having any material effect upon, a given respondent can be seen to be so remote that the case can fairly be described as 'perfectly hopeless', to use Hoffmann J's phrase, and hence that it would be abusive to require that respondent to remain as such or to be added as such. Is this such a case?

i    It is best first to look at the likelihood or otherwise of OAG being ordered, with the other respondents, to buy the petitioner's shares – the only substantive relief sought against OAG in the amended petition. Prima facie, when a

[1994] 2 BCLC 420

litigant's case against a person is within the relevant jurisdiction he should be
permitted, if he so chooses, to pursue his case against that person. Thus I
framed the question at the end of the last paragraph in the way that I did,       *a*
rather than by reference to RSC Ord 15, r 6, because, on the facts of this case,
where no blame can be laid at the petitioner's door for not including OAG
from the outset or for delay in applying to amend, it seems appropriate to look
at the petitioner's position more as it would be on an application for a strike
out by OAG than where the petitioner comes cap in hand, as it were, asking       *b*
for leave to amend. However, it is also to be borne in mind that it is plainly
abusive to press a person into hopeless litigation, litigation which cannot
succeed. Quite apart from other vexation inherent in litigation, even a party
who recovers an order for his costs against a solvent party on an indemnity
basis may well be left substantially out of pocket at the end of a s 459 petition,
a type of proceeding known neither for its speed nor its economy.                *c*

At this point in the argument, Mr Aldous redeploys on the discretionary
side of things many of the arguments used unsuccessfully (as I have held) on
the jurisdiction. OAG is not and never has been a member of the company.
OAG is not said to have controlled the company or its board or even to have
had a nominee on the company's board. True it is that its wholly owned         *d*
subsidiary, Newco, is a respondent but, as did Knox J in *Re Baltic Real Estate
Ltd (No 1)*, I see it as no reason, sufficient in itself, for the joinder of a person
as a further party that an existing respondent is owned by or controlled by
that person. Newco can respond for itself and were there a principle that
shareholders in or directors or controllers of a corporate respondent could,
without more, be required to be parties in addition to that corporate          *e*
respondent itself, then s 459 would indeed be oppressive.

I thus see neither OAG's ownership of Newco nor the potential effect of
the petition on Newco as being reason for OAG's joinder. It is said that
beyond the buy-out required of it, OAG is affected by the relief sought in that
its wholly owned subsidiary Newco may find itself holding its assets on
constructive trust for, and may be liable to account to, others, but, again, the  *f*
simple answer is, as I see it, that Newco, already a party, is able fully to deal
with that, and if it sufficed, without more, to require a company to be
respondent that the assets of a company in which it held shares might be
affected by the relief sought that would, again, be a needlessly oppressive
burden on corporations.

Mr Aldous emphasises that no substantive relief is sought against OAG in  *g*
the petition save that it is sought that with six others (other than the company
itself, and on the basis that Star is added) it should be a joint purchaser of the
petitioner's shares in the company. There is no suggestion in evidence that
the addition of OAG is necessary if there is to be a purchaser able to pay the
price required or that the other respondents are of straw. There is nothing    *h*
to suggest that a buy-out without OAG as a joint or several buyer is
impracticable or impossible or that such an order against the original
respondents would be worthless or nugatory As the original respondents
include persons who are alleged to be the wrongdoers in relation to the acts
complained of and who are said to have profited in substantial amounts from
those acts, then if they, if ordered to do so, would be able to buy – and it is  *i*
nowhere said they would not be so able – Mr Aldous urges that no court is
likely to find it necessary to join with them as a co-purchaser a party, OAG,

against whom nothing wrong is urged. It is a strong course, he says, to require a party at what is likely to be considerable expense and against its will to

*a* become a shareholder in a company, a shell company, and to do so when the party is not said to have done anything wrong and where there are others who are wrongdoers and who are available as alternative purchasers. So to order, Mr Aldous urges, would be remarkable, unprecedented and unnecessary. He goes on to show that the petition contains no allegation of any wrong done

*b* by OAG to the company; it is nowhere said the company has a cause of action against OAG.

Against this Mr Potts took me to the provisions of the amended petition. As early as December 1990, well before the sale of the company's assets to Newco, OAG and its solicitors were involved in discussions for the grant to OAG of an option to acquire the issued capital of Newco. Mr Potts says that

*c* from the outset a number of related steps were planned to lead to the conclusion that was ultimately arrived at and of which the petitioner complains and that OAG was party to the planning from that outset. He says that OAG was involved in proposals as to a loan to the company which was made with the intent of being lent-on by the company to discharge an individual's debts and that OAG was concerned in carrying through such a

*d* proposal. OAG, the amended petition alleges, was party to an option agreement of 21 December 1990 whereunder it would be able to acquire the capital of Newco for a price strangely expressed as –

*e* 'subject to a maximum sum of £8 million or as might otherwise be agreed between Star and OAG with a maximum of £10 million and an overall minimum of £1 million.'

It was, says Mr Potts and as the amended petition alleges, the intention of OAG throughout in relation to the option agreement that the company would hive up its business and goodwill to Newco in return for an indemnity and for

*f* nothing else of any real worth and that only after that would the option be exercised by OAG. OAG knew and approved the price paid on the hive up to Newco and was conscious of at least the possibility of that transaction being at a substantial undervalue, as it demonstrated by way of its solicitors pressing for and obtaining an undertaking that no steps would be taken for at least two years to put the company into voluntary winding up. The

*g* acquisition of Newco's shares by OAG was an acquisition improperly given financial assistance by the company in breach of s 151 of the 1985 Act, the company at the time being a subsidiary of Newco. In these ways, says Mr Potts, as para 107 of the amended petition states, OAG 'was directly concerned in transactions of which complaint is made herein'. It is in this

*h* context that Mr Potts says that the petitioner's complaint is (and I use his words) that there is here a 'con' and that OAG is 'in it up to its neck'. However, I think I need to be a little more analytical than that. Mr Potts's strong language is surely that of, at worst, conspiracy or, at least, of OAG having knowledge – actual, imputed or constructive knowledge – that its activities or omissions were or might represent ·nfair prejudice to

*i* the petitioner or that OAG committed some other material wrongs. But no such allegation is anywhere to be found in the petition. Such wrongs, if there were any, under s 151 are not said to be wrongs by OAG. It is

nowhere said that what OAG acquired was acquired for less than full market
consideration, and the matters pleaded suggest, if anything, that it has paid
or will pay a little over the odds for what it received. Mr Potts gave me a list *a*
of the paragraphs in the amended petition said to show OAG's involvement
in the matters complained of, and para 107 of the amended petition gives a
similar but not identical list. I hope I have not overlooked anything material
in the 94 pages of the body of the petition but I have not found any reference
to anything done or omitted by OAG being alleged to have been wrongful or *b*
unlawful or in breach of some duty or obligation upon OAG. Whilst it is
undoubtedly the case that OAG was, in a sense, concerned in transactions of
which complaint is made, I cannot in the circumstances alleged in the
amended petition see that concern as amounting to anything material. Both
Mr Aldous and Mr Snowden made the valid point that if a person against
whom no wrong doing is alleged, whose involvement, such as it is, has been *c*
paid for at 100p in the pound, and who is not a member, can be required
against his will to be a respondent who may be ordered to buy shares, then
no trading company could feel safe that it would not be expensively drawn
into the internal disputes of its customers and of others with whom it might
deal.

Mr Aldous next argues that all the attacks made on the hive up agreement *d*
are attacks not on anything done or omitted by OAG but by the trio and that
the company and the petitioner (by way of derivative action) have full causes
of action in respect thereof. The specially adjusted price which the petitioner
claims should be paid for the petitioner's shares is, in respect of any suggested
adjustment, to be adjusted by reason of complaints against the trio, not
against OAG. To require OAG to pay some special price for the petitioner's *e*
shares not only involves adjusting the price to be paid by OAG by reference to
someone else's wrongs but, as OAG has paid full value already for what
it had received, would involve it in paying more than once over for the very
same assets, a step which, however possible against a wrongdoer, would be
unprecedented against a party not said to be in breach of any duty or *f*
obligation whatsoever.

None of these points put by OAG and by the original respondents is devoid
of weight. I do not need to ascribe to each a separate force, but I do say that
together their weight is such that, in my judgment, it can fairly be said that
if the proposed amendments were allowed the petitioner would be quite
unable on the amended petition to obtain the only relief, the buy-out, which *g*
it seeks against OAG.

Although the court *could*, if it chose, make a buy-out order against OAG
of the kind which the petitioner seeks, it is on the case put in the amended
petition, even if wholly true, plain and obvious, in my judgment, that no court
*would* make such an order. Had OAG been a respondent from the start it *h*
could, in my view, have successfully moved to have the buy-out provisions
and its role as a respondent struck out. It not yet being a respondent, it would
be an abuse of process were it to be required, against its will, to be a
respondent obliged to resist relief which would in practice never be granted.

Once that has emerged, so far as concerns the buy-out relief, the rest of the
matter is readily determinable by reference to RSC Ord 15, r 6, which is made *i*
to apply by r 2(2) of the 1986 Rules. So far as material, Ord 15, r 6 provides
at para (2) that the court may:

'(b) order any of the following persons to be added as a party, namely
– (i) any person who ought to have been joined as a party or whose
*a*  presence before the Court is necessary to ensure that all matters in
dispute in the cause or matter may be effectually or completely determined
and adjudicated upon, or (ii) any person between whom and any party
to the cause or matter there may exist a question or issue arising out of
or relating to or connected with any relief or remedy claimed in the cause
*b*  or matter which in the opinion of the Court it would be just and
convenient to determine as between him and that party as well as
between the parties to the cause or matter.'

Once it is recognised that no buy-out relief will be ordered against it,
OAG's presence is not necessary for the purpose specified in (i), nor is there
*c*  any question or issue between OAG and the petitioner such that it would be
just and convenient to hear that matter alongside the petition. Given, as I
have already indicated, that OAG's ownership or control of Newco is, in my
view, no reason to require the joinder of OAG, I see no reason either why
OAG is a person who 'ought to have been joined' within (i). Once the
buy-out relief falls away as a possibility, Ord 15, r 6 requires, in my judgment,
*d*  a conclusion that OAG should not be joined as a respondent at all, and I so
rule.
    However, the summons before me raises questions other than the one that
I have so far dealt with and concerns respondents other than OAG. Subject
to my first being addressed on the costs so far and any other questions
involving OAG, I shall, once OAG has withdrawn, go on to hear the
*e*  remaining issues on this summons and on the summons as to security for costs
later in the day.


[His Lordship then heard argument on costs]

*f*

**LINDSAY J.** So far as concerns the costs of OAG, I am concerned only with
their costs of 28 March and of the longer later two day hearing. The costs
of OAG of and incidental to the summons in relation to those two hearings
should be paid by the petitioner, to be taxed and paid forthwith.
    So far as concerns the costs of the original respondents other than the
*g*  company which, as it transpires, has taken no part, it seems to me that their
costs of three occasions are in issue: those before Mr Registrar Buckley on
22 March, those before me on 28 March, and the later fuller hearing of two
days or so. The argument has, all along, even on the part of the original
respondents, principally concerned the original respondent's wish that OAG
*h*  should not be required to be a respondent and it seems to me that the original
respondents were entitled to take that view, just as much as OAG was entitled
to take that view and, moreover, the original respondents have in that respect
succeeded. Mr Potts argues that they would have been before the court in any
event, even if OAG's addition had not been sought, but it seems to me that
the battle would have been then a very much simpler one and might indeed
*i*  not have taken place.
    I think the appropriate order for the costs of the original respondents other
than the company is that those costs should be taxed on a standard basis (not

forthwith) and that they should be required to be paid in any event by the petitioners to the original respondents other than the company.

a

*Order that OAG should not be joined as a respondent.*

Jacqueline Metcalfe   Barrister.

**EXHIBIT D**



# *1619 Arnold v Britton and others



✓ **Positive/Neutral Judicial Consideration**

**Court**
Supreme Court

**Judgment Date**
10 June 2015

**Report Citation**
[2015] UKSC 36
[2015] A.C. 1619

Supreme Court

Lord Neuberger of Abbotsbury PSC , Lord Sumption , Lord Carnwath , Lord Hughes , Lord Hodge JJSC

2015 Jan 26; June 10

*Landlord and tenant—Covenant—Service charge—Long leases for holiday chalets—Clause in leases purporting to provide for payment of charge at fixed sum to be increased at compound rate of 10% per year—Clause inserted at time of high inflation— Inflation subsequently at consistently lower annual rates—Landlord levying service charge in accordance with specified sum —Tenants claiming commercial sense requiring clause to be construed as variable service charge based on actual expenditure with fixed sum as cap only—Whether clause providing for fixed sum payment—Whether open to court to depart from natural meaning of clause to prevent commercially absurd result*

From 1974 the then owners of an area of land granted a number of 99-year leases of plots on which holiday chalets were to be built, the preamble to each lease stating that it would be granted "upon terms similar in all respects" to the other leases, the introductory words of clause 3 providing that each lessee's covenants as to use and repair of chalets were, inter alia, for the benefit of other lessees, and clause 4(8) containing a covenant by the lessors that the covenants imposed on other lessees were to like effect. Clause 3 of the first group of leases included, in clause 3(2), a lessee's covenant "to pay … a proportionate part of the expenses and outgoings incurred by the lessors in the repair, maintenance, renewal and the provision of services [as set out in the lease] in the yearly sum of £90", increasing thereafter at a three-yearly compound rate of 10%. Subsequently, leases in respect of further chalets were granted in which clause 3(2) provided for an annual 10% compound increase. In 2011 the tenants of those chalets whose annual service charge had risen to over £2,700, as opposed to £282 for the chalets subject to the earlier leases, and who claimed that an interpretation of the clause which required a fixed sum payment resulted in such an absurdly high annual service charge that it could not be right, claimed that clause 3(2) should be read as requiring them to pay a variable sum, being a fair proportion of the cost of providing the services, with the specified sum being no more than a cap on the maximum sum payable. The landlord commenced CPR Pt 8 proceedings in the county court seeking a declaration that clause 3(2) required the payment of the fixed sum and not any lesser variable amount. The judge accepted the construction contended for by the tenants and so dismissed the claim. Allowing an appeal by the landlord the High Court judge held that, on a natural reading of the clause, the object of the verb "to pay" was the fixed sum of £90 as escalated, whereas the construction contended for by the tenants would involve rewriting the bargain which the parties had made, which, given the high levels of inflation in the United Kingdom when those leases had been granted, could not be said at that time to have lacked commercial purpose. Dismissing the tenants' appeal, the Court of Appeal affirmed the High Court judge's reasoning and held, additionally, that the words "a proportionate part" were not inconsistent with a fixed service charge in circumstances where other lessees were contributing to the overall service charge, which in consequence was to be apportioned between them.

© 2021 Thomson Reuters.

Arnold v Britton, [2015] A.C. 1619 (2015)

On the tenants' further appeal—

*Held* , dismissing the appeal (Lord Carnwath JSC dissenting), (1) that the interpretation of a contractual provision, including one as to service charges, involved identifying what the parties had meant through the eyes of a reasonable reader, and, save in a very unusual case, that meaning was most obviously to be  ***1620***  gleaned from the language of the provision; that, although the less clear the relevant words were, the more the court could properly depart from their natural meaning, it was not to embark on an exercise of searching for drafting infelicities in order to facilitate a departure from the natural meaning; that commercial common sense was relevant only to the extent of how matters would or could have been perceived by the parties, or by reasonable people in the position of the parties, as at the date on which the contract had been made; and that, moreover, since the purpose of contractual interpretation was to identify what the parties had agreed, not what the court thought that they should have agreed, it was not the function of a court to relieve a party from the consequences of imprudence or poor advice (post, paras 15-20, 23, 66, 76-77).

Dicta of Lord Hoffmann in Chartbrook Ltd v Persimmon Homes Ltd [2009] AC 1101 , para 14, HL(E) and of Lord Clarke of Stone-cum-Ebony JSC in *Rainy Sky SA v Kookmin Bank [2011] 1 WLR 2900* , para 21, SC(E) applied.

(2) That, applying those principles, the natural meaning of the words used in clause 3(2) was clear, namely that the first half of the clause stipulated that the lessee was to pay an annual service charge and the second half identified how that charge was to be calculated, namely by way of a fixed increase in the annual sum, which was explicable on the basis that the parties had assumed that the cost of providing the services would increase in line with the level of inflation then current and so accorded with commercial common sense at the date of the agreement; that the fact that it was now apparent that the sum payable could substantially exceed the parties' expectations at the time of the grant of the lease was not a reason for giving the clause a different meaning; that it followed that clause 3(2) of each lease fell to be applied as charging a fixed amount increasing annually at the compound rate stipulated therein; that such conclusion was unaffected by any building or letting scheme to be implied from the preamble to each lease read together with the introductory words to clause 3 and with clause 4(8), in that, even on an assumption that such a scheme of reciprocity and mutual enforceability of covenants could extend to a positive covenant to pay a service charge, it could not extend to the implication of a term preventing the lessor from recovering more by way of service charge than could be recovered under each of the earlier leases; and that, accordingly, the landlord was entitled to the declaration sought (post, paras 24-26, 35, 48-49, 51, 55-58, 60, 62, 66, 75, 77).

Decision of the Court of Appeal [2013] EWCA Civ 902; [2013] L & TR 371 affirmed.

The following cases are referred to in the judgments:

*Aberdeen City Council v Stewart Milne Group Ltd [2011] UKSC 56; 2012 SC (UKSC) 240; 2012 SCLR 114* , SC(Sc)
*Antaios Cia Naviera SA v Salen Rederierna AB (The Antaios) [1985] AC 191; [1984] 3 WLR 592; [1984] 3 All ER 229; [1984] 2 Lloyd's Rep 235* , HL(E)
*Attorney General of Belize v Belize Telecom Ltd [2009] UKPC 10; [2009] 1 WLR 1988; [2009] Bus LR 1316; [2009] 2 All ER 1127; [2009] 2 All ER (Comm) 1* , PC
*Bank of Credit and Commerce International SA v Ali [2001] UKHL 8; [2002] 1 AC 251; [2001] 2 WLR 735; [2001] ICR 337; [2001] 1 All ER 961* , HL(E)
*Chartbrook Ltd v Persimmon Homes Ltd [2009] UKHL 38; [2009] AC 1101; [2009] 3 WLR 267; [2009] Bus LR 1200; [2009] 4 All ER 677; [2010] 1 All ER (Comm) 365* , HL(E)
*Co-operative Wholesale Society Ltd v National Westminster Bank plc [1995] 1 EGLR 97* , CA
*Dolphin's Conveyance, In re [1970] Ch 654; [1970] 3 WLR 31; [1970] 2 All ER 664*
*Homburg Houtimport BV v Agrosin Private Ltd (The Starsin) [2003] UKHL 12; [2004] 1 AC 715; [2003] 2 WLR 711; [2003] 2 All ER 785; [2003] 1 All ER (Comm) 625; [2003] 1 Lloyd's Rep 571* , HL(E)

© 2021 Thomson Reuters.

*Hyams v Titan Properties Ltd (1972) 24 P & CR 359* , CA  ***\*1621***
*Johnson v Unisys Ltd [2001] UKHL 13; [2003] 1 AC 518; [2001] 2 WLR 1076; [2001] ICR 480; [2001] 2 All ER 801*
, HL(E)
*KPMG LLP v Network Rail Infrastructure Ltd [2007] EWCA Civ 363; [2007] Bus LR 1336* , CA
*MRS Distribution Ltd v DS Smith (UK) Ltd 2004 SLT 631*
*McHale v Earl Cadogan [2010] EWCA Civ 14; [2010] HLR 412; [2010] 1 EGLR 51* , CA
*Norwich Union Life Insurance Society v Low Profile Fashions Ltd [1992] 1 EGLR 86; 64 P & CR 187* , CA
Pennant Hills Restaurants Pty Ltd v Barrell Insurances Pty Ltd (1981) 145 CLR 625
*Pink Floyd Music Ltd v EMI Records Ltd (Practice Note) [2010] EWCA Civ 1429; [2011] 1 WLR 770* , CA
*Prenn v Simmonds [1971] 1 WLR 1381; [1971] 3 All ER 237* , HL(E)
*Rainy Sky SA v Kookmin Bank [2011] UKSC 50; [2011] 1 WLR 2900; [2012] Bus LR 313; [2012] 1 All ER 1137; [2012]
1 All ER (Comm) 1; [2012] 1 Lloyd's Rep 34* , SC(E)
*Reardon Smith Line Ltd v Yngvar Hansen-Tangen (trading as HE Hansen-Tangen) [1976] 1 WLR 989; [1976] 3 All ER
570; [1976] 2 Lloyd's Rep 621* , HL(E)
*Sigma Finance Corpn, In re [2009] UKSC 2; [2010] 1 All ER 571* , SC(E)
*Simon v Helmot [2012] UKPC 5; 126 BMLR 73* , PC
*Walker v Giles (1848) 6 CB 662*
*Wickman Machine Tool Sales Ltd v L Schuler AG [1974] AC 235; [1973] 2 WLR 683; [1973] 2 All ER 39; [1973] 2 Lloyd's
Rep 53* , HL(E)

The following additional cases were cited in argument:

*Debenhams Retail plc v Sun Alliance and London Assurance Co Ltd [2005] EWCA Civ 868; [2005] STC 1443* , CA
*Napier Park European Credit Opportunities Fund Ltd v Harbourmaster Pro-Rata CLO 2 BV [2014] EWCA Civ 984* , CA
*Waites (H) Ltd v Hambledon Court Ltd [2014] EWHC 651 (Ch); [2014] 1 EGLR 119*

**APPEAL** from the Court of Appeal

By a claim form issued in the Swansea County Court dated 7 December 2011 the claimant landlord, Paddy Arnold, freehold owner of the Oxwich Leisure Park, Oxwich, Gower, Swansea, sought against the defendant tenants, Rodney Britton and 42 others, each being a lessee of a chalet on the land under a 99-year lease from 12 December 1974, a declaration that (i) clause 3(2) of the lease obliged the lessee to pay a fixed sum of £90 in the first year of the term and thereafter a fixed sum which rose by the rate of 10% per annum, and (ii) accordingly, the sum payable pursuant to clause 3(2) was not a "service charge" within section 18 of the Landlord and Tenant Act 1985 . On 1 June 2012 Judge Jarman QC, sitting in the Cardiff County Court, refused to grant the declaration sought and instead declared that (i) clause 3(2) required the lessee to pay a proportionate part of the expenses and outgoings incurred by the lessor in the repair, maintenance, renewal and provision of services set out in the respective lease, the charge being limited to a yearly sum of £90 for the first year of the term granted by each lease and to a yearly sum increasing by 10% per annum for every subsequent year of the respective lease, and (ii) such charge was a service charge within section 18 of the 1985 Act.

 ***\*1622***
The claimant appealed. On 3 December 2012 Morgan J, sitting in the *Cardiff District Registry [2012] EWHC 3451 (Ch); [2013]
L & TR 174* allowed the appeal and granted a declaration in the terms sought by her.

38 of the tenants appealed. On 22 July 2013 the Court of Appeal (Richards, Davis, Lloyd Jones LJJ) [2013] EWCA Civ 902;
[2013] L & TR 371 dismissed the appeal.

On 11 February 2014 the Supreme Court (Lord Neuberger of Abbotsbury PSC, Lord Carnwath, Lord Toulson JJSC) granted those tenants permission to appeal, pursuant to which they appealed. The issue for the court, as stated in the parties' agreed statement of facts and issues, was whether as a matter of interpretation (including the possible implication of a term) the service charge clause in each of the leases provided for a fixed service charge with annual compounded increases at the rate of 10%, or for a variable service charge subject to a cap.

The facts are stated in the judgments of Lord Neuberger of Abbotsbury PSC and Lord Carnwath JSC.

*Timothy Morshead QC* and *Rawdon Crozier* (instructed by *Fursdon Knapper Solicitors, Plymouth* ) for the tenants.

© 2021 Thomson Reuters.

Arnold v Britton, [2015] A.C. 1619 (2015)

The six principles applicable when ascertaining the meaning of a document which are applicable here are as follow. (i) In order to ascertain the meaning of a document the court must undertake an iterative process, checking each of the rival meanings against other provisions of the document and investigating its commercial consequences: see *In re Sigma Finance Corpn [2010] 1 All ER 571* , para 12. (ii) Any test for ambiguity must be conducted after and in light of the iterative process, not before or apart from that process: see *Napier Park European Credit Opportunities Fund Ltd v Harbourmaster Pro-Rata CLO 2 BV [2014] EWCA Civ 984* at [36]-[37]. As a matter of law it is wrong to foreshorten or downplay the iterative process merely because language viewed in isolation appears at first glance to be unambiguous. (iii) Generally speaking, the commercial purpose of the contract is more important than niceties of language. Even where neither of the rival meanings produces an outcome which can be characterised as flouting business common sense, it is appropriate to adopt the more, rather than the less, commercial construction where the clause is capable of both meanings: see *Rainy Sky SA v Kookmin Bank [2011] 1 WLR 2900* , paras 25-30. If detailed semantic and syntactical analysis of words in a commercial contract is going to lead to a conclusion which flouts business common sense, it must be made to yield to business common sense: see *Antaios Cia Naviera SA v Salen Rederierna AB (The Antaios) [1985] AC 191* , 201. (iv) The court should be wary of an interpretation which makes the structure and language of other parts of the document appear arbitrary and irrational when it is possible for the concepts employed by the parties to be combined in a rational way: see Chartbrook Ltd v Persimmon Homes Ltd [2009] AC 1101 , para 20. (v) The document must be construed as a whole, viewing the words used therein against the relevant background and having regard to context. The relevant background includes facts, forming part of the circumstances in which the parties contract, in which one or both may take no particular interest, their minds being addressed to or concentrated on other facts so that if asked they would assert that they did not have these facts in the forefront of their mind, but that will not prevent those facts from forming part of an objective setting in which the **\*1623** contract is to be construed: see *Reardon Smith Line Ltd v Yngvar Hansen-Tangen (trading as HE Hansen-Tangen) [1976] 1 WLR 989* , 996-997 and *Attorney General of Belize v Belize Telecom Ltd [2009] 1 WLR 1988* , para 25. Moreover, in the context of leases, service charge provisions should be construed restrictively. (vi) The court's interpretation must promote the purposes and values which are expressed or implicit in the wording: *Debenhams Retail plc v Sun Alliance and London Assurance Co Ltd [2005] STC 1443* , para 27. This principle is not limited to cases where circumstances have changed since the date of the contract.

After the court has ascertained the meaning of a document, it must correct any mistake made by the parties in their choice of language and/or imply any term necessary to give effect to the ascertained meaning: see *Aberdeen City Council v Stewart Milne Group Ltd 2012 SC (UKSC) 240* . In particular, the court will imply a term where the parties contracted on an assumption which has since been falsified by events: see *H Waites Ltd v Hambledon Court Ltd [2014] 1 EGLR 119* , paras 65-67.

Here, the reasonable expectations of the parties must have been that, between them, the tenants on the estate would reimburse the landlord for the actual expenditure incurred from year to year, with the overall cost being spread fairly between them, and with the percentage operating merely as a maximum annual increase so as to control excessive expenditure whether driven by inflation or otherwise (in the place of an alternative control such as restricting recovery to "reasonable" expenditure). The drafting of the various versions of the clause in dispute—clause 3(2)—was predicated on an assumption, namely that the landlord's actual expenditure would rise by at least 10% per annum. Where, as has happened, circumstances have changed so that that assumption had become falsified, the correct response of the court, applying the above principles, is to recognise that the effect intended by the parties—having regard to the purpose and the values of the lease—is no longer being achieved, with the result that the implication of a term reflecting that purpose and those values is necessary.

*Crozier* followed.

*Michael Daiches* (instructed by *Morgan LaRoche Solicitors, Swansea* ) for the landlord.

The question whether a term should be implied only falls for consideration after the meaning of the contract has been ascertained from the express language (in context): see *Attorney General of Belize v Belize Telecom Ltd [2009] 1 WLR 1988* , para 17. Ordinary principles of contractual construction apply to leases: there is no special rule that service charge provisions are in general to be construed restrictively.

Here, the meaning of clause 3(2) is plain and unambiguous. The lessee was to pay an annual charge of £90 etc, as consideration for the provision by the lessor of the specified services. There is no basis for asserting that there is a linguistic mistake within the clause. In particular, there is nothing in the wording of the leases which shows an intention that the lessee was to pay a variable service charge subject to a cap.

A fixed annual service charge is intended to represent the annualised average expenses and outgoings estimated to be incurred by the lessor throughout the entire term of the lease. The essence of a fixed charge is that the annual payments do not fluctuate according to the actual expenses and *1624 outgoings incurred by the landlord during any particular accounting period. The expression in clause 3(2) requiring payment of "a proportionate part" of the expenses and outgoings incurred by the lessors is not merely consistent with a fixed service charge; it is paradigm wording for a fixed service charge. If the parties had intended that the lessees should pay a variable service charge subject to a cap, they would undoubtedly have made express provision for the quantification, ascertainment and collection of the yearly variable charge: there is none. Nor is there any commercial purpose for a landlord agreeing to a variable service charge provision subject to a cap. Far from it being clear that the parties intended that the lessee should pay a variable service charge subject to a cap, it is abundantly clear that they did not.

Once the meaning of clause 3(2) has been ascertained by the process of construing the express terms, the iterative process is at an end and there is no need to consider the question of implied terms. In any event, a term cannot be implied which is inconsistent with the meaning derived from the express terms. Any reliance on *H Waites Ltd v Hambledon Court Ltd [2014] 1 EGLR 119* is misplaced. The parties did not assume that the landlord's actual expenditure would rise by at least 10% per annum: that would take no account of infrequently occurring major expenditure. In so far as the parties made any assumptions, the only relevant one was that the lessees would pay a fixed service charge, increasing at the rate of 10% per annum, regardless of actual inflation. Such assumption can never be "falsified" by actual inflation rates, no matter how far such rates might diverge from 10% per annum. The fact that the parties may have acted on the basis that the average inflation rate throughout the term would be 10% was not an assumption; it was a best guess made in the knowledge that the chances of average inflation actually turning out to be 10% throughout the term would be virtually nil. That best guess would never be falsified no matter what the actual inflation rates were.

A term cannot be implied into a lease to supply a meaning which is inconsistent with the express language of the contract. Nor can commercial considerations supply a meaning which is inconsistent with the express language of the contract. In any event, any such commerciality argument would be in substance an argument based on 34 years' hindsight, namely that actual inflation would be significantly below 10% per annum. The risk which the parties took in selecting an inflation adjustment rate as a fixed percentage was one which they were perfectly entitled to judge—and must be inferred to have judged—for themselves. It is not for the court to judge the wisdom of the parties' bargain or to second-guess their motives.

*Morshead QC* replied.

The court took time for consideration.

10 June 2015. The following judgments were handed down.

LORD NEUBERGER OF ABBOTSBURY PSC (with whom LORD SUMPTION and LORD HUGHES JJSC agreed)

1.  This appeal concerns the interpretation of service charge contribution provisions in the leases of a number of chalets in a caravan park in south Wales.
*1625*


The facts

2.  The facts may be summarised as follows (although they are more fully set out by Lord Carnwath JSC at paras 81-103).

3.  Oxwich Leisure Park is on the Gower peninsular, and contains 91 chalets, each of which is let on very similar terms. The five leases which we have seen were granted between 1978 and 1991, either for a premium (of less than £20,000) or in return for the lessee constructing the chalet. Each of the 91 chalets was let on a lease which was for a term of 99 years from 25 December 1974 and reserved a rent of £10 per annum increasing by £5 for each subsequent period of 21 years. Paragraph (2) of the recital of each lease contains the statement that the chalets on the leisure park were intended to be subject to leases "upon terms similar in all respects to the present demise".

4.  Clause 3 of each lease contains various covenants by the lessee, and it is introduced by the words:

Arnold v Britton, [2015] A.C. 1619 (2015)

"The lessee hereby covenants with the lessor and with and for the benefit of the owners and lessees from time to time during the currency of the term hereby granted of the other plots on the estate so far as the obligations hereafter mentioned are capable of benefitting them …"

The covenants that follow concern use, repair, alienation and the like. Crucially for present purposes, clause 3(2) is a covenant to pay an annual service charge. Each lease also contains covenants by the lessor. One such covenant is to provide services to the park, such as maintaining roads, paths, fences, a recreation ground and drains, mowing lawns, and removing refuse. The lessor also covenants in clause 4(8) that leases of other chalets "shall contain covenants on the part of the lessees thereof to observe the like obligations as are contained herein or obligations as similar thereto as the circumstances permit".

5. 25 of the chalets are said by the respondent, the current owner of the leisure park and the landlord under the leases, to be subject to leases containing a service charge provision in clause 3(2), which requires the lessee to pay for the first year of the term a fixed sum of £90 per annum, and for each ensuing year a fixed sum representing a 10% increase on the previous year —ie an initial annual service charge of £90, which increases at a compound rate of 10% in each succeeding year. The issue on this appeal is whether the respondent's interpretation of clause 3(2) in those 25 leases is correct.

6. Of the 25 leases in question, 21 were granted between 1977 and 1991. Prior to the grant of most of those 21 leases, the other 70 chalets had been the subject of leases granted from the early 1970s. In each of those 70 leases, clause 3(2) was a covenant by the lessee:

"To pay to the lessors without any deduction in addition to the said rent a proportionate part of the expenses and outgoings incurred by the lessors in the repair maintenance renewal and the provision of services hereafter set out the yearly sum of £90 and VAT (if any) for the first three years of the term hereby granted increasing thereafter by ten pounds per hundred for every subsequent three year period or part thereof."

*1626* The effect of this clause, at least on the face of it, is that the initial service charge of £90 per annum was to be increased on a compound basis by 10% every three years, which is roughly equivalent to a compound rate of 3% per annum.

7. The 21 leases referred to in para 6 have two slightly different versions of clause 3(2), but the clause can be set out in the following form (with the words shown in italics included in 14 of the 21 leases, but not in the other seven):

"To pay to the lessors without any deductions in addition to the said rent *as* a proportionate part of the expenses and outgoings incurred by the lessors in the repair maintenance renewal *and renewal of the facilities of the estate* and the provision of services hereafter set out the yearly sum of £90 and VAT (if any) for the first year of the term hereby granted increasing thereafter by ten pounds per hundred for every subsequent year *or part* thereof."

8. To complicate matters a little further, the service charge clause in four of these 21 leases (being four of the seven which did not include the words in italics in the preceding quotation), had the word "for" before "the yearly sum of £90". These four leases also included a proviso to the effect that, so long as "the term hereby created is vested in the [original lessees] or the survivor of them", clause 3(2) would be treated as being in the form set out in para 6 above. This proviso has ceased to have effect as these four leases are no longer vested in the original lessees.

9. Finally, the service charge clause in four of the 70 leases referred to in para 6 above were varied pursuant to deeds of variation executed between October 1998 and August 2002 so as to be identical to that set out in para 7 above, including the words in italics.

The issues between the parties

10. As already explained, the respondent, the current landlord, contends that the service charge provisions in clause 3(2) of the 25 leases referred to in paras 6-9 above have the effect of providing for a fixed annual charge of £90 for the first year of the term, increasing each subsequent year by 10% on a compound basis. The appellants, the current tenants under 24 of the 25 leases, primarily contend that the respondent's construction results in such an increasingly absurdly high annual service charge

Arnold v Britton, [2015] A.C. 1619 (2015)

in the later years of each of the 25 leases that it cannot be right. They argue that, properly read, each service charge clause in the 25 leases requires the lessee to pay a fair proportion of the lessor's costs of providing the services, subject to a maximum, which is £90 in the first year of the term, and increases every year by 10% on a compound basis. In other words, the appellants argue that, in effect, the words "up to" should be read into the clause set out in para 7 above, between the words "the provision of services hereafter set out" and "the yearly sum of £90". The appellants also have an alternative contention, based on the provisions of recital (2), the opening words of clause 3 and the provisions of clause 4(8) of their leases, namely that the lessor cannot recover more by way of service charge than could be recovered under each of the first 70 leases.

*1627*

The evidence

11. Apart from the documents themselves and the published Retail Price Index ("RPI") for each of the years 1970-2010, there is no evidence as to the surrounding circumstances in which the 21 leases were executed, other than the fact that the four leases referred to in para 8 above were granted to individuals connected with the lessor. Following a request from the court, we were also told that three of the four deeds of variation referred to in para 9 above were entered into with the lessor's daughter as lessee.

12. I do not find it surprising that we have not been provided with any further evidence. So far as the wording of clause 3(2) is concerned, there may have been letters or notes of discussions in connection with the original drafting and granting (and, in the four cases referred to in para 9 above, the amending) of the leases. But, even if such notes or letters had survived, I very much doubt that they would have thrown any light on what was intended to be the effect of the drafting of the various forms of clause 3(2). Even if they had done, they would probably have been inadmissible as I strongly suspect that they would merely have shown what one party thought, or was advised, that the clause meant. If such documents had shown what both parties to the lease in question intended, they would probably only have been admissible if there had been a claim for rectification.

13. As to the possibility of other material, I am unconvinced that, even if it existed, evidence of the original level of services, the original cost of the services or any investigations made on behalf of a potential lessee in relation to the original services and their cost would have assisted on the issue of what clause 3(2) of any of the 25 leases meant. The provisions for increase at the end of clause 3(2) of each lease were plainly included to allow for inflation, and the only evidence which appears to me to be potentially relevant would be contemporary assessments of the actual and anticipated annual rate of inflation, and, as already mentioned, we have the RPI for each of the years in question.

Interpretation of contractual provisions

14. Over the past 45 years, the House of Lords and Supreme Court have discussed the correct approach to be adopted to the interpretation, or construction, of contracts in a number of cases starting with *Prenn v Simmonds [1971] 1 WLR 1381* and culminating in *Rainy Sky SA v Kookmin Bank [2011] 1 WLR 2900* .

15. When interpreting a written contract, the court is concerned to identify the intention of the parties by reference to "what a reasonable person having all the background knowledge which would have been available to the parties would have understood them to be using the language in the contract to mean", to quote Lord Hoffmann in Chartbrook Ltd v Persimmon Homes Ltd [2009] AC 1101 , para 14. And it does so by focussing on the meaning of the relevant words, in this case clause 3(2) of each of the 25 leases, in their documentary, factual and commercial context. That meaning has to be assessed in the light of (i) the natural and ordinary meaning of the clause, (ii) any other relevant provisions of the lease, (iii) the overall purpose of the clause and the lease, (iv) the facts and circumstances known or assumed by the parties at the time that the document was executed, and (v) commercial common sense, but (vi) disregarding *1628* subjective evidence of any party's intentions. In this connection, see *Prenn [1971] 1 WLR 1381* , 1384-1386; *Reardon Smith Line Ltd v Yngvar Hansen-Tangen (trading as HE Hansen-Tangen) [1976] 1 WLR 989* , 995-997, per Lord Wilberforce; *Bank of Credit and Commerce International SA v Ali [2002] 1 AC 251* , para 8, per Lord Bingham of Cornhill; and the survey of more recent authorities in *Rainy Sky [2011] 1 WLR 2900* , paras 21-30, per Lord Clarke of Stone-cum-Ebony JSC.

16. For present purposes, I think it is important to emphasise seven factors.

17. First, the reliance placed in some cases on commercial common sense and surrounding circumstances (eg in Chartbrook [2009] AC 1101 , paras 16-26) should not be invoked to undervalue the importance of the language of the provision which is to be construed. The exercise of interpreting a provision involves identifying what the parties meant through the eyes of a

Arnold v Britton, [2015] A.C. 1619 (2015)

reasonable reader, and, save perhaps in a very unusual case, that meaning is most obviously to be gleaned from the language of the provision. Unlike commercial common sense and the surrounding circumstances, the parties have control over the language they use in a contract. And, again save perhaps in a very unusual case, the parties must have been specifically focussing on the issue covered by the provision when agreeing the wording of that provision.

18.  Secondly, when it comes to considering the centrally relevant words to be interpreted, I accept that the less clear they are, or, to put it another way, the worse their drafting, the more ready the court can properly be to depart from their natural meaning. That is simply the obverse of the sensible proposition that the clearer the natural meaning the more difficult it is to justify departing from it. However, that does not justify the court embarking on an exercise of searching for, let alone constructing, drafting infelicities in order to facilitate a departure from the natural meaning. If there is a specific error in the drafting, it may often have no relevance to the issue of interpretation which the court has to resolve.

19.  The third point I should mention is that commercial common sense is not to be invoked retrospectively. The mere fact that a contractual arrangement, if interpreted according to its natural language, has worked out badly, or even disastrously, for one of the parties is not a reason for departing from the natural language. Commercial common sense is only relevant to the extent of how matters would or could have been perceived by the parties, or by reasonable people in the position of the parties, as at the date that the contract was made. Judicial observations such as those of Lord Reid in *Wickman Machine Tools Sales Ltd v L Schuler AG [1974] AC 235* , 251 and Lord Diplock in *Antaios Cia Naviera SA v Salen Rederierna AB (The Antaios) [1985] AC 191* , 201, quoted by Lord Carnwath JSC at para 110, have to be read and applied bearing that important point in mind.

20.  Fourthly, while commercial common sense is a very important factor to take into account when interpreting a contract, a court should be very slow to reject the natural meaning of a provision as correct simply because it appears to be a very imprudent term for one of the parties to have agreed, even ignoring the benefit of wisdom of hindsight. The purpose of interpretation is to identify what the parties have agreed, not what the court thinks that they should have agreed. Experience shows that it is by no means unknown for people to enter into arrangements which are ill-advised, even *\*1629* ignoring the benefit of wisdom of hindsight, and it is not the function of a court when interpreting an agreement to relieve a party from the consequences of his imprudence or poor advice. Accordingly, when interpreting a contract a judge should avoid re-writing it in an attempt to assist an unwise party or to penalise an astute party.

21.  The fifth point concerns the facts known to the parties. When interpreting a contractual provision, one can only take into account facts or circumstances which existed at the time that the contract was made, and which were known or reasonably available to both parties. Given that a contract is a bilateral, or synallagmatic, arrangement involving both parties, it cannot be right, when interpreting a contractual provision, to take into account a fact or circumstance known only to one of the parties.

22.  Sixthly, in some cases, an event subsequently occurs which was plainly not intended or contemplated by the parties, judging from the language of their contract. In such a case, if it is clear what the parties would have intended, the court will give effect to that intention. An example of such a case is *Aberdeen City Council v Stewart Milne Group Ltd 2012 SC (UKSC) 240* , where the court concluded that "any … approach" other than that which was adopted "would defeat the parties' clear objectives", but the conclusion was based on what the parties "had in mind when they entered into" the contract: see paras 21 and 22.

23.  Seventhly, reference was made in argument to service charge clauses being construed "restrictively". I am unconvinced by the notion that service charge clauses are to be subject to any special rule of interpretation. Even if (which it is unnecessary to decide) a landlord may have simpler remedies than a tenant to enforce service charge provisions, that is not relevant to the issue of how one interprets the contractual machinery for assessing the tenant's contribution. The origin of the adverb was in a judgment of Rix LJ in McHale v Earl Cadogan [2010] HLR 412 , para 17. What he was saying, quite correctly, was that the court should not "bring within the general words of a service charge clause anything which does not clearly belong there". However, that does not help resolve the sort of issue of interpretation raised in this case.

Discussion: interpretation of clause 3(2)

24.  When one turns to clause 3(2) of each of the 91 leases of the chalets in Oxwich Park, the natural meaning of the words used, at least until one considers the commercial consequences, seems clear. The first half of the clause (up to and including the words "hereafter set out") stipulates that the lessee is to pay an annual charge to reimburse the lessor for the costs of providing the services which he covenants to provide, and the second half of the clause identifies how that service charge is to be calculated.

© 2021 Thomson Reuters.

8

25.  The fact that the second half of the clause results in the service charge being a fixed sum, rather than a sum dependent on the costs to the lessor of providing the contractual services is readily explicable. As stated in *Wonnacott, The History of the Law of Landlord and Tenant in England and Wales* (2012), p 106, clauses which provide for charges which vary with the costs of providing services have resulted, at least since around 1960, in "more trouble between landlord and tenant than anything else". Further, legislation which started to come into force in 1972 has rendered it progressively more difficult for an "amateur landlord" (to use Wonnacott's  *\*1630*  expression) to recover a disputed service charge calculated on such a basis. The fact that the second half of the clause goes on to provide for a fixed increase in the annual sum is also readily explicable: the parties assumed that the cost of providing the services in sterling terms would increase, or, to put the same point another way, they assumed that the value of money would fall.

26.  Davis LJ concisely explained the thinking behind the clause in the course of his judgment in the Court of Appeal [2013] L & TR 371, para 52:

"Lack of correspondence between outlay and receipt is the almost inevitable consequence of such a clause if the parties have elected for a fixed charge formula. It has a similarity with a liquidated damages clause: it represents the parties' estimate at the outset for the future with neither guarantee nor even expectation of entire coincidence with the eventual outcome. But the advantage is certainty. The parties know from the outset where they stand. Moreover, it is a surrounding circumstance legitimately to be taken into account here that the leases were made at a time of inflation—in some years, very significant inflation—which the parties, objectively and commercially speaking, could be expected to want to confront. They chose to do so by this particular formula of increase."

27.  In those seven leases where the word "as" is not included, I suppose that it might be said that this is not clear unless words such as "quantified in the sum of" were included in order to link the two halves of the clause, but that is, to my mind, a really pedantic argument. Although perfectionist drafting might suggest the inclusion of such words, it seems to me that the absence of such words cannot fairly be invoked to suggest ambiguity or a lack of clarity. The reasonable reader of the clause would see the first half of the clause as descriptive of the purpose of clause 3(2), namely to provide for an annual service charge, and the second half as a quantification of that service charge.

28.  It is true that the first part of the clause refers to a lessee paying a "proportionate part" of the cost of the services, and that, unless inflation increases significantly in the next 50 years, it looks likely that the service charge payable under each of the 25 leases may exceed the cost of providing services to the whole of the leisure park. However, if, as I believe is clear, the purpose of the second part of the clause is to quantify the sum payable by way of service charge, then the fact that, in the future, its quantum may substantially exceed the parties' expectations at the time of the grant of the lease is not a reason for giving the clause a different meaning. As already explained, the mere fact that a court may be pretty confident that the subsequent effect or consequences of a particular interpretation was not intended by the parties does not justify rejecting that interpretation.

29.  However, given the way things have turned out, it is tempting to latch onto the absence of words such as "quantified in the sum of", and to see the two halves of clause 3(2) as mutually inconsistent in their effect. This would be on the ground that the first half of the clause requires the lessee to pay a "proportionate part" of the cost to the lessor of providing services, whereas the latter half requires the lessee to pay a sum which could exceed the whole of that cost. On that basis, it might be said that the court can reject or modify one half to give effect to the real intention of the parties: see  *\*1631*  eg *Walker v Giles (1848) 6 CB 662* . However, as explained in para 24 and 25 above, this argument would, in my view, involve the court inventing a lack of clarity in the clause as an excuse for departing from its natural meaning, in the light of subsequent developments.

30.  Were it not for the percentage increases of 10% per annum specified in the 25 service charge clauses which are being considered on this appeal, coupled with the subsequent history of inflation in the United Kingdom, that would be the end of it. Thus, it seems to me that the original 70 leases (referred to in para 6 above), with a clause 3(2) which provided for increases of about 3% per annum (at a time when inflation was running at a significantly higher rate), should plainly be interpreted in the way in which the respondent contends. However, the consequences of the annual sum of £90 being increased annually by 10% on a compound basis are plainly unattractive, indeed alarming, to a lessee holding a chalet under one of the 25 leases. If one assumes a lease granted in 1980, the service charge would be over £2,500 this year, 2015, and over £550,000 by 2072. This appears to be an alarming outcome for the lessees, at least judging by how things look in 2015, because annual inflation in the last 15 years has hardly ever been above 4%, indeed has been under 3% for ten of those years, and has notoriously been falling recently almost to the point of turning negative, whereas the service charge over that period has increased, and will continue to increase, by 10% per annum.

Arnold v Britton, [2015] A.C. 1619 (2015)

31. The appellants argue that these figures illustrate the extreme unlikelihood of the parties to the 21 leases (or to the four subsequent deeds of variation), and in particular the lessees, having intended to agree that the original £90 service charge would be automatically increased by 10% annually on a compound basis. Accordingly, they contend, the latter half of clause 3(2) should be interpreted as imposing a maximum on the annual service charge recoverable by the lessor. In other words, the effect of the clause is said to be that the lessor is entitled to an appropriate percentage of the annual cost of providing the contracted services, subject to a maximum—which was initially £90, but which increases by 10% compound annually.

32. Despite the unattractive consequences, particularly for a lessee holding a chalet under one of the 25 leases, I am unconvinced by this argument. It involves departing from the natural meaning of clause 3(2) in each of those leases, and it involves inserting words which are not there.

33. Further, the appellants' argument involves attributing to the parties to the 25 leases an intention that there should be a varying service charge and that the lessor (or some other unspecified person) should assess the total costs of the services and determine the appropriate proportion of the cost of the contractual services to allocate to each chalet. Although I accept that it has an element of circularity, it appears to me that the average reader of clause 3(2) would have thought that those are exercises which the clause seems to have been designed to avoid.

34. Although there are one or two very small errors in the drafting, I do not consider that anything has gone significantly wrong with the wording of clause 3(2) of any of the 25 leases. As already explained, I would reject the notion that, on a natural reading, the two parts of the clause do not relate to each other, or appear to say different things, even in the seven cases where the word "as" is not included: as the Court of Appeal said, the first half *1632* imposes a liability for an annual service charge and the second half explains how it is to be assessed. I do not think that the reference to part of a year in the closing words of the clause (para 7 above refers), or the inclusion of an unnecessary "for" (para 8 above refers), in some of the 25 leases can possibly justify departing from the natural meaning of clause 3(2). At best the reference to part of a year is meaningless. However, given that the 99-year term of each lease ran from Christmas 1974, all of them would have ended part way through a year, as they would also have been very likely to do if surrendered or forfeited. Furthermore, the fact that some clauses refer not merely to "repair maintenance and renewal", but also to "renewal of facilities on the estate" seems to me to be irrelevant to the issue on this appeal.

35. Quite apart from the fact that the effect of clause 3(2) appears clear in each lease as a matter of language, I am far from convinced by the commercially-based argument that it is inconceivable that a lessee would have agreed a service charge provision which had the effect for which the respondent contends, at least in the 1970s and much of the 1980s. Although I would have expected most solicitors to have advised against it, and imprudent though it undoubtedly has turned out to be (at least so far), a lessee could have taken the view that a fixed rate of increase of 10% per annum on a fixed initial service charge, at a time when annual inflation had been running at a higher rate for a number of years (well over 10% per annum between 1974 and 1981, indeed over 15% per annum for six of those eight years; although it was less than 10% per annum after 1981), was attractive or at least acceptable.

36. If inflation is running at, say, 10% per annum, it is, of course, very risky for both the payer and the payee, under a contract which is to last around 90 years, to agree that a fixed annual sum would increase automatically by 10% a year. They are taking a gamble on inflation, but at least it is a bilateral gamble: if inflation is higher than 10% per annum, the lessee benefits; if it is lower, the lessor benefits. On the interpretation offered by the appellants, it is a one way gamble: the lessee cannot lose because, at worst, he will pay the cost of the services, but, if inflation runs at more than 10% per annum, the lessor loses out.

37. The fact that a court may regard it "unreasonable to suppose that any economist will be able to predict with accuracy the nature and extent of changes in the purchasing power of money" over many decades (to quote Gibbs J in Pennant Hills Restaurants Pty Ltd v Barrell Insurances Pty Ltd (1981) 145 CLR 625 , 639) is nothing to the point. People enter into all sorts of contracts on the basis of hopes, expectations and assessments which no professional expert would consider prudent, let alone feel able to "predict with accuracy". I have little doubt that many fortunes have been both made and lost (and sometimes both) by someone entering into such a contract.

38. In terms of commercial justification, the analysis in paras 34 and 35 above becomes more difficult to invoke the further one moves on from 1981, the last year when inflation was above 10% per annum, although in 1990 it almost hit that figure. Accordingly, while I think the analysis comfortably applies to the 21 leases referred to in paras 6-8 above, which were granted between 1977 and 1990, it is unconvincing in relation to the four leases whose service charge provisions were amended around 2000, as mentioned in para 9 above.

*1633*

Arnold v Britton, [2015] A.C. 1619 (2015)

39. It seems rather extraordinary that a lessee under a lease which provided for an increase in a fixed service charge at the rate of 10% over three years should have agreed to vary the lease so that the increase was to be at the rate of 10% per annum, at a time when inflation was running at around 3% per annum. However, I do not accept that this justifies reaching a different result in relation to any of the four leases which were varied in 2000. Three of them are relatively easily explicable, as the lessee who agreed the variation was closely connected with the lessor. The fact that they were subsequently assigned is, I accept, remarkable, but that last fact cannot affect the interpretation of the deeds. As to the fourth deed, it was, on any view, an improvident variation to have agreed, but, as already explained, that is not enough to justify the court rewriting the contract under the guise of interpreting it. Further, given that, at least in my view, there could be no ground for suggesting that the original clause 3(2) in the three leases (providing as it did for an annual increase of around 3%) had any effect other than that for which the respondent contends, it is particularly difficult to suggest that the substituted clause, which changed the annual increase to 10%, but was otherwise identically worded (save that it included the word "as" and was therefore even clearer), should have a different effect.

40. I note in this connection that, at a time when inflation was running at well over 10% per annum from 1974 to 1980 (possibly excepting 1984), the lessor was granting leases which provided, in effect, for increases in the £90 at the rate of about 3% per annum (para 6 above refers). Of course, that cannot be taken into account when interpreting any of the 25 leases, but it shows the lessor was prepared to take what appears to have been an unwise decision which was not entirely dissimilar from the unwise decision which, in my view, the lessees under the 25 leases took.

41. I do not think that this is a case where the approach adopted by this court in *Aberdeen City Council* 2012 SC (UKSC) 240 can assist the appellants. Unlike that case, this is not a case where one of the parties has done something which was not contemplated by the contract. It is clear that the 10% per annum increase in clause 3(2) was included to allow for a factor which was out of the control of either party, namely inflation. In my judgment, there is no principle of interpretation which entitles a court to re-write a contractual provision simply because the factor which the parties catered for does not seem to be developing in the way in which the parties may well have expected.

42. It also appears to me that there is a degree of inconsistency in the appellants' case. That case is, of course, ultimately based on the unlikelihood of a lessor and lessee of a single chalet agreeing that an initial annual service charge of £90 should be increased at a rate which could well lead to the annual charge being an absurdly high figure—possibly more than the cost of providing the services for the whole leisure park. But it is also rather unlikely (albeit less unlikely, I accept) that they will have agreed a ceiling on the annual service charge which would become so absurdly high that it would be meaningless. In other words, it can be said with some force that the appellants' solution to the problem which they identify does not actually address the problem: it merely changes its commercial consequences.

43. I should add that, subject to the point dealt with in the next section of this judgment, I am unconvinced that any assistance can be gained *\*1634* from the differences between the various forms of clause 3(2). It seems to me positively unlikely that the lessees under the later 21 leases would have been aware of the terms of clause 3(2) of the earlier 70 leases. But, even if they had been so aware, it seems to me that it would assist the respondent's case, not that of the appellants. That is because, given that it appears clear that the second half of clause 3(2) in the earlier 70 leases operated to quantify the service charge, then it seems to me (as explained in the last sentence of para 39 above) that it is very unlikely that the parties can have intended the almost identically worded second half of clause 3(2) in the later 21 leases to have a very different effect from that in the earlier 70 leases.

44. In his judgment at para 116, Lord Carnwath JSC rightly points out that, even after he assigns the lease, the original lessee is bound for the duration (at least if it was granted before 1996). However, I do not see what that adds in this case: on any view, these leases involve long term commitments on both sides. I agree with his view in para 117 that a prospective lessee of a flat in a block or the like (as here) will normally be likely to have less negotiating freedom as to the terms than in relation to a "free standing" property. But so will the lessor, and either is free to walk away if he regards the terms as unsatisfactory.

45. I am also unconvinced that the remedies available (whether in common law or under statute) to the parties in the event of a breach in connection with services or service charge, as discussed in Lord Carnwath JSC's paras 121-123, assists on the issue we have to decide. We are concerned with what a service charge clause means, not how it is being operated.

46. Finally on this first point, Lord Carnwath JSC makes some remarks about service charge provisions in his para 119. There will, I suspect, be many cases where his observations are very much in point: indeed, they may well be normally in point. However, the lessor has no duty to be "fair" when negotiating the terms of a lease (any more than the lessee does), although it

may well be in his interest to be (or at least to appear to be) fair. But, whoever interpretation is correct, clause 3(2) was self-evidently not a "normal" service charge clause: on the respondent's case, the landlord might get more or less than the costs of providing the services; on the appellants' case, the landlord might get less than the costs of providing the services.

Discussion: the effect of clause 4(8) and the terms of the other leases

47.  The appellants, at the invitation of the court, argued that clause 4(8), which as explained in para 4 above required leases of chalets to be granted subject to identical or similar obligations, substantially mitigated the effect of clause 3(2) of their leases. They contended that clause 4(8), when read together with the opening words of clause 3 and paragraph (2) of the recital to each lease, referred to in paras 3 and 4 above, enable them to limit the service charge which the landlord could otherwise recover under clause 3(2).

48.  The appellants' argument in this connection proceeds in two steps. First, as a result of clause 4(8), the opening words of clause 3, and paragraph (2) of the recital in each of their leases, a term was implied into their leases to the effect that clause 3(2) was in the same terms as clause 3(2) of the leases of chalets which had already been granted—ie the 70 leases referred to in para 6 above. Secondly, in those circumstances the lessor is now precluded from recovering more by way of service charge than would  *1635  be recoverable under the terms of the service charge provisions in the 70 leases—ie £90 plus 10% compounded every three years. While this argument has obvious attraction, I would reject it.

49.  The purpose of clause 4(8), the opening words of clause 3, and recital (2) was, I would accept, to create what is sometimes referred to as a "building scheme", but, at least in the present context is more accurately described as a letting scheme. Such a scheme, which is recognised and given effect to by equity, has to be apparent from the terms of the relevant leases (or, very unusually, from a side agreement entered into by each lessee with the lessor). A letting scheme involves properties within a given area being let on identical or similar terms, normally by the same lessor, with the intention that the terms are to be enforceable not only by the lessor against any lessee, but as between the various lessees—even by an earlier lessee of one property against a later lessee of another property. There is plainly a strong case for saying the combination of paragraph (2) of the recital, the opening words of clause 3 and the provisions of clause 4(8) establishes that there is such a scheme in relation to the chalets in the leisure park. Accordingly, I am prepared to assume that there was envisaged that there would be a degree of reciprocity and mutual enforceability between the lessees of chalets when it came to the covenants they entered into.

50.  However, in my view, the appellants' reliance on the scheme in order to limit the service charges recoverable under clause 3(2) of their leases faces a number of problems.

51.  First, it seems to me to be unclear whether a provision such as clause 3(2) could be or was subject to the scheme. There is room for argument whether a letting scheme can only extend, like freehold schemes, to restrictive covenants, or whether it can also extend to positive covenants (on the basis that positive covenants between lessor and lessee are enforceable as between their respective successors, whereas only restrictive covenants are enforceable as against successors of covenantors in relation to freeholds). Even if a leasehold scheme can extend to positive covenants, it is also questionable whether a lessee's covenant to pay a service charge, or any other sum of money to the lessor, can be within the ambit of a scheme.

52.  Secondly, in so far as they are dealing with the provisions of leases of other chalets, clause 4(8), and (arguably) the opening words of clause 3 and recital (2) appear to refer to future lettings, not to past lettings. It is quite a bold step to imply a term as to what has happened in the past from an express provision which is limited to the future. Having said that, there is considerable practical force in the contention that the scheme contemplated by the three provisions could only work if leases of all the chalets, past, present and future, were on the same terms.

53.  Thirdly, even if the appellants' argument based on an implied term was otherwise correct, there would still be considerable force in the contention that it would not exonerate the appellants from complying with their obligations under clause 3(2). It seems clear that, where there is a letting scheme, a tenant can enjoin the landlord from letting a property within the scheme area on terms which are inconsistent with the scheme. However, as far as I am aware, there is no case where the landlord has been held liable to a tenant in damages (or otherwise) for having let a property within the scheme area on such terms, prior to the grant of the tenant's lease.
 *1636

54.  Fourthly, even if these arguments are all rejected, the closing words of clause 4(8) clearly permit a degree of variation between the terms of the leases of different chalets. If the second part of clause 3(2) is intended to reflect the level of projected

Arnold v Britton, [2015] A.C. 1619 (2015)

inflation, then the parties may well have regarded it as almost inevitable that any annual or triennial adjustment would vary from time to time. On that basis, there may be no breach of any implied term anyway.

55. However, it is unnecessary to address the four points identified in paras 51-54 above, because, in my judgment, there is a fatal flaw in the appellants' argument based on an implied term. In effect, the appellants' case is that the implied term in each of the 21 leases is that the lessor was not asking anything of the lessee which had not been, or would not be, required of lessees of other chalets, whether their leases were in the past or the future. However, it seems to me that, assuming everything else in the appellants' favour, that would not be the correct term to imply. As I see it, if there is an implied term along the lines argued for, it is that the already existing 70 leases of chalets contain a clause 3(2) identical with that in the appellant's leases—ie that the 70 existing leases have service charges which increase at the compound rate of 10% per annum as in the 21 leases.

56. In so far as it relates to the 70 existing leases, the implied term suggested by the appellants is inconsistent with both (a) an express term of the appellants' leases, namely clause 3(2) itself, and (b) what is implied in relation to future leases. As to point (a), the appellants' suggested implied term means that clause 3(2) involves a 10% increase every three years, whereas there is an express term to the effect that the 10% increase is every year; and it is a fundamental principle that one cannot imply a term which is inconsistent with an express term. As to point (b), any reader of an appellant's lease who was asked what future leases of chalets would contain by way of a service charge provision would answer that it would be the same as that in the instant lease—ie £90 pa subject to an increase of 10% per annum compounded; and the implied term applicable to future leases should be the same as that applicable to past leases.

57. If the appellants are right in their contention that there is an implied term, the term which I would favour (as set out at the end of para 55 above) runs into neither of these difficulties. It amounts to saying that, as clause 3(2) of an appellant's lease means that the service charge is to be £90 pa increasing by 10% pa compounded, there is a term implied into the lease that that is what the existing leases provide and it is what future leases will provide.

58. If, as the appellants contend, there is an implied term, but that is its correct characterisation, it is difficult to see how it can help them. An appellant can say that the fact that the 70 existing leases contain a different clause 3(2) means that there is a breach of the implied term, but it is hard to see what damage or other injury has been suffered if the respondent now insists on enforcing clause 3(2) of their leases against the appellants. If an appellant could show that the value of his lease was reduced because the lessor had not granted the first 70 leases with the same clause 3(2) as was in the appellant's lease, the consequent reduction in the value of that lease could well be the appropriate measure of damages. But I cannot at the moment see on what basis the breach can assist an appellant in resisting the full financial consequences of the clause 3(2) he entered into.

*1637*

59. I should add that, if, contrary to my view expressed in para 43 above, the lessees under the later 21 leases would have been aware of the terms of clause 3(2) of the earlier 70 leases (as Lord Carnwath JSC suggests), it would negative any reliance which the lessees under the 21 leases could place on clause 4(8), as just discussed. This is because the later lessees would have known of, and accepted, the departure from the original clause 3(2).

Conclusion

60. Accordingly, in agreement with the reasons given by Lord Hodge JSC in this court, Davis LJ in the Court of Appeal and Morgan J in the High Court, I would dismiss this appeal, and I do not consider that the appellants are assisted by the additional argument raised in this court. I should, however, make five final points.

61. First, the Court of Appeal suggested that the only way the lessees under the 25 leases could escape from their problems would be by surrendering or suffering forfeiture. In case this is misinterpreted, it is right to point out that surrender is consensual between lessee and lessor, and forfeiture involves unilateral action by a lessor, and so neither course can be forced on the lessor.

62. Secondly, I have considerable sympathy with Lord Carnwath JSC's conclusion that the appeal should be allowed (not least because it is a much more satisfactory outcome in common sense terms, particularly viewed as at today), and I acknowledge that his reasons are as powerful as his conclusion allows. However, for the reasons I have given, I cannot agree with him.

63. Thirdly, the fact that four leases were granted to associates of the lessor with the proviso described in para 8 above, and that three of the deeds of variation described in para 9 above were entered into with a lessee who was a close relation of the lessor, is worthy of comment. It suggests that the lessor or her advisers may have appreciated the potential disadvantages of the

© 2021 Thomson Reuters.

13

Arnold v Britton, [2015] A.C. 1619 (2015)

clause now contained in the 25 leases. However, I do not see how it can assist the lessees on the issue in these proceedings, namely the interpretation of the clause in the 25 leases.

64.    Fourthly, as Lord Carnwath JSC records in para 155 below, it appears that the respondent realistically recognises the unsatisfactory situation in which the lessees under the 25 leases find themselves, and is prepared to agree appropriate amendments to their leases. I hope that a fair and just amendment can be agreed.

65.    Finally, as Lord Carnwath JSC also points out in paras 90-93 below, there are various statutory provisions which protect tenants against unreasonable service charges, but none of them applies here. The present case suggests that there may be a strong case for extending such provisions to cases such as the present, even though they involve a fixed sum payable by way of service charge. But that is a policy issue for Parliament, and there may be arguments either way.


LORD HODGE JSC (who agreed with LORD NEUBERGER OF ABBOTSBURY PSC)

66.    I agree that the appeal must be dismissed for the reasons which Lord Neuberger of Abbotsbury PSC sets out. But it is a highly unsatisfactory outcome for the chalet tenants who are affected by the annual escalator of the service charge. It is not clear whether there are many long leases  *1638  containing fixed service charges with escalators which are beyond the reach of statutory regulation. If there are, there may be a case for Parliament to consider extending the provisions that protect tenants against unreasonable service charges.

67.    Mr Morshead QC for the appellants submitted in his written case that what was important was "(a) that the risk [of inflation falling and remaining substantially below 10%] would have been obvious to the officious, reasonable bystander who must be imagined interrogating the actual parties and (b) that no reasonable person in the position of the parties, looking at the leases in their entirety and in context, would understand them to have intended that the tenants should assume that risk". He envisaged that in a hypothetical dialogue the officious bystander would warn the parties of the risks of their proposed contract and they would make it clear that that was not their intention.

68.    In the course of the debate we were referred directly or by reference to several cases concerning the remediation of a mistake by construction or the implication of a term. In my view they do not give the support that Mr Morshead needs.

69.    In  *Homburg Houtimport BV v Agrosin Private Ltd (The Starsin) [2004] 1 AC 715*  the mistaken omission of words in a clause was apparent because the bill of lading had been modelled on a standard clause. The person who had transposed the standard clause into the bill of lading had omitted a phrase in the standard clause in which the same word had appeared at the end of two consecutive phrases. The mistake was clear and it was apparent what correction was called for: paras 22 and 23 per Lord Bingham of Cornhill.

70.    In Chartbrook Ltd v Persimmon Homes Ltd [2009] AC 1101 a definition, which contained a grammatical ambiguity, made no commercial sense if interpreted in accordance with the ordinary rules of syntax. The background to the deal and the internal context of the contract showed that there was a linguistic mistake in the definition, which the court was able to remove by means of construction. In his speech Lord Hoffmann, at para 23, referred with approval to the judgment of Carnwath LJ in  *KPMG LLP v Network Rail Infrastructure Ltd [2007] Bus LR 1336* . In that case, which concerned a rent review clause in a lease, it was clear from the terms of the clause that its wording did not make sense. The court was assisted by an earlier agreement which set out the then intended clause containing a parenthesis, of which only part had remained in the final lease. It was not clear whether the parties had mistakenly deleted words from the parenthesis, which they had intended to include, or had failed to delete the parenthesis in its entirety. But that uncertainty as to the nature of the mistake, unusually, did not matter as the outcome was the same on either basis.

71.    In  *Aberdeen City Council v Stewart Milne Group Ltd 2012 SC (UKSC) 240*  the internal context of the contract provided the answer. The sale contract provided for the payment to the vendor of a further sum on disposal of the land by the purchaser. Two of the methods of disposal required the parties to ascertain the market value of the property on disposal in calculating the additional payment and the other used the "gross sales proceeds" in calculating that payment. The purchaser sold the site at an under-value to an associated company, a circumstance which on the face of the contract the parties had not contemplated. The courts at each level  *1639  interpreted the provision, which used the gross sales proceeds in the calculation, as requiring a market valuation where there was a sale which was not at arm's length. They inferred the intention of the parties at the time of the agreement from the contract as a whole and in particular from the fact that the other two methods of disposal required such

14

Arnold v Britton, [2015] A.C. 1619 (2015)

a valuation. While this line of reasoning was criticised by Professor Martin Hogg "Fundamental Issues for Reform of the Law of Contractual Interpretation" (2011) 15 Edin LR 406 on the ground that it protected a party from its commercial fecklessness, it seems to me to be the correct approach in that case as the internal context of the contract pointed towards the commercially sensible interpretation.

72.  The context, whether internal to the contract or otherwise, provides little assistance in this case. Beyond the words of the relevant clauses, there is the context of the other provisions of each of the 25 individual leases which are at issue. They are long leases, having a term of 99 years. The court in interpreting the leases can and should take into account the great difficulty in predicting economic circumstances in the distant future and ask itself whether the parties really intended to do so.

73.  The court also can and should take into account the economic circumstances which prevailed at the time each lease was entered into. It is clear from the table which Lord Carnwath JSC has set out in para 100 of his judgment that between 1974 and 1988 the use of a 10% annual escalator achieved a result which was not far off the diminution of the value of money in the difficult economic circumstances that then prevailed. The future was and is unknown.

74.  Little else is known and I do not think that it is appropriate to speculate about the extent to which lessees would have known the terms of earlier leases. In my view there is much to be said for the practice, which Lord Drummond Young and other judges have encouraged in Scotland, of requiring parties to give notice in their written pleadings both of the nature of the surrounding circumstances on which they rely and of their assertions as to the effect of those facts on the construction of the disputed words: *MRS Distribution Ltd v DS Smith (UK) Ltd 2004 SLT 631* , para 14. Such notice of relevant facts, which are either admitted or proved at trial, would avoid disputes on appeal such as whether the affected lessees were aware of the earlier leases.

75.  While there are infelicities in the language of the relevant clauses in some of the leases and no clear explanation of minor changes in drafting, I am not persuaded that the meaning of the language is open to question when full weight is given to the very limited factual matrix with which the courts have been presented in this case. We are invited to construe that which reads on a first consideration as a fixed service charge with an escalator to deal with future inflation, as a variable service charge which is subject to a cap to which the escalator applies. I find that very difficult. In my view there is nothing in the relevant context to support the construction of the clause as creating a cap, other than the view, which events have fully justified, that it was unwise of the lessees to agree to a fixed service charge with an escalator based on an assumption that the value of money would diminish by 10% per year.

76.  This conclusion is not a matter of reaching a clear view on the natural meaning of the words and then seeing if there are circumstances which displace that meaning. I accept Lord Clarke of Stone-cum-  **\*1640**  Ebony JSC's formulation of the unitary process of construction, in *Rainy Sky SA v Kookmin Bank [2011] 1 WLR 2900* , para 21:

> "the exercise of construction is essentially one unitary exercise in which the court must consider the language used and ascertain what a reasonable person, that is a person who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract, would have understood the parties to have meant. In doing so, the court must have regard to all the relevant surrounding circumstances. If there are two possible constructions, the court is entitled to prefer the construction which is consistent with business common sense and to reject the other."

77.  This unitary exercise involves an iterative process by which each of the rival meanings is checked against the provisions of the contract and its commercial consequences are investigated: *In re Sigma Finance Corpn [2010] 1 All ER 571* , para 12, per Lord Mance JSC. But there must be a basis in the words used and the factual matrix for identifying a rival meaning. The role of the construct, the reasonable person, is to ascertain objectively, and with the benefit of the relevant background knowledge, the meaning of the words which the parties used. The construct is not there to re-write the parties' agreement because it was unwise to gamble on future economic circumstances in a long term contract or because subsequent events have shown that the natural meaning of the words has produced a bad bargain for one side. The question for the court is not whether a reasonable and properly informed tenant would enter into such an undertaking. That would involve the possibility of re-writing the parties' bargain in the name of commercial good sense. In my view, Mr Morshead's formulation (para 67 above), on which his case depends, asks the court to re-write the parties' leases on this illegitimate basis.

78.  Nor is this a case in which the courts can identify and remedy a mistake by construction. Even if, contrary to my view, one concluded that there was a clear mistake in the parties' use of language, it is not clear what correction ought to be made. The court

Arnold v Britton, [2015] A.C. 1619 (2015)

must be satisfied as to both the mistake and the nature of the correction: *Pink Floyd Music Ltd v EMI Records Ltd [2010] EWCA Civ 1429* at [21], per Lord Neuberger of Abbotsbury MR. This is not an unusual case, such as *KPMG [2007] Bus LR 1336* in which a mistake was obvious on the face of the contract and the precise nature of the correction had no effect on the outcome.

79. My conclusion that the court does not have power to remedy these long term contracts so as to preserve the essential nature of the service charge in changed economic circumstances does not mean that the lessees' predicament is acceptable. If the parties cannot agree an amendment of the leases on a fair basis, the lessees will have to seek parliamentary intervention.


LORD CARNWATH JSC (dissenting)


Preliminary comments

80. The contractual provisions in this case pose unusual interpretative challenges, which may call for unusual solutions. The leases with which we are concerned are of 25 chalets within Oxwich Leisure Park, in south Wales. *\*1641* It is an estate of 91 such chalets first developed in 1974. It is in an attractive holiday location close to Oxwich Beach on the Gower peninsular. The challenges arise from a combination of factors. The intention, stated in the preamble to each lease, was that they should be "upon terms similar in all respects …". Yet we are faced with five forms of service charge provision, agreed over a period of some 20 years, the variations in which at first sight defy rational analysis. As interpreted by the Court of Appeal, they would lead over the course of the leases to supposedly "proportionate" service charges becoming wholly disproportionate to the costs of the relevant services, to extreme and arbitrary differences between the treatment of different groups of leases within the estate, and to the prospect in the foreseeable future of potentially catastrophic financial consequences for the lessees directly concerned.

81. It does not help that, remarkably, the case has come to us with minimal evidence to explain the circumstances, or "factual matrix", in which these variations were agreed at different times, or even simply to add some context or colour to the bare legal and statistical analysis. That applies even to the most recent, and most surprising, of the transactions, effected as recently as 2000, and to which Mrs Arnold the present respondent was herself a party. Nor have we been told anything about how the clauses have been operated in practice at any time: for example how the estate has been managed and what costs incurred by the lessor, what service charge payments have been demanded of the various categories of lessee, and what has happened to any surplus.

82. It is to be borne in mind also that in the early 1970s (when this clause was first devised) variable service charge provisions were a relatively "new and modern" addition to the law, prompted in part by rapidly increasing prices: see Mark Wonnacott, *The History of the Law of Landlord and Tenant in England and Wales* (2012), p 105 and *Hyams v Titan Properties Ltd (1972) 24 P & CR 359* . Since then, it is said in the same history (p 106), service charges have caused "more trouble between landlord and tenant than anything else", but they have in turn been regulated by statute to such an extent as to make it "all but impossible for an amateur landlord to recover [a service charge] in the event of a dispute". Whether or not that extreme view is justifiable, the need for special measures to safeguard the interests of lessees has been acknowledged by the legislature, which has thus for the most part relieved the courts of responsibility for developing a common law response to the problems.

83. As I shall explain, these leases are a rare example of a category of residential lease which has slipped through the statutory net. That is of no direct relevance to the legal issues before us, save that it may help to explain why no ready solutions are to be found in the authorities. Furthermore, in so far as policy has a part to play in the development of the common law, it may be legitimate to seek guidance in the approaches adopted by the legislature in analogous contexts: see *Johnson v Unisys Ltd [2003] 1 AC 518* , para 37, per Lord Hoffmann.


The leases

84. The first lease was granted on 26 October 1974. Of the others most were granted during the 1970s, and are not directly involved in the present dispute. The 25 with which we are concerned were granted (or varied) in the *\*1642* period from 1980 to 2000. Whenever granted, all the leases (with one immaterial exception) were expressed as being for terms of 99 years starting from 25 December 1974, and for a yearly rent of £10, increasing by £5 for every subsequent period of 21 years. Each lease began with a preamble which described the "lessor" as the owner of the land edged pink on the attached lay-out plan ("the estate") and stated: "(2) It is intended to erect chalets on the estate and to grant leases on terms similar in all respects to the present demise." The lessees' covenants (clause 3) limited the use to that of a "holiday residence of a single family" from March to October: clause 3(12).

© 2021 Thomson Reuters.

85.  It seems from the examples before us that the earliest leases were granted in return for lessees' covenants to construct chalets in accordance with plans approved by the lessors (eg chalet 40—lease dated 9 August 1977, clause 3(3)). Later chalets, presumably after erection of chalets by the lessor or others, were granted without such a covenant but for a premium (eg £13,000 for chalet 76—lease dated 22 September 1980; £16,500 for chalet 96—lease dated 1 July 1985). Otherwise no issue arises on the lessee's covenants other than clause 3(2) relating to service charges, to which I will come.

86.  The lessors in turn covenanted to provide various common services. They included constructing and maintaining the roads and footways (unless or until becoming maintainable at public expense), mowing lawns, maintaining a recreation ground, keeping fences and drains in good repair, issuing regulations, and arranging refuse collection and a regular patrol to discourage vandalism during the unoccupied period: clause 4. By clause 4(8) the lessors covenanted:

"(viii)  That the leases granted by the lessors of all other plots on or comprised in the estate shall contain covenants on the part of the lessees thereof to observe the like obligations as are contained herein or obligations as similar thereto as the circumstances permit."

87.  Five leases have been selected for the purpose of showing the different versions of clause 3(2) relevant to the dispute. The principal difference is between the original leases, granted between 1974 and 1980, in which an initial service charge figure of £90 is increased by 10% every three years ("the triennial formula"), and later leases in which it is increased by 10% every year ("the annual formula"). The five versions were applied as follows (the selected lease in each case is indicated in brackets): (i) *Version 1* (Chalet 40, dated 9 August 1977). This was the "original version", applied to 70 leases granted mainly during the 1970s. The first was granted on 26 October 1974. The rest followed at a steady rate over the next six years at an average of just over 12 per year, until 1980 when seven were granted in this form, the last on 9 July 1980. Four of these leases (granted between August 1977 and July 1980) were varied in 2000 to incorporate the annual formula: see version 5 below. (ii) *Version 2* (Chalet 76, dated 22 September 1980). This version applied to 14 leases granted between August 1980 and February 1983, the first being dated 11 August 1980. (iii) *Version 3* (Chalet 96 dated 1 July 1985). This applied to three leases granted between July 1985 and January 1988. (iv) *Version 4* (Chalet 29 dated 22 March 1991). This applied to four leases granted between December 1988 and March 1991. (v) *Version 5* (Deed of variation dated 20 August 2000). This applied to four leases previously subject to version 1. The lessors for the first three   *1643*  selected leases in this list were Mr A and Mr B Lewis; for version 4, Mrs J Short; and for version 5, Mrs Arnold, the present respondent. In the result the triennial formula now applies to 66 leases on the estate, the annual formula to 25.

88.  I now set out the five clauses, emphasising the parts which are material to the dispute:

(i) Version 1 (triennial (1974-1980))

"To pay to the lessors without any deductions in addition to the said rent *a proportionate part* of the expenses and outgoings incurred by the lessors in the repair maintenance renewal and the provision of services hereafter set out the yearly sum of £90 and VAT (if any) *for the first three years* of the term hereby granted increasing thereafter *by ten pounds per hundred for every subsequent three year period or part thereof* ."

(ii) Version 2 (annual (1980-1983))

"To pay to the lessors without any deductions in addition to the said rent *as a proportionate part* of the expenses and outgoings incurred by the lessors in the repair maintenance and renewal *of the facilities of the estate and the provisions* of services hereafter set out the yearly sum of £90 and VAT (if any) *for the first year of the term* hereby granted increasing thereafter *by ten pounds per hundred for every subsequent year or part thereof* ."

Apart from the change from the triennial to the annual 10% rate, other differences are the lengthening of the expression "renewal and the provision of services" to "renewal of the facilities of the estate and the provisions (sic) of services", and the inclusion of "as" before "a proportionate part".

(iii) Version 3 (annual (1985-1988))

Arnold v Britton, [2015] A.C. 1619 (2015)

"To pay to the lessor without any deductions in addition to the said rent *a proportionate part* of the expenses and outgoings incurred by the lessor in the repair maintenance renewal and the provision of services hereafter set out the yearly sum of £90 and VAT tax (if any) *for the first year of the term hereby granted increasing thereafter by ten pounds per hundred for every subsequent year thereof* ."

Changes from version 2 are: reversion to the expression "renewal and the provision of services", the omission of "as" before "a proportionate part", and the omission at the end of "or part (thereof)".

(iv) Version 4 (annual subject to triennial proviso (1988-1991))

"To pay to the lessor without any deductions in addition to the said rent *a proportionate part* of the expenses and outgoings incurred by the lessor in the repair maintenance renewal and the provision of services hereafter set out *for* the yearly sum of £90 and VAT (if any) *for the first year of the term hereby granted increasing thereafter by ten pounds per hundred for every subsequent year thereof* ."

This version was subject to a proviso:

"Provided always and it is hereby expressly agreed that *whilst the term hereby created is vested in the said William Richard Short and the said *1644 Janice Short or the survivor of them* then maintenance shall be calculated as follows:

"To pay to the lessor without any deduction in addition to the said rent *a proportionate part* of the expenses and outgoings incurred by the lessor in the repair maintenance renewal and the provision of services hereafter set out the yearly sum of £90 and value added tax (if any) *for the first three years of the term hereby granted increasing thereafter by ten pounds per hundred for every subsequent three year period or part thereof* ."

The main clause is identical to version 3 save for the insertion of "for" before "the yearly sum". The proviso had the effect of substituting temporarily the triennial formula as in version 1, but that has ceased to be operative following the disposal of the lease by the Shorts.

(v) Version 5 (varied from triennial to annual (2000))

In four of the original 1970s version 1 leases (triennial), a deed of variation dated 20 August 2000, at the same time as revising the extent of land demised, substituted with effect from the beginning of the lease a new clause 3(2) in the form of version 2 (annual formula).

89. Although we have been invited to consider all five versions, the most important for the purposes of interpretation are the first (October 1974) and the second (August 1980), and the circumstances surrounding them. The first is not directly in issue but set the drafting pattern, and provided the background to what followed. The second saw the first incorporation of the controversial annual formula. The later versions are of more limited relevance, save in so far as they throw some light on how the clauses were interpreted in practice, or help to illustrate the relative merits of the rival interpretations.

The statutory provisions

90. By sections 18 and 19 of the Landlord and Tenant Act 1985 , a "service charge" (as defined) payable by a tenant of a "dwelling", is limited to an amount which reflects the costs "reasonably incurred" in the provision of services. The controls originally applied only to "flats" but were extended by amendment in 1987 to include "dwellings" as defined: see sections 41 and 60 of, and paragraph 1 of Schedule 2 to, the Landlord and Tenant Act 1987 . It is not in dispute, in these proceedings at least, that the chalets are "dwellings" for this purpose. The issue is whether the charges are "service charges" as defined by section 18(1) :

"'service charge' means an amount payable by the tenant of a dwelling as part of or in addition to the rent— (a) which is payable, directly or indirectly, for services, repairs, maintenance, improvements or insurance or the landlord's costs of management, and (b) the whole or part of which varies or may vary according to the relevant costs."

Arnold v Britton, [2015] A.C. 1619 (2015)

91.  The lessees submit that properly interpreted the clause imposes an obligation to pay a "proportionate part" of the costs incurred, subject only to an upper limit or cap determined by reference to the formula in the second part of the clause. On this footing it is an amount which "varies or may vary according to the relevant costs": section 18(1)(b) . The respondent submits that charge is outside the statutory definition because the annual amount is fixed by that formula, without any reference to the costs actually incurred by  *1645  the lessor. If the lessees are right, the amount of the charge is limited to the amounts reasonably incurred. If the lessor is right, there is no statutory limit or other control.

92.  Other safeguards for lessees were introduced by the 1987 Act, but none covers the present situation. Thus it introduced a new right for any party to a long lease (not only the lessee) of a "flat" to apply to the court (now the First-tier Tribunal) for an order varying a lease on the grounds that it "fails to make satisfactory provision" in respect of various matters, one being the computation of service charges, but this did not apply to other forms of dwelling such as in this case. There is a more general provision, for application by "a majority of parties" for variation of a number of leases under a single lessor ( section 37 ), but again it applies only to flats. On the other hand, section 40 , which allows similar applications for variation of insurance provisions, applies to "dwellings" in general. It is difficult to detect any legislative purposes for these distinctions. The present case illustrates the potentially unfortunate consequences for parties to those rare forms of residential lease which for no apparent reason fall outside any of the protections given by the legislative scheme.

93.  For completeness, I note also that no issue arises in the present proceedings as to the possible application of other more general protections relating to unfair contractual terms. Sections 2 to 4 of the Unfair Contract Terms Act 1977 do not in any event apply to contracts relating to the creation or transfer of interests in land: paragraph 1(b) of Schedule 1 . No such limitation appears in the Unfair Terms in Consumer Contracts Regulations 1999 (SI 1999/2083), which give effect in this country to Council Directive 93/13/EEC of 5 April 1993 on unfair terms in consumer contracts ( OJ 1993 L95 , p 29). The Directive was first transposed in the Unfair Terms in Consumer Contracts Regulations 1994 (SI 1994/3159) which were later replaced by the 1999 Regulations. The 1994 Regulations came into effect on 1 July 1995, and therefore would not it seems apply to contracts concluded before that date: regulation 1 ; Chitty on Contracts , 31st ed (2014), para 37-087. Accordingly, it could be relevant if at all only to version 5 (2000).

The proceedings

94.  We know very little about the background to the present dispute. It first reached the courts in September 2011 in the form of an application by the appellant lessees to the county court for pre-action disclosure. The application was said to be in anticipation of a representative application to resolve an ambiguity in the service charge clause, which "appears to result in a variable service charge but on the other hand create a fixed service charge". It also spoke of the lessees' concerns that the sums collected by way of service charge were exceeding the amount of "legitimate" expenditure by "such a substantial amount as to produce a credit balance that should be held in a service charge trust account"; and also that the lessor had disposed of the former clubhouse for the park to provide accommodation for her daughter. They sought disclosure of information about the sums collected as service charge and the amounts expended since 2005.

95.  An order for disclosure was made on 20 September 2011, but was quickly met by an application by the lessor for declaratory relief relating to the interpretation of the service charge clause, following which the  *1646  disclosure order was stayed pending the determination of these proceedings. The application sought in particular a declaration that on the true interpretation of the service charge clause, the sum payable was not a "service charge" within the meaning of section 18 of the Landlord and Tenant Act 1985 . In the county court, Judge Jarman QC determined the issue in favour of the lessees. But his decision was reversed on appeal to Morgan J [2013] L & TR 174, whose judgment was upheld by the Court of Appeal (Richards, Davis, Lloyd Jones LJJ) [2013] L & TR 371. The lessees appeal to this court with permission granted by the court itself.

96.  The issue between the parties has throughout been very narrow: that is, whether the figure of £90 as inflated is to be read as a fixed amount, or as an upper limit or cap. That in turn depends on whether it is permissible and appropriate to read in such words as "limited to" (Judge Jarman QC's words) or "up to" before the reference to "£90". As Mr Morshead submits in his printed case: "There is no need to undertake an elaborate drafting exercise. The necessary effect can be achieved by implying the words 'up to' before the words '£90'; and, in versions 2 and 5, deleting the word 'as'."

© 2021 Thomson Reuters.

Arnold v Britton, [2015] A.C. 1619 (2015)

97. Giving the single judgment in the Court of Appeal, Davis LJ rejected that approach, holding in substantial agreement with Morgan J that the addition of these words "would involve subverting the proper process of construction of the language actually used and would in truth involve the court rewriting the bargain the parties have made": para 45. He rejected the argument that this interpretation would consign the first part of the clause to "mere surplusage". Its function was to identify "the character of the payment to be made". The words "a proportionate part" were apt for a situation where "other lessees also are contributing to the overall service charge: which is in consequence to be apportioned between them". Although he accepted that the word "incurred" was "the language of actual outlay", it was "entirely explicable when one appreciates that this part of the sub-clause identifies the character of the payment being made": paras 48-49. He also pointed to other difficulties in Mr Morshead's interpretation, in particular the problems of calculating a "proportionate" amount, and the lack of any protection for the lessor if the inflation regularly exceeded 10%: para 53.

Inflation calculations

98. The judge was shown without objection two sets of tables, one showing the annual Retail Price Index ("RPI") from 1948 to 2012, taken from figures published by the Office of National Statistics ("the inflation table"); the other, the effect of the increases of service charge compounded over the period of the leases in accordance with respectively the annual and the triennial formula ("the compounding table"). As I understand it, the information in these tables is accepted as forming part of the factual matrix against which it is appropriate to judge the parties' contractual intentions at the relevant dates. There are some minor but apparently immaterial differences between the hard-copy and electronic versions of the compounding table; I have used the latter.

99. It is helpful to focus on the rates which would have been in immediate contemplation of the parties at dates when each of the five versions was first agreed: that is, 26 October 1974 (the date of the first lease on the estate incorporating version 1, rather than the 1977 lease which was *1647* used as an example at the hearing); 11 August 1980 (the first version 2 lease); 1 July 1985 (version 3); 1 December 1988 (the first version 4 lease); 20 August 2000 (version 5). The table below includes also the rate in contemplation at the date of the county court hearing (June 2012), and in the last year of the lease (2072). The figures in the compounding table are given for 25 December 1974, the commencement of the lease period, and for the same date in each subsequent year. For illustrative purposes I have taken the rate for the year commencing after each of the identified dates (ie 25 December next following each such date), which would have been the rate applicable to the first complete year under each new lease.

100. The resulting figures (rounded) for annual service charges at each such years:

|      | Triennial | Annual     | [Actual inflation] |
| ---- | --------- | ---------- | ------------------ |
| 1974 | £90       | £90        | £90                |
| 1980 | £109      | £159       | £219               |
| 1985 | £132      | £257       | £310               |
| 1988 | £145      | £342       | £350               |
| 2000 | £212      | £1,073     | £557               |
| 2012 | £311      | £3,366     | £794               |
| 2072 | £1,900    | £1,025,004 | N/A                |

[The last column shows for purposes of comparison the equivalent figures implied by actual inflation, arrived at by increasing the initial £90 by the recorded price increases over the period from 1974 to each of the selected years. Though not in evidence before us, those figures have been taken from the "inflation calculator" on the Bank of England's website, and are used for illustration only.]

101. The rate of price increase during the 1970s can also be contrasted with the pattern in the previous and subsequent decades. Average annual inflation in the 1950s and 1960s was of the order of 3·5-4%. (It had averaged 2·5% in the 50 years from 1900 to 1950.) It then rose sharply to 6·4% in 1970 and 9·3% in 1973, followed by a much steeper rise to 16% in 1974 and an annual peak of 24·2% in 1975. It dropped to 8·3% in 1978 before rising again to 16% in 1980. The annual rate fell to 12% in 1981,

Arnold v Britton, [2015] A.C. 1619 (2015)

and then to around 5-6% in the period 1983-85 (immediately before version 3), 4-5% in 1986-88 (before version 4), and 3% in 2000 (version 5). It has remained at, or below, that low level ever since.

102. The compounding table enables comparisons to be drawn between the contributions made respectively by the 66 "triennial" and the 25 "annual" leases over different periods, if the lessor is correct. For example, on the 1988 figures, the triennial leases would have contributed a total of £8,712 (66 × £132), slightly more than the total contribution of the annual leases (£8,550 = 25 × £342). On the basis of the figures in the third column, the combined total (£17,262) was still much lower than the figure required to keep pace with actual inflation since 1974 (91 × £350 = £31,850). The figures at or about the time of the hearing show a very different picture. On the 2012 figures the triennial leases would have been contributing a total of £18,612 (66 × £282) compared to £84,150 (25 × £3,366) contributed by the annual leases. The total amount (£102,762) was now substantially more *1648 than that required to keep pace with inflation (91 × £794 = £72,254). (These figures differ slightly from those in the submitted tables due to rounding.)

103. The table also shows the amounts that, on the lessor's interpretation, would be payable under each formula over the whole period from 24 December 2013 to the end of the term (2072). The total amount payable during that period under each "annual" lease would be £11,238,016, compared to £53,386 payable for the same period under each "triennial" lease.

Inflation and the factual matrix

104. There is no difficulty in principle in taking account of the calculations in the compounding table, which require no outside information, and could have been carried out by the parties (or a reasonable observer) at any of the relevant dates. On the Court of Appeal's interpretation, the figures show increases which appear extraordinary in themselves, in the light of modern conditions of low inflation. No less importantly, they result in dramatically increasing, and ultimately grotesque, differences between the amounts payable by the two different groups of lessees on the same estate. This consequence could and should have been anticipated at the time, certainly by the lessors who were parties to both groups of leases and responsible for maintaining reasonable equivalence between them.

105. The use to be made of the historic inflation figures raises rather different questions. By agreeing to their use, the parties impliedly ask us to assume that the figures up to and including those for each of the relevant years (or the then most recently published figures) would been have been known to the parties at the time, and therefore must be taken as part of the relevant factual matrix. This is no doubt a reasonable working assumption to indicate the general trend as known to the public.

106. It is however highly artificial to be asked to take account of the bare statistics, without reference to the political and economic circumstances which surrounded them, so far as they were common knowledge at the time. We are not required to assume total ignorance of current events, in the parties or their reasonable observers. It would not have been difficult to obtain information about contemporary perceptions of the direction of inflation, whether from official reports of the time, or from reports in the south Wales press. Even without such evidence, we are entitled in my view to assume knowledge of some of the key events: for example, of the dramatic rise in oil prices at the end of 1973 and again in 1979, each followed by a sharp increase in inflation in the following year; and also of the election in 1979 of a new Conservative government committed to controlling inflation. We are not required to assume that predictions about future inflation were made in a vacuum.

107. We are also entitled, as part of the factual matrix, to take account of the nature and circumstances of the estate, as they would have been perceived by potential purchasers. It was planned as a holiday estate close to a popular beach. Potential buyers were likely to come from people already familiar with the area from previous visits with their families. It is fair to assume also that they would have regarded the acquisition of a holiday chalet, not simply as source of pleasure, but also as a long term investment *1649 for them and their families. They would have been keen to avoid undue financial burden or risk. It would be strange if they had not taken the opportunity to talk to existing residents about their own experiences of the estate and its management, and of the associated costs. This will become relevant when considering what knowledge of previous terms should be attributed to the first version 2 lessees.

Approach to interpretation

108. In an unusual case such as this, little direct help is to be gained from authorities on other contracts in other contexts. As Tolstoy said of unhappy families, every ill-drafted contract is ill-drafted "in its own way". However, the authorities provide guidance as to the interpretative tools available for the task. The general principles are now authoritatively drawn together in an

Arnold v Britton, [2015] A.C. 1619 (2015)

important passage in the judgment of Lord Clarke of Stone-cum-Ebony JSC in *Rainy Sky SA v Kookmin Bank [2011] 1 WLR 2900* , paras 14-30. As that passage shows, there is often a tension between, on the one hand, the principle that the parties' common intentions should be derived from the words they used, and on the other the need if possible to avoid a nonsensical result.

109.  The former is evident, as Lord Clarke JSC emphasised, in the rule that "where the parties have used unambiguous language, the court must apply it": para 23. However, in view of the importance attached by others to the so-called "natural meaning" of clause 3(2), it is important to note that Lord Clarke JSC (paras 20-23) specifically rejected Patten LJ's proposition that "unless the most natural meaning of the words produces a result so extreme as to suggest that it was unintended, the court must give effect to that meaning." In Lord Clarke JSC's view it was only if the words used by the parties were "unambiguous" that the court had no choice in the matter.

110.  He illustrated the other side of the coin by quotations from Lord Reid in *Wickman Machine Tools Sales Ltd v L Schuler AG [1974] AC 235* , 251:

"The fact that a particular construction leads to a very unreasonable result must be a relevant consideration. The more unreasonable the result, the more unlikely it is that the parties can have intended it, and if they do intend it the more necessary it is that they shall make that intention abundantly clear."

and Lord Diplock in *Antaios Cia Naviera SA v Salen Rederierna AB (The Antaios) [1985] AC 191* , 201:

"if detailed and syntactical analysis of words in a commercial contract is going to lead to a conclusion that flouts business common sense, it must yield to business common sense."

As a rider to the last quotation, Lord Clarke JSC cited the cautionary words of Hoffmann LJ ( *Co-operative Wholesale Society Ltd v National Westminster Bank plc [1995] 1 EGLR 97* , 99):

"This robust declaration does not, however, mean that one can rewrite the language which the parties have used in order to make the contract conform to business common sense. But language is a very flexible instrument and, if it is capable of more than one construction, one *\*1650* chooses that which seems most likely to give effect to the commercial purpose of the agreement."

111.  I agree with Mr Morshead (questioning in this respect the approach of Davis LJ (para 35)) that it may be unnecessary and unhelpful to draw sharp distinctions between problems of ambiguity and of mistake, or between the different techniques available to resolve them. In Chartbrook Ltd v Persimmon Homes Ltd [2009] AC 1101 , para 23, Lord Hoffmann cited with approval a passage of my own (in *KPMG LLP v Network Rail Infrastructure Ltd [2007] Bus LR 1336* , para 50) where I discussed the role of what is sometimes called "interpretation by construction". I criticised the tendency to deal separately with "correction of mistakes" and "construing the paragraph 'as it stands'", as though they were distinct exercises, rather than as "aspects of the single task of interpreting the agreement in its context, in order to get as close as possible to the meaning which the parties intended". Lord Hoffmann added, at para 25:

"What is clear from these cases is that there is not, so to speak, a limit to the amount of red ink or verbal rearrangement or correction which the court is allowed. All that is required is that it should be clear that something has gone wrong with the language and that it should be clear what a reasonable person would have understood the parties to have meant."

112.  Another permissible route to the same end is by the implication of terms "necessary to give business efficacy to the contract". I refer again to Lord Hoffmann's words, this time in *Attorney General of Belize v Belize Telecom Ltd [2009] 1 WLR 1988* , para 22, explaining the "two important points" underlined by that formulation:

"The first, conveyed by the use of the word 'business', is that in considering what the instrument would have meant to a reasonable person who had knowledge of the relevant background, one assumes the notional reader will take into account the practical consequences of deciding that it means one thing or the other. In the case of an instrument such as a commercial contract, he will consider whether a different construction would frustrate the apparent business purpose of

Arnold v Britton, [2015] A.C. 1619 (2015)

the parties … The second, conveyed by the use of the word 'necessary', is that it is not enough for a court to consider that the implied term expresses what it would have been reasonable for the parties to agree to. It must be satisfied that it is what the contract actually means."

113.  *Aberdeen City Council v Stewart Milne Group Ltd 2012 SC (UKSC) 240* is a useful recent illustration in this court of how these various principles may be deployed, to enable the court to achieve a commercially sensible result in the face of apparently intractable language. A contract for the sale of development land gave the council the right to an uplift (described as "the profit share") in certain defined circumstances, one being the sale of the property by the purchaser. The issue was the calculation of the profit share, which the contract defined as a specified percentage of the "estimated profit" (defined by reference to "open market value") or "the gross sale proceeds". The issue was how the definition should be applied in the case of a sale by the purchaser to an associated party at an undervalue. The court  *1651* held in agreement with the lower courts that, in that event, notwithstanding the apparently unqualified reference to gross sale proceeds, the calculation should be based on open market value.

114.  In a concurring judgment, with which all the members of the court agreed, Lord Clarke JSC, at para 28, referred to his own judgment in Rainy Sky as indicating the "ultimate aim", that is:

> "to determine what the parties meant by the language used, which involves ascertaining what a reasonable person would have understood the parties to have meant; the relevant reasonable person being one who has all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract."

As he pointed out, "on the face of it" the reference in the contract to the gross sale proceeds was a reference to the "actual sale proceeds" received by the appellants. It was not easy to conclude "as a matter of language" that the parties meant, not the actual sale proceeds, but the amount the appellants would have received on an arm's length sale at market value of the property; nor was it easy to conclude that the parties "must have intended" the language to have that meaning. He referred, at para 31, to the comment of Baroness Hale of Richmond JSC in the course of the argument that:

> "unlike Rainy Sky , this is not a case in where there are two alternative available constructions of the language used. It is rather a case in which, notwithstanding the language used, the parties must have intended that, in the event of an on sale, the appellants would pay the respondents the appropriate share of the proceeds of sale on the assumption that the on sale was at a market price."

He thought the problem should be solved by implying a term to the effect that, in the event of a sale which was not at arm's length in the open market, an open market valuation should be used. As he explained, at para 33:

> "If the officious bystander had been asked whether such a term should be implied, he or she would have said 'of course'. Put another way, such a term is necessary to make the contract work or to give it business efficacy."

He preferred the use of an implied term to "a process of interpretation", although "the result is of course the same": paras 30-33.

115.  As Mr Morshead observes, the result in the Aberdeen case could probably have been explained equally as a case of correction by interpretation. In any event, this example provides support for his proposition that, where an ordinary reading of the contractual words produces commercial nonsense, the court will do its utmost to find a way to substitute a more likely alternative, using whichever interpretative technique is most appropriate to the particular task.

Residential leases

116.  Long residential leases are an exceptional species of contract, and as such may pose their own interpretative problems. In no other context is a private individual expected to enter into a financial commitment extending for the rest of his or her life, and probably beyond. The original lessee may  *1652*  have been unaware that (at least under contracts before the Landlord and Tenant (Covenants) Act 1995 ) he was taking on a personal legal commitment which could continue even after he had disposed of any interest in the property itself: *Norwich Union Life Insurance Society v Low Profile Fashions Ltd [1992] 1 EGLR 86* . So

Arnold v Britton, [2015] A.C. 1619 (2015)

far as it relates only to ground rent, the commitment is unlikely to be burdensome, and it may be readily accepted as a necessary incident of a valuable property interest. Service charges are a different matter, since the amounts may be substantial, and, apart from statute, the lessee is likely to have no direct control over the lessor's expenditure.

117. Where the lease is for one of a number of units in a managed building or estate, provision has to be made for expenditure by the lessor on common services and maintenance, and for the cost to be shared between the lessees. Substantial equivalence of rights and obligations under such leases is normally important for all parties, both for the good management of the building or estate, and for harmony among those living within it. Equivalence can only be achieved by the lessor, who alone is party to them all. After the first lease has been negotiated and granted, later incoming lessees will usually have little choice in practice but to accept the covenants in the form dictated by the lessor. Their reasonable expectation will be that all have been granted in like terms, both in terms of covenants and in terms of sharing financial responsibility for services, with a view to ensuring fair distribution of the overall cost. Often that expectation and the lessor's responsibility for achieving it, will be expressed in the terms of the lease (as here, in the preamble and clause 4(8)).

118. Mr Daiches submits, correctly in my view, that the effect of such words is to create "a letting scheme, or local law, of negative obligations mutually enforceable in equity between all occupiers of the properties on the estate". He cites authorities such as *In re Dolphin's Conveyance [1970] Ch 654* , which related to an estate of freehold properties. Examples of the same principle as applied to leasehold developments are given in the textbooks: see *Megarry & Wade, The Law of Real Property* , 8th ed (2012), para 32-079. As I understand his argument, he asks us to infer that a clause such as 4(8) has to "look to the future not the past", and that accordingly it is not to be construed as containing any implied representation as to previous leases. I cannot agree. In my view, the existence of such a scheme reinforces the view that each lessee has a legitimate interest in the form and content of all leases within the development, whenever granted. Even if, as in clause 4(8), the lessor's responsibility is expressed as an obligation in respect of future leases, it should in its context (including the preamble) be read also as containing an implied representation that leases previously granted are also in substantially the same form.

119. Provision for services is normally dealt with by reciprocal covenants, positive in form: by the lessor to arrange and pay for the carrying out of the necessary services, and by the lessees to pay their respective shares of the costs so incurred. There is no common format for such service charge covenants, and they can and do vary greatly between different buildings or estates. Unlike negative covenants, it seems that they are not mutually enforceable as such, but the expectation is that they will have been drafted to ensure that the lessees' financial obligations are shared fairly between them all. Again this is in the interests of good management *1653* and harmony within the development for both lessor and lessees. Differences may be necessary to cater for differences in size of the individual units or other features, but otherwise they will normally be in a standard form in all the leases.

120. In the courts below there was some discussion of the "restrictive" approach said to be appropriate to service charge provisions: McHale v Earl Cadogan [2010] HLR 412 , para 17, per Rix LJ. I agree, if by this it is meant that the court should lean towards an interpretation which limits such clauses to their intended purpose of securing fair distribution between the lessees of the reasonable cost of shared services.

121. Support for this approach is to be found also in the disparity in practice between the potential remedies available to each party for breach by the other. A lessor who fails to maintain services at the level thought appropriate by the lessees is in principle open to enforcement action in court. But the practical effect of such action for the lessees is uncertain in the absence of a precise definition of what he is required to provide. If there has been a complete breakdown of services, they may be able to obtain injunctive relief or appointment of their own manager. In less extreme circumstances the form of remedy or the extent of any damages may be difficult to define.

122. By contrast, the lessor's remedies for breach of the service charge clause are all too clear. In the Court of Appeal, Davis LJ was apparently content to assume that the charges might "in extremis, force some of these lessees into surrender or forfeiture": para 57. However, if by this he intended to imply that either escape-route would be available to the lessees other than by agreement with the lessors, he would have been wrong. Apart from any special provision, the lessee's obligation, once the service charge has been determined, will have crystallised into a contractual obligation to pay a fixed amount. That is in principle enforceable by a simple action through the courts, and ultimately by forfeiture and bankruptcy. The legislature intervened long ago to provide some statutory relief against forfeiture: section 146 of the Law of Property Act 1925 . But that provides no protection against enforcement of the personal liability to pay the contractual amount.

© 2021 Thomson Reuters.

Arnold v Britton, [2015] A.C. 1619 (2015)

123.  As already explained, the scope for abuse has been recognised by the legislature in the special provision made for controlling "variable" charges as defined in the 1987 Act. Fixed service charges do not normally give rise to the same risk of abuse. The lessee is given the certainty of a fixed financial commitment, and the lessor has the advantage of simplified administration. Provision is needed to deal with price inflation. But if this is fixed by reference to an independent formula, such as an official inflation index, there is no significant risk to either party. The approach adopted in this case seems highly unusual, if not unique. Even where the legislature has not intervened, the courts have a responsibility in my view to ensure that such clauses are interpreted as far as possible not only to give effect to their intended purpose, but also to guard against unfair and unintended burdens being placed on the lessees.

Interpretation of clause 3(2)

124.  Against that general background, I come to consider the construction of clause 3(2) in its various versions. At first sight, the main  *1654  principles seem reasonably clear: (i) The intention was that all the leases should be on terms as "similar … as the circumstances permit", and that it was the lessors' responsibility to achieve such equivalence (necessarily, since only they would be party to all of them): preamble (2); clause 4(8). (ii) The commercial purpose of clause 3(2) was to enable the lessor to recover from the lessees the costs incurred by him in maintaining the estate on their behalf, the payment by each lessee being intended to represent a "proportionate" part of the expenses so incurred. (iii) Although there was a general description of the services which the lessor was contractually obliged to provide, the extent of those services was not precisely defined by the lessors' covenants (clause 4), which left to them a large measure of discretion as to the amounts to be spent in practice. In themselves, these features are typical and uncontroversial. It is at the next stage, in giving effect to those principles, that the clause becomes problematic.

125.  It is clear to my mind that something has gone wrong with the drafting, at least in the original wording, as it appeared in the 1974 version, and (apart from the change of inflation formula) was repeated in 1985 and 1988. The clause imposes an obligation to pay, but contains two different descriptions of the payable amount: by reference, first, to a "proportionate part of the expenses and outgoings incurred by the lessor in the repair maintenance renewal and the provision of services …", and secondly, to a "yearly sum" determined by reference to a fixed formula. There are two linguistic problems. First, there is no grammatical connection to show the relationship between the two descriptions. Secondly, they are mutually inconsistent. A figure can be determined as a proportionate part of some other variable amount, or it can be a yearly sum, fixed by a predetermined formula; but it cannot be both. There is an inherent ambiguity which needs to be resolved.

126.  In the Court of Appeal Davis LJ thought that the first part of the clause was designed simply to identify "the character of the payment to be made": para 48. I find that unconvincing. If the intention was to indicate no more than the purpose of the payment, one would have expected some such general words as "by way of contribution to the services", not a detailed and specific formula. Conversely, if the character of the contributions was to be that of payments determined by reference to a fixed formula and nothing else, the description in the first part was neither accurate nor useful. Proportionality had no part to play in such a fixed calculation, nor any relation to reality after 1980 if the court's interpretation is correct. Nor is it easy to explain the purpose of the specific reference to "expenses and outgoings incurred" by the lessor on a defined range of services, unless it was intended to play some material part in the calculation.

127.  At this point it is convenient to note the minor differences of wording in some later versions. A change such as the omission of the words "or part …" in version 3 can readily be dismissed as a copying error. Others give more room for argument. It would be tempting to read more significance into the word "as", which appears for the first time in the important 1980 version 2. Grammatically, it may be said (with Davis LJ, at para 54), the insertion of the word "as" implies that the operative text is in the second part of the clause, the first part being merely descriptive. There are two difficulties with that explanation. First, for the reasons I have given, neither the reference to proportionality nor the detail of the  *1655  formula in the first part is compatible with that limited sense. Secondly, there are linguistic indications the other way. The word "as" did not survive into any of the later versions, except the 2000 deed of variation (version 5), which seems to have been copied directly from version 2. Version 2 itself also saw the introduction of a new reference to expenditure on "the renewal of the facilities of the estate", which is hard to explain if the detail of the first part had no practical significance. Version 4 added to the mystery by adopting a different connecting word "for", this time in front of the second description ("*for* the yearly sum of £90"). That is even more difficult to interpret, but if anything it seems to imply that it was the first part of the clause which was the primary description. In the end I conclude that no persuasive guidance, one way or the other, is to be derived from these minor changes.

128.  There are only two realistic possibilities for the second part of the clause, which are those respectively adopted by Judge Jarman, on the one hand, and Morgan J and the Court of Appeal, on the other. Either it is a fixed amount which in effect supplants

Arnold v Britton, [2015] A.C. 1619 (2015)

any test of proportionality under the first part; or it is no more than an upper limit to the assessment of a proportionate amount. I reject the theoretical alternative that it was designed as a lower limit for the benefit of the lessors. That interpretation would have made no sense at all in relation to version 1, agreed at a time when the possibility of inflation falling *below* 3% would have occurred to no-one as a risk requiring special provision, particularly for the lessor who unlike the lessees was in control of the level of his own expenditure. There is thus no doubt that this part of the clause was originally designed for the benefit of the lessees, and I see no reason to think that its purpose had radically changed by the time of version 2.

129.  Davis LJ was concerned as to the practicalities of determining the "proportionate" amount of the qualifying expenditure. Morgan J ([2013] L & TR 174, para 51) described it as "workable but not ideal". I do not see any great difficulty. The relevant items are precisely defined. The lessor has simply to demonstrate (to the lessees and if necessary to the court) that the expenditure has been properly incurred on those items, and that it has been divided "proportionately" between the lessees.

130.  I note that in Hyams v Titan Properties 24 P & CR 359 (see para 82 above), which was decided two years before the first of these leases, the court had to fix the terms of a new business lease under the Landlord and Tenant Act 1954 taking account of rapid price inflation. Buckley LJ recorded, at p 362, that "the modern practice generally accepted … was to make service charges payable on a proportional basis". In that case (where there were nine units) the court approved a clause "requiring the tenant to pay one-ninth of the cost of providing the services under the covenant in addition to the rent payable under the lease". There was no suggestion that this formulation was defective in the absence of specific machinery to settle the figure. The first half of clause 3(2) follows the same model, allowing for the fact that the precise number of units was probably not known at the outset, so that it was not possible to put in a specific fraction. The use of the same figure of £90 in all the leases (whatever its precise purpose) would have been a strong indication that equal shares were intended.
*1656*

131.  I turn therefore to consider the two alternatives as applied to each of the five versions in its own context. In the words of the authorities, we must inquire "what a reasonable person would have understood the parties to have meant", that person being one who had "all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract", and who would have also taken into account "the practical consequences of deciding that it means one thing or the other". Where necessary the reasonable observer can be invited notionally to take on the more active role of "officious bystander", in order to interrogate the parties as to their common intentions.


The five versions in context

*Version 1 (October 1974-July 1980)*

132.  It is impossible to do more than guess at the common intentions of the parties to the first lease in relation to this part of clause 3(2). It is hard at first sight to see any rational basis for selecting a rate of 10% every three years, at a time when annual inflation was running at around twice that rate. At little over 3% per year, it was a little low even by reference to the inflation of the two previous decades, although it was in line with the historic long term average.

133.  In such inflationary conditions, there is no difficulty in understanding why it was acceptable to the lessees. It is the lessor's thinking which needs explaining. We know nothing of the first lessors (the Lewises). They may perhaps have been builders, themselves involved in the development of the estate, and so more able to absorb the initial costs of maintenance in their other expenditure. If so, to make the estate attractive to purchasers, they may have gambled on being able to bear the price increases during the early years, in the expectation of inflation falling to more reasonable levels in the near future. (Comparable optimism seems to have been reflected in their view of ground rent, which was to be increased by only 50% every 21 years.)

134.  In any event, their apparent generosity would be more explicable if, as may have been the case, the figure of £90 was based not simply on an estimate of current costs, but gave a reasonable margin for anticipated inflation in the short term. That possibility is borne out to some extent by the fact that the triennial formula survived, apparently without question, for six years of high inflation. If so, it is certainly possible that, even during that period, it was treated as a cap, the contributions being based on a share of actual expenditure from year to year. (Unlike Morgan J [2013] L & TR 174, para 32, I see no basis, in the absence of evidence, for any positive inference that service charges were paid, then or later, "in accordance with the lessor's interpretation".)

135.  Since version 1 is not in issue, it is unnecessary to decide between the alternative interpretations at this stage. Version 1 does however provide the necessary background to the contentious versions which came later. It makes clear that the inclusion

Arnold v Britton, [2015] A.C. 1619 (2015)

of a specific figure for inflation was designed originally for the benefit of the lessees not the lessor. It may also enable one to discount any intention on the part of the Lewises at least to take unfair advantage of their lessees.
 *1657*

*Version 2 (August 1980-February 1983)*

136.  As I have said, the fact that it took the Lewises six years to react to the apparent disparity between the triennial formula and actual inflation suggests that, one way or another, they were able to maintain expenditure within the initial figure for some time. The change of heart may well have been triggered by the renewed jump in inflation in 1979, which reached its peak in summer 1980, although it is notable that the last version 1 lease was granted as late as July 1980. If the Court of Appeal is right, there was then in August 1980 a dramatic change in their thinking, from the exaggerated optimism which had prevailed over the last six years, to such abject pessimism about the future of the economy that they thought it reasonable to assume continuing 10% inflation for the remaining 93 years of the leases, and to expect their purchasers to share that assumption.

137.  If that is the correct interpretation, they would have been contemplating an impossibility, even for economists. In Pennant Hills Restaurants Pty Ltd v Barrell Insurances Pty Ltd (1981) 145 CLR 625 , 639 Gibbs J spoke of the reasons for making no allowance for inflation in awards for future loss:

> "It is unreasonable to suppose that any economist will be able to predict with accuracy the nature and extent of changes in the purchasing power of money during a period extending for several decades ahead. Whether inflation increases or is brought under control depends upon political and economic events and decisions at home and abroad as to whose occurrence it is not possible to do more than conjecture. Predictions as to the economic future in 30 years time may perhaps be made by a soothsayer but expert evidence cannot rationally be given on such a subject." (cited with approval by Lord Hope of Craighead DPSC in *Simon v Helmot (2012) 126 BMLR 73* , para 45)

If that is unreasonable for an economist, how much less likely is it as an explanation of the thinking of the lessors or lessees of these modest holiday chalets in August 1980?

138.  The improbability becomes even more striking when one compares the figures for the new and old groups of lessees. It is true that, even as a cap, the annual formula would result in the new lessees paying more initially than the existing lessees (£159 in 1980, compared to £109 under version 1). But over the period of the lease the differences become grotesque. On the Court of Appeal's interpretation the parties were accepting, as a mathematical certainty, that by the end of the lease period each lessee's service charges would have totalled over £11m, more than 200 times the amounts payable by the existing lessees. Put the other way, if the assumed prediction were correct, the lessees of more than two-thirds of the chalets on the estate would by then have contributed 200 times less than the figure necessary for the lessors' expenditure to keep pace with inflation. Even from the lessors' point of view, that scenario implied commercial disaster.

139.  Whatever the lessors' state of mind, it beggars belief that the new lessees would have been content to proceed on that basis. It is particularly improbable for a person of ordinary means investing perhaps limited savings in a holiday home. It is simply inconceivable that such a potential purchaser would have been willing to accept a prediction of continuing inflation at that level for over 90 years, and to take that as a basis for undertaking a  *1658*  contractual obligation lasting for the rest of his life and beyond without any escape route.

140.  There has been some discussion before us as to whether the lessees would have known of the comparable clauses in the previous leases. Mr Daiches asks us (and through us the reasonable observer) to proceed on the basis that the new lessees in 1980 would have been unaware of the triennial formula used in the previous leases, and says that is the basis on which the case has been approached hitherto. I am unwilling to make that assumption, which I regard as wholly unrealistic. It is not on any view an assumption that can be made in respect of versions 4 and 5, where the change was apparent on the face of the documents: see below.

141.  Even without direct information in the documents, a potential purchaser in 1980 could be expected to have wanted to satisfy himself about the existing arrangements within the estate, and would have had a legitimate interest in doing so. Absent bad faith, it is hard to see any reason why the lessor would have wished or felt able to hide information about the previous leases. In any event, it could readily have been discovered by talking to other lessees within the estate. In Lord Clarke of Stone-cum-Ebony JSC's words in *Rainy Sky SA v Kookmin Bank [2011] 1 WLR 2900* , para 21 it would have been "background knowledge … reasonably … available to the parties" in the circumstances of the contract. I would accordingly approach the interpretation

Arnold v Britton, [2015] A.C. 1619 (2015)

of version 2 on the assumption that both parties (like their reasonable observer) would have been aware of the proposed change from the triennial formula, and that they are to be taken as having accepted the change for what they regarded as good reasons.

142. On the basis that it was intended as a cap, the lessees' thinking is understandable. They would have needed persuasion to take the leases on less generous terms than their predecessors. On the other hand, they would have understood that any assumptions made in 1974 about the prospects of an early fall in inflation had been falsified by events. They would have understood also that the lessor would find it difficult to support reasonable expenditure on services without some adjustment. We do not of course know what if anything may have been said about increasing future contributions from the existing lessees to ensure fair distribution. But from their own point of view, with current inflation at or around 20%, substitution of a limit of 10% might have been seen by them as an acceptable compromise for the immediate future, while allowing for a return to more normal levels in the medium term. That may not be a complete explanation, but it is at least plausible, unlike the alternative.

143. As in the *Aberdeen case 2012 SC (UKSC) 240* , we can imagine the responses of lessor and lessee to questioning by the officious bystander as to the purpose of the clause. Did they really intend to enter into a contract which had the extraordinary long term implications outlined in the previous paragraphs? I find it hard to conceive of any other response than "of course not; it is a cap not a fixed amount". The alternative would have seemed absurd and unreasonable to both, as much to the lessor as to the lessees.

144. The Court of Appeal thought they were applying the "natural meaning" of the clause, and that it was not the task of the court to relieve the lessees of a "bad bargain" entered into in different circumstances, albeit possibly without having done their arithmetic. For the reasons I have given, *\*1659* I am not convinced that the "natural meaning" is that adopted by the Court of Appeal, at least once one discounts the inclusion of the word "as" in version 2, or that, even if it is, it relieves the court of the obligation to seek a sensible result. On the other side of the coin, I agree with Mr Morshead that "bad bargain" is a gross understatement of the implications of their interpretation, which as he says were from the outset "not only stark but disastrous". Nor do I see any reason to assume that these contracting parties, treated (in Lord Hoffmann's words in *Attorney General of Belize v Belize Telecom Ltd [2009] 1 WLR 1988* , para 22) as alive to the "practical consequences" of the alternative interpretations, should have been ignorant of the ordinary principles governing compound interest.

*Version 3 (1985)*

145. By this time inflation had fallen significantly to around 5-6%. Pessimistic thoughts about the future direction of inflation for the foreseeable future would have largely dissipated. If it was difficult in 1980, it would surely be impossible now, for the reasonable observer to imagine the parties committing themselves, even in the medium term, to a fixed inflation figure of almost double the current rate. As a cap, it would hardly have attracted attention.

*Version 4 (1988)*

146. By this time annual inflation had fallen to less than 5%. The annual formula produced a figure more than double that implied by the triennial formula, but one closely comparable to that resulting from actual inflation since 1974 (£342 compared to £350, in the table at para 100 above). If the then lessor, Mrs Short, was still charging her pre-1980 lessees by reference to the lower triennial rate, it raises a question of how she was covering her own expenditure on services, in circumstances where two-thirds of the leases were contributing at only half the rate implied by inflation since 1974. That may suggest either that she was able in practice to keep expenditure to a level significantly below that implied by inflation, or possibly that in order to maintain services at a reasonable level some of the pre-1980 lessees had been persuaded to pay more than their strict obligation.

147. The only novel feature of this version is that it was subject to a proviso in effect substituting the triennial formula during the tenure of the named lessees. It appears to have escaped notice in the courts below that the example used for this version was in a lease between the lessor, Mrs J Short, and herself and a Mr W R Short (her husband) as joint lessees. Since the hearing it has been confirmed that she had the same interest in the other three "proviso" leases granted between 1988 and 1991. They were clearly not arms-length transactions.

148. We know nothing about Mrs Short, or her thinking. It is difficult to understand how this special personal protection could have been reconciled with her obligation to the other post-1980 lessees (under clause 4(8)) to ensure that the covenants in these leases were as "similar … as the circumstances permit". It is even more difficult, at least on the Court of Appeal's interpretation, to understand how she would have explained the change to her future assignees, who were to lose that protection. The contrast

Arnold v Britton, [2015] A.C. 1619 (2015)

between the two versions could not have been drawn more clearly  *1660  to their attention. On the basis that the revised percentage figure was no more than a cap, they may plausibly have been content to accept an obligation to keep pace with inflation, in line with other post-1980 lessees. The alternative assumes that, at time when inflation rates were less than 5% and apparently falling, they knowingly accepted a continuing obligation to pay service charges increasing at twice that rate for the rest of the term. On any view that is absurd.

*Version 5 (2000)*

149.  By this time inflation had fallen to about 3%. The clause 3(2) figure was by now more than five times greater under the annual formula than under the triennial formula. As Mr Daiches accepts, the parties to these transactions were fully aware of the differences between the two versions. In those circumstances, whatever the changes in the extent of their holdings, there is on the face of it no rational explanation for four lessees agreeing not only to the loss of the protection of version 1, but to the substitution of a permanent obligation to pay service charges increasing at a rate three times the then current rate of inflation.

150.  Since these variations were agreed only 15 years ago, and since by this time the respondent, Mrs Arnold, was herself directly involved, it might have been thought that she at least would be able to throw some light on these extraordinary transactions. After the hearing, the parties were put on notice of the court's concern on this point, and invited to comment. It has emerged that three out of the four variations were agreed between Mrs Arnold and her daughter, Mrs Fraser (signed under a power of attorney by Mrs Arnold's son). The fourth was a Mrs Pace, of whom no information has been provided, save that she is apparently still the owner of the chalet, and she is named as one of the defendants in these proceedings.

151.  If there was in Mrs Arnold's thinking a rational explanation for these particular variations, she has not taken the opportunity to disclose it. Instead of such direct evidence, Mr Daiches remarkably asks us to imagine a series of "inferences" drawn by the parties (including his client and her daughter) and the reasonable observer. They would have inferred, he says, that version 1 lessees were paying less than the rates required by inflation and that there were in consequence "historic shortfalls" in the lessor's service charge income; and that the multiplier was to be increased, not only to take account of actual inflation since 1974, and to reflect the fact that it might once again rise to levels above that implied by the triennial formula, but also to compensate the lessor both for past shortfalls, and for the risk that he or she might not be able to persuade other lessees to agree to similar increases in the future.

152.  With respect to Mr Daiches I have to say that, even in this extraordinary case, I find these submissions quite astonishing. Given that his client and her daughter were the principal parties to these transactions, why on earth should the court be expected to draw "inferences" as to what was in their minds? Why should we speculate as to the extent of any "historic shortfalls", when she presumably has access to the actual accounts, and has resisted the lessees' requests for disclosure? What evidence is there that by 2000 anyone was seriously concerned about an imminent risk of return to double-digit inflation? Finally, what possible reason would these lessees  *1661  have had for wishing to "compensate" the lessor for the past or future financial consequences of imperfections in leases for which they were not responsible?

153.  With regard to the only independent party, Mrs Pace, Mr Daiches asks us to note that her variation was agreed shortly after the sale of the lease to her by the respondent herself. It should not be difficult, he says, to "infer that the purchase price paid by her to the respondent reflected her agreement to increase the multiplier". Although she is apparently one of the appellants represented by Mr Morshead, he has not volunteered any specific explanation on her behalf. He merely points to the difficulty of imagining any price reduction or other inducement sufficient to compensate her for "the devastating implications" of the multiplier if it operates as Mrs Arnold contends.

154.  In the absence of further evidence from either side, it is impossible to draw any clear conclusions about the purpose of these curious transactions. It is enough to observe that, viewed objectively, they are at least consistent with an interpretation which limits the lessees' future exposure to actual inflation, within a defined limit. On the lessors' interpretation, as with version 4, they make no sense at all.

Conclusion

155.  The true explanation for these wretchedly conceived clauses may be lost in history, but the problems for the parties are all too present and deeply regrettable. No doubt in recognition of such considerations, Mr Daiches, on behalf of Mrs Arnold,

Arnold v Britton, [2015] A.C. 1619 (2015)

indicated that his client "fully understands the appellants' predicament and is sympathetic to it", and that if the appeal fails there would have to be a re-negotiation of the leases "for pragmatic if not for legal reasons". She wished it to be stated openly that:

"she is willing for the appellants' leases to be renegotiated on terms that would, among other things, involve the leases being varied by substituting an adjustment linked to the Consumer Price Inflation index instead of the current fixed adjustment of 10% per annum."

156. Although on its face this indication seems helpful and realistic, it is not clear what it would mean in practical terms. It rightly acknowledges that the problems may well be incapable of truly satisfactory resolution by conventional legal analysis. The main obstacle may be that hinted at in Mr Daiches' post-hearing submission. That is the need to find some way of making good the shortfall resulting from the unrealistically low contributions required from more than two-thirds of the lessees under the pre-1980 leases. Even if the lessees' interpretation prevails, it will still leave an unhappy imbalance between these lessees, and the version 1 lessees, who will be left paying substantially less than their proportionate share.

157. Whatever the strict legal position, the other lessees may perhaps be persuaded that they have a common interest in the good management of the estate, and at least a moral obligation to contribute their fair share of its costs. A long-running dispute of this kind can hardly be conducive to the atmosphere appropriate to a holiday location, even for those not directly involved. It is to be hoped that some way can be found of bringing them into *1662 the discussions. On any view, the case seems to cry out for expert mediation, if it has not been attempted before, preferably not confined to the present parties. If thought appropriate, one possibility might be an application by consent to the President of the First-Tier Tribunal (Property Chamber—Residential Property) to appoint as mediator a senior judge of that tribunal, with the benefit of that tribunal's experience of dealing with service charge issues under statute. However, that must be a matter for the parties not this court.

158. It is necessary therefore to return to the essential question: what in the view of a reasonable observer did clause 3(2) mean? It will be apparent from my detailed analysis that I regard the consequences of the lessor's interpretation as so commercially improbable that only the clearest words would justify the court in adopting it. I agree with Judge Jarman QC that the limited addition proposed by the lessees does not do such violence to the contractual language as to justify a result which is commercial nonsense.

159. For these reasons, in respectful disagreement with the majority, I would have allowed the appeal and restored the order of Judge Jarman QC.

*Appeal dismissed.*

*Colin Beresford, Barrister*  *1663

(c) Incorporated Council of Law Reporting for England & Wales

© 2021 Thomson Reuters.

**EXHIBIT E**

**Judgment 17/2013**

T – In the matter of the C Trust
and in the matter of Section 69
of The Trusts (Guernsey) Law, 2007
Royal Court
21st March, 2013

---

Application for relief pursuant to section 69(1)(a)(i) and (iv) and (2) (b) of the Trusts (Guernsey) Law, 2007, and/or the inherent jurisdiction of the Court.

Approved Text
21.03.2013

# IN THE ROYAL COURT OF GUERNSEY

## (CIVIL DIVISION)

T                                                                    Applicant

## IN THE MATTER OF THE C TRUST AND

## IN THE MATTER OF

## SECTION 69 OF THE TRUSTS (GUERNSEY) LAW, 2007

Hearing date:        22nd February 2013

Judgment handed down:        21st March 2013

Before:        Richard James McMahon, Esq., Deputy Bailiff

Advocate for the Applicant:        Advocate N Kapp

**Cases, Texts & legislation referred to:**

The Trusts (Guernsey) Law, 2007
*IFS Investments Limited v Manor Park (Guernsey) Limited* [2003-04] GLR 77
*In re Mr and Mrs W's 1966 Settlement* (1998) 25.GLJ.46
*Jersey Evening Post Limited v Al Thani* [2002] JLR 542
*In re The Colour Trusts* (unreported, 24 May 2012)
*In the matter of the Sanne Trust Company Limited* [2009] JRC 25B
The Royal Court Civil Rules, 2007
*In the matter of the Internine and the Intertraders Trusts* [2005] JLR 236
*In the matter of the Representation of BBB Limited* [2011] JRC 240
*Investors Compensation Scheme Ltd. v West Bromwich Building Society* [1998] 1 All ER 98
*British Airways Pension Trustee Ltd v British Airways plc* [2002] EWCA Civ 672

© Royal Court of Guernsey

Guernsey Judgment 17/2013 In the matter of the C Trust & in the matter of Section 69 of the Trusts (Guernsey) Law, 2007

*W.T. Ramsay v IRC* [1982] AC 300
*Arbuthnott v Fagan* [1995] CLC 1396
*Gartside v Silkstone and Dodworth Coal and Iron Company* (1882) 21 Ch D 762
Lewison, *The Interpretation of Contracts,* 5th ed.
*Davis v Richards & Wallington Industries Ltd* [1990] 1 WLR 1511
*Sugden on Powers,* 7th ed.
*Commissioners of Inland Revenue v Botnar* [1999] STC 711


Introduction

1.  By an application dated 13 February 2013, T, as trustee of a settlement to which I will refer as "The C Trust" (hereafter referred to as "the Trustee"), has sought relief pursuant to section 69(1)(a)(i) and (iv) and (2)(b) of the Trusts (Guernsey) Law, 2007 and/or the inherent jurisdiction of the Court. The principal relief sought is declaratory in nature or, in the alternative, for rectification of a Declaration of Exclusion made on 21 October 1997.

2.  At the first appointment on 15 February 2013, Advocate Kapp, on behalf of the Trustee, applied for the proceedings to be heard *in camera*. After considering the submissions set out in her Skeleton Argument dated 13 February 2013, as expanded upon at the hearing, as requested, I made that order, at least insofar as it attached to the first stage of the proceedings dealing with the construction point on which this judgment focuses. In doing so, I was mindful of the helpful general guidance about the presumption in favour of open justice set out in the judgment of Lieutenant-Bailiff Day in *IFS Investments Limited v Manor Park (Guernsey) Limited* [2003-04] GLR 77 and the position often adopted in trusts cases involving the private affairs of individuals, as exemplified by *In re Mr and Mrs W's 1966 Settlement* (1998) 25.GLJ.46. I expressly reserved the position if the alternative basis of the Application needed to be pursued, recognising that the public interest in rectification proceedings might outweigh any private sensitivities that confidential information would be disclosed (see, e.g., *Jersey Evening Post Limited v Al Thani* [2002] JLR 542, as well as the approach adopted in *In re The Colour Trusts* (unreported, 24 May 2012) and *In the matter of the Sanne Trust Company Limited* [2009] JRC 25B).

3.  The second issue considered at that first hearing was whether any other persons needed to be convened. In particular, two questions arose about the potential interests of unascertained beneficiaries and the position of the "Reserve Beneficiary", a well-known international charity (hereafter referred to as "the Charity"). I took the view that the interests of the unascertained beneficiaries were already adequately protected because the Application had the support of a foundation (hereafter referred to as "The C Foundation"). I also took the view that the nature of the principal relief sought, being declarations to be made as a result of construing some documentation, meant that the arguments that might be advanced on behalf of the persons potentially affected would not provide any further assistance to the Court. The construction issues would, in my view, be capable of being canvassed adequately by considering the material put before the Court and through Advocate Kapp reviewing all the possible outcomes, in accordance with her duty as an officer of the Court. Moreover, whether or not the declarations sought are made, the Charity will continue to be the Reserve Beneficiary under the settlement. I also took into account that rule 35 of the Royal Court Civil Rules, 2007 provides that beneficiaries are bound by the outcome of proceedings, even if they have not been made parties, unless the Court directs otherwise. Accordingly, whilst reserving the position if the rectification aspect of the Application needed to be pursued, I decided that the construction arguments could be made without the need to convene any other party.

4.  Finally, in terms of case management, I directed that the questions of law arising from the construction of the documentation should be heard by me sitting unaccompanied by Jurats and that the Court should then only convene with Jurats if the declaratory relief sought did not

resolve the matter in a manner acceptable to the Trustee. Although section 79 of the 2007 Law permits the Court to be properly constituted by a judge alone, in my view, in rectification cases (as indeed in other situations relating to trusts) it is desirable, unless it is impracticable to do so for whatever valid reason, for the Jurats to participate.

5. This judgment, therefore, deals with the declaratory relief sought at para. 4 of the Application, which is in the following terms:

> "*on a proper construction of the Trust, Clause 4.9(d) of the Trust does not prohibit the Trustee from exercising a power or discretion in favour of a Beneficiary if an Excluded Person is intended to or might otherwise benefit indirectly therefrom; and*

> *the declaration of exclusion made by the Trustee on 21 October 1997 (the "**1997 Exclusion**") did not preclude the Trustee from exercising its powers under the Trust to add the [C] Foundation (the "**Foundation**") as a beneficiary of the Trust in accordance with the deed of appointment made by the Trustee on 21 October 1997 even though the persons who were declared Excluded Persons under the 1997 Exclusion were intended or might otherwise benefit under the [C] Foundation, nor precludes the Trustee for exercising any dispositive powers in favour of the Foundation or any other beneficiary of the Trust if an Excluded Person is intended to or might otherwise benefit indirectly therefrom*".

<u>The Evidence</u>

6. In support of the Application, four Affidavits have been filed. They are from A, a former director of the Trustee who was responsible for the C Trust at the relevant time, sworn on 25 January 2013, B, an executive manager of the C Foundation, also sworn on 25 January 2013, the Settlor, sworn on 7 February 2013, and D, a director of the Trustee, sworn on 12 February 2013. The material facts relevant for the purposes of the construction issues are taken from those Affidavits and the exhibits thereto.

7. The C Trust was declared by the Trustee on 3 February 1993. The Settlor is an extremely successful and driven businessman. The assets of the Trust have become, and are at present, very significant. The Settlor is divorced and has two sons and one adopted daughter. His daughter has three minor children. Sadly, the Settlor does not enjoy good health. In 2012, his health deteriorated further. He has realised that, rather than leaving it until after his death for his children to benefit from the fruits of his endeavours, he would derive pleasure from seeing them enjoy those fruits during his lifetime.

8. Shortly after the Trust was established, consideration was given to it being restructured. This was a consequence of plans for the Settlor to change where he lived. The Trustee dealt with F, the Settlor's South African in-house legal adviser, in relation to this. It was suggested that it might be beneficial for the Settlor to be excluded as a beneficiary of the C Trust. The proposal was to make use of a new trust in Liechtenstein, although in due course this was modified so that it was a Liechtenstein foundation that was being thought about.

9. Progress in relation to these proposals was intermittent over the next few years. The Trustee took advice as to the legal status of a Liechtenstein foundation, receiving confirmation that it is "*an asset holding body, ... a legal entity fully capable to obligate itself towards third parties and to be the holder of legal rights and titles*". The Trustee did not wish simply to exclude the Settlor's linear descendants from a fairly substantial trust fund (although the assets then were many times smaller than they are now) unless satisfied it was in their best interests. F confirmed that the Settlor's lawful linear descendants were fully eligible to benefit under the C Foundation, which had been established in Liechtenstein. F also commented on and revised the draft documentation prepared by the Trustee to give effect to

the proposal to appoint the C Foundation as a beneficiary and to exclude the Settlor and his linear descendants as beneficiaries.

10. The Trustee took the precaution of seeking confirmation from the Settlor, with one of his closest friends and colleagues acting as witness, that he supported the proposed changes to the C Trust. By signing the document on 13 May 1997, the Settlor confirmed his opinion that he considered it to be in the best interests of his lawful linear and adopted descendants "*who are beneficiaries of the [C] Foundation of Liechtenstein*" for the changes to be made.

11. Once the position had been checked once more with B, the Trustee convened a meeting of its directors on 21 October 1997. The minutes of that meeting recorded, under appropriate headings:

> "*IT WAS NOTED that the Trustees had received a recommendation from [the Settlor] regarding the beneficiaries of the trust. The recommendation refers to the addition of the [C] Foundation of Liechtenstein as a beneficiary of the trust and the exclusion of the lawful linear and adopted descendants of [the Settlor] as beneficiaries of the trust. A copy of the recommendation is attached hereto and forms part of these minutes. IT WAS FURTHER NOTED that the aforementioned recommendation is dated 13 May 1997 and the Trustees wish to record the fact that the time span between that date and this has occurred because the Trustees have wished to consider all aspects of the recommendation which has involved consulting with [the Settlor] and his legal advisers.*
>
> *IT WAS NOTED the administrators of the [C] Foundation, ... had confirmed in writing (copy attached) that the beneficiaries of the [C] Foundation include the lawful linear and adopted descendants of [the Settlor], including adopted children.*
>
> *IT WAS RESOLVED that, in accordance with the terms of Clause 4.9(b) of the [C]Trust deed, the lawful linear and adopted descendants of [the Settlor] shall henceforth be Excluded Persons for all the intents and purposes of the Trust so that none of them shall be eligible to benefit from the Trust.*
>
> *IT WAS RESOLVED that, in accordance with the terms of Clause 4.8(a) of the [C] Trust deed, The [C] Foundation of Vaduz be and is hereby irrevocably nominated to be a members of the Appointed Class for all the intents and purposes of the Trust.*"

A and the corporate company secretary were authorised to seal and sign the necessary documents, which they then did.

12. B has exhibited a copy of the Regulations and Supplementary Regulations of the C Foundation and confirmed that it was established for the benefit of the Settlor's lawful linear descendants, including adopted children, and whether born or unborn. They have no vested right or interest in the Foundation but only a contingent interest in it.

13. The Trustee became aware of the Settlor's desire to see various distributions made for the benefit of his family and some other associates in September 2012. The Trustee has been liaising since that time in relation to the most appropriate ways in which to achieve the Settlor's desired outcomes. In doing so, the possibility that the terms of the Declaration of Exclusion executed in 1997 (hereafter referred to as "the Deed of Exclusion") prevent the C Trust being used to benefit the Settlor's linear descendants has arisen.

14. On behalf of the Trustee, Carey Olsen sought advice from English Counsel, Judith Bryant. Her Opinion dated 6 December 2012 is exhibited to A's Affidavit. She has identified that the extremely wide wording used in the Deed of Exclusion would, in her view, be construed in

such a way as to exclude the Settlor's linear descendants "*from all future benefit under the Trust*". Nicholas Le Poidevin QC was also instructed to advise. His Opinion dated 28 January 2013 is exhibited to D's Affidavit. Whilst agreeing in principle with Ms Bryant's conclusion, he noted that her conclusion assumed "*an intention to effect the sweeping exclusion*" and that such an outcome "*would plainly be incorrect*" because the Deed of Exclusion "*must have been intended to be consistent with*" the Deed of Addition. It is fair to note that the advice sought from Nicholas Le Poidevin QC was specific to this issue, whereas Judith Bryant was apparently instructed to advise more generally about a proposal to establish a new trust to which part of the trust fund of the C Trust could be transferred and without the benefit of a full explanation of the background to events in 1997.

15. Because of the difference of Opinion between Counsel and the fact that confirmation one way or the other is certainly desirable for the Trustee before such a momentous decision as will be called for by the Trustee is taken the present Application has been made.

<u>The Documents</u>

16. The Deed of Exclusion provides:

> "*Under the terms of Clause 4.9(b) of the Declaration of Trust whereby The [C] Trust ("the Trust") was brought into being we the Trustees do hereby declare that the undermentioned shall henceforth be Excluded Persons for all the intents and purposes of the Trust so that none of them shall be eligible to benefit in any way from the Trust, namely*
>
> > *The lawful linear descendants of [the Settlor] whether now alive or yet to be born (including persons lawfully adopted as his children or as the children of his lawful linear descendants as here defined)*
>
> *This declaration is irrevocable and applies to the whole Trust Fund*".

The Deed of Addition executed the same day simply provides:

> "*Under the terms of Clause 4.8(a) of the Declaration of Trust whereby The [C] Trust ("the Trust") was brought into being we the Trustees do hereby irrevocably nominate THE [C] FOUNDATION Vaduz to be a member of the Appointed Class for all the intents and purposes of the Trust*".

17. The Declaration of Trust of the C Trust provides that the settlement is irrevocable (clause 1.3) and established under the laws of Guernsey (clause 2.2(a)). The Trust Period was 100 years unless declared by the Trustee to end earlier (clause 2.1). It is a discretionary trust of income and capital (clause 3.1). In Schedule One, the expression "Beneficiaries" was originally defined as the Settlor (who was also declared to be the Primary Beneficiary by Schedule Two), "*His lawful linear descendants whether now alive or yet to be born (including persons lawfully adopted as his children or as the children of his lawful linear descendants, as here defined)*", "*All persons who are for the time being members of the Appointed Class*", any charity selected by the Trustee with the consent of the Primary Beneficiary, and the Reserve Beneficiary, the Charity.

18. Clause 4.9 of the Declaration of Trust on exclusion of persons as beneficiaries provides:

> "*a) Notwithstanding anything herein contained any of the Beneficiaries (being of full age) shall have the power at any time or times during the Trust Period by instrument or instruments in writing to declare that he is no longer to be a Beneficiary (an Excluded Person).*

      b)    *Notwithstanding anything herein contained and without prejudice to the power of any Beneficiary to declare that he shall be an Excluded Person the Trustees shall also have power at any time or times during the Trust Period to declare that any person is thenceforth to be an Excluded Person.*

      c)    *Any such declaration made pursuant hereto may*

            i)    *be either revocable or be made so that it shall not under any circumstances be revoked,*

            ii)    *be either in respect of the whole of the Trust Fund or any specified part or parts thereof, and*

            iii)    *be in respect of income alone or capital alone or both income and capital.*

      d)    *As from the date hereof or of any such declaration as the case may be (and in the case of a revocable declaration until such time if at all at which it shall be revoked) the Trustees shall be absolutely prohibited from exercising in favour of the person who is or thereby becomes an Excluded Person (or as the case may be his personal representatives) any power or discretion conferred on appropriation or application of the income or capital of the Trust Fund or of the part or parts thereof to which such declaration may relate but the Trustee shall not be liable in respect of any such payment appropriation or application which may be made by them before receiving notice of such declaration.*"

By clause 1.1.8, the term "Excluded Persons" is defined as "*The persons (if any) declared to be Excluded Persons pursuant to the provisions of Part 4 hereof*".

19. Clause 4.8 of the Declaration of Trust deals with the appointed class as follows:

      "a)    *The Trustees may at any time and from time to time before the termination of the Trust Period by deed or deeds revocable or irrevocable nominate one or more individuals charities or corporations (none of whom is an Excluded Person) to be a member of the Appointed Class.*

      b)    *If the Trustees shall revocably nominate a person to be a member of the Appointed Class the Trustees may revoke that nomination and upon such revocation the person nominated shall cease to be a member of the Appointed Class.*

      c)    *The Trustees shall have the power to renominate (on any number of occasions) any person who has ceased to be a member of the Appointed Class by virtue of the revocation of a previous nomination.*

      d)    *No beneficiary may prevent the nomination of new members of the Appointed Class.*"

By clause 1.1.3, the term "Appointed Class" is defined as "*Such persons (not being Excluded Persons) as are for the time being the subject of a nomination duly made according to the provisions of the section hereof entitled Trustees' Powers of Appointment*", that section being Part 4. "Corporation" is defined in clause 1.1.5 as "*Any corporate body (of whatsoever kind) incorporated or otherwise brought into existence in any part of the world*".

20. Although not expressly referred to in the Deed of Exclusion, Judith Bryant's Opinion refers to a number of other provisions in Part 4 that the Trustee may be taken to have exercised. Clause 4.1(a) (power of appointment) provides:

> "*Notwithstanding the provisions of Part 3 the Trustees shall have power at any time and from time to time during the Trust Period to appoint that they shall hold the whole or any part or parts of the Trust Fund Upon Trust for all or such one or more exclusively of the other or others of the Beneficiaries at such age or time or respective ages or times if more than one in such shares and with such trusts for their respective advancement maintenance and education as they shall think fit*".

Clause 4.4 (powers of revocation and declaration of new trusts) provides:

> "*a)   The Trustees shall have power at any time or times before the expiration of the Trust Period in their absolute discretion by deed or deeds revocable or irrevocable wholly or partially to revoke or otherwise vary all or any of the trusts hereinbefore declared and to declare such other trusts as they shall think fit for the benefit of such one or more of the Beneficiaries in such manner and in all respects as they shall think fit.*
>
> *b)   The Trustees shall have power to release either entirely or to such extent as they shall think fit the foregoing power and any such release shall be binding on their successors.*
>
> *c)   Any such revocable deed if not revoked before the date of expiry of the Trust Period shall become irrevocable on that date.*"

<u>The law</u>

*Interpretation guidance*

21. There is helpful guidance relating to the principles for the construction of a trust instrument set out by the Royal Court of Jersey in <u>*In the matter of the Internine and the Intertraders Trusts*</u> [2005] JLR 236, at para. 62 *per* Commissioner Page:

> "*The correct approach to the task before the court is to a large extent the same as it is for any instrument the meaning of which is in contention:*
>
> (i)    *the aim is to establish the presumed intention of the maker(s) of the document from the words used …;*
>
> (ii)   *words must, however, be construed against the background of the surrounding circumstances or "matrix" of facts existing at the time when the document was executed – a principle that has been a bedrock of English law since the judgment of Lord Wilberforce in <u>Prenn v Simmonds</u> [1971] 1 W.L.R. 1381 and appears now to have been accepted as also properly reflecting the approach that this court should adopt in relation to such matters;*
>
> (iii)  *the circumstances relevant and admissible for this purpose are those that must be taken to have been known to the maker at the time or, where there are more than one, known to the makers of or the parties to the document and include (to use the language of Lord Hoffmann in <u>Investors Compensation Scheme Ltd. V West Bromwich Bldg Socy</u> ([1998] 1 W.L.R. at 913), from whose speech only Lord Lloyd of Berwick dissented) – "… absolutely anything which would have*

*affected the way in which the language of the document would have been understood by a reasonable man";*

(iv) *evidence of subjective intention, drafts and negotiations and other matters extrinsic to the document in question is inadmissible, as is evidence of events subsequent to the making of the instrument (evidence of this kind being relevant where an estoppel is said to arise but not in this jurisdiction, unlike some others, as an aid to construing the original meaning of the document);*

(v) *the critical provisions …, as with all words and phrases, have to be read in the context of the document as a whole;*

(vi) *words should as far as possible be given their ordinary meaning: "Loyalty to the text of a commercial contract, instrument, or document read in its contextual setting is the paramount principle of interpretation": per Lord Steyn in Society of Lloyd's v Robinson ([1999] 1 W.L.R. at 763); and*

(vii) *this last precept may, however, have to give way if consideration of the document as a whole, having regard to the principles set out above or common sense, points to a different conclusion: "common sense" in the context being best reflected by the passage from the speech of Lord Reid in Schuler (L.) A.G. v Wickman Machine Tool Sales Ltd. ([1974] A.C. at 251) in which he observed:*

> *"The fact that a particular construction leads to a very unreasonable result must be a relevant consideration. The more unreasonable the result the more unlikely it is that the parties can have intended it, and if they do intend it the more necessary it is that they shall make that intention abundantly clear."*

*(See also Lord Steyn, again in Society of Lloyd's v Robinson ([1999] 1 W.L.R. at 763), and Lord Hoffmann's observations in the Investors Compensation Scheme case concerning the need, on occasion, for a court to accept that the parties must have used the wrong words or syntax.)"*

The learned Commissioner continued in paragraph 63:

> *"It is also elementary, first, that when attempting to discern the true meaning of a power conferred in a trust deed or other instrument the court must have regard to the nature of the deed and the purpose for which the power appears to have been granted – though this will depend to a large extent on the terms of the instrument itself; and secondly, that a power of amendment reserved in a trust must be exercised for the purpose for which it was granted and not for one beyond the contemplation of the makers of the original instrument (Lord Steyn (ibid.), citing Hole v Garnsey [1930] A.C. 472)."*

This guidance was adopted and applied in *In the matter of the Representation of BBB Limited* [2011] JRC 240 and I propose to adopt it in the present case as being equally useful under the laws of Guernsey.

22. In many respects, that guidance explains and elaborates on the summary of the principles given by Lord Hoffmann in his speech in *Investors Compensation Scheme Ltd. v West Bromwich Building Society* [1998] 1 All ER 98, at 114g, which has been accepted and applied by this Court previously:

© Royal Court of Guernsey

"*(1)    Interpretation is the ascertainment of the meaning which the document would convey to a reasonable person having all the background knowledge which would reasonably have been available to the parties in the situation in which they were at the time of the contract.*

*(2)    The background was famously referred to by Lord Wilberforce [in <u>Prenn v Simmonds</u>] as the 'matrix of fact', but the phrase is, if anything, an understated description of what the background may include. Subject to the requirement that it should have been reasonably available to the parties and to the exception to be mentioned next, it includes absolutely anything which would have affected the way in which the language of the document would have been understood by a reasonable man.*

*(3)    The law excludes from the admissible background the previous negotiations of the parties and their declarations of subjective intent. They are admissible only in an action for rectification. The law makes this distinction for reasons of practical policy and, in this respect only, legal interpretation differs from the way we would interpret utterances in ordinary life. The boundaries of this exception are in some respects unclear. But this is not the occasion on which to explore them.*

*(4)    The meaning which a document (or any other utterance) would convey to a reasonable man is not the same thing as the meaning of its words. The meaning of words is a matter of dictionaries and grammars; the meaning of the document is what the parties using those words against the relevant background would reasonably have been understood to mean. The background may not merely enable the reasonable man to choose between the possible meanings of words which are ambiguous but even (as occasionally happens in ordinary life) to conclude that the parties must, for whatever reason, have used the wrong words or syntax (see <u>Mannai Investment Co Ltd v Eagle Star Life Assurance Co Ltd</u> [1997] 3 All ER 352, [1997] 2 WLR 945).*

*(5)    The 'rule' that words should be given their 'natural and ordinary meaning' reflects the commonsense proposition that we do not easily accept that people have made linguistic mistakes, particularly in formal documents. On the other hand, if one would nevertheless conclude from the background that something must have gone wrong with the language, the law does not require judges to attribute to the parties an intention which they plainly could not have had.*"

Further, in the context of construing a trust deed, in <u>British Airways Pension Trustee Ltd v British Airways plc</u> [2002] EWCA Civ 672 it was noted that "*a provision of a trust deed must be interpreted in the light of the factual situation at the time it was created*" (para. [30]).

23.  In <u>W.T. Ramsay v IRC</u> [1982] AC 300, Lord Wilberforce also commented on the need to ascertain the true intention from the document, adding (at p. 323):

"*This is a cardinal principle but it must not be overstated or overextended. While obliging the court to accept documents or transactions found to be genuine, as such, it does not compel the court to look at a document or transaction in blinkers, isolated from any context to which it properly belongs. If it can be seen that a document or transaction was intended to have effect as part of a nexus or series of transactions, or as an ingredient of a wider transaction intended as a whole, there is nothing in the doctrine to prevent it being so regarded: to do so is not to prefer form to substance, or substance to form ...*".

© Royal Court of Guernsey

Further general guidance is found at the end of the judgment of Sir Thomas Bingham MR in *Arbuthnott v Fagan* [1995] CLC 1396:

> "*Courts will never construe words in a vacuum. To a greater or lesser extent, depending on the subject matter, they will wish to be informed of what may variously be described as the context, the background, the factual matrix or the mischief. To seek to construe any instrument in ignorance or disregard of the circumstances which gave rise to it or the situation in which it is expected to take effect is in my view pedantic, sterile and productive of error. But that is not to say that an initial judgment of what an instrument was or should reasonably have been intended to achieve should be permitted to override the clear language of the instrument, since what an author says is usually the surest guide to what he means. To my mind construction is a composite exercise, neither uncompromisingly literal nor unswervingly purposive: the instrument must speak for itself, but it must do so in situ and not be transported to the laboratory for microscopic analysis.*"

*Contemporaneity*

24. The fact that the Deed of Exclusion and the Deed of Addition were so closely related is also relevant. In *Gartside v Silkstone and Dodworth Coal and Iron Company* (1882) 21 Ch D 762, Fry J (at p. 767) stated:

> "*I think the law stands in this way, that when two deeds are executed on the same day, the Court must enquire which was in fact executed first, but that if there is anything in the deeds themselves to shew an intention, either that they shall take effect pari passu or even that the later deed shall take effect in priority to the earlier, in that case the Court will presume that the deeds were executed in such order as to give effect to the manifest intention of the parties.*"

The inference from the minutes of the meeting of the directors of the Trustee held on 21 October 1997 is that the business conducted first was to exclude the Settlor's linear descendants and the business conducted second was to add the C Foundation as an Appointed Class. In any event, the two transactions are clearly so inter-related that the Deed of Addition is relevant background for the purposes of the proper construction of the Deed of Exclusion. Indeed, the precise order in which they were executed is probably irrelevant because they were being treated almost as if they were equal and opposite elements of a combined transaction. This approach is also consistent with general contractual principles: "*A document executed contemporaneously with, or shortly after, the primary document to be construed may be relied upon as an aid to construction, if it forms part of the same transaction as the primary document*" (Lewison, *The Interpretation of Contracts*, 5th ed., para. 3.03).

*Imputed exercise of power*

25. Under English law, the imputation to a trustee of an intention to exercise a power available to him to achieve the desired result unless it can be inferred that there was an intention <u>not</u> to exercise it, to which Judith Bryant referred, derives from *Davis v Richards & Wallington Industries Ltd* [1990] 1 WLR 1511. The analysis of Scott J (on p. 1530) begins by referring to *Sugden on Powers*, 7th ed. (1845), vol. 1, p. 356:

> "*A donee of a power may execute it without referring to it, or taking the slightest notice of it, provided that the intention to execute it appears.*"

to which was added (at p. 421):

> "It is <u>intention</u> then that in these cases governs: therefore, where it can be inferred that the power was not meant to be exercised, the court cannot consider it as executed."

Scott J then states (at p. 1530F):

> "A disponor (A) purports to make a disposition of property. The disposition cannot be effective unless associated with the exercise of a power vested in A and that A could properly have exercised in order to make the disposition. The disposition makes no mention of the power and does not purport to be an exercise of it. The effect of the principle and the cases to which I have referred is that A's intention to make the disposition justifies imputing to him an intention to exercise the power, provided always that not to exercise the power cannot be inferred. If the requisite intention [sic] can be imputed, the court will treat the disposition as an exercise of the power. In the present case, Industries purported, in conjunction with Mr. Davis and Mr. Wardle, to bring into effect valid rules for the pension scheme. It was objected that Mr. Parsons was a trustee whose concurrence was necessary. But Industries had power to remove Mr. Parsons as a trustee and could properly have exercised that power in order to bring the rules into effect. I can see no difference in principle between the position of A in my example and the position of Industries, nor any reason why the courts should be prepared to apply an ameliorating principle of equity only to disposition of property. In my judgment, the principle is applicable in the present case, unless an intention on Industries' part not to exercise its power of removal can be inferred."

I have quoted the application of the principle in that case as well as the bare principle in order to explain that it was used to render effective what would otherwise have been an ineffective act. I also note that it is referred to as "*an ameliorating principle of equity*", whereas the effect of applying it without more ado in the present case might arguably produce an outcome that is adverse to the interests of everyone concerned.

*Direct or indirect benefit*

26. The main case, however, to which reference has been made is <u>Commissioners of Inland Revenue v Botnar</u> [1999] STC 711, but also bearing the reference "1999 WL 477359". It is a judgment of the English Court of Appeal dated 23 June 1999. Mr Botnar and his wife had been excluded as beneficiaries under the settlement in question, which contained the following provision at clause 23:

> "<u>NO</u> Excluded Person shall be capable of taking any benefit in accordance with the terms of this Settlement and in particular but without prejudice to the generality of the foregoing provisions of this Clause:-
>
> (a) The Trust Fund shall henceforth be possessed and enjoyed to the entire exclusion of any such Excluded Person and of any benefit to him by contract or otherwise
>
> (b) No part of the capital or income of the Trust Fund shall be paid or lent or applied for the benefit of any such Excluded Person".

The Settlement also contained a power (in clause 3(c)) for the trustees to pay or transfer the whole or any part of the capital to the trustees of another trust, the only restriction being that at least one of the Appointed Class must be interested in the transferee trust. The question was whether the possibility of Mr Botnar being a beneficiary of such a transferee trust meant that, in the words of section 478(1) of the Income and Corporation Taxes Act 1970, he had

"*power to enjoy, whether forthwith or in the future, any income of*" a company that was resident or domiciled out of the United Kingdom, that income being accumulated in the transferor trust. If the trust documentation had been construed so that Mr Botnar could never benefit from such a transferee trust, then such a "*power to enjoy*" could not be shown.

27. Mance LJ (as he then was) drew a distinction between a payment or transfer "*between*" trusts and a payment, application or appointment "*under*" the trust. In relation to clause 23, he highlighted the words "*in accordance with the terms of this Settlement*". Accordingly, when read as a whole, the powers in the Settlement enabled the trustees to make a payment or transfer to a transferee trust from which Mr Botnar might benefit and there was nothing within the Settlement prohibiting the trustees from conferring such a benefit indirectly, meaning he had a "*power to enjoy*", even though they could not confer a direct benefit on an Excluded Person such as Mr Botnar. That conclusion was shared by Aldous LJ:

> "… *clause 23 does not prevent the trustees settling capital under the terms of another settlement. Thus clause 23 does not prevent the trustees settling capital under clause 3(c) so long as the restrictions imposed by clause 3(c) are complied with. Mr Botnar, an excluded person under this settlement, can be a potential beneficiary under another settlement to which capital could be transferred under clause 3(c).*"

Accordingly, a trustee decision to pay or transfer to another settlement from which Mr Botnar might benefit would not contravene the doctrine of fraud on the power, which "*invalidates the exercise of a power which appears to be in conformity with its terms but is in fact made for some collateral purpose not within its proper scope*". Morritt LJ, however, took the view that it was not permissible to exercise the power if the purpose of doing so (as opposed to any incidental effect) was to benefit an excluded person.

Discussion

28. With those principles in mind, I turn to consider what construction to give to the Deed of Exclusion, bearing in mind the powers in the Declaration of Trust. I take the view that the principles of English law to which I was referred (and on which Judith Bryant and Nicholas Le Poidevin QC relied when giving their respective Opinions) are equally applicable as a matter of Guernsey law. The principal exercise in this case is to construe the relevant documents and I am not aware of anything in Guernsey law that would lead to a different approach being required to that to which I have already referred set out in the English law authorities.

29. The power in clause 4.9(b) is "*to declare that any person is thenceforth to be an Excluded Person*". The Deed of Exclusion does not name any person or persons but refers to a class of person. I consider that this is permissible under the terms of clause 4.9(b) because the wording used for the class in the Deed of Exclusion means the persons to be included were capable of being ascertained. It was also a means by which any future persons coming within the definition were covered. In effect, the Deed of Exclusion removed (a)(ii) from Schedule One to the Declaration of Trust as if it had been capable of being excised through amendment.

30. The first significant thing to note is the final sentence of the Deed of Exclusion ("*This declaration is irrevocable and applies to the whole Trust Fund*"). In my view, this wording accurately reflects the powers of the Trustee under clause 4.9(c). The Trustee chose to make the declaration irrevocable rather than revocable and applied it to the entirety of the Trust Fund rather than specifying a part only. By choosing not to refer to just income or just capital, the declaration must be taken to cover both income and capital. The effect of the exclusion of the Settlor's linear descendants was, therefore, as complete as it could be under clause 4.9.

31. Because of the inclusion of those words, the issue for determination is what meaning to give to the words earlier in the Deed of Exclusion: "*for all the intents and purposes of the Trust so that none of them shall be eligible to benefit in any way from the Trust*". Taking those words at face value, my immediate reaction to them is that declaring the class of the lawful linear descendants of the Settlor to be "*Excluded Persons for all intents and purposes of the Trust*" offers a similar focus to the words "*in accordance with the terms of this Settlement*" in clause 23 of the Settlement in the *Botnar* case. If the final sentence of the Deed of Exclusion had not been inserted, these words would have been indicative of the Trustee wishing to exercise the power to exclude the class of persons from the whole of the Trust Fund. To that extent, the words "*for all the intents and purposes of the Trust*" appear to do no more than duplicate, rather than add to, what the Trustee was permitted to do. However, the addition of the words "*so that none of them shall be eligible to benefit in any way from the Trust*" may be construed as meaning something over and above that or they may be yet another way of saying exactly the same thing. The latter construction is possible because of the benefit being confined to being a benefit "*from the Trust*", but the words "*in any way*" might point to a broader meaning.

32. I note that in Judith Bryant's Opinion she concludes that clause 4.4(a) of the Declaration of Trust "*is sufficiently widely drafted to have enabled the Trustee to vary the trusts of the Trust so as to exclude the Linear Descendants from all future benefit from under the Trust, such a variation being for the benefit of the Beneficiaries other than the Linear Descendants*" (para. 11) and that (at para. 12):

> "*... there is nothing in the Declaration of Exclusion to suggest that the Trustee did <u>not</u> intend to exercise the power conferred on it by clause 4.4(a) to exclude the Linear Descendants from future benefit under the Trust. On that basis, there would appear to be nothing to prevent the Court from imputing to the Trustee an intention to exercise the power conferred on it by clause 4.4(a) to bring about the result intended in the Declaration of Exclusion, and on that basis, it seems most likely that the Court would decide that the Declaration of Exclusion <u>was</u> effective to exclude the Linear Descendants from being eligible to benefit from the Trust Fund in any way whatsoever*".

Looking at the Deed of Exclusion, I accept that that is one possible construction of the document and, if looking solely at that document, the conclusion that can properly be reached.

33. As I have already indicated, though, it is not the only possible construction of the document. Further, it relies on imputing to the Trustee an intention to exercise the power conferred on it by clause 4.4(a) when to do so would be contrary to what appear to be the interests and intention of the Primary Beneficiary. As such, applying the principle of imputation would also potentially lead to an outcome not desired by the Trustee, which took care to ensure that the Deed of Exclusion and Deed of Addition produced an effect that was not automatically disadvantageous to that class of persons. Having regard to the steps taken by the Trustee, on a balance of probabilities, I consider that the evidence supports the inference that the Trustee did not intend to exercise any power under clause 4.4(a).

34. Moreover, unlike in *Davis v Richards & Wallington Industries Ltd* (*supra*), the imputation of an intention to exercise the power in clause 4.4(a) would not result in a transaction that might otherwise fail being saved, but rather might produce the opposite outcome. As it was put by Nicholas Le Poidevin QC (at para. 19 of his Opinion), "*Despite the wide words of the deed of exclusion, the inference that the descendants were meant to be excluded from benefit via the Foundation would be plainly incorrect: that deed must have been intended to be consistent with the deed of addition*".

35. I am satisfied that this is the proper conclusion to reach as to the meaning of the words in the Deed of Exclusion. It is consistent with the approach of the English Court of Appeal in the

Botnar case to have regard to what it means for a Beneficiary to be declared to be an Excluded Person. This prohibits the Trustee from conferring a direct benefit on such a person under the Trust. It should not, and in my view does not, prohibit the Trustee from conferring a direct benefit on a person in the Appointed Class which may have the incidental effect of conferring a benefit on a person who has been declared to be an Excluded Person. If that were the consequence of the Deed of Exclusion, it would mean that the Deed of Addition was entered into in error and the precautions taken by the Trustee back in the run-up to 1997 would all have been for nothing.

36. In reaching this conclusion, I have paid particular attention to the minutes of the meeting of the directors of the Trustee on 21 October 1997 and the inter-connection between the Deed of Exclusion and the Deed of Appointment. In my view, they cannot be regarded as anything other than part of the overall transaction to be effected in these two documents. Looked at in the round, "*the surrounding circumstances or "matrix" of facts existing at the time*" were that those concerned in considering the re-structuring of the C Trust wanted to interpose the C Foundation above the Settlor's descendants, thereby enabling them to benefit directly from that Foundation rather than directly from the C Trust. I note the need to be careful to distinguish here between the Trustee's subjective intent and the surrounding background. None of the evidence indicates that it is a proper inference that the power in clause 4.4(a) was to be executed by the Trustee, but rather that it was not to be executed despite the wording contained in the Deed of Exclusion. As Mance LJ noted in the *Botnar* case, "*the court should eschew remote hypotheses of unlikely fact*". I think that it would be a remote hypothesis of unlikely fact to suggest that it was the presumed intention of the Trustee, or of anyone corresponding with the Trustee in the 1990s, to exclude the Settlor's linear descendants from any benefit, direct or indirect, and at the same time to add the C Foundation in the Appointed Class.

37. As regards the words "*for all the intents and purposes of the Trust*", I further note that they were also included in the Deed of Addition. I consider that their use in both documents supports the conclusion that these words mean that the Trustee was doing no more than clarifying that the exclusion or addition, as the case may be, was to be effective in respect of the entirety of the Trust. I further consider that it is significant that the words that follow in the Deed of Exclusion commence with "*so that*". Those two words, in my view, provide a clear link with the preceding words, demonstrating that the proper meaning of the following words ("*none of them shall be eligible to benefit in any way from the Trust*") arises from the context of a further explanation of the generality of the exclusion. In giving the Deed of Exclusion this construction, I have sought to identify the presumed intention of its maker, namely the Trustee, from the words actually used, construing the document as a whole, and the background of the surrounding circumstances at the time in 1997 and for the years since 1993.

38. This interpretation is also consistent with the meaning of clause 4.9(d) of the Declaration of Trust. As was noted in both Opinions from Counsel, something has gone wrong with the wording of this paragraph. The final words refer to "*the Trustee [not being liable] in respect of any such payment appropriation or application which may be made by them before receiving notice of such declaration*", whereas the preceding words refer to "*any power or discretion conferred on appropriation or application*" but without referring to "*payment*". The omission of some words, "on the Trustees to effect any payment" possibly being needed immediately after "*conferred*", does not make any difference for the purposes of determining this case. This is because the operative words are the absolute prohibition on the Trustee "*exercising in favour of the person who is or thereby becomes an Excluded Person ... any power or discretion conferred*" (emphasis added).

39. As in the *Botnar* case, the Trustee acts within the confines of the powers or discretions contained in the C Trust. In my judgment, use of "*in favour of*" indicates that the paragraph relates to direct benefits under the C Trust rather than indirect benefits obtained more broadly

as a result of it. If, contrary to the conclusion I have reached, the imputation of intention principle were applicable, it would mean that clause 4.9(d) would have to be modified to make it accord with the wider exclusion suggested in Judith Bryant's Opinion. Because the Deed of Exclusion is completely silent about such a modification and how it would operate, I regard this as a further reason why the Trustee should not be treated as purporting to exercise the power conferred by clause 4.4(a). In my view, it is simply asking too much to introduce into the Deed of Exclusion this much wider construction of the wording. I therefore agree with the Trustee's contention (at para. 44 of its Skeleton Argument) "*that the prohibition in Clause 4.9(d) simply prevents the Trustee exercising a power or discretion to make a payment, appropriation or application of the trust fund directly in favour of an Excluded Person but it would not prevent the Trustee exercising a power or discretion in favour of a beneficiary who was not an Excluded Person in circumstances where there was either the intention or a possibility that an Excluded Person or Excluded Persons could also benefit indirectly.*"

Conclusion

40. For the reasons given, I will grant the relief sought by the Trustee at paragraph 4 of its Application. The interpretation I have given to the documentation leads to the result that the Deed of Addition has not been rendered invalid and confirms that the Trustee is free, as appears to have been the presumed intention of all those concerned, to treat the C Foundation as a Beneficiary, even if the consequences of doing so may be that one or more of the Settlor's linear descendants, who have been declared to be Excluded Persons, take an indirect benefit. As a result, the alternative relief pursued in para. 5 of the Application falls away and the hearing with Jurats provisionally scheduled can be vacated.

41. In accordance with paragraph 6 of the Application, I am also content to make the customary order that "*all the costs of the Application … be paid from the funds of the Trust on an indemnity basis*". As a final note, I should also record my gratitude to Advocate Kapp for her helpful written and oral submissions.

**EXHIBIT F**

**[2005 JLR 236]**

## IN THE MATTER OF THE INTERNINE AND THE INTERTRADERS TRUSTS

### SHEIKH ABDULLAH ALI M. ALHAMRANI v. RUSSA MANAGEMENT and NINE OTHERS

ROYAL COURT (Page, Commr.): May 27th, 2005

*Trusts-trust protector-powers and duties-power to amend-to be exercised bona fide, for proper purpose and in interests of beneficiaries because protector's position is fiduciary, even if also beneficiary-radical amendments increasing protector's power require greater justification-amendment of administrative provisions not beyond contemplation of maker if no increase in financial burdens or reduction of beneficial entitlements*

The representor sought a declaration that his amendments to two trust deeds were valid.

The representor and the third to tenth respondents were siblings and the beneficiaries of two Jersey trusts. The trust deeds provided that the representor and the third respondent, the eldest brothers, were to be the first protectors of the trusts and they therefore supervised the management of the extensive trust assets on behalf of themselves and the other beneficiaries.

After serious disagreements arose between the representor and the third respondent, however, the representor purported unilaterally to amend the trust deeds so as *inter alia* to appoint himself the sole first protector from then on and to entrench himself in that position by deleting the provision providing for his removal by the beneficiaries. He claimed to have the

2005 JLR 237

power to make those amendments under cll. 2(b) and 6(f) of the trust deeds and also to have had good reasons for so doing. Clause 2(b) of the deeds originally read: "[T]he first protectors shall have the right … to revoke … or otherwise amend … this instrument" and clause 6(f) provided that "the first protectors may exercise their powers individually and the exercise by one of the first protectors of any of their powers under cll. 2(b) … shall bind the other first protector."

The representor initially claimed that his power to amend the trust deeds was not subject to any limitations but he subsequently agreed that it was in fact a fiduciary power. He submitted that, when construing the original deeds to determine the validity of his amendments, account should not be taken of any later events nor of any potential future exercise by him of the power to amend.

The third to tenth respondents challenged the validity of the representor's purported amendments. They were also concerned as to what further amendments to the deeds the representor might make and therefore sought to adduce at trial evidence of certain events alleged to have occurred after the amendments were made as being illustrative of his intentions.

**Held,** ruling as follows:

(1) As one of the first trust protectors, the representor had the power, under cll. 2(b) and 6(f) of the trusts, unilaterally to make the amendments-so as *inter alia* to make himself the sole

first protector and to remove the beneficiaries' power to displace him from that position-and also thereby to bind the third respondent, previously the joint first protector. The clauses amended were not so fundamental that the original maker(s) of the deeds would not have envisaged their amendment, as they merely concerned the administration of the trusts, and the amendments did not therefore impose additional financial burdens nor deny substantive beneficial entitlements. Nor was there a term in the deeds by which the amended clauses were expressed to be entrenched and thus incapable of amendment. In addition, the protectors' power to amend was a fiduciary one and the representor's exercise of it was therefore subject to the restraints necessarily inherent in the exercise of such a power, namely, that it was exercised *bona fide*, for a proper purpose and in the interests of the beneficiaries as a whole, even though he was also a beneficiary. Consequently, the more radical the departure from the original deed effected by an amendment, the greater the need for justification. Since the result of certain of the amendments in the present case was a substantial accretion of additional power to the representor and the elimination of means by which he could be removed by the beneficiaries, there was a heavy burden on him to explain the necessity for such measures and to justify them as being for a proper purpose and in the *bona fide* exercise of his power for the benefit of the beneficiaries as a whole (paras. 73–76; para. 79; para. 81).

(2) Evidence of events which occurred after the amendments were made or of actions which the representor might take in the future would

2005 JLR 238

be inadmissible in the present proceedings concerning the validity of the amendments. When construing cll. 2(b) and 6(f) of the trust deeds, so as to determine whether the representor had the power to make the amendments in question, the presumed intention of the maker(s) of the deeds had to be established from the words used, construed against the background circumstances or "matrix of facts." The only relevant circumstances would be those which must have been known to the maker at the time the deeds were made. Evidence of subsequent events and extrinsic evidence of subjective intentions, negotiations, *etc.* would not be admissible. Furthermore, cll. 2(b) and 6(f) should be read in the context of the trust deeds as a whole and the words used should be given their ordinary meaning. When construing the true meaning of the power conferred on the first protectors in those clauses, regard should be had to the nature of the deeds and the purpose for which it appears the power was granted. The first protectors' power of amendment should only be exercised for that purpose and not for one beyond the contemplation of the maker(s) of the deeds (para. 60; paras. 62–63).

**Cases cited:**

(1)  *Hole* v. *Garnsey*, [1930] A.C. 472; [1930] All E.R. Rep. 568, distinguished.

(2)  *Investors Compensation Scheme Ltd.* v. *West Bromwich Bldg. Socy.*, [1998] 1 W.L.R. 896; [1998] 1 All E.R. 98, considered.

(3)  *Prenn* v. *Simmonds*, [1971] 1 W.L.R. 1381; [1971] 3 All E.R. 237; (1971), 115 Sol. Jo. 654, referred to.

(4)  *Schuler (L.) A.G.* v. *Wickman Machine Tool Sales Ltd.*, [1974] A.C. 235; [1973] 2 All E.R. 39; (1973), 117 Sol. Jo. 340, *dicta* of Lord Reid considered.

(5)  *Society of Lloyd's* v. *Robinson*, [1999] 1 W.L.R. 756; [1999] 1 All E.R. (Comm.) 545; [1999] C.L.C. 987, considered.

(6)    *Z Trust*, *In re*, 1997 CILR 248, referred to.

**Text cited:**
*Lewin on Trusts*, 17th ed., para. 30–02, at 771–772 (2000).

*P.D. James* for the representor;
*D.F. Le Quesne* for the first respondent;
*A.R. Binnington* for the second respondent;
*M.H.D. Taylor* for the third to eighth respondents;
*S.J. Young* for the ninth and tenth respondents.

1  **PAGE, COMMR.:**

**Background to the litigation**

The Alhamranis are a well-known Saudi Arabian family with widespread commercial interests and investments both inside and outside the Kingdom. In June 1976 (I shall be forgiven, I hope, if I use the western

2005 JLR 239

calendar for the purposes of this judgment), Sheikh Ali Mohamed Alhamrani, then head of the family, died leaving seven sons and two daughters. According to Sharia law, the Sheikh's estate was to be distributed as to one share to each son and as to one half-share to each daughter.

2  The inherited assets within Saudi Arabia have, for the most part, been held by the Alhamrani group of companies. On the other hand, the inherited foreign-based wealth of the family was at one time held through certain Liechtenstein foundations and Cayman Islands trusts, but in 1998 was transferred for the most part into three new Jersey-based trusts: the Intertraders Trust, the Internine Trust and the Manastar Trust. Manastar was later wound up and its assets transferred into Internine. Each of the nine brothers and sisters is a beneficiary of each trust.

3  The trustee of Intertraders is Russa Management Ltd., represented by Advocate Le Quesne of Viberts, and the trustee of Internine is J.P. Morgan Trust Company (Jersey) Ltd., formerly known as Chase Bank & Trust Company (C.I.) Ltd., represented by Advocate Binnington of Mourant du Feu & Jeune. J.P. Morgan was also the trustee of the Manastar Trust until it was dissolved.

4  The current litigation arises out of a number of disputes between different factions among the siblings, the precise composition of those factions having changed as alliances and perceived interests have shifted. The most recent groupings, each separately represented, are: Sheikh Abdullah Ali Alhamrani ("Sheikh Abdullah"), represented by Advocate James of Crill Canavan; Sheikhs Mohamed, Siraj, Khalid, Abdulaziz and Ahmed Ali Alhamrani (often referred to, collectively, as "the first party" for reasons that will become apparent later in this judgment), together with Sheikh Fahad Ali Alhamrani ("Sheikh Fahad"), represented by Advocate Taylor of Bedell Cristin; and Ladies Noura and Adawiya Ali Alhamrani ("the Ladies"), represented by Advocate Young of Bois Bois. So far as concerns the issues with which this present judgment deals, Sheikh Abdullah is in a minority of one, opposed, as he is, by all the others.

5  Procedurally, the matters discussed in this judgment originated in three representations: the first by Russa, dated March 28th, 2003, the second by Sheikh Abdullah, dated May 12th, 2003, and the third by the members of the first party, dated September 26th, 2003. The disputes encompassed in

the litigation, taken as a whole, are numerous and in some cases complex. In very broad terms, they arise in one way or another out of the following circumstances.

6 Originally, and at all times up until mid-April 2000, there were two first protectors of each trust, Sheikh Mohamed and Sheikh Abdullah.

2005 JLR 240

Between them they managed the family wealth on behalf of themselves and their brothers and sisters. By 2000, however, serious disagreements had arisen between them. In April that year, Sheikh Abdullah executed two deeds by which he claimed to exercise powers under cll. 2(b) and 6(f) of the trust instruments, as then constituted, to vary them so as to appoint himself sole first protector from then on, and thus remove his brother Sheikh Mohamed as a co-first protector. There were, he says, good reasons for doing this. Sheikh Mohamed and the other members of the first party subsequently wrote to each of the trustees, challenging Sheikh Abdullah's conduct and terminating-or at least claiming to terminate-his authority to act on their behalf (the effect of these letters being a matter for another day). The validity or otherwise of these amendments is the central issue with which this judgment is concerned.

7 Peace appeared to have been secured when, on September 16th, 2000, an instrument known as the "disengagement" or "separation" agreement was signed in the expectation that this would put an end to hostilities. The parties to that agreement were Sheikh Mohamed and the other members of the first party (this being the origin of that expression) and Sheikh Abdullah, Sheikh Fahad and the Ladies, who were referred to as "the second party." The purpose of that agreement, which was governed by the law of Saudi Arabia, was to effect a fair division of the family assets in accordance with the inheritance provisions of Sharia law, the intention being-broadly speaking-that the Saudi Arabian interests would go to the first party and the foreign assets, represented by the two Jersey trusts, to the second party. But, before this could be done, a complicated and protracted exercise of valuing the family's extensive interests and assets was to be undertaken by a valuation committee, composed of KPMG (representing the first party), PricewaterhouseCoopers (representing the second party), and Arthur Anderson (as arbitrator).

8 Much of the next two and a half years was devoted to a variety of steps and events designed to carry out that valuation and to put the disengagement agreement into effect, the detail of which is of no relevance for present purposes. But the process ran into serious difficulties, not least because of differences of view between the two parties as to the extent to which the members of the first party were entitled to be provided with information about distributions, investments and certain pledges of assets held in the Jersey trusts. This latter issue came to a head in February 2003, when Sheikh Abdullah made it clear that he objected to the provision of any further information by either of the trustees on the ground that, as a result of the disengagement agreement and subsequent events, the members of the first party had disclaimed all interest in the Jersey trusts and no longer had any standing as beneficiaries to demand such information-a state of affairs vigorously contested by the first party. Shortly afterwards, J.P. Morgan, the Internine

2005 JLR 241

trustee, wrote to say that it proposed to cease making distributions from the trust until the issue of entitlement had been clarified. Russa adopted a similar, though slightly more flexible, position.

9  This impasse led, on March 28th, 2003, to Russa issuing a short representation in the Royal Court, reciting the dispute that had arisen and Russa's inability to determine the rights and wrongs of it, and seeking determination of the question whether or not there had been any such disclaimer.

10  That was followed, on May 12th, 2003, by the issue of a representation in the Royal Court by Sheikh Abdullah, seeking positive declarations to the effect that the members of the first party had disclaimed all interest in Internine and Intertraders, that they were, accordingly, not entitled to any further information about them from the respective trustees and that the trustees were entitled to make distributions to those persons who remained beneficiaries of those trusts: in other words, the members of the second party. At around the same time, Sheikh Abdullah also started proceedings before the Grievance Board in the Kingdom of Saudi Arabia, seeking orders to compel the members of the first party to abide by the terms of the disengagement agreement.

11  By that stage, Sheikh Fahad and Ladies Noura and Adawiya had parted company with Sheikh Abdullah and had revoked the power of attorney previously held by him to represent them in connection with the disengagement agreement. They too started proceedings before the Grievance Board, in their case seeking to have that agreement declared void and the process of division of assets stopped.

12  On September 26th, 2003, the third of three representations in the Royal Court was issued, this time by the members of the first party. It sought a variety of orders challenging Sheikh Abdullah's purported amendments to the two trust deeds by which he had claimed to appoint himself sole first protector in April 2000; requiring the trustees to provide certain information; and seeking to hold both sets of trustees to account for alleged breaches of duty. It sought no specific declaration about the disengagement agreement, presumably because this was already the subject of Sheikh Abdullah's representation.

13  Shortly afterwards, Sheikh Fahad joined forces with the members of the first party, authorizing Sheikh Mohamed to act for him. From this point onwards, the alignment and representation of the parties in the Royal Court litigation has been as described in para. 4 above.

14  On October 2nd, 2003, Mourants, on behalf of J.P. Morgan, wrote to the other parties listing what they saw as the 12 principal issues raised by the three representations in so far as they concerned Internine (though, for the most part, the same issues also arose in relation to Intertraders). They were grouped under four headings:

---

2005 JLR 242

   (i) the validity of the April 17th, 2000 instrument, by which Sheikh Abdullah had purported to appoint himself sole first protector (Issues 1–5);

     (ii) the effect of the disengagement agreement and related documents (the question of "disclaimer": Issue 6);

   (iii) issues concerning the provision by the trustee of information and the making of distributions from the trust fund (Issues 7–9); and

   (iv) matters concerning the conduct of the Internine trustee, including allegations of breach of duty (Issues 10–12).

This breakdown of issues, with certain modifications, has been the effective working basis for the management of the litigation.

15 On November 7th, 2003, the Bailiff, giving directions in effect in all three sets of proceedings, ordered the trial of Issues 1–5 and Issue 6 before all other issues. At the same time, he ordered that, until further order, the Internine trustee should discharge present and future obligations under certain specified loans without prejudice to the right of the beneficiaries to contend subsequently that these were not properly obligations of Internine; and that both the Internine trustee and the Intertraders trustee should "pay and discharge their operational expenses on an ongoing basis," again without prejudice to subsequent argument as to the propriety of such payments being made from trust funds. Finally, he directed that, pending further argument, neither trustee should disclose any further information or documents concerning either trust to any member of the first party or to Sheikh Fahad, a restriction that was subsequently modified on January 14th, 2004 to permit disclosure of pre-September 2000 information.

16 At a further hearing before the Bailiff, on December 4th, 2003, orders were made temporarily suspending, without prejudice to any later decision by the court, all powers of the "protectors or purported protectors" of Internine and Intertraders (though leaving all previous directions in force) and conferring, in the meantime, an unfettered discretion on the two trustees as regards the investment of trust funds. In addition, any further loans or distributions out of the trust funds to or at the behest of any beneficiary or purported beneficiary were banned without the approval of the court.

17 The "interim regime" established by these two sets of directions remains, for the moment, largely in force, one consequence of which has been that both trustees have felt obliged to seek directions from the court in relation to the exercise of their discretion on a number of issues where the beneficiaries-or potential beneficiaries-have been at loggerheads as to the appropriate course.

---

2005 JLR 243

18 For much of 2004, as well as 2003, Issue 6 dominated the litigation in three respects. First, because until it was resolved the question of the identity of the beneficiaries of the two Jersey trusts remained uncertain; secondly, because if Sheikh Abdullah were to succeed on this particular issue much of the remaining dispute would be likely to fall away; and thirdly, because it was being litigated in both Jersey and Saudi Arabia without any certainty as to where a definitive, final ruling would first be obtained. The matter continued, in particular, to dog the question of whether or not the trustees should be authorized to release further, post-September 2000 information to the members of the first party, Sheikh Abdullah maintaining that this would be wrong until such time as Issue 6 had been finally decided and all possibilities of appeal exhausted.

19 In the event, the issue was finally determined in the courts of Saudi Arabia before it ever came to trial in the Royal Court when, in or about July 2004, the Saudi Court of Appeal upheld an earlier ruling of the Grievance Board in January that year that the disengagement agreement was null and void. For a brief period thereafter, Sheikh Abdullah continued to contend that there were still avenues of further appeal open to him and to resist the provision of post-September 2000 information to members of the first party (and the Ladies). But following an adverse ruling by the Jersey Court of Appeal on September 10th, 2004, rejecting Sheikh Abdullah's plea that it was still premature for such information to be released, and the refusal of the Privy Council to grant leave

to appeal, he eventually conceded defeat and, on November 3rd, 2004, formally sought, and was granted, leave to abandon Issue 6.

20 From then on, Issue 6 ceased to be of immediate relevance and the parties were effectively back to the pre-September 2000 position: no split of assets had been agreed and all nine brothers and sisters remained, and remain today, beneficiaries of each of the trusts.

21 Of the remaining five issues directed by the Bailiff's order of November 7th, 2003 to be tried first, Issues 1–3 were the main ones. Issues 4 and 5, which concern the circumstances, validity and effect of two trust "instruments" exhibited by Sheikh Abdullah to his first affidavit of May 24th, 2003, are probably subsidiary aspects of Issue 3.

22 The terms of Issues 1 and 2 are as follows:

(i) What is the true construction of cl. 6(c) and (f), and cl. 2(b) of the Internine Trust deed, dated June 22nd, 1998, and the Intertraders Trust deed, dated January 23rd, 1998?

(ii) Whether a first protector had, and whether Sheikh Abdullah has, the right freely to modify the terms of the Internine Trust deed, likewise the Intertraders Trust deed, pursuant to such provisions.

2005 JLR 244

23 Issue 3 originally read:

"Whether Sheikh Abdullah's (a) purported amendments to the Intertraders Trust by an instrument dated October 14th, 1998 are invalid and whether, as a result, all distributions from the Intertraders Trust required the consent of both protectors at all times; and (b) unilateral amendments, by two instruments dated April 17th, 2000 are invalid and whether, as a result, Sheikh Mohamed remains as first protector of the Internine Trust and the Intertraders Trust."

But, as a result of further orders made on February 9th and 13th, 2004, and confirmed at a directions hearing before the Bailiff on March 18th, 2004, its terms were amended by the addition of the following words:

"Without prejudice to the generality of the foregoing-

(1) whether the representor's [*i.e.* Sheikh Abdullah's] amendments or any of them are invalid by reason of breach of fiduciary duty and/or improper motivation and/or made in fraud of his power (if any) to make them and/or for any other reason; and/or

(2) notwithstanding the answers to (1) above, whether the first party is precluded from challenging the amendments or any of them for any reason advanced before February 20th, 2004 or that may be advanced with leave of the court after the date hereof."

24 Later, following certain amendments by the first party to its pleaded case, it became evident that the scope of the factual inquiry for the purposes of Issue 3, expanded in this way, might well overlap significantly with that required for the purpose of dealing with the later Issues 10–12, concerning alleged breaches of duty by trustees. Deliberations between the parties and the court led, accordingly, to a decision in September 2004 to confine the stage 1 trial-which was set for January 2005-to Issues 1, 2 and 6. On the subsequent abandonment by Sheikh Abdullah of Issue 6 in November 2004, the scope of the January hearing was further reduced to Issues 1 and 2.

25  It is against the background described above that these issues came to trial. Because the issues were largely ones of law, the parties agreed and the court concurred and duly certified that it would be appropriate for me to sit alone without Jurats.

26  Before I go further, I wish to express my very considerable gratitude to all counsel involved in this matter for the assistance that they have given the court in this difficult case, particularly Advocates James, Taylor and Binnington, who bore the brunt of the debate (Advocates Young and Le Quesne, for budgetary reasons, having taken a more limited part in the proceedings); and also my gratitude to the parties and their respective

2005 JLR 245

advocates and advisers for their forbearance while awaiting delivery of this overdue judgment.

27  It is convenient at this point to mention the stance taken by the two sets of trustees in relation to Issues 1 and 2. Both were given leave to participate in the trial of Issues 1 and 2, without prejudice to the question of how the costs of such involvement ought properly to be dealt with (a matter that was reserved until after the trial). In the event, J.P. Morgan, via Mr. Binnington, chose to make fairly extensive submissions, while Russa, via Mr. Le Quesne, took a less active part. Both understandably insisted that their role was entirely neutral as regards these particular issues, neither of which directly involved any consideration of the trustees' conduct (those issues being reserved for trial at a later stage). At the same time, both clearly had and have an interest in the outcome of these issues, given that they were the trustees at the time when the relevant amendments were made by Sheikh Abdullah and that both are criticized by the first party for permitting these amendments to be made-a factor that it has been necessary to keep in mind when weighing those of the trustees' submissions that were supportive of Sheikh Abdullah's case.

**The original declarations of trust and letters of direction**

28  The structure and terms of the Intertraders and Internine Trust deeds are substantially the same, though their antecedents are slightly different. In the case of Intertraders, the original instrument took the form of a declaration of trust made by Russa on January 23rd, 1998, at the request and on the authority of Sheikh Abdullah, as set out in a two-page letter from him addressed to and countersigned by Russa, dated January 15th, 1998. That letter made reference to a declaration of trust "the terms of which have previously been agreed between us," summarized some of the more important provisions and requested Russa's signature as confirmation that this accurately reflected what had been agreed.

29  Some five months later, the Internine deed was executed. This also took the form of a declaration of trust, this time by Chase Bank & Trust Company (C.I.) Ltd. ("Chase," now J.P. Morgan), dated June 22nd, 1998, but differed in some respects from the Intertraders deed. The request and authority for the establishment of this trust was contained, in this case, in a more formal, four-page Chase "Declaration of trust letter of direction," which was signed by Sheikh Abdullah on June 19th, 1998 and "agreed and accepted" by Chase. Among other things, this required Chase to incorporate and manage, as part of the trust property, a BVI private investment company by the name of Wingara Enterprises Inc.: this was and is the principal corporate vehicle through which the Internine Trust assets are held.

2005 JLR 246

30  The establishment of Manastar was contemporaneous with that of Internine and followed the same pattern, though in this case the investment company was to be Sidara Ventures Ltd., another BVI corporation.

31  There are several points about these instruments, particularly the letters of direction, that are of note.

32  The Internine and Manastar letters open by emphasizing that they are not intended to amount to an additional trust or to override any discretionary power vested in the trustee. It is plain, therefore, that if and to the extent that there is any disparity between the two, the executed declarations of trust were to prevail.

33  Secondly, under the heading, "Declaration of trust and transfer of assets," both these letters declare:

> "I am/we are transferring to you the property listed below with the intention that you should declare a trust substantially in the terms of the draft which you have supplied to me/us a copy of which is attached to this letter ** reference [B or A]. The property which is being transferred is my/our own absolutely and I am/we are entitled to dispose of it by way of gift."

This was, to say the least, an inexactitude: Sheikh Abdullah, the sole author-signatory of these letters, was clearly not the absolute owner of the property in question. To describe him as the "settlor" of these trusts, as was suggested from time to time, is therefore incorrect.

34  Thirdly, the Internine and Manastar letters give minimal information about the assets to be taken into the trust: in the former case, it merely says "(a) Chase accounts: Global Custody, $**. . . New York, ** As per attached 'map reports'"[copies of which were not included in the versions in evidence]. There is no sub-para. (b). In the case of Manastar, sub-para. (a) is in identical terms, but a sub-para. (b) reads: "The entire issued share capital of Delapluma N.V., a Netherlands Antilles company." The less formal Intertraders letter says nothing at all about the identity of the relevant assets. None of the three declarations of trust does any more than define "the trust fund" as the sum of US$100 and any other property that might thereafter be paid or transferred to the trustee by any of the beneficiaries and accepted by the trustee.

35  Fourthly, each of the three letters includes the following passages:

> "Sheikh Mohamed Ali M. Alhamrani and Sheikh Abdullah Ali M. Alhamrani have been appointed first protectors under the terms of the trust and as such will represent the beneficiaries to the extent set forth in the trust instrument."

2005 JLR 247

And a little later:

> "The trust instrument sets out the powers, and provides for succession, of the protectors … The protectors have the right and power to amend the terms of the trust, subject to certain restrictions being placed on the exercise of the powers of amendment by the successor protectors …"

36 Fifthly, each of the letters refers to the fact that the trust instrument listed the beneficiaries and also describes the manner in which capital and/or income is to be distributed from the trusts as follows:

> "It should be noted that all distributions of income or capital from the trust should be paid to the following bank account, unless otherwise directed in writing by the protectors: National Commercial Bank, Khalidiah Branch, Jeddah, For credit to account: Sons of Sheikh Ali M. Alhamrani, US$ Account No. 101 272 700 101 06 …"

37 Sixthly, the only member of the Alhamrani family to sign the three letters was Sheikh Abdullah: in the case of Intertraders, without any description of the capacity in which he did this, but in the case of the other two letters under the rubric: "Client (Protector)." Neither letter gives any indication as to the source of the relevant funds, or how and on whose authority they were to be transferred into these new trusts.

38 There seems little doubt that the reality is that the funds in question were, for the most part at least, the family's inherited "foreign assets," previously held in two Liechtenstein foundations (Clubnine and Manaskaf) and in nine Cayman Islands trusts. And the necessary transfers, however formally effected (of which this court knows little), were almost certainly authorized by Sheikh Abdullah, acting under a wide-ranging authority granted to him and to Sheikh Mohamed jointly and severally some six years earlier. On March 5th, 1992, the brothers and sisters had made a formal declaration before a notary public in Saudi Arabia, the effect of which was to create what, for the purposes of this litigation, has been called a "power of attorney." By this declaration, each of them appointed Sheikh Mohamed and Sheikh Abdullah (as recorded in the English translation of the original Arabic notarial Act)-

> "individually and jointly, to represent us, the inheritors of Ali Alhamrani according to the inheritance deed issued by the Baljuashi court under 224 on 1/6/1396H, in everything that concerns us in the inheritance from our father …"

with wide powers and no territorial limit. It concluded with the following passage:

> "This is a general proxy for both of them authorizing them

2005 JLR 248

> individually and jointly … The two representatives [that is, Sheikh Mohamed and Sheikh Abdullah] … in their capacity as inheritors to their father as mentioned above, agree that each of them has appointed the other as his legal representative."

**The October 14th, 1998 Intertraders amendment**

39 On October 14th, 1998, a further instrument, amending the January 23rd, 1998 Intertraders declaration of trust, was made and executed by Sheikh Abdullah and Russa in order to bring the terms of Intertraders into line with those of Internine and Manastar: that was, at least, the purpose according to Sheikh Abdullah and was undoubtedly the effect. In executing this deed, Sheikh Abdullah claimed to act in his capacity as one of the two first protectors of Intertraders and to exercise his power to amend the trust deed pursuant to cll. 2(b) and 6(f). For present purposes, the principal change of significance was to reduce the trustees' former obligation to obtain the written *consent* of the protectors to make distributions of income or capital to one of *consultation* with the protectors (cl. 3(a)). Changes were also made to cll. 2(b) and 6(f).

40  From then onwards, the terms of these cll. 2(b) and 6(f)-which lie at the heart of Issues 1, 2 and 3-were identical in all three trust deeds. I shall refer to them hereafter as "the original" provisions.

41  These October 1998 amendments to the Intertraders Trust are also challenged by the first party and the Ladies, as well as the later April 2000 amendments to all three Jersey trusts.

**The critical provisions**

42  The expression "first protectors" was originally defined by cl. 1(b) as meaning "the persons appointed as the first protectors pursuant to cl. 6(b)" (in other words, Sheikh Abdullah and Sheikh Mohamed); and the meaning of the terms "the protectors" and "the successor protectors" were likewise defined by reference to persons appointed pursuant to cl. 6.

43  By cl. 3, the trustees declared themselves possessed of the trust fund on terms, among others, that, upon expiration of the trust period, both capital and income should be held upon trust absolutely for the nine siblings (who were defined as the beneficiaries) as to one share each for the brothers and one half-share each for the Ladies.

44  Clause 6 provided as follows:

"(a)   The protectors shall at all times comprise two persons.

(b)  The first protectors shall be Sheikh Mohamed Ali M. Alhamrani and Sheikh Abdullah Ali M. Alhamrani

2005 JLR 249

(c)   A person shall cease to be a protector:

(i)   If he dies.

(ii)   If he shall be found to be lunatic or of unsound mind, as confirmed by any court order.

(iii)    If he informs the trustee and the other protector of his desire to resign.

(iv)    If he shall be removed by notice in writing served on him by the trustee and the other protector signed by beneficiaries who would be entitled to at least 75% of the trust fund as if the trust period had expired on the date of such notice pursuant to the provisions of cl. 3(c).

(d)    In the event of a person ceasing to be one of the protectors, the next person in the order listed below shall automatically and immediately become a protector in his place and the trustee shall cause a memorandum to this effect to be endorsed on or annexed to this trust, namely [there then followed a list of the seven siblings other than Sheikh Mohamed and Sheikh Abdullah, starting with Sheikh Siraj].

. . .

(f)   The first protectors may exercise their powers individually and the exercise by one of the first protectors of any of their powers under cll. 2(b), 5(b), 6(h) or 9 hereof and any consent given by one of the first protectors under the provisions of this trust shall

bind the other first protector or successor protector (as the case may be) and shall be binding on the trustee who shall act in accordance with the action or consent of such first protector. Successor protectors shall exercise their powers jointly and the consent of a successor protector shall not bind the other protector.

(g)  In the event that the successor protectors shall be unable to agree as to the manner in which they should exercise any of their powers, then in such event if either of the successor protectors obtains the written consent of beneficiaries who including himself or herself would be entitled to at least 75% of the trust fund pursuant to the provision of cl. 3(c) to a specified course of action this shall be notified in writing to the other protector and to the trustee and will be binding on them.

. . .

(j)  The protectors may exercise any power conferred on the

2005 JLR 250

protectors under this trust notwithstanding that any protector may be a beneficiary hereof."

45  The first of the four provisions mentioned in cl. 6(f), that is, cl. 2(b), provided:

"The first protectors shall have the right at any time and from time to time to revoke (as to the whole or any part or parts of the trust fund) or otherwise amend (both as to its beneficial and administrative provisions) this instrument by written instrument delivered to the trustee provided (first) that no such amendment shall diminish the compensation or the provisions for exoneration to which the trustee is entitled or increase its obligations hereunder without its consent in writing and (secondly) that no such amendment shall have retrospective effect or otherwise invalidate or prejudice any previous exercise by the trustee of its powers hereunder."

46  The second, cl. 5(b), provided that the protectors should have wide powers to give directions to the trustee as regards investment. The third, cl. 6(h), empowered the protectors to remove any requirement for their consent otherwise contained in the trust deed. And the fourth, cl. 9, gave the protectors the power to require a trustee to resign and to appoint a replacement.

**The April 17th, 2000 amendments**

47  On April 17th, 2000, Sheikh Abdullah, acting alone under powers conferred on him by a combination of cll. 2(b) and 6(f) (as he claimed at the time and claims today), executed three instruments in substantially identical form and terms, one for each trust. According to the provisions of these deeds, far-reaching amendments to the pre-existing trusts were introduced and, in effect, were made irrevocable without the consent, alone, of Sheikh Abdullah himself.

48  In the first place, cl. 1(b) was revoked and replaced by the words: "'the first protector' or 'the first protectors' means the person [note the singular] appointed as first protector pursuant to cl. 6(a) hereof." Corresponding amendments were made to the terms "protectors" and "successor protectors."

49  In the second place, the original text of cl. 6 was revoked and replaced, so far as material to the present issues, by the following:

"(a)   The first protector shall be Sheikh Abdullah Ali M. Alhamrani. [The original cl. 6(a) to the effect there should at all times be two first protectors was removed.]

(b)   The first protector shall cease to be the protector:

(i)   If he dies.

(ii)   If he shall be found to be lunatic or of unsound mind as confirmed by any court order.

(iii)   If he informs the trustee and the other protector of his desire to resign. [The previous cl. 6(c)(iv), providing for removal by a 75% vote of the beneficiaries did not appear.]

(c)   In the event of the first protector ceasing to be the protector the protector shall at all times thereafter comprise two persons who shall be appointed in accordance with the provisions of sub-cll. (e) or (f) of this clause.

(d)   A successor protector shall cease to be the protector if [there was then enumerated the same set of circumstances as those applicable to the first protector, but retaining, in the case of successor protectors, the power of beneficiaries representing 75% of the trust fund to remove him or her].

(e)   [This, together with (f) listed the potential successor protectors and made provision for their succession, substantially as before.]

. . .

(g)   Successor protectors shall exercise their powers jointly and the consent of a successor protector shall not bind the other protector. [This represented the residue of the previous cl. 6(f) after the removal of the original provision for first protectors to act individually, which was now redundant.]"

It is unnecessary to set out the terms of the remaining sub-clauses.

50  Shortly after this development, on June 12th, 2000, the entirety of the Manastar Trust fund, consisting of the shares in Sidara, was transferred into Internine by the trustee, exercising powers conferred on it by the original Manastar deed of June 1998, as amended by Sheikh Abdullah's April 17th, 2000 instrument and a further supplemental instrument, dated June 8th, 2000, executed by Sheikh Abdullah in (purported) exercise of his power as sole "present protector" (as he was described there).

51  The effect of these amendments, if valid, was and is radical. Not only have they established Sheikh Abdullah in the position of sole first protector, to the exclusion of Sheikh Mohamed, but they have also done so in a way that entrenches him in it irreversibly until such time as he dies, becomes of unsound mind or chooses to resign. As there is no longer another first protector, there is no one with power to displace Sheikh

Abdullah in the same way that he claims to have been able lawfully to remove Sheikh Mohamed from office in order (allegedly) to protect the trust and the interests of the beneficiaries. The ability of beneficiaries representing 75% of the trust fund to remove him, as provided in the old cl. 6(c)(iv), has also been eliminated (though retained, as just noted, in the case of successor protectors).

## The scope of the trial

52   Two matters that had a significant bearing on the course and scope of the trial can be conveniently mentioned at this point. First, Sheikh Abdullah's contentions as to whether the power to amend conferred by cl. 2(b) was subject to any constraint of a fiduciary nature and whether that question was within the scope of Issues 1 and 2. Secondly, the rival contentions of Sheikh Abdullah and Sheikh Mohamed in particular as to the extent to which, if at all, Issue 2 required and entitled the court to concern itself with the future as well as the past, and the extent to which the court should admit in evidence and have regard to post-April 17th, 2000 documents and events.

53   As to the first of these, Sheikh Abdullah's pleaded case denied that the cl. 2(b) power of amendment *was subject to any limitation, whether as a matter of construction or otherwise*, and later again *denied that the exercise by a first protector of any of the said powers is subject to the overriding common law fiduciary duty alleged, or any like duty or other limitation, other than as expressly provided for by the terms of the trust deed.* And, as late as December 8th, 2004, when he swore his 15th affidavit, Sheikh Abdullah appeared still to be maintaining this stance, though perhaps with less confidence than before:

> "It was always my understanding that my powers to amend the trust deed, both before and after the October 14th, 1998 instrument of amendment, were unconstrained. It is alleged (and as I understand that this issue is not to be determined at the January 2005 trial, which relates only to questions of construction) that there were some external constraints on my ability to amend arising from the existence of some fiduciary obligations on my part. I make no comment on the existence or otherwise of any such obligations. Suffice to say that as far as I am concerned, and it was always my intention that this should be the case, there is nothing in the wording of the deeds that restricts the powers of first protectors to amend the terms of the trust deed."

54   It will be apparent from the words in parenthesis in para. 53 that Sheikh Abdullah and his advisers had hoped to dissuade the court from addressing the question of any fiduciary element attaching to the exercise of the power of amendment conferred by cl. 2(b) in the course of the

2005 JLR 253

January trial. But, as was made clear by the court at a directions hearing on December 20th, 2004, such an approach was neither justified by the formulation of Issues 1 and 2 nor realistic, given the nature of the questions posed for determination. Whether or not the power to amend was a fiduciary one was inextricably bound up with the questions of construction.

55   This stance of Sheikh Abdullah resulted in a considerable portion of the subsequently-delivered skeleton arguments of the other parties being devoted to an analysis of the nature of the cl. 2(b) power and its correct characterization (as beneficial (or personal); restricted; qualified fiduciary; or wholly fiduciary). But, by the time Sheikh Abdullah's own skeleton argument came to be

delivered, his position had moved on to the point where he no longer sought to contest the proposition that that power, properly construed, was subject to certain constraints of a fiduciary nature. He conceded and indeed argued, instead, that its proper classification was that of a "restricted personal" or "qualified fiduciary" power (in terms of his preferred four-fold classification, derived from *Lewin on Trusts*, 17th ed., para. 30–02, at 771–772 (2000)), there being, it was suggested, little difference between these two in the present case, and that the power was one which by its nature must be exercised for a proper purpose and (it may well be) with due consideration to the interests of the trusts (including all beneficiaries) as a whole. This concession, it must be said, was properly and necessarily made: Sheikh Abdullah's previous position was untenable. An attempt to reconcile this new position with Sheikh Abdullah's earlier stance was no more than wishful thinking.

56  This development left all the parties more or less agreed that the power was and is a fiduciary one: not "beneficial or personal," nor at the other end of the scale "fully or wholly fiduciary" as both first protectors were themselves designated beneficiaries and were expressly authorized by cl. 6(j) to exercise their powers notwithstanding this fact; but in the middle territory, covered by what can most conveniently be termed a "qualified fiduciary" power. To the extent that the discussion of classification of powers reduced the ambit of the dispute between the parties, it served a useful purpose. But, important as it is, this conclusion alone is not necessarily sufficient to arrive at the correct answers to the questions posed by Issues 1 and 2. Such categorization is no more than a convenient, rough shorthand for various "baskets" of ideas: the full range and nuances of powers is as varied as the circumstances of the settlements under which they are given: see Smellie, J. in *In re Z Trust* (6) (1997 CILR at 265) (a decision of the Grand Court of the Cayman Islands). The terms of the particular document(s) in question still have to be construed.

57  The second area of difference between the parties concerning the scope of the trial was whether and to what extent the court should be

---

2005 JLR 254

concerning itself with what might or might not happen in the future as regards any further exercise-or purported exercise-of the power to amend the trust deeds.

58  Mr. Taylor, on behalf of the first party, made no secret of his clients' concerns as to what Sheikh Abdullah might attempt (illegitimately, in their view) to do next in exercise of his claimed powers as sole first protector and was anxious to try to ensure that the court was cognizant of certain events that had happened (as he contended) subsequent to the April 17th, 2000 amendments. These were said to be indicative of Sheikh Abdullah's mischievous intentions, or at least illustrative of what could happen. From this he sought to argue that it was "essential that the court should decide not only on the powers and the nature of the powers that a first protector *had* but on the powers and the nature of the powers that the first protector *has*." For a while it also seemed that he was seeking to use post-April 17th, 2000 materials as an aid to construction of the trust deeds, though this was later disavowed.

59  At the other end of the spectrum, Mr. James, on behalf of Sheikh Abdullah, was insistent that it was no part of the function of the court on the trial of Issues 1 and 2 to concern itself with the validity of any particular amendment, actual or hypothetical, other than those that were effected by the instruments of October 14th, 1998 and April 17th, 2000, his concern evidently being that to go down that road might allow the first party to "obtain the collateral advantage of fettering [Sheikh

Abdullah] in the exercise of his powers as first protector for the future." He accepted, however, that it would be perfectly legitimate for the court to take account of "the scope of amendments which would be permitted on a particular construction of the trust deeds."

60  I can well understand the nervous concern of Mr. Taylor's clients as to what Sheikh Abdullah might consider it appropriate and legitimate to do next in the exercise of powers which-until shortly before the trial-he was repeatedly asserting were not subject to any limitation of any kind whatever, fiduciary or otherwise. But it would be wrong and unnecessary, for the purpose of determining Issues 1 and 2, for me to take account of the sort of matters that Mr. Taylor invites me to look at. Mr. James rightly submits-as does Mr. Binnington for the Internine trustee-that what is at issue in the present trial is the construction of the relevant provisions of the trust deeds with a view to determining the validity or otherwise of the amendments made by the instruments executed by Sheikh Abdullah on October 14th, 1998 and April 17th, 2000 and that no other specific amendments are currently in issue. In the course of that exercise of construction it was, of course, inevitable that the possible ramifications of competing submissions as to the true meaning and intent of the relevant provisions might be explored and that this might involve considering

what the position would be in a variety of hypothetical circumstances as indicators for or against a particular construction. But this was something that could be done perfectly well as a matter of submission and debate, and required no evidence of anything. I would, moreover, have been in no position in the present trial to make any finding of fact on any contested issue. Nor would evidence of post-amendment events have been admissible as an aid to construction.

61  For the record, however, I note that the trustee gives an assurance, in response to the first party's skeleton argument, that there is no "other secret amendment" planned.

**Construing cll. 2(b) and 6(c) and (f): the principles**

62  The correct approach to the task before the court is to a large extent the same as it is for any instrument the meaning of which is in contention:

   (i) the aim is to establish the presumed intention of the maker(s) of the document from the words used: in the present case, there being no settlor-signatory, the maker must be taken in each case to be the trustee-or possibly the trustee and Sheikh Abdullah as the parties to the letters of instruction which conferred authority on the trustees to execute the declarations of trust (it makes little difference which in the present case);

   (ii) words must, however, be construed against the background of the surrounding circumstances or "matrix" of facts existing at the time when the document was executed-a principle that has been a bedrock of English law since the judgment of Lord Wilberforce in *Prenn* v. *Simmonds* (3) and appears now to have been accepted as also properly reflecting the approach that this court should adopt in relation to such matters;

   (iii) the circumstances relevant and admissible for this purpose are those that must be taken to have been known to the maker at the time or, where there are more than one, known to the makers of or the parties to the document, and include (to use the language of Lord Hoffmann in *Investors Compensation Scheme Ltd.* v. *West Bromwich Bldg. Socy.* (2) ([1998] 1 W.L.R. at 913), from whose speech only Lord Lloyd of Berwick dissented)-". . . absolutely anything which would have

affected the way in which the language of the document would have been understood by a reasonable man";

(iv) evidence of subjective intention, drafts and negotiations and other matters extrinsic to the document in question is inadmissible, as is evidence of events subsequent to the making of the instrument (evidence of this kind being relevant where an estoppel is said to arise but not in this jurisdiction, unlike some others, as an aid to construing the original meaning of the document);

2005 JLR 256

(v) the critical provisions, cll. 2(b), 6(c) and 6(f), as with all words and phrases, have to be read in the context of the document as a whole;

(vi) words should as far as possible be given their ordinary meaning: "Loyalty to the text of a commercial contract, instrument, or document read in its contextual setting is the paramount principle of interpretation": *per* Lord Steyn in *Society of Lloyd's* v. *Robinson* (5) ([1999] 1 W.L.R. at 763); and

(vii) this last precept may, however, have to give way if consideration of the document as a whole, having regard to the principles set out above or common sense, points to a different conclusion: "common sense" in this context being best reflected by the passage from the speech of Lord Reid in *Schuler (L.) A.G.* v. *Wickman Machine Tool Sales Ltd.* (4) ([1974] A.C. at 251) in which he observed:

"The fact that a particular construction leads to a very unreasonable result must be a relevant consideration. The more unreasonable the result the more unlikely it is that the parties can have intended it, and if they do intend it the more necessary it is that they shall make that intention abundantly clear."

(See also Lord Steyn, again in *Society of Lloyd's* v. *Robinson* ([1999] 1 W.L.R. at 763), and Lord Hoffmann's observations in the *Investors Compensation Scheme* case (2) concerning the need, on occasion, for a court to accept that the parties must have used the wrong words or syntax.)

63 It is also elementary, first, that when attempting to discern the true meaning of a power conferred in a trust deed or other instrument the court must have regard to the nature of the deed and the purpose for which the power appears to have been granted-though this will depend to a large extent on the terms of the instrument itself; and secondly, that a power of amendment reserved in a trust must be exercised for the purpose for which it was granted and not for one beyond the contemplation of the makers of the original instrument (Lord Steyn (*ibid.*), citing *Hole* v. *Garnsey* (1)).

64 In the present case, the party most concerned to appeal to extrinsic evidence as part of the relevant surrounding circumstances or factual matrix was the first party. Mr. Taylor's submissions originally envisaged an examination of a substantial body of material, running to several lever-arch files, as necessary for this purpose. But by the start of the trial this had been reduced to fewer than 20 documents and a limited number of affidavits, and it was whittled down further in the course of the hearing to a few very limited passages of affidavit evidence and a handful of documents, most of which were either uncontroversial, inadmissible or of no particular help. The matters of which these materials were said to

2005 JLR 257

contain relevant evidence were, essentially, these-tracing them back in chronological sequence from the execution of the two trust deeds:

(i) The three letters of instruction: all parties were agreed that these letters, and the fact that the resulting declarations of trust were executed in pursuance of them, were admissible and relevant circumstances.

(ii) The fact that, of the siblings, Sheikh Abdullah alone was involved in negotiations surrounding the creation of the trusts, although all nine siblings were entitled to share in the intended creation of the intended trust assets: this again was common ground.

(iii) The fact that the immediate source of the settled funds was the Liechtenstein foundations and the Cayman trusts: this was common ground between all parties as regards Internine and Manastar but, in the case of Intertraders, was not accepted by Mr. Le Quesne as having been known to Russa and thus a legitimate part of the factual matrix. Beyond this there was, however, no agreement. Mr. Taylor suggested that the court should look at the terms of foundation documents with a view to making submissions as to similarities between them and the Jersey trusts. Sheikh Abdullah had acknowledged in his fourth affidavit that the form of the Intertraders deed was "loosely based on that previously entered into between me and ABN AMRO in Geneva." But it was plain that this would be an exercise of uncertain value, not least because there was no evidence before the court of the relevant laws of these other jurisdictions to help with a proper understanding of them; and, in the case of the Clubnine by-laws and statutes, the power to amend was not, in any event, vested in the protectors but in another body, the so-called "Foundation Board." Nor do I think that any useful or legitimate assistance can be gained from a letter, dated May 7th, 1997, in which Mr. Allan Johnson, then managing director of Russa, wrote to Le Gallais & Luce, Russa's then lawyers, reporting his client's request that the trust that was to be established should "follow the lines of a Liechtenstein Foundation which the family has": other considerations apart, this would be getting into the forbidden and unreliable area of pre-deed "negotiations" and subjective intention.

(iv) The power of attorney conferred on Sheikh Mohamed and Sheikh Abdullah by the other brothers and sisters on May 3rd, 1992: again it was accepted by all concerned with Internine and Manastar that Sheikh Abdullah held such a power of attorney authorizing him (acting individually) to represent his eight siblings in respect of (at least) those assets which became assets of those two trusts and that the trustee was aware of this. Russa, however, did not accept that it knew of this at the relevant time, though I find it difficult to believe that this can really have been the case.

2005 JLR 258

(v) The fact that the settled funds were substantial and derived originally from those constituting the inheritance of the children of Sheikh Ali Alhamrani, that they were, in short, "family assets": here too there was no dispute that this was known to all concerned at the time when the declarations of trusts were made.

65  But, when all is said and done, with one important exception, none of these matters helps very much to answer the disputed issue of construction with which the court is faced. It may, in particular, have been the practice of the members of the family to confer authority on the two eldest

brothers, Sheikhs Mohamed and Abdullah, to act in one capacity or another on behalf of the others, as in the case of the March 1992 power of attorney, or (perhaps) as protectors under the Liechtenstein foundations or the Cayman trusts, but that of itself does nothing to further the present inquiry as to the meaning and effect of the provisions of the two later Jersey trusts with which we are now concerned.

66  What these contextual facts and matters do, however, is to put beyond any doubt whatever the fiduciary nature of the role of the protectors (whether first or successor) and of the powers conferred on them *and* the need for that role to be performed, and those powers to be exercised, for the benefit of the beneficiaries as a whole.

67  Turning to the terms of the declarations of trust themselves, a striking feature of them is that, although the possibility of dissent between successor protectors was expressly recognized, and provision was made for resolving it by allowing the beneficiaries, on a 75% vote, to hold the balance of power (cl. 6(g)), no attempt was made by the draftsman to cater for the equivalent situation arising between the first protectors. Nor is it obvious what the draftsman had in mind as regards the combined operation of cl. 6(f) and cl. 5(b)(iii) in the event of a breakdown in relations between the two first protectors. The latter clause provides: "Directions [by protectors under cl. 5(b)(i)] shall be in writing and shall be effective when received by the trustee." But what would the position be in the event of sequential conflicting directions being given by each of the first protectors in relation to a matter that was not irreversible, such as the buying or selling of a particular investment? On the face of things, there was, in theory, nothing to stop a direction to the trustee from first protector *A* on Monday, to sell *X* bonds and buy *Y* shares, being followed by a direction from *B* a week later to the opposite effect, and so on indefinitely. Clause 6(f) makes the exercise of any cl. 5(b) power, and thus the giving of any investment direction, by one first protector binding on the other; but it is difficult to see that *A*'s direction in the example given could have been intended to require the trustee not only to make the specified investment in the first place but to continue to hold it without limit in time so as to preclude *B* from ever giving a direction of his own. No counsel

2005 JLR 259

was able to offer a satisfactory solution to this conundrum other than to suggest that, in practice, sooner or later the beneficiaries would intervene or the directions of the court would be sought.

68  What then was the thinking behind this? How were differences between first protectors "concerning the manner in which they should exercise any of their powers" (to borrow the language of cl. 6(g)) expected to be resolved? It is difficult to see that the omission to make the beneficiaries the arbiters of any dispute, in the same way as that established by cl. 6(g) in the case of successor protectors, was anything other than deliberate. And while one can speculate that it may have been thought, at the time, that any conflict was unlikely to arise as Sheikh Abdullah and Sheikh Mohamed would probably each be content to leave the other to get on with looking after matters in his traditional sphere of influence-the foreign assets in the case of the former and the Saudi Arabian assets in the latter case-there could be no guarantee that differences might not arise one day. Logically, the only solution would appear to be the extreme remedy of removal altogether of one or other first protector by the beneficiaries under cl. 6(c)(iv)-or, if Sheikh Abdullah is right in his submission, by one of the first protectors amending the trust so as to remove the other or

restrict his powers. Either way, this seems a heavy-handed solution for each and every contentious situation.

69  Another striking feature is that, while there were only two exceptions to the first protectors' power to revoke or amend (designed to protect the trustee and to rule out any retrospective effect or the undoing of any previous exercise by the trustee of its powers), in the case of successor protectors there was a third limitation expressed in the following terms:

"[P]rovided … that any such amendment *increasing the powers* of the successor protectors shall only be exercised with the prior or simultaneous written consent of the beneficiaries who would be entitled to at least 75% of the trust fund pursuant to the provisions of cl.6 (c)." [Emphasis supplied.]

> It is plain, therefore, that there was deliberately intended to be no restriction on first protectors amending the trust deed so as to increase *their* powers without reference to the beneficiaries.

70  The main thrust of the attack by Mr. Taylor and Mr. Young on Sheikh Abdullah's April 17th, 2000 amendments (and those of October 14th, 1998) was fairly simple and direct (though none the worse for that) and can be summarized as follows:

  (i) Clause 6(a) provides in terms that the protectors "shall at all times comprise two persons," a stipulation that broadly reflects the position in

---

2005 JLR 260

the case of the 1992 power of attorney and the earlier foundations and trusts, and the intention of the other members of the family to entrust their affairs, as represented by their shares in the trust funds in question, to the joint care of the two eldest brothers.

  (ii) Clause 6(d) ensures that in the event of a protector vacancy occurring, it is automatically filled by the next senior sibling.

  (iii) Clause 6(c) contains a comprehensive code of the circumstances in which a first protector ceases to hold office, to which it is not legitimate to add by use of the power to amend contained in cl. 2(b); or, to put it another way, cl. 2(b) has to be read in such a way as to exclude, by necessary implication, any amendment that would be inconsistent with cl. 6(c).

  (iv) To do otherwise would be "outside the contemplation of the parties" at the time when the power of amendment was conferred by cl. 2(b) and would make a nonsense "at a stroke" (as Mr. Young put it) of those provisions of the trust deeds that contemplate the existence of two protectors-provisions that are intended to create a necessary system of "checks and balances" against the abuse of power and should be regarded as fundamental and unalterable.

  (v) To accede to Sheikh Abdullah's arguments would amount to a licence for him to use his power as a first protector in breach of fiduciary duty and/or for improper motivation and/or in fraud on his power.

71  The case so advanced undoubtedly has an immediate and superficial appeal, reflecting as it does the lapidary observation of Lord Acton that "power corrupts and absolute power corrupts absolutely," and thus (it is implied) ought not, in the latter form, to be tolerated wherever it can be avoided. It could also be said to draw support from the *dictum* of Lord Reid in *Wickman* (4) mentioned earlier. The idea that, from Day 1-and, as others have observed in the past, it always

salutary to test these things by reference to a time when "the ink is still wet on the paper"-either first protector should have had the capacity to pre-empt action by the other by cutting down his power or removing him completely from office, is not something that immediately strikes one as obviously reasonable. And these would be powerful submissions indeed were the terms of cl. 2(b) such as to confer no more than a wide-ranging power on each of the first protectors to do, say, "all things necessary for the protection of the trust fund and the interests of the beneficiaries," without reference to any power to amend the very instrument under which they hold office. But that is not the case here. Once the capacity to amend the *source* of the power, the "constitution," is granted, the whole premise of arguments such as those advanced on behalf of the first party and the Ladies goes out of the window-the premise being that the original deed is the sole,

2005 JLR 261

exclusive and definitive determinant of what can and cannot be done. The argument then becomes remorselessly circular.

72   This, in short, is the problem that Sheikh Abdullah's opponents face. And it is not as if the power to amend is one that is only there by inference: it is clearly and unequivocally stated, is not expressed to be limited in any way, and is said in terms (by cl. 6(f), with its express reference to cl. 2(b)) to be exercisable by either first protector individually and to be binding on the other. Advocate Young suggested that cl. 6(f) was unworkable and should be disregarded, alternatively, that it should be construed as limited to the right of each first protector to communicate the result of any jointly-reached decision, but I cannot say that I find either submission persuasive.

73   The only way out of this labyrinth is to have recourse to the constitutional device of the "entrenched" or "fundamental" provision. But, for this to be justifiable, there either has to be an express term or there have to be circumstances so compelling as to leave no doubt that, as a matter of implication, amendments of a certain nature are off-limit. *Hole* v. *Garnsey* (1), to which reference has previously been made, was just such a case of this second kind, the Appellate Committee being unwilling to accept that the amendment to the society's rules in question could ever have been within the contemplation of its members. But the "fundamental" nature of the relevant provision there stemmed from the fact that the effect of the amendment would have been to impose additional financial obligations (to subscribe capital) not only on those members who assented to the proposed amendment but also on those who voted against it. It therefore went beyond purely administrative matters: see, in particular, the speech of Lord Atkin ([1930] A.C. at 496), in which he expressed the view that full effect could be given to the rule ". . . by limiting its operation as against dissentients to matters which are within the scope of the administration of the venture as originally framed … an increase in capital contribution is something quite different," being a matter to which no man can be bound against his will.

74   In the present case, there is no express entrenching provision and there are, as I see it, no considerations equivalent to those in *Hole* v. *Garnsey* that bear on the true meaning and effect of the provisions under consideration here and compel one, as a matter of principle, common sense or logic, to conclude that they are so fundamental as to have been beyond the contemplation of the maker(s) of the original deeds as falling within the scope of cll. 2(b) and 6(f).

75   In the first place, the amendments in issue concern the administration of the trusts; they neither impose any additional financial obligations on anyone nor destroy any substantive beneficial entitlement.

76  In the second place, once the fiduciary nature of the power to amend or revoke is recognized, there is nothing in the terms of the deeds themselves or in the circumstances or factual matrix in which these trusts came into existence that *necessarily* requires this conclusion: the potential vice, and potentially unreasonable result, otherwise inherent in a concentration of power in one person is restrained and controlled at every point by the effect of this fiduciary overlay. Mr. Taylor's suggestion, in relation to Issue 2, that the case put forward by Sheikh Abdullah would, if right, give him a licence to use his power in breach of his fiduciary duty, was a fair response to Sheikh Abdullah's original case, but it ceases to apply once the true nature of the power to amend is acknowledged (the opportunity to act in breach of fiduciary duty may of course be there, but not the "licence" in the sense of legitimation).

77  In the third place, the main problem with the concept of entrenchment in the present case is the difficulty of discerning with confidence which provisions would enjoy this specially protected status and which would not. On any view, there must be many that would *not* fall within this category, otherwise the power of amendment by either one of the protectors becomes meaningless. On the other hand, it is by no means clear why the two-first-protector provision should be the *only* entrenched one, important as it plainly is. On what sure basis could one draw a logical distinction between the two-first-protector provision and what one might reasonably regard as the highly important safeguard enabling the beneficiaries to get rid of one or both first protectors on a 75% vote? Or, to take another example, what about the identities of successor protectors: would it be open to a first protector, acting alone, to change this so as to bring in someone from outside the family circle altogether? Would not such far-reaching possibilities also have to be ruled out on the ground that the relevant provisions were beyond the contemplation of the maker(s) of the original declarations of trust and must be accorded special-status protection? And if so, what is the touchstone by reference to which these difficult questions fall to be decided? The answers are elusive.

78  Further conundrums arise if one asks what difference it would make, in relation to some of these provisions, if the two first protectors were to act in concert. Would that factor be of relevance if and when it came to considering whether or not it was within their power of amendment to free themselves of any risk of removal by vote of the beneficiaries? What logical basis would there be for concluding that such a move was permissible if done by agreement of the two first protectors but impermissible if done unilaterally? Either way, the other members of the family would be disenfranchised as regards any specific right to exercise ultimate control over the first protectors.

## Conclusion

79  The conclusion to which I find that I am compelled in the end is that the true meaning and intent was that each of the two first protectors was to be entrusted with far-reaching powers to act individually within the scope expressly assigned to them in the trust deeds; that that scope included (as an inescapable conclusion from the matters discussed above) the power unilaterally to amend, or even revoke, the administrative provisions of the trusts, including those concerning the number,

identity, appointment and removal of protectors, whether first or successor, so as to bind the other first protector; that this power, exercised *bona fide*, constituted-among other things-the effective and only check on the potential abuse of power by an errant first protector; and that there was, accordingly, nothing to stop Sheikh Abdullah executing the amending deeds of October 14th, 1998 and April 17th, 2000 other than the constraints necessarily inherent in the exercise of fiduciary powers of the kind involved here. I say nothing, for the moment, as to whether the same conclusion would necessarily apply to amendments purporting to affect the identity or entitlement of the beneficiaries.

80  The matter could, of course, have been better expressed in the original declarations of trust. And how exactly a duality of individually plenipotentiary, equal-ranking commanding officers-every military man's nightmare-was expected to work in the event of conflict between them, other than by the extreme measure of one exercising his power of amendment to remove the other, remains unsolved. With the benefit of hindsight it is, of course, easy to see that it was always a potential recipe for serious contention. And whether it was a case of the consequences never having been rigorously thought through, or of a deliberate decision based on the view that the risk of such problems was a price worth paying for the advantages of having two people with extensive powers to "protect" the trusts in any and every eventuality, it is impossible to be wholly certain. But I can well understand that the latter might have been the case, given the substantial nature and potential geographical spread of the trusts' foreign investments. Seen in this way, far from being wholly unreasonable or repugnant to common sense, it could have been thought highly desirable that *in extremis* each first protector should have been able to curtail the power of the other, or even remove him from office altogether, if that were necessary in order to protect the trust and could in all other respects be justified in terms of fiduciary considerations.

81  The importance of the fiduciary element in all this cannot be overstated. The more radical the departure from the original instrument, particularly where, as here, the result is the substantial accretion of additional power to the remaining first protector and the elimination of all means of removing him from office against his will, the greater the need

2005 JLR 264

for explanation and justification. Amending the original January 1998 Intertraders declaration of trust to bring it in line with the later Internine declaration might be one thing (if that were indeed the sole motive, a matter for inquiry on another occasion). But the April 17th, 2000 amendments are plainly of an altogether different order and put a heavy burden on Sheikh Abdullah to explain the necessity for these draconian measures and otherwise to justify them as being for a proper purpose and in the *bona fide* exercise, for the benefit of the beneficiaries as a whole, of the powers conferred on him. Sheikh Abdullah has sworn a number of affidavits giving what he says is his explanation for what he did, but the actual circumstances and motivations are matters for the trial of Issue 3.

82  It may also be-though I put the matter no higher than this, as the point was not debated at the trial of Issues 1 and 2-that there is another point that will also have to be addressed: that is whether, irrespective of the justification or otherwise of the April 17th, 2000 amendments, the indefinite perpetuation of the new state of affairs introduced by those amendments can also be justified in the face of the sustained, united opposition of all the other beneficiaries, the passage of time and

(possibly) changing circumstances, or whether, like wartime or emergency legislation, there comes a point when the force of the original justification (if there were one) is spent.

83  In conclusion, it should be clearly understood that nothing in this judgment is to be construed as qualifying or varying any extant order of this court and that, unless and until otherwise expressly ordered, the interim regime imposed in late 2003 remains in force.

*Order accordingly.*

**<u>EXHIBIT G</u>**

# The Federal Republic of Nigeria v JP Morgan Chase Bank, N.A.

 Positive/Neutral Judicial Consideration

**Court**
Queen's Bench Division (Commercial Court)

**Judgment Date**
21 February 2019

Case No: CL-2017-000730

High Court of Justice Business and Property Courts of England and Wales Commercial Court (QBD)

**[2019] EWHC 347 (Comm), 2019 WL 00826591**

Before: Andrew Burrows QC (Sitting as a Judge of the High court)

Date: 21 February 2019

Hearing dates: 4-5 February 2019

**Representation**

Mr Roger Masefield QC and Mr Richard Blakeley (instructed by Reynolds Porter Chamberlain ) for the Claimant/ Respondent.
Ms Rosalind Phelps QC and Mr David Murray (instructed by Freshfields Bruckhaus Deringer LLP ) for the Defendant/ Applicant.

Judgment

Andrew Burrows QC:

1 Introduction

*(1) General*

1.   This judgment deals with an application by the defendant, JP Morgan Chase Bank NA, for reverse summary judgment against the claimant, the Federal Republic of Nigeria, under *CPR 24.2* ; and/or for the claimant's statement of case to be struck out under *CPR 3.4(2)* . The defendant submits that, under *CPR 24.2* , the claimant has no real prospect of succeeding and that there is no other compelling reason for a trial; and that, under *CPR 3.4(2)* , the Re-amended Particulars of Claim disclose no reasonable grounds for bringing the claim. The claim is one by a sovereign state against an international bank. Even by the standards of this court, it is a very large claim amounting to some US$875,740,000. The claimant alleges that the defendant bank made three transfers ($401,540,000, $400,000,000, and $74,200,000.03) from an account that the claimant held with it, which the defendant bank would not have made had it been exercising reasonable care. More specifically, it is alleged that the defendant bank was in breach of what is commonly referred to as the ' *Quincecare* duty of care', named after the case of *Barclays Bank plc v Quincecare Ltd [1992] 4 All ER 363* in which Steyn J first set out this duty of care. What is being alleged, therefore, is that, although the bank had reasonable grounds for believing that the payments out of its customer's account were defrauding the customer, the bank went ahead, in breach of its duty of care to its customer, and made those payments.

2.   The claim was commenced on 29 November 2017. Amended Particulars of Claim were served on 4 July 2018 and an Amended Defence was served on 24 July 2018. This application for summary judgment/striking out was commenced on 31 July 2018. Since then, the claimant has put forward (draft) Re-amended Particulars of Claim. They significantly differ from the Amended Particulars of Claim. In particular, a number of claims have been abandoned (such as breach of fiduciary duty,

breach of the Nigerian constitution, breach of anti-money laundering legislation, knowing receipt and breach of mandate). Instead it has been made clear that the claim in contract and tort rests solely on the breach of the *Quincecare* duty of care; and brief particulars of the alleged fraud are also pleaded. Rosalind Phelps QC, for the defendant bank, indicated at the start of the hearing (see transcript day 1, p 9, lines 13-20) that there would be no objection to those re-amendments if this application fails. The important point — and there is no dispute about this between the parties — is that the court is required to deal with this application on the basis of the Re-amended Particulars of Claim.

*(2) the relevant facts*

3.  It is alleged by the claimant that the full background to this case is a complex web of facts that reveal a fraudulent and corrupt scheme whereby the claimant (and hence ultimately the people of Nigeria) has been defrauded of large sums of money. Plainly the court on a summary judgment application cannot possibly attempt to get to the bottom of such allegations and no-one is suggesting that it should. What this application is therefore concerned with is narrow and, as is explained in paragraph 6(iii) below, the court must assume that the claimant will be able to prove the facts it is alleging unless it is clear that those allegations have no real substance.

4.  For the purposes of this application, the relevant and undisputed facts can be stated in a few sentences. In this respect, I was assisted by Ms Phelps, who guided me through the first parts of a helpful agreed chronology of events. The claim centres on a depository account that was opened pursuant to a depository agreement dated May 20, 2011 between the Federal Government of Nigeria and the defendant bank. Under that agreement, the defendant bank was the 'depository' and the Federal Government of Nigeria was the 'depositor'. The background to that depository agreement was a long-running dispute about an offshore Nigerian oilfield known as OPL 245. In 1998, the rights to exploit OPL 245 had been originally awarded by the Federal Government of Nigeria to Malabu Oil and Gas Nigeria Ltd ('Malabu'), owned by the then Minister of Petroleum, Chief Daniel Etete (who in 2007 was convicted in France of money-laundering arising out of bribery offences committed in Nigeria). That dispute was settled and, as part of its obligations under the resolution/settlement agreements (dated 29 April 2011), the Federal Government of Nigeria was required to set up an escrow account and, subsequently, set up the depository account with the defendant bank for the purpose of money being paid to those entitled under the settlement. On 23 August 2011, the defendant bank, on instructions by authorised signatories of the Federal Government of Nigeria, made two transfers, of $401,540,000 and $400,000,000 respectively, from the depository account to two separate accounts in the name of Malabu at First Bank of Nigeria plc and Keystone Bank Ltd. On 29 August 2013, the defendant bank, on instructions by authorised signatories of the Federal Government of Nigeria, made a further transfer of the remaining funds in the depository account, $74,200,000.03, to an account in the name of Malabu at Keystone Bank Ltd.

5.  Under the Re-amended Particulars of Claim, it is alleged (see paras 20-21D of the Re-amended Particulars of Claim) that, in breach of its contractual and tortious *Quincecare* duty of care, the defendant, having been put on inquiry that the claimant was being defrauded, paid out irrevocably (to the accounts in the name of Malabu) sums of $801,540,000 and $74,200,000.03 from the depository account. It is alleged that that money was used to pay off corrupt former and contemporary Nigerian government officials and/or their proxies. It is alleged that some of the money was also intended to be used (and some was used) to make payments to senior executives at Royal Dutch Shell and Eni Corporation (those companies having formed an alliance for the purposes of acquiring the rights to develop the OPL 245 oilfield from Malabu).

*(3) the law on summary judgment and the grounds for this application*

6.  The correct approach for a court to take on an application for summary judgment under *CPR 24.2* has been clarified in several cases. These include *Swain v Hillman [2001] 2 All ER 91* , *ED & F Man Liquid Products Ltd v Patel [2003] EWCA Civ 472* , at [10], *Easyair Ltd v Opal Telecom Ltd [2009] EWHC 339 (Ch)* at [15], and *Daniels v Lloyds Bank plc [2018] EWHC 660 (Comm), [2018] IRLR 813* , at [48]. As regards applications by defendants for reverse summary judgment, the central points to be derived from those cases are as follows:

i.   The burden of proof is on the defendant.

ii.  The court must consider whether the claimant has a 'realistic', as opposed to a 'fanciful', prospect of success.

iii. The court should not conduct a mini-trial. Where there is a dispute on the facts, the court should assume that the claimant will be able to prove the facts it is alleging unless it is clear that there is no real substance to those allegations, as where they are contradicted by the documentary evidence.

iv.  If there is a short point of law, or construction, and the court is satisfied that it has before it all the evidence necessary for the proper determination of the question and that the parties have had an adequate opportunity to address it in argument, the court should grasp the nettle and decide it.

© 2021 Thomson Reuters.

7.  The defendant bank's application rests on three grounds. The first is that there was no *Quincecare* duty of care applicable on these facts because such a duty was inconsistent with, or was excluded by, the express terms of the depository agreement. We can refer to this as the 'no *Quincecare* duty of care' issue. The second ground is that, even if such a duty was owed, there is no realistic prospect of the claimant establishing causation of loss: the same outcome would have eventuated even if the defendant had not been in breach of its duty. This is the 'causation of loss' issue. The third ground is that, even if the claimant could establish the breach of a *Quincecare* duty of care causing the alleged loss, the defendant bank would have a complete defence to the claim because of an indemnity clause in the depository agreement: as the defendant bank would be entitled under that clause to be indemnified by the claimant, the claim would fail for circularity. This is the 'circularity' issue.

8.  It is important to clarify that an 'incorrect party' ground is not now being put forward by the defendant bank. The claim is being brought by the Federal Republic of Nigeria although the depository agreement was made by the Federal Government of Nigeria. The defendant bank previously contended that that was a reason why summary judgment should be given and/or the claim should be struck out. But in the light of expert evidence put forward on behalf of the claimant — to the effect that, as a matter of Nigerian law, the Federal Government of Nigeria and the Federal Republic of Nigeria are not different legal entities - that line of argument has been abandoned by the defendant bank for the purposes of this application. More generally, it is not in dispute that for the purposes of this application the Federal Republic of Nigeria and the Federal Government of Nigeria should be treated as one and the same.

9.  It was common ground between the parties that, leaving aside the 'causation of loss' issue, the court should grasp the nettle and decide the 'no *Quincecare* duty of care' and 'circularity' issues on this application. This is because they are concerned with questions of law as to the contractual interpretation of the depository agreement and the nature of the *Quincecare* duty of care. In other words, in respect of those issues, there has been full legal argument before me and nothing will be changed by having further evidence at trial. I accept that that is the correct approach. So I will be deciding those two issues one way or the other (rather than asking whether the claimant has a realistic prospect of success on the particular point of law). In contrast, the 'causation of loss' issue is primarily a factual issue, although also raising some legal issues, and should be approached by directly asking whether the claimant has a realistic prospect of success.

2 Outline of the Main Submissions of the Parties

10.  Although I will be referring at various stages later to further details of the parties' submissions, it will be helpful now to give an outline of their main submissions.

*(1) Outline of the Defendant Bank's Main Submissions*

(i) the 'no Quincecare duty of care' issue

11.  This issue took most time at the hearing. In general terms, Ms Phelps submitted that the nature and purpose of the depository account, as set out in the terms of the depository agreement, left no room for a *Quincecare* duty of care. In contrast to an ordinary current account, the depository account was essentially a single-purpose account, analogous to an escrow account, and was set up to enable the claimant to fulfil its specific payment obligations under the resolution/settlement agreements. The depository agreement contained, for example, detailed and narrow depository release conditions. These required written instructions in the form of a 'release notice' (a draft of which was scheduled to the agreement), signed by an authorised officer and confirmed by a telephone call-back. The contract was a detailed code setting out expressly the conditions which had to be satisfied before the 'depository amount' could be released. The contract was designed to preclude any additional duty of care to go behind instructions which were in compliance with the contract. The defendant bank could not be liable, outside the express terms of the contract, for following compliant instructions. The role of the defendant bank was intended to be largely automatic or mechanical.

12.  More specifically, Ms Phelps submitted that a *Quincecare* duty of care, whether seen as arising by reason of an implied term or in the tort of negligence, was in conflict with particular express terms of the depository agreement. She categorised the conflicting terms into three broad types. First, there was clause 5.1 which excluded a *Quincecare* duty of care because it confined the defendant bank's obligations to those under the express terms of the contract. Secondly, there were clauses (clauses 5.8, 7.2, 7.4 and 11.5) which had a content which was inconsistent with a *Quincecare* duty of care. Thirdly, even if a *Quincecare* duty of care did apply, clauses 8.2(d) and 10.1(a) were exemption clauses which excluded the defendant bank from the consequences of complying with the mandate given. In interpreting some clauses of the contract it was relevant to

recognise that, in her submission, the cases show that the *Quincecare* duty of care embodies a duty to enquire/investigate: it is not merely a negative duty to refrain from paying in certain circumstances.

13.  It is helpful at this point to set out the specific terms of the depository agreement relied on by Ms Phelps:

'5.1   The duties and obligations of the Depository in respect of the Depository Cash shall be determined solely by the express terms of this Agreement. The Depository has no knowledge of the terms and provisions of any separate agreement or any agreement relating to the Depositor's Obligations, and shall have no responsibility for compliance by the Depositor with terms of any other agreement, or for ensuring that the terms of any such agreement are reflected in this Agreement and shall have no duties to anyone other than the Depositor.'

'5.8  The Depositor hereby authorises the Depository to act hereunder notwithstanding that:… (ii) the Depository or any of its divisions, branches or affiliates may be in possession of information tending to show that the instructions received may not be in the best interests of the Depositor and the Depositor agrees that the Depository is not under any duty to disclose any such information.'

'7.2   The Depository shall be under no duty to enquire into or investigate the validity, accuracy or content of any instruction or other communication.'

'7.4   The Depository need not act upon instructions which it reasonably believes to be contrary to law, regulation or market practice but is under no duty to investigate whether any instructions comply with any applicable law, regulation or market practice.'

'8.2  (d) [The Depository shall not be liable to the Depositor for any loss suffered by the Depositor by] the Depository acting on what it in good faith believes to be instructions or in relation to notices, requests, waivers, consents, receipts, or other documents which the Depository in good faith believes to be genuine and to have been given or signed by the appropriate parties.'

'10.1   The Depositor hereby irrevocably and unconditionally agrees on demand to indemnify, and to keep fully and effectively indemnified … the Depository, and its directors, officers, agents and employees (the "indemnitees") against all costs, claims, losses, liabilities, damages, expenses, fines, penalties, Tax and other matters ("Losses") which may be imposed on, incurred by or asserted against the indemnitees or any of them directly or indirectly in respect of:

(a)  the following of any instruction of other directions upon which the indemnitees is authorised to act or rely pursuant to the terms of this Agreement, or arising as a result of entering into this Agreement or their status as holder of the Depository Cash;'

'11  The Depositor hereby represents and warrants to the Depository on a continuing basis that:

11.5  …the transactions to be effected under this Agreement will not violate any law, regulation, by-law or rule applicable to it or any agreement by which it is bound or by which any of its assets are affected and it is not restricted under the terms of its constitution or in any other manner from performing its obligations hereunder.'

(ii) the 'causation of loss' issue

14.  Ms Phelps submitted that, even if a *Quincecare* duty of care was imposed on the defendant bank in this case, there is no realistic prospect of the claimant successfully showing causation of loss: the same outcome would have eventuated even if the defendant had not been in breach of its duty. In other words, there is no realistic prospect of the claimant showing that the payments out would have been avoided had that duty been complied with. This was because reasonable enquiries would not have uncovered the alleged fraud. Indeed, the defendant bank sought and obtained a letter from the Attorney-General of Nigeria to the effect that the payment instructions were legitimate. Moreover, the investigation into the alleged fraudulent scheme has taken years of work by, for example, the Italian and Nigerian law-enforcement authorities so that the idea that the defendant bank, faced with payment instructions that on the face of it complied with the mandate — and with the express assurances of the Attorney-General of Nigeria — would, or should, reasonably have taken on this task, in order to decide whether to make the payments, is wholly unrealistic. Put another way, if, as alleged, the fraudulent scheme went to the highest

level of the Nigerian government — including the then President Goodluck Jonathan — reasonable checks with the highest of officials would merely have served to satisfy the defendant bank that the money should be paid. So, in short, the essential submission here is that because of the nature and extent of the alleged fraudulent scheme there is no realistic prospect of the claimant establishing that it would have avoided paying the money away, even if a *Quincecare* duty of care was imposed on it.

(iii) the 'circularity' issue

15.  Ms Phelps submitted that, even if the claimant could establish that the defendant bank owed the claimant a *Quincecare* duty of care and had a realistic prospect of establishing breach causing loss, the defendant bank has a complete defence to the claim by reason of the indemnity clause, clause 10.1(a), in the depository agreement (set out in paragraph 13 above). As the defendant bank would be entitled to be indemnified against the claim by the claimant, the claim fails for circularity.

*(2) Outline of the Claimant's Main Submissions*

(i) the 'no Quincecare duty of care' issue

16.  Roger Masefield QC for the claimant initially stressed — and Ms Phelps did not dispute this — that because, on a summary judgment application, the court should assume that the claimant will be able to prove the facts alleged (and there was nothing sufficient here to counteract that assumption), the court must accept the following: that the claimant was defrauded by way of a fraudulent and corrupt scheme; that the defendant bank was 'on inquiry' (ie it had reasonable grounds for believing) that the payment instructions it received were part of an attempt to defraud the claimant; and that, despite that, the defendant bank went ahead and made the payments to Malabu of $801,540,000 in 2011 and $74,200,000.03 in 2013. The factual basis for the *Quincecare* duty of care arose because the defendant bank was 'on inquiry'. Mr Masefield then submitted that the terms of the depository agreement did not displace that *Quincecare* duty of care, whether one stood back and looked at the contract generally or one examined the particular terms highlighted by Ms Phelps (each of which, he submitted, should be given a different interpretation than the one Ms Phelps was putting forward). The *Quincecare* duty of care arose by reason of a term implied by law at common law and/or by statute (under s 13 of the Supply of Goods and Services Act 1982 ); and/or was imposed by the tort of negligence. As the duty gave the customer a valuable right and was imposed by the general law for good policy reasons — to encourage banks to help combat fraud — the correct approach to interpretation was that there had to be clear wording in the contract to displace it. There was no such clear wording in the depository agreement. Moreover, there was no reason of principle or authority why the *Quincecare* duty of care should not be applied to a depository account (rather than a current account). Indeed, as such an account had a limited purpose with limited numbers of transactions and instructions — and in that sense would place a less onerous burden on the bank than where an account involves multiple transactions — it was *a fortiori* that a *Quincecare* duty of care should be owed.

17.  In so far as relevant to interpreting the contract, Mr Masefield submitted that the *Quincecare* duty of care is a duty which requires a bank, while it is 'on inquiry' that a payment out would be a fraud on its customer, to refrain from paying out. In his submission, the authorities do not establish that, once the bank is on inquiry, it is under any duty to investigate: all that the cases lay down is that the bank should refrain from paying unless and until it no longer has reasonable grounds for believing that the payment would be defrauding the customer.

(ii) the 'causation of loss' issue

18.  Mr Masefield submitted that this was pre-eminently a triable issue which the court would need to decide in the light of all the evidence at trial. It raised questions of fact and law; and the legal issues would be influenced by the precise scope of the *Quincecare* duty of care (on which banking expertise would be needed). The defendant bank could not show that the claimant had no realistic prospect of successfully establishing causation of loss. In answer to the defendant bank's submission that further checks by the bank would have led to the same outcome - the money being paid out - Mr Masefield submitted that that would depend on the relevant counterfactual for the causation enquiry. He went through some details of the background, in particular drawing my attention to concerns David Steel J had expressed about instructions to the defendant bank for money to be paid out of the depository account. That was in the context of a freezing order that had been granted over the depository account in relation to a claim brought by Energy Venture Partners Ltd against Malabu (see the comments of David Steel J at a hearing on 21 July 2011 (at bundle 3/23/16) and his judgment at [2011] EWHC 2215 (Comm)). This was put forward by Mr Masefield as part of a general submission that, had the defendant bank not paid out the money, one realistic possibility was that the account would have been frozen by court order (perhaps by reason of the defendant bank invoking clause 5.7 of the depository agreement which, according to Mr Masefield, expressly allowed the bank to come to court for a determination of its duties in the event of a dispute or uncertainty as to its duties).

Nigeria v JP Morgan Chase Bank NA, 2019 WL 00826591 (2019)

(iii) the 'circularity' issue

19. Mr Masefield submitted that, on the correct interpretation of clause 10.1(a), there was no circularity. The clause was dealing with the customer indemnifying the bank in respect of claims by third parties against the defendant bank, not claims by the customer. If it were not construed in that way, it would conflict with other clauses of the contract (for example, clause 8 on exclusion of the bank to its customer) and indeed would tend to remove any legal liability of the bank to its customer therefore emptying the contract of its content. Even if that were incorrect, it is well-established in the cases that indemnity clauses should be narrowly construed so that general words, as opposed to clear explicit words, are insufficient for an indemnity clause to cover against negligence, including a negligent breach of contract. One was here concerned with the alleged negligence of the defendant bank (and indeed gross negligence was alleged) and yet there were no words in clause 10.1(a) clearly referring to negligence.

3 The Relevant Law

20. I now set out the relevant law on, first, the *Quincecare* duty of care and, secondly, the interpretation of exemption, indemnity, and entire agreement clauses. As regards the former, the parties disagreed as to whether the *Quincecare* duty of care embodies a duty to make enquiries. As regards the latter, the parties were largely in agreement as to the legal principles, albeit with differences of emphasis and starting points, but disagreed as to how those legal principles should be applied in interpreting the depository agreement.


*(1) the law on the Quincecare duty of care*

21. The *Quincecare* duty of care was very carefully formulated and explained by Steyn J in *Barclays Bank plc v Quincecare Ltd [1992] 4 All ER 363* . His mode of expression was that it is a duty on a bank to refrain from executing a customer's order if, and for so long as, the bank is 'put on inquiry' in the sense that the bank has reasonable grounds for believing — assessed according to the standards of an ordinary prudent banker — that the order is an attempt to defraud the customer. It is an aspect of the bank's duty of reasonable skill and care in or about executing the customer's orders and therefore arises by reason of an implied term of the contract or under a coextensive duty of care in the tort of negligence.

22. On the facts of the *Quincecare* case, a bank had agreed to loan £400,000 to a company. Under the loan facility, the chairman of the company caused the bank to transfer some £340,000 to a firm of solicitors who, under prior arrangements with him, then transferred that sum into his account in the USA. This constituted a defrauding of the company by the chairman. In the bank's action against the company for repayment of the loan, the company counterclaimed for loss caused by the bank's breach of duty to the company. The counterclaim/defence failed because, on the facts, it was held that the bank was not 'put on inquiry': ie it had no reasonable grounds for believing that the chairman's instruction to make the transfer was an attempt to defraud the company. The duty to refrain from payment did not therefore arise.

23. Steyn J set out the position as follows and, given that he was the first judicial expositor of this duty, I make no excuse for citing this long passage from his judgment which repays careful reading (see [1992] 4 All ER 363 at 376-377 with my emphasis):

In my judgment it is an implied term of the contract between the bank and the customer that the bank will observe reasonable skill and care in and about executing the customer's orders. Moreover, notwithstanding what was said in *Tai Hing Cotton Mill Ltd v Liu Chong Hing Bank Ltd [1985] 2 All ER 947* at 957, [1986] AC 80 at 107, a banker may in a case such as the present be sued in tort as well as in contract: see *Midland Bank Trust Co Ltd v Hett Stubbs & Kemp (a firm) [1978] 3 All ER 571, [1979] Ch 384* . But the duties in contract and tort are coextensive, and in the context of the present case nothing turns on the question whether the case is approached as one in contract or tort.

Given that the bank owes a legal duty to exercise reasonable care in and about executing a customer's order to transfer money, it is nevertheless a duty which must generally speaking be subordinate to the bank's other conflicting contractual duties. Ex hypothesi one is considering a case where the bank received a valid and proper order which it is prima facie bound to execute promptly on pain of incurring liability for consequential loss to the customer. How are these conflicting duties to be reconciled in a case where the customer suffers loss because it is subsequently established that the order to transfer money was an act of misappropriation of money by the director or officer? If the bank executes the order knowing it to be dishonestly given, shutting its eyes to the obvious fact of the dishonesty, or acting recklessly in failing

to make such inquiries as an honest and reasonable man would make, no problem arises: the bank will plainly be liable. But in real life such a stark situation seldom arises. The critical question is: what lesser state of knowledge on the part of the bank will oblige the bank to make inquiries as to the legitimacy of the order? In judging where the line is to be drawn there are countervailing policy considerations. The law should not impose too burdensome an obligation on bankers, which hampers the effective transacting of banking business unnecessarily. On the other hand, the law should guard against the facilitation of fraud, and exact a reasonable standard of care in order to combat fraud and to protect bank customers and innocent third parties. To hold that a bank is only liable when it has displayed a lack of probity would be much too restrictive an approach. On the other hand, to impose liability whenever speculation might suggest dishonesty would impose wholly impractical standards on bankers. **In my judgment the sensible compromise, which strikes a fair balance between competing considerations, is simply to say that a banker must refrain from executing an order if and for as long as the banker is 'put on inquiry' in the sense that he has reasonable grounds (although not necessarily proof) for believing that the order is an attempt to misappropriate the funds of the company** … And, the external standard of the likely perception of an ordinary prudent banker is the governing one. That in my judgment is not too high a standard. Indeed, the evidence of Mr Redhead, a most experienced banker, showed that the principle which I have stated is the very criterion usually applied by bankers. He used the language of a banker being put on inquiry. He explained that if the order had been to transfer £350,000 to a local casino, the money would not have been sent. In this case the bank knew that the funds were required to purchase a business, and the bank expected the funds, or a large part of it, to go to the company's solicitors. Mr Redhead made clear that if he had reason to suspect the payment to [the solicitors], he would have made further inquiries, and notably from the solicitors. He would, he said, have put up with the embarrassment. This evidence reinforces my view that the principle which I have stated does not impose too high a duty on a bank.

Having stated what appears to me to be the governing principle, it may be useful to consider briefly how one should approach the problem. Everything will no doubt depend on the particular facts of each case. Factors such as the standing of the corporate customer, the bank's knowledge of the signatory, the amount involved, the need for a prompt transfer, the presence of unusual features, and the scope and means for making reasonable inquiries may be relevant. But there is one particular factor which will often be decisive. That is the consideration that, in the absence of telling indications to the contrary, a banker will usually approach a suggestion that a director of a corporate customer is trying to defraud the company with an initial reaction of instinctive disbelief… [I]t is right to say that trust, not distrust, is … the basis of a bank's dealings with its customers. And full weight must be given to this consideration before one is entitled, in a given case, to conclude that the banker had reasonable grounds for thinking that the order was part of a fraudulent scheme to defraud the company.'

24. Having then decided that, on the facts, the bank was not 'put on inquiry', Steyn J went on briefly to consider the position if the duty had arisen on the facts: ie if the bank had been 'put on inquiry'. He concluded that, in that situation, causation could not in any event have been satisfied because the only conceivable enquiries that the bank would have made would not have alerted the bank to the fraud so that the payments would still have been made and the loss would not have been averted. In his words, in relation to 'the question of causation' (see [1992] 4 All ER 363 at 381):

'In my judgment, the only inquiries which the bank could conceivably have made would not have alerted the bank to the impending fraud, and would not have averted the loss. For this additional reason the defence must fail.'

25. I was referred to two subsequent cases in which the *Quincecare* duty of care has been discussed. The first was *Lipkin Gorman v Karpnale Ltd* in the Court of Appeal, [1989] 1 WLR 1340. That became a celebrated case in the law of unjust enrichment when it was appealed on separate matters to the House of Lords. But the relevance of the case for present purposes is that the Court of Appeal discussed the duty of care owed by a banker to its customer in terms that are similar to those of Steyn J; and May LJ acknowledged (at 1356) the 'substantial assistance' he had derived from the judgment of Steyn J which, at that stage, had only been reported in *The Times* . On the facts, Cass, a partner in a firm of solicitors, had been drawing on the client account (he was an authorised signatory) to subsidise his addiction to gambling. It was held that the bank, where the client account was held, was not 'put on inquiry' — ie it did not have 'reasonable grounds for believing that Cass was operating the client account in fraud' (to use the words of Parker LJ at 1377) — so that the bank was not in breach of a duty of care by honouring cheques drawn by Cass.

26. The second case is *Singularis Holdings Ltd v Daiwa Capital Markets Europe Ltd [2018] EWCA Civ 84, [2018] 1 WLR 2777* . The claimant company, Singularis, was wholly owned by Mr Al Sanea. A large sum of money was held for the claimant

in a client account by the defendant 'bank' (Daiwa). The defendant paid out that money on Sanea's instructions to bank accounts in the names of three other companies within the group. This was a fraud by Sanea on the claimant company. The claimant's liquidators successfully argued, inter alia, that the defendant had been in breach of its *Quincecare* duty of care. The major question on appeal , which was decided in the claimant liquidators' favour (subject to a reduction for contributory negligence), was whether Sanea's illegal conduct should be attributed to the claimant so that illegality was a defence to the claim. But a subsidiary question on the appeal was whether the *Quincecare* duty of care applied where only the claimant company's creditors stood to benefit from the claim (because the claimant was insolvent). The important point for our purposes is that, in holding in favour of the claimant on this question, the Court of Appeal (the leading judgment being given by Sir Geoffrey Vos C , with whom Gloster and McCombe LJJ agreed) succinctly explained the *Quincecare* duty of care, and contrasted it with the duty of care owed by an auditor. Sir Geoffrey Vos C said the following, at [87]-[88]:

> 'The [Quincecare] duty was to protect the funds held in Singularis's account from fraudulent disposition, and the fact that vindicating that right will benefit only creditors rather than the company itself is nothing to the point… That duty is a binary one to stop payments from being made out of the customer's bank account in certain very limited circumstances. It is unlike the duty of an auditor in reporting publicly on a company's financial statements, where any number of potential claimants may wish to claim that they suffered loss as a result of what the auditor said having been inaccurate. The question of the scope of the duty is far more difficult there, because it would create an impossible situation if the duty were to protect everyone from loss. The limited scope of the Quincecare duty makes it obvious that it is only to protect the customer from the loss of its money, and that only the customer can vindicate a claim for breach of it.'

27.  It is relevant to note that, of the three cases, this is the only one in which the claimant succeeded in its claim based on a *Quincecare* duty of care: ie it is the only case of the three in which the bank was held to have the necessary reasonable grounds for believing that the payments were defrauding the customer (and causation of loss was also satisfied). I should add that, although Mr Masefield submitted that Sir Geoffrey Vos C's reference to a 'binary' duty was because the *Quincecare* duty was an 'on-off' duty (to pay or not to pay) and did not impose a duty of enquiry, there is much to be said for Ms Phelps' submission that, putting that description in its context, Sir Geoffrey Vos C was talking about who the duty was owed to, not the content of the duty: ie it was owed only to the customer and, in contrast to the scope of an auditor's duty of care, not to any wider class.

28.  These three cases make clear that the core of the *Quincecare* duty of care is the negative duty on a bank to refrain from making a payment (despite an instruction on behalf of its customer to do so) where it has reasonable grounds for believing that that payment is part of a scheme to defraud the customer. What is not entirely clear is whether, in addition to that core duty, a bank with such reasonable grounds has a duty to make reasonable enquiries so as to ascertain whether or not there is substance to those reasonable grounds. I strongly incline to the view (although, as will become clear at paragraphs 47-50 below, I do not ultimately need to decide this) that Ms Phelps is correct in her submission that the cases do envisage there as being an additional duty of enquiry.

29.  In support of this additional duty of enquiry, Ms Phelps invoked, for example, the following passages from the three cases we have referred to above (with Ms Phelps' emphasis).

From Steyn J in the *Quincecare* case:

> "If the bank executes the order knowing it to be dishonestly given, shutting its eyes to the obvious fact of the dishonesty, or acting recklessly in failing to make such inquiries as an honest and reasonable man would make, no problem arises: the bank will plainly be liable. But in real life such a stark situation seldom arises. The critical question is: what lesser state of knowledge on the part of the bank will oblige the bank to make inquiries as to the legitimacy of the order?" (at 376d-e).

> "[One of the factors to be considered is] the scope and means for making reasonable inquiries" (at 377b).

> "I propose to examine only those matters which could arguably be said to be known to the Hull branch, or which they should, on the basis of what was known, have inquired about." (at 380b-c).

From *Lipkin Gorman v Karpnale Ltd* :

> "… *it is, in my opinion, only when the circumstances are such that any reasonable cashier would hesitate to pay a cheque at once and refer it to his or her superior, and when any reasonable superior would hesitate to authorise payment*

*without inquiry* , *that a cheque should not be paid immediately on presentation* **and such inquiry made** *.* " (at 1356E-F, per May LJ).

" *A single telephone call to Mr Gorman, one of the partners in the plaintiff firm of solicitors, would have brought the whole enterprise to a close. Was there any* **duty on the bank to make such a call** *? Rather more searching inquiry by the bank of Cass about where he was obtaining his funds with which to gamble, even to the extent of which they were aware, might well also have had the same effect. Was there any* **duty on the bank to make that inquiry** *until the truth was out?*" (at 1357C, per May LJ).

" *I think that if Mr Fox [the bank manager] had or ought to have learned of the frequent and substantial withdrawals by Cass in cash from the clients' account even the limited duty of care to which he was subject would have* **required him to tell Mr Gorman** *.* " (at 1358, per May LJ).

"*The question must be whether, if a reasonable and honest banker knew of the relevant facts, he would have considered that there was a serious or real possibility, albeit not amounting to a probability, that its customers might be being defrauded, or, in this case, that there was a serious or real possibility that Cass was drawing on the client account and using the funds so obtained for his own and not the solicitors' or beneficiaries' purposes. That, at least, the customer must establish. If it is established, then in my view a reasonable banker would be in breach of duty if he continued to pay cheques* **without inquiry** *.* " (at 1378B, per Parker LJ).

From Sir Geoffrey Vos C in the *Singularis Holdings* case:

" *The judge held that Daiwa had breached its duty of care to Singularis in making the payment* **without any proper inquiry** *.* " (at [5] citing Rose J at first instance [2017] EWHC 257 (Ch), [2017] 1 Lloyd's Rep 226, [164].)

'*[The duty is] a duty not to pay away money in a customer's account* **without proper inquiry** *.* ' (at [87].)

30.  To recognise such a duty of enquiry would be in line with sound policy. In the fight to combat fraud, banks with the relevant reasonable grounds for belief should not sit back and do nothing. Moreover, the duty of enquiry on banks would not be unduly onerous because it would always be limited by what an ordinary prudent banker would regard as reasonable enquiries in a situation where there are reasonable grounds for believing that the customer is being defrauded.

31.  But even assuming that Ms Phelps is correct in her submission that a bank with the relevant reasonable grounds for belief has a duty of care to make reasonable enquiries, it would be potentially misleading to go on from that to describe the *Quincecare* duty of care as a duty of care to make enquiries/to investigate. The core of the *Quincecare* duty is, as Steyn J set it out, a negative duty not to pay while the bank has the relevant reasonable grounds. A positive duty of enquiry/investigation would be additional to that. In any event, a bank, which is acting honestly and *without* reasonable grounds for believing that its customer is being defrauded, has no duty of care to enquire/investigate. In other words, there is no duty of care to enquire/investigate prior to the point in time when the bank has reasonable grounds for believing that its customer is being defrauded. I shall return to these issues at paragraphs 47-50 below where I deal with the interpretation of clauses 7.2 and 7.4.

*(2) the law on the interpretation of exemption, indemnity, and entire agreement clauses*

32.  I have elsewhere summarised the modern approach in English law to contractual interpretation: see, eg, *Greenhouse v Paysafe Financial Services Ltd [2018] EWHC 3296 (Comm)* at [11]. The modern approach is to ascertain the meaning of the words used by applying an objective and contextual approach. One must ask what the term, viewed in the light of the whole contract, would mean to a reasonable person having all the relevant background knowledge reasonably available to the parties at the time the contract was made (excluding the previous negotiations of the parties and their declarations of subjective intent). Business common sense and the purpose of the term (which appear to be very similar ideas) may also be relevant. But the words used by the parties are of primary importance so that one must be careful to avoid placing too much weight on business common sense or purpose at the expense of the words used; and one must be astute not to rewrite the contract so as to protect one of the parties from having entered into a bad bargain. Important cases of the House of Lords and Supreme Court articulating the modern approach include *Investors Compensation Scheme Ltd v West Bromwich Building Society [1998] 1 WLR 896* , HL, especially at 912-913 ( *per* Lord Hoffmann giving the leading speech), *Rainy Sky SA v*

*Kookmin Bank [2011] UKSC 50, [2011] 1 WLR 2900* , *Arnold v Britton [2015] UKSC 36, [2015] AC 1619* , and *Wood v Capita Insurance Services Ltd [2017] UKSC 24, [2017] AC 1173* .

33.   In this case I am particularly concerned with applying the modern approach to contractual interpretation to the interpretation of exemption, indemnity and entire agreement clauses (see, respectively, clauses 8, 10 and 5 of the depository agreement). The submissions of counsel raised two topical questions of legal principle. First, in interpreting exemption and indemnity clauses, what is the present status of the *contra proferentem* rule? Secondly, does an entire agreement clause operate to exclude terms implied by law?

(i) the interpretation of exemption and indemnity clauses: what is the present status of the contra proferentem rule?

34.   When Lord Hoffmann set out the modern approach to contractual interpretation in *Investment Compensation Scheme v West Bromwich* , he said, at 912: 'Almost all the old intellectual baggage of "legal" interpretation has been discarded'. One question that arises, therefore, is whether the traditional rule of interpretation *contra proferentem* survives and in what form. In the context of exemption clauses that rule was to the effect that an exemption clause should be construed strictly against the person who drew up the exemption clause or was relying on it. But the recent authorities — see, especially, *HIH Casualty and General Insurance Ltd v Chase Manhattan Bank [2003] UKHL 6, [2003] 2 Lloyd's Rep 61* , at [11], [58]-[67], [95], [116]; *Stocznia Gdynia SA v Gearbulk Holdings Ltd [2009] EWCA Civ 75, [2010] QB 27* , at [23]; *Capita (Bamstead 2011) Ltd v FRIB Group Ltd [2015] EWCA Civ 1310, [2016] QB 835* , at [10]; *Nobahar-Cookson v Hut Group Ltd [2016] EWCA Civ 128, [2016] 1 CLC 573* , at [18]-[21] (and see generally *Chitty on Contracts* (ed Beale) (33rd edn, 2018) paras 15-012 — 15-020) — indicate that the law is as follows:

i.   The ambiguity of who is the 'proferens' (is it the person who drew up the exemption or the person relying on it?) means that reference to a *contra proferentem* rule is problematic.

ii.   In any event, the modern objective and contextual approach to the meaning of the words, with business common sense and purpose also being relevant in some cases, renders it unnecessary to regard there as being a separate *contra proferentem* rule.

iii.   Applying the modern approach, the force of what was the *contra proferentem* rule is embraced by recognising that a party is unlikely to have agreed to give up a valuable right that it would otherwise have had without clear words. And as Moore-Bick LJ put it in the *Stocznia* case, at [23], 'The more valuable the right, the clearer the language will need to be'. So, for example, clear words will generally be needed before a court will conclude that the agreement excludes a party's liability for its own negligence. The well-known principles in *Canada Steamship Lines Ltd v The King [1952] AC 192* (that general words, not explicitly mentioning negligence, will not exclude or indemnify against negligence unless that is the only possible liability) should be regarded as a flexible guide and not as a rigid code.

35.   I should add for completeness that the passing of the Unfair Contract Terms Act 1977 (and see now the Consumer Rights Act 2015 ) adds a further reason for not distorting standard principles of interpretation in the context of exemption clauses (and indemnity clauses in consumer contracts) given the power conferred on the courts by the legislature to strike down such clauses as unreasonable.

(ii) the interpretation of an entire agreement clause: are terms implied by law excluded?

36.   In relation to clause 5, I was referred to two cases dealing with the law on the question of whether an entire agreement clause excludes implied terms — *AXA Sun Life Services v Campbell Martin Ltd [2011] EWCA Civ 133, [2011] 2 Lloyd's Rep 1* , at [41] and *Great Elephant Corp v Trafigura Beheer BV [2012] EWHC 1745 (Comm), [2012] 2 Lloyd's Rep 503* , at [88]-[91] (reversed on appeal on a different point: [2013] EWCA Civ 905, [2014] 1 Lloyd's Rep 1) — and to passages on this question in *Chitty on Contracts* at para 14-019 and Lewison, *The Interpretation of Contracts* (6th edn, 2015) p 156.

37.   The correct approach here is in line with what I have set out in paragraph 34 above in relation to exemption and indemnity clauses. One must, as ever, apply the modern approach to contractual interpretation (see paragraph 32 above). It is unnecessary to regard there as being a separate rule for the interpretation of an entire agreement clause. However, where the entire agreement clause will have the effect of excluding an implied term that would otherwise arise, one should recognise that a party is unlikely to have agreed to give up a valuable right that it would otherwise have had without clear words. The more valuable the right, the clearer the words will need to be. It follows that an entire agreement clause may or may not exclude an implied term. This will primarily depend on the words used, in their context, but it will also be relevant to consider, for example, the nature of the implied term. So it may be that a term implied by law, at common law or by statute, as opposed to some terms implied by fact or by custom, confers a particularly valuable right so that it is unlikely that a party has agreed to give up that right other than by clear wording. In our case, it is not in dispute that the *Quincecare* duty of care

arises either by reason of a term implied by law at common law — because necessary to the particular type of contract or relationship, applying the test in, for example, *Liverpool CC v Irwin [1977] AC 239* — or by reason of a term implied by s 13 of the Supply of Goods and Services Act 1982 ; or it arises in tort. It is plain that the right that would otherwise be conferred is of considerable value to the customer — hence the implication by law or the imposition by tort — so that clear wording is needed to exclude it.

## 4 The Reasons Why the Application for Summary Judgment Fails

38.  Having outlined the parties' submissions, and having articulated the relevant law, I can now explain why the defendant bank's application for reverse summary judgment (or striking out) fails. I shall take each of the three grounds in turn. The first will take the most time.

### (1) the 'no Quincecare duty of care' issue

39.  In line with the allegations made by the claimant in the Re-amended Particulars of Claim and in the witness statement of Jonathan Cary (dated 26 October 2018), it is not in dispute that I must assume on this application that the claimant has a realistic prospect of successfully establishing at trial that the defendant bank had reasonable grounds for believing that the payments out were part of an attempt to defraud the claimant: ie that the defendant bank was 'put on inquiry'. Prima facie that means that the bank owed a *Quincecare* duty of care to the claimant; and there is no good reason of principle or policy why that duty of care should be confined to current accounts and should not apply to the depository account in this case. That duty of care entailed that the defendant bank could not simply follow the mandate of abiding by the instructions given by the claimant because the bank's duty of care, at its core, was to protect the claimant against being defrauded by not paying out unless and until it was 'off inquiry': ie unless and until those reasonable grounds, for believing that the payment out was part of an attempt to defraud the customer, no longer existed. Indeed, as was forcefully said by Mr Masefield, if the defendant bank's submissions were correct, and the depository agreement, on its true interpretation, meant that no *Quincecare* duty of care was owed in this case, it would appear that the defendant bank, while still reasonably believing that the payment out was an attempt to defraud its customer, should have gone ahead (or at least was entitled to go ahead) and paid out those huge sums of money. Mr Masefield submitted that that would have been an extraordinary contract for the claimant to have entered into and I accept that, at the very least, it would have been an imprudent contract for the claimant.

40.  Applying the law on contractual interpretation set out at paragraphs 32-37 above, the depository agreement was not inconsistent with and did not exclude, either generally or by particular terms, the *Quincecare* duty of care. That duty, as we have seen (see paragraphs 21-23 above) is a specific manifestation of the duty of care owed by a banker to its customer in relation to instructions. It is imposed as an implied term of law by common law or by statute under s 13 of the Supply of Goods and Services Act 1982 or is imposed by the tort of negligence. The duty is imposed by law for good policy reasons, not least to encourage banks to help combat fraud, and it gives the customer a valuable right. It is of course possible that the *Quincecare* duty may not arise because it is inconsistent with the express terms of the contract or it may be excluded by an exemption clause. It is trite common law that an implied term cannot be inconsistent with an express term; and that idea is spelt out, as regards the s 13 implied term, in s 16 of the Supply of Goods and Services Act 1982 . Similarly, the duty of care in tort may be shaped by, and can be excluded by, contractual terms. But given that the *Quincecare* duty of care is imposed for good policy reasons and is a valuable right for the customer, clear wording, including clear inconsistency, will be needed before a court concludes that that duty of care does not arise. In my view, there is no such clear wording in the depository agreement whether looked at generally or in focussing on particular clauses.

41.  I now turn to the particular clauses in the depository agreement relied on by the defendant bank. Before I do so, I should make clear the perhaps obvious point that I have had the benefit — which is important in applying the modern objective and *contextual* approach to interpretation — of reading the full depository agreement and the full clauses from which these specific terms, or parts of terms, have here been extracted.

### (i) Clause 5.1

42.  *'5.1 The duties and obligations of the Depository in respect of the Depository Cash shall be determined solely by the express terms of this Agreement. The Depository has no knowledge of the terms and provisions of any separate agreement or any agreement relating to the Depositor's Obligations, and shall have no responsibility for compliance by the Depositor*

Nigeria v JP Morgan Chase Bank NA, 2019 WL 00826591 (2019)

*with terms of any other agreement, or for ensuring that the terms of any such agreement are reflected in this Agreement and shall have no duties to anyone other than the Depositor.'*

43.  'Entire agreement' clauses come in many forms and one may describe this as an 'entire agreement' clause. The question at issue concerns the first sentence. Does that sentence, with its words 'express terms', exclude the *Quincecare* duty of care given that that duty of care arises either by operation of a term implied by law (whether at common law or under statute) or under the tort of negligence?

44.  I have set out at paragraphs 36-37 above, the law on the interpretation of entire agreement clauses, and the question of whether implied terms are excluded. Applying that law, the first sentence of clause 5.1 does not exclude the *Quincecare* duty of care implied term, or the imposition of that duty of care by the tort of negligence, for the following reasons:

i.  Clear words are required to exclude the valuable right conferred by the *Quincecare* duty of care. But there is no express mention of implied terms, including terms implied by law, being excluded; nor is there any mention of the operation of the tort of negligence being excluded.

ii.  If one were to interpret the reference to 'express' terms of the contract as ruling out a *Quincecare* duty of care, it would also operate to rule out (because there are no other relevant express terms) all other manifestations of a bank's implied duty of care to its customer in respect of the depository cash; and all other liabilities imposed in tort or in equity (in respect of the depository cash) including, for example, the tort of deceit or knowing receipt or dishonest assistance or breach of confidence. That would be an alarming interpretation given that it would deprive the customer of many valuable rights.

iii.  The ruling out of tort duties would be inconsistent with other clauses in the contract. For example, clause 8.1 limits liability to the customer for 'fraud' or 'gross negligence' but there is nothing in the express terms of the contract prohibiting such conduct: it must follow that at least some tort liability is not being excluded. Again that clause goes on to refer expressly to obligations in tort: ie it limits the bank's liability for indirect or consequential loss for liability under the agreement 'or for obligations relating to this Agreement (including… obligations in tort)'. Excluding breach of confidence (in respect of the depository cash) would also be inconsistent with clauses 2.2 and 5.9 which assume that there would otherwise be a liability for breach of confidence. Again clause 19 on the Governing Law envisages there as being non-contractual obligations. It reads *'This Agreement and any non contractual obligation arising out of it, is governed by, and shall be construed in accordance with, English law.'*

iv.  The relevant context, in applying the required objective and contextual approach to the interpretation of the first sentence of clause 5.1, includes the context of the full clause. In other words, one should not interpret the first sentence in isolation. Looked at as a whole, clause 5.1 is seeking to make clear that the terms of this contract, and no other agreement, govern. In other words, one cannot go outside the provisions of this agreement (for example, to the resolution agreements of 29 April 2011 which are mentioned in the preamble/recital on page 1 of the agreement) to determine what the parties have agreed.

v.  Although the word 'express' could equally well not have been included, the correct interpretation is that this was emphasising that the relevant terms are those of this contract and no other.

45.  In reaching this conclusion on clause 5.1, I have not found it necessary to resolve the question whether, as Ms Phelps tentatively submitted, some of what Teare J said in *Great Elephant Corp v Trafigura Beheeer BV [2012] EWHC 1745 (Comm), [2012] 2 Lloyd's Rep 503* , at [90] — a case I have referred to in paragraph 36 above — cannot stand in the light of the apparent criticism made by the Supreme Court in *Marks and Spencer plc v BNP Paribas Services Trust Company (Jersey) Ltd [2015] UKSC 72, [2016] AC 742* of some of Lord Hoffmann's reasoning in *Attorney-General of Belize v Belize Telecom Ltd [2009] UKPC 10, [2009] 1 WLR 1988* . Teare J was considering an entire agreement clause which included the following words: 'Each party further acknowledges that it will only be entitled to remedies in respect of breach of the express terms of the contract…' Part of Teare J's reasoning in deciding that an implied term by law under s 12 of the Sale of Goods Act 1979 was not excluded by that clause was that, applying *Belize Telecom* , implied terms merely 'spell out in express words what the instrument, read against the relevant background, would reasonably be understood to mean' (Teare J at [21], citing Lord Hoffmann]). In other words, in a high level sense, a reference to express terms included, and did not exclude, implied terms because the two types of term go together in answering the essential single question (as Lord Hoffmann saw it) which is what the contract, read in context, would be reasonably understood to mean. I merely note — because it may possibly make a difference to the analysis — that *Belize Telecom* and the *Marks and Spencer* case were both concerned with terms implied by fact — that is, a term based on the parties' common intentions objectively understood and to which the well-established 'officious bystander' and 'business efficacy' tests apply — rather than terms implied by law (whether at common law or by statute). We are here concerned only with terms implied by law.

Nigeria v JP Morgan Chase Bank NA, 2019 WL 00826591 (2019)

(ii) Clauses 7.2 and 7.4

46.   '7.2 The Depository shall be under no duty to enquire into or investigate the validity, accuracy or content of any instruction or other communication.'

'7.4 The Depository need not act upon instructions which it reasonably believes to be contrary to law, regulation or market practice but is under no duty to investigate whether any instructions comply with any applicable law, regulation or market practice.'

47.   These clauses are consistent with, at least, the core *Quincecare* duty of care. I have considered in detail above (see paragraphs 21-31) what the *Quincecare* duty of care requires. I have explained that, at its core, the *Quincecare* duty of care imposes a negative duty not to pay (ie to refrain from paying) despite compliant instructions where the bank has reasonable grounds (assessed according to the standards of an ordinary prudent banker) for believing that to make the payment would defraud its customer. I have also explained that, in line with what has been said in the three cases on the *Quincecare* duty and as a matter of policy, I am strongly inclined to the view that, once the bank has those reasonable grounds for belief (ie it is 'put on inquiry'), the *Quincecare* duty imposes an additional positive duty to make reasonable enquiries: but that, even if that is correct, it would be potentially misleading to describe the *Quincecare* duty of care as a duty to enquire/investigate not least because there is no duty of care on an honest bank to enquire or investigate prior to the point at which the bank has the relevant reasonable grounds for belief.

48.   The correct interpretation of clauses 7.2 and 7.4 is that, apart from the opening sentence in clause 7.4 (which is plainly consistent with a *Quincecare* duty of care), they do not apply at all where the bank has reasonable grounds for believing that the customer is being defrauded. In other words, the references to there being no duty to enquire or investigate are making clear, consistently with the law as I have summarised it in the last paragraph, that there is no duty of care to enquire or investigate prior to the point at which the bank has the relevant reasonable grounds for belief. Put another way still, clauses 7.2 and 7.4 are consistent with the *Quincecare* duty of care even if it is correct that that duty of care imposes an additional positive duty to enquire/investigate along with the core negative duty not to pay.

49.   But even if I am wrong on that interpretation, clauses 7.2 and 7.4 are consistent with the core *Quincecare* duty of care and would only go as far as excluding any additional positive duty to enquire or investigate. One might say that the draftsperson has explicitly drawn a distinction between, on the one hand, paying out where the bank has reasonable grounds for believing that the instructions are contrary to law - where the bank is expressly not bound to act upon instructions and, applying *Quincecare* , would be bound not to pay out - and, on the other hand, an additional duty to enquire or investigate which is excluded. Put another way, on this interpretation what clauses 7.2 and 7.4 are doing is modifying the *Quincecare* duty of care by excluding any additional duty to enquire or investigate while leaving in place the core negative duty. Such a modification would produce no difficulty for the claimant if, as I understand it — see, for example, the claimant's skeleton argument at paragraph 46 — the claimant is alleging only a breach of that core negative duty. It would only be if the claimant were alleging that there was a duty to make enquiries that clauses 7.2 and 7.4 would bite on the claim (admittedly the last sentence of paragraph 56 of the Re-amended Particulars of Claim still refers to the defendant needing to make further enquiries; and see also paragraph 32.2 of the claimant's Reply). Even then, clauses 7.2 and 7.4 would only bite on the claim to the extent of knocking out an additional positive duty to enquire or investigate: the core negative duty not to pay would be left intact.

50.   I consider the interpretation in paragraph 48 to be the correct one. But even if I am wrong about that, I would adopt the alternative interpretation in paragraph 49 which would leave intact the core *Quincecare* duty of care.

(iii) Clauses 5.8 and 11.5

51.   '5.8 The Depositor hereby authorises the Depository to act hereunder notwithstanding that :… (ii) the Depository or any of its divisions, branches or affiliates may be in possession of information tending to show that the instructions received may not be in the best interests of the Depositor and the Depositor agrees that the Depository is not under any duty to disclose any such information.'

'11   The Depositor hereby represents and warrants to the Depository on a continuing basis that:

© 2021 Thomson Reuters.

11.5 …the transactions to be effected under this Agreement will not violate any law, regulation, by-law or rule applicable to it or any agreement by which it is bound or by which any of its assets are affected and it is not restricted under the terms of its constitution or in any other manner from performing its obligations hereunder.'

52.  It is hard to see how these clauses impact on whether there is a *Quincecare* duty of care or not. Neither of them is purporting to deal with where the customer is itself the victim of a fraud. Neither indicates that the bank should go ahead with instructions where the bank has reasonable grounds for believing that the customer would be the victim of a fraud if the payment were made. The reference in clause 5.8 to being 'in possession of information' so that the instructions may not be in the 'best interests of the Depositor' is best interpreted as referring to commercial information and to the best commercial interests of the customer and does not cover the different and extreme case where the bank has information giving it reasonable grounds for believing that complying with the instructions would defraud the customer. Clause 11.5 is dealing with regulations 'applicable to it' (ie to the bank) such as the laws of Nigeria and it cannot plausibly be regarded as a reference to the law of fraud where the customer is the victim of that fraud: to deny that would be tantamount to adopting a far-fetched interpretation that the customer is warranting to the bank that the customer is not being defrauded by relevant transactions.

(iv) Clause 8.2(d)

53.  '8.2(d) [The Depository shall not be liable to the Depositor for any loss suffered by the Depositor by] the Depository acting on what it in good faith believes to be instructions or in relation to notices, requests, waivers, consents, receipts, or other documents which the Depository in good faith believes to be genuine and to have been given or signed by the appropriate parties.'

54.  Again this does not help the defendant bank in the situation with which we are here dealing for the following reasons:

i.  In deciding on the correct interpretation, I must apply the law on the interpretation of exemption clauses, as set out at paragraph 34 above. This requires there to be clear words if there is to be an exclusion of the valuable right that, on the facts of this case, would otherwise be conferred on the customer by the *Quincecare* duty of care. Here there are no such clear words.

ii.  On its correct interpretation, clause 8.2(d) does not apply to the alleged facts. This clause protects a bank where apparently authorised instructions have not been authorised (eg because someone impersonated one of the authorised officers) or where apparently genuine documents were non-genuine. But in our case it is not alleged that the instructions were unauthorised (ie it is not in dispute that the authorised officers gave the instructions) or that the documents were non-genuine. Rather the allegation is that authorised instructions (and, in so far as relevant, genuine documents) were being used as part of a scheme to defraud the customer. So the correct interpretation of this clause is that it does not exclude the *Quincecare* duty of care in relation to the alleged facts as to fraud in this case.

iii.  Even if I am wrong on that interpretation, a bank, which has reasonable grounds for believing that its customer is being defrauded, and goes ahead with paying out, may not be acting in 'good faith'. Whether that is so or not will be dependent on the precise facts including the knowledge of the bank. That must be a matter for full evidence at trial and one cannot say now that the claimant has no realistic prospect of successfully showing that the defendant bank was not acting in 'good faith'. Ms Phelps submitted that it was not open to the claimant to rely on this point because there has been no pleading by the claimant that the defendant bank was not acting in good faith (although it has pleaded 'gross' negligence at paragraph 107 of the Re-amended Particulars of Claim). I do not agree. The first indication that the defendant bank was relying on clause 8.2(d) was in paragraph 100 of the Amended Defence dated 24 July 2018. The claimant would then have had the opportunity to plead that the defendant bank was not acting in good faith, so that that clause did not apply, in a Reply to that Amended Defence. But that did not happen because the normal timing and sequence for pleadings were overtaken by the defendant bank issuing its summary judgment application on 31 July 2018. Indeed this was one day after a letter from the claimant's solicitors to the defendant bank's solicitors saying that they would be serving an Amended Reply. It follows that, as Mr Masefield submitted, it cannot fairly be held against the claimant that it has not put in an Amended Reply which includes pleading no good faith. Mr Masefield made clear in open court that, in so far as the normal order for pleadings is resumed following this judgment, the claimant will be pleading the 'good faith' point in an Amended Reply. So I reject Ms Phelps' pleading objection.

55.  Alongside clause 8.2(d), Ms Phelps relied on the indemnity clause 10(1)(a) as also constituting an exclusion of liability for the defendant bank acting in accordance with its mandate and therefore as excluding a *Quincecare* duty of care. That indemnity clause is set out and considered in more detail below under the circularity issue. Even if treated as excluding

the liability of the defendant bank to the claimant, rather than indemnifying the bank against liability to third parties (see paragraph 63 below), it would not here exempt the defendant bank for the reasons set out at paragraph 64 below.

(v) Conclusion on the 'no Quincecare duty of care' issue

56.  My conclusion on this first issue is that the defendant bank did owe a *Quincecare* duty of care to the claimant, which was imposed by an implied term in the depository agreement (implied by law at common law and/or under statute) and/or by the tort of negligence. On the correct interpretation of the depository agreement, that *Quincecare* duty of care was neither inconsistent with, nor excluded by, the terms of that agreement.

*(2) the 'causation of loss' issue*

57.  I have explained at paragraph 9 above that, in contrast to the other two issues, this is primarily a factual issue, although also raising some legal issues, and should be approached by directly asking whether the claimant has a realistic prospect of success.

58.  In my view, causation of loss in this case, as one would expect in most cases, is plainly one that should go to trial where the court will have the benefit of full evidence. Although Ms Phelps submitted that this was the unusual case where one could now say on causation that the claimant has no realistic prospect of success, I disagree. Indeed the complexity of the underlying facts in this case — and the nature and scale of the alleged fraud — means that, far from it being the unusual case where reverse summary judgment can be given on causation of loss, it is *a fortiori* a case where a court needs to examine all the relevant evidence that would be put forward at a trial in order to make a proper determination on the causation issue.

59.  It is true that the defendant bank made checks with the Attorney-General of Nigeria and he gave assurance that the money could be paid out. And Ms Phelps submitted that if, as alleged, even the then President of Nigeria was involved in the fraud, it followed that, had the bank been under a duty of care, reasonable checks by it would still have resulted in the money being paid out. But that is a speculative submission. The starting point is that, had the defendant bank complied with its core *Quincecare* duty of care, the payments would not have been made. The determination of what would, or should, then have occurred is dependent on full evidence. I cannot now say what an ordinary prudent bank would have done in those circumstances: that is a matter on which evidence from banking experts would be needed. On the face of it, one plausible possibility would have simply been for the bank — because of continuing reasonable grounds for believing that the payments would defraud the customer - to continue to refrain from making any payment so that the money would have remained in the account. As I have outlined at paragraph 18 above, Mr Masefield submitted that another plausible outcome was that the money would have been frozen in the account by court order. Although Ms Phelps submitted that, if the government were corrupt, there would be no party disputing the payment out, so that interpleader proceedings would not eventuate, and there would be no obvious route to a freezing injunction, I cannot say now that the freezing of the account by court order (perhaps by reason of intervention by the regulatory authorities, such as the Serious Organised Crime Agency) is an unrealistic analysis of what would have happened. It may have been open to the defendant bank to seek directions or a declaration from a court not least by reason of clause 5.7 of the depository agreement which reads as follows (my emphasis):

> '5.7  In the event of any dispute between or conflicting claims by any person or persons with respect to the Depository Cash, **or the Depository is uncertain as to its duties or rights hereunder** , the Depository shall be entitled to apply to a court of law to determine the rights of such persons and meanwhile at its option to refuse to comply with any and all claims, demands or instructions with respect to such Depository Cash or any obligations hereunder so long as such dispute or conflict shall continue.'

60.  In conclusion on this second issue, the defendant bank has failed to establish that the claimant has no realistic prospect of success in proving causation of loss.

*(3) the 'circularity' issue*

61.  This is a question of law in relation to which, as I have explained at paragraph 9 above, I am grasping the nettle and making a decision at this stage.

62.  The relevant clause of the depository agreement on this issue is clause 10.1(a) (clause 10 is headed 'Indemnity'). This reads as follows:

'10.1 The Depositor hereby irrevocably and unconditionally agrees on demand to indemnify, and to keep fully and effectively indemnified … the Depository, and its directors, officers, agents and employees (the "indemnitees") against all costs, claims, losses, liabilities, damages, expenses, fines, penalties, Tax and other matters ("Losses") which may be imposed on, incurred by or asserted against the indemnitees or any of them directly or indirectly in respect of:

(a) the following of any instruction or other directions upon which the indemnitees is authorised to act or rely pursuant to the terms of this Agreement, or arising as a result of entering into this Agreement or their status as holder of the Depository Cash…'

63. On its correct interpretation, there is no circularity problem posed by this clause. This clause does not entitle the defendant bank to be indemnified against the claim by the claimant. Given that clause 8 deals with the exclusion of the liability of the bank to the customer, this clause is best interpreted as dealing with the liability of the bank to third parties. If that were not so, one would have a clash with clause 8: eg clause 8.1 excludes the bank from liability to the customer for action pursuant to the agreement unless caused by the fraud, gross negligence or wilful misconduct of the bank in which event the extent of liability is limited to the market value of the depository cash. But if, by reason of clause 10.1(a), the customer is bound to indemnify the bank in any event, the exception for fraud, gross negligence or wilful misconduct would be undermined.

64. Even if one were to interpret clause 10.1(a) as excluding the liability of the defendant bank to the claimant, rather than indemnifying the defendant bank against liability to third parties, it would not exempt the defendant bank here. I have set out the law on the interpretation of exemption and indemnity clauses at paragraph 34 above. Although to be treated as a flexible guide, rather than as a rigid code, the *Canada Steamship* principles indicate that a court should be reluctant to find that a generally worded clause, rather than an explicit reference to negligence, exempts, or indemnifies against, negligence (which would take away a valuable right). The following of instructions negligently — in breach of a *Quincecare* duty of care — is in my view not covered by the general words of clause 10.1(a) which do not explicitly refer to negligence.

65. In conclusion, therefore, on a correct interpretation of clause 10.1(a) in the depository agreement, the claim does not fail for circularity.

5 Conclusions

66. My conclusions are therefore as follows:

i. On the 'no *Quincecare* duty of care' issue, the defendant bank did owe a *Quincecare* duty of care to the claimant, which was imposed by an implied term in the depository agreement (implied by law at common law and/or under statute) and/or by the tort of negligence. On the correct interpretation of the depository agreement, that *Quincecare* duty of care was neither inconsistent with, nor excluded by, the terms of that agreement.
ii. On the 'causation of loss' issue, the defendant bank has failed to establish that the claimant has no realistic prospect of success in proving causation of loss.
iii. As regards the 'circularity' issue, on the correct interpretation of clause 10.1(a) in the depository agreement, the claim does not fail for circularity.
iv. My overall conclusion, therefore, is that the defendant bank has failed to establish that the claimant has no real prospect of success under CPR 24.2 .

67. For these reasons, the application for reverse summary judgment under CPR 24.2 fails. It also follows that the Re-amended Particulars of Claim do disclose reasonable grounds for bringing the claim so that the application to strike out under CPR 3.4(2) also fails.

68. It remains for me to thank counsel on both sides for their helpful submissions.

© 2021 Thomson Reuters.

Nigeria v JP Morgan Chase Bank NA, 2019 WL 00826591 (2019)

Crown copyright

© 2021 Thomson Reuters.

**<u>EXHIBIT H</u>**



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed April 13, 2018**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-SGJ-7 |
| | § | |
| Alleged Debtor. | § | |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT GP, | § | CASE NO. 18-30265-SGJ-7 |
| L.L.C., | § | |
| | § | |
| Alleged Debtor. | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF
## ORDERS FOR RELIEF ISSUED AFTER TRIAL ON
## CONTESTED INVOLUNTARY BANKRUPTCY PETITIONS

Joshua N. Terry (the "Petitioning Creditor" or "Mr. Terry") filed involuntary bankruptcy

petitions (the "Involuntary Petitions") against each of the two above-referenced related

1

companies (the "Alleged Debtors") on January 30, 2018.[1]  The Involuntary Petitions were

contested, and the court held a multi-day trial (the "Trial") spanning March 21, 22, 23, 27, and

March 29, 2018.[2]  This constitutes the court's findings of fact, conclusions of law and ruling,

pursuant to Fed. Rs. Bankr. Proc. 7052 and 9014.[3]  As explained below, the court has decided

that Orders for Relief are legally required and appropriate as to each of the Alleged Debtors.

## I.    FINDINGS OF FACT

### A.    Introduction.

1.      The Alleged Debtors—Acis Capital Management, L.P. ("Acis LP"), a Delaware

limited partnership, and ACIS CAPITAL MANAGEMENT GP, L.L.C. ("Acis GP/LLC"), a Delaware

limited liability company—are two entities in the mega-organizational structure of a company

that is known as Highland Capital Management, L.P. ("Highland").

2.      Highland is a Dallas, Texas-based company that is a Registered Investment

Advisor.  Highland was founded in 1993 (changing its original name from "Protective Asset

Management" to Highland in 1997) by James D. Dondero ("Mr. Dondero"), originally with a

---

[1] Exhs. 50 & 51.

[2] Shortly after the Involuntary Petitions were filed, the court held hearings on February 6-7, 2018, on the Petitioning Creditor's Emergency Motion to Abrogate or Modify 11 U.S.C. § 303(f), Prohibit Transfer of Assets, and Import, Inter Alia, 11 U.S.C. § 363 [DE # 3] (the "303(f) Motion") and the Alleged Debtors' Emergency Motion to Seek Emergency Hearing on the Alleged Debtors' Motion to Dismiss Involuntary Petitions and Request for Award of Fees, Costs, and Damages [DE # 9] (the "Emergency Motion to Set Hearing on Motion to Dismiss").  The court ultimately granted the 303(f) Motion and denied the Emergency Motion to Set Hearing on Motion to Dismiss. Both the Petitioning Creditor and the Alleged Debtors have proposed that the court should consider the evidence it heard at the hearings held on February 6-7, 2018, in determining whether it should enter orders for relief.  The court has, accordingly, considered such evidence in this ruling.

[3] Bankruptcy subject matter jurisdiction exists in this contested matter, pursuant to 28 U.S.C. § 1334(b). This is a core proceeding over which the bankruptcy court may exercise subject matter jurisdiction, pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (O) and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984. This bankruptcy court has Constitutional authority to issue a final order or judgment in this matter, as it arises under a bankruptcy statute— 11 U.S.C. § 303. Venue is proper in this district, pursuant to 28 U.S.C. § 1409(a), as the Alleged Debtors have their business headquarters in this district.

2

75% ownership interest, and Mark K. Akada ("Mr. Akada"), originally with a 25% ownership interest.[4]

3.      Both Mr. Dondero and Mr. Akada provided witness testimony at the Trial on the Involuntary Petitions, and their names are mentioned numerous times herein—since they were generally the subject of significant evidence and argument presented at the Trial. Mr. Dondero is the chief executive officer for Highland and Mr. Akada is the chief investment officer. Mr. Dondero is also the president of each of the two Alleged Debtors.

4.      Highland, through its organizational structure of approximately 2,000 separate business entities, manages approximately $14-$15 billion of investor capital in vehicles ranging from: collateral loan obligation funds ("CLOs"); private equity funds; and mutual funds.

5.      Highland's CLO business was front-and-center at the Trial on the Involuntary Petitions. The Alleged Debtor, Acis LP, for approximately the past seven years, has been the vehicle through which Highland's CLO business has been managed.

6.      The Petitioning Creditor, Mr. Terry, became an employee of Highland in the year 2005, starting as a portfolio analyst, promoting to a loan trader, then ultimately becoming the portfolio manager for (and 25% limited partner in) Highland's CLO business—specifically, Mr. Terry was the human being who was acting for the CLO manager, Acis LP.

7.      Mr. Terry was highly successful in his role in the CLO business, managing billions of dollars of assets during his tenure, but Mr. Terry and Mr. Dondero had a bitter parting of ways on June 9, 2016. Specifically, Mr. Terry's employment was terminated on that date (for

---

[4] Mr. Dondero testified at the Trial that, three years ago, Messrs. Dondero and Akada sold their interests in Highland to a charitable remainder trust in exchange for a 15 year note receivable.

3

reasons that have been highly disputed) and his 25% limited partnership interest in Acis LP was deemed forfeited without any payment of consideration to him.

8.      In September 2016, Highland sued Mr. Terry in the 162nd Judicial District Court of Dallas County, Texas ("State Court 1") for breach of fiduciary duty/self-dealing, disparagement, breach of contract, and various other causes of action and theories.  Mr. Terry asserted his own claims against Highland, and also claims against the two Alleged Debtors, Mr. Dondero, and others and demanded arbitration.  On September 28, 2016, State Court 1 stayed the litigation and ordered the parties to arbitrate.  The parties participated in ten days of arbitration in September 2017 before JAMS.  On October 20, 2017, Mr. Terry obtained an Arbitration Award (herein so called),[5] jointly and severally against both of the Alleged Debtors in the amount of $7,949,749.15, plus post-award interest at the legal rate, which was based on theories of breach of contract and breach of fiduciary duties.

9.      There are still claims pending between and among the Petitioning Creditor, Highland, and others (not including the Alleged Debtors) in State Court 1.

10.     A Final Judgment (herein so called) confirming the Arbitration Award was entered by the 44th Judicial District Court of Dallas County, Texas ("State Court 2") on December 18, 2017, in the same amount as that contained in the Arbitration Award— $7,949,749.15.[6]

11.     Mr. Terry began pursuing post-judgment discovery soon after obtaining his Arbitration Award and even more so after entry of the Final Judgment.  Mr. Terry undertook a UCC search on November 8, 2017, to investigate whether there were any liens on the Alleged

---

[5] Exh. 1.

[6] Exh. 105.

Debtors' assets (none appeared).[7]  Mr. Terry also pursued a garnishment of an Acis LP bank account (at a time when there was only around $2,000 in the account).  Mr. Terry's counsel deposed Highland's General Counsel Scott Ellington (who sat for the deposition as a representative of Acis, LP) on January 26, 2018, and asked numerous questions about: (a) how many creditors the Alleged Debtors had,[8] and (b) whether Acis LP was able to pay its debts as they became due,[9] but did not receive meaningful answers.

12.     Mr. Terry requested a temporary restraining order ("TRO") from State Court 2, on January 24, 2018, after discovering certain transactions and transfers involving Acis LP's interests, that he believed were pursued without any legitimate business purpose and with the purpose of denuding Acis LP of its assets and to make it judgment proof.  Most particularly, it appeared as though Highland was engaged in a scheme to transfer certain fee-generating CLO management contracts of Acis LP away from it and into a Cayman Island affiliate of Highland.[10] At a January 24, 2018 hearing on the request for a TRO, Acis LP agreed and State Court 2 ordered that, between that hearing and a later hearing on a request for a temporary injunction, no CLO management contracts would be transferred away from Acis LP and that no monies would be diverted from it.[11]

13.     Then, on January 29, 2018, the Controller of and CPA for Highland  (David Klos) submitted a Declaration to State Court 2 concerning the net worth of the Alleged Debtors, stating

---

[7] Exh. 84.

[8] Exh. 25, pp. 7-9.

[9] *Id.* at pp. 102-04.

[10] Exh. 27.

[11] Exh. 28.

that Acis GP/LLC had a net worth of $0 and that Acis LP might have a net worth, at best, of $990,141.[12]  Mr. Terry thought this was preposterous—given the management fees that Acis LP was entitled to and the receivables that should be owing to it.  Mr. Terry believes that the collateral management agreements on which Acis LP receives management fees have a present value of $30 million (about $6 million for each of the five CLOs which Acis LP has been managing).

14.     On January 29, 2018, the Alleged Debtors filed a motion for leave to post a supersedeas bond in the amount of **$495,070.50** with State Court 2 (purportedly half of the net worth of the two Alleged Debtors—as stated in the David Klos Declaration), so that they could suspend enforcement of the Final Judgment while they appealed it.[13]  Although there is a very stringent standard for appealing an Arbitration Award, the Alleged Debtors apparently believe they have an argument that State Court 2 lacked the subject matter jurisdiction to confirm the Arbitration Award (a motion to vacate the Final Judgment based on this argument has previously been denied by State Court 2).[14]

15.     Meanwhile, Mr. Terry was learning of more transactions and transfers involving Acis LP's assets and interests.  On January 29, 2018, Mr. Terry filed supplemental pleadings with State Court 2, alleging that further shenanigans (*i.e.,* transfers and transactions that would amount to fraudulent transfers) were underway at Acis LP and seeking a receiver.[15]  Also, at

---

[12] Exh. 26.

[13] Exh. 73.

[14] *See* DE # 35, in Case No. 18-30264 and DE # 34 in Case No. 18-30265.  Unless otherwise noted, references to "DE #" herein refer to the docket entry number at which a pleading appears in the docket maintained with the Bankruptcy Clerk in the Acis Capital Management L.P. bankruptcy case (Case No. 18-30264).

[15] Exhs. 28-31.

6

some point, in the weeks leading up to this, an Acis LP lawyer represented to Mr. Terry's counsel that the Alleged Debtors were "judgment proof."[16]

16.    At approximately 11:57 p.m. on January 30, 2018 (on the evening before a scheduled temporary injunction hearing in State Court 2—at which time State Court 2 presumably might have considered the Alleged Debtors' request to post the $495,070.50 supersedeas bond to stay enforcement of the Final Judgment), Mr. Terry filed the Involuntary Petitions, as a sole petitioning creditor, against both Acis LP and Acis GP/LLC.

17.    For purposes of this Trial (and this Trial only), the Alleged Debtors do not dispute that Mr. Terry has standing to be a petitioning creditor pursuant to Bankruptcy Code section 303(b)—in other words, they do not dispute that Mr. Terry is a holder of a claim against the Alleged Debtors that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount and that aggregates at least $15,775 in unsecured amount.  However, the Alleged Debtors argue that:  (a) the Alleged Debtors have *12 or more creditors* and, thus, three or more petitioning creditors were required to prosecute the Involuntary Petitions pursuant to Bankruptcy Code section 303(b)(1); (b) the Petitioning Creditor did not establish, pursuant to Bankruptcy Code section 303(h)(1), that the Alleged Debtors are not *generally paying their debts as such debts become due* unless such debts are the subject of a bona fide dispute as to liability or amount; (c) regardless of whether the Petitioning Creditor has met the statutory tests in sections 303(b)(1) and (h)(1), the Petitioning Creditor has acted in *bad faith*—which serves as an equitable basis for dismissal of the Involuntary Petitions; and (d) if the court disagrees with the Alleged Debtors and determines that the section 303(b) and (h) statutory tests are met, and also determines that the Petitioning Creditor has not acted in bad faith, the court should

---

[16] Exh. 27 (exhibit 3 thereto).

7

nevertheless *abstain* in this matter, pursuant to Bankruptcy Code *section 305*, since this is essentially a two-party dispute and the interests of creditors and the debtor would be better served by dismissal.

18.     The Petitioning Creditor argues that he has met the statutory tests of sections 303(b) and (h) but, even if he has not, there is a *"special circumstances"* exception to the section 303 statutory requirements, whenever a petitioning creditor establishes fraud, trick, scheme, artifice or the like on the part of an alleged debtor—which "special circumstances," Mr. Terry alleges, have been established here.  Moreover, the Petitioning Creditor argues that the facts here *do not warrant section 305 abstention* because the interests of creditors and the Alleged Debtors would not be better served by dismissal.

19.     As further explained below, the court finds and concludes that the Petitioning Creditor has met his burden of proving by a preponderance of the evidence that the statutory tests of sections 303(b) and (h) are met here.  Thus, the court does not need to reach the question of whether there is a *"special circumstances"* exception to the section 303 statutory requirements, whenever a petitioning creditor establishes fraud, trick, scheme, artifice or the like on the part of an alleged debtor, and—if so—whether the exception is applicable here.[17]

20.     Moreover, the Alleged Debtors have not shown by a preponderance of the evidence that the Petitioning Creditor acted in bad faith, such that the Involuntary Petitions should be dismissed.

---

[17] *See e.g., In re Norriss Bros. Lumber Co.*, 133 B.R. 599 (Bankr. N.D. Tex. 1991); *In re Moss*, 249 B.R. 411 (Bankr. N.D. Tex. 2000); *In re Smith*, 415 B.R. 222 (Bankr. N.D. Tex. 2009).

21.     Finally, the Alleged Debtors also have ***not shown facts here that warrant section***

***305 abstention*** because they have not shown that the interests of creditors and the Alleged

Debtors would be better served by dismissal.

**B.     The CLO Business:  Understanding the Alleged Debtors' Business Operations, Structure, and What Creditors and Interest Holders They Actually Have.**

22.     Highland set up its first CLO in the year 1996.  Highland was one of the early

participants in the CLO industry.

23.     The Alleged Debtors were formed in 2011 to be the new "brand" or face of the

Highland CLO business, after Highland's name had suffered some negative publicity in the

marketplace.

24.     Acis LP has acted as the portfolio manager of Highland's CLOs since 2011.  Acis

LP currently has a contractual right to CLO portfolio management fees on five CLOs[18] which

were referred to at the Trial as CLO 2013-1; CLO 2014-3; CLO 2014-4; CLO 2014-5; and CLO

2016-6.  CLOs typically have an 8-12 year life.  Thus, there are still several years of life left on

these CLOs (since the oldest one was established in the year 2013).

25.     The key "players" in and features with regard to the Highland CLOs, during the

time period relevant to the issues adjudicated at the Trial, have been:

(a)     The CLO manager.  As mentioned earlier, the CLO manager is the Alleged

        Debtor, Acis LP.  Acis LP, has collateral management agreements (hereinafter,

        the "CLO Collateral Management Agreements") with the CLOs (which CLOs

        were set up as special purpose entities) and, pursuant thereto, receives

---

[18] There is still another Highland CLO (CLO 2017-7), set up in April 2017, as to which Acis LP's contractual right to manage was terminated shortly before the Petition Date, as will be further described herein.

9

management fees[19] from the CLOs in exchange for managing the pool of assets within the CLOs and communicating with investors in the CLOs.[20]  As mentioned earlier, Mr. Terry was the human being that performed the management function at Acis LP until Highland fired him on June 9, 2016 and also terminated his limited partnership interest in Acis LP.  Mr. Terry, and all employees who have ever provided services to the CLO manager, are Highland employees—which were provided to Acis LP through shared and sub-advisory services agreements—as further explained below.  Thus, to be clear, Acis LP has always essentially subcontracted its CLO managerial function out to Highland.

(b)  <u>The pool of assets.</u> Within each CLO that the CLO manager manages is a basket of loans that the CLO manager purchases.  The basket of loans typically consists of approximately 200 loans-payable (or portions of loans payable), on which large well-known companies typically are the makers/obligors (and which loans, collectively, provide a variable rate of interest).[21]  The CLO manager can typically decide to buy and sell different loans to go into the pool of assets, with certain restrictions, during a four or five year reinvestment time period.

---

[19] These fees typically include "senior fees" (*e.g.,* 15 basis points); additional "subordinate fees" (*e.g.,* 25 basis points) if the CLOs are passing certain tests; and perhaps even an "incentive fee" beyond a certain hurdle rate (*e.g.,* after the equity in the CLO received an internal rate of return of 10%, the CLO manager would get 15% of the excess).  Exh. 82, p. 59, lines 14-25.

[20] *See,* as an example, Exh. 3 (the collateral management agreement between Acis LP and CLO 2014-3). Note that the document is entitled "Portfolio Management Agreement" but, to avoid confusion with other similarly titled documents and to highlight the true nature of the agreement, the court uses the defined term "CLO Collateral Management Agreement," which terminology the lawyers also sometimes used at the Trial.

[21] Exh. 8.

10

(c)     The CLO investors (*i.e.,* CLO note holders).  These may be any number of persons or entities, including pension funds, life insurance companies, or others who decide to invest in the CLOs and contribute capital to fund the purchase of a CLO's loan pool, and, in return, receive fixed rate notes payable—the ratings on which can range anywhere from Triple-A to Single-B, depending upon the risk option the investor chooses.  There are typically five or six traunches of notes issued by the CLO (with the top AAA-rated traunche being the least risky and the bottom traunche being the most risky) and—to be clear—the CLO itself (again, in each case, the CLO is a special purpose vehicle) is the obligor.  As the CLO manager receives income from the pool of loans in the CLO, he distributes that income to the CLO investors, in accordance with their note indentures,[22] starting with the top traunche of notes and then down to the other traunches.  The top traunche of notes (AAA-rated) is considered the "controlling" class and a majority of holders in this class can terminate the CLO manager (*i.e.,* Acis LP) for cause on 45 days' notice, although all parties seem to agree this would be a rare event.

(d)     The CLO equity holder.  The CLO equity holder actually is a holder of subordinated notes issued by the CLOs (*i.e.,* the bottom traunche of notes on which the CLO special purpose entity is obligated), and has voting rights and is itself a capital provider, but it takes the most risk and receives the very last cash

---

[22] The indenture trustee on the CLO notes may actually operate as a payment agent in some cases, for purposes of making the quarterly note payments to holders.

11

flow from the CLOs.  It, in certain ways, controls the CLO vehicle[23]—for

example, by virtue of having the ability to make a redemption call after a certain

"no-call" period—which would force a liquidation of the basket of loans in the

CLO, with the proceeds paying down the traunches of notes, starting at the top

with the Triple A's).  Note that, until recently, a separate entity known as Acis

Loan Funding, Ltd. ("ALF"), which was incorporated under the laws of the island

nation of Guernsey,[24] was the CLO equity holder.  To be clear, ***ALF was***

***essentially the equity owner in the CLO special purpose entities—not the equity***

***owner of Acis LP***.  Acis LP was a party to a separate portfolio management

agreement with ALF (hereinafter, the "ALF Portfolio Management Agreement"—

not to be confused with the CLO Collateral Management Agreements that Acis

LP separately has with the special purpose CLOs).  No fees were paid from ALF

to Acis LP pursuant to the ALF Portfolio Management Agreement (rather, fees

are only paid to Acis LP on the CLO Collateral Management Agreements).  The

complicated structure of the CLO business—all parties seemed to agree—has

been developed, among other reasons, to comply with "risk-retention

requirements" imposed by the U.S. Congress's massive Dodd-Frank financial

reform legislation[25] enacted in year 2010, in response to the financial crisis and

recession that first began in 2008.

---

[23] The top traunche of AAA notes also has certain control—such as the ability to terminate the portfolio manager for cause, on notice.

[24] Guernsey is located in the English Channel.  ALF was created in August 2015.

[25] Simply put, one of the results of the Dodd-Frank legislation (*i.e.*, the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, H.R. 4173, 124 Stat. 1376-2223, 111th Congress, effective July 21, 2010), which was implemented over a period of several years, was that, ***subsequent to December 2016***, managers of securitizations needed to retain at least a 5% interest in that securitization.  Thus, if a $400 million CLO were to be

(e)    The Equity Owners of ALF.  Until recently (*i.e.,* until October 24, 2017—four

days after the Arbitration Award), Acis LP itself, as required for a CLO manager,

had a 15% indirect ownership in ALF, in order to be regulatory compliant.[26]  The

parties sometimes refer to ALF (and the web of ownership between it and Acis

LP) as the "risk retention structure."[27]  The evidence at the Trial revealed that

ALF (which has recently been renamed), now, has three equity owners:  (i) a 49%

equity owner that is a charitable fund (*i.e.,* a donor advised fund or "DAF") that

was seeded with contributions from Highland, is managed/advised by Highland,

and whose independent trustee is a long-time friend of Highland's chief executive

officer, Mr. Dondero; (ii) 2% is owned by Highland employees; and (iii) finally,

ALF *may* be 49% owned by a third-party institutional investor based in Boston

that Highland believed it was required to keep anonymous at the Trial.  Not only

is the court unaware of who this independent third-party is, but the evidence

seems to suggest that it may have acquired its interest fairly recently or may have

simply committed to invest recently.[28]

---

issued, the CLO manager would need to retain at least 5% or $20 million of the assets in the CLO (which 5% could be either all at the equity level or vertically, up and down the note traunches).  There are multiple ways to accomplish this 5% retention (*i.e.,* with either the CLO manager directly investing in at least 5% of the CLO or doing it through a controlled subsidiary).  This particular rule was announced in ***December 2014*** and the SEC thereafter issued a no action letter stating that ***if a CLO was issued prior to December 2014***, then any refinancing of such CLO that happens within four years can be done without risk retention in place.  Resets of any CLO (*i.e.,* changes in terms and maturity—as opposed to mere changes in interest rates), on the other hand, must have risk retention in place.  ***Four of Acis LP's current CLOs were issued prior to December 2014***.  Thus, these four CLOs are still technically able to do a refinancing without a risk retention structure in place.  In any event, by early-to-middle 2017, Acis LP was risk retention compliant.  Exh. 82, pp. 65-69 & 75.  That was recently changed—on October 24, 2017—four days after the Arbitration Award—as later explained herein.

[26] *See* n.23, *supra.*

[27] *See* Demonstrative Aid No. 3.

[28] *See* Exh. 173, which seems to suggest that the only equity owners of ALF just prior to October 24, 2017 were Acis LP and the DAF, until Acis LP's interest in ALF was sold back to ALF on October 24, 2017.  *See also* Exh. 82, p. 162, lines 2-7.

13

     (f)    <u>The underwriter for the CLO notes.</u>  As with any publicly traded notes, there is an underwriter for the CLO notes which solicits investors for the CLO notes (examples given at the Trial:  Mizuho Securities USA, LLC; Merrill Lynch; JP Morgan Chase).[29]  The CLO notes are traded on the Over-the-Counter Market.

     (g)    <u>The independent indenture trustee for the CLO notes.</u>  As also with any issuance of publicly traded notes, there is an indenture trustee (example given at the Trial: U.S. Bank).[30]

     26.    Mr. Terry, the Petitioning Creditor, as earlier mentioned, began working for Highland in 2005 until his employment was terminated on June 9, 2016.

     27.    Acis LP and Acis GP/LLC have never had any employees.  Rather, all employees that work for any of the Highland family of companies (including Mr. Terry) have, almost without exception, been employees of Highland itself.  Highland has approximately 150 employees in the United States.  Highland provides employees to entities in the organizational structure, such as Acis LP and Acis GP/LLC, through both the mechanism of:  (a) a Shared Services Agreement (herein so called),[31] which provides "back office" personnel—such as human resources, accounting, legal and information technology to the Highland family of companies; and (b) a Sub-Advisory Agreement (herein so called),[32] which provides "front office" personnel to entities—such as the managers of investments like Mr. Terry.  The evidence indicated that this is typical in the CLO industry to have such agreements.  The court notes that

---

[29] *See* Exh. 193.

[30] *See* Exh. 7.

[31] Exhs. 17, 99, 179 & 5.

[32] Exhs. 18, 178 & 4.

14

all iterations of the Shared Services Agreements and Sub-Advisory Agreements between Acis LP

and Highland were signed by Mr. Dondero both as President of Acis LP and as President of the

General Partner of Highland.

28.     Because Acis LP essentially subcontracts out all of its functions to Highland

pursuant to the Shared Services Agreement and the Sub-Advisory Agreement, Acis LP has very

few vendors or creditors.  Rather Highland incurs expenses and essentially bills them to Acis LP

through these two agreements.[33]  In other words, Highland is one of Acis LP's largest and most

frequent creditor.

29.     The evidence reflected that at all times Mr. Dondero has been the President of

both of the Alleged Debtors, and there have been, at all times, very few, if any, other officers. It

appears that the only other officer of Acis GP/LLC that ever existed was Frank Waterhouse,

Treasurer.[34]  It also appears that the only other officer of Acis LP that ever existed was Frank

Waterhouse, Treasurer, Mr. Terry as Portfolio Manager, and someone named Patrick Boyce as

Secretary at one time.[35]

30.     Mr. Dondero testified that he has decision making authority for the Alleged

Debtors but usually delegates that authority to Highland's in-house lawyers, Scott Ellington

(General Counsel, Chief Legal Officer, and Partner of Highland) and Isaac Leventon (Assistant

General Counsel of Highland) and is rarely involved in "nitty gritty negotiations."   Sometimes

instructions will come to him from the compliance group headed up by Chief Compliance

Officer Thomas Surgent.  Additionally, he testified that he signs hundreds of documents per

---

[33] Exh. 83, pp. 228 (line 8)-230 (line 14).

[34] *See, e.g.*, Exh. 10 & Exh. 173, p.3

[35] Exhs. 14 & 15.

15

week, and much of what he signs is on advice of counsel and he sometimes even delegates to his

assistant the authority to sign his name. As set forth above, Mr. Ellington (who *did not* testify at

the Trial)[36] and Mr. Leventon (who *did* testify at the Trial) are not officers, directors, or

employees of the Alleged Debtors. Mr. Leventon is designated to be the representative for the

Alleged Debtors (and testified as a Rule 30(b)(6) witness during pre-Trial discovery)—he

explained that this representative-authority derives from the Shared Services Agreement. Mr.

Leventon testified that he takes his instructions generally through his direct supervisor, Mr.

Ellington, although Highland partners can ask him to perform legal services for any of

Highland's 2,000 entities.

C.    **Transfers and Transactions Involving the Alleged Debtors Since the
       Litigation with Mr. Terry Commenced—and Especially After the
       Arbitration Award.**

31.    Below is a listing of some (but not necessarily all) of the transfers and

transactions that the Alleged Debtors, Highland, and related parties undertook *after* the litigation

with Mr. Terry commenced.

(a)    Acis LP's Sale to Highland of a "Participation Interest" in its CLO Cash Flow

       Stream.  On October 7, 2016 (approximately one month after the litigation arose

       among Mr. Terry, Highland, and the Alleged Debtors), Acis LP sold to Highland

       a participation interest in its expected future cash flow from the CLO Collateral

       Management Agreements—specifically, it sold a portion of the cash flow it

       expected to earn from November 2016 to August 2019 (not the full life of the

       CLOs), for $666,655 cash, plus a $12,666,446 note payable from Highland to

---

[36] Mr. Ellington did testify at a hearing in the bankruptcy court on February 6, 2018—which the parties
asked this court to take judicial notice of—and also provided deposition testimony that was submitted into evidence.
*See* Exh. 25.

Acis LP (hereinafter, the "Acis LP Note Receivable from Highland"). Mr.
Dondero signed the purchase and sale agreement for both purchaser and seller.[37]
Mr. Dondero signed the Acis LP Note Receivable from Highland, which accrued
interest at 3% per annum. It appears that the $666,665 cash down payment was
actually paid, and a payment required on the Acis LP Note Receivable from
Highland of $3,370,694 on May 31, 2017, was actually made. The Acis LP Note
Receivable from Highland was payable in three installments, with a $5,286,243
payment required on May 31, 2018, and a $4,677,690 payment required on May
31, 2019. When viewed in complete isolation, this transaction does not
necessarily appear problematic. Although there was evidence that Acis LP had
been managing the five CLOs for about $10 million per year of fees, some of the
recitals in the purchase and sale agreement suggest that there may have been a
sound business reason for the transaction and the arbitration panel,[38] viewing this
transaction in isolation, did not think it was necessarily problematic or actionable.
In any event, Highland is adamant it was a net neutral transaction.

(b)     Transfer of Acis LP's interest in ALF.  Recall that ALF was the entity that held
equity (*i.e.,* the subordinated notes) in the CLO special purpose vehicles, and held
voting rights and was a capital provider to the overall risk retention structure
supporting the CLOs. And Acis LP, in turn, held a 15% indirect interest in ALF.
On October 24, 2017 (***four days after the Arbitration Award***), Acis, LP entered
into an agreement with ALF whereby ALF acquired back the shares that Acis LP

---

[37] Exhs. 14 & 15.

[38] Exh. 1, p. 18.

17

indirectly held in ALF (966,679 shares) for the sum of $991,180.13.[39]  No

credible business justification was offered for this transaction, other than mostly

uncorroborated (and self-serving) statements from Highland witnesses that Acis

LP was "toxic" in the market place (due to the litigation with Mr. Terry) and this

was a step in the process of extricating Acis LP from the CLO business.[40]  The

court finds the testimony about Acis LP's toxicity in the marketplace to not be

credible or at all convincing.  For one thing, a new CLO (Acis CLO 2017-7, Ltd.)

was closed on April 10, 2017 with Acis LP as the portfolio manager.  Moreover,

Acis LP subcontracts all of its CLO management function to Highland—and there

was no evidence to suggest that anyone in the marketplace at this juncture

differentiates between Acis LP (whose president is Mr. Dondero) and Highland

(whose president is Mr. Dondero).  ***In any event, the October 24, 2017***

***transaction had the highly consequential effect of making Acis LP***

***"noncompliant" or unable to continue serving as a CLO manager for***

***regulatory purposes for any new CLOs or reset CLOs (or for a refinancing of***

***any of the Highland CLOs that had been created after December 2014)[41]***

***because aspects of the federal Dodd Frank legislation require CLO managers to***

***have "skin in the game" with regard to the CLOs they manage (i.e., they must***

***retain at least 5% of CLOs they manage).***  Mr. Akada, who testified that he had

been involved with the CLO business from the beginning and that the CLO team

---

[39] Exh. 173.

[40] There were also a few hearsay-laden emails offered, that the court did not find probative.  Exhs, 19-22.

[41] *See* n.23 *supra*.

reported to him (including Mr. Terry before his termination), testified that he had no knowledge of this particular transaction. The document effectuating this transaction was signed by Frank Waterhouse, Treasurer for and on behalf of Acis LP, acting by its general partner, Acis GP/LLC.[42]

(c)  <u>ALF Next Decides to Jettison Acis, LP as its Portfolio Manager and Replace it with a new Highland Cayman Island Entity</u>.  On October 27, 2017 (seven days after the Arbitration Award), ALF—having purchased back the ownership interest that Acis LP had in it, just three days earlier—decided that it would no longer use Acis LP as its portfolio manager and entered into a new portfolio management agreement to supersede and replace the ALF Portfolio Management Agreement. Specifically, on October 27, 2017, ALF entered into a new Portfolio Management Agreement with a Cayman Island entity called Highland HCF Advisor, Ltd., replacing Acis LP in its role with ALF.[43]  This agreement appears to have been further solidified in a second portfolio management agreement dated November 15, 2017.[44]

(d)  <u>The Acis LP Note Receivable from Highland is Transferred from Acis LP to Yet Another Highland Cayman Island Entity.</u>  On November 3, 2017 (10 days after the Arbitration Award), Acis LP assigned and transferred its interests in the Acis LP Note Receivable from Highland—which at that point had a balance owing of over $9.5 million—to a Highland Cayman Island entity known as Highland CLO

---

[42] Exh. 173, p. 3.

[43] Exh. 43.

[44] Exh. 168.

Management Ltd. which apparently was created sometime recently to be the new

collateral manager of the CLOs (in other words, the new Acis LP).[45]  The

Assignment and Transfer Agreement memorializing this transaction is signed by

Mr. Dondero for Acis LP and Mr. Dondero for Highland and some

undecipherable name for Highland CLO Management Ltd.[46]  The document

recites that (i) Highland is no longer willing to continue providing support

services to Acis LP, (ii) Acis LP, therefore, can no longer fulfill its duties as a

collateral manager, and (iii) Highland CLO Management Ltd. agrees to step into

the collateral manager role if Acis  LP will assign to it the Acis LP Note

Receivable from Highland.   One more thing:  since Acis LP was expected to

potentially incur future legal and accounting/administrative fees, and might not

have the ability to pay them when due, ***Highland CLO Management Ltd.*** agreed

to reimburse Acis LP (or pays its vendors directly) up to $2 million of future legal

expenses and up to $1 million of future accounting/administrative expenses.[47]

(e)   <u>Various Additional Transactions that further Transitioned CLO Management and
Fees Away from Acis LP to Highland Cayman Island Entity.</u>  On December 19,

2017—just one day after the Arbitration Award was confirmed with the entry of

the Final Judgment—the vehicle that can most easily be described as the Acis LP

"risk retention structure" (necessitated by federal Dodd Frank law) was

transferred away from Acis LP and into the ownership of Highland CLO

---

[45] Exh. 16.

[46] *Id.* at p.6.

[47] *Id.* at pp. 1 & 2.

20

Holdings, Ltd. (yet another Cayman Island entity, incorporated on October 27, 2017[48]).

(f)    In addition to transferring Acis LP's interest in the Acis LP risk retention structure on December 19, 2017, Acis LP also transferred its contractual right to receive management fees for Acis CLO 2017-7, Ltd. (which had just closed April 10, 2017), which Mr. Terry credibly testified had a combined value of $5 million, to Highland CLO Holdings, Ltd., another Cayman entity, purportedly in exchange for forgiveness of a $2.8 million receivable that was owed to Highland under the most recent iteration of the Shared Services Agreement and Sub-Advisory Agreement for CLO-7.[49]   In conjunction with this transfer, Highland CLO Holdings, Ltd. then entered into new Shared Services and Sub-Advisory Agreements with Highland.[50]

(g)    <u>Change of Equity Owners of the Alleged Debtors</u>.  When Acis LP was first formed, it was owned by one general partner (Acis GP/LLC, with a .1% interest) and it had three limited partners: (a) Dugaboy Investment Trust (a Dondero family trust of which either Mr. Dondero or his sister, Nancy Dondero, have been the Trustee at all relevant times) with a 59.9% interest; (b) Mr. Terry with a 25% interest; and (c) Mr. Akada with a 15% interest.  When Acis GP/LLC was formed

---

[48] Exh. 157.

[49] *See* Ex. 45 (the Transfer Document); *see also* Exh. 4 (the March 17, 2017 Third Amended and Restated Sub-Advisory Agreement between Acis LP and Highland); Exh. 5 (the March 17, 2017 4th Amended & Restated Shared Services Agreement between Acis LP and Highland); Exh. 165 (March 17, 2017 Staff and Services Agreement between Acis CLO Management, LLC and Acis LP); Exh. 166 (March 17, 2017 Master Sub-Advisory Agreement between Acis CLO Management, LLC and Acis LP).

[50] *See* Exhs. 161 & 162.

21

(*i.e.,* the .1% owner of Acis LP), its sole member was the Dugaboy Investment

Trust.   After Mr. Terry was terminated by Highland, his 25% limited partnership

interest in Acis LP was forfeited and divided among the two remaining limited

partners: Mr. Akada (increasing his interest by 10% up to 25%), and Dugaboy

Investment Trust (increasing its interest by 15% up to 74.9%).  But, more

importantly, on the day after entry of Mr. Terry's Final Judgment (*i.e.,* on

December 18, 2017), both Mr. Akada and Dugaboy Investment Trust conveyed

their entire limited partnership interests in Acis LP—25% and 74.9%,

respectively—to a Cayman Island entity called Neutra, Ltd., a Cayman Islands

exempted company.   Dugaboy Investment Trust also conveyed its 100%

membership interest in Acis GP/LLC to Neutra, Ltd.  Mr. Akada testified that he

did this on advice of counsel.  He also did not dispute that he had made millions

of dollars of equity dividends from his equity investment in Acis LP in recent

years[51]—which he conveyed away for no consideration on December 18, 2017.

(h)     The Intended Reset of Acis CLO 2014-3.  With all of the above maneuverings

having been accomplished, Highland was posed to do a reset on Acis CLO 2014-3

in February 2018 (until Mr. Terry filed the Involuntary Petitions).  The investment

bank Mizuho Securities USA, LLC was engaged November 15, 2017[52] and a final

offering circular was issued in January 2018[53]—contemplating a reset of Acis

CLO 20-14-3 with the recently created Highland CLO Management Ltd.

---

[51] Exh. 23, p.3.

[52] Exh. 104.

[53] Exh. 31.

Identified as the new portfolio manager, rather than Acis LP.  The act of

implementing a reset on the CLO was not in itself suspect.  However, the reset

would, of course, have the effect of depriving Acis LP from a valuable asset—an

agreement that could realistically be expected to provide millions of dollars of

future collateral management fees—coincidentally (or not) just after Mr. Terry

obtained his large judgment.

**D.      Findings Regarding Credibility of Witnesses.**

32.      The court found the testimony of Mr. Terry to be very credible.  He was very

familiar with the financial condition of the Alleged Debtors, since he presided over the business

of the Alleged Debtors from their inception until June 9, 2016, and has also closely followed

publicly available information regarding the companies since his termination.  Mr. Terry credibly

testified that the Alleged Debtors have never had a significant number of creditors, since most of

the Alleged Debtors' vendors are engaged by and send their invoices to Highland, and Highland

simply obtains reimbursement from the Alleged Debtors (and other entities in the Highland

family), as its in-house lawyers determine is appropriate, through the Shared Services Agreement

and Sub-Advisory Agreement.  Thus, Highland should at all times be the Alleged Debtors' main

creditor.  The court finds that Mr. Terry had a good faith belief that the Alleged Debtors had only

a handful of creditors (maybe four or so) besides him and Highland.  The court also finds that

Mr. Terry—at the time he filed the Involuntary Petitions—had a good faith belief that the

Alleged Debtors and those controlling them were engaged in an orchestrated, sophisticated effort

to denude the Alleged Debtors of their assets and value (*i.e.*, transferring assets and rights for

23

less than reasonably equivalent value), which started with intensity after issuance of the

Arbitration Award (if not sooner).[54]

33.     The court found the testimony of almost all of the witnesses for the Alleged

Debtors to be of questionable reliability and, oftentimes, there seemed to be an effort to convey

plausible deniability.  For example, sometimes business decisions concerning the Alleged

Debtors were said to have been made by a "collective," and other times the in-house Highland

lawyers (who, of course, are not themselves officers or employees of Acis LP and Acis GP/LLC)

stressed that Mr. Dondero (the president and manager of the two entities) had ultimate decision

making authority for them.  Meanwhile, Mr. Dondero testified that, while he has decision

making authority at Acis LP, he usually delegates to Highland's in-house lawyers Scott Ellington

and Isaac Leventon.   He testified that he signs hundreds of documents per week and often must

rely on information of others when signing.  Additionally, Mr. Dondero (again, the President of

each of the Alleged Debtors) testified that he had never even read the Arbitration Award.  While

Mr. Dondero is the chief executive of a multi-billion dollar international investment company,

and naturally has widespread responsibilities and must delegate to and rely upon others including

lawyers, this court simply does not believe that he never read the Arbitration Award.  The court

perceived the animosity between Mr. Dondero and Mr. Terry to be rather enormous and Mr.

Dondero even testified (as did others) that the litigation with Mr. Terry was hurting Acis LP and

Highland in the CLO marketplace (*i.e.,* no investors or underwriters wanting to be associated

---

[54] The court also found that the deposition testimony of Brian Shaw and Rahkee Patel (counsel for Mr. Terry) was also credible and did not demonstrate any bad faith on their parts in filing the Involuntary Petitions on behalf of Mr. Terry.

24

with the Acis brand).[55]  If that were the case, it strains credulity to suggest Mr. Dondero never

even read the Arbitration Award.

34.     As mentioned earlier, in December 2017, Acis GP/LLC became 100% owned by

a Cayman Island entity known as Neutra, Ltd. (whose beneficial owner is a Dondero family

trust) and Acis LP became 99.9% owned by Neutra, Ltd.  The directors of Acis GP/LLC and

Acis LP are provided to it now by an entity known as "Maples Fiduciary Services"—another

Cayman Island entity, but the Highland Assistant General Counsel could not remember the

names of those directors provided to Acis GP/LLC and Acis LP, except for perhaps one.  Mr.

Dondero, when questioned about some of the recent transactions pertaining to Acis LP, testified

that there were tax reasons—tax lawyers recommended the recent transactions and transfers.  No

tax lawyers testified.  Mr. Dondero also testified that certain transactions were at the directive of

the Thomas Surgent group (the Highland chief compliance officer).  Neither Mr. Surgent nor

anyone else from the compliance group testified.

35.     Meanwhile, Mr. Akada, who, while testifying, seemed like a generally lovely

person and seemed as knowledgeable as a human being could possibly be on the topic of CLOs

generally, had no idea if he was an officer or director of the Alleged Debtors, nor did he know

whom its officers were.  He could not testify as to the meaning of certain transactions in which

Acis LP had engaged in during recent weeks and said that he signed certain documents on advice

of counsel.  He also could not even testify as to whether Highland was opposing the Involuntary

Petitions.

36.     Again, there was a lot of plausible deniability at Trial as to the "whos" and

"whys" for the recent maneuverings involving the Alleged Debtors assets and rights in the weeks

---

[55] No such investors or underwriters provided testimony.

since the Arbitration Award. The one thing that the court was wholly convinced of was that conflicts of interest among Highland and the Alleged Debtors abound, and no one is looking out for the interests of the Alleged Debtors as a fiduciary should.

### E.  Evidence Regarding the Number of Creditors of the Alleged Debtors.[56]

37.    The Alleged Debtors do not dispute Mr. Terry's claim for the purposes of counting creditors under section 303(b) of the Bankruptcy Code. However, Mr. Terry asserts that the Alleged Debtors have fewer than 12 creditors, and the Alleged Debtors dispute this fact. Specifically, the Alleged Debtors initially filed on January 31, 2018, a Notice of List of Creditors Pursuant to Fed. R. Bankr. P. 1003(b) signed by Mr. Dondero listing 18 creditors (the "Original Notice of Creditors").[57] The Alleged Debtors subsequently filed on February 5, 2018, a First Amended Notice of List of Creditors Pursuant to Fed. R. Bankr. P. 1003(b) signed by Mr. Leventon listing 19 creditors (the "First Amended Notice of Creditors").[58] Finally, the Alleged Debtors filed on March 6, 2018, a Second Amended Notice of List of Creditors Pursuant to Fed. R. Bank. P. 1003(b) signed by Mr. Leventon listing 20 creditors (the "Second Amended List of Creditors").[59] The following chart summarizes the name, amount, and nature of the 20 creditors listed by the Alleged Debtors in their Second Amended List of Creditors.

---

[56] The court notes that neither Mr. Terry nor the Alleged Debtors attempted to differentiate between the creditors of Acis GP/LLC versus the creditors of Acis LP, but rather presented evidence regarding the collective number of creditors for both of the Alleged Debtors. This seems legally appropriate, since Acis LP is the entity that incurred most of the debt, and ACIS GP/LLC would be liable on such debt as the general partner of Acis LP.

[57] *See* DE # 7 in Case No. 18-30264 & DE # 7 in Case No. 18-30265.

[58] *See* DE # 17 in Case No. 18-30264 & DE # 16 in Case No. 18-30265.

[59] *See* DE # 39 in Case No. 18-30264 & DE # 38 in Case No. 18-30265.

26

| Creditor No. | Creditor Name | Nature of Claim | Total Indebtedness[60] |
|---|---|---|---|
| 1 | Andrews Kurth | Legal Fees | $211,088.13 |
| 2 | Case Anywhere, LLC | Law Firm Vendor | $417.20 |
| 3 | CSI Global Deposition Services | Law Firm Vendor | $38,452.56 |
| 4 | David Langford | Court Reporter/Law Firm Vendor | $550 |
| 5 | Drexel Limited | Fee Rebate | $6,359.96 |
| 6 | Elite Document Technology | Data Hosting/Law Firm Vendor | $199.72 |
| 7 | Highfield Equities, Inc. | Fee Rebate | $2,510.04 |
| 8 | Highland Capital Management, L.P. | Advisory and Participation Fees | $2,770,731.00 |
| 9 | JAMS, Inc. | Law Firm Vendor | $1,352.27 |
| 10 | Jones Day | Legal Fees | $368.75 |
| 11 | Joshua Terry | Judgment Creditor | $8,060,827.84 |
| 12 | KPMG LLP | Auditor Fees | $34,000 |
| 13 | Lackey Hershman LLP | Legal Fees | $236,977.54 |
| 14 | McKool Smith, P.C. | Legal Fees | $70,082.18 |
| 15 | Reid Collins & Tsai LLP | Legal Fees | $17,383.75 |
| 16 | Stanton Advisors LLC | Testifying Expert Fees/Law Firm Vendor | $10,000 |
| 17 | Stanton Law Firm | Legal Fees | $88,133.99 |
| 18 | The TASA Group. Inc. | Testifying Expert Fees/Law Firm Vendor | $14,530.54 |
| 19 | CT Corporation | Report Filing Representation | $517.12 |
| 20 | David Simek | Expense Reimbursement | $1,233.19 |

38.     First, the court believes it necessary to remove certain insider creditor claims,

which are required not to be counted pursuant to section 303(b)(2) of the Bankruptcy Code.[61]

This would clearly include Highland (the Alleged Debtors do not dispute this).

---

[60] The dollar amounts listed here are based upon the amounts listed in the Second Amended List of Creditors.

[61] *In re Moss*, 249 B.R. 411, 419 n. 6 (Bankr. N.D. Tex. 2000).

27

39.     Additionally, there were certain creditors that filed sworn statements saying they were not creditors of the Alleged Debtors or were subsequently removed from the creditor list by agreement of the Alleged Debtors.  These creditors would include Case Anywhere, CSI Global Deposition Services,[62] Elite Document Technology, JAMS, Inc.,[63] Stanton Advisors LLC,[64] and the TASA Group, Inc..[65]  Thus, the updated chart now shows 13 creditors of the Alleged Debtors.

| Creditor No. | Creditor Name | Nature of Claim | Total Indebtedness |
|---|---|---|---|
| 1 | Andrews Kurth | Legal Fees | $211,088.13 |
| 2 | Case Anywhere, LLC | Law Firm Vendor | $417.20 |
| 3 | CSI Global Deposition Services | Law Firm Vendor | $38,452.56 |
| 4 | David Langford | Court Reporter/Law Firm Vendor | $550 |
| 5 | Drexel Limited | Fee Rebate | $6,359.96 |
| 6 | Elite Document Technology | Data Hosting/Law Firm Vendor | $199.72 |
| 7 | Highfield Equities, Inc. | Fee Rebate | $2,510.04 |
| 8 | Highland Capital Management, L.P. | Advisory and Participation Fees | $2,770,731.00 |
| 9 | JAMS, Inc. | Law Firm Vendor | $1,352.27 |
| 10 | Jones Day | Legal Fees | $368.75 |
| 11 | Joshua Terry | Judgment Creditor | $8,060,827.84 |
| 12 | KPMG LLP | Auditor Fees | $34,000 |
| 13 | Lackey Hershman LLP | Legal Fees | $236,977.54 |
| 14 | McKool Smith, P.C. | Legal Fees | $70,082.18 |
| 15 | Reid Collins & Tsai LLP | Legal Fees | $17,383.75 |

---

[62] CSI Global Deposition Services was removed as a creditor by the agreement of the Alleged Debtors.

[63] JAMS, Inc. was removed as a creditor by agreement of the Alleged Debtors.

[64] Stanton Advisors LLC was removed as a creditor by agreement of the Alleged Debtors.

[65] *See* Exh. 40B, Exh. 186, Exh. 92, and Exh. 94.

28

| 16 | Stanton Advisors LLC | Testifying Expert Fees/Law Firm Vendor | $10,000 |
| 17 | Stanton Law Firm | Legal Fees | $88,133.99 |
| 18 | The TASA Group. Inc. | Testifying Expert Fees/Law Firm Vendor | $14,530.54 |
| 19 | CT Corporation | Report Filing Representation | $517.12 |
| 20 | David Simek | Expense Reimbursement | $1,233.19 |

40. Next, the court finds that there are certain creditors included in the "Law Firm Vendor" category (*e.g.*, experts, data hosting, document managers, court reporters) that are really creditors of the individual law firms and/or Highland, and that these law firm vendor creditors should not be considered creditors of the Alleged Debtors. For these, there was no evidence of a direct contractual obligation on the part of either the Alleged Debtors or Highland—although the court certainly understands that, when the law firms would retain vendors, they would bill these to either the Alleged Debtors or Highland as an expense to be reimbursed. Most of these were already eliminated with agreement of the Alleged Debtors but, from the remaining list of creditors, this would include David Langford (a Dallas County court reporter).[66] To be clear, while the individual law firm creditors may ultimately have a right to reimbursement for these vendor expenses from Highland (who may then potentially have a right to reimbursement from the Alleged Debtors via the Shared Services and Sub-Advisory Agreements), the court does not find this vendor to have a claim ***directly*** against the Alleged Debtors for purposes of section 303(b) of the Bankruptcy Code.

---

[66] *See* Exh. 40D, Exh. 187, Exh. 40O.

29

41.     Next, as to the Stanton Law Firm, the court finds that this creditor should also be removed from the pool of creditors that "count," for section 303(b) purposes, since this claim appears to be the subject of a "bona fide dispute as to liability or amount,"[67] based on the evidence presented at the Trial.  First, there was no engagement letter between either of the Alleged Debtors and the Stanton Law Firm produced.[68]  Second, the heavily redacted invoice of the Stanton Law Firm dated October 18, 2016 shows only that it was relating to the "Joshua Terry Matter" and that it was billed to Highland.[69]  Third, the Responses and Objections to Mr. Terry's Notice of Intention to Take Depositions by Written Questions sent to the Stanton Law Firm[70] provides the following responses:

> **Question No. 11**: What is the total amount of debt Acis Capital Management L.P. to the Firm. is liable to the Firm.
>
> **Answer**: Acis Capital Management L.P.'s debt to the Firm is unknown at this time.
>
> **Question No. 12**: What is the total amount of debt Acis Capital Management GP, LLC is liable for to the firm?
>
> **Answer**: Acis Capital Management GP, LLC to the Firm is unknown at this time.
>
> **Question No**. **13**: Is any other party also liable for the debt of Acis Capital Management L.P. to the Firm? If so, please state the liable party and portion of Acis Capital Management L.P. debt the other party is liable for to the Firm.

[67] *See Credit Union Liquidity Servs., L.L.C. v. Green Hills Dev. Co., L.L.C. (In re Green Hills Dev. Co., L.L.C.)*, 741 F.3d 651, 655 (5th Cir. 2014) (a claimholder does not have standing to file a petition under section 303(b) if its claim is "the subject of a bona fide dispute as to liability or amount"); *In re Smith*, 415 B.R. 222, 237 (Bankr. N.D. Tex. 2009) (only "a holder of a claim ... that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount" is counted in determining the number of creditors necessary to file an involuntary petition).

[68] Rather, there is only an engagement letter between Lackey Hershman LLP (acting on behalf of its client, Highland) and Stanton Advisors LLC to act as an expert in the Terry litigation.  *See* Exh. 144.  As previously noted, the claim of Stanton Advisors LLC was removed from the creditor list by agreement of the Alleged Debtors.

[69] *See* Exh. 40R.

[70] The court notes that these responses were actually signed by James Michael Stanton, attorney for Stanton LLP.  *See* Exh. 139.

30

> **Answer**: Whether any other party is also liable to the firm for the debt of Acis Capital Management, L.P. is unknown at this time.
>
> **Question No**. **14**: Is any other party also liable for the debt of Acis Capital Management GP, LLC to Firm? If so, please state the liable party and portion of Acis Capital Management GP, LLC debt the other party is liable for to the Firm.
>
> **Answer**: Whether any other party is also liable for the debt of Acis Capital Management GP, LLC is unknown at this time. . . .
>
> **Question No. 21**: Does the Firm currently represent Acis Capital Management, L.P.? If so, please state the representation.
>
> **Answer**: Based on Acis's assertion that this question calls for information protected by the attorney-client privilege, the Firm cannot answer this question at this time.
>
> **Question No. 22**: Does the Firm currently represent Acis Capital Management GP, LLC? If so, please state the representation?
>
> **Answer**: Based on Acis's assertion that this question calls for information protected by the attorney-client privilege, the Firm cannot answer this question at this time. . . .[71]

The court finds that this evidence demonstrates that the claim of the Stanton Law Firm is the subject of a bona fide dispute as to either liability or amount and should not be counted since there is no real way of even knowing who the Stanton Law Firm was engaged by and, thus, whether the Alleged Debtors are even responsible for these alleged legal fees.  The court would also specifically refer to the testimony of Mr. Leventon, the in-house lawyer employed by Highland who was in charge of allocating all of the bills that came into Highland's legal invoicing system, where he described a process in which all legal bills relating to the "Terry Matter" would automatically be assigned to the Alleged Debtors, without any real regard to whether the particular law firm had even been engaged by the Alleged Debtors or if whether the

---

[71] *See* Exhibit 139.

31

representation was actually relating to one of the other parties in the Terry litigation (*e.g.*, Highland, Mr. Dondero, etc.). Accordingly, the court finds that there is a bona fide dispute as to whether the Alleged Debtors are actually liable for the Stanton Law Firm legal fees and that they should not be counted as a creditor for purposes of section 303(b) of the Bankruptcy Code.[72]

42. Thus, it appears, at most, that there are 11 creditors[73] of the Alleged Debtors as set forth in the chart below:

| Creditor No. | Creditor Name | Nature of Claim | Total Indebtedness |
|---|---|---|---|
| 1 | Andrews Kurth | Legal Fees | $211,088.13 |
| 2 | ~~Case Anywhere, LLC~~ | ~~Law Firm Vendor~~ | ~~$417.20~~ |
| 3 | ~~CSI Global Deposition Services~~ | ~~Law Firm Vendor~~ | ~~$38,452.56~~ |
| 4 | ~~David Langford~~ | ~~Court Reporter/Law Firm Vendor~~ | ~~$550~~ |
| 5 | Drexel Limited | Fee Rebate | $6,359.96 |
| 6 | ~~Elite Document Technology~~ | ~~Data Hosting/Law Firm Vendor~~ | ~~$199.72~~ |
| 7 | Highfield Equities, Inc. | Fee Rebate | $2,510.04 |
| 8 | ~~Highland Capital Management, L.P.~~ | ~~Advisory and Participation Fees~~ | ~~$2,770,731.00~~ |
| 9 | ~~JAMS, Inc.~~ | ~~Law Firm Vendor~~ | ~~$1,352.27~~ |
| 10 | Jones Day | Legal Fees | $368.75 |

---

[72] *See also In re CorrLine Int'l, LLC*, 516 B.R. 106, 152 (Bankr. S.D. Tex. 2014) (bankruptcy court found that creditors contained in the alleged debtor's list of creditors with uncertain or unknown amounts could not be counted towards the numerosity requirement of section 303(b)).

[73] The court notes that, in all likelihood, the list of creditors that should be tallied for purposes of section 303(b) may actually be less than 11, because certain of the remaining creditors (*i.e.*, Drexel Limited, Highfield Equities, Inc., Lackey Hershman LLP, and David Simek) received payments during the 90 days preceding the Petition Date—and, thus, arguably should not be counted as creditors pursuant to section 303(b) of the Bankruptcy Code (which instructs that transferees of voidable transfers should not be counted). *See, e.g.*, Ex. 124 & Ex. 131. Additionally, certain of the remaining law firm creditors that are owed legal fees are also creditors of Highland and Highland-affiliates, not just the Alleged Debtors. To elaborate, many of these law firm creditors were employed to represent not only the Alleged Debtors, but also Highland and Highland-affiliates, so there may be an actual dispute as to the allocation of these legal fees among Highland and the Alleged Debtors (thus there could be bona fide disputes as to the amounts allocated by Highland's in-house lawyers to the Alleged Debtors). *See, e.g.*, Ex. 123 (McKool Smith, P.C. engagement letter referencing representation of numerous parties) & Exhibit 90 (Reid Collins & Tsai's Answers and Objections to Mr. Terry's Deposition by Written Questions, questions 13 & 14, stating that based upon allocation determinations to be made by Highland, other individuals may be liable for the full amount of the debt including Acis LP, Highland, Mr. Dondero, and Mr. Okada).

| 11 | Joshua Terry | Judgment Creditor | $8,060,827.84 |
| 12 | KPMG LLP | Auditor Fees | $34,000 |
| 13 | Lackey Hershman LLP | Legal Fees[74] | $236,977.54 |
| 14 | McKool Smith, P.C. | Legal Fees | $70,082.18 |
| 15 | Reid Collins & Tsai LLP | Legal Fees | $17,383.75 |
| ~~16~~ | ~~Stanton Advisors LLC~~ | ~~Testifying Expert Fees/Law Firm Vendor~~ | ~~$10,000~~ |
| ~~17~~ | ~~Stanton Law Firm~~ | ~~Legal Fees~~ | ~~$88,133.99~~ |
| ~~18~~ | ~~The TASA Group, Inc.~~ | ~~Testifying Expert Fees/Law Firm Vendor~~ | ~~$14,530.54~~ |
| 19 | CT Corporation | Report Filing Representation | $517.12 |
| 20 | David Simek | Expense Reimbursement | $1,233.19 |

43.     Finally, on the topic of creditor numerosity, the court further finds that the evidence strongly suggested hurried manufacturing of creditors on the part of the Alleged Debtors and Highland, in order to bolster an argument that having a sole petitioning creditor was legally inadequate in this case.[75]  For example, the Klos Declaration and other information, that was provided to State Court 2 and in discovery, only days before the Involuntary Petitions were filed,

---

[74] Mr. Terry has also argued that certain of the law firm creditors (McKool Smith, P.C., Lackey Hershman, LLP, and Reid Collins & Tsai) are "insiders" that must be excluded from the creditor list pursuant to section 303(b) of the Bankruptcy Code.  While there may be some support in case law for such an argument, Mr. Terry would ultimately need to show by a preponderance of the evidence that the law firms exercised such control or influence over the Alleged Debtors as to render their transactions not at arm's length.  *See In re CorrLine Intern., LLC*, 516 B.R. 106, 157-58 (Bankr. S.D. Tex. 2014) (citing *Kepler v. Schmalbach (In re Lemanski)*, 56 B.R. 981, 983 (Bankr.W.D.Wis.1986)).  *See also In re Holloway*, 955 F.2d 1008, 1011 (5th Cir. 1992) (in evaluating whether insider status existed for purposes of evaluating alleged fraudulent conveyance court considered  (1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length).  Because there was no evidence suggesting abuse or control by these law firm creditors, nor was there any evidence that would suggest that their dealings with the Alleged Debtors were anything but arm's length, the court finds that these law firm creditors should not be excluded from the creditor list as "insiders" pursuant to section 303(b) of the Bankruptcy Code.

[75] *See* the Original Notice of Creditors, the First Amended Notice of Creditors, and the Second Amended Notice of Creditors.

33

seemed to show only a small number of creditors of Acis LP—Mr. Terry credibly testified that

he thought there were less than 12 creditors based on his review of such information, as well as

his understanding of the Alleged Debtors' business. Yet, only a few days later, the Alleged

Debtors filed their Original Notice of Creditors, which showed 18 creditors, which was amended

twice to add another creditor and then yet another. This simply does not jive in the court's mind

and supports this court's belief that the Alleged Debtors were scurrying to determine which

Highland creditors might cogently be painted as Acis LP creditors—so as to preclude Mr. Terry

from being able to file the Involuntary Petitions as the single, petitioning creditor.

F.    **Evidence Regarding Whether the Alleged Debtors are Generally Not Paying Debts as They Become Due (Unless Such Debts are the Subject of a Bona Fide Dispute as to Liability or Amount).**

44.    The evidence submitted reflects that, for the 11 creditors identified above, 9 out of

11 have unpaid invoices that were more than 90 days old. The remaining 2 of the 11 were

McKool Smith, P.C. (current counsel for the Alleged Debtors) and the Petitioning Creditor.[76]

The court makes findings with regard to each of the 11 creditors below—focusing specifically on

whether the Alleged Debtors have been paying these creditors as their debts have become due.

45.    First, with regard to Andrews Kurth & Kenyon ("AKK"), the evidence reflected

that out of the $211,088.13 allegedly owed by Acis LP to AKK, the great majority of it—

$173,448.42—was invoiced on November 16, 2016[77] (more than 14 months before the Petition

Date). Other, smaller amounts were invoiced on a monthly basis in each of the months August

2017, September 2017, October 2017, November 2017, and December 2017. Although

requested in discovery, no engagement letter for AKK was produced and AKK represented in

---

[76] Exhs. 40 & 54.

[77] Exh. 40.

written discovery that, to its knowledge, none existed.[78]  The court notes anecdotally that AKK's invoices (although allegedly related to Acis LP legal matters) were addressed to Highland.[79]  In any event, AKK represented that both the Alleged Debtors and Highland are jointly and severally liable for the fees owed to it.[80]  AKK also represented that, to its knowledge, the amounts owing to it by Acis LP and Highland are not disputed.[81]  AKK also represented that it has not provided legal work on a contingency basis for the Alleged Debtors or Highland.[82]  The court makes a logical inference that AKK expected timely payment of its invoices—the largest of which was dated more than 14 months prior to the Petition Date—and, thus, it has generally not been paid timely.

46.     Next, with regard to Drexel Limited, the Petitioning Creditor concedes that its $6,359.96 indebtedness (which is a fee rebate owing to it) is not past-due.

47.     Next, with regard to Highfield Equities, Inc., the Petitioning Creditor concedes that its $2,510.04 indebtedness (which is also a fee rebate owing to it) is not past-due.

48.     Next, with regard to the Jones Day law firm, the $368.75 indebtedness owed to it is well more than 90 days old.  Specifically, there is a six-and-a-half-month old invoice dated July 19, 2017 invoice in the amount of $118.75, and two five-month old invoices dated August 30, 2017 (both in the amount of $150).[83]  The court makes a logical inference that Jones Day

---

[78] Exh. 98, Requests 1-2.

[79] Exh. 98, pp. AKK000061-AKK000060.

[80] Exh. 98, Question 13.

[81] Exh. 98, Questions 52-55.

[82] Exh.  98, Questions 73-75.

[83] Exh. 40K.

35

expected timely payment of its invoices prior to the Petition Date and, thus, it has generally not been paid timely.

49.     Next with regard to the Petitioning Creditor, Mr. Terry, the court notes that his liquidated claim in the amount of $8,060,827.84 first arose with the final Arbitration Award on October 20, 2017 (although such award was not confirmed by State Court 2 until December 18, 2017). The judgment was unstayed as of the January 30, 2018 Petition Date, although the Alleged Debtors state that they still desire to appeal it—as difficult as that is in the situation of an arbitration award. The court makes a logical inference that the Alleged Debtors had, on the Petition Date, no intention of paying this claim any time soon based on their conduct after the Arbitration Award—although the Arbitration Award had only been in existence for three-and-a-half months as of the Petition Date. The cash in the Alleged Debtors' bank accounts is wholly insufficient to cover the Arbitration Award and, meanwhile, corporate transactions have been ongoing to ensure that no cash streams will be coming into Acis LP in the future in the same way that they have in the past. Thus, this court finds that this large claim, as of the Petition Date, was not being paid timely.

50.     Next with regard to KPMG LLP, the $34,000 indebtedness owed to it was for the service of auditing Acis LP's financial statements, pursuant to an engagement letter with it dated March 1, 2017.[84] KPMG's engagement letter reflected a $40,000 flat fee was agreed to by Acis LP for the service, of which 40% was due October 2017 (*i.e.,* $16,000), with another 45% was due in January 2018 ($18,000), and the remaining 15% would be due at the time that a final bill was sent. Acis LP has only paid $6,000 of the agreed upon amount—meaning $28,000 was overdue as of the January 30, 2018 Petition Date (with $10,000 of that being four months past

---

[84] Exh. 40M.

36

due).  The court makes a logical inference that KPMG LLP expected payment of its audit fees in

accordance with its engagement letter and, thus, it has generally not been paid timely.

51.     Next with regard to Lackey Hershman LLP, the $236,977.54 indebtedness owed

to it was for legal services provided to the Alleged Debtors and Highland in connection with the

arbitration and litigation with Mr. Terry.  No engagement letter was provided, but the invoices

for their services are all directed to Highland.[85]  The evidence reflected that three invoices had

not been paid as of the Petition Date:  an October 31, 2017 invoice in the amount of $56,909.53;

a November 30, 2017 invoice setting forth new fees in the amount of $84,789.83; and a

December 31, 2017 invoice setting forth new fees in the amount of $95,278.18.[86]  The court

makes a logical inference that Lackey Hershman LLP expected prompt payment on its invoices

(if nothing else, the statement on its invoice indicating "Total now due")[87] and, thus, it has

generally not been paid timely.

52.     Next with regard to Reid Collins & Tsai LLP, the $17,383.75 indebtedness owed

to it was billed in an invoice dated August 31, 2017, indicating an August 31, 2017 "Due Date"

(five months before the Petition Date).[88]  Although requested in discovery, no engagement letter

for this firm was produced and Reid Collins & Tsai LLP in fact represented in written discovery

that none existed.[89]  Moreover, written discovery propounded on the law firm indicated that,

while Acis LP was liable on this debt, other parties including Acis GP/LLC, Highland, Mr.

---

[85] Demonstrative Aid No. 1 (Lackey Hershman tab).

[86] Exh. 40, p. 3.

[87] Demonstrative Aid No. 1 (Lackey Hershman tab).

[88] Exh. 40P; Exh. 130, pp. 7-8.

[89] Exh. 90, Requests 1 & 2; Ex. 130, Requests 1 & 2.

37

Dondero, the Dugaboy Trust, and Mr. Akada might also be liable for the full amount of the debt—subject to Highland's allocation determinations.[90]  Based on this evidence, the court makes a logical inference that Reid Collins & Tsai LLP generally has not been paid timely.

53.     Next with regard to CT Corporation and the $517.12 indebtedness that the Alleged Debtors represent is owed, CT Corporation asserts that $4,074.84 is, in fact, owed to it by Acis LP and Acis GP/LLC.[91]  CT Corporation also believes Highland has liability for the Alleged Debtors' indebtedness.[92]  CT Corporation also believes the amount owed to it is undisputed.[93]  CT Corporation further represents that its invoices are due upon receipt.[94] CT Corporation produced several invoices in discovery, all showing due upon receipt, and one was dated as far back as December 31, 2016 (in the amount of $932).[95]  Based on this evidence, the court makes a logical inference that CT Corporation expected prompt payment on its invoices and, thus, has not been paid timely.

54.     Next with regard to David Simek, the Petitioning Creditor concedes that his $1,233.19 indebtedness (which is apparently an expense reimbursement relating to some consulting) is not past-due.

---

[90] Exh. 90, Questions 13 & 14; Exh. 130, Questions 13-14.

[91] Exh. 143, Questions 12 & 13.

[92] *Id.* at Question 14.

[93] *Id.* at Questions 22 & 23.

[94] *Id.* at Question 30.

[95] *Id.* at p. 8; Exh. 40T.

38

55.     In summary, the evidence reflects that the creditors of the Alleged Debtors are generally not being paid timely (except for perhaps four that are relatively insignificant and which may also be able to look to Highland for payment).[96]

56.     Further on the topic of timeliness, Mr. Leventon (Highland's in-house Assistant General Counsel) testified that 96% of bills submitted get paid more than 90 days after they are submitted, that approximately 70% of bills are later than 120 days after they are submitted, and some are even later than 150 days.  Mr. Leventon testified that this was a result of Acis LP receiving cash on a quarterly basis from the CLOs.  He further elaborated and testified that, for example, if Acis LP got cash on say February 1st, and it received a legal bill on that same day, that he would probably not approve it and allocate it until say February 8th.  By that time, Acis LP would have already used up all its cash, and that particular creditor would need to wait until the next quarterly payment was received in order to be paid.  He further testified that he explained this to law firms before their engagements and that, if they wanted the business, they would need to understand the process.  There are several things the court finds problematic about this testimony.  First, no testimony was offered showing that this was, in fact, the understanding of the law firms or other creditors, and, moreover, none of the engagement letters or invoices submitted into evidence reflect such payment terms.  Without this additional evidence, the court believes that the Alleged Debtors' testimony regarding how it paid invoices was mostly self-serving and did not support a finding that the Alleged Debtors were generally paying their debts

[96] Courts have also held that a debtor is generally not paying its debts as they become due when a debtor is found to have been transferring assets so as to avoid paying creditors.  *See, e.g., In re Moss*, 249 B.R. 411, 423 (Bankr. N.D. Tex. 2000) (bankruptcy court determined that an alleged debtor was not paying its debts as they came due when the alleged debtor "attempted to delay creditors through the transfers of assets she has made," concluding that "[the alleged debtor's] overall conduct of her financial affairs has been poor").  This court has also found that there may have been significant transfers of the Alleged Debtors' assets prior to the filing of the Involuntary Petitions to potentially avoid paying creditors (*i.e.*, Mr. Terry) and this may provide further support for the court's finding that the Alleged Debtors are generally not paying their debts as they become due under section 303(h).

39

as they became due.[97]  Second, to the extent Mr. Leventon's testimony demonstrates that

creditors of the Alleged Debtors expected to be paid on a quarterly basis (at the latest), certain of

the remaining 11 creditors have debts that are significantly older than four months (*i.e.*, CT

Corporation, Jones Day, AKK, and possibly even Reid Collins & Tsai LLP).  Third, the

Financial Statements of Acis LP submitted into evidence do not support the notion that the cash

balances at Acis LP were only sufficient enough to pay vendors once every quarter.[98]  For

example, the balance sheet for January 31, 2017 shows a cash balance in Acis LP bank accounts

of $1,061,663.19; the balance sheet for February 28, 2017 shows a cash balance in Acis LP bank

accounts of $905,212.36; the balance sheet for March 31, 2017 shows a cash balance in Acis LP

bank accounts of $525,626.59; the balance sheet for April 30, 2017 shows a cash balance in Acis

LP bank accounts of $117,885.96; the balance sheet for May 31, 2017 shows a cash balance in

Acis LP bank accounts of $62,733.31; the balance sheet for June 30, 2017 shows a cash balance

in Acis LP bank accounts of $10,329.15; the balance sheet for July 31, 2017 shows a cash

balance in Acis LP bank accounts of $701,904.39; the balance sheet for August 31, 2017 shows a

cash balance in Acis LP bank accounts of $332,847.05.[99]  In summary, while there may be cash

fluctuations with Acis LP, there is not a clear pattern of Acis LP being only able to pay vendors

once every quarter.

---

[97] *See In re Trans-High Corp.*, 3 B.R. 1, 2-3 (Bankr. S.D.N.Y. 1980) (bankruptcy court found that evidence showing that the petitioning creditor gave the debtor generous terms of payment (90 days) which were substantially better than the terms set forth in the actual writings between the parties supported finding that the alleged debtors were generally paying debts as they became due and that the involuntary petition must be dismissed).

[98] Exh. 147.

[99] *Id.*

40

## II.    Conclusions of Law

Section 303 of the Bankruptcy Code sets forth the various requirements for initiating an involuntary bankruptcy case.  First, pursuant to section 303(b) of the Bankruptcy Code, an involuntary case may be filed against a person by the filing with the bankruptcy court of a petition under Chapter 7—

> (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount ... [that] aggregate at least $15,775 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

> (2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $15,775 of such claims . . .[100]

Thus, if there are twelve or more eligible creditors holding qualified claims on the Petition Date, three or more entities must participate in the involuntary filing and must hold unsecured claims aggregating $15,775.00.  If there are less than twelve creditors, a single creditor with an unsecured claim of $15,775.00 may file the involuntary petition.  To the extent a bankruptcy court finds that the requisite number of petitioning creditors have commenced the involuntary case, the court shall order relief against the debtor under the chapter under which the petition was filed only if "the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount."[101]

Here, as noted earlier, the Alleged Debtors have made four arguments as to why an order for relief should not be entered against the Alleged Debtors: (1) the Alleged Debtors have 12 or

---

[100] 11 U.S.C.A § 303(b) (West 2018).

[101] 11 U.S.C.A § 303(h) (West 2018).

41

more creditors, and, thus, with Mr. Terry being the sole petitioning creditor, the Involuntary

Petitions were not commenced by the requisite number of creditors; (2) the Alleged Debtors are

generally paying their debts as they become due; (3) the Involuntary Petitions were filed in bad

faith by Mr. Terry; (4) the interests of creditors and the debtors would be better served by

dismissal and the court should abstain pursuant to section 305 of the Bankruptcy Code.

### A. Have the Requisite Number of Creditors Commenced the Involuntary Proceedings?

Pursuant to section 303(b)(2) of the Bankruptcy Code, a sole petitioning creditor holding

at least $15,775 in claims can initiate an involuntary bankruptcy case so long as the alleged

debtors have fewer than 12 creditors. After the Second Amended List of Creditors was filed, Mr.

Terry had the burden, by a preponderance of the evidence, of showing that the Alleged Debtors

actually had less than 12 qualified creditors.[102] Here, the court has found that the Alleged

Debtors have, *at most*, 11 qualified creditors.[103] Accordingly, Mr. Terry has met his burden of

showing that the Alleged Debtors have less than 12 creditors for section 303(b) purposes, and

that he, as the sole petitioning creditor, was permitted to file the Involuntary Petitions. While

Mr. Terry has made additional arguments as to why certain of these 11 creditors should not be

counted as creditors for purposes of section 303(b) of the Bankruptcy Code, the court does not

believe it necessary to address these arguments at this time.[104]

---

[102] *See In re Moss*, 249 B.R. 411, 419 n. 6 (Bankr. N.D. Tex. 2000); *In re Smith*, 415 B.R. 222, 229 (Bankr. N.D. Tex. 2009).

[103] To be clear, the court believes that even on these 11, there are likely bona fide disputes as to the liability or amount that *Acis LP* has—as opposed to the liability or amount that Highland or other insiders bear responsbility.

[104] Moreover, as previously stated, since the court has determined there are fewer than 12 creditors, the court need not address whether there is a "special circumstances" exception to the statutory requirements of section 303, in situations where an alleged debtor may have engaged in fraud, schemes, or artifice to thwart a creditor or creditors. *See, e.g., In re Norriss Bros. Lumber Co.*, 133 B.R. 599 (Bankr. N.D. Tex. 1991); *In re Moss*, 249 B.R. 411 (Bankr. N.D. Tex. 2000); *In re Smith*, 415 B.R. 222 (Bankr. N.D. Tex. 2009).

## B.    Are the Alleged Debtors Generally Paying Their Debts as They Become Due?

Section 303(h) of the Bankruptcy Code requires that a court shall enter order for relief in an involuntary case "if … (1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount . . . ."[105] Again, the burden is on the Petitioning Creditor to prove this element by a preponderance of the evidence.[106] The determination is made as of the filing date of the Involuntary Petitions.[107] In determining whether an alleged debtor is generally paying its debts as they come due, courts typically look to four factors: (i) the number of unpaid claims; (ii) the amount of such claims; (iii) the materiality of the non-payments; and (iv) the nature of the debtor's overall conduct in its financial affairs.[108] No one factor is more meritorious than another; what is most relevant depends on the facts of each case.[109] Courts typically hold that "generally not paying debts" includes regularly missing a significant number of payments *or* regularly missing payments which are significant in amount in relation to the size of the debtor's operation.[110]

---

[105] 11 U.S.C.A § 303(h) (West 2018).

[106] *See Norris v. Johnson (In re Norris)*, No. 96-30146, 1997 WL 256808, at *3-*4 (5th Cir. Apr. 11, 1997) (unpublished).

[107] *Subway Equip. Leasing Corp. v. Sims (In re Sims)*, 994 F.2d 210, 222 (5th Cir. 1993).

[108] *See, e.g., In re Moss*, 249 B.R. 411, 422 (Bankr. N.D. Tex. 2000) (citing *In re Norris*, 183 B.R. 437, 456-57 (Bankr. W.D. La. 1995)).

[109] *In re Bates*, 545 B.R. 183, 186 (Bankr. W.D. Tex. 2016) (also noting that petitioning creditors' counsel consistently argued that the final prong—overall conduct in financial affairs—should be afforded more weight than the other factors, and the court found no authority to support this assertion).

[110] *See, e.g., In re All Media Props., Inc.*, 5 B.R. 126, 143 (Bankr. S.D. Tex. 1980).  See also *Concrete Pumping Serv., Inc. v. King Constr. Co. (In re Concrete Pumping Serv., Inc.)*, 943 F.2d 627, 630 (6th Cir.1991) (a debtor was not paying his debts as they became due where the debtor was in default on 100% of its debt to only one creditor); *Knighthead Master Fund, L.P. v. Vitro Packaging, LLC (In re Vitro Asset Corp.)*, No. 3:11–CV–2603–D (N.D.Tex. Aug. 28, 2012) (district court found error in bankruptcy court ruling that the debtors were generally paying their debts as they became due, where bankruptcy court had relied on the fact that the alleged debtors had a significant number of third-party creditors/trade vendors, which had been continually paid, even though the unpaid debts to the petitioning creditors far exceeded the paid debts in terms of dollar amount; petitioning creditors were holders of promissory notes that were guaranteed by the alleged debtors, as to which the primary obligor and alleged

43

Furthermore, any debt which the alleged debtor is not current on as of the petition date should be considered as a debt not being paid as it became due.[111]

Here, the court concludes that the creditors of the Alleged Debtors—what few there are—are generally not being paid as their debts have become due (except for perhaps four[112] that are relatively insignificant and which may also be able to look to Highland for payment). Mr. Terry has met his burden by a preponderance of the evidence as to section 303(h) of the Bankruptcy Code.

   **C.      With the Section 303 Statutory Requirements Being Met by the Petitioning
            Creditor, Should the Court, Nonetheless, Dismiss the Involuntary Petitions
            Because They Were Filed in Bad Faith?**

Despite Mr. Terry meeting the necessary statutory requirements for this court to enter orders for relief as to the Alleged Debtors pursuant to section 303 of the Bankruptcy Code, the Alleged Debtors have argued that the Involuntary Petitions must, nonetheless, be dismissed because they were filed in "bad faith" by Mr. Terry. As support for this argument, the Alleged Debtors rely primarily on the Third Circuit's decision in *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015). While the court certainly acknowledges that authority exists in other circuits that suggests that dismissal of an involuntary bankruptcy case may be appropriate—even when section 303's statutory requirements have been met—based upon an

---

debtors had ceased making interest payments; the unpaid debts represented 99.9% of the total dollar amount of debt of each of the alleged debtors); *Crown Heights Jewish Cmty. Council, Inc. v. Fischer (In re Fischer)*, 202 B.R. 341, 350–51 (E.D.N.Y. 1996) (even though the debtor only had two outstanding debts, the total dollar amount failed to establish that, in terms of dollar amounts, the debtor was paying anywhere close to 50% of his liabilities, so he was not generally paying his debts as they became due); *In re Smith*, 415 B.R. 222, 231 (Bankr. N.D. Tex. 2009) (while the debtor was paying small recurring debts, he was not paying 99 percent of his debts in the aggregate amount and thus was not generally paying his debts as they became due).

[111] *In re Bates*, 545 B.R. 183, 188 (Bankr. W.D. Tex. 2016).

[112] Those four are: Drexel Limited ($6,359.96); Highfield Equities ($2,510.04); David Simek ($1,233.19); and McKool Smith ($70,082.18).

44

independent finding of "bad faith," the court need not ultimately decide the efficacy or

applicability of such authority, because the court does not believe that the evidence demonstrated

any "bad faith" on the part of Mr. Terry (or his counsel) in filing the Involuntary Petitions.

Indeed, the evidence suggested that Mr. Terry and his counsel filed the Involuntary Petitions out

of a legitimate concern that Highland was dismantling and denuding Acis LP of all of its assets

and value and that a bankruptcy filing was the most effective and efficient way to preserve value

for the Acis LP creditors. The court concludes that Mr. Terry was wholly justified in pursuing

the Involuntary Petitions.

> **D.**      ***Should This Court, Nonetheless, Abstain and Dismiss the Involuntary Petitions Pursuant to Section 305 of the Bankruptcy Code?***

Section 305(a)(1) of the Bankruptcy Code provides that:

> (a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—
>> (1) the interests of creditors and the debtor would be better served by such dismissal or suspension; . . .[113]

Courts construing section 305(a)(1) of the Bankruptcy Code have found that abstention in a

properly filed bankruptcy case is an ***extraordinary remedy***.[114] Moreover, granting an abstention

motion pursuant to section 305(a)(1) of the Bankruptcy Code requires more than a simple

balancing of harm to the debtor and creditors; rather, the interests of ***both*** the ***debtor*** and its

***creditors*** must be served by granting the request to abstain.[115] The moving party bears the

---

[113] 11 U.S.C.A. § 305(a)(1) (West 2018).

[114] *In re AMC Investors, LLC*, 406 B.R. 478, 487 (Bankr. D. Del. 2009); *see also In re Compania de Alimentos Fargo, S.A.*, 376 B.R. 427, 434 (Bankr. S.D.N.Y. 2007); *In re 801 S. Wells St. Ltd. P'ship*, 192 B.R. 718, 726 (Bankr. N.D. Ill. 1996).

[115] *In re Smith*, 415 B.R. 222, 238-39 (Bankr. N.D. Tex. 2009) (citing to *AMC Investors, LLC*, 406 B.R. at 488).

45

burden to demonstrate that dismissal benefits the debtor and its creditors.[116]  Courts must look to

the individual facts of each case to determine whether abstention is appropriate.[117]

Case law has set forth a litany of factors to be considered by the court to gauge the

overall best interests of the creditors and the debtor for section 305(a)(1) purposes:

(1) the economy and efficiency of administration;
(2) whether another forum is available to protect the interests of both parties or
there is already a pending proceeding in state court;
(3) whether federal proceedings are necessary to reach a just and equitable solution;
(4) whether there is an alternative means of achieving an equitable distribution of
assets;
(5) whether the debtor and the creditors are able to work out a less expensive out-
of-court arrangement which better serves all interests in the case;
(6) whether a non-federal insolvency has proceeded so far in those proceedings that
it would be costly and time consuming to start afresh with the federal bankruptcy
process; and
(7) the purpose for which bankruptcy jurisdiction has been sought.[118]

While all factors are considered, not all are given equal weight in every case and the court should

not conduct a strict balancing.[119]

*i.        Factor 1: The Economy and Efficiency of Administration.*

---

[116] *In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 462-63 (Bankr. S.D.N.Y. 2008).

[117] *In re Spade*, 258 B.R. 221, 231 (Bankr. D. Colo. 2001).

[118] *Monitor Single Lift I, Ltd.*, 381 B.R. at 464-65 (citing to *In re Paper I Partners, L.P.*, 283 B.R. 661, 679 (Bankr. S.D.N.Y. 2002)); *see also Smith*, 415 B.R. at 239; *AMC Investors, LLC*, 406 B.R. at 488; *In re Euro-American Lodging Corp.*, 357 B.R. 700, 729 (Bankr. S.D.N.Y. 2007); *but see Spade*, 258 B.R. at 231-32 (Bankr. D. Colo. 2001) (applied a four criteria test in evaluating section 305 abstention which included:  (1) the motivation of the parties who sought bankruptcy jurisdiction; (2) whether another forum was available to protect the interests of both parties or there was already a pending proceeding in state court; (3) the economy and efficiency of administration; and (4) the prejudice to the parties).  The Alleged Debtors cite to the case of *In re Murray*, 543 B.R. 484 (Bankr. S.D.N.Y. 2016), in particular, as support for why this court should abstain under section 305(a) of the Bankruptcy Code and dismiss the Involuntary Petitions.  However, in *Murray*, Judge Gerber was analyzing dismissal of an involuntary proceeding pursuant to section 707 of the Bankruptcy Code, more specifically for "cause," and not based upon abstention under section 305(a) of the Bankruptcy Code.  Thus, the court is not convinced *Murray* is relevant to this court's section 305 abstention analysis.

[119] *In re TPG Troy, LLC*, 492 B.R. 150, 160 (Bankr. S.D.N.Y. 2013) (citing *Monitor Single Lift*, 381 B.R. at 464).

The economy and efficiency of administering a case in the bankruptcy court is routinely evaluated in considering abstention under section 305 of the Bankruptcy Code. Here, the evidence suggests that the most economical and efficient forum for these parties to resolve their disputes is the bankruptcy court. The court heard ample evidence that the Alleged Debtors are already, essentially, in the process of being liquidated by Highland. This is not a situation where an ably-functioning, going-concern business is being foisted in disruptive fashion into a bankruptcy.[120] Because of the fact that the Alleged Debtors are already in the process of being liquidated, the bankruptcy court (and not a state court) is the most efficient and economical forum to complete this liquidation and distribute whatever assets remain to creditors in accordance with the distribution scheme set forth in the Bankruptcy Code and with the oversight of a neutral third-party trustee. Thus, with the bankruptcy court being the more economic and efficient forum for administering this case, this factor goes against abstention.

> ii. *Factors 2, 3, 4, 5, and 6: Whether Another Forum is Available to Protect the Interests of Both Parties Or There is Already a Pending Proceeding in State Court; Whether Federal Proceedings are Necessary to Reach a Just and Equitable Solution; Whether There is an Alternative Means of Achieving an Equitable Distribution of Assets; Whether the Debtor and the Creditors are Able to Work Out a Less Expensive Out-of-Court Arrangement Which Better Serves All Interests in the Case; and Whether a Non-Federal Insolvency Has Proceeded So Far in Those Proceedings That it Would Be Costly and Time Consuming to Start Afresh With the Federal Bankruptcy Process.*

---

[120] *See, e.g., In re The Ceiling Fan Distrib., Inc.*, 37 B.R. 701 (Bankr. M.D. La. 1983) (noting that while the dissection of a living business may not properly be the business of a bankruptcy court, the division of a "carcass" and the reclamation of pre-petition gouging may well be); *In re Bos*, 561 B.R. 868, 898-99 (Bankr. N.D. Fla. 2016) (citing as one of the reasons to abstain under section 305 of the Bankruptcy Code the fact that entities and subsidiaries under the alleged debtor's umbrella were still operating successful businesses and had employed more than 500 people); *but see Remex Elecs. Ltd. v. Axl Indus., Inc. (In re Axl Indus., Inc.)*, 127 B.R. 482, 484-86 (S.D. Fla. 1991) (in affirming the bankruptcy court's decision to dismiss an involuntary bankruptcy case, the district court also found that "the interests of a defunct business enterprise would be little affected by the pendency of a bankruptcy proceeding," which the district court believed favored abstention).

47

The court believes that factors 2-6 should be grouped together for purposes of its abstention analysis, since all of these factors specifically touch on the availability of an alternative forum to achieve an *equitable* distribution.[121]  By way of example, where bringing a case into the bankruptcy court would simply add an additional layer of expense to the resolution of a two-party dispute and another forum already provides a suitable place to resolve the dispute, some courts have found that abstention is the more appropriate choice since keeping the case would transform the bankruptcy process into a collection device.[122]  Here, the Alleged Debtors have repeatedly argued that, because there is already pending state court litigation involving Mr. Terry, Highland, and the Alleged Debtors, these cases should be dismissed and the parties should go back to state court to resolve their issues.  The court does not agree for several reasons.

First, it is worth noting that this court has already heard multiple days of evidence in this case (including almost five days just for the Trial) and would certainly not be "starting afresh" by any means if things go forward in the bankruptcy court.  Additionally, while the Alleged Debtors have argued that a significant amount of attorney's fees have already been spent litigating this case in state court (which they believe supports abstention), the court surmises that these fees have not been wasted dollars, as the money expended by the parties developed discovery of facts that could assist a bankruptcy trustee in pursuing avoidance actions that may be viable and might lead to value that could pay creditors' claims.[123]

---

[121] *See, e.g., In re Monitor Single Lift I, Ltd.*, 381 B.R. 455, 460-70 (Bankr. S.D.N.Y. 2008).

[122] *AMC Investors, LLC*, 406 B.R. at 488; *see also Axl Indus., Inc.*, 127 B.R. at 484-86.

[123] *See, e.g., The Ceiling Fan Distributor, Inc.*, 37 B.R. at 703 (the court noted that, despite there being significant legal expenses in the state court, such expenses were not wasted since the legal work done to date would be quite helpful to a trustee).

48

Second, this court heard considerable evidence involving potentially voidable transfers

that may have occurred involving the Alleged Debtors and Highland/Highland-affiliates and,

while the state court certainly provides a forum for eventually bringing fraudulent transfer

claims, the court also heard evidence that none of these claims have actually been brought in the

state court.[124]  Moreover, to the extent fraudulent transfer claims were to be pursued in state

court and were successful, the state court would still need the ability to reach the assets of

alleged fraudulent transfer recipients (which, in this situation, include certain Highland-affiliates

located in the Cayman Islands).  The bankruptcy court has concerns whether a state court process

could efficiently accomplish this task.[125]  Similarly, it is worth noting that, while a request for a

receiver was filed in the state court by Mr. Terry, such request had not yet been heard and

decided by the state court.  Thus, at the present time, it does not appear that there is an alternative

forum to address the pertinent issues in this case, without the necessity of significant, additional

steps being taken by the parties in the state court.

Third, this court believes that a federal bankruptcy proceeding is necessary in order to

achieve an equitable result in this case.  Specifically, the court heard evidence from the Alleged

Debtors that, if this court chose to abstain and dismiss the Involuntary Petitions, the Alleged

Debtors would ultimately pay all of their creditors in full, except for Mr. Terry.  This clearly

demonstrates how keeping the case in the bankruptcy court is necessary to allow an equitable

---

[124] *See, e.g., In re Texas EMC Mgmt., LLC,* Nos. 11-40008 & 11-40017, 2012 WL 627844, at *3 (Bankr. S.D. Tex. 2012) (noting that one of the reasons abstention was proper under section 305 of the Bankruptcy Code was because the issues to be litigated amongst the parties were already joined in the state court litigation); *Spade,* 258 B.R. at 236 (court held that one of the reasons abstention was warranted under section 305 of the Bankruptcy Code was because the petitioning creditors had already filed and had pending a "collection case" in the state court).

[125] *See, e.g., Smith,* 415 B.R. at 239 (the bankruptcy court held that there "are remedies under the Bankruptcy Code that are not available to Rhodes under state law, due to Mr. Smith's transfer of the majority of his assets to the Cook Island Trust," and "federal proceedings may be necessary to reach a just and equitable solution").

49

distribution to **all creditors**, including Mr. Terry.  Additionally, a federal bankruptcy court has

certain tools available to it that are not available to a state court such as the ability to invalidate

potential *ipso facto* clauses in contracts pursuant to section 365 of the Bankruptcy Code, sell

assets free and clear of liens, claims and encumbrances pursuant to section 363 of the

Bankruptcy Code, and impose the automatic stay pursuant to section 362 of the Bankruptcy

Code.  These are all useful tools available to the Alleged Debtors in a bankruptcy case that would

be lost if this court were to ultimately abstain.

Finally, there was more than enough evidence showing the acrimonious and bitter

relationship that exists between Mr. Terry and Mr. Dondero.  Thus, the availability of an out-of-

court arrangement being obtained in this case is, in this court's mind, slim to none.

In summation, the court finds that all of the factors above support this case staying with

the bankruptcy court.

iii.    *Factor 7: The Purpose for Which Bankruptcy Jurisdiction Has Been Sought.*

The Alleged Debtors have repeatedly argued that Mr. Terry filed this case in bad faith

and as a litigation tactic to gain some sort of advantage in the state court proceedings.  The court

has already found above that these cases were not filed in bad faith and that Mr. Terry has met

the necessary statutory requirements of section 303 of the Bankruptcy Code.  Moreover, it is

worth noting that at least one court has stated that the filing of an involuntary bankruptcy petition

is always a "litigation tactic," but whether the filing is inappropriate for abstention purposes is a

fact-dependent determination.[126]  Here, the facts show that there was no inappropriateness

---

[126] *In re Marciano*, 459 B.R. 27, 50 (B.A.P. 9th Cir. 2011) (noting that while the filing of the involuntary bankruptcy was a litigation tactic, the bankruptcy court did not abuse its discretion in denying the alleged debtor's motion to dismiss based upon the bankruptcy court's primary concern that the issue of equality of distribution would not effectively be dealt with in another forum).

50

behind Mr. Terry's decision to file the Involuntary Petitions. Specifically, Mr. Terry repeatedly and credibly testified that the purpose for filing the Involuntary Petitions was to ensure that creditors (including him) were treated fairly and received an equal distribution from the Alleged Debtors' assets, not to gain some sort of advantage in the state court. This testimony was absolutely consistent with additional evidence showing that, since the entry of the arbitration award, there has been a calculated effort (largely by Highland) to effectively liquidate the Alleged Debtors. Unlike the bankruptcy court in *In re Selectron Mgmt. Corp.*,[127] which had no evidence or "smoking gun" showing that steps were being taken by the alleged debtor to evade payment on the petitioning creditor's judgment, thereby necessitating abstention, this court has heard ample evidence showing that the Alleged Debtors, with the aid of Highland, were transferring assets away from the Alleged Debtors, so that Mr. Terry would have nowhere to look at the end of the day.

In light of the court's analysis of all the seven factors above, the Alleged Debtors have not credibly shown how both the Alleged Debtors and the creditors are better served outside of bankruptcy. If this matter were to remain outside of bankruptcy, there seems to be a legitimate prospect that the Alleged Debtors and Highland will continue dismantling the Alleged Debtors, to the detriment of Acis LP creditors. Abstention would fly in the face of fundamental fairness and the principles underlying the Bankruptcy Code.

Beyond just addressing the factors above, the Alleged Debtors have also argued that, if this court were to not abstain under section 305 of the Bankruptcy Code, there would be

---

[127] *In re Selectron Mgmt. Corp.*, No. 10-75320-DTE, 2010 WL 3811863, at *6-7 (Bankr. E.D.N.Y. Sept. 27, 2010); *see also In re White Nile Software, Inc.*, No. 08–33325–SGJ–11, 2008 WL 5213393, at *4 (Bankr. N.D. Tex. Sept. 16, 2008) (finding that where the filing of a voluntary chapter 11 did not appear to be about insuring a distribution to creditors or winding down or giving a soft landing to a business or avoiding dismantling and dissipation of valuable assets or preserving avoidance actions, but rather was about changing the forum of ongoing litigation between the parties, abstention under section 305 was proper).

51

significant harm to the "equity" of the Alleged Debtors. Specifically, the Alleged Debtors have

argued that, if this court were to enter orders for relief, the equity would be forced to "call" and

ultimately liquidate CLO 2014-3 (and perhaps all of the CLOs Acis LP manages), resulting in

substantial losses to the equity on their investments. First, to be clear, the current equity of the

Alleged Debtors is being held by a Highland-affiliate called Neutra, Ltd., which actually only

became the equity of the Alleged Debtors on December 19, 2017. But this is not the "equity"

being referred to by the Alleged Debtors in its argument. Rather, the so-called "equity," about

which the Alleged Debtors seemed so concerned, is actually ***certain parties that own the equity***

***of the entity that owns the equity in the CLOs***—which includes (a) an unnamed third-party

investor out of Boston (49%),[128] (b) a charitable foundation managed by a Highland-affiliate

(49%), and (c) Highland employees (2%). However, abstention under section 305 of the

Bankruptcy Code does not require this court to look at what is in the best interests of these third-

parties (who are not current creditors or interest holders of the Alleged Debtors), but rather what

is in the best interests of the Alleged Debtors and the creditors. Accordingly, the Alleged

Debtors' effort to argue potential harm to these parties is misplaced for purposes of evaluating

abstention under section 305 of the Bankruptcy Code, and, if anything, further highlights who

the Alleged Debtors are really out to protect—Highland and Highland-affiliates. Moreover, the

court would note that, even if there were to be a "call" and liquidation of CLO 2014-3, thereby

ending the Alleged Debtors' right to receive future management fees, there would still be

potential assets for a chapter 7 trustee to administer such as chapter 5 causes of action (which

include fraudulent transfers) as well as the Alleged Debtors' contingent claim for approximately

---

[128] Notably, this entity never appeared at the Trial or filed papers stating that it would be harmed by entry
of orders for relief in these cases.

$3 million in expense reimbursement owing by Highland CLO Management Ltd., as part of the November 3, 2017 transfer of the Acis LP Note Receivable from Highland. Thus, even if the so-called doomsday scenario of an equity call on CLO 2014-3 (or other CLOs) were to happen, there is still a potential benefit to creditors if this court chooses not to abstain.

## III.    **CONCLUSION**

In conclusion, these involuntary proceedings were appropriately filed under section 303, and orders for relief will be issued forthwith.   This court declines to exercise its discretion to abstain, because a chapter 7 trustee appears necessary to halt the post-Arbitration Award transactions and transfers of value out of Acis LP, as discussed above. A chapter 7 trustee appears necessary to resolve the inherent conflicts of interest between the Alleged Debtors and Highland. A chapter 7 trustee will have tools available to preserve value that a state court receiver will not have. The bankruptcy court is single handedly the most efficient place to administer property of the estate for creditors. This is not just a two party dispute between Mr. Terry and the Alleged Debtors, and even if it were, dismissal or abstention is clearly not warranted.

### ###END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW###

## **EXHIBIT I**



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed January 31, 2019**

**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-SGJ-11 |
| | § | (Chapter 11) |
| Debtor. | § | |

---

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT GP, L.L.C., | § | CASE NO. 18-30265-SGJ-11 |
| | § | (Chapter 11) |
| | § | |
| Debtor. | § | |

### BENCH RULING AND MEMORANDUM OF LAW IN SUPPORT OF:
### (A) FINAL APPROVAL OF DISCLOSURE STATEMENT; AND (B)
### CONFIRMATION OF CHAPTER 11 TRUSTEE'S THIRD AMENDED JOINT PLAN

Before this court is a request by the Chapter 11 Trustee (herein so called) for final

approval of the adequacy of a disclosure statement and for confirmation of his Third Amended

1

Joint Plan of Reorganization,[1] as amended, modified or supplemented (the "Plan"), for the two

above-referenced debtors:  (1) Acis Capital Management, L.P. (the "Debtor-Acis"), a Delaware

limited partnership, and (2) Acis Capital Management GP, LLC, a Delaware limited liability

company (the general partner of the Debtor-Acis; collectively, the "Debtors").  The two chapter

11 cases have been administratively consolidated.[2]

   The hearing on these matters transpired over multiple days in December 2018, and the

court considered the testimony of more than a dozen witnesses, more than 700 exhibits, and

hundreds of pages of legal briefing.  Based on the foregoing, the court **overrules all objections**

and will confirm the Plan, including all proposed modifications to it.  The Chapter 11 Trustee has

demonstrated, by a preponderance of the evidence, that the Plan, as modified, satisfies the

applicable provisions of the Bankruptcy Code including but not limited to Sections 1122, 1123,

1127, and 1129 of the Bankruptcy Code.[3]  The court also approves on a final basis the adequacy

of the accompanying disclosure statement to the Plan, determining that it meets the requirements

set forth in Section 1125 of the Bankruptcy Code.  Notice and solicitation with respect to the

---

[1] Exhs. 508 & 509; *see also* DE ## 660, 661, 693, 702, & 769.  References to "DE # __" from time to time in this ruling relate to the docket number at which a pleading or other item appears in the docket maintained in these administratively consolidated Bankruptcy Cases, in Case # 18-30264.

[2] Note that the Debtor-Acis is, essentially, the debtor that is the operating company.  As a general partner, Acis Capital Management GP, LLC is legally obligated on all of the operating company's debt.  *See* 6 Del. C. § 17-403(b) ("Except as provided in this chapter, a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law in effect on July 11, 1999 (6 Del. C. § 1501 et seq.) to persons other than the partnership and the other partners."); *see also* 6 Del. C. § 15-306(a) ("(a) Except as otherwise provided in subsections (b) and (c) of this section, all partners are liable jointly and severally for all obligations of the partnership unless otherwise agreed by the claimant or provided by law").  The Plan jointly addresses both of the Debtors' debts.

[3] *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. (In re Briscoe Enters.),* 994 F.2d 1160, 1165 (5th Cir. 1993); *In re Sears Methodist Ret. Sys.,* No. 14-32821-11, 2015 Bankr. LEXIS 709, at *8 (Bankr. N.D. Tex. Mar. 5, 2015); *In re Couture Hotel Corp.,* 536 B.R. 712, 732 (Bankr. N.D. Tex. 2015); *In re Mirant Corp.,* No. 03-46590, 2007 Bankr. LEXIS 4951, at *19-20 (Bankr. N.D. Tex. Apr. 27, 2007).

Plan is determined to have complied with the applicable Bankruptcy Rules and due process.  The court provides reasoning for its ruling below.  The court directs the Chapter 11 Trustee to submit to the court for signing the proposed Findings of Fact and Conclusions of Law and Order that were filed at DE # 814.  This Bench Ruling supplements those Findings of Fact and Conclusions of Law and Order and, where appropriate, should be considered additional findings and conclusions as contemplated by Fed. R. Bankr. Proc. 7052.

**I.**     **Background.**[4]

The above-referenced bankruptcy cases (the "Bankruptcy Cases") have been pending since January 30, 2018 and have been astonishingly contentious.  The Chapter 11 Trustee has been in place since on or about May 14, 2018.  The Plan (which is the fourth one proposed by the Chapter 11 Trustee) has been objected to by three related entities: (a) Highland Capital Management, L.P. ("Highland"), (b) Highland CLO Funding Ltd. ("HCLOF Guernsey"), and (c) Neutra, Ltd. ("Neutra Cayman").  The Chapter 11 Trustee loosely refers to these three objectors (the "Objectors") as "the Highlands" because they are not only related to each other (*i.e.,* they are all, directly or indirectly, part of the Highland 2,000-member corporate organizational structure), but they also have been in "lockstep" with one another in objecting to virtually every position taken by the Chapter 11 Trustee during the Bankruptcy Cases.[5]  These Objectors' parties-in-interest status will be explained below.

---

[4] For a complete set of background facts, the court incorporates herein by reference its Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Contested Involuntary Petitions, entered April 13, 2018.  DE # 118.  Exh. 243.

[5] It is also undisputed that, prior to the appointment of the Chapter 11 Trustee, *the Debtors* and Highland were affiliated and had a close relationship.  Exhs. 17, 18, 22-27, 251, 619 & 649.

3

In simplest terms, the Debtor-Acis, which was formed in the year 2011, is primarily a CLO portfolio manager. [6] It manages hundreds of millions of dollars' worth of CLOs (which is an acronym for "collateralized loan obligations"). Specifically, it provides fund management services to various special purpose entities that hold CLOs. The Debtor-Acis was providing management services for five such special purpose entities (the "Acis CLOs") as of the time that it and its general partner were put into the involuntary Bankruptcy Cases. The parties have informally referred to the special purpose entities themselves as the "CLO Issuers" or "CLO Co-Issuers" but, to be clear, these special purpose entities (hereinafter, the "CLO SPEs") are structured as follows: (a) on the asset side of their balance sheets, the entities own pieces of senior debt owed by large corporations and, therefore, earn revenue from the variable interest payments made by those corporations on such senior debt; and (b) on the liability side of their balance sheets, the entities have obligations in the form of notes (*i.e.,* tranches of fixed interest rate notes) on which the CLO SPEs themselves are obligated—the holders of which notes are mostly institutions and pension funds (these tranches of notes are usually rated anywhere from Triple A to Single B, depending upon things such as their interest rate and perceived risk). The CLO SPEs make a profit, based on the spread or "delta" between: (a) the variable rates of interest paid on the assets that the CLO SPEs own (*i.e.,* the basket of senior notes); and (b) the fixed rates of interest that the CLO SPEs must pay on their own tranches of debt. At the bottom of the CLO SPEs' capital structure is their equity (sometimes referred to as "subordinated notes," but these "notes" are genuinely equity). As portfolio manager, the Debtor-Acis manages the CLO SPEs' pools of assets (by buying and selling senior loans to hold in the CLO SPEs'

---

[6] The Debtor-Acis has managed other funds, from time to time, besides CLOs.

4

portfolios) and communicates with investors in the CLO SPEs. The CLO SPEs' tranches of

notes are traded on the Over-the-Counter market.

To be perfectly clear, none of the CLO SPEs themselves are in bankruptcy. This has

never been threatened or a concern. Only the Debtor-Acis which **manages** the CLO business is

in bankruptcy. For the most part, the CLO SPEs have continued somewhat "business as usual"

during the Chapter 11 Bankruptcy Cases (*i.e.,* they have continued to receive interest payments

on their baskets of loans; the usual interest payments on their tranches of debt have been paid;[7]

and baskets of loans have been bought and sold from time to time). The CLO SPEs have

retained their own separate counsel during the Chapter 11 cases, have appeared from time-to-

time on matters, and are not currently objecting to the Plan. There is also an indenture trustee

(U.S. Bank National Association) for the CLO SPEs' debt, that has seemingly faithfully carried

on its role during the Chapter 11 Bankruptcy Cases without many objections to the bankruptcy

process—only making occasional statements aimed at ensuring that the indentures for the CLOs

are not interfered with or disrespected. The indenture trustee has retained and appeared through

its own separate counsel during the Chapter 11 Bankruptcy Cases and is not currently objecting

to the Plan.

Historically, the Debtor-Acis has had four main sets of contracts that were at the heart of

its business and allowed it to function. The Chapter 11 Trustee has from time-to-time credibly

---

[7] The evidence reflected that there have been a couple of occasions recently when there were insufficient
funds to make distributions to the equity. *E.g.,* Transcript 12/11/18 (PM) [DE # 790], at p. 15 (line 2)
through p. 16 (line 18). But it appears to this court that these missed distributions were due to actions of
Highland—as later explained herein—in improperly, surreptitiously attempting to liquidate the Acis
CLOs, from the time period after the Chapter 11 Trustee was appointed, until the bankruptcy court issued
an injunction to temporarily halt Highland's actions. *E.g.,* Transcript 12/11/18 (AM) [DE # 789], p. 67
(line 14) through p. 68 (line 6).

5

testified that these agreements essentially created an "eco-system" that allowed the Acis CLOs to be effectively and efficiently managed by the Debtor-Acis.

 1. The PMAs with the CLO SPEs.[8]

First, the Debtor-Acis has various portfolio management agreements (the "PMAs") **with the CLO SPEs**, pursuant to which the Debtor-Acis earns management fees. The PMAs have been the primary "assets" (loosely speaking) of the Debtor-Acis (to be more precise, the PMAs are executory contracts pursuant to section 365 of the Bankruptcy Code). They are what generate revenue for the Debtor-Acis.

 2. The Sub-Advisory Agreement with Highland.[9]

Second, the Debtor-Acis had a Sub-Advisory Agreement (herein so called) with an insider, **Highland** (*i.e.,* one of the Objectors). Highland's "insider" status will be further explained below. Pursuant to this agreement, the Debtor-Acis essentially sub-contracted for the use of Highland front-office personnel/advisors to perform management services for the Debtor-Acis (*i.e.,* so that the Debtor-Acis could fulfill its obligations to the CLO SPEs under the PMAs). The Debtor-Acis paid handsome fees to Highland pursuant to this agreement. This, too, was an executory contract pursuant to section 365 of the Bankruptcy Code. As explained below, this agreement was rejected (with bankruptcy court approval)[10] by the Chapter 11 Trustee during the Bankruptcy Cases, when the Chapter 11 Trustee credibly represented that he had not only found resources to provide these services at a much lower cost to the estate, but he also had begun to

---

[8] Exhs. 6-10.

[9] Exh. 17.

[10] *See* 11 U.S.C. § 365(a).

6

believe that Highland was engaging in stealth efforts to liquidate the Acis CLOs, to the detriment

of the Debtor-Acis's creditors.[11]

### 3.   The Shared Services Agreement with Highland.[12]

Third, the Debtor-Acis also had a Shared Services Agreement (herein so called) with

Highland, pursuant to which the Debtor-Acis essentially sub-contracted for the use of Highland's

back-office services (again, so that the Debtor-Acis could fulfill its obligations to the CLO SPEs

under the PMAs).  To be clear, the Debtor-Acis had no employees of its own—only a couple of

officers and members.  The Debtor-Acis paid handsome fees to Highland for the personnel and

back-office services that Highland provided to the Debtor-Acis.  This, too, was an executory

contract pursuant to section 365 of the Bankruptcy Code.  As explained below, this agreement

was also rejected by the Chapter 11 Trustee during the Bankruptcy Cases (with bankruptcy court

approval) for the same reasons that the Sub-Advisory Agreement with Highland was rejected.

### 4.   The Equity PMA.[13]

Fourth, until a few weeks before the Bankruptcy Cases were filed, the Debtor-Acis also

had yet another portfolio management agreement (distinct from its PMAs with the CLO SPEs)

whereby the Debtor-Acis provided services not just to the CLO SPEs themselves, but separately

to the equity holder in the CLO SPEs.  This portfolio management agreement with the equity

holder in the CLO SPEs is sometimes referred to by the parties as the "ALF PMA," but it would

probably be easier to refer to it as the "Equity PMA" (for ease of reference, the court will refer to

---

[11] *See* Transcript 12/11/18 (AM) [DE # 789], at p. 48 (line 15) through p. 49 (line 16); p. 50 (line 12)
through p. 52 (line 7).

[12] Exh. 18.

[13] Exh. 11.

it as the "Equity/ALF PMA").[14]  The Debtor-Acis did not earn a specific fee pursuant to the

Equity/ALF PMA, but the Chapter 11 Trustee and certain of his witnesses credibly testified that

the Debtor-Acis considered the agreement valuable and very important, because it essentially

gave the Debtor-Acis the ability to control the whole Acis CLO eco-system—in other words,

gave the Debtor-Acis the ability to make substantial decisions on behalf of the CLO SPEs'

*equity*—distinct from making decisions for the CLO SPEs themselves pursuant to the PMAs.

The more credible evidence before the court suggests that the Equity/ALF PMA delegated to the

portfolio manager (*i.e.,* the Debtor-Acis) the right to control the terms of any liquidation of

collateral in an optional redemption under the terms of the CLO indentures.[15]  In any event,

shortly before the Bankruptcy Cases were filed, agents of Highland and/or others controlling the

Debtor-Acis (including but not limited to Mr. James Dondero—the chief executive officer of

both the Debtor-Acis and of Highland):  (a) caused the Debtor-Acis to terminate this Equity/ALF

PMA (notably, the counter-party to this agreement, the equity owner, would have only been able

to terminate it "for cause"[16]); and (b) then caused the equity owner to enter into a new Equity

PMA with a newly formed offshore entity called Highland HCF Advisor, Ltd. ("Highland

HCF").[17]  Mr. Dondero, in addition to being the chief executive of Highland and the Debtor-

Acis, also became the president of the newly formed Highland HCF.[18]  The Equity/ALF PMA

---

[14] There were actually different iterations of the Equity/ALF PMA including one dated August 10, 2015, and another dated December 22, 2016.

[15] Transcript 12/18/18 [DE # 804], at pp. 77-78.  *See also* Exh. 11 at §§ 5 and 6.

[16] The Equity/ALF PMA provided that the Debtor-Acis could only be removed as portfolio manager "for cause" at § 14(a)-(e).  Exh. 11.  On the contrary, the Debtor-Acis could terminate the Equity/ALF PMA without cause upon at least ninety (90) days' notice, pursuant to § 13(a)-(c).  Exh. 11.

[17] Exh. 23 (testimony of Scott Ellington), p. 175 (lines 6-25); *see also* Transcript 12/11/18 (AM) [DE # 789], at p. 54 (line 11) through p. 55 (line 5).

[18] *Id.* at p. 266 (lines 1-4).

8

would have been an executory contract of the Debtor-Acis, pursuant to section 365 of the Bankruptcy Code, if it had not been terminated shortly before the Bankruptcy Cases. The court has heard credible testimony that leads it to conclude that the Equity/ALF PMA would have been assumed by the Debtor-Acis, pursuant to section 365 of the Bankruptcy Code, if not terminated by agents of Highland on the eve of bankruptcy. The court has heard credible testimony that it is important for a portfolio manager to have not only the PMAs with the CLO SPEs themselves, but also with the equity owners of the CLO SPEs.

## II.    A Few More Basics About CLOs.

In the world of CLOs (like other public debt instruments) there are occasionally redemptions, refinancings, and resets. A redemption is essentially when the equity in the CLO, before maturity, calls for the liquidation of the collateral in the CLO and the repayment of the tranches of notes, so that the CLO comes to an end. A refinancing is when a lower interest rate can be accomplished in the market place on the tranches of debt of the CLO, but the maturity date and other terms remain in place (similar to a refinancing on a home mortgage). This can happen typically after a two-year non-call period. A reset is when the maturity date, the reinvestment period, or other changes in the terms of a CLO (beyond simply interest rate) are accomplished.[19]

It should be noted that the top tranche of notes in the CLO SPEs (AAA-rated) is considered the "controlling" class, and a majority of holders in this class can terminate the CLO manager (*i.e.,* the Debtor-Acis LP) for cause on 45 days' notice, but these folks have apparently been content to ignore the Bankruptcy Cases and the fighting between the Debtor-Acis and

---

[19] *See generally* Transcript 2/9/2018 [DE # 26], at p. 74-75.

Highland (as further described below)—no doubt because they are earning their fixed income stream without a hitch. And the bottom tranche of "notes" in the CLO SPEs (the equity) has voting rights and is a capital provider and, in certain ways, controls the CLO SPEs, by virtue of having the ability to make a redemption call after a certain "no-call" period—which would force a liquidation of the basket of loans in the CLO, with the proceeds paying down the tranches of notes, starting at the top with the Triple A's. But, by virtue of the Equity/ALF PMA, the Debtor-Acis was really acting for the equity. It seems substantially likely to the court that this is why Highland and its agents caused the Debtor-Acis to terminate the Equity/ALF PMA (which, as mentioned above, was an agreement that the equity could have only terminated "for cause"—and it appears there would have been no "cause").

### III.    The Non-Insider Creditors.

The Debtor-Acis does not have many creditors. The non-insider creditors are, for the most part, Joshua Terry ("Mr. Terry") and a few vendors (most of which are law firms).

Mr. Terry commenced the Bankruptcy Cases with the filing of involuntary bankruptcy petitions. Mr. Terry was the human being who formerly, quite successfully served as the portfolio manager for the Debtor-Acis for many years. Mr. Terry was terminated under contentious circumstances on June 9, 2016, after getting into disagreements with Mr. Dondero. Mr. Terry was technically an employee of Highland itself (like all employees are, in the Highland family of companies—no matter which subsidiary or affiliate they work for). After his employment termination, Highland sued Mr. Terry in September 2016. Mr. Terry asserted claims back against Highland and both of the above-referenced Debtors. The litigation was referred to arbitration, and, after a ten-day arbitration trial in September 2017 before "JAMS," Mr. Terry obtained an Arbitration Award (herein so called), on October 20, 2017, jointly and

10

Case 19-34054-sgj11 Doc 1735 Filed 01/13/21 Entered 01/13/21 19:53:00 Page 221 of
362
Case 19-34054-sgj11 Doc 827 Filed 01/31/19 Entered 01/31/19 15:15:04 Page 12 of 47

severally, against both of the Debtors in the amount of $7,949,749.15, plus post-award interest at the legal rate. A Final Judgment (the "Terry Judgment") confirming the Arbitration Award was entered on December 18, 2017, in the same amount as that contained in the Arbitration Award—$7,949,749.15.

Mr. Terry commenced the Bankruptcy Cases when he became concerned that the Debtor-Acis was being rendered insolvent and unable to pay creditors including himself, due to actions undertaken by Highland and its agents immediately after entry of the Arbitration Award (*e.g.,* transfers of assets, contracts, and business away from the Debtor-Acis).

The Debtor-Acis also is obligated on large administrative expense claims, since: (a) a Chapter 11 Trustee was appointed very early—due to what the bankruptcy court perceived to be massive conflicts of interest with regard to the Debtors' management; and (b) the Objectors have opposed virtually every action taken by the Chapter 11 Trustee during the Bankruptcy Cases, resulting in many long hearings.

## IV.    The Objectors (all of which are "Insiders").

*There are no non-insider creditors objecting to the Plan*.  Mr. Terry supports the Plan. The CLO SPEs and Indenture Trustee do not oppose the Plan. None of the vendors oppose the Plan. The U.S. Trustee is not opposing the Plan. As a technical matter, two impaired classes of creditors voted to accept the Plan.[20]  *So who are the Objectors to the Plan (which Plan will be further described below) and what is their party-in-interest status here?*

As earlier mentioned, the Objectors are: (a) Highland, (b) HCLOF Guernsey, and (c) Neutra Cayman. As noted earlier, the Chapter 11 Trustee frequently refers to them collectively as "The Highlands"—but the Objectors do not like this conflation. At one time Highland and

---

[20] Classes 2 and 3.  *See* Exh. 613.

HCLOF Guernsey had the same lawyers. They do not anymore. However, they frequently file

joint pleadings and take the same positions. Highland and Neutra Cayman do still have the same

lawyers.

1. Highland.

Highland is a Dallas, Texas-based company that is a Registered Investment Advisor.

Highland was founded in 1993 by Mr. Dondero, originally with a 75% ownership interest, and

Mark K. Akada ("Mr. Akada"), originally with a 25% ownership interest. As mentioned earlier,

Mr. Dondero is the chief executive of Highland. Highland, through its organizational structure

of approximately 2,000 separate business entities, manages approximately $14-$15 billion of

investor capital in vehicles including CLOs, private equity funds, and mutual funds. Highland

provides employees to entities in the organizational structure, such as it did with the Debtor-

Acis, through the mechanism of shared services agreements and sub-advisory agreements (as

mentioned above). ***Notably, Highland's chief executive, Mr. Dondero, served as the President***

***of the Debtor-Acis at all relevant times prepetition***.[21]  Highland claims to be a large creditor of

the Debtor-Acis for services provided to the Debtor-Acis under the Shared Services Agreement

and the Sub-Advisory Agreement. The Chapter 11 Trustee disputes these claims and has

asserted numerous claims back against Highland in an adversary proceeding (the "Highland

Entities Adversary Proceeding").

In any event, Highland is a ***disputed insider creditor***. It is an "insider," as contemplated

by Bankruptcy Code section 101(31)(C), because it, beyond any shadow of a doubt, controlled

the Debtor-Acis until these Bankruptcy Cases developed to the point of having a Chapter 11

---

[21] One witness, Hunter Covitz, referred to the Debtor-Acis as the "structured credit arm of Highland."
Transcript 12/13/18 (AM) [DE # 793], at p. 57.

12

Case 19-34054-sgj11 Doc 1735 Filed 01/13/21 Entered 01/13/21 15:53:00 Page 223 of
362
Case 19-34054-sgj11 Doc 3275 Filed 01/13/21 Entered 01/13/21 15:53:04 Page 13 of 41

Trustee take charge of the Debtor-Acis.  Highland does not seem to dispute that it is an insider.[22]

But, for the avoidance of doubt, Highland should be considered an insider of the Debtor-Acis for

at least the following reasons:  (a) the same human being (Mr. Dondero) was president of the

Debtor-Acis and was the chief executive of Highland; (b) Highland's General Counsel, Scott

Ellington, testified that Mr. Dondero controlled them both;[23] and (c) Highland provided the

Debtor-Acis with employees and management services pursuant to the Sub-Advisory Agreement

and Shared Services Agreement.[24]

Additionally, the court believes that the Chapter 11 Trustee made a convincing argument

in connection with Plan confirmation (and his justification for the separate classification of

Highland's claim in the Plan from other general unsecured creditors) that Highland should also

be regarded as a "competitor" of the Debtor-Acis at this juncture, since they are both in the fund

management business and Highland's control over the Debtor-Acis has now been divested.

Highland's competitor status, in addition to its insider status, warrants additional scrutiny of its

---

[22] Under section 101(31) of the Bankruptcy Code, an insider includes certain enumerated parties, such as an officer of the debtor, affiliate, *etc.*  Further, the list of enumerated "insiders" is not exclusive or exhaustive.  *See Wilson v. Huffman (In re Missionary Baptist Foundation of Am., Inc.),* 712 F.2d 206, 210 (5th Cir. 1983). Recently, the United States Supreme Court stated: "Courts have additionally recognized as insiders some persons not on that [101(31)] list—commonly known as 'nonstatutory insiders.'  The conferral of that status often turns on whether the person's transactions with the debtor (or another of its insiders) were at arm's length."  *U.S. Bank N.A. v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 963 (2018). The Fifth Circuit has noted that "cases which have considered whether insider status exists generally have focused on two factors in making that determination: (1) the closeness of the relationship between the parties and (2) whether the transaction . . . [was] conducted at arm's length."  *Browning Interests v. Allison* (*In re Holloway)*, 955 F.2d 1008, 1011 (5th Cir. 1992).

[23] *E.g.,* Exh. 23, at pp. 160 (line 15) through 161 (line 4); p. 196 (lines 14-19); p. 219 (lines 1-21).

[24] *See* 11 U.S.C. §§ 101(2)(D); (31)(C)(5).  The court notes that, although Highland has, from time to time, alleged that Mr. Terry is a "non-statutory insider" of the Trustee, it has never put on any credible evidence to support this contention.

13

motivations in objecting to the Plan. More importantly, it provides a sound legal and business justification for separately classifying its claim in the Plan.

2. HCLOF Guernsey.

The second Objector, HCLOF Guernsey, is an entity formed in the island nation of Guernsey. It has two allegedly independent Directors from Guernsey who have provided testimony in connection with confirmation of the Plan. It was enormously clear to the court (as will be elaborated upon below) that the two Directors of HCLOF Guernsey are—stated in the kindest way possible—mere "figureheads" for HCLOF Guernsey and they defer to Highland *entirely* to tell them what to do, what to say, and when. In any event, HCLOF Guernsey is the owner of the equity in the CLO SPEs (as earlier mentioned, this equity is sometimes referred to as the "subordinated notes" in the CLO SPEs). According to HCLOF Guernsey's 2017 Annual Report and Audited Financials, all of its subordinated notes issued by the Acis CLOs are physically held at and are pledged to HCLOF Guernsey's lender, NexBank, which happens to be a Dallas bank that is an affiliate of Highland.[25] HCLOF Guernsey was created in the year 2015 and was formerly known as "ALF."[26] Its name was changed on October 30, 2017 (ten days after Mr. Terry's Arbitration Award was entered), to allegedly distance itself from the Debtor-Acis. The equity owner HCLOF Guernsey, in turn, has three equity owners: (i) a 49% equity owner that is a charitable fund (*i.e.,* a donor advised fund or "DAF") that was seeded with contributions from **Highland**, is managed/advised by **Highland**, and whose **independent trustee is a long-time friend of Highland's chief executive officer, Mr. Dondero**; (ii) 2% is owned by **Highland employees**; and (iii) a 49% equity owner that is a third-party institutional investor based in

---

[25] Exh. 647.

[26] "ALF" is short-hand for Acis Loan Funding, Ltd.

14

Case 19-34054-sgj11 Doc 1735 Filed 01/13/21 Entered 01/13/21 19:53:00 Page 225 of
362
Case 19-34054-sgj11 Doc 827 Filed 01/31/21 Entered 01/31/21 19:53:00 Page 13 of 47

Boston, Massachusetts that only recently invested in HCLOF Guernsey (*i.e.,* in November 2017, just after the Terry Arbitration Award was issued), and desires to remain passive and anonymous (hereinafter, the "Passive Investor").[27]  Notably, the Debtor-Acis itself owned a small percentage of HCLOF Guernsey, in addition to providing management services to it, until October 24, 2017 (four days after the Terry Arbitration Award was issued).

The court has allowed HCLOF Guernsey to vigorously participate in the confirmation hearing (and other hearings during the Bankruptcy Cases), although its party-in-interest status has been questionable.  So how is HCLOF Guernsey a party-in-interest?  The answer is a bit of a stretch—but the court has decided it is impacted by the Plan, so it should have the right to object. Its party-in-interest status has evolved during the Bankruptcy Cases.

First, early on in these Bankruptcy Cases, HCLOF Guernsey (together with Highland) sued the Chapter 11 Trustee in the above-mentioned "Highland Entities Adversary Proceeding"—mostly, if not entirely, seeking injunctive relief.  At that point, the Chapter 11 Trustee treated HCLOF Guernsey as a disputed creditor,[28] since it was seeking equitable relief that could arguably be monetized.[29]  However, HCLOF Guernsey subsequently withdrew its requests for relief in that Highland Entities Adversary Proceeding.  But then, the Chapter 11 Trustee subsequently filed claims ***against*** HCLOF Guernsey in the Highland Entities Adversary Proceeding (along with his claims against Highland and a couple of other Highland entities) asserting avoidance actions and other causes of action against HCLOF Guernsey (among other

---

[27] The testimony was that the Passive Investor committed to a $150 million investment ($75 million immediately and $75 million callable over the next several years).

[28] In fact, on August 15, 2018, the Chapter 11 Trustee filed a proof of claim on behalf of HCLOF Guernsey.  HCLOF Guernsey has since objected to the proof of claim.

[29] *See* 11 U.S.C. §§ 101(5)(B) & 101(10).

15

Case 18-30264-sgj11 Doc 827 Filed 01/31/19 Entered 01/31/19 15:11:04 Page 16 of 47

things, the Chapter 11 Trustee alleged that HCLOF Guernsey schemed with Highland to terminate the Equity/ALF PMA, in a step toward systematically dismantling the Debtor-Acis of its value). Thus, HCLOF Guernsey may ultimately owe money to this estate. But most importantly, HCLOF Guernsey should be deemed a party-in-interest because of a proposed temporary injunction in the Plan that essentially would enjoin (for a finite, defined period) HCLOF Guernsey from exercising certain of its rights with regard to its equity in the CLO SPEs, pending resolution of the Highland Entities Adversary Proceeding. This temporary injunction in the Plan, directed towards HCLOF Guernsey and affiliates, will be further described below.

3. Neutra Cayman.

Neutra Cayman is a Cayman island exempted company that is the equity owner ***of the Debtor-Acis itself*** (in contrast to HCLOF Guernsey, which only owns equity in the CLO SPEs). Neutra Cayman only acquired its equity interest in the Debtor-Acis the day after the Terry Judgment was entered (on December 18, 2017), and for no consideration, from the Dugaboy Investment Trust (a family trust on which Mr. Dondero's sister is named trustee, that previously owned 74.9% of the Debtor-Acis) and from Mr. Akada (who previously owned 25% of the Debtor-Acis).[30] The court concludes that Neutra Cayman has standing to object to the Plan,

[30] The court is repeatedly referring to the Debtor-Acis but, to be clear, there are two consolidated Debtors: Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP/LLC"). *See* note 2, *supra*. When Acis LP was first formed, it was owned by one general partner (Acis GP/LLC, with a .1% interest) and it had three limited partners: (a) the Dugaboy Investment Trust (a Dondero family trust of which either Mr. Dondero or his sister, Nancy Dondero, have been the trustee at all relevant times) with a 59.9% interest; (b) Mr. Terry with a 25% interest; and (c) Mr. Akada with a 15% interest. When Acis GP/LLC was formed (*i.e.*, the .1% owner of Acis LP), its sole member was the Dugaboy Investment Trust. After Mr. Terry was terminated by Highland, his 25% limited partnership interest in Acis LP was forfeited and divided among the two remaining limited partners: Mr. Akada (increasing his interest by 10% up to 25%), and the Dugaboy Investment Trust (increasing its interest by 15% up to 74.9%). But, most importantly, on the day after entry of Mr. Terry's Final Judgment (*i.e.*, on December 18, 2017), both Mr. Akada and the Dugaboy Investment Trust conveyed their entire limited partnership interests in Acis LP—25% and 74.9%, respectively—to Neutra Cayman. The Dugaboy Investment Trust also conveyed its 100% membership interest in Acis GP/LLC to Neutra Cayman.

since it is an equity owner of the Debtors (albeit only having acquired its equity about a month before the bankruptcy). As with HCLOF Guernsey, the court also concludes that Neutra-Cayman is absolutely, beyond any reasonable doubt, controlled by Highland, as explained further below.

## V.    The Plan.

The Plan is fairly simple, considering the complexity of the business and the relationships, and the contentiousness of the Bankruptcy Cases. Again, there aren't many creditors.

The Plan proposes[31] that the Debtor-Acis, as a "Reorganized Debtor," will continue with the business operations of the Debtors after the Effective Date[32] of the Plan. Specifically, the Debtor-Acis will assume, pursuant to section 365 of the Bankruptcy Code, its CLO PMAs and continue to serve as the portfolio manager to the CLO SPEs (and as to any resets of the CLOs therein). The Reorganized Debtor will continue to earn fees and will pay claims from post-Effective Date income as provided in the Plan. The Reorganized Acis will actively pursue additional fund management contracts. Again, there is no objection by the CLO SPEs to the Plan, and the indenture trustee on the tranches of CLO notes has no objection.

Mr. Terry (again, the former human manager of the Debtor-Acis and also the largest creditor) shall receive 100% of the equity interests in the Reorganized Debtor, in exchange for a negotiated $1 million reduction in his partially secured claim.[33] The remainder of his claim will

---

[31] This is merely a high-level summary of the Plan. The Plan terms, as modified, shall in all ways govern, not this summary.

[32] The "Effective Date" is defined, essentially, as the first business day which is fourteen (14) days after entry of an order confirming the Plan, if the confirmation order is not stayed.

[33] Mr. Terry has asserted partial secured status as to his claim in the proofs of claim he has filed in these cases. The Chapter 11 Trustee credibly testified that there was no other logical party to take the equity of

17

be treated as an unsecured claim. Each unsecured creditor will receive on the Plan Effective Date an unsecured cash flow note in the full amount of its claim, which notes will mature three years after the Effective Date of the Plan, with equal quarterly payments of principal and interest, at 5% interest per annum. These cash flow notes are expected to yield payment in full (actually 102%) to the unsecured creditors.[34]

As for the sub-advisory and shared services agreements with Highland, as noted earlier, the Chapter 11 Trustee, with bankruptcy court approval, has already (as of August 2018) rejected these during the Bankruptcy Cases, pursuant to section 365 of the Bankruptcy Code. The Chapter 11 Trustee caused the Debtor-Acis to subsequently contract, with bankruptcy court approval, with a different entity, Brigade Capital Management, L.P. ("Brigade"), to provide the sub-advisory and shared services going forward, for a minimum two-year term (unless the Reorganized Debtor and Brigade otherwise agree), at a much cheaper cost than Highland.[35] Thus, Brigade will provide sub-servicing and sub-advisory services to the Reorganized Debtor.

---

the Reorganized Debtor, at this juncture, and that he had negotiated this reduction to Mr. Terry's secured claim, and he thought it was justified by the circumstances of this case. While the Objectors have argued that the secured status of Mr. Terry's claim may be subject to challenge under section 547(b) of the Bankruptcy Code, section 547(b) is discretionary (*e.g.*, a "trustee may avoid any transfer" that might be avoidable as a preference). The Chapter 11 Trustee credibly emphasized that this was negotiated treatment of an asserted secured claim, and he had no "exclusivity" on proposing a plan if someone else had wanted to propose something different. Transcript 12/11/18 (AM) [DE # 789], at p. 70 (line 3) through p. 71 (line 2).

[34] Insider claims—namely Highland—are separately classified from general unsecured claims under the Plan. To the extent such claims are ultimately allowed (after any allowed defenses and offsets), and to the extent such claims are not equitably subordinated by Bankruptcy Court adjudication, these claims will receive the same treatment as other general unsecured claims (cash flow notes). To the extent any of these claims are ultimately allowed but equitably subordinated, they will receive subordinated promissory notes, accruing interest at 5% per annum, that will not be payable until all non-subordinated claims have been paid in full (they will have maturity dates to occur on the earlier of: (i) the date that is two years after the date all Unsecured Cash Flow Notes have been paid in full, or (ii) five years after the Effective Date). The expected recovery under the Plan for the insider claims is from 65% to 100%.

[35] An entity named Cortland Capital Markets Services LLC ("Cortland") is actually providing some of the back-office shared services agreement type functions.

As for the Equity/ALF PMA, it is not an agreement with the Debtor-Acis anymore to either be assumed or rejected, pursuant to section 365. However, in the Highland Entities Adversary Proceeding, the Chapter 11 Trustee seeks to avoid the termination of the Equity/ALF PMA. Pursuant to the Plan, the Reorganized Debtor will be vested with certain Assets of the Debtors, including Estate Claims and Estate Defenses, to be administered and liquidated by the Reorganized Debtor.

    1.   The Highland Entities Adversary Proceeding (Adv. Proc. No. 18-03212).

Suffice it to say that the Highland Entities Adversary Proceeding is a somewhat significant part of the Plan; it is what justifies the temporary injunction that is a critical part of the Plan. With regard to the Highland Entities Adversary Proceeding, the Defendants in it (there are five of them) are: (i) Highland; (ii) HCLOF Guernsey; (iii) Highland HCF (*i.e.,* the Cayman Island entity that was recently formed to essentially replace the Debtor-Acis under the Equity/ALF PMA); (iv) Highland CLO Management, Ltd. ("Highland Management") (an entity registered in the Cayman Islands on October 27, 2017—seven days after Mr. Terry's Arbitration Award); and (v) Highland CLO Holdings, Ltd. (yet another entity incorporated in the Cayman Island on October 27, 2017). The Highland Entities Adversary Proceeding is essentially a multi-faceted fraudulent transfer action. The statutory predicates for the relief sought are sections 502, 542, 544, 547, 548, and 550 of the Bankruptcy Code and Texas Business & Commerce Code § 24.001 et seq. ("TUFTA").

Distilled to its essence, the Highland Entities Adversary Proceeding argues that Highland, along with its related Co-Defendants, ***orchestrated a systematic transfer of value away from the Debtor-Acis to other Highland entities*** (all of those transferee-entities are offshore entities—whereas the Debtor-Acis is a Delaware entity), beginning almost immediately after Mr. Terry

19

was terminated in June 2016, and continuing on during Mr. Terry's litigation/arbitration with the

Debtor-Acis, and then rapidly unfolding after the Arbitration Award. This was allegedly done to

denude the Debtor-Acis of value and make the Debtors "judgment proof." This was allegedly

also done to ensure that the Debtor-Acis's very valuable business as portfolio manager would be

taken over by other Highland entities and remain under Highland's and Mr. Dondero's control.[36]

The evidence is rather startling on this point. Among other things, pursuant to

amendments made to the Debtor-Acis's Sub-Advisory Agreement and Shared Services

Agreements with Highland, starting soon after Mr. Terry was terminated, the fees owed by the

Debtor-Acis to Highland under these agreements shot up to an enormously higher level. Then,

in April 2017, a new CLO was issued (or actually a former Acis CLO was reset) and a new

Highland-affiliated Cayman Island entity was ultimately put in place to manage it instead of the

Debtor-Acis (even though the Debtor-Acis managed all other CLOs in the Highland corporate

empire). Numerous other transactions were undertaken through the Fall of 2017, removing

assets and agreements away from the Debtor-Acis. For example, a multi-million dollar note

receivable owed to the Debtor-Acis by Highland was transferred out of the Debtor-Acis,[37] and

---

[36] Exh. 627.

[37] On November 3, 2017, the Debtor-Acis, Highland, and Highland Management (a newly created, offshore Highland affiliate) entered into that certain Agreement for Assignment and Transfer of Promissory Note (the "Note Assignment and Transfer Agreement"). Exh. 225. The Note Assignment and Transfer Agreement, among other things, transferred a $9.5 million principal amount promissory note executed by Highland and payable to the Debtor-Acis (the "Note"), Exh. 218, from the Debtor-Acis to Highland Management (the "Note Transfer"). The Assignment and Transfer Agreement memorializing this transaction is signed by Mr. Dondero for the Debtor-Acis. The document recites that (i) Highland is no longer willing to continue providing support services to the Debtor-Acis, (ii) the Debtor-Acis, therefore, can no longer fulfill its duties as a collateral manager, and (iii) Highland Management agrees to step into the collateral manager role if the Debtor-Acis will assign the Note to it. Notably, Highland Management was registered in the Cayman Islands on October 27, 2017, roughly a week before the Note Transfer. Thus, Highland Management had no portfolio or collateral management experience whatsoever when it entered the Assignment and Transfer Agreement. To the contrary, it appears Highland Management was an entity that was created specifically to hold the Note and eventually take possession of the CLO PMAs in an international forum that would be difficult for Mr. Terry to reach. The Debtor-

20

shares in HCLOF Guernsey held by the Debtor-Acis were sold back to HCLOF Guernsey (four

days after the Arbitration Award). And then the Equity/ALF PMA was terminated so that the

Debtor-Acis would no longer have management-control over HCLOF Guernsey as its portfolio

manager—arguably putting Highland in a position to liquidate the Acis CLOs and put the

Debtor-Acis out of business. Specifically, on October 27, 2017, just seven days after Mr. Terry's

Arbitration Award, the Debtor-Acis ostensibly terminated its own portfolio management rights

under the Equity/ALF PMA[38] and transferred its authority and its valuable portfolio management

rights—for no value—to Highland HCF, an affiliate of Highland. It appears that the only alleged

consideration for these transfers, to the extent there was any, was the satisfaction of purported

debts owed to other Highland entities or their representatives.

---

Acis appears to have received no or insufficient consideration for the Note Transfer. The primary
consideration for the Note Transfer was an alleged payable due from the Debtor-Acis to Highland in the
approximate amount of $7.5 million for participation fees, which was transferred to Highland
Management shortly before the Note Assignment and Transfer Agreement was entered. The validity of
the alleged "participation fees" is unknown. The remainder of the consideration for the Note Transfer is a
promise to pay certain expenses of the Debtor-Acis, which has apparently never occurred. In any event, it
appears highly likely that the Note Transfer took away the Note as an asset from which Mr. Terry could
collect his judgment.

[38] As mentioned earlier, the Equity/ALF PMA provided that the Debtor-Acis could only be removed as
portfolio manager by the equity owner (now known as HCLOF Guernsey) *"for cause"* at § 14(a)-(e).
Exh. 11. Meanwhile, the Debtor-Acis could terminate the Equity/ALF PMA without cause upon at least
ninety (90) days' notice, pursuant to § 13(a)-(c). Exh. 11. It would appear that these terms were wholly
ignored by the persons orchestrating the Equity/ALF PMA termination. It appears that the Debtor-Acis
was simply manipulated to consent and agree to its removal and replacement as portfolio manager of
HCLOF Guernsey. This transfer of the Debtor-Acis's portfolio management rights to the offshore entity
Highland HCF was accomplished by way of a new portfolio management agreement entered into by the
equity owner (now known as HCLOF Guernsey) and Highland HCF on October 27, 2017, which
empowered Highland HCF with the same broad authority to direct the management of HCLOF Guernsey
as was previously held by the Debtor-Acis LP under the Equity/ALF PMA. *See* Exh. 19, October 27,
2017 PMA §§ 1 & 5(a)-(q). This agreement appears to have been further solidified in a second portfolio
management agreement dated November 15, 2017. Exh. 215. The Debtor-Acis received no consideration
for this transfer.

21

The Highland Defendants argue that the Equity/ALF PMA (its termination being
arguably the most significant transfer referenced in the Highland Entities Adversary Proceeding)
did not have value.  But the evidence convinces the court that it absolutely did.  A witness, Mr.
Zachary Alpern, credibly testified that the portfolio manager (under the Equity/ALF PMA) made
decisions regarding the underlying financial instruments including seeking an optional
redemption and negotiating a reset.  Mr. Alpern also credibly testified about the importance, in
the CLO industry, of the portfolio manager having control of a CLO's equity to ensure an
"evergreen fee stream."[39]  Additionally, Mr. Terry also credibly testified that the portfolio
manager (not the CLO equity interest holder) has the right to control the terms of the liquidation
of collateral in an optional redemption under the terms of the indentures.[40]  The Chapter 11
Trustee also credibly testified that the Equity/ALF PMA allowed the Debtor-Acis to have control
of an optional redemption.[41]  Finally, a witness, Mr. Klein, credibly testified about the value of
the Equity/ALF PMA and the negative impact of its transfer on the Debtor-Acis LP. [42]

To be clear, Highland and HCLOF Guernsey have argued in opposition to the Chapter 11
Trustee's position that it is HCLOF Guernsey—the actual equity holder of the CLO SPEs—that
had/has the absolute power and authority to control the CLO SPEs' destinies and it is ludicrous
to suggest otherwise.  However, not only does the Equity/ALF PMA appear to this court to have
delegated the relevant power and authority **to the Debtor-Acis**, but Highland's own expert on this

---

[39] Exh. 404, Transcript 8/23/18 (AM) at pp. 65-67, 81-93 and Transcript 8/23/18 (PM) at pp. 34-35, 38-
40, 46, and 49.

[40] Transcript 12/18/18 [DE # 804], at pp. 77-78.  *See also* Exh. 405, Transcript 8/27/18 (AM) at pp. 63-75.

[41] Exh. 405, Transcript 8/27/18 (AM) at p. 53.

[42] Exh. 405, Transcript 8/27/18 (PM) at pp. 143-144, 147-159 and 205-207.

topic, Mr. Castro, testified that the "actual humans" who would make the decision for HCLOF Guernsey as to whether to request an optional redemption of the Acis CLOs were not the HCLOF Guernsey directors but, rather, Highland executives Mr. Dondero, Mr. Okada, and Highland employee Mr. Covitz (acting for Highland HCF).[43]  Moreover, Mr. Alpern credibly testified that, before the Terry Arbitration Award, the Debtor-Acis, as the portfolio manager under the Equity/ALF PMA, rather than the HCLOF Guernsey's directors, issued the notices of optional redemption for HCLOF Guernsey.[44]

The court concludes that the Chapter 11 Trustee has demonstrated a likelihood of success on the merits with regard to his claims set forth in the Highland Entities Adversary Proceeding.  Therefore, the Temporary Injunction that is part of the Plan is supportable (as further explained below).  Of course, the nature and extent of the rights ultimately recovered by the Debtor-Acis will either be determined in the Highland Entities Adversary Proceeding or, as HCLOF Guernsey's own Guernsey expert conceded, in a binding arbitration in Dallas, Texas under the terms of the Equity/ALF PMA.[45]

## 2.  The Plan Injunction.

The most controversial aspect of the Plan—the aspect of it that seems to be the primary focus of the Objectors—is a ***portion*** of an injunction in the Plan (the "Temporary Injunction"). The Temporary Injunction would ***temporarily*** enjoin the following parties ***from effectuating an optional redemption or liquidating the Acis CLOs*** and related actions: (i) Highland; (ii) HCLOF

---

[43] Exh. 406, Transcript 8/28/18 (PM) at pp. 61-63.

[44] Exh. 404, Transcript 8/23/18 (AM) at pp. 85-89 and Exhs. 323-325 (Notices of Optional Redemption signed by the Debtor-Acis as portfolio manager of HCLOF).

[45] Transcript 12/13/18 (PM) [DE #794], at pp. 116, 118-19, 122, 124 (Corfield); *see also*, p. 140 (McGuffin).

Guernsey; (iii) CLO Holdco, Ltd. (the donor advised fund, seeded with Highland contributions and managed by Highland that owns 49% of HCLOF Guernsey); (iv) Neutra Cayman; (v) Highland HCF (the Cayman Island entity created shortly before the Bankruptcy Cases to replace the Debtor-Acis under the Equity/ALF PMA); (vi) Highland Management (the Highland-created entity that entered into a portfolio management agreement with a new Acis-CLO that was established in 2017); and (vii) any affiliates of Highland and their respective employees, agents, representatives, transferees, assigns, and successors.[46]  This Temporary Injunction is proposed to only last until the earlier of when:  (a) the creditors of the Debtors are paid in full; (b) resolution of the Highland Entities Adversary Proceeding; (c) a material breach in the Plan; or (d) the bankruptcy court terminates the Temporary Injunction upon request of a party-in-interest.  ***Fully consensual resets of the Acis CLOs are permissible if HCLOF Guernsey, as the equity owner in the CLO SPEs, chooses to agree to resets***.  The basis for the Temporary Injunction is as follows:  The Chapter 11 Trustee has asserted numerous claims in the Highland Entities Adversary Proceeding against Highland, HCLOF Guernsey, and affiliates, including claims to recover the Debtor-Acis's rights under the Equity/ALF PMA.[47]  The Temporary Plan Injunction essentially provides for the continuation, after the Effective Date, of injunctive relief that the bankruptcy court previously granted in its Preliminary Injunction Order (the "Preliminary Injunction") [DE # 21 in Adversary No. 18-03212-sgj] entered on July 10, 2018 in the Highland Entities Adversary Proceeding.  The Preliminary Injunction was originally set to expire by its

---

[46] There is another portion of this Plan injunction that is more of a general plan injunction (*i.e.,* very typical) that would prohibit actions against the Debtors, Reorganized Debtor and the Estate Assets, based on acts occurring before the Effective Date, which would be permanent and would not expire upon the occurrence of any event that causes the Temporary Plan Injunction to expire.

[47] *See* Exh. 627, Trustee's Counterclaims and Claim Objection.

own terms upon confirmation of the Plan but would be extended pursuant to an order confirming the Plan, through the Effective Date of the Plan.

As the Fifth Circuit has stated, the four elements to justify a preliminary injunction are (a) substantial likelihood of success on the merits; (b) substantial threat that the plaintiff will suffer irreparable injury; (c) the threatened injury outweighs any harm the injunction might cause the defendant; and (d) the injunction is in the public interest.[48] Each element is present in these cases.

*Immediate and Irreparable Harm.* The court finds and concludes that the Temporary Injunction is legally permissible, necessary, and appropriate to avoid immediate and irreparable harm to the Reorganized Debtor (*i.e.,* evisceration of the Acis CLOs, by parties with unclean hands, that would have no authority to effectuate a liquidation of the CLOs, absent the prepetition wrongful termination of the Equity/ALF PMA). Mr. Scott, a director of HCLOF Guernsey, testified that, absent the Temporary Plan Injunction, HCLOF Guernsey would call for an optional redemption of the Acis CLOs.[49] The testimony of Ms. Bestwick, the other director of HCLOF Guernsey, also implied that, when the injunction expires, HCLOF Guernsey would redeem the Acis CLOs so that they could once again be managed by Highland.[50] The Chapter 11 Trustee credibly testified that if the Acis CLOs are liquidated, there is nothing for the Debtor-Acis to manage.[51] The Chapter 11 Trustee credibly testified that the Temporary Plan Injunction

---

[48] *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009); *Women's Med. Ctr. of N.W. Houston v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001); *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998).

[49] Exh. 721, Mr. Scott Depo. at pp. 204.

[50] Exh. 719, Bestwick Depo. at p. 112.

[51] Exh. 405, Transcript 8/27/18 (AM) at p. 40.

25

is very important because it protects the revenues under the Acis PMAs, which is a source of potential recovery to creditors under the Plan.[52] Mr. Terry credibly testified that the Temporary Plan Injunction is a critical component of the Plan and that the Debtor-Acis would have no going concern value without it. In fact, without the Plan Injunction, Mr. Terry will be precluded from reorganizing the business and paying creditors.[53]

The Objectors have argued that the Chapter 11 Trustee cannot suffer irreparable harm because he has an adequate remedy at law. This argument misses the mark. The destruction of the Debtors' ongoing business, which has the potential to repay creditors under the Plan in two years, constitutes irreparable harm. The fact that the estate possesses a number of avoidance claims for damages against Highland and its affiliates, and could potentially obtain damages on such claims, does not render the destruction of the Debtor-Acis's ongoing business any less harmful. Indeed, according to the Fifth Circuit:

> [T]he mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.' For example, some courts have found that a remedy at law is inadequate if legal redress may be obtained only by pursuing a multiplicity of actions.[54]

*Likelihood of Success on the Merits.* The Chapter 11 Trustee has also demonstrated a likelihood of succeeding on the merits in the Highland Entities Adversary Proceeding.

---

[52] Transcript 12/11/18 (AM) [DE # 789], at pp. 71-72.

[53] Transcript 12/12/18 (AM) [DE # 791], at pp. 40-41, 54-55.

[54] *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011) (citing *Lee v. Bickell*, 292 U.S. 415, 421 (1934) ("we are not in doubt, the multiplicity of actions necessary for redress at law [is] sufficient . . . to uphold the remedy by injunction.")).

26

The record contains substantial evidence of both intentional and constructive fraudulent transfers with regard to the Equity/ALF PMA and other assets.[55] The numerous prepetition transfers that occurred around the time of and after the Terry Arbitration Award appear more likely than not to have been made to deprive the Debtor-Acis of value and with actual intent to hinder, delay or defraud the Debtors' creditors. Highland's only purported business justifications for the prepetition transfers were that the Passive Investor demanded it and that the Debtor-Acis's brand was toxic in the market place.[56] However, these business justifications were not supported (and, in fact, were contradicted) by the evidence.

Indeed, while representatives of Highland and its affiliates said that the Passive Investor's demands were the reason for the termination (*i.e.,* essentially a "transfer") of the Equity/ALF PMA, the Passive Investor's representative testified that this was untrue and that these alleged demands were never made by the Passive Investor.[57] In fact, the Passive Investor was just that— a passive, minority investor in HCLOF Guernsey with no ability to influence or control any of

---

[55] *E.g.,* Exh. 22, Transcript 2/6/18 at pp. 82-109, 130, 202-244, and the exhibits discussed therein; Exh. 201, Transcript 3/21/18 at pp. 110-133 & 186-191; Exh. 24, Transcript 3/22/18 at pp. 71-75 & pp. 204-205; Transcript 12/11/18 [DE # 789], at pp. 52-56; *see also* Transcript 8/27/18 (AM) [DE # 552], at p. 52; Transcript 12/12/18 (PM) [DE # 792], at pp. 92-98;

[56] Highland General Counsel Scott Ellington testified that the Passive Investor said it had no interest in doing business with the Debtor-Acis because the Debtor-Acis brand was purportedly toxic and, consequently, nothing associated with the Debtor-Acis could be managed or marketed as a CLO. Exh. 23, Transcript 2/7/18 at pp. 55-58. Mr. Ellington further testified that the Passive Investor demanded that the Equity/ALF PMA be transferred. Exh. 23, Transcript 2/7/18 at pp. 203-204. Mr. Ellington also testified that, because the Passive Investor would be putting in additional capital in connection with any reset CLOs, it had the ability to "start calling the shots" and dictate the terms of any reset transactions. Exh. 23, Transcript 2/7/18 at p. 226. Additionally, Highland executive Mark Okada testified that a reset transaction could not be performed by the Debtor-Acis because the market would not accept the Debtor-Acis as a portfolio manager and the Debtor-Acis was no longer risk-retention compliant. Exh. 25, Transcript 3/23/18 at p. 53. Additionally, Mr. Dondero testified that the "Boston investor" deal was contingent on getting away from the Debtor-Acis and getting a new collateral manager. Exh. 25, Transcript 3/23/18 at pp. 143-144.

[57] *See* Exh. 720 and excerpts read in to the trial record on 12/11/18 (PM) at pp. 149-157.

the actual investment decisions.[58]  The only other business justification Highland and HCLOF

Guernsey have suggested for the prepetition transfers was that the Debtor-Acis "was a shell" and

not capable of being risk retention compliant.[59]  However, Highland portfolio manager Hunter

Covitz testified that in October 2017, prior to the Terry Arbitration Award, there was a structure

in place that would comply with risk retention.[60]  Mr. Covitz could not convincingly distinguish

why the "shell" status of the Debtor-Acis was distinguishable from the "shell" status of other

Highland-related entities that were the recipients of various fraudulent transfers.[61]  Mr. Covitz

also subsequently admitted that the Passive Investor did not request that the Debtor-Acis end its

involvement with HCLOF Guernsey through the Equity/ALF PMA fraudulent transfer or request

that ALF change its name to HCLOF [Guernsey].[62]  Mr. Covitz's testimony contradicted the

testimony provided by Scott Ellington, General Counsel[63] and Mr. Dondero.[64]  And, at bottom, if

the Debtor-Acis was a thinly capitalized "shell," it appears to be only because Highland

systematically made it that way after the Terry Arbitration Award.

The evidence established overwhelmingly that there is a substantial likelihood that the

transfers were part of an intentional scheme to keep assets away from Mr. Terry as a creditor.

Highland put on an expert, Mr. Greenspan, who testified that he did not consider whether the

---

[58] Exh. 720, Depo. of Passive Investor representative at pp. 32-33.

[59] Transcript 12/13/18 (AM) [DE # 793], at pp. 55-58.

[60] Transcript 12/13/18 (AM) [DE # 793], at pp. 77-78.

[61] Transcript 12/13/18 (AM) [DE # 793], at p. 78; Transcript 12/18/18 [DE # 804], at pp. 59-63.

[62] Transcript 12/13/18 (AM) [DE # 793], at p. 103.

[63] *See* Exh. 23, Transcript 2/7/18 at pp. 177-178.

[64] *See* Ex. 25, Transcript 3/23/28 at pp. 143-44.

Equity/ALF PMA transfer was an "actual" fraudulent transfer, but only considered whether the transfer was "constructively" fraudulent.[65] While Highland has taken the position that termination of the Equity/ALF PMA was not a transfer, Mr. Greenspan testified that the termination of a contract can constitute a transfer and acknowledged that the definition of a transfer in the Bankruptcy Code does not include a value component.[66]

*Balance of Harms.* The Chapter 11 Trustee has also shown the balance of harms weighs in his and the estates' favor in granting the Plan's Temporary Injunction. The Chapter 11 Trustee is entitled to the Temporary Injunction pending resolution of the claims asserted in the Highland Entities Adversary Proceeding. The Chapter 11 Trustee credibly testified that the Temporary Plan Injunction is important to the Plan, because it allows the cash flow from the CLO management to be collected by the Reorganized Debtor, and that is the source of revenue available at this time to pay creditors.[67] Mr. Terry also credibly testified that the Temporary Plan Injunction is a critical component of the Plan necessary to preserve the Debtors' going concern value and allow the Reorganized Debtor to generate new business and repay creditors.[68] Conversely, in this court's view, there is no real harm to Highland or the Co-Defendants because they can ask for a reset under the Plan.[69] Mr. Scott, a director of HCLOF Guernsey, testified that

---

[65] Transcript 12/12/18 (PM) [DE # 792], at pp. 116-117 and 161.

[66] Transcript 12/12/18 (PM) [DE # 792], at pp. 92-98. Section 548(a)(1)(A) of the Bankruptcy Code only requires that a transfer be made with actual intent to hinder, delay or defraud creditors. In the context of an intentionally fraudulent transfer claim, questions of value are immaterial. 11 U.S.C. § 548(a)(1)(A). The definition of "transfer" under the Texas Uniform Fraudulent Transfer Act ("TUFTA") also does not include a value component. Tex. Bus. & Comm. Code Ann. § 24.002(12) (West, Westlaw through 2017).

[67] Transcript 12/11/18 (AM) [DE # 789], at pp. 71-72.

[68] Transcript 12/12/18 (AM) [DE # 791], at pp. 40-41, 54-55.

[69] Transcript 12/11/18 (AM) [DE # 792], at p. 92.

29

Case 19-34054-sgj11 Doc 3275 Filed 01/31/22 Entered 01/31/22 15:53:00 Page 240 of
362
Case 19-34054-sgj11 Doc 327 Filed 01/31/19 Entered 01/31/19 15:53:00 Page 36 of 47

HCLOF Guernsey can sell its interest in the subordinated notes in the market.[70]  The Chapter 11

Trustee credibly testified that the Temporary Plan Injunction would not impair the value of the

subordinated notes because a rational investor would not want to liquidate the Acis CLOs, but

rather would acquire them to do a reset under the Plan.[71]  Mr. Terry credibly testified that even if

the Acis CLOs are not reset, it still does not make sense to redeem the Acis CLOs.[72]

    *Public Interest.*  Finally, issuance of the Plan Injunction is consistent with public policy.

Public policy favors the equitable collecting of a debtor's assets, maximizing the value of those

assets, and distributing the proceeds in an orderly fashion in accordance with the priorities and

safeguards set forth in the Bankruptcy Code, rather than in an uncontrolled, piecemeal, and

potentially wasteful way.  Public policy also supports successful reorganizations.[73]  The public

interest is furthered by confirming a plan that saves the Debtor-Acis's business operations and

allows it to pay its creditors under a successful plan of reorganization.  The public interest is also

furthered by maintaining the status quo through the Temporary Plan Injunction so that the

avoidance action relating to the Equity ALF PMA can be determined on its merits.  The public

interest is not furthered by allowing potential wrongdoers to complete the last step in what

appears likely to have been a scheme to strip the Debtor-Acis of its assets, steal its business, and

leave it unable to pay creditors.  The public interest is not furthered by leaving the Debtors

---

[70] Exh. 721, Mr. Scott Depo. at p. 28.

[71] Transcript 12/11/18 (PM) [DE # 790], at pp. 23-24.

[72] Transcript 12/12/18 (AM) [DE #791], at p. 82.

[73] *Tex. Comptroller of Pub. Accounts v. Transtexas Gas Corp. (In re Transtexas Gas Corp.)*, 303 F.3d 571, 580 (5th Cir. 2002).

without sufficient resources to pursue and effectively litigate potentially valuable causes of action.

In sum, the court finds and concludes that the proposed Plan injunction (including the Temporary Injunction) is legally permissible and justified under all the circumstances. It is narrowly tailored to address the specific harm to which it is directed and comports with governing case and statutory authority and applicable rules of bankruptcy and civil procedure. The Plan Injunction is consistent with Fifth Circuit precedent.[74] Such an injunction would not violate section 524(e) of the Bankruptcy Code. That subsection provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt."[75] The Plan Injunction would not affect the liability of any entity, or the liability of any property. The injunction would only temporarily prohibit Highland and its Co-Defendants from exercising one form of economic recourse, thereby preserving the status quo while the Chapter 11 Trustee and/or Reorganized Debtor has a fair opportunity to prosecute the

---

[74] The Fifth Circuit, in an unpublished opinion, has recognized the propriety of an injunction to preserve the status quo in cases where equitable relief is sought. *See Animale Group v. Sunny's Perfume, Inc.,* 256 F. App'x 707, 709 (5th Cir. 2007) ("Because Defendants seek equitable relief, the district court was authorized to preserve the status quo by entering a limited asset freeze."). The Chapter 11 Trustee's claims in the Highland Entities Adversary Proceeding to avoid fraudulent transfers seek equitable relief. *See United States ex rel. Rahmen v. Oncology Assocs., P.C.,* 198 F.3d 489, 498 (4th Cir. 1999) ("The complaint's request to void transfers as fraudulent—a form of rescission—is also an equitable remedy."); *Dong v. Miller,* No. 16-CV-5836 (NGG) (JO), 2018 U.S. Dist. LEXIS 48506, at *30-31 (E.D.N.Y. Mar. 23, 2018) ("The setting-aside of a fraudulent conveyance is a form of equitable relief."). *See also Iantosca v. Step Plan Servs.,* 604 F.3d 24, 33 (1st Cir. 2010) (affirming preliminary injunction where creditors had a "colorable claim that appellants' own supposed interest under the settlement rests upon a fraudulent conveyance"); *Seidel v. Warner (In re Atlas Fin. Mortg., Inc.),* Adv. No. 13-03222, 2014 Bankr. LEXIS 140 at *10 (Bankr. N.D. Tex. Jan. 14, 2014) (granting preliminary injunction where complaint sought avoidance of fraudulent transfers under the Bankruptcy Code and the Texas Uniform Fraudulent Conveyance Act); *Paradigm Biodevices, Inc. v. Centinel Spine, Inc.,* No. 11 Civ. 3489 (JMF), 2013 U.S. Dist. LEXIS 66858, at *7 (S.D.N.Y. May 9, 2013) (authority to grant preliminary injunction existed because plaintiff alleged not only a legal claim for money damages, but also an equitable claim to avoid fraudulently transferred assets).

[75] 11 U.S.C. § 524(e).

31

Highland Entities Adversary Proceeding.[76]  Likewise, the proposed injunction does not

contravene any other provision of the Bankruptcy Code or the Bankruptcy Rules.[77]  Finally, the

Chapter 11 Trustee's avoidance claim relating to the Equity/ALF PMA transfer under TUFTA

also provides a statutory basis for injunctive relief.[78]

> ### 3.  Feasibility of the Plan—Specific Findings and Conclusions Regarding Mr. Terry and Brigade.

The Objectors have challenged the feasibility of the Plan.[79]  The court finds and

concludes that the preponderance of the evidence supported the feasibility of the Plan.  Among

other things, the Chapter 11 Trustee credibly testified that Mr. Terry has an excellent track

record as a portfolio manager, and that there is no reason why Mr. Terry will not be able to

obtain new business—that is, new portfolios to manage which will provide additional revenue

streams for the Reorganized Debtor.[80]  The evidence was credible and compelling that Mr. Terry

---

[76] *See In re Seatco, Inc.*, 259 B.R. 279, 283-84 (Bankr. N.D. Tex. 2001) (approving temporary injunction of suit against nondebtor on guaranty of debt treated in plan).

[77] *Compare Omni Mfg. v. Smith (In re Smith),* 21 F.3d 660, 666-67 (5th Cir. 1994) (disapproving injunction extending time to file proof of claim beyond limits set in Bankruptcy Rules 3003(c)(3) and 9006(b)(1)); *Chiasson v. Bingler (In re Oxford Mgmt.),* 4 F.3d 1329, 1334 (5th Cir. 1993) (disapproving injunction ordering payment that altered distribution scheme set forth in § 726(b)); *Unites States v. Sutton*, 786 F.2d 1305, 1308 (5th Cir. 1986) (disapproving injunction ordering spousal support payments contrary to § 523(a)(5)).

[78] Tex. Bus. & Comm. Code Ann. § 24.008 (West, Westlaw through 2017) (providing a creditor may obtain "an injunction against further disposition by the debtor or the transferee, or both, of the asset transferred or of other property . . . [or] any other relief the circumstances may require.").  TUFTA's injunction provision is construed broadly and courts have found that "[a] claim for fraudulent transfer under Texas law contemplates the issuance of a preliminary injunction." *Sargeant v. Al Saleh*, 512 S.W.3d 399, 413 (Tex. App.—Corpus Christi 2016, no pet.); *accord, Janvey v Alguire*, 647 F.3d 585, 602-03 (5th Cir. 2011).

[79] 11 U.S.C. § 1129(a)(11).

[80] Transcript 12/11/18 (AM) [DE # 789], at p. 90 (lines 5-12).  Moreover, to the extent there are any gaps, recoveries from the Highland Entities Adversary Proceeding might eventually be available for ongoing operations and payment of creditors.

Case 19-34054-sgj11 Doc 3275 Filed 01/13/21 Entered 01/13/21 15:53:00 Page 243 of
362
Case 19-34054-sgj11 Doc 3275 Filed 01/13/21 Entered 01/13/21 15:53:04 Page 33 of 47

will be capable of fulfilling the equity owner position in the Reorganized Debtor (stepping in to essentially run the Reorganized Debtor) and will be able to ensure the feasibility of the Plan. He is well qualified to reorganize the Debtor-Acis. Mr. Terry testified that his role with the Reorganized Debtor will be similar to the role he very successfully performed for the Debtor-Acis.[81] The Debtor-Acis received numerous awards during Mr. Terry's service as the portfolio manager of the Acis CLOs.[82] The arbitration panel that issued the Arbitration Award found that Mr. Terry was terminated for essentially doing the right thing for investors.[83] Mr. Terry credibly testified that numerous market participants have expressed an interest in working with the Reorganized Debtor if the Plan is confirmed.[84]

Moreover, the court finds and concludes that Brigade (who stepped in as sub-advisor in place of Highland during the Bankruptcy Cases and is a registered investment advisor) is qualified to serve as a sub-advisor to the Reorganized Acis. Mr. Jared Worman, a portfolio manager for Brigade,[85] credibly testified that Brigade, founded in the year 2007, currently has $20 billion of total assets under management, $5 billion of which consists of six U.S. CLOs, two U.S. CDOs, and three European CLOs.[86] Mr. Worman credibly testified that Brigade has issued 17 CLOs and has reset or refinanced several of them.[87] Mr. Worman and Mr. Terry credibly

[81] Transcript 12/11/18 (PM) [DE # 790], at pp. 172-73.

[82] Transcript 12/11/18 (PM) [DE # 790], at pp. 162-163 and Exh. 752.

[83] Transcript 12/11/18 (PM) [DE # 790], at pp. 161-62.

[84] Transcript 12/12/18 (AM) [DE # 791], at pp. 16-18.

[85] Mr. Worman has an undergraduate degree from Emory University and an MBA from Wharton.

[86] Transcript 12/11/18 (PM) [DE # 790], at p. 84.

[87] Transcript 12/11/18 (PM) [DE # 790], at p. 86.

33

Case 19-34054-sgj11 Doc 1735 Filed 01/13/21 Entered 01/13/21 15:53:00 Page 244 of
362
Case 19-34054-sgj11 Doc 827 Filed 01/13/21 Entered 01/13/21 15:53:00 Page 34 of 47

testified that Brigade is willing to serve as sub-advisor to the Reorganized Acis for fifteen basis

points.[88]  Highland attempted to show with evidence and argument that Brigade had made some

failed trades since stepping in as sub-advisor to the Acis CLOs and that this perhaps made them

unfit to serve in this role.  But Mr. Terry credibly testified that the fact that a few failed trades

were made by Brigade does not make them unfit to serve as sub-advisor to Reorganized Acis,

and that trades out of compliance with the applicable CLO tests occasionally happen, and

Brigade has handled them appropriately.[89]  In fact, the evidence suggested that at least ten failed

trades occurred while Highland was acting as sub-advisor to the Debtor-Acis.[90]

Highland's suggestions that Brigade is not up to the task to manage the Reorganized

Debtor are specious.  Likewise, HCLOF Guernsey's insistence that it will not be getting the

benefit of its bargain if the Acis CLOs are not managed by Highland personnel going forward

appears to be a manufactured position aimed at thwarting Mr. Terry at all costs.  Not only is

there no credible evidence of Brigade mismanagement but, to the contrary, it appears that

Highland (prior to the Debtor-Acis's rejection of the Sub-Advisory Agreement and Shared

Services Agreement), intentionally liquidated assets of the CLO SPEs and built up cash without

reasonable justification.  Specifically, Mr. Terry credibly testified that there were $85 million in

purchases in the Acis CLOs in the hours leading up to the entry of the orders for relief, but

virtually no purchases of loans in the CLOs afterwards—only sales.[91]  And Mr. Worman further

---

[88] Transcript 12/11/18 (PM) [DE # 790], at p. 89; Transcript 12/12/18 (AM) [DE # 791], at p. 62.

[89] Transcript 12/11/18 (PM) [DE # 790], at pp. 182-83; Transcript 12/18/18 [DE # 804], at pp. 72-73.

[90] *See* Exhs. 727, 728; Transcript 12/11/18 (PM) [DE # 790], at pp. 71-74, 182-83.

[91] Transcript 12/12/18 (AM) [DE # 791], at pp. 18-19, 28-31; Transcript 12/18/18 [DE # 804], at pp. 87-89; *see also,* Terry Demonstrative.

credibly testified that Highland, while acting as sub-advisor, allowed approximately $380 million in cash to build up in the Acis CLOs. Meanwhile, Brigade has subsequently reduced that cash balance by $280 million to approximately $100 million.[92] Mr. Worman also credibly testified that Brigade has purchased approximately $300 million in loans for the Acis CLOs.[93] The Chapter 11 Trustee and Mr. Terry both credibly testified that the build-up of cash in the Acis CLOs while Highland was sub-advisor, rather than the loans acquired by Brigade, left the Acis CLOs without sufficient interest income to make a distribution to the equity holders.[94] Certain contradictory testimony of Hunter Covitz was not convincing that: (a) there were very few conforming loans available to be purchased for the Acis CLOs in the approximately four months that elapsed between the entry of the Order for Relief and the time when Highland was terminated as sub-advisor;[95] and (b) it made more sense to accumulate cash to pay down the AAA notes rather than invest in new loans.[96] The court found more convincing the testimony of Mr. Terry: (a) that there was $310 billion of performing loans rated above CCC in the S&P loan index in May of 2018 available for purchase in CLO-6 that would have satisfied the weighted average life test;[97] (b) that Highland purchased loans for CLO-7 that would have satisfied the weighted average life constraints in the Debtor-Acis's CLO-4, CLO-5, and CLO-6;[98] and (c)

---

[92] Transcript 12/11/18 (PM) [DE # 790], at p. 100.

[93] Transcript 12/11/18 (PM) [DE # 790], at pp. 70, 94.

[94] Transcript 12/11/18 (AM) [DE # 789], at pp. 67-69; Transcript 12/11/18 (PM) [DE # 790], at pp. 70-71; Transcript 12/12/18 (AM) [DE # 791] at pp. 34-37.

[95] Transcript 12/13/18 (AM) [DE # 793], at pp. 12-13.

[96] Transcript 12/13/18 (AM) [DE # 793], at pp. 13-16.

[97] Transcript 12/18/18 [DE # 804], at p. 87.

[98] Transcript 12/18/18 [DE # 804], at pp. 87-88.

that, although there was no change in market conditions, Highland essentially stopped buying

collateral for the Acis CLOs[99] after the entry of the Orders for Relief.[100]

    4.   Resets—Non-impairment of Anyone's Rights.

The Plan only contemplates **consensual** resets of the Acis CLOs—in other words, only if

HCLOF Guernsey requests resets.[101]  Messrs. Worman and Terry both credibly testified that they

believed the Reorganized Acis and Brigade could perform a consensual reset of the Acis

CLOs.[102]  Mr. Terry credibly testified that other asset managers have been able to issue or reset

CLOs after a bankruptcy proceeding.[103]  Mr. Terry also credibly testified that he wants to come

to a resolution with HCLOF Guernsey and consensually reset the Acis CLOs.[104]

HCLOF Guernsey has taken the position that it and its new Passive Investor (new as of

mid-November 2017—just before the Bankruptcy Cases) only want to be involved with CLOs

that are managed by Highland or Highland affiliates.  Is the Plan impairing their rights—to the

extent the Plan (and any subsequent re-sets) brings in Brigade as the sub-advisor to the

Reorganized Debtor (whereas Highland was in that sub-advisor role before)?  It appears no.  The

---

[99] Transcript 12/18/18 [DE # 804], at pp. 88-89.

[100] Highland has also argued that the Plan is not feasible because the administrative expense claims are extremely high (to which the Chapter 11 Trustee responds, it is of Highland's making, since Highland has objected to literally every action proposed by the Chapter 11 Trustee).  The court does not believe there is a legitimate feasibility problem here.  Not only has the court not ruled yet on final professional fee applications, but the Chapter 11 Trustee represented that certain professionals have agreed to defer their fees (beyond payment in full on the Effective Date) as necessary.

[101] *See* Plan § 6.08.

[102] Transcript 12/11/18 (PM) [DE # 790], at pp. 86-90, 176-178; Transcript 12/12/18 (AM) [DE # 793], at pp. 16-18.

[103] Transcript 12/11/18 (PM) [DE # 790], at pp. 179-180.

[104] Transcript 12/18/18 [DE # 804], at p. 74.

Offering Memorandum between HCLOF Guernsey and the Passive Investor, dated November 15, 2017, pursuant to which the Passive Investor agreed to invest in HCLOF Guernsey, provided that there may be a change in circumstances following the date of the Offering Memorandum and that any forward-looking statements in the Offering Memorandum involved risks and uncertainties "because they relate to events and depend on circumstances that may or may not occur in the future."[105]  Heather Bestwick, one of the HCLOF Guernsey directors, testified that the Offering Memorandum does not require HCLOF Guernsey to invest only in Highland-managed funds[106] and instead expressly provides that HCLOF Guernsey will invest in "CLOs managed by other asset managers."[107]  Another witness, Mr. McGuffin, testified that the HCLOF Guernsey directors' fiduciary duties require them to act independently and objectively in the best interests of HCLOF Guernsey, and also require them to consider a change in circumstances.[108]  HCLOF Guernsey's counsel, HCLOF Guernsey's director, and the Passive Investor have all testified that they would consider doing a reset with the Reorganized Acis in the event the Plan is confirmed.[109]

   Mr. Terry credibly testified that a reset of the Acis CLOs can occur after the expiration of the reinvestment periods of the Acis CLOs.[110]  The Plan is feasible regardless of whether a reset of the Acis CLOs is requested by HCLOF Guernsey.  Messrs. Phelan and Terry both credibly

---

[105] *See* Exh. 90, HCLOF Guernsey Offering Memorandum, at pp. 4-5.

[106] *See* Exh. 719, Bestwick Depo., at pp. 109, 118-121.

[107] *See* Exh. 90, HCLOF Offering Memorandum, at p. 12**.**

[108] Transcript 12/13/18 (PM) [DE # 794], at pp. 142-145.

[109] *See* Exh. 602, p. 12 of 70 (statement by HCLOF Guernsey's Counsel); Exh. 719 at pp. 166-167 (Heather Bestwick); Exh. 720, p. 72.

[110] Transcript 12/18/18 [DE # 804], at pp. 82-83.

testified that the Reorganized Debtor will have cash flow from multiple potential sources—

including the revenues from the CLO PMAs with the Acis CLOs, potential new business

developed by the Reorganized Acis, and the outcome of any potential litigation claims.[111]

## VI. General Credibility Assessments.

In ruling in a contested matter such as confirmation, and weighing the preponderance of

the evidence, the credibility of witnesses and contradictions in their testimony naturally can be

significant. Here, there were some noteworthy problems and contradictions with some of the

testimony provided by the Objectors' witnesses. They are summarized below.

### 1. Scott Ellington: A Seemingly Manufactured Narrative to Justify Prior Actions.

Scott Ellington testified on February 7, 2018 at the trial on the involuntary petitions, and

the court was asked to consider his testimony again in connection with confirmation (he did not

attend the confirmation hearing). He is the General Counsel, Chief Legal Officer, and a Partner

at Highland. Mr. Ellington testified that the Debtor-Acis's name is "toxic" in the market place

and that, due to the litigation with Mr. Terry and allegations in that litigation, "nothing can be

associated with the Acis brand and be managed as a CLO or marketed as a CLO."[112]  Mr.

Ellington elaborated that it had been determined in late 2016 or 2017 that re-sets or re-financings

of the Acis CLOs were a prudent thing to pursue (in fact, there was indeed a trend of

refinancings and resets for this vintage of CLOs in the market place) and, in connection with

that, the Debtor-Acis's contracts and assets needed to be diverted to different, newly created

entities because:  (a) the "Acis" name was toxic and underwriters and investors were not going to

---

[111] Transcript 12/11/18 (AM) [DE # 789], at pp. 72, 88-90; Transcript 12/12/18 (AM) [DE # 791], at p. 53.

[112] Exh. 23, p. 55 (line 17) through p. 56 (line 7); p. 98 (lines 8-12).

Case 19-34054-sgj11 Doc 3275 Filed 01/31/21 Entered 01/31/21 15:53:00 Page 249 of
362
Case 19-34054-sgj11 Doc 827 Filed 01/31/21 Entered 01/31/21 15:53:00 Page 33 of 47

be interested in re-financings or resets for CLOs managed by the Debtor-Acis;[113] and (b) the new Passive Investor wanted the Debtor-Acis out of the picture.[114]  Mr. Ellington further elaborated: "The equity, you know, calls the tune, so to speak, in terms of the CLO . . .."[115]  In summary, an overarching theme of Mr. Ellington's testimony was that the Debtor-Acis was tainted or toxic in the marketplace and the Passive Investor wanted the Debtor-Acis out of the picture—thus, this was the motivation for the prepetition transactions orchestrated by Highland prior to the Bankruptcy Cases.  The problems with the Scott Ellington testimony were at least two-fold. First, there is no credible evidence that the Debtor-Acis is/was toxic in the market place.  In fact, in April 2017 (well after the litigation with Mr. Terry commenced), the Debtor-Acis issued a new CLO (CLO-7).  And in market publications as recently as August 21, 2017, Highland was touting the *Acis* structure stating "our vehicle will allow us to issue between six and 12 CLOs over the next few years."[116]  Second, the Passive Investor denies demanding that the Debtor-Acis be removed as the CLO manager.  Term sheets as recent as August 21, 2017 contemplated the Debtor-Acis as the continuing portfolio manager of CLOs, with apparently no protestations by the Passive Investor.[117]

---

[113] *E.g., Id.* at p. 177 (line 21) though p. 178 (line 12); p. 184 (lines 13-17) ("The underwriters in this case, Mizuho, Goldman, et al., the equity, they said we want every possible relation to anything that could be legacy Acis or Acis-related affiliates to be severed").

[114] *Id.* at p. 202 (lines 11-13) ("we have third-party investors that said we don't want to be involved in this brand; and their equity is one of the reasons that new CLOs can be launched"); p. 203 (lines 7-8) ("It was call the deal and terminate the CMAs or transfer the CMAs"); p. 223 (lines 8-12) ("Because if the involuntary remains, and I'm just – I'm just being frank – we've already been told by equity holders, including the separate account, BBK, that you may have seen on some of the exhibits, they're pulling everything.").

[115] *Id.* at p. 74 (lines 3-6).

[116] Exh. 801, pp. 3 & 5.

[117] Exh. 802, p.1.

39

## 2.   Michael Pugatch: The Passive Investor Made Into a Scapegoat.

The reality is that Highland, indeed, started working on the concept of doing resets of

some of the older vintage Acis CLOs in at least early 2017 (and perhaps late 2016).  Highland, in

fact, completed a reset of one Acis CLO in April 2017 (with the Debtor-Acis still in place as the

portfolio manager for that reset in April 2017).  As part of that process of implementing resets

for the Acis CLOs, Highland worked on bringing in a new investor or investors to have a share

of the equity tranche of the Acis CLOs.  Highland finally obtained the commitment of the

Passive Investor in November 2017, after starting initial discussions with them in the second

quarter of 2017.[118]  A representative for the Passive Investor referred to itself as "passive" in a

deposition.[119]  Concepts and documentation for the Passive Investor's investment in the Acis

CLOs were discussed for a while during 2017.  As recently as August 2017, the negotiations

with the Passive Investor appeared to contemplate the Debtor-Acis still as the portfolio manager

for the CLOs.[120]  Then the arbitration trial with Mr. Terry began in September 2017 and the

Terry Arbitration Award was issued on October 20, 2017.  Suddenly, it appears that the

dismantling of the Debtor-Acis began with all deliberate speed.  The court believes, based on the

totality of the evidence, that it was Highland who did not want the Debtor-Acis as CLO manager

going forward, so that Highland could keep reaping the benefits of the reset CLOs.  Specifically,

when deposed on the topic, a representative for the Passive Investor, Mr. Pugatch, denied the

accuracy of Mr. Ellington's testimony, stating that the Passive Investor "viewed Acis and

Highland as interchangeable from the perspective of the—you know, the actual investment

---

[118] *See* Exh. 720, Pugatch Deposition Transcript dated November 27, 2018, p. 18, lines 14-20.

[119] *Id.* at p. 22 (lines 2-3) ("we're you know, 49 percent sort of passive minority investor").

[120] Exh. 802, p. 1.

40

Case 19-34054-sgj11 Doc 4735 Filed 05/13/21 Entered 05/13/21 19:53:00 Page 251 of
362
Case 19-34054-sgj11 Doc 3275 Filed 03/31/31 Entered 03/31/31 19:53:04 Page 428 of 47

opportunity."[121]  When asked, "Are you aware that Scott Ellington, general counsel for HCM,

testified that [the Passive Investor] said with absolute certainty that they had no interest in doing

business with Acis because the Acis brand was purportedly toxic and, consequently, nothing

associated with Acis could be managed or marketed as a CLO?" Mr. Pugatch testified that he

had read that testimony and that the statement was not true.[122]  He further stated that "the

ultimate sort of name change did not come from [the Passive Investor]."[123]  In fact, when further

asked whether the Passive Investor knew why Acis CLO Funding Limited changed its name to

Highland CLO Funding Limited (*i.e.*, HCLOF Guernsey), Mr. Pugatch testified, "We were told

that it was a change in the brand or the name, as requested by Highland."[124]  And when asked

"Did [the Passive Investor] request that the name be changed?" he answered "No."[125]  When

asked whether the Passive Investor considered "Acis toxic in the industry?" Mr. Pugatch

answered:  "No. What I would say is, when the suggested name change did occur, there were

commercial reasons given to us as to why that would be beneficial in terms of the ongoing

management of those CLOs and the intended investment thesis around the investment that we

had made, which seemed to make commercial sense."[126]  When Mr. Pugatch was asked, "Those

reasons were given by Highland, correct?" he replied "Correct" and confirmed that they were not

demanded by the Passive Investor.[127]  Mr. Pugatch was emphatic that the Passive Investor was

---

[121] *Id.* at p. 30 (lines 19-20).

[122] *Id*. at p. 31 (lines 6-19).

[123] *Id.* (lines 24-25).

[124] *Id.* at p. 27 (lines 24-25).

[125] *Id.* at p. 28 (lines 1-3).

[126] *Id.* at p. 32 (lines 1-8).

[127] *Id.* at p. 32 (lines 9-12).

just that—a passive investor—that did not have the ability to "start calling the shots" and dictate the terms of any reset transactions.[128]  When asked if the Passive Investor was concerned about the Terry Arbitration Award, Mr. Pugatch replied:  "The award itself, no.  I think the only thing we were concerned about or focused on was that vis-à-vis our equity investment in Highland CLO Funding Limited and, in turn, the equity that that vehicle held in the various CLOs was appropriately, you know, ring-fenced or not exposed to any potential damages or economic loss in value as a result of that arbitration award."[129]

The Passive Investor further testified that Brigade has "a fine reputation in the market" but that it had no interaction with them historically.[130]  The Passive Investor also testified that it was concerned about the cash buildups that had happened recently due to actions while Highland had still been the sub-advisor on the Acis CLOs.[131]

### 3.   The Seemingly Rehearsed Testimony of the Two HCLOF Guernsey Witnesses.

The court was presented with video depositions of HCLOF Guernsey's two non-executive directors (*i.e.,* its only directors):  Mr. William Scott[132] and Ms. Heather Bestwick.[133]  It was very apparent to the court that HCLOF Guernsey is controlled by Highland in every way.  Putting things in the kindest way possible, Mr. Scott and Ms. Bestwick appear to be nominal figureheads who are paid to act like they are in charge, while they are not.  They are both

---

[128] *Id.* at p. 32 (lines 16-17); pp. 33-35.

[129] *Id.* at p. 43 (lines 3-9); p. 89.

[130] *Id.* at p. 68 (lines 11-13).

[131] *Id.* at p. 82, lines 9-24.

[132] *See* Exh. 721.

[133] *See* Exh. 719.

42

basically professional directors-for-hire, for companies that choose to form/organize in the nation of Guernsey.

Ms. Bestwick testified that she is a nonexecutive director for six companies in Guernsey (none of the others are in the CLO business).[134] She testified that she earned £35,000 per year to serve as a director of HCLOF Guernsey.[135] She testified that she was selected by Highland[136] and that Highland also made the decision to hire HCLOF Guernsey's law firm in the Bankruptcy Cases.[137] Ms. Bestwick, when questioned as to why the Equity/ALF PMA it had with the Debtor-Acis was terminated shortly after the Terry Arbitration Award was issued, testified that she was told it was "a condition precedent to the new Passive Investor" coming in and that she was told this by Highland.[138] She also testified that she had never talked to the Passive Investor (who, of course, is a 49% owner of HCLOF Guernsey)[139] or Grant Scott (the trustee of the charitable organization that owns 49% of HCLOF Guernsey).[140] She reiterated that she only talks to Highland employees. She also was under the impression that terminating the Equity/ALF PMA would improve marketability of the CLOs going forward but that it was the same people and "business as usual for us."[141] She testified that she learned of the Terry

---

[134] *Id.* at pp. 7-8; p. 21 (line 5) through p. 22 (line 20); p. 26 (lines 10-12).

[135] *Id.* at p. 43 (lines 18-19).

[136] *Id.* at p. 42 (lines 17-25).

[137] *Id.* at p. 53 (lines 7-20).

[138] *Id.* at p. 16 (line 13) through p. 17 (line 23); p. 58 (line 21) through p. 60 (line 17).

[139] *Id.* at p. 188 (lines 12-15).

[140] *Id.* at p. 188 (line 19) through p. 189 (line 9).

[141] *Id.* at p. 189 (lines 12-15); p. 200 (line 22).

43

Arbitration Award in mid-April 2018 (some six months after the fact)[142] and "[y]ou'd have to ask Highland"[143] why it did not inform her sooner. Her testimony was clear that she defers to Highland on everything, stating that as directors they were "heavily reliant on our service providers, and that means Highland."[144] With regard to a lawsuit that HCLOF Guernsey filed against Mr. Terry in Guernsey during the Bankruptcy Cases, she testified that it was neither her nor the other director, William Scott's, idea.

Mr. Scott, the other HCLOF Guernsey director, is a "professional director" for 10-15 Guernsey companies[145]—all of which are "paying assignments."[146] He became rather incensed when testifying, at the suggestion that he and Ms. Bestwick were not in control of HCLOF Guernsey, stating that board minutes and other documents would show that they took a great level of interest in running the company.[147] He testified that he earned £40,000 per year to serve as a director of HCLOF Guernsey and that, due to the extra work of the Bankruptcy Cases, he also was charging another £350 per hour, after the first 35 hours[148] (the court notes, anecdotally, that it required participation in court hearings by a director of HCLOF Guernsey each time that HCLOF Guernsey took a position in court). Mr. Scott confirmed that he was not aware of the litigation with Mr. Terry nor the Acis Bankruptcy Cases until April 2018.[149] He also testified

---

[142] *Id.* at p. 61 (lines 3-19); p. 130 (line 14) through p. 136 (line 2).

[143] *Id.* at p. 137 (line 21).

[144] *Id.* at p. 152 (lines 18-19).

[145] *See* Exh. 721 at p 8 (line 9) through p. 9 (line 5); p. 79 (lines 20-25).

[146] *Id.* at p. 80 (lines 3-5).

[147] *Id.* at p. 13 (lines 1-12); p. 22 (line 23) through p. 23 (line 12).

[148] *Id.* at p. 80 (lines 6-18).

[149] *Id.* at p. 132 (line 20) through p. 135 (line 10).

44

that Highland had proposed the legal counsel HCLOF Guernsey used in the Bankruptcy Cases
and that he had never disagreed with Highland's advice.[150] He confirmed that all investment
decisions were made by Highland and that he and Ms. Bestwick's role was to "police" service
providers.[151] Like Ms. Bestwick, Mr. Scott testified that they were told that the Passive Investor
had made it a condition precedent to their investment in HCLOF Guernsey that "Acis depart."[152]
But he had not talked to the Passive Investor.[153] As if all this deference to Highland were not
enough, HCLOF Guernsey's lender is NexBank (an affiliate of Highland—which is based in
Dallas, not Guernsey) and HCLOF Guernsey has given its actual equity notes to NexBank as
security for its loans from NexBank.[154] Also, interestingly, when asked about the adversary
proceeding that HCLOF Guernsey filed against the Chapter 11 Trustee a few months ago in the
Bankruptcy Cases (*i.e.,* the Highland Entities Adversary Proceeding—it was originally
commenced by Highland and HCLOF Guernsey as Plaintiffs), Mr. Scott testified that "we
haven't sued the trustee, he has sued us" but later acknowledged his mistake when corrected by
counsel.

This court is not naïve—it realizes that so-called "fiduciary services firms" are apparently
a typical thing in the world of off-shore jurisdictions that are large financial centers.[155] Maybe

---

[150] *See generally id.* at pp. 277-280.

[151] *Id.* at p. 106 (lines 1-7).

[152] *Id.* at p. 254 (line 20) through p. 260.

[153] *Id.* at p. 155 (lines 2-25).

[154] *See* Exh. 719 at p. 213 (line 2-22); Exh. 721 at p. 129 (line 10) through p. 130 (line 13).

[155] During the testimony of both Ms. Bestwick and Mr. Scott, the court was reminded of an old TV commercial in which an actor states, "I am not a doctor, but I play one on TV." The court could not help but conclude that these were not real directors but were playing them (when legally necessary).

Case 19-34054-sgj11 Doc 1875 Filed 01/13/21 Entered 01/13/21 15:53:00 Page 256 of
362
Case 19-30264-sgj11 Doc 827 Filed 01/31/21 Entered 01/31/21 15:53:04 Page 46 of 47

the system works, for the most part and in many business contexts. But not when trying to convince a bankruptcy court of the bona fides of transactions that look like attempts to denude another party of value and/or to thwart creditors. And not when accusations are made that you are the alter ego of the party (Highland) who orchestrated the company's creation. The evidence was overwhelming that: (a) the HCLOF Guernsey Directors do whatever they are told to do by Highland; (b) they do not talk to anyone else but Highland; (c) they have never challenged Highland; (d) they let Highland pick and consult with their lawyers; and (e) they were not made aware by Highland of the Terry Arbitration Award, the Terry Judgment, the involuntary bankruptcy petitions, or pleadings that lawyers filed in the Bankruptcy Cases on HCLOF Guernsey's behalf.

In summary, the testimony of these two HCLOF Guernsey Directors was of little or no value in convincing the court that the Objector, HCLOF Guernsey, has valid concerns of its own (separate from Highland's) with regard to the bona fides of the Plan.

## VII. **Conclusion**.

This Bench Ruling and Memorandum Opinion is intended to address some of the most pertinent facts and issues raised in connection with confirmation of the Plan. Among other things, the court believed it was necessary to stress, in a separate ruling: (a) *the unique status of the Objectors* (they are "insiders" as defined in the Bankruptcy Code whose prepetition actions suggest unclean hands—this seems highly relevant to consider, when there are no non-insider creditors or other relevant parties objecting to the Plan); (b) *the appropriateness and legality of the proposed Plan Injunction* that would temporarily prevent nonconsensual redemptions/liquidations (it is in all ways justified given the allegations in the Highland Entities Adversary Proceeding and under the traditional four-prong test for preliminary injunctions); and

46

Case 19-34054-sgj11 Doc 3735 Filed 09/13/21 Entered 09/13/21 16:53:00 Page 257 of
362
Case 19-30264-sgj11 Doc 3275 Filed 01/31/13 Entered 01/31/13 15:15:04 Page 47 of 47

(c) *the feasibility of the Plan* (Mr. Terry and Brigade are well qualified to perform their

contemplated roles).

      The court will separately sign the Findings of Fact, Conclusions of Law and Order

Confirming Plan submitted by the Chapter 11 Trustee to address all other relevant issues.

      **#### End of Bench Ruling and Memorandum Opinion ####**

## **<u>EXHIBIT J</u>**

Michael D. Warner (TX Bar No. 00792304)  Gary Cruciani (TX Bar No. 05177300)
Benjamin L. Wallen (TX Bar No. 24102623)  Michael P. Fritz (TX Bar No. 24036599)
**COLE SCHOTZ P.C.**  **MCKOOL SMITH, P.C.**
301 Commerce Street, Suite 1700  300 Crescent Court, Suite 1500
Fort Worth, Texas 76102  Dallas, Texas 75201
817-810-5250 Telephone  214-978-4000 Telephone
817-810-5255 Facsimile  214-978-4044 Facsimile
**mwarner@coleschotz.com**  **gcruciani@mckoolsmith.com**
**bwallen@coleschotz.com**  **mfritz@mckoolsmith.com**

*Attorneys for Acis Capital Management, L.P. and Acis*
*Capital Management GP, LLC*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re | Chapter 7 |
| ACIS CAPITAL MANAGEMENT, L.P. | Case No. 18-30264-SGJ7 |
| Alleged Debtor. | |
| In re | Chapter 7 |
| ACIS CAPITAL MANAGEMENT GP, LLC | Case No. 18-30265-SGJ7 |
| Alleged Debtor. | |

## JOINT OBJECTION OF ALLEGED DEBTORS TO
## EMERGENCY MOTION OF PETITIONING CREDITOR TO ABROGATE OR
## MODIFY 11 U.S.C. § 303(F), PROHIBIT TRANSFER OF ASSETS, AND IMPOSE,
## *INTER ALIA*, 11 U.S.C. § 363

**TO THE HONORABLE STACEY G. C. JERNIGAN, UNITED STATES BANKRUPTCY
JUDGE**:

Acis Capital Management, L.P. ("**Acis LP**") and Acis Capital Management GP, LLC

("**Acis GP**" and together with Acis LP, "**Acis**"), the alleged debtors in the above-captioned

cases, hereby submit this Joint Objection (the "**Objection**") to the *Emergency Motion of*

*Petitioning Creditor to Abrogate or Modify 11 U.S.C. § 303(f), Prohibit Transfer of Assets, and*

*Impose, inter alia, 11 U.S.C. 363* [Case No. 18-30264-SGJ7, Docket No. 3; Case No. 18-30265-

SGJ7, Docket No. 3] (the "**303(f) Motion**") filed by Joshua Terry ("**Terry**"). In support of this

Objection, Acis respectfully states as follows:

## I.
## INTRODUCTION

1.     Terry holds a state-court judgment against Acis and is one of 18 creditors of Acis.

Terry initiated these involuntary chapter 7 cases—acting alone as opposed to in concert with

other creditors as required by Section 303(b)(1) of Title 11 of the United States Code (the

"**Bankruptcy Code**") - as a bad-faith litigation tactic and attempt at forum shopping in the

context of his longstanding dispute with Acis. Terry filed his involuntary petition against Acis

LP at 11:57 p.m. on January 30 and against Acis GP on January 31 at 12:00 a.m. (the

"**Involuntary Petitions**"). On January 31, Acis filed a Joint Motion to Dismiss the Involuntary

Petitions (the "**Motion to Dismiss**") and a Notice of List of Creditors Pursuant to Fed. R. Bankr.

P. 1003(d) (the "**Creditor List**"). Acis's Motion to Dismiss establishes that the Involuntary

Petitions are fatally defective because Acis has more than 12 creditors, thereby requiring a

minimum of 3 creditors to join in the filing of the Involuntary Petitions. Yet, Terry was the sole

creditor to file.

2.     The filing of the Involuntary Petitions filings was a transparent attempt to derail

two imminent events. The first was a temporary injunction hearing that was scheduled to be

heard in Dallas state court on January 31 (the "**Temporary Injunction Hearing**"). The second

was the closing of a $420 million transaction involving the reissuance of CLO-3 (as detailed and

defined below) (the "**$420 Million CLO-3 Reissue Transaction**" or "**Transaction**") that has

been in the making since May 2017 and that was scheduled to close on February 1.

2

3.     Terry sought a state-court injunction to prevent Acis from transferring a management contract (the "**Collateral Management Agreement**" or "**CMA**") from Acis to a Highland entity as part of the Transaction.  As will be explained, this CMA is central to Terry's 303(f) Motion.  The transfer of the CMA is a ministerial task that Acis is contractually required to perform and is the last remaining condition to close the $420 Million CLO-3 Reissue Transaction. Terry has falsely and without any basis claimed that this CMA is worth multiple millions of dollars and that Acis is attempting to fraudulently transfer the CMA in order to avoid paying an $8 million judgment (that will be appealed) that Terry recently obtained against Acis. But, as set forth below, the facts are the opposite.

4.     First, contrary to Terry's unsupported assertions, the CMA has no value. Acis has no employees, and has never had any employees. Acis has always performed the management services required of it by the CMA by subcontracting those obligations to certain Highland entities ("**Highland Servicers**"). Thus, Acis receives management fees (the "cash inflows") but then pays fees to the Highland Servicers (the "cash outflows") under contracts that have been in place for years. Presently, *the cash outflows under the CMA exceed the cash inflows that results in negative cash flow, and thereby rendering the CMA worthless*.

5.     Second, and a point that cannot be overstated, the very relief that Terry previously sought in state court, and now seeks in this Court, would cause the CMA to be terminated pursuant to its terms and thereby also render the CMA worthless. On January 29, Terry filed an application with the state court seeking the appointment of a receiver over Acis. In this Court, Terry has filed Involuntary Petitions against Acis.  However, *under paragraph 15 of the CMA, [1] the appointment of a receiver and [2] an involuntary bankruptcy petition that "remain[s] undismissed for 60 days and result[s] in an adjudication of bankruptcy or insolvency" are*

3

*grounds for the CMA to be terminated and for Acis to be removed "for cause" as the collateral manager upon 30 days' notice*.  On the one hand, Terry argues that the CMA is worth millions of dollars and asks this Court to preserve its value by preventing the CMA from being transferred as part of the $420 Million CLO-3 Reissue Transaction.  On the other hand, if Terry succeeds in his effort to throw Acis into bankruptcy, the CMA will be terminated and will cease to have any value. These undisputed facts expose Terry's bad faith motive behind his state-court and bankruptcy-court filings. Ironically, the very relief requested by Terry in state court and in Bankruptcy Court regarding the CMA would itself destroy any value associated with the CMA by causing the CMA to be terminated.

6.      So, why is Terry engaging in this act of self-immolation that will guarantee the CMA will be terminated and any value associated with it to be extinguished? The answer: to try to hold hostage the $420 Million CLO-3 Reissue Transaction and extort a settlement. Terry's motive is not to preserve the CMA as part of Acis's assets that would be available to satisfy his judgment. As discussed herein, the CMA has no value and is going away *regardless* of whether or not the Transaction closes.

7.      To fully understand the context of the 303(f) Motion, it is important to understand what transpired in the underlying litigation that resulted in the judgment that Terry obtained against Acis, which judgment Terry is now using as a pretext to throw Acis into bankruptcy and block the $420 Million CLO-3 Reissue Transaction. Terry was an employee of Highland who was integrally involved in the formation and management of Highland's CLO business, including CLO-3. In 2016, Highland fired Terry for cause for various acts of misconduct. Terry is *persona non grata* in the CLO industry because he secretly tape recorded his Highland

colleagues, and no one in the CLO industry wants anything to do with Terry or Acis, and the Acis name is now toxic as a result of Terry's actions.

8.      Upon being terminated by Highland, Terry filed arbitration claims against six parties: Acis LP; Acis GP; Highland; Highland's two founders (James Dondero and Mark Okada); and Dugaboy Investment Trust ("Dugaboy"). Terry asserted a claim for more than $200 million and received an $8 million award against Acis. Terry's claims against Highland, Dondero, Okada, and Dugaboy were all dismissed. Also, Terry's claim that the promissory note transaction between Highland and Acis (the "**Promissory Note**") (the same note referenced at paragraphs 2 and 6 of the 303(f) Motion) was a fraudulent transfer, but the arbitration panel likewise rejected this claim.

9.      As a result of losing on all his claims against the deep-pocketed defendants in the arbitration and losing on his fraudulent transfer claim, Terry is left with a pyrrhic victory—a largely uncollectible judgment against Acis. If that fact was not already apparent to Terry, it became so on January 29 when, pursuant to Texas state law, Acis filed a motion to post a supersedeas bond in the amount of $495,070.50, which is equal to 50 percent of Acis's net worth as of January 29. Terry thus realized that even if he ultimately prevailed on Acis's appeal of the $8 million judgment, Terry was never going to recover more than the approximately $500,000 bond amount.

10.      Thus, Terry has been flailing about trying to create as much mayhem as possible to see if he can succeed in a shakedown by attempting to block the $420 Million CLO-3 Reissue Transaction from closing. Terry's filings are made in complete disregard of Terry's own self-interest (the request for a receiver and the Involuntary Petitions) and in complete disregard for

5

the investors in the $420 Million CLO-3 Transaction who stand to lose tens of millions of dollars

if the Transaction does not close.

11.     According to Terry's fanciful allegations, the Transaction is itself a fraudulent

transfer that Highland and Acis allegedly orchestrated to deprive him of the ability to satisfy his

judgment against Acis. But, as will be explained, there are numerous reissues or refinances that

have taken place, and are scheduled to take place, throughout the CLO industry as a result of

changing market forces—specifically, declining interest rates from the time the CLOs were first

issued.

12.     In fact, Highland has been engaged in efforts to restructure the Acis CLOs long

before the arbitration award was issued in October 2017. Highland closed on a restructure of

CLO-2 on April 10, 2017 and it began work on the restructure of CLO-3 (the CLO at issue) as

far back as May 2017.   Thus, contrary to Terry's wild assertions, the $420 Million CLO-3

Reissue Transaction is being driven by legitimate business purposes in the ordinary course of

business and not by some Machiavellian scheme by Acis to "dismantle their business to the great

detriment of their single largest creditor, Mr. Terry" as Terry falsely claims.

13.     Another important point for the Court to consider is that Terry's 303(f) Motion is

long on hyperbole and name-calling but short on facts regarding alleged past fraudulent transfers

and future fraudulent transfers.  But, here are the facts.  To date, there has been a single

fraudulent-transfer <u>claim</u> that has been litigated and that is Terry's claim in the arbitration

involving the October 2016 transaction giving rise to the Promissory Note in which Highland

agreed to pay $12.6 million to Acis in return for Acis transferring to Highland the right to certain

future cash flows was a fraudulent transfer.[1]  The arbitration panel roundly rejected Terry's

---

[1] In his 303(f) Motion regarding a subsequent November 2017 transaction involving this same promissory note (the
"**Note Transfer**"), Terry alleges that "*[u]pon information and belief*, Acis did not receive *sufficient consideration*

fraudulent-transfer claims, holding that "[t]he transactional documents recite business purpose and reasonable consideration for the sale." Final Award, at 17, Exhibit No. 1, hereto.[2] Moreover, "Terry offer[ed] no evidence that ACIS did not receive reasonable equivalent value in the transaction or that ACIS made the transfer with 'actual intent to hinder delay or defraud.'" *Id.* With respect to the fraudulent-transfer allegations that are littered throughout the 303(f) Motion, this Court should take such allegations with a heavy dose of salt given Terry's prior, unsuccessful claims of fraudulent transfers.

14.     To bring things full circle, given that the same relief that Terry now seeks in his 303(f) Motion—blocking the $420 Million CLO-3 Reissuance Transaction—was scheduled to be heard by the state court judge at the Temporary Injunction Hearing on January 31, that begs the following question: Why did Terry simply not go forward with the January 31 Temporary Injunction Hearing in state court and instead file the Involuntary Petitions against Acis and file an emergency 303(f) Motion? The answer is clear: Terry knew that the handwriting was on the wall and that the state court was not going to enjoin the $420 Million CLO-3 Reissuance Transaction from closing the next day and then Terry would lose all leverage to try to block the Transaction. Terry's machinations did succeed in causing the closing of the Transaction to be rescheduled from February 1 to February 13. However, as the evidence will show, if this

---

for the Note Transfer." This assertion is in sharp contrast to a sworn declaration that Terry signed on January 23 in support of a temporary restraining order in which he falsely claimed based upon his "*personal knowledge*" that the November 2017 Note Transfer was for "*no consideration*." Terry Decl. ¶11, Exhibit No.2. At a TRO hearing in state court on January 24, Acis's counsel pointed out that this statement in Terry's declaration was false because, among other consideration, the Note Transfer reflected a commitment by a Highland entity to pay Acis upon demand up to *$2 million in legal expenses and an additional $1 million in administrative expenses*. Thus, in his 303(f) Motion, Terry has been forced to change his tune that the Note Transfer was a fraudulent transfer based upon his "personal knowledge" that Acis received "no consideration" for the transfer to a statement that "upon information and belief" Acis did not receive "sufficient consideration" for the transfer. The sworn statement in Terry's January 23 declaration is just one of many misleading and false statements that Terry has made and Acis intends to bring to light in its cross-examination of him at the hearing on his 303(f) Motion.

[2] Each Exhibit referenced herein is incorporated herein by such reference.

Transaction does not close on February 13, it will never close and will cause innocent third party investors to lose tens of millions of dollars.

15.     As is detailed herein, Acis's interest in the Transaction is limited to the ministerial assignment of the CMA and not a transfer of millions of dollars of assets of Acis—as Terry suggests is happening.  Moreover, Terry's requested relief is an exercise in futility because whether or not the Transaction closes Terry will be in same position. Either the Transaction goes forward or CLO-3 will liquidate.  In either case, Acis no longer will manager CLO-3 and the CMA will have no value.  However, if CLO-3 liquidates, the third-party investors to whom Acis owes a fiduciary duty stand to lose tens of millions of dollars.  Preventing the Transaction therefore would create no additional value for Acis, while creating substantial damages for the investors and risk of claims by them against Acis (and Terry).

16.     Because Section 303(f) of the Bankruptcy Code would have allowed Acis to complete the closing of the $420 Million CLO-3 Reissue Transaction, notwithstanding the Involuntary Petitions, Terry compounded his ill-conceived litigation strategy in filing the Involuntary Petitions by filing the 303(f) Motion, which seeks to impose (before an order for relief is entered and on the strength of Involuntary Petitions which are deficient on their face) the requirements of Section 363 of the Bankruptcy Code.  For the reasons set forth below, the 303(f) Motion should be denied.

8

# II.
# HISTORICAL BACKGROUND[3]

### A. Acis, Highland, and the CLO Structure

17.     Highland is in the business of putting together and managing collateralized loan obligations ("**CLOs**").  It is one of the primary players in the CLO industry. A CLO is a legal entity that owns a basket of loans, which are managed by a collateral manager (the "**Collateral Manager**").  The Collateral Manager buys loans into, or sells them out of, the basket.  The CLO has its own bondholders (lenders to the CLO) ("**Bondholders**"), and its own equity holders ("**Equity Holders**").

18.     Acis LP is the Collateral Manager for CLO-3 as well as four other distinct CLOs. Acis has absolutely no economic interest in any of the CLOs, which includes CLO-3 and the $420 million in loans that CLO-3 holds. Rather, Acis, as Collateral Manager, provides services to the CLO and is compensated for its services in accordance with the Collateral Management Agreement or CMA.  Exhibit No. 3, hereto.  The duties and obligations Acis owes CLO-3, in its capacity as Collateral Manager, are governed by the CMA.  Among other things, Acis's duties as Collateral Manager include: supervising and directing the investment and reinvestment of CLO assets; monitoring the CLO assets and providing to the Issuer (the CLO) certain reports, schedules, and other data; and directing an optional redemption under the Indenture on behalf of the Issuer. CMA § 3.  Additionally, Acis is obligated to "use commercially reasonable efforts to ensure that no action is taken by it" that would materially and adversely affect the Issuer."  CMA § 8.

---

[3] The facts and statements herein will be supported by testimony and evidence presented at the hearing on the 303(f) Motion.

19.    Because Acis has no employees it does not and cannot provide any services directly to the CLOs as required by the CMAs. However, the CMA allows Acis to contract with third parties to provide these services, which Acis has done. Specifically, Acis has entered into several agreements with other Highland affiliates to provide the required services. In one such agreement, a Highland affiliate provides "front-office" services that include the buying and selling of the loans that comprise the CLO (the "**Sub-Advisory Agreement**"). Pursuant to the Sub-Advisory Agreement, Highland provides to Acis, among other things, the following services: "mak[ing] recommendations to [Acis] . . . as to the general composition and allocation of the Portfolio . . . including recommendations as to the specific loans and other assets to be purchased, retained or sold"; "plac[ing] orders with respect to, and arrang[ing] for, any investment by or on behalf of [an] Account"; "identify[ing], evaluat[ing], recommend[ing] to [Acis] . . . the structure and/or terms of investment opportunities within the specific investment strategy of [Acis]"; "provid[ing] information to [Acis] . . . regarding any investments to facilitate the monitoring and servicing of such investments"; and "assist[ing] and advis[ing] [Acis] . . . with respect to credit functions including, but not limited to, credit analysis and market research and analysis." Sub-Advisory Agreement § 1(b).  Exhibit No. 4, hereto.  The Sub-Advisory Agreement "shall terminate automatically with respect to any Management Agreement on the date on which (i) such Management Agreement has been terminated . . . or (ii) [Acis] is no longer acting as portfolio manager . . . whether due to removal, resignation or assignment." *Id.* § 6(b).

20.    In another agreement, a Highland affiliate provides "back-office" services that include the accounting, legal, and other administrative functions necessary in servicing the loans (the "**Shared Services Agreement**"). Under the Shared Services Agreement, Highland provides

10

to Acis essential services, including: "[a]ssistance and advice with respect to back- and middle-office functions including, but not limited to, accounting, payments, operations, technology and finance"; "[a]ssistance and advice with respect to legal issues, compliance support and implementation and general risk analysis"; "access to marketing team representatives to assist with the marketing of [Acis]"; "[a]ssistance relating to any reporting [Acis] is required to make"; and "[t]he provision of office space, information technology services and equipment, infrastructure and other related services requested or utilized by [Acis]." Shared Services Agreement § 2.02. Exhibit No. 5. Though these services are essential to Acis's capacity to serve as Collateral Manager, "[e]ither party may terminate [the Shared Services] Agreement *at any time* upon at least thirty (30) days' written notice to the other." *Id.* § 7.01 (emphasis added).

21.     The Highland affiliates have notified Acis that they no longer intend to provide services to Acis pursuant either to the Sub-Advisory Agreement or Shared Services Agreement for CLO-3. Thus, even if the Transaction did not close, that would leave Acis unable to provide the services it is required to provide as Collateral Manager, which failure constitutes a basis for removing Acis as collateral manager and terminating the CMA on 30 days' notice. *See* CMA § 15(g) (CMA may be terminated and Acis may be removed as Collateral Manager upon 30 days' notice due to "the inability of [Acis] to perform its duties hereunder in accordance with the standard of care specified herein due to the termination of the Service Agreements [defined as the Shared Services Agreement and Sub-Advisory Agreement]." Exhibit No. 3.

22.     Terry was an employee of Highland from 2005 until June 2016 when Highland terminated Terry for cause. Terry was integrally involved in the Acis CLOs, having launched the CLOs, set up their structure, and serving as portfolio manager for several years.

11

23.     Highland helped put together six CLOs bearing the Acis name from 2013 until 2015. These are named Acis CLO-I through Acis CLO-6. These CLOs had loan portfolios ranging in value from around $300 million to $550 million at the time they were initiated.

### B.  CLO Reissuances Prompted by Falling Interest Rates

24.     The loans held by the CLO pay cash when the borrowers from the CLO pay interest and principal on the loans.  The borrowers send their payments to the CLO Trustee's[4] collections account.  Each quarter, the Trustee pays out the cash in the collections account.  The quarterly payments, also called the "waterfall," are made according to the priority set out in the CLO's indenture (the CLO's governing document).  First, the CLO's Collateral Manager receives a fee.  Second, the Bondholders are paid in order of priority: the AAA bondholders are paid first, the AA bondholders are paid, etc., until the most-junior bondholders are paid.  Third, the Equity Holders—the last group to be paid in a CLO structure—receive what is left from the collections account after all the management expenses and Bondholders are paid.  If there is enough cash left at the bottom of the waterfall, the Equity Holders receive a good return.  If there is not enough cash, the Equity Holders may get no money for that quarter.

25.     The amount of money paid to the Equity Holders in a given quarter will depend on the amount of cash paid ***into*** the CLO by the borrowers, less the amount that has to be paid ***out*** to the CLO's Bondholders for that quarter.  When loan interest rates are high in the market, the borrowers pay more cash into the CLO and the Equity Holders receive a good return each quarter.  CLOs created in calendar year 2014, including CLO-3, were issued when interest rates were higher than they are today. Given these lower interest rates Borrowers have refinanced their

---

[4]  The CLO Trustee is a third party, in this instance Bank of New York, which oversees the collection of loan payments from the borrowers, among other responsibilities.

loans to lower interest rates. (This is no different than a homeowner taking advantage of lower interest rates to refinance their home, which would result in the lender receiving reduced principal and interest payments). As a result, the borrowers pay less cash into the CLO each quarter than the prior quarter. This is what is currently happening with CLO-3.

26. However, the amount owed to the Bondholders does not change with interest rates. Rather, it is fixed by the indenture (the agreement under which the Bondholders loan money to the CLO), so that amount paid to the Bondholders remains constant. Therefore, as interest rates fall, there is less, and potentially no money left for the Equity Holders at the end of each quarter. The CLO industry has solved this problem by restructuring currently-existing CLOs, called a "reissue." The reissued CLO will pay lower interest rates to the CLO's Bondholders. This reduces the cash the CLO must pay *out* each quarter to the Bondholders, leaving more cash available to pay to the Equity Holders. As loan interest rates fall, a CLO must reissue or its Equity Holders will get no more return on their CLO equity-holdings. Last year, 125 CLOs reissued for a total of $62 billion.[5] One such transaction involved Acis CLO-2 refinancing $192 million of its loans in April 2017. This reissue or refinancing trend has continued in 2018 with 19 CLOs reissuing for a total of $10 billion in transactions. *Id.*

27. In addition to doing a reissuance of the CLO, another option available to Equity Holders who are dissatisfied with reduced payments that they are receiving in an era of lower interest rates is to *shut down* the CLO. Pursuant to the CLO's indenture, the Equity Holders have the right to "call" the CLO, which means to demand that the CLO sell its basket of loans into the market, distribute the remaining proceeds in one, final waterfall, and then cease operations. When a CLO is called, the loans must be liquidated on the open market within a set

---

[5] Exhibit No. 6, is an excerpt from JP Morgan 2017-2018 CLO Weekly New Issue Datasheet dated January 29, 2018, showing the CLO market's reissuance and refinancing activity for 2017 and 2018.

period of time, usually between one and four weeks. Though the Equity Holders often realize a substantial loss in this process, it is better than leaving their money in an investment that pays little or no returns for years to come. (Each CLO has a finite life after which it automatically terminates. In the case of CLO-3, it terminates in 2026). Acis CLO-2014-C Indenture at §1.1, Def. Payment Date, p44, and §2.7(e) re: Final Payment Date, and §9.5, re: surrender of Notes. Exhibit 7.

28.     A Collateral Manager only receives management fees for as long as the CLO operates. The Collateral Manager has no control over when a CLO is reissued or called. Instead, the Collateral Manager must follow the directions of the Bondholders and the Equity Holders to whom it owes a fiduciary duty. Once the decision to either reissue or call a CLO has been made, the Collateral Manager is duty-bound to undertake all necessary actions to effectuate the directed outcome. After a CLO is called, the Collateral Manager no longer will get any management fees. Moreover, regardless of whether a CLO is reissued or called, the Collateral Manager does not receive any compensation relating to the reissuance.

### C.  The Planned Reissuance of CLO-3

29.     CLO-3 (Acis CLO 2014-3, Ltd.) was created on February 1, 2014 and terminates on February 1, 2026. CLO-3 owns a basket of loans valued at $420 million, including loans to Delta Airlines, Dunkin Donuts, and Tribune Media. CLO-3's Bondholders and Equity Holders own the economic interest in this $420 million basket of loans. CLO-3's Bondholders include public pension funds, insurance companies, and banks. The Equity Holder of CLO-3 is Acis

14

Loan Funding, Ltd. ("ALF"),[6] which in turn is owned by two entities: a charitable foundation and a third-party private firm (collectively, the "**CLO-3 Equity Holders**").

30.    When CLO-3 was created, its basket of loans had an average interest rate of 4.59%, resulting in a quarterly waterfall payment of approximately $2 million to the CLO-3 Equity Holders.  However, in recent years, the borrowers on these loans have been refinancing to a lower average interest rate (3.21%).  This has resulted in falling distributions to the CLO-3 Equity Holders for each quarter.  The returns to the CLO-3 Equity Holders have been as follows: $1.4 million in the first quarter of 2017, $1.36 million in the second quarter, $875,000 in the third quarter, and $1.1 million in the last quarter of 2017.  The quarterly payment for the first quarter of 2018 is $470,000, and the CLO-3 Equity Holders are expected to receive no distributions by the next waterfall, scheduled for May 2018.  Like other similarly-situated CLOs, CLO-3 either needed to be reissued or called to protect the CLO-3 Equity Holders' interests.[7]

31.    Starting in May 2017, CLO-3 started the reissuance process on behalf of its Equity Holders. Typically, the most difficult investors to sign up are the equity holders.  As previously explained, the equity is the riskiest investment because it is last in line for payment under the CLO waterfall and faces the prospect of receiving reduced or no payments (which is expected to happen with the May 2018 quarterly payment). In May 2017, a private equity firm

---

[6] Acis Loan Funding, Ltd. recently changed its name to Highland CLO Funding, Ltd.

[7] Exhibit No. 8, is a copy of The Loan Syndications and Trading Association's *2017 CLO Review, 2018 Preview: Necessity is the Mother of Invention* article (also found at https://www.lsta.org/news-and-resources/news/2017-clo-review-2018-preview-necessity-is-the-mother-of-invention ), which makes the following relevant observations: (a) "When they weren't doing new deals, managers were busy reducing CLO liability costs via refis or resets." (b) "Of course, the reason that CLOs were repricing and/or resetting was because i) they could and ii) falling loan spreads meant they needed to reduce liabilities costs to keep the arbitrage working. Wells calculated that the weighted average CLO spread dropped 31 bps during 2017. Without refinancings (which simply reduce spread) and resets (which reduce spread, extend tenor and can reset tests), economics on existing CLOs simply might not work." (c) Reissuances will become industry standard: "Ultimately, Wells concluded that we may be seeing the development of a new lifecycle for CLOs: i) issuance, ii) refinancing after the non-call expires and then iii) a reset as the end of reinvestment nears."

15

expressed an interest in making a $150 million investment in ALF (the "**$150 Million Equity Investor**"). ALF was the investment vehicle used for the various Acis CLOs, including CLO-3. However, one of the conditions demanded by the $150 Million Equity Investor in making its investment was that ALF would instruct the reissuance of certain CLOs, including CLO-3 and would sever any continuing connection that Acis had with the CLOs, including removing it as Collateral Manager. ALF issued this instruction requested by the $150 Million Equity Investor on October 6, 2017 (two weeks *prior* to the arbitration award).[8]

32.     An investment bank was required to be engaged in connection with the contemplated reissuance transaction. The investment bank's responsibilities included securing new equity investors and new bondholders. Goldman Sachs was the first investment bank that was approached in connection with the reissue of CLO-3. Goldman Sachs recommended that all the CLOs be "called" and that the CLOs start with a fresh slate. Goldman Sachs also unambiguously communicated that Acis could not be the Collateral Manager following the reissuance of the CLOs because of Acis' now toxic public image after the Terry dispute had so damaged the Acis brand.  CLO-3's Equity Holders agreed. As part of the reissuance, the CMA for CLO-3 would have to be assigned to a new Collateral Manager, in this instance, Highland CLO Management, LLC (the "**New Collateral Manager**"), another Highland affiliate.

33.     Goldman Sachs ultimately dropped out due to the "noise" associated with Terry and the Acis brand. Thereafter, in November 2017, CLO-3 engaged a new investment bank, Mizuho, to undertake the efforts to reissue CLO-3. Mizuho worked to find new Bondholders to

---

[8] On October 6, 2017, and again on dates subsequent thereto, <u>ALF</u> (on behalf of the CLO-3 Equity Holders, issued the following instruction: *In accordance with Sections 9.2 and 14.3 of the Indenture, ALF hereby directs the Issuer, the Trustee and the Portfolio Manager [Acis] to (i) effect an optional redemption on the 45th day following the date of this direction letter, and (ii) redeem each Class of Secured Notes in whole from Refinancing Proceeds, in each case, on the terms and subject to the conditions set forth in the Indenture.*  Exhibit Nos. 9 - 12.

invest in the reissued CLO-3. It completed that process on January 26, 2018. On or about January 29, the Bondholders of the reissued CLO-3 agreed to purchase approximately $375 million of new bonds issued by the reissued CLO-3. The $375 million from the purchase of the new bonds would in turn be used to pay-off the old Bondholders in the original CLO-3. Collectively the foregoing process is referred to as the "**Reissuance of CLO-3**".

34. *At this point in time, the transfer of the CMA from ACIS, LP to the New Collateral Manager, is the sole remaining formality before closing of the Reissuance of CLO-3 can occur.*[9] This is the transaction that Terry argues should require compliance with Section 363 of the Bankruptcy Code, and not be completed by Acis LP in accordance with Section 303(f) of the Bankruptcy Code.

35. But, based on Acis' fiduciary duty to CLO-3's Equity Holders, it must execute the transfer.[10] To do otherwise would be to put its interests before those of the CLO-3 Equity Holders. Acis has been instructed to execute the transfer of the CLO-3 Management Agreement to the New Collateral Manager. Holding-up the assignment of the CLO-3 Management Agreement will not result in Acis receiving any more value or funds. Rather, failing to act in the best interest of the CLO subjects Acis to liability to CLO-3, its Bondholders, and its Equity Holders.

---

[9] The CMA may be assigned by either Acis or CLO-3 if certain requirements are met. Specifically, Acis may not assign any of the management agreements "without the written consent of the Issuer, at least a Majority of the Subordinated Notes . . . and at least a Majority of the Controlling Class." CMA § 14(a). Likewise, the Issuer may not assign a management agreement "without the prior written consent of [Acis]." *Id.* § 14(c).

[10] As a registered investment advisor, Acis is bound to act in accordance with the Investment Advisors Act of 1940 (the "**IAA**"). Under the IAA, it is "unlawful for any investment advisor . . . to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative." IAA § 206. Section 206 has since been interpreted as establishing "a statutory fiduciary duty for investment advisers to act for the benefit of their clients, requiring advisers to exercise the utmost good faith in dealing with clients, to disclose all material facts, and to employ reasonable care to avoid misleading clients." *S.E.C. v. Treadway*, 430 F. Supp. 2d 293, 338 (S.D.N.Y. 2006) (internal quotations omitted).

17

### D. Terry's bad-faith litigation gamesmanship to block the Reissuance of CLO-3

36.     Terry completely understands the foregoing reissue process, why it is necessary, and the devastating consequences of the reissuance not closing.  Terry launched CLO-3, set up its structure, and managed its portfolio for several years.  Moreover, never in the history of the CLO industry has a CLO reissuance progressed to the point of funding, and then not closed.  The new Bondholders already have committed to buy $375 million in bonds, the old Bondholders already have been assured they will be paid off, and the CLO-3 Equity Holders already have been assured that their investment will not face liquidation.

37.     Knowing this, Terry sought to leverage the situation.  On January 24, he filed an application for a TRO to, among other things, prevent Acis from assigning the CMA. The TRO was supported by a declaration from Terry that contained materially misleading statements and omissions, and outright falsehoods. The state court conducted a hearing that resulted in Acis and Terry reaching a short-term agreement that would remain in place until the temporary injunction that was scheduled to be heard within the week. Specifically, Acis agreed in the state court to not transfer the CMAs or remove Acis as manager until the temporary injunction hearing. Acis also informed the state court that the Reissuance of CLO-3 was in progress and, therefore, it was important to have the temporary injunction heard as soon as possible. The temporary injunction hearing was originally scheduled for February 1.

38.     On January 29, Terry filed a supplemental TRO, also supported by a declaration from Terry, that Acis "**had transferred**" management of CLO-3 to a Highland entity. The TRO and Terry's supporting declaration, once again, were false. Acis had **not** transferred management of CLO-3 to a Highland entity as Acis had agreed not to transfer such rights until the temporary injunction hearing and had honored that agreement.

18

39.     Also, on January 29, Terry filed an application for a turnover order and for
appointment of a receiver (the "**Application for Receiver**"). In the Application for Receiver,
Terry made false and unsubstantiated allegations that Acis had fraudulently transferred more
than $16 million in assets to affiliated entities after entry of the arbitration award in October
2016. As noted in the Introduction, under paragraph 15 of the CMA, *the appointment of a
receiver would cause the CMA to be terminated and Acis to be removed as the Collateral
Manager, thereby rendering the CMA worthless*. Yet, Terry inexplicably asked for the
appointment of a receiver as just another litigation tactic designed to sow confusion regardless of
the fatal consequences to Terry's claims, i.e. his supposed attempts to preserve the value of the
CMA.

40.     At the January 29 hearing, the Court did not make any substantive rulings. Rather,
at the request of Acis's counsel and in light of the scheduled closing of the Reissuance of CLO-3
on February 1, the state court moved the temporary injunction hearing up from February 1 to
January 31 to ensure that the hearing would take place prior to the scheduled February 1 closing.
Also, the Court reconfirmed its prior orders that Terry would supply an expert report by noon on
January 30 and that both Terry and his expert would appear for deposition for up to two hours'
each prior to the temporary injunction hearing that had been rescheduled for January 31 at 2:00
p.m.

41.     On January 30, Terry provided his expert report as ordered. Later that day, Terry
withdrew his expert, which resulted in the expert deposition being called off.  However, Terry's
deposition remained scheduled to take place at 10:00 a.m. on January 31, the day of the
temporary injunction hearing. Then, out of the blue and with no advance notice, Terry filed his
Involuntary Petitions against Acis at midnight on January 30 and filed a "suggestion of

19

bankruptcy" with the state court. Terry's counsel advised that in light of the bankruptcy filings that Terry would not appear for his court-ordered deposition on January 31 and would not appear at the temporary injunction hearing. In response, on January 31, Acis filed a motion to vacate the agreed order that the parties had entered on January 24 and advised Terry that Acis intended to present the motion to vacate to the state court at the 2:00 p.m. hearing.

42.     The parties appeared at the 2:00 p.m. hearing on January 31. During the middle of argument, Judge Goldstein announced that Judge Jernigan was on the phone, which resulted in a recess of about one hour as Judge Goldstein took Judge Jernigan's call. When Judge Goldstein returned to the bench after that call, she announced her view that the filing of the Involuntary Petitions deprived her of jurisdiction to make any further rulings pending action by the Bankruptcy Court.

### E.  Closing of the Transaction is rescheduled from February 1 to February 13

43.     CLO-3 has been able to move the closing date for the Transaction from February 1 to February 13. However, this is a short-term fix that demands a permanent solution. The very pendency of these involuntary cases severely impacts CLO-3's ability to ensure that all of the constituent parties remain committed to the transaction. Each day that passes creates greater risk for this $420 million transaction.  The new Bondholders will grow nervous about the unprecedented delay.  The ratings agencies, law firms offering opinion letters, and various trustees have refused to act in the shadow of a potential bankruptcy stay.  Indeed, for the Transaction to go forward on February 13, it must "price" five business days in advance, on February 8; and the pendency of these Involuntary cases likely will prevent pricing – which will likely quash the Transaction before the February 13th closing date.  And the longer the

Transaction waits, the more likely that changing market conditions, such last Friday's precipitous stock market fall, will cause parties to reconsider if they want to enter into the Transaction at the previously negotiated prices. Absent the denial of the 303(f) Motion and the granting of the Motions to Dismiss,[11] the Reissuance of CLO-3 may never close,[12] to the detriment of the CLO-3 Equity Holders and Bondholders to whom Acis owes a fiduciary duty.[13] However, it is beyond question if the assignment of the CMA is not executed prior to February 13, CLO-3 will be called, its basket of loans liquidated, and the CLO-3 Equity Holders and other parties will incur tens of millions of dollars in losses.

44.     The CLO-3 Indenture provides that the Equity Holders may "call"—*i.e.*, force the liquidation of—CLO-3 through an optional redemption of the outstanding notes. Specifically, a majority of the Equity Holders may initiate an optional redemption "on any Business Day after the Non-Call Period." CLO-3 Indenture § 9.2(a). Exhibit No. 7. The Non-Call Period for CLO-3 ended in February 2016. CLO-3 Indenture § 1.1. Exhibit No. 7. After being notified of an optional redemption, "the Portfolio Manager [Acis] in its sole discretion shall direct the sale (and the manner thereof) of all or part of the Collateral Obligations and other Assets." *Id.* § 9.2(b).

45.     Even if Acis subsequently escapes bankruptcy and the appointment of a receiver, the Equity Holders in CLO-3 will nonetheless issue an optional redemption, thereby liquidating

---

[11]   In connection with the Motions to Expedite the Hearing on the Motions to Dismiss (which will be considered by the Court current with the 303(f) Motion), Acis is filing a Supplemental Brief, in support of the expedited consideration. As noted therein, it is not enough to simply deny the 303(f) Motion, thus permitting Acis to continue operations, unrestricted by Section 363 of the Bankruptcy Code, until an Order for Relief is entered or the Involuntary Cases are dismissed, as, and most important, the mere existence of the Involuntary Petitions against Acis is interfering with and causing damage to all of the CLO's managed by Acis.

[12]   As noted in Paragraph 43, a failure to close the Reissuance of CLO-3 does not result in the continued operations as Collateral Manager by Acis. Rather, Acis is done and CLO-3 is liquidated. Thus, the *hold-up* by Terry of the Reissuance of CLO-3 has no utility for Acis, Terry or any other creditor of Acis.

[13] Each week the transaction is delayed costs the Equity Holders between $50,000 and $100,000.

21

all CLO-3 assets. Under such a scenario, the CMA will automatically terminate upon "the liquidation of the Assets and the final distribution of the proceeds of such liquidation to the Holders." CMA § 13(a)(ii).

46. What appears to be lost on Terry is that regardless of whether the Reissuance of CLO-3 occurs, Acis's fate is sealed. In short order, Acis will no longer be the Collateral Manager for CLO-3. Either the Collateral Management Agreement will be transferred pursuant to a reissuance or it will expire when CLO-3 is called and liquidated.

47. Furthermore, and as previously discussed, even if Acis is prohibited from transferring the Collateral Management Agreement, Acis will nonetheless be terminated as Collateral Manager due to (1) the bankruptcy filing, (2) a receivership requested by Terry in state court, or (3) Acis's inability to provide management services as a result of the Highland Servicers exercising their contractual right to refuse to continue to provide  services to Acis under the Sub-Advisory Agreement and Shares Services Agreement. The delay or even prevention of the assignment of the CMA to the New Collateral Manager will not result in more assets owned by Acis, and, in fact, will increase the claims against Acis (not to mention the forthcoming claims against Terry) for its breach of fiduciary duties owed to CLO-3, its Bondholders and the CLO-3 Equity Holders.

### III.
### OBJECTIONS TO THE 303(f) MOTION

48. The relief Terry seeks in the 303(f) Motion has no basis in law or fact and is nothing more than the latest maneuver in his scheme to exert pressure on Acis (and Highland) by jeopardizing the closing of the Reissuance of CLO-3.

22

49.     As set forth in the Motions to Dismiss, Terry has improperly invoked the jurisdiction of this Court and did so in bad faith.  Allowing Terry to compound those abuses by imposing on Acis the requirements of Section 363 of the Bankruptcy Code would not only be inequitable, but also has the potential to cause millions of dollars of damage to multiple parties, including creditors of Acis or affiliates thereof.  Moreover, it would be inappropriate for this Court to condone such abuses by modifying Section 303(f) before this Court has considered the propriety of Acis being subject to Title 11 cases.

## A. Section 303(f) Permits the Alleged Debtors to Operate Unencumbered During the Gap Period

50.     Section 303(f) provides:

> "Notwithstanding Section 363 of [the Bankruptcy Code,] except to the extent that the court orders otherwise, and until an order for relief in the case, any business of the debtor may continue to operate, and the debtor may continue to use, acquire, or dispose of property as if an involuntary case concerning the debtor had not been commenced."

51.     In the *Texas Rangers* case the Court confirmed the scope and rationale of Section 303(f) by quoting from *Consolidated Partners Inv. Co. v. Lake*, 152 B.R. 485, 490 (Bankr. N.D. Ohio 1993):

> By virtue of § 303(f), during the gap period, the Debtor was authorized to continue such operations until an order for relief was entered as though no involuntary petition had been filed.  The rationale for allowing the debtor to operate during the involuntary gap period is that prior to the entry of an order for relief, the subject of an involuntary petition should not be adversely affected by the case."

*In re Texas Rangers Baseball Partners*, 434 B.R. 393 ( Bankr. N.D. Tex. 2010).

52.     In the 303(f) Motion, Terry cites two cases for the proposition that "courts have imposed restrictions on an involuntary gap debtor's operations to preserve and protect assets;

23

especially where there is a concern that a debtor may dispose of assets for less than fair value or dismantle a business for the private gain of its principals." 303(f) Motion, at ¶¶ 18-19; *In re Tex. Rangers Baseball Partners*, 434 B.R. 393 (Bankr. N.D. Tex. 2010); *Wilson v. Davis (In re Wilson)*, 62 B.R. 42 (E.D. Tenn. 1985).

53.     Terry's characterization and attempts to analogize the facts of those cases is unavailing. First, in the *Wilson* case, the court did not modify Section 303(f), but simply observed that because Section 303 permits an involuntary debtor to use, acquire, or dispose of property through the time the order for relief is entered (as opposed to through the date of the involuntary <u>filing</u>, which the appellee had argued), that the proper date for determining the scope of an involuntary debtor's exempt property was the date on which an order for relief was entered. *Id.* at 45-46.

54.     In *Texas Rangers* the Court abrogated Section 303(f), but, the main reason for doing so was that the alleged debtors' sole asset was *itself* a debtor in a *voluntary* chapter 11 case and that it was appropriate to impose on the involuntary debtors the same fiduciary duties as a debtor in possession because of such ownership structure. 434 B.R. at 404-405. Indeed, the Court acknowledged that section 303(f) generally permits an involuntary debtor to "proceed without court oversight[,] . . . so long as [its] conduct can be justified under the business judgment rule." *Id.* at 405. Moreover, as acknowledged by Terry, the Court's conclusion was very much "based on the facts and circumstances of the case." 303(f) Motion, at ¶ 19.

55.     The *Texas Rangers* Court was further concerned that the alleged debtors were not operating consistent with the fiduciary duties of a debtor-in-possession in the gap period. Thus, the Court imposed the obligations of Section 363 of the Bankruptcy Code on the alleged debtors.

Terry makes no comparison of the facts of that case to the facts of this matter in support of his 303(f) Motion – and he cannot.

56.     Here, Acis is operating consistent with both Acis's fiduciary duties and the industry trend of almost 140 CLO reissuances.  As noted above, blocking the Transaction benefits neither Acis nor its creditors.  In fact, the liabilities undertaken from a failure to comply will surely injure Acis, and its creditors.  Further, to cause the assertion of claims against Acis is contrary to its fiduciary duties to its creditors and third parties.

57.     In connection with the assignment of the CMA as part and parcel of the Reissuance of CLO-3, there is no evidence to suggest that Acis is not acting in a fashion consistent with the fiduciary responsibilities of a debtor-in-possession (were Acis to become debtors-in-possession at a later date).  Rather, the unsupported allegations by Terry of pre-petition transactions undertaken by Acis fail to demonstrate in any regard that the assignment of the CMA to complete the Reissuance of CLO-3 is inappropriate.

58.     As demonstrated above, Acis is, by assigning the CMA to the New Collateral Manager, performing exactly as is required of it and is complying with its fiduciary duties to CLO-3.  To do otherwise would be a breach of its fiduciary duties as well as cause significant damage to innocent third parties, all of which may assert claims against Acis.  Thus, by complying with its fiduciary duties to CLO-3, Acis is also complying with its fiduciary duties to its creditors (if Acis were to become debtors-in-possession).

59.     The drastic remedy of imposing upon Acis obligations to comply with Section 363 during the gap period makes no sense when what is being undertaken by Acis is exactly what is in the best interests of all interested parties.

**B. Terry's "Fraudulent Transfer" Argument is Based on an Incorrect Understanding of the CMA and the Law**

60.     Boiled down to its essence, Terry's "fraudulent transfer" argument asserts the following positions: (i) the CMA (the management agreement by which Acis manages CLO-3) is a valuable asset of Acis; (ii) Acis proposes to transfer that valuable asset to the New Collateral Manager; and (iii) the New Collateral Manager is not providing anything to Acis in exchange for the transfer of the CMA.  Thus, Terry argues, the transfer of the CMA eliminates a valuable asset of Acis for no consideration.

61.     The flaws in Terry's "fraudulent transfer" argument, however, are fatal.  First, the CMA has no value, as Acis's operation thereunder results in a loss to Acis (see ¶ 4, *infra*).  Second, the contractual arrangement between Acis and CLO-3 (i.e., the CMA), which has been in place since 2014, provides, among other things, that Acis will perform various services, be compensated for those services, and, most relevant here, undertake actions as instructed by CLO-3, including, in this instance, assign the contract (the CMA).  Simply put, the provisions of the CMA requiring the Collateral Manager (Acis) to perform as instructed – in this instance *to transfer the CMA*,  is a negotiated contractual obligation among Acis and CLO-3 that has nothing to do with the transferee (i.e., the New Collateral Manager).  From the outset of the relationship among Acis and CLO-3, Acis has performed in accordance with its fiduciary duties to the CLO, its Equity Holders and its Bondholders; and has been compensated all along by CLO-3 for such performance.  It is not being instructed to make the assignment – which it must do consistent with its fiduciary duties.

62.     The four year long relationship among Acis and CLO-3 has included performance of the *back and forth* obligations of the parties, which has resulted in consideration flowing to and among the parties.  Thus, Acis has already been compensated in anticipation of performing

26

its instructed obligations including assigning the CMA in further of the Transactions. There is no consideration or value flowing from Acis to the New Collateral Manager. Rather, Acis continues to perform under the terms of its existing contract (i.e., the CMA) by making the assignment as instructed CLO-3.

63. Accordingly, Terry's suggestion that the New Collateral Manager is receiving a fraudulent transfer, and that Acis is making a fraudulent transfer, is not correct. Rather, Acis simply is performing in accordance with a contractual obligation, long-ago entered into, and for which it has been, and continues to be, compensated. The transfer is not anything more than Acis's compliance with the terms of a contract – the CMA. The foregoing analysis debunks any assertion that the assignment of the CMA, a ministerial act to be performed by Acis as part and of the Reissuance of CLO-3, is a fraudulent transfer.

### C. The Involuntary Petitions are Factually Defective

64. As described in detail in the Motions to Dismiss, the Involuntary Petitions are subject to dismissal because they are not supported by the requisite number of creditors needed to commence an involuntary chapter 7 case under Section 303 of the Bankruptcy Code. Section 303(b)(1) of the Bankruptcy Code states, in relevant part:

> An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—
>
> (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $15,775 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

27

> (2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724 (a) of this title, by one or more of such holders that hold in the aggregate at least $15,775 of such claims . . . .

11 U.S.C. § 303(b).

65.     Section 303(b) contains "very specific requirements concerning the number of entities that are necessary to commence an involuntary filing." 2 COLLIER ON BANKRUPTCY ¶ 303.14 (16th rev. ed. 2013). Those requirements are based on the policy of preventing one or more "recalcitrant creditors" from filing an involuntary case to harass a debtor. Id.

66.     Perhaps the most basic of all requirements is that section 303(b)(l) requires that when a debtor has twelve or more creditors, an involuntary case may be commenced only by three or more entities. *See In re Tichy Elec. Co., Inc.*, 332 B.R. 364, 372-73 (Bankr. N.D. Iowa 2005) (citations omitted); *Sipple v. Atwood (In re Atwood)*, 124 B.R. 402, 406 (S.D. Ga. 1991) ("If there are twelve or more qualifying claims, excluding voidable claims, the debtor cannot be forced into involuntary bankruptcy by fewer than three of the qualifying creditors."). Where a debtor has twelve or more creditors and there are less than three petitioning creditors, the case must be dismissed—section 303(b)(l) leaves no room for Court discretion.

67.     Terry has the burden of demonstrating that he has satisfied the numerosity requirement under section 303(b) of the Bankruptcy Code. *Pleas Doyle & Assocs. v. James Plaza Joint Venture (In re James Plaza Joint Venture)*, 67 B.R. 445, 448 (Bankr. S.D. Tex. 1986) ("It is plaintiffs' burden to demonstrate the number of creditors of [the] debtor's estate."); *In re Charon*, 94 B.R. 403, 405-06 (Bankr. E.D. Va. 1988) (petitioner has "burden of proving that it satisfied the jurisdictional requirements of § 303(b)"); 2 COLLIER ON BANKRUPTCY ¶ 303.15, at 76 (15th ed. 1988) ("When fewer than three creditors file an involuntary petition, the

28

alleged debtor has the burden to raise the issue that it has 12 or more creditors by filing a list pursuant to Bankruptcy Rule 1003(b). The petitioning creditor then has the burden to show that the alleged debtor actually has fewer than 12."). *Terry cannot do so.*

68. Here, it is beyond dispute that Acis has twelve or more creditors. Ironically, substantially all of Acis's creditors became creditors because of the pending state court action between Terry and Acis. Specifically, Acis's creditors include numerous law firms, professionals, and experts, which are creditors of Acis LP and also creditors of Acis GP due to its role as the general partner. Acis has filed with this Court a statement pursuant to Bankruptcy Rule 1003(b) listing such creditors. *See* Case No. 18-30264-SGJ7, Docket No. 7; Case No. 18-30265-SGJ7, Docket No. 7. Exhibit No. 13. Thus, Acis has more than twelve creditors, making clear that three creditors are required to force Acis into bankruptcy pursuant to section 303(b)(1).[14]

69. Based on the foregoing, the Involuntary Petitions lack the statutorily required number of petitioning creditors and therefore are subject to dismissal because they are factually defective.

70. The significance of the Motion to Dismiss cannot be over emphasized. As the fatal flaw in the Involuntary Petitions – only one creditor filed the Involuntary Petitions – is so obvious, this Court should not consider the 303(f) Motion, until and unless consideration has been given to the Dismissal Motion.[15]

---

[14] In addition to filing the 1003(b) Notice, Acis has provided to Terry copies of the invoices, statements and other documents evidencing and supporting each of the creditors' asserted claims. In addition, Acis also offered to present a witness to provide a deposition (including the offer of a deposition to be conducted over the just-concluded weekend) to testify to the creditors and their claims. Terry failed to respond to this offer.

[15] While the Motion to Expedite the Court's consideration of the Motions to Dismiss is being considered concurrently with the Court's consideration of the 303(f) Motion, Acis asserts that Dismissal of the Involuntary Petitions should be heard in *advance* of the 303(f) Motion. Were the blatant disagreed and failure to comply with Section 303(b) not as obvious as it is, this Court might consider the 303(f) Motion in advance of the Motions to

**D. The 303(f) Motion is a Blatant Attempt to Pressure Acis by Threatening the Reissuance of CLO-3, in Contravention of the Intent Underlying the Bankruptcy Code's Involuntary Provisions.**

71.     Terry's bad faith litigation strategy is clear—he intends to exert pressure on Acis (and Highland) by jeopardizing the Reissuance of CLO-3.  In furtherance of that ill-conceived objective, Terry filed the 303(f) Motion, which seeks to impose the requirements of Section 363 of the Bankruptcy Code before there has been an adjudication on the merits of the propriety or validity of the Involuntary Petitions.  Granting the relief requested would run completely counter to the balance Congress attempted to strike in the Bankruptcy Code's involuntary bankruptcy provisions.

72.     The filing of an involuntary petition is a drastic remedy.  *See Credit Union Liquidity Servs., L.L.C. v. Green Hills Dev. Co., L.L.C. (In re Green Hills Dev. Co., L.L.C.)*, 741 F.3d 651, 655 (5th Cir. 2014).  In recognition of this fact, "Congress limited the circumstances in which creditors may force a debtor into such a proceeding."  *Id.* (citing, *inter alia*, 30 Cong. Rec. S7618 (daily ed. June 19, 1984)); *see In re Landmark Distribs., Inc.*, 189 B.R. 290, 306 (Bankr. D.N.J. 1995) ("The filing of an involuntary petition by a creditor must be carefully scrutinized by the Court because such an action is extreme in nature and carries with it serious consequences to the alleged debtor, examples of which include loss of credit standing, interference with general business affairs and public embarrassment.") (citations omitted).  Congress created the Bankruptcy Code to serve "as a shield for debtors, not a sword for creditors," *In re R.N. Salem Corp.*, 29 B.R. 424, 429 (S.D. Ohio 1983), and even the good-faith filing of an involuntary petition creates onerous circumstances for an alleged debtor.  *Schmid v.*

---

Dismiss.  However, the immediately apparent flaw in the Involuntary Petitions warrants consideration of the Motions to Dismiss first.

*Yorke* (*In re Reid*), 773 F.2d 945, 946 (7th Cir. 1985) (the filing of an involuntary petition is "an extreme remedy with serious consequences to the alleged debtor") (citations omitted).

73.     Balancing the harshness of the possibility of an entity being put into bankruptcy against its will is the protection afforded by Section 303(f) of the Bankruptcy Code. Recognizing that an alleged debtor should be afforded due process and its day in Court before being required to abide the restrictions the Bankruptcy Code imposes on its operations, Section 303(f) allows an alleged debtor to operate free of those restrictions pending an adjudication of the involuntary petition.  The presumption that an alleged debtor should be free to operate its business without restriction pending adjudication of an order for relief is even more critical when the petitioning creditor, like Terry here, has acted alone in an attempt to gain an improper tactical advantage in a longstanding two-party dispute in state court.

74.     As set forth in the Motion to Dismiss, the Involuntary Petitions are blatant examples of forum shopping.  Terry filed the Involuntary Petitions literally on the eve on an evidentiary hearing in the state court that Terry knew would have resulted in Acis being free to close the Reissuance of CLO-3.  Rather than participate in that hearing (and sit for the deposition that was to precede that hearing), Terry attempted a "Hail Mary pass" and precipitously attempted to transfer the venue of his dispute with Acis to this Court.  Having done so, Terry should be forced to await the adjudication of the merits of the Involuntary Petitions (already the subject of the Motions to Dismiss, filed less than 24 hours after the Involuntary Petitions themselves) before being granted relief that is akin to a pre-determination that the Acis entities should be adjudicated debtors.  To hold otherwise would offend the balancing Congress built into Section 303 and would offend notions of equity and due process.[16]

---

[16] As the Motions to Dismiss demonstrate, Acis asserts that the Involuntary Petitions suffer from fatal flaws, both because the numerosity requirement of Section 303(b)(1) is not met and because the filings were made in

40000/0626-15453210v2

# IV.
## CONCLUSION

WHEREFORE, for the reasons set forth herein, Acis respectfully requests that the Court enter an Order denying the Motion and granting such other relief as the Court deems just and proper.

Dated: February 5, 2018

Respectfully submitted,

By: /s/ *Michael D. Warner*

Michael D. Warner (TX Bar No. 00792304)
Benjamin L. Wallen (TX Bar No. 24102623)
**COLE SCHOTZ P.C.**
301 Commerce Street, Suite 1700
Fort Worth, TX 76102
(817) 810-5250
(817) 977-5273 (Facsimile)
mwarner@coleschotz.com
bwallen@coleschotz.com

Gary Cruciani (TX Bar No. 05177300)
Michael P. Fritz (TX Bar No. 24036599)
**MCKOOL SMITH, P.C.**
300 Crescent Court, Suite 1500
Dallas, Texas 75201
214-978-4000 Telephone
214-978-4044 Facsimile
gcruciani@mckoolsmith.com
mfritz@mckoolsmith.com

*Attorneys for Acis Capital Management,*
*L.P. and Acis Capital Management GP, LLC*

---

bad faith. At a minimum, the relief Terry seeks in the 303(f) Motion should await this Court's adjudication of the Motions to Dismiss. At most, the 303(f) Motion should be denied, without prejudice to Terry's right to seek the same relief if these involuntary cases proceed beyond Acis' Motions to Dismiss.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 5th day of February, 2018, a true and correct copy of the foregoing *Joint Objection of Alleged Debtors to Emergency Motion of Petitioning Creditor to Abrogate or Modify 11 U.S.C. § 303(f), Prohibit Transfer of Assets, and Impose, inter alia, 11 U.S.C. 363* was served upon all parties that are registered to receive electronic service through the court's ECF notice system in the above cases.

By:    */s/ Michael D. Warner*        
        Michael D. Warner

**<u>EXHIBIT K</u>**

1

| | |
|---|---|
| 1 | IN THE UNITED STATES BANKRUPTCY COURT |
| | NORTHERN DISTRICT OF TEXAS (DALLAS) |
| 2 | |

In Re:                                ) Case No. 18-30264-sgj7
                                       ) Dallas, Texas
ACIS CAPITAL MANAGEMENT, L.P.,         )
                                       )
         Alleged Debtor.               ) February 7, 2018
                                       ) 9:36 a.m.
------------------------------ )
                                       )
ACIS CAPITAL MANAGEMENT GP, LLC, )  Case No. 18-30265-7-sgj7
                                       )
         Alleged Debtor.               )
                                       )
------------------------------ )


TRANSCRIPT OF HEARING ON:

AS TO CASE NO. 18-30264-sgj7:
EMERGENCY MOTION TO ABROGATE OR MODIFY 11 U.S.C. SECTION
303(F), PROHIBIT TRANSFER OF ASSETS, AND IMPOSE, INTER ALIA,
11 U.S.C. SECTION 363, FILED BY PETITIONING CREDITOR JOSHUA
TERRY (3);
EMERGENCY MOTION TO SET HEARING (RELATED DOCUMENTS 8 MOTION TO
DISMISS CASE), FILED BY ALLEGED DEBTOR ACIS CAPITAL
MANAGEMENT, L.P. (9)

AS TO CASE NO. 18-30265-7-sgj7:
EMERGENCY MOTION TO ABROGATE OR MODIFY 11 U.S.C. SECTION
303(F), PROHIBIT TRANSFER OF ASSETS, AND IMPOSE, INTER ALIA,
11 U.S.C. SECTION 363, FILED BY PETITIONING CREDITOR JOSHUA
TERRY (3);
EMERGENCY MOTION TO SET HEARING (RELATED DOCUMENTS 8 MOTION TO
DISMISS CASE), FILED BY ALLEGED DEBTOR ACIS CAPITAL MANAGEMENT
GP, LLC (9)

BEFORE THE HONORABLE STACEY G. JERNIGAN
UNITED STATES BANKRUPTCY COURT

Transcription Services:            eScribers, LLC
                                   352 Seventh Avenue
                                   Suite #604
                                   New York, NY 10001
                                   (973) 406-2250

PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.
TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE

2

```
 1   APPEARANCES:

 2   For the Alleged Debtor:      MICHAEL D. WARNER, ESQ.
                                  BENJAMIN L. WALLEN, ESQ.
 3                                Cole Schotz P.C.
                                  1700 City Center Tower II
 4                                301 Commerce Street
                                  Suite 1700
 5                                Fort Worth, TX 76102

 6                                JACOB S. FRUMKIN, ESQ.
                                   (TELEPHONIC)
 7                                Cole Schotz P.C.
                                  Court Plaza North
 8                                25 Main Street
                                  Hackensack, NJ 0760
 9
                                  GARY CRUCIANI, ESQ.
10                                MICHAEL P. FRITZ, ESQ.
                                  McKool Smith
11                                300 Crescent Court
                                  Suite 1500
12                                Dallas, TX 75201

13   For Joshua Terry,           RAKHEE V. PATEL, ESQ.
     Petitioning Creditor:       ANNMARIE CHIARELLO, ESQ.
14                                Winstead PC
                                  2728 N. Harwood Street
15                                Suite 500
                                  Dallas, TX 75201
16
                                  BRIAN P. SHAW, ESQ.
17                                Clouse Dunn LLP
                                  1201 Elm Street
18                                Suite 5200
                                  Dallas, TX 75270
19
     Also Present:               JOSHUA TERRY
20                                Petitioning Creditor

21                                SCOTT B. ELLINGTON, ESQ.
                                  General Counsel of Highland
22                                Capital Management

23

24

25
```

Case 19-34054-sgj11 Doc 1735 Filed 02/13/21 Entered 02/13/21 16:53:00 Page 295 of 381
Case 19-34054-sgj11 Doc 2875 Filed 02/11/22 Entered 02/11/22 15:16:53 Page 93 of 381
362

Colloquy                                                53

 1            MS. PATEL:  -- I haven't put on --

 2            THE COURT:  You may have a witness on that if it --

 3            MS. PATEL:  I don't know what their evidence --

 4            THE COURT:  Okay.

 5            MS. PATEL:  -- is going to be, so I may very well,

 6   yes.

 7            THE COURT:  All right.  Well, then let's go to the

 8   other side.  To expedite things, I think I made clear but

 9   maybe I didn't make clear, Mr. Cruciani, your witness can be

10   combined testimony in response to the 303(f) as well in

11   support of your motion to expedite.  And so --

12            MR. CRUCIANI:  Okay.  Thank you, Your Honor.  So Mr.

13   Ellington will testify to both.

14            THE COURT:  Okay.

15            MR. CRUCIANI:  As relates to the motion to expedite,

16   the actual substantive testimony on our motion to dismiss will

17   be primarily Mr. Leventon; I understand that was kind of the

18   next step, but that's not something we'll be doing for this

19   particular motion, right?

20            THE COURT:  Correct.

21            MR. CRUCIANI:  Okay.

22            THE COURT:  Um-hum.

23            MR. CRUCIANI:  Yes, ma'am.

24            THE COURT:  All right.  So it's Mr. Ellington?  Okay,

25   welcome.  If you could approach the witness stand.

1          All right, please raise your right hand.

2      (Witness sworn)

3              THE COURT:  All right, please take a seat.

4              THE WITNESS:  Thank you.

5              THE CLERK:  I will get them and come back here.

6              MR. CRUCIANI:  Okay.

7              THE CLERK:  It's very directional.

8              MR. CRUCIANI:  Okay.  Thank you, ma'am.

9    DIRECT EXAMINATION

10   BY MR. CRUCIANI:

11   Q.   Please state your name for the record.

12   A.   Scott Ellington.

13   Q.   What is your position, Mr. Ellington?

14   A.   I am the general counsel, chief legal officer, and

15   partner at Highland Capital Management, L.P.

16   Q.   Okay.  I'd like to start with just a few things we just

17   heard from Mr. Terry.

18   A.   Okay.

19              MR. CRUCIANI:  Let's put up, Omar, slide 4, please.

20   Q.   Recall Mr. Terry just testified that the reason Acis is

21   in this structure was due to the toxic brand name of Highland

22   back in the 2012 time period?

23   A.   Yes, I do.

24   Q.   Now, fast-forward; today.  What is, based on your

25   dealings with the marketplace, the nature of the Acis brand

 1    today --

 2            MR. SHAW:  Your Honor, I'm going to object on

 3    foundation.  If he's going to testify that his knowledge

 4    regarding the perception is based upon hearsay, people are

 5    telling him what the perception of Acis is, it's rank hearsay.

 6    So if the basis is what others are telling him, it's hearsay

 7    and it's not admissible; there's no exception to that.  So --

 8            MR. CRUCIANI:  It's not offered to prove the truth of

 9    the matter asserted.  Doesn't matter whether they in their

10    heart of hearts believe it.  It's just what's been

11    communicated and how they respond to that.

12            THE COURT:  Okay --

13            MR. SHAW:  It's --

14            THE COURT:  -- overruled.

15            MR. CRUCIANI:  Okay.

16            THE COURT:  I'll allow it.

17    Q.    Do you deal with market participants in the CLO industry?

18    A.    Yes.

19    Q.    Give us a general overview of the nature of those

20    dealings

21    A.    Especially around these transactions, I've dealt directly

22    with two investment banks and with the equity holders.

23    Q.    Okay.  And has the subject of the Acis brand name come up

24    in those discussions?

25    A.    Countless times.

Scott Ellington - Direct                                    56

1  Q.   What has been communicated to you?

2  A.   That it is so toxic that it's impossible to sell the

3  bonds with Acis as the manager, that you would not be able to

4  raise the equity and, due to this litigation and allegations

5  that've been in the litigations and the press, by Mr. Terry's

6  actions, that nothing can be associated with the Acis brand

7  and be managed as a CLO or marketed as a CLO.

8  Q.   Who has communicated that to you?

9  A.   Goldman Sachs, equity holders, large law firms that do

10 structured products, CLO work for a living, and Mizuho.

11 Q.   What role was Goldman Sachs slated to have in this case?

12 A.   They were the investment banker that was going to

13 refinance these CLOs.

14 Q.   Who is the current investment banker?

15 A.   Mizuho.

16 Q.   Why is Goldman Sachs not the investment banker?

17 A.   They dropped out because of the Acis name and dealing

18 with these Acis transactions.

19 Q.   How did what you were hearing about the Acis name impact

20 the decision of whether or not Acis would continue as the

21 collateral manager in these ventures?

22 A.   The bondholders, the -- and -- existing and purchasing,

23 and the equity holders, existing and new equity holders, said

24 categorically, with absolute certainty, if there's any

25 relation to Acis, the Acis brand, the Acis structure, we have

 1  no interest in doing business with you at all.

 2  Q.   How were these -- how was this new reissue transaction

 3  marketed?  What was the document that was sent to the

 4  investors?

 5  A.   Was called a circular, and it lays out -- it's

 6  essentially a term sheet of how the deal will look.

 7  Q.   Was there any discussion in the circular about who the

 8  collateral manager would be in the new deal?

 9  A.   Yes.

10  Q.   Who was it?

11  A.   Highland Capital Loan -- it's that HCLOM -- sorry,

12  there's just so many names; I'd have to look at the chart.

13  Q.   A Highland entity?

14  A.   A Highland affiliate, correct, yes.

15  Q.   Not Acis?

16  A.   Correct.

17  Q.   Is it important that these offering circulars be

18  accurate?

19  A.   They have to be.

20  Q.   What are the penalties if they're not?

21  A.   Securities fraud, negligent misrep., fraud in the

22  inducement.  I mean, it's severe.

23  Q.   Okay.  And so the information that the investors had --

24  what information did they have at the time they're making

25  their investment?  What were they told as to who that

 1    investment manager would be?

 2    A.    It would be a new entity per their request.

 3    Q.    What would be -- would it be of any concern to you -- and

 4    if so, how -- if they changed that after the investment

 5    decision was made in part (indiscernible)?

 6    A.    We'd have to go and redo the circular, go out and

 7    resolicit the bond and equity tranches.  It -- it would

 8    essentially be a recasting of the entire deal, and then it

 9    looks like you don't have your ducks in a row.  They're more

10    likely to not fix.

11    Q.    And then what rights would the new investors have to say,

12    well -- say, now you're telling me there's a new -- Acis is

13    back in the play, what rights would they have in terms of

14    going forward or not?

15    A.    Rescission, various breaches, you know, lost

16    relationship, goodwill, brand again.  I mean, it's -- it's a

17    whole host of things, probably a lot that I couldn't even

18    think of at the top of my head.

19    Q.    Okay.  Another thing -- let's go to Exhibit 7, the

20    indenture, paragraph 8.3(e), which is page 164.  This is what

21    Mr. Terry and I just got done discussing.  He pointed me to

22    this in response to my question whether there was anything in

23    the documents that gave the collateral manager effectively a

24    veto right over the (indiscernible) transaction.  Recall that

25    discussion?

Case 19-34054-sgj11 Doc 2875 Filed 02/13/21 Entered 02/13/21 16:53:00 Page 301 of 301
Case 19-34054-sgj11 Doc 2875 Filed 02/13/21 Entered 02/13/21 16:53:00 Page 301 of 301
362

Scott Ellington - Cross                    201

1   A.   Correct.

2   Q.   Bloomberg issued some media publications as well, right?

3   A.   Correct.

4   Q.   There was a Dealbreaker internet post about the dispute,

5   right?

6   A.   I remember that, yes.

7   Q.   Right.  And this issue with Mr. Terry having recorded

8   while he was an employee of Highland was well known to the

9   market, right?

10  A.   I would assume so.

11  Q.   So despite the fact that this is common knowledge that

12  Mr. Terry did this, you have Mr. Covitz, who's running Acis in

13  August of 2017, well after all this stuff comes out, saying

14  that Acis still intends to issue new CLOs, right?

15  A.   Yes, that was the plan.

16  Q.   And Acis is risk-retention-compliant, right?

17  A.   Yes.

18  Q.   And Acis has been risk-retention-compliant?

19  A.   As far as I understand, yes.

20  Q.   Yet now, fast forward to October or November of 2017 into

21  the new year in 2018, all of a sudden, this noise about Mr.

22  Terry recording is what creates the toxic nature of the Acis

23  brand; is that right?

24  A.   No, I don't think that's -- the timing is right.  I think

25  the toxicity was there, but I think the effectuation was

1  actually around this mechanism.

2  Q.   You're familiar with the news article that came out in

3  The Wall Street Journal after the award was made public, when

4  Mr. Terry went to confirm that award, right?

5  A.   Yes, I do.

6  Q.   But one of the things that's changed since Mr. Covitz

7  makes this representation in this document that's posted on

8  Highland's website about Acis' intent to issue new CLOs as

9  Acis and now, is that we've got an arbitration award and we've

10 got a judgment, right?

11 A.   And we have third-party investors that said we don't want

12 to be involved in this brand; and their equity is one of the

13 reasons that new CLOs can be launched.

14 Q.   I want to follow up on that.  Those third-party

15 investors, they never told Highland or Mr. Dondero or you or

16 Mr. Covitz that in order for them to invest that they were

17 going to bar this new entity -- this Highland Cayman entity or

18 the Delaware new Highland CLO entity -- from paying for the

19 transfer of these CMAs, right?

20 A.   What do you mean by "paying for the transfers"?

21 Q.   Paying some amount of consideration for Acis to transfer

22 the management contract?

23 A.   No, they just said we want things to be structured in

24 this way or we're not investing.

25 Q.   Right.  They didn't say hey, we'll do the deal, but as a

1  condition of doing the deal, we want you to transfer these
2  assets -- this collateral-management agreement from Acis to
3  Acis Cayman; and we don't want you to pay -- we don't want
4  Acis Cayman to pay a dollar for the transfer of that CMA?
5  A.   Well, I think there's two questions.  I'll try to address
6  them both.
7       It was call the deal and terminate the CMAs or transfer
8  the CMAs.  That's question one.  So yes, they not only
9  necessitated, they demanded it.
10      How we paid consideration for those transfers to Acis,
11  they didn't have any involvement in it.
12 Q.   Right.  I mean, again, I may be belaboring the point, but
13 I think it's an important one.  These investors' involvement
14 is not an impediment to Acis receiving value in exchange for
15 the transfer of the CMAs?
16 A.   I disagree.
17 Q.   Tell me why?
18 A.   If they do not become investors or you cannot reset or
19 refi, the deals will be called and therefore Acis' CMAs don't
20 have any value.
21 Q.   No, no, no.  What I'm saying is, everything is the same,
22 right?  The transaction that's going forward on the 13th is
23 the same.  Everything.  Right?
24 A.   Wrong.
25 Q.   No, no.  This is -- a hypothetical, what I'm saying.

Case 19-34054-sgj11 Doc 2875 Filed 02/13/21 Entered 02/13/21 16:53:00 Page 304 of 391
Case 19-34054-sgj11 Doc 2875 Filed 02/13/21 Entered 02/13/21 16:53:00 Page 304 of 391
362

Scott Ellington - Cross                          204

1    A.    Oh, I'm sorry.  Okay, I misunderstood.
2    Q.    All right.  Everything is going forward as is, right?
3    It's going to close on the 13th.  There's going to be a
4    transfer of the collateral-management agreement.  There's
5    going to be a reset.  All these things are going to happen,
6    right, just like you planned.  The one variable that's changed
7    is that instead of Acis receiving nothing for the transfer of
8    the collateral-management agreement, is that Acis receives
9    something for the transfer of the collateral-management
10   agreement to a Highland affiliate.
11   A.    Correct.  But they weren't going to receive anything from
12   a refi or a reset or a call anyway.
13   Q.    I understand that.
14   A.    Okay.
15   Q.    But there's nothing that the investors are saying that
16   stops Highland Cayman or Highland or anybody else giving Acis
17   value for the CMAs.
18   A.    As a directive from the investors; is that what you're
19   asking me?
20   Q.    Right.
21   A.    No, they have not given that directive.  Their only
22   directive was call and get rid of Acis or get rid of Acis or
23   we're not doing the deal through a reset.
24   Q.    All right, so you said that when Acis was set up that --
25   in 2011, that that was directly analogous to what this new

1  transaction that you're doing or that Highland and its

2  affiliates are doing with regard to the reset and the

3  transfers of the collateral-management agreement.  Do you

4  remember that?

5  A.    Yeah, the idea of Acis and -- yes.

6  Q.    Right.

7  A.    Correct.

8  Q.    Now, when --

9  A.    A new brand.

10  Q.    Right.  Now, when Acis was set up, Highland had existing

11  CLOs that it managed, right?

12  A.    Correct.

13  Q.    None of those existing collateral-management agreements

14  from Highland were transferred as a part of the formation of

15  Acis to Acis, right?

16  A.    I don't recall, but I think Mr. Terry earlier said one

17  CLO was taken over and managed by Acis.  I just don't remember

18  how it was effectuated, and I didn't remember that till he

19  said it.

20  Q.    But you don't know if that CLO was originally managed by

21  Highland or if it was managed by some other third party?

22  A.    I believe he said it was managed by Highland.  But

23  again --

24  Q.    I --

25  A.    -- Mr. Terry would know more than me.  I just can't

 1  bankers didn't want to be involved with the name.

 2          THE COURT:  All right, late '16 or early 2017.  All

 3  right.  Well, how then, were you all able to do the refi on

 4  CLO 2?

 5          THE WITNESS:  Well, because I think CLO 2 was before

 6  things got to the point where people would say no, because

 7  there was successive articles as things developed in the

 8  litigation.

 9          THE COURT:  Okay.  When was CLO 2, the refi closed?

10          THE WITNESS:  I believe it was closed on April, but

11  they usually take several months to effectuate.  So that

12  was -- call it -- and these are just generalizations.  But

13  let's say you start on January 2017, you'll close March or

14  April of '17.  And that process is already ongoing, just like

15  in these resets, things were ongoing.

16          THE COURT:  Well, the name got toxic late 2016 or

17  early 2017.

18          THE WITNESS:  Correct.  So you had a bank willing to

19  do it, and then it got to the point to where they didn't want

20  to be involved in ongoing litigation.  The snowball just got

21  larger.

22          THE COURT:  Well, but April 2017, there was a refi

23  with Acis as the portfolio manager on CLO 2.

24          THE WITNESS:  Correct.

25          THE COURT:  I'm trying to understand why was

 1  everything fine and rosy in April 2002 (sic) to have Acis in
 2  there, even though its name had gotten toxic in late 2016 or
 3  early 2017, and now just no go, no one will touch it?
 4          THE WITNESS:  I don't think it was rosy.  I think it
 5  was tolerable.  And then as things got worse and there was
 6  more mud that was slung, it became intolerable.
 7          And you also have the addition of the third-party
 8  investor coming in who gets to start calling the shots.
 9          THE COURT:  Okay.  When was the decision made to do
10  this refi on CLO 3?
11          THE WITNESS:  That began back in the May/June time
12  frame on that particular CLO, because that's when I got
13  involved on the due diligence calls with the third-party
14  investor.  And it wasn't just about 3; it was about resetting
15  them all.
16          THE COURT:  All.  All the others.
17          THE WITNESS:  And then the actual structure, Your
18  Honor, is what dictates why they were taken out of order, just
19  the way they economically worked.
20          THE COURT:  Okay.  Um-hum.  Um-hum.
21          So May/June of 2017, discussion of doing a refi on
22  all of the five remaining?
23          THE WITNESS:  Yes, with the new equity investor.
24  Then they were able to dictate this is what we want the world
25  to look like that we'll be sticking our 150 million dollars.

1          THE COURT:  Okay.  When did the offering circular go
2    out for the one you want to close February 13th?
3          THE WITNESS:  I don't know the exact date, but it was
4    sometime last fall-ish.  It may have been after that.  I just
5    don't recall.  Because they would be drafted; they would be
6    changed; you had Goldman doing some; then it got changed.  If
7    anyone knows the date -- I simply don't know the date.
8          THE COURT:  Okay.  This is a really big deal.
9          THE WITNESS:  No, I know.
10         THE COURT:  And you don't know the date?
11         THE WITNESS:  That's -- I know.  I just don't have
12   this memorized.  Does anybody know when the offer circular
13   went out on 3?
14         THE COURT:  You don't know?
15         THE WITNESS:  I can't remember now.
16         THE COURT:  It wasn't -- you don't know if it was
17   before or after October 20th, 2017?
18         THE WITNESS:  Oh, I think it was after.  The circular
19   goes out when everything else is finished in terms of this is
20   what we're going to do; this is what the terms are going to
21   look like; this is what the structure's going to look like.
22         THE COURT:  Well, it had to be after this Exhibit 22,
23   when Goldman is saying --
24         THE WITNESS:  Oh, yes, it was after --
25         THE COURT:  -- we're not going to do it.

**<u>EXHIBIT L</u>**

|     |                                                              |
|-----|--------------------------------------------------------------|
|  1  | IN THE UNITED STATES BANKRUPTCY COURT                        |
|     | NORTHERN DISTRICT OF TEXAS (DALLAS)                          |
|  2  |                                                              |
|  3  | In Re:                          ) Case No. 18-30264-Sgj7     |
|     |                                 ) Dallas, Texas              |
|  4  | ACIS CAPITAL MANAGEMENT, L.P.,   )                           |
|     |                                 )                            |
|  5  |         Alleged Debtor.         ) March 23, 2018             |
|     |                                 ) 9:36 a.m.                  |
|  6  | ------------------------------ )                             |
|  7  | ACIS CAPITAL MANAGEMENT GP, LLC, ) Case No. 18-30265-sgj7    |
|     |                                 )                            |
|  8  |         Alleged Debtor.         )                            |
|     |                                 )                            |
|  9  | ------------------------------ )                             |

```
                  1    IN THE UNITED STATES BANKRUPTCY COURT
                         NORTHERN DISTRICT OF TEXAS (DALLAS)
                  2
                  3    In Re:                         ) Case No. 18-30264-Sgj7
                                                      ) Dallas, Texas
                  4    ACIS CAPITAL MANAGEMENT, L.P., )
                                                      )
                  5           Alleged Debtor.         ) March 23, 2018
                                                      ) 9:36 a.m.
                  6    ------------------------------ )
                  7    ACIS CAPITAL MANAGEMENT GP, LLC, ) Case No. 18-30265-sgj7
                                                      )
                  8           Alleged Debtor.         )
                                                      )
                  9    ------------------------------ )

                 10              TRANSCRIPT OF HEARING ON:

                 11          AS TO CASE NO. 18-30264-sgj7:
                      [#80] EMERGENCY MOTION TO INTERVENE IN PROCEEDINGS CONTESTING
                 12   INVOLUNTARY PETITIONS FILED BY CLO HOLDCO, LTD., HIGHLAND CLO
                                FUNDING, LTD., NEUTRA, LTD.;

                 13      [#81] MOTION FOR EXPEDITED HEARING (RELATED DOCUMENTS #80
                      MOTION TO INTERVENE) FILED BY CREDITOR HIGHLAND CLO FUNDING,
                 14   LTD., CREDITOR CLO HOLDCO, LTD., CREDITOR NEUTRA, LTD.) FILED
                            BY PETITIONING CREDITOR JOSHUA TERRY
                 15
                      [#87] OBJECTION TO (RELATED DOCUMENT(S): #80 EMERGENCY MOTION
                 16   TO INTERVENE IN PROCEEDINGS CONTESTING INVOLUNTARY PETITIONS
                       FILED BY CREDITOR HIGHLAND CLO FUNDING, LTD., CREDITOR CLO
                 17   HOLDCO, LTD., CREDITOR NEUTRA, LTD., #81 MOTION FOR EXPEDITED
                      HEARING (RELATED DOCUMENTS, #80 MOTION TO INTERVENE) FILED BY
                 18    CREDITOR HIGHLAND CLO FUNDING, LTD., CREDITOR CLO HOLDCO,
                      LTD., CREDITOR NEUTRA, LTD.) FILED BY PETITIONING CREDITOR
                 19                      JOSHUA TERRY

                 20
                      (cont'd. next page)
                 21

                 22

                 23

                 24

                 25
```

```
 1                      AS TO CASE NO. 18-30265-sgj7:
        [#77] EMERGENCY MOTION TO INTERVENE IN PROCEEDINGS CONTESTING
 2   INVOLUNTARY PETITIONS FILED BY CLO FUNDING, LTD., HIGHLAND CLO
                       FUNDING, LTD., NEUTRA, LTD.;
 3
        [#78] MOTION FOR EXPEDITED HEARING (RELATED DOCUMENTS #77
 4    MOTION TO INTERVENE) FILED BY CLO FUNDING, LTD., HIGHLAND CLO
                       FUNDING, LTD., NEUTRA, LTD.;
 5
      [#83] OBJECTION TO (RELATED DOCUMENT(S): #77 EMERGENCY MOTION
 6    TO INTERVENE IN PROCEEDINGS CONTESTING INVOLUNTARY PETITIONS
     FILED BY CREDITOR NEUTRA, LTD., CREDITOR HIGHLAND CLO FUNDING,
 7     LTD., CREDITOR CLO FUNDING, LTD., #78 MOTION FOR EXPEDITED
      HEARING (RELATED DOCUMENTS #77 MOTION TO INTERVENE) FILED BY
 8     CREDITOR NEUTRA, LTD., CREDITOR HIGHLAND CLO FUNDING, LTD.,
        CREDITOR CLO FUNDING, LTD.) FILED BY PETITIONING CREDITOR
 9                           JOSHUA TERRY

10              BEFORE THE HONORABLE STACEY G. JERNIGAN

11                 UNITED STATES BANKRUPTCY COURT

12

13

14

15

16

17

18

19

20

21   Transcription Services:             eScribers, LLC
                                          7227 North 16th Street
22                                        Suite #207
                                          Phoenix, AZ 85020
23                                        (973) 406-2250

24   PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING.

25   TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE
```

```
 1  APPEARANCES:

 2  For the Debtor:              MICHAEL D. WARNER, ESQ.
                                 Cole Schotz P.C.
 3                               1700 City Center Tower II
                                 301 Commerce Street
 4                               Suite 1700
                                 Fort Worth, TX 76102
 5
                                 WARREN A. USATINE, EQ.
 6                               Cole Schotz P.C.
                                 25 Main Street
 7                               Hackensack, NJ 07601

 8                               GARY CRUCIANI, ESQ.
                                 MICHAEL P. FRITZ, ESQ.
 9                               McKool Smith
                                 300 Crescent Court
10                               Suite 1500
                                 Dallas, TX 75201
11
    For Joshua N. Terry,         RAKHEE V. PATEL, ESQ.
12  Petitioning Creditor:        ANNMARIE CHIARELLO, ESQ.
                                 Winstead PC
13                               2728 N. Harwood Street
                                 Suite 500
14                               Dallas, TX 75201

15                               BRIAN P. SHAW, ESQ.
                                 Clouse Dunn LLP
16                               1201 Elm Street
                                 Suite 5200
17                               Dallas, TX 75270

18  For Highland CLO Funding,    SCOTT RICHARD LARSON, ESQ.
    Ltd., CLO Holdco, Ltd., and  Bell Nunnally & Martin LLP
19  Neutra Ltd.:                 3232 McKinney
                                 Suite 1400
20                               Dallas, TX 75204

21

22

23

24

25
```

James Dondero - Direct                            142

1    November 3, 2017.  And you'll see at the beginning paragraph
2    the parties are Acis, Highland, and then an entity called
3    Highland CLO Management, Ltd. with a acronym "HCLOM".  Do you
4    know the function or purpose of HCLOM?
5    A.    Not -- not specifically.
6    Q.    And there are a lot of acronyms here, so let me maybe
7    help you out on this one if I may.  I believe this was the
8    entity designed to be the successor portfolio manager to Acis.
9    Does that perhaps refresh your memory on it?
10        (Sneeze)
11   A.    Bless you.  Yes, okay.
12   Q.    Okay, and let's go back to the signature page here.  And
13   there's your signature on behalf of Highland and on behalf of
14   Acis.  And then there's actually another signature here on
15   behalf of Highland CLO Management, Ltd.  I'm not sure if you
16   can make out that signature or not.  Do you know who's
17   actually signing that? Can you tell?
18   A.    No.  I imagine it's one of the board members of that
19   entity.
20   Q.    And why is it that this Cayman entity has a -- is a -- is
21   signing this agreement; do you know?
22   A.    I believe -- I would -- I'm guessing it's a -- a
23   requisite for a Cayman Island entity to have approval of the
24   board member -- or a board member.
25   Q.    Okay, and I see this is on behalf of the director, this

1  signature you see there at the bottom?

2  A.    Yes.

3  Q.    All right, now, this timing wise was entered about two

4  weeks after the arbitration award.  So first question is did

5  you have any role in negotiating Exhibit 16?

6  A.    No.

7  Q.    What role, if any, did you play in connection with

8  Exhibit 16?

9  A.    Just final approval.

10 Q.    Do you know -- do you have any understanding about what

11 group of people would have been responsible for putting

12 together the document -- for putting together the document?

13 A.    Sure.  Yeah, I mean, the general context is we'd been

14 negotiating for months with a large institutional investor out

15 of Boston to come in for approximately fifty percent of the

16 ALF.  And the investor came into fifty percent of the ALF

17 based on a schedule of refining -- refining and redoing of the

18 various different Acis transactions.

19     The refi -- the refining the whole operation of the ALF

20 post the investor coming in from Boston was all dependent upon

21 getting as far away from Acis and a new collateral manager as

22 possible.  And so this was part of that as far as I

23 understand.

24 Q.    To your understanding, was that institutional investor

25 willing to invest if Acis remained as collateral manager?

1   A.   No, the way it was described to me, which I believe and

2   have no reason to disbelieve even at this point, is no

3   investor or no underwriter wanted to have any legacy or

4   reputational exposure to Acis, period.

5   Q.   And again, this is sort of coming full circle.  Highland

6   had this problem '08, '09 period and now it's Acis having this

7   brand period.

8   A.   Yeah, I would describe it as different.  I mean, Highland

9   back in the day was performance related to real estate.  You

10   know, the Acis problem is terrorism around a former employee

11   trying to reputationally tarnish in the press as much as

12   possible a brand.

13   Q.   Okay.  Let's look at a couple of the whereas clauses here

14   if we may, on the first page.  The third whereas clause says,

15   "Highland has notified Acis that Highland is unwilling to

16   continue to provide support personnel and other critical

17   services to Acis with respect to the CLOs."  Did Highland have

18   that right to do that?

19   A.   Yes.

20   Q.   And why was that Highland's position?

21   A.   It -- it's under no obli -- it's under no obligation.  As

22   a matter of fact, the -- the only reason why it was at this

23   point was to just facilitate the refinancings, you know, but

24   it -- but it's under no obligation to provide services to a

25   shell.

**<u>EXHIBIT M</u>**

Rakhee V. Patel – State Bar No. 00797213
Phillip Lamberson – State Bar No. 00794134
Joe Wielebinski – State Bar No. 21432400
Annmarie Chiarello – State Bar No. 24097496
**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
Telephone: (214) 745-5400
Facsimile: (214) 745-5390
rpatel@winstead.com
plamberson@winstead.com
jwielebinski@winstead.com
achiarello@winstead.com

**SPECIAL COUNSEL FOR
ROBIN PHELAN, CHAPTER 11 TRUSTEE**

Jeff P. Prostok – State Bar No. 16352500
J. Robert Forshey – State Bar No. 07264200
Suzanne K. Rosen – State Bar No. 00798518
Matthias Kleinsasser – State Bar No. 24071357
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mkleinsasser@forsheyprostok.com

**COUNSEL FOR
THE CHAPTER 11 TRUSTEE**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | **CHAPTER 11 CASES** |
| | § | |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | **Case No. No. 18-30264-SGJ-11)** |
| **ACIS CAPITAL MANAGEMENT GP, LLC,** | § | **(Jointly Administered)** |
| | § | |
| | § | **Expedited Hearing Requested** |
| **DEBTORS.** | § | |

## MOTION FOR 2004 EXAMINATION OF INVESTOR IN HIGHLAND CLO FUNDING, LTD. AND CERTAIN AFFILIATES THEREOF

**TO THE HONORABLE STACEY G.C. JERNIGAN, UNITED STATES BANKRUPTCY JUDGE:**

Robin Phelan (the "Trustee"), the Chapter 11 Trustee of Acis Capital Management, L.P. ("Acis LP") and Acis Capital Management GP, LLC ("Acis GP," together with Acis LP, the "Debtors" or "Acis"), the Debtors in the above-styled and numbered bankruptcy cases (the "Cases"), files this *Motion for 2004 Examination of Investor in Highland CLO Funding, Ltd. and Certain Affiliates Thereof* (the "2004 Motion"), and respectfully states the following:

---

## BACKGROUND

1.     Acis LP is portfolio manager for certain collateralized loan obligations ("CLOs") including: (i) Acis CLO 2013-1 LTD. ("CLO-1"), (ii) Acis CLO 2014-3 ("CLO-3"), (iii) Acis CLO 2014-4 LTD. ("CLO-4"), (iv) Acis CLO 2014-5 LTD. ("CLO-5"), and (v) Acis CLO 2015-6 LTD. ("CLO-6"). CLO-1, CLO-3, CLO-4, CLO-5, and CLO-6 are collectively referred to herein as the "Acis CLOs."

2.     Acis LP manages the Acis CLOs through: (i) that certain Portfolio Management Agreement by and between Acis LP and CLO-1, dated March 18, 2013 (the "CLO-1 PMA"); (ii) that certain Portfolio Management Agreement by and between Acis LP and CLO-3, dated February 25, 2014 (the "CLO-3 PMA"); (iii) that certain Portfolio Management Agreement by and between Acis LP and CLO-4, dated June 5, 2014 (the "CLO-4 PMA"); (iv) that certain Portfolio Management Agreement by and between Acis LP and CLO-5, dated November 18, 2014 (the "CLO-5 PMA"); and that certain Portfolio Management Agreement by and between Acis LP and CLO-6, dated April 16, 2015 (the "CLO-6 PMA"). The CLO-1 PMA, CLO-3 PMA, CLO-4 PMA, CLO-5 PMA, and CLO-6 PMA are collectively referred to herein as the "PMAs." Acis LP generates revenue primarily through the management of the Acis CLOs via the PMAs.[1]

3.     Highland CLO Funding, Ltd. ("HCLOF"), formerly known as Acis Loan Funding ("ALF"), is the holder of either all or the majority of the subordinated notes in each of the Acis CLOs, except for CLO-1, in which it possesses a blocking position.

4.     HCLOF has taken many positions throughout the course of this case that appear to be economically irrational, contrary to the best interests of HCLOF and its investors, and

---

[1] *See Findings of Fact and Conclusions of Law in Support of Orders for Relief Issued After Trial on Involuntary Bankruptcy Petition* [Case No. 18-30264, Docket No. 118 & Case No. 18-30265, Docket No. 113] (the "Opinion") at page 13.

instead designed to ensure the destruction of the Acis CLOs so that creditors of Acis, and Joshua Terry in particular, receive nothing or as little as possible from the Acis bankruptcy estate. Recently,[2] William Scott, the director of HCLOF, testified that he wants to "reset" the Acis CLOs to bring them in line with current market interest rates and that the inability to do the reset is causing damage to HCLOF in the amount of approximately $295,000 per week.[3] Likewise, J.P. Sevilla, in-house counsel for Highland Capital Management, LP ("HCM," and together with its affiliates, including HCLOF, the "Highlands"), recently swore in an affidavit filed in Guernsey that a reset transaction, which involves changing the interest rate, reinvestment terms and non-call period in the Acis CLOs, would be extremely beneficial to HCLOF because it would "create greater cash at the end of the payment waterfall for the holder of the sub-notes," and was cheaper and easier to accomplish that creating a new CLO or doing a refinancing transaction because the existing collateral pool stays the same, a new issuer is not required, and the legal expenses are much lower.[4] Mark Okada, a principal and 25% owner of HCM, testified that not doing a reset was "a bad thing" and that "we don't want that."[5] Finally, counsel for Acis (while it was receiving shared services and sub-advisory services from HCM) likewise concurred that it "makes no sense" for an equity investor to just sit back and watch its dividend diminish without requesting a reset transaction.[6]

5.     To address HCLOF's request, the Trustee's Second Amended Joint Plan (the "Plan") [Docket No. 612] provides for such a reset to be performed by the Reorganized Acis and

---

[2] As the Court will recall, HCLOF previously requested a liquidation of the Acis CLOs after the entry of the order for relief, which the Court enjoined, but then vigorously contested the Trustee's original plan which would have resulted in HCLOF receiving mid-NAV plus 25 basis points, an amount well in excess of the liquidation value of the subordinated notes.

[3] Transcript, July 6, 2018, p. 136.

[4] Affidavit of J.P. Sevilla, p. 6.

[5] See Transcript, Involuntary Trial, March 23, 2018 at pp. 38-39.

[6] See Transcript, Involuntary Trial, February 21, 2018, pp 74-75.

---

**MOTION FOR 2004 EXAMINATION**                                                    **Page 3 of 11**

its sub-advisor, Brigade Capital Management, LP ("Brigade"). Although Mr. Scott, Mr. Sevilla, and all of the experts in this case have testified that pursuing a reset transaction would make the Acis CLOs more profitable to HCLOF, HCLOF has indicated that it will not reset the Acis CLOs with the Reorganized Acis and Brigade under the Plan. Instead, despite the substantial potential losses to HCLOF and its investors, it appears that HCLOF will wind-down the Acis CLOs by declining to reset them prior to the expiration of their respective reinvestment periods which, at least for Acis CLO-3, will expire in a few short months, on February 1, 2019.

6. Such a decision by HCLOF would "make no sense" and be contrary to its own best interests. Although HCLOF/ALF was at one time wholly-owned by an affiliate of Highland, it did an offering memorandum in November 2017 and, as a result, is now owned 49.985% by certain affiliates of a large investor and manager of private equity funds ("Investor"),[7] and 50.015% by affiliates (49.0153%) and employees (0.9997%) of Highland. Despite its large ownership percentage in HCLOF and the alleged millions in losses that will result if the Acis CLOs are not reset to make them consistent with prevailing market conditions, the Investor has not yet appeared in this case or taken any position in this bankruptcy case. Further, the Trustee does not have any information as to whether the Investor would be amenable to pursuing a reset with Reorganized Acis and Brigade following confirmation of the Plan. Because time is short if CLO-3 is to be reset before the end of its reinvestment period, the Trustee needs to obtain information from the Investor immediately.

7. During the involuntary trial, a number of representations were made to the Court by counsel for Acis (while HCM was its shared services provider and sub-advisor) that the Investor only invested in HCLOF on the condition that Acis would not have anything to do with

---

[7] Although the identity of the Investor and the amount of its investment in HCLOF has previously been disclosed on the record in this case, the Trustee is taking an ultra-conservative approach in this Motion because certain of the documents reflecting the identity of the Investor in HCLOF were marked as "confidential" in discovery.

the Acis CLOs going forward, and that the Investor would demand its money back if a reset transaction was done with Acis.[8] Likewise, Scott Ellington, general counsel for HCM, testified that the new equity holders (Investor) said, with absolute certainty, that they had no interest in doing business with Acis because the Acis brand was purportedly toxic and, consequently, nothing associated with Acis could be managed or marketed as a CLO.[9] Mr. Ellington also testified that, because it would be putting in additional capital in connection with any reset CLOs, the Investor had the ability to "start calling the shots" and dictate the terms of any reset transactions.[10] Finally, Mr. Okada testified that a reset transaction could not be performed by Acis because the market would not accept Acis as a portfolio manager and Acis was no longer risk-retention compliant.[11]

8.      However, circumstances have changed dramatically in the six months since the conclusion of the involuntary trial, and the harbingers of doom predicted by the Highlands have not come to fruition. For example, the Court found that the Highlands' self-serving allegations regarding the Acis brand being toxic were not credible or convincing because Acis CLO 2017-7, Ltd. closed in April 2017 with Acis as the portfolio manager.[12] Further, the operations of Acis LP have stabilized in bankruptcy and Acis LP, with the assistance of Brigade, has not only continued to perform its duties under the PMAs, but improved the condition of the CLOs through the acquisition of additional loans. In addition, although the Highlands took actions that rendered Acis non-complaint with certain risk-retention requirements,[13] such requirements were

---

[8] See Transcript, Involuntary Trial, February 6, 2018 at p. 46.

[9] See Transcript, Involuntary Trial, February 7, 2018 at pp. 56-57.

[10] See Transcript, Involuntary Trial, February 7, 2018 at p. 226.

[11] See Transcript, Involuntary Trial, March 23, 2018 at p. 53.

[12] See Findings of Fact and Conclusions of Law, Docket No. 118, at p. 18.

[13] Id.

---

determined to be inapplicable to CLO managers and such decision was not appealed by regulators to the Supreme Court.[14] As a result, there are neither reputational issues nor any other impediments to the ability of the Reorganized Acis, with the assistance of Brigade, to both perform the resets and continue to serve as the portfolio manager of any reset Acis CLOs. Finally, Brigade has explored the market and believes that the Reorganized Acis and Brigade will be able to reset the Acis CLOs on terms that improve the economics of the Acis CLOs if a reset is requested by HCLOF in a timely fashion.

9.       The Trustee needs information from the Investor regarding whether its purported refusal to doing a reset with Acis was based on the erroneous assumptions articulated during the involuntary trial that Acis would not be able to perform the resets due to risk-retention issues, unsubstantiated reputational issues, or an alleged inability to accomplish the resets without the assistance of the Highlands. None of these purported concerns exist to impair the ability of the Reorganized Acis and Brigade to perform a reset. Further, although these matters were alleged by the Highlands, no one from the Investor ever testified during the involuntary trial. As a result, the Trustee needs to examine the Investor to determine whether the Investor ever actually had such concerns regarding proceeding with Acis. The Trustee also needs information regarding whether the Investor presently has any concerns about pursuing reset transactions with the Reorganized Acis and Brigade under the Plan now that Acis has been able to successfully serve as the portfolio manager for the Acis CLOs on a post-petition basis and there are no impediments to the ability of the Reorganized Acis and Brigade to pursue a reset on the Acis CLOs. This is particularly necessary given Mr. Ellington's previous sworn testimony that the Investor is the party calling the shots for HCLOF with respect to any reset transactions. Time is also of the essence as the reinvestment period for Acis CLO-3 will expire on February 1, 2019.

---

[14] *Loan Syndications & Trading Ass'n v. SEC*, 882 F.3d 220, 229 (D.C. Cir. 2018).

10.     Finally, although the Highlands have represented to the Court that the Investor is an unrelated and independent third party, a decision by an unrelated and independent third party to refuse the opportunity to reset the Acis CLOs with the Reorganized Acis and Brigade "makes no sense" and would appear to be economically irrational given that Brigade has at least as good of a track record (if not a better track record) than does Highland in relation to its CLO business. As a result, the Trustee seeks information regarding the relationship, if any, between the Investor and the Highlands.

## **RELIEF SOUGHT AND GROUNDS THEREFOR**

11.     The Trustee requests entry of an Order, pursuant to Section 105(a) of the Bankruptcy Code and Rule 2004, authorizing and directing (i) the production of documents by the Investor in response to the document requests attached as **Exhibit A**; and (ii) testimony by one or more corporate representatives of the Investor through depositions, including testimony relating to the matters set forth in **Exhibit B** attached hereto. A copy of the Trustee's proposed order granting the relief requested herein is attached as **Exhibit C** hereto.[15]

12.     The Rule 2004 information requested in this 2004 Motion will provide Debtor with information it needs to understand (i) the Investor's intentions at the time it invested in HCLOF, (ii) the Investor's position regarding doing the reset transactions with Acis prior to the entry of the order for relief on April 13, 2018, (iii) the Investor's current position regarding whether HCLOF should do a reset with the Reorganized Acis and Brigade, (iv) whether and to what extent the Investor is "calling the shots" for HCLOF, and (v) the relationship, if any, between the Investor and the Highlands.

---

[15] Again, out of an abundance of caution, the identity of the Investor is not disclosed in the proposed order. At the hearing on the Motion, the Trustee will ask the Court to determine whether any order on the Motion should either identify the Investor, identify but redact the name of the Investor, or be entered under seal.

13.     Bankruptcy Rule 2004 allows a party in interest, including the Trustee, to examine any entity regarding matters that may affect the administration of the Debtors' estate. *See, e.g., In re Summit Corp.*, 891 F. 2d 1, 5 (1st Cir. 1989). Bankruptcy Rule 2004 also allows the Court to order parties-in-interest to produce documents. *See In re Correra*, No. 16-30728-SGJ-7, 2018 Bankr. LEXIS 2498, *14 (Bankr. N.D. Tex. 2018).

14.     It is well settled that a Rule 2004 examination is broad in scope. *See, e.g*., *In re Washington Mutual, Inc*., 408 B.R. 45, 49 (Bankr. D. Del. 2009) ("[t]he scope of a Rule 2004 examination is unfettered and broad.") (internal quotation marks omitted). "Third parties are subject to examination pursuant to Rule 2004 if they have knowledge of the debtor's affairs." *Correra*, 2018 Bankr. LEXIS 2498 at *60 (citing *In re GHR Energy Corp*., 33 B.R. 451, 453-54 (Bankr. D. Mass. 1983)). "Courts tend to be reluctant to allow 'escape from a Rule 2004 examination unless the party can show that the examination' would be 'oppressive or burdensome.'" *Id*. at *60 (citing 9 Collier On Bankruptcy ¶ 2004.01[8] (Richard Levin et al. eds. 16th ed.)).

15.     The Trustee does not propose to use the examination for any improper purpose, such as to annoy, embarrass or oppress the party being examined. *See In re Drexel Burnham Lambert Group, Inc*., 123 B.R. 702, 712 (Bankr. S.D.N.Y. 1991).

16.     The requested information in **Exhibit A**, and the deposition topics reflected on the attached **Exhibit B**, relates to, among other things, the Investor's intentions at the time it invested in HCLOF, the Investor's prior position regarding pursuing a reset of the Acis CLOs with Acis as the portfolio manager, the Investor's current position regarding pursuing a reset transaction with the Reorganized Acis and Brigade under the Plan, whether the Investor is actually calling the shots for HCLOF, and the relationship between the Investor and the

---

Highlands.  The requested information is within the scope of Bankruptcy Rule 2004 because it relates to the Plan and the administration of this bankruptcy case.

**WHEREFORE, PREMISES CONSIDERED**, the Trustee respectfully requests that the Court:  (i) grant the 2004 Motion; (ii) enter the proposed order attached hereto as **Exhibit C**, (iii) order the requested examination under oath of one or more corporate representatives of the Investor under Federal Rule of Bankruptcy Procedure 2004; (iv) order Investor, within thirty (30) days of entry of an order approving the 2004 Motion, to produce the records requested in **Exhibit A;** (v) order the attorneys for the Trustee be authorized to execute and serve any and all subpoenas that are necessary for the requested production of documents; and (vi) grant the Trustee such further relief, whether in law or in equity, to which he may be justly entitled.

**DATED:  OCTOBER 10, 2018**

Respectfully submitted,

By: */s/Jeff P. Prostok*
Jeff P. Prostok
State Bar No. 16352500
J. Robert Forshey
State Bar No. 07264200
Suzanne K. Rosen
State Bar No. 00798518
Matthias Kleinsasser
State Bar No. 24071357
**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mkleinsasser@forsheyprostok.com
**COUNSEL FOR THE CHAPTER 11 TRUSTEE**

-and-

**WINSTEAD PC**
500 Winstead Building

2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5400 (Phone)
(214) 745-5390 (Facsimile)
Rakhee V. Patel
State Bar No. 00797213
rpatel@winstead.com
Phillip Lamberson
State Bar No. 00794134
plamberson@winstead.com
Joe Wielebinski
State Bar No. 21432400
jwielebinski@winstead.com
Annmarie Chiarello
State Bar No. 24097496
achiarello@winstead.com
**SPECIAL COUNSEL FOR ROBIN
PHELAN, CHAPTER 11 TRUSTEE**

## CERTIFICATE OF CONFERENCE

Pursuant to Local Bankruptcy Rule 2004-1(a), I hereby certify that the undersigned counsel for the Trustee has conferred with Craig A. Bruens, counsel for the Investor, regarding the relief requested by the 2004 Motion. A conference was held and no agreement regarding the date, time, and place of examination could be reach and the 2004 Motion is presented to the Bankruptcy Court for determination.


*/s/ Jeff P. Prostok*
Jeff P. Prostok

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 10, 2018, notice of this document will be (i) electronically mailed to the parties that are registered or otherwise entitled to receive electronic notices in this case pursuant to the Electronic Court Filing (ECF) Procedures in this District, (ii) emailed and mailed to counsel for the Investor at the address below, and (iii) served by first class U.S. mail, postage prepaid, on any parties on the attached Service List that do not receive the Court's ECF notifications.

Craig A. Bruens
Debevoise & Plimpton LLP
801 Pennsylvania Avenue N.W.
Washington, D.C. 20004
cabruens@debevoise.com

*/s/ Suzanne K. Rosen*
Suzanne K. Rosen

# EXHIBIT A

## DOCUMENTS TO BE PRODUCED BY INVESTOR

## TRUSTEE'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS

## I. DEFINITIONS

1.        "<u>Document</u>" or "<u>Documents</u>" is defined broadly to include: (a) all originals and all non-identical copies of all written, typed, printed, or recorded matter of any kind, as well as all attachments, addenda, and appendices thereto, of any nature or description whatsoever, wherever located, and in whatever form or condition, including, without limitation, all letters, correspondence, e-mails, facsimiles, telegrams, telexes, memoranda, notes, marginal notations, summaries or other records of personal or telephonic conversations, summaries or other records of meetings or conferences, summaries or other records of negotiations or discussions of any kind, diaries, diary entries, calendars, appointment books, time records, visitor records, work records, telephone bills and records, expense records, travel and entertainment records, inspections, estimates, reports, offers, counter-offers, proposals, counter-proposals, drafts, revisions, rejections, acceptances, repudiations, agreements, contracts, understandings, articles of incorporation and all amendments thereto, by-laws and all amendments thereto, notices, waivers, consents, proxies, minutes, motions, votes, resolutions, orders, directives, policy statements, organization charts, partnership agreements and all amendments thereto, partnership certificates and all amendments thereto, stock or share certificates, transfer books or ledgers, voting lists, progress reports, completion agreements, purchase orders, invoices, financial records, financial statements, balance sheets, income statements, financial summaries, journals, journal entries, ledgers, ledger entries, worksheets, work papers, accounting records, bank records, bank statements, canceled checks, check stubs, checkbooks, deposit receipts, employee records, payroll records, drafts, promissory notes, letters of credit, bills of lading, bills of sale, cash receipts, revolving credit agreements, deeds, deeds of trust, security agreements, mortgages, liens, guaranty agreements, UCC filings, insurance agreements or policies, reports, opinions, evaluations, appraisals, feasibility studies, analyses, recommendations, bills, invoices, fee statements, books, articles, magazines, circulars, trade letters, press clippings, surveys, statistical data, punch cards, programs, and all drafts, alterations, modifications, changes, and amendments of any of the foregoing; (b) graphic or aural records or representations of any kind including, without limitation, graphs, maps, charts, pamphlets, speeches, transcripts, transcripts of hearings, transcripts of testimony, microfilm, microfiche, voice recordings, video recordings, tape or disc recordings, film, photographs, electronic recordings, and any other data compilations from which information can be obtained or translated; and, (c) electronic, mechanical or electric records or representations of any kind, including, without limitation, e-mails, tapes, cassettes, disks, discs, recordings, and all transcriptions, in whole or in part, of any of the foregoing.

For purposes of electronically stored information ("<u>ESI</u>"), "<u>Document</u>" also includes but is not limited to any electronically stored data on magnetic or optical storage media as an "active" file or files (readily accessible by one or more computer applications or forensics software); and "deleted" but recoverable electronic files on such media; any electronic file fragments (files that have been deleted and partially overwritten with new data); and slack (data fragments stored randomly from random access memory on a hard drive during normal operations of a computer [RAM slack] or residual data left on the hard drive after new data has been overwritten some but not all of previously stored data).

**TRUSTEE'S REQUESTS FOR PRODUCTION OF DOCUMENTS**

2.      "<u>Person</u>" as used herein shall mean and include any natural person, governmental agency, corporate entity, proprietorship, partnership, corporation, board, committee, or any other form of organization, association, or legal entity of any type, whether public or private.

3.      "<u>Identify</u>" means, when referring to a document, to give to the extent known, the following information:

(a) the type of document;
(b) the general subject matter of the document;
(c) the date of the document;
(d) the authors, addressees, and recipients of the document;
(e) the location of the document;
(f) the identity of the person who has custody of the document; and
(g) whether the document has been destroyed, and if so
(i)  the date of its destruction,
(j)  the reason for its destruction, and
(k) the identity of the person who destroyed it.

4.      "<u>Identify</u>" means, when referring to a person, to give to the extent known, the person's full name, present or last known address, telephone number, and, when referring to a natural person, the present or last known place of employment.  Once a person has been identified in compliance with this paragraph, only the name of that person needs to be listed in response to later discovery requesting the identification of that person.

5.      "<u>Identify</u>" means, as applied to a location or place, the full street address, including the city, state and zip code or postal code of the location, as well as the person whose place of business is located there or who uses or occupies such location.

6.      "<u>Identify</u>" means, as applied to a Communication, the identity of the Person or Persons making the Communication, and the identity of the Person or Persons who was the recipient of the Communication, as well as the subject matter and contents of the Communication.

7.      "<u>Communication</u>" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise), and includes without limitation, any document, email, electronic transmission, oral statement, meeting or conference, formal or informal, at any time or place, and under any circumstances whatsoever, whereby information of any kind was transmitted, received, or stored in any matter whatsoever.

8.      "<u>Pertaining to</u>" is defined as relating to, referring to, relevant to, constituting, depicting, showing, describing, identifying, indicating, summarizing, analyzing, explaining, evaluating, appraising, justifying, supporting, contradicting, establishing, refuting, tending to establish the truth or falsity of or tending to establish the existence or non-existence of.

9.      The use of the singular form of any word includes the plural and vice versa.

**TRUSTEE'S REQUESTS FOR PRODUCTION OF DOCUMENTS**

10.     The following terms shall have the meaning set forth below:

(i)      "<u>Acis CLOs</u>" refers to CLO-1, CLO-3, CLO-4, CLO-5, and CLO-6.

(ii)     "<u>Acis GP</u>" refers to Acis Capital Management GP, LLC;

(iii)    "<u>Acis LP</u>" refers to Acis Capital Management, L.P.;

(iv)     "<u>Acis PMAs</u>" refers to the CLO-1 PMA, CLO-3 PMA, CLO-4 PMA, CLO-5 PMA, and CLO-6 PMA;

(v)      "<u>Affiliates</u>" has the meaning ascribed to such term in section 101(2) of the Bankruptcy Code;

(vi)     "<u>Bankruptcy Court</u>" refers to the United States Bankruptcy Court for the Northern District of Texas, Dallas Division;

(vii)    "<u>Bankruptcy Cases</u>" refers to the Debtors' chapter 11 bankruptcy cases, which are being jointly-administered under Case No. 18-30264-sgj-11;

(viii)   "<u>Bankruptcy Code</u>" refers to the United States Bankruptcy Code, 11 U.S.C. § 101, et seq.;

(ix)     "<u>Brigade</u>" refers to Brigade Capital Management, L.P.;

(x)      "<u>CLO-1</u>" refers to Acis CLO 2013-1 Ltd.;

(xi)     "<u>CLO-1 PMA</u>" refers to that certain Portfolio Management Agreement by and between Acis LP and CLO-1, dated March 18, 2013;

(xii)    "<u>CLO-3</u>" refers to Acis CLO 2014-3 Ltd.;"

(xiii)   "<u>CLO-3 PMA</u>" refers to that certain Portfolio Management Agreement by and between Acis LP and CLO-3, dated February 25, 2014;

(xiv)    "<u>CLO-4</u>" refers to Acis CLO 2014-4 Ltd.;

(xv)     "<u>CLO-4 PMA</u>" refers to that certain Portfolio Management Agreement by and between Acis LP and CLO-4, dated June 5, 2014;

(xvi)    "<u>CLO-5</u>" refers to Acis CLO 2014-5 Ltd.;

(xvii)   "<u>CLO-5 PMA</u>" refers to that certain Portfolio Management Agreement by and between Acis LP and CLO-5, dated November 18, 2014;

(xviii)  "<u>CLO-6</u>" refers to Acis CLO 2015-6 Ltd.;

(xix)    "<u>CLO-6 PMA</u>" refers to that certain Portfolio Management Agreement by and between Acis LP and CLO-6, dated April 16, 2015;

**TRUSTEE'S REQUESTS FOR PRODUCTION OF DOCUMENTS**

(xx)  "Debtors" refer individually or collectively to Acis LP and Acis GP;

(xxi)  "HCLOF" refers to Highland CLO Funding, Ltd.;

(xxii)  "HCM" refers to Highland Capital Management, L.P.;

(xxiii)  "Highlands" refers to HCM, HCLOF, and any Affiliates of HCM or HCLOF;

(xxiv)  "Investor," "You," or "Your" refers to the Investor, its Affiliates, and any successors in interest thereto;

(xxv)  "Petition Date" refers to the date of the filing of the involuntary Chapter 11 petitions against the Debtors on January 30, 2018;

(xxvi)  "Plan" refers to any plan proposed by the Trustee in the Bankruptcy Cases;

(xxvii)  "PMAs" refers to the CLO-1 PMA, CLO-3 PMA, CLO-4 PMA, CLO-5 PMA, and CLO-6 PMA;

(xxviii)  "Reorganized Acis" refers collectively to the reorganized Acis LP and Acis GP following the effective date of the Trustee's Plan; and

(xxix)  "Trustee" refers to Robin Phelan, the Chapter 11 Trustee for the Debtors.

## II. INSTRUCTIONS

1.  Unless otherwise indicated, the use herein of the name of a party, business organization, entity or other person shall specifically include all employees, agents, representatives, members, officers, directors, partners, parent, subsidiaries, affiliates, and attorneys of the party, business organization, entity or other person.

2.  In accordance with Rule 34 of the Federal Rules of Civil Procedure, as made applicable by Rule 7034, you are required to produce all responsive documents and tangible things within your possession, custody and control within such time as may be specified in Rule 34, agreed to by the parties or as may be fixed by the Bankruptcy Court.  Possession, custody and control include constructive possession, and include all responsive documents in the possession or control of your employees, agents, attorneys or representatives.  You need not have actual physical possession of such documents or tangible things.  So long as you have a superior right to compel production from a third party (including any employee, agent, attorney or representative), you have possession, custody or control of the documents and tangible things.

2.  With regard to the production of ESI, pursuant to Rule 34(E) of the Federal Rules of Civil Procedure, the Debtor requests that all ESI be produced in the form in which it is ordinarily maintained (native format) with all original metadata intact.

**TRUSTEE'S REQUESTS FOR PRODUCTION OF DOCUMENTS**

3.      In accordance with Rule 26(e) of the Federal Rules of Civil Procedure, these requests are continuing in nature.  If you obtain information upon the basis of which you know that a response was incorrect or incomplete when made, or such that though correct and complete when made, a response is no longer true and complete and the circumstances are such that failure to amend the answer is in substance misleading, then supplementation of your responses is required.

**TRUSTEE'S REQUESTS FOR PRODUCTION OF DOCUMENTS**

## III. REQUESTS FOR PRODUCTION

1.      All documents and communications pertaining to the Investor's decision to invest in HCLOF.

2.      All documents and communications pertaining to the Investor's investment in HCLOF.

3.      All documents and communications pertaining to any reset or proposed reset of one or more of the Acis CLOs.

4.      All documents and communications pertaining to the Debtors.

5.      All documents and communications pertaining to the PMAs.

6.      All documents and communications pertaining to the portfolio manager of the Acis CLOs or any reset Acis CLOs.

7.      All documents and communications pertaining to the Bankruptcy Cases.

8.      All documents and communications pertaining to the Plan.

9.      All documents and communications pertaining to the Reorganized Acis or Brigade.

10.     All documents and communications reflecting the governance or decision-making processes of HCLOF.

11.     All documents and communications pertaining to or reflecting any relationship between the Investor and any of the Highlands.

12.     All documents and communications pertaining to or reflecting any equity ownership by any of the Highlands in the Investor, or by the Investor in any of the Highlands.

**TRUSTEE'S REQUESTS FOR PRODUCTION OF DOCUMENTS**

# EXHIBIT B

## DEPOSITION TOPICS FOR A CORPORATE REPRESENTATIVE OF INVESTOR

# TRUSTEE'S DEPOSITION TOPICS FOR INVESTOR

## I. DEFINITIONS

1.     "Document" or "Documents" is defined broadly to include: (a) all originals and all non-identical copies of all written, typed, printed, or recorded matter of any kind, as well as all attachments, addenda, and appendices thereto, of any nature or description whatsoever, wherever located, and in whatever form or condition, including, without limitation, all letters, correspondence, e-mails, facsimiles, telegrams, telexes, memoranda, notes, marginal notations, summaries or other records of personal or telephonic conversations, summaries or other records of meetings or conferences, summaries or other records of negotiations or discussions of any kind, diaries, diary entries, calendars, appointment books, time records, visitor records, work records, telephone bills and records, expense records, travel and entertainment records, inspections, estimates, reports, offers, counter-offers, proposals, counter-proposals, drafts, revisions, rejections, acceptances, repudiations, agreements, contracts, understandings, articles of incorporation and all amendments thereto, by-laws and all amendments thereto, notices, waivers, consents, proxies, minutes, motions, votes, resolutions, orders, directives, policy statements, organization charts, partnership agreements and all amendments thereto, partnership certificates and all amendments thereto, stock or share certificates, transfer books or ledgers, voting lists, progress reports, completion agreements, purchase orders, invoices, financial records, financial statements, balance sheets, income statements, financial summaries, journals, journal entries, ledgers, ledger entries, worksheets, work papers, accounting records, bank records, bank statements, canceled checks, check stubs, checkbooks, deposit receipts, employee records, payroll records, drafts, promissory notes, letters of credit, bills of lading, bills of sale, cash receipts, revolving credit agreements, deeds, deeds of trust, security agreements, mortgages, liens, guaranty agreements, UCC filings, insurance agreements or policies, reports, opinions, evaluations, appraisals, feasibility studies, analyses, recommendations, bills, invoices, fee statements, books, articles, magazines, circulars, trade letters, press clippings, surveys, statistical data, punch cards, programs, and all drafts, alterations, modifications, changes, and amendments of any of the foregoing; (b) graphic or aural records or representations of any kind including, without limitation, graphs, maps, charts, pamphlets, speeches, transcripts, transcripts of hearings, transcripts of testimony, microfilm, microfiche, voice recordings, video recordings, tape or disc recordings, film, photographs, electronic recordings, and any other data compilations from which information can be obtained or translated; and, (c) electronic, mechanical or electric records or representations of any kind, including, without limitation, e-mails, tapes, cassettes, disks, discs, recordings, and all transcriptions, in whole or in part, of any of the foregoing.

For purposes of electronically stored information ("ESI"), "Document" also includes but is not limited to any electronically stored data on magnetic or optical storage media as an "active" file or files (readily accessible by one or more computer applications or forensics software); and "deleted" but recoverable electronic files on such media; any electronic file fragments (files that have been deleted and partially overwritten with new data); and slack (data fragments stored randomly from random access memory on a hard drive during normal operations of a computer [RAM slack] or residual data left on the hard drive after new data has been overwritten some but not all of previously stored data).

**TRUSTEE'S DEPOSITION TOPICS FOR INVESTOR**

2.      "Person" as used herein shall mean and include any natural person, governmental agency, corporate entity, proprietorship, partnership, corporation, board, committee, or any other form of organization, association, or legal entity of any type, whether public or private.

3.      "Identify" means, when referring to a document, to give to the extent known, the following information:

> (a) the type of document;
> (b) the general subject matter of the document;
> (c) the date of the document;
> (d) the authors, addressees, and recipients of the document;
> (e) the location of the document;
> (f) the identity of the person who has custody of the document; and
> (g) whether the document has been destroyed, and if so
> (i)  the date of its destruction,
> (j)  the reason for its destruction, and
> (k) the identity of the person who destroyed it.

4.      "Identify" means, when referring to a person, to give to the extent known, the person's full name, present or last known address, telephone number, and, when referring to a natural person, the present or last known place of employment.  Once a person has been identified in compliance with this paragraph, only the name of that person needs to be listed in response to later discovery requesting the identification of that person.

5.      "Identify" means, as applied to a location or place, the full street address, including the city, state and zip code or postal code of the location, as well as the person whose place of business is located there or who uses or occupies such location.

6.      "Identify" means, as applied to a Communication, the identity of the Person or Persons making the Communication, and the identity of the Person or Persons who was the recipient of the Communication, as well as the subject matter and contents of the Communication.

7.      "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise), and includes without limitation, any document, email, electronic transmission, oral statement, meeting or conference, formal or informal, at any time or place, and under any circumstances whatsoever, whereby information of any kind was transmitted, received, or stored in any matter whatsoever.

8.      "Pertaining to" is defined as relating to, referring to, relevant to, constituting, depicting, showing, describing, identifying, indicating, summarizing, analyzing, explaining, evaluating, appraising, justifying, supporting, contradicting, establishing, refuting, tending to establish the truth or falsity of or tending to establish the existence or non-existence of.

9.      The use of the singular form of any word includes the plural and vice versa.

**TRUSTEE'S DEPOSITION TOPICS FOR INVESTOR**

10.     The following terms shall have the meaning set forth below:

(i)     "Acis CLOs" refers to CLO-1, CLO-3, CLO-4, CLO-5, and CLO-6.

(ii)     "Acis GP" refers to Acis Capital Management GP, LLC;

(iii)     "Acis LP" refers to Acis Capital Management, L.P.;

(iv)     "Acis PMAs" refers to the CLO-1 PMA, CLO-3 PMA, CLO-4 PMA, CLO-5 PMA, and CLO-6 PMA;

(v)     "Affiliates" has the meaning ascribed to such term in section 101(2) of the Bankruptcy Code;

(vi)     "Bankruptcy Court" refers to the United States Bankruptcy Court for the Northern District of Texas, Dallas Division;

(vii)     "Bankruptcy Cases" refers to the Debtors' chapter 11 bankruptcy cases, which are being jointly-administered under Case No. 18-30264-sgj-11;

(viii)     "Bankruptcy Code" refers to the United States Bankruptcy Code, 11 U.S.C. § 101, et seq.;

(ix)     "Brigade" refers to Brigade Capital Management, L.P.;

(x)     "CLO-1" refers to Acis CLO 2013-1 Ltd.;

(xi)     "CLO-1 PMA" refers to that certain Portfolio Management Agreement by and between Acis LP and CLO-1, dated March 18, 2013;

(xii)     "CLO-3" refers to Acis CLO 2014-3 Ltd.;"

(xiii)     "CLO-3 PMA" refers to that certain Portfolio Management Agreement by and between Acis LP and CLO-3, dated February 25, 2014;

(xiv)     "CLO-4" refers to Acis CLO 2014-4 Ltd.;

(xv)     "CLO-4 PMA" refers to that certain Portfolio Management Agreement by and between Acis LP and CLO-4, dated June 5, 2014;

(xvi)     "CLO-5" refers to Acis CLO 2014-5 Ltd.;

(xvii)     "CLO-5 PMA" refers to that certain Portfolio Management Agreement by and between Acis LP and CLO-5, dated November 18, 2014;

(xviii)     "CLO-6" refers to Acis CLO 2015-6 Ltd.;

(xix)     "CLO-6 PMA" refers to that certain Portfolio Management Agreement by and between Acis LP and CLO-6, dated April 16, 2015;

**TRUSTEE'S DEPOSITION TOPICS FOR INVESTOR**

(xx)        "Debtors" refer individually or collectively to Acis LP and Acis GP;

(xxi)        "HCLOF" refers to Highland CLO Funding, Ltd.;

(xxii)        "HCM" refers to Highland Capital Management, L.P.;

(xxiii)        "Highlands" refers to HCM, HCLOF, and any Affiliates of HCM or HCLOF;

(xxiv)        "Investor," "You," or "Your" refers to Investor, its Affiliates, and any successors in interest thereto;

(xxv)        "Petition Date" refers to the date of the filing of the involuntary Chapter 11 petitions against the Debtors on January 30, 2018;

(xxvi)        "Plan" refers to any plan proposed by the Trustee in the Bankruptcy Cases;

(xxvii)        "PMAs" refers to the CLO-1 PMA, CLO-3 PMA, CLO-4 PMA, CLO-5 PMA, and CLO-6 PMA;

(xxviii)        "Reorganized Acis" refers collectively to the reorganized Acis LP and Acis GP following the effective date of the Trustee's Plan; and

(xxix)        "Trustee" refers to Robin Phelan, the Chapter 11 Trustee for the Debtors.

**TRUSTEE'S DEPOSITION TOPICS FOR INVESTOR**

## III. DEPOSITION TOPICS

1.      The decision of the Investor to invest in HCLOF including, but not limited to, whether its decision to invest in HCLOF was conditioned upon the removal of Acis LP as the portfolio manager for the Acis CLOs.

2.      The position taken by the Investor from 2017 to the present regarding Acis LP's or the Reorganized Acis' role as the portfolio manager for the Acis CLOs or any reset Acis CLOs.

3.      The current position of the Investor pertaining to the reset of one or more of the Acis CLOs by the Reorganized Debtor and Brigade.

4.      The governance and decision-making processes of HCLOF.

5.      The relationship, if any, between Investor and the Highlands.

6.      Any equity ownership by any of the Highlands in the Investor, or by the Investor in any of the Highlands.

**TRUSTEE'S DEPOSITION TOPICS FOR INVESTOR**

# EXHIBIT C

# PROPOSED ORDER

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | **Case No. 18-30264-SGJ-11** |
| | § | **Case No. 18-30265-SGJ-11** |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **ACIS CAPITAL MANAGEMENT GP,** | § | **(Jointly Administered Under Case** |
| **LLC,** | § | **No. 18-30264-SGJ-11)** |
| | § | |
| DEBTORS. | § | **Chapter 11** |

<u>**ORDER GRANTING MOTION FOR 2004 EXAMINATION OF [INVESTOR] AND
CERTAIN AFFILIATES THEREOF**</u>

Upon the Motion for 2004 Examination of [Investor] and Certain Affiliates Thereof (the

"<u>2004 Motion</u>")[1] filed by Robin Phelan (the "<u>Trustee</u>"), the Chapter 11 Trustee of Acis Capital

Management, L.P. ("<u>Acis LP</u>") and Acis Capital Management GP, LLC ("<u>Acis GP</u>," together with

---

[1] Unless otherwise indicated, capitalized terms used in this Order shall have the meanings ascribed to them in the 2004 Motion.

---

**ORDER GRANTING RULE 2004 MOTION**

Acis LP, the "Debtors" or "Acis"), the Debtors in the above-styled and numbered bankruptcy cases (the "Cases"), and the Court having jurisdiction to consider the 2004 Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the 2004 Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and notice of the 2004 Motion having been adequate and appropriate under the circumstances; and after due deliberation and sufficient cause appearing,

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1.  The 2004 Motion is **GRANTED**, as set forth herein;

2.  The examination of [Investor] is **ORDERED** as set forth herein;

3.  [Investor] shall produce the documents requested in **Exhibit "A"** to the 2004 Motion, within thirty (30) days of entry of this Order;

4.  [Investor] shall present one or more corporate representatives for deposition by the Trustee regarding the matters set forth in **Exhibit "B"** to the Motion; and

5.  The attorneys for the Trustee are authorized to execute and serve any and all subpoenas that are necessary for the requested production of documents and the depositions of one or more corporate representatives of [Investor]

**### END OF ORDER ###**

Submitted by:

Jeff P. Prostok
State Bar No. 16352500
J. Robert Forshey
State Bar No. 07264200
Suzanne K. Rosen
State Bar No. 00798518
Matthias Kleinsasser
State Bar No. 24071357

**FORSHEY & PROSTOK LLP**
777 Main St., Suite 1290
Ft. Worth, TX 76102
Telephone: (817) 877-8855
Facsimile: (817) 877-4151
jprostok@forsheyprostok.com
bforshey@forsheyprostok.com
srosen@forsheyprostok.com
mkleinsasser@forsheyprostok.com
**COUNSEL FOR THE CHAPTER 11 TRUSTEE**

-and-

**WINSTEAD PC**
500 Winstead Building
2728 N. Harwood Street
Dallas, Texas 75201
(214) 745-5400 (Phone)
(214) 745-5390 (Facsimile)
Rakhee V. Patel
State Bar No. 00797213
rpatel@winstead.com
Phillip Lamberson
State Bar No. 00794134
plamberson@winstead.com
Joe Wielebinski
State Bar No. 21432400
jwielebinski@winstead.com
Annmarie Chiarello
State Bar No. 24097496
achiarello@winstead.com
**SPECIAL COUNSEL FOR ROBIN PHELAN, CHAPTER 11 TRUSTEE**

# **<u>EXHIBIT N</u>**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | ) Chapter 11 |
|  | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-12239 (CSS) |
|  | ) |
| Debtor. | ) **Ref. Docket No.: 86** |
|  | ) |

### ORDER TRANSFERRING VENUE OF THIS CASE TO THE UNITED STATES BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS

Upon the motion (the "Motion")[2] of the Committee requesting entry of an order (this "Order") transferring the venue of the above-captioned chapter 11 case to the United States Bankruptcy Court for the Northern District of Texas; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and this matter being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue of this Motion being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and adequate notice of, and the

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

25658315.1

opportunity for a hearing on, the Motion having been given; and for the reasons stated on the

record, it is HEREBY ORDERED THAT:

1.      Effective as of the date of this Order, the above-captioned chapter 11 case shall be

transferred to the Dallas Bankruptcy Court pursuant to 28 U.S.C. § 1412.

**Dated: December 4th, 2019**
**Wilmington, Delaware**

**CHRISTOPHER S. SONTCHI**
**UNITED STATES BANKRUPTCY JUDGE**

25658315.1

## **EXHIBIT O**

| | |
|---|---|
| **From:** | Brad Eden <BEden@HighlandCapital.com> |
| **To:** | Willard, Dustin |
| **CC:** | Thomas Surgent |
| **Sent:** | 8/15/2017 6:10:27 PM |
| **Subject:** | Legal summary |
| **Attachments:** | HarbourVest Legal Summaries.pdf |

Dustin, attached is the legal summary. Of course, Thomas is available to answer any follow-up questions.

Best,
Brad

# H. Bradley Eden, J.D. | Managing Director, Global Head of Marketing & IR



300 Crescent Court | Suite 700
Dallas, Texas 75201
D: 972.628.4195 |M: 817.995.5944
beden@highlandcapital.com
www.highlandcapital.com



DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

**EXHIBIT P**

**SEC Financial Crisis Matter**

As discussed, the SEC has undertaken an unprecedented level of audits and field office referrals to enforcement following the financial crisis. In connection therewith, on September 25, 2014, Highland Capital Management, L.P. ("Highland") entered into a settlement with the Securities and Exchange Commission ("SEC") resulting in the SEC issuing an order. This order involves certain principal and cross transactions that occurred between 2007 and 2009 that were generally executed in an effort to generate or maintain liquidity for the advised accounts during the financial crisis. Highland did ultimately receive client consent for many of the transactions; however, this consent was received after the transactions had settled, and therefore did not comply with the requirements of Advisers Act Section 206(3). In addition, the order also cited Highland for a books and records violation and required Highland to pay a civil monetary penalty of $225,000.

In connection with the settlement, we engaged a third party compliance consultant to review our policies and procedures and a full year of recent trading activity. While no violations were identified, as one would expect for an engagement of this nature the consultant did recommend some minor procedural enhancements, all of which we promptly implemented. The consultant issued its final report in March 2016 in which it acknowledged all recommendations were implemented and no further recommendations were required. In June 2016, Highland submitted its final certification and written narrative demonstrating compliance with all undertakings of the settlement to the SEC. No further undertakings are required under the settlement.

For additional context, this matter spanned over 5 years, involved over one million pages of document production, and resulted in only the modest findings and $225k financial settlement set forth in the order. Some summary points of note include:

- There are no fraud-based violations, disgorgement, or findings against any individuals.
- The cross transactions referenced in the order primarily occurred during the height of the financial crisis in 2008 and 2009. Most of the Trades were executed in an effort to generate or maintain liquidity for advised accounts.
- Most of the Trades took place during September and October 2008 when, with the onset of the financial crisis, asset values were dropping across the market, the market for credit products was essentially frozen, and margin calls were being made on Highland's accounts.
- Highland did ultimately receive client consent for many of the Trades; however, this consent was received after the trade had occurred.
- The matter also involves a books and records charge, which we believe was substantially related to records issues with our former institutional administrator, which we have since replaced.
- We have since implemented numerous policy and procedure enhancements, and believe we maintain a world class compliance program.

**Crusader**

In July 2016, the Redeemer Committee of the Highland Crusader Fund filed a lawsuit against Highland Capital Management, L.P. related to the liquidation of the Crusader Fund. The Committee's allegations stem from a contract dispute over a plan of liquidation related to the fund that has been in wind-down since 2008.

348 / 359

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Rather than liquidating the fund in the midst of the financial crisis for pennies on the dollar, through Highland's unwavering efforts it was able to develop a liquidation plan to maximize investor recoveries. Notably, a super-majority of investors of all classes approved the plan. Through July 2016, Highland had distributed to Crusader Fund investors $1.55 billion of the target distribution amount of $1.70 billion, as per the liquidation plan approved by the majority of the Fund's investors. Cash distributions to date are more than $600 million above the Crusader Fund's net asset value of $900 million at the 2009 market trough.

What should otherwise be hailed as a remarkable success story of Highland navigating a levered hedge fund liquidation through the financial crisis has unfortunately taken a skewed narrative due to the impact of a separate court order that halted the fund's liquidation and distribution activities for 36 months. In addition to resuming those activities once the court order was lifted, Highland received its previously earned, fully vested and unforfeitable fees following consultation with outside counsel. While the Crusader Fund Redeemer Committee's attorneys disagree with this determination, Highland continues to believe that its actions were legally permissible and disputes the allegations in the complaint.

In conjunction with the lawsuit, the Crusader Fund Redeemer Committee elected to replace Highland as investment manager for the remainder of the liquidation—a right Highland voluntarily provided to the Redeemer Committee in 2011 under the original liquidation plan. As such, we cooperated in transitioning management and, as investors ourselves, have a shared interest in the subsequent manager's success.

**Terry**

Mr. Terry was a senior member of Highland's structured products team. In June 2016, Mr. Terry was terminated for cause for various misconduct, including with respect to certain violations of Highland's internal compliance policies. Mr. Terry filed a counterclaim for calculation of his separation compensation. When Highland refused to meet Mr. Terry's demand for separation compensation to which he was not entitled, Mr. Terry made numerous allegations against Highland unrelated to the circumstances of his termination or the calculation of his alleged compensation. Among these, Mr. Terry alleged that Highland violated its duties in connection with the purchase of an asset in Brazil. However, the facts of the transaction are as follows:

- Highland's legal and compliance team was involved with the transaction from inception to ensure that it was handled appropriately.
- Accordingly, the completion of the transaction was made subject to prior receipt of all necessary approvals after full disclosure of all material facts.
- The narrative of material facts disclosure was prepared by Highland's legal and compliance department with involvement by all relevant personnel.
- Prior approval of such transaction was received by the independent directors of the portfolio company involved, together with the independent directors of each of the client accounts with an interest in such company.
- The transaction was also unanimously approved in advance by Highland's internal Conflicts Committee, of which Josh Terry himself was a member and affirmatively approved the transaction.
- Outside legal counsel was consulted with respect to such transaction and provided written legal advice as to the appropriateness of the transaction.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- The transaction was separately reviewed by Highland's independent auditors following Mr. Terry's allegations, which auditors identified no misconduct in connection with such transaction.

All further proceedings on this matter has been referred to arbitration subject to confidentiality.

**Daugherty**

A Court ruled in 2012 that Mr. Daugherty, a former employee, breached his fiduciary duty to Highland, owed damages to Highland, and ordered Mr. Daugherty to cease using or disclosing Highland's confidential information. Additionally, an award was entered in favor of Mr. Daugherty against a separate incentive compensation entity for an interest that was already escrowed in his name prior to trial and in which he was already vested. The dispute over the amount of his vested interest is on-going. Additionally, Highland from time to time must take action to enforce the permanent injunction against Mr. Daugherty's continuing improper disclosures of Highland's confidential information.

**UBS**

Highland and certain affiliated investment vehicles are defendants in a complaint filed on February 24, 2009 New York state court by UBS Securities LLC and UBS AG, London Branch relating to a CLO warehouse facility with respect to which UBS is attempting to extend liability beyond the two entities that bore sole risk of loss under the governing documents. On February 19, 2010, the court dismissed all claims against Highland Capital Management. UBS since has filed additional claims against Highland Capital Management and certain additional investment vehicles. On July 21, 2011, the First Appellate Division again dismissed two of UBS's four claims against Highland Capital, severely limiting the remaining two claims. Certain of UBS's remaining claims currently are being reviewed by the Appellate Division.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## **EXHIBIT Q**

| | |
|---|---|
| **From:** | Hunter Covitz <HCovitz@HighlandCapital.com> |
| **To:** | Willard, Dustin; Pugatch, Michael; Bellisario, Nick |
| **CC:** | Trey Parker; Brad Eden |
| **Sent:** | 11/29/2017 5:33:02 PM |
| **Subject:** | RE: Wall Street Journal Article |
| **Attachments:** | Highland Capital Management Letter to the Wall Street Journal _November ....pdf |

Dustin/Mike/Nick,

We write to provide an additional update and more extensive response to the recent Wall Street Journal article and the inaccuracies it contained.  The article is the result of a reporter with an agenda, fueled by a lack of oversight and intervention on behalf of the Journal that enabled that agenda to make its way into print to the detriment of Highland and, in turn, our investors.

We hope you can understand that we cannot let this agenda-driven reporting be what defines our firm in the public realm, especially when the reporting challenges the quality of our people, the strength of our culture and the regard we have toward our fundamental responsibility to our clients. For the sake of our employees and our investors, which together are what truly defines Highland, we feel we must correct these inaccuracies and refute the accusations against us. To do so we have contacted Wall Street Journal editor-in-chief Gerard Baker to make him aware of the situation and provide him with the facts that the reporter responsible and his editors received from Highland in advance of the article, yet deemed irrelevant. Attached is the letter we shared last night.

We also will be making public a response that addresses the inaccuracies of the article and the situation we encountered at the Journal. While our response is substantial, we believe a full account of the background here was required given the severity of the claims made in the article. Our brand and reputation as strong investors and fiduciaries for our clients' capital is sacrosanct. Therefore, as unfortunate as it is to have to publicly defend ourselves and create more noise for our firm and our investors, we felt it was acutely necessary to stand up for ourselves and what is right under these circumstances.

As always, please let us know if you have any questions or there is anything additional we can provide.

Thank you,
Hunter

Hunter Covitz
972-628-4124


**From:** Hunter Covitz
**Sent:** Monday, November 27, 2017 3:56 PM
**To:** 'Willard, Dustin' <dwillard@harbourvest.com>; Pugatch, Michael <mpugatch@harbourvest.com>; Bellisario, Nick <nbellisario@harbourvest.com>
**Cc:** Trey Parker <TParker@HighlandCapital.com>; Brad Eden <BEden@HighlandCapital.com>
**Subject:** Wall Street Journal Article

Hello, as you may be aware, the Wall Street Journal published an article (attached) which ran online yesterday and in print this morning on the ongoing compensation dispute between Highland and a former employee, Josh Terry, who was terminated in 2016. Specifically, the article addresses the recently completed arbitration, which resulted in additional compensation awarded to Mr. Terry related to his position in Acis, the structured products affiliate.

Despite our willingness to provide the *Wall Street Journal* with the relevant facts, the article that was published severely mischaracterizes the situation and provides a misleading account of this and other activities.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Outside of the compensation award, there were no findings by the arbitrators against Acis. Further, Mr. Terry lost all of his claims against Highland. The firm did not ask Mr. Terry to breach his fiduciary duty, nor did it breach any duty to its investors, and these facts were confirmed by the arbitrators' findings.

Highland has a number of outstanding claims against Mr. Terry, including contract and fiduciary breaches, the malicious taping of co-workers and counter parties for over a year, and other misconduct that contributed to Mr. Terry's termination from Highland. Since Highland's claims were not subject to the arbitration and were stayed pending the completion of the arbitration, they were not addressed by the arbitrators. Now, Highland will have the opportunity to adjudicate these claims in court, which are likely to be substantially larger than the arbitration award.

This situation, while contentious, highlights the strength of our compliance process and culture of accountability, both areas of the firm in which we take great pride. Mr. Terry was found in violation of our compliance standards and Highland took swift action to address that and other misconduct that was uncovered. Thanks to this response, Mr. Terry's misconduct did not affect investors, and Highland took every step to ensure clients' interests were first and foremost protected.

While the dispute has no impact on our investment activities, as always, we welcome any questions you may have. In the meantime, we are so extremely exciting about the opportunity to work together with Harbourvest and we are fully committed to managing our clients' money with the highest standards of ethics and execution.

Thank you,
Hunter


**HUNTER COVITZ |** MANAGING DIRECTOR



300 Crescent Court | Suite 700 | Dallas, Texas 75201
O: 972.628.4124 | C: 214.394.5510
hcovitz@highlandcapital.com | www.hcmlp.com

---

DISCLAIMER- This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary or legally privileged information. If you receive this message in error, please immediately delete it.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# **EXHIBIT R**

**[TO BE OFFERED UNDER SEAL]**

# EXHIBIT S

**[TO BE OFFERED UNDER SEAL]**

**<u>EXHIBIT T</u>**

**<u>[TO BE OFFERED UNDER SEAL]</u>**