**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717) (*pro hac vice*)
Robert J. Feinstein (NY Bar No. 1767805) (*pro hac vice*)
John A. Morris (NY Bar No. 266326) (*pro hac vice*)
Elissa A. Wagner (CA Bar No. 213589) (*pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

**HAYWARD PLLC**
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-34054-sgj11 |
| | ) |
| Debtor. | ) **Re: Docket Nos. 2199, 2268, 2293,** |
| | ) **2295** |

## DEBTOR'S OMNIBUS REPLY IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENT WITH UBS SECURITIES AND UBS AG LONDON BRANCH AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

The above-captioned debtor and debtor-in-possession (the "Debtor") hereby submits this reply (the "Reply") (a) in response to (i) the *Limited Preliminary Objection to the Debtor's Motion for Entry of an Order Approving Settlement With UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2268] (the "Initial Dugaboy Objection"), (ii) the *Supplemental Opposition to Debtor's Motion for Entry of an Order Approving Settlement With UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2293] (the "Supplemental Dugaboy Objection," and together with the Initial Dugaboy Objection, the "Dugaboy Objection"), and (iii) *James Dondero's Objection to Debtor's Motion for Entry of an Order Approving Settlement With UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2295] (the "Dondero Objection," and together with the Dugaboy Objection, the "Objections") and (b) in support of its *Motion for Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2199] (the "Motion").[2] In further support of the Motion, the Debtor respectfully states as follows:

## PRELIMINARY STATEMENT

1.      As set forth in the Motion, the Settlement Agreement provides UBS with a Class 8 (General Unsecured Claim) of $65 million and a Class 9 (Subordinated Claim) of $60 million. The Settlement Agreement also provides that Multi-Strat will pay $18.5 million to UBS in satisfaction of UBS's claims against Multi-Strat. This is an extraordinary achievement that is supported by the Debtor's major creditors. It resolves over a decade of highly acrimonious litigation, including extensive litigation in this Court, and UBS's $1 billion plus claim against the Debtor as well as its claim against Multi-Strat. The settlement paves the way for the Debtor to

---

[2] All capitalized terms used but not defined herein have the meanings given to them in the Motion.

begin making long-overdue distributions to creditors following the effective date of the Plan. It is opposed by no one except Mr. Dondero and the "family trust" – The Dugaboy Investment Trust ("Dugaboy") – that he controls (together, the "Dondero Objectors").[3]

2.  And, while the Debtor believed, and continues to believe, that it has defenses to UBS's claims, those defenses would be (i) subject to substantial factual disputes, (ii) require the cooperation of now-adverse parties whose credibility has already been questioned, and (iii) require expensive, time-consuming litigation that would likely be resolved only after a lengthy trial (and likely rounds of appeals) all while the Debtor (or its successor) assumes the risk that the defenses might fail.

3.  The Dondero Objectors do not (and cannot) dispute that the proposed settlement is the product of substantial, arm's length – and sometimes quite heated – negotiations between and among the principals and their counsel. The Debtor believes that the proposed settlement is fair and reasonable, results from the valid and proper exercise of its business judgment, and represents the successful resolution of an incredibly complicated and substantial claim.

4.  The facts underlying the Settlement Agreement are well known to this Court, but some bear repeating:

- In late 2008, CDO Fund and SOHC breached certain warehouse agreements;

- After years of litigation, in November 2019, UBS secured a judgment in the State Court against CDO Fund and SOHC on account of that breach of over $1 billion (inclusive of interest);

- As part of this litigation, UBS alleged that certain entities managed and/or controlled by the Debtor, including Multi-Strat, engaged in a series of orchestrated

---

[3] *See Order Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified) and (ii) Granting Related Relief* [Docket No. 1943] (the "Confirmation Order") ¶ 19. As this Court has previously found, and as set forth below, Mr. Dondero and Dugaboy have only the most tenuous economic interest in and connection to the Debtor's estate. *Id.* ¶¶ 17-18.

fraudulent conveyances with the goal of moving assets away from the Funds and outside the reach of UBS;

- UBS also alleged that the Debtor (then under Mr. Dondero's control) breached the implied covenant of good faith and fair dealing by interfering with CDO Fund and SOHC's payment of its obligations to UBS under the warehouse agreement;

- In December 2020, this Court entered an order estimating UBS's claim against the Debtor at $94,761,076 (the "Estimated Claim"), which included an estimation that UBS had a 90% chance of recovering $25,782,988 (plus interest) from Multi-Strat (resulting in a risk-adjusted claim against Multi-Strat of approximately $23.2 million) on account of UBS's fraudulent conveyance claim against it;

- After reaching an agreement in principle with UBS, the Debtor uncovered a secret scheme by the Debtor's former management (a) to transfer more than $300 million in face amount of securities and cash from the Funds to Sentinel – a Cayman-based reinsurance company owned and controlled by Mr. Dondero and Scott Ellington – and (b) to hide that transfer from the Independent Directors, UBS, and this Court; and

- But for that transfer, CDO Fund and SOHC could have used the value of such fraudulently transferred securities and cash to satisfy UBS's judgment.

Despite the facts set forth above, Mr. Dondero – directly and through Dugaboy – has the audacity to file the Objections and object to the UBS settlement.

