# EXHIBIT 1

**Memorandum Number _____**

# Confidential Private Placement Memorandum

*Series B, Series C and Series D Limited Partner Interests in*

# Highland Multi Strategy Credit Fund, L.P.

*General Partner*

Highland Multi Strategy Credit Fund GP, L.P.

*Investment Manager*

Highland Capital Management, L.P.

**November 2014**

## **TABLE OF CONTENTS**

Page

NOTICE....................................................................................................................... ii

DIRECTORY ...............................................................................................................iv

EXECUTIVE SUMMARY OF PRINCIPAL TERMS ...................................................1

INVESTMENT PROGRAM ..........................................................................................2

MANAGEMENT ...........................................................................................................4

SUMMARY OF TERMS ................................................................................................8

RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST..........................25

BROKERAGE AND CUSTODY ..................................................................................54

TAX CONSIDERATIONS ............................................................................................56

ERISA AND OTHER REGULATORY CONSIDERATIONS .....................................67

PARTNERSHIP AGREEMENT - APPENDIX A

**NOTICE**

This Confidential Private Placement Memorandum (this "*Memorandum*") is being furnished on a confidential basis solely to selected qualified investors (or their respective authorized representatives) considering the purchase of limited partner interests (the "*Interests*") in Highland Multi Strategy Credit Fund, L.P. (the "*Fund*"). This Memorandum is not to be reproduced or distributed to others, at any time, without the prior written consent of Highland Multi Strategy Credit Fund GP, L.P. (the "*General Partner*") (other than to professional advisors and employees of the prospective investor receiving this Memorandum from the General Partner or its authorized representative or such prospective investor).

Each recipient agrees to keep confidential all information contained herein not already in the public domain and will use this Memorandum for the sole purpose of evaluating a possible investment in the Fund. Notwithstanding anything herein to the contrary, each investor (and each employee, representative, or other agent of the investor) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of an investment in the Fund and all materials of any kind (including opinions or other tax analyses) that are provided to the investor relating to such tax treatment and tax structure. Acceptance of this Memorandum by prospective investors constitutes an agreement to be bound by the foregoing terms.

No person has been authorized to give any information or to make any representation concerning the Fund or the offering of the Interests other than the information contained in this Memorandum and, if given or made, such information or representation must not be relied upon as having been authorized by the Fund or the General Partner. Prospective investors should not construe the contents of this Memorandum as legal, tax or financial advice. Each prospective investor should consult its own professional advisors as to the legal, financial, tax, ERISA (as defined herein) or other related matters relevant to the suitability of an investment in the Fund for such investor. In making an investment decision, investors must rely on their own examination of the Fund and the terms of the offering contemplated by this Memorandum. The Interests have not been recommended by any U.S. federal or state, or any non-U.S., securities commission or regulatory authority. Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this Memorandum. Any representation to the contrary is a criminal offense.

This Memorandum does not constitute an offer to sell, or the solicitation of an offer to buy, any Interests in any state or other jurisdiction where, or to or from any person to or from whom, such offer or solicitation is unlawful or not authorized. The Interests have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "*Securities Act*"), or the securities laws of any of the states of the United States. The offering and any potential sale contemplated by this Memorandum will be made in reliance upon an exemption from the registration requirements of the Securities Act for offers and sales of securities which do not involve any public offering and analogous exemptions under state securities laws. There will be no public market for the Interests, and there is no obligation on the part of any person to register the Interests under the Securities Act or any state securities laws. The Fund has not been and will not be registered under the U.S. Investment Company Act of 1940, as amended. Interests are suitable only for sophisticated investors who do not require immediate liquidity for their investments, for whom an investment in the Fund does not constitute a complete investment program and who fully understand and are willing to assume the risks involved in the Fund's investment program. The Fund's investment practices, by their nature, may be considered to involve a

substantial degree of risk. See "*Risk Factors and Potential Conflicts of Interest*" beginning at page 25. No assurance can be given that the Fund's investment objectives will be achieved or that investors will receive a return of their capital.

The Interests are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and any applicable state or other securities laws, pursuant to registration or an exemption therefrom. The transferability of the Interests will be further restricted by the terms of the limited partnership agreement of the Fund. Investors should be aware that they will be required to bear the financial risks of an investment in the Interests for an extended period of time.

This Memorandum does not purport to be, and should not be construed as, a complete description of the limited partnership agreement of the Fund or the investment management agreement by and among the Fund's investment manager, the General Partner and the Fund. Each prospective investor in the Fund is encouraged to review the Fund's limited partnership agreement carefully, in addition to consulting appropriate legal and tax advisors. To the extent of any inconsistency between this Memorandum and the Fund's limited partnership agreement, the terms of the Fund's limited partnership agreement control.

Certain information contained in this Memorandum constitutes "forward-looking statements," which can be identified by the use of forward-looking terminology such as "may," "will," "should," "expect," "anticipate," "project," "estimate," "intend," or "believe" or the negatives thereof or other variations thereon or comparable terminology. Due to various risks and uncertainties, including those described in "Risk Factors and Potential Conflicts of Interest," actual events or results or the actual performance of the Fund may differ materially from those reflected or contemplated in such forward-looking statements.

Pursuant to an exemption from the Commodity Futures Trading Commission, neither the General Partner nor the Investment Manager is registered with as a commodity pool operator and therefore, unlike a registered commodity pool operator, is not required to deliver a disclosure document or a certified annual report to participants in this pool. Among other things, the exemption requires the filing of a claim of exemption with the National Futures Association. It is also required that at all times either: (a) the aggregate initial margin and premiums required to establish commodity interest positions does not exceed 5% of the liquidation value of the Fund's portfolio; or (b) the aggregate net notional value of the Fund's commodity interest positions does not exceed 100% of the liquidation value of the Fund's portfolio and further that all pool participants are required to be accredited investors or certain other qualified investors.

All references herein to "$" refer to U.S. dollars.

This Memorandum is accurate as of its date, and no representation or warranty is made as to its continued accuracy after such date.

**DIRECTORY**

| | |
|---|---|
| **General Partner** | **Highland Multi Strategy Credit Fund GP, L.P.**<br>300 Crescent Court<br>Suite 700<br>Dallas, Texas 75201 |
| **Investment Manager** | **Highland Capital Management, L.P.**<br>300 Crescent Court<br>Suite 700<br>Dallas, Texas 75201 |
| **Prime Broker** | **BNY Mellon Trust Company N.A.**<br>601 Travis Street, 16th FL (775-1700)<br>Houston, Texas 77002 |
| **Administrator** | **SEI Global Services, Inc.**<br>One Freedom Valley Drive<br>Oaks, Pennsylvania 19456 |
| **Auditors** | **PricewaterhouseCoopers LLP**<br>2001 Ross Avenue, Suite 1800<br>Dallas, Texas 75201 |
| **Legal Counsel** | **Akin Gump Strauss Hauer & Feld LLP**<br>1700 Pacific Avenue, Suite 4100<br>Dallas, Texas 75201 |

\* \* \* \* \*

*This Memorandum does not purport to be and should not be construed as a complete description of the Fund's limited partnership agreement, a copy of which is attached hereto as Appendix A. Any potential investor in the Fund is encouraged to review the Fund's limited partnership agreement carefully, in addition to consulting appropriate legal and tax counselors.*

iv

**EXECUTIVE SUMMARY OF PRINCIPAL TERMS**

| | |
|---|---|
| **The Fund** | Highland Multi Strategy Credit Fund, L.P., a Delaware limited partnership (the "*Fund*"). |
| **General Partner** | Highland Multi Strategy Credit Fund GP, L.P., a Delaware limited partnership (the "*General Partner*"). |
| **Investment Manager** | Highland Capital Management, L.P., a Delaware limited partnership (the "*Investment Manager*"). |
| **Investor Eligibility** | Investors must be both "accredited investors" and "qualified purchasers." |
| **Offshore Feeder Fund** | In order to facilitate investments by non-U.S. and other tax-exempt investors, the Investment Manager has sponsored the formation of Highland Multi Strategy Credit Fund, Ltd., a Cayman Islands exempted company (the "*Offshore Fund*"). The Offshore Fund places all of its assets in and conducts all of its investment and trading activities through the Fund as a limited partner of the Fund. |
| **Investment Objective** | The Fund seeks attractive risk-adjusted returns, consistent with the preservation of capital and prudent investment management. |
| **Series of Interests** | The Fund has four series of Interests and is offering Series B Interests, Series C Interests and Series D Interests pursuant to this Memorandum. |
| **Minimum Investment** | The initial minimum investment is $1,000,000.00, although the General Partner has the right to accept lesser amounts. |
| **Management Fee** | Annual rate of 1.5% for Series B Interests, 1.0% for Series C Interests, and 2.0% for Series D Interests, calculated and payable quarterly in advance. |
| **Performance Allocation** | Highland Capital Management, L.P., as a special limited partner of the Fund, is entitled to receive an annual performance-based profit allocation at the end of each year equal to 20% of the Fund's net profits, subject to a "high water mark." |
| **Withdrawals** | Withdrawal rights vary by Series and are subject to timing restrictions, reserves for contingencies, partial hold-back pending completion of an annual audit and suspension restrictions as further described in "*Summary of Terms*." |
| **Variation of Terms** | The General Partner and/or the Investment Manager (as applicable) may agree with certain limited partners to a variation of the terms set forth in this Memorandum or establish additional classes or series of limited partner interests that have terms that differ from those described herein, including different management fees, performance allocations and withdrawal rights. |

## INVESTMENT PROGRAM

### Investment Objective

The Fund's investment objective is to seek attractive risk-adjusted returns, consistent with the preservation of capital and prudent investment management.   No assurance can be given, however that the Fund will achieve this objective.

### Investment Strategy

*Investment Asset Classes*

The following is a description of the principal types of securities in which the Fund may invest and certain trading techniques the Fund may employ.   The following description is merely a summary and the Investment Manager has discretion to cause the Fund to invest in other types of securities and to follow other investment criteria and guidelines.   However, consistent with the investment strategy of the Fund, all new investments made by the Fund must, at the time of purchase, (i) trade over-the-counter or on an exchange, (ii) have a third-party quote or valuation available, and (iii) be considered a marketable investment in the reasonable opinion of the Investment Manager.   An investment is a marketable investment if in the reasonable opinion of the Investment Manager it can be sold at the mark within 30 calendar days.   Notwithstanding the foregoing, the Fund may invest up to 20% of its net asset value in non-marketable investments if and when the Fund's net asset value reaches $1 billion.

*Debt and Debt-Like Securities.*   The Investment Manager intends for debt securities to be the Fund's primary focus, with a target allocation of 40-60% of net asset value of the Fund, although this may vary depending on market conditions.   The Fund may invest (both long and short) in debt securities of any kind, including debt securities of varying maturities, debt securities paying a fixed or fluctuating rate of interest, inflation-indexed bonds, structured notes, loan assignments, loan participations, asset-backed securities, collateralized loan obligation ("***CLO***") securities (including, rated and unrated, debt, equity and preference share instruments relating to collateralized loan obligations ("***CLO Securities***")), debt securities convertible into equity securities, and securities issued or guaranteed by the U.S. Government or its agencies or instrumentalities, by foreign governments or international agencies or supranational entities or by domestic or private issuers.

The Fund may invest in debt securities of any credit quality, including below investment grade securities (also known as "high yield securities" or "junk securities").   Such securities are rated below investment grade by a nationally recognized statistical rating organization ("***NRSRO***") or are unrated but deemed by the Investment Manager to be of comparable quality.   The Fund may invest without limitation in below investment grade or unrated securities, including in insolvent borrowers or borrowers in default.

*Equity and Equity-Like Securities.*   The Fund may invest (both long and short) in common stock, preferred stock, securities convertible into common stock, rights and warrants or securities or other instruments whose price is linked to the value of common stock.   Although the equity securities in which the Fund invests may have any capitalization, may be dominated in any currency, and may be located in emerging markets without limit, the Fund will primarily invest in equity securities of large capitalization companies that are located in developed markets. Additionally, the Fund may invest in equity or subordinated tranches of asset-backed securities, including CLOs, and may also invest in life settlement

2

policies and other instruments that have equity-like characteristics that meet the investment objective of the Fund.

*Investment Themes*

The Investment Manager's investment philosophy is based on the belief that thorough, fundamental research and a disciplined research methodology increase the likelihood of producing attractive long-term results. The Investment Manager uses this research in an attempt to anticipate long-term secular trends and identify those investments that have the highest relative value characteristics across four primary investment themes.

1) Convergence – Investments in market sectors in which the Investment Manager believes are mispriced and will converge to historic norms over time.

2) Deep Value – Investments in companies that the Investment Manager believes the market has undervalued. Through thorough research the Investment Manager believes the current market value does not correspond with the company's long-term fundamentals.

3) Event Driven – The Investment Manager will generally focus on equity and debt investments with catalysts that could include, but are not limited to, asset sales, covenant violations, liability management, amend/extend, refinancing, tenders and mergers/acquisitions.

4) Activism – Material holdings or controlling interests in companies, including the potential to obtain representation on the company's board, with the goal of affecting a change in the company in order to drive future profitability and value realization.

The Investment Manager may also manage interest rate, default, currency and other risks through a variety of trading methods and market tools, including security shorting and derivative hedging instruments, as it deems appropriate.

Although the Investment Manager expects to maintain a diversified portfolio of investments, it does not intend to limit itself to any one particular investment theme or asset class. Rather, the Investment Manager intends to follow a flexible approach in order to place itself in the best position to capitalize on opportunities in the financial markets.

*The investment objectives and methods summarized above represent the General Partner's and Investment Manager's current intentions. Depending on conditions and trends in the securities markets and the economy in general, the General Partner and the Investment Manager may pursue any objectives, employ any investment techniques or purchase any type of security that they consider appropriate and in the best interests of the Fund whether or not described in this section. The foregoing discussion includes and is based upon numerous assumptions and opinions of the General Partner and Investment Manager concerning world financial markets and other matters, the accuracy of which cannot be assured.* **There can be no assurance that the Fund's investment strategy will achieve** *profitable results.*

# MANAGEMENT

## The General Partner and the Investment Manager

Highland Multi Strategy Credit Fund GP, L.P., a Delaware limited partnership (the "***General Partner***"), serves as the general partner of the Fund. Highland Capital Management, L.P., a Delaware partnership (the "***Investment Manager***" or "***Highland***"), serves as the investment manager of the Fund and has responsibility for the Fund's investment program. James D. Dondero ultimately controls the General Partner and the Investment Manager.

The General Partner has the full authority of a general partner under Delaware law. The powers of the General Partner described in this Memorandum and the Partnership Agreement are not exhaustive and are not limited to the specific authorities described therein. Thus, subject to applicable law, the General Partner may make certain decisions or take certain actions even where those decisions or actions are not expressly granted in the Partnership Agreement or described in this Memorandum.

## The Investment Management Agreement

The Investment Manager serves pursuant to an investment management agreement with the Fund, the Offshore Fund and the General Partner (the "***Investment Management Agreement***"). Under the Investment Management Agreement, the Investment Manager has full discretion to invest the assets of the Fund in pursuit of the investment objective and strategy described in this Memorandum.

The Investment Management Agreement provides that, in the absence of willful misconduct, fraud or gross negligence, each of the Investment Manager, its principals, shareholders, managers, employees and affiliates will be indemnified by the Fund and/or the Offshore Fund, to the extent permitted by law, against any loss or liability incurred by any of such persons in performing their duties under the Investment Management Agreement. For its services the Investment Manager is entitled to the Management Fee and reimbursement of any expenses incurred on behalf of the Fund or the Offshore Fund.

## Investment Personnel

The key investment professionals of the Investment Manager who will be responsible for the Fund's investments are described below.

## James Dondero, CFA, Co-Founder, President

James Dondero is Co-founder and President of Highland Capital Management, L.P. (an alternative asset manager specializing in high-yield fixed income investments). Jim has over 30 years of experience in the credit markets. Prior to founding Highland in 1993, Jim served as Chief Investment Officer of Protective Life's GIC subsidiary and helped grow the business from concept to over $2 billion between 1989 and 1993. His portfolio management experience includes mortgage-backed securities, investment grade corporates, leveraged bank loans, high-yield bonds, emerging market debt, derivatives, preferred stocks and common stocks. From 1985 to 1989, he managed approximately $1 billion in fixed income funds for American Express. Prior to American Express, he completed the financial training program at JP Morgan. Jim received a BS in Commerce (Accounting and Finance) from the University of Virginia. Jim is a Certified Public Accountant, a Certified Managerial Accountant, and a Chartered Financial Analyst. He currently serves as Chairman for CCS Medical and NexBank and serves on the

4

Board of Directors of American Banknote Corporation, Cornerstone Healthcare Group and Metro-Goldwyn-Mayer.

**Mark Okada, CFA, Co-Founder, Chief Investment Officer**

Mr. Okada is Chief Investment Officer of Highland Capital Management, L.P. and is responsible for overseeing Highland's investment activities for its various strategies. Mr. Okada is a pioneer in the development of the bank loan market and has over 30 years of credit experience. He is responsible for structuring one of the industry's first arbitrage CLOs and was actively involved in the development of Highland's bank loan separate account and mutual fund platforms. Mr. Okada received a BA in Economics and a BA in Psychology, cum laude, from the University of California, Los Angeles. He has earned the right to use the Chartered Financial Analyst designation. Mr. Okada is a Director of NexBank, Chairman of the Board of Directors of Common Grace Ministries, Inc., is on the Board of Directors for Education is Freedom, and also serves on the GrowSouth Fund Advisory board.

**Josh Terry, CFA, Head of Structured Products and Trading**

Mr. Terry is Head of Structured Products and Trading at Highland Capital Management, L.P. He leads the trading desk, structured products and CLO fund management teams. Since joining Highland in July 2005, Mr. Terry has served in various roles, including Senior Portfolio Analyst on the Distressed & Special Situations investment team, trading loans, bonds and equities on Highland's trading desk, and leading the sector rotation and fund management process for Highland's par credit funds. Prior to joining Highland in July 2005, Mr. Terry worked as an Investment Banking Analyst at Stephens Inc., where he focused on M&A transactions and equity financings for public and private middle-market companies. Mr. Terry serves as Chairman of the Finance Committee on the Board of Governors of Uplift Education, a network of charter schools in the Dallas-Fort Worth area. He received a BBA in Finance and Economics, summa cum laude, from Baylor University. Mr. Terry has earned the right to use the Chartered Financial Analyst designation.

**Trey Parker, Managing Director**

Mr. Parker is Managing Director and Head of Credit Research at Highland Capital Management, L.P. Mr. Parker is responsible for managing the Credit Research Team/Platform. Prior to his current role, Mr. Parker was a Portfolio Manager covering a number of the industrial verticals, as well as parts of Tech, Media and Telecom; he also worked as a Senior Portfolio Analyst on the Distressed & Special Situations investment team. Prior to joining Highland in March 2007, Mr. Parker was a Senior Associate at Hunt Special Situations Group, L.P., a Private Equity group focused on distressed and special situation investing. Mr. Parker was responsible for sourcing, executing and monitoring control Private Equity investments across a variety of industries. Prior to joining Hunt in 2004, Mr. Parker was an analyst at BMO Merchant Banking, a Private Equity group affiliated with the Bank of Montreal. While at BMO, Mr. Parker completed a number of LBO and mezzanine investment transactions. Prior to joining BMO, Mr. Parker worked in sales and trading for First Union Securities and Morgan Stanley. Mr. Parker received an MBA with concentrations in Finance, Strategy and Entrepreneurship from the University of Chicago Booth School of Business and a BA in Economics and Business from the Virginia Military Institute. Mr. Parker serves on the Board of Directors of Euramax Holdings, Inc., TerreStar Corporation, JHT Holdings, Inc., and a non-profit organization, the Juvenile Diabetes Research Foundation (Dallas chapter).

**Advisory Committee**

The General Partner and/or the Investment Manager may appoint, or cause to be appointed, a committee (the "*Advisory Committee*") consisting of one or more individuals selected by the General Partner and/or the Investment Manager, none of whom is affiliated with the General Partner and/or the Investment Manager (except as a Limited Partner or as an investor in the Fund or an affiliate thereof). If established, the Advisory Committee will have the authority, at the request of the General Partner and/or the Investment Manager, to consult with the General Partner and/or the Investment Manager on any matters that may involve a conflict of interest between the General Partner and/or the Investment Manager (or their affiliates) on the one hand and the Limited Partners (or shareholders of the Offshore Fund) and the Fund on the other. Any consent given by a majority of the Advisory Committee on behalf of the Fund in good faith after consultation with the General Partner and/or the Investment Manager is binding on the Fund and the Limited Partners or shareholders of the Offshore Fund (so long as such majority consists of persons independent of the General Partner and/or the Investment Manager and their affiliates). The Fund will have the authority to agree to reimburse members of the Advisory Committee for their out-of-pocket expenses and to indemnify them to the maximum extent permitted by law.

**Administrator**

SEI Investments is a leading global provider of investment processing, investment management and investment operations solutions for institutional and personal wealth management. For more than 40 years, SEI has helped corporations, financial institutions, financial advisors and ultra-high-net-worth families create and manage wealth by providing comprehensive, innovative, investment and investment-business solutions. SEI manages or administers $601.9 billion in funds and separately managed assets. SEI is a public company and is listed on the NASDAQ exchange under the symbol SEIC. SEI has been retained to perform certain administrative, accounting and investor services for the Fund and the Offshore Fund (in such capacity, the "*Administrator*"). In its capacity as Administrator, it will receive customary fees that will be paid out of the assets of the Fund. The Administrator will also be reimbursed for all reasonable out-of-pocket expenses.

The Fund will enter into an administration agreement (the "*Administration Agreement*") with the Administrator. The Administrator will be under no duty to take any action on behalf of the Fund except as specifically set forth in the Administration Agreement or as may be specifically agreed to by the Administrator and the Fund in a written amendment thereto.

The Administrator will act as liaison with the Fund's accountants and auditors and will provide account analyses, fiscal year summaries, and other audit-related schedules with respect to the Fund. The Administrator will take all reasonable action in the performance of its duties under the Administration Agreement to assure that the necessary information is made available to such accountants and auditors for the expression of their opinion, as required by the Fund.

The Administrator will enter into and will maintain in effect with appropriate parties one or more agreements making reasonable provisions for emergency use of electronic data processing equipment to the extent appropriate equipment is available. In the event of equipment failures, the Administrator will, at no additional expense to the Fund, take reasonable steps to minimize service interruptions. The Administrator will have no liability with respect to the loss of data or service interruptions caused by equipment failure, provided such loss or interruption is not caused by the Administrator's own willful misfeasance, bad faith, gross negligence or reckless disregard of its duties or obligations under the Administration Agreement.

Subject to the terms of the Administration Agreement, the Administrator will be liable to the Fund (or any person or entity claiming through the Fund) for damages only to the extent caused by the Administrator's own fraud or willful misconduct under the Administration Agreement ("***Standard of Care***"). The Administrator will not be liable for damages (including, without limitation, damages caused by delays, failure, errors, interruption or loss of data) occurring directly or indirectly by reason of circumstances beyond its reasonable control. The Administrator will not be under any duty or obligation to inquire into and will not be liable for the validity or invalidity, authority or lack thereof, or truthfulness or accuracy or lack thereof, of any instruction, direction, notice, instrument or other information which the Administrator reasonably believes to be genuine. The Administrator will not be liable for any damages that are caused by actions or omissions taken by the Administrator in accordance with written instructions by authorized persons of the Fund or advice of counsel. The Administrator will not be liable for any damages arising out of any action or omission to act by any prior service provider of the Fund or for any failure to discover any such error or omission. Neither the Administrator nor its affiliates will be liable for any consequential, incidental, exemplary, punitive, special or indirect damages, whether or not the likelihood of such damages was known by the Administrator or its affiliates. Both the Fund and the Administrator will have a duty to mitigate damages for which the other party may become responsible.

