# <u>EXHIBIT 2</u>

**Memorandum Number _____**

# Confidential Private Offering Memorandum

*Series B, Series C and Series D Shares of*

## Highland Multi Strategy Credit Fund, Ltd.

*A Cayman Islands Exempted Company*

*Investment Manager*

Highland Capital Management, L.P.

**November 2014**

*This Confidential Private Offering Memorandum must be read in conjunction with the Confidential Private Placement Memorandum of Highland Multi Strategy Credit Fund, L.P.*

## **TABLE OF CONTENTS**

Page

NOTICE.................................................................................................................................1

DIRECTORY .......................................................................................................................4

INTRODUCTION .................................................................................................................5

MANAGEMENT ..................................................................................................................6

SUMMARY OF TERMS ......................................................................................................9

RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST..........................................22

SHARES OF THE FUND .....................................................................................................27

TAX CONSIDERATIONS ....................................................................................................31

ERISA CONSIDERATIONS .................................................................................................39

CAYMAN ISLANDS MUTUAL FUND LAW..........................................................................42

ANTI-MONEY LAUNDERING COMPLIANCE.......................................................................43

ANNEX A ...........................................................................................................................45

Attachment:  Confidential Private Placement Memorandum of Highland Multi Strategy Credit Fund, L.P.

**NOTICE**

This Private Offering Memorandum (this "***Memorandum***") is confidential and intended solely for the use of the person to whom it has been delivered by Highland Multi Strategy Credit Fund, Ltd. (the "***Fund***") for the purpose of enabling the recipient to evaluate an investment in the Fund. The purpose of the Fund is to invest all of its assets in, and carry out its investment program through, Highland Multi Strategy Credit Fund, L.P., a Delaware limited partnership (the "***Partnership***"). Accordingly, this Memorandum must be read in conjunction with the Partnership's Confidential Private Placement Memorandum, as amended and supplemented from time to time (the "***Partnership Memorandum***").

This Memorandum is not to be reproduced or distributed to others, at any time, without the prior written consent of the Fund (other than to professional advisors and employees of the investor receiving this Memorandum from the Fund or its authorized representative or such investor) and all recipients agree they will keep confidential all information contained herein not already in the public domain and will use this Memorandum for the sole purpose of evaluating a possible investment and monitoring a subsequent investment in the Fund. Notwithstanding the foregoing, each investor (and each employee, representative or other agent of each investor) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of an investment in the Fund and all materials of any kind (including opinions or other tax analyses) that are provided to the investor relating to such tax treatment or tax structure. Acceptance of this Memorandum and the Partnership Memorandum by a recipient constitutes an agreement to be bound by the foregoing terms. No person is authorized to make any representations concerning the Fund which are inconsistent with those contained in this Memorandum.

Prospective investors are not to construe the contents of this Memorandum or the Partnership Memorandum as legal, tax, investment or other advice. Each prospective investor should consult its own advisors as to legal, financial, tax, ERISA and other related matters concerning an investment in the Fund.

In making an investment decision, investors must review both this Memorandum and the Partnership Memorandum and must rely on their own examination of the Fund and the Partnership and the terms of the offering, including the merits and risks involved. The shares in the Fund (the "***Shares***") have not been recommended by any U.S. federal or state, or any non-U.S., securities commission or regulatory authority. Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this Memorandum. Any representation to the contrary is a criminal offense.

Neither this Memorandum nor the Shares described herein have been qualified for offer, sale or distribution under the laws of any jurisdiction governing the offer or sale of mutual fund shares or other securities, and this Memorandum shall not constitute an offer to sell or a solicitation of an offer to buy nor shall there be any sale of Shares in any jurisdiction in which such offer, solicitation or sale is not authorized or to any person to whom it is unlawful to make such offer, solicitation or sale.

In each member state of the European Economic Area (each a "***Relevant Member State***") that has implemented EU Directive 2011/61/EU on Alternative Investment Fund Managers (the "***AIFM Directive***"), the Fund may only be offered to investors in accordance with local measures implementing

1

the AIFM Directive. Investors in a Relevant Member State where the Fund is not being offered pursuant to private placement rules implementing the AIFM Directive may invest in the Fund, but only in circumstances where they do so at their own initiative.

No person has been authorized to give any information or to make any representation concerning the Fund or the offering of the Shares other than the information contained in the Memorandum and the Partnership Memorandum and, if given or made, such information or representation must not be relied upon as having been authorized by the Fund.

The Shares have not been, and will not, be registered under the United States Securities Act of 1933, as amended, or the securities laws of any of the states of the United States, and the Fund has not been and will not be registered under the United States Investment Company Act of 1940, as amended. Direct or indirect acquisition or ownership of Shares by "*U.S. Persons*" (as defined herein) without compliance with applicable U.S. securities laws or in contravention of the relevant provisions of the constituent documents of the Fund is prohibited.

The Fund is not a recognized collective investment scheme for the purposes of Section 264 of the Financial Services and Markets Act 2000 of the United Kingdom (the "*Act*"). The promotion of the Fund and the distribution of this Memorandum in the United Kingdom are accordingly restricted by law. This Memorandum is directed at persons to whom it may lawfully be issued or directed at under the Financial Services and Markets Act 2000 (Financial Promotion) Order 2001, including persons who are authorized under the Act, certain persons having professional experience in matters relating to investments, high net worth companies, high net worth unincorporated associations or partnerships, trustees of high value trusts and persons who qualify as certified sophisticated investors. The Shares are only available to such persons in the United Kingdom and this Memorandum must not be relied or acted upon by any other persons in the United Kingdom. In order to qualify as a certified sophisticated investor a person must (i) have a certificate in writing or other legible form signed by an authorized person to the effect that he or she is sufficiently knowledgeable to understand the risks associated with participating in unrecognized collective investment schemes and (ii) have signed, within the last 12 months, a statement in a prescribed form declaring, amongst other things, that he or she qualifies as a sophisticated investor in relation to such investments. This Memorandum is exempt from the general restriction in Section 21 of the Act on the communication of invitations or inducements to engage in investment activity on the grounds that it is being issued to and/or directed at only the types of persons referred to above. The content of this Memorandum has not been approved by an authorized person and such approval is, save where this Memorandum is directed at or issued to the types of persons referred to above, required by Section 21 of the Act.

The Shares described in this Memorandum are not the subject of a public offering in the Cayman Islands. No offer or invitation to subscribe for Shares may be made to the public in the Cayman Islands.

Any information forwarded to the Fund by any potential shareholder will be treated on a confidential basis except that such information may be passed on to a relevant third party by the Fund where so required by law or regulation and each shareholder upon subscribing for Shares shall be deemed to have consented to such release of such confidential information pursuant to the terms of the Confidential Relationships (Preservation) Law (as amended) of the Cayman Islands (or any amendment thereto).

An investment in the Shares involves significant risks. Prospective investors should pay particular attention to the risk factors disclosed in this Memorandum and the Partnership Memorandum. Investment in the Fund is suitable only for sophisticated investors and requires the financial ability and willingness to accept the high risks inherent in an investment in the Fund. No assurance can be given that the Fund's investment objective will be achieved.

Each prospective investor is invited to meet with representatives of the Fund and to discuss with, ask questions of and receive answers from such representatives concerning the terms and conditions of this offering and to obtain any additional information, to the extent that such representatives possess such information or can acquire it without unreasonable effort or expense, necessary to verify the information contained herein.

The Fund is a registered mutual fund for the purposes of the Mutual Funds Law (2013 Revision) of the Cayman Islands. The Fund is registered with the Cayman Islands Monetary Authority pursuant to Section 4(3) of that law and the prescribed details in respect of this Memorandum have been filed with the Cayman Islands Monetary Authority. Such registration does not imply that the Cayman Islands Monetary Authority has approved this Memorandum or the offering of Shares hereunder.

This Memorandum does not purport to be, and should not be construed as, a complete description of the memorandum of association and articles of association of the Fund (the "*Articles*") or the Partnership's limited partnership agreement, as amended and supplemented from time to time (the "*Partnership Agreement*"), copies of which will be provided to each prospective investor upon request. Each prospective investor in the Fund is encouraged to review the Articles and the Partnership Agreement carefully, in addition to consulting appropriate legal and tax counselors. To the extent of any inconsistency between this Memorandum, the Articles and the Partnership Agreement, the terms of the Articles and the Partnership Agreement control.

Pursuant to an exemption from the Commodity Futures Trading Commission (the "*CFTC*"), neither the General Partner nor the Investment Manager (each as defined herein) is registered with the CFTC as a commodity pool operator ("*CPO*") or as a commodity trading advisor and therefore, unlike a registered CPO, is not required to deliver a disclosure document or a certified annual report to participants in this pool. Among other things, the exemption requires the filing of a claim of exemption with the National Futures Association. It is also required that at all times either: (a) the aggregate initial margin and premiums required to establish commodity interest positions does not exceed 5% of the liquidation value of the Fund's portfolio; or (b) the aggregate net notional value of the Fund's commodity interest positions does not exceed 100% of the liquidation value of the Fund's portfolio and further that all pool participants are required to be accredited investors or certain other qualified investors.

The delivery of this Memorandum does not, under any circumstances, create any implication that there has been no change in the circumstances affecting the Fund since the date hereof. An amended or updated Memorandum will be provided to reflect any material changes to the information contained herein.

Except as otherwise noted, all monetary amounts set forth herein are expressed in United States ("*U.S.*") dollars.

3

## DIRECTORY

| | |
|---|---|
| **Registered Office** | **Highland Multi Strategy Credit Fund, Ltd.**<br>c/o Maples Corporate Services Limited<br>PO Box 309, Ugland House<br>Grand Cayman, KY-1109<br>Cayman Islands |
| **Investment Manager** | **Highland Capital Management, L.P.**<br>300 Crescent Court<br>Suite 700<br>Dallas, Texas 75201 |
| **Directors** | James D. Dondero<br>Mark K. Okada |
| **Administrator** | **SEI Global Services, Inc.**<br>One Freedom Valley Drive<br>Oaks, Pennsylvania 19456 |
| **Auditors** | **PricewaterhouseCoopers LLP**<br>P.O. Box 258<br>Strathvale House, George Town<br>Grand Cayman KY1-1104<br>Cayman Islands |
| **Legal Counsel** | *In the United States*<br>**Akin Gump Strauss Hauer & Feld LLP**<br>1700 Pacific Avenue, Suite 4100<br>Dallas, Texas 75201<br><br>*In the Cayman Islands*<br>**Maples and Calder**<br>PO Box 309<br>Ugland House<br>Grand Cayman, KY-1104<br>Cayman Islands |

4

# INTRODUCTION

Highland Multi Strategy Credit Fund, Ltd. (the "***Fund***") is a Cayman Islands exempted company offering participating shares of the Fund ("***Shares***") for the purpose of enabling qualified non-U.S. investors and U.S. tax-exempt investors to participate in the investment program of Highland Multi Strategy Credit Fund, L.P., a Delaware limited partnership (the "***Partnership***"), on a more tax efficient basis. The Partnership seeks attractive risk-adjusted returns, consistent with the preservation of capital and prudent investment management.

Highland Multi Strategy Credit Fund GP, L.P., a Delaware limited partnership (the "***General Partner***"), serves as the general partner of the Partnership. Highland Capital Management, L.P., a Delaware partnership (the "***Investment Manager***"), serves as the investment manager of the Partnership and has responsibility for the Partnership's investment program. James D. Dondero ultimately controls the General Partner and the Investment Manager.

The Fund is a limited partner in the Partnership and invests all of its investible assets in, and conducts all of its operations through, the Partnership. Therefore, to be fully informed about an investment in the Fund, an investor must first understand the terms of an investment in the Partnership. Prospective investors are therefore urged to carefully review the current Confidential Private Placement Memorandum of the Partnership, as amended and supplemented from time to time (the "***Partnership Memorandum***"), the Limited Partnership Agreement of the Partnership, as amended and supplemented from time to time (the "***Partnership Agreement***") and the Investment Management Agreement by and among the Partnership, the General Partner, the Fund and the Investment Manager, as amended and supplemented from time to time (the "***Investment Management Agreement***"). A copy of the Partnership Memorandum is being provided to investors with this Memorandum. Copies of the Partnership Agreement and the Investment Management Agreement will be provided to investors upon request. The Partnership Memorandum, together with the Partnership Agreement and the Investment Management Agreement, describe the material terms of an investment in the Partnership. Aside from the differences described in this Memorandum, an investment in the Fund will have substantially similar terms and risks to an investment in the Partnership, as described in the Partnership Memorandum.

The Fund is seeking subscriptions from non-U.S. investors and U.S. tax-exempt investors that qualify as "accredited investors" and "qualified purchasers" (as defined in the Fund's subscription materials), generally in minimum amounts of at least $1,000,000. The Fund generally accepts subscriptions on the first business day of each calendar month.

Pursuant to recent amendments adopted by the Fund, as further explained in this Memorandum and the Partnership Memorandum, all outstanding Shares held as of the effective date of the amendments were, notwithstanding their designation prior to the amendments, re-designated as "Series A Shares." Additionally, under these amendments, the Fund created three additional series of Shares – "Series B Shares," "Series C Shares" and "Series D Shares." The Fund is offering Series B Shares, Series C Shares and Series D Shares pursuant to this Memorandum. The terms applicable to the Series A Shares are set forth in a Supplement to this Memorandum.

This Memorandum describes the principal terms that apply to an investment in the Fund in Series B, Series C and Series D Shares and certain other information that relates specifically to the offering of Shares. **This is not an offering of limited partner interests in the Partnership, although an investor should be fully informed about the Partnership in making an investment decision.**

# MANAGEMENT

**Board of Directors**

The Fund's board of directors (the "***Board of Directors***") consists of two (2) directors (collectively, the "***Directors***").  The members of the Board of Directors are James D. Dondero and Mark K. Okada.  The biographies of the Directors are set forth in the Partnership Memorandum.

