# EXHIBIT 7

# HIGHLAND CREDIT OPPORTUNITIES FUND, LTD.

### SUBSCRIBER INFORMATION FORM

PART A OF THIS SUBSCRIBER INFORMATION FORM IS DIVIDED INTO THREE SECTIONS. ALL SUBSCRIBERS ARE REQUIRED TO COMPLETE SECTION I. SUBSCRIBERS WHO ARE NATURAL PERSONS, INDIVIDUAL RETIREMENT ACCOUNTS (IRAs) OR GRANTOR TRUSTS MUST COMPLETE SECTION II. ALL OTHER SUBSCRIBERS MUST COMPLETE SECTION III.

ALL SUBSCRIBERS MUST COMPLETE THE SUBSCRIBER QUALIFICATION QUESTIONS IN PART B.

SUBSCRIBERS SUBSCRIBING AS A CUSTODIAN OR AN AGENT ON BEHALF OF A BENEFICIAL OWNER SHOULD COMPLETE THE QUESTIONS BELOW WITH REFERENCE TO THE BENEFICIAL OWNER OF THE SHARES.

*YOUR SUBSCRIPTION WILL NOT BE DEEMED COMPLETE UNTIL ALL OF THE REQUIRED DOCUMENTATION LISTED HEREIN AND ADDITIONALLY REQUESTED DOCUMENTATION IS RECEIVED BY THE ADMINISTRATOR.*

## PART A – SUBSCRIBER INFORMATION

## SECTION I.  TO BE COMPLETED BY ALL SUBSCRIBERS

1. **Identity of Subscriber**

   Name(s): _THE DUGABOY INVESTMENT TRUST_    Country of domicile/ Citizenship _USA_

   Please check *all* of the boxes that describe the beneficial owner(s) for whose account the Shares are being acquired.

   | | |
   |---|---|
   | ☐ Individual | ☐ Broker-dealer |
   | ☐ Joint (spouses) | ☐ Insurance company |
   | ☐ Joint (other) | ☐ Registered investment company |
   | ☒ Personal trust (taxable to grantor) | ☐ Tax-exempt endowment |
   | ☐ Personal trust (other) | ☐ Other tax-exempt organization |
   | ☐ Individual retirement account | ☐ Employee benefit plan (self-directed) |

| | | | |
|---|---|---|---|
| ☐ | Charitable trust | ☐ | Employee benefit plan (trustee directed) |
| ☐ | Private tax-exempt foundation | ☐ | Fund of Funds |
| ☐ | Other private fund | ☐ | Banking or thrift institution |
| ☐ | Family partnership or LLC | ☐ | Sovereign wealth fund or foreign office institution |
| ☐ | Business entity (other) | ☐ | Other |

If "Other" or "Business entity (other)" was checked, please describe the entity or beneficial owner:_____

_____

2.  **Contact Information**

Primary Contact for Notices and Communications

Name:  JAMES DONDERO

Mailing Address:  300 CRESCENT CT STE 700

DALLAS, TX 75201

Telephone:  972-628-4100

Fax:  _____

E-mail:  JDONDERO@ HCMLP.COM

Secondary Contact for Notices and Communications (optional)

Name:  MELISSA SCHROTH

Mailing Address:  300 CRESCENT CT STE. 700

DALLAS, TX 75201

Telephone:  972-628-4100

Fax:  _____

E-mail:  MSCHROTH@HCMLP.COM

Subscriber Information Form                    2

<u>Send copy of Financial Statements and Tax Information Returns to (optional)</u>

Name: *MELISSA SCHROTH*

Mailing Address: *300 CRESCENT CT STE 700*

*DALLAS, TX 75201*

Telephone: *972-628-4100*

Fax: _____

E-mail: *M.SCHROTH@HCMLP.COM*

Please set forth below the names of persons authorized by the Subscriber to give and receive instructions between the Fund (or its Administrator) and the Subscriber together with their respective signatures. Such persons are the only persons so authorized until further written notice to the Administrator signed by one or more of such persons.

| <u>Name</u> | <u>Signature</u> |
|---|---|
| *MELISSA SCHROTH* | |
| *JAMES DONDERO* | |
| | |
| | |

3. **Remitting Bank or Financial Institution**

Except as otherwise agreed by the Fund, all subscriptions are payable in full by wire transfer of readily available funds to the account of the Fund **at least two business days prior to the proposed date of subscription.** Please identify the bank or other financial institution (the "*Wiring Institution*") from which the Subscriber's funds will be wired. Note that any amounts paid to the Subscriber will be paid to the same account from which its subscription funds were originally remitted, which shall be in the name of the Subscriber, unless the Fund agrees otherwise.

A. Name of Wiring Institution[1]: *NEXBANK*

Address[2]: *DALLAS TEXAS*

---

[1] Important notice: please instruct your bank to ensure that the originating account and bank information is available in the wire. **Your transaction may be delayed or rejected if this information is not provided.**

[2] If the Wiring Institution is not located in a jurisdiction that is member of the Financial Action Task Force on Money Laundering (the "*FATF*"), the Administrator may require additional information. For a current list of FATF members see: www.fatf-gafi.org.

ABA, Chips or SWIFT Number:

Account Name: _THE DuEABoy INVESTMENT TRust_

Account Number:

For Benefit of: [ _Subscriber Name_ ] _JAMES DONDERO_

Account Representative: _(TRUSTEE)_

Telephone:

B.  Is the Subscriber a customer of the Wiring Institution?

☑ Yes   ☐ No

**If you responded "No," please contact the Administrator for additional information that may be required.**

4.  **Electronic Delivery of Reports and Other Communications**

The Fund may make reports and other communications available in electronic form, such as e-mail or by posting on a web site (with notification of the posting by e-mail). Do you consent to receive deliveries of reports and other communications from the Fund (including annual and other updates of our consumer privacy policies and procedures) exclusively in electronic form without separate mailing of paper copies?

☑ Yes   ☐ No

5.  **Information Regarding Actual Ownership of the Shares**

Is the Subscriber subscribing for the Shares with the intent to sell, distribute or transfer the Shares to any other person or persons?

☐ Yes   ☑ No

Is the Subscriber subscribing for the Shares as agent, nominee, trustee, partner, or otherwise on behalf of, for the account of, or jointly with any other person or entity?

☐ Yes   ☑ No

Will any other person or persons have a beneficial interest in the Shares acquired or a right to receive payments through contract or otherwise relating to the increase or decrease in value of the Shares (other than as a shareholder, partner or other beneficial owner of equity interests in the Subscriber)?

☐ Yes ☑ No

Does the Subscriber control, or is the Subscriber controlled by or under common control with, any other existing or prospective investor in the Fund?

☐ Yes ☑ No

Note: If any of the above questions were answered "Yes," please provide identifying information or contact the Administrator:

_____

6. **Government Entities**

(a) Is the Subscriber a government entity or an officer, agent or employee thereof?

☐ Yes ☑ No

Note: Government entities include all state and local governments, their agencies and instrumentalities, and any investment programs, defined benefit plans as defined in Section 414(j) of the Internal Revenue Code of 1986, as amended (the "*Code*"), state general funds, pools of assets or plans sponsored or established by state and local governments, including all public pension plans and any participant-directed plan or program of a government entity, such as "qualified tuition plans" authorized by section 529 of the Code and retirement plans authorized by section 403(b) or 457 of the Code.

If the answer is "Yes," please answer the following question. If the answer is "No," skip to question 7.

Is the Subscriber aware of any political contributions it or any of its employees has received from Highland Capital Management, L.P. (in its capacity as investment manager of the Fund, the "***Investment Manager***") or any of the Investment Manager's employees?

☐ Yes ☐ No

If the answer is "Yes," please provide the date of the contribution:

_____

If the answer to either or both of the above questions is "Yes," please contact the Administrator.

7. **Private Investment Fund Experience**

Has the Subscriber previously made an investment in a private investment fund such as a hedge fund, private equity or venture capital fund, commodity pool, real estate or energy partnership or fund of funds?

☑ Yes ☐ No

8. **Net Worth**

Is the Subscriber's net worth more than 10 times the amount of the subscription commitment?

☑ Yes ☐ No

9. **Ability to Bear Risk**

Does the Subscriber have the financial ability to bear the economic risk of this investment and have adequate means to provide for its current needs and contingencies?

