# **EXHIBIT 8**

*Execution Version*

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of May 11, 2020 between and among UBS Securities LLC and UBS AG, London Branch (collectively, "UBS"), on the one hand, and Highland Multi Strategy Credit Fund, L.P. (f/k/a Highland Credit Opportunities CDO, L.P.) ("MSCF"), Highland Credit Opportunities CDO, Ltd. ("Credit Opps"), and Highland Credit Opportunities CDO Asset Holdings, L.P. ("Asset Holdings," and together with MSCF and Credit Opps, the "Funds"), on the other. UBS and the Funds are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

## R E C I T A L S

A.    **WHEREAS,** MSCF and Credit Opps are parties to that certain Loan Agreement, made by and between MSCF, Credit Opps, and NexBank, SSB ("NexBank," and together with MSCF and Credit Opps, the "Loan Parties"), dated as of May 1, 2018 (as amended, the "Loan Agreement");

B.    **WHEREAS,** Asset Holdings, a wholly owned subsidiary of MSCF, holds life settlement policies with policy numbers ███████████████████████ ███████████████ (collectively, the "Life Settlement Policies");

C.    **WHEREAS,** on June 28, 2019, the Loan Parties entered into that certain Second Amendment to Loan Agreement pursuant to which it was agreed that the Life Settlement Policies with policy numbers ████████████████████████████ (the "NexBank Life Settlement Policies") would be pledged to secure the obligations under the Loan Agreement;

D.    **WHEREAS,** on June 28, 2019, Asset Holdings executed that certain Collateral Assignment of Life Insurance in favor of NexBank pursuant to which Asset Holdings believes it assigned the NexBank Life Settlement Policies to NexBank to secure the obligations under the Loan Agreement ("Assignment");

E.    **WHEREAS,** the Funds have determined that it is in their best interests to sell the Life Settlement Policies;

F.    **WHEREAS,** UBS believes that it has a valid claim that the Life Settlement Policies were fraudulently conveyed to Asset Holdings in 2009 (the "Fraudulent Conveyance Claims");

G.    **WHEREAS,** the Fraudulent Conveyance Claims, among other claims, are the subject of a lawsuit brought by UBS in the Supreme Court of the State of New York, captioned *UBS Securities LLC and UBS AG, London Branch v. Highland Capital Management, L.P., Highland Special Opportunity Holding Company, Highland CDO Opportunity Master Fund, L.P., Highland Financial Partners, L.P., Highland Credit Strategies Master Fund, L.P., Highland Crusader Offshore Partners, L.P., Highland Credit Opportunities CDO, L.P., Strand Advisors, Inc.*, No. 650097/2009, against Highland Credit Opportunities CDO, L.P., the predecessor of MSCF, amongst other parties (the "State Court Action");

1

H.　　**WHEREAS,** UBS, in the State Court Action, has asserted, among other things, that the Life Settlement Policies or their value must be turned over to UBS;

I.　　**WHEREAS**, the Funds, among other defendants in the State Court Action, dispute UBS's claims to the Life Settlement Policies and the validity of the Fraudulent Conveyance Claims and UBS disputes the validity of the Assignment;

J.　　**WHEREAS,** because of the Fraudulent Conveyance Claims and the Assignment, the Funds' ability to sell the Life Settlement Policies has been compromised;

K.　　**WHEREAS**, solely to avoid the expense, inconvenience, and uncertainty associated with litigation, and without either Party admitting liability, fault, or wrongdoing, or releasing or waiving any rights or defenses with respect to the Fraudulent Conveyance Claims, the Parties desire to enter into this Agreement to allow the Life Settlement Policies to be sold and the proceeds to be distributed.

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1.　　**Sale of Life Settlement Policies; Free and Clear.**

(a)　　The Funds will use commercially reasonable efforts to cause the Life Settlement Policies to be sold at an auction (the "Auction") conducted by Maple Life Analytics, LLC ("Maple") for $37,135,000.00 in addition to amounts sufficient to reimburse the Funds for any Life Settlement Policy premiums paid in or after May 2020.

(b)　　Subject to the terms of this Agreement, including Section 4 hereof, UBS agrees that, if all or some of the Life Settlement Policies are sold at the Auction, any such sale of the Life Settlement Policies will be free and clear of any and all claims (including the Fraudulent Conveyance Claims) against or interests in such Life Settlement Policies that have been, could have been, or could be asserted by UBS whether in the State Court Action or otherwise. For the avoidance of doubt, UBS shall retain any and all such claims against (i) any Life Settlement Policies that are not sold in the Auction and/or (ii) against the Funds for the full value of such claims as they otherwise existed at the time of the completion of the Auction, including without limitation, for the value of any Life Settlement Policies sold at auction, and for any prejudgment interest, attorneys' fees, punitive damages, or other economic claims. For the avoidance of doubt, the Parties' intent is that this Agreement shall neither diminish nor augment the recoverable value of any claims UBS has with respect to the Funds or the Life Settlement Policies.

2.　　**Distribution of Proceeds.**

(a)　　Subject to Section 2(b), the proceeds from the Auction will be distributed as soon as reasonably practicable as follows:

(i)　　*First*, $371,350.00 to Maple as payment for their fees;

*Execution Version*

(ii)     *Second*, $100,000.00 to MSCF to be used to pay other expenses associated with the Auction;

(iii)     *Third*, $15,840,000.000, representing the net proceeds from the sale of the NexBank Life Settlement Policies, to NexBank in satisfaction of its claimed security interest in the NexBank Life Settlement Policies and in repayment of a portion of the obligations owed by the Loan Parties to NexBank pursuant to the Loan Agreement;

(iv)     *Fourth,* $1,750,000 to Highland Capital Management, L.P. ("HCMLP"), in satisfaction of certain amounts previously loaned to MSCF for the payment of Life Settlement Policy premiums and certain other operating expenses;

