**LATHAM & WATKINS LLP**
Andrew Clubok (*pro hac vice*)
Sarah Tomkowiak (*pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, District of Columbia 20004
Telephone: (202) 637-2200
Email: andrew.clubok@lw.com
        sarah.tomkowiak@lw.com

and

Jeffrey E. Bjork (*pro hac vice*)
Kimberly A. Posin (*pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Email: jeff.bjork@lw.com
        kim.posin@lw.com

**BUTLER SNOW LLP**
Martin Sosland (TX Bar No. 18855645)
Candice Carson (TX Bar No. 24074006)
2911 Turtle Creek Boulevard, Suite 1400
Dallas, Texas 75219
Telephone: (469) 680-5502
E-mail: martin.sosland@butlersnow.com
        candice.carson@butlersnow.com

*Counsel for UBS Securities LLC and UBS*
*AG London Branch*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

------------------------------------------------------------------x

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| | : | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | : | Case No. 19-34054-sgj11 |
| | : | |
| Debtor. | : | |

------------------------------------------------------------------x

## UBS'S REPLY IN SUPPORT OF DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENT WITH UBS SECURITIES LLC AND UBS AG LONDON BRANCH AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

---

[1] The last four digits of the Debtor's taxpayer identification number are 6725. The headquarters and service address for the Debtor is 300 Crescent Bankruptcy Court, Suite 700, Dallas, TX 75201.

UBS Securities LLC and UBS AG London Branch (together "**UBS**"), by and through their undersigned counsel, hereby submit this reply (this "**Reply**") (a) in response to (i) the *Limited Preliminary Objection to the Debtor's Motion For Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2268] (the "**Initial Dugaboy Objection**")[2]; (ii) the *Supplemental Opposition to Debtor's Motion For Entry of an Order Approving Settlement With UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2293] (the "**Supplemental Dugaboy Objection**" and together with the Initial Dugaboy Objection, collectively, the "**Dugaboy Objections**"); and (iii) *James Dondero's Objection to Debtor's Motion For Entry of an Order Approving Settlement With UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2295] (the "**Dondero Objection**" and together with the Dugaboy Objections, collectively, the "**Objections**") and (b) in support of the *Debtor's Motion For Entry of an Order Approving Settlement with UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* [Docket No. 2199] (the "**9019 Motion**"), and, in support of this Reply, state as follows:

## REPLY

1.     In an effort to streamline the briefing with respect to the 9019 Motion, UBS joins the Debtor's response to the Objections filed substantially contemporaneously herewith.   In addition, UBS states the following in support of the 9019 Motion.

### I.     **UBS's Claims Entitle It To Significant Damages**

2.     As set forth in detail in the 9019 Motion, UBS's claims derive from a state court action initiated in 2009 against the Debtor and several of its affiliates (amongst other parties)

---

[2]     Capitalized terms used but not defined herein have the meanings ascribed to such terms in the 9019 Motion.

(the "**State Court Action**"). The underlying facts and procedural history of the State Court Action are complex and set forth in detail in *UBS's Motion for Relief From the Automatic Stay to Proceed with State Court Action* [Docket No. 644]. On November 14, 2019, the Supreme Court of the State of New York (the "**State Court**") entered a Decision and Order on the first phase of the State Court Action ("**Phase I**"), ruling in favor of UBS on almost every issue presented in Phase I and awarding UBS over $1 billion in damages (including interest) against certain of the Debtor's affiliated funds, Highland CDO Opportunity Master Fund, L.P. ("**CDO Fund**") and Highland Special Opportunities Holding Company ("**SOHC**" and together with CDO Fund, collectively, the "**Funds**"). The second phase of the State Court Action, which includes UBS's direct claims against the Debtor and certain of its affiliates, including Highland Credit Opportunities CDO, L.P. (n/k/a Highland Multi Strategy Credit Fund, L.P.) ("**Multi-Strat**") (a non-debtor fund managed by the Debtor), is currently stayed as to the Debtor by the automatic stay imposed by section 362 of the Bankruptcy Code.

