## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | **Cause No.** _____ |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P. , HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| *Defendants.* | § | |

---

## ORIGINAL COMPLAINT

---

### I.

### INTRODUCTION

This action arises out of the acts and omissions of Defendant Highland Capital Management, L.P. ("HCM"), which is the general manager of Highland HCF Advisor, Ltd. ("HCFA"), both of which are registered investment advisers under the Investment Advisers Act of 1940 (the "Advisers Act"),[1] and nominal Defendant Highland CLO Funding, Ltd. ("HCLOF") (HCM and HCFA each a "Defendant," or together, "Defendants"). The acts and omissions which have recently come to light reveal breaches of fiduciary duty, a pattern of violations of the Advisers Act's anti-fraud provisions, and concealed breaches of the HCLOF Company Agreement, among others, which have caused and/or likely will cause Plaintiffs damages.

---

[1] https://adviserinfo.sec.gov/firm/summary/110126

At all relevant times, HCM was headed by CEO and potential party James P. Seery ("Seery"). Seery negotiated a settlement with the several Habourvest[2] entities who owned 49.98% of HCLOF. The deal had HCM (or its designee) purchasing the Harbourvest membership interests in HCLOF for $22.5 million. Recent revelations, however, show that the sale was predicated upon a sales price that was vastly below the Net Asset Value ("NAV") of those interests. Upon information and belief, the NAV of HCLOF's assets had risen precipitously, but was not disclosed to Harbourvest nor to Plaintiffs.

Under the Advisers Act, Defendants have a non-waivable duty of loyalty and candor, which includes its duty not to inside trade with its own investors, *i.e.*, not to trade with an investor to which HCM and Seery had access to superior non-public information. Upon information and belief, HCM's internal compliance policies required by the Advisers Act would not generally have allowed a trade of this nature to go forward—meaning, the trade either was approved in spite of compliance rules preventing it, or the compliance protocols themselves were disabled or amended to a level that leaves Defendants HCM and HCLOF exposed to liability. Thus, Defendants have created an unacceptable perpetuation of exposure to liability.

Additionally, Defendants are liable for a pattern of conduct that gives rise to liability for their conduct of the enterprise consisting of HCM in relation to HCFA and HCLOF, through a pattern of concealment, misrepresentation, and violations of the securities rules. In the alternative, HCFA and HCM, are guilty of self-dealing, violations of the Advisers Act, and tortious interference by (a) not disclosing that Harbourvest had agreed to sell at a price well below the current NAV, and (b) diverting the Harbourvest opportunity to themselves.

---

[2] "Habourvest" refers to the collective of Harbourvest Dover Street IX Investment, L.P., Harbourvest 2017 Global AIF, L.P., Harbourvest 2017 lobal Fund, L.P., HV International VIII Secondary, L.P., and Harbourvest Skew Base AIF, L.P. Each was a member of Defendant Highland CLO Funding, Ltd.

For these reasons, judgment should be issued in Plaintiffs' favor.

## II.

## <u>PARTIES</u>

1.      Plaintiff CLO Holdco, Ltd. is a limited company incorporated under the laws of the Cayman Islands.

2.      Plaintiff Charitable DAF Fund, L.P., ("<u>DAF</u>") is a limited partnership formed under the laws of the Cayman Islands.

3.      Defendant Highland Capital Management, L.P. is a limited partnership with its principal place of business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. It may be served at its principal place of business or through its principal officer, James P. Seery, Jr., or through the Texas Secretary of State, or through any other means authorized by federal or state law.

4.      Defendant Highland HCF Advisor, Ltd.  is a limited company incorporated under the laws of the Cayman Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201. It is a registered investment adviser ("<u>RIA</u>") subject to the laws and regulations of the Investment Advisers Act of 1940 (the "<u>Adviser's Act</u>"). It is a wholly-owned subsidiary of Highland Capital Management, L.P.

5.      Nominal Defendant Highland CLO Funding, Ltd. is a limited company incorporated under the laws of the Island of Guernsey. Its registered office is at First Floor, Dorey Court, Admiral Park, St. Peter Port, Guernsey GY1 6HJ, Channel Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201.

6.      Potential party James P. Seery, Jr. ("Seery") is an officer and/or director and/or control person of Defendants Highland Capital Management, L.P., Highland CLO Funding, Ltd., and Highland HCF Advisor, Ltd., and is a citizen of and domiciled in Floral Park, New York.

### III.

### JURISDICTION AND VENUE

**7.** This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331 as one or more rights and/or causes of action arise under the laws of the United States. This Court has supplemental subject matter jurisdiction over all other claims under 28 U.S.C. § 1367.

**8.** Personal jurisdiction is proper over the Defendants because they reside and/or have continual contacts with the state of Texas, having regularly submitted to jurisdiction here. Jurisdiction is also proper under 18 U.S.C. § 1965(d).

**9.** Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) because one or more Defendants reside in this district and/or a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of the action is situated in this district. Venue in this district is further provided under 18 U.S.C. § 1965(d).

### IV.

### RELEVANT BACKGROUND

#### *HCLOF IS FORMED*

**10.** Plaintiff DAF is a charitable fund that helps several causes throughout the country, including providing funding for humanitarian issues (such as veteran's welfare associations and women's shelters), public works (such as museums, parks and zoos), and education (such as specialty schools in underserved communities). Its mission is critical.

**11.** Since 2012, DAF was advised by its registered investment adviser, Highland Capital Management, L.P., and its various subsidiaries, about where to invest. This relationship was governed by an Investment advisory Agreement.

12.     At one point in 2017, HCM advised DAF to acquire 143,454,001 shares of HCLOF, with HCFA (a subsidiary of HCM) serving as the portfolio manager. DAF did so via a holding entity, Plaintiff CLO Holdco, Ltd.

13.     On November 15, 2017, through a Subscription and Transfer Agreement, the DAF entered into an agreement with others to sell and transfer shares in HCLOF, wherein the DAF retained 49.02% in CLO Holdco.

14.     Pursuant to that agreement, Harbourvest acquired the following interests in the following entities:

Harbourvest Dover Street IX Investment, L.P., acquired 35.49%;

Harbourvest 2017 Global AIF, L.P., acquired 2.42%;

Harbourvest 2017 lobal Fund, L.P., acquired 4.85%;

HV International VIII Secondary, L.P., acquired 6.5%; and

Harbourvest Skew Base AIF, L.P., acquired 0.72%;

for a total of 49.98% (altogether, the "Harbourvest interests").

15.     On or about October 16, 2019, Highland Capital Management filed for Chapter 11 bankruptcy in Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court, in the case styled *In Re: Highland Capital Management, L.P., Debtor*, Cause No. 19-34054, (the "HCM Bankruptcy" and the Court is the "Bankruptcy Court").

### The Harbourvest Settlement with
### Highland Capital Management in Bankruptcy

16.     On April 8, 2020, Harbourvest submitted its proofs of claim in the HCM bankruptcy proceeding. Annexed to its proofs of claims was an explanation of the Proof of Claim and the basis therefor setting out various pre-petition allegations of wrongdoing by HCM. *See, e.g.,* Case No. 19-bk-34054, Doc. 1631-5.

17. The debtor, HCM, made an omnibus response to the proofs of claims, stating they were duplicative of each other, overstated, late, and otherwise meritless.

18. Harbourvest responded to the omnibus objections on September 11, 2020. *See* Cause No. 19-bk-34054, Doc. 1057.

19. Harbourvest represented that it had invested in HCLOF, purchasing 49.98% of HCLOF's outstanding shares.

20. Plaintiff CLO Holdco was and is also a 49.02% holder of HCLOF's member interests.

21. In its Omnibus Response, Harbourvest explained that its claims included unliquidated legal claims for fraud, fraud in the inducement, RICO violations under 18 U.S.C. 1964, among others (the "Harbourvest Claims"). *See* Cause No. 19-bk-34054, Doc. 1057.

22. The Harbourvest Claims centered on allegations that when Harbourvest was intending to invest in a pool of Collateralized Loan Obligations, or CLOs, that were then-managed by Acis Capital Management ("Acis"), a subsidiary of HCM, HCM failed to disclose key facts about ongoing litigation with a former employee, Josh Terry.

23. Harbourvest contended that HCM never sufficiently disclosed the underlying facts about the litigation with Terry, and HCM's then-intended strategy to fight Terry caused HCLOF to incur around $15 million in legal fees and costs. It contended that had it known the nature of the lawsuit and how it would eventually turn out, Harbourvest never would have invested in HCLOF. *See* Cause No. 19-bk-34054, Doc. 1057.

24. HCLOF's portfolio manager is HCFA. HCM is the parent of HCFA and is managed by its General Partner, Strand Management, who employs Seery and acts on behalf of HCM.

25.     Before acceding to the Harbourvest interests, HCM was a 0.6% holder of HCLOF interests.

26.     While even assuming Harbourvest's underlying claims were valid as far as the lost $15 million went, the true damage of the legal fees to Harbourvest would have been 49.98% of the HCLOF losses (i.e., less than $7.5 million). Harbourvest claimed that it had lost over $100 million in the HCLOF transaction due to fraud, which, after trebling under the racketeering statute, it claimed it was entitled to over $300 million in damages.

27.     In truth, as of September 2020, Harbourvest had indeed lost some $52 million due to the alleged diminishing value of the HCLOF assets (largely due to the underperformance of the Acis entities[3])—and the values were starting to recover.

28.     HCM denied the allegations in the Bankruptcy Court. Other than the claim for waste of corporate assets of $15 million, HCM at all times viewed the Harbourvest legal claims as being worth near zero and having no merit.

29.     On December 23, 2020, HCM moved the Court to approve a settlement between itself and Harbourvest. No discovery had taken place between the parties, and Plaintiff did not have any notice of the settlement terms or other factors prior to the motion's filing (or even during its pendency) in order to investigate its rights.

30.     HCM set the hearing right after the Christmas and New Year's holidays, almost ensuring that no party would have the time to scrutinize the underpinnings of the deal.

31.     On January 14, 2021, the Bankruptcy Court held an evidentiary hearing and approved the settlement in a bench ruling, overruling the objections to the settlement.

---

[3] Acis was being managed by Joshua Terry. JP Morgan had listed the four ACIS entities under his management as the four worst performers of the 1200 CLOs it evaluated.

32.     An integral part of the settlement was allowing $45 million in unsecured claims that, at the time of the agreement, were expected to net Harbourvest around 70 cents on the dollar. In other words, Harbourvest was expected to recover around $31,500,000 from the allowed claims.

33.     As part of the consideration for the $45 million in allowed claims, Harbourvest agreed to transfer all of its interests in HCLOF to HCM or its designee.

34.     HCM and Seery rationalized the settlement value by allocating $22.5 million of the net value of the $45 million in unsecured claims as consideration to purchase Harbourvest's interests in HCLOF, meaning, if 70% of the unsecured claims—i.e., $31.5 million—was realized, because $22.5 million of that would be allocated to the purchase price of the Harbourvest interests in HCLOF, the true "settlement" for Harbourvest's legal claims was closer to $9 million.

35.     Plaintiffs here are taking no position at this time about the propriety of settling the Harbourvest legal claims for $9 million. That is for another day.

36.     At the core of this lawsuit is the fact that HCM purchased the Harbourvest interests in HCLOF for $22.5 million knowing that they were worth far more than that.

37.     It has recently come to light that, upon information and belief, the Harbourvest interests, as of December 31, 2020, were worth in excess of $41,750,000, and they have continued to go up in value.

38.     On November 30, 2020, which was less than a month prior to the filing of the Motion to Approve the Settlement, the net asset value of those interests was over $34.5 million. Plaintiffs were never made aware of that.

39.     The change is due to how the net asset value, or NAV, was calculated. The means and methods for calculating the "net asset value" of the assets of HCLOF are subject to and

governed by the regulations passed by the SEC pursuant to the Adviser's Act, and by HCM's internal policies and procedures.

40.     Typically, the value of the securities reflected by a market price quote.

41.     However, the underlying securities in HCLOF are not liquid and had not been traded in a long while.

42.     There not having been any contemporaneous market quotations that could be used in good faith to set the marks[4] meant that other prescribed methods of assessing the value of the interests, such as the NAV, would have been the proper substitutes.

43.     Seery testified that the fair market value of the Harbourvest HCLOF interests was $22.5 million. Even allowing some leeway there, it was off the mark by a mile.

44.     Given the artifice described herein, Seery and the entity Defendants had to know that the representation of the fair market value was false. But it does not appear that they disclosed it to Harbourvest to whom they owed fiduciary duties as the RIA in charge of HCLOF, and they certainly did not disclose the truth to the Plaintiff.

45.     It is either the case that (i) Defendants conducted the proper analysis to obtain a current value of the assets but decided to use a far lower valuation in order to whitewash the settlement or enrich the bankruptcy estate; *or* (ii) Defendants never conducted the proper current valuation, and therefore baselessly represented what the current value of the assets was, despite knowingly having no reasonable basis for making such a claim.

46.     For years HCM had such internal procedures and compliance protocols. HCM was not allowed by its own compliance officers to trade with an investor where HCM had superior knowledge about the value of the assets, for example. While Plaintiff has no reason to believe that

---

[4] The term "mark" is shorthand for an estimated or calculated value for a non-publicly traded instrument.

those procedures were scrapped in recent months, it can only assume that they were either overridden improperly or circumvented wholesale.

47.    Upon finalizing the Harbourvest Settlement Agreement and making representations to the Bankruptcy Court to the Plaintiffs about the value of the Harbourvest Interests, Seery and HCM had a duty to use current values and not rely on old valuations of the assets or the HCLOF interests.

48.    Given Defendants' actual or constructive knowledge that they were purchasing Harbourvest's Interests in HCLOF for a less than 50% of what those interests were worth— Defendants owed Plaintiff a fiduciary duty not to purchase them for themselves.

49.    Defendants should have either had HCLOF repurchase the interests with cash, or offer those interests to Plaintiff and the other members *pro rata*, before HCM agreed to purchase them all lock, stock and barrel, for no up-front cash.

50.    Indeed, had Plaintiff been offered those interests, it would have happily purchased them and therefore would have infused over $20 million in cash into the estate for the purpose of executing the Harbourvest Settlement.

51.    That Defendants (and to perhaps a lesser extent, the Unsecured Creditors Committee (the "UCC")) agreed to pay $22.5 million for the HCLOF assets, where they had previously not consented to any such expenditure by the estate on behalf of HCLOF, strongly indicates their awareness that they were purchasing assets for far below market value.

52.    The above is the most reasonable and plausible explanation for why Defendants and the UCC forwent raising as much as $22.5 million in cash now in favor of hanging on to the HCLOF assets.

APP_0010

53.     Indeed, in January 2021 Seery threatened Ethen Powell that "[Judge Jernigan] is laughing at you" and "we are coming after you" in response to the latter's attempt to exercise his right as beneficial holder of the CLO, and pointing out a conflict of interest in Seery's plan to liquidate the funds.

54.     HCM's threat, made by Seery, is tantamount to not only a declaration that he intends to liquidate the funds regardless of whether the investors want to do so, and whether it is in their best interests, but also that HCM intends to leverage what it views as the Bankruptcy Court's sympathy to evade accountability.

**V.**

**<u>CAUSES OF ACTION</u>**

FIRST CAUSE OF ACTION
*Breaches of Fiduciary Duty*

55.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

56.     HCM is a registered investment advisor and acts on behalf of HCFA. Both are fiduciaries to Plaintiffs.

57.     The Advisers Act establishes an unwaivable federal fiduciary duty for investment advisers.[5]

---

[5] *See e.g, SEC v. Capital Gains Research Bureau, Inc*., 375 U.S. 180, 194 (1963); *Transamerica Mortg. Advisors (tama) v. Lewis*, 444 U.S. 11, 17 (1979) ("§ 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers."); *Santa Fe Indus, v. Green*, 430 U.S. 462, 471, n.11 (1977) (in discussing *SEC v. Capital Gains*, stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"). *See also* Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing* Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003)).

Case 19-34054-sgj11 Doc 2313-1 Filed 05/14/21 Entered 05/14/21 17:05:00 Page 12 of
125
Case 3:21-cv-00842-B Document 1 Filed 04/12/21 Page 12 of 26 PageID 12

58.     HCM and the DAF entered into an Amended and Restated Investment Advisory
Agreement, executed between them on July 1, 2014 (the "RIA Agreement"). It renews annually
and continued until the end of January 2021.

59.     In addition to being the RIA to the DAF, HCM was appointed the DAF's attorney-
in-fact for certain actions, such as "to purchase or otherwise trade in Financial Instruments that
have been approved by the General Partner." RIA Agreement ¶ 4.

60.     The RIA Agreement further commits HCM to value financial assets "in accordance
with the then current valuation policy of the Investment Advisor [HCM], a copy of which will
provided to the General Partner upon request." RIA Agreement ¶ 5.

61.     While HCM contracted for the recognition that it would be acting on behalf of
others and could be in conflict with advice given the DAF, (RIA Agreement ¶ 12), nowhere did it
purport to waive the fiduciary duties owed to the DAF not to trade as a principal in a manner that
harmed the DAF.

62.     HCFA owed a fiduciary duty to Holdco as an investor in HCLOF and to which
HCFA was the portfolio manager. HCM owed a fiduciary duty to the DAF (and to Holdco as its
subsidiary) pursuant to a written Advisory Agreement HCM and the DAF had where HCM agreed
to provide sound investment advice and management functions.

63.     As a registered investment adviser, HCM's fiduciary duty is broad and applies to
the entire advisor-client relationship.

64.     The core of the fiduciary duty is to act in the best interest of their investors—the
advisor must put the ends of the client before its own ends or the ends of a third party.

APP_0012

65.     This is manifested in a duty of loyalty and a duty of utmost care. It also means that the RIA has to follow the terms of the company agreements and the regulations that apply to the investment vehicle.

66.     The fiduciary duty that HCM and Seery owed to Plaintiff is predicated on trust and confidence. Section 204A of the Advisers Act requires investment advisors (whether SEC-registered or not) to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the RIA from trading on material, non-public information. *See* 17 C.F.R. § 275.206(4)-7. That means that Plaintiff should be able to take Defendants at their word and not have to second guess or dig behind representations made by them.

67.     The simple thesis of this claim is that Defendants HCFA and HCM breached their fiduciary duties by (i) insider trading with Harbourvest and concealing the rising NAV of the underlying assets—i.e., trading with Harbourvest on superior, non-public information that was neither revealed to Harbourvest nor to Plaintiff; (ii) concealing the value of the Harbourvest Interests; and (iii) diverting the investment opportunity in the Harbourvest entities to HCM (or its designee) without offering it to or making it available to Plaintiff or the DAF.

68.     HCM, as part of its contractual advisory function with Plaintiffs, had expressly recommended the HCLOF investment to the DAF. Thus, diverting the opportunity for returns on its investment was an additional breach of fiduciary duty.

69.     This violated a multitude of regulations under 27 C.F.R. part 275, in addition to Rules 10b-5 and 10b5-1. 17 CFR 240.10b5-1 ("Rule 10b5-1") explains that one who trades while possessing non-public information is liable for insider trading, and they do not necessarily have to have *used* the specific inside information.

70.     It also violated HCM's own internal policies and procedures.

71.     Also, the regulations impose obligations on Defendants to calculate a *current* valuation when communicating with an investor, such as what may or may not be taken into account, and what cannot pass muster as a current valuation. Upon information and belief, these regulations were not followed by the Defendants.

72.     HCM's internal policies and procedures, which it promised to abide by both in the RIA Agreement and in its Form ADV SEC filing, provided for the means of properly calculating the value of the assets.

73.     HCM either did not follow these policies, changed them to be out of compliance both with the Adviser Act regulations and its Form ADV representations, and/or simply misrepresented or concealed their results.

74.     In so doing, because the fiduciary duty owed to Plaintiff is a broad one, and because Defendants' malfeasance directly implicates its relationship with Plaintiff, Defendants have breached the Advisers Act's fiduciary duties owed to Plaintiff as part of their fiduciary relationship.[6]

75.     At no time between agreeing with Harbourvest to the purchase of its interests and the court approval did Defendants disclose to either Harbourvest or to Plaintiff (and the Bankruptcy Court for that matter) that the purchase was at below 50% the current net asset value as well, and when they failed to offer Plaintiff (and the other members of HCLOF) their right to purchase the interests pro rata at such advantageous valuations. Plaintiff's lost opportunity to

---

[6] *See* Advisers Act Release No. 4197 (Sept. 17, 2015) (Commission Opinion) ("[O]nce an investment Advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary relationship by defrauding his client in any investment transaction connected to the Advisory relationship."); *see also SEC v. Lauer*, No. 03-80612-CIV, 2008 U.S. Dist. LEXIS 73026, at 90 (S.D. Fla. Sept. 24, 2008) ("Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206 of the Advisers Act does not require that the activity be 'in the offer or sale of any' security or 'in connection with the purchase or sale of any security.'").

purchase has harmed Plaintiff. Plaintiff had been led to believe by the Defendants that the value of what was being purchased in the Harbourvest settlement by HCM (or its designee) was at fair market value. This representation, repeated again in the Bankruptcy Court during the Harbourvest confirmation, implicitly suggested that a proper current valuation had been performed.

