# EXHIBIT 1

# EXHIBIT 1

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor | Highland Capital Management, L.P. |
| United States Bankruptcy Court for the: | Northern ___ District of Texas |
| | (State) |
| Case number | 19-34054 |

Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

| | | |
|---|---|---|
| 1. | **Who is the current creditor?** | Integrated Financial Associates, Inc. <br> Name of the current creditor (the person or entity to be paid for this claim) <br><br> Other names the creditor used with the debtor ___ |
| 2. | **Has this claim been acquired from someone else?** | ☑ No <br> ☐ Yes.  From whom? ___ |

| | | | |
|---|---|---|---|
| 3. | **Where should notices and payments to the creditor be sent?** <br><br> Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** <br><br> Integrated Financial Associates, Inc. <br> 3111 S. Rainbow Blvd., Suite 209 <br> Las Vegas, NV 89146 <br><br><br> Contact phone  702-257-0021 <br> Contact email  Bill_IFA@yahoo.com <br><br> Uniform claim identifier for electronic payments in chapter 13 (if you use one): <br> ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ ___ | **Where should payments to the creditor be sent?** (if different) <br><br><br><br><br><br> Contact phone ___ <br> Contact email ___ |

| | | |
|---|---|---|
| 4. | **Does this claim amend one already filed?** | ☑ No <br> ☐ Yes.  Claim number on court claims registry (if known) ___  Filed on ___ <br> MM / DD / YYYY |
| 5. | **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No <br> ☐ Yes. Who made the earlier filing? ___ |

1934054200408000000000006

**Part 2:**     **Give Information About the Claim as of the Date the Case Was Filed**

6. **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

7. **How much is the claim?**    $ 241,002,696.73 _____ . **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Tort and contract damages _____

9. **Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**     $_____

**Amount of the claim that is secured:**     $_____

**Amount of the claim that is unsecured:**     $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**     $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

10. **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**     $_____

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

1934054200040800000000000006

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | | |
|---|---|---|---|
| | ☐ Yes. *Check all that apply:* | | **Amount entitled to priority** |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | | |

| 13. **Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No |
|---|---|
| | ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. |
| | $_____ |

---

**Part 3:** Sign Below

| **The person completing this proof of claim must sign and date it. FRBP 9011(b).** | *Check the appropriate box:* |
|---|---|
| | ☑ I am the creditor. |
| If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is. | ☐ I am the creditor's attorney or authorized agent. |
| | ☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004. |
| | ☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. |
| **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt. |
| | I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct. |
| | I declare under penalty of perjury that the foregoing is true and correct. |
| | Executed on date   04/08/2020 |
| | MM / DD / YYYY |
| | /s/William Dyer |
| | Signature |
| | **Print the name of the person who is completing and signing this claim:** |
| | Name   William Dyer |
| | First name          Middle name          Last name |
| | Title   President |
| | Company   Integrated Financial Associates, Inc. |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| | Address |
| | Contact phone   _____   Email   _____ |

1934054200408000000000006

# KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** <br> 19-34054 - Highland Capital Management, L.P. | |
| **District:** <br> Northern District of Texas, Dallas Division | |
| **Creditor:** <br> Integrated Financial Associates, Inc. <br><br> 3111 S. Rainbow Blvd., Suite 209 <br><br> Las Vegas, NV, 89146 <br> **Phone:** <br> 702-257-0021 <br> **Phone 2:** <br><br> **Fax:** <br><br> **Email:** <br> Bill_IFA@yahoo.com | **Has Supporting Documentation:** <br> Yes, supporting documentation successfully uploaded <br> **Related Document Statement:** <br><br> **Has Related Claim:** <br> No <br> **Related Claim Filed By:** |
| **Other Names Used with Debtor:** | **Amends Claim:** <br> No <br> **Acquired Claim:** <br> No |

| | | |
|---|---|---|
| **Basis of Claim:** <br> Tort and contract damages | **Last 4 Digits:** <br> No | **Uniform Claim Identifier:** |
| **Total Amount of Claim:** <br> 241,002,696.73 | **Includes Interest or Charges:** <br> Yes | |
| **Has Priority Claim:** <br> No | **Priority Under:** | |

| | |
|---|---|
| **Has Secured Claim:** <br> No | **Nature of Secured Amount:** <br> **Value of Property:** |
| **Amount of 503(b)(9):** <br> No | **Annual Interest Rate:** |
| **Based on Lease:** <br> No | **Arrearage Amount:** |
| **Subject to Right of Setoff:** <br> No | **Basis for Perfection:** <br> **Amount Unsecured:** |
| **Submitted By:** <br> William Dyer on 08-Apr-2020 1:31:30 p.m. Eastern Time | |
| **Title:** <br> President | |
| **Company:** <br> Integrated Financial Associates, Inc. | |

**Fill in this information to identify the case:**

Debtor 1 _Highland Capital Management, L.P._

Debtor 2 _____
(Spouse, if filing)

United States Bankruptcy Court for the: Northern District of Texas ▼

Case number _19-34045-sgi11_

## Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

| | | |
| --- | --- | --- |
| 1. Who is the current creditor? | Integrated Financial Associates, Inc. | |
| | Name of the current creditor (the person or entity to be paid for this claim) | |
| | Other names the creditor used with the debtor _____ | |

2. **Has this claim been acquired from someone else?**
☑ No
☐ Yes. From whom? _____

3. **Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
| --- | --- |
| Carlyon Cica Chtd | Integrated Financial Associates, Inc. |
| Name | Name |
| 265 E. Warm Springs Road, Suite 1-7 | 3111 S. Rainbow Blvd., SUite 209 |
| Number Street | Number Street |
| Las Vegas NV 89119 | Las Vegas NV 89146 |
| City State ZIP Code | City State ZIP Code |
| Contact phone 702-684-4444 | Contact phone _____ |
| Contact email ccarlyon@carlyoncica.com | Contact email Bill_IFA@yahoo.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __

4. **Does this claim amend one already filed?**
☑ No
☐ Yes. Claim number on court claims registry (if known) _____
Filed on _____
MM / DD / YYYY

5. **Do you know if anyone else has filed a proof of claim for this claim?**
☑ No
☐ Yes. Who made the earlier filing? _____

**Part 2:**    **Give Information About the Claim as of the Date the Case Was Filed**

6. **Do you have any number you use to identify the debtor?**

   ☑ No

   ☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

7. **How much is the claim?**    $_____341,002,696.73 **Does this amount include interest or other charges?**

   ☐ No

   ☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

   Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

   Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

   Limit disclosing information that is entitled to privacy, such as health care information.

   Tort and contract damages

9. **Is all or part of the claim secured?**

   ☑ No

   ☐ Yes. The claim is secured by a lien on property.

   **Nature of property:**

   ☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

   ☐ Motor vehicle

   ☐ Other. Describe: _____

   **Basis for perfection:** _____

   Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

   **Value of property:**    $_____

   **Amount of the claim that is secured:**    $_____

   **Amount of the claim that is unsecured:**    $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

   **Amount necessary to cure any default as of the date of the petition:**    $_____

   **Annual Interest Rate** (when case was filed) _____%

   ☐ Fixed

   ☐ Variable

10. **Is this claim based on a lease?**

    ☑ No

    ☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

11. **Is this claim subject to a right of setoff?**

    ☑ No

    ☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:  Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   04/07/2020
               MM / DD / YYYY

_William Dyer_ (signature)
Signature

Print the name of the person who is completing and signing this claim:

| | |
|---|---|
| Name | **William**     **Dyer**<br>First name     Middle name     Last name |
| Title | **President** |
| Company | Integrated Financial Associates, Inc.<br>Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 3111 S. Rainbow Blvd., Suite 209<br>Number     Street |
| | Las Vegas                    NV       89146<br>City                    State     ZIP Code |
| Contact phone | 702-257-0021        Email Bill_IFA@yahoo.com |

## STATEMENT TO ACCOMPANY PROOF OF CLAIM

IFA is the payee under a November 29, 2007 note (the "IFA Note") in the original principal amount of $23,100,000 (attached hereto as Exhibit 1[1]) executed by Essex Real Estate Partners, LLC ("Essex"). A second note (the "Highland Note") in the original principal amount of $42,900,000 was executed by Essex payable to The Foothill Group, Inc., but subsequently assigned, first to Highland Crusader Holdings Corporation and Highland Credit Opportunities Holding Corporation and then to various CLO entities, Westchester CLO, Ltd, Gleneagles CLO, Ltd, Stratford CLO, Ltd, Greenbriar CLO, Ltd, Eastland CLO, Ltd, Brentwood CLO, Ltd, Jasper CLO, Ltd, Longhorn Credit Funding LLC, Grayson CLO, Ltd., and Red River CLO, Ltd. (collectively, the "Highland Investors" and, together with IFA, the "Lenders"). Pursuant to the underlying Term Loan Agreement, NexBank, LLC ("NexBank") is the Agent for the Lenders under the Term Loan Agreement. Debtor, which is jointly controlled with NexBank, acts on behalf of the Lenders. As detailed by the complaint attached hereto as Exhibit 2 (without its exhibits), NexBank has not fulfilled its duties to IFA, to IFA's expense and detriment. Further, Essex has alleged in a separate complaint, which is attached hereto as Exhibit 3 (without Exhibits) that, as a result of NexBank's failure to foreclose on the collateral for the IFA Note and the Highland Note, those notes are uncollectible and the related deed of trust unenforceable. Essex further alleges that NexBank's refusal to release the deed of trust entitles Essex to an award of damages.

NexBank has asserted that all of its actions (and inactions) which are the subject of the Complaints were undertaken pursuant to directions and control of the "Required Lenders." Debtor has, at all times, acted on behalf of the Highland Lenders and asserted that such directions constitute directions from the "Required Lenders".

As a result of the allegations of the two complaints, IFA has incurred significant attorneys' fees and damages, and faces the risk of losing its ability to collect on the IFA Note and/or to realize upon the deed of trust securing the IFA Note. NexBank asserts that the total amount due is $584,462.133.68. *See* NexBank Proof of Claim and Exhibit E thereto, attached hereto as Exhibit 4. IFA's portion of that amount, less interest accruing on the IFA Note between Debtor's bankruptcy filing and the Essex bankruptcy filing, plus estimated fees and expenses incurred and to be incurred by IFA as a result of the wrongful conduct of Debtor and NexBank, totals approximately $241,002.696.73.[2]

IFA reserves the right to amend this claim, including upon completion of the underlying litigation referenced herein.

---

[1] Copies of all Exhibits are available upon request from Claimant's counsel and are also available to the public via the various courts before whom the matters have been filed.

[2] 41.06% of $584,462,122.88 (=$243,136,247.61), less approximately $3,133,550.88 in interest accrued between October 16, 2019 (Debtor's petition date) and December 27, 2019 (the Essex Petition Date), plus $1,000,000 estimated attorneys' fees and expenses incurred, and which will be incurred, by IFA as a result of the wrongful conduct of Debtor and NexBank.

# EXHIBIT "1"

# EXHIBIT "1"

## DEED OF TRUST NOTE

$23,100,000                                                        November 29, 2007

FOR VALUE RECEIVED, ESSEX REAL ESTATE PARTNERS, LLC, a Nevada limited-liability company ("Borrower," whether one or more) hereby promises to pay to the order of INTEGRATED FINANCIAL ASSOCIATES, INC., a Nevada corporation ("Lender") under that certain Loan Agreement (defined below) among Borrower, NEXBANK, SSB, as the collateral agent and administrative agent (together with any and all of its successors and assigns, "Agent") as agent for the benefit of the lenders (collectively, "Lenders") from time to time a party to that certain Term Loan Agreement (the "Loan Agreement") dated November 29, 2007, without offset, in immediately available funds in lawful money of the United States of America, at Agent's Office as defined in the Loan Agreement, the principal sum of TWENTY THREE MILLION ONE HUNDRED THOUSAND AND 00/100 DOLLARS ($23,100,000) (or the unpaid balance of all principal advanced against this Note, if that amount is less), together with interest on the unpaid principal balance of this Note from day to day outstanding as hereinafter provided.

