# EXHIBIT 1

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Case No. 19-34054-sgj11 |
| | § | |
| **HIGHLAND CAPITAL MANAGEMENT,** | § | |
| **L.P.,** | § | **Chapter 11** |
| | § | |
| **Debtor** | § | |

---

### DECLARATION OF MARK PATRICK

---

I, Mark Patrick, hereby declare as follows:

1.      My name is Mark Patrick, and I am over the age of 21.  I have personal knowledge of the facts set forth herein, and make this declaration pursuant to 28 U.S.C. § 1746.

2.      I am the managing member of the sole general partner of Charitable DAF Fund, L.P. (Charitable DAF Holdco, Ltd. and Charitable DAF Fund, L.P., and their direct and indirect subsidiaries will be referred to herein as the "DAF").

3.      I have reviewed the *Motion for Entry of an Order Authorizing the Examination of Rule 2004 Parties pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure* (Dkt. No. 2620) (the "Rule 2004 Motion") and the *Motion for Further Extend the Stay of the Adversary Proceeding Through October 15, 2021* (Dkt. No. 70) (the "Second Stay Motion") both filed by the Official Committee of Unsecured Creditors (the "Committee") and the Litigation Trustee (the "Litigation Trustee," along with the Committee, the "Movants") and the exhibits thereto, including Exhibit 7 which appears to target the DAF and Highland Dallas Foundation, Inc. ("Highland Dallas," along with the DAF, the "Charitable Defendants").  For a robust discussion of the charitable enterprise that the DAF and Highland Dallas are a part of, I point the Court to the

*Response to the Disclosures Order* (Dkt. No. 2547) and I hereby adopt and incorporate my *Declaration in Support* thereof (Dkt. No. 2547-1 ).

4.     During all times relevant to the Rule 2004 Motion through January 2021, the DAF was managed by the Debtor pursuant to a *Second Amended and Restated Service Agreement effective January 1, 2017* (the "Second Amended and Restated Service Agreement"), a true and correct copy is attached hereto as **Exhibit 1.**

5.     Under the terms of the Second Amended and Restated Service Agreement, the Debtor provided: finance, accounting, tax, legal, trade, facilities, public relation support, and information technology infrastructure support for the DAF.

6.     During all times relevant to the Rule 2004 Motion, the DAF had no employees and was solely managed by Grant Scott who was my predecessor to my management of the DAF.

7.     Pursuant to the Second Amended and Restated Service Agreement, the DAF relied on the Debtor for all IT services including email services (though there was no specific DAF email) and storage of any ESI.

8.     To my knowledge, the Debtor was and is in control or possession of every document and ESI belonging to the DAF created through January 2021.  Attached hereto as **Exhibit 2** is a true and correct copy of that certain Termination Notice sent from the Debtor regarding the Amended and Restated Service Agreement.  The other repository for DAF Documents and ESI would have Grant Scott, who upon information and belief, has already produced thousands of pages of documents and/or ESI to the Committee.

9.     On or about May 27, 2021, I learned that The Dallas Foundation's directors and officers coverage was not renewed specifically because the Committee had commenced Adversary Case No. 20-03195, alleging over $20 million in liability against Highland Dallas Foundation.

10.     Attached hereto as **<u>Exhibit 3</u>** is a true and correct copy of the *Second Amended and Restated Investment Advisory Agreement, Dated January 1, 2017* between Highland Capital Management, L.P. and Charitable DAF Fund, L.P., and Charitable DAG GP, LLC

11.     Attached hereto as **<u>Exhibit 4</u>** is a true and correct copy of that *certain November 30, 2020 Termination Letter Investment Advisory Agreement*

12.     Attached hereto as **<u>Exhibit 5</u>** is a true and correct copy of that certain *Shared Resources Agreement effective as of March 1, 2021* by and amongst Highland Capital Management, L.P. and NexPoint Parties and First Amendment Thereto

13.     I have reviewed the Objection to the Rule 2004 Motion prepared by counsel for the DAF and Highland Dallas and certify that the factual recitations therein are accurate.

**Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.**

**Executed on August 17, 2021**

*/s/ Mark Patrick*_____
**Mark Patrick**

# EXHIBIT 1
## to DECLARATION OF MARK PATRICK

## SECOND AMENDED AND RESTATED SERVICE AGREEMENT

THIS SECOND AMENDED AND RESTATED SERVICE AGREEMENT (this "*Agreement*") entered into to be effective from the 1st day of January, 2017 (the "*Effective Date*") by and among Highland Capital Management, L.P., a Delaware limited partnership ("*HCMLP*"), Charitable DAF Fund, L.P., a Cayman Islands exempted limited partnership (the "*Fund*"), Charitable DAF GP, LLC, a Delaware limited liability company (the "*General Partner*"), and any affiliate of the General Partner that becomes a party hereto.  Each of the signatories hereto is individually a "*Party*" and collectively, the "*Parties*".

### RECITALS

A.      HCMLP, the Fund and the General Partner entered into that certain Shared Services Agreement dated January 1, 2012 (the "*Original Agreement*");

B.      The Parties amended and restated the Original Agreement in its entirety on the terms as set forth in that certain Amended and Restated Agreement effective as of July 1, 2014 (the "*Existing Agreement*");

C.      The Parties desire to amend and restated the Existing Agreement in its entirety on the terms set forth herein;

C.      Since the inception of the Fund, the Parties have intended that the Fund and the General Partner would incur reasonable arm's-length fees in connection with the operation of the Fund and management and reporting activities with respect to Fund assets;

D.      HCMLP has incurred and will continue to incur substantial expenses on behalf of the Fund and the General Partner in performing the Services (as defined below);

E.      The Parties agree that it is in their mutual best interests for HCMLP to continue to provide the Services to the General Partner, the Fund and other Recipients (as defined below) and for HCMLP to be provided sufficient financial incentives to continue to provide the Services;

F.      The General Partner and the Fund desire to provide HCMLP sufficient compensation for performing the Services and to reimburse HCMLP for expenses incurred on their behalf;

G.      During the Term (as defined below), HCMLP will provide to the General Partner, on behalf of the Fund and/or its subsidiaries, certain services as more fully described herein, subject to the terms and conditions set forth herein.

### AGREEMENT

In consideration of the foregoing recitals and the mutual covenants and conditions contained herein, the Parties agree, intending to be legally bound, and the Existing Agreement is hereby amended and restated in its entirety as follows:

### ARTICLE I
### DEFINITIONS

"*Advisory Agreement*" means that certain Second Amended and Restated Investment Advisory Agreement, dated effect as of the Effective Date, by and among the Parties, as amended, restated, modified and supplemented from time to time.

"***Affiliate***" means a Person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, a specified Person. The term "***control***" (including, with correlative meanings, the terms "***controlled by***" and "***under common control with***") means the possession of the power to direct the management and policies of the referenced Person, whether through ownership interests, by contract or otherwise.

"***Agreement***" has the meaning set forth in the preamble.

"***Change***" has the meaning set forth in Section 2.02(a).

"***Change Request***" has the meaning set forth in Section 2.02(b).

"***Code***" means the Internal Revenue Code of 1986, as amended, and the related regulations and published interpretations.

"***Dispute***" has the meaning set forth in Section 7.14.

"***Effective Date***" has the meaning set forth in the preamble.

"***Enforcement Court***" has the meaning set forth in Section 7.14.

"***Existing Agreement***" has the meaning set forth in the recitals.

"***Fund***" has the meaning set forth in the preamble.

"***General Partner***" has the meaning set forth in the preamble.

"***Governmental Entity***" means any government or any regulatory agency, bureau, board, commission, court, department, official, political subdivision, tribunal or other instrumentality of any government, whether federal, state or local, domestic or foreign.

"***HCMLP***" has the meaning set forth in the preamble.

"***Liabilities***" means any cost, liability, indebtedness, obligation, co-obligation, commitment, expense, claim, deficiency, guaranty or endorsement of or by any Person of any nature (whether direct or indirect, known or unknown, absolute or contingent, liquidated or unliquidated, due or to become due, accrued or unaccrued, matured or unmatured).

"***Loss***" means any cost, damage, disbursement, expense, liability, loss, obligation, penalty or settlement, including interest or other carrying costs, legal, accounting and other professional fees and expenses incurred in the investigation, collection, prosecution and defense of claims and amounts paid in settlement, that may be imposed on or otherwise incurred or suffered by the referenced Person; provided, however, that the term "***Loss***" will not be deemed to include any special, exemplary or punitive damages, except to the extent such damages are incurred as a result of third party claims.

"***Management Fee***" has the meaning set forth in the Advisory Agreement.

"***New Service***" has the meaning set forth in Section 2.03.

"***Original Agreement***" has the meaning set forth in the recitals. "***Party***" or "***Parties***" has the

meaning set forth in the preamble.

"***Person***" means an association, a corporation, an individual, a partnership, a limited liability company, a trust or any other entity or organization, including a Governmental Entity.

"***Recipient***" means the General Partner, the Fund, and any of the Fund's direct or indirect Subsidiaries or managed funds or accounts in their capacity as a recipient of the Services.

"***Service Provider***" means any of HCMLP and its direct or indirect Subsidiaries in its capacity as a provider of Services.

"***Service Standards***" has the meaning set forth in Section 4.01.

"***Services***" shall have the meaning set forth in Section 2.01.

"***Subsidiary***" means, with respect to any Person, any Person in which such Person has a direct or indirect equity ownership interest in excess of 50%.

"***Tax***" or "***Taxes***" means: (i) all state and local sales, use, value-added, gross receipts, foreign, privilege, utility, infrastructure maintenance, property, federal excise and similar levies, duties and other similar tax-like charges lawfully levied by a duly constituted taxing authority against or upon the Services; and (ii) tax-related surcharges or fees that are related to the Services identified and authorized by applicable tariffs.

"***Term***" has the meaning set forth in Section 5.01.

ARTICLE II
SERVICES

Section 2.01    Services.  During the Term, Service Provider will provide Recipient with Services, each as requested by Recipient and as described more fully on **Annex A** attached hereto (the "***Services***").

Section 2.02    Changes to the Services.

(a)    During the Term, the Parties may agree to modify the terms and conditions of a Service Provider's performance of any Service in order to reflect new procedures, processes or other methods of providing such Service, including modifying the applicable fees for such Service to reflect the then current fair market value of such service (a "***Change***").  The Parties will negotiate in good faith the terms upon which a Service Provider would be willing to provide such New Service to Recipient.

(b)    The Party requesting a Change will deliver a description of the Change requested (a "***Change Request***").

(c)    Notwithstanding any provision of this Agreement to the contrary, a Service Provider may make: (i) Changes to the process of performing a particular Service that do not adversely affect the benefits to Recipient of Service Provider's provision or quality of such Service in any material respect or increase Recipient's cost for such Service; (ii) emergency Changes on a temporary and short-term basis; and/or (iii) Changes to a particular Service in order to comply with applicable law or regulatory requirements, in each case without obtaining the prior consent of Recipient.  A Service Provider will notify Recipient in writing of any such Change as follows: in the case of clauses (i) and (iii) above, prior to the

3

implementation of such Change, and, in the case of clause (ii) above, as soon as reasonably practicable thereafter.

Section 2.03    New Services.  The Parties may, from time to time during the Term of this Agreement, negotiate in good faith for Services not otherwise specifically listed in Section 2.01 (a "*New Service*").  Any agreement between the Parties on the terms for a New Service must be in accordance with the provisions of Article III and Article IV hereof, will be deemed to be an amendment to this Agreement and such New Service will then be a "*Service*" for all purposes of this Agreement.

Section 2.04    Subcontractors.  Nothing in this Agreement will prevent Service Provider from, with the consent of Recipient, using subcontractors, hired with due care, to perform all or any part of a Service hereunder.  A Service Provider will remain fully responsible for the performance of its obligations under this Agreement in accordance with its terms, including any obligations it performs through subcontractors, and a Service Provider will be solely responsible for payments due to its subcontractors.

ARTICLE III
PAYMENT OF FEES; TAXES

Section 3.01    Management Fee.  The Fund shall pay the Service Provider the Management Fee in accordance with the terms and subject to the conditions set forth in the Advisory Agreement.

Section 3.02    Taxes.

(a)    Recipient is responsible for and will pay all Taxes applicable to the Services provided to Recipient, provided, that such payments by Recipient to Service Provider will be made in the most tax-efficient manner and provided further, that Service Provider will not be subject to any liability for Taxes applicable to the Services as a result of such payment by Recipient.  Service Provider will collect such Tax from Recipient in the same manner it collects such Taxes from other customers in the ordinary course of Service Provider's business, but in no event prior to the time it invoices Recipient for the Services, costs for which such Taxes are levied.  Recipient may provide Service Provider with a certificate evidencing its exemption from payment of or liability for such Taxes.

(b)    Service Provider will reimburse Recipient for any Taxes collected from Recipient and refunded to Service Provider.  In the event a Tax is assessed against Service Provider that is solely the responsibility of Recipient and Recipient desires to protest such assessment, Recipient will submit to Service Provider a statement of the issues and arguments requesting that Service Provider grant Recipient the authority to prosecute the protest in Service Provider's name.  Service Provider's authorization will not be unreasonably withheld.  Recipient will finance, manage, control and determine the strategy for such protest while keeping Service Provider reasonably informed of the proceedings.  However, the authorization will be periodically reviewed by Service Provider to determine any adverse impact on Service Provider, and Service Provider will have the right to reasonably withdraw such authority at any time.  Upon notice by Service Provider that it is so withdrawing such authority, Recipient will expeditiously terminate all proceedings.  Any contest for Taxes brought by Recipient may not result in any lien attaching to any property or rights of Service Provider or otherwise jeopardize Service Provider's interests or rights in any of its property.  Recipient agrees to indemnify Service Provider for all Losses that Service Provider incurs as a result of any such contest by Recipient.

(c)    The provisions of this Section 3.02 will govern the treatment of all Taxes arising as a result of or in connection with this Agreement notwithstanding any other Article of this Agreement to the contrary.

## ARTICLE IV
### SERVICE PROVIDER RESPONSIBILITIES

Section 4.01    <u>Service Provider General Obligations</u>.  Service Provider will provide the Services to Recipient, subject to the requirements under Sections 3.01 and 3.02 herein and subject to reimbursement of permitted expenses in accordance with the Investment Advisory Agreement entered into concurrently herewith, on a non-discriminatory basis and will provide the Services in the same manner as if it were providing such services on its own account (the "***Service Standards***").  Service Provider will conduct its duties hereunder in a lawful manner in compliance with applicable laws, statutes, rules and regulations and in accordance with the Service Standards, including, for avoidance of doubt, laws and regulations relating to privacy of customer information.

Section 4.02    <u>Books and Records; Access to Information</u>.  Service Provider will keep and maintain books and records with respect to the Services in accordance with past practices and internal control procedures. Recipient will have the right, at any time and from time to time upon reasonable prior notice to Service Provider, to inspect and copy (at its expense) during normal business hours at the offices of Service Provider the books and records relating to the Services, with respect to Service Provider's performance of its obligations hereunder.  This inspection right will include the ability of Recipient's financial auditors to review such books and records in the ordinary course of performing standard financial auditing services for Recipient (but subject to Service Provider imposing reasonable access restrictions to Service Provider's and its Affiliates' proprietary information and such financial auditors executing appropriate confidentiality agreements reasonably acceptable to Service Provider).  Service Provider will promptly respond to any reasonable requests for information or access.  For the avoidance of doubt, all books and records kept and maintained by Service Provider on behalf of Recipient shall be the property of Recipient, and Service Provider will surrender promptly to Recipient any of such books or records upon Recipient's request (provided that Service Provider may retain a copy of such books or records) and shall make all such books and records available for inspection and use by the Securities and Exchange Commission or any person retained by Recipient at all reasonable times.  Such records shall be maintained by Service Provider for the periods and in the places required by laws and regulations applicable to Recipient.

