# EXHIBIT 28

SIDLEY AUSTIN LLP
Penny P. Reid
Paige Holden Montgomery
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 74201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

Matthew A. Clemente (admitted pro hac vice)
Dennis M. Twomey (admitted pro hac vice)
Alyssa Russell (admitted pro hac vice)
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

*Counsel for the Official Committee of Unsecured Creditors*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | |
| Debtor. | Case No. 19-34054-sgj11 |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | |
| Plaintiff, | Adversary Case No. 20-03195 |
| v. | |
| CLO HOLDCO, LTD. | |
| Defendant. | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

<u>**MOTION FOR PRELIMINARY INJUNCTION**</u>                    **Page i**

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ........................................................................................1

II.     STATEMENT OF FACTS .............................................................................................3

        A.      The CLO Holdco Transaction.............................................................................3

        B.      The Dugaboy Note.............................................................................................5

        C.      The Debtor Files For Bankruptcy Amidst Pending Lawsuits.................................6

III.    ARGUMENT AND AUTHORITIES.............................................................................8

        A.      The Committee Can Demonstrate A Substantial Likelihood of Success on the
                Merits ................................................................................................................9

                1.      Fraudulent Transfer – Texas Uniform Fraudulent Transfer Act...............10

                2.      Money Had and Received.........................................................................15

                3.      Unjust Enrichment ..................................................................................16

                4.      Declaratory Judgment for Alter Ego Liability ..........................................17

                5.      Conspiracy Claim....................................................................................19

        B.      There Is A Substantial Threat of Irreparable Injury If the Injunction Is Not Issued
                Because Funds Would Most Likely Be Removed From the Court's Jurisdiction.21

        C.      Balancing The Hardships: The Harm to the Committee Outweighs Any Potential
                Harm to CLO Holdco...............................................................................22

        D.      The Public Interest Will Be Served By Issuance of the Injunctive Relief Sought 23

IV.     CONCLUSION................................................................................................24

Case 19-34054-sgj11 Doc 2735-16 Filed 08/17/21    Entered 08/17/21 17:00:39    Page 4 of
146
Case 20-03195-sgj Doc 7 Filed 12/30/20    Entered 12/30/20 13:39:10    Page 3 of 34

## TABLE OF AUTHORITIES

**Page(s)**

### Cases

*In re Acis Capital Mgmt., L.P.,*
  584 B.R. 115 (Bankr. N.D. Tex. 2018)...............................................................................7, 13

*In re Acis Capital Mgmt., L.P.,*
  No. 18-30264, 2019 WL 417149
  (Bankr. N.D. Tex. Jan. 31, 2019),
  *aff'd,* 604 B.R. 484 (N.D. Tex. 2019) ................................................................ *passim*

*In re Adelphia Commc'ns Corp.,*
  376 B.R. 87 (Bankr. S.D.N.Y. 2007)...................................................................................17

*ASARCO LLC v. Ams. Min. Corp.,*
  382 B.R. 49 (S.D. Tex. 2007) ........................................................................................17, 18

*In re Atlas Fin. Mortg., Inc.,*
  No. 13-32683-BJH-7, 2014 WL 172283
  (Bankr. N.D. Tex. Jan. 14, 2014)................................................................................2, 8, 23

*In re Autobacs Strauss, Inc.,*
  473 B.R. 525 (Bankr. D. Del. 2012) .................................................................................17

*Bourland v. State,*
  528 S.W.2d 350 (Tex. App.—Austin 1975, writ ref'd n.r.e.)................................................19

*Byrum v. Landreth,*
  566 F.3d 442 (5th Cir. 2009) ..............................................................................................9

*Chu v. Hong,*
  249 S.W.3d 441 (Tex. 2008).............................................................................................19

*City of Dallas v. Delta Air Lines, Inc.,*
  847 F.3d 279 (5th Cir. 2017) ............................................................................................10

*First Tech Fed. Credit Union v. Fisher,*
  No. 14-18-00140-CV, 2020 WL 830052
  (Tex. App.—Houston [14th Dist.] Feb. 20, 2020, pet. filed)...........................................4, 9, 15

*First United Pentecostal Church of Beaumont v. Parker,*
  514 S.W.3d 214 (Tex. 2017)..............................................................................................19

*Griffin v. Box,*
  910 F.2d 255 (5th Cir. 1990) ..............................................................................................8

*In re Heritage Org., LLC*,
   No. 04-35574-BJH-11, 2008 WL 5215688
   (Bankr. N.D. Tex. Dec. 12, 2008) ........................................................................12

*In re Highland Capital Mgmt., L.P.*,
   No. 19-34054-sgj11 (Nov. 24, 2020) ....................................................................7

*Holland Am. Ins. Co. v. Succession of Roy*,
   777 F.2d 992 (5th Cir. 1985) .............................................................................21

*Holt v. Kelso*,
   No. 3-11-258-CV, 2014 WL 858345
   (Tex. App.—Austin Feb. 26, 2014, no pet.) ..........................................................19

*In re Houston Drywall, Inc.*,
   No. 05-95161-H4-7, 2008 WL 2754526
   (Bankr. S.D. Tex. July 10, 2008) ...................................................................10, 11

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*,
   804 F.2d 1390 (5th Cir. 1986) ...........................................................................21

*Janvey v. Alguire*,
   647 F.3d 585 (5th Cir. 2011) ..........................................................................9, 22

*Janvey v. Nanes*,
   No. 3:15-CV-3171-N, 2016 WL 9527979
   (N.D. Tex. Oct. 5, 2016) ....................................................................................11

*Matter of Life Partners Holdings, Inc.*,
   926 F.3d 103 (5th Cir. 2019) .........................................................................10, 14

*Med-Cert Home Care, LLC v. Azar*,
   365 F. Supp. 3d 742 (N.D. Tex. 2019) ..............................................................8, 22

*Mowbray v. Avery*,
   76 S.W.3d 663 (Tex. App.—Corpus Christi 2002, pet. denied) ...............................16

*In re OGA Charters, LLC*,
   554 B.R. 415 (Bankr. S.D. Tex. 2016) ......................................................... *passim*

*Redeemer Comm. of Highland Crusader Fund v.*
   *Highland Capital Mgmt., L.P.*, No. CV 12533-VCG,
   2017 WL 713633 (Del. Ch. Feb. 23, 2017) ........................................................6, 7

*In re Soza*,
   542 F.3d 1060 (5th Cir. 2008) ...........................................................................12

*Staats v. Miller,*
  150 Tex. 581, 243 S.W.2d 686 (1951) ...................................................................15

*Thompson v. Mayes,*
  707 S.W.2d 951 (Tex. App.—Eastland 1986, writ ref'd n.r.e.) .............................16

*Travelers Cas. & Sur. Co. of Am. v. Padron,*
  No. 5:15-CV-200-DAE, 2017 WL 9360906
  (W.D. Tex. Aug. 2, 2017) .......................................................................................22

*U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.,*
  817 F. Supp. 2d 934 (N.D. Tex. 2011) ...................................................................11

*Union Carbide Corp. v. UGI Corp.,*
  731 F.2d 1186 (5th Cir. 1984) .................................................................................9

*Univ. of Tex. v. Camenisch,*
  451 U.S. 390 (1981) .................................................................................................8

*Wheeler v. Blacklands Prod. Credit Ass'n,*
  627 S.W.2d 846 (Tex. App.—Fort Worth 1982, no writ) ......................................16

## Statutes/Rules

11 U.S.C. § 105(a) ...........................................................................................................1, 8

Tex. Bus. & Com. Code § 24.001 et seq. ..........................................................................10

Tex. Bus. & Com. Code § 24.005 ...........................................................................10, 11, 12

Fed. R. Bankr. P. 7065 ........................................................................................................1, 8

Fed. R. Civ. P. 65 .................................................................................................................8

## Other

Charles Alan Wright, Arthur R. Miller, Mary Kay Kane,
  11A FEDERAL PRACTICE & PROCEDURE § 2948.3 (2d ed. 1995) ...................................9

## MOTION FOR PRELIMINARY INJUNCTION[2]

The Official Committee of Unsecured Creditors (the "Committee") of Highland Capital Management, L.P. (the "Debtor"), by and through its attorneys, hereby files this motion for preliminary injunction ("Motion") and declaration in support (App. 096-097), pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7065, and seeks an order from this Court, ordering that the "Proceeds"[3] shall continue to be held in the Registry of the Court and shall not be distributed to CLO Holdco, Ltd. ("CLO Holdco"), because (1) the Committee has a substantial likelihood of success on the merits of the adversary proceeding filed on behalf of the Debtor's Estate on December 17, 2020 ("Adversary Proceeding"); (2) there is a substantial threat of irreparable injury if the injunction is not issued; (3) the balance of hardships weighs in favor of granting an injunction; and (4) the public interest will be served by the injunction. Further, a preliminary injunction would otherwise preserve the status quo and relative position of the parties, as well as that of any assets that can be potentially used to satisfy valid claims against the bankruptcy estate.

## I. PRELIMINARY STATEMENT

If this Court does not issue a preliminary injunction, irreparable harm will likely occur. That is, any funds released to CLO Holdco, a Cayman Islands entity, most likely will leave the country and go beyond the reach and jurisdiction of this Court and the Estate. CLO Holdco should be enjoined from receiving disputed funds from this Court's registry, particularly when, as here,

---

[2] In connection with this Motion, the Committee has filed an adversary complaint, pursuant to this Court's *Order Granting Extension of Time to File an Adversary Proceeding Against CLO Holdco, Ltd.* [Docket No. 1168]. The adversary complaint is expressly incorporated herein in its entirety.

[3] *See Order Denying Motion for Remittance of Funds Held in Registry of Court* [Docket No. 825] (defining "Proceeds" as including both the "CLO Proceeds," as defined in the *Motion for Remittance of Funds Held in Registry of Court* [Docket No. 590], together with the anticipated distributions of liquidation proceeds from the Dynamic and AROF funds (that is, the "Additional CLO Proceeds")).

MOTION FOR PRELIMINARY INJUNCTION          Page 1

such funds are likely assets that can be potentially used to satisfy valid claims against the Debtor's estate.

The central purpose of a preliminary injunction is to preserve the status quo and relative position of the parties pending a trial on the merits.  Here, such purposes are best served by issuance of a preliminary injunction "to preserve the court's ability to render a meaningful decision on the merits."  *See In re Atlas Fin. Mortg., Inc.*, No. 13-32683-BJH-7, 2014 WL 172283, at \*3 (Bankr. N.D. Tex. Jan. 14, 2014); *In re OGA Charters, LLC*, 554 B.R. 415, 424 (Bankr. S.D. Tex. 2016). Importantly, the Committee need not prove that it will ultimately prevail on the merits for the relief requested in this motion to follow.  The Committee need only establish a substantial likelihood of success on the merits by alleging a *prima facie* case.  For the reasons stated herein, this low bar is met.

Moreover, the balance of harms and the public interest favor injunctive relief.  Any injunction granted pursuant to this motion is temporary and merely preserves the status quo until such time as the Adversary Proceeding can be resolved.  And keeping the Proceeds in the Court's registry ensures that such funds will not be depleted.  However, any release of such funds to CLO Holdco may deprive the Debtor of its only opportunity to obtain redress for fraudulent or improper transactions involving CLO Holdco.  The balance of harms weighs in favor of injunctive relief. Likewise, preserving potential assets for trial on the merits serves the public interest.  *In re OGA Charters,* 554 B.R. at 428.

To be sure, CLO Holdco is not some distant third party.  In fact, as the Court has previously observed, Charitable DAF, the parent of CLO Holdco, "was seeded with contributions from **Highland**, is managed/advised by **Highland**, and whose **independent trustee is a long-time friend of Highland's chief executive officers, Mr. Dondero**… ." *In re Acis Capital Mgmt., L.P.*,

Case No. 18-30264, 2019 WL 417149 (Bankr. N.D. Tex. Jan. 31, 2019), *aff'd,* 604 B.R. 484 (N.D. Tex. 2019) (emphasis in original). Based on the foregoing and the reasons that follow, injunctive relief is proper.

## II.     STATEMENT OF FACTS[4]

### A.  The CLO Holdco Transaction

On December 28, 2016, Jim Dondero ("Dondero") effected a convoluted, four-step transaction, in which he caused the Debtor to exchange three separate assets with a total fair market value of approximately $23.4 million for a 97.6835% interest in an overvalued promissory note on which the Dugaboy Investment Trust ("Dugaboy") (i.e., Dondero's family trust regarding which Dondero has the power to remove/appoint trustees)[5] was the payor, and The Get Good Nonexempt Trust ("Get Good") was the payee.[6] The assets included in the exchange were transferred four times in a series of transactions (collectively, the "CLO Holdco Transaction") executed contemporaneously and ultimately funneled down to CLO Holdco. Notably, Dondero effectively owns and controls both Get Good and Dugaboy, and Grant James Scott III ("Scott"), Dondero's

---

[4] The Committee hereby expressly incorporates by reference the Adversary Complaint concurrently filed herewith.

[5] *See* Appendix at APP 021-062 [DOC_00459140] (attaching Dugaboy Investment Trust Agreement which in Section 3.1(a)(i) states that "Jim is the primary beneficiary of the trust.")); *See id.* (confirming that "Grant James Scott, III" is the "Independent Trustee" of Dugaboy").

[6] Out of an abundance of caution, "Get Good" shall include all three trusts including "The Get Good Trust," "The Get Good Nonexempt Trust No. 1," and "The Get Good Nonexempt Trust No. 2," due to the fact that the record reflects that, at times, they have been referred to interchangeably, and they share the same EIN number (75-6601385), according to tax documents.

long-time friend and former college roommate is a purported independent trustee for both Get Good and Dugaboy.[7]

*First*, Get Good transferred a 97.6835% interest in a $23,817,639.58 million promissory note from Dugaboy, of which Get Good was the payee, to the Debtor (the "Dugaboy Note").[8] In exchange, the Debtor transferred to Get Good the following assets: (1) $2,032,183.24 (based on the November 30, 2016 NAV) Series A Interests in Highland Capital Loan Fund, L.P. (the "Series A Interests"); (2) $8,710,000.00 (based on the December 27, 2016 MV) participation interest in call options of American Airlines Group, Inc. (the "AA Interests"); and (3) a participation interest in certain Highland Crusader Fund, L.P. and Highland Crusader Fund II, Ltd. shares, as well as a tracking interest in certain participation shares of Highland Crusader Fund II, Ltd., collectively valued at $12,625,395.44 (based on the November 30, 2016 NAV) (the "Crusader Interests") (collectively, with the Series A Interests and the AA Interests, the "Transferred Assets").[9] This transaction was effectuated by a Purchase and Sale Agreement executed by Dondero, on behalf of the Debtor, and Scott, on behalf of Get Good.

*Second*, Get Good donated the Transferred Assets to Highland Dallas Foundation by exercise of discretion, executed by Scott in his capacity as trustee of Get Good.[10] At that time, the Highland Dallas Foundation's directors were Dondero, Scott and Mary Jalonick ("Jalonick").[11]

---

[7] *See* Appendix at APP 021-062 [DOC_00459140] (attaching Dugaboy Investment Trust Agreement which in Section 3.1(a)(i) states that "Jim is the primary beneficiary of the trust.")); *See id.* (confirming "Grant James Scott, III" as "Independent Trustee" of Dugaboy).

[8] *See* Appendix at APP 001-016 [DOC_00231365] (reflecting Dugaboy Note in the amount of $23,817,639.58).

[9] *See* Appendix at APP 001-016 [DOC_00231365] (Purchase and Sale Agreement).

[10] *See* Appendix at APP 086-090 [Highland/PEO-032698] (Donative Assignment of Interests); Appendix at APP 091-095 [Highland/PEO-032707] (Exercise of Discretion).

[11] Both Dondero and Scott served as directors on multiple boards together, including but not limited to the Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., and Highland Kansas City Foundation, Inc. (the "Highland Foundations"); that is, boards that effectively owned DAF Holdco, DAF, and CLO Holdco, and where Dondero, likewise, served as President.

<u>**MOTION FOR PRELIMINARY INJUNCTION**</u>                                                                 **Page 4**

*Third*, Highland Dallas Foundation contributed the Transferred Assets to Charitable DAF Holdco by unanimous written consent, executed by Dondero, Scott, and Jalonick, each in their capacity as the sole directors of Highland Dallas Foundation.[12]

*Fourth*, by an omnibus assignment agreement,[13] Charitable DAF Holdco transferred the Transferred Assets to Charitable DAF Fund, which immediately transferred the Transferred Assets to CLO Holdco. Scott signed on behalf of each entity, as director of Charitable DAF Holdco, managing member of Charitable DAF, and director of CLO Holdco to effectuate these transfers.[14]

### B. The Dugaboy Note

As the first step of the CLO Holdco Transaction, Get Good transferred more than 97% of the Dugaboy Note to the Debtor. What is not evident from the transaction documents, however, is that the note was modified shortly before the CLO Holdco Transaction.

An original promissory note was issued on December 7, 2012, whereby Dugaboy promised to pay Get Good the principal sum of $23,595,920, plus interest (the "Original Dugaboy Note"). Dondero exercised complete control over whether any payments were made on the Original Dugaboy Note.[15] Over the course of four years, no payments were made on the principal or the interest accrued.[16] And nearly four-years after its issuance and halfway into its term for maturity, the Original Dugaboy Note was effectively cancelled pursuant to an apparently unilateral, restructuring that would lengthen the prior term of ten years to twenty years (i.e., by an additional

---

[12] *See* Appendix at APP 073-078 [Highland/PEO-032603] (Unanimous Written Consent of Directors).

[13] *See* Appendix at APP 079-085 [Highland/PEO-032686] (Omnibus Assignment Agreement).

[14] *Id.*

[15] *See* Appendix at APP 021-062 [DOC_00459140] (attaching Dugaboy Investment Trust Agreement which in Section 3.1(a)(i) states that "Jim is the primary beneficiary of the trust.")).

[16] *See* Appendix at APP 017-018 [CONTROL_0000068249-250] (reflecting insufficient payments of $0.00 over the course of four years such that principal was not reduced, and further, displaying payment history for total $23,395,920 note payable amount, per sub-amounts of $15,482,680 and $8,113,240 (together totaling $23,395,920)).

fourteen years). The restructured note, dated October 31, 2016, reflected a new, principal sum of $23,817,639.58 on terms completely prejudicial to the initial payee (i.e., Get Good) and in favor of the payor, Dugaboy, who after the restructured note was issued, was granted an *additional* fourteen years to pay off the note.[17]

On its face, this restructuring evidences the high level of risk associated with the Dugaboy Note, including the actual failure to make *any* payments on the note and the unilateral restructuring of the note on terms more favorable to the payor rather than the payee-recipient. Under the direction of Dondero, the Debtor would accept an interest in the Dugaboy Note as its new payee-recipient in exchange for highly valuable assets of the Debtor that would be funneled to the Cayman Islands in the care of CLO Holdco.

### C. The Debtor Files For Bankruptcy Amidst Pending Lawsuits.

Shortly before and after the CLO Holdco Transaction, the Debtor was facing various arbitrations and litigations, which ultimately resulted in judgments against the Debtor, stemming from fraudulent transactions and breaches of fiduciary duties.

On July 5, 2016, the Redeemer Committee of the Highland Crusader Fund ("Redeemer Committee"), filed a complaint in Delaware Chancery Court against the Debtor, seeking a limited status quo order, a declaration that the Redeemer Committee had "cause" to terminate the Debtor as manager, and a declaration that the Debtor was not entitled to indemnification, as a result of the Debtor's failure to distribute proceeds to investors of various funds.[18] Also on July 5, 2016, the Redeemer Committee filed a demand for arbitration against the Debtor, ultimately bringing claims

---

[17] *See* Appendix at APP 001-016 [DOC_00231365] (reflecting Original Dugaboy Note in the amount of $23,595,920.00 as *replaced* by new note for $23,817,639.58).

[18] *Redeemer Comm. of Highland Crusader Fund v. Highland Capital Mgmt., L.P.*, No. CV 12533-VCG, 2017 WL 713633, at *2 (Del. Ch. Feb. 23, 2017).

of violations of fiduciary and contractual duties.[19]  The CLO Holdco Transaction occurred less than six months later.  On May 9, 2019, the arbitration panel issued a final award in favor of the Redeemer Committee in the total amount of $190.8 million.[20]

And on September 8, 2016, less than three months prior to the CLO Holdco Transaction, the Debtor sued Joshua Terry, a recently terminated former employee of the Debtor, who would assert his own counter-claims and demand arbitration against the Debtor, Dondero, Acis Capital Management, L.P. ("Acis LP"), Acis Capital Management GP, L.L.C. ("Acis GP," and with Acis LP, "Acis") and others.[21]  Acis is a member of the Committee in the Bankruptcy Proceeding.

Because Dondero knew that the Debtor could, and likely would, become liable for its fraudulent actions, and ultimately, the various judgment and awards rendered against the Debtor, he began moving assets out of the Debtor's estate into a Cayman Islands entity, with the intent to hinder, delay, or defraud the Debtor's creditors.  The transfer of assets out of the Debtor's estate as a part of the CLO Holdco transaction, for less than reasonably equivalent value, is one such transaction.  The CLO Holdco Transaction was structured to move assets out of the Debtor's estate out of the reach of the Debtor's creditors, yet ultimately still under the control of Dondero.[22]

On October 16, 2019, less than three years after the CLO Holdco Transaction, the Debtor filed for bankruptcy.

---

[19] *Id.*

[20] *See In re Highland Capital Mgmt., L.P.*, No. 19-34054-sgj11 at 5 (Nov. 24, 2020) [Dkt. No. 1473] (reflecting disclosure statement for amended plan of reorganization of Debtor ).

[21] *See In re Acis Capital Mgmt., L.P.*, 584 B.R. 115 (Bankr. N.D. Tex. 2018).

[22] *See* Appendix at APP 063-072 [DOC_01698978 at 2] (providing list of "James Dondero's Related Interests" and listing "CLO Holdco, Ltd. as under the "Indirect Control" of Dondero).

<u>MOTION FOR PRELIMINARY INJUNCTION</u>                                                              Page 7

### III.     <u>ARGUMENT AND AUTHORITIES</u>

Federal Rule of Civil Procedure 65, as incorporated by Federal Rule of Bankruptcy Procedure 7065, enables bankruptcy courts to issue preliminary injunctions pending trial. *In re Atlas*, 2014 WL 172283, at *5. Likewise, bankruptcy courts have the power to issue a preliminary injunction pursuant to 11 U.S.C. § 105(a). *In re OGA Charters,* 554 B.R. at 428 ("[T]his Court finds that it possesses the power to issue a preliminary injunction, pursuant to § 105(a) . . . ." (citing *Law v. Siegel*, 571 U.S. 415, 423 (2014))).

The central purpose of a preliminary injunction is to preserve the status quo. *Griffin v. Box*, 910 F.2d 255, 263 (5th Cir. 1990); *see also Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395, (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."); *Med-Cert Home Care, LLC v. Azar*, 365 F. Supp. 3d 742, 748 (N.D. Tex. 2019) ("The purpose of a preliminary injunction is to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits."). This Court may issue injunctive relief "to preserve the status quo pending judgment where the legal remedy might prove inadequate and the preliminary relief furthers the court's ability to grant the final relief requested." *In re Atlas*, 2014 WL 172283, at *3; *In re OGA Charters,* 554 B.R. at 424 ("A preliminary injunction seeks to 'prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.'" (quoting *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985))).

The four elements a plaintiff must establish to secure a preliminary injunction are: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any

harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Id.* (quoting *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011)).

Here, all four elements are satisfied. *First*, there is a substantial likelihood of success that the Committee will establish its estate claims against CLO Holdco. *Second*, a preliminary injunction will preserve the status quo, preserve estate assets pending trial on the merits, and prevent irreparable injury that would likely ensue should CLO Holdco (a Cayman Islands company) be allowed to remove the Proceeds beyond the reach of this Court's jurisdiction. *Third*, granting the preliminary injunction merely maintains the status quo; that is, CLO Holdco will suffer no significant harm if the Proceeds remain in the Court Registry or harm that would outweigh the Court's interest in preserving the Debtor's estate. And, *fourth*, the public interest will be served by issuance of the injunctive relief sought because preserving any "assets that can be potentially used to satisfy valid claims against the bankruptcy estate" serves the public interest. *In re OGA Charters,* 554 B.R. at 432.

## A. The Committee Can Demonstrate A Substantial Likelihood of Success on the Merits.

At this stage, the Committee need not show that it will ultimately prevail at trial. Rather, to show a likelihood of success on the merits, the Committee need only present a *prima facie* case. *Union Carbide Corp. v. UGI Corp.*, 731 F.2d 1186, 1189 (5th Cir. 1984) (requiring a *prima facie* case for preliminary injunctive relief); *see also* Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, 11A FEDERAL PRACTICE & PROCEDURE § 2948.3 (2d ed. 1995) ("All courts agree that plaintiff must present a prima facie case but need not show that he is certain to win." (footnote omitted))); *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009); *Janvey*, 647 F.3d at 595–96 (The movant's "evidence in the preliminary injunction proceeding is not required to prove his entitlement to summary judgment."). The Court "look[s] to 'standards provided by the substantive

law'" to determine likelihood of success on the merits. *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 286 (5th Cir. 2017).

As demonstrated herein, Plaintiffs can establish a substantial likelihood of success on the merits for their claims of actual fraudulent transfer, constructive fraudulent transfer, money had and received, alter ego, unjust enrichment, and conspiracy.

### 1.   *Fraudulent Transfer – Texas Uniform Fraudulent Transfer Act*

As an initial matter, the first three elements of actual fraudulent transfer (section 24.005(a)(1)), and constructive fraudulent transfer (sections 24.005(a)(2) are the same under the Texas Uniform Fraudulent Transfer Act ("TUFTA").[23] *See* Tex. Bus. & Com. Code § 24.005(a); *Matter of Life Partners Holdings, Inc.*, 926 F.3d 103, 120 (5th Cir. 2019). Those elements are: (1) a creditor; (2) a debtor; and (3) the debtor transferred assets "within a reasonable time" before or after the creditor's claim arose. Tex. Bus. & Com. Code § 24.005(a).

"Although the definition of 'reasonable time' under TUFTA is not specifically defined, the four year statute of limitations suggests that a 'reasonable time' is within four years." *In re Houston Drywall, Inc.*, No. 05-95161-H4-7, 2008 WL 2754526, at *19 n.23 (Bankr. S.D. Tex. July 10, 2008) (citing *Williams v. Performance Diesel, Inc.*, No. 14-00-00063-CV, 2002 WL 596414, at *4 (Tex. App.—Houston [14th Dist.] Apr. 18, 2002, no pet.)). In this case, the transfers occurred approximately 3 years prior to the commencement of the bankruptcy proceedings.

### a.   Actual Fraudulent Transfer

The Committee has a substantial likelihood of success on the merits concerning its actual fraudulent transfer claim under TUFTA because the CLO Holdco Transaction satisfies the above-

---

[23] Tex. Bus. & Com. Code § 24.001 et seq.

mentioned, three factors and indicates several of the indicia of fraud (listed below) pursuant to TUFTA's section 24.005(b).

To plead *actual fraudulent transfer* under section 24.005(a)(1), in addition to the three factors above, a claimant must also plead fraudulent intent to "hinder, delay, or defraud any creditor of the debtor." Tex. Bus. & Com. Code § 24.005(a)(1); *Janvey v. Nanes*, No. 3:15-CV-3171-N, 2016 WL 9527979, at *3 (N.D. Tex. Oct. 5, 2016). Section § 24.005(b), provides several non-exclusive indicia, factors or "badges of fraud" that this Court may consider in determining actual intent. Tex. Bus. & Com. Code § 24.005(b); *In re Houston Drywall,* 2008 WL 2754526, at *20. Those badges of fraud are as follows:

1. the transfer or obligation was to an insider;
2. the debtor retained possession or control of the property transferred after the transfer;
3. the transfer or obligation was concealed;
4. before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
5. the transfer was of substantially all the debtor's assets;
6. the debtor absconded;
7. the debtor removed or concealed assets;
8. the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
9. the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
10. the transfer occurred shortly before or shortly after a substantial debt was incurred; and
11. the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Fifth Circuit courts have held that factual allegations relating to at least three (3) badges of fraud are sufficient to plead an actual fraudulent transfer claim. *See U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, 817 F. Supp. 2d 934, 942 (N.D. Tex. 2011) (alleging three (3) badges of

fraud was sufficient to plead fraudulent transfer); *see also In re Heritage Org., LLC*, No. 04-35574-BJH-11, 2008 WL 5215688, at *7 (Bankr. N.D. Tex. Dec. 12, 2008) (same); *In re Soza*, 542 F.3d 1060, 1067 (5th Cir. 2008) (quoting *Roland v. United States*, 838 F.2d 1400, 1402–03 (5th Cir. 1988)).

The CLO Holdco Transaction constitutes actual fraudulent transfer because it involved a transfer of the debtor's assets within a reasonable time before the creditor's claim arose (i.e., the first three elements), and several indices or "badges" of fraud were attendant to that transaction (i.e., the fourth element). *See* Tex. Bus. & Com. Code § 24.005(b).

The December 28, 2016, CLO Holdco Transaction removed money from the Debtor to an insider of Dondero. Notably, the CLO Holdco Transaction effected the transfer of approximately $24 million in Transferred Assets of the Debtor in exchange for an overvalued note from Dugaboy, a trust for the benefit of Dondero and for which Scott was the independent trustee. As this Court has previously found, Scott is a long-time friend of Dondero and independent trustee of CLO Holdco's parent company, Charitable DAF. *In re Acis Capital Mgmt.*, 2019 WL 417149. While the Debtor's assets moved through several entities before settling at CLO Holdco, all of those entities were subject to either Scott and/or Dondero's control. As stated above, both Dondero and Scott were directors in the Highland Foundations. And Scott effected the CLO Holdco Transaction on behalf of DAF Holdco, DAF and CLO Holdco, as respectively, "Director," "Managing Member," and "Director."[24] Thus, along with Dondero, Scott effected the contemporaneous transfers in the shoes of the transferor *and* transferee.[25] The circumstances of the CLO Holdco Transaction reflect the insider-relationship(s) and inherent conflicts of interest.

---

[24] *See* Appendix at APP 079-085 [Highland/PEO-032686] (Omnibus Assignment Agreement).

[25] *See* Appendix at APP 063-072 [DOC_01698978 at 2] (providing list of "James Dondero's Related Interests" and listing "CLO Holdco, Ltd. as under the "Indirect Control" of Dondero ).

Moreover, the CLO Holdco Transaction was concealed, not the least of which by a convoluted, multi-step contemporaneous series of transfers that would remove the Debtor's assets to the Cayman Islands, beyond the reach of the Debtor's creditors, at a time when the Debtor was embroiled in ongoing, material litigation with Redeemer Committee, Acis, and others.[26]  Likewise, the value of the Dugaboy Note received by the Debtor was not for reasonably equivalent value of the Transferred Assets.[27]  Not only did Dondero have unilateral ability to control payment, but he also had already executed on that ability, just prior to maturity, and having made no payments towards principal or accrued interest, as evidenced by the unilateral restructuring of that note, prior to the CLO Holdco Transaction.  And, less than three years after the CLO Holdco transaction, the Debtor would file for bankruptcy.[28]  These badges of fraud, among others, meet the low threshold of establishing a *prima facie* case of actual fraudulent transfer.

Thus, and notwithstanding any ultimate findings or merits-based determinations of the Court at trial, the Committee's allegations establish a substantial likelihood of success on the merits concerning its actual fraudulent transfer claim under TUFTA.

<p style="text-align:center;">b.   <u>Constructive Fraudulent Transfer</u></p>

The Committee also has a substantial likelihood of success on the merits concerning its constructive fraudulent transfer claims under TUFTA because the CLO Holdco Transaction satisfies the above-mentioned, three factors (i.e., debtor transferred assets to creditor within a reasonable time before the creditor's claim arose), and the debtor was financially vulnerable or insolvent at the time of the transaction.

---

[26] *See In re Acis Capital Mgmt.*, 584 B.R. 115.

[27] *Compare* Appendix at APP 019-020 [CONTROL_0000068251] (Original Dugaboy Note) *with* Appendix at APP 001-016 [DOC_00231365] (Restructured Dugaboy Note).

[28] The Debtor filed for Bankruptcy on October 16, 2019.

In addition to the three, aforementioned factors, a claimant pleading *constructive fraudulent transfer* under section 24.005(a)(2), must also "plead facts demonstrating: (1) a lack of reasonably equivalent value for the transfer; and (2) that the transferor was 'financially vulnerable' or insolvent at the time of the transaction." *Matter of Life Partners Holdings*, 926 F.3d at 120. Pleading intent is not required.

To establish financial vulnerability or insolvency, a movant must establish that the debtor/transferor (1) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (2) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due. Tex. Bus. & Com. Code

Here, the CLO Holdco Transaction constitutes a constructive fraudulent transfer because, in addition to the foregoing factors, the Debtor was financially vulnerable. That is, the Debtor either intended to incur, and/or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due. It cannot be disputed that the Debtor was under the control of Dondero, who as President and founder of Debtor, certainly was privy to the mounting material litigation risk(s) and related liability facing the Debtor. The level of litigation risk alone facing the Debtor was material as a matter of law and establishes that Dondero reasonably should have believed that the Debtor would incur debts (both litigation and commercial debts arising in the ordinary course) beyond its ability to pay as they became due. Indeed, that situation is exactly what ultimately resulted in these proceedings. This fact establishes the Debtor's insolvency or financial vulnerability, in addition to the other factors evidencing constructive fraud.

