# EXHIBIT 1

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Attorneys for the Reorganized Debtor*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Reorganized Debtor. | § | |

## OBJECTION TO PROOF OF CLAIM NUMBER 177
## FILED BY THE DUGABOY INVESTMENT TRUST ON APRIL 23, 2020

Pursuant to sections 502(b) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>")

and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), the

---

[1] Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.


1934054210909000000000005

reorganized debtor, Highland Capital Management, L.P. ("HCMLP", and prior to the effective

date of the Plan (defined below), the "Debtor"), hereby objects (the "Objection") to Proof of Claim

No. 177 ("Claim No. 177") filed by claimant The Dugaboy Investment Trust ("Dugaboy"). The

Debtor requests that Claim No. 177 be summarily disallowed, and respectfully represents as

follows:

## PRELIMINARY STATEMENT

1.        As this Court knows, Dugaboy is James Dondero's family "trust." Dugaboy has

appeared numerous times in this case and has objected to many of the Debtor's decisions and

actions. Dugaboy contends that it has standing to assert those objections because of (a) three

proofs of claim it filed against the Debtor's estate, and (b) its 0.1866% Class A limited partnership

interest in the Debtor. As the Debtor has stated many times, each of the claims is frivolous and

without merit. The claim at issue here – Claim No. 177 – is emblematic of both the lack of merit

in Dugaboy's claims and Mr. Dondero's litigiousness.[2]

2.        Claim No. 177 arises from Dugaboy's purported 1.71% limited partnership interest

in Multi-Strat (defined below) – an investment vehicle managed by the Debtor. Through its claim,

Dugaboy seeks to recover damages it "may have" against the Debtor based upon Multi-Strat's sale

---

[2] This Court will remember that Dugaboy, in an attempt to circumvent this Court, filed a complaint in the U.S. District Court for the Northern District of Texas (the "ND Complaint"), which was duplicative of Claim No. 177, through its attorneys at Sbaiti & Co. ("Sbaiti"). *The Dugaboy Investment Trust v. Highland Capital Management, L.P.*, Case No. 21-cv-01479-S (N.D. Tex. Jun. 23, 2021). Dugaboy was forced to withdraw the ND Complaint after the Debtor disclosed the ND Complaint to this Court and informed the Court that it was duplicative of Claim No. 177. Transcript, June 25, 2021, 115:13-25; 116:1-25; 117:1-25; 118:1-25; 119:1-12.

Not to be deterred, on July 22, 2021, Mr. Dondero, again through Sbaiti, filed another action in the Northern District of Texas through the Charitable Donor Advised Fund, L.P. (the "DAF Complaint"). *The Charitable DAF Fund, LP v. Highland Capital Management, L.P.*, Case No. 21-cv-01710-N (N.D. Tex. Jul. 22, 2021). The DAF Complaint alleges that the DAF is a limited partner in Multi-Strat and asserts claims against the Debtor for alleged mismanagement of Multi-Strat during the pendency of this bankruptcy case. The DAF Complaint is essentially verbatim the ND Complaint and asserts the same claims as Claim No. 177. The Debtor believes the DAF Complaint is frivolous for multiple reasons, including because the DAF is not a limited partner in Multi-Strat and has no standing to assert claims against the Debtor for its alleged mismanagement of Multi-Strat. The Debtor is assessing its options and reserves all rights with respect to the DAF Complaint.

of certain assets which were undertaken at the direction of the Debtor in its capacity, and in the fulfillment of its duties, as Multi-Strat's investment manager. Dugaboy does not allege that the Debtor breached Multi-Strat's governing documents or any duty to Dugaboy, and Dugaboy proffers no factual support for the speculative claim that it "may have." Those failures are sufficient in and of themselves to doom Claim No. 177.

3. On the merits, and as Dugaboy is undoubtedly aware, Multi-Strat's governing documents grant the Debtor, as investment manager, complete discretion and authority over Multi-Strat's investment program, including the determination of whether, when, how, and on what terms to sell Multi-Strat's assets. Dugaboy fails to identify any contractual provision or other legal basis that would enable Dugaboy to substitute its judgment for that of the Debtor's. Consequently, there is no basis (i) for Dugaboy to bring a claim against the Debtor for doing what it is required to do as the investment manager of Multi-Strat or (ii) to second guess the Debtor's decision to liquidate Multi-Strat's assets. Claim No. 177 is simply another attempt by Mr. Dondero to interfere with the Debtor's monetization of assets and to otherwise harm an estate in which Dugaboy has nothing but speculative or *de minimis* interests.

4. Importantly, even if Dugaboy could assert a viable claim for damages (and it cannot), the Debtor is fully exculpated under the governing documents as to all of its activities as investment manager except for willful misconduct, fraud, gross negligence, or violation of applicable laws. Dugaboy has not asserted any such claim, nor could it ever credibly or successfully do so. Claim No. 177 fails for this reason as well.

5. Dugaboy has not met its burden, and Claim No. 177 should be disallowed in all respects.

## JURISDICTION

6.      The Court has jurisdiction over this matter under the Bankruptcy Code and pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A), (B) and (L).  Venue is proper in this District under 28 U.S.C. §§ 1408 and 1409.

7.      The statutory predicates for the relief requested herein are 11 U.S.C. § 502(b)-(d) and Bankruptcy Rule 3007.

## FACTUAL BACKGROUND

### A.      General Background

8.      On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS).

9.      Venue of the case was transferred to the United States Bankruptcy Court for the Northern District of Texas (the "Court") by order entered on December 4, 2019 [Docket No. 186].[3]

10.      On July 30, 2020, the Debtor filed the Debtor's *First Omnibus Objection to Certain Claims (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 906] (the "First Omnibus Claim Objection") in which it, *inter alia*, objected to claim number 131 ("Claim No. 131" and collectively with Claim No. 177, the "Dugaboy Claims") and Claim No. 177, both filed by Dugaboy.

11.      On October 8, 2020, Dugaboy filed the *Response of the Dugaboy Investment Trust to the Debtor's First Omnibus Objection to Certain Proofs of Claim* [Docket No. 1153] (the

---

[3] All docket numbers refer to the docket maintained by this Court.

"Dugaboy Response"),[4] and on October 9, 2020, Dugaboy filed *The Dugaboy Investment Trust's Motion for Leave to Amend Certain Proofs of Claim* [Docket No. 1154] (the "Motion to Amend"). The Debtor did not oppose the Motion to Amend, and on November 24, 2020, the Clerk of the Court issued a notification [Docket No. 1471] (the "Notification") requesting that Dugaboy's counsel electronically file an order relating to the Motion to Amend on or before December 8, 2020.[5]

12.     Dugaboy failed to comply with the Notification by timely filing an order on the Motion and has never amended either of the Dugaboy Claims.

13.     On February 22, 2021, this Court entered the *Order (i) Confirming the Fifth Amended Plan of Reorganization (as Modified) and (ii) Granting Related Relief* [Docket No. 1943], which confirmed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*, as modified (the "Plan").[6]  The effective date of the Plan occurred on August 11, 2021, and HCMLP is the reorganized debtor pursuant to the Plan.  *See Notice of Occurrence of Effective Date of Confirmed Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 2700].

**B.     Factual Background on Multi-Strat**

14.     Multi-Strat is a pooled-investment fund that is structured as a "mini master."[7]  A "mini master" consists of an offshore feeder fund and an onshore master fund.  Generally, foreign

---

[4] To date, no hearing has been held and no ruling has been made by the Court on the First Omnibus Claim Objection with respect to the Dugaboy Claims.

[5] In the Notification, the Clerk of the Court informed Dugaboy that "[f]ailure to respond within two weeks of the date of this letter may result in the Court setting a status conference to determine why the document(s) has not been filed or the matter may be denied for want of prosecution."  Docket No. 1471.

[6] The confirmed Plan included certain amendments filed on February 1, 2021.  *See Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)*, Ex. B [Docket No. 1875].

[7] Additional background on Multi-Strat is included in the *Confidential Private Placement Memorandum of Highland Multi Strategy Credit Fund, L.P.*, dated November 2014 (the "Master PPM"), and the *Confidential Private Offering Memorandum of Highland Multi Strategy Credit Fund, Ltd.*, dated November 2014 (the "Feeder PPM" and together

investors and tax-exempt entities invest in the foreign feeder for tax reasons, and the foreign feeder fund in turn invests substantially all its assets in the onshore master fund as a limited partner together with the other direct limited partners in the master fund. The master fund is the dominant entity within the "mini master" structure (and the entity most commonly referenced in the structure) as it holds and invests all the assets, including those of the feeder fund. Here, Multi-Strat's "master fund" is Highland Multi Strategy Credit Fund, L.P., a Delaware limited partnership (the "Master Fund"),[8] and its offshore feeder fund is Highland Multi Strategy Credit Fund, Ltd., a Cayman Islands exempted company (the "Feeder Fund"). The Master Fund, the Feeder Fund, their direct and indirect subsidiaries, and their respective general partners are known collectively as "Multi-Strat."[9]

15.     All of Multi-Strat's investment activity is conducted through the Master Fund, and all of its investable assets are held by the Master Fund (either directly or indirectly).[10] Investors in the Master Fund and in the Feeder Fund generally have the same rights and liquidity. *See* Feeder PPM at 5 ("Aside from the differences described in this Memorandum, an investment in the [Feeder] Fund will have substantially similar terms and risks to an investment in the [Master Fund], as described in the [Master PPM].")

16.     Multi-Strat is managed by its investment manager – the Debtor/HCMLP – and its general partner – Highland Multi Strategy Credit Fund GP, L.P. (the "MSCF GP"). HCMLP indirectly owns 100% of the MSCF GP, and the current sole officer of MSCF GP is James P.

---

with the Master PPM, the "PPMs"). Copies of the Master PPM and Feeder PPM are attached as **Exhibits A** and **B**, respectively.

[8] Multi-Strat was originally called Highland Credit Opportunities CDO, L.P. but changed its name in 2014.

[9] Multi-Strat has a number of offshore and onshore wholly owned direct and indirect subsidiaries. An organizational chart showing Multi-Strat's corporate structure is attached as **Exhibit C**.

[10] Specifically, Multi-Strat holds its assets at a series of onshore and offshore subsidiaries that are wholly owned by the Master Fund.

Seery, Jr.[11]  The Debtor's rights, duties, and obligations as investment manager are set forth in the *Third Amended and Restated Investment Management Agreement, by and among Highland Multi Strategy Credit Fund, Ltd., Highland Multi Strategy Credit Fund, L.P., and Highland Capital Management, L.P.*, dated November 1, 2013 (the "IMA"), the *Fourth Amended and Restated Limited Partnership Agreement of Highland Multi Strategy Credit Fund, L.P.*, dated November 1, 2014 (the "LPA"), the PPMs, and the *Amended and Restated Memorandum and Articles of Association of Highland Multi Strategy Credit Fund, Ltd.*, as adopted on November 1, 2014 (the "Articles" and together with the IMA, the LPA, and the PPMs, the "Governing Documents").[12] MSCF GP's rights, duties, and obligations are set forth in the LPA, the Master PPM, and general Delaware partnership law.

17.    Multi-Strat's investors include both the limited partners in the Master Fund and the shareholders of the Feeder Fund (which itself is a limited partner of the Master Fund). Nevertheless, for convenience of reference, the ultimate investors, whether direct or through the Feeder Fund, are commonly referred to as Multi-Strat's limited partners.  Multi-Strat's current limited partners are:

| Limited Partner | Ownership %[13] |
|---|---|
| Debtor | 58.70% |
| CLO Holdco, Ltd. ("CLOH") | 4.06% |
| Dugaboy | 1.71% |
| Highland Capital Management Services, Inc. ("HCMS") | 35.10% |
| Mark Okada | 0.43% |

---

[11] Mr. Seery is HCMLP's chief executive officer and, prior to the effective date of the Plan, was the Debtor's Court-approved chief executive officer and chief restructuring officer.

[12] Copies of the IMA, LPA, and Articles are attached as **Exhibits D, E,** and **F**, respectively.

[13] Ownership is provided on a consolidated basis without regard to whether a party is invested in the Master Fund or the Feeder Fund.  HCMLP reserves the right to challenge the limited partnership interests purportedly held by each of the Dondero Entities and Mr. Okada.

As this Court knows, CLOH, Dugaboy, and HCMS (together, the "Dondero Entities") are all

directly or indirectly owned and/or controlled by Mr. Dondero. Thus, besides HCMLP, Multi-

Strat's limited partners include only the Dondero Entities and Mr. Okada, Mr. Dondero's long-

time business partner. There are no third-party limited partners.

## C.     Background to Claim No. 177

18.     Claim No. 177 asserts that Dugaboy "may have claims against the Debtor" and

seeks an unspecified amount based on unspecified actions or inactions of the Debtor, acting as

investment manager of Multi-Strat. Exhibit A to Claim No. 177 provides:

> The Dugaboy Investment Trust ("Claimant"), an investor in certain funds managed
> by the Debtor, including Highland Multi-Strategy Credit Fund, L.P. and Highland
> Multi-Strategy Credit Fund, Ltd., ***may have claims against the Debtor*** relating to
> the post-petition actions or inactions of the fund investment manager in managing
> these funds pursuant to Debtor's Fourth Amended and Restated Limited
> Partnership Agreement and that certain Third Amended and Restated Investment
> Management Agreement by and between Highland Multi-Strategy Credit Fund,
> L.P., Highland Multi-Strategy Credit Fund, Ltd., and the Debtor, as amended from
> time to time. While the potential claims relate to the post-petition actions or
> inactions of the fund investment manager, Claimant is filing this claim to preserve
> all potential rights, claims, and causes of action it may have against the Debtor
> under these prepetition agreements relating to the investment manager's actions or
> inactions in managing these funds.

Claim 177, Exhibit A (emphasis added).

19.     In the Dugaboy Response filed last October, Dugaboy puts a bit – but not much –

more meat on the bones of its purported claim while still asserting only that "it may have claims

against the Debtor." It states:

> Specifically, Dugaboy ***may have claims*** against the Debtor relating to the Debtor's
> sale of certain assets, namely life settlement policies and Omnimaxx [sic], held by
> Highland Multi-Strategy Credit Fund, L.P. and Highland Multi-Strategy Credit
> Fund, Ltd. Dugaboy believes that the sale of these assets was improper, did not
> maximize value, was detrimental to the investors in these funds, and not in the best
> interest of the Debtor or its estate. As a result of these actions by the Debtor,
> Dugaboy and the other fund investors have been significantly damaged. Dugaboy's
> damages as a result of this transaction are not less than $700,000.

Dugaboy Response ¶ 18 (emphasis added).[14]

20.     Thus, Dugaboy "may have claims" for at least $700,000 against the Debtor, as investment manager of Multi-Strat, apparently arising out of the sale of certain assets that Multi-Strat held.   The only proffered basis for Claim No. 177 is Dugaboy's subjective and unsubstantiated belief that "the sale of these assets was improper, did not maximize value, was detrimental to the investors in these funds, and not in the best interest of the Debtor or its estate." As demonstrated below, the Governing Documents make clear that Dugaboy has not asserted (and cannot assert) a valid or allowable claim.[15]

## OBJECTION

### A.     Legal Standard

21.     The Bankruptcy Code establishes a burden-shifting framework for proving the amount and validity of a claim.   "A claim . . . proof of which is filed under section 501 [of the Bankruptcy Code], is deemed allowed, unless a party in interest . . . objects."   11 U.S.C. § 502(a).   "A proof of claim executed and filed in accordance with the [Bankruptcy Rules] shall constitute *prima facie* evidence of the validity and amount of the claim."   FED. R. BANKR. P. 3001(f); *see also In re Armstrong*, 347 B.R. 581, 583 (Bankr. N.D. Tex. 2006).   However, the ultimate burden of proof for a claim always lies with the claimant.   *Armstrong*, 347 B.R. at 583 (citing *Raleigh v. Ill. Dep't of Rev.*, 530 U.S. 15 (2000)).

---

[14] The Motion to Amend contains the same paragraph.  Motion to Amend ¶ 19.

[15] As stated above, Sbaiti recently filed the DAF Complaint.  The DAF Complaint is largely duplicative of Claim No. 177 but fails for an additional, independent reason:  the DAF is not a limited partner in Multi-Strat and has no standing to assert claims against Multi-Strat.

**B.**   **Claim No. 177 Should Be Disallowed Because Dugaboy Has Failed to Allege Any Factual or Legal Basis in Support**

22.     Dugaboy's sole allegation in Claim No. 177 is that it "may have" claims against the Debtor based on the sale of certain of Multi-Strat's assets.  Dugaboy identifies no contractual or factual basis to support this assertion.  Nor does it provide a calculation of its asserted damage claim.  Instead, Dugaboy simply alleges that it believes the Debtor's sale of Multi-Strat assets was "improper, did not maximize value, was detrimental to the investors in these funds, and not in the best interest of the Debtor or its estate" and that Dugaboy was damaged in an amount not less than $700,000.  Dugaboy Response ¶ 18.

23.     Dugaboy's assertions are insufficient as a matter of law.  The Debtor should not be required to guess as to the precise factual allegations and legal contentions that Dugaboy contends render the Debtor liable.  As the Claimants have not met their burden, the Claim No. 177 should be disallowed.

**C.**   **Claim No. 177 Should Be Disallowed Because the Governing Documents Give the Debtor, as Investment Manager, Exclusive Authority to Determine Whether, When, How, and on What Terms to Sell Multi-Strat's Assets**

24.     Dugaboy appears to assert that it is entitled to a claim because the Debtor, as Multi-Strat's investment manager, caused Multi-Strat to sell certain of its assets that Dugaboy either believes should have been sold on different terms or not at all.  *See* Dugaboy Response ¶ 18. However, under the Governing Documents, the Debtor had sole discretion and exclusive authority to make investment determinations for Multi-Strat, including determining which assets to sell, when, and on what terms.  Dugaboy expressly agreed to this grant of authority, and, accordingly, Claim No. 177 is baseless.

25.     Pursuant to a subscription agreement (the "Subscription"), Dugaboy subscribed for shares in the Feeder Fund by investing $180,000.[16]   Because Dugaboy is a "revocable grantor trust," the Subscription required that it be signed by Dugaboy's beneficiary as if the beneficiary was the one subscribing to Multi-Strat in his individual capacity.   James Dondero is Dugaboy's beneficiary and signed the Subscription on behalf of Dugaboy.   By signing the Subscription, Mr. Dondero represented that he had received a copy of the Governing Documents on behalf of Dugaboy.

26.     As Dugaboy knows, Multi-Strat's Governing Documents provide that Multi-Strat's activities will be conducted through the Master Fund and vest investment authority in the Debtor (as investment manager) and MSCF GP (as general partner).   For example, in the section titled "Risk Factors and Potential Conflicts of Interest," the Master PPM states that "[s]ubstantially all decisions with respect to the management of the Fund are made by the General Partner and the Investment Manager.  *Limited Partners have no right or power to take part in the management of the Fund*."   Master PPM at 25 (emphasis added); *see also* Feeder PPM at 5 ("The [Feeder] Fund is a limited partner in the [Master Fund] and invests all of its investible assets in, and conducts all of its operations through, the [Master Fund]"); *id.* at 6 ("[T]he [Feeder] Fund's management, as well as investment decisions at the [Master Fund] level, are effectively controlled by the Investment Manager or its affiliates.")

27.     Similarly, among other things, section 2(c)(i) of the IMA grants the Debtor, as investment manager, full discretion and authority to:

> continuously supervise the investment program of the [Master] Fund and the composition of its investment portfolio including, without limitation, *determining from time to time what investments will be purchased, retained or sold* . . .; to cause the [Master] Fund to purchase or sell any asset, enter into any other

---

[16] A copy of the Subscription is attached as **Exhibit G**.

investment-related transaction. . .; and to undertake to do anything incidental to the foregoing to facilitate the performance of its obligations [t]hereunder.

IMA Section 2(c)(1) (emphasis added).

28.      Furthermore, under section 4.1 of the LPA, the MSCF GP (i) "has complete and exclusive power and responsibility . . . . for all investment and investment management decisions to be undertaken on behalf of the Partnership"; (ii) has full power and authority "to engage in all activities and transactions, as it may deem necessary or advisable for, or as may be incidental to, the conduct of the business contemplated by this Section 4.1"; and (iii) may delegate "to any other Person, including the Investment Manager," any power and authority vested in the MSCF GP pursuant to the LPA.  LPA § 4.1.

29.      Finally, the LPA also provides that Multi-Strat's limited partners, such as Dugaboy (and the Feeder Fund), have **no** right to manage, control, or operate Multi-Strat or to act on its behalf until expressly stated otherwise.  *See* LPA § 4.3 ("The Limited Partners may not take any part in the management, control or operation of the Partnership's business, and have no right or authority to act for the Partnership or to vote on matters other than the matters set forth in this Agreement or as required by applicable law.")

30.      In sum, the Governing Documents unambiguously give the Debtor the exclusive right (as investment manager) to sell any of Multi-Strat's assets; and under those Documents, Dugaboy has no right to challenge such decisions or to substitute its judgment for the Debtor's. Claim No. 177 fails for this reason alone.

**D.      Claim No. 177 Is Barred by the Exculpatory Provisions Contained in the Governing Documents**

31.      In Claim No. 177, Dugaboy alleges – with no factual or contractual support – that it "may have claims" against the Debtor because the Debtor caused Multi-Strat to sell certain assets in a manner that Dugaboy believes was "improper" and which "did not maximize value, was

detrimental to the investors in these funds, and not in the best interest of the Debtor or its estate."

Under the express terms of the Governing Documents, however, Dugaboy agreed that the Debtor

would never be liable to Dugaboy or anyone else for the types of claims alleged by Dugaboy in

Claim No. 177 by providing for broad exculpation of the Debtor, as Investment Manager, and the

MSCF GP, among others (the provisions referred to below are collectively referred to as the

"Exculpation Protections").

32.    Specifically, the IMA provides:

> The Clients [i.e., the Master Fund and the Feeder Fund] agree that the Investment
> Manager is not liable to the Clients or any of their partners or shareholders for any
> losses, damages, expenses or claims occasioned by any act or omission of the
> Investment Manager in connection with the performance of its services hereunder,
> other than as a result of the Investment Manager's willful misconduct, fraud or
> gross negligence, or as otherwise prescribed by applicable law."

IMA § 7.

33.    Similarly, section 4.5(a) of the LPA provides the same protection to the Debtor as

Investment Manager:

> The General Partner, the Investment Manager, any of their Affiliates, each. . .
> director, officer. . . and employee of any of the foregoing. . . shall not be liable to
> the Partnership or to any of the Limited Partners for any loss or damage occasioned
> by any acts or omissions in the performance of services under this Agreement or
> the Investment Management Agreement, or otherwise in connection with the
> Partnership, its Investments or operations, unless such loss or damage has occurred
> by reason of the willful misconduct, fraud or gross negligence of such Indemnified
> Person or as otherwise required by law.

LPA § 4.5(a).

34.    Finally, the Master PPM and Feeder PPM state:

> The Partnership Agreement provides that the General Partner, the Investment
> Manager and each of their affiliates are not liable to the Fund or the Limited
> Partners for any loss or damage arising by reason of being or having been the
> General Partner or the Investment Manager, or from any acts or omissions in the
> performance of its services as the General Partner or the Investment Manager, as
> applicable in the absence of willful misconduct, fraud, or gross negligence or as
> otherwise required by law . . . .

Master PPM at 20; Feeder PPM at 18.

35.     Because Claim No. 177 does not (and cannot) allege that the Debtor, as investment manager, acted with willful misconduct, fraud, or gross negligence or in violation of any applicable law, the Exculpation Protections otherwise bar Dugaboy's speculative claims.  Accordingly, Claim No. 177 should be disallowed and expunged in all respects.

**E.     The Debtor Has Caused Multi-Strat to Conduct All Asset Sales in a Manner Consistent with the Governing Documents and in the Best Interests of Investors**

36.     Dugaboy's Claim No. 177 is barred by the express terms of the Governing Documents and should be dismissed on the foregoing grounds.  However, and for the avoidance of doubt, any asset sales conducted by Multi-Strat were conducted in a manner that maximized the value of such assets and were in the best interests of Multi-Strat.  If required by this Court, the Debtor will provide evidence of the foregoing.

**F.     Reservation of Rights**

37.     The Debtor reserves its right to supplement or modify this Objection and to assert such further objections, defenses, or arguments as are or may later become available or apparent.

*[Remainder of Page Intentionally Blank]*

WHEREFORE, Debtor respectfully requests that Claim No. 177 be disallowed in its entirety, and such other and further relief as this Court may deem just and proper.

Dated: September 9, 2021.      **PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717) (*pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*pro hac vice*)
John A. Morris (NY Bar No. 266326) (*pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:      jpomerantz@pszjlaw.com
             ikharasch@pszjlaw.com
             jmorris@pszjlaw.com
             gdemo@pszjlaw.com
             hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Attorneys for the Reorganized Debtor*

# EXHIBIT A

Memorandum Number _____

# Confidential Private Placement Memorandum

*Series B, Series C and Series D Limited Partner Interests in*

# Highland Multi Strategy Credit Fund, L.P.

*General Partner*

Highland Multi Strategy Credit Fund GP, L.P.

*Investment Manager*

Highland Capital Management, L.P.

**November 2014**

# <u>TABLE OF CONTENTS</u>

Page

NOTICE ........................................................................................................................ ii

DIRECTORY ................................................................................................................ iv

EXECUTIVE SUMMARY OF PRINCIPAL TERMS ................................................. 1

INVESTMENT PROGRAM ......................................................................................... 2

MANAGEMENT ........................................................................................................... 4

SUMMARY OF TERMS ............................................................................................... 8

RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST .......................... 25

BROKERAGE AND CUSTODY .................................................................................. 54

TAX CONSIDERATIONS ............................................................................................ 56

ERISA AND OTHER REGULATORY CONSIDERATIONS ..................................... 67

PARTNERSHIP AGREEMENT - APPENDIX A

# NOTICE

This Confidential Private Placement Memorandum (this "***Memorandum***") is being furnished on a confidential basis solely to selected qualified investors (or their respective authorized representatives) considering the purchase of limited partner interests (the "***Interests***") in Highland Multi Strategy Credit Fund, L.P. (the "***Fund***"). This Memorandum is not to be reproduced or distributed to others, at any time, without the prior written consent of Highland Multi Strategy Credit Fund GP, L.P. (the "***General Partner***") (other than to professional advisors and employees of the prospective investor receiving this Memorandum from the General Partner or its authorized representative or such prospective investor).

Each recipient agrees to keep confidential all information contained herein not already in the public domain and will use this Memorandum for the sole purpose of evaluating a possible investment in the Fund. Notwithstanding anything herein to the contrary, each investor (and each employee, representative, or other agent of the investor) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of an investment in the Fund and all materials of any kind (including opinions or other tax analyses) that are provided to the investor relating to such tax treatment and tax structure. Acceptance of this Memorandum by prospective investors constitutes an agreement to be bound by the foregoing terms.

No person has been authorized to give any information or to make any representation concerning the Fund or the offering of the Interests other than the information contained in this Memorandum and, if given or made, such information or representation must not be relied upon as having been authorized by the Fund or the General Partner. Prospective investors should not construe the contents of this Memorandum as legal, tax or financial advice. Each prospective investor should consult its own professional advisors as to the legal, financial, tax, ERISA (as defined herein) or other related matters relevant to the suitability of an investment in the Fund for such investor. In making an investment decision, investors must rely on their own examination of the Fund and the terms of the offering contemplated by this Memorandum. The Interests have not been recommended by any U.S. federal or state, or any non-U.S., securities commission or regulatory authority. Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this Memorandum. Any representation to the contrary is a criminal offense.

This Memorandum does not constitute an offer to sell, or the solicitation of an offer to buy, any Interests in any state or other jurisdiction where, or to or from any person to or from whom, such offer or solicitation is unlawful or not authorized. The Interests have not been and will not be registered under the U.S. Securities Act of 1933, as amended (the "***Securities Act***"), or the securities laws of any of the states of the United States. The offering and any potential sale contemplated by this Memorandum will be made in reliance upon an exemption from the registration requirements of the Securities Act for offers and sales of securities which do not involve any public offering and analogous exemptions under state securities laws. There will be no public market for the Interests, and there is no obligation on the part of any person to register the Interests under the Securities Act or any state securities laws. The Fund has not been and will not be registered under the U.S. Investment Company Act of 1940, as amended. Interests are suitable only for sophisticated investors who do not require immediate liquidity for their investments, for whom an investment in the Fund does not constitute a complete investment program and who fully understand and are willing to assume the risks involved in the Fund's investment program. The Fund's investment practices, by their nature, may be considered to involve a

substantial degree of risk. See "*Risk Factors and Potential Conflicts of Interest*" beginning at page 25. No assurance can be given that the Fund's investment objectives will be achieved or that investors will receive a return of their capital.

The Interests are subject to restrictions on transferability and resale and may not be transferred or resold except as permitted under the Securities Act and any applicable state or other securities laws, pursuant to registration or an exemption therefrom. The transferability of the Interests will be further restricted by the terms of the limited partnership agreement of the Fund. Investors should be aware that they will be required to bear the financial risks of an investment in the Interests for an extended period of time.

This Memorandum does not purport to be, and should not be construed as, a complete description of the limited partnership agreement of the Fund or the investment management agreement by and among the Fund's investment manager, the General Partner and the Fund. Each prospective investor in the Fund is encouraged to review the Fund's limited partnership agreement carefully, in addition to consulting appropriate legal and tax advisors. To the extent of any inconsistency between this Memorandum and the Fund's limited partnership agreement, the terms of the Fund's limited partnership agreement control.

Certain information contained in this Memorandum constitutes "forward-looking statements," which can be identified by the use of forward-looking terminology such as "may," "will," "should," "expect," "anticipate," "project," "estimate," "intend," or "believe" or the negatives thereof or other variations thereon or comparable terminology. Due to various risks and uncertainties, including those described in "Risk Factors and Potential Conflicts of Interest," actual events or results or the actual performance of the Fund may differ materially from those reflected or contemplated in such forward-looking statements.

Pursuant to an exemption from the Commodity Futures Trading Commission, neither the General Partner nor the Investment Manager is registered with as a commodity pool operator and therefore, unlike a registered commodity pool operator, is not required to deliver a disclosure document or a certified annual report to participants in this pool. Among other things, the exemption requires the filing of a claim of exemption with the National Futures Association. It is also required that at all times either: (a) the aggregate initial margin and premiums required to establish commodity interest positions does not exceed 5% of the liquidation value of the Fund's portfolio; or (b) the aggregate net notional value of the Fund's commodity interest positions does not exceed 100% of the liquidation value of the Fund's portfolio and further that all pool participants are required to be accredited investors or certain other qualified investors.

All references herein to "$" refer to U.S. dollars.

This Memorandum is accurate as of its date, and no representation or warranty is made as to its continued accuracy after such date.

# DIRECTORY

| | |
|---|---|
| **General Partner** | **Highland Multi Strategy Credit Fund GP, L.P.**<br>300 Crescent Court<br>Suite 700<br>Dallas, Texas 75201 |
| **Investment Manager** | **Highland Capital Management, L.P.**<br>300 Crescent Court<br>Suite 700<br>Dallas, Texas 75201 |
| **Prime Broker** | **BNY Mellon Trust Company N.A.**<br>601 Travis Street, 16th FL (775-1700)<br>Houston, Texas 77002 |
| **Administrator** | **SEI Global Services, Inc.**<br>One Freedom Valley Drive<br>Oaks, Pennsylvania 19456 |
| **Auditors** | **PricewaterhouseCoopers LLP**<br>2001 Ross Avenue, Suite 1800<br>Dallas, Texas 75201 |
| **Legal Counsel** | **Akin Gump Strauss Hauer & Feld LLP**<br>1700 Pacific Avenue, Suite 4100<br>Dallas, Texas 75201 |

\* \* \* \* \*

*This Memorandum does not purport to be and should not be construed as a complete description of the Fund's limited partnership agreement, a copy of which is attached hereto as Appendix A. Any potential investor in the Fund is encouraged to review the Fund's limited partnership agreement carefully, in addition to consulting appropriate legal and tax counselors.*

iv

## EXECUTIVE SUMMARY OF PRINCIPAL TERMS

| | |
|---|---|
| **The Fund** | Highland Multi Strategy Credit Fund, L.P., a Delaware limited partnership (the "*Fund*"). |
| **General Partner** | Highland Multi Strategy Credit Fund GP, L.P., a Delaware limited partnership (the "*General Partner*"). |
| **Investment Manager** | Highland Capital Management, L.P., a Delaware limited partnership (the "*Investment Manager*"). |
| **Investor Eligibility** | Investors must be both "accredited investors" and "qualified purchasers." |
| **Offshore Feeder Fund** | In order to facilitate investments by non-U.S. and other tax-exempt investors, the Investment Manager has sponsored the formation of Highland Multi Strategy Credit Fund, Ltd., a Cayman Islands exempted company (the "*Offshore Fund*"). The Offshore Fund places all of its assets in and conducts all of its investment and trading activities through the Fund as a limited partner of the Fund. |
| **Investment Objective** | The Fund seeks attractive risk-adjusted returns, consistent with the preservation of capital and prudent investment management. |
| **Series of Interests** | The Fund has four series of Interests and is offering Series B Interests, Series C Interests and Series D Interests pursuant to this Memorandum. |
| **Minimum Investment** | The initial minimum investment is $1,000,000.00, although the General Partner has the right to accept lesser amounts. |
| **Management Fee** | Annual rate of 1.5% for Series B Interests, 1.0% for Series C Interests, and 2.0% for Series D Interests, calculated and payable quarterly in advance. |
| **Performance Allocation** | Highland Capital Management, L.P., as a special limited partner of the Fund, is entitled to receive an annual performance-based profit allocation at the end of each year equal to 20% of the Fund's net profits, subject to a "high water mark." |
| **Withdrawals** | Withdrawal rights vary by Series and are subject to timing restrictions, reserves for contingencies, partial hold-back pending completion of an annual audit and suspension restrictions as further described in "*Summary of Terms*." |
| **Variation of Terms** | The General Partner and/or the Investment Manager (as applicable) may agree with certain limited partners to a variation of the terms set forth in this Memorandum or establish additional classes or series of limited partner interests that have terms that differ from those described herein, including different management fees, performance allocations and withdrawal rights. |

# INVESTMENT PROGRAM

## Investment Objective

The Fund's investment objective is to seek attractive risk-adjusted returns, consistent with the preservation of capital and prudent investment management. No assurance can be given, however that the Fund will achieve this objective.

## Investment Strategy

*Investment Asset Classes*

The following is a description of the principal types of securities in which the Fund may invest and certain trading techniques the Fund may employ. The following description is merely a summary and the Investment Manager has discretion to cause the Fund to invest in other types of securities and to follow other investment criteria and guidelines. However, consistent with the investment strategy of the Fund, all new investments made by the Fund must, at the time of purchase, (i) trade over-the-counter or on an exchange, (ii) have a third-party quote or valuation available, and (iii) be considered a marketable investment in the reasonable opinion of the Investment Manager. An investment is a marketable investment if in the reasonable opinion of the Investment Manager it can be sold at the mark within 30 calendar days. Notwithstanding the foregoing, the Fund may invest up to 20% of its net asset value in non-marketable investments if and when the Fund's net asset value reaches $1 billion.

*Debt and Debt-Like Securities.* The Investment Manager intends for debt securities to be the Fund's primary focus, with a target allocation of 40-60% of net asset value of the Fund, although this may vary depending on market conditions. The Fund may invest (both long and short) in debt securities of any kind, including debt securities of varying maturities, debt securities paying a fixed or fluctuating rate of interest, inflation-indexed bonds, structured notes, loan assignments, loan participations, asset-backed securities, collateralized loan obligation ("***CLO***") securities (including, rated and unrated, debt, equity and preference share instruments relating to collateralized loan obligations ("***CLO Securities***")), debt securities convertible into equity securities, and securities issued or guaranteed by the U.S. Government or its agencies or instrumentalities, by foreign governments or international agencies or supranational entities or by domestic or private issuers.

The Fund may invest in debt securities of any credit quality, including below investment grade securities (also known as "high yield securities" or "junk securities"). Such securities are rated below investment grade by a nationally recognized statistical rating organization ("***NRSRO***") or are unrated but deemed by the Investment Manager to be of comparable quality. The Fund may invest without limitation in below investment grade or unrated securities, including in insolvent borrowers or borrowers in default.

*Equity and Equity-Like Securities.* The Fund may invest (both long and short) in common stock, preferred stock, securities convertible into common stock, rights and warrants or securities or other instruments whose price is linked to the value of common stock. Although the equity securities in which the Fund invests may have any capitalization, may be dominated in any currency, and may be located in emerging markets without limit, the Fund will primarily invest in equity securities of large capitalization companies that are located in developed markets. Additionally, the Fund may invest in equity or subordinated tranches of asset-backed securities, including CLOs, and may also invest in life settlement

policies and other instruments that have equity-like characteristics that meet the investment objective of the Fund.

*Investment Themes*

The Investment Manager's investment philosophy is based on the belief that thorough, fundamental research and a disciplined research methodology increase the likelihood of producing attractive long-term results. The Investment Manager uses this research in an attempt to anticipate long-term secular trends and identify those investments that have the highest relative value characteristics across four primary investment themes.

1) Convergence – Investments in market sectors in which the Investment Manager believes are mispriced and will converge to historic norms over time.

2) Deep Value – Investments in companies that the Investment Manager believes the market has undervalued. Through thorough research the Investment Manager believes the current market value does not correspond with the company's long-term fundamentals.

3) Event Driven – The Investment Manager will generally focus on equity and debt investments with catalysts that could include, but are not limited to, asset sales, covenant violations, liability management, amend/extend, refinancing, tenders and mergers/acquisitions.

4) Activism – Material holdings or controlling interests in companies, including the potential to obtain representation on the company's board, with the goal of affecting a change in the company in order to drive future profitability and value realization.

The Investment Manager may also manage interest rate, default, currency and other risks through a variety of trading methods and market tools, including security shorting and derivative hedging instruments, as it deems appropriate.

Although the Investment Manager expects to maintain a diversified portfolio of investments, it does not intend to limit itself to any one particular investment theme or asset class. Rather, the Investment Manager intends to follow a flexible approach in order to place itself in the best position to capitalize on opportunities in the financial markets.

*The investment objectives and methods summarized above represent the General Partner's and Investment Manager's current intentions. Depending on conditions and trends in the securities markets and the economy in general, the General Partner and the Investment Manager may pursue any objectives, employ any investment techniques or purchase any type of security that they consider appropriate and in the best interests of the Fund whether or not described in this section. The foregoing discussion includes and is based upon numerous assumptions and opinions of the General Partner and Investment Manager concerning world financial markets and other matters, the accuracy of which cannot be assured.* **There can be no assurance that the Fund's investment strategy will achieve** *profitable results.*

# MANAGEMENT

## The General Partner and the Investment Manager

Highland Multi Strategy Credit Fund GP, L.P., a Delaware limited partnership (the "*General Partner*"), serves as the general partner of the Fund.   Highland Capital Management, L.P., a Delaware partnership (the "*Investment Manager*" or "*Highland*"), serves as the investment manager of the Fund and has responsibility for the Fund's investment program.   James D. Dondero ultimately controls the General Partner and the Investment Manager.

The General Partner has the full authority of a general partner under Delaware law.   The powers of the General Partner described in this Memorandum and the Partnership Agreement are not exhaustive and are not limited to the specific authorities described therein.   Thus, subject to applicable law, the General Partner may make certain decisions or take certain actions even where those decisions or actions are not expressly granted in the Partnership Agreement or described in this Memorandum.

## The Investment Management Agreement

The Investment Manager serves pursuant to an investment management agreement with the Fund, the Offshore Fund and the General Partner (the "*Investment Management Agreement*").   Under the Investment Management Agreement, the Investment Manager has full discretion to invest the assets of the Fund in pursuit of the investment objective and strategy described in this Memorandum.

The Investment Management Agreement provides that, in the absence of willful misconduct, fraud or gross negligence, each of the Investment Manager, its principals, shareholders, managers, employees and affiliates will be indemnified by the Fund and/or the Offshore Fund, to the extent permitted by law, against any loss or liability incurred by any of such persons in performing their duties under the Investment Management Agreement.   For its services the Investment Manager is entitled to the Management Fee and reimbursement of any expenses incurred on behalf of the Fund or the Offshore Fund.

## Investment Personnel

The key investment professionals of the Investment Manager who will be responsible for the Fund's investments are described below.

## James Dondero, CFA, Co-Founder, President

James Dondero is Co-founder and President of Highland Capital Management, L.P. (an alternative asset manager specializing in high-yield fixed income investments).   Jim has over 30 years of experience in the credit markets.   Prior to founding Highland in 1993, Jim served as Chief Investment Officer of Protective Life's GIC subsidiary and helped grow the business from concept to over $2 billion between 1989 and 1993.   His portfolio management experience includes mortgage-backed securities, investment grade corporates, leveraged bank loans, high-yield bonds, emerging market debt, derivatives, preferred stocks and common stocks.   From 1985 to 1989, he managed approximately $1 billion in fixed income funds for American Express.   Prior to American Express, he completed the financial training program at JP Morgan.   Jim received a BS in Commerce (Accounting and Finance) from the University of Virginia.   Jim is a Certified Public Accountant, a Certified Managerial Accountant, and a Chartered Financial Analyst.   He currently serves as Chairman for CCS Medical and NexBank and serves on the

4

Board of Directors of American Banknote Corporation, Cornerstone Healthcare Group and Metro-Goldwyn-Mayer.

**Mark Okada, CFA, Co-Founder, Chief Investment Officer**

Mr. Okada is Chief Investment Officer of Highland Capital Management, L.P. and is responsible for overseeing Highland's investment activities for its various strategies. Mr. Okada is a pioneer in the development of the bank loan market and has over 30 years of credit experience. He is responsible for structuring one of the industry's first arbitrage CLOs and was actively involved in the development of Highland's bank loan separate account and mutual fund platforms. Mr. Okada received a BA in Economics and a BA in Psychology, cum laude, from the University of California, Los Angeles. He has earned the right to use the Chartered Financial Analyst designation. Mr. Okada is a Director of NexBank, Chairman of the Board of Directors of Common Grace Ministries, Inc., is on the Board of Directors for Education is Freedom, and also serves on the GrowSouth Fund Advisory board.

**Josh Terry, CFA, Head of Structured Products and Trading**

Mr. Terry is Head of Structured Products and Trading at Highland Capital Management, L.P. He leads the trading desk, structured products and CLO fund management teams. Since joining Highland in July 2005, Mr. Terry has served in various roles, including Senior Portfolio Analyst on the Distressed & Special Situations investment team, trading loans, bonds and equities on Highland's trading desk, and leading the sector rotation and fund management process for Highland's par credit funds. Prior to joining Highland in July 2005, Mr. Terry worked as an Investment Banking Analyst at Stephens Inc., where he focused on M&A transactions and equity financings for public and private middle-market companies. Mr. Terry serves as Chairman of the Finance Committee on the Board of Governors of Uplift Education, a network of charter schools in the Dallas-Fort Worth area. He received a BBA in Finance and Economics, summa cum laude, from Baylor University. Mr. Terry has earned the right to use the Chartered Financial Analyst designation.

**Trey Parker, Managing Director**

Mr. Parker is Managing Director and Head of Credit Research at Highland Capital Management, L.P. Mr. Parker is responsible for managing the Credit Research Team/Platform. Prior to his current role, Mr. Parker was a Portfolio Manager covering a number of the industrial verticals, as well as parts of Tech, Media and Telecom; he also worked as a Senior Portfolio Analyst on the Distressed & Special Situations investment team. Prior to joining Highland in March 2007, Mr. Parker was a Senior Associate at Hunt Special Situations Group, L.P., a Private Equity group focused on distressed and special situation investing. Mr. Parker was responsible for sourcing, executing and monitoring control Private Equity investments across a variety of industries. Prior to joining Hunt in 2004, Mr. Parker was an analyst at BMO Merchant Banking, a Private Equity group affiliated with the Bank of Montreal. While at BMO, Mr. Parker completed a number of LBO and mezzanine investment transactions. Prior to joining BMO, Mr. Parker worked in sales and trading for First Union Securities and Morgan Stanley. Mr. Parker received an MBA with concentrations in Finance, Strategy and Entrepreneurship from the University of Chicago Booth School of Business and a BA in Economics and Business from the Virginia Military Institute. Mr. Parker serves on the Board of Directors of Euramax Holdings, Inc., TerreStar Corporation, JHT Holdings, Inc., and a non-profit organization, the Juvenile Diabetes Research Foundation (Dallas chapter).

**Advisory Committee**

The General Partner and/or the Investment Manager may appoint, or cause to be appointed, a committee (the "***Advisory Committee***") consisting of one or more individuals selected by the General Partner and/or the Investment Manager, none of whom is affiliated with the General Partner and/or the Investment Manager (except as a Limited Partner or as an investor in the Fund or an affiliate thereof). If established, the Advisory Committee will have the authority, at the request of the General Partner and/or the Investment Manager, to consult with the General Partner and/or the Investment Manager on any matters that may involve a conflict of interest between the General Partner and/or the Investment Manager (or their affiliates) on the one hand and the Limited Partners (or shareholders of the Offshore Fund) and the Fund on the other. Any consent given by a majority of the Advisory Committee on behalf of the Fund in good faith after consultation with the General Partner and/or the Investment Manager is binding on the Fund and the Limited Partners or shareholders of the Offshore Fund (so long as such majority consists of persons independent of the General Partner and/or the Investment Manager and their affiliates). The Fund will have the authority to agree to reimburse members of the Advisory Committee for their out-of-pocket expenses and to indemnify them to the maximum extent permitted by law.

**Administrator**

SEI Investments is a leading global provider of investment processing, investment management and investment operations solutions for institutional and personal wealth management. For more than 40 years, SEI has helped corporations, financial institutions, financial advisors and ultra-high-net-worth families create and manage wealth by providing comprehensive, innovative, investment and investment-business solutions. SEI manages or administers $601.9 billion in funds and separately managed assets. SEI is a public company and is listed on the NASDAQ exchange under the symbol SEIC. SEI has been retained to perform certain administrative, accounting and investor services for the Fund and the Offshore Fund (in such capacity, the "***Administrator***"). In its capacity as Administrator, it will receive customary fees that will be paid out of the assets of the Fund. The Administrator will also be reimbursed for all reasonable out-of-pocket expenses.

The Fund will enter into an administration agreement (the "***Administration Agreement***") with the Administrator. The Administrator will be under no duty to take any action on behalf of the Fund except as specifically set forth in the Administration Agreement or as may be specifically agreed to by the Administrator and the Fund in a written amendment thereto.

The Administrator will act as liaison with the Fund's accountants and auditors and will provide account analyses, fiscal year summaries, and other audit-related schedules with respect to the Fund. The Administrator will take all reasonable action in the performance of its duties under the Administration Agreement to assure that the necessary information is made available to such accountants and auditors for the expression of their opinion, as required by the Fund.

The Administrator will enter into and will maintain in effect with appropriate parties one or more agreements making reasonable provisions for emergency use of electronic data processing equipment to the extent appropriate equipment is available. In the event of equipment failures, the Administrator will, at no additional expense to the Fund, take reasonable steps to minimize service interruptions. The Administrator will have no liability with respect to the loss of data or service interruptions caused by equipment failure, provided such loss or interruption is not caused by the Administrator's own willful misfeasance, bad faith, gross negligence or reckless disregard of its duties or obligations under the Administration Agreement.

Subject to the terms of the Administration Agreement, the Administrator will be liable to the Fund (or any person or entity claiming through the Fund) for damages only to the extent caused by the Administrator's own fraud or willful misconduct under the Administration Agreement ("**Standard of Care**"). The Administrator will not be liable for damages (including, without limitation, damages caused by delays, failure, errors, interruption or loss of data) occurring directly or indirectly by reason of circumstances beyond its reasonable control. The Administrator will not be under any duty or obligation to inquire into and will not be liable for the validity or invalidity, authority or lack thereof, or truthfulness or accuracy or lack thereof, of any instruction, direction, notice, instrument or other information which the Administrator reasonably believes to be genuine. The Administrator will not be liable for any damages that are caused by actions or omissions taken by the Administrator in accordance with written instructions by authorized persons of the Fund or advice of counsel. The Administrator will not be liable for any damages arising out of any action or omission to act by any prior service provider of the Fund or for any failure to discover any such error or omission. Neither the Administrator nor its affiliates will be liable for any consequential, incidental, exemplary, punitive, special or indirect damages, whether or not the likelihood of such damages was known by the Administrator or its affiliates. Both the Fund and the Administrator will have a duty to mitigate damages for which the other party may become responsible.

Absent the Administrator's failure to meet its Standard of Care, the Fund agrees to indemnify, defend and hold harmless the Administrator and its affiliates and their respective directors, trustees, officers, agents and employees from certain claims, suits, actions, damages, losses, liabilities, obligations, costs and reasonable expenses (including attorneys' fees and court costs, travel costs and other reasonable out-of-pocket costs related to dispute resolution) arising directly or indirectly from any actions taken or omitted to be taken by the Administrator in connection with the provision of services to the Fund.

The Offshore Fund will also enter into an administration agreement with the Administrator, under which the terms will be substantially as above.

## SUMMARY OF TERMS

*The following Summary of Terms summarizes the principal terms of an investment in the Fund, and is subject, and qualified in its entirety by reference, to the limited partnership agreement of the Fund, as amended (the "**Partnership Agreement**") and the subscription documents (the "**Subscription Documents**"). This summary is intended to be brief and does not purport to provide a comprehensive explanation of the Partnership Agreement and the Subscription Documents. Accordingly, statements made in this Memorandum are subject to the detailed provisions of those agreements. Prospective investors are urged to review those agreements in their entirety prior to determining whether to invest in the Fund.*

| | |
|---|---|
| **The Fund** | The Fund is a limited partnership formed on December 1, 2005 under the laws of the State of Delaware with the name "Highland Credit Opportunities CDO, L.P." The General Partner filed an amendment to the Certificate of Limited Partnership of the Fund on August 26, 2014, changing the name of the Fund to "Highland Multi Strategy Credit Fund, L.P." |
| **Recent Amendments; Series of Interests** | The General Partner and the existing Limited Partners of the Fund adopted the Fourth Amended and Restated Limited Partnership Agreement of the Fund, effective November 1, 2014 (the "**Effective Date**"), whereby all existing limited partner interests were re-designated as "Series A Interests" and three new series of limited partner interests were created – "Series B Interests," "Series C Interests" and "Series D Interests" (the "**Amendments**"). |
| | As of the Effective Date, all existing Limited Partners will hold Series A Interests, the terms of which are set forth in a supplement to this Memorandum. The Fund is currently offering for subscription Series B Interests, Series C Interests and Series D Interests pursuant to this Memorandum. |
| | The Fund may issue additional series of Interests over time (each, a "**Series**"). Not all Series of Interests will be available for subscription at the same time and the terms among the Series of Interests will vary. New Series of Interests may be established by the General Partner without notice to or approval of the Limited Partners. |
| | Except with respect to management fees, performance-based profit allocations and withdrawal rights (each as discussed below), the rights and privileges attributable to Series A Interests, Series B Interests, Series C Interests and Series D Interests are identical. |
| | References herein to "Interests" or "Limited Partners" shall include all Series of Interests and Limited Partners unless otherwise specified or context so requires. |

8

| | |
|---|---|
| **General Partner** | Highland Multi Strategy Credit Fund GP, L.P., a Delaware limited partnership. The general partner of the General Partner is Highland Multi Strategy Credit GP, LLC, a Delaware limited liability company of which the Investment Manager is currently the sole member. |
| **Investment Manager** | Highland Capital Management, L.P., a Delaware limited partnership. |
| **Eligible Investors** | Limited partner interests ("*Interests*") may be purchased by investors who are "accredited investors" and "qualified purchasers," as defined in the Fund's Subscription Documents. Subscribers will be required to complete the Fund's Subscription Documents consisting of the subscription agreement and the subscriber information form to determine their eligibility. The General Partner reserves the right to reject any investor for any reason or for no reason in its sole discretion. |
| | An investment in the Fund is suitable only for persons that have adequate means of providing for their current needs and personal contingencies and have no need for liquidity in their investments. An investment in the Fund should not be made by any person that (a) cannot afford a total loss of its principal, or (b) has not carefully read or does not understand this Memorandum, including the portions concerning the risks and the income tax consequences of an investment in the Fund. |
| **Subscriptions** | Subscriptions for Interests may be accepted as of the first Business Day of each calendar month and/or such other days as the General Partner may determine from time to time, generally subject to the receipt of cleared funds on or before the acceptance date. The initial minimum investment is $1,000,000, although the General Partner may accept investments in a lesser amount. Capital contributions may be made in cash or, with the consent of the General Partner, in securities or partly in cash and partly in securities. |
| | "*Business Day*" means any day other than Saturdays, Sundays or any other day banks located in in New York, New York are required or authorized to be closed. |
| | A subscriber admitted to the Fund (a "*Limited Partner*") receives, in exchange for its initial capital contribution and any subsequent capital contribution, an Interest representing a proportionate share of the net assets of the Fund at that time. |
| | There is no minimum aggregate amount of subscriptions that is required for the initial acceptance of subscriptions, nor has the General Partner established any maximum aggregate amount of subscriptions that may be accepted. |
| | All subscribers will be required to comply with such anti-money laundering procedures as are required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and |

|                        | Obstruct Terrorism (USA PATRIOT Act) Act of 2001 (Pub. L. No. 107-56) and other applicable anti-money laundering regulations as further described in the Subscription Documents. |
|---|---|

**Offshore Feeder Fund**

In order to facilitate investments by non-U.S. and other tax-exempt investors, the Investment Manager has sponsored the formation of Highland Multi Strategy Credit Fund, Ltd., a Cayman Islands exempted company (the "***Offshore Fund***"). The Offshore Fund places all of its assets in and conducts all of its investment and trading activities through the Fund as a limited partner of the Fund.

Investors in the Offshore Fund will be issued participating non-voting shares of the Offshore Fund; provided that in the event that the Fund seeks the approval, vote or consent of the Offshore Fund with respect to any matter to which it would be entitled to vote as a limited partner of the Fund under the Partnership Agreement, the Offshore Fund: (i) shall submit such matter for the consent of the holders of shares in the Offshore Fund and (ii) shall cause the Offshore Fund to vote its Interest proportionally for and against such matter in the same proportion that the shareholders in the Offshore Fund voted for and against such matter.

The Investment Manager may establish one or more additional feeder vehicles to invest in the Fund.

**Capital Accounts**

The Fund will maintain a book capital account (a "***Capital Account***") for the General Partner and each Limited Partner (each, a "***Partner***" and collectively, the "***Partners***") to reflect contributions, withdrawals, distributions and allocations of net profit and net loss. The initial balance of each Partner's Capital Account will be equal to the amount of cash or net value of any property contributed to the Fund by such Partner.

If a Partner invests in more than one Series of Interests, the Fund will maintain a separate Capital Account on behalf of such Partner with respect to each such Series and each Capital Account will be treated as if it were the Capital Account of a separate Partner for purposes of determining the Management Fee, the Performance Allocation and withdrawal rights applicable to each Series Capital Account.

If a Partner makes an additional capital contribution to an existing Capital Account, the Capital Account will be sub-divided into separate sub-accounts attributable to each separate capital contribution, with each capital sub-account treated as if it were the Capital Account of a separate Partner for purposes of determining the Management Fee, the Performance Allocation and withdrawal rights applicable to each capital sub-account. References herein to a Partner's "Capital Account" include any such separately maintained capital sub-accounts.

The Fund will issue to the Offshore Fund an Interest and maintain capital sub-accounts that correspond to each Sub-Series of Shares (as defined in the Partnership Agreement) and each capital sub-account is treated separately for determining Management Fees, the Performance Allocations and withdrawal rights.

**Alternative Investment Vehicles**

The General Partner will have the right, in connection with any investment, to direct the capital contributions of some or all of the subscribers to be made through one or more alternative investment vehicles (each an "***Alternative Investment Vehicle***"), and, in the case of an existing investment, transfer all or a portion of such investment to an Alternative Investment Vehicle, if, in the judgment of the General Partner, the use of such vehicle or vehicles would allow the Fund to overcome legal or regulatory constraints, invest in a more tax-efficient manner or would facilitate participation in certain types of investments. Any Alternative Investment Vehicle will be subject to terms and conditions substantially similar to those of the Fund (including Management Fees and the Performance Allocation defined below) and will be managed by the Investment Manager or an affiliate thereof.

**Affiliated Investors**

Interests in the Fund held by the Investment Manager or its affiliates (collectively, "***Affiliated Investors***") may not be assessed the management fees or the performance allocations that are applicable to other investors in the Fund, but share pro rata in other applicable expenses of the Fund (as more fully described in the Partnership Agreement).

**Borrowing and Leverage**

The Fund may buy securities on margin and arrange with banks, brokers and others to borrow money against a pledge of securities in order to employ leverage when the Investment Manager deems such action appropriate.

**Management Fee**

For its services to the Fund, the Investment Manager is entitled to a management fee (the "***Management Fee***"), calculated and payable quarterly in advance, equal to: (i) 1.5% (per annum) of each Capital Account attributable to a Series B Interest, (ii) 1.0% (per annum) of each Capital Account attributable to a Series C Interest and (iii) 2.0% (per annum) of each Capital Account attributable to a Series D Interest.

Management Fees will be appropriately adjusted for any partial quarter. The Investment Manager may reduce or eliminate the Management Fee with respect to any Limited Partner (or Capital Account) in its sole discretion.

**Other Fees and Expenses**

The Fund bears the reasonable, out-of-pocket expenses of the offering of the Interests contemplated hereunder and the recent Amendments, described above, including expenses associated with obtaining any requisite investor consent to such Amendments. To the extent the General Partner deems appropriate, expenses related to the

Amendments may be capitalized and amortized by the Fund over a 36-month period from the Effective Date, even though such capitalization and amortization may be a divergence from U.S. generally accepted accounting principles ("*GAAP*"). Amortization of such expenses over a 36-month period may, in certain circumstances, result in a qualification of the Fund's annual audited financial statements. In such instances, the General Partner may decide to (i) avoid the qualification by recognizing the unamortized expenses or (ii) make GAAP conforming changes for financial reporting purposes, but amortize expenses for purposes of calculating the Fund's net asset value. There will be a divergence in the Fund's fiscal year-end net asset value and in the net asset value reported in the Fund's financial statements in any year where, pursuant to clause (ii), GAAP conforming changes are made only to the Fund's financial statements for financial reporting purposes.

If the Fund is terminated within 36 months of the Effective Date, any unamortized expenses will be recognized.

Investment and Operational Expenses. The Fund bears all reasonable costs and expenses directly related to its investment program, including expenses related to research, due diligence, proxies, underwriting and private placements, brokerage commissions, interest on debt balances or borrowings, custody fees, travel fees and expenses related to the Fund's offering and any withholding or transfer taxes imposed on the Fund. The Fund also bears all reasonable, out-of-pocket costs of the administration of the Fund, including (i) accounting, audit and legal expenses (including those incurred for the Fund, the General Partner or the Investment Manager to comply with applicable law, rule or regulation), (ii) costs of any litigation or investigation involving the Fund's activities, (iii) the costs, fees and expenses of any appraisers, accountants or other experts engaged by the General Partner or the Investment Manager as well as other expenses directly related to the Fund's investments and (iv) costs associated with reporting and providing information to existing and prospective Limited Partners. However, the General Partner or the Investment Manager may, in its sole discretion, choose to absorb any such expenses incurred on behalf of the Fund.

The Fund does not have its own separate employees or office. Except as described above and provided for in the Partnership Agreement, the Fund generally does not reimburse the General Partner or the Investment Manager for salaries, office rent and other general overhead costs of the General Partner or the Investment Manager. However, a portion of the commissions generated on the Fund's brokerage transactions may generate "soft dollar" credits that the General Partner and the Investment Manager are authorized to use to pay for research and research-related services and products used by the General Partner or the Investment Manager. In the event that the Investment Manager elects to use soft dollars, it intends to limit such use to services that fall

within the safe harbor afforded by Section 28(e) of the United States Securities Exchange Act of 1934, as amended. See "*Brokerage and Custody*."

**Allocation of Net Profit and Loss**

Net profit or net loss of the Fund (including unrealized gains or losses and Fund expenses) is allocated among the Capital Accounts of the General Partner and the Limited Partners (collectively, the "***Partners***") as of the close of each calendar month, at such times as the Fund receives an additional capital contribution or effects a withdrawal or distribution, or at such other times as the General Partner may determine.

Profit and loss attributable and any Restricted New Issues (as described below) and are determined and allocated among the Partners separately and are not reflected in the determinations and allocations of net profit or net loss attributable to the remainder of the Fund's net assets.

As of the close of each accounting period, the net profit or net loss (other than any profit or loss attributable to Restricted New Issues, which are allocated as per below) will be allocated *pro rata* among the Capital Accounts of the Partners in proportion to their percentage interests in the Fund as of the commencement of the period. Each Partner's percentage interest in the Fund as of the commencement of any period is based on the value of the Partner's Capital Account at such time (excluding any amount attributable to such Partner's share of Restricted New Issues), in relation to the total value of the Fund's net assets at such time (excluding the aggregate amount of net assets attributable to Restricted New Issues).

If the General Partner determines that for legal, tax, regulatory or bona fide other reasons as to which the General Partner and any Limited Partner may agree such Limited Partner should not participate (or should receive a reduced participation) in the net profit or net loss with respect to any investment, the General Partner may allocate net profit or net loss, if any, with respect to the investment to Limited Partners to the extent to which the above restrictions do not apply.

The Management Fee is calculated based on the Capital Account balance of each Limited Partner and is debited from each Limited Partner's Capital Account. Allocations to each Partner of net profit or net loss of the Fund will be subject to periodic adjustment to give effect to the Performance Allocation, as described below.

**Restricted New Issues**

The Fund may from time to time purchase securities in public offerings made through member firms of the Financial Industry Regulatory Authority, Inc. ("***FINRA***"). FINRA member firms are not permitted to sell certain new issues ("***Restricted New Issues***") to accounts in which certain persons have a significant beneficial interest that are involved in the securities industry or to executive officers or directors

13

of companies that are current, recent, or prospective investment banking clients of the relevant underwriters ("**Restricted Persons**"). In order to enable the Fund to participate in Restricted New Issues, the Fund will require each Limited Partner to provide information to enable the Fund to determine whether the Limited Partner is a Restricted Person. When the Fund invests in a Restricted New Issue, the profits and losses associated with the investment will specifically be allocated to those Partners who are permitted by the FINRA rules to have a beneficial interest therein.

The FINRA rules permit Restricted Persons that are involved in the securities industry to have in the aggregate up to a 10% participation in Restricted New Issues and Restricted Persons affiliated with a FINRA member's investment banking clients to have up to 25% participation in Restricted New Issues. If the ownership of the Fund by Restricted Persons exceeds the maximum percentage, the General Partner will allocate such excess amount *pro rata* among the Capital Accounts of Partners who are not Restricted Persons or on such other basis that the General Partner reasonably determines ensures compliance with the FINRA Rules.

If a Restricted New Issue in which participation by Restricted Persons has been capped is not promptly sold, the investment may be reallocated among all Partners on a *pro rata* basis (including all Restricted Persons) after a secondary market develops at such secondary market price.

| | |
|---|---|
| **Performance Allocation** | The Investment Manager, in its capacity as a special limited partner in the Fund, is entitled to a performance allocation at the end of each calendar year (the "**Performance Allocation**"), which is calculated and charged separately with respect to each Capital Account of each Limited Partner, equal to 20% of the amount by which the Capital Account's "Performance Change Amount" (if positive) for the current calendar year exceeds the Capital Account's "Loss Carryforward Amount." |

A Capital Account's "**Performance Change Amount**" for any calendar year equals such Capital Account's *pro rata* allocation of net profit or net loss (including Management Fees, Restricted New Issues and/or other items of income or expense specially allocable to the Capital Account).

The "**Loss Carryforward Amount**" for any calendar year equals the aggregate Performance Change Amounts, if negative, allocated to a Capital Account during any preceding calendar year, minus any subsequent positive Performance Change Amounts on which no Performance Allocation was charged. If a Limited Partner makes a withdrawal from its Capital Account at a time when there is a Loss Carryforward Amount, such Loss Carryforward Amount will be reduced in the same proportion that the withdrawal amount bears to the

Limited Partner's total Capital Account balance immediately prior to the withdrawal.

The Performance Allocation is calculated and charged to each Capital Account as of the last day of each calendar year. The Performance Allocation is also calculated and charged with respect to any Capital Account from which there is a permitted or required withdrawal as of any time other than the last day of a calendar year on the basis of net profits allocated to such Capital Account through the applicable date of withdrawal. In the case of a partial withdrawal, the Performance Allocation is calculated and charged only with respect to the portion of the Capital Account being withdrawn.

The Performance Allocation and Loss Carryforward Amount will be computed separately for each Capital Account (and each separately maintained capital sub-account reflecting additional contributions by a Limited Partner). Thus, if a Limited Partner has multiple Capital Accounts, the Performance Allocation and Loss Carryforward will be computed separately for each Capital Account, and the Capital Accounts will not be netted against one another for purposes of calculating the Performance Allocation. Accordingly, Limited Partners with multiple Capital Accounts may be charged a Performance Allocation in respect of one or more Capital Accounts for a year in which the aggregate net profits allocated to all of such Limited Partner's Capital Accounts do not exceed the aggregate Loss Carryforward Amount allocated to all of such Limited Partner's Capital Accounts.

The Performance Allocation with respect to any Limited Partner may be waived or altered by the Investment Manager in its sole discretion.

**Distributions**

Subject to the withdrawal privilege described below, all earnings of the Fund are ordinarily retained for investment. Other than distributions made pursuant to a withdrawal described below, Limited Partners should not expect the Fund to make any distributions.

**Withdrawals Generally**

Withdrawal rights vary by Series. For the purposes of establishing the withdrawal privileges below, withdrawal rights are determined separately with respect to each Capital Account (and each capital sub-account, if applicable) of a Limited Partner.

**Series Withdrawal Dates**

Subject to certain withdrawal restrictions described below, Limited Partners have the following withdrawal rights:

Series B Interests: Annual Liquidity. A Limited Partner is permitted to make complete or partial withdrawals of its Series B Interests upon written notice to the General Partner at least 180 days prior to the applicable Series B Withdrawal Date. The "***Series B Withdrawal Date***" means: (i) the end of the day on the last Business Day of the calendar month that immediately precedes the one-year anniversary of

the contribution of the capital to be withdrawn; and thereafter (ii) the end of the day on each one-year anniversary of the preceding Series B Withdrawal Date (i.e., if capital was contributed to the Fund on November 1, 2014, such capital would be eligible for withdrawal on October 31, 2015 and every year thereafter on October 31st, or the last Business Day of that month).

Series C Interests: Two Year Liquidity.   A Limited Partner is permitted to make complete or partial withdrawals of its Series C Interests upon written notice to the General Partner at least 180 days prior to the applicable Series C Withdrawal Date. The "*Series C Withdrawal Date*" means: (i) the end of the day on the last Business Day of the calendar month that immediately precedes the two-year anniversary of the contribution of the capital to be withdrawn; and thereafter (ii) the end of the day on each two-year anniversary of the preceding Series C Withdrawal Date (i.e., if capital was contributed to the Fund on November 1, 2014, such capital would be eligible for withdrawal on October 31, 2016 and every two years thereafter on October 31st, or the last Business Day of that month).

Series D Interests: One Year Hard Lock-Up; Quarterly Liquidity.   A Limited Partner is permitted to make complete or partial withdrawals of its Series D Interest as of the last Business Day of each calendar quarter (and/or such other days as the General Partner may determine in its sole discretion) (each, a "*Series D Withdrawal Date*") following the one-year anniversary of the contribution of the capital to be withdrawn. Notice of any withdrawal of Series D Interests must be provided in writing to the General Partner at least 90 calendar days prior to the requested Series D Withdrawal Date.

The General Partner may, at any time and in its sole discretion, waive or modify the foregoing withdrawal and distribution restrictions with respect to any Limited Partner.

**Settlement of Withdrawal Proceeds**

With respect to any amounts withdrawn, a withdrawing Partner shall not share in the income, gains and losses of the Fund or have any other rights as a Partner (in the case of a complete withdrawal) after the applicable date of withdrawal, and withdrawn amounts will be fixed as of the effective date of withdrawal, except as otherwise provided in the Partnership Agreement with respect to reserves for contingencies.

At least 90% of the estimated amount due with respect to the Fund's marketable investments is normally settled in cash or, subject to the sole discretion of the General Partner, wholly or partially with securities or other assets of the Fund, within 30 Business Days after the date of withdrawal, provided that the General Partner may delay such payment if such delay is reasonably necessary to prevent such withdrawal from having a material adverse impact on the Fund or the remaining Capital Accounts.   The General Partner is entitled to deduct from such

settlement an amount equal to the pro rata portion of any Performance Allocation (based on the portion of the withdrawal being settled) payable to the Investment Manager with respect to such withdrawn amount. Any balance will be held back and distributed, without interest thereon, promptly following completion of the audit of the Fund's financial statements for such fiscal year, or sooner in the General Partner's discretion.

In the case of a complete withdrawal, or a partial withdrawal that cannot be fully funded out of the Limited Partner's interest in the Fund's marketable investments, no settlements occur with respect to any of such Limited Partner's interest in the Fund's non-marketable investments until the occurrence of liquidity events with respect to such non-marketable investments after the scheduled payment date for the withdrawal (without interest thereon). Notwithstanding the foregoing, the General Partner may, in its sole discretion, make settlements in such cases prior to the occurrence of a liquidity event if such settlement would, in the good faith opinion of the General Partner, not have a material adverse effect on the Fund. Generally, a liquidity event will be a sale of the relevant investment for cash, in which case the settlement will be funded in cash within 90 days after the liquidity event (without interest). If the liquidity event is not a sale for cash, the General Partner may effect the settlement either by making a distribution in kind of the Limited Partner's ratable share of the relevant investment or by distributing the net proceeds derived from a sale of such investment. The General Partner is entitled to withdraw from each such settlement an amount equal to the remaining portion of any Performance Allocation (pro rata based on the portion of such withdrawal being distributed) to be credited to the Investment Manager at the same time and in the same form (in cash or in kind) as the distribution to the withdrawing Limited Partner.

The General Partner may withhold for the benefit of the Fund from any distribution to a withdrawing Limited Partner an amount representing the actual or estimated costs incurred by the Fund with respect to such withdrawal.

**Withdrawal Conditions**   The General Partner may refuse to accept a withdrawal request if it is not accompanied by such additional information as the General Partner or the Administrator may reasonably require. This power may, without limitation to the generality of the foregoing, be exercised where proper information has not been provided for money laundering verification purposes. In addition, where withdrawal proceeds are requested to be remitted to an account which is not in the name of the investor, the General Partner and the Administrator reserve the right to request such information as may be reasonably necessary in order to verify the identity of the investor and the owner of the account to which the withdrawal proceeds will be paid. The withdrawal proceeds will not

be paid to a third-party account if the investor and/or owner of the account fails to provide such information.

**Compulsory Withdrawals**

The General Partner reserves the right, in its sole discretion, to compel the withdrawal of any Limited Partner's Interest, in part or in its entirety, on not less than five days' prior written notice (or immediately if the General Partner determines in its sole discretion that such Limited Partner's continued participation in the Fund may cause the Fund, the Investment Manager or the General Partner to violate any applicable law). Settlements are made in the same manner as voluntary withdrawals.

**Suspension of Valuations, Withdrawals and Withdrawal Payments**

The General Partner may suspend the issuance of Interests, the Partners' withdrawal privileges, the payment of withdrawal proceeds and the valuation of the Fund's net assets:

(i) during any period when any stock exchange or over-the-counter market on which the Fund's investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended;

(ii) during the existence of any state of affairs as a result of which, in the reasonable opinion of the General Partner, disposal of investments by the Fund, or the determination of the value of the assets of the Fund, would not be reasonably practicable;

(iii) during any breakdown in the means of communication normally employed in determining the price or value of the Fund's assets or liabilities, or of current prices in any stock market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Fund cannot reasonably be accurately ascertained within a reasonable time frame;

(iv) during any period when the transfer of funds involved in the realization or acquisition of any investments cannot, in the reasonable opinion of the General Partner, be effected at normal rates of exchange;

(v) in other circumstances where the General Partner is unable to fairly value the Fund's assets due to extreme market conditions; or

(vi) automatically upon liquidation of the Fund.

Upon the reasonable determination by the General Partner that conditions leading to suspension no longer apply, withdrawal rights for all Limited Partners shall be promptly reinstated, and any pending withdrawal requests (or new, timely withdrawal requests) shall be

18

honored as of the last Business Day of the calendar quarter in which withdrawals have recommenced, subject to the application of the withdrawal limitations described herein.

**Soft Wind Down**

It is anticipated that any suspension in the circumstances described above in "Suspension of Valuations, Withdrawals and Withdrawal Payments" (each, a "*Suspension*") would ordinarily be temporary (other than in connection with a decision to proceed with the liquidation of the Fund). However, there may be situations in which the circumstances giving rise to the Suspension continue to be present for a considerable period of time with the result that the General Partner, in consultation with the Investment Manager, considers it appropriate to keep the Suspension in place indefinitely. In certain circumstances, even where a Suspension has not been declared, the General Partner may, in consultation with the Investment Manager, make a determination that the investment strategy should no longer be continued. During any such period of Suspension or having made such determination that the investment strategy should no longer be continued, the Investment Manager may recommend to the General Partner to cause the Fund to return the Fund's assets to Limited Partners in an orderly manner (without proceeding with a liquidation of the Fund) (an "*Orderly Realization*"). The General Partner may, in such circumstances, resolve to effect an Orderly Realization should it determine that doing so is in the best interests of the Fund as a whole. Such Orderly Realization shall not constitute a dissolution or winding up of the Fund for any purposes, but rather only the continued management of the Fund's portfolio so as to reduce such portfolio to cash (to the extent reasonably practicable, as advised by the Investment Manager) and return such cash as well as all other assets of the Fund to the Limited Partners. The General Partner will notify Limited Partners of any decision to proceed with an Orderly Realization of the Fund. During an Orderly Realization, the Investment Manager may, in consultation with the General Partner, take such steps as are considered appropriate in the best interests of the Fund as a whole to effect the Orderly Realization. The General Partner, in consultation with the Investment Manager, shall establish what they consider to be a reasonable time by which the Orderly Realization should be effected (the "*Realization Period*"). Any resolution to undertake an Orderly Realization and the process thereof shall be deemed to be integral to the business of the Fund and may be carried out without recourse to a formal process of liquidation under Delaware law or any other applicable bankruptcy or insolvency regime. The General Partner, in consultation with the Investment Manager, may resolve to cease the Orderly Realization within the Realization Period and recommence active trading if the circumstances permit a lifting of any applicable Suspension or, where no Suspension is in effect, if the circumstances are such that the investment strategy can then be continued. Management Fees shall be payable and Performance Allocations shall

be made during an Orderly Realization on the same basis as described herein.

**Transfers**

Interests are not transferable except with the prior written consent of the General Partner, which consent may be withheld in the General Partner's sole discretion. The General Partner in its sole discretion may require any transferee or assignee of any Limited Partner to agree in writing to be bound by the Partnership Agreement. Interests of any Affiliated Investors may be transferred to other affiliates thereof without restriction.

**Duty of Care; Indemnification**

The Partnership Agreement provides that the General Partner, the Investment Manager and each of their affiliates are not liable to the Fund or the Limited Partners for any loss or damage arising by reason of being or having been the General Partner or the Investment Manager or from any acts or omissions in the performance of its services as General Partner or Investment Manager, as applicable, in the absence of willful misconduct, fraud or gross negligence or as otherwise required by law, and contains provisions for the indemnification of the General Partner, the Investment Manager and each of their affiliates by the Fund (but not by the Limited Partners individually) against any liabilities arising by reason of being or having been the General Partner or the Investment Manager or in connection with the Partnership Agreement or the Fund's business or affairs to the fullest extent permitted by law. The General Partner is not personally liable to any Limited Partner for the repayment of any positive balance in such Limited Partner's Capital Account or for contributions by such Limited Partner to the capital of the Fund or by reason of any change in the federal or state income tax laws applicable to the Fund or its investors.

**Valuations**

In general, the Fund's financial statements will be prepared in accordance with GAAP. The General Partner has delegated the valuation of the Fund's assets to the Investment Manager who values the Fund's assets as of the close of each accounting period in accordance with its valuation policies and procedures. Valuations may be suspended as set forth above in "Suspension of Valuations, Withdrawals and Withdrawal Payments."

**Reserves**

Appropriate reserves may be accrued and charged against net assets and proportionately against the Capital Accounts of the Partners for contingent liabilities, such reserves to be in the amounts (subject to increase or reduction) that the General Partner in its sole discretion deems necessary or appropriate. In the sole discretion of the General Partner, the amount of any such reserve (or any increase or decrease therein) may be charged or credited, as appropriate, to the Capital Accounts of those investors who are Partners at the time when such reserve is created, increased, or decreased, as the case may be, or alternatively may be charged or credited to those investors who were

Partners at the time of the act or omission giving rise to the contingent liability for which the reserve was established.

If the General Partner determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then such amount may be proportionately charged or credited, as appropriate, to those persons who were Partners during any such prior period.

**Fiscal Year**

The Fund has a fiscal year ending on December 31 of each calendar year.

**Reports to Partners**

The Fund furnishes to its Partners as soon as practicable after the end of each taxable year (or as otherwise required by law) annual reports containing financial statements examined by the Fund's independent auditors as well as such tax information as is necessary for each Partner to complete federal and state income tax or information returns, along with any other tax information required by law. The Fund also furnishes monthly reports reviewing the Fund's performance for such calendar month. The General Partner selects the Fund's independent accountants in its sole discretion.

**Advisory Committee**

The General Partner and/or the Investment Manager may appoint, or cause to be appointed, a committee (the "*Advisory Committee*") consisting of one or more individuals selected by the General Partner and/or the Investment Manager, none of whom is affiliated with the General Partner and/or the Investment Manager (except as a Limited Partner or as an investor in the Fund or an affiliate thereof). If established, the Advisory Committee will have the authority, at the request of the General Partner and/or the Investment Manager, to consult with the General Partner and/or the Investment Manager on any matters that may involve a conflict of interest between the General Partner and/or the Investment Manager (or their affiliates) on the one hand and the Limited Partners (or shareholders of the Offshore Fund) and the Fund on the other. Any consent given by a majority of the Advisory Committee on behalf of the Fund in good faith after consultation with the General Partner and/or the Investment Manager is binding on the Fund and the Limited Partners or shareholders of the Offshore Fund (so long as such majority consists of persons independent of the General Partner and/or the Investment Manager and their affiliates). The Fund will have the authority to agree to reimburse members of the Advisory Committee for their out-of-pocket expenses and to indemnify them to the maximum extent permitted by law.

| | |
|---|---|
| **Dissolution and Liquidation** | In the event an Orderly Realization lasts longer than three years, Limited Partners with a combined percentage interest in the Fund of at least 75% may seek a court decree of dissolution or seek the appointment by the court of a liquidator for the Fund. The Limited Partners will not have any other right to bring an action in court to dissolve the Fund. |
| | Dissolution of the Fund may also occur upon the General Partner's election, in its sole discretion, to dissolve the Fund or upon the occurrence of any event which results in the General Partner (or a successor to its business) ceasing to be the general partner of the Fund. Upon the occurrence of any such event, the General Partner (or a liquidator elected by a majority in interest of the Limited Partners, if the General Partner is unable to perform this function) is charged with winding up the affairs of the Fund, liquidating its assets to the extent feasible and making liquidating distributions (in cash or in securities or other assets, whether or not readily marketable) *pro rata* in accordance with each Partner's Capital Account balance. |
| **Placement Agents** | The Investment Manager may engage third parties to solicit investors and act as placement agents for the Fund. Placement agents may charge a placement fee directly to investors solicited by any such placement agent, but such fees will not affect the subscription amount and will not be collected by or from the Fund. The placement agent may be reimbursed for its expenses and indemnified by the Fund. |
| | Furthermore, placement agents may be paid a portion of the Management Fee or Performance Allocation attributable to such investors solicited by them, thereby reducing the Management Fee or Performance Allocation received by the Investment Manager. Accordingly, investors should recognize that a placement agent's or distributor's participation in this offering may be influenced by its interest in such current or future fees and compensation. Investors should consider these potential conflicts of interest in making their investment decisions. |
| | Each placement agent must comply with the legal requirements of the jurisdictions within which it offers and sells Interests. |
| **Tax Status** | The General Partner believes that the Fund should be treated as a partnership for U.S. federal income tax purposes and that it should not itself be subject to U.S. federal income taxation. Each Limited Partner otherwise subject to U.S. federal income tax is required to include in such Limited Partner's taxable income such Limited Partner's share of the Fund's income and gains, when realized by the Fund (regardless of cash distributions from the Fund to such investor), and may claim, to the extent allowable, such Limited Partner's share of the Fund's losses and deductions. Due to the nature of the Fund's activities, the Fund's income or loss for U.S. federal income tax purposes for a particular taxable period may differ from its financial or economic results. The |

deductibility of a Limited Partner's share of any Fund losses or deductions may be limited.   See "*Tax Considerations*."

**ERISA**

The General Partner intends to limit investment in the Fund by "benefit plan investors" so that the assets of the Fund will not be considered "plan assets" for purposes of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***").   See "*ERISA and Other Regulatory Considerations*."

**Amendment of the Limited Partnership Agreement**

The Partnership Agreement may be amended by the General Partner with the consent of a majority in interest of the Limited Partners, which consent may be obtained through negative consent.   However, the Fund may not: (a) increase the obligation of a Limited Partner to make any contribution to the capital of the Fund; (b) reduce the Capital Account of any Limited Partner other than as contemplated by the Partnership Agreement; or (c) reduce any Limited Partner's right to share in net profits or assets of the Fund without the consent of each Limited Partner adversely affected thereby.   The above consent may be obtained by negative consent (affording the Limited Partners notice and opportunity to object).

Notwithstanding the foregoing, the General Partner may amend the Partnership Agreement at any time without the consent of any Limited Partner: (a) to comply with applicable laws and regulations; (b) to make changes that do not adversely affect the rights or obligations of any Limited Partner; (c) to cure any ambiguity or correct or supplement any conflicting provisions of the Partnership Agreement; or (d) with respect to any other amendment, if any Limited Partner whose contractual rights as a Limited Partner would be materially and adversely changed by such amendment has an opportunity to withdraw from the Fund as of a date that is not less than 30 days after the General Partner has furnished written notice of such amendment to each Limited Partner and that is prior to the effective date of the amendment.

**Variation of Terms**

The General Partner, in its sole discretion, may enter into a side letter or similar agreement to or with one or more Limited Partners that has the effect of establishing rights under, or altering or supplementing the terms of the Partnership Agreement or the Subscription Documents (including those relating to Management Fees, the Performance Allocation, transparency, and withdrawals) with respect to such Limited Partner.   The General Partner generally grants waivers of the Management Fees, Performance Allocation and withdrawal restrictions to principals and employees of the Investment Manager and its affiliates, as well as their related family members and affiliates.

**Dispute Resolution**

Any controversy or claim ("***Dispute***") out of or relating to or in connection with the Partnership Agreement or otherwise involving the Fund, its Partners and/or any Indemnified Party (as defined in the Partnership Agreement) shall be submitted to mediation in accordance

with the Partnership Agreement and if such dispute has not been resolved within 90 days, will be resolved by binding arbitration in accordance with the Partnership Agreement. Mediation and arbitration shall be held in Dallas, Texas and Delaware law shall apply to any dispute, except as otherwise provided in the Partnership Agreement.

## RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST

*Investment in the Fund is speculative and involves certain risks. Certain of these risks are summarized below. The Fund may not be suitable for all investors and is intended for sophisticated investors who can accept the risks associated with its investments. An investment in the Fund does not constitute a complete investment program. Investors will not have recourse except with respect to the assets of the Fund. Prospective investors should consider, among others, the risk factors and potential conflicts of interest described in this section. All investors in the Fund should consult their own legal, tax and financial advisors prior to investing in the Fund.*

## Fund Risks

*Investment Judgment; Market Risk.* The profitability of a significant portion of the Fund's investment program depends to a great extent upon correctly assessing the future course of the price movements of securities and other investments. There can be no assurance that the Investment Manager will be able to predict accurately these price movements. With respect to the investment strategy utilized by the Fund, there is always some, and occasionally a significant, degree of market risk.

*Reliance on Key Persons.* The Fund will be substantially dependent on the services of James Dondero, Mark Okada and Joshua Terry (the "**Key Man Group**"). In the event of the death, disability, departure or insolvency of a member of the Key Man Group, or the complete transfer of a member's interest in the Investment Manager, the business of the Fund may be adversely affected. Each member of the Key Man Group will devote such time and effort as he deems necessary for the management and administration of the Fund's business. However, the members of the Key Man Group may engage in various other business activities in addition to managing the Fund, and consequently may not devote all time to Fund business.

*Investment Authority.* Substantially all decisions with respect to the management of the Fund are made by the General Partner and the Investment Manager. Limited Partners have no right or power to take part in the management of the Fund. The Investment Manager also makes all of the trading and investment decisions of the Fund. In the event of the withdrawal or bankruptcy of the General Partner, generally the Fund will be liquidated.

*Performance Allocation.* The Performance Allocation made to the Investment Manager may create an incentive for the Investment Manager to make investments that are riskier or more speculative than would be the case in the absence of such Performance Allocation.

*Withdrawal Restrictions.* There are severe restrictions on withdrawals from the Fund (which may be settled in securities rather than cash) and on transfers of Interests. The prior written consent of the General Partner is required for a transfer of the Interest of any Limited Partner and the General Partner, in its sole discretion, may require any transferee or assignee of any Limited Partner to agree in writing to be bound by the Partnership Agreement. Because of the restrictions on withdrawals and transfers, an investment in the Fund is a relatively illiquid investment and involves a high degree of risk. There is no independent market for the purchase or sale of Interests and none is expected to develop. Limited Partners must represent that they are purchasing Interests for investment. A subscription for Interests should be considered only by persons financially able to maintain their investment and who can accept a loss of all of their investment.

*No Distributions.* Since the Fund does not generally intend to pay distributions, an investment in the Fund is not suitable for investors seeking current distributions of income. Moreover, an investor is required to report and pay taxes on its allocable share of income from the Fund, even though no cash is distributed by the Fund.

*In-Kind Distributions*. The Partnership Agreement authorizes the General Partner to make distributions in kind of securities in lieu of or in addition to cash. In the event the General Partner makes distributions of securities in kind, such securities could be illiquid or subject to legal, contractual and other restrictions on transfer.

*Diversification.* Since the Fund's portfolio will not necessarily be widely diversified, the investment portfolio of the Fund may be subject to more rapid changes in value than would be the case if the Fund were required to maintain a wide diversification among companies, securities and types of securities.

*Valuations.* From time to time, certain situations affecting the valuation of the Fund's investments (such as limited liquidity, unavailability or unreliability of third-party pricing information and acts or omissions of service providers to the Fund) could have an impact on the net asset value of the Fund, particularly if prior judgments as to the appropriate valuation of an investment should later prove to be incorrect after a net asset value-related calculation or transaction is completed. The Fund is not required to make retroactive adjustments to prior subscription or withdrawal transactions or Management Fees or Performance Allocations based on subsequent valuation data.

*Non-Public Information.* From time to time, the Investment Manager may come into possession of non-public information concerning specific companies. Under applicable securities laws, this may limit the Investment Manager's flexibility to buy or sell portfolio securities issued by such companies. The Fund's investment flexibility may be constrained as a consequence of the Investment Manager's inability to use such information for investment purposes.

*Soft Dollars.* The Investment Manager may enter into "soft dollar" arrangements with one or more broker-dealers whereby the Investment Manager will direct securities transactions to the broker-dealer in return for research products and services from the broker-dealer. Although the Investment Manager will use the research and services in making investment decisions for the Fund, the Investment Manager may use such research or services for other accounts and the Fund will generally pay more than the lowest available commissions for execution of these transactions. The Investment Manager may also enter into "soft dollar" arrangements to cover Fund expenses or costs and expenses of the Investment Manager to the extent such arrangements are permitted by law and described in this Memorandum. See "*Brokerage and Custody*."

*Absence of Registration*. The Fund has not and will not register under the Investment Company Act. Accordingly, the provisions of the Investment Company Act which, among other things, require that a fund's board of directors, including a majority of disinterested directors, approve certain of the fund's activities and contractual relationships, prohibit certain trading and investment activities and prohibit the fund from engaging in certain transactions with its affiliates, will not be applicable. Neither the General Partner nor the Investment Manager is registered as a CPO or a CTA with the NFA in reliance on an exemption from registration pursuant to CFTC Regulation 4.13(a)(3). Accordingly, the provisions of the Commodity Exchange Act and the regulations promulgated thereunder applicable to registered persons will not be applicable to the General Partner or the Investment Manager.

*Recent Developments in the Financial Services Industry*. Recent developments in the U.S. financial markets illustrate that the current environment is one of extraordinary and possibly unprecedented uncertainty for the financial services industry. In July of 2010, the Dodd-Frank Financial Reform Act was passed which imposes many new requirements and restrictions on the financial services industry that may likely affect the business, operations and performance of hedge funds, such as increased reporting requirements, limitations on certain trading activity and regulatory oversight by different agencies, such as the newly created Financial Stability Oversight Counsel. The implications of the passage of the Dodd-Frank Financial Reform Act for the hedge fund industry as a whole still remain somewhat unclear. The hedge fund industry may continue to be adversely affected by the recent developments in the financial markets in the U.S. and abroad, and any future legal, regulatory or governmental action and developments in such financial markets and the broader U.S. economy could have an adverse effect on the Fund's business, operations and performance.

**Investment Strategy Risks**

<u>Risks Associated With Investing in CLOs</u>

*Risks of Investment Focus*. The Fund's portfolio may consist of CLO Securities. A cash flow CLO is generally analogous to a special purpose finance company. The CLO owns a portfolio consisting of corporate loans and other investments typically from which it receives interest income, together with capital gains and losses. The CLO is often financed with equity, which may be in the form of preference shares or income notes ("***CLO Equity***") and several levels of long-term debt ("***CLO Debt***"). CLO Debt is typically rated by the rating agencies based on the deal structure as well as outstanding principal amount of portfolio securities and, in most cases, is not contingent on the market value of the underlying portfolio. CLO Equity is almost always unrated.

CLO Securities are subject to, among other risks, credit, liquidity and interest rate risks. The CLO Equity that the Fund may purchase may be unrated or non-investment grade. In addition, as a holder of CLO Equity, the Fund may have limited remedies available upon the default of the CLO.

The value of the CLO Securities that the Fund may own generally will fluctuate with, among other things, the financial condition of the obligors or issuers of the CLO Securities' underlying portfolio of assets ("***CLO Collateral***"), general economic conditions, the condition of certain financial markets, political events, developments or trends in any particular industry and changes in prevailing interest rates. CLO Securities are issued on a non-recourse basis and holders of CLO Securities must rely solely on distributions on the CLO Collateral or proceeds thereof for payment in respect thereof. If distributions on the CLO Collateral are insufficient to make payments on the CLO Securities, no other assets will be available for payment of the deficiency and following realization of the CLO Collateral, the obligations of such issuer to pay such deficiency generally will be extinguished.

Issuers of CLO Securities may acquire interests in loans and other debt obligations by way of sale, assignment or participation. The purchaser of an assignment typically succeeds to all the rights and obligations of the assigning institution and becomes a lender under the credit agreement with respect to the loan or debt obligation; however, its rights can be more restricted than those of the assigning institution.

CLO Collateral may consist of corporate loans, leveraged loans and other instruments, which often are rated below investment grade (or of equivalent credit quality). Loans may be unsecured and may be subordinated to certain other obligations of the issuer thereof. The lower ratings of below

27

investment grade loans reflect a greater possibility that adverse changes in the financial condition of an issuer or in general economic conditions or both may impair the ability of the related issuer or obligor to make payments of principal or interest. Such investments may be speculative.

*Dependence Upon Other Unrelated Managers*. The success of a CLO may depend on the management talents and efforts of one person or a small group of persons whose management could adversely affect the CLO and, accordingly, the Fund as an investor in such CLO. Given that the Investment Manager will not have an active role in the management of these CLOs, the return on the Fund's investments in such CLOs will depend on the performance of unrelated managers.

*Investments in CLOs Managed by the Investment Manager or its Affiliates*. The Fund may invest a significant portion of its capital in structured investments, including CLO tranches originated and managed by third parties and CLO tranches managed by the Investment Manager or its affiliates (the "*Affiliated CLOs*"). If the Fund invests in Affiliated CLOs, the Limited Partners will indirectly pay the fees (senior and subordinated) (but only if such investment is in the equity tranche of such Affiliated CLO), expenses and any carried interest at primary issuance. The Investment Manager or its affiliates will receive senior and subordinated management fees and, in some cases, a performance-based allocation or fee with respect to its role as general partner and/or manager of the Affiliated CLOs. If the Fund provides all of the equity for an Affiliated CLO, there may be no third party with whom the amount of such fees, expenses and carried interest can be negotiated on an arm's-length basis. The Investment Manager will have conflicting division of loyalties and responsibilities regarding the Fund and an Affiliated CLO, and certain other conflicts of interest would be inherent in the situation. There can be no assurance that the interests of the Fund would not be subordinated to those of an Affiliated CLO or to other interests of the Investment Manager.

*Multiple Levels of Fees*. The Fund and the CLOs (including Affiliated CLOs) are expected to impose management fees, other administrative fees, carried interest and other performance allocations on realized and unrealized appreciation in the value of the assets managed and other income. This may result in greater expense than if Limited Partners were able to invest directly in the CLOs or underlying investments. Limited Partners should take into account that the return on their investment will be reduced to the extent of both levels of fees. The general partner or manager of a CLO (including a member of the Highland Group (defined below)) may receive the economic benefit of certain fees from its portfolio companies for services and in connection with unconsummated transactions (*e.g.*, break-up, placement, monitoring, directors', organizational and set-up fees and financial advisory fees). Additionally, some of the CLOs may invest themselves in underlying hedge funds or CLOs. In such case, additional management costs and other administrative expenses may be incurred.

*Limited Diversification*. CLOs may invest in concentrated portfolios of assets. The concentration of an underlying portfolio in any one obligor would subject the related CLO Securities (the related CLO Equity in particular) to a greater degree of risk with respect to defaults by such obligor and the concentration of a portfolio in any one industry would subject the related CLOs (the related CLO Equity in particular) to a greater degree of risk with respect to economic downturns relating to such industry. The Fund may have a concentrated exposure to CLOs of a particular type of CLO.

*CLO Embedded Leverage Risk*. The Fund's participation in CLOs involves varying amounts of leverage. Leverage is embedded in all classes of a CLO other than the most senior tranche. If the Fund retains either the most or one of the most subordinate tranches of the CLO's securities, it will hold the most leveraged investment in the CLO. While leverage presents opportunities for increasing the Fund's total return, it has the effect of potentially increasing losses as well. Accordingly, any event which

adversely affects the value of an investment in a CLO would be magnified to the extent such CLO is leveraged. The cumulative effect of the use of leverage by a CLO in a market that moves adversely to the CLO's investments could result in a substantial loss to the CLO which would be greater than if the CLO were not leveraged. The borrowing arrangements of CLOs will contain events of default that, under certain circumstances, could result in early amortization or in the acceleration of the maturities of these obligations. In the event of acceleration of the borrowing arrangements of a CLO, in whole or in part, it may be required to dispose of all or a significant portion of its investments. Such a forced disposal of securities could result in realization of value of such investments significantly below the anticipated market values for such securities. When the Fund invests in derivative transactions, it may also gain leverage through such derivative transactions, which will expose the Fund to a greater risk of loss.

*Interest Rate Mismatch.* CLOs may be subject to interest rate risk. The CLO Collateral of an issuer of a CLO may bear interest at a fixed or floating rate, while the CLO Debt may bear interest at a floating or fixed rate. As a result, there could be a floating/fixed rate or basis mismatch between such CLO Debt and the CLO Collateral which bears interest at a fixed rate ("***Fixed Rate Assets***"), and there may be a timing mismatch between such CLO Debt and the assets that are not Fixed Rate Assets ("***Floating Rate Assets***"). In addition, the interest rate on Floating Rate Assets may adjust more frequently or less frequently, on different dates and based on different indices than the interest rates on the CLO Debt. As a result of such mismatches, an increase or decrease in the level of the floating rate indices could adversely impact the ability to make payments on such CLO Debt or Equity. Although many CLOs attempt to hedge this interest rate risk, the hedges may not eliminate this risk and payments by the CLO under the hedges may significantly reduce the distributions on the CLO securities. In addition, these hedges may have additional risks, such as counterparty risk, that are not present without these hedges.

*Lower Credit Quality Securities.* There are no restrictions on the credit quality of the investments of the Fund. CLO Securities in which the Fund will invest may have no ratings or may be deemed by rating agencies to have substantial vulnerability to default in payment of interest and/or principal and have the lowest quality ratings. The Fund may purchase CLO Securities which have ratings that have been downgraded or placed on "credit watch" for future downgrading. Lower rated and unrated securities in which the Fund may invest have large uncertainties or major risk exposures to adverse conditions and are considered to be predominantly speculative and may become a defaulted asset for a variety of reasons. Generally, such securities offer a higher return potential than higher rated securities, but involve greater volatility of price and greater risk of loss of income and principal.

The market values of certain of these securities (such as subordinated securities) also tend to be more sensitive to changes in economic conditions than higher rated securities. The value of leveraged loans and other assets underlying a CLO may also be affected by changes in the market's perception of the entity issuing or guaranteeing them, or by changes in government regulations and tax policies. Additionally, loans and interests in loans have significant liquidity and market value risks since they are not generally traded in organized exchange markets but are traded by banks and other institutional investors engaged in loan syndications. Because loans are privately syndicated and loan agreements are privately negotiated and customized, loans are not purchased or sold as easily as publicly traded securities. In addition, historically the trading volume in the loan market has been small relative to the high-yield debt securities market, and such illiquidity has been exacerbated during the current liquidity crisis.

Leveraged loans have historically experienced greater default rates than has been the case for investment grade securities. There can be no assurance as to the levels of defaults and/or recoveries that may be experienced on the assets underlying CLO Securities.

In general, the ratings of nationally recognized rating organizations represent the opinions of such agencies as to the quality of securities that they rate. Such ratings may be used by the Investment Manager as an initial basis for the selection of portfolio securities. Such ratings, however, are relative and subjective; they are not absolute standards of quality and do not evaluate the market value risk of the securities. Such ratings also do not reflect macroeconomic or systematic risk, including the risk of increased illiquidity in the credit markets. It is also possible that a rating agency might not change its rating of a particular issue on a timely basis to reflect subsequent events.

*Defaulted Assets Underlying CLO Securities*. If the assets underlying a CLO Security become defaulted assets, such defaulted assets may become subject to either substantial workout negotiations or restructuring, which may entail, among other things, a substantial reduction in the interest rate, a substantial write-down of principal, and a substantial change in the terms, conditions and covenants with respect to such defaulted asset. In addition, such negotiations or restructuring may be quite extensive and protracted over time, and therefore may result in substantial uncertainty with respect to the ultimate recovery on such defaulted asset. The liquidity for defaulted assets may be limited, and to the extent that defaulted assets are sold, it is highly unlikely that the proceeds from such sale will be equal to the amount of unpaid principal and interest thereon. Furthermore, there can be no assurance that the ultimate recovery on any defaulted assets will be at least equal to either the minimum recovery rate assumed by any rating agency that rates the notes of the CLO security. Therefore, if any CLO security has defaulted assets which correspond to the exposure of the Fund's interest in the CLO security, the Fund may be adversely affected.

There exist significant additional risks for CLO Securities and investors in such securities as a result of the current liquidity crisis. Those risks include, among others, (i) the likelihood that the issuer of the CLO Security will find it harder to sell any of its assets in the secondary market, thus rendering it more difficult to dispose of assets which it has the discretion to manage, including credit risk obligations, credit improved obligations or defaulted obligations, (ii) the possibility that the price at which assets can be sold by the issuer of the CLO Security will have deteriorated from their effective purchase price and (iii) the increased illiquidity of the notes issued by the CLO Security. These additional risks may affect the returns on the investments in the Fund's portfolio.

*Subordination of CLO Debt and CLO Equity*. The Fund's portfolio may consist of CLO Equity and subordinate CLO Debt. Subordinate CLO Debt generally is fully subordinated to the related CLO senior tranches. CLO Equity generally is fully subordinated to any related CLO Debt. Thus, some of the investments of the Fund in a CLO may rank behind other creditors of the CLO and an investment by the Fund in the equity tranche of a CLO may rank behind all creditors of the CLO. To the extent that any losses are incurred by a CLO in respect of its related CLO Collateral, such losses are likely to be borne first by the holders of the related CLO Equity, next by the holders of any related subordinated CLO debt and finally by the holders of the related CLO senior tranches. In addition, if an event of default occurs under the governing instrument or underlying investment, as long as any CLO senior tranches are outstanding, the holders thereof generally are likely to be entitled to determine the remedies to be exercised under the instrument governing the CLO. Remedies pursued by such holders could be adverse to the interests of the holders of any related subordinated CLO Debt and/or the holders of the related CLO Equity, as applicable. Investments of the Fund may be the first to absorb any losses by the

CLO on its underlying portfolio. This may result in losses on the invested proceeds of the Fund and could result in the complete loss of invested proceeds.

*Mandatory Redemption of CLO Senior Tranches and CLO Debt.* Under certain circumstances, cash flows from CLO Collateral that otherwise would have been paid to the holders of any related CLO Debt and the related CLO Equity will be used to redeem the related CLO senior tranches. This could result in an elimination, deferral or reduction in the interest payments, principal repayments or other payments made to the holders of such CLO Debt or such CLO Equity, which could adversely impact the returns to the holders of such CLO Debt or such CLO Equity.

*Optional Redemption of CLO Senior Tranches and CLO Debt.* An optional redemption by a CLO of its securities and, in particular, the exercise of rights by the holders of one or more classes of its securities (or the requisite percentages thereof) so as to effect any such optional redemption, could require the collateral or portfolio manager of the related CLO to liquidate positions more rapidly than would otherwise be desirable, which is likely to materially and adversely affect the realized value of the items of CLO Collateral sold (and which in turn is likely to materially and adversely impact the holders of any related CLO securities, including the Fund). As a result of any such rapid liquidation of a CLO, a holder of the related CLO securities (including the Fund) could lose all or a substantial portion of its investment in such CLO securities.

*Insolvency Risks.* Various laws enacted for the protection of creditors may apply to the issuers of the CLO Collateral (solely for purposes of this risk factor, an "***Insolvent Company***"). The information in this paragraph and the following paragraph is applicable with respect to U.S. issuers of CLO Collateral. Insolvency considerations may differ with respect to non-U.S. issuers of CLO Collateral. If a court in a lawsuit brought by an unpaid creditor or representative of creditors of an Insolvent Company, such as a trustee in bankruptcy, were to find that the issuer did not receive fair consideration or reasonably equivalent value for incurring the indebtedness constituting the CLO or CLO Collateral (as applicable) and, after giving effect to such indebtedness, the Insolvent Company (i) was insolvent, (ii) was engaged in a business for which the remaining assets of the Insolvent Company constituted unreasonably small capital or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature, such court could determine to invalidate, in whole or in part, such indebtedness as a fraudulent conveyance, to subordinate such indebtedness to existing or future creditors of the Insolvent Company or to recover amounts previously paid by such issuer in satisfaction of such indebtedness. The measure of insolvency for purposes of the foregoing will vary. Generally, an Insolvent Company would be considered insolvent at a particular time if the sum of its debts were then greater than all of its property at a fair valuation or if the present fair saleable value of its assets were then less than the amount that would be required to pay its probable liabilities on its existing debts as they became absolute and matured. There can be no assurance as to what standard a court would apply in order to determine whether the Insolvent Company was "insolvent" after giving effect to the incurrence of the indebtedness constituting the CLO or CLO Collateral (as applicable) or that, regardless of the method of valuation, a court would not determine that the Insolvent Company was "insolvent" upon giving effect to such incurrence. In addition, in the event of the insolvency of an Insolvent Company, payments made on such CLO or CLO Collateral (as applicable) could be subject to avoidance as a "preference" if made within a certain period of time (which may be as long as one year) before insolvency.

In general, if payments on a CLO or CLO Collateral (as applicable) are avoidable, whether as fraudulent conveyances or preferences, such payments can be recaptured either from the initial recipient (such as the Fund) or from subsequent transferees of such payments (such as the Limited Partners).

However, a court in a bankruptcy or insolvency proceeding would be able to direct the recapture of any such payment from a Limited Partner only to the extent that such court has jurisdiction over such holder or its assets. Moreover, it is likely that avoidable payments could not be recaptured directly from a holder that has given value in exchange for its interest, in good faith and without knowledge that the payments were avoidable. Nevertheless, there can be no assurance that a Limited Partner will be able to avoid recapture on this or any other basis.

The preceding discussion is based upon principles of United States Federal and state laws. Insofar as the Fund's portfolio consists of the obligations of non-United States obligors, the laws of certain foreign jurisdictions may provide for avoidance remedies under factual circumstances similar to those described above or under different circumstances, with consequences that may or may not be analogous to those described above under United States Federal and state laws.

*"Widening" Risk*. For reasons not necessarily attributable to any of the risks set forth herein (for example, supply/demand imbalances or other market forces), the prices of the CLO Securities in which the Fund invests may decline substantially. In particular, purchasing assets at what may appear to be "undervalued" levels is no guarantee that these assets will not be trading at even lower levels at a time of valuation or at the time of sale. It may not be possible to predict, or to hedge against, such "spread widening" risk.

*There Is Limited Disclosure About the CLO Securities and the Underlying CLO Collateral in this Memorandum.* The Investment Manager will not be required to provide the investors in the Fund with financial or other information (which may include material non-public information) it receives related to the CLO Securities. The Investment Manager also may not disclose to investors notices the Investment Manager receives and it will not have any obligation to keep investors informed as to defaults in the CLO Securities, failure by the Fund to receive any payment of principal, interest, or other amounts or to disclose the portfolio or the decisions of which CLO Securities were not purchased in general to any investor. In addition, the investors will not have any right to inspect any records relating to the CLO Securities, and the Investment Manager will not be obligated to disclose any further information or evidence regarding the existence or terms of, or the identity of any obligor on, any CLO Securities.

*Impact of the Volcker Rule on the Liquidity of the Notes*. Section 619 of the Dodd-Frank Act added a provision, commonly referred to (together with the final regulations with respect thereto adopted on December 10, 2013) as the Volcker Rule, to federal banking laws to generally prohibit various covered banking entities from engaging in proprietary trading or acquiring or retaining an ownership interest in "covered funds" which generally include, sponsoring or having certain relationships with a hedge fund or private equity fund (defined in final regulations adopted on December 10, 2013 as any entity relying on Section 3(c)(1) or Section 3(c)(7) of the Investment Company Act to be exempt from registration under the Investment Company Act), subject to certain exemptions. The Volcker Rule also provides for certain supervised nonbank financial companies that engage in such activities or have such interests or relationships to be subject to additional capital requirements, quantitative limits or other restrictions. The conformance period for the Volcker Rule has been extended to July 21, 2015, and to July 21, 2017 for CLOs. Certain CLOs may be considered "covered funds" under the Volcker rule and therefore the most senior tranche of the CLO may be a restricted security for various banking and nonbanking entities. This may restrict the liquidity of certain non-Volcker compliant CLOs in the future and may affect the Fund's ability to liquidate these positions on a timely basis.

Investment Strategy and Investment Risks

*General Economic and Market Conditions*.   The success of the Fund's activities will be affected by general economic and market conditions, such as interest rates, availability of credit, inflation rates, economic uncertainty, changes in laws (including laws relating to taxation of the Fund's investments), trade barriers, currency exchange controls, and national and international political circumstances (including wars, terrorist acts or security operations).   These factors may affect the level and volatility of securities prices and the liquidity of the Fund's investments.   Volatility or illiquidity could impair the Fund's profitability or result in losses.   The Fund may maintain substantial trading positions that can be adversely affected by the level of volatility in the financial markets; the larger the positions, the greater the potential for loss.

Unpredictable or unstable market conditions may result in reduced opportunities to find suitable investments to deploy capital or make it more difficult to exit and realize value (or avoid significant losses) from the Fund's existing investments.   It is important to understand that the Fund can incur material losses even if it reacts quickly to difficult market conditions and there can be no assurance that the Fund will not suffer material adverse effects from broad and rapid changes in market conditions.

*Recent Developments in Global Credit Markets*.   Recently, declines in the market value of asset-backed securities, especially securities backed by subprime mortgages, have been concomitant with significant market events.   Increasing credit and valuation problems in the subprime mortgage market have generated extreme volatility and illiquidity in the markets for securities directly or indirectly exposed to subprime mortgage loans.   This volatility and illiquidity has extended to the global credit and equity markets generally, and, in particular, to the high-yield bond and loan markets, exacerbated by, among other things, growing uncertainty regarding the extent of the problems in the mortgage industry and the degree of exposure of financial institutions and others, decreased risk tolerance by investors and significantly tightened availability of credit.   The duration and ultimate effect of current market conditions cannot be predicted, nor is it known whether or the degree to which such conditions may worsen.   However, the continuation of current market conditions, uncertainty or further deterioration could result in further declines in the market values of potential Fund investments or declines in the market values of subsequently purchased Fund investments.   Such declines could lead to diminished investment opportunities for the Fund, prevent the Fund from successfully executing its investment strategies or require the Fund to dispose of investments at a loss while such adverse market conditions prevail.

*Illiquidity*.   The investments made by the Fund may be or become very illiquid, and consequently the Fund may not be able to sell such investments at prices that reflect the Investment Manager's assessment of their value or the amount paid for such investments by the Fund.   Illiquidity may result from the absence of an established market for the investments as well as legal, contractual or other restrictions on their resale by the Fund and other factors.   Furthermore, the nature of the Fund's investments, especially those in financially distressed companies, may require a long holding period prior to profitability.   The Partnership Agreement authorizes the General Partner to make distributions in kind (including interests in affiliated liquidating vehicles) of securities in lieu of or in addition to cash. In the event the General Partner makes distributions of securities in kind, such securities could be illiquid or subject to legal, contractual and other restrictions on transfer.

*Short Sales*.   The Fund may enter into transactions, known as "short sales," in which it sells a security it does not own in anticipation of a decline in the market value of the security.   Short sales by the Fund that are not made "against the box" theoretically involve unlimited loss potential since the

33

market price of securities sold short may continuously increase.   The Fund may mitigate such losses by replacing the securities sold short before the market price has increased significantly.   Under adverse market conditions, the Fund might have difficulty purchasing securities to meet its short sale delivery obligations, and might have to sell portfolio securities to raise the capital necessary to meet its short sale obligations at a time when fundamental investment considerations would not favor such sales.

*Derivatives*.   Derivative instruments, or "derivatives," include futures, options, swaps, structured securities and other instruments and contracts that are derived from, or the value of which is related to, one or more underlying securities, financial benchmarks, currencies or indices.   Derivatives allow an investor to hedge or speculate upon the price movements of a particular security, financial benchmark currency or index at a fraction of the cost of investing in the underlying asset.   The value of a derivative depends largely upon price movements in the underlying asset.   Therefore, many of the risks applicable to trading the underlying asset are also applicable to derivatives of such asset.  However, there are a number of other risks associated with derivatives trading.   For example, because many derivatives are "leveraged," and thus provide significantly more market exposure than the money paid or deposited when the transaction is entered into, a relatively small adverse market movement can not only result in the loss of the entire investment, but may also expose the Fund to the possibility of a loss exceeding the original amount invested.   Derivatives may also expose investors to liquidity risk, as there may not be a liquid market within which to close or dispose of outstanding derivatives contracts, and to counterparty risk.   The counterparty risk lies with each party with whom the Fund contracts for the purpose of making derivative investments (the "**Counterparty**").   In the event of the Counterparty's default, the Fund will only rank as an unsecured creditor and risks the loss of all or a portion of the amounts it is contractually entitled to receive.

*Life Settlement Investments*.   The Fund may invest in life settlements or own companies that may invest in life settlements, which are the transfers of the beneficial interest in a life insurance policy by the underlying insured person to a third party.   The Fund will generally purchase the beneficial interest in a life insurance policy for more than its cash surrender value but at a discount to its face value (i.e., the payment amount set forth in the life insurance policy that is payable on the death of the insured or upon maturity of the life insurance policy).   After purchase the Fund will be responsible for premiums payable on the life insurance policy and will be entitled to receive the full face value from the insurance company upon maturation (i.e., upon the death of the insured).   Accordingly, if the Fund is unable to make premium payments on a purchased life insurance policy due to liquidity issues or for any other reason, the policy will lapse, and the Fund will lose its ownership interest in the policy.   In addition, the Fund's investments in life settlement policies involve certain additional risks, including inaccurate estimations of life expectancy of the insured individuals, liquidity risk, credit risk of the insurance company, risks of any policies purchased being unenforceable and risks of adverse regulatory and legal changes.

The actual rate of return on a life settlement policy cannot be calculated before the insured dies and the longer the insured lives, the lower the rate of return on the related life settlement policy will be.  Current privacy laws may limit the information available to the Fund about insureds and may cause the Fund to inaccurately estimate the value of particular policies.   The Fund's inability to predict with certainty the life expectancies of the pool of underlying insured persons tied to purchased life settlement policies may cause unanticipated delays in the collection of a substantial number of life settlement policies.   Life settlements are also generally considered illiquid because there is a limited secondary market for such policies to be bought and sold.   Accordingly, the Fund may be limited in its ability to sell policies in its portfolio in a timely fashion and/or at a favorable price.   In addition, if a life insurance company declares bankruptcy or otherwise is insolvent, there may not be sufficient funds for it to pay

its liability, and while many states have an insurance guarantee fund to provide payments to beneficiaries of insurance companies that declare bankruptcy, the collection process can be prolonged and complicated, and collection may not be possible in all circumstances.

Life settlement policies may also be subject to contest by the issuing life insurance company. If the insurance company successfully contests a policy, the policy will be rescinded and declared void. For example, insurers may refuse to pay benefits on certain life insurance policies on the basis that there was no "insurable interest" on the part of the purchaser of a life insurance policy at the time such policy was issued. Recently the issue of a lack of insurable interest has been raised by insurers and beneficiaries of irrevocable life insurance trusts, in the context of so-called "stranger originated life insurance" policies. It is possible that courts may void certain life settlement policies for these or other reasons. The market for life settlement policies may also be subject to new government regulation that may impact the ability of the Fund to obtain life settlement policies. Insurance companies may seek regulation or changes of law restricting or otherwise encumbering the transfer of life insurance policies in life settlement policy transactions. No assurance can be made that insurance companies will not be successful in limiting the supply of life insurance policies available for purchase in life settlement policy transactions.

Any or all of the risks described above could have a material adverse effect on the Fund's investment returns and, therefore, on its ability to make distributions to its shareholders. In addition, it is unclear under a variety of federal income tax principles whether the income from life settlements or the Fund's ownership in a non-U.S. company that makes distributions resulting from such life settlement investments is qualifying income for purposes of the IRS 90% gross income test the Fund must satisfy each year to qualify as a regulated investment company ("*RIC*"). Further, the Fund's ownership in a non-U.S. company that invests in life settlements, it is unclear whether the U.S. will respect the non-U.S. company reliance on the applicable U.S. tax treaty for purposes of the avoidance of certain withholding tax or whether the non-U.S. company is deemed to be engaged in a U.S. trade or business within the U.S. If any such was the case, the Fund could be materially adversely effected by such determination on the non-U.S. company with respect to the Fund's investments returns and its ability to make distributions to its shareholders. The Fund intends to monitor its investments to ensure that the Fund remains qualified as a RIC.

*Foreign Securities*. Investments in foreign securities involve certain factors not typically associated with investing in U.S. securities, such as risks relating to (i) currency exchange matters, including fluctuations in the rate of exchange between the U.S. dollar (the currency in which the books of the Fund are maintained) and the various foreign currencies in which the Fund's portfolio securities will be denominated and costs associated with conversion of investment principal and income from one currency into another; (ii) differences between the U.S. and foreign securities markets, including the absence of uniform accounting, auditing and financial reporting standards and practices and disclosure requirements, and less government supervision and regulation; (iii) political, social or economic instability; (iv) imposition of foreign income, withholding or other taxes; and (v) the extension of credit, especially in the case of sovereign debt.

*Commodities and Futures.* The Fund may trade on a limited basis in commodities and futures. Such trading activity is regulated by the Commodity Futures Trading Commission (the "*CFTC*"). Pursuant to an exemption from registration under CFTC regulations, neither the General Partner nor the Investment Manager is required to register, and neither is registered, with the CFTC or the National Futures Association ("*NFA*") as a commodity pool operator (a "*CPO*") or as a commodity trading advisor ("*CTA*"). To comply with the exemption, the Investment Manager is subject to specific

limitations on the amount of commodities and futures that it can trade on behalf of the Fund. Should the Fund's investments in commodities or futures instruments exceed the limits provided by the applicable exemption from registration, the Investment Manager will either have to register with the NFA or cease providing commodity interest trading advice to the Fund and liquidate the Fund's holdings of commodities and futures which could result in losses and additional costs to the Fund.

*Leverage.* Subject to applicable margin and other limitations, the Fund may borrow funds in order to make additional investments and thereby increase both the possibility of gain and risk of loss. Consequently, the effect of fluctuations in the market value of the Fund's portfolio would be amplified. Interest on borrowings will be a portfolio expense of the Fund and will affect the operating results of the Fund. Also, the Fund could potentially create leverage via the use of instruments such as options and other derivative instruments.

*Options.* Investing in options can provide a greater potential for profit or loss than an equivalent investment in the underlying asset. The value of an option may decline because of a change in the value of the underlying asset relative to the strike price, the passage of time, changes in the market's perception as to the future price behavior of the underlying asset, or any combination thereof. In the case of the purchase of an option, the risk of loss of an investor's entire investment (*i.e.*, the premium paid plus transaction charges) reflects the nature of an option as a wasting asset that may become worthless when the option expires. Where an option is written or granted (*i.e.*, sold) uncovered, the seller may be liable to pay substantial additional margin, and the risk of loss is unlimited, as the seller will be obligated to deliver, or take delivery of, an asset at a predetermined price which may, upon exercise of the option, be significantly different from the market value.

*Currency Exposure.* The Interests will be issued and generally withdrawal proceeds will be paid in U.S. Dollars. A limited amount of the assets of the Fund may, however, be invested in securities and other investments which are denominated in currencies other than U.S. Dollars. Accordingly, the value of such assets may be affected favorably or unfavorably by fluctuations in currency rates. The Investment Manager may hedge the non-U.S. currency exposure of the Fund using Currency Hedging Instruments, as described in "Investment Program" above. However, the assets of the Fund will necessarily be subject to foreign exchange risks. In addition, prospective investors whose assets and liabilities are predominately in other currencies should take into account the potential risk of loss arising from fluctuations in value between the U.S. Dollar and other currencies.

To the extent unhedged, the value of the Fund's positions in non-U.S. investments will fluctuate with U.S. Dollar exchange rates as well as with the price changes of the investments in the various local markets and currencies. In such cases, an increase in the value of the U.S. Dollar compared to the other currencies in which the Fund makes investments will reduce the effect of any increases and magnify the effect of any decreases in the prices of the Fund's financial instruments in their local markets and may result in a loss to the Fund. Conversely, a decrease in the value of the U.S. Dollar will have the opposite effect on the Fund's non-U.S. Dollar investments.

*Concentration of the Fund's Portfolio.* The Fund may be highly concentrated in CLO Securities. The concentration of the Fund's portfolio in CLO Securities subjects the Fund to a greater degree of risk than if the Fund's portfolio was diversified with respect to several investment strategies. Also, the concentration of the Fund's portfolio in any one obligor would subject the Fund to a greater degree of risk with respect to defaults by such obligor.

*Volatility Risk*. The Fund's investment program may involve the purchase and sale of relatively volatile instruments such as derivatives, which are frequently valued based on implied volatilities of such derivatives compared to the historical volatility of underlying financial instruments. Fluctuations or prolonged changes in the volatility of such instruments, therefore, can adversely affect the value of investments held by the Fund. In addition, many non-U.S. financial markets are not as developed or as efficient as those in the U.S., and as a result, price volatility may be higher for the Fund's investments.

*Long-Biased Investment Program.* The Fund expects that its strategy will have a long bias. Therefore, any decline in the overall market may result in a decline in the value of the Fund's assets.

*Leverage*. Leverage may take a variety of forms, including but not limited to the following: long-term loans, convertible notes and repurchase arrangements. Leverage arrangements used by the Fund when financing is contingent on the market value of the financed assets may include those which may be subject to mark to market collateral or margin calls.

While leverage presents the opportunity for increasing the total return on investments, it has the effect of potentially increasing losses as well. Accordingly, any event that adversely affects the value of an investment could be magnified to the extent leverage is utilized. The cumulative effect of the use of leverage with respect to investments in a market that moves adversely to such investments could result in a substantial loss, which would be greater than if the investments were not leveraged.

In the futures markets, margin deposits are typically low relative to the value of the futures contracts purchased or sold. Such low margin deposits are indicative of the fact that any commodity futures contract trading is typically accompanied by a high degree of leverage. Low margin deposits mean that a relatively small price movement in a futures contract may result in immediate and substantial losses to the investor. For example, if at the time of purchase 10 percent of the price of a futures contract is deposited as margin, a 10 percent decrease in the price of the futures contract would, if the contract is then closed out, result in a total loss of the margin deposit before any deduction for the brokerage commission. Thus, like other leveraged investments, any purchase or sale of a commodity contract may result in losses in excess of the amount invested.

The use of short-term margin borrowings results in certain additional risks to the Fund. For example, should the securities pledged to brokers to secure the Fund's margin accounts decline in value, the Fund could be subject to a "margin call," pursuant to which the Fund must either deposit additional funds or securities with the broker, or suffer mandatory liquidation of the pledged securities to compensate for the decline in value. In the event of a sudden drop in the value of the Fund's assets, the Fund might not be able to liquidate assets quickly enough to satisfy its margin requirements.

The Fund may borrow by entering into reverse repurchase agreements. Under a reverse repurchase agreement, the Fund sells securities and agrees to repurchase them at a mutually agreed date and price. Reverse repurchase agreements may involve the risk that the market value of the securities retained in lieu of sale by the Fund may decline below the price of the securities the Fund has sold but is obligated to repurchase. In the event the buyer of securities under a reverse repurchase agreement files for bankruptcy or becomes insolvent, such buyer or its trustee or receiver may receive an extension of time to determine whether to enforce the Fund's obligation to repurchase the securities and the Fund's use of the proceeds of the reverse repurchase agreement may effectively be restricted pending such decision. To the extent that, in the meantime, the value of the securities that the Fund has purchased has decreased, the Fund could experience a loss.

The financing used by the Fund to leverage its portfolio include those extended by securities brokers and dealers in the marketplace in which the Fund will invest. While the Fund attempts to negotiate the terms of these financing arrangements with such brokers and dealers, its ability to do so is limited. The Fund is therefore subject to changes in the value that the broker-dealer ascribes to a given security or position, the amount of margin required to support such security or position, the borrowing rate to finance such security or position and/or such broker-dealer's willingness to continue to provide any such credit to the Fund. In addition, the Fund could be forced to liquidate its portfolio on short notice to meet its financing obligations. The forced liquidation of all or a portion of the Fund's portfolio at distressed prices could result in significant losses to the Fund.

*Market Liquidity and Leverage*. The Fund may be adversely affected by a decrease in market liquidity for the instruments in which it invests which may impair the Fund's ability to adjust its positions. The size of the Fund's positions may magnify the effect of a decrease in market liquidity for such instruments. Changes in overall market leverage, deleveraging as a consequence of a decision by the prime brokers and custodians, or other counterparties with which the Fund enters into repurchase/reverse repurchase agreements or derivative transactions, to reduce the level of leverage available, or the liquidation by other market participants of the same or similar positions, may also adversely affect the Fund's portfolio.

*Risks Associated with Bankruptcies*. Many of the events within a bankruptcy case are adversarial and often beyond the control of the creditors. While creditors generally are afforded an opportunity to object to significant actions, there can be no assurance that a bankruptcy court would not approve actions which may be contrary to the interests of the Fund. Furthermore, there are instances where creditors and equity holders lose their ranking and priority as such if they are considered to have taken over management and functional operating control of a debtor.

Generally, the duration of a bankruptcy case can only be roughly estimated. The reorganization of a company usually involves the development and negotiation of a plan of reorganization, plan approval by creditors and confirmation by the bankruptcy court. This process can involve substantial legal, professional and administrative costs to the company and the Fund; it is subject to unpredictable and lengthy delays; and during the process the company's competitive position may erode, key management may depart and the company may not be able to invest adequately. In some cases, the company may not be able to reorganize and may be required to liquidate assets. Although the Fund intends to invest primarily in debt, the debt of companies in financial reorganization will, in most cases, not pay current interest, may not accrue interest during reorganization and may be adversely affected by an erosion of the issuer's fundamental value. Such investments can result in a total loss of principal.

U.S. bankruptcy law permits the classification of "substantially similar" claims in determining the classification of claims in a reorganization for purpose of voting on a plan of reorganization. Because the standard for classification is vague, there exists a significant risk that the Fund's influence with respect to a class of securities can be lost by the inflation of the number and the amount of claims in, or other gerrymandering of, the class. In addition, certain administrative costs and claims that have priority by law over the claims of certain creditors (for example, claims for taxes) may be quite high.

Furthermore, there are instances where creditors and equity holders lose their ranking and priority as such when they take over management and functional operating control of a debtor. In those cases where the Fund, by virtue of such action, is found to exercise "domination and control" of a debtor, the Fund may lose its priority if the debtor can demonstrate that its business was adversely impacted or other creditors and equity holders were harmed by the Fund.

The Fund may invest in companies based outside the United States. Investment in the debt of financially distressed companies domiciled outside the United States involves additional risks. Bankruptcy law and process may differ substantially from that in the United States, resulting in greater uncertainty as to the rights of creditors, the enforceability of such rights, reorganization timing and the classification, seniority and treatment of claims. In certain developing countries, although bankruptcy laws have been enacted, the process for reorganization remains highly uncertain.

The General Partner, on behalf of the Fund, may elect to serve on creditors' committees, equity holders' committees or other groups to ensure preservation or enhancement of the Fund position as a creditor or equity holder. A member of any such committee or group may owe certain obligations generally to all parties similarly situated that the committee represents. If the General Partner concludes that its obligations owed to the other parties as a committee or group member conflict with its duties owed to the Fund, it will resign from that committee or group, and the Fund may not realize the benefits, if any, of participation on the committee or group. In addition, and also as discussed above, if the Fund is represented on a committee or group, it may be restricted or prohibited under applicable law from disposing of or increasing its investments in such company while it continues to be represented on such committee or group.

The Fund may purchase creditor claims subsequent to the commencement of a bankruptcy case. Under judicial decisions, it is possible that such purchase may be disallowed by the bankruptcy court if the court determines that the purchaser has taken unfair advantage of an unsophisticated seller, which may result in the rescission of the transaction (presumably at the original purchase price) or forfeiture by the purchaser.

*Equitable Subordination*. Under common law principles that in some cases form the basis for lender liability claims, if a lender (a) intentionally takes an action that results in the undercapitalization of a borrower or issuer to the detriment of other creditors of such borrower or issuer, (b) engages in other inequitable conduct to the detriment of such other creditors, (c) engages in fraud with respect to, or makes misrepresentations to, such other creditors or (d) uses its influence as a stockholder to dominate or control a borrower or issuer to the detriment of other creditors of such borrower or issuer, a court may elect to subordinate the claim of the offending lender or bondholder to the claims of the disadvantaged creditor or creditors (a remedy called "***equitable subordination***"). The Fund does not intend to engage in conduct that would form the basis for a successful cause of action based upon the equitable subordination doctrine; however, because of the nature of the debt obligations, the Fund may be subject to claims from creditors of an obligor that debt obligations of such obligor which are held by the issuer should be equitably subordinated.

*Fraud*. Of paramount concern in lending is the possibility of material misrepresentation or omission on the part of the borrower. Such inaccuracy or incompleteness may adversely affect the valuation of the collateral underlying the loans or may adversely affect the ability of the Fund to perfect or effectuate a lien on the collateral securing the loan. The Fund will rely upon the accuracy and completeness of representations made by borrowers to the extent reasonable, but cannot guarantee such accuracy or completeness. Under certain circumstances, payments to the Fund may be reclaimed if any such payment or distribution is later determined to have been a fraudulent conveyance or a preferential payment.

*Interest Rate Risk*. The value of the fixed rate securities in which the Fund may invest generally will have an inverse relationship with interest rates. Accordingly, if interest rates rise the value of such securities may decline. In addition, to the extent that the receivables or loans underlying specific

securities are prepayable without penalty or premium, the value of such securities may be negatively affected by increasing prepayments, which generally occur when interest rates decline.

*Reinvestment Risk*. The Fund reinvests the cash flows received from a security. The additional income from such reinvestment, sometimes called interest-on-interest, is reliant on the prevailing interest rate levels at the time of reinvestment. There is a risk that the interest rate at which interim cash flows can be reinvested will fall. Reinvestment risk is greater for longer holding periods and for securities with large, early cash flows such as high-coupon bonds. Reinvestment risk also applies generally to the reinvestment of the proceeds the Fund receives upon the maturity or sale of a portfolio security.

The amount and timing of the addition of investments will affect the cash flows available to make payments on the Interests. Reduced liquidity and lower volumes of trading in certain investments, in addition to restrictions on investment represented by the Fund's investment criteria, could result in periods of time during which the Fund has not been able to maximize its exposure to investments. The longer the period before reinvestment of cash in investments, the greater the adverse impact may be on aggregate interest collected and distributed by the Fund, thereby resulting in lower yield than could have been obtained if the net proceeds associated with the offering of the Interests were immediately reinvested. In addition, the timing of the addition of investments, the scheduled interest payment dates of the investments and the amount of the net proceeds associated with the offering of the Interests invested in lower-yielding alternate short-term investments until applied to the addition of investments, may have a material impact on the amount of interest payments collected during any accrual period, which could affect payments on the Interests.

Further, obligors of investments may be more likely to exercise any rights they may have to prepay such obligations when interest rates or credit spreads are declining. Any decrease in the yield on the investments will have the effect of reducing the amounts available to make payments on the Interests.

*Timing Risk*. Many agency, corporate and municipal bonds, and all mortgage-backed securities, contain a provision that allows the issuer to "call" all or part of the issue before the bond's maturity date. The issuer usually retains the right to refinance the bond in the future if market interest rates decline below the coupon rate. There are three disadvantages to the call provision. First, the cash flow pattern of a callable bond is not known with certainty. Second, because the issuer will call the bonds when interest rates have dropped, the Fund is exposed to reinvestment rate risk, *i.e.*, the Fund will have to reinvest the proceeds received when the bond is called at lower interest rates. Finally, the capital appreciation potential of a bond will be reduced because the price of a callable bond may not rise much above the price at which the issuer may call the bond.

*Maturity Risk*. In certain situations, the Fund may purchase a bond of a given maturity as an alternative to another bond of a different maturity. Ordinarily, under these circumstances, the Fund will make an adjustment to account for the differential interest rate risks in the two bonds. This adjustment, however, makes an assumption about how the interest rates at different maturities will move. To the extent that the yield movements deviate from this assumption, there is a yield-curve or maturity risk. Another situation where yield-curve risk should be considered is in the analysis of bond swap transactions where the potential incremental returns are dependent entirely on the parallel shift assumption for the yield curve.

*Inflation Risk*. Inflation risk results from the variation in the value of cash flows from a security due to inflation, as measured in terms of purchasing power. For example, if the Fund purchases a five

(5) year bond in which it can realize a coupon rate of five percent (5%), but the rate of inflation is six percent (6%), then the purchasing power of the cash flow has declined. For all but adjustable bonds or floating rate bonds, the Fund is exposed to inflation risk because the interest rate the issuer promises to make is fixed for the life of the security. To the extent that interest rates reflect the expected inflation rate, floating rate bonds have a lower level of inflation risk.

*Over-the-Counter-Trading*. Financial instruments that may be purchased or sold by the Fund may include instruments not traded on an exchange, including, but not limited to, swap transactions, and forward foreign currency transactions. Over-the-counter options, unlike exchange-traded options, are two-party contracts with price and other terms negotiated by the buyer and seller. The risk of nonperformance by the obligor on such an instrument may be greater and the ease with which the Fund can dispose of or enter into closing transactions with respect to such an instrument may be less than in the case of an exchange-traded instrument. In addition, significant disparities may exist between "bid" and "asked" prices for financial instruments that are not traded on an exchange. Financial instruments not traded on exchanges are also not subject to the same type of government regulation as exchange traded instruments, and many of the protections afforded to participants in a regulated environment may not be available in connection with such transactions.

To the extent that the Fund engages in these transactions, the Fund must rely on the creditworthiness of its counterparty. In certain instances, counterparty or credit risk is affected by the lack of a central clearinghouse for foreign exchange trades. To reduce their credit risk exposure, the Fund may trade in the forward foreign currency market through money center banks and leading brokerage firms.

*Position Limits*. "Position limits" imposed by various regulators or regulations may also limit the Fund's ability to effect desired trades. Position limits are the maximum amounts of gross, net long or net short positions that any one person or entity may own or control in a particular financial instrument. All positions owned or controlled by the same person or entity, even if in different accounts, may be aggregated for purposes of determining whether the applicable position limits have been exceeded. Thus, even if the Fund does not intend to exceed applicable position limits, it is possible that different accounts managed by the General Partner or its affiliates may be aggregated. If at any time positions managed by the General Partner were to exceed applicable position limits, the General Partner would be required to liquidate positions, which might include positions of the Fund, to the extent necessary to come within those limits. Further, to avoid exceeding the position limits, the Fund might have to forego or modify certain of its contemplated trades.

*Material, Nonpublic Information*. From time to time, certain personnel of the Investment Manager may come into possession of material, nonpublic information (including in connection with other investments or proposed investments not intended to benefit the Fund) that would limit the Investment Manager's ability to buy and sell investments. The Fund's investment flexibility may be constrained as a consequence of the Investment Manager's inability to take certain actions because of such information. The Fund may experience losses if it is unable to sell an investment that it holds because certain personnel of the Investment Manager have obtained material, nonpublic information about such investment.

*Co-Investments with Third Parties*. The Fund may co-invest with third parties through joint ventures or other entities. Such investments may involve risks in connection with such third-party involvement, including the possibility that a third-party co-venturer may have financial difficulties resulting in a negative impact on such investment, economic or business interests or goals that are

inconsistent with those of the Fund or be in a position to take (or block) action in a manner contrary to the Fund's investment objectives. In those circumstances where such third parties involve a management group, such third parties may enter into compensation arrangements relating to such investments, including incentive compensation arrangements. Such compensation arrangements will reduce the returns to participants in the investments.

*Other Investment Vehicles.* The Investment Manager may allocate a portion of the Fund's assets to pooled investment vehicles that may be managed by the Investment Manager or its affiliates or unaffiliated managers. Since the Fund may not have full transparency with respect to the trading activities of such investment vehicles, it may be limited in its ability to hedge its exposure or to prevent concentration of its assets within the same issuer, asset or asset class, industry, section, strategy, currency, country or geographic region. Further, the Investment Manager may be limited with respect to its ability to monitor unaffiliated managers, including their adherence to their respective trading and risk guidelines (if such guidelines exist). Even in the event that such information may be available to the Fund, the Fund's investment in such investment vehicles may be "locked up" and subject to limitations on withdrawals, and in light of the broad exculpation and indemnification provisions typically contained in the governing documents of such investment vehicles, may have limited recourse against the managers of such investment vehicles.

The managers of pooled investment vehicles with which the Fund may invest may be subject to asset-based fees and performance-based compensation. Such fees or compensation may be higher than the fees or compensation of comparable investment vehicles.

Performance-based compensation is typically paid or allocated at the investment vehicle level on the basis of the performance of each individual investment vehicle, not on the basis of the overall performance of the Fund. Consequently, performance-based compensation could be payable to a particular investment vehicle in respect of its performance during periods when the Fund as a whole incurs losses. The existence of performance-based compensation also could cause the manager of such investment vehicle to trade in a more aggressive manner than it otherwise might.

*Futures Contracts.* The value of futures depends upon the price of the financial instruments, such as commodities, underlying them. The prices of futures are highly volatile, and price movements of futures contracts can be influenced by, among other things, interest rates, changing supply and demand relationships, trade, fiscal, monetary and exchange control programs and policies of governments, and national and international political and economic events and policies. In addition, investments in futures are also subject to the risk of the failure of any of the exchanges on which the Fund's positions trade or of its clearing houses or counterparties.

Futures positions may be illiquid because certain commodity exchanges limit fluctuations in certain futures contract prices during a single day by regulations referred to as "daily price fluctuation limits" or "daily limits." Under such daily limits, during a single trading day no trades may be executed at prices beyond the daily limits. Once the price of a particular futures contract has increased or decreased by an amount equal to the daily limit, positions in that contract can neither be taken nor liquidated unless traders are willing to effect trades at or within the limit. This could prevent the Fund from promptly liquidating unfavorable positions and subject the Fund to substantial losses or prevent it from entering into desired trades. In extraordinary circumstances, a futures exchange or the Commodities Futures Trading Commission could suspend trading in a particular futures contract, or order liquidation or settlement of all open positions in such contract.

*Forward Trading*.  Forward contracts and options thereon, unlike futures contracts, are not traded on exchanges and are not standardized; rather, banks and dealers act as principals in these markets, negotiating each transaction on an individual basis.  Forward and "cash" trading is substantially unregulated; there is no limitation on daily price movements and speculative position limits are not applicable.  The principals who deal in the forward markets are not required to continue to make markets in the currencies or commodities they trade and these markets can experience periods of illiquidity, sometimes of significant duration.  There have been periods during which certain participants in these markets have refused to quote prices for certain currencies or commodities or have quoted prices with an unusually wide spread between the price at which they were prepared to buy and that at which they were prepared to sell.  Disruptions can occur in any market traded by the Fund due to unusual trading volume, political intervention or other factors.  The imposition of controls by governmental authorities might also limit such forward trading to less than that which the General Partner would otherwise recommend, to the possible detriment of the Fund.  Market illiquidity or disruption could result in major losses to the Fund.

*Hedging Transactions*.  The Fund may (but is not required to) utilize financial instruments both for investment purposes and for risk management purposes in order to (i) protect against possible changes in the market value of the Fund's investment portfolios resulting from fluctuations in the markets and changes in interest rates; (ii) protect the Fund's unrealized gains in the value of its investment portfolio; (iii) facilitate the sale of any such investments; (iv) enhance or preserve returns, spreads or gains on any investment in the Fund's portfolios; (v) hedge against a directional trade; (vi) hedge the interest rate, credit or currency exchange rate on any of the Fund's financial instruments; (vii) protect against any increase in the price of any financial instruments the Fund anticipates purchasing at a later date; or (viii) act for any other reason that the Investment Manager deems appropriate.  The Fund will not be required to hedge any particular risk in connection with a particular transaction or its portfolios generally.

The success of the Fund's hedging strategy will be subject to the Investment Manager's ability to correctly assess the degree of correlation between the performance of the instruments used in the hedging strategy and the performance of the investments in the portfolio being hedged.  Since the characteristics of many securities change as markets change or time passes, the success of the Fund's hedging strategy will also be subject to the Investment Manager's ability to continually recalculate, readjust, and execute hedges in an efficient and timely manner.  While the Fund may enter into hedging transactions to seek to reduce risk, such transactions may result in a poorer overall performance for the Fund than if it had not engaged in any such hedging transactions.  For a variety of reasons, the Investment Manager may not seek to establish a perfect correlation between such hedging instruments and the portfolio holdings being hedged.  Such imperfect correlation may prevent the Fund from achieving the intended hedge or expose the Fund to risk of loss.  The successful utilization of hedging and risk management transactions requires skills complementary to those needed in the selection of the Fund's portfolio holdings.  Moreover, it should be noted that the portfolio will always be exposed to certain risks that cannot be hedged.

*Use of Derivatives and Other Specialized Techniques*.  The Fund may engage in a variety of swaps and related derivative transactions including, but not limited to, total return swaps, interest rate swaps, credit derivative swaps, the use of forward contracts, put and call options, floors, collars or other similar arrangements and derivative transactions.  While some swaps will be required to be cleared and entered into through exchanges once the U.S. Commodity Futures Trading Commission (the "***CFTC***") makes its final clearing determination, swap contracts excluded from the clearing determination will not be traded on exchanges and will not be subject to margin and clearing requirements or the same type of

government regulation as exchange markets.   As a result, many of the protections afforded to participants on organized exchanges and in a regulated environment are not available in connection with these transactions.   The swap markets with respect to noncleared swaps are "principals' markets", in which performance with respect to a swap contract is the responsibility only of the counterparty to the contract, and not of any exchange or clearinghouse.   As a result, the Fund will be subject to the risk of the inability or refusal to perform with respect to non-cleared swap contracts on the part of the counterparties with whom the Fund will trade.

There are no limitations on daily price movements in swap transactions.   Speculative position limits are not currently applicable to swap transactions, although the Fund's swap counterparties may limit the size or duration of positions available to the Fund as a consequence of credit considerations. In addition, the CFTC has sought to impose federal speculative position limits on futures, swaps that reference those futures and contracts on non-U.S. boards of trade that settle against those contracts. While the CFTC adopted final position limits, the rulemaking was vacated due to the CFTC's failure to perform proper cost benefit analysis.   If the CFTC re-adopts rules or the above referenced discussion is overturned on appeal, the Fund may be limited in its ability to concentrate its positions in certain swaps. Furthermore, the Fund may also be subject to position limits pursuant to current or pending non-U.S. regulations.

Participants in the swap markets are not required to make continuous markets in the swap contracts in which they trade.   Participants could refuse to quote prices for swap contracts or quote prices with an unusually wide spread between the price at which they are prepared to buy and the price at which they are prepared to sell.   If an event of default or an additional termination event were to occur with respect to the Fund under an ISDA master agreement governing the Fund's swap transactions, the relevant swap counterparty and other swap counterparties may terminate all transactions with the Fund at significant losses to the Fund.

In addition to the foregoing, the investment techniques related to derivative instruments are highly specialized and may be considered speculative.   Such techniques often involve forecasts and complex judgments regarding relative price movements and other economic developments.   The success or failure of these investment techniques may turn on small changes in exogenous factors not within the control of any of the Investment Manager.   For all the foregoing reasons, the use of derivatives and related techniques can expose the Fund to significant risk of loss.

Moreover, trading in swaps and other derivative instruments offers scope for a high degree of synthetic leverage.   Accordingly, the leverage offered by trading in derivative instruments may magnify the gains and losses experienced by the Fund.   Thus, like other leveraged investments, a derivatives trade may result in losses in excess of the amount invested.   Any increase in the amount of leverage applied will increase the risk of loss due to the amount of additional leverage applied.   Also, swap agreements tend to shift the investment exposure from one type of investment to another.   Depending on how they are used, swap agreements may increase or decrease the overall volatility of the Fund.   The most significant factor in the performance of swap agreements is the change in the specific factors that determine the amounts of payments due to and from the Fund.   If a swap agreement calls for payments by the Fund, the Fund must be prepared to make such payments when due.   In addition, if a counterparty's creditworthiness declines, the value of swap agreements with such counterparty can be expected to decline, potentially resulting in losses to the Fund.

Finally, counterparties to the Fund may be subject to capital and other requirements as a "swap dealer" or "major swap participant" which may increase their costs of doing of business, a portion of which increase may be passed on to the Fund. If a person is deemed to (i) enter into swaps as its ordinary course of business, (ii) be a market maker for any type of swaps, (iii) maintain a "substantial position" in any type of swap for speculative purposes, (iv) otherwise create counterparty risk that could have serious adverse consequences on the financial stability of the United States, or (v) be a financial entity that is highly leveraged relevant to its capital, the person may be deemed to be a swap dealer (in the case of (i) or (ii)) or a major swap participant (in the case of (iii), (iv) or (v)). Persons deemed to be swap dealers or major swap participants are required to register with the CFTC as such and would be subject to a number of regulatory requirements, such as specific recordkeeping, back-office and reporting requirements, margin collection requirements for swaps that are not cleared, capital requirements, disclosure obligations, specific compliance obligations and special obligations to governmental entities. While it is unlikely that the Fund would be subject to these requirements, the requirements will likely apply to many of the Fund's counterparties which may increase the cost of trading swaps through increased fees to offset the counterparties' trading and compliance costs.

*Counterparty Insolvency.* The Fund's assets may be held in one or more accounts maintained for the Fund by counterparties, including its prime brokers. There is a risk that any of such counterparties could become insolvent. In September 2008, Lehman Brothers Holdings Inc., a major investment bank based in the United States, filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code. While none of its U.S. broker-dealer subsidiaries was included in the Chapter 11 filing and all of its U.S. registered broker-dealer subsidiaries currently continue to operate, certain of Lehman Brothers subsidiaries, including Lehman Brothers International (Europe) ("**LBIE**") have been placed under the administration chartered to wind down their respective business. To date, it is uncertain what percentage of the assets custodied with LBIE by its trading counterparties (including hedge funds) will ultimately be recovered and when. The insolvency of the Fund's counterparties is likely to impair the operational capabilities or the assets of the Fund. Although the Investment Manager regularly monitors the financial condition of the counterparties it uses, if one or more of the Fund's counterparties were to become insolvent or the subject of liquidation proceedings in the United States (either under the Securities Investor Protection Act or the United States Bankruptcy Code), there exists the risk that the recovery of the Fund's securities and other assets from such prime broker or broker-dealer will be delayed or be of a value less than the value of the securities or assets originally entrusted to such prime broker or broker-dealer.

In addition, the Fund may use counterparties located in various jurisdictions outside the United States like LBIE. Such local counterparties are subject to various laws and regulations in various jurisdictions that are designed to protect their customers in the event of their insolvency. However, the practical effect of these laws and their application to the Fund's assets are subject to substantial limitations and uncertainties. Because of the large number of entities and jurisdictions involved and the range of possible factual scenarios involving the insolvency of a counterparty, it is impossible to generalize about the effect of their insolvency on the Fund and its assets. Investors should assume that the insolvency of any counterparty would result in a loss to the Fund and the Fund, which could be material.

*Counterparty Risk.* Some of the markets in which the Fund may effect transactions are "over-the-counter" or "interdealer" markets. The participants in such markets are typically not subject to credit evaluation and regulatory oversight as are members of "exchange-based" markets. This exposes the Fund to the risk that a counterparty will not settle a transaction in accordance with its terms and conditions because of a dispute over the terms of the contract (whether or not *bona fide*) or because of a

45

credit or liquidity problem, thus causing the Fund to suffer a loss. Such "counterparty risk" is accentuated for contracts with longer maturities where events may intervene to prevent settlement, or where the Fund has concentrated its transactions with a single or small group of counterparties. The Fund is not restricted from dealing with any particular counterparty or from concentrating any or all of its transactions with one counterparty. Moreover, the Fund's internal credit function which evaluates the creditworthiness of its counterparties may prove insufficient. The lack of a complete and "foolproof" evaluation of the financial capabilities of the Fund's counterparties and the absence of a regulated market to facilitate settlement may increase the potential for losses by the Fund.

*Exchange-Traded Funds.* The Fund may invest in exchange-traded funds ("***ETFs***"), which are shares of publicly-traded unit investment trusts, open-end funds, or depository receipts that seek to track the performance and dividend yield of specific indices or companies in related industries. These indices may be either broad-based, sector, or international. ETF shareholders are generally subject to the same risk as holders of the underlying securities they are designed to track. ETFs are also subject to certain additional risks, including, without limitation, the risk that their prices may not correlate perfectly with changes in the prices of the underlying securities they are designed to track, and the risk of trading in an ETF halting due to market conditions or other reasons, based on the policies of the exchange upon which the ETF trades. In addition, the Fund may bear, along with other shareholders of an ETF, its *pro rata* portion of the ETF's expenses, including management fees. Accordingly, in addition to bearing their proportionate share of the Fund's expenses (e.g., Management Fees and operating expenses), Partners may also indirectly bear similar expenses of an ETF, which may have a material adverse effect on the performance of the Fund.

*Non-U.S. Investments and Emerging Markets*. Investing in the securities of companies located outside the U.S. (including, western countries, "emerging market" countries and underdeveloped countries) involves certain considerations not usually associated with investing in securities of U.S. companies, including political and economic considerations, such as greater risks of expropriation and nationalization, confiscatory taxation, the potential difficulty of repatriating funds, general social, political and economic instability and adverse diplomatic developments; the possibility of imposition of withholding or other taxes on dividends, interest, capital gain or other income; the small size of the securities markets in such countries and the low volume of trading, resulting in potential lack of liquidity and in price volatility; fluctuations in the rate of exchange between currencies and costs associated with currency conversion; and certain government policies that may restrict the Fund's investment opportunities.

In addition, accounting and financial reporting standards that prevail in non-U.S. countries generally are not equivalent to U.S. standards and, consequently, less information is available to shareholders of companies located in such countries than is available to shareholders of companies located in the U.S. Moreover, an issuer of securities may be domiciled in a country other than the country in whose currency the instrument is denominated. The values and relative yields of investments in the securities markets of different countries, and their associate risks, are not expected to be highly correlated with each other and may behave in unpredictable ways. There is also less regulation, generally, of the securities markets in non-U.S. countries.

The Fund may be subject to additional risks which include possible adverse political and economic developments, possible seizure or nationalization of non-U.S. deposits and possible adoption of governmental restrictions which might adversely affect the payment of principal and interest to investors located outside the country of the issuer, whether from currency blockage or otherwise. Furthermore, some of the securities may be subject to brokerage, stamp or other taxes levied by

governments, which has the effect of increasing the cost of such investment and reducing the realized gain or increasing the realized loss on such securities at the time of sale. Furthermore, a non-U.S. issuer of debt or the non-U.S. governmental authorities that control the repayment of the debt may be unable or unwilling to repay principal or interest when due, and the Fund may have limited recourse in the event of a default. Some of these risks do not apply equally to issuers in larger, more developed countries. These risks are more pronounced in investments in issuers in countries with emerging markets or if the Fund invests significantly in a particular country.

Investment in emerging market securities and underdeveloped markets involves a greater degree of risk than an investment in securities of issuers based in developed countries. Among other things, emerging market securities investments may carry the risks of less publicly available information, more volatile markets, less strict securities market regulation, less favorable tax provisions and a greater likelihood of severe inflation, unstable currency, war and expropriation of personal property than investments in securities of issuers based in developed countries. In addition, the Fund's investment opportunities in certain emerging markets may be restricted by legal limits on foreign investment in local securities.

Emerging markets generally are not as efficient as those in developed countries. In some cases, a market for the security may not exist locally, and transactions will need to be made on a neighboring exchange. Volume and liquidity levels in emerging markets are lower than in developed countries. When seeking to sell emerging market securities, little or no market may exist for the securities. In addition, issuers based in emerging markets are not generally subject to uniform accounting and financial reporting standards, practices and requirements comparable to those applicable to issuers based in developed countries, thereby potentially increasing the risk of fraud or other deceptive practices. Furthermore, the quality and reliability of official data published by the government or securities exchanges in emerging markets may not accurately reflect the actual circumstances being reported.

The issuers of some non-U.S. securities, such as banks and other financial institutions, may be subject to less stringent regulations in emerging markets than would be the case for issuers in developed countries and therefore potentially carry greater risk. Custodial expenses for a portfolio of emerging markets securities generally are higher than for a portfolio of securities of issuers based in developed countries.

While the General Partner will take these factors into consideration in making investment decisions for the Fund, no assurance can be given that they will be able to fully avoid these risks.

In view of the foregoing considerations, an investment in Interests is suitable only for investors who are capable of bearing the relevant investment risks.

## Tax Related Risks

*Tax Uncertainty*. The Fund may take positions with respect to certain tax issues which depend on legal conclusions not yet resolved by the courts. Should any such positions be successfully challenged by the Service or other applicable taxing authority, there could be a materially adverse effect on the Fund, and a Limited Partner might be found to have a different tax liability for that year than that reported on its income tax returns.

*Uncertainty and Complexity of Tax Treatment*. The tax aspects of an investment in a partnership are complicated and complex and, in many cases, uncertain. Statutory provisions and administrative

regulations have been interpreted inconsistently by the courts. Additionally, some statutory provisions remain to be interpreted by administrative regulations. Investors will thus be subject to the risk caused by the uncertainty of the tax consequences with respect to an investment in the Fund. Each prospective investor should have the tax aspects of an investment in the Fund reviewed by professional advisors familiar with such investor's personal tax situation and with the tax laws and regulations applicable to the investor and private investment vehicles.

*Risk of Adverse Determination*. There can be no assurance that the conclusions set forth in this Memorandum will not be challenged successfully by the Internal Revenue Service (the "*Service*"), or significantly modified by new legislation, changes in the Service's positions or court decisions. The Fund has not applied for, nor does it expect to apply for, any advance rulings from the Service with respect to any of the federal income tax consequences described in this Memorandum. No representation or warranty of any kind is made by the General Partner with respect to the federal income tax consequences relating to an investment in the Fund. The Fund may take positions with respect to certain tax issues which depend on legal conclusions not yet resolved by the courts. Should any such positions be successfully challenged by the Service or other applicable taxing authority, there could be a materially adverse effect on the Fund, and a Limited Partner might be found to have a different tax liability for that year than that reported on its income tax returns.

*Risk of Tax Audit*. An audit of the Fund by the Service or another taxing authority could result in adjustments to the tax consequences initially reported by the Fund and may result in an audit of the returns of some or all of the Limited Partners, which examination could affect items not related to a Limited Partner's investment in the Fund. If audit adjustments result in an increase in a Limited Partner's income tax liability for any year, such Limited Partner may also be liable for interest and penalties with respect to the amount of underpayment. The legal and accounting costs incurred in connection with any audit of the Fund's tax returns will be borne by the Fund. The cost of any audit of a Limited Partner's tax return will be borne solely by that Limited Partner.

*Tax Considerations Taken into Account*. The General Partner may take tax considerations into account in determining when the Fund's investments should be sold or otherwise disposed of, and may assume certain market risk and incur certain expenses in this regard to achieve favorable tax treatment of a transaction.

*Tax Liabilities Without Distributions*. If the Fund has taxable income in a fiscal year, each Limited Partner will be taxed on that income in accordance with its distributive share of the Fund's profits, whether or not such profits have been distributed. Because the General Partner anticipates that there will be no cash distributions to the Limited Partners, an investor may incur tax liability with respect to activities of the Fund without receiving sufficient distributions from the Fund to defray such tax liabilities. In order to satisfy its tax liability in such a case, a Limited Partner would need sufficient funds from sources other than the Fund. Furthermore, the Fund may make investments with respect to which the Fund recognizes income for U.S. federal income tax purposes prior to receiving the cash or realizing the income as an economic matter. In addition, the Fund may recognize income for U.S. federal income tax purposes that does not reflect income as an economic matter. Such recognition of income prior to receipt of an economic benefit, if any, may result in increased tax liability for the Partners.

*Delayed Schedules K-1*. The Fund will provide Schedules K-1 as soon as practical after receipt of all of the necessary information. However, the Fund may be unable to provide final Schedules K-1 to Limited Partners for any given tax year until significantly after April 15 of the following year. The

General Partner will endeavor to provide Limited Partners with estimates of the taxable income or loss allocated to their investment in the Fund on or before such date, but final Schedules K-1 may not be available until completion of the Fund's annual audit. Limited Partners should be prepared to obtain extensions of the filing date for their income tax returns at the federal, state and local levels.

*Unrelated Business Taxable Income*. The Fund may make investments or engage in activities that will give rise to unrelated business taxable income ("*UBTI*"). Thus, an investment in the Fund may not be desirable for certain tax-exempt investors. The Fund may participate in investments that give rise to UBTI through entities that are treated as partnerships for U.S. federal income tax purposes. Because of the "flow-through" principles applicable to partnerships, if UBTI is earned by the Fund, a tax-exempt investor in the Fund will realize UBTI. Because of the Investment Manager's objective of maximizing the pre-tax returns of all the Limited Partners, the Investment Manager may be required to make certain decisions to maximize pre-tax returns that result in Tax-Exempt U.S. Investors (as defined below) recognizing more UBTI than might otherwise be the case. In some cases, the Investment Manager may forego actions with regard to the acquisition, financing, management and disposition of assets that would reduce UBTI because such actions would reduce the overall pre-tax returns to all the Limited Partners.

*Tax Changes*. Investors will be subject to the risk that changes to the tax law may adversely affect the federal income tax consequences of their investment in the Fund. Changes in existing tax laws or regulations and their interpretation may be enacted after the date of this Memorandum, possibly with retroactive effect, and could alter the income tax consequences of an investment in the Fund. Certain provisions of the Internal Revenue Code of 1986, as amended (the "*Code*") may be further amended or interpreted in a manner adverse to the Fund, in which event any benefits derived from an investment in the Fund may be adversely affected. In addition, significant legislative and budgetary proposals affecting tax laws have been made by the legislative and executive branches of the U.S. federal government. The likelihood of enactment of any such proposals, or any similar proposals, into law is uncertain. The enactment of any such proposals, including subsequent proposals, into law could have material adverse effects on the Fund and/or the Limited Partners. Enactment of such legislation, or similar legislation, could require significant restructuring of the Fund in order to mitigate such effects.

***The foregoing is not intended to be an exhaustive analysis or listing of the tax risks associated with an investment in the Fund. Many of the relevant tax considerations will vary depending on a prospective Limited Partner's individual circumstances. The tax aspects associated with such an investment are complex and complicated and are subject to a variety of interpretations. Prospective investors are strongly urged to review the discussions below under "Tax Considerations" and "ERISA and Other Regulatory Considerations" for a more complete discussion of certain of the tax risks inherent in the acquisition of Interests, and to seek and rely upon the advice of their own tax advisor who is qualified to discuss the foregoing and other possible tax risks.***

In view of the foregoing considerations, an investment in Interests is suitable only for investors who are capable of bearing the relevant investment risks.

## Potential Conflicts of Interest

The scope of the activities of the Investment Manager, its affiliates, and the funds and clients managed or advised by the Investment Manager or any of its affiliates may give rise to conflicts of interest or other restrictions and/or limitations imposed on the Fund in the future that cannot be foreseen

or mitigated at this time. The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts.

None of the Investment Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees (collectively, the "*Highland Group*") is precluded from engaging in or owning an interest in other business ventures or investment activities of any kind, whether or not such ventures are competitive with the Fund. The Investment Manager is permitted to manage other client accounts, some of which may have objectives similar or identical to those of the Fund, including other collective investment vehicles that may be managed by the Highland Group and in which the Investment Manager or any of its affiliates may have an equity interest.

The Fund will be subject to a number of actual and potential conflicts of interest involving the Highland Group including, among other things, the fact that: (i) the Highland Group conducts substantial investment activities for accounts, funds, collateralized debt obligations that invest in leveraged loans (collectively, "*CDOs*") and other vehicles managed by members of the Highland Group ("*Highland Accounts*") in which the Fund has no interest; (ii) the Highland Group advises Highland Accounts, which utilize the same, similar or different methodologies as the Fund and may have financial incentives (including, without limitation, as it relates to the composition of investors in such funds and accounts or to the Highland Group's compensation arrangements) to favor certain Highland Accounts over the Fund; (iii) the Highland Group may use the strategy described herein in certain Highland Accounts; (iv) the Investment Manager may give advice and recommend securities to, or buy or sell securities for, the Fund, which advice or securities may differ from advice given to, or securities recommended or bought or sold for, Highland Accounts; (v) the Investment Manager has the discretion, to the extent permitted under applicable law, to use its affiliates as service providers to the Fund and its portfolio investments; (vi) Affiliated Investors may choose to personally invest only in certain funds advised by the Highland Group and the amounts invested by them in such funds is expected to vary significantly; (vii) the Highland Group and Highland Accounts may actively engage in transactions in the same securities sought by the Fund and, therefore, may compete with the Fund for investment opportunities or may hold positions opposite to positions maintained on behalf of the Fund; (viii) the Fund may invest in CDOs and Highland Accounts managed by members of the Highland Group; and (ix) the Investment Manager will devote to the Fund only as much time as the Investment Manager deems necessary and appropriate to manage the Fund's business.

The Investment Manager undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Fund's investors.

It is the policy of the Investment Manager to allocate investment opportunities fairly and equitably over time. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) whether the risk-return profile of the proposed investment is consistent with the account's objectives and program, whether such objectives are considered in light of the specific investment under consideration or in the context of the portfolio's overall holdings; (ii) the potential for the proposed investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (iii) liquidity requirements of the account; (iv) potentially adverse tax consequences; (v) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed investment; and (vi) the need to re-size risk in the account's portfolio. The Investment Manager has the authority to allocate trades to multiple Highland Accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order on behalf of any accounts cannot be fully allocated under prevailing market conditions, the Investment Manager may

allocate the trades among different accounts on a basis it considers fair and equitable over time. One or more of the foregoing considerations may (and are often expected to) result in allocations among the Fund and one or more Highland Accounts on other than a *pari passu* basis.

The General Partner and/or its affiliates may open "average price" accounts with brokers. In an "average price" account, purchase and sale orders placed during a trading day on behalf of the Fund, the Highland Accounts or affiliates of the General Partner are combined, and securities bought and sold pursuant to such orders are allocated among such accounts on an average price basis.

As part of their regular business, the members of the Highland Group hold, purchase, sell, trade or take other related actions both for their respective accounts and for the accounts of their respective clients, on a principal or agency basis, with respect to loans, securities and other investments and financial instruments of all types. The members of the Highland Group also provide investment advisory services, among other services, and engage in private equity, real estate and capital markets-oriented investment activities. The members of the Highland Group will not be restricted in their performance of any such services or in the types of debt or equity investments which they may make. The members of the Highland Group may have economic interests in or other relationships with obligors or issuers in whose obligations or securities or credit exposures the Fund may invest. In particular, such persons may make and/or hold an investment in an obligor's or issuer's securities that may be pari passu, senior or junior in ranking to an investment in such obligor's or issuer's securities made and/or held by the Fund or in which partners, security holders, members, officers, directors, agents, personnel or employees of such persons serve on boards of directors or otherwise have ongoing relationships. Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Fund and otherwise create conflicts of interest for the Fund. In such instances, the members of the Highland Group may in their discretion make investment recommendations and decisions that may be the same as or different from those made with respect to the Fund's investments. In connection with any such activities described above, the members of the Highland Group may hold, purchase, sell, trade or take other related actions in securities or investments of a type that may be suitable to investments for the Fund. The members of the Highland Group will not be required to offer such securities or investments to the Fund or provide notice of such activities to the Fund. In addition, in managing the Fund's portfolio, the Investment Manager may take into account its relationship or the relationships of its affiliates with obligors and their respective affiliates, which may create conflicts of interest. Furthermore, in connection with actions taken in the ordinary course of business of the Investment Manager in accordance with its fiduciary duties to its other clients, the Investment Manager may take, or be required to take, actions which adversely affect the interests of the Fund.

In connection with the foregoing activities the Highland Group may from time to time come into possession of material nonpublic information that limits the ability of the Investment Manager to effect a transaction for the Fund, and the Fund's investments may be constrained as a consequence of the Investment Manager's inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Fund.

Although the professional staff of the Investment Manager will devote as much time to the Fund as the Investment Manager deems appropriate to perform its duties in accordance with the Investment Management Agreement and in accordance with reasonable commercial standards, the staff may have conflicts in allocating its time and services among the Fund and the Investment Manager's other accounts.

The directors, officers, personnel, employees and agents of the Investment Manager and its affiliates may, subject to applicable law, serve as directors (whether supervisory or managing), officers, personnel, employees, partners, agents, nominees or signatories, and receive arm's length fees in connection with such service, for the Fund or other entities that operate in the same or a related line of business as the Fund, for other clients managed by the Investment Manager or its affiliates, or for any obligor or issuer in respect of the CLOs, to the extent permitted by their governing instruments, or by any resolutions duly adopted by the Fund, such affiliated entities or any obligor or issuer in respect of any of the CLOs pursuant to their respective governing instruments, and the Fund shall have no right to any such fees. In serving in these multiple capacities, they may have obligations to such other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Fund.

There is no limitation or restriction on the Investment Manager or any of its affiliates with regard to acting as investment adviser or collateral manager (or in a similar role) to other parties or persons. This and other future activities of the Investment Manager and/or its affiliates may give rise to additional conflicts of interest. Such conflicts may relate to obligations that the Investment Manager's investment committee, the Investment Manager or its affiliates have to other clients.

The Investment Manager and/or its affiliates may act as an underwriter, arranger or placement agent, or otherwise participate in the origination, structuring, negotiation, syndication or offering of CLOs and Highland Accounts purchased by the Fund. Such transactions are on an arm's-length basis and shall be subject to fees that are no greater than arm's-length fees. There is no expectation for preferential access to transactions involving CLOs and Highland Accounts that are underwritten, originated, arranged or placed by the Investment Manager and/or its affiliates and the Fund shall not have any right to any such fees.

As further described below, the Investment Manager may effect client cross-transactions where the Investment Manager causes a transaction to be effected between the Fund and another client advised by it or any of its affiliates. The Investment Manager may engage in a client cross-transaction involving the Fund any time that the Investment Manager believes such transaction to be fair to the Fund and such other client. By purchasing an Interest in the Fund, a Limited Partner is deemed to have consented to such client cross-transactions between the Fund and another client of the Investment Manager or one of its affiliates.

As further described below, the Investment Manager may effect principal transactions where the Fund acquires securities from or sells securities to the Investment Manager and/or its affiliates, in each case in accordance with applicable law, which may include the Investment Manager obtaining the consent and approval of the Advisory Committee prior to engaging in any such principal transaction between the Fund and the Investment Manager or its affiliates. By subscribing for Interests, the Limited Partners are deemed to have consented to such procedures relating to principal transactions between the Fund and the Investment Manager or its affiliates.

The Investment Manager may direct the Fund to acquire or dispose of securities in cross trades between the Fund and other clients of the Investment Manager or its affiliates in accordance with applicable legal and regulatory requirements. In addition, the Fund may invest in securities of obligors or issuers in which the Investment Manager and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Fund may enhance the profitability of the Investment Manager's own investments in such companies. Moreover, the Fund may invest in assets originated by the Investment Manager or its affiliates. In each such case, the Investment Manager and such affiliates may have a potentially conflicting division of loyalties and responsibilities regarding the

Fund and the other parties to such trade. Under certain circumstances, the Investment Manager and its affiliates may determine that it is appropriate to avoid such conflicts by selling a security at a fair value that has been calculated pursuant to the Investment Manager's valuation procedures to another client managed or advised by the Investment Manager or such affiliates. In addition, the Investment Manager may enter into agency cross-transactions where it or any of its affiliates acts as broker for the Fund and for the other party to the transaction, to the extent permitted under applicable law. The Investment Manager may obtain the Fund's written consent through the Advisory Committee if any such transaction requires the consent of the Fund under Section 206(3) of the Advisers Act.

There are generally no ethical screens or information barriers among the Investment Manager and certain of its affiliates of the type that many firms implement to separate persons who make investment decisions from others who might possess material, non-public information that could influence such decisions. If the Investment Manager, any of its personnel or its affiliates were to receive material non-public information about a particular obligor, issuer or CLO, or have an interest in causing the Fund to acquire a particular CLO Security, the Investment Manager may be prevented from causing the Fund to purchase or sell such asset due to internal restrictions imposed on the Investment Manager. Notwithstanding the maintenance of certain internal controls relating to the management of material non-public information, it is possible that such controls could fail and result in the Investment Manager, or one of its investment professionals, buying or selling an asset while, at least constructively, in possession of material non-public information. Inadvertent trading on material non-public information could have adverse effects on the Investment Manager's reputation, result in the imposition of regulatory or financial sanctions, and as a consequence, negatively impact the Investment Manager's ability to perform its portfolio management services to the Fund. In addition, while the Investment Manager and certain of its affiliates currently operate without information barriers on an integrated basis, such entities could be required by certain regulations, or decide that it is advisable, to establish information barriers. In such event, the Investment Manager's ability to operate as an integrated platform could also be impaired, which would limit the Investment Manager's access to personnel of its affiliates and potentially impair its ability to manage the Fund's investments.

Akin Gump Strauss Hauer & Feld LLP ("*Akin Gump*") serves as counsel to the Fund, the Investment Manager, the General Partner and certain of their Affiliates (the "*Clients*") in connection with the formation of the Fund and certain other Clients, the offering of Interests as well as certain other matters for which the Clients may engage Akin Gump from time to time. Akin Gump disclaims any obligation to verify the Clients' compliance with their obligations either under applicable law or the governing documents of the Fund. In acting as counsel to the Clients, Akin Gump has not represented and will not represent any Limited Partners nor does it purport to represent their interests. No independent counsel has been retained to represent the Limited Partners. In assisting in the preparation of this Memorandum, Akin Gump has relied on information provided by the Fund, the Investment Manager and the General Partner and certain of the Fund's other service providers (including, without limitation, the principal's biographical data, summaries of market conditions, the planned investment strategy of the Fund and the performance of the Fund, its investments or any predecessor Fund) without verification and does not express a view as to whether such information is accurate or complete.

# BROKERAGE AND CUSTODY

**Portfolio Transactions**

Substantially all of the Fund's investments in marketable securities, as well as its cash and cash equivalents, are expected to be held at The Bank of New York Mellon ("***BNY Mellon***").

BNY Mellon and other prime brokers or their affiliates may provide capital introduction or other placement services to the Fund and the Investment Manager (with or without separate charges for such other services). In determining which broker-dealer generally provides the best available price and most favorable execution, the Investment Manager considers a totality of circumstances, including the broker-dealer's research capabilities and the success of prior research recommendations, ability to efficiently execute difficult trades (such as those in illiquid markets or trades of substantial size), the broker's risk in positioning a block of securities, commitment of capital, access to new issues, nature and frequency of sales coverage, depth of services provided, including economic or political coverage, arbitrage and option operations, back office and processing capabilities, financial strength, stability and responsibility, efficiency, reputation, access to markets, confidentiality, commission rate, responsiveness to the Investment Manager and the value of research and brokerage and research products and services provided by such brokers.

The Investment Manager may also execute trades with brokers and dealers with whom the Fund or the Investment Manager has other business relationships, including prime brokerage, credit relationships and capital introduction or investments by affiliates of the broker-dealers in the Fund or other entities managed by the Investment Manager. However, the Investment Manager does not believe that these other relationships will influence the choice of brokers and dealers who execute trades for the Fund.

Broker-dealers may provide research that may include written or oral proprietary research. Broker-dealers may also provide research products that include software and related support services for use in research and trading, quotation boards, computer databases and quotation equipment, in each case to access research or which provide research directly. Research services may include, among other things, research concerning market, economic and financial data, statistical information, data on pricing and availability of securities, financial publications, attendance at conferences and meetings, electronic market quotations, performance measurement services, analyses and/or due diligence concerning specific securities, companies or sectors, including due diligence on specific aspects of a company's operations or finances, analyses on issues raised in proxy statements and market, economic and financial studies and forecasts. Research services may be in written or oral form or on-line and may be produced by broker-dealers or third parties such as attorneys, accountants or consultants. Brokerage products and services may include certain order management system components and order routing.

The receipt of brokerage and research products from broker-dealers through client commission payments is commonly referred to as "soft dollars." Broker-dealers may provide products and services paid for through soft dollars either directly or through credits deposited into an account that may be used for research developed by the broker-dealer, third-party research and brokerage services. Section 28(e) of the Exchange Act provides a safe harbor from liability for breach of fiduciary duties relating to the purchase of limited research or brokerage services using soft dollars so long as the products and services received constitute lawful and appropriate assistance and the amount indirectly paid for those products or services is reasonable. If the Investment Manager uses research or

brokerage products or services, it intends to limit research and brokerage to those services included in the safe harbor under Section 28(e) of the Exchange Act.

In selecting broker-dealers on the basis of the foregoing factors, the Investment Manager may pay a brokerage commission in excess of that which another broker might have charged for effecting the same transaction. In connection therewith, the Investment Manager will make a good faith determination that the amount of commission is reasonable in relation to the value of the research or brokerage services received, viewed in terms of either the specific transaction or the Investment Manager's overall responsibility to its clients. The Investment Manager will regularly evaluate the placement of brokerage services and the reasonableness of commissions paid. Research received from brokers will be supplemental to the Investment Manager's own research efforts. While the receipt of research will not reduce the Investment Manager's normal research activities, the Investment Manager's expenses could increase materially if it attempted to generate such additional research or brokerage services through its own staff, and the Management Fee will not be reduced as a consequence of the receipt of such research or brokerage services or products. As such, the Investment Manager's arrangements for the receipt of research and brokerage services from brokers may create a conflict of interest, in that the Investment Manager may have an incentive to choose a broker-dealer that provides research and brokerage services, instead of one that does not but charges a lower commission rate. In some instances, the Investment Manager receives products and services that may be used for both research and non-research purposes. In such instances, the Investment Manager will make a good faith effort to determine the relative proportion of the products and services used to assist the Investment Manager in carrying out its investment decision-making responsibilities or order execution, including research and brokerage, and the relative proportion used for administrative or other non-research purposes. The proportionate amount of the research attributable to assisting the Investment Manager in carrying out its investment decision-making responsibilities or order execution will be paid through brokerage commissions generated by the Fund's and other client's transactions; the proportionate amount attributable to administrative or other non-research purposes will be paid for by the Investment Manager from its own resources. The receipt of "mixed-use" research and the determination of the appropriate allocation may result in a potential conflict of interest between the Investment Manager and its clients.

The Investment Manager will be responsible for the placement of the portfolio transactions of the Fund and the negotiation of any commissions or spreads paid on such transactions. Portfolio transactions normally will be effected through brokers on securities exchanges or directly with the issuer, or through an underwriter, or market maker or other dealer for the investments. Portfolio transactions through brokers involve a commission to the broker. Portfolio transactions with dealers typically are priced to include a spread between the bid and the asked price to compensate the dealer. Portfolio transactions will be executed by brokers selected solely by the Investment Manager in its absolute discretion.

## Custody

Custody of the Fund's assets is maintained by brokers and banks selected by the Investment Manager in its sole discretion. The custodian or custodians may be changed at any time and from time to time by the Investment Manager without the consent of the Fund. Currently, the custodian is BNY Mellon. The Fund is eligible for insurance coverage against loss with respect to assets held in the custody of BNY Mellon in the event of the bankruptcy or liquidation of BNY Mellon to the same extent BNY Mellon's other customers.

# TAX CONSIDERATIONS

## Introduction

The following is a summary of certain aspects of the taxation of the Fund and its Limited Partners arising from the purchase, ownership and disposition of an Interest that should be considered by a prospective Limited Partner. The Fund has not sought a ruling from the Service or any similar state, local or foreign authority with respect to any of the tax issues affecting Limited Partners or the Fund, nor has it obtained an opinion of counsel with respect to any U.S. federal, state, local or foreign tax issues.

This summary is based on the Code, the Treasury regulations promulgated under the Code (the "***Treasury Regulations***"), judicial decisions, administrative rulings, and state and local tax laws in force on the date of this Memorandum, all of which are subject to change (possibly with retroactive effect). Changes in existing laws or regulations and their interpretation may occur after the date of this Memorandum and could alter the income tax consequences of an investment in the Fund. This discussion does not address all of the tax consequences that may be relevant to a particular investor, nor does it address, unless specifically indicated, the tax consequences to, among others (i) persons that may be subject to special treatment under U.S. federal income tax law, including, but not limited to, banks, insurance companies, thrift institutions, regulated investment companies, real estate investment trusts and dealers in securities or currencies, (ii) persons that will hold Interests as part of a position in a "straddle" or as part of a "hedging," "conversion" or other integrated investment transaction for U.S. federal income tax purposes, (iii) persons whose functional currency is not the U.S. dollar or (iv) persons that do not hold Interests as capital assets within the meaning of Code section 1221.

Further, this discussion assumes that all non-U.S. persons will invest in the Offshore Fund and will not invest in the Fund and, therefore, does not address the tax considerations relevant to an investment in the Fund by a non-U.S. person.

If a partnership holds an Interest in the Fund, the tax treatment of a partner in such partnership will generally depend upon the status of the partner and the activities of the partnership. Prospective investors who are partners of a partnership should consult their own tax advisors.

Unless otherwise expressly provided herein, this discussion does not address possible state, local or non-U.S. tax consequences of the purchase, ownership or disposition of Interests, some or all of which may be material to particular investors. This discussion also does not address the potential application of the U.S. federal alternative minimum tax ("***AMT***") to the Limited Partners. There is uncertainty concerning certain tax aspects of the Fund, and there can be no assurance that the Service will not challenge the positions taken by the Fund.

*The tax consequences of an investment in the Fund are particularly complex. Accordingly, prospective investors should not consider this discussion as a substitute for careful tax planning. Prospective investors should consult with their own tax advisors, attorneys or accountants on matters relating to an investment in the Fund with special references to such investor's particular situation.*

**Certain United States Taxation Matters**

<u>Classification of the Fund</u>

The General Partner believes that, under the provisions of the Code and the Treasury Regulations as currently in effect, the Fund should be treated for U.S. federal income tax purposes as a partnership and not as an association taxable as a corporation.

Certain "publicly traded partnerships" are treated as associations that are taxable as corporations for U.S. federal income tax purposes. A publicly traded partnership is any partnership the interests in which are traded on an established securities market or which are readily tradable on a secondary market (or the substantial equivalent thereof). Interests in the Fund are not and will not be traded on an established securities market. Treasury Regulations concerning the classification of partnerships as publicly traded partnerships provide certain safe harbors under which interests in a partnership will not be considered readily tradable on a secondary market (or the substantial equivalent thereof). Depending on the number of Partners, the Fund may qualify for a safe harbor exemption for partnerships that are offered to investors in a private placement.

The remainder of this discussion assumes that the Fund will be treated, for U.S. federal income tax purposes, as a partnership and not as a publicly traded partnership treated as an association that is taxable as a corporation.

<u>U.S. Federal Income Taxation of the Fund and Partners Generally</u>

As a partnership, the Fund will not be subject to U.S. federal income tax. Each Limited Partner will be required to report separately on its income tax return its distributive share of the Fund's net long-term capital gain or loss, net short-term capital gain or loss, and net ordinary income and deductions and credits in accordance with the allocations set forth in the Partnership Agreement. Each Limited Partner will be liable for any taxes owed upon its distributive share of the income or gains realized by the Fund, and may claim deductions for its distributive share of the Fund's losses and deductions and credits for its distributive share of the Fund's credits, to the extent allowed under the Code. Each Limited Partner will be taxed on its distributive share of the Fund's taxable income and gain regardless of whether it has received or will receive a distribution from the Fund. Consequently, a Limited Partner may be subject to tax with respect to its share of the taxable income of the Fund for a taxable year and may not receive a corresponding distribution of cash from the Fund in such year with which to satisfy its tax liability in respect of such taxable income.

The Fund will file an annual partnership information return with the Service that reports the results of its operations for the taxable year, and will distribute annually to each Limited Partner a form showing its distributive share of the Fund's items of income, gain, loss, deduction or credit. The General Partner will have the authority to decide how to report these items on the Fund's tax returns, and all Limited Partners will be required under the Partnership Agreement to treat the items consistently on their own returns. An audit by the Service of the tax treatment of the Fund's income and deductions generally will be determined at the Fund level in a single proceeding rather than by individual audits of the Limited Partners. In this regard, the General Partner, as the "***Tax Matters Partner***," will have the authority to bind certain Limited Partners to settlement agreements and the right on behalf of all Limited Partners to extend the statute of limitations relating to the Limited Partners' tax liabilities with respect to Fund items.

Under the Partnership Agreement, for U.S. federal income tax purposes, the General Partner has the discretion to allocate specially an amount of the Fund's net gains or net losses (or items of gross income or losses or deduction) to a withdrawing Partner to the extent that the Partner's Capital Account differs either positively or negatively from its U.S. federal income tax basis in its Interest. There can be no assurance that, if the General Partner makes such a special allocation, the Service will accept such allocation. If such allocation is successfully challenged by the Service, the Fund's allocations to the remaining Partners would be affected as well.

The Fund expects to act as a trader or investor, and not as a dealer, with respect to its securities transactions. Generally, the gains and losses realized by a trader or investor on the sale of securities are capital gains and losses. Thus, in general, the Fund expects that its gains and losses from its securities transactions typically will be capital gains and capital losses. These capital gains and losses may be long-term or short-term depending, in general, upon the length of time the Fund maintains a particular investment position and, in some cases, upon the nature of the transaction. Property held for more than 12 months generally will be eligible for long-term capital gain or loss treatment. Long term capital gains may be eligible for favorable tax rates in the hands of non-corporate U.S. Limited Partners. Limited Partners should consult with their own tax advisors to determine the tax rates applicable to them in their particular tax situations.

In addition, individuals who are U.S. persons with "modified adjusted gross income" that exceeds certain thresholds (for example, $250,000 for married individuals filing jointly, $200,000 for single individuals) are subject to a Medicare tax of 3.8% on the lesser of (i) their investment income, net of deductions properly allocable to such income, and (ii) the excess of their "modified adjusted gross income" above the applicable threshold. The General Partner expects that most or all of the Fund's income will be treated as investment income for this purpose, and as a result Limited Partners receiving allocations of income from the Fund for these taxable years will be subject to this tax. This tax will be in addition to any U.S. federal income tax imposed on such Limited Partners with respect to their allocable share of income of the Fund. Trusts and estates also may be subject to this additional tax.

The Fund may be involved in a variety of hedging transactions to reduce the risk of changes in value in the Fund's investments. Special rules may apply to determine the tax treatment of such hedging transactions, which may affect the Fund's holding period attributable to such property, the characterization of gain or loss as ordinary or capital and, if capital, as long-term or short-term, and the timing of the realization of gains or losses on the actual or deemed sale of the property, including, in some cases, property owned by a Limited Partner outside of the Fund. For instance, gain or loss from a short sale of property generally will be considered as capital gain or loss to the extent the property used to close the short sale constitutes a capital asset in the Fund's hands. Except with respect to certain situations where the property used by the Fund to close a short sale has a long-term holding period on the date of the short sale, gains on short sales will be treated as short-term capital gains. These rules also may terminate the running of the holding period of "substantially identical property" held by the Fund. Moreover, a loss on a short sale will be treated as a long-term capital loss if, on the date of the short sale, "substantially identical property" has been held by the Fund for more than one year. Certain hedging transactions also may cause a constructive sale of the Fund's long position that is the subject of the hedge.

The Fund may derive ordinary interest income and dividends on securities, and may be required to recognize income in respect of certain securities prior to receipt of any payment in respect of such securities. For instance, the Fund may hold debt obligations with "original issue discount." In such case, the Fund will be required to include a portion of such discount in its taxable income on a current

basis, and the Fund must allocate such income to the Limited Partners, even though receipt of such amounts by the Fund may occur in a subsequent tax year. The Fund also may acquire debt obligations with "market discount." Upon disposition of such an obligation, which might include the receipt of securities of the issuer in a recapitalization exchange, the Fund generally will be required to treat any gain realized (and required to be recognized) as ordinary interest income to the extent of the market discount that accrued during the period the debt obligation was held by the Fund. Recapitalization exchanges involving securities held by the Fund also may result in the recognition of taxable gains prior to the receipt of cash or readily tradable property.

If the Fund is treated as a trader, it may, in its discretion, make an election under Code section 475(f) to apply a mark to market system of recognizing unrealized gains and losses on securities as if the securities were sold for fair market value at the close of any taxable year of the Fund. The amount recognized when gain or loss is subsequently realized would be adjusted for amounts recognized in marking to market. The election would apply with respect to securities held in connection with the Fund's trade or business as a trader in securities. The election would not apply to any securities with respect to which the Fund could demonstrate, to the satisfaction of the Service, that they are held for investment. Once a Code section 475(f) election is made, it can be revoked only with the consent of the Service. In the event that the Fund makes such an election, the Fund's gains and losses from marking securities to market (and gain or loss recognized before the end of the taxable year with respect to any security that would have been marked to market) would be treated as ordinary income and losses. The rules relating to appreciated financial positions under Code section 1259 and wash sales under Code section 1091 would not apply to the securities to which the election applies and the Code section 1092 straddle rules would not have any effect where all the offsetting positions of a straddle are marked to market.

The Fund may be required to purchase foreign currency with which to make its investments and may receive foreign currency when a security is sold or when an interest payment is made on a security. These transactions may give rise to gains and losses because of fluctuations in the value of the foreign currency relative to the U.S. dollar during the Fund's holding period of an investment. Foreign currency gain or loss in respect of certain types of transactions must be accounted for separately, apart from any gain or loss on the underlying transaction, and the Code contains special rules which treat, in most circumstances, such gains and losses as ordinary income or losses rather than capital gains or losses.

The U.S. federal income tax treatment of the Fund's investment in swaps or other derivatives is subject to significant uncertainty and depends in large part on the terms of the specific swap or other derivative. In particular, it is possible that the Fund may enter into so-called "bullet swaps" or other swaps that provide for non-periodic payments. In certain circumstances, income from a swap can be treated as ordinary income and not capital gain if the swap is treated as a "constructive ownership transaction" under Code section 1260. The Fund intends to take positions that are reasonable under the law that provide for optimal tax treatment of the Limited Partners. However, there can be no assurance that the Service or a court would agree with the Fund's position. Moreover, the Service might take the contrary position that the Fund is subject to U.S. federal income tax in respect of some or all of the income earned from the swap investments on the theory that the Fund should be treated as the owner for U.S. federal income tax purposes of the property underlying certain swaps, in which case the after-tax return on the swap investments could be significantly reduced.

Pursuant to various "anti-deferral" provisions of the Code (*e.g.*, the "Subpart F" and "passive foreign investment company" provisions), any investments by the Fund in certain foreign corporations may cause a Limited Partner to (i) recognize taxable income prior to the Fund's receipt of distributable

proceeds, (ii) pay an interest charge on receipts that are deemed as having been deferred or (iii) recognize ordinary income that, but for the "anti-deferral" provisions, would have been treated as long-term or short-term capital gain.

Under the Partnership Agreement, the General Partner has the authority to elect on behalf of the Fund, under Code section 754, to adjust the tax basis of the Fund's assets in connection with certain distributions to Limited Partners or certain transfers of Interests. Such an election, if made, could affect the amount of a Limited Partner's distributive share of the gain or loss recognized by the Fund upon the disposition of its assets. Because of the complexity and additional expense involved in making a section 754 election, the General Partner has no present intention to make such election on behalf of the Fund.

Prospective investors that are subject to the AMT should consider the tax consequences of an investment in the Fund in view of their AMT position, taking into account the special rules that apply in computing the AMT.

<u>Taxation of Distributions and Withdrawals</u>

Cash non-liquidating distributions and withdrawals, to the extent they do not exceed a Limited Partner's basis in its Interest, will not result in taxable income to that Limited Partner, but will reduce its tax basis in its Interest by the amount distributed or withdrawn. Cash distributed to a Limited Partner in excess of the basis of its Interest is generally taxable as capital gain.

Prospective Limited Partners should be aware that a Limited Partner's share of the taxable income of the Fund for any year may exceed the amount of cash distributed to such Limited Partner for that year, which may require that the Limited Partner make an out-of-pocket expenditure to cover its tax liability. Conversely, if the cash distributed by the Fund to a Partner for any year exceeds the taxable income of the Fund allocated to such Partner for that year, the excess will be treated as a return of capital for U.S. federal income tax purposes to the extent of a Limited Partner's tax basis of its Interest. To the extent that cash distributions are treated as a return of capital and to the extent that any tax losses are allocated to the Limited Partners, the tax bases of the Limited Partners in their Interests will be reduced (but not below zero). Because of such basis adjustments, any tax that is avoided in the early years of a Limited Partner's investment in the Fund may become due later through the realization of gain upon the sale of assets of the Fund, the liquidation of the Fund or the sale of Interests.

The Fund's ability to make cash distributions to a withdrawing Limited Partner or to the Partners, if applicable, may be limited by, among other things, the terms of the investment leverage entered into by the Fund for the purpose of making portfolio investments on a leveraged basis.

Upon the withdrawal of a Limited Partner receiving a cash liquidating distribution from the Fund, such Limited Partner generally will recognize capital gain or loss to the extent of the difference between the proceeds received by the withdrawing Limited Partner and such Partner's adjusted tax basis in its Interest. Such capital gain or loss will be short-term or long-term depending upon the Partner's holding period (or holding periods) for its Interest. However, a withdrawing Limited Partner will recognize ordinary income to the extent such Partner's allocable share of the Fund's "unrealized receivables" exceeds the Partner's basis in such unrealized receivables (as determined pursuant to the Treasury Regulations). For these purposes, accrued but untaxed market discount, if any, on securities held by the Fund will be treated as an unrealized receivable, with respect to which a withdrawing Partner would recognize ordinary income.

Distributions of property other than cash, whether in complete or partial liquidation of a Limited Partner's Interest, generally will not result in the recognition of taxable income or loss to the Limited Partner (except to the extent such distribution is treated as made in exchange for such Limited Partner's share of the Fund's unrealized receivables). However, a distribution of marketable securities will be treated as a distribution of cash (which, as described above, can require the recognition of gain by the recipient Limited Partner), unless the distributing partnership is an "investment partnership" and the recipient is an "eligible partner" as defined in Code section 731(c). Although the General Partner cannot provide any assurances of whether the Fund is an "investment partnership" for these purposes, the General Partner anticipates that the Fund should qualify as an "investment partnership." Thus, if a Limited Partner is an "eligible partner," which term should include a Limited Partner whose sole contributions to the Fund consisted of cash, a distribution of marketable securities to such Limited Partner should not require the recognition of gain by such Limited Partner.

As discussed above, under the Partnership Agreement, the General Partner has the discretion to allocate specially an amount of the Fund's net gains or net losses (or items of gross income or losses or deductions) for U.S. federal income tax purposes to a withdrawing Partner to the extent that the Partner's capital account differs from its U.S. federal income tax basis in its Interest. Such a special allocation may result in the withdrawing Partner recognizing more or less taxable income, which may include short-term gain, in the Partner's last taxable year in the Fund, thereby reducing, or increasing, as applicable, the amount of long-term capital gain recognized during the tax year in which it receives its liquidating distribution upon withdrawal. In certain circumstances, special allocations of net gains (or items of income or gain) to a withdrawing Partner may result in a greater allocation of losses, or a lower allocation of taxable income or gain, to the remaining Partners. Likewise, special allocations of net losses (or items of expense, loss or deduction) to a withdrawing Partner may result in a greater allocation of taxable income or gain, or a lower allocation of losses, to the remaining Partners.

Assuming the Fund has not made an election pursuant to Code section 754 and the General Partner does not exercise its discretion to specially allocate losses to a withdrawing Limited Partner, distributions of property or cash by the Fund to a Limited Partner in redemption of its Interest in certain circumstances where the Fund has a substantial built-in loss may require the Fund to reduce the tax basis of its remaining property.

<u>Limitations on Losses and Deductions</u>

Limited Partners that are individuals or certain types of corporations may be limited in their ability to deduct expenses or losses of the Fund. For instance, if or to the extent that the Fund's operations do not constitute a "trade or business" within the meaning of Code section 162 and other provisions of the Code, an individual Limited Partner's distributive share of the Fund's expenses (including any amounts that are treated for tax purposes as expenses of the Fund) would be deductible only as itemized deductions, subject to the limitations of Code sections 67 and 68. In this regard, if all or a portion of the Performance Allocation to the General Partner were re-characterized for tax purposes as an expense of the Fund, each non-corporate Limited Partner's share of such expense could be subject to such limitations. Itemized deductions are non-deductible in computing such Limited Partner's alternative minimum taxable income and alternative minimum tax liability.

Further, income, gains and losses of the Fund generally will not be treated as passive income or losses for purposes of the passive activity loss limitations of Code section 469. Accordingly, individuals, personal service corporations and certain closely-held corporations that have passive activity

losses from other activities are restricted in their ability to use such losses to offset income and gains from the Fund, although losses of the Fund will not be subject to the passive activity loss limitation.

The ability of a non-corporate Limited Partner to deduct its share of the Fund's ordinary losses attributable to interest and certain short sale expenses may be subject to the "investment interest limitation" under Section 163(d) of the Code. In general, a non-corporate taxpayer's investment interest (including interest and certain short sale expenses) in the current year is not deductible to the extent it exceeds its "net investment income," consisting of net gain and ordinary income derived from investments in the current year less certain directly connected expenses (other than interest or short sale expenses). For this purpose, any long-term capital gain and qualified dividend income is excluded from net investment income unless the taxpayer elects to pay tax on such amount at ordinary income tax rates. The Fund's activities are expected to be treated as giving rise to investment income for a Limited Partner, and the investment interest limitation would apply to a non-corporate Limited Partner's share of the interest and short sale expenses attributable to the Fund's operation. Accordingly, a non-corporate Limited Partner would be denied a deduction for all or a part of its distributive share of the Fund's ordinary losses attributable to interest and short sale expenses unless it has sufficient investment income from all sources including the Fund. Any amount not deducted as a result of the application of the investment interest limitation may be carried forward to future years, subject to certain limitations. The Fund may incur certain expenses in connection with its organization and the marketing of its Interests. Amounts paid or incurred to organize a partnership are not deductible, but may, by election of the Fund, be capitalized and amortized over a period of not less than 180 months. Amounts paid or incurred to market interests in the Fund that qualify as "syndication expenses" are not deductible or amortizable.

Tax Consequences for Tax-Exempt U.S. Investors

A Limited Partner that is an organization exempt from tax under Code section 501(a) (a "*Tax-Exempt U.S. Investor*") will be subject to tax on its allocable share of the Fund's income that is considered to be "unrelated business taxable income" ("*UBTI*") as defined in Code section 512, and may be subject to the AMT with respect to items of tax preference which enter into the computation of UBTI. Code section 512(b) provides that UBTI generally does not include dividends, interest, and gain or loss from the disposition of property other than stock in trade or property held for sale in the ordinary course of the unrelated trade or business. The Fund may invest in entities that are treated as partnerships or other pass-through entities. UBTI generated by such entities would generally flow up to Tax-Exempt U.S. Investors, causing the realization of UBTI by such investors. Therefore, in light of the Fund's investment program, a Tax-Exempt U.S. Investor should not realize UBTI to the extent that its distributive share of the Fund's income consists of dividends, interest, capital gains and certain other items which are excluded from UBTI under Code section 512(b) (except to the extent any such income constitutes "UDFI," as discussed in the next paragraph).

A Tax-Exempt U.S. Investor is also subject to tax with respect to its, and its allocable share of the Fund's, "unrelated debt-financed income" pursuant to Code section 514 ("*UDFI*"). In general, UDFI consists of (i) income derived by a tax-exempt organization (directly or through a partnership) from income-producing property with respect to which there is "acquisition indebtedness" at any time during the taxable year and (ii) gains derived by a tax-exempt organization (directly or through a partnership) from the disposition of property with respect to which there is "acquisition indebtedness." In addition, a tax-exempt organization that borrows money to finance its investment in the Fund would be subject to tax on the portion of its income that is UDFI. Income and gains derived by a tax-exempt organization from the ownership and sale of debt-financed property is taxable in the

proportion to which such property is financed by acquisition indebtedness during the relevant period of time.

The Fund expects to generate income attributable to debt-financed property which will be attributed to the Partners, including any Tax-Exempt U.S. Investors. A Tax-Exempt U.S. Investor's share of the Fund's income that is treated as UBTI will vary depending upon the degree of leverage utilized by the Fund and could be significant. In addition to other relevant considerations, fiduciaries of employee pension trusts and other prospective tax-exempt investors should consider the consequences of realizing UBTI in making a decision whether to invest in the Fund.

*We urge prospective Tax-Exempt U.S. Investors that are sensitive to UBTI or UDFI to consult their tax advisors as to the tax consequences of investing in the Fund and as to the comparative tax treatment of an investment in the Offshore Fund.*

<u>Investor Tax Filings and Record Retention.</u>

The U.S. Treasury Department has adopted Treasury Regulations designed to assist the Service in identifying abusive tax shelter transactions. In general, these Treasury Regulations require investors in specified transactions (including partners in partnerships that engage in such transactions) to satisfy certain special tax filing and record retention requirements. Significant monetary penalties (in addition to penalties that generally may be applicable as a result of a failure to comply with the applicable Treasury Regulations) may be imposed for failure to comply with these tax filing and record retention rules.

These Treasury Regulations are broad in scope, and it is conceivable that the Fund may enter into transactions that will subject the Fund and certain investors to the special tax filing and record retention rules. Additionally, under these Treasury Regulations, an investor's recognition of loss upon its disposition of its Interest could cause the investor to become subject to special tax filing and record retention rules. The General Partner intends to use its reasonable efforts to provide information to investors necessary to enable investors to satisfy any tax filing and record retention requirements that may arise as a result of any transactions entered into by the Fund.

<u>Reporting under FATCA</u>

Sections 1471 through 1474 of the Code, known as the U.S. Foreign Account Tax Compliance Act (together with any regulations, rules and other guidance implementing such Code sections and any applicable intergovernmental agreement ("***IGA***") and related statutes, regulations, rules and other guidance thereunder, "***FATCA***") impose a withholding tax of 30% on (i) certain U.S. source interest, dividends and other types of income, and (ii) the gross proceeds from the sale or disposition of certain assets of a type that can produce U.S. source interest and dividends, which are received by a foreign financial institution ("***FFI***"), unless such FFI enters into an agreement with the IRS (an "***FFI Agreement***"), and/or complies with an IGA, to obtain certain information as to the identity of the direct and indirect owners of accounts in such institution. In addition, a withholding tax may be imposed on payments to certain non-financial foreign entities which do not obtain and provide information as to their direct and indirect owners. These rules generally apply to payments of U.S. source interest, dividends and certain other types of income from U.S. sources since July 1, 2014, and will apply to payments of gross proceeds from the sale or disposition of assets of a type that can produce U.S. source interest or dividends after December 31, 2016.

The Service has released temporary and final Treasury Regulations and other guidance that will be used in implementing FATCA, which contain a number of phase-in dates for FATCA compliance. Additional guidance is forthcoming.

It is possible that a lower-tier non-U.S. entity in which the Fund invests may be considered an FFI. The Fund intends to assist lower-tier non-U.S. entities in complying with FATCA, but can give no assurance that it will be able to provide such assistance or that such an entity will be able to avoid the imposition of this withholding tax on it.

Further, the Fund may be required to act as a withholding agent for the Service under FATCA and therefore be required to withhold on income and proceeds paid or allocated to an investor that fails to comply with FATCA, which could occur if an investor that is an FFI does not enter into an FFI Agreement, is not otherwise exempt from such withholding, and/or does not provide the appropriate information and documentation (including the prescribed forms) to the Fund or its agents showing its exemption from such withholding or compliance with FATCA. The General Partner intends to collect the appropriate documentation from all investors in the Fund in order to determine whether it is required to withhold under FATCA with respect to distributions or allocations of income and gains made to investors.

The General Partner and the Fund reserve the right to take any action and/or pursue all remedies at their disposal to avoid withholding requirements or otherwise to mitigate the consequences of an investor's failure to comply with FATCA, including compulsory redemption or withdrawal of the investor concerned. In this regard, the General Partner and the Fund have certain rights to request, and the investors have certain obligations to provide, information and documentation that may be used by the General Partner and the Fund in complying with their obligations under FATCA. In addition, no investor affected by any action or remedy by the Fund shall have any claim against the Fund, the General Partner, and the Administrator (or their agents, delegates, employees, directors, officers or affiliates) for any form of damages or liability as a result of actions taken or remedies pursued by or on behalf of the Fund in order to comply with FATCA.

*__Investors should consult their tax advisors as to the withholding, filing and information reporting requirements that may be imposed on them in respect of their ownership of Interests of the Fund.__*

State and Local Taxes

In addition to the U.S. federal income tax consequences described above, prospective investors should consider potential state and local tax consequences of an investment in the Fund. State and local laws often differ from U.S. federal income tax laws with respect to the treatment of specific items of income, gain, loss, deduction and credit. A Partner's distributive share of the taxable income or loss of the Fund generally will be required to be included in determining its reportable income for state and local tax purposes in the jurisdiction in which it is a resident.

Limited Partners or the Fund may be subject to state and/or local franchise, withholding, income, capital gain or other tax payment obligations and filing requirements in those jurisdictions where the Fund owns real estate assets or is otherwise regarded as doing business or earning income. Credits for these taxes may not be available (or may be subject to limitations) in the jurisdictions in which Limited Partners, or the Fund, as applicable, are residents. Each potential investor is urged to consult with its own tax advisor in this regard.

*Each prospective Limited Partner should consult its own tax advisor with respect to its state and local tax consequences and filing obligations as a result of an investment in the Fund.*

Other Taxes

The Fund and its Limited Partners may be subject to other taxes, such as the AMT, and estate, inheritance or intangible property taxes that may be imposed by various domestic jurisdictions, as well as foreign withholding or gains taxes. Each prospective investor should consider the potential consequences of such taxes on an investment in the Fund. It is the responsibility of each prospective investor to satisfy itself as to, among other things, the legal and tax consequences of an investment in the Fund, under the laws of the various jurisdictions of its domicile and its residence, by obtaining advice from its own tax counsel or other advisor, and to file all appropriate tax returns that may be required.

Tax Returns; Tax Audits

The Fund will file an annual partnership information return with the Service that reports the results of its operations for the taxable year, and will distribute annually to each Limited Partner a form showing its distributive share of the Fund's items of income, gain, loss, deduction or credit. The General Partner has the authority to decide how to report these items on the Fund's tax returns, and all Limited Partners will be required under the Partnership Agreement to treat the items consistently on their own returns. If the income tax returns of the Fund are audited by the Service, the tax treatment of the Fund's income and deductions is generally determined at the Fund level in a single proceeding rather than by individual audits of the Limited Partners. In this regard, the General Partner, as the "Tax Matters Partner," has considerable authority to make decisions affecting the tax treatment and procedural rights of all Limited Partners. In addition, the Tax Matters Partner has the authority to bind certain Limited Partners to settlement agreements and the right on behalf of all Limited Partners to extend the statute of limitations relating to the Limited Partners' tax liabilities with respect to Fund items.

In certain cases, the Fund may be required to file a statement with the Service, disclosing one or more positions taken on its tax return, generally where the tax law is uncertain or a position lacks clear authority. All Partners are required under the Code to treat the partnership items consistently on their own returns, unless they file a statement with the Service disclosing the inconsistency. Given the uncertainty and complexity of the tax laws, it is possible that the Service may not agree with the manner in which the Fund's items have been reported.

**Other Income Taxation**

Although there can be no assurance, it is intended that the affairs of the Fund will be conducted such that the Fund will not be subject to regular income taxation in any foreign jurisdiction. However, income and gains from investments held by the Fund may be subject to withholding taxes or taxes in jurisdictions other than those described herein, subject to the possibility of reduction under applicable tax treaties. Limited Partners generally may be entitled, subject to applicable limitations, to a credit against U.S. income tax for creditable foreign income taxes paid on the foreign source income and gains of the Fund (which may not include all of the Fund's gains). The foreign tax credit rules are complex, and may, depending on each Limited Partner's particular circumstances, limit the availability or use of foreign tax credits. Prospective investors are advised to consult their own tax advisors regarding the application of the foreign tax credit rules.

**Future Tax Legislation; Necessity of Obtaining Professional Advice**

Future amendments to the Code, other legislation, new or amended Treasury Regulations, administrative rulings or decisions by the Service or judicial decisions may adversely affect the U.S. federal income tax aspects of an investment in the Fund, with or without advance notice, retroactively or prospectively. The foregoing analysis is not intended as a substitute for careful tax planning. The tax matters relating to the Fund are complex and are subject to varying interpretations. There can be no assurance that the Service will agree with each position taken by the Fund with respect to the tax treatment of Fund items and transactions. Moreover, the effect of existing income tax laws and of proposed changes in income tax laws on Limited Partners will vary with the particular circumstances of each Limited Partner and, in reviewing this Memorandum and any exhibits hereto, these matters should be considered.

Accordingly, each prospective investor must consult with and rely solely on its professional tax advisors with respect to the tax results of its investment in the Fund. In no event will the Fund, the General Partner, the Investment Manager, or their Affiliates, counsel or other professional advisors be liable to any Limited Partner for any U.S. federal, state, local or foreign tax consequences of an investment in the Fund, whether or not such consequences are as described above.

*The foregoing is a summary of some of the important tax rules and considerations affecting the Limited Partners, the Fund, and the Fund's proposed operations. This summary does not purport to be a complete analysis of all relevant tax rules and considerations, which will vary with the particular circumstances of each Limited Partner, nor does it purport to be a complete listing of all potential tax risks inherent in purchasing or holding an Interest. The foregoing does not address tax considerations affecting investors that are not U.S. persons. Each prospective investor in the Fund is urged to consult its own tax advisor in order to understand fully the U.S. federal, state, local and any foreign tax consequences of such an investment in its particular situation.*

# ERISA AND OTHER REGULATORY CONSIDERATIONS

## ERISA Considerations

<u>General</u>

Fiduciaries and other persons who are proposing to invest in Interests on behalf of retirement plans, IRAs and other employee benefit plans ("**Plans**") covered by the U.S. Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), or the Code must give appropriate consideration to, among other things, the role that an investment in the Fund plays in the Plan's portfolio, taking into consideration whether the investment is designed to reasonably further the Plan's purposes, the investment's risk and return factors, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the anticipated cash flow needs of the Plan, the projected return of the total portfolio relative to the Plan's objectives, the limited right of Limited Partners to withdraw all or any part of their capital or to transfer their Interests and whether investment in the Fund constitutes a direct or indirect transaction with a party in interest (under ERISA) or a disqualified person (under the Code).

<u>Plan Asset Regulations and Benefit Plan Investors</u>

The United States Department of Labor ("**DOL**") has adopted regulations that treat the assets of certain pooled investment vehicles, such as the Fund, as "plan assets" for purposes of Title I of ERISA and Section 4975 of the Code ("**Plan Assets**"). Section 3(42) of ERISA defines the term "Plan Assets" to mean plan assets as defined by such regulations as the DOL may prescribe, except that under such regulations the assets of an entity shall not be treated as Plan Assets if, immediately after the most recent acquisition of an equity interest in the entity, less than 25% of the total value of each class of equity interest in the entity is held by "Benefit Plan Investors" (the "**significant participation test**"). For purposes of this determination, the value of any equity interest held by a person (other than such a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person, shall be disregarded. An entity shall be considered to hold Plan Assets only to the extent of the percentage of the equity interest held by Benefit Plan Investors. The term "**Benefit Plan Investors**" means any employee benefit plan subject to part 4 of Title I of ERISA (*i.e.*, plans subject to the fiduciary provisions of ERISA), any plan to which the prohibited transaction provisions of Section 4975 of the Code apply (*e.g.*, IRAs), and any entity whose underlying assets include Plan Assets by reason of a plan's investment in such entity (a "**Plan Asset Entity**").

In order to prevent the assets of the Fund from being considered Plan Assets under ERISA, it is the intention of the Fund to monitor the investments in the Fund and prohibit the acquisition, withdrawal or transfer of any Interests by any Limited Partner, including a Benefit Plan Investor, unless, after giving effect to such an acquisition, withdrawal or transfer, the total proportion of Interests of any class owned by Benefit Plan Investors would be less than 25% of the aggregate value of the class of Interests (determined, as described above, by excluding certain Interests held by the General Partner, other fiduciaries and affiliates).

Without limiting the generality of the foregoing, in order to limit equity participation in any class of Interests by Benefit Plan Investors to less than 25%, the Fund may require the compulsory withdrawal of Interests of any class. Each Limited Partner that is an insurance company acting on behalf of its general account or a Plan Asset Entity will be required to represent and warrant as of the date it acquires

Interests the maximum percentage of such general account or Plan Asset Entity that will constitute Plan Assets (the "***Maximum Percentage***") so such percentage can be calculated in determining the percentage of Plan Assets invested in the Fund. Further, each such insurance company and Plan Asset Entity will be required to covenant that if, after its initial acquisition of Interests, the Maximum Percentage is exceeded at any time, then such insurance company or Plan Asset Entity shall immediately notify the General Partner of that occurrence and shall, if and as directed by the General Partner, in a manner consistent with the restrictions on transfer set forth herein, redeem or dispose of some or all of the Interests held in its general account or Plan Asset Entity by the end of the next following calendar month (or such earlier period directed by the General Partner).

If the Fund's assets were considered Plan Assets, then, under ERISA and the Code, the General Partner would be a fiduciary, and certain employees, partners and officers of the General Partner as well as certain affiliates would become "parties in interest" and "disqualified persons," with respect to the investing Plans, with the result that the rendering of services to certain related parties, the lending of money or other extensions of credit, the sale, exchange or leasing of property by the Fund or certain related parties or the payment of certain fees, as well as certain other transactions, might be deemed to constitute prohibited transactions. Additionally, individual investment in Interests by persons who are fiduciaries, and/or parties-in-interest and disqualified persons, to a Plan might be deemed to constitute prohibited transactions under such circumstances.

Representation by Plans

The fiduciaries of each Plan proposing to invest in the Fund will be required to represent that they have been informed of and understand the Fund's investment objectives, policies and strategies and that the decision to invest Plan Assets in the Fund is consistent with the provisions of ERISA and/or the Code that require diversification of Plan Assets and impose other fiduciary responsibilities. By its purchase, each investor will be deemed to have represented that either (a) it is not a Plan that is subject to the prohibited transaction rules of ERISA or the Code, (b) it is not an entity whose assets include Plan Assets or (c) its investment in the Fund will not constitute a non-exempt prohibited transaction under ERISA or the Code.

Ineligible Purchasers

Interests may not be purchased with Plan Assets if the General Partner, any selling agent, finder, any of their respective affiliates or any of their respective employees: (a) has investment discretion with respect to the investment of such Plan Assets; (b) has authority or responsibility to give or regularly gives investment advice with respect to such Plan Assets, for a fee, and pursuant to an agreement or understanding that such advice will serve as a primary basis for investment decisions with respect to such Plan Assets and that such advice will be based on the particular investment needs of the Plan; or (c) is an employer maintaining or contributing to such Plan. A party that is described in clause (a) or (b) of the preceding sentence is a fiduciary under ERISA and the Code with respect to the Plan, and any such purchase might result in a "prohibited transaction" under ERISA and the Code.

Plans' Reporting Obligations

The information contained herein and in the other documentation provided to investors in connection with an investment in the Fund is intended to satisfy the alternative reporting obligation for "eligible indirect compensation" on Schedule C of the Form 5500, in addition to the other purposes for which such documents were created.

*Whether or not the underlying assets of the Fund are deemed Plan Assets, an investment in the Fund by a Plan is subject to ERISA and the Code. Accordingly, Plan fiduciaries should consult their own counsel as to the consequences under ERISA and the Code of an investment in the Fund. Note that similar laws governing the investment and management of the assets of governmental or non-U.S. plans may contain fiduciary and prohibited transaction requirements similar to those under ERISA and the Code. Accordingly, fiduciaries of such governmental or non-U.S. plans, in consultation with their counsel, should consider the impact of their respective laws and regulations on an investment in the Fund.*

## Other Regulatory Matters

### Securities Act of 1933

Interests are not registered under the U.S. Securities Act of 1933, as amended, or any other securities law, including state securities or blue sky laws. Interests are offered without registration in reliance upon the exemption contained in Regulation D of this act and/or rules and regulations of the Securities and Exchange Commission applicable to transactions not involving a public offering. Each investor is required, in the Fund's Subscription Documents pursuant to which such investor subscribes for an Interest, to make customary Regulation D representations.

### Investment Company Act of 1940

The Fund is not registered under the U.S. Investment Company Act of 1940, as amended, in reliance upon relief from registration afforded to collective investment vehicles whose outstanding securities are not publicly offered and are beneficially owned exclusively by investors that are considered "qualified purchasers" within the meaning of the Investment Company Act. "Qualified purchasers" generally include individuals and certain family-owned companies owning total investments in excess of $5 million and entities owning total investments in excess of $25 million. Each investor will be required to complete the Fund's Subscription Documents to enable the Fund to determine its eligibility.

### Investment Adviser Registration

The Investment Manager is registered as an investment adviser with the Securities and Exchange Commission under the U.S. Investment Advisers Act of 1940, as amended (the "***Advisers Act***"). Each prospective investor will be required to make a representation to indicate that it is a "qualified client" as defined in the Advisers Act.

### Commodity Exchange Act

Neither the General Partner nor the Investment Manager is required to register as a commodity pool operator or commodity trading adviser under the U.S. Commodity Exchange Act because the Fund is limiting participation to certain qualified investors, is restricting the Fund's commodity interest trading, and the Investment Manager only provides commodity trading advice to the Fund (or other pools for which it is an exempt commodity pool operator). Therefore, unlike a registered commodity pool operator, there is no requirement to deliver this Memorandum or other disclosure document or any certified annual report to the Fund's investors.

<u>Anti-Money Laundering Regulations</u>

All subscriptions for Interests will be subject to applicable anti-money laundering regulations. Investors will be required to comply with such anti-money laundering procedures as are required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act) Act of 2001 (Pub. L. No. 107-56).

As part of the Fund's responsibility to comply with regulations aimed at the prevention of money laundering, the General Partner or its delegate may require verification of identity from all prospective investors.  Depending on the circumstances of each subscription, it may not be necessary to obtain full documentary evidence of identity.

The General Partner reserves the right to request such information as is necessary to verify the identity of a prospective investor.  The General Partner also reserves the right to request such identification evidence in respect of a transferee of Interests.  In the event of delay or failure by the prospective investor or transferee to produce any information required for verification purposes, the General Partner may refuse to accept the application or (as the case may be) to register the relevant transfer and (in the case of a subscription of Interests) any funds received will be returned without interest to the account from which the monies were originally debited.

The General Partner also reserves the right to refuse to make any withdrawal payment or distribution to a Limited Partner, if the General Partner suspects or is advised that the payment of any withdrawal or distribution moneys to such Limited Partner might result in a breach or violation of any applicable anti-money laundering or other laws or regulations by any person in any relevant jurisdiction, or such refusal is considered necessary or appropriate to ensure the compliance by the Fund, the General Partner and the Investment Manager with any such laws or regulations in any relevant jurisdiction.

# EXHIBIT B

**Memorandum Number** _____

# Confidential Private Offering Memorandum

*Series B, Series C and Series D Shares of*

## Highland Multi Strategy Credit Fund, Ltd.

*A Cayman Islands Exempted Company*

*Investment Manager*

Highland Capital Management, L.P.

**November 2014**

*This Confidential Private Offering Memorandum must be read in conjunction with the Confidential Private Placement Memorandum of Highland Multi Strategy Credit Fund, L.P.*

# **TABLE OF CONTENTS**

Page

NOTICE ...................................................................................................................... 1

DIRECTORY ............................................................................................................... 4

INTRODUCTION ........................................................................................................ 5

MANAGEMENT .......................................................................................................... 6

SUMMARY OF TERMS ............................................................................................... 9

RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST .......................................... 22

SHARES OF THE FUND .............................................................................................. 27

TAX CONSIDERATIONS ............................................................................................. 31

ERISA CONSIDERATIONS .......................................................................................... 39

CAYMAN ISLANDS MUTUAL FUND LAW ..................................................................... 42

ANTI-MONEY LAUNDERING COMPLIANCE ................................................................. 43

ANNEX A ................................................................................................................. 45

Attachment:   Confidential Private Placement Memorandum of Highland Multi Strategy Credit Fund, L.P.

## NOTICE

This Private Offering Memorandum (this "***Memorandum***") is confidential and intended solely for the use of the person to whom it has been delivered by Highland Multi Strategy Credit Fund, Ltd. (the "***Fund***") for the purpose of enabling the recipient to evaluate an investment in the Fund. The purpose of the Fund is to invest all of its assets in, and carry out its investment program through, Highland Multi Strategy Credit Fund, L.P., a Delaware limited partnership (the "***Partnership***"). Accordingly, this Memorandum must be read in conjunction with the Partnership's Confidential Private Placement Memorandum, as amended and supplemented from time to time (the "***Partnership Memorandum***").

This Memorandum is not to be reproduced or distributed to others, at any time, without the prior written consent of the Fund (other than to professional advisors and employees of the investor receiving this Memorandum from the Fund or its authorized representative or such investor) and all recipients agree they will keep confidential all information contained herein not already in the public domain and will use this Memorandum for the sole purpose of evaluating a possible investment and monitoring a subsequent investment in the Fund. Notwithstanding the foregoing, each investor (and each employee, representative or other agent of each investor) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of an investment in the Fund and all materials of any kind (including opinions or other tax analyses) that are provided to the investor relating to such tax treatment or tax structure. Acceptance of this Memorandum and the Partnership Memorandum by a recipient constitutes an agreement to be bound by the foregoing terms. No person is authorized to make any representations concerning the Fund which are inconsistent with those contained in this Memorandum.

Prospective investors are not to construe the contents of this Memorandum or the Partnership Memorandum as legal, tax, investment or other advice. Each prospective investor should consult its own advisors as to legal, financial, tax, ERISA and other related matters concerning an investment in the Fund.

In making an investment decision, investors must review both this Memorandum and the Partnership Memorandum and must rely on their own examination of the Fund and the Partnership and the terms of the offering, including the merits and risks involved. The shares in the Fund (the "***Shares***") have not been recommended by any U.S. federal or state, or any non-U.S., securities commission or regulatory authority. Furthermore, the foregoing authorities have not confirmed the accuracy or determined the adequacy of this Memorandum. Any representation to the contrary is a criminal offense.

Neither this Memorandum nor the Shares described herein have been qualified for offer, sale or distribution under the laws of any jurisdiction governing the offer or sale of mutual fund shares or other securities, and this Memorandum shall not constitute an offer to sell or a solicitation of an offer to buy nor shall there be any sale of Shares in any jurisdiction in which such offer, solicitation or sale is not authorized or to any person to whom it is unlawful to make such offer, solicitation or sale.

In each member state of the European Economic Area (each a "***Relevant Member State***") that has implemented EU Directive 2011/61/EU on Alternative Investment Fund Managers (the "***AIFM Directive***"), the Fund may only be offered to investors in accordance with local measures implementing

the AIFM Directive. Investors in a Relevant Member State where the Fund is not being offered pursuant to private placement rules implementing the AIFM Directive may invest in the Fund, but only in circumstances where they do so at their own initiative.

No person has been authorized to give any information or to make any representation concerning the Fund or the offering of the Shares other than the information contained in the Memorandum and the Partnership Memorandum and, if given or made, such information or representation must not be relied upon as having been authorized by the Fund.

The Shares have not been, and will not, be registered under the United States Securities Act of 1933, as amended, or the securities laws of any of the states of the United States, and the Fund has not been and will not be registered under the United States Investment Company Act of 1940, as amended. Direct or indirect acquisition or ownership of Shares by "*U.S. Persons*" (as defined herein) without compliance with applicable U.S. securities laws or in contravention of the relevant provisions of the constituent documents of the Fund is prohibited.

The Fund is not a recognized collective investment scheme for the purposes of Section 264 of the Financial Services and Markets Act 2000 of the United Kingdom (the "*Act*"). The promotion of the Fund and the distribution of this Memorandum in the United Kingdom are accordingly restricted by law. This Memorandum is directed at persons to whom it may lawfully be issued or directed at under the Financial Services and Markets Act 2000 (Financial Promotion) Order 2001, including persons who are authorized under the Act, certain persons having professional experience in matters relating to investments, high net worth companies, high net worth unincorporated associations or partnerships, trustees of high value trusts and persons who qualify as certified sophisticated investors. The Shares are only available to such persons in the United Kingdom and this Memorandum must not be relied or acted upon by any other persons in the United Kingdom. In order to qualify as a certified sophisticated investor a person must (i) have a certificate in writing or other legible form signed by an authorized person to the effect that he or she is sufficiently knowledgeable to understand the risks associated with participating in unrecognized collective investment schemes and (ii) have signed, within the last 12 months, a statement in a prescribed form declaring, amongst other things, that he or she qualifies as a sophisticated investor in relation to such investments. This Memorandum is exempt from the general restriction in Section 21 of the Act on the communication of invitations or inducements to engage in investment activity on the grounds that it is being issued to and/or directed at only the types of persons referred to above. The content of this Memorandum has not been approved by an authorized person and such approval is, save where this Memorandum is directed at or issued to the types of persons referred to above, required by Section 21 of the Act.

The Shares described in this Memorandum are not the subject of a public offering in the Cayman Islands. No offer or invitation to subscribe for Shares may be made to the public in the Cayman Islands.

Any information forwarded to the Fund by any potential shareholder will be treated on a confidential basis except that such information may be passed on to a relevant third party by the Fund where so required by law or regulation and each shareholder upon subscribing for Shares shall be deemed to have consented to such release of such confidential information pursuant to the terms of the Confidential Relationships (Preservation) Law (as amended) of the Cayman Islands (or any amendment thereto).

An investment in the Shares involves significant risks. Prospective investors should pay particular attention to the risk factors disclosed in this Memorandum and the Partnership Memorandum. Investment in the Fund is suitable only for sophisticated investors and requires the financial ability and willingness to accept the high risks inherent in an investment in the Fund. No assurance can be given that the Fund's investment objective will be achieved.

Each prospective investor is invited to meet with representatives of the Fund and to discuss with, ask questions of and receive answers from such representatives concerning the terms and conditions of this offering and to obtain any additional information, to the extent that such representatives possess such information or can acquire it without unreasonable effort or expense, necessary to verify the information contained herein.

The Fund is a registered mutual fund for the purposes of the Mutual Funds Law (2013 Revision) of the Cayman Islands. The Fund is registered with the Cayman Islands Monetary Authority pursuant to Section 4(3) of that law and the prescribed details in respect of this Memorandum have been filed with the Cayman Islands Monetary Authority. Such registration does not imply that the Cayman Islands Monetary Authority has approved this Memorandum or the offering of Shares hereunder.

This Memorandum does not purport to be, and should not be construed as, a complete description of the memorandum of association and articles of association of the Fund (the "**Articles**") or the Partnership's limited partnership agreement, as amended and supplemented from time to time (the "**Partnership Agreement**"), copies of which will be provided to each prospective investor upon request. Each prospective investor in the Fund is encouraged to review the Articles and the Partnership Agreement carefully, in addition to consulting appropriate legal and tax counselors. To the extent of any inconsistency between this Memorandum, the Articles and the Partnership Agreement, the terms of the Articles and the Partnership Agreement control.

Pursuant to an exemption from the Commodity Futures Trading Commission (the "**CFTC**"), neither the General Partner nor the Investment Manager (each as defined herein) is registered with the CFTC as a commodity pool operator ("**CPO**") or as a commodity trading advisor and therefore, unlike a registered CPO, is not required to deliver a disclosure document or a certified annual report to participants in this pool. Among other things, the exemption requires the filing of a claim of exemption with the National Futures Association. It is also required that at all times either: (a) the aggregate initial margin and premiums required to establish commodity interest positions does not exceed 5% of the liquidation value of the Fund's portfolio; or (b) the aggregate net notional value of the Fund's commodity interest positions does not exceed 100% of the liquidation value of the Fund's portfolio and further that all pool participants are required to be accredited investors or certain other qualified investors.

The delivery of this Memorandum does not, under any circumstances, create any implication that there has been no change in the circumstances affecting the Fund since the date hereof. An amended or updated Memorandum will be provided to reflect any material changes to the information contained herein.

Except as otherwise noted, all monetary amounts set forth herein are expressed in United States ("**U.S.**") dollars.

# DIRECTORY

| | |
|---|---|
| **Registered Office** | **Highland Multi Strategy Credit Fund, Ltd.**<br>c/o Maples Corporate Services Limited<br>PO Box 309, Ugland House<br>Grand Cayman, KY-1109<br>Cayman Islands |
| **Investment Manager** | **Highland Capital Management, L.P.**<br>300 Crescent Court<br>Suite 700<br>Dallas, Texas 75201 |
| **Directors** | James D. Dondero<br>Mark K. Okada |
| **Administrator** | **SEI Global Services, Inc.**<br>One Freedom Valley Drive<br>Oaks, Pennsylvania 19456 |
| **Auditors** | **PricewaterhouseCoopers LLP**<br>P.O. Box 258<br>Strathvale House, George Town<br>Grand Cayman KY1-1104<br>Cayman Islands |
| **Legal Counsel** | *In the United States*<br>**Akin Gump Strauss Hauer & Feld LLP**<br>1700 Pacific Avenue, Suite 4100<br>Dallas, Texas 75201<br><br>*In the Cayman Islands*<br>**Maples and Calder**<br>PO Box 309<br>Ugland House<br>Grand Cayman, KY-1104<br>Cayman Islands |

# INTRODUCTION

Highland Multi Strategy Credit Fund, Ltd. (the "***Fund***") is a Cayman Islands exempted company offering participating shares of the Fund ("***Shares***") for the purpose of enabling qualified non-U.S. investors and U.S. tax-exempt investors to participate in the investment program of Highland Multi Strategy Credit Fund, L.P., a Delaware limited partnership (the "***Partnership***"), on a more tax efficient basis.  The Partnership seeks attractive risk-adjusted returns, consistent with the preservation of capital and prudent investment management.

Highland Multi Strategy Credit Fund GP, L.P., a Delaware limited partnership (the "***General Partner***"), serves as the general partner of the Partnership.  Highland Capital Management, L.P., a Delaware partnership (the "***Investment Manager***"), serves as the investment manager of the Partnership and has responsibility for the Partnership's investment program.   James D. Dondero ultimately controls the General Partner and the Investment Manager.

The Fund is a limited partner in the Partnership and invests all of its investible assets in, and conducts all of its operations through, the Partnership.  Therefore, to be fully informed about an investment in the Fund, an investor must first understand the terms of an investment in the Partnership. Prospective investors are therefore urged to carefully review the current Confidential Private Placement Memorandum of the Partnership, as amended and supplemented from time to time (the "***Partnership Memorandum***"), the Limited Partnership Agreement of the Partnership, as amended and supplemented from time to time (the "***Partnership Agreement***") and the Investment Management Agreement by and among the Partnership, the General Partner, the Fund and the Investment Manager, as amended and supplemented from time to time (the "***Investment Management Agreement***").   A copy of the Partnership Memorandum is being provided to investors with this Memorandum.   Copies of the Partnership Agreement and the Investment Management Agreement will be provided to investors upon request.   The Partnership Memorandum, together with the Partnership Agreement and the Investment Management Agreement, describe the material terms of an investment in the Partnership.   Aside from the differences described in this Memorandum, an investment in the Fund will have substantially similar terms and risks to an investment in the Partnership, as described in the Partnership Memorandum.

The Fund is seeking subscriptions from non-U.S. investors and U.S. tax-exempt investors that qualify as "accredited investors" and "qualified purchasers" (as defined in the Fund's subscription materials), generally in minimum amounts of at least $1,000,000.  The Fund generally accepts subscriptions on the first business day of each calendar month.

Pursuant to recent amendments adopted by the Fund, as further explained in this Memorandum and the Partnership Memorandum, all outstanding Shares held as of the effective date of the amendments were, notwithstanding their designation prior to the amendments, re-designated as "Series A Shares." Additionally, under these amendments, the Fund created three additional series of Shares – "Series B Shares," "Series C Shares" and "Series D Shares."   The Fund is offering Series B Shares, Series C Shares and Series D Shares pursuant to this Memorandum.   The terms applicable to the Series A Shares are set forth in a Supplement to this Memorandum.

This Memorandum describes the principal terms that apply to an investment in the Fund in Series B, Series C and Series D Shares and certain other information that relates specifically to the offering of Shares.  **This is not an offering of limited partner interests in the Partnership, although an investor should be fully informed about the Partnership in making an investment decision.**

# MANAGEMENT

## Board of Directors

The Fund's board of directors (the "**Board of Directors**") consists of two (2) directors (collectively, the "**Directors**"). The members of the Board of Directors are James D. Dondero and Mark K. Okada. The biographies of the Directors are set forth in the Partnership Memorandum.

The Fund's Board of Directors does not currently consist of any directors that are not affiliated with the Investment Manager, and thus the Fund's management, as well as investment decisions at the Partnership level, are effectively controlled by the Investment Manager or its affiliates.

The Board of Directors has the full authority of a board under Cayman law. The powers of the Board of Directors described in this Memorandum and the Articles are not exhaustive and are not limited to the specific authorities described therein. Thus, subject to applicable law, the Board of Directors may take certain decisions or actions even where those decisions or actions are not expressly granted in the Articles or described in this Memorandum.

It is anticipated that the Board of Directors will meet, in person or by conference telephone, at least once a year to review the investment and administrative affairs of the Fund. The Directors will delegate investment of the Fund's assets to the Investment Manager, and the Directors are not responsible for the day to day conduct of the Fund's trading program. The Directors will also delegate certain day to day administrative and clerical affairs of the Fund to the Administrator or others.

The Directors each serve in a non-executive capacity. Any Director may hold any other office in connection with the Fund (other than the office of the Fund's independent auditors) in conjunction with his office of Director on such terms as to tenure of office and otherwise as the Directors may determine. Any Director may also act in a professional capacity (other than as the Fund's independent auditors) and he or its firm will be entitled to remuneration for such services as if he were not a Director. A Director may contract with the Fund provided that the Director declares his or its interest or gives notice of his or its interest as soon as practicable after the Director obtains such interest.

Each of the Directors has been duly registered, as applicable, under the Cayman Islands Directors Registration and Licensing Law, 2014.

A Director may vote at, or be counted in the quorum of, any meeting of the Board of Directors to consider any contract in which the Director is interested other than as a shareholder, provided that such Director declares such interest prior to the taking of the vote at such meeting.

Independent, third-party Directors, if any, will be entitled to remuneration for their services at such rate not exceeding the customary rate for the provision of services of a director as may be approved by the Fund. The Directors will be reimbursed for all out of pocket costs and expenses properly incurred by them, including in connection with attending meetings of the Directors or any committee of the Directors or any general meeting or any meeting held in connection with the business of the Fund. The Fund will indemnify the Directors for all liabilities, costs or expenses of

whatsoever kind incurred or suffered by them (other than those arising by reason of fraud, willful neglect or willful default on the part of a Director or servant or agent thereof).

**Administrator**

SEI Investments is a leading global provider of investment processing, investment management and investment operations solutions for institutional and personal wealth management. For more than 40 years, SEI has helped corporations, financial institutions, financial advisors and ultra-high-net-worth families create and manage wealth by providing comprehensive, innovative, investment and investment-business solutions. SEI manages or administers $601.9 billion in funds and separately managed assets. SEI is a public company and is listed on the NASDAQ exchange under the symbol SEIC. SEI has been retained to perform certain administrative, accounting and investor services for the Fund and the Partnership (in such capacity, the "***Administrator***"). In its capacity as Administrator, it will receive customary fees that will be paid out of the assets of the Fund. The Administrator will also be reimbursed for all reasonable out-of-pocket expenses.

The Fund will enter into an administration agreement (the "***Administration Agreement***") with the Administrator. The Administrator will be under no duty to take any action on behalf of the Fund except as specifically set forth in the Administration Agreement or as may be specifically agreed to by the Administrator and the Fund in a written amendment thereto.

The Administrator will act as liaison with the Fund's accountants and auditors and will provide account analyses, fiscal year summaries, and other audit-related schedules with respect to the Fund. The Administrator will take all reasonable action in the performance of its duties under the Administration Agreement to assure that the necessary information is made available to such accountants and auditors for the expression of their opinion, as required by the Fund.

The Administrator will enter into and will maintain in effect with appropriate parties one or more agreements making reasonable provisions for emergency use of electronic data processing equipment to the extent appropriate equipment is available. In the event of equipment failures, the Administrator will, at no additional expense to the Fund, take reasonable steps to minimize service interruptions. The Administrator will have no liability with respect to the loss of data or service interruptions caused by equipment failure, provided such loss or interruption is not caused by the Administrator's own willful misfeasance, bad faith, gross negligence or reckless disregard of its duties or obligations under the Administration Agreement.

Subject to the terms of the Administration Agreement, the Administrator will be liable to the Fund (or any person or entity claiming through the Fund) for damages only to the extent caused by the Administrator's own fraud or willful misconduct under the Administration Agreement ("***Standard of Care***"). The Administrator will not be liable for damages (including, without limitation, damages caused by delays, failure, errors, interruption or loss of data) occurring directly or indirectly by reason of circumstances beyond its reasonable control. The Administrator will not be under any duty or obligation to inquire into and will not be liable for the validity or invalidity, authority or lack thereof, or truthfulness or accuracy or lack thereof, of any instruction, direction, notice, instrument or other information which the Administrator reasonably believes to be genuine. The Administrator will not be liable for any damages that are caused by actions or omissions taken by the Administrator in accordance with written instructions by authorized persons of the Fund or advice of counsel. The Administrator will not be liable for any damages arising out of any action or omission to act by any prior service provider of the Fund or for any failure to discover any such error or omission. Neither the

Administrator nor its affiliates will be liable for any consequential, incidental, exemplary, punitive, special or indirect damages, whether or not the likelihood of such damages was known by the Administrator or its affiliates. Both the Fund and the Administrator will have a duty to mitigate damages for which the other party may become responsible.

Absent the Administrator's failure to meet its Standard of Care, the Fund agrees to indemnify, defend and hold harmless the Administrator and its affiliates and their respective directors, trustees, officers, agents and employees from certain claims, suits, actions, damages, losses, liabilities, obligations, costs and reasonable expenses (including attorneys' fees and court costs, travel costs and other reasonable out-of-pocket costs related to dispute resolution) arising directly or indirectly from any actions taken or omitted to be taken by the Administrator in connection with the provision of services to the Fund.

The Partnership will also enter into an administration agreement with the Administrator, under which the terms will be substantially as above.

# SUMMARY OF TERMS

*To understand this investment opportunity, a prospective investor should read both the Partnership Memorandum and the following summary. The information in the Partnership Memorandum is important to a prospective investor's investment decision because: (i) the purpose of the Fund is to invest in the Partnership and therefore the underlying investment opportunity is in the Partnership; (ii) an investment in the Fund will (aside from the differences described below) have substantially similar terms to those applicable to a direct investment in the Partnership; and (iii) many terms relevant to an investment in the Fund, including the information concerning compensation, expenses, distributions, risk factors and conflicts of interest, are set forth in the Partnership Memorandum and not in this Memorandum.*

*The following summary highlights certain differences from the terms that would apply were the investor to hold a limited partner interest in the Partnership directly, and does not purport to provide a summary of the investment terms or risks of an investment in the Partnership, which is provided in the Partnership Memorandum. The summary of differences does not purport to be, and should not be construed as, a complete description of the Fund's Articles. To the extent of any inconsistency between this Memorandum and the Articles, the terms of the Articles control. Moreover, this summary and the summary set forth in the Partnership Memorandum are subject to the detailed provisions of the Partnership Agreement and are qualified in their entirety by the terms of the Partnership Agreement.* **Capitalized terms used but not defined herein have the meanings ascribed to them in the Partnership Memorandum.**

| | |
|---|---|
| **The Fund** | Highland Multi Strategy Credit Fund, Ltd., a Cayman Islands exempted company. |
| **The Partnership** | Highland Multi Strategy Credit Fund, L.P., a Delaware limited partnership. The Fund is a limited partner in the Partnership and invests all of its investible assets in, and conducts all of its investment activities through, the Partnership. As a limited partner of the Partnership, the Fund is subject to all of the terms and conditions of the Partnership applicable to limited partners of the Partnership. The Partnership will issue to the Fund an Interest in the Partnership and maintain capital sub-accounts that correspond to each Sub-Series of Shares (defined below). |
| **General Partner of the Partnership** | Highland Multi Strategy Credit Fund GP, L.P., a Delaware limited partnership. The general partner of the General Partner is Highland Multi Strategy Credit GP, LLC, a Delaware limited liability company of which the Investment Manager is currently the sole member. |
| **Investment Manager** | Highland Capital Management, L.P., a Delaware limited partnership. |
| **Recent Amendments; Series of Shares** | Effective November 1, 2014, the Board of Directors amended the terms of the Fund, whereby all outstanding Shares in the Fund were re-designated as "Series A Shares" and three new series of Shares were created – "Series B Shares," "Series C Shares" and "Series D Shares" (the "***Amendments***"). The General Partner and limited partners of the Partnership adopted similar amendments. |

As of the effective date of the Amendments (the "***Effective Date***"), all existing shareholders will hold Series A Shares, the terms of which are set forth in a supplement to this Memorandum. The Fund is currently offering for subscription Series B Shares, Series C Shares and Series D Shares pursuant to this Memorandum.

The Fund may issue additional series (each, a "***Series***") of Shares over time. Not all Series of Shares will be available for subscription at the same time and the terms among the Series of Shares will vary. New Series of Shares may be established by the Fund without notice to or approval of the shareholders.

Except with respect to management fees, performance-based profit allocations and redemption rights (each as discussed below), the rights and privileges attributable to Series A Shares, Series B Shares, Series C Shares and Series D Shares are identical.

References herein to "Shares" or "shareholders" shall include all Series of Shares and shareholders unless otherwise specified or context so requires.

**Eligible Investors**     Participating, redeemable, non-voting shares of the Fund (the "***Shares***") are being offered to investors that are not U.S. Persons and to selected U.S. investors that are tax-exempt persons who qualify both as "accredited investors" and as "qualified purchasers," as defined in the Fund's subscription application materials. The Fund reserves the right to reject any investor for any reason or for no reason in its discretion.

No Shares may be offered to the public in the Cayman Islands (which shall not include an exempted or ordinary non-resident company incorporated in the Cayman Islands). Shares of the Fund may be purchased only by eligible investors who are sophisticated individual or institutional investors. Each subscriber for Shares of the Fund must certify that the beneficial owner of such Shares will not be a "***U.S. Person***" as defined in Annex A attached to this Memorandum; provided, however, that subscriptions for Shares of the Fund may also be accepted from certain qualified U.S. tax-exempt organizations. The Fund reserves the right to reject subscriptions in its sole discretion.

Shares of the Fund will not be registered under the U.S. Securities Act of 1933, as amended, any state "blue sky" laws, or the securities laws of any other jurisdiction. Shares may be offered privately (i) outside the United States of America, its territories or possessions, or areas subject to its jurisdiction (the "***United States***"), or to or for the benefit of an investor that is not a U.S. Person, only in accordance with relevant laws of the jurisdiction where the offer is made, or (ii) within the United States or to a U.S. Person only in a transaction that does not require the registration of the Shares or the Fund under applicable U.S. federal or state securities laws.

More detailed information concerning the applicable suitability criteria is set forth in the Fund's subscription application materials (the "**Subscription Documents**").

The Fund or the Administrator reserves the right to request such information as is necessary to verify the identity and the source of funds of an applicant.  To ensure compliance with statutory and other requirements relating to anti-money laundering, the Fund or the Administrator may require verification of identity and/or source of funds from any person submitting completed Subscription Documents. Pending the provision of evidence satisfactory to the Fund or the Administrator as to identity, the evidence of title in respect of Shares may be retained at the absolute discretion of the Fund or the Administrator.  If within a reasonable period of time following a request for verification of identity, the Fund or the Administrator has not received evidence satisfactory to it as aforesaid, it may, in its absolute discretion, refuse to allot the Shares applied for in which event subscription monies will be returned without interest to the account from which such monies were originally debited.  Subscription monies may be rejected by the Fund or the Administrator if the remitting bank or financial institution is unknown to the Fund or the Administrator.

An investment in the Fund is suitable only for persons that have adequate means of providing for their current needs and personal contingencies and have no need for liquidity in their investments.  An investment in the Fund should not be made by any person that (a) cannot afford a total loss of its principal, or (b) has not carefully read or does not understand this Memorandum and the Partnership Memorandum, including the portions concerning the risks and the income tax consequences of an investment in the Fund.

**Subscriptions**

Subscriptions for Shares are accepted on the first Business Day of each calendar month and/or such other days as the Board of Directors may determine from time to time, generally subject to the receipt of cleared funds on or before the acceptance date.  Each investor will be required to invest a minimum of US$1,000,000 in the Fund, although the Fund may accept investments of a lesser amount in its discretion, subject to compliance with the applicable Cayman Islands Mutual Funds Law (2013 Revision) ("**Mutual Funds Law**").  Subscription payments may be made in cash or, with the consent of the Fund, in securities or partly in cash and partly in securities.  The Fund reserves the right to reject subscriptions in its sole discretion.

"**Business Day**" means any day other than Saturdays, Sundays or any other day banks located in in New York, New York are required or authorized to be closed.

A subscriber admitted to the Fund (a "**shareholder**") receives, in exchange for the initial capital contribution and any subsequent capital

11

contribution, Shares representing a proportionate share of the net assets of the Fund at that time.

Where a subscription for Shares is accepted, the Shares will be treated as having been issued with effect from the relevant subscription date notwithstanding that the subscriber for those Shares may not be entered in the Fund's register of members until after the relevant subscription date. The subscription monies paid by a subscriber for Shares will accordingly be subject to investment risk in the Fund from the relevant subscription date.

There is no minimum aggregate amount of subscriptions that is required for the initial acceptance of subscriptions, nor has the Fund established any maximum aggregate amount of subscriptions that may be accepted.

All subscribers will be required to comply with such anti-money laundering procedures as are required by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act) Act of 2001 (Pub. L. No. 107-56) and other applicable anti-money laundering regulations as further described in the Subscription Documents.

**Share Sub-Series**

The Fund may issue Shares as a separate sub-series of the relevant Series on each subscription date (each, a "*Sub-Series*") at $1,000 per Share. The Fund may issue Shares as a separate Sub-Series for purposes of, among others, accounting for any profits and losses attributable to each individual shareholder and for the purpose of permitting the Performance Allocation to be calculated separately with respect to each shareholder to reflect different returns achieved as a result of subscriptions received at different times. Each separate Sub-Series will be identified and referrable to each shareholder and by its date of issue. In general, each Sub-Series will participate in the Fund's profits and losses in the same manner as all other Sub-Series of Shares, except that the Performance Allocation to be charged to each Sub-Series of Shares will be calculated separately on the basis of the performance of the Sub-Series.

The Partnership maintains capital sub-accounts that correspond to each Sub-Series of Shares issued to shareholders of the Fund and each such capital sub-account is treated separately for purposes of determining Management Fees, Performance Allocations and redemption rights and restrictions (each as described in the Partnership Memorandum).

**Alternative Investment Vehicles**

The Directors will have the right, in connection with any investment, to direct the capital contributions of some or all of the subscribers to be made through one or more alternative investment vehicles (each an "*Alternative Investment Vehicle*"), and, in the case of an existing investment, transfer all or a portion of such investment to an Alternative Investment Vehicle, if, in the judgment of the Directors, the use of such vehicle or vehicles would allow the Fund to overcome legal or regulatory

constraints, invest in a more tax-efficient manner or would facilitate participation in certain types of investments. Any Alternative Investment Vehicle will be subject to terms and conditions substantially similar to those of the Fund and will be managed by the Investment Manager or an affiliate thereof.

**Affiliated Investors**
Shares held by the Investment Manager or its affiliates (collectively, "*Affiliated Investors*") may not be assessed the Management Fee or the Performance Allocations that are applicable to other investors in the Fund, but share pro rata in other applicable expenses of the Fund (as more fully described in the Partnership Agreement).

**Management Fee**
Although the Fund will not pay an asset-based fee directly to the Investment Manager, it will, as a limited partner in the Partnership, bear its pro rata share of the Management Fee paid by the Partnership to the Investment Manager in its capacity as investment manager of the Partnership. Accordingly, the Management Fee will be paid at the Partnership level by assessing such fee to the appropriate capital sub-account. The Management Fee is calculated and payable quarterly in advance at an annual rate of (i) 1.5% of the net asset value of each Series B Share, (ii) 1.0% of the net asset value of each Series C Share and (iii) 2.0% of the net asset value of each Series D Share. The Management Fee may be waived or reduced by the Investment Manager in its sole discretion.

**Other Fees and Expenses**
The Fund bears the reasonable, out-of-pocket expenses of the offering of the Shares contemplated hereunder and the recent Amendments, described above, including expenses associated with obtaining any requisite investor consent to such Amendments. To the extent the Directors deem appropriate, these expenses may be capitalized and amortized by the Fund over a 36-month period from the Effective Date, even though such capitalization and amortization may be a divergence from U.S. generally accepted accounting principles ("*GAAP*"). Amortization of such expenses over a 36-month period may, in certain circumstances, result in a qualification of the Fund's annual audited financial statements. In such instances, the Directors may decide to (i) avoid the qualification by recognizing the unamortized expenses or (ii) make GAAP conforming changes for financial reporting purposes, but amortize expenses for purposes of calculating the Fund's net asset value. There will be a divergence in the Fund's fiscal year-end net asset value and in the net asset value reported in the Fund's financial statements in any year where, pursuant to clause (ii), GAAP conforming changes are made only to the Fund's financial statements for financial reporting purposes.

If the Fund is terminated within 36 months of the Effective Date, any unamortized expenses will be recognized.

Investment and Operational Expenses.  The Fund bears all reasonable costs and expenses directly related to its operations, including its pro rata share of all Partnership expenses, including the Management Fee paid by the Partnership to the Investment Manager.  The Fund also bears all reasonable, out-of-pocket costs of the administration of the Fund, including accounting, audit and legal expenses, costs of any litigation or investigation involving the Fund's activities, and costs associated with reporting and providing information to existing and prospective investors.  However, the General Partner or the Investment Manager may, in its sole discretion, choose to absorb any such expenses incurred on behalf of the Fund.

The Fund does not have its own separate employees or office.  Except as described above and provided for in the Partnership Agreement, the Fund generally does not reimburse the General Partner or the Investment Manager for salaries, office rent and other general overhead costs of the General Partner or the Investment Manager.

**Restricted New Issues**    The Partnership may from time to time purchase securities in public offerings made through member firms of the Financial Industry Regulatory Authority, Inc. ("***FINRA***").  FINRA member firms are not permitted to sell certain new issues ("***Restricted New Issues***") to accounts in which certain persons have a significant beneficial interest that are involved in the securities industry or to executive officers or directors of companies that are current, recent or prospective investment banking client of the relevant underwriters ("***Restricted Persons***").  In order to enable the Partnership to participate in Restricted New Issues, the Fund will require each shareholder to provide information to enable the Fund to determine whether the shareholder is a Restricted Person.  When the Partnership invests in a Restricted New Issue, the profits and losses associated with the investment will be specially allocated exclusively to those shareholders who are permitted by the FINRA rules to have a beneficial interest therein.

The FINRA rules permit Restricted Persons that are involved in the securities industry to have in the aggregate up to a 10% participation in Restricted New Issues and Restricted Persons affiliated with a particular investment banking client to have up to 25% participation in Restricted New Issues.  If the ownership of the Partnership by Restricted Persons exceeds the maximum percentage, the Investment Manager will allocate such excess amount pro rata among the shareholders and the Partners of the Partnership who are not Restricted Persons or on such other basis that the Investment Manager reasonably determines ensures compliance with the FINRA rules.

If a Restricted New Issue in which participation by Restricted Persons has been capped is not promptly sold, the investment may be reallocated among all shareholders and the Partners of the Partnership on a pro rata

basis (including all Restricted Persons) after a secondary market develops at such secondary market price.

**Performance Allocation**

As further described in the Partnership Agreement, the Investment Manager, in its capacity as a special limited partner of the Partnership, is entitled to receive an annual performance-based profit allocation at the end of each year equal to 20% of the Partnership's net profits attributable to the Limited Partners of the Partnership, subject to a "high water mark" limitation.

The Performance Allocation is made at the Partnership level by deducting the Performance Allocation from the capital sub-account relating to each Sub-Series of Shares. The Performance Change (as defined in the Partnership Agreement) of each Sub-Series will not be netted against one another for purposes of determining the applicability of the "high water mark."

**Distributions**

Subject to the redemption privilege described below, all earnings of the Fund are ordinarily retained for investment. Other than distributions made pursuant to a redemption described below, shareholders should not expect the Fund to make any distributions.

**Redemptions Generally**

Redemptions from the Fund are subject to the withdrawal restrictions contained in the Partnership Agreement, whereby the Series A Interests in the Partnership correspond to the Series A Shares of the Fund, Series B Interests in the Partnership correspond to the Series B Shares of the Fund, the Series C Interests in the Partnership correspond to the Series C Shares of the Fund and the Series D Interests in the Partnership correspond to the Series D Shares of the Fund.

**Series Redemption Dates**

Subject to certain redemption restrictions described below, shareholders have the following redemption rights:

Series B Shares: Annual Liquidity. A shareholder is permitted to make complete or partial redemptions of its Series B Shares upon written notice to the Administrator at least 180 days prior to the applicable Series B Redemption Date. The "***Series B Redemption Date***" means: (i) the end of the day on the last Business Day of the calendar month that immediately precedes the one-year anniversary of date of the issuance of the Shares being redeemed; and thereafter (ii) the end of the day on each one-year anniversary of the preceding Series B Redemption Date (i.e., if Shares were issued on November 1, 2014, such Shares would be eligible for redemption on October 31, 2015 and every one year thereafter on October 31st, or the last Business Day of that month).

Series C Shares: Two Year Liquidity. A shareholder is permitted to make complete or partial redemptions of its Series C Shares upon written notice to the Administrator at least 180 days prior to the applicable Series C Redemption Date. The "***Series C Redemption Date***" means: (i) the end

of the day on the last Business Day of the calendar month that immediately precedes the two-year anniversary of the date of issuance of the Shares being redeemed; and thereafter (ii) the end of the day on each two-year anniversary of the preceding Series C Redemption Date (or the last Business Day of that month) (i.e., if Shares were issued on November 1, 2014, such Shares would be eligible for redemption on October 31, 2016 and every two years thereafter on October 31st, or the last Business Day of that month).

<u>Series D Shares: One Year Hard Lock-Up; Quarterly Liquidity</u>.  A shareholder is permitted to make complete or partial redemptions of Series D Shares as of the last Business Day of each calendar quarter (each, a "**Series D Redemption Date**") following the one-year anniversary of the date of issuance of the Shares being redeemed. Notice of any redemption of Series D Shares must be provided in writing to the Administrator at least 90 calendar days prior to the requested Series D Redemption Date.

The Board of Directors may, at any time and in its sole discretion, waive or modify the foregoing redemption and distribution restrictions with respect to any shareholder.

|   |   |
|---|---|
| **Settlement of Redemption Proceeds** | Redemption proceeds will be paid promptly following receipt by the Fund of the withdrawal proceeds from the Partnership in accordance with the Partnership Agreement. |
| **Redemption Conditions** | The Fund may refuse to accept a redemption request if it is not accompanied by such additional information as the Fund or the Administrator may reasonably require.  This power may, without limitation to the generality of the foregoing, be exercised where proper information has not been provided for money laundering verification purposes.  In addition, where redemption proceeds are requested to be remitted to an account which is not in the name of the investor, each of the Fund and the Administrator reserve the right to request such information as may be reasonably necessary in order to verify the identity of the investor and the owner of the account to which the redemption proceeds will be paid.   The redemption proceeds will not be paid to a third-party account if the investor and/or owner of the account fails to provide such information. |
| **Compulsory Redemptions** | The Board of Directors reserves the right, in its sole discretion, to compel the redemption of any shareholder's Shares for any or no reason, in part or in their entirety, on not less than five days' prior written notice (or immediately if the Board of Directors determines in its sole discretion that such shareholder's continued participation in the Fund may cause the Fund, the Partnership, the General Partner or the Investment Manager to violate any applicable law).   Settlements are made in the same manner as voluntary redemptions. |

**Suspension of Valuations,**
**Redemption and**
**Redemption Payments**

The Board of Directors may suspend the issuance of Shares, the shareholders' redemption privileges, the payment of redemption proceeds and the valuation of the Fund's net assets in the same circumstances as described in the Partnership Memorandum and set forth in the Partnership Agreement with respect to the suspension of valuations or of withdrawal privileges.

Upon the reasonable determination by the Board of Directors that conditions leading to suspension no longer apply, redemption rights for all shareholders shall be promptly reinstated, and any pending redemption requests (or new, timely withdrawal requests) shall be honored as of the last Business Day of the calendar quarter in which redemptions have recommenced, subject to the application of the redemption limitations described herein.

**Soft Wind Down**

It is anticipated that any suspension in the circumstances described above in "Suspension of Valuations, Redemptions and Redemption Payments" (each, a "***Suspension***") would ordinarily be temporary. However, there may be situations in which the circumstances giving rise to the Suspension continue to be present for a considerable period of time with the result that the Board of Directors, in consultation with the Investment Manager, considers it appropriate to keep the Suspension in place indefinitely. In certain circumstances, even where a Suspension has not been declared, the Directors may, in consultation with the Investment Manager, make a determination that the investment strategy should no longer be continued. During any such period of Suspension or having made such determination that the investment strategy should no longer be continued, the Investment Manager may recommend to the Board of Directors that the Fund be managed with the objective of returning the Fund's assets to shareholders in an orderly manner (an "***Orderly Realisation***"). The Board of Directors may, in such circumstances, resolve to effect an Orderly Realisation should they determine that doing so is in the best interests of the shareholders. Such Orderly Realisation shall not constitute a dissolution or winding up of the Fund for any purposes, but rather only the continued management of the Fund's portfolio so as to reduce such portfolio to cash (to the extent reasonably practicable, as advised by the Investment Manager) and return such cash as well as all other assets of the Fund to the shareholders. The Board of Directors shall promptly communicate to shareholders any resolution to proceed with an Orderly Realisation of the Fund. During an Orderly Realisation, the Investment Manager may, in consultation with the Board of Directors, take such steps as are considered appropriate in the best interests of the Fund's shareholders to effect the Orderly Realisation. The Board of Directors, in consultation with the Investment Manager shall establish what they consider to be a reasonable time by which the Orderly Realisation should be effected (the "***Realisation Period***"). Any resolution to undertake an Orderly Realisation and the process thereof shall be deemed to be integral to the business of the Fund and may be carried out without recourse to a formal process of liquidation under the

Companies Law or any other applicable bankruptcy or insolvency regime. The Board of Directors, in consultation with the Investment Manager, may resolve to cease the Orderly Realisation within the Realisation Period and recommence active trading if the circumstances permit a lifting of any applicable Suspension or, where no Suspension is in effect, if the circumstances are such that the investment strategy can then be continued. Management Fees shall be payable and Performance Allocations shall be made during an Orderly Realisation on the same basis as described herein.

**Transfers**

Shares may not be transferred without the prior written consent of the Board of Directors, which consent may be withheld in the sole discretion of the Board of Directors. Any transferee or assignee of any investor will be required to execute a subscription agreement in the same form as required to be completed and executed by a subscriber for Shares in the Fund.

**Duty of Care; Indemnification**

The Partnership Agreement provides that the General Partner, the Investment Manager and each of their affiliates are not liable to the Partnership and the Limited Partners (including the Fund) for any loss or damage arising by reason of being or having been the General Partner or the Investment Manager or from any acts or omissions in the performance of its services as General Partner or Investment Manager, as applicable, in the absence of willful misconduct, fraud or gross negligence (as construed in accordance with the laws of the state of Delaware) or as otherwise required by law, and contains provisions for the indemnification of the General Partner, the Investment Manager and each of their affiliates by the Partnership (but not by the Limited Partners individually) against any liabilities arising by reason of being or having been the General Partner or the Investment Manager or in connection with the Partnership Agreement or the Partnership's business or affairs to the fullest extent permitted by law. The General Partner is not personally liable to any Limited Partner for the repayment of any positive balance in such Limited Partner's Capital Account or for contributions by such Limited Partner to the capital of the Fund or by reason of any change in the federal or state income tax laws applicable to the Fund or its investors.

Neither the Board of Directors of the Fund nor the Administrator shall be liable to the Fund or its shareholders for any loss or damage occasioned by any acts or omissions in the performance of its services on behalf of the Fund, except under certain limited circumstances. In addition, the Board of Directors and the Administrator and their respective affiliates will be indemnified by the Fund (but not by the shareholders individually) against any liabilities arising in connection with the performance of their activities on behalf of the Fund to the extent permitted by the Articles.

| | |
|---|---|
| **Valuations** | The Fund's assets are valued based on the value of the Partnership's assets as set forth in the Partnership Memorandum. |
| **Reserves** | Appropriate reserves may be accrued and charged against net assets and proportionately against the Shares of the shareholders for contingent liabilities, such reserves to be in the amounts (subject to increase or reduction) that the Board of Directors in its sole discretion deems necessary or appropriate.  At the sole discretion of the Board of Directors, the amount of any such reserve (or any increase or decrease therein) may be charged or credited, as appropriate, to the Shares of those investors who are shareholders at the time when such reserve is created, increased, or decreased, as the case may be, or alternatively may be charged or credited to those investors who were shareholders at the time of the act or omission giving rise to the contingent liability for which the reserve was established. |
| | If the Board of Directors determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then such amount may be proportionately charged or credited, as appropriate, to those persons who were shareholders during any such prior period. |
| **Fiscal Year** | The Fund has a fiscal year ending on December 31 of each calendar year. |
| **Reports to Partners** | The Fund furnishes to its shareholders as soon as practicable after the end of each taxable year (or as otherwise required by law) annual reports containing financial statements examined by the Fund's independent auditors as well as such tax information as is necessary for each shareholder to complete federal and state income tax or information returns, along with any other tax information required by law.   The Fund also furnishes monthly reports reviewing the Fund's performance for such calendar month.   The Board of Directors selects the Fund's independent accountants in its sole discretion. |
| **Dissolution and Liquidation** | In the event an Orderly Realization lasts longer than three years, shareholders holding Shares with a combined net asset value equal to at least 75% of the total net asset value of the Fund may seek a court decree of dissolution or seek the appointment by the court of a liquidator for the Fund. |
| | Wind down and liquidation of the Fund shall occur as set forth in the Articles. |
| **Placement Agents** | The Investment Manager may engage third parties to solicit investors and act as placement agents for the Fund.   Placement agents may charge a placement fee directly to investors solicited by any such placement agent, but such fees will not affect the subscription amount and will not |

be collected by or from the Fund. The placement agent may be reimbursed for its expenses and indemnified by the Fund.

Furthermore, placement agents may be paid a portion of the Management Fee or Performance Allocation attributable to such investors solicited by them, thereby reducing the Management Fee or Performance Allocation received by the Investment Manager. Accordingly, investors should recognize that a placement agent's or distributor's participation in this offering may be influenced by its interest in such current or future fees and compensation. Investors should consider these potential conflicts of interest in making their investment decisions.

Each placement agent must comply with the legal requirements of the jurisdictions within which it offers and sells Shares.

**Certain Tax Considerations**

The Government of the Cayman Islands will not, under existing legislation, impose any income, corporate or capital gains tax, estate duty, inheritance tax, gift tax or withholding tax upon the Fund or the shareholders. The Cayman Islands are not party to a double tax treaty with any country that is applicable to any payments made to or by the Fund.

The Fund has applied for and received an undertaking from the Governor-in-Cabinet of the Cayman Islands that, in accordance with section 6 of the Tax Concessions Law (2011 Revision) of the Cayman Islands, for a period of 20 years from July 10, 2012 (being the date of the undertaking), no law which is enacted in the Cayman Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Fund or its operations and, in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable (i) on or in respect of the shares, debentures or other obligations of the Fund or (ii) by way of the withholding in whole or in part of a payment of dividend or other distribution of income or capital by the Fund to its members or a payment of principal or interest or other sums due under a debenture or other obligation of the Fund.

The Investment Manager believes that the Fund will be treated as a non-U.S. corporation for U.S. federal income tax purposes. The Fund does not intend to be subject to U.S. federal income tax on its capital gains from securities trading. Dividends and certain interest received by the Fund may be subject to withholding at the source. See "*Tax Considerations*."

**ERISA**

The Fund intends to limit investment in the Fund by "benefit plan investors" so that the assets of the Fund will not be considered "plan assets" for purposes of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"). See "*ERISA Considerations*."

| | |
|---|---|
| **Voting** | Shares in the Fund are participating non-voting shares; provided that in the event the Partnership seeks the approval, vote or consent of the Fund with respect to any matter to which it would be entitled to vote as a Limited Partner of the Partnership under the Partnership Agreement, the Fund will: (i) submit such matter for the consent of the shareholders and (ii) shall cause the Fund to vote its Limited Partner interest proportionally for and against such matter in the same proportion that the shareholders voted for and against such matter. |
| **Variation of Terms** | The Board of Directors, with the consent of the Investment Manager, shall have the absolute discretion to agree with a shareholder to waive or modify the terms applicable to such shareholder's subscription for Shares (including those relating to Management Fees, the Performance Allocation, transparency and redemptions) without obtaining the consent of any other shareholder; provided that such waiver or modification does not amount to a variation of the rights attaching to the Shares of such other shareholders. The Fund generally grants waivers of the Management Fees and Performance Allocation to the Affiliated Investors. |

# RISK FACTORS AND POTENTIAL CONFLICTS OF INTEREST

*Investment in the Fund, and in turn, the Partnership, is speculative and involves certain risks. There can be no assurance that the Partnership's investment objective will be achieved, or that an investor will receive a return of its Capital. Certain of these risks are summarized below. The Fund may not be suitable for all investors, and is intended for sophisticated investors who can accept the risks associated with its investments. Investors will not have recourse except with respect to the assets of the Fund. Prospective investors should consider, among others, the risk factors described in this section.*

***This discussion must be read in conjunction with the risk factors and potential conflicts of interest of the Partnership set forth in the Partnership Memorandum. The following is not meant to be an exhaustive listing of all potential risks associated with investing in the Fund. Investment-specific risks factors associated with the Partnership's investment strategy should be read in their entirety.***

*Illiquidity of Shares.* Shares are not transferable without the approval of the Board of Directors, and there will be no secondary market for Shares. Consequently, investors may not be able to dispose of their Shares prior to the liquidation of the Fund or as described in this Memorandum and the Partnership Memorandum, and may receive securities rather than cash in exchange for their Shares.

*Side Letters.* The Board of Directors may from time to time, with the consent of the Partnership, enter into letter agreements or other similar agreements (collectively, "***Side Letters***") with one or more investors which provide such investor(s) with additional and/or different rights than such investor(s) have pursuant to this Memorandum or the Partnership Memorandum. As a result of such Side Letters, certain investors may receive additional benefits (including, but not limited to, reduced fee/allocation obligations and/or expanded informational rights) which other investors will not receive. The Fund is not be required to notify any or all of the other investors of any such Side Letters or any of the rights and/or terms or provisions thereof, nor will the Fund be required to offer such additional and/or different rights and/or terms to any or all of the other investors. The Fund may enter into such Side Letters with any party as the Board of Directors may determine in its discretion at any time. The other investors will have no recourse against the Fund, the Board of Directors and/or any of their affiliates in the event that certain investors receive additional and/or different rights and/or terms as a result of such Side Letters.

*Authority.* Investors in the Fund have no right or power to take part in the management of the Fund. The Board of Directors control the Fund and the General Partner controls the Partnership. The Investment Manager is responsible for all investment decisions of the Partnership.

*Absence of Regulatory Oversight.* The Fund is not registered under the Cayman Islands Mutual Funds Law (as amended). Neither the Cayman Islands Monetary Authority nor any other governmental authority in the Cayman Islands has commented on or approved the terms or merits of this Memorandum. There is no financial obligation or compensation scheme imposed on or by the government of the Cayman Islands in favor of or available to the investors in the Fund.

*Investment Judgment; Market Risk.* The profitability of a significant portion of the Fund's investment program depends to a great extent upon correctly assessing the future course of the price movements of securities and other investments. There can be no assurance that the Investment Manager will be able to predict accurately these price movements. With respect to the investment strategy utilized by the Fund, there is always some, and occasionally a significant, degree of market risk.

*Performance Allocation.*   The Performance Allocation made to the Investment Manager may create an incentive for the Investment Manager to make investments that are riskier or more speculative than would be the case in the absence of such Performance Allocation.

*Redemption Restrictions.*   There are severe restrictions on redemptions from the Fund (which may be settled in securities rather than cash) and on transfers of Shares.   Because of the restrictions on redemptions, an investment in the Fund is a relatively illiquid investment and involves a high degree of risk.   There is no independent market for the purchase or sale of Shares and none is expected to develop. Shareholders must represent that they are purchasing Shares for investment.   A subscription for Shares should be considered only by persons financially able to maintain their investment and who can accept a loss of all of their investment.

*No Distributions.*   Since the Fund does not generally intend to pay distributions, an investment in the Fund is not suitable for investors seeking current distributions of income.   Moreover, an investor is required to report and pay taxes on its allocable share of income from the Fund, even though no cash is distributed by the Fund.

*In-Kind Distributions*.   The Partnership Agreement authorizes the General Partner to make distributions in kind of securities in lieu of or in addition to cash.   In the event the General Partner makes distributions of securities in kind, such securities could be illiquid or subject to legal, contractual and other restrictions on transfer.

*Diversification.*   Since the Partnership's portfolio will not necessarily be widely diversified, the investment portfolio of the Partnership (and thus the Fund) may be subject to more rapid changes in value than would be the case if the Partnership were required to maintain a wide diversification among companies, securities and types of securities.

*Valuations.*   From time to time, certain situations affecting the valuation of the Partnership's (and thus the Fund's) investments (such as limited liquidity, unavailability or unreliability of third-party pricing information and acts or omissions of service providers to the Partnership) could have an impact on the net asset value of the Fund, particularly if prior judgments as to the appropriate valuation of an investment should later prove to be incorrect after a net asset value-related calculation or transaction is completed.   The Fund is not required to make retroactive adjustments to prior subscription or redemption transactions or Management Fees or Performance Allocations based on subsequent valuation data.

*Contagion*.   The Fund has the power to issue Shares in different series.   The Articles provide for the manner in which the liabilities are to be attributed across the various series (liabilities are to be attributed to the specific series in respect of which the liability was incurred).   However, the Fund is a single legal entity and there is no limited recourse protection for any series.   Accordingly, all of the assets of the Fund will be available to meet all of its liabilities regardless of the series to which such assets or liabilities are attributable.   In practice, cross-series liability is only expected to arise where liabilities referable to one series are in excess of the assets referable to such series and it is unable to meet all liabilities attributed to it.   In such a case, the assets of the Fund attributable to other series may be applied to cover such liability excess and the value of the contributing classes or series will be reduced as a result.

*Handling of mail*.   Mail addressed to the Fund and received at its registered office will be forwarded unopened to the Investment Manager to be dealt with.   None of the Fund, its Directors,

officers, advisors or service providers (including the organization which provides registered office services in the Cayman Islands) will bear any responsibility for any delay howsoever caused in mail reaching the Investment Manager. In particular the Directors will only receive, open or deal directly with mail addressed to them personally (as opposed to mail which is addressed to just the Fund).

*Recent Developments in the Financial Services Industry*. Recent developments in the U.S. financial markets illustrate that the current environment is one of extraordinary and possibly unprecedented uncertainty for the financial services industry. In July of 2010, the Dodd-Frank Financial Reform Act was passed which imposes many new requirements and restrictions on the financial services industry that may likely affect the business, operations and performance of hedge funds, such as increased reporting requirements, limitations on certain trading activity and regulatory oversight by different agencies, such as the newly created Financial Stability Oversight Counsel. The implications of the passage of the Dodd-Frank Financial Reform Act for the hedge fund industry as a whole still remain somewhat unclear. The hedge fund industry may continue to be adversely affected by the recent developments in the financial markets in the U.S. and abroad, and any future legal, regulatory or governmental action and developments in such financial markets and the broader U.S. economy could have an adverse effect on the Fund's business, operations and performance.

In view of the foregoing considerations, an investment in Shares is suitable only for investors who are capable of bearing the relevant investment risks.

## Tax Related Risks

*Uncertainty and Complexity of Tax Treatment*. The tax aspects of an investment in the Fund are complicated and complex and, in many cases, uncertain. Statutory provisions and administrative regulations have been interpreted inconsistently by the courts. Additionally, some statutory provisions remain to be interpreted by administrative regulations. Investors will thus be subject to the risk caused by the uncertainty of the tax consequences with respect to an investment in the Fund. Each prospective investor should have the tax aspects of an investment in the Fund reviewed by professional advisors familiar with such investor's personal tax situation and with the tax laws and regulations applicable to the investor and private investment vehicles. Prospective investors are strongly urged to review the discussion below under "*Tax Considerations*" and "*ERISA Considerations*" for a more complete discussion of certain of the tax risks inherent in the acquisition of Shares and to consult their own independent tax advisors.

*Risk of Adverse Determination*. There can be no assurance that the conclusions set forth in this Memorandum will not be challenged successfully by the Internal Revenue Service (the "**Service**") or other applicable taxing authority, or significantly modified by new legislation, changes in a taxing authority's positions or court decisions. The Fund has not applied for, nor does it expect to apply for, any advance rulings from the Service with respect to any of the U.S. federal income tax consequences described in this Memorandum. No representation or warranty of any kind is made by the Investment Manager with respect to the U.S. federal income tax consequences relating to an investment in the Fund. The Fund may take positions with respect to certain tax issues which depend on legal conclusions not yet resolved by the courts. Should any such positions be successfully challenged by the Service or other applicable taxing authority, there could be a materially adverse effect on the Fund.

*Tax Considerations Taken into Account*. The Fund will attempt to minimize the tax burden of the Fund over the long-term. However, the Investment Manager will not overlook short-term trading opportunities. Therefore, shareholders should not expect that the Fund will make tax-efficiency a

priority. However, the Investment Manager may take tax considerations into account in determining when the Fund's investments should be sold or otherwise disposed of, and may assume certain market risk and incur certain expenses in this regard to achieve favorable tax treatment of a transaction.

*Tax-Exempt Entities*. Certain prospective investors that are tax-exempt for U.S. income tax purposes may be subject to U.S. federal and state laws, rules and regulations that regulate their participation in the Fund, or their engaging directly or indirectly through an investment in the Fund, in certain investment strategies that the Partnership may utilize from time-to-time (*e.g.,* short-sales of securities and the use of leverage, the purchase and sale of options and limited diversification). While the Fund believes its investment program is generally appropriate for U.S. tax-exempt investors for which an investment in the Fund would otherwise be suitable, each type of tax-exempt organization may be subject to different laws, rules and regulations, and prospective investors should consult with their own advisers as to the advisability and tax consequences of an investment in the Fund. Investments in the Fund by entities subject to ERISA, and other tax-exempt entities, require special consideration. Trustees or administrators of such entities are urged to review carefully the matters discussed in this Memorandum.

*Non-U.S. Taxation*. With respect to certain countries, there is a possibility of expropriation, confiscatory taxation, imposition of withholding or other taxes on dividends, interest, capital gains or other income, limitations on the removal of funds or other assets of the Fund, political or social instability or diplomatic developments that could affect investments in those countries. An issuer of securities may be domiciled in a country other than the country in whose currency the instrument is denominated. The values and relative yields of investments in the securities markets of different countries, and their associated risks, are expected to change independently of each other.

*Tax Changes*. Investors will be subject to the risk that changes to the tax law may adversely affect the federal income tax consequences of their investment in the Fund. Changes in existing tax laws or regulations and their interpretation may be enacted after the date of this Memorandum, possibly with retroactive effect, and could alter the income tax consequences of an investment in the Fund. Certain provisions of the Internal Revenue Code of 1986, as amended (the "*Code*"), may be further amended or interpreted in a manner adverse to the Fund, in which event any benefits derived from an investment in the Fund may be adversely affected. In addition, significant legislative and budgetary proposals affecting tax laws have been made by the legislative and executive branches of the U.S. federal government. The likelihood of enactment of any such proposals, or any similar proposals, into law is uncertain. The enactment of any such proposals, including subsequent proposals, into law could have material adverse effects on the Fund and/or its shareholders. Enactment of such legislation, or similar legislation, could require significant restructuring of the Fund in order to mitigate such effects.

***The foregoing is not intended to be an exhaustive analysis or listing of the tax risks associated with an investment in the Fund. Many of the relevant tax considerations will vary depending on a prospective shareholder's individual circumstances. The tax aspects associated with such an investment are complex and complicated and are subject to a variety of interpretations. Prospective investors are strongly urged to review the discussions below under "Tax Considerations" and "ERISA Considerations" for a more complete discussion of certain of the tax risks inherent in the acquisition of Shares, and to seek and rely upon the advice of their own tax advisor who is qualified to discuss the foregoing and other possible tax risks.***

In view of the foregoing considerations, an investment in Shares is suitable only for investors who are capable of bearing the relevant investment risks.

**Potential Conflicts of Interest**

*No Independent Directors.* The Fund's Board of Directors does not currently consist of any directors that are not affiliated with the Investment Manager, and thus the Fund's management, as well as the investment decisions at the Partnership level, are effectively controlled by the Investment Manager or its affiliates. However, the Fund may establish an Advisory Committee with respect to matters in which it seeks to resolve certain conflicts of interest that may arise. See "*Management—Advisory Committee*" in the Partnership Memorandum.

*No Separate Counsel.* Akin Gump Strauss Hauer & Feld LLP ("**Akin Gump**") serves as counsel to the Fund, the Partnership, the Investment Manager, the General Partner and certain of their affiliates (the "**Clients**") in connection with the operation of the Fund and certain other Clients, the offering of Shares as well as certain other matters for which the Clients may engage Akin Gump from time to time. Akin Gump disclaims any obligation to verify the Clients' compliance with their obligations either under applicable law or the governing documents of the Fund. In acting as counsel to the Clients, Akin Gump has not represented and will not represent any shareholders nor does it purport to represent their interests. No independent counsel has been retained to represent the shareholders. In assisting in the preparation of the Partnership Memorandum and this Memorandum (as well as any supplements thereto), Akin Gump has relied on information provided by the Fund, the Partnership, the Investment Manager and the General Partner and certain of the Fund's other service providers (including, without limitation, the biographical data of key investment personnel, summaries of market conditions, the planned investment strategy of the Fund and the performance of the Fund, its investments or any predecessor Fund) without verification and does not express a view as to whether such information is accurate or complete.

Maples and Calder, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, acts as Cayman Islands legal counsel to the Fund. In connection with the Fund's offering of Shares and subsequent advice to the Fund, Maples and Calder will not be representing shareholders. No independent legal counsel has been retained to represent the shareholders. Maples and Calder's representation of the Fund is limited to specific matters as to which it has been consulted by the Fund. There may exist other matters that could have a bearing on the Fund as to which Maples and Calder has not been consulted. In addition, Maples and Calder does not undertake to monitor compliance by the Investment Manager and its affiliates with the investment program, valuation procedures and other guidelines set forth herein, nor does Maples and Calder monitor ongoing compliance with applicable laws. In connection with the preparation of this Memorandum, Maples and Calder's responsibility is limited to matters of Cayman Islands law and it does not accept responsibility in relation to any other matters referred to or disclosed in this Memorandum. In the course of advising the Fund, there are times when the interests of shareholders may differ from those of the Fund. Maples and Calder does not represent the shareholders' interests in resolving these issues. In reviewing this Memorandum, Maples and Calder has relied upon information furnished to it by the Fund and has not investigated or verified the accuracy and completeness of information set forth herein concerning the Fund.

*The Partnership Memorandum contains further disclosures concerning potential conflicts of interests. Such disclosures are incorporated herein by reference and should be read in their entirety prior to making a decision to invest in the Fund.*

*In view of the foregoing considerations, an investment in Shares is only suitable for investors who are capable of bearing the relevant risks and who understand the potential conflicts of interest.*

# SHARES OF THE FUND

## The Fund's Share Capital

The Fund has an authorized share capital of U.S.$50,000 divided into 100 management shares ("**Management Shares**") of a par value of U.S.$1.00 each and 4,990,000 participating non-voting shares (the "**Shares**") of a par value of U.S.$0.01. The Directors may by resolution divide the Shares into separate series (each, a "**Series**") which may be subject to different rights, restrictions, preferences, privileges and payment obligations as between the different Series and further into separate sub-series (each, a "**Sub-Series**") within such Series (for example, a Sub-Series of Shares which will participate in Restricted New Issues and a Sub-Series of Shares which will not participate in such Restricted New Issues). The different Series and Sub-Series thereof shall be established and designated, and the variations in the relative rights and preferences as between the different Series and Sub-Series thereof shall be fixed and determined by the Board of Directors. Sub-Series of Shares are issued for the purposes, among others, of accounting for any profits and losses attributable to each individual shareholder and of permitting the Performance Allocation to be calculated separately to reflect different returns achieved as a result of subscriptions received at different times.

The Fund previously issued Series A Shares and currently offers Series B Shares, Series C Shares and Series D Shares, all of which generally have identical rights and privileges except for purposes of calculating Management Fees and redemption rights. The Fund is offering Series B Shares, Series C Shares and Series D Shares pursuant to this Memorandum. Certain terms that specifically apply to Series A Shares are set forth in a Supplement to this Memorandum.

Each separate Sub-Series of Shares is identified by the investor to whom it was issued and its date of issue. Shares are issued to shareholders in Sub-Series at $1,000 per Share. Immediately following the close of any fiscal year in which a Performance Allocation is charged at the Partnership level with respect to a Sub-Series of Shares of a Series, each such Sub-Series of Shares may be compulsorily redeemed and the proceeds immediately applied to the subscription for an earlier Sub-Series of Shares of such Series; provided that such earlier Sub-Series of Shares has also been assessed as having a Performance Allocation payable at the Partnership level.

The Management Shares will carry all the voting rights but will have no right to participate in the assets of the Fund (other than to a return of the par value on a winding up). The Management Shares will be held by the Investment Manager or an affiliate, and will be voted in accordance with the instructions of the Investment Manager.

The Articles provide that, subject to the Companies Law (2013 Revision) of the Cayman Islands and the other provisions of the Articles, all or any of the class rights or other terms of offer, whether set out in this Memorandum, the Subscription Documents or otherwise (including any representations, warranties or other disclosure relating to the offer or holding of Shares) (collectively referred to as "**Share Rights**"), for the time being applicable to any class or Series of Shares in issue (unless otherwise provided by the terms of issue of those Shares) may (whether or not the Fund is being wound up) be varied without the consent of the holders of the issued Shares of that class or Series where such variation is considered by the Directors not to have a material adverse effect upon such holders' Share Rights; otherwise, any such variation shall be made only with the prior consent in writing of the holders of not less than two-thirds by net asset value of such Shares, or with the sanction of a resolution passed by a majority of at least two-thirds of the votes cast in person or by proxy at a separate meeting of the holders of such Shares. For the avoidance of doubt, the Directors reserve the right, notwithstanding that any

27

such variation might not have a material adverse effect, to obtain consent from the holders of such Shares. Each subscriber for Shares will be required to agree that the terms of offer set out in the Subscription Documents and the rights attaching to the Shares can be varied in accordance with the provisions of the Articles.

The Articles further provide that, in relation to any class or Series consent required pursuant to the "Variation of Share Rights" Article, the Directors in their discretion may invoke the following procedure (the "**Negative Consent Procedure**"). The Directors shall provide written notice in respect of the proposed variation (the "**Proposal**") to the shareholders of the affected class or Series and shall specify a deadline (the "**Redemption Request Date**"), which shall be no earlier than 30 days after the date of giving such notice, by which date such shareholders may submit a written request for redemption of some or all of their Shares of the affected class and/or Series on the Redemption Date (the "**Specified Redemption Date**") specified by the Directors in such notice. The terms of the Proposal shall be such that its specified effective date (the "**Effective Date**") shall not be on or prior to the Specified Redemption Date. Such notice shall further provide that the holders of any Shares in respect of which a request for redemption has not been received by the Redemption Request Date (the "**Affected Shares**") shall, in the absence of express written refusal to consent, be deemed to have consented in writing to the Proposal (such Affected Shares being the "**Negative Consent Shares**"). In the event that the Negative Consent Procedure is followed, only the Affected Shares shall be considered for the purposes of determining whether the written consent majority has been obtained under the "Variation of Share Rights" Article with the holders of the Negative Consent Shares being deemed to have submitted a written consent in favor of the Proposal on the Effective Date.

The rights conferred upon the holders of the Shares of any class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Shares, be deemed to be materially adversely varied or abrogated by, inter alia, the creation, allotment or issue of further Shares ranking *pari passu* with or subsequent to them, the redemption or purchase of any Shares or by the passing of any Directors' resolution to change or vary any investment objective, investment technique and strategy and/or investment policy in relation to the Shares or any modification of the fees payable to any service provider to the Fund.

In general, each Share will participate in the Fund's profits and losses attributable to the relevant class in the same manner, except that the Performance Allocation to be charged (at the Partnership level) to Shares of a Sub-Series held by each shareholder will be calculated separately on the basis of the performance of such Shares of a Sub-Series. The Performance Allocation is calculated and charged at the Partnership level through the use of separate capital sub-accounts within the Fund's capital account in the Partnership that correspond to the Shares of a Sub-Series of each shareholder in the Fund. Subject to the foregoing, each of the Shares will participate ratably with all other outstanding Shares in the Fund's assets and earnings and will have the redemption rights discussed above.

The Directors may impose such restrictions as they think necessary for the purpose of ensuring that no Shares in the Fund are held by (i) any person in breach of the laws or requirements of any country or governmental authority or (ii) any person or persons in circumstances which, in the opinion of the Directors, might result in the Fund incurring any liability of taxation or suffering any other pecuniary disadvantage which the Fund might not otherwise have incurred or suffered. A person who becomes aware that he or she is holding or owning Shares in breach of any restriction mentioned in the Articles shall promptly either deliver to the Fund a written request for redemption of his or her Shares or deliver to the Fund a written request to transfer the same to a person who would not thereby be a non-qualified person.

28

## Management Shares

General meetings of the holders of Management Shares may be held to vote on various matters including to elect the Directors, to select the Fund's auditors and to attend to such other business as may properly be placed before the meeting. At any such general meeting, the favorable vote of a majority of the Management Shares present generally is sufficient for the approval of any action, unless such action is a matter requiring a special resolution, in which case two-thirds of the Management Shares shall be required, in each case as further detailed in the Articles.

## Registration of Management Shares and Shares and Share Certificates

Management Shares and Shares of the Fund are issued only in registered form. A current register of the names and addresses of the Fund's shareholders and their shareholdings is maintained at the office of the Administrator. No share certificates have been or will be issued.

## Other Rights and Liabilities

Under the terms of the Articles, the liability of the shareholders of the Fund is limited, and shareholders will not be liable for any debt, obligation or default of the Fund in excess of the amounts unpaid on their Shares.

The Fund and the Investment Manager may agree with certain investors to a fee structure, redemption rights or other terms that differ from the fee structure, redemption rights and other terms that are set forth in this Memorandum. Such different rights may, subject to applicable law, be effected by issuance of a separate Series of Shares or any other permissible means. Such rights may not be offered to all investors.

## Calculation of Fund Net Asset Value

The Directors have delegated to the Administrator the calculation of the net asset value of the Fund and the net asset value per Share of each Series and, if applicable, Sub-Series, subject to the overall supervision and direction of the Investment Manager and the Board of Directors. Net asset valuations of the Fund and each Series of Shares will be calculated as of the close of business on the last day of each fiscal period and any other date selected by the Board of Directors, in consultation with the Investment Manager, no less than quarterly, which shall, to avoid doubt, include each Redemption Date (each, a "***Valuation Date***").

The Fund's assets are valued based on the value of the Partnership's assets. The net asset value of the Fund is determined by taking the amount of all cash and credit balances plus the market value of all securities, commodities and other assets comprising the Fund's assets (including any interest and dividends receivable, but excluding any subscription amounts committed to the Fund from time to time to the extent such amounts are not held by or on behalf of the Fund), as calculated by the Administrator, minus all debit balances and other liabilities and obligations of the Fund. Net asset value in respect of any Series or Sub-Series of Shares is calculated by dividing the value of the account relating to that Series or Sub-Series of Shares by the number of Shares of that Series in issue. For the sole purpose of determining the number of Shares of a Series in issue, Shares of that Series which are to be redeemed on the relevant Valuation Date shall be deemed to be in issue until and including the close of business on the applicable Valuation Date. The principal amounts of the investments, cash balances and other assets of the Fund, the value of which is expressed in a currency other than that of the United States,

shall be valued after taking into account the market rate or rates of exchange in force on the Valuation Date in question.

# TAX CONSIDERATIONS

## General

The following is a general discussion of certain of the anticipated U.S. federal and Cayman Islands income tax considerations applicable to the Fund's activities and those relevant to non-U.S. persons (as defined below) and U.S. tax-exempt entities arising from the purchase, ownership and disposition of Shares. Prospective investors should consult their own tax advisors to determine the application and effect of tax laws with respect to their own particular circumstances. This discussion is based on laws and regulations currently in effect, which may change or be subject to differing interpretations (possibly on a retroactive basis). The Fund does not intend to seek a ruling from the Service, or any similar state or local authority, with respect to any of the tax issues affecting the Fund.

In view of the number of different jurisdictions where local laws may apply to shareholders, the discussion below does not address the local tax consequences to prospective investors of the purchase, ownership and disposition of Shares. Prospective investors are urged to consult their own tax advisors in determining the possible tax, exchange control or other consequences to them under the laws of the jurisdictions of which they are citizens, residents or domiciliaries or in which they conduct business.

The summary assumes that no U.S. taxable investors will invest in the Fund and, therefore, does not address the U.S. tax consequences to such investors. Potential U.S. taxable investors should be aware that the Fund does not intend to provide information to any U.S. Person for purposes of such person qualifying to make an election to treat the Fund as a "qualifying electing fund" for U.S. federal income tax purposes. Accordingly, potential U.S. shareholders are urged to consult their tax advisors in this regard.

## United States Taxation Matters

The Fund will be treated as a corporation for U.S. federal income tax purposes. For U.S. federal income tax purposes, the Partnership is expected to be treated as a partnership. The Fund and the Partnership will make any necessary entity classification elections for U.S. tax purposes consistent with such respective treatment. Because the Fund is organized under the laws of the Cayman Islands, it will be considered a non-U.S. person for purposes of U.S. tax laws. As such, the U.S. federal income tax treatment of the Fund will vary depending on whether the Fund derives income or gains that are effectively connected with the conduct of a trade or business in the United States. The Fund intends to structure its operations (including those conducted through the Partnership) in order to minimize to the extent consistent with its investment strategy the possibility that the Fund will be treated as being engaged in a U.S. trade or business for U.S. federal income tax purposes, although there can be no certainty that the Fund will be successful minimizing such a possibility. It is also intended that the Fund's affairs will be conducted such that no income realized by the Fund will be effectively connected with the conduct of a U.S. trade or business or otherwise subject to regular U.S. federal income taxation on a net basis.

Pursuant to a safe harbor in the Code, trading in securities or commodities on an organized commodities exchange for the Fund's own account (including through the Partnership) is not considered a U.S. trade or business. It is not certain whether this safe harbor would apply to the trading of physical commodities. Although no assurances can be given that the Service will not successfully assert an

alternative position, the Fund intends to take the position that the Partnership's trading of physical commodities is within the prescribed safe harbor and does not constitute a trade or business and as such the Fund anticipates generally that its income will not be subject to U.S. corporate income tax, except as described below. However, the Fund will be subject to a 30% U.S. withholding tax on its allocable share of certain types of the Partnership's non-effectively connected income. As described below, the types of income (to the extent not constituting effectively connected income) on which a U.S. withholding tax will be imposed generally consist of dividends, interest and certain types of investment income, but not capital gains derived from the sale of stock or other capital assets (unless such capital gains are derived from the sale of stock of a "United States Real Property Holding Company" within the meaning of Section 897 of the Code and certain other interests in real property).

In general, a non-U.S. partner, such as the Fund, that is a partner of a partnership, such as the Partnership, is subject to U.S. federal income taxation on a net basis on its allocable share of the partnership's "effectively connected income." The Fund's allocable share of the Partnership's income will constitute "effectively connected income," and thus will be subject to U.S. federal income taxation, to the extent such income is derived by the Partnership from a trade or business carried on in the United States by the Partnership. Although there can be no assurances, the Partnership does not itself expect to engage directly in activities that would constitute a U.S. trade or business.

If the Fund were treated as being engaged in a U.S. trade or business as a result of activities conducted by the Partnership, then all or a portion of the Fund's allocable share of the Partnership's income would be treated as effectively connected income subject to U.S. federal income tax on a net basis at corporate tax rates. In such a case, the Fund would be required to file a U.S. federal income tax return to report its share of such income and pay U.S. federal income tax at regular U.S. rates on this income. In addition, the Partnership would be required (and would be legally liable) to withhold and pay over to the Service on behalf of the Fund an amount equal to 35% percent of the Fund's share of the Partnership's effectively connected income. Any amount so withheld would be creditable against the Fund's ultimate U.S. federal income tax liability, and the Fund would be entitled to a refund to the extent that the amount withheld exceeded the Fund's U.S. federal income tax liability for the taxable year. Furthermore, in such event, the Fund's allocable share of any effectively connected income of the Partnership would also be subject to a 30% U.S. branch profits tax, and possibly could be subject to state and/or local taxation in the United States. Such taxation of the Fund's activities could have a material adverse effect on the Fund's returns. Prospective investors are advised to consult their tax advisors regarding the risk of the Fund being treated as engaged in a trade or business in the United States.

Because the Fund is organized under the laws of the Cayman Islands, it is considered a non-U.S. person for purposes of the U.S. tax laws. As a result, dividends received by the Fund through the Partnership from U.S. sources will be subjected to U.S. withholding tax at a 30% rate. U.S. source interest income received by the Fund through the Partnership generally will be exempt from U.S. federal income and withholding tax under the exemption for "portfolio interest" or under another statutory exemption. Interest on corporate obligations will not qualify as "portfolio interest" to a non-U.S. person that owns (directly and under certain constructive ownership rules) 10% or more of the total combined voting power of the corporation paying the interest, or, with respect to certain obligations issued after April 7, 1993, if and to the extent the interest is determined by reference to certain economic attributes of the debtor (or a person related thereto) or the underlying obligations are not in "registered form" for U.S. tax purposes. In addition, interest on U.S. bank deposits, certificates of deposit and certain obligations with maturities of 183 days or less (from original issuance) will not be subject to

withholding tax. Interest (including original issue discount) derived by the Fund or the Partnership from U.S. sources not qualifying as "portfolio interest" or not otherwise exempt under U.S. law will be subject to U.S. withholding tax at a rate of 30%. In addition, based on recent legislation, income from certain swaps directly or indirectly over certain stocks (e.g., U.S. stocks) are subject to U.S. withholding tax.

**Taxation of Non-U.S. shareholders**

For U.S. federal income tax purposes, a shareholder of the Fund who is a non-U.S. person will not be subject to U.S. federal income taxation on amounts paid by the Fund in respect of the Shares or gains recognized on the sale, exchange or redemption of Shares, provided that such income and gains are not considered to be effectively connected with the conduct of a trade or business by the shareholder in the United States. In limited circumstances, an individual shareholder who is present in the United States for 183 days or more during a taxable year may be subject to U.S. income tax at a flat rate of 30% on gains realized on a disposition of Shares in such year. Individual shareholders who at the time of their death are not citizens, former citizens or residents of the United States should not be subject, by reason of the ownership of Shares, to any U.S. federal gift or estate taxes.

For these purposes the term "***non-U.S. person***" means any person that is not a U.S. Person for U.S. federal income tax purposes. A "***U.S. Person***" means a citizen or resident of the United States, a partnership or corporation created or organized in the United States or under the laws of the United States or any state (other than a partnership that is not treated as a U.S. Person under any applicable Treasury Regulations), an estate whose income is includable in gross income for federal income tax purposes regardless of its source or a trust if a U.S. court is able to exercise primary supervision over the administration of the trust and one or more U.S. Persons have the authority to control all substantial decisions of the trust. In addition, to the extent provided in Treasury Regulations, certain trusts in existence on August 20, 1996, and treated as U.S. Persons prior to such date, which elect to continue to be treated as U.S. Persons will also be U.S. Persons for these purposes.

Special rules may apply in the case of non-U.S. persons that (i) conduct a trade or business in the United States or that have an office or fixed place of business in the United States, (ii) have a tax home in the United States, (iii) are former citizens or long-term residents of the United States or (iv) are controlled foreign corporations, passive foreign investment companies, foreign insurance companies that hold Shares in connection with their U.S. business or corporations which accumulate earnings to avoid U.S. federal income tax. Such persons are urged to consult their U.S. tax advisors before investing in the Fund.

In the case of Shares held in the United States by a custodian or nominee for a non-U.S. person, U.S. "backup" withholding taxes may apply to distributions in respect of Shares held by such shareholder unless such shareholder properly certifies as to its non-U.S. status or otherwise establishes an exemption from "backup" withholding. Back-up withholding is not an additional tax. Rather, the U.S. federal income tax liability of non-U.S. persons subject to back-up withholding will be reduced by the amount of tax withheld. If back-up withholding results in an overpayment of U.S. federal income taxes, a refund may be obtained, provided the required documents are filed with the Service.

**Taxation of U.S. Tax-Exempt shareholders**

In general, U.S. tax-exempt shareholders should not be subject to the tax on "unrelated business taxable income" ("***UBTI***"), as defined in Code section 512, in respect of income and gains from the

Shares.   In general, UBTI is the excess of gross income from any unrelated trade or business conducted by a U.S. tax-exempt entity over the deductions attributable to such trade or business, with certain modifications.   These modifications provide that UBTI generally does not include interest, dividends or gains from the sale of securities not held as either inventory or primarily for sale to customers in the ordinary course of business, except to the extent that any such item of income is deemed to constitute "unrelated debt-financed income" ("**UDFI**") within the meaning of Code section 514 and the Treasury Regulations.   Income that a U.S. tax-exempt shareholder derives from an investment in Shares should not give rise to UBTI under Code section 511, except to the extent that such entity's acquisition of Shares is financed with acquisition indebtedness within the meaning of Code section 514.   In addition to UBTI that may arise when a tax-exempt investor uses leverage to finance the acquisition of Shares, the United States Congress from time to time has considered legislation that could result in a tax-exempt investor realizing UBTI in respect of an investment in a foreign investment company that leverages its investments.

The Fund is expected to constitute a "passive foreign investment company" (a "**PFIC**") for U.S. federal income tax purposes.   Under the Treasury Regulations, a U.S. tax-exempt shareholder is not considered to be a shareholder in a PFIC, and thus will not be subject to the PFIC tax rules, except to the extent that a "dividend" from the PFIC would be taxable under subchapter F of the Code, for example, as UDFI.   Hence, under the Treasury Regulations, a U.S. tax-exempt shareholder would be subject to tax under the PFIC regime in respect of an excess distribution from, or any gain realized on the sale of the shares of, a PFIC only under limited circumstances.   Moreover, different rules may apply to certain types of tax-exempt entities, such as charitable remainder trusts.   Accordingly, potential U.S. tax-exempt investors are urged to consult their own tax advisors regarding the tax consequences of an investment in the Fund.

**Prospective U.S. tax-exempt investors are urged to consult their own tax advisors regarding the tax consequences of the purchase, ownership and disposition of the Shares.**

### Information Reporting Requirements and FATCA

Sections 1471 through 1474 of the Code, known as the U.S. Foreign Account Tax Compliance Act (together with any regulations, rules and other guidance implementing such Code sections and any applicable intergovernmental agreement ("**IGA**") and related statutes, regulations, rules and other guidance thereunder, "**FATCA**") impose a withholding tax of 30% on (i) certain U.S. source interest, dividends and other types of income, and (ii) the gross proceeds from the sale or disposition of certain assets of a type that can produce U.S. source interest and dividends, which are received by a foreign financial institution ("**FFI**"), unless such FFI enters into an agreement with the Service, and/or complies with an applicable IGA, to obtain certain information as to the identity of the direct and indirect owners of accounts in such institution.   In addition, a withholding tax may be imposed on payments to certain non-financial foreign entities which do not obtain and provide information as to their direct and indirect owners.   These rules generally apply to payments of U.S. source interest, dividends and certain other types of income from U.S. sources since July 1, 2014, and will apply to payments of gross proceeds from the sale or disposition of assets of a type that can produce U.S. source interest or dividends after December 31, 2016.

The Service has released temporary and final Treasury Regulations and other guidance that will be used in implementing FATCA, which contain a number of phase-in dates for FATCA compliance. In addition, the Cayman Islands has entered into a Model 1 IGA with the United States (the "**Cayman IGA**"), which came into force on April 14, 2014, and has issued the Tax Information Authority

(International Tax Compliance) (United States of America) Regulations 2014, as updated from time to time, and draft guidance notes thereunder. Additional guidance is forthcoming. In addition, the Cayman Islands have signed a similar inter-governmental agreement with the United Kingdom (the "*UK IGA*"). The UK IGA imposes similar requirements to the Cayman IGA, so that the Fund will be required to identify accounts held directly or indirectly by "Specified United Kingdom Persons" and report information on such Specified United Kingdom Persons to the Cayman Islands authorities, which will exchange such information annually with HM Revenue & Customs ("*HMRC*"), the United Kingdom tax authority. It is anticipated that further inter-governmental agreements ("*future IGAs*") similar to the Cayman IGA and the UK IGA may be entered into with other third countries by the Cayman Islands Government to introduce similar regimes for reporting to such third countries fiscal authorities ("*foreign fiscal authorities*").

The Fund is likely to be considered an FFI for FATCA purposes. In order to avoid U.S. withholding tax under FATCA on amounts paid to the Fund, the Fund is generally required to register with the Service and to comply with the Cayman IGA and any Cayman Islands legislation or guidance implementing the Cayman IGA. The Fund intends to register with the Service and, therefore, generally does not expect to become subject to U.S. withholding under FATCA. The Fund also expects that it will be required to identify and report on certain direct and indirect U.S. owners or investors in order to comply with the Cayman IGA in the future. An investor will be required to provide to the Fund information which identifies its direct and indirect ownership. Any such information provided to the Fund will ultimately be shared with the Cayman Islands government and transmitted to the Service and, potentially, certain other authorities and withholding agents, as applicable.

Further, it is possible that a lower-tier non-U.S. entity in which the Partnership invests also may be considered an FFI. The Fund intends to assist lower-tier non-U.S. entities in which the Partnership invests in complying with FATCA, but the Fund can give no assurance that it will be able to provide such assistance or that such an entity will be able to avoid the imposition of this withholding tax on it.

By investing (or continuing to invest) in the Fund (and indirectly investing in the Partnership), investors will be deemed to have acknowledged, and to have given their consent to, the following:

(i)      the Fund (or its agent) may be required to disclose to the Cayman Islands authorities and withholding agents certain information (which could otherwise be deemed to be confidential) in relation to the investor or its direct or indirect owners, including the investor's name, address, tax identification number (if any), social security number (if any) and certain additional information or documentation relating to the investor's investment or identity, and the investor may be required to provide any such information or documentation;

(ii)     the Cayman Islands authorities may be required to automatically exchange information with, among other authorities, the Service, and to provide additional information to such authorities should they have further inquiries, and the Fund (or its agent) may be required to disclose certain information (including information that could otherwise be deemed to be confidential) when registering with such authorities and in response to a request by any such authority for further information;

(iii)    in the event an investor's failure to comply with any FATCA related reporting requirements gives rise to any withholding tax, the Fund reserves the right to ensure that any such withholding tax and any related cost, interest, penalties and other losses or

liabilities suffered by the Fund, the Partnership, the General Partner, the Investment Manager, the Administrator or any other investor, or any agent, delegate, employee, director, officer or affiliate of any of the foregoing persons, arising from such investor's failure to provide information to the Fund, is economically borne by such investor;

(iv) in the event an investor does not provide the information and/or documentation necessary for the Fund's (or the Partnership's) satisfaction of its FATCA related reporting requirements, whether or not that actually leads to compliance failures by the Fund, or a risk of the Fund (or the Partnership) or its investors being subject to withholding tax under the relevant FATCA regime, the Fund reserves the right to take any action and/or pursue all remedies at its disposal to mitigate the consequences of the investor's failure to comply with the requirements described above, including compulsory redemption of such investor; and

(v) no investor affected by any such action or remedy shall have any claim against the Fund, the Partnership, the General Partner, the Investment Manager, the Administrator (or their agents, delegates, employees, directors, officers or affiliates) for any form of damages or liability as a result of actions taken or remedies pursued by or on behalf of the Fund in order to comply with FATCA.

*Investors should consult their tax advisors as to the withholding, filing and information reporting requirements that may be imposed on them in respect of their ownership of Interests of the Fund.*

**Investor Tax Filings and Record Retention**

The United States Treasury Department has adopted regulations designed to assist the Service in identifying abusive tax shelter transactions. In general, the regulations require investors in specified transactions (including certain shareholders in foreign corporations and partners in partnerships that engage in such transactions) to satisfy certain special tax filing and record retention requirements. Significant monetary penalties may be imposed (in addition to penalties that generally may be applicable as a result of a failure to comply with applicable Treasury regulations) for failure to comply with these tax filing and record retention rules.

The regulations are broad in scope and it is conceivable that the Fund or the Partnership may enter into transactions that will subject the Fund and certain investors in the Fund to the special tax filing and record retention rules. The Fund and the Investment Manager intend to use reasonable efforts to obtain and provide information to investors necessary to enable investors to satisfy any tax filing and record retention requirements that may arise as a result of any transactions entered into by the Fund or the Partnership.

**Transfer Reporting Requirements**

A U.S. Person (including in certain circumstances a U.S. tax-exempt entity) that transfers property (including cash) to the Fund in exchange for Shares will be required to file a Form 926 or a similar form with the Service. In the event a U.S. shareholder fails to file any required form, such holder could be subject to a penalty of up to 10% of the value of the property transferred, subject to a $100,000 limit so long as the failure was not due to intentional disregard.

**Cayman Islands Taxation**

The Government of the Cayman Islands will not, under existing legislation, impose any income, corporate or capital gains tax, estate duty, inheritance tax, gift tax or withholding tax upon the Fund or its shareholders.   The Cayman Islands are not party to any double taxation treaties.

The Fund has applied for and expects to receive an undertaking from the Governor-in-Cabinet of the Cayman Islands that, in accordance with section 6 of the Tax Concessions Law (2011 Revision) of the Cayman Islands, for a period of 20 years from the date of the undertaking, no law which is enacted in the Cayman Islands imposing any tax to be levied on profits, income, gains or appreciations shall apply to the Fund or its operations and, in addition, that no tax to be levied on profits, income, gains or appreciations or which is in the nature of estate duty or inheritance tax shall be payable (i) on or in respect of the Shares, debentures or other obligations of the Fund or (ii) by way of the withholding, in whole or in part, of a payment of dividend or other distribution of income or capital by the Fund to its shareholders or a payment of principal or interest or other sums due under a debenture or other obligation of the Fund.

**European Union Savings Directive**

Dividends and other distributions of income made by the Administrator on behalf of the Fund, together with payment of the proceeds of sale and/or redemption of Shares ("***Payments***") are not subject to any reporting or withholding requirements that may arise as a result of the applicable legislation which implements the EU Council Directive 2003/48/EC of June 3, 2003 on taxation of savings income in the form of interest payments (the "***EUSD***") as the Administrator is not located in the European Union (or a country that has implemented measures similar or equivalent to the EUSD).

If an investor in the Fund is based in the European Union or certain states which have similar or equivalent measures to the EUSD (including Switzerland, Channel Islands, Monaco and the Cayman Islands) and is making investments on behalf of other underlying investors who are individuals or certain unincorporated entities resident in the European Union or certain of the states which have similar equivalent measures to the EUSD, then the provisions of the EUSD or similar or equivalent measures may apply.   In such circumstances such an investor may become a "paying agent" and may be required to obtain all relevant documentation relating to its underlying investors and make returns to the appropriate tax authorities or withhold tax at applicable rates from any redemption proceeds in accordance with the applicable legislation that implements the EUSD or similar or equivalent measures.

Such investors to whom the EUSD may be relevant should also be aware that on 24 March 2014, the Council of the European Union adopted a directive amending the EUSD to extend its scope to cover additional types of savings income and products that generate interest or equivalent income (including certain types of life insurance contracts) as well as a broader range of investment funds.   In addition, a "look through" procedure will be established to limit the opportunities for circumventing the application of the EUSD by the use of certain intermediaries.   Member States of the European Union have until 1 January 2016 to adopt domestic legislation to give effect to these changes, which must be applied from 1 January 2017.   It is not yet clear as to whether those states which have similar or equivalent measures to the EUSD (including Switzerland, Channel Islands, Monaco and the Cayman Islands) will adopt such changes and if so by what date.

**Future Changes in Applicable Law**

The foregoing description of United States and Cayman Islands income tax consequences of an investment in, and the operations of, the Fund are based on laws and regulations that are subject to change through legislative, judicial or administrative action. Other legislation could be enacted that would subject the Fund to income taxes or subject shareholders to increased income taxes.

**Other Taxation**

A portion of the Fund's investments may be made in non-U.S. jurisdictions. With respect to certain countries, there is a possibility of expropriation, confiscatory taxation, imposition of withholding or other taxes on dividends, interest, capital gains or other income, limitations on the removal of funds or other assets of the Fund, political or social instability or diplomatic developments that could affect investments in those countries. An issuer of securities may be domiciled in a country other than the country in whose currency the instrument is denominated. The values and relative yields of investments in the securities markets of different countries, and their associated risks, are expected to change independently of each other.

**Future Tax Legislation, Necessity of Obtaining Professional Advice**

Future amendments to the Code, other legislation, new or amended Treasury Regulations, administrative rulings or decisions by the Internal Revenue Service or judicial decisions may adversely affect the federal income tax aspects of an investment in the Fund, with or without advance notice, retroactively or prospectively. The foregoing analysis is not intended as a substitute for careful tax planning. The tax matters relating to the Fund are complex and are subject to varying interpretations. There can be no assurance that the Internal Revenue Service will agree with each position taken by the Fund with respect to the tax treatment of Fund items and transactions. Moreover, the effect of existing income tax laws and of proposed changes in income tax laws on shareholders will vary with the particular circumstances of each shareholder and, in reviewing this Memorandum and any exhibits hereto, these matters should be considered.

It is the responsibility of all persons interested in purchasing Shares to inform themselves as to any tax consequences from their investing in the Fund and the Fund's operations or management, as well as any foreign exchange or other fiscal or legal restrictions, which are relevant to their particular circumstances in connection with the acquisition, holding or disposition of Shares. Accordingly, each prospective shareholder should therefore seek their own separate tax advice in relation to their holding of Shares. In no event will the Fund, the Partnership, the Principals or the Investment Manager, or their affiliates, counsel or other professional advisers, be liable to any shareholder for any tax consequences of an investment in the Fund, whether or not such consequences are as described above.

*The foregoing is a summary of the important tax rules and considerations affecting the shareholders, the Fund and the Fund's proposed operations. This summary does not purport to be a complete analysis of all relevant tax rules and considerations, which will vary with the particular circumstances of each shareholder, nor does it purport to be a complete listing of all potential tax risks inherent in purchasing or holding Shares. Each prospective investor in the Fund is urged to consult its own tax advisor in order to understand fully the U.S. federal, state, local and any non-U.S. tax consequences of such an investment in its particular situation.*

# ERISA CONSIDERATIONS

## CIRCULAR 230 NOTICE

**The tax discussion contained in this Memorandum is not in the form of a covered opinion, within the meaning of Circular 230 issued by the United States Secretary of the Treasury. Thus, we are required to inform you that you cannot rely upon the summary contained in this Memorandum for the purpose of avoiding U.S. federal tax penalties. The following summary was written to support the promotion or marketing of the transactions or matters described in this Memorandum. Each prospective investor should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.**

### General

Fiduciaries and other persons who are proposing to invest in Shares on behalf of retirement plans, IRAs and other employee benefit plans ("***Plans***") covered by ERISA or the Code must give appropriate consideration to, among other things, the role that an investment in the Fund plays in the Plan's portfolio, taking into consideration whether the investment is designed to reasonably further the Plan's purposes, the investment's risk and return factors, the portfolio's composition with regard to diversification, the liquidity and current return of the total portfolio relative to the anticipated cash flow needs of the Plan, the projected return of the total portfolio relative to the Plan's objectives, the limited right of shareholders to redeem all or any part of their capital or to transfer their Shares and whether investment in the Fund constitutes a direct or indirect transaction with a party in interest (under ERISA) or a disqualified person (under the Code).

### Plan Asset Regulations and Benefit Plan Investors

The United States Department of Labor ("***DOL***") has adopted regulations that treat the assets of certain pooled investment vehicles, such as the Fund, as "plan assets" for purposes of Title I of ERISA and Section 4975 of the Code ("***Plan Assets***"). Section 3(42) of ERISA defines the term "Plan Assets" to mean plan assets as defined by such regulations as the DOL may prescribe, except that under such regulations the assets of an entity shall not be treated as Plan Assets if, immediately after the most recent acquisition of an equity interest in the entity, less than twenty-five percent (25%) of the total value of each class of equity interest in the entity is held by "Benefit Plan Investors" (the "***significant participation test***"). For purposes of this determination, the value of any equity interest held by a person (other than a Benefit Plan Investor) who has discretionary authority or control with respect to the assets of the entity or any person who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person, shall be disregarded. An entity shall be considered to hold Plan Assets only to the extent of the percentage of the equity interest held by Benefit Plan Investors. The term "***Benefit Plan Investors***" means any employee benefit plan subject to part 4 of subtitle B of Title I of ERISA (*i.e.*, plans subject to the fiduciary provisions of ERISA), any plan to which the prohibited transaction provisions of Section 4975 of the Code apply (*e.g.*, IRAs) and any entity whose underlying assets include Plan Assets by reason of a plan's investment in such entity (a "***Plan Asset Entity***").

In order to prevent the assets of the Partnership from being considered Plan Assets under ERISA, it is the intention of the Partnership to monitor the investments in the Fund and prohibit the acquisition, redemption or transfer of any Shares by any investor, including a Benefit Plan Investor, unless, after

giving effect to such an acquisition, redemption or transfer, the total proportion of each class of equity interests of the Partnership owned by Benefit Plan Investors would be less 25% of the aggregate value of such class (determined, as described above, by excluding certain Shares held by the Investment Manager, other fiduciaries and affiliates).

Without limiting the generality of the foregoing, in order to limit equity participation in each class of equity interests of the Partnership by Benefit Plan Investors to less than 25%, the Partnership may require the compulsory redemption of Shares of any Series. Each shareholder that is an insurance company acting on behalf of its general account or a Plan Asset Entity will be required to represent and warrant as of the date it acquires Shares or equity interests of the Partnership the maximum percentage of such general account or Plan Asset Entity (as reasonably determined by such insurance company or Plan Asset Entity) that will constitute Plan Assets (the "***Maximum Percentage***") so such percentage can be calculated in determining the percentage of Plan Assets invested in the Partnership. Further, each such insurance company and Plan Asset Entity will be required to covenant that if, after its initial acquisition of Shares or equity interests of the Partnership, the Maximum Percentage is exceeded at any time, then such insurance company or Plan Asset Entity shall immediately notify the Investment Manager of that occurrence and shall, if and as directed by the Investment Manager, in a manner consistent with the restrictions on transfer set forth herein, redeem or dispose of some or all of the Shares held in its general account or Plan Asset Entity.

If the Partnership's assets were considered Plan Assets, then, under ERISA and the Code, the Investment Manager would be a fiduciary, and certain employees, partners and officers of the Investment Manager, as well as certain affiliates, would become "parties in interest" and "disqualified persons," with respect to the investing Plans, with the result that the rendering of services to certain related parties or the lending of money or other extensions of credit, or the sale, exchange or leasing of property by the Partnership or certain related parties, or the payment of certain fees, as well as certain other transactions, might be deemed to constitute prohibited transactions. Additionally, individual investment in equity interests of the Partnership by persons who are fiduciaries and/or parties-in-interest and disqualified persons to a Plan might be deemed to constitute prohibited transactions under such circumstances.

It is anticipated that investment in the Fund by Benefit Plan Investors may be "significant" for purposes of the DOL regulations. In such event, the underlying assets of the Fund would be deemed to constitute Plan Assets. As a general rule, if the assets of the Fund were regarded as Plan Assets of a Benefit Plan Investor, the Investment Manager would be deemed to be a fiduciary with respect to each Plan investing in the Fund. However, the Investment Manager believes that, given the limited purpose and role of the Fund and the requirement that the Investment Manager follow the directions of the fiduciaries of each Benefit Plan Investor investing in the Fund, as set forth in each such investor's Subscription Documents, with respect to the investment by the Fund in the Partnership, neither the Investment Manager nor any other entity providing services to the Fund would be exercising any discretionary authority or control with respect to the Fund. Accordingly, the Investment Manager believes that neither the Investment Manager nor any other entity providing services to the Fund will act as a fiduciary (as defined in Section 3(21) of ERISA) with respect to the assets of the Fund or any Benefit Plan Investor. Rather, the Investment Manager believes that, given the limited purpose and role of the Fund and the requirement that the Investment Manager follow the directions of the fiduciary of each Benefit Plan Investor investing in the Fund, as set forth in each such investor's Subscription Documents, with respect to the investment by the Fund in the Partnership, the fiduciary of each such Benefit Plan Investor has retained the fiduciary authority and responsibility with respect to the Benefit

Plan Investor's initial and continuing investment in the Fund as though the Benefit Plan Investor is investing directly in the Partnership.

**Representation by Plans**

The fiduciaries of each Plan proposing to invest in the Fund will be required to represent that they have been informed of and understand the Fund's investment objectives, policies and strategies, and that the decision to invest Plan Assets in the Fund is consistent with the provisions of ERISA and/or the Code that require diversification of Plan Assets and impose other fiduciary responsibilities. In particular, exempt organizations should consider the applicability to them of the provisions relating to UBTI. By its purchase, each investor will be deemed to have represented that either (i) it is not a Plan that is subject to the prohibited transaction rules of ERISA or the Code, (ii) it is not an entity whose assets include Plan Assets or (iii) its investment in the Fund will not constitute a non-exempt prohibited transaction under ERISA or the Code.

**Ineligible Purchasers**

Shares may not be purchased with Plan Assets if the Investment Manager, any selling agent, finder, any of their respective affiliates or any of their respective employees: (i) has investment discretion with respect to the investment of such Plan Assets; (ii) has authority or responsibility to give or regularly gives investment advice with respect to such Plan Assets, for a fee, and pursuant to an agreement or understanding that such advice will serve as a primary basis for investment decisions with respect to such Plan Assets and that such advice will be based on the particular investment needs of the Plan; or (iii) is an employer maintaining or contributing to such Plan. A party that is described in clause (i) or (ii) of the preceding sentence is a fiduciary under ERISA and the Code with respect to the Plan, and any such purchase might result in a "prohibited transaction" under ERISA and the Code.

**Plans' Reporting Obligations**

The information contained herein and in the other documentation provided to investors in connection with an investment in the Fund is intended to satisfy the alternative reporting option for "eligible indirect compensation" on Schedule C of the Form 5500, in addition to the other purposes for which such documents were created.

*Whether or not the underlying assets of the Fund are deemed Plan Assets, an investment in the Fund by a Plan is subject to ERISA and the Code. Accordingly, Plan fiduciaries should consult their own counsel as to the consequences under ERISA and the Code of an investment in the Fund. Note that similar laws governing the investment and management of the assets of governmental or non-U.S. plans may contain fiduciary and prohibited transaction requirements similar to those under ERISA and the Code. Accordingly, fiduciaries of such governmental or non-U.S. plans, in consultation with their counsel, should consider the impact of their respective laws and regulations on an investment in the Fund.*

## CAYMAN ISLANDS MUTUAL FUND LAW

The Fund is regulated as a mutual fund under the Mutual Funds Law (2013 Revision) of the Cayman Islands ("***Mutual Funds Law***").  The Cayman Islands Monetary Authority (the "***Authority***") has supervisory and enforcement powers to ensure compliance with the Mutual Funds Law.   Regulation under the Mutual Funds Law entails the filing of prescribed details and audited accounts annually with the Authority.   As a regulated mutual fund, the Authority may at any time instruct the Fund to have its accounts audited and to submit them to the Authority within such time as the Authority specifies. Failure to comply with these requests by the Authority may result in substantial fines on the part of the Directors and may result in the Authority applying to the court to have the Fund wound up.

The Fund will not, however, be subject to supervision in respect of its investment activities or the constitution of the Fund's portfolio by the Authority or any other governmental authority in the Cayman Islands, although the Authority does have power to investigate the activities of the Fund in certain circumstances.   Neither the Authority nor any other governmental authority in the Cayman Islands has commented upon or approved the terms or merits of this document.   There is no investment compensation scheme available to investors in the Cayman Islands.

The Authority may take certain actions if it is satisfied that a regulated mutual fund is or is likely to become unable to meet its obligations as they fall due or is carrying on or is attempting to carry on business or is winding up its business voluntarily in a manner that is prejudicial to its investors or creditors.   The powers of the Authority include the power to require the substitution of Directors, to appoint a person to advise the Fund on the proper conduct of its affairs or to appoint a person to assume control of the affairs of the Fund.   There are other remedies available to the Authority including the ability to apply to court for approval of other actions.

The Fund, or any directors or agents domiciled in the Cayman Islands, may be compelled to provide information, subject to a request for information made by a regulatory or governmental authority or agency under applicable law; e.g. by the Authority, either for itself or for a recognised overseas regulatory authority, under the Monetary Authority Law (2013 Revision), or by the Tax Information Authority, under the Tax Information Authority Law (2013 Revision) or Reporting of Savings Income information (European Union) Law (2007 Revision) and associated regulations, agreements, arrangements and memoranda of understanding.   Disclosure of confidential information under such laws shall not be regarded as a breach of any duty of confidentiality and, in certain circumstances, the Fund, director or agent, may be prohibited from disclosing that the request has been made.

## ANTI-MONEY LAUNDERING COMPLIANCE

**Cayman Islands**

In order to comply with legislation or regulations aimed at the prevention of money laundering the Fund is required to adopt and maintain anti-money laundering procedures, and may require subscribers to provide evidence to verify their identity and source of funds. Where permitted, and subject to certain conditions, the Fund may also delegate the maintenance of its anti-money laundering procedures (including the acquisition of due diligence information) to a suitable person.

The Fund, and the Administrator on the Fund's behalf, reserve the right to request such information as is necessary to verify the identity of a shareholder (i.e. a subscriber or a transferee). Where the circumstances permit, the Fund, or the Administrator on the Fund's behalf, may be satisfied that full due diligence may not be required where an exemption applies under the Money Laundering Regulations (2013 Revision) of the Cayman Islands, as amended and revised from time to time or any other applicable law.

In the event of delay or failure on the part of the subscriber in producing any information required for verification purposes, the Fund, or the Administrator on the Fund's behalf, may refuse to accept the application, in which case any funds received will be returned without interest to the account from which they were originally debited.

The Fund, and the Administrator on the Fund's behalf, also reserve the right to refuse to make any redemption or dividend payment to a shareholder if the Board of Directors or the Administrator suspect or are advised that the payment of redemption or dividend proceeds to such shareholder may be non-compliant with applicable laws or regulations, or if such refusal is considered necessary or appropriate to ensure the compliance by the Fund or the Administrator with any applicable laws or regulations.

If any person resident in the Cayman Islands knows or suspects or has reasonable grounds for knowing or suspecting that another person is engaged in criminal conduct or is involved with terrorism or terrorist property and the information for that knowledge or suspicion came to their attention in the course of business in the regulated sector, or other trade, profession, business or employment, the person will be required to report such knowledge or suspicion to (i) the Financial Reporting Authority of the Cayman Islands, pursuant to the Proceeds of Crime Law, 2008 of the Cayman Islands if the disclosure relates to criminal conduct or money laundering, or (ii) a police officer of the rank of constable or higher, or the Financial Reporting Authority, pursuant to the Terrorism Law (2011 Revision) of the Cayman Islands, if the disclosure relates to involvement with terrorism or terrorist financing and property. Such a report shall not be treated as a breach of confidence or of any restriction upon the disclosure of information imposed by any enactment or otherwise.

**United States**

In response to increased regulatory concerns with respect to the identification of sources of funds used to make an investment in the Fund, the Investment Manager and/or its affiliates have implemented policies and procedures ("**AML Program**") designed to guard against and identify money laundering activities. Pursuant to the Fund's AML Program, the Investment Manager and/or its affiliates will request prospective investors and, in some instances, existing shareholders to provide additional documentation verifying, among other things, such person's identity and the source of funds used to

purchase its Shares of the Fund. The Investment Manager may decline to accept a subscription based upon this information, or if this information is not provided.

Pursuant to the Fund's AML Program, the Investment Manager and/or its affiliates will undertake enhanced due diligence procedures prior to accepting investors the Investment Manager believes present high risk factors with respect to money laundering activities. Examples, although not comprehensive, of persons posing high risk factors are persons resident in or organized under the laws of a "non-cooperative jurisdiction" or other jurisdictions designated by the Department of the Treasury as warranting special measures due to money laundering concerns, and any person whose capital contributions originate from or are routed through certain banking entities organized or chartered in a non-cooperative jurisdiction.

In addition, the Fund's AML Program prohibits the acceptance of subscriptions from or on behalf of:

    1.    persons on the List of Specially Designated Nationals and Blocked Persons maintained by the U.S. Office of Foreign Asset Control;

    2.    the Annex to Executive Order 13224;

    3.    such other lists as may be promulgated by law or regulation; and

    4.    foreign banks unregulated in the jurisdiction they are domiciled in or which have no physical presence.

Governmental regulators are continuing to consider appropriate measures to implement anti-money laundering laws as they apply to private investment funds such as the Fund. The Investment Manager and/or its affiliates will take such steps as it determines are necessary to comply with applicable law, regulations, orders, directives or special measures that may be required by governmental regulators. The specific policies and procedures that the Fund may be required to implement remain unclear, although such steps may include additional measures to confirm the identity of each investor, including the principal beneficial owners of the investor, if applicable, and/or reporting suspicious transactions to governmental regulators.

The requirements for the Investment Manager to guard against and identify money laundering activities in deciding whether to accept subscriptions are in addition to the discretion that the Investment Manager has in deciding whether to accept subscriptions.

# ANNEX A

**Definition of "U.S. Person"**

For purposes of the applicable prohibitions against ownership and transfer of Shares of the Fund, the term "U.S. Person" means:

(1)    a resident or citizen of the United States;

(2)    a partnership or corporation organized under the laws of the United States;

(3)    any entity not organized under the laws of the United States:

    (a)    that has its principal office or place of business in the United States; or

    (b)    (i)    in which citizens or residents of or entities organized under the laws of or existing in the United States directly or indirectly hold in the aggregate 50% or more of the beneficial interests; and

            (ii)    that will own directly or indirectly, either alone or together with affiliated persons, an aggregate of more than 9.9% of the Fund's outstanding Shares; or

    (c)    (i)    that is organized principally for passive investment (such as an investment company, a commodity pool or other similar vehicle); and

            (ii)    (A)    in which the amount of units of participation held by United States Persons (other than "qualified eligible participants" as defined in Rule 4.7(a)(2) under the United States Commodity Exchange Act) represents in the aggregate 10% or more of the beneficial interest in the entity;

                    (B)    that was formed for the purpose of facilitating investment by United States Persons in the Fund, or in any other commodity pool with respect to which the operator is exempt from certain requirements of Part 4 of the regulations promulgated by the United States Commodity Futures Trading Commission by virtue of its participants being non-United States Persons; or

                    (C)    that was formed by United States Persons principally for the purpose of investing in securities not registered under the United States Securities Act of 1933, as amended, unless it is formed and owned by "accredited investors" (as defined in Rule 501(a) under the Securities Act of 1933, as amended) who are not natural persons, estates or trusts;

(4)    an estate or trust:

    (a)    of which an executor, administrator or trustee is a United States Person, unless:

            (i)    an executor, administrator or trustee who is not a United States Person has sole or shared investment discretion with respect to the assets of the estate or trust; and

            (ii)    (A)    in the case of an estate, it is governed by non-U.S. law; or

(B)     in the case of a trust, no beneficiary (and no settlor if the trust is revocable) is a United States Person; or

(b)     the income of which is subject to United States income tax regardless of source;

(5)     any agency or branch of a foreign entity located in the United States;

(6)     any non-discretionary account or similar account (other than an estate or trust) held for the benefit or account of one or more United States Persons; and

(7)     any discretionary account or similar account (other than an estate or trust) held by a dealer or other fiduciary organized, incorporated, or (if an individual) resident in the United States, unless it is held by a dealer or other professional fiduciary exclusively for the benefit or account of one or more non-United States Persons.

For purposes of the foregoing, the term "*United States*" means the United States of America, its territories and possessions, any state of the United States, and the District of Columbia. Persons requiring details regarding other terms used in the foregoing definition (such as "qualified eligible participant" and "accredited investor") should contact the Administrator.

# **EXHIBIT C**

# HIGHLAND MULTI STRATEGY CREDIT FUND



# **EXHIBIT D**

**THIRD AMENDED AND RESTATED INVESTMENT MANAGEMENT AGREEMENT**

**by and among**

**HIGHLAND MULTI STRATEGY CREDIT FUND, LTD.**

**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P.**

**and**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

**November 1, 2013**

**THIS THIRD AMENDED AND RESTATED INVESTMENT MANAGEMENT AGREEMENT** (this "*Agreement*"), is dated effective as of November 1, 2014, by and among:

**HIGHLAND MULTI STRATEGY CREDIT FUND, LTD.**, a Cayman Islands exempted company (the "*Offshore Fund*");

**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P.**, a Delaware limited partnership (the "*Domestic Fund*," and together with the Offshore Fund, the "*Clients*") acting through its general partner, Highland Multi Strategy Credit Fund GP, L.P. a Delaware limited partnership (the "*General Partner*"); and

**HIGHLAND CAPITAL MANAGEMENT, L.P.**, a Delaware limited partnership (the "*Investment Manager*").

## PRELIMINARY STATEMENTS

A.     The Domestic Fund previously retained the Investment Manager as its investment manager pursuant to an investment management agreement dated as of December 1, 2005, as amended and restated as of December 29, 2005 and as further amended and restated as of September 1, 2006 (the "*Original Agreement*").

B.     The Offshore Fund will invest all of its investable assets in the Domestic Fund.  The Investment Manager will exercise no discretion with respect to the investment of the assets of the Offshore Fund and will serve merely as a steward thereof.  The Investment Manager will conduct its investment activities at the Domestic Fund level as the investment manager to the Domestic Fund.

C.     The Domestic Fund desires to continue to retain the Investment Manager and the Offshore Fund desires to retain the Investment Manager to provide certain discretionary advisory services relating to the assets and liabilities of the Domestic Fund and the Investment Manager desires to accept such appointment, all subject to the terms and conditions hereinafter set forth.

## AGREEMENT

This Agreement amends and restates in its entirety the Original Agreement as set forth below.  For good and valuable consideration, the sufficiency and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.     **Appointment.**

The Clients hereby appoint the Investment Manager as investment manager with respect to the assets and liabilities of the Domestic Fund and the Investment Manager hereby accepts such appointment and agrees to perform its obligations in accordance with the terms hereof and of the Fourth Amended and Restated Limited Partnership Agreement of the Domestic Fund, dated effective as of November 1, 2014, as amended from time to time (the "*Domestic Fund Partnership Agreement*"), and the investment objectives, policies,

guidelines and restrictions that from time to time are set forth in the Governing Documents of the Clients as applicable. "**Governing Documents**" mean, with respect to:

(a)     the Offshore Fund:  the Memorandum and Articles of Association of the Offshore Fund, as amended from time to time, and the Confidential Private Offering Memorandum dated November 2014, as may be supplemented from time to time (the "**POM**");

(b)     the Domestic Fund: the Domestic Fund Partnership Agreement and the Private Placement Memorandum dated November 2014, as may be supplemented from time to time (the "**PPM**").

## 2.     Authority and Duties of the Investment Manager.

(a)     All of the investable assets of the Offshore Fund must be invested in, and the investment program of the Offshore Fund is to be conducted by the Investment Manager through, the Domestic Fund.  The Investment Manager will exercise no discretion with respect to the investment of the assets of the Offshore Fund and the investment activities of the Investment Manager will be conducted at the Domestic Fund level as the investment manager to the Domestic Fund.

(b)     The Domestic Fund's investment program will be conducted by the Investment Manager in accordance with the PPM.

(c)     The Investment Manager serves as the investment manager to the Domestic Fund and in that capacity has full discretion and authority, without obtaining the prior approval of any officer or other agent of the Domestic Fund:

(i)      to continuously supervise the investment program of the Domestic Fund and the composition of its investment portfolio including, without limitation, determining from time to time what investments will be purchased, retained or sold, what contracts will be entered into by the Domestic Fund and what portion of its assets will be retained as cash, and to engage consultants and analysts in connection therewith; to cause the Domestic Fund to purchase or sell any asset, enter into any other investment-related transaction, including (directly or through subsidiaries or affiliates of the Domestic Fund) borrowing money, entering into swap transactions, lending securities, exercising control over a company, exercising voting or approval rights and selecting brokers and dealers for execution of portfolio transactions; and to undertake to do anything incidental to the foregoing to facilitate the performance of its obligations hereunder;

(ii)     to invest within or outside the United States of America in "Investments" (as defined in, and subject to the provisions of, the Domestic Fund Limited Partnership Agreement);

(iii)    to effect any and all transactions in Investments, including collateralized loan obligations, asset-backed securities, commodities, total return swaps,

credit default swaps, synthetic securities and other financial instruments and assets (and options and other contracts thereon), and everything connected therewith in the broadest sense, including, without limitation, the full discretion and authority to make short sales, to purchase or write options (including uncovered options) and to trade on margin;

(iv) to, on behalf of the Clients, exercise all rights, powers, privileges and other incidents of ownership or possession with respect to the Investments and other property and funds held or owned by the Domestic Fund, including without limitation the right to possess, lend, transfer, mortgage, pledge or otherwise deal in, and to secure the payment of obligations of the Domestic Fund by mortgage upon, or hypothecation or pledge of, all or part of the property of the Domestic Fund, whether at the time owned or thereafter acquired, and to vote Investments, participate in arrangements with creditors, institute and settle or compromise suits and administrative proceedings and other similar matters;

(v) to select brokers, dealers, banks and other intermediaries by or through whom such transactions will be executed or carried out and to open, maintain and close accounts with brokers, which power shall include the authority to issue all instructions and authorizations to brokers regarding securities and money therein and to cause the Domestic Fund to pay, or authorize the payment and reimbursement of, brokerage commissions;

(vi) to open, maintain and close bank accounts and authorize the drawing of checks or other orders for the payment of monies;

(vii) to borrow or raise monies or utilize any other forms of leverage and to issue, accept, endorse and execute promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other negotiable or non- negotiable instruments and evidences of indebtedness and otherwise to utilize any lines of credit, credit balances or overdraft privileges available to the Domestic Fund;

(viii) to value the Client's assets as of the close of each fiscal period and any other date selected by the respective Client;

(ix) to direct any administrator of the Clients, banks, brokers or other custodians to effect deliveries of funds or assets, but only in the course of effecting portfolio transactions for the account of the Clients;

(x) to remove or replace any administrator of the Clients and/or any accountant of the Clients at any time; and

(xi) to make and execute all such documents and to take all such other actions as the Investment Manager considers necessary or appropriate to carry out its investment management duties hereunder.

4

(d)     In furtherance of the foregoing, the Board of Directors, on behalf of the Offshore Fund, and the General Partner, on behalf of the Domestic Fund, has delegated certain rights and responsibilities with respect to the operation of their respective partnerships and funds to the Investment Manager, as more fully set forth in the Governing Documents.

(e)     Each Client hereby designates the Investment Manager as the commodity pool operator (the "**CPO**") for such Client with complete authority and responsibility for compliance with the U.S. Commodity Exchange Act and the regulations promulgated thereunder, including to perform any and all duties required of a CPO (i) that is exempt from registration under the regulations of the U.S. Commodity Futures Trading Commission (the "**CFTC**") and (ii) that is in compliance with CFTC Rule 4.13(a)(3), including the filing of a notice of exemption under said Rule 4.13(a)(3) with the CFTC.

(f)     Additionally, each of the Clients hereby designates and appoints the Investment Manager as its agent and attorney-in-fact, with full power and authority and without the need for further approval of the Clients (except as may be required by law) to complete and execute all such documents and to take any and all actions that the Investment Manager, in its discretion, may deem advisable to carry out the foregoing with respect to the assets of the Clients; provided, however, that the Investment Manager is not intended to have actual or constructive custody of any assets of the Clients.  In connection with any of the foregoing, the Investment Manager is further authorized to transfer or tender for cash or exchange such assets. In all such purchases, sales or trades the Clients authorize the Investment Manager to act for the Clients, and at their risk, and in their name and on their behalf, in the same manner and with the same force and effect as the Clients might or could do with respect to such purchases, sales or trades without prior consultation with the Clients.  The Clients also appoint the Investment Manager as their agent and attorney-in-fact to vote, and to execute proxies, waivers, consents and other instruments with respect to, the assets of the Clients.

(g)     At the request of a Client, in any wind down of such Client, the Investment Manager will manage the realization of the Client's assets and the distribution thereof to investors.

(h)     In connection with the execution of transactions on behalf of the Domestic Fund, the Domestic Fund hereby acknowledges and agrees that in the course of selecting brokers, dealers, futures commission merchants, banks and financial intermediaries to effect transactions for the Domestic Fund's account, the Investment Manager may agree to such commissions, fees and other charges on behalf of the Domestic Fund's account as it may deem reasonable in the circumstances, taking into consideration all such factors as the Investment Manager deems relevant, including the following: the ability to effect prompt and reliable executions at favorable prices; the operational efficiency with which transactions are effected; the financial strength, integrity and stability of the broker; the quality, comprehensiveness and frequency of available research and other services considered to be of value; and

5

the competitiveness of commission rates in comparison with other brokers satisfying the Investment Manager's other selection criteria. It is understood that the costs of such services will not necessarily represent the lowest costs available and that the Investment Manager is under no obligation to combine or arrange orders so as to obtain reduced charges.

**3.      Fees and Expenses.**

(a)      For its services to the Domestic Fund, the Domestic Fund will pay the Investment Manager the Management Fee (as defined in the Domestic Fund Partnership Agreement), calculated and payable monthly in advance. The Investment Manager may waive or reduce the management fees with respect to capital account and capital sub-accounts of the Domestic Fund in its discretion.

(b)      The Clients will pay, or will reimburse the Investment Manager, for all costs and expenses arising in connection with their operations, including without limitation, with respect to the Domestic Fund, all costs and expenses directly related to portfolio investments or prospective investments (whether or not consummated) of the Domestic Fund.

(c)      The Clients will not have their own separate employees or office, and they will not reimburse the Investment Manager for salaries, office rent and other general overhead costs of the Investment Manager. The Investment Manager will pay all of its own operating and overhead costs (except liability insurance) without reimbursement by the Clients. The Investment Manager is entitled to reimbursement from the Clients for any expenses paid by it on behalf of the Clients; provided that, the Investment Manager in its sole discretion may absorb any or all of such expenses incurred on behalf of the Clients. If the Investment Manager incurs any such expenses for the account of the Clients and any Customers (as defined below), the Investment Manager will allocate such expenses among the Clients and each such Customer in proportion to the size of the investment made by each in the activity or entity to which the expense relates, or in such other manner as the Investment Manager in its sole discretion considers fair and reasonable.

**4.      Other Activities and Investments.**

(a)      The Investment Manager is not required to devote its full time to the affairs of the Clients, but must devote such of its time to the business and affairs of the Clients as it may determine, in its discretion exercised in good faith, to be necessary to conduct the affairs of the Clients for the benefit of the Clients, the shareholders of the Offshore Fund and the partners of the Domestic Fund. Subject to this limitation, the Investment Manager, its partners and principals and their affiliates are not precluded from engaging in or owning an interest in other business ventures or investment activities of any kind. It is expressly understood that the Investment Manager and its affiliates may effect investment transactions for their own accounts and for the accounts of other customers (generally, "***Customers***"), and the Clients further understand and agree that nothing herein restricts the ability of the

Investment Manager and its affiliates to engage in any such transactions notwithstanding the fact that the Clients may enter into or engage in such transactions so long as such transactions are in the best interests of the Clients.

(b)  The Investment Manager will act in a manner that it considers fair, reasonable and equitable in allocating investment opportunities to the Clients.  It is understood that when the Investment Manager determines that it would be appropriate for the Clients and one or more of the Customers to participate in an investment opportunity, the Investment Manager will seek to execute orders for, or otherwise allocate such opportunities to, the Clients and such Customers on an equitable basis. In such situations, the Investment Manager may place orders for the Clients and each Customer simultaneously, and if all such orders are not filled at the same price, the Investment Manager may cause the Clients and each Customer to pay or receive the average of the prices at which such orders were filled for the Clients and all other Customers.  If all such orders cannot be fully executed under prevailing market conditions, the Investment Manager may allocate among the Clients and the Customers the investments traded in a manner which the Investment Manager considers equitable, taking into account the size of the order placed for the Clients and each such Customer as well as any other factors which the Investment Manager deems relevant.

5.  **Account and Other Information.**

(a)  The Investment Manager must furnish such information concerning activities undertaken for the account of the Clients as the Clients may reasonably request.

(b)  The Clients agree to keep confidential and not to disclose to any person any information or matter relating to the Clients' investments (other than disclosure to the Clients' shareholders, partners, directors and employees, legal counsel, administrator, registrar and accountant in connection with the preparation and review of financial statements and with the filing of any tax returns or to any other person approved in writing by the Investment Manager (each such person being hereinafter referred to as an "*Authorized Representative*")); provided that the Clients and their Authorized Representatives may make such disclosure to the extent that (x) the information to be disclosed is publicly known at the time of proposed disclosure by the Clients or Authorized Representative, (y) the information otherwise is or becomes legally known to the Clients other than through disclosure by the Investment Manager or (z) such disclosure is required by law or in response to any governmental agency request or in connection with an examination by any regulatory authorities, provided that such agency, regulatory authorities or association is aware of the confidential nature of the information disclosed.  Prior to making any disclosure required by law, the Clients will use their best efforts to notify the Investment Manager of such disclosure.  Prior to any disclosure to any Authorized Representative, the Clients must advise such Authorized Representative of the obligations set forth in this Section 5(b) and are responsible for any breach of these obligations made by an Authorized Representative.

7

(c)     The Investment Manager retains, or arranges for the retention of, for a period of at least 5 years, copies of any documents generated or received by the Investment Manager in the ordinary course of business pertaining to the financial condition of the account of the Clients or to the compensation payable to the Investment Manager. At the request of the Clients, the Investment Manager will afford to the Clients' independent auditors reasonable access to such documents during customary business hours and will permit the Clients' auditors to make copies thereof or extracts therefrom at the expense of the Clients.

**6.     Custody.**

The assets of the Clients must be held in the custody of one or more custodians (or other independent institutions performing the functions of custodian, with respect to the assets which are held by such institutions) selected by the Investment Manager. The Investment Manager will notify the Clients promptly of the proposed selection of any custodians.

**7.     Scope of Liability.**

The Clients agree that the Investment Manager is not liable to the Clients or any of their partners or shareholders for any losses, damages, expenses or claims occasioned by any act or omission of the Investment Manager in connection with the performance of its services hereunder, other than as a result of the Investment Manager's willful misconduct, fraud or gross negligence, or as otherwise prescribed by applicable law. The Clients explicitly recognize that the investment advisory opinions, recommendations and actions of the Investment Manager will be based on advice and information deemed to be reliable but not guaranteed by or to the Investment Manager.

**8.     Indemnification.**

(a)     The Clients must indemnify and hold harmless the Investment Manager, each member, shareholder, partner, manager or director of, or any person who controls, the Investment Manager, each of the respective affiliates of the foregoing and each of the respective executors, heirs, assigns, successors or other legal representatives of the foregoing (each, an "***indemnitee***") from and against any expense, loss, liability or damage arising out of any claim asserted or threatened to be asserted against such indemnitee in connection with the Investment Manager's serving or having served as such pursuant to this Agreement; provided, however, that the indemnitee is not entitled to any such indemnification with respect to any expense, loss, liability or damage that was caused by the indemnitee's willful misconduct, fraud or gross negligence.

(b)     In the event that the Investment Manager or any other indemnitee entitled to indemnification pursuant to paragraph (a) above is or becomes a party to any action or proceeding in respect of which, or there otherwise exists a claim pursuant to which, it may be entitled to seek indemnification hereunder, the indemnitee must promptly notify the respective Client thereof. The respective Client is entitled to participate in any such suit or proceeding and, to the extent that it may wish, to

assume the defense thereof with counsel reasonably satisfactory to the indemnitee. After notice of an election by the Client so to assume the defense thereof, the Client will not be liable to the indemnitee hereunder for any legal or other expenses subsequently incurred by the indemnitee in connection with the defense thereof other than reasonable costs of investigation or reasonable legal expenses incurred as a result of (i) potential conflicts of interest between the indemnitee and the Client or (ii) the protection of proprietary or privacy interests of other clients of or parties in interest with the indemnitee. The Client must advance to the indemnitee the reasonable costs and expenses of investigating and/or defending such claim, subject to receiving a written undertaking from the indemnitee to repay such amounts if and to the extent of any subsequent determination by a court or other tribunal of competent jurisdiction that the indemnitee was not entitled to indemnification hereunder.

(c)     A Client is not liable hereunder for any settlement of any action or claim effected without its written consent thereto.

**9.     Independent Contractor.**

For all purposes of this Agreement, the Investment Manager is an independent contractor and not an employee or dependent agent of any Client. Nothing herein is to be construed as making any Client a partner or co-venturer with the Investment Manager or any of its affiliates or Customers. Except as provided in this Agreement, the Investment Manager has no authority to bind, obligate or represent the Clients.

**10.    Term; Termination; Renewal.**

(a)     This Agreement will remain in full force and effect for a period commencing on the date first above written and ending on December 31, 2014, and thereafter will renew automatically for successive one-year periods. This Agreement may be terminated by any party hereto, without penalty, upon 75 days' prior written notice to the other parties.

(b)     The termination of this Agreement does not extinguish the obligations of the Clients for the payment of fees and expenses in respect of services rendered by the Investment Manager prior to the effective date of such termination.

**11.    Acknowledgement.**

Each of the Clients certifies and acknowledges to the Investment Manager that it:

(i)     has fully disclosed to potential investors the fee provisions and other arrangements relating to the Client's account with the Investment Manager and is satisfied that the potential investors have received sufficient information from the Investment Manager to enable them to evaluate the terms of this Agreement; and

(ii)    fully understands the method of compensation provided herein and its associated risks, including the risk that the performance compensation arrangements with

9

affiliates of the Investment Manager may create an incentive for the Investment Manager to engage in transactions that are riskier or more speculative than would be the case in the absence of performance compensation and that such risk has been disclosed to potential investors.

**12.   Amendment; Modification; Waiver.**

Except as otherwise expressly provided herein, this Agreement may not be amended, nor may any provision of this Agreement be considered modified or waived, unless evidenced by a writing signed by the party to be charged with such amendment, waiver or modification.

**13.   Binding Effect; Assignment.**

This Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors, but the rights and obligations hereunder are not, except as otherwise expressly provided herein, assignable, transferable or delegable without the written consent of the other parties hereto and any attempted assignment, transfer or delegation thereof without such consent is null and void, except that the Investment Manager may assign its rights and obligations hereunder to an entity that controls, is controlled by or is under common control with the Investment Manager; provided, however, that such entity assumes the obligations of the Investment Manager hereunder.

**14.   Governing Law.**

This Agreement is governed by and construed in accordance with the substantive laws of the State of Delaware which are applicable to contracts made and entirely to be performed therein, without regard to the place of performance hereunder.

[SIGNATURE PAGE FOLLOWS]

10

The parties have executed this Agreement as of the day and year first above written.

**HIGHLAND MULTI STRATEGY CREDIT FUND, LTD.**

By: _____

Name: James Dondero

Title: Director

**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P.**

By: HIGHLAND MULTI STRATEGY CREDIT FUND GP, L.P

attorney-in-fact for the Limited Partners

By: HIGHLAND MULTI STRATEGY CREDIT GP, LLC

its general partner

By: HIGHLAND CAPITAL MANAGEMENT, L.P.

its sole member

By: STRAND ADVISORS, INC.

its general partner

By: _____

Name: James Dondero

Title: President

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: STRAND ADVISORS, INC.

By: _____

Name: James Dondero

Title: President

*Signature Page to Third Amended and Restated Investment Management Agreement*

# EXHIBIT E

# Highland Multi Strategy Credit Fund, L.P.

A Delaware Limited Partnership

**Fourth Amended and Restated**

**Limited Partnership Agreement**

November 1, 2014

# TABLE OF CONTENTS

**Page**

Article I DEFINITIONS ................................................................................................1

Article II ORGANIZATION.........................................................................................10
2.1    Continuation of Limited Partnership .................................................10
2.2    Name of Partnership .........................................................................11
2.3    Principal Office; Registered Office....................................................11
2.4    Term of Partnership...........................................................................11
2.5    Object and Powers of Partnership....................................................11
2.6    Liability of Partners ...........................................................................12
2.7    Actions by Partnership ......................................................................12
2.8    Reliance by Third Parties ..................................................................12
2.9    UCC Status of Limited Partner Interests ..........................................12
2.10   Series of Interests.............................................................................12

Article III CAPITAL.....................................................................................................13
3.1    Contributions to Capital ....................................................................13
3.2    Rights of Partners in Capital .............................................................14
3.3    Capital Accounts ...............................................................................14
3.4    Allocations of Net Profit and Net Loss..............................................15
3.5    Allocation of Management Fees, Withholding Taxes and Certain Other
       Expenditures .....................................................................................15
3.6    Reserves; Adjustments for Certain Future Events ............................16
3.7    Performance Allocation .....................................................................17
3.8    Limited Participation Investments and New Issues ...........................17
3.9    Allocation to Avoid Capital Account Deficits .....................................18
3.10   Regulatory Allocations.......................................................................18
3.11   Allocations for Income Tax Purposes ...............................................19
3.12   Individual Partner's Tax Treatment...................................................21
3.13   Distributions......................................................................................21

Article IV MANAGEMENT ..........................................................................................22
4.1    Duties and Powers of the General Partner ........................................22
4.2    Expenses ..........................................................................................23
4.3    Rights of Limited Partners.................................................................25
4.4    Other Activities of Partners...............................................................25
4.5    Exculpation; Indemnification.............................................................26
4.6    Advisory Committee ..........................................................................28
4.7    Alternative Investment Vehicles ........................................................29

Article V ADMISSIONS, TRANSFERS AND WITHDRAWALS ...................................29
5.1    Admission of Limited Partners...........................................................29
5.2    Admission of Additional General Partners .........................................29
5.3    Transfer of Interests of Limited Partners ...........................................30
5.4    Transfer of Interest of the General Partner .......................................30
5.5    Withdrawal of Interests of Partners ...................................................31

i

Article VI SOFT WIND DOWN, DISSOLUTION AND LIQUIDATION ................................... 35
    6.1     Soft Wind Down ................................................................................................ 35
    6.2     Dissolution of Partnership ................................................................................ 36
    6.3     Liquidation of Assets ........................................................................................ 36

Article VII ACCOUNTING AND VALUATION; BOOKS AND RECORDS ............................ 37
    7.1     Accounting and Reports ................................................................................... 37
    7.2     Valuation of Partnership Assets and Interests ................................................. 38
    7.3     Determinations by the General Partner ............................................................ 38
    7.4     Books and Records ........................................................................................... 39
    7.5     Confidentiality ................................................................................................. 39

Article VIII GENERAL PROVISIONS ...................................................................................... 41
    8.1     Amendment of Partnership Agreement ............................................................ 41
    8.2     Special Power-of-Attorney .............................................................................. 43
    8.3     Notices ............................................................................................................. 44
    8.4     Agreement Binding Upon Successors and Assigns; Delegation ...................... 44
    8.5     Governing Law ................................................................................................ 44
    8.6     Not for Benefit of Creditors ............................................................................ 45
    8.7     Dispute Resolution .......................................................................................... 45
    8.8     Consents and Voting ........................................................................................ 47
    8.9     Merger and Consolidation ................................................................................ 48
    8.10    Miscellaneous .................................................................................................. 48
    8.11    BHCA Subject Persons .................................................................................... 48
    8.12    RIC Limited Partners ....................................................................................... 49
    8.13    Bad Actor Limited Partners ............................................................................. 50
    8.14    Entire Agreement ............................................................................................. 50

THIS FOURTH AMENDED AND RESTATED LIMITED PARTNERSHIP AGREEMENT of Highland Multi Strategy Credit Fund, L.P., dated effective as of November 1, 2014, is by and among Highland Multi Strategy Credit Fund GP, L.P., as General Partner, and certain Persons who were admitted as Limited Partners in accordance with the Prior Agreement and those Persons who are hereafter admitted as additional Limited Partners in accordance with this Agreement.   Capitalized terms have the meanings set forth in Article I below.

## PRELIMINARY STATEMENTS

(A)     The General Partner and certain of the Limited Partners have heretofore formed a limited partnership pursuant to the Act (as defined herein) by filing a Certificate of Limited Partnership with the office of the Secretary of State of the State of Delaware on December 1, 2005, and previously entered into a Limited Partnership Agreement, dated effective as of December 1, 2005, as last amended and restated by the Third Amended and Restated Limited Partnership Agreement dated as of December 31, 2007 (the "*Prior Agreement*").

(B)     The General Partner filed an amendment to the Certificate of Limited Partnership of the Fund on August 26, 2014, changing the name of the Fund to "Highland Multi Strategy Credit Fund, L.P."

(C)     The parties hereto desire to continue the Partnership as a limited partnership under the Act and to make certain modifications to the Prior Agreement, as hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants expressed herein and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto hereby agree that the Prior Agreement is amended and restated in its entirety to read as follows:

## Article I
## DEFINITIONS

For purposes of this Agreement:

"*Act*" means the Delaware Revised Uniform Limited Partnership Act, 6 Del. C. §§ 17-101, et seq., as in effect on the date hereof and as amended from time to time, or any successor law.

"*Accounting Period*" means each period that starts on the day immediately following the last day of the preceding Accounting Period, and that ends on the earliest of the following dates:

(a)     the last day of a calendar month;

(b)     any date as of which any withdrawal or distribution of capital is made with respect to any Capital Account or as of which this Agreement provides for any amount to be credited to or debited against a Capital Account, other than a withdrawal or distribution by or to, or an allocation to, all Capital Accounts that does not result in any change of the Partnership Percentage relating to any Capital Account;

1

(c)     the date which immediately precedes any day as of which a capital contribution is accepted by the General Partner from any new or existing Partner; or

(d)     any other date which the General Partner selects.

"*Advisers Act*" means the U.S. Investment Advisers Act of 1940, as amended, and the rules promulgated thereunder.

"*Advisory Committee*" has the meaning set forth in Section 4.6.

"*Affiliate*" means, with respect to any Person, a Person which controls, is controlled by, or is under common control with, such Person.  For these purposes, "control" (including "controlled by" and "under common control") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"*Affiliated Investor*" means any Limited Partner that is an Affiliate of the General Partner or the Investment Manager, including their respective employees, members or partners and their respective immediate family members.

"*Agreement*" means this Fourth Amended and Restated Limited Partnership Agreement of the Partnership, as amended from time to time.

"*Alternative Investment Vehicle*" has the meaning set forth in Section 4.7.

"*Arbitration Rules*" has the meaning set forth in Section8.7(b)(i).

"*Authorized Representative*" has the meaning set forth in Section 7.5(a).

"*Bad Actor Limited Partner*" means a Limited Partner that (i) would cause the disqualification of the Partnership from using Rule 506 under the Securities Act due to the operation of paragraph (d) thereof (or its successor) if such Limited Partner were to beneficially own 20% or more of the outstanding voting interest of all of the Partners (excluding any other Interests that are Non-Voting Interests) or (ii) the General Partner determines is likely to become subject to a conviction, order, judgment, finding or that would be likely to cause the disqualification described in clause (i).

"*BHCA*" means the U.S. Bank Holding Company Act of 1956, as amended.

"*BHCA Subject Person*" means any Limited Partner that is subject, directly or indirectly, to the provisions of Section 4 of the BHCA and the regulations of the Board of Governors of the Federal Reserve System promulgated thereunder.

"*Business Day*" means any day other than (a) Saturday and Sunday and (b) any other day on which banks located in New York, New York are required or authorized by law to be closed.

"*Calculation Period*" means, with respect to each Capital Account, the period commencing as of the date of the establishment of the Capital Account (in the case of the initial Calculation

Period) and thereafter each period commencing as of the day following the last day of the preceding Calculation Period with respect to such Capital Account, and ending as of the close of business on the first to occur of the following:

  (a) the last day of a calendar year;

  (b) the withdrawal of all or a portion of the Interest attributable to such Capital Account (but only with respect to such withdrawn amount);

  (c) the permitted Transfer of all or any portion of such Limited Partner's Interest; or

  (d) the final distribution to such Limited Partner following the dissolution of the Partnership.

"***Capital Account***" means, with respect to each Partner, the capital account established and maintained on behalf of such Partner as described in Section 3.3.

"***Carryforward Account***" means a memorandum account to be recorded in the books and records of the Partnership with respect to each Capital Account that has an initial balance of zero and that is adjusted as follows:

  (a) As of the first day after the close of each Calculation Period for such Capital Account, the balance of the Carryforward Account is (i) increased by the amount, if any, of such the Negative Performance Change with respect to such Capital Account for such Calculation Period and (ii) reduced (but not below zero) by the amount, if any, of the Positive Performance Change with respect to such Capital Account for such Calculation Period.

  (b) As of the close of the Calculation Period, any positive balance of the Carryforward Account is further adjusted if such Capital Account has been reduced during such Calculation Period as a result of a distribution or withdrawal, by reducing such positive balance (but not below zero) by an amount determined by multiplying (i) such positive balance by (ii) a fraction, of which (A) the numerator is equal to the amount so distributed or withdrawn, and (B) the denominator is equal to the balance of such Capital Account immediately before giving effect to such distribution or withdrawal.

The Carryforward Account attributable to each Series A Capital Account shall be reset to zero on the Effective Date. For the avoidance of doubt, any gains or losses allocated by the Partnership to any Capital Account of a Limited Partner prior to the Effective Date will be inapplicable in the calculation of the Carryforward Account following the Effective Date.

"***Certificate***" means the Certificate of Limited Partnership of the Partnership referred to in Section 2.1(b).

"***Code***" means the U.S. Internal Revenue Code of 1986, as amended, and as hereafter amended, or any successor law.

"***Dispute***" has the meaning set forth in Section 8.7.

"***Effective Date***" means the date set forth above as the effective date of this Agreement.

"***Election Notice***" has the meaning set forth in Section 8.11(c).

"***FAA***" has the meaning set forth in Section 8.7(b)(ii)

"***FATCA***" means Sections 1471 through 1474 of the Code, as amended, and any Regulations thereunder or official interpretations thereof, including any successor Regulations or interpretations, and any intergovernmental agreement implementing the foregoing.

"***FINRA***" means the Financial Industry Regulatory Authority, Inc.

"***Fiscal Year***" means each period commencing on January 1 of each year and ending on December 31 of such year, unless the General Partner elects another fiscal year; provided that any such other fiscal year is permissible for U.S. federal income tax purposes. In the case of the Fiscal Year in which the Partnership is terminated in accordance with Article VI, "***Fiscal Year***" means the portion of the calendar year ending on the date on which the Partnership is terminated.

"***GAAP***" means generally accepted accounting principles in the United States, as amended.

"***General Partner***" means Highland Multi Strategy Credit Fund GP, L.P., a Delaware limited partnership, any successor thereto, and any Person hereafter admitted as an additional general partner, in its capacity as general partner of the Partnership.

"***Indemnified Person***" has the meaning set forth in Section 4.5(a).

"***Interest***" means the entire ownership interest of a Partner in the Partnership at the relevant time, including the right of such Partner to any and all benefits to which a Partner may be entitled as provided in this Agreement, together with the obligations of such Partner to comply with all the terms and provisions of this Agreement.

"***Investment Company Act***" means the U.S. Investment Company Act of 1940, as amended, and the regulations promulgated thereunder.

"***Investment Management Agreement***" means the investment management agreement between the Investment Manager, the General Partner, the Offshore Fund and the Partnership.

"***Investment Manager***" means Highland Capital Management, L.P., a Delaware limited partnership, or any successor thereto, or any Person thereafter appointed as an investment manager of the Partnership in accordance with the Investment Management Agreement.

"***Investments***" means investment in securities, assets and other financial or intangible investment instruments, contracts or products made as described in the Partnership's offering memorandum.

"**Limited Partners**" means any Person who is a limited partner of the Partnership (which, except as otherwise indicated, will include a substituted Limited Partner) at the time of reference thereto, in such Person's capacity as a limited partner of the Partnership. For all purposes of the Act, the Limited Partners of the Partnership will constitute a single class or group of limited partners.

"**Majority-in-Interest of Limited Partners**" means Limited Partners whose Partnership Percentages represent more than 50% of the aggregate Partnership Percentages of all Limited Partners.

"**Management Fee**" means, with respect to each Capital Account, an amount equal to one fourth of (i) 1.5% of each Series A Capital Account balance; (ii) 1.5% of each Series B Capital Account balance; (iii) 1.0% of each Series C Capital Account balance; and (iv) 2.0% of each Series D Capital Account balance, which amounts are calculated on the first Business Day of each calendar quarter. Management Fees shall be appropriately adjusted for contributions during any partial quarter.

"**Negative Basis**" means, with respect to any Partner and as of any time of calculation, the excess of such Partner's "adjusted tax basis" in its Interest for U.S. federal income tax purposes at such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any Transfer of such Interest) over the amount that such Partner is entitled to receive upon withdrawal from or liquidation of the Partnership.

"**Negative Basis Partner**" means any Partner who withdraws from the Partnership and who has a Negative Basis as of the Withdrawal Date, but such Partner shall cease to be a Negative Basis Partner at such time as it has received allocations pursuant to Section 3.11(d) equal to such Partner's Negative Basis as of the Withdrawal Date and without regard to such Partner's share of the liabilities of the Partnership under Section 752 of the Code.

"**Net Assets**" means the total value, as determined by the General Partner or its delegate(s) in accordance with Section 7.2, of all Investments and other assets of the Partnership (including net unrealized appreciation or depreciation of the assets and accrued interest and dividends receivable net of any withholding taxes), less an amount equal to all accrued debts, liabilities and obligations of the Partnership (including any reserves for contingencies accrued pursuant to Section 3.6,). Except as otherwise expressly provided herein, Net Assets as of the first day of any Accounting Period are determined on the basis of the valuation of assets conducted as of the close of the immediately preceding Accounting Period, but after giving effect to any capital contributions made by any Partner subsequent to the last day of such immediately preceding Accounting Period, and after giving effect to Management Fee charges, and Net Assets as of the last day of any Accounting Period are determined before giving effect to any of the following amounts payable by the Partnership generally or in respect of any Investment which are effective as of the date on which such determination is made:

        (a)    any Performance Allocation as of the date on which such determination is made;

(b)    any withdrawals or distributions payable to any Partner which are effective as of the date on which such determination is made; and

(c)    withholding or other taxes, expenses of processing withdrawals and other items payable, any increases or decreases in any reserves, holdbacks or other amounts recorded pursuant to Section 3.6 and any increases or decreases in the value of any Restricted New Issues pursuant to Section 3.8(b) and other amounts specially allocated pursuant to Section 3.8 during the Accounting Period ending as of the date on which such determination is made, to the extent the General Partner determines that, pursuant to any provisions of this Agreement, such items are not to be charged ratably among the Capital Accounts of all Partners on the basis of their respective Partnership Percentages as of the commencement of the Accounting Period.

"*Net Loss*" means any amount by which the Net Assets as of the first day of an Accounting Period exceed the Net Assets as of the last day of the same Accounting Period.

"*Net Profit*" means any amount by which the Net Assets as of the last day of an Accounting Period exceed the Net Assets as of the first day of the same Accounting Period.

"*New Issue Rules*" has the meaning set forth in Section 3.8(b).

"*Nonrecourse Deductions*" has the meaning set forth in Regulations Section 1.704-2(b)(1) and (c).

"*Non-Voting Interest*" means an Interest, the holder of which is not entitled to vote, consent or withhold consent with respect to any Partnership matter (including but not limited to mergers, sales of substantially all assets or consolidations of the Partnership), except as otherwise expressly provided in this Agreement.

"*Offshore Fund*" means Highland Multi Strategy Credit Fund, Ltd., a Cayman Islands exempted company and a Limited Partner of the Partnership.

"*Orderly Realization*" has the meaning set forth in Section 6.1.

"*Other Account*" means any assets or investments of the General Partner, or any assets managed by the General Partner or any Affiliate of the General Partner for the account of any Person or entity (including investment vehicles) other than the Partnership, which are invested or which are available for investment in securities or other instruments or for trading activities whether or not of the specific type being conducted by the Partnership.

"*Partner*" means the General Partner or any of the Limited Partners, except as otherwise expressly provided herein, and "*Partners*" means the General Partner and all of the Limited Partners.

"*Partnership*" means the limited partnership governed by this Agreement.

"*Partnership Minimum Gain*" has the meaning set forth in Regulations Section 1.704-2(b)(2) and (d).

"***Partnership Percentage***" means a percentage established for each Capital Account on the Partnership's books as of the first day of each Accounting Period. The Partnership Percentage of a Capital Account for an Accounting Period is determined by dividing the amount of such Capital Account as of the beginning of the Accounting Period by the sum of the Capital Accounts of all of the Partners as of the beginning of the Accounting Period. The numerator and denominator of the above shall be calculated after crediting all capital contributions to the Capital Account or Partnership, as appropriate, which are effective as of such date, net of all deductions, including Management Fees. The sum of the Partnership Percentages of all Capital Accounts for each Accounting Period shall equal 100%.

"***Performance Allocation***" means, for each Capital Account of a Limited Partner, 20% of the amount by which (a) the Positive Performance Change for such Calculation Period for such Capital Account, if any, exceeds (b) any positive balance in the Carryforward Account for such Capital Account as of the most recent prior date as of which any adjustment has been made thereto.

"***Performance Change***" means, with respect to each Capital Account of a Limited Partner for each Calculation Period, the difference between:

       (a)     the sum of (i) the balance of such Capital Account as of the close of the Calculation Period (after giving effect to Management Fees and all allocations to be made to such Capital Account as of such date, including such Capital Account's allocable share of any profits or losses pursuant to Section 3.8 and any credits or debits of any applicable carrying charge associated therewith other than any Performance Allocation to be debited against such Capital Account), plus (ii) any debits to such Capital Account during the Calculation Period to reflect any actual or deemed distributions or withdrawals with respect to such Capital Account, plus (iii) any debits to such Capital Account during the Calculation Period to reflect any items allocable to such Capital Account pursuant to Section 3.5(b) or (c); and

       (b)     the balance of such Capital Account as of the commencement of the Calculation Period.

If the amount specified in clause (a) exceeds the amount specified in clause (b) such difference is a "***Positive Performance Change***," and if the amount specified in clause (b) exceeds the amount specified in clause (a), such difference is a "***Negative Performance Change***."

The Performance Change will be computed separately for each Capital Account (and thus each separately maintained capital sub-account created to reflect an additional contribution to a Capital Account). Thus, if a Limited Partner has multiple Capital Accounts, the Performance Change will be calculated separately for each Capital Account and the resulting "Positive Performance Change" and "Negative Performance Change" shall be separately allocated to each such Capital Account and shall not be netted against each other.

"***Person***" means any individual, partnership, corporation, limited liability company, trust or other entity or any government (including a governmental agency or political subdivision thereof).

7

"*Positive Basis*" means, with respect to any Partner and as of any time of calculation, the excess of the amount that such Partner is entitled to receive upon withdrawal from or liquidation of the Partnership over such Partner's "adjusted tax basis" in its Interest for U.S. federal income tax purposes at such time (determined without regard to any adjustments made to such adjusted tax basis by reason of any Transfer of such Interest).

"*Positive Basis Partner*" means any Partner who withdraws from the Partnership and who has a Positive Basis as of the Withdrawal Date, but such Partner ceases to be a Positive Basis Partner at such time as it has received allocations pursuant to Section 3.11(c) equal to such Partner's Positive Basis as of the Withdrawal Date and without regard to such Partner's share of the liabilities of the Partnership under Section 752 of the Code.

"*Prior Agreement*" has the meaning set forth in the Preliminary Statements to this Agreement.

"*Realization Period*" has the meaning set forth in Section 6.1.

"*Recent Amendments*" means the changes to the terms of an investment in the Partnership as contemplated in this Agreement and the constituent documents related thereto, including, but not limited to, the re-designation of all Interests held by Limited Partners on the Effective Date as Series A Interests.

"*Regulations*" means the proposed, temporary and final U.S. Treasury Regulations promulgated under the Code, including any successor regulations.

"*Regulatory Allocations*" has the meaning set forth in Section 3.10(d).

"*Restricted Capital Accounts*" has the meaning set forth in Section 3.8(b).

"*Restricted Issues*" has the meaning set forth in Section 3.8(b).

"*Revocation Notice*" has the meaning set forth in Section 8.11(c).

"*RIC Limited Partner*" means a Limited Partner that is registered as an investment company under the Investment Company Act.

"*Schedule of Partners*" means a schedule to be maintained by the General Partner containing the following information with respect to each Partner: (a) name; (b) address; (c) date of admission; (d) amount and date of all capital contributions and withdrawals; and (e) the amount and date of any permitted Transfers.

"*Series*" means a designated series of Interests established in accordance with this Agreement and having such terms as the General Partner determines.

"*Series A Capital Account*" means the Capital Account attributable to a Limited Partner's Series A Interest.

"***Series A Interests***" means a Series of Interests having the rights and obligations applicable to Series A Interests as set forth in this Agreement.

"***Series A Lock-Up***" has the meaning set forth in Section 5.5(c)(i).

"***Series A Withdrawal Date***" has the meaning set forth in Section 5.5(c)(i).

"***Series B Capital Account***" means the Capital Account attributable to a Limited Partner's Series B Interest.

"***Series B Interests***" means a Series of Interests having the rights and obligations applicable to Series B Interests as set forth in this Agreement.

"***Series B Withdrawal Date***" has the meaning set forth in Section 5.5(c)(ii).

"***Series C Capital Account***" means the Capital Account attributable to a Limited Partner's Series C Interest.

"***Series C Interests***" means a Series of Interests having the rights and obligations applicable to Series C Interests as set forth in this Agreement.

"***Series C Withdrawal Date***" has the meaning set forth in Section 5.5(c)(iii).

"***Series D Capital Account***" means the Capital Account attributable to a Limited Partner's Series D Interest.

"***Series D Interests***" means a Series of Interests having the rights and obligations applicable to Series D Interests as set forth in this Agreement.

"***Series D Withdrawal Date***" has the meaning set forth in Section 5.5(c)(iv).

"***Sub-Series of Shares***" refers to sub-series of the shares of the Offshore Fund, as created from time to time, for purposes of accounting for any profits and losses attributable to each individual shareholder and of permitting the Performance Allocation to be calculated separately with respect to each shareholder to reflect different returns achieved as a result of subscriptions received from shareholders at different times.

"***Suspension***" has the meaning set forth in Section 5.5(l).

"***Super-Majority-in-Interest of Limited Partners***" means Limited Partners whose Partnership Percentages represent more than 75% of the aggregate Partnership Percentages of all Limited Partners.

"***Transfer***" means any direct, indirect or synthetic sale, exchange, transfer, assignment, pledge, encumbrance, charge, exchange, hypothecation, placing of a lien or a security interest on an Interest or any other disposition by a Partner of its Interest to or in favor of another party, whether voluntary or involuntary (including, but not limited to, being offered or listed on or through any placement agent, intermediary, online service, site, agent or similar Person).

9

"*Withdrawal Date*" means, as applicable, the Series A Withdrawal Date, the Series B Withdrawal Date, the Series C Withdrawal Date, and the Series D Withdrawal Date or any other effective date of withdrawal pursuant to Section 5.5.

## Article II
## ORGANIZATION

**2.1    Continuation of Limited Partnership**

(a)     The General Partner and the Limited Partners hereby agree to continue the Partnership as a limited partnership under and pursuant to the Act and this Agreement.

(b)     The General Partner has executed and filed with the Secretary of State of the State of Delaware a Certificate, and shall execute, acknowledge and file with the Secretary any amendments thereto as may be required by the Act, and any other instruments, documents and certificates which, in the opinion of the Partnership's legal counsel, may from time to time be required by the laws of the United States of America, the State of Delaware or any other jurisdiction in which the Partnership determines to do business, or any political subdivision or agency thereof, or which such legal counsel may deem necessary or appropriate to effectuate, implement and continue the valid and subsisting existence and business of the Partnership.  The General Partner shall cause any required amendment to the Certificate to be filed promptly following the event requiring such amendment.  All amendments may be signed by the General Partner (as required by the Act) and may be signed either personally or by an attorney-in-fact.

(c)     The parties hereto agree to operate the Partnership as a limited partnership pursuant to the provisions of the Act and of this Agreement and agree that the rights and liabilities of the Limited Partners and the General Partner are as provided in the Act, for limited partners and the general partner except as provided herein.

(d)     The parties hereto acknowledge and agree that the Partnership shall be classified as a "partnership" and not as an association taxable as a corporation for U.S. federal income tax purposes.  No election may be made by the Partners or the Partnership to treat the Partnership as other than a "partnership" for U.S. federal, state and/or local income tax purposes and, to the extent necessary, the Partners or Partnership shall make any election to treat the Partnership as a "partnership."  The Partners shall treat the Partnership consistently with its status as a "partnership" for U.S. federal income tax purposes and agree to undertake any further action which is necessary to treat the Partnership as such, and shall not undertake any action that is inconsistent with the Partnership's status as a "partnership" for U.S. federal, state and/or local income tax purposes.

(e)     The General Partner may change the domicile of the Partnership to another state, country or other jurisdiction where advisable due to legal, tax or other

10

considerations; <u>provided</u> that no such change of domicile would reasonably be expected to have a material adverse effect on the Limited Partners.

**2.2    Name of Partnership**

(a)    The name of the Partnership is Highland Multi Strategy Credit Fund, L.P. or such other name as the General Partner may hereafter adopt, subject to causing an amendment to the Certificate to be filed with the Secretary of State of the State of Delaware in accordance with the Act.   The General Partner shall send a notice of any change of name to the Limited Partners.   All business of the Partnership shall be conducted under such name or under such other name as the General Partner deems appropriate.

(b)    The Partnership shall have the exclusive ownership and right to use the Partnership name so long as the Partnership continues, despite the withdrawal, expulsion, resignation or removal of any Limited Partner, but upon the Partnership's termination or at such time as there ceases to be a general partner, the Partnership shall assign the name and the goodwill attached thereto to the General Partner without payment by the assignee(s) of any consideration therefor.

**2.3    Principal Office; Registered Office**

(a)    The Partnership's principal office shall be at such location as the General Partner may designate from time to time.

(b)    The Partnership's registered office in the State of Delaware is at 1209 Orange Street, County of New Castle, Wilmington, Delaware 19801, and the registered agent of the Partnership in the State of Delaware is The Corporation Trust Company, unless a different registered office or agent is designated from time to time by the General Partner.

**2.4    Term of Partnership**

The term of the Partnership commenced on the date on which the Certificate was filed with the Secretary of State of the State of Delaware and continues until the Partnership is dissolved pursuant to Section 6.1 (unless its term is extended pursuant to Section 6.1).   The legal existence of the Partnership as a separate legal entity continues until the cancellation of the Certificate.

**2.5    Object and Powers of Partnership**

(a)    The object and business of the Partnership is (i) to purchase, sell (including short sales), invest and trade in Investments, (ii) to engage in financial transactions, including borrowing, financing, pledging, hedging and other derivative transactions relating thereto for the benefit of the Partnership, (iii) to engage in any lawful act or activity of which limited partnerships may be formed under the Act and (iv) to engage in any and all activities necessary or incidental to the foregoing.

(b)     The Partnership possesses and may exercise all such powers and privileges as the General Partner considers necessary, convenient or incidental to the conduct, promotion or attainment of the object of the Partnership.

## 2.6     Liability of Partners

In no event shall any Limited Partner (or former Limited Partner) be obligated to make any contribution to the Partnership in addition to its agreed capital contribution (or other payments provided for herein) or have any liability for the repayment or discharge of the debts and obligations of the Partnership except to the extent provided herein or as required by the Act.

## 2.7     Actions by Partnership

The Partnership may execute, deliver and perform all contracts, agreements and other undertakings and engage in all activities and transactions as may in the opinion of the General Partner be necessary or advisable to carry out its objects.

## 2.8     Reliance by Third Parties

Persons dealing with the Partnership are entitled to rely conclusively upon the power and authority of the General Partner as herein set forth.

## 2.9     UCC Status of Limited Partner Interests

(a)     For purposes of the grant, pledge, attachment or perfection of a security interest in an Interest or otherwise, the Interests are deemed to be "securities" within the meaning of Section 8-102(a)(15) and as provided by Section 8-103(c) of the Uniform Commercial Code as in effect from time to time in the State of Delaware or analogous provisions in the Uniform Commercial Code in effect in any other jurisdiction.

(b)     Any Interest may be evidenced by a certificate of partnership interest issued by the Partnership in such form as the General Partner may approve. Every certificate representing an Interest shall bear a legend substantially in the following form:

"For the purposes of Section 8-103 of the Uniform Commercial Code of the United States of America in effect in any relevant jurisdiction, the certificates representing an interest in the Limited Partnership constitute "securities" within the meaning of Section 8-102 and Section 8-103 of the Uniform Commercial Code."

## 2.10    Series of Interests

(a)     The General Partner, at any time, may without notification to or consent of the other Limited Partners, create and offer different Series of Interests in the Partnership with such rights, obligations, liabilities, privileges, designations and preferences (including different investment strategies, underlying investments, degrees of leverage, Management Fees, Performance Allocations, brokerage commissions, transparency, withdrawal rights, co-investment opportunities, and other

12

differences) as the General Partner may determine upon the issuance of such Series; <u>provided</u> that such Series would not reasonably be expected to have a material adverse effect on the existing Limited Partners. The terms and rights of such Series may be set forth in a supplement to the Partnership's offering memorandum or a "side letter" or other agreement, which the General Partner may incorporate by reference.

(b)    All Interests in the Partnership held by Limited Partners (including Affiliated Investors) as of the Effective Date are hereby designated as Series A Interests.

**Article III
CAPITAL**

**3.1    Contributions to Capital**

(a)    The minimum required initial capital contribution of each Limited Partner is the amount determined by the General Partner. The General Partner may change the required minimum initial contribution amount at any time with respect to any, all or less than all Limited Partners.

(b)    The Partnership may accept additional contributions at such times as the General Partner may permit, but no Limited Partner shall be obligated to make any additional capital contribution to the Partnership, subject to the provisions of Section 3.5(b) and any contrary provision of the Act. The minimum required additional capital contribution of any existing Limited Partner to the Partnership shall be the amount the General Partner may determine. The General Partner may change the required minimum additional contribution amount at any time with respect to any, all or less than all Limited Partners.

(c)    The General Partner or an Affiliate has made a capital contribution to the Partnership as set forth in the Schedule of Partners. Except as required by the Act, the General Partner is not required to make any additional capital contributions to the Partnership. The General Partner may, however, make capital contributions to the Partnership in such amounts and at such times as it may determine. The General Partner or any of its Affiliates have the right at any time to make additional capital contributions as a Limited Partner or General Partner. If the General Partner or any of its Affiliates (including their associated Persons, such as officers, directors, partners, members or employees or any of their family members) makes a capital contribution as a Limited Partner, the General Partner or the Investment Manager shall have authority to waive the Management Fee and/or Performance Allocation with respect to such Limited Partner.

(d)    Except as otherwise permitted by the General Partner (i) initial or additional capital contributions by each Partner shall be paid in one installment with cash and/or Investments having an aggregate value as set forth in the Partnership's books and records, and (ii) initial contributions are due as of the date of admission of such Person as a Limited Partner of the Partnership. Whether Investments may be

accepted as a contribution to the capital of the Partnership is determined by the General Partner.

## 3.2 Rights of Partners in Capital

(a) No Partner shall be entitled to interest on its capital contributions to the Partnership. For the avoidance of doubt, interest income, if any, earned on subscription amounts remitted to the Partnership prior to the date that an Interest is issued to a Partner shall be payable to the Partnership and not applied toward the purchase of an Interest.

(b) No Partner shall have the right to the return of any capital contribution to the Partnership except (i) upon withdrawal of such Partner pursuant to Section 5.5 or (ii) upon the dissolution of the Partnership pursuant to Section 6.1. The entitlement to any such return is limited to the value of the Capital Account(s) of the Partner. The General Partner shall not be liable for the return of any such amounts.

## 3.3 Capital Accounts

(a) The Partnership shall maintain a separate Capital Account for each Partner. In the event a Limited Partner invests in more than one Series of Interests, the Partnership will maintain a separate Capital Account with respect to each Series of Interests held by such Limited Partner, with each such Capital Account being treated as if it were the Capital Account of a separate Partner for purposes of computing the Performance Allocation, the Management Fee and the withdrawal rights attributable to the Series.

(b) The General Partner may, in its discretion, maintain a separate sub-account for such purposes as the General Partner may determine appropriate, including for recordkeeping, accounting or reporting or to otherwise give effect to the provisions of this Agreement. Each Capital Account shall reflect the aggregate sum of the balances in such Partner's Capital Account.

(c) If a Partner makes an additional capital contribution to an existing Capital Account, the Capital Account will be sub-divided into separate capital sub-accounts attributable to each separate capital contribution, with each capital sub-account treated as if it were the Capital Account of a separate Partner for purposes of determining the Management Fee, the Performance Allocation and withdrawal rights and restrictions applicable to each capital sub-account. References herein to a Partner's "Capital Account" include any such separately maintained capital sub-accounts.

(d) The Partnership will issue to the Offshore Fund an Interest and maintain capital sub-accounts that correspond to each Sub-Series of Shares and each capital sub-account is treated separately for determining Management Fees, the Performance Allocations and withdrawal rights.

14

(e)     Each Capital Account has an initial balance equal to the amount of any cash and the net value of any property constituting the relevant Partner's initial capital contribution to such Capital Account.

(f)     Each Capital Account shall be increased by such Capital Account's allocable share of the Net Profits allocated by the Partnership to such Capital Account pursuant to Section 3.4.

(g)     Each Capital Account shall be reduced by (i) the amount of any cash and the net value of any property withdrawn by or distributed to the relevant Partner pursuant to Sections 5.5 or 6.3, including any amount deducted from any such withdrawal or distribution pursuant to Section 5.5(h), (ii) such Capital Account's allocable share of the Net Losses allocated by the Partnership to such Capital Account pursuant to Section 3.4, (iii) such Capital Account's *pro rata* portion of the expenses allocable (or specially allocable) by the Partnership pursuant to Section 3.5, (iv) such Capital Account's allocable share of the Performance Allocation allocable pursuant to Section 3.7, and (v) such Capital Account's *pro rata* portion of the expenses payable by the Partnership pursuant to Section 4.2(b).

(h)     The Capital Account of the Investment Manager, as a special Limited Partner of the Partnership, shall be increased by the amount of the Performance Allocation allocated to such Capital Account and the investment gains therein.

(i)     Each Capital Account shall also be adjusted to reflect all other allocations and other changes in the value of such Capital Account not otherwise described in this Section 3.3 in the manner specified in the remaining provisions of this Article III.

## 3.4     Allocations of Net Profit and Net Loss

Subject to Sections 3.5 through 3.10, as of the last day of each Accounting Period, any Net Profit or Net Loss of such Accounting Period shall be separately allocated among and credited to or debited against the Capital Accounts of the Partners in proportion to their respective Partnership Percentages for such Accounting Period.

## 3.5     Allocation of Management Fees, Withholding Taxes and Certain Other Expenditures

(a)     As of the first Business Day of each calendar quarter, each Capital Account's Management Fee for such calendar quarter shall be debited against such Capital Account and paid by the Partnership to the Investment Manager.  Capital contributions accepted after the commencement of the calendar quarter shall be subject to a prorated Management Fee reflecting the time remaining during that quarter.  The Investment Manager may reduce or eliminate the Management Fee with respect to any Partner (or Capital Account) in its sole discretion; provided that such reduction or elimination shall not increase the Management Fee payable by any other Partner (or Capital Account).

(b)     To the extent the General Partner or the Partnership is required by law (including under circumstances where the General Partner or the Partnership is unable to rely

conclusively on any withholding certification provided by a Partner) to withhold or to make tax payments on behalf of or with respect to any Partner or Partners (including backup withholding or withholding under FATCA), the General Partner or the Partnership may withhold such amounts and make such tax payments as so required. If the Partnership pays or incurs any withholding tax or other tax obligation (including under FATCA) with respect to the income allocable or distributable to one or more Partners, then the amount of such withholding tax or tax obligation shall be treated as a distribution to such Partner or Partners, as applicable, pursuant to the terms of this Agreement. Such amount shall be debited against the Capital Account(s) of such Partner or Partners as of the close of the Accounting Period during which the Partnership so withholds, pays or incurs such obligation. If the amount so withheld, paid or incurred is greater than the balance of the Capital Account(s) of the relevant Partner or Partners, as applicable, then such Partner or Partners and any successors shall make a contribution to the capital of the Partnership, within 10 days following request by the General Partner, the amount of such excess. The General Partner is not obligated to apply for or obtain a reduction of or exemption from withholding tax on behalf of any Partner that may be eligible for such reduction or exemption, or be otherwise obligated to structure Investments so as to reduce or avoid any such withholding tax.

(c)     Except as otherwise provided for in this Agreement, any expenditures payable by the Partnership, to the extent determined by the General Partner to have been paid or withheld on behalf of, or by reason of particular circumstances applicable to, one or more but fewer than all of the Partners, shall be specially allocated only to the Capital Accounts of those Partners on whose behalf such payments are made or whose particular circumstances gave rise to such payments. Such allocations shall be debited from the relevant Capital Accounts of such Partners as of the close of the Accounting Period during which any such items were accrued by the Partnership.

**3.6     Reserves; Adjustments for Certain Future Events**

(a)     The General Partner may cause appropriate reserves to be created, accrued and charged against Net Assets and proportionately against the Capital Accounts for contingent liabilities or probable losses, such reserves to be in the amounts which the General Partner deems necessary or appropriate. The General Partner may increase or reduce any such reserve from time to time by such amounts as the General Partner deems necessary or appropriate. The amount of any such reserve, or any increase or decrease therein, may, at the election of the General Partner, be debited or credited, as the General Partner deems appropriate, to the Capital Accounts of current Partners that (i) are Partners at the time when such reserve is created, increased, or decreased, as the case may be, or (ii) were Partners, or are transferees from Persons who were Partners, at the time of the act or omission giving rise to the contingent liability for which the reserve has been established by the General Partner.

16

(b)     If the General Partner determines that it is equitable to treat an amount to be paid or received as being applicable to one or more prior periods, then all or a portion of such amount may be proportionately debited or credited, as appropriate, in proportion to the Capital Account balances of the current Partners as such balances existed during any such prior period.

**3.7     Performance Allocation**

(a)     The Performance Allocation shall be debited against each Capital Account of each Limited Partner as of the last day of each Calculation Period with respect to such Capital Account, and the amount so debited shall simultaneously be credited to the Capital Account of the Investment Manager, as a special Limited Partner of the Partnership.

(b)     The Investment Manager may waive or alter the Performance Allocation with respect to any Limited Partner.

**3.8     Limited Participation Investments and New Issues**

(a)     If the General Partner determines that for legal, tax, regulatory or bona fide other reasons as to which the General Partner and any Partner may agree such Partner should not participate (or should receive a reduced participation) in the Net Profit or Net Loss with respect to any Investment, the General Partner may allocate Net Profit or Net Loss, if any, with respect to such Investment only to Partners to whom the restrictions on participating in that Investment do not apply. In order to allocate Net Profit or Net Loss accordingly, the General Partner may establish and maintain a memorandum account in the accounting records of the Partnership on a Partner-by-Partner basis with respect to each such Investment. The Net Profit and Net Loss and expenses relating to such Investment will be separately calculated and allocated based on each participating Partner's balance in such memorandum account for such Investment divided by the sum of the balances of all memorandum accounts for all participating Partners. In order to compensate a Limited Partner who is not participating in an Investment pursuant to this Section 3.8 for the use of such Partner's share of Partnership capital to purchase the Investment, the General Partner may credit the non-participating Partner's Capital Account (and correspondingly debit the Capital Account of the participating Partners with a carrying charge). Any distributions from the memorandum account will be based on the participating Partner's respective percentage interest in such Investment.

(b)     Pursuant to certain rules of FINRA ("***New Issue Rules***"), members of FINRA are permitted to sell to the Partnership certain publicly-offered securities ("***Restricted Issues***") only if the Capital Accounts of Partners connected with the securities industry or executive officers or directors of investment banking clients of underwriters ("***Restricted Capital Accounts***") are not restricted from sharing a beneficial interest in such Restricted Issues in accordance with the provisions of the New Issue Rules. Notwithstanding the provisions of Section 3.4, if the Partnership chooses to invest in Restricted Issues, the Partnership shall not allocate any items

17

of income, gain, loss, deduction and credit that relate to investments in Restricted Issues to Restricted Capital Accounts except to the extent permitted by the New Issue Rules, and shall instead allocate such items among the other Capital Accounts on a *pro rata* basis. To the extent the New Issue Rules permit certain Persons with Restricted Capital Accounts to participate in profits and losses from Restricted Issues, the General Partner shall allocate such profits and losses from Restricted Issues among such Restricted Capital Accounts on a *pro rata* basis or on such other basis that the General Partner reasonably determines ensures compliance with the New Issue Rules. To the extent consistent with the New Issue Rules, the General Partner shall determine when all Capital Accounts may participate in the Net Profit and Net Loss from any Restricted Issue. The General Partner shall value any Restricted Issue at such time at the then-current price of the security in the secondary market.

**3.9      Allocation to Avoid Capital Account Deficits**

To the extent that any debits pursuant to this Article III would reduce the balance of the Capital Account of any Limited Partner below zero, that portion of any such debits shall instead be allocated to the Capital Account of the General Partner. Any credits in any subsequent Accounting Period which would otherwise be allocable pursuant to this Article III to a Capital Account of any Limited Partner previously affected by the application of this Section 3.9 shall instead be allocated to the Capital Account of the General Partner in such amounts as are necessary to offset all previous debits attributable to such Limited Partner pursuant to this Section 3.9 not previously recovered.

**3.10      Regulatory Allocations**

Notwithstanding anything to the contrary in this Agreement:

(a)      Qualified Income Offset.   In the event any Limited Partner unexpectedly receives any adjustments, allocations, or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Regulations, items of Partnership income and gain shall be specially allocated to each such Limited Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the deficit balance in the Capital Account of such Limited Partner as quickly as possible; provided that an allocation pursuant to this Section 3.10(a) may be made only if and to the extent that such Limited Partner would have a deficit balance in its Capital Account after all other allocations provided for in this Article III have been tentatively made as if this Section 3.10(a) were not in this Agreement. This Section 3.10(a) is intended to constitute a "qualified income offset" within the meaning of Section 1.704-1(b)(2)(ii) of the Regulations and is to be interpreted consistently therewith.

(b)      Minimum Gain Chargeback.   Notwithstanding any other provision of this Section 3.10, if there is a net decrease in Partnership Minimum Gain during any Fiscal Year, the Partners shall be specially allocated items of Partnership income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an

18

amount equal to the portion of any such Partner's share of the net decrease in Partnership Minimum Gain, determined in accordance with Regulations Sections 1.704-2(f) and (g). This Section 3.10(b) is intended to comply with the minimum gain chargeback requirement in such Sections of the Regulations and shall be interpreted consistently therewith.

(c)     <u>Gross Income Allocation</u>.   In the event any Limited Partner has a deficit Capital Account at the end of any Fiscal Year that is in excess of the sum of (i) the amount such Limited Partner is obligated to restore pursuant to any provision of this Agreement and (ii) the amount such Limited Partner is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations, each such Limited Partner shall be specially allocated items of Partnership gross income and gain in the amount of such excess as quickly as possible; <u>provided</u> that an allocation pursuant to this Section 3.10(c) may be made only if and to the extent that such Limited Partner would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article III have been made as if Section 3.10(a) and this Section 3.10(c) were not in this Agreement.

(d)     <u>Curative Allocations</u>.   The allocations set forth this Section 3.10 (the "***Regulatory Allocations***") are intended to comply with certain requirements of the Regulations. It is the intent of the Partners that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Partnership income, gain, loss, or deduction pursuant to this Section 3.10.   Therefore, notwithstanding any other provision of this Article III (other than the Regulatory Allocations), the General Partner shall make such offsetting special allocations of the Partnership income, gain, loss, or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Partner's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Partner would have had if the Regulatory Allocations were not part of this Partnership Agreement and all Partnership items were allocated pursuant to other provisions of this Article III (other than the Regulatory Allocations).

(e)     <u>Nonrecourse Deductions</u>.   Any Nonrecourse Deductions for any Fiscal Year or other period shall be allocated to the Partners in accordance with their Partnership Percentages.

(f)     <u>Section 704(b) Compliance</u>.   The allocations provided in this Section 3.10 are intended to comply with the Regulations under Section 704(b) of the Code and may, as determined by the General Partner, be interpreted and applied in a manner consistent therewith.

**3.11     Allocations for Income Tax Purposes**

(a)     <u>Income Tax Allocations</u>.   Except as otherwise required by Code Section 704(c), items of income, gain, deduction, loss, or credit that are recognized for U.S. federal

income tax purposes in each Fiscal Year shall be allocated among the Partners in such manner as to reflect equitably amounts credited to or debited against each Partner's Capital Account, whether in such Fiscal Year or in prior Fiscal Years. To this end, the Partnership shall establish and maintain records which shall show the extent to which the Capital Account of each Partner comprises amounts that have not been reflected in the taxable income of such Partner as of the last day of each Fiscal Year.   To the extent deemed by the General Partner to be feasible and equitable, taxable income and gains in each Fiscal Year shall be allocated among the Partners who have enjoyed the related credits to their Capital Accounts, and items of deduction, loss and credit in each Fiscal Year shall be allocated among the Partners who have borne the burden of the related debits to their Capital Accounts. Foreign tax credits attributable to taxes incurred by the Partnership shall be allocated in a manner consistent with Section 1.704-1(b)(4)(viii) of the Regulations. All matters concerning allocations for U.S. federal, state and/or local income tax purposes, including accounting procedures, not expressly provided for in this Agreement shall be determined by the General Partner.

(b)     Basis Adjustments.   To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Section 734(b) of the Code or Section 743(b) of the Code is required under Section 1.704-1(b)(2)(iv)(m) of the Regulations to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Section of the Regulations; provided that in the event that an adjustment to the book value of Partnership property is made as a result of an adjustment pursuant to Section 734(b) of the Code, items of income, gain, loss, or deduction, as computed for book and tax purposes, shall be specially allocated among the Partners so that the effect of any such adjustment shall benefit (or be borne by) the Partner(s) receiving the distribution that caused such adjustment.

(c)     Positive Basis Allocations.   If the Partnership recognized gains or items of gross income (including short-term capital gain) from the sale of Partnership assets for U.S. federal income tax purposes for any Fiscal Year in which one or more Positive Basis Partners withdraws from the Partnership pursuant to Section 5.5, the General Partner may elect:   (i) to allocate such gains or items of gross income among such Positive Basis Partners, pro rata in proportion to the respective Positive Basis of each such Positive Basis Partner, until either the full amount of such gains or items of gross income shall have been so allocated or the Positive Basis of each such Positive Basis Partner shall have been eliminated; and (ii) to allocate any gains or items of gross income not so allocated to Positive Basis Partners to the other Partners in such manner that reflects equitably the amounts credited to such Partners' Capital Accounts pursuant to Section 3.3; provided, however, that if, following such Fiscal Year, the Partnership recognizes gains or items of gross income from a sale of an Investment the proceeds of which are designated on the Partnership's books and records as being used to effect payment of all or part of the

liquidating share of any Positive Basis Partner, that continues to be a Partner in the Partnership following such withdrawal (*i.e.,* such Positive Basis Partner effected a partial, and not a complete, withdrawal of its Interest), then such Positive Basis Partner may be allocated an amount of such gains or items of gross income equal to the amount, if any, by which its or its Positive Basis as of the Withdrawal Date exceeds the amount allocated to such Partner pursuant to clause (i) of this Section 3.11(c).

(d)     <u>Negative Basis Allocations</u>.  If the Partnership recognizes net losses or items of gross loss or deduction (including short-term capital loss) from the sale of Partnership assets for U.S. federal income tax purposes for any Fiscal Year in which one or more Negative Basis Partners withdraws from the Partnership pursuant to Section 5.5, the General Partner may elect:  (i) to allocate such net losses or items of gross loss or deduction among such Negative Basis Partners, *pro rata* in proportion to the respective Negative Basis of each such Negative Basis Partner, until either the full amount of such losses or items of loss or deduction shall have been so allocated or the Negative Basis of each such Negative Basis Partner has been eliminated; and (ii) to allocate any net losses or items of gross loss or deduction not so allocated to Negative Basis Partners to the other Partners in such manner that reflects equitably the amounts credited to such Partners' Capital Accounts pursuant to Section 3.3; <u>provided</u>, <u>however</u>, that if, following such Fiscal Year, the Partnership recognizes net losses or items of gross loss and deduction from a sale of an Investment the proceeds of which are designated on the Partnership's books and records as being used to effect payment of all or part of the liquidating share of any Negative Basis Partner that continues to be a Partner in the Partnership following such withdrawal (*i.e.*, such Negative Basis Partner effected a partial, and not a complete, withdrawal of its Interest), there may be allocated to such Negative Basis Partner an amount of such net losses or items of gross loss or deduction equal to the amount, if any, by which its or its Negative Basis as of the Withdrawal Date exceeds the amount allocated to such Partner pursuant to clause (i) of this Section 3.11(d).

## 3.12    Individual Partner's Tax Treatment

Each Partner agrees not to treat, on any U.S. federal, state, local and/or non-U.S. income tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with the treatment of such item by the Partnership or which would result in inconsistent treatment, and each Partner further agrees to treat, on any U.S. federal, state, local and/or non-U.S. income tax return in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner consistent with the treatment of such item by the Partnership.

## 3.13    Distributions

(a)     The Partnership shall make distributions in respect of withdrawals in accordance with Section 5.5 and liquidation in accordance with Section 6.3.  In addition, the General Partner may make other distributions at the times and in the amounts the

General Partner determines. Any distributions may be paid in cash, in kind or partly in cash and partly in kind.

(b)     Notwithstanding any provision to the contrary contained in this Agreement, the Partnership, and the General Partner on behalf of the Partnership, may not make a distribution to any Partner on any account of its Interest if such distribution would violate Section 17-607 of the Act or other applicable law.

### Article IV
### MANAGEMENT

## 4.1     Duties and Powers of the General Partner

(a)     Subject to the terms and conditions of this Agreement, the General Partner has complete and exclusive power and responsibility, to the fullest extent permitted by the Act, for (i) all investment and investment management decisions to be undertaken on behalf of the Partnership and (ii) managing and administering the affairs of the Partnership, and shall have the power and authority to do all things that the General Partner considers necessary or desirable to carry out its duties hereunder and to achieve the purposes of the Partnership, whether or not such action or authority is expressly provided for in this Agreement. Without limiting the foregoing generality, the General Partner's powers include the power to borrow, obtain leverage or otherwise incur indebtedness with respect to the Partnership's capital.

(b)     Without limiting the generality of the General Partner's duties and powers hereunder and notwithstanding anything to the contrary contained herein, the General Partner has full power and authority, subject to the other terms and provisions of this Agreement, to execute, deliver and perform such contracts, agreements and other undertakings on behalf of the Partnership, without the consent or approval of any other Person, and to engage in all activities and transactions, as it may deem necessary or advisable for, or as may be incidental to, the conduct of the business contemplated by this Section 4.1.

(c)     The General Partner may delegate to any other Person, including the Investment Manager, any power and authority vested in the General Partner pursuant to this Agreement.

(d)     The General Partner is the "tax matters partner" for purposes of Section 6231(a)(7) of the Code. The General Partner has the exclusive authority in its determination to make any elections required or permitted to be made by the Partnership under any provisions of the Code or any other revenue laws. The General Partner shall be entitled to be reimbursed by the Partnership for all costs and expenses incurred by it in connection with any administrative or judicial proceeding affecting tax matters of the Partnership and/or the Partners in their capacity as such and to be indemnified by the Partnership (solely out of Partnership assets) with respect to any

action brought against it in connection with any judgment in or settlement of any such proceeding.

(e)     Every power vested in the General Partner pursuant to this Agreement and any decision or determination that it is permitted to make is to be construed as a power to act (or not to act) in its sole and absolute discretion, except as otherwise expressly provided herein, and the General Partner shall be entitled to consider in making such decisions or determinations only such interests and factors as it desires, including its own interests.   No provision of this Agreement is to be construed to require the General Partner to violate the Act, the Advisers Act, or any other law, regulation or rule of any self-regulatory organization.   Notwithstanding any other provision of this Agreement, whenever in this Agreement, the General Partner is permitted or required to make a decision in its "good faith" or under another expressed standard, the General Partner must act under such express standard and will not be subject to any other or different standards.

(f)     Each Limited Partner shall deliver to the General Partner, upon a reasonable request, (i) an affidavit or certificate in form satisfactory to the General Partner that is sufficient to establish that the applicable Partner (and its partners, members, and/or beneficial owners, as the case may be) is not subject to withholding under the provisions of any U.S. federal, state, local, non-U.S. or other tax laws, or with respect to such Partner's tax status under such laws, and (ii) any information or documentation prescribed under FATCA or as may be necessary, as reasonably determined by the General Partner, for the Partnership to comply with its obligations under FATCA (including, but not limited to, information with respect to citizenship, residency, ownership or control of such Partner).   Each Limited Partner shall reasonably cooperate with the General Partner in connection with any tax audit of the Partnership, or any existing or former Investment.

**4.2     Expenses**

(a)     Except as otherwise provided herein, and in consideration of the Management Fee, the General Partner and the Investment Manager shall each pay all of its own operating and overhead costs, without reimbursement by the Partnership.

(b)     The Partnership shall pay, or reimburse the General Partner and the Investment Manager for, all other reasonable costs, fees and expenses arising in connection with the Partnership's operations.   Such expenses payable by the Partnership include the following:

(i)     all costs, fees and expenses directly related to Investments or prospective Investments (whether or not consummated) of the Partnership, including research and due diligence costs related to an Investment; brokerage commissions and other execution and transaction costs, interest on, and commitment fees and expenses arising out of, debit balances or borrowings; exchange, clearing and settlement charges; fees and expenses of any third-party providers of "back office" and "middle office" services relating to

23

trade settlement; travel expenses; appraisal fees; investment banking fees and expenses; borrowing charges on Investments sold short; custody fees; and fees of consultants and finders relating to Investments or prospective Investments of the Partnership; the costs, fees and expenses of any appraisers, accountants or other experts engaged by the General Partner or the Investment Manager as well as other expenses directly related to the Partnership's Investments;

(ii) any withholding, transfer or other taxes imposed on the Partnership;

(iii) the reasonable, out-of-pocket fees, costs and expenses (including legal fees and expenses) incurred to comply with any applicable law, rule or regulation (including regulatory filings or other expenses of the Partnership and the pro rata portion of any regulatory and other expenses of the General Partner or the Investment Manager, which benefit or are attributable to the Partnership);

(iv) the reasonable, out-of-pocket costs, fees and expenses for financial and tax accounting, bookkeeping and reporting services, and administrative services performed by any Person on behalf of the Partnership (e.g., the administrator of the Partnership), including the cost of any audit of the Partnership's financial statements and the preparation of its tax returns (including with respect to FATCA compliance);

(v) Management Fees;

(vi) the reasonable, out-of-pocket costs, fees and expenses of legal counsel and any other litigation or investigation involving Partnership activities;

(vii) specific expenses incurred in obtaining, maintaining or performing systems, research and other information, including information service subscriptions, utilized with respect to the Partnership's Investments including without limitation for portfolio management, valuations and accounting purposes, including the costs of statistics and pricing services, service contracts for quotation equipment and related hardware, software, phone and internet charges;

(viii) the reasonable, out-of-pocket costs, fees and expenses associated with the Recent Amendments, including legal and accounting fees, printing costs, reporting and providing information to existing and prospective Partners, obtaining requisite consent from Limited Partners, travel fees and expenses related to the Partnership's offering, filing fees (including any "blue sky" filing fees) and other out-of-pocket expenses and compliance with any applicable federal and state laws;

(ix) the costs and expenses associated with meetings of Partners;

24

(x) the expenses of the Advisory Committee and the members thereof, including any indemnification expenses;

(xi) the costs associated with maintaining "directors and officers" or similar liability insurance for the benefit of the Partnership, the General Partner, the Investment Manager, or any other Indemnified Person; and

(xii) any costs or expenses of winding up and liquidating the Partnership and

(xiii) all costs, fees and expenses associated with the ongoing offering of Limited Partner Interests.

(c) Expenses with respect to Section 4.2(b)(viii) above will be amortized by the Partnership over a period of 36 months from the Effective Date; however, the General Partner may limit the amount of expenses amortized so that the Partnership's audited financial statements do not contain qualification.

(d) Except as otherwise provided elsewhere in this Agreement, including Sections 3.4, 3.5, 3.6, 3.8 and 5.5(i), expenses are generally borne *pro rata* by the Partners in accordance with their respective Partnership Percentages.

(e) If the General Partner or the Investment Manager, as appropriate, incurs any Partnership expenses for the account or for the benefit of, or in connection with its activities or those of its Affiliates on behalf of, both the Partnership and any Other Account, the General Partner or the Investment Manager, as appropriate, shall allocate such expense among the Partnership and each such Other Account in proportion to the size of the Investment made by each in the activity or entity to which the expense relates, or in such other manner as the General Partner considers fair and reasonable.

(f) The General Partner and the Investment Manager may, to the extent disclosed in the Partnership's offering memorandum or otherwise disclosed to the Limited Partners, use "soft dollars" generated by the Partnership. Use of "soft dollars" by the General Partner or the Investment Manager as disclosed herein shall not constitute a breach by either the General Partner or the Investment Manager of any fiduciary or other duty which the General Partner or the Investment Manager may be deemed to owe to the Partnership or its Partners.

## 4.3    Rights of Limited Partners

The Limited Partners may not take any part in the management, control or operation of the Partnership's business, and have no right or authority to act for the Partnership or to vote on matters other than the matters set forth in this Agreement or as required by applicable law.

## 4.4    Other Activities of Partners

(a) The General Partner is not required to devote any specific amount of its time to the affairs of the Partnership, but shall devote such of its time to the business and affairs

25

of the Partnership as it may determine to be necessary to conduct the affairs of the Partnership for the benefit of the Partnership and the Partners.

(b)     Each Partner acknowledges and agrees that the General Partner, its Affiliates and their respective partners, managers, directors, officers, shareholders, members or employees may engage in or possess an interest in other business ventures or commercial dealings of every kind and description, independently or with others, including, but not limited to, management of other accounts, investment in, or financing, acquisition and disposition of, Investments, investment and management counseling, brokerage services, serving as directors, officers, advisers or agents of other issuers, partners of any partnership, or trustee of any trust, or entering into any other commercial arrangements, whether or not any such activities may conflict with any interest of the parties with respect to the Partnership.  Without in any way limiting the foregoing, each Partner hereby acknowledges that none of the General Partner, its Affiliates or their respective partners, managers, directors, officers, shareholders, members or employees shall have any obligation or responsibility to disclose or refer any of the investment or other opportunities obtained through activities contemplated by this Section 4.4(b) to the Partnership, but may refer the same to any other party or keep such opportunities for their own benefit.

(c)     The General Partner and its Affiliates shall act in a manner that each considers fair, reasonable and equitable on an overall basis in allocating investment opportunities to the Partnership and any Other Account.   The General Partner and its Affiliates shall allocate investment opportunities as set forth in their policies and procedures, as may be amended from time to time, and as communicated to Limited Partners through the Partnership's private offering memorandum for Interests or otherwise.

(d)     Each of the Partners hereby waives and covenants not to sue on the basis of any law (statutory, common law or otherwise) respecting the rights and obligations of the Partners *inter se* which is or may be inconsistent with this Section 4.4.

## 4.5     Exculpation; Indemnification

(a)     The General Partner, the Investment Manager, any of their Affiliates, each direct or indirect member, manager, partner, director, officer, shareholder and employee of any of the foregoing and, with the approval of the General Partner, any agent of any of the foregoing (including their respective executors, heirs, assigns, successors or other legal representatives) (each an "***Indemnified Person***") shall not be liable to the Partnership or to any of the Limited Partners for any loss or damage occasioned by any acts or omissions in the performance of services under this Agreement or the Investment Management Agreement, or otherwise in connection with the Partnership, its Investments or operations, unless such loss or damage has occurred by reason of the willful misconduct, fraud or gross negligence of such Indemnified Person or as otherwise required by law; <u>provided</u> that nothing in this Agreement is to be construed as waiving any legal rights or remedies which the Partnership may have under state or federal securities laws.

(b)     The Partnership (but not the Partners individually) shall indemnify each Indemnified Person to the fullest extent permitted by law against any cost, expense (including reasonable attorneys' fees), judgment or liability incurred by or imposed upon it in connection with any action, suit or proceeding (including any proceeding before any judicial, administrative or legislative body or agency) to which it may be made a party or otherwise be involved or with which it shall be threatened by reason of being or having been General Partner, having been the Investment Manager pursuant to the Investment Management Agreement or its having provided services to the Partnership; provided that the Indemnified Person is not so indemnified to the extent such cost, expense, judgment or liability has been finally determined (i) in a non-appealable decision on the merits in any such action, suit or proceeding, or (ii) on a plea of *nolo contendere*, to have been incurred or suffered by the Indemnified Person solely by reason of willful misconduct, fraud or gross negligence by the Indemnified Person.

(i)     The right to indemnification granted by this Section 4.5 shall be in addition to any rights to which the Indemnified Person may otherwise be entitled and shall inure to the benefit of the successors or assigns of such Indemnified Person. The Partnership shall pay the expenses incurred by the Indemnified Person in defending a civil or criminal action, suit or proceeding in advance of the final disposition of such action, suit or proceeding, upon receipt of an undertaking by the Indemnified Person to repay such payment if there is an adjudication or determination that it is not entitled to indemnification as provided herein; provided that no such advance shall be made in connection with any action brought by a Majority-in-Interest of the Limited Partners.

(ii)    In any suit in the name of the Partnership to recover expenses advanced pursuant to the terms of an undertaking, the Partnership shall be entitled to recover such expenses upon a final adjudication that the Indemnified Person or other Person claiming a right to indemnification hereunder has not met the applicable standard of conduct set forth in Section 4.5(a). In any such suit brought to enforce a right to indemnification or to recover an advancement of expenses pursuant to the terms of an undertaking, the burden of proving that the Indemnified Person or other Person claiming a right to indemnification shall not be entitled to be indemnified, or to an advancement of expenses, hereunder shall be on the Partnership (or any Limited Partner acting derivatively or otherwise on behalf of the Partnership or the Limited Partners) unless otherwise required by applicable law.

(iii)   Each Indemnified Person may not satisfy any right of indemnity or reimbursement granted in this Section 4.5 or to which it may be otherwise entitled except out of the assets of the Partnership, and no Partner shall be personally liable with respect to any such claim for indemnity or reimbursement. The General Partner may obtain appropriate insurance on behalf, and at the expense, of the Partnership to secure the Partnership's obligations hereunder.

27

(iv)    Nothing in this Agreement is to be construed as to provide for the indemnification of an Indemnified Person for any liability (including liability under U.S. federal securities laws) to the extent that such indemnification would be in violation of applicable law but is to be construed so as to effectuate this Section 4.5 to the fullest extent permitted by law.

(v)    Each Indemnified Person shall be deemed a third-party beneficiary (to the extent not a direct party hereto) of this Agreement and, in particular, the provisions of this Section 4.5.  The General Partner and/or the Investment Manager may enter into agreements on behalf of the Partnership with an Indemnified Person to provide an indemnity to the same extent provided in this Section 4.5.

**4.6**    **Advisory Committee**

(a)    The General Partner and/or the Investment Manager may appoint a committee (the "*Advisory Committee*") composed of one or more individuals selected from time to time by the General Partner.  No member of the Advisory Committee may be an Affiliate of the General Partner and/or the Investment Manager (except as a Limited Partner or as an investor in an Affiliate of the Partnership).

(b)    If established, the Advisory Committee will meet with the General Partner and/or the Investment Manager from time to time as requested by and deemed appropriate by the General Partner and/or the Investment Manager to consult with and advise the General Partner and/or the Investment Manager on any matter deemed appropriate by the General Partner and/or the Investment Manager, including any circumstances involving conflicts of interest between the General Partner and/or the Investment Manager (and their Affiliates), on the one hand, and the Limited Partners and the Partnership, on the other.

(c)    The General Partner and/or the Investment Manager may in its discretion seek the approval of the Advisory Committee or establish any other reasonable mechanism in connection with (i) approvals that are or would be required under the Investment Advisers Act (including Section 206(3)) or (ii) any other matter deemed appropriate by the General Partner and/or the Investment Manager.  Each Limited Partner agrees that, except as otherwise specifically provided herein and to the extent permitted by applicable law, the approval of a majority of the members of the Advisory Committee at such time is binding upon the Partnership and each Partner with respect to any approval sought under this Section 4.6(c).

(d)    As determined by the General Partner and/or the Investment Manager, meetings of the Advisory Committee may be held in person or by telephone.  Approval of the Advisory Committee is deemed to have been given if given by a majority of those members present at a meeting or by a majority of all members of the Advisory Committee if given pursuant to a written consent without a meeting.

(e)     The Partnership agrees to reimburse members of the Advisory Committee for their out-of-pocket expenses relating to their services as Advisory Committee members and to indemnify each Advisory Committee member to the maximum extent permitted by law

(f)     In the event an Advisory Committee is not appointed, the General Partner and/or the Investment Manager may obtain the approval of an unaffiliated third party, as is determined advisable by the General Partner and/or the Investment Manager, and any such approval by such third party shall, to the extent permitted under applicable law, serve as the approval of the Advisory Committee and shall be binding on the Partnership and the Limited Partners.

## 4.7     Alternative Investment Vehicles

The General Partner shall have the right in connection with any Investment to direct the capital contributions of some or all of the Partners to be made through one or more alternative investment vehicles ("*Alternative Investment Vehicles*") and to exchange a portion of the Interests of one or more Limited Partners for similar equity interests in one or more Alternative Investment Vehicles if, in the judgment of the General Partner, the use of such vehicle or vehicles would allow the Partnership to overcome legal or regulatory constraints or invest in a more tax efficient manner and/or would facilitate participation in certain types of Investments; provided that the General Partner shall not employ the use of an Alternative Investment Vehicle in any manner that would reasonably be expected to have a material adverse effect on the participating Limited Partners. Any Alternative Investment Vehicle shall contain terms and conditions substantially similar to those of the Partnership and shall be managed by the General Partner or an Affiliate thereof, and such controlling Person is required to comply with the provisions of this Agreement applicable to Alternative Investment Vehicles.   Expenses related to an Alternative Investment Vehicle on behalf of less than all of the Partners shall not be borne by the Partners that do not participate in such Alternative Investment Vehicle.

## Article V
## ADMISSIONS, TRANSFERS AND WITHDRAWALS

## 5.1     Admission of Limited Partners

The General Partner may, at such times as the General Partner may determine, without advance notice to or consent from the Limited Partners, admit to the Partnership any Person who executes this Agreement or any other writing evidencing the intent of such Person to become a Limited Partner.   Such admission shall be effective when the General Partner enters the name of such Person on the books and records of the Partnership as a Partner and does not require the consent or approval of any other Partner.   The General Partner has the authority to reject subscriptions for Interests in whole or in part.

## 5.2     Admission of Additional General Partners

(a)     Except as provided in Section 5.2(b), the General Partner may admit one or more Persons as additional general partners to the Partnership.   No additional general

partner shall be added unless such additional general partner agrees to be bound by all of the terms of this Agreement.

(b)     Any Person to whom the General Partner has transferred its general partner interest in accordance with Section 5.4 shall be admitted to the Partnership as a substitute General Partner without the consent of the Limited Partners unless otherwise provided for in Section 5.4.

## 5.3     Transfer of Interests of Limited Partners

(a)     No Transfer of any Limited Partner's Interest, whether voluntary or involuntary, shall be valid or effective, and no transferee may become a substituted Limited Partner, unless the prior written consent of the General Partner has been obtained, which consent may be granted, withheld or conditioned for any reason by the General Partner. Any attempted Transfer not made in accordance with this Section 5.3, to the fullest extent permitted by law, shall be void *ab initio*.

(b)     Prior to recognizing any Transfer in accordance with this Section 5.3, the General Partner may require the transferring Limited Partner to execute and acknowledge an instrument of Transfer in form and substance satisfactory to the General Partner, and may require the transferee to make certain representations and warranties to the Partnership and Partners and to accept, adopt and approve in writing all of the terms and provisions of this Agreement.

(c)     In the event of a Transfer of a Partner's Interest or in the event of a distribution of assets of the Partnership to any Partner, the Partnership may, but shall not be required to, file an election under Section 754 of the Code and in accordance with the applicable Regulations, to cause the basis of the Partnership's assets to be adjusted for U.S. federal income tax purposes as provided by Section 734 or 743 of the Code.

(d)     In the event of a Transfer at any time other than the end of a Fiscal Year, items of income, gain, loss, deduction or credit recognized by the Partnership for U.S. federal income tax purposes shall be allocated between the transferring parties, as determined by the General Partner, using any permissible method under Code Section 706(d) and the Regulations thereunder. To the extent the transferring parties have given the General Partner written notice prior to the consent by the General Partner pursuant to Section 5.3(a) of their agreement to apply a particular and reasonable method, then the General Partner may elect to use such method. The transferring parties agree to reimburse the General Partner and the Partnership for any incidental accounting fees and other expenses incurred by the General Partner and the Partnership in making allocations pursuant to this Section 5.3(d).

## 5.4     Transfer of Interest of the General Partner

The General Partner may Transfer its Interest as a General Partner in the Partnership; provided that if any such proposed Transfer would result in an "assignment" (as such term is

defined under the Advisers Act), the General Partner shall obtain the consent of Limited Partners constituting a Majority-in-Interest of Limited Partners that are not Affiliated Investors.

**5.5    Withdrawal of Interests of Partners**

(a)    The Interest of a Limited Partner may not be withdrawn from the Partnership prior to its dissolution except as provided in this Section 5.5.

(b)    Withdrawal rights are determined separately with respect to each Capital Account (and each capital sub-account, if applicable).  Each capital contribution shall be accounted for using a separate capital sub-account, and, in the case of a Limited Partner for which more than one capital sub-account is maintained, the withdrawals from any such capital sub-accounts shall be processed on a "first-in, first-out" basis based upon the date on which each capital contribution was made, unless otherwise agreed between the General Partner and such Partner.  Each capital sub-account relating to a contribution of capital from a Limited Partner will be treated as if it were the separate Capital Account of a separate Partner for the purposes of applying the withdrawal provisions of this Section 5.5.

(c)    Subject to a Suspension and the other provisions of this Section 5.5:

(i)    A Limited Partner may make a complete or partial withdrawal from its Series A Capital Account effective on the last Business Day of each calendar quarter occurring at least 36 calendar months after the contribution of the capital to be withdrawn (each, a "***Series A Withdrawal Date***") by providing written notice to the General Partner at least 90 days prior to the proposed Series A Withdrawal Date (such restriction, the "***Series A Lock-Up***").  For purposes of calculating the Series A Lock-Up, each Limited Partner holding Series A Interests as on of the Effective Date is deemed to have made its initial contribution for Series A Interests as of the Effective Date.  Additional contributions for Series A Interests after the Effective Date will also be subject to the Series A Lock-Up, which lock-up period shall commence on the date of each such additional contribution.

(ii)    A Limited Partner may make a complete or partial withdrawal from its Series B Capital Account upon written notice to the General Partner at least 180 days prior to the applicable Series B Withdrawal Date. The "***Series B Withdrawal Date***" means: (i) the end of the day on the last Business Day of the calendar month that immediately precedes the one-year anniversary of the contribution of the capital to be withdrawn; and thereafter (ii) the end of the day on each one-year anniversary of the preceding Series B Withdrawal Date (or the last Business Day of such month).

(iii)    A Limited Partner may make a complete or partial withdrawal from its Series C Capital Account upon written notice to the General Partner at least 180 days prior to the applicable Series C Withdrawal Date.  The "***Series C Withdrawal Date***" means: (i) the end of the day on the last Business Day of

31

the calendar month that immediately precedes the two-year anniversary of the contribution of the capital to be withdrawn; and thereafter (ii) the end of the day on each two-year anniversary of the preceding Series C Withdrawal Date (or the last Business Day of such month).

(iv)    A Limited Partner may make a complete or partial withdrawal from its Series D Capital Account effective on the last Business Day of each calendar quarter (each, a "**Series D Withdrawal Date**") occurring at least 12 calendar months after the contribution of the capital to be withdrawn by providing written notice to the General Partner at least 90 days prior to the proposed Series D Withdrawal Date.

(d)    Any notice of withdrawal shall be irrevocable by the Limited Partner, unless otherwise agreed by the General Partner.  For the avoidance of doubt, if a Limited Partner notifies the General Partner of its intent to withdraw and later chooses not to withdraw (with the General Partner's consent), any transaction costs incurred by the Partnership or the General Partner in connection therewith may be charged to such withdrawing Limited Partner.  The General Partner may refuse to honor any Limited Partner's request for a full or partial withdrawal if such request is not accompanied by such additional information as the General Partner may reasonably require, including any information required to determine the "adjusted basis" for U.S. federal income tax purposes in the Limited Partner's Interest withdrawn.

(e)    With respect to any amounts withdrawn, a withdrawing Partner shall not share in the income, gains and losses of the Partnership or have any other rights as a Partner (in the case of a complete withdrawal) after the applicable Withdrawal Date, and withdrawn amounts will be fixed as of the applicable Withdrawal Date, except as provided in Section 3.6.  For the avoidance of doubt, none of the Partnership, the General Partner or the Investment Manager shall be liable to a Limited Partner for interest on the proceeds of any withdrawal.

(f)    At least 90% of the estimated amount due with respect to the Partnership's marketable investments is normally settled in cash or, subject to the sole discretion of the General Partner, wholly or partially with securities or other assets of the Partnership, within 30 Business Days after the Withdrawal Date, provided that the General Partner may delay such payment if such delay is reasonably necessary to prevent such withdrawal from having a material adverse impact on the Partnership or the remaining Capital Accounts.  The General Partner is entitled to deduct from such settlement payment an amount equal to the pro rata portion of any Performance Allocation (based on the portion of the withdrawal being settled) payable to the Investment Manager with respect to such withdrawn amount.  Any balance will be held back and distributed, without interest thereon, promptly following completion of the audit of the Partnership's financial statements for such Fiscal Year, or sooner in the General Partner's discretion.

(g)    In the case of a complete withdrawal, or a partial withdrawal that cannot be fully funded out of the Limited Partner's interest in the Partnership's marketable

32

investments, no settlements occur with respect to any of such Limited Partner's interest in the Partnership's non-marketable investments until the occurrence of liquidity events with respect to such non-marketable investments after the scheduled payment date for the withdrawal (without interest thereon). Notwithstanding the foregoing, the General Partner may, however, make settlements in such cases prior to the occurrence of a liquidity event if such settlement would, in the good faith opinion of the General Partner, not have a material adverse effect on the Partnership.  Generally, a liquidity event will be a sale of the relevant investment for cash, in which case the settlement will be funded in cash within 90 days after the liquidity event (without interest).  If the liquidity event is not a sale for cash, the General Partner may effect the settlement either by making a distribution in kind of the Limited Partner's ratable share of the relevant investment or by distributing the net proceeds derived from a sale of such investment.  The General Partner is entitled to withdraw from each such settlement an amount equal to the remaining portion of any Performance Allocation (pro rata based on the portion of such withdrawal being distributed) to be credited to the Investment Manager at the same time and in the same form (in cash or in kind) as the distribution to the withdrawing Limited Partner.

(h)     The General Partner may effect withdrawal payments (i) in cash, (ii) in kind, by transfer of marketable or non-marketable Investments to the Limited Partner, the value of which, as determined in accordance with Section 7.2, would satisfy the Limited Partner's request for withdrawal, or (iii) in any combination of the foregoing.

(i)     The General Partner may deduct from any withdrawal proceeds due to any Limited Partner pursuant to this Section 5.5 an amount representing the Partnership's actual or estimated expenses, as determined by the General Partner, associated with processing the withdrawal.  Any such withdrawal deduction shall be retained by the Partnership for the benefit of the remaining Limited Partners.

(j)     The right of any Partner to withdraw or receive distributions pursuant to the provisions of this Section 5.5 is subject to all Capital Account allocations and adjustments contemplated by this Agreement and to the provision by the General Partner for all Partnership liabilities and for reserves and holdbacks for contingencies provided in Section 3.6.

(k)     The General Partner may suspend or limit, in whole or in part, (i) the right of the Partners to withdraw or receive distributions from the Partnership and/or (ii) the valuation of the Partnership's Net Assets:

(i)     during any period when any exchange or over-the-counter market on which the Partnership's Investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended;

      (ii)      during the existence of any state of affairs as a result of which, in the reasonable opinion of the General Partner, disposal of, or withdrawals or redemptions from, Investments by the Partnership, or the determination of the value of the assets of the Partnership, would not be reasonably practicable;

      (iii)     during any breakdown in the means of communication normally employed in determining the price or value of the Partnership's assets or liabilities, or of current prices in any market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Partnership cannot reasonably be accurately ascertained within a reasonable time frame;

      (iv)     during any period when the transfer of funds involved in the realization or acquisition of any Investments cannot, in the reasonable opinion of the General Partner, be effected at normal rates of exchange;

      (v)      in other circumstances where the General Partner is unable to fairly value the Partnership's assets due to extreme market conditions; or

      (vi)     automatically upon liquidation of the Partnership.

(l)     In the event of any such suspension or limitation described above in Section 5.5(k) (a "*Suspension*"), the General Partner shall promptly notify each Limited Partner. Any Limited Partner who has submitted a withdrawal request and to whom payment in full of the amount being withdrawn has not yet been remitted is not given any priority with respect to the withdrawal of such Interests or portions thereof after the cause for such Suspension ceases to exist. The General Partner may, however, allow any such Partners to rescind their withdrawal requests to the extent of any portion thereof for which withdrawal proceeds have not been remitted. Upon the reasonable determination by the General Partner that conditions leading to Suspension no longer apply, withdrawal rights for all Limited Partners shall be promptly reinstated, and any pending withdrawal requests (or new, timely withdrawal requests) shall be honored as of the last Business Day of the calendar quarter in which withdrawals have recommenced, subject to the application of the withdrawal limitations described herein.

(m)    The General Partner may, notwithstanding any Suspension, upon not less than five days' prior written notice (or immediately if the General Partner determines in its sole discretion that such Limited Partner's continued participation in the Partnership may cause the Partnership, the Investment Manager or the General Partner to violate any applicable law), require any Limited Partner's Interest to be withdrawn in part or in its entirety from the Partnership (including, but not limited to, for reasons relating to FATCA) and for the Limited Partner to cease to be a Limited Partner of the Partnership (in the case of a withdrawal of a Limited Partner's Interest in its entirety) pursuant to this Section 5.5(m). Except as otherwise provided herein, settlements of withdrawals pursuant to this Section 5.5(m) are made in the same manner as voluntary withdrawals.

(n)     Notwithstanding the foregoing, the General Partner may waive any restrictions on any Limited Partner's ability to withdraw.

## Article VI
## SOFT WIND DOWN, DISSOLUTION AND LIQUIDATION

**6.1     Soft Wind Down**

(a)     The General Partner may, in consultation with the Investment Manager, make a determination that the investment strategy should no longer be continued (whether or not the General Partner has implemented a Suspension).  Having made such determination, the Investment Manager may recommend to the General Partner to cause the Partnership to return the Partnership's assets to Limited Partners in an orderly manner (without proceeding with a liquidation of the Partnership) (an "***Orderly Realization***").  The General Partner may, in such circumstances, resolve to effect an Orderly Realization should it determine that doing so is in the best interests of the Partnership as a whole.  Such Orderly Realization shall not constitute a dissolution or winding up of the Partnership for any purposes, but rather only the continued management of the Partnership's portfolio so as to reduce such portfolio to cash (to the extent reasonably practicable, as advised by the Investment Manager) and return such cash as well as all other assets of the Partnership to the Limited Partners.

(b)     The General Partner will notify the Limited Partners of any decision to proceed with an Orderly Realization of the Partnership.  During an Orderly Realization, the Investment Manager may, in consultation with the General Partner, take such steps as are considered appropriate in the best interests of the Partnership as a whole to effect the Orderly Realization.  The General Partner, in consultation with the Investment Manager, shall establish what they consider to be a reasonable time by which the Orderly Realization should be effected (the "***Realization Period***").  Any resolution to undertake an Orderly Realization and the process thereof shall be deemed to be integral to the business of the Partnership and may be carried out without recourse to a formal process of liquidation under Delaware law or any other applicable bankruptcy or insolvency regime.

(c)     The General Partner, in consultation with the Investment Manager, may resolve to cease the Orderly Realization within the Realization Period and recommence active trading if the circumstances permit a lifting of any applicable Suspension or, where no Suspension is in effect, if the circumstances are such that the investment strategy can then be continued.

(d)     Management Fees, and all other fees and expenses, shall be payable and Performance Allocations shall be made during an Orderly Realization on the same basis as provided herein.

**6.2    Dissolution of Partnership**

(a)    The Partnership shall be dissolved upon the first to occur of the following dates:

    (i)    any date on which the General Partner shall elect in writing to dissolve the Partnership; or

    (ii)    the occurrence of any other event causing (A) the General Partner (or a successor to its business) to cease to be the general partner of the Partnership or (B) the dissolution of the Partnership under the Act.

(b)    In the event an Orderly Realization lasts longer than three years, a Super-Majority-in-Interest of the Limited Partners may seek a court decree of dissolution or seek the appointment by the court of a liquidator for the Partnership.  The Limited Partners will not have any other right to bring an action in court to dissolve the Partnership.  The parties agree that irreparable damage would be done to the goodwill and reputation of the Partners if any Limited Partner should bring an action in court to dissolve the Partnership.  Care has been taken in this Agreement to provide for fair and just payment in liquidation of the Interests of all Partners.  Accordingly, each Limited Partner hereby waives and renounces its right to such a court decree of dissolution or to seek the appointment by the court of a liquidator for the Partnership except as provided herein.

**6.3    Liquidation of Assets**

(a)    Upon dissolution of the Partnership, the General Partner shall promptly liquidate the business and administrative affairs of the Partnership to the extent feasible, except that if the General Partner is unable to perform this function, a liquidator elected by a Majority-in-Interest of Limited Partners shall liquidate the business and administrative affairs of the Partnership.   Net Profit and Net Loss during any Accounting Period, which includes the period of liquidation, shall be allocated pursuant to Article III.   The proceeds from liquidation shall be divided in the following manner, subject to the Act:

    (i)    the debts, liabilities and obligations of the Partnership, other than any debts to the Partners as Partners, and the expenses of liquidation (including legal, administrative and accounting expenses incurred in connection therewith), up to and including the date that distribution of the Partnership's assets to the Partners has been completed, shall first be satisfied (whether by payment or the making of reasonable provision for payment thereof);

    (ii)    such debts as are owing to the Partners as Partners are next paid; and

    (iii)    the Partners shall next be paid liquidating distributions (in cash or in securities or other assets, whether or not readily marketable) *pro rata* in accordance with, and up to the positive balances of their respective Capital Accounts, as adjusted pursuant to Article III to reflect allocations for the

Accounting Period ending on the date of the distributions under this Section 6.1(a)(iii).

(b) Notwithstanding this Section 6.3 and the priorities set forth in the Act, the General Partner or liquidator may distribute ratably in kind rather than in cash, upon dissolution, any assets of the Partnership; provided, however, that if any in kind distribution is to be made, (i) the assets distributed in kind shall be valued pursuant to Section 7.2, and charged as so valued and distributed against amounts to be paid under Section 6.3(a) and (ii) any gain or loss (as computed for book purposes) attributable to property distributed in kind shall be included in the Net Profit or Net Loss for the Accounting Period ending on the date of such distribution.

## Article VII
## ACCOUNTING AND VALUATION; BOOKS AND RECORDS

**7.1** **Accounting and Reports**

(a) The Partnership may adopt for tax accounting purposes any accounting method that the General Partner shall decide is in the best interests of the Partnership and that is permissible for U.S. federal income tax purposes.

(b) As soon as practicable after the end of each Fiscal Year thereafter, the General Partner shall cause an audit of the financial statements of the Partnership as of the end of each such period to be made by a firm of independent accountants selected by the General Partner. As soon as is practicable thereafter, but subject to Section 7.4, the General Partner shall furnish to each Limited Partner a copy of the set of financial statements prepared in accordance with GAAP, with such adjustments thereto as the General Partner determines appropriate, including the report of such independent accountants.

(c) As soon as practicable after the end of each taxable year, the General Partner shall furnish to each Limited Partner such information as may be required to enable each Limited Partner properly to report for U.S. federal, state and local income tax purposes its distributive share of each Partnership item of income, gain, loss, deduction or credit for such year. The General Partner shall have discretion as to how to report Partnership items of income, gain, loss, deduction or credit on the Partnership's tax returns, and the Limited Partners shall treat such items consistently on their own tax returns.

(d) As soon as practicable after the end of each calendar month, but subject to Section 7.5, the General Partner shall arrange for the preparation and delivery to each Limited Partner of an interim report containing such information concerning the affairs of the Partnership (which need not include any financial statements) as the General Partner considers appropriate.

**7.2    Valuation of Partnership Assets and Interests**

(a)    The General Partner (or its delegate, including the Investment Manager or the administrator of the Partnership) shall value the assets of the Partnership as of the close of business on the last day of each Accounting Period.  Such valuations will generally be in accordance with GAAP, with such adjustments thereto as the General Partner reasonably determines appropriate.  In addition, the General Partner shall value the assets which are being distributed in kind as of the close of the Business Day immediately preceding the distribution date in accordance with Section 5.5(c) or Section 6.3(b).  In determining the value of the assets of the Partnership, no value shall be placed on the goodwill or name of the Partnership, or the office records, files, statistical data or any similar intangible assets of the Partnership not normally reflected in the Partnership's accounting records, but there shall be taken into consideration any related items of income earned but not received, expenses incurred but not yet paid, liabilities fixed or contingent, prepaid expenses to the extent not otherwise reflected in the books of account, and the value of options or commitments to purchase or sell securities pursuant to agreements entered into on or prior to such valuation date.

(b)    To the extent readily available, valuations will be based on independent market quotations obtained by the General Partner from recognized pricing services, market participants or other sources.  In the case of any Investment for which a quotation from an independent source is not available or is determined by the General Partner to be unreliable or inadequate, the General Partner (i) shall be authorized, to the extent permitted by applicable law, to value such positions at their fair value in such manner as the General Partner determines in good faith, or (ii) may (but shall not be required to) obtain an appraisal, at the expense of the Partnership, by an independent third party selected by the General Partner.  Except as otherwise determined by or at the direction of the General Partner, investment and trading transactions shall be accounted for on the trade date.

(c)    Accounts shall be maintained in U.S. dollars, and except as otherwise determined by or at the direction of the General Partner:  (i)  assets and liabilities denominated in currencies other than U.S. dollars shall be translated at the rates of exchange quoted by an independent pricing service as in effect as of the close of business on the relevant valuation dates (and exchange adjustments shall be recorded in the results of operations); and (ii) investment and trading transactions and income and expenses shall be translated at the rates of exchange in effect at the time of each transaction.

**7.3    Determinations by the General Partner**

(a)    All matters concerning the determination and allocation among the Partners of the amounts to be determined and allocated pursuant to this Agreement, including Article III and accounting procedures applicable thereto, shall be determined by the General Partner, unless specifically and expressly otherwise provided for by the provisions of this Agreement, and such determinations and allocations shall be final

and binding on all the Partners; <u>provided</u>, <u>however</u>, that all calculations of the Performance Allocation will be made on the basis of, or subject to correction based on, the annual audit of the Partnership's financial statements and appropriate adjustments will be made to all such calculations and related allocations to the extent necessary as a result of that audit.

(b)    The General Partner may make such adjustments to the computation of Net Profit or Net Loss or any other allocations with respect to any Limited Partner, or any component items comprising any of the foregoing, as it considers appropriate to reflect the financial results of the Partnership and the intended allocation thereof among the Partners in a reasonably accurate, fair and efficient manner. Without limiting the generality of the foregoing, any provision of this Agreement that requires an adjustment to be made to any Capital Account or sub-account as of any mid-month or mid-quarter date may be made as of the most recent preceding or succeeding date when a regular valuation is being conducted.

**7.4    Books and Records**

(a)    The General Partner shall keep books and records pertaining to the Partnership's affairs showing all of its assets and liabilities, receipts and disbursements, realized income, gains, deductions and losses, Partners' Capital Accounts and all transactions entered into by the Partnership.  The General Partner shall afford to the Partnership's independent auditors reasonable access to such documents during customary business hours and shall permit the Partnership's auditors to make copies thereof or extracts therefrom at the expense of the Partnership.

(b)    The General Partner shall establish such standards as it deems appropriate regarding the access of Limited Partners to the books and records of the Partnership and shall not be obliged to permit access by a Limited Partner to the name or address of any other Limited Partner.

**7.5    Confidentiality**

(a)    Each Limited Partner agrees to keep confidential, and not to make any use of (other than for purposes reasonably related to its Interest or for purposes of filing such Limited Partner's tax returns) or disclose to any Person, any information or matter relating to the Partnership and its affairs and any information or matter related to any Investment (other than disclosure to such Limited Partner's directors, employees, agents, advisors, or representatives responsible for matters relating to the Partnership or to any other Person approved in writing by the General Partner (each such Person being hereinafter referred to as an "***Authorized Representative***")); <u>provided</u> that (i) such Limited Partner and its Authorized Representatives may make such disclosure to the extent that (A) the information to be disclosed is publicly available at the time of proposed disclosure by such Limited Partner or Authorized Representative, (B) the information otherwise is or becomes legally available to such Limited Partner other than through disclosure by the Partnership or the General Partner, or (C) such disclosure is required by law or in

39

response to any governmental agency request or in connection with an examination by any regulatory authorities; <u>provided</u> that such governmental agency, regulatory authorities or association is aware of the confidential nature of the information disclosed; (ii) such Limited Partner and its Authorized Representatives may make such disclosure to its beneficial owners to the extent required under the terms of its arrangements with such beneficial owners; and (iii) each Limited Partner will be permitted, after written notice to the General Partner, to correct any false or misleading information which becomes public concerning such Limited Partner's relationship to the Partnership or the General Partner. Prior to making any disclosure required by law, each Limited Partner shall use its best efforts to notify the General Partner of such disclosure. Prior to any disclosure to any Authorized Representative or beneficial owner, each Limited Partner shall advise such Authorized Representative or beneficial owner of the obligations set forth in this Section 7.5(a) and each such Authorized Representative or beneficial owner shall agree to be bound by such obligations.

(b)     The General Partner may keep confidential from the Limited Partners, for such period of time as the General Partner deems reasonable, any information, including the identity of the Partners or information regarding the Partners or Investments, which the General Partner reasonably believes to be in the nature of trade secrets or other information the disclosure of which the General Partner believes is not in the best interests of the Partnership or could damage the Partnership or its business or which the Partnership is required by law or agreement with a third party to keep confidential.

(c)     Subject to applicable legal and regulatory considerations, the General Partner shall use reasonable efforts to keep confidential any information relating to a Limited Partner obtained by the General Partner in connection with or arising out of the Partnership which the Limited Partner requests to be kept confidential.

(d)     Notwithstanding the provisions of this Section 7.5, Partners (and their employees, representatives and other agents) may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the Partnership and its transactions and all materials of any kind (including tax opinions or other tax analyses) that are provided to such Person by, or on behalf of the Partnership. For this purpose, "tax treatment" is the purported or claimed U.S. federal income tax treatment of a transaction and "tax structure" is limited to any fact that may be relevant to understanding the purported or claimed U.S. federal income tax treatment of a transaction. For this purpose, the names of the Partnership, the Partners, their affiliates, the names of their partners, members or equity holders and the representatives, agents and tax advisors of any of the foregoing are not items of tax structure.

(e)     The General Partner may disclose to prospective investors such information relating to the Partnership or the Investments as it believes in good faith will benefit the Partnership and facilitate investment in the Partnership by such prospective investors.

(f)     The Investment Manager and a Person acting as a service provider to the Partnership shall have the right to access all information belonging to the Partnership.

## Article VIII
## GENERAL PROVISIONS

**8.1     Amendment of Partnership Agreement**

(a)     Except as otherwise provided in this Section 8.1, this Agreement may be amended, in whole or in part, with the written consent of (i) the General Partner and (ii) the consent of a Majority-in-Interest of Limited Partners (which approval may be obtained by negative consent affording the Limited Partners at least 30 calendar days to object).

(b)     Any amendment that would:

(i)     increase the obligation of a Partner to make any contribution to the capital of the Partnership;

(ii)     reduce the Capital Account of a Partner other than in accordance with Article III;

(iii)     adversely alter any Partner's rights with respect to the allocation of Net Profit or Net Loss or with respect to distributions and withdrawals; or

(iv)     change the respective liabilities of the General Partner and the Limited Partners;

may only be made if the consent of each Partner adversely affected thereby is obtained (which consent may be obtained by negative consent affording the Partner at least 30 calendar days to object).

(c)     Notwithstanding paragraphs (a) and (b) of this Section 8.1, this Agreement may be amended by the General Partner without the consent of the Limited Partners, at any time and without limitation, if any Limited Partner whose contractual rights as a Limited Partner would be materially and adversely changed by such amendment has an opportunity to withdraw from the Partnership as of a date determined by the General Partner that is not less than 30 calendar days after the General Partner has furnished written notice of such amendment to each affected Limited Partner and that is prior to the effective date of the amendment.  The admission and withdrawal of Limited Partners will not require notice or disclosure to, or the approval of, the other Limited Partners.

(d)     The General Partner may at any time without the consent of the other Partners:

(i)     add to the representations, duties or obligations of the General Partner or surrender any right or power granted to the General Partner under this Agreement, for the benefit of the Limited Partners;

(ii)    cure any ambiguity or correct or supplement any conflicting provisions of this Agreement;

(iii)   change the name of the Partnership;

(iv)    make any changes required by a governmental body or agency which is deemed to be for the benefit or protection of the Limited Partners, provided, however, that no such amendment may be made unless such change (A) is for the benefit of, or not adverse to, the interests of Limited Partners, (B) does not affect the right of the General Partner to manage and control the Partnership's business, (C) does not affect the allocation of profits and losses among the Partners and (D) does not affect the limited liability of the Limited Partners;

(v)     amend this Agreement to reflect a change in the identity of the General Partner which has been made in accordance with this Agreement;

(vi)    amend this Agreement (other than with respect to the matters set forth in Section 8.1(b)) to effect compliance with any applicable laws, regulations or administrative actions;

(vii)   subject to Section 8.1(b), amend this Agreement to reflect the creation, and terms, of any new Series of Interests;

(viii)  effect any other amendment which would not, in the good faith judgment of the General Partner, adversely affect any of the existing Limited Partners; and

(ix)    restate this Agreement together with any amendments hereto which have been duly adopted in accordance herewith to incorporate such amendments in a single, integrated document.

(e)     Following the adoption of any amendments to this Agreement pursuant to 8.1(d), the General Partner shall promptly deliver a copy of such amendments to this Agreement to the Limited Partners.

(f)     The General Partner may agree with a Limited Partner to waive or modify the application of any provision of this Agreement with respect to such Limited Partner without notifying or obtaining the consent of any other Limited Partner (other than a Limited Partner whose rights as a Limited Partner pursuant to this Agreement would be materially and adversely changed by such waiver or modification).  Any such waiver or modification may be evidenced by a "side letter" or other document which will govern with respect to the applicable Limited Partner and be incorporated as part of this Agreement.

**8.2** **Special Power-of-Attorney**

(a) Each Limited Partner hereby irrevocably makes, constitutes and appoints the General Partner (and each of its successors and permitted assigns), with full power of substitution, the true and lawful representative and attorney-in-fact of, and in the name, place and stead of, such Limited Partner with the power from time to time to make, execute, sign, acknowledge, swear to, verify, deliver, record, file or publish:

    (i) an amendment to this Agreement that complies with the provisions of this Agreement (including the provisions of Section 8.1);

    (ii) the Certificate and any amendment thereof required because this Agreement is amended, including an amendment to effectuate any change in the membership of the Partnership or in the capital contributions of the Partners;

    (iii) any financing statement or other filing or document required or permitted to perfect the security interests contemplated by any provision hereof; and

    (iv) all such other instruments, documents and certificates which, in the opinion of legal counsel to the Partnership, may from time to time be required by the laws of the United States of America, the State of Delaware, or any other jurisdiction in which the Partnership determines to do business, or any political subdivision or agency thereof, or which such legal counsel may deem necessary or appropriate to effectuate, implement and continue the valid and subsisting existence and business of the Partnership as a limited partnership, exchange a portion of a Limited Partner's Interest for similar equity interests in an Alternative Investment Vehicle, or to effect the dissolution or termination of the Partnership.

(b) Each Limited Partner is aware that the terms of this Agreement permit certain amendments to this Agreement to be effected and certain other actions to be taken or omitted by or with respect to the Partnership without that Limited Partner's consent. If an amendment of the Certificate or this Agreement or any action by or with respect to the Partnership is taken by the General Partner in the manner contemplated by this Agreement, each Limited Partner agrees that, notwithstanding any objection which such Limited Partner may assert with respect to such action, the General Partner in its sole discretion is authorized and empowered, with full power of substitution, to exercise the authority granted above in any manner which may be necessary or appropriate to permit such amendment to be made or action to be lawfully taken or omitted. Each Partner is fully aware that each other Partner relies on the effectiveness of this special power-of-attorney with a view to the orderly administration of the affairs of the Partnership. This power-of-attorney is a special power-of-attorney and is coupled with an interest in favor of the General Partner and as such:

    (i) is irrevocable and continues in full force and effect notwithstanding the subsequent death or incapacity of any party granting this power-of-attorney,

regardless of whether the Partnership or the General Partner has had notice thereof; and

(ii)     survives the delivery of an assignment by a Limited Partner of the whole or any portion of such Limited Partner's Interest, except that where the assignee thereof has been approved by the General Partner for admission to the Partnership as a substituted Limited Partner, this power-of-attorney given by the assignor survives the delivery of such agreement for the sole purpose of enabling the General Partner to execute, acknowledge and file any instrument necessary to effect such substitution.

## 8.3    Notices

Notices which may be or are required to be given under this Agreement by any party to another shall be given by hand delivery, transmitted by facsimile, transmitted electronically to an address that has been previously provided or verified through another form of notice or sent by registered or certified mail, return receipt requested or internationally recognized courier service, and shall be addressed to the respective parties hereto at their addresses as set forth on the register of Partners maintained by the General Partner or to such other addresses, facsimile numbers or electronic addresses as may be designated by any party hereto by notice addressed to (a) the General Partner, in the case of notice given by any Limited Partner, and (b) each of the Limited Partners, in the case of notice given by the General Partner. Notices will be deemed to have been given (i) when delivered by hand, transmitted by facsimile or transmitted electronically or (ii) on the date indicated as the date of receipt on the return receipt when delivered by mail or courier service.

## 8.4    Agreement Binding Upon Successors and Assigns; Delegation

This Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors, but the rights and obligations of the Partners hereunder are not assignable, transferable or delegable except as provided in Sections 4.1(c), 5.3 and 5.4, and any attempted assignment, transfer or delegation thereof which is not made pursuant to the terms of such Sections will be null and void *ab initio*.

## 8.5    Governing Law

This Agreement is, and the rights of the Partners hereunder are, governed by and shall be construed in accordance with the laws of the State of Delaware, without regard to the conflict of laws rule thereof which would result in the application of the laws of a different jurisdiction. The parties hereby consent to the exclusive jurisdiction and venue for any action arising out of this Agreement in the courts located in Dallas County, Texas. Each Partner consents to service of process in any action or proceeding involving the Partnership by the mailing thereof by registered or certified mail, postage prepaid, to such Partner's mailing address set forth in the register of Partners maintained by the General Partner.

**8.6     Not for Benefit of Creditors**

The provisions of this Agreement are intended only for the regulation of relations among Partners and between Partners and former or prospective Partners and the Partnership.  Except for the rights of the Indemnified Persons hereunder, this Agreement is not intended for the benefit of non-Partner creditors and no rights are granted to non-Partner creditors under this Agreement.

**8.7     Dispute Resolution**

The following procedures shall be used to resolve any controversy or claim ("***Dispute***") arising out of, relating to or in connection with the Agreement or otherwise involving the Partnership, its Partners and/or any Indemnified Person.   If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a)     <u>Mediation</u>

(i)     Any Dispute shall be submitted to mediation by written notice to the other party or parties.  In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations.   The mediator will be selected by agreement of the parties.   If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect.

(ii)     The mediation will be conducted as specified by the mediator and agreed upon by the parties.   The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

(iii)     The mediation will be treated as a settlement discussion and therefore will be confidential.   The mediator may not testify for either party in any later proceeding relating to the dispute.   No recording or transcript shall be made of the mediation proceedings.

(iv)     Each party will bear its own costs in the mediation.   The fees and expenses of the mediator will be shared equally by the parties.

(b)     <u>Arbitration</u>

(i)     If a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration.   A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed. Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the

mediation and arbitration provisions herein. The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in this document and the commercial dispute arbitration rules then in effect ("***Arbitration Rules***"). In the event of a conflict, the provisions of this document will control.

(ii) The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the U.S. Federal Arbitration Act ("***FAA***"), and resolved by the arbitrators, *provided, however*, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality, non-competition, non-solicitation or non-recruitment covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a state arbitration act preclude application of the FAA, including any choice of law provisions in this Agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

(iii) The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.

(iv) The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement.

(v) No discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes

it. In any event, there shall be no more than (a) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (b) one non-party deposition of six hours; (c) twenty-five interrogatories; (d) twenty-five requests for admission; (e) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; and (f) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.

(vi)     All aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term.

(vii)    The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

## 8.8    Consents and Voting

(a)      Except as provided in Section 5.4, Limited Partners do not have any right to vote for the admission or removal of any General Partner and, except for the right to vote on certain amendments proposed by the General Partner and as otherwise expressly set out herein, have no other voting rights. Upon the request of any Limited Partner, the General Partner may designate an Interest as a Non-Voting Interest, in which case the Limited Partner shall not have the right to vote on any matter including amendments.

(b)      Any and all consents, agreements or approvals provided for or permitted by this Agreement shall be in writing and a copy thereof shall be filed and kept with the books of the Partnership. For the avoidance of doubt, an amendment made pursuant to Section 8.1(c) or pursuant to negative consent under Section 8.1(a) or Section 8.1(b) shall not require any affirmative written response by any Limited Partner who is not electing to withdraw from the Partnership.

(c)      In the event the Partnership seeks the approval, vote or consent of the Offshore Fund with respect to any matter to which it would be entitled to vote as a Limited

Partner of the Partnership under this Agreement, the Offshore Fund will: (i) submit such matter for the consent of the shareholders and (ii) shall vote its Limited Partner interest proportionally for and against such matter in the same proportion that the shareholders voted for and against such matter.

## 8.9 Merger and Consolidation

(a)     The Partnership may merge or consolidate with or into one or more limited partnerships formed under the Act or other business entities pursuant to an agreement of merger or consolidation which has been approved in the manner contemplated by Section 17-211(b) of the Act.

(b)     Notwithstanding anything to the contrary contained elsewhere in this Agreement, an agreement of merger or consolidation approved in accordance with Section 17-211(b) of the Act may, to the extent permitted by Section 17-211(g) of the Act, (i) effect any amendment to this Agreement, (ii) effect the adoption of a new limited partnership agreement for the Partnership if it is the surviving or resulting limited partnership in the merger or consolidation, or (iii) provide that the limited partnership agreement of any other constituent partnership to the merger or consolidation (including a limited partnership formed for the purpose of consummating the merger or consolidation) shall be the limited partnership agreement of the surviving or resulting limited partnership.

## 8.10 Miscellaneous

(a)     The captions and titles preceding the text of each Section hereof shall be disregarded in the construction of this Agreement.   Use of the word "including" in this Agreement means in each case "without limitation," whether or not such term is explicitly stated.

(b)     This Agreement may be executed in counterparts, each of which shall be deemed to be an original hereof.

(c)     If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement shall remain in full force and effect.   Any provision of this Agreement held invalid or unenforceable only in part or degree shall remain in full force and effect to the extent not held invalid or unenforceable.

## 8.11 BHCA Subject Persons

Notwithstanding any other provision of this Agreement to the contrary:

(a)     Solely for purposes of any provision of this Agreement that confers voting rights on the Limited Partners and any other provisions hereof regarding consents of or action by the Limited Partners, any BHCA Subject Person that shall have given the General Partner an Election Notice and shall not thereafter have given the General Partner a Revocation Notice, and that at any time has a Partnership Percentage in

excess of 4.9% of the aggregate Partnership Percentages of the Limited Partners entitled to participate in such voting or the giving of any consent or the taking of any action, shall be deemed to hold a Partnership Percentage of only 4.9% of the aggregate Partnership Percentages of the Limited Partners (after giving effect to the limitations imposed by this Section 8.11 on all such Limited Partners), and such Partnership Percentage in excess of said 4.9% shall be deemed held by the Limited Partners who are not BHCA Subject Persons, *pro rata* in proportion to their respective Partnership Percentages; provided that this limitation shall not prohibit a Limited Partner from voting or participating in giving or withholding consent or taking any action under any provision of this Agreement up to the full amount of its Partnership Percentage in situations where such Limited Partner's vote or consent or action is of the type customarily provided by statute or stock exchange rules with regard to matters that would significantly and adversely affect the rights or preference of the Limited Partner's Interest. The foregoing voting restriction shall continue to apply with respect to any assignee or other transferee of such BHCA Subject Person's Interest; provided, however, that the foregoing voting restriction shall not continue to apply if the Interest is transferred: (i) to the Partnership; (ii) to the public in an offering registered under the Securities Act; (iii) in a transaction pursuant to Rule 144 or Rule 144A under the Securities Act in which no Person acquires more than 2% of the Partnership's outstanding Interests; or (iv) in a single transaction to a third party who acquires at least a majority of the Partnership's outstanding Interests without regard to the Transfer of such Interests.

(b)     Except as specifically provided otherwise in this Agreement, a Limited Partner that is a BHCA Subject Person that shall have given the General Partner an Election Notice, and shall not thereafter have given the General Partner a Revocation Notice, shall not be entitled to exercise any rights to consent to actions to be taken with respect to the Partnership, including rights conferred by any applicable law. Such right to consent shall be deemed granted to the Limited Partners who are not BHCA Subject Persons, *pro rata* in proportion to their respective Partnership Percentages.

(c)     A Limited Partner that is a BHCA Subject Person and that elects to be subject to Section 8.11(a) and (b) shall notify the General Partner thereof (an "***Election Notice***") and, on the General Partner's receipt of such Election Notice, such Limited Partner shall be subject to Section 8.11(a) and (b) until 10 calendar days after such Limited Partner notifies the General Partner that it elects no longer to be subject to Section 8.11(a) and (b) (a "***Revocation Notice***"), which period may be reduced by the General Partner.

## 8.12   RIC Limited Partners

An Interest of a RIC Limited Partner does not entitle the RIC Limited Partner to vote or consent with respect to any Partnership matter unless the RIC Limited Partner's vote or consent with respect to its Interest would not be considered to be "voting securities" as defined under Section 2(a)(42) of the Investment Company Act. Except as provided in this Section 8.12, an Interest held by a RIC Limited Partner as a Non-Voting Interest is identical in all regards to all other Interests held by Limited Partners.

**8.13    Bad Actor Limited Partners**

Under Rule 506(d) under the Securities Act, the Partnership may be banned from selling Interests under Rule 506 if a Limited Partner beneficially owning 20% or more of the Partnership's voting securities engages in a "bad act" set forth in Rule 506.   Accordingly, each Limited Partner agrees that the General Partner may deem the portion of any Bad Actor Limited Partner's Interests to be, or convert any Bad Actor Limited Partner's Interests into, Non-Voting Interests (except for the purposes of voting on any amendment to this Agreement that would materially and adversely change the Bad Actor Limited Partner's rights and preferences as a Limited Partner other than pursuant to an amendment under Section 8.1(c)) to the extent that the General Partner determines that such portion is in excess of 19.99% of the outstanding aggregate voting Interests of all Partners excluding any Interests that are Non-Voting Interests.

**8.14    Entire Agreement**

The parties acknowledge and agree that, this Agreement, together with any other agreement with a Limited Partner pursuant to Section 8.1(e), constitutes the entire agreement among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements and understandings pertaining thereto.

[Signature Page Follows]

The parties hereto have executed this Agreement as of the day and year first above written.

**GENERAL PARTNER:**

HIGHLAND MULTI STRATEGY CREDIT FUND GP, L.P.

By:   HIGHLAND MUTI STRATEGY CREDIT GP, LLC
      its general partner

By:   HIGHLAND CAPITAL MANAGEMENT, L.P.
      its sole member

By:   STRAND ADVISORS, INC.
      its general partner

By: _____

Name: __James Dondero_____

Title: __President_____

**LIMITED PARTNERS:**

By:   HIGHLAND MULTI STRATEGY CREDIT FUND GP, L.P
      attorney-in-fact for the Limited Partners

By:   HIGHLAND MULTI STRATEGY CREDIT GP, LLC
      its general partner

By:   HIGHLAND CAPITAL MANAGEMENT, L.P.
      its sole member

By:   STRAND ADVISORS, INC.
      its general partner

By: _____

Name: __James Dondero_____

Title: __President_____

*Signature Page to the Fourth Amended and Restated Limited Partnership Agreement of Highland Multi Strategy Credit Fund, L.P.*

# **EXHIBIT F**

THE COMPANIES LAW (2013 REVISION)

OF THE CAYMAN ISLANDS

COMPANY LIMITED BY SHARES


AMENDED AND RESTATED

MEMORANDUM AND ARTICLES OF ASSOCIATION


OF


HIGHLAND MULTI STRATEGY CREDIT FUND, LTD.

(As Adopted by Special Resolution on 1 November 2014)



*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

THE COMPANIES LAW (2013 REVISION)

OF THE CAYMAN ISLANDS

COMPANY LIMITED BY SHARES


AMENDED AND RESTATED

MEMORANDUM OF ASSOCIATION

OF

HIGHLAND MULTI STRATEGY CREDIT FUND, LTD.

**(As Adopted by Special Resolution on 1 November 2014)**


1    The name of the Company is **Highland Multi Strategy Credit Fund, Ltd.**

2    The Registered Office of the Company shall be at the offices of Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands, or at such other place within the Cayman Islands as the Directors may decide.

3    The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by the laws of the Cayman Islands.

4    The liability of each Member is limited to the amount unpaid on such Member's Shares.

5    The share capital of the Company is US$50,000 divided into 100 Management Shares of US$0.01 par value each and 49,999,000 Participating Shares of US$0.001 par value each.

6    The Company has power to register by way of continuation as a body corporate limited by shares under the laws of any jurisdiction outside the Cayman Islands and to be deregistered in the Cayman Islands.

7    Capitalised terms that are not defined in this Memorandum of Association bear the respective meanings given to them in the Articles of Association of the Company.



**THE COMPANIES LAW (2013 REVISION)**

**OF THE CAYMAN ISLANDS**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**ARTICLES OF ASSOCIATION**

**OF**

**HIGHLAND MULTI STRATEGY CREDIT FUND, LTD.**

**(As Adopted by Special Resolution on 1 November 2014)**

## 1     Interpretation

1.1     In these Articles, Table A in the First Schedule to the Statute does not apply and unless there is something in the subject or context inconsistent therewith:

| | |
|---|---|
| "**Administrator**" | means the person, firm or corporation appointed and from time to time acting as administrator of the Company. |
| "**Articles**" | means these articles of association of the Company. |
| "**Auditor**" | means the person (if any) for the time being performing the duties of auditor of the Company. |
| "**Business Day**" | means any day normally treated as a business day in such places and/or on such markets as the Directors may from time to time determine. |
| "**Cayman Islands**" | means the British Overseas Territory of the Cayman Islands. |
| "**Class**" | means a separate class of Participating Share (and includes any sub-class of any such class). |
| "**Company**" | means the above-named Company. |
| "**Directors**" | means the directors for the time being of the Company. |
| "**Dollars**" or "**US$**" | refers to the currency of the United States. |
| "**Electronic Record**" | has the same meaning as in the Electronic Transactions Law. |



*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

| | |
|---|---|
| "**Electronic Transactions Law**" | means the Electronic Transactions Law (2003 Revision) of the Cayman Islands. |
| "**Eligible Investor**" | means a person eligible to hold Participating Shares, as determined from time to time by the Directors. |
| "**FATCA**" | means: |

    (i)    sections 1471 to 1474 of the US Internal Revenue Code of 1986 and any associated legislation, regulations or guidance, or similar legislation, regulations or guidance enacted in any jurisdiction which seeks to implement similar tax reporting and/or withholding tax regimes;

    (ii)    any intergovernmental agreement, treaty, regulation, guidance or any other agreement between the Cayman Islands (or any Cayman Islands government body) and the US, the UK or any other jurisdiction (including any government bodies in such jurisdiction), entered into in order to comply with, facilitate, supplement or implement the legislation, regulations or guidance described in paragraph (i); and

    (iii)    any legislation, regulations or guidance in the Cayman Islands that give effect to the matters outlined in the preceding paragraphs.

| | |
|---|---|
| "**Gross Negligence**" | shall have the meaning ascribed thereto under the laws of the State of Delaware, USA. |
| "**Investment Manager**" | means the person, firm or corporation appointed and for the time being acting as the investment manager of the Company. |
| "**Management Share**" | means a voting non participating Share in the capital of the Company of US$0.01 par value designated as a Management Share and having the rights provided for in these Articles. |
| "**Master Fund**" | means Highland Multi Strategy Credit Fund, L.P., or any other entity in which all, or substantially all, of the assets of the Company are invested. |
| "**Member**" | means each person whose name is, from time to time and for the time being, entered in the Register of Members as the holder of one or more Shares. |

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

| | |
|---|---|
| **"Memorandum"** | means the memorandum of association of the Company. |
| **"Net Asset Value"** | means the value of the assets less the liabilities of the Company, or of a Separate Account (as the context may require), calculated in accordance with these Articles. |
| **"Net Asset Value per Participating Share"** | means the amount determined in accordance with these Articles as being the Net Asset Value per Participating Share of a particular Class and/or Series. |
| **"New Issue"** | has the meaning ascribed thereto by Rule 2790 adopted by the National Association of Securities Dealers, Inc. |
| **"New Issue Investment"** | means any New Issue acquired by the Company. |
| **"New Issue Shares"** | means a class of Participating Shares issued and designated as "New Issue Shares" and which may be issued in any one or more Series having the rights and restrictions set out in these Articles |
| **"Offering Memorandum"** | means an offering memorandum relating to Participating Shares of any Class and/or Series as amended or supplemented from time to time subject to and in accordance with these Articles. |
| **"Ordinary Resolution"** | means a resolution passed by a simple majority of the votes of such Members as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting, and includes a unanimous written resolution. |
| **"Participating Share"** | means a participating redeemable Share in the capital of the Company of US$0.001 par value and having the rights provided for in these Articles.  Participating Shares may be divided into Classes in the discretion of the Directors in accordance with the provisions of these Articles and each Class may be further divided into different Series of Participating Shares and the term "Participating Share" shall include all such Classes and Series of Participating Share. |
| **"Prohibited Person"** | means any person who is restricted from participating in a New Issue pursuant to the Free-Riding and Withholding Interpretation adopted by the Board of Governors of the National Association of Securities Dealers Inc. |
| **"Redemption Date"** | means, in relation to any Class and/or Series of Participating Shares, such day or days as are set out in the Offering Memorandum or as may be specified by the Directors from time to time, upon which a Member is entitled to require the redemption of Participating Shares |

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

of that Class and/or Series.

| | |
|---|---|
| "**Redemption Fee**" | means such fee (if any) payable by a Member to the Company on a redemption of Participating Shares, as the same may be determined by the Directors and disclosed to the Member at the time of its subscription for such Participating Shares. |
| "**Redemption Notice**" | means a notice in a form approved by the Directors by which a holder of Participating Shares is entitled to require the Company to redeem its Participating Shares. |
| "**Redemption Price**" | means the price determined in accordance with these Articles at which redeemable Participating Shares of the relevant Class and/or Series may be redeemed. |
| "**Register of Members**" | means the register of Members, which shall be maintained in accordance with the Statute and includes (except where otherwise stated) any branch or duplicate Register of Members. |
| "**Registered Office**" | means the registered office for the time being of the Company. |
| "**Sales Charge**" | means such sales charge (if any) determined by the Directors as being payable by a subscriber on a subscription for Participating Shares of any Class and/or Series. |
| "**Seal**" | means the common seal of the Company and includes every duplicate seal. |
| "**Separate Account**" | means a separate internal account of the Company which the Directors may establish and cause to be maintained in accordance with these Articles. |
| "**Series**" | means a separate series of Participating Share (and includes any sub-series of any such series). |
| "**Share**" and "**Shares**" | means a share or shares of any class or series in the Company, including a Management Share, a Participating Share or a New Issue Share, as well as any fraction of a Share. |
| "**Share Rights**" | means, with respect to the Participating Shares of any Class or Series in issue, the class rights for the time being applicable to such Participating Shares or other terms of offer for the time being applicable to such Participating Shares whether set out in the Offering Memorandum, any subscription agreement or otherwise (including any representations, warranties or other disclosure relating |

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

|  |  |
|---|---|
| | to the offer or holding of such Participating Shares). |
| "**Special Resolution**" | has the same meaning as in the Statute and includes a unanimous written resolution. |
| "**Statute**" | means the Companies Law (2013 Revision) of the Cayman Islands. |
| "**Subscriber**" | means the subscriber to the Memorandum. |
| "**Subscription Date**" | means, in relation to Participating Shares of any Class and/or Series, such day or days as are set out in the Offering Memorandum or as may be specified by the Directors from time to time upon which a person may subscribe for Participating Shares of that Class and/or Series. |
| "**Subscription Price**" | means the price determined in accordance with these Articles at which Participating Shares of the relevant Class and/or Series may be subscribed. |
| "**Suspension**" | means a determination by the Directors to postpone or suspend (i) the calculation of the Net Asset Value of Participating Shares of any one or more Classes and/or Series (and the applicable Valuation Date) (a "**Calculation Suspension**"); (ii) the issue of Participating Shares of any one or more Classes and/or Series (and the applicable Subscription Date) (an "**Issue Suspension**"); (iii) the redemption by Members (in whole or in part) of Participating Shares of any one or more Classes and/or Series (and the applicable Redemption Date) (a "**Redemption Suspension**"); and/or (iv) the payment (in whole or in part) of any redemption proceeds (even if Valuation Dates and Redemption Dates are not postponed) (a "**Payment Suspension**"). |
| "**Transfer**" | means, in respect of any Share, any sale, assignment, exchange, transfer, pledge, encumbrance or other disposition of that Share, and "**Transferred**" shall be construed accordingly. |
| "**Treasury Share**" | means a Share held in the name of the Company as a treasury share in accordance with the Statute. |
| "**Valuation Date**" | means, in relation to each Class and/or Series of Participating Shares, the day or days determined from time to time by the Directors to be the day or days on which the Net Asset Value per Participating Share of that Class and/or Series is calculated. |
| "**Valuation Point**" | means, with respect to any Class and/or Series, the time or times on the Valuation Date of such Class and/or Series at which the Directors |

Uploaded: 03-Nov-2014 14:05 EST

Filed: 05-Nov-2014 18:02 EST

determine that the Net Asset Value per Participating Share of that Class and/or Series shall be calculated.

1.2     In these Articles:

(a)     the singular number includes the plural number and vice versa;

(b)     the masculine gender includes the feminine gender;

(c)     persons includes corporations;

(d)     "written" and "in writing" include all modes of representing or reproducing words in visible form, including in the form of an Electronic Record;

(e)     "shall" shall be construed as imperative and "may" shall be construed as permissive;

(f)     references to provisions of any law or regulation shall be construed as references to those provisions as amended, modified, re-enacted or replaced from time to time;

(g)     any phrase introduced by the terms "including", "include", "in particular" or any similar expression shall be construed as illustrative and shall not limit the sense of the words preceding those terms;

(h)     the term "and/or" is used herein to mean both "and" as well as "or."  The use of "and/or" in certain contexts in no respects qualifies or modifies the use of the terms "and" or "or" in others.   "Or" shall not be interpreted to be exclusive, and "and" shall not be interpreted to require the conjunctive — in each case, unless the context otherwise requires;

(i)     any reference to the powers of the Directors shall include, when the context admits, the service providers or any other person to whom the Directors may delegate their powers;

(j)     any requirements as to delivery under the Articles include delivery in the form of an Electronic Record;

(k)     any requirements as to execution or signature under the Articles including the execution of the Articles themselves can be satisfied in the form of an electronic signature as defined in the Electronic Transactions Law;

(l)     sections 8 and 19(3) of the Electronic Transactions Law shall not apply; and

(m)     headings are inserted for reference only and shall be ignored in construing these Articles.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

## 2 Commencement of Business

2.1 The business of the Company may be commenced as soon after incorporation as the Directors shall see fit.

2.2 The Directors may pay, out of the capital or any other monies of the Company, all expenses incurred in or about the formation and operation of the Company, including the expenses of registration and the initial offering of Participating Shares.

## 3 Service Providers

3.1 The Directors may appoint any person, firm or corporation to act as a service provider to the Company (whether in general or in respect of any Class and/or Series of Shares) and may entrust to and confer upon any such service providers any of the functions, duties, powers and discretions exercisable by them as Directors, upon such terms and conditions (including as to remuneration payable by the Company) and with such powers of delegation, but subject to such restrictions, as they think fit. Without limiting the generality of the foregoing, such service providers may include managers, investment advisers, administrators, registrars, transfer agents, custodians and prime brokers.

3.2 Without prejudice to the generality of the preceding Article, the Directors may appoint any person, firm or corporation to act as the Investment Manager with respect to the assets of the Company (whether in general or in respect of any Class and/or Series of Shares). The Directors may entrust to and confer upon the Investment Manager any of the functions, duties, powers and discretions exercisable by them as Directors upon such terms and conditions (including as to remuneration payable by the Company) and with such powers of delegation, but subject to such restrictions, as they think fit.

## 4 Rights attaching to Shares

4.1 The Management Shares shall have the following rights:

(a) as to voting: the holder of a Management Share shall (in respect of such Management Share) have the right to receive notice of, attend at and vote as a Member at any general meeting of the Company; and

(b) as to capital: a Management Share shall confer upon the holder the right in a winding up to repayment of capital as provided in these Articles but shall confer no other right to participate in the profits or assets of the Company; and

(c) as to income: no dividends shall be payable on the Management Shares.

4.2 The Participating Shares shall have the following rights:



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

(a)  as to voting: the holder of a Participating Share shall not (in respect of such Participating Share) have the right to receive notice of, attend at or vote as a Member at any general meeting of the Company, but may vote at a separate Class meeting convened in accordance with these Articles; and

(b)  as to capital: a Participating Share shall confer upon the holder thereof the right in a winding up to participate in the surplus assets of the Company by reference to the Separate Account attributable to the relevant Class or Series of Participating Shares as provided in these Articles; and

(c)  as to income: the Participating Shares shall confer on the holders thereof the right to receive dividends as provided in these Articles.

4.3  Notwithstanding Articles 4.1(a) and 4.2(a), if the Company, in its capacity as a limited partner of the Master Fund, is called upon to approve, vote or consent to any matter to which it would be entitled to vote as a limited partner of the Master Fund and is required to seek the consent of the holders of Participating Shares in connection with any such approval, vote or consent pursuant to the constitutional documents of the Master Fund (a "**Master Fund Consent Transaction**"), each holder of a Participating Share shall have the right (in respect of such Participating Share), to the exclusion of the holders of the Management Shares (in respect of such Management Shares), to receive notice of, and vote on, the Master Fund Consent Transaction (the "**Special Voting Right**").  The voting rights attributable to each Participating Share shall be calculated by reference to the Net Asset Value per Participating Share (calculated as at the most recent Valuation Date) and not on the basis of one Participating Share, one vote.  For every Master Fund Consent Transaction, the Directors shall cause the Company to vote its limited partnership interest in the Master Fund proportionally for and against such matter in the same proportion that the Members holding Participating Shares voted for and against such matter pursuant to the Special Voting Right.

4.4  In relation to any Special Voting Right pursuant to Article 4.3, unless otherwise determined by the Directors in their sole discretion, the procedure in this Article 4.4 shall be invoked.  The Directors shall provide written notice of the proposed Master Fund Consent Transaction to the Members holding Participating Shares and shall specify a deadline (the "**Consent Date**"), which shall be no earlier than 30 days after the date of giving such notice, by which date such Members may submit a written refusal to consent to the proposed Master Fund Consent Transaction.  The holders of Participating Shares in respect of which an express written refusal to consent has not been received by the Consent Date shall be deemed to have consented in writing to the proposed Master Fund Consent Transaction.

## 5  Share Capital

5.1  Subject to these Articles, the Directors may allot, issue, grant options or warrants over, or otherwise dispose of Shares in separate classes and/or series with different terms, preferences, privileges or special rights including, without limitation, with respect to investment strategy and/or policy, participation in assets, profits and losses of the Company, voting, fees charged (including

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

management, performance and incentive fees), redemption privileges, allocation of costs and expenses (including, without limitation, the costs and expenses incurred in any hedging activities and any profits and losses arising therefrom) as they think proper.  Subject to the Statute, these Articles and any applicable subscription agreement, any Share Rights (other than those set out in these Articles or set out in a Special Resolution) may be varied by either the Directors or by Ordinary Resolution.  Notwithstanding the foregoing, the Subscriber shall have the power to:

(a)    issue one Share to itself;

(b)    transfer that Share by an instrument of transfer to any person; and

(c)    update the Register of Members in respect of the issue and transfer of that Share.

5.2    On or before the allotment of any Participating Share the Directors shall resolve the Class and/or Series to which such Participating Share shall be classified and may, prior to the issue of any Participating Share, reclassify such Participating Share.  Each Class and/or Series shall be specifically identified.  Subject to the Statute and these Articles, the Directors may at any time re-name any Participating Share.

5.3    Notwithstanding the currency in which the par value of the Participating Shares is denominated, the Directors may specify any currency as the currency in which the Subscription Price, Redemption Price and Net Asset Value of Participating Shares of a Class and/or Series is calculated.

5.4    The Company shall not issue Shares to bearer.

5.5    Fractional Shares may be issued.

5.6    Shares shall only be issued as fully paid-up.

5.7    No right of pre-emption or first refusal shall attach to any Shares.

5.8    New Issue Shares shall not be issued to a Prohibited Person.

**6    Allotment and Issue of Participating Shares**

6.1    The Directors may from time to time allot and issue Participating Shares of any Class and/or Series.  The Directors may, in their discretion, refuse to allot and issue any Participating Shares, and shall not issue any Participating Shares to or for the account of an investor who is not an Eligible Investor.  If the Directors have declared a Calculation Suspension or Issue Suspension, no Participating Shares of that Class or Series (as appropriate) shall be issued until the relevant Suspension has ended.

6.2    The Directors shall determine the Subscription Price at the time of issue of the first issue of Participating Shares of any Class and/or Series.  Thereafter, the Directors may allot and issue

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

Participating Shares of the same Class and/or Series on any Subscription Date provided that such additional Participating Shares are issued at a Subscription Price equal to not less than the Net Asset Value per Participating Share of such Class and/or Series calculated on the relevant Subscription Date (or if the Subscription Date is not also a Valuation Date then on the immediately preceding Valuation Date).

6.3     The Directors may add to the Subscription Price per Participating Share (before making any rounding adjustment) an amount which they consider to be an appropriate allowance to reflect fiscal and purchase charges which would be incurred for the account of the Company in investing an amount equal to the Subscription Price.  The Directors may also add, in their discretion, a Sales Charge and/or an amount equal to any stamp duty and any other governmental taxes or charges payable by the Company with respect to the issue of such Participating Shares.

6.4     An applicant for Participating Shares shall pay for such Participating Shares in such currencies, in such manner, at such time, in such place and to such person acting on behalf of the Company as the Directors may from time to time determine.

6.5     Subject to the terms of any subscription agreement, an application for Participating Shares shall be irrevocable by an applicant for Participating Shares once it has been received by the Company.  Participating Shares shall be treated as having been issued with effect from the relevant Subscription Date notwithstanding that the subscriber for those Participating Shares may not be entered in the Register of Members until after the Subscription Date.

6.6     Participating Shares shall be issued in such minimum numbers as the Directors may specify either generally or in any particular case; likewise the Directors may from time to time prescribe an amount as the minimum subscription amount.

6.7     The Directors may resolve to accept non-cash assets in satisfaction (in whole or in part) of the Subscription Price.

6.8     The Directors may require an applicant for Participating Shares to pay to the Company for the benefit of any selling agent such selling commissions or such organisational charges as may have been disclosed to such applicant.  The Directors may differentiate between applicants as to the amount of such selling commissions or such organisational charges.

6.9     The Company may, in so far as the Statute permits, pay a commission to any person in consideration of that person subscribing or agreeing to subscribe whether absolutely or conditionally for any Participating Shares.  Such commissions may be satisfied by the payment of cash and/or the issue of fully or partly paid-up Participating Shares.  The Company may also on any issue of Participating Shares pay such brokerage as may be lawful.

## 7     Separate Accounts

7.1     The Directors shall have the power to establish and maintain, with respect to Participating Shares of any Class and/or Series, a Separate Account, to record (purely as an internal accounting

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

matter) the allocation, on a differentiated basis, of the assets and liabilities of the Company to the holders of Participating Shares of any such Class and/or a Series in a manner consistent with the methodology set forth in the Offering Memorandum and the rights otherwise attaching to the Participating Shares.

7.2 The proceeds from the issue of Participating Shares of any Class and/or Series shall be applied in the books of the Company to the Separate Account established for Participating Shares of that Class and/or Series. The assets and liabilities and income and expenditure attributable to that Separate Account shall be applied to such Separate Account and, subject to the provisions of these Articles, to no other Separate Account. In the event that the assets of a Separate Account referable to any Class and/or Series are exhausted, any and all unsatisfied claims which any Members or former Members referable to that Class and/or Series have against the Company shall be extinguished. The Members or former Members referable to a Class and/or Series shall have no recourse against the assets of any other Separate Account established by the Company.

7.3 Where any asset is derived from another asset (whether cash or otherwise), such derivative asset shall be applied in the books of the Company to the same Separate Account as the asset from which it was derived, and on each revaluation of an asset the increase or diminution in value shall be applied to the same Separate Account and, subject to the provisions of these Articles, to no other Separate Account.

7.4 In the case of any asset or liability of the Company which the Directors do not consider is attributable to a particular Separate Account, the Directors shall have discretion to determine the basis upon which any such asset or liability shall be allocated between or among Separate Accounts.

7.5 The Directors may, in the books of the Company, allocate assets and liabilities to and from Separate Accounts if, as a result of a creditor proceeding against certain of the assets of the Company or otherwise, a liability would be borne in a different manner from that in which it would have been borne if applied under the foregoing Articles.

7.6 The Directors may from time to time transfer, allocate or exchange an asset or liability from one Separate Account to another Separate Account provided that at the time of such transfer, allocation or exchange the Directors form the opinion (in good faith) that the value in money or money's worth of each such asset or liability transferred, allocated or exchanged is not significantly less or more than the value in money or money's worth (referred to in these Articles as "proper value") received by the Separate Account from which such asset or liability is transferred, allocated or exchanged except only as is otherwise provided by these Articles.

## 8 Determination of Net Asset Value

8.1 The Net Asset Value and Net Asset Value per Participating Share of each Class and/or Series shall be determined by or on behalf of the Directors as at the relevant Valuation Point on each relevant Valuation Date.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

8.2 In calculating the Net Asset Value and the Net Asset Value per Participating Share, the Directors shall apply such generally accepted accounting principles as they may determine.

8.3 The assets and liabilities of the Company shall be valued in accordance with such policies as the Directors may determine. Absent bad faith or manifest error, any valuation made pursuant to these Articles shall be binding on all persons.

8.4 Unless otherwise determined by the Directors in any resolution creating a Class and/or Series of Participating Shares or as otherwise disclosed in any Offering Memorandum, the Net Asset Value per Participating Share of each Class (or Series) shall be determined by allocating *pro rata* the Net Asset Value, as at the relevant Valuation Point, of the Company and/or of the relevant Separate Account among each Class and/or Series, adjusting the amount so calculated to reflect any fees, costs, foreign exchange items or other assets or liabilities which are properly attributable to a specific Class and/or Series and then by dividing the resultant amount by the number of Participating Shares of such Class and/or Series then in issue.

8.5 The Directors may determine that the Net Asset Value of any Class and/or Series shall be definitively determined on the basis of estimates and that such determination shall not be modified to reflect final valuations.

8.6 Any expense or liability may be amortised over such period as the Directors may determine.

8.7 The Directors may establish such reserves as they deem reasonably necessary for Company expenses and any other contingent Company assets or liabilities, and may, upon the reversal or release of such reserves, apply any monies resulting therefrom in such manner as they may, in their absolute discretion, determine.

8.8 Net Asset Value per Participating Share shall be rounded to the nearest cent or such other amount as the Directors may determine and the benefit of any such roundings may be retained by the Company.

8.9 The Directors may cause the Company to issue new Participating Shares at par or to compulsorily redeem at par such number of Participating Shares as they consider necessary to address, in such manner as they consider equitable, any prior miscalculation of Net Asset Value or Net Asset Value per Participating Share. The Company shall not be required to pay to the holder the redemption proceeds of any such compulsorily redeemed Participating Shares, which proceeds shall be retained by the Company.

## 9 Suspensions

9.1 The Directors may, from time to time, in the circumstances disclosed in the Offering Memorandum, declare a Suspension with respect to any one or more Classes and/or Series of Participating Shares.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

9.2    The Directors shall promptly notify all affected Members of any such Suspension and shall promptly notify such Members upon termination of such Suspension.

## 10    Transfer of Shares

10.1    Subject to Article 5.1, Shares may not be Transferred without the prior written approval of the Directors (which may be withheld for any or no reason) provided that the Directors may waive this requirement to the extent that they deem appropriate in connection with the listing of any Class or Series of Share on a stock exchange.

10.2    The Directors shall not register any Transfer of any Share to any person who is, in the opinion of the Directors, not an Eligible Investor.

10.3    Any proposed transferee shall provide to the Directors such information and documents as the Directors may request, including, without limitation, such documents or information as the Directors deem necessary or desirable:

(a)    to enable the Directors to determine that the proposed transferee is an Eligible Investor; and

(b)    to enable the Company to comply with all applicable laws, including anti-money laundering laws.

10.4    The instrument of Transfer of any Share shall be in writing and shall be executed by or on behalf of the transferor (and, if the Directors so require, signed by or on behalf of the transferee). The transferor shall be deemed to remain the holder of a Share until the name of the transferee is entered in the Register of Members.

## 11    Transmission of Shares

11.1    If a Member dies, the survivor or survivors (where the Member was a joint holder) or his or her legal personal representatives (where the Member was a sole holder) shall be the only persons recognised by the Company as having any title to the Member's interest in the Company.  The death of any Member shall not operate to relieve, waive or reduce any liabilities attaching to the Member's Shares at the time of death and such liabilities shall continue to bind any survivor or survivors, or any personal representative, as the case may be.

11.2    Any person becoming entitled to a Share in consequence of the death or bankruptcy, or the liquidation or dissolution, of a Member (or in any other way than by Transfer) and who is an Eligible Investor may, upon delivery to the Directors of such evidence as may from time to time be required by them of:

(a)    such person's entitlement to such Shares; and/or

(b)    such person's status as an Eligible Investor,



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

elect, either to become the holder of such Share or to have such Share Transferred to another Eligible Investor nominated by such person. If such person elects to become the holder of such Share, such person shall give notice in writing to the Directors to that effect, but the Directors shall, in either case, have the same right to decline registration of such person as a holder of such Share as they would have had in the case of a Transfer of the Share by that Member before his or her death or bankruptcy, or liquidation or dissolution, as the case may be.

11.3    Any person becoming entitled to a Share in consequence of the death or bankruptcy, or the liquidation or dissolution, of a Member (or in any other way than by Transfer) and who is not an Eligible Investor shall not be registered as the holder of such Share and shall promptly Transfer such Share to an Eligible Investor in accordance with these Articles.

11.4    A person becoming entitled to a Share by reason of the death or bankruptcy or liquidation or dissolution of the holder (or in any other case than by Transfer), and who is an Eligible Investor, shall be entitled to the same dividends and other advantages to which such person would be entitled if such person were the registered holder of such Share. However, the person shall not, before becoming a Member in respect of a Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company and the Directors may at any time give notice requiring any such person to elect either to be registered himself or to have some person nominated by him become the holder of the Share (but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the relevant Member before his death or bankruptcy or liquidation or dissolution or any other case than by transfer, as the case may be). If the notice is not complied with within ninety days the Directors may thereafter withhold payment of all dividends, bonuses or other monies payable in respect of the Share until the requirements of the notice have been complied with.

## 12    Redemption of Shares

12.1    Subject to any provisions relating to a specific Class and/or Series as set out in the Offering Memorandum or these Articles or in any resolution constituting a Class and/or Series or otherwise forming part of the special rights of such Participating Shares, a Member may require the redemption of all or any of such Member's Participating Shares by serving a Redemption Notice on the Company. Unless timely receipt is waived by the Directors in a particular case, a Redemption Notice shall be required to be received on or before a Redemption Date with respect to such Participating Shares (or such number of days prior to such Redemption Date as may be determined by the Directors).  Any Member redeeming Participating Shares shall submit to the Directors the share certificate (if any) issued in respect of those Participating Shares.  The Company shall redeem such Participating Shares at the Redemption Price, being an amount equal to the Net Asset Value per Participating Share of the relevant Class and/or Series prevailing on the relevant Redemption Date (or if the Redemption Date is not a Valuation Date then on the immediately preceding Valuation Date) subject to any deductions, holdbacks or adjustments provided for in these Articles and/or the Offering Memorandum.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

12.2   The Directors may deduct any Redemption Fee from the Redemption Price.  The Directors may also deduct such amount which they consider to be an appropriate allowance to reflect fiscal and sale charges which would be incurred for the account of the Company in realising assets or closing out positions to provide funds to meet any redemption request.

12.3   A Member may not withdraw a Redemption Notice once submitted to the Company unless (a) the Directors shall have declared a Calculation Suspension or Redemption Suspension or (b) the Directors determine (in their sole discretion) to permit the withdrawal of such redemption request (which they may do in whole or in part).  If a relevant Suspension has been declared by the Directors, the right of a Member to have its Participating Shares redeemed shall be suspended and during the period of Suspension the Member may withdraw its Redemption Notice.  Any withdrawal of the Redemption Notice shall be made in writing and shall only be effective if actually received by the Company before the termination of the period of the Redemption Suspension or Calculation Suspension, as applicable.  If the Redemption Notice is not withdrawn, any Participating Shares the redemption of which has been suspended shall be redeemed once the relevant Suspension has ended at the Redemption Price for Participating Shares of the relevant Class and/or Series calculated on the next Redemption Date following the end of the relevant Suspension.

12.4   The Directors may impose a gate the effect of which is to limit the redemptions of Participating Shares of any Class and/or Series or to limit the redemptions of Participating Shares held by any Member or Members as of any Redemption Date to such extent and in such manner as is disclosed in the Offering Memorandum.  If the Directors determine to limit redemptions, the Directors may determine the manner in which such gated redemption requests will be dealt with on any subsequent Redemption Date.

12.5   If the Company is required by the laws of any relevant jurisdiction to make a withholding from any redemption monies payable to the holder of Participating Shares the amount of such withholding shall be deducted from the redemption monies otherwise payable to such person.

12.6   No redemption of part of a Member's holding of Participating Shares of any one Class and/or Series may be made if, as a result thereof, such Member would hold fewer Participating Shares of such Class and/or Series than such minimum number or value of Participating Shares of such Class and/or Series as may from time to time be specified (either generally or in any particular case or cases) by the Directors.  If such partial redemption would reduce such Member's holding of Participating Shares to less than such minimum holding, the Directors may, in their discretion, elect to compulsorily redeem all of such Member's Participating Shares.

12.7   The Company may, in the absolute discretion of the Directors, refuse to make a redemption payment to a Member if the Directors suspect or are advised that the payment of any redemption proceeds to such Member may result in a breach or violation of any anti-money laundering law by any person in any relevant jurisdiction, or if such refusal is necessary to ensure the compliance by the Company, its Directors, the Administrator or any other service provider of the Company with any anti-money laundering law in any relevant jurisdiction.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

12.8    Any amount payable to a Member for the redemption of Participating Shares shall be paid in such currency or currencies as the Directors may determine.  Subject to any Payment Suspension, the Company shall remit redemption proceeds (net of the costs of remittance) by cheque or wire transfer within such period or periods as the Directors shall have disclosed to the Member at the time of its subscription for Participating Shares or, in the absence of any such disclosure, within such period or periods as the Directors shall determine.  In the absence of directions as to payment the Company may remit redemption proceeds by cheque to the address of the Member appearing on the Register of Members or by wire transfer to such account as the Directors deem appropriate in the circumstances.  The Company shall not be liable for any loss resulting from this procedure.

12.9    On any redemption of Participating Shares the Directors shall have the power to satisfy (in whole or in part) the Redemption Price (and any other sums payable on redemption as provided in these Articles) owing on the redemption of such Participating Shares by dividing *in specie* the whole or any part of the assets of the Company (including, without limitation, shares, debentures, or securities of any other company whether or not held by the Company on the Redemption Date in question) and either (i) distributing such assets directly to the redeeming shareholder, and/or (ii) distributing or allocating such assets to a liquidating account or other similar mechanism to be managed and/or liquidated at the discretion of the Directors.

12.10   Participating Shares shall be treated as having been redeemed with effect from the relevant Redemption Date irrespective of whether or not a Member has been removed from the Register of Members or the Redemption Price has been determined or remitted. Accordingly, on and from the relevant Redemption Date, Members in their capacity as such will not be entitled to or be capable of exercising any rights arising under these Articles with respect to Participating Shares being redeemed (including any right to receive notice of, attend or vote at any meeting of the Company) save the right to receive the Redemption Price and any dividend which has been declared prior to the relevant Redemption Date but not yet paid (in each case with respect to the Participating Shares being redeemed). Such Members will be treated as creditors of the Company with respect to the Redemption Price and will rank accordingly in the priority of the Company's creditors.

12.11   Once a Participating Share is redeemed it shall be available for re issue and, until re issue, shall form part of the authorised and unissued share capital of the Company.

12.12   Upon the written request of a Member or prospective Member in a form acceptable to the Directors, the Company may, in the discretion of the Directors, accept a standing redemption request from such Member or prospective Member pursuant to which the Company shall agree (without assuming any liability for failing to do so) to use its commercially reasonable efforts to redeem such Member's Participating Shares to the extent necessary to ensure that such Member does not own over a specified percentage of the outstanding Participating Shares of the Company or any Class and/or Series thereof; such percentage to be the percentage identified by such Member or prospective Member in such written request as being the percentage which such Member's or prospective Member's ownership cannot exceed without material risk of such



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

Member or prospective Member being in violation of applicable law or regulation. Any such written request may be revoked by notice in writing to the Company from the affected Member.

12.13 No amendment to these Articles made after a Redemption Date shall affect a Member with respect to Participating Shares of that Member which have been redeemed, or are being treated as redeemed, on or prior to that Redemption Date.

12.14 Unless otherwise provided in the Offering Memorandum, unremitted redemption proceeds shall not bear interest against the Company and redeemed Participating Shares shall not participate in the profits and losses of the Company with effect from the relevant Redemption Date.

## 13 Compulsory Redemption

13.1 The Directors may cause the Company to redeem any or all of the Participating Shares held by any person at the appropriate Redemption Price in the circumstances disclosed in the Offering Memorandum. If the Directors determine compulsorily to redeem any Participating Shares under this Article they shall give the holder of the Participating Shares such notice of the redemption as they shall have disclosed to the Member at the time of its subscription for Participating Shares or, in the absence of any such disclosure, within such period as the Directors shall determine.

13.2 The Directors may cause a compulsory redemption during any period for which a Redemption Suspension has been declared.

13.3 Without prejudice to the generality of the foregoing, the Company may (without notice) compulsorily redeem the Participating Shares of any Member and, on behalf of such Member, apply the proceeds of redemption in paying for new Participating Shares to give effect to any exchange, conversion or roll-up policy disclosed to Members pursuant to which Participating Shares of one Class or Series (the "**Old Shares**") may, at the option of the Company, be exchanged for Participating Shares of another Class or Series (the "**New Shares**") by means of the redemption of the Old Shares and the immediate re-subscription of the redemption proceeds in paying up the New Shares.

## 14 FATCA

14.1 Notwithstanding any other Article, in order to comply with FATCA, any Director shall be entitled to release and/or disclose on behalf of the Company to the Cayman Islands Tax Information Authority or equivalent authority (the "**TIA**") and any other foreign government body as required by FATCA, any information in its or its agents' or delegates' possession regarding a Member including, without limitation, financial information concerning the Member's investment in the Company, and any information relating to any shareholders, principals, partners, beneficial owners (direct or indirect) or controlling persons (direct or indirect) of such Member. Any such Director may also authorise any third party agent, including but not limited to, the Investment Manager or Administrator, to release and/or disclose such information on behalf of the Company.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

14.2 In order to comply with FATCA and, if necessary, to reduce or eliminate any risk that the Company or its Members are subject to withholding taxes pursuant to FATCA or incur any costs or liabilities associated with FATCA, the Directors may cause the Company to undertake any of the following actions:

(a) compulsorily redeem any or all of the Shares held by a Member either (i) where the Member fails to provide (in a timely manner) to the Company, or any agent or delegate of the Company, including but not limited to, the Investment Manager or the Administrator, any information requested by the Company or such agent or delegate pursuant to FATCA; or (ii) where there has otherwise been non-compliance by the Company with FATCA whether caused, directly or indirectly, by the action or inaction of such Member, or any related person, or otherwise;

(b) deduct from, or hold back, redemption or repurchase proceeds, dividend payments or any other distributions, in order to:

(i) comply with any requirement to apply and collect withholding tax pursuant to FATCA;

(ii) allocate to a Member an amount equal to any withholding tax imposed on the Company as a result of the Member's, or any related person's, action or inaction (direct or indirect), or where there has otherwise been non-compliance by the Company with FATCA;

(iii) ensure that any FATCA related costs, debts, expenses, obligations or liabilities (whether external, or internal, to the Company) are recovered from the Member(s) whose action or inaction (directly or indirectly, including the action or inaction of any person related to such Member) gave rise or contributed to such costs or liabilities;

(c) in order to give effect to the requirements imposed upon the Company by FATCA, including the actions contemplated by articles 14.2(a) and 14.2(b), the Directors may:

(i) create separate classes and/or series of Shares ("**FATCA Shares**"), with such rights and terms as the Directors may in their sole discretion determine, and following the compulsory redemption of some or all of a Member's Shares may immediately apply such redemption proceeds in subscribing for such number of FATCA Shares as the Directors determine; and/or

(ii) may re-name any number of Shares (whether issued or unissued) as FATCA Shares, create a Separate Account with respect to such FATCA Shares and apply any FATCA related costs, debts, expenses, obligations or liabilities (whether external, or internal, to the Company) to such Separate Account; and/or



Uploaded: 03-Nov-2014 14:05 EST

Filed: 05-Nov-2014 18:02 EST

(iii)    allocate any FATCA costs, debts, expenses, obligations, liabilities or withholding tax among Separate Accounts on a basis determined solely by the Directors; and/or

(iv)    adjust the Net Asset Value per Share of any relevant Shares (including any FATCA Share).

## 15    Designated Investments

15.1    The Directors may, in their discretion, classify certain of the Company's investments which are deemed by the Directors or the Investment Manager to be illiquid or the value of which is not readily or reliably ascertainable or which may have a relatively long-term investment horizon as "**Designated Investments**".  Once so classified, Designated Investments may, in the discretion of the Directors, be represented by a separate Class and/or Series of Participating Shares which, unless otherwise determined by the Directors, shall be allotted only to those Members who are holders of Participating Shares at the time of such designation.  The gains and losses attributable to Designated Investments may, in the discretion of the Directors, be segregated and separately calculated and attributed amongst Members holding Shares of the relevant Class or Series in such manner as is consistent with the relevant provisions of the Offering Memorandum. Participating Shares of any such separate Class and/or Series may be issued by way of bonus or by way of conversion or exchange of all or part of a Member's holding of Participating Shares of another Class and/or Series.  Similarly, Shares of a Designated Investment Class and/or Series may be converted or exchanged back into Participating Shares of the original Class and/or Series upon the Directors making a determination that the relevant investment no longer qualifies as a Designated Investment.  The power to convert or exchange Participating Shares of one Class and/or Series into Participating Shares of another Class and/or Series may be effected by the Directors in any manner permitted by the Statute and the Articles, including the compulsory redemption of Participating Shares of one Class and/or Series and the application of the proceeds of redemption in subscribing for Participating Shares of the other Class and/or Series or by redesignating a portion of the Participating Shares of any existing Class and/or Series as thereafter belonging to a new Class and/or Series.  Shares of a Class or Series of Shares which represent Designated Investments shall not, unless the Directors otherwise determine, be redeemable at the option of the Members holding such Participating Shares.  Where investments are classified as Designated Investments and Participating Shares of a separate Class and/or Series are issued by way of bonus, the requirement of these Articles to ensure proper value is transferred to the Separate Account of the Participating Shares of the original Class and/or Series to which such investments were originally allocated shall not apply.

## 16    Purchase and Surrender of Shares

16.1    Subject to the provisions of the Statute and without prejudice to these Articles, the Company may purchase its own Shares (including any redeemable Shares) in such manner and on such other terms as the Directors may agree with the relevant Member.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

16.2 The Company may make a payment in respect of the redemption or purchase of its own Shares in any manner permitted by the Statute, including out of capital.

16.3 The Directors may accept the surrender for no consideration of any fully paid Share.

## 17 Treasury Shares

17.1 The Directors may, prior to the purchase, redemption or surrender of any Share, determine that such Share shall be held as a Treasury Share.

17.2 The Directors may determine to cancel a Treasury Share or transfer a Treasury Share on such terms as they think proper (including, without limitation, for nil consideration).

## 18 Variation of Share Rights

18.1 Subject to the Statute, these Articles and any applicable subscription agreement, all or any of the Share Rights applicable to any Class or Series of Participating Shares in issue (unless otherwise provided by the terms of issue of those Participating Shares) may (whether or not the Company is being wound up) be varied without the consent of the holders of the issued Participating Shares of that Class or Series where such variation is considered by the Directors not to have a material adverse effect upon such holders' Share Rights; otherwise, any such variation may be made with the prior consent in writing of the holders of not less than two-thirds by Net Asset Value of such Participating Shares, or with the sanction of a resolution passed by a majority of at least two-thirds of the votes cast in person or by proxy at a separate meeting of the holders of such Participating Shares. For the avoidance of doubt, the Directors reserve the right, notwithstanding that any such variation may not have a material adverse effect, to obtain consent from the holders of such Participating Shares. To any such meeting all the provisions of these Articles as to general meetings shall *mutatis mutandis* apply, but so that any holder of a Participating Share present in person or by proxy may demand a poll, and the quorum for any such meeting shall be Members holding not less than twenty per cent. by Net Asset Value of the issued Participating Shares of the relevant Class or Series. At any Class meeting, the voting rights attributable to each Participating Share shall be calculated by reference to the Net Asset Value per Participating Share (calculated as at the most recent Valuation Date) and not on the basis of one Participating Share, one vote.

18.2 For the purposes of a Class consent, the Directors may treat two or more or all the Classes or Series of Participating Shares as forming one Class or Series if the Directors consider that such Classes or Series would be affected in the same way by the proposals under consideration, but in any other case shall treat them as separate Classes or Series.

18.3 Where the Shares of any Class or Series (the "**First Class**") rank, or will on issue rank, pari passu with the Shares of another Class or Series (the "**Second Class**") with respect to participation in the same pool of profits or assets of the Company on a winding up, the rights of the First Class shall be deemed to be varied by any variation of or creation of rights in the Second



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

Class (including on initial issue) which gives the Second Class priority over the First Class on a winding up of the Company.

18.4   Subject to the foregoing Articles, the Share Rights applicable to any Class or Series of Shares in issue shall (unless otherwise expressly provided by the conditions of issue of such Shares) be deemed not to be varied by:

   (a)   the creation, allotment or issue of further Shares ranking pari passu therewith and which may be issued with the benefit of the terms referred to below;

   (b)   the purchase or redemption of any Shares;

   (c)   the exercise of the powers to allocate assets and charge liabilities to the various Separate Accounts or any of them and to transfer the same to and from the various Separate Accounts or any of them, as provided for in these Articles;

   (d)   any reduction or waiver of any fees (including early redemption, management or performance fees) chargeable or allocable to any Class or Series of Shares;

   (e)   any reduction or waiver of any redemption notice, gate or lock-up period applicable to any Class or Series of Shares; or

   (f)   any variation or waiver contemplated by or provided for in the Offering Memorandum applicable to the relevant Class and/or Series.

18.5   In relation to any Class or Series consent required pursuant to Article 18.1, the Directors in their discretion may invoke the following procedure (the "**Negative Consent Procedure**"). The Directors shall provide written notice of the proposed variation (the "**Proposal**") to the Members of the affected Class or Series and shall specify a deadline (the "**Redemption Request Date**"), which shall be no earlier than 30 days after the date of giving such notice, by which date such Members may submit a written request for redemption of some or all of their Participating Shares of the affected Class and/or Series on the Redemption Date (the "**Specified Redemption Date**") specified by the Directors in such notice. The terms of the Proposal shall be such that its specified effective date (the "**Effective Date**") shall not be on or prior to the Specified Redemption Date. Such notice shall further provide that the holders of any Participating Shares in respect of which a request for redemption has not been received by the Redemption Request Date (the "**Affected Shares**") shall, in the absence of express written refusal to consent, be deemed to have consented in writing to the Proposal (such Affected Shares being the "**Negative Consent Shares**"). In the event that the Negative Consent Procedure is followed, only the Affected Shares shall be considered for the purposes of determining whether the written consent majority has been obtained under Article 18.1 with the holders of the Negative Consent Shares being deemed to have submitted a written consent in favour of the Proposal on the Effective Date.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

## 19 Variation of Terms

The Directors, with the consent of the Investment Manager, shall have the absolute discretion to agree with a Member to waive or modify the terms applicable to such Member's subscription for Participating Shares (including those relating to management and performance fees and redemption terms) without obtaining the consent of any other Member; provided that such waiver or modification does not amount to a variation of the rights attaching to the Participating Shares of such other Members.

## 20 Certificates for Shares

20.1 A Member shall only be entitled to a share certificate if the Directors resolve that share certificates shall be issued. Share certificates representing Shares, if any, shall be in such form as the Directors may determine. Share certificates shall be signed by one or more Directors or another person authorised by the Directors. The Directors may authorise certificates to be issued with the authorised signature(s) affixed by mechanical process. All certificates for Shares shall be consecutively numbered or otherwise identified and shall specify the Shares to which they relate. All certificates surrendered to the Company for transfer shall be cancelled and, subject to these Articles, no new certificate shall be issued until the former certificate representing a like number of relevant Shares shall have been surrendered and cancelled.

20.2 The Company shall not be bound to issue more than one certificate for Shares held jointly by more than one person and delivery of a certificate to one joint holder shall be a sufficient delivery to all of them.

20.3 If a share certificate is defaced, worn out, lost or destroyed, it may be renewed on such terms (if any) as to evidence and indemnity and on the payment of such expenses reasonably incurred by the Company in investigating evidence, as the Directors may prescribe, and (in the case of defacement or wearing out) on delivery up of the old certificate.

## 21 Register of Members

21.1 The Company shall maintain or cause to be maintained the Register of Members.

21.2 The Directors may determine that the Company shall maintain one or more branch registers of Members in accordance with the Statute. The Directors may also determine which register of Members shall constitute the principal register and which shall constitute the branch register or registers, and to vary such determination from time to time.

## 22 Closing Register of Members and Fixing Record Date

22.1 For the purpose of determining Members entitled to notice of, or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any dividend, or in order to make a determination of Members for any other proper purpose, the Directors may provide that the Register of Members shall be closed for transfers for a stated period which shall not in any case exceed thirty days.

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

22.2 In lieu of, or apart from, closing the Register of Members, the Directors may fix in advance or arrears a date as the record date for any such determination of Members entitled to notice of, or to vote at any meeting of the Members or any adjournment thereof, or for the purpose of determining the Members entitled to receive payment of any dividend or in order to make a determination of Members for any other proper purpose.

22.3 If the Register of Members is not so closed and no record date is fixed for the determination of Members entitled to notice of, or to vote at, a meeting of Members or Members entitled to receive payment of a dividend, the date on which notice of the meeting is sent or the date on which the resolution of the Directors declaring such dividend is passed, as the case may be, shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Article, such determination shall apply to any adjournment thereof.

## 23 Non Recognition of Trusts

The Company shall not be bound by or compelled to recognise in any way (even when notified) any equitable, contingent, future or partial interest in any Share, or (except only as is otherwise provided by these Articles or the Statute) any other rights in respect of any Share other than an absolute right to the entirety thereof in the registered holder.

23.1 if it is not paid all the provisions of these Articles shall apply as if that amount had become due and payable by virtue of a call.

23.2 The Directors may issue Shares with different terms as to the amount and times of payment of calls, or the interest to be paid.

23.3 The Directors may, if they think fit, receive an amount from any Member willing to advance all or any part of the monies uncalled and unpaid upon any Shares held by it, and may (until the amount would otherwise become payable) pay interest at such rate as may be agreed upon between the Directors and the Member paying such amount in advance.

23.4 No such amount paid in advance of calls shall entitle the Member paying such amount to any portion of a dividend declared in respect of any period prior to the date upon which such amount would, but for such payment, become payable.

## 24 Lien on Shares

24.1 The Company shall have a first and paramount lien on all Shares (whether fully paid-up or not) registered in the name of a Member (whether solely or jointly with others) for all debts, liabilities or engagements to or with the Company (whether presently payable or not) by such Member or such Member's estate, either alone or jointly with any other person, whether a Member or not, but the Directors may at any time declare any Share to be wholly or in part exempt from the provisions of this Article. The registration of a Transfer of any such Share shall operate as a waiver of the Company's lien thereon. The Company's lien on a Share shall also extend to any amount payable in respect of that Share.

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

23

24.2 The Company may sell, in such manner as the Directors think fit, any Shares on which the Company has a lien, if a sum in respect of which the lien exists is presently payable, and is not paid within fourteen clear days after notice has been given to the holder of the Shares, or to the person entitled to it in consequence of the death or bankruptcy of the holder, demanding payment and stating that if the notice is not complied with the Shares may be sold.

24.3 To give effect to any such sale the Directors may authorise any person to execute an instrument of Transfer of the Shares sold to, or in accordance with the directions of, the purchaser. The purchaser or such purchaser's nominee shall be registered as the holder of the Shares comprised in any such Transfer, and the purchaser shall not be bound to see to the application of the purchase money, nor shall the purchaser's title to the Shares be affected by any irregularity or invalidity in the sale or the exercise of the Company's power of sale under these Articles.

24.4 The net proceeds of such sale after payment of costs, shall be applied in payment of such part of the amount in respect of which the lien exists as is presently payable and any balance shall (subject to a like lien for sums not presently payable as existed upon the Shares before the sale) be paid to the person entitled to the Shares at the date of the sale.

## 25 Amendments of Memorandum and Articles and Alteration of Capital

25.1 The Company may, by Ordinary Resolution:

(a) increase its share capital by such sum and with such rights, priorities and privileges annexed thereto, as the resolution shall prescribe;

(b) consolidate and divide all or any of its share capital into Shares of larger amount than its existing Shares;

(c) by subdivision of its existing Shares or any of them divide the whole or any part of its share capital into Shares of smaller amount than is fixed by the Memorandum; and

(d) cancel any Shares that at the date of the passing of the resolution have not been taken or agreed to be taken by any person.

25.2 All new Shares created in accordance with the provisions of the preceding Article shall be subject to the same provisions of these Articles with reference to liens, Transfer, transmission and otherwise as the Shares in the original share capital.

25.3 Subject to the provisions of the Statute and the provisions of these Articles as regards the matters to be dealt with by Ordinary Resolution the Company may, by Special Resolution:

(a) change its name;

(b) alter or add to these Articles;



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

(c)    alter or add to the Memorandum with respect to any objects, powers or other matters specified therein; and

(d)    reduce its share capital or any capital redemption reserve fund.

## 26    Registered Office

Subject to the provisions of the Statute, the Company may by resolution of the Directors change the location of its Registered Office.  The Company may, in addition to its Registered Office, maintain such other offices or places of business as the Directors determine.

## 27    General Meetings

27.1    All general meetings other than annual general meetings shall be called extraordinary general meetings.  The Directors may call general meetings.

27.2    The Company may but shall not be obliged to hold a general meeting in each year as its annual general meeting, and shall specify the meeting as such in the notice calling it.  Any annual general meeting shall be held at such time and place as the Directors shall determine.

## 28    Notice of General Meetings

28.1    At least five Business Days' notice shall be given of any general meeting.  Every notice shall be exclusive of the day on which it is given or deemed to be given and of the day on which the meeting is to be held and shall specify the place, the day and the hour of the meeting and the general nature of the business and shall be given in the manner hereinafter mentioned or in such other manner if any as may be prescribed by the Company, provided that a general meeting of the Company shall, whether or not the notice specified in this Article has been given and whether or not the provisions of these Articles regarding general meetings have been complied with, be deemed to have been duly convened if it is so agreed:

(a)    in the case of an annual general meeting, by all the Members entitled to attend and vote thereat; and

(b)    in the case of an extraordinary general meeting, by a majority in number of the Members having the right to attend and vote at the meeting, being a majority together holding not less than ninety five per cent. in par value of the Shares giving that right.

28.2    The accidental omission to give notice of a general meeting to, or the non receipt of notice of a meeting by, any person entitled to receive notice thereof shall not invalidate the proceedings of that meeting.

## 29    Proceedings at General Meetings

29.1    No business shall be transacted at any general meeting unless a quorum is present. A quorum shall be one or more Members (present in person, by proxy or authorised corporate

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

representative, as the case may be) entitled to attend and vote and representing not less than twenty per cent. in par value of all of the Shares in issue and carrying the right to vote at the meeting.

29.2 A person may, with the consent of the Directors, participate at a general meeting by conference telephone or other communications equipment by means of which all the persons participating in the meeting can communicate with each other. Participation by a person in a general meeting in this manner is treated as presence in person at that meeting.

29.3 A resolution (including a Special Resolution) in writing (in one or more counterparts) signed by all Members for the time being entitled to receive notice of and to attend and vote at general meetings (or, being corporations or other non-natural persons, signed by their duly authorised representatives) shall be as valid and effective as if the resolution had been passed at a general meeting of the Company duly convened and held.

29.4 If a quorum is not present within half an hour from the time appointed for the meeting or if during such a meeting a quorum ceases to be present, the meeting, if convened upon the requisition of Members, shall be dissolved and in any other case it shall stand adjourned to the same day in the next week at the same time and place or to such other day, time or such other place as the Directors may determine, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Members present shall be a quorum.

29.5 The chairman, if any, of the board of Directors shall preside as chairman at every general meeting of the Company, or if there is no such chairman, or if the chairman shall not be present within fifteen minutes after the time appointed for the holding of the meeting, or is unwilling to act, the Directors present shall elect one of their number to be chairman of the meeting.

29.6 If no Director is willing to act as chairman, or if no Director is present within fifteen minutes after the time appointed for holding the meeting, the Members present shall choose one of their number to be chairman of the meeting.

29.7 The chairman may, with the consent of a meeting at which a quorum is present (and shall if so directed by the meeting) adjourn the meeting from time to time and from place to place, but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a general meeting is adjourned for thirty days or more, notice of the adjourned meeting shall be given as in the case of an original meeting. Otherwise it shall not be necessary to give any such notice.

29.8 A resolution put to the vote of a meeting shall be decided on a show of hands unless before, or on the declaration of the result of, the show of hands, the chairman or any Member present in person or by proxy (or in the case of a non-natural person, by its duly authorised representative or by proxy) demands a poll.

29.9 Unless a poll is duly demanded a declaration by the chairman that a resolution has been carried or carried unanimously, or by a particular majority, or lost or not carried by a particular majority,

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

an entry to that effect in the minutes of the proceedings of the meeting shall be conclusive evidence of that fact without proof of the number or proportion of the votes recorded in favour of or against such resolution.

29.10 The demand for a poll may be withdrawn.

29.11 Except on a poll demanded on the election of a chairman or on a question of adjournment, a poll shall be taken as the chairman directs, and the result of the poll shall be deemed to be the resolution of the general meeting at which the poll was demanded.

29.12 A poll demanded on the election of a chairman or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the general meeting directs, and any business other than that upon which a poll has been demanded or is contingent thereon may proceed pending the taking of the poll.

29.13 In the case of an equality of votes, whether on a show of hands or on a poll, the chairman shall not be entitled to a second or casting vote.

## 30 Votes of Members

30.1 Subject to any rights or restrictions attached to any Shares, on a show of hands every Member holding Shares carrying the right to vote on the matter in question who (being an individual) is present in person or by proxy or (if a corporation or other non-natural person) is present by its duly authorised representative or by proxy, shall have one vote and on a poll every such Member shall have one vote for every Share of which he is the holder.

30.2 In the case of joint holders of record, the vote of the senior holder who tenders a vote, whether in person or by proxy, shall be accepted to the exclusion of the votes of the other joint holders. Seniority among joint holders shall be determined by the order in which the names of the holders stand in the Register of Members.

30.3 A Member of unsound mind, or in respect of whom an order has been made by any court or authority having jurisdiction in lunacy, may vote, whether on a show of hands or on a poll, by the Member's committee, receiver, curator bonis, or other similar person appointed on such Member's behalf by that court or authority and any such committee, receiver, curator bonis or other similar person may vote by proxy.

30.4 No person shall be entitled to vote at any general meeting unless such person is registered as a Member on the record date for such meeting, nor unless all calls or other monies then payable by such person in respect of such Shares have been paid.

30.5 No objection shall be raised to the qualification of any voter except at the general meeting or adjourned general meeting at which the vote objected to is purported to be given or tendered and every vote not disallowed at the meeting shall be valid. Any objection made in due time shall be referred to the chairman whose decision shall be final and conclusive.

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

30.6 On a poll or on a show of hands votes may be cast either personally or by proxy. A Member may appoint more than one proxy or the same proxy under one or more instruments to attend and vote at a meeting. Where a Member appoints more than one proxy the instrument of proxy shall state which proxy is entitled to vote on a show of hands.

30.7 A Member holding more than one Share need not cast the votes in respect of its Shares in the same way on any resolution and therefore may vote a Share or some or all such Shares either for or against a resolution and/or abstain (any such abstentions to count neither for nor against the resolution) from voting a Share or some or all of the Shares and, subject to the terms of the instrument appointing it, a proxy appointed under one or more instruments may vote a Share or some or all of the Shares in respect of which such proxy is appointed either for or against a resolution and/or abstain from voting.

## 31      Proxies

31.1 The instrument appointing a proxy shall be in writing, be executed under the hand of the appointor or of such appointor's attorney duly authorised in writing or, if the appointor is a corporation or other non-natural person, under the hand of an officer or other person duly authorised for that purpose.   A proxy need not be a Member of the Company.

31.2 The Directors may, in the notice convening any meeting or adjourned meeting, or in an instrument of proxy sent out by the Company, specify the place and the time (being not later than the time for holding the meeting or adjourned meeting to which the proxy relates) at which the instrument appointing a proxy shall be deposited.   In the absence of any such direction from the Directors in the notice convening any meeting or adjourned meeting, the instrument appointing a proxy shall be deposited at the Registered Office not less than 48 hours before the time for holding the meeting or adjourned meeting at which the person named in the instrument proposes to vote.

31.3 The chairman may in any event, at the chairman's discretion, declare that an instrument of proxy shall be deemed to have been duly deposited.   An instrument of proxy that is not deposited in the manner permitted and which has not been declared to have been duly deposited by the chairman, shall be invalid.

31.4 The instrument appointing a proxy may be in any usual or common form and may be incorporated within any subscription agreement or other document signed by or on behalf of the Member.   An instrument appointing a proxy may be expressed to be for a particular meeting or any adjournment thereof or generally until revoked.   An instrument appointing a proxy shall be deemed to include the power to demand or join or concur in demanding a poll.

31.5 Votes given in accordance with the terms of an instrument of proxy shall be valid notwithstanding the previous death or insanity of the principal or revocation of the proxy or of the authority under which the proxy was executed, or the Transfer of the Share in respect of which the proxy is given unless notice in writing of such death, insanity, revocation or Transfer was received by the



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

Company at the Registered Office before the commencement of the general meeting, or adjourned meeting at which it is sought to use the proxy.

**32 Corporate Members**

Any corporation or other non-natural person which is a Member of the Company may in accordance with its constitutional documents, or in the absence of such provision by resolution of its directors or other governing body, authorise such person as it thinks fit to act as its representative at any meeting of the Company or of any Class of Members, and the person so authorised shall be entitled to exercise the same powers on behalf of the corporation which such person represents as the corporation could exercise if it were an individual Member.

**33 Shares Beneficially Owned by the Company**

Shares of the Company that are beneficially owned by the Company shall not be voted, directly or indirectly, at any meeting and shall not be counted in determining the total number of outstanding Shares at any given time.

**34 Directors**

There shall be a board of Directors consisting of not less than one person (exclusive of alternate Directors) provided however that the Company may from time to time by Ordinary Resolution increase or reduce the limits in the number of Directors. The first Directors of the Company shall be determined in writing by, or appointed by a resolution of, the Subscriber.

**35 Powers of Directors**

35.1 Subject to the provisions of the Statute, the Memorandum and the Articles and to any directions given by Special Resolution, the business of the Company shall be managed by the Directors who may exercise all the powers of the Company. No alteration of the Memorandum or these Articles and no such direction shall invalidate any prior act of the Directors which would have been valid if that alteration had not been made or that direction had not been given. A duly convened meeting of Directors at which a quorum is present may exercise all powers exercisable by the Directors.

35.2 All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for monies paid to the Company shall be signed, drawn, accepted, endorsed or otherwise executed as the case may be in such manner as the Directors shall determine by resolution.

35.3 The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof and to issue debentures, debenture stock, mortgages, bonds and other such securities whether outright or as security for any debt, liability or obligation of the Company or of any third party. Notwithstanding the foregoing, the Directors shall not exercise the powers specified in this Article in breach of any limits or restrictions specified in the Offering Memorandum.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

## 36 Appointment and Removal of Directors

36.1 The Company may, by Ordinary Resolution, appoint any person to be a Director and may, by Ordinary Resolution, remove any Director.

36.2 The Directors may appoint any person to be a Director, either to fill a vacancy or as an additional Director provided that the appointment does not cause the number of Directors to exceed any number fixed by or in accordance with these Articles as the maximum number of Directors.

## 37 Vacation of Office of Director

The office of a Director shall be vacated if:

(a) the Director gives notice in writing to the Company that such Director resigns the office of Director;

(b) the Director is absent (without being represented by proxy or an alternate Director appointed by such Director) from three consecutive meetings of the board of Directors without special leave of absence from the Directors, and they pass a resolution that such Director has by reason of such absence vacated office;

(c) the Director dies, becomes bankrupt or makes any arrangement or composition with such Director's creditors generally;

(d) the Director is or becomes of unsound mind;

(e) the Director ceases to be a Director by virtue of, or is prohibited from being a Director by, an order made pursuant to any law or regulation binding on the Company; or

(f) all the other Directors of the Company (being not less than two in number) resolve that such Director should be removed as a Director.

## 38 Proceedings of Directors

38.1 The quorum for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed shall be two if there are two or more Directors, and shall be one if there is only one Director. A person who holds office as an alternate Director shall, if such person's appointor is not present, be counted in the quorum. A Director who also acts as an alternate Director shall, if such Director's appointor is not present, count twice towards the quorum.

38.2 Subject to the provisions of these Articles, the Directors may regulate their proceedings as they think fit. Questions arising at any meeting shall be decided by a majority of votes. In the case of an equality of votes, the chairman shall not have a second or casting vote. A Director who is also an alternate Director shall be entitled in the absence of such Director's appointor to a separate vote on behalf of such Director's appointor in addition to such Director's own vote.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

38.3    A person may participate in a meeting of the Directors or any committee of Directors by conference telephone or other communications equipment by means of which all the persons participating in the meeting can communicate with each other at the same time. Participation by a person in a meeting in this manner is treated as presence in person at that meeting.  Unless otherwise determined by the Directors, the meeting shall be deemed to be held at the place where the chairman is located at the start of the meeting.

38.4    A resolution in writing (in one or more counterparts) signed by all the Directors or all the members of a committee of Directors (an alternate Director being entitled to sign such a resolution on behalf of such alternate Director's appointor) shall be as valid and effectual as if it had been passed at a meeting of the Directors, or committee of Directors as the case may be, duly convened and held.

38.5    A Director or alternate Director may, or other officer of the Company at the direction of a Director or alternate Director may call a meeting of the Directors by at least two days' notice in writing to every Director and alternate Director which notice shall set forth the general nature of the business to be considered unless notice is waived by all the Directors (or their alternates) either at, before or after the meeting is held.

38.6    The continuing Directors may act notwithstanding any vacancy in their body, but if and so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors the continuing Directors or Director may act for the purpose of increasing the number of Directors to that number, or of summoning a general meeting of the Company, but for no other purpose.

38.7    The Directors may elect a chairman of their board and determine the period for which the chairman is to hold office; but if no such chairman is elected, or if at any meeting the chairman is not present within five minutes after the time appointed for holding the same, the Directors present may choose one of their number to be chairman of the meeting.

38.8    All acts done by any meeting of the Directors or of a committee of Directors (including any person acting as an alternate Director) shall, notwithstanding that it be afterwards discovered that there was some defect in the appointment of any Director or alternate Director, or that they or any of them were disqualified, be as valid as if every such person had been duly appointed and qualified to be a Director or alternate Director as the case may be.

38.9    A Director but not an alternate Director may be represented at any meetings of the board of Directors by a proxy appointed in writing by such Director.  The proxy shall count towards the quorum and the vote of the proxy shall for all purposes be deemed to be that of the appointing Director.

## 39    Presumption of Assent

A Director who is present at a meeting of the board of Directors at which action on any Company matter is taken shall be presumed to have assented to the action taken unless the Director's dissent shall be entered in the minutes of the meeting or unless the Director shall file such

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

Director's written dissent from such action with the person acting as the chairman or secretary of the meeting before the close or adjournment thereof or shall forward such dissent by personal delivery, courier or registered post to such person immediately after the close or adjournment of the meeting. Such right to dissent shall not apply to a Director who voted in favour of such action.

## 40 Directors' Interests

40.1 A Director may hold any other office or place of profit under the Company (other than the office of Auditor) in conjunction with such Director's office of Director for such period and on such terms as to remuneration and otherwise as the Directors may determine.

40.2 A Director may act alone or by such Director's firm in a professional capacity for the Company and the Director or such Director's firm shall be entitled to remuneration for professional services as if such Director were not a Director or alternate Director.

40.3 A Director or alternate Director of the Company may be or become a director or other officer of or otherwise interested in any company promoted by the Company or in which the Company may be interested as shareholder or otherwise, and no such Director or alternate Director shall be accountable to the Company for any remuneration or other benefits received by such Director or alternate Director as a director or officer of, or from such Director or alternate Director's interest in, such other company.

40.4 No person shall be disqualified from the office of Director or alternate Director or prevented by such office from contracting with the Company, either as vendor, purchaser or otherwise, nor shall any such contract or any contract or transaction entered into by or on behalf of the Company in which any Director or alternate Director shall be in any way interested be or be liable to be avoided, nor shall any Director or alternate Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or transaction by reason of such Director holding office or of the fiduciary relationship thereby established. A Director (or such Director's alternate Director in such Director's absence) shall be at liberty to vote in respect of any contract or transaction in which such Director is interested provided that the nature of the interest of any Director or alternate Director in any such contract or transaction shall be disclosed by such Director at or prior to such Director's consideration and any vote thereon.

40.5 A general notice that a Director or alternate Director is a shareholder, director, officer or employee of any specified firm or company and is to be regarded as interested in any transaction with such firm or company shall be sufficient disclosure for the purposes of voting on a resolution in respect of a contract or transaction in which such Director has an interest, and after such general notice it shall not be necessary to give special notice relating to any particular transaction.

## 41 Minutes

The Directors shall cause minutes to be made in books kept for the purpose of recording all appointments of officers made by the Directors, all proceedings at meetings of the Company or



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

the holders of any Class of Shares and of the Directors, and of committees of Directors including the names of the Directors or alternate Directors present at each meeting.

## 42 Delegation of Directors' Powers

42.1 The Directors may delegate any of their powers to any committee consisting of one or more Directors or such other persons as the Directors may designate. They may also delegate to any managing director or any Director holding any other executive office such of their powers as they consider desirable to be exercised by such managing director or any Director provided that an alternate Director may not act as managing director and the appointment of a managing director shall be revoked forthwith if such managing director ceases to be a Director.  Any such appointment may be made subject to any conditions the Directors may impose, and either collaterally with or to the exclusion of their own powers, and may be revoked or altered.  Subject to any such conditions, the proceedings of a committee of Directors shall be governed by these Articles regulating the proceedings of Directors, so far as they are capable of applying.

42.2 The Directors may establish any committees, local boards or agencies or appoint any person to be a manager or agent for managing the affairs of the Company and may appoint any person to be a member of such committees or local boards.  Any such appointment may be made either collaterally with or to the exclusion of the Directors' powers, shall be subject to any conditions the Directors may impose, and may be revoked or altered.  Subject to any such conditions, the proceedings of any such committee, local board or agency shall be governed by these Articles regulating the proceedings of Directors, so far as they are capable of applying.

42.3 The Directors may by power of attorney or otherwise appoint any company, firm, person or body of persons to be the attorney or authorised signatory of the Company for such purpose and with such powers, authorities and discretions (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such powers of attorney or other appointment may contain such provisions for the protection and convenience of persons dealing with any such attorneys or authorised signatories as the Directors may think fit and may also authorise any such attorney or authorised person to delegate all or any of the powers, authorities and discretions vested in such attorney or authorised person.

42.4 The Directors may appoint such officers as they consider necessary on such terms, at such remuneration (if any) and to perform such duties, and subject to such provisions as to disqualification and removal as the Directors may think fit.  Unless otherwise specified in the terms of such officer's appointment an officer may be removed by resolution of the Directors or Members.

## 43 Alternate Directors

43.1 Any Director (other than an alternate Director) may by written notice to the Company appoint any other Director, or any other person willing to act, to be an alternate Director and by written notice to the Company may remove from office an alternate Director so appointed by the Director.

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

43.2 An alternate Director shall be entitled to receive notice of all meetings of Directors and of meetings of committees of Directors of which such alternate Director's appointor is a member, to attend and vote at every such meeting at which the Director appointing such alternate Director is not personally present, and generally to perform all the functions of such alternate Director's appointor as a Director in such Director's absence.

43.3 An alternate Director shall cease to be an alternate Director if such alternate Director's appointor ceases to be a Director.

43.4 Any appointment or removal of an alternate Director shall be by notice to the Company signed by the Director making or revoking the appointment or in any other manner approved by the Directors.

43.5 Subject to the provisions of the Articles, an alternate Director shall be deemed for all purposes to be a Director and shall alone be responsible for such alternate Director's own acts and defaults and shall not be deemed to be the agent of the Director appointing such alternate Director.

## 44    No Minimum Shareholding for Directors

The Company in general meeting may fix a minimum shareholding required to be held by a Director, but unless and until such a shareholding qualification is fixed a Director shall not be required to hold Shares.

## 45    Remuneration of Directors

45.1 The remuneration to be paid to the Directors, if any, shall be such remuneration as the Directors shall determine.  The Directors shall also be entitled to be paid all travelling, hotel and other expenses properly incurred by them in connection with their attendance at meetings of Directors or committees of Directors, or general meetings of the Company, or separate meetings of the holders of any Class of Shares or debentures of the Company, or otherwise in connection with the business of the Company, or to receive a fixed allowance in respect thereof as may be determined by the Directors, or a combination partly of one such method and partly the other.

45.2 The Directors may by resolution approve additional remuneration to any Director for any services other than such Director's ordinary routine work as a Director.  Any fees paid to a Director who is also counsel to the Company, or otherwise serves it in a professional capacity, shall be in addition to such Director's remuneration as a Director.

## 46    Seal

The Company may, if the Directors so determine, have a Seal, which shall only be used by the authority of the Directors or of a committee of the Directors authorised by the Directors.  Every instrument to which the Seal has been affixed shall be signed by at least one person who shall be either a Director or some officer or other person authorised by the Directors for the purpose.



SFC/690420-000001/33202513v4

*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

## 47    Dividends, Distributions and Reserves

47.1    Subject to the Statute, these Articles, and the special rights attaching to Participating Shares of any Class and/or Series, the Directors may, in their absolute discretion, declare dividends and distributions on Participating Shares of any Class and/or Series in issue and authorise payment of the dividends or distributions out of the relevant Separate Account in respect of such Participating Shares.  No dividend or distribution shall be paid except out of the realised or unrealised profits of the Company, or out of the share premium account attributable to Participating Shares of the Class and/or Series in respect of which the dividend or distribution is proposed to be paid, or as otherwise permitted by law.

47.2    Except as otherwise provided by the rights attached to Participating Shares, or as otherwise determined by the Directors, all dividends and distributions in respect of Participating Shares of a particular Class and/or Series shall be declared and paid according to Net Asset Value of the Participating Shares of the Class and/or Series that a Member holds. If any Participating Share is issued on terms providing that it shall rank for dividend or distribution as from a particular date, that Participating Share shall rank for dividend or distribution accordingly.

47.3    The Directors may deduct and withhold from any dividend or distribution otherwise payable to any Member all sums of money (if any) then payable by it to the Company on account of calls or otherwise or any monies which the Company is obliged by law to pay to any taxing or other authority.

47.4    Under no circumstances may the assets (or the income derived from such assets) attributed to a Separate Account in respect of any Class and/or Series be used to pay a dividend in respect of a Separate Account that is attributed to any other Class and/or Series.

47.5    The Directors may declare that any dividend or distribution be paid wholly or partly by the distribution of specific assets and in particular of shares, debentures or securities of any other company or in any one or more of such ways and, where any difficulty arises in regard to such distribution, the Directors may settle the same as they think expedient and in particular may issue fractional Shares and fix the value for distribution of such specific assets or any part thereof and may determine that cash payments shall be made to any Members upon the basis of the value so fixed in order to adjust the rights of all Members and may vest any such specific assets in trustees as may seem expedient to the Directors.

47.6    Any dividend, distribution, interest or other monies payable in cash in respect of Participating Shares may be paid by wire transfer to the holder or by cheque or warrant sent through the post directed to the registered address of the holder or, in the case of joint holders, to the registered address of the holder who is first named on the Register of Members or to such person and to such address as such holder or joint holders may in writing direct.  Every such cheque or warrant shall (unless the Directors in their sole discretion otherwise determine) be made payable to the order of the person to whom it is sent.  Any one of two or more joint holders may give effectual receipts for any dividends, bonuses, or other monies payable in respect of the Participating Share held by them as joint holders.

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

47.7    Any dividend or distribution which cannot be paid to a Member and/or which remains unclaimed after six months from the date of declaration of such dividend or distribution may, in the discretion of the Directors, be paid into a separate account in the Company's name, provided that the Company shall not be constituted as a trustee in respect of that account and the dividend or distribution shall remain as a debt due to the Member.  Any dividend or distribution which remains unclaimed after a period of six years from the date of declaration of such dividend or distribution shall be forfeited and shall revert to the Company.

47.8    No dividend or distribution shall bear interest against the Company.

## 48    Capitalisation

The Directors may capitalise any sum standing to the credit of any of the Company's reserve accounts (including share premium account and capital redemption reserve) or any sum standing to the credit of profit and loss account or otherwise available for distribution and to appropriate such sum to Members of any Class and/or Series in the proportions in which such sum would have been divisible amongst them had the same been a distribution of profits by way of dividend and to apply such sum on their behalf in paying up in full unissued Participating Shares for allotment and distribution credited as fully paid-up to and amongst them in the proportion aforesaid.  In such event the Directors shall do all acts and things required to give effect to such capitalisation, with full power to the Directors to make such provisions as they think fit for the case of Participating Shares becoming distributable in fractions (including provisions whereby the benefit of fractional entitlements accrue to the Company rather than to the Members concerned). The Directors may authorise any person to enter into an agreement with the Company, on behalf of all of the Members interested, providing for such capitalisation and matters incidental thereto and any agreement made under such authority shall be effective and binding on all concerned.

## 49    Books of Account

49.1    The Directors shall cause proper books of account (including, where applicable, material underlying documentation including contracts and invoices) to be kept with respect to all sums of money received and expended by the Company and the matters in respect of which the receipt or expenditure takes place, all sales and purchases of goods by the Company and the assets and liabilities of the Company.  Such books of account must be retained for a minimum period of five years from the date on which they are prepared.  Proper books shall not be deemed to be kept if there are not kept such books of account as are necessary to give a true and fair view of the state of the Company's affairs and to explain its transactions.

49.2    The Directors shall from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Members not being Directors and no Member (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by Statute, or authorised by the Directors or by the Company in general meeting.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

49.3 The Directors may from time to time cause to be prepared and to be laid before the Company in general meeting profit and loss accounts, balance sheets, group accounts (if any) and such other reports and accounts as may be required by law.

## 50 Audit

50.1 The Directors may appoint an Auditor of the Company who shall hold office on such terms as the Directors determine.

50.2 Every Auditor of the Company shall have a right of access at all times to the books and accounts and vouchers of the Company and shall be entitled to require from the Directors and officers of the Company such information and explanation as may be necessary for the performance of the duties of the Auditor.

50.3 Any Auditors of the Company shall, if so required by the Directors, make a report on the accounts of the Company during their tenure of office at the next annual general meeting following their appointment in the case of a company which is registered with the Registrar of Companies as an ordinary company, and at the next extraordinary general meeting following their appointment in the case of a company which is registered with the Registrar of Companies as an exempted company, and at any other time during their term of office, upon request of the Directors or any general meeting of the Members.

## 51 Notices

51.1 Notices shall be in writing and may be given by the Company to any Member either personally or by sending it by courier, post, cable, telex, fax or e-mail to the Member or to the address as shown in the Register of Members (or where the notice is given by e-mail by sending it to the e-mail address provided by such Member). Any notice, if posted from one country to another, is to be sent airmail.

51.2 Where a notice is sent by courier, service of the notice shall be deemed to be effected by delivery of the notice to a courier company, and shall be deemed to have been received on the third day (not including Saturdays or Sundays or public holidays) following the day on which the notice was delivered to the courier. Where a notice is sent by post, service of the notice shall be deemed to be effected by properly addressing, pre paying and posting a letter containing the notice, and shall be deemed to have been received on the fifth day (not including Saturdays or Sundays or public holidays in the Cayman Islands) following the day on which the notice was posted. Where a notice is sent by cable, telex or fax, service of the notice shall be deemed to be effected by properly addressing and sending such notice and shall be deemed to have been received on the same day that it was transmitted. Where a notice is given by e-mail service shall be deemed to be effected by transmitting the e-mail to the e-mail address provided by the intended recipient and shall be deemed to have been received on the same day that it was sent, and it shall not be necessary for the receipt of the e-mail to be acknowledged by the recipient.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

51.3 A notice may be given by the Company to the person or persons which the Company has been advised are entitled to a Share or Shares in consequence of the death or bankruptcy of a Member in the same manner as other notices which are required to be given under these Articles and shall be addressed to them by name, or by the title of representatives of the deceased, or trustee of the bankrupt, or by any like description at the address supplied for that purpose by the persons claiming to be so entitled, or at the option of the Company by giving the notice in any manner in which the same might have been given if the death or bankruptcy had not occurred.

51.4 Notice of every general meeting shall be given in the manner authorised by these Articles to every person shown as holding Shares carrying an entitlement to receive such notice in the Register of Members on the record date for such meeting except that in the case of joint holders the notice shall be sufficient if given to the joint holder first named in the Register of Members and every person upon whom the ownership of a Share devolves by reason of such person being a legal personal representative or a trustee in bankruptcy of a Member where the Member but for such Member's death or bankruptcy would be entitled to receive notice of the meeting, and no other person shall be entitled to receive notices of general meetings.

## 52 Winding Up

52.1 If the Company shall be wound up the liquidator shall apply the assets of the Company in satisfaction of creditors' claims in such manner and order as such liquidator thinks fit. The liquidator shall in relation to the assets available for distribution among the Members make in the books of the Company such transfers thereof to and from Separate Accounts as may be necessary in order that the effective burden of such creditors' claims may be shared among the holders of Participating Shares of different Classes and/or Series in such proportions as the liquidator in such liquidator's absolute discretion may think equitable.

52.2 Subject to the special rights attaching to Participating Shares of any Class or Series, the balance shall then be applied in the following priority:

(a) first, to the holders of Management Shares, an amount equal to the par value of such Management Shares; and

(b) second, the balance shall be paid to the holders of Participating Shares in proportion to the Net Asset Value of Participating Shares held, subject to a deduction from those Participating Shares in respect of which there are monies due, of all monies due to the Company for unpaid calls, or otherwise.

52.3 If the Company shall be wound up (whether the liquidation is voluntary or by or under the supervision of the Court) the liquidator may, with the authority of a resolution or resolutions passed by the holders of Participating Shares (whether as a whole or at separate Class meetings), divide among the Members in specie the whole or any part of the assets of the Company, and whether or not the assets shall consist of property of one kind or shall consist of property of different kinds, and may for such purposes set such value as the liquidator deems fair upon any one or more class or classes of property, and may determine how such division shall be

Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

carried out as between the Members or different classes of Members. The liquidator may, with the like authority, vest any part of the assets in trustees upon such trusts for the benefit of Members as the liquidator, with the like authority, shall think fit, and the liquidation of the Company may be closed and the Company dissolved, but so that no Member shall be compelled to accept any shares or other property in respect of which there is a liability.

## 53     Indemnity and Insurance

53.1    Every Director and officer of the Company (which for the avoidance of doubt, shall not include any Auditor), together with every former Director and former officer of the Company (each an "**Indemnified Person**") shall be indemnified out of the assets of the Company against any liability, action, proceeding, claim, demand, costs, damages or expenses, including legal expenses, whatsoever which they or any of them may incur as a result of any act or failure to act in carrying out their functions other than such liability (if any) that they may incur by reason of their own actual fraud, wilful default or Gross Negligence. No Indemnified Person shall be liable to the Company for any loss or damage incurred by the Company as a result (whether direct or indirect) of the carrying out of their functions unless that liability arises through the actual fraud, wilful default or Gross Negligence of such Indemnified Person. No person shall be found to have committed actual fraud, wilful default or Gross Negligence under this Article unless or until a court of competent jurisdiction shall have made a finding to that effect.

53.2    The Company shall advance to each Indemnified Person reasonable attorneys' fees and other costs and expenses incurred in connection with the defence of any action, suit, proceeding or investigation involving such Indemnified Person for which indemnity will or could be sought. In connection with any advance of any expenses hereunder, the Indemnified Person shall execute an undertaking to repay the advanced amount to the Company if it shall be determined by final judgment or other final adjudication that such Indemnified Person was not entitled to indemnification pursuant to this Article. If it shall be determined by a final judgment or other final adjudication that such Indemnified Person was not entitled to indemnification with respect to such judgment, costs or expenses, then such party shall not be indemnified with respect to such judgment, costs or expenses and any advancement shall be returned to the Company (without interest) by the Indemnified Person.

53.3    The Directors, on behalf of the Company, may purchase and maintain insurance for the benefit of any Director or other officer of the Company against any liability which, by virtue of any rule of law, would otherwise attach to such person in respect of any negligence, default, breach of duty or breach of trust of which such person may be guilty in relation to the Company.

53.4    Pursuant to the foregoing provisions, the Company may enter into a service or other agreement with any Director (or any entity providing one or more persons to the Company to act as Directors) upon such terms and conditions (including as to indemnification and exculpation) as the Directors shall, in their absolute discretion, determine. Any such indemnification and exculpation provisions may be specified to a standard equal to or more favourable (but not less favourable) to the Company than any standard specified in these Articles.



Uploaded: 03-Nov-2014 14:05 EST
Filed: 05-Nov-2014 18:02 EST

## 54 Disclosure

If required to do so under the laws of any jurisdiction to which the Company, the Investment Manager, the Administrator or any other service provider is subject, or in compliance with the rules of any stock exchange upon which the Company's Shares are listed, or to ensure the compliance by any person with any anti-money laundering law in any relevant jurisdiction, any Director, Officer, the Investment Manager, the Administrator or Auditor of the Company shall be entitled to release or disclose any information in its possession regarding the affairs of the Company or a Member including, without limitation, any information contained in the Register of Members or subscription documentation of the Company relating to any Member.

## 55 Financial Year

Unless the Directors otherwise prescribe, the financial year of the Company shall end on 31st December in each year and, following the year of incorporation, shall begin on 1st January in each year.

## 56 Transfer by way of Continuation

The Company shall, subject to the provisions of the Statute and with the approval of a Special Resolution, have the power to register by way of continuation as a body corporate under the laws of any jurisdiction outside the Cayman Islands and to be deregistered in the Cayman Islands.

## 57 Mergers and Consolidations

The Company shall, with the approval of a Special Resolution, have the power to merge or consolidate with one or more constituent companies (as defined in the Statute), upon such terms as the Directors may determine.



*Uploaded: 03-Nov-2014 14:05 EST*
*Filed: 05-Nov-2014 18:02 EST*

# EXHIBIT G

# HIGHLAND CREDIT OPPORTUNITIES FUND, LTD.

### SUBSCRIBER INFORMATION FORM

PART A OF THIS SUBSCRIBER INFORMATION FORM IS DIVIDED INTO THREE SECTIONS. ALL SUBSCRIBERS ARE REQUIRED TO COMPLETE SECTION I. SUBSCRIBERS WHO ARE NATURAL PERSONS, INDIVIDUAL RETIREMENT ACCOUNTS (IRAs) OR GRANTOR TRUSTS MUST COMPLETE SECTION II. ALL OTHER SUBSCRIBERS MUST COMPLETE SECTION III.

ALL SUBSCRIBERS MUST COMPLETE THE SUBSCRIBER QUALIFICATION QUESTIONS IN PART B.

SUBSCRIBERS SUBSCRIBING AS A CUSTODIAN OR AN AGENT ON BEHALF OF A BENEFICIAL OWNER SHOULD COMPLETE THE QUESTIONS BELOW WITH REFERENCE TO THE BENEFICIAL OWNER OF THE SHARES.

*YOUR SUBSCRIPTION WILL NOT BE DEEMED COMPLETE UNTIL ALL OF THE REQUIRED DOCUMENTATION LISTED HEREIN AND ADDITIONALLY REQUESTED DOCUMENTATION IS RECEIVED BY THE ADMINISTRATOR.*

## PART A – SUBSCRIBER INFORMATION

## SECTION I. TO BE COMPLETED BY ALL SUBSCRIBERS

1.  **Identity of Subscriber**

    Name(s): _THE DUGABOY INVESTMENT TRUST_

    Country of domicile/ Citizenship _USA_

    Please check *all* of the boxes that describe the beneficial owner(s) for whose account the Shares are being acquired.

    | | |
    |---|---|
    | ☐ Individual | ☐ Broker-dealer |
    | ☐ Joint (spouses) | ☐ Insurance company |
    | ☐ Joint (other) | ☐ Registered investment company |
    | ☒ Personal trust (taxable to grantor) | ☐ Tax-exempt endowment |
    | ☐ Personal trust (other) | ☐ Other tax-exempt organization |
    | ☐ Individual retirement account | ☐ Employee benefit plan (self-directed) |

☐ Charitable trust      ☐ Employee benefit plan (trustee directed)

☐ Private tax-exempt foundation      ☐ Fund of Funds

☐ Other private fund      ☐ Banking or thrift institution

☐ Family partnership or LLC      ☐ Sovereign wealth fund or foreign office institution

☐ Business entity (other)      ☐ Other

If "Other" or "Business entity (other)" was checked, please describe the entity or beneficial owner:_____

**2.**    **Contact Information**

Primary Contact for Notices and Communications

Name: _JAMES DONDERO_

Mailing Address: _300 CRESCENT CT STE 700_

_DALLAS, TX 75201_

Telephone: _972-628-4100_

Fax: _____

E-mail: _JDONDERO@ HCMLP.COM_

Secondary Contact for Notices and Communications (optional)

Name: _MELISSA SCHROTH_

Mailing Address: _300 CRESCENT CT STE. 700_

_DALLAS, TX 75201_

Telephone: _972-628-4100_

Fax: _____

E-mail: _MSCHROTH@HCMLP.COM_

Send copy of Financial Statements and Tax Information Returns to (optional)

Name: _MELISSA SCHROTH_

Mailing Address: _300 CRESCENT CT STE 700_

_DALLAS, TX 75201_

Telephone: _972-628-4100_

Fax: _____

E-mail: _MSCHROTH@HCHLP.COM_

Please set forth below the names of persons authorized by the Subscriber to give and receive instructions between the Fund (or its Administrator) and the Subscriber together with their respective signatures. Such persons are the only persons so authorized until further written notice to the Administrator signed by one or more of such persons.

| Name | Signature |
|------|-----------|
| _MELISSA SCHROTH_ | |
| _JAMES DONDERO_ | |
| | |
| | |

3. **Remitting Bank or Financial Institution**

Except as otherwise agreed by the Fund, all subscriptions are payable in full by wire transfer of readily available funds to the account of the Fund **at least two business days prior to the proposed date of subscription.** Please identify the bank or other financial institution (the "*Wiring Institution*") from which the Subscriber's funds will be wired. Note that any amounts paid to the Subscriber will be paid to the same account from which its subscription funds were originally remitted, which shall be in the name of the Subscriber, unless the Fund agrees otherwise.

A. Name of Wiring Institution[1]: _NEXBANK_

Address[2]: _DALLAS TEXAS_

---

[1] Important notice: please instruct your bank to ensure that the originating account and bank information is available in the wire. **Your transaction may be delayed or rejected if this information is not provided.**

[2] If the Wiring Institution is not located in a jurisdiction that is member of the Financial Action Task Force on Money Laundering (the "*FATF*"), the Administrator may require additional information. For a current list of FATF members see: www.fatf-gafi.org.

ABA, Chips or SWIFT Number: ▓▓▓▓▓

Account Name: _THE DuGABoy INVESTMENT TRust_

Account Number: ▓▓▓▓▓

For Benefit of: [ *Subscriber Name* ] _JAMES DoNDERO_

Account Representative: _(TRUSTEE)_

Telephone: _____

B.    Is the Subscriber a customer of the Wiring Institution?

☑ Yes      ☐ No

**If you responded "No," please contact the Administrator for additional information that may be required.**

**4.    Electronic Delivery of Reports and Other Communications**

The Fund may make reports and other communications available in electronic form, such as e-mail or by posting on a web site (with notification of the posting by e-mail). Do you consent to receive deliveries of reports and other communications from the Fund (including annual and other updates of our consumer privacy policies and procedures) exclusively in electronic form without separate mailing of paper copies?

☑ Yes      ☐ No

**5.    Information Regarding Actual Ownership of the Shares**

Is the Subscriber subscribing for the Shares with the intent to sell, distribute or transfer the Shares to any other person or persons?

☐ Yes      ☑ No

Is the Subscriber subscribing for the Shares as agent, nominee, trustee, partner, or otherwise on behalf of, for the account of, or jointly with any other person or entity?

☐ Yes      ☑ No

Will any other person or persons have a beneficial interest in the Shares acquired or a right to receive payments through contract or otherwise relating to the increase or decrease in value of the Shares (other than as a shareholder, partner or other beneficial owner of equity interests in the Subscriber)?

☐ Yes  ☑ No

Does the Subscriber control, or is the Subscriber controlled by or under common control with, any other existing or prospective investor in the Fund?

☐ Yes  ☑ No

Note: If any of the above questions were answered "Yes," please provide identifying information or contact the Administrator:

_____

6.    **Government Entities**

(a)    Is the Subscriber a government entity or an officer, agent or employee thereof?



☐ Yes  ☑ No

Note: Government entities include all state and local governments, their agencies and instrumentalities, and any investment programs, defined benefit plans as defined in Section 414(j) of the Internal Revenue Code of 1986, as amended (the "*Code*"), state general funds, pools of assets or plans sponsored or established by state and local governments, including all public pension plans and any participant-directed plan or program of a government entity, such as "qualified tuition plans" authorized by section 529 of the Code and retirement plans authorized by section 403(b) or 457 of the Code.

If the answer is "Yes," please answer the following question. If the answer is "No," skip to question 7.

Is the Subscriber aware of any political contributions it or any of its employees has received from Highland Capital Management, L.P. (in its capacity as investment manager of the Fund, the "*Investment Manager*") or any of the Investment Manager's employees?

☐ Yes  ☐ No

If the answer is "Yes," please provide the date of the contribution:

_____

If the answer to either or both of the above questions is "Yes," please contact the Administrator.

7. **Private Investment Fund Experience**

Has the Subscriber previously made an investment in a private investment fund such as a hedge fund, private equity or venture capital fund, commodity pool, real estate or energy partnership or fund of funds?

☑ Yes ☐ No

8. **Net Worth**

Is the Subscriber's net worth more than 10 times the amount of the subscription commitment?

☑ Yes ☐ No

9. **Ability to Bear Risk**

Does the Subscriber have the financial ability to bear the economic risk of this investment and have adequate means to provide for its current needs and contingencies?

☑ Yes ☐ No

## SECTION II. ADDITIONAL QUESTIONS FOR NATURAL PERSONS, INDIVIDUAL RETIREMENT ACCOUNTS OR GRANTOR TRUSTS

1. **Please indicate desired type of ownership interest**

   ☐ Individual          ☑ Individual Retirement Account
   ☐ Joint               ☑ Grantor Trust

2. **Place of Residence**

   (a) Indicate the state where Subscriber has his or her principal residence:

   _TEXAS_

   Note: If you are married and live in a community property state, both you and your spouse must sign the signature page of the Subscription Agreement. Community property states are Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Puerto Rico, Texas, Washington and Wisconsin. Property held by married persons resident in Alaska may also be subject to community property law if the married persons opted into the community property regime.

   (b) Is the Subscriber or trust grantor a United States citizen or permanent resident of the United States?

   ☑ Yes          ☐ No

3. **Social Security Number:** ███████████

4. **Joint Subscriptions**

   If you are subscribing with another person, please answer the following questions:

   (a) Please indicate type of ownership interest:

   ☐ Joint tenants (rights of survivorship)
   ☐ Tenants in common (no rights of survivorship)

   (b) If you are purchasing Shares jointly with another person, please answer the following questions:

   (i) Is the other person a United States citizen or permanent resident of the United States?

   ☐ Yes          ☐ No

   (ii) If the answer to the above question is "Yes," please provide such other person's U.S. Social Security number: _____

Subscriber Information Form                 7

5. **Individual Retirement Account Investors**

(a)    If the Subscriber is subscribing as a trustee or custodian for an individual retirement account, is the Subscriber a qualified IRA custodian or trustee?

☐ Yes    ☐ No

(b)    Name of qualified IRA trustee or custodian:

_____

6. **Grantor Trust Investors**

(a)    Please indicate whether the Subscriber, for federal income tax purposes, files now or has ever filed a tax or information return as a partnership, as a "grantor" trust or (if the Subscriber is a U.S. corporation) as an "S corporation" under Sections 1361-1379 of the Code.

 ☐ Yes    ☑ No

(b)    If the answer is "Yes," will the investment in the Fund represent more than 75% of the assets of the Subscriber?

 ☐ Yes    ☑ No

| SECTION III.   ADDITIONAL QUESTIONS FOR ENTITIES AND NON-GRANTOR TRUSTS |
|---|

1.   **Organizational Data**

    (a)   Legal form of entity: _____

    (b)   Jurisdiction of organization: _____

    (c)   Year of organization: _____

    (d)   Briefly identify the Subscriber's primary business: _____

_____

_____

    (e)   Identify the Subscriber's principal place of business:

_____

_____

    (f)   Total number of shareholders, partners or other holders of equity or beneficial interests or other securities (including any debt securities other than short term paper of the Subscriber) (If the number is more than 100, it is sufficient to respond "more than 100."):

_____

    (g)   Is the Subscriber a wholly owned or majority-owned subsidiary of another entity?

        ☐ Yes   ☐ No

If yes, please provide name and address: _____

    (h)   Is the direct parent of the Subscriber a wholly owned or majority-owned subsidiary of another entity?

        ☐ Yes   ☐ No

If yes, please provide name and address: _____

(i)     Was the Subscriber organized for the specific purpose of acquiring the Shares?

☐ Yes     ☐ No

(j)     Have shareholders, partners or other holders of equity or beneficial interests in the Subscriber been provided the opportunity to decide individually whether or not to participate, or the extent of their participation, in the Subscriber's investment in the Fund (*i.e.*, have investors in the Subscriber been permitted to determine whether their capital will form part of the specific capital invested by the Subscriber in the Fund)?

☐ Yes     ☐ No

(k)     Is the Subscriber an entity engaged primarily in investing or trading securities?

☐ Yes     ☐ No

If the answer is "Yes," please answer the following question. If the answer is "No," skip to question 2.

Does the current amount of the Subscriber's subscription to the Fund exceed 40% of the value of the Subscriber's total assets?

☐ Yes     ☐ No

## 2.     Benefit Plan Accounts

(a)     Is the Subscriber (1) an employee benefit plan subject to the fiduciary provisions of the Employee Retirement Income Security Act of 1974, as amended ("***ERISA***"), (2) a "plan" subject to Section 4975 of the Code, (3) an entity that otherwise constitutes a "benefit plan investor" within the meaning of any Department of Labor regulation promulgated under Section 3(42) of ERISA, (a party described in (1), (2), or (3), a "***Plan***"), or (4) an entity whose underlying assets include "plan assets" for purposes of ERISA by reason of a Plan's investment in the Subscriber (a "***Plan Asset Entity***")?

☐ Yes     ☐ No

(b)     Is the Subscriber a Plan that is both voluntary and contributory?

☐ Yes     ☐ No

(c)     Have beneficiaries of the Plan been provided the opportunity to decide individually whether or not to participate, or the extent of their participation, in the Plan's investment in the Fund (*i.e.*, have beneficiaries of the Plan been permitted to determine whether their capital will form part of the specific capital invested by the Plan in the Fund)?

☐ Yes     ☐ No

(d)     Is the Subscriber either (1) an insurance company general account the underlying assets of which include "plan assets" for purposes of ERISA or (2) a Plan Asset Entity?

☐ Yes     ☐ No

If the answer is "Yes", the maximum percentage of the Subscriber constituting "plan assets" will be:

_____

(Note that the Subscriber has an obligation under the Subscription Agreement to promptly notify the Fund if this percentage is exceeded in any calendar month).

3.     **Regulated Institutions**

(a)     Is the Subscriber a regulated institution that is subject to legal or regulatory restrictions or limitations on the nature of its investments (such as a bank or an insurance company)?

☐ Yes     ☐ No

(b)     If the answer is "Yes," has the Subscriber verified that the proposed subscription is in compliance with applicable laws and regulations?

☐ Yes     ☐ No

4.     **Tax Information**

(a)     Employer identification number:

_____

(b)     Indicate the annual date on which the Subscriber's taxable year ends for purposes of reporting federal income tax or filing information returns:

_____

(c)    Please indicate whether the Subscriber, for federal income tax purposes, files now or has ever filed a tax or information return, as a partnership, as a "grantor" trust or (if the Subscriber is a U.S. corporation) as an "S corporation" under Sections 1361-1379 of the Code.

☐   Yes    ☐   No

If the answer is "Yes," will the investment in the Fund represent more than 75% of the assets of the Subscriber?

☐   Yes    ☐   No

(d)    Is the Subscriber exempt from federal income tax (e.g., a qualified employee benefit plan or trust, retirement account, charitable remainder trust, or a charitable foundation or other tax-exempt organization described in Section 501(c)(3) of the Code)?

☐   Yes    ☐   No

## 5.   Bank Investors

(a)    Is the Subscriber an insured depository institution, as defined in the Federal Deposit Insurance Act or a company that controls directly or indirectly an insured depository institution?

☐   Yes    ☐   No

(b)    Is the Subscriber treated as a bank holding company for the purposes of Section 8 of the International Banking Act of 1978?

☐   Yes    ☐   No

(c)    Is the Subscriber a direct or indirect subsidiary of an entity described in (a) or (b) above?

☐   Yes    ☐   No

## PART B – SUBSCRIBER QUALIFICATION

Subscriptions will be accepted only from persons who qualify as eligible investors within the meaning of applicable federal and state securities regulations. Unless otherwise indicated, responses should be given by reference to the specific person for whose account the Shares are being acquired. The Subscriber may be required to provide such further information and execute and deliver such documents as the Fund or the Administrator may reasonably request to verify that the Subscriber qualifies as an eligible investor.

## SECTION I.  ACCREDITED INVESTOR STATUS

Each Subscriber must indicate whether the intended beneficial owner of the Shares qualifies as an "accredited investor" pursuant to *at least one* of the following tests. (Please check *all* that apply, or, if none applies, consult the Administrator.)

**FOR NATURAL PERSONS:**

☐ The Subscriber is a *natural person* whose individual net worth, or joint net worth with that person's spouse, at the time of purchase exceeds $1,000,000, *excluding* the value of the Subscriber's primary residence.[3]

☐ The Subscriber is a *natural person* with individual income (without including any income of the Subscriber's spouse) in excess of $200,000 or joint income with that person's spouse of $300,000, in each of the two most recent years and who reasonably expects to reach the same income level in the current year.

☑ The Subscriber is an individual retirement account or a grantor trust and the owner of the individual retirement account or the grantor of the grantor trust is a *natural person* that meets the requirements described above.[4]

**FOR ENTITIES:**

☐ The Subscriber is an *entity* with total assets in excess of $5,000,000 that was not formed for the purpose of investing in the Fund and is one of the following:

 ☐ a corporation;

 ☐ a partnership;

 ☐ a limited liability company;

---

[3] An individual need not deduct from his or her net worth the amount of mortgage debt secured by an excluded primary residence other than (i) the amount by which the mortgage liability exceeds the fair value of the residence and (ii) any increase in the amount of the debt secured by the primary residence in the 60 days preceding the date hereof unless the increase was a result of the acquisition of the residence.

[4] Additional information may be required in connection with a grantor trust's investment.

Subscriber Information Form    13

☐    a business trust; or

☐    a tax-exempt organization described in Section 501(c)(3) of the Code.

☐    The Subscriber is a personal (non-business) trust, other than an employee benefit trust, with total assets in excess of $5,000,000 that was not formed for the purpose of investing in the Fund and whose decision to invest in the Fund has been directed by a person who has such knowledge and experience in financial and business matters that such person is capable of evaluating the merits and risks of the investment.

☐    The Subscriber is an employee benefit plan within the meaning of Title I of ERISA, (including an individual retirement account), which satisfies at least one of the following conditions:

    ☐    it has total assets in excess of $5,000,000;

    ☐    the investment decision is being made by a plan fiduciary that is a bank, savings and loan association, insurance company or registered investment adviser; or

    ☐    it is a self-directed plan (*i.e.*, a tax-qualified defined contribution plan in which a participant may exercise control over the investment of assets credited to his or her account) and the decision to invest is made by those participants investing, and each such participant qualifies as an accredited investor.

☐    The Subscriber is an employee benefit plan established and maintained by a state, its political subdivisions or any agency or instrumentality of a state or its political subdivisions that has total assets in excess of $5,000,000.

☐    The Subscriber is licensed, or subject to supervision, by federal or state examining authorities such as a "bank," "savings and loan association," "insurance company," or "small business investment company" (as such terms are used and defined in 17 CFR §230.501(a)) or is an account for which a bank or savings and loan association is subscribing in a fiduciary capacity.

☐    The Subscriber is registered with the Securities and Exchange Commission as a broker or dealer or an investment company; or has elected to be treated or qualifies as a "business development company" (within the meaning of Section 2(a)(48) of the Investment Company Act of 1940, as amended (the "***Investment Company Act***"), or Section 202(a)(22) of the Investment Advisers Act of 1940, as amended (the "***Investment Advisers Act***")).

☐    The Subscriber is an entity in which *all* of the equity owners are persons described above.

## SECTION II. QUALIFIED CLIENT STATUS

Each subscriber must indicate whether the intended beneficial owner of the Shares qualifies as a "qualified client." IRAs and revocable grantor trusts should complete the questions for natural persons.

### FOR NATURAL PERSONS:

[✓] The Subscriber (or the grantor, in the case of a grantor trust) is a natural person whose net worth (together, in the case of a natural person, with assets held jointly with that person's spouse), at the time of subscription exceeds $2,000,000, *excluding* the value of the Subscriber's primary residence.[5].

### FOR ENTITIES:

[ ] The Subscriber is an entity that has a net worth at the time of subscription in excess of $2,000,000

If the entity is an entity engaged primarily in investing or trading in securities, state whether each of the shareholders, partners or other holders of equity or beneficial interests in the Subscriber (please answer both (A) and (B)):

(A) has a net worth of at least $2,000,000 *excluding* the value of the holder's primary residence:[6]

[ ] Yes [ ] No

(B) is either an entity which is not engaged primarily in investing or trading in securities or a natural person:

[ ] Yes [ ] No

---

[5]. An individual need not deduct from his or her net worth the amount of mortgage debt secured by an excluded primary residence other than (i) the amount by which the mortgage liability exceeds the fair value of the residence and (ii) any increase in the amount of the debt secured by the primary residence in the 60 days preceding the date hereof unless the increase was a result of the acquisition of the residence.

[6]. See footnote immediately above.

## SECTION III. FUND INVESTMENTS IN FINRA-RESTRICTED ISSUES AND AFFILIATION WITH FINRA MEMBERS IN UNDERWRITTEN OFFERINGS

The Fund may, from time to time, consider direct or indirect investing in certain publicly offered equity securities, more commonly known as "new issue" securities (*"New Issues"*), through member firms of the Financial Industry Regulatory Authority, Inc. ("*FINRA*") in accordance with Rules 5130 and 5131 adopted by FINRA. Also, FINRA requires any member that is participating in a public offering of securities to report any affiliation between a 5% shareholder of the company whose securities are being offered with a FINRA member. In order for the Fund to be able to determine the extent to which a Subscriber is eligible to participate in New Issues and to comply with any filings required in any underwritten public offering that is conducted by any company in which the Fund invests, the Subscriber must complete the questionnaire below. *Even if the Subscriber does not wish to participate in the profits related to New Issues, the Subscriber must complete Items A and B, as the tests in each Item are conducted separately.*

A. **Determination of Restricted Person Status under Rule 5130:**

Section 1 (Restricted Persons)

The Subscriber is:

☐ a FINRA member or other securities broker-dealer;

☐ an affiliate of a broker-dealer.[7]

☐ an officer, director, general partner, associated person or employee of any member of FINRA or any other securities broker-dealer, in either case other than a limited business broker-dealer. [8]

If the Subscriber checked any of the preceding boxes, please describe the name and CRD number of the applicable FINRA member along with a description of the relationship between such broker-dealer or affiliate and the Subscriber including, if applicable, the percentage of the Subscriber that is owned by a FINRA member: _____

_____

_____

---

[7] As used herein, an "*affiliate*" means an entity which controls, is controlled by or is under common control with such broker-dealer. "Control" means (i) beneficial ownership of 10% or more of the outstanding common equity of an entity, including any right to receive such securities within 60 days; (ii) the right to 10% or more of the distributable profits or losses of an entity that is a partnership, including any right to receive an interest in such distributable profits or losses within 60 days; (iii) beneficial ownership of 10% or more of the outstanding subordinated debt of an entity, including any right to receive such subordinated debt within 60 days; (iv) beneficial ownership of 10% or more of the outstanding preferred equity of an entity, including any right to receive such preferred equity within 60 days; or (v) the power to direct or cause the direction of the management or policies of an entity.

[8] As used herein, a "*limited business broker-dealer*" means any broker-dealer whose authorization to engage in the securities business is limited solely to the purchase and sale of investment company/variable contracts securities or direct participation programs.

☐ an agent of any member of the FINRA or any other securities broker-dealer that is engaged in the investment banking or securities business.

☐ a person who, directly or indirectly, owns or has contributed capital to any FINRA member or other securities broker-dealer (other than solely a limited business broker-dealer), and the Subscriber:

(a) is listed, or required to be listed, in Schedule A of the Form BD for such FINRA member or other securities broker-dealer, and is identified by an ownership code of at least 10%;

(b) is listed, or required to be listed, in Schedule B of the Form BD for such FINRA member or other securities broker-dealer, and such listing relates to a direct owner of such FINRA member or other securities broker-dealer that is identified by an ownership code of at least 10%;

(c) is listed, or required to be listed, in Schedule C of the Form BD of the FINRA member or other securities broker-dealer that meets any of the criteria noted in paragraphs (a) or (b) above;

(d) owns 10% or more of a public reporting company listed, or required to be listed, as a direct owner in Schedule A of a Form BD of any FINRA member or other securities broker-dealer (other than solely a limited business broker-dealer). For this purpose, a "public reporting company" does not include a reporting company that is listed on a national securities exchange; or

(e) owns 25% or more of a public reporting company listed, or required to be listed, as an indirect owner in Schedule B of a Form BD of any FINRA member or other securities broker-dealer (other than solely a limited business broker-dealer). For this purpose, a "public reporting company" does not include a reporting company that is listed on a national securities exchange.

If the Subscriber checked the immediately preceding box, please describe the name and CRD number of the FINRA member on whose form the relationship is disclosed: _____

_____

_____

☐ a person who may act as a finder with respect to any public offering of securities.

☐ a person, such as an attorney, accountant or financial consultant, whose professional activities may include acting in a fiduciary capacity to any managing underwriter of any public offering of securities.

☐ a person who has the authority to buy or sell securities for a bank, savings and loan institution, insurance company, investment company, investment advisor or other collective investment account (including any hedge fund, investment partnership, investment corporation or any other collective investment vehicle that

is engaged primarily in the purchase and/or sale of securities), other than a family investment account or investment club.

☐    a member of the immediate family of any person to whom any of the preceding paragraphs refer.[9]

If the Subscriber checked this box, please specify the identity and the nature of the relationship with the Restricted Person, the firm with which the Restricted Person is associated, and whether the Restricted Person either contributes directly or indirectly to the Subscriber's support or receives material support from the Subscriber.

_____

_____

☐    a domestic or foreign bank, bank branch, trust company, or other conduit for an undisclosed principal. The Fund may request additional information in order to determine the eligibility of the undisclosed principal.

☐    an employee benefit plan qualified under ERISA, that is sponsored by a FINRA member or other securities broker-dealer or an affiliate thereof.

☐    an entity (including a partnership, investment fund, limited liability company or other account) which either (i) knows that one or more of its beneficial owners is a Restricted Person described in any of the preceding categories, or (ii) has not affirmatively determined that there is no Restricted Person described in any of the preceding categories that has a beneficial interest in the entity.[10]

A Subscriber who has checked one of the boxes above may be able to participate in New Issues to the extent an exemption in Item C applies. See C below.

Section 2 (Unrestricted Persons)

☑    None of the Restricted Person Categories in Section 1 above apply and the Subscriber is eligible to fully participate in profits and losses from investments in New Issues.

---

[9]   The term "*immediate family*" includes parents; mother-in-law or father-in-law; husband or wife; brother or sister; brother-in-law or sister-in-law; son-in-law or daughter-in-law; children; whether by birth or adoption; and any other person who is supported, directly or indirectly, to a material extent by such person. For this purpose, "*material support*" means directly or indirectly providing more than 25% of a person's income in the prior calendar year. Members of the immediate family living in the same household are deemed to be providing each other with material support.

[10]   The term "*beneficial interest*" means any economic interest such as the right to share in gains or losses. The receipt of a management or performance-based fee for operating a collective investment account, or other fee for acting in a fiduciary capacity, is not considered a beneficial interest in the account. However, for purposes of FINRA Rule 5130 and 5131, if such fee is subsequently invested into the account (as a deferred fee arrangement or otherwise), it would then be considered a beneficial interest in the account.

B.    **Determination of Covered Person Status under Rule 5131:**

Section 1 (Persons Covered by Rule 5131)

The Subscriber is:

☐    an executive officer or director of a public company.[11]

☑    an executive officer or director of a covered non-public company.[12]

☐    a person materially supported by an executive officer or director of a public company or a covered non-public company.[13]

If any of the three preceding boxes are checked, please provide the name of the "public company" or "covered non-public company" in the space below.

*NExBANK , MGM, CORNERSTONE, CCS MEDICAL, AM. BANKNOTE*

If the Subscriber is an entity in which any of the above persons have a direct or indirect beneficial interest, please specify the current beneficial interest of each such person (as a percentage) and each relevant "public company" or "covered non-public company" for which the relevant investor is an executive officer or director.

_____

_____

Note that Subscribers checking the boxes above may not be restricted in their participation in New Issues depending on such Subscriber's Interest in the Fund and the investment banking relationships of the companies they serve.

Section 2 (Persons Not Covered by Rule 5131)

☐    None of the Covered Person Categories in Section 1 above apply and the Subscriber is eligible to fully participate in profits and losses from investments in New Issues.

_____

[11] As used herein, a ***public company*** is any company that has a class of securities registered under Section 12 of the Securities Exchange Act of 1934, as amended (the "***Exchange Act***"), or any company that files periodic reports pursuant to Section 15(d) of the Exchange Act.

[12] As used herein, a "***covered non-public company***" means any non-public company satisfying any of the following three criteria:

    (a)  income of at least $1 million in the previous fiscal year or in two of the three previous fiscal years *and* shareholders' equity of at least $15 million;

    (b)  shareholders' equity of at least $30 million and an operating history of two years; or

    (c)  total assets and total revenue of at least $75 million in the latest fiscal year *or* in two of the three most recent fiscal years.

[13] As used herein, "***material support***" means directly or indirectly providing more than 25% of a person's income in the prior calendar year. Members of the immediate family living in the same household are deemed to be providing each other with material support.

C. **Determination of Exempted Entity Status under Rules 5130 and 5131:**

A Subscriber who has checked one of the boxes set forth in Item A, Section 1 or Item B, Section 1 above may be eligible to participate in New Issues if the Subscriber meets certain criteria for exempted entities. In order for the Fund to be able to determine the extent to which an exemption applies, please check all appropriate boxes that describe the Subscriber.

Section 1 (Rules 5130 and 5131)

The Subscriber is an entity that:

☐    is an investment company registered under the Investment Company Act;

☐    is a common trust fund or similar fund, as described in Section 3(a)(12)(A)(iii) of the Securities Exchange Act of 1934, as amended (the "***Exchange Act***"), and the fund (i) has investments from 1,000 or more accounts and (ii) does not limit beneficial interests in the fund principally to trust accounts of Restricted Persons;

☐    is an insurance company general, separate or investment account, and (i) the account is funded by premiums from 1,000 or more policyholders, or, if a general account, the insurance company has 1,000 or more policyholders and (ii) the insurance company does not limit the policyholders whose premiums are used to fund the account principally to Restricted Persons, or, if a general account, the insurance company does not limit its policyholders principally to Restricted Persons;

☐    is a publicly traded entity (other than a broker-dealer or an affiliate of a broker-dealer where such broker-dealer is authorized to engage in the public offering of New Issues either as a selling group or underwriter) that (i) is listed on a national securities exchange, or (ii) is a foreign issuer whose securities meet the quantitative designation criteria for listing on a national securities exchange;

☐    is an investment company organized under the laws of a foreign jurisdiction, (i) that is listed on a foreign exchange or authorized for sale to the public by a foreign regulatory authority; and (ii) in which no person owning more than 5% of the shares of such investment company is a Restricted Person;

☐    is an employee benefit plan under ERISA that is qualified under Section 401(a) of the Code, and such plan is not sponsored solely by a broker-dealer;

☐    is a state or municipal government benefit plan that is subject to state and/or municipal regulation;

☐    is a tax-exempt charitable organization under Section 501(c)(3) of the Code and has attached a copy of the IRS determination letter confirming the entity's qualification under Section 501(c)(3) of the Code, by virtue of which there are no "beneficial owners" as calculated based on the definition of "beneficial interest" under FINRA Rule 5130; or

☐    is a church plan under Section 414(e) of the Code.

☑    None of the preceding categories in this Item C apply to the Subscriber.

<u>Section 2 (Rule 5130 only)</u>

The Subscriber is:

☐    an entity that represents, based upon a representation from the beneficial account holders or a person authorized to represent the beneficial owners of the Subscriber (in either case, dated no earlier than 12 months prior to the date of the Subscription Agreement), that none of the beneficial owners of the Subscriber who participate in New Issues are persons who are not entitled to do so under FINRA Rule 5130, and the Subscriber is eligible to purchase New Issues in compliance with FINRA Rule 5130; or

☐    is an entity (including a private investment vehicle, such as a hedge fund or fund of hedge funds) (i) in which the beneficial interests of Restricted Persons do not exceed in the aggregate 10% of such entity or (ii) that limits participation in New Issue profits by Restricted Persons to not more than 10% of the profits from New Issues.

> If the immediately preceding box is checked, please specify the current percentage of the net profits from New Issues allocable to beneficial owners of such entity who are Restricted Persons.
>
> _____

# HIGHLAND CREDIT OPPORTUNITIES FUND, LTD.

## SUBSCRIPTION AGREEMENT

Highland Credit Opportunities Fund, Ltd.
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201

Ladies and Gentlemen:

## 1.    Documents Received

(a)    The undersigned (the "*Subscriber*") hereby acknowledges having (i) received, read and understood the current Confidential Private Offering Memorandum, as supplemented and amended from time to time (the "*Private Offering Memorandum*"), of Highland Credit Opportunities Fund, Ltd., a Cayman Islands exempted company (the "*Fund*"), including but not limited to those sections dealing with risk factors, conflicts of interest, fees and tax consequences of an investment in the Fund, and the Memorandum and Articles of Association of the Fund, as amended to date (the "*Articles*"), (ii) received a copy of Form ADV Part 2A, the firm brochure, and Form ADV Part 2B, the brochure supplement, of Highland Capital Management, L.P. (in its capacity as the investment manager of the Fund, the "*Investment Manager*"), as amended to date (the "*Form ADV*"), prior to or simultaneously with delivery of this Subscription Agreement to the Fund and (iii) been given the opportunity to (A) ask questions of, and receive answers from the Investment Manager or one of its affiliates concerning the terms and conditions of the offering and other matters pertaining to an investment in the Fund and (B) obtain any additional information that the Investment Manager can acquire without unreasonable effort or expense that is necessary to evaluate the merits and risks of an investment in the Fund.

(b)    Appendix A hereto contains the definitions of certain capitalized terms used but not otherwise defined herein and should be read by the Subscriber prior to entering into this Subscription Agreement.

## 2.    Subscription Commitment

(a)    The Subscriber hereby irrevocably subscribes for shares of the Fund (the "*Shares*"), subject to Articles, as may be amended from time to time, and the Private Offering Memorandum, and agrees to contribute in cash (unless otherwise agreed by the Fund) to the capital of the Fund, the amount set forth on the Signature Page of this Subscription Agreement. Such amount shall be payable in full in readily available funds by wire transfer to the bank account of the Fund at least two business days prior to the proposed date of subscription.

(b)    The Subscriber understands that this subscription is not binding on the Fund until accepted by the Fund, and it may be rejected, in whole or in part, by the Fund in its absolute discretion. If and to the extent rejected, the Fund shall, to the extent permitted by law, return to the Subscriber, without interest or deduction, any payment tendered by the Subscriber, and the Fund and the Subscriber shall have no further obligation to each other hereunder. The Subscriber acknowledges and accepts that none of the Fund, the Investment Manager, the Fund's

administrator (the "**Administrator**," which term shall be construed to include any sub-administrator of the Fund unless the context otherwise requires) nor their respective agents, affiliates or representatives shall be responsible for any lost profit, revenue or damages of any kind due to a delayed acceptance or a rejected subscription.

3.      **Representations, Warranties and Covenants – All Subscribers**

To induce the Fund to accept this subscription, the Subscriber hereby makes the following representations, warranties and covenants to the Fund:

(a)      The information set forth in the subscriber information form attached hereto, which shall be considered an integral part of this Subscription Agreement (the "**Subscriber Information Form**"), is true, correct, accurate and complete, and will be relied upon by the Fund for the purpose of determining the eligibility of the Subscriber to purchase and own Shares.

(b)      The Subscriber hereby represents that the information set forth in the Subscriber Information Form is true, correct, accurate and complete as of the date hereof, and the Subscriber agrees to notify the Fund immediately if any representation or warranty contained in this Subscription Agreement, or any information provided pursuant to the Subscriber Information Form becomes untrue, misleading, or otherwise requires updating at any time. For so long as the Subscriber is a shareholder of the Fund, the Subscriber further agrees to provide any revised or updated information necessary to cause the Subscriber Information Form to remain true and correct as soon as practicable upon the Subscriber becoming aware that any such change or revision is necessary. The Subscriber agrees to provide, if requested, any additional information that may reasonably be required to substantiate the Subscriber's status as an "accredited investor" or "qualified purchaser" or to otherwise determine the eligibility of the Subscriber to purchase Shares. The Subscriber agrees to provide any additional information and execute any additional documents as may reasonably be required in connection with any subscription, credit facility or other similar borrowing arrangement by the Fund or any lender named in the credit facility or similar lending arrangement.

(c)      The Subscriber consents to the disclosure of any such information, and any other information furnished to the Fund, to any governmental authority or self-regulatory organization or, to the extent required by law or deemed (subject to applicable law) by the Fund to be in the best interest of the Fund, to any other person.

(d)      Except as disclosed in the accompanying Subscriber Information Form, the Subscriber is acquiring the Shares for the Subscriber's own account; does not have any contract, undertaking or arrangement with any person or entity to sell, transfer or grant a participation with respect to any of the Shares; and is not acquiring the Shares with a view to or for sale in connection with any distribution of the Shares.

(e)      The Subscriber or an advisor or consultant relied upon by the Subscriber in reaching a decision to subscribe has such knowledge and experience in financial, tax and business matters as to enable the Subscriber or such advisor or consultant to evaluate the merits and risks of an investment in the Fund (including the risks set forth in the Private Offering Memorandum) and to make an informed investment decision with respect thereto and has made its own investment decision, including decisions regarding suitability based on its own judgment

2

or upon the advice from such advisers as it deemed necessary and not upon the views or advice of the Fund, the Investment Manager, or their affiliates or representatives.

(f)     The Subscriber understands that the Shares have not been and will not be registered under the Securities Act of 1933, as amended (the "*Securities Act*"), or any state law and that the Fund is not registered under the Investment Company Act of 1940, as amended (the "*Investment Company Act*"). The Subscriber agrees to notify the Fund prior to any proposed sale, transfer, distribution or other disposition of the Shares or any beneficial interest therein, and will not sell, transfer, distribute or otherwise dispose of the Shares (including, without limitation, by pledge, option, swap or nominee or similar relationship, and further including, without limitation, the offering or listing of any Shares on or through any placement agent, intermediary, online service, site, agent or other similar person, service or entity) without the consent of the directors of the Fund (the "*Directors*") and the Investment Manager, which may be granted or withheld in their sole discretion, and unless the Shares are registered or such sale, transfer, distribution or other disposition is exempt from registration. The Subscriber understands that any such transfers without the consent of the Directors and the Investment Manager are null and void. The Subscriber also understands that the Fund has no intention to register the Fund or the Shares with the Securities and Exchange Commission or any state and is under no obligation to assist the Subscriber in obtaining or complying with any exemption from registration. The Fund may require that a proposed transferee meet appropriate financial and other suitability standards and that the transferor furnish a legal opinion satisfactory to the Fund and its counsel that the proposed transfer complies with applicable federal, state and any other applicable securities laws. An appropriate legend evidencing such restrictions may be placed on any certificates issued representing the Shares and appropriate stop-transfer instructions may be placed with respect to the Shares.

(g)     The Subscriber confirms that it has not been invited as a member of the public in the Cayman Islands to subscribe for Shares.

(h)     In formulating a decision to invest in the Fund, the Subscriber has not relied on or acted on the basis of any representations or other information purported to be given on behalf of the Fund or the Investment Manager, except as set forth in the Private Offering Memorandum or the Articles or the Form ADV (it being understood that no person has been authorized by the Fund or the Investment Manager to furnish any such representations or other information).

(i)     The Subscriber recognizes that there is not now any secondary market for the Shares and that such a market is not expected to develop; accordingly, it may not be possible for the Subscriber readily to liquidate the Subscriber's investment in the Fund other than through a redemption of Shares as provided in the Articles and the Subscriber may be holding such Shares for an indefinite period of time.

(j)     The Subscriber understands the investment objectives and policies of, and the investment strategies that may be pursued by, the Fund. The Subscriber's investment is consistent with the investment purposes and objectives and cash flow requirements of the Subscriber and will not adversely affect the Subscriber's overall need for diversification and liquidity.

3

(k)     The Subscriber can afford a complete loss of its investment in the Fund and can afford to hold its investment in the Fund for an indefinite period of time.

(l)     If the Subscriber is a natural person, the Subscriber is qualified to become a shareholder of the Fund and has the legal capacity to execute, deliver and perform this Subscription Agreement.

(m)     If the Subscriber is a corporation, partnership, limited liability company, trust or other entity, it is authorized and qualified to become a shareholder of, and authorized to make its subscription payment to, the Fund and otherwise to comply with its obligations as a shareholder of the Fund; the person signing this Subscription Agreement on behalf of such entity has been duly authorized by such entity to do so; and this Subscription Agreement has been duly executed and delivered on behalf of the Subscriber and is the valid and binding agreement of the Subscriber, enforceable against the Subscriber in accordance with its terms. In addition, such Subscriber will, upon request of the Fund or the Administrator, deliver any documents, including an opinion of counsel to the Subscriber, evidencing the existence of the Subscriber, the legality of an investment in the Fund and the authority of the person executing this Subscription Agreement on behalf of the Subscriber.

(n)     The purchase of the Shares hereunder and the compliance by such Subscriber with all of the provisions of this Subscription Agreement applicable to such Subscriber and the consummation by such Subscriber of the transactions herein and therein contemplated will not (a) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, any statute, indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which such Subscriber is a party or by which such Subscriber is bound or to which any of the property or assets of such Subscriber is subject, nor (b) will such action result in any violation of (i), if such Subscriber is an entity, the provisions of the organizational documents of such Subscriber or (ii) any statute applicable to such Subscriber or any order, rule or regulation of any court or governmental agency or body having jurisdiction over such Subscriber or the property of such Subscriber.

(o)     The Subscriber has carefully reviewed and understands the various risks of an investment in the Fund, as well as the fees and conflicts of interest to which the Fund is subject, as set forth in the Private Offering Memorandum. The Subscriber hereby consents and agrees to the payment of the fees so described to the parties identified as the recipients thereof, and to such conflicts of interest.

(p)     The Subscriber believes that the compensation terms of the Fund represent an "arm's-length" arrangement and the Subscriber is satisfied that it has received adequate disclosure from the Fund and the Investment Manager to enable it to understand and evaluate the compensation and other terms of the Fund and the risks associated therewith.

(q)     The Subscriber represents and warrants that no holder of any beneficial interest in the Shares (each a "*Beneficial Interest Holder*") and, in the case of a Subscriber which is an entity, no Related Person is:

(1)     A person or entity whose name appears on the List of Specially Designated Nationals and Blocked Persons maintained by the Office of Foreign Asset Control from time to time;

(2)     A Foreign Shell Bank; or

(3)     A person or entity resident in or whose subscription funds are transferred from or through an account in a Non-Cooperative Jurisdiction.

The Subscriber agrees promptly to notify the Fund or the person appointed to administer the Fund's anti-money laundering program, if applicable, of any change in information affecting this representation and covenant.

(r)     The Subscriber represents that (except as otherwise disclosed to the Fund in writing):

(1)     neither it, any Beneficial Interest Holder nor any Related Person (in the case of a Subscriber that is an entity) is a Senior Foreign Political Figure, any member of a Senior Foreign Political Figure's Immediate Family or any Close Associate of a Senior Foreign Political Figure;

(2)     neither it, any Beneficial Interest Holder nor any Related Person (in the case of a Subscriber that is an entity) is resident in, or organized or chartered under the laws of, a jurisdiction that has been designated by the Secretary of the Treasury under Section 311 or 312 of the USA PATRIOT Act as warranting special measures due to money laundering concerns;[14] and

(3)     its subscription funds do not originate from, nor will they be routed through, an account maintained at a Foreign Shell Bank, an "offshore bank," or a bank organized or chartered under the laws of a Non-Cooperative Jurisdiction.

(s)     The Subscriber acknowledges and agrees that any amounts paid to it will be paid to the same account from which its subscription funds were originally remitted, unless the Fund agrees otherwise.

(t)     If the Subscriber is purchasing the Shares as agent, representative or intermediary/nominee, or in any similar capacity for any other person, or is otherwise requested to do so by the Fund, it shall provide a copy of its anti-money laundering policies ("*AML Policies*") to the Fund. The Subscriber represents that (i) it is in compliance with its AML Policies, (ii) its AML Policies have been approved by counsel or internal compliance personnel who have been reasonably informed of the legal requirements and best practices for anti-money laundering policies and their implementation, and (iii) it has not received a deficiency letter, negative report or any similar determination regarding its AML Policies from independent

---

[14]     The Treasury Department's Financial Crimes Enforcement Network ("*FinCEN*") issues advisories regarding countries of primary money laundering concern. FinCEN's advisories are posted at http://www.fincen.gov/pub_main.html.

accountants, internal auditors or some other person responsible for reviewing compliance with its AML Policies.

(u) The Subscriber represents and warrants that as a result of its acquisition and holding of the Shares: (i) the assets of the Fund will not constitute the assets of any employee benefit plan subject to any federal, state, local or non-U.S. law, rule or regulations ("*Similar Law*") that is similar to (A) the U.S. Employee Retirement Income Security Act of 1974, as amended ("*ERISA*"), or (B) Section 4975 of the U.S. Internal Revenue Code of 1986, as amended (the "*Code*"); (ii) the Investment Manager will not be considered to be a fiduciary of the Subscriber under any Similar Law; and (iii) no activity of the Fund contemplated in the Private Offering Memorandum or the Articles will violate any Similar Law.

(v) The Subscriber will promptly provide any additional documentation the Fund or the Administrator may request in the future to the extent that the Fund or the Administrator determines necessary in order to comply with applicable anti-money laundering laws or policies or any other applicable law.

(w) The Subscriber acknowledges that due to anti-money laundering requirements operating within their respective jurisdictions, the Fund, the Investment Manager and/or the Administrator (as the case may be) may require additional documentation before a subscription application or redemption request can be processed. Please be aware that your failure to provide or a delay in providing any such documentation may delay your acceptance to the Fund, cause your subscription to be rejected entirely or delay the satisfaction of your redemption request, as applicable. The Fund, the Investment Manager and the Administrator shall be held harmless and indemnified against any loss arising as a result of any such delay or rejection due to the Subscriber's failure to provide or delay in providing any such requested information.

(x) The Subscriber acknowledges and agrees that Shares of the Fund will not be issued until such time as the Fund and/or the Administrator has received and is satisfied with all the information and documentation requested to verify the Subscriber's identity. Where at the sole discretion of the Fund, Shares are issued prior to the Fund and/or Administrator having received all the information and documentation required to verify the Subscriber's identity, the Subscriber will be prohibited from redeeming any Shares so issued, and the Fund and the Administrator on its behalf reserves the right to refuse to make any redemption payment or distribution to the Subscriber, until such time as the Fund and/or the Administrator, as applicable, has received and is satisfied with all the information and documentation requested to verify the Subscriber's identity.

(y) The Subscriber acknowledges and agrees that each of the Fund, the Administrator and the Investment Manager may disclose to each other, to any affiliate, to any other service provider to the Fund or to any regulatory body in any applicable jurisdiction copies of the Subscriber's subscription documents and any information concerning the Subscriber in their respective possession, whether provided by the Subscriber to the Fund, the Administrator or the Investment Manager or otherwise, including details of the Subscriber's Shares, historical and pending transactions in the Shares and the value thereof, and any such disclosure shall not be treated as a breach of any restriction upon the disclosure of information imposed on any such person by law or otherwise.

6

(z)     The Subscriber agrees to provide the Fund and/or the Administrator any additional tax information or documentation that the Fund or the Administrator believes will enable it, the Fund or any subsidiary of the foregoing to comply with or mitigate any of their respective tax reporting, tax withholding, and/or tax compliance obligations, including any such obligations under the U.S. Hiring Incentives to Restore Employment Act (P.L. 111-147), or which may arise as a result of a change in law or in the interpretation thereof.

(aa)    The Subscriber understands that Akin Gump Strauss Hauer & Feld LLP ("*Akin Gump*") acts as U.S. counsel to the Fund, the Investment Manager and their affiliates.  The Subscriber also understands that, in connection with this offering of Shares and ongoing advice to the Fund, the Investment Manager and their affiliates, Akin Gump will not be representing investors in the Fund, including the Subscriber, and no independent counsel has been retained to represent investors in the Fund.  In addition, Akin Gump does not undertake to monitor the compliance of the Investment Manager and its affiliates with the investment program, valuation procedures and other guidelines set forth in the Private Offering Memorandum, nor does Akin Gump monitor compliance with applicable laws.    In preparing the Private Offering Memorandum, Akin Gump relied on information furnished to it by the Fund and/or the Investment Manager, and did not investigate or verify the accuracy or completeness of the information set forth therein concerning the Fund, the Investment Manager and their affiliates and personnel.

4.     **Representations, Warranties and Covenants – ERISA Subscribers**

If the Subscriber is, or is acting on behalf of, an employee benefit plan which is subject to ERISA or Section 4975 of the Code, to induce the Fund to accept this subscription, the Subscriber hereby makes the following additional representations, warranties and covenants to the Fund:

(a)     The person executing this Subscription Agreement on behalf of the Subscriber either is a "named fiduciary" (within the meaning of ERISA) of the Subscriber, or is acting on behalf of a named fiduciary of the Subscriber pursuant to a proper delegation of authority.

(b)     The person executing this Subscription Agreement on behalf of the Subscriber represents and warrants on behalf of such person or the Subscriber, as applicable, as follows:

(1)     The Subscriber is (w) an employee benefit plan subject to the fiduciary provisions of ERISA, (x) a "plan" subject to Section 4975 of the Code, (y) an entity that otherwise constitutes a "benefit plan investor" within the meaning of any Department of Labor regulation promulgated under Section 3(42) of ERISA (a party described in (w), (x) or (y) a "*Plan*") or (z) any entity whose underlying assets include "plan assets" for purposes of ERISA by reason of a Plan's investment in the Subscriber (a "*Plan Asset Entity*").

(2)     The execution and delivery of this Subscription Agreement and the consummation of the transactions contemplated hereunder, and in the Private Offering Memorandum and the Articles will not result in a breach or violation of any charter or organizational documents pursuant to which

7

the Subscriber was formed, or any statute, rule, regulation or order of any court or governmental agency or body having jurisdiction over the Subscriber or any of its assets, or in any material respect, any mortgage, indenture, contract, agreement or instrument to which the Subscriber is a party or otherwise subject.

(3)     The investment in the Fund is permitted by the documents of the Subscriber and such documents permit the Subscriber to invest in private investment funds that will engage in the investment program described in the Private Offering Memorandum.

(c)     The Subscriber is not in any way affiliated with (*i.e.*, does not own or control, is not owned or controlled by, nor is under common ownership or control with) any person or entity which will receive compensation, directly or indirectly, from the Fund, as specifically identified and described in the Private Offering Memorandum.

(d)     The Subscriber acknowledges and agrees that the decision to invest in the Fund and the review of the terms of the Fund must be made solely and independently by a fiduciary of the Subscriber who has no affiliation with the Investment Manager or any of its affiliates or employees, without relying on any recommendation of the Investment Manager or any of its affiliates or employees as a primary basis for its decision.

(e)     The appropriate fiduciaries of the Subscriber have considered the investment in light of the risks relating thereto and fiduciary responsibility provisions of ERISA applicable to the Subscriber and have determined that, in view of such considerations, the investment is appropriate for the Subscriber and is consistent with such fiduciaries' responsibilities under ERISA, and the appropriate fiduciaries: (i) are responsible for the Subscriber's decision to invest in the Fund, including the determination that such investment is consistent with the requirement imposed by Section 404 of ERISA that employee benefit plan investments be diversified so as to minimize the risk of large losses; (ii) are independent of the Investment Manager and any of its affiliates and employees and of any person or entity that will receive compensation, whether directly or indirectly, from the Fund, as specifically identified and described in the Private Offering Memorandum; (iii) are qualified and authorized to make such investment decision; and (iv) in making such decision, have not relied on the recommendation of the Investment Manager or any of its affiliates or employees.

(f)     The Subscriber through the appropriate fiduciaries has been given the opportunity to discuss the Subscriber's investment in the Fund, and the structure and operation of the Fund with the Investment Manager and has been given all information that the Subscriber or the appropriate fiduciaries have requested and which the Subscriber or the appropriate fiduciaries deemed relevant to the Subscriber's decision to participate in the Fund.

5.     **Representations, Warranties and Covenants – Insurance Company General Account and Plan Asset Entity Subscribers**

(a)     If the Subscriber is acquiring the Shares with the assets of the general account of an insurance company (a "***General Account***"), the Subscriber represents, warrants and covenants that, on each day the Subscriber owns the Shares, either (i) the assets of such General Account

are not considered to be plan assets within the meaning of Section 3(42) of ERISA, Department of Labor Regulations Section 2510.3-101 or Department of Labor regulations issued pursuant to Section 401(c)(1)(A) of ERISA, or (ii) the execution and delivery of this Subscription Agreement, and the acquisition and redemption of the Shares, is exempt from the prohibited transaction rules of Section 406(a) of ERISA and Section 4975(c)(1)(A) - (D) of the Code by virtue of Department of Labor Prohibited Transaction Class Exemption 95-60 or some other exemption of such rules.

(b) By signing this Subscription Agreement, each Subscriber that is either a Plan Asset Entity or using the assets of a General Account hereby covenants that if, after its initial acquisition of the Shares, at any time during any calendar month the percentage of the assets of such General Account (as reasonably determined by the Subscriber) or Plan Asset Entity, as applicable, that constitute "plan assets" for purposes of Title I of ERISA or Section 4975 of the Code exceeds the maximum percentage limit specified by the Subscriber in Question 2(d) of Section III of the Subscriber Information Form, then such Subscriber shall promptly notify the Fund of such occurrence and the Fund may require the Subscriber to redeem or dispose of all or a portion of the Shares held in such General Account or by such Plan Asset Entity, as applicable, by the end of the next following calendar month or such other time as may be determined by the Investment Manager.

**6.     Indemnification**

(a) The Subscriber understands the meaning and legal consequences of the representations, warranties, agreements, covenants and confirmations set out above and agrees that the subscription made hereby, if accepted by the Fund, will be accepted in reliance thereon. The Subscriber agrees to indemnify and hold harmless the Fund, the Directors, the Investment Manager and their affiliates, and the partners, members, managers, stockholders, other beneficial owners, officers, directors and employees of any of the foregoing (together, the "*Indemnified Persons*") from and against any and all loss, damage, liability or expense, including reasonable costs and attorneys' fees and disbursements, which an Indemnified Person may incur by reason of, or in connection with, any representation or warranty made herein (or in the accompanying Subscriber Information Form) not having been true, correct and complete when made, any misrepresentation made by the Subscriber or any failure by the Subscriber to fulfill any of the covenants or agreements set forth herein, in the Subscriber Information Form or in any other document provided by the Subscriber to the Fund.

(b) To the extent that any provisions of this Subscription Agreement, including, without limitation, Section 6 hereof, are not enforceable under applicable law by virtue of any person not being party to this Subscription Agreement (each such person, a "*Third Party*"), the Subscriber hereby agrees that the Fund may execute one or more deed polls and/or enter into one or more separate agreements with any such Third Party and take all further actions as may be necessary or desirable, in the sole opinion of the Fund, to give effect to such provisions.

(c) The Subscriber expressly consents to the Investment Manager or the Administrator accepting and executing any instructions transmitted in written or facsimile form (or by other electronic means) in respect of an investment in the Fund to which this application relates (including, without limitation, withdrawal requests). If instructions are given by the Subscriber in facsimile form (or by other electronic means), the Subscriber undertakes to send

the original letter of instructions to the Fund and the Administrator and hereby agrees to hold harmless and indemnify each of the Indemnified Persons, the Administrator and any of its employees and agents against any loss of any nature whatsoever arising to any of them as a result of any of them acting upon instructions submitted by facsimile or by other electronic means. Each Indemnified Person and each of the Administrator and any of its employees and agents may rely conclusively upon and shall incur no liability (i) for any loss arising from the non-receipt of any instructions relating to the Shares of the Subscriber delivered by facsimile or other electronic means or (ii) in respect of any action taken upon any notice, consent, request, instructions or other instrument believed in good faith to be genuine or to be signed by properly authorized persons on behalf of the Subscriber. Each Indemnified Person and each of the Administrator and any of its employees and agents shall be allowed such amount of time to act on and implement any instructions as may be reasonable having regard to their systems and operations and any other circumstances then prevailing and shall not be liable for any loss arising from any delay in acting on any instruction.

## 7.    **Miscellaneous**

(a)    The Subscriber agrees that neither this Subscription Agreement, nor any of the Subscriber's rights, interest or obligations hereunder, is transferable or assignable by the Subscriber, and further agrees that the transfer or assignment of any Shares acquired pursuant hereto shall be made only in accordance with the provisions hereof and all applicable laws. Any assignment in violation of this Section 7(a) shall be null and void.

(b)    The Subscriber agrees that, except as permitted by applicable law, it may not cancel, terminate or revoke this Subscription Agreement or any agreement of the Subscriber made hereunder, and that this Subscription Agreement shall survive the death or legal disability of the Subscriber and shall be binding upon the Subscriber's heirs, executors, administrators, successors and assigns.

(c)    All of the representations, warranties, covenants, agreements, indemnities and confirmations set out above and in the Subscriber Information Form shall survive the acceptance of the subscription made herein and the issuance of any Shares.

(d)    This Subscription Agreement together with the Subscriber Information Form constitutes the entire agreement between the parties hereto with respect to the subject matter hereof and may be amended only by a writing executed by both parties.

(e)    The Subscriber hereby agrees that any representation made hereunder will be deemed to be reaffirmed by the Subscriber at any time it makes an additional capital contribution to the Fund and the act of making such additional contribution will be evidence of such reaffirmation.

(f)    Within 10 days after receipt of a written request therefor from the Fund, the Subscriber agrees to provide such information and to execute and deliver such documents as the Fund may deem reasonably necessary to comply with any and all laws, rules, regulations, orders and ordinances to which the Fund is or may be subject.

(g)     The Subscriber agrees to keep confidential, and not to make any use of (other than for purposes reasonably related to its investment in the Fund) or disclose to any person, any information or matter relating to the Fund and its affairs and any information or matter related to any investment of the Fund (other than disclosure to the Subscriber's authorized representatives); provided that (i) the Subscriber may make such disclosure to the extent that (x) the information to be disclosed is publicly known at the time of proposed disclosure by the Subscriber, (y) the information otherwise is or becomes legally known to the Subscriber other than through disclosure by the Fund, or (z) such disclosure is required by law or in response to any governmental agency request or in connection with an examination by any regulatory authorities; provided that such agency, regulatory authorities or association is aware of the confidential nature of the information disclosed; (ii) the Subscriber may make such disclosure to its Beneficial Interest Holders to the extent required under the terms of its arrangements with such persons; and (iii) the Subscriber will be permitted, after written notice to the Fund, to correct any false or misleading information that becomes public concerning the Subscriber's relationship to the Fund. Prior to making any disclosure required by law, the Subscriber shall use its best efforts to notify the Fund of such disclosure. Prior to any disclosure to any authorized representative or Beneficial Interest Holder, the Subscriber shall advise such persons of the confidentiality obligations set forth herein and each such person shall agree to be bound by such obligations. Notwithstanding the foregoing, the Subscriber may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of an investment in the Fund and all materials of any kind (including opinions or other tax analyses) that are provided in connection with this Subscription Agreement to the Subscriber relating to such tax treatment or tax structure. The Subscriber acknowledges and agrees that the Fund and the Investment Manager would be damaged irreparably and would not have an adequate remedy at law if this Section (g) is not performed in accordance with its specific terms or is otherwise breached. Accordingly, in addition to any other remedy to which it may be entitled at law or in equity, each party will be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Section 7(g) and to enforce specifically this Section 7(g), without bond or other security being required. The rights and remedies in this Section 7(g) are cumulative and in addition to any other rights and remedies otherwise available at law or in equity. Nothing will be considered an election of remedies or a waiver of the right to pursue any other right or remedy to which party may be entitled.

(h)     The Subscriber acknowledges and understands that if any person who is resident in the Cayman Islands has a suspicion that a payment to the Fund (by way of subscription or otherwise) is the proceeds of criminal conduct, that person is required to report such suspicion to the relevant Cayman authorities pursuant to The Proceeds of Crime Law (as amended) of the Cayman Islands.

(i)     Except as otherwise indicated in PART A – SECTION I.4 of the Subscriber Information Form, the Subscriber has agreed to receive and accept reports and communications indefinitely from the Fund, the Administrator and the Investment Manager exclusively via e-mail to the e-mail address set forth in the Subscriber Information Form unless the Subscriber notifies the Investment Manager or the Administrator in writing that the Subscriber wishes to receive reports to either another e-mail address or alternatively, via regular mail in lieu of electronic mail. *If instructions are given by the Subscriber via e-mail, the Subscriber agrees to indemnify each Indemnified Person and each of the Administrator and any of its employees and agents*

11

*against any loss of any nature whatsoever arising to any of them as a result of any of them acting upon instructions submitted by facsimile or by other electronic means. Each Indemnified Party and the Administrator may rely conclusively upon and shall incur no liability in respect of any loss arising from (i) the non-receipt of any instructions relating to the interests of the Subscriber delivered via e-mail or (ii) any action taken upon any notice, consent, request, instructions or other instrument believed in good faith to be genuine or to be signed by properly authorized persons on behalf of the Subscriber.*

## 8. Standing Proxy

The Subscriber hereby designates and appoints the Administrator with power of substitution, as the Subscriber's true and lawful proxy for the purpose of voting any Shares issued pursuant to this Subscription Agreement (or such portion thereof from time to time owned by the Subscriber) as said proxy may determine on any and all matters arising at any annual or special general meeting of the Fund or any class meeting upon which such Shares could be voted by the Subscriber (or the person in whose name the Shares hereby subscribed are registered at the Subscriber's direction) if present in person at the meeting. This proxy may be revoked by the Subscriber (or his registered nominee) either personally or by presentation of a subsequently executed form of proxy at any annual or special general meeting or any class meeting of the Fund or by written notice to the Administrator received at the Fund's registered office prior to any such meeting.

## 9. Notices

Any notice required or permitted to be given to the Subscriber in relation to the Fund shall be sent to the address specified in Part A, Section I of the Subscriber Information Form or to such other address as the Subscriber designates by written notice received by the Fund. The Subscriber acknowledges and agrees that any consent that need be obtained from the Subscriber by the Fund may be obtained by the form of a negative consent following written notice. For purposes of clarity, the Fund may provide the Subscriber with reasonable advance notice of an issue requiring the Subscriber's consent, and if the Subscriber does not respond to such notice within a reasonable time as set forth in the notice, the Subscriber shall be deemed to have approved and consent to such issue.

## 10. Arbitration and Mediation

The Subscriber acknowledges and agrees that the following procedures shall be used to resolve any controversy or claim (*"**Dispute**"*) arising out of, relating to or in connection with this Subscription Agreement, the Articles or otherwise involving the Fund and/or any Indemnified Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a) <u>Mediation</u>.

(i) Any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a

mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect.

(ii)    The mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

(iii)    The mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings.

(iv)    Each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties.

(b)    Arbitration.

(i)    If a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed. Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the mediation and arbitration provisions herein. The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in this document and the commercial dispute arbitration rules then in effect ("*Arbitration Rules*"). In the event of a conflict, the provisions of this document will control.

(ii)    The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the U.S. Federal Arbitration Act ("*FAA*"), and resolved by the arbitrators, provided, however, that the Fund or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will another arbitration law or regulation preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

(iii)    The arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and

13

conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.

(iv)  The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Subscription Agreement. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive.

(v)  No discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.

(vi)  All aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such monies recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term.

(vii)  The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

## 11.    Governing Law

Except for Section 10 of this Subscription Agreement which shall be governed by the laws of the State of Texas, this Subscription Agreement shall be governed by, and construed in accordance with, the laws of the Cayman Islands, without giving effect to any conflict of law principles that would result in the application of the laws of any other jurisdiction.

[Signature Page Follows]

# SIGNATURE PAGE

By signing below, the Subscriber (1) confirms that the information contained in the Subscriber Information Form is accurate and complete, (2) agrees to the terms of the Subscription Agreement, the Private Offering Memorandum and the Articles and (3) requests that the records of the Fund reflect the Subscriber's admission as a shareholder.

Executed as a Deed:

Dated: _____, 20___

**AMOUNT OF SUBSCRIPTION**

$ _180,000.00_____

_THE DUGABOY INVESTMENT TRUST_

_____
Name of Other Subscriber
(*if a natural person and purchasing jointly*)

Name of Subscriber

_____

_____
Signature of Other Subscriber
(*if natural person and purchasing jointly*)

Signature

_____
Witness

_MELISSA SCHROTH_____
Witness

_Melissa Schroth_____

_EXECUTIVE ACCOUNTANT_____
Name and title or representative
capacity, if applicable

If the Subscriber is an individual retirement account, Keogh Plan or other self-directed plan, the custodian or trustee of the Subscriber is also required to execute this Agreement below:

Dated:_____, 20____

_____
Name of custodian or trustee

_____
Signature
Title: _____

The Subscriber's subscription is accepted, subject to the provisions of the Subscription Agreement, the Private Offering Memorandum and the Articles.

Highland Credit Opportunities Fund, Ltd.

By: _____
Name: _____
Title: _____

Dated: _____

Signature Page