# EXHIBIT A

Page 1

```
 1   IN THE UNITED STATES BANKRUPTCY COURT
 2   FOR THE NORTHERN DISTRICT OF TEXAS
 3   DALLAS DIVISION.
 4   ----------------------------------)
 5   In Re:                   Chapter 11
 6   HIGHLAND CAPITAL          Case No.
 7   MANAGEMENT, LP,           19-34054-SGJ 11
 8
 9         Debtor
10   -------------------------------------
11
12
13   REMOTE DEPOSITION OF JAMES P. SEERY, JR.
14           January 29, 2021
15             10:11 a.m. EST
16
17
18
19
20
21
22
23
     Reported by:
24   Debra Stevens, RPR-CRR
     JOB NO. 189212
25
```

Page 22

```
 1                    J. SEERY
 2      Q.    Excuse me?
 3      A.    I believe it does.
 4      Q.    Is there a subsidiary ledger
 5   that would tell me what is the note
 6   component versus what is the hard asset
 7   component?
 8      A.    Yes.
 9      Q.    Who has that?
10      A.    I do.
11            MR. DRAPER:  Mr. Morris, can I
12      get that document?
13            MR. MORRIS:  I will take it
14      under advisement.
15      Q.    There is also a Dugaboy note in
16   your notes that is to be sold.  Is that
17   Dugaboy note in the $40 million, or is it
18   in the hard asset monetization?
19      A.    I believe it is in the -- it is
20   to be sold, so it is not collected in
21   full.  If they default, then we would
22   accelerate that and collect that in full
23   as well.
24      Q.    That doesn't answer my question
25   unfortunately.  What I am asking you, is
```

Page 23

```
 1                J. SEERY
 2   it in the $40 million calculation, or in
 3   the $200 million number?
 4        A.    It doesn't answer your question
 5   because you didn't listen to my prior
 6   answer.  I said that the 40 million
 7   calculation was for stuff that had been
 8   demanded.  I think you represent -- do you
 9   represent Dugaboy?  I don't think we
10   demanded --
11        Q.    I do.  Excuse me?
12        A.    So if it wasn't demanded, it is
13   not in the hard asset calculation; it's in
14   the discounted amount.
15        Q.    Let me try to understand your
16   answer.  What you are telling me, just so
17   we are both clear, is that that Dugaboy
18   note is not in the $40 million; it is in
19   the balance of the 257?  That is a yes or
20   no answer.
21        A.    I didn't take it as a question.
22   It sounded like a statement.  I agree with
23   your statement.
24        Q.    Thank you.  So the answer is
25   yes?
```

```
 1                    J. SEERY
 2       A.    It wasn't a question.  I agree
 3  with your statement; yes.
 4       Q.    Thank you.
 5             Now, let's go to the
 6  November 2020 schedule that we had.  If
 7  you see in the line "Estimated proceeds
 8  from monetization of assets," you had
 9  $190 million under the plan analysis?
10       A.    Yes.
11       Q.    What percentage of that are
12  notes versus hard assets?
13       A.    The demand notes only were
14  included in the proceeds in terms of
15  recovery in full.  I don't quite
16  understand your distinction between hard
17  assets.  There is a lot of intangibles as
18  well as tangibles in the total.
19             But if we are distinguishing
20  between notes and other assets, the demand
21  notes are included in the 190.  The longer
22  dated notes are assumed to be sold.  So,
23  they are included but they are included at
24  a much lower amount.
25       Q.    Okay.  Now how much of the
```

Page 25

```
 1                J. SEERY
 2   demand notes in the 190, Mr. Seery?
 3       A.    Off the top of my head I don't
 4   recall.  It is the Dondero demand notes as
 5   well as the HCFMA demand notes, so it
 6   should be about 15 to $20 million.
 7   Somewhere in that realm.  The same as the
 8   other demand notes.
 9       Q.    Were the other notes, the
10   $40 million of notes that you referenced
11   in the January document, were they carried
12   at face or at discounted amount in the
13   190?
14       A.    In the 190, the ones that were
15   demand were carried at face.  The ones
16   that were long dated, which really at that
17   point I believe -- the only difference is
18   the $24-and-change-million NexPoint
19   Advisors note was at a discounted amount.
20   The others were at face.
21       Q.    What was the discount that was
22   applied to that note?
23       A.    I don't recall off the top of my
24   head.  It is pretty significant because of
25   the long dated nature of the notes.  They
```