5.      Dugaboy's objection also questions the Debtor's corporate authority and business judgment and accuses the Debtor (now under the control of the Independent Directors) of having breached its duties and obligations by settling with UBS. As set forth below, there is absolutely no basis for this contention. Dugaboy is a limited partner in Multi-Strat and knows (or should know) that Multi-Strat's governing documents provide the Debtor, as investment manager, and indirect owner of Multi-Strat's general partner with complete authority to manage Multi-Strat's property and to "***settle or compromise suits and administrative proceedings and other similar matters***."

6.      Mr. Dondero's efforts to litigate every issue in this case – directly and by proxy – and to disenfranchise this Court by questioning its authority should be rebuffed, and the objections

4

overruled. The Debtor asks this Court to (once again) see through the pretense of the Dondero-controlled entities' objections to the USB settlement and approve it as a fair settlement and valid exercise of the Debtor's business judgment.

## ADDITIONAL BACKGROUND ON MULTI-STRAT

7.     Multi-Strat is a pooled investment fund that is structured as a "mini master."[4]   A "mini master" consists of an offshore feeder fund and onshore master fund.  Generally speaking, foreign investors and tax-exempt entities invest in the foreign feeder for tax reasons, and the foreign feeder fund in turn invests substantially all of its assets in the onshore master fund as a limited partner together with the other direct limited partners in the master fund.  The master fund is the dominant entity within the "mini master" structure (and the entity most commonly referenced in the structure) as it holds and invests all the assets, including those of the feeder fund.  Here, Multi-Strat's "master fund" is Highland Multi Strategy Credit Fund, L.P., a Delaware limited partnership (the "Master Fund"),[5] and its offshore feeder fund is Highland Multi Strategy Credit Fund, Ltd., a Cayman Islands exempted company (the "Feeder Fund").  The Master Fund, the Feeder Fund, their direct and indirect subsidiaries, and their respective general partners are referred to in the Settlement Agreement, collectively, as "Multi-Strat."[6]  All of Multi-Strat's investment activity is conducted through the Master Fund and all of its investable assets are held by the Master Fund (either directly or indirectly).  Investors in the Master Fund and in the Feeder Fund generally have the same rights and liquidity.  *See* Feeder PPM at 5 ("Aside from the differences described

---

[4] Additional background on Multi-Strat is included in the *Confidential Private Placement Memorandum of Highland Multi Strategy Credit Fund, L.P.*, dated November 2014 (the "Master PPM") and the *Confidential Private Offering Memorandum of Highland Multi Strategy Credit Fund, Ltd.*, dated November 2014 (the "Feeder PPM" and together with the Master PPM, the "PPMs").  Copies of the Master PPM and Feeder PPM are attached as Exhibits 1 and 2, respectively.

[5] Multi-Strat was originally called Highland Credit Opportunities CDO, L.P. but changed its name in 2014.

[6] Multi-Strat has a number of offshore and onshore wholly-owned direct and indirect subsidiaries.  An organizational chart showing Multi-Strat's corporate structure is attached hereto as Exhibit 3.

5

in this Memorandum, an investment in the [Feeder] Fund will have substantially similar terms and risks to an investment in the [Master Fund], as described in the [Master PPM].")

8.    Multi-Strat is managed by its investment manager – the Debtor – and its general partner – Highland Multi Strategy Credit Fund GP, L.P. (the "MSCF GP").  The MSCF GP is 100% owned – indirectly – by the Debtor, and the sole officer of MSCF GP is James P. Seery, Jr., the Debtor's chief executive officer and chief restructuring officer.  The Debtor's rights, duties, and obligations as investment manager are set forth in the *Third Amended and Restated Investment Management Agreement, by and among Highland Multi Strategy Credit Fund, Ltd., Highland Multi Strategy Credit Fund, L.P., and Highland Capital Management, L.P.*, dated November 1, 2013 (the "IMA"), the *Fourth Amended and Restated Limited Partnership Agreement of Highland Multi Strategy Credit Fund, L.P.*, dated November 1, 2014 (the "LPA"), the PPMs, and the *Amended and Restated Memorandum and Articles of Association of Highland Multi Strategy Credit Fund, Ltd.*, as adopted on 1 November 2014 (the "Articles" and together with the IMA, the LPA, and the PPMs, the "Governing Documents").[7]  MSCF GP's rights, duties, and obligations are set forth in the LPA, the Master PPM, and general Delaware partnership law.

9.    Multi-Strat's investors include both the limited partners in the Master Fund and the shareholders of the Feeder Fund (which itself is a limited partner of the Master Fund).  Nevertheless, for convenience of reference, the ultimate investors, whether direct or through the Feeder Fund, are commonly referred to as Multi-Strat's limited partners.  Multi-Strat's current limited partners are:

---

[7] Copies of the IMA, LPA, and Articles are attached hereto as Exhibits 4, 5, and 6, respectively.  These documents were created at Mr. Dondero's direction years before the Petition Date, severely undermining his challenge to the Debtor's authority and again calling into substantial question his credibility and motivations.

| **Limited Partner** | **Ownership %**[8] |
|---|---|
| Debtor | 58.70% |
| CLO Holdco, Ltd. ("CLOH") | 4.06% |
| Dugaboy | 1.71% |
| Highland Capital Management Services, Inc. ("HCMS") | 35.10% |
| Mark Okada | 0.43% |

As this Court knows, CLOH, Dugaboy, and HCMS are all directly owned and/or controlled by Mr. Dondero. Mr. Okada, in turn, is Mr. Dondero's long-time business partner. As such, besides the Debtor, the *only* limited partners in Multi-Strat are (directly or indirectly) owned and/or controlled by Mr. Dondero. There are no third-party limited partners.