Absent the Administrator's failure to meet its Standard of Care, the Fund agrees to indemnify, defend and hold harmless the Administrator and its affiliates and their respective directors, trustees, officers, agents and employees from certain claims, suits, actions, damages, losses, liabilities, obligations, costs and reasonable expenses (including attorneys' fees and court costs, travel costs and other reasonable out-of-pocket costs related to dispute resolution) arising directly or indirectly from any actions taken or omitted to be taken by the Administrator in connection with the provision of services to the Fund.

The Offshore Fund will also enter into an administration agreement with the Administrator, under which the terms will be substantially as above.

## SUMMARY OF TERMS

*The following Summary of Terms summarizes the principal terms of an investment in the Fund, and is subject, and qualified in its entirety by reference, to the limited partnership agreement of the Fund, as amended (the "**Partnership Agreement**") and the subscription documents (the "**Subscription Documents**"). This summary is intended to be brief and does not purport to provide a comprehensive explanation of the Partnership Agreement and the Subscription Documents. Accordingly, statements made in this Memorandum are subject to the detailed provisions of those agreements. Prospective investors are urged to review those agreements in their entirety prior to determining whether to invest in the Fund.*

| | |
|---|---|
| **The Fund** | The Fund is a limited partnership formed on December 1, 2005 under the laws of the State of Delaware with the name "Highland Credit Opportunities CDO, L.P." The General Partner filed an amendment to the Certificate of Limited Partnership of the Fund on August 26, 2014, changing the name of the Fund to "Highland Multi Strategy Credit Fund, L.P." |
| **Recent Amendments; Series of Interests** | The General Partner and the existing Limited Partners of the Fund adopted the Fourth Amended and Restated Limited Partnership Agreement of the Fund, effective November 1, 2014 (the "***Effective Date***"), whereby all existing limited partner interests were re-designated as "Series A Interests" and three new series of limited partner interests were created – "Series B Interests," "Series C Interests" and "Series D Interests" (the "***Amendments***"). |
| | As of the Effective Date, all existing Limited Partners will hold Series A Interests, the terms of which are set forth in a supplement to this Memorandum. The Fund is currently offering for subscription Series B Interests, Series C Interests and Series D Interests pursuant to this Memorandum. |
| | The Fund may issue additional series of Interests over time (each, a "***Series***"). Not all Series of Interests will be available for subscription at the same time and the terms among the Series of Interests will vary. New Series of Interests may be established by the General Partner without notice to or approval of the Limited Partners. |
| | Except with respect to management fees, performance-based profit allocations and withdrawal rights (each as discussed below), the rights and privileges attributable to Series A Interests, Series B Interests, Series C Interests and Series D Interests are identical. |
| | References herein to "Interests" or "Limited Partners" shall include all Series of Interests and Limited Partners unless otherwise specified or context so requires. |

**General Partner**　　　　Highland Multi Strategy Credit Fund GP, L.P., a Delaware limited partnership. The general partner of the General Partner is Highland Multi Strategy Credit GP, LLC, a Delaware limited liability company of which the Investment Manager is currently the sole member.

**Investment Manager**　　Highland Capital Management, L.P., a Delaware limited partnership.

**Eligible Investors**　　Limited partner interests ("*Interests*") may be purchased by investors who are "accredited investors" and "qualified purchasers," as defined in the Fund's Subscription Documents. Subscribers will be required to complete the Fund's Subscription Documents consisting of the subscription agreement and the subscriber information form to determine their eligibility. The General Partner reserves the right to reject any investor for any reason or for no reason in its sole discretion.

An investment in the Fund is suitable only for persons that have adequate means of providing for their current needs and personal contingencies and have no need for liquidity in their investments. An investment in the Fund should not be made by any person that (a) cannot afford a total loss of its principal, or (b) has not carefully read or does not understand this Memorandum, including the portions concerning the risks and the income tax consequences of an investment in the Fund.

**Subscriptions**　　Subscriptions for Interests may be accepted as of the first Business Day of each calendar month and/or such other days as the General Partner may determine from time to time, generally subject to the receipt of cleared funds on or before the acceptance date. The initial minimum investment is $1,000,000, although the General Partner may accept investments in a lesser amount. Capital contributions may be made in cash or, with the consent of the General Partner, in securities or partly in cash and partly in securities.

"*Business Day*" means any day other than Saturdays, Sundays or any other day banks located in in New York, New York are required or authorized to be closed.

A subscriber admitted to the Fund (a "*Limited Partner*") receives, in exchange for its initial capital contribution and any subsequent capital contribution, an Interest representing a proportionate share of the net assets of the Fund at that time.

There is no minimum aggregate amount of subscriptions that is required for the initial acceptance of subscriptions, nor has the General Partner established any maximum aggregate amount of subscriptions that may be accepted.

All subscribers will be required to comply with such anti-money laundering procedures as are required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and

Obstruct Terrorism (USA PATRIOT Act) Act of 2001 (Pub. L. No. 107-56) and other applicable anti-money laundering regulations as further described in the Subscription Documents.

**Offshore Feeder Fund**    In order to facilitate investments by non-U.S. and other tax-exempt investors, the Investment Manager has sponsored the formation of Highland Multi Strategy Credit Fund, Ltd., a Cayman Islands exempted company (the "***Offshore Fund***"). The Offshore Fund places all of its assets in and conducts all of its investment and trading activities through the Fund as a limited partner of the Fund.

Investors in the Offshore Fund will be issued participating non-voting shares of the Offshore Fund; provided that in the event that the Fund seeks the approval, vote or consent of the Offshore Fund with respect to any matter to which it would be entitled to vote as a limited partner of the Fund under the Partnership Agreement, the Offshore Fund: (i) shall submit such matter for the consent of the holders of shares in the Offshore Fund and (ii) shall cause the Offshore Fund to vote its Interest proportionally for and against such matter in the same proportion that the shareholders in the Offshore Fund voted for and against such matter.

The Investment Manager may establish one or more additional feeder vehicles to invest in the Fund.

**Capital Accounts**    The Fund will maintain a book capital account (a "***Capital Account***") for the General Partner and each Limited Partner (each, a "***Partner***" and collectively, the "***Partners***") to reflect contributions, withdrawals, distributions and allocations of net profit and net loss. The initial balance of each Partner's Capital Account will be equal to the amount of cash or net value of any property contributed to the Fund by such Partner.

If a Partner invests in more than one Series of Interests, the Fund will maintain a separate Capital Account on behalf of such Partner with respect to each such Series and each Capital Account will be treated as if it were the Capital Account of a separate Partner for purposes of determining the Management Fee, the Performance Allocation and withdrawal rights applicable to each Series Capital Account.

If a Partner makes an additional capital contribution to an existing Capital Account, the Capital Account will be sub-divided into separate sub-accounts attributable to each separate capital contribution, with each capital sub-account treated as if it were the Capital Account of a separate Partner for purposes of determining the Management Fee, the Performance Allocation and withdrawal rights applicable to each capital sub-account. References herein to a Partner's "Capital Account" include any such separately maintained capital sub-accounts.

The Fund will issue to the Offshore Fund an Interest and maintain capital sub-accounts that correspond to each Sub-Series of Shares (as defined in the Partnership Agreement) and each capital sub-account is treated separately for determining Management Fees, the Performance Allocations and withdrawal rights.

**Alternative Investment Vehicles**

The General Partner will have the right, in connection with any investment, to direct the capital contributions of some or all of the subscribers to be made through one or more alternative investment vehicles (each an "***Alternative Investment Vehicle***"), and, in the case of an existing investment, transfer all or a portion of such investment to an Alternative Investment Vehicle, if, in the judgment of the General Partner, the use of such vehicle or vehicles would allow the Fund to overcome legal or regulatory constraints, invest in a more tax-efficient manner or would facilitate participation in certain types of investments. Any Alternative Investment Vehicle will be subject to terms and conditions substantially similar to those of the Fund (including Management Fees and the Performance Allocation defined below) and will be managed by the Investment Manager or an affiliate thereof.

**Affiliated Investors**

Interests in the Fund held by the Investment Manager or its affiliates (collectively, "***Affiliated Investors***") may not be assessed the management fees or the performance allocations that are applicable to other investors in the Fund, but share pro rata in other applicable expenses of the Fund (as more fully described in the Partnership Agreement).

**Borrowing and Leverage**

The Fund may buy securities on margin and arrange with banks, brokers and others to borrow money against a pledge of securities in order to employ leverage when the Investment Manager deems such action appropriate.

**Management Fee**

For its services to the Fund, the Investment Manager is entitled to a management fee (the "***Management Fee***"), calculated and payable quarterly in advance, equal to: (i) 1.5% (per annum) of each Capital Account attributable to a Series B Interest, (ii) 1.0% (per annum) of each Capital Account attributable to a Series C Interest and (iii) 2.0% (per annum) of each Capital Account attributable to a Series D Interest.

Management Fees will be appropriately adjusted for any partial quarter. The Investment Manager may reduce or eliminate the Management Fee with respect to any Limited Partner (or Capital Account) in its sole discretion.

**Other Fees and Expenses**

The Fund bears the reasonable, out-of-pocket expenses of the offering of the Interests contemplated hereunder and the recent Amendments, described above, including expenses associated with obtaining any requisite investor consent to such Amendments. To the extent the General Partner deems appropriate, expenses related to the

11

Amendments may be capitalized and amortized by the Fund over a 36-month period from the Effective Date, even though such capitalization and amortization may be a divergence from U.S. generally accepted accounting principles ("**GAAP**"). Amortization of such expenses over a 36-month period may, in certain circumstances, result in a qualification of the Fund's annual audited financial statements. In such instances, the General Partner may decide to (i) avoid the qualification by recognizing the unamortized expenses or (ii) make GAAP conforming changes for financial reporting purposes, but amortize expenses for purposes of calculating the Fund's net asset value. There will be a divergence in the Fund's fiscal year-end net asset value and in the net asset value reported in the Fund's financial statements in any year where, pursuant to clause (ii), GAAP conforming changes are made only to the Fund's financial statements for financial reporting purposes.

If the Fund is terminated within 36 months of the Effective Date, any unamortized expenses will be recognized.

<u>Investment and Operational Expenses</u>. The Fund bears all reasonable costs and expenses directly related to its investment program, including expenses related to research, due diligence, proxies, underwriting and private placements, brokerage commissions, interest on debt balances or borrowings, custody fees, travel fees and expenses related to the Fund's offering and any withholding or transfer taxes imposed on the Fund. The Fund also bears all reasonable, out-of-pocket costs of the administration of the Fund, including (i) accounting, audit and legal expenses (including those incurred for the Fund, the General Partner or the Investment Manager to comply with applicable law, rule or regulation), (ii) costs of any litigation or investigation involving the Fund's activities, (iii) the costs, fees and expenses of any appraisers, accountants or other experts engaged by the General Partner or the Investment Manager as well as other expenses directly related to the Fund's investments and (iv) costs associated with reporting and providing information to existing and prospective Limited Partners. However, the General Partner or the Investment Manager may, in its sole discretion, choose to absorb any such expenses incurred on behalf of the Fund.

The Fund does not have its own separate employees or office. Except as described above and provided for in the Partnership Agreement, the Fund generally does not reimburse the General Partner or the Investment Manager for salaries, office rent and other general overhead costs of the General Partner or the Investment Manager. However, a portion of the commissions generated on the Fund's brokerage transactions may generate "soft dollar" credits that the General Partner and the Investment Manager are authorized to use to pay for research and research-related services and products used by the General Partner or the Investment Manager. In the event that the Investment Manager elects to use soft dollars, it intends to limit such use to services that fall

within the safe harbor afforded by Section 28(e) of the United States Securities Exchange Act of 1934, as amended. See "*Brokerage and Custody*."

**Allocation of Net Profit and Loss**

Net profit or net loss of the Fund (including unrealized gains or losses and Fund expenses) is allocated among the Capital Accounts of the General Partner and the Limited Partners (collectively, the "***Partners***") as of the close of each calendar month, at such times as the Fund receives an additional capital contribution or effects a withdrawal or distribution, or at such other times as the General Partner may determine.

Profit and loss attributable and any Restricted New Issues (as described below) and are determined and allocated among the Partners separately and are not reflected in the determinations and allocations of net profit or net loss attributable to the remainder of the Fund's net assets.

As of the close of each accounting period, the net profit or net loss (other than any profit or loss attributable to Restricted New Issues, which are allocated as per below) will be allocated *pro rata* among the Capital Accounts of the Partners in proportion to their percentage interests in the Fund as of the commencement of the period. Each Partner's percentage interest in the Fund as of the commencement of any period is based on the value of the Partner's Capital Account at such time (excluding any amount attributable to such Partner's share of Restricted New Issues), in relation to the total value of the Fund's net assets at such time (excluding the aggregate amount of net assets attributable to Restricted New Issues).

If the General Partner determines that for legal, tax, regulatory or bona fide other reasons as to which the General Partner and any Limited Partner may agree such Limited Partner should not participate (or should receive a reduced participation) in the net profit or net loss with respect to any investment, the General Partner may allocate net profit or net loss, if any, with respect to the investment to Limited Partners to the extent to which the above restrictions do not apply.

The Management Fee is calculated based on the Capital Account balance of each Limited Partner and is debited from each Limited Partner's Capital Account. Allocations to each Partner of net profit or net loss of the Fund will be subject to periodic adjustment to give effect to the Performance Allocation, as described below.

**Restricted New Issues**

The Fund may from time to time purchase securities in public offerings made through member firms of the Financial Industry Regulatory Authority, Inc. ("***FINRA***"). FINRA member firms are not permitted to sell certain new issues ("***Restricted New Issues***") to accounts in which certain persons have a significant beneficial interest that are involved in the securities industry or to executive officers or directors

of companies that are current, recent, or prospective investment banking clients of the relevant underwriters ("***Restricted Persons***"). In order to enable the Fund to participate in Restricted New Issues, the Fund will require each Limited Partner to provide information to enable the Fund to determine whether the Limited Partner is a Restricted Person. When the Fund invests in a Restricted New Issue, the profits and losses associated with the investment will specifically be allocated to those Partners who are permitted by the FINRA rules to have a beneficial interest therein.

The FINRA rules permit Restricted Persons that are involved in the securities industry to have in the aggregate up to a 10% participation in Restricted New Issues and Restricted Persons affiliated with a FINRA member's investment banking clients to have up to 25% participation in Restricted New Issues. If the ownership of the Fund by Restricted Persons exceeds the maximum percentage, the General Partner will allocate such excess amount *pro rata* among the Capital Accounts of Partners who are not Restricted Persons or on such other basis that the General Partner reasonably determines ensures compliance with the FINRA Rules.

If a Restricted New Issue in which participation by Restricted Persons has been capped is not promptly sold, the investment may be reallocated among all Partners on a *pro rata* basis (including all Restricted Persons) after a secondary market develops at such secondary market price.

**Performance Allocation**    The Investment Manager, in its capacity as a special limited partner in the Fund, is entitled to a performance allocation at the end of each calendar year (the "***Performance Allocation***"), which is calculated and charged separately with respect to each Capital Account of each Limited Partner, equal to 20% of the amount by which the Capital Account's "Performance Change Amount" (if positive) for the current calendar year exceeds the Capital Account's "Loss Carryforward Amount."

A Capital Account's "***Performance Change Amount***" for any calendar year equals such Capital Account's *pro rata* allocation of net profit or net loss (including Management Fees, Restricted New Issues and/or other items of income or expense specially allocable to the Capital Account).

The "***Loss Carryforward Amount***" for any calendar year equals the aggregate Performance Change Amounts, if negative, allocated to a Capital Account during any preceding calendar year, minus any subsequent positive Performance Change Amounts on which no Performance Allocation was charged. If a Limited Partner makes a withdrawal from its Capital Account at a time when there is a Loss Carryforward Amount, such Loss Carryforward Amount will be reduced in the same proportion that the withdrawal amount bears to the

Limited Partner's total Capital Account balance immediately prior to the withdrawal.

The Performance Allocation is calculated and charged to each Capital Account as of the last day of each calendar year. The Performance Allocation is also calculated and charged with respect to any Capital Account from which there is a permitted or required withdrawal as of any time other than the last day of a calendar year on the basis of net profits allocated to such Capital Account through the applicable date of withdrawal. In the case of a partial withdrawal, the Performance Allocation is calculated and charged only with respect to the portion of the Capital Account being withdrawn.

The Performance Allocation and Loss Carryforward Amount will be computed separately for each Capital Account (and each separately maintained capital sub-account reflecting additional contributions by a Limited Partner). Thus, if a Limited Partner has multiple Capital Accounts, the Performance Allocation and Loss Carryforward will be computed separately for each Capital Account, and the Capital Accounts will not be netted against one another for purposes of calculating the Performance Allocation. Accordingly, Limited Partners with multiple Capital Accounts may be charged a Performance Allocation in respect of one or more Capital Accounts for a year in which the aggregate net profits allocated to all of such Limited Partner's Capital Accounts do not exceed the aggregate Loss Carryforward Amount allocated to all of such Limited Partner's Capital Accounts.

The Performance Allocation with respect to any Limited Partner may be waived or altered by the Investment Manager in its sole discretion.

**Distributions**

Subject to the withdrawal privilege described below, all earnings of the Fund are ordinarily retained for investment. Other than distributions made pursuant to a withdrawal described below, Limited Partners should not expect the Fund to make any distributions.

**Withdrawals Generally**

Withdrawal rights vary by Series. For the purposes of establishing the withdrawal privileges below, withdrawal rights are determined separately with respect to each Capital Account (and each capital sub-account, if applicable) of a Limited Partner.

**Series Withdrawal Dates**

Subject to certain withdrawal restrictions described below, Limited Partners have the following withdrawal rights:

Series B Interests: Annual Liquidity. A Limited Partner is permitted to make complete or partial withdrawals of its Series B Interests upon written notice to the General Partner at least 180 days prior to the applicable Series B Withdrawal Date. The "*Series B Withdrawal Date*" means: (i) the end of the day on the last Business Day of the calendar month that immediately precedes the one-year anniversary of

the contribution of the capital to be withdrawn; and thereafter (ii) the end of the day on each one-year anniversary of the preceding Series B Withdrawal Date (i.e., if capital was contributed to the Fund on November 1, 2014, such capital would be eligible for withdrawal on October 31, 2015 and every year thereafter on October 31st, or the last Business Day of that month).

Series C Interests: Two Year Liquidity.   A Limited Partner is permitted to make complete or partial withdrawals of its Series C Interests upon written notice to the General Partner at least 180 days prior to the applicable Series C Withdrawal Date. The "**Series C Withdrawal Date**" means: (i) the end of the day on the last Business Day of the calendar month that immediately precedes the two-year anniversary of the contribution of the capital to be withdrawn; and thereafter (ii) the end of the day on each two-year anniversary of the preceding Series C Withdrawal Date (i.e., if capital was contributed to the Fund on November 1, 2014, such capital would be eligible for withdrawal on October 31, 2016 and every two years thereafter on October 31st, or the last Business Day of that month).

Series D Interests: One Year Hard Lock-Up; Quarterly Liquidity.   A Limited Partner is permitted to make complete or partial withdrawals of its Series D Interest as of the last Business Day of each calendar quarter (and/or such other days as the General Partner may determine in its sole discretion) (each, a "**Series D Withdrawal Date**") following the one-year anniversary of the contribution of the capital to be withdrawn. Notice of any withdrawal of Series D Interests must be provided in writing to the General Partner at least 90 calendar days prior to the requested Series D Withdrawal Date.

The General Partner may, at any time and in its sole discretion, waive or modify the foregoing withdrawal and distribution restrictions with respect to any Limited Partner.

**Settlement of Withdrawal Proceeds**

With respect to any amounts withdrawn, a withdrawing Partner shall not share in the income, gains and losses of the Fund or have any other rights as a Partner (in the case of a complete withdrawal) after the applicable date of withdrawal, and withdrawn amounts will be fixed as of the effective date of withdrawal, except as otherwise provided in the Partnership Agreement with respect to reserves for contingencies.

At least 90% of the estimated amount due with respect to the Fund's marketable investments is normally settled in cash or, subject to the sole discretion of the General Partner, wholly or partially with securities or other assets of the Fund, within 30 Business Days after the date of withdrawal, provided that the General Partner may delay such payment if such delay is reasonably necessary to prevent such withdrawal from having a material adverse impact on the Fund or the remaining Capital Accounts.   The General Partner is entitled to deduct from such

settlement an amount equal to the pro rata portion of any Performance Allocation (based on the portion of the withdrawal being settled) payable to the Investment Manager with respect to such withdrawn amount. Any balance will be held back and distributed, without interest thereon, promptly following completion of the audit of the Fund's financial statements for such fiscal year, or sooner in the General Partner's discretion.

In the case of a complete withdrawal, or a partial withdrawal that cannot be fully funded out of the Limited Partner's interest in the Fund's marketable investments, no settlements occur with respect to any of such Limited Partner's interest in the Fund's non-marketable investments until the occurrence of liquidity events with respect to such non-marketable investments after the scheduled payment date for the withdrawal (without interest thereon). Notwithstanding the foregoing, the General Partner may, in its sole discretion, make settlements in such cases prior to the occurrence of a liquidity event if such settlement would, in the good faith opinion of the General Partner, not have a material adverse effect on the Fund. Generally, a liquidity event will be a sale of the relevant investment for cash, in which case the settlement will be funded in cash within 90 days after the liquidity event (without interest). If the liquidity event is not a sale for cash, the General Partner may effect the settlement either by making a distribution in kind of the Limited Partner's ratable share of the relevant investment or by distributing the net proceeds derived from a sale of such investment. The General Partner is entitled to withdraw from each such settlement an amount equal to the remaining portion of any Performance Allocation (pro rata based on the portion of such withdrawal being distributed) to be credited to the Investment Manager at the same time and in the same form (in cash or in kind) as the distribution to the withdrawing Limited Partner.

The General Partner may withhold for the benefit of the Fund from any distribution to a withdrawing Limited Partner an amount representing the actual or estimated costs incurred by the Fund with respect to such withdrawal.

**Withdrawal Conditions** The General Partner may refuse to accept a withdrawal request if it is not accompanied by such additional information as the General Partner or the Administrator may reasonably require. This power may, without limitation to the generality of the foregoing, be exercised where proper information has not been provided for money laundering verification purposes. In addition, where withdrawal proceeds are requested to be remitted to an account which is not in the name of the investor, the General Partner and the Administrator reserve the right to request such information as may be reasonably necessary in order to verify the identity of the investor and the owner of the account to which the withdrawal proceeds will be paid. The withdrawal proceeds will not

be paid to a third-party account if the investor and/or owner of the account fails to provide such information.

**Compulsory Withdrawals**   The General Partner reserves the right, in its sole discretion, to compel the withdrawal of any Limited Partner's Interest, in part or in its entirety, on not less than five days' prior written notice (or immediately if the General Partner determines in its sole discretion that such Limited Partner's continued participation in the Fund may cause the Fund, the Investment Manager or the General Partner to violate any applicable law).   Settlements are made in the same manner as voluntary withdrawals.

**Suspension of Valuations, Withdrawals and Withdrawal Payments**   The General Partner may suspend the issuance of Interests, the Partners' withdrawal privileges, the payment of withdrawal proceeds and the valuation of the Fund's net assets:

> (i)   during any period when any stock exchange or over-the-counter market on which the Fund's investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended;

> (ii)   during the existence of any state of affairs as a result of which, in the reasonable opinion of the General Partner, disposal of investments by the Fund, or the determination of the value of the assets of the Fund, would not be reasonably practicable;

> (iii)   during any breakdown in the means of communication normally employed in determining the price or value of the Fund's assets or liabilities, or of current prices in any stock market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Fund cannot reasonably be accurately ascertained within a reasonable time frame;

> (iv)   during any period when the transfer of funds involved in the realization or acquisition of any investments cannot, in the reasonable opinion of the General Partner, be effected at normal rates of exchange;

> (v)   in other circumstances where the General Partner is unable to fairly value the Fund's assets due to extreme market conditions; or

> (vi)   automatically upon liquidation of the Fund.