The Fund's Board of Directors does not currently consist of any directors that are not affiliated with the Investment Manager, and thus the Fund's management, as well as investment decisions at the Partnership level, are effectively controlled by the Investment Manager or its affiliates.

The Board of Directors has the full authority of a board under Cayman law.  The powers of the Board of Directors described in this Memorandum and the Articles are not exhaustive and are not limited to the specific authorities described therein.  Thus, subject to applicable law, the Board of Directors may take certain decisions or actions even where those decisions or actions are not expressly granted in the Articles or described in this Memorandum.

It is anticipated that the Board of Directors will meet, in person or by conference telephone, at least once a year to review the investment and administrative affairs of the Fund.  The Directors will delegate investment of the Fund's assets to the Investment Manager, and the Directors are not responsible for the day to day conduct of the Fund's trading program.  The Directors will also delegate certain day to day administrative and clerical affairs of the Fund to the Administrator or others.

The Directors each serve in a non-executive capacity.  Any Director may hold any other office in connection with the Fund (other than the office of the Fund's independent auditors) in conjunction with his office of Director on such terms as to tenure of office and otherwise as the Directors may determine.  Any Director may also act in a professional capacity (other than as the Fund's independent auditors) and he or its firm will be entitled to remuneration for such services as if he were not a Director.  A Director may contract with the Fund provided that the Director declares his or its interest or gives notice of his or its interest as soon as practicable after the Director obtains such interest.

Each of the Directors has been duly registered, as applicable, under the Cayman Islands Directors Registration and Licensing Law, 2014.

A Director may vote at, or be counted in the quorum of, any meeting of the Board of Directors to consider any contract in which the Director is interested other than as a shareholder, provided that such Director declares such interest prior to the taking of the vote at such meeting.

Independent, third-party Directors, if any, will be entitled to remuneration for their services at such rate not exceeding the customary rate for the provision of services of a director as may be approved by the Fund.  The Directors will be reimbursed for all out of pocket costs and expenses properly incurred by them, including in connection with attending meetings of the Directors or any committee of the Directors or any general meeting or any meeting held in connection with the business of the Fund.  The Fund will indemnify the Directors for all liabilities, costs or expenses of

whatsoever kind incurred or suffered by them (other than those arising by reason of fraud, willful neglect or willful default on the part of a Director or servant or agent thereof).

**Administrator**

SEI Investments is a leading global provider of investment processing, investment management and investment operations solutions for institutional and personal wealth management. For more than 40 years, SEI has helped corporations, financial institutions, financial advisors and ultra-high-net-worth families create and manage wealth by providing comprehensive, innovative, investment and investment-business solutions. SEI manages or administers $601.9 billion in funds and separately managed assets. SEI is a public company and is listed on the NASDAQ exchange under the symbol SEIC. SEI has been retained to perform certain administrative, accounting and investor services for the Fund and the Partnership (in such capacity, the "***Administrator***"). In its capacity as Administrator, it will receive customary fees that will be paid out of the assets of the Fund. The Administrator will also be reimbursed for all reasonable out-of-pocket expenses.

The Fund will enter into an administration agreement (the "***Administration Agreement***") with the Administrator. The Administrator will be under no duty to take any action on behalf of the Fund except as specifically set forth in the Administration Agreement or as may be specifically agreed to by the Administrator and the Fund in a written amendment thereto.

The Administrator will act as liaison with the Fund's accountants and auditors and will provide account analyses, fiscal year summaries, and other audit-related schedules with respect to the Fund. The Administrator will take all reasonable action in the performance of its duties under the Administration Agreement to assure that the necessary information is made available to such accountants and auditors for the expression of their opinion, as required by the Fund.

The Administrator will enter into and will maintain in effect with appropriate parties one or more agreements making reasonable provisions for emergency use of electronic data processing equipment to the extent appropriate equipment is available. In the event of equipment failures, the Administrator will, at no additional expense to the Fund, take reasonable steps to minimize service interruptions. The Administrator will have no liability with respect to the loss of data or service interruptions caused by equipment failure, provided such loss or interruption is not caused by the Administrator's own willful misfeasance, bad faith, gross negligence or reckless disregard of its duties or obligations under the Administration Agreement.

Subject to the terms of the Administration Agreement, the Administrator will be liable to the Fund (or any person or entity claiming through the Fund) for damages only to the extent caused by the Administrator's own fraud or willful misconduct under the Administration Agreement ("***Standard of Care***"). The Administrator will not be liable for damages (including, without limitation, damages caused by delays, failure, errors, interruption or loss of data) occurring directly or indirectly by reason of circumstances beyond its reasonable control. The Administrator will not be under any duty or obligation to inquire into and will not be liable for the validity or invalidity, authority or lack thereof, or truthfulness or accuracy or lack thereof, of any instruction, direction, notice, instrument or other information which the Administrator reasonably believes to be genuine. The Administrator will not be liable for any damages that are caused by actions or omissions taken by the Administrator in accordance with written instructions by authorized persons of the Fund or advice of counsel. The Administrator will not be liable for any damages arising out of any action or omission to act by any prior service provider of the Fund or for any failure to discover any such error or omission. Neither the

Administrator nor its affiliates will be liable for any consequential, incidental, exemplary, punitive, special or indirect damages, whether or not the likelihood of such damages was known by the Administrator or its affiliates. Both the Fund and the Administrator will have a duty to mitigate damages for which the other party may become responsible.

Absent the Administrator's failure to meet its Standard of Care, the Fund agrees to indemnify, defend and hold harmless the Administrator and its affiliates and their respective directors, trustees, officers, agents and employees from certain claims, suits, actions, damages, losses, liabilities, obligations, costs and reasonable expenses (including attorneys' fees and court costs, travel costs and other reasonable out-of-pocket costs related to dispute resolution) arising directly or indirectly from any actions taken or omitted to be taken by the Administrator in connection with the provision of services to the Fund.

The Partnership will also enter into an administration agreement with the Administrator, under which the terms will be substantially as above.

## SUMMARY OF TERMS

To understand this investment opportunity, a prospective investor should read both the Partnership Memorandum and the following summary. The information in the Partnership Memorandum is important to a prospective investor's investment decision because: (i) the purpose of the Fund is to invest in the Partnership and therefore the underlying investment opportunity is in the Partnership; (ii) an investment in the Fund will (aside from the differences described below) have substantially similar terms to those applicable to a direct investment in the Partnership; and (iii) many terms relevant to an investment in the Fund, including the information concerning compensation, expenses, distributions, risk factors and conflicts of interest, are set forth in the Partnership Memorandum and not in this Memorandum.

The following summary highlights certain differences from the terms that would apply were the investor to hold a limited partner interest in the Partnership directly, and does not purport to provide a summary of the investment terms or risks of an investment in the Partnership, which is provided in the Partnership Memorandum. The summary of differences does not purport to be, and should not be construed as, a complete description of the Fund's Articles. To the extent of any inconsistency between this Memorandum and the Articles, the terms of the Articles control. Moreover, this summary and the summary set forth in the Partnership Memorandum are subject to the detailed provisions of the Partnership Agreement and are qualified in their entirety by the terms of the Partnership Agreement. **Capitalized terms used but not defined herein have the meanings ascribed to them in the Partnership Memorandum.**

| | |
|---|---|
| **The Fund** | Highland Multi Strategy Credit Fund, Ltd., a Cayman Islands exempted company. |
| **The Partnership** | Highland Multi Strategy Credit Fund, L.P., a Delaware limited partnership. The Fund is a limited partner in the Partnership and invests all of its investible assets in, and conducts all of its investment activities through, the Partnership. As a limited partner of the Partnership, the Fund is subject to all of the terms and conditions of the Partnership applicable to limited partners of the Partnership. The Partnership will issue to the Fund an Interest in the Partnership and maintain capital sub-accounts that correspond to each Sub-Series of Shares (defined below). |
| **General Partner of the Partnership** | Highland Multi Strategy Credit Fund GP, L.P., a Delaware limited partnership. The general partner of the General Partner is Highland Multi Strategy Credit GP, LLC, a Delaware limited liability company of which the Investment Manager is currently the sole member. |
| **Investment Manager** | Highland Capital Management, L.P., a Delaware limited partnership. |
| **Recent Amendments; Series of Shares** | Effective November 1, 2014, the Board of Directors amended the terms of the Fund, whereby all outstanding Shares in the Fund were re-designated as "Series A Shares" and three new series of Shares were created – "Series B Shares," "Series C Shares" and "Series D Shares" (the "*Amendments*"). The General Partner and limited partners of the Partnership adopted similar amendments. |

As of the effective date of the Amendments (the "***Effective Date***"), all existing shareholders will hold Series A Shares, the terms of which are set forth in a supplement to this Memorandum. The Fund is currently offering for subscription Series B Shares, Series C Shares and Series D Shares pursuant to this Memorandum.

The Fund may issue additional series (each, a "***Series***") of Shares over time. Not all Series of Shares will be available for subscription at the same time and the terms among the Series of Shares will vary. New Series of Shares may be established by the Fund without notice to or approval of the shareholders.

Except with respect to management fees, performance-based profit allocations and redemption rights (each as discussed below), the rights and privileges attributable to Series A Shares, Series B Shares, Series C Shares and Series D Shares are identical.

References herein to "Shares" or "shareholders" shall include all Series of Shares and shareholders unless otherwise specified or context so requires.

|  |  |
|---|---|
| **Eligible Investors** | Participating, redeemable, non-voting shares of the Fund (the "***Shares***") are being offered to investors that are not U.S. Persons and to selected U.S. investors that are tax-exempt persons who qualify both as "accredited investors" and as "qualified purchasers," as defined in the Fund's subscription application materials. The Fund reserves the right to reject any investor for any reason or for no reason in its discretion. |

No Shares may be offered to the public in the Cayman Islands (which shall not include an exempted or ordinary non-resident company incorporated in the Cayman Islands). Shares of the Fund may be purchased only by eligible investors who are sophisticated individual or institutional investors. Each subscriber for Shares of the Fund must certify that the beneficial owner of such Shares will not be a "***U.S. Person***" as defined in Annex A attached to this Memorandum; provided, however, that subscriptions for Shares of the Fund may also be accepted from certain qualified U.S. tax-exempt organizations. The Fund reserves the right to reject subscriptions in its sole discretion.

Shares of the Fund will not be registered under the U.S. Securities Act of 1933, as amended, any state "blue sky" laws, or the securities laws of any other jurisdiction. Shares may be offered privately (i) outside the United States of America, its territories or possessions, or areas subject to its jurisdiction (the "***United States***"), or to or for the benefit of an investor that is not a U.S. Person, only in accordance with relevant laws of the jurisdiction where the offer is made, or (ii) within the United States or to a U.S. Person only in a transaction that does not require the registration of the Shares or the Fund under applicable U.S. federal or state securities laws.

More detailed information concerning the applicable suitability criteria is set forth in the Fund's subscription application materials (the "***Subscription Documents***").

The Fund or the Administrator reserves the right to request such information as is necessary to verify the identity and the source of funds of an applicant. To ensure compliance with statutory and other requirements relating to anti-money laundering, the Fund or the Administrator may require verification of identity and/or source of funds from any person submitting completed Subscription Documents. Pending the provision of evidence satisfactory to the Fund or the Administrator as to identity, the evidence of title in respect of Shares may be retained at the absolute discretion of the Fund or the Administrator. If within a reasonable period of time following a request for verification of identity, the Fund or the Administrator has not received evidence satisfactory to it as aforesaid, it may, in its absolute discretion, refuse to allot the Shares applied for in which event subscription monies will be returned without interest to the account from which such monies were originally debited. Subscription monies may be rejected by the Fund or the Administrator if the remitting bank or financial institution is unknown to the Fund or the Administrator.

An investment in the Fund is suitable only for persons that have adequate means of providing for their current needs and personal contingencies and have no need for liquidity in their investments. An investment in the Fund should not be made by any person that (a) cannot afford a total loss of its principal, or (b) has not carefully read or does not understand this Memorandum and the Partnership Memorandum, including the portions concerning the risks and the income tax consequences of an investment in the Fund.

**Subscriptions**     Subscriptions for Shares are accepted on the first Business Day of each calendar month and/or such other days as the Board of Directors may determine from time to time, generally subject to the receipt of cleared funds on or before the acceptance date. Each investor will be required to invest a minimum of US$1,000,000 in the Fund, although the Fund may accept investments of a lesser amount in its discretion, subject to compliance with the applicable Cayman Islands Mutual Funds Law (2013 Revision) ("***Mutual Funds Law***"). Subscription payments may be made in cash or, with the consent of the Fund, in securities or partly in cash and partly in securities. The Fund reserves the right to reject subscriptions in its sole discretion.

"***Business Day***" means any day other than Saturdays, Sundays or any other day banks located in in New York, New York are required or authorized to be closed.

A subscriber admitted to the Fund (a "***shareholder***") receives, in exchange for the initial capital contribution and any subsequent capital

contribution, Shares representing a proportionate share of the net assets of the Fund at that time.

Where a subscription for Shares is accepted, the Shares will be treated as having been issued with effect from the relevant subscription date notwithstanding that the subscriber for those Shares may not be entered in the Fund's register of members until after the relevant subscription date. The subscription monies paid by a subscriber for Shares will accordingly be subject to investment risk in the Fund from the relevant subscription date.

There is no minimum aggregate amount of subscriptions that is required for the initial acceptance of subscriptions, nor has the Fund established any maximum aggregate amount of subscriptions that may be accepted.

All subscribers will be required to comply with such anti-money laundering procedures as are required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act) Act of 2001 (Pub. L. No. 107-56) and other applicable anti-money laundering regulations as further described in the Subscription Documents.

**Share Sub-Series**

The Fund may issue Shares as a separate sub-series of the relevant Series on each subscription date (each, a "*Sub-Series*") at $1,000 per Share. The Fund may issue Shares as a separate Sub-Series for purposes of, among others, accounting for any profits and losses attributable to each individual shareholder and for the purpose of permitting the Performance Allocation to be calculated separately with respect to each shareholder to reflect different returns achieved as a result of subscriptions received at different times. Each separate Sub-Series will be identified and referrable to each shareholder and by its date of issue. In general, each Sub-Series will participate in the Fund's profits and losses in the same manner as all other Sub-Series of Shares, except that the Performance Allocation to be charged to each Sub-Series of Shares will be calculated separately on the basis of the performance of the Sub-Series.