☑ Yes ☐ No

## SECTION II. ADDITIONAL QUESTIONS FOR NATURAL PERSONS, INDIVIDUAL RETIREMENT ACCOUNTS OR GRANTOR TRUSTS

1. **Please indicate desired type of ownership interest**

   ☐ Individual ☑ Individual Retirement Account
   ☐ Joint ☑ Grantor Trust

2. **Place of Residence**

   (a) Indicate the state where Subscriber has his or her principal residence:

   _TEXAS_

   Note: If you are married and live in a community property state, both you and your spouse must sign the signature page of the Subscription Agreement. Community property states are Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington and Wisconsin. Property held by married persons resident in Alaska may also be subject to community property law if the married persons opted into the community property regime.

   (b) Is the Subscriber or trust grantor a United States citizen or permanent resident of the United States?

   ☑ Yes ☐ No

3. **Social Security Number:** ███████████

4. **Joint Subscriptions**

   If you are subscribing with another person, please answer the following questions:

   (a) Please indicate type of ownership interest:

   ☐ Joint tenants (rights of survivorship)
   ☐ Tenants in common (no rights of survivorship)

   (b) If you are purchasing Shares jointly with another person, please answer the following questions:

   (i) Is the other person a United States citizen or permanent resident of the United States?

   ☐ Yes ☐ No

   (ii) If the answer to the above question is "Yes," please provide such other person's U.S. Social Security number: _____

5. **Individual Retirement Account Investors**

    (a)    If the Subscriber is subscribing as a trustee or custodian for an individual retirement account, is the Subscriber a qualified IRA custodian or trustee?

☐   Yes      ☐   No

    (b)    Name of qualified IRA trustee or custodian:

_____

6. **Grantor Trust Investors**

    (a)    Please indicate whether the Subscriber, for federal income tax purposes, files now or has ever filed a tax or information return as a partnership, as a "grantor" trust or (if the Subscriber is a U.S. corporation) as an "S corporation" under Sections 1361-1379 of the Code.

☐   Yes      ☑   No

    (b)    If the answer is "Yes," will the investment in the Fund represent more than 75% of the assets of the Subscriber?

☐   Yes      ☑   No

| SECTION III. | ADDITIONAL QUESTIONS FOR ENTITIES AND NON-GRANTOR TRUSTS |
|---|---|

1. **Organizational Data**

    (a)    Legal form of entity: _____

    (b)    Jurisdiction of organization: _____

    (c)    Year of organization: _____

    (d)    Briefly identify the Subscriber's primary business: _____

_____

_____

    (e)    Identify the Subscriber's principal place of business:

_____

_____

    (f)    Total number of shareholders, partners or other holders of equity or beneficial interests or other securities (including any debt securities other than short term paper of the Subscriber) (If the number is more than 100, it is sufficient to respond "more than 100."):

_____

    (g)    Is the Subscriber a wholly owned or majority-owned subsidiary of another entity?

        ☐  Yes    ☐  No

    If yes, please provide name and address:

_____

    (h)    Is the direct parent of the Subscriber a wholly owned or majority-owned subsidiary of another entity?

        ☐  Yes    ☐  No

    If yes, please provide name and address:

_____

(i)     Was the Subscriber organized for the specific purpose of acquiring the Shares?

☐   Yes     ☐   No

(j)     Have shareholders, partners or other holders of equity or beneficial interests in the Subscriber been provided the opportunity to decide individually whether or not to participate, or the extent of their participation, in the Subscriber's investment in the Fund (*i.e.*, have investors in the Subscriber been permitted to determine whether their capital will form part of the specific capital invested by the Subscriber in the Fund)?

☐   Yes     ☐   No

(k)     Is the Subscriber an entity engaged primarily in investing or trading securities?

☐   Yes     ☐   No

If the answer is "Yes," please answer the following question. If the answer is "No," skip to question 2.

Does the current amount of the Subscriber's subscription to the Fund exceed 40% of the value of the Subscriber's total assets?

☐   Yes     ☐   No

## 2.   Benefit Plan Accounts

(a)     Is the Subscriber (1) an employee benefit plan subject to the fiduciary provisions of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), (2) a "plan" subject to Section 4975 of the Code, (3) an entity that otherwise constitutes a "benefit plan investor" within the meaning of any Department of Labor regulation promulgated under Section 3(42) of ERISA, (a party described in (1), (2), or (3), a "***Plan***"), or (4) an entity whose underlying assets include "plan assets" for purposes of ERISA by reason of a Plan's investment in the Subscriber (a "***Plan Asset Entity***")?

☐   Yes     ☐   No

(b)     Is the Subscriber a Plan that is both voluntary and contributory?

☐   Yes     ☐   No

(c)     Have beneficiaries of the Plan been provided the opportunity to decide individually whether or not to participate, or the extent of their participation, in the Plan's investment in the Fund (*i.e.*, have beneficiaries of the Plan been permitted to determine whether their capital will form part of the specific capital invested by the Plan in the Fund)?

☐   Yes     ☐   No

(d)     Is the Subscriber either (1) an insurance company general account the underlying assets of which include "plan assets" for purposes of ERISA or (2) a Plan Asset Entity?

☐   Yes     ☐   No

If the answer is "Yes", the maximum percentage of the Subscriber constituting "plan assets" will be:

_____

(Note that the Subscriber has an obligation under the Subscription Agreement to promptly notify the Fund if this percentage is exceeded in any calendar month).

3.     **Regulated Institutions**

(a)     Is the Subscriber a regulated institution that is subject to legal or regulatory restrictions or limitations on the nature of its investments (such as a bank or an insurance company)?

☐   Yes     ☐   No

(b)     If the answer is "Yes," has the Subscriber verified that the proposed subscription is in compliance with applicable laws and regulations?

☐   Yes     ☐   No

4.     **Tax Information**

(a)     Employer identification number:

_____

(b)     Indicate the annual date on which the Subscriber's taxable year ends for purposes of reporting federal income tax or filing information returns:

_____

(c)     Please indicate whether the Subscriber, for federal income tax purposes, files now or has ever filed a tax or information return, as a partnership, as a "grantor" trust or (if the Subscriber is a U.S. corporation) as an "S corporation" under Sections 1361-1379 of the Code.

☐   Yes    ☐   No

If the answer is "Yes," will the investment in the Fund represent more than 75% of the assets of the Subscriber?

☐   Yes    ☐   No

(d)     Is the Subscriber exempt from federal income tax (e.g., a qualified employee benefit plan or trust, retirement account, charitable remainder trust, or a charitable foundation or other tax-exempt organization described in Section 501(c)(3) of the Code)?

☐   Yes    ☐   No

5.    **Bank Investors**

(a)     Is the Subscriber an insured depository institution, as defined in the Federal Deposit Insurance Act or a company that controls directly or indirectly an insured depository institution?

☐   Yes    ☐   No

(b)     Is the Subscriber treated as a bank holding company for the purposes of Section 8 of the International Banking Act of 1978?

☐   Yes    ☐   No

(c)     Is the Subscriber a direct or indirect subsidiary of an entity described in (a) or (b) above?

☐   Yes    ☐   No

## PART B – SUBSCRIBER QUALIFICATION

SUBSCRIPTIONS WILL BE ACCEPTED ONLY FROM PERSONS WHO QUALIFY AS ELIGIBLE INVESTORS WITHIN THE MEANING OF APPLICABLE FEDERAL AND STATE SECURITIES REGULATIONS. UNLESS OTHERWISE INDICATED, RESPONSES SHOULD BE GIVEN BY REFERENCE TO THE SPECIFIC PERSON FOR WHOSE ACCOUNT THE SHARES ARE BEING ACQUIRED. THE SUBSCRIBER MAY BE REQUIRED TO PROVIDE SUCH FURTHER INFORMATION AND EXECUTE AND DELIVER SUCH DOCUMENTS AS THE FUND OR THE ADMINISTRATOR MAY REASONABLY REQUEST TO VERIFY THAT THE SUBSCRIBER QUALIFIES AS AN ELIGIBLE INVESTOR.

## SECTION I. ACCREDITED INVESTOR STATUS

Each Subscriber must indicate whether the intended beneficial owner of the Shares qualifies as an "accredited investor" pursuant to *at least one* of the following tests. (Please check *all* that apply, or, if none applies, consult the Administrator.)