(v)     *Fifth*, $8,969,000.00 to MSCF to be used to pay operating costs of the Funds (or to repay advances made to pay such costs), including, but not limited to, amounts due under the Loan Agreement and premiums due on any remaining life settlement policies, provided that none of the amounts in this Section 2(a)(v) shall be transferred to HCMLP as direct or indirect repayment of any amounts advanced by HCMLP to MSCF prior to the commencement of HCMLP's chapter 11 bankruptcy case; and

(vi)     *Sixth*, $10,104,650.00 to the Escrow Account (as defined below) on the terms set forth in Section 3 hereof;

(b)     In addition to the distributions set forth above:

(i)     HCMLP will be entitled to receive any premium repayments or refunds made by any buyer of a Life Settlement Policy prior to any distributions being made pursuant to Section 2; and

(ii)     Subject to Section 5 below, MSCF will retain any payments or proceeds received on the Life Settlement Policies that are not otherwise payable to the buyer of such Life Settlement Policy in the Auction.

(c)     Notwithstanding anything in this Agreement to the contrary:

(i)     if some, but not all, of the NexBank Life Settlement Policies are sold at the Auction, or if the NexBank Life Settlement Policies are sold for less than $15,840,000.00, the amount set forth in Section 2(a)(iii) will be reduced to reflect the net proceeds from the NexBank Life Settlement Policies actually sold and the amount set forth in Section 2(a)(i) will be adjusted to reflect the fee actually payable to Maple; and

(ii)     if the proceeds from the Auction are less than $37,135,000.00 for any reason, other than as set forth in Section 2(c)(i), the amount set forth in Section 2(a)(i) will be adjusted to reflect the fee actually payable to Maple and any decrease in the gross proceeds shall be apportioned equally (i.e., by 50%) to each of the amounts set forth in Section 2(a)(vi) and Section 2(a)(iv).  If the proceeds from the Auction are greater than $37,135,000.00, then the additional gross proceeds shall be apportioned equally (i.e., by 50%) to each of the amounts set forth in Section 2(a)(v) and Section 2(a)(vi).

*Execution Version*

3. **Escrow Account.** The proceeds from the Auction distributed pursuant to Section 2(a)(vi), will be deposited in an escrow account (the "Escrow Account") maintained at Citibank the terms and conditions set forth in the escrow agreement in the form attached hereto as **Exhibit A** (the "Escrow Agreement"). All costs associated with maintaining the Escrow Account will be paid by the Funds. As set forth in the Escrow Agreement, the Escrow Account will be maintained for a period of two years from the date proceeds are initially deposited therein, unless such date is extended by mutual agreement of the Parties or pursuant to an order from a court of applicable jurisdiction, and no amounts will be released from the Escrow Account during such two year period unless subject to court order or the agreement of the Parties. For the avoidance of doubt, it is expected that UBS will seek an extension of this two year period (upon a proper showing) if UBS's claims against HCMLP and/or the Funds have not been resolved. Any amounts remaining in the Escrow Account at the expiration of the two year period, as may be extended and subject to contrary court order or agreement of the Parties, will be distributed to MSCF.

4. **No Release; No Waiver**. Except as set forth in Section 1(a) hereof, nothing contained herein is or will be construed as a waiver or release (i) by UBS of any claim, cause of action, or right of relief against any of the Funds or their predecessors, including the Fraudulent Conveyance Claims, whether in law, equity, or contract, including with respect to any proceeds from the sale of any of the Life Settlement Policies (the "Sale") held in the Escrow Account (the "Escrow Amount"), or (ii) by the Funds, their predecessors, or any other party of any defense whether in law, equity, or contract with respect to the Fraudulent Conveyance Claims or any other claims that UBS may assert. All such rights are expressly reserved. For the avoidance of doubt, notwithstanding the Sale of the Life Settlement Policies, (a) UBS's claims against the Life Settlement Policies are fully preserved against the proceeds of the Sale up to the Escrow Amount, and (b) all of UBS's claims, causes of action, and rights of relief, whether in law or equity, against the Funds and their predecessors, or any of them, and whether currently pending or not, are preserved as to (but not limited by) the total proceeds of the Sale as against any and all present and future assets held by, or interests in, the Funds (other than the Life Settlement Policies) and shall in no way be deemed altered, diminished, impaired, released, or waived in any respect by the Sale, this Agreement, or the execution of this Agreement. For the further avoidance of doubt, the payment of proceeds from the Sale to HCMLP shall not be deemed in any way to impair, release, or waive any claims, causes of action, or rights of relief held by UBS against HCMLP or the Funds and their predecessors, nor shall any such payments in any way impair, release, waive, alter, or diminish UBS's ability to recover such amounts on account of its claims against HCMLP in HCMLP's chapter 11 case or otherwise. For the further avoidance of doubt, any claims UBS currently has (if any) with respect to the Life Settlement Policies or otherwise against the Funds and their predecessors, including but not limited to, claims for the value of the Life Settlement Policies as of the date of the Auction, claims for prejudgment interest, claims for attorneys' fees and/or claims for punitive damages are intended to be preserved against the Funds, and shall not be diminished (or augmented) by the fact of the Sale of the Life Settlement Policies in the Auction.

5. **No Additional Distributions**.

(a) Except for the distributions set forth in Section 2 above, none of the Funds will make any distributions or redemption payments to any of MSCF's limited partners, general

partners, shareholders, or other equity holders (collectively, the "Equity Parties") (regardless of whether an Equity Party has tendered its equity interest for redemption) for two years from the date of the closing of the Life Settlement Policy sales (the "Standstill Term") unless such payments are made with the mutual agreement of HCMLP and UBS or pursuant to an order from a court of applicable jurisdiction. It is agreed that the Funds shall provide UBS with no less than five (5) business days' advance written notice prior to seeking such an order. It is expressly recognized that, upon a proper showing (subject to proper objections by HCMLP), UBS may obtain a court-ordered extension of the Standstill Term. The Standstill Term may be extended by mutual agreement of the Parties or pursuant to an order from a court of applicable jurisdiction. Following the expiration of the Standstill Term, as may be extended, MSCF may make distributions or redemption payments to the Equity Parties, to the extent permissible and appropriate, in its sole discretion. For the avoidance of doubt, the expiration of the Standstill Term, in of itself, shall not have any impact on UBS's rights, if any, with respect to its claims against HCMLP and/or the Funds.