3. On June 26, 2020, UBS timely filed two substantively identical claims in the Bankruptcy Case: (i) Claim No. 190 filed by UBS Securities LLC; and (ii) Claim No. 191 filed by UBS AG London Branch (hereinafter collectively referred to as the "**UBS Claim**"). The UBS Claim asserts a general unsecured claim against the Debtor for $1,039,957,799.40, on account of, among other things, damages, prejudgment interest, and attorneys' fees arising from UBS's fraudulent transfer and breach of the duty of good faith and fair dealing claims asserted in the State Court Action. In essence, the UBS Claim arises from the Debtor's multi-faceted strategy to intentionally frustrate and prevent UBS from recovering amounts owed to UBS resulting from breaches of the Cash Warehouse Agreement among UBS, the Debtor and the Funds and the Synthetic Warehouse Agreement among UBS, the Debtor and the Funds (together,

US-DOCS\123976474.13

the "**Warehouse Agreements**"). As set forth in the UBS Claim, the Debtor directed the Funds to withhold payment to UBS and undertook a litany of other actions to ensure that, even if UBS was successful in the State Court Action against the Funds (as it ultimately was), it would not be able to collect any judgment arising out of the litigation. These actions included a series of fraudulent transfers overseen by Mr. Dondero transferring assets out of the Funds and Highland Financial Partners, L.P. ("**HFP**"), SOHC's parent. All such actions and omissions by the Debtor were performed with either the specific intent to prevent or frustrate UBS's ability to recover the amounts owed to it under the Warehouse Agreements or a wanton and reckless disregard of UBS's rights to those amounts. It has always been UBS's contention that such actions and omissions constitute breaches of the Debtor's implied duty of good faith and fair dealing under the Warehouse Agreements.

4. On August 7, 2020, the Debtor filed an objection to the UBS Claim [Docket No. 928] (the "**UBS Claim Objection**") and, on September 25, 2020, UBS filed its response [Docket No. 1105]. Then, on October 16, 2020, the Debtor and the Redeemer Committee of the Highland Crusader Fund and the Crusader Fund filed partial summary judgment motions [Docket Nos. 1180 and 1183] (together, the "**MSJs**") seeking to disallow a significant portion of the UBS Claim. On November 6, 2020, UBS filed (i) *UBS's Brief in Opposition to Motions for Partial Summary Judgment on Proof of Claim Nos. 190 and 191 and in Support of Rule 56(d) Request* [Docket No. 1355] (the "**MSJ Response**") and (ii) *UBS's Motion for Temporary Allowance of Claims for Voting Purposes Pursuant to Federal Rule of Bankruptcy Procedure 3018* [Docket No. 1342] (the "**3018 Motion**") and a brief in support of the 3018 Motion [Docket No. 1354] (the "**3018 Brief**"). After a hearing held on November 20, 2020, the Court granted the MSJs and allowed the UBS Claim for voting purposes only in the amount of $94,761,076. *Order Granting*

*UBS's Motion for Temporary Allowance of Claims for Voting Purposes Pursuant to Federal Rule of Bankruptcy Procedure 3018* [Docket No. 1518] (the "**3018 Order**"), ¶ 2. Of that amount, approximately $43 million (inclusive of pre-judgment interest) related to transfers made to Multi-Strat, based on the Court estimating a 90% chance that UBS would prevail on that portion of the UBS Claim. 9019 Motion, ¶ 3.

5. The 3018 Order reflects the Court's determination that the evidence presented by UBS established that UBS had a "colorable claim capable of temporary evaluation." *In re Frascella Enterprises*, 360 B.R. 435, 458 n. 498 (Bankr. E.D. Pa. 2007). In entering the 3018 Order, the Court was also "bound by the legal rules which govern the ultimate value of the claim." *In re Brints Cotton Mktg., Inc.*, 737 F.2d 1338, 1341 (5th Cir. 1984) (citation omitted). And, as detailed in the 9019 Motion, the record from the November 20 hearing reflects the fact that the Court gave consideration to each of UBS's causes of action and theories of liability against the Debtor as set forth in the UBS Claim. 11/20/20 Hrg. Tr. at 213:25-214:1; 9019 Motion, ¶ 33.

6. However, the 3018 Order was entered by the Court prior to the discovery by the independent board of the Debtor's general partner (the "**Independent Board**") of the 2017 transfer of more than $300 million in face amount of securities and cash (the "**Sentinel Transfers**") mainly from the Funds (and HFP) to Sentinel Reinsurance, Ltd. ("**Sentinel**"), an entity indirectly owned and controlled by Mr. Dondero and Scott Ellington. 9019 Motion, ¶ 6.

**II.    The Sentinel Transfers Justify Additional Consideration to UBS**

7. As detailed in the 9019 Motion, under the terms of the Settlement Agreement, UBS will receive an allowed $65 million claim in Class 8 (General Unsecured Claims) and an allowed

$60 million claim in Class 9 (Subordinated General Unsecured Claims).[3] UBS will also receive a direct payment of $18.5 million from Multi-Strat. The terms of the Settlement Agreement were renegotiated between the parties' initial announcement of the settlement on February 2, 2021 and the filing of the 9019 Motion on April 15, 2021, to account for the Independent Board's discovery of additional evidence of the Debtor's conspiratorial and fraudulent activities.