76.     Defendant's principal, Seery, testified in January 2021 that the then-current fair market value of Habourvests's 49.98% interest in HCLOF was worth around $22.5 million. But by then, it was worth almost double that amount and has continued to appreciate. Seery knew or should have known that fact because the value of some of the HCLOF assets had increased, and he had a duty to know the current value. His lack of actual knowledge, while potentially not overtly fraudulent, would nonetheless amount to a breach of fiduciary duty for acting without proper diligence and information that was plainly available.

77.     Furthermore, HCLOF holds equity in MGM Studios and debt in CCS Medical via various CLO positions. But Seery, in his role as CEO of HCM, was made aware during an advisors meeting in December 2020 that Highland would have to restrict its trading in MGM because of its insider status due to activities that were likely to apply upward pressure on MGM's share price.

78.     Furthermore, Seery controlled the Board of CCS Medical. And in or around October 2020, Seery was advocating an equatization that would have increased the value of the CCS securities by 25%, which was not reflected in the HCM report of the NAV of HCLOF's holdings.

79.     Seery's knowledge is imputed to HCM.

80.     Moreover, it is a breach of fiduciary duty to commit corporate waste, which is effectively what disposing of the HCLOF assets would constitute in a rising market, where there

is no demand for disposition by the investors (save for HCM, whose proper 0.6% interest could easily be sold to the DAF at fair value).

81.     As holder of 0.6% of the HCLOF interests, and now assignee of the 49.98% Harbourvest Interests), HCM has essentially committed self-dealing by threatening to liquidate HCLOF now that it may be compelled to do so under its proposed liquidation plan, which perhaps inures to the short term goals of HCM but to the pecuniary detriment of the other holders of HCLOF whose upside will be prematurely truncated.

82.     Seery and HCM should not be allowed to benefit from the breach of their fiduciary duties because doing so would also cause Plaintiffs irreparable harm. The means and methods of disposal would likely render the full scope of damages to the DAF not susceptible to specific calculation—particularly as they would relate to calculating the lost opportunity cost. Seery and HCM likely do not have the assets to pay a judgment to Plaintiffs that would be rendered, simply taking the lost appreciation of the HCLOF assets.

83.     Defendants are thus liable for diverting a corporate opportunity or asset that would or should have been offered to Plaintiff and the other investors. Because federal law makes the duties invoked herein unwaivable, it is preposterous that HCM, as a 0.6% holder of HCLOF, deemed itself entitled to the all of the value and optionality of the below-market Harbourvest purchase.

84.     Defendants cannot rely on any contractual provision that purports to waive this violation. Nothing in any agreement purports to permit, authorize or otherwise sanitize Defendants' self-dealing. All such provisions are void.

85.     In the fourth quarter of 2020, Seery and HCM notified staff that they would be terminated on December 31, 2020. That termination was postponed to February 28, 2021.

Case 19-34054-sgj11 Doc 2313-1 Filed 05/14/21 Entered 05/14/21 17:05:00 Page 17 of
125
Case 3:21-cv-00842-B Document 1 Filed 04/12/21 Page 17 of 26 PageID 17

Purchasing the Harbourvest assets without staffing necessary to be a functioning Registered Investment Advisor was a strategic reversal from prior filings that outlined canceling the CLO management contracts and allowing investors to replace Highland as manager.

86.      Seery's compensation agreement with the UCC incentivizes him to expedite recoveries and to prevent transparency regarding the Harbourvest settlement.

87.      What is more, Seery had previously testified that the management contracts for the funds—HCLOF included—were unprofitable, and that he intended to transfer them. But he later rejected offers to purchase those management contracts for fair value and instead decided to continue to manage the funds—which is what apparently gave rise to the Harbourvest Settlement, among others. He simultaneously rejected an offer for the Harbourvest assets of $24 million, stating that they were worth much more than that.

88.      Because of Defendants' malfeasance, Plaintiffs have lost over $25 million in damages—a number that continues to rise—and the Defendants should not be able to obtain a windfall.

89.      For the same reason, Defendants' malfeasance has also exposed HCLOF to a massive liability from Harbourvest since the assignment of those interests is now one that is likely unenforceable under the Advisers Act, Section 47(b), if there was unequal information.

90.      HCM and HCFA are liable as principals for breach of fiduciary duty, as are the principals and compliance staff of each entity.

91.      Plaintiffs seek disgorgement, damages, exemplary damages, attorneys' fees and costs. To the extent the Court determines that this claim had to have been brought derivatively on behalf of HCLOF, then Plaintiffs represent that any pre-suit demand would have been futile since asking HCM to bring suit against its principal, Seery, would have been futile.

### SECOND CAUSE OF ACTION
### *Breach of HCLOF Company Agreement*
### (By Holdco against HCLOF, HCM and HCFA)

92.      Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

93.      On November 15, 2017, the members of HCLOF, along with HCLOF and HCFA, executed the *Members Agreement Relating to the Company* (the "Company Agreement").

94.      The Company Agreement governs the rights and duties of the members of HCLOF.

95.      Section 6.2 of HCLOF Company Agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not to an affiliate of the selling member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

96.      Here, despite the fact that Harbourvest agreed to sell its interests in HCLOF for $22.5 million when they were worth more than double that, Defendants did not offer Plaintiff the chance to buy its pro rata share of those interests at the same agreed price of $22.5 million (adjusted pro rata).

97.      The transfer and sale of the interests to HCM were accomplished as part of the Harbourvest Settlement which was approved by the Bankruptcy Court.

98.      Plaintiff was not informed of the fact that Harbourvest had offered its shares to Defendant HCM for $22.5 million—which was under 50% of their true value.

99.      Plaintiff was not offered the right to purchase its pro rata share of the Harbourvest interests prior to the agreement being struck or prior to court approval being sought.

APP_0018

100.     Had Plaintiff been allowed to do so, it would have obtained the interests with a net equity value over their purchase price worth in excess of $20 million.

101.     No discovery or opportunity to investigate was afforded Plaintiff prior to lodging an objection in the Bankruptcy Court.

102.     Plaintiff is entitled to specific performance or, alternatively, disgorgement, constructive trust, damages, attorneys' fees and costs.

**THIRD CAUSE OF ACTION**
*Negligence*
**(By the DAF and CLO Holdco against HCM and HCFA)**

103.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

104.     Plaintiffs incorporate the foregoing causes of action and note that all the foregoing violations were breaches of the common law duty of care imposed by law on each of Seery, HCFA and HCM.

105.     Each of these Defendants should have known that their actions were violations of the Advisers Act, HCM's internal policies and procedures, the Company Agreement, or all three.

106.     Seery and HCM owed duties of care to Plaintiffs to follow HCM's internal policies and procedures regarding both the propriety and means of trading with a customer [Harbourvest], the propriety and means of trading as a principal in an account but in a manner adverse to another customer [the DAF and Holdco], and the proper means of valuing the CLOs and other assets held by HCLOF.

107.     It would be foreseeable that failing to disclose the current value of the assets in the HCLOF would impact Plaintiffs negatively in a variety of ways.

108. It would be reasonably foreseeable that failing to correctly and accurately calculate the current net asset value of the market value of the interests would cause Plaintiffs to value the Harbourvest Interests differently.

109. It would be reasonably foreseeable that referring to old and antiquated market quotations and/or valuations of the HCLOF assets or interests would result in a mis-valuation of HCLOF and, therefore, a mis-valuation of the Harbourvest Interests.

110. Likewise, it would have been foreseeable that Plaintiff's failure to give Plaintiff the opportunity to purchase the Harbourvest shares at a $22.5 million valuation would cause Plaintiff damages. Defendants knew that the value of those assets was rising. They further knew or should have known that whereas those assets were sold to HCM for an allowance of claims to be funded in the future, selling them to Plaintiff would have provided the estate with cash funds.

111. Defendants' negligence foreseeably and directly caused Plaintiff harm.

112. Plaintiff is thus entitled to damages.

## FOURTH CAUSE OF ACTION
### *Racketeering Influenced Corrupt Organizations Act*
### (CLO Holdco and DAF against HCM)

113. Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

114. Defendants are liable for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, for the conduct of an enterprise through a pattern of racketeering activity.

115. HCLOF constitutes an enterprise under the RICO Act. Additionally, or in the alternative, HCM, HCLA, and HCLOF constituted an association-in-fact enterprise. The purpose of the association-in-fact was the perpetuation of Seery's position at HCM and using the

APP_0020

Harbourvest settlement as a vehicle to enrich persons other than the HCLOF investors, including Holdco and the DAF, and the perpetuation of HCM's holdings in collateralized loan obligations owned by HCLOF, while attempting to deny Plaintiffs the benefit of its rights of ownership.

116. The association-in-fact was bound by informal and formal connections for years prior to the elicit purpose, and then changed when HCM joined it in order to achieve the association's illicit purpose. For example, HCM is the parent and control person over HCFA, which is the portfolio manager of HCLOF pursuant to a contractual agreement—both are registered investment advisors and provide advisory and management services to HCLOF.

117. Defendants injured Plaintiffs through their continuous course of conduct of the HCM-HCLA-HCLOF association-in-fact enterprise. HCM's actions (performed through Seery and others) constitute violations of the federal wire fraud, mail fraud, fraud in connection with a case under Title 11, and/or securities fraud laws, pursuant to 18 U.S.C. § 1961(1)(B) and (D).

118. HCM operated in such a way as to violate insider trading rules and regulations when it traded with Harbourvest while it had material, non-public information that it had not supplied to Harbourvest or to Plaintiffs.

119. In or about November 2020, HCM and Harbourvest entered into discussions about settling the Harbourvest Claims. Seery's conduct of HCLOF and HCLA on behalf of HCM through the interstate mails and/or wires caused HCM to agree to the purchase of Harbourvest's interests in HCLOF.

120. On or about each of September 30, 2020, through December 31, 2020, Seery, through his conduct of the enterprise, utilized the interstate wires and/or mails to obtain or arrive at valuations of the HCLOF interests. Seery's conduct of the enterprise caused them to cease

APP_0021

sending the valuation reports to Plaintiffs, which eventually allowed Plaintiffs to be misled into believing that Seery had properly valued the interests.

121.    On or about September 30, 2020, Seery transmitted or caused to be transmitted though the interstate wires information to HCLOF investors from HCM (via HCFA), including Harbourvest, regarding the value of HCLOF interests and underlying assets.

122.    Additionally, Seery operated HCM in such a way that he concealed the true value of the HCLOF interests by utilizing the interstate wires and mails to transmit communications to the court in the form of written representations on or about December 23, 2020, and then further transmitted verbal representations of the current market value (the vastly understated one) on January 14, 2021, during live testimony.

123.    However, Harbourvest was denied the full picture and the true value of the underlying portfolio. At the end of October and November of 2020, HCM had updated the net asset values of the HCLOF portfolio. According to sources at HCM at the time, the HCLOF assets were worth north of $72,969,492 as of November 30, 2020. Harbourvest's share of that would have been $36,484,746.

124.    The HCLOF net asset value had reached $86,440,024 as of December 31, 2021, which means that by the time Seery was testifying in the Bankruptcy Court on January 14, 2021, the fair market value of the Harbourvest Assets was $22.5 million, when it was actually closer to $43,202,724. Seery, speaking on behalf of HCM, knew of the distinction in value.

125.    On January 14, 2021, Seery also testified that he (implying HCM, HCLA and HCLOF) had valued the Harbourvest Assets at their current valuation and at fair market value. This was not true because the valuation that was used and testified to was ancient. The ostensible purpose of this concealment was to induce Plaintiff and other interest holdings to take no action.

Case 19-34054-sgj11 Doc 2313-1 Filed 05/14/21 Entered 05/14/21 17:05:00 Page 23 of
125
Case 3:21-cv-00842-B Document 1 Filed 04/12/21 Page 23 of 26 PageID 23

126.    In supporting HCM's motion to the Bankruptcy Court to approve the Harbourvest Settlement, Seery omitted the fact that HCM was purchasing the interests at a massive discount, which would violate the letter and spirit of the Adviser's Act.

127.    Seery was informed in late December 2020 at an in-person meeting in Dallas to which Seery had to fly that HCLOF and HCM had to suspend trading in MGM Studios' securities because Seery had learned from James Dondero, who was on the Board of MGM, of a potential purchase of the company. The news of the MGM purchase should have caused Seery to revalue the HCLOF investment in MGM.

128.    In or around October 2020, Seery (who controls the Board of CSS Medical) was pursuing "equatization" of CSS Medical's debt, which would have increased the value of certain securities by 25%. In several communications through the U.S. interstate wires and/or mails, and with Plaintiffs, and the several communications with Harbourvest during the negotiations of the settlement, Seery failed to disclose these changes which were responsible in part for the ever-growing value of the HCLOF CLO portfolio.

129.    Seery was at all relevant times operating as an agent of HCM.

130.    This series of related violations of the wire fraud, mail fraud, and securities fraud laws, in connection with the HCM bankruptcy, constitute a continuing pattern and practice of racketeering for the purpose of winning a windfall for HCM and himself--a nearly $30,000,000 payday under the confirmation agreement.

131.    The federal RICO statute makes it actionable for one's conduct of an enterprise to include "fraud in connection with a [bankruptcy case]". The Advisers' Act antifraud provisions require full transparency and accountability to an advisers' investors and clients and does not require a showing of reliance or materiality. The wire fraud provision likewise is violated when,

APP_0023

as here, the interstate wires are used as part of a "scheme or artifice … for obtaining money or property by means of false … pretenses, [or] representations[.]"

132.     Accordingly, because Defendants' conduct violated the wire fraud and mail fraud laws, and the Advisers' Act antifraud provisions, and their acts and omissions were in connection with the HCM Bankruptcy proceedings under Title 11, they are sufficient to bring such conduct within the purview of the RICO civil action provisions, 18 U.S.C. § 1964.

133.     Plaintiffs are thus entitled to damages, treble damages, attorneys' fees and costs of suit, in addition to all other injunctive or equitable relief to which they are justly entitled.

### FIFTH CAUSE OF ACTION
### *Tortious Interference*
### (CLO Holdco against HCM)

134.     Plaintiff respectfully incorporates the foregoing factual averments as if fully set forth herein and further alleges the following:

135.     At all relevant times, HCM owned a 0.6% interest in HCLOF.

136.     At all relevant times, Seery and HCM knew that Plaintiff had specific rights in HCLOF under the Company Agreement, § 6.2.

137.     Section 6.2 of HCLOF Company agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not an affiliate of the member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

138.     HCM, through Seery, tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, diverting the Harbourvest Interests in HCLOF to HCM without giving HCLOF or Plaintiff the option to purchase those assets at the same favorable price that HCM obtained them.

139.    HCM and Seery tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, misrepresenting the fair market value as $22.5 million and concealing the current value of those interests.

140.    But for HCM and Seery's tortious interference, Plaintiff would have been able to acquire the Harbourvest Interests at a highly favorable price. HCM and Seery's knowledge of the rights and intentional interference with these rights has caused damage to Plaintiff CLO Holdco.

141.    Plaintiff is therefore entitled to damages from HCM and Seery, as well as exemplary damages.

## VI.

## JURY DEMAND

142.    Plaintiff demands trial by jury on all claims so triable.

## VII.

## PRAYER FOR RELIEF

143.    Wherefore, for the foregoing reasons, Plaintiffs respectfully pray that the Court enter judgment in its favor and against Defendants, jointly and severally, for:

  a.  Actual damages;

  b.  Disgorgement;

  c.  Treble damages;

  d.  Exemplary and punitive damages;

  e.  Attorneys' fees and costs as allowed by common law, statute or contract;

  f.  A constructive trust to avoid dissipation of assets;

  g.  All such other relief to which Plaintiff is justly entitled.

Dated:  April 12, 2021                         Respectfully submitted,

                                               **SBAITI & COMPANY PLLC**

                                               */s/  Mazin A. Sbaiti*
                                               **Mazin A. Sbaiti**
                                               Texas Bar No. 24058096
                                               **Jonathan Bridges**
                                               Texas Bar No. 24028835
                                               JPMorgan Chase Tower
                                               2200 Ross Avenue – Suite 4900W
                                               Dallas, TX  75201
                                               T:  (214) 432-2899
                                               F:  (214) 853-4367
                                               E:  mas@sbaitilaw.com
                                                    jeb@sbaitilaw.com

                                               **Counsel for Plaintiffs**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| **v.** | § | **CAUSE NO. 3:21-cv-00842-B** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P., HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **and HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| *Defendants.* | § | |

<u>**PLAINTIFFS' MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT**</u>

**I.**

<u>**NECESSITY OF MOTION**</u>

Plaintiffs submit this Motion under Rule 15 of the Federal Rules of Civil Procedure for one purpose: to name as defendant one James P. Seery, Jr., the CEO of Defendant Highland Capital Management, L.P. ("HCM"), and the chief perpetrator of the wrongdoing that forms the basis of Plaintiffs' causes of action.

Seery is not named in the Original Complaint. But this is only out of an abundance of caution due to the bankruptcy court, in HCM's pending Chapter 11 proceeding, having issued an order prohibiting the filing of any causes of action against Seery in any way related to his role at HCM, subject to certain prerequisites. In that order, the bankruptcy court also asserts "sole jurisdiction" over all such causes of action.

Plaintiffs respectfully submit that, to the extent the bankruptcy court order prohibits the filing of an action in ***this Court***, whose jurisdiction the bankruptcy court's jurisdiction is wholly

---

derivative of, that order exceeds the bankruptcy court's powers and is unenforceable. Alternatively, Plaintiffs submit that filing *this Motion* satisfies the prerequisites provided in the bankruptcy court's order. Either of these reasons provides sufficient grounds to grant this Motion.

The proposed First Amended Complaint is attached as Exhibit 1.

## II.

## BACKGROUND

On June 23, 2020, counsel for HCM filed a motion in HC's bankruptcy proceedings asking the bankruptcy court to defer to the "business judgment" of the board's compensation committee and approve the terms of its appointment of Seery as chief executive officer and chief restructuring officer at HCM, retroactive to March.[1] Counsel also asked the bankruptcy court to declare that it had exclusive jurisdiction over any claims asserted against Seery in this role.

On July 16, 2020, the bankruptcy court granted that motion and stated as follows:

> No entity may commence or pursue a claim or cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery, and (ii) specifically authorizing such entity to bring such claim. *The Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted*.[2]

---

[1] Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative *Nunc Pro Tunc* to March 15, 2020 [Doc. 774]. This motion is attached as Exhibit 2.

[2] Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020 [Doc 854]. A related order dated January 9, 2020, contains a similar provision with regard to Seery's role as an "Independent Director." Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Doc 339]. These orders are attached, respectively, as Exhibits 3 and 4.

---

On March 22, 2021, the bankruptcy court entered an order confirming HCM's reorganization plan.[3] That order purports to extend the prohibitions on suits against Seery, and it also prohibits certain actions against HCM and its affiliates. By its own terms, however, that order is not effective due to a pending appeal.

On April 12, 2021, Plaintiffs filed their Original Complaint in this action, alleging that HCM and related entities are liable as a result of insider trading and other violations of the antifraud provisions of the Investment Company Act of 1940, among other causes of action. The Original Complaint does not name Seery as a defendant. But the action is based on Seery's misrepresentations, omissions, and other breaches of duty committed in his role as HCM's CEO, which are sufficient to demonstrate his willful misconduct or gross negligence, though Plaintiffs submit that mere negligence and breach of fiduciary duty also form sufficient bases for his personal liability.

### III.

### <u>ARGUMENT</u>

This Court should grant leave to amend because the liberal policies behind Rule 15 require it and because leave is not prohibited by the bankruptcy court's order.

### A. Rule 15(a) Allows Plaintiffs' Amendment As a Matter of Course

Rule 15(a) instructs the Court to "freely give leave [to amend] when justice so requires." FED. R. CIV. P. 15(a). The Fifth Circuit, in *Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States Co.,* 195 F.3d 765 (5th Cir. 1999), interpreted the rule as "evinc[ing] a bias in favor of granting leave to amend." *Id.* at 770. Thus the Court must possess a "substantial reason"

---

[3] Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified) And (II) Granting Related Relief [Doc. 1943].

---

to deny a request for leave to amend. *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 286 (5th Cir. 2002); *Jamieson v. Shaw*, 772 F.2d 1205, 1208 (5th Cir. 1985); *cf. Foman v. Davis*, 371 U.S. 178, 182 (1962) (explaining that leave should be granted "[i]n the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.").

Moreover, one amendment, filed within 21 days of service of the pleading it seeks to amend or before a responsive pleading is filed, is allowed "as a matter of course." Fed. R. Civ. P. 15(a)(1); *Zaidi v. Ehrlich*, 732 F.2d 1218, 1220 (5th Cir. 1984) ("When, as in this case, a plaintiff who has a right to amend nevertheless petitions the court for leave to amend, the court should grant the petition."); *Galustian v. Peter*, 591 F.3d 724, 729-30 (4th Cir. 2010) (holding that district court abused its discretion in denying timely motion to amend adding defendant because "[t]he plaintiff's right to amend once is absolute"); *Rogers v. Girard Tr. Co.*, 159 F.2d 239, 241 (6th Cir. 1947) (holding that complaint may be amended as matter of course where defendant has filed no responsive pleading, and leave of district court is not necessary, but it is error to deny leave when asked); *Bancoult v. McNamara*, 214 F.R.D. 5, 7-8 (D.D.C. 2003) (holding that plaintiff's filing of a motion for leave to amend does not nullify plaintiff's absolute right to amend once before responsive pleadings, even if the amendment would be futile).