1.      Note; Interest; Payment Schedule and Maturity Date.  This Note is the Note referred to in the Loan Agreement and is entitled to the benefits thereof and subject to prepayment in whole or in part as provided therein.  The entire principal balance of this Note then unpaid shall be due and payable at the times set forth in the Loan Agreement.  Accrued unpaid interest shall be due and payable at the times and at the interest rate(s) set forth in the Loan Agreement until all principal and accrued interest owing on this Note shall have been fully paid and satisfied.  Any amount not paid when due and payable hereunder shall, to the extent permitted by applicable Law, bear interest and, if applicable, a late charge as set forth in the Loan Agreement.

2.      Security; Loan Documents.  The security for this Note includes a Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing (which, as it may have been or may be amended, restated, modified or supplemented from time to time, is herein called the "Deed of Trust") dated November 29, 2007 herewith from Borrower to Chicago Title Company, Trustee, covering certain property in the City of Henderson County of Clark, State of Nevada, described therein (the "Property").  This Note, the Deed of Trust, the Loan Agreement and all other documents now or hereafter securing, guaranteeing or executed in connection with the loan evidenced by this Note (the "Loan"), as the same have been or may be amended, restated, modified or supplemented from time to time, are herein sometimes called individually a "Loan Document" and together the "Loan Documents."  Notwithstanding the foregoing, the Environmental Indemnity Agreement dated November 29, 2007 ("Environmental Indemnity Agreement") is not a Loan Document.

3.      Defaults.

(a)      It shall be a default ("Default") under this Note and each of the other Loan Documents if (i) any principal, interest or other amount of money due under this Note is not paid in full within ten (10) days of the date when due, regardless of how such amount may have become due, (ii) any covenant, agreement, condition, representation or warranty herein or in any other Loan Document is not fully and timely performed, observed or kept, subject to any

H3131.0021 BN 1545339v3

applicable grace or cure periods, or (iii) there shall occur any default or event of default under the Deed of Trust or any other Loan Document, subject to any applicable grace or cure periods. Upon the occurrence of a Default, Agent on behalf of Lenders shall have the rights to declare the unpaid principal balance and accrued but unpaid interest on this Note, and all other amounts due hereunder and under the other Loan Documents, at once due and payable (and upon such declaration, the same shall be at once due and payable), to foreclose any liens and security interests securing payment hereof and to exercise any of its other rights, powers and remedies under this Note, under any other Loan Document, or at Law or in equity.

(b)　All of the rights, remedies, powers and privileges (together, "Rights") of Agent on behalf of Lenders provided for in this Note and in any other Loan Document are cumulative of each other and of any and all other Rights at Law or in equity. The resort to any Right shall not prevent the concurrent or subsequent employment of any other appropriate Right. No single or partial exercise of any Right shall exhaust it or preclude any other or further exercise thereof, and every Right may be exercised at any time and from time to time. No failure by Agent or Lenders to exercise, and no delay in exercising any Right, including the right to accelerate the maturity of this Note, shall be construed as a waiver of any Default or as a waiver of any Right. Without limiting the generality of the foregoing provisions, the acceptance by Lender from time to time of any payment under this Note which is past due or which is less than the payment in full of all amounts due and payable at the time of such payment, shall not (i) constitute a waiver of or impair or extinguish the right of Agent or Lenders to accelerate the maturity of this Note or to exercise any other Right at the time or at any subsequent time, or nullify any prior exercise of any such Right, (ii) constitute a waiver of the requirement of punctual payment and performance or a novation in any respect, or (iii) in any way excuse the existence of a Default.

(c)　If there is a prevailing party in any lawsuit, reference or arbitration arising out of or relating to this Note, the Loan Documents or the Loan, such prevailing party shall be entitled to recover from each other party such sums as the court, referee or arbitrator may adjudge to be reasonable attorneys' fees in the action, reference or arbitration, including the market value of services of in-house counsel, in addition to costs and expenses otherwise allowed by law. In all other situations, Borrower agrees to pay all costs and expenses of the holder of this Note which may be incurred in enforcing or protecting the rights or interests of such holder, including attorneys' fees and expenses (including the market value of services of in-house counsel), investigation costs and all court costs, whether or not suit is filed hereon, whether before or after the Maturity Date defined in the Loan Agreement, or whether in connection with bankruptcy, insolvency or appeal, or whether collection is made against Borrower or any guarantor or endorser or any other person primarily or secondarily liable hereunder. From the time(s) incurred until paid in full to the holder of this Note, all such sums shall bear interest at the Past Due Rate defined in the Loan Agreement.

4.　Heirs, Successors and Assigns. The terms of this Note and of the other Loan Documents shall bind and inure to the benefit of the heirs, devisees, representatives, successors and assigns of the parties. The foregoing sentence shall not be construed to permit Borrower to assign the Loan except as otherwise permitted under the Loan Documents. As further provided in the Loan Agreement, a Lender may, at any time, sell, transfer, or assign all or a portion of its interest in this Note, the Deed of Trust and the other Loan Documents, as set forth in the Loan Agreement.

H3131.0021 BN 1545339v3　　　　　　　　　2

5. <u>General Provisions</u>. Time is of the essence with respect to Borrower's obligations under this Note. If more than one person or entity executes this Note as Borrower, all of said parties shall be jointly and severally liable for payment of the indebtedness evidenced hereby. Borrower and all sureties, endorsers, guarantors and any other party now or hereafter liable for the payment of this Note in whole or in part, hereby severally (a) waive demand, presentment for payment, notice of dishonor and of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices (except any notices which are specifically required by this Note or any other Loan Document), filing of suit and diligence in collecting this Note or enforcing any of the security herefor; (b) agree to any substitution, subordination, exchange or release of any such security or the release of any party primarily or secondarily liable hereon; (c) agree that neither Agent nor any Lender shall be required first to institute suit or exhaust its remedies hereon against Borrower or others liable or to become liable hereon or to perfect or enforce its rights against them or any security herefor; (d) consent to any extensions or postponements of time of payment of this Note for any period or periods of time and to any partial payments, before or after maturity, and to any other indulgences with respect hereto, without notice thereof to any of them; and (e) submit (and waive all rights to object) to non-exclusive personal jurisdiction of any state or federal court sitting in the city and county, and venue in the city or county, in which payment is to be made as specified in <u>Section 1</u> of this Note, for the enforcement of any and all obligations under this Note and the Loan Documents; (f) waive the benefit of all homestead and similar exemptions as to this Note; (g) agree that their liability under this Note shall not be affected or impaired by any determination that any security interest or lien taken by Lender to secure this Note is invalid or unperfected; and (h) hereby subordinate any and all rights against Borrower and any of the security for the payment of this Note, whether by subrogation, agreement or otherwise, until this Note is paid in full. A determination that any provision of this Note is unenforceable or invalid shall not affect the enforceability or validity of any other provision and the determination that the application of any provision of this Note to any person or circumstance is illegal or unenforceable shall not affect the enforceability or validity of such provision as it may apply to other persons or circumstances. This Note may not be amended except in a writing specifically intended for such purpose and executed by the party against whom enforcement of the amendment is sought. Captions and headings in this Note are for convenience only and shall be disregarded in construing it. The words "<u>include</u>" and "<u>including</u>" shall be interpreted as if followed by the words "<u>without limitation</u>." THIS NOTE, AND ITS VALIDITY, ENFORCEMENT AND INTERPRETATION, SHALL BE GOVERNED BY NEVADA LAW (WITHOUT REGARD TO ANY CONFLICT OF LAWS PRINCIPLES) AND APPLICABLE UNITED STATES FEDERAL LAW.

6. <u>Notices</u>. Any notice, request, or demand to or upon Borrower or Lender shall be deemed to have been properly given or made when delivered in accordance with the Loan Agreement.

THE WRITTEN LOAN DOCUMENTS REPRESENT THE FINAL AGREEMENT BETWEEN AND AMONG THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO ORAL AGREEMENTS BETWEEN THE PARTIES.

*(Reminder of page left intentionally blank – Signatures follow on next page)*

H3131.0021 BN 1545339v3                                                          3

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the date first above written.

**BORROWER:**

**ESSEX REAL ESTATE PARTNERS, LLC,**
a Nevada limited liability company

By: Las Vegas Development Associates, LLC,
a Nevada limited liability company
Its: Manager

By:

Name: George F. Holman
Its: Managing Member

S-1
Deed of Trust Note -
Integrated Financial Associates, Inc.

# EXHIBIT "2"

# EXHIBIT "2"

Electronically Filed
4/5/2018 3:04 PM
Steven D. Grierson
CLERK OF THE COURT

1  **COMPB**
CLARK HILL, PLLC
2  CANDACE C. CARLYON, ESQ.
Nevada Bar No. 2666
3  3800 Howard Hughes Parkway, Suite 500
Las Vegas, NV 89169
4  Telephone No. (702) 862-8300
Facsimile No.  (702) 862-8400
5  Email: ccarlyon@clarkhill.com
*Counsel for Integrated Financial Associates, Inc.*
6

**EIGHTH JUDICIAL DISTRICT COURT**
7  **CLARK COUNTY, NV**

8  INTEGRATED FINANCIAL          Case #:       A-18-772359-B
ASSOCIATES, INC.,
9                                            Department 27
Plaintiff.          **COMPLAINT**
10  vs.

11

12  NEXBANK, SSB, DOES 1-X; ROES XI-XX
Defendants.

13

14

15

16

17      Debtor, Integrated Financial Associates, Inc. ("IFA"), by and through its undersigned

18  counsel, hereby complains and alleges against Defendants as follows:

I.
19  **PARTIES, JURISDICTION AND VENUE**

20  **A. The Parties.**

21      1.      Plaintiff, Integrated Financial Associates, Inc. ("IFA") is a Nevada

22  Corporation.

23      2.      Defendant, NexBank, SSB ("NexBank" or "Agent"), is a Texas Chartered

24  State Savings Bank, and the Agent for IFA as well as participating lenders Westchester CLO,

25  Ltd., Gleneagles CLO, Ltd., Stratford CLO, Ltd., Greenbriar CLO, Ltd., Eastland CLO, Ltd.,

1

Brentwood CLO, Ltd., Jasper CLO, Ltd., Longhorn Credit Funding LLC, Grayson CLO, Ltd., and Red River CLO, Ltd. (collectively, the "Highland Lenders") pursuant to the term loan agreement between and among certain parties, including IFA, NexBank, Highland Financial Corp. ("HC"); and Essex Real Estate Partners, LLC ("Essex"), dated November 29, 2007 (the "Loan Agreement").

3. The Loan Agreement is governed by Nevada law, and the parties to the Loan Agreement, including NexBank, have agreed that any proceeding arising in connection with the Loan Agreement will be litigated in Clark County, Nevada.

4. Does I-X are individuals who, upon information and belief, participated or assisted Defendant in the actions complained of herein; and/or caused or contributed to Plaintiff's damages as alleged herein.

5. Roes XI-XX are corporate entities which, upon information and belief, participated or assisted Defendant in the actions complained of herein; and/or caused or contributed to Plaintiff's damages as alleged herein.

## II.

## COMMON FACTS

### A. IFA's Operation as a Licensed Mortgage Broker

6. IFA is a licensed mortgage broker whose business has, throughout its history, included the origination, brokering, and servicing of loans secured by real property.

7. The average loan brokered by IFA ranged between $500,000 - $10,000,000,

8. IFA would identify lending opportunities, with funding to come primarily from investors who would purchase undivided fractional interests in the loan.

9. Each investor was assigned a beneficial interest in the loan they desired to invest in, and that assignment was recorded with the county recorder's office in the county where the property was located.

2

1       10.    In many cases IFA was also an investor and held a fractional interest in the

2 loan along with other investors.

3       11.    IFA also serviced the loans it originated, and typically received an annual loan

4 servicing fee equal to 0.5% of the loan amount.

5     **B.**     **IFA is Approached to Assist With Funding the Essex Loan**

6       12.    IFA was approached by George Holman ("Holman") in July 2007 about a land

7 deal he was structuring with KB Home Nevada, Inc. ("KB Home") to acquire 100+ acres in

8 the Inspirada Town Center project located in Henderson, NV.