Section 4.03    <u>Return of Property and Equipment</u>.  Upon expiration or termination of this Agreement, Service Provider will be obligated to return to Recipient, as soon as is reasonably practicable, any equipment or other property or materials of Recipient that is in Service Provider's control or possession.

## ARTICLE V
### TERM AND TERMINATION

Section 5.01    <u>Term</u>.  The term of this Agreement will commence as of the Effective Date and will continue in full force and effect until the first anniversary of the Effective Date (the "***Term***"), unless terminated earlier in accordance with Section 7.02.  The Term shall automatically renew for successive one year periods unless sooner terminated under Section 5.02.

Section 5.02    <u>Termination</u>.  Either Party may terminate this Agreement, with or without cause, upon at least 60 days advance written notice at any time prior to the expiration of the Term.

## ARTICLE VI
## LIMITED WARRANTY

Section 6.01    Limited Warranty.  Service Provider will perform the Services hereunder in accordance with the Service Standards.  Except as specifically provided in this Agreement, Service Provider makes no express or implied representations, warranties or guarantees relating to its performance of the Services under this Agreement, including any warranty of merchantability, fitness, quality, non-infringement of third party rights, suitability or adequacy of the Services for any purpose or use or purpose. Service Provider will (to the extent possible and subject to Service Provider's contractual obligations) pass through the benefits of any express warranties received from third parties relating to any Service, and will (at Recipient's expense) assist Recipient with any warranty claims related thereto.

## ARTICLE VII
## MISCELLANEOUS

Section 7.01    No Partnership or Joint Venture; Independent Contractor.  Nothing contained in this Agreement will constitute or be construed to be or create a partnership or joint venture between or among HCMLP or Recipient or their respective successors or assigns.  The Parties understand and agree that this Agreement does not make any of them an agent or legal representative of the other for any purpose whatsoever.  No Party is granted, by this Agreement or otherwise, any right or authority to assume or create any obligation or responsibilities, express or implied, on behalf of or in the name of any other Party, or to bind any other Party in any manner whatsoever.  The Parties expressly acknowledge that Service Provider is an independent contractor with respect to Recipient in all respects, including with respect to the provision of the Services.

Section 7.02    Amendments; Waivers.  Except as expressly provided herein, this Agreement may be amended only by agreement in writing of all Parties.  No waiver of any provision nor consent to any exception to the terms of this Agreement or any agreement contemplated hereby will be effective unless in writing and signed by all of the Parties affected and then only to the specific purpose, extent and instance so provided.  No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 7.03    Schedules and Exhibits; Integration.  Each Schedule and Exhibit delivered pursuant to the terms of this Agreement must be in writing and will constitute a part of this Agreement, although schedules need not be attached to each copy of this Agreement.  This Agreement, together with such Schedules and Exhibits constitutes the entire agreement among the Parties pertaining to the subject matter hereof and supersedes all prior agreements and understandings of the Parties in connection therewith.

Section 7.04    Further Assurances.  Each Party will take such actions as any other Party may reasonably request or as may be necessary or appropriate to consummate or implement the transactions contemplated by this Agreement or to evidence such events or matters.

Section 7.05    Governing Law.  Subject to Section 7.14, this Agreement and the legal relations between the Parties will be governed by and construed in accordance with the laws of the State of Texas applicable to contracts made and performed in such State and without regard to conflicts of law doctrines unless certain matters are preempted by federal law.

Section 7.06    Assignment.  Except as otherwise provided hereunder, neither this Agreement nor any rights or obligations hereunder are assignable by one Party without the express prior written consent of the other Parties.

Section 7.07    Headings.  The descriptive headings of the Articles, Sections and subsections of this Agreement are for convenience only and do not constitute a part of this Agreement.

Section 7.08    Counterparts.  This Agreement and any amendment hereto or any other agreement delivered pursuant hereto may be executed in one or more counterparts and by different Parties in separate counterparts.  All counterparts will constitute one and the same agreement and will become effective when one or more counterparts have been signed by each Party and delivered to the other Parties.

Section 7.09    Successors and Assigns; No Third Party Beneficiaries.  This Agreement is binding upon and will inure to the benefit of each Party and its successors or assigns, and nothing in this Agreement, express or implied, is intended to confer upon any other Person or Governmental Entity any rights or remedies of any nature whatsoever under or by reason of this Agreement.

Section 7.10    Notices.  All notices, demands and other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given: (i) immediately when personally delivered; (ii) when received by first class mail, return receipt requested; (iii) one day after being sent for overnight delivery by Federal Express or other overnight delivery service; or (iv) when receipt is acknowledged, either electronically or otherwise, if sent by facsimile, telecopy or other electronic transmission device.  Notices, demands and communications to the other Parties will, unless another address is specified by such Parties in writing, be sent to the addresses indicated below:

> If to HCMLP, addressed to:
>
> Highland Capital Management, L.P.
> 300 Crescent Court, Suite 700
> Dallas, Texas 75201
> Attention:  Chief Legal Officer
> Fax:  (972) 628-4147
>
> If to the General Partner or the Fund, addressed to:
>
> Charitable DAF GP, LLC
> 4140 Park Lake Avenue, Suite 600
> Raleigh, North Carolina 27612
> Attention:  Grant Scott
> Fax:  (919) 854-1401

Section 7.11    Expenses.  Except as otherwise provided herein, the Parties will each pay their own expenses incident to the negotiation, preparation and performance of this Agreement, including the fees, expenses and disbursements of their respective investment bankers, accountants and counsel.

Section 7.12    Waiver.  No failure on the part of any Party to exercise or delay in exercising any right hereunder will be deemed a waiver thereof, nor will any single or partial exercise preclude any further or other exercise of such or any other right.

Section 7.13    Severability.  If any provision of this Agreement is held to be unenforceable for any reason, it will be adjusted rather than voided, if possible, to achieve the intent of the Parties.  All other provisions of this Agreement will be deemed valid and enforceable to the extent possible.

Section 7.14 <u>Jurisdiction; Venue; Waiver of Jury Trial</u>. The Parties hereby agree that any action, claim, litigation, or proceeding of any kind whatsoever against any other Party in any way arising from or relating to this Agreement and all contemplated transactions, including claims sounding in contract, equity, tort, fraud and statute ("***Dispute***") shall be submitted exclusively to the U.S. District Court for the Northern District of Texas or, if such court does not have subject matter jurisdiction, the courts of the State of Texas sitting in Dallas County, and any appellate court thereof ("***Enforcement Court***"). Each Party irrevocably and unconditionally submits to the exclusive personal and subject matter jurisdiction of the Enforcement Court for any Dispute and agrees to bring any Dispute only in the Enforcement Court. Each Party further agrees it shall not commence any Dispute in any forum, including administrative, arbitration, or litigation, other than the Enforcement Court. Each Party agrees that a final judgment in any such action, litigation, or proceeding is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY EXHIBITS, SCHEDULES, AND APPENDICES ATTACHED TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) IT HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) IT MAKES THIS WAIVER KNOWINGLY AND VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 7.15 <u>General Rules of Construction</u>. For all purposes of this Agreement and the Exhibits and Schedules delivered pursuant to this Agreement: (i) the terms defined in Article I have the meanings assigned to them in Article I and include the plural as well as the singular; (ii) all accounting terms not otherwise defined herein have the meanings assigned under GAAP; (iii) all references in this Agreement to designated "Articles," "Sections" and other subdivisions are to the designated Articles, Sections and other subdivisions of the body of this Agreement; (iv) pronouns of either gender or neuter will include, as appropriate, the other pronoun forms; (v) the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; (vi) "or" is not exclusive; (vii) "including" and "includes" will be deemed to be followed by "but not limited to" and "but is not limited to, "respectively; (viii) any definition of or reference to any law, agreement, instrument or other document herein will be construed as referring to such law, agreement, instrument or other document as from time to time amended, supplemented or otherwise modified; and (ix) any definition of or reference to any statute will be construed as referring also to any rules and regulations promulgated thereunder.

IN WITNESS HEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officers to be effective from the Effective Date.

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:   Strand Advisors, Inc., its general partner

By:_____
Name:  James Dondero
Title:  President
Date:  6/21/17

**CHARITABLE DAF GP, LLC**

By:_____
Name:  Grant J. Scott
Title:  Managing Member
Date:

**CHARITABLE DAF FUND, L.P.**

By:  Charitable DAF GP, LLC, its general partner

By:_____
Name:  Grant J. Scott
Title:  Managing Member
Date:

9

IN WITNESS HEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized officers to be effective from the Effective Date.

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:    Strand Advisors, Inc., its general partner

By:_____
Name:  James Dondero
Title:  President
Date:

**CHARITABLE DAF GP, LLC**

By:_____
Name:  Grant J. Scott
Title:  Managing Member
Date:  6/21/2017

**CHARITABLE DAF FUND, L.P.**

By:  Charitable DAF GP, LLC, its general partner

By:_____
Name:  Grant J. Scott
Title:  Managing Member
Date:  6/21/2017

## <u>Annex A</u>

**Services**

**Finance & Accounting**
       Book keeping
       Cash management
       Cash forecasting
       Financial reporting
       Accounts payable
       Accounts receivable
       Expense reimbursement
       Vendor management
       Valuation

**Tax**
       Tax audit support
       Tax planning
       Tax prep and filing

**Legal**
       Document review and preparation

**Trading**
       Trade execution
       Risk management
       Trade settlement
       General operations

**Facilities**

**Public Relations Support**

**Information Technology Infrastructure Support**

# EXHIBIT 2
# to DECLARATION OF MARK PATRICK

November 30, 2020

Charitable DAF GP, LLC
4140 Park Lake Avenue, Suite 600
Raleigh, North Carolina 27612
Attention:  Grant Scott

      **RE:**     **Termination of Second Amended and Restated Service Agreement, dated January 1, 2017, by and among Highland Capital Management, L.P. ("HCMLP"), Charitable DAF Fund, L.P., and Charitable DAF GP, LLC (the "Agreement").**

To Whom It May Concern:

As set forth in Section 5.02 of the Agreement, the Agreement is terminable at will upon at least 60 days advance written notice.

By this letter, HCMLP is notifying you that it is terminating the Agreement.  Such termination will be effective January 31, 2021.  HCMLP reserves the right to rescind this notice of termination.

Please feel free to contact me with any questions.

Sincerely,

HIGHLAND CAPITAL MANAGEMENT, L.P.


/s/ James P. Seery, Jr.

James P. Seery, Jr.
Chief Executive Officer
Chief Restructuring Officer

# EXHIBIT 3
# to DECLARATION OF MARK PATRICK

SECOND AMENDED AND RESTATED
INVESTMENT ADVISORY AGREEMENT

THIS SECOND AMENDED AND RESTATED INVESTMENT ADVISORY AGREEMENT (this "**Agreement**"), dated to be effective from January 1, 2017 (the "***Effective Date***") is entered into by and between **Charitable DAF Fund, L.P.**, a Cayman Islands exempted limited partnership (the "***Fund***"), **Charitable DAF GP, LLC**, a limited liability company organized under the laws of the State of Delaware (the "***General Partner***"), the general partner of the Fund, and **Highland Capital Management, L.P.**, a limited partnership organized under the laws of the State of Delaware (the "***Investment Advisor***"). Each of the signatories hereto is sometimes referred to herein individually as a "***Party***" and collectively as the "***Parties***."

RECITALS

WHEREAS, the Fund, the General Partner and the Investment Advisor entered into that certain Investment Advisory Agreement dated January 1, 2012 (the "***Original Agreement***");

WHEREAS, the Parties amended and restated the Original Agreement in its entirety on the terms set forth in that certain Amended and Restated Investment Advisory Agreement dated July 1, 2014 (the "***Existing Agreement***");

WHEREAS, the parties desire to amend and restate the Existing Agreement in its entirety with the terms as set forth in this Agreement effective as of the Effective Date;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties hereby agree, and the Existing Agreement is hereby amended and restated in its entirety, as follows:

1. <u>Investment Advisory Services</u>. Subject to Section 7, the Investment Advisor shall act as investment advisor to the Fund, the General Partner with respect to the Fund and its subsidiaries and shall provide investment advice with respect to the investment and reinvestment of the cash, Financial Instruments and other properties comprising the assets and liabilities of the Fund and its subsidiaries.

2. <u>Custody</u>. The Financial Instruments shall be held in the custody of Jefferies & Company, Inc. or one or more banks selected by the General Partner (each such bank, a "Custodian"). The General Partner will notify the Investment Advisor promptly of the proposed selection of any other Custodians. The Custodian shall at all times be responsible for the physical custody of the Financial Instruments; for the collection of interest, dividends, and other income attributable to the Financial Instruments; and for the exercise of rights and tenders on the Financial Instruments after consultation with and as then directed by the General Partner. At no time shall the Investment Advisor have possession of or maintain custody over any of the Financial Instruments. The Investment Advisor shall not be responsible for any loss incurred by reason of any act or omission of the Custodian.

3.     Authority of the Investment Advisor.  Subject to Section 7 of this Agreement, the Investment Advisor shall advise the General Partner on behalf of the Fund and/or its subsidiaries with respect to:

(a)     investing, directly or indirectly, on margin or otherwise, in all types of securities and other financial instruments of United States and non-U.S. entities, including, without limitation, capital stock; all manner of equity securities (whether registered or unregistered, traded or privately offered, American Depository Receipts, common or preferred); physical commodities; shares of beneficial interest; partnership interests, limited liability company interests and similar financial instruments; secured and unsecured debt (both corporate and sovereign, bank debt, vendor claims and/or other contractual claims); bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; interest rate, currency, equity and other derivative products, including, without limitation, (i) future contracts (and options thereon) relating to stock indices, currencies, United States Government securities, securities of non-U.S. governments, other financial instruments and all other commodities, (ii) swaps and contracts for difference, options, swaptions, rights, warrants, when-issued securities, caps, collars, floors, forward rate agreements, and repurchase and reverse repurchase agreements and other cash equivalents, (iii) spot and forward currency transactions and (iv) agreements relating to or securing such transactions; leases, including, without limitation, equipment lease certificates; equipment trust certificates; mortgage-backed securities and other similar instruments (including, without limitation, fixed-rate, pass-throughs, adjustable rate mortgages, collateralized mortgage obligations, stripped mortgage-backed securities and REMICs); loans; credit paper; accounts and notes receivable and payable held by trade or other creditors; trade acceptances and claims; contract and other claims; executory contracts; participations; mutual funds, exchange traded funds and similar financial instruments; money market funds and instruments; obligations of the United States, any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; letters of credit; choses in action; puts; calls; other obligations and instruments or evidences of indebtedness of whatever kind or nature; and real estate and any kind of interests in real estate; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (each of such items, "***Financial Instruments***"), and the sale of Financial Instruments short and covering such sales.

(b)     engaging in such other lawful Financial Instruments transactions;

(c)     research and analysis;

(d)     purchasing Financial Instruments and holding them for investment;

(e)     entering into contracts for or in connection with investments in Financial Instruments;

(f)     investing in other pooled investment vehicles, which investments shall be subject in each case to the terms and conditions of the respective governing document for each such vehicle;

(g)     possessing, transferring, mortgaging, pledging or otherwise dealing in, and exercising all rights, powers, privileges and other incidents of ownership or possession with respect to Financial Instruments and other property and funds held or owned by the Fund and/or its subsidiaries;

(h)     lending, either with or without security, any Financial Instruments, funds or other properties of the Funds, including by entering into reverse repurchase agreements, and, from time to time, undertaking leverage on behalf of the Fund;

(i)     opening, maintaining and closing accounts, including margin and custodial accounts, with brokers and dealers, including brokers and dealers located outside the United States;

(j)     opening, maintaining and closing accounts, including custodial accounts, with banks, including banks located outside the United States, and drawing checks or other orders for the payment of monies;

(k)     combining purchase or sale orders on behalf of the Fund with orders for other accounts to which the Investment Advisor or any of its affiliates provides investment services ("*Other Accounts*") and allocating the Financial Instruments or other assets so purchased or sold, on an average-price basis or in any other manner deemed fair and equitable to the Investment Advisor in its sole discretion, among such accounts;

(l)     entering into arrangements with brokers to open "average price" accounts wherein orders placed during a trading day are placed on behalf of the Fund and Other Accounts and are allocated among such accounts using an average price;

(m)     organizing one or more corporations and other entities formed to hold record title, as nominee for the Fund and/or its subsidiaries (whether alone or together with the Other Accounts), to Financial Instruments or funds of the Fund and/or its subsidiaries;

(n)     causing the Fund and/or its subsidiaries to engage in (i) agency, agency cross, related party principal transactions with affiliates of the Investment Manager and (ii) cross transactions with Other Accounts, in each case, to the extent permitted by applicable laws;

(o)     engaging personnel, whether part-time or full-time, and attorneys, independent accountants or such other persons (including, without limitation, finders, consultants and investment bankers); and

(p)     voting of Financial Instruments, participation in arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other like or similar matters.