Based on the foregoing, the Committee has a substantial likelihood of success on the merits concerning its constructive fraudulent transfer claims under TUFTA.

### 2.  *Money Had and Received*

The Committee has a substantial likelihood of success on the merits concerning its money had and received claim against CLO Holdco.

To state a cause of action for money had and received, a claimant need only prove that in equity and good conscience, the money belongs to it.  *Staats v. Miller*, 150 Tex. 581, 584, 243 S.W.2d 686, 687 (1951).  "The action does not require a showing of wrongdoing, but rather looks only to the justice of the case and inquires whether the defendant has received money that rightfully belongs to another."  *First Tech Fed. Credit Union v. Fisher*, No. 14-18-00140-CV, 2020 WL 830052, at *3 (Tex. App.—Houston [14th Dist.] Feb. 20, 2020, pet. filed).  Under Texas substantive law,

> [A] cause of action for money had and received is 'less restricted and fettered by technical rules and formalities than any other form of action. It aims at the abstract justice of the case, and looks solely to the inquiry, whether the defendant holds money, which belongs to the [claimant].

*Staats*, 150 Tex. at 585, 243 S.W.2d at 687–88.

Here, the facts show that the Proceeds held in the Court's registry in equity and good conscience belong to the Debtor due to the actual and/or constructive fraudulent transfer(s) of Dondero and CLO Holdco.  But for their fraud, the money never would have left the Debtor's estate.  Under the circumstances related above, concerning the CLO Holdco Transaction, the justice of the case establishes that CLO Holdco has received money that rightfully belongs to the Debtor's estate.  Thus, the Committee has a substantial likelihood of success on the merits concerning this claim.

### 3.    *Unjust Enrichment*

Likewise, the unjust enrichment doctrine may provide further basis for recovery, and the

Committee has a substantial likelihood of success on the merits in proving that CLO Holdco has

been unjustly enriched.  In *Mowbray v. Avery*, 76 S.W.3d 663, 680 (Tex. App.—Corpus Christi

2002, pet. denied), the court explained that "[t]he unjust enrichment doctrine . . . is based on the

equitable principle that one who receives benefits which would be unjust for him to retain ought

to make restitution."  *Id.* at 679 (citing *Bransom v. Standard Hardware, Inc.*, 874 S.W.2d 919, 927

(Tex. App.—Fort Worth 1994, writ denied)).  "A party may recover under an unjust enrichment

theory where a person has obtained a benefit from another due to fraud, duress or taking of undue

advantage."  *Id.*

When, as here, creditors' property has been fraudulently conveyed, such creditors are

entitled to the creation of a constructive trust on such property.  *See, e.g., Wheeler v. Blacklands

Prod. Credit Ass'n*, 627 S.W.2d 846 (Tex. App.—Fort Worth 1982, no writ) (imposing

constructive trust on behalf of unsecured creditor pursuant to unjust enrichment doctrine); *see also

Thompson v. Mayes*, 707 S.W.2d 951, 954 (Tex. App.—Eastland 1986, writ ref'd n.r.e.) (noting a

suit to impose a constructive trust "is an action in equity to prevent unjust enrichment of a person

who has wrongfully acquired property").  As related above, CLO Holdco has been unjustly

enriched due to the fraudulent transfers of Debtor's assets, for which this Court may impose a

constructive trust remedy on the proceeds of such wrongdoing.  *See Wheeler*, 627 S.W.2d at 851

("[T]he law imposes a constructive trust on that property **and any proceeds** from the sale thereof,

**or revenues therefrom**.").

Based on the foregoing allegations, concerning which the Committee has a substantial

likelihood of success in proving at trial, CLO Holdco has been unjustly enriched.  Thus, this Court

may impose a constructive trust remedy on the proceeds of CLO Holdco's, Dondero's and Scott's wrongdoing.

### 4. *Declaratory Judgment for Alter Ego Liability*

The Committee also has a substantial likelihood of success on the merits concerning its alter ego claim. The corporate entity / fiction may be disregarded, even though corporate formalities have been observed and corporate and individual property have been kept separately, when the corporate form has been used as part of a basically unfair device to achieve an inequitable result. *See In re Autobacs Strauss, Inc.*, 473 B.R. 525, 556 (Bankr. D. Del. 2012).

Courts look to several factors to determine whether alter ego liability exists, including but not limited to the following: "(a) the subsidiary is undercapitalized; (b) the subsidiary was insolvent at the relevant time; (c) the companies failed to observe corporate formalities (d) the subsidiary did not pay dividends to the parent; (e) there was a siphoning of the subsidiary's funds by the dominant stockholder; (f) the absence of corporate records; and (g) whether the corporation is merely a façade for the operations of the dominant stockholder or stockholders." *Id.*; *see also ASARCO LLC v. Ams. Min. Corp.*, 382 B.R. 49, 65-66 (S.D. Tex. 2007) (applying Delaware law to veil piercing claim under internal affairs doctrine); *cf. In re Adelphia Commc'ns Corp.*, 376 B.R. 87, 107–08 (Bankr. S.D.N.Y. 2007) (discussing veil piercing claim as applicable to partnerships under uniform partnership law and discussing Delaware standards). These factors are "not exhaustive, no single factor is dispositive, and [only] some combination is required." *In re Autobacs Strauss,* 473 B.R. at 556.

Likewise, "[t]o state a veil-piercing claim, the plaintiff must plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity designed to defraud investors and creditors." *ASARCO*, 382 B.R. at 66. "[F]ederal courts applying Delaware law have

held that a party may pierce the veil on an alter ego theory when there is a misuse of the corporate form or an overall element of injustice or unfairness." *Id.* "Delaware permits exercise of this 'broad' equitable power only where equity demands." *Id.* Importantly, "the alter ego claim is available where equitable relief is required to prevent injustice," as in the context of evidence of fraudulent transfer. *See ASARCO,* 382 B.R. at 84.

Here, alter ego liability applies because equity demands it. The fraudulent transfers discussed above warrant use of this Court's broad equitable power to ensure that the type of fraud perpetrated by Dondero, pursuant to the CLO Holdco Transaction, is redressed for the benefit of the defrauded estate. Among other reasons, Dondero used DAF Holdco, the DAF, and CLO Holdco as an alter ego of himself and the Debtor (which was controlled by Dondero) to siphon funds away from the Debtor's estate at a time when the Debtor was facing mounting, material litigation risk and pending liabilities, among other risks. Dondero used the Debtor as a façade for his operations, at all times standing on both sides of the CLO Holdco Transaction steps/transfers in the capacity as both a transferor and a transferee. Essentially, Dondero made use of DAF Holdco, the DAF, and CLO Holdco as a business conduit of the Debtor, to funnel assets away from creditors and beyond the jurisdiction of U.S. courts. Due to his control over these entities, Dondero was able to transfer estate assets for less than reasonably equivalent value, and without the safeguards normally accorded to such asset transfers inherent in the corporate form, due to his effective control from both sides of the transactions.

Applicable here, courts disregard the corporate fiction when it is used as a means of perpetrating fraud; when it is operated as a business conduit of another corporation; when it is resorted to as a means of evading existing legal obligations, such as those that Dondero and Debtor

are obligated unto the Debtor's creditors; and when the corporate fiction is relied upon as a protection of a crime or to justify a wrong, as in the face of the fraudulent scheme related above.

Based on the arguments above and cited throughout this motion, the Committee has a substantial likelihood of success on the merits of its alter ego liability claim. Thus, a preliminary injunction is warranted.

### 5. *Conspiracy Claim*

The Committee has a substantial likelihood of success on the merits of its conspiracy claim. CLO Holdco is liable for conspiring to perpetrate the fraudulent transfer scheme reflected in the CLO Holdco Transaction. Under Texas law, agreeing to participate in the commission of a statutory violation or a tort makes one liable for conspiracy. *See Chu v. Hong*, 249 S.W.3d 441, 444 n.4 (Tex. 2008). An action for civil conspiracy has five elements: (1) a combination of two or more persons; (2) the persons seek to accomplish an object or course of action; (3) the persons reach a meeting of the minds on the object or course of action;[29] (4) one or more unlawful, overt acts are taken in pursuance of the object or course of action; and (5) damages occur as a proximate result. *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214 (Tex. 2017). The agreement and the overt acts establish the conspiracy. It is not required that each and every act of a conspirator be shown to have been in concert with the others to establish liability; neither is it required that all participants combine at a given time prior to each transaction. *Bourland v. State*, 528 S.W.2d 350, 354 (Tex. App.—Austin 1975, writ ref'd n.r.e.).

Here, the elements are satisfied. The Debtor (under the direction of Dondero) acted in combination with CLO Holdco among others (under the direction of Scott),[30] and further, in

---

[29] When a defendant benefits from another's wrongful conduct and took steps that facilitated his receipt of that benefit, the jury can infer the defendant had a meeting of the minds with the individual who committed the wrongful acts. *Holt v. Kelso*, No. 3-11-258-CV, 2014 WL 858345 (Tex. App.—Austin Feb. 26, 2014, no pet.).

[30] *See* Appendix at APP 079-085 [Highland/PEO-032686] (Omnibus Assignment Agreement).

<u>**MOTION FOR PRELIMINARY INJUNCTION**</u>                                              **Page 19**

combination with Dugaboy and Get Good (under the direction of both Dondero and Scott)[31] to remove the Debtor's Assets beyond the reach of the Debtor's creditors, during a time at which the Debtor was financially vulnerable. CLO Holdco participated in the scheme to obtain the Transferred Assets, which would remain accessible by the Debtor through its shared services agreement. Dugaboy and Get Good are insiders of Dondero and facilitated the scheme to swap the Debtor's assets for the Dugaboy Note, worth substantially less in value than the Transferred Assets.

CLO Holdco, Dugaboy, and Dondero and Scott took overt steps to benefit from the CLO Holdco Transaction and to cause the fraudulent transfer of nearly $24 million of the Debtor's assets. This caused injury to the Debtor's estate and its creditors. Dondero and Scott knowingly perpetrated their fraudulent scheme, as both had superior knowledge and sat on both sides of the inside transaction. Scott acted as the control person for CLO Holdco and as independent trustee of *both* Get Good and Dugaboy. Dondero acted as the control person of the Debtor and effectively owned and controlled *both* Get Good and Dugaboy. Likewise, both men sat on the boards of the foundations that would receive the purported "gifts" from the Debtor, in the form of the Debtor's converted / distressed assets.

CLO Holdco, under Scott's direction; the Debtor, under Dondero's direction; and Dugaboy and Get Good, under the direction of both Dondero and Scott, would effect the CLO Holdco Transaction, exchanging the Dugaboy promissory note for the Debtor's Transferred Assets. Dondero and Scott necessarily knew the Dugaboy promissory note was not equivalent value for the Transferred Assets, not only due to their respective, control positions in Dugaboy and Get

---

[31] *See* Appendix at APP 021-062 [DOC_00459140] (attaching Dugaboy Investment Trust Agreement which in Section 3.1(a)(i) states that "Jim is the primary beneficiary of the trust.")); *See id.* (confirming "Grant James Scott, III" as "Independent Trustee" of Dugaboy).

Good, the Debtor and CLO Holdco, but also because the Dugaboy Note itself reflected less than reasonably equivalent value, as reflected in that note's unilateral restructuring that grossly prejudiced the payee-recipient.  CLO Holdco, Dugaboy and Get Good, and Dondero and Scott were unjustly enriched as a result of the CLO Holdco Transaction, and this Court should enjoin any release of the disputed funds in connection therewith, pending trial on the merits.

Because there is a substantial likelihood that the Committee will recover on its conspiracy claim and recoup the Proceeds currently held in the Court's registry back into the estate, a preliminary injunction is warranted to preserve the Debtor's assets pending trial.

### B.  There Is A Substantial Threat of Irreparable Injury If the Injunction Is Not Issued Because Funds Would Most Likely Be Removed From the Court's Jurisdiction.

Release of the Proceeds from the Court's registry to CLO Holdco, a Cayman Islands entity, would remove the Proceeds beyond the reach of this Court, resulting in irreparable injury for which there is no adequate remedy at law.  *In re OGA Charters*, 554 B.R. at 424 ("A preliminary injunction seeks to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.").  If the injunction is not issued, the relative rights of the parties would not be preserved and this Court's ability to render a meaningful decision on the merits would be mooted.  To show irreparable injury, "it is not necessary to demonstrate that harm is inevitable and irreparable.  The [Committee] need show only a significant threat of injury from the impending action, that the injury is imminent, and that money damages would not fully repair the harm."  *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986).  Likewise, "there must be more than an unfounded fear on the part of the applicant."  *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985).

Here, the significant concerns underlying the Committee's request that the Proceeds be withheld include the fact that CLO Holdco and Charitable DAF are part of Dondero's web of

complex, interrelated entities; CLO Holdco's interests in at least one of the funds were initially owned by the Debtor and transferred to CLO Holdco, while both were under the control of Dondero; and this Court has previously found that Dondero has a well-documented history of engaging in improper or fraudulent transactions, including fraudulent transfers.[32]

Given this history and the fact that any released funds would likely be irrecoverable, there is a substantial threat of irreparable injury, and this Court should grant the injunction so as to preserve the estate and potential recoveries. *See Janvey*, 647 F.3d at 600 (holding that "dissipation of the assets ... would impair the court's ability to grant an effective remedy," and thus the court found a threat of irreparable harm for which there was no adequate remedy at law).

### C.  Balancing The Hardships: The Harm to the Committee Outweighs Any Potential Harm to CLO Holdco.

There is greater harm in denying the injunction that in granting it.  In balancing the hardships, the Committee must "establish that [its] irreparable harm is greater than the hardship that the preliminary injunction would cause [CLO Holdco]." *Travelers Cas. & Sur. Co. of Am. v. Padron*, No. 5:15-CV-200-DAE, 2017 WL 9360906, at *12 (W.D. Tex. Aug. 2, 2017).  That is, the Committee "must show that granting the injunction would do less harm to [CLO Holdco] than denying the injunction would do to [the Committee]." *Id.*

Here, the equitable argument for granting the injunction and continuing to order the Proceeds to be held in the Court Registry is straightforward.  A preliminary injunction merely preserves the relative positions of the parties and maintains the status quo. *Med-Cert Home Care*, 365 F. Supp. 3d at 748 ("The purpose of a preliminary injunction is to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a

---

[32] *See In re Acis Capital Mgmt., L.P.*, No. 18-30264-SGJ-11, 2019 WL 417149, at *11 (Bankr. N.D. Tex. Jan. 31, 2019), *aff'd*, 604 B.R. 484 (N.D. Tex. 2019) ("The record contains substantial evidence of both intentional and constructive fraudulent transfers . . . .").

trial on the merits."). CLO Holdco will suffer no significant harm if the Proceeds remain in the Court Registry and certainly no magnitude of harm that would outweigh the Court's interest in preserving the Debtor's estate. *See In re OGA Charters,* 554 B.R. at 432 ("[T]his Court finds that the balance of harm favors the entry of the preliminary injunction in order to protect potential assets of the estate from dissipation.").

On one hand, keeping the Proceeds in the Court's registry ensures that such funds will not be depleted, and any purported loss concerning the time-value of money is mitigated, as the funds are in an interest-bearing account. On the other hand, any release of such funds to CLO Holdco may deprive the Debtor of its only opportunity to obtain redress for fraudulent or improper transactions involving CLO Holdco or the interests or claims it holds.

Thus, this factor weighs in favor of granting injunctive relieve on a preliminary basis pending trial on the merits.

### D. The Public Interest Will Be Served By Issuance of the Injunctive Relief Sought.

"[E]ntry of a preliminary injunction will serve the public interest by preserving the status quo and preserving [the Debtor's] assets for the benefit of whomever is entitled to them after trial." *In re Atlas,* 2014 WL 172283, at *6; *see also In re OGA Charters,* 554 B.R. at 432 (holding that it is in the public interest to "maintain[] the status quo by not dissipating any potential assets of bankruptcy estate.").

As set forth above, CLO Holdco and its parent entities are very closely associated with Dondero, who has previously engaged in schemes and other behaviors designed to evade creditors, including fraudulent asset transfers.[33] The evidence related above clearly establishes a prima facie case that the disputed Proceeds are potential assets of the Debtor's bankruptcy estate. Courts

---

[33] *See id.*

routinely grant motions for preliminary injunctive relief and find that it is in the public interest to do so, in order to preserve the status quo and prevent dissipation of assets pending trial. *In re OGA Charters,* 554 B.R. at 432.

Thus, this factor weighs in favor of this Court granting the Committee's request for a preliminary injunction to preserve the status quo and to further preserve any "assets that can be potentially used to satisfy valid claims against the bankruptcy estate." *In re OGA Charters,* 554 B.R. at 432.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, the Committee respectfully asks that this Court grant the Motion for Preliminary Injunction, as this would preserve the relative position of the parties and the status quo, and further, preserve assets that can be potentially used to satisfy valid claims against the bankruptcy estate.  The Committee respectfully requests that this Court grant such other and further relief as it deems necessary and proper.

Dated: December 29, 2020
Dallas, Texas

SIDLEY AUSTIN LLP
*/s/ Paige Montgomery*
Paige Holden Montgomery
Penny P. Reid
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 74201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

-and-

Matthew A. Clemente (admitted *pro hac vice*)
Dennis M. Twomey (admitted *pro hac vice*)
Alyssa Russell (admitted *pro hac vice*)
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

COUNSEL FOR THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS

## CERTIFICATE OF CONFERENCE

I hereby certify that counsel for the Official Committee of Unsecured Creditors has

conferred with counsel for the Debtor and counsel for CLO Holdco, Ltd. regarding the relief sought

in this motion.  Counsel for CLO Holdco, Ltd. opposes the relief requested in this motion.

Dated: December 17, 2020

*/s/ Paige Montgomery*
Paige Holden Montgomery
*Counsel for the Official Committee
of Unsecured Creditors*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above and foregoing document was sent via electronic mail via the Court's ECF system to all parties authorized to receive electronic notice in this case on December 29, 2020.

<div align="right">

*/s/ Paige Montgomery*
Paige Holden Montgomery
*Counsel for the Official Committee*
*of Unsecured Creditors*

</div>

## **EXHIBIT 1**

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P., [1] | Case No. 19-34054-sgj11 |
| Debtor. | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | |
| Plaintiff, | Adversary Case No. 20-03195 |
| v. | |
| CLO HOLDCO, LTD. | |
| Defendant. | |

### ORDER GRANTING THE MOTION FOR PRELIMINARY INJUNCTION AGAINST CLO HOLDCO, LTD.

On this day, the Court considered the Official Committee of Unsecured Creditors' (the "Committee") *Motion for Preliminary Injunction Against CLO Holdco, Ltd.* (the "Motion"). Based on the pleadings on file, the Court finds that good cause exists to grant the Motion.

**IT IS THEREFORE ORDERED** that

1. The Motion is **GRANTED**.

2. The Proceeds shall continue to be held in the Registry of the Court until such time as the Adversary Proceeding is completed.[2]

### ### End of Order ###

---

[1]    The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2]    Capitalized terms used herein but not defined herein shall have the meanings ascribed to such terms in the Motion.

SIDLEY AUSTIN LLP
Penny P. Reid
Paige Holden Montgomery
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 74201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

Matthew A. Clemente (admitted pro hac vice)
Dennis M. Twomey (admitted pro hac vice)
Alyssa Russell (admitted pro hac vice)
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

*Counsel for the Official Committee of Unsecured Creditors*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Debtor. | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | |
| Plaintiff, | Adversary Case No. 20-03195 |
| v. | |
| CLO HOLDCO, LTD. | |
| Defendant. | |

## APPENDIX IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

<u>**APPENDIX IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**</u>          **Page 1**

Pursuant to Local Rule 7.1(i), The Official Committee of Unsecured Creditors

(the "Committee") of Highland Capital Management, L.P. (the "Debtor"), respectfully

submit this Appendix in support of its Motion for Preliminary Injunction.

| App. | Ex. | Description |
|---|---|---|
| APP 001-016 | 1. | 12-28-2016 Purchase and Sale Agreement between Highland Capital Management, L.P. and The Get Good Nonexempt Trust |
| APP 017-018 | 2. | 12-31-2012 Note Payable to Get Good NE #2 and 12-07-2012 Note Payable to Get Good NE #1 |
| APP 019-020 | 3. | 12-07-2012 Promissory Note between The Dugaboy Investment Trust and The Get Good Trust |
| APP 021-062 | 4. | Dugaboy Trust Agreement |
| APP 063-072 | 5. | James Dondero's Related Interests Chart |
| APP 073-078 | 6. | Highland Dallas Foundation, Inc., Unanimous Written Consent of Directors in Lieu of Meeting |
| APP 079-085 | 7. | 12-28-2016 Omnibus Agreement Assignment |
| APP 086-090 | 8. | 6-29-2001 Donative Assignment of Interests Recitals |
| APP 091-095 | 9. | 6-29-2001 Exercise of Discretion by Trustee with Respect to Distributed to Charitable Beneficiary – The Get Good Nonexempt Trust |
| APP 096-097 | 10. | Declaration of Mustafa Abdul-Jabbar |

Dated: December 17, 2020
       Dallas, Texas

SIDLEY AUSTIN LLP

*/s/ Paige H. Montgomery*

Paige Holden Montgomery
Penny P. Reid
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 74201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

-and-

Matthew A. Clemente (admitted *pro hac vice*)
Dennis M. Twomey (admitted *pro hac vice*)
Alyssa Russell (admitted *pro hac vice*)
One South Dearborn Street
Chicago, Illinois 60603
Telephone:  (312) 853-7000
Facsimile:  (312) 853-7036

COUNSEL FOR THE OFFICIAL COMMITTEE OF
UNSECURED CREDITORS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was sent via electronic mail via the Court's ECF system to all parties authorized to receive electronic notice in this case on December 17, 2020.

/s/ *Paige H. Montgomery*
Paige Holden Montgomery

# EXHIBIT  1

PURCHASE AND SALE AGREEMENT

PURCHASE AND SALE AGREEMENT (this "Agreement"), dated as of December 28, 2016 (the "Effective Date"), between Highland Capital Management, L.P., a Delaware limited partnership ("HCMLP"), and The Get Good Nonexempt Trust, a trust established under the laws of the State of Texas ("Get Good). Each of HCMLP and Get Good are sometimes referred to herein individually as a "Party", and together as the "Parties".

RECITALS

WHEREAS, Get Good is the payee pursuant to that certain Promissory Note, dated October 31, 2016, issued by Dugaboy in the principal amount of $23,817,639.58, a copy of which is attached hereto as Exhibit A (the "Note");

WHEREAS, as of the Effective Date, there is $23,817,639.58 of principal and $104,079.82 of accrued and unpaid interest outstanding under the Note;

WHEREAS, reference is hereby made to (i) the Limited Partnership Agreement of Highland Capital Loan Fund, L.P. ("Highland Loan Fund"), dated March 28, 2013, and (ii) the Confidential Private Placement Memorandum for Series A Interests in Highland Capital Loan Fund, L.P., dated March 2013 (together, the "Highland Loan Fund Governing Documents");

WHEREAS, HCMLP owns certain Series A Interests (as defined in the Highland Loan Fund Governing Documents) of Highland Loan Fund;

WHEREAS, HCMLP owns certain call options (the "AA Options") of American Airlines Group, Inc., a Delaware corporation ("AA");

WHEREAS, reference is hereby made to (i) the Joint Plan of Distribution of the Crusader Funds adopted by Highland Crusader Offshore Partners, L.P., Highland Crusader Fund, L.P. (the "Domestic Crusader Fund"), Highland Crusader Fund, Ltd. and Highland Crusader Fund II, Ltd. (the "Offshore Crusader Fund"), and (ii) the Scheme of Arrangement between the Offshore Crusader Fund and its Scheme Creditors (as defined therein) ((i) and (ii), collectively, as amended from time to time, the "Crusader Scheme and Plan");

WHEREAS, HCMLP, directly and indirectly through its wholly-owned subsidiary, Eames, Ltd. ("Eames"), owns (i) certain participating shares of the Domestic Crusader Fund (the "Domestic Crusader Interests"), and (ii) certain participating shares of the Offshore Crusader Fund (the "Offshore Crusader Interests"); and

WHEREAS, the Parties desire to enter into a series of purchases, sales, transfers and assignments, in each case, on the terms and subject to the conditions set forth herein.

AGREEMENT

NOW THEREFORE, in consideration of the premises and the mutual covenants and the agreements herein set forth, the Parties hereby agree as follows:

**APP 001**

DOC_00231365

Section 1. <u>Definitions</u>. As used in this Agreement, the following terms have the meanings stated:

"<u>Encumbrances</u>" means any liens, pledges, interests, charges, options, encumbrances and other restrictions (other than restrictions on transfer under applicable securities laws, and other than restrictions under the Highland Loan Fund Governing Agreements, as applicable)

"<u>Governmental Authority</u>" means any government, governmental agency, authority, court or other tribunal.

"<u>Knowledge</u>" means, with respect to (i) an individual, the actual knowledge of such individual, after reasonable inquiry, and (ii) a person that is not an individual, the actual knowledge of the executive officers and the members of the board of directors (or similar governing body) of such Person, in each case, after reasonable inquiry.

"<u>Law</u>" means any law, statute, ordinance, code, regulation, rule, or other requirement of any Governmental Authority.

Section 2. <u>Purchases and Sales</u>.

(a) <u>Purchase and Sale of the Get Good Transferred Assets</u>. Get Good hereby irrevocably sells, transfers and assigns to HCMLP a 97.6835% interest in the Note (the "<u>Get Good Transferred Assets</u>"), and HCMLP hereby purchases and accepts the Get Good Transferred Assets.

(b) <u>Purchase and Sale of the HCMLP Transferred Assets</u>. HCMLP hereby (i) irrevocably sells, transfers and assigns to Get Good all of HCMLP's right, title and interest in and to the Series A Interests of Highland Loan Fund set forth on <u>Exhibit B</u> attached hereto, (ii) hereby sells, transfers and assigns to Get Good all of HCMLP's right, title and interest in and to the AA Options set forth on <u>Exhibit C</u>, and (iii) hereby irrevocably grants, sells, transfers and assigns to Get Good (A) a participation interest (the "<u>Participation Interest</u>") in certain Offshore Crusader Interests and certain Onshore Crusader Interests, and (B) a tracking interest (the "<u>Tracking Interest</u>"), in certain Onshore Crusader Interests (the "<u>Underlying Crusader Interests</u>"), in each case, as more particularly described and subject to the terms set forth in <u>Exhibit D</u> attached hereto ((i), (ii) and (iii), collectively, the "<u>HCMLP Transferred Assets</u>), and Get Good hereby purchases and accepts the HCMLP Transferred Assets.

Section 3. <u>Representations and Warranties of Get Good</u>. Get Good hereby represents and warrants to HCMLP as of the Effective Date, as follows:

(a) <u>Power</u>. Get Good is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Get Good has the necessary power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby.

(b) <u>Binding Effect</u>. This Agreement has been duly authorized, executed and delivered by Get Good and is a legal, valid and binding obligation of Get Good enforceable against it in

2

**APP 002**

DOC_00231365

accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting the rights and remedies of creditors or by general equitable principles.

(c)    Non-Contravention.   The execution and delivery of this Agreement and the performance by Get Good of its obligations hereunder will not (i) violate or breach any provision of Get Good's organizational documents, (ii) subject to the accuracy of HCMLP's representations and warranties set forth herein, violate or breach any Law applicable to Get Good, (iii) breach or result in default of any judgment, injunction, decree or determination of any Governmental Authority applicable to Get Good, or (iv) breach, or result in a default under, any material contract or material agreement to which Get Good is a party or by which Get Good or any of its properties may be bound.

(d)    Consents.   No authorization, consent, order or approval of, notice to or registration or filing with, or any other action by, any governmental authority or other person or entity is required or advisable in connection with (i) the due execution and delivery by Get Good of this Agreement, (ii) the performance by Get Good of its obligations under this Agreement or (iii) the sale, transfer and delivery of the Get Good Transferred Assets to HCMLP.

(e)    Title.   Get Good is the sole record, legal and beneficial owner of the Get Good Transferred Assets and has good and valid title to the Get Good Transferred Assets, free and clear of all Encumbrances.   From and after the Effective Date, good and valid title to the Get Good Transferred Assets, free and clear of all Encumbrances, will be transferred to HCMLP.

(f)    Sophistication. Get Good: (i) is a sophisticated entity with respect to the purchase of the HCMLP Transferred Assets; (ii) is able to bear the economic risk associated with the purchase of the HCMLP Transferred Assets; (iii) has adequate information concerning the business and financial condition of Highland Loan Fund, AA, the Domestic Crusader Fund and the Offshore Crusader Fund to make an informed decision regarding the purchase of the HCMLP Transferred Assets; (iv) has such knowledge and experience, and has made investments of a similar nature, so as to be aware of the risks and uncertainties inherent in the purchase of investments of the type contemplated in this Agreement; (v) has received, reviewed and understands each of the documents listed and disclosures made by HCMLP on Schedule I attached hereto, and has had an adequate opportunity to ask questions to the Company with respect thereto and (vi) has independently and without reliance on HCMLP, and based on such information as Get Good has deemed appropriate, made its own analysis and decision to enter into this Agreement.

(g)    No Brokers.   Get Good has not engaged or employed any finder, broker, agent or other intermediary in connection with the transactions described herein.   There are no fees, commissions or compensation required to be paid by HCMLP to any person engaged or retained by, through or on behalf of Get Good in connection with the consummation of the transactions described herein, and if any such fees, commissions, or compensation is required in connection with the consummation of the transactions described herein, Get Good shall remain solely responsible.

3

**APP 003**

DOC_00231365

Section 4. <u>Representations and Warranties of Purchaser</u>. HCMLP represents and warrants to Get Good, as of the Effective Date, as follows:

(a)    <u>Power</u>. HCMLP is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. HCMLP has the necessary power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby.

(b)    <u>Binding Effect</u>. This Agreement has been duly authorized, executed and delivered by HCMLP and is a legal, valid and binding obligation of HCMLP enforceable against it in accordance with its terms, except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or affecting the rights and remedies of creditors or by general equitable principles.

(c)    <u>Non-Contravention</u>. The execution and delivery of this Agreement and the performance by HCMLP of its obligations hereunder will not (i) violate or breach any provision of HCMLP's organizational documents, (ii) subject to the accuracy of Get Good's representations and warranties set forth herein, violate or breach any Law applicable to HCMLP, (iii) breach, or result in a default of, any judgment, injunction, decree or determination of any Governmental Authority applicable to HCMLP, or (iv) breach, or result in a default under, any material contract or material agreement to which HCMLP is a party or by which HCMLP or any of its properties may be bound.

(d)    <u>Consents</u>. No authorization, consent, order or approval of, notice to or registration or filing with, or any other action by, any Governmental Authority or other person or entity is required or advisable in connection with (i) the due execution and delivery by HCMLP of this Agreement, (ii) the performance by HCMLP of its obligations under this Agreement or (iii) the purchase of the Get Good Transferred Assets by HCMLP.

(e)    <u>Title</u>. HCMLP is the sole record, legal and beneficial owner of the HCMLP Transferred Assets, the Participating Shares (as defined on <u>Exhibit E</u> attached hereto) and the Tracking Shares (as defined on <u>Exhibit E</u> attached hereto), and has good and valid title to the HCMLP Transferred Assets, the Participating Shares and the Tracking Shares, in each case, free and clear of all Encumbrances, except as set forth on <u>Schedule I</u> attached hereto. From and after the Effective Date, good and valid title to the HCMLP Transferred Assets, free and clear of all Encumbrances, will be transferred to Get Good.

(e)    <u>Sophistication</u>. HCMLP: (i) is a sophisticated entity with respect to the purchase of the Get Good Transferred Assets; (ii) is able to bear the economic risk associated with the purchase of the Get Good Transferred Assets; (iii) has adequate information concerning the business and financial condition of Dugaboy to make an informed decision regarding the purchase of the Get Good Transferred Assets; (iv) has such knowledge and experience, and has made investments of a similar nature, so as to be aware of the risks and uncertainties inherent in the purchase of investments of the type contemplated in this Agreement; and (v) has independently

4

**APP 004**

DOC_00231365

and without reliance on Get Good, and based on such information as HCMLP has deemed appropriate, made its own analysis and decision to enter into this Agreement.

(f)    No Brokers.  HCMLP has not engaged or employed any finder, broker, agent or other intermediary in connection with the transactions described herein.  There are no fees, commissions or compensation required to be paid by Get Good to any person engaged or retained by, through or on behalf of HCMLP in connection with the consummation of the transactions described herein, and if any such fees, commissions, or compensation is required in connection with the consummation of the transactions described herein, HCMLP shall remain solely responsible.

Section 5.  Miscellaneous.

(a)    Fees and Expenses.  All costs and expenses incurred in connection with this Agreement and the consummation of the transactions contemplated herein will be paid by the Party incurring such expense.