Page 26

```
 1                J. SEERY
 2   were amended without consideration a few
 3   years ago.  So, for our purposes we didn't
 4   make the assumption, which I am sure will
 5   happen, a fraudulent conveyance claim on
 6   those notes, that a fraudulent conveyance
 7   action would be brought.  We just assumed
 8   that we'd have to discount the notes
 9   heavily to sell them because nobody would
10   respect the ability of the counterparties
11   to fairly pay.
12        Q.    And the same discount was
13   applied in the liquidation analysis to
14   those notes?
15        A.    Yes.
16        Q.    Now --
17        A.    The difference -- there would be
18   a difference, though, because they would
19   pay for a while because they wouldn't want
20   to accelerate them.  So there would be
21   some collections on the notes for P and I.
22        Q.    But in fact as of January you
23   have accelerated those notes?
24        A.    Just one of them, I believe.
25        Q.    Which note was that?
```

```
                                              Page 27
1                   J. SEERY
2        A.    NexPoint, I said.  They
3   defaulted on the note and we accelerated
4   it.
5        Q.    So there is no need to file a
6   fraudulent conveyance suit with respect to
7   that note.  Correct, Mr. Seery?
8              MR. MORRIS:  Objection to the
9        form of the question.
10       A.    Disagree.  Since it was likely
11  intentional fraud, there may be other
12  recoveries on it.  But to collect on the
13  note, no.
14       Q.    My question was with respect to
15  that note.  Since you have accelerated it,
16  you don't need to deal with the issue of
17  when it's due?
18             MR. MORRIS:  Objection to the
19       form of the question.
20       A.    That wasn't your question.  But
21  to that question, yes, I don't need to
22  deal with when it's due.
23       Q.    Let me go over certain assets.
24  I am not going to ask you for the
25  valuation of them but I am going to ask
```

```
                                            Page 28
 1              J. SEERY
 2   you whether they are included in the asset
 3   portion of your $257 million number, all
 4   right?  Mr. Morris didn't want me to go
 5   into specific asset value, and I don't
 6   intend to do that.
 7           The first question I have for
 8   you is, the equity in Trustway Highland
 9   Holdings, is that included in the
10   $257 million number?
11       A.   There is no such entity.
12       Q.   Then I will do it in a different
13   way.  In connection with the sale of the
14   hard assets, what assets are included in
15   there specifically?
16       A.   Off the top of my head -- it is
17   all of the assets, but it includes
18   Trustway Holdings and all the value that
19   flows up from Trustway Holdings.  It
20   includes Targa and all the value that
21   flows up from Targa.  It includes CCS
22   Medical and all the value that would flow
23   to the Debtor from CCS Medical.  It
24   includes Cornerstone and all the value
25   that would flow from Cornerstone.  It
```

```
                                            Page 29
1                  J. SEERY
2    includes any other securities and all the
3    value that would flow from Cornerstone.
4    It includes HCLOF and all the value that
5    would flow up from HCLOF.  It includes
6    Korea and all the value that would flow up
7    from Korea.
8              There may be others off the top
9    of my head.  I don't recall them.  I don't
10   have a list in front of me.
11       Q.    Now, with respect to those
12   assets, have you started the sale process
13   of those assets?
14       A.    No.  Well, each asset is
15   different.  So, the answer is, with
16   respect to any securities, we do seek to
17   sell those regularly and we do seek to
18   monetize those assets where we can
19   depending on whether there is a
20   restriction or not and whether there is
21   liquidity in the market.
22             With respect to the PE assets or
23   the companies I described -- Targa, CCS,
24   Cornerstone, JHT -- we have not --
25   Trustway.  We have not sought to sell
```

Page 48

1      J. SEERY

2      Q.    And if I understand what you
3 just said, it is that the Houlihan Lokey
4 valuation for those two businesses showed
5 a significant increase between November of
6 2020 and January of 2021?
7           MR. MORRIS:  Objection to form
8      of the question.
9      A.    I didn't say that.
10     Q.    I am trying to account for the
11 increase between the two dates, and you
12 identified three assets.  You identified
13 MGM stock, which has, I can guess, as you
14 have said, a readily ascertainable value.
15 Then you identified two others that the
16 valuation is based upon something Houlihan
17 Lokey provided you.  Correct?
18     A.    I gave you three examples.  I
19 never said "readily."  That is your word,
20 not mine.  And I didn't say that Houlihan
21 had a significant change in their
22 valuation.
23     Q.    So let's now go back to the
24 question.  There is an increase in value
25 from November 24th of 2020 to January 28th

```
 1                  J. SEERY
 2    of 2021, the magnitude being roughly 60
 3    some odd million dollars.  Correct?
 4         A.    Correct.
 5         Q.    We can account for $22 million
 6    of it easily, right?
 7               MR. MORRIS:  Objection to form.
 8         A.    Correct.
 9         Q.    That is the HarbourVest
10    settlement, so that leaves roughly
11    $40 million unaccounted for?
12               MR. MORRIS:  Objection to the
13         form of the question if that is a
14         question.  It is accounted for.
15         Q.    What makes up that difference,
16    Mr. Seery?
17         A.    A change in the plan value of
18    the assets.
19         Q.    Okay.  Which assets?  Let's sort
20    of go back to where we were.
21         A.    There are numerous assets in the
22    plan formulation.  I gave you three
23    examples of the operating businesses.  The
24    securities, I believe, have increased in
25    value since the plan, so those would go up
```

Page 50

1      J. SEERY

2  for one. On the operating businesses, we

3  looked at each of them and made an

4  assessment based upon where the market is

5  and what we believe the values are, and we

6  have moved those valuations.

7     Q.   Let me look at some numbers

8  again. In the liquidation analysis in

9  November of 2020, the liquidation value is

10  $149 million. Correct?

11     A.   Yes.

12     Q.   And in the liquidation analysis

13  in January of 2021, you have $191 million?

14     A.   Yes.

15     Q.   You see that number. So there

16  is $51 million there, right?

17     A.   No.

18     Q.   What is the difference between

19  191 and -- sorry. My math may be a little

20  off. What is the difference between the

21  two numbers, Mr. Seery?

22     A.   Your math is off.

23     Q.   Sorry. It is 41 million?

24     A.   Correct.

25     Q.   $22 million of that is the