10.     In addition to the current limited partners, there are a number of former "redeemed" limited partners of Multi-Strat, which are referred to as the "redeemers." Under the terms of the LPA and Articles, limited partners are allowed to redeem their limited partnership interests under certain circumstances. Once redeemed, a limited partnership interest is extinguished and the balance of the amount owed to the redeemer is "crystallized," *i.e.*, reduced to a fixed dollar amount (based on the value of Multi-Strat's assets at the time of redemption) and is treated similar to a debt obligation of the fund, *i.e.*, the redeemer no longer participates in the appreciation of the fund's assets and only has a claim for its set dollar amount. Currently, Multi-Strat owes its redeemers approximately $90 million on account of their unpaid redemptions.

11.     Prior to 2021, the Debtor believed – because that is what it was told by certain of the Debtor's then-employees – that *all* the redeemers were third party investors unaffiliated with the Debtor. As the Debtor recently discovered, however, that is not true. In fact, the largest redeemer is Sentinel – the entity owned by Mr. Dondero and Mr. Ellington – which is purportedly

---

[8] Ownership is provided on a consolidated basis without regard to whether a party is invested in the Master Fund or the Feeder Fund. The Debtor reserves the right to challenge the purported Dondero and/or Okada controlled limited partnership interests.

owed approximately $33 million, or one-third of the total redeemed interests. The majority of Sentinel's interest in Multi-Strat was originally owned by CDO Fund but was fraudulently taken from CDO Fund and moved to Sentinel in August 2017. Sentinel purportedly redeemed its Multi-Strat interest in November 2019 as the State Court was entering its judgment against the Funds. Sentinel's redeemed interest is referred to as the "MSCF Interests" in the Settlement Agreement. On information and belief, the other redeemers are unaffiliated third party investors.

## **REPLY**

A.    **Standing**

12.     In the Dondero Objection, Mr. Dondero goes to great lengths to prove that he has standing to object to the UBS settlement asserting that he is a "creditor, indirect equity security holder, and party in interest" in the Debtor's bankruptcy. Dondero Obj. ¶¶4-13. This Court has already made substantial findings of fact concerning Mr. Dondero and Dugaboy's interests in the estate, finding that "the remoteness of their interests is noteworthy." Confirmation Order ¶¶ 17-18. In light of Mr. Dondero's misleading statements, the Debtor must again address Mr. Dondero and Dugaboy's purported "standing."[9]

13.     **James Dondero.** On April 8, 2020, Mr. Dondero filed three unliquidated, contingent claims that he promised to update "in the next ninety days."[10] Over a year later, Mr.

---

[9] The following analysis should look familiar as it is nearly verbatim the analysis included in *Debtor's Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154), and Authorizing Actions Consistent Therewith* [Docket No. 1731] (the "HarbourVest Motion"). Mr. Dondero – directly and through his proxies – was also the only person to object to the Debtor's settlement with HarbourVest (as defined in the HarbourVest Motion). Dugaboy and Mr. Dondero's other family trust – The Get Good Trust – are currently appealing the settlement with HarbourVest. Two of Mr. Dondero's other entities – The Charitable DAF Fund, L.P. and CLO Holdco, Ltd. – recently filed a complaint in the District Court for the Northern District of Texas, which seeks to have the District Court undertake a reconsideration or *de facto* appeal of the settlement with HarbourVest. *See Original Complaint*, Case No. 21-00842-B, Docket No. 1 (N.D. Tex. Apr. 12, 2001).

[10] Mr. Dondero filed two other proofs of claim that he has since withdrawn with prejudice. *See* Docket No. 1460.

8

Dondero has yet to "update" those claims to assert an actual claim against the Debtor's estate.[11] Mr. Dondero's claim as an "indirect equity security holder" is also a stretch. Mr. Dondero holds no direct equity interest in the Debtor. Mr. Dondero instead owns 100% of Strand Advisors, Inc. ("Strand"), the Debtor's general partner. Strand, however, holds only 0.25% of the total limited partnership interests in the Debtor through its ownership of Class A limited partnership interests. The Class A limited partnership interests are junior in priority of distribution to the Debtor's Class B and Class C limited partnership interests. The Class A interests are also junior to all other claims filed against the Debtor. Finally, Mr. Dondero's recovery on his indirect equity interest is junior to any claims against Strand itself, including any indemnification claims asserted against Strand by the Independent Directors or their agents. Consequently, before Mr. Dondero can recover on his "indirect" equity interest, the Debtor's estate must be solvent, priority distributions to Class B and Class C creditors must be satisfied, and all claims against Strand must be satisfied. And, if all of that occurred, Mr. Dondero would recover 0.25% of the net distributions from the estate.