Upon the reasonable determination by the General Partner that conditions leading to suspension no longer apply, withdrawal rights for all Limited Partners shall be promptly reinstated, and any pending withdrawal requests (or new, timely withdrawal requests) shall be

honored as of the last Business Day of the calendar quarter in which withdrawals have recommenced, subject to the application of the withdrawal limitations described herein.

**Soft Wind Down**

It is anticipated that any suspension in the circumstances described above in "Suspension of Valuations, Withdrawals and Withdrawal Payments" (each, a "***Suspension***") would ordinarily be temporary (other than in connection with a decision to proceed with the liquidation of the Fund). However, there may be situations in which the circumstances giving rise to the Suspension continue to be present for a considerable period of time with the result that the General Partner, in consultation with the Investment Manager, considers it appropriate to keep the Suspension in place indefinitely. In certain circumstances, even where a Suspension has not been declared, the General Partner may, in consultation with the Investment Manager, make a determination that the investment strategy should no longer be continued. During any such period of Suspension or having made such determination that the investment strategy should no longer be continued, the Investment Manager may recommend to the General Partner to cause the Fund to return the Fund's assets to Limited Partners in an orderly manner (without proceeding with a liquidation of the Fund) (an "***Orderly Realization***"). The General Partner may, in such circumstances, resolve to effect an Orderly Realization should it determine that doing so is in the best interests of the Fund as a whole. Such Orderly Realization shall not constitute a dissolution or winding up of the Fund for any purposes, but rather only the continued management of the Fund's portfolio so as to reduce such portfolio to cash (to the extent reasonably practicable, as advised by the Investment Manager) and return such cash as well as all other assets of the Fund to the Limited Partners. The General Partner will notify Limited Partners of any decision to proceed with an Orderly Realization of the Fund. During an Orderly Realization, the Investment Manager may, in consultation with the General Partner, take such steps as are considered appropriate in the best interests of the Fund as a whole to effect the Orderly Realization. The General Partner, in consultation with the Investment Manager, shall establish what they consider to be a reasonable time by which the Orderly Realization should be effected (the "***Realization Period***"). Any resolution to undertake an Orderly Realization and the process thereof shall be deemed to be integral to the business of the Fund and may be carried out without recourse to a formal process of liquidation under Delaware law or any other applicable bankruptcy or insolvency regime. The General Partner, in consultation with the Investment Manager, may resolve to cease the Orderly Realization within the Realization Period and recommence active trading if the circumstances permit a lifting of any applicable Suspension or, where no Suspension is in effect, if the circumstances are such that the investment strategy can then be continued. Management Fees shall be payable and Performance Allocations shall

be made during an Orderly Realization on the same basis as described herein.

**Transfers**

Interests are not transferable except with the prior written consent of the General Partner, which consent may be withheld in the General Partner's sole discretion. The General Partner in its sole discretion may require any transferee or assignee of any Limited Partner to agree in writing to be bound by the Partnership Agreement. Interests of any Affiliated Investors may be transferred to other affiliates thereof without restriction.

**Duty of Care; Indemnification**

The Partnership Agreement provides that the General Partner, the Investment Manager and each of their affiliates are not liable to the Fund or the Limited Partners for any loss or damage arising by reason of being or having been the General Partner or the Investment Manager or from any acts or omissions in the performance of its services as General Partner or Investment Manager, as applicable, in the absence of willful misconduct, fraud or gross negligence or as otherwise required by law, and contains provisions for the indemnification of the General Partner, the Investment Manager and each of their affiliates by the Fund (but not by the Limited Partners individually) against any liabilities arising by reason of being or having been the General Partner or the Investment Manager or in connection with the Partnership Agreement or the Fund's business or affairs to the fullest extent permitted by law. The General Partner is not personally liable to any Limited Partner for the repayment of any positive balance in such Limited Partner's Capital Account or for contributions by such Limited Partner to the capital of the Fund or by reason of any change in the federal or state income tax laws applicable to the Fund or its investors.

**Valuations**

In general, the Fund's financial statements will be prepared in accordance with GAAP. The General Partner has delegated the valuation of the Fund's assets to the Investment Manager who values the Fund's assets as of the close of each accounting period in accordance with its valuation policies and procedures. Valuations may be suspended as set forth above in "Suspension of Valuations, Withdrawals and Withdrawal Payments."

**Reserves**

Appropriate reserves may be accrued and charged against net assets and proportionately against the Capital Accounts of the Partners for contingent liabilities, such reserves to be in the amounts (subject to increase or reduction) that the General Partner in its sole discretion deems necessary or appropriate. In the sole discretion of the General Partner, the amount of any such reserve (or any increase or decrease therein) may be charged or credited, as appropriate, to the Capital Accounts of those investors who are Partners at the time when such reserve is created, increased, or decreased, as the case may be, or alternatively may be charged or credited to those investors who were

Partners at the time of the act or omission giving rise to the contingent liability for which the reserve was established.

If the General Partner determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then such amount may be proportionately charged or credited, as appropriate, to those persons who were Partners during any such prior period.

**Fiscal Year**

The Fund has a fiscal year ending on December 31 of each calendar year.

**Reports to Partners**

The Fund furnishes to its Partners as soon as practicable after the end of each taxable year (or as otherwise required by law) annual reports containing financial statements examined by the Fund's independent auditors as well as such tax information as is necessary for each Partner to complete federal and state income tax or information returns, along with any other tax information required by law. The Fund also furnishes monthly reports reviewing the Fund's performance for such calendar month. The General Partner selects the Fund's independent accountants in its sole discretion.

**Advisory Committee**

The General Partner and/or the Investment Manager may appoint, or cause to be appointed, a committee (the "*Advisory Committee*") consisting of one or more individuals selected by the General Partner and/or the Investment Manager, none of whom is affiliated with the General Partner and/or the Investment Manager (except as a Limited Partner or as an investor in the Fund or an affiliate thereof). If established, the Advisory Committee will have the authority, at the request of the General Partner and/or the Investment Manager, to consult with the General Partner and/or the Investment Manager on any matters that may involve a conflict of interest between the General Partner and/or the Investment Manager (or their affiliates) on the one hand and the Limited Partners (or shareholders of the Offshore Fund) and the Fund on the other. Any consent given by a majority of the Advisory Committee on behalf of the Fund in good faith after consultation with the General Partner and/or the Investment Manager is binding on the Fund and the Limited Partners or shareholders of the Offshore Fund (so long as such majority consists of persons independent of the General Partner and/or the Investment Manager and their affiliates). The Fund will have the authority to agree to reimburse members of the Advisory Committee for their out-of-pocket expenses and to indemnify them to the maximum extent permitted by law.

**Dissolution and Liquidation**

In the event an Orderly Realization lasts longer than three years, Limited Partners with a combined percentage interest in the Fund of at least 75% may seek a court decree of dissolution or seek the appointment by the court of a liquidator for the Fund. The Limited Partners will not have any other right to bring an action in court to dissolve the Fund.

Dissolution of the Fund may also occur upon the General Partner's election, in its sole discretion, to dissolve the Fund or upon the occurrence of any event which results in the General Partner (or a successor to its business) ceasing to be the general partner of the Fund. Upon the occurrence of any such event, the General Partner (or a liquidator elected by a majority in interest of the Limited Partners, if the General Partner is unable to perform this function) is charged with winding up the affairs of the Fund, liquidating its assets to the extent feasible and making liquidating distributions (in cash or in securities or other assets, whether or not readily marketable) *pro rata* in accordance with each Partner's Capital Account balance.

**Placement Agents**

The Investment Manager may engage third parties to solicit investors and act as placement agents for the Fund. Placement agents may charge a placement fee directly to investors solicited by any such placement agent, but such fees will not affect the subscription amount and will not be collected by or from the Fund. The placement agent may be reimbursed for its expenses and indemnified by the Fund.

Furthermore, placement agents may be paid a portion of the Management Fee or Performance Allocation attributable to such investors solicited by them, thereby reducing the Management Fee or Performance Allocation received by the Investment Manager. Accordingly, investors should recognize that a placement agent's or distributor's participation in this offering may be influenced by its interest in such current or future fees and compensation. Investors should consider these potential conflicts of interest in making their investment decisions.

Each placement agent must comply with the legal requirements of the jurisdictions within which it offers and sells Interests.

**Tax Status**

The General Partner believes that the Fund should be treated as a partnership for U.S. federal income tax purposes and that it should not itself be subject to U.S. federal income taxation. Each Limited Partner otherwise subject to U.S. federal income tax is required to include in such Limited Partner's taxable income such Limited Partner's share of the Fund's income and gains, when realized by the Fund (regardless of cash distributions from the Fund to such investor), and may claim, to the extent allowable, such Limited Partner's share of the Fund's losses and deductions. Due to the nature of the Fund's activities, the Fund's income or loss for U.S. federal income tax purposes for a particular taxable period may differ from its financial or economic results. The

|  | deductibility of a Limited Partner's share of any Fund losses or deductions may be limited. See "*Tax Considerations*." |
|---|---|
| **ERISA** | The General Partner intends to limit investment in the Fund by "benefit plan investors" so that the assets of the Fund will not be considered "plan assets" for purposes of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"). See "*ERISA and Other Regulatory Considerations*." |
| **Amendment of the Limited Partnership Agreement** | The Partnership Agreement may be amended by the General Partner with the consent of a majority in interest of the Limited Partners, which consent may be obtained through negative consent. However, the Fund may not: (a) increase the obligation of a Limited Partner to make any contribution to the capital of the Fund; (b) reduce the Capital Account of any Limited Partner other than as contemplated by the Partnership Agreement; or (c) reduce any Limited Partner's right to share in net profits or assets of the Fund without the consent of each Limited Partner adversely affected thereby. The above consent may be obtained by negative consent (affording the Limited Partners notice and opportunity to object). |
|  | Notwithstanding the foregoing, the General Partner may amend the Partnership Agreement at any time without the consent of any Limited Partner: (a) to comply with applicable laws and regulations; (b) to make changes that do not adversely affect the rights or obligations of any Limited Partner; (c) to cure any ambiguity or correct or supplement any conflicting provisions of the Partnership Agreement; or (d) with respect to any other amendment, if any Limited Partner whose contractual rights as a Limited Partner would be materially and adversely changed by such amendment has an opportunity to withdraw from the Fund as of a date that is not less than 30 days after the General Partner has furnished written notice of such amendment to each Limited Partner and that is prior to the effective date of the amendment. |
| **Variation of Terms** | The General Partner, in its sole discretion, may enter into a side letter or similar agreement to or with one or more Limited Partners that has the effect of establishing rights under, or altering or supplementing the terms of the Partnership Agreement or the Subscription Documents (including those relating to Management Fees, the Performance Allocation, transparency, and withdrawals) with respect to such Limited Partner. The General Partner generally grants waivers of the Management Fees, Performance Allocation and withdrawal restrictions to principals and employees of the Investment Manager and its affiliates, as well as their related family members and affiliates. |
| **Dispute Resolution** | Any controversy or claim ("***Dispute***") out of or relating to or in connection with the Partnership Agreement or otherwise involving the Fund, its Partners and/or any Indemnified Party (as defined in the Partnership Agreement) shall be submitted to mediation in accordance |

with the Partnership Agreement and if such dispute has not been resolved within 90 days, will be resolved by binding arbitration in accordance with the Partnership Agreement.   Mediation and arbitration shall be held in Dallas, Texas and Delaware law shall apply to any dispute, except as otherwise provided in the Partnership Agreement.

## RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST

*Investment in the Fund is speculative and involves certain risks. Certain of these risks are summarized below. The Fund may not be suitable for all investors and is intended for sophisticated investors who can accept the risks associated with its investments. An investment in the Fund does not constitute a complete investment program. Investors will not have recourse except with respect to the assets of the Fund. Prospective investors should consider, among others, the risk factors and potential conflicts of interest described in this section. All investors in the Fund should consult their own legal, tax and financial advisors prior to investing in the Fund.*

## Fund Risks

*Investment Judgment; Market Risk*. The profitability of a significant portion of the Fund's investment program depends to a great extent upon correctly assessing the future course of the price movements of securities and other investments. There can be no assurance that the Investment Manager will be able to predict accurately these price movements. With respect to the investment strategy utilized by the Fund, there is always some, and occasionally a significant, degree of market risk.

*Reliance on Key Persons.* The Fund will be substantially dependent on the services of James Dondero, Mark Okada and Joshua Terry (the "***Key Man Group***"). In the event of the death, disability, departure or insolvency of a member of the Key Man Group, or the complete transfer of a member's interest in the Investment Manager, the business of the Fund may be adversely affected. Each member of the Key Man Group will devote such time and effort as he deems necessary for the management and administration of the Fund's business. However, the members of the Key Man Group may engage in various other business activities in addition to managing the Fund, and consequently may not devote all time to Fund business.

*Investment Authority.* Substantially all decisions with respect to the management of the Fund are made by the General Partner and the Investment Manager. Limited Partners have no right or power to take part in the management of the Fund. The Investment Manager also makes all of the trading and investment decisions of the Fund. In the event of the withdrawal or bankruptcy of the General Partner, generally the Fund will be liquidated.

*Performance Allocation.* The Performance Allocation made to the Investment Manager may create an incentive for the Investment Manager to make investments that are riskier or more speculative than would be the case in the absence of such Performance Allocation.

*Withdrawal Restrictions.* There are severe restrictions on withdrawals from the Fund (which may be settled in securities rather than cash) and on transfers of Interests. The prior written consent of the General Partner is required for a transfer of the Interest of any Limited Partner and the General Partner, in its sole discretion, may require any transferee or assignee of any Limited Partner to agree in writing to be bound by the Partnership Agreement. Because of the restrictions on withdrawals and transfers, an investment in the Fund is a relatively illiquid investment and involves a high degree of risk. There is no independent market for the purchase or sale of Interests and none is expected to develop. Limited Partners must represent that they are purchasing Interests for investment. A subscription for Interests should be considered only by persons financially able to maintain their investment and who can accept a loss of all of their investment.

*No Distributions.* Since the Fund does not generally intend to pay distributions, an investment in the Fund is not suitable for investors seeking current distributions of income. Moreover, an investor is required to report and pay taxes on its allocable share of income from the Fund, even though no cash is distributed by the Fund.

*In-Kind Distributions*. The Partnership Agreement authorizes the General Partner to make distributions in kind of securities in lieu of or in addition to cash. In the event the General Partner makes distributions of securities in kind, such securities could be illiquid or subject to legal, contractual and other restrictions on transfer.

*Diversification.* Since the Fund's portfolio will not necessarily be widely diversified, the investment portfolio of the Fund may be subject to more rapid changes in value than would be the case if the Fund were required to maintain a wide diversification among companies, securities and types of securities.

*Valuations.* From time to time, certain situations affecting the valuation of the Fund's investments (such as limited liquidity, unavailability or unreliability of third-party pricing information and acts or omissions of service providers to the Fund) could have an impact on the net asset value of the Fund, particularly if prior judgments as to the appropriate valuation of an investment should later prove to be incorrect after a net asset value-related calculation or transaction is completed. The Fund is not required to make retroactive adjustments to prior subscription or withdrawal transactions or Management Fees or Performance Allocations based on subsequent valuation data.

*Non-Public Information.* From time to time, the Investment Manager may come into possession of non-public information concerning specific companies. Under applicable securities laws, this may limit the Investment Manager's flexibility to buy or sell portfolio securities issued by such companies. The Fund's investment flexibility may be constrained as a consequence of the Investment Manager's inability to use such information for investment purposes.

*Soft Dollars.* The Investment Manager may enter into "soft dollar" arrangements with one or more broker-dealers whereby the Investment Manager will direct securities transactions to the broker-dealer in return for research products and services from the broker-dealer. Although the Investment Manager will use the research and services in making investment decisions for the Fund, the Investment Manager may use such research or services for other accounts and the Fund will generally pay more than the lowest available commissions for execution of these transactions. The Investment Manager may also enter into "soft dollar" arrangements to cover Fund expenses or costs and expenses of the Investment Manager to the extent such arrangements are permitted by law and described in this Memorandum. See "*Brokerage and Custody*."

*Absence of Registration*. The Fund has not and will not register under the Investment Company Act. Accordingly, the provisions of the Investment Company Act which, among other things, require that a fund's board of directors, including a majority of disinterested directors, approve certain of the fund's activities and contractual relationships, prohibit certain trading and investment activities and prohibit the fund from engaging in certain transactions with its affiliates, will not be applicable. Neither the General Partner nor the Investment Manager is registered as a CPO or a CTA with the NFA in reliance on an exemption from registration pursuant to CFTC Regulation 4.13(a)(3). Accordingly, the provisions of the Commodity Exchange Act and the regulations promulgated thereunder applicable to registered persons will not be applicable to the General Partner or the Investment Manager.

*Recent Developments in the Financial Services Industry*. Recent developments in the U.S. financial markets illustrate that the current environment is one of extraordinary and possibly unprecedented uncertainty for the financial services industry. In July of 2010, the Dodd-Frank Financial Reform Act was passed which imposes many new requirements and restrictions on the financial services industry that may likely affect the business, operations and performance of hedge funds, such as increased reporting requirements, limitations on certain trading activity and regulatory oversight by different agencies, such as the newly created Financial Stability Oversight Counsel. The implications of the passage of the Dodd-Frank Financial Reform Act for the hedge fund industry as a whole still remain somewhat unclear. The hedge fund industry may continue to be adversely affected by the recent developments in the financial markets in the U.S. and abroad, and any future legal, regulatory or governmental action and developments in such financial markets and the broader U.S. economy could have an adverse effect on the Fund's business, operations and performance.

## Investment Strategy Risks

<u>Risks Associated With Investing in CLOs</u>

*Risks of Investment Focus*. The Fund's portfolio may consist of CLO Securities. A cash flow CLO is generally analogous to a special purpose finance company. The CLO owns a portfolio consisting of corporate loans and other investments typically from which it receives interest income, together with capital gains and losses. The CLO is often financed with equity, which may be in the form of preference shares or income notes ("***CLO Equity***") and several levels of long-term debt ("***CLO Debt***"). CLO Debt is typically rated by the rating agencies based on the deal structure as well as outstanding principal amount of portfolio securities and, in most cases, is not contingent on the market value of the underlying portfolio. CLO Equity is almost always unrated.

CLO Securities are subject to, among other risks, credit, liquidity and interest rate risks. The CLO Equity that the Fund may purchase may be unrated or non-investment grade. In addition, as a holder of CLO Equity, the Fund may have limited remedies available upon the default of the CLO.

The value of the CLO Securities that the Fund may own generally will fluctuate with, among other things, the financial condition of the obligors or issuers of the CLO Securities' underlying portfolio of assets ("***CLO Collateral***"), general economic conditions, the condition of certain financial markets, political events, developments or trends in any particular industry and changes in prevailing interest rates. CLO Securities are issued on a non-recourse basis and holders of CLO Securities must rely solely on distributions on the CLO Collateral or proceeds thereof for payment in respect thereof. If distributions on the CLO Collateral are insufficient to make payments on the CLO Securities, no other assets will be available for payment of the deficiency and following realization of the CLO Securities, the obligations of such issuer to pay such deficiency generally will be extinguished.

Issuers of CLO Securities may acquire interests in loans and other debt obligations by way of sale, assignment or participation. The purchaser of an assignment typically succeeds to all the rights and obligations of the assigning institution and becomes a lender under the credit agreement with respect to the loan or debt obligation; however, its rights can be more restricted than those of the assigning institution.

CLO Collateral may consist of corporate loans, leveraged loans and other instruments, which often are rated below investment grade (or of equivalent credit quality). Loans may be unsecured and may be subordinated to certain other obligations of the issuer thereof. The lower ratings of below

investment grade loans reflect a greater possibility that adverse changes in the financial condition of an issuer or in general economic conditions or both may impair the ability of the related issuer or obligor to make payments of principal or interest. Such investments may be speculative.

*Dependence Upon Other Unrelated Managers*. The success of a CLO may depend on the management talents and efforts of one person or a small group of persons whose management could adversely affect the CLO and, accordingly, the Fund as an investor in such CLO. Given that the Investment Manager will not have an active role in the management of these CLOs, the return on the Fund's investments in such CLOs will depend on the performance of unrelated managers.

*Investments in CLOs Managed by the Investment Manager or its Affiliates*. The Fund may invest a significant portion of its capital in structured investments, including CLO tranches originated and managed by third parties and CLO tranches managed by the Investment Manager or its affiliates (the "*Affiliated CLOs*"). If the Fund invests in Affiliated CLOs, the Limited Partners will indirectly pay the fees (senior and subordinated) (but only if such investment is in the equity tranche of such Affiliated CLO), expenses and any carried interest at primary issuance. The Investment Manager or its affiliates will receive senior and subordinated management fees and, in some cases, a performance-based allocation or fee with respect to its role as general partner and/or manager of the Affiliated CLOs. If the Fund provides all of the equity for an Affiliated CLO, there may be no third party with whom the amount of such fees, expenses and carried interest can be negotiated on an arm's-length basis. The Investment Manager will have conflicting division of loyalties and responsibilities regarding the Fund and an Affiliated CLO, and certain other conflicts of interest would be inherent in the situation. There can be no assurance that the interests of the Fund would not be subordinated to those of an Affiliated CLO or to other interests of the Investment Manager.

*Multiple Levels of Fees*. The Fund and the CLOs (including Affiliated CLOs) are expected to impose management fees, other administrative fees, carried interest and other performance allocations on realized and unrealized appreciation in the value of the assets managed and other income. This may result in greater expense than if Limited Partners were able to invest directly in the CLOs or underlying investments. Limited Partners should take into account that the return on their investment will be reduced to the extent of both levels of fees. The general partner or manager of a CLO (including a member of the Highland Group (defined below)) may receive the economic benefit of certain fees from its portfolio companies for services and in connection with unconsummated transactions (*e.g.*, break-up, placement, monitoring, directors', organizational and set-up fees and financial advisory fees). Additionally, some of the CLOs may invest themselves in underlying hedge funds or CLOs. In such case, additional management costs and other administrative expenses may be incurred.

*Limited Diversification*. CLOs may invest in concentrated portfolios of assets. The concentration of an underlying portfolio in any one obligor would subject the related CLO Securities (the related CLO Equity in particular) to a greater degree of risk with respect to defaults by such obligor and the concentration of a portfolio in any one industry would subject the related CLOs (the related CLO Equity in particular) to a greater degree of risk with respect to economic downturns relating to such industry. The Fund may have a concentrated exposure to CLOs of a particular type of CLO.

*CLO Embedded Leverage Risk*. The Fund's participation in CLOs involves varying amounts of leverage. Leverage is embedded in all classes of a CLO other than the most senior tranche. If the Fund retains either the most or one of the most subordinate tranches of the CLO's securities, it will hold the most leveraged investment in the CLO. While leverage presents opportunities for increasing the Fund's total return, it has the effect of potentially increasing losses as well. Accordingly, any event which

adversely affects the value of an investment in a CLO would be magnified to the extent such CLO is leveraged. The cumulative effect of the use of leverage by a CLO in a market that moves adversely to the CLO's investments could result in a substantial loss to the CLO which would be greater than if the CLO were not leveraged. The borrowing arrangements of CLOs will contain events of default that, under certain circumstances, could result in early amortization or in the acceleration of the maturities of these obligations. In the event of acceleration of the borrowing arrangements of a CLO, in whole or in part, it may be required to dispose of all or a significant portion of its investments. Such a forced disposal of securities could result in realization of value of such investments significantly below the anticipated market values for such securities. When the Fund invests in derivative transactions, it may also gain leverage through such derivative transactions, which will expose the Fund to a greater risk of loss.