The Partnership maintains capital sub-accounts that correspond to each Sub-Series of Shares issued to shareholders of the Fund and each such capital sub-account is treated separately for purposes of determining Management Fees, Performance Allocations and redemption rights and restrictions (each as described in the Partnership Memorandum).

**Alternative Investment Vehicles**

The Directors will have the right, in connection with any investment, to direct the capital contributions of some or all of the subscribers to be made through one or more alternative investment vehicles (each an "*Alternative Investment Vehicle*"), and, in the case of an existing investment, transfer all or a portion of such investment to an Alternative Investment Vehicle, if, in the judgment of the Directors, the use of such vehicle or vehicles would allow the Fund to overcome legal or regulatory

constraints, invest in a more tax-efficient manner or would facilitate participation in certain types of investments. Any Alternative Investment Vehicle will be subject to terms and conditions substantially similar to those of the Fund and will be managed by the Investment Manager or an affiliate thereof.

**Affiliated Investors**

Shares held by the Investment Manager or its affiliates (collectively, "*Affiliated Investors*") may not be assessed the Management Fee or the Performance Allocations that are applicable to other investors in the Fund, but share pro rata in other applicable expenses of the Fund (as more fully described in the Partnership Agreement).

**Management Fee**

Although the Fund will not pay an asset-based fee directly to the Investment Manager, it will, as a limited partner in the Partnership, bear its pro rata share of the Management Fee paid by the Partnership to the Investment Manager in its capacity as investment manager of the Partnership. Accordingly, the Management Fee will be paid at the Partnership level by assessing such fee to the appropriate capital sub-account. The Management Fee is calculated and payable quarterly in advance at an annual rate of (i) 1.5% of the net asset value of each Series B Share, (ii) 1.0% of the net asset value of each Series C Share and (iii) 2.0% of the net asset value of each Series D Share. The Management Fee may be waived or reduced by the Investment Manager in its sole discretion.

**Other Fees and Expenses**

The Fund bears the reasonable, out-of-pocket expenses of the offering of the Shares contemplated hereunder and the recent Amendments, described above, including expenses associated with obtaining any requisite investor consent to such Amendments. To the extent the Directors deem appropriate, these expenses may be capitalized and amortized by the Fund over a 36-month period from the Effective Date, even though such capitalization and amortization may be a divergence from U.S. generally accepted accounting principles ("*GAAP*"). Amortization of such expenses over a 36-month period may, in certain circumstances, result in a qualification of the Fund's annual audited financial statements. In such instances, the Directors may decide to (i) avoid the qualification by recognizing the unamortized expenses or (ii) make GAAP conforming changes for financial reporting purposes, but amortize expenses for purposes of calculating the Fund's net asset value. There will be a divergence in the Fund's fiscal year-end net asset value and in the net asset value reported in the Fund's financial statements in any year where, pursuant to clause (ii), GAAP conforming changes are made only to the Fund's financial statements for financial reporting purposes.

If the Fund is terminated within 36 months of the Effective Date, any unamortized expenses will be recognized.

<u>Investment and Operational Expenses</u>.  The Fund bears all reasonable costs and expenses directly related to its operations, including its pro rata share of all Partnership expenses, including the Management Fee paid by the Partnership to the Investment Manager.  The Fund also bears all reasonable, out-of-pocket costs of the administration of the Fund, including accounting, audit and legal expenses, costs of any litigation or investigation involving the Fund's activities, and costs associated with reporting and providing information to existing and prospective investors.  However, the General Partner or the Investment Manager may, in its sole discretion, choose to absorb any such expenses incurred on behalf of the Fund.

The Fund does not have its own separate employees or office.  Except as described above and provided for in the Partnership Agreement, the Fund generally does not reimburse the General Partner or the Investment Manager for salaries, office rent and other general overhead costs of the General Partner or the Investment Manager.

**Restricted New Issues**    The Partnership may from time to time purchase securities in public offerings made through member firms of the Financial Industry Regulatory Authority, Inc. ("***FINRA***").  FINRA member firms are not permitted to sell certain new issues ("***Restricted New Issues***") to accounts in which certain persons have a significant beneficial interest that are involved in the securities industry or to executive officers or directors of companies that are current, recent or prospective investment banking client of the relevant underwriters ("***Restricted Persons***").  In order to enable the Partnership to participate in Restricted New Issues, the Fund will require each shareholder to provide information to enable the Fund to determine whether the shareholder is a Restricted Person.  When the Partnership invests in a Restricted New Issue, the profits and losses associated with the investment will be specially allocated exclusively to those shareholders who are permitted by the FINRA rules to have a beneficial interest therein.

The FINRA rules permit Restricted Persons that are involved in the securities industry to have in the aggregate up to a 10% participation in Restricted New Issues and Restricted Persons affiliated with a particular investment banking client to have up to 25% participation in Restricted New Issues.  If the ownership of the Partnership by Restricted Persons exceeds the maximum percentage, the Investment Manager will allocate such excess amount pro rata among the shareholders and the Partners of the Partnership who are not Restricted Persons or on such other basis that the Investment Manager reasonably determines ensures compliance with the FINRA rules.

If a Restricted New Issue in which participation by Restricted Persons has been capped is not promptly sold, the investment may be reallocated among all shareholders and the Partners of the Partnership on a pro rata

basis (including all Restricted Persons) after a secondary market develops at such secondary market price.

**Performance Allocation**

As further described in the Partnership Agreement, the Investment Manager, in its capacity as a special limited partner of the Partnership, is entitled to receive an annual performance-based profit allocation at the end of each year equal to 20% of the Partnership's net profits attributable to the Limited Partners of the Partnership, subject to a "high water mark" limitation.

The Performance Allocation is made at the Partnership level by deducting the Performance Allocation from the capital sub-account relating to each Sub-Series of Shares. The Performance Change (as defined in the Partnership Agreement) of each Sub-Series will not be netted against one another for purposes of determining the applicability of the "high water mark."

**Distributions**

Subject to the redemption privilege described below, all earnings of the Fund are ordinarily retained for investment. Other than distributions made pursuant to a redemption described below, shareholders should not expect the Fund to make any distributions.

**Redemptions Generally**

Redemptions from the Fund are subject to the withdrawal restrictions contained in the Partnership Agreement, whereby the Series A Interests in the Partnership correspond to the Series A Shares of the Fund, Series B Interests in the Partnership correspond to the Series B Shares of the Fund, the Series C Interests in the Partnership correspond to the Series C Shares of the Fund and the Series D Interests in the Partnership correspond to the Series D Shares of the Fund.

**Series Redemption Dates**

Subject to certain redemption restrictions described below, shareholders have the following redemption rights:

Series B Shares: Annual Liquidity. A shareholder is permitted to make complete or partial redemptions of its Series B Shares upon written notice to the Administrator at least 180 days prior to the applicable Series B Redemption Date. The "**_Series B Redemption Date_**" means: (i) the end of the day on the last Business Day of the calendar month that immediately precedes the one-year anniversary of date of the issuance of the Shares being redeemed; and thereafter (ii) the end of the day on each one-year anniversary of the preceding Series B Redemption Date (i.e., if Shares were issued on November 1, 2014, such Shares would be eligible for redemption on October 31, 2015 and every one year thereafter on October 31st, or the last Business Day of that month).

Series C Shares: Two Year Liquidity. A shareholder is permitted to make complete or partial redemptions of its Series C Shares upon written notice to the Administrator at least 180 days prior to the applicable Series C Redemption Date. The "**_Series C Redemption Date_**" means: (i) the end

of the day on the last Business Day of the calendar month that immediately precedes the two-year anniversary of the date of issuance of the Shares being redeemed; and thereafter (ii) the end of the day on each two-year anniversary of the preceding Series C Redemption Date (or the last Business Day of that month) (i.e., if Shares were issued on November 1, 2014, such Shares would be eligible for redemption on October 31, 2016 and every two years thereafter on October 31st, or the last Business Day of that month).

<u>Series D Shares: One Year Hard Lock-Up; Quarterly Liquidity</u>. A shareholder is permitted to make complete or partial redemptions of Series D Shares as of the last Business Day of each calendar quarter (each, a "***Series D Redemption Date***") following the one-year anniversary of the date of issuance of the Shares being redeemed. Notice of any redemption of Series D Shares must be provided in writing to the Administrator at least 90 calendar days prior to the requested Series D Redemption Date.

The Board of Directors may, at any time and in its sole discretion, waive or modify the foregoing redemption and distribution restrictions with respect to any shareholder.

| | |
|---|---|
| **Settlement of Redemption Proceeds** | Redemption proceeds will be paid promptly following receipt by the Fund of the withdrawal proceeds from the Partnership in accordance with the Partnership Agreement. |
| **Redemption Conditions** | The Fund may refuse to accept a redemption request if it is not accompanied by such additional information as the Fund or the Administrator may reasonably require. This power may, without limitation to the generality of the foregoing, be exercised where proper information has not been provided for money laundering verification purposes. In addition, where redemption proceeds are requested to be remitted to an account which is not in the name of the investor, each of the Fund and the Administrator reserve the right to request such information as may be reasonably necessary in order to verify the identity of the investor and the owner of the account to which the redemption proceeds will be paid. The redemption proceeds will not be paid to a third-party account if the investor and/or owner of the account fails to provide such information. |
| **Compulsory Redemptions** | The Board of Directors reserves the right, in its sole discretion, to compel the redemption of any shareholder's Shares for any or no reason, in part or in their entirety, on not less than five days' prior written notice (or immediately if the Board of Directors determines in its sole discretion that such shareholder's continued participation in the Fund may cause the Fund, the Partnership, the General Partner or the Investment Manager to violate any applicable law). Settlements are made in the same manner as voluntary redemptions. |

| | |
|---|---|
| **Suspension of Valuations, Redemption and Redemption Payments** | The Board of Directors may suspend the issuance of Shares, the shareholders' redemption privileges, the payment of redemption proceeds and the valuation of the Fund's net assets in the same circumstances as described in the Partnership Memorandum and set forth in the Partnership Agreement with respect to the suspension of valuations or of withdrawal privileges. |
| | Upon the reasonable determination by the Board of Directors that conditions leading to suspension no longer apply, redemption rights for all shareholders shall be promptly reinstated, and any pending redemption requests (or new, timely withdrawal requests) shall be honored as of the last Business Day of the calendar quarter in which redemptions have recommenced, subject to the application of the redemption limitations described herein. |
| **Soft Wind Down** | It is anticipated that any suspension in the circumstances described above in "Suspension of Valuations, Redemptions and Redemption Payments" (each, a "***Suspension***") would ordinarily be temporary.  However, there may be situations in which the circumstances giving rise to the Suspension continue to be present for a considerable period of time with the result that the Board of Directors, in consultation with the Investment Manager, considers it appropriate to keep the Suspension in place indefinitely.   In certain circumstances, even where a Suspension has not been declared, the Directors may, in consultation with the Investment Manager, make a determination that the investment strategy should no longer be continued.  During any such period of Suspension or having made such determination that the investment strategy should no longer be continued, the Investment Manager may recommend to the Board of Directors that the Fund be managed with the objective of returning the Fund's assets to shareholders in an orderly manner (an "***Orderly Realisation***").  The Board of Directors may, in such circumstances, resolve to effect an Orderly Realisation should they determine that doing so is in the best interests of the shareholders.   Such Orderly Realisation shall not constitute a dissolution or winding up of the Fund for any purposes, but rather only the continued management of the Fund's portfolio so as to reduce such portfolio to cash (to the extent reasonably practicable, as advised by the Investment Manager) and return such cash as well as all other assets of the Fund to the shareholders.   The Board of Directors shall promptly communicate to shareholders any resolution to proceed with an Orderly Realisation of the Fund.  During an Orderly Realisation, the Investment Manager may, in consultation with the Board of Directors, take such steps as are considered appropriate in the best interests of the Fund's shareholders to effect the Orderly Realisation. The Board of Directors, in consultation with the Investment Manager shall establish what they consider to be a reasonable time by which the Orderly Realisation should be effected (the "***Realisation Period***").   Any resolution to undertake an Orderly Realisation and the process thereof shall be deemed to be integral to the business of the Fund and may be carried out without recourse to a formal process of liquidation under the |

Companies Law or any other applicable bankruptcy or insolvency regime. The Board of Directors, in consultation with the Investment Manager, may resolve to cease the Orderly Realisation within the Realisation Period and recommence active trading if the circumstances permit a lifting of any applicable Suspension or, where no Suspension is in effect, if the circumstances are such that the investment strategy can then be continued. Management Fees shall be payable and Performance Allocations shall be made during an Orderly Realisation on the same basis as described herein.

**Transfers**

Shares may not be transferred without the prior written consent of the Board of Directors, which consent may be withheld in the sole discretion of the Board of Directors. Any transferee or assignee of any investor will be required to execute a subscription agreement in the same form as required to be completed and executed by a subscriber for Shares in the Fund.

**Duty of Care; Indemnification**

The Partnership Agreement provides that the General Partner, the Investment Manager and each of their affiliates are not liable to the Partnership and the Limited Partners (including the Fund) for any loss or damage arising by reason of being or having been the General Partner or the Investment Manager or from any acts or omissions in the performance of its services as General Partner or Investment Manager, as applicable, in the absence of willful misconduct, fraud or gross negligence (as construed in accordance with the laws of the state of Delaware) or as otherwise required by law, and contains provisions for the indemnification of the General Partner, the Investment Manager and each of their affiliates by the Partnership (but not by the Limited Partners individually) against any liabilities arising by reason of being or having been the General Partner or the Investment Manager or in connection with the Partnership Agreement or the Partnership's business or affairs to the fullest extent permitted by law. The General Partner is not personally liable to any Limited Partner for the repayment of any positive balance in such Limited Partner's Capital Account or for contributions by such Limited Partner to the capital of the Fund or by reason of any change in the federal or state income tax laws applicable to the Fund or its investors.