**FOR NATURAL PERSONS:**

☐ The Subscriber is a *natural person* whose individual net worth, or joint net worth with that person's spouse, at the time of purchase exceeds $1,000,000, *excluding* the value of the Subscriber's primary residence.[3]

☐ The Subscriber is a *natural person* with individual income (without including any income of the Subscriber's spouse) in excess of $200,000 or joint income with that person's spouse of $300,000, in each of the two most recent years and who reasonably expects to reach the same income level in the current year.

☑ The Subscriber is an individual retirement account or a grantor trust and the owner of the individual retirement account or the grantor of the grantor trust is a *natural person* that meets the requirements described above.[4]

**FOR ENTITIES:**

☐ The Subscriber is an *entity* with total assets in excess of $5,000,000 that was not formed for the purpose of investing in the Fund and is one of the following:

   ☐ a corporation;

   ☐ a partnership;

   ☐ a limited liability company;

---

[3]. An individual need not deduct from his or her net worth the amount of mortgage debt secured by an excluded primary residence other than (i) the amount by which the mortgage liability exceeds the fair value of the residence and (ii) any increase in the amount of the debt secured by the primary residence in the 60 days preceding the date hereof unless the increase was a result of the acquisition of the residence.

[4] Additional information may be required in connection with a grantor trust's investment.

☐     a business trust; or

☐     a tax-exempt organization described in Section 501(c)(3) of the Code.

☐     The Subscriber is a personal (non-business) trust, other than an employee benefit trust, with total assets in excess of $5,000,000 that was not formed for the purpose of investing in the Fund and whose decision to invest in the Fund has been directed by a person who has such knowledge and experience in financial and business matters that such person is capable of evaluating the merits and risks of the investment.

☐     The Subscriber is an employee benefit plan within the meaning of Title I of ERISA, (including an individual retirement account), which satisfies at least one of the following conditions:

      ☐     it has total assets in excess of $5,000,000;

      ☐     the investment decision is being made by a plan fiduciary that is a bank, savings and loan association, insurance company or registered investment adviser; or

      ☐     it is a self-directed plan (*i.e.*, a tax-qualified defined contribution plan in which a participant may exercise control over the investment of assets credited to his or her account) and the decision to invest is made by those participants investing, and each such participant qualifies as an accredited investor.

☐     The Subscriber is an employee benefit plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions that has total assets in excess of $5,000,000.

☐     The Subscriber is licensed, or subject to supervision, by federal or state examining authorities such as a "bank," "savings and loan association," "insurance company," or "small business investment company" (as such terms are used and defined in 17 CFR §230.501(a)) or is an account for which a bank or savings and loan association is subscribing in a fiduciary capacity.

☐     The Subscriber is registered with the Securities and Exchange Commission as a broker or dealer or an investment company; or has elected to be treated or qualifies as a "business development company" (within the meaning of Section 2(a)(48) of the Investment Company Act of 1940, as amended (the "*Investment Company Act*"), or Section 202(a)(22) of the Investment Advisers Act of 1940, as amended (the "*Investment Advisers Act*")).

☐     The Subscriber is an entity in which *all* of the equity owners are persons described above.

## SECTION II. QUALIFIED CLIENT STATUS

Each subscriber must indicate whether the intended beneficial owner of the Shares qualifies as a "qualified client." IRAs and revocable grantor trusts should complete the questions for natural persons.

**FOR NATURAL PERSONS:**

☑ The Subscriber (or the grantor, in the case of a grantor trust) is a natural person whose net worth (together, in the case of a natural person, with assets held jointly with that person's spouse), at the time of subscription exceeds $2,000,000, *excluding* the value of the Subscriber's primary residence.[5].

**FOR ENTITIES:**

☐ The Subscriber is an entity that has a net worth at the time of subscription in excess of $2,000,000

If the entity is an entity engaged primarily in investing or trading in securities, state whether each of the shareholders, partners or other holders of equity or beneficial interests in the Subscriber (please answer both (A) and (B)):

(A) has a net worth of at least $2,000,000 *excluding* the value of the holder's primary residence:[6]

☐ Yes ☐ No

(B) is either an entity which is not engaged primarily in investing or trading in securities or a natural person:

☐ Yes ☐ No

---

[5]. An individual need not deduct from his or her net worth the amount of mortgage debt secured by an excluded primary residence other than (i) the amount by which the mortgage liability exceeds the fair value of the residence and (ii) any increase in the amount of the debt secured by the primary residence in the 60 days preceding the date hereof unless the increase was a result of the acquisition of the residence.

[6] See footnote immediately above.

## SECTION III.    FUND INVESTMENTS IN FINRA-RESTRICTED ISSUES AND AFFILIATION WITH FINRA MEMBERS IN UNDERWRITTEN OFFERINGS

The Fund may, from time to time, consider direct or indirect investing in certain publicly offered equity securities, more commonly known as "new issue" securities ("***New Issues***"), through member firms of the Financial Industry Regulatory Authority, Inc. ("***FINRA***") in accordance with Rules 5130 and 5131 adopted by FINRA. Also, FINRA requires any member that is participating in a public offering of securities to report any affiliation between a 5% shareholder of the company whose securities are being offered with a FINRA member. In order for the Fund to be able to determine the extent to which a Subscriber is eligible to participate in New Issues and to comply with any filings required in any underwritten public offering that is conducted by any company in which the Fund invests, the Subscriber must complete the questionnaire below. *Even if the Subscriber does not wish to participate in the profits related to New Issues, the Subscriber must complete Items A and B, as the tests in each Item are conducted separately.*

A.    **Determination of Restricted Person Status under Rule 5130:**

Section 1 (Restricted Persons)

The Subscriber is:

☐    a FINRA member or other securities broker-dealer;

☐    an affiliate of a broker-dealer.[7]

☐    an officer, director, general partner, associated person or employee of any member of FINRA or any other securities broker-dealer, in either case other than a limited business broker-dealer. [8]

If the Subscriber checked any of the preceding boxes, please describe the name and CRD number of the applicable FINRA member along with a description of the relationship between such broker-dealer or affiliate and the Subscriber including, if applicable, the percentage of the Subscriber that is owned by a FINRA member: _____

_____

_____

---

[7]    As used herein, an "***affiliate***" means an entity which controls, is controlled by or is under common control with such broker-dealer. "Control" means (i) beneficial ownership of 10% or more of the outstanding common equity of an entity, including any right to receive such securities within 60 days; (ii) the right to 10% or more of the distributable profits or losses of an entity that is a partnership, including any right to receive an interest in such distributable profits or losses within 60 days; (iii) beneficial ownership of 10% or more of the outstanding subordinated debt of an entity, including any right to receive such subordinated debt within 60 days; (iv) beneficial ownership of 10% or more of the outstanding preferred equity of an entity, including any right to receive such preferred equity within 60 days; or (v) the power to direct or cause the direction of the management or policies of an entity.

[8]    As used herein, a "***limited business broker-dealer***" means any broker-dealer whose authorization to engage in the securities business is limited solely to the purchase and sale of investment company/variable contracts securities or direct participation programs.

☐ an agent of any member of the FINRA or any other securities broker-dealer that is engaged in the investment banking or securities business.

☐ a person who, directly or indirectly, owns or has contributed capital to any FINRA member or other securities broker-dealer (other than solely a limited business broker-dealer), and the Subscriber:

    (a)    is listed, or required to be listed, in Schedule A of the Form BD for such FINRA member or other securities broker-dealer, and is identified by an ownership code of at least 10%;

    (b)    is listed, or required to be listed, in Schedule B of the Form BD for such FINRA member or other securities broker-dealer, and such listing relates to a direct owner of such FINRA member or other securities broker-dealer that is identified by an ownership code of at least 10%;

    (c)    is listed, or required to be listed, in Schedule C of the Form BD of the FINRA member or other securities broker-dealer that meets any of the criteria noted in paragraphs (a) or (b) above;

    (d)    owns 10% or more of a public reporting company listed, or required to be listed, as a direct owner in Schedule A of a Form BD of any FINRA member or other securities broker-dealer (other than solely a limited business broker-dealer). For this purpose, a "public reporting company" does not include a reporting company that is listed on a national securities exchange; or

    (e)    owns 25% or more of a public reporting company listed, or required to be listed, as an indirect owner in Schedule B of a Form BD of any FINRA member or other securities broker-dealer (other than solely a limited business broker-dealer). For this purpose, a "public reporting company" does not include a reporting company that is listed on a national securities exchange.