(b)     During the Standstill Term (and any extension of that term pursuant to agreement or court order as set forth herein), the Funds agree to provide UBS with no less than five (5) business days' written notice of any proposed sale, transfer, or other disposition of any assets held by, or interest in, the Funds, including the proceeds from such transfer or disposition, and the proposed transferee with respect to such assets or interests.

6.     **Representations and Warranties**. As of the date hereof, the Funds represent, warrant and covenant that the Funds' current assets and their most recent valuations are set forth in **Schedule 1** hereto in the following format:

| Asset | Value | Date of Valuation | Source of Valuation |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

For the avoidance of doubt, nothing in this Section 6 or **Schedule 1** constitutes a representation or warranty as to the actual value of the Funds' assets or the price that can or may be obtained from a sale, if any, of such assets.

7.     **Successors In Interest**. Each of the Parties agrees that this Agreement will be binding upon the Parties, and, as applicable, upon their predecessors, successors, subsidiaries,

divisions, alter egos, affiliated and related entities, and their past or present officers, directors, partners, employees, attorneys, assigns, agents, representatives, and any or all of them.

8.    **No Admission of Liability**.   The Parties acknowledge that there is a bona fide dispute with respect to the Fraudulent Conveyance Claims.   Nothing in this Agreement will imply an admission of liability, fault or wrongdoing by the Funds or any other person.   In particular, the execution of this Agreement will not constitute an admission of liability, fault, or wrongdoing on the part of the Funds or any other person

9.    **Confidentiality**.   The Parties agree that the information provided in **Schedule 1** shall be strictly confidential except as required by law or if necessary to disclose to enforce this Agreement (but in such case the Parties will take reasonable care to ensure confidentiality to the extent permitted by law).   The Parties to this Agreement stipulate and covenant not to repeat, speak, display or disclose any of the information set forth in **Schedule 1** to anyone other than their attorneys and advisors; *provided however*, that such information may be provided to the unsecured creditor committee appointed in the bankruptcy of HCMLP.

10.    **Notice**.   Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**UBS**

UBS Legal Department – Americas Litigation
Attn:  Patrick Shilling
1285 Avenue of the Americas
New York, NY 10019
Telephone No.:  212-713-3685
E-mail: patrick.shilling@ubs.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, CA 90071
Attention: Jeffrey E. Bjork, Esq.
Telephone No.:  213-485-1234
Facsimile No.:  213-891-8763
E-mail:  jeff.bjork@lw.com

**MSCF, Asset Holdings, or Credit Opps**

Highland Multi Strategy Credit Fund, L.P.
c/o Highland Capital Management, L.P.

*Execution Version*

300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: Legal Department
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: notices@HighlandCapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

11.   **Advice of Counsel**.  Each of the Parties represents that such Party has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

12.   **Entire Agreement**. This Agreement contains the entire agreement and understanding concerning the subject matter of this Agreement, and supersedes and replaces all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

13.   **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement. In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

14.   **Severability**.  If any term or provision, or portion thereof, of this Agreement is declared to be illegal or invalid, the validity of the remaining provisions or portions thereof will

*Execution Version*

not be affected thereby, and the illegal or invalid provision or portions thereof will be deemed not a part of the Agreement.

15. **Counterparts**. This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

16. **Governing Law; Venue**. The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of New York without regard to conflict-of-law principles. Each of the Parties hereby submits to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan with respect to any disputes arising from or out of this Agreement.

*[Remainder of Page Intentionally Blank]*

*Execution Version*

**IT IS HEREBY AGREED.**

**UBS SECURITIES LLC and UBS AG London Branch**

By: _____
Name: _Patrick Shilling_____
Its: __Authorized Signatory_____

By: _____
Name: _____
Its: _____

**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P.**

By: _____
Name: _____
Its: _____

**HIGHLAND CREDIT OPPORTUNITIES CDO LTD.**

By: _____
Name: _____
Its: _____

**HIGHLAND CREDIT OPPORTUNITIES CDO ASSET HOLDINGS, LP**

By: _____
Name: _____
Its: _____

[*Signature Page to Settlement Agreement*]

*Execution Version*

**IT IS HEREBY AGREED.**

**UBS SECURITIES LLC and UBS AG London Branch**

By: _____

Name: William W. Chandler

Its:    Authorized Signatory

By: _____

Name: _____

Its: _____

**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P.**

By: _____

Name: _____

Its: _____

**HIGHLAND CREDIT OPPORTUNITIES CDO LTD.**

By: _____

Name: _____

Its: _____

**HIGHLAND CREDIT OPPORTUNITIES CDO ASSET HOLDINGS, LP**

By: _____

Name: _____

Its: _____

*Execution Version*

**IT IS HEREBY AGREED.**

**UBS SECURITIES LLC and UBS AG London Branch**

By: _____
Name: _____
Its: _____

By: _____
Name: _____
Its: _____

**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P.**

By: _____
Name: _____
Its: _____Authorized Signatory_____

**HIGHLAND CREDIT OPPORTUNITIES CDO LTD.**

By: _____
Name: _____
Its: _____Authorized Signatory_____

**HIGHLAND CREDIT OPPORTUNITIES CDO ASSET HOLDINGS, LP**

By: _____
Name: ____James P. Surry, Jr.____
Its: _____Authorized Signatory_____

*[Signature Page to Settlement Agreement]*

*Execution Version*

**Schedule 1**

**Fund Assets**

**Highland Multi Strategy Credit Fund**
As of 4.30.20 [1][2]



| Instrument | Market Value | Shares | Price | Price Source |
|------------|-------------|--------|-------|--------------|