8. Neither of the objecting parties appears to object to the settled claims against the Debtor that were initially announced, which consisted of a $50 million allowed Class 8 claim and a $25 million allowed Class 9 claim. Rather Dugaboy focuses exclusively on the $18.5 million payment to be made by Multi-Strat to UBS and Mr. Dondero, in addition to the Multi-Strat payment, focuses on the $15 million increase in UBS's Class 8 claim and the $35 million increase in UBS's Class 9 claim demanded by UBS as the result of newly discovered, clear and convincing evidence of the Debtor's pattern of fraudulent acts and breaches, including the orchestration of the Sentinel Transfers. Mr. Dondero argues that these incremental increases improperly inflate UBS's recovery from the estate, and that the 9019 Motion does not demonstrate the "nexus" between the Sentinel Transfers and UBS's claims against the Debtor. Dondero Objection, ¶ 29. This argument is a bold one given Mr. Dondero's apparent involvement in authorizing and orchestrating these transfers in 2017. 9019 Motion, ¶¶ 10-11.

9. In any event, the argument reflects a material misunderstanding of the UBS Claims as the Sentinel Transfers fall squarely within the scope of UBS's claims against the estate.[4] In the

---

[3] The Debtor currently projects that Class 8 will not be paid in full and Class 9 claims will not receive any recovery. Mr. Dondero also concedes that the Class 9 claims "may not receive a large recovery." Dondero Objection, ¶ 34.

[4] Additionally, the UBS Claims included a broad reservation of rights "to assert any additional claims, defenses, remedies, and causes of action, including without limitation, claims for fraudulent inducement, breach of contract, tortious interference with contractual relations, fraudulent conveyances, or alter ego recovery." *See* UBS Claims, Addenda ¶ 28.

UBS Claim, UBS asserts that the Debtor took steps after the filing of the State Court Action to ensure that UBS could never recover on its claims against the Funds, took actions to prevent transfers of valuable assets to the Funds and to leave the Funds undercapitalized and took affirmative actions to transfer any remaining assets out of the Funds. UBS Claim Addenda, ¶¶ 15-16. This describes the Sentinel Transfers to a tee. After summary judgment was denied, and with trial looming in the State Court Action, the Debtor, at Mr. Dondero's apparent direction, denuded the Funds—defendants in the State Court Action—of their remaining assets. 9019 Motion, ¶ 10. These transfers evidence a pattern and practice of fraud and fraudulent transfers and the Debtor's continuous efforts to hide assets from UBS during Mr. Dondero's reign. And, they provide further evidence to support UBS's alter-ego claims against HFP.

10.     Liability of the Debtor for conduct just like this—a deep-seated pattern of fraud—was clearly contemplated by the UBS Claim and included in the 3018 Brief and MSJ Response. In those briefs, UBS noted that the March 2009 transfers that precipitated the State Court Action are not a sufficient damage metric to take into account the full range of damages flowing from the Debtor's actions. 3018 Brief, ¶ 37, MSJ Response ¶ 49. At that time, UBS had not received sufficient discovery from the Debtor to quantify its damages related to transfers of assets from the Funds over time. *Id.* The Court considered these issues in its ruling on the 3018 Motion, estimating UBS's "other claims" at $10 million plus $10 million in pre-judgment interest. 11/20/20 Hrg. Tr. at 216:15-16. UBS respectfully submits that had the Court been apprised of the Sentinel Transfers prior to the November 20 hearing, that amount would have been significantly higher.[5]  Discovery with respect to the Sentinel Transfers is ongoing, but the Debtor has

---

[5]     The Debtor previously represented to the Court that the Funds had few remaining assets or were insolvent, as the Debtor's prepetition management had repeatedly told the Independent Board that the Funds were "ghost funds" that had no material assets. *Debtor's Objection to UBS's Motion for Relief From the Automatic Stay to Proceed With State Court Action* [Docket No. 687] ¶ 1; UBS Claim Objection ¶ 2; 9019 Motion, ¶ 5.

7

represented that it believes that more than $300 million in face amount of securities and cash were secretly transferred from the Funds in and after 2017. 9019 Motion, ¶ 6. In addition, it is UBS's expectation, based on the prior actions of Mr. Dondero and the entities he controls and his pattern and practice of trying to keep assets beyond the reach of UBS, that the assets that comprised the Sentinel Transfers resided at the Funds at the time the Funds breached their obligations to UBS and the State Court Action was initiated. 9019 Motion, ¶¶ 10-11, and n. 7 and 8.[6] Settling the Debtor's liability to UBS as to the entirety of the allegations made in the State Court Action against the Debtor is in the best interests of the estate because additional discovery may uncover still further fraudulent activities (among other reasons). Litigating this dispute would also be costly and time consuming for the Debtor, which would affect the ultimate recovery of other creditors of the Debtor's estate.