Here, Plaintiffs did not name Seery as a defendant in the Original Complaint out of an abundance of caution in light of the bankruptcy court's order of July 16, 2020 [Doc. 854]. Instead, Plaintiffs are seeking leave in this Motion to do so. Because the proposed amendment is their first, and because it comes within 21 days of service of the Original Complaint, as well as before any

responsive pleadings, Plaintiffs respectfully submit that they are entitled to leave and their proposed First Amended Complaint should be allowed.

## B.  The Bankruptcy Court's Order Should Not Prohibit Plaintiffs' Amendment

Plaintiffs submit that the bankruptcy court order of July 16, 2020, does not prohibit the proposed amendment for two independent reasons.

### 1.  The Bankruptcy Court's Order Exceeds Its Jurisdiction

#### a.  The Bankruptcy Court Cannot Strip This Court of Jurisdiction

Because the bankruptcy court's jurisdiction derives from and is dependent upon the jurisdiction of this Court, its order declaring that it has "sole jurisdiction" is overreaching.

Congress provided for and limited the jurisdiction of bankruptcy courts in 28 U.S.C. § 1334 and 28 U.S.C. § 157. As a result, bankruptcy court jurisdiction derives from and is limited by statute. *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995) ("The jurisdiction of the bankruptcy courts, like that of other federal courts, is grounded in, and limited by, statute."); *Williams v. SeaBreeze Fin., LLC (In re 7303 Holdings, Inc.)*, Nos. 08-36698, 10-03079, 2010 Bankr. LEXIS 2938 at *7 (Bankr. S.D. Tex. Aug. 26, 2010) ("A bankruptcy court's jurisdiction is derivative of the district court's jurisdiction. The bankruptcy court does not have jurisdiction unless the district court could exercise authority over the matter . . . ."). The plain provisions of § 1334 grant **to the district courts** "original jurisdiction" over all bankruptcy cases and related civil proceedings. 28 U.S.C. § 1334(a)-(b). What Congress giveth, the bankruptcy courts cannot taketh away.

#### b.  The *Barton* Doctrine Does Not Apply

The bankruptcy court's overreach seems to stem from a misapplication of the *Barton* doctrine. That doctrine protects receivers and trustees who are appointed by the bankruptcy court. *Randazzo v. Babin*, No. 15-4943, 2016 U.S. Dist. LEXIS 110465, at *3 (E.D. La. Aug. 18, 2016)

---

("While the *Barton* case involved a receiver in state court, the United States Court of Appeals for the Fifth Circuit has extended this principle, now known as the *Barton* doctrine, to lawsuits against bankruptcy trustees for acts committed in their official capacities."). The doctrine does not apply to executives of a debtor, like Seery, who are not receivers or trustees, and who are stretching the truth to claim that they were "appointed" by the bankruptcy court after asking it merely to approve their appointment in deference to their discretion under the business judgment rule.[4]

### c. The Order Exceeds the Constitutional Limits of the Bankruptcy Court's Jurisdiction

Plainly the bankruptcy court does not have "***sole jurisdiction***" over all causes of action that might be brought against Seery related to his role as HCM's CEO. But more to the point, the bankruptcy court does not even have ***concurrent jurisdiction*** over *all* such claims. The separation of powers doctrine does not allow that. *See Stern v. Marshall*, 564 U.S. 462, 499 (2011) (holding that Congress cannot bypass Article III and create jurisdiction in bankruptcy courts "simply because a proceeding may have some bearing on a bankruptcy case"); *id.* at 488 (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1856), for the proposition that "Congress cannot 'withdraw from judicial [read Article III] cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty'" with the limited exception of matters involving certain public rights); *id.* at 494 (quoting the dissent's quote of *Thomas v. Union Carbide Agricultural Products Co.*, 473 U.S. 568, 584 (1985), for the proposition that "Congress may not vest in a non-Article III court the power to adjudicate, render final judgment, and issue binding orders in a traditional contract action arising under state law," and

---

[4] Exhibit 2 at 14-15 (arguing that the bankruptcy court should not "interfere" with their "corporate decisions . . . as long as they are attributable to any rational business purpose") (internal quotes omitted); *id.* at 5-7 (detailing the compensation committee's "appointment" of Seery as CEO as well as chief restructuring officer).

then adding "tort" to the rule for purposes of the matter before it); *cf. In re Prescription Home Health Care,* 316 F.3d 542, 548 (5th Cir. 2002) (holding that trustee's tax liability was not within the bankruptcy court's related-to jurisdiction and rejecting "the theory that a bankruptcy court has jurisdiction to enjoin any activity that threatens the debtor's reorganization prospects [because that] would permit the bankruptcy court to intervene in a wide variety of third-party disputes [such as] any action (however personal) against key corporate employees, if they were willing to state that their morale, concentration, or personal credit would be adversely affected by that action"). The bankruptcy court's order asserting "sole jurisdiction" here is hardly even relevant since that court lacks the power to expand its jurisdiction or manufacture jurisdiction where none exists.

The proposed First Amended Complaint asserts common law and equitable contract and tort claims. For the reasons explained by the Supreme Court in *Stern,* such claims should not be deemed within the bankruptcy court's jurisdiction.

### d. The Order Exceeds the Bankruptcy Court's Statutory Authorization

Not only are there constitutional issues with the scope of the bankruptcy court's order, there is also the limitation of 28 U.S.C. § 157(d). *See TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512, 523 & n.40 (5th Cir. 2014) (noting bankruptcy court's "more limited jurisdiction" as a result of its "limited power" under 28 U.S.C. § 157). In § 157(d), Congress prohibited the bankruptcy court, absent the parties' consent, from presiding over cases or proceedings that require consideration of both Title 11 and other federal law regulating organizations or activities affecting interstate commerce.

The First Amended Complaint's allegations against Seery—accusing him of insider trading, violations of the RICO statute (18 U.S.C. § 1961 et seq.), and violations of the antifraud provisions of the Investment Advisers Act of 1940—require precisely that. Even determining the

---

"colorability" of such claims will require a close examination of both the proceedings that took place in the bankruptcy court under Title 11 and the Investment Advisers Act as well as the RICO statute. The bankruptcy court lacks the authority to make such determinations. This Court has that power.

Thus, at least as it applies to the proposed First Amended Complaint, the bankruptcy court's order exceeds its authority under 28 U.S.C. § 157(d), and any determination of "colorability" should take place in this Court, which Rule 12(b)(6) of the Federal Rules of Civil Procedure already provides for. To hold otherwise would create unnecessary tension with the congressional aims of 28 U.S.C. § 959 ("Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property.").

### 2. The Prerequisites in the Bankruptcy Court's Order Are Satisfied by This Motion and the Detailed Allegations in the Proposed First Amended Complaint

Alternatively, or in addition, should this Court read the bankruptcy court's order as prohibiting the filing of actions against Seery even in *this* Court, Plaintiffs submit that this Motion seeking leave provides the mechanisms required by that order and therefore satisfies it.

The bankruptcy court's order requires only that any contemplated action must first be submitted to that court for a preliminary determination of colorability. Because that court only has derivative jurisdiction as a result of this Court's jurisdiction—and only over matters referred to it by this Court—Plaintiffs submit that filing a motion for leave here is the correct procedure for complying with that order. This Court may refer this Motion to the bankruptcy court under Miscellaneous Order No. 33, as authorized by § 104 of the Bankruptcy Amendments and Federal Judgeship Act of 1984, codified at 28 U.S.C. § 157(a). Or it may instead decline to refer the Motion or withdraw the reference under 28 U.S.C. § 157(d), as Plaintiffs submit is appropriate for the

reasons addressed above. Regardless, this Motion presents the issue in a manner that allows the bankruptcy court to address it, should this Court decide that the bankruptcy court is authorized to do so. *Cf.* Confirmation Order [Doc. 1943] at 77, ¶ AA ("The Bankruptcy Court will have sole and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, ***only to the extent legally permissible*** and as provided for in Article XI of the Plan, shall have jurisdiction to adjudicate the underlying colorable claim or cause of action.") (emphasis added).

Plaintiffs therefore submit that, by filing this Motion in this Court, they have complied with the bankruptcy court's order.

## IV.

## CONCLUSION

Plaintiffs are entitled to amend as a matter of course. The bankruptcy court lacks jurisdiction to prohibit the proposed amendment. In these circumstances, Plaintiffs respectfully submit that the interests of justice support the granting of leave to amend, and Rule 15(a) requires that this Motion be granted.

Dated: April 19, 2021                          Respectfully submitted,

                                               **SBAITI & COMPANY PLLC**

                                               */s/ Jonathan Bridges*
                                               **Mazin A. Sbaiti**
                                               Texas Bar No. 24058096
                                               **Jonathan Bridges**
                                               Texas Bar No. 24028835
                                               JPMorgan Chase Tower
                                               2200 Ross Avenue – Suite 4900W
                                               Dallas, TX  75201
                                               T:  (214) 432-2899
                                               F:  (214) 853-4367
                                               E:  mas@sbaitilaw.com
                                                   jeb@sbaitilaw.com

                                               **Counsel for Plaintiffs**

## <u>CERTIFICATE OF CONFERENCE</u>

I hereby certify that, on April 19, 2021, I conferred with Defendant HCM's counsel in the HCM bankruptcy proceedings regarding this Motion. I have not conferred with counsel for the other Defendants because they have not been served and I do not know who will represent them. HCM's counsel indicated that they are opposed to  the relief sought in this Motion.


*/s/ Jonathan Bridges*
Jonathan Bridges

# EXHIBIT 1

APP_0037

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | **Cause No. 3:21-CV-00842-B** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P. , HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **JAMES P. SEERY,** *individually*, **and** | § | |
| **HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| *Defendants.* | § | |

---

**FIRST AMENDED COMPLAINT**

---

**I.**

**INTRODUCTION**

This action arises out of the acts and omissions of Defendant James P. Seery ("Seery") in

his conduct as chief executive officer and chief restructuring officer of Defendant Highland Capital

Management, L.P. ("HCM"), which is the general manager of Highland HCF Advisor, Ltd.

("HCFA"), both of which are registered investment advisers under the Investment Advisers Act of

1940 (the "Advisers Act"),[1] and nominal Defendant Highland CLO Funding, Ltd. ("HCLOF")

(Seery, HCM, and HCFA each a "Defendant," or together, "Defendants"). The acts and omissions

which have recently come to light reveal breaches of fiduciary duty, a pattern of violations of the

Advisers Act's anti-fraud provisions, and concealed breaches of the HCLOF Company Agreement,

among others, which have caused and/or likely will cause Plaintiffs damages, and which arise out

---

[1] https://adviserinfo.sec.gov/firm/summary/110126

of or are related to acts or omissions that constitute bad faith, fraud, gross negligence, or willful misconduct.

Seery negotiated a settlement with the several Habourvest[2] entities who owned 49.98% of HCLOF. The deal had HCM (or its designee) purchasing the Harbourvest membership interests in HCLOF for $22.5 million. Recent revelations, however, show that the sale was predicated upon a sales price that was vastly below the Net Asset Value ("NAV") of those interests. Upon information, the NAV of HCLOF's assets had risen precipitously, but was not disclosed to Harbourvest nor to Plaintiffs.

Under the Advisers Act, Defendants have a non-waivable duty of loyalty and candor, which includes its duty not to inside trade with its own investors, *i.e.*, not to trade with an investor to which HCM and Seery had access to superior non-public information. Upon information and belief, HCM's internal compliance policies required by the Advisers Act would not generally have allowed a trade of this nature to go forward—meaning, the trade either was approved in spite of compliance rules preventing it, or the compliance protocols themselves were disabled or amended to a level that leaves Defendants HCM and HCLOF exposed to liability. Thus, Defendants have created an unacceptable perpetuation of exposure to liability.

Additionally, Defendants are liable for a pattern of conduct that gives rise to liability for their conduct of the enterprise consisting of HCM in relation to HCFA and HCLOF, through a pattern of concealment, misrepresentation, and violations of the securities rules. In the alternative, Seery, HCFA and HCM, are guilty of self-dealing, violations of the Advisers Act, and tortious

---

[2] "Habourvest" refers to the collective of Harbourvest Dover Street IX Investment, L.P., Harbourvest 2017 Global AIF, L.P., Harbourvest 2017 lobal Fund, L.P., HV International VIII Secondary, L.P., and Harbourvest Skew Base AIF, L.P. Each was a member of Defendant Highland CLO Funding, Ltd.

APP_0039

interference by (a) not disclosing that Harbourvest had agreed to sell at a price well below the current NAV, and (b) diverting the Harbourvest opportunity to themselves.

For these reasons, judgment should be issued in Plaintiffs' favor.

## II.

## PARTIES

1.     Plaintiff CLO Holdco, Ltd. is a limited company incorporated under the laws of the Cayman Islands.

2.     Plaintiff Charitable DAF Fund, L.P., ("DAF") is a limited partnership formed under the laws of the Cayman Islands.

3.     Defendant Highland Capital Management, L.P. is a limited partnership with its principal place of business at 300 Crescent Court, Suite 700, Dallas, Texas 75201. It may be served at its principal place of business or through its principal officer, James P. Seery, Jr., or through the Texas Secretary of State, or through any other means authorized by federal or state law.

4.     Defendant Highland HCF Advisor, Ltd.  is a limited company incorporated under the laws of the Cayman Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201. It is a registered investment adviser ("RIA") subject to the laws and regulations of the Investment Advisers Act of 1940 (the "Adviser's Act"). It is a wholly-owned subsidiary of Highland Capital Management, L.P.

5.     Defendant James Seery is an officer and/or director and/or control person of Defendants Highland Capital Management, L.P., Highland CLO Funding, Ltd., and Highland HCF Adviser, Ltd., and is a citizen of and domiciled in Floral Park, New York. He can be served personally at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or wherever he may be found.

6.     Nominal Defendant Highland CLO Funding, Ltd. is a limited company incorporated under the laws of the Island of Guernsey. Its registered office is at First Floor, Dorey

APP_0040

Court, Admiral Park, St. Peter Port, Guernsey GY1 6HJ, Channel Islands. Its principal place of business is 300 Crescent Court, Suite 700, Dallas, Texas 75201.

## III.

## JURISDICTION AND VENUE

**7.** This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331 as one or more rights and/or causes of action arise under the laws of the United States. This Court has supplemental subject matter jurisdiction over all other claims under 28 U.S.C. § 1367.

**8.** Personal jurisdiction is proper over the Defendants because they reside and/or have continual contacts with the state of Texas, having regularly submitted to jurisdiction here. Jurisdiction is also proper under 18 U.S.C. § 1965(d).

**9.** Venue is proper in this Court under 28 U.S.C. § 1391(b) and (c) because one or more Defendants reside in this district and/or a substantial part of the events or omissions giving rise to the claim occurred or a substantial part of property that is the subject of the action is situated in this district. Venue in this district is further provided under 18 U.S.C. § 1965(d).

## IV.

## RELEVANT BACKGROUND

### *HCLOF IS FORMED*

**10.** Plaintiff DAF is a charitable fund that helps several causes throughout the country, including providing funding for humanitarian issues (such as veteran's welfare associations and women's shelters), public works (such as museums, parks and zoos), and education (such as specialty schools in underserved communities). Its mission is critical.

**11.** Since 2012, DAF was advised by its registered investment adviser, Highland Capital Management, L.P., and its various subsidiaries, about where to invest. This relationship was governed by an Investment advisory Agreement.

12.     At one point in 2017, HCM advised DAF to acquire 143,454,001 shares of HCLOF, with HCFA (a subsidiary of HCM) serving as the portfolio manager. DAF did so via a holding entity, Plaintiff CLO Holdco, Ltd.

13.     On November 15, 2017, through a Subscription and Transfer Agreement, the DAF entered into an agreement with others to sell and transfer shares in HCLOF, wherein the DAF retained 49.02% in CLO Holdco.

14.     Pursuant to that agreement, Harbourvest acquired the following interests in the following entities:

Harbourvest Dover Street IX Investment, L.P., acquired 35.49%;

Harbourvest 2017 Global AIF, L.P., acquired 2.42%;

Harbourvest 2017 lobal Fund, L.P., acquired 4.85%;

HV International VIII Secondary, L.P., acquired 6.5%; and

Harbourvest Skew Base AIF, L.P., acquired 0.72%;

for a total of 49.98% (altogether, the "Harbourvest interests").

15.     On or about October 16, 2019, Highland Capital Management filed for Chapter 11 bankruptcy in Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court, in the case styled *In Re: Highland Capital Management, L.P., Debtor*, Cause No. 19-34054, (the "HCM Bankruptcy" and the Court is the "Bankruptcy Court").

16.     HCLOF's portfolio manager is HCFA. HCM is the parent of HCFA and is managed by its General Partner, Strand Management, who employs Seery and acts on behalf of HCM. Seery is the CEO of HCM which, upon information and belief, is the parent of HCFA.

17.     Before acceding to the Harbourvest interests, HCM was a 0.6% holder of HCLOF interests.

### The Harbourvest Settlement with
### Highland Capital Management in Bankruptcy

**18.** On April 8, 2020, Harbourvest submitted its proofs of claim in the HCM bankruptcy proceeding. Annexed to its proofs of claims was an explanation of the Proof of Claim and the basis therefor setting out various pre-petition allegations of wrongdoing by HCM. *See, e.g.,* Case No. 19-bk-34054, Doc. 1631-5.

**19.** The debtor, HCM, made an omnibus response to the proofs of claims, stating they were duplicative of each other, overstated, late, and otherwise meritless.

**20.** Harbourvest responded to the omnibus objections on September 11, 2020. *See* Cause No. 19-bk-34054, Doc. 1057.

**21.** Harbourvest represented that it had invested in HCLOF, purchasing 49.98% of HCLOF's outstanding shares.

**22.** Plaintiff CLO Holdco was and is also a 49.02% holder of HCLOF's member interests.

**23.** In its Omnibus Response, Harbourvest explained that its claims included unliquidated legal claims for fraud, fraud in the inducement, RICO violations under 18 U.S.C. 1964, among others (the "Harbourvest Claims"). *See* Cause No. 19-bk-34054, Doc. 1057.

**24.** The Harbourvest Claims centered on allegations that when Harbourvest was intending to invest in a pool of Collateralized Loan Obligations, or CLOs, that were then-managed by Acis Capital Management ("Acis"), a subsidiary of HCM, HCM failed to disclose key facts about ongoing litigation with a former employee, Josh Terry.

**25.** Harbourvest claimed that it had lost over $100 million in the HCLOF transaction due to fraud, which, after trebling under the racketeering statute, it claimed it was entitled to over $300 million in damages.

---

First Amended Complaint                                                                                    Page 6

26. Harbourvest contended that HCM never sufficiently disclosed the underlying facts about the litigation with Terry, and HCM's then-intended strategy to fight Terry caused HCLOF to incur around $15 million in legal fees and costs. It contended that had it known the nature of the lawsuit and how it would eventually turn out, Harbourvest never would have invested in HCLOF. *See* Cause No. 19-bk-34054, Doc. 1057.

27. While even assuming Harbourvest's underlying claims were valid as far as the lost $15 million went, the true damage of the legal fees to Harbourvest would have been 49.98% of the HCLOF losses (i.e., less than $7.5 million).

28. In truth, as of September 2020, Harbourvest had indeed lost some $52 million due to the alleged diminishing value of the HCLOF assets (largely due to the underperformance of the Acis entities[3])—and the values were starting to recover.

29. HCM denied the allegations in the Bankruptcy Court. Other than the claim for waste of corporate assets of $15 million, HCM at all times viewed the Harbourvest legal claims as being worth near zero and having no merit.

30. On December 23, 2020, HCM moved the Court to approve a settlement between itself and Harbourvest. No discovery had taken place between the parties, and Plaintiff did not have any notice of the settlement terms or other factors prior to the motion's filing (or even during its pendency) in order to investigate its rights.

31. HCM set the hearing right after the Christmas and New Year's holidays, almost ensuring that no party would have the time to scrutinize the underpinnings of the deal.

---

[3] Acis was being managed by Joshua Terry. JP Morgan had listed the four ACIS entities under his management as the four worst performers of the 1200 CLOs it evaluated.

32.     On January 14, 2021, the Bankruptcy Court held an evidentiary hearing and approved the settlement in a bench ruling, overruling the objections to the settlement.

33.     An integral part of the settlement was allowing $45 million in unsecured claims that, at the time of the agreement, were expected to net Harbourvest around 70 cents on the dollar. In other words, Harbourvest was expected to recover around $31,500,000 from the allowed claims.

34.     As part of the consideration for the $45 million in allowed claims, Harbourvest agreed to transfer all of its interests in HCLOF to HCM.

35.     HCM and Seery rationalized the settlement value by allocating $22.5 million of the net value of the $45 million in unsecured claims as consideration to purchase Harbourvest's interests in HCLOF, meaning, if 70% of the unsecured claims—i.e., $31.5 million—was realized, and $22.5 million of that would be allocated to the purchase price of the Harbourvest interests in HCLOF, the true "settlement" for Harbourvest's legal claims was closer to $9 million. Still $1.5 million over the reasonable damages amount that Harbourvest suffered.

36.     Plaintiffs here are taking no position at this time about the propriety of settling the Harbourvest legal claims for $9 million. That is for another day.

37.     At the core of this lawsuit is the fact that HCM purchased the Harbourvest interests in HCLOF for $22.5 million knowing that they were worth far more than that.

38.     It has recently come to light that the Harbourvest interests, as of December 31, 2020, were worth in excess of $41,750,000, and they have continued to go up in value.