9       13.    IFA reviewed the proposal but determined that IFA was not in a position to

10 fund such a large loan.

11       14.    Holman went back to KB Home and reduced the acquisition to 83.8 acres for

12 $62 million. The purchase agreement provided that KB Home would receive $55 million at

13 the close of escrow and accept a subordinated note for $7 million.

14       15.    IFA was still not able to raise sufficient investor funds to finance the 83.8 acre

15 acquisition.

16     **C.**     **Highland Capital Is Approached to Provide Additional Investors for the**

17       **Essex Loan; NexBank and Highland are Aware That IFA is Providing Investor**

18       **Funding**

19       16.    Holman met with Highland Capital Management, L.P. ("Highland Capital"), a

20 multi-billion dollar, Dallas based, hedge fund that was, at the time, very aggressively lending

21 in the Las Vegas area.

22       17.    Highland Capital was co-founded by James Dondero and Mark Okada.

23       18.    The terms of the loan provided for $55 million to be paid to KB Home and an

24 additional $11 million be held to provide for an interest reserve, closing costs and origination

25

1   fees for a total of $66 million. Highland Capital agreed to fund 65% of the transaction in the

2   sum of $42.5 Million, so long as IFA funded the remaining 35% in the sum of $23.1M.

3        19.    Upon information and belief, the funding provided by Highland Capital was

4   provided by investors in various funds which are affiliates of, and managed by, Highland

5   Capital (the "Highland Funds").

6        20.    The Highland Funds are identified as Brentwood CLO, Ltd.; Eastland CLO,

7   Ltd.; Gleneagles CLO, Ltd.; Grayson CLO, Ltd.; Greenbriar CLO, Ltd.; Jasper CLO, Ltd.;

8   Longhorn Credit Funding, LLC; Red River CLO, Ltd.; Stratford CLO, Ltd.; and Westchester

9   CLO, Ltd.

10       21.    Highland Capital and Highland Financial were advised and aware, from the

11  very beginning of their discussions with IFA, that IFA was a Nevada licensed mortgage

12  broker under NRS 645B and had to comply with Nevada law relative to this loan.

13       **D. Highland Requires that the Participation Agent be NexBank**

14       22.    Highland Capital **required** that NexBank be used as the Administrative Agent

15  for the Essex Loan.

16       23.    James Dondero, in addition to being a principal in and President of Highland

17  Capital, is the Chairman of the Board of NexBank, and Mark Okada, a principal in Highland

18  Capital, sits on the Board of Directors of NexBank.

19       24.    Scott Ellington is the Secretary and General Counsel of Highland Capital.

20       25.    Plaintiff is informed and believes, and thereon alleges, that Highland Capital

21  owns a substantial interest in NexBank.

22       26.    Plaintiff is informed and believes, and thereon alleges, that Highland Capital

23  exerts control over NexBank.

24       27.    IFA provided a form participation agreement in connection with the Essex

25  Loan. Highland Capital and NexBank refused to utilize the form of agreement proposed by

4

1    IFA. Instead, they provided their own form of agreement, which was wholly drafted by

2    NexBank and/or Highland Capital.

3    **E. IFA and Highland Provide Investor Funding for the Essex Loan**

4        28.    Holman formed Essex to acquire 83.39 acres of real property (the "Essex

5    Property" or the "Collateral") in the "Town Center" portion of the Inspirada development in

6    Henderson, NV from KB Home.

7        29.    In or around November of 2007, IFA and the Highland Lenders and/or other

8    affiliates of Highland Capital collectively loaned Essex approximately $66 million (the

9    "Essex Loan") to finance the purchase of the Essex Property, taking a deed of trust on the

10    Essex Property (the "Deed of Trust").

11        30.    The Highland Lenders loaned $42.5 million and the Foothill Group, Inc.,

12    another Highland affiliate, received a note for that amount (the "Highland Note"). IFA and its

13    investors loaned $23.1 million and received a separate Note for that amount (the "IFA Note").

14        31.    Plaintiff is informed and believes, and thereon alleges, that the Foothill Group,

15    Inc. assigned its interest in the Highland Note to Highland Crusader Holding Corporation and

16    Highland Credit Opportunities Holding Corporation on or about April 14, 2008.

17        32.    The Highland Note and the IFA Note are both secured by the Deed of Trust.

18        33.    Of the $23.1 million representing the consideration for the IFA Note,

19    approximately $5.8 million was funded by IFA with its own money.

20        34.    Approximately $14.3 million of the funds comprising the IFA Note came from

21    monies which had been provided by investors specifically for the purpose of funding the

22    Essex Loan. Those funds were invested in exchange for assignments of undivided beneficial

23    interests in a portion of the IFA Note.

24        35.    Vestin Realty Mortgage Inc., II ("Vestin"), as an additional investor in IFA's

25    portion of the loan, separately funded $3 million directly into the loan escrow.

36. As per IFA's business model, the assignments of the undivided interests in the IFA Note (the "Assignments") included assignments of an undivided interest in IFA's beneficial interest under the Deed of Trust securing the IFA Note.

**F. As Required by Law, IFA Recorded the Investor Assignments**

37. NRS 645B.310(3) requires that, in connection with an assignment of an interest in a loan by a licensed Mortgage Broker, the Mortgage Broker must record the assignment in the office of the county recorder of the county in which the real property is located.

38. Thus, pursuant to Nevada law, IFA was required to record the Assignments of the percentage beneficial interests in the IFA Note secured by the Deed of Trust.

39. IFA recorded the Assignments with the Clark County Recorder.

**G. KB Home Undermines the Value of the Collateral**

40. The value of the Essex Property was derived in part from an existing obligation of KB Home and others to construct major infrastructure improvements on the Town Center project pursuant to an approved schedule and budget.

41. However, within three months following the purchase by Essex of the Essex Property, KB Home purported to enter into a contract, or contract revision, to relieve itself of its obligation to build the infrastructure, decimating the value of the Essex Property.

**H.    Essex, NexBank, Highland, and IFA Sue KB Home**

42. On June 30, 2008, Essex, *et. al,* commenced a lawsuit against KB Home, as Case #08A566442 in the Eighth Judicial District Court, Clark County, Nevada (along with the additional claims discussed in this section, the "Essex Litigation").

43. On November 4, 2008, Integrated Financial Associates, Inc. commenced a separate lawsuit against KB Home, as Case #08A574976 in the Eighth Judicial District Court, Clark County, Nevada (the "Court").

44.    On or about July 7, 2009, the Court issued an order consolidating Case #08A566442 with Case #08A574976.

45.    IFA is informed and believes, and thereon alleges, that Essex assigned the beneficial interest in its claims against KB Home to IFA and the Highland Lenders.

46.    On or about July 30, 2010, the Court granted a motion to intervene in the consolidated Essex Litigation filed by NexBank, SSB; Westchester CLO, Ltd.; Gleneagles CLO, Ltd.; Stratford CLO, Ltd.; Greenbriar CLO, Ltd.; Eastland CLO, Ltd.; Brentwood CLO, Ltd.; Jasper CLO, Ltd.; Longhorn Credit Funding LLC; Grayson CLO, Ltd.; and Red River CLO, Ltd. (collectively, the "Highland Plaintiffs").

47.    The law firms of Lackey Hershman and Hutchison & Steffan (collectively, the "Law Firms") represented IFA, the Highland Plaintiffs, and NexBank with regard to the Essex Litigation, pursuant to contingency fee agreements with respect to any actual recovery from KB Home in the Essex Litigation.

**I.    IFA Files Bankruptcy; NexBank Accepts the Benefit of the Automatic Stay to Stop a Tax Sale of the Essex Property; NexBank is Again Informed of the Assignments During the Bankruptcy.**

48.    Although the funds provided by Vestin to fund its percentage interest in the IFA Note were intended to be short term bridge funds, IFA was unable to raise the capital to repay Vestin in a timely manner, and Vestin brought suit against IFA, resulting in a substantial judgment. This led IFA to file for chapter 11 bankruptcy protection in 2011 (the "Bankruptcy").

49.    Throughout IFA's Bankruptcy, IFA disclosed to Highland Capital and NexBank that it had issued and recorded Assignments to the investors in the Essex Loan.

50.     In addition to disclosing the Assignments in its Disclosure Statement, IFA had numerous communications about this issue with the principals of NexBank and Highland Capital during the Bankruptcy.

51.     One of the issues which arose during the Bankruptcy was Clark County's purported commencement of foreclosure proceedings for delinquent taxes on the Real Property securing the Essex Loan. IFA argued, to the benefit of NexBank and the Highland Lenders, that such foreclosure was a violation of the automatic stay, since IFA retained an approximate $5.8 million interest in the Deed of Trust.

52.     On March 16, 2012, IFA's counsel wrote to Clark County's attorney specifying that "IFA assigned beneficial interests totaling $17,289,622.57".

53.     A true and correct copy of the letter referenced in the preceding paragraph is attached hereto as Exhibit 1.

54.     A copy of Exhibit 1 was also sent to Jeff Scott of NexBank and Jim Pfertner of Highland Capital.

55.     Both NexBank and Highland Capital also received a copy of IFA's Motion for Order Enforcing Automatic Stay and for Sanctions filed in its Bankruptcy, which reflected that IFA retained a $5.8 million interest in the Essex Loan.

56.     IFA coordinated its efforts to reverse the tax sale not only with NexBank and Highland, but with Kennedy Barnes of the Lackey Hershman firm, which represented NexBank and the Highland Plaintiffs (and IFA) in the Essex Litigation. In May 2012, as a direct result of IFA's involvement, the Clark County Treasurer reversed the foreclosure proceedings and deeded title to the Real Property back to Essex.

57.     In short, NexBank had actual knowledge about the assignments, and accepted the benefits of IFA's Bankruptcy, all while never raising any concerns regarding whether it received "prior" notice of the Assignments or whether the Assignments were proper.

8

**J. The Firms Representing IFA, NexBank and the Highland Plaintiffs Against KB Home Are Employed by the Bankruptcy Court, With Expenses to be Paid By the Other Plaintiffs**

58.    The employment of the Law Firms in IFA's Bankruptcy was approved by Bankruptcy Court orders which included: "the express condition that all expenses incurred with the employment of [Lackey Hershman, LLP and Hutchison & Steffen, LLC] be paid by other plaintiffs and/or the promissory note beneficiaries and not by the Debtor in this action."

**K.    NexBank Falsely Asserts that IFA is Required to Pay Costs, and Grossly Inflates the Numbers, as a Pretext to Disenfranchising IFA**

59.    Notwithstanding the agreement, which was incorporated into the Bankruptcy Court orders that NexBank and the Highland Plaintiffs would pay expenses associated with the Essex Litigation, on July 1, 2014, Brian Wick, Counsel for NexBank, demanded payment from IFA in violation of the Bankruptcy Court's orders.

60.    A true and correct copy of Mr. Wick's July 1, 2014 Correspondence (the "Demand Letter") is attached hereto as Exhibit 2.

61.    The Demand Letter states, in part, "NexBank hereby makes demand that IFA immediately pay to NexBank for IFA's share of all legal fees and costs incurred in the Litigation."

62.    The Demand Letter, while providing no legal invoices, backup, or proof of payments advanced, asserted that legal "fees" (notwithstanding that counsel is on a contingency) and costs had been incurred in the amount of $1,164,291.40.

63.    In the Demand Letter Mr. Wick "demanded" that IFA pay sums to NexBank on or before July 1, 2014 (the same day that the letter was written).

64.    The Demand Letter was sent on behalf of NexBank

65.    The Demand Letter was sent by NexBank's authorized Agent.

9

66.     IFA made at least six separate requests over 2 ½ years, commencing in July of 2014, for copies of invoices and other documents demonstrating amounts that NexBank asserted were due from IFA.

67.     No report or detail of any purported fees or expenses was provided to IFA until a partial invoice (the "Invoice") was attached to correspondence from LH sent on February 8, 2017.

68.     A true and correct copy of the February 8, 2017 correspondence, with the enclosed Invoice, is attached hereto as Exhibit 3.

69.     When the Invoice was finally provided on February 8, 2017, the total expenses were $835,526.22 (not over $1.164 million as had been represented by NexBank).