4.     <u>Policies of the Fund</u>.  The activities engaged in by the Investment Advisor on behalf of the Fund and/or its subsidiaries shall be subject to the policies and control of the General Partner.

The Investment Advisor shall submit such periodic reports to the General Partner regarding the Investment Advisor's activities hereunder as the General Partner may reasonably request and a representative of the Investment Advisor shall be available to meet with the General Partner and/or any other representative of the Fund or its subsidiaries as reasonably requested by the General Partner.

In furtherance of the foregoing, the General Partner hereby appoints the Investment Advisor as the Fund's attorney-in-fact, with full power of authority to act in the Fund's name and on its behalf with respect to the Fund, as follows:

(a)    to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner;

(b)    to execute and combine purchase or sale orders on behalf of the Fund with orders for Other Accounts and allocate the Financial Instruments or other assets so purchased or sold, on an average-price basis or in any other manner deemed fair and equitable to the Investment Advisor in its sole discretion, among such accounts; *provided, however*, that such purchase or sale orders shall be market rates;

(c)    to direct the Custodian to deliver funds or the Financial Instruments, but only in the course of effecting trading and investment transactions for the Fund and subject to such restrictions as may be contained in the custody agreement between the Custodian and the Fund;

(d)    to enter into contracts, provide certifications or take any other actions necessary to effect any of the foregoing transactions; and

(e)    to select brokers on the basis of best execution and in consideration of relevant factors, including, but not limited to, price quotes; the size of the transaction; the nature of the market for the security; the timing of the transaction; the difficulty of execution; the broker-dealer's expertise in the relevant market or sector; the extent to which the broker-dealer makes market in the security or has an access to such market; the broker-dealer's skill in positioning the relevant market; the broker-dealer's facilities, reliability, promptness and financial stability; the broker-dealer's reputation for diligence and integrity (including in correcting errors); confidentiality considerations; the quality and usefulness of research services and investment ideas presented by the broker-dealer; and other factors deemed appropriate by the Investment Advisor.

5.    <u>Valuation of Financial Instruments</u>.  Financial Instruments will be valued in accordance with the then current valuation policy of the Investment Advisor, a copy of which will be provided to the General Partner upon request.

6.    <u>Status of the Investment Advisor</u>.  The Investment Advisor shall, for all purposes, be an independent contractor and not an employee of the General Partner or the Fund or its subsidiaries, nor shall anything herein be construed as making the Fund or its subsidiaries or the General Partner, a partner, member or co-venturer with the Investment Advisor or any of its affiliates or clients.  The Investment Advisor shall have no authority to act for, represent, bind or obligate the Fund or its subsidiaries or the General Partner except as specifically provided herein.

7.    _Investments_.    ALL ULTIMATE INVESTMENT DECISIONS WITH RESPECT TO THE FUND AND ITS SUBSIDIARIES SHALL AT ALL TIMES REST SOLELY WITH THE GENERAL PARTNER AND/OR THE OFFICERS/DIRECTORS OF THE APPLICABLE SUBSIDIARY, IT BEING EXPRESSLY UNDERSTOOD THAT THE GENERAL PARTNER AND/OR THE OFFICERS/DIRECTORS OF THE APPLICABLE SUBSIDIARY SHALL BE FREE TO ACCEPT AND OR REJECT ANY OF THE ADVICE RENDERED BY THE INVESTMENT MANAGER HEREUNDER FOR ANY REASON OR FOR NO REASON.

8.    _Reimbursement by the General Partner_.    The Investment Advisor may retain, in connection with its responsibilities hereunder, the services of others to assist in the investment advice to be given to the General Partner with respect to the Fund and/or its subsidiaries (any such appointee, a "**_Sub-Advisor_**"), including, but not limited to, any affiliate of the Investment Advisor, but payment for any such services shall be assumed by the Investment Advisor, and, therefore, neither the General Partner nor the Fund or any of its subsidiaries shall have any liability therefor; _provided, however_, that the Investment Advisor, in its sole discretion, may retain the services of independent third party professionals, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the General Partner with respect to the Fund and/or its subsidiaries hereunder, and the Fund shall bear full responsibility therefor and the expense of any fees and disbursements arising therefrom.

9.    _Expenses_.

(a)    The Fund shall pay or reimburse the Investment Advisor and its affiliates for all expenses related to the services hereunder, including, but not limited to, investment-related expenses, brokerage commissions and other transaction costs, expenses related to clearing and settlement charges, professional fees relating to legal, auditing or valuation services, any governmental, regulatory, licensing, filing or registration fees incurred in compliance with the rules of any self-regulatory organization or any federal, state or local laws, research-related expenses (including, without limitation, news and quotation equipment and services, investment and trading-related software, including, without limitation, trade order management software (i.e., software used to route trade orders)), accounting (including accounting software), tax preparation expenses, costs and expenses associated with reporting and providing information to the Fund, any taxes imposed upon the Fund (including, but not limited to, collateralized debt obligations managed by the Investment Advisor or its affiliates), fees relating to valuing the Financial Instruments, and extraordinary expenses.  In no event shall any of the foregoing costs or expenses include any salaries, occupational expense or general overhead of the Investment Advisor.  For the avoidance of doubt, (i) the cost of all third party expenses incurred in connection with this Agreement shall not exceed standard market rates (which may include standard soft dollar arrangements) and (ii) to the extent any of the foregoing expenses were incurred on behalf of, or benefit of a number of Investment Advisor's advised accounts, such expenses shall be allocated pro rata among such accounts.

(b)     To the extent that expenses to be borne by the Fund are paid by the Investment Advisor or by any Sub-Advisor, the Fund shall reimburse the Investment Advisor (or Sub-Advisors, as applicable) for such expenses so long as such expenses are at market rates.

10.     <u>Fees</u>.

(a)     The Fund shall pay the Investment Advisor a quarterly fee (the "***Management Fee***") equal to 2.0% per annum (0.5% per quarter) of the Net Assets (as defined below) of the Fund, payable in advance at and calculated as of the first business day of each calendar quarter.  For purposes of calculating the Management Fee, the Net Assets of the Fund will be determined before giving effect to any of the following amounts payable by the Fund generally or in respect of any Investment which are effective as of the date on which such determination is made: (i) any fee payable to the Investment Advisor as of the date on which such determination is made; (ii) any capital withdrawals or distributions payable by the Fund which are effective as of the date on which such determination is made; and (iii) withholding or other taxes, expenses of processing withdrawals and other items payable, any increases or decreases in any reserves, holdback or other amounts specially allocated ending as of the date on which such determination is made.  The Management Fee shall be prorated for partial periods and any applicable excess fees should be returned to the Fund by the Investment Advisor.  Capital contributions made to the Fund after the commencement of a calendar quarter shall be subject to a prorated Management Fee based on the number of days remaining during such quarter.

(b)     Subject to clauses (c) and (d) below, at the end of each Calculation Period (as defined below), an amount equal to 20% of the net capital appreciation of the Fund's Investments (as defined below) after deducting the Management Fee shall be paid to the Investment Advisor (the "***Performance Fee***"); *provided*, *however*, that the net capital appreciation upon which the calculation of the Performance is based shall be reduced to the extent of any unrecovered balance remaining in the Loss Recovery Account (as defined below) maintained on the books and records of the Fund. The amount of the unrecovered balance remaining in the Loss Recovery Account at the time of calculating the Performance Fee shall be the amount existing immediately prior to its reduction pursuant to the second clause of the second sentence of clause (c) below.

(c)     There shall be established on the books of the Fund a memorandum account (the "***Loss Recovery Account***"), the opening balance of which shall be zero.  At the end of each Calculation Period, the balance in the Loss Recovery Account shall be adjusted as follows: first, if there has been, in the aggregate, net capital depreciation of the Fund's Investments (as adjusted pursuant to the last sentence of this paragraph) since the end of the immediately preceding Calculation Period (or with respect to the initial Calculation Period, since the Effective Date), an amount equal to such net capital depreciation shall be credited to the Loss Recovery Account, and, second, if there has been, in the aggregate, net capital appreciation of the Fund's investments (as adjusted pursuant to the last sentence of this paragraph) since the end of the immediately preceding Calculation Period, an amount equal to such net capital appreciation, before taking into account any Performance Fee to be paid to the Investment Advisor, shall be debited to and reduce any unrecovered balance in the Loss Recovery Account, but not below zero. Solely for purposes of this paragraph, in determining the Loss Recovery Account, net capital appreciation and net capital

depreciation for any applicable Calculation Period shall be calculated by taking into account the amount of the Management Fee paid for such period.

(d)     In the event that all or a portion of the Fund's capital is distributed or withdrawn while there exists an unrecovered balance in the Loss Recovery Account, the unrecovered balance in the Loss Recovery Account shall be reduced as of the beginning of the next Calculation Period by an amount equal to the product obtained by multiplying the balance in such Loss Recovery Account by a fraction, the numerator of which is the amount distributed or withdrawn with respect to the immediately preceding distribution or withdrawal date, and the denominator of which is the total fair value of the Fund's Investment immediately prior to such distribution or withdrawal.

(e)     For purposes of this Section 10, the net capital appreciation and net capital depreciation of the Fund's Investments for any given period will be calculation in accordance with the then current valuation policy of the Investment Advisor, a copy of which will be provided upon the General Partner's request.  As soon as reasonably practicable following the end of a Calculation Period, the Investment Advisor shall deliver, or cause to be delivered, to the General Partner a statement showing the calculation of the Performance Fee, if any, with respect to such Calculation Period.  The Performance Fee, if any, shall be payable within three (3) business days of the General Partner's receipt of such statement.

(f)     Payments due to the Investment Advisor shall be made by wire transfer to:

| | |
|---|---|
| Bank Name: | Compass Bank |
| ABA#: | 113010547 |
| FBO: | Highland Capital Management, L.P. (Master Operating Account) |
| Acct#: | 0025876342 |

(g)     For purposes of this Section 10, the following terms have the definitions set forth below:

"*Calculation Period*" means the period commencing on the Effective Date (in the case of the initial Calculation Period) and thereafter each period commencing as of the day following the last day of the preceding Calculation Period, and ending as of the close of business on the first to occur of the following: (i) the last day of a calendar year; (ii) the distribution or withdrawal of capital of the Fund (but only with respect to such distributed or withdrawn amount); (iii) the permitted transfer of all or any portion of a partner's interest in the Fund; and (iv) the final capital distribution of the Fund following its dissolution;

"*Investments*" means all investments, securities, cash, receivables, financial instruments, contracts and other assets, whether tangible or intangible, owned by the Fund;

"***Net Assets***" means, with respect to the Fund as of any date, the excess of the total fair value of all Investments over the total liabilities, debts and obligations of the Fund, in each case, calculated on an accrual basis in accordance with accounting principles generally accepted in the United States and the then current valuation policy of the Service Provider, a copy of which will be provided to the General Partner upon request;  and

"***Services Agreement***" means that certain Second Amended and Restated Service Agreement, dated effective as of the Effective Date, by and among the Parties, as amended, restated, modified and supplemented from time to time.

11.    <u>Exculpation; Indemnification</u>.

(a)    Whether or not herein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the Investment Advisor, its members or any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents (including parties acting as agents for the execution of transactions) (each, a "***Covered Person***" and collectively, "***Covered Persons***") shall be subject to the provisions of this Section.

(b)    To the fullest extent permitted by law, no Covered Person shall be liable to the General Partner or the Fund or any of its subsidiaries or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the General Partner or the Fund, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the General Partner or the Fund, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the General Partner or the Fund or any of its subsidiaries whom such Covered Person believes is authorized to make such suggestions on behalf of the General Partner or the Fund or any of its subsidiaries, (iii) any act or omission by the General Partner or the Fund or any of its subsidiaries, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the General Partner or the Fund or any of its subsidiaries selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or gross negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

(c)    Covered Persons may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the General Partner or the Fund or any of its subsidiaries or in furtherance of the business of the General Partner or the Fund or any of its subsidiaries in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

(d)    To the fullest extent permitted by law, the General Partner and the Fund and its subsidiaries shall indemnify and hold harmless Covered Persons (the "***Indemnified***

*Party*"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnified Party and arise out of or in connection with the business of the General Partner or the Fund or any of its subsidiaries, any investment made under or in connection with this Agreement, or the performance by the Indemnified Party of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnified Party in connection with the General Partner or the Fund or any of its subsidiaries, provided that an Indemnified Party shall not be entitled to indemnification hereunder to the extent the Indemnified Party's conduct constitutes willful misconduct or gross negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnified Party's conduct constituted willful misconduct or gross negligence.

(e) Expenses incurred by an Indemnified Party in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the General Partner prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnified Party to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnified Party is not entitled to be indemnified hereunder.

(f) The right of any Indemnified Party to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnified Party may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnified Party's successors, assigns and legal representatives.

(g) The provisions of this Section are expressly intended to confer benefits upon Covered Persons and such provisions shall remain operative and in full force and effect regardless of the expiration or any termination of this Agreement.

(h) In no event shall any Covered Person be liable for special, exemplary, punitive, indirect, or consequential loss, or damage of any kind whatsoever, including without limitation lost profits.

(i) No Covered Person shall be liable hereunder for any settlement of any action or claim effected without its written consent thereto.

(j) Pursuant to the exculpation and indemnification provisions described above, the Investment Advisor and each Indemnified Party will generally not be liable to the General Partner or the Fund for any act or omission (or alleged act or omission), absent bad faith, willful misconduct, fraud or gross negligence, and the General Partner and the Fund will generally be required to indemnify such persons against any Losses they may incur by reason of any act or omission (or alleged act or omission) related to the General Partner, the Fund or its subsidiaries, absent bad faith, willful misconduct, fraud or gross negligence. As a result of these provisions, the General Partner, the Fund and its subsidiaries, as applicable (not the Investment

Advisor or any other Indemnified Party) will be responsible for any Losses resulting from trading errors and similar human errors, absent bad faith, willful misconduct, fraud or gross negligence or the ability to waive or limit such Losses under applicable law. Trading errors might include, for example, keystroke errors that occur when entering trades into an electronic trading system or typographical or drafting errors related to derivatives contracts or similar agreements. Given the volume of transactions executed by the Investment Advisor and its affiliates on behalf of the Fund and/or its subsidiaries, the General Partner acknowledges that trading errors (and similar errors) will occur and that the General Partner will be responsible for any resulting Losses, even if such Losses result from the negligence (but not gross negligence) of the Investment Advisor or its affiliates.