(b)    Entire Agreement, Counterparts; Amendments.  This Agreement constitutes the entire agreement of the Parties and supersedes all prior written or oral and all contemporaneous oral agreements, understandings and negotiations with respect to the subject matter hereof.  This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which taken together will constitute one and the same instrument.  Transmission by facsimile or other form of electronic transmission of an executed counterpart of this Agreement will be deemed to constitute due and sufficient delivery of such counterpart.  This Agreement may not be amended or modified except in writing by all of the Parties hereto and no condition herein (express or implied) may be waived except in writing by the Party whom the condition was meant to benefit.

(c)    Survival; Successors and Assigns.  All representations, warranties, covenants and other provisions made by the Parties will survive the execution, delivery, and performance of this Agreement.  This Agreement will inure to the benefit of and be binding upon the Parties and their respective successors and no other person will have any right or obligation hereunder.  Each Party is expressly permitted to assign or transfer any or all of its rights or obligations hereunder without the consent of the other Party.

(d)    Severability.  The invalidity or unenforceability of any term or provision of this Agreement will not affect the validity or enforceability of any other term or provision hereof.  If any term or provision of this Agreement is for any reason determined to be invalid or unenforceable, there will be deemed to be made such changes (and only such changes) as are necessary to make it valid and enforceable.

(e)    Governing Law.  This Agreement will be governed by, and construed in accordance with, the laws of the State of Texas (without reference to any conflicts of law provision) applicable to agreements made in and to be performed entirely within such state.

5

**APP 005**

DOC_00231365

(f) <u>Arbitration</u>. In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; <u>provided</u>, <u>however</u>, that either party or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. The arbitration will be conducted by the American Arbitration Association, or another, mutually agreeable arbitration service. A panel of three arbitrators will preside over the arbitration and will together deliberate, decided and issue the final award. The arbitrators shall be duly licensed to practice law in the State of Texas. The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. The arbitrators will not have the authority to render a decision that contains an outcome determinative error of state or federal law, or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law. Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law. In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable, arbitration service rules. The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys' fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury. All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

(g) <u>Further Assurances</u>. Each Party agrees to (i) execute and deliver, or to cause to be executed and delivered, all such agreements, documents and instruments and (ii) take or cause to be taken all such actions as the other Party may reasonably request to effectuate the intent and purposes, and to carry out the terms, of this Agreement.

(h) <u>Equitable Remedy</u>. Each Party acknowledges that a breach or threatened breach by such Party of any of its obligations under this Agreement would give rise to irreparable harm to the other Party for which monetary damages may not be an adequate remedy and hereby agrees that in the event of a breach or a threatened breach by such Party of any such obligations, the other Party shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

*[Signatures on next page]*

6

**APP 006**

DOC_00231365

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement as of the date first written above.

**GET GOOD:**

THE GET GOOD NONEXEMPT TRUST

By: _____
Name: Grant James Scott
Title: Trustee

**HCMLP:**

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: Strand Advisors, Inc., its General Partner

By: _____
Name: James Dondero
Title: President

SIGNATURE PAGE TO PURCHASE AND SALE AGREEMENT

**APP 007**

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement as of the date first written above.

**GET GOOD:**

THE GET GOOD NONEXEMPT TRUST

By: _____
Name: Grant James Scott
Title: Trustee

**HCMLP:**

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: Strand Advisors, Inc., its General Partner

By: _____
Name: James Dondero
Title: President

SIGNATURE PAGE TO PURCHASE AND SALE AGREEMENT

**APP 008**

DOC_00231365

## SCHEDULE I

### Additional Disclosures

Documents Received, Reviewed and Understood by Purchaser

Joint Plan of Distribution of the Crusader Funds adopted by Highland Crusader Offshore Partners, L.P., Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (the "Crusader Funds").

Scheme of Arrangement between Highland Crusader Fund II, Ltd. and its Scheme Creditors (as defined therein).

The audited financial statements for the year ended December 31, 2015 for each of the Crusader Funds.

Additional Disclosures

The Crusader Funds are currently in liquidation and are subject to the Crusader Scheme and the Plan. On August 4, 2016, HCMLP was removed as the investment manager of the Crusader Funds, and neither HCMLP nor any of its affiliates controls the Crusader Funds.

Prior to the Effective Date, HCMLP granted, sold, transferred and assigned a participation in 87.14% of the Underlying Crusader Interests.

Recently, HCMLP became aware of a Notice of Computational Adjustment issued to Offshore Crusader Fund which calculates additional tax of $52,705,089. It is not clear, what, if any impact, this could have upon investors in the Crusader Funds. Irrespective of whether the additional tax is correct or has any legal basis, assuming such a tax is owed by the Offshore Crusader Fund may result in the Crusader Master Fund having to sell assets in the future to pay such tax which could negatively impact all the investors in the Crusader Funds. Further, if such tax is not paid the IRS could impose liens or levies upon any U.S. assets owned by the Offshore Crusader Fund and potentially the Crusader Master Fund as well.

**EXHIBIT A**

**The Note**

(*Attached.*)

## PROMISSORY NOTE

**$23,817,639.58**                                                      **October 31, 2016**

THIS PROMISSORY NOTE (this "**Note**") is in substitution for and replacement of that certain promissory note dated December 7, 2012, in the original face amount of $23,595,920.00 from James D. Dondero, in his capacity as Trustee of The Dugaboy Investment Trust, as Maker and The Get Good Trust, as Payee (collectively, the "**Prior Note**"), together with accrued interest on the Prior Note.

FOR VALUE RECEIVED, THE DUGABOY INVESTMENT TRUST ("**Maker**") promises to pay to the order of THE GET GOOD NONEXEMPT TRUST ("**Payee**"), in legal and lawful tender of the United States of America, the principal sum of TWENTY-THREE MILLION EIGHT HUNDRED SEVENTEEN THOUSAND SIX HUNDRED THIRTY-NINE DOLLARS AND FIFTY-EIGHT CENTS ($23,817,639.58), together with interest, on the terms set forth below. All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas 75201, or such other address as Payee may specify to Maker in writing from time to time.

1.      Interest Rate.  The unpaid principal balance of this Note from time to time outstanding shall bear interest at a fair market rate as determined by Waterview Advisors as of October 31, 2016, which the parties in good faith have estimated to be two and seventy-five hundredths percent (2.75%) per annum from the date hereof until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note.  If the fair market rate of interest as finally determined by Waterview Advisors is more or less than the parties originally estimated, the parties agree that the interest rate on this Note shall be adjusted up or down to reflect the appraised fair market rate. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable annually.

2.      Payment of Principal and Interest.  The principal and any accrued interest on this Note shall be due and payable on October 30, 2036 (the "**Maturity Date**").

3.      Prepayment Allowed; Renegotiation Discretionary.  Maker may prepay in whole or in part the unpaid principal or accrued interest of this Note.  Any payments on this Note shall be applied first to unpaid accrued interest hereon, and then to unpaid principal hereof.

4.      Acceleration Upon Default.  Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof.  No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

5.      Waiver.  Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

**APP 011**

6      Attorneys' Fees. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7      Limitation on Agreements. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8      Governing Law. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

MAKER:

THE DUGABOY INVESTMENT TRUST

By: _____
Name: Nancy Marie Dondero
Title: Family Trustee

APP 012

**EXHIBIT B**

**The Series A Interests of Highland Loan Fund**

$2,032,183.24 (based on 11/30/16 NAV) Series A Interests of Highland Capital Loan Fund, L.P. (as defined in the Limited Partnership Agreement of Highland Capital Loan Fund, L.P, dated March 28, 2013, as amended from time to time).

## EXHIBIT C

### The AA Options

| American Airlines Call Options | | | # Contracts | 12/27/16 MV | Amount Assigned | Total Est. MV Assigned |
|---|---|---|---|---|---|---|
| CALL AAL JAN 40 1/20/17 | | | 10,000 | 8,710,000.00 | 100.0000% | $ 8,710,000.00 |

APP 014

DOC_00231365

## EXHIBIT D

### The Participation Interest and the Tracking Interest

The following sets forth the terms and conditions with respect to (i) a participation interest (the "Participation Interest") granted by Highland Capital Management, L.P. ("HCMLP") in certain participating shares of Highland Crusader Fund, L.P. (the "Onshore Crusader Fund") and Highland Crusader Fund II, Ltd. (the "Offshore Crusader Fund", and such participating shares collectively, the "Participating Shares"), and (ii) a tracking interest (the "Tracking Interest") in certain participating shares of the Onshore Crusader Fund (the "Tracking Shares").

### Participation and Tracking Interest

Crusader Participation Interests

| Account Name | Legal Owner | Feeder Fund Investment | 11/31/18 NAV per statement | Amount Participated | Total NAV Participated |
|---|---|---|---|---|---|
| HCM LP corp | Highland Capital Management LP | Crusader Fund II Ltd. | $ 5,185,723.14 | 100.00% | $ 5,185,728.54 |
| HCMLP pmt | Highland Capital Management LP | Crusader Fund II Ltd. | 1,138,673.19 | 100.00% | 1,138,673.19 |
| Eaton Ltd. | Eaton Ltd. | Crusader Fund LP | 6,581,043.01 | 100.00% | 6,581,043.01 |
| HCMLP (1) | Highland Capital Management LP | Crusader Fund LP | 369,467.24 | 12.88% | 1,936,636 |
| HCMLP (2) | Highland Capital Management LP | Crusader Fund LP | 1,302,883.08 | 12.86% | 167,464.31 |
| Total: | | | $ 12,625,304.84 | | $ 11,144,507.85 |

Tracking Interests

| Account Name | Legal Owner | Feeder Fund Investment | 11/31/18 NAV per statement | Tracking Amount | Total Tracked Interest |
|---|---|---|---|---|---|
| HCMLP (1) | Highland Capital Management LP | Crusader Fund LP | 369,467.24 | 87.12% | 643,462.94 |
| HCMLP (2) | Highland Capital Management LP | Crusader Fund LP | 1,302,883.08 | 87.14% | 1,135,368.58 |
| Total: | | | $ 2,699,350.70 | | $ 1,480,887.59 |

Total of Crusader Participation and Tracked Interests

$ 12,625,395.44

Evidence of Participations and the Tracking Interest. HCMLP shall maintain records of all payments received from or owed by the holder of the Participation Interest and the Tracking Interest and all payments made or owed by HCMLP to the holder of the Participation Interest and the Tracking Interest.

**APP 015**

DOC_00231365

Payments by and to HCMLP with respect to the Participation Interest and the Tracking Interest. Subject to any applicable tax withholding, HCMLP shall promptly pay to the holder of the Participation Interest an amount equal to such holder's share of each amount received and applied by HCMLP (or Eames, Ltd., a wholly-owned subsidiary of HCMLP, if applicable) in payment of distributions, Plan Claims (as defined in the Joint Plan of Distribution of the Crusader Funds adopted by Highland Crusader Offshore Partners, L.P., the Onshore Crusader Fund, Highland Crusader Fund, Ltd. and the Offshore Crusader Fund, and the Scheme of Arrangement between the Offshore Crusader Fund and its Scheme Creditors, as applicable) and proceeds of any sale, assignment or other disposition of any interest, in each case, with respect to or in the Participating Shares (such holder's share of such amounts, collectively, the "Participation Proceeds"). Pending such payment of Participation Proceeds by HCMLP to the holder of the Participation Interest, HCMLP will hold the Participation Proceeds in trust for the benefit of such holder and will not commingle such amounts with other property of HCMLP. Subject to any applicable tax withholding, HCMLP shall promptly pay to the holder of the Tracking Interest an amount equal to each amount received and applied by HCMLP in payment of distributions, Plan Claims and proceeds of any sale, assignment or other disposition of any interest, in each case, with respect to or in the Underlying Shares. Notwithstanding anything herein to the contrary, except for the right to receive amounts specified in this paragraph, no holder shall have, by reason of the Participation Interest or the Tracking Interest, any rights with respect to the Participating Shares or the Tracking Shares.

Nonrecourse Participation Interest and Tracking Interest. The Interest and the Tracking Interest are held by the holder thereof without recourse to HCMLP (except in respect of the HCMLP's express obligations as set forth herein) and for such holder's own account and risk. HCMLP makes no representation or warranty as to, and shall have no responsibility for the value, legality, genuineness, validity, sufficiency or enforceability of the Participating Interest, the Tracking Interest or any of the rights attaching to them; any representation or warranty made by, or the accuracy, completeness, correctness or sufficiency of any information (or the validity, completeness or adequate disclosure of assumptions underlying any estimates, forecasts or projections contained in such information) provided (directly or indirectly through HCMLP) by any person; the performance or observance by any person (at any time, whether prior to or after the date hereof) of the financial condition of the Onshore Crusader Fund or the Offshore Crusader Fund; or (except as otherwise expressly provided herein) any other matter relating to any person, the Participating Interest or the Tracking Interest.

Standard of Care. Notwithstanding anything contained herein to the contrary, HCMLP shall administer the Participation Interest and the Tracking Interest and enforce its rights, with respect to the Participating Shares and the Tracking Shares in the same manner as if it had not granted the Participation Interest or the Tracking Interest but owned the Participating Shares the Tracking Shares solely for its own account with no obligation to make or receive payments in respect of the Participation Interest or the Tracking Interest.

Assignment. Each holder of the Participation Interest or the Tracking Interest is expressly permitted to assign or transfer any or all of its rights with respect thereto without the consent of HCMLP.

# EXHIBIT  2

**Note Payable to Get Good NEES** [illegible]

Original Principal | $15,482,680.00 | Shares of [illegible]
Maturity 12/07/2022
Initial Rate 0.24%

| Period | | Beg. Balance | Principal Advance | Interest Payment | Interest Accrual | Principal Payment | Ending Balance | Accrued Interest |
|---|---|---|---|---|---|---|---|---|
| 12/07/2012 | | $15,482,680.00 | | | $0.00 | $0.00 | $15,482,680.00 | $0.00 |
| 12/31/2012 | 24 | $15,482,680.00 | | | $2,442.29 | $0.00 | $15,482,680.00 | $2,446.73 |
| 01/31/2013 | 31 | $15,482,680.00 | | | $3,155.92 | | $15,482,680.00 | $5,598.22 |
| 02/28/2013 | 28 | $15,482,680.00 | | | $2,850.51 | | $15,482,680.00 | $8,448.73 |
| 03/31/2013 | 31 | $15,482,680.00 | | | $3,155.92 | | $15,482,680.00 | $11,604.65 |
| 04/30/2013 | 30 | $15,482,680.00 | | | $3,054.12 | | $15,482,680.00 | $14,659.05 |
| 05/31/2013 | 31 | $15,482,680.00 | | | $3,155.92 | | $15,482,680.00 | $17,815.55 |
| 06/30/2013 | 30 | $15,482,680.00 | | | $3,054.12 | | $15,482,680.00 | $20,869.67 |
| 07/31/2013 | 31 | $15,482,680.00 | | | $3,155.92 | | $15,482,680.00 | $24,025.73 |
| 08/31/2013 | 31 | $15,482,680.00 | | | $3,155.92 | | $15,482,680.00 | $27,181.55 |
| 09/30/2013 | 30 | $15,482,680.00 | | | $3,054.12 | | $15,482,680.00 | $30,235.67 |
| 10/31/2013 | 31 | $15,482,680.00 | | | $3,155.92 | | $15,482,680.00 | $33,391.57 |
| 11/30/2013 | 30 | $15,482,680.00 | | | $3,054.12 | | $15,482,680.00 | $36,445.62 |
| 12/07/2013 | 7 | $15,519,125.80 | | | $714.30 | | $15,519,840.11 | $0.00 |
| 12/31/2013 | 24 | $15,519,840.11 | | | $2,449.16 | $0.00 | $15,519,840.11 | $2,449.16 |
| 01/31/2014 | 31 | $15,519,840.11 | | | $3,163.50 | | $15,519,840.11 | $5,612.65 |
| 02/28/2014 | 28 | $15,519,840.11 | | | $2,857.35 | | $15,519,840.11 | $8,470.01 |
| 03/31/2014 | 31 | $15,519,840.11 | | | $3,163.50 | | $15,519,840.11 | $11,633.50 |
| 04/30/2014 | 30 | $15,519,840.11 | | | $3,061.45 | | $15,519,840.11 | $14,694.95 |
| 05/31/2014 | 31 | $15,519,840.11 | | | $3,163.50 | | $15,519,840.11 | $17,858.45 |
| 06/30/2014 | 30 | $15,519,840.11 | | | $3,061.45 | | $15,519,840.11 | $20,919.89 |
| 07/31/2014 | 31 | $15,519,840.11 | | | $3,163.50 | | $15,519,840.11 | $24,083.39 |
| 08/31/2014 | 31 | $15,519,840.11 | | | $3,163.50 | | $15,519,840.11 | $27,246.89 |
| 09/30/2014 | 30 | $15,519,840.11 | | | $3,061.45 | | $15,519,840.11 | $30,308.33 |
| 10/31/2014 | 31 | $15,519,840.11 | | | $3,163.50 | | $15,519,840.11 | $33,471.83 |
| 11/30/2014 | 30 | $15,519,840.11 | | | $3,061.45 | | $15,519,840.11 | $36,533.28 |
| 12/07/2014 | 7 | $15,556,373.38 | | | $714.57 | | $15,557,088.41 | $0.00 |
| 12/31/2014 | 24 | $15,557,088.41 | | | $2,455.04 | $0.00 | $15,557,088.41 | $2,456.04 |
| 01/31/2015 | 31 | $15,557,088.41 | | | $3,171.09 | | $15,557,088.41 | $5,626.13 |
| 02/28/2015 | 28 | $15,557,088.41 | | | $2,864.21 | | $15,557,088.41 | $8,490.33 |
| 03/31/2015 | 31 | $15,557,088.41 | | | $3,171.09 | | $15,557,088.41 | $11,661.42 |
| 04/30/2015 | 30 | $15,557,088.41 | | | $3,068.80 | | $15,557,088.41 | $14,730.22 |
| 05/31/2015 | 31 | $15,557,088.41 | | | $3,171.09 | | $15,557,088.41 | $17,901.31 |
| 06/30/2015 | 30 | $15,557,088.41 | | | $3,068.80 | | $15,557,088.41 | $20,970.10 |
| 07/31/2015 | 31 | $15,557,088.41 | | | $3,171.09 | | $15,557,088.41 | $24,141.19 |
| 08/31/2015 | 31 | $15,557,088.41 | | | $3,171.09 | | $15,557,088.41 | $27,312.28 |
| 09/30/2015 | 30 | $15,557,088.41 | | | $3,068.80 | | $15,557,088.41 | $30,381.08 |
| 10/31/2015 | 31 | $15,557,088.41 | | | $3,171.09 | | $15,557,088.41 | $33,552.17 |
| 11/30/2015 | 30 | $15,557,088.41 | | | $3,068.80 | | $15,557,088.41 | $36,620.96 |
| 12/07/2015 | 7 | $15,593,710.37 | | | $717.74 | | $15,594,428.11 | $0.00 |
| 12/31/2015 | 24 | $15,594,428.11 | | | $2,460.83 | $0.00 | $15,594,428.11 | $2,460.83 |
| 01/31/2016 | 31 | $15,594,428.11 | | | $3,178.70 | | $15,594,428.11 | $5,639.53 |
| 02/29/2016 | 29 | $15,594,428.11 | | | $2,973.62 | | $15,594,428.11 | $8,613.35 |
| 03/31/2016 | 31 | $15,594,428.11 | | | $3,178.70 | | $15,594,428.11 | $11,781.95 |
| 04/30/2016 | 30 | $15,594,428.11 | | | $3,076.16 | | $15,594,428.11 | $14,858.11 |
| 05/31/2016 | 31 | $15,594,428.11 | | | $3,178.70 | | $15,594,428.11 | $18,036.81 |
| 06/30/2016 | 30 | $15,594,428.11 | | | $3,076.16 | | $15,594,428.11 | $21,112.97 |
| 07/31/2016 | 31 | $15,594,428.11 | | | $3,178.70 | | $15,594,428.11 | $24,291.67 |
| 08/31/2016 | 31 | $15,594,428.11 | | | $3,178.70 | | $15,594,428.11 | $27,470.37 |
| 09/30/2016 | 30 | $15,594,428.11 | | | $3,076.16 | | $15,594,428.11 | $30,546.53 |
| 10/31/2016 | 31 | $15,594,428.11 | | | $3,178.70 | | $15,594,428.11 | $33,725.23 |
| 11/30/2016 | 30 | $15,594,428.11 | | | $3,076.16 | | $15,594,428.11 | $36,801.39 |
| 12/07/2016 | 7 | $15,631,229.50 | | | $719.47 | | $15,631,958.97 | $0.00 |
| 12/31/2016 | 24 | $15,631,958.97 | | | $2,468.25 | $0.00 | $15,631,958.97 | $2,468.25 |

| | | | | | |
|---|---|---|---|---|---|
| $0.00 | $0.00 | $151,746.63 | | $15,482,680.00 | $5,446.73 |

APP 017

CONTROL_000006B248

**Note Payable to Get Good NE#1**                    12/07/2012

Original Principal     | $8,113,240.00| Shares of Nexbank 387,067
Maturity               12/07/2022
Initial Rate           0.24%

| Period | | Beg. Balance | Principal Advance | Interest Payment | Interest Accrual | Principal Payment | Ending Balance | Accrued Interest |
|---|---|---|---|---|---|---|---|---|
| 12/07/2012 | | $8,113,240.00 | | | $0.00 | $0.00 | $8,113,240.00 | $0.00 |
| 12/31/2012 | 24 | $8,113,240.00 | | | $1,280.34 | $0.00 | $8,113,240.00 | $1,280.34 |
| 01/31/2013 | 31 | $8,113,240.00 | | | $1,653.77 | | $8,113,240.00 | $2,934.10 |
| 02/28/2013 | 28 | $8,113,240.00 | | | $1,493.73 | | $8,113,240.00 | $4,427.83 |
| 03/31/2013 | 31 | $8,113,240.00 | | | $1,653.77 | | $8,113,240.00 | $6,081.60 |
| 04/30/2013 | 30 | $8,113,240.00 | | | $1,600.42 | | $8,113,240.00 | $7,682.02 |
| 05/31/2013 | 31 | $8,113,240.00 | | | $1,653.77 | | $8,113,240.00 | $9,335.78 |
| 06/30/2013 | 30 | $8,113,240.00 | | | $1,600.42 | | $8,113,240.00 | $10,936.20 |
| 07/31/2013 | 31 | $8,113,240.00 | | | $1,653.77 | | $8,113,240.00 | $12,589.97 |
| 08/31/2013 | 31 | $8,113,240.00 | | | $1,653.77 | | $8,113,240.00 | $14,243.74 |
| 09/30/2013 | 30 | $8,113,240.00 | | | $1,600.42 | | $8,113,240.00 | $15,844.16 |
| 10/31/2013 | 31 | $8,113,240.00 | | | $1,653.77 | | $8,113,240.00 | $17,497.92 |
| 11/30/2013 | 30 | $8,113,240.00 | | | $1,600.42 | | $8,113,240.00 | $19,098.34 |
| 12/07/2013 | 7 | $8,132,338.34 | | | $374.31 | | $8,132,712.66 | $0.00 |
| 12/31/2013 | 24 | $8,132,712.66 | | | $1,283.41 | $0.00 | $8,132,712.66 | $1,283.41 |
| 01/31/2014 | 31 | $8,132,712.66 | | | $1,657.74 | | $8,132,712.66 | $2,941.15 |
| 02/28/2014 | 28 | $8,132,712.66 | | | $1,497.31 | | $8,132,712.66 | $4,438.46 |
| 03/31/2014 | 31 | $8,132,712.66 | | | $1,657.74 | | $8,132,712.66 | $6,096.19 |
| 04/30/2014 | 30 | $8,132,712.66 | | | $1,604.26 | | $8,132,712.66 | $7,700.45 |
| 05/31/2014 | 31 | $8,132,712.66 | | | $1,657.74 | | $8,132,712.66 | $9,358.19 |
| 06/30/2014 | 30 | $8,132,712.66 | | | $1,604.26 | | $8,132,712.66 | $10,962.45 |
| 07/31/2014 | 31 | $8,132,712.66 | | | $1,657.74 | | $8,132,712.66 | $12,620.19 |
| 08/31/2014 | 31 | $8,132,712.66 | | | $1,657.74 | | $8,132,712.66 | $14,277.92 |
| 09/30/2014 | 30 | $8,132,712.66 | | | $1,604.26 | | $8,132,712.66 | $15,882.19 |
| 10/31/2014 | 31 | $8,132,712.66 | | | $1,657.74 | | $8,132,712.66 | $17,539.92 |
| 11/30/2014 | 30 | $8,132,712.66 | | | $1,604.26 | | $8,132,712.66 | $19,144.18 |
| 12/07/2014 | 7 | $8,151,856.84 | | | $375.21 | | $8,152,232.05 | $0.00 |
| 12/31/2014 | 24 | $8,152,232.05 | | | $1,286.49 | $0.00 | $8,152,232.05 | $1,286.49 |
| 01/31/2015 | 31 | $8,152,232.05 | | | $1,661.72 | | $8,152,232.05 | $2,948.20 |
| 02/28/2015 | 28 | $8,152,232.05 | | | $1,500.90 | | $8,152,232.05 | $4,449.11 |
| 03/31/2015 | 31 | $8,152,232.05 | | | $1,661.72 | | $8,152,232.05 | $6,110.82 |
| 04/30/2015 | 30 | $8,152,232.05 | | | $1,608.11 | | $8,152,232.05 | $7,718.94 |
| 05/31/2015 | 31 | $8,152,232.05 | | | $1,661.72 | | $8,152,232.05 | $9,380.65 |
| 06/30/2015 | 30 | $8,152,232.05 | | | $1,608.11 | | $8,152,232.05 | $10,988.76 |
| 07/31/2015 | 31 | $8,152,232.05 | | | $1,661.72 | | $8,152,232.05 | $12,650.48 |
| 08/31/2015 | 31 | $8,152,232.05 | | | $1,661.72 | | $8,152,232.05 | $14,312.19 |
| 09/30/2015 | 30 | $8,152,232.05 | | | $1,608.11 | | $8,152,232.05 | $15,920.30 |
| 10/31/2015 | 31 | $8,152,232.05 | | | $1,661.72 | | $8,152,232.05 | $17,582.02 |
| 11/30/2015 | 30 | $8,152,232.05 | | | $1,608.11 | | $8,152,232.05 | $19,190.13 |
| 12/07/2015 | 7 | $8,171,422.18 | | | $376.11 | | $8,171,798.29 | $0.00 |
| 12/31/2015 | 24 | $8,171,798.29 | | | $1,289.58 | $0.00 | $8,171,798.29 | $1,289.58 |
| 01/31/2016 | 31 | $8,171,798.29 | | | $1,665.70 | | $8,171,798.29 | $2,955.28 |
| 02/29/2016 | 29 | $8,171,798.29 | | | $1,558.24 | | $8,171,798.29 | $4,513.52 |
| 03/31/2016 | 31 | $8,171,798.29 | | | $1,665.70 | | $8,171,798.29 | $6,179.22 |
| 04/30/2016 | 30 | $8,611,798.29 | | | $1,611.97 | | $8,171,798.29 | $7,791.19 |
| 05/31/2016 | 31 | $8,171,798.29 | | | $1,665.70 | | $8,171,798.29 | $9,456.90 |
| 06/30/2016 | 30 | $8,611,798.29 | | | $1,611.97 | | $8,171,798.29 | $11,068.87 |
| 07/31/2016 | 31 | $8,171,798.29 | | | $1,665.70 | | $8,171,798.29 | $12,734.57 |
| 08/31/2016 | 31 | $8,171,798.29 | | | $1,665.70 | | $8,171,798.29 | $14,400.28 |
| 09/30/2016 | 30 | $8,171,798.29 | | | $1,611.97 | | $8,171,798.29 | $16,012.25 |
| 10/31/2016 | 31 | $8,171,798.29 | | | $1,665.70 | | $8,171,798.29 | $17,677.95 |
| 11/30/2016 | 30 | $8,171,798.29 | | | $1,611.97 | | $8,171,798.29 | $19,289.92 |
| 12/07/2016 | 7 | $8,191,088.21 | | | $377.01 | | $8,191,465.22 | $0.00 |
| 12/31/2016 | 24 | $8,191,465.22 | | | $1,292.68 | $0.00 | $8,191,465.22 | $1,292.68 |

|  | $0.00 | $0.00 | $79,517.90 | | $8,113,240.00 | $4,427.83 |

**APP 018**

CONTROL_0000068250

# EXHIBIT  3

## PROMISSORY NOTE

$23,595,920                                                                December 7, 2012

FOR VALUE RECEIVED, THE DUGABOY INVESTMENT TRUST, a Delaware trust ("*Maker*") hereby unconditionally promises to pay to the order of THE GET GOOD TRUST, a Texas trust ("*Payee*"), in legal and lawful tender of the United States of America, the principal sum of TWENTY THREE MILLION, FIVE HUNDRED NINETY FIVE THOUSAND, NINE HUNDRED TWENTY and 00/100 Dollars ($23,595,920.00), together with interest, on the terms set forth below (the "*Note*"). All sums hereunder are payable to Payee at 300 Crescent Court, Suite 700, Dallas, Texas or such other address as Payee may specify to Maker in writing from time to time.

This Note is entered into in connection with: (i) that certain transaction, dated on or about the date hereof, between the Payee and the Maker pursuant to which the Payee sold and assigned its economic interest in 589,898 shares of NexBank Capital, Inc., a Delaware corporation (such entity together with its successors, "*NCI*" and such shares, the "*Specified NCI Shares*") to the Maker; and (ii) that certain Voting Trust Agreement, dated on or about the date thereof, pursuant to which the Payee transferred the voting rights in such shares to the Trustee as defined therein. This Note constitutes the consideration paid by the Maker in exchange for receipt of the economic interests of the Specified NCI Shares.

1.    Interest Rate.    The unpaid principal balance of this Note from time to time outstanding shall bear interest at the short-term Applicable Federal Rate as promulgated by the U.S. Internal Revenue Services from time to time during the term of this Note until Maturity Date (hereinafter defined), compounded annually on the anniversary of the date of this Note. Interest shall be calculated at a daily rate equal to 1/365th (1/366 in a leap year) of the rate per annum, shall be charged and collected on the actual number of days elapsed, and shall be payable on the maturity of this Note.

2.    Payment of Principal and Interest.    Any interest due and owing and the outstanding principal amount of this Note shall be due and payable on December 7, 2022 (the "*Maturity Date*").

3.    Prepayment Allowed; Renegotiation Discretionary.    Maker may prepay at any time and from time to time, in whole or in part, the unpaid principal of, together with any unpaid interest on, this Note. Any payments on this Note shall be applied first to any unpaid interest hereon, and then to unpaid principal hereof.

4.    Acceleration Upon Default.    Failure to pay this Note or any installment hereunder as it becomes due shall, at the election of the holder hereof, without notice, demand, presentment, notice of intent to accelerate, notice of acceleration, or any other notice of any kind which are hereby waived, mature the principal of this Note and all interest then accrued, if any, and the same shall at once become due and payable and subject to those remedies of the holder hereof. No failure or delay on the part of Payee in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

**APP 019**

CONTROL_0000068251

5.    Waiver. Maker hereby waives grace, demand, presentment for payment, notice of nonpayment, protest, notice of protest, notice of intent to accelerate, notice of acceleration and all other notices of any kind hereunder.

6.    Attorneys' Fees. If this Note is not paid at maturity (whether by acceleration or otherwise) and is placed in the hands of an attorney for collection, or if it is collected through a bankruptcy court or any other court after maturity, the Maker shall pay, in addition to all other amounts owing hereunder, all actual expenses of collection, all court costs and reasonable attorneys' fees and expenses incurred by the holder hereof.

7.    Limitation on Agreements. All agreements between Maker and Payee, whether now existing or hereafter arising, are hereby limited so that in no event shall the amount paid, or agreed to be paid to Payee for the use, forbearance, or detention of money or for the payment or performance of any covenant or obligation contained herein or in any other document evidencing, securing or pertaining to this Note, exceed the maximum interest rate allowed by law. The terms and provisions of this paragraph shall control and supersede every other provision of all agreements between Payee and Maker in conflict herewith.

8.    Governing Law. This Note and the rights and obligations of the parties hereunder shall be governed by the laws of the United States of America and by the laws of the State of Texas, and is performable in Dallas County, Texas.

**MAKER:**

THE DUGABOY INVESTMENT TRUST

By: _____
Name: James D. Dondero, not in his individual
capacity, but solely as Family Trustee

2

**APP 020**

CONTROL_0000068251

# EXHIBIT  4



# Commonwealth Trust Company

"an independent Trust Company"

November 15, 2010

Mr. James D. Dondero, Co-Trustee
13455 Noel Road, Suite 800
Dallas, TX 75240

Re:     **The Dugaboy Investment Trust**

Dear Mr. Dondero:

We are pleased to be considered to serve as Trustee of the above-referenced Trust (the "Trust"). Our goal is to build long-lasting relationships by providing high quality, efficient, and responsive services. We submit for your review this letter and the attached *Pricing Trust Services* document, which in the absence of a contrary provision in the Trust document, will govern our compensation and reimbursement for expenses in connection with the Trust.