14. **Dugaboy.** Dugaboy is a sham Dondero "trust" with only the most attenuated standing. Dugaboy filed three proofs of claim (Claim Nos. 113; 131; 177). In two of these claims, Dugaboy argues that (a) the Debtor is liable to Dugaboy for its postpetition mismanagement of Multi-Strat, and (b) this Court should pierce the corporate veil and allow Dugaboy to sue the Debtor for a claim it ostensibly has against the Highland Select Equity Master Fund, L.P. – a Debtor-managed investment vehicle. These claims are frivolous, and the Debtor has objected to them. [Docket No. 906]. In its third claim, Dugaboy asserts a claim against the Debtor arising from its Class A limited partnership interest in the Debtor (which represents just 0.1866% of the total limited partnership interests in the Debtor). Like Mr. Dondero, Dugaboy can recover on its

---

[11] Without knowing the nature of the "updates," the Debtor does not concede that any "updates" would have been procedurally proper and reserves the right to object to any proposed amendment to Mr. Dondero's claims.

equity interest only if the Debtor is solvent and all priority distributions to Class B and Class C creditors and all claims against Strand are satisfied. Then, and only then, would Dugaboy recover 0.1866% of the net distributions from the estate. Dugaboy also claims to own 1.71% of the limited partnership interests in Multi-Strat (as discussed above).

15. Consequently, the Dondero Objectors' standing to object to the UBS settlement is extremely attenuated and their chances of recovery in this case are, at best, theoretical and speculative thereby calling into question the Dondero Objectors' motivation. *See In re Kutner*, 3 B.R. 422, 425 (Bankr. N.D. Tex. 1980) (finding that a party had standing only when it had a "pecuniary interest . . . directly affected by the bankruptcy proceeding"); *see also In re Flinkote Co.*, 486 B.R. 99, 114-15 (Bankr. D. Del. 2012), *aff'd.* 526 B.R. 515 (D. Del. 2014) (a claim that is speculative cannot confer party in interest standing). Mr. Dondero and Dugaboy's minimal interest in the estate should not allow them to overrule the estate's business judgment or veto settlements with creditors, especially when no actual creditors and constituents have objected. "[A] bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, [the judge] should consider all salient factors . . . and . . . act to further the diverse interests of the debtor, creditors and equity holders, alike." *In re Lionel*, 722 F.2d 1063, 1071 (2d Cir. 1983).

## B. The Objections Fail on the Merits

16. As discussed in the Motion, under applicable Fifth Circuit precedent, a bankruptcy court may approve a compromise or settlement as long as the proposed settlement is fair, reasonable, and in the best interest of the estate. *See, e.g., In re Age Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015). In making this determination, courts look to the following factors:

- probability of success in the litigation, with due consideration for the uncertainty of law and fact;

- complexity and likely duration of the litigation and any attendant expense, inconvenience and delay; and

- all other factors bearing on the wisdom of the compromise, including (i) "the paramount interest of creditors with proper deference to their reasonable views" and (ii) whether the settlement is the product of arm's length bargaining and not of fraud or collusion.

*Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citations omitted); *see also Age Ref. Inc.*, 801 F.3d at 540; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 918 (5th Cir. 1995).

1. **The Dugaboy Objection Is Without Merit**

17.    In its Objection, Dugaboy presses various arguments and makes various factual assertions but neglects to disclose its affiliation with Mr. Dondero and its interest in Multi-Strat. Those neglected facts undermine the majority of the Dugaboy Objection.

a. **Dugaboy is a Limited Partner in Multi-Strat**

18.    Pursuant to a subscription agreement (the "Subscription"), Dugaboy subscribed for shares in the Feeder Fund by investing $180,000. A copy of the Subscription is attached as Exhibit 7. Because Dugaboy is a "revocable grantor trust," the Subscription required that it be signed by Dugaboy's beneficiary as if the beneficiary was the one subscribing to Multi Strat in his individual capacity. Mr. Dondero is Dugaboy's beneficiary and therefore signed the Subscription on behalf of Dugaboy. By signing the Subscription, Mr. Dondero represented that he had received a copy of the Governing Documents on behalf of Dugaboy. Consequently, Dugaboy has no excuse not to know how Multi-Strat is governed.

19.    As Mr. Dondero knows and intended, Multi-Strat's Governing Documents vest in the Debtor (as investment manager) and MSCF GP (as general partner) the exclusive authority (and obligation) to manage and bind Multi-Strat, including the authority to settle claims against

11

Multi-Strat. For example, in the section titled "Risk Factors and Potential Conflicts of Interest," the Master PPM states that "[s]ubstantially all decisions with respect to the management of the Fund are made by the General Partner and the Investment Manager. Limited Partners have no right or power to take part in the management of the Fund." Master PPM at 25; *see also* Feeder PPM at 6 ("[T]he [Feeder] Fund's management, as well as investment decisions at the [Master Fund] level, are effectively controlled by the Investment Manager or its affiliates.").

20. Further, among other things:

- Section 2(a) of the IMA requires that the Feeder Fund invest all of its assets in the Master Fund to be managed by the Debtor as investment manager.[12] IMA, § 2(a)

- Section 2(c)(i) of the IMA grants the Debtor, as investment manager, full discretion and authority on behalf of both the Master Fund and the Feeder Fund to "exercise all rights, powers, privileges and other incidents of ownership or possession" with respect to Multi-Strat's investments and "other property and funds held or owned by the Master Fund." *Id.* § 2(c).

- Section 2(c)(i) of the IMA also expressly and explicitly grants the Debtor, as investment manager, the authority to "***institute and settle or compromise suits and administrative proceedings and other similar matters***." *Id.* (emphasis added).

- Under Section 4.1 of the LPA, the MSCF GP:

  o has "complete and exclusive power and responsibility, to the fullest extent permitted" by Delaware law to manage and administer the affairs of the Partnership, and "to do all things that the General Partner considers necessary or desirable to carry out its duties" under the LPA "whether or not such action or authority is expressly provided for in [the LPA]."

  o has full power and authority "to engage in all activities and transactions, as it may deem necessary or advisable for, or as may be incidental to, the conduct of the business contemplated by this Section 4.1."

  o may delegate "to any other Person, including the Investment Manager," any power and authority vested in the MSCF GP pursuant to the LPA.