*Interest Rate Mismatch.* CLOs may be subject to interest rate risk. The CLO Collateral of an issuer of a CLO may bear interest at a fixed or floating rate, while the CLO Debt may bear interest at a floating or fixed rate. As a result, there could be a floating/fixed rate or basis mismatch between such CLO Debt and the CLO Collateral which bears interest at a fixed rate ("***Fixed Rate Assets***"), and there may be a timing mismatch between such CLO Debt and the assets that are not Fixed Rate Assets ("***Floating Rate Assets***"). In addition, the interest rate on Floating Rate Assets may adjust more frequently or less frequently, on different dates and based on different indices than the interest rates on the CLO Debt. As a result of such mismatches, an increase or decrease in the level of the floating rate indices could adversely impact the ability to make payments on such CLO Debt or Equity. Although many CLOs attempt to hedge this interest rate risk, the hedges may not eliminate this risk and payments by the CLO under the hedges may significantly reduce the distributions on the CLO securities. In addition, these hedges may have additional risks, such as counterparty risk, that are not present without these hedges.

*Lower Credit Quality Securities.* There are no restrictions on the credit quality of the investments of the Fund. CLO Securities in which the Fund will invest may have no ratings or may be deemed by rating agencies to have substantial vulnerability to default in payment of interest and/or principal and have the lowest quality ratings. The Fund may purchase CLO Securities which have ratings that have been downgraded or placed on "credit watch" for future downgrading. Lower rated and unrated securities in which the Fund may invest have large uncertainties or major risk exposures to adverse conditions and are considered to be predominantly speculative and may become a defaulted asset for a variety of reasons. Generally, such securities offer a higher return potential than higher rated securities, but involve greater volatility of price and greater risk of loss of income and principal.

The market values of certain of these securities (such as subordinated securities) also tend to be more sensitive to changes in economic conditions than higher rated securities. The value of leveraged loans and other assets underlying a CLO may also be affected by changes in the market's perception of the entity issuing or guaranteeing them, or by changes in government regulations and tax policies. Additionally, loans and interests in loans have significant liquidity and market value risks since they are not generally traded in organized exchange markets but are traded by banks and other institutional investors engaged in loan syndications. Because loans are privately syndicated and loan agreements are privately negotiated and customized, loans are not purchased or sold as easily as publicly traded securities. In addition, historically the trading volume in the loan market has been small relative to the high-yield debt securities market, and such illiquidity has been exacerbated during the current liquidity crisis.

Leveraged loans have historically experienced greater default rates than has been the case for investment grade securities. There can be no assurance as to the levels of defaults and/or recoveries that may be experienced on the assets underlying CLO Securities.

In general, the ratings of nationally recognized rating organizations represent the opinions of such agencies as to the quality of securities that they rate. Such ratings may be used by the Investment Manager as an initial basis for the selection of portfolio securities. Such ratings, however, are relative and subjective; they are not absolute standards of quality and do not evaluate the market value risk of the securities. Such ratings also do not reflect macroeconomic or systematic risk, including the risk of increased illiquidity in the credit markets. It is also possible that a rating agency might not change its rating of a particular issue on a timely basis to reflect subsequent events.

*Defaulted Assets Underlying CLO Securities*. If the assets underlying a CLO Security become defaulted assets, such defaulted assets may become subject to either substantial workout negotiations or restructuring, which may entail, among other things, a substantial reduction in the interest rate, a substantial write-down of principal, and a substantial change in the terms, conditions and covenants with respect to such defaulted asset. In addition, such negotiations or restructuring may be quite extensive and protracted over time, and therefore may result in substantial uncertainty with respect to the ultimate recovery on such defaulted asset. The liquidity for defaulted assets may be limited, and to the extent that defaulted assets are sold, it is highly unlikely that the proceeds from such sale will be equal to the amount of unpaid principal and interest thereon. Furthermore, there can be no assurance that the ultimate recovery on any defaulted assets will be at least equal to either the minimum recovery rate assumed by any rating agency that rates the notes of the CLO security. Therefore, if any CLO security has defaulted assets which correspond to the exposure of the Fund's interest in the CLO security, the Fund may be adversely affected.

There exist significant additional risks for CLO Securities and investors in such securities as a result of the current liquidity crisis. Those risks include, among others, (i) the likelihood that the issuer of the CLO Security will find it harder to sell any of its assets in the secondary market, thus rendering it more difficult to dispose of assets which it has the discretion to manage, including credit risk obligations, credit improved obligations or defaulted obligations, (ii) the possibility that the price at which assets can be sold by the issuer of the CLO Security will have deteriorated from their effective purchase price and (iii) the increased illiquidity of the notes issued by the CLO Security. These additional risks may affect the returns on the investments in the Fund's portfolio.

*Subordination of CLO Debt and CLO Equity*. The Fund's portfolio may consist of CLO Equity and subordinate CLO Debt. Subordinate CLO Debt generally is fully subordinated to the related CLO senior tranches. CLO Equity generally is fully subordinated to any related CLO Debt. Thus, some of the investments of the Fund in a CLO may rank behind other creditors of the CLO and an investment by the Fund in the equity tranche of a CLO may rank behind all creditors of the CLO. To the extent that any losses are incurred by a CLO in respect of its related CLO Collateral, such losses are likely to be borne first by the holders of the related CLO Equity, next by the holders of any related subordinated CLO debt and finally by the holders of the related CLO senior tranches. In addition, if an event of default occurs under the governing instrument or underlying investment, as long as any CLO senior tranches are outstanding, the holders thereof generally are likely to be entitled to determine the remedies to be exercised under the instrument governing the CLO. Remedies pursued by such holders could be adverse to the interests of the holders of any related subordinated CLO Debt and/or the holders of the related CLO Equity, as applicable. Investments of the Fund may be the first to absorb any losses by the

CLO on its underlying portfolio. This may result in losses on the invested proceeds of the Fund and could result in the complete loss of invested proceeds.

*Mandatory Redemption of CLO Senior Tranches and CLO Debt.* Under certain circumstances, cash flows from CLO Collateral that otherwise would have been paid to the holders of any related CLO Debt and the related CLO Equity will be used to redeem the related CLO senior tranches. This could result in an elimination, deferral or reduction in the interest payments, principal repayments or other payments made to the holders of such CLO Debt or such CLO Equity, which could adversely impact the returns to the holders of such CLO Debt or such CLO Equity.

*Optional Redemption of CLO Senior Tranches and CLO Debt.* An optional redemption by a CLO of its securities and, in particular, the exercise of rights by the holders of one or more classes of its securities (or the requisite percentages thereof) so as to effect any such optional redemption, could require the collateral or portfolio manager of the related CLO to liquidate positions more rapidly than would otherwise be desirable, which is likely to materially and adversely affect the realized value of the items of CLO Collateral sold (and which in turn is likely to materially and adversely impact the holders of any related CLO securities, including the Fund). As a result of any such rapid liquidation of a CLO, a holder of the related CLO securities (including the Fund) could lose all or a substantial portion of its investment in such CLO securities.

*Insolvency Risks*. Various laws enacted for the protection of creditors may apply to the issuers of the CLO Collateral (solely for purposes of this risk factor, an "***Insolvent Company***"). The information in this paragraph and the following paragraph is applicable with respect to U.S. issuers of CLO Collateral. Insolvency considerations may differ with respect to non-U.S. issuers of CLO Collateral. If a court in a lawsuit brought by an unpaid creditor or representative of creditors of an Insolvent Company, such as a trustee in bankruptcy, were to find that the issuer did not receive fair consideration or reasonably equivalent value for incurring the indebtedness constituting the CLO or CLO Collateral (as applicable) and, after giving effect to such indebtedness, the Insolvent Company (i) was insolvent, (ii) was engaged in a business for which the remaining assets of the Insolvent Company constituted unreasonably small capital or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature, such court could determine to invalidate, in whole or in part, such indebtedness as a fraudulent conveyance, to subordinate such indebtedness to existing or future creditors of the Insolvent Company or to recover amounts previously paid by such issuer in satisfaction of such indebtedness. The measure of insolvency for purposes of the foregoing will vary. Generally, an Insolvent Company would be considered insolvent at a particular time if the sum of its debts were then greater than all of its property at a fair valuation or if the present fair saleable value of its assets were then less than the amount that would be required to pay its probable liabilities on its existing debts as they became absolute and matured. There can be no assurance as to what standard a court would apply in order to determine whether the Insolvent Company was "insolvent" after giving effect to the incurrence of the indebtedness constituting the CLO or CLO Collateral (as applicable) or that, regardless of the method of valuation, a court would not determine that the Insolvent Company was "insolvent" upon giving effect to such incurrence. In addition, in the event of the insolvency of an Insolvent Company, payments made on such CLO or CLO Collateral (as applicable) could be subject to avoidance as a "preference" if made within a certain period of time (which may be as long as one year) before insolvency.

In general, if payments on a CLO or CLO Collateral (as applicable) are avoidable, whether as fraudulent conveyances or preferences, such payments can be recaptured either from the initial recipient (such as the Fund) or from subsequent transferees of such payments (such as the Limited Partners).

However, a court in a bankruptcy or insolvency proceeding would be able to direct the recapture of any such payment from a Limited Partner only to the extent that such court has jurisdiction over such holder or its assets. Moreover, it is likely that avoidable payments could not be recaptured directly from a holder that has given value in exchange for its interest, in good faith and without knowledge that the payments were avoidable. Nevertheless, there can be no assurance that a Limited Partner will be able to avoid recapture on this or any other basis.

The preceding discussion is based upon principles of United States Federal and state laws. Insofar as the Fund's portfolio consists of the obligations of non-United States obligors, the laws of certain foreign jurisdictions may provide for avoidance remedies under factual circumstances similar to those described above or under different circumstances, with consequences that may or may not be analogous to those described above under United States Federal and state laws.

*"Widening" Risk.* For reasons not necessarily attributable to any of the risks set forth herein (for example, supply/demand imbalances or other market forces), the prices of the CLO Securities in which the Fund invests may decline substantially. In particular, purchasing assets at what may appear to be "undervalued" levels is no guarantee that these assets will not be trading at even lower levels at a time of valuation or at the time of sale. It may not be possible to predict, or to hedge against, such "spread widening" risk.

*There Is Limited Disclosure About the CLO Securities and the Underlying CLO Collateral in this Memorandum.* The Investment Manager will not be required to provide the investors in the Fund with financial or other information (which may include material non-public information) it receives related to the CLO Securities. The Investment Manager also may not disclose to investors notices the Investment Manager receives and it will not have any obligation to keep investors informed as to defaults in the CLO Securities, failure by the Fund to receive any payment of principal, interest, or other amounts or to disclose the portfolio or the decisions of which CLO Securities were not purchased in general to any investor. In addition, the investors will not have any right to inspect any records relating to the CLO Securities, and the Investment Manager will not be obligated to disclose any further information or evidence regarding the existence or terms of, or the identity of any obligor on, any CLO Securities.

*Impact of the Volcker Rule on the Liquidity of the Notes.* Section 619 of the Dodd-Frank Act added a provision, commonly referred to (together with the final regulations with respect thereto adopted on December 10, 2013) as the Volcker Rule, to federal banking laws to generally prohibit various covered banking entities from engaging in proprietary trading or acquiring or retaining an ownership interest in "covered funds" which generally include, sponsoring or having certain relationships with a hedge fund or private equity fund (defined in final regulations adopted on December 10, 2013 as any entity relying on Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act to be exempt from registration under the Investment Company Act), subject to certain exemptions. The Volcker Rule also provides for certain supervised nonbank financial companies that engage in such activities or have such interests or relationships to be subject to additional capital requirements, quantitative limits or other restrictions. The conformance period for the Volcker Rule has been extended to July 21, 2015, and to July 21, 2017 for CLOs. Certain CLOs may be considered "covered funds" under the Volcker rule and therefore the most senior tranche of the CLO may be a restricted security for various banking and nonbanking entities. This may restrict the liquidity of certain non-Volcker compliant CLOs in the future and may affect the Fund's ability to liquidate these positions on a timely basis.

Investment Strategy and Investment Risks

*General Economic and Market Conditions*.    The success of the Fund's activities will be affected by general economic and market conditions, such as interest rates, availability of credit, inflation rates, economic uncertainty, changes in laws (including laws relating to taxation of the Fund's investments), trade barriers, currency exchange controls, and national and international political circumstances (including wars, terrorist acts or security operations).    These factors may affect the level and volatility of securities prices and the liquidity of the Fund's investments.    Volatility or illiquidity could impair the Fund's profitability or result in losses.    The Fund may maintain substantial trading positions that can be adversely affected by the level of volatility in the financial markets; the larger the positions, the greater the potential for loss.

Unpredictable or unstable market conditions may result in reduced opportunities to find suitable investments to deploy capital or make it more difficult to exit and realize value (or avoid significant losses) from the Fund's existing investments.    It is important to understand that the Fund can incur material losses even if it reacts quickly to difficult market conditions and there can be no assurance that the Fund will not suffer material adverse effects from broad and rapid changes in market conditions.

*Recent Developments in Global Credit Markets*.    Recently, declines in the market value of asset-backed securities, especially securities backed by subprime mortgages, have been concomitant with significant market events.    Increasing credit and valuation problems in the subprime mortgage market have generated extreme volatility and illiquidity in the markets for securities directly or indirectly exposed to subprime mortgage loans.    This volatility and illiquidity has extended to the global credit and equity markets generally, and, in particular, to the high-yield bond and loan markets, exacerbated by, among other things, growing uncertainty regarding the extent of the problems in the mortgage industry and the degree of exposure of financial institutions and others, decreased risk tolerance by investors and significantly tightened availability of credit.    The duration and ultimate effect of current market conditions cannot be predicted, nor is it known whether or the degree to which such conditions may worsen.    However, the continuation of current market conditions, uncertainty or further deterioration could result in further declines in the market values of potential Fund investments or declines in the market values of subsequently purchased Fund investments.    Such declines could lead to diminished investment opportunities for the Fund, prevent the Fund from successfully executing its investment strategies or require the Fund to dispose of investments at a loss while such adverse market conditions prevail.

*Illiquidity*.    The investments made by the Fund may be or become very illiquid, and consequently the Fund may not be able to sell such investments at prices that reflect the Investment Manager's assessment of their value or the amount paid for such investments by the Fund.    Illiquidity may result from the absence of an established market for the investments as well as legal, contractual or other restrictions on their resale by the Fund and other factors.    Furthermore, the nature of the Fund's investments, especially those in financially distressed companies, may require a long holding period prior to profitability.    The Partnership Agreement authorizes the General Partner to make distributions in kind (including interests in affiliated liquidating vehicles) of securities in lieu of or in addition to cash. In the event the General Partner makes distributions of securities in kind, such securities could be illiquid or subject to legal, contractual and other restrictions on transfer.

*Short Sales*.    The Fund may enter into transactions, known as "short sales," in which it sells a security it does not own in anticipation of a decline in the market value of the security.    Short sales by the Fund that are not made "against the box" theoretically involve unlimited loss potential since the

market price of securities sold short may continuously increase. The Fund may mitigate such losses by replacing the securities sold short before the market price has increased significantly. Under adverse market conditions, the Fund might have difficulty purchasing securities to meet its short sale delivery obligations, and might have to sell portfolio securities to raise the capital necessary to meet its short sale obligations at a time when fundamental investment considerations would not favor such sales.

*Derivatives*. Derivative instruments, or "derivatives," include futures, options, swaps, structured securities and other instruments and contracts that are derived from, or the value of which is related to, one or more underlying securities, financial benchmarks, currencies or indices. Derivatives allow an investor to hedge or speculate upon the price movements of a particular security, financial benchmark currency or index at a fraction of the cost of investing in the underlying asset. The value of a derivative depends largely upon price movements in the underlying asset. Therefore, many of the risks applicable to trading the underlying asset are also applicable to derivatives of such asset. However, there are a number of other risks associated with derivatives trading. For example, because many derivatives are "leveraged," and thus provide significantly more market exposure than the money paid or deposited when the transaction is entered into, a relatively small adverse market movement can not only result in the loss of the entire investment, but may also expose the Fund to the possibility of a loss exceeding the original amount invested. Derivatives may also expose investors to liquidity risk, as there may not be a liquid market within which to close or dispose of outstanding derivatives contracts, and to counterparty risk. The counterparty risk lies with each party with whom the Fund contracts for the purpose of making derivative investments (the "**Counterparty**"). In the event of the Counterparty's default, the Fund will only rank as an unsecured creditor and risks the loss of all or a portion of the amounts it is contractually entitled to receive.

*Life Settlement Investments*. The Fund may invest in life settlements or own companies that may invest in life settlements, which are the transfers of the beneficial interest in a life insurance policy by the underlying insured person to a third party. The Fund will generally purchase the beneficial interest in a life insurance policy for more than its cash surrender value but at a discount to its face value (i.e., the payment amount set forth in the life insurance policy that is payable on the death of the insured or upon maturity of the life insurance policy). After purchase the Fund will be responsible for premiums payable on the life insurance policy and will be entitled to receive the full face value from the insurance company upon maturation (i.e., upon the death of the insured). Accordingly, if the Fund is unable to make premium payments on a purchased life insurance policy due to liquidity issues or for any other reason, the policy will lapse, and the Fund will lose its ownership interest in the policy. In addition, the Fund's investments in life settlement policies involve certain additional risks, including inaccurate estimations of life expectancy of the insured individuals, liquidity risk, credit risk of the insurance company, risks of any policies purchased being unenforceable and risks of adverse regulatory and legal changes.

The actual rate of return on a life settlement policy cannot be calculated before the insured dies and the longer the insured lives, the lower the rate of return on the related life settlement policy will be. Current privacy laws may limit the information available to the Fund about insureds and may cause the Fund to inaccurately estimate the value of particular policies. The Fund's inability to predict with certainty the life expectancies of the pool of underlying insured persons tied to purchased life settlement policies may cause unanticipated delays in the collection of a substantial number of life settlement policies. Life settlements are also generally considered illiquid because there is a limited secondary market for such policies to be bought and sold. Accordingly, the Fund may be limited in its ability to sell policies in its portfolio in a timely fashion and/or at a favorable price. In addition, if a life insurance company declares bankruptcy or otherwise is insolvent, there may not be sufficient funds for it to pay

its liability, and while many states have an insurance guarantee fund to provide payments to beneficiaries of insurance companies that declare bankruptcy, the collection process can be prolonged and complicated, and collection may not be possible in all circumstances.

Life settlement policies may also be subject to contest by the issuing life insurance company. If the insurance company successfully contests a policy, the policy will be rescinded and declared void. For example, insurers may refuse to pay benefits on certain life insurance policies on the basis that there was no "insurable interest" on the part of the purchaser of a life insurance policy at the time such policy was issued. Recently the issue of a lack of insurable interest has been raised by insurers and beneficiaries of irrevocable life insurance trusts, in the context of so-called "stranger originated life insurance" policies. It is possible that courts may void certain life settlement policies for these or other reasons. The market for life settlement policies may also be subject to new government regulation that may impact the ability of the Fund to obtain life settlement policies. Insurance companies may seek regulation or changes of law restricting or otherwise encumbering the transfer of life insurance policies in life settlement policy transactions. No assurance can be made that insurance companies will not be successful in limiting the supply of life insurance policies available for purchase in life settlement policy transactions.

Any or all of the risks described above could have a material adverse effect on the Fund's investment returns and, therefore, on its ability to make distributions to its shareholders. In addition, it is unclear under a variety of federal income tax principles whether the income from life settlements or the Fund's ownership in a non-U.S. company that makes distributions resulting from such life settlement investments is qualifying income for purposes of the IRS 90% gross income test the Fund must satisfy each year to qualify as a regulated investment company ("*RIC*"). Further, the Fund's ownership in a non-U.S. company that invests in life settlements, it is unclear whether the U.S. will respect the non-U.S. company reliance on the applicable U.S. tax treaty for purposes of the avoidance of certain withholding tax or whether the non-U.S. company is deemed to be engaged in a U.S. trade or business within the U.S. If any such was the case, the Fund could be materially adversely effected by such determination on the non-U.S. company with respect to the Fund's investments returns and its ability to make distributions to its shareholders. The Fund intends to monitor its investments to ensure that the Fund remains qualified as a RIC.

*Foreign Securities.* Investments in foreign securities involve certain factors not typically associated with investing in U.S. securities, such as risks relating to (i) currency exchange matters, including fluctuations in the rate of exchange between the U.S. dollar (the currency in which the books of the Fund are maintained) and the various foreign currencies in which the Fund's portfolio securities will be denominated and costs associated with conversion of investment principal and income from one currency into another; (ii) differences between the U.S. and foreign securities markets, including the absence of uniform accounting, auditing and financial reporting standards and practices and disclosure requirements, and less government supervision and regulation; (iii) political, social or economic instability; (iv) imposition of foreign income, withholding or other taxes; and (v) the extension of credit, especially in the case of sovereign debt.

*Commodities and Futures.* The Fund may trade on a limited basis in commodities and futures. Such trading activity is regulated by the Commodity Futures Trading Commission (the "*CFTC*"). Pursuant to an exemption from registration under CFTC regulations, neither the General Partner nor the Investment Manager is required to register, and neither is registered, with the CFTC or the National Futures Association ("*NFA*") as a commodity pool operator (a "*CPO*") or as a commodity trading advisor ("*CTA*"). To comply with the exemption, the Investment Manager is subject to specific

limitations on the amount of commodities and futures that it can trade on behalf of the Fund. Should the Fund's investments in commodities or futures instruments exceed the limits provided by the applicable exemption from registration, the Investment Manager will either have to register with the NFA or cease providing commodity interest trading advice to the Fund and liquidate the Fund's holdings of commodities and futures which could result in losses and additional costs to the Fund.

*Leverage.* Subject to applicable margin and other limitations, the Fund may borrow funds in order to make additional investments and thereby increase both the possibility of gain and risk of loss. Consequently, the effect of fluctuations in the market value of the Fund's portfolio would be amplified. Interest on borrowings will be a portfolio expense of the Fund and will affect the operating results of the Fund. Also, the Fund could potentially create leverage via the use of instruments such as options and other derivative instruments.

*Options.* Investing in options can provide a greater potential for profit or loss than an equivalent investment in the underlying asset. The value of an option may decline because of a change in the value of the underlying asset relative to the strike price, the passage of time, changes in the market's perception as to the future price behavior of the underlying asset, or any combination thereof. In the case of the purchase of an option, the risk of loss of an investor's entire investment (*i.e.*, the premium paid plus transaction charges) reflects the nature of an option as a wasting asset that may become worthless when the option expires. Where an option is written or granted (*i.e.*, sold) uncovered, the seller may be liable to pay substantial additional margin, and the risk of loss is unlimited, as the seller will be obligated to deliver, or take delivery of, an asset at a predetermined price which may, upon exercise of the option, be significantly different from the market value.

*Currency Exposure.* The Interests will be issued and generally withdrawal proceeds will be paid in U.S. Dollars. A limited amount of the assets of the Fund may, however, be invested in securities and other investments which are denominated in currencies other than U.S. Dollars. Accordingly, the value of such assets may be affected favorably or unfavorably by fluctuations in currency rates. The Investment Manager may hedge the non-U.S. currency exposure of the Fund using Currency Hedging Instruments, as described in "Investment Program" above. However, the assets of the Fund will necessarily be subject to foreign exchange risks. In addition, prospective investors whose assets and liabilities are predominately in other currencies should take into account the potential risk of loss arising from fluctuations in value between the U.S. Dollar and other currencies.

To the extent unhedged, the value of the Fund's positions in non-U.S. investments will fluctuate with U.S. Dollar exchange rates as well as with the price changes of the investments in the various local markets and currencies. In such cases, an increase in the value of the U.S. Dollar compared to the other currencies in which the Fund makes investments will reduce the effect of any increases and magnify the effect of any decreases in the prices of the Fund's financial instruments in their local markets and may result in a loss to the Fund. Conversely, a decrease in the value of the U.S. Dollar will have the opposite effect on the Fund's non-U.S. Dollar investments.