Neither the Board of Directors of the Fund nor the Administrator shall be liable to the Fund or its shareholders for any loss or damage occasioned by any acts or omissions in the performance of its services on behalf of the Fund, except under certain limited circumstances. In addition, the Board of Directors and the Administrator and their respective affiliates will be indemnified by the Fund (but not by the shareholders individually) against any liabilities arising in connection with the performance of their activities on behalf of the Fund to the extent permitted by the Articles.

| | |
|---|---|
| **Valuations** | The Fund's assets are valued based on the value of the Partnership's assets as set forth in the Partnership Memorandum. |
| **Reserves** | Appropriate reserves may be accrued and charged against net assets and proportionately against the Shares of the shareholders for contingent liabilities, such reserves to be in the amounts (subject to increase or reduction) that the Board of Directors in its sole discretion deems necessary or appropriate. At the sole discretion of the Board of Directors, the amount of any such reserve (or any increase or decrease therein) may be charged or credited, as appropriate, to the Shares of those investors who are shareholders at the time when such reserve is created, increased, or decreased, as the case may be, or alternatively may be charged or credited to those investors who were shareholders at the time of the act or omission giving rise to the contingent liability for which the reserve was established. |
| | If the Board of Directors determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then such amount may be proportionately charged or credited, as appropriate, to those persons who were shareholders during any such prior period. |
| **Fiscal Year** | The Fund has a fiscal year ending on December 31 of each calendar year. |
| **Reports to Partners** | The Fund furnishes to its shareholders as soon as practicable after the end of each taxable year (or as otherwise required by law) annual reports containing financial statements examined by the Fund's independent auditors as well as such tax information as is necessary for each shareholder to complete federal and state income tax or information returns, along with any other tax information required by law. The Fund also furnishes monthly reports reviewing the Fund's performance for such calendar month. The Board of Directors selects the Fund's independent accountants in its sole discretion. |
| **Dissolution and Liquidation** | In the event an Orderly Realization lasts longer than three years, shareholders holding Shares with a combined net asset value equal to at least 75% of the total net asset value of the Fund may seek a court decree of dissolution or seek the appointment by the court of a liquidator for the Fund. |
| | Wind down and liquidation of the Fund shall occur as set forth in the Articles. |
| **Placement Agents** | The Investment Manager may engage third parties to solicit investors and act as placement agents for the Fund. Placement agents may charge a placement fee directly to investors solicited by any such placement agent, but such fees will not affect the subscription amount and will not |

be collected by or from the Fund.    The placement agent may be reimbursed for its expenses and indemnified by the Fund.

Furthermore, placement agents may be paid a portion of the Management Fee or Performance Allocation attributable to such investors solicited by them, thereby reducing the Management Fee or Performance Allocation received by the Investment Manager.    Accordingly, investors should recognize that a placement agent's or distributor's participation in this offering may be influenced by its interest in such current or future fees and compensation.    Investors should consider these potential conflicts of interest in making their investment decisions.

Each placement agent must comply with the legal requirements of the jurisdictions within which it offers and sells Shares.

**Certain Tax Considerations**

The Government of the Cayman Islands will not, under existing legislation, impose any income, corporate or capital gains tax, estate duty, inheritance tax, gift tax or withholding tax upon the Fund or the shareholders.    The Cayman Islands are not party to a double tax treaty with any country that is applicable to any payments made to or by the Fund.

The Fund has applied for and received an undertaking from the Governor-in-Cabinet of the Cayman Islands that, in accordance with section 6 of the Tax Concessions Law (2011 Revision) of the Cayman Islands, for a period of 20 years from July 10, 2012 (being the date of the undertaking), no law which is enacted in the Cayman Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Fund or its operations and, in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable (i) on or in respect of the shares, debentures or other obligations of the Fund or (ii) by way of the withholding in whole or in part of a payment of dividend or other distribution of income or capital by the Fund to its members or a payment of principal or interest or other sums due under a debenture or other obligation of the Fund.

The Investment Manager believes that the Fund will be treated as a non-U.S. corporation for U.S. federal income tax purposes.    The Fund does not intend to be subject to U.S. federal income tax on its capital gains from securities trading.    Dividends and certain interest received by the Fund may be subject to withholding at the source.    See "*Tax Considerations*."

**ERISA**

The Fund intends to limit investment in the Fund by "benefit plan investors" so that the assets of the Fund will not be considered "plan assets" for purposes of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***").    See "*ERISA Considerations*."

| | |
|---|---|
| **Voting** | Shares in the Fund are participating non-voting shares; provided that in the event the Partnership seeks the approval, vote or consent of the Fund with respect to any matter to which it would be entitled to vote as a Limited Partner of the Partnership under the Partnership Agreement, the Fund will: (i) submit such matter for the consent of the shareholders and (ii) shall cause the Fund to vote its Limited Partner interest proportionally for and against such matter in the same proportion that the shareholders voted for and against such matter. |
| **Variation of Terms** | The Board of Directors, with the consent of the Investment Manager, shall have the absolute discretion to agree with a shareholder to waive or modify the terms applicable to such shareholder's subscription for Shares (including those relating to Management Fees, the Performance Allocation, transparency and redemptions) without obtaining the consent of any other shareholder; provided that such waiver or modification does not amount to a variation of the rights attaching to the Shares of such other shareholders.  The Fund generally grants waivers of the Management Fees and Performance Allocation to the Affiliated Investors. |

## RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST

*Investment in the Fund, and in turn, the Partnership, is speculative and involves certain risks. There can be no assurance that the Partnership's investment objective will be achieved, or that an investor will receive a return of its Capital. Certain of these risks are summarized below. The Fund may not be suitable for all investors, and is intended for sophisticated investors who can accept the risks associated with its investments. Investors will not have recourse except with respect to the assets of the Fund. Prospective investors should consider, among others, the risk factors described in this section.*

***This discussion must be read in conjunction with the risk factors and potential conflicts of interest of the Partnership set forth in the Partnership Memorandum. The following is not meant to be an exhaustive listing of all potential risks associated with investing in the Fund. Investment-specific risks factors associated with the Partnership's investment strategy should be read in their entirety.***

*Illiquidity of Shares.* Shares are not transferable without the approval of the Board of Directors, and there will be no secondary market for Shares. Consequently, investors may not be able to dispose of their Shares prior to the liquidation of the Fund or as described in this Memorandum and the Partnership Memorandum, and may receive securities rather than cash in exchange for their Shares.

*Side Letters.* The Board of Directors may from time to time, with the consent of the Partnership, enter into letter agreements or other similar agreements (collectively, "***Side Letters***") with one or more investors which provide such investor(s) with additional and/or different rights than such investor(s) have pursuant to this Memorandum or the Partnership Memorandum. As a result of such Side Letters, certain investors may receive additional benefits (including, but not limited to, reduced fee/allocation obligations and/or expanded informational rights) which other investors will not receive. The Fund is not be required to notify any or all of the other investors of any such Side Letters or any of the rights and/or terms or provisions thereof, nor will the Fund be required to offer such additional and/or different rights and/or terms to any or all of the other investors. The Fund may enter into such Side Letters with any party as the Board of Directors may determine in its discretion at any time. The other investors will have no recourse against the Fund, the Board of Directors and/or any of their affiliates in the event that certain investors receive additional and/or different rights and/or terms as a result of such Side Letters.

*Authority.* Investors in the Fund have no right or power to take part in the management of the Fund. The Board of Directors control the Fund and the General Partner controls the Partnership. The Investment Manager is responsible for all investment decisions of the Partnership.

*Absence of Regulatory Oversight.* The Fund is not registered under the Cayman Islands Mutual Funds Law (as amended). Neither the Cayman Islands Monetary Authority nor any other governmental authority in the Cayman Islands has commented on or approved the terms or merits of this Memorandum. There is no financial obligation or compensation scheme imposed on or by the government of the Cayman Islands in favor of or available to the investors in the Fund.

*Investment Judgment; Market Risk.* The profitability of a significant portion of the Fund's investment program depends to a great extent upon correctly assessing the future course of the price movements of securities and other investments. There can be no assurance that the Investment Manager will be able to predict accurately these price movements. With respect to the investment strategy utilized by the Fund, there is always some, and occasionally a significant, degree of market risk.

*Performance Allocation.*   The Performance Allocation made to the Investment Manager may create an incentive for the Investment Manager to make investments that are riskier or more speculative than would be the case in the absence of such Performance Allocation.

*Redemption Restrictions.*   There are severe restrictions on redemptions from the Fund (which may be settled in securities rather than cash) and on transfers of Shares.   Because of the restrictions on redemptions, an investment in the Fund is a relatively illiquid investment and involves a high degree of risk.   There is no independent market for the purchase or sale of Shares and none is expected to develop. Shareholders must represent that they are purchasing Shares for investment.   A subscription for Shares should be considered only by persons financially able to maintain their investment and who can accept a loss of all of their investment.

*No Distributions.*   Since the Fund does not generally intend to pay distributions, an investment in the Fund is not suitable for investors seeking current distributions of income.   Moreover, an investor is required to report and pay taxes on its allocable share of income from the Fund, even though no cash is distributed by the Fund.

*In-Kind Distributions*.   The Partnership Agreement authorizes the General Partner to make distributions in kind of securities in lieu of or in addition to cash.   In the event the General Partner makes distributions of securities in kind, such securities could be illiquid or subject to legal, contractual and other restrictions on transfer.

*Diversification.*   Since the Partnership's portfolio will not necessarily be widely diversified, the investment portfolio of the Partnership (and thus the Fund) may be subject to more rapid changes in value than would be the case if the Partnership were required to maintain a wide diversification among companies, securities and types of securities.

*Valuations.*   From time to time, certain situations affecting the valuation of the Partnership's (and thus the Fund's) investments (such as limited liquidity, unavailability or unreliability of third-party pricing information and acts or omissions of service providers to the Partnership) could have an impact on the net asset value of the Fund, particularly if prior judgments as to the appropriate valuation of an investment should later prove to be incorrect after a net asset value-related calculation or transaction is completed.   The Fund is not required to make retroactive adjustments to prior subscription or redemption transactions or Management Fees or Performance Allocations based on subsequent valuation data.

*Contagion*.   The Fund has the power to issue Shares in different series.   The Articles provide for the manner in which the liabilities are to be attributed across the various series (liabilities are to be attributed to the specific series in respect of which the liability was incurred).   However, the Fund is a single legal entity and there is no limited recourse protection for any series.   Accordingly, all of the assets of the Fund will be available to meet all of its liabilities regardless of the series to which such assets or liabilities are attributable.   In practice, cross-series liability is only expected to arise where liabilities referable to one series are in excess of the assets referable to such series and it is unable to meet all liabilities attributed to it.   In such a case, the assets of the Fund attributable to other series may be applied to cover such liability excess and the value of the contributing classes or series will be reduced as a result.

*Handling of mail*.   Mail addressed to the Fund and received at its registered office will be forwarded unopened to the Investment Manager to be dealt with.   None of the Fund, its Directors,

officers, advisors or service providers (including the organization which provides registered office services in the Cayman Islands) will bear any responsibility for any delay howsoever caused in mail reaching the Investment Manager. In particular the Directors will only receive, open or deal directly with mail addressed to them personally (as opposed to mail which is addressed to just the Fund).

*Recent Developments in the Financial Services Industry*. Recent developments in the U.S. financial markets illustrate that the current environment is one of extraordinary and possibly unprecedented uncertainty for the financial services industry. In July of 2010, the Dodd-Frank Financial Reform Act was passed which imposes many new requirements and restrictions on the financial services industry that may likely affect the business, operations and performance of hedge funds, such as increased reporting requirements, limitations on certain trading activity and regulatory oversight by different agencies, such as the newly created Financial Stability Oversight Counsel. The implications of the passage of the Dodd-Frank Financial Reform Act for the hedge fund industry as a whole still remain somewhat unclear. The hedge fund industry may continue to be adversely affected by the recent developments in the financial markets in the U.S. and abroad, and any future legal, regulatory or governmental action and developments in such financial markets and the broader U.S. economy could have an adverse effect on the Fund's business, operations and performance.

In view of the foregoing considerations, an investment in Shares is suitable only for investors who are capable of bearing the relevant investment risks.

## Tax Related Risks

*Uncertainty and Complexity of Tax Treatment*. The tax aspects of an investment in the Fund are complicated and complex and, in many cases, uncertain. Statutory provisions and administrative regulations have been interpreted inconsistently by the courts. Additionally, some statutory provisions remain to be interpreted by administrative regulations. Investors will thus be subject to the risk caused by the uncertainty of the tax consequences with respect to an investment in the Fund. Each prospective investor should have the tax aspects of an investment in the Fund reviewed by professional advisors familiar with such investor's personal tax situation and with the tax laws and regulations applicable to the investor and private investment vehicles. Prospective investors are strongly urged to review the discussion below under "*Tax Considerations*" and "*ERISA Considerations*" for a more complete discussion of certain of the tax risks inherent in the acquisition of Shares and to consult their own independent tax advisors.

*Risk of Adverse Determination*. There can be no assurance that the conclusions set forth in this Memorandum will not be challenged successfully by the Internal Revenue Service (the "***Service***") or other applicable taxing authority, or significantly modified by new legislation, changes in a taxing authority's positions or court decisions. The Fund has not applied for, nor does it expect to apply for, any advance rulings from the Service with respect to any of the U.S. federal income tax consequences described in this Memorandum. No representation or warranty of any kind is made by the Investment Manager with respect to the U.S. federal income tax consequences relating to an investment in the Fund. The Fund may take positions with respect to certain tax issues which depend on legal conclusions not yet resolved by the courts. Should any such positions be successfully challenged by the Service or other applicable taxing authority, there could be a materially adverse effect on the Fund.