If the Subscriber checked the immediately preceding box, please describe the name and CRD number of the FINRA member on whose form the relationship is disclosed: _____

_____

_____

☐ a person who may act as a finder with respect to any public offering of securities.

☐ a person, such as an attorney, accountant or financial consultant, whose professional activities may include acting in a fiduciary capacity to any managing underwriter of any public offering of securities.

☐ a person who has the authority to buy or sell securities for a bank, savings and loan institution, insurance company, investment company, investment advisor or other collective investment account (including any hedge fund, investment partnership, investment corporation or any other collective investment vehicle that

is engaged primarily in the purchase and/or sale of securities), other than a family investment account or investment club.

☐ a member of the immediate family of any person to whom any of the preceding paragraphs refer.[9]

If the Subscriber checked this box, please specify the identity and the nature of the relationship with the Restricted Person, the firm with which the Restricted Person is associated, and whether the Restricted Person either contributes directly or indirectly to the Subscriber's support or receives material support from the Subscriber.

_____

_____

☐ a domestic or foreign bank, bank branch, trust company, or other conduit for an undisclosed principal. The Fund may request additional information in order to determine the eligibility of the undisclosed principal.

☐ an employee benefit plan qualified under ERISA, that is sponsored by a FINRA member or other securities broker-dealer or an affiliate thereof.

☐ an entity (including a partnership, investment fund, limited liability company or other account) which either (i) knows that one or more of its beneficial owners is a Restricted Person described in any of the preceding categories, or (ii) has not affirmatively determined that there is no Restricted Person described in any of the preceding categories that has a beneficial interest in the entity.[10]

A Subscriber who has checked one of the boxes above may be able to participate in New Issues to the extent an exemption in Item C applies. See C below.

<u>Section 2 (Unrestricted Persons)</u>

☑ None of the Restricted Person Categories in Section 1 above apply and the Subscriber is eligible to fully participate in profits and losses from investments in New Issues.

---

[9] The term *"immediate family"* includes parents; mother-in-law or father-in-law; husband or wife; brother or sister; brother-in-law or sister-in-law; son-in-law or daughter-in-law; children; whether by birth or adoption; and any other person who is supported, directly or indirectly, to a material extent by such person. For this purpose, *"material support"* means directly or indirectly providing more than 25% of a person's income in the prior calendar year. Members of the immediate family living in the same household are deemed to be providing each other with material support.

[10] The term *"beneficial interest"* means any economic interest such as the right to share in gains or losses. The receipt of a management or performance-based fee for operating a collective investment account, or other fee for acting in a fiduciary capacity, is not considered a beneficial interest in the account. However, for purposes of FINRA Rule 5130 and 5131, if such fee is subsequently invested into the account (as a deferred fee arrangement or otherwise), it would then be considered a beneficial interest in the account.

B. **Determination of Covered Person Status under Rule 5131:**

Section 1 (Persons Covered by Rule 5131)

The Subscriber is:

☐ an executive officer or director of a public company.[11]

☑ an executive officer or director of a covered non-public company.[12]

☐ a person materially supported by an executive officer or director of a public company or a covered non-public company.[13]

If any of the three preceding boxes are checked, please provide the name of the "public company" or "covered non-public company" in the space below.

*NEXBANK, MGM, CORNERSTONE, CCS MEDICAL, AM. BANKNOTE*

If the Subscriber is an entity in which any of the above persons have a direct or indirect beneficial interest, please specify the current beneficial interest of each such person (as a percentage) and each relevant "public company" or "covered non-public company" for which the relevant investor is an executive officer or director.

_____

_____

Note that Subscribers checking the boxes above may not be restricted in their participation in New Issues depending on such Subscriber's Interest in the Fund and the investment banking relationships of the companies they serve.

Section 2 (Persons Not Covered by Rule 5131)

☐ None of the Covered Person Categories in Section 1 above apply and the Subscriber is eligible to fully participate in profits and losses from investments in New Issues.

---

[11] As used herein, a ***public company*** is any company that has a class of securities registered under Section 12 of the Securities Exchange Act of 1934, as amended (the "***Exchange Act***"), or any company that files periodic reports pursuant to Section 15(d) of the Exchange Act.

[12] As used herein, a "***covered non-public company***" means any non-public company satisfying any of the following three criteria:

(a) income of at least $1 million in the previous fiscal year or in two of the three previous fiscal years *and* shareholders' equity of at least $15 million;

(b) shareholders' equity of at least $30 million and an operating history of two years; or

(c) total assets and total revenue of at least $75 million in the latest fiscal year *or* in two of the three most recent fiscal years.

[13] As used herein, "***material support***" means directly or indirectly providing more than 25% of a person's income in the prior calendar year. Members of the immediate family living in the same household are deemed to be providing each other with material support.

C. **Determination of Exempted Entity Status under Rules 5130 and 5131:**

A Subscriber who has checked one of the boxes set forth in Item A, Section 1 or Item B, Section 1 above may be eligible to participate in New Issues if the Subscriber meets certain criteria for exempted entities. In order for the Fund to be able to determine the extent to which an exemption applies, please check all appropriate boxes that describe the Subscriber.

<u>Section 1 (Rules 5130 and 5131)</u>

The Subscriber is an entity that:

☐ is an investment company registered under the Investment Company Act;

☐ is a common trust fund or similar fund, as described in Section 3(a)(12)(A)(iii) of the Securities Exchange Act of 1934, as amended (the "***Exchange Act***"), and the fund (i) has investments from 1,000 or more accounts and (ii) does not limit beneficial interests in the fund principally to trust accounts of Restricted Persons;

☐ is an insurance company general, separate or investment account, and (i) the account is funded by premiums from 1,000 or more policyholders, or, if a general account, the insurance company has 1,000 or more policyholders and (ii) the insurance company does not limit the policyholders whose premiums are used to fund the account principally to Restricted Persons, or, if a general account, the insurance company does not limit its policyholders principally to Restricted Persons;

☐ is a publicly traded entity (other than a broker-dealer or an affiliate of a broker-dealer where such broker-dealer is authorized to engage in the public offering of New Issues either as a selling group or underwriter) that (i) is listed on a national securities exchange, or (ii) is a foreign issuer whose securities meet the quantitative designation criteria for listing on a national securities exchange;

☐ is an investment company organized under the laws of a foreign jurisdiction, (i) that is listed on a foreign exchange or authorized for sale to the public by a foreign regulatory authority; and (ii) in which no person owning more than 5% of the shares of such investment company is a Restricted Person;

☐ is an employee benefit plan under ERISA that is qualified under Section 401(a) of the Code, and such plan is not sponsored solely by a broker-dealer;

☐ is a state or municipal government benefit plan that is subject to state and/or municipal regulation;

☐ is a tax-exempt charitable organization under Section 501(c)(3) of the Code and has attached a copy of the IRS determination letter confirming the entity's qualification under Section 501(c)(3) of the Code, by virtue of which there are no "beneficial owners" as calculated based on the definition of "beneficial interest" under FINRA Rule 5130; or

☐    is a church plan under Section 414(e) of the Code.

☑    None of the preceding categories in this Item C apply to the Subscriber.

Section 2 (Rule 5130 only)

The Subscriber is:

☐    an entity that represents, based upon a representation from the beneficial account holders or a person authorized to represent the beneficial owners of the Subscriber (in either case, dated no earlier than 12 months prior to the date of the Subscription Agreement), that none of the beneficial owners of the Subscriber who participate in New Issues are persons who are not entitled to do so under FINRA Rule 5130, and the Subscriber is eligible to purchase New Issues in compliance with FINRA Rule 5130; or

☐    is an entity (including a private investment vehicle, such as a hedge fund or fund of hedge funds) (i) in which the beneficial interests of Restricted Persons do not exceed in the aggregate 10% of such entity or (ii) that limits participation in New Issue profits by Restricted Persons to not more than 10% of the profits from New Issues.