**Exhibit A**

**Form of Escrow Agreement**

ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Agreement") is made and entered into as of May ___, 2020, by and among (i) **UBS Securities LLC** ("UBS"), (ii) **Highland Multi Strategy Credit Fund, L.P.** ("MSCF") and **Highland Credit Opportunities CDO Asset Holdings, LP** ("Asset Holdings" and together with MSCF, sometimes referred to individually and collectively, the "Funds") and the Funds together with UBS, sometimes referred to individually as a "Party" and collectively as the "Parties"), and (iii) **CITIBANK, N.A.**, as escrow agent (the "Escrow Agent").

RECITALS

WHEREAS, the Parties, along with UBS AG, London Branch and Highland Credit Opportunities CDO, Ltd., entered into a Settlement Agreement dated May 11, 2020 (as amended, restated, supplemented or otherwise modified from time to time, the "Settlement Agreement") pursuant to which the Parties have agreed to place in escrow a portion of the proceeds from the sale of certain assets (the "Sale Proceeds").

WHEREAS, the Parties and the Escrow Agent desire to set forth their rights and obligations with respect to the Escrow Funds (as defined below) and the distribution and release thereof.

NOW THEREFORE, in consideration of the foregoing and of the mutual covenants hereinafter set forth, the parties hereto agree as follows:

1.      Appointment.  The Parties hereby appoint the Escrow Agent as their escrow agent for the purposes set forth herein, and the Escrow Agent hereby accepts such appointment and agrees to act as escrow agent in accordance with the terms and conditions set forth herein.

2.      Escrow Funds.

(a)      Simultaneous with the execution and delivery of this Agreement, MSCF shall deposit or cause to be deposited with the Escrow Agent Sale Proceeds in the amount of $10,104,650.00 (or such other amount as may be agreed to by the Parties) (such amount, the "Escrow Amount") in immediately available funds.  The Escrow Agent hereby acknowledges receipt of the Escrow Amount, together with all products and proceeds thereof, including all interest, dividends, gains and other income (collectively, the "Escrow Earnings") earned with respect thereto (collectively, the "Escrow Funds") in separate and distinct account (the "Escrow Account"), subject to the terms and conditions of this Agreement.

(b)      For greater certainty, all escrow earnings shall be retained by the Escrow Agent and reinvested in the Escrow Funds and shall become part of the Escrow Funds; and shall be disbursed as part of the Escrow Funds in accordance with the terms and conditions of this Agreement.

3.      Investment of Escrow Funds.

(a)     Unless otherwise instructed in writing by the Parties, the Escrow Agent shall hold the Escrow Funds in a "noninterest-bearing deposit account" insured by the Federal Deposit Insurance Corporation ("FDIC") to the applicable limits.  The Escrow Funds shall at all times remain available for distribution in accordance with Section 4 below.

(b)     The Escrow Agent shall send an account statement to each of the Parties on a monthly basis reflecting activity in the Escrow Account for the preceding month.

(c)     The Escrow Agent shall have no responsibility for any investment losses resulting from the investment, reinvestment or liquidation of the escrowed property, as applicable, provided that the Escrow Agent has made such investment, reinvestment or liquidation of the escrowed property in accordance with the terms, and subject to the conditions of this Agreement. The Escrow Agent does not have a duty nor will it undertake any duty to provide investment advice.

4.     Disposition and Termination of the Escrow Funds.

(a)     Escrow Funds.  The Parties shall act in accordance with, and the Escrow Agent shall hold and release the Escrow Funds as provided in, this Section 4(a) as follows:

(i)     Upon receipt of a Joint Release Instruction with respect to the Escrow Funds, the Escrow Agent shall promptly, but in any event within two (2) Business Days after receipt of a Joint Release Instruction, disburse all or part of the Escrow Funds in accordance with such Joint Release Instruction.

(ii)     Upon receipt by the Escrow Agent of a copy of Final Determination from any Party, the Escrow Agent shall on the second (2nd) Business Day following receipt of such copy, disburse as directed, part or all, as the case may be, of the Escrow Funds (but only to the extent funds are available in the Escrow Account) to the applicable Party or Parties, in accordance with such Final Determination.  The Escrow Agent will act on such Final Determination without further inquiry.

(iii)     If the Escrow Funds have not been released in accordance with clause (i) or (ii) of this Section 4(a) on or before May [  ], 2022, or such later date as agreed, and notified to the Escrow Agent, in writing by the Parties or established pursuant to an order from a court of applicable jurisdiction (the "Escrow End Date"), then, upon receipt of written instruction from the Funds (the "Final Instruction") executed by an authorized signer of each of the Funds, unless the Parties deliver to the Escrow Agent a Joint Release Instruction or a contrary order from a court of applicable jurisdiction prior to the disbursement expressly superseding such Final Instruction, the Escrow Agent shall on the second (2nd) Business Day following receipt of such Final Instruction, disburse all remaining Escrow Funds in accordance with such Final Instruction. The Funds agree not to send the Final Instruction prior to the Escrow End Date.

(iv)     All payments of any part of the Escrow Funds shall be made by wire transfer of immediately available funds or check as set forth in the Joint Release Instruction, Final Determination or Final Instruction, as applicable.