11.     Finally, the assertion in the Dondero Objection that the Debtor's agreement to assist UBS with respect to the Transferred Assets and UBS's efforts to collect its judgment against the Funds should somehow decrease the value of UBS's claims against the estate is absurd on its face. Dondero Objection, ¶ 28. The Debtor's assistance with respect to the Transferred Assets is necessary to avoid a perpetuation of the Dondero-controlled Debtor's prior fraudulent acts and because the Debtor is likely the only entity that still maintains any records with respect to the Funds and the Transferred Assets, as difficult as those records may be to locate. And, it is reflective of the Debtor's continuing obligations under the parties' original agreement in which the Debtor committed to UBS's right to fully recover for all of its losses against the Funds. Moreover,

---

[6]     However, the Debtor's own shoddy recordkeeping and history of destroying documents (and active concealment of relevant information) while under Mr. Dondero's control has made it difficult for the Debtor to locate relevant documents to confirm this expectation. At a minimum, if such records no longer exist due to Mr. Dondero's or any other former Debtor employee's spoliation of them, UBS would be entitled to an adverse inference that the Funds held the Transferred Assets (and potentially additional assets) in March 2009.

UBS - not the estate - is indisputably entitled to any recovery from the Funds to satisfy its judgment.

12.     Additionally, although Debtor's counsel announced at the hearing to confirm the Debtor's chapter 11 plan that the Debtor and UBS had reached an agreement in principle for a claims settlement, that settlement always remained subject to documentation, and the Court's approval (as does the Settlement Agreement).  The discovery of the Sentinel Transfers provided UBS with a rational basis to reconsider its agreement in principle and to consider whether reverting to litigation against the Debtor (with the possibility of uncovering still further fraudulent acts that would increase UBS's likelihood of success and the magnitude of its damages) was a better path forward.  For the reasons set forth above, UBS submits that the Sentinel Transfers evidence additional damages suffered by UBS at the Debtor's hand, which, absent the Settlement Agreement, likely would have resulted in additional protracted litigation between UBS and the Debtor and increased claims against the estate.  9019 Motion, ¶ 45.  The existence of the Sentinel Transfers also bolsters UBS's ability to prove its long-standing claims regarding a pattern of breaches of the implied duty of good faith and fair dealing by the Dondero-controlled Debtor.  Accordingly, the amounts of UBS's settled claims against the Debtor are appropriate and reasonable.

**III.     The Settlement of UBS's Claims Against Multi-Strat Is Appropriate**

13.     UBS joins the Debtor's response to the Objections with respect to the Court's jurisdiction to approve the Settlement Agreement, the Debtor's authority to bind Multi-Strat to the Settlement Agreement, and the Debtor's fiduciary duties with respect to Multi-Strat.  From UBS's own review of the applicable organizational and investment management documents, UBS has no reason to doubt that the Debtor had authority to bind Multi-Strat to the Settlement Agreement and

US-DOCS\123976474.13

that the actions taken by the Debtor in its capacity as Multi-Strat's investment manager, among other capacities comply with applicable law.

14. The assertion in the Dugaboy Objections that UBS's recovery from Multi-Strat is a double recovery that should reduce UBS's claim against the Debtor is meritless, as is the argument that the Settlement somehow transfers Debtor assets to UBS, requiring a modification to the Debtor's chapter 11 plan. UBS has always had an independent fraudulent transfer claim against Multi-Strat in the amount of $25,782,988 (plus prejudgment interest, which more than doubles that amount and continues to accrue), which the Court gave a 90% chance of success. 3018 Brief, ¶ 15, 11/20/20 Hrg. Tr. at 214:14-215:15. If that fraudulent transfer were to be unwound, the transferred amount would be returned to the Funds (against whom UBS also holds independent claims and a judgment), not the Debtor. No assets of the Debtor itself are being transferred from Multi-Strat to UBS; Multi-Strat is simply paying UBS to settle a fraudulent transfer claim that UBS holds against Multi-Strat directly. Mr. Dondero is well aware that UBS's claims against Multi-Strat are independent from its claims against the Debtor. In his own attempts to settle UBS's claims as part of his proposed "pot plan" Mr. Dondero insisted that any settlement of UBS's claims include a settlement of its claims against all Highland-affiliated entities, including Multi-Strat.