39.     On November 30, 2020, which was less than a month prior to the filing of the Motion to Approve the Settlement, the net asset value of those interests was over $34.5 million. Plaintiffs were never made aware of that.

40.    The change was due to how the net asset value, or NAV, was calculated. The means and methods for calculating the "net asset value" of the assets of HCLOF are subject to and governed by the regulations passed by the SEC pursuant to the Adviser's Act, and by HCM's internal policies and procedures.

41.    Typically, the value of the securities are reflected by a market price quote.

42.    However, the underlying securities in HCLOF are not liquid and had not been traded in a long while. Therefore, any market quotes were stale.

43.    There not having been any contemporaneous market quotations that could be used in good faith to set the marks,[4] meant that other prescribed methods of assessing the value of the interests, such as the NAV, would have been the proper substitutes.

44.    Seery testified that the fair market value of the Harbourvest HCLOF interests was $22.5 million. Even allowing some leeway there, it was off by a mile.

45.    Given the artifice described herein, Seery and the entity Defendants had to know that the representation of the fair market value at $22.5 million was false because the NAV was so much higher.

46.    But it does not appear that they disclosed that fact to Harbourvest to whom they owed fiduciary duties as the RIA in charge of HCLOF, and they certainly did not disclose the truth to the Plaintiff. One would expect HCM to disclose that its trade with Harbourvest—or someone in Harbourvest's position—was sanitized by complete disclosure of the NAV of the interests, and noting Harbourvest's acceptance of the trade notwithstanding that disclosure. The abject silence of the information's disclosure—both in the Settlement Agreement and in the papers seeking to

---

[4] The term "mark" is shorthand for an estimated or calculated value for a non-publicly traded instrument.

approval of the settlement and the testimony proffered in its support—strongly suggests its absence from the negotiations.

47.     What it appears is that Seery used an old valuation, itself a reckless if not intentional misrepresentation of value. Thus, it is either the case that (i) Defendants conducted the proper analysis to obtain a current value of the assets but decided to use a far lower valuation in order to whitewash the settlement or enrich the bankruptcy estate; *or* (ii) Defendants never conducted the proper current valuation, and therefore baselessly represented what the current value of the assets was, despite knowingly having no reasonable basis for making such a claim.

48.     For years HCM had internal procedures and compliance protocols to govern this not infrequent occurrence. Prior to Seery taking over as CEO, HCM's internal compliance policies, enforced by its compliance officers, prohibiting HCM from trading with an investor where HCM had superior knowledge about the value of the assets, for example. While Plaintiff has no reason to believe that those procedures were scrapped in recent months, it can only assume that they were either overridden improperly or circumvented wholesale.

49.     Upon finalizing the Harbourvest Settlement Agreement and making representations to the Bankruptcy Court to the Plaintiffs about the value of the Harbourvest Interests, Seery and HCM had a duty to use current values and not rely on old valuations of the assets or the HCLOF interests.

50.     Given Defendants' actual or constructive knowledge that they were purchasing Harbourvest's Interests in HCLOF for a less than 50% of what those interests were worth—Defendants owed Plaintiff a fiduciary duty not to purchase them for themselves.

51.     Defendants should have either had HCLOF repurchase the interests with cash, or offer those interests to Plaintiff and the other members *pro rata*, before HCM agreed to purchase them all lock, stock and barrel, for no up-front cash.

52.     Indeed, had Plaintiff been offered those interests, it would have happily purchased them and therefore would have infused over $20 million in cash into the estate for the purpose of executing the Harbourvest Settlement.

53.     That Defendants (and to perhaps a lesser extent, the Unsecured Creditors Committee (the "UCC")) agreed to pay $22.5 million for the HCLOF assets, where they had previously not consented to any such expenditure by the estate on behalf of HCLOF, strongly indicates their awareness that they were purchasing assets for far below market value.

54.     The above is the most reasonable and plausible explanation for why Defendants and the UCC forwent raising as much as $22.5 million in cash now in favor of hanging on to the HCLOF assets.

55.     Indeed, in January 2021 Seery threatened Ethen Powell that "[Judge Jernigan] is laughing at you" and "we are coming after you" in response to the latter's attempt to exercise his right as beneficial holder of the CLO, and pointing out a conflict of interest in Seery's plan to liquidate the funds.

56.     HCM's threat, made by Seery, is tantamount to not only a declaration that he intends to liquidate the funds regardless of whether the investors want to do so, and whether it is in their best interests, but also that HCM intends to leverage what it views as the Bankruptcy Court's sympathy to evade accountability.

## V.

## **CAUSES OF ACTION**

APP_0048

## FIRST CAUSE OF ACTION
### *Breaches of Fiduciary Duty*

**57.**    Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

**58.**    HCM is a registered investment advisor and acts on behalf of HCFA. Both are fiduciaries to Plaintiffs because HCM had a direct advisor agreement with the DAF at all relevant times, and HCM, through HCFA, advised CLO Holdco in the HCLOF venture.

**59.**    The Advisers Act establishes an unwaivable federal fiduciary duty for investment advisers,[5] and its chief compliance officers.[6]

**60.**    HCM and the DAF entered into an Amended and Restated Investment Advisory Agreement, executed between them on July 1, 2014 (the "RIA Agreement"). It renews annually and continued until the end of January 2021.

**61.**    In addition to being the RIA to the DAF, HCM was appointed the DAF's attorney-in-fact for certain actions, such as "to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner." RIA Agreement ¶ 4.

---

[5] *See e.g, SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 194 (1963); *Transamerica Mortg. Advisors (tama) v. Lewis*, 444 U.S. 11, 17 (1979) ("§ 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers."); *Santa Fe Indus, v. Green*, 430 U.S. 462, 471, n.11 (1977) (in discussing *SEC v. Capital Gains*, stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"). *See also* Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing* Proxy Voting by Investment Advisers, Investment Advisers Act Release No. 2106 (Jan. 31, 2003)).

[6] Advisers Act Rule 206(4)-7 ("An adviser's chief compliance officer should be competent and knowledgeable regarding the Advisers Act and should be empowered with full responsibility and authority to develop and enforce appropriate policies and procedures for the firm.").

---

62.    The RIA Agreement further commits HCM to value financial assets "in accordance with the then current valuation policy of the Investment Advisor [HCM], a copy of which will provided to the General Partner upon request." RIA Agreement ¶ 5.

63.    While HCM contracted for the recognition that it would be acting on behalf of others and could be in conflict with advice given the DAF, (RIA Agreement ¶ 12), nowhere did it purport to waive the fiduciary duties owed to the DAF not to trade as a principal in a manner that harmed the DAF.

64.    HCFA owed a fiduciary duty to Holdco as an investor in HCLOF and to which HCFA was the portfolio manager. HCM owed a fiduciary duty to the DAF (and to Holdco as its subsidiary) pursuant to a written Advisory Agreement HCM and the DAF had where HCM agreed to provide sound investment advice and management functions.

65.    As a registered investment adviser, HCM's fiduciary duty is broad and applies to the entire advisor-client relationship.

66.    The core of the fiduciary duty is to act in the best interest of their investors—the advisor must put the ends of the client before its own ends or the ends of a third party.

67.    This is manifested in a duty of loyalty and a duty of utmost care. It also means that the RIA has to follow the terms of the company agreements and the regulations that apply to the investment vehicle.

68.    Seery in controlling HCM, HCFA, and by extension, HCLOF, directly owed a fiduciary duty to Plaintiffs by virtue of his position, or is liable for aiding and abetting HCM's and HCFA's breaches of fiduciary duty by controlling them and either recklessly or intentionally causing them to breach their duties.

APP_0050

69.     The fiduciary duty that HCM and Seery owed to Plaintiff is predicated on trust and confidence. Section 204A of the Advisers Act requires investment advisors (whether SEC-registered or not) to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the RIA from trading on material, non-public information. *See* 17 C.F.R. § 275.206(4)-7. That means that Plaintiff should be able to take Defendants at their word and not have to second guess or dig behind representations made by them.

70.     The simple thesis of this claim is that Defendants Seery, HCFA and HCM breached their fiduciary duties by (i) insider trading with Harbourvest and concealing the rising NAV of the underlying assets—i.e., trading with Harbourvest on superior, non-public information that was neither revealed to Harbourvest nor to Plaintiff; (ii) concealing the value of the Harbourvest Interests; and (iii) diverting the investment opportunity in the Harbourvest entities to HCM (or its designee) without offering it to or making it available to Plaintiff or the DAF.

71.     HCM, as part of its contractual advisory function with Plaintiffs, had expressly recommended the HCLOF investment to the DAF. Thus, diverting the opportunity for returns on its investment was an additional breach of fiduciary duty.

72.     This violated a multitude of regulations under 27 C.F.R. part 275, in addition to Rules 10b-5 and 10b5-1. 17 CFR 240.10b5-1 ("Rule 10b5-1") explains that one who trades while possessing non-public information is liable for insider trading, and they do not necessarily have to have *used* the specific inside information.

73.     It also violated HCM's own internal policies and procedures.

74.     Also, the regulations impose obligations on Defendants to calculate a *current* valuation when communicating with an investor, such as what may or may not be taken into

account, and what cannot pass muster as a current valuation. Upon information and belief, these regulations were not followed by the Defendants.

75.    HCM's internal policies and procedures, which it promised to abide by both in the RIA Agreement and in its Form ADV SEC filing, provided for the means of properly calculating the value of the assets.

76.    HCM either did not follow these policies, changed them to be out of compliance both with the Adviser Act regulations and its Form ADV representations, and/or simply misrepresented or concealed their results.

77.    In so doing, because the fiduciary duty owed to Plaintiff is a broad one, and because Defendants' malfeasance directly implicates its relationship with Plaintiff, Defendants have breached the Advisers Act's fiduciary duties owed to Plaintiff as part of their fiduciary relationship.[7]

78.    At no time between agreeing with Harbourvest to the purchase of its interests and the court approval did Defendants disclose to either Harbourvest or to Plaintiff (and the Bankruptcy Court for that matter) that the purchase was at below 50% the current net asset value as well, and when they failed to offer Plaintiff (and the other members of HCLOF) their right to purchase the interests pro rata at such advantageous valuations. Plaintiff's lost opportunity to purchase has harmed Plaintiff. Plaintiff had been led to believe by the Defendants that the value of what was being purchased in the Harbourvest settlement by HCM (or its designee) was at fair

---

[7] *See* Advisers Act Release No. 4197 (Sept. 17, 2015) (Commission Opinion) ("[O]nce an investment Advisory relationship is formed, the Advisers Act does not permit an adviser to exploit that fiduciary relationship by defrauding his client in any investment transaction connected to the Advisory relationship."); *see also SEC v. Lauer*, No. 03-80612-CIV, 2008 U.S. Dist. LEXIS 73026, at 90 (S.D. Fla. Sept. 24, 2008) ("Unlike the antifraud provisions of the Securities Act and the Exchange Act, Section 206 of the Advisers Act does not require that the activity be 'in the offer or sale of any' security or 'in connection with the purchase or sale of any security.'").

market value. This representation, repeated again in the Bankruptcy Court during the Harbourvest confirmation, implicitly suggested that a proper current valuation had been performed.

79.     Seery testified in January 2021 that the then-current fair market value of Habourvests's 49.98% interest in HCLOF was worth around $22.5 million.

80.     But by then, it was worth almost double that amount and has continued to appreciate. Seery knew or should have known that fact because the value of some of the HCLOF assets had increased, and he had a duty to know the current value. His lack of actual knowledge, while potentially not overtly fraudulent, would nonetheless amount to a reckless breach of fiduciary duty for acting without proper diligence and information that was plainly available.

81.     Furthermore, HCLOF holds equity in MGM Studios and debt in CCS Medical via various CLO positions. But Seery, in his role as CEO of HCM, was made aware during an advisors meeting in December 2020 that Highland would have to restrict its trading in MGM because of its insider status due to activities that were likely to apply upward pressure on MGM's share price.

82.     Furthermore, Seery controlled the Board of CCS Medical. And in or around October 2020, Seery was advocating an equatization that would have increased the value of the CCS securities by 25%, which was not reflected in the HCM report of the NAV of HCLOF's holdings.

83.     Seery's knowledge is and should be imputed to HCM and HCFA.

84.     Moreover, it is a breach of fiduciary duty to commit corporate waste, which is effectively what disposing of the HCLOF assets would constitute in a rising market, where there is no demand for disposition by the investors (save for HCM, whose proper 0.6% interest could easily be sold to the DAF at fair value).

85.     As holder of 0.6% of the HCLOF interests, and now assignee of the 49.98%
Harbourvest Interests), HCM has essentially committed self-dealing by threatening to liquidate
HCLOF now that it may be compelled to do so under its proposed liquidation plan, which perhaps
inures to the short term goals of HCM but to the pecuniary detriment of the other holders of
HCLOF whose upside will be prematurely truncated.

86.     Seery and HCM should not be allowed to benefit from the breach of their fiduciary
duties because doing so would also cause Plaintiffs irreparable harm. The means and methods of
disposal would likely render the full scope of damages to the DAF not susceptible to specific
calculation—particularly as they would relate to calculating the lost opportunity cost. Seery and
HCM likely do not have the assets to pay a judgment to Plaintiffs that would be rendered, simply
taking the lost appreciation of the HCLOF assets.

87.     Defendants are thus liable for diverting a corporate opportunity or asset that would
or should have been offered to Plaintiff and the other investors. Because federal law makes the
duties invoked herein unwaivable, it is preposterous that HCM, as a 0.6% holder of HCLOF,
deemed itself entitled to the all of the value and optionality of the below-market Harbourvest
purchase.

88.     Defendants cannot rely on any contractual provision that purports to waive this
violation. Nothing in any agreement purports to permit, authorize or otherwise sanitize
Defendants' self-dealing. All such provisions are void.

89.     In the fourth quarter of 2020, Seery and HCM notified staff that they would be
terminated on December 31, 2020. That termination was postponed to February 28, 2021.
Purchasing the Harbourvest assets without staffing necessary to be a functioning Registered

APP_0054

Investment Advisor was a strategic reversal from prior filings that outlined canceling the CLO management contracts and allowing investors to replace Highland as manager.

90.    Seery's compensation agreement with the UCC incentivizes him to expedite recoveries and to prevent transparency regarding the Harbourvest settlement.

91.    What is more, Seery had previously testified that the management contracts for the funds—HCLOF included—were unprofitable, and that he intended to transfer them. But he later rejected offers to purchase those management contracts for fair value and instead decided to continue to manage the funds—which is what apparently gave rise to the Harbourvest Settlement, among others. He simultaneously rejected an offer for the Harbourvest assets of $24 million, stating that they were worth much more than that.

92.    Because of Defendants' malfeasance, Plaintiffs have lost over $25 million in damages—a number that continues to rise—and the Defendants should not be able to obtain a windfall.

93.    For the same reason, Defendants' malfeasance has also exposed HCLOF to a massive liability from Harbourvest since the assignment of those interests is now one that is likely unenforceable under the Advisers Act, Section 47(b), if there was unequal information.

94.    Seery is liable as a principal and as an officer and control person under the regulations promulgated pursuant to Dodd-Frank and other laws.

95.    HCM and HCFA are liable as principals for breach of fiduciary duty, as are the principals and compliance staff of each entity.

96.    Plaintiffs seek disgorgement, damages, exemplary damages, attorneys' fees and costs. To the extent the Court determines that this claim had to have been brought derivatively on

behalf of HCLOF, then Plaintiffs represent that any pre-suit demand would have been futile since asking HCM to bring suit against its principal, Seery, would have been futile.

## SECOND CAUSE OF ACTION
### *Breach of HCLOF Company Agreement*
### (By Holdco against HCLOF, HCM and HCFA)

97.    Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein and further alleges the following:

98.    On November 15, 2017, the members of HCLOF, along with HCLOF and HCFA, executed the *Members Agreement Relating to the Company* (the "Company Agreement").

99.    The Company Agreement governs the rights and duties of the members of HCLOF.

100.    Section 6.2 of HCLOF Company Agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not to an affiliate of the selling member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

101.    Here, despite the fact that Harbourvest agreed to sell its interests in HCLOF for $22.5 million when they were worth more than double that, Defendants did not offer Plaintiff the chance to buy its pro rata share of those interests at the same agreed price of $22.5 million (adjusted pro rata).

102.    The transfer and sale of the interests to HCM were accomplished as part of the Harbourvest Settlement which was approved by the Bankruptcy Court.

103.    Plaintiff was not informed of the fact that Harbourvest had offered its shares to Defendant HCM for $22.5 million—which was under 50% of their true value.

**104.** Plaintiff was not offered the right to purchase its pro rata share of the Harbourvest interests prior to the agreement being struck or prior to court approval being sought.

**105.** Had Plaintiff been allowed to do so, it would have obtained the interests with a net equity value over their purchase price worth in excess of $20 million.

**106.** No discovery or opportunity to investigate was afforded Plaintiff prior to lodging an objection in the Bankruptcy Court.

**107.** Plaintiff is entitled to specific performance or, declaratory relief, and/or disgorgement, constructive trust, damages, attorneys' fees and costs.

### THIRD CAUSE OF ACTION
#### *Negligence*
#### (By the DAF and CLO Holdco against Seery, HCM, and HCFA)

**108.** Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

**109.** Plaintiffs incorporate the foregoing causes of action and note that all the foregoing violations were breaches of the common law duty of care imposed by law on each of Seery, HCFA and HCM.

**110.** Each of these Defendants should have known that their actions were violations of the Advisers Act, HCM's internal policies and procedures, the Company Agreement, or all three.

**111.** Seery and HCM owed duties of care to Plaintiffs to follow HCM's internal policies and procedures regarding both the propriety and means of trading with a customer [Harbourvest], the propriety and means of trading as a principal in an account but in a manner adverse to another customer [the DAF and Holdco], and the proper means of valuing the CLOs and other assets held by HCLOF.

**112.** It would be foreseeable that failing to disclose the current value of the assets in the HCLOF would impact Plaintiffs negatively in a variety of ways.

**113.** It would be reasonably foreseeable that failing to correctly and accurately calculate the current net asset value of the market value of the interests would cause Plaintiffs to value the Harbourvest Interests differently.

**114.** It would be reasonably foreseeable that referring to old and antiquated market quotations and/or valuations of the HCLOF assets or interests would result in a mis-valuation of HCLOF and, therefore, a mis-valuation of the Harbourvest Interests.

**115.** Relying on stale valuations without updating them was reckless due to Seery's and HCM's knowledge that the values of the interests were not static and likely would have changed over time, such that old information had a high degree of probability of being inaccurate.

**116.** Seery's and HCM's failure to inform the DAF and Holdco of the updated valuations, and/or to misstate the value in January 2021 in support of the Harbourvest settlement was likewise reckless in the face of the known risk that Plaintiffs would be relying on those representations, as would Harbourvest and the Court.

**117.** Seery's and HCM's failure to offer the DAF and Holdco the right to purchase the Harboruvest Interests was likewise reckless in light of the obvious risk.

**118.** Likewise, it would have been foreseeable that Plaintiff's failure to give Plaintiff the opportunity to purchase the Harbourvest shares at a $22.5 million valuation would cause Plaintiff damages. Defendants knew that the value of those assets was rising. They further knew or should have known that whereas those assets were sold to HCM for an allowance of claims to be funded in the future, selling them to Plaintiff would have provided the estate with cash funds.

APP_0058

119.     Defendants' negligence or gross negligence foreseeably and directly caused Plaintiff harm.

120.     Plaintiff is thus entitled to damages.

### FOURTH CAUSE OF ACTION
### *Racketeering Influenced Corrupt Organizations Act*
### (CLO Holdco and DAF against HCM and Seery)

121.     Plaintiffs respectfully incorporate the foregoing factual averments as if fully set forth herein, and further alleges the following:

122.     Defendants HCM and Seery are liable for violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961 *et seq.*, for the conduct of an enterprise through a pattern of racketeering activity.

123.     HCLOF constitutes an enterprise under the RICO Act. Additionally, or in the alternative, HCM, HCLA, and HCLOF constituted an association-in-fact enterprise. The purpose of the association-in-fact was the perpetuation of Seery's position at HCM and using the Harbourvest settlement as a vehicle to enrich persons other than the HCLOF investors, including Holdco and the DAF, and the perpetuation of HCM's holdings in collateralized loan obligations owned by HCLOF, while attempting to deny Plaintiffs the benefit of its rights of ownership.

124.     The association-in-fact was bound by informal and formal connections for years prior to the elicit purpose, and then changed when HCM and Seery joined it in order to achieve the association's illicit purpose. For example, HCM is the parent and control person over HCFA, which is the portfolio manager of HCLOF pursuant to a contractual agreement—both are registered investment advisors and provide advisory and management services to HCLOF.

125.     HCM and Seery injured Plaintiffs through their continuous course of conduct of the HCM-HCLA-HCLOF association-in-fact enterprise. Seery's actions (performed on behalf of

HCM and the association-in-fact enterprise) constitute violations of the federal wire fraud, mail fraud, fraud in connection with a case under Title 11, and/or securities fraud laws, pursuant to 18 U.S.C. § 1961(1)(B) and (D).

126.    Seery operated HCM in such a way as to violate insider trading rules and regulations when it traded with Harbourvest while it had material, non-public information that it had not supplied to Harbourvest or to Plaintiffs.