70.     The purported expenses listed in the Invoice include routine charges of what appear to be excessive/luxury travel expenses, including over $100,000 in what appears to be first class air fare, with such air fare charges ranging from over two thousand dollars to over $11,000 for a single trip.

71.     The Invoice reflected numerous payments to third parties with no explanation of the basis, including (but not limited to) payments to HS totaling approximately $42,108.10; payments to Duff & Phelps totaling approximately $185,952.55 (including two identical payments of $13,430 on 1/31/14 and 3/31/14); payments to George Smith Partners, Inc. of approximately $70,177.54; payment to Bell Nunnally & Martin LLP of $6,038.89; and a payment to Keith Beckman of $6,000 (labeled only "reimbursement").

72.     With the exception of HS, none of the payees listed in the preceding paragraph were employed or authorized by the Bankruptcy Court to perform services on behalf of, or at the expense of, IFA.

73.     Although HS was employed by order of the Bankruptcy Court, IFA still has never received any detail explaining the basis for the charges or expenses purportedly

10

1  incurred by, or any payments allegedly made to, that firm, which is required under

2  Bankruptcy Law.

3      74.    IFA is informed and believes, and thereon alleges, that NexBank is in

4  possession of the information described in this Section but, in violation of the Loan

5  Agreement and of its duties to IFA as Agent, NexBank has refused to provide it to IFA.

6      **L.    NexBank Excludes IFA From Efforts to Realize the Full Value of the**

7      **Collateral, and Refuses to Inform IFA of its Activities Relative to the Essex**

8      **Litigation and the Essex Loan.**

9      75.    On May 30, 2014, Agent, via Mr. Wick, sent correspondence to IFA

10  demanding that it "cease and desist" from engaging in any settlement communications with

11  respect to the Essex Litigation.

12      76.    IFA responded on June 27, 2014, advising Agent that IFA had not been

13  involved in any such communications other than those involving representatives of Highland

14  Capital, LH and HS.  IFA also pointed out that Agent was to act with the consent of the

15  lenders, including IFA.

16      77.    Instead of recognizing its obligations to IFA, Agent responded by purporting to

17  "instruct IFA to cease and desist from further attempts to direct, control or otherwise

18  influence matters relating to the Loan Agreement, the underlying property, and the KB Home

19  litigation", threatening to, *inter alia*, seek injunctive relief and recovery of attorneys' fees"

20  against IFA.

21      78.    Agent's actions toward IFA were inappropriately hostile, and in complete

22  derogation of its duties as IFA's agent.

23      79.    Agent's improper conduct, in violation of both the express and implied terms

24  of the Loan Agreement and in violation of the Bankruptcy Court orders, required IFA to

25  engage counsel, who wrote to Agent, via its counsel, on July 9, 2014.

80. By that correspondence IFA requested, *inter alia*, that Agent confirm that it was not engaging in settlement discussions without consultation of IFA, reminding Agent of the provisions of the Loan Agreement providing for IFA to have the right to investigate and consult with respect to the Essex Loan, and suggesting that Agent adopt a cooperative relationship with IFA.

81. A true and correct copy of IFA's July 9, 2014 correspondence to NexBank is attached hereto as Exhibit 4.

82. NexBank refused to respond to or comply with IFA's July 9, 2014 requests.

83. On July 30, 2014, IFA, via its counsel, reminded Agent in writing that IFA was entitled to participate in any settlement discussions, and reminded Agent that IFA had not received the accounting previously requested.

84. A true and correct copy of IFA's July 30, 2014 correspondence to NexBank is attached hereto as Exhibit 5.

85. Agent refused to respond to or comply with IFA's July 30, 2014 requests.

86. On September 3, 2014, without consulting with IFA, and in violation of the provisions of the Loan Agreement setting forth the process of foreclosure and subsequent marketing of the Collateral, NexBank offered to sell the Collateral (which it did not own) to KB Home for the amount of $21,750,000, and also offered to "finance" the purchase price for one year (by extending the time for payment to IFA, also in contravention of the terms of the Loan Agreement).

87. Via correspondence dated September 9, 2014, IFA again requested that NexBank consult with IFA prior to taking any action which could impair or materially affect IFA's interests in connection with the Essex Loan or the Essex Litigation, and provide copies of all documents and communications (past or future) with respect thereto.

1    88.    A true and correct copy of IFA's September 9, 2014 correspondence is
2  attached hereto as Exhibit 6.

3    89.    NexBank refused to respond to or comply with IFA's September 9, 2014
4  requests.

5    90.    On March 4, 2016, IFA, via counsel, requested that Mr. Wick withdraw his
6  "Cease and Desist" demand of May 30, 2014, in order to permit IFA to discuss a possible sale
7  of the Essex Property with local builders and developers in order to obtain a greater return
8  than would be obtainable via the proposed settlement with KB Home.

9    91.    A true and correct copy of IFA's March 4, 2016 correspondence is attached
10  hereto as Exhibit 7.

11    92.    Agent refused to respond to or comply with IFA's March 4, 2016 request.

12    **M. NexBank "Settles" With KB Home, in a Manner Which Restricts the Ability**
13    **of IFA and its Investors to Realize the Full Value of the Collateral.**

14    93.    On or about November 24, 2015, NexBank, via its EVP and General Counsel,
15  Dierk Hohman, Esq., sent IFA a "Notice Concerning Settlement with KB Home Nevada, Inc.
16  and Application of Payments Received from Settlement Agreement" (the "11/15
17  Correspondence").

18    94.    Despite knowing that IFA was represented by counsel, attorney Hohman sent
19  the 11/15 Correspondence directly to IFA and did not copy IFA's counsel.

20    95.    The 11/15 Correspondence informed IFA that its Agent had negotiated a
21  "settlement in principal" with KB Home, and attached a document labeled "Estimated
22  settlement payouts (in millions)" which asserted that Agent would make a payment to LH and
23  HS of $4.2 million in connection with the "settlement", would establish a 2.5 million "legal
24  reserve", and would pay over to the "Highland Lenders" $4.2 million, "Inclusive of estimated
25  $204,000 advanced on behalf of IFA plus interest...."

13

96. The proposed "Settlement" did not call for any material payment from KB Home as a result of the Essex Litigation; instead, the "Settlement" called for NexBank to agree to foreclose on the Collateral and then sell it to KB Home for a price that IFA believes is significantly below its current value.

97. IFA objected to the proposal to pay attorneys' fees which were not based upon recovery on the litigation claims, but instead on the proposed purchase price of the Collateral, and further objected to the proposal to pre-negotiate a sale price without following the procedures in the Loan Agreement which governed the method of foreclosure and sale of the Collateral.

98. In addition, the proposed "Settlement" constituted a transaction that is governed by NRS 645B, which includes the requirements of Section 645B.340 that:

2. A person designated to act pursuant to subsection 1 on behalf of the holders of the beneficial interest in a loan or the ownership interest in real property shall, not later than 30 days before the date on which the holders will determine whether or not to act pursuant to subsection 1, send a written notice of the action to each holder of a beneficial interest or ownership interest at the holder's last known address, by a delivery service that provides proof of delivery or evidence that the notice was sent. The written notice must state:

(a) The actions that will be taken on behalf of the holders who consent to an action pursuant to this section, if the holders of the beneficial interest in a loan whose interests represent 51 percent or more of the outstanding principal balance of the loan or the holders of 51 percent or more of the ownership interest in the real property act pursuant to subsection 1;

(b) The actions that will be taken on behalf of the holders who do not consent to an action pursuant to this section, if the holders of the beneficial interest in a loan whose interests represent 51 percent or more of the outstanding principal balance of the loan or the holders of 51 percent or more of the ownership interest in the real property act pursuant to subsection 1; and

(c) The amount of the costs or, if an amount is unknown, an estimate of the amount of the costs that will be allocated to, or due from, the holder and deducted from any proceeds owed to the holder.

3. If real property is sold, transferred, encumbered or leased pursuant to paragraph (c) of subsection 1, any beneficial interest in the loan or ownership interest in the real property of a holder who does not consent to the sale, transfer, encumbrance or lease, including, without limitation, any interest of a tenant in common who does not consent to the sale, transfer, encumbrance or lease, must be sold, transferred, encumbered or leased by a reference to this section and by the signatures on the necessary documents of the holders

14

1       consenting to the sale, transfer, encumbrance or lease of the real property. The
holders consenting to the sale, transfer, encumbrance or lease of the real
2       property shall designate a representative to sign any necessary documents on
behalf of the holders who do not consent to the sale, transfer, encumbrance or
3       lease and, if the representative maintains written evidence of the consent of the
number of holders described in subsection 1, the representative is not liable for
4       any action taken pursuant to this subsection.

5       99.    IFA requested that NexBank provide an explanation of the proposed fee

6 payments and reserves, and an estimate of the costs which would be allocated to, or due from,

7 IFA and its Investors, in order for IFA to provide the notice required by NRS 645B.340.

8       100.    NexBank repeatedly refused to provide the information requested by IFA,

9 despite the requirement of Section 6.6(b) of the Loan Agreement that it do so.

10       101.    On December 14, 2015, LH wrote to IFA encouraging IFA to accept the

11 "settlement offer", voicing concern with regard to the "significant [] litigation risk of losing

12 on liability...."

13       102.    IFA responded to LH on January 25, 2016, noting, *inter alia*, that other

14 purchase offers for the Essex Property were being received from qualified and bona fide

15 buyers, and that a higher price could be obtained for the Essex Property.

16       103.    On April 6, 2016, IFA again requested that Agent provide an explanation of

17 the purported legal fees and legal reserve, and again requested that Mr. Wick withdraw his

18 "Cease and Desist" demand of May 30, 2014.

19       104.    Agent refused to respond to or comply with IFA's April 6, 2016 requests.

20       105.    On July 1, 2016, IFA, via counsel, wrote to Agent and LH expressing its

21 significant concerns with regard to any proposed KB Home settlement. IFA requested that

22 there be an adequate marketing of the Essex Property to third parties; that Agent and LH

23 respond to IFA's request to explain the purported payments to be made to LH and the

24 purported legal reserve; and that IFA be included in all settlement negotiations, including

25 meetings and emails.

15

106. Agent and LH refused to respond to or comply with IFA's July 1, 2016 requests.

107. In its December 3, 2016 correspondence to Michael Warner, counsel for NexBank, IFA advised NexBank that, in order to send the Investor Notice and request for consent, IFA required information which had been repeatedly requested, "including a detailed estimate of the proceeds of the proposed settlement including project[ed] distribution to the IFA Investors. The information regarding past and future legal fees is an essential component of such calculations."

108. Agent refused to respond to or comply with IFA's December 3, 2016 request.

109. IFA's request for information regarding fees and costs incurred and anticipated to be incurred, and estimated distributions based on the proposed settlement was repeated, *inter alia*, on March 7, 2017, in correspondence to Mr. Warner and other counsel, advising again that "IFA requires a breakdown of the economic impact of the settlement, including the net distribution to IFA (and its assignees), in order to request approval from the investors as required by Nevada law."

110. Agent refused to respond to or comply with IFA's March 7, 2017 requests and, upon information and belief, instructed LH and HS not to comply with IFA's March 7, 2017 requests.

111. On April 3, 2017, IFA wrote to the Agent again expressing concerns with the structure of the proposed settlement, and requesting that the Agent "facilitate a meaningful discussion involving the lenders and the attorneys in order to attempt to resolve the fee issue, so that we can move forward cooperatively..."

112. Agent refused to respond to or comply with IFA's April 3, 2017 request.

113. On January 23, 2017, IFA, via counsel, wrote to Agent, LH and HS, requesting that each of them comply with their duties to IFA "by working cooperatively with IFA toward a mutually agreeable resolution to the KB Home litigation matter."

114. Agent, LH and HS refused to respond to or comply with IFA's January 23, 2017 request.

115. Eventually, the reason became clear-NexBank and the attorneys, in violation of the express directive of IFA, dismissed the KB Home Litigation, and entered into an agreement to sell the Property (following foreclosure) to KB Home for a specified price (the "KB Agreement").