12.     <u>Activities of the Investment Advisor and Others</u>. The Investment Advisor, and its affiliates may engage, simultaneously with their investment management activities on behalf of the Fund, in other businesses, and may render services similar to those described in this Agreement to other individuals, companies, trusts or persons, and shall not by reason of such engaging in other businesses or rendering of services for others be deemed to be acting in conflict with the interests of the Fund. Notwithstanding the foregoing, the Investment Advisor and its affiliates shall devote as much time to provide advisory service to the General Partner with respect to the management of the Fund's assets as the Investment Advisor deems necessary and appropriate. In addition, the Investment Advisor or any of its affiliates, in their individual capacities, may engage in securities transactions which may be different than, and contrary to, the investment advice provided by the Investment Advisor to the General Partner with respect to the Fund. The Investment Advisor may give advice and recommend securities to, or buy securities for, accounts and other clients, which advice or securities may differ from advice given to, or securities recommended or bought for, the Fund, even though their investment objectives may be the same or similar. The Investment Advisor may recommend transactions in securities and other assets in which the Investment Advisor has an interest, including securities or other assets issued by affiliates of the Investment Manager. Each of the General Partner and the Fund acknowledges that it has received, reviewed and had an opportunity with respect to (a) a copy of Part 2 of the Investment Advisor's Form ADV, and (b) the supplemental disclosures attached hereto as <u>Exhibit A</u>, each of which further describes conflicts of interest relating to the Investment Advisor, its affiliates and their respective advised accounts.

13.     <u>Term</u>. This Agreement shall remain in effect through an initial term concluding December 31, 2017 and shall be automatically extended for additional one-year terms thereafter, except that it may be terminated by the Investment Advisor, on the one hand, or by the General Partner and the Fund, on the other hand, upon at least 90 days' prior written notice to the General Partner or the Investment Advisor, as the case may be, prior to General Partner's fiscal year-end.

14.     <u>Miscellaneous</u>.

(a)     <u>Notices</u>. Any notice, consent or other communication made or given in connection with this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or facsimile or five days after mailed by certified mail, return receipt requested, as follows:

If to the Investment Advisor, to:

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Telephone Number:  (972) 628-4100
Facsimile Number:  (972) 628-4147

If to the General Partner or the Fund, to:

Charitable DAF GP, LLC
4140 Park Lake Avenue, Suite 600
Raleigh, North Carolina 27612
Attention:  Grant Scott
Telephone Number:  (919) 854-1407
Facsimile Number:  (919) 854-1401

(b)      <u>Entire Agreement</u>.  This Agreement contains all of the terms agreed upon or made by the parties relating to the subject matter of this Agreement, and supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter.

(c)      <u>Amendments and Waivers</u>.  No provision of this Agreement may be amended, modified, waived or discharged except as agreed to in writing by the parties.  No amendment to this Agreement may be made without first obtaining the required approval from the Fund.  The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver thereof or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

(d)      <u>Binding Effect; Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the General Partner, the Fund, the Investment Advisor, each Indemnified Party and their respective successors and permitted assigns.  Any person that is not a signatory to this Agreement but is nevertheless conferred any rights or benefits hereunder (*e.g.*, officers, partners and personnel of the Investment Advisor and others who are entitled to indemnification hereunder) shall be entitled to such rights and benefits as if such person were a signatory hereto, and the rights and benefits of such person hereunder may not be impaired without such person's express written consent.  No party to this Agreement may assign (as such term is defined under the U.S. Investment Advisers Act of 1940, as amended) all or any portion of its rights, obligations or liabilities under this Agreement without the prior written consent of the other parties to this Agreement; <u>provided</u>; <u>however</u>, that the Investment Advisor may assign all or any portion of its rights, obligations and liabilities hereunder to any of its affiliates at its discretion.

(e)      <u>Governing Law</u>.  Notwithstanding the place where this Agreement may be executed by any of the parties thereto, the parties expressly agree that all terms and provisions hereof shall be governed by and construed in accordance with the laws of the State of Texas applicable to agreements made and to be performed in that State.

(f)     Jurisdiction; Venue; Waiver of Jury Trial.  The Parties hereby agree that any action, claim, litigation, or proceeding of any kind whatsoever against any other Party in any way arising from or relating to this Agreement and all contemplated transactions, including claims sounding in contract, equity, tort, fraud and statute ("*Dispute*") shall be submitted exclusively to the U.S. District Court for the Northern District of Texas or, if such court does not have subject matter jurisdiction, the courts of the State of Texas sitting in Dallas County, and any appellate court thereof ("***Enforcement Court***").  Each Party irrevocably and unconditionally submits to the exclusive personal and subject matter jurisdiction of the Enforcement Court for any Dispute and agrees to bring any Dispute only in the Enforcement Court.  Each Party further agrees it shall not commence any Dispute in any forum, including administrative, arbitration, or litigation, other than the Enforcement Court.  Each Party agrees that a final judgment in any such action, litigation, or proceeding is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY EXHIBITS, SCHEDULES, AND APPENDICES ATTACHED TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) IT HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) IT MAKES THIS WAIVER KNOWINGLY AND VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Nothing in this Section 14(f) shall be construed to limit either party's right to obtain equitable or injunctive relief in a court of competent jurisdiction in appropriate circumstances.

(g)     Headings.  The headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the parties to this Agreement.

(h)     Counterparts.  This Agreement may be signed in any number of counterparts with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement.

(i)     Survival.  The provisions of Sections 8, 9, 10, 11 and 14 hereof shall survive the termination of this Agreement.

(j)     Pronouns.  All pronouns shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons' firm or company may require in the context thereof.

(k)     <u>Arm's-Length Agreement</u>.  The General Partner and the Fund have approved this Agreement and reviewed the activities described in Section 12 and in the Investment Advisor's Form ADV and the risks related thereto.

*[Signature Page to Follow]*

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed to be effective from the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:    Strand Advisors, Inc., its general partner

By:_____

Name:  James Dondero
Title:  President
Date:  6/21/17

CHARITABLE DAF GP, LLC

By:_____

Name:  Grant J. Scott
Title:  Managing Member
Date:

CHARITABLE DAF FUND, L.P.

By:    Charitable DAF GP, LLC, its general partner

By:_____

Name:  Grant J. Scott
Title:  Managing Member
Date:

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed to be effective from the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:    Strand Advisors, Inc., its general partner

By:_____

Name:  James Dondero
Title:  President
Date:

CHARITABLE DAF GP, LLC

By:_____

Name:  Grant J. Scott
Title:  Managing Member
Date:  6/21/2017

CHARITABLE DAF FUND, L.P.

By:    Charitable DAF GP, LLC, its general partner

By:_____

Name:  Grant J. Scott
Title:  Managing Member
Date:  6/21/2017

14

## EXHIBIT A

## Supplemental Disclosures

**Potential Conflicts of Interest**

The scope of the activities of Highland Capital Management, L.P. (the "***Investment Adviser***"), its affiliates, and the funds and clients managed or advised by the Investment Adviser or any of its affiliates may give rise to conflicts of interest or other restrictions and/or limitations imposed on Charitable DAF Fund, L.P. and its subsidiaries (collectively, the "***Fund***") in the future that cannot be foreseen or mitigated at this time. The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts.  Additional conflicts are described in the Investment Adviser's Form ADV.  You are urged to review the Investment Adviser's Form ADV in its entirety prior to investing in the Fund.[1]

*Highland Group & Highland Accounts*.  None of the Investment Adviser, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees (collectively, the "***Highland Group***") is precluded from engaging in or owning an interest in other business ventures or investment activities of any kind, whether or not such ventures are competitive with the Fund. The Investment Adviser is permitted to manage other client accounts, and does manage other client accounts, some of which may have objectives similar or identical to those of the Fund, including other collective investment vehicles that may be managed by the Highland Group and in which the Investment Adviser or any of its affiliates may have an equity interest.

The Fund will be subject to a number of actual and potential conflicts of interest involving the Highland Group including, among other things, the fact that: (i) the Highland Group conducts substantial investment activities for accounts, funds, collateralized debt obligations and collateralized loan obligations that invest in leveraged loans (collectively, "***CDOs***") and other vehicles managed by members of the Highland Group (collectively, "***Highland Accounts***") in which the Fund has no interest; (ii) the Highland Group advises Highland Accounts, which utilize the same, similar or different methodologies as the Fund and may have financial incentives (including, without limitation, as it relates to the composition of investors in such funds and accounts or to the Highland Group's compensation arrangements) to favor certain Highland Accounts over the Fund; (iii) the Highland Group may use the strategy described herein in certain Highland Accounts; (iv) the Investment Adviser may give advice and recommend securities to, or buy or sell securities for, the Fund, which advice or securities may differ from advice given to, or securities recommended or bought or sold for, Highland Accounts; (v) the Investment Adviser has the discretion, to the extent permitted under applicable law, to use its affiliates as service providers to the Fund and its portfolio investments; (vi) certain investors affiliated with the Highland Group may choose to personally invest only in certain funds advised by the Highland Group and the amounts invested by them in such funds is expected to vary significantly; (vii) the Highland Group and Highland Accounts may actively engage in transactions in the same securities sought by the

---

[1]  The Investment Adviser's latest Form ADV filed and Part 2 Brochures can be accessed here: https://adviserinfo.sec.gov/IAPD/IAPDFirmSummary.aspx?ORG_PK=110126

Fund and, therefore, may compete with the Fund for investment opportunities or may hold positions opposite to positions maintained by the Fund; (viii) the Fund may invest in CDOs and Highland Accounts managed by members of the Highland Group; and (ix) the Investment Adviser will devote to the Fund only as much time as the Investment Adviser deems necessary and appropriate to manage the Fund's business.

The Investment Adviser undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Fund's investors.

*Allocation of Trading Opportunities*.  It is the policy of the Investment Adviser to allocate investment opportunities fairly and equitably over time. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) fiduciary duties owed to the accounts; (ii) the primary mandate of the accounts; (iii) the capital available to the accounts; (iv) any restrictions on the accounts and the investment opportunity; (v) the sourcing of the investment, size of the investment and amount of follow-on available related to the investment; (vi) whether the risk-return profile of the proposed investment is consistent with the account's objectives and program, whether such objectives are considered in light of the specific investment under consideration or in the context of the portfolio's overall holdings; (vii) the potential for the proposed investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (viii) liquidity requirements of the account; (ix) potentially adverse tax consequences; (x) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed investment; and (xi) the need to re-size risk in the account's portfolio.

The Investment Adviser has the authority to allocate trades to multiple Highland Accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order for any accounts cannot be fully allocated under prevailing market conditions, the Investment Adviser may allocate the trades among different accounts on a basis it considers fair and equitable over time. One or more of the foregoing considerations may (and are often expected to) result in allocations among the Fund and one or more Highland Accounts on other than a *pari passu* basis.  The Investment Adviser will allocate investment opportunities across its accounts for which the opportunities are appropriate, consistent with (i) its internal conflict of interest and allocation policies and (ii) the requirements of the U.S. Investment Advisers Act of 1940, as amended.  The Investment Adviser will seek to allocate investment opportunities among such entities in a manner that is fair and equitable over time and consistent with its allocation policy.  However, there is no assurance that such investment opportunities will be allocated to the Fund fairly or equitably in the short-term or over time and there can be no assurance that the Fund will be able to participate in all investment opportunities that are suitable for it.

The Investment Adviser and/or its affiliates may open "average price" accounts with brokers. In an "average price" account, purchase and sale orders placed during a trading day for the Fund, the Highland Accounts or affiliates of the Investment Adviser are combined, and securities bought and sold pursuant to such orders are allocated among such accounts on an average price basis.

*Highland Group Trading*.  As part of their regular business, the members of the Highland Group hold, purchase, sell, trade or take other related actions both for their respective accounts and for the accounts of their respective clients, on a principal or agency basis, with respect to loans, securities and other investments and financial instruments of all types. The members of the Highland Group also provide investment advisory services, among other services, and engage in private equity, real estate and capital markets oriented investment activities. The members of the Highland Group will not be restricted in their performance of any such services or in the types of debt or equity investments which they may make. The members of the Highland Group may have economic interests in or other relationships with obligors or issuers in whose obligations or securities or credit exposures the Fund may invest. In particular, such persons may make and/or hold an investment in an obligor's or issuer's securities that may be *pari passu*, senior or junior in ranking to an investment in such obligor's or issuer's securities made and/or held by the Fund or in which partners, security holders, members, officers, directors, agents, personnel or employees of such persons serve on boards of directors or otherwise have ongoing relationships. Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Fund and otherwise create conflicts of interest for the Fund. In such instances, the members of the Highland Group may in their discretion make investment recommendations and decisions that may be the same as or different from those made with respect to the Fund's investments. In connection with any such activities described above, the members of the Highland Group may hold, purchase, sell, trade or take other related actions in securities or investments of a type that may be suitable to investments for the Fund. The members of the Highland Group will not be required to offer such securities or investments to the Fund or provide notice of such activities to the Fund. In addition, in managing the Fund's portfolio, the Investment Adviser may take into account its relationship or the relationships of its affiliates with obligors and their respective affiliates, which may create conflicts of interest. Furthermore, in connection with actions taken in the ordinary course of business of the Investment Adviser in accordance with its fiduciary duties to its other clients, the Investment Adviser may take, or be required to take, actions which adversely affect the interests of the Fund.

The Highland Group has invested and may continue to invest in investments that would also be appropriate for the Fund. Such investments may be different from those made by the Fund. The Highland Group does not have any duty, in making or maintaining such investments, to act in a way that is favorable to the Fund or to offer any such opportunity to the Fund, subject to the Investment Adviser's internal allocation policy. The investment policies, fee arrangements and other circumstances applicable to such other accounts and investments may vary from those applicable to the Fund and its investments. The Highland Group may also provide advisory or other services for a customary fee with respect to investments made or held by the Fund, and neither the Fund nor its investors shall have any right to such fees. The Highland Group may also have ongoing relationships with, render services to or engage in transactions with other clients who make investments of a similar nature to those of the Fund, and with companies whose securities or properties are acquired by the Fund.

As further described below, in connection with the foregoing activities the Highland Group may from time to time come into possession of material nonpublic information that limits the ability of the Investment Adviser to effect a transaction for the Fund, and the Fund's investments may be constrained as a consequence of the Investment Adviser's inability to use such information for

advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Fund.

Although the professional staff of the Investment Adviser will devote as much time to the Fund as the Investment Adviser deems appropriate to perform its duties in accordance with the Fund's advisory agreement and in accordance with reasonable commercial standards, the staff may have conflicts in allocating its time and services among the Fund and the Investment Adviser's other accounts.

*Various Activities of the Investment Adviser and its Affiliates*. The directors, officers, personnel, employees and agents of the Investment Adviser and its affiliates may, subject to applicable law, serve as directors (whether supervisory or managing), officers, personnel, employees, partners, agents, nominees or signatories or provide banking, agency, insurance and/or other services, and receive arm's length fees in connection with such services, for the Fund or its investments or other entities that operate in the same or a related line of business as the, for other clients managed by the Investment Adviser or its affiliates, or for any obligor or issuer in respect of the CDOs, and the Fund shall have no right to any such fees. In serving in these multiple capacities, they may have obligations to such other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Fund. The Fund may compete with other Highland Accounts for capital and investment opportunities.

There is no limitation or restriction on the Investment Adviser or any of its affiliates with regard to acting as investment adviser or collateral manager (or in a similar role) to other parties or persons. This and other future activities of the Investment Adviser and/or its affiliates may give rise to additional conflicts of interest. Such conflicts may relate to obligations that the Investment Adviser's investment committee, the Investment Adviser or its affiliates have to other clients.

The Investment Adviser and its affiliates may participate in creditors or other committees with respect to the bankruptcy, restructuring or workout of an investment of the Fund or another account. In such circumstances, the Investment Adviser or its affiliates may take positions on behalf of themselves or another account that are adverse to the interests of the Fund.

The Investment Adviser and/or its affiliates may act as an underwriter, arranger or placement agent, or otherwise participate in the origination, structuring, negotiation, syndication or offering of CDOs, Highland Accounts and other investments purchased by the Fund. Such transactions shall be subject to fees that are intended to be no greater than arm's-length fees, and the Fund shall have no right to any such fees. There is no expectation for preferential access to transactions involving CDOs and Highland Accounts that are underwritten, originated, arranged or placed by the Investment Adviser and/or its affiliates and the Fund shall not have any right to any such fees.