Based upon information that has been provided to us:

- The Trust is a Dynasty Trust
- The Trust will be funded with or hold the attached list of assets

1.     **Fees and Expenses.**

a.     *Types of Fees.* We charge the following types of fees: a one-time set-up fee, an annual fee, and in certain cases, additional fees. For details about what services each type of fee covers, please refer to the attached *Pricing Trust Services* document. We propose the following one-time set-up fee and first year's annual fee in connection with the Trust:

- One-time set-up fee          $      2,500.00
- First year's annual fee       $      5,500.00

However, these fees may change if the above information about the type of trust or funding of the Trust is inaccurate. Typically, the annual fee for the second year will be the same as the annual fee for the first year, though significant changes (such as in the assets of the Trust or our duties) may result in an adjustment.

b.     *Expenses.* We may charge for expenses reasonably incurred in performing our duties as Trustee of the Trust.

---

29 Bancroft Mills Road, 2nd Floor
Wilmington, DE 19806
Phone: (302) 658-7214

Fax: (302) 658-7219
E-mail: ctc@comtrst.com
Internet: www.comtrst.com

APP 021

Mr. James D. Dondero
November 15, 2010
Page 2 of 2

      c.    *Timing of Payment*.

        i.  The **one-time set-up fee and the first year's annual fee** are due before we execute any document accepting the position of Trustee of the Trust. With regard to The Dugaboy Investment Trust we have waived the requirement that we be paid before executing the Trust documentation and expect payment in full after the Decanting Memorandum has been fully executed and the assets of The Dugaboy Trust have been decanted to the The Dugaboy Investment Trust.

        ii.  The **annual fee for each subsequent year** will be billed on or around the anniversary date of our accepting the position of Trustee of the Trust.

        iii.  Any **expenses or additional fees** may be billed from time to time or included with the bill for the annual fee.

      d.    *Removal or Resignation*. While it is unusual for us to resign or be removed as Trustee, we reserve the right to charge for our time and expenses in connection with that process.

      e.    *Source of Payment*. Absent an indication to the contrary from you, subsequent years' annual fees and any expenses or additional fees will be paid from the Trust. Payment of our fees and/or expenses may have gift and generation-skipping transfer tax consequences unless payment is made with assets of the Trust. You should consult your advisor prior to making any payment of our fees and/or expenses (including our set-up fee and first year's annual fee) other than with assets of the Trust. We prefer that there be a bank or brokerage account in the name of the Trust to facilitate payments.

     2.    **Commonwealth Trust Company Personnel**.

      There will be many individuals working together at Commonwealth Trust Company ("CTC") on the administration of the Trust. I am the attorney assigned to the Trust. The CTC Trust Administrator assigned to the Trust is Kristen M. Powers, who is likely to be your primary point of contact as she handles the day-to-day aspects of the administration of the Trust, such as information requests and distribution requests. Tax and accounting professionals are also on staff to assist in the administration of the Trust.

      All of these individuals can be reached by telephone at (302) 658-7214, by fax at (302) 658-7219, or by e-mail. We use the following convention for the e-mail address of each CTC employee (with no spaces in the e-mail address): [first initial of first name, full last name]@comtrst.com. For example, my e-mail address is hflanagan@comtrst.com.

      Please sign at the bottom of the copy of this letter, signifying that you have read and understand the terms of this letter and the attached *Pricing Trust Services* document, and then kindly return it to us. We will be happy to respond to any questions you have with respect to any of the foregoing.

**APP 022**

Mr. James D. Dondero
November 15, 2010
Page 2 of 2

        We hope that we will have the opportunity to serve as Trustee of the Trust for many
years.

                                        Very truly yours,

                                        Heather M. Flanagan, MA, JD, LLM
                                        Trust Counsel

Attachment


**I have read and understand the terms of this letter and the *Pricing Trust Services* document
attached therewith.**


_____

**Mr. James D. Dondero**

**Date:**_____


APP 023

**\*\*\*\*Dugaboy Assets and Liabilities as 09/30/2010**

**Dugaboy Assets**

| | | | |
|---|---|---|---|
| Cash | | 1,658.36 | |
| Short Term Investments | | 683.68 | |
| Note Receivable- 4201 Locust LP | Note | 2,779,588.82 | |
| Accrued Interest Receivable-4201 Locust LP | Note | 213,124.09 | |
| Investment in 4201 Locust LP | DE Partnership | 30,350.00 | |
| Dugaboy Management LLC | DE LLC | 447,055.18 | 3,472,460.13 |

**Dugaboy Liabilities**

| | | | |
|---|---|---|---|
| Note Payable- Dondero (principal) | | 3,272,891.53 | |
| Accrued Interst payable - Dondero | | 48,576.31 | |
| Note Payable- Get Good (principal) | | 20,203.84 | |
| Accrued Interst payable – Get Good | | 606.67 | 3,342,278.35 |

APP 024

# COMMONWEALTH TRUST COMPANY

*An Independent Delaware Trust Company*
*"Turning the Delaware Advantage into Your Advantage Since 1931"*
29 Bancroft Mills Road 2nd Floor
Wilmington, DE 19806
Phone (302) 658-7214    Fax (302) 658-7219
www.comtrst.com    ctc@comtrst.com

## PRICING TRUST SERVICES

Unlike large bank trust departments, Commonwealth Trust Company provides individual service that reflects the unique requirements of each trust we administer. We consider this personalized approach when quoting fees for a new trust. We can estimate our set-up fee and annual fee after we have received information such as what assets will be transferred to the trust, the number of beneficiaries, the terms of the trust and frequency of distributions. Once our legal department has had the opportunity to review the trust and the particular circumstances of the trust arrangement, we will set a firm fee. Particular services are covered in these fees and additional fees will be charged for services outside our standard services.

### ANNUAL FEES

Below are our minimum fees for some of the most common trust arrangements:

| TRUST TYPE | TRUST ASSETS | MINIMUM ANNUAL FEE |
|---|---|---|
| **Insurance Trusts** | N/A | $ 2,000 |
| **Business Trusts** | N/A | $ 2,500 |
| **Asset Protection Trusts** | $ 1,500,000 | $ 5,500 |
| | $ 5,000,000 | $ 7,500 |
| | $ 10,000,000 | $ 12,500 |
| | $ 25,000,000 | $ 25,500 |
| **All Other Trusts** | $ 1,000,000 | $ 4,000 |
| | $ 5,000,000 | $ 6,500 |
| | $ 10,000,000 | $ 11,500 |
| | $25,000,000 | $ 22,500 |
| **All Unfunded Trusts including APTs** | $0 | $500 |

Our annual fee includes the following services:
- Review of one LLC Agreement, LP Agreement, or corporate governing document
- Opening of one bank or brokerage account
- One annual distribution (whether mandatory or discretionary)
- Review and execution of one promissory note
- Up to three payments of the Trust's expenses
- Crummey notices sent annually or any other required annual notice to beneficiaries
- Maintaining the books and records of the trust
- An annual accounting
- The acquisition of one life insurance policy and the payment of an annual premium for insurance trusts.

6/29/2010

**APP 025**

# COMMONWEALTH TRUST COMPANY

*An Independent Delaware Trust Company*
*"Turning the Delaware Advantage into Your Advantage Since 1931"*
29 Bancroft Mills Road 2nd Floor
Wilmington, DE 19806
Phone (302) 658-7214   Fax (302) 658-7219
www.comtrst.com    ctc@comtrst.com

## SET UP FEE

There is a one-time set-up fee for each trust between $1,500-$2,000 (APTs $1,750-$2,500).  Our standard set-up fee includes the following:

- Review of the existing trust document or draft document for new trusts
- Communications with the grantor's attorney regarding the trust and CTC's requirements
- Review of the revised trust or any documents relating to the reformation of a trust
- Execution of the finalized trust or an acceptance to serve as trustee
- Patriot Act checks for the grantor(s) and any co-trustee
- If the trust will be decanted, preparation and negotiation of any release agreement
- For asset protection trusts, a solvency review
- Assistance with transfer of assets and or opening of associated accounts.

The set-up fee will increase in relation to additional work associated with each individual trust. For example, additional fees will be due if several reviews of the trust documents are necessary or if there are other issues causing a significant amount of time and review including, but not limited to, trust reformation or decanting.

## ADDITIONAL FEES

Below are examples of additional minimum fees for services.  Additional fees are charged based on time.

|  | Minimum |
|---|---|
| Review of corporate organizational documents for each entity | $500 |
| Opening additional bank or brokerage account | $250 |
| Additional distributions | $300 |
| Each additional set up for Crummey notices | $250 |
| Acquisition of additional life insurance policy | $300 |
| Additional payment of premiums | $300 |
| 1035 Exchange | $500 |
| Preparation and filing of fiduciary income tax returns | $500 |
| Transmitting information to prepare and review fiduciary income tax returns not prepared by CTC | $500 |
| Federal income tax elections (i.e. QSST, ESBT) | $750 |
| Change of Investment Advisor or Investment Manager | $500 |

Although we do not charge a termination fee, we do charge for time in terminating or transferring a trust and the annual fee will be prorated.  The general pricing outlined above is reviewed annually by the President.  The fee for each trust is analyzed on a yearly basis.  CTC generally increases fees every two years in increments of $250-$500.  Otherwise, annual fees remain stable from year to year, only increasing due to changed administrative duties or significant changes in assets under administration.

6/29/2010

**APP 026**

TRUST AGREEMENT


Between


DANA SCOTT BREAULT,
Settlor


and


JAMES D. DONDERO and
COMMONWEALTH TRUST COMPANY,
Trustees


THE DUGABOY INVESTMENT TRUST


WINSTEAD PC
DALLAS, TEXAS

**APP 027**

THE DUGABOY INVESTMENT TRUST

TABLE OF CONTENTS

PAGE

ARTICLE I DEFINITIONS ...............................................................................1
   1.1    Settlor.................................................................................1
   1.2    Jim......................................................................................1
   1.3    Trustees.............................................................................1
   1.4    Children.............................................................................1
   1.5    Descendants .....................................................................1
   1.6    Code ..................................................................................1
   1.7    Per Stirpes .......................................................................1

ARTICLE II FUNDING ......................................................................................2

ARTICLE III DISTRIBUTION OF PRINCIPAL AND INCOME .......................2
   3.1    Trust for Jim.....................................................................2
   3.2    Trust for Child..................................................................5
   3.3    Trusts for Descendants.....................................................6
   3.4    Contingent Distribution ...................................................9
   3.5    General Power of Appointment for Certain Beneficiaries.........9
   3.6    Postponement of Distribution .......................................10

ARTICLE IV PROVISIONS AFFECTING DISTRIBUTION.............................10
   4.1    Withdrawal Right............................................................10
   4.2    Restriction Upon Alienation ..........................................12
   4.3    Distributions Constitute Separate Property.....................12
   4.4    Method of Payment.........................................................12
   4.5    Evidence of Need............................................................12
   4.6    Termination of Small Trust.............................................12
   4.7    Generation-Skipping Transfer Taxes and Payment ...............13

ARTICLE V THE TRUSTEE ............................................................................13
   5.1    Resignation of Trustee ....................................................13
   5.2    Appointment and Succession of Trustees........................14
   5.3    Removal of Trustee.........................................................16
   5.4    Succession of Corporate Trustee ....................................16
   5.5    Trustee's Fees.................................................................16
   5.6    Bond................................................................................16
   5.7    Liability of Trustee. ........................................................16
   5.8    Predecessor Fiduciary ....................................................18
   5.9    Periodic Accounting........................................................18
   5.10   Beneficiary under Disability ...........................................19
   5.11   Incapacity of Individual Trustee .....................................19

ARTICLE VI TRUST ADMINISTRATION .......................................................19

-i-

APP 028

TABLE OF CONTENTS
(Continued)

PAGE

| | | |
|---|---|---|
| 6.1 | General Powers | 19 |
| 6.2 | Division of Powers | 24 |
| 6.3 | Merger of Trusts | 25 |
| 6.4 | Certain Powers and Rights Limited | 25 |
| 6.5 | GST Inclusion Ratio | 25 |
| 6.6 | Out-of-State Properties | 25 |
| 6.7 | Management of Real Property | 26 |
| 6.8 | No Court Supervision | 26 |
| 6.9 | Division of Trusts | 26 |
| 6.10 | Limitation of Powers | 26 |
| 6.11 | Dealing with Fiduciaries | 27 |

ARTICLE VII IRREVOCABILITY .............................................................27

ARTICLE VIII MISCELLANEOUS PROVISIONS ...............................28
| | | |
|---|---|---|
| 8.1 | Applicable Law | 28 |
| 8.2 | Perpetuities Provision | 28 |
| 8.3 | Gestation | 28 |
| 8.4 | Survivorship | 29 |
| 8.5 | Release of Powers and Interests | 29 |
| 8.6 | Powers of Appointment. | 29 |
| 8.7 | Liability of Third Party | 30 |
| 8.8 | Use of Words | 30 |
| 8.9 | Unenforceable Provision | 30 |
| 8.10 | Titles, Headings, and Captions | 30 |
| 8.11 | Counterpart Signatures | 30 |
| 8.12 | Trust Name | 30 |

APP 029

## THE DUGABOY INVESTMENT TRUST

November AGREEMENT OF TRUST made and entered into at Dallas, Texas, this 15th day of October, 2010, by and between DANA SCOTT BREAULT, as Settlor, and JAMES D. DONDERO, and COMMONWEALTH TRUST COMPANY, as Trustees.

### ARTICLE I

### DEFINITIONS

The following terms, as used in this Trust Agreement, have the meanings set forth below, unless another meaning is clearly indicated by context or circumstances:

1.1    Settlor. "Settlor" means DANA SCOTT BREAULT.

1.2    Jim. "Jim" means JAMES D. DONDERO.

1.3    Trustees. The initial Trustee of each trust created hereunder is JAMES D. DONDERO. "Trustee" means any person or entity serving as Trustee, whether original or successor and whether one or more in number. "Administrative Trustee" means COMMONWEALTH TRUST COMPANY in its capacity as Administrative Trustee, and any successor Administrative Trustee appointed in accordance with Section 5.2(c). "Independent Trustee" means GRANT JAMES SCOTT, III, (upon his acceptance as set forth in Section 5.2(b)) in his capacity as Trustee, and any successor Independent Trustee appointed in accordance with Section 5.2(b). "Family Trustee" means JAMES D. DONDERO in his capacity as Trustee, and any successor Family Trustee appointed in accordance with Section 5.2(a). The rights, powers, duties, and obligations, of the Family Trustee, Independent Trustee and Administrative Trustee are to be exercised and allocated pursuant to Section 6.2 of this Trust Agreement.

1.4    Children. "Children" means REESE AVRY DONDERO, JAMESON DRUE DONDERO, and any other child born to or adopted by Jim after the date of this Trust Agreement. "Child" means one of the Children.

1.5    Descendants. "Descendants" means the legitimate children of the person designated and the legitimate lineal descendants of such children, and includes any person adopted before attaining age fifteen (15) and the adopted person's legitimate lineal descendants. A posthumous child shall be considered as living at the death of his parent.

1.6    Code. "Code" means the Internal Revenue Code of 1986, as amended, and corresponding provisions of future federal tax law.

1.7    Per Stirpes. "Per Stirpes," when used with respect to a distribution of property among a class of beneficiaries, shall mean by representation; that is, the Descendants of a deceased ancestor take the share such ancestor would have received had he or she been living, and the issue of a living ascendant would not take in competition with such ascendant. The per

-1-

**APP 030**

stirpital allocation shall commence with the most senior generation that has a living representative.

## ARTICLE II

## FUNDING

Settlor has transferred to the Trustee, without consideration, One Thousand and No/100 Dollars ($1,000.00) which shall be administered and distributed in accordance with the terms of this Trust Agreement. Settlor and others may transfer to the Trustee properties acceptable to them, to be added to the trust estate. The Trustee shall administer the initial trust estate pursuant to the terms of Section 3.1.

## ARTICLE III

## DISTRIBUTION OF PRINCIPAL AND INCOME

3.1     Trust for Jim. The trust for the benefit of Jim shall be administered and distributed upon the following terms:

(a)     Distributions to Jim. The Family Trustee may distribute to Jim so much of the net income and principal of the trust as the Family Trustee deems necessary to provide for Jim's maintenance, support and health. Undistributed income shall be accumulated and added to principal. In exercising its discretion, the Family Trustee shall take into account the following factors:

(i)     Jim is the primary beneficiary of the trust.

(ii)     The Family Trustee shall take into consideration in determining Jim's needs any other income or resources known upon reasonable inquiry by the Family Trustee to be available to Jim for these purposes.

(iii)     Settlor's intention to assist or enable Jim to obtain and furnish a home commensurate with his standard of living.

(iv)     Settlor's intention to assist or enable Jim to obtain capital to enter a business or profession.

(v)     Any federal, state or local income taxes imposed on Jim as a result of the income and/or gains from the trust

(b)     Distributions by Independent Trustee. The Independent Trustee may, in its sole and absolute discretion, distribute to Jim so much of the income and principal of the trust as the Independent Trustee shall deem appropriate or advisable. It is Settlor's intention to give the Independent Trustee the broadest discretion possible in determining the amount and timing of distributions of income and principal hereunder and Settlor recognizes that the Independent Trustee may, in the exercise of its discretion, determine

-2-

**APP 031**

to distribute the entire trust estate to Jim or to make no distributions to Jim during Jim's disability or for so long as Jim shall have a judgment outstanding, or for so long as any distribution might be lost to Jim's creditors. It is also Settlor's intention and desire for the Independent Trustee to consider any federal, state or local income taxes imposed on Jim as a result of the income and/or gains from the trust in determining the amount of distributions to be made to Jim under this subsection (b).

(c)     Inter Vivos Special Power of Appointment. During Jim's lifetime, he shall have a special power to appoint any part or all of the trust estate to any individual or entity, except that no appointment shall be made to Jim, his creditors, his estate, or the creditors of his estate. Valid appointments may be in such amounts and proportions and upon such terms and conditions as Jim shall determine and evidence by written instrument delivered to the Trustee which specifically refers to this power of appointment and expresses the intention to exercise it; provided that such power of appointment shall not extend to any life insurance policies insuring Jim's life that constitute a part of the trust estate; and provided further that Jim shall not have a power to appoint by deed to or for the benefit of Jim or any individual or entity if such appointment has the effect of satisfying Jim's contractual or legal obligations. Any exercise of this power of appointment must be made in an executed and acknowledged written instrument delivered to the Trustee which to be effective must refer specifically to the power granted under this Section 3.1(c).

(d)     Independent Trustee's Power to Grant Testamentary General Power of Appointment. Except as otherwise provided herein, the Independent Trustee, by signed acknowledged instrument delivered to Jim, may grant Jim a testamentary general power of appointment (as defined in Sections 2041 of the Code) over part or all of the trust estate, provided, however, that such power of appointment shall only be effective in an amount up to but not in excess of the amount, if any, above which any further addition to the amount subject to the power of appointment would increase the Net Death Taxes (as hereinafter defined) by an amount equal to or greater than the decrease in the generation-skipping transfer tax that would result from such further addition. Unless Jim's will provides otherwise by express reference to this Trust Agreement and the above power of appointment, the increase in the Net Death Taxes resulting from such power shall be paid from that amount of the principal of the trust estate over which the power is exercisable. As used in this section, the term "Net Death Taxes" shall mean the aggregate death taxes (including, without limitation, Federal, state, local and other estate taxes and inheritance taxes but exclusive of interest and penalties), after taking into account all applicable credits, payable with respect to Jim's estate.

(i)     If Jim has one or more other general powers of appointment exercisable and measured substantially as provided in subsection (d) above, the amount that Jim may appoint under subsection (d) shall be reduced proportionally, based on the net fair market values of the principal of the trusts with respect to which such powers are exercisable as of the date of Jim's death, so that the aggregate of the amount so appointable under this Trust Agreement and the amount or amounts so appointable pursuant to such other power or powers

-3-

**APP 032**

together shall be no greater than the amount otherwise appointable under subsection (d) above.

(ii) The scope and terms of the power shall be defined in the instrument. Before such a power is exercised by Jim and the exercise becomes effective, the Independent Trustee may, in a similar manner, revoke or alter the power which was granted. This power shall not apply if the trust has an inclusion ratio of zero for generation-skipping transfer tax purposes. Jim shall not have a general power of appointment over any part of the trust estate unless such power is specifically granted to Jim by the Independent Trustee pursuant to this subsection.

(e) <u>Termination</u>. If not earlier terminated by distribution of the entire trust estate under the foregoing provisions, the trust shall terminate upon Jim's death. Upon termination of the trust, the Trustee shall distribute the balance of the trust estate as follows:

(i) <u>Pursuant to General Testamentary Power of Appointment</u>. This paragraph (i) shall apply if, but only if, the Independent Trustee grants Jim a general testamentary power of appointment pursuant to subsection (d) above and the Independent Trustee has not revoked the grant of that general power prior to the date of Jim's death. In that event, if Jim validly exercises such general testamentary power of appointment, the Trustee shall distribute so much of the trust estate then remaining as is validly appointed by Jim pursuant to such power in accordance with the terms of such appointment.

(ii) <u>Special Testamentary Power of Appointment</u>. This paragraph (ii) shall apply to so much of the trust estate then remaining as is not distributed pursuant to paragraph (i) above. The Trustee shall distribute the trust estate to such one or more individuals and entities, in such amounts and proportions and upon such terms and conditions, as Jim appoints by will or codicil which specifically refers to this power of appointment and expresses the intention to exercise it. However, Jim may not appoint to Jim, Jim's estate, Jim's creditors, or creditors of Jim's estate.

(iii) <u>Alternative Disposition</u>. The remaining and unappointed trust estate shall be held in trust or distributed as follows:

(1) If one or more of Jim's Descendants are then living, the Trustee shall divide the trust estate into separate equal shares, one for each then living Child and one for the then living Descendants, collectively, of each deceased Child with one or more Descendants then living. The Trustee shall administer a share for each Child in a separate trust for the primary benefit of the Child and for the Child's Descendants pursuant to Section 3.2 hereof. The Trustee shall administer a share for the Descendants of each deceased Child pursuant to Section 3.3 hereof.

-4-

APP 033

        (2)    If none of Jim's Descendants is then living, the trust estate shall be administered or distributed in accordance with Section 3.4 hereof.

    3.2    <u>Trust for Child</u>. All property directed to be administered in a separate trust for a Child under this Section 3.2 shall be administered and distributed for the Child's benefit upon the following terms:

    (a)    <u>Distributions to Child</u>. The Trustee may distribute to the Child so much of the net income and principal of the trust as the Trustee deems necessary to provide for the Child's reasonable maintenance, support, health and education. In exercising its discretion, the Trustee shall take into account the following factors:

    (i)    The Child's standard of living at the creation of the trust.

    (ii)    The Child is the primary beneficiary of the trust.

    (iii)    The Trustee shall take into consideration, in determining the Child's needs, any other income or resources known upon reasonable inquiry by it to be available to the Child for these purposes.

    (iv)    Settlor's intention to enable or assist each Child to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Child's advantage and to receive an excellent earlier education.

    (v)    Settlor's intention that the trust distributions not serve as a disincentive to the Child's motivation to provide for her own needs in life.

    (b)    <u>Distributions to Child's Descendants</u>. The Trustee may distribute to the Child's Descendants so much of the net income and principal of the trust as the Trustee, in its discretion, deems necessary to provide for their reasonable maintenance, support, health and education. In exercising its discretion, the Trustee shall take into account the following factors:

    (i)    The primary purpose of the trust.

    (ii)    The respective needs of each Descendant.

    (iii)    The Trustee shall take into consideration, in determining a Descendant's needs, any other income or resources known upon reasonable inquiry by it to be available to the Descendant for these purposes.

    (iv)    Settlor's intention to enable or assist each Descendant to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Descendant's advantage and to receive an excellent earlier education.

-5-

**APP 034**

(v)    Settlor's intention that the trust distributions not serve as a disincentive to a Descendant's motivation to provide for his or her own needs in life, and Settlor's instruction to the Trustee to terminate or lessen distributions to a Descendant if that objective, in the judgment of the Trustee, would thereby be served.

Distributions hereunder need not be equal among the Descendants, and the Trustee may make distributions to one or more Descendants to the exclusion of others. Distributions shall be charged against the trust estate as a whole, and not against the distributive share of any Descendant upon termination of the trust.

(c)    <u>Inter Vivos Special Power of Appointment</u>. The Child, acting in the Child's individual capacity, shall have a special power to appoint the income and principal of the trust to or for the benefit of one or more members of the limited class consisting of the Descendants of the Children, in such amounts and proportions and upon such terms and conditions, as the Child shall direct; provided that the Child shall not have a power to appoint by deed to or for the benefit of any individual if such appointment has the effect of satisfying a contractual obligation or legal support obligation of the Child. This power of appointment may be exercised subject to such terms and conditions as the Child shall direct, including an appointment in further trust, but no trust created by the exercise of such power may extend beyond the maximum term allowable with respect to any trust created under this Trust Agreement. Any exercise of this power of appointment must be made in an executed and acknowledged written instrument delivered to the Trustee which to be effective must refer specifically to the power granted under this Section 3.2(c).

(d)    <u>Termination</u>. If not earlier terminated by distribution of the entire trust estate under the foregoing provisions, the trust shall terminate upon the death of the Child. Upon termination, the Trustee shall distribute the trust estate then remaining, or any part thereof, to such one or more members of the limited class consisting of Jim's Descendants, in such amounts and proportions and upon such terms and conditions, as the Child shall appoint by will or codicil which specifically refers to this power of appointment and expresses the intention to exercise it. However, the Child may not appoint to the Child, the Child's creditors, estate, or creditors of the Child's estate. The trust property not appointed by the Child in accordance with this special power of appointment shall be administered by the Trustees for the Child's then living Descendants pursuant to Section 3.3 hereof. If there are no Descendants of the Child then living, the Trustee shall distribute the remaining trust estate to Jim's then living Descendants, <u>Per Stirpes</u>. If any property is distributable to a person for whose benefit a trust which was established under this Trust Agreement is then being administered, the property shall be added to that trust and administered according to its terms. If no Descendant of Jim is then living, the Trustee shall administer or distribute the remaining trust estate pursuant to Section 3.4 hereof.

3.3    <u>Trusts for Descendants</u>. The Trustee shall divide property which is to be administered under this Section 3.3 for the Descendants of a deceased Child, among such

-6-

**APP 035**

Descendants, Per Stirpes. The Trustee shall administer each share created for a Descendant of a deceased Child (the "Beneficiary") in a separate trust for the Beneficiary's benefit upon the following terms:

(a) _Distributions_. The Trustee shall distribute to the Beneficiary so much of the net income and principal of the trust as the Trustee deems necessary for the Beneficiary's reasonable maintenance, support, health and education. In exercising its discretion, the Trustee shall take into account the following factors:

(i) The Beneficiary's standard of living at the creation of the trust.

(ii) The Beneficiary is the primary beneficiary of the trust.

(iii) The Trustee shall take into consideration, in determining the Beneficiary's needs, any other income or resources known upon reasonable inquiry by it to be available to the Beneficiary for these purposes.

(iv) Settlor's intention to enable or assist each Beneficiary to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Beneficiary's advantage and to receive an excellent earlier education.

(v) Settlor's intention that the trust distributions not serve as a disincentive to the Beneficiary's motivation to provide for his or her own needs in life.

(b) _Distributions to Beneficiary's Descendants_. The Trustee may distribute to the Beneficiary's Descendants so much of the net income and principal of the trust as the Trustee, in its discretion, deems necessary to provide for their reasonable maintenance, support, health and education. In exercising its discretion, the Trustee shall take into account the following factors:

(i) The primary purpose of the trust.

(ii) The respective needs of each Descendant.

(iii) The Trustee shall take into consideration, in determining a Descendant's needs, any other income or resources known upon reasonable inquiry by it to be available to the Descendant for these purposes.

(iv) Settlor's intention to enable or assist each Descendant to pursue vocational, college, graduate, and/or professional education as long as in the Trustee's judgment it is pursued to the Descendant's advantage and to receive an excellent earlier education.

(v) Settlor's intention that the trust distributions not serve as a disincentive to a Descendant's motivation to provide for his or her own needs in

**APP 036**

life, and Settlor's instruction to the Trustee to terminate or lessen distributions to a Descendant if that objective, in the judgment of the Trustee, would thereby be served.

Distributions hereunder need not be equal among the Descendants, and the Trustee may make distributions to one or more Descendants to the exclusion of others. Distributions shall be charged against the trust estate as a whole, and not against the distributive share of any Descendant upon termination of the trust.

(c)     Inter Vivos Special Power of Appointment. The Beneficiary, acting in the Beneficiary's individual capacity, shall have a special power to appoint the income and principal of the trust to or for the benefit of one or more members of the limited class consisting of Jim's Descendants in such amounts and proportions and upon such terms and conditions, as the Beneficiary shall direct; provided that the Beneficiary shall not have a power to appoint by deed to or for the benefit of any individual if such appointment has the effect of satisfying a contractual obligation or legal support obligation of the Beneficiary. Furthermore, the Beneficiary may not appoint to the Beneficiary, the Beneficiary's creditors, estate or creditors of the Beneficiary's estate. This power of appointment may be exercised subject to such terms and conditions as the Beneficiary shall direct, including an appointment in further trust, but no trust created by the exercise of such power may extend beyond the maximum term allowable with respect to any trust created under this Trust Agreement. Any exercise of this power of appointment must be made in an executed and acknowledged written instrument delivered to the Trustee which to be effective must refer specifically to the power granted under this Section 3.3(c).

(d)     Termination. If not earlier terminated by distribution of the entire trust estate under the foregoing provisions, the trust shall terminate at the death of the Beneficiary. Upon termination, and except as otherwise provided pursuant to Section 3.5 hereof, the Trustee shall distribute the trust estate then remaining, or any part thereof to such one or more members of the limited class consisting of Jim's Descendants, in such amounts and proportions and upon such terms and conditions, as the Beneficiary shall appoint by will or codicil which specifically refers to this power of appointment and expresses the intention to exercise it. However, the Beneficiary may not appoint to the Beneficiary, the Beneficiary's creditors, estate or creditors of the Beneficiary's estate. The trust property not effectively appointed by the Beneficiary in accordance with this special power of appointment or pursuant to Section 3.5 hereof shall be distributed, Per Stirpes, to: the Beneficiary's Descendants living at the termination of the trust; or if there are no such Descendants then living, to the then living Descendants of the Child who was the parent of the Beneficiary; or if there are no such Descendants then living, to Jim's then living Descendants. If any property is distributable under this subsection to a Child, such property shall be added to the Child's Trust and administered pursuant to the terms of Section 3.2. If any property is distributable under this subsection to a Descendant of Jim (other than a Child), such property shall be administered in trust for such Descendant's benefit pursuant to the terms of this Section 3.3. If no Descendant of Jim is then living,

-8-

APP 037

the Trustee shall administer or distribute the remaining trust estate pursuant to Section 3.4 hereof.

3.4 <u>Contingent Distribution</u>. If Jim and Jim's Descendants are all are deceased and no other disposition of the trust estate is called for in this Trust Agreement, the trust estate then remaining shall be distributed to those persons other than creditors and Settlor who, under the laws of Texas in force at that time, would have taken the personal property of Jim had he died intestate, a single person without Descendants, domiciled in the State of Texas, the moment after the event causing the distribution hereunder, the shares and proportions of taking to be determined by Texas laws.

3.5 <u>General Power of Appointment for Certain Beneficiaries</u>.

(a) Except as provided in subsection (c) below, any provision of this Trust Agreement to the contrary notwithstanding, at the death of any individual ("such beneficiary") at whose death the generation-skipping transfer tax would, but for the provisions of this section, be applicable with respect to any trust created under this Trust Agreement, the Trustees shall pay out of the principal of such trust such amount as such beneficiary, by express provision referring to this Trust Agreement and this power of appointment in his or her will, appoints, to or among such beneficiary's creditors, up to but not in excess of the amount, if any, above which any further addition to the amount subject to the power of appointment would increase the Net Death Taxes (as hereinafter defined) by an amount equal to or greater than the decrease in the generation-skipping transfer tax that would result from such further addition. Unless such beneficiary's will otherwise provides by express reference to this Trust Agreement and the above power of appointment, the increase in the Net Death Taxes resulting from such power shall be paid from that amount of the principal of such trust over which such power is exercisable. The foregoing provisions of this section shall be effective only if the Trustees make a determination that the generation-skipping transfer tax would not be applicable with respect to the amount of such trust over which such power is exercisable. As used in this section, the term "Net Death Taxes" shall mean "the aggregate death taxes (including, without limitation, federal, state, local and other estate taxes and inheritance taxes but exclusive of interest and penalties), after taking into account all applicable credits, payable with respect to the estate of such beneficiary."

(b) If under the will of any individual or individuals and/or any other trust instrument or instruments, such beneficiary has one or more other general powers of appointment exercisable and measured substantially as provided in subsection (a) above, the amount such beneficiary may appoint under subsection (a) shall be reduced proportionally, based on the net fair market values of the principal of the trusts with respect to which such powers are exercisable as of the date of death of such beneficiary, so that the aggregate of the amount so appointable under this Trust Agreement and the amount or amounts so appointable pursuant to such other power or powers together shall be no greater than the amount otherwise appointable under subsection (a) above.