---

[12] IMA, § 2(a) ("All of the investable assets of the [Feeder] Fund must be invested in, and the investment program of the [Feeder] Fund is to be conducted by the Investment Manager through the [Master] Fund. The Investment Manager will exercise no discretion with respect to the investment of the assets of the [Feeder] Fund and the investment activities of the Investment Manager will be conducted at the [Master] Fund level as the investment manager to the [Master] Fund.").

The LPA also provides that Multi-Strat's limited partners, such as Dugaboy (and the Feeder Fund), have **no** right to manage, control, or operate Multi-Strat or to act on its behalf until expressly stated otherwise. *See* LPA, § 4.3 ("The Limited Partners may not take any part in the management, control or operation of the Partnership's business, and have no right or authority to act for the Partnership or to vote on matters other than the matters set forth in this Agreement or as required by applicable law.").

### b. UBS Has Direct Claims Against Multi-Strat

21. Dugaboy alleges that the Debtor used Multi-Strat to decrease the Debtor's liability to UBS. This ignores (a) UBS's substantial, direct claims against Multi-Strat arising from an alleged fraudulent conveyance of assets to Multi-Strat – a fraudulent conveyance that was done to frustrate UBS's ability to recover on its claims against the Funds – and (b) the extensive arguments and judicial findings concerning UBS's direct claims against Multi-Strat in connection with the 3018 Motion.[13]

22. The assets conveyed to Multi-Strat did not belong to the Debtor, and they were not conveyed to Multi-Strat by the Debtor. These claims have not yet been litigated and would have been addressed in "Phase II" of the UBS litigation if the Debtor had not filed bankruptcy. Consequently, UBS has a claim against the Debtor, under various theories, for $1 billion **and** a separate and distinct claim against Multi-Strat for approximately $26 million (plus interest). Notably, Dugaboy admits that UBS has separate and distinct claims against Multi-Strat. Dugaboy Obj. ¶12.

---

[13] Dugaboy attempts to paint this fraudulent transfer as somehow benefiting the Debtor. "What the Debtor received for the transfer of its interest in Multi-Strat is unknown, however, and in assessing the value the Debtor received for its interest in Multi-Strat it is safe to assume that in some measure the Debtor received the benefit of the so-called fraudulently transferred assets." Dugaboy Obj. ¶9. This misrepresents the facts. The Debtor did not transfer its interests in Multi-Strat (although it did sell a small amount of its interest to Sentinel prior to the 2017 fraudulent conveyance).

23. Indeed, this Court previously estimated the value of UBS's claim against Multi-Strat at approximately $23 million, excluding interest. As such, Multi-Strat would be required to either settle or litigate to conclusion UBS's claims against it – regardless of whether the Debtor settled UBS's claims against the Debtor. Mr. Dondero knows this. In fact, Mr. Dondero approached the Debtor and certain of its creditors in late 2020 with the hope of effectuating his "pot plan." As part of his "pot plan," Mr. Dondero required that the "UBS settlement . . . be global and inclusive of all affiliated entities, including offshore entities and the Multi Strat Credit Fund" to avoid this exact result.

### c. The Debtor Satisfied Its Fiduciary Duty

24. Dugaboy alleges that the Debtor breached its fiduciary duties to Multi-Strat under the Investment Advisers Act of 1940 (the "<u>Advisers Act</u>") by, among other things, causing Multi-Strat to settle with UBS. These allegations are false, but as importantly, they are a smokescreen.

25. Multi-Strat's redeemers have approximately $90 million in redemption claims (including Sentinel's putative redemption claim), but they will not be affected by Multi-Strat's settlement with UBS. Multi-Strat has approximately $120 million in assets. The redeemers' claims therefore will be paid in full even if Multi-Strat pays UBS $18.5 million to satisfy UBS's claims. In terms of Multi-Strat's remaining limited partners, as set forth above, there are functionally only two: (a) the Debtor (59%) and (b) Mr. Dondero's controlled entities (41%).[14] The Settlement Agreement – as evidenced by the lack of objection by the Debtor's creditors – is in the best interests of Multi-Strat as a whole, Mr. Dondero's objections notwithstanding. There is simply no point in continuing to engage in costly, time-consuming litigation with UBS that Multi-Strat might well lose.

---

[14] As evidenced by Mr. Dondero's objection to the UBS settlement, each of the investors in Multi-Strat had notice of the Settlement Agreement and the chance to object.

26.     Because the Debtor – as investment manager – settled UBS's claims against Multi-Strat in the best interests of Multi-Strat, there can be no breach of fiduciary duty (particularly since the settlement value ($18.5 million) is materially less than the Court's estimated value of the claim ($23 million plus interest)).  Moreover, it is black-letter law that the Debtor's fiduciary duties under the Advisers Act run to Multi-Strat only, not to any individual investor in Multi-Strat such as Dugaboy.[15]  Further, even if an adviser has a conflict of interest, such conflict does not constitute a breach of the adviser's duty to its client if it is either eliminated *or* fully and fairly disclosed.[16]  Here, the required disclosures concerning the Debtor's potential conflicts of interests were made.[17]

27.     Finally, Dugaboy alleges that the Settlement Agreement puts the Debtor in direct conflict with Multi-Strat because (a) the Debtor is not releasing claims against Multi-Strat for the assets fraudulently transferred to Multi-Strat, (b) the Settlement Agreement obligates the Debtor to investigate and participate in the prosecution of claims against Multi-Strat, and (c) the Settlement Agreement is unclear if UBS is releasing all claims against Multi-Strat.  These can be quickly dispatched.