*Concentration of the Fund's Portfolio.* The Fund may be highly concentrated in CLO Securities. The concentration of the Fund's portfolio in CLO Securities subjects the Fund to a greater degree of risk than if the Fund's portfolio was diversified with respect to several investment strategies. Also, the concentration of the Fund's portfolio in any one obligor would subject the Fund to a greater degree of risk with respect to defaults by such obligor.

*Volatility Risk*.   The Fund's investment program may involve the purchase and sale of relatively volatile instruments such as derivatives, which are frequently valued based on implied volatilities of such derivatives compared to the historical volatility of underlying financial instruments.   Fluctuations or prolonged changes in the volatility of such instruments, therefore, can adversely affect the value of investments held by the Fund.   In addition, many non-U.S. financial markets are not as developed or as efficient as those in the U.S., and as a result, price volatility may be higher for the Fund's investments.

*Long-Biased Investment Program.*   The Fund expects that its strategy will have a long bias. Therefore, any decline in the overall market may result in a decline in the value of the Fund's assets.

*Leverage*.   Leverage may take a variety of forms, including but not limited to the following: long-term loans, convertible notes and repurchase arrangements.   Leverage arrangements used by the Fund when financing is contingent on the market value of the financed assets may include those which may be subject to mark to market collateral or margin calls.

While leverage presents the opportunity for increasing the total return on investments, it has the effect of potentially increasing losses as well.   Accordingly, any event that adversely affects the value of an investment could be magnified to the extent leverage is utilized.   The cumulative effect of the use of leverage with respect to investments in a market that moves adversely to such investments could result in a substantial loss, which would be greater than if the investments were not leveraged.

In the futures markets, margin deposits are typically low relative to the value of the futures contracts purchased or sold.   Such low margin deposits are indicative of the fact that any commodity futures contract trading is typically accompanied by a high degree of leverage.   Low margin deposits mean that a relatively small price movement in a futures contract may result in immediate and substantial losses to the investor.   For example, if at the time of purchase 10 percent of the price of a futures contract is deposited as margin, a 10 percent decrease in the price of the futures contract would, if the contract is then closed out, result in a total loss of the margin deposit before any deduction for the brokerage commission.   Thus, like other leveraged investments, any purchase or sale of a commodity contract may result in losses in excess of the amount invested.

The use of short-term margin borrowings results in certain additional risks to the Fund.   For example, should the securities pledged to brokers to secure the Fund's margin accounts decline in value, the Fund could be subject to a "margin call," pursuant to which the Fund must either deposit additional funds or securities with the broker, or suffer mandatory liquidation of the pledged securities to compensate for the decline in value.   In the event of a sudden drop in the value of the Fund's assets, the Fund might not be able to liquidate assets quickly enough to satisfy its margin requirements.

The Fund may borrow by entering into reverse repurchase agreements.   Under a reverse repurchase agreement, the Fund sells securities and agrees to repurchase them at a mutually agreed date and price.   Reverse repurchase agreements may involve the risk that the market value of the securities retained in lieu of sale by the Fund may decline below the price of the securities the Fund has sold but is obligated to repurchase.   In the event the buyer of securities under a reverse repurchase agreement files for bankruptcy or becomes insolvent, such buyer or its trustee or receiver may receive an extension of time to determine whether to enforce the Fund's obligation to repurchase the securities and the Fund's use of the proceeds of the reverse repurchase agreement may effectively be restricted pending such decision.   To the extent that, in the meantime, the value of the securities that the Fund has purchased has decreased, the Fund could experience a loss.

The financing used by the Fund to leverage its portfolio include those extended by securities brokers and dealers in the marketplace in which the Fund will invest.  While the Fund attempts to negotiate the terms of these financing arrangements with such brokers and dealers, its ability to do so is limited.  The Fund is therefore subject to changes in the value that the broker-dealer ascribes to a given security or position, the amount of margin required to support such security or position, the borrowing rate to finance such security or position and/or such broker-dealer's willingness to continue to provide any such credit to the Fund.  In addition, the Fund could be forced to liquidate its portfolio on short notice to meet its financing obligations.  The forced liquidation of all or a portion of the Fund's portfolio at distressed prices could result in significant losses to the Fund.

*Market Liquidity and Leverage*.  The Fund may be adversely affected by a decrease in market liquidity for the instruments in which it invests which may impair the Fund's ability to adjust its positions.  The size of the Fund's positions may magnify the effect of a decrease in market liquidity for such instruments.  Changes in overall market leverage, deleveraging as a consequence of a decision by the prime brokers and custodians, or other counterparties with which the Fund enters into repurchase/reverse repurchase agreements or derivative transactions, to reduce the level of leverage available, or the liquidation by other market participants of the same or similar positions, may also adversely affect the Fund's portfolio.

*Risks Associated with Bankruptcies*.  Many of the events within a bankruptcy case are adversarial and often beyond the control of the creditors.  While creditors generally are afforded an opportunity to object to significant actions, there can be no assurance that a bankruptcy court would not approve actions which may be contrary to the interests of the Fund.  Furthermore, there are instances where creditors and equity holders lose their ranking and priority as such if they are considered to have taken over management and functional operating control of a debtor.

Generally, the duration of a bankruptcy case can only be roughly estimated.  The reorganization of a company usually involves the development and negotiation of a plan of reorganization, plan approval by creditors and confirmation by the bankruptcy court.  This process can involve substantial legal, professional and administrative costs to the company and the Fund; it is subject to unpredictable and lengthy delays; and during the process the company's competitive position may erode, key management may depart and the company may not be able to invest adequately.  In some cases, the company may not be able to reorganize and may be required to liquidate assets.  Although the Fund intends to invest primarily in debt, the debt of companies in financial reorganization will, in most cases, not pay current interest, may not accrue interest during reorganization and may be adversely affected by an erosion of the issuer's fundamental value.  Such investments can result in a total loss of principal.

U.S. bankruptcy law permits the classification of "substantially similar" claims in determining the classification of claims in a reorganization for purpose of voting on a plan of reorganization.  Because the standard for classification is vague, there exists a significant risk that the Fund's influence with respect to a class of securities can be lost by the inflation of the number and the amount of claims in, or other gerrymandering of, the class.  In addition, certain administrative costs and claims that have priority by law over the claims of certain creditors (for example, claims for taxes) may be quite high.

Furthermore, there are instances where creditors and equity holders lose their ranking and priority as such when they take over management and functional operating control of a debtor.  In those cases where the Fund, by virtue of such action, is found to exercise "domination and control" of a debtor, the Fund may lose its priority if the debtor can demonstrate that its business was adversely impacted or other creditors and equity holders were harmed by the Fund.

The Fund may invest in companies based outside the United States. Investment in the debt of financially distressed companies domiciled outside the United States involves additional risks. Bankruptcy law and process may differ substantially from that in the United States, resulting in greater uncertainty as to the rights of creditors, the enforceability of such rights, reorganization timing and the classification, seniority and treatment of claims. In certain developing countries, although bankruptcy laws have been enacted, the process for reorganization remains highly uncertain.

The General Partner, on behalf of the Fund, may elect to serve on creditors' committees, equity holders' committees or other groups to ensure preservation or enhancement of the Fund position as a creditor or equity holder. A member of any such committee or group may owe certain obligations generally to all parties similarly situated that the committee represents. If the General Partner concludes that its obligations owed to the other parties as a committee or group member conflict with its duties owed to the Fund, it will resign from that committee or group, and the Fund may not realize the benefits, if any, of participation on the committee or group. In addition, and also as discussed above, if the Fund is represented on a committee or group, it may be restricted or prohibited under applicable law from disposing of or increasing its investments in such company while it continues to be represented on such committee or group.

The Fund may purchase creditor claims subsequent to the commencement of a bankruptcy case. Under judicial decisions, it is possible that such purchase may be disallowed by the bankruptcy court if the court determines that the purchaser has taken unfair advantage of an unsophisticated seller, which may result in the rescission of the transaction (presumably at the original purchase price) or forfeiture by the purchaser.

*Equitable Subordination*. Under common law principles that in some cases form the basis for lender liability claims, if a lender (a) intentionally takes an action that results in the undercapitalization of a borrower or issuer to the detriment of other creditors of such borrower or issuer, (b) engages in other inequitable conduct to the detriment of such other creditors, (c) engages in fraud with respect to, or makes misrepresentations to, such other creditors or (d) uses its influence as a stockholder to dominate or control a borrower or issuer to the detriment of other creditors of such borrower or issuer, a court may elect to subordinate the claim of the offending lender or bondholder to the claims of the disadvantaged creditor or creditors (a remedy called "***equitable subordination***"). The Fund does not intend to engage in conduct that would form the basis for a successful cause of action based upon the equitable subordination doctrine; however, because of the nature of the debt obligations, the Fund may be subject to claims from creditors of an obligor that debt obligations of such obligor which are held by the issuer should be equitably subordinated.

*Fraud*. Of paramount concern in lending is the possibility of material misrepresentation or omission on the part of the borrower. Such inaccuracy or incompleteness may adversely affect the valuation of the collateral underlying the loans or may adversely affect the ability of the Fund to perfect or effectuate a lien on the collateral securing the loan. The Fund will rely upon the accuracy and completeness of representations made by borrowers to the extent reasonable, but cannot guarantee such accuracy or completeness. Under certain circumstances, payments to the Fund may be reclaimed if any such payment or distribution is later determined to have been a fraudulent conveyance or a preferential payment.

*Interest Rate Risk*. The value of the fixed rate securities in which the Fund may invest generally will have an inverse relationship with interest rates. Accordingly, if interest rates rise the value of such securities may decline. In addition, to the extent that the receivables or loans underlying specific

securities are prepayable without penalty or premium, the value of such securities may be negatively affected by increasing prepayments, which generally occur when interest rates decline.

*Reinvestment Risk*. The Fund reinvests the cash flows received from a security. The additional income from such reinvestment, sometimes called interest-on-interest, is reliant on the prevailing interest rate levels at the time of reinvestment. There is a risk that the interest rate at which interim cash flows can be reinvested will fall. Reinvestment risk is greater for longer holding periods and for securities with large, early cash flows such as high-coupon bonds. Reinvestment risk also applies generally to the reinvestment of the proceeds the Fund receives upon the maturity or sale of a portfolio security.

The amount and timing of the addition of investments will affect the cash flows available to make payments on the Interests. Reduced liquidity and lower volumes of trading in certain investments, in addition to restrictions on investment represented by the Fund's investment criteria, could result in periods of time during which the Fund has not been able to maximize its exposure to investments. The longer the period before reinvestment of cash in investments, the greater the adverse impact may be on aggregate interest collected and distributed by the Fund, thereby resulting in lower yield than could have been obtained if the net proceeds associated with the offering of the Interests were immediately reinvested. In addition, the timing of the addition of investments, the scheduled interest payment dates of the investments and the amount of the net proceeds associated with the offering of the Interests invested in lower-yielding alternate short-term investments until applied to the addition of investments, may have a material impact on the amount of interest payments collected during any accrual period, which could affect payments on the Interests.

Further, obligors of investments may be more likely to exercise any rights they may have to prepay such obligations when interest rates or credit spreads are declining. Any decrease in the yield on the investments will have the effect of reducing the amounts available to make payments on the Interests.

*Timing Risk*. Many agency, corporate and municipal bonds, and all mortgage-backed securities, contain a provision that allows the issuer to "call" all or part of the issue before the bond's maturity date. The issuer usually retains the right to refinance the bond in the future if market interest rates decline below the coupon rate. There are three disadvantages to the call provision. First, the cash flow pattern of a callable bond is not known with certainty. Second, because the issuer will call the bonds when interest rates have dropped, the Fund is exposed to reinvestment rate risk, *i.e.*, the Fund will have to reinvest the proceeds received when the bond is called at lower interest rates. Finally, the capital appreciation potential of a bond will be reduced because the price of a callable bond may not rise much above the price at which the issuer may call the bond.

*Maturity Risk*. In certain situations, the Fund may purchase a bond of a given maturity as an alternative to another bond of a different maturity. Ordinarily, under these circumstances, the Fund will make an adjustment to account for the differential interest rate risks in the two bonds. This adjustment, however, makes an assumption about how the interest rates at different maturities will move. To the extent that the yield movements deviate from this assumption, there is a yield-curve or maturity risk. Another situation where yield-curve risk should be considered is in the analysis of bond swap transactions where the potential incremental returns are dependent entirely on the parallel shift assumption for the yield curve.

*Inflation Risk*. Inflation risk results from the variation in the value of cash flows from a security due to inflation, as measured in terms of purchasing power. For example, if the Fund purchases a five

(5) year bond in which it can realize a coupon rate of five percent (5%), but the rate of inflation is six percent (6%), then the purchasing power of the cash flow has declined. For all but adjustable bonds or floating rate bonds, the Fund is exposed to inflation risk because the interest rate the issuer promises to make is fixed for the life of the security. To the extent that interest rates reflect the expected inflation rate, floating rate bonds have a lower level of inflation risk.

*Over-the-Counter-Trading*. Financial instruments that may be purchased or sold by the Fund may include instruments not traded on an exchange, including, but not limited to, swap transactions, and forward foreign currency transactions. Over-the-counter options, unlike exchange-traded options, are two-party contracts with price and other terms negotiated by the buyer and seller. The risk of nonperformance by the obligor on such an instrument may be greater and the ease with which the Fund can dispose of or enter into closing transactions with respect to such an instrument may be less than in the case of an exchange-traded instrument. In addition, significant disparities may exist between "bid" and "asked" prices for financial instruments that are not traded on an exchange. Financial instruments not traded on exchanges are also not subject to the same type of government regulation as exchange traded instruments, and many of the protections afforded to participants in a regulated environment may not be available in connection with such transactions.

To the extent that the Fund engages in these transactions, the Fund must rely on the creditworthiness of its counterparty. In certain instances, counterparty or credit risk is affected by the lack of a central clearinghouse for foreign exchange trades. To reduce their credit risk exposure, the Fund may trade in the forward foreign currency market through money center banks and leading brokerage firms.

*Position Limits*. "Position limits" imposed by various regulators or regulations may also limit the Fund's ability to effect desired trades. Position limits are the maximum amounts of gross, net long or net short positions that any one person or entity may own or control in a particular financial instrument. All positions owned or controlled by the same person or entity, even if in different accounts, may be aggregated for purposes of determining whether the applicable position limits have been exceeded. Thus, even if the Fund does not intend to exceed applicable position limits, it is possible that different accounts managed by the General Partner or its affiliates may be aggregated. If at any time positions managed by the General Partner were to exceed applicable position limits, the General Partner would be required to liquidate positions, which might include positions of the Fund, to the extent necessary to come within those limits. Further, to avoid exceeding the position limits, the Fund might have to forego or modify certain of its contemplated trades.

*Material, Nonpublic Information*. From time to time, certain personnel of the Investment Manager may come into possession of material, nonpublic information (including in connection with other investments or proposed investments not intended to benefit the Fund) that would limit the Investment Manager's ability to buy and sell investments. The Fund's investment flexibility may be constrained as a consequence of the Investment Manager's inability to take certain actions because of such information. The Fund may experience losses if it is unable to sell an investment that it holds because certain personnel of the Investment Manager have obtained material, nonpublic information about such investment.

*Co-Investments with Third Parties*. The Fund may co-invest with third parties through joint ventures or other entities. Such investments may involve risks in connection with such third-party involvement, including the possibility that a third-party co-venturer may have financial difficulties resulting in a negative impact on such investment, economic or business interests or goals that are

inconsistent with those of the Fund or be in a position to take (or block) action in a manner contrary to the Fund's investment objectives. In those circumstances where such third parties involve a management group, such third parties may enter into compensation arrangements relating to such investments, including incentive compensation arrangements. Such compensation arrangements will reduce the returns to participants in the investments.

*Other Investment Vehicles.* The Investment Manager may allocate a portion of the Fund's assets to pooled investment vehicles that may be managed by the Investment Manager or its affiliates or unaffiliated managers. Since the Fund may not have full transparency with respect to the trading activities of such investment vehicles, it may be limited in its ability to hedge its exposure or to prevent concentration of its assets within the same issuer, asset or asset class, industry, section, strategy, currency, country or geographic region. Further, the Investment Manager may be limited with respect to its ability to monitor unaffiliated managers, including their adherence to their respective trading and risk guidelines (if such guidelines exist). Even in the event that such information may be available to the Fund, the Fund's investment in such investment vehicles may be "locked up" and subject to limitations on withdrawals, and in light of the broad exculpation and indemnification provisions typically contained in the governing documents of such investment vehicles, may have limited recourse against the managers of such investment vehicles.

The managers of pooled investment vehicles with which the Fund may invest may be subject to asset-based fees and performance-based compensation. Such fees or compensation may be higher than the fees or compensation of comparable investment vehicles.

Performance-based compensation is typically paid or allocated at the investment vehicle level on the basis of the performance of each individual investment vehicle, not on the basis of the overall performance of the Fund. Consequently, performance-based compensation could be payable to a particular investment vehicle in respect of its performance during periods when the Fund as a whole incurs losses. The existence of performance-based compensation also could cause the manager of such investment vehicle to trade in a more aggressive manner than it otherwise might.

*Futures Contracts*. The value of futures depends upon the price of the financial instruments, such as commodities, underlying them. The prices of futures are highly volatile, and price movements of futures contracts can be influenced by, among other things, interest rates, changing supply and demand relationships, trade, fiscal, monetary and exchange control programs and policies of governments, and national and international political and economic events and policies. In addition, investments in futures are also subject to the risk of the failure of any of the exchanges on which the Fund's positions trade or of its clearing houses or counterparties.

Futures positions may be illiquid because certain commodity exchanges limit fluctuations in certain futures contract prices during a single day by regulations referred to as "daily price fluctuation limits" or "daily limits." Under such daily limits, during a single trading day no trades may be executed at prices beyond the daily limits. Once the price of a particular futures contract has increased or decreased by an amount equal to the daily limit, positions in that contract can neither be taken nor liquidated unless traders are willing to effect trades at or within the limit. This could prevent the Fund from promptly liquidating unfavorable positions and subject the Fund to substantial losses or prevent it from entering into desired trades. In extraordinary circumstances, a futures exchange or the Commodities Futures Trading Commission could suspend trading in a particular futures contract, or order liquidation or settlement of all open positions in such contract.

*Forward Trading*.  Forward contracts and options thereon, unlike futures contracts, are not traded on exchanges and are not standardized; rather, banks and dealers act as principals in these markets, negotiating each transaction on an individual basis.  Forward and "cash" trading is substantially unregulated; there is no limitation on daily price movements and speculative position limits are not applicable.  The principals who deal in the forward markets are not required to continue to make markets in the currencies or commodities they trade and these markets can experience periods of illiquidity, sometimes of significant duration.  There have been periods during which certain participants in these markets have refused to quote prices for certain currencies or commodities or have quoted prices with an unusually wide spread between the price at which they were prepared to buy and that at which they were prepared to sell.  Disruptions can occur in any market traded by the Fund due to unusual trading volume, political intervention or other factors.  The imposition of controls by governmental authorities might also limit such forward trading to less than that which the General Partner would otherwise recommend, to the possible detriment of the Fund.  Market illiquidity or disruption could result in major losses to the Fund.

*Hedging Transactions*.  The Fund may (but is not required to) utilize financial instruments both for investment purposes and for risk management purposes in order to (i) protect against possible changes in the market value of the Fund's investment portfolios resulting from fluctuations in the markets and changes in interest rates; (ii) protect the Fund's unrealized gains in the value of its investment portfolio; (iii) facilitate the sale of any such investments; (iv) enhance or preserve returns, spreads or gains on any investment in the Fund's portfolios; (v) hedge against a directional trade; (vi) hedge the interest rate, credit or currency exchange rate on any of the Fund's financial instruments; (vii) protect against any increase in the price of any financial instruments the Fund anticipates purchasing at a later date; or (viii) act for any other reason that the Investment Manager deems appropriate.  The Fund will not be required to hedge any particular risk in connection with a particular transaction or its portfolios generally.

The success of the Fund's hedging strategy will be subject to the Investment Manager's ability to correctly assess the degree of correlation between the performance of the instruments used in the hedging strategy and the performance of the investments in the portfolio being hedged.  Since the characteristics of many securities change as markets change or time passes, the success of the Fund's hedging strategy will also be subject to the Investment Manager's ability to continually recalculate, readjust, and execute hedges in an efficient and timely manner.  While the Fund may enter into hedging transactions to seek to reduce risk, such transactions may result in a poorer overall performance for the Fund than if it had not engaged in any such hedging transactions.  For a variety of reasons, the Investment Manager may not seek to establish a perfect correlation between such hedging instruments and the portfolio holdings being hedged.  Such imperfect correlation may prevent the Fund from achieving the intended hedge or expose the Fund to risk of loss.  The successful utilization of hedging and risk management transactions requires skills complementary to those needed in the selection of the Fund's portfolio holdings.  Moreover, it should be noted that the portfolio will always be exposed to certain risks that cannot be hedged.

*Use of Derivatives and Other Specialized Techniques*.  The Fund may engage in a variety of swaps and related derivative transactions including, but not limited to, total return swaps, interest rate swaps, credit derivative swaps, the use of forward contracts, put and call options, floors, collars or other similar arrangements and derivative transactions.  While some swaps will be required to be cleared and entered into through exchanges once the U.S. Commodity Futures Trading Commission (the "***CFTC***") makes its final clearing determination, swap contracts excluded from the clearing determination will not be traded on exchanges and will not be subject to margin and clearing requirements or the same type of

43

government regulation as exchange markets. As a result, many of the protections afforded to participants on organized exchanges and in a regulated environment are not available in connection with these transactions. The swap markets with respect to noncleared swaps are "principals' markets", in which performance with respect to a swap contract is the responsibility only of the counterparty to the contract, and not of any exchange or clearinghouse. As a result, the Fund will be subject to the risk of the inability or refusal to perform with respect to non-cleared swap contracts on the part of the counterparties with whom the Fund will trade.

There are no limitations on daily price movements in swap transactions. Speculative position limits are not currently applicable to swap transactions, although the Fund's swap counterparties may limit the size or duration of positions available to the Fund as a consequence of credit considerations. In addition, the CFTC has sought to impose federal speculative position limits on futures, swaps that reference those futures and contracts on non-U.S. boards of trade that settle against those contracts. While the CFTC adopted final position limits, the rulemaking was vacated due to the CFTC's failure to perform proper cost benefit analysis. If the CFTC re-adopts rules or the above referenced discussion is overturned on appeal, the Fund may be limited in its ability to concentrate its positions in certain swaps. Furthermore, the Fund may also be subject to position limits pursuant to current or pending non-U.S. regulations.

Participants in the swap markets are not required to make continuous markets in the swap contracts in which they trade. Participants could refuse to quote prices for swap contracts or quote prices with an unusually wide spread between the price at which they are prepared to buy and the price at which they are prepared to sell. If an event of default or an additional termination event were to occur with respect to the Fund under an ISDA master agreement governing the Fund's swap transactions, the relevant swap counterparty and other swap counterparties may terminate all transactions with the Fund at significant losses to the Fund.

In addition to the foregoing, the investment techniques related to derivative instruments are highly specialized and may be considered speculative. Such techniques often involve forecasts and complex judgments regarding relative price movements and other economic developments. The success or failure of these investment techniques may turn on small changes in exogenous factors not within the control of any of the Investment Manager. For all the foregoing reasons, the use of derivatives and related techniques can expose the Fund to significant risk of loss.

Moreover, trading in swaps and other derivative instruments offers scope for a high degree of synthetic leverage. Accordingly, the leverage offered by trading in derivative instruments may magnify the gains and losses experienced by the Fund. Thus, like other leveraged investments, a derivatives trade may result in losses in excess of the amount invested. Any increase in the amount of leverage applied will increase the risk of loss due to the amount of additional leverage applied. Also, swap agreements tend to shift the investment exposure from one type of investment to another. Depending on how they are used, swap agreements may increase or decrease the overall volatility of the Fund. The most significant factor in the performance of swap agreements is the change in the specific factors that determine the amounts of payments due to and from the Fund. If a swap agreement calls for payments by the Fund, the Fund must be prepared to make such payments when due. In addition, if a counterparty's creditworthiness declines, the value of swap agreements with such counterparty can be expected to decline, potentially resulting in losses to the Fund.