*Tax Considerations Taken into Account*. The Fund will attempt to minimize the tax burden of the Fund over the long-term. However, the Investment Manager will not overlook short-term trading opportunities. Therefore, shareholders should not expect that the Fund will make tax-efficiency a

priority.  However, the Investment Manager may take tax considerations into account in determining when the Fund's investments should be sold or otherwise disposed of, and may assume certain market risk and incur certain expenses in this regard to achieve favorable tax treatment of a transaction.

*Tax-Exempt Entities*.  Certain prospective investors that are tax-exempt for U.S. income tax purposes may be subject to U.S. federal and state laws, rules and regulations that regulate their participation in the Fund, or their engaging directly or indirectly through an investment in the Fund, in certain investment strategies that the Partnership may utilize from time-to-time (*e.g.,* short-sales of securities and the use of leverage, the purchase and sale of options and limited diversification).  While the Fund believes its investment program is generally appropriate for U.S. tax-exempt investors for which an investment in the Fund would otherwise be suitable, each type of tax-exempt organization may be subject to different laws, rules and regulations, and prospective investors should consult with their own advisers as to the advisability and tax consequences of an investment in the Fund.  Investments in the Fund by entities subject to ERISA, and other tax-exempt entities, require special consideration. Trustees or administrators of such entities are urged to review carefully the matters discussed in this Memorandum.

*Non-U.S. Taxation*.  With respect to certain countries, there is a possibility of expropriation, confiscatory taxation, imposition of withholding or other taxes on dividends, interest, capital gains or other income, limitations on the removal of funds or other assets of the Fund, political or social instability or diplomatic developments that could affect investments in those countries.  An issuer of securities may be domiciled in a country other than the country in whose currency the instrument is denominated. The values and relative yields of investments in the securities markets of different countries, and their associated risks, are expected to change independently of each other.

*Tax Changes*.  Investors will be subject to the risk that changes to the tax law may adversely affect the federal income tax consequences of their investment in the Fund.  Changes in existing tax laws or regulations and their interpretation may be enacted after the date of this Memorandum, possibly with retroactive effect, and could alter the income tax consequences of an investment in the Fund. Certain provisions of the Internal Revenue Code of 1986, as amended (the "*Code*"), may be further amended or interpreted in a manner adverse to the Fund, in which event any benefits derived from an investment in the Fund may be adversely affected.  In addition, significant legislative and budgetary proposals affecting tax laws have been made by the legislative and executive branches of the U.S. federal government.  The likelihood of enactment of any such proposals, or any similar proposals, into law is uncertain.  The enactment of any such proposals, including subsequent proposals, into law could have material adverse effects on the Fund and/or its shareholders.  Enactment of such legislation, or similar legislation, could require significant restructuring of the Fund in order to mitigate such effects.

***The foregoing is not intended to be an exhaustive analysis or listing of the tax risks associated with an investment in the Fund.  Many of the relevant tax considerations will vary depending on a prospective shareholder's individual circumstances.  The tax aspects associated with such an investment are complex and complicated and are subject to a variety of interpretations.  Prospective investors are strongly urged to review the discussions below under "Tax Considerations" and "ERISA Considerations" for a more complete discussion of certain of the tax risks inherent in the acquisition of Shares, and to seek and rely upon the advice of their own tax advisor who is qualified to discuss the foregoing and other possible tax risks.***

In view of the foregoing considerations, an investment in Shares is suitable only for investors who are capable of bearing the relevant investment risks.

**Potential Conflicts of Interest**

*No Independent Directors.*   The Fund's Board of Directors does not currently consist of any directors that are not affiliated with the Investment Manager, and thus the Fund's management, as well as the investment decisions at the Partnership level, are effectively controlled by the Investment Manager or its affiliates.   However, the Fund may establish an Advisory Committee with respect to matters in which it seeks to resolve certain conflicts of interest that may arise.   See "*Management—Advisory Committee*" in the Partnership Memorandum.

*No Separate Counsel.*   Akin Gump Strauss Hauer & Feld LLP ("***Akin Gump***") serves as counsel to the Fund, the Partnership, the Investment Manager, the General Partner and certain of their affiliates (the "***Clients***") in connection with the operation of the Fund and certain other Clients, the offering of Shares as well as certain other matters for which the Clients may engage Akin Gump from time to time. Akin Gump disclaims any obligation to verify the Clients' compliance with their obligations either under applicable law or the governing documents of the Fund.   In acting as counsel to the Clients, Akin Gump has not represented and will not represent any shareholders nor does it purport to represent their interests.   No independent counsel has been retained to represent the shareholders.   In assisting in the preparation of the Partnership Memorandum and this Memorandum (as well as any supplements thereto), Akin Gump has relied on information provided by the Fund, the Partnership, the Investment Manager and the General Partner and certain of the Fund's other service providers (including, without limitation, the biographical data of key investment personnel, summaries of market conditions, the planned investment strategy of the Fund and the performance of the Fund, its investments or any predecessor Fund) without verification and does not express a view as to whether such information is accurate or complete.

Maples and Calder, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, acts as Cayman Islands legal counsel to the Fund.   In connection with the Fund's offering of Shares and subsequent advice to the Fund, Maples and Calder will not be representing shareholders.   No independent legal counsel has been retained to represent the shareholders.   Maples and Calder's representation of the Fund is limited to specific matters as to which it has been consulted by the Fund. There may exist other matters that could have a bearing on the Fund as to which Maples and Calder has not been consulted.   In addition, Maples and Calder does not undertake to monitor compliance by the Investment Manager and its affiliates with the investment program, valuation procedures and other guidelines set forth herein, nor does Maples and Calder monitor ongoing compliance with applicable laws.   In connection with the preparation of this Memorandum, Maples and Calder's responsibility is limited to matters of Cayman Islands law and it does not accept responsibility in relation to any other matters referred to or disclosed in this Memorandum. In the course of advising the Fund, there are times when the interests of shareholders may differ from those of the Fund.   Maples and Calder does not represent the shareholders' interests in resolving these issues.   In reviewing this Memorandum, Maples and Calder has relied upon information furnished to it by the Fund and has not investigated or verified the accuracy and completeness of information set forth herein concerning the Fund.

*The Partnership Memorandum contains further disclosures concerning potential conflicts of interests. Such disclosures are incorporated herein by reference and should be read in their entirety prior to making a decision to invest in the Fund.*

*In view of the foregoing considerations, an investment in Shares is only suitable for investors who are capable of bearing the relevant risks and who understand the potential conflicts of interest.*

# SHARES OF THE FUND

## The Fund's Share Capital

The Fund has an authorized share capital of U.S.$50,000 divided into 100 management shares ("***Management Shares***") of a par value of U.S.$1.00 each and 4,990,000 participating non-voting shares (the "***Shares***") of a par value of U.S.$0.01. The Directors may by resolution divide the Shares into separate series (each, a "***Series***") which may be subject to different rights, restrictions, preferences, privileges and payment obligations as between the different Series and further into separate sub-series (each, a "***Sub-Series***") within such Series (for example, a Sub-Series of Shares which will participate in Restricted New Issues and a Sub-Series of Shares which will not participate in such Restricted New Issues). The different Series and Sub-Series thereof shall be established and designated, and the variations in the relative rights and preferences as between the different Series and Sub-Series thereof shall be fixed and determined by the Board of Directors. Sub-Series of Shares are issued for the purposes, among others, of accounting for any profits and losses attributable to each individual shareholder and of permitting the Performance Allocation to be calculated separately to reflect different returns achieved as a result of subscriptions received at different times.

The Fund previously issued Series A Shares and currently offers Series B Shares, Series C Shares and Series D Shares, all of which generally have identical rights and privileges except for purposes of calculating Management Fees and redemption rights. The Fund is offering Series B Shares, Series C Shares and Series D Shares pursuant to this Memorandum. Certain terms that specifically apply to Series A Shares are set forth in a Supplement to this Memorandum.

Each separate Sub-Series of Shares is identified by the investor to whom it was issued and its date of issue. Shares are issued to shareholders in Sub-Series at $1,000 per Share. Immediately following the close of any fiscal year in which a Performance Allocation is charged at the Partnership level with respect to a Sub-Series of Shares of a Series, each such Sub-Series of Shares may be compulsorily redeemed and the proceeds immediately applied to the subscription for an earlier Sub-Series of Shares of such Series; provided that such earlier Sub-Series of Shares has also been assessed as having a Performance Allocation payable at the Partnership level.

The Management Shares will carry all the voting rights but will have no right to participate in the assets of the Fund (other than to a return of the par value on a winding up). The Management Shares will be held by the Investment Manager or an affiliate, and will be voted in accordance with the instructions of the Investment Manager.

The Articles provide that, subject to the Companies Law (2013 Revision) of the Cayman Islands and the other provisions of the Articles, all or any of the class rights or other terms of offer, whether set out in this Memorandum, the Subscription Documents or otherwise (including any representations, warranties or other disclosure relating to the offer or holding of Shares) (collectively referred to as "***Share Rights***"), for the time being applicable to any class or Series of Shares in issue (unless otherwise provided by the terms of issue of those Shares) may (whether or not the Fund is being wound up) be varied without the consent of the holders of the issued Shares of that class or Series where such variation is considered by the Directors not to have a material adverse effect upon such holders' Share Rights; otherwise, any such variation shall be made only with the prior consent in writing of the holders of not less than two-thirds by net asset value of such Shares, or with the sanction of a resolution passed by a majority of at least two-thirds of the votes cast in person or by proxy at a separate meeting of the holders of such Shares. For the avoidance of doubt, the Directors reserve the right, notwithstanding that any

such variation might not have a material adverse effect, to obtain consent from the holders of such Shares. Each subscriber for Shares will be required to agree that the terms of offer set out in the Subscription Documents and the rights attaching to the Shares can be varied in accordance with the provisions of the Articles.

The Articles further provide that, in relation to any class or Series consent required pursuant to the "Variation of Share Rights" Article, the Directors in their discretion may invoke the following procedure (the "*Negative Consent Procedure*"). The Directors shall provide written notice in respect of the proposed variation (the "*Proposal*") to the shareholders of the affected class or Series and shall specify a deadline (the "*Redemption Request Date*"), which shall be no earlier than 30 days after the date of giving such notice, by which date such shareholders may submit a written request for redemption of some or all of their Shares of the affected class and/or Series on the Redemption Date (the "*Specified Redemption Date*") specified by the Directors in such notice. The terms of the Proposal shall be such that its specified effective date (the "*Effective Date*") shall not be on or prior to the Specified Redemption Date. Such notice shall further provide that the holders of any Shares in respect of which a request for redemption has not been received by the Redemption Request Date (the "*Affected Shares*") shall, in the absence of express written refusal to consent, be deemed to have consented in writing to the Proposal (such Affected Shares being the "*Negative Consent Shares*"). In the event that the Negative Consent Procedure is followed, only the Affected Shares shall be considered for the purposes of determining whether the written consent majority has been obtained under the "Variation of Share Rights" Article with the holders of the Negative Consent Shares being deemed to have submitted a written consent in favor of the Proposal on the Effective Date.

The rights conferred upon the holders of the Shares of any class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Shares, be deemed to be materially adversely varied or abrogated by, inter alia, the creation, allotment or issue of further Shares ranking *pari passu* with or subsequent to them, the redemption or purchase of any Shares or by the passing of any Directors' resolution to change or vary any investment objective, investment technique and strategy and/or investment policy in relation to the Shares or any modification of the fees payable to any service provider to the Fund.

In general, each Share will participate in the Fund's profits and losses attributable to the relevant class in the same manner, except that the Performance Allocation to be charged (at the Partnership level) to Shares of a Sub-Series held by each shareholder will be calculated separately on the basis of the performance of such Shares of a Sub-Series. The Performance Allocation is calculated and charged at the Partnership level through the use of separate capital sub-accounts within the Fund's capital account in the Partnership that correspond to the Shares of a Sub-Series of each shareholder in the Fund. Subject to the foregoing, each of the Shares will participate ratably with all other outstanding Shares in the Fund's assets and earnings and will have the redemption rights discussed above.

The Directors may impose such restrictions as they think necessary for the purpose of ensuring that no Shares in the Fund are held by (i) any person in breach of the laws or requirements of any country or governmental authority or (ii) any person or persons in circumstances which, in the opinion of the Directors, might result in the Fund incurring any liability of taxation or suffering any other pecuniary disadvantage which the Fund might not otherwise have incurred or suffered. A person who becomes aware that he or she is holding or owning Shares in breach of any restriction mentioned in the Articles shall promptly either deliver to the Fund a written request for redemption of his or her Shares or deliver to the Fund a written request to transfer the same to a person who would not thereby be a non-qualified person.

**Management Shares**

General meetings of the holders of Management Shares may be held to vote on various matters including to elect the Directors, to select the Fund's auditors and to attend to such other business as may properly be placed before the meeting. At any such general meeting, the favorable vote of a majority of the Management Shares present generally is sufficient for the approval of any action, unless such action is a matter requiring a special resolution, in which case two-thirds of the Management Shares shall be required, in each case as further detailed in the Articles.

**Registration of Management Shares and Shares and Share Certificates**

Management Shares and Shares of the Fund are issued only in registered form. A current register of the names and addresses of the Fund's shareholders and their shareholdings is maintained at the office of the Administrator. No share certificates have been or will be issued.

**Other Rights and Liabilities**

Under the terms of the Articles, the liability of the shareholders of the Fund is limited, and shareholders will not be liable for any debt, obligation or default of the Fund in excess of the amounts unpaid on their Shares.

The Fund and the Investment Manager may agree with certain investors to a fee structure, redemption rights or other terms that differ from the fee structure, redemption rights and other terms that are set forth in this Memorandum. Such different rights may, subject to applicable law, be effected by issuance of a separate Series of Shares or any other permissible means. Such rights may not be offered to all investors.

**Calculation of Fund Net Asset Value**

The Directors have delegated to the Administrator the calculation of the net asset value of the Fund and the net asset value per Share of each Series and, if applicable, Sub-Series, subject to the overall supervision and direction of the Investment Manager and the Board of Directors. Net asset valuations of the Fund and each Series of Shares will be calculated as of the close of business on the last day of each fiscal period and any other date selected by the Board of Directors, in consultation with the Investment Manager, no less than quarterly, which shall, to avoid doubt, include each Redemption Date (each, a "*Valuation Date*").