> If the immediately preceding box is checked, please specify the current percentage of the net profits from New Issues allocable to beneficial owners of such entity who are Restricted Persons.
>
> _____

# HIGHLAND CREDIT OPPORTUNITIES FUND, LTD.

## SUBSCRIPTION AGREEMENT

Highland Credit Opportunities Fund, Ltd.
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

Ladies and Gentlemen:

## 1.     Documents Received

(a)     The undersigned (the "*Subscriber*") hereby acknowledges having (i) received, read and understood the current Confidential Private Offering Memorandum, as supplemented and amended from time to time (the "*Private Offering Memorandum*"), of Highland Credit Opportunities Fund, Ltd., a Cayman Islands exempted company (the "*Fund*"), including but not limited to those sections dealing with risk factors, conflicts of interest, fees and tax consequences of an investment in the Fund, and the Memorandum and Articles of Association of the Fund, as amended to date (the "*Articles*"), (ii) received a copy of Form ADV Part 2A, the firm brochure, and Form ADV Part 2B, the brochure supplement, of Highland Capital Management, L.P. (in its capacity as the investment manager of the Fund, the "*Investment Manager*"), as amended to date (the "*Form ADV*"), prior to or simultaneously with delivery of this Subscription Agreement to the Fund and (iii) been given the opportunity to (A) ask questions of, and receive answers from the Investment Manager or one of its affiliates concerning the terms and conditions of the offering and other matters pertaining to an investment in the Fund and (B) obtain any additional information that the Investment Manager can acquire without unreasonable effort or expense that is necessary to evaluate the merits and risks of an investment in the Fund.

(b)     Appendix A hereto contains the definitions of certain capitalized terms used but not otherwise defined herein and should be read by the Subscriber prior to entering into this Subscription Agreement.

## 2.     Subscription Commitment

(a)     The Subscriber hereby irrevocably subscribes for shares of the Fund (the "*Shares*"), subject to Articles, as may be amended from time to time, and the Private Offering Memorandum, and agrees to contribute in cash (unless otherwise agreed by the Fund) to the capital of the Fund, the amount set forth on the Signature Page of this Subscription Agreement. Such amount shall be payable in full in readily available funds by wire transfer to the bank account of the Fund at least two business days prior to the proposed date of subscription.

(b)     The Subscriber understands that this subscription is not binding on the Fund until accepted by the Fund, and it may be rejected, in whole or in part, by the Fund in its absolute discretion. If and to the extent rejected, the Fund shall, to the extent permitted by law, return to the Subscriber, without interest or deduction, any payment tendered by the Subscriber, and the Fund and the Subscriber shall have no further obligation to each other hereunder. The Subscriber acknowledges and accepts that none of the Fund, the Investment Manager, the Fund's

administrator (the "*Administrator*," which term shall be construed to include any sub-administrator of the Fund unless the context otherwise requires) nor their respective agents, affiliates or representatives shall be responsible for any lost profit, revenue or damages of any kind due to a delayed acceptance or a rejected subscription.

3.     **Representations, Warranties and Covenants – All Subscribers**

To induce the Fund to accept this subscription, the Subscriber hereby makes the following representations, warranties and covenants to the Fund:

(a)     The information set forth in the subscriber information form attached hereto, which shall be considered an integral part of this Subscription Agreement (the "*Subscriber Information Form*"), is true, correct, accurate and complete, and will be relied upon by the Fund for the purpose of determining the eligibility of the Subscriber to purchase and own Shares.

(b)     The Subscriber hereby represents that the information set forth in the Subscriber Information Form is true, correct, accurate and complete as of the date hereof, and the Subscriber agrees to notify the Fund immediately if any representation or warranty contained in this Subscription Agreement, or any information provided pursuant to the Subscriber Information Form becomes untrue, misleading, or otherwise requires updating at any time. For so long as the Subscriber is a shareholder of the Fund, the Subscriber further agrees to provide any revised or updated information necessary to cause the Subscriber Information Form to remain true and correct as soon as practicable upon the Subscriber becoming aware that any such change or revision is necessary. The Subscriber agrees to provide, if requested, any additional information that may reasonably be required to substantiate the Subscriber's status as an "accredited investor" or "qualified purchaser" or to otherwise determine the eligibility of the Subscriber to purchase Shares. The Subscriber agrees to provide any additional information and execute any additional documents as may reasonably be required in connection with any subscription, credit facility or other similar borrowing arrangement by the Fund or any lender named in the credit facility or similar lending arrangement.

(c)     The Subscriber consents to the disclosure of any such information, and any other information furnished to the Fund, to any governmental authority or self-regulatory organization or, to the extent required by law or deemed (subject to applicable law) by the Fund to be in the best interest of the Fund, to any other person.

(d)     Except as disclosed in the accompanying Subscriber Information Form, the Subscriber is acquiring the Shares for the Subscriber's own account; does not have any contract, undertaking or arrangement with any person or entity to sell, transfer or grant a participation with respect to any of the Shares; and is not acquiring the Shares with a view to or for sale in connection with any distribution of the Shares.

(e)     The Subscriber or an advisor or consultant relied upon by the Subscriber in reaching a decision to subscribe has such knowledge and experience in financial, tax and business matters as to enable the Subscriber or such advisor or consultant to evaluate the merits and risks of an investment in the Fund (including the risks set forth in the Private Offering Memorandum) and to make an informed investment decision with respect thereto and has made its own investment decision, including decisions regarding suitability based on its own judgment

or upon the advice from such advisers as it deemed necessary and not upon the views or advice of the Fund, the Investment Manager, or their affiliates or representatives.

(f)     The Subscriber understands that the Shares have not been and will not be registered under the Securities Act of 1933, as amended (the "*Securities Act*"), or any state law and that the Fund is not registered under the Investment Company Act of 1940, as amended (the "*Investment Company Act*"). The Subscriber agrees to notify the Fund prior to any proposed sale, transfer, distribution or other disposition of the Shares or any beneficial interest therein, and will not sell, transfer, distribute or otherwise dispose of the Shares (including, without limitation, by pledge, option, swap or nominee or similar relationship, and further including, without limitation, the offering or listing of any Shares on or through any placement agent, intermediary, online service, site, agent or other similar person, service or entity) without the consent of the directors of the Fund (the "*Directors*") and the Investment Manager, which may be granted or withheld in their sole discretion, and unless the Shares are registered or such sale, transfer, distribution or other disposition is exempt from registration. The Subscriber understands that any such transfers without the consent of the Directors and the Investment Manager are null and void. The Subscriber also understands that the Fund has no intention to register the Fund or the Shares with the Securities and Exchange Commission or any state and is under no obligation to assist the Subscriber in obtaining or complying with any exemption from registration. The Fund may require that a proposed transferee meet appropriate financial and other suitability standards and that the transferor furnish a legal opinion satisfactory to the Fund and its counsel that the proposed transfer complies with applicable federal, state and any other applicable securities laws. An appropriate legend evidencing such restrictions may be placed on any certificates issued representing the Shares and appropriate stop-transfer instructions may be placed with respect to the Shares.

(g)     The Subscriber confirms that it has not been invited as a member of the public in the Cayman Islands to subscribe for Shares.

(h)     In formulating a decision to invest in the Fund, the Subscriber has not relied on or acted on the basis of any representations or other information purported to be given on behalf of the Fund or the Investment Manager, except as set forth in the Private Offering Memorandum or the Articles or the Form ADV (it being understood that no person has been authorized by the Fund or the Investment Manager to furnish any such representations or other information).

(i)     The Subscriber recognizes that there is not now any secondary market for the Shares and that such a market is not expected to develop; accordingly, it may not be possible for the Subscriber readily to liquidate the Subscriber's investment in the Fund other than through a redemption of Shares as provided in the Articles and the Subscriber may be holding such Shares for an indefinite period of time.

(j)     The Subscriber understands the investment objectives and policies of, and the investment strategies that may be pursued by, the Fund. The Subscriber's investment is consistent with the investment purposes and objectives and cash flow requirements of the Subscriber and will not adversely affect the Subscriber's overall need for diversification and liquidity.

Subscription Agreement

(k)     The Subscriber can afford a complete loss of its investment in the Fund and can afford to hold its investment in the Fund for an indefinite period of time.

(l)     If the Subscriber is a natural person, the Subscriber is qualified to become a shareholder of the Fund and has the legal capacity to execute, deliver and perform this Subscription Agreement.

(m)     If the Subscriber is a corporation, partnership, limited liability company, trust or other entity, it is authorized and qualified to become a shareholder of, and authorized to make its subscription payment to, the Fund and otherwise to comply with its obligations as a shareholder of the Fund; the person signing this Subscription Agreement on behalf of such entity has been duly authorized by such entity to do so; and this Subscription Agreement has been duly executed and delivered on behalf of the Subscriber and is the valid and binding agreement of the Subscriber, enforceable against the Subscriber in accordance with its terms. In addition, such Subscriber will, upon request of the Fund or the Administrator, deliver any documents, including an opinion of counsel to the Subscriber, evidencing the existence of the Subscriber, the legality of an investment in the Fund and the authority of the person executing this Subscription Agreement on behalf of the Subscriber.