US-DOCS\115507286.12

(v)     Any instructions setting forth, claiming, containing, objecting to, or in any way related to the transfer or distribution of any funds on deposit in any Escrow Account under the terms of this Agreement must be in writing, executed by the appropriate Party or Parties as evidenced by the signatures of the person or persons set forth on Exhibit A-1 and Exhibit A-2, and delivered to the Escrow Agent either (i) by confirmed facsimile only at the fax number set forth in Section 11 below or (ii) attached to an e-mail received on a Business Day from an e-mail address set forth in Section 11 below. In the event a Joint Release Instruction, Final Instruction or Final Determination is delivered to the Escrow Agent, whether in writing, by facsimile or otherwise, the Escrow Agent is authorized to seek confirmation of such instruction by telephone call back to the person or persons designated in Exhibits A-1 and/or A-2 annexed hereto (the "Call Back Authorized Individuals"), and the Escrow Agent may rely upon the confirmations of anyone purporting to be a Call Back Authorized Individual. To assure accuracy of the instructions it receives, the Escrow Agent may record such call backs. If the Escrow Agent is unable to verify the instructions, or is not satisfied with the verification it receives, it will not execute the instruction until all such issues have been resolved. The persons and telephone numbers for call backs may be changed only in writing, executed by an authorized signer of the applicable Party set forth on Exhibit A-1 or Exhibit A-2, actually received and acknowledged by the Escrow Agent.

(b)     Certain Definitions.

(i)     "Business Day" means any day that is not a Saturday, a Sunday or other day on which banks are not required or authorized by law to be closed in New York, New York.

(ii)     "Final Determination" means a final non-appealable order of any court of competent jurisdiction, including without limitation, any judgment, order or decree, that finally adjudicates ownership of, or entitlement to, the Sale Proceeds, together with (A) a certificate of the prevailing Party to the effect that such order is final and non-appealable and from a court of competent jurisdiction having proper authority and (B) the written payment instructions of the prevailing Party to effectuate such order.

(iii)     "Joint Release Instruction" means the joint written instruction, substantially in the form of Exhibit B attached hereto, executed by an authorized signer of each of UBS and the Funds directing the Escrow Agent to disburse all or a portion of the Escrow Funds, as applicable.

(iv)     "Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

5.     Escrow Agent. The Escrow Agent undertakes to perform only such duties as are expressly set forth herein, which shall be deemed purely ministerial in nature, and no duties, including but not limited to any fiduciary duties, shall be implied. The Escrow Agent shall neither be responsible for, nor chargeable with, knowledge of, nor have any requirements to comply with, the terms and conditions of any other agreement, instrument or document between

3

the Parties, in connection herewith, if any, including without limitation the Settlement Agreement, nor shall the Escrow Agent be required to determine if any Person has complied with any such agreements, nor shall any additional obligations of the Escrow Agent be inferred from the terms of such agreements, even though reference thereto may be made in this Agreement. Notwithstanding the terms of any other agreement between the Parties, the terms and conditions of this Agreement will control the actions of Escrow Agent. The Escrow Agent may rely upon and shall not be liable for acting or refraining from acting upon any Joint Release Instruction, Final Instruction or Final Determination furnished to it hereunder and believed by it to be genuine and to have been signed and presented by an authorized signer of the proper Party or Parties. Concurrent with the execution of this Agreement, the Parties shall deliver to the Escrow Agent authorized signers' forms in the form of <u>Exhibit A-1</u> and <u>Exhibit A-2</u> attached hereto. The Escrow Agent shall be under no duty to inquire into or investigate the validity, accuracy or content of any such document, notice, instruction or request. The Escrow Agent shall have no duty to solicit any payments which may be due it or the Escrow Funds. In the event that the Escrow Agent shall be uncertain as to its duties or rights hereunder or shall receive instructions, claims or demands from any Party hereto which, in its opinion, conflict with any of the provisions of this Agreement, it shall be entitled to refrain from taking any action and its sole obligation shall be to keep safely all property held in escrow until it shall be directed otherwise in a Joint Release Instruction, Final Instruction or Final Determination. The Escrow Agent may interplead all of the assets held hereunder into a court of competent jurisdiction or may seek a declaratory judgment with respect to certain circumstances, and thereafter be fully relieved from any and all liability or obligation with respect to such interpleaded assets or any action or nonaction based on such declaratory judgment. The Escrow Agent may consult with legal counsel of its selection in the event of any dispute or question as to the meaning or construction of any of the provisions hereof or its duties hereunder. The Escrow Agent will not be liable for any action taken, suffered or omitted to be taken by it in good faith except to the extent that the Escrow Agent's gross negligence or willful misconduct was the cause of any direct loss to either Party. To the extent practicable, the Parties agree to pursue any redress or recourse in connection with any dispute without making the Escrow Agent a party to the same. Anything in this Agreement to the contrary notwithstanding, in no event shall the Escrow Agent be liable for any special, indirect, punitive, incidental or consequential losses or damages of any kind whatsoever (including but not limited to lost profits), even if the Escrow Agent has been advised of the likelihood of such losses or damages and regardless of the form of action.

6.      <u>Resignation and Removal of Escrow Agent</u>. The Escrow Agent (a) may resign and be discharged from its duties or obligations hereunder by giving thirty (30) calendar days advance notice in writing of such resignation to the Parties specifying a date when such resignation shall take effect or (b) may be removed, with or without cause, by the Parties acting jointly at any time by providing written notice to the Escrow Agent. Any corporation or association into which the Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all of the escrow business of the Escrow Agent's line of business may be transferred, shall be the Escrow Agent under this Agreement without further act (provided that the Escrow Agent will provide the Parties with reasonable notice of any such merger, conversion, consolidation or sale.) The Escrow Agent's sole responsibility after such thirty (30) day notice period expires or after receipt of written notice of removal shall be to hold and safeguard the Escrow Funds (without any obligation to reinvest the same) and to deliver the same (i) to a substitute or successor escrow

agent pursuant to a joint written designation from the Parties, (ii) as set forth in a Joint Release Instruction or (iii) in accordance with the directions of a Final Determination, and, at the time of such delivery, the Escrow Agent's obligations hereunder shall cease and terminate. In the event the Escrow Agent resigns, if the Parties have failed to appoint a successor escrow agent prior to the expiration of thirty (30) calendar days following receipt of the notice of resignation, the Escrow Agent may petition any court of competent jurisdiction for the appointment of such a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto.