15. Finally, the assertion in the Dugaboy Objections that it is unclear whether UBS is releasing all of its claims against Multi-Strat is based on a misreading of the Settlement Agreement. As Section 3(a) of the Settlement Agreement makes clear, UBS *is* releasing its claims against the "MSCF Parties," *i.e.* Multi-Strat, its general partner, and its direct and indirect wholly-owned subsidiaries. What UBS is not releasing are claims related to the "MSCF Interests," *i.e.*, the interests in Multi-Strat that were among the Transferred Assets and other interests in Multi-Strat

that were later purportedly redeemed by Sentinel.  To be clear, UBS has no intention of releasing any causes of action related to those fraudulently transferred interests and continues to evaluate its potential options to recover the Transferred Asset from Sentinel or later transferees.

### IV.     The Settlement Meets the Standard for Approval Under Bankruptcy Rule 9019.

16.     The Settlement Agreement reflects extensive, arms-length, months-long, often contentious negotiations among the parties and their counsel, as well as multiple mediation sessions with Judge Allan L. Gropper (Ret.) and Sylvia A. Mayer (the "**Mediators**").  It resolves a decade-long dispute between the Debtor, several of its affiliates, and UBS.  UBS respectfully submits that by resolving its claim—the largest asserted against the estate—the Settlement Agreement is fair and equitable and clearly meets the standard for approval under Bankruptcy Rule 9019.  *In re Moore*, 608 F.3d 253, 263 (5th Cir. 2010) (under Rule 9019, a "proposed settlement must be 'fair and equitable' and in the best interests of the estate"); *see also In re Cajun Elec. Power Co-op., Inc.*, 119 F.3d 349, 356 (5th Cir. 1997) (noting that the court's task is to compare "the terms of the compromise with the rewards of litigation").

17.     Bankruptcy Rule 9019 does not require that a settlement be the "best possible outcome," it simply needs to be fair, *i.e.* reasonable, in the Debtor's business judgment.  *See In re Victory Medical Center Mid-Cities, LP*,. 601 B.R. 739, 749 (Bankr. N.D. Tex. 2019) ("A proposed compromise settlement need not result in the best possible outcome for the debtor, but must not fall beneath the lowest point in the range of reasonableness."); *see also*, *In re Y-Knot Const., Inc.*, 369 B.R. 405, 408 (8th Cir. B.A.P. 2007) ("The trustee, however, does not need to establish that the proposed settlement is the best possible outcome, but only that it does not fall below the lowest point in the range of reasonableness.").  The Court should give no weight when evaluating the Settlement Agreement to the fact that the Debtor previously argued that UBS's claims against the

11

estate were without merit. As a fiduciary of the estate, in the absence of an agreement regarding UBS's claim, it is not at all surprising that the Debtor would contest UBS's claims vigorously. UBS respectfully submits that litigation of its claims would have been a costly, protracted process for all parties involved and that the Settlement Agreement is in the best interests of all. Indeed, it is telling that no creditors other than Mr. Dondero and the Dondero-controlled Dugaboy Investment Trust have objected to the Settlement Agreement.

18. For these reasons and those set forth in the Debtor's response, UBS submits that the Court should overrule the Objections and approve the Settlement Agreement and the relief sought in the 9019 Motion.

*[Remainder of Page Left Blank Intentionally]*

DATED this 14th day of May, 2021.

**LATHAM & WATKINS LLP**

By */s/ Martin Sosland*
Andrew Clubok (*pro hac vice*)
Sarah Tomkowiak (*pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, District of Columbia 20004
Telephone: (202) 637-2200
Email: andrew.clubok@lw.com
        sarah.tomkowiak@lw.com

and

Jeffrey E. Bjork (*pro hac vice*)
Kimberly A. Posin (*pro hac vice*)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Email: jeff.bjork@lw.com
        kim.posin@lw.com

**BUTLER SNOW LLP**
Martin Sosland (TX Bar No. 18855645)
Candice M. Carson (TX Bar No. 24074006)
5430 LBJ Freeway, Suite 1200
Dallas, Texas 75240
Telephone: (469) 680-5502
E-mail: martin.sosland@butlersnow.com
        candice.carson@butlersnow.com

*Counsel for UBS Securities LLC and UBS*
*AG London Branch*

## <u>CERTIFICATE OF SERVICE</u>

I, Martin Sosland, certify that the *UBS's Reply in Support of Debtor's Motion For Entry of an Order Approving Settlement With UBS Securities LLC and UBS AG London Branch and Authorizing Actions Consistent Therewith* was filed electronically through the Court's ECF system, which provides notice to all parties of interest.

Dated: May 14, 2021.

*/s/ Martin Sosland*