127.    In or about November 2020, HCM and Harbourvest entered into discussions about settling the Harbourvest Claims. Seery's conduct of HCLOF and HCLA on behalf of HCM through the interstate mails and/or wires caused HCM to agree to the purchase of Harbourvest's interests in HCLOF.

128.    On or about each of September 30, 2020, through December 31, 2020, Seery, through his conduct of the enterprise, utilized the interstate wires and/or mails to obtain or arrive at valuations of the HCLOF interests. Seery's conduct of the enterprise caused them to cease sending the valuation reports to Plaintiffs, which eventually allowed Plaintiffs to be misled into believing that Seery had properly valued the interests.

129.    On or about September 30, 2020, Seery transmitted or caused to be transmitted though the interstate wires information to HCLOF investors from HCM (via HCFA), including Harbourvest, regarding the value of HCLOF interests and underlying assets.

130.    Additionally, Seery operated HCM in such a way that he concealed the true value of the HCLOF interests by utilizing the interstate wires and mails to transmit communications to the court in the form of written representations on or about December 23, 2020, and then further transmitted verbal representations of the current market value (the vastly understated one) on January 14, 2021, during live testimony.

131.    However, Harbourvest was denied the full picture and the true value of the underlying portfolio. At the end of October and November of 2020, HCM had updated the net asset values of the HCLOF portfolio. According to sources at HCM at the time, the HCLOF assets were worth north of $72,969,492 as of November 30, 2020. Harbourvest's share of that would have been $36,484,746.

132.    The HCLOF net asset value had reached $86,440,024 as of December 31, 2021, which means that by the time Seery was testifying in the Bankruptcy Court on January 14, 2021, that the fair market value of the Harbourvest Assets was $22.5 million, it was actually closer to $43,202,724.

133.    Seery, speaking on behalf of HCM, knew of the distinction in value and made the representations either knowingly or with reckless disregard for the truth.

134.    On January 14, 2021, Seery also testified that he (implying HCM, HCLA and HCLOF) had valued the Harbourvest Assets at their current valuation and at fair market value. This was not true because the valuation that was used and testified to was at that time ancient. The ostensible purpose of this concealment was to induce Plaintiff and other interest holdings to take no action.

135.    In supporting HCM's motion to the Bankruptcy Court to approve the Harbourvest Settlement, Seery omitted the fact that HCM was purchasing the interests at a massive discount, which would violate the letter and spirit of the federal Adviser's Act.

136.    Seery was informed in late December 2020 at an in-person meeting in Dallas to which Seery had to fly that HCLOF and HCM had to suspend trading in MGM Studios' securities because Seery had learned from James Dondero, who was on the Board of MGM, of a potential purchase of the company. The news of the MGM purchase should have caused Seery to revalue

the HCLOF investment in MGM. Seery's failure to disclose this information which would have been germane to the valuation of the Harbourvest Interests was another incidence of wrongful omission in violation of the Advisers Act's antifraud provision and RICO.

137.     In or around October 2020, Seery (who controls the Board of CSS Medical) was pursuing "equatization" of CSS Medical's debt, which would have increased the value of certain securities by 25%. In several communications through the U.S. interstate wires and/or mails, and with Plaintiffs, and the several communications with Harbourvest during the negotiations of the settlement, Seery failed to disclose these changes which were responsible in part for the ever-growing value of the HCLOF CLO portfolio. Seery's failure to disclose this information which would have been germane to the valuation of the Harbourvest Interests was another incidence of wrongful omission in violation of the Advisers Act's antifraud provision and RICO.

138.     Seery's failure to disclose the information about the current valuation, which would have been material to the value of the Harbourvest Interest—and by extension, to Plaintiff's rights with respect to those as part of the Harbourvest Settlement was another incidence of wrongful omission in violation of the Advisers Act's antifraud provision and RICO.

139.     The Harbourvest Settlement is not final and unwinding it could prove difficult— which Seery had to be counting on.

140.     Seery was at all relevant times operating as an agent of HCM and its control person as CEO.

141.     This series of related violations of the wire fraud, mail fraud, and securities fraud laws, in connection with the HCM bankruptcy, constitute a continuing pattern and practice of racketeering for the purpose of winning a windfall for HCM and himself--a nearly $30,000,000 payday under the confirmation agreement.

**142.** The federal RICO statute makes it actionable for one's conduct of an enterprise to include "fraud in connection with a [bankruptcy case]". The Advisers' Act antifraud provisions require full transparency and accountability to an advisers' investors and clients and does not require a showing of reliance or materiality. The wire fraud provision likewise is violated when, as here, the interstate wires are used as part of a "scheme or artifice … for obtaining money or property by means of false … pretenses, [or] representations[.]"

**143.** Accordingly, because Seery and HCM's conduct violated the wire fraud and mail fraud laws, and the Advisers' Act antifraud provisions, and their acts and omissions were in connection with the HCM Bankruptcy proceedings under Title 11, they are sufficient to bring such conduct within the purview of the RICO civil action provisions, 18 U.S.C. § 1964.

**144.** Plaintiffs are thus entitled to damages, treble damages, attorneys' fees and costs of suit, in addition to all other injunctive or equitable relief to which they are justly entitled.

**FIFTH CAUSE OF ACTION**
***Tortious Interference***
**(CLO Holdco against HCM and Seery)**

**145.** Plaintiff respectfully incorporates the foregoing factual averments as if fully set forth herein and further alleges the following:

**146.** At all relevant times, HCM owned a 0.6% interest in HCLOF.

**147.** At all relevant times, Seery and HCM knew that Plaintiff had specific rights in HCLOF under the Company Agreement, § 6.2.

**148.** Section 6.2 of HCLOF Company agreement provides that when a member "other than … CLO Holdco [Plaintiff] or a Highland Affiliate," intends to sell its interest in HCLOF to a third party (i.e., not an affiliate of the member), then the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell.

149.    HCM, through Seery, tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, diverting the Harbourvest Interests in HCLOF to HCM without giving HCLOF or Plaintiff the option to purchase those assets at the same favorable price that HCM obtained them.

150.    HCM and Seery tortiously interfered with Plaintiff's contractual rights with HCLOF by, among other things, misrepresenting the fair market value as $22.5 million and concealing the current value of those interests.

151.    But for HCM and Seery's tortious interference, Plaintiff would have been able to acquire the Harbourvest Interests at a highly favorable price. HCM and Seery's knowledge of the rights and intentional interference with these rights has caused damage to Plaintiff CLO Holdco.

152.    Plaintiff is therefore entitled to damages from HCM and Seery, as well as exemplary damages.

## VI.

## **JURY DEMAND**

153.    Plaintiffs demand trial by jury on all claims so triable.

## VII.

## **PRAYER FOR RELIEF**

154.    Wherefore, for the foregoing reasons, Plaintiffs respectfully pray that the Court enter judgment in their favor and against Defendants, jointly and severally, for:

    a.  Actual damages;

    b.  Disgorgement;

    c.  Treble damages;

    d.  Exemplary and punitive damages;

e.   Attorneys' fees and costs as allowed by common law, statute or contract;

f.   A constructive trust to avoid dissipation of assets;

g.   All such other relief to which Plaintiff is justly entitled.


Dated:  April 19, 2021                            Respectfully submitted,

                                                  **SBAITI & COMPANY PLLC**

                                                  */s/  Jonathan Bridges*
                                                  **Mazin A. Sbaiti**
                                                  Texas Bar No. 24058096
                                                  **Jonathan Bridges**
                                                  Texas Bar No. 24028835
                                                  JPMorgan Chase Tower
                                                  2200 Ross Avenue – Suite 4900W
                                                  Dallas, TX  75201
                                                  T:  (214) 432-2899
                                                  F:  (214) 853-4367
                                                  E:  mas@sbaitilaw.com
                                                       jeb@sbaitilaw.com


                                                  **Counsel for Plaintiffs**

# EXHIBIT 2

APP_0066

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**

**NORTHERN DISTRICT OF TEXAS**

**DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT, L.P.,** | § | **Case No. 19-34054** |
| | § | **Chapter 11** |
| | § | |
| **Debtor.** | § | |
| | § | |

**Response Deadline:  July 10, 2020 at 5:00 p.m.**
**Hearing Date:  July 14, 2020 at 1:30 p.m.**

**DEBTOR'S MOTION UNDER BANKRUPTCY CODE
SECTIONS 105(a) AND 363(b) FOR AUTHORIZATION TO
RETAIN JAMES P. SEERY, JR., AS CHIEF EXECUTIVE OFFICER,
CHIEF RESTRUCTURING OFFICER AND FOREIGN REPRESENTATIVE
*NUNC PRO TUNC* TO MARCH 15, 2020**

The above-captioned debtor and debtor in possession (the "Debtor") hereby moves (the "Motion") pursuant to sections 105(a) and 363(b) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code") for the entry of an order, substantially in the form attached hereto as Exhibit A (the "Proposed Order"), authorizing the Debtor (a) (i) to retain James P. Seery, Jr. as the chief executive officer and chief restructuring officer of the Debtor, pursuant to the terms of the letter attached as Exhibit 1 to the Proposed Order (the "Agreement") *nunc pro tunc* to March 15, 2020, and (ii) for Mr. Seery to replace the Debtor's current chief restructuring officer as the Debtor's foreign representative pursuant to 11 U.S.C. § 1505, and (b) granting related relief.  In support of the Motion, the Debtor respectfully represents as follows:

## Jurisdiction

1.      The United States Bankruptcy Court for the Northern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      The bases for the relief requested herein are sections 105 and 363 of the Bankruptcy Code.

## Background

3.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Bankruptcy Court").

4.      On October 29, 2019, the Official Committee of Unsecured Creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.  On December 4, 2019,

the Delaware Bankruptcy Court entered an order transferring venue of the Debtor's chapter 11 case to this Court [Docket No. 186].[1]

5. The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this chapter 11 case.

6. On December 4, 2019, the Debtor filed in the Delaware Bankruptcy Court its *Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) To Retain Development Specialists, Inc. to Provide a Chief Restructuring Officer, Additional Personnel, and Financial Advisory and Restructuring-Related Services, Nunc Pro Tunc, as of the Petition Date* [Docket No. 74] (the "CRO Motion"). The CRO Motion sought, among other things, to appoint Bradley Sharp as the Debtor's chief restructuring officer and for DSI to provide financial advisory services to the Debtor in support of Mr. Sharp.

7. On December 27, 2019, the Debtor filed the *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion"). The Settlement Motion sought approval of the settlement between the Debtor and the Committee and provided for, among other things, the creation of a new independent board of directors of Strand Advisors, Inc.[2] (the "New Board") consisting of

---

[1] All docket numbers refer to the docket maintained by this Court.
[2] Strand Advisors, Inc. ("Strand") is the general partner of the Debtor.

APP_0069

James P. Seery, Jr., John S. Dubel, and Russell Nelms (collectively, the "Independent Directors").

8.   The order granting the Settlement Motion authorized the Debtor to guarantee Strand's obligations to indemnify each Independent Director pursuant to the terms of any indemnification agreements entered into by Strand with each of the Independent Directors (the "Indemnification Agreements").

9.   The Court entered orders approving the Settlement Motion on January 9, 2020[3] and the DSI Approval Order on January 10, 2020.

10.   The Settlement Order approved, among other things, a term sheet setting forth the agreement between the Debtor and the Committee.  The final term sheet was attached to the *Notice of Final Term Sheet* filed in the Court on January 14, 2020 [Docket No. 354] (the "Final Term Sheet").  The Settlement Order also provided that no entity could commence or pursue a claim or cause of action against any Independent Director and/or his respective advisors and agents relating in any way to his role as an independent director of Strand unless authorized by this Court pursuant to the criteria set forth in the Settlement Order.[4]

11.   The Settlement Motion and Final Term each provided that "[a]s soon as practicable after their appointments, the Independent Directors shall, in consultation with the

---

[3] *See Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and the Procedures for Operations in the Ordinary Course* [Docket No. 339] (the "Settlement Order").
[4] Specifically, paragraph 10 of the Settlement Order provides:

> No entity may commence or pursue a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent Director's advisors relating in any way to the Independent Director's role as an independent director of Strand without the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Independent Director, any Independent Director's agents, or any Independent Director's advisors and (ii) specifically authorizing such entity to bring such claim. The Court will have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

Committee, determine whether a CEO should be appointed for the Debtor.  If the Independent Directors determine that appointment of a CEO is appropriate, the Independent Directors shall appoint a CEO acceptable to the Committee as soon as possible, which may be one of the Independent Directors."  Final Term Sheet, page 3; Settlement Motion, ¶ 13.

12.    On February 18, 2020, the Court entered its *Order (I) Authorizing Bradley D. Sharp to Act as Foreign Representative Pursuant to 11 U.S.C. § 1505 and (II) Granting Related Relief* [Docket No. 461] (the "Foreign Representative Order").  The Foreign Representative Order authorized Mr. Sharp, as chief restructuring officer, to act as the Debtor's foreign representative pursuant to section 1515 of the Bankruptcy Code (the "Foreign Representative").  The Foreign Representative specifically appointed Mr. Sharp to act as the Debtor's foreign insolvency officeholder to seek appropriate relief in Bermuda pursuant to Bermudian common law (the "Bermuda Foreign Representative") and the Cayman Islands pursuant to Section 241(1) of the Companies Law (2019 Revision) with respect to that British overseas territory (the "Cayman Foreign Representative").

13.    Since the appointment of the Independent Directors, it was apparent that it would be more efficient to have a traditional corporate management structure oversee the Debtor – i.e., a fully engaged chief executive officer supervised by the New Board – as contemplated by the Final Term Sheet.  This need was driven by the complexity of the Debtor's organization and business operations and the need for daily management and oversight of the Debtor's personnel. The search for a chief executive officer, however, was delayed while the Independent Directors made initial efforts to learn the Debtor's business and its day-to-day operations.  It was further delayed with the onset of the COVID-19 global pandemic, which both had a serious impact on

the Debtor's operations and assets and limited the Independent Directors' ability to search for an appropriate chief executive officer.

14.     During this time, however, Mr. Seery integrated himself into the daily operations of the Debtor and became essential in stabilizing the Debtor's assets and trading accounts during the economic distress caused by COVID-19.  While Mr. Dubel and Mr. Nelms were each spending on average approximately 140 hours a month addressing the operational issues facing the Debtor and certain of its fund entities, Mr. Seery's workload was at least 180 hours a month.

15.     As such, it was readily apparent to the Independent Directors who would be the best fit for the role:  Mr. Seery.  Mr. Seery had the appropriate skill set, extensive relevant background, and was already carrying the responsibility of the role.  Mr. Seery had been functionally operating as the Debtor's de facto chief executive officer since at least early March and was already overseeing the Debtor's ordinary course operations, including managing the Debtor's personnel and the daily interactions with the Debtor's bankruptcy professionals

16.     The Independent Directors subsequently appointed a compensation committee consisting of Messrs. Dubel and Nelms (the "Compensation Committee") to negotiate the terms and conditions of the Agreement on behalf of the Debtor.  And, on June 23, 2020, the Compensation Committee approved the appointment of Mr. Seery to serve as both the Debtor's chief executive officer and chief restructuring officer concurrently with his role as one of the Independent Directors pursuant to the terms of the Agreement.  Because Mr. Seery has been fulfilling the role since March 2020, the Compensation Committee determined that it was appropriate to make Mr. Seery's appointment as the Debtor's chief executive officer and chief

restructuring officer effective as of March 15, 2020.[5]  The Independent Directors also authorized the Debtor to file this Motion.

**A.**     The Chief Executive Officer and Chief Restructuring Officer Positions

17.     Mr. Seery has agreed to, among other things, provide daily leadership and direction to the Debtor's employees on business and restructuring matters relating to the Debtor's chapter 11 case.  In that capacity, he will direct the Debtor's day-to-day ordinary course operations, oversee the Debtor's personnel, make management decisions with respect to the Debtor's trading operations, direct the Debtor's reorganization efforts, monetize the Debtor's assets, oversee the claims objection and resolution process, and lead the process toward the hopeful consensual confirmation of a plan in this chapter 11 case in the capacities as chief executive officer and chief restructuring officer positions.  Mr. Seery would report directly to the New Board and would continue to serve as an Independent Director, as provided under the Settlement Order.

18.     Mr. Seery has extensive management and restructuring experience.  Mr. Seery recently served as a Senior Managing Director at Guggenheim Securities, LLC, where he was responsible for helping direct the development of a credit business.   Prior to joining Guggenheim, Mr. Seery was the President and a senior investing partner of River Birch Capital, LLC, where he was responsible for originating, executing, and managing stressed and distressed credit investments.  Mr. Seery is also a long-time attorney licensed to practice in New York who

---

[5] The Committee has also agreed to Mr. Seery's appointment as chief executive officer and chief restructuring officer and to the amount of Mr. Seery's Base Compensation (as defined below).  The Committee has not agreed, however, as to the amount and timing of the payment of the Restructuring Fee (defined below) and are continuing to discuss payment of the Restructuring Fee with the Compensation Committee.

has run corporate reorganization groups and numerous restructuring matters.  He also served as a

Commissioner of the American Bankruptcy Institute's Commission to Study the Reform of

Chapter 11.  Mr. Seery was also a Managing Director and the Global Head of Lehman Brothers'

Fixed Income Loan business where he was responsible for managing the firm's investment grade

and high yield loans business, including underwriting commitments, distribution, hedging,

trading and sales (including CLO manager relationships), portfolio management and

restructuring.  From 2000 to 2004, Mr. Seery ran Lehman Brothers' restructuring and workout

businesses with responsibility for the management of distressed corporate debt investments and

was a key member of the small team that successfully sold Lehman Brothers to Barclays in 2008.

The Agreement

19.     The Compensation Committee negotiated the Agreement with Mr. Seery

at arm's length.  The additional material economic terms of the Agreement are as follows:[6]

(a) Term: Commencing retroactively to March 15, 2020.

(b) Roles:  Mr. Seery shall serve as the chief executive officer and
chief restructuring officer of the Debtor and shall be responsible
for the overall management of the business of the Debtor during its
chapter 11 case, including: directing the Debtor's day-to-day
ordinary course operations, overseeing the Debtor's personnel,
making management decisions with respect to the Debtor's trading
operations, directing the reorganization and restructuring of the
Debtor, the monetization of the Debtor's assets, resolution of
claims, the development and negotiation of a plan of
reorganization or liquidation, and the implementation of such plan.
Mr. Seery shall remain a full member of the New Board and shall
be entitled to vote on matters other than on those in which he is
conflicted.  Mr. Seery shall devote as much time to the engagement
as he determines is required to execute his responsibilities as chief
executive officer and chief restructuring officer.  Mr. Seery will
have no specific on-site requirements in Dallas, Texas, but shall be

---

[6] What follows is by way of summary only and is qualified in its entirety by reference to the Agreement, which
controls. Capitalized terms not otherwise defined herein have the meanings ascribed to them in the Agreement.

on site as much as he determines is necessary to execute his responsibilities as chief executive officer and chief restructuring officer, consistent with applicable COVID-19 orders, protocols and advice.

(c) <u>Compensation for Services</u>:  Mr. Seery's compensation under the Agreement shall consist of the following:

(1) <u>Base Compensation</u>: $150,000 per month, which shall be due and payable at the start of each calendar month; plus

(2) <u>Bonus Compensation; Restructuring Fee</u>:

Subject to separate Bankruptcy Court approval, the Compensation Committee and Mr. Seery have reached agreement on the payment of a restructuring fee upon confirmation of either a Case Resolution Plan or a Monetization Vehicle Plan in each case as defined below (the "<u>Restructuring Fee</u>").[7]  The Committee has not yet agreed to the amount, composition, and timing of the Restructuring Fee.  The Compensation Committee and Mr. Seery have agreed to defer Court consideration of the Restructuring Fee until further development in the Case. The Restructuring Fee agreed to by Mr. Seery and the Compensation Committee is as follows:

<u>Case Resolution Restructuring Plan</u>

On confirmation of any plan or reorganization or liquidation based on resolution of a material amount of the outstanding claims and their respective treatment, even if such plan includes (x) a debtor/creditor trust or similar monetization and claims resolution vehicle, (y) post-confirmation litigation of certain of the claims, and (z) post-confirmation monetization of debtor assets (a "<u>Case Resolution Plan</u>"):

$1,000,000 on confirmation of the Case Resolution Plan;

$500,000 on the effective date of the Case Resolution Plan; and

---

[7] Although the Compensation Committee and Mr. Seery have agreed on the amount and timing of the Restructuring Fee, both the Compensation Committee and Mr. Seery understand that the Restructuring Fee is payable only upon order of this Court.  The Compensation Committee is reserving the right to seek approval of the Restructuring Fee from this Court in connection with the confirmation hearing on a plan or as otherwise appropriate.

$750,000 on completion of cash or property distributions to creditors as contemplated by the Case Resolution Plan.

<u>Debtor/Creditor Monetization Vehicle Restructuring Fee:</u>

On confirmation of any plan or reorganization or liquidation based on a debtor/creditor trust or similar asset monetization and claims resolution vehicle that does not include agreement among the debtor and creditors on a material amount of the outstanding claims and their respective treatment at confirmation (a "<u>Monetization Vehicle Plan</u>"):

$500,000 on confirmation of the Monetization Vehicle Plan;

$250,000 on the effective date of the Monetization Vehicle Plan; and

A contingent restructuring fee to be determined by the board or oversight committee installed to oversee the implementation of any Monetization Vehicle Plan based on the CEO/CRO (or acting as trustee) based upon performance under the plan after all material distributions under the Monetization Vehicle Plan are made.