116. The KB Agreement violates the Loan Agreement in numerous respects, including (i) operating as a prohibited release of the liability of the borrower and guarantor; (ii) violation of the requirement that, on default, the Agent foreclose in its own name or in the name of an affiliate; (iii) that, following foreclosure, a property manager be retained; (iv) that following foreclosure, after consultation with the property manager, Agent prepare a written plan for operation, management, maintenance, repair, sale and disposition of the property; (v) the requirement that such plan be provided to each Lender prior to voting for approval; (vi) the agreement to finance the purchase price; and (vii) the agreement to indemnify KB Home for certain matters.

**III.**

**FIRST CAUSE OF ACTION**

**FOR DECLARATORY RELIEF**

117. IFA hereby incorporates each and every allegation made above as though fully set forth in this paragraph.

118. Under NRS 30.010 *et. seq.*, the Uniform Declaratory Judgment Act, any person interested under a written contract or other writings constituting a contract, or whose

rights, status or other legal relations are affected by a contract, may have determined any question of construction or validity arising under the contract and obtain a declaration of rights, status or other legal relations thereunder.

119. A justiciable controversy exists between IFA and NexBank regarding their respective rights pursuant to the Loan Agreement.

120. Plaintiff seeks, and is entitled to, a judicial determination that IFA validly assigned undivided percentage interests in its interest in the IFA Note.

121. Plaintiff seeks, and is entitled to, a judicial determination that NexBank is equitably estopped from denying the validity of the assignments made by IFA with regard to IFA's interest in the IFA Note.

122. Plaintiff seeks, and is entitled to, a judicial determination that NexBank cannot require IFA or its assignees to transfer their interests in the IFA note to a Nevada Business Trust as contemplated by the Settlement.

123. Plaintiff seeks, and is entitled to, a judicial determination that IFA is not a "Defaulting Lender" under the Loan Agreement.

124. Plaintiff seeks, and is entitled to, a judicial determination that there are no Defaulting Lender Payment Amounts owed by IFA under the Loan Agreement or, alternatively, for a determination of such amounts.

125. Plaintiff seeks, and is entitled to, a judicial determination that IFA is entitled to receive from NexBank all information provided to Agent pursuant to the Loan Agreement.

126. Plaintiff seeks, and is entitled to, a judicial determination that NexBank's actions as alleged herein constituted willful misconduct or gross negligence, such that NexBank is not protected by any disclaimer of duty or indemnity provision of the Loan Agreement.

## IV.

## SECOND CAUSE OF ACTION

### FOR BREACH OF DUTY BY NEXBANK

127. IFA hereby incorporates each and every allegation made above as though fully set forth in this paragraph.

128. NexBank, as the administrative agent, had a fiduciary relationship with IFA as NexBank was bound to act for the benefit of IFA and the other Lenders.

129. NexBank, as the administrative agent, also had contractual duties to IFA, including the duty not to take actions inconsistent with the terms or purposes of the Loan Agreement.

130. These duties included the duty to maximize the return to IFA and its investors; to provide information to IFA; to include IFA in matters relating to the subject matter of the Loan Agreement; to be honest in its communications with IFA; to treat IFA on par with the other Lenders, and not to prefer Lenders whose interests were managed by Highland Capital or its affiliates over IFA and its investors.

131. Rather than complying with its duties to IFA, NexBank repeatedly acted against IFA's express wishes, and in blatant derogation of IFA's interests.

132. As a lender under the Loan Agreement, IFA was entitled to be kept informed by NexBank, the Agent of IFA, with respect to the Essex Loan, including the Essex Litigation.

133. Agent refused to provide IFA with current information regarding the Essex Loan, the purported fees and costs incurred and/or paid, and its negotiations on behalf of the Lenders, in derogation of its duties and obligations to IFA.

134. Agent acted throughout the course of the Essex Litigation to exclude IFA from discussions, refused IFA the opportunity to participate in settlement negotiations, denied

1   IFA's right to input with regard to the Essex Litigation, the proposed settlement, and the

2   realization upon the Collateral of the Essex Loan, entered into a settlement which violated the

3   terms of the Loan Agreement, and agreed to payment of sums to the obligors under the Essex

4   Loan prior to payment in full of the IFA Note, all in derogation of Agents duties and

5   obligations to IFA.

6        135.   IFA is informed and believes, and thereon alleges, that Agent acted exclusively

7   in furtherance of the interests of NexBank and its affiliates, the Highland Lenders, to the

8   exclusion of, and detriment to, the rights and interests of IFA, and in derogation of NexBank's

9   duties and obligations to IFA.

10       136.   IFA is informed and believes, and thereon alleges, that in undermining the

11   rights of IFA in favor of the Highland Lenders, Agent acted to further its own economic

12   interests, including its interest in maintaining and expanding upon its economic relationship

13   with Highland and its affiliates, in derogation of its duties and obligations to IFA.

14       137.   IFA is informed and believes, and thereon alleges, that NexBank did so in

15   order to benefit its affiliates and others with whom NexBank had preexisting (and, in many

16   cases, undisclosed) relationships, rather than to act in order to maximize return to IFA and the

17   investors in the Essex Loan.

18       138.   NexBank's actions as alleged herein, including, without limitation, NexBank's

19   refusing to comply with IFA's numerous requests, as well as in acting in contravention to

20   IFA's interests in order to further its own and its affiliates' interests to the detriment of IFA,

21   constituted willful and intentional misconduct.

22       139.   This is not the only instance of Mr. Dondero (NexBank's Chairman of the

23   Board and Highland Capital's co-founder and president) acting in violation of duties to

24   investors.   In a JAMS arbitration hearing held in Dallas County, Texas in September, 2017

25   (Arbitration No. 1310022713) (the "Arbitration"), a panel of three retired judges concluded

1   that Highland's founder, James Dondero, fired the firm's most productive portfolio manager,

2   Josh Terry, in June 2016 after Mr. Terry opposed a plan by Mr. Dondero to transfer funds

3   between Highland investment vehicles and to delay repaying money owed to Highland

4   investors. Mr. Terry believed the plan was a breach of his fiduciary duty to Highland clients

5   and an external lawyer hired by the firm sided with him against Mr. Dondero, according to the

6   panel. The Panel concluded that "Highland's termination of Terry's employment was not, in

7   fact, 'for cause.' Highland's stated 'for cause' termination of Terry's employment was, in

8   fact, pre-textual and for the purpose of denying Terry's benefits of employment payable at his

9   termination.."

10      140.    The Arbitration panel further reported that "The evidence establishes that

11  Highland's termination of Terry was, in fact, pre-textual, without cause and only because

12  Dondero wanted him gone." The arbitrators awarded Mr. Terry $7.9 million in damages and

13  interest.

14      141.    A Wall Street Journal article, dated December 1, 2017, reporting on the

15  Arbitration, also reported that "Highland also lost arbitration in 2016 against investors in one

16  of its hedge funds who alleged they had been cheated out of millions of dollars. The firm

17  subsequently reached an agreement with the investors."

18      142.    As a direct result of NexBank's failure to act in accordance with its fiduciary

19  and contractual duties to IFA, IFA has suffered damage including, but not limited to, the

20  difference in price between the actual value of the Collateral and the sale price to KB Home,

21  and excessive attorney's fees and costs and other damages in excess of $10,000.

22  . . .

23  . . .

24

25

21

**VI.**

**THIRD CAUSE OF ACTION**

**FOR BREACH OF CONTRACT BY NEXBANK**

143. IFA hereby incorporates each and every allegation made above as though fully set forth in this paragraph.

144. NexBank has repeatedly and materially breached its contractual obligations to IFA, including, without limitation:

    a. By refusing to provide information to IFA, despite IFA's numerous requests;

    b. By demanding payment from IFA of sums not owed by IFA;

    c. By utilizing a pretext in an effort to declare IFA a "Defaulting Lender" when IFA was in compliance with its duties under the Loan Agreement;

    d. By negotiating a collusive purchase arrangement with KB Home over IFA's objection;

    e. By agreeing on foreclosure procedures in contravention of the express provisions of the Loan Agreement.

    f. By dispensing with the agreed upon method of determining the value, management and marketing of the property following foreclosure.

    g. By permitting the distribution of funds to the obligors under the Loan Agreement prior to payment in full of amounts due to IFA.

    h. By exposing the Lenders to claims for contingency fees based upon the sale price of the Collateral.

    i. By agreeing to finance the purchase of the Collateral with the monies owed to IFA and its investors.

1            j.    By agreeing to indemnify KB Home for certain matters, creating an

2               additional liability against the proceeds of the Collateral.

3      145.    All conditions precedent to NexBank's obligations under the Loan Agreement

4 have been performed or have occurred.

5      146.    IFA has been damaged as a direct and proximate result of NexBank's actions

6      147.    IFA has been damaged in a sum in excess of $10,000

7      148.    In order to pursue its claims and as a direct and proximate result of the

8 Defendants' conduct outlined herein, IFA has incurred attorneys' fees as special damages in

9 the approximate sum in excess of $50,000 as of the date of this pleading and increasing up to

10 and through trial and appeal, if any.

11 **VI.**

12 **FOURTH CAUSE OF ACTION**

13 **FOR BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING AGAINST**

14 **NEXBANK**

15      149.    IFA hereby incorporates each and every allegation made above as though

16 fully set forth in this paragraph.

17      150.    Inherent in every contract is the duty of good faith and fair dealing, such that

18 the parties are prevented from contravening the intention and spirit of the contract.

19      151.    NexBank repeatedly acted in derogation of its duties to IFA.

20      152.    NexBank's failure to comply with its duties to IFA included, but is not

21 limited to:

22            a.    Refusal to provide IFA with copies of documents and communications.

23            b.    Refusal to include IFA in settlement discussions.

24            c.    Failure to provide IFA with timely accounting of purported advances.

25            d.    Misrepresentation of advances.

23

e. Making demand upon IFA for payment which was not owed by IFA.

f. Making demand upon IFA for payment without providing written notice.

g. Making demand upon IFA for payment without providing details of invoices or proof of advances.

h. Utilizing a pretext for purportedly declaring IFA a "Defaulting Lender".

i. Refusing to market the Essex Property for fair value.

j. Threatening IFA in order to prevent IFA from marketing of the Essex Property for fair value.

k. Bypassing the safeguards provided in the Loan Agreement for professional management of the property and development of a marketing plan with the advice of a disinterested professional.

l. Threatening to dilute IFA's recovery with improper deductions and reserves.

m. Agreeing to a collusive foreclosure bid and resale for less than the amount bid.

n. Permitting the distribution of funds to the obligors prior to payment in full of the Lenders.

o. Exposing the Lenders and the Collateral proceeds to claims for contingency fees based on the sale price of the Collateral.

p. Agreeing to finance the purchase of the Collateral with the monies owed to IFA and its investors.

q. Agreeing to indemnify KB Home for certain matters, creating an additional liability against the proceeds of the Collateral.

153.    As a result of NexBank's conduct in violation of the implied covenant of good faith and fair dealing, IFA has suffered damages in a sum in excess of $10,000.

24

154.   In order to pursue its claims and as a direct and proximate result of the Defendants' conduct outlined herein, IFA has incurred attorneys' fees as special damages in the approximate amount in excess of $50,000 as of the date of this pleading and increasing up to and through trial and appeal, if any.

## VII.

### FIFTH CAUSE OF ACTION

### FOR COLLUSIVE FORECLOSURE

155.   IFA hereby incorporates each and every allegation made above as though fully set forth in this paragraph.

156.   In entering into the Settlement, NexBank agreed to bid at the foreclosure sale up to an amount in excess of what KB Home would pay for the Essex Property, and then turn the property over to Essex for an amount less than the credit bid (the "Bid Agreement").

157.   The purpose of the Bid Agreement was to provide that the Essex Property would be sold to KB Home for a predetermined price, even if a free and fair foreclosure sale would result in a higher price than KB Home would pay.

158.   The result of the Bid Agreement is to chill any bidding at the sale, as well as to deprive IFA and the investors of the full value of the Essex Property via a fair and open foreclosure process, as required by Nevada Law.

159.   IFA has been materially damaged by the difference in the settlement value and the fair market value which damages are believed to be in excess of $10,000.