*Investments in Highland Accounts Managed by the Investment Manager or its Affiliates*. The Fund may invest a significant portion of its capital in Highland Accounts. The Investment Adviser or its affiliates will receive senior and subordinated management fees and, in some cases, a performance-based allocation or fee with respect to its role as general partner and/or manager of the Highland Accounts. If the Fund invests in Highland Accounts in secondary transactions, the Fund will indirectly pay the fees (senior and subordinated) of such Highland Accounts and any

carried interest. If the Fund provides all of the equity for a Highland Account, there may be no third party with whom the amount of such fees, expenses and carried interest can be negotiated on an arm's-length basis. The Investment Adviser or its affiliates will have conflicting division of loyalties and responsibilities regarding the Fund and a Highland Account, and certain other conflicts of interest would be inherent in the situation. There can be no assurance that the interests of the Fund would not be subordinated to those of a Highland Account or to other interests of the Investment Adviser.

*Multiple Levels of Fees*. The Investment Adviser and the Highland Accounts are expected to impose management fees, other administrative fees, carried interest and other performance allocations on realized and unrealized appreciation in the value of the assets managed and other income. This may result in greater expense than if investors in the Fund were able to invest directly in the Highland Accounts or their respective underlying investments. Investors in the Fund should take into account that the return on their investment will be reduced to the extent of both levels of fees. The general partner or manager of a Highland Account may receive the economic benefit of certain fees from its portfolio companies for services and in connection with unconsummated transactions (*e.g.*, break-up, placement, monitoring, directors', organizational and set-up fees and financial advisory fees).

*Cross Transactions and Principal Transactions.* The Investment Adviser may effect client cross-transactions where the Investment Adviser causes a transaction to be effected between the Fund and another client advised by it or any of its affiliates. The Investment Adviser may engage in a client cross-transaction involving the Fund any time that the Investment Adviser believes such transaction to be fair to the Fund and such other client.

The Investment Adviser may effect principal transactions where the Fund acquires securities from or sells securities to the Investment Adviser and/or its affiliates, in each case in accordance with applicable law, which will include the Investment Adviser obtaining independent consent on behalf of the Fund prior to engaging in any such principal transaction between the Fund and the Investment Adviser or its affiliates.

The Investment Adviser may advise the Fund to acquire or dispose of securities in cross trades between the Fund and other clients of the Investment Adviser or its affiliates in accordance with applicable legal and regulatory requirements. In addition, the Fund may invest in securities of obligors or issuers in which the Investment Adviser and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Fund may enhance the profitability of the Investment Adviser's own investments in such companies. Moreover, the Fund may invest in assets originated by the Investment Adviser or its affiliates. In each such case, the Investment Adviser and such affiliates may have a potentially conflicting division of loyalties and responsibilities regarding the Fund and the other parties to such trade. Under certain circumstances, the Investment Adviser and its affiliates may determine that it is appropriate to avoid such conflicts by selling a security at a fair value that has been calculated pursuant to the Investment Adviser's valuation procedures to another client managed or advised by the Investment Adviser or such affiliates. In addition, the Investment Adviser may enter into agency cross-transactions where it or any of its affiliates acts as broker for the Fund and for the other party to the transaction, to the extent permitted under applicable law. The Investment Adviser may obtain independent consent

in writing on behalf of the Fund, which consent may be provided by the managing member of the General Partner or any other independent party on behalf of the Fund, if any such transaction requires the consent of the Fund under Section 206(3) of the U.S. Investment Advisers Act of 1940, as amended.

*Material Non-Public Information*. There are generally no ethical screens or information barriers among the Investment Adviser and certain of its affiliates of the type that many firms implement to separate persons who make investment decisions from others who might possess material, non-public information that could influence such decisions. If the Investment Adviser, any of its personnel or its affiliates were to receive material non-public information about a particular obligor or issuer, or have an interest in causing the Fund to acquire a particular security, the Investment Adviser may be prevented from advising the Fund to purchase or sell such asset due to internal restrictions imposed on the Investment Adviser. Notwithstanding the maintenance of certain internal controls relating to the management of material nonpublic information, it is possible that such controls could fail and result in the Investment Adviser, or one of its investment professionals, buying or selling an asset while, at least constructively, in possession of material non-public information. Inadvertent trading on material nonpublic information could have adverse effects on the Investment Adviser's reputation, result in the imposition of regulatory or financial sanctions, and as a consequence, negatively impact the Investment Adviser's ability to perform its portfolio management services to the Fund. In addition, while the Investment Adviser and certain of its affiliates currently operate without information barriers on an integrated basis, such entities could be required by certain regulations, or decide that it is advisable, to establish information barriers. In such event, the Investment Adviser's ability to operate as an integrated platform could also be impaired, which would limit the Investment Adviser's access to personnel of its affiliates and potentially impair its ability to manage the Fund's investments.

*Conflicts Relating to Equity and Debt Ownership by the Fund and Affiliates.* In certain circumstances, the Fund and other client accounts may invest in securities or other instruments of the same issuer (or affiliated group of issuers) having a different seniority in the issuer's capital structure. If the issuer becomes insolvent, restructures or suffers financial distress, there may be a conflict between the interests in the Fund and those other accounts insofar as the issuer may be unable (or in the case of a restructuring prior to bankruptcy may be expected to be unable) to satisfy the claims of all classes of its creditors and security holders and the Fund and such other accounts may have competing claims for the remaining assets of such issuers. Under these circumstances it may not be feasible for the Investment Adviser to reconcile the conflicting interests in the Fund and such other accounts in a way that protects the Fund's interests. Additionally, the Investment Adviser or its nominees may in the future hold board or creditors' committee memberships which may require them to vote or take other actions in such capacities that might be conflicting with respect to certain funds managed by the Investment Adviser in that such votes or actions may favor the interests of one account over another account. Furthermore, the Investment Adviser's fiduciary responsibilities in these capacities might conflict with the best interests of the investors.

*Other Fees*. The Investment Adviser and its affiliates are permitted to receive consulting fees, investment banking fees, advisory fees, breakup fees, director's fees, closing fees, transaction fees and similar fees in connection with actual or contemplated investments. Such fees will not reduce

or offset the Management Fee.  Conflicts of interest may also arise due to the allocation of such fees to or among co-investors.

*Soft Dollars*.  The Investment Adviser's authority to use "soft dollar" credits generated by the Fund's securities transactions to pay for expenses that might otherwise have been borne by the Investment Adviser may give the Investment Adviser an incentive to select brokers or dealers for transactions, or to negotiate commission rates or other execution terms, in a manner that takes into account the soft dollar benefits received by the Investment Adviser rather than giving exclusive consideration to the interests of the Fund.

# EXHIBIT 4
# to DECLARATION OF MARK PATRICK

November 30, 2020

Charitable DAF GP, LLC
4140 Park Lake Avenue, Suite 600
Raleigh, North Carolina 27612
Attention:  Grant Scott

      **RE:**    **Termination of Second Amended and Restated Investment Advisory Agreement, dated January 1, 2017, by and among Highland Capital Management, L.P. ("<u>HCMLP</u>"), Charitable DAF Fund, L.P., and Charitable DAF GP, LLC (the "<u>Agreement</u>").**

To Whom It May Concern:

As set forth in Section 13 of the Agreement, the Agreement is terminable at will upon at least 90 days advance written notice.

By this letter, HCMLP is notifying you that it is terminating the Agreement.  Such termination will be effective 90 days from the date hereof.  HCMLP reserves the right to rescind this notice of termination.

Please feel free to contact me with any questions.

Sincerely,

HIGHLAND CAPITAL MANAGEMENT, L.P.


/s/ James P. Seery, Jr.

James P. Seery, Jr.
Chief Executive Officer
Chief Restructuring Officer

# EXHIBIT 5
# to DECLARATION OF MARK PATRICK

EXECUTION VERSION

# SHARED RESOURCES AGREEMENT

This Shared Resources Agreement (including the Schedule attached hereto, this "Agreement") is entered into effective as of March 1, 2021 (the "Effective Date") by and among Highland Capital Management, L.P. ("HCMLP") and the following parties (collectively, the "NexPoint Parties"): NexPoint Advisors, L.P. ("NPA"), and Highland Capital Management Fund Advisors, L.P. ("HCMFA").

The NexPoint Parties and HCMLP collectively are referred to as the "Parties" and each of them as a "Party".

## PREAMBLE

WHEREAS, HCMLP and the NexPoint Parties were parties to certain Shared Services Agreements (collectively, the "Shared Services Agreements") pursuant to which HCMLP provided certain services, including access to and use of the IT-related systems and resources of HCMLP set forth on Schedule A to this Agreement (the "Shared Resources").

WHEREAS, such Shared Services Agreements were duly terminated as of February 19, 2021.

WHEREAS, the Bankruptcy Court entered an order on February 24, 2021 (the "Order") governing the transfer of books and records and data.

WHEREAS, certain employees of HCMLP have or may form a new company ("Newco") to provide services similar to certain of those provided under the Shared Service Agreements to the NexPoint Parties and other third parties.

WHEREAS, pursuant to that certain Letter Agreement, dated March 1, 2021, between HCMLP and NPA, each of HCMLP and NPA have reached an agreement regarding the retention, assignment and assumption, as applicable, of certain contracts, licenses, and agreements with Bloomberg Finance L.P. and its subsidiaries and affiliates that are needed in connection with the Parties' respective businesses.

WHEREAS, further to the objectives of the Order and pursuant to the terms and subject to the conditions set forth in this Agreements, HCMLP is willing to provide access and use of the Shared Resources to and by the NexPoint Parties in consideration of payments and other agreements of the NexPoint Parties contained herein.

NOW, THEREFORE, in consideration of the covenants and agreements set forth in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## I.   RESOURCES AND PAYMENTS

Section 1.1      Access to Certain Shared Resources.

(a)      Subject to terms and conditions set forth in this Agreement and the NexPoint Parties' compliance therewith, HCMLP shall provide employees and personnel of the NexPoint Parties with access to and use of the Shared Resources during the term of this Agreement. For the avoidance of doubt, the Parties agree that NexPoint Parties will have access to the same books and records as available under the applicable Shared Services Agreements; provided, however, that notwithstanding anything herein or in the Shared Services Agreements to the contrary, none of the NexPoint Parties, Newco or any of their respective

Agents (as hereinafter defined) shall have access to HCMLP's proprietary data. In addition, HCMLP shall not access any of the NexPoint Parties' proprietary data to the extent generated on or after the Effective Date.  Further, to the extent permitted by the terms and agreements governing the Shared Resource, HCMLP agrees that subject to the advance written consent of HCMLP (which may be withheld in its sole discretion), the NexPoint Parties shall have the right to share or sublicense such Shared Resource; provided that HCMLP's prior written consent shall not be required in order for the NexPoint Parties to share or sublicense the Shared Resources to Newco or any other person or entity (or their respective subsidiaries in existence as of the Effective Date) that was a historical user of a Shared Resources as of February 19, 2021 pursuant to a written shared services agreement with HCMLP; provided, further, that each other such person or entity, including Newco and any such historical user, as applicable, shall have executed and delivered to HCMLP a joinder to this Agreement, other than with respect to the payment obligations set forth herein, that is satisfactory to HCMLP in its sole reasonable discretion.

(b)       In consideration of this Agreement, the NexPoint Parties shall make prompt payments in cash, by wire transfer, to HCMLP or its designee in such amounts as are set forth on Schedule A to this Agreement.  The NexPoint Parties shall pay the amounts owed for (i) March 2021 as set forth on Schedule A to HCMLP on the Effective Date and (ii) April 2021 as set forth on Schedule A to HCMLP on March 15, 2021.  Thereafter, the NexPoint Parties shall make all monthly payments (or other periodic payments) set forth on Schedule A to HCMLP on or before the first day of the calendar month preceding the calendar month (or other period) to which such payment relates.  The Parties acknowledge and agree that the amounts set forth on Schedule A reflect the historical costs for such Shared Resources as of calendar year 2020.  In the event that the actual invoiced amounts for a given Shared Resource differ from what is set forth in the initial Schedule A, HCMLP shall deliver to NPA an amended Schedule A to reflect such actual amounts and such costs shall continue to be borne 60% by the NexPoint Parties and 40% by HCMLP and paid in accordance with the terms set forth herein.  In the event that Schedule A is amended in accordance with the foregoing in respect of payments that have already been made by the NexPoint Parties hereunder, the applicable Party shall promptly reimburse the other Party following the delivery of the amended Schedule A. All payment obligations of the NexPoint Parties under this Agreement shall be joint and not several. Except with respect to such payment obligations, the obligations and liabilities of the NexPoint Parties hereunder shall be several and not joint.

(c)       The NexPoint Parties shall pay their allocable portion of the Siepe Master Agreement for January 2021 and February 2021 within three (3) Business Days of being invoiced.

(d)       Each such Shared Resource shall be renewed only to the extent necessary to remain available to employees and personnel of the NexPoint Parties and HCMLP for such parties to perform their duties consistent with past practices through the End Date (as hereinafter defined).  Thereafter, no Party to this Agreement shall be responsible for extension or renewal of any such Shared Resource or to provide access to any such Shared Resource with any other Party.  The aggregate cost of any renewal (even if such renewal extends beyond the End Date) shall be borne 60% by the NexPoint Parties and 40% by HCMLP. The NexPoint Parties shall promptly pay their portion of such renewal costs to HCMLP or its designee at the request of HCMLP at least five (5) Business Days  before the date such renewal payment is required to be made to the applicable vendor, and assuming timely receipt of such portion, HCMLP shall timely make the full renewal payment to the applicable vendor. For purposes of this Agreement, "Business Day" shall mean a day on which the New York Stock Exchange is open for regular trading. The parties hereby agree to discuss the renewal of each vendor contract in respect of the Shared Resources prior to renewal and agree that (i) if both Parties agree that a Shared Resource in respect of such vendor contract is no longer necessary for each of the Parties to operate through the End Date, then such vendor contract shall not be renewed, and (ii) if either Party determines that a Shared Resource in respect of such vendor contract is necessary for such Party to operate through the End Date, such vendor contract shall be renewed and the aggregate cost of such renewal (even if such renewal extends beyond the term provided in Schedule A) shall be borne 60%

by the NexPoint Parties and 40% by HCMLP. Each of the Parties shall proceed diligently and in good faith, and agree to use all reasonable best efforts to do, and cause to be done, all things necessary, desirable and/or appropriate to ensure such Party will not need any Shared Resource following the End Date.

(e)      The Parties acknowledge and agree that it will be necessary for HCMLP, in its sole good faith discretion, to employ and/or engage certain personnel (the "Necessary Personnel") in order to maintain, provide access to and use of the Shared Resources as contemplated herein, and that HCMLP may engage former employees of HCMLP, including, without limitation, any former employee of HCMLP who enters into an employment or independent contractor relationship with Newco and/or the NexPoint Parties as Necessary Personnel to provide back-office services in connection therewith. The NexPoint Parties shall cooperate fully with HCMLP's efforts to engage such Necessary Personnel and the NexPoint Parties shall not, and shall cause their affiliates and its and their respective employees, personnel, officers, directors, managers, members, representatives, agents, principals, owners, or partners (collectively, "Agents") to not, directly or indirectly, prohibit, prevent, limit or otherwise discourage any former HCMLP employee or any other person from accepting such engagement. Notwithstanding anything herein to the contrary, in the event that HCMLP is unable or ceases to be able to employ and/or engage the Necessary Personnel, HCMLP shall thereafter have no further obligations to the NexPoint Parties or any of their Agents with respect to the Shared Services; provided, that, the foregoing shall not relieve the NexPoint Parties of any of their obligations hereunder.