-9-

**APP 038**

(c)     The provisions of this section shall not apply to the trust administered for Jim under Section 3.1.

3.6     <u>Postponement of Distribution</u>.     Upon termination of any trust established hereunder, if any property is distributable to a beneficiary who is then under age twenty-five (25), or who, because of age, physical or mental weakness, or for any other reason is, in the sole discretion of the Trustee, unable to manage the property, the Trustee shall retain such property in a separate trust for the benefit of that beneficiary, until he or she attains age twenty-five (25) and in the sole discretion of the Trustee becomes able to manage the property.   At that time, the remaining trust property shall be distributed to the beneficiary and the separate trust shall terminate.   During the term of the trust, the Trustee shall distribute to the beneficiary so much of the net income and principal as the Trustee deems necessary to provide for the beneficiary's health, support, maintenance and education.   If the beneficiary dies before the termination of the trust, the then remaining trust estate shall be distributed to the beneficiary's estate.

# ARTICLE IV

# PROVISIONS AFFECTING DISTRIBUTION

4.1     <u>Withdrawal Right</u>.   Jim shall have the right, following a contribution to Jim's trust, to make a withdrawal in accordance with the provisions of this section unless the transferor indicates otherwise when making the transfer.   A separate withdrawal right shall attach to each separate contribution of properties to Jim's trust.   If a transferor is married at the time of contribution to the Trustee, then solely for purposes of the withdrawal rights granted in this Section 4.1, unless the transferor notifies the Trustee in writing to the contrary, such contribution shall be treated as two separate contributions having been made one-half (1/2) by the transferor and one-half (1/2) by the transferor's spouse, regardless of whether the property contributed is community property and regardless of whether they elect to treat such contribution as having been made one-half by each of them for Federal gift tax purposes.   Any person making a contribution to Jim's trust may give the Trustee written instructions that no withdrawal right is to be granted, or that alternative withdrawal rights are to be granted with respect to the contribution being made.

(a)     <u>Amount That May Be Withdrawn</u>.   When a contribution is made, Jim may withdraw the lesser of the following amounts:

(i)     the maximum present interest exclusion amount permitted, under Section 2503(b) of the Code, or any similar succeeding statute (such amount being $12,000 at the date of execution of this Trust Agreement), less the cumulative value of all previous known gifts to or for the benefit of Jim by the same transferor during the same calendar year which would qualify for the present interest exclusion; or

(ii)     the remainder determined by subtracting Jim's cumulative rights of withdrawal with respect to any other gifts from any transferor that are either

-10-

APP 039

currently outstanding or that have previously lapsed (but not including the present right of withdrawal) during the same calendar year from the greater of (1) Five Thousand Dollars ($5,000), or (2) Five Percent (5%) of the total value of Jim's trust determined as of the date the current withdrawal power is to lapse (such value may be estimated by the Trustee), or (3) any greater withdrawal power, the lapse of which would not constitute a release of such power under Sections 2041(b)(2) and 2514(e) of the Code or any similar subsequent statute; or

(iii)   the value of the contribution that is subject to the withdrawal right.

(b)   <u>Withdrawal Period and Notice</u>.  Unless directed to the contrary by the transferor, the Trustee shall promptly provide Jim with written notice of the date of the contribution, the name of the transferor, the value of the properties contributed, and the value of Jim's withdrawal right.  Withdrawals may be made at any time for a period of thirty (30) days following Jim's receipt of the notice of the existence of the withdrawal right.  During any period that Jim lacks legal capacity, Jim's guardian or other legal representative, other than Settlor, may exercise Jim's withdrawal right on Jim's behalf.  If Jim does not exercise the withdrawal right before the expiration of that period, the unexercised right shall lapse.  For purposes of this section, the term "contribution" means any cash or other property which is transferred to the Trustee as part of the trust estate.  The value of any contribution to the trust estate shall be its value for federal gift tax purposes.

(c)   <u>Payment of Withdrawal Amount</u>.  If Jim exercises his withdrawal right, payment of the amount due shall be made in cash immediately upon receipt by the Trustee of a demand in writing from Jim or his guardian or other legal representative, other than Settlor.  Upon the exercise of a withdrawal right, payment shall be made, first, from any gifts made to Jim's trust prior to the exercise of such withdrawal right, but during the same calendar year in which the withdrawal right is exercised, and shall be charged against the trust.  Should such gift or gifts not consist of sufficient cash to satisfy the exercised withdrawal right, the Trustee shall use other liquid assets of Jim's trust for such purpose.  Should Jim's trust not contain sufficient liquid assets to satisfy an exercised withdrawal right when made, the Trustee shall borrow funds in order to satisfy the demand and shall, if necessary, pledge trust property to secure the loan.

(d)   <u>Distributions During Withdrawal Period</u>.  If any contribution is made subject to a withdrawal right, the Trustee shall not make any distributions under any other provision of the Trust Agreement which would prevent the Trustee from being able to satisfy fully any unexpired right of withdrawal.

(e)   <u>Lapse of Withdrawal Right</u>. In the event Jim allows a withdrawal right granted under this Section 4.1 to lapse with respect to a contribution, or any portion thereof, the Trustee is authorized to characterize such lapse as a "release" for purposes of Section 678(a) of the Code.

-11-

APP 040

4.2 <u>Restriction Upon Alienation</u>. No beneficiary may anticipate, by assignment or otherwise, his beneficial interest in the principal or income of the trust estate; nor may any beneficiary sell, transfer, encumber, or in any way charge his interest in trust income or principal prior to actually receiving it. Neither the income nor the principal of any trust established hereunder shall be subject to any execution, garnishment, attachment, bankruptcy, claims for alimony or support, other legal proceeding of any character, legal sequestration, levy or sale, or in any other event or manner be applicable or subject, voluntarily or involuntarily, to the payment of a beneficiary's debts. The Trustee shall make distributions to or for each beneficiary according to the terms hereof, notwithstanding any purported sale, assignment, hypothecation, transfer, attachment, or judicial process. The provisions of this section shall not limit or detract from any power of appointment or withdrawal right granted to any beneficiary herein.

4.3 <u>Distributions Constitute Separate Property</u>. Settlor intends to make a gift to each beneficiary hereunder of only that portion of the income and principal of each trust that is in fact distributed to such beneficiary. Inasmuch as the amounts actually distributed to a beneficiary hereunder constitute the gift Settlor contemplated making, such distributions, whether they be income or principal, shall constitute the separate property of such beneficiary and not the community property of such beneficiary. Furthermore, it is Settlor's intention that no beneficiary shall have any interest in any undistributed income or principal until the distribution of such income or principal and, accordingly, such undistributed income and principal shall not be deemed the community property of any such beneficiary and that beneficiary's spouse.

4.4 <u>Method of Payment</u>. The Trustee, in its discretion, may make distributions to any beneficiary, including a beneficiary who is under a physical, mental, or legal disability (minority or other), in any one or more of the following ways: directly to the beneficiary without the intervention of any legal guardian or other legal representative; as expenditures in the beneficiary's behalf; to the guardian, committee, conservator, or other similar official acting for the beneficiary; to a custodian for the beneficiary under a Uniform Transfers to Minors Act or Uniform Gifts to Minors Act; to a relative of the beneficiary or to any suitable person with whom the beneficiary resides or who has care or custody of the beneficiary; and in all ways provided by law for gifts or other transfers to or for minors or other persons under disability. In each case, receipt by the beneficiary or other person to whom payment is made or a distribution entrusted shall be a complete discharge of the Trustee with respect thereto. The Trustee may act upon such evidence as it deems appropriate and reliable in determining a beneficiary's ability to manage property and identifying a proper recipient of trust funds hereunder.

4.5 <u>Evidence of Need</u>. In exercising its discretion under this Trust Agreement, the Trustee shall be entitled to rely upon the written certification of a beneficiary or of another as to the nature and extent of a beneficiary's needs, and the adequacy of the beneficiary's resources apart from the trust to meet those needs. The Trustee may, but shall not be required to, make inquiry into the accuracy of the information it receives

4.6 <u>Termination of Small Trust</u>. Notwithstanding any provision of this Trust Agreement to the contrary, the Trustee may at any time terminate any trust when in its judgment the trust is so small that it would be inadvisable or uneconomical to continue the trust administration. In the event of termination, the Trustee shall distribute the trust to the income

**APP 041**

beneficiaries of the trust determined at the time of distribution in the proportions to which they are entitled to receive income. If at that time rights to income are not fixed by the terms of the trust, distribution shall be made to the persons to whom the Trustee may then distribute income, in proportions determined in the Trustee's discretion, exercised consistently with the trust's purposes. Distribution of trust funds in the manner herein provided shall relieve the Trustee of any further responsibility with respect to such funds. This section shall not apply to a Trustee with respect to any trust of which such Trustee is a beneficiary, or if Trustee has duty to support the beneficiary or to any Trustee who may be removed and replaced by a beneficiary of the trust unless the successor trustee must be a corporate fiduciary or someone who is not related or subordinate to the beneficiary within the meaning of Section 672(c) of the Code. The provisions of this section shall not limit or detract from any withdrawal right granted to any beneficiary herein.

4.7    Generation-Skipping Transfer Taxes and Payment. It is Settlor's intent that the trusts created hereunder be exempt from Generation-Skipping Transfer Taxes. If, however, the Trustee considers any distribution or termination of an interest or power in a trust to be a taxable distribution (a "Distribution") or a taxable termination (a "Termination"), or a direct skip (a "Direct Skip") for generation-skipping transfer tax purposes, the Trustee may exercise the following authorities with respect to any such Distribution, Termination or Direct Skip. In the case of a Distribution, the Trustee may increase the amount to be distributed by an amount estimated to be sufficient to permit the beneficiary receiving such Distribution to pay the estimated generation-skipping tax attributable to such Distribution. Generally, the Trustee would not be expected to augment any partial terminating distribution in order to pay generation-skipping transfer taxes attributable to such partial terminating distribution from a trust. In the case of a Termination or Direct Skip, the Trustee shall pay the generation-skipping transfer tax attributable to such Termination or Direct Skip, and may postpone final termination of any trust or the complete funding of any Direct Skip, and may withhold all or any portion of the trust property, until the Trustee is satisfied it no longer has any liability to pay any generation-skipping transfer tax with reference to the Termination or Direct Skip. If a generation-skipping transfer tax is imposed in part by reason of property held in trust under a Settlor's will or codicil, and in part by reason of other property, the Trustee shall pay only the portion of such tax that is fairly attributable to the Distribution, Termination, or Direct Skip hereunder, taking into consideration deductions, exemptions, credits and other factors which the Trustee deems appropriate. The Trustee may, but need not make any equitable adjustments among beneficiaries of a trust as a consequence of additional distributions or generation-skipping transfer tax payments made with respect to Distributions or Terminations or Direct Skips.

ARTICLE V

THE TRUSTEE

5.1    Resignation of Trustee. The Trustee may resign as to any one or more of the trusts created hereunder by giving written notice to Settlor, if living; otherwise to the current income beneficiary of the trust.

-13-

5.2    Appointment and Succession of Trustees.

    (a)    Generally.

        (i)    Family Trustee. Jim is the initial Family Trustee of all trusts created hereunder. If Jim ceases to act as Family Trustee, or if any successor Family Trustee fails or ceases to act, Jim may appoint a successor Family Trustee within thirty (30) days of a vacancy arising. If Jim is deceased or if Jim otherwise fails to appoint a successor, GRANT JAMES SCOTT, III is appointed as successor Family Trustee. If GRANT JAMES SCOTT, III fails or ceases to act as Family Trustee, or if any other Family Trustee fails or ceases to act, and a successor is not appointed by Jim as provided above, JOHN WILLIAM HONIS is appointed as successor Family Trustee. If JOHN WILLIAM HONIS fails or ceases to act as Family Trustee, and a successor is not appointed by Jim as provided above, the Family Trustee last serving shall appoint a successor Family Trustee. If a successor Family Trustee is not appointed within sixty (60) days of a vacancy arising, the successor Family Trustee shall be appointed pursuant to the provisions of subsection (b) hereof.

        (ii)    Independent Trustee. GRANT JAMES SCOTT, III is appointed as the initial Independent Trustee and shall begin serving as such upon delivery of a written acknowledged instrument to the Family Trustee wherein GRANT JAMES SCOTT, III accepts the trust and the position of Independent Trustee. If GRANT JAMES SCOTT, III, fails or ceases to act, or if any other Independent Trustee fails or ceases to act, Jim may appoint a successor within thirty days (30) of the vacancy arising; provided that Jim shall not serve as Independent Trustee and a successor Independent Trustee appointed by Jim may not be related or subordinate to Jim within the meaning of Section 672(c) of the Code. If a successor is not so appointed, JOHN WILLIAM HONIS is appointed Independent Trustee. If JOHN WILLIAM HONIS fails or ceases to act as Independent Trustee, and a successor is not appointed by Jim as provided above, the Independent Trustee last serving may appoint the successor Independent Trustee. If a successor Independent Trustee is not so appointed within sixty (60) days of a vacancy arising, a successor Independent Trustee shall be appointed pursuant to the provisions of subsection (b) hereof.

        (iii)    Administrative Trustee. COMMONWEALTH TRUST COMPANY is the initial Administrative Trustee. If COMMONWEALTH TRUST COMPANY fails or ceases to serve, Jim may appoint a successor Administrative Trustee within thirty days (30) of the vacancy arising. If a successor is not so appointed, the Family Trustee may appoint a successor Administrative Trustee within sixty (60) days of the vacancy arising. If a successor is not so appointed, a successor shall be appointed in the same manner as provided for the Family Trustee under subsection (a) above. The selection of the Administrative Trustee can have a substantial impact on the situs of the trust, which should be considered in appointing a successor Administrative Trustee.

**APP 043**

Notwithstanding any other provision in the Trust Agreement to the contrary, no Administrative Trustee may be appointed under this paragraph if the appointment of such Administrative Trustee would change the situs of the trust to a jurisdiction that has a rule against perpetuities or similar rule which limits the period during which property can be held in trust

The Administrative Trustee shall act in a fiduciary capacity but shall not be a Trustee or co-Trustee except to the extent and for the limited purposes described in Section 6.2. Accordingly, no reference in this Trust Agreement to the "Trustee" or "co-Trustee" shall include, or be deemed to refer to, the Administrative Trustee. Notwithstanding the foregoing, the same individual or bank or trust company may serve simultaneously as both a Trustee or co-Trustee and as Administrative Trustee for any trust created hereunder. The initial Administrative Trustee and each successor may resign at any time and may be removed at any time by the Family Trustee.

For services rendered as Administrative Trustee under this Agreement, any Administrative Trustee shall be entitled to reasonable compensation for his, her or its services, as well as be entitled to reimbursement for all expenses reasonably incurred in performing his, her or its duties hereunder. Any Administrative Trustee may receive (or retain) payment in accordance with its schedule or rates as published from time to time and as in effect at the time such compensation becomes payable, unless otherwise agreed in writing with the Family Trustee.

No termination fee shall be charged upon removal or resignation of an Administrative Trustee. However, such Administrative Trustee shall be entitled to reasonable compensation for time and materials for additional services over and above Administrative Trustee's normal duties in transferring trust assets and administration of the trust to the new Administrative Trustee.

(b)     Successor Trustee.  If a named or appointed successor Trustee fails or ceases to serve and no other successor is named or appointed pursuant to subsection (a) hereof, a majority in number of the beneficiaries to whom the Trustee is to or may distribute income at that time may appoint the successor Trustee, and each shall have a reasonable time in which to act.  If a successor Trustee is not so appointed, any beneficiary of a trust may secure the appointment of a successor Trustee by a court of competent jurisdiction at the expense of the trust estate.

(c)     Manner of Appointment; Permissible Trustees.  Appointment, other than by a court, shall be by a signed, acknowledged instrument delivered to the appointed Trustee.  An appointment may be made before a vacancy arises, to become effective in the event of the vacancy with the last such instrument to control.  The successor Trustee appointed by Jim or a Trustee may be one or more persons and/or entities; provided that neither Settlor nor Jim shall serve as Independent Trustee and a successor Independent Trustee appointed by Jim may not be related or subordinate to Jim within the meaning of

-15-

APP 044

Section 672(c) of the Code. Any other successor Trustee shall be a trust company or a bank in the United States having trust powers with not less than Fifty Million Dollars unimpaired capital and surplus. A successor Trustee shall have a reasonable time after a vacancy occurs in which to accept the office by signed, acknowledged instrument delivered to those making the appointment, if living, or to the then current beneficiaries to whom the Trustees are to or may make distributions.

5.3     Removal of Trustee. Jim shall have the power to remove the Trustee of any trust created hereunder, without cause. If Jim is deceased or if Jim is incapacitated within the meaning of Section 5.11 hereof, the primary beneficiary (or, if more than one, a majority of the primary beneficiaries) of a trust may remove any Trustee without cause. Removal shall be effected by delivering to the Trustee a signed acknowledged instrument which is effective thirty (30) days from its receipt (unless a shorter period is agreed to by the Trustee).

5.4     Succession of Corporate Trustee. If any corporate Trustee before or after qualification changes its name, becomes consolidated or merged with another corporation, or otherwise reorganizes, any resulting corporation which succeeds to the fiduciary business of such corporate Trustee shall become a Trustee hereunder in lieu of such corporate Trustee.

5.5     Trustee's Fees. Jim and Jim's Descendants shall not receive a fee for serving as Trustee. Any other Trustee shall be entitled to reasonable fees commensurate with its duties and responsibilities, taking into account the value and nature of the trust estate and the time and work involved. The Trustee shall be reimbursed for reasonable costs and expenses incurred in connection with its fiduciary duties hereunder.

5.6     Bond. The Trustee shall not be required to furnish bond or other security.

5.7     Liability of Trustee.

(a)     Generally. A Trustee other than a corporate trustee shall only be liable for willful misconduct or gross negligence, and shall not be liable for breach of fiduciary duty by virtue of mistake or error in judgment.

(b)     Administrative Trustee. Every act done, power exercised or obligation assumed by the Administrative Trustee pursuant to the provisions of this Agreement shall be held to be done, exercised or assumed, as the case may be, by the Administrative Trustee acting in a fiduciary capacity and not otherwise, and every person, firm, corporation or other entity contracting or otherwise dealing with the Administrative Trustee shall look only to the funds and property of the trust fund for payment under such contract or payment of any money that may become due or payable under any obligation arising under this Agreement, in whole or in part, and the Administrative Trustee shall not be individually liable therefor even though the Administrative Trustee did not exempt himself, herself or itself from individual liability when entering into any contract, obligation or transaction in connection with or growing out of the trust fund.

The decision of the Administrative Trustee hereunder with respect to the exercise or nonexercise by such Administrative Trustee of any power hereunder, or the time or

-16-

**APP 045**

manner of the exercise thereof, made in good faith, shall fully protect such Administrative Trustee and shall be final, conclusive and binding upon all persons interested in the Trust or the income therefrom. To the extent permitted under applicable law, the Administrative Trustee acting hereunder shall not be responsible for any error of judgment or mistake of fact or law, absent bad faith or willful misconduct.

The Administrative Trustee shall be liable hereunder only for the Administrative Trustee's bad faith or willful misconduct proved by clear and convincing evidence in the court then having primary jurisdiction over the trust. The Administrative Trustee shall not be personally liable for making any delegation that is authorized under this Agreement, nor for any action taken without the Administrative Trustee's express agreement, nor for any failure to act absent willful misconduct. The Administrative Trustee shall not be liable for relying absolutely on (i) any apparently valid documents and certifications including, but not limited to, tax reports and other tax information provided to the Administrative Trustee by any entity in which the trust fund holds an ownership interest; and (ii) the opinions of counsel or any accountant to any trust.

Prior to the death of Settlor, the Administrative Trustee shall be under no duty to inform any person having a beneficial interest in any trust created hereunder of the existence of any such trust or the nature and extent of that person's beneficial interest in, or rights with respect to, any such trust. Following the death of Settlor, the Administrative Trustee shall be under no duty to inform any person, other than the primary beneficiary of each trust hereunder, having a beneficial interest in any trust created hereunder of the existence of such trust or the nature and extent of that person's beneficial interest in, or rights with respect to, any such trust.

While not required, the same procedure used to settle the Administrative Trustee's accounts may also be employed to obtain the conclusive consent by the beneficiaries to the Administrative Trustee's specific conduct of any other particular matter. The Administrative Trustee and each former Administrative Trustee shall be indemnified and held harmless by each trust created hereunder against any threatened, pending or completed action, claim, demand, suit or proceeding, whether civil, criminal, administrative or investigative, falling within the exculpatory provisions of this Section or to which the Administrative Trustee is made a party, or threatened to be made a party, by reason of serving as Administrative Trustee if the Administrative Trustee acted in good faith, subject to the limitations set forth above. Such indemnification shall include expenses, including attorneys' fees, judgments, fines and amounts paid in settlement actually incurred by the Administrative Trustee in connection with such action, claim, demand, suit or proceeding. The cost of indemnification shall be apportioned against the various trusts created hereunder as the Administrative Trustee reasonably considers appropriate, taking into account the nature of the claims involved.

The Administrative Trustee shall not have any fiduciary responsibility to observe, monitor or evaluate the actions of any Trustee or other fiduciary and shall not be liable to any party for the failure to seek to attempt to prevent a breach of trust, or failure to remedy a breach of trust, or in a recurring situation to request instructions from a court

-17-

**APP 046**

having jurisdiction over the trust. In no event shall any Administrative Trustee hereunder be liable for any matter with respect to which he, she or it is not authorized to participate hereunder (including the duty to review or monitor trust investments).

Any Successor Administrative Trustee shall be deemed vested with all the duties, rights, titles and powers, whether discretionary or otherwise, as if originally named as Administrative Trustee. No Successor Administrative Trustee shall be personally liable for any act or failure to act of any predecessor Administrative Trustee or any other Trustee. The Successor Administrative Trustee may accept the account rendered and the property delivered by the predecessor Administrative Trustee as a full and complete discharge to the predecessor Administrative Trustee, without incurring any liability for so doing.

5.8     Predecessor Fiduciary.  No successor Trustee shall be obligated or required to inquire into the acts, omissions, or accounts of any prior trustee or to bring any action against any prior trustee to compel redress of any breach of trust or for any other reason. In no event shall a successor Trustee be liable for any act or omission of any prior Trustee. A successor Trustee may accept the account rendered and the property received from a prior Trustee as a full and complete discharge to the prior Trustee without incurring any liability for doing so. A successor Trustee shall have all of the powers and discretions conferred in the governing instrument upon the original trustee.

5.9     Periodic Accounting.  The Trustee may from time to time render an informal account, statement or report of its administration of each separate trust hereunder to each beneficiary who during the period covered by the account was entitled absolutely to a current payment of income or principal from the trust, or, if there is no such beneficiary, to such beneficiaries who are entitled absolutely or in the discretion of the Trustee to a payment of income or principal from the trust. If any beneficiary or legal representative or parent of a beneficiary who is not of full age or legal capacity to whom any such account is rendered shall not, within ninety (90) days after the mailing of such statement, have notified the Trustee in writing of its disapproval of the same, such statement shall be deemed to be approved

No Administrative Trustee shall be required to file or render periodic accounts in or to any court other than for good cause shown. No Administrative Trustee shall be required to give any bond.

Within 90 days following the close of each calendar year, if information is available, and if not within 30 days after it is delivered to the Administrative Trustee, and within 90 days after the removal or resignation of the Administrative Trustee, the Administrative Trustee may deliver an accounting to each primary beneficiary. The accounting shall be a written accounting of the trusts hereunder during such year or during the period from the close of the last preceding year to the date of such removal or resignation and shall set forth all investments, receipts, distributions, expenses and other transactions of each such trust and show all cash, securities, and other property held as a part of each such trust at the end of such year or as of the date of such removal or resignation, as the case may be. The accountings referred to in this Section shall be deemed to be an account stated, accepted and approved by all of the beneficiaries of each trust for which an

-18-

accounting is rendered, and the Administrative Trustee shall be relieved and discharged, as if such accounting had been settled and allowed by a final judgment or decree of a court of competent jurisdiction, unless protested by written notice to the Administrative Trustee, within 60 days of mailing thereof, by the person designated to receive such accounting. The Administrative Trustee shall have the right, at the expense of the trust, to apply at any time to a court of competent jurisdiction for judicial settlement of any account of the Administrative Trustee whether or not previously settled as herein provided or for the determination of any question of construction or for instructions. In any such action or proceeding it shall be necessary to join as parties solely the Administrative Trustee and the Settlor (although the Administrative Trustee may also join such other parties as it may deem appropriate), and any judgment or decree entered therein shall be conclusive and binding on all persons at any time interested in the trust.

5.10    Beneficiary under Disability.    A parent, custodian, or guardian of any beneficiary who is under the disability of minority or, in the Trustee's opinion, any other legal, physical, or mental disability, may, in carrying out the provisions of this Trust Agreement, act and receive notice in the beneficiary's stead, and sign any instrument for the beneficiary.

5.11    Incapacity of Individual Trustee.    In the event a Trustee other than a corporate Trustee becomes unable to discharge his duties as Trustee hereunder by reason of accident, physical or mental illness or deterioration, or other cause, and does not resign, then upon certification by two medical doctors affirming that each has examined the Trustee and that each has concluded, based on such examination, that he is unable to discharge his duties hereunder, the Trustee shall cease to serve, as if he had resigned, effective the date of the certification.

ARTICLE VI

TRUST ADMINISTRATION

6.1    General Powers.    Subject to any limitation stated elsewhere in this Trust Agreement, and the division of powers contained in Section 6.2, the Trustee shall have, in addition to all powers granted to trustees by the common law and by Delaware statutes, as amended from time to time, the following powers with respect to each trust established hereunder:

(a)    Retain Property.    To retain any property received from any source, including any corporate Trustee's securities, regardless of lack of diversification, risk, or nonproductivity.

(b)    Invest.    To invest the trust estate in any kind of property, including common trust funds administered by a corporate Trustee or by others, without being limited by any statute or any rule of law dealing with the character, risk, productivity, diversification of, or otherwise concerning, investments by trustees.

(c)    Sell.    By public offering or private negotiation, to sell, exchange, assign, transfer, or otherwise dispose of all or any real or personal trust property and give options

-19-

for these purposes, for such price and on such terms, with such covenants of warranty and such security for deferred payment as the Trustee deems proper. To partition between the trust and any other owner, as the Trustee deems proper, any property in which the trust owns an undivided interest.

(d)     Lease. To lease trust property for terms within or extending beyond the term of the trust, for any purpose.

(e)     Real Estate. To operate, maintain, repair, rehabilitate, alter, erect, improve, or remove any improvements on real estate; to subdivide real estate; to grant easements, give consents, and enter into contracts relating to real estate or its use; and to release or dedicate any interest in real estate.

(f)     Borrow. To borrow money for any purpose either from the banking department of any corporate Trustee or from others; to encumber or hypothecate trust property by mortgage, deed of trust, or otherwise; and to maintain, renew, or extend any indebtedness upon such terms as the Trustee deems appropriate.

(g)     Loans. To lend money to any person or entity, including, but not limited to, a beneficiary hereunder, but not including a Settlor or a Trustee (other than a beneficiary serving as Trustee) hereunder, or a spouse of theirs, upon such terms and with such security as the Trustee deems advisable.

(h)     Conserve Estate. To take any action to conserve the trust estate.

(i)     Litigation. To commence or defend at the expense of the trust such litigation with respect to the trust estate as the Trustee deems advisable.

(j)     Claims. To collect, pay, contest, compromise, settle, renew, or abandon any claims or demands of or against the trust estate without court authority on whatever terms the Trustee deems advisable.

(k)     Abandon Property. To abandon any property or interest in property belonging to the trust when, in the Trustee's discretion, such abandonment is in the best interest of the trust and its beneficiaries.

(l)     Documents. To execute contracts, notes, conveyances, and other instruments containing covenants, representations, or warranties binding upon and creating a charge against the trust estate or containing provisions excluding personal liability, or any other written instrument of any character appropriate to any of the powers or duties conferred upon the Trustee.

(m)     Agents. To employ attorneys, auditors, investment advisors, depositaries, and agents with or without discretionary powers, to employ a bank with trust powers as agent for the purpose of performing any ministerial duties incident to the administration, and to pay all expenses and fees so incurred.

APP 049

(n) <u>Securities</u>. To engage in all actions necessary to the effective administration of securities including, but not limited to, the authority to: vote securities in person or by proxy; engage in a voting trust or voting agreement; and consent to or participate in mergers, consolidations, sales of assets, recapitalizations, reorganizations, dissolutions, or other alterations of corporate structure affecting securities held in the trust.

(o) <u>Nominee</u>. To hold securities and other property in bearer form or in the name of a trustee or nominee with or without disclosure of any fiduciary relationship.

(p) <u>Additional Property</u>. To receive additional property from any source and add it to the trust estate.

(q) <u>Insurance</u>. To carry insurance of such kinds and in such amounts as the Trustee deems advisable, except for insurance on the life of a Settlor, the Trustee, or a spouse of theirs. The Trustee shall not apply trust property to the payment of premiums on an insurance policy on the life of Settlor, the Trustee, or a spouse of theirs.

(r) <u>Business Powers</u>.

(i) <u>In General</u>. To engage in any lawful business including, but not limited to, the power to continue at the risk of the trust estate the operation of any business which may become a part of the trust estate, and to sell, liquidate, or otherwise terminate any business interest, including, but not limited to, the fulfillment of any agreement for the disposition of any such business interest.

(ii) <u>Closely Held Businesses</u>. This trust may be funded with, or subsequently purchase or otherwise acquire, securities or other financial interests in one or more closely held businesses (each of which is hereinafter referred to as the "business").

(1) <u>Exoneration from Liability</u>. It is realized that the business may not be the type of investment in which fiduciaries would normally invest estate or trust funds. Nonetheless, the Trustees shall incur no liability for any loss which may be sustained by reason of the retention, operation or sale of the business or the exercise of any power conferred upon the Trustees with respect to the business.

(2) <u>Management Powers</u>. The Family Trustee shall have the exclusive duty to deal with and manage the business. In addition to any power granted by law or elsewhere in this document, the Family Trustee shall have the following powers:

(A) To retain and continue the business or any interest therein for such time as the Family Trustee considers advisable;

-21-

**APP 050**

(B)     To operate or participate in the operation of the business in the form of a corporation, limited liability company, partnership or proprietorship;

(C)     To direct, control, supervise, manage, operate or participate in the operation of the business; to serve as an officer and director of the business; and to receive from the business compensation for his services in addition to his compensation as a Family Trustee;

(D)     To delegate all or any part of his power to supervise, manage or operate the business to such persons as he may select, including any director, officer or employee of the business;

(E)     To engage, compensate and discharge such managers, employees, agents, attorneys, accountants, consultants or other representatives as he considers advisable, including anyone who may be a beneficiary or fiduciary of this Trust;

(F)     To invest or employ in the business, or to use as collateral for loans to the business, such other estate or trust funds as he considers advisable;

(G)     To sell, liquidate or otherwise dispose of all or any part of the business at such time or times, for such prices and upon such terms and conditions as he considers advisable, and to sell the business to anyone who is a beneficiary or  a fiduciary of this Trust; and

(3)     <u>Exclusion from Powers</u>.  Neither Commonwealth Trust Company nor any successor Administrative Trustee shall have any power, duty and/or responsibility in connection with the operation, control, supervision, management and participation of the business.

(s)     <u>Income and Principal</u>.  To determine, in accordance with the provisions of Delaware law, what constitutes income and principal of the trust estate, the manner in which expenses and other charges shall be allocated between these accounts, and whether or not to establish reserves for depreciation or depletion, and to add undistributed income to principal.

(t)     <u>Tax Elections</u>.  To exercise any tax option or election permitted by law as the Trustee determines, in its sole discretion, even though the effect is to treat beneficiaries hereunder differently, or to favor some at the expense of others.  The Trustee may, but need not, make such compensating adjustments among beneficiaries with respect thereof as it deems appropriate considering the nature of the tax election and the amounts involved.

-22-

**APP 051**

(u) <u>Reliance</u>. To rely upon any notice, certificate, affidavit, or other document or evidence believed by the Trustee to be genuine and accurate, in making any payment or distribution. The Trustee shall incur no liability for a disbursement or distribution made in good faith and without actual notice or knowledge of a changed condition or status affecting any person's interest in the trust or any other matter.

(v) <u>Commingling</u>. To commingle and invest as one fund, or make joint investments with, the principal of two or more separate trusts established hereunder, with each trust having an undivided interest therein.

(w) <u>Division and Distribution</u>. To make all allocations, distributions, or divisions contemplated by this Trust Agreement; to allocate, distribute and divide different kinds or disproportionate shares of property or undivided interests in property among the beneficiaries or trusts, in cash or in kind, or both, without regard to the income tax basis of specific property allocated to any beneficiary or trust, even though shares may as a result be composed differently, and to determine the value of any property so allocated, divided or distributed.

(x) <u>Withholding of Distribution</u>. To withhold from distribution all or any part of the trust property as long as the Trustee, in its discretion, determines that such property may be subject to conflicting claims, to tax deficiencies, or to liabilities, contingent or otherwise, properly incurred in the administration of the trust.