28.     *First*, the Debtor is not releasing claims against Multi-Strat arising from Multi-

---

[15] *See Goldstein v. SEC*, 451 F.3d 873, 879 (D.C. Cir. 2006) ("An investor in a private fund may benefit from the adviser's advice (or he may suffer from it) but he does not receive the advice directly.  He invests a portion of his assets in the fund.  The fund manager – the adviser – controls the disposition of the pool of capital in the fund.  The adviser does not tell the investor how to spend his money; the investor made that decision when he invested in the fund.  Having bought into the fund, the investor fades into the background; his role is completely passive.  If the person or entity controlling the fund is not an "investment adviser" to each individual investor, then a fortiori each investor cannot be a "client" of that person or entity.").

[16] *Commission Interpretation Regarding Standard of Conduct for Investment Advisers* (the "Release"), Release No. IA-5248; File No. S7-07-18, effective July 12, 2019 at 8 ("Under its duty of loyalty, an investment adviser must eliminate *or* make full and fair disclosure of all conflicts of interest which might incline an investment adviser – consciously or unconsciously – to render advice which is not disinterested such that a client can provide informed consent to the conflict.") (emphasis added).

[17] Each of the PPMs includes pages of disclosures on potential conflicts of interests.  None of these disclosures were even acknowledged by Dugaboy in its objection.  *See generally* Master PPM "Risk Factors and Potential Conflicts of Interest" at 49-53; Feeder PPM "Risk Factors and Potential Conflicts of Interest" at 26.  The Feeder PPM cross references to and incorporates the disclosures contained in the Master PPM.  "The [Master PPM] contains further disclosures concerning potential conflicts of interests.  Such disclosures are incorporated herein by reference and should be read in their entirety prior to making a decision to invest in the [Feeder] Fund."  Feeder PPM at 26.

Strat's receipt of fraudulently conveyed assets because the Debtor has no claim to the fraudulently conveyed assets (unlike UBS) and therefore has no claim against Multi-Strat as the recipient of such assets.[18] *Second*, Dugaboy is confused by the language of the Settlement Agreement. The Settlement Agreement provides that the Debtor will cooperate with respect to claims relating to the MSCF Interests and any injunctive relief necessary to ensure that additional money and assets are not transferred to Sentinel, among others. Settlement Agreement at § 1(c). Similarly, UBS has released all claims against Multi-Strat but has preserved its claims with respect to the MSCF Interests. *Id.* at § 3(a). As discussed above, the MSCF Interests are the interests in Multi-Strat that were fraudulently conveyed to Sentinel from CDO Fund in 2017. By preserving its claims with respect to the MSCF Interest, UBS has preserved its right to seek recovery of the MSCF Interests from Sentinel, not to sue Multi-Strat.

### d. This Court Has Jurisdiction to Approve All Aspects of the Settlement

29.     Dugaboy also objects to the settlement between UBS and Multi-Strat "on the ground that the Bankruptcy Court lacks jurisdiction to approve a settlement between non-debtors." Dugaboy Obj. ¶12.[19] As support for this objection, Dugaboy states that (a) linking UBS's separate settlements with Multi-Strat and the Debtor does not create "arising in, under, or related to" jurisdiction;[20] (b) the automatic stay does not apply to co-defendants, and (c) the Debtor has

---

[18] Dugaboy makes the nonsensical argument that the Debtor could settle its claims against Multi-Strat for "$18,000,000 [sic]" in lieu of Multi-Strat settling its claim against UBS. In Dugaboy's mind, this settlement would provide a cash inflow to the estate of $18 million and the failure to do this settlement somehow constitutes an impermissible plan modification under 11 U.S.C. § 1127. Dugaboy Obj. ¶ 11. For the reasons set forth above, this makes no sense. The Debtor does not have a claim against Multi-Strat on account of the fraudulently conveyed assets. The Debtor did not convey those assets to Multi-Strat nor were those assets fraudulently transferred out of an entity that the Debtor had a claim against.

[19] This position is ironic. Mr. Dondero has consistently argued to this Court that the Debtor has violated, among other statutes, 11 U.S.C. § 363 by *not* seeking this Court's authority before causing its managed funds and CLOs to sell assets. *See, e.g., James Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside the Ordinary Course of Business* [Docket No. 1439].

[20] Because Multi-Strat's settlement with UBS could conceivably have an impact on the estate, at a minimum, "related to" jurisdiction exists. *See, e.g., Burch v. Freedom Mortg. Corp. (In re Burch)*, 835 Fed. Appx. 741, 748 (5th Cir.

admitted to this Court's lack of jurisdiction. Each of these arguments evinces a clear misunderstanding of the facts and the relief sought.