Finally, counterparties to the Fund may be subject to capital and other requirements as a "swap dealer" or "major swap participant" which may increase their costs of doing of business, a portion of which increase may be passed on to the Fund. If a person is deemed to (i) enter into swaps as its ordinary course of business, (ii) be a market maker for any type of swaps, (iii) maintain a "substantial position" in any type of swap for speculative purposes, (iv) otherwise create counterparty risk that could have serious adverse consequences on the financial stability of the United States, or (v) be a financial entity that is highly leveraged relevant to its capital, the person may be deemed to be a swap dealer (in the case of (i) or (ii)) or a major swap participant (in the case of (iii), (iv) or (v)). Persons deemed to be swap dealers or major swap participants are required to register with the CFTC as such and would be subject to a number of regulatory requirements, such as specific recordkeeping, back-office and reporting requirements, margin collection requirements for swaps that are not cleared, capital requirements, disclosure obligations, specific compliance obligations and special obligations to governmental entities. While it is unlikely that the Fund would be subject to these requirements, the requirements will likely apply to many of the Fund's counterparties which may increase the cost of trading swaps through increased fees to offset the counterparties' trading and compliance costs.

*Counterparty Insolvency.* The Fund's assets may be held in one or more accounts maintained for the Fund by counterparties, including its prime brokers. There is a risk that any of such counterparties could become insolvent. In September 2008, Lehman Brothers Holdings Inc., a major investment bank based in the United States, filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code. While none of its U.S. broker-dealer subsidiaries was included in the Chapter 11 filing and all of its U.S. registered broker-dealer subsidiaries currently continue to operate, certain of Lehman Brothers subsidiaries, including Lehman Brothers International (Europe) ("***LBIE***") have been placed under the administration chartered to wind down their respective business. To date, it is uncertain what percentage of the assets custodied with LBIE by its trading counterparties (including hedge funds) will ultimately be recovered and when. The insolvency of the Fund's counterparties is likely to impair the operational capabilities or the assets of the Fund. Although the Investment Manager regularly monitors the financial condition of the counterparties it uses, if one or more of the Fund's counterparties were to become insolvent or the subject of liquidation proceedings in the United States (either under the Securities Investor Protection Act or the United States Bankruptcy Code), there exists the risk that the recovery of the Fund's securities and other assets from such prime broker or broker-dealer will be delayed or be of a value less than the value of the securities or assets originally entrusted to such prime broker or broker-dealer.

In addition, the Fund may use counterparties located in various jurisdictions outside the United States like LBIE. Such local counterparties are subject to various laws and regulations in various jurisdictions that are designed to protect their customers in the event of their insolvency. However, the practical effect of these laws and their application to the Fund's assets are subject to substantial limitations and uncertainties. Because of the large number of entities and jurisdictions involved and the range of possible factual scenarios involving the insolvency of a counterparty, it is impossible to generalize about the effect of their insolvency on the Fund and its assets. Investors should assume that the insolvency of any counterparty would result in a loss to the Fund and the Fund, which could be material.

*Counterparty Risk.* Some of the markets in which the Fund may effect transactions are "over-the-counter" or "interdealer" markets. The participants in such markets are typically not subject to credit evaluation and regulatory oversight as are members of "exchange-based" markets. This exposes the Fund to the risk that a counterparty will not settle a transaction in accordance with its terms and conditions because of a dispute over the terms of the contract (whether or not *bona fide*) or because of a

credit or liquidity problem, thus causing the Fund to suffer a loss. Such "counterparty risk" is accentuated for contracts with longer maturities where events may intervene to prevent settlement, or where the Fund has concentrated its transactions with a single or small group of counterparties. The Fund is not restricted from dealing with any particular counterparty or from concentrating any or all of its transactions with one counterparty. Moreover, the Fund's internal credit function which evaluates the creditworthiness of its counterparties may prove insufficient. The lack of a complete and "foolproof" evaluation of the financial capabilities of the Fund's counterparties and the absence of a regulated market to facilitate settlement may increase the potential for losses by the Fund.

*Exchange-Traded Funds.* The Fund may invest in exchange-traded funds ("***ETFs***"), which are shares of publicly-traded unit investment trusts, open-end funds, or depository receipts that seek to track the performance and dividend yield of specific indices or companies in related industries. These indices may be either broad-based, sector, or international. ETF shareholders are generally subject to the same risk as holders of the underlying securities they are designed to track. ETFs are also subject to certain additional risks, including, without limitation, the risk that their prices may not correlate perfectly with changes in the prices of the underlying securities they are designed to track, and the risk of trading in an ETF halting due to market conditions or other reasons, based on the policies of the exchange upon which the ETF trades. In addition, the Fund may bear, along with other shareholders of an ETF, its *pro rata* portion of the ETF's expenses, including management fees. Accordingly, in addition to bearing their proportionate share of the Fund's expenses (e.g., Management Fees and operating expenses), Partners may also indirectly bear similar expenses of an ETF, which may have a material adverse effect on the performance of the Fund.

*Non-U.S. Investments and Emerging Markets*. Investing in the securities of companies located outside the U.S. (including, western countries, "emerging market" countries and underdeveloped countries) involves certain considerations not usually associated with investing in securities of U.S. companies, including political and economic considerations, such as greater risks of expropriation and nationalization, confiscatory taxation, the potential difficulty of repatriating funds, general social, political and economic instability and adverse diplomatic developments; the possibility of imposition of withholding or other taxes on dividends, interest, capital gain or other income; the small size of the securities markets in such countries and the low volume of trading, resulting in potential lack of liquidity and in price volatility; fluctuations in the rate of exchange between currencies and costs associated with currency conversion; and certain government policies that may restrict the Fund's investment opportunities.

In addition, accounting and financial reporting standards that prevail in non-U.S. countries generally are not equivalent to U.S. standards and, consequently, less information is available to shareholders of companies located in such countries than is available to shareholders of companies located in the U.S. Moreover, an issuer of securities may be domiciled in a country other than the country in whose currency the instrument is denominated. The values and relative yields of investments in the securities markets of different countries, and their associate risks, are not expected to be highly correlated with each other and may behave in unpredictable ways. There is also less regulation, generally, of the securities markets in non-U.S. countries.

The Fund may be subject to additional risks which include possible adverse political and economic developments, possible seizure or nationalization of non-U.S. deposits and possible adoption of governmental restrictions which might adversely affect the payment of principal and interest to investors located outside the country of the issuer, whether from currency blockage or otherwise. Furthermore, some of the securities may be subject to brokerage, stamp or other taxes levied by

governments, which has the effect of increasing the cost of such investment and reducing the realized gain or increasing the realized loss on such securities at the time of sale. Furthermore, a non-U.S. issuer of debt or the non-U.S. governmental authorities that control the repayment of the debt may be unable or unwilling to repay principal or interest when due, and the Fund may have limited recourse in the event of a default. Some of these risks do not apply equally to issuers in larger, more developed countries. These risks are more pronounced in investments in issuers in countries with emerging markets or if the Fund invests significantly in a particular country.

Investment in emerging market securities and underdeveloped markets involves a greater degree of risk than an investment in securities of issuers based in developed countries. Among other things, emerging market securities investments may carry the risks of less publicly available information, more volatile markets, less strict securities market regulation, less favorable tax provisions and a greater likelihood of severe inflation, unstable currency, war and expropriation of personal property than investments in securities of issuers based in developed countries. In addition, the Fund's investment opportunities in certain emerging markets may be restricted by legal limits on foreign investment in local securities.

Emerging markets generally are not as efficient as those in developed countries. In some cases, a market for the security may not exist locally, and transactions will need to be made on a neighboring exchange. Volume and liquidity levels in emerging markets are lower than in developed countries. When seeking to sell emerging market securities, little or no market may exist for the securities. In addition, issuers based in emerging markets are not generally subject to uniform accounting and financial reporting standards, practices and requirements comparable to those applicable to issuers based in developed countries, thereby potentially increasing the risk of fraud or other deceptive practices. Furthermore, the quality and reliability of official data published by the government or securities exchanges in emerging markets may not accurately reflect the actual circumstances being reported.

The issuers of some non-U.S. securities, such as banks and other financial institutions, may be subject to less stringent regulations in emerging markets than would be the case for issuers in developed countries and therefore potentially carry greater risk. Custodial expenses for a portfolio of emerging markets securities generally are higher than for a portfolio of securities of issuers based in developed countries.

While the General Partner will take these factors into consideration in making investment decisions for the Fund, no assurance can be given that they will be able to fully avoid these risks.

In view of the foregoing considerations, an investment in Interests is suitable only for investors who are capable of bearing the relevant investment risks.

## Tax Related Risks

*Tax Uncertainty*. The Fund may take positions with respect to certain tax issues which depend on legal conclusions not yet resolved by the courts. Should any such positions be successfully challenged by the Service or other applicable taxing authority, there could be a materially adverse effect on the Fund, and a Limited Partner might be found to have a different tax liability for that year than that reported on its income tax returns.

*Uncertainty and Complexity of Tax Treatment*. The tax aspects of an investment in a partnership are complicated and complex and, in many cases, uncertain. Statutory provisions and administrative

regulations have been interpreted inconsistently by the courts. Additionally, some statutory provisions remain to be interpreted by administrative regulations. Investors will thus be subject to the risk caused by the uncertainty of the tax consequences with respect to an investment in the Fund. Each prospective investor should have the tax aspects of an investment in the Fund reviewed by professional advisors familiar with such investor's personal tax situation and with the tax laws and regulations applicable to the investor and private investment vehicles.

*Risk of Adverse Determination*. There can be no assurance that the conclusions set forth in this Memorandum will not be challenged successfully by the Internal Revenue Service (the "*Service*"), or significantly modified by new legislation, changes in the Service's positions or court decisions. The Fund has not applied for, nor does it expect to apply for, any advance rulings from the Service with respect to any of the federal income tax consequences described in this Memorandum. No representation or warranty of any kind is made by the General Partner with respect to the federal income tax consequences relating to an investment in the Fund. The Fund may take positions with respect to certain tax issues which depend on legal conclusions not yet resolved by the courts. Should any such positions be successfully challenged by the Service or other applicable taxing authority, there could be a materially adverse effect on the Fund, and a Limited Partner might be found to have a different tax liability for that year than that reported on its income tax returns.

*Risk of Tax Audit*. An audit of the Fund by the Service or another taxing authority could result in adjustments to the tax consequences initially reported by the Fund and may result in an audit of the returns of some or all of the Limited Partners, which examination could affect items not related to a Limited Partner's investment in the Fund. If audit adjustments result in an increase in a Limited Partner's income tax liability for any year, such Limited Partner may also be liable for interest and penalties with respect to the amount of underpayment. The legal and accounting costs incurred in connection with any audit of the Fund's tax returns will be borne by the Fund. The cost of any audit of a Limited Partner's tax return will be borne solely by that Limited Partner.

*Tax Considerations Taken into Account*. The General Partner may take tax considerations into account in determining when the Fund's investments should be sold or otherwise disposed of, and may assume certain market risk and incur certain expenses in this regard to achieve favorable tax treatment of a transaction.

*Tax Liabilities Without Distributions*. If the Fund has taxable income in a fiscal year, each Limited Partner will be taxed on that income in accordance with its distributive share of the Fund's profits, whether or not such profits have been distributed. Because the General Partner anticipates that there will be no cash distributions to the Limited Partners, an investor may incur tax liability with respect to activities of the Fund without receiving sufficient distributions from the Fund to defray such tax liabilities. In order to satisfy its tax liability in such a case, a Limited Partner would need sufficient funds from sources other than the Fund. Furthermore, the Fund may make investments with respect to which the Fund recognizes income for U.S. federal income tax purposes prior to receiving the cash or realizing the income as an economic matter. In addition, the Fund may recognize income for U.S. federal income tax purposes that does not reflect income as an economic matter. Such recognition of income prior to receipt of an economic benefit, if any, may result in increased tax liability for the Partners.

*Delayed Schedules K-1*. The Fund will provide Schedules K-1 as soon as practical after receipt of all of the necessary information. However, the Fund may be unable to provide final Schedules K-1 to Limited Partners for any given tax year until significantly after April 15 of the following year. The

General Partner will endeavor to provide Limited Partners with estimates of the taxable income or loss allocated to their investment in the Fund on or before such date, but final Schedules K-1 may not be available until completion of the Fund's annual audit. Limited Partners should be prepared to obtain extensions of the filing date for their income tax returns at the federal, state and local levels.

*Unrelated Business Taxable Income*. The Fund may make investments or engage in activities that will give rise to unrelated business taxable income ("***UBTI***"). Thus, an investment in the Fund may not be desirable for certain tax-exempt investors. The Fund may participate in investments that give rise to UBTI through entities that are treated as partnerships for U.S. federal income tax purposes. Because of the "flow-through" principles applicable to partnerships, if UBTI is earned by the Fund, a tax-exempt investor in the Fund will realize UBTI. Because of the Investment Manager's objective of maximizing the pre-tax returns of all the Limited Partners, the Investment Manager may be required to make certain decisions to maximize pre-tax returns that result in Tax-Exempt U.S. Investors (as defined below) recognizing more UBTI than might otherwise be the case. In some cases, the Investment Manager may forego actions with regard to the acquisition, financing, management and disposition of assets that would reduce UBTI because such actions would reduce the overall pre-tax returns to all the Limited Partners.

*Tax Changes*. Investors will be subject to the risk that changes to the tax law may adversely affect the federal income tax consequences of their investment in the Fund. Changes in existing tax laws or regulations and their interpretation may be enacted after the date of this Memorandum, possibly with retroactive effect, and could alter the income tax consequences of an investment in the Fund. Certain provisions of the Internal Revenue Code of 1986, as amended (the "***Code***") may be further amended or interpreted in a manner adverse to the Fund, in which event any benefits derived from an investment in the Fund may be adversely affected. In addition, significant legislative and budgetary proposals affecting tax laws have been made by the legislative and executive branches of the U.S. federal government. The likelihood of enactment of any such proposals, or any similar proposals, into law is uncertain. The enactment of any such proposals, including subsequent proposals, into law could have material adverse effects on the Fund and/or the Limited Partners. Enactment of such legislation, or similar legislation, could require significant restructuring of the Fund in order to mitigate such effects.

***The foregoing is not intended to be an exhaustive analysis or listing of the tax risks associated with an investment in the Fund. Many of the relevant tax considerations will vary depending on a prospective Limited Partner's individual circumstances. The tax aspects associated with such an investment are complex and complicated and are subject to a variety of interpretations. Prospective investors are strongly urged to review the discussions below under "Tax Considerations" and "ERISA and Other Regulatory Considerations" for a more complete discussion of certain of the tax risks inherent in the acquisition of Interests, and to seek and rely upon the advice of their own tax advisor who is qualified to discuss the foregoing and other possible tax risks.***

In view of the foregoing considerations, an investment in Interests is suitable only for investors who are capable of bearing the relevant investment risks.

## Potential Conflicts of Interest

The scope of the activities of the Investment Manager, its affiliates, and the funds and clients managed or advised by the Investment Manager or any of its affiliates may give rise to conflicts of interest or other restrictions and/or limitations imposed on the Fund in the future that cannot be foreseen

or mitigated at this time. The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts.

None of the Investment Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees (collectively, the "*Highland Group*") is precluded from engaging in or owning an interest in other business ventures or investment activities of any kind, whether or not such ventures are competitive with the Fund. The Investment Manager is permitted to manage other client accounts, some of which may have objectives similar or identical to those of the Fund, including other collective investment vehicles that may be managed by the Highland Group and in which the Investment Manager or any of its affiliates may have an equity interest.

The Fund will be subject to a number of actual and potential conflicts of interest involving the Highland Group including, among other things, the fact that: (i) the Highland Group conducts substantial investment activities for accounts, funds, collateralized debt obligations that invest in leveraged loans (collectively, "*CDOs*") and other vehicles managed by members of the Highland Group ("*Highland Accounts*") in which the Fund has no interest; (ii) the Highland Group advises Highland Accounts, which utilize the same, similar or different methodologies as the Fund and may have financial incentives (including, without limitation, as it relates to the composition of investors in such funds and accounts or to the Highland Group's compensation arrangements) to favor certain Highland Accounts over the Fund; (iii) the Highland Group may use the strategy described herein in certain Highland Accounts; (iv) the Investment Manager may give advice and recommend securities to, or buy or sell securities for, the Fund, which advice or securities may differ from advice given to, or securities recommended or bought or sold for, Highland Accounts; (v) the Investment Manager has the discretion, to the extent permitted under applicable law, to use its affiliates as service providers to the Fund and its portfolio investments; (vi) Affiliated Investors may choose to personally invest only in certain funds advised by the Highland Group and the amounts invested by them in such funds is expected to vary significantly; (vii) the Highland Group and Highland Accounts may actively engage in transactions in the same securities sought by the Fund and, therefore, may compete with the Fund for investment opportunities or may hold positions opposite to positions maintained on behalf of the Fund; (viii) the Fund may invest in CDOs and Highland Accounts managed by members of the Highland Group; and (ix) the Investment Manager will devote to the Fund only as much time as the Investment Manager deems necessary and appropriate to manage the Fund's business.

The Investment Manager undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Fund's investors.

It is the policy of the Investment Manager to allocate investment opportunities fairly and equitably over time. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) whether the risk-return profile of the proposed investment is consistent with the account's objectives and program, whether such objectives are considered in light of the specific investment under consideration or in the context of the portfolio's overall holdings; (ii) the potential for the proposed investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (iii) liquidity requirements of the account; (iv) potentially adverse tax consequences; (v) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed investment; and (vi) the need to re-size risk in the account's portfolio. The Investment Manager has the authority to allocate trades to multiple Highland Accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order on behalf of any accounts cannot be fully allocated under prevailing market conditions, the Investment Manager may

allocate the trades among different accounts on a basis it considers fair and equitable over time. One or more of the foregoing considerations may (and are often expected to) result in allocations among the Fund and one or more Highland Accounts on other than a *pari passu* basis.

The General Partner and/or its affiliates may open "average price" accounts with brokers. In an "average price" account, purchase and sale orders placed during a trading day on behalf of the Fund, the Highland Accounts or affiliates of the General Partner are combined, and securities bought and sold pursuant to such orders are allocated among such accounts on an average price basis.

As part of their regular business, the members of the Highland Group hold, purchase, sell, trade or take other related actions both for their respective accounts and for the accounts of their respective clients, on a principal or agency basis, with respect to loans, securities and other investments and financial instruments of all types. The members of the Highland Group also provide investment advisory services, among other services, and engage in private equity, real estate and capital markets-oriented investment activities. The members of the Highland Group will not be restricted in their performance of any such services or in the types of debt or equity investments which they may make. The members of the Highland Group may have economic interests in or other relationships with obligors or issuers in whose obligations or securities or credit exposures the Fund may invest. In particular, such persons may make and/or hold an investment in an obligor's or issuer's securities that may be pari passu, senior or junior in ranking to an investment in such obligor's or issuer's securities made and/or held by the Fund or in which partners, security holders, members, officers, directors, agents, personnel or employees of such persons serve on boards of directors or otherwise have ongoing relationships. Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Fund and otherwise create conflicts of interest for the Fund. In such instances, the members of the Highland Group may in their discretion make investment recommendations and decisions that may be the same as or different from those made with respect to the Fund's investments. In connection with any such activities described above, the members of the Highland Group may hold, purchase, sell, trade or take other related actions in securities or investments of a type that may be suitable to investments for the Fund. The members of the Highland Group will not be required to offer such securities or investments to the Fund or provide notice of such activities to the Fund. In addition, in managing the Fund's portfolio, the Investment Manager may take into account its relationship or the relationships of its affiliates with obligors and their respective affiliates, which may create conflicts of interest. Furthermore, in connection with actions taken in the ordinary course of business of the Investment Manager in accordance with its fiduciary duties to its other clients, the Investment Manager may take, or be required to take, actions which adversely affect the interests of the Fund.

In connection with the foregoing activities the Highland Group may from time to time come into possession of material nonpublic information that limits the ability of the Investment Manager to effect a transaction for the Fund, and the Fund's investments may be constrained as a consequence of the Investment Manager's inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Fund.

Although the professional staff of the Investment Manager will devote as much time to the Fund as the Investment Manager deems appropriate to perform its duties in accordance with the Investment Management Agreement and in accordance with reasonable commercial standards, the staff may have conflicts in allocating its time and services among the Fund and the Investment Manager's other accounts.

The directors, officers, personnel, employees and agents of the Investment Manager and its affiliates may, subject to applicable law, serve as directors (whether supervisory or managing), officers, personnel, employees, partners, agents, nominees or signatories, and receive arm's length fees in connection with such service, for the Fund or other entities that operate in the same or a related line of business as the Fund, for other clients managed by the Investment Manager or its affiliates, or for any obligor or issuer in respect of the CLOs, to the extent permitted by their governing instruments, or by any resolutions duly adopted by the Fund, such affiliated entities or any obligor or issuer in respect of any of the CLOs pursuant to their respective governing instruments, and the Fund shall have no right to any such fees.   In serving in these multiple capacities, they may have obligations to such other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Fund.

There is no limitation or restriction on the Investment Manager or any of its affiliates with regard to acting as investment adviser or collateral manager (or in a similar role) to other parties or persons. This and other future activities of the Investment Manager and/or its affiliates may give rise to additional conflicts of interest.   Such conflicts may relate to obligations that the Investment Manager's investment committee, the Investment Manager or its affiliates have to other clients.

The Investment Manager and/or its affiliates may act as an underwriter, arranger or placement agent, or otherwise participate in the origination, structuring, negotiation, syndication or offering of CLOs and Highland Accounts purchased by the Fund.   Such transactions are on an arm's-length basis and shall be subject to fees that are no greater than arm's-length fees.   There is no expectation for preferential access to transactions involving CLOs and Highland Accounts that are underwritten, originated, arranged or placed by the Investment Manager and/or its affiliates and the Fund shall not have any right to any such fees.

As further described below, the Investment Manager may effect client cross-transactions where the Investment Manager causes a transaction to be effected between the Fund and another client advised by it or any of its affiliates.   The Investment Manager may engage in a client cross-transaction involving the Fund any time that the Investment Manager believes such transaction to be fair to the Fund and such other client.   By purchasing an Interest in the Fund, a Limited Partner is deemed to have consented to such client cross-transactions between the Fund and another client of the Investment Manager or one of its affiliates.

As further described below, the Investment Manager may effect principal transactions where the Fund acquires securities from or sells securities to the Investment Manager and/or its affiliates, in each case in accordance with applicable law, which may include the Investment Manager obtaining the consent and approval of the Advisory Committee prior to engaging in any such principal transaction between the Fund and the Investment Manager or its affiliates.   By subscribing for Interests, the Limited Partners are deemed to have consented to such procedures relating to principal transactions between the Fund and the Investment Manager or its affiliates.

The Investment Manager may direct the Fund to acquire or dispose of securities in cross trades between the Fund and other clients of the Investment Manager or its affiliates in accordance with applicable legal and regulatory requirements.   In addition, the Fund may invest in securities of obligors or issuers in which the Investment Manager and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Fund may enhance the profitability of the Investment Manager's own investments in such companies.   Moreover, the Fund may invest in assets originated by the Investment Manager or its affiliates.   In each such case, the Investment Manager and such affiliates may have a potentially conflicting division of loyalties and responsibilities regarding the

Fund and the other parties to such trade.   Under certain circumstances, the Investment Manager and its affiliates may determine that it is appropriate to avoid such conflicts by selling a security at a fair value that has been calculated pursuant to the Investment Manager's valuation procedures to another client managed or advised by the Investment Manager or such affiliates.   In addition, the Investment Manager may enter into agency cross-transactions where it or any of its affiliates acts as broker for the Fund and for the other party to the transaction, to the extent permitted under applicable law.   The Investment Manager may obtain the Fund's written consent through the Advisory Committee if any such transaction requires the consent of the Fund under Section 206(3) of the Advisers Act.