The Fund's assets are valued based on the value of the Partnership's assets. The net asset value of the Fund is determined by taking the amount of all cash and credit balances plus the market value of all securities, commodities and other assets comprising the Fund's assets (including any interest and dividends receivable, but excluding any subscription amounts committed to the Fund from time to time to the extent such amounts are not held by or on behalf of the Fund), as calculated by the Administrator, minus all debit balances and other liabilities and obligations of the Fund. Net asset value in respect of any Series or Sub-Series of Shares is calculated by dividing the value of the account relating to that Series or Sub-Series of Shares by the number of Shares of that Series in issue. For the sole purpose of determining the number of Shares of a Series in issue, Shares of that Series which are to be redeemed on the relevant Valuation Date shall be deemed to be in issue until and including the close of business on the applicable Valuation Date. The principal amounts of the investments, cash balances and other assets of the Fund, the value of which is expressed in a currency other than that of the United States,

shall be valued after taking into account the market rate or rates of exchange in force on the Valuation Date in question.

# TAX CONSIDERATIONS

**General**

The following is a general discussion of certain of the anticipated U.S. federal and Cayman Islands income tax considerations applicable to the Fund's activities and those relevant to non-U.S. persons (as defined below) and U.S. tax-exempt entities arising from the purchase, ownership and disposition of Shares. Prospective investors should consult their own tax advisors to determine the application and effect of tax laws with respect to their own particular circumstances. This discussion is based on laws and regulations currently in effect, which may change or be subject to differing interpretations (possibly on a retroactive basis). The Fund does not intend to seek a ruling from the Service, or any similar state or local authority, with respect to any of the tax issues affecting the Fund.

In view of the number of different jurisdictions where local laws may apply to shareholders, the discussion below does not address the local tax consequences to prospective investors of the purchase, ownership and disposition of Shares. Prospective investors are urged to consult their own tax advisors in determining the possible tax, exchange control or other consequences to them under the laws of the jurisdictions of which they are citizens, residents or domiciliaries or in which they conduct business.

The summary assumes that no U.S. taxable investors will invest in the Fund and, therefore, does not address the U.S. tax consequences to such investors. Potential U.S. taxable investors should be aware that the Fund does not intend to provide information to any U.S. Person for purposes of such person qualifying to make an election to treat the Fund as a "qualifying electing fund" for U.S. federal income tax purposes. Accordingly, potential U.S. shareholders are urged to consult their tax advisors in this regard.

**United States Taxation Matters**

The Fund will be treated as a corporation for U.S. federal income tax purposes. For U.S. federal income tax purposes, the Partnership is expected to be treated as a partnership. The Fund and the Partnership will make any necessary entity classification elections for U.S. tax purposes consistent with such respective treatment. Because the Fund is organized under the laws of the Cayman Islands, it will be considered a non-U.S. person for purposes of U.S. tax laws. As such, the U.S. federal income tax treatment of the Fund will vary depending on whether the Fund derives income or gains that are effectively connected with the conduct of a trade or business in the United States. The Fund intends to structure its operations (including those conducted through the Partnership) in order to minimize to the extent consistent with its investment strategy the possibility that the Fund will be treated as being engaged in a U.S. trade or business for U.S. federal income tax purposes, although there can be no certainty that the Fund will be successful minimizing such a possibility. It is also intended that the Fund's affairs will be conducted such that no income realized by the Fund will be effectively connected with the conduct of a U.S. trade or business or otherwise subject to regular U.S. federal income taxation on a net basis.

Pursuant to a safe harbor in the Code, trading in securities or commodities on an organized commodities exchange for the Fund's own account (including through the Partnership) is not considered a U.S. trade or business. It is not certain whether this safe harbor would apply to the trading of physical commodities. Although no assurances can be given that the Service will not successfully assert an

alternative position, the Fund intends to take the position that the Partnership's trading of physical commodities is within the prescribed safe harbor and does not constitute a trade or business and as such the Fund anticipates generally that its income will not be subject to U.S. corporate income tax, except as described below. However, the Fund will be subject to a 30% U.S. withholding tax on its allocable share of certain types of the Partnership's non-effectively connected income. As described below, the types of income (to the extent not constituting effectively connected income) on which a U.S. withholding tax will be imposed generally consist of dividends, interest and certain types of investment income, but not capital gains derived from the sale of stock or other capital assets (unless such capital gains are derived from the sale of stock of a "United States Real Property Holding Company" within the meaning of Section 897 of the Code and certain other interests in real property).

In general, a non-U.S. partner, such as the Fund, that is a partner of a partnership, such as the Partnership, is subject to U.S. federal income taxation on a net basis on its allocable share of the partnership's "effectively connected income." The Fund's allocable share of the Partnership's income will constitute "effectively connected income," and thus will be subject to U.S. federal income taxation, to the extent such income is derived by the Partnership from a trade or business carried on in the United States by the Partnership. Although there can be no assurances, the Partnership does not itself expect to engage directly in activities that would constitute a U.S. trade or business.

If the Fund were treated as being engaged in a U.S. trade or business as a result of activities conducted by the Partnership, then all or a portion of the Fund's allocable share of the Partnership's income would be treated as effectively connected income subject to U.S. federal income tax on a net basis at corporate tax rates. In such a case, the Fund would be required to file a U.S. federal income tax return to report its share of such income and pay U.S. federal income tax at regular U.S. rates on this income. In addition, the Partnership would be required (and would be legally liable) to withhold and pay over to the Service on behalf of the Fund an amount equal to 35% percent of the Fund's share of the Partnership's effectively connected income. Any amount so withheld would be creditable against the Fund's ultimate U.S. federal income tax liability, and the Fund would be entitled to a refund to the extent that the amount withheld exceeded the Fund's U.S. federal income tax liability for the taxable year. Furthermore, in such event, the Fund's allocable share of any effectively connected income of the Partnership would also be subject to a 30% U.S. branch profits tax, and possibly could be subject to state and/or local taxation in the United States. Such taxation of the Fund's activities could have a material adverse effect on the Fund's returns. Prospective investors are advised to consult their tax advisors regarding the risk of the Fund being treated as engaged in a trade or business in the United States.

Because the Fund is organized under the laws of the Cayman Islands, it is considered a non-U.S. person for purposes of the U.S. tax laws. As a result, dividends received by the Fund through the Partnership from U.S. sources will be subjected to U.S. withholding tax at a 30% rate. U.S. source interest income received by the Fund through the Partnership generally will be exempt from U.S. federal income and withholding tax under the exemption for "portfolio interest" or under another statutory exemption. Interest on corporate obligations will not qualify as "portfolio interest" to a non-U.S. person that owns (directly and under certain constructive ownership rules) 10% or more of the total combined voting power of the corporation paying the interest, or, with respect to certain obligations issued after April 7, 1993, if and to the extent the interest is determined by reference to certain economic attributes of the debtor (or a person related thereto) or the underlying obligations are not in "registered form" for U.S. tax purposes. In addition, interest on U.S. bank deposits, certificates of deposit and certain obligations with maturities of 183 days or less (from original issuance) will not be subject to

32

withholding tax. Interest (including original issue discount) derived by the Fund or the Partnership from U.S. sources not qualifying as "portfolio interest" or not otherwise exempt under U.S. law will be subject to U.S. withholding tax at a rate of 30%. In addition, based on recent legislation, income from certain swaps directly or indirectly over certain stocks (e.g., U.S. stocks) are subject to U.S. withholding tax.

**Taxation of Non-U.S. shareholders**

For U.S. federal income tax purposes, a shareholder of the Fund who is a non-U.S. person will not be subject to U.S. federal income taxation on amounts paid by the Fund in respect of the Shares or gains recognized on the sale, exchange or redemption of Shares, provided that such income and gains are not considered to be effectively connected with the conduct of a trade or business by the shareholder in the United States. In limited circumstances, an individual shareholder who is present in the United States for 183 days or more during a taxable year may be subject to U.S. income tax at a flat rate of 30% on gains realized on a disposition of Shares in such year. Individual shareholders who at the time of their death are not citizens, former citizens or residents of the United States should not be subject, by reason of the ownership of Shares, to any U.S. federal gift or estate taxes.

For these purposes the term "***non-U.S. person***" means any person that is not a U.S. Person for U.S. federal income tax purposes. A "***U.S. Person***" means a citizen or resident of the United States, a partnership or corporation created or organized in the United States or under the laws of the United States or any state (other than a partnership that is not treated as a U.S. Person under any applicable Treasury Regulations), an estate whose income is includable in gross income for federal income tax purposes regardless of its source or a trust if a U.S. court is able to exercise primary supervision over the administration of the trust and one or more U.S. Persons have the authority to control all substantial decisions of the trust. In addition, to the extent provided in Treasury Regulations, certain trusts in existence on August 20, 1996, and treated as U.S. Persons prior to such date, which elect to continue to be treated as U.S. Persons will also be U.S. Persons for these purposes.

Special rules may apply in the case of non-U.S. persons that (i) conduct a trade or business in the United States or that have an office or fixed place of business in the United States, (ii) have a tax home in the United States, (iii) are former citizens or long-term residents of the United States or (iv) are controlled foreign corporations, passive foreign investment companies, foreign insurance companies that hold Shares in connection with their U.S. business or corporations which accumulate earnings to avoid U.S. federal income tax. Such persons are urged to consult their U.S. tax advisors before investing in the Fund.

In the case of Shares held in the United States by a custodian or nominee for a non-U.S. person, U.S. "backup" withholding taxes may apply to distributions in respect of Shares held by such shareholder unless such shareholder properly certifies as to its non-U.S. status or otherwise establishes an exemption from "backup" withholding. Back-up withholding is not an additional tax. Rather, the U.S. federal income tax liability of non-U.S. persons subject to back-up withholding will be reduced by the amount of tax withheld. If back-up withholding results in an overpayment of U.S. federal income taxes, a refund may be obtained, provided the required documents are filed with the Service.

**Taxation of U.S. Tax-Exempt shareholders**

In general, U.S. tax-exempt shareholders should not be subject to the tax on "unrelated business taxable income" ("***UBTI***"), as defined in Code section 512, in respect of income and gains from the

Shares.   In general, UBTI is the excess of gross income from any unrelated trade or business conducted by a U.S. tax-exempt entity over the deductions attributable to such trade or business, with certain modifications.   These modifications provide that UBTI generally does not include interest, dividends or gains from the sale of securities not held as either inventory or primarily for sale to customers in the ordinary course of business, except to the extent that any such item of income is deemed to constitute "unrelated debt-financed income" ("**UDFI**") within the meaning of Code section 514 and the Treasury Regulations.   Income that a U.S. tax-exempt shareholder derives from an investment in Shares should not give rise to UBTI under Code section 511, except to the extent that such entity's acquisition of Shares is financed with acquisition indebtedness within the meaning of Code section 514.   In addition to UBTI that may arise when a tax-exempt investor uses leverage to finance the acquisition of Shares, the United States Congress from time to time has considered legislation that could result in a tax-exempt investor realizing UBTI in respect of an investment in a foreign investment company that leverages its investments.

The Fund is expected to constitute a "passive foreign investment company" (a "**PFIC**") for U.S. federal income tax purposes.   Under the Treasury Regulations, a U.S. tax-exempt shareholder is not considered to be a shareholder in a PFIC, and thus will not be subject to the PFIC tax rules, except to the extent that a "dividend" from the PFIC would be taxable under subchapter F of the Code, for example, as UDFI.   Hence, under the Treasury Regulations, a U.S. tax-exempt shareholder would be subject to tax under the PFIC regime in respect of an excess distribution from, or any gain realized on the sale of the shares of, a PFIC only under limited circumstances.   Moreover, different rules may apply to certain types of tax-exempt entities, such as charitable remainder trusts.   Accordingly, potential U.S. tax-exempt investors are urged to consult their own tax advisors regarding the tax consequences of an investment in the Fund.

**Prospective U.S. tax-exempt investors are urged to consult their own tax advisors regarding the tax consequences of the purchase, ownership and disposition of the Shares.**

### Information Reporting Requirements and FATCA

Sections 1471 through 1474 of the Code, known as the U.S. Foreign Account Tax Compliance Act (together with any regulations, rules and other guidance implementing such Code sections and any applicable intergovernmental agreement ("**IGA**") and related statutes, regulations, rules and other guidance thereunder, "**FATCA**") impose a withholding tax of 30% on (i) certain U.S. source interest, dividends and other types of income, and (ii) the gross proceeds from the sale or disposition of certain assets of a type that can produce U.S. source interest and dividends, which are received by a foreign financial institution ("**FFI**"), unless such FFI enters into an agreement with the Service, and/or complies with an applicable IGA, to obtain certain information as to the identity of the direct and indirect owners of accounts in such institution.   In addition, a withholding tax may be imposed on payments to certain non-financial foreign entities which do not obtain and provide information as to their direct and indirect owners.   These rules generally apply to payments of U.S. source interest, dividends and certain other types of income from U.S. sources since July 1, 2014, and will apply to payments of gross proceeds from the sale or disposition of assets of a type that can produce U.S. source interest or dividends after December 31, 2016.

The Service has released temporary and final Treasury Regulations and other guidance that will be used in implementing FATCA, which contain a number of phase-in dates for FATCA compliance. In addition, the Cayman Islands has entered into a Model 1 IGA with the United States (the "**Cayman IGA**"), which came into force on April 14, 2014, and has issued the Tax Information Authority

(International Tax Compliance) (United States of America) Regulations 2014, as updated from time to time, and draft guidance notes thereunder. Additional guidance is forthcoming. In addition, the Cayman Islands have signed a similar inter-governmental agreement with the United Kingdom (the "**UK IGA**"). The UK IGA imposes similar requirements to the Cayman IGA, so that the Fund will be required to identify accounts held directly or indirectly by "Specified United Kingdom Persons" and report information on such Specified United Kingdom Persons to the Cayman Islands authorities, which will exchange such information annually with HM Revenue & Customs ("**HMRC**"), the United Kingdom tax authority. It is anticipated that further inter-governmental agreements ("**future IGAs**") similar to the Cayman IGA and the UK IGA may be entered into with other third countries by the Cayman Islands Government to introduce similar regimes for reporting to such third countries fiscal authorities ("**foreign fiscal authorities**").