(n)     The purchase of the Shares hereunder and the compliance by such Subscriber with all of the provisions of this Subscription Agreement applicable to such Subscriber and the consummation by such Subscriber of the transactions herein and therein contemplated will not (a) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any statute, indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which such Subscriber is a party or by which such Subscriber is bound or to which any of the property or assets of such Subscriber is subject, nor (b) will such action result in any violation of (i), if such Subscriber is an entity, the provisions of the organizational documents of such Subscriber or (ii) any statute applicable to such Subscriber or any order, rule or regulation of any court or governmental agency or body having jurisdiction over such Subscriber or the property of such Subscriber.

(o)     The Subscriber has carefully reviewed and understands the various risks of an investment in the Fund, as well as the fees and conflicts of interest to which the Fund is subject, as set forth in the Private Offering Memorandum. The Subscriber hereby consents and agrees to the payment of the fees so described to the parties identified as the recipients thereof, and to such conflicts of interest.

(p)     The Subscriber believes that the compensation terms of the Fund represent an "arm's-length" arrangement and the Subscriber is satisfied that it has received adequate disclosure from the Fund and the Investment Manager to enable it to understand and evaluate the compensation and other terms of the Fund and the risks associated therewith.

(q)     The Subscriber represents and warrants that no holder of any beneficial interest in the Shares (each a "*Beneficial Interest Holder*") and, in the case of a Subscriber which is an entity, no Related Person is:

4

(1)    A person or entity whose name appears on the List of Specially Designated Nationals and Blocked Persons maintained by the Office of Foreign Asset Control from time to time;

(2)    A Foreign Shell Bank; or

(3)    A person or entity resident in or whose subscription funds are transferred from or through an account in a Non-Cooperative Jurisdiction.

The Subscriber agrees promptly to notify the Fund or the person appointed to administer the Fund's anti-money laundering program, if applicable, of any change in information affecting this representation and covenant.

(r)    The Subscriber represents that (except as otherwise disclosed to the Fund in writing):

(1)    neither it, any Beneficial Interest Holder nor any Related Person (in the case of a Subscriber that is an entity) is a Senior Foreign Political Figure, any member of a Senior Foreign Political Figure's Immediate Family or any Close Associate of a Senior Foreign Political Figure;

(2)    neither it, any Beneficial Interest Holder nor any Related Person (in the case of a Subscriber that is an entity) is resident in, or organized or chartered under the laws of, a jurisdiction that has been designated by the Secretary of the Treasury under Section 311 or 312 of the USA PATRIOT Act as warranting special measures due to money laundering concerns;[14] and

(3)    its subscription funds do not originate from, nor will they be routed through, an account maintained at a Foreign Shell Bank, an "offshore bank," or a bank organized or chartered under the laws of a Non-Cooperative Jurisdiction.

(s)    The Subscriber acknowledges and agrees that any amounts paid to it will be paid to the same account from which its subscription funds were originally remitted, unless the Fund agrees otherwise.

(t)    If the Subscriber is purchasing the Shares as agent, representative or intermediary/nominee, or in any similar capacity for any other person, or is otherwise requested to do so by the Fund, it shall provide a copy of its anti-money laundering policies ("**AML Policies**") to the Fund. The Subscriber represents that (i) it is in compliance with its AML Policies, (ii) its AML Policies have been approved by counsel or internal compliance personnel who have been reasonably informed of the legal requirements and best practices for anti-money laundering policies and their implementation, and (iii) it has not received a deficiency letter, negative report or any similar determination regarding its AML Policies from independent

---

[14]    The Treasury Department's Financial Crimes Enforcement Network ("**FinCEN**") issues advisories regarding countries of primary money laundering concern. FinCEN's advisories are posted at http://www.fincen.gov/pub_main.html.

accountants, internal auditors or some other person responsible for reviewing compliance with its AML Policies.

(u)     The Subscriber represents and warrants that as a result of its acquisition and holding of the Shares: (i) the assets of the Fund will not constitute the assets of any employee benefit plan subject to any federal, state, local or non-U.S. law, rule or regulations ("*Similar Law*") that is similar to (A) the U.S. Employee Retirement Income Security Act of 1974, as amended ("*ERISA*"), or (B) Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "*Code*"); (ii) the Investment Manager will not be considered to be a fiduciary of the Subscriber under any Similar Law; and (iii) no activity of the Fund contemplated in the Private Offering Memorandum or the Articles will violate any Similar Law.

(v)     The Subscriber will promptly provide any additional documentation the Fund or the Administrator may request in the future to the extent that the Fund or the Administrator determines necessary in order to comply with applicable anti-money laundering laws or policies or any other applicable law.

(w)     The Subscriber acknowledges that due to anti-money laundering requirements operating within their respective jurisdictions, the Fund, the Investment Manager and/or the Administrator (as the case may be) may require additional documentation before a subscription application or redemption request can be processed. Please be aware that your failure to provide or a delay in providing any such documentation may delay your acceptance to the Fund, cause your subscription to be rejected entirely or delay the satisfaction of your redemption request, as applicable. The Fund, the Investment Manager and the Administrator shall be held harmless and indemnified against any loss arising as a result of any such delay or rejection due to the Subscriber's failure to provide or delay in providing any such requested information.

(x)     The Subscriber acknowledges and agrees that Shares of the Fund will not be issued until such time as the Fund and/or the Administrator has received and is satisfied with all the information and documentation requested to verify the Subscriber's identity. Where at the sole discretion of the Fund, Shares are issued prior to the Fund and/or Administrator having received all the information and documentation required to verify the Subscriber's identity, the Subscriber will be prohibited from redeeming any Shares so issued, and the Fund and the Administrator on its behalf reserves the right to refuse to make any redemption payment or distribution to the Subscriber, until such time as the Fund and/or the Administrator, as applicable, has received and is satisfied with all the information and documentation requested to verify the Subscriber's identity.

(y)     The Subscriber acknowledges and agrees that each of the Fund, the Administrator and the Investment Manager may disclose to each other, to any affiliate, to any other service provider to the Fund or to any regulatory body in any applicable jurisdiction copies of the Subscriber's subscription documents and any information concerning the Subscriber in their respective possession, whether provided by the Subscriber to the Fund, the Administrator or the Investment Manager or otherwise, including details of the Subscriber's Shares, historical and pending transactions in the Shares and the value thereof, and any such disclosure shall not be treated as a breach of any restriction upon the disclosure of information imposed on any such person by law or otherwise.

(z)     The Subscriber agrees to provide the Fund and/or the Administrator any additional tax information or documentation that the Fund or the Administrator believes will enable it, the Fund or any subsidiary of the foregoing to comply with or mitigate any of their respective tax reporting, tax withholding, and/or tax compliance obligations, including any such obligations under the U.S. Hiring Incentives to Restore Employment Act (P.L. 111-147), or which may arise as a result of a change in law or in the interpretation thereof.

(aa)     The Subscriber understands that Akin Gump Strauss Hauer & Feld LLP ("*Akin Gump*") acts as U.S. counsel to the Fund, the Investment Manager and their affiliates.  The Subscriber also understands that, in connection with this offering of Shares and ongoing advice to the Fund, the Investment Manager and their affiliates, Akin Gump will not be representing investors in the Fund, including the Subscriber, and no independent counsel has been retained to represent investors in the Fund.  In addition, Akin Gump does not undertake to monitor the compliance of the Investment Manager and its affiliates with the investment program, valuation procedures and other guidelines set forth in the Private Offering Memorandum, nor does Akin Gump monitor compliance with applicable laws.   In preparing the Private Offering Memorandum, Akin Gump relied on information furnished to it by the Fund and/or the Investment Manager, and did not investigate or verify the accuracy or completeness of the information set forth therein concerning the Fund, the Investment Manager and their affiliates and personnel.