7. <u>Fees and Expenses</u>. All fees and expenses of the Escrow Agent are described in <u>Schedule 1</u> attached hereto and shall be paid by the Funds. The fees agreed upon for the services to be rendered hereunder are intended as full compensation for the Escrow Agent services as contemplated by this Agreement.

8. <u>Indemnity</u>. UBS, on the one hand, and the Funds, on the other hand, hereby agree to, severally and not jointly, indemnify, defend, and hold harmless the Escrow Agent and its affiliates and their respective successors, assigns, directors, officers, agents and employees (the "<u>Indemnitees</u>") from and against any and all losses, damages, claims, liabilities, penalties, judgments, settlements, actions, suits, proceedings, litigation, investigations, costs or expenses (including the reasonable fees and expenses of one outside counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively "<u>Escrow Agent Losses</u>") arising out of or in connection with (a) the Escrow Agent's execution and performance of this Agreement, tax reporting or withholding, the enforcement of any rights or remedies under or in connection with this Agreement, or as may arise by reason of any act, omission or error of the Indemnitee, except to the extent that such Escrow Agent Losses, as adjudicated by a court of competent jurisdiction, have been caused by the fraud, gross negligence or willful misconduct of such Indemnitee, or (b) its following any instructions or other directions from UBS or the Funds. Notwithstanding anything to the contrary herein, the Parties agree, solely as between the Parties, that any obligation for indemnification under this <u>Section 8</u> (or for reasonable fees and expenses of the Escrow Agent described in <u>Section 7</u>) shall be borne by the Party or Parties determined by a court of competent jurisdiction to be responsible for causing the loss, damage, liability, cost or expense against which the Escrow Agent is entitled to indemnification or, if no such determination is made, then one-half by UBS and one-half by the Funds. The Parties acknowledge that the foregoing indemnities shall survive the resignation or removal of the Escrow Agent or the termination of this Agreement.

9. <u>Tax Matters.</u>

(a) MSCF shall be responsible for and the taxpayer on all taxes due on the interest or income earned, if any, on the Escrow Funds for the calendar year in which such interest or income is earned. The Escrow Agent shall report any interest or income earned on the Escrow Funds to the IRS or other taxing authority on IRS Form 1099. Prior to the date hereof, the Parties shall provide the Escrow Agent with certified tax identification numbers by furnishing appropriate forms W-9 or W-8 as applicable and such other forms and documents that the Escrow Agent may request.

(b)    The Escrow Agent shall be responsible only for income reporting to the Internal Revenue Service with respect to income earned on the Escrow Funds. The Escrow Agent shall withhold any taxes required to be withheld by applicable law, including but not limited to required withholding in the absence of proper tax documentation, and shall remit such taxes to the appropriate authorities.

(c)    The Escrow Agent, its affiliates, and its employees are not in the business of providing tax or legal advice to any taxpayer outside of Citigroup, Inc. and its affiliates. This Agreement and any amendments or attachments hereto are not intended or written to be used, and may not be used or relied upon, by any such taxpayer or for the purpose of avoiding tax penalties.    Any such taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

10.    <u>Covenant of Escrow Agent</u>.  The Escrow Agent hereby agrees and covenants with the Parties that it shall perform all of its obligations under this Agreement and shall not deliver custody or possession of any of the Escrow Funds to anyone except pursuant to the express terms of this Agreement or as otherwise required by law.

11.    <u>Notices</u>.  All notices, requests, demands and other communications required under this Agreement shall be in writing, in English, and shall be deemed to have been duly given if delivered (i) personally, (ii) by facsimile transmission with written confirmation of receipt, (iii) on the day of transmission if sent by electronic mail ("e-mail") with a PDF attachment executed by an authorized signer of the Party/ Parties to the e-mail address given below, and written confirmation of receipt is obtained promptly after completion of the transmission, (iv) by overnight delivery with a reputable national overnight delivery service, or (v) by mail or by certified mail, return receipt requested, and postage prepaid. If any notice is mailed, it shall be deemed given five Business Days after the date such notice is deposited with the United States Postal Service.  If notice is given to a Party, it shall be given at the address for such Party set forth below. It shall be the responsibility of the Parties to notify the Escrow Agent and the other Party in writing of any name or address changes.

<u>if to UBS, then to</u>:

UBS Legal Department – Americas Litigation
Attn:  Patrick Shilling
1285 Avenue of the Americas
New York, NY 10019
Telephone No.:  212-713-3685
E-mail: patrick.shilling@ubs.com

6

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
355 South Grand Avenue
Los Angeles, CA 90071
Attention: Jeffrey E. Bjork, Esq.
Telephone No.: 213-485-1234
Facsimile No.: 213-891-8763
E-mail: jeff.bjork@lw.com

or, if to MSCF or Asset Holdings, then to:

Highland Multi Strategy Credit Fund, L.P.
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: Legal Department
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: notices@HighlandCapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

or, if to the Escrow Agent, then to:

Citibank, N.A.
Citi Private Bank
One Sansome Street, 24th Floor
San Francisco, CA 94144
Attn: Hamyd Mazrae
Telephone No.: 415-627-6044
Facsimile No.: 415-592-5584
E-mail: hamyd.mazrae@citi.com

Notwithstanding the above, in the case of communications delivered to the Escrow Agent pursuant to the foregoing clause (i) through (iv) of this Section 11, such communications shall be deemed to have been given on the date received by the Escrow Agent. In the event that the

7

Escrow Agent, in its sole discretion, shall determine that an emergency exists, the Escrow Agent may use such other means of communication as the Escrow Agent deems appropriate.