(e) <u>Participation in Employee Benefit Plans</u>:  Mr. Seery shall act as an independent professional contractor and shall not be an employee of the Debtor.  Mr. Seery will pay for his own benefits and will not participate under the Debtor's existing employee benefit plans.

(f) <u>Expenses</u>: Reimbursement of actual and reasonable out-of-pocket expenses in connection with the services provided under the Agreement.  Expenses will be generally consistent with expenses incurred to date as a member of the New Board.

(g) <u>Conflicts and Other Engagements</u>.  Mr. Seery is not aware of any potential conflicts of interest based on his understanding of the various parties involved in the Debtor's chapter 11 case to date.  Mr. Seery shall not be precluded from representing or working with or for any other person or entity in matters not directly related to the services being provided to the Debtor under the Agreement.  Mr. Seery shall not undertake any engagements directly adverse to the Debtor during the term of his engagement.

(h) <u>Termination</u>.  The Agreement may be terminated at any time by either the Debtor or by Mr. Seery upon two weeks advance written notice given to the other party.  The termination of the Agreement shall not affect Mr. Seery's right to receive, and the Debtor's obligation to pay, any and all Base Compensation and Expenses incurred (even if not billed) prior to the giving of any termination notice; *provided however*, that (1) if the Agreement is terminated by Mr. Seery, the amount of Base Compensation owed shall be calculated based on the actual number of days worked during the applicable month and Mr. Seery will return any Base Compensation received in excess of such amount, and (2) if the Agreement is terminated by the Debtor, Base Compensation shall be deemed fully earned as of the first day of any month.  Bonus Compensation shall be earned by Mr. Seery immediately upon his termination by the Debtor; *provided  however*, Mr. Seery shall not be entitled to Bonus Compensation if:  (A) the Debtor's chapter 11 case is converted to chapter 7 or dismissed; (B) a chapter 11 trustee is appointed in the Debtor's chapter 11 case; (C) Mr. Seery is terminated by the Debtor for Cause;[8] or (D) Mr. Seery resigns prior to confirmation of a plan or court approval of a sale as described in the Fees and Expense/Compensation for Services section of the Agreement.

(j) <u>Conditional Requirement to Seek Further Court Approval of Agreement</u>.    The Committee may, upon two weeks advance written notice to the Debtor, require the Debtor to file a motion with the Bankruptcy Court on normal notice seeking a continuation of the Agreement and if such motion is not filed, the Agreement will terminate at the expiration of such two week period.  If the Debtor files such motion, Mr. Seery will be entitled to the Base Compensation through and including the date on which a final order is entered on such motion by this Court.  Notwithstanding anything herein to the contrary, the Committee may not deliver such notice to the Debtor until a date which is more than ninety days following the date this Court enters an order approving the Agreement.

(j) <u>Indemnification</u>.  the Debtor agrees (i) to indemnify and hold harmless Mr. Seery and any of his affiliates (the "<u>Indemnified Party</u>"), to the fullest extent lawful, from and against any and all

---

[8] For purposes of the Agreement, "Cause" means any of the following grounds for termination of Mr. Seery's engagement, in each case as reasonably determined by the New Board within 60 days of the New Board becoming aware of the existence of the event or circumstance:  (A) fraud, embezzlement, or any act of moral turpitude or willful misconduct on the part of Mr. Seery; (B) conviction of or the entry of a plea of *nolo contendere* by Mr. Seery for any felony; (C) the willful breach by Mr. Seery of any material term of the Agreement; or (D) the willful failure or refusal by Mr. Seery to perform his duties to the Debtor, which, if capable of being cured, is not cured on or before fifteen (15) days after Mr. Seery's receipt of written notice from the Debtor.

losses, claims, costs, damages or liabilities (or actions in respect thereof), joint or several, arising out of or related to the Agreement, Mr. Seery's engagement under the Agreement, or any actions taken or omitted to be taken by Mr. Seery or the Debtor in connection with the Agreement and (ii) to reimburse the Indemnified Party for all expenses (including, without limitation, the reasonable fees and expenses of counsel) as they are incurred in connection with investigating, preparing, pursuing, defending, settling or compromising any action, suit, dispute, inquiry, investigation or proceeding, pending or threatened, brought by or against any person (including, without limitation, any shareholder or derivative action, or any fee dispute), arising out of or relating to the Agreement, or such engagement, or actions. However, the Debtor shall not be liable under the foregoing indemnity and reimbursement agreement for any loss, claim, damage or liability which is finally judicially determined by a court of competent jurisdiction to have resulted primarily from the willful misconduct or gross negligence of the Indemnified Party.

The Debtor has agreed to extend the indemnification and insurance currently covering Mr. Seery's role as a director to fully cover Mr. Seery in his roles as chief executive officer and chief restructuring officer. The Debtor is currently working to extend such coverage.

Mr. Seery is also entitled to any indemnification or other similar provisions under the Debtor's existing or future insurance policies, including any policy tails obtained (or which may be obtained in the future), by the Debtor.

<u>Relief Requested</u>

20.    By this Motion, the Debtor seeks the entry of the Proposed Order authorizing the Debtor to retain Mr. Seery pursuant to the terms of the Agreement, *nunc pro tunc* to March 15, 2020. The Motion also seeks to amend the Foreign Representative Order to appoint Mr. Seery as the Debtor's Foreign Representative, Bermuda Foreign Representative and Cayman Foreign Representative in the stead of Mr. Sharp.

21.    The Debtor believes that the Debtor's retention of a chief executive officer and chief restructuring officer constitutes an act in the ordinary course of business, and

consequently, is permissible under Bankruptcy Code section 363(c) without Court approval. However, out of an abundance of caution, the Debtor seeks this Court's approval of the Agreement under Bankruptcy Code section 363(b).

Basis For Relief

**B.**   The Debtor's Entry Into the Agreement is a Valid Exercise of the Debtor's Business Judgment and the Proposed Compensation is Appropriate Under the Circumstances and Within the Range of Similar Market Transactions

22.   The Compensation Committee's decision for the Debtor to retain Mr. Seery pursuant to the terms of the Agreement should be approved pursuant to sections 363(b) and 105(a) of the Bankruptcy Code. Section 363(b)(1) of the Bankruptcy Code provides, in relevant part: "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). In addition, section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

23.   The proposed use, sale, or lease of property of the estate may be approved under Bankruptcy Code section 363(b) if it is supported by sound business justification. *See In re Montgomery Ward*, 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under this section, courts require the debtor to show that a sound business purpose justifies such actions"). Although established in the context of a proposed sale, the "business judgment" standard has been applied in non-sale situations. *See, e.g., Inst. Creditors of Cont'l Air Lines v. Cont'l Air Lines (In re Cont'l Air Lines)*, 780 F.2d 1223, 1226 (5th Cir. 1986) (applying the "business judgment" standard in context of proposed

"use" of estate property).  Moreover, pursuant to section 105, this Court has expansive equitable powers to fashion any order or decree which is in the interest of preserving or protecting the value of a debtor's assets.  11 U.S.C. § 105(a).

24.     It is well established that courts are unwilling to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence, and will uphold a board's decisions as long as they are attributable to "any rational business purpose." *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985) (citing *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971)).  Whether or not there are sufficient business reasons to justify the use of assets of the estate depends upon the facts and circumstances of each case.  *See Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).  In this case, the Debtor has ample justification to retain Mr. Seery as the Debtor's chief executive officer and chief restructuring officer pursuant to the Agreement.  The Final Term Sheet expressly contemplated that the New Board could appoint a chief executive officer and that the chief executive officer could also be one of the Independent Directors.  Because Mr. Seery will also be serving as chief restructuring officer, it is not necessary to have two separate ranking chief restructuring officers, especially considering that Mr. Sharp (the current chief restructuring officer) and his firm has agreed to continue to provide financial advisory services on behalf of the Debtor.[9]  Mr. Seery is well- qualified to serve as the Debtor's chief executive officer and chief restructuring officer.

---

[9] *See Amended Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to Employ and Retain Development Specialists, Inc. to Provide Financial Advisory and Restructuring-Related Services, Nunc Pro Tunc, to March 15, 2020* filed concurrently herewith

25.     The Compensation Committee negotiated the Agreement in good faith and at arm's length.  The Compensation Committee also worked with the Debtor's compensation consultant, Mercer (US) Inc., to determine the appropriate compensation for Mr. Seery as chief executive officer and chief restructuring officer.  The Compensation Committee, therefore, believes that the terms of the Agreement are reasonable, are consistent with the market within the Debtor's industry, and are entirely appropriate given the scope of Mr. Seery's duties. Accordingly, entry into the Agreement is a sound exercise of the Debtor's business judgment.

26.     Finally, the Debtor requests that the Court apply the same criteria by which parties in interest must first petition the Court prior to asserting claims against the Independent Director approved in the Settlement Order be extended to Mr. Seery in his capacity as chief executive officer and chief restructuring officer contemplated by this Motion.  *See* Settlement Order, ¶ 10.  The rationale for the Court to first determine whether or not a colorable claim or cause of action can be maintained against the Mr. Seery, as one of the Independent Directors, is equally applicable to Mr. Seery in his capacity as chief executive officer and chief restructuring officer, will further aid in the implementation of the Settlement Order, and discourage frivolous litigation.  As was true in the Settlement Order with respect to the Independent Directors, no parties will be prejudiced by having to first apply to this Court to determine the propriety of any hypothetical claim that may be asserted against Mr. Seery in his officer capacities of the Debtor.

**C.**     The Debtor Has Satisfied Bankruptcy Code Section 503(c)(3)

27.     Bankruptcy Code section 503(c)(3) provides that "transfers or obligations that are outside the ordinary course of business . . . including transfers made to . . . consultants

hired after the date of the filing of the petition" are not allowed if they are "not justified by the facts and circumstances of the case." 11 U.S.C. § 503(c)(3). Courts generally use a form of the "business judgment" and the "facts and circumstances" standard. *See In re Pilgrim's Pride Corp.*, 401 B.R. 229, 236-37 (Bankr. N.D. Tex. 2009) (citing *In re Dura Auto Sys., Inc.*, Case No. 06-11202 (Bankr. D. Del. June 29, 2007) and *In re Supplements LT, Inc.,* Case No. 08-10446 (KJC) (Bankr. D. Del. Apr. 14, 2008)). Specifically, the court examines first, whether the transaction meets the Debtor's business judgment standard, and second, whether the facts and circumstances justify the transaction. *See In re Pilgrim's Pride Corp.*, 401 B.R. at 237 (Bankr. N.D. Tex. 2009).

28.     The Debtor submits that the proposed transaction is within the ordinary course of its business and thus that Bankruptcy Code section 503(c)(3) does not apply to the Agreement. Nevertheless, for the reasons stated above — the benefits from Mr. Seery's leadership skills and industry experience — even if this were outside the ordinary course of business, entry into the Agreement is well within the Debtor's business judgment as applied to the facts and circumstances of the Debtor. Further, the facts and circumstances of this case support entry into the relationship under the Agreement where the Debtor will benefit from the ability to retain Mr. Seery at a critical juncture to ongoing restructuring efforts.

29.     For the reasons set forth above, the Debtor submits that the relief requested herein is in the best interest of the Debtor, its estate, creditors, stakeholders, and other parties in interest, and therefore, should be granted.

**D.**    The Proposed Chief Executive Officer and Chief Restructuring Officer Should Also Serve as the Debtor's Foreign Representative

30.    Bankruptcy Code section 1505 provides that:

A trustee or another entity (including an examiner) may be authorized by the court to act in a foreign country on behalf of an estate created under section 541.  An entity authorized to act under this section may act in any way permitted by the applicable foreign law.

11 U.S.C. § 1505.

31.    The Debtor respectfully submits that Mr. Seery is qualified and capable of representing the Debtor's estate as the Foreign Representative.  The Debtor believes it is appropriate for Mr. Seery, as an officer of the Debtor, to replace Mr. Sharp as Foreign Representative inasmuch as Mr. Sharp will no longer be an officer of the Debtor if the Motion is granted.  In order to avoid any possible confusion or doubt regarding this authority and to comply with the requirements of Part XVII of the Cayman Law, the Debtor seeks entry of an order, pursuant to section 1505 of the Bankruptcy Code, explicitly substituting Mr. Seery in the place of Mr. Sharp as the Debtor's Foreign Representative, including specifically to serve as the Bermuda Foreign Representative and Cayman Foreign Representative.

32.    For the reasons set forth in the Foreign Representative Motion, authorizing Mr. Seery to act as the Foreign Representative on behalf of the Debtor's estate in Bermuda, the Cayman Islands or any other foreign proceeding will allow coordination of this chapter 11 case and each of the foreign proceedings and provide an effective mechanism to protect and maximize the value of the Debtor's assets and estate.  Courts have routinely granted relief similar to that requested herein in other large chapter 11 cases where a debtor has foreign assets or operations requiring a recognition proceeding.  *See, e.g., In re CJ Holding Co.,* No. 16-33590 (Bankr. S.D.

Tex. July 21, 2016); ECF No. 59; *In re CHC Group Ltd.,* No. 16-31854 (Bankr. N.D. Tex. Sept. 20, 2016), ECF No. 884; *In re Ultra Petroleum Corp.,* No. 16-32202 (Bankr. S.D. Tex. May 3, 2016); *In re Digital Domain Media Grp., Inc.*, No. 12-12568 (BLS) (Bankr. D. Del. Sept. 12, 2012); ECF No. 82; *In re Probe Resources US Ltd., No.* 10-40395 (Bankr. S.D. Tex. Mar. 21, 2011); ECF N. 320; *In re Bigler LP,* No. 09-38188 (Bankr. S.D. Tex. Jan. 12, 2010), ECF No. 159; In *re Horsehead Holdings Corp.,* No. 16-10287 (CSS) (Bankr. D. Del. Feb. 4, 2016); *In re Colt Holding Co. LLC*, No. 15-11296 (LSS) (Bankr. D. Del. June 16, 2015). The Debtor believes it is appropriate for one of its officers to serve as the Foreign Representative. In several jurisdictions, an officer or someone acting in a similar capacity is a prerequisite to serve as a Foreign Representative.[10] As more fully explained in the Foreign Representative Motion, the Debtor has assets in jurisdictions other than the United States, including in Bermuda and the Cayman Islands. To the extent any disputes with respect to such assets arise, it is critical that the Foreign Representative be permitted to appear on behalf of the Debtor and it estate in any court in which a foreign proceeding may be pending.

<u>Notice</u>

33.     Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a)the Office of the United States Trustee; (b)the Office of the United States Attorney for the Northern District of Texas; (c)the Debtor's principal secured

---

[10] *See e.g.* Part XVII, Section 240o f the Companies Law (2018 Revision) of the Cayman Islands requiring that the foreign representative be "a trustee, liquidator or other official in respect of a debtor for the purposes of a foreign bankruptcy proceeding." In addition, and as more fully explained in the Foreign Representative Motion, Bermuda common law and conflict of laws principles will recognize the authority of a foreign insolvency officeholder appointed in proceedings in the jurisdiction of incorporation of a company (or, in the instant case, the jurisdiction of the establishment of a limited partnership) to act on behalf of and in the name of the company (or partnership) in Bermuda.

parties; (d)counsel to the Committee; and (e)parties requesting notice pursuant to Bankruptcy

Rule 2002.  The Debtor submits that, in light of the nature of the relief requested, no other or

further notice need be given.

Conclusion

WHEREFORE, the Debtor respectfully requests that the Court enter an order,

substantially in the form annexed hereto as **Exhibit A**, granting the relief requested in the Motion

and such other and further relief as may be just and proper.

Dated:  June 23, 2020

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:     jpomerantz@pszjlaw.com
            ikharasch@pcszjlaw.com
            gdemo@pszjlaw.com

-and-

*/s/ Zachery Z. Annable*
HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**EXHIBIT A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | **Case No. 19-34054** |
| **L.P.,** | § | **Chapter 11** |
| | § | |
| **Debtor.** | § | **Re: Docket No. _____** |
| | § | |

**ORDER APPROVING DEBTOR'S MOTION UNDER**
**BANKRUPTCY CODE SECTIONS 105(a) AND 363(b)**
**AUTHORIZING RETENTION OF JAMES P. SEERY, JR., AS**
**CHIEF EXECUTIVE OFFICER, CHIEF RESTRUCTURING OFFICER, AND**
**FOREIGN REPRESENTATIVE NUNC PRO TUNC TO MARCH 15, 2020**

Upon the *Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b)*

*for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring*

*Officer and Foreign Representative Nunc Pro Tunc To March 15, 2020* (the "Motion"),[1] and the

Court finding that: (i) this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

---

[1] All terms not otherwise defined herein shall be given the meanings ascribed to them in the Motion.

and 1334; (ii) venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409; (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (iv) due and sufficient notice of the Motion has been given; (v) entry into the Agreement was an exercise of the Debtor's sound business judgment; and (vi) it appearing that the relief requested in the Motion is necessary and in the best interests of the Debtor's estate and creditors; and good and sufficient cause appearing therefor, it is hereby

ORDERED, ADJUDGED, AND DECREED that:

1.      The Motion is granted.

2.      Pursuant to sections 363(b) and 105(a) of the Bankruptcy Code, the Agreement attached hereto as <u>Exhibit 1</u> and all terms and conditions thereof are approved, *nunc pro tunc* to March 15, 2020.

3.      The Debtor is hereby authorized to enter into and perform under the Agreement.

4.      The Debtor is authorized to indemnify Mr. Seery pursuant to the terms of the Agreement.  Mr. Seery is also entitled to any indemnification or other similar provisions under the Debtor's existing or future insurance policies, including any policy tails obtained (or which may be obtained in the future), by the Debtor.  The Debtor and Strand are authorized to enter into any agreements necessary to execute or implement the transactions described in this paragraph.  For avoidance of doubt and notwithstanding anything to the contrary in this Order, Mr. Seery shall be entitled to any state law indemnity protections to which he may be entitled under applicable law.

5.      No entity may commence or pursue a claim or cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery, and (ii) specifically authorizing such entity to bring such claim. The Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

6.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

7.      This Court shall retain jurisdiction over any and all matters arising from or related to the interpretation and/or implementation of this Order.

8.      The Foreign Representative Order is hereby amended to substitute James P. Seery, Jr., as the chief executive officer, in place of Bradley S. Sharp, as the Debtor's Foreign Representative, Bermuda Foreign Representative and Cayman Foreign Representative.  All other provisions of the Foreign Representative Order shall remain in full force and effect.

### # # # END OF ORDER # # #

DOCS_SF:103156.17 36027/002

APP_0090

## EXHIBIT A-1

**Engagement Agreement**

DOCS_SF:103156.17 36027/002

APP_0091

795 Columbus Ave., 12A
New York, New York 10025
631-804-2049
jpseeryjr@gmail.com


June 23, 2020

CONFIDENTIAL

The Board of Directors of Strand Advisors, Inc.
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201


Re:      Highland Capital Management L.P. (the "Company")

Dear Fellow Board Members:

This letter agreement ("Agreement") sets forth the terms and conditions of the engagement of the
undersigned James P. Seery, Jr. ("I", "me" or "my"), as Chief Executive Officer ("CEO") and
Chief Restructuring Officer ("CRO"), effective as of March 15, 2020 (the "Commencement Date
"), by the Company and its affiliates to perform financial advisory services as detailed below.

I appreciate the trust you have placed in me by asking me to assume these roles and thank you
for the opportunity to continue to work with you to restructure the Company.

Roles:

I will serve as the CEO and CRO of the Company during its Chapter 11 bankruptcy case (the "
Bankruptcy Case") currently pending in the United States Bankruptcy Court for the Northern
District of Texas (the "Bankruptcy Court").

In those roles, I will be responsible for overall management of the business of the Company in
Chapter 11 including, directing the reorganization and restructuring of the Company,
monetization of assets, resolution of claims, development and negotiation of a plan of
reorganization or liquidation, and implementation of such a plan.

My direct reports will include the individuals at the Company that currently report to the Board
of Directors of Strand Advisors, Inc. (the "Board") or such other individuals employed by the
Company as I determine should report to directly to me.  In the event that the Board determines
to restructure the reporting lines or functions of the Company, my direct reports will be amended
in accordance with the Board approved restructuring.

At all times, I will remain a full member of the Board entitled to vote on all matters other than
those on which I am conflicted.

I will devote as much time to this engagement as I determine is required to execute my responsibilities as CEO and CRO.  I will have no specific on-site requirements in Dallas, but will be on site as much as I determine is necessary to execute my responsibilities as CEO and CRO, consistent with Covid-19 orders applicable to Dallas and New York City.

Limitations on Services

My services under this engagement are limited to those specifically noted in this Agreement and do not include legal, accounting, or tax-related assistance or advisory services.  For the avoidance of doubt, I am not providing any legal services in connection with this engagement and will have not any duties as a lawyer to the Company, the Board, or any of the Company's employees.  The accuracy and completeness of all information submitted to me by the Company are the sole responsibility of the Company, and I will be entitled to rely on such information without independent investigation or verification.

In my role as CEO and CRO, I will act as an independent professional contractor to the Company and will not be an employee of the Company.  I will provide and pay for my own benefits, including medical benefits, by J.P Seery & Co. LLC or otherwise.