WHEREFORE, IFA prays for relief as follows:

1. That there be a determination that no money is due and owing from IFA to NexBank.

2. For recovery of damages against NexBank in an amount to be proven at trial.

3. For punitive and exemplary damages as permitted by law.

25

4. For an accounting of the assets and liabilities associated with the Essex Loan.

5. For determination of the reasonableness of any fees and costs claimed by Plaintiff with respect to the Essex Loan.

6. For equitable relief.

7. For recovery of attorney's fees and costs.

8. For costs of suit.

9. For any other relief which this Court deems fair and just.

Respectfully submitted this 5th day of April, 2018.

CLARK HILL, PLLC

CANDACE C. CARLYON, ESQ.
Nevada Bar No. 2666
3800 Howard Hughes Parkway, Suite 500
Las Vegas, NV 89169
Telephone No. (702) 862-8300
Facsimile No.  (702) 862-8400
Email: ccarlyon@clarkhill.com
*Counsel for Plaintiff, Integrated Financial Associates, Inc.*

# EXHIBIT "3"

# EXHIBIT "3"

STEPHEN R. HARRIS, ESQ.
Nevada Bar No. 001463
HARRIS LAW PRACTICE LLC
6151 Lakeside Drive, Suite 2100
Reno, NV 89511
Telephone: (775) 786-7600
Facsimile: (775) 786-7764
E-Mail: steve@harrislawreno.com
Attorney for Debtor/ Plaintiff

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF NEVADA

* * * * *

IN RE:

ESSEX REAL ESTATE PARTNERS, LLC,

Case No. 19-51486-btb
(Chapter 11)

Adv. No.

Debtor.

_____/

**COMPLAINT**

ESSEX REAL ESTATE PARTNERS, LLC,

Plaintiff,

v.

INTEGRATED FINANCIAL ASSOCIATES, INC., a Nevada corporation; and NEXBANK, SSB, a Texas chartered state savings bank,

Defendants.

_____/

Plaintiff ESSEX REAL ESTATE PARTNERS, LLC ("Plaintiff," "Debtor" or "Essex"), Debtor in the above-captioned Chapter 11 case, by and through its attorney STEPHEN R. HARRIS, ESQ. of HARRIS LAW PRACTICE LLC, hereby complains against Defendants

1   INTEGRATED FINANCIAL ASSOCIATES, INC. and NEXBANK, SSB, and their successors

2   and assigns, and states and alleges as follows:

### JURISDICTIONAL STATEMENT

4         1.       This Court has jurisdiction over this adversary proceeding and pendent jurisdiction

5   over related state law claims hereinafter set forth pursuant to 28 U.S.C. §§ 157(a) and (b), 28

6   U.S.C. § 1334, Federal Rule of Bankruptcy Procedure 7001 and Local Rule 1001(b)(1). The

7   Court also has jurisdiction to grant the relief requested herein pursuant to 11 U.S.C. §§ 323, 502

8   and 105.

9         2.       Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10         3.       This adversary proceeding arises under Title 11 of the United States Code (the

11   "Bankruptcy Code"), and arises in or is related to the above captioned Chapter 11 case filed in

12   the United States Bankruptcy Court for the District of Nevada, as Case No. BK-19-51486-btb.

13         4.       This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(B), (K) and (O).

14   However, if the Court finds one or all, or less than all causes of action to be non-core, then Plaintiff

15   does consent to entry of final order or judgment by the United States Bankruptcy Court, pursuant

16   to Fed. R. Bankr. P. 7008.

### PARTIES

18         5.       Essex Real Estate Partners, LLC is a Nevada limited liability company conducting

19   business in the state of Nevada at all relevant times herein. On December 27, 2019 (the "Petition

20   Date"), Essex filed its voluntary petition under Chapter 11 of the United States Bankruptcy Code

21   (the "Bankruptcy Case"), as related to the Chapter 7 bankruptcy case of George F. Holman, Sr.

22   ("Holman") pending in this Court as Case No. 13-52092-btb. No trustee has been appointed in

23   the Chapter 11 Bankruptcy Case and Essex remains a debtor-in-possession herein.

24         6.       Jeri Coppa-Knudson is the duly appointed Trustee for Holman's Chapter 7

25   bankrupt estate, and Holman's .67 of one percent (.67%) member's interest in Essex is property

26   of Holman's bankrupt estate pursuant to 11 U.S.C. §541. The other members in Essex are

27   identified in the List of Equity Holders filed as DE 1 in the Debtor's Chapter 11 case. Jeri Coppa-

28   Knudson is also the duly appointed Manager of Essex.

7.  Defendant NEXBANK, SSB, is a Texas chartered state savings bank ("NexBank"), doing business in the state of Nevada at times relevant to the claims detailed in this Complaint.

8.  Defendant INTEGRATED FINANCIAL ASSOCIATES, INC., is a Nevada corporation ("IFA"), doing business in the state of Nevada at times relevant to the claims detailed in this Complaint.

9.  The identities of other potential Defendants are unknown at this time, but will be named specifically at a later date as their identities become known to Plaintiff.

## GENERAL ALLEGATIONS

10.  Plaintiff realleges and incorporates herein by this reference, the allegations of paragraphs 1 through 9, inclusive, as though fully set forth herein.

11.  As of November 29, 2007, and through the present, Essex was and is the owner of that certain commercial real property located in Henderson, Clark County, Nevada identified as APNs: 191-15-811-001; 191-15-711-022; 191-23-211-003; 191-23-211-004; and 191-14-311-002 (collectively the "Property").

12.  On November 29, 2007, Essex borrowed the total principal sum of Sixty-Six Million Dollars ($66,000,000) under a Term Loan Agreement dated November 29, 2007, and a Deed of Trust Note in the amount of $42,900,000 payable to The Foothill Group, Inc. (the "Foothill Note") and a Deed of Trust Note in the principal amount of $23,100,000 payable to IFA (the "IFA Note") (the Foothill Note and IFA Note are collectively referred to as the "Notes"). Copies of both Notes, which collectively total $66,000,000, are attached hereto as **Exhibit A**. The Term Loan Agreement is attached hereto as **Exhibit B.**

13.  At all relevant times, NexBank was and is the duly appointed collateral agent and administrative agent for the lenders under the Notes and the Term Loan Agreement.

14.  Concurrent with execution of the Notes and the Term Loan Agreement, Essex executed a Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing ("Deed of Trust"), for the purpose of securing the obligations under the Notes and Term Loan Agreement. The Deed of Trust was recorded on December 4, 2007, in the Official Records

Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, Nevada 89511
(775) 786 7600

3

1   of the Clark County Recorder as Inst.# 20071204-0001853, thus encumbering Essex's Property

2   at the time of recordation. A copy of the Deed of Trust is attached hereto as **Exhibit C**.

3         15.     On November 29, 2007, Holman executed a Guaranty Agreement pursuant to

4   which Holman guaranteed payment of all amounts due under the Notes and the Term Loan

5   Agreement.

6         16.     Essex is informed and believes, and on that basis alleges, that NexBank, as

7   collateral agent and administrative agent for the lenders, is the beneficiary of the Term Loan

8   Agreement, Notes and other related documents relevant to the $66 million loan (the "Loan").

9         17.     The purpose of the Loan was to finance the purchase and development of the

10   Property based on a Development Agreement dated November 29, 2007, between Essex and KB

11   Home Nevada, Inc.

12         18.     The entire principal and accrued interest owing under the Notes and Term Loan

13   Agreement was due and payable by Essex on the initial Maturity Date of December 1, 2008.

14         19.     Essex had the option to exercise a six month first extension of the initial Maturity

15   Date under the Notes and Loan Agreement to June 1, 2009 (the "First Extended Maturity Date"),

16   under certain conditions.

17         20.     Essex had the option to exercise an additional six month second extension of the

18   initial Maturity Date under the Notes and Loan Agreement to December 1, 2009 (the "Second

19   Extended Maturity Date"), under certain conditions.

20         21.     Essex did not exercise the First Extended Maturity Date or the Second Extended

21   Maturity Date.

22         22.     Even if Essex had exercised the First Extended Maturity Date and the Second

23   Extended Maturity Date, the final date that the Notes and Term Loan Agreement would mature

24   and become wholly due and payable under both extensions was December 1, 2009.

25         23.     Essex is informed and believes, and on that basis alleges, that in or about April

26   2008, The Foothill Group, Inc. assigned its rights and obligations under the Term Loan

27   Agreement and the Foothill Note to Highland Crusader Holdings Corporation and Highland

28   Credit Opportunities Holding Corporation. Approximately one day later, each of those entities

1   assigned their respective rights and obligations to the Highland Funds.

2      24.    Additionally, Essex is informed and believes, and on that basis alleges, that at

3   various times after November 29, 2007, fractional beneficial interests under the Notes and the

4   Deed of Trust were assigned to numerous other parties.

5      25.    Notwithstanding the numerous alleged assignments of interests under the Notes

6   and Deed of Trust, NexBank remains the duly appointed collateral agent and administrative agent

7   for all lenders under the Notes and Term Loan Agreement, including all parties receiving

8   fractional beneficial interests under the Notes and the Deed of Trust.

9      26.    Based on NexBank's appointment as collateral agent and administrative agent for

10   all lenders, Essex has not named all of the numerous lender parties as defendants in this action.

11   In the event it is determined at a later date that each and every beneficiary under the Notes or

12   Deed of Trust must be named as defendants in this action, Essex reserves its right to amend this

13   Complaint and identify each of those defendants.

14      27.    NexBank is also the agent for IFA under the Notes, Term Loan Agreement and the

15   Deed of Trust. However, because NexBank and IFA are currently involved in certain litigation

16   between themselves, Essex has named IFA as a Defendant in this action out of an abundance of

17   caution.

18      28.    As a result of the Great Financial Recession that commenced in 2008 and the

19   subsequent breach of the Development Agreement by KB Home Nevada, Inc., the principal and

20   accrued interest under the Notes and the Term Loan Agreement was not timely paid by Essex on

21   or before the Maturity Date of December 1, 2008.

22      29.    On or about June 30, 2008, certain litigation ensued between Essex, Las Vegas

23   Development Associates, LLC, and KB Home Nevada, Inc., in the Eighth Judicial District Court,

24   Clark County, Nevada, as Case No. A566442.

25      30.    Other litigation was initiated on or about November 4, 2008, by IFA against KB

26   Home Nevada, Inc., also in the Eighth Judicial District Court, Clark County, Nevada, as Case No.

27   A574976 (Case No. A566442 and Case No. A574976 collectively referred to as the "KB Home

28   Litigations").

1        31.    Nothing in the KB Home Litigations changed the Maturity Date under the Notes

2 and the Term Loan Agreement, and at all times herein, the Notes and the Term Loan Agreement

3 fully matured and became wholly due on December 1, 2008.

4        32.    On June 6, 2016, pursuant to N.R.S. § 361.570, the Ex Officio Tax Receiver for

5 Clark County prepared a certificate for each parcel of the Property on which delinquent taxes had

6 not been paid, authorizing the Clark County Treasurer to hold each parcel of the property

7 described in the certificates for a period of two (2) years unless sooner redeemed by payment of

8 the taxes and accruing taxes, penalties and costs, together with interest on the taxes at the rate of

9 10 percent (10%) per annum from the date due until paid.

10        33.    Because neither Essex, NexBank, IFA or any of the lenders redeemed the Property

11 by paying all past due taxes, on July 2, 2018, Tax Trustee Deeds with respect to each parcel of

12 the Property were recorded by the Clark County Treasurer in the records of the Clark County

13 Recorder as Instrument Numbers 20180702-0000741, 20180702-0000742, 20180702-0000743,

14 20180702-0000744 and 20180702-0000745.

15        34.    The effect of the Tax Trustee Deeds is that title to the Property is held in trust by

16 the Clark County Treasurer with Essex as the owner of said Property, until such time as the

17 Property is sold at a public sale or otherwise conveyed pursuant to N.R.S. § 361.595.

18        35.    As of Essex's Petition Date, no sale or conveyance of the Property had occurred

19 by Clark County, and title of the Property remains vested in Essex and Laura B. Fitzpatrick, the

20 Treasurer of Clark County. Attached hereto as **Exhibit D** is a copy of a Commitment for Title

21 Insurance issued by Fidelity National Title Group on October 10, 2019, reflecting the vested title

22 and encumbrances recorded against the Property.