(f)      The fully loaded aggregate cost of such Necessary Personnel from the Effective Date through the End Date shall be borne 60% by the NexPoint Parties and 40% by HCMLP. HCMLP will invoice the NexPoint Parties for their allocable portion of the Necessary Personnel monthly and the NexPoint Parties shall make payment in respect thereof within five (5) Business Days following delivery of each such invoice.

(g)      The NexPoint Parties shall, and shall ensure that their employees and personnel, comply with and fulfill any obligations or responsibilities applicable to employees or personnel of HCMLP under the policies governing the use of the Shared Resources hereunder. HCMLP shall promptly notify NPA in writing of (i) any changes to HCMLP's policies governing its employees' and personnel's use of the Shared Services and (ii) any amendments to the vendor contracts underlying the Shared Resources, in each case, following the Effective Date, and until HCMLP has delivered such written notification, the NexPoint Parties shall not have any obligation to comply, or to ensure the compliance of their employees and personnel, with such changes and/or amendments, as applicable.

Section 1.2      Unexpected Costs; Repairs. In the event it is necessary for the Parties to incur any costs (e.g., in the case of breakdowns or repairs) for the continued functionality of the Shared Resources, such additional expenditures shall be (i) approved by HCMLP and NPA, and (ii) borne 60% by the NexPoint Parties and 40% by HCMLP.

Section 1.3      Failure to Pay; Cure Period. In the event a NexPoint Party fails to satisfy any payments such NexPoint Party is obligated to make pursuant to this Agreement or breaches its obligations under Section 1.1(d) and such NexPoint Party fails to cure such failure to make prompt payment or breach, as applicable, within five (5) Business Days of receipt of written notice of such failure from HCMLP, HCMLP shall have the right to terminate access to all Shared Resources and all respective agreements in connection with such Shared Resources with respect to all of the NexPoint Parties. HCMLP further agrees that in the event that HCMLP fails to make any payment to a Shared Resource vendor required to be made hereunder, the NexPoint Parties shall have the right to make the payments necessary to retain such vendor contract in respect of such Shared Resource and deduct the amount of such payments from future payments due to HCMLP under this Agreement. If the amounts paid by the NexPoint Parties exceed what would

otherwise be due to HCMLP from such NexPoint Parties, the NexPoint Parties may pursue recovery from HCMLP for such excess amount.

## II.    LIMITED LIABILITY

Section 2.1    HCMLP shall not be liable to any person or entity, including any third party, for any action, inaction, or conduct of any NexPoint Party or any of their respective Agents in connection with use by the NexPoint Parties or their Agents of the Shared Resources under this Agreement.

The NexPoint Parties shall not be liable to any person or entity, including any third party, for any obligation of HCMLP to pay any regularly scheduled fee explicitly set forth in the vendor contracts underlying the Shared Resources.

Section 2.2    The NexPoint Parties shall indemnify and hold harmless HCMLP from and against any and all costs and expenses (including advancing of reasonable attorneys' fees) of HCMLP or its affiliates or any of their Agents (including, without limitation, costs and expenses of any disputes, legal actions, examinations, investigations, and other legal or regulatory costs or expenses), related to or arising out of any action, inaction, or conduct by the NexPoint Parties or their Agents in connection with use by the NexPoint Parties of the Shared Resources under this Agreement.

HCMLP shall indemnify and hold harmless the NexPoint Parties from and against any and all costs and expenses (including advancing of reasonable attorneys' fees) of any NexPoint Party or any of their affiliates or Agents (including, without limitation, costs and expenses of any disputes, legal actions, examinations, investigations, and other legal or regulatory costs or expenses), solely to the extent directly arising from HCMLP's failure to pay any regularly scheduled fee explicitly set forth in the vendor contracts underlying the Shared Resources.

Section 2.3    No Party shall be liable to any other Party or to any other person or entity for the failure to provide services, access, or resources hereunder if such failure results from an event beyond the reasonable control of the Party obligated to provide such services, access, or resources.  Further, no Party shall be liable to any other Party for any consequential, indirect, special, incidental or punitive damages, including, without limitation, loss of profit or revenue, cost of capital, or cost of temporary equipment or services, whether based in whole or in part in contract, in tort, including negligence, strict liability, or any other theory of liability.

Section 2.4    Notwithstanding anything herein to the contrary, in no event shall HCMLP's liability to the NexPoint Parties and its Agents under this Agreement exceed, in the aggregate, the actual amounts paid by the NexPoint Parties to HCMLP hereunder.

## III.    BINDING AGREEMENT

Section 3.1    <u>Binding Agreement</u>.  The Parties agree that this Agreement constitutes the legal, valid and binding obligation of each Party, enforceable against each Party in accordance with its terms.

Section 3.2    <u>Entire Current Understanding and Agreement</u>.  This Agreement constitutes the entire current understanding and agreement by and among the Parties hereto with respect to the subject matter hereof and supersedes any and all prior or contemporaneous negotiations, term sheets, covenants, agreements, undertakings and understandings (written or oral) and courses of conduct and dealing by or among the Parties with respect to the matters expressly set forth herein. For the avoidance of doubt, this Agreement does not modify, supersede, or alter the Letter Agreement concerning continued access to Bloomberg services.

Section 3.3     Agreement Controls.    Any express terms and conditions set forth in this Agreement shall control any conflict or inconsistency with, and amend and supersede, the terms and conditions of any and all other agreements between or among the Parties, except to the extent that (x) another agreement is amended and/or restated or entered into after the Effective Date with the prior written consent of each of HCMLP and NPA and (y) such other agreement states that it shall control in the event of any conflict or inconsistency between such other agreement. For the avoidance of doubt, this Agreement does not modify, supersede, or alter the Letter Agreement concerning continued access to Bloomberg services.

Section 3.4     Efforts, Authorizations and Consents; Cooperation; No Ulterior Actions.

(a)     Efforts.    Each Party shall proceed diligently and in good faith, and agrees to use all reasonable best efforts to do, and cause to be done, all things necessary, desirable and/or appropriate to, as promptly as practicable and in accordance with the terms and timeline set forth herein, consummate the transactions contemplated by this Agreement, and shall direct and cause its Agents to so proceed and to so act.

(b)     Authorizations and Consents.    Each Party shall use reasonable best efforts to obtain all authorizations, consents, registrations, orders and approvals that may be or become necessary, desirable and/or appropriate for such Party's execution and delivery of, and the performance of such Party's obligations pursuant to, this Agreement, and each Party agrees to cooperate fully and promptly with a requesting Party in its seeking to obtain all such authorizations, consents, registrations, orders and approvals.

(c)     Indirect Actions.    Each Party acknowledges and agrees that he will not, on or after the Effective Date, avoid or seek to avoid, the economic and other rights, powers, privileges or interests of the other Parties set forth in this Agreement.  Each Party shall not, and each Party shall cause Persons under his control not to, do indirectly that which cannot be done directly under this Agreement.

Section 3.5     Further Assurances.    At any time and from time to time, at the request of any Party and without further consideration, the other Parties shall execute and deliver such instruments and take such action as such Party may reasonably determine is necessary, desirable and/or appropriate to carry out the actions contemplated by this Agreement.

Section 3.6     NexPoint Parties Representative.    For convenience of administration, all of the NexPoint Parties hereby appoint NPA as their sole representative for purposes of all actions, consents, notices, and communications hereunder to or from the NexPoint Parties.  HCMLP may rely upon any action by NPA or communication to or from NPA to serve as an action of, or communication to or from, and to bind, all of the NexPoint Parties.

## IV.     MISCELLANEOUS OTHER PROVISIONS

Section 4.1     Term.    This Agreement shall terminate without further action of any Party on August 31, 2021 (the "End Date") (unless otherwise agreed in writing by HCMLP and NPA).   Any payments required to be made by a Party hereunder shall for periods through the End Date shall survive termination of this Agreement.   In addition, the following sections shall survive termination of this Agreement indefinitely:  Sections II (Limited Liability), 4.4 (Notices) 4.7 (Governing Law; Submission to Jurisdiction; Service of Process), 4.9 (No Third-Party Beneficiaries).

Section 4.2    Amendment.  This Agreement shall be binding upon the Parties and may not be modified in any manner, except by an instrument in writing of concurrent or subsequent date signed by each of HCMLP and NPA.

Section 4.3    Waiver of Rights.  No delay or omission by any Party in exercising any right under this Agreement shall operate as a waiver of that or any other right.  A waiver or consent given by any Party hereto on any one occasion shall be effective only in that instance and shall not be construed as a ban or waiver of any right on any other occasion.

Section 4.4    Notices.  All notices, requests, demands, claims, and other communications hereunder shall be in writing.  Any notice, request, demand, claim, or other communication hereunder shall be deemed duly delivered:  (a) four (4) Business Days after it is sent by registered or certified mail, return receipt requested, postage prepaid; (b) one (1) Business Day after it is sent for next Business Day delivery via a reputable nationwide overnight courier service; (c) when sent, if e-mailed on a Business Day; (d) the next Business Day following the day on which the e-mail is sent if e-mailed on a day that is not a Business Day; (e) when receipt is acknowledged, if facsimiled on a Business Day; and (f) the next Business Day following the day on which receipt is acknowledged if facsimiled on a day that is not a Business Day, in each case to the intended recipient as set forth below:

If to HCMLP:

Highland Capital Management, LP
300 Crescent Court
Dallas, Texas 75201
Attention: Thomas Surgent, General Counsel
Email:  tsurgent@highlandcapital.com

With copies to:

Pachulski Stang Ziehl & Jones LLP
780 3rd Ave #34
New York, NY 10017
Attention:  Gregory V. Demo
Email:  GDemo@pszjlaw.com

and

Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
Attention:  Timothy F. Silva
Email:  timothy.silva@wilmerhale.com

If to the NexPoint Parties:

D.C. Sauter
2515 McKinney Ave, Suite 1700
Dallas, Texas 75201
Email:  DSauter@NexPoint.com

With a copy to:

6

K&L Gates LLP
4350 Lassiter at North Hills Avenue
Suite 300
P.O. Box 17047
Raleigh, North Carolina 27619
Attention:  A. Lee Hogewood III
Email:  lee.hogewood@klgates.com

Any Party may give any notice, request, demand, claim, or other communication hereunder using any other means (including personal delivery, expedited courier, messenger service, telecopy, telex, ordinary mail, or electronic mail), but no such notice, request, demand, claim, or other communication shall be deemed to have been duly given unless and until it actually is received by the Party for whom it is intended.  Any Party may change the address to which notices, requests, demands, claims, and other communications hereunder are to be delivered by giving the other Parties notice in the manner herein set forth.

Section 4.5   Reservation of Rights.  For the avoidance of doubt, each Party reserves all rights it has, or may have, including all rights to pursue and defend any claims and/or causes of action, with respect to any matter, agreement, or understanding not explicitly addressed in this Agreement.  The Parties expressly reserve all rights with respect to amounts asserted in connection with the NexPoint Parties' administrative claim, including, without limitation the NexPoint Parties' right to amend such claim to assert additional or lesser amounts, including with respect to the post-petition amounts owed under the Shared Services Agreements; provided, that under no circumstances shall such claim or claims give rise to any right of offset against any amounts payable hereunder,  the rights of HCMLP to object to such claim as well as all rights and defenses in connection with all pending and potential Adversary Proceedings between the Parties.  All such claims and defenses are expressly preserved for future resolution by the court.

Section 4.6   Successors and Assigns; Survival.  This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.  No NexPoint Party may assign its rights or obligations hereunder without the prior written consent of HCMLP.  HCMLP may not assign its rights or obligations hereunder without the prior written consent of NPA.

Section 4.7   Voluntary Assent; Review of Agreement; Independent Counsel; Construction.  Each Party acknowledges and agrees that no promises or agreements of any kind have been made to or with him by the other or by any person or entity whatsoever to cause him to sign this Agreement other than those set forth in this Agreement, and that such Party fully understands the meaning and intent of this Agreement.  Each Party further states and represents that it is sophisticated, has carefully read this Agreement, understands its contents, and freely and voluntarily assents to all of its terms and conditions.  Each Party further states and represents that he has been represented by independent legal counsel of its own choosing with respect to the negotiation and preparation of this Agreement.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  In the event any ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by HCMLP and the NexPoint Parties, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

Section 4.8   Governing Law; Submission to Jurisdiction; Service of Process.  This Agreement shall be interpreted and construed in accordance with the laws of the State of Texas, without regard to conflict of laws provisions.  Each Party hereby irrevocably submits to and acknowledges and recognizes the exclusive jurisdiction of the United States Bankruptcy Court for the Northern District of Texas, Dallas

7

Division (the "Bankruptcy Court") (which court, for purposes of this Agreement, is the only court of competent jurisdiction), over any suit, action or other proceeding arising out of, under or in connection with this Agreement or its subject matter. Each Party irrevocably consents to service of process in any action or proceeding arising out of or relating to this Agreement in the manner provided for notices in Section 4.4. Nothing in this Agreement shall affect the right of any Party to serve process in any other manner permitted by law.

Section 4.9 <u>Severability; Remedies Cumulative</u>. The provisions of this Agreement shall be deemed severable and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions of this Agreement. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is found by a court or other regulatory authority of competent jurisdiction to be invalid or unenforceable, (a) the Parties shall negotiate in good faith to modify this Agreement so as to give effect to the original intent of the Parties of such invalid or unenforceable provision to the fullest extent permitted by law, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction. The rights and remedies of the Parties to this Agreement are cumulative and not alternative, and each Party shall have the right in any particular circumstance to enforce any provision of this Agreement without regard to the availability of a remedy under any other provision of this Agreement.

Section 4.10 <u>No Third-Party Beneficiaries</u>.

(a) It is the explicit intention of the Parties that no Person other than the Parties — and, for the avoidance of doubt, no employee or officer of any Party or any of its affiliates or any of a Party's or its affiliates' owners, officers or employees and no client or investor in any product managed or sponsored by any Party — is or shall be entitled to bring any action to enforce any provision of this Agreement against any Party or otherwise, and that the covenants, undertakings and agreements set forth in this Agreement are for the sole benefit of, and shall be enforceable only by the Parties (and their respective successors and permitted assigns), and they shall not be construed as conferring, and are not intended to confer, any rights on any other person or entity whatsoever.

(b) No investors and no creditors of any Party shall have any right or entitlement to enforce any of the provisions of this Agreement or to require any Party to discharge its obligations hereunder.

Section 4.11 <u>Headings</u>. The headings of the Sections and sub-Sections of this Agreement are for convenience of reference only, and are not to be considered in construing the terms and provisions of this Agreement.

Section 4.12 <u>Construction</u>. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless otherwise indicated: (i) the words "herein," "hereof" and "hereunder," and words of similar import when used in this Agreement, shall be construed to refer this Agreement in its entirety and not to any particular provision hereof and (ii) all references in this Agreement to Exhibits, Schedules, Articles, Sections, paragraphs and sentences shall be construed to refer to Exhibits and Sections to, and Articles, Sections, paragraphs and sentences of, this Agreement. References to statues shall mean such statutes as amended.

Section 4.13    <u>Payments</u>.  All payments and distributions required to be made pursuant this Agreement shall be made in cash and/or other immediately available funds to one (1) or more accounts as directed by the person or entity to whom such amounts are due.

Section 4.14    <u>Counterparts and Electronic Signatures</u>.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original but all of which together shall constitute one (1) and the same instrument.  This Agreement may be executed by facsimile and/or electronically by any one (1) or more of the Parties.