(y) <u>Mineral Powers</u>. To retain or acquire interests in oil, gas, or other mineral resources; to execute as to those interests any agreements, assignments, contracts, deeds, grants or leases for any term (even though the term may extend beyond the termination of the trust); to manage, control, operate, explore, mine, develop, or take any action for the production, recovery, sale, treatment, storage, or transportation of any such interest; to drill, rework, or recomplete wells of any type; to conduct or participate in secondary recovery operations; to enter into agreements for pooling or unitization; and to install, operate, or participate in the operation of any plant, mine, or other facility.

(z) <u>Environmental Hazards</u>. To use and expend the trust income and principal to (i) take all appropriate action to prevent, identify, or respond to actual or threatened violations of any environmental law or regulation for which the Trustee may have responsibility, including the authority to conduct environmental assessments, audits, and site monitoring to determine compliance with any environmental law or regulation; (ii) take all appropriate remedial action to contain, cleanup, or remove any environmental hazard including a spill, release, discharge, or contamination, either on its own accord or in response to an actual or threatened violation of any environmental law or regulation; (iii) institute legal proceedings concerning environmental hazards or contest or settle legal proceedings brought by any local, state, or federal agency concerned with environmental compliance, or by a private litigant; and (iv) comply with any local, state, or federal agency order or court order directing an assessment, abatement, or cleanup of any environmental hazards.

APP 052

(aa)   Miscellaneous Powers.   Generally to do and perform any and all acts, things, or deeds which, in the discretion of the Trustee, may be necessary or proper for the protection, preservation, and promotion of the trust properties and estate.

6.2   Division of Powers.   The powers and duties granted under this Trust Agreement shall be divided among the Trustees as follows:

(a)   Administrative Trustee.   The Administrative Trustee shall have the following exclusive duties, which shall all be carried out in the State of Delaware or such other jurisdiction as the Trustee shall, from time to time, select as the situs of the trust:

(i)   To maintain bank accounts, brokerage accounts and other custody accounts which receive trust income and contributions and from which trust expenditures and distributions are disbursed.

(ii)   To maintain storage of tangible personalty and evidence of intangible trust property.

(iii)   To maintain trust records.

(iv)   To maintain an office for Trustee meetings and other trust business.

(v)   To originate, facilitate and review trust accountings, reports and other communications with the Settlor, any co-Trustees, beneficiaries and unrelated third parties.

(vi)   To respond to inquiries concerning the trust from the Settlor, any co-Trustees, beneficiaries and unrelated third parties.

(vii)   To execute documents with respect to trust account transactions.

(viii)   To retain accountants, attorneys, investment counsel, agents and other advisers in connection with the performance of its duties under this Section 6.2.

(b)   Independent Trustee.   The Independent Trustee shall have all of the powers and duties specifically assigned to the Independent Trustee under this Trust Agreement. These powers may only be exercised by the Independent Trustee.

(c)   Family Trustee.   The Family Trustee shall possess and exercise all of the powers and duties of the Trustee not specifically granted to the Administrative Trustee or the Independent Trustee under this Trust Agreement, including those specifically assigned to the Family Trustee. Without limiting the generality of the foregoing, the Family Trustee shall exercise all Trustee authority and have all Trustee responsibility with respect to the investment of the trust estate. If there is no Family Trustee serving,

-24-

APP 053

however, all of the powers and duties of the Trustee, including those assigned to the Family Trustee, shall be exercised and discharged by the Independent Trustee.

6.3     Merger of Trusts. If at any time a Trustee of any trust created pursuant to this Trust Agreement shall also be acting as Trustee of any other trust created by trust instrument or by will for the benefit of the same beneficiary or beneficiaries and upon substantially the same terms and conditions, the Trustee is authorized and empowered, if in the Trustee's discretion such action is in the best interest of the beneficiary or beneficiaries of the trust created hereunder, to transfer and merge all of the assets then held under such trust created pursuant to this Trust Agreement to and with such other trust and thereupon and thereby to terminate the trust created pursuant to this Trust Agreement. The Trustee is further authorized to accept the assets of the other trust which may be transferred to the Trustee of the trust created hereunder and to administer and distribute such assets and properties so transferred in accordance with the provisions of this Trust Agreement. If the component trusts differ as to contingent beneficiaries and the contingency occurs, the funds may be distributed in such shares as the Trustee, in the Trustee's sole discretion, shall deem necessary to create a fair ratio between the various sets of remaindermen. If any trust created in this Trust Agreement is merged with any trust created under any other instrument, such merged trust shall not continue beyond the date on which the earliest maximum term of the trusts so merged would, without regard to such merger, have been required to expire. Settlor further directs that, as to any property at any time a part of any trust estate (including a merged trust) as to which under the laws of any state applicable to said property that trust is required to be terminated at any time prior to its normal termination date, the trust as to that particular property shall terminate at the time required by the laws of said state.

6.4     Certain Powers and Rights Limited. Settlor intends that the trust created under Section 3.1 hereof shall not be included in Jim's gross estate for estate tax purposes unless the Independent Trustee grants Jim a general power of appointment pursuant to paragraph 3.1(d). All issues applicable to the trust shall be resolved accordingly.

6.5     GST Inclusion Ratio. If property not having an inclusion ratio for purposes of the generation-skipping transfer tax equal to zero is directed to be added to a trust which has an inclusion ratio equal to zero, the Trustee may decline to make the addition and may, instead, administer the property as a separate trust with provisions identical to the trust having an inclusion ratio equal to zero. If property having an inclusion ratio for purposes of the generation-skipping transfer tax equal to zero is directed to be added to a trust which has an inclusion ratio not equal to zero, the Trustee may decline to make the addition and may, instead, administer the property as a separate trust with provisions identical to the trust having an inclusion ratio not equal to zero.

6.6     Out-of-State Properties. If any trust property is situated in a jurisdiction in which the Trustee is unable or unwilling to act, the Trustee may appoint an ancillary trustee for such jurisdiction and may confer upon the ancillary trustee such powers and discretions, exercisable without court order, to act with respect to such property as the Trustee deems proper. The ancillary trustee shall be responsible to the Trustee for all property it administers. The Trustee

-25-

APP 054

may pay the ancillary trustee reasonable compensation for its services and may absolve it from any requirement to furnish bond or other security.

6.7 <u>Management of Real Property</u>. The Family Trustee (or the Independent Trustee pursuant to Section 6.2(c) hereof), acting alone, shall make any and all decisions regarding: (i) the acquisition, retention and disposal of real estate; (ii) the operation, maintenance, repair, rehabilitation, alteration, construction, erection, improvement, or removal of any improvements on real estate; (iii) the subdivision of real estate; (iv) the granting of easements, giving of consents, and entering into contracts relating to real estate or its use; (v) the release or dedication of any interest in real estate; and (vi) the payment of taxes, utilities, and maintenance expenses attributable to real estate owned by any trust created hereunder. The Family Trustee (or the Independent Trustee pursuant to Section 6.2(c) hereof) may, in its discretion, either exercise such powers or appoint an ancillary trustee to exercise such powers. The Trustee may pay the ancillary trustee reasonable compensation for its services and may absolve it from any requirement to furnish bond or other security.

6.8 <u>No Court Supervision</u>. The Trustee shall not be required to qualify before or be appointed by any court; nor shall the Trustee be required to obtain the order or approval of any court in the exercise of any power or discretion.

6.9 <u>Division of Trusts</u>. The Trustee may divide any trust established by this Trust Agreement into two or more separate trusts as provided in this section. Settlor exonerates the Trustee from any liability arising from the exercise or failure to exercise any powers granted herein, provided the Trustee acts in good faith.

(a) <u>Division and Funding of Separate Trusts</u>. The Trustee may divide any trust established by this Trust Agreement, at any time, into two or more separate trusts so that the generation-skipping transfer tax inclusion ratio as defined in Section 2642(a) of the Code for each trust shall be either zero or one. Any such division shall be accomplished in accordance with applicable regulations under Chapter 13 of the Code.

(b) <u>Administration of Separate Trusts</u>. Such separate trusts shall have the identical provisions as the original trust. However, with respect to each separate trust, the Trustee may: (1) make different tax elections, (2) expend principal and exercise any other discretionary powers with respect to such separate trusts differently, (3) invest such separate trusts differently, and (4) take all other actions consistent with such trusts being separate trusts.

(c) <u>Powers of Appointment</u>. The donee of any power of appointment with respect to a trust so divided may exercise such power of appointment differently with respect to the separate trusts created by the division.

6.10 <u>Limitation of Powers</u>. The following limitations, affecting the administration of the trusts created hereunder, apply notwithstanding any other provision of this Trust Agreement. For purposes of this Section 6.10, the term "Settlor" shall include any individual who contributes property to the Trustee to be added to the trust estate.

-26-

**APP 055**

(a)    <u>Support Duty</u>. Distributions from the trust estate shall not be made which discharge, in whole or in part, the personal legal obligations of a Settlor or a Trustee from time to time existing, to support or educate any of the trust beneficiaries. When determining these legal obligations, the existence of this trust and funds made available by it shall not be taken into consideration.

(b)    <u>Adequacy of Consideration</u>. No party may, through purchase, exchange, or otherwise, deal with or dispose of the corpus or the income of the trust estate for less than adequate consideration in money or money's worth.

(c)    <u>Insurance</u>. The Trustee shall not apply trust property to the payment of premiums on an insurance policy on the life of a Settlor, the Trustee or a spouse of either of them.

(d)    <u>Borrow</u>. The Trustee shall not allow a Settlor to borrow trust principal or income, directly or indirectly, without adequate interest or security.

(e)    <u>Substitute Property</u>. The Trustee shall not allow a Settlor to reacquire or exchange any property of the trust estate by substituting other property with an equivalent value.

(f)    <u>Vote</u>. A Settlor, acting as a Trustee, shall not be entitled to vote, directly or indirectly, shares of stock of a controlled corporation, as defined under Section 2036 of the Code, which is held as part of the trust estate.

6.11    <u>Dealing with Fiduciaries</u>. The Trustee may enter into any transaction with the Trustee or beneficiaries of the trusts created hereunder, acting in their individual or in another fiduciary capacity, or with any person or entity related to the Trustee or a beneficiary in any manner, if such transaction is otherwise authorized under this Trust Agreement. Without limiting the generality of the foregoing authorization, the Trustee may enter into any transaction otherwise authorized hereunder on behalf of any trust created hereunder even though the other party to the transaction is: a trust of which a beneficiary or Trustee under this Trust Agreement is a beneficiary or trustee, including, but not limited to, any trust established by this Trust Agreement; an estate of which a beneficiary or Trustee under this Trust Agreement is a representative or beneficiary; or a business or charitable corporation of which a beneficiary or Trustee under this Trust Agreement is a director, officer, employee, or owner.

<div align="center">ARTICLE VII</div>

<div align="center"><u>IRREVOCABILITY</u></div>

This Trust Agreement and each of its provisions may not be revoked, amended, or modified.

<div align="center">-27-</div>

**APP 056**

ARTICLE VIII

MISCELLANEOUS PROVISIONS

8.1 <u>Applicable Law</u>. The trust created under this Trust Agreement shall be deemed a Delaware trust and all matters pertaining to the validity, construction, and application of this Trust Agreement or to the administration of the trust created hereunder shall, in all respects, be governed by the laws of the State of Delaware. However, if the Trustee, in its sole discretion, determines that a change of situs would be beneficial to the purposes of the trust established by this Trust Agreement, the Trustee shall have the discretion and authority to change the situs of any such trust to another state. No change of situs shall be authorized herein, however, which would result in a termination of the trust for federal tax purposes. Furthermore, the Trustee shall not be entitled to change the situs of the trust to a jurisdiction that has a rule against perpetuities or similar rule which limits the period during which property can be held in trust. Any proceeding involving the Trust must be brought in the State of Delaware for so long as the situs of the Trust shall be the State of Delaware.

8.2 <u>Perpetuities Provision</u>. The trust created hereunder shall be perpetual to the fullest extent permitted by Delaware law. If the trust created hereunder is deemed to be subject to the law of a jurisdiction that has a rule against perpetuities or similar rule which limits the period during which property can be held in trust, then such trust shall terminate in all events upon the expiration of the longest period the property may be held in trust under this Agreement under the law of such jurisdiction (including any application periods in gross, such as 110 years, 360 years, or 1,000 years); provided, however, that if the jurisdiction has a rule against perpetuities or similar rule which applies only to certain types of property, such as real property, the provisions of this Section shall apply only to such property. If under the law of such jurisdiction the longest period that property may be held in trust is determined with reference to the death of the last survivor of a group of individuals in being upon the date of this Trust Agreement, those individuals shall consist of Jim and Jim's Descendants who are in being on the date of this Trust Agreement. Upon termination of a trust pursuant to the provisions of this Section 8.2, the Trustee shall distribute such trust to its income beneficiaries determined at the time of distribution. If at that time rights to income are not fixed by the terms of the trust, distribution shall be made to the persons to whom the Trustee may then distribute income, in proportions determined in the Trustee's discretion, exercised consistently with the trust's purposes.

In the event any trust created hereunder owns real property, and if such real property is subject to a rule against perpetuities or similar rule which limits the period during which property can be held in trust, then the Trustee shall take such action as is necessary to avoid termination of the trust with respect to that real property interest including, without limitation, selling the real property or contributing the real property to a business entity in exchange for ownership interests in such entity to be owned by the trust.

8.3 <u>Gestation</u>. A child in gestation who is born alive shall be considered a child in being throughout the period of gestation.

-28-

**APP 057**

8.4 <u>Survivorship</u>. Any person must survive by thirty (30) days for a gift made in this Trust Agreement which directly or indirectly requires such person's survival of another to be effective.

8.5 <u>Release of Powers and Interests</u>. Any person, including a beneficiary and a Trustee, shall have the power to disclaim, release, or restrict, irrevocably, in whole or in part, any interest, right, power, or discretion granted to such person with respect to any trust by signed instrument delivered to the Trustee, or in any other manner permitted by law. Any person designated or appointed as a Trustee may, prior to accepting the trust, by written instrument decline to accept any right, power, or discretion with respect to the trust and may accept the trust without such right, power, or discretion.

8.6 <u>Powers of Appointment</u>.

(a) <u>Capacity in Which Exercisable</u>. Every power of appointment granted to a beneficiary under this Trust Agreement is exercisable by that beneficiary in the beneficiary's individual capacity, notwithstanding the fact that the beneficiary may also be serving as a Trustee of the trust.

(b) <u>Manner of Appointment</u>. Every power of appointment granted herein: (i) shall be personal to the donee of such power and may not be exercised on behalf of the donee by any other person, including an attorney-in-fact, a guardian, or any other court appointed representative, and (ii) may be exercised in whole or in part and in favor of one or more potential beneficiaries to the exclusion of others. Appointment may be outright or in further trust, with all provisions determined by the donee of the power, and may confer a power of appointment upon the beneficiary or others, if within the constraints imposed by any applicable rule against perpetuities and any other law which is applicable to the appointment.

(c) <u>Exercise of Inter Vivos Power</u>. An inter vivos power of appointment granted in this Trust Agreement may be exercised only by a written instrument, executed and acknowledged by the donee and delivered to the Trustee during the donee's lifetime, which specifically refers to the power of appointment and expresses the intention to exercise it. If no such instrument is delivered to the Trustee during the donee's lifetime, upon the donee's death the Trustee may distribute the property subject to the power in the manner provided in this Trust Agreement for distribution in default of exercise.

(d) <u>Determination of the Exercise of a Testamentary Power</u>. The Trustee may rely upon any instrument admitted to probate as a will or codicil in determining whether a testamentary power of appointment granted herein has been exercised. If no will or codicil is brought to the Trustee's attention within ninety (90) days of a death to indicate the exercise of a testamentary power, the Trustee may distribute the property subject to the power according to the terms herein provided for distribution in default of exercise. The Trustee will be protected from liability for its actions as authorized in this subsection (d), but this subsection does not affect a beneficiary's rights in the property subject to the power of appointment.

-29-

**APP 058**

(e) <u>Tax Consequences</u>. The exercise of a power of appointment may have important tax consequences. The donee of any power of appointment should consult with counsel before exercising such power of appointment.

8.7 <u>Liability of Third Party</u>. No person paying money or delivering property to the Trustee need see to the application of such money or property. No person dealing with the Trustee need inquire into the propriety of any transaction or the Trustee's authority to enter into and consummate the same.

8.8 <u>Use of Words</u>. As used in this Trust Agreement, the masculine, feminine, and neuter gender, and the singular or plural of any word each includes the others unless the context indicates otherwise.

8.9 <u>Unenforceable Provision</u>. If any provision of this Trust Agreement is unenforceable, the remaining provisions shall be given effect, unless to do so would produce an unreasonable result.

8.10 <u>Titles, Headings, and Captions</u>. All titles, headings, and captions used in this Trust Agreement have been included for administrative convenience only and should not be construed in interpreting this Trust Agreement.

8.11 <u>Counterpart Signatures</u>. This document may be executed in counterparts, and all counterparts so executed shall constitute a single document, notwithstanding that the interested parties are not or may not be signatories to the original or to the same counterpart.

8.12 <u>Trust Name</u>. The trusts established under Article II of this Trust Agreement, collectively, shall be known as the "The Dugaboy Investment Trust".

IN WITNESS WHEREOF, the Settlor, the Family Trustee and the Administrative Trustee have hereunto set their hands on the day and year first above written in multiple originals. The Trustees agree to administer the trust estate in accordance with the terms of this Trust Agreement. The Independent Trustee shall begin serving as such upon delivery of a written acknowledged instrument to the Family Trustee in accordance with Section 5.2 hereof.

**APP 059**

_Dana Scott Breault_ 23 Oct 10

DANA SCOTT BREAULT, Settlor

STATE OF TEXAS          §
                        §
COUNTY OF DALLAS        §

 BEFORE ME, the undersigned authority, on this day personally appeared DANA SCOTT BREAULT, as Settlor, known to me to be the person whose name is subscribed to the foregoing Trust Agreement and acknowledged to me that she executed the same for the purposes and consideration therein expressed.

 GIVEN UNDER MY HAND AND SEAL OF OFFICE this 23rd day of October, 2010.



Notary Public

RAVI IYER
Notary Public, State of Texas
My Commission Expires
June 12, 2013

-31-

**APP 060**

_____
JAMES D. DONDERO, Family Trustee

STATE OF TEXAS          §
                        §
COUNTY OF DALLAS        §

BEFORE ME, the undersigned authority, on this day personally appeared JAMES D. DONDERO, as Family Trustee, known to me to be the person whose name is subscribed to the foregoing Trust Agreement and acknowledged to me that he executed the same for the purposes and consideration therein expressed.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 28th day of October, 2010.



_____
Notary Public

MELINDA SLOANE
Notary Public, State of Texas
My Commission Expires
October 19, 2011

-32-

**APP 061**

COMMONWEALTH TRUST COMPANY,
Administrative Trustee


By: _Cynthia D M Brown_

    Name:    Cynthia D. M. Brown

    Title:     President


STATE OF DELAWARE       §
                          §
COUNTY OF NEW CASTLE   §

    BEFORE ME, the undersigned authority on this day personally appeared _Cynthia D. M. Brown_, _President_, known to me to be the person and officer whose name is subscribed to the foregoing instrument and acknowledged to me that he/she executed the same for the purposes and consideration therein expressed as the act of COMMONWEALTH TRUST COMPANY and in the capacity therein expressed.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE this _15th_ day of ~~October~~ November, 2010.


_Laura M Owens_
Notary Public

5480300v.6 47609/1

-33-

**APP 062**

# EXHIBIT  5

**JAMES DONDERO'S RELATED INTERESTS**

| Entity | Relationship to Related Interest |
|---|---|
| 1905 Wylie LLC | Indirect Control |
| 2006 Milam East Partners GP, LLC | Indirect Control |
| 2006 Milam East Partners, L.P. | Indirect Control |
| 201 Tarrant Partners, LLC | Indirect Control |
| 2014 Corpus Weber Road LLC | Indirect Control |
| 2014 Galveston Jones Drive, LLC | Indirect Control |
| 2325 Stemmons HoldCo, LLC | Indirect Control |
| 2325 Stemmons Hotel Partners, LLC | Indirect Control |
| 2325 Stemmons TRS, Inc. | Indirect Control |
| 3801 Shenandoah, L.P. | Indirect Control |
| 3820 Goar Park LLC | Indirect Control |
| 401 Ame, L.P. | Indirect Control |
| 4201 Locust, L.P. | Indirect Control |
| 5833 Woodland, L.P. | Indirect Control |
| Aberdeen Loan Funding, Ltd. | Indirect Control |
| Acis Capital Management GP, LLC | Indirect Control |
| Acis Capital Management, L.P. | Indirect Control |
| Acis CLO 2013-1 Chemical Holdings, LLC | Indirect Control |
| Acis CLO 2013-1 Ltd. | Indirect Control |
| Acis CLO 2013-2 Ltd. | Indirect Control |
| Acis CLO 2014-3 Chemical Holdings, LLC | Indirect Control |
| Acis CLO 2014-3 Ltd | Indirect Control |
| Acis CLO 2014-4 Chemical Holdings, LLC | Indirect Control |
| Acis CLO 2014-4 Ltd | Indirect Control |
| Acis CLO 2014-5 Chemical Holdings, LLC | Indirect Control |
| Acis CLO 2014-5 Ltd | Indirect Control |
| Acis CLO 2015-6 Chemical Holdings, LLC | Indirect Control |
| Acis CLO 2015-6 Ltd | Indirect Control |
| Acis CLO 2015-7 Ltd | Indirect Control |
| Acis CLO Management GP, LLC | Indirect Control |
| Acis CLO Management Holdings, L.P. | Indirect Control |
| Acis CLO Management Intermediate Holdings I, LLC | Indirect Control |
| Acis CLO Management Intermediate Holdings II, LLC | Indirect Control |
| Acis CLO Management, LLC | Indirect Control |
| Acis CLO Value Fund II (Cayman), L.P. | Indirect Control |
| Acis CLO Value Fund II Charitable DAF Ltd. | Indirect Control |
| Acis CLO Value Fund II GP, LLC | Indirect Control |
| Acis CLO Value Fund II Incentive Holdings, LLC | Indirect Control |
| Acis CLO Value Fund II, L.P. | Indirect Control |
| Acis CLO Value Master Fund II, L.P. | Indirect Control |
| Acis Funding GP, Ltd. | Indirect Control |
| Acis Funding, L.P. | Indirect Control |
| Acis Loan Funding, Ltd. | Indirect Control |
| AHC Riverside Villas, LLC | Indirect Control |
| Allenby, LLC | Indirect Control |
| Ashford at Feather Sound, LLC | Indirect Control |
| Ashmore Property Holdings, LLC | Indirect Control |
| Bandera Strategic Credit Partners I GP, LLC | Indirect Control |
| Bandera Strategic Credit Partners I SLP GP, LLC | Indirect Control |
| Bandera Strategic Credit Partners I SLP, L.P. | Indirect Control |
| Bandera Strategic Credit Partners I, L.P. | Indirect Control |
| BayVK R2 Lux S.A., SICAV-FIS - Highland | Indirect Control |
| BB Votorantim Highland Infrastructure, LLC | Indirect Control |
| BH Willowdale Manager, LLC | Indirect Control |
| Brentwood CLO, Ltd. | Indirect Control |
| Brentwood Investors Corp. | Indirect Control |
| Brentwood Panda Holdings, Ltd. | Indirect Control |
| Bristol Bay Funding, LTD. | Indirect Control |
| BVP Property LLC | Indirect Control |
| Cabi Holdco GP, LLC | Indirect Control |
| Cabi Holdco I, Ltd. | Indirect Control |

| Entity | Relationship to Related Interest |
|---|---|
| Cabi Holdco, L.P. | Indirect Control |
| Camelback Residential Partners, LLC | Indirect Control |
| Charitable DAF Fund, L.P. | Indirect Control |
| Charitable DAF GP, LLC | Indirect Control |
| Charitable DAF HoldCo, Ltd | Indirect Control |
| Claymore Holdings, LLC | Indirect Control |
| CLO HoldCo, Ltd. | Indirect Control |
| Corbusier, Ltd. | Indirect Control |
| Dallas Lease and Finance, L.P. | Indirect Control |
| De Kooning, Ltd. | Indirect Control |
| DFA/BH Autumn Ridge, LLC | Indirect Control |
| DFA/BH Midtown, LLC | Indirect Control |
| Dolomiti, LLC | Indirect Control |
| DrugCrafters, L.P. | Indirect Control |
| Dugaboy Management, LLC | Indirect Control |
| Dugaboy Project Management GP, LLC | Indirect Control |
| Eames, Ltd. | Indirect Control |
| Eastland CLO, Ltd. | Indirect Control |
| Eastland Investors Corp. | Indirect Control |
| Emory Property Holdings, LLC | Indirect Control |
| Empower Dallas Foundation, Inc. | Indirect Control |
| Entegra Strat Superholdco, LLC | Indirect Control |
| Entegra-DCF Superholdco, LLC | Indirect Control |
| Entegra-FRO Holdco, LLC | Indirect Control |
| Entegra-FRO Superholdco, LLC | Indirect Control |
| Entegra-Granite Bay Holdco, LLC | Indirect Control |
| Entegra-HOCF Holdco, LLC | Indirect Control |
| Entegra-NHF Holdco, LLC | Indirect Control |
| Entegra-NHF Superholdco, LLC | Indirect Control |
| Entegra-RCP Holdco, LLC | Indirect Control |
| Estates on Maryland Holdco, LLC | Indirect Control |
| Estates on Maryland Owners SM, Inc. | Indirect Control |
| Estates on Maryland Owners, LLC | Indirect Control |
| Estates on Maryland, LLC | Indirect Control |
| Falcon E&P Five, LLC | Indirect Control |
| Falcon E&P Four Holdings, LLC | Indirect Control |
| Falcon E&P One, LLC | Indirect Control |
| Falcon E&P Opportunities Fund, L.P. | Indirect Control |
| Falcon E&P Opportunities GP, LLC | Indirect Control |
| Falcon E&P Six, LLC | Indirect Control |
| Falcon E&P Three, LLC | Indirect Control |
| Falcon E&P Two, LLC | Indirect Control |
| Falcon Four Midstream, LLC | Indirect Control |
| Falcon Four Upstream, LLC | Indirect Control |
| Falcon Incentive Partners GP, LLC | Indirect Control |
| Falcon Incentive Partners, LP | Indirect Control |
| Falcon Six Midstream, LLC | Indirect Control |
| Flamingo Vegas Holdco, LLC | Indirect Control |
| FRBH Abbington, LLC | Indirect Control |
| FRBH Arbors, LLC | Indirect Control |
| FRBH Beechwood, LLC | Indirect Control |
| FRBH C1 Residential, LLC | Indirect Control |
| FRBH Courtney Cove, LLC | Indirect Control |
| FRBH CP, LLC | Indirect Control |
| FRBH Duck Creek, LLC | Indirect Control |
| FRBH Eaglecrest, LLC | Indirect Control |
| FRBH Edgewater JV, LLC | Indirect Control |
| FRBH Edgewater Owner, LLC | Indirect Control |
| FRBH Frederick, LLC | Indirect Control |
| FRBH JAX-TPA, LLC | Indirect Control |
| FRBH Nashville Residential, LLC | Indirect Control |
| FRBH Regatta Bay, LLC | Indirect Control |
| FRBH Sabal Park, LLC | Indirect Control |
| FRBH Silverbrook, LLC | Indirect Control |

DOC_01698978

Case 20-03195-sgj Doc 7-1 Filed 12/30/20 Entered 12/30/20 13:39:10 Page 74 of 111

| Entity | Relationship to Related Interest |
|---|---|
| FRBH Timberglen, LLC | Indirect Control |
| FRBH Toscana, LLC | Indirect Control |
| FRBH Willow Grove, LLC | Indirect Control |
| FRBH Woodbridge, LLC | Indirect Control |
| Freedom C1 Residential, LLC | Indirect Control |
| Freedom Duck Creek, LLC | Indirect Control |
| Freedom Edgewater, LLC | Indirect Control |
| Freedom JAX-TPA Residential, LLC | Indirect Control |
| Freedom La Mirage, LLC | Indirect Control |
| Freedom LHV LLC | Indirect Control |
| Freedom Lubbock LLC | Indirect Control |
| Freedom Miramar Apartments, LLC | Indirect Control |
| Freedom Miramar SM, Inc. | Indirect Control |
| Freedom Overlook Manor, LLC | Indirect Control |
| Freedom Regatta Bay, LLC | Indirect Control |
| Freedom Sandstone, LLC | Indirect Control |
| Freedom Willowdale, LLC | Indirect Control |
| G-LA Resorts Holdings LLC | Indirect Control |
| Gardens of Denton II, L.P. | Indirect Control |
| Gardens of Denton III, L.P. | Indirect Control |
| Gleneagles CLO, Ltd. | Indirect Control |
| Governance Re, Ltd. | Indirect Control |
| Governance, Ltd. | Indirect Control |
| Granite Bay Advisors GP, LLC | Indirect Control |
| Granite Bay Advisors, L.P. | Indirect Control |
| Granite Bay Long/Short Credit Fund, L.P. | Indirect Control |
| Granite Bay Long/Short Credit Fund, ltd. | Indirect Control |
| Granite Bay Long/Short Credit GP, LLC | Indirect Control |
| Granite Bay Long/Short Credit Master Fund, L.P. | Indirect Control |
| Grayson CLO, Ltd. | Indirect Control |
| Grayson Investors Corp. | Indirect Control |
| Greenbriar CLO, Ltd. | Indirect Control |
| Gunwale LLC | Indirect Control |
| Hammark Holdings LLC | Indirect Control |
| Harko, LLC | Indirect Control |
| Haygood, LLC | Indirect Control |
| HCBH 11611 Ferguson, LLC | Indirect Control |
| HCBH Buffalo Pointe II, LLC | Indirect Control |
| HCBH Buffalo Pointe, LLC | Indirect Control |
| HCBH Hampton Woods SM, Inc. | Indirect Control |
| HCBH Hampton Woods, LLC | Indirect Control |
| HCBH Overlook SM, Inc. | Indirect Control |
| HCBH Overlook, LLC | Indirect Control |
| HCBH Rent Investors, LLC | Indirect Control |
| HCM Holdco, LLC | Indirect Control |
| HCM Park West Guarantor, LLC | Indirect Control |
| HCM Park West Office, LLC | Indirect Control |
| HCMS Falcon GP, LLC | Indirect Control |
| HCMS Falcon, L.P. | Indirect Control |
| HCO Holdings, LLC | Indirect Control |
| HCOF Preferred Holdings, LP | Indirect Control |
| HCOF Preferred Holdings, Ltd. | Indirect Control |
| HCRE Addison, LLC | Indirect Control |
| HCRE Hotel Partner, LLC | Indirect Control |
| HCRE Las Colinas, LLC | Indirect Control |
| HCRE Partners, LLC | Indirect Control |
| HCRE Plano, LLC | Indirect Control |
| HCREF-I Holding Corp. | Indirect Control |
| HCREF-II Holding Corp. | Indirect Control |
| HCREF-III Holding Corp. | Indirect Control |
| HCREF-IV Holding Corp. | Indirect Control |
| HCREF-IX Holding Corp. | Indirect Control |
| HCREF-V Holding Corp. | Indirect Control |
| HCREF-VI Holding Corp. | Indirect Control |