30. The Debtor does not contend that this Court has jurisdiction over Multi-Strat's assets. Multi-Strat's assets are not "property of the estate" under 11 U.S.C. § 541 or for purposes of 11 U.S.C. § 363(b). *See, e.g., In re Guyana Dev. Corp.*, 68 B.R. 892, 905 (Bankr. S.D. Tex. 1994) ("As a general rule, property of the estate includes the debtor's stock in a subsidiary but not the assets of the subsidiary."). However, the Motion recognizes that 11 U.S.C. § 363(b) might still apply to the Debtor's exercise of its contractual rights under the IMA to manage and govern Multi-Strat (Motion ¶53), as those rights ***do*** constitute property of the estate. *See In re Thomas*, 2020 Bankr. LEXIS 1364 at *31 (Bankr. W.D. Tenn. 2020) (a debtor's membership interest in an LLC, including both its economic rights and governance rights, became property of the estate on the petition date, but the assets of the LLC remain separate and the debtor must manage them consistent with the terms of the operating agreement and applicable law); *In re Cardinal Indus.*, 105 B.R. 834, 849 (Bankr. S.D. Ohio 1989).

31. This is consistent with the Debtor's position throughout this case that: (a) assets of non-debtor subsidiaries and funds are not "property of the estate;" (b) the Debtor's contractual right to manage and control the disposition of those assets is "property of the estate;" and (c) the Debtor generally does not need Court approval to exercise those rights because causing the managed funds to sell assets is in the "ordinary course of [the Debtor's] business" and exempt from approval under 11 U.S.C. § 363(c).[21] *See generally Debtor's Response to Mr. James*

---

2021) (finding that a proceeding "relates to" a case under Title 11 if "the outcome of [the non-bankruptcy] proceeding could conceivably have any effect on the estate being administered in bankruptcy.")*.*

[21] Dugaboy cites to the "May 20, 2020 settlement between UBS, the Debtor and Multi-Strat" as an example of an agreement that was not brought to this Court for approval under 11 U.S.C. § 363. A true and correct copy of the May 20, 2020 settlement agreement (the "May Agreement") is attached hereto as Exhibit 8. As an initial matter, the Debtor was not party to that agreement; it was executed solely by UBS, Multi-Strat, and certain of Multi-Strat's wholly-

*Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside the Ordinary Course of Business* [Docket No. 1546].

32.     The difference here is that the Debtor is exercising its management and control rights to cause Multi-Strat to settle a material litigation claim against it. That does not involve the sale of an asset or an investment and is arguably outside the ordinary course of the Debtor's business, necessitating this Court's approval under 11 U.S.C. § 363(b). *See, e.g., In re Patriot Place, Ltd.*, 486 B.R. 773, 793 (Bankr. W.D. Tex. 2013) (finding that a transaction is "ordinary course" if it does not "subject[] a hypothetical creditor to a different economic risk than existed when the creditor originally extended credit" and is "of the sort commonly undertaken in the industry."). The Debtor respectfully submits that the settlement between UBS and Multi-Strat as negotiated by the Debtor in an exercise of its management rights should be approved pursuant to 11 U.S.C. § 363(b) for the reasons set forth herein and in the Motion.

> **2.     The Dondero Objection Is Without Merit**

33.     Mr. Dondero generally objects to the UBS settlement on two purported grounds: (a) the settlement impermissibly inflates UBS's claim, and (b) Multi-Strat's settlement of UBS's claims against Multi-Strat potentially violate the Bankruptcy Code and are contrary to investor interests. Mr. Dondero's objections are without merit.

> **a.     The Settlement Does Not Inflate UBS's Claims**

34.     Mr. Dondero argues that the Motion "lacks a sufficient foundation to demonstrate

---

owned subsidiaries. Further, the May Agreement was entered into to allow Multi-Strat to sell certain assets that were the subject of UBS's claim against Multi-Strat. Consequently, the May Agreement was not brought to this Court because it involved Multi-Strat executing an agreement with a non-debtor that would allow Multi-Strat to sell assets. The May Agreement was thus executed in the ordinary course of business and did not require this Court's approval pursuant to 11 U.S.C. § 363(c).

Dugaboy cannot assert that it did not have notice of the May Agreement. Dugaboy filed a proof of claim (Claim No. 177) alleging that the transactions effectuated through the May Agreement constituted a breach of the Debtor's duty to Dugaboy. Dugaboy, therefore, cannot ***not*** have had notice of the May Agreement.

that UBS is entitled to the inflated claim proposed under the settlement." Dondero Obj. ¶27. In other words, Mr. Dondero does **not** object to the proposed settlement with UBS that was announced at the hearing on the Debtor's Plan, which included a $50 million general unsecured claim and a $25 million subordinated claim being provided to UBS. Instead, Mr. Dondero objects, without irony, to the additional $15 million general unsecured claim and $35 million subordinated claim. Mr. Dondero clearly misunderstands the relevant facts and law.

35.     UBS has asserted claims against the Debtor alleging, among other things, that the Debtor caused the Funds **not** to pay the amounts they owed to UBS. Recently, the Debtor discovered that Dondero and the Dondero-controlled Debtor actually and intentionally caused the Funds to transfer over $300 million in face amount of the Funds' assets to an offshore entity owned and controlled by Mr. Dondero and Mr. Ellington. The Dondero and Dondero-controlled Debtor then covered up that transaction during this Bankruptcy Case. These facts are undeniable and damning; substantially undercut the Debtor's defense that it did not impede the Funds' ability to pay UBS's judgment; and caused the Debtor to agree to increase the consideration under the proposed settlement.