There are generally no ethical screens or information barriers among the Investment Manager and certain of its affiliates of the type that many firms implement to separate persons who make investment decisions from others who might possess material, non-public information that could influence such decisions.   If the Investment Manager, any of its personnel or its affiliates were to receive material non-public information about a particular obligor, issuer or CLO, or have an interest in causing the Fund to acquire a particular CLO Security, the Investment Manager may be prevented from causing the Fund to purchase or sell such asset due to internal restrictions imposed on the Investment Manager. Notwithstanding the maintenance of certain internal controls relating to the management of material non-public information, it is possible that such controls could fail and result in the Investment Manager, or one of its investment professionals, buying or selling an asset while, at least constructively, in possession of material non-public information.   Inadvertent trading on material non-public information could have adverse effects on the Investment Manager's reputation, result in the imposition of regulatory or financial sanctions, and as a consequence, negatively impact the Investment Manager's ability to perform its portfolio management services to the Fund.   In addition, while the Investment Manager and certain of its affiliates currently operate without information barriers on an integrated basis, such entities could be required by certain regulations, or decide that it is advisable, to establish information barriers.   In such event, the Investment Manager's ability to operate as an integrated platform could also be impaired, which would limit the Investment Manager's access to personnel of its affiliates and potentially impair its ability to manage the Fund's investments.

Akin Gump Strauss Hauer & Feld LLP ("*Akin Gump*") serves as counsel to the Fund, the Investment Manager, the General Partner and certain of their Affiliates (the "*Clients*") in connection with the formation of the Fund and certain other Clients, the offering of Interests as well as certain other matters for which the Clients may engage Akin Gump from time to time.   Akin Gump disclaims any obligation to verify the Clients' compliance with their obligations either under applicable law or the governing documents of the Fund.   In acting as counsel to the Clients, Akin Gump has not represented and will not represent any Limited Partners nor does it purport to represent their interests.   No independent counsel has been retained to represent the Limited Partners.   In assisting in the preparation of this Memorandum, Akin Gump has relied on information provided by the Fund, the Investment Manager and the General Partner and certain of the Fund's other service providers (including, without limitation, the principal's biographical data, summaries of market conditions, the planned investment strategy of the Fund and the performance of the Fund, its investments or any predecessor Fund) without verification and does not express a view as to whether such information is accurate or complete.

# BROKERAGE AND CUSTODY

**Portfolio Transactions**

Substantially all of the Fund's investments in marketable securities, as well as its cash and cash equivalents, are expected to be held at The Bank of New York Mellon ("**_BNY Mellon_**").

BNY Mellon and other prime brokers or their affiliates may provide capital introduction or other placement services to the Fund and the Investment Manager (with or without separate charges for such other services). In determining which broker-dealer generally provides the best available price and most favorable execution, the Investment Manager considers a totality of circumstances, including the broker-dealer's research capabilities and the success of prior research recommendations, ability to efficiently execute difficult trades (such as those in illiquid markets or trades of substantial size), the broker's risk in positioning a block of securities, commitment of capital, access to new issues, nature and frequency of sales coverage, depth of services provided, including economic or political coverage, arbitrage and option operations, back office and processing capabilities, financial strength, stability and responsibility, efficiency, reputation, access to markets, confidentiality, commission rate, responsiveness to the Investment Manager and the value of research and brokerage and research products and services provided by such brokers.

The Investment Manager may also execute trades with brokers and dealers with whom the Fund or the Investment Manager has other business relationships, including prime brokerage, credit relationships and capital introduction or investments by affiliates of the broker-dealers in the Fund or other entities managed by the Investment Manager. However, the Investment Manager does not believe that these other relationships will influence the choice of brokers and dealers who execute trades for the Fund.

Broker-dealers may provide research that may include written or oral proprietary research. Broker-dealers may also provide research products that include software and related support services for use in research and trading, quotation boards, computer databases and quotation equipment, in each case to access research or which provide research directly. Research services may include, among other things, research concerning market, economic and financial data, statistical information, data on pricing and availability of securities, financial publications, attendance at conferences and meetings, electronic market quotations, performance measurement services, analyses and/or due diligence concerning specific securities, companies or sectors, including due diligence on specific aspects of a company's operations or finances, analyses on issues raised in proxy statements and market, economic and financial studies and forecasts. Research services may be in written or oral form or on-line and may be produced by broker-dealers or third parties such as attorneys, accountants or consultants. Brokerage products and services may include certain order management system components and order routing.

The receipt of brokerage and research products from broker-dealers through client commission payments is commonly referred to as "soft dollars." Broker-dealers may provide products and services paid for through soft dollars either directly or through credits deposited into an account that may be used for research developed by the broker-dealer, third-party research and brokerage services. Section 28(e) of the Exchange Act provides a safe harbor from liability for breach of fiduciary duties relating to the purchase of limited research or brokerage services using soft dollars so long as the products and services received constitute lawful and appropriate assistance and the amount indirectly paid for those products or services is reasonable. If the Investment Manager uses research or

brokerage products or services, it intends to limit research and brokerage to those services included in the safe harbor under Section 28(e) of the Exchange Act.

In selecting broker-dealers on the basis of the foregoing factors, the Investment Manager may pay a brokerage commission in excess of that which another broker might have charged for effecting the same transaction. In connection therewith, the Investment Manager will make a good faith determination that the amount of commission is reasonable in relation to the value of the research or brokerage services received, viewed in terms of either the specific transaction or the Investment Manager's overall responsibility to its clients. The Investment Manager will regularly evaluate the placement of brokerage services and the reasonableness of commissions paid. Research received from brokers will be supplemental to the Investment Manager's own research efforts. While the receipt of research will not reduce the Investment Manager's normal research activities, the Investment Manager's expenses could increase materially if it attempted to generate such additional research or brokerage services through its own staff, and the Management Fee will not be reduced as a consequence of the receipt of such research or brokerage services or products. As such, the Investment Manager's arrangements for the receipt of research and brokerage services from brokers may create a conflict of interest, in that the Investment Manager may have an incentive to choose a broker-dealer that provides research and brokerage services, instead of one that does not but charges a lower commission rate. In some instances, the Investment Manager receives products and services that may be used for both research and non-research purposes. In such instances, the Investment Manager will make a good faith effort to determine the relative proportion of the products and services used to assist the Investment Manager in carrying out its investment decision-making responsibilities or order execution, including research and brokerage, and the relative proportion used for administrative or other non-research purposes. The proportionate amount of the research attributable to assisting the Investment Manager in carrying out its investment decision-making responsibilities or order execution will be paid through brokerage commissions generated by the Fund's and other client's transactions; the proportionate amount attributable to administrative or other non-research purposes will be paid for by the Investment Manager from its own resources. The receipt of "mixed-use" research and the determination of the appropriate allocation may result in a potential conflict of interest between the Investment Manager and its clients.

The Investment Manager will be responsible for the placement of the portfolio transactions of the Fund and the negotiation of any commissions or spreads paid on such transactions. Portfolio transactions normally will be effected through brokers on securities exchanges or directly with the issuer, or through an underwriter, or market maker or other dealer for the investments. Portfolio transactions through brokers involve a commission to the broker. Portfolio transactions with dealers typically are priced to include a spread between the bid and the asked price to compensate the dealer. Portfolio transactions will be executed by brokers selected solely by the Investment Manager in its absolute discretion.

**Custody**

Custody of the Fund's assets is maintained by brokers and banks selected by the Investment Manager in its sole discretion. The custodian or custodians may be changed at any time and from time to time by the Investment Manager without the consent of the Fund. Currently, the custodian is BNY Mellon. The Fund is eligible for insurance coverage against loss with respect to assets held in the custody of BNY Mellon in the event of the bankruptcy or liquidation of BNY Mellon to the same extent BNY Mellon's other customers.

## TAX CONSIDERATIONS

**Introduction**

The following is a summary of certain aspects of the taxation of the Fund and its Limited Partners arising from the purchase, ownership and disposition of an Interest that should be considered by a prospective Limited Partner. The Fund has not sought a ruling from the Service or any similar state, local or foreign authority with respect to any of the tax issues affecting Limited Partners or the Fund, nor has it obtained an opinion of counsel with respect to any U.S. federal, state, local or foreign tax issues.

This summary is based on the Code, the Treasury regulations promulgated under the Code (the "*Treasury Regulations*"), judicial decisions, administrative rulings, and state and local tax laws in force on the date of this Memorandum, all of which are subject to change (possibly with retroactive effect). Changes in existing laws or regulations and their interpretation may occur after the date of this Memorandum and could alter the income tax consequences of an investment in the Fund. This discussion does not address all of the tax consequences that may be relevant to a particular investor, nor does it address, unless specifically indicated, the tax consequences to, among others (i) persons that may be subject to special treatment under U.S. federal income tax law, including, but not limited to, banks, insurance companies, thrift institutions, regulated investment companies, real estate investment trusts and dealers in securities or currencies, (ii) persons that will hold Interests as part of a position in a "straddle" or as part of a "hedging," "conversion" or other integrated investment transaction for U.S. federal income tax purposes, (iii) persons whose functional currency is not the U.S. dollar or (iv) persons that do not hold Interests as capital assets within the meaning of Code section 1221.

Further, this discussion assumes that all non-U.S. persons will invest in the Offshore Fund and will not invest in the Fund and, therefore, does not address the tax considerations relevant to an investment in the Fund by a non-U.S. person.

If a partnership holds an Interest in the Fund, the tax treatment of a partner in such partnership will generally depend upon the status of the partner and the activities of the partnership. Prospective investors who are partners of a partnership should consult their own tax advisors.

Unless otherwise expressly provided herein, this discussion does not address possible state, local or non-U.S. tax consequences of the purchase, ownership or disposition of Interests, some or all of which may be material to particular investors. This discussion also does not address the potential application of the U.S. federal alternative minimum tax ("*AMT*") to the Limited Partners. There is uncertainty concerning certain tax aspects of the Fund, and there can be no assurance that the Service will not challenge the positions taken by the Fund.

*The tax consequences of an investment in the Fund are particularly complex. Accordingly, prospective investors should not consider this discussion as a substitute for careful tax planning. Prospective investors should consult with their own tax advisors, attorneys or accountants on matters relating to an investment in the Fund with special references to such investor's particular situation.*

**Certain United States Taxation Matters**

<u>Classification of the Fund</u>

The General Partner believes that, under the provisions of the Code and the Treasury Regulations as currently in effect, the Fund should be treated for U.S. federal income tax purposes as a partnership and not as an association taxable as a corporation.

Certain "publicly traded partnerships" are treated as associations that are taxable as corporations for U.S. federal income tax purposes. A publicly traded partnership is any partnership the interests in which are traded on an established securities market or which are readily tradable on a secondary market (or the substantial equivalent thereof). Interests in the Fund are not and will not be traded on an established securities market. Treasury Regulations concerning the classification of partnerships as publicly traded partnerships provide certain safe harbors under which interests in a partnership will not be considered readily tradable on a secondary market (or the substantial equivalent thereof). Depending on the number of Partners, the Fund may qualify for a safe harbor exemption for partnerships that are offered to investors in a private placement.

The remainder of this discussion assumes that the Fund will be treated, for U.S. federal income tax purposes, as a partnership and not as a publicly traded partnership treated as an association that is taxable as a corporation.

<u>U.S. Federal Income Taxation of the Fund and Partners Generally</u>

As a partnership, the Fund will not be subject to U.S. federal income tax. Each Limited Partner will be required to report separately on its income tax return its distributive share of the Fund's net long-term capital gain or loss, net short-term capital gain or loss, and net ordinary income and deductions and credits in accordance with the allocations set forth in the Partnership Agreement. Each Limited Partner will be liable for any taxes owed upon its distributive share of the income or gains realized by the Fund, and may claim deductions for its distributive share of the Fund's losses and deductions and credits for its distributive share of the Fund's credits, to the extent allowed under the Code. Each Limited Partner will be taxed on its distributive share of the Fund's taxable income and gain regardless of whether it has received or will receive a distribution from the Fund. Consequently, a Limited Partner may be subject to tax with respect to its share of the taxable income of the Fund for a taxable year and may not receive a corresponding distribution of cash from the Fund in such year with which to satisfy its tax liability in respect of such taxable income.

The Fund will file an annual partnership information return with the Service that reports the results of its operations for the taxable year, and will distribute annually to each Limited Partner a form showing its distributive share of the Fund's items of income, gain, loss, deduction or credit. The General Partner will have the authority to decide how to report these items on the Fund's tax returns, and all Limited Partners will be required under the Partnership Agreement to treat the items consistently on their own returns. An audit by the Service of the tax treatment of the Fund's income and deductions generally will be determined at the Fund level in a single proceeding rather than by individual audits of the Limited Partners. In this regard, the General Partner, as the "***Tax Matters Partner***," will have the authority to bind certain Limited Partners to settlement agreements and the right on behalf of all Limited Partners to extend the statute of limitations relating to the Limited Partners' tax liabilities with respect to Fund items.

Under the Partnership Agreement, for U.S. federal income tax purposes, the General Partner has the discretion to allocate specially an amount of the Fund's net gains or net losses (or items of gross income or losses or deduction) to a withdrawing Partner to the extent that the Partner's Capital Account differs either positively or negatively from its U.S. federal income tax basis in its Interest.  There can be no assurance that, if the General Partner makes such a special allocation, the Service will accept such allocation.  If such allocation is successfully challenged by the Service, the Fund's allocations to the remaining Partners would be affected as well.

The Fund expects to act as a trader or investor, and not as a dealer, with respect to its securities transactions.  Generally, the gains and losses realized by a trader or investor on the sale of securities are capital gains and losses.  Thus, in general, the Fund expects that its gains and losses from its securities transactions typically will be capital gains and capital losses.  These capital gains and losses may be long-term or short-term depending, in general, upon the length of time the Fund maintains a particular investment position and, in some cases, upon the nature of the transaction.  Property held for more than 12 months generally will be eligible for long-term capital gain or loss treatment.  Long term capital gains may be eligible for favorable tax rates in the hands of non-corporate U.S. Limited Partners. Limited Partners should consult with their own tax advisors to determine the tax rates applicable to them in their particular tax situations.

In addition, individuals who are U.S. persons with "modified adjusted gross income" that exceeds certain thresholds (for example, $250,000 for married individuals filing jointly, $200,000 for single individuals) are subject to a Medicare tax of 3.8% on the lesser of (i) their investment income, net of deductions properly allocable to such income, and (ii) the excess of their "modified adjusted gross income" above the applicable threshold.  The General Partner expects that most or all of the Fund's income will be treated as investment income for this purpose, and as a result Limited Partners receiving allocations of income from the Fund for these taxable years will be subject to this tax.  This tax will be in addition to any U.S. federal income tax imposed on such Limited Partners with respect to their allocable share of income of the Fund.  Trusts and estates also may be subject to this additional tax.

The Fund may be involved in a variety of hedging transactions to reduce the risk of changes in value in the Fund's investments.  Special rules may apply to determine the tax treatment of such hedging transactions, which may affect the Fund's holding period attributable to such property, the characterization of gain or loss as ordinary or capital and, if capital, as long-term or short-term, and the timing of the realization of gains or losses on the actual or deemed sale of the property, including, in some cases, property owned by a Limited Partner outside of the Fund.  For instance, gain or loss from a short sale of property generally will be considered as capital gain or loss to the extent the property used to close the short sale constitutes a capital asset in the Fund's hands.  Except with respect to certain situations where the property used by the Fund to close a short sale has a long-term holding period on the date of the short sale, gains on short sales will be treated as short-term capital gains.  These rules also may terminate the running of the holding period of "substantially identical property" held by the Fund.  Moreover, a loss on a short sale will be treated as a long-term capital loss if, on the date of the short sale, "substantially identical property" has been held by the Fund for more than one year.  Certain hedging transactions also may cause a constructive sale of the Fund's long position that is the subject of the hedge.

The Fund may derive ordinary interest income and dividends on securities, and may be required to recognize income in respect of certain securities prior to receipt of any payment in respect of such securities.  For instance, the Fund may hold debt obligations with "original issue discount."  In such case, the Fund will be required to include a portion of such discount in its taxable income on a current

basis, and the Fund must allocate such income to the Limited Partners, even though receipt of such amounts by the Fund may occur in a subsequent tax year. The Fund also may acquire debt obligations with "market discount." Upon disposition of such an obligation, which might include the receipt of securities of the issuer in a recapitalization exchange, the Fund generally will be required to treat any gain realized (and required to be recognized) as ordinary interest income to the extent of the market discount that accrued during the period the debt obligation was held by the Fund. Recapitalization exchanges involving securities held by the Fund also may result in the recognition of taxable gains prior to the receipt of cash or readily tradable property.

If the Fund is treated as a trader, it may, in its discretion, make an election under Code section 475(f) to apply a mark to market system of recognizing unrealized gains and losses on securities as if the securities were sold for fair market value at the close of any taxable year of the Fund. The amount recognized when gain or loss is subsequently realized would be adjusted for amounts recognized in marking to market. The election would apply with respect to securities held in connection with the Fund's trade or business as a trader in securities. The election would not apply to any securities with respect to which the Fund could demonstrate, to the satisfaction of the Service, that they are held for investment. Once a Code section 475(f) election is made, it can be revoked only with the consent of the Service. In the event that the Fund makes such an election, the Fund's gains and losses from marking securities to market (and gain or loss recognized before the end of the taxable year with respect to any security that would have been marked to market) would be treated as ordinary income and losses. The rules relating to appreciated financial positions under Code section 1259 and wash sales under Code section 1091 would not apply to the securities to which the election applies and the Code section 1092 straddle rules would not have any effect where all the offsetting positions of a straddle are marked to market.

The Fund may be required to purchase foreign currency with which to make its investments and may receive foreign currency when a security is sold or when an interest payment is made on a security. These transactions may give rise to gains and losses because of fluctuations in the value of the foreign currency relative to the U.S. dollar during the Fund's holding period of an investment. Foreign currency gain or loss in respect of certain types of transactions must be accounted for separately, apart from any gain or loss on the underlying transaction, and the Code contains special rules which treat, in most circumstances, such gains and losses as ordinary income or losses rather than capital gains or losses.

The U.S. federal income tax treatment of the Fund's investment in swaps or other derivatives is subject to significant uncertainty and depends in large part on the terms of the specific swap or other derivative. In particular, it is possible that the Fund may enter into so-called "bullet swaps" or other swaps that provide for non-periodic payments. In certain circumstances, income from a swap can be treated as ordinary income and not capital gain if the swap is treated as a "constructive ownership transaction" under Code section 1260. The Fund intends to take positions that are reasonable under the law that provide for optimal tax treatment of the Limited Partners. However, there can be no assurance that the Service or a court would agree with the Fund's position. Moreover, the Service might take the contrary position that the Fund is subject to U.S. federal income tax in respect of some or all of the income earned from the swap investments on the theory that the Fund should be treated as the owner for U.S. federal income tax purposes of the property underlying certain swaps, in which case the after-tax return on the swap investments could be significantly reduced.

Pursuant to various "anti-deferral" provisions of the Code (*e.g.*, the "Subpart F" and "passive foreign investment company" provisions), any investments by the Fund in certain foreign corporations may cause a Limited Partner to (i) recognize taxable income prior to the Fund's receipt of distributable

proceeds, (ii) pay an interest charge on receipts that are deemed as having been deferred or (iii) recognize ordinary income that, but for the "anti-deferral" provisions, would have been treated as long-term or short-term capital gain.

Under the Partnership Agreement, the General Partner has the authority to elect on behalf of the Fund, under Code section 754, to adjust the tax basis of the Fund's assets in connection with certain distributions to Limited Partners or certain transfers of Interests. Such an election, if made, could affect the amount of a Limited Partner's distributive share of the gain or loss recognized by the Fund upon the disposition of its assets. Because of the complexity and additional expense involved in making a section 754 election, the General Partner has no present intention to make such election on behalf of the Fund.

Prospective investors that are subject to the AMT should consider the tax consequences of an investment in the Fund in view of their AMT position, taking into account the special rules that apply in computing the AMT.

<u>Taxation of Distributions and Withdrawals</u>

Cash non-liquidating distributions and withdrawals, to the extent they do not exceed a Limited Partner's basis in its Interest, will not result in taxable income to that Limited Partner, but will reduce its tax basis in its Interest by the amount distributed or withdrawn. Cash distributed to a Limited Partner in excess of the basis of its Interest is generally taxable as capital gain.

Prospective Limited Partners should be aware that a Limited Partner's share of the taxable income of the Fund for any year may exceed the amount of cash distributed to such Limited Partner for that year, which may require that the Limited Partner make an out-of-pocket expenditure to cover its tax liability. Conversely, if the cash distributed by the Fund to a Partner for any year exceeds the taxable income of the Fund allocated to such Partner for that year, the excess will be treated as a return of capital for U.S. federal income tax purposes to the extent of a Limited Partner's tax basis of its Interest. To the extent that cash distributions are treated as a return of capital and to the extent that any tax losses are allocated to the Limited Partners, the tax bases of the Limited Partners in their Interests will be reduced (but not below zero). Because of such basis adjustments, any tax that is avoided in the early years of a Limited Partner's investment in the Fund may become due later through the realization of gain upon the sale of assets of the Fund, the liquidation of the Fund or the sale of Interests.

The Fund's ability to make cash distributions to a withdrawing Limited Partner or to the Partners, if applicable, may be limited by, among other things, the terms of the investment leverage entered into by the Fund for the purpose of making portfolio investments on a leveraged basis.

Upon the withdrawal of a Limited Partner receiving a cash liquidating distribution from the Fund, such Limited Partner generally will recognize capital gain or loss to the extent of the difference between the proceeds received by the withdrawing Limited Partner and such Partner's adjusted tax basis in its Interest. Such capital gain or loss will be short-term or long-term depending upon the Partner's holding period (or holding periods) for its Interest. However, a withdrawing Limited Partner will recognize ordinary income to the extent such Partner's allocable share of the Fund's "unrealized receivables" exceeds the Partner's basis in such unrealized receivables (as determined pursuant to the Treasury Regulations). For these purposes, accrued but untaxed market discount, if any, on securities held by the Fund will be treated as an unrealized receivable, with respect to which a withdrawing Partner would recognize ordinary income.

Distributions of property other than cash, whether in complete or partial liquidation of a Limited Partner's Interest, generally will not result in the recognition of taxable income or loss to the Limited Partner (except to the extent such distribution is treated as made in exchange for such Limited Partner's share of the Fund's unrealized receivables). However, a distribution of marketable securities will be treated as a distribution of cash (which, as described above, can require the recognition of gain by the recipient Limited Partner), unless the distributing partnership is an "investment partnership" and the recipient is an "eligible partner" as defined in Code section 731(c). Although the General Partner cannot provide any assurances of whether the Fund is an "investment partnership" for these purposes, the General Partner anticipates that the Fund should qualify as an "investment partnership." Thus, if a Limited Partner is an "eligible partner," which term should include a Limited Partner whose sole contributions to the Fund consisted of cash, a distribution of marketable securities to such Limited Partner should not require the recognition of gain by such Limited Partner.

As discussed above, under the Partnership Agreement, the General Partner has the discretion to allocate specially an amount of the Fund's net gains or net losses (or items of gross income or losses or deductions) for U.S. federal income tax purposes to a withdrawing Partner to the extent that the Partner's capital account differs from its U.S. federal income tax basis in its Interest. Such a special allocation may result in the withdrawing Partner recognizing more or less taxable income, which may include short-term gain, in the Partner's last taxable year in the Fund, thereby reducing, or increasing, as applicable, the amount of long-term capital gain recognized during the tax year in which it receives its liquidating distribution upon withdrawal. In certain circumstances, special allocations of net gains (or items of income or gain) to a withdrawing Partner may result in a greater allocation of losses, or a lower allocation of taxable income or gain, to the remaining Partners. Likewise, special allocations of net losses (or items of expense, loss or deduction) to a withdrawing Partner may result in a greater allocation of taxable income or gain, or a lower allocation of losses, to the remaining Partners.