The Fund is likely to be considered an FFI for FATCA purposes. In order to avoid U.S. withholding tax under FATCA on amounts paid to the Fund, the Fund is generally required to register with the Service and to comply with the Cayman IGA and any Cayman Islands legislation or guidance implementing the Cayman IGA. The Fund intends to register with the Service and, therefore, generally does not expect to become subject to U.S. withholding under FATCA. The Fund also expects that it will be required to identify and report on certain direct and indirect U.S. owners or investors in order to comply with the Cayman IGA in the future. An investor will be required to provide to the Fund information which identifies its direct and indirect ownership. Any such information provided to the Fund will ultimately be shared with the Cayman Islands government and transmitted to the Service and, potentially, certain other authorities and withholding agents, as applicable.

Further, it is possible that a lower-tier non-U.S. entity in which the Partnership invests also may be considered an FFI. The Fund intends to assist lower-tier non-U.S. entities in which the Partnership invests in complying with FATCA, but the Fund can give no assurance that it will be able to provide such assistance or that such an entity will be able to avoid the imposition of this withholding tax on it.

By investing (or continuing to invest) in the Fund (and indirectly investing in the Partnership), investors will be deemed to have acknowledged, and to have given their consent to, the following:

(i)     the Fund (or its agent) may be required to disclose to the Cayman Islands authorities and withholding agents certain information (which could otherwise be deemed to be confidential) in relation to the investor or its direct or indirect owners, including the investor's name, address, tax identification number (if any), social security number (if any) and certain additional information or documentation relating to the investor's investment or identity, and the investor may be required to provide any such information or documentation;

(ii)    the Cayman Islands authorities may be required to automatically exchange information with, among other authorities, the Service, and to provide additional information to such authorities should they have further inquiries, and the Fund (or its agent) may be required to disclose certain information (including information that could otherwise be deemed to be confidential) when registering with such authorities and in response to a request by any such authority for further information;

(iii)   in the event an investor's failure to comply with any FATCA related reporting requirements gives rise to any withholding tax, the Fund reserves the right to ensure that any such withholding tax and any related cost, interest, penalties and other losses or

liabilities suffered by the Fund, the Partnership, the General Partner, the Investment Manager, the Administrator or any other investor, or any agent, delegate, employee, director, officer or affiliate of any of the foregoing persons, arising from such investor's failure to provide information to the Fund, is economically borne by such investor;

(iv)     in the event an investor does not provide the information and/or documentation necessary for the Fund's (or the Partnership's) satisfaction of its FATCA related reporting requirements, whether or not that actually leads to compliance failures by the Fund, or a risk of the Fund (or the Partnership) or its investors being subject to withholding tax under the relevant FATCA regime, the Fund reserves the right to take any action and/or pursue all remedies at its disposal to mitigate the consequences of the investor's failure to comply with the requirements described above, including compulsory redemption of such investor; and

(v)      no investor affected by any such action or remedy shall have any claim against the Fund, the Partnership, the General Partner, the Investment Manager, the Administrator (or their agents, delegates, employees, directors, officers or affiliates) for any form of damages or liability as a result of actions taken or remedies pursued by or on behalf of the Fund in order to comply with FATCA.

***Investors should consult their tax advisors as to the withholding, filing and information reporting requirements that may be imposed on them in respect of their ownership of Interests of the Fund.***

**Investor Tax Filings and Record Retention**

The United States Treasury Department has adopted regulations designed to assist the Service in identifying abusive tax shelter transactions.   In general, the regulations require investors in specified transactions (including certain shareholders in foreign corporations and partners in partnerships that engage in such transactions) to satisfy certain special tax filing and record retention requirements. Significant monetary penalties may be imposed (in addition to penalties that generally may be applicable as a result of a failure to comply with applicable Treasury regulations) for failure to comply with these tax filing and record retention rules.

The regulations are broad in scope and it is conceivable that the Fund or the Partnership may enter into transactions that will subject the Fund and certain investors in the Fund to the special tax filing and record retention rules.   The Fund and the Investment Manager intend to use reasonable efforts to obtain and provide information to investors necessary to enable investors to satisfy any tax filing and record retention requirements that may arise as a result of any transactions entered into by the Fund or the Partnership.

**Transfer Reporting Requirements**

A U.S. Person (including in certain circumstances a U.S. tax-exempt entity) that transfers property (including cash) to the Fund in exchange for Shares will be required to file a Form 926 or a similar form with the Service.   In the event a U.S. shareholder fails to file any required form, such holder could be subject to a penalty of up to 10% of the value of the property transferred, subject to a $100,000 limit so long as the failure was not due to intentional disregard.

**Cayman Islands Taxation**

The Government of the Cayman Islands will not, under existing legislation, impose any income, corporate or capital gains tax, estate duty, inheritance tax, gift tax or withholding tax upon the Fund or its shareholders. The Cayman Islands are not party to any double taxation treaties.

The Fund has applied for and expects to receive an undertaking from the Governor-in-Cabinet of the Cayman Islands that, in accordance with section 6 of the Tax Concessions Law (2011 Revision) of the Cayman Islands, for a period of 20 years from the date of the undertaking, no law which is enacted in the Cayman Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Fund or its operations and, in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable (i) on or in respect of the Shares, debentures or other obligations of the Fund or (ii) by way of the withholding, in whole or in part, of a payment of dividend or other distribution of income or capital by the Fund to its shareholders or a payment of principal or interest or other sums due under a debenture or other obligation of the Fund.

**European Union Savings Directive**

Dividends and other distributions of income made by the Administrator on behalf of the Fund, together with payment of the proceeds of sale and/or redemption of Shares ("***Payments***") are not subject to any reporting or withholding requirements that may arise as a result of the applicable legislation which implements the EU Council Directive 2003/48/EC of June 3, 2003 on taxation of savings income in the form of interest payments (the "***EUSD***") as the Administrator is not located in the European Union (or a country that has implemented measures similar or equivalent to the EUSD).

If an investor in the Fund is based in the European Union or certain states which have similar or equivalent measures to the EUSD (including Switzerland, Channel Islands, Monaco and the Cayman Islands) and is making investments on behalf of other underlying investors who are individuals or certain unincorporated entities resident in the European Union or certain of the states which have similar equivalent measures to the EUSD, then the provisions of the EUSD or similar or equivalent measures may apply. In such circumstances such an investor may become a "paying agent" and may be required to obtain all relevant documentation relating to its underlying investors and make returns to the appropriate tax authorities or withhold tax at applicable rates from any redemption proceeds in accordance with the applicable legislation that implements the EUSD or similar or equivalent measures.

Such investors to whom the EUSD may be relevant should also be aware that on 24 March 2014, the Council of the European Union adopted a directive amending the EUSD to extend its scope to cover additional types of savings income and products that generate interest or equivalent income (including certain types of life insurance contracts) as well as a broader range of investment funds. In addition, a "look through" procedure will be established to limit the opportunities for circumventing the application of the EUSD by the use of certain intermediaries. Member States of the European Union have until 1 January 2016 to adopt domestic legislation to give effect to these changes, which must be applied from 1 January 2017. It is not yet clear as to whether those states which have similar or equivalent measures to the EUSD (including Switzerland, Channel Islands, Monaco and the Cayman Islands) will adopt such changes and if so by what date.

**Future Changes in Applicable Law**

The foregoing description of United States and Cayman Islands income tax consequences of an investment in, and the operations of, the Fund are based on laws and regulations that are subject to change through legislative, judicial or administrative action.   Other legislation could be enacted that would subject the Fund to income taxes or subject shareholders to increased income taxes.

**Other Taxation**

A portion of the Fund's investments may be made in non-U.S. jurisdictions.   With respect to certain countries, there is a possibility of expropriation, confiscatory taxation, imposition of withholding or other taxes on dividends, interest, capital gains or other income, limitations on the removal of funds or other assets of the Fund, political or social instability or diplomatic developments that could affect investments in those countries.   An issuer of securities may be domiciled in a country other than the country in whose currency the instrument is denominated.   The values and relative yields of investments in the securities markets of different countries, and their associated risks, are expected to change independently of each other.

**Future Tax Legislation, Necessity of Obtaining Professional Advice**

Future amendments to the Code, other legislation, new or amended Treasury Regulations, administrative rulings or decisions by the Internal Revenue Service or judicial decisions may adversely affect the federal income tax aspects of an investment in the Fund, with or without advance notice, retroactively or prospectively.   The foregoing analysis is not intended as a substitute for careful tax planning.   The tax matters relating to the Fund are complex and are subject to varying interpretations. There can be no assurance that the Internal Revenue Service will agree with each position taken by the Fund with respect to the tax treatment of Fund items and transactions.   Moreover, the effect of existing income tax laws and of proposed changes in income tax laws on shareholders will vary with the particular circumstances of each shareholder and, in reviewing this Memorandum and any exhibits hereto, these matters should be considered.

It is the responsibility of all persons interested in purchasing Shares to inform themselves as to any tax consequences from their investing in the Fund and the Fund's operations or management, as well as any foreign exchange or other fiscal or legal restrictions, which are relevant to their particular circumstances in connection with the acquisition, holding or disposition of Shares.   Accordingly, each prospective shareholder should therefore seek their own separate tax advice in relation to their holding of Shares.   In no event will the Fund, the Partnership, the Principals or the Investment Manager, or their affiliates, counsel or other professional advisers, be liable to any shareholder for any tax consequences of an investment in the Fund, whether or not such consequences are as described above.

*The foregoing is a summary of the important tax rules and considerations affecting the shareholders, the Fund and the Fund's proposed operations.   This summary does not purport to be a complete analysis of all relevant tax rules and considerations, which will vary with the particular circumstances of each shareholder, nor does it purport to be a complete listing of all potential tax risks inherent in purchasing or holding Shares.   Each prospective investor in the Fund is urged to consult its own tax advisor in order to understand fully the U.S. federal, state, local and any non-U.S. tax consequences of such an investment in its particular situation.*

**ERISA CONSIDERATIONS**

**CIRCULAR 230 NOTICE**

**The tax discussion contained in this Memorandum is not in the form of a covered opinion, within the meaning of Circular 230 issued by the United States Secretary of the Treasury. Thus, we are required to inform you that you cannot rely upon the summary contained in this Memorandum for the purpose of avoiding U.S. federal tax penalties. The following summary was written to support the promotion or marketing of the transactions or matters described in this Memorandum. Each prospective investor should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.**

**General**

Fiduciaries and other persons who are proposing to invest in Shares on behalf of retirement plans, IRAs and other employee benefit plans ("**Plans**") covered by ERISA or the Code must give appropriate consideration to, among other things, the role that an investment in the Fund plays in the Plan's portfolio, taking into consideration whether the investment is designed to reasonably further the Plan's purposes, the investment's risk and return factors, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the anticipated cash flow needs of the Plan, the projected return of the total portfolio relative to the Plan's objectives, the limited right of shareholders to redeem all or any part of their capital or to transfer their Shares and whether investment in the Fund constitutes a direct or indirect transaction with a party in interest (under ERISA) or a disqualified person (under the Code).

**Plan Asset Regulations and Benefit Plan Investors**

The United States Department of Labor ("**DOL**") has adopted regulations that treat the assets of certain pooled investment vehicles, such as the Fund, as "plan assets" for purposes of Title I of ERISA and Section 4975 of the Code ("**Plan Assets**"). Section 3(42) of ERISA defines the term "Plan Assets" to mean plan assets as defined by such regulations as the DOL may prescribe, except that under such regulations the assets of an entity shall not be treated as Plan Assets if, immediately after the most recent acquisition of an equity interest in the entity, less than twenty-five percent (25%) of the total value of each class of equity interest in the entity is held by "Benefit Plan Investors" (the "**significant participation test**"). For purposes of this determination, the value of any equity interest held by a person (other than a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person, shall be disregarded. An entity shall be considered to hold Plan Assets only to the extent of the percentage of the equity interest held by Benefit Plan Investors. The term "**Benefit Plan Investors**" means any employee benefit plan subject to part 4 of subtitle B of Title I of ERISA (*i.e.*, plans subject to the fiduciary provisions of ERISA), any plan to which the prohibited transaction provisions of Section 4975 of the Code apply (*e.g.*, IRAs) and any entity whose underlying assets include Plan Assets by reason of a plan's investment in such entity (a "**Plan Asset Entity**").

In order to prevent the assets of the Partnership from being considered Plan Assets under ERISA, it is the intention of the Partnership to monitor the investments in the Fund and prohibit the acquisition, redemption or transfer of any Shares by any investor, including a Benefit Plan Investor, unless, after

39

giving effect to such an acquisition, redemption or transfer, the total proportion of each class of equity interests of the Partnership owned by Benefit Plan Investors would be less 25% of the aggregate value of such class (determined, as described above, by excluding certain Shares held by the Investment Manager, other fiduciaries and affiliates).

Without limiting the generality of the foregoing, in order to limit equity participation in each class of equity interests of the Partnership by Benefit Plan Investors to less than 25%, the Partnership may require the compulsory redemption of Shares of any Series. Each shareholder that is an insurance company acting on behalf of its general account or a Plan Asset Entity will be required to represent and warrant as of the date it acquires Shares or equity interests of the Partnership the maximum percentage of such general account or Plan Asset Entity (as reasonably determined by such insurance company or Plan Asset Entity) that will constitute Plan Assets (the "***Maximum Percentage***") so such percentage can be calculated in determining the percentage of Plan Assets invested in the Partnership. Further, each such insurance company and Plan Asset Entity will be required to covenant that if, after its initial acquisition of Shares or equity interests of the Partnership, the Maximum Percentage is exceeded at any time, then such insurance company or Plan Asset Entity shall immediately notify the Investment Manager of that occurrence and shall, if and as directed by the Investment Manager, in a manner consistent with the restrictions on transfer set forth herein, redeem or dispose of some or all of the Shares held in its general account or Plan Asset Entity.