## 4.     Representations, Warranties and Covenants – ERISA Subscribers

If the Subscriber is, or is acting on behalf of, an employee benefit plan which is subject to ERISA or Section 4975 of the Code, to induce the Fund to accept this subscription, the Subscriber hereby makes the following additional representations, warranties and covenants to the Fund:

(a)     The person executing this Subscription Agreement on behalf of the Subscriber either is a "named fiduciary" (within the meaning of ERISA) of the Subscriber, or is acting on behalf of a named fiduciary of the Subscriber pursuant to a proper delegation of authority.

(b)     The person executing this Subscription Agreement on behalf of the Subscriber represents and warrants on behalf of such person or the Subscriber, as applicable, as follows:

(1)     The Subscriber is (w) an employee benefit plan subject to the fiduciary provisions of ERISA, (x) a "plan" subject to Section 4975 of the Code, (y) an entity that otherwise constitutes a "benefit plan investor" within the meaning of any Department of Labor regulation promulgated under Section 3(42) of ERISA (a party described in (w), (x) or (y) a "*Plan*") or (z) any entity whose underlying assets include "plan assets" for purposes of ERISA by reason of a Plan's investment in the Subscriber (a "*Plan Asset Entity*").

(2)     The execution and delivery of this Subscription Agreement and the consummation of the transactions contemplated hereunder, and in the Private Offering Memorandum and the Articles will not result in a breach or violation of any charter or organizational documents pursuant to which

the Subscriber was formed, or any statute, rule, regulation or order of any court or governmental agency or body having jurisdiction over the Subscriber or any of its assets, or in any material respect, any mortgage, indenture, contract, agreement or instrument to which the Subscriber is a party or otherwise subject.

(3)     The investment in the Fund is permitted by the documents of the Subscriber and such documents permit the Subscriber to invest in private investment funds that will engage in the investment program described in the Private Offering Memorandum.

(c)     The Subscriber is not in any way affiliated with (*i.e.*, does not own or control, is not owned or controlled by, nor is under common ownership or control with) any person or entity which will receive compensation, directly or indirectly, from the Fund, as specifically identified and described in the Private Offering Memorandum.

(d)     The Subscriber acknowledges and agrees that the decision to invest in the Fund and the review of the terms of the Fund must be made solely and independently by a fiduciary of the Subscriber who has no affiliation with the Investment Manager or any of its affiliates or employees, without relying on any recommendation of the Investment Manager or any of its affiliates or employees as a primary basis for its decision.

(e)     The appropriate fiduciaries of the Subscriber have considered the investment in light of the risks relating thereto and fiduciary responsibility provisions of ERISA applicable to the Subscriber and have determined that, in view of such considerations, the investment is appropriate for the Subscriber and is consistent with such fiduciaries' responsibilities under ERISA, and the appropriate fiduciaries: (i) are responsible for the Subscriber's decision to invest in the Fund, including the determination that such investment is consistent with the requirement imposed by Section 404 of ERISA that employee benefit plan investments be diversified so as to minimize the risk of large losses; (ii) are independent of the Investment Manager and any of its affiliates and employees and of any person or entity that will receive compensation, whether directly or indirectly, from the Fund, as specifically identified and described in the Private Offering Memorandum; (iii) are qualified and authorized to make such investment decision; and (iv) in making such decision, have not relied on the recommendation of the Investment Manager or any of its affiliates or employees.

(f)     The Subscriber through the appropriate fiduciaries has been given the opportunity to discuss the Subscriber's investment in the Fund, and the structure and operation of the Fund with the Investment Manager and has been given all information that the Subscriber or the appropriate fiduciaries have requested and which the Subscriber or the appropriate fiduciaries deemed relevant to the Subscriber's decision to participate in the Fund.

**5.     Representations, Warranties and Covenants – Insurance Company General Account and Plan Asset Entity Subscribers**

(a)     If the Subscriber is acquiring the Shares with the assets of the general account of an insurance company (a "***General Account***"), the Subscriber represents, warrants and covenants that, on each day the Subscriber owns the Shares, either (i) the assets of such General Account

are not considered to be plan assets within the meaning of Section 3(42) of ERISA, Department of Labor Regulations Section 2510.3-101 or Department of Labor regulations issued pursuant to Section 401(c)(1)(A) of ERISA, or (ii) the execution and delivery of this Subscription Agreement, and the acquisition and redemption of the Shares, is exempt from the prohibited transaction rules of Section 406(a) of ERISA and Section 4975(c)(1)(A) - (D) of the Code by virtue of Department of Labor Prohibited Transaction Class Exemption 95-60 or some other exemption of such rules.

(b) By signing this Subscription Agreement, each Subscriber that is either a Plan Asset Entity or using the assets of a General Account hereby covenants that if, after its initial acquisition of the Shares, at any time during any calendar month the percentage of the assets of such General Account (as reasonably determined by the Subscriber) or Plan Asset Entity, as applicable, that constitute "plan assets" for purposes of Title I of ERISA or Section 4975 of the Code exceeds the maximum percentage limit specified by the Subscriber in Question 2(d) of Section III of the Subscriber Information Form, then such Subscriber shall promptly notify the Fund of such occurrence and the Fund may require the Subscriber to redeem or dispose of all or a portion of the Shares held in such General Account or by such Plan Asset Entity, as applicable, by the end of the next following calendar month or such other time as may be determined by the Investment Manager.

## 6. Indemnification

(a) The Subscriber understands the meaning and legal consequences of the representations, warranties, agreements, covenants and confirmations set out above and agrees that the subscription made hereby, if accepted by the Fund, will be accepted in reliance thereon. The Subscriber agrees to indemnify and hold harmless the Fund, the Directors, the Investment Manager and their affiliates, and the partners, members, managers, stockholders, other beneficial owners, officers, directors and employees of any of the foregoing (together, the "*Indemnified Persons*") from and against any and all loss, damage, liability or expense, including reasonable costs and attorneys' fees and disbursements, which an Indemnified Person may incur by reason of, or in connection with, any representation or warranty made herein (or in the accompanying Subscriber Information Form) not having been true, correct and complete when made, any misrepresentation made by the Subscriber or any failure by the Subscriber to fulfill any of the covenants or agreements set forth herein, in the Subscriber Information Form or in any other document provided by the Subscriber to the Fund.

(b) To the extent that any provisions of this Subscription Agreement, including, without limitation, Section 6 hereof, are not enforceable under applicable law by virtue of any person not being party to this Subscription Agreement (each such person, a "*Third Party*"), the Subscriber hereby agrees that the Fund may execute one or more deed polls and/or enter into one or more separate agreements with any such Third Party and take all further actions as may be necessary or desirable, in the sole opinion of the Fund, to give effect to such provisions.

(c) The Subscriber expressly consents to the Investment Manager or the Administrator accepting and executing any instructions transmitted in written or facsimile form (or by other electronic means) in respect of an investment in the Fund to which this application relates (including, without limitation, withdrawal requests). If instructions are given by the Subscriber in facsimile form (or by other electronic means), the Subscriber undertakes to send

9

the original letter of instructions to the Fund and the Administrator and hereby agrees to hold harmless and indemnify each of the Indemnified Persons, the Administrator and any of its employees and agents against any loss of any nature whatsoever arising to any of them as a result of any of them acting upon instructions submitted by facsimile or by other electronic means. Each Indemnified Person and each of the Administrator and any of its employees and agents may rely conclusively upon and shall incur no liability (i) for any loss arising from the non-receipt of any instructions relating to the Shares of the Subscriber delivered by facsimile or other electronic means or (ii) in respect of any action taken upon any notice, consent, request, instructions or other instrument believed in good faith to be genuine or to be signed by properly authorized persons on behalf of the Subscriber. Each Indemnified Person and each of the Administrator and any of its employees and agents shall be allowed such amount of time to act on and implement any instructions as may be reasonable having regard to their systems and operations and any other circumstances then prevailing and shall not be liable for any loss arising from any delay in acting on any instruction.

## 7. Miscellaneous

(a)     The Subscriber agrees that neither this Subscription Agreement, nor any of the Subscriber's rights, interest or obligations hereunder, is transferable or assignable by the Subscriber, and further agrees that the transfer or assignment of any Shares acquired pursuant hereto shall be made only in accordance with the provisions hereof and all applicable laws. Any assignment in violation of this Section 7(a) shall be null and void.

(b)     The Subscriber agrees that, except as permitted by applicable law, it may not cancel, terminate or revoke this Subscription Agreement or any agreement of the Subscriber made hereunder, and that this Subscription Agreement shall survive the death or legal disability of the Subscriber and shall be binding upon the Subscriber's heirs, executors, administrators, successors and assigns.