12.    Termination.  This Agreement shall terminate on the first to occur of (a) the distribution of all of the amounts in the Escrow Funds in accordance with this Agreement or (b) delivery to the Escrow Agent of a written notice of termination executed jointly by the Parties after which this Agreement shall be of no further force and effect except that the provisions of Section 8 hereof shall survive termination.

13.    Miscellaneous.  The provisions of this Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by all of the parties hereto.  Neither this Agreement nor any right or interest hereunder may be assigned in whole or in part by any party without the prior consent of the other parties.  This Agreement shall be governed by and construed under the laws of the State of New York. Each party irrevocably waives any objection on the grounds of venue, forum non-conveniens or any similar grounds and irrevocably consents to service of process by mail or in any other manner permitted by applicable law and submits to the exclusive jurisdiction of the federal and state courts in the Borough of Manhattan in the City of New York.  The parties hereby waive any right to a trial by jury with respect to any lawsuit or judicial proceeding arising from or relating to this Agreement. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  All signatures of the parties to this Agreement may be transmitted by facsimile or electronic transmission in portable document format (.pdf), and such facsimile or .pdf will, for all purposes, be deemed to be the original signature of such party whose signature it reproduces, and will be binding upon such party.  If any provision of this Agreement is determined to be prohibited or unenforceable by reason of any applicable law of a jurisdiction, then such provision shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof, and any such prohibition or unenforceability in such jurisdiction shall not invalidate or render unenforceable such provisions in any other jurisdiction.  The Parties represent, warrant and covenant that each document, notice, instruction or request provided by such Party to the Escrow Agent shall comply with applicable laws and regulations.  Where, however, the conflicting provisions of any such applicable law may be waived, they are hereby irrevocably waived by the parties hereto to the fullest extent permitted by law, to the end that this Agreement shall be enforced as written.  Except as expressly provided in Sections 7 and 8, nothing in this Agreement, whether express or implied, shall be construed to give to any person or entity other than the Escrow Agent and the Parties any legal or equitable right, remedy, interest or claim under or in respect of this Agreement or any funds escrowed hereunder.

14.    Compliance with Court Orders.  In the event that any escrow property shall be attached, garnished or levied upon by any court order, or the delivery thereof shall be stayed or enjoined by an order of a court, or any order, judgment or decree shall be made or entered by any court order affecting the property deposited under this Agreement, the Escrow Agent is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, orders or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Escrow Agent obeys or complies with any such writ, order or decree it shall not be liable to any of the Parties or to any other

Person, by reason of such compliance notwithstanding such writ, order or decree be subsequently reversed, modified, annulled, set aside or vacated.

15. <u>Further Assurances</u>. Following the date hereof, each party shall deliver to the other parties such further information and documents and shall execute and deliver to the other parties such further instruments and agreements as any other party shall reasonably request to consummate or confirm the transactions provided for herein, to accomplish the purpose hereof or to assure to any other party the benefits hereof.

16. <u>Assignment</u>. No assignment of the interest of any of the Parties shall be binding upon the Escrow Agent unless and until written notice of such assignment shall be filed with and consented to by the Escrow Agent (such consent not to be unreasonably withheld). Any transfer or assignment of the rights, interests or obligations hereunder in violation of the terms hereof shall be void and of no force or effect.

17. <u>Force Majeure.</u> The Escrow Agent shall not incur any liability for not performing any act or fulfilling any obligation hereunder by reason of any occurrence beyond its control (including, but not limited to, any provision of any present or future law or regulation or any act of any governmental authority, any act of God or war or terrorism, or the unavailability of the Federal Reserve Bank wire services or any electronic communication facility), it being understood that the Escrow Agent shall use commercially reasonable efforts which are consistent with accepted practices in the banking industry to resume performance as soon as reasonably practicable under the circumstances.

18. <u>Compliance with Federal Law</u>. To help the U.S. Government fight the funding of terrorism and money laundering activities and to comply with Federal law requiring financial institutions to obtain, verify and record information on the source of funds deposited to an account, the Parties agree to provide the Escrow Agent with the name, address, taxpayer identification number, and remitting bank for all Parties depositing funds at Citibank pursuant to the terms and conditions of this Agreement. For a non-individual person such as a business entity, a charity, a trust or other legal entity, the Escrow Agent will ask for documentation to verify its formation and existence as a legal entity. The Escrow Agent may also ask to see financial statements, licenses, an identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

19. <u>Use of Citibank Name.</u> No publicly distributed printed or other material in any language, including prospectuses, notices, reports, and promotional material which mentions "Citibank" by name or the rights, powers, or duties of the Escrow Agent under this Agreement shall be issued by any other parties hereto, or on such party's behalf, without the prior written consent of the Escrow Agent.

*　*　*　*　*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date set forth above.

**UBS SECURITIES LLC**

By: _____

Name: _____

Its: _____


By: _____

Name: _____

Its: _____


**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P.**

By: _____

Name: _____

Its: _____


**HIGHLAND CREDIT OPPORTUNITIES CDO ASSET HOLDINGS, LP**

By: _____

Name: _____

Its: _____

*Signature Page to Escrow Agreement*

<u>ESCROW AGENT</u>:

**CITIBANK, N.A.**

By: _____

Name: _____

Its: _____

<u>Schedule 1</u>

**ESCROW AGENT FEE SCHEDULE**
**Citibank, N.A., Escrow Agent**

**<u>Acceptance Fee</u>**
To cover the acceptance of the Escrow Agency appointment, the study of the Agreement, and supporting documents submitted in connection with the execution and delivery thereof, and communication with other members of the working group:

      **Fee:**              **WAIVED**

**<u>Administration Fee</u>**
The annual administration fee covers maintenance of the Escrow Account including safekeeping of assets in the escrow account, normal administrative functions of the Escrow Agent, including maintenance of the Escrow Agent's records, follow-up of the Agreement's provisions, and any other safekeeping duties required by the Escrow Agent under the terms of the Agreement. Fee is based on Escrow Amount being deposited in a non-interest bearing deposit account, FDIC insured to the applicable limits.