Fees and Expenses:

In consideration of my acceptance of this engagement and performance of the services pursuant to this Agreement, the Company shall pay the following:

1. Compensation for Services:
   a. Base Compensation:  As compensation for my services as CEO and CRO of the Company, the Company shall pay me $150,000.00 per calendar month ("Base Compensation").  Base Compensation shall be due and payable at the start of each calendar month.  Consistent with current Board compensation practice, invoices rendered by me to the Company are due and payable by the Company on receipt. Payment of the Base Compensation will be retroactive to March 15, 2020.
   b. Bonus Compensation/Restructuring Fee:
      i. The Company has agreed to pay me a restructuring fee upon confirmation of either a Case Resolution Plan or a Monetization Vehicle Plan in each case as defined below (the "Restructuring Fee").
      ii. Case Resolution Restructuring Plan
         1. On confirmation of any plan or reorganization or liquidation based on resolution of a material amount of the outstanding claims and their respective treatment, even if such plan includes (x) a debtor/creditor trust or similar monetization and claims resolution vehicle, (y) post-confirmation litigation of certain of the claims, and (z) post-confirmation monetization of debtor assets (a "Case Resolution Plan"):
            a. $1,000,000 on confirmation of the Case Resolution Plan;
            b. $500,000 on the effective date of the Case Resolution Plan; and
            c. $750,000 on completion of cash or property distributions to creditors as contemplated by the Case Resolution Plan.

APP_0093

      iii.  Debtor/Creditor Monetization Vehicle Restructuring Fee:

          1.  On confirmation of any plan or reorganization or liquidation based on a debtor/creditor trust or similar asset monetization and claims resolution vehicle that does not include agreement among the debtor and creditors on a material amount of the outstanding claims and their respective treatment at confirmation (a "Monetization Vehicle Plan"):

              a.  $500,000 on confirmation of the Monetization Vehicle Plan;

              b.  $250,000 on the effective date of the Monetization Vehicle Plan; and

              c.  A contingent restructuring fee to be determined by the board or oversight committee installed to oversee the implementation of any Monetization Vehicle Plan based on the CEO/CRO (or acting as trustee) based upon performance under the plan after all material distributions under the Monetization Vehicle Plan are made.

2.  <u>Out-of-Pocket Expenses</u>:  In addition to the Base and Bonus Compensation, I shall be entitled to reimbursement for actual and reasonable out-of-pocket expenses ("Expenses") incurred in connection with the provision of services hereunder.  Expenses will be billed along with Base Compensation and shall be paid by the Company at the same time. Expenses will be generally consistent with expenses incurred to date as a member of the Board.

<u>Bankruptcy Court Approval</u>

Notwithstanding anything herein to the contrary, I understand that this Agreement is contingent, in all respects, on the approval of the Bankruptcy Court.  I also understand that the Company will seek approval of this Agreement in stages and that the Company will first seek approval of my retention as CEO and CRO and the payment of the Base Compensation and will defer seeking Bankruptcy Court approval of the Restructuring Fee until there have been further developments in the Bankruptcy Case.

<u>Conflicts and Other Engagements</u>

I am not aware of any potential conflicts of interest based on my understanding of the various parties involved in this matter to date.

The Company is aware that this engagement is not an exclusive engagement of my time, and that I have and will continue to have other business engagements and investments unrelated to the Company.  Nothing in this Agreement or otherwise precludes me from representing or working with or for any other person or entity in matters not directly related to the services being provided to the Company under this Agreement.  However, I will not take on any engagements directly adverse to the Company during the term of this engagement.

<u>Privilege</u>

APP_0094

I understand that in the course of this engagement, I may become party to or my services may become part of work product of legal counsel to the Company (the Company's in-house and outside counsel are collectively referred to as "Counsel"), and all communications between Counsel  and me relating to this engagement shall be protected from disclosure to third parties under the attorney work product doctrine and/or the attorney-client privilege, and, therefore, shall be treated by me as privileged and confidential.  I further understand that the Company has the exclusive right to waive the attorney-client privilege, and Counsel has the exclusive right to waive the protections afforded under the attorney work-product doctrine.

Termination of Engagement

This Agreement may be terminated at any time by either the Company or by me upon two weeks advance written notice given to the other party.  The termination of this Agreement shall not affect my right to receive, and the Company's obligation to pay, any and all Base Compensation and Expenses incurred (even if not billed) prior to the giving of the termination notice; provided, however, that (i) if this Agreement is terminated by me, the amount of Base Compensation owed shall be calculated based on the actual number of days worked during the applicable month and I will return any Base Compensation received in excess of such amount and (ii) if this Agreement is terminated by the Company, Base Compensation shall be deemed fully earned as of the first day of any month.  Bonus Compensation shall be earned by me immediately upon termination of me by the Company; provided, however, I shall not be entitled to Bonus Compensation if (a) the Bankruptcy Case is converted to chapter 7 or dismissed; (b) a chapter 11 trustee is appointed in the Bankruptcy Case; (c) I am terminated by the Company for Cause; or (d) I resign prior to confirmation of a plan or court approval of a sale as described in the Fees and Expense/Compensation for Services section hereof.  For purposes of this Agreement, "Cause" means any of the following grounds for termination of my engagement, in each case as reasonably determined by the Board within 60 days of the Board becoming aware of the existence of the event or circumstance:  (A) fraud, embezzlement, or any act of moral turpitude or willful misconduct on my part; (B) conviction of or the entry of a plea of nolo contendere by me for any felony; (C) the willful breach by me of any material term of this Agreement; or (D) the willful failure or refusal by me to perform my duties to the Company, which, if capable of being cured, is not cured on or before fifteen (15) days after my receipt of written notice from the Company.

Conditional Requirement to Seek Further Bankruptcy Court Approval of Agreement

The official committee of unsecured creditors in the Bankruptcy Case (the "Committee") may, upon two weeks advance written notice to the Company, require the Company to file a motion with the Bankruptcy Court on normal notice seeking a continuation of this Agreement and if such motion is not filed, this Agreement will terminate at the expiration of such two week period. If the Company files such motion, I will be entitled to my Base Compensation through and including the date on which a final order is entered on such motion by the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Committee may not deliver such notice to the Company until a date which is more than ninety days following the date the Bankruptcy Court enters an order approving this Agreement.

APP_0095

Indemnification

As a material part of the consideration to me under this Agreement, the Company agrees (i) to indemnify and hold harmless me and any of my affiliates (the "Indemnified Party"), to the fullest extent lawful, from and against any and all losses, claims, costs, damages or liabilities (or actions in respect thereof), joint or several, arising out of or related to this Agreement, my engagement under this Agreement, or any actions taken or omitted to be taken by me or the Company in connection with this Agreement and (ii) to reimburse the Indemnified Party for all expenses ( including, without limitation, the reasonable fees and expenses of counsel) as they are incurred in connection with investigating, preparing, pursuing, defending, settling or compromising any action, suit, dispute, inquiry, investigation or proceeding, pending or threatened, brought by or against any person (including, without limitation, any shareholder or derivative action, or any fee dispute), arising out of or relating to this Agreement, or such engagement, or actions.  However, the Company shall not be liable under the foregoing indemnity and reimbursement agreement for any loss, claim, damage or liability which is finally judicially determined by a court of competent jurisdiction to have resulted primarily from the willful misconduct or gross negligence of the Indemnified Party.

The indemnification and insurance currently covering my role as a director shall be extended to me and fully cover me as provided therein in my roles as CEO and CRO.

Miscellaneous

This Agreement (a) constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes any other communications, understandings or agreements among the parties with respect to the subject matter hereof, and (b) may be modified, amended or supplemented only by written agreement among all the parties hereto.

This Agreement is subject to approval by the Bankruptcy Court.  As part of such approval the Company shall request that any such order approving this Agreement contain a provision extending the protections afforded to me as a Board Member pursuant to Paragraph 10 of the Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course entered by the Bankruptcy Court on January 9, 2020 [Docket No. 339] to my role as CEO and CRO, which Order prohibits the commencement of any action against me without first obtaining Bankruptcy Court approval to initiate such action.

This Agreement and all controversies arising from or related to performance hereunder shall be governed by and construed in accordance with the laws of the State of New York.  The parties hereby submit to the jurisdiction of and venue in the federal and state courts located in New York City and waive any right to trial by jury in connection with any dispute related to this Agreement.

This Agreement shall be binding upon the parties and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

Failure of any party at any time to require performance of any provision of this Agreement shall not affect the right to require full performance thereof at any time thereafter, and the waiver by any party of a breach of such provisions shall not be taken as or held to be a waiver of any subsequent breach or as nullifying the effectiveness of such provision.

Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective address set forth above in this Agreement, or to such other address as either party may have furnished to the other in writing in accordance herewith.

This Agreement and my rights and duties hereunder shall not be assignable or delegable by me.

The Company may withhold from any amounts payable under this Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

This Agreement may be executed (including by electronic execution) in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument.  Delivery of an executed counterpart of this Agreement by electronic mail shall have the same force and effect as the delivery of an original executed counterpart of this Agreement.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,

James. P. Seery, Jr.

AGREED AND ACCEPTED

HIGHLAND CAPITAL MANAGEMENT L.P.

By: Strand Advisors, Inc., its general partner


_____       _____
John Dubel                                 Russell Nelms
Director                                   Director
Strand Advisors, Inc.                      Strand Advisors, Inc.

APP_0097

This Agreement shall be binding upon the parties and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

Failure of any party at any time to require performance of any provision of this Agreement shall not affect the right to require full performance thereof at any time thereafter, and the waiver by any party of a breach of such provisions shall not be taken as or held to be a waiver of any subsequent breach or as nullifying the effectiveness of such provision.

Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective address set forth above in this Agreement, or to such other address as either party may have furnished to the other in writing in accordance herewith.

This Agreement and my rights and duties hereunder shall not be assignable or delegable by me.

The Company may withhold from any amounts payable under this Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

This Agreement may be executed (including by electronic execution) in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument.  Delivery of an executed counterpart of this Agreement by electronic mail shall have the same force and effect as the delivery of an original executed counterpart of this Agreement.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,


James. P. Seery, Jr.

AGREED AND ACCEPTED

**HIGHLAND CAPITAL MANAGEMENT L.P.**

By: Strand Advisors, Inc., its general partner

_____          _____
John Dubel                                Russell Nelms
Director                                  Director
Strand Advisors, Inc.                     Strand Advisors, Inc.

**APP_0098**

This Agreement shall be binding upon the parties and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

Failure of any party at any time to require performance of any provision of this Agreement shall not affect the right to require full performance thereof at any time thereafter, and the waiver by any party of a breach of such provisions shall not be taken as or held to be a waiver of any subsequent breach or as nullifying the effectiveness of such provision.

Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective address set forth above in this Agreement, or to such other address as either party may have furnished to the other in writing in accordance herewith.

This Agreement and my rights and duties hereunder shall not be assignable or delegable by me.

The Company may withhold from any amounts payable under this Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

This Agreement may be executed (including by electronic execution) in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument.  Delivery of an executed counterpart of this Agreement by electronic mail shall have the same force and effect as the delivery of an original executed counterpart of this Agreement.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,


James. P. Seery, Jr.

AGREED AND ACCEPTED

**HIGHLAND CAPITAL MANAGEMENT L.P.**

By: Strand Advisors, Inc., its general partner


_____          _____
John Dubel                                Russell Nelms
Director                                  Director
Strand Advisors, Inc.                     Strand Advisors, Inc.

APP_0099

# EXHIBIT 3

APP_0100



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed July 16, 2020**

_____
**United States Bankruptcy Judge**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **In re:** | § | |
| | § | |
| | § | **Case No. 19-34054** |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | **Chapter 11** |
| **L.P.,** | § | |
| | § | **Re: Docket No. 774** |
| **Debtor.** | § | |

**ORDER APPROVING DEBTOR'S MOTION UNDER
BANKRUPTCY CODE SECTIONS 105(a) AND 363(b)
AUTHORIZING RETENTION OF JAMES P. SEERY, JR., AS
CHIEF EXECUTIVE OFFICER, CHIEF RESTRUCTURING OFFICER, AND
FOREIGN REPRESENTATIVE NUNC PRO TUNC TO MARCH 15, 2020**

Upon the _Debtor's Motion under Bankruptcy Code Sections 105(a) and 363(b) for
Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring
Officer and Foreign Representative Nunc Pro Tunc To March 15, 2020_ (the "Motion"),[1] and the

---

[1] All terms not otherwise defined herein shall be given the meanings ascribed to them in the Motion.



Court finding that: (i) this Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; (ii) venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409; (iii) this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); (iv) due and sufficient notice of the Motion has been given; (v) entry into the Agreement was an exercise of the Debtor's sound business judgment; and (vi) it appearing that the relief requested in the Motion is necessary and in the best interests of the Debtor's estate and creditors; and good and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, and DECREED** that:

1.      The Motion is **GRANTED**.

2.      Pursuant to sections 363(b) and 105(a) of the Bankruptcy Code, the Agreement attached hereto as **Exhibit 1** and all terms and conditions thereof are approved, *nunc pro tunc* to March 15, 2020.

3.      The Debtor is hereby authorized to enter into and perform under the Agreement.

4.      The Debtor is authorized to indemnify Mr. Seery pursuant to the terms of the Agreement.  Mr. Seery is also entitled to any indemnification or other similar provisions under the Debtor's existing or future insurance policies, including any policy tails obtained (or which may be obtained in the future), by the Debtor.  The Debtor and Strand are authorized to enter into any agreements necessary to execute or implement the transactions described in this paragraph. For avoidance of doubt and notwithstanding anything to the contrary in this Order, Mr. Seery shall be entitled to any state law indemnity protections to which he may be entitled under applicable law.

5.      No entity may commence or pursue a claim or cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery, and (ii) specifically authorizing such entity to bring such claim. The Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

6.      Notwithstanding anything in the Motion, the Agreement or the Order to the contrary, the Agreement shall be deemed terminated upon the effective date of a confirmed plan of reorganization unless such plan provides otherwise.

7.      Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

8.      This Court shall retain jurisdiction over any and all matters arising from or related to the interpretation and/or implementation of this Order.

9.      The Foreign Representative Order is hereby amended to substitute James P. Seery, Jr., as the chief executive officer, in place of Bradley S. Sharp, as the Debtor's Foreign Representative, Bermuda Foreign Representative and Cayman Foreign Representative.  All other provisions of the Foreign Representative Order shall remain in full force and effect.

### ###END OF ORDER###

## EXHIBIT 1

**Engagement Agreement**

June 23, 2020

CONFIDENTIAL

The Board of Directors of Strand Advisors, Inc.
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201


Re:     Highland Capital Management L.P. (the "Company")

Dear Fellow Board Members:

This letter agreement ("Agreement") sets forth the terms and conditions of the engagement of the undersigned James P. Seery, Jr. ("I", "me" or "my"), as Chief Executive Officer ("CEO") and Chief Restructuring Officer ("CRO"), effective as of March 15, 2020 (the "Commencement Date "), by the Company and its affiliates to perform financial advisory services as detailed below.

I appreciate the trust you have placed in me by asking me to assume these roles and thank you for the opportunity to continue to work with you to restructure the Company.

Roles:

I will serve as the CEO and CRO of the Company during its Chapter 11 bankruptcy case (the " Bankruptcy Case") currently pending in the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court").

In those roles, I will be responsible for overall management of the business of the Company in Chapter 11 including, directing the reorganization and restructuring of the Company, monetization of assets, resolution of claims, development and negotiation of a plan of reorganization or liquidation, and implementation of such a plan.

My direct reports will include the individuals at the Company that currently report to the Board of Directors of Strand Advisors, Inc. (the "Board") or such other individuals employed by the Company as I determine should report to directly to me.  In the event that the Board determines to restructure the reporting lines or functions of the Company, my direct reports will be amended in accordance with the Board approved restructuring.

At all times, I will remain a full member of the Board entitled to vote on all matters other than those on which I am conflicted.

APP_0105

I will devote as much time to this engagement as I determine is required to execute my responsibilities as CEO and CRO. I will have no specific on-site requirements in Dallas, but will be on site as much as I determine is necessary to execute my responsibilities as CEO and CRO, consistent with Covid-19 orders applicable to Dallas and New York City.

Limitations on Services

My services under this engagement are limited to those specifically noted in this Agreement and do not include legal, accounting, or tax-related assistance or advisory services. For the avoidance of doubt, I am not providing any legal services in connection with this engagement and will have not any duties as a lawyer to the Company, the Board, or any of the Company's employees. The accuracy and completeness of all information submitted to me by the Company are the sole responsibility of the Company, and I will be entitled to rely on such information without independent investigation or verification.

In my role as CEO and CRO, I will act as an independent professional contractor to the Company and will not be an employee of the Company. I will provide and pay for my own benefits, including medical benefits, by J.P Seery & Co. LLC or otherwise.

Fees and Expenses:

In consideration of my acceptance of this engagement and performance of the services pursuant to this Agreement, the Company shall pay the following:

1. Compensation for Services:
   a. Base Compensation: As compensation for my services as CEO and CRO of the Company, the Company shall pay me $150,000.00 per calendar month ("Base Compensation"). Base Compensation shall be due and payable at the start of each calendar month. Consistent with current Board compensation practice, invoices rendered by me to the Company are due and payable by the Company on receipt. Payment of the Base Compensation will be retroactive to March 15, 2020.
   b. Bonus Compensation/Restructuring Fee:
      i. The Company has agreed to pay me a restructuring fee upon confirmation of either a Case Resolution Plan or a Monetization Vehicle Plan in each case as defined below (the "Restructuring Fee").
      ii. Case Resolution Restructuring Plan
          1. On confirmation of any plan or reorganization or liquidation based on resolution of a material amount of the outstanding claims and their respective treatment, even if such plan includes (x) a debtor/creditor trust or similar monetization and claims resolution vehicle, (y) post-confirmation litigation of certain of the claims, and (z) post-confirmation monetization of debtor assets (a "Case Resolution Plan"):
             a. $1,000,000 on confirmation of the Case Resolution Plan;
             b. $500,000 on the effective date of the Case Resolution Plan; and
             c. $750,000 on completion of cash or property distributions to creditors as contemplated by the Case Resolution Plan.

APP_0106

 

      iii. Debtor/Creditor Monetization Vehicle Restructuring Fee:
         1. On confirmation of any plan or reorganization or liquidation based on a debtor/creditor trust or similar asset monetization and claims resolution vehicle that does not include agreement among the debtor and creditors on a material amount of the outstanding claims and their respective treatment at confirmation (a "Monetization Vehicle Plan"):
           a. $500,000 on confirmation of the Monetization Vehicle Plan;
           b. $250,000 on the effective date of the Monetization Vehicle Plan; and
           c. A contingent restructuring fee to be determined by the board or oversight committee installed to oversee the implementation of any Monetization Vehicle Plan based on the CEO/CRO (or acting as trustee) based upon performance under the plan after all material distributions under the Monetization Vehicle Plan are made.

2. <u>Out-of-Pocket Expenses</u>: In addition to the Base and Bonus Compensation, I shall be entitled to reimbursement for actual and reasonable out-of-pocket expenses ("Expenses") incurred in connection with the provision of services hereunder. Expenses will be billed along with Base Compensation and shall be paid by the Company at the same time. Expenses will be generally consistent with expenses incurred to date as a member of the Board.

<u>Bankruptcy Court Approval</u>

Notwithstanding anything herein to the contrary, I understand that this Agreement is contingent, in all respects, on the approval of the Bankruptcy Court. I also understand that the Company will seek approval of this Agreement in stages and that the Company will first seek approval of my retention as CEO and CRO and the payment of the Base Compensation and will defer seeking Bankruptcy Court approval of the Restructuring Fee until there have been further developments in the Bankruptcy Case.

<u>Conflicts and Other Engagements</u>

I am not aware of any potential conflicts of interest based on my understanding of the various parties involved in this matter to date.

The Company is aware that this engagement is not an exclusive engagement of my time, and that I have and will continue to have other business engagements and investments unrelated to the Company. Nothing in this Agreement or otherwise precludes me from representing or working with or for any other person or entity in matters not directly related to the services being provided to the Company under this Agreement. However, I will not take on any engagements directly adverse to the Company during the term of this engagement.

<u>Privilege</u>

I understand that in the course of this engagement, I may become party to or my services may become part of work product of legal counsel to the Company (the Company's in-house and outside counsel are collectively referred to as "Counsel"), and all communications between Counsel and me relating to this engagement shall be protected from disclosure to third parties under the attorney work product doctrine and/or the attorney-client privilege, and, therefore, shall be treated by me as privileged and confidential. I further understand that the Company has the exclusive right to waive the attorney-client privilege, and Counsel has the exclusive right to waive the protections afforded under the attorney work-product doctrine.

<u>Termination of Engagement</u>

This Agreement may be terminated at any time by either the Company or by me upon two weeks advance written notice given to the other party. The termination of this Agreement shall not affect my right to receive, and the Company's obligation to pay, any and all Base Compensation and Expenses incurred (even if not billed) prior to the giving of the termination notice; provided, however, that (i) if this Agreement is terminated by me, the amount of Base Compensation owed shall be calculated based on the actual number of days worked during the applicable month and I will return any Base Compensation received in excess of such amount and (ii) if this Agreement is terminated by the Company, Base Compensation shall be deemed fully earned as of the first day of any month. Bonus Compensation shall be earned by me immediately upon termination of me by the Company; provided, however, I shall not be entitled to Bonus Compensation if (a) the Bankruptcy Case is converted to chapter 7 or dismissed; (b) a chapter 11 trustee is appointed in the Bankruptcy Case; (c) I am terminated by the Company for Cause; or (d) I resign prior to confirmation of a plan or court approval of a sale as described in the Fees and Expense/Compensation for Services section hereof. For purposes of this Agreement, "Cause" means any of the following grounds for termination of my engagement, in each case as reasonably determined by the Board within 60 days of the Board becoming aware of the existence of the event or circumstance: (A) fraud, embezzlement, or any act of moral turpitude or willful misconduct on my part; (B) conviction of or the entry of a plea of nolo contendere by me for any felony; (C) the willful breach by me of any material term of this Agreement; or (D) the willful failure or refusal by me to perform my duties to the Company, which, if capable of being cured, is not cured on or before fifteen (15) days after my receipt of written notice from the Company.

<u>Conditional Requirement to Seek Further Bankruptcy Court Approval of Agreement</u>

The official committee of unsecured creditors in the Bankruptcy Case (the "Committee") may, upon two weeks advance written notice to the Company, require the Company to file a motion with the Bankruptcy Court on normal notice seeking a continuation of this Agreement and if such motion is not filed, this Agreement will terminate at the expiration of such two week period. If the Company files such motion, I will be entitled to my Base Compensation through and including the date on which a final order is entered on such motion by the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Committee may not deliver such notice to the Company until a date which is more than ninety days following the date the Bankruptcy Court enters an order approving this Agreement.

<u>Indemnification</u>

As a material part of the consideration to me under this Agreement, the Company agrees (i) to indemnify and hold harmless me and any of my affiliates (the "<u>Indemnified Party</u>"), to the fullest extent lawful, from and against any and all losses, claims, costs, damages or liabilities (or actions in respect thereof), joint or several, arising out of or related to this Agreement, my engagement under this Agreement, or any actions taken or omitted to be taken by me or the Company in connection with this Agreement and (ii) to reimburse the Indemnified Party for all expenses ( including, without limitation, the reasonable fees and expenses of counsel) as they are incurred in connection with investigating, preparing, pursuing, defending, settling or compromising any action, suit, dispute, inquiry, investigation or proceeding, pending or threatened, brought by or against any person (including, without limitation, any shareholder or derivative action, or any fee dispute), arising out of or relating to this Agreement, or such engagement, or actions.  However, the Company shall not be liable under the foregoing indemnity and reimbursement agreement for any loss, claim, damage or liability which is finally judicially determined by a court of competent jurisdiction to have resulted primarily from the willful misconduct or gross negligence of the Indemnified Party.

The indemnification and insurance currently covering my role as a director shall be extended to me and fully cover me as provided therein in my roles as CEO and CRO.

<u>Miscellaneous</u>

This Agreement (a) constitutes the entire agreement of the parties with respect to the subject matter hereof and supersedes any other communications, understandings or agreements among the parties with respect to the subject matter hereof, and (b) may be modified, amended or supplemented only by written agreement among all the parties hereto.

This Agreement is subject to approval by the Bankruptcy Court.  As part of such approval the Company shall request that any such order approving this Agreement contain a provision extending the protections afforded to me as a Board Member pursuant to Paragraph 10 of the Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course entered by the Bankruptcy Court on January 9, 2020 [Docket No. 339] to my role as CEO and CRO, which Order prohibits the commencement of any action against me without first obtaining Bankruptcy Court approval to initiate such action.

This Agreement and all controversies arising from or related to performance hereunder shall be governed by and construed in accordance with the laws of the State of New York.  The parties hereby submit to the jurisdiction of and venue in the federal and state courts located in New York City and waive any right to trial by jury in connection with any dispute related to this Agreement.

This Agreement shall be binding upon the parties and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

APP_0109

Failure of any party at any time to require performance of any provision of this Agreement shall not affect the right to require full performance thereof at any time thereafter, and the waiver by any party of a breach of such provisions shall not be taken as or held to be a waiver of any subsequent breach or as nullifying the effectiveness of such provision.

Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective address set forth above in this Agreement, or to such other address as either party may have furnished to the other in writing in accordance herewith.

This Agreement and my rights and duties hereunder shall not be assignable or delegable by me.

The Company may withhold from any amounts payable under this Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

This Agreement may be executed (including by electronic execution) in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument.  Delivery of an executed counterpart of this Agreement by electronic mail shall have the same force and effect as the delivery of an original executed counterpart of this Agreement.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,

James. P. Seery, Jr.

AGREED AND ACCEPTED

HIGHLAND CAPITAL MANAGEMENT L.P.

By: Strand Advisors, Inc., its general partner

_____          _____
John Dubel                                                    Russell Nelms
Director                                                         Director
Strand Advisors, Inc.                                      Strand Advisors, Inc.

This Agreement shall be binding upon the parties and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

Failure of any party at any time to require performance of any provision of this Agreement shall not affect the right to require full performance thereof at any time thereafter, and the waiver by any party of a breach of such provisions shall not be taken as or held to be a waiver of any subsequent breach or as nullifying the effectiveness of such provision.

Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective address set forth above in this Agreement, or to such other address as either party may have furnished to the other in writing in accordance herewith.

This Agreement and my rights and duties hereunder shall not be assignable or delegable by me.

The Company may withhold from any amounts payable under this Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

This Agreement may be executed (including by electronic execution) in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument.  Delivery of an executed counterpart of this Agreement by electronic mail shall have the same force and effect as the delivery of an original executed counterpart of this Agreement.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,


James. P. Seery, Jr.

AGREED AND ACCEPTED

**HIGHLAND CAPITAL MANAGEMENT L.P.**

By: Strand Advisors, Inc., its general partner


_____          _____
John Dubel                                                                     Russell Nelms
Director                                                                           Director
Strand Advisors, Inc.                                                      Strand Advisors, Inc.


**APP_0111**

This Agreement shall be binding upon the parties and their respective successors and assigns, and no other person shall acquire or have any right under or by virtue of this Agreement.

Failure of any party at any time to require performance of any provision of this Agreement shall not affect the right to require full performance thereof at any time thereafter, and the waiver by any party of a breach of such provisions shall not be taken as or held to be a waiver of any subsequent breach or as nullifying the effectiveness of such provision.

Notices provided for in this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or overnight courier or three days after it has been mailed by United States registered mail, return receipt requested, postage prepaid, addressed to the respective address set forth above in this Agreement, or to such other address as either party may have furnished to the other in writing in accordance herewith.

This Agreement and my rights and duties hereunder shall not be assignable or delegable by me.

The Company may withhold from any amounts payable under this Agreement such Federal, state and local taxes as may be required to be withheld pursuant to any applicable law or regulation.

This Agreement may be executed (including by electronic execution) in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument.  Delivery of an executed counterpart of this Agreement by electronic mail shall have the same force and effect as the delivery of an original executed counterpart of this Agreement.

Please confirm the foregoing is in accordance with your understanding by signing and returning a copy of this Agreement, whereupon it shall become binding and enforceable in accordance with its terms.

Very truly yours,


James. P. Seery, Jr.

AGREED AND ACCEPTED

**HIGHLAND CAPITAL MANAGEMENT L.P.**

By: Strand Advisors, Inc., its general partner


_____           _____
John Dubel                                Russell Nelms
Director                                  Director
Strand Advisors, Inc.                     Strand Advisors, Inc.

**APP_0112**

# EXHIBIT 4

APP_0113



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed January 9, 2020**

United States Bankruptcy Judge

---

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | Related to Docket Nos. 7 & 259 |

**ORDER APPROVING SETTLEMENT WITH OFFICIAL COMMITTEE OF
UNSECURED CREDITORS REGARDING GOVERNANCE OF THE DEBTOR
AND PROCEDURES FOR OPERATIONS IN THE ORDINARY COURSE**

Upon the *Motion of the Debtor to Approve Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* (the "Motion"),[2] filed by the above-captioned debtor and debtor in possession

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

(the "Debtor"); the Court having reviewed the Motion, and finding that (a) the Court has

jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334, (b) this is a core proceeding

pursuant to 28 U.S.C. §157(b)(2)(A), and (c) notice of this Motion having been sufficient under

the circumstances and no other or further notice is required; and having determined that the legal

and factual bases set forth in the Motion establish just cause for the relief granted herein; and

having determined that the relief sought in the Motion is in the best interests of the Debtor and its

estate; and after due deliberation and sufficient cause appearing therefore,

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED on the terms and conditions set forth herein, and

the United States Trustee's objection to the Motion is OVERRULED.

2.      The Term Sheet is approved and the Debtor is authorized to take such steps

as may be necessary to effectuate the settlement contained in the Term Sheet, including, but not

limited to: (i) implementing the Document Production Protocol; and (ii) implementing the

Protocols.

3.      The Debtor is authorized (A) to compensate the Independent Directors for

their services by paying each Independent Director a monthly retainer of (i) $60,000 for each of

the first three months, (ii) $50,000 for each of the next three months, and (iii) $30,000 for each of

the following six months, provided that the parties will re-visit the director compensation after the

sixth month and (B) to reimburse each Independent Director for all reasonable travel or other

expenses, including expenses of counsel, incurred by such Independent Director in connection

with its service as an Independent Director in accordance with the Debtor's expense

reimbursement policy as in effect from time to time.

2

DOCS_NY:39973.13 36027/002

APP_0115

4.    The Debtor is authorized to guarantee Strand's obligations to indemnify each Independent Director pursuant to the terms of the Indemnification Agreements entered into by Strand with each Independent Director on the date hereof.

5.    The Debtor is authorized to purchase an insurance policy to cover the Independent Directors.

6.    All of the rights and obligations of the Debtor referred to in paragraphs 3 and 4 hereof shall be afforded administrative expense priority under 11 U.S.C. § 503(b).

7.    Subject to the Protocols and the Term Sheet, the Debtor is authorized to continue operations in the ordinary course of its business.

8.    Pursuant to the Term Sheet, Mr. James Dondero will remain as an employee of the Debtor, including maintaining his title as portfolio manager for all funds and investment vehicles for which he currently holds that title; provided, however, that Mr. Dondero's responsibilities in such capacities shall in all cases be as determined by the Independent Directors and Mr. Dondero shall receive no compensation for serving in such capacities.  Mr. Dondero's role as an employee of the Debtor will be subject at all times to the supervision, direction and authority of the Independent Directors.  In the event the Independent Directors determine for any reason that the Debtor shall no longer retain Mr. Dondero as an employee, Mr. Dondero shall resign immediately upon such determination.

9.    Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor.

10.    No entity may commence or pursue a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent

DOCS_NY:39973.13 36027/002

APP_0116

Director's advisors relating in any way to the Independent Director's role as an independent director of Strand without the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Independent Director, any Independent Director's agents, or any Independent Director's advisors and (ii) specifically authorizing such entity to bring such claim. The Court will have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

11.     Nothing in the Protocols, the Term Sheet or this Order shall affect or impair Jefferies LLC's rights under its Prime Brokerage Customer Agreements with the Debtor and non-debtor Highland Select Equity Master Fund, L.P., or any of their affiliates, including, but not limited to, Jefferies LLC's rights of termination, liquidation and netting in accordance with the terms of the Prime Brokerage Customer Agreements or, to the extent applicable, under the Bankruptcy Code's "safe harbor" protections, including under sections 555 and 561 of the Bankruptcy Code. The Debtor shall not conduct any transactions or cause any transactions to be conducted in or relating to the Jefferies LLC accounts without the express consent and cooperation of Jefferies LLC or, in the event that Jefferies withholds consent, as otherwise ordered by the Court. For the avoidance of doubt, Jefferies LLC shall not be deemed to have waived any rights under the Prime Brokerage Customer Agreements or, to the extent applicable, the Bankruptcy Code's "safe harbor" protections, including under sections 555 and 561 of the Bankruptcy Code, and shall be entitled to take all actions authorized therein without further order of the Court

12.     Notwithstanding any stay under applicable Bankruptcy Rules, this Order shall be effective immediately upon entry.

4

13.     The Court shall retain jurisdiction over all matters arising from or related to the interpretation and implementation of this Order, including matters related to the Committee's approval rights over the appointment and removal of the Independent Directors.

## ## END OF ORDER ##

DOCS_NY:39973.13 36027/002

APP_0118

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | **Cause No.  3:21-CV-00842-B** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P. , HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **JAMES P. SEERY,** *individually*, **and** | § | |
| **HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| *Defendants.* | § | |

## <u>ORDER</u>

The Court,  having considered Plaintiffs' Motion for Leave to File First Amended

Complaint, finds that the Motion should be GRANTED.

IT IS THEREFORE ORDERED that Plaintiff's First Amended Complaint is hereby

deemed filed.

SO ORDERED.

Dated this ____ day of _____, 2021.

_____
UNITED STATES DISTRICT JUDGE

**Kim James**

| | |
|---|---|
| **From:** | ecf_txnd@txnd.uscourts.gov |
| **Sent:** | Tuesday, April 20, 2021 1:19 PM |
| **To:** | Courtmail@txnd.uscourts.gov |
| **Subject:** | Activity in Case 3:21-cv-00842-B Charitable DAF Fund et al v. Highland Capital Management LP et al Order on Motion for Leave to File |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

If you need to know whether you must send the presiding judge a paper copy of a document that you have docketed in this case, click here: Judges' Copy Requirements. Click here to see Judge Specific Requirements. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms and Instructions found at www.txnd.uscourts.gov. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge.

**U.S. District Court**

**Northern District of Texas**

**Notice of Electronic Filing**

The following transaction was entered on 4/20/2021 at 1:18 PM CDT and filed on 4/20/2021
**Case Name:** Charitable DAF Fund et al v. Highland Capital Management LP et al
**Case Number:** 3:21-cv-00842-B
**Filer:**
**Document Number:** 8(No document attached)

**Docket Text:**
**ELECTRONIC ORDER denying [6] Motion for Leave to File without prejudice. To the extent a motion for leave to file an amended complaint is required under Rule 15, Plaintiffs may renew their motion after Defendants are served and have appeared. (Ordered by Judge Jane J. Boyle on 4/20/2021) (chmb)**

**3:21-cv-00842-B Notice has been electronically mailed to:**

Jonathan Bridges    jeb@sbaitilaw.com, jbridges99@ymail.com

Mazin A Sbaiti    MAS@SbaitiLaw.com, kls@sbaitilaw.com, knc@sbaitilaw.com, krj@sbaitilaw.com, mgp@sbaitilaw.com

**3:21-cv-00842-B The CM/ECF system has NOT delivered notice electronically to the names listed below. The clerk's office will only serve notice of court Orders and Judgments by mail as required by the federal rules.**

1

APP_0120

**From:** Jonathan E. Bridges
**Sent:** Monday, April 19, 2021 7:25 PM
**To:** Jeff Pomerantz
**Cc:** Mazin Sbaiti; Kim James; John A. Morris
**Subject:** Re: CLO Holdco v. Highland

Mr. Pomerantz,

Thank you for sending the orders and for keeping in mind that we're new to a matter that, in the bankruptcy court, has over 2,000 filings. We may well have missed something. But we have seen and carefully studied the orders that you sent. And we do not believe they prohibit the motion we are filing, which briefs them and explains why we don't believe they prohibit our motion.

We also don't think the district court will both decide that we're wrong about this and nonetheless grant our motion. As I read the orders, that's the only theoretical way that a motion for leave could violate them.

And if the district court does grant our motion for the reasons we ask — because it finds that the bankruptcy court exceeded its jurisdiction or because it finds that our motion for leave (which can be referred) complies with the bankruptcy court orders — then we don't think the bankruptcy court can or will overrule the district court.

So please know that we are not willfully violating those orders, as your email suggests. Quite the contrary, we are giving them careful attention. Which is why we are seeking leave rather than amending as of right.

Jonathan Bridges

**Sbaiti & Company PLLC**
CHASE TOWER
2200 Ross Avenue, Suite 4900W
Dallas, Texas 75201
O: (214) 432-2899
C: (214) 663-3036
F: (214) 853-4367
E: JEB@SbaitiLaw.com
W: https://www.SbaitiLaw.com

On Apr 19, 2021, at 6:20 PM, Jeff Pomerantz <jpomerantz@pszjlaw.com> wrote:

> These Orders require you to seek such authority from the Bankruptcy Court which has exclusive jurisdiction to make the determination as to whether an action against Mr. Seery may be brought.
>
> If you violate such Orders by filing your motion in the District Court we will seek

appropriate relief from the Bankruptcy Court including sanctions against you and your
client for a willful violation of the Bankruptcy Court's orders.

Jeff

On 4/19/21, 4:11 PM, "Mazin Sbaiti" <MAS@sbaitilaw.com> wrote:

  District Court where we filed the case, where we suspect it will be referred to the bk
court.
  M


  From Mazin A. Sbaiti, Esq.


  -----Original Message-----
  From: Jeff Pomerantz <jpomerantz@pszjlaw.com>
  Sent: Monday, April 19, 2021  6:10 PM
  To: Mazin Sbaiti <MAS@sbaitilaw.com>; Jonathan E. Bridges <JEB@sbaitilaw.com>
  Cc: Kim James <KRJ@sbaitilaw.com>; John A. Morris <jmorris@pszjlaw.com>; Jeff
Pomerantz <jpomerantz@pszjlaw.com>
  Subject: Re: CLO Holdco v. Highland

  Yes. Put us down as opposed. And you will be filing that motion in the bankruptcy
court correct?

  Jeff

  On 4/19/21, 4:09 PM, "Mazin Sbaiti" <MAS@sbaitilaw.com> wrote:

    Jeff,

    Our meet and confer is for our motion for leave to amend to add him. I believe, per
those orders' language, we are following the court's instruction.
    We are not unilaterally adding him.

    I take it you want us to put you down as "opposed" on the certificate of conference?

    Mazin



    From Mazin A. Sbaiti, Esq.


    -----Original Message-----
    From: Jeff Pomerantz <jpomerantz@pszjlaw.com>

Sent: Monday, April 19, 2021 6:05 PM
To: Jonathan E. Bridges <JEB@sbaitilaw.com>
Cc: Mazin Sbaiti <MAS@sbaitilaw.com>; Kim James <KRJ@sbaitilaw.com>; Jeff
Pomerantz <jpomerantz@pszjlaw.com>; John A. Morris <jmorris@pszjlaw.com>
Subject: Re: CLO Holdco v. Highland

I appreciate that you are new to the case but you need to be aware of the attached
July 9, 2020 and July 16, 2020 Bankruptcy Court orders that prohibit Mr. Seery (among
others) from being sued without first obtaining authority from the Bankruptcy Court. If
you proceed to amend the complaint as you suggest below without first obtaining
Bankruptcy Court approval we reserve all rights to take appropriate action and seek
appropriate relief from the Bankruptcy Court.

Also please keep my partner John Morris copied on emails.

Jeff Pomerantz


From: "Jonathan E. Bridges" <JEB@sbaitilaw.com>
Date: Monday, April 19, 2021 at 12:49 PM
To: Jeffrey Pomerantz <jpomerantz@pszjlaw.com>
Cc: Mazin Sbaiti <MAS@sbaitilaw.com>, Kim James <KRJ@sbaitilaw.com>
Subject: CLO Holdco v. Highland

Mr. Pomerantz,

Mazin and I intend to move for leave today in the district court seeking permission
to amend our complaint to add claims against Mr. Seery. They are the same causes of
action. We believe we are entitled to amend as a matter of course. But we will also raise
and brief the bankruptcy court's orders re the same.

Can we put your client down as unopposed?

We appreciate your prompt reply.

Jonathan Bridges
[cid:image001.png@01D67A35.9FEE2C90] Sbaiti & Company PLLC CHASE TOWER
2200 Ross Avenue, Suite 4900W<x-apple-data-detectors://1/0>
Dallas, Texas 75201<x-apple-data-detectors://1/0>
O: (214) 432-2899<tel:(214)%20432-2899>
C: (214) 663-3036<tel:(214)%20663-3036>
F: (214) 853-4367<tel:(214)%20853-4367>
E: JEB@SbaitiLaw.com<mailto:JEB@SbaitiLaw.com>
W: https://www.SbaitiLaw.com<https://www.sbaitilaw.com>

_____

CONFIDENTIALITY
This e-mail message and any attachments thereto is intended only for use by the
addressee(s) named herein and may contain legally privileged and/or confidential
information. If you are not the intended recipient of this e-mail message, you are hereby
notified that any dissemination, distribution or copying of this e-mail message, and any
attachments thereto is strictly prohibited. If you have received this e-mail message in
error, please immediately notify me by telephone and permanently delete the original
and any copies of this email and any prints thereof.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

| | | |
|---|---|---|
| **CHARITABLE DAF FUND, L.P.** | § | |
| **and CLO HOLDCO, LTD.,** | § | |
| *directly and derivatively*, | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | **Cause No. 3:21-CV-00842-B** |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P. , HIGHLAND HCF ADVISOR, LTD.,** | § | |
| **JAMES P. SEERY,** *individually*, **and** | § | |
| **HIGHLAND CLO FUNDING, LTD.,** | § | |
| *nominally,* | § | |
| | § | |
| *Defendants.* | § | |

## <u>ORDER</u>

The Court, having considered Plaintiffs' Motion for Leave to File First Amended Complaint, finds that the Motion should be GRANTED.

IT IS THEREFORE ORDERED that Plaintiff's Motion for Leave to File First Amended Complaint is GRANTED.

SO ORDERED.

Dated this ____ day of _____, 2021.

_____
UNITED STATES DISTRICT JUDGE