23        36.    Pursuant to N.R.S. §§ 361.585(3) and (4), the Property may be reconveyed out of

24 trust from the Clark County Treasurer to the legal owner, Essex, upon payment equal to all taxes

25 accrued, together with any costs, penalties and interest legally chargeable against the Property.

26        37.    Essex is informed and believes, and on that basis alleges, that the total amount due

27 to the Clark County Treasurer in order to reconvey the Property from trust under the Tax Trustee

28 Deeds, is approximately $2,600,000. In fact, the Clark County Treasurer filed a Proof of Claim

1  in the Bankruptcy Case on January 15, 2020 (Claim 2-1), attesting to the fact that the Clark County

2  Treasurer is owed $2,597,004.72. Attached hereto as **Exhibit E** is a copy of Claim 2-1.

3     38.    On October 30, 2013, Holman filed his Voluntary Petition for Chapter 7 relief in

4  this Bankruptcy Court, as Case No. 13-52092-btb.

5     39.    On October 16, 2014, NexBank filed an unsecured Proof of Claim (Claim 4-1) in

6  the amount of $174,096,328.82 in Holman's Chapter 7 case. NexBank's Proof of Claim in

7  Holman's case was based on Holman's Guaranty Agreement.

8     40.    On July 3, 2014, an Order Discharging Debtor was entered in Holman's Chapter

9  7 case, at which time his personal liability under the Guaranty Agreement was discharged

10  pursuant to 11 U.S.C. §727.

11     41.    On January 27, 2016, a Final Decree, Discharge of Trustee and Closing of Chapter

12  7 Case was entered in Holman's Chapter 7 case.

13     42.    On March 13, 2019, the United States Trustee filed her Ex Parte Motion to Reopen

14  Chapter 7 Case in Holman's Chapter 7 case, for the purpose of administering Holman's ownership

15  interest in Essex.

16     43.    On March 18, 2019, Jeri Coppa-Knudson was once again appointed as Trustee of

17  Holman's re-opened Chapter 7 case.

18     44.    Harris Law Practice LLC was appointed as bankruptcy counsel for Jeri Coppa-

19  Knudson ("Trustee") in Holman's re-opened Chapter 7 case, pursuant to an order entered March

20  29, 2019.

21     45.    In the course of carrying out her duties in Holman's re-opened Chapter 7 case, the

22  Trustee and her counsel became aware that more than ten (10) years had elapsed since the Notes

23  and the Term Loan Agreement became wholly due and payable on December 1, 2008.

24     46.    N.R.S. § 106.240, colloquially known as Nevada's "Ancient Mortgage Statute,"

25  states the following:

26     The lien heretofore or hereafter created of any mortgage or deed of trust upon any

27     real property, appearing of record, and not otherwise satisfied and discharged of

28     record, shall at the expiration of 10 years after the debt secured by the mortgage or

Harris Law Practice LLC
615) Lakeside Drive
Suite 2100
Reno, Nevada 89511
(775) 786 7600

1      deed of trust according to the terms thereof or any recorded written extension

2      thereof become wholly due, terminate, and it shall be conclusively presumed that

3      the debt has been regularly satisfied and the lien discharged.

4  N.R.S. § 106.240.

5      47.    In the ten (10) years since the Notes and the Term Loan Agreement became wholly

6  due and payable by their own terms, neither NexBank, IFA or any of the lenders foreclosed on

7  the Deed of Trust.

8      48.    Based on the Ancient Mortgage Statute provisions of N.R.S. § 106.240, as of

9  December 2, 2018, the Notes, the Term Loan Agreement and the Deed of Trust are conclusively

10  presumed to be satisfied and the lien discharged.

11      49.    On January 6, 2020, NexBank filed a secured Proof of Claim (Claim No. 1) in this

12  Bankruptcy Case alleging that the sum of $584,462,133.58 is due and owing under the Notes, the

13  Term Loan Agreement and the Deed of Trust.

14      50.    Essex intends to sell all or a portion of the Property or to borrow the necessary

15  funds in its Bankruptcy Case, after seeking Court approval, to pay all amounts due and owing to

16  the Clark County Treasurer in order to reconvey the Property from trust under the Tax Trust

17  Deeds pursuant to N.R.S. §§ 361.585(3) and (4).

18      51.    The unpaid taxes owing to the Clark County Treasurer in the approximate sum of

19  $2,600,000 are the only valid claims secured by the Property as of the Petition Date.

20                        **FIRST CLAIM FOR RELIEF**

21              **Quiet Title (N.R.S. § 40.010) (All Defendants)**

22      52.    Plaintiff realleges and incorporates herein by this reference the allegations

23  contained in the preceding paragraphs as though fully set forth herein.

24      53.    As stated previously above, the Notes and the Term Loan Agreement became

25  wholly due and payable on the Maturity Date of December 1, 2008, and no agreements or

26  extensions exist that extended the Maturity Date.

27      54.    Based on N.R.S. § 106.240, the Notes, the Term Loan Agreement and the Deed of

28  Trust became conclusively satisfied, discharged and the liens released ten (10) years after

1   December 1, 2008.

2       55.   N.R.S. § 106.240 is a statute of repose, not a statute of limitations, and is not

3 subject to equitable tolling. There is no other statute under Nevada law to revive an obligation

4 that has been terminated and discharged pursuant to N.R.S. § 106.240.

5       56.   Notwithstanding the plain and unambiguous reading of N.R.S. § 106.240 and the

6 Maturity Date under the Notes and the Term Loan Agreement, IFA and NexBank, on behalf of

7 all lenders and beneficiaries under the Note and the Deed of Trust, have refused and failed to

8 voluntarily reconvey and release the Deed of Trust to clear title on Essex's Property.

9       57.   As evidenced by the Deed of Trust that remains on record against the Property and

10 has not been reconveyed by NexBank, IFA or the other lenders and beneficiaries, said parties are

11 claiming an adverse interest in the Property.

12       58.   N.R.S. § 40.010 provides that: "An action may be brought by any person against

13 another who claims an estate or interest in real property, adverse to the person bringing the action,

14 for the purpose of determining such adverse claim."

15       59.   Additionally, 11 U.S.C. § 323(b), provides that "[t]he trustee in a case under this

16 title has capacity to sue and be sued." 11 U.S.C. § 323(b). Finally, 11 U.S.C. § 1107(a) provides

17 that ". . . a debtor in possession shall have all the rights . . . and powers, and shall perform all the

18 functions and duties, except the duties specified in sections 1106(a)(2), (3) and (4) of this title, of

19 a trustee serving in a case under this chapter." 11 U.S.C. § 1107(a).

20       60.   Based on N.R.S. § 40.010, 11 U.S.C. §§ 323(b) and 1107(a), Essex is entitled to a

21 judgment quieting title in the Property by expunging and extinguishing any obligations or liens

22 under the Notes, the Term Loan Agreement and the Deed of Trust, because those are conclusively

23 deemed satisfied, and the lien(s) discharged, pursuant to Nevada's Ancient Mortgage Statute

24 codified as N.R.S. § 106.240.

25                     **SECOND CLAIM FOR RELIEF**

26           **Wrongful Disparagement/Slander of Title (All Defendants)**

27       61.   Plaintiff realleges and incorporates herein by this reference the allegations

28 contained in the preceding paragraphs as though fully set forth herein.

62. IFA and NexBank are under a duty not to publish disparaging matter that disparages another's title to real property.

63. Based on N.R.S. § 106.240, the Notes, the Term Loan Agreement and the Deed of Trust became conclusively satisfied, discharged and the liens released ten (10) years after December 1, 2008.

64. N.R.S. § 106.240 is a statute of repose, not a statute of limitations, and is not subject to equitable tolling. There is no other statute under Nevada law to revive an obligation that has been terminated and discharged pursuant to N.R.S. § 106.240.

65. On January 23, 2020, counsel for Essex sent written notice to IFA and NexBank pursuant to N.R.S. § 107.077 that informed them that the Deed of Trust has been discharged and they were obligated to reconvey the estate to Essex.

66. Prior to the filing of this Complaint, IFA and NexBank had actual knowledge that the Deed of Trust has been discharged and that they were under a duty to execute a deed of reconveyance pursuant to N.R.S. § 107.077.

67. Defendants' actions in failing to voluntarily reconvey the Deed of Trust in contravention of N.R.S. § 106.240 constitutes false statements that disparage and slander Plaintiff's interest in the Property.

68. Defendants' failure to reconvey the Deed of Trust creates the perception that the Notes and Term Loan Agreement remain due and owing and/or that the Property is encumbered by liens even though the obligations and liens are no longer valid or enforceable based on N.R.S. § 106.240.

69. Defendants' Deed of Trust recorded against the Property prevents the Plaintiff from selling or otherwise monetizing the value of its Property.

70. The recovery of damages for recording of a slanderous document without seeking expungement of that document for the public records would not give the Plaintiff complete relief. The title to the Property would be clouded as long as the Deed of Trust is a public record and its nullity not declared.

71. The Plaintiff is entitled to declaratory relief from this Court that the document or

1 documents that cloud title to the Property are a nullity and that they be expunged from the public

2 record.

3     72.    Plaintiff is informed, believes and thereon alleges that Defendants' actions in

4 maintaining false documents against the Property and/or failing to release and reconvey the

5 invalid Deed of Trust in a timely manner, were done with a willful and conscious disregard for

6 Plaintiff's rights and interests in the Property. As such, Plaintiff is entitled to a judgment finding

7 that Defendants have slandered Plaintiff's title in the Property and that Plaintiff is entitled to an

8 award of compensatory and punitive damages against Defendants in an amount to be proven at

9 the time of trial.

10                    **THIRD CLAIM FOR RELIEF**

11          **Extent, Priority and Validity of Liens (All Defendants)**

12     73.    Plaintiff realleges and incorporates herein by this reference the allegations

13 contained in the preceding paragraphs as though fully set forth herein.

14     74.    The Property at issue here is property of the Plaintiff Debtor's estate under 11

15 U.S.C. § 541.

16     75.    This is an action brought pursuant to Fed. R. Bankr. P. 7001(2) to determine the

17 validity, priority and extent of any purported liens under the Deed of Trust recorded against the

18 Property. This action seeks to determine the validity, extent, and priority of any legal, equitable,

19 or adverse claims or interest asserted therein by Defendants or anyone else laying claim to the

20 Property under the Deed of Trust.

21     76.    As stated previously, the Notes, the Term Loan Agreement and the Deed of Trust

22 previously encumbering the Property are conclusively presumed satisfied and discharged ten (10)

23 years after December 1, 2008, pursuant to N.R.S. § 106.240.

24     77.    As of December 2, 2018, none of the Defendants have any enforceable liens or

25 secured claims against the Property.

26     78.    As stated previously, prior to the filing of this Complaint, IFA and NexBank have

27 failed to execute a deed of reconveyance, the effect of which was to allow a false statement

28 concerning the encumbrances against this Property to continue in the public record.

Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, Nevada 89511
(775) 786-7600

11

1  79.  Based on the foregoing, an actual present dispute and controversy exists and,

2 therefore, a declaration, judgment, and/or order from this Court is necessary to determine that

3 Essex owns its interest in the Property free and clear of Defendants' Deed of Trust; that

4 Defendants' Notes are conclusively presumed to be regularly satisfied and the Deed of Trust

5 discharged and of no force and effect.

6           **FOURTH CLAIM FOR RELIEF**

7       **Cancellation of Instrument (All Defendants)**

8  80.  Plaintiff realleges and incorporates herein by this reference the allegations

9 contained in the preceding paragraphs as though fully set forth herein.

10  81.  The Notes, the Term Loan Agreement and the Deed of Trust previously

11 encumbering the Property are conclusively presumed satisfied and discharged ten (10) years after

12 December 1, 2008, pursuant to N.R.S. § 106.240.

13  82.  As of December 2, 2018, none of the Defendants have any enforceable liens or

14 secured claims against the Property.

15  83.  There is a reasonable and actual cause that the unenforceable Deed of Trust

16 remaining on record will cause serious injury to Plaintiff because it clouds the title and wrongly

17 presents the appearance that the Property is greatly encumbered. The Deed of Trust will prevent

18 Plaintiff from selling or otherwise monetizing the value in its Property.

19  84.  Based on the foregoing, Plaintiff is entitled to a judgment and/or order cancelling

20 or reconveying Defendants' Deed of Trust to remove the effect of the unenforceable Deed of

21 Trust from the Property's title.

22  85.  In the absence of the Court cancelling or reconveying Defendants' Deed of Trust,

23 Plaintiff is without adequate remedy at law.

24           **FIFTH CLAIM FOR RELIEF**

25   **Objection to Proof of Claim (11 U.S.C. § 502(a)) (All Defendants)**

26  86.  Plaintiff realleges and incorporates herein by this reference the allegations

27 contained in the preceding paragraphs as though fully set forth herein.

28  87.  The Notes, the Term Loan Agreement and the Deed of Trust previously

1     encumbering the Property are conclusively presumed satisfied and discharged ten (10) years after

2     December 1, 2008, pursuant to N.R.S. § 106.240.

3         88.     As of December 2, 2018, none of the Defendants have any enforceable loans or

4     claims against Plaintiff or liens or secured claims against the Property.

5         89.     Notwithstanding the foregoing, NexBank filed a Proof of Claim on January 6,

6     2020, in the Bankruptcy Case as Claim No. 1 ("NexBank's POC"), alleging a secured claim

7     against the Property in the amount of $584,462,133.58, based on the Notes, the Term Loan

8     Agreement and the Deed of Trust.

9         90.     NexBank, in its capacity as collateral agent and administrative agent for the

10     lenders, filed its Proof of Claim on behalf of all lenders and beneficiaries under the Notes, the

11     Term Loan Agreement and the Deed of Trust.

12         91.     NexBank's POC was signed under penalty of perjury by NexBank's counsel even

13     though the plain and unambiguous Maturity Date under the Notes and the Term Loan Agreement,

14     in conjunction with N.R.S. § 106.240, make it evident that the Notes, the Term Loan Agreement

15     and the Deed of Trust are conclusively presumed satisfied and discharged and no longer due or

16     enforceable as of December 2, 2018.

17         92.     Based on the foregoing, Plaintiff objects to NexBank's POC in its entirety,

18     pursuant to 11 U.S.C. § 502(a), and requests a judgment or order finding that NexBank's Proof

19     of Claim No. 1 is disallowed in its entirety, and the Defendants have no valid or allowed claims

20     in Plaintiff's Bankruptcy Case. NexBank's POC is attached hereto as **Exhibit F**, without

21     duplicate exhibits, because most of the exhibits to NexBank's POC are the Loan documents that

22     are already attached to this Complaint.

23                     **SIXTH CLAIM FOR RELIEF**

24                     **Attorney Fees (All Defendants)**

25         93.     Plaintiff realleges and incorporates herein by this reference the allegations

26     contained in the preceding paragraphs as though fully set forth herein.

27         94.     Prior to the filing of this complaint, IFA and NexBank had actual knowledge that

28     the deed of trust has been discharged and that they were each under a duty to execute a deed of

1  reconveyance pursuant to NRS 107.077.

2      95.    Defendants' actions in failing to voluntarily reconvey the Deed of Trust in
3  contravention of N.R.S. §106.240, constitutes false statements that disparage and slander
4  Plaintiff's interest in the Property.

5      96.    Defendants' failure to reconvey the Deed of Trust creates the perception that the
6  Notes and Term Loan Agreement remain due and owing and/or that the Property is encumbered
7  by liens even though the obligations and liens are no longer valid or enforceable based on N.R.S.
8  §106.240.

9      97.    Based upon the slander of title caused by the Defendants, it is impossible for the
10  Plaintiff to remove the cloud upon the title of its property without retaining an attorney.

11      98.    The only way in which the cloud upon the title to the Property can be removed and
12  the slander of title remedied is by an order of this Court

13      99.    In order to remove the cloud of title, Plaintiff has been forced to retain counsel to
14  file this Complaint.

15      100.    Undersigned counsel is experienced in matters of liens and litigation, and he
16  charges $550.00 per hour.

17      101.    Plaintiff is entitled to an award of attorney fees for the necessity in retaining
18  counsel to remove the invalid lien as special damages

19                     **PRAYER FOR RELIEF**

20      WHEREFORE, Plaintiff Essex Real Estate Partners, LLC, prays for judgment against
21  Defendants, and each of them, as follows:

22      1.    For a judgment to quiet title in the Property by expunging the Deed of Trust
23          currently recorded in the title record of the Property;

24      2.    For a judgment finding and concluding that Defendants have slandered, and are
25          continuing to slander Plaintiff's title by willfully and consciously maintaining the
26          false and unenforceable Deed of Trust on the Property's record title;

27      3.    For a judgment determining that the validity, extent and priority of Defendants'
28          purported lien against the Property is such that Essex owns its interest in the

1       Property free and clear of Defendants' Deed of Trust, and that Defendants' Deed

2       of Trust is, by operation of law, satisfied, terminated, discharged and released and

3       of no force and effect;

4   4.    For a judgment and/or order cancelling or reconveying Defendants' Deed of Trust

5       to remove the effect of the unenforceable Deed of Trust from the Property's title;

6   5.    For a judgment or order finding that NexBank's Proof of Claim No. 1 filed in the

7       Bankruptcy Case on January 6, 2020, is disallowed in its entirety, and Defendants

8       have no valid or allowed claims in Plaintiff's Bankruptcy Case;

9   6.    For an award of Plaintiff's reasonable attorneys' fees and costs incurred herein;

10   7.    For an award of compensatory and punitive damages in an amount to be proven at

11       the time of trial; and

12   8.    For such other and further relief as this Court may deem just and proper.

13 DATED this _28th_ day of January, 2020.

14

15           STEPHEN R. HARRIS, ESQ.
                HARRIS LAW PRACTICE LLC

16

17

18           Attorney for Debtor/Plaintiff
                Essex Real Estate Partners, LLC

19

20

21

22

23

24

25

26

27

28

Harris Law Practice LLC
6151 Lakeside Drive
Suite 2100
Reno, Nevada 89511
(775) 786 7600

# EXHIBIT "4"

# EXHIBIT "4"

| Fill in this information to identify the case: | |
|---|---|
| Debtor 1 | **Essex Real Estate Partners, LLC** |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: District of Nevada | |
| Case number | **19-51486-btb** |

Official Form 410

# Proof of Claim

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) **that you received.**

## Part 1: Identify the Claim

| | | |
|---|---|---|
| 1. Who is the current creditor? | **Nexbank, SSB** | |
| | Name of the current creditor (the person or entity to be paid for this claim) | |
| | Other names the creditor used with the debtor | |
| 2. Has this claim been acquired from someone else? | ☑ No<br>☐ Yes. From whom? | |
| 3. Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent?<br><br>**William M. Noall, Garman Turner Gordon LLP**<br>Name<br><br>**650 White Dr., Suite 100**<br>Number     Street<br><br>**Las Vegas        NV        89119**<br>City             State        ZIP Code<br><br>Contact phone **(725) 777-3000**<br><br>Contact email **wnoall@gtg.legal** | Where should payments to the creditor be sent? (if different)<br><br>Name<br><br>Number     Street<br><br>City        State        ZIP Code<br><br>Contact phone<br><br>Contact email |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br><br>__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ | |
| 4. Does this claim amend one already filed? | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____ | Filed on _____<br>MM  / DD  / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No<br>☐ Yes. Who made the earlier filing? _____ | |

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**   $ _____584,462,133.58__ . Does this amount include interest or other charges?

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See Description of Claim Attached Hereto

**9. Is all or part of the claim secured?**

☐ No

☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☑ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:**   Deed of Trust

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:   $_____

Amount of the claim that is secured:   $_____

Amount of the claim that is unsecured:   $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:   $_____

Annual Interest Rate (when case was filed) __19.50__ %

☑ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition.   $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

    **Amount entitled to priority**

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $_____

☐ Up to $2,850* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $_____

☐ Wages, salaries, or commissions (up to $12,850*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).    $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).    $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).    $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.    $_____

\* Amounts are subject to adjustment on 4/01/19 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   <u>01/06/2020</u>
                MM / DD / YYYY

     <u>/s/ William M. Noall</u>
         Signature

**Print the name of the person who is completing and signing this claim:**

Name    William M. Noall
        First name            Middle name          Last name

Title

Company    Garman Turner Gordon LLP
         Identify the corporate servicer as the company if the authorized agent is a servicer.

Address    650 White Dr., Suite 100
         Number      Street

         Las Vegas              NV     89119
         City                   State     ZIP Code

Contact phone   (725) 777-3000         Email   wnoall@gtg.legal

## SUMMARY OF CLAIM OF NEXBANK, SSB AGAINST ESSEX REAL ESTATE PARTNERS, LLC

1.  On December 27, 2019 (the "Petition Date"), Essex Real Estate Partners, LLC (the "Debtor") filed a petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101 – 1532, commencing Case No. 19-51486-BTB in the U.S. Bankruptcy Court for the District of Nevada.

2.  The Debtor borrowed $66 million under a Term Loan Agreement dated November 29, 2007, attached hereto as **Exhibit A**, pursuant to which NexBank, SSB ("NexBank") serves as collateral agent and administrative agent for the lenders.

3.  On November 29, 2007, George F. Holman, Sr., ("Holman") executed a Guaranty Agreement attached hereto as **Exhibit B**, pursuant to which Holman guaranteed Debtor's payment of all amounts due under the Term Loan Agreement and related documents. Holman is a debtor in a separate chapter 7 case, and NexBank has filed a claim in that case.

4.  Certain amounts due under the Term Loan Agreement are also reflected in the Deed of Trust Notes attached hereto as **Exhibit C**.

5.  The obligations due under the Term Loan Agreement and certain other documents evidencing or related to the loan (collectively with the Guarantee and Deed of Trust as hereafter defined, the "Loan Documents") are secured by that certain Deed of Trust, Assignment of Rents and Leases, Security Agreement and Fixture Filing recorded on December 4, 2007, in the Official Records of the Clark County Nevada Recorder's Office ("Deed of Trust") attached hereto as **Exhibit D**. The recording information is reflected on Exhibit D.

6.  NexBank, as collateral agent and administrative agent for the lenders, is the beneficiary of the Term Loan Agreement and certain other Loan Documents.

7.  As of the Petition Date, Debtor owed $584,462,133.58 in principal, interest and other fees, costs and expenses, including attorney's fees and costs, under the Loan Documents, See **Exhibit E** attached hereto, and Debtor owes certain additional fees, costs and expenses, including attorney fees and costs, that are being determined.

8.        Debtor and certain other parties entered into a Joint Litigation Agreement in March 2010, a true and correct copy of which is attached hereto as **Exhibit F**.   Pursuant to sections II 2 and VII, the Joint Litigation Agreement tolled statutes of limitations for filing claims as provided therein, which includes the Debtor's obligations under the Loan Documents.

9.        NexBank reserves its rights to amend, modify, supplement, or withdraw this proof of claim in any respect, including, without limitation, to file additional or supplemental proofs of claim for claims that are not ascertainable or liquidated at this time as further information becomes available, including to recognize payments that may be made on any claim asserted herein by a third party or for any other reason in its discretion.  NexBank also reserves its rights to assert additional claims, including those for allowance and payment of administrative expenses, as NexBank deems necessary or appropriate within its discretion.

4843-5007-0699, v. 1

**EXHIBIT E**

**SUMMARY OF CLAIM**

| Category | Amount |
|---|---|
| Unpaid Principal | $ 66,000,000.00 |
| Unpaid Interest | $ 506,342,131.92 |
| Costs and Expenses Advanced by Agent | $ 2,365,780.04 |
| Agent Fee | $ 450,000.00 |
| Exit Fee | $ 9,232,767.12 |
| Deed of Trust Fees and Expenses | $ 71,454.50 |
| | $ 584,462,133.58 |