***[Remainder of page intentionally left blank; signature page follows]***

IN WITNESS WHEREOF, the Parties have executed this Agreement effective as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, LP**

By:
Name:
Title:

**NEXPOINT ADVISORS, L.P.**

By:
Name:  Dustin Norris
Title:    Executive Vice President

**HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.**

By:
Name:  Dustin Norris
Title:    Executive Vice President

**Schedule A**

**Schedule of Shared Resources and Payments**

**Highland Capital Management, L.P.**
**Contract Listing - Sharing Agreement**
**Schedule A-Shared Resources Agreement**

| | Services | End Date | Cost | | Value | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Shared IT Contracts** | | | | | | | | | | | | |
| AT&T | Internet-Pre Petition | monthly | 857 | Month | - | 857 | 857 | 857 | 857 | 857 | 857 | 5,142 |
| AT&T | Intersite Agreement-Post Petition | 3/28/2023 | 3,574 | Month | - | 3,574 | 3,574 | 3,574 | 3,574 | 3,574 | 3,574 | 21,444 |
| AT&T | Bandwidth connection at Evoque | monthly | 138 | Month | - | 138 | 138 | 138 | 138 | 138 | 138 | 828 |
| At&T | Land line req'd for 1 fax line and 911 | monthly | 395 | Month | - | 395 | 395 | 395 | 395 | 395 | 395 | 2,370 |
| AWS | Dev server hosting | monthly | 2,635 | Month | - | 2,635 | 2,635 | 2,635 | 2,635 | 2,635 | 2,635 | 15,810 |
| CenturyLink | WAN line and Telephones | 1/28/2023 | 6,190 | Month | - | 6,190 | 6,190 | 6,190 | 6,190 | 6,190 | 6,190 | 37,140 |
| Cisco/CDW | Cisco Hardware Support | 3/31/2021 | 40,000 | Year | - | 40,000 | - | - | - | - | - | 40,000 |
| DUO Security | 2 factor authentication | monthly | 800 | Month | - | 800 | 800 | 800 | 800 | 800 | 800 | 4,800 |
| Evoque Data Center | Disaster Recovery DC | 10/15/2022 | 2,845 | Month | - | 2,845 | 2,845 | 2,845 | 2,845 | 2,845 | 2,845 | 17,070 |
| CDW | F5 load balancers | 6/2/2021 | 6,283 | Year | - | - | - | - | 6,283 | - | - | 6,283 |
| Flexential | Primary Data Center | 8/31/2021 | 11,888 | Month | - | 11,888 | 11,888 | 11,888 | 11,888 | 11,888 | 11,888 | 71,328 |
| CDW | IBM Websphere OMS software | 4/1/2021 | 4,080 | Year | - | - | 4,080 | - | - | - | - | 4,080 |
| Mxtoolbox | E Mailflow monitoring | monthly | 182 | Month | - | 182 | 182 | 182 | 182 | 182 | 182 | 1,092 |
| CDW | NetappSAN Maintenance | 4/30/2021 | 24,862 | Year | - | - | 24,862 | - | - | - | - | 24,862 |
| Netwrix | Auditor for active directory | 6/24/2021 | 2,635 | Year | - | - | - | - | 2,635 | - | - | 2,635 |
| Netwrix | Audits WFH and Cloud Activity | 6/24/2021 | 1,963 | Year | - | - | - | - | 1,963 | - | - | 1,963 |
| Onelogin | Cloud single sign on for HR related employee login | monthly | 340 | Month | - | 340 | 340 | 340 | 340 | 340 | 340 | 2,040 |
| Opentext | Fax Server | 4/9/2021 | 2,834 | Year | - | - | 2,834 | - | - | - | - | 2,834 |
| Solarwinds | FTP server maintenance | 6/1/2021 | 700 | Year | - | - | - | - | 700 | - | - | 700 |
| CDW | Trustwave E Mail Gateway-Anti Spam | 8/10/2021 | 2,182 | Year | - | - | - | - | - | - | 2,182 | 2,182 |
| CDW | Veritas Backup Exec | 3/1/2021 | 1,961 | Year | - | 1,961 | - | - | - | - | - | 1,961 |
| CDW | Veritas Enterprise Vault | 3/1/2021 | 4,706 | Year | - | 4,706 | - | - | - | - | - | 4,706 |
| Verity Group | Print Services for printers in office | monthly | 2,500 | Month | - | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 9,000 |
| WP Engine | Public Website hosting | monthly | 778 | Month | - | 778 | 778 | 778 | 778 | 778 | 778 | 4,668 |
| Zayo Group | WAN line | mo or 3/26/202 | 2,083 | Month | - | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 12,498 |
| Zendesk | Helpdesk Platform | monthly | 252 | Month | - | 252 | 252 | 252 | 252 | 252 | 252 | 1,512 |
| SPECOPS | Password protection | 2/27/2021 | 3,717 | Year | - | 3,717 | - | - | - | - | - | 3,717 |
| **Total** | | | | | - | 84,841 | 66,233 | 34,457 | 46,038 | 34,457 | 36,639 | 302,665 |
| **NexPoint Parties' 60% Share** | | | 60.0% | | | 50,905 | 39,740 | 20,674 | 27,623 | 20,674 | 21,983 | 181,599 |
| | | | | | | | | | | | | |
| **Shared Other Contracts** | | | | | | | | | | | | |
| Siepe Software | Software | 9/1/2021 | 18,042 | Month | - | 18,042 | 18,042 | 18,042 | 18,042 | 18,042 | 18,042 | 108,252 |
| Markit | Loan Pricing (pd in full 103,402 thru 3/31/21) | 3/27/2022 | 103,402 | Yearly | - | 103,402 | - | - | - | - | - | 103,402 |
| Markit (Direct bill to funds) | WSO Dirct invoice to all funds (pd qtrly) | 10/31/2021 | | | - | - | - | - | - | - | - | - |
| Advent | Geneva software-prepaid thru termination date | 5/10/2021 | | | - | - | - | - | - | - | - | - |
| Bloomberg | Routers At Flexential | | | | - | - | 8,411 | - | - | 8,411 | - | 16,822 |
| Compliance Science fka Financial Tracking | Other Research/Service Contracts | 4/1/2021 | 29,602 | Annual | - | - | 29,602 | - | - | - | - | 29,602 |
| DTCC (Pre trade compliance softeare) | Other Research/Service Contracts | | 3,237 | Monthly | - | 3,237 | 3,237 | 3,237 | 3,237 | 3,237 | 3,237 | 19,422 |
| FT Interactive Data Corp (Also known as IC | Other Research/Service Contracts | 10/1/2021 | 5,187 | Monthly | - | 5,187 | 5,187 | 5,187 | 5,187 | 5,187 | 5,187 | 31,122 |
| Moody'sHigh Yield Research | Other Research/Service Contracts/Allow to Expire | 11/30/2021 | 15,239 | Qtr | - | 15,239 | - | - | 15,239 | - | - | 30,479 |
| **Total** | | | | | - | 145,107 | 64,479 | 26,466 | 41,705 | 34,877 | 26,466 | 339,101 |
| **NexPoint Parties' 60% Share** | | | 60% | | - | 87,064 | 38,687 | 15,880 | 25,023 | 20,926 | 15,880 | 203,460 |
| | | | | | | | | | | | | |
| **Shared Remaining $ Value Contracts (remaining value has been prepaid):** | | | | | | | | | | | | |
| Credit Flux (formerly MergerMarket) | | 9/30/2021 | 18,673 | 7 | 10,893 | 1,556 | 1,556 | 1,556 | 1,556 | 1,556 | 1,556 | 9,337 |
| Debt Domain | | 8/22/2021 | 9,500 | 6 | 4,750 | 792 | 792 | 792 | 792 | 792 | 792 | 4,750 |
| Insider Score | | 5/31/2021 | 25,000 | 3 | 6,250 | 2,083 | 2,083 | 2,083 | - | - | - | 6,250 |
| Intralinks | | 7/31/2021 | 7,500 | 5 | 3,125 | 625 | 625 | 625 | 625 | 625 | - | 3,125 |
| Moody's Ratings-Instrument File | | 12/29/2021 | 61,703 | 10 | 51,419 | 5,142 | 5,142 | 5,142 | 5,142 | 5,142 | 5,142 | 30,852 |
| Proofpoint | | 9/29/2021 | 6,300 | 7 | 3,675 | 525 | 525 | 525 | 525 | 525 | 525 | 3,150 |
| Reorg Research | | 7/31/2021 | 34,521 | 5 | 14,384 | 2,877 | 2,877 | 2,877 | 2,877 | 2,877 | - | 14,384 |
| **Total Remaining Value Contracts** | | | | | 94,496 | 13,600 | 13,600 | 13,600 | 11,516 | 11,516 | 8,015 | 71,847 |
| **NexPoint Parties' 60% Share** | | | 60% | | | 8,160 | 8,160 | 8,160 | 6,910 | 6,910 | 4,809 | 43,108 |
| | | | | | | | | | | | | |
| **Total NexPoint Parties' Monthly Payment Requirement for IT, Other Contracts and Remaining Value Contracts** | | | | | | 146,129 | 86,587 | 44,714 | 59,556 | 48,510 | 42,672 | 428,167 |

## AMENDMENT NO. 1 TO SHARED RESOURCES AGREEMENT

This Amendment No. 1 to Shared Resources Agreement (this "Amendment") is entered into effective as of March 1, 2021 (the "Effective Date"), by and among Highland Capital Management, L.P. ("HCMLP") and the following parties (collectively, the "NexPoint Parties"): NexPoint Advisors, L.P. ("NPA"), and Highland Capital Management Fund Advisors, L.P. ("HCMFA").

The NexPoint Parties and HCMLP collectively are referred to as the "Parties" and each of them as a "Party".

## PREAMBLE

WHEREAS, the Parties have entered into that certain Shared Resources Agreement dated as of the Effective Date (the "Existing Agreement"); and

WHEREAS, the Parties hereto desire to amend the Existing Agreement to on the terms and subject to the conditions set forth herein.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. <u>Definitions</u>. Capitalized terms used and not defined in this Amendment have the respective meanings assigned to them in the Existing Agreement.

2. <u>Amendments to the Existing Agreement</u>. As of the Effective Date, the Existing Agreement is hereby amended and modified as follows:

(a) Section 1.1(c) of the Existing Agreement is hereby deleted and replaced in its entirety as follows:

(c) Within three (3) Business Days of being invoiced by HCMLP, the NexPoint Parties shall pay to HCMLP (i) the NexPoint Parties', and their respective affiliates' and NexBank, SSB's ("NexBank") allocable portion of the fees owed (A) under the Siepe Master Agreement based on the allocation of projects performed by Siepe for January 2021, February 2021 and each month during the term of this Agreement, (B) under the MarkIT – WSOWeb and Portfolio Management Services contract for each quarter during the term of the MarkIT – WSOWeb and Portfolio Management Services contract, including with respect to post-petition periods prior to the Effective Date, and (ii) 60% of the fees under each such contract that are not specifically allocable to any of the Parties or their affiliates; after prior allocation by Siepe and MarkIT of amounts attributable to HCMLP. Each invoice provided by HCMLP to the NexPoint Parties with respect to the

foregoing contracts shall include the allocation spreadsheet in accordance with which each Parties' respective allocable portions were calculated.

In addition, the NexPoint Parties shall promptly pay or cause to be paid to WSO, all amounts that WSO indicates that the NexPoint Parties or their respective affiliates and NexBank owe under invoices issued under the MarkIT – WSOWeb and Portfolio Management Services contract in respect of service periods before HCMLP filed for bankruptcy.

(b)     A new Section 1.1(g) is hereby added to the Existing Agreement as follows:

(g)     In consideration of $25,000, which the NexPoint Parties shall pay to HCMLP on or before March 12, 2021, HCMLP shall sell and deliver to the NexPoint Parties the equipment listed on Schedule B attached hereto (the "IT Equipment"), including all ancillary equipment and attachments (e.g., monitors, keyboards, cables, standing desks, monitor stands, etc.), to the IT Equipment; provided, that with respect to the IT Equipment identified on Schedule B as 'Copy Prior to Sale', the NexPoint Parties shall immediately return such equipment to HCMLP so that HCMLP can make a copy of all data contained on such equipment as HCMLP determines in its sole discretion, and such equipment shall remain HCMLP's sole and exclusive property unless and until such copies are made to HCMLP's sole satisfaction. The NexPoint Parties acknowledge and agree that the IT Equipment is being sold 'as is', and the NexPoint Parties accept the IT Equipment in its existing condition and has either inspected the IT Equipment or chose not to inspect it. HCMLP expressly disclaims any implied warranty as to fitness for a particular purpose, any implied warranty as to merchantability and any and all other express or implied warranties with respect to the IT Equipment.

(c)     A new Section 1.1(h) is hereby added to the Existing Agreement as follows:

(h)     Each of the following shall terminate effective as of 11:59 p.m. on February 19, 2021, in accordance with its terms: (i) that certain *Payroll Reimbursement Agreement*, dated May 1, 2018, by and between HCMLP and NPA, as subsequently amended on December 14, 2018, and (ii) that certain *Payroll Reimbursement Agreement*, dated May 1, 2018, by and between HCMFA and HCMLP, as subsequently amended on December 14, 2018.

(d)     Schedule A to the Existing Agreement is hereby deleted and replaced in its entirety with Schedule A attached hereto.

(e)    <u>Schedule B</u> attached hereto is hereby added as a new Schedule B to the Existing Agreement.

3.    <u>Date of Effectiveness; Limited Effect</u>. This Amendment will be effective as of the Effective Date. Except as expressly provided in this Amendment, all the terms and provisions of the Existing Agreement are and will remain in full force and effect and are hereby ratified and confirmed by the Parties. Without limiting the generality of the foregoing, the amendments contained herein will not be construed as an amendment to or waiver of any other provision of the Existing Agreement or as a waiver of or consent to any further or future action on the part of either Party that would require the waiver or consent of the other Party. On and after the Effective Date, each reference in the Existing Agreement to "this Agreement," "the Agreement," "hereunder," "hereof," "herein," or words of like import will mean and be a reference to the Existing Agreement as amended by this Amendment.

4.    <u>Miscellaneous</u>.    Each of the terms and provisions set forth in Article IV – Miscellaneous Other Provisions of the Existing Agreement are hereby incorporated by reference.

[*Signature Page Follows.*]

IN WITNESS WHEREOF, the Parties have executed this Agreement effective as of the date first written above.

**HIGHLAND CAPITAL MANAGEMENT, LP**

By: _____

Name: _____

Title: _____

**NEXPOINT ADVISORS, L.P.**

By: _____

Name:  Frank Waterhouse

Title:  Chief Financial Officer

**HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P.**

By: _____

Name:  Frank Waterhouse

Title:  Chief Financial Officer

**Schedule A**

**Schedule of Shared Resources and Payments**

(*Attached*.)

Highland Capital Management, L.P.
Contract Listing - Sharing Agreement
Schedule A-Shared Resources Agreement

| | Services | End Date | Cost | | Value | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 | Totals |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Shared IT Contracts** | | | | | | | | | | | | |
| AT&T | Internet-Pre Petition | monthly | 857 | Month | - | 857 | 857 | 857 | 857 | 857 | 857 | 5,142 |
| AT&T | Intersite Agreement-Post Petition | 3/28/2023 | 3,574 | Month | - | 3,574 | 3,574 | 3,574 | 3,574 | 3,574 | 3,574 | 21,444 |
| AT&T | Bandwidth connection at Evoque | monthly | 138 | Month | - | 138 | 138 | 138 | 138 | 138 | 138 | 828 |
| At&T | Land line req'd for 1 fax line and 911 | monthly | 395 | Month | - | 395 | 395 | 395 | 395 | 395 | 395 | 2,370 |
| AWS | Dev server hosting | monthly | 2,635 | Month | - | 2,635 | 2,635 | 2,635 | 2,635 | 2,635 | 2,635 | 15,810 |
| CenturyLink | WAN line and Telephones | 1/28/2023 | 6,190 | Month | - | 6,190 | 6,190 | 6,190 | 6,190 | 6,190 | 6,190 | 37,140 |
| Cisco/CDW | Cisco Hardware Support | 3/31/2021 | 40,000 | Year | - | 40,000 | - | - | - | - | - | 40,000 |
| DUO Security | 2 factor authentication | monthly | 800 | Month | - | 800 | 800 | 800 | 800 | 800 | 800 | 4,800 |
| Evoque Data Center | Disaster Recovery DC | 10/15/2022 | 2,845 | Month | - | 2,845 | 2,845 | 2,845 | 2,845 | 2,845 | 2,845 | 17,070 |
| CDW | F5 load balancers | 6/2/2021 | 6,283 | Year | - | - | - | - | 6,283 | - | - | 6,283 |
| Flexential | Primary Data Center | 8/31/2021 | 11,888 | Month | - | 11,888 | 11,888 | 11,888 | 11,888 | 11,888 | 11,888 | 71,328 |
| CDW | IBM Websphere OMS software | 4/1/2021 | 4,080 | Year | - | 4,080 | - | - | - | - | - | 4,080 |
| Mxtoolbox | E Mailflow monitoring | monthly | 182 | Month | - | 182 | 182 | 182 | 182 | 182 | 182 | 1,092 |
| CDW | NetappSAN Maintenance | 4/30/2021 | 24,862 | Year | - | - | 24,862 | - | - | - | - | 24,862 |
| Netwrix | Auditor for active directory | 6/24/2021 | 2,635 | Year | - | - | - | - | 2,635 | - | - | 2,635 |
| Netwrix | Audits WFH and Cloud Activity | 6/24/2021 | 1,963 | Year | - | - | - | - | 1,963 | - | - | 1,963 |
| Onelogin | Cloud single sign on for HR related employee login | monthly | 340 | Month | - | 340 | 340 | 340 | 340 | 340 | 340 | 2,040 |
| Opentext | Fax Server | 4/9/2021 | 2,834 | Year | - | - | 2,834 | - | - | - | - | 2,834 |
| Solarwinds | FTP server maintenance | 6/1/2021 | 700 | Year | - | - | - | - | 700 | - | - | 700 |
| CDW | Trustwave E Mail Gateway-Anti Spam | 8/10/2021 | 2,182 | Year | - | - | - | - | - | - | 2,182 | 2,182 |
| CDW | Veritas Backup Exec | 3/1/2021 | 1,961 | Year | - | 1,961 | - | - | - | - | - | 1,961 |
| CDW | Veritas Enterprise Vault | 3/1/2021 | 4,706 | Year | - | 4,706 | - | - | - | - | - | 4,706 |
| Verity Group | Print Services for printers in office | monthly | 2,500 | Month | - | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 9,000 |
| WP Engine | Public Website hosting | monthly | 778 | Month | - | 778 | 778 | 778 | 778 | 778 | 778 | 4,668 |
| Zayo Group | WAN line | o or 3/26/202 | 2,083 | Month | - | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 2,083 | 12,498 |
| Zendesk | Helpdesk Platform | monthly | 252 | Month | - | 252 | 252 | 252 | 252 | 252 | 252 | 1,512 |
| SPECOPS | Password protection | 2/27/2021 | 3,717 | Year | - | 3,717 | - | - | - | - | - | 3,717 |
| **Total** | | | | | - | 84,841 | 66,233 | 34,457 | 46,038 | 34,457 | 36,639 | 302,665 |
| **NexPoint Parties' 60% Share** | | 60.0% | | | | 50,905 | 39,740 | 20,674 | 27,623 | 20,674 | 21,983 | 181,599 |
| | | | | | | | | | | | | |
| **Shared Other Contracts** | | | | | | | | | | | | |
| Siepe Software | Software License | 9/1/2021 | 18,042 | Month | - | 18,042 | 18,042 | 18,042 | 18,042 | 18,042 | 18,042 | 108,252 |
| Siepe Master Service Agreement | NexPoint Parties to pay allocable portion + 60% of unallocated amounts, if any. | | | | - | | | | | | | |
| Markit | Loan Pricing (pd in full 103,402 thru 3/31/21) | 3/27/2022 | 103,402 | Yearly | - | 103,402 | - | - | - | - | - | 103,402 |
| Markit-WSOWeb and Portfolio Management Services | NexPoint Parties to pay allocable portion + 60%of unallocated amounts, if any | 10/31/2021 | | | - | - | - | - | - | - | - | - |
| Oracle | General Ledger Software | 8/15/2021 | | | | 15,000 | - | - | 15,000 | - | - | 30,000 |
| Advent | Geneva software-prepaid thru termination date | 5/10/2021 | | | | - | - | - | - | - | - | - |
| Bloomberg | Routers At Flexential | ? | | | | - | 8,411 | - | - | 8,411 | - | 16,822 |
| Compliance Science fka Financial Tracking | Other Research/Service Contracts | 4/1/2021 | 29,602 | Annual | - | 29,602 | - | - | - | - | - | 29,602 |
| DTCC (Pre trade compliance software) | Other Research/Service Contracts | | 3,237 | Monthly | - | 3,237 | 3,237 | 3,237 | 3,237 | 3,237 | 3,237 | 19,422 |
| FT Interactive Data Corp (Also known as IC | Other Research/Service Contracts | 10/1/2021 | 5,187 | Monthly | - | 5,187 | 5,187 | 5,187 | 5,187 | 5,187 | 5,187 | 31,122 |
| Moody's High Yield Research | Other Research/Service Contracts/Allow to Expire | 11/30/2021 | 15,239 | Qtr | - | 15,239 | - | - | 15,239 | - | - | 30,479 |
| **Total** | | | | | - | 160,107 | 64,479 | 26,466 | 56,705 | 34,877 | 26,466 | 369,101 |
| **NexPoint Parties' 60% Share** | | 60% | | | - | 96,064 | 38,687 | 15,880 | 34,023 | 20,926 | 15,880 | 221,460 |
| | | | | | | | | | | | | |
| **Shared Remaining $ Value Contracts (remaining value has been prepaid):** | | | | | | | | | | | | |
| Credit Flux (formerly MergerMarket) | | 9/30/2021 | 18,673 | 7 | 10,893 | 1,556 | 1,556 | 1,556 | 1,556 | 1,556 | 1,556 | 9,337 |
| Debt Domain | | 8/22/2021 | 9,500 | 6 | 4,750 | 792 | 792 | 792 | 792 | 792 | 792 | 4,750 |
| Insider Score | | 5/31/2021 | 25,000 | 3 | 6,250 | 2,083 | 2,083 | 2,083 | - | - | - | 6,250 |
| Intralinks | | 7/31/2021 | 7,500 | 5 | 3,125 | 625 | 625 | 625 | 625 | 625 | - | 3,125 |
| Moody's Ratings-Instrument File | | 12/29/2021 | 61,703 | 10 | 51,419 | 5,142 | 5,142 | 5,142 | 5,142 | 5,142 | 5,142 | 30,852 |
| Proofpoint | | 9/29/2021 | 6,300 | 7 | 3,675 | 525 | 525 | 525 | 525 | 525 | 525 | 3,150 |
| Reorg Research | | 7/31/2021 | 34,521 | 5 | 14,384 | 2,877 | 2,877 | 2,877 | 2,877 | 2,877 | - | 14,384 |
| **Total Remaining Value Contracts** | | | | | 94,496 | 13,600 | 13,600 | 13,600 | 11,516 | 11,516 | 8,015 | 71,847 |
| **NexPoint Parties' 60% Share** | | 60% | | | | 8,160 | 8,160 | 8,160 | 6,910 | 6,910 | 4,809 | 43,108 |
| | | | | | | | | | | | | |
| **Total NexPoint Parties' Monthly Payment Requirement for IT, Other Contracts and Remaining Value Contracts** | | | | | | 155,129 | 86,587 | 44,714 | 68,556 | 48,510 | 42,672 | 446,167 |

**Schedule B**

**IT Equipment**

(*Attached.*)

| Username | Name | Owner | Hardware Class | Hardware Item | |
|----------|------|-------|----------------|---------------|---|
| ABARBERA | Angela Barbera | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 6 | |
| ABRUMLEY | Angela Brumley | HCMLP | Machine Model | HP - HP ProBook 440 G7 | |
| AGIFFORD | Alex Gifford | HCMLP | Machine Model | LENOVO - 20KFCTO1WW | |
| ASIMS | Austin Sims | HCMLP | Machine Model | Microsoft Corporation - Surface Pro | |
| AWILLIAMS | Andy Williams | HCMLP | Machine Model | LENOVO - 20Q0002CUS | |
| BFLAHERTY | Brendan Flaherty | HCMLP | Machine Model | HP - HP EliteDesk 800 G3 TWR | |
| BFUENTES | Brian Fuentes | HCMLP | Machine Model | HP - HP ProBook 440 G7 | |
| BGRAIME | Brian Graime | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 7 | |
| BHEISS | Bradford Heiss | HCMLP | Machine Model | LENOVO - 20KFCTO1WW | |
| BHEISS | Bradford Heiss | HCMLP | Machine Model | LENOVO - 20UD000HUS | |
| BJAIN | Bhawika Jain | HCMLP | Machine Model | HP - HP ProBook 440 G7 | |
| BLOOMBERG | | HCMLP | Machine Model | Microsoft Corporation - Virtual Machine | |
| BMCDERMETT | Bonner McDermett | HCMLP | Machine Model | HP - HP ProBook 445R G6 | |
| BMCDERMETT | Bonner McDermett | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 4 | |
| BMITTS | Brian Mitts | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 4 | |
| BSANBORN | Brian Sanborn | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 4 | |
| BSANBORN | Brian Sanborn | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 6 | |
| CCOLEMAN | Clayton Coleman | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 7 | |
| CEMERT | Craig Emert | HCMLP | Machine Model | LENOVO - 20Q0002CUS | |
| CHAKEMACK | Chris Hakemack | HCMLP | Machine Model | Microsoft Corporation - Surface Pro | |
| CLO | | HCMLP | Machine Model | Microsoft Corporation - Virtual Machine | |
| COMPLIANCE | | HCMLP | Machine Model | Microsoft Corporation - Virtual Machine | |
| CZULUAGA | Camilo Zuluaga | HCMLP | Machine Model | HP - HP ProBook 445R G6 | |
| DBULGER | David Bulger | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 7 | |
| DNORRIS | Dustin Norris | HCMLP | Machine Model | LENOVO - 20KHCTO1WW | |
| DSAUTER | DC Sauter | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 6 | |
| DWILLMORE | David Willmore | HCMLP | Machine Model | LENOVO - 20Q0CTO1WW | |
| EBREAULT | Evan Breault | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 4 | |
| EFRITZ | Eric Fritz | HCMLP | Machine Model | HP - HP ProBook 440 G7 | |
| EHOLT | Eric Holt | HCMLP | Machine Model | HP - HP ProBook 440 G7 | |
| GESCURDERO | Gaston Escudero | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 7 | |
| GMILLER | Gordon Miller | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 7 | |
| HCOVITZ | Hunter Covitz | HCMLP | Machine Model | HP - HP ProBook 440 G7 | Copy Prior to Sale |
| HSOTO | Hailey Soto | HCMLP | Machine Model | Hewlett-Packard - HP EliteDesk 800 G1 TWR | |
| IHOWLE | Ian Howle | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 7 | |
| JBLAIR | Jesse Blair | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 7 | |
| JCONNOLLY | James Connolly | HCMLP | Machine Model | Standing Desk | |
| JDUNN | John Dunn | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 6 | |
| JGRAHAM | Jackie Graham | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 7 | |
| JGRANT | Jennifer Grant | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 4 | |
| JPOST | Jason Post | HCMLP | Machine Model | HP - HP ProBook 440 G7 | |
| JSCHOOL | Jenny School | HCMLP | Machine Model | HP - HP ProBook 430 G7 | |
| JSOWIN | Joe Sowin | HCMLP | Machine Model | LENOVO - 20R1S04100 | Copy Prior to Sale |
| jSOWIN | Joe Sowin | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 3 | Copy Prior to Sale |
| JYEHIA | Josef Yehia | HCMLP | Machine Model | Microsoft Corporation - Surface Pro | |
| KCASTLE | Kyle Castle | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 7 | |
| KCAWLEY | Keith Cawley | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 4 | |
| KFULLMER | Kevin Fullmer | HCMLP | Machine Model | Microsoft Corporation - Surface Pro | |
| KGATZKI | Kent Gatzki | HCMLP | Machine Model | Hewlett-Packard - HP EliteDesk 800 G1 TWR | |
| KNELSON | Kaitlin Nelson | HCMLP | Machine Model | LENOVO - 20Q0002CUS | |
| KNOEL | Kirby Noel | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 6 | |

| KROLLINS | Kristin Rollins | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 6 | |
|---|---|---|---|---|---|
| KSACHDEV | Kunal Sachdev | HCMLP | Machine Model | HP - HP ProBook 440 G7 | |
| LBANNON | Lucy Bannon | HCMLP | Machine Model | HP - HP EliteDesk 800 G2 TWR | Copy Prior to Sale |
| LBANNON | Lucy Bannon | HCMLP | Machine Model | HP - HP ProBook 440 G7 | Copy Prior to Sale |
| LCASTANIEN | Luke Castanien | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 4 | |
| MBEISPIEL | Michael Beispiel | HCMLP | Machine Model | HP - HP EliteDesk 800 G3 TWR | |
| MBRENNAN | Mike Brennan | HCMLP | Machine Model | LENOVO - 20KFS1TE00 | |
| MDILLON | Mark Dillon | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 7 | |
| MFRIZELL | Madeline Frizell | HCMLP | Machine Model | Microsoft Corporation - Surface Pro | |
| MGOETZ | Matthew Goetz | HCMLP | Machine Model | Microsoft Corporation - Surface Pro | |
| MHASELROTH | Matt Haselroth | HCMLP | Machine Model | LENOVO - 20Q0CTO1WW | |
| MHOLLISTER | Mike Hollister | HCMLP | Machine Model | LENOVO - 20KG0022US | |
| MHURLEY | Mike Hurley | HCMLP | Machine Model | HP - HP ProBook 440 G7 | |
| MJEONG | Michael Jeong | HCMLP | Machine Model | HP - HP EliteDesk 800 G4 TWR | |
| MJEONG | Michael Jeong | HCMLP | Machine Model | HP - HP ProBook 440 G7 | |
| MJONES | Michael Jones | HCMLP | Machine Model | LENOVO - 20KHCTO1WW | |
| MJORDAN | Micah Jordan | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 6 | |
| MMCGRANER | Matt McGraner | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 6 | |
| MMCGRANER | Matt McGraner | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 7 | |
| MPEARSON | Matt Pearson | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 7 | |
| NBURNS | Nate Burns | HCMLP | Machine Model | HP - HP ProBook 440 G7 | |
| PRICHARDS | Paul Richards | HCMLP | Machine Model | LENOVO - 20U9001NUS | |
| RHARRIS | Rob Harris | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 7 | |
| SABAYARATHNA | Sahan Abayarathna | HCMLP | Machine Model | HP - HP EliteDesk 800 G3 TWR | |
| SABAYARATHNA | Sahan Abayarathna | HCMLP | Machine Model | HP - HP ProBook 440 G7 | |
| SBELVAL | Scott Belval | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 7 | |
| SBERRY | Scott Berry | HCMLP | Machine Model | Microsoft Corporation - Surface Pro | |
| SBRODEUR | Steven Brodeur | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 7 | |
| SBRODEUR | Steven Brodeur | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 7 | |
| SKOUZMENKO | Svetlana Kouzmenko | HCMLP | Machine Model | HP - HP ProBook 440 G7 | |
| SPARVIN | Sean Parvin | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 7 | |
| SSIMON | Scott Simon | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 6 | |
| TCHAPLINE | Tom Chapline | HCMLP | Machine Model | LENOVO - 20Q0CTO1WW | |
| TCOLBERT | Taylor Colbert | HCMLP | Machine Model | LENOVO - 20KFCTO1WW | |
| WLARKIN | Will Larkin | HCMLP | Machine Model | Microsoft Corporation - Surface Pro 6 | |