**APP 065**

DOC_01698978

| Entity | Relationship to Related Interest |
|---|---|
| HCREF-VII Holding Corp. | Indirect Control |
| HCREF-VIII Holding Corp. | Indirect Control |
| HCREF-XI Holding Corp. | Indirect Control |
| HCREF-XII Holding Corp. | Indirect Control |
| HCREF WP, LLC | Indirect Control |
| HCSLR Camelback Investors (Cayman), Ltd. | Indirect Control |
| HCSLR Camelback Investors, LLC | Indirect Control |
| HCSLR Camelback, LLC | Indirect Control |
| HCT Holdco 2, Ltd. | Indirect Control |
| HE Capital 232 Phase I Property, LLC | Indirect Control |
| HE Capital 232 Phase I, LLC | Indirect Control |
| HE Capital Asante, LLC | Indirect Control |
| HE Capital Fox Trails, LLC | Indirect Control |
| HE Capital KR, LLC | Indirect Control |
| HE Capital, LLC | Indirect Control |
| HE CLO Holdco, LLC | Indirect Control |
| HE Mezz Fox Trails, LLC | Indirect Control |
| HE Mezz KR, LLC | Indirect Control |
| HE Peoria Place Property, LLC | Indirect Control |
| HE Peoria Place, LLC | Indirect Control |
| Heron Pointe Investors, LLC | Indirect Control |
| Hewett's Island CLO I-R, Ltd. | Indirect Control |
| HFP Asset Funding II, Ltd. | Indirect Control |
| HFP Asset Funding III, Ltd. | Indirect Control |
| HFP CDO Construction Corp. | Indirect Control |
| HFP GP, LLC | Indirect Control |
| Hibiscus HoldCo, LLC | Indirect Control |
| Highland - First Foundation Income Fund | Indirect Control |
| Highland 401(k) Plan | Indirect Control |
| Highland Acquisition Corporation | Indirect Control |
| Highland Argentina Regional Opportunity Fund, Ltd. *(fka MBA Latin America Opportunity Fund, Ltd.)* | Indirect Control |
| Highland Brasil, LLC | Indirect Control |
| Highland Capital Brasil Gestora de Recursos | Indirect Control |
| Highland Capital Funds Distributor, Inc. | Indirect Control |
| Highland Capital Healthcare Advisors GP, LLC | Indirect Control |
| Highland Capital Healthcare Advisors, L.P. | Indirect Control |
| Highland Capital Loan Fund, L.P. | Indirect Control |
| Highland Capital Loan GP, LLC | Indirect Control |
| Highland Capital Management (Singapore) Pte Ltd | Indirect Control |
| Highland Capital Management AG | Indirect Control |
| Highland Capital Management Fund Advisors, L.P. | Indirect Control |
| Highland Capital Management Korea Limited | Indirect Control |
| Highland Capital Management Latin America, L.P. | Indirect Control |
| Highland Capital Management Multi-Strategy Insurance Dedicated Fund, L.P. | Indirect Control |
| Highland Capital Management Partners Charitable Trust #1 | Indirect Control |
| Highland Capital Management Services, Inc. | Indirect Control |
| Highland Capital Management, L.P. | Indirect Control |
| Highland Capital Management, L.P. Charitable Fund | Indirect Control |
| Highland Capital Management, L.P. Retirement Plan and Trust | Indirect Control |
| Highland Capital Multi-Strategy Fund, LP | Indirect Control |
| Highland Capital of New York, Inc. | Indirect Control |
| Highland Capital Real Estate Fund GP, LLC | Indirect Control |
| Highland Capital Real Estate Fund, L.P. | Indirect Control |
| Highland Capital Special Allocation, LLC | Indirect Control |
| Highland CDO Holding Company | Indirect Control |
| Highland CDO Opportunity Fund GP, L.P. | Indirect Control |
| Highland CDO Opportunity Fund, L.P. | Indirect Control |
| Highland CDO Opportunity Fund, Ltd. | Indirect Control |
| Highland CDO Opportunity GP, LLC | Indirect Control |
| Highland CDO Opportunity Master Fund, L.P. | Indirect Control |
| Highland CLO Gaming Holdings, LLC | Indirect Control |
| Highland Commingled Holding Company | Indirect Control |
| Highland Credit Opportunities CDO Asset Holdings GP, Ltd. | Indirect Control |

| Entity | Relationship to Related Interest |
| --- | --- |
| Highland Credit Opportunities CDO Asset Holdings, L.P. | Indirect Control |
| Highland Credit Opportunities CDO Financing, LLC | Indirect Control |
| Highland Credit Opportunities CDO, Ltd. | Indirect Control |
| Highland Credit Opportunities Holding Corporation | Indirect Control |
| Highland Credit Opportunities Japanese Feeder Sub-Trust | Indirect Control |
| Highland Credit Strategies Fund, L.P. | Indirect Control |
| Highland Credit Strategies Fund, Ltd. | Indirect Control |
| Highland Credit Strategies Holding Corporation | Indirect Control |
| Highland Credit Strategies Master Fund, L.P. | Indirect Control |
| Highland Dallas Foundation, Inc. | Indirect Control |
| Highland Diversified Credit Fund GP, L.P. | Indirect Control |
| Highland Diversified Credit Fund, L.P. | Indirect Control |
| Highland Diversified Credit GP, LLC | Indirect Control |
| Highland Employee Retention Assets LLC | Indirect Control |
| Highland Energy Holdings, LLC | Indirect Control |
| Highland Energy MLP Fund | Indirect Control |
| Highland ERA Management, LLC | Indirect Control |
| Highland Financial Corp. | Indirect Control |
| Highland Financial Partners, L.P. | Indirect Control |
| Highland Fixed Income Fund | Indirect Control |
| Highland Floating Rate Opportunities Fund | Indirect Control |
| Highland Fund Holdings, LLC | Indirect Control |
| Highland Funds I | Indirect Control |
| Highland Funds II | Indirect Control |
| Highland GAF Chemical Holdings, LLC | Indirect Control |
| Highland Gemini Program  (Castor), L.P. | Indirect Control |
| Highland Gemini Program  (Pollux), L.P. | Indirect Control |
| Highland Gemini Program , L.P. | Indirect Control |
| Highland Gemini Program GP, LLC | Indirect Control |
| Highland General Partner, LP | Indirect Control |
| Highland Global Allocation Fund | Indirect Control |
| Highland GP Holdings, LLC | Indirect Control |
| Highland iBoxx Senior Loan ETF | Indirect Control |
| Highland Kansas City Foundation, Inc. | Indirect Control |
| Highland Latin America Consulting, Ltd. | Indirect Control |
| Highland Latin America GP, Ltd. | Indirect Control |
| Highland Latin America LP, Ltd. | Indirect Control |
| Highland Legacy Limited | Indirect Control |
| Highland LF Chemical Holdings, LLC | Indirect Control |
| Highland Life Settlement Program, LP | Indirect Control |
| Highland Loan Fund, Ltd. | Indirect Control |
| Highland Loan Funding V, Ltd. | Indirect Control |
| Highland Loan Master Fund, L.P. | Indirect Control |
| Highland Long/Short Equity Fund | Indirect Control |
| Highland Long/Short Healthcare Fund | Indirect Control |
| Highland LS GP, LLC | Indirect Control |
| Highland Marcal Holding, Inc. | Indirect Control |
| Highland Merger Arbitrage Fund | Indirect Control |
| Highland Multi Strategy Credit Fund GP, L.P. | Indirect Control |
| Highland Multi Strategy Credit Fund, L.P. | Indirect Control |
| Highland Multi Strategy Credit Fund, Ltd. | Indirect Control |
| Highland Multi Strategy Credit GP, LLC | Indirect Control |
| Highland Multi-Strategy Fund GP, LLC | Indirect Control |
| Highland Multi-Strategy Fund GP, LP | Indirect Control |
| Highland Multi-Strategy IDF GP, LLC | Indirect Control |
| Highland Multi-Strategy Master Fund, LP | Indirect Control |
| Highland Multi-Strategy Onshore Master SubFund II, LLC | Indirect Control |
| Highland Multi-Strategy Onshore Master Subfund, LLC | Indirect Control |
| Highland Offshore Partners, L.P. | Indirect Control |
| Highland Opportunistic Credit Fund | Indirect Control |
| Highland Park CDO 1, Ltd. | Indirect Control |
| Highland Premier Growth Equity Fund | Indirect Control |
| Highland Prometheus Feeder Fund I, L.P. | Indirect Control |
| Highland Prometheus Feeder Fund II, L.P. | Indirect Control |

| Entity | Relationship to Related Interest |
| --- | --- |
| Highland Prometheus Master Fund, L.P. | Indirect Control |
| Highland Receivables Finance I, LLC | Indirect Control |
| Highland Restoration Capital Partners GP, LLC | Indirect Control |
| Highland Restoration Capital Partners Master, L.P. | Indirect Control |
| Highland Restoration Capital Partners Offshore, L.P. | Indirect Control |
| Highland Restoration Capital Partners, L.P. | Indirect Control |
| Highland Santa Barbara Foundation, Inc. | Indirect Control |
| Highland Select Equity Fund GP, L.P. | Indirect Control |
| Highland Select Equity Fund, L.P. | Indirect Control |
| Highland Select Equity GP, LLC | Indirect Control |
| Highland Select Equity Master Fund, L.P. | Indirect Control |
| Highland Small-Cap Equity Fund | Indirect Control |
| Highland Special Opportunities Holding Company | Indirect Control |
| Highland SunBridge GP, LLC | Indirect Control |
| Highland Tax-Exempt Fund | Indirect Control |
| Highland TCI Holding Company, LLC | Indirect Control |
| Highland Total Return Fund | Indirect Control |
| Highland's Roads Land Holding Company, LLC | Indirect Control |
| Hirst, Ltd. | Indirect Control |
| HMCF IB Investors, LLC | Indirect Control |
| HMCF PB Investors, LLC | Indirect Control |
| HMCF RV Investors, LLC | Indirect Control |
| Hockney, Ltd. | Indirect Control |
| HRT North Atlanta, LLC | Indirect Control |
| HRT Timber Creek, LLC | Indirect Control |
| HRTBH Arbors, LLC | Indirect Control |
| HRTBH Knolls, LLC | Indirect Control |
| HRTBH North Atlanta, LLC | Indirect Control |
| HRTBH Timber Creek, LLC | Indirect Control |
| HRTBH Wood Bridge, LLC | Indirect Control |
| HRTBH Wood Station, LLC | Indirect Control |
| HWS Investors Holdco, LLC | Indirect Control |
| Jewelry Ventures I, LLC | Indirect Control |
| JMIJM, LLC | Indirect Control |
| Keelhaul LLC | Indirect Control |
| Kuilima Montalban Holdings, LLC | Indirect Control |
| Kuilima Resort Holdco, LLC | Indirect Control |
| Las Vegas Land Holdings, LLC | Indirect Control |
| Lautner, Ltd. | Indirect Control |
| Liberty Cayman Holdings, Ltd. | Indirect Control |
| Liberty CLO Holdco, Ltd. | Indirect Control |
| Liberty CLO, Ltd. | Indirect Control |
| Life Settlements Prospects GP, LLC | Indirect Control |
| Life Settlements Prospects, L.P. | Indirect Control |
| LM Houston Apartments, LLC | Indirect Control |
| Longhorn Credit Funding, LLC | Indirect Control |
| Maple Avenue Holdings, LLC | Indirect Control |
| Markham Fine Jewelers, L.P. | Indirect Control |
| Meritage Residential Partners, LLC | Indirect Control |
| MGM Studios HoldCo, Ltd. | Indirect Control |
| ML CLO XIX Sterling (Cayman), Ltd. | Indirect Control |
| NCI Apache Trail LLC | Indirect Control |
| NCI Assets Holding Company LLC | Indirect Control |
| NCI Country Club LLC | Indirect Control |
| NCI Fort Worth Land LLC | Indirect Control |
| NCI Front Beach Road LLC | Indirect Control |
| NCI Minerals LLC | Indirect Control |
| NCI Royce City Land LLC | Indirect Control |
| NCI Stewart Creek LLC | Indirect Control |
| NCI Storage, LLC | Indirect Control |
| Neutra, Ltd. | Indirect Control |
| Nevada Land Group, LLC | Indirect Control |
| New Jersey Tissue Company Holdco, LLC | Indirect Control |
| NexBank Capital Trust I | Indirect Control |

**APP 068**

DOC_01698978

| Entity | Relationship to Related Interest |
|---|---|
| NexBank Capital, Inc. | Indirect Control |
| NexBank Land Advisors, Inc. | Indirect Control |
| NexBank Securities, Inc. | Indirect Control |
| NexBank SSB | Indirect Control |
| NexBank Title, Inc. (dba NexVantage Title Services) | Indirect Control |
| NexPoint Advisors GP, LLC | Indirect Control |
| NexPoint Advisors, L.P. | Indirect Control |
| NexPoint Capital, Inc. | Indirect Control |
| NexPoint Credit Strategies Fund | Indirect Control |
| NexPoint Discount Yield Fund | Indirect Control |
| NexPoint Energy and Materials Opportunities Fund | Indirect Control |
| NexPoint Healthcare Opportunities Fund | Indirect Control |
| NexPoint Hospitality Trust, Inc. | Indirect Control |
| NexPoint Hospitality, L.P. | Indirect Control |
| NexPoint Latin American Opportunities Fund | Indirect Control |
| NexPoint Merger Arbitrage Fund | Indirect Control |
| NexPoint Multifamily Capital Trust, Inc. | Indirect Control |
| NexPoint Multifamily Operating Partnership, L.P. | Indirect Control |
| NexPoint Opportunistic Credit Fund | Indirect Control |
| NexPoint Real Estate Advisors GP, LLC | Indirect Control |
| NexPoint Real Estate Advisors II, L.P. | Indirect Control |
| NexPoint Real Estate Advisors III, L.P. | Indirect Control |
| NexPoint Real Estate Advisors, L.P. | Indirect Control |
| NexPoint Real Estate Capital, LLC | Indirect Control |
| NexPoint Real Estate Opportunities LLC | Indirect Control |
| NexPoint Real Estate Strategies Fund | Indirect Control |
| NexPoint Residential Trust Inc. | Indirect Control |
| NexPoint Residential Trust Operating Partnership GP, LLC | Indirect Control |
| NexPoint Residential Trust Operating Partnership, L.P. | Indirect Control |
| NexWash on 380 LLC | Indirect Control |
| NHF CCD, Inc. | Indirect Control |
| NLA Assets LLC | Indirect Control |
| NMRT TRS, Inc. | Indirect Control |
| Northland Floresta, LLC | Indirect Control |
| NREA Casa Investors, LLC | Indirect Control |
| NREA Gardens DST Manager, LLC | Indirect Control |
| NREA Gardens Investment Co, LLC | Indirect Control |
| NREA Gardens Leaseco Manager, LLC | Indirect Control |
| NREA Gardens Leaseco, LLC | Indirect Control |
| NREA Gardens Springing LLC | Indirect Control |
| NREA Gardens Springing Manager, LLC | Indirect Control |
| NREA Gardens, DST | Indirect Control |
| NREA Keystone Investors, LLC | Indirect Control |
| NREA SOV Investors, LLC | Indirect Control |
| NREC AR Investors, LLC | Indirect Control |
| NREC BM Investors, LLC | Indirect Control |
| NREC BP Investors, LLC | Indirect Control |
| NREC EAH Investors, LLC | Indirect Control |
| NREC HG Investors, LLC | Indirect Control |
| NREC Latitude Investors, LLC | Indirect Control |
| NREC Latitude Investors, LLC | Indirect Control |
| NREC MOM, LLC | Indirect Control |
| NREC Nashville Investors, LLC | Indirect Control |
| NREC NF Investors, LLC | Indirect Control |
| NREC Richmond Investors, LLC | Indirect Control |
| NREC VAH Investors, LLC | Indirect Control |
| NREC WO Investors, LLC | Indirect Control |
| NREC WW Investors, LLC | Indirect Control |
| NREC YC Investors, LLC | Indirect Control |
| NRESF REIT Sub, LLC | Indirect Control |
| NXRT AZ2, LLC | Indirect Control |
| NXRT Barrington Mill, LLC | Indirect Control |
| NXRT Bayberry, LLC | Indirect Control |
| NXRT Cornerstone, LLC | Indirect Control |

**APP 069**

DOC_01698978

| Entity | Relationship to Related Interest |
|---|---|
| NXRT H2 TRS, LLC | Indirect Control |
| NXRT Hollister TRS LLC | Indirect Control |
| NXRT Hollister, LLC | Indirect Control |
| NXRT McMillan, LLC | Indirect Control |
| NXRT Nashville Residential, LLC | Indirect Control |
| NXRT North Dallas 3, LLC | Indirect Control |
| NXRT Old Farm, LLC | Indirect Control |
| NXRT Radbourne Lake, LLC | Indirect Control |
| NXRT Rockledge, LLC | Indirect Control |
| NXRT Rockledge, LLC | Indirect Control |
| NXRT Sabal Palms, LLC | Indirect Control |
| NXRT Steeplechase, LLC | Indirect Control |
| NXRT Stone Creek, LLC | Indirect Control |
| NXRT Vanderbilt, LLC | Indirect Control |
| NXRTBH AZ2, LLC | Indirect Control |
| NXRTBH Barrington Mill Owner, LLC | Indirect Control |
| NXRTBH Barrington Mill SM, Inc. | Indirect Control |
| NXRTBH Barrington Mill, LLC | Indirect Control |
| NXRTBH Bayberry, LLC | Indirect Control |
| NXRTBH Cityview, LLC | Indirect Control |
| NXRTBH Colonnade, LLC | Indirect Control |
| NXRTBH Cornerstone Owner, LLC | Indirect Control |
| NXRTBH Cornerstone, LLC | Indirect Control |
| NXRTBH Dana Point SM, Inc. | Indirect Control |
| NXRTBH Dana Point, LLC | Indirect Control |
| NXRTBH Foothill SM, Inc. | Indirect Control |
| NXRTBH Foothill, LLC | Indirect Control |
| NXRTBH Heatherstone SM, Inc. | Indirect Control |
| NXRTBH Heatherstone, LLC | Indirect Control |
| NXRTBH Hollister Tenant, LLC | Indirect Control |
| NXRTBH Hollister, LLC | Indirect Control |
| NXRTBH Madera SM, Inc. | Indirect Control |
| NXRTBH Madera, LLC | Indirect Control |
| NXRTBH McMillan, LLC | Indirect Control |
| NXRTBH North Dallas 3, LLC | Indirect Control |
| NXRTBH Old Farm II, LLC | Indirect Control |
| NXRTBH Old Farm Tenant, LLC | Indirect Control |
| NXRTBH Old Farm, LLC | Indirect Control |
| NXRTBH Radbourne Lake, LLC | Indirect Control |
| NXRTBH Rockledge, LLC | Indirect Control |
| NXRTBH Rockledge, LLC | Indirect Control |
| NXRTBH Sabal Palms, LLC | Indirect Control |
| NXRTBH Steeplechase, LLC | Indirect Control |
| NXRTBH Stone Creek, LLC | Indirect Control |
| NXRTBH Vanderbilt, LLC | Indirect Control |
| NXRTBH Versailles SM, Inc. | Indirect Control |
| NXRTBH Versailles, LLC | Indirect Control |
| Off-the-Strip Land Holding Company, LLC | Indirect Control |
| Oldenburg, Ltd. | Indirect Control |
| Pam Capital Funding GP Co. Ltd. | Indirect Control |
| Pam Capital Funding, L.P. | Indirect Control |
| Park Central Residential, LLC | Indirect Control |
| Park West 1700 Valley View Holdco, LLC | Indirect Control |
| Park West 2021 Valley View Holdco, LLC | Indirect Control |
| Park West Holdco, LLC | Indirect Control |
| Park West Portfolio Holdco, LLC | Indirect Control |
| PCMG Trading Partners XXIII, L.P. | Indirect Control |
| Penant Management GP, LLC | Indirect Control |
| Penant Management LP | Indirect Control |
| PensionDanmark Pensionsforsikringsaktieselskab | Indirect Control |
| Pharmacy Ventures I, LLC | Indirect Control |
| Pharmacy Ventures II, LLC | Indirect Control |
| Pollack, Ltd. | Indirect Control |
| PWM1 Holdings, LLC | Indirect Control |

**APP 070**

DOC_01698978

| Entity | Relationship to Related Interest |
|---|---|
| PWM1, LLC | Indirect Control |
| Radco NREC Bay Park Holdings, LLC | Indirect Control |
| Ramarim, LLC | Indirect Control |
| Red River CLO, Ltd. | Indirect Control |
| Red River Investors Corp. | Indirect Control |
| Restoration Funding CLO, Ltd. | Indirect Control |
| Richmond Cummins, LP | Indirect Control |
| Rockwall CDO II Ltd. | Indirect Control |
| Rockwall CDO II Panda Holdings, Ltd. | Indirect Control |
| Rockwall CDO, Ltd. | Indirect Control |
| Rockwall Investors Corp. | Indirect Control |
| Rothko, Ltd. | Indirect Control |
| RTT Hollister, LLC | Indirect Control |
| RTT Rockledge, LLC | Indirect Control |
| Rundberg Residential Partners, LLC | Indirect Control |
| Sevilla Residential Partners, LLC | Indirect Control |
| Southfork Cayman Holdings, Ltd. | Indirect Control |
| Southfork CLO, Ltd. | Indirect Control |
| Specialty Financial Products Limited | Indirect Control |
| Spiritus Life, Inc. | Indirect Control |
| Starck, Ltd. | Indirect Control |
| Sterling Capital Long/Short Equity Fund | Indirect Control |
| Stonebridge-Highland Healthcare Private Equity Fund | Indirect Control |
| Strand Advisors III, Inc. | Indirect Control |
| Strand Advisors IV, LLC | Indirect Control |
| Strand Advisors IX, LLC | Indirect Control |
| Strand Advisors V, LLC | Indirect Control |
| Strand Advisors XIII, LLC | Indirect Control |
| Strand Advisors XVI, Inc. | Indirect Control |
| Strand Advisors, Inc. | Indirect Control |
| Stratford CLO, Ltd. | Indirect Control |
| SV TIC Residential Partners, LLC | Indirect Control |
| The Dondero Insurance Rabbi Trust | Indirect Control |
| The Dugaboy Investment Trust | Indirect Control |
| The Get Good Non-Exempt Trust No. 1 | Indirect Control |
| The Get Good Non-Exempt Trust No. 2 | Indirect Control |
| The Get Good Trust | Indirect Control |
| The SLHC Trust | Indirect Control |
| Thread 55, LLC | Indirect Control |
| Tihany, Ltd. | Indirect Control |
| Triple R Eastwood Holdings, LLC | Indirect Control |
| Valhalla CLO, Ltd. | Indirect Control |
| VB Holding, LLC | Indirect Control |
| Venue at Home Town, LTD. | Indirect Control |
| Wake LV Holdings II, Ltd. | Indirect Control |
| Wake LV Holdings, Ltd. | Indirect Control |
| Walter Holdco GP, LLC | Indirect Control |
| Walter Holdco I, Ltd. | Indirect Control |
| Walter Holdco, L.P. | Indirect Control |
| Warhol, Ltd. | Indirect Control |
| Westchester CLO, Ltd. | Indirect Control |
| Wright, Ltd. | Indirect Control |
| Yellow Metal Merchants, Inc. | Indirect Control |

DOC_01698978

Case 20-03195-sgj Doc 7-1 Filed 12/30/20 Entered 12/30/20 13:39:10 Page 81 of 111

| Entity | Relationship to Related Interest |
|---|---|
| **Portfolio Companies** | |
| American BanknoteCorporation | Board Member |
| CCS Medical, Inc. | Board Member with >10% voting securities |
| Cornerstone Healthcare Group Holding, Inc. | Board Member with >10% voting securities |
| Metro-Goldwyn-Mayer, Inc. | Board Member with >10% voting securities |
| NexBank Capital, Inc. | Board Member with >10% voting securities |
| NexBank, SSB | Board Member with >10% voting securities |
| Big Springs Partners, LLC | >25% voting securities |
| Carey Holdings, Inc. | >25% voting securities |
| Genesys Limited | >25% voting securities |
| JHT Holdings, Inc. | >25% voting securities |
| Romacorp | >25% voting securities |
| Trussway Industries, Inc. | >25% voting securities |
| Turtle Bay Holdings, LLC | >25% voting securities |

# EXHIBIT 6

Case 19-34054-sgj11 Doc 2735-16 Filed 08/17/21 Entered 08/17/21 17:00:39 Page 118 of 146

Case 20-03195-sgj Doc 7-1 Filed 12/30/20 Entered 12/30/20 13:39:10 Page 83 of 111
2016 Highland Dallas Foundation Unanimous Consent 12.28.16.pdf

## HIGHLAND DALLAS FOUNDATION, INC.

### Unanimous Written Consent of Directors
### In Lieu of Meeting

THE UNDERSIGNED, being all of the directors of Highland Dallas Foundation, Inc. ("Foundation"), a Delaware nonprofit nonstock corporation, do hereby consent to the adoption of, and do hereby adopt, the following resolutions pursuant to Section 141(f) of the General Corporation Law of the State of Delaware, and hereby direct that this Written Consent be filed with the minutes of the proceedings of the Board of Directors of the Foundation:

WHEREAS, the Foundation has received and hereby accepts a gift from The Get Good Nonexempt Trust created by Trust Agreement dated June 29, 2001 (the "Trust") consisting of the assets listed on Exhibit A attached hereto (collectively, the "Gifted Interests"), effective December 28, 2016 ; and

WHEREAS, the Foundation currently owns 100 Participating Shares in Charitable DAF HoldCo, Ltd. ("DAF HoldCo"), a Cayman Islands exempted company, which shares represent one-third of the economic value of DAF HoldCo; and

WHEREAS, the Foundation's interest in DAF HoldCo has produced significant returns for the Foundation that are used in furtherance of its exempt purposes and those of its supported organization; and

WHEREAS, the directors of the Foundation, after careful consideration, believe it is in the best interests of the Foundation and its supported organization to contribute the Gifted Interests to DAF HoldCo;

NOW, THEREFORE, be it hereby

RESOLVED, that the Board of Directors of the Foundation hereby approves and authorizes the Foundation to contribute the Gifted Assets to DAF HoldCo, effective December 28, 2016;

FURTHER RESOLVED, that the officers of the Foundation are hereby authorized to execute and deliver such documents, and to take such other actions, as are appropriate to implement the purposes of the foregoing resolution, with such additional terms and conditions, consistent therewith, as may be approved by such officers; and

FURTHER RESOLVED, that this Written Consent may be validly executed by electronic means to the fullest extent permitted by Delaware law.

CONFIDENTIAL-PEO

Highland/PEO-032603

IN WITNESS WHEREOF, the undersigned, being all of the directors of the Foundation, have caused this Unanimous Written Consent to be executed effective as of December 28, 2016.

78673.000002 EMF_US 62996137v1

Case 19-34054-sgj11 Doc 2735-16 Filed 08/17/21 Entered 08/17/21 17:00:39 Page 120 of 146

Case 20-03195-sgj Doc 7-1 Filed 12/30/20 Entered 12/30/20 13:39:10 Page 85 of 111
2016 Highland Dallas Foundation Unanimous Consent 12.28.16.pdf

James Dondero

Grant Scott

Mary M. Jalonick

HIGHLAND DALLAS FOUNDATION, INC. – UNANIMOUS WRITTEN CONSENT OF DIRECTORS IN LIEU OF MEETING
78673.000002 EMF_US 62996137v1

CONFIDENTIAL-PEO

CONFIDENTIAL-PEO

2016 Highland Dallas Foundation Unanimous Consent 12.28.16.pdf

## Exhibit A

$2,032,183.24 (based on 11/30/16 NAV) Series A Interests of Highland Capital Loan Fund, L.P. (as defined in the Limited Partnership Agreement of Highland Capital Loan Fund, L.P, dated March 28, 2013, as amended from time to time).

The following call options of American Airlines Group, Inc., a Delaware corporation:

| American Airlines Call Options | # Contracts | 12/27/16 MV | Amount Assigned | Total Est. MV Assigned |
|---|---|---|---|---|
| CALL AAL JAN 40 1/20/17 | 10,000 | 8,710,000.00 | 100.0000% $ | 8,710,000.00 |

A participation interest and a tracking interest in certain participating shares of Highland Crusader Fund, L.P. and Highland Crusader Fund II, Ltd., in each case, as more particularly described on Schedule I attached hereto.

Highland/PEO-032606

78673.000002 EMF_US 62996137v1

CONFIDENTIAL-PEO

Highland/PEO-032607

2016 Highland Dallas Foundation Unanimous Consent 12.28.16.pdf

### Schedule I

### The Participation Interest and the Tracking Interest

The following sets forth the terms and conditions with respect to (i) a participation interest (the "Participation Interest") granted by Highland Capital Management, L.P. "HCMLP") in certain participating shares of Highland Crusader Fund, L.P. (the "Onshore Crusader Fund") and Highland Crusader Fund II, Ltd. (the "Offshore Crusader Fund", and such participating shares collectively, the "Participating Shares"), and (ii) a tracking interest (the "Tracking Interest") in certain participating shares of the Onshore Crusader Fund (the "Tracking Shares").

Participation and Tracking Interest

Crusader Participation Interests

| Account Name | Legal Owner | Feeder Fund Investment | 11/30/16 NAV per statement | Amount Participated | Total NAV Participated |
|---|---|---|---|---|---|
| HCMLP comp | Highland Capital Management, LP | Crusader Fund II, Ltd. | $ 3,185,728.54 | 100.00% | $ 3,185,728.54 |
| HCMLP prior | Highland Capital Management, LP | Crusader Fund II, Ltd. | 1,158,673.19 | 100.00% | 1,158,673.19 |
| Eames, Ltd. | Eames, Ltd. | Crusader Fund, LP | 6,581,643.01 | 100.00% | 6,581,643.01 |
| HCMLP (1) | Highland Capital Management, LP | Crusader Fund, LP | 396,467.54 | 12.86% | 50,968.60 |
| HCMLP (2) | Highland Capital Management, LP | Crusader Fund, LP | 1,302,883.16 | 12.86% | 167,494.51 |
| Totals | | | $ 12,625,395.44 | | $ 11,144,507.85 |

Tracking interests

| Account Name | Legal Owner | Feeder Fund Investment | 11/30/16 NAV per statement | Tracking Amount | Total Tracked Interest |
|---|---|---|---|---|---|
| HCMLP (1) | Highland Capital Management, LP | Crusader Fund, LP | 396,467.54 | 87.14% | 345,498.94 |
| HCMLP (2) | Highland Capital Management, LP | Crusader Fund, LP | 1,302,883.16 | 87.14% | 1,135,388.65 |
| Totals | | | $ 1,699,350.70 | | $ 1,480,887.59 |

Total of Crusader Participations and Tracked Interests $ 12,625,395.44

Evidence of Participations and the Tracking Interest. HCMLP shall maintain records of all payments received from or owed by the holder of the Participation Interest and the Tracking Interest and all payments made or owed by HCMLP to the holder of the Participation Interest and the Tracking Interest.

78673.000002 EMF_US 62996137v1

**APP 077**

CONFIDENTIAL-PEO

Highland/PEO-032608

2016 Highland Dallas Foundation Unanimous Consent 12.28.16.pdf

Payments by and to HCMLP with respect to the Participation Interest and the Tracking Interest. Subject to any applicable tax withholding, HCMLP shall promptly pay to the holder of the Participation Interest an amount equal to such holder's share of each amount received and applied by HCMLP (or Eames, Ltd., a wholly-owned subsidiary of HCMLP, if applicable) in payment of distributions, Plan Claims (as defined in the Joint Plan of Distribution of the Crusader Funds adopted by Highland Crusader Offshore Partners, L.P., the Onshore Crusader Fund, Highland Crusader Fund, Ltd. and the Offshore Crusader Fund, and the Scheme of Arrangement between the Offshore Crusader Fund and its Scheme Creditors, as applicable) and proceeds of any sale, assignment or other disposition of any interest, in each case, with respect to or in the Participating Shares (such holder's share of such amounts, collectively, the "Participation Proceeds"). Pending such payment of Participation Proceeds by HCMLP to the holder of the Participation Interest, HCMLP will hold the Participation Proceeds in trust for the benefit of such holder and will not commingle such amounts with other property of HCMLP. Subject to any applicable tax withholding, HCMLP shall promptly pay to the holder of the Tracking Interest an amount equal to each amount received and applied by HCMLP in payment of distributions, Plan Claims and proceeds of any sale, assignment or other disposition of any interest, in each case, with respect to or in the Underlying Shares. Notwithstanding anything herein to the contrary, except for the right to receive amounts specified in this paragraph, no holder shall have, by reason of the Participation Interest or the Tracking Interest, any rights with respect to the Participating Shares or the Tracking Shares.

Nonrecourse Participation Interest and Tracking Interest. The Interest and the Tracking Interest are held by the holder thereof without recourse to HCMLP (except in respect of the HCMLP's express obligations as set forth herein) and for such holder's own account and risk. HCMLP makes no representation or warranty as to, and shall have no responsibility for the value, legality, genuineness, validity, sufficiency or enforceability of the Participating Interest, the Tracking Interest or any of the rights attaching to them; any representation or warranty made by, or the accuracy, completeness, correctness or sufficiency of any information (or the validity, completeness or adequate disclosure of assumptions underlying any estimates, forecasts or projections contained in such information) provided (directly or indirectly through HCMLP) by any person; the performance or observance by any person (at any time, whether prior to or after the date hereof) of the financial condition of the Onshore Crusader Fund or the Offshore Crusader Fund; or (except as otherwise expressly provided herein) any other matter relating to any person, the Participating Interest or the Tracking Interest.

Standard of Care. Notwithstanding anything contained herein to the contrary, HCMLP shall administer the Participation Interest and the Tracking Interest and enforce its rights, with respect to the Participating Shares and the Tracking Shares in the same manner as if it had not granted the Participation Interest or the Tracking Interest but owned the Participating Shares the Tracking Shares solely for its own account with no obligation to make or receive payments in respect of the Participation Interest or the Tracking Interest.

Assignment. Each holder of the Participation Interest or the Tracking Interest is expressly permitted to assign or transfer any or all of its rights with respect thereto without the consent of HCMLP.

78673.000002 EMF_US 62996137v1

**APP 078**

# EXHIBIT 7

Case 19-34054-sgj11 Doc 2735-16 Filed 08/17/21 Entered 08/17/21 17:00:39 Page 125 of 146

Case 20-03195-sgj Doc 7-1 Filed 12/30/20 Entered 12/30/20 13:39:10 Page 90 of 111
Assignment and Assumption Agreement (Fully Executed).pdf

## OMNIBUS ASSIGNMENT AGREEMENT

OMNIBUS ASSIGNMENT AGREEMENT (this "Agreement"), dated as of December 28, 2016 (the "Effective Date"), by and among Charitable DAF Holdco, Ltd, an exempted company incorporated in the Cayman Islands ("Charitable DAF HoldCo"), Charitable DAF Fund, LP, an exempted limited partnership in the Cayman Islands ("Charitable DAF Fund"), and CLO HoldCo, Ltd., an exempted company in the Cayman Islands ("CLO HoldCo"). Each of Charitable DAF HoldCo, Charitable DAF Fund and CLO HoldCo are sometimes referred to herein individually as a "Party", and together as the "Parties".

### RECITALS

WHEREAS, (i) Charitable DAF HoldCo is the sole limited partner of Charitable DAF Fund, and (ii) Charitable DAF Fund is the sole shareholder of CLO HoldCo; and

WHEREAS, the Parties desire to enter into a series of transfers and assignments of the Assets (as defined herein) as of the Effective Date, on the terms set forth in this Agreement.

### AGREEMENT

NOW THEREFORE, in consideration of the premises and the mutual covenants and the agreements herein set forth, the Parties hereby agree as follows:

Section 1. <u>Transfers and Assignments</u>. On the Effective Date:

(a) Charitable DAF HoldCo hereby irrevocably transfers and assigns to Charitable DAF Fund all of Charitable DAF HoldCo's right, title and interest in and to the assets listed on <u>Exhibit A</u> (the "Assets"), and Charitable DAF Fund hereby accepts the Assets (the "Charitable DAF HoldCo Transfer").

(b) Immediately following the Charitable DAF HoldCo Transfer, Charitable DAF Fund hereby irrevocably transfers and assigns to CLO HoldCo all of Charitable DAF Fund's right, title and interest in and to the Assets, and CLO HoldCo hereby accepts the Assets (the "Charitable DAF Fund Transfer").

(c) As consideration for the transfers and assignments contemplated by this Section 1, each of the Foundation, Charitable DAF HoldCo, Charitable DAF Fund and CLO HoldCo hereby agree to be fully bound by, and subject to, all of the covenants, terms and conditions of the Multi Strat Governing Documents for all purposes hereof.

Section 2. <u>Miscellaneous</u>.

(a) <u>Fees and Expenses</u>. All costs and expenses incurred in connection with this Agreement and the consummation of the transactions contemplated herein will be paid by the Party incurring such expense.

CONFIDENTIAL-PEO

Case 19-34054-sgj11 Doc 2735-16 Filed 08/17/21 Entered 08/17/21 17:00:39 Page 126 of 146

Case 20-03195-sgj Doc 7-1 Filed 12/30/20 Entered 12/30/20 13:39:10 Page 91 of 111
Assignment and Assumption Agreement (Fully Executed).pdf

(b)    <u>Entire Agreement, Counterparts; Amendments</u>.  This Agreement constitutes the entire agreement of the Parties and supersedes all prior written or oral and all contemporaneous oral agreements, understandings and negotiations with respect to the subject matter hereof.  This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but all of which taken together will constitute one and the same instrument.  Transmission by facsimile or other form of electronic transmission of an executed counterpart of this Agreement will be deemed to constitute due and sufficient delivery of such counterpart.  This Agreement may not be amended or modified except in writing by all of the Parties hereto and no condition herein (express or implied) may be waived except in writing by the Party whom the condition was meant to benefit.

(c)    <u>Survival; Successors and Assigns</u>.  All representations, warranties, covenants and other provisions made by the Parties will survive the execution, delivery, and performance of this Agreement.  This Agreement will inure to the benefit of and be binding upon the Parties and their respective successors and no other person will have any right or obligation hereunder.  Each Party is expressly permitted to assign or transfer any or all of its rights or obligations hereunder without the consent of the other Party.

(d)    <u>Severability</u>.  The invalidity or unenforceability of any term or provision of this Agreement will not affect the validity or enforceability of any other term or provision hereof.  If any term or provision of this Agreement is for any reason determined to be invalid or unenforceable, there will be deemed to be made such changes (and only such changes) as are necessary to make it valid and enforceable.

(e)    <u>Governing Law</u>.  This Agreement will be governed by, and construed in accordance with, the laws of the State of Texas (without reference to any conflicts of law provision) applicable to agreements made in and to be performed entirely within such state.

(f)    <u>Arbitration</u>.  In the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; <u>provided, however</u>, that either party or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on the other party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief.  The arbitration will be conducted by the American Arbitration Association, or another, mutually agreeable arbitration service.  A panel of three arbitrators will preside over the arbitration and will together deliberate, decided and issue the final award.  The arbitrators shall be duly licensed to practice law in the State of Texas. The arbitrators shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered.  The arbitrators will not have the authority to render a decision that contains an outcome determinative error of state or federal law, or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law.  Any dispute over whether the arbitrators have failed to comply with the foregoing will be resolved by summary judgment in a court of law.  In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's

2

Case 19-34054-sgj11 Doc 2735-16 Filed 08/17/21 Entered 08/17/21 17:00:39 Page 127 of 146

Case 20-03195-sgj Doc 7-1 Filed 12/30/20 Entered 12/30/20 13:39:10 Page 92 of 111
Assignment and Assumption Agreement (Fully Executed).pdf

dispute resolution rules or other mutually agreeable, arbitration service rules. The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys' fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury. All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

(g)     Further Assurances. Each Party agrees to (i) execute and deliver, or to cause to be executed and delivered, all such agreements, documents and instruments and (ii) take or cause to be taken all such actions as the other Party may reasonably request to effectuate the intent and purposes, and to carry out the terms, of this Agreement.

(h)     Equitable Remedy. Each Party acknowledges that a breach or threatened breach by such Party of any of its obligations under this Agreement would give rise to irreparable harm to the other Party for which monetary damages may not be an adequate remedy and hereby agrees that in the event of a breach or a threatened breach by such Party of any such obligations, the other Party shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

*[Signatures on next page]*

3

Case 19-34054-sgj11 Doc 2735-16 Filed 08/17/21 Entered 08/17/21 17:00:39 Page 128 of 146

Case 20-03195-sgj Doc 7-1 Filed 12/30/20 Entered 12/30/20 13:39:10 Page 93 of 111
Assignment and Assumption Agreement (Fully Executed).pdf

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement as of the date first written above.

CHARITABLE DAF HOLDCO, LTD

By: _____
Name: Grant Scott
Title: Director

CHARITABLE DAF FUND, LP

By: Charitable DAF GP, LLC, its General Partner

By: _____
Name: Grant Scott
Title: Managing Member

CLO HOLDCO, LTD.

By: _____
Name: Grant Scott
Title: Director

SIGNATURE PAGE TO OMNIBUS ASSIGNMENT AGREEMENT

CONFIDENTIAL-PEO

CONFIDENTIAL-PEO

Assignment and Assumption Agreement (Fully Executed).pdf

**Exhibit A**

$2,032,183.24 (based on 11/30/16 NAV) Series A Interests of Highland Capital Loan Fund, L.P. (as defined in the Limited Partnership Agreement of Highland Capital Loan Fund, L.P, dated March 28, 2013, as amended from time to time).

The following call options of American Airlines Group, Inc., a Delaware corporation:

| American Airlines Call Options | | | # Contracts | 12/27/16 MV | Amount Assigned | Total Est. MV Assigned |
|---|---|---|---|---|---|---|
| CALL AAL JAN 40 1/20/17 | | | 10,000 | 8,710,000.00 | 100.0000% | $  8,710,000.00 |

A participation interest and a tracking interest in certain participating shares of Highland Crusader Fund, L.P. and Highland Crusader Fund II, Ltd., in each case, as more particularly described on <u>Schedule I</u> attached hereto.

Highland/PEO-032690

**APP 083**

CONFIDENTIAL-PEO

Assignment and Assumption Agreement (Fully Executed).pdf

## Schedule I

### The Participation Interest and the Tracking Interest

The following sets forth the terms and conditions with respect to (i) a participation interest (the "Participation Interest") granted by Highland Capital Management, L.P. "HCMLP") in certain participating shares of Highland Crusader Fund, L.P. (the "Onshore Crusader Fund") and Highland Crusader Fund II, Ltd. (the "Offshore Crusader Fund", and such participating shares collectively, the "Participating Shares"), and (ii) a tracking interest (the "Tracking Interest") in certain participating shares of the Onshore Crusader Fund (the "Tracking Shares").

Participation and Tracking Interest

**Crusader Participation Interests**

| Account Name | Legal Owner | Feeder Fund Investment | 11/30/16 NAV per statement | Amount Participated | Total NAV Participated |
|---|---|---|---|---|---|
| HCMLP comp | Highland Capital Management, LP | Crusader Fund II, Ltd. | $ 3,185,728.54 | 100.00% | $ 3,185,728.54 |
| HCMLP prior | Highland Capital Management, LP | Crusader Fund II, Ltd. | 1,158,673.19 | 100.00% | 1,158,673.19 |
| Eames, Ltd. | Eames, Ltd. | Crusader Fund, LP | 6,581,643.01 | 100.00% | 6,581,643.01 |
| HCMLP (1) | Highland Capital Management, LP | Crusader Fund, LP | 396,467.54 | 12.86% | 50,968.60 |
| HCMLP (2) | Highland Capital Management, LP | Crusader Fund, LP | 1,302,883.16 | 12.86% | 167,494.51 |
| Totals | | | $ 12,625,395.44 | | $ 11,144,507.85 |

**Tracking interests**

| Account Name | Legal Owner | Feeder Fund Investment | 11/30/16 NAV per statement | Tracking Amount | Total Tracked Interest |
|---|---|---|---|---|---|
| HCMLP (1) | Highland Capital Management, LP | Crusader Fund, LP | 396,467.54 | 87.14% | 345,498.94 |
| HCMLP (2) | Highland Capital Management, LP | Crusader Fund, LP | 1,302,883.16 | 87.14% | 1,135,388.65 |
| Totals | | | $ 1,699,350.70 | | $ 1,480,887.59 |

| Total of Crusader Participations and Tracked Interests | | | | | $ 12,625,395.44 |
|---|---|---|---|---|---|

Evidence of Participations and the Tracking Interest. HCMLP shall maintain records of all payments received from or owed by the holder of the Participation Interest and the Tracking Interest and all payments made or owed by HCMLP to the holder of the Participation Interest and the Tracking Interest.

Highland/PEO-032691

CONFIDENTIAL-PEO

Highland/PEO-032692

Assignment and Assumption Agreement (Fully Executed).pdf

Payments by and to HCMLP with respect to the Participation Interest and the Tracking Interest. Subject to any applicable tax withholding, HCMLP shall promptly pay to the holder of the Participation Interest an amount equal to such holder's share of each amount received and applied by HCMLP (or Eames, Ltd., a wholly-owned subsidiary of HCMLP, if applicable) in payment of distributions, Plan Claims (as defined in the Joint Plan of Distribution of the Crusader Funds adopted by Highland Crusader Offshore Partners, L.P., the Onshore Crusader Fund, Highland Crusader Fund, Ltd. and the Offshore Crusader Fund, and the Scheme of Arrangement between the Offshore Crusader Fund and its Scheme Creditors, as applicable) and proceeds of any sale, assignment or other disposition of any interest, in each case, with respect to or in the Participating Shares (such holder's share of such amounts, collectively, the "Participation Proceeds"). Pending such payment of Participation Proceeds by HCMLP to the holder of the Participation Interest, HCMLP will hold the Participation Proceeds in trust for the benefit of such holder and will not commingle such amounts with other property of HCMLP. Subject to any applicable tax withholding, HCMLP shall promptly pay to the holder of the Tracking Interest an amount equal to each amount received and applied by HCMLP in payment of distributions, Plan Claims and proceeds of any sale, assignment or other disposition of any interest, in each case, with respect to or in the Underlying Shares. Notwithstanding anything herein to the contrary, except for the right to receive amounts specified in this paragraph, no holder shall have, by reason of the Participation Interest or the Tracking Interest, any rights with respect to the Participating Shares or the Tracking Shares.

Nonrecourse Participation Interest and Tracking Interest. The Interest and the Tracking Interest are held by the holder thereof without recourse to HCMLP (except in respect of the HCMLP's express obligations as set forth herein) and for such holder's own account and risk. HCMLP makes no representation or warranty as to, and shall have no responsibility for the value, legality, genuineness, validity, sufficiency or enforceability of the Participating Interest, the Tracking Interest or any of the rights attaching to them; any representation or warranty made by, or the accuracy, completeness, correctness or sufficiency of any information (or the validity, completeness or adequate disclosure of assumptions underlying any estimates, forecasts or projections contained in such information) provided (directly or indirectly through HCMLP) by any person; the performance or observance by any person (at any time, whether prior to or after the date hereof) of the financial condition of the Onshore Crusader Fund or the Offshore Crusader Fund; or (except as otherwise expressly provided herein) any other matter relating to any person, the Participating Interest or the Tracking Interest.

Standard of Care. Notwithstanding anything contained herein to the contrary, HCMLP shall administer the Participation Interest and the Tracking Interest and enforce its rights, with respect to the Participating Shares and the Tracking Shares in the same manner as if it had not granted the Participation Interest or the Tracking Interest but owned the Participating Shares the Tracking Shares solely for its own account with no obligation to make or receive payments in respect of the Participation Interest or the Tracking Interest.

Assignment. Each holder of the Participation Interest or the Tracking Interest is expressly permitted to assign or transfer any or all of its rights with respect thereto without the consent of HCMLP.

87737.000001 EMF_US 63370384v2

**APP 085**

# EXHIBIT  8

Case 19-34054-sgj11 Doc 2735-16 Filed 08/17/21 Entered 08/17/21 17:00:39 Page 133 of 146

Case 20-03195-sgj Doc 7-1 Filed 12/30/20 Entered 12/30/20 13:39:10 Page 98 of 111
Donative Assignment of Interests (Fully Executed).pdf

## DONATIVE ASSIGNMENT OF INTERESTS

### RECITALS

WHEREAS, The Get Good Nonexempt Trust (the "Trust") is a Texas trust created under a Trust Agreement dated June 29, 2001 (the "Partnership Agreement"); and

WHEREAS, the Trust owns all of the assets listed on Exhibit A attached hereto; and

WHEREAS, Grant James Scott, in the exercise of his discretion as Trustee of the Trust, has approved the distribution of the assets listed on Exhibit A as a charitable contribution to Highland Dallas Foundation, Inc., a permissible beneficiary of the Trust which is a tax exempt public charity that is a supporting organization described in Section 509(a)(3) of the Internal Revenue Code of 1986, as amended (the "Code"); and

WHEREAS, the Trustee of the Trust wishes to give and assign the assets listed on Exhibit A to Highland Dallas Foundation, Inc. effective December 28, 2016;

### TRANSFER AND ASSIGNMENT

NOW, THEREFORE, the Trustee of the Trust hereby gives, donates and assigns the assets listed on Exhibit A to Highland Dallas Foundation, Inc.

This donative assignment is to be effective as 5:00 p.m. CST, December 28, 2016.

THE GET GOOD NONEXEMPT TRUST

By: _____
Grant James Scott, Trustee

78673.000002 EMF_US 63355876v1

CONFIDENTIAL-PEO

APP 086
Highland/PEO-032698

Case 19-34054-sgj11 Doc 2735-16 Filed 08/17/21 Entered 08/17/21 17:00:39 Page 134 of 146

Case 20-03195-sgi Doc 7-1 Filed 12/30/20 Entered 12/30/20 13:39:10 Page 99 of 111
Donative Assignment of Interests (Fully Executed).pdf

The undersigned hereby acknowledges that it (i) is aware of this donative assignment of interests from The Get Good Nonexempt Trust to Highland Dallas Foundation, Inc., and (ii) agrees to be bound by this donative assignment.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: Strand Advisors, Inc.
Its General Partner

By: _____
James Dondero, President

2

78673.000002 EMF_US 63355876v1

CONFIDENTIAL-PEO

APP 087
Highland/PEO-032699

CONFIDENTIAL-PEO

Donative Assignment of Interests (Fully Executed).pdf

## Exhibit A

$2,032,183.24 (based on 11/30/16 NAV) Series A Interests of Highland Capital Loan Fund, L.P. (as defined in the Limited Partnership Agreement of Highland Capital Loan Fund, L.P, dated March 28, 2013, as amended from time to time).

The following call options of American Airlines Group, Inc., a Delaware corporation:

| American Airlines Call Options | | | # Contracts | 12/27/16 MV | Amount Assigned | Total Est. MV Assigned |
|---|---|---|---|---|---|---|
| CALL AAL JAN 40 1/20/17 | | | 10,000 | 8,710,000.00 | 100.0000% | $ 8,710,000.00 |

A participation interest and a tracking interest in certain participating shares of Highland Crusader Fund, L.P. and Highland Crusader Fund II, Ltd., in each case, as more particularly described on Schedule I attached hereto.

78673.000002 EMF_US 63355876v1

Highland/PEO-032700

APP 088

CONFIDENTIAL-PEO

**Schedule I**

**The Participation Interest and the Tracking Interest**

    The following sets forth the terms and conditions with respect to (i) a participation interest (the "Participation Interest") granted by Highland Capital Management, L.P. ("HCMLP") in certain participating shares of Highland Crusader Fund, L.P. (the "Onshore Crusader Fund") and Highland Crusader Fund II, Ltd. (the "Offshore Crusader Fund", and such participating shares collectively, the "Participating Shares"), and (ii) a tracking interest (the "Tracking Interest") in certain participating shares of the Onshore Crusader Fund (the "Tracking Shares").

Participation and Tracking Interest

**Crusader Participation Interests**

| Account Name | Legal Owner | Feeder Fund Investment | 11 30 16 NAV per statement | Amount Participated | Total NAV Participated |
|---|---|---|---|---|---|
| HCMLP comp | Highland Capital Management, LP | Crusader Fund II, Ltd. | $ 3,185,728.54 | 100.00% | $ 3,185,728.54 |
| HCMLP prior | Highland Capital Management, LP | Crusader Fund II, Ltd. | 1,158,673.19 | 100.00% | 1,158,673.19 |
| Eames, Ltd. | Eames, Ltd. | Crusader Fund, LP | 6,581,643.01 | 100.00% | 6,581,643.01 |
| HCMLP (1) | Highland Capital Management, LP | Crusader Fund, LP | 396,467.54 | 12.86% | 50,968.60 |
| HCMLP (2) | Highland Capital Management, LP | Crusader Fund, LP | 1,302,883.16 | 12.86% | 167,494.51 |
| **Totals** | | | **$ 12,625,595.44** | | **$ 11,144,507.85** |

**Tracking Interests**

| Account Name | Legal Owner | Feeder Fund Investment | 11 30 16 NAV per statement | Tracking Amount | Total Tracked Interest |
|---|---|---|---|---|---|
| HCMLP (1) | Highland Capital Management, LP | Crusader Fund, LP | 396,467.54 | 87.14% | 345,498.94 |
| HCMLP (2) | Highland Capital Management, LP | Crusader Fund, LP | 1,302,883.16 | 87.14% | 1,135,388.65 |
| **Totals** | | | **$ 1,699,350.70** | | **$ 1,480,887.59** |

| **Total of Crusader Participations and Tracked Interests** | | | | | **$ 12,625,395.44** |
|---|---|---|---|---|---|

    Evidence of Participations and the Tracking Interest. HCMLP shall maintain records of all payments received from or owed by the holder of the Participation Interest and the Tracking Interest and all payments made or owed by HCMLP to the holder of the Participation Interest and the Tracking Interest.

Highland/PEO-032701

78673.000002 EMF_US 63355876v1

**APP 089**

CONFIDENTIAL-PEO

Donative Assignment of Interests (Fully Executed).pdf

Highland/PEO-032702

Payments by and to HCMLP with respect to the Participation Interest and the Tracking Interest.  Subject to any applicable tax withholding, HCMLP shall promptly pay to the holder of the Participation Interest an amount equal to such holder's share of each amount received and applied by HCMLP (or Eames, Ltd., a wholly-owned subsidiary of HCMLP, if applicable) in payment of distributions, Plan Claims (as defined in the Joint Plan of Distribution of the Crusader Funds adopted by Highland Crusader Offshore Partners, L.P., the Onshore Crusader Fund, Highland Crusader Fund, Ltd. and the Offshore Crusader Fund, and the Scheme of Arrangement between the Offshore Crusader Fund and its Scheme Creditors, as applicable) and proceeds of any sale, assignment or other disposition of any interest, in each case, with respect to or in the Participating Shares (such holder's share of such amounts, collectively, the "Participation Proceeds"). Pending such payment of Participation Proceeds by HCMLP to the holder of the Participation Interest, HCMLP will hold the Participation Proceeds in trust for the benefit of such holder and will not commingle such amounts with other property of HCMLP.  Subject to any applicable tax withholding, HCMLP shall promptly pay to the holder of the Tracking Interest an amount equal to each amount received and applied by HCMLP in payment of distributions, Plan Claims and proceeds of any sale, assignment or other disposition of any interest, in each case, with respect to or in the Underlying Shares.  Notwithstanding anything herein to the contrary, except for the right to receive amounts specified in this paragraph, no holder shall have, by reason of the Participation Interest or the Tracking Interest, any rights with respect to the Participating Shares or the Tracking Shares.

Nonrecourse Participation Interest and Tracking Interest.  The Interest and the Tracking Interest are held by the holder thereof without recourse to HCMLP (except in respect of the HCMLP's express obligations as set forth herein) and for such holder's own account and risk. HCMLP makes no representation or warranty as to, and shall have no responsibility for the value, legality, genuineness, validity, sufficiency or enforceability of the Participating Interest, the Tracking Interest or any of the rights attaching to them; any representation or warranty made by, or the accuracy, completeness, correctness or sufficiency of any information (or the validity, completeness or adequate disclosure of assumptions underlying any estimates, forecasts or projections contained in such information) provided (directly or indirectly through HCMLP) by any person; the performance or observance by any person (at any time, whether prior to or after the date hereof) of the financial condition of the Onshore Crusader Fund or the Offshore Crusader Fund; or (except as otherwise expressly provided herein) any other matter relating to any person, the Participating Interest or the Tracking Interest.

Standard of Care.  Notwithstanding anything contained herein to the contrary, HCMLP shall administer the Participation Interest and the Tracking Interest and enforce its rights, with respect to the Participating Shares and the Tracking Shares in the same manner as if it had not granted the Participation Interest or the Tracking Interest but owned the Participating Shares the Tracking Shares solely for its own account with no obligation to make or receive payments in respect of the Participation Interest or the Tracking Interest.

Assignment.  Each holder of the Participation Interest or the Tracking Interest is expressly permitted to assign or transfer any or all of its rights with respect thereto without the consent of HCMLP.

5

**APP 090**

# EXHIBIT 9

Case 19-34054-sgj11 Doc 2735-16 Filed 08/17/21 Entered 08/17/21 17:00:39 Page 139 of 146

Case 20-03195-sgj Doc 7-1 Filed 12/30/20 Entered 12/30/20 13:39:10 Page 104 of 111
Exercise of Discretion by Trustee - The Get Good Trust (Fully Executed).pdf

## EXERCISE OF DISCRETION BY TRUSTEE WITH RESPECT TO DISTRIBUTION TO CHARITABLE BENEFICIARY

### THE GET GOOD NONEXEMPT TRUST

The Get Good Nonexempt Trust (the "Trust") was created by Trust Agreement dated June 29, 2001 (the "Trust Agreement"). Grant James Scott is the currently acting Trustee of the Trust. Pursuant to Section V.B. of the Trust Agreement, the permissible class of beneficiaries has previously been expanded by adding Highland Dallas Foundation, Inc., a tax exempt public charity that is a supporting organization described in Section 509(a)(3) of the Internal Revenue Code of 1986, as amended (the "Code"), as a permissible beneficiary of The Get Good Nonexempt Trust created under the Trust Agreement.

Grant James Scott, in his capacity as Trustee of The Get Good Nonexempt Trust, has determined in the exercise of his sole discretion that it is appropriate to distribute, and hereby approves the distribution of, all of that trust's interests in the assets listed on Exhibit A attached hereto to Highland Dallas Foundation, Inc. effective as of December 28, 2016.

87737.000001 EMF_US 63370396v2

CONFIDENTIAL-PEO

APP 091
Highland/PEO-032707

Grant James Scott, Trustee of The Get Good
Nonexempt Trust

EXERCISE OF DISCRETION BY TRUSTEE WITH RESPECT TO DISTRIBUTION
TO CHARITABLE BENEFICIARY – THE GET GOOD NONEXEMPT TRUST

87737.000001 EMF_US 63370396v2

CONFIDENTIAL-PEO

CONFIDENTIAL-PEO

Exercise of Discretion by Trustee - The Get Good Trust (Fully Executed).pdf

## Exhibit A

$2,032,183.24 (based on 11/30/16 NAV) Series A Interests of Highland Capital Loan Fund, L.P. (as defined in the Limited Partnership Agreement of Highland Capital Loan Fund, L.P, dated March 28, 2013, as amended from time to time).

The following call options of American Airlines Group, Inc., a Delaware corporation:

| American Airlines Call Options | | | # Contracts | 12/27/16 MV | Amount Assigned | Total Est. MV Assigned |
|---|---|---|---|---|---|---|
| CALL AAL JAN 40 1/20/17 | | | 10,000 | 8,710,000.00 | 100.0000% $ | 8,710,000.00 |

A participation interest and a tracking interest in certain participating shares of Highland Crusader Fund, L.P. and Highland Crusader Fund II, Ltd., in each case, as more particularly described on Schedule I attached hereto.

Highland/PEO-032709

87737.000001 EMF_US 63370396v2

CONFIDENTIAL-PEO

Highland/PEO-032710

Exercise of Discretion by Trustee - The Get Good Trust (Fully Executed).pdf

### Schedule I

### The Participation Interest and the Tracking Interest

The following sets forth the terms and conditions with respect to (i) a participation interest (the "Participation Interest") granted by Highland Capital Management, L.P. ("HCMLP") in certain participating shares of Highland Crusader Fund, L.P. (the "Onshore Crusader Fund") and Highland Crusader Fund II, Ltd. (the "Offshore Crusader Fund", and such participating shares collectively, the "Participating Shares"), and (ii) a tracking interest (the "Tracking Interest") in certain participating shares of the Onshore Crusader Fund (the "Tracking Shares").

Participation and Tracking Interest

| Crusader Participation Interests | | | | | |
|---|---|---|---|---|---|
| Account Name | Legal Owner | Feeder Fund Investment | 11/30/16 NAV per statement | Amount Participated | Total NAV Participated |
| HCMLP comp | Highland Capital Management, LP | Crusader Fund II, Ltd. | $ 3,185,728.54 | 100.00% | $ 3,185,728.54 |
| HCMLP prior | Highland Capital Management, LP | Crusader Fund II, Ltd. | 1,158,673.19 | 100.00% | 1,158,673.19 |
| Eames, Ltd. | Eames, Ltd. | Crusader Fund, LP | 6,581,643.01 | 100.00% | 6,581,643.01 |
| HCMLP (1) | Highland Capital Management, LP | Crusader Fund, LP | 396,467.54 | 12.86% | 50,968.60 |
| HCMLP (2) | Highland Capital Management, LP | Crusader Fund, LP | 1,302,883.16 | 12.86% | 167,494.51 |
| Totals | | | $ 12,625,395.44 | | $ 11,144,507.85 |
| | | | | | |
| Tracking interests | | | | | |
| Account Name | Legal Owner | Feeder Fund Investment | 11/30/16 NAV per statement | Tracking Amount | Total Tracked Interest |
| HCMLP (1) | Highland Capital Management, LP | Crusader Fund, LP | 396,467.54 | 87.14% | 345,498.94 |
| HCMLP (2) | Highland Capital Management, LP | Crusader Fund, LP | 1,302,883.16 | 87.14% | 1,135,388.65 |
| Totals | | | $ 1,699,350.70 | | $ 1,480,887.59 |
| | | | | | |
| Total of Crusader Participations and Tracked Interests | | | | | $ 12,625,395.44 |

Evidence of Participations and the Tracking Interest. HCMLP shall maintain records of all payments received from or owed by the holder of the Participation Interest and the Tracking Interest and all payments made or owed by HCMLP to the holder of the Participation Interest and the Tracking Interest.

CONFIDENTIAL-PEO

Highland/PEO-032711

Exercise of Discretion by Trustee - The Get Good Trust (Fully Executed).pdf

<u>Payments by and to HCMLP with respect to the Participation Interest and the Tracking Interest</u>.  Subject to any applicable tax withholding, HCMLP shall promptly pay to the holder of the Participation Interest an amount equal to such holder's share of each amount received and applied by HCMLP (or Eames, Ltd., a wholly-owned subsidiary of HCMLP, if applicable) in payment of distributions, Plan Claims (as defined in the Joint Plan of Distribution of the Crusader Funds adopted by Highland Crusader Offshore Partners, L.P., the Onshore Crusader Fund, Highland Crusader Fund, Ltd. and the Offshore Crusader Fund, and the Scheme of Arrangement between the Offshore Crusader Fund and its Scheme Creditors, as applicable) and proceeds of any sale, assignment or other disposition of any interest, in each case, with respect to or in the Participating Shares (such holder's share of such amounts, collectively, the "<u>Participation Proceeds</u>").  Pending such payment of Participation Proceeds by HCMLP to the holder of the Participation Interest, HCMLP will hold the Participation Proceeds in trust for the benefit of such holder and will not commingle such amounts with other property of HCMLP.  Subject to any applicable tax withholding, HCMLP shall promptly pay to the holder of the Tracking Interest an amount equal to each amount received and applied by HCMLP in payment of distributions, Plan Claims and proceeds of any sale, assignment or other disposition of any interest, in each case, with respect to or in the Underlying Shares.  Notwithstanding anything herein to the contrary, except for the right to receive amounts specified in this paragraph, no holder shall have, by reason of the Participation Interest or the Tracking Interest, any rights with respect to the Participating Shares or the Tracking Shares.

<u>Nonrecourse Participation Interest and Tracking Interest</u>.  The Interest and the Tracking Interest are held by the holder thereof without recourse to HCMLP (except in respect of the HCMLP's express obligations as set forth herein) and for such holder's own account and risk.  HCMLP makes no representation or warranty as to, and shall have no responsibility for the value, legality, genuineness, validity, sufficiency or enforceability of the Participating Interest, the Tracking Interest or any of the rights attaching to them; any representation or warranty made by, or the accuracy, completeness, correctness or sufficiency of any information (or the validity, completeness or adequate disclosure of assumptions underlying any estimates, forecasts or projections contained in such information) provided (directly or indirectly through HCMLP) by any person; the performance or observance by any person (at any time, whether prior to or after the date hereof) of the financial condition of the Onshore Crusader Fund or the Offshore Crusader Fund; or (except as otherwise expressly provided herein) any other matter relating to any person, the Participating Interest or the Tracking Interest.

<u>Standard of Care</u>.  Notwithstanding anything contained herein to the contrary, HCMLP shall administer the Participation Interest and the Tracking Interest and enforce its rights, with respect to the Participating Shares and the Tracking Shares in the same manner as if it had not granted the Participation Interest or the Tracking Interest but owned the Participating Shares the Tracking Shares solely for its own account with no obligation to make or receive payments in respect of the Participation Interest or the Tracking Interest.

<u>Assignment</u>.  Each holder of the Participation Interest or the Tracking Interest is expressly permitted to assign or transfer any or all of its rights with respect thereto without the consent of HCMLP.

87737.000001 EMF_US 63370396v2

**APP 095**

# EXHIBIT 10

SIDLEY AUSTIN LLP
Penny P. Reid
Paige Holden Montgomery
Juliana L. Hoffman
2021 McKinney Avenue
Suite 2000
Dallas, Texas 74201
Telephone: (214) 981-3300
Facsimile: (214) 981-3400

Matthew A. Clemente (admitted pro hac vice)
Dennis M. Twomey (admitted pro hac vice)
Alyssa Russell (admitted pro hac vice)
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036

*Counsel for the Official Committee of Unsecured Creditors*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | Case No. 19-34054-sgj11 |
| Debtor. | |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | |
| Plaintiff, | Adversary Case No. 20-03195 |
| v. | |
| CLO HOLDCO, LTD. | |
| Defendant. | |

## DECLARATION IN SUPPORT OF
## MOTION FOR PRELIMINARY INJUNCTION

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

**DECLARATION IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**   **Page 1**
ACTIVE 263773813v.1

I, Mustafa Abdul-Jabbar, pursuant to 28 U.S.C. § 1746, hereby declare:

1. I am an attorney at Sidley Austin LLP ("Sidley"), located at 2021 McKinney Avenue, Suite 2000, Dallas, TX 75201. I am over twenty-one (21) years of age, am of sound mind, have personal knowledge of the facts stated herein, and these facts are true and correct. Sidley serves as Counsel for The Official Committee of Unsecured Creditors (the "Committee") of Highland Capital Management, L.P. (the "Debtor"), in the above-captioned matter (the "Bankruptcy Case"). As a result of my employment at Sidley, I am familiar with the documents produced in discovery by Debtor to date.

2. I submit this Declaration in support of the Motion for Preliminary Injunction (the "Motion") filed contemporaneously herewith by the Committee.

3. Each of the documents cited in the Motion and specifically contained in the separately filed Appendix in Support of Motion for Preliminary Injunction were received by the Committee or its representatives, from the Debtor in the Bankruptcy Case pursuant to requests for production or, alternatively, pursuant to order of the Court.

I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and correct.

/s/ *Mustafa Abdul-Jabbar*
Mustafa Abdul-Jabbar

**Page 2**