36.     Mr. Dondero also argues that the August 2017 transfer to Sentinel cannot relate to UBS's claim because that claim arose out of actions taken in 2008 and 2009. Mr. Dondero, however, misunderstands UBS's claim, which includes a broad reservation of rights "to assert any additional claims, defenses, remedies, and causes of action, including without limitation, claims for fraudulent inducement, breach of contract, tortious interference with contractual relations, fraudulent conveyances, or alter ego recovery." *See* Claim Nos. 190, 191, Annex ¶28. Just because the Sentinel fraud occurred *after* 2009 and potentially included assets not held by the Funds in 2009 does not mean that the Debtor escapes all potential liability for those transfers (especially

when they were hidden from UBS, the Independent Directors, and this Court).

37.    Mr. Dondero next argues that the settlement is "vastly inflated from the Debtor's contention that the maximum amount should be $35,742,978.978 [sic] and exceeds even the Court's determination as to the amount to be allowed for voting purposes."  Dondero Obj. ¶34. Mr. Dondero again ignores the facts.  This Court estimated UBS's claim at approximately $95 million, which included approximately $23 million (exclusive of interest) from Multi-Strat.  The proposed settlement provides for (a) an $18.5 million payment from Multi-Strat and (b) a $65 million general unsecured claim and a $60 million subordinated claim against the estate.  As such, Mr. Dondero ignores the fact that Multi-Strat will pay substantially less under the settlement than was estimated by this Court.  Mr. Dondero also assumes that the $65 million general unsecured claim and the $60 million subordinated claim will obtain the same rate of recovery under the Plan; they may not.  As such, the Settlement Agreement is substantially in line with the Court's Estimated Claim (even after subtracting amounts allocable to Multi-Strat).

> **b.    The Settlement Does Not Contravene the Plan's Classification of Claims and Interests**

38.    Mr. Dondero states – without case law or support – that because the UBS settlement provides a "direct payment from Multi-Strat, one of its managed funds which the Debtor asserts it owns 59% and controls" it may violate the "fair and equitable" standard and the Plan's classification scheme.  Dondero Obj. ¶38.  Admittedly, the Debtor does not fully understand this argument.  Nevertheless, Mr. Dondero plainly ignores UBS's substantial and direct claims against Multi-Strat.  There is nothing improper about Multi-Strat – a non-debtor – paying cash to one of its creditors outside of the Plan, and there is no need to classify UBS's claim against Multi-Strat under the Debtor's Plan.  *See Guyana.*, 168 B.R. at 905.

### c. "Investor Desires" Are Irrelevant

39. Mr. Dondero next argues that the "Multi-Strat payment also may conflict with investor desires and the Debtor's management agreement with Multi-Strat." Dondero Obj. ¶39. In light of the fraud discussed above, this argument is absurd.

40. *First*, and as discussed above, the only limited partners in Multi-Strat are the Debtor and entities controlled by Mr. Dondero. Moreover, the Debtor and MSCF GP have the sole and exclusive right to manage and control Multi-Strat, including to settle litigation. The fact that the settlement may reduce the value of Mr. Dondero's indirect, minority interests in Multi-Strat does not give Mr. Dondero the authority to block Multi-Strat's settlement of claims against it. *Second*, the Multi-Strat settlement with UBS is well in line with this Court's estimation of Multi-Strat's liability to UBS. *Third*, Mr. Dondero has no direct interest in Multi-Strat, and, unless he is finally ready to admit that there is no distinction between him and CLOH, Dugaboy, and HCMS (which is clear notwithstanding a formal admission), he has no standing to object on behalf of Multi-Strat's investors. *Fourth*, if Mr. Dondero is implying that the Debtor's creditors do not support the settlement, he should note that he is the ***only*** (purported) creditor objecting. The foregoing applies equally to Mr. Dondero's claim that the releases under the Settlement Agreement with respect to Multi-Strat are vague.

## C. Mr. Dondero and Dugaboy Ignore the "Paramount Interest of Creditors"

41. Despite spending considerable time and expense objecting to the UBS settlement, neither Mr. Dondero nor Dugaboy even address the third factor analyzed by the Fifth Circuit when approving settlements – all other factors bearing on the wisdom of the compromise, including "the paramount interest of creditors with proper deference to their reasonable views." *Cajun Elec.*, 119 F.3d at 356. This omission is telling. Except for Mr. Dondero and Dugaboy – one of Mr. Dondero's proxies – no creditor or party in interest has objected to the settlement. And Mr.

21

Dondero and Dugaboy can barely be classified as creditors as they have no cognizable pecuniary interest in the estate. Mr. Dondero's desire to re-assert control over the estate or to "burn the place down" should not, in any circumstance, outweigh the preferences of the Debtor and its legitimate creditors. Those creditors have not objected to the settlement, and their preference for a reasonable and expeditious settlement of UBS's claims and the start of distributions under the Plan is clear.

*[Remainder of Page Intentionally Blank]*

DOCS_NY:43138.5 36027/002

WHEREFORE, for the reasons set forth above and in the Motion, the Debtor respectfully requests that the Court grant the Motion.

Dated: May 14, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
Robert J. Feinstein (NY Bar No. 1767805)
John A. Morris (NY Bar No. 266326)
Elissa A. Wagner (CA Bar No. 213589)
Gregory V. Demo (NY Bar No. 5371992)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        rfeinstein@pszjlaw.com
        jmorris@pszjlaw.com
        ewagner@pszjlaw.com
        gdemo@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*