Assuming the Fund has not made an election pursuant to Code section 754 and the General Partner does not exercise its discretion to specially allocate losses to a withdrawing Limited Partner, distributions of property or cash by the Fund to a Limited Partner in redemption of its Interest in certain circumstances where the Fund has a substantial built-in loss may require the Fund to reduce the tax basis of its remaining property.

<u>Limitations on Losses and Deductions</u>

Limited Partners that are individuals or certain types of corporations may be limited in their ability to deduct expenses or losses of the Fund. For instance, if or to the extent that the Fund's operations do not constitute a "trade or business" within the meaning of Code section 162 and other provisions of the Code, an individual Limited Partner's distributive share of the Fund's expenses (including any amounts that are treated for tax purposes as expenses of the Fund) would be deductible only as itemized deductions, subject to the limitations of Code sections 67 and 68. In this regard, if all or a portion of the Performance Allocation to the General Partner were re-characterized for tax purposes as an expense of the Fund, each non-corporate Limited Partner's share of such expense could be subject to such limitations. Itemized deductions are non-deductible in computing such Limited Partner's alternative minimum taxable income and alternative minimum tax liability.

Further, income, gains and losses of the Fund generally will not be treated as passive income or losses for purposes of the passive activity loss limitations of Code section 469. Accordingly, individuals, personal service corporations and certain closely-held corporations that have passive activity

losses from other activities are restricted in their ability to use such losses to offset income and gains from the Fund, although losses of the Fund will not be subject to the passive activity loss limitation.

The ability of a non-corporate Limited Partner to deduct its share of the Fund's ordinary losses attributable to interest and certain short sale expenses may be subject to the "investment interest limitation" under Section 163(d) of the Code. In general, a non-corporate taxpayer's investment interest (including interest and certain short sale expenses) in the current year is not deductible to the extent it exceeds its "net investment income," consisting of net gain and ordinary income derived from investments in the current year less certain directly connected expenses (other than interest or short sale expenses). For this purpose, any long-term capital gain and qualified dividend income is excluded from net investment income unless the taxpayer elects to pay tax on such amount at ordinary income tax rates. The Fund's activities are expected to be treated as giving rise to investment income for a Limited Partner, and the investment interest limitation would apply to a non-corporate Limited Partner's share of the interest and short sale expenses attributable to the Fund's operation. Accordingly, a non-corporate Limited Partner would be denied a deduction for all or a part of its distributive share of the Fund's ordinary losses attributable to interest and short sale expenses unless it has sufficient investment income from all sources including the Fund. Any amount not deducted as a result of the application of the investment interest limitation may be carried forward to future years, subject to certain limitations. The Fund may incur certain expenses in connection with its organization and the marketing of its Interests. Amounts paid or incurred to organize a partnership are not deductible, but may, by election of the Fund, be capitalized and amortized over a period of not less than 180 months. Amounts paid or incurred to market interests in the Fund that qualify as "syndication expenses" are not deductible or amortizable.

Tax Consequences for Tax-Exempt U.S. Investors

A Limited Partner that is an organization exempt from tax under Code section 501(a) (a "***Tax-Exempt U.S. Investor***") will be subject to tax on its allocable share of the Fund's income that is considered to be "unrelated business taxable income" ("***UBTI***") as defined in Code section 512, and may be subject to the AMT with respect to items of tax preference which enter into the computation of UBTI. Code section 512(b) provides that UBTI generally does not include dividends, interest, and gain or loss from the disposition of property other than stock in trade or property held for sale in the ordinary course of the unrelated trade or business. The Fund may invest in entities that are treated as partnerships or other pass-through entities. UBTI generated by such entities would generally flow up to Tax-Exempt U.S. Investors, causing the realization of UBTI by such investors. Therefore, in light of the Fund's investment program, a Tax-Exempt U.S. Investor should not realize UBTI to the extent that its distributive share of the Fund's income consists of dividends, interest, capital gains and certain other items which are excluded from UBTI under Code section 512(b) (except to the extent any such income constitutes "UDFI," as discussed in the next paragraph).

A Tax-Exempt U.S. Investor is also subject to tax with respect to its, and its allocable share of the Fund's, "unrelated debt-financed income" pursuant to Code section 514 ("***UDFI***"). In general, UDFI consists of (i) income derived by a tax-exempt organization (directly or through a partnership) from income-producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year and (ii) gains derived by a tax-exempt organization (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness." In addition, a tax-exempt organization that borrows money to finance its investment in the Fund would be subject to tax on the portion of its income that is UDFI. Income and gains derived by a tax-exempt organization from the ownership and sale of debt-financed property is taxable in the

proportion to which such property is financed by acquisition indebtedness during the relevant period of time.

The Fund expects to generate income attributable to debt-financed property which will be attributed to the Partners, including any Tax-Exempt U.S. Investors.  A Tax-Exempt U.S. Investor's share of the Fund's income that is treated as UBTI will vary depending upon the degree of leverage utilized by the Fund and could be significant.   In addition to other relevant considerations, fiduciaries of employee pension trusts and other prospective tax-exempt investors should consider the consequences of realizing UBTI in making a decision whether to invest in the Fund.

*We urge prospective Tax-Exempt U.S. Investors that are sensitive to UBTI or UDFI to consult their tax advisors as to the tax consequences of investing in the Fund and as to the comparative tax treatment of an investment in the Offshore Fund.*

Investor Tax Filings and Record Retention.

The U.S. Treasury Department has adopted Treasury Regulations designed to assist the Service in identifying abusive tax shelter transactions.   In general, these Treasury Regulations require investors in specified transactions (including partners in partnerships that engage in such transactions) to satisfy certain special tax filing and record retention requirements.   Significant monetary penalties (in addition to penalties that generally may be applicable as a result of a failure to comply with the applicable Treasury Regulations) may be imposed for failure to comply with these tax filing and record retention rules.

These Treasury Regulations are broad in scope, and it is conceivable that the Fund may enter into transactions that will subject the Fund and certain investors to the special tax filing and record retention rules.   Additionally, under these Treasury Regulations, an investor's recognition of loss upon its disposition of its Interest could cause the investor to become subject to special tax filing and record retention rules.  The General Partner intends to use its reasonable efforts to provide information to investors necessary to enable investors to satisfy any tax filing and record retention requirements that may arise as a result of any transactions entered into by the Fund.

Reporting under FATCA

Sections 1471 through 1474 of the Code, known as the U.S. Foreign Account Tax Compliance Act (together with any regulations, rules and other guidance implementing such Code sections and any applicable intergovernmental agreement ("***IGA***") and related statutes, regulations, rules and other guidance thereunder, "***FATCA***") impose a withholding tax of 30% on (i) certain U.S. source interest, dividends and other types of income, and (ii) the gross proceeds from the sale or disposition of certain assets of a type that can produce U.S. source interest and dividends, which are received by a foreign financial institution ("***FFI***"), unless such FFI enters into an agreement with the IRS (an "***FFI Agreement***"), and/or complies with an IGA, to obtain certain information as to the identity of the direct and indirect owners of accounts in such institution.   In addition, a withholding tax may be imposed on payments to certain non-financial foreign entities which do not obtain and provide information as to their direct and indirect owners.   These rules generally apply to payments of U.S. source interest, dividends and certain other types of income from U.S. sources since July 1, 2014, and will apply to payments of gross proceeds from the sale or disposition of assets of a type that can produce U.S. source interest or dividends after December 31, 2016.

The Service has released temporary and final Treasury Regulations and other guidance that will be used in implementing FATCA, which contain a number of phase-in dates for FATCA compliance. Additional guidance is forthcoming.

It is possible that a lower-tier non-U.S. entity in which the Fund invests may be considered an FFI. The Fund intends to assist lower-tier non-U.S. entities in complying with FATCA, but can give no assurance that it will be able to provide such assistance or that such an entity will be able to avoid the imposition of this withholding tax on it.

Further, the Fund may be required to act as a withholding agent for the Service under FATCA and therefore be required to withhold on income and proceeds paid or allocated to an investor that fails to comply with FATCA, which could occur if an investor that is an FFI does not enter into an FFI Agreement, is not otherwise exempt from such withholding, and/or does not provide the appropriate information and documentation (including the prescribed forms) to the Fund or its agents showing its exemption from such withholding or compliance with FATCA. The General Partner intends to collect the appropriate documentation from all investors in the Fund in order to determine whether it is required to withhold under FATCA with respect to distributions or allocations of income and gains made to investors.

The General Partner and the Fund reserve the right to take any action and/or pursue all remedies at their disposal to avoid withholding requirements or otherwise to mitigate the consequences of an investor's failure to comply with FATCA, including compulsory redemption or withdrawal of the investor concerned. In this regard, the General Partner and the Fund have certain rights to request, and the investors have certain obligations to provide, information and documentation that may be used by the General Partner and the Fund in complying with their obligations under FATCA. In addition, no investor affected by any action or remedy by the Fund shall have any claim against the Fund, the General Partner, and the Administrator (or their agents, delegates, employees, directors, officers or affiliates) for any form of damages or liability as a result of actions taken or remedies pursued by or on behalf of the Fund in order to comply with FATCA.

_**Investors should consult their tax advisors as to the withholding, filing and information reporting requirements that may be imposed on them in respect of their ownership of Interests of the Fund.**_

## State and Local Taxes

In addition to the U.S. federal income tax consequences described above, prospective investors should consider potential state and local tax consequences of an investment in the Fund. State and local laws often differ from U.S. federal income tax laws with respect to the treatment of specific items of income, gain, loss, deduction and credit. A Partner's distributive share of the taxable income or loss of the Fund generally will be required to be included in determining its reportable income for state and local tax purposes in the jurisdiction in which it is a resident.

Limited Partners or the Fund may be subject to state and/or local franchise, withholding, income, capital gain or other tax payment obligations and filing requirements in those jurisdictions where the Fund owns real estate assets or is otherwise regarded as doing business or earning income. Credits for these taxes may not be available (or may be subject to limitations) in the jurisdictions in which Limited Partners, or the Fund, as applicable, are residents. Each potential investor is urged to consult with its own tax advisor in this regard.

*__Each prospective Limited Partner should consult its own tax advisor with respect to its state and local tax consequences and filing obligations as a result of an investment in the Fund.__*

Other Taxes

The Fund and its Limited Partners may be subject to other taxes, such as the AMT, and estate, inheritance or intangible property taxes that may be imposed by various domestic jurisdictions, as well as foreign withholding or gains taxes. Each prospective investor should consider the potential consequences of such taxes on an investment in the Fund. It is the responsibility of each prospective investor to satisfy itself as to, among other things, the legal and tax consequences of an investment in the Fund, under the laws of the various jurisdictions of its domicile and its residence, by obtaining advice from its own tax counsel or other advisor, and to file all appropriate tax returns that may be required.

Tax Returns; Tax Audits

The Fund will file an annual partnership information return with the Service that reports the results of its operations for the taxable year, and will distribute annually to each Limited Partner a form showing its distributive share of the Fund's items of income, gain, loss, deduction or credit. The General Partner has the authority to decide how to report these items on the Fund's tax returns, and all Limited Partners will be required under the Partnership Agreement to treat the items consistently on their own returns. If the income tax returns of the Fund are audited by the Service, the tax treatment of the Fund's income and deductions is generally determined at the Fund level in a single proceeding rather than by individual audits of the Limited Partners. In this regard, the General Partner, as the "Tax Matters Partner," has considerable authority to make decisions affecting the tax treatment and procedural rights of all Limited Partners. In addition, the Tax Matters Partner has the authority to bind certain Limited Partners to settlement agreements and the right on behalf of all Limited Partners to extend the statute of limitations relating to the Limited Partners' tax liabilities with respect to Fund items.

In certain cases, the Fund may be required to file a statement with the Service, disclosing one or more positions taken on its tax return, generally where the tax law is uncertain or a position lacks clear authority. All Partners are required under the Code to treat the partnership items consistently on their own returns, unless they file a statement with the Service disclosing the inconsistency. Given the uncertainty and complexity of the tax laws, it is possible that the Service may not agree with the manner in which the Fund's items have been reported.

**Other Income Taxation**

Although there can be no assurance, it is intended that the affairs of the Fund will be conducted such that the Fund will not be subject to regular income taxation in any foreign jurisdiction. However, income and gains from investments held by the Fund may be subject to withholding taxes or taxes in jurisdictions other than those described herein, subject to the possibility of reduction under applicable tax treaties. Limited Partners generally may be entitled, subject to applicable limitations, to a credit against U.S. income tax for creditable foreign income taxes paid on the foreign source income and gains of the Fund (which may not include all of the Fund's gains). The foreign tax credit rules are complex, and may, depending on each Limited Partner's particular circumstances, limit the availability or use of foreign tax credits. Prospective investors are advised to consult their own tax advisors regarding the application of the foreign tax credit rules.

**Future Tax Legislation; Necessity of Obtaining Professional Advice**

Future amendments to the Code, other legislation, new or amended Treasury Regulations, administrative rulings or decisions by the Service or judicial decisions may adversely affect the U.S. federal income tax aspects of an investment in the Fund, with or without advance notice, retroactively or prospectively. The foregoing analysis is not intended as a substitute for careful tax planning. The tax matters relating to the Fund are complex and are subject to varying interpretations. There can be no assurance that the Service will agree with each position taken by the Fund with respect to the tax treatment of Fund items and transactions. Moreover, the effect of existing income tax laws and of proposed changes in income tax laws on Limited Partners will vary with the particular circumstances of each Limited Partner and, in reviewing this Memorandum and any exhibits hereto, these matters should be considered.

Accordingly, each prospective investor must consult with and rely solely on its professional tax advisors with respect to the tax results of its investment in the Fund. In no event will the Fund, the General Partner, the Investment Manager, or their Affiliates, counsel or other professional advisors be liable to any Limited Partner for any U.S. federal, state, local or foreign tax consequences of an investment in the Fund, whether or not such consequences are as described above.

*The foregoing is a summary of some of the important tax rules and considerations affecting the Limited Partners, the Fund, and the Fund's proposed operations. This summary does not purport to be a complete analysis of all relevant tax rules and considerations, which will vary with the particular circumstances of each Limited Partner, nor does it purport to be a complete listing of all potential tax risks inherent in purchasing or holding an Interest. The foregoing does not address tax considerations affecting investors that are not U.S. persons. Each prospective investor in the Fund is urged to consult its own tax advisor in order to understand fully the U.S. federal, state, local and any foreign tax consequences of such an investment in its particular situation.*

## ERISA AND OTHER REGULATORY CONSIDERATIONS

**ERISA Considerations**

General

Fiduciaries and other persons who are proposing to invest in Interests on behalf of retirement plans, IRAs and other employee benefit plans ("***Plans***") covered by the U.S. Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), or the Code must give appropriate consideration to, among other things, the role that an investment in the Fund plays in the Plan's portfolio, taking into consideration whether the investment is designed to reasonably further the Plan's purposes, the investment's risk and return factors, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the anticipated cash flow needs of the Plan, the projected return of the total portfolio relative to the Plan's objectives, the limited right of Limited Partners to withdraw all or any part of their capital or to transfer their Interests and whether investment in the Fund constitutes a direct or indirect transaction with a party in interest (under ERISA) or a disqualified person (under the Code).

Plan Asset Regulations and Benefit Plan Investors

The United States Department of Labor ("***DOL***") has adopted regulations that treat the assets of certain pooled investment vehicles, such as the Fund, as "plan assets" for purposes of Title I of ERISA and Section 4975 of the Code ("***Plan Assets***"). Section 3(42) of ERISA defines the term "Plan Assets" to mean plan assets as defined by such regulations as the DOL may prescribe, except that under such regulations the assets of an entity shall not be treated as Plan Assets if, immediately after the most recent acquisition of an equity interest in the entity, less than 25% of the total value of each class of equity interest in the entity is held by "Benefit Plan Investors" (the "***significant participation test***"). For purposes of this determination, the value of any equity interest held by a person (other than such a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person, shall be disregarded. An entity shall be considered to hold Plan Assets only to the extent of the percentage of the equity interest held by Benefit Plan Investors. The term "***Benefit Plan Investors***" means any employee benefit plan subject to part 4 of Title I of ERISA (*i.e.*, plans subject to the fiduciary provisions of ERISA), any plan to which the prohibited transaction provisions of Section 4975 of the Code apply (*e.g.*, IRAs), and any entity whose underlying assets include Plan Assets by reason of a plan's investment in such entity (a "***Plan Asset Entity***").

In order to prevent the assets of the Fund from being considered Plan Assets under ERISA, it is the intention of the Fund to monitor the investments in the Fund and prohibit the acquisition, withdrawal or transfer of any Interests by any Limited Partner, including a Benefit Plan Investor, unless, after giving effect to such an acquisition, withdrawal or transfer, the total proportion of Interests of any class owned by Benefit Plan Investors would be less than 25% of the aggregate value of the class of Interests (determined, as described above, by excluding certain Interests held by the General Partner, other fiduciaries and affiliates).

Without limiting the generality of the foregoing, in order to limit equity participation in any class of Interests by Benefit Plan Investors to less than 25%, the Fund may require the compulsory withdrawal of Interests of any class. Each Limited Partner that is an insurance company acting on behalf of its general account or a Plan Asset Entity will be required to represent and warrant as of the date it acquires

Interests the maximum percentage of such general account or Plan Asset Entity that will constitute Plan Assets (the "***Maximum Percentage***") so such percentage can be calculated in determining the percentage of Plan Assets invested in the Fund. Further, each such insurance company and Plan Asset Entity will be required to covenant that if, after its initial acquisition of Interests, the Maximum Percentage is exceeded at any time, then such insurance company or Plan Asset Entity shall immediately notify the General Partner of that occurrence and shall, if and as directed by the General Partner, in a manner consistent with the restrictions on transfer set forth herein, redeem or dispose of some or all of the Interests held in its general account or Plan Asset Entity by the end of the next following calendar month (or such earlier period directed by the General Partner).

If the Fund's assets were considered Plan Assets, then, under ERISA and the Code, the General Partner would be a fiduciary, and certain employees, partners and officers of the General Partner as well as certain affiliates would become "parties in interest" and "disqualified persons," with respect to the investing Plans, with the result that the rendering of services to certain related parties, the lending of money or other extensions of credit, the sale, exchange or leasing of property by the Fund or certain related parties or the payment of certain fees, as well as certain other transactions, might be deemed to constitute prohibited transactions. Additionally, individual investment in Interests by persons who are fiduciaries, and/or parties-in-interest and disqualified persons, to a Plan might be deemed to constitute prohibited transactions under such circumstances.

Representation by Plans

The fiduciaries of each Plan proposing to invest in the Fund will be required to represent that they have been informed of and understand the Fund's investment objectives, policies and strategies and that the decision to invest Plan Assets in the Fund is consistent with the provisions of ERISA and/or the Code that require diversification of Plan Assets and impose other fiduciary responsibilities. By its purchase, each investor will be deemed to have represented that either (a) it is not a Plan that is subject to the prohibited transaction rules of ERISA or the Code, (b) it is not an entity whose assets include Plan Assets or (c) its investment in the Fund will not constitute a non-exempt prohibited transaction under ERISA or the Code.

Ineligible Purchasers

Interests may not be purchased with Plan Assets if the General Partner, any selling agent, finder, any of their respective affiliates or any of their respective employees: (a) has investment discretion with respect to the investment of such Plan Assets; (b) has authority or responsibility to give or regularly gives investment advice with respect to such Plan Assets, for a fee, and pursuant to an agreement or understanding that such advice will serve as a primary basis for investment decisions with respect to such Plan Assets and that such advice will be based on the particular investment needs of the Plan; or (c) is an employer maintaining or contributing to such Plan. A party that is described in clause (a) or (b) of the preceding sentence is a fiduciary under ERISA and the Code with respect to the Plan, and any such purchase might result in a "prohibited transaction" under ERISA and the Code.

Plans' Reporting Obligations

The information contained herein and in the other documentation provided to investors in connection with an investment in the Fund is intended to satisfy the alternative reporting obligation for "eligible indirect compensation" on Schedule C of the Form 5500, in addition to the other purposes for which such documents were created.

*Whether or not the underlying assets of the Fund are deemed Plan Assets, an investment in the Fund by a Plan is subject to ERISA and the Code. Accordingly, Plan fiduciaries should consult their own counsel as to the consequences under ERISA and the Code of an investment in the Fund. Note that similar laws governing the investment and management of the assets of governmental or non-U.S. plans may contain fiduciary and prohibited transaction requirements similar to those under ERISA and the Code. Accordingly, fiduciaries of such governmental or non-U.S. plans, in consultation with their counsel, should consider the impact of their respective laws and regulations on an investment in the Fund.*

## Other Regulatory Matters

### Securities Act of 1933

Interests are not registered under the U.S. Securities Act of 1933, as amended, or any other securities law, including state securities or blue sky laws. Interests are offered without registration in reliance upon the exemption contained in Regulation D of this act and/or rules and regulations of the Securities and Exchange Commission applicable to transactions not involving a public offering. Each investor is required, in the Fund's Subscription Documents pursuant to which such investor subscribes for an Interest, to make customary Regulation D representations.

### Investment Company Act of 1940

The Fund is not registered under the U.S. Investment Company Act of 1940, as amended, in reliance upon relief from registration afforded to collective investment vehicles whose outstanding securities are not publicly offered and are beneficially owned exclusively by investors that are considered "qualified purchasers" within the meaning of the Investment Company Act. "Qualified purchasers" generally include individuals and certain family-owned companies owning total investments in excess of $5 million and entities owning total investments in excess of $25 million. Each investor will be required to complete the Fund's Subscription Documents to enable the Fund to determine its eligibility.

### Investment Adviser Registration

The Investment Manager is registered as an investment adviser with the Securities and Exchange Commission under the U.S. Investment Advisers Act of 1940, as amended (the "*Advisers Act*"). Each prospective investor will be required to make a representation to indicate that it is a "qualified client" as defined in the Advisers Act.

### Commodity Exchange Act

Neither the General Partner nor the Investment Manager is required to register as a commodity pool operator or commodity trading adviser under the U.S. Commodity Exchange Act because the Fund is limiting participation to certain qualified investors, is restricting the Fund's commodity interest trading, and the Investment Manager only provides commodity trading advice to the Fund (or other pools for which it is an exempt commodity pool operator). Therefore, unlike a registered commodity pool operator, there is no requirement to deliver this Memorandum or other disclosure document or any certified annual report to the Fund's investors.

<u>Anti-Money Laundering Regulations</u>

All subscriptions for Interests will be subject to applicable anti-money laundering regulations. Investors will be required to comply with such anti-money laundering procedures as are required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act) Act of 2001 (Pub. L. No. 107-56).

As part of the Fund's responsibility to comply with regulations aimed at the prevention of money laundering, the General Partner or its delegate may require verification of identity from all prospective investors.   Depending on the circumstances of each subscription, it may not be necessary to obtain full documentary evidence of identity.

The General Partner reserves the right to request such information as is necessary to verify the identity of a prospective investor.   The General Partner also reserves the right to request such identification evidence in respect of a transferee of Interests.   In the event of delay or failure by the prospective investor or transferee to produce any information required for verification purposes, the General Partner may refuse to accept the application or (as the case may be) to register the relevant transfer and (in the case of a subscription of Interests) any funds received will be returned without interest to the account from which the monies were originally debited.

The General Partner also reserves the right to refuse to make any withdrawal payment or distribution to a Limited Partner, if the General Partner suspects or is advised that the payment of any withdrawal or distribution moneys to such Limited Partner might result in a breach or violation of any applicable anti-money laundering or other laws or regulations by any person in any relevant jurisdiction, or such refusal is considered necessary or appropriate to ensure the compliance by the Fund, the General Partner and the Investment Manager with any such laws or regulations in any relevant jurisdiction.