If the Partnership's assets were considered Plan Assets, then, under ERISA and the Code, the Investment Manager would be a fiduciary, and certain employees, partners and officers of the Investment Manager, as well as certain affiliates, would become "parties in interest" and "disqualified persons," with respect to the investing Plans, with the result that the rendering of services to certain related parties or the lending of money or other extensions of credit, or the sale, exchange or leasing of property by the Partnership or certain related parties, or the payment of certain fees, as well as certain other transactions, might be deemed to constitute prohibited transactions. Additionally, individual investment in equity interests of the Partnership by persons who are fiduciaries and/or parties-in-interest and disqualified persons to a Plan might be deemed to constitute prohibited transactions under such circumstances.

It is anticipated that investment in the Fund by Benefit Plan Investors may be "significant" for purposes of the DOL regulations. In such event, the underlying assets of the Fund would be deemed to constitute Plan Assets. As a general rule, if the assets of the Fund were regarded as Plan Assets of a Benefit Plan Investor, the Investment Manager would be deemed to be a fiduciary with respect to each Plan investing in the Fund. However, the Investment Manager believes that, given the limited purpose and role of the Fund and the requirement that the Investment Manager follow the directions of the fiduciaries of each Benefit Plan Investor investing in the Fund, as set forth in each such investor's Subscription Documents, with respect to the investment by the Fund in the Partnership, neither the Investment Manager nor any other entity providing services to the Fund would be exercising any discretionary authority or control with respect to the Fund. Accordingly, the Investment Manager believes that neither the Investment Manager nor any other entity providing services to the Fund will act as a fiduciary (as defined in Section 3(21) of ERISA) with respect to the assets of the Fund or any Benefit Plan Investor. Rather, the Investment Manager believes that, given the limited purpose and role of the Fund and the requirement that the Investment Manager follow the directions of the fiduciary of each Benefit Plan Investor investing in the Fund, as set forth in each such investor's Subscription Documents, with respect to the investment by the Fund in the Partnership, the fiduciary of each such Benefit Plan Investor has retained the fiduciary authority and responsibility with respect to the Benefit

Plan Investor's initial and continuing investment in the Fund as though the Benefit Plan Investor is investing directly in the Partnership.

**Representation by Plans**

The fiduciaries of each Plan proposing to invest in the Fund will be required to represent that they have been informed of and understand the Fund's investment objectives, policies and strategies, and that the decision to invest Plan Assets in the Fund is consistent with the provisions of ERISA and/or the Code that require diversification of Plan Assets and impose other fiduciary responsibilities. In particular, exempt organizations should consider the applicability to them of the provisions relating to UBTI. By its purchase, each investor will be deemed to have represented that either (i) it is not a Plan that is subject to the prohibited transaction rules of ERISA or the Code, (ii) it is not an entity whose assets include Plan Assets or (iii) its investment in the Fund will not constitute a non-exempt prohibited transaction under ERISA or the Code.

**Ineligible Purchasers**

Shares may not be purchased with Plan Assets if the Investment Manager, any selling agent, finder, any of their respective affiliates or any of their respective employees: (i) has investment discretion with respect to the investment of such Plan Assets; (ii) has authority or responsibility to give or regularly gives investment advice with respect to such Plan Assets, for a fee, and pursuant to an agreement or understanding that such advice will serve as a primary basis for investment decisions with respect to such Plan Assets and that such advice will be based on the particular investment needs of the Plan; or (iii) is an employer maintaining or contributing to such Plan. A party that is described in clause (i) or (ii) of the preceding sentence is a fiduciary under ERISA and the Code with respect to the Plan, and any such purchase might result in a "prohibited transaction" under ERISA and the Code.

**Plans' Reporting Obligations**

The information contained herein and in the other documentation provided to investors in connection with an investment in the Fund is intended to satisfy the alternative reporting option for "eligible indirect compensation" on Schedule C of the Form 5500, in addition to the other purposes for which such documents were created.

*Whether or not the underlying assets of the Fund are deemed Plan Assets, an investment in the Fund by a Plan is subject to ERISA and the Code. Accordingly, Plan fiduciaries should consult their own counsel as to the consequences under ERISA and the Code of an investment in the Fund. Note that similar laws governing the investment and management of the assets of governmental or non-U.S. plans may contain fiduciary and prohibited transaction requirements similar to those under ERISA and the Code. Accordingly, fiduciaries of such governmental or non-U.S. plans, in consultation with their counsel, should consider the impact of their respective laws and regulations on an investment in the Fund.*

## CAYMAN ISLANDS MUTUAL FUND LAW

The Fund is regulated as a mutual fund under the Mutual Funds Law (2013 Revision) of the Cayman Islands ("***Mutual Funds Law***").   The Cayman Islands Monetary Authority (the "***Authority***") has supervisory and enforcement powers to ensure compliance with the Mutual Funds Law.   Regulation under the Mutual Funds Law entails the filing of prescribed details and audited accounts annually with the Authority.   As a regulated mutual fund, the Authority may at any time instruct the Fund to have its accounts audited and to submit them to the Authority within such time as the Authority specifies. Failure to comply with these requests by the Authority may result in substantial fines on the part of the Directors and may result in the Authority applying to the court to have the Fund wound up.

The Fund will not, however, be subject to supervision in respect of its investment activities or the constitution of the Fund's portfolio by the Authority or any other governmental authority in the Cayman Islands, although the Authority does have power to investigate the activities of the Fund in certain circumstances.   Neither the Authority nor any other governmental authority in the Cayman Islands has commented upon or approved the terms or merits of this document.   There is no investment compensation scheme available to investors in the Cayman Islands.

The Authority may take certain actions if it is satisfied that a regulated mutual fund is or is likely to become unable to meet its obligations as they fall due or is carrying on or is attempting to carry on business or is winding up its business voluntarily in a manner that is prejudicial to its investors or creditors.   The powers of the Authority include the power to require the substitution of Directors, to appoint a person to advise the Fund on the proper conduct of its affairs or to appoint a person to assume control of the affairs of the Fund.   There are other remedies available to the Authority including the ability to apply to court for approval of other actions.

The Fund, or any directors or agents domiciled in the Cayman Islands, may be compelled to provide information, subject to a request for information made by a regulatory or governmental authority or agency under applicable law; e.g. by the Authority, either for itself or for a recognised overseas regulatory authority, under the Monetary Authority Law (2013 Revision), or by the Tax Information Authority, under the Tax Information Authority Law (2013 Revision) or Reporting of Savings Income information (European Union) Law (2007 Revision) and associated regulations, agreements, arrangements and memoranda of understanding.   Disclosure of confidential information under such laws shall not be regarded as a breach of any duty of confidentiality and, in certain circumstances, the Fund, director or agent, may be prohibited from disclosing that the request has been made.

## ANTI-MONEY LAUNDERING COMPLIANCE

**Cayman Islands**

In order to comply with legislation or regulations aimed at the prevention of money laundering the Fund is required to adopt and maintain anti-money laundering procedures, and may require subscribers to provide evidence to verify their identity and source of funds. Where permitted, and subject to certain conditions, the Fund may also delegate the maintenance of its anti-money laundering procedures (including the acquisition of due diligence information) to a suitable person.

The Fund, and the Administrator on the Fund's behalf, reserve the right to request such information as is necessary to verify the identity of a shareholder (i.e. a subscriber or a transferee). Where the circumstances permit, the Fund, or the Administrator on the Fund's behalf, may be satisfied that full due diligence may not be required where an exemption applies under the Money Laundering Regulations (2013 Revision) of the Cayman Islands, as amended and revised from time to time or any other applicable law.

In the event of delay or failure on the part of the subscriber in producing any information required for verification purposes, the Fund, or the Administrator on the Fund's behalf, may refuse to accept the application, in which case any funds received will be returned without interest to the account from which they were originally debited.

The Fund, and the Administrator on the Fund's behalf, also reserve the right to refuse to make any redemption or dividend payment to a shareholder if the Board of Directors or the Administrator suspect or are advised that the payment of redemption or dividend proceeds to such shareholder may be non-compliant with applicable laws or regulations, or if such refusal is considered necessary or appropriate to ensure the compliance by the Fund or the Administrator with any applicable laws or regulations.

If any person resident in the Cayman Islands knows or suspects or has reasonable grounds for knowing or suspecting that another person is engaged in criminal conduct or is involved with terrorism or terrorist property and the information for that knowledge or suspicion came to their attention in the course of business in the regulated sector, or other trade, profession, business or employment, the person will be required to report such knowledge or suspicion to (i) the Financial Reporting Authority of the Cayman Islands, pursuant to the Proceeds of Crime Law, 2008 of the Cayman Islands if the disclosure relates to criminal conduct or money laundering, or (ii) a police officer of the rank of constable or higher, or the Financial Reporting Authority, pursuant to the Terrorism Law (2011 Revision) of the Cayman Islands, if the disclosure relates to involvement with terrorism or terrorist financing and property. Such a report shall not be treated as a breach of confidence or of any restriction upon the disclosure of information imposed by any enactment or otherwise.

**United States**

In response to increased regulatory concerns with respect to the identification of sources of funds used to make an investment in the Fund, the Investment Manager and/or its affiliates have implemented policies and procedures ("***AML Program***") designed to guard against and identify money laundering activities. Pursuant to the Fund's AML Program, the Investment Manager and/or its affiliates will request prospective investors and, in some instances, existing shareholders to provide additional documentation verifying, among other things, such person's identity and the source of funds used to

43

purchase its Shares of the Fund.   The Investment Manager may decline to accept a subscription based upon this information, or if this information is not provided.

Pursuant to the Fund's AML Program, the Investment Manager and/or its affiliates will undertake enhanced due diligence procedures prior to accepting investors the Investment Manager believes present high risk factors with respect to money laundering activities.   Examples, although not comprehensive, of persons posing high risk factors are persons resident in or organized under the laws of a "non-cooperative jurisdiction" or other jurisdictions designated by the Department of the Treasury as warranting special measures due to money laundering concerns, and any person whose capital contributions originate from or are routed through certain banking entities organized or chartered in a non-cooperative jurisdiction.

In addition, the Fund's AML Program prohibits the acceptance of subscriptions from or on behalf of:

      1.     persons on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Office of Foreign Asset Control;

      2.     the Annex to Executive Order 13224;

      3.     such other lists as may be promulgated by law or regulation; and

      4.     foreign banks unregulated in the jurisdiction they are domiciled in or which have no physical presence.

Governmental regulators are continuing to consider appropriate measures to implement anti-money laundering laws as they apply to private investment funds such as the Fund.   The Investment Manager and/or its affiliates will take such steps as it determines are necessary to comply with applicable law, regulations, orders, directives or special measures that may be required by governmental regulators. The specific policies and procedures that the Fund may be required to implement remain unclear, although such steps may include additional measures to confirm the identity of each investor, including the principal beneficial owners of the investor, if applicable, and/or reporting suspicious transactions to governmental regulators.

The requirements for the Investment Manager to guard against and identify money laundering activities in deciding whether to accept subscriptions are in addition to the discretion that the Investment Manager has in deciding whether to accept subscriptions.

## ANNEX A

**Definition of "U.S. Person"**

For purposes of the applicable prohibitions against ownership and transfer of Shares of the Fund, the term "U.S. Person" means:

(1)    a resident or citizen of the United States;

(2)    a partnership or corporation organized under the laws of the United States;

(3)    any entity not organized under the laws of the United States:

      (a)    that has its principal office or place of business in the United States; or

      (b)  (i)    in which citizens or residents of or entities organized under the laws of or existing in the United States directly or indirectly hold in the aggregate 50% or more of the beneficial interests; and

          (ii)    that will own directly or indirectly, either alone or together with affiliated persons, an aggregate of more than 9.9% of the Fund's outstanding Shares; or

      (c)  (i)    that is organized principally for passive investment (such as an investment company, a commodity pool or other similar vehicle); and

          (ii)  (A)    in which the amount of units of participation held by United States Persons (other than "qualified eligible participants" as defined in Rule 4.7(a)(2) under the United States Commodity Exchange Act) represents in the aggregate 10% or more of the beneficial interest in the entity;

              (B)    that was formed for the purpose of facilitating investment by United States Persons in the Fund, or in any other commodity pool with respect to which the operator is exempt from certain requirements of Part 4 of the regulations promulgated by the United States Commodity Futures Trading Commission by virtue of its participants being non-United States Persons; or

              (C)    that was formed by United States Persons principally for the purpose of investing in securities not registered under the United States Securities Act of 1933, as amended, unless it is formed and owned by "accredited investors" (as defined in Rule 501(a) under the Securities Act of 1933, as amended) who are not natural persons, estates or trusts;

(4)    an estate or trust:

      (a)    of which an executor, administrator or trustee is a United States Person, unless:

          (i)    an executor, administrator or trustee who is not a United States Person has sole or shared investment discretion with respect to the assets of the estate or trust; and

          (ii)  (A)    in the case of an estate, it is governed by non-U.S. law; or

(B)     in the case of a trust, no beneficiary (and no settlor if the trust is revocable) is a United States Person; or

(b)     the income of which is subject to United States income tax regardless of source;

(5)     any agency or branch of a foreign entity located in the United States;

(6)     any non-discretionary account or similar account (other than an estate or trust) held for the benefit or account of one or more United States Persons; and

(7)     any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States, unless it is held by a dealer or other professional fiduciary exclusively for the benefit or account of one or more non-United States Persons.

For purposes of the foregoing, the term "*United States*" means the United States of America, its territories and possessions, any state of the United States, and the District of Columbia.  Persons requiring details regarding other terms used in the foregoing definition (such as "qualified eligible participant" and "accredited investor") should contact the Administrator.