(c)     All of the representations, warranties, covenants, agreements, indemnities and confirmations set out above and in the Subscriber Information Form shall survive the acceptance of the subscription made herein and the issuance of any Shares.

(d)     This Subscription Agreement together with the Subscriber Information Form constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by both parties.

(e)     The Subscriber hereby agrees that any representation made hereunder will be deemed to be reaffirmed by the Subscriber at any time it makes an additional capital contribution to the Fund and the act of making such additional contribution will be evidence of such reaffirmation.

(f)     Within 10 days after receipt of a written request therefor from the Fund, the Subscriber agrees to provide such information and to execute and deliver such documents as the Fund may deem reasonably necessary to comply with any and all laws, rules, regulations, orders and ordinances to which the Fund is or may be subject.

(g)     The Subscriber agrees to keep confidential, and not to make any use of (other than for purposes reasonably related to its investment in the Fund) or disclose to any person, any information or matter relating to the Fund and its affairs and any information or matter related to any investment of the Fund (other than disclosure to the Subscriber's authorized representatives); provided that (i) the Subscriber may make such disclosure to the extent that (x) the information to be disclosed is publicly known at the time of proposed disclosure by the Subscriber, (y) the information otherwise is or becomes legally known to the Subscriber other than through disclosure by the Fund, or (z) such disclosure is required by law or in response to any governmental agency request or in connection with an examination by any regulatory authorities; provided that such agency, regulatory authorities or association is aware of the confidential nature of the information disclosed; (ii) the Subscriber may make such disclosure to its Beneficial Interest Holders to the extent required under the terms of its arrangements with such persons; and (iii) the Subscriber will be permitted, after written notice to the Fund, to correct any false or misleading information that becomes public concerning the Subscriber's relationship to the Fund. Prior to making any disclosure required by law, the Subscriber shall use its best efforts to notify the Fund of such disclosure. Prior to any disclosure to any authorized representative or Beneficial Interest Holder, the Subscriber shall advise such persons of the confidentiality obligations set forth herein and each such person shall agree to be bound by such obligations. Notwithstanding the foregoing, the Subscriber may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of an investment in the Fund and all materials of any kind (including opinions or other tax analyses) that are provided in connection with this Subscription Agreement to the Subscriber relating to such tax treatment or tax structure. The Subscriber acknowledges and agrees that the Fund and the Investment Manager would be damaged irreparably and would not have an adequate remedy at law if this Section (g) is not performed in accordance with its specific terms or is otherwise breached. Accordingly, in addition to any other remedy to which it may be entitled at law or in equity, each party will be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Section 7(g) and to enforce specifically this Section 7(g), without bond or other security being required. The rights and remedies in this Section 7(g) are cumulative and in addition to any other rights and remedies otherwise available at law or in equity. Nothing will be considered an election of remedies or a waiver of the right to pursue any other right or remedy to which party may be entitled.

(h)     The Subscriber acknowledges and understands that if any person who is resident in the Cayman Islands has a suspicion that a payment to the Fund (by way of subscription or otherwise) is the proceeds of criminal conduct, that person is required to report such suspicion to the relevant Cayman authorities pursuant to The Proceeds of Crime Law (as amended) of the Cayman Islands.

(i)     Except as otherwise indicated in PART A – SECTION I.4 of the Subscriber Information Form, the Subscriber has agreed to receive and accept reports and communications indefinitely from the Fund, the Administrator and the Investment Manager exclusively via e-mail to the e-mail address set forth in the Subscriber Information Form unless the Subscriber notifies the Investment Manager or the Administrator in writing that the Subscriber wishes to receive reports to either another e-mail address or alternatively, via regular mail in lieu of electronic mail. *If instructions are given by the Subscriber via e-mail, the Subscriber agrees to indemnify each Indemnified Person and each of the Administrator and any of its employees and agents*

*against any loss of any nature whatsoever arising to any of them as a result of any of them acting upon instructions submitted by facsimile or by other electronic means. Each Indemnified Party and the Administrator may rely conclusively upon and shall incur no liability in respect of any loss arising from (i) the non-receipt of any instructions relating to the interests of the Subscriber delivered via e-mail or (ii) any action taken upon any notice, consent, request, instructions or other instrument believed in good faith to be genuine or to be signed by properly authorized persons on behalf of the Subscriber.*

## 8.    Standing Proxy

The Subscriber hereby designates and appoints the Administrator with power of substitution, as the Subscriber's true and lawful proxy for the purpose of voting any Shares issued pursuant to this Subscription Agreement (or such portion thereof from time to time owned by the Subscriber) as said proxy may determine on any and all matters arising at any annual or special general meeting of the Fund or any class meeting upon which such Shares could be voted by the Subscriber (or the person in whose name the Shares hereby subscribed are registered at the Subscriber's direction) if present in person at the meeting. This proxy may be revoked by the Subscriber (or his registered nominee) either personally or by presentation of a subsequently executed form of proxy at any annual or special general meeting or any class meeting of the Fund or by written notice to the Administrator received at the Fund's registered office prior to any such meeting.

## 9.    Notices

Any notice required or permitted to be given to the Subscriber in relation to the Fund shall be sent to the address specified in Part A, Section I of the Subscriber Information Form or to such other address as the Subscriber designates by written notice received by the Fund. The Subscriber acknowledges and agrees that any consent that need be obtained from the Subscriber by the Fund may be obtained by the form of a negative consent following written notice. For purposes of clarity, the Fund may provide the Subscriber with reasonable advance notice of an issue requiring the Subscriber's consent, and if the Subscriber does not respond to such notice within a reasonable time as set forth in the notice, the Subscriber shall be deemed to have approved and consent to such issue.

## 10.    Arbitration and Mediation

The Subscriber acknowledges and agrees that the following procedures shall be used to resolve any controversy or claim (*"**Dispute**"*) arising out of, relating to or in connection with this Subscription Agreement, the Articles or otherwise involving the Fund and/or any Indemnified Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a)    Mediation.

(i)    Any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a

mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect.

(ii)     The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

(iii)     The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

(iv)     Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

(b)     Arbitration.

(i)     If a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed. Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the mediation and arbitration provisions herein. The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in this document and the commercial dispute arbitration rules then in effect ("*Arbitration Rules*"). In the event of a conflict, the provisions of this document will control.

(ii)     The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the U.S. Federal Arbitration Act ("*FAA*"), and resolved by the arbitrators, provided, however, that the Fund or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will another arbitration law or regulation preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

(iii)     The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and

conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.

(iv)  The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Subscription Agreement. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive.

(v)  No discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.

(vi)  All aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term.

(vii)  The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

## 11.  Governing Law

Except for Section 10 of this Subscription Agreement which shall be governed by the laws of the State of Texas, this Subscription Agreement shall be governed by, and construed in accordance with, the laws of the Cayman Islands, without giving effect to any conflict of law principles that would result in the application of the laws of any other jurisdiction.

[Signature Page Follows]

14

# SIGNATURE PAGE

By signing below, the Subscriber (1) confirms that the information contained in the Subscriber Information Form is accurate and complete, (2) agrees to the terms of the Subscription Agreement, the Private Offering Memorandum and the Articles and (3) requests that the records of the Fund reflect the Subscriber's admission as a shareholder.

Executed as a Deed:

Dated: _____, 20___

**AMOUNT OF SUBSCRIPTION**

$ _180,000.00_

_THE DUGABOY INVESTMENT TRUST_

_____
Name of Other Subscriber
(*if a natural person and purchasing jointly*)

Name of Subscriber

_____
Signature of Other Subscriber
(*if natural person and purchasing jointly*)

Signature

_____
Witness

_MELISSA SCHROTH_
Witness

_EXECUTIVE ACCOUNTANT_
Name and title or representative
capacity, if applicable

If the Subscriber is an individual retirement account, Keogh Plan or other self-directed plan, the custodian or trustee of the Subscriber is also required to execute this Agreement below:

Dated:_____, 20___

_____
Name of custodian or trustee

_____
Signature
Title: _____

The Subscriber's subscription is accepted, subject to the provisions of the Subscription Agreement, the Private Offering Memorandum and the Articles.

Highland Credit Opportunities Fund, Ltd.

By: _____
Name: _____
Title: _____

Dated: _____