      **Fee:**              **WAIVED**

**<u>Tax Preparation Fee</u>**
To cover preparation and mailing of Forms 1099-INT, if applicable for the escrow parties for each calendar year:

      **Fee:**              **WAIVED**

**<u>Transaction Fees</u>**
To oversee all required disbursements or release of property from the escrow account to any escrow party, including cash disbursements made via check and/or wire transfer, fees associated with postage and overnight delivery charges incurred by the Escrow Agent as required under the terms and conditions of the Agreement:

      **Fee:**              **WAIVED**

**<u>Other Fees</u>**
Material amendments to the Agreement: additional fee(s), if any, to be discussed at time of amendment.

---

**TERMS AND CONDITIONS**: The above schedule of fees does not include charges for out-of-pocket expenses or for any services of an extraordinary nature that Citibank or its legal counsel may be called upon from time to time to perform. Fees are also subject to satisfactory review of the documentation, and Citibank reserves the right to modify them should the characteristics of the transaction change. Citibank's participation in this program is subject to internal approval of the third party depositing monies into the escrow account to be established hereunder. The Acceptance Fee, if any, is payable upon execution of the Agreement. Should this schedule of fees be accepted and agreed upon and work commenced on this program but subsequently halted and the program is not brought to market, the Acceptance Fee and legal fees incurred, if any, will still be payable in full.

## EXHIBIT A-1

### Certificate as to UBS' Authorized Signatures

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of UBS and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under this Agreement, on behalf of UBS.  The below listed persons (must list at least two individuals, if applicable) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of Escrow Funds from the escrow account(s).

Name / Title / Telephone                    Specimen Signature

_____          _____
Name                                        Signature

_____
Title

_____          _____
Phone                                       Mobile Phone *(Required for DocuSign Capabilities)*

_____          _____
Name                                        Signature

_____
Title

_____          _____
Phone                                       Mobile Phone *(Required for DocuSign Capabilities)*

_____          _____
Name                                        Signature

_____
Title

_____          _____
Telephone                                   Mobile Phone *(Required for DocuSign Capabilities)*

NOTE: Actual signatures are required above.  Electronic signatures, "Docusigned" signatures and/or signature fonts are not acceptable.

*Exhibit to Escrow Agreement*

<u>EXHIBIT A-2</u>

<u>Certificate as to the Funds' Authorized Signatures</u>

The specimen signatures shown below are the specimen signatures of the individuals who have been designated as authorized representatives of the Funds and are authorized to initiate and approve transactions of all types for the escrow account or accounts established under this Agreement, on behalf of the Funds. The below listed persons (must list at least two individuals, if applicable) have also been designated Call Back Authorized Individuals and will be notified by Citibank N.A. upon the release of Escrow Funds from the escrow account(s)..

<u>Name / Title / Telephone</u>                    <u>Specimen Signature</u>

_____              _____
Name                                    Signature

_____
Title

_____              _____
Phone                                   Mobile Phone *(Required for DocuSign Capabilities)*

_____              _____
Name                                    Signature

_____
Title

_____              _____
Phone                                   Mobile Phone *(Required for DocuSign Capabilities)*

_____              _____
Name                                    Signature

_____
Title

_____              _____
Telephone                               Mobile Phone *(Required for DocuSign Capabilities)*

NOTE: Actual signatures are required above. Electronic signatures, "Docusigned" signatures and/or signature fonts are not acceptable.

*Exhibit to Escrow Agreement*

EXHIBIT B

Form of Joint Release Instruction

[●], 202[●]

Citibank, N.A.
c/o Citi Private Bank
One Sansome Street
San Francisco, CA 94104
Attn: Hamyd Mazrae
E-mail: hamyd.mazrae@citi.com

**Re:    Joint Release Instruction**

Dear Mr. Mazrae,

Reference is made to that certain Escrow Agreement by and among (i) **UBS Securities LLC** ("UBS"), (ii) **Highland Multi Strategy Credit Fund, L.P.** ("MSCF") and **Highland Credit Opportunities CDO Asset Holdings, LP** ("Asset Holdings" and together with MSCF, the "Funds") and (iii) **CITIBANK, N.A.** (the "Escrow Agent"), dated as of [●], 2020 (the "Escrow Agreement"). Unless otherwise indicated, all capitalized terms used and not otherwise defined herein have the respective meanings given to them in the Escrow Agreement.

This notice constitutes a Joint Release Instruction signed jointly by UBS and the Funds pursuant to Exhibit A-1 and Exhibit A-2 to the Escrow Agreement.

UBS and the Funds hereby jointly instruct the Escrow Agent, in accordance with Section 4(a)i of the Escrow Agreement to release $[●] from the Escrow Account to [*recipient*], via wire transfer of immediately available funds to the following wire instructions:

Name of Bank:             [●]
ABA #:                    [●]
Beneficiary Account #:    [●]
Beneficiary Account Name: [●]

The Parties acknowledge that prior to the remittance of funds from the Escrow Account, the Escrow Agent will need to speak to an authorized representative of each of UBS and the Funds to confirm payment details.

**[SIGNATURE PAGES FOLLOW]**

*Exhibit to Escrow Agreement*

Very truly yours,


**UBS SECURITIES LLC**


By: _____
Name: _____
Its: _____


By: _____
Name: _____
Its: _____

*Exhibit to Escrow Agreement*

Very truly yours,

**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P.**

By: _____
Name: _____
Its: _____

**HIGHLAND CREDIT OPPORTUNITIES CDO ASSET HOLDINGS, LP**

By: _____
Name: _____
Its: _____

*Exhibit